**Hearing Date: March 15, 2023**
**Objection Date: December 9, 2022**
**Reply Date: January 11, 2023**

Pamela A. Miller
Amber Covucci
O'MELVENY & MYERS LLP
Seven Times Square
New York, New York 10036
Telephone: (212) 326-2000
E-mail: pmiller@omm.com
*Attorneys for Merrill Lynch International*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff, | Adv. Pro. No. 10-05346 (CGM) |
| Plaintiff, | |
| v. | |
| MERRILL LYNCH INTERNATIONAL, | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MERRILL LYNCH INTERNATIONAL'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 4

    A.    MLI ................................................................................................................ 4

    B.    The Funds ..................................................................................................... 4

    C.    MLI's Leveraged Notes and Warrants ......................................................... 5

    D.    The Amended Complaint and Related Proceedings .................................... 5

ARGUMENT ........................................................................................................................... 7

    I.    THE AMENDED COMPLAINT SHOULD BE DISMISSED FOR LACK
        OF PERSONAL JURISDICTION UNDER RULE 12(B)(2) ............................. 7

        A.    The Court lacks general jurisdiction over MLI ........................................... 7

        B.    MLI did not consent to personal jurisdiction by entering into
                subscription agreements governed by New York law and
                submitting to venue in New York .............................................................. 8

        C.    The Court lacks specific jurisdiction over MLI ........................................ 9

        D.    Exercise of Jurisdiction Over MLI Would Not Comport With Due
                Process. .................................................................................................... 16

    II.    THE AMENDED COMPLAINT FAILS TO CONTAIN A "SHORT AND
         PLAIN STATEMENT OF THE CLAIM" IN VIOLATION OF RULE
         8(A)(2) ...................................................................................................... 19

    III.    THE AMENDED COMPLAINT DOES NOT PLAUSIBLY ALLEGE
          THAT THE MLI REDEMPTIONS WERE BLMIS PROPERTY .................... 22

        A.    The Trustee does not adequately allege that the funds transferred to
                MLI originated with BLMIS ..................................................................... 22

        B.    Based on the Trustee's own allegations, it is implausible that all of
                the MLI Redemptions contain BLMIS customer property. ...................... 24

    IV.    THE NEW YORK FRAUDULENT TRANSFER, CONSTRUCTIVE
         FRAUDULENT TRANSFER, AND PREFERENCE CLAIMS ARE
         BARRED UNDER BANKRUPTCY CODE SECTION 546(e) ....................... 26

        A.    The Initial Transfers Were Made By and To Entities Covered by
                Section 546(e). ........................................................................................ 27

i

**TABLE OF CONTENTS**
**(continued)**

Page

V.    THE COURT SHOULD DISMISS THE SECTION 548(A)(1)(A)
CLAIMS FOR FAILURE TO STATE A CLAIM UPON WHICH
RELIEF CAN BE GRANTED. ........................................................... 28

VI.    THE AMENDED COMPLAINT ESTABLISHES THAT MLI IS
ENTITLED TO THE GOOD FAITH DEFENSE. ............................... 31

    A.    MLI Received The Redemptions For Value ........................................... 31

    B.    MLI Received The Redemptions In Good Faith ...................................... 32

    C.    The Good Faith Defense is Particularly Warranted For The
Preference Claims. .................................................................... 39

CONCLUSION ................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Affiliated FM Ins. Co. v. Kuehne + Nagel, Inc.*,
328 F. Supp.3d 329 (S.D.N.Y. 2018) .......................................................................... 9

*Amidax Trading Grp. v. S. W.I.F.T. SCRL*,
671 F.3d 140 (2d Cir.2011) ....................................................................................... 10

*Anwar v. Fairfield Greenwich Ltd.*,
286 F.R.D. 258 (S.D.N.Y. 2012) ........................................................................ 35, 37

*Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano cnty.*,
480 U.S. 102 (1987) ............................................................................................ 14, 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................... 22

*Beacon Enters., Inc. v. Menzies*,
715 F.2d 757 (2d Cir. 1983) ...................................................................................... 16

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................ 22, 25

*Best Van Lines, Inc. v. Walker*,
490 F.3d 239 (2d Cir. 2007) ...................................................................................... 16

*Bos. Trading Grp., Inc. v. Burnazos*,
835 F.2d 1504 (1st Cir. 1987) ................................................................................... 40

*Bristol-Myers Squibb v. Super. Ct. of Cal.*,
137 S. Ct. 1773 (2017) ........................................................................................... 9, 11

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018) ...................................................................................... 7, 11

*Chirag v. MT Marida Marguerite Schiffahrts*,
604 F. App'x 16 (2d Cir. 2015) .................................................................................. 9

*Citigroup Inc. v. City Holding Co.*,
97 F. Supp. 2d 549 (S.D.N.Y. 2000) ......................................................................... 15

*Cohen v. (Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC)*,
No. 08-01789, 2016 WL 1695296 (Bankr. S.D.N.Y. Apr. 25, 2016) ...................... 32

*Constellation Energy Commodities Grp. v. Transfield ER Cape, Ltd.*,
801 F. Supp. 2d 211 (S.D.N.Y. 2011) ....................................................................... 21

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)................................................................................ 8, 9

*Daniel v. Tootsie Roll Indus., LLC*,
    17 Civ. 7541 (NRB), 2018 WL 3650015 (S.D.N.Y. Aug. 1, 2018) ...................................... 11

*Davidson v. Honeywell Int'l*,
    No. 14 Civ. 3886(LGS), 2015 WL 1399891 (S.D.N.Y. Mar. 26, 2015) .............................. 15

*Davis v. Bifani*,
    No. 07–cv–00122, 2007 WL 1216518 (D. Colo. Apr. 24, 2007) .......................................... 21

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. (In Re Enron Creditors
    Recovery Corp.)*,
    651 F.3d 329 (2d Cir. 2011)............................................................................. 28

*Fairfield Sentry Limited (In Liquidation), v. Citibank, N.A. London*,
    No. 19-CV-3911 (VSB), 2022 WL 3644436 (S.D.N.Y. Aug. 24, 2022) ...................... 8, 9, 12

*Fairfield Sentry Ltd. v. Citco Global Custody NV*,
    No. 19-1122 (Bankr. S.D.N.Y. Nov. 26, 2019) .................................................... 25

*Fairfield Sentry Ltd. v. Migani*,
    [2014] UKPC ........................................................................................... 31

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
    No. 10-03496, 2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020) ............................ 27, 32

*Fairfield Sentry Ltd., (In Liquidation), et al., v. Theodoor GGC Amsterdam, et al.*,
    No. Adv. Pro. No. 10-03496 (July 19, 2012)........................................................ 17

*Finn v. Alliance Bank*,
    860 N.W.2d 638 (Minn. 2015)................................................................... 29, 30, 31

*Garfinkle v. Conf. on Jewish Material Claims Against Ger., Inc.*,
    2020 WL 6323462 (S.D.N.Y. Oct. 28, 2020) ...................................................... 25

*Gucci Am., Inc. v. Weixing Li*,
    768 F.3d 122 (2d Cir. 2014)............................................................................. 8

*Gundlach v. Int'l Bus. Machines Corp.*,
    No. 11–CV–846, 2012 WL 1520919 (S.D.N.Y. May 1, 2012), aff'd 594 F.
    App'x 8 (2d Cir. 2014) ................................................................................... 8

*Hau Yin To v. HSBC Holdings, PLC*,
    No. 15CV3590, 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017), aff'd 700 F.
    App'x 66 (2d Cir. 2017)............................................................................. 10, 16

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984)......................................................................................... 14

*Hill v. HSBC Bank plc*,
    207 F.Supp.3d 333 (S.D.N.Y. 2016).................................................... 10, 12, 16

*Hunter v. Shanghai Huangzhou Elec. Appliance Mfg. Co.*,
    No. 5:17-cv-00052 (BKS/TWD), 2020 WL 5258313 (N.D.N.Y. Sept. 3, 2020)................... 15

*In re Bayou Group, LLC*,
    439 B.R. 284 (S.D.N.Y. 2010)........................................................................ 32

*In re Bernard L. Madoff Inv. Sec.*, LLC,
    440 B.R. 243 (Bankr. S.D.N.Y. 2010) ............................................................ 29

*In re Dreier LLP*,
    453 B.R. 499 (Bankr. S.D.N.Y. 2011) ............................................................ 35

*In re Geiger*,
    446 B.R. 670 (Bankr. E.D. Pa. 2010) ............................................................ 20

*In re Mexican Gov't Bonds Antitrust Litig.*,
    2020 WL 7046837 (S.D.N.Y. Nov. 30, 2020)................................................ 15

*In re Morrison*,
    375 B.R. 179 (Bankr. W.D. Pa. 2007) ........................................................... 20

*In re Picard v. BNP Paribas S.A.*, (*In re BLMIS*),
    594 B.R. 167 (Bankr. S.D.N.Y. 2018).............................................. 11, 13, 34, 37

*In re Terrorist Attacks on September 11, 2001*,
    714 F.3d 659 (2d Cir. 2013)......................................................................... 9, 16

*In re Tribune Co. Fraudulent Conv. Litig.*,
    946 F.3d 66 (2d Cir. 2019)............................................................................. 26

*In re Unified Com. Cap., Inc.*,
    260 B.R. 343 (Bankr. W.D.N.Y. 2001), *aff'd sub nom. In re Unified Com.*
    *Cap.*, No. 01-MBK-6004L, 2002 WL 32500567 (W.D.N.Y. June 21, 2002) ........... 29, 30, 31

*Int'l Customs Assocs., Inc. v. Ford Motor Co.*,
    893 F. Supp. 1251 (S.D.N.Y. 1995)................................................................ 16

*Irving Tr. Co. v. Chase Nat'l Bank*,
    65 F.2d 409 (2d Cir. 1933)............................................................................. 40

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*J. McIntyre Mach., Ltd. v. Nicastro,*
    564 U.S. 873 (2011) ........................................................................................ 14

*Jones v. Nat'l Comms. & Surveillance Networks,*
    266 F. App'x 31 (2d Cir. 2008) ..................................................................... 20

*LaMonica v. CEVA Group PLC (In re CIL Ltd.),*
    582 B.R. 46 (Bankr. S.D.N.Y. 2018) ................................................. 17, 18, 19

*Lehigh Val. Indus., Inc. v. Birenbaum,*
    527 F.2d 87 (2d Cir. 1975) ............................................................................ 10

*Maranga v. Vira,*
    386 F. Supp. 2d 299 (S.D.N.Y. 2005) ........................................................... 16

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.,*
    138 S. Ct. 883 (2018) ..................................................................................... 26

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.,*
    84 F.3d 560 (2d Cir. 1996) ...................................................................... 18, 19

*NCUA Bd. v. Morgan Stanley & Co.,*
    No. 13 Civ. 6705, 2014 WL 1673351 (S.D.N.Y. Apr. 28, 2014) ................. 21

*Nicholsen v. Feeding Tree Style, Inc.,*
    No. 12 CIV. 6236 JPO, 2014 WL 476355 (S.D.N.Y. Feb. 6, 2014) ............. 10

*Nycomed U.S. Inc. v. Glenmark Generics Ltd.,*
    No. 08-CV-5023, 2010 WL 1257803 (E.D.N.Y. Mar. 26, 2010) .................. 21

*Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.,*
    712 F.3d 705 (2d Cir. 2013) .......................................................................... 25

*Picard v. ABN Amro Bank N.A. (Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv.*
    *Sec. LLC),*
    No. AP 08-01789, 2020 WL 1584491 (Bankr. S.D.N.Y. Mar. 31, 2020) ...... 31

*Picard v. Banque SYZ & Co. (In re BLMIS),*
    No. 11-02149, 2022 WL 2135019 (Bankr. S.D.N.Y. Jun. 14, 2022) ....... 12, 32

*Picard v. Bureau of Labor Ins. (In re BLMIS),*
    480 B.R. 501 (Bankr. S.D.N.Y. 2012) ...................................................... 12, 13

*Picard v. Citibank, N.A.* (*In re Bernard L. Madoff Inv. Sec. LLC),*
    12 F.4th 171 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard,*
    142 S. Ct. 1209 (2022) ............................................................................. passim

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC),*
    773 F.3d 411 (2d Cir. 2014)...........................................................27, 28

*Picard v. Shapiro (In re Madoff),*
    542 B.R. 100 (Bankr. S.D.N.Y. 2015) ...........................................23, 24

*Salahuddin v. Cuomo,*
    861 F.2d 40 (2d Cir. 1988)..................................................................20

*Saltz v. First Frontier, LP,*
    782 F. Supp. 2d 61 (S.D.N.Y. 2010), *aff'd sub nom. Saltz v. First Frontier,*
    *L.P.*, 485 F. App'x 461 (2d Cir. 2012) .............................................37

*Sapia v. Home Box Off., Inc.,*
    No. 18 CIV. 1317, 2018 WL 6985223 (S.D.N.Y. Dec. 17, 2018).........26

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,*
    No. 08-01789, 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021)...............31, 39

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,*
    No. 12 MC 115, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ...........26

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.),*
    403 F.3d 43 (2d Cir. 2005)..................................................29, 30, 39, 40

*Siddiqui v. Athene Holding Ltd.,*
    806 F. App'x 50 (2d Cir. 2020)............................................................9, 12

*SIPC v. Bernard L. Madoff Inv. Sec. LLC,*
    476 B.R. 715 (S.D.N.Y. 2012), *aff'd sub nom. Picard v. Ida Fishman*
    *Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411 (2d
    Cir. 2014) ..............................................................................................27

*Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG,*
    277 F.Supp.3d 521 (S.D.N.Y. 2017)......................................................7

*SPV Osus Ltd. v. UBS AG,*
    882 F.3d 333 (2nd Cir. 2018)...............................................................16

*Stephenson v. Citco Grp. Ltd.,*
    700 F. Supp. 2d 599 (S.D.N.Y. 2010), *aff'd Stephenson*, 482 F. App'x 618 .........38

*Stephenson v. PricewaterhouseCoopers, LLP,*
    768 F. Supp. 2d 562 (S.D.N.Y. 2011), *aff'd,* 482 F. App'x 618 (2d Cir. 2012),
    as amended (June 13, 2012) *Stephenson*, 768 F. Supp. 2d at 577–78 ....................37

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Stoebner v. Opportunity Fin., LLC,*
909 F.3d 219 (8th Cir. 2018) ............................................................ 30

*Sunward Elec., Inc. v. McDonald,*
362 F.3d 17 (2d Cir. 2004) ............................................................ 7, 11

*Tamam v. Fransabank Sal,*
677 F. Supp. 2d 720 (S.D.N.Y. 2010) .............................................. 11

*U.S. Philips Corp. v. ATI Techs., Inc.,*
No. 05CIV.8176, 2008 WL 2073928 (S.D.N.Y. May 8, 2008) ........... 34

*U.S. v. Int'l Longshoremen's Association,*
518 F. Supp. 2d 422 (E.D.N.Y. 2007) .............................................. 21

*Volkswagenwerk AG v. Beech Aircraft Corp.,*
751 F.2d 117 (2d Cir. 1984) .............................................................. 8

*Walden v. Fiore,*
571 U.S. 277 (2014) .................................................................... 9, 14

*Waldman v. Palestine Liberation Org.,*
835 F.3d 317 (2d Cir. 2016) .......................................................... 7, 16

*Weisfelner v. Blavatnik (In re Lyondell Chem. Co.),*
543 B.R. 127 (Bankr. S.D.N.Y. 2016) ............................................ 8, 10

*Youngers v. Virtus Inv. Partners Inc.,*
No. 15CV8262, 2017 WL 5991800 (S.D.N.Y. Dec. 4, 2017) ............. 34

*Zim Integrated Shipping Servs. Ltd. v. Bellwether Design Techs. LLC,*
No. 19-cv-3444, 2020 WL 5503557 (S.D.N.Y. Sept. 10, 2020) ......... 15

## Statutes

11 U.S.C. § 546(e) ....................................................................... 26, 28

11 U.S.C. § 548(a)(1)(A) ..................................................................... 28

11 U.S.C. § 550(a) ............................................................................ 22

11 U.S.C. § 550(a)(2) ......................................................................... 26

11 U.S.C. § 550(b) ............................................................................ 31

EU GDPR Art. 4(1) ............................................................................ 18

EU GDPR Art. 44 ............................................................................. 19

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

EU GDPR Art. 45 ................................................................................................ 19

EU GDPR Art. 46 ................................................................................................ 19

SIPA § 78fff-2(c)(3) ........................................................................................... 22

UKDPA, Part 2, Ch. 1 § 2 ................................................................................... 18

UKDPA, Part 2, Ch. 2 § 18 ................................................................................. 19

**Other Authorities**

https://www.gov.uk/government/publications/uk-approach-to-international-data-
transfers/international-data-transfers-building-trust-delivering-growth-and-
firing-up-innovation ..................................................................................... 19

**Rules**

Fed. R. Civ. P. 12(b)(2) ........................................................................................ 1

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 1

Fed. R. Civ. P. 9(b) ............................................................................................. 30

Fed. R. Civ. Pro. 8(a)(2) ..................................................................................... 19

**Treatises**

Wright & Miller, 5 Federal Practice and Procedure § 1282 (4th ed. 2021) ................................. 19

Defendant Merrill Lynch International ("MLI"), by and through its undersigned counsel, submits this memorandum of law in support of its motion to dismiss the Amended Complaint ("Amended Complaint" or "Am. Compl.," ECF No. 137)[1] filed by Plaintiff Irving H. Picard (the "Trustee"), trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the substantially consolidated estate of Bernard L. Madoff, under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).

## PRELIMINARY STATEMENT

MLI is a "net loser " and was never a direct investor in BLMIS. MLI never had an account with BLMIS. Instead, MLI bought approximately $30 million of shares in Fairfield. Fairfield, in turn, entrusted most of its money to BLMIS. MLI redeemed approximately half of its shares in Fairfield, leaving it with a net loss of over $15 million after BLMIS' Ponzi scheme came to light.

Despite this loss, the Trustee demands that MLI forfeit its entire principal to be redistributed to BLMIS' customers—converting MLI's roughly 50% loss into a complete loss for the benefit of other investors. The Trustee's Amended Complaint provides no basis to support that extreme and inequitable result.

The transfers the Trustee seeks to avoid all took place outside of the United States, among non-United States entities. The Trustee does not allege that MLI—a United Kingdom stockbroker—is subject to general jurisdiction in the United States. And the Amended Complaint pleads no facts about the transfers that would give rise to specific jurisdiction: the Trustee concedes MLI invested in, and redeemed shares from, two British Virgin Islands hedge funds. The Southern

---

[1] Unless otherwise noted, references to "ECF No. __" refer to Adv. Proc. No. 10-05346 (CGM). (Bankr. S.D.N.Y.). Unless otherwise noted, internal citations and quotation marks in case references are omitted. "Jackson-Proes Decl." refers to the Declaration of Richard Jackson-Proes in Support of Defendant Merrill Lynch International's Motion to Dismiss. "Covucci Decl." refers to the Attorney Declaration of Amber Covucci in Support of Defendant Merrill Lynch International's Motion to Dismiss.

District of New York recently affirmed that MLI's subscription agreements with Fairfield cannot give rise to personal jurisdiction. Similarly, numerous courts have held that allegations similar to the Trustee's other allegations—MLI's limited communications with Fairfield, MLI's New York correspondent bank account, and the Fairfield Funds' investments in BLMIS—are insufficient to establish specific jurisdiction. Exercising personal jurisdiction over MLI, a foreign entity, based on entirely foreign transactions would be unreasonable and contrary to both this Circuit's precedent and due process requirements. The Amended Complaint should be dismissed for that reason alone.

The Amended Complaint fails for the additional reason that it does not comply with Rule 8(a)'s requirement that a complaint contain a "short and plain state statement of the claim showing that the pleader is entitled to relief." To support its allegations that the initial transfers from BLMIS to Sentry were avoidable—an *essential element* of the subsequent transfer claims against MLI—the Trustee purports to incorporate by reference a 105 page complaint, attaching 23 exhibits, in an entirely separate action to which MLI is not even a party. Am. Compl. ¶ 74 (incorporating *Picard v. Fairfield Sentry Ltd., et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 09-1239 ECF No. 286 (the "Fairfield Second Amended Complaint")). Rule 8(a) forbids the Trustee from taking such opaque and confusing pleading shortcuts.

The Amended Complaint also fails on another essential element of its claims: it does not sufficiently allege that the subsequent transfers to MLI contained BLMIS customer property. The Amended Complaint makes the conclusory allegations that "[t]he total sum transferred to MLI includes: (a) $14,200,000 fraudulently transferred by BLMIS to Fairfield Sentry and then subsequently transferred to MLI; and (b) $1,877,730 fraudulently transferred by BLMIS to Fairfield Sentry, then subsequently transferred from Fairfield Sentry to Fairfield Sigma, and then

2

subsequently transferred from Fairfield Sigma to MLI." Am. Compl. ¶ 2. But the Trustee makes no attempt to trace the funds from BLMIS to the Fairfield Funds to MLI. This is not a mere formality: the Trustee acknowledges in the Fairfield First Amended Complaint that the Fairfield Funds at times used some customers' subscription fees to pay other customers' redemptions, so that at least some redemptions never came from BLMIS property at all. In fact, the Trustee seeks to recover roughly $2 billion *more* from subsequent transferees of Sentry than it alleges BLMIS transferred to Sentry in the first place. The Trustee's allegations are not simply implausible, but mathematically impossible.

Further, under prior judgments of this Court, the District Court, and the Second Circuit, Bankruptcy Code section 546(e)'s safe harbor applies to the Trustee's claims for redemptions other than intentional fraudulent conveyance subject to 548(A)(1)(A). BLMIS is a "stockbroker" and Sentry a "financial institution" within the meaning of section 546(e); the transfers were made in connection with both Sentry's accounts with BLMIS and the contract governing MLI's redemptions from Sentry, both of which are "securities contracts"; and BLMIS's redemption payments to its customers constitute "settlement payments." The intentional fraudulent conveyance claims similarly fail, because the Amended Complaint does not plead *any* specific facts showing that the initial transfers were made with "intent to defraud."

Even if the Trustee had made a *prima facie* showing of both jurisdiction and the elements of his fraudulent conveyance and preference claims, which he has not, the Amended Complaint demonstrates an additional reason to dismiss: MLI is entitled to the good faith defense under 11 U.S.C. § 550(b). The Amended Complaint does not argue, and the facts do not support, that MLI should have suspected and investigated one of the largest frauds in history—a fraud that the entire banking industry and even the SEC failed to detect for decades. The Amended Complaint does not

plead that MLI knew of the scheme or any facts that could have put it on inquiry notice, nor that it could ever have discovered the scheme even with further diligence. Most powerfully, MLI's investment and loss of its own principal in the Funds belies that notion. What major brokerage house would risk its own capital if it suspected the securities were worthless as the result of a massive Ponzi scheme? Compounding MLI's losses by clawing back its remaining principal would be contrary to the facts and the law. The Amended Complaint should be dismissed in its entirety.

## BACKGROUND

### A.    MLI

MLI is a stockbroker based in London, England. *See* Jackson-Proes Decl. ¶ 2. At all relevant times, MLI's place of incorporation and principal place of business have been London. *Id.* MLI does not have any offices or employees based in the United States. *Id.* ¶¶ 4–6.

### B.    The Funds

Fairfield Sentry Ltd. ("Sentry") and Fairfield Sigma Ltd. ("Sigma," together with Sentry, the "Funds") are hedge funds based in the British Virgin Islands (BVI). Am. Compl. ¶ 3. Sentry maintained one or more customer accounts at BLMIS and was one of BLMIS's sources of investor principal, and Sigma was entirely invested in Sentry. *Id*. Sentry transacted in US Dollars and Sigma transacted in Euros. *See* Complaint, ECF No. 1-1 ("Initial Complaint" or "Initial Compl.") ¶¶ 55, 121. On July 21, 2009, the Eastern Caribbean Supreme Court in the High Court of Justice of the BVI placed both Funds in liquidation. *Picard v. Fairfield Sentry Limited, et al.*, No. 08-01789 (BRL), Adv. Proc. No. 09-01239, ECF No. 23 ¶ 22.

The Trustee filed a complaint against, and eventually settled with, the Liquidators of Sentry and Sigma. *See* Covucci Decl. Ex. A (Fairfield Am. Compl.); *Id* Ex. B (*Settlement Agreement, Picard v. Fairfield Sentry Ltd., et. al.*, Adv. Proc. No. 09-1239 (Bankr. S.D.N.Y. May 9, 2011), ECF 69-2 (the "Fairfield Settlement Agreement")). The parties stipulated to the entry of a

4

judgment in favor of the BLMIS Estate (in the amount of approximately $3 billion for Sentry and approximately $750 million for Sigma). *See* Fairfield Settlement Agreement, at 4. The Fairfield Settlement Agreement provided for cooperation and information sharing between the joint liquidators for the Funds and the Trustee concerning, *inter alia*, claims against parties that redeemed shares from Sentry and Sigma. *See id*. ¶ 14. Under that Agreement, the Trustee has had access to the Funds' books and records for well over a decade. *Id.*

### C.    MLI's Leveraged Notes and Warrants

The Amended Complaint omits most of the basic facts from the story of MLI's investment in the Fairfield Funds, leaving only generalizations. MLI sold notes and warrants indexed against a basket of funds, which included up to 10% shares of the Fairfield Funds. Am. Compl. ¶ 8. The Trustee acknowledges that MLI invested its own money in Fairfield at least in part as a "hedge" against the risk that the basket (including the Fairfield Funds) would increase in value. *See* Am. Compl. ¶ 10; *cf.* Initial Compl. ¶¶ 11–16 (financial institutions often purchase shares of the index funds to hedge against the risk that the index funds will increase in value). The Trustee now alleges that MLI created a "synthetic short" of approximately $3 million—but as the Initial Complaint makes clear, even taking the Trustee's allegations as true, that "synthetic short" constituted only approximately 10% of MLI's actual investment. *See* Am. Compl. ¶ 10; *cf.* Initial Compl. ¶¶ 120, 121. The Amended Complaint selectively omits that MLI's total investment in the Fairfield Funds was over $30 million, approximately twice the amount MLI redeemed—making it a net loser to the tune of 50%. *Cf.* Initial Compl. ¶¶ 120, 121.

### D.    The Amended Complaint and Related Proceedings

The Trustee filed the Initial Complaint over a decade ago, on December 8, 2010. MLI moved to dismiss the Initial Complaint on June 23, 2022. *See* ECF No. 129 *(Memorandum of Law in Support of Merrill Lynch International's Motion to Dismiss)* (the "Motion to Dismiss"). On

consent, the Trustee filed an Amended Complaint on August 19, 2022.

The Trustee seeks to recover $16,077,730 that MLI allegedly received from the Funds. Am. Compl. ¶ 2. The Trustee alleges that MLI's redemptions from Sentry are avoidable because $14,200,000 of BLMIS's initial transfers to Sentry was subsequently transferred to MLI through its redemptions. *Id.* ¶¶ 77. Similarly, the Amended Complaint alleges that MLI's redemption of $1,877,730 from Sigma is recoverable as derived from a payment from BLMIS, which was transferred to Sentry, and then transferred from Sentry to Sigma. *Id.* ¶¶ 81–82.

However, despite having had access to Sentry's books and records for more than a decade and ample time to investigate and amend its complaint, the Trustee does not specifically trace any of the MLI redemptions to BLMIS. Rather, the Trustee attaches an exhibit comprising seventy three pages listing thousands of transactions among BLMIS and Sentry. *See Id.*, Exs. A, B. The exhibits show that those payments were made from Citco bank accounts designated for the benefit of Sentry, referred to as "Citco Global Custody N V FBO Fairfield Sentry Ltd."

The Amended Complaint similarly contains no specific allegations about the initial transfers from BLMIS to Sentry; rather, the Amended Complaint purports to incorporate by reference the allegations of the Fairfield Second Amended Complaint in the Trustee's case against various parties related to the Funds. *Id.* ¶ 74; *see also* Fairfield Second Am. Compl. MLI is not a party to the Fairfield Second Amended Complaint, and the Trustee does not identify which paragraphs or allegations it intends to incorporate by reference.

The Fairfield Second Amended Complaint alleges, in broad terms, that BLMIS's operations were characterized by secrecy and a lack of transparency. It also alleges that the Fairfield Funds lied to clients and the SEC about BLMIS. *Id* ¶ 5–10, 166, 236–262; *Infra* Sec.VI.B.2.

6

The Amended Complaint fails to plead specific details about MLI's investments in the Funds, omitting such basic facts as the amounts and dates of MLI's investments. Instead, it makes generalized allegations about the Merrill Lynch corporate family. It broadly alleges that "Merrill Lynch was an integrated organization, [whose] umbrella groups . . . share[d] knowledge across the organization," without addressing the relationship between any particular Merrill Lynch entities, or stating what information, if any, other Merrill Lynch entities shared with MLI. Am. Compl. ¶ 20. Further, instead of focusing on *MLI's* redemptions, on which the claims in the Amended Complaint are based, the Amended Complaint makes general allegations about *Merrill Lynch's* investments with and redemptions from the Funds. *Id.* ¶¶ 7–10.

## ARGUMENT

## I.      THE AMENDED COMPLAINT SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION UNDER RULE 12(B)(2)

The Trustee bears the "burden of establishing jurisdiction over the defendant." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 334 (2d Cir. 2016). At the motion to dismiss stage, the Trustee "must make a prima facie showing that jurisdiction exists" consistent with due process. *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 81 (2d Cir. 2018). "Such a showing entails making legally sufficient allegations of jurisdiction, including an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant." *Id.* Jurisdiction must be established as to each specific claim asserted in the action. *See Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F.Supp.3d 521, 586 (S.D.N.Y. 2017) (citing *Sunward Elec. Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)).

### A.      The Court lacks general jurisdiction over MLI

MLI is not subject to the Court's general jurisdiction. A party is subject to general personal jurisdiction only when it is essentially "at home" in the forum by virtue of its place of incorporation

or principal place of business. *See, e.g., Daimler AG v. Bauman*, 571 U.S. 117, 136–37 (2014); *see also Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014) (court had no general jurisdiction over the Bank of China, which had offices in New York but was "incorporated and headquartered elsewhere" and conducted only a small portion of its worldwide business in the forum.). It is undisputed that MLI's principal place of business is not in the United States. *See supra* at 4. And jurisdiction cannot arise from the fact a defendant has a corporate affiliate in the jurisdiction. *see Volkswagenwerk AG v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984) ("the presence of a local corporation does not create jurisdiction over a related, but independently managed, foreign corporation"); *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 543 B.R. 127, 141 (Bankr. S.D.N.Y. 2016) ("as long as a parent and a subsidiary are separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other."); *Gundlach v. Int'l Bus. Machines Corp.*, No. 11–CV–846, 2012 WL 1520919, at *9 (S.D.N.Y. May 1, 2012*), aff'd* 594 F. App'x 8 (2d Cir. 2014) (a foreign subsidiary cannot be sued in New York "simply because its parent company is based in New York").

### B.    MLI did not consent to personal jurisdiction by entering into subscription agreements governed by New York law and submitting to venue in New York

As the District Court for the Southern District of New York recently affirmed, allegations that a defendant "entered into subscription agreements [with the Funds] that were governed by New York law and included agreements to submit to venue in New York and the jurisdiction of the New York courts," cannot give rise to personal jurisdiction. Am Compl. ¶ 24; *Fairfield Sentry Limited (In Liquidation), v. Citibank, N.A. London*, No. 19-CV-3911 (VSB), 2022 WL 3644436, at *11–12 (S.D.N.Y. Aug. 24, 2022). The District Court affirmed this Court's holding that, as redemption payments are not governed by the Funds' subscription agreements, "the forum selection clause [in the subscription agreements] cannot establish the Bankruptcy Court's personal

jurisdiction." *Id.*; *see also Siddiqui v. Athene Holding Ltd.*, 806 F. App'x 50, 53 (2d Cir. 2020) (forum selection clause inapplicable where claims did not relate to the contract containing the clause). Moreover, the Trustee is not a party to the subscription agreement and thus cannot invoke its forum selection clause. *See Affiliated FM Ins. Co. v. Kuehne + Nagel, Inc.*, 328 F. Supp.3d 329, 338–39 (S.D.N.Y. 2018) (rejecting enforcement of forum selection clause where the claims and parties to the suit were not subject to the forum selection clause). This decision applies with full force to MLI and to the Subscription Agreements that MLI entered into with the Funds.

### C.    The Court lacks specific jurisdiction over MLI

In the absence of general jurisdiction, the Trustee must plead facts supporting specific jurisdiction. *See Daimler AG*, 571 U.S. at 136–37. To do so, the Trustee must assert that (1) the claims arise out of MLI's sufficient "minimum contacts" with New York and (2) "the exercise of jurisdiction is reasonable in the circumstances." *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). The minimum contacts inquiry focuses on "the relationship among the defendant, the forum, and the litigation," a relationship that "must arise out of contacts that the defendant himself creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014); *see also Bristol-Myers Squibb v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1781 (2017) (declining to exercise personal jurisdiction where "[w]hat is missing . . . is a connection between the forum and *the specific claims at issue*") (emphasis added). "A prima facie case requires non-conclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place." *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19 (2d Cir. 2015). The Trustee has failed to meet this pleading burden.

### 1.    Vague and conclusory allegations cannot support jurisdiction

When assessing jurisdiction "the court need not accept '[t]hreadbare recitals of the elements of [jurisdiction] which are essentially legal conclusions." *Nicholsen v. Feeding Tree*

*Style, Inc.*, No. 12 CIV. 6236 JPO, 2014 WL 476355, at *1 (S.D.N.Y. Feb. 6, 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Amidax Trading Grp. v. S. W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir.2011) (applying plausibility standard to facial attack on subject matter jurisdiction)).

The Trustee's blanket allegations that MLI "purposely availed itself of the laws and protections of the United States and the state of New York by undertaking significant commercial activities in New York," "knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York," and "maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims" are no more than a recitation of the jurisdictional test. Am. Compl. ¶ 21–22. The Amended Complaint is devoid of any detail regarding the "business" or "commercial activities" allegedly conducted by MLI "in New York." Such generalized, boilerplate allegations are insufficient to establish jurisdiction where there "are no allegations of specific facts which would connect [MLI] with any New York activity." *Lehigh Val. Indus., Inc. v. Birenbaum*, 527 F.2d 87, 93–94 (2d Cir. 1975); *see also Lyondell*, 543 B.R. at 137 ("conclusory allegations are not enough to establish personal jurisdiction.").

### 2. Maintenance of a New York bank account is insufficient to establish jurisdiction

The Amended Complaint's allegations that MLI used a New York bank account (*see* Am. Compl. ¶ 26) are similarly insufficient to confer personal jurisdiction on this Court. *See Hau Yin To v. HSBC Holdings, PLC*, No. 15CV3590, 2017 WL 816136, at *6 (S.D.N.Y. Mar. 1, 2017), *aff'd* 700 F. App'x 66 (2d Cir. 2017) (rejecting personal jurisdiction over foreign defendants because their alleged connection to the forum was the transmission of information and funds "to and from BLMIS . . . [as an] incidental consequence[] of fulfilling a foreign contract"); *Hill v. HSBC Bank plc*, 207 F.Supp.3d 333, 339-340 (S.D.N.Y. 2016) (same, holding such transmissions

10

insufficient to 'project' the Foreign Defendants into New York" which did "not amount to 'purposeful availment' of the laws of" the forum); *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 727 (S.D.N.Y. 2010) ("Courts in this district have routinely held that merely maintaining a New York correspondent bank account is insufficient to subject a foreign bank to personal jurisdiction.") (citing cases)).

Amazingly, although the Trustee had access to Sentry's records for over 10 years, including information about the relevant transfers, the Amended Complaint does not specify which, if any, of MLI's redemption payments were received by MLI in a New York bank account. *See* Am. Compl., Exs. C, E (listing the subsequent transfers from the Funds to MLI, but omitting bank account information). Thus the Trustee fails to connect the allegations about MLI's maintenance of a New York bank account to the claim at issue, falling short of the Trustee's obligation to establish jurisdiction with respect to each of the subsequent transfers. *See In re Picard v. BNP Paribas S.A.*, (*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Each transfer is a separate claim . . . and the Trustee must establish the court's jurisdiction with respect to each claim asserted."); *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d at 83 (quoting *Sunward Elecs., Inc.*, 362 F.3d at 24); *Daniel v. Tootsie Roll Indus., LLC*, 17 Civ. 7541 (NRB), 2018 WL 3650015, at *8 (S.D.N.Y. Aug. 1, 2018); *Bristol-Myers Squibb*, 137 S. Ct. at 1781 (personal jurisdiction absent where "a connection between the forum and the specific claims at issue" is missing).

The Amended Complaint also alleges that MLI agreed, through the subscription agreements, that "all subscription payments from MLI to [] Sentry were required to be made in U.S. dollars and sent via Fedwire to [] Sentry's HSBC bank account, located in New York. MLI directed funds to this New York-based HSBC bank account in connection with its investments in [] Sentry." Am. Comp. ¶ 25. As explained in section I.B., the *subscription* agreements are

11

irrelevant to whether the Court has personal jurisdiction over this action arising from MLI's *redemptions*. *Fairfield Sentry Limited (In Liquidation),* 2022 WL 3644436, at *11; *Siddiqui*, 806 F. App'x at 53. To the extent that the subscription agreements have any relevance at all, they show only that *Sentry*—not MLI—requested that redemptions be made in U.S. dollars through a New York bank account and therefore are not evidence that MLI intentionally created contact with New York. *See Hill*, 207 F.Supp.3d at 339-340 (transmission of information and funds to and from BLMIS were "incidental consequences of fulfilling a foreign contract" which did "not amount to 'purposeful availment' of the laws of" the forum).

### 3.    MLI's investments in the Funds do not establish jurisdiction

Likewise, MLI's investments with the Funds do not amount to sufficient connections with New York to establish jurisdiction. Unlike in *Picard v. Bureau of Labor Ins. (In re BLMIS)*, 480 B.R. 501 (Bankr. S.D.N.Y. 2012) ("*BLI*"), the Trustee does not allege that MLI knew substantially all money invested in the Funds would be invested in BLMIS. In *BLI*, the Court held that jurisdiction was established where the complaint alleged the defendant knew the "substantial majority of funds invested in Fairfield Sentry would be transferred to BLMIS in New York to be invested in the New York securities market" and "kn[ew], intend[ed] and contemplate[ed] that the substantial majority of funds invested in Fairfield Sentry would be transferred to BLMIS in New York" *Id* at 517.[2] The Amended Complaint lacks similar allegations. Rather, it simply states that at the time of making the Sentry investments, MLI knew that "FGG maintained accounts at BLMIS" and that the Fairfield Funds had some unspecified portion of assets "managed and

---

[2] *See also*, *e.g. Picard v. Multi-Strategy Fund Limited (In re BLMIS)*, No. 12-01205, 2022 WL 2137073, at *3 (Bankr. S.D.N.Y. Jun. 13, 2022) (the complaint made clear Multi-Strategy had actual knowledge that "approximately 95% of the Fund's assets were under the custody of New York based BLMIS."); *Picard v. Banque SYZ & Co. (In re BLMIS)*, No. 11-02149, 2022 WL 2135019, at *3 (Bankr. S.D.N.Y. Jun. 14, 2022) (noting SYZ Banque's subscription agreements incorporated the Funds' Private Placement Memorandum, which disclosed the Funds principally allocated assets to BLMIS).

custodied by BLMIS in New York." Am. Compl. ¶¶ 27, 23. It does not allege that MLI knew that the Funds were required to invest substantially all of their assets in BLMIS or that they would in fact invest MLI's investments in BLMIS. Thus, there is no similar basis to conclude here that MLI "kn[ew], intend[ed] and contemplate[ed] that the substantial majority of funds invested in [the] Fairfield [Funds] would be transferred to BLMIS." *BLI*, 480 B.R. at 516–17.

To buttress its claims of personal jurisdiction, the Amended Complaint levies vague allegations on the basis of documents MLI received *only after* its initial investment, including tear sheets, semi-annual update letters, weekly fund reports and monthly fund reports. Am. Compl. ¶¶ 29, 24. It alleges MLI was aware that "Fairfield Sentry invested substantially all of its assets with New York-based BLMIS," "BLMIS was the executing broker for the Fairfield Funds' investments," and "BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and Treasury Bills, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York." *Id.* ¶¶ 34–35. But despite his obligation to establish jurisdiction with respect to each subsequent transfer, the Trustee does not allege when any of these documents were received by MLI, or when "MLI knew [of the alleged] facts indicating that they were transacting business in New York in connection with their investments in the Fairfield Funds." Compl. ¶ 35. *See BNP Paribas*, 594 B.R. at 190; *supra* at 11. Without more, these allegations bear no relation to any particular investment.

With respect to Sigma specifically, the Amended Complaint does not allege that MLI knew that Sigma invested substantially all of its assets in Sentry, let alone that MLI's investments in Sigma would subsequently be transferred to BLMIS through Sentry. The Amended Complaint simply alleges that "Fairfield Sigma invested in Fairfield Sentry" and the "Fairfield Sigma PPM, which MLI received and represented that it reviewed and read in its Sigma subscription agreement,

13

contained similar representations regarding the SSC strategy and BLMIS's role as investment advisor, executing broker, and custodian." Am. Compl. ¶¶ 35, 31. Those allegations fall far short of suggesting that MLI knew that Sigma would necessarily invest in BLMIS in New York.

At its core, the Amended Complaint conflates the *Funds'* actions with the actions of *MLI.* But Supreme Court precedent forbids jurisdiction premised on the acts of an intermediary. In *Walden*, the Supreme Court held that the defendant's "actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections." 571 U.S. at 289. To hold otherwise would "impermissibly allow[] a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Id.* As the Supreme Court made clear, the "unilateral activity of a third party . . . cannot satisfy the requirement of contact with the forum State." *Id* at 291. *See also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984) ("unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction.") (collecting cases); *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano Cnty.*, 480 U.S. 102, 112 (1987) ("The substantial connection . . . between the defendant and the forum State necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum.").

Finally, the law does not support the Trustee's expansive view that an investment company can sue its investors in any jurisdiction where that investment company itself decides to make investments. That is nothing more than the type of "stream of commerce" theory of personal jurisdiction rejected by the Supreme Court. See *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882, 886 (2011) ("[I]t is not enough that [a] defendant might have predicted that its goods will reach the forum," but rather the defendant must "engage[] in conduct purposefully directed at [the

14

forum]."); *In re Mexican Gov't Bonds Antitrust Litig.*, 2020 WL 7046837, at *3-4 (S.D.N.Y. Nov. 30, 2020) (holding neither an attempt to profit from conduct underlying the claim nor foreseeability of a harm in the forum were sufficient to establish jurisdiction in the absence of a defendant's contact with forum); *Hunter v. Shanghai Huangzhou Elec. Appliance Mfg. Co.*, No. 5:17-cv-00052 (BKS/TWD), 2020 WL 5258313, at *9 (N.D.N.Y. Sept. 3, 2020) (explaining that "Supreme Court and Second Circuit precedent . . . have emphasized the importance of purposeful [s]tate specific targeting" in assessing personal jurisdiction and stream of commerce theories); *Davidson v. Honeywell Int'l*, No. 14 Civ. 3886(LGS), 2015 WL 1399891, at *3 (S.D.N.Y. Mar. 26, 2015) (merely placing goods into the stream of commerce "does not establish purposeful availment" because the defendant must "purposefully direct[]" conduct toward the forum).

### 4. Communications with Fairfield Greenwich Group in New York do not establish jurisdiction

The Trustee's vague allegations that MLI communicated with Fairfield Greenwich Group ("FGG") cannot support jurisdiction as there are no facts tying those communications to the relevant investments. The Trustee alleges broadly that those communications concerned MLI's "investments, the terms, and negotiations of draft letter agreements." Am. Compl. ¶ 33. But the Trustee fails to specify what was discussed, and importantly, does not suggest the communications related to the redemptions, the subject matter of the Amended Complaint. Accordingly, any communications lack the nexus required to support jurisdiction. *See, e.g., Zim Integrated Shipping Servs. Ltd. v. Bellwether Design Techs. LLC*, No. 19-cv-3444, 2020 WL 5503557, at *5 (S.D.N.Y. Sept. 10, 2020) (various New York contracts did not give rise to jurisdiction where "none of these contacts [gave] rise to [the Plaintiff's] cause of action" and "none of the contacts [plaintiff] identifies has anything to do with this dispute other than generally involving [defendant's] business"); *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 564 (S.D.N.Y. 2000); *Best Van*

*Lines, Inc. v. Walker*, 490 F.3d 239, 253 (2d Cir. 2007).

Even if the Trustee explained how MLI's communications with FGG were relevant to the claims at issue, they would still be insufficient to establish jurisdiction. As the Second Circuit held in *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 345 (2nd Cir. 2018) a "handful of communications and transfer of funds . . . are insufficient to allow the exercise of specific personal jurisdiction over [Foreign] Defendants". *See also, e.g., Hill*, 207 F. Supp. 3d 333, 339–40 (allegations that foreign defendants "communicated with and transmitted information and funds to and from BLMIS located in New York" were "insufficient to 'project' the Foreign Defendants into New York"); *Hau Yin To*, 2017 WL 816136, at *6 (communications with, and transmission of information and funds to and from BLMIS in New York "in connection with their fund administration and/or custodial duties under agreements negotiated with BLMIS . . . were incidental consequences of fulfilling a foreign contract and [] insufficient to 'project' the Foreign Defendants into New York.").[3]

### D.    Exercise of Jurisdiction Over MLI Would Not Comport With Due Process.

Even if the Trustee established that MLI had sufficient contacts to enable this Court to exercise personal jurisdiction, which it has not, this Court would still have to find the exercise of jurisdiction reasonable under the circumstances. *Terrorist Attacks on September 11, 2001*, 714 F.3d at 673; *see also Waldman*, 835 F.3d at 331. When evaluating the reasonableness of personal jurisdiction, courts assess: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in

---

[3] More generally, "'New York courts have consistently refused to sustain section 302(a)(1) jurisdiction solely on the basis of defendant's communication from another locale with a party in New York.'" *Maranga v. Vira*, 386 F. Supp. 2d 299, 306 (S.D.N.Y. 2005) (quoting *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 766 (2d Cir. 1983)); *see also, e.g., Int'l Customs Assocs., Inc. v. Ford Motor Co.*, 893 F. Supp. 1251, 1261 (S.D.N.Y. 1995) ("Telephone calls and correspondence sent into New York, by a non-domiciliary defendant who is outside New York, generally are insufficient to establish personal jurisdiction.") (collecting cases).

16

obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining

the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering

social substantive policies." *LaMonica v. CEVA Group PLC (In re CIL Ltd.)*, 582 B.R. 46, 79

(Bankr. S.D.N.Y. 2018); *Asahi Metal Indus.*, 480 U.S. at 113. Where a defendant's connections

with the forum are weak, the bar for showing reasonableness is high. *LaMonica,* 582 B.R. at 79

("the weaker the plaintiff's showing on minimum contacts, the less a defendant needs to show in

terms of unreasonableness to defeat jurisdiction").

The Trustee seeks to rely on the most incidental of contacts to establish jurisdiction. *See*

*supra* Sec. I.C. The Trustee must therefore make a *stronger showing* that exercise of jurisdiction

would be reasonable. But the relevant factors weigh *against* jurisdiction. *First*, forcing MLI to

defend a suit in the United States would impose a substantial burden on MLI. Cross-border

discovery would be particularly burdensome as the Amended Complaint is wholly concerned with

transfers and activities occurring outside the United States, by entities and actors who are not

present in the United States (*supra* at 4–5, Sec. I.A–C). MLI is a U.K. stockbroker, and discovery

of documents in the United States would involve cross-border discovery issues that could implicate

foreign laws. *See* Bench Ruling Granting in Part and Denying in Part the Foreign Representatives

Mot. Seeking Limited Relief, *Fairfield Sentry Ltd., (In Liquidation), et al., v. Theodoor GGC*

*Amsterdam, et al.*, Adv. Pro. No. 10-03496, ECF No. 799-2 (July 19, 2012) ("The various

respondents have described . . . the strong and undeniable interest of many nations in enforcing

their banking secrecy laws. Thus, yielding to the Foreign Representative's Disclosure Request

implicates the significant bank customer confidentiality laws of no fewer than 30 countries . . . As

such, this Court is hard- pressed to find any compelling United States' interest in mandating

discovery here at this juncture of the pending litigation."). In addition to the foreign law concerns,

17

cross-border discovery would impose financial and logistical burdens on MLI as "none of [MLI's] records, files, or witnesses with information about the litigation are located" in the United States. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 574 (2d Cir. 1996).

The *second* and *third* factors—respectively, the United States' interest and the availability of a more appropriate forum elsewhere—are closely related and both weigh against the exercise of jurisdiction here. The dispute concerns a foreign defendant and "transaction[s] that took place almost entirely outside of the United States." *LaMonica*, 582 B.R. at 80. The United States' interest in adjudicating this transaction is thus minimal at best. And effective relief is available to the Trustee where the transactions *did* occur, including in the United Kingdom. Convenience to the Trustee alone cannot tip the balance in favor of an exercise of jurisdiction. *LaMonica*, 582 B.R at 80 ("While there is undoubtedly an interest in the plaintiff obtaining convenient and effective relief, the dismissal . . . based on lack of personal jurisdiction does not mean that the Trustee would not be able to continue this Adversary Proceeding and ultimately obtain effective relief.").

*Finally*, forcing cross-border discovery involving records dating back at least 17 years, which are predominately located on the other side of the Atlantic, would place a heavy burden on MLI and witnesses. *See* Initial Compl. ¶ 112. ("In 2005, MLI began creating . . . the 'Absolute Alpha' indices"). The United Kingdom Data Protection Act of 2018 (the "UKDPA")[4] prohibits the transfer of "Personal Data"[5] from the United Kingdom to a country outside of the United

---

[4] For the purpose of these submissions, UKDPA refers to the UK Data Protection Act 2018 together with Regulation (EU) 2016/679 (General Data Protection Regulation) ("EU GDPR") as retained and amended post-Brexit (i.e. from 1 January 2021) pursuant to the UK European Union (Withdrawal) Act 2018 and the UK Data Protection, Privacy and Electronic Communications (Amendments etc) (EU Exit) Regulations 2019 (SI 2019/419). As the UKDPA generally incorporates by reference the substantive terms of the EU GDPR but not the specific text, citations are to the relevant articles of the EU GDPR, unless modified, supplemented, or specifically addressed by the UKDPA.

[5] "Personal Data" is defined as "any information relating to an identified or identifiable natural person ('data subject'); an identifiable natural person is one who can be identified, directly or indirectly, in particular by reference to an identifier such as a name, an identification number, location data, an online identifier or to one or more factors specific to the physical, physiological, genetic, mental, economic, cultural or social identity of that natural person." UKDPA, Part 2, Ch. 1 § 2; EU GDPR Art. 4(1).

Kingdom, unless the country to which the data is transferred has been determined by the United

Kingdom to provide adequate safeguards for Personal Data. *See* UKDPA, Part 2, Ch. 2 § 18; EU

GDPR Arts. 44, 45, 46. The UK has not determined the United States to be a country with these

adequate safeguards.[6]  MLI would thus face significant burdens in evaluating the Personal Data

implicated by each request and determining whether and how it can be permissibly transferred to

and processed in the United States. As such, efficient resolution of this case is better served by

adjudication in a United Kingdom Court, where the majority of the witnesses and records

implicated by the Amended Complaint lie. *See Metro Life Ins*., 84 F.3d at 574 (In evaluating the

efficient resolution of the case, courts "generally consider where witnesses and evidence are likely

to be located.") This factor weighs heavily against the exercise of jurisdiction here. *LaMonica*, 582

B.R at 80 (finding jurisdiction unreasonable where litigation involved "mostly foreign defendants

over a transaction that took place almost entirely outside of the United States").

       These factors compel a finding that jurisdiction would be unreasonable.

## II.    THE AMENDED COMPLAINT FAILS TO CONTAIN A "SHORT AND PLAIN STATEMENT OF THE CLAIM" IN VIOLATION OF RULE 8(A)(2)

       Even if jurisdiction is established, the Trustee's Complaint fails because it lacks "a short

and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P.

8(a)(2) ("Rule 8"). Rule 8 is intended to avoid "plac[ing] an unjustified burden on the [Court] and

the party who must respond to it because they are forced to ferret out the relevant material from a

mass of verbiage." Wright & Miller, 5 Federal Practice and Procedure § 1282, at 422 (4th ed.

2021). When a complaint fails to comply with the "short and plain" requirement, the court has the

authority to "strike any portions that are redundant or immaterial or to dismiss the complaint."

---

[6] *See*  https://www.gov.uk/government/publications/uk-approach-to-international-data-transfers/international-data-transfers-building-trust-delivering-growth-and-firing-up-innovation (the United States is not deemed "adequate" under UKDPA).

*Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988); *see also Jones v. Nat'l Comms. & Surveillance Networks*, 266 F. App'x 31, 33 (2d Cir. 2008) (affirming dismissal of "single-spaced 58-page complaint with 87 additional pages of attachments, alleging over twenty separate causes of action against more than 40 defendants").

While incorporation by reference is permitted, it is "always accompanied by the requirement that it be done with a degree of specificity and clarity which would enable a responding party to easily determine the nature and extent of the incorporation." *In re Morrison*, 375 B.R. 179, 193 (Bankr. W.D. Pa. 2007). And when a Complaint recklessly incorporates pleadings by reference, the court has the authority to dismiss the complaint for violating Rule 8. *See In re Geiger*, 446 B.R. 670, 679–80 (Bankr. E.D. Pa. 2010) (dismissing the complaint at hand for improperly incorporating by reference other pleadings). As the bankruptcy court in *In re Geiger* stated, "[The] most serious problem with the Complaint is that it leaves the reader—the Defendant and the Court—to sift through many pages of attached material trying to figure out which fact goes with which allegation […] Putting together the puzzle of matching the bare-bones allegations with the meat of the attached materials is the job of the Plaintiffs, not of the Debtor or the Court. For this reason alone, the Complaint must be dismissed." *Id*. at 679–80.

Rather than provide sufficient details in the Amended Complaint, the Trustee incorporated by reference an entirely different complaint filed in another proceeding to which MLI and the Funds are not party. *See* Am. Compl. ¶ 74. The Fairfield Second Amended Complaint contains 406 paragraphs spanning 105 pages, with 23 accompanying exhibits, asserting a panoply of claims including recovery of subsequent transfers, disgorgement, and constructive trust, all against numerous defendants, *none of which is MLI*, nor even Sentry or Sigma. Trustee relies on this morass to plead an essential element of its claim against MLI: the avoidability of the initial

transfers from BLMIS to the Funds. *See, e.g.* Am. Compl. ¶¶ 74–76.

Moreover, this wholesale incorporation violates the Federal Rules of Civil Procedure. While Rule 10(c) provides that "[a] statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading," it does not permit a party to adopt wholesale an entirely separate pleading. *See, e.g.*, *Nycomed U.S. Inc. v. Glenmark Generics Ltd.*, No. 08-CV-5023, 2010 WL 1257803, at *4 (E.D.N.Y. Mar. 26, 2010) ("A Rule 10(c) adoption clause that does little more than make wholesale reference to the contents of a prior pleading exemplifies the kind of incorporation that fails to give the requisite guidance to the responding party."). That is all the more true where, as here, a party attempts to incorporate an entire pleading filed in a *separate action*. *See, e.g.*, *Constellation Energy Commodities Grp. v. Transfield ER Cape, Ltd.*, 801 F. Supp. 2d 211, 223 (S.D.N.Y. 2011) ("A pleading may not adopt other pleadings from a wholly separate action."); *NCUA Bd. v. Morgan Stanley & Co.*, No. 13 Civ. 6705, 2014 WL 1673351, at *9 (S.D.N.Y. Apr. 28, 2014) (striking defense where defendant attempted to "incorporate the affirmative defenses in answers filed by defendants *in other actions* into its answer"); *Davis v. Bifani*, No. 07–cv–00122, 2007 WL 1216518, at *1 (D. Colo. Apr. 24, 2007) (striking attempt "to incorporate by reference wholesale the allegations in a complaint in a completely separate action"); *see also U.S. v. Int'l Longshoremen's Association*, 518 F. Supp. 2d 422, 463 (E.D.N.Y. 2007) (dismissing a civil RICO complaint after concluding that "the Government's proposed method of pleading necessary elements of its RICO claim by incorporating factual allegations contained in several prior lengthy criminal and civil RICO pleadings is . . . a blatant violation of Rule 8(a)(2)'s direction that a civil plaintiff provide a 'short and plain statement of the claim.'").

Despite having had the benefit of reviewing MLI's Motion to Dismiss the Initial Complaint, which raised this pleading failure, the Trustee failed to correct this deficiency in the

Amended Complaint. *See* Motion to Dismiss at 17–20. The Trustee's reference to 245 paragraphs in the Fairfield Second Amended Complaint "without limitation" does nothing to limit the breadth of the purported incorporation. Am. Compl. ¶ 74. MLI cannot be expected to parse through the Fairfield Second Amended Complaint, against defendants not relevant to this action, to determine which allegations it should respond to when the Trustee has been unable to specify with certainty or clarity the extent of the purported incorporation.

For all these reasons, the Court should reject the Trustee's attempt to incorporate the Fairfield Second Amended Complaint by reference. Without the incorporated complaint, this Complaint's pleadings are conclusory at best and do not adequately plead the avoidability of the initial transfers from BLMIS to Sentry—an essential element of the claims to recover the MLI Subsequent Transfers. Accordingly, the Amended Complaint should be dismissed.

## III.   THE AMENDED COMPLAINT DOES NOT PLAUSIBLY ALLEGE THAT THE MLI REDEMPTIONS WERE BLMIS PROPERTY

Even excusing these facial deficiencies, dismissal is appropriate because the Amended Complaint does not state a plausible claim for relief as required by the Supreme Court's holdings in *Iqbal* and *Twombly*. *See Iqbal*, 556 U.S. at 678; *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007) (plausibility requires "more than a sheer possibility that a defendant has acted unlawfully").

### A.   The Trustee does not adequately allege that the funds transferred to MLI originated with BLMIS

The single count in the Amended Complaint relies on Bankruptcy Code section 550(a) and SIPA § 78fff-2(c)(3) to avoid the redemption payments as subsequent transfers of BLMIS property. The applicability of both those sections turns on whether the subsequent transfer sought to be avoided contained estate property. *See* 11 U.S.C. § 550(a) (permitting recovery of estate property from subsequent transferee); SIPA § 78fff-2(c)(3) ("trustee may recover any property

transferred by the debtor which, except for such transfer, would have been customer property"). The Trustee must identify which of the funds transferred to MLI originated with BLMIS. In *Picard v. Shapiro (In re Madoff)*, 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015) the Court set forth precisely what facts the Trustee must plead to assert a subsequent transferee claim:

> The Trustee must allege facts that support the inference that the funds at issue originated with . . . BLMIS, and contain the "necessary vital statistics"—the "who, when, and how much" of the transfers to establish that an entity was a subsequent transferee of the funds. At the pleading stage, the Trustee is not required to provide a "dollar-for-dollar accounting" of the exact funds at issue. However, barebones allegations that the funds at issue were transferred to the Subsequent Transferees, without more detail, are insufficient.

Although MLI flagged this deficiency in its Motion to Dismiss, the Amended Complaint similarly contains no details regarding the "who, when, and how much" of the subsequent transfers allegedly made to MLI. Instead, the Trustee simply asserts that "Fairfield Sentry subsequently transferred . . . a portion of the Fairfield Sentry Initial Transfers to MLI . . . total[ing] $14,200,000" and "Fairfield Sigma transferred at least $1,877,730 to MLI," derived from funds initially transferred from BLMIS to Sentry, and then Sentry to Sigma. Am. Compl. ¶¶ 77, 82, 2. Exhibits A and B do not substantiate these allegations: they simply list transfers made from BLMIS to Sentry, without tying those transfers to the payment of any redemption request from MLI.

More specifically, the Amended Complaint does not specify the legal basis for avoiding each *initial* transfer from BMLIS to Sentry alleged to have been subsequently transferred to MLI. The Amended Complaint simply states that "[e]ach of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code, applicable provisions of the N.Y. Debt. & Cred. Law, . . . and applicable provisions of SIPA" and "[e]ach of the Fairfield Sentry Two Year Transfers is avoidable under Bankruptcy Code section 548 and applicable provisions of SIPA." Am. Compl. ¶¶ 75–76. But these allegations refer to the universe of transfers between BLMIS and

Sentry. The Amended Complaint does not specify whether the subsequent transfers to MLI derived

from the "Fairfield Sentry Six Year Transfers" or the "Fairfield Sentry Two Year Transfers." Thus

it is unclear which, if any, of the subsequent transfers to MLI implicate Bankruptcy Code section

548. These "barebones" and conclusory allegations are insufficient to support the claims. *See*

*Shapiro*, 542 B.R. at 119 ("The SAC does not tie any initial transfer to any subsequent transfer or

Subsequent Transferee. Moreover, it does not plausibly imply that the initial transferees even made

subsequent transfers to the Subsequent Transferees as opposed to third parties, or that they made

the subsequent transfers rather than simply keep the initial transfers for themselves.")

### B.    Based on the Trustee's own allegations, it is implausible that all of the MLI Redemptions contain BLMIS customer property.

The Trustee's allegations are not only unsupported, they are mathematically impossible.

The Trustee alleges that BLMIS transferred approximately $2.9 billion to Sentry in the six years

preceding the Petition. Am. Compl. ¶ 75. But the Trustee seeks to "recover" $5 billion total,

comprised of two components. *First,* the Trustee seeks an aggregate of approximately $4 billion

of alleged subsequent transfers of customer property in the form of redemption payments made to

dozens of defendants who redeemed from Sentry, including Sigma itself. *See* Covucci Decl. Ex.

C (Fairfield Second Amended Complaint, Exs. 5 and 6). *Second*, the Trustee seeks to recover, also

as alleged subsequent transfers of customer property from Sentry, another approximately $1 billion

allegedly paid by Sentry to the Fairfield Greenwich Group defendants in a separate action. *See id.*

(Exs. 8, 10, 12, 13, 14 and 21). In other words, the Trustee is attempting to recover $2 billion *more*

in subsequent transfers than he alleges BLMIS initially transferred to Sentry. As such, the

Trustee's theory that all of the redemption payments are customer property is facially implausible.

The Trustee's own pleadings make clear why Sentry distributed far more to its investors

than BLMIS transferred to Sentry: Sentry was receiving funds from several sources, including not

just BLMIS, but also its own investors. *See e.g.* Am. Compl. ¶ 23 ("MLI invested in the Fairfield Funds that are the subject of this action"). To make redemption payments, Sentry sometimes used subscription payments from other investors, rather than withdrawing any funds from BLMIS accounts. *See* Covucci Decl. Ex. D, First Amended Complaint, *Fairfield Sentry Ltd. v. Citco Global Custody NV*, No. 19-1122 (Bankr. S.D.N.Y. Nov. 26, 2019), ECF 19, ¶ 63 ("From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry). . . utilized subscription monies of other investors on hand."). This is an "obvious alternative explanation" for the source of the redemption funds, which demonstrates the facial implausibility of the Trustee's theory. *See Garfinkle v. Conf. on Jewish Material Claims Against Ger., Inc.,* 2020 WL 6323462, at *5 (S.D.N.Y. Oct. 28, 2020); *Twombly*, 550 U.S. at 567–68.

This pleading failure cannot be excused for lack of information. Here, the Trustee, rather than MLI, possesses all the records relevant to establishing whether and to what extent Sentry's transfers to MLI and Sigma included any BLMIS customer property. By virtue of the document-sharing provisions of the Fairfield Settlement, the Trustee had access to Sentry's books and records prior to filing the Initial Complaint. *See* Covucci Decl. Ex. B (Fairfield Settlement) ¶ 14 (Trustee and Liquidators "each agree to provide reasonable access to the other's documents, data, and other information relating to, or beneficial to the pursuit of, the Sharing Claims"). Nonetheless, the Trustee fails to allege precisely what transfers to MLI contain customer property, and from which initial transfer that transfer originates. That failure alone is grounds for dismissal. *See Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 709, 723 (2d Cir. 2013) (affirming dismissal and finding "such imprecise pleading is particularly inappropriate here, where the plaintiffs necessarily have access, without discovery, to plan documents and reports that provide specific information from which to fashion a suitable complaint"); *Sapia v. Home Box Off., Inc.*,

No. 18 CIV. 1317, 2018 WL 6985223, at *8 (S.D.N.Y. Dec. 17, 2018) (dismissing claim where plaintiffs failed to precisely plead necessary facts that were "uniquely in [p]laintiffs' possession").

## IV.    THE NEW YORK FRAUDULENT TRANSFER, CONSTRUCTIVE FRAUDULENT TRANSFER, AND PREFERENCE CLAIMS ARE BARRED UNDER BANKRUPTCY CODE SECTION 546(e)

Section 546(e) bars the Trustee's fraudulent transfer claims, except those based on 548(a)(1)(A). The Trustee asserts these claims under Bankruptcy Code section 550(a), which provides that avoided transfers can be recovered from a subsequent "transferee of such initial transferee." 11 U.S.C. § 550(a)(2). But these transfers are protected from clawback under the "securities safe harbor" of Section 546(e). *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 889 (2018). Under section 546(e), a trustee may not avoid a transfer "made by or to (or for the benefit of)" a qualifying entity, including a "stockbroker, financial institution, financial participant, or securities clearing agency" "in connection with a securities contract," or a "settlement payment," except under section 548(a)(1)(A) (*i.e.*, those based on federal intentional fraudulent conveyance claims). *See* 11 U.S.C. § 546(e). The safe harbor protections extend to state law claims, including those brought under New York's Debtor and Creditor Law. *See In re Tribune Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 90 (2d Cir. 2019) (Section 546(e) preempts state-law claims that have the same effect as a fraudulent transfer claim that would otherwise be barred by section 546(e)).

As an alleged subsequent transferee, MLI is entitled to raise a section 546(e) defense. *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC 115, 2013 WL 1609154, at *10 (S.D.N.Y. Apr. 15, 2013) ("both initial transferees and subsequent transferees are entitled to raise a defense based on the application of Section 546(e).") Dismissal of the fraudulent transfer and preference claims is warranted here because the initial transfers at issue were made by a stockbroker in connection with a securities contract.

**A.    The Initial Transfers Were Made By and To Entities Covered by Section 546(e).**

**1.    The Alleged Initial Transfers Were Made by a Stockbroker.**

The District Court has already found that BLMIS is a stockbroker for purposes of section 546(e). *See SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 719 (S.D.N.Y. 2012), *aff'd sub nom. Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411 (2d Cir. 2014) ("even assuming the truth of the allegation that [BLMIS] never traded securities on behalf of clients, Madoff Securities nonetheless qualifies as a stockbroker by virtue of the trading conducted by its market making and proprietary trading divisions.").

**2.    The Alleged Initial Transfers Were Made to a Financial Institution.**

In addition, Judge Bernstein has already held that the Funds are "financial institutions within the meaning of 11 U.S.C. § 546(e)" as "customers of Citco Bank who acted as their agents in connection with the securities contracts pursuant to which the redemption payments were made." *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, No. 10-03496, 2020 WL 7345988, at *7 (Bankr. S.D.N.Y. Dec. 14, 2020). That holding applies with equal force here, because the Trustee alleges that the Initial Transfers were made from BLMIS accounts entitled "Citco Global Custody N V FBO Fairfield Sentry Ltd." *See* Am. Compl. Exs. A, B.

**3.    The Alleged Initial Transfers Were "Transfers In Connection With A Securities Contract."**

The Second Circuit has also held that account opening documents of BLMIS customers constituted securities contracts for purposes of section 546(e). *Picard v. Ida Fishman Revocable Trust* (*In re Bernard L. Madoff Inv. Sec. LLC*), 773 F.3d 411, 418 (2d Cir. 2014). As Sentry "maintained customer accounts with BLMIS," it held securities contracts with BLMIS. Am. Compl. ¶ 3. The Initial Transfers from Sentry's BLMIS accounts were "in connection with" those securities contracts. *See* Am. Compl. ¶¶ 2, 72. As the Second Circuit has held, "Section 546(e)

27

only requires that a covered transfer be broadly related to a 'securities contract,' not that it be connected to an actual securities transaction." *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 420 (2d Cir. 2014). The Initial Transfers easily satisfy this "low bar." *Id.* at 422.

### 4.    The Alleged Initial Transfers Were "Settlement Payments"

Finally, as the Second Circuit held in *Fishman*, "[e]ach time a customer requested a withdrawal from BLMIS . . . each transfer in respect of such an order or request constituted a settlement payment." 773 F.3d at 422 (citing *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. (In Re Enron Creditors Recovery Corp.)*, 651 F.3d 329, 334 (2d Cir. 2011)). That reasoning applies here, and is an additional reason the initial transfers are protected under section 546(e).

For the reasons stated above, the alleged transfers meet the requirements of section 546(e) and are subject to the safe harbor protections. Accordingly, all fraudulent transfer and preference claims, except those made under section 548(a)(1)(A), should be dismissed under section 546(e).

## V.    THE COURT SHOULD DISMISS THE SECTION 548(A)(1)(A) CLAIMS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

The Amended Complaint states that "[i]f MLI challenges the avoidability of the Fairfield Sentry Initial Transfers, the Trustee seeks a judgment . . . declaring that such transfers are avoidable" pursuant to *inter alia*, section 548(a)(1)(A), the only exception to the safe harbor rule.[7] Am. Compl. at 22. That provision of the Code allows the Trustee to avoid transfers made "within 2 years before" the bankruptcy petition was filed if the debtor "made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted." 11 U.S.C. § 548(a)(1)(A). Because "'actual intent to hinder, delay or defraud' constitutes fraud it must be pled with specificity, as required by Fed. R. Civ. P. 9(b)." *Sharp Int'l Corp. v. State St. Bank &*

---

[7] Section 546(e) prevents the Trustee from avoiding certain transfers "except under section 548(a)(1)(A) of this title." 11 U.S.C. § 546(e).

*Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005); *In re Bernard L. Madoff Inv. Sec.*, LLC, 440 B.R. 243, 258 (Bankr. S.D.N.Y. 2010) ("To adequately plead intent, the Trustee must allege "facts that give rise to a strong inference of fraudulent intent.")

Both the Amended Complaint and the 105 page Fairfield Second Amended Complaint are devoid of *any specific* allegation regarding BLMIS's actual intent to hinder, delay, or defraud. In the absence of such allegations, the Trustee appears to rely on the "Ponzi scheme presumption," a judicially-created shortcut that bypasses pleading requirements and "presume[s] that transfers from a debtor in furtherance of a Ponzi scheme are made with fraudulent intent rather than to satisfy an antecedent debt." *Picard v. Citibank, N.A.* (*In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171, 201 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard*, 142 S. Ct. 1209 (2022) (Menashi J., concurring).

The presumption is not settled law. *In re Unified Com. Cap., Inc.*, 260 B.R. 343, 350 (Bankr. W.D.N.Y. 2001), *aff'd sub nom.* No. 01-MBK-6004L, 2002 WL 32500567 (W.D.N.Y. June 21, 2002); *Finn v. Alliance Bank*, 860 N.W.2d 638, 647 (Minn. 2015). The Second Circuit has not definitively spoken on the presumption, applying it only where it is uncontested. *See e.g., Citibank, N.A.* 12 F.4th at 181, n.7 ("parties do not dispute the applicability of the Ponzi scheme presumption here" and "we do not address—whether the Ponzi scheme presumption is well-founded.") Thus, there is no binding precedent compelling its application here.

In *Citibank* Judge Menashi explained that the "Ponzi scheme presumption" represents a "questionable" application of fraudulent transfer statutes. *Id*. at 202 (Menashi, J., concurring). Several cogent reasons support this observation all of which apply here and militate against the application of the presumption on these facts.

*First*, the presumption "obscures the essential distinction between fraudulent transfers and

preferences. It uses fraudulent transfer law rather than the law relating to preferences to promote an equal distribution among creditors." *Id*. at 202. On this basis, some courts have rejected the presumption. *Id* at 201; *see also Unified*, 260 B.R. at 350 ("By forcing the square peg facts of a 'Ponzi' scheme into the round holes of the fraudulent conveyance statutes in order to accomplish a further reallocation and redistribution to implement a policy of equality of distribution in the name of equity, I believe that many courts have done a substantial injustice to those statutes and have made policy decisions that should be made by Congress."). In the case of BLMIS, the presumption would essentially permit—subject to other defenses—the clawback of all property transferred from BLMIS within two years before the bankruptcy filing, effectively expanding the preference period by 21 months (i.e. from 90 days to two years).

*Second*, 548(a)(1)(A) focuses on the debtor's mindset at the time of making *particular* transactions "rather than a pattern of transactions that are part of a greater 'scheme.'" *Finn*, 860 N.W.2d at 647 (construing Minnesota UFTA) *cited with approval in Citibank*, 12 F.4th at 201 (Menashi J., concurring). The statute therefore necessitates an "asset-by-asset and transfer-by-transfer" inquiry, which "requires a creditor to prove the elements of a fraudulent transfer with respect to each transfer, rather than relying on a presumption related to the form or structure of the entity making the transfer." *Finn*, 860 N.W.2d at 647; *see also Stoebner v. Opportunity Fin., LLC*, 909 F.3d 219, 226 (8th Cir. 2018). Allowing the Trustee to avoid that "asset-by-asset" analysis is particularly inappropriate here, where the Trustee has not even specified the relevant transfers at issue making it virtually impossible to infer intent at the time of any one of those transfers.

*Third*, the Ponzi scheme presumption abrogates Rule 9(b)'s pleading requirements, which require "actual intent" to hinder, delay, or defraud to be pled "with particularity." Fed. R. Civ. P. 9(b), *see Sharp*, 403 F.3d at 56. A judicially created exception to the Federal Rules runs counter

to Congress' intent. *Finn,* 860 N.W.2d at 647 (concluding "there is no statutory justification for relieving the Receiver of its burden of proving—or for preventing the transferee from attempting to disprove—fraudulent intent" under the "Ponzi-scheme presumption" and that a creditor must "prove the elements of a fraudulent transfer with respect to each transfer"); *see also Unified*, 260 B.R. at 350 (cited approvingly in *Citibank*, 12 F.4th at 202 (Menashi J. concurring)).

## VI.    THE AMENDED COMPLAINT ESTABLISHES THAT MLI IS ENTITLED TO THE GOOD FAITH DEFENSE.

Under section 550(b), a trustee may not recover from a subsequent transferee who took "for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b). MLI took for value, in good faith, and without knowledge of the voidability of the transfer. In fact, the Trustee's own allegations establish that MLI was a net loser in the Madoff scheme to the tune of almost $15M. *See supra* at 5. There is no plausible reason for MLI to invest over $30M of its own money, and lose almost 50% of that investment, if it had any reason to believe the Funds would invest its money in a Ponzi scheme. MLI is thus entitled to the good faith defense with respect to all claims.

### A.    MLI Received The Redemptions For Value

To establish "value" the Code simply requires that a redemption is "sufficient to support a simple contract, analogous to the 'value' required under state law to achieve the status of a bona fide purchaser for value." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-01789, 2021 WL 3477479, at *9 (Bankr. S.D.N.Y. Aug. 6, 2021). Here, the Amended Complaint clearly shows the redemption payments were in exchange for MLI "[s]urrendering equity interests" which "constitutes value for purposes of section 550(b)." *Picard v. ABN Amro Bank N.A. (Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC)*, No. AP 08-01789, 2020 WL 1584491, at *9 (Bankr. S.D.N.Y. Mar. 31, 2020); *see also Fairfield Sentry Ltd. v. Migani*, [2014] UKPC. Moreover, as

31

MLI was a "net loser" in its dealings with the Funds, this is a straightforward case where *all* of the

redemptions received by MLI were for value. *See In re Bayou Group, LLC*, 439 B.R. 284, 309

(S.D.N.Y. 2010) (investors in Ponzi scheme "gave value in the form of their initial investments");

*Cohen v. (Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC)*, No. 08-01789, 2016 WL

1695296, at *10, 14 (Bankr. S.D.N.Y. Apr. 25, 2016) ("transferee does not give value beyond his

deposits of principal" and "[i]n all Ponzi scheme fraudulent transfer litigation, a transferee must

return transfers in excess of his principal deposits"). Further, as explained *infra* Sec. VI.B.1(2), the

Trustee's allegations support the conclusion that at the time MLI made the redemptions, it did not

know "that the redemption prices were based on fictitious assets." *See Banque SYZ*, 2022 WL

2135019 at *11. Accordingly, it is clear from the face of the Amended Complaint that MLI

received the transfers for value.

### B.    MLI Received The Redemptions In Good Faith

The Second Circuit has recently concluded that "good faith" in the context of fraudulent

transfers under the Bankruptcy Code "embraces an inquiry notice standard." *Citibank*, 12 F.4th at

188. Whether a defendant was on inquiry notice of fraud involves a three-step inquiry:

- *First*, a court must examine what facts the defendant knew, a subjective inquiry;

- *Second*, a court must determine whether these facts put the transferee on inquiry notice of the fraudulent purpose behind a transaction—that is, whether the facts the transferee knew would have led a reasonable person in the transferee's position to conduct further inquiry into a debtor-transferor's possible fraud;

- *Third*, the Court must ascertain whether diligent inquiry by the transferee would have discovered the fraudulent purpose of the transfer.

*Id.* at 191–92. An objective "reasonable person" standard applies in the second and third steps. *Id.*

### 1.    The facts available to MLI were not sufficient to put MLI on inquiry notice (steps 1 and 2).

From any perspective, the Trustee has not pled facts that "a reasonable person in [MLI's]

position [would have] conduct[ed] further inquiry into [BLMIS's] possible fraud." *Id* at 191–92.

> **(1)** <u>The alleged knowledge of other Merrill Lynch entities is not relevant to the analysis of MLI's inquiry notice.</u>

As a threshold matter, the relevant knowledge for purposes of the good faith defense is the defendant MLI's, not (as the Trustee indicates) unspecified "Merrill Lynch entities" or corporate affiliates'. *See Citibank*, 12 F.4th at 191 ("a court must examine what facts *the defendant* knew; this is a subjective inquiry and not 'a theory of constructive notice.'").

The Amended Complaint alleges that "[t]o the world . . . there was only one Merrill Lynch" and "Merrill Lynch was an integrated organization, [whose] umbrella groups . . . share[d] knowledge across the organization." Am. Compl. ¶ 20. Relying on that alleged interconnectedness, it sets forth a hodge-podge of allegations from various, and sometimes undefined, Merrill Lynch entities, as follows:

- "Merrill Lynch barred any investments related to Madoff" and "Merrill Lynch's due diligence team was well-aware of BLMIS's concentration of [] three roles." Am. Compl. ¶¶ 5, 32;

- MLI "did not fully hedge its position in the Fairfield Funds but instead created a 'synthetic short' position with respect to BLMIS." Am. Compl. ¶ 10.

- A former executive in Merrill Lynch's Global Markets & Investment Bank group ("GMI"), and later Merrill Lynch Investment Managers group ("MLIM"), stated that "Merrill Lynch had identified 'many, many, many red flags' at BLMIS and said that 'the whole thing smelled.'" Am. Compl. ¶¶ 5–6.

- After the Madoff fraud was exposed, "Merrill Lynch exhibited a kind of indifference" and one Merrill Lynch executive expressed that it was "[n]ot a big surprise," while another wrote in an email, "[w]e all knew there was something wrong at Madoff – I guess now our suspicions have been confirmed." Am. Compl. ¶ 11.

But general statements about what other Merrill employees in other offices and on other continents may have known or said are irrelevant to the good faith inquiry regarding *MLI's* notice of fraud. Further, the quotations in the Complaint consist solely of hindsight observations, cherry-

picked from communications that occurred *after* Madoff's fraud was exposed. They say nothing of Merrill Lynch or MLI's knowledge at the time of making any investments or redemptions.

This Court's opinion in *BNP Paribas* is instructive. There, the trustee alleged that "various third parties expressed concern to one or more of the Defendants about BLMIS or refused to do business with BLMIS." 594 B.R. at 200. In particular, the trustee claimed a member of the defendant's asset management group, "shared its knowledge that Madoff was illegitimate, as well as its prohibitions against investing with Madoff" with the defendant, while others shared concerns, including "generally known" red flags. *Id.* The Court held that warnings or concerns of third parties, including other BNP Paribas entities, were not relevant to the defendant's knowledge and amounted to no more than "pleading by innuendo." *Id* at 202. Here, unlike *BNP Paribas*, the Trustee does not even allege that other Merrill Lynch entities shared knowledge or concerns about BLMIS with MLI or that MLI knew of those alleged concerns. That other Merrill Lynch entities are affiliated with MLI, does not change the analysis. The Trustee may not simply impute alleged knowledge among separate corporate entities. *Youngers v. Virtus Inv. Partners Inc.*, No. 15CV8262, 2017 WL 5991800, at *5 (S.D.N.Y. Dec. 4, 2017) ("a parent-subsidiary relationship 'is not on its own sufficient to impute the scienter of the subsidiary to the parent or affiliate.'"); *U.S. Philips Corp. v. ATI Techs., Inc.*, No. 05CIV.8176, 2008 WL 2073928, at *2 (S.D.N.Y. May 8, 2008) (a parent's knowledge will not be imputed to a subsidiary unless it is "shown that the parent's employees informed of the [information] were under a duty to report that information to the subsidiary."). The Trustee does not allege that other Merrill Lynch entities conveyed any concerns or specific information about Madoff to MLI, or that they were obligated to do so.

**(2)**    The facts known to MLI were insufficient to put MLI on inquiry notice that BLMIS was a Ponzi scheme.

Absent that improper imputation, the Amended Complaint demonstrates that MLI was *not*

34

on inquiry notice that BLMIS was a Ponzi scheme.

**MLI's knowledge.** The Amended Complaint does not make a single specific allegation about MLI's actual knowledge at the time of making the redemptions at issue. To support a claim that a defendant was on inquiry notice, the plaintiff must allege that the defendant at least had actual knowledge of the "red flags." *Anwar v. Fairfield Greenwich Ltd.*, 286 F.R.D. 258, 260 (S.D.N.Y. 2012) (dismissing claims based on "red flags" where the complaint failed to "allege facts plausibly suggesting that defendants were aware of these red flags, or that if they were aware, they then translated those red flags into a suspicion of fraud.") The Trustee fails on that count.

In fact, the Trustee's allegations about the economics of the Absolute Alpha notes are inconsistent with the notion that MLI reasonably suspected that BLMIS was a Ponzi scheme. By issuing the structured notes, MLI set itself up to *lose* money if the index *rose* and to *make* money if the index *fell*. *See supra* at 3. To hedge the risk that the index would rise, MLI purchased shares of the indexed funds, including Sentry and Sigma. *Id*. If MLI suspected BLMIS was a Ponzi scheme, the economically rational course of action would be not to purchase shares and simply collect its profits when the shares became worthless and the value of the Absolute Alpha index fell. *In re Dreier LLP*, 453 B.R. 499 (Bankr. S.D.N.Y. 2011) is instructive on this point. Applying the inquiry notice standard, the Court held that it was facially implausible that the defendant bank would have knowingly chose to facilitate the fraudulent scheme just to earn fees, and while it may not have accurately assessed Dreier as a credit risk, this did not amount to inquiry notice such that it could not satisfy the good faith test. *Id.* at. 514. As in *Dreier*, it is facially implausible to conclude that MLI suspected BLMIS was a Ponzi scheme, yet would *knowingly* choose to expose its own money to the scheme.

Further, MLI invested more than $30 million USD in Sentry and Sigma, and only redeemed

$16 million. *Supra* at 5; Am. Compl. ¶ 2. Its investments and redemptions were made over time, between 2005 and 2008, consistent with routine market conduct, not suspicion of a Ponzi scheme. *See* Initial Compl. ¶¶ 121, 124. Indeed MLI's decision to withdraw its Fairfield position in 2008 also followed adverse market conditions and sustained negative outlook in 2008.[8]

In fact, even the Trustees' allegations about Merrill Lynch, which cannot put MLI on inquiry notice for the reasons already discussed, are inconsistent with inquiry notice. The Trustee suggests that by requiring clients to pay the first 25% of the total amount to be invested in a basket of funds, and by capping the Fairfield Funds' portion of that basket at 10%, Merrill Lynch was "risk free and suffered no loss because the entirety of the risk was within the range . . . passed onto its clients." Am. Compl. ¶ 9. On the contrary, the Amended Complaint suggests that for every $1 of client money Merrill Lynch is alleged to have invested in the Funds, it put $3 of its own capital at risk to hedge the leveraged portion of the transaction. Am. Compl. ¶ 7. As the Initial Complaint explains, investors' contributions would have been utilized to purchase shares of each of "the funds comprising the reference index," not just the Fairfield Funds. Initial Compl. ¶ 15. Accordingly, only 10% of the initial client investment would have gone towards purchasing shares in the Fund, while the remainder would have been used to purchase shares of other funds in the index. As with MLI, it is clear that Merrill Lynch would not have put its own money at risk if it suspected BLMIS was operating a Ponzi scheme.

**Generic allegations of "red flags" available to all investors.** The Trustee describes several hindsight indicators that BLMIS was engaged in fraud. Am. Compl. ¶¶ 44–66. The Trustee does not suggest that MLI was aware of any of these facts or that they support an inference that

---

[8] Between December 2007 and October 31, 2008 (the date of MLI's last redemption), the Dow Jones Industrial Average fell 36%. The S&P 100 fell 32%. There were among the largest and steepest stock market declines ever. Financial giant Bear Stearns collapsed in February; by September the casualties included Lehman Brothers, AIG, and Washington Mutual. Credit markets seized up. Things were so bad, even the illusory Sentry returns fell. *Id* ¶ 79.

MLI was on inquiry notice of BLMIS's fraud. *See Anwar*, 286 F.R.D. at 260 (dismissing claims where complaint failed to "allege facts plausibly suggesting that defendants were aware of these red flags" or that if they were, they "translated those red flags into a suspicion of fraud"); *see also Citibank*, 12 F.4th at 191 ("a court must examine what facts the defendant knew; this is a subjective inquiry and not 'a theory of constructive notice.'").

Even if the Trustee did argue that MLI was aware of those red flags, this Court has previously held that the "red flag" allegations, such as those recited in the Amended Complaint, do not support an inference that defendants believed BLMIS was not actually trading securities. *See BNP Paribas*, 594 B.R. at 199 (rejecting "the Trustee's attempt to plead, in hindsight, a defendant's subjective knowledge by showing trading impossibilities in BLMIS account statements." And finding allegations that "returns of BLMIS feeder funds were too consistent," "Defendants received trade confirmations for BLMIS feeder funds with prices above the daily high or below the daily low," "BLMIS timed trades too consistently," "BLMIS option volumes were too high," and "BLMIS made trades that were inconsistent with the SSC Strategy" did not support an inference defendants believed BLMIS was not trading securities.); *see also Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 72 (S.D.N.Y. 2010), *aff'd sub nom. Saltz v. First Frontier, L.P.*, 485 F. App'x 461 (2d Cir. 2012) ("An inference of scienter based on publicly available red flags is simply not as cogent and compelling as the opposing inference of nonfraudulent intent."); *Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 577–78 (S.D.N.Y. 2011), *aff'd*, 482 F. App'x 618 (2d Cir. 2012), as amended (June 13, 2012) *Stephenson*, 768 F. Supp. 2d at 577–78 (allegation that Madoff's trades could not be accomplished without a market footprint did not establish an inference that PWC knew market data did not reflect transactions BLMIS reported, nor establish PWC would have learned those aspects of the fraudulent funds on diligent inquiry);

*Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599, 624 (S.D.N.Y. 2010), *aff'd Stephenson*, 482

F. App'x 618 (concluding allegations that the auditor "was small, not well known, and not properly

certified" were insufficient because plaintiffs failed to allege that defendants knew of this).

### 2. More diligent inquiry by MLI would not have discovered the fraudulent purpose of the transfers (step 3).

Finally, even if MLI was on notice that something was amiss at BLMIS, the Amended

Complaint itself demonstrates that further "diligent inquiry" would not have led MLI to "discover[]

the fraudulent purpose of the transfer[s]." *Citibank*, 12 F.4th at 192. BLMIS was founded in 1960

and was operating a Ponzi scheme "since at least the 1980's." Am. Compl. ¶ 38; Fairfield Second

Amended Compl. ¶ 72. In December 2008 it had "over 4,900 active customer accounts with a

purported value of approximately $68 billion in AUM" Am. Compl. ¶ 43. Yet the fraud went

undiscovered for decades, even by its numerous and sophisticated customers.

Moreover, while the Trustee should not be permitted to incorporate by reference the entire

Fairfield Second Amended Complaint, *see supra* Sec. II, in the event the Court does consider that

complaint, its allegations only underscore how futile any further inquiry would have been. The

Fairfield Second Amended Complaint alleges that BLMIS was highly secretive and that the Funds

"covered for Madoff in deliberate efforts to get investors and regulators off the scent," "needed

Madoff to enrich themselves and were willing to lie to protect their relationship" and "spun

information to pacify existing FGG investors and to encourage new investment." *Id.* ¶¶ 5–6. It

continues that the Funds "protected BLMIS from inquiry," "lied to clients about BLMIS's

practices" and "knowingly misled the SEC at Madoff's direction." *Id* ¶¶ 8–9. It asserts that every

step taken by the Funds was "a calculated effort to maintain the viability of the BLMIS Ponzi

scheme despite knowing Madoff was not engaged in the trading of securities." *Id.* ¶ 10.

Both the Amended Complaint and the Fairfield Second Amended Complaint assert that

BLMIS filed fraudulent financial reports with the SEC, "omit[ing] the existence of billions of dollars of customer funds BLMIS managed through its IA Business." *Id.* ¶ 31–32; Am. Compl. ¶ 42. BLMIS even managed to deceive the SEC, despite its investigative tools, broad resources and power to subpoena documents and information. Fairfield Second Am. Compl. ¶¶ 166, 236–262 (discussing SEC investigations that failed to uncover fraud and alleging the Funds strategized with Madoff to deceive the SEC).

The Second Circuit has recognized that the Madoff Ponzi scheme was "a fraud of 'unparalleled magnitude.'" *Sec. Inv. Prot. Corp.*, 2021 WL 3477479, at *1. That MLI could have discovered this highly secretive, longstanding, Ponzi scheme while thousands of other market participants and the SEC did not is simply inconceivable.

### C.    The Good Faith Defense is Particularly Warranted For The Preference Claims.

Even if the Court finds that the face of the Amended Complaint does not demonstrate that MLI is entitled to the good faith defense for the fraudulent transfer claims, to the extent the Trustee pleads the transfers are subject to preference claims, they should be dismissed. Am. Compl. at 22 ("If MLI challenges the avoidabilty of the Fairfield Sentry Initial Transfers, the Trustee seeks a judgment . . . that such transfers are avoidable pursuant to . . . [Bankruptcy Code section] 547(b)"). The Second Circuit limited its *Citibank* holding to fraudulent transfer claims under sections 548 and 550 of the Bankruptcy Code, and in doing so expressly distinguished preference claims from fraudulent transfer claims. *See id* at 191 ("[T]he absence of an inquiry notice standard in the preferential transfers context simply has no bearing on the meaning of good faith here.").

Under Second Circuit precedent, "[a] mere preference between creditors does not constitute bad faith . . . Nor does it matter that the preferred creditor knows that the debtor is insolvent." *In re Sharp Intern. Corp.*, 403 F.3d 43, 54 (2d Cir. 2005). A creditor is not "subject to

attack" on grounds of bad faith "by reason of knowledge on the part of the transferee that the transferor is preferring him to other creditors" and where no ground exists to "collapse" a transfer into other "bad-faith maneuvers." *Id.* at 54–55. The Court in *Sharp* relied on the First Circuit decision in *Boston Trading Group*, which held that bad faith centers on a defendant's "'state of mind,' his subjective appreciation of the situation" and may be found "where the transferee participates in the original dishonesty." *Bos. Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1512 (1st Cir. 1987). This is consistent with the Second Circuit's decision in *Irving Tr. Co.*, which declined to avoid preferential transfers where the transferee did not "knowingly aid[] the debtor to defeat equal distribution," and was not "privy to the grantor's purpose." 65 F.2d at 410–411. Accordingly, the good faith standard only requires a transferee to show that it did not "knowingly aid" the debtor-transferor in defeating equal distribution among creditors. *See Irving Tr. Co. v. Chase Nat'l Bank*, 65 F.2d 409, 410 (2d Cir. 1933).

It is clear from the face of the Amended Complaint that MLI had no actual knowledge of BLMIS's scheme, much less any knowing participation in it. *Supra* Sec. VI.B. There is no suggestion that MLI engaged directly with BLMIS at any point, or that it conspired with the feeder funds  to defraud other creditors or obtain preferential transfers to their detriment. As such, the alleged preferential transfers are not subject to attack on grounds of bad faith. *Sharp*, 403 F.3d at 54.

## CONCLUSION

For the reasons discussed above, the Court should dismiss the Amended Complaint.

40

Dated: October 19, 2022                    Respectfully submitted,

New York, New York                         O'MELVENY & MYERS LLP

                                           By: /s/ *Pamela A. Miller*
                                           Pamela A. Miller
                                           Amber Covucci
                                           O'MELVENY & MYERS LLP
                                           Seven Times Square
                                           New York, New York 10036
                                           Telephone: (212) 326-2000
                                           E-mail: pmiller@omm.com

                                           *Attorneys for Merrill Lynch International*