HERBERT SMITH FREEHILLS NEW YORK LLP
Marc J. Gottridge
Christopher Emch
450 Lexington Avenue
New York, New York 10017
Telephone: (917) 542-7600
marc.gottridge@hsf.com
chris.emch@hsf.com

*Attorneys for Defendants Barclays Bank (Suisse) S.A., Caixabank S.A., as successor by merger to Barclays Bank S.A., and Zedra Trust Company (Jersey) Limited (f/k/a Barclays Private Bank & Trust Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 11-02569 (CGM) |
| Plaintiff, | |
| v. | **ANSWER TO COMPLAINT AND JURY DEMAND** |
| BARCLAYS BANK (SUISSE) S.A., CAIXABANK S.A., as successor by merger to Barclays Bank S.A., and ZEDRA TRUST COMPANY (JERSEY) LIMITED (f/k/a Barclays Private Bank & Trust Limited), | |
| Defendants. | |

Defendants Barclays Bank (Suisse) S.A. ("Barclays Suisse"), Caixabank S.A., as successor by merger to Barclays Bank S.A. ("Barclays Spain"), and Zedra Trust Company (Jersey) Limited (f/k/a Barclays Private Bank & Trust Limited) ("Barclays Jersey," and, together with Barclays Suisse and Barclays Spain, the "Defendants"), by their undersigned attorneys Herbert Smith Freehills New York LLP, as and for their answer (the "Answer") to the Complaint, as amended (the "Complaint"),[1] of plaintiff Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC (the "Trustee" or the "Plaintiff"), state as follows:

## GENERAL DENIAL

Except as otherwise expressly admitted herein, the Defendants deny each and every allegation in the Complaint. The Defendants state that the headings and sub-headings throughout the Complaint do not constitute well-pleaded allegations of fact and therefore require no response. To the extent a response to them is deemed to be required, all allegations in the headings and sub-headings are denied; the Defendants repeat below the headings and subheadings solely for convenient reference and without admitting any allegations that are or may be deemed to be contained therein. In answering the allegations in the Complaint, the Defendants do not intend to

---

[1] The Complaint filed on September 1, 2011 (ECF No. 1) was amended by stipulation and orders entered on December 16, 2021 (ECF No. 119) and February 14, 2022 (ECF No. 122). The December 2021 Stipulation and Order amended the Complaint to: (i) substitute Caixabank S.A. as successor by merger to Barclays Bank S.A., as a defendant in place of Barclays Bank S.A.; and (ii) amend the caption to remove "Barclays Private Bank & Trust Limited," and replace it with "Zedra Trust Company (Jersey) Limited (f/k/a Barclays Private Bank & Trust Limited)." The February 2022 Stipulation and Order dismissed the Trustee's claims as to four alleged subsequent transfers listed on Exhibits F and I to the Complaint, reducing the amount sought by the Trustee by $2,733,843. The Trustee has not, however, filed an Amended Complaint reflecting these changes.

Unless otherwise specified, all "ECF No. __" citations refer to Adv. Pro. No. 12-02569 and capitalized terms not defined herein have the same meaning ascribed to them in the Complaint.

waive, and do not waive, any and all applicable objections to the relevance, admissibility, or prejudicial effect of any allegations in the Complaint. To the extent it is later determined that a response is required to any allegation the Defendants aver has been mooted by a previous dismissal of the Trustee's claims, the Defendants deny any such allegation. The Defendants expressly reserve the right to amend and/or supplement this Answer.

## RESPONSES TO SPECIFIC ALLEGATIONS

### I.    NATURE OF THE ACTION

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS Customer Property that was stolen as part of the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff") and others.

**ANSWER**: The Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 1, except: (a) admit that the Plaintiff purports to bring this action as trustee for the liquidation of BLMIS and the substantively consolidated estate of Bernard L. Madoff ("Madoff") pursuant to the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*; (b) admit, on information and belief, that Madoff perpetrated a Ponzi scheme through BLMIS; and (c) admit that SIPA, in 15 U.S.C. § 78*lll*(4), contains a definition of "Customer Property," to which the Defendants respectfully refer the Court for its complete and accurate terms.

2.    With this Complaint, the Trustee seeks to recover approximately $67,396,667 in subsequent transfers of Customer Property collectively made to the Barclays Defendants. The subsequent transfers were derived from investments with BLMIS made by Fairfield Sentry Limited ("Fairfield Sentry"), which was a Madoff feeder fund. Fairfield Sentry is currently in liquidation in the British Virgin Islands ("BVI"). It was a BVI company that had direct customer accounts with BLMIS's investment advisory business ("IA Business") for the purpose of investing assets with BLMIS. Fairfield Sentry maintained in excess of 95% of its assets in BLMIS customer accounts. Some of the subsequent transfers from Fairfield Sentry came through Fairfield Sigma Limited ("Fairfield Sigma"), which invested 100% of its assets in Fairfield Sentry. Fairfield Sigma also is in liquidation in the BVI.

**ANSWER**:  The Defendants deny the allegations of paragraph 2, except (a) admit: (i) on information and belief, that Fairfield Sentry is a BVI company currently in liquidation in the BVI, and (ii) that, following entry of a stipulation and order on February 14, 2022 (ECF No. 122), the Trustee seeks in this action to recover approximately $64,662,821 in alleged subsequent transfers that he claims were made to the Defendants; and (b) deny knowledge or information sufficient to form a belief as to the truth of the allegations concerning whether Fairfield Sentry had direct customer accounts with BLMIS's IA Business.

3.      When the Barclays Defendants received subsequent transfers of BLMIS Customer Property, the Barclays Defendants was part of Barclays PLC Group ("Barclays"), a global financial services provider engaged in wealth management and retail, corporate, and investment banking. According to its 2010 Annual Review, Barclays's success was due, in part, to its effective risk management, which underpins all the commercial decisions it makes. *See* Exhibit A.

**ANSWER**:  The Defendants deny the allegations of paragraph 3 except: (a) admit that at all relevant times they were indirect subsidiaries of Barclays PLC which, through various subsidiaries and affiliates, provided financial services including wealth management and retail, corporate, and investment banking services, in various jurisdictions; and (b) admit that Exhibit A is a true and correct copy of Barclays PLC's 2010 Annual Review.

## II.    JURISDICTION AND VENUE

4.      The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3); sections 105(a), 544, 550(a), and 551 of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code"); and the New York Fraudulent Conveyance Act (New York Debtor & Creditor Law) ("NYDCL") §§ 273-279 (McKinney 2001), to obtain avoidable and recoverable transfers received by the Barclays Defendants as subsequent transferees of funds originating from BLMIS.

**ANSWER**:  The allegations of paragraph 4 constitute legal conclusions to which no response is required.  To the extent a response is deemed to be required, the Defendants deny the allegations of paragraph 4 except admit that the Trustee has brought this adversary proceeding, purportedly pursuant to the cited statutes.

5.     This is an adversary proceeding brought in this Court, in which the main underlying substantively consolidated SIPA case, No. 08-01789 (BRL) (the "SIPA Case"), is pending. The SIPA Case was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding"). This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), and 15 U.S.C. § 78eee(b)(2)(A), (b)(4).

**ANSWER**: The allegations of paragraph 5 constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, the Defendants deny the allegations of paragraph 5, except: (a) admit that the main substantively consolidated SIPA case (No. 08-01789 (CGM)) is pending in this Court; and (b) admit, on information and belief, that the District Court Proceeding was commenced in the District Court. Without limitation, the Defendants deny that this Court has jurisdiction to enter a final order or judgment in this proceeding.

6.     The Barclays Defendants are subject to personal jurisdiction in this judicial district because they purposely availed themselves of the laws and protections of the United States and the state of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through Fairfield Sentry. The Barclays Defendants knowingly received transfers of Customer Property from BLMIS. The Trustee's investigation to date reveals that each of the Barclays Defendants obtained Customer Property by withdrawing money from Fairfield Sentry, and that Defendant Barclays Suisse and Defendant Barclays Spain obtained even more Customer Property by withdrawing money from Fairfield Sigma. Both Fairfield Sentry and Fairfield Sigma are Madoff feeder funds managed by the Fairfield Greenwich Group ("FGG"). By directing investments through FGG, the Barclays Defendants knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York. Upon information and belief, the Barclays Defendants entered into subscription agreements with Fairfield Sentry under which they submitted to New York jurisdiction, sent copies of the subscription agreements to FGG's New York City office, wired funds to Fairfield Sentry through a bank in New York, and regularly communicated by email and telephone with their Fairfield Sentry account representatives located in FGG's New York City office. The Barclays Defendants thus derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

**ANSWER**: The allegations of paragraph 6 contain legal conclusions to which no response is required. To the extent a response is deemed to be required, the Defendants deny the allegations

of paragraph 6, except: (a) admit, upon information and belief, that Fairfield Sentry and Fairfield

Sigma were investment funds managed by FGG; (b) admit that one or more of the Defendants

entered into subscription agreements with Fairfield Sentry, and respectfully refer the Court to such

documents for their complete and accurate contents; and (c) admit that on certain occasions one or

more of the Defendants (i) made investments in Fairfield Sentry and in that connection caused

funds to be wire transferred to Fairfield Sentry, including through a bank in New York, and (ii)

redeemed portions of their investments in Fairfield Sentry or Fairfield Sigma.

7.      Defendant Barclays Private Bank is also subject to the jurisdiction of this Court
because it filed customer claims with the Trustee, which the Trustee has designated as Claims #
004979, # 005100, # 005952, # 005944, # 13796, and # 013941, thereby subjecting itself to New
York jurisdiction.

**ANSWER**:  The allegations of paragraph 7 contain legal conclusions to which no response

is required.  To the extent a response is deemed to be required, the Defendants deny the allegations

of paragraph 7, except admit that Barclays Jersey, solely in its capacity as trustee, filed one or

more customer claims with the Trustee.

8.      The Barclays Defendants should reasonably expect to be subject to New York
jurisdiction and are subject to personal jurisdiction pursuant to New York Civil Practice Law &
Rules § 302 (McKinney 2001) and Bankruptcy Rule 7004.

**ANSWER**:  The allegations of paragraph 8 constitute legal conclusions to which no

response is required.  To the extent a response is deemed to be required, the Defendants deny the

allegations of paragraph 8.

9.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).

**ANSWER**:  The allegations of paragraph 9 constitute legal conclusions to which no

response is required.  To the extent a response is deemed to be required, the Defendants deny the

allegations of paragraph 9, state that they do not consent to the issuance of entry of final orders or

judgments by the Bankruptcy Court and demand trial by jury of all issues that may be tried by a

jury.

10.       Venue in this District is proper under 28 U.S.C. § 1409.

**ANSWER**:  The allegations of paragraph 10 constitute legal conclusions to which no

response is required.  To the extent a response is deemed to be required, The Defendants admit the

allegations of paragraph 10.

## III.    **BACKGROUND**

11.       On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents
for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment
adviser fraud, and mail and wire fraud. Contemporaneously, the U.S. Securities and Exchange
Commission ("SEC") commenced the District Court Proceeding against Madoff and BLMIS. The
SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser
activities of BLMIS. The District Court Proceeding remains pending.

**ANSWER**:  The Defendants deny knowledge or information sufficient to form a belief as

to the truth of the allegations of paragraph 11, except admit, on information and belief, that: (a)

Madoff was arrested on or about December 11, 2008; and (b) the SEC filed a civil complaint

against Madoff and BLMIS on or about that date.

12.       On December 12, 2008, The Honorable Louis L. Stanton of the District Court
entered an order appointing Lee S. Richards as receiver for the assets of BLMIS.

**ANSWER**:  The Defendants deny knowledge or information sufficient to form a belief as

to the truth of the allegations of paragraph 12, and respectfully refer the Court to the District

Court's Order dated December 12, 2008 for a complete and accurate statement of its contents.

13.       On December 15, 2008, under § 78eee(a)(4)(A), the SEC consented to a
combination of its own action with an application of the Securities Investor Protection Corporation
("SIPC"). Thereafter, under § 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District
Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers
as they came due and, accordingly, its customers needed the protections afforded by SIPA.

**ANSWER**: The Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 13, and respectfully refer the Court to the application filed by SIPC, to which reference is made in paragraph 13, for a complete and accurate statement of its contents.

14.    Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order under SIPA (known as the "Protective Decree"), which, in pertinent part:

      a.    removed the receiver and appointed the Trustee for the liquidation of the business of BLMIS and under SIPA § 78eee(b)(3);

      b.    appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA § 78eee(b)(3); and

      c.    removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under § 78eee(b)(4) of SIPA.

**ANSWER**: The Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 14 and respectfully refer the Court to the District Court's Order dated December 15, 2008 for a complete and accurate statement of its contents.

15.    By orders dated December 23, 2008, and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

**ANSWER**: The Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 15 and respectfully refer the Court to this Court's Orders dated December 23, 2008 and February 4, 2009, respectively, for complete and accurate statements of their contents.

16.    At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." *Id.* at 23. Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id.* On June 29, 2009, Madoff was sentenced to 150 years in prison.

**ANSWER**: The Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 16, except admit on information and belief that: (a) Madoff pleaded guilty to a criminal information filed against him by the United States Attorney's Office for the Southern District of New York at a hearing in the District Court on or about March 12, 2009; and (b) Madoff was sentenced, on or about June 29, 2009, to a term of imprisonment. The Defendants respectfully refer the Court to the transcript of the March 9, 2009 hearing for a complete and accurate statement of its contents and to the relevant judgment of conviction entered in the District Court (and subsequent orders and judgments relating thereto, if any) for a complete and accurate statement of the sentence imposed on Madoff.

17.    On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a plea hearing on August 11, 2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), DiPascali pled guilty to a ten-count criminal information. Among other things, DiPascali admitted that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s. *Id.* at 46.

**ANSWER**: The Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 17, except admit on information and belief that Frank DiPascali pleaded guilty to a criminal information filed against him by the United States Attorney's Office for the Southern District of New York at a hearing in the District Court on or about August 11, 2009, and respectfully refer the Court to the transcript of that hearing for a complete and accurate statement of its contents.

## IV.    TRUSTEE'S POWERS AND STANDING

18.    As Trustee appointed under SIPA, the Trustee is charged with recovering and paying out Customer Property to BLMIS customers, assessing claims, and liquidating any other assets of BLMIS for the benefit of the estate and its creditors. The Trustee is in the process of marshaling BLMIS's assets, and this liquidation is well underway. However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years. Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recoveries, including those from individuals and entities that

received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

**ANSWER**:  The Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 18, except state that the allegations concerning the Trustee's responsibilities and authority under SIPA and the Bankruptcy Code constitute legal conclusions to which no response is required; to the extent a response is deemed to be required, the Defendants deny those allegations.

19.    Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under section 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

**ANSWER**:  The allegations of paragraph 19 constitute legal conclusions to which no response is required.  To the extent a response is deemed to be required, the Defendants deny the allegations of paragraph 19.

20.    Under SIPA §§ 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

**ANSWER**:  The allegations of paragraph 20 constitute legal conclusions to which no response is required.  To the extent a response is deemed to be required, the Defendants deny the allegations of paragraph 20.

21.    The Trustee has standing to bring these claims under § 78fff-1(a) of SIPA and the Bankruptcy Code, including sections 323(b), 544 and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

**ANSWER**:  The allegations of paragraph 21 constitute legal conclusions to which no response is required.  To the extent a response is deemed to be required, the Defendants deny the allegations of paragraph 21.

## V.    THE DEFENDANTS

22.    Defendant Barclays Suisse is a Swiss *société anonyme* operating as a private bank and maintaining a place of business at Chemin de Grange-Canal 18-20, 1224 Chêne-Bougeries, Switzerland.

**ANSWER**:  The Defendants admit the allegations in Paragraph 22.

23.    Defendant Barclays Spain is a Spanish *sociedad anónima* operating as a bank and maintaining a place of business at Plaza de Colon 1, 28046 Madrid, Spain.

**ANSWER**:  The Defendants deny the allegations of paragraph 23 and state that the former

Spanish *sociedad anónima* has been merged into Caixbank, S.A.

24.    Defendant Barclays Private Bank is a Jersey registered private company operating as a private bank and maintaining a place of business at 39/41 Broad Street, St. Helier, Jersey JE4 8PU.

**ANSWER**:  The Defendants deny the allegations of Paragraph 24, except admit that Zedra

Trust Company (Jersey) Limited, formerly known as Barclays Private Bank & Trust Limited, is a

Jersey registered private company maintaining a place of business at 50 La Colombiere Street, St.

Helier, Jersey JE2 4QB.

## VI.    THE PONZI SCHEME

25.    BLMIS was founded by Madoff in 1959 and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several of his friends and family members. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). By virtue of that registration, BLMIS was a member of SIPC. BLMIS had three business units: market making, proprietary trading, and the IA Business.

**ANSWER**:  The Defendants deny knowledge or information sufficient to form a belief as

to the truth of the allegations of paragraph 25, except admit on information and belief that Madoff

founded and operated BLMIS from a date unknown to the Defendants until approximately

December 2008.

26.    Outwardly, Madoff ascribed the consistent success of the IA Business to the so-called split-strike conversion strategy ("SSC Strategy"). Under that strategy, Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100")—a collection of the 100 largest publicly traded companies. Madoff claimed that his basket of stocks would mimic the movement of the S&P 100. He also asserted that he would carefully time purchases and sales to maximize value, and BLMIS customers' funds would, intermittently, be out of the equity markets.

**ANSWER**:  The Defendants deny knowledge or information sufficient to form a belief as

to the truth of the allegations of paragraph 26.

27.    The second part of the SSC Strategy was a hedge of Madoff's stock purchases with options contracts. Those option contracts acted as a "collar" to limit both the potential gains and losses on the basket of stocks. Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options. Madoff told BLMIS customers that when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual funds holding Treasury bills. Madoff also told customers that he would enter and exit the market between six and ten times each year.

**ANSWER**:  The Defendants deny knowledge or information sufficient to form a belief as

to the truth of the allegations of paragraph 27.

28.    BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never made the investments he promised clients, who believed they were invested with him in the SSC Strategy. He further admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts. In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform on which BLMIS reasonably could have traded securities. Instead, investors' funds were principally deposited into the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxxx703.

**ANSWER**:  The Defendants deny knowledge or information sufficient to form a belief as

to the truth of the allegations of paragraph 28, and respectfully refer the Court to the transcript of

the Plea Hearing for a complete and accurate statement of its contents.

29.    Prior to his arrest, Madoff assured clients and regulators that he purchased and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than through any listed exchange. Based on the Trustee's investigation to date, there is no evidence that the IA Business ever entered into any OTC options trades on behalf of IA Business account holders.

**ANSWER**:  The Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 29.

30.    For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options, but rather used to pay withdrawals and to make other avoidable transfers. Madoff also used his customers' investments to enrich himself, his associates, and his family.

**ANSWER**:  The Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 30.

31.    The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion of new investments to fulfill payment requests or withdrawals from other BLMIS accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

**ANSWER**:  The Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 31.

32.    It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in demand, investigation, the filing of a claim, and disclosure of the fraud.

**ANSWER**:  The Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 32.

33.    Madoff's scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

**ANSWER**:   The Defendants admit, upon information and belief, that Madoff's Ponzi scheme collapsed in or about December 2008, but deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 33.

34.    Based upon the Trustee's ongoing investigation, it now appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction

of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. By the time the Ponzi scheme came to light on December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

**ANSWER**:  The Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 34.

35.    Thus, at all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

**ANSWER**:  The Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 35.

## VII.    THE TRANSFERS

36.    Each of the Barclays Defendants received subsequent transfers of Customer Property from Fairfield Sentry, which maintained customer accounts with BLMIS. Defendant Barclays Spain and Defendant Barclays Suisse received additional subsequent transfers of Customer Property from Fairfield Sentry through Fairfield Sigma.

**ANSWER**:  The Defendants deny the allegations in paragraph 36.

### A.    Initial Transfers From BLMIS To Fairfield Sentry

37.    The Trustee has filed an adversary proceeding against Fairfield Sentry, Fairfield Sigma, and other defendants in the Bankruptcy Court under the caption *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Fairfield Sentry in the amount of approximately $3 billion (the "Fairfield Amended Complaint"). The Trustee incorporates by reference the allegations contained in the Fairfield Amended Complaint as if fully set forth herein.

**ANSWER**:  The Defendants: (a) admit that the Trustee filed an adversary proceeding in this Court styled as *Picard v. Fairfield Sentry Limited, et al.*, No. 08-01789 (BRL), Adv. Pro. No. 09-01239 (the "Fairfield Action"); (b) deny knowledge or information sufficient to form a belief as to which of the three complaints filed in the Fairfield Action the Trustee purports to incorporate by reference in the Complaint; and (c) deny that the alleged initial transfers of Customer Property from BLMIS to Fairfield Sentry were avoided or are avoidable.  To the extent necessary to support

13

the foregoing denials, the Defendants further state that they: (i) deny knowledge or information sufficient to form a belief as to the truth of the allegations in each of the three complaints filed in the Fairfield Action upon which the Trustee relies to support his claim that any initial transfers of alleged Customer Property to Fairfield Sentry are or were avoided or avoidable; and (ii) object to (A) the Trustee's purported incorporation by reference of all other paragraphs and allegations of the three complaints filed in the Fairfield Action (and therefore do not answer such allegations) and (B) the inclusion in this adversary proceeding of any issue implicated by any of the three complaints in the Fairfield Action other as to the alleged avoidance or avoidability of what the Trustee characterizes as initial transfers of Customer Property. The Defendants reserve their right to rely on and introduce any allegations in any of the Trustee's three complaints filed in the Fairfield Action (including the exhibits thereto) as opposing party admissions admissible for the truth of their contents. To the extent that any further response is deemed to be required, the Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 37.

38.    During the six years preceding the Filing Date, BLMIS made transfers to Fairfield Sentry of approximately $3 billion (the "Fairfield Sentry Six Year Initial Transfers"). The Fairfield Sentry Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), are avoidable, and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**: The Defendants deny knowledge or information sufficient to form a belief as to the allegations of the first sentence of paragraph 38, and state that the allegations of the second sentence of paragraph 38 constitute legal conclusions to which no response is required. To the extent a response to such allegations is deemed to be required, the Defendants deny knowledge or information sufficient to form a belief as to the truth of those allegations.

39.    The Fairfield Sentry Six Year Initial Transfers include approximately $1.6 billion which BLMIS transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Initial Transfers"). The Fairfield Sentry Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), are avoidable, and recoverable under sections 548(a), 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:  The Defendants deny knowledge or information sufficient to form a belief as to the allegations of the first sentence of paragraph 39, and state that the allegations of the second sentence of paragraph 39 constitute legal conclusions to which no response is required.  To the extent a response to such allegations is deemed to be required, the Defendants deny knowledge or information sufficient to form a belief as to the truth of those allegations.

40.    The Fairfield Sentry Two Year Initial Transfers include approximately $1.1 billion which BLMIS transferred to Fairfield Sentry during the 90 days preceding the Filing Date (the "Fairfield Sentry Preference Period Initial Transfers"). The Fairfield Sentry Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), are avoidable, and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:  The Defendants deny knowledge or information sufficient to form a belief as to the allegations of the first sentence of paragraph 40, and state that the allegations of the second sentence of paragraph 40 constitute legal conclusions to which no response is required.  To the extent a response to such allegations is deemed to be required, the Defendants deny knowledge or information sufficient to form a belief as to the truth of those allegations.

41.    The Fairfield Sentry Six Year Initial Transfers, the Fairfield Sentry Two Year Initial Transfers, and the Fairfield Sentry Preference Period Initial Transfers are collectively defined as the "Fairfield Sentry Initial Transfers." Charts setting forth these transfers are attached as Exhibits B and C.

**ANSWER**:  The Defendants deny the allegations of paragraph 41, except: (a) admit that the Trustee defines the term "Fairfield Sentry Initial Transfers" as set forth therein; and (b) respectfully refer the Court to Exhibits B and C to the Complaint for their complete and accurate

contents (while denying that they accurately and correctly state what the Trustee claims are set forth therein).

42.    Pursuant to the Bankruptcy Court's June 7 and June 10, 2011 orders, the Bankruptcy Court approved a settlement among the Trustee, Fairfield Sentry, and others (the "Settlement Agreement"). As part of the Settlement Agreement, on July 13, 2011, the Bankruptcy Court entered a consent judgment granting the Trustee a judgment in the amount of $3,054,000,000. Fairfield Sentry is obligated to pay $70,000,000 to the Trustee under the terms of the Settlement Agreement.

**ANSWER**:  The Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 42 and respectfully refer the Court to the Settlement Agreement and this Court's orders dated June 7, 2011, June 10, 2011, and July 13, 2011, to which reference is made in paragraph 42, respectively, for their complete and accurate contents.

**B.    Subsequent Transfers From Fairfield Sentry To Defendant Barclays Spain**

43.    A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Barclays Spain and is recoverable pursuant to section 550 of the Bankruptcy Code. Based on the Trustee's investigation to date, approximately $4,719,252 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Defendant Barclays Spain (the "Fairfield Sentry-Barclays Spain Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry-Barclays Spain Subsequent Transfers is attached as Exhibit D.

**ANSWER**:  The allegations of paragraph 43 contain legal conclusions to which no response is required.  To the extent a response is deemed to be required, the Defendants deny the allegations of paragraph 43 and respectfully refer the Court to Exhibit D for its complete and accurate contents (while denying that it accurately and correctly states what the Trustee claims is set forth therein).

44.    The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Sentry- Barclays Spain Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER**: The Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 44.

### C.    Subsequent Transfers From Fairfield Sentry To Fairfield Sigma And Subsequently To Defendant Barclays Spain

45.    A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Barclays Spain through Fairfield Sigma and is recoverable pursuant to section 550 of the Bankruptcy Code. Based on the Trustee's investigation to date, approximately $752,273,917 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Fairfield Sigma, which in turn transferred the equivalent of approximately $16,105,498 to Defendant Barclays Spain (the "Fairfield Sigma-Barclays Spain Subsequent Transfers"). Charts setting forth the presently known Fairfield Sigma-Barclays Spain Subsequent Transfers are attached as Exhibits E and F.

**ANSWER**: The allegations of paragraph 45 contain legal conclusions to which no response is required. To the extent a response is deemed to be required, the Defendants deny the allegations of paragraph 45 and respectfully refer the Court to Exhibits E and F, as amended, in the case of Exhibit F, by the stipulation and order entered on February 14, 2022 (ECF No. 122), for their complete and accurate contents (while denying that they accurately and correctly state what the Trustee claims are set forth therein).

46.    The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Sigma- Barclays Spain Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER**: The Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 46.

47.    The Fairfield Sentry-Barclays Spain Subsequent Transfers and the Fairfield Sigma-Barclays Spain Subsequent Transfers are collectively defined as the "Barclays Spain Subsequent Transfers."

**ANSWER**: The Defendants deny the allegations of paragraph 47, except admit that the Trustee defines the term "Barclays Spain Subsequent Transfers" as set forth therein.

**D.    Subsequent Transfers From Fairfield Sentry To Defendant Barclays Suisse**

48.    A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Barclays Suisse and is recoverable pursuant to section 550 of the Bankruptcy Code. Based on the Trustee's investigation to date, approximately $37,973,175 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Defendant Barclays Suisse (the "Fairfield Sentry-Barclays Suisse Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry-Barclays Suisse Subsequent Transfers is attached as Exhibit G.

**ANSWER**:  The allegations of paragraph 48 contain legal conclusions to which no

response is required.  To the extent a response is deemed to be required, the Defendants deny the

allegations of paragraph 48 and respectfully refer the Court to Exhibit G for its complete and

accurate contents (while denying that it accurately and correctly states what the Trustee claims is

set forth therein).

49.    The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Sentry- Barclays Suisse Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER**:  The Defendants deny knowledge or information sufficient to form a belief as

to the truth of the allegations of paragraph 49.

**E.    Subsequent Transfers From Fairfield Sentry To Fairfield Sigma And Subsequently To Defendant Barclays Suisse**

50.    A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Barclays Suisse through Fairfield Sigma and is recoverable pursuant to section 550 of the Bankruptcy Code. Based on the Trustee's investigation to date, approximately $752,273,917 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Fairfield Sigma, which in turn transferred the equivalent of approximately $7,704,754 to Defendant Barclays Suisse (the "Fairfield Sigma-Barclays Suisse Subsequent Transfers"). Charts setting forth the presently known Fairfield Sigma-Barclays Suisse Subsequent Transfers are attached as Exhibits E and H.

**ANSWER**:  The allegations of paragraph 50 contain legal conclusions to which no

response is required.  To the extent a response is deemed to be required, the Defendants deny the

allegations of paragraph 50 and respectfully refer the Court to Exhibits E and H for their complete

and accurate contents (while denying that they accurately and correctly state what the Trustee

claims are set forth therein).

51.    The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Sigma- Barclays Suisse Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER**:  The Defendants deny knowledge or information sufficient to form a belief as

to the truth of the allegations of paragraph 51.

52.    The Fairfield Sentry-Barclays Suisse Subsequent Transfers and the Fairfield Sigma-Barclays Suisse Subsequent Transfers are collectively defined as the "Barclays Suisse Subsequent Transfers."

**ANSWER**:  The Defendants deny the allegations of paragraph 52, except admit that the

Trustee defines the term "Barclays Suisse Subsequent Transfers" as set forth therein.

### F.    Subsequent Transfers From Fairfield Sentry To Defendant Barclays Private Bank

53.    A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Barclays Private Bank and is recoverable pursuant to section 550 of the Bankruptcy Code. Based on the Trustee's investigation to date, approximately $893,988 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Defendant Barclays Private Bank (the "Barclays Private Bank Subsequent Transfers"). A chart setting forth the presently known Barclays Private Bank Subsequent Transfers is attached as Exhibit I.

**ANSWER**:  The allegations of paragraph 53 contain legal conclusions to which no

response is required.  To the extent a response is deemed to be required, the Defendants deny the

allegations of paragraph 53 and respectfully refer the Court to Exhibit I, as amended by the

stipulation and order entered on February 14, 2022 (ECF No. 122), for its complete and accurate

contents (while denying that it accurately and correctly states what the Trustee claims is set forth

therein).

54.     The Trustee's investigation is on-going and the Trustee reserves the right to: supplement the information on the Fairfield Sentry Initial Transfers, the Barclays Private Bank Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER**:  The Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 54.

55.     The Barclays Spain Subsequent Transfers, the Barclays Suisse Subsequent Transfers, and the Barclays Private Bank Subsequent Transfers are collectively defined as the "Fairfield Subsequent Transfers."

**ANSWER**:  The Defendants deny the allegations of paragraph 55, except admit that the Trustee defines the term "Fairfield Subsequent Transfers" as set forth therein.

## COUNT ONE
## RECOVERY OF SUBSEQUENT TRANSFERS –
## 11 U.S.C. §§ 550(a) AND 551

56.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

**ANSWER**:  The Defendants incorporate and reassert their responses to the allegations contained in all of the previous paragraphs of this Complaint with the same force and effect as if fully set forth herein.

57.     Defendant Barclays Spain received the Barclays Spain Subsequent Transfers, totaling approximately $20,824,750; Defendant Barclays Suisse received the Barclays Suisse Subsequent Transfers, totaling approximately $45,677,929, and Defendant Barclays Private Bank received the Barclays Private Bank Subsequent Transfers, totaling approximately $893,988 (collectively defined above as the "Fairfield Subsequent Transfers"). The Fairfield Subsequent Transfers, totaling approximately $67,396,667, are recoverable pursuant to section 550(a) of the Bankruptcy Code.

**ANSWER**:  The allegations of paragraph 57 constitute legal conclusions to which no response is required.  To the extent a response is deemed to be required, the Defendants deny the allegations of paragraph 57.

58.     Each of the Fairfield Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Barclays Defendants.

**ANSWER**: The allegations of paragraph 58 constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, the Defendants deny the allegations of paragraph 58.

59. The Barclays Defendants are immediate or mediate transferees of the Fairfield Sentry Initial Transfers.

**ANSWER**: The allegations of paragraph 59 constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, the Barclays Defendants deny the allegations of paragraph 59.

60. As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Barclays Defendants recovering the Fairfield Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER**: The allegations of paragraph 60 constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, the Barclays Defendants deny the allegations of paragraph 60.

## RESPONSE TO REQUEST FOR RELIEF

The Defendants deny that the Trustee is entitled to the requested judgment in his favor and against the Defendants, in whole or in part. The Defendants further deny that this Court has the authority or jurisdiction to enter any such judgment.

## AFFIRMATIVE DEFENSES

The Defendants assert the following defenses without assuming the burden of proof or any other burden if and to the extent, as a matter of law, such burdens would otherwise be on Plaintiff. The Defendants reserve the right to amend this Answer to assert additional defenses, as well as the right to assert counterclaims or claims against third parties based on discovery in this adversary

proceeding or any other investigation.  The following defenses are set forth cumulatively and in the alternative.

## FIRST AFFIRMATIVE DEFENSE
## (Failure to State A Claim for Relief)

1.      The Complaint fails to state a claim upon which relief can be granted, including without limitation for the reasons stated in the Defendants' motion to dismiss this adversary proceeding.

## SECOND AFFIRMATIVE DEFENSE
## (Dismissed Claims)

2.      The Trustee's claims are barred to the extent they have been or may in the future be dismissed by the Court, are based on allegations that have been or may in the future be dismissed or stricken by the Court, or are based on theories or allegations that have been or may in the future be rejected by this Court or by another court on appeal from any orders of this Court.

## THIRD AFFIRMATIVE DEFENSE
## (11 U.S.C. § 546(e): Securities Safe Harbor)

3.      Pursuant to 11 U.S.C. § 546(e) ("Section 546(e)"), the Trustee may not avoid any alleged Fairfield Sentry Initial Transfers, or pursue under 11 U.S.C. §550(a) any recovery claims against the Defendants premised upon the alleged avoidance or avoidability of any alleged Fairfield Sentry Initial Transfers, except to the extent (if at all) the Trustee can establish that such transfers were made with actual intent to defraud within two years before the Filing Date.

4.      The alleged Fairfield Sentry Initial Transfers, except to such extent, are subject to the "safe harbor" created by Section 546(e) and as such the Trustee may neither avoid them nor maintain claims for recovery against the Defendants on the basis of such alleged initial transfers. In particular: (a) any such transfers were made "in connection with securities contracts") – *i.e.*, (i) BLMIS-Fairfield Sentry account agreements and (ii) the agreements (including Fairfield Sentry's

Articles of Association governing the Defendants' redemptions of shares; (b) separately and in the alternative, any such transfers were "settlement payments" made by BLMIS in response to Fairfield Sentry's requests for withdrawals; (c) the alleged Fairfield Sentry Initial Transfers were made by, to and for the benefit of entities covered by Section 546(e) – *i.e.*, (a) BLMIS, the alleged initial transferor, was at all relevant times a "stockbroker";  and (b) each Defendant was at all relevant times a "financial institution" and, additionally or alternatively, Fairfield Sentry itself was at all relevant times a "financial institution."

**FOURTH AFFIRMATIVE DEFENSE**
**(11 U.S.C. § 550(a)—Failure to Avoid Initial Transfers)**

9.      Under 11 U.S.C. § 550(a), the Trustee may recover transferred Customer Property only "to the extent that a transfer is avoided" under specified provisions of the Bankruptcy Code. As a result, before the Trustee may recover any property or funds from any Defendant, "he must first avoid BLMIS's transfers."[2]

10.      The Trustee has not avoided any of the alleged Fairfield Sentry Initial Transfers, and therefore may not now recover from any of the Defendants.

**FIFTH AFFIRMATIVE DEFENSE**
**(11 U.S.C. § 550(b): Value, Good Faith and Without Knowledge of Voidability)**

11.      To the extent that any Defendant received any Fairfield Sentry-Barclays Spain Subsequent Transfers, the Fairfield Sigma-Barclays Spain Subsequent Transfers, Fairfield Sentry-Barclays Suisse Subsequent Transfers, Fairfield Sigma-Barclays Suisse Subsequent Transfers, or Barclays Private Bank Subsequent Transfers, all as defined in the Complaint and allegedly listed

---

[2]    *Picard v. Citibank, N.A.*, 12 F.4th 171, 181 (2d Cir. 2021); *see also In re Picard*, 917 F.3d 85, 95 (2d Cir. 2019) ("Only once a transfer is avoided may a trustee recover the underlying property" under 11 U.S.C. § 550(a)); *id.* at 97 ("[A] trustee cannot use § 550(a) to recover property unless the trustee has first avoided a transfer under one of [the enumerated] provisions").

in Exhibits D through I, inclusive to the Complaint (together, the "Alleged Subsequent Transfers"), or any proceeds thereof, the Trustee may not recover any such transfers or proceeds because the Defendants took for value, in good faith, and without knowledge of the voidability of the alleged Fairfield Sentry Initial Transfers within the meaning of 11 U.S.C. § 550(b).

12.     The Defendants took for value because any Alleged Subsequent Transfers received by the Defendants were made in exchange for their surrender of shares in Fairfield Sentry or Fairfield Sigma, which the Defendants redeemed.

13.     The Defendants took in good faith because they did not have knowledge that BLMIS was not trading securities or was conducting a fraud or of any fraudulent purpose behind the alleged transfers (if any) they received, because they did not know facts that would have prompted a reasonable person in the Defendants' position to conduct further inquiry into any such possible fraud or fraudulent purpose ("Inquiry Notice"), and because even if the Defendants had been on Inquiry Notice, a diligent inquiry by the Defendants would not have discovered the alleged fraudulent purpose of the alleged Fairfield Sentry Initial Transfers or any Alleged Subsequent Transfers, or that BLMIS was not trading securities or was conducting a fraud.

14.     At the time each of the Alleged Subsequent Transfers was made, the Defendants had access to and were aware of only: publicly available information about Fairfield Sentry, Fairfield Sigma, and BLMIS; and information provided by Fairfield Greenwich Group ("FGG") and/or its agents to the wealth division of Barclays Bank PLC ("Barclays Wealth"), whose London-based research analysts performed due diligence on Fairfield Sentry and other investment funds on behalf of the Defendants.  Neither the Defendants nor Barclays Wealth nor anyone acting on behalf of the Defendants ever had personal access to Bernard Madoff or BLMIS, or met or

communicated with them, nor did they have access to non-public information regarding Bernard

Madoff or BLMIS.

15.     At the time each of the Alleged Subsequent Transfers was made, the Defendants

understood and believed that: Fairfield Sentry (and Fairfield Sigma, through Fairfield Sentry)

invested in U.S. securities primarily through an account that Fairfield Sentry held at BLMIS; that

Fairfield Sentry had reported consistent, positive, and generally above-market returns; that BLMIS

was founded and operated by Bernard L. Madoff ("Madoff"); that Madoff was a well-respected

member of the investment community and former chair of NASDAQ; that BLMIS was one of the

largest market makers in NASDAQ stocks and reported delivering consistently high returns on

investment; that BLMIS was regulated by the National Association of Securities Dealers

(predecessor to the Financial Industry Regulatory Authority, or FINRA) and registered with the

U.S. Securities and Exchange Commission ("SEC") as a broker-dealer and investment advisor;

and that BLMIS claimed to use a "split strike conversion" strategy to obtain these results, which

the Defendants did not know then to be false.

16.     The Defendants were aware from publicly available information that some

investment professionals had raised concerns about the possible lack of separation between

BLMIS's asset management and brokerage services, including the potential for a conflict of

interest where a fund manager and a broker dealer are the same entity, and about the possibility

that BLMIS's brokerage arm would be able to engage in "frontrunning," or trading on insider

information from its wealth management arm.  Neither of these concerns suggested that BLMIS

was a fraud, and in fact, each was premised on the assumption and understanding that BLMIS was

actually trading securities.

17.    The Defendants, through Barclays Wealth, conducted due diligence on Fairfield Sentry, which included (but was not limited to) meeting, requesting and obtaining information from and otherwise communicating with FGG.  For example, during a meeting with FGG in or about November 2006, FGG represented to Barclays Wealth that appropriate barriers were in place at BLMIS to screen the exchange of information between BLMIS's asset management and brokerage divisions, and that the SEC had conducted four separate audits of BLMIS and found no evidence of wrongdoing.  During that meeting, FGG also represented to Barclays Wealth that it had oversight of BLMIS's trades.  In addition, FGG stated to Barclays Wealth that Citco, one of the world's largest hedge fund administrators, provided independent review and verification of trades that BLMIS executed on Fairfield Sentry's behalf.

18.    FGG reassured Barclays Wealth, acting on behalf of the Defendants, that the known potential for questionable practices at BLMIS—none of which related to the possibility that BLMIS was a Ponzi scheme or was engaged in a fraud upon its customers—had been investigated and appropriately dispelled.  The Defendants justifiably relied on FGG and its agents to perform due diligence on BLMIS.  Through Barclays Wealth, the Defendants understood (among other things) that: PricewaterhouseCoopers, the world-renowned "Big Four" accounting firm, served as Fairfield Sentry's auditor; FGG had substantial management experience and market presence, which in 2008 the Defendants understood to include nine offices in the United States, Latin America, and Europe, with approximately $16 billion under management for more than 10,000 investors; and that Citco served as custodian for cash and non-split-strike-conversion investments, and managed subscription and redemption cash flow, for Fairfield Sentry.

19.    Neither the Defendants nor Barclays Wealth had any communications with BLMIS or its officers, Madoff, or employees of Madoff.   None of the communications that the Defendants

and/or Barclays Wealth had with FGG, Fairfield Sentry, Fairfield Sigma, and/or any of their respective directors, officers, employees, agents, or consultants, revealed or suggested that BLMIS was not trading securities or was a fraud or a Ponzi scheme, or that FGG, Fairfield Sentry, Fairfield Sigma, and/or any of their respective directors, officers, employees, agents or consultants knew, believed or suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

20.    At no time prior to Madoff's arrest were any of the Defendants, or Barclays Wealth, aware that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that FGG, Fairfield Sentry, Fairfield Sigma, or any of their respective directors, officers, employees, agents, or consultants knew, believed or suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

21.    The Alleged Subsequent Transfers (if any) did not have a fraudulent purpose, but rather were routine transfers made in exchange for redemptions of the Defendants' investments in Fairfield Sentry or Fairfield Sigma.  A reasonable person knowing the facts in the Defendants' (and Barclays Wealth's) possession at the time of each of the Alleged Subsequent Transfers (if any) would not have been on inquiry notice of any fraudulent purpose behind the Alleged Subsequent Transfers or of the alleged Fairfield Sentry Initial Transfers, nor would those facts have led such a person to conduct further inquiry into whether there was a fraudulent purpose to the Alleged Subsequent Transfers or the alleged Fairfield Sentry Initial Transfers, or whether BLMIS was trading securities or was a fraud or a Ponzi scheme.

22.    Even if the Defendants had been on inquiry notice of the possible fraudulent purposes behind the alleged Fairfield Sentry Initial Transfers or the Alleged Subsequent Transfers, or of facts that would have led a reasonable person to conduct further inquiry into whether BLMIS was trading securities or was a fraud or a Ponzi scheme, a diligent inquiry by the Defendants would

not have discovered that BLMIS was not trading securities or was a fraud or Ponzi scheme.  Other entities with vastly greater investigatory power and capability than the Defendants, and (unlike the Defendants) with access to BLMIS personnel and documentation, investigated BLMIS but failed to uncover that it was a Ponzi scheme before December 2008.  These entities included the SEC, which in 2006 investigated BLMIS but was unable to discover BLMIS's fraudulent purpose.  The Defendants—all foreign entities with no investigatory power over BLMIS—could not possibly have discovered information that United States federal regulatory authorities could not discover. The Defendants therefore could not have discovered any fraudulent purpose of the alleged Fairfield Sentry Initial Transfers or of the Alleged Subsequent Transfers.  As entities not in privity with BLMIS or Madoff, the Defendants did not have any reasonable ability to conduct a diligent investigation into BLMIS that could have led to the discovery of any fraudulent purpose of the alleged Fairfield Sentry Initial Transfers.

23.    The Defendants did not have knowledge of the voidability of the Fairfield Sentry Initial Transfers when they received each of the Alleged Subsequent Transfers (if any).

## SIXTH AFFIRMATIVE DEFENSE
### (11 U.S.C. § 550(d)—Single Satisfaction)

24.     Under 11 U.S.C. § 550(d), the Trustee "is entitled to only a single satisfaction under" 11 U.S.C. § 550(a).

25.    Accordingly, to the extent the Trustee has recovered, or will recover, from Fairfield Sentry or from any other immediate or mediate transferee the amount of any avoided initial transfer that includes Customer Property that the Trustee alleges any Defendant received, the Trustee is barred from recovering any such alleged transfer (or its proceeds) from a Defendant.

## SEVENTH AFFIRMATIVE DEFENSE
### (Extraterritoriality)

26.    The Trustee's claims to recover from the Defendants subsequent transfers allegedly made to them by Fairfield Sentry and Fairfield Sigma constitute an impermissible extraterritorial application of 11 U.S.C. § 550(a).

## EIGHTH AFFIRMATIVE DEFENSE
### (Comity)

27.    The Trustee's claims to recover from the Defendants subsequent transfers allegedly made to them by Fairfield Sentry and Fairfield Sigma violate principles of international comity.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 9015 of the Federal Rules of Bankruptcy Procedure, the Defendants hereby demand a jury trial on all claims and issues that may be tried to a jury.

## STATEMENT PURSUANT TO FED. R. BANKR. P. 7012(b)

The Defendants do **not** consent, but instead **object**, to the entry of a final order or Judgment against them by the Bankruptcy Court.

**WHEREFORE**, the Defendants request that this Court dismiss the Complaint with prejudice, award the Defendants their attorneys' fees, costs and disbursements incurred in connection with this adversary proceeding, and grant the Defendants such other and further relief as the Court deems just and proper.

29

Dated: New York, New York
October 31, 2022

**HERBERT SMITH FREEHILLS
NEW YORK LLP**

By:

Marc J. Gottridge
Christopher Emch
450 Lexington Avenue
New York, New York 10017
Telephone: (917) 542-7600
marc.gottridge@hsf.com
chris.emch@hsf.com

*Attorneys for Defendants Barclays Bank
(Suisse) S.A., Caixabank S.A., as successor by
merger to Barclays Bank S.A., and Zedra Trust
Company (Jersey) Limited (f/k/a Barclays
Private Bank and Trust Limited)*

30