**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 12-01697 (CGM) |
| Plaintiff, | |
| v. | |
| ABN AMRO RETAINED NOMINEES (IOM) LIMITED, f/k/a ABN AMRO Fund Services (Isle of Man) Nominees, and f/k/a Fortis (Isle of Man) Nominees Limited, and PLATINUM ALL WEATHER FUND LIMITED, | **AMENDED COMPLAINT** |
| Defendants. | |

Irving H. Picard, as trustee (the "Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa-*lll* ("SIPA"),[1] substantively consolidated with the chapter 7 estate of Bernard L. Madoff ("Madoff"), by and through his undersigned counsel, for his Amended Complaint against ABN AMRO Fund Services (Isle of Man) Nominees Limited, formerly known as Fortis (Isle of Man) Nominees Limited, ("Fortis IOM") and Platinum All Weather Fund Limited ("Platinum") (collectively, the "Defendants"),[2] alleges the following:

## I.    NATURE OF THE PROCEEDING

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS customer property, as defined by SIPA § 78*lll*(4), that was stolen by BLMIS as part of the massive Ponzi scheme perpetrated by Madoff and others.

2.    With this Amended Complaint, the Trustee seeks to recover at least $104,819,602 in subsequent transfers of BLMIS customer property made to Defendants (the "Subsequent Transfers"). The Subsequent Transfers were obtained by Defendants by redeeming shares owned in BLMIS feeder funds Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Fairfield Sigma" and with Fairfield Sentry, the "Fairfield Funds"). From November 1990 through December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS; Fairfield Sigma was a "currency feeder," meaning it accepted subscriptions in euros, converted the money to U.S. dollars, and then invested 100% of these assets in Fairfield Sentry.

---

[1] For convenience, further references to SIPA will omit title 15 and be cited as SIPA §____.

[2] The Trustee's initial complaint named Odyssey Alternative Strategies Fund Limited ("Odyssey") as a defendant. *See generally* Compl., *Picard v. ABN AMRO Retained Nominees (IOM) Limited et al.*, Adv. Pro. No. 12-01697 (CGM) (Bankr. S.D.N.Y. June 6, 2012), ECF No. 1. The Trustee subsequently agreed to dismiss his claim against Odyssey with prejudice. *See* Stipulation, *Picard v. ABN AMRO Retained Nominees (IOM) Limited et al.*, Adv. Pro. No. 12-01697 (CGM) (Bankr. S.D.N.Y. Sept. 27, 2021), ECF No. 136.

3.      Defendants Platinum and/or Fortis IOM received at least $103,541,099 in subsequent transfers of BLMIS customer property from Fairfield Sentry.  These equity interests in Fairfield Sentry were identified in the relevant subscription agreements and redemption requests as "Fortis (Isle of Man) Nominees Limited re Platinum."

4.      Additionally, Defendant Fortis IOM individually received at least $1,063,953 in subsequent transfers of BLMIS customer property from Fairfield Sentry and $214,549 in subsequent transfers of BLMIS customer property from Fairfield Sigma.

5.      The Fairfield Funds were among the various investment vehicles that invested all or substantially all of their assets with BLMIS's investment advisory business ("BLMIS Feeder Funds"). In addition to the Fairfield Funds, Defendant Platinum also invested in other BLMIS Feeder Funds, including Kingate Global Fund Limited and Santa Clara II Fund Limited.  Likewise, Defendant Fortis IOM served as administrator to Harley International (Cayman) Limited and assisted affiliates as they pursued investments with funds managed by Tremont Partners, Inc., both of which were other avenues to BLMIS.

6.      The Trustee brings this proceeding to recover for the benefit of the estate the subsequent transfers of BLMIS customer property that Defendants received from the Fairfield Funds.

## II.      SUBJECT MATTER JURISDICTION AND VENUE

7.      This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to

this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

8.    This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

9.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

10.    This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

## III.    BACKGROUND, THE TRUSTEE AND STANDING

11.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

12.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

13.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

(a)    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

(b)    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

3

(c)     removed the case to this Court pursuant to SIPA § 78eee(b)(4).

14.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

15.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

16.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

17.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

18.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

4

19.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

20.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

21.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

22.     The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## IV.     BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.     BLMIS

23.     Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker-dealer with the SEC.  In 2001, Madoff changed the corporate form of BLMIS from a sole

proprietorship to a New York limited liability company.  At all relevant times, Madoff controlled

BLMIS first as its sole member and thereafter as its chairman and chief executive.

24.      In compliance with 15 U.S.C. § 78*o*(b)(1) and SEC Rule 15b1-3, and regardless of

its business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public records

obtained from the Central Registration Depository of the Financial Industry Regulatory Authority,

Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation.  At

all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System

database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning

on January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC when SIPC was

created and continued its membership after 2001 without any change in status.  SIPC membership

is contingent on registration of the broker-dealer with the SEC.

25.      For most of its existence, BLMIS's principal place of business was 885 Third

Avenue in New York City, where Madoff operated three principal business units: a proprietary

trading desk, a broker-dealer operation, and an investment advisory business (the "IA Business").

26.      BLMIS's website publicly boasted about the sophistication and success of its

proprietary trading desk and broker-dealer operations, which were well known in the financial

industry.  BLMIS's website omitted the IA Business entirely.  BLMIS did not register as an

investment adviser with the SEC until 2006, following an investigation by the SEC, which forced

Madoff to register.

27.      For more than 20 years preceding that registration, the financial reports BLMIS

filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds

BLMIS managed through its IA Business.

28.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion.  BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion.  In reality, Madoff grossly understated these numbers.  In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

**B.    The Ponzi Scheme**

29.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

30.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.  It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.  The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

31.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person accounting firm

7

based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one

was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant

living in Florida.

32.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling &

Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for

Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these

fictitious annual audited financial statements prepared by Friehling & Horowitz.

1.    Madoff's Investment Strategy

33.    In general, BLMIS purported to execute two primary investment strategies for

BLMIS customers: the convertible arbitrage strategy and the split-strike conversion strategy (the

"SSC Strategy"). For a limited group of BLMIS customers, primarily consisting of Madoff's close

friends and their families, Madoff also purportedly purchased securities that were held for a certain

time and then purportedly sold for a profit. At all relevant times, Madoff conducted no legitimate

business operations using any of these strategies.

34.    All funds received from BLMIS customers were commingled in a single BLMIS

account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade

securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff

and his family personally, and to prop up Madoff's proprietary trading business.

35.    The convertible arbitrage investment strategy was supposed to generate profits by

taking advantage of the pricing mismatches that can occur between the equity and bond/preferred

equity markets. Investors were told they would gain profits from a change in the expectations for

the stock or convertible security over time. In the 1970s this strategy represented a significant

portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in

only a small percentage of BLMIS accounts.

36.     From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

37.     BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

38.     By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

39.     The put options were to limit the downside risk of sizeable price changes in the basket.  The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option should have entailed a loss for BLMIS.

40.     The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

41.     The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar."  The collar provides downside protection while limiting the upside.

42.     If Madoff was putting on the same baskets of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the

market value of the equities in the basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

43.    Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the Madoff SSC Strategy.

44.    Madoff could not be using the SSC Strategy because his returns drastically outperformed the market.  BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly).  Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

2.    BLMIS's Fee Structure

45.    BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits.  By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

3.    BLMIS's Market Timing

46.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he succeeded at market timing by intermittently entering and exiting the market.  During the times when Madoff purported to be out

of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

47.    As a registered broker-dealer, BLMIS was required, pursuant to  17 C.F.R. § 240.17a-5, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS reportedly exited the market completely at year end and every quarter ending in 2003.  These quarterly and year-end exits were undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.  It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

48.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

4.    BLMIS Execution

49.    BLMIS's execution showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

5.    No Evidence of BLMIS Trading

50.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

11

51.     All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

6.     The Collapse of the Ponzi Scheme

52.     The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

53.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

54.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

V.     **DEFENDANTS AND RELEVANT NON-PARTIES**

A.     **Defendant Platinum and Non-Party Platinum Management**

55.     Defendant Platinum was a single-strategy hedge fund that invested exclusively in BLMIS Feeder Funds.

56.     Platinum was organized under the laws of the Cayman Islands with a registered address care of DMS Corporate Services, at DMS House, 20 Genesis Close, P.O. Box 31910, Grand Cayman KY1-1208.

57.     Platinum was managed by non-party Platinum Capital Management Ltd. ("Platinum Management"), a global investment firm that manages and distributes single-strategy funds, funds of funds, and structured products.  While headquartered in London, Platinum Management had a global presence, with offices around the world and in America.  Platinum

Management specifically used subsidiaries in New York and Stamford, Connecticut to manage its BLMIS Feeder Fund investments, including those made by Platinum.

### B.    Defendant Fortis IOM and Non-Party Fortis

58.    Defendant Fortis IOM was a limited company incorporated and organized under the laws of the Isle of Man with a registered address at First Floor, Jubilee Building, Douglas, Isle of Man IM1 2SH.

59.    Throughout the relevant period, Fortis IOM served as administrator for Platinum's investments in the Fairfield Funds and, accordingly, acted as a Platinum's agent.  Fortis IOM conducted due diligence, completed subscription agreements and made redemption requests all on Platinum's behalf.

60.    Fortis IOM was a wholly-owned subsidiary of Fortis Prime Fund Solutions (Isle of Man) Limited (formerly known as Fortis Fund Services (Isle of Man) Limited) ("FPFS IOM"). During the relevant period, Fortis IOM and FPFS IOM functioned as one entity, sharing the same address, offices, phone numbers, employees, and directors.

61.    Fortis IOM and FPFS IOM were part of a global network of financial organizations, collectively known as "Fortis," that provided banking, asset management, structured financing, and administrative services.  Fortis touted this network's unified approach, claiming in marketing materials and public filings that the constituent parts of the network "Act[ed] as One," and that the network communicated seamlessly.

62.    Several entities, all part of the "Fortis" network, held roles with Platinum, sometimes concurrently. When Platinum launched in 2003, the marketing materials identified Fortis IOM as the fund's "Administrator, Custodian, and Transfer Agent."  In the summary section of these marketing materials, FPFS IOM was also separately listed as the administrator.  When negotiating the transactions with the Fairfield Funds in 2006, Platinum represented that "Fortis"

was its administrator and would handle all subscription documents. In 2008 marketing materials,

Platinum represented that, another entity, ABN Amro Custodial Services (Ireland) Ltd. (f/k/a/

Fortis Prime Fund Solutions Custodial Services (Ireland) Ltd.) was the fund's custodian.

### C. Non-Party Fairfield Funds

63.    Non-party Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in

New York, operated and managed Fairfield Sentry and Fairfield Sigma.

64.    Non-party Fairfield Sentry was a hedge fund incorporated in the British Virgin

Islands and had its headquarters and primary business operations in New York. From November

1990 until Madoff's arrest in December 2008, Fairfield Sentry maintained direct customer

accounts with BLMIS in New York. Fairfield Sentry invested at least 95% of its assets with

BLMIS.

65.    Non-party Fairfield Sigma, a Fairfield Sentry sister fund, was, as noted above, a

"currency feeder" that accepted subscriptions in Euros, converted the money to U.S. Dollars, and

then invested 100% of its assets by purchasing shares of Fairfield Sentry.

### D. Relevant BLMIS Feeder Funds

66.    This action seeks the recovery of subsequent transfers of BLMIS customer property

Defendants received from the Fairfield Funds, but Defendants and their affiliates were experienced

BLMIS investors, having gained knowledge of BLMIS through their investments in other BLMIS

Feeder Funds.

67.    Defendants and their affiliates also invested in BLMIS Feeder Funds managed by

Tremont Partners, Inc., Kingate Global Fund, Ltd., Harley International (Cayman) Limited, and

Santa Clara II Fund Limited. Defendants understood that each of these BLMIS Feeder Funds were

other access points to BLMIS, and through their investments, Defendants were exposed to clear

indicia of BLMIS's fraud. Any information Defendants learned regarding Madoff, BLMIS, or the

BLMIS Feeder Funds by virtue of these relationships and/or investments is relevant to the current action before this Court.

## VI.    PERSONAL JURISDICTION

68.    Defendants are subject to the jurisdiction of the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 7004 and the United States Constitution, as well as sections 301 and 302 of the New York Civil Practice Law and Rules, because they purposely availed themselves of the laws and protections of the United States and the State of New York. Defendants knowingly accepted the rights, benefits, and privileges of conducting business in the United States and the state of New York and should reasonably expect to be subject to New York jurisdiction.

69.    The Trustee's claims against Defendants arise from business they transacted within New York. Defendants derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

### A.    Defendants Purposefully Invested with Madoff in New York

70.    Defendants invested in the Fairfield Funds with the specific purpose of investing with BLMIS in New York, and relinquished control over investment decisions and their implementation to Madoff in New York.

71.    In April 2003, Platinum Management launched Platinum as a single-manager fund directing 100% of its assets to BLMIS through investments in BLMIS Feeder Funds. Platinum Management hired U.S.-based Eric Munson to serve as the president of its New York subsidiary, and together Munson and Platinum Management's New York-based subsidiary launched and operated Platinum from New York.

72.    Platinum's business revolved around access to Madoff and the BLMIS Feeder Funds. Platinum boasted in its marketing materials of its Madoff connection, describing itself as

"a feeder fund investing into Bernard Madoff's funds." And in discussions with potential clients, such as on a June 2003 call with Ivy Asset Management, Platinum represented that it "is actually a feeder fund into Madoff."

73.     Platinum monitored the potential retrocession fees offered by different BLMIS Feeder Funds. After investing with other BLMIS Feeder Funds, Platinum, via its agent Defendant Fortis IOM, began investing in Fairfield Sentry in January 2007, receiving retrocession fees for these investments.

74.     Defendant Fortis IOM, individually and on behalf of Platinum, entered into a subscription agreement with Fairfield Sentry (the "January 2007 Agreement"), by which both Fortis IOM and Platinum affirmed having received and read Fairfield Sentry's private placement memorandum ("PPM") and agreed to be bound by the terms set forth in the PPM.

75.     In January 2008, Fortis IOM, individually and on behalf of Platinum, entered into an additional subscription agreement with Fairfield Sentry (the "January 2008 Agreement"), reaffirming the receipt of the PPM and the agreement to be bound by its terms. The January 2008 Agreement contained the same language as the January 2007 Agreement.

**B.     Defendants Intended Their Fairfield Fund Investments to Be Investments in U.S.-Based Securities**

76.     By executing the Fairfield Sentry subscription agreements, Defendants submitted to New York jurisdiction, venue, service of process, and law. Specifically, Defendants (i) "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding," (ii) "agree[d] that any suit, action or proceeding . . . with respect to this Agreement and the Fund may be brought in New York," (iii) "consent[ed] to the service of process out of any New York court," and (iv) agreed that "[t]his Agreement shall be governed and enforced in accordance with the laws of New York . . . ."

16

77.    Defendants intended that the monies they invested in the BLMIS Feeder Funds be used to purchase securities in the United States.  By investing in this way, Defendants purposely undertook investment activities in New York.

78.    Defendants invested in Fairfield Sentry knowing that it was created, operated and controlled by New York-based FGG, with the specific purpose of having funds invested with BLMIS in New York and profiting therefrom.

79.    The Fairfield Sentry PPM explained that the SSC Strategy involved the purchase of a "basket" of U.S.-based equity securities consisting of approximately "35 to 50 stocks in the S&P 100 [Index]," as well as "the sale of out-of-the-money S&P 100 Index call options" and "the purchase of out-of-the-money S&P 100 Index put options."

80.    Thus, Defendants knew that any purported return on investments in Fairfield Sentry would be earned in New York by BLMIS engaging in the purchase and sale of U.S. securities, options, and treasuries.

81.    Based on the Fairfield Sentry PPMs and other FGG materials, Defendants knew that:

(a)    Fairfield Sentry invested substantially all of its assets in accounts managed by New York-based BLMIS;

(b)    BLMIS was Fairfield Sentry's investment adviser;

(c)    BLMIS was the executing broker for Fairfield Sentry's investments and purportedly operated and executed the SSC Strategy on the fund's behalf;

(d)    The services of BLMIS and its personnel were essential to Fairfield Sentry;

(e)    BLMIS was the custodian of Fairfield Sentry's assets invested with BLMIS;

(f)    BLMIS was registered with the SEC;

(g)    Subscription payments were to be wired in US dollars to a New York bank account; and

(h)      BLMIS was "essential to the continued operation" of the Fairfield Funds.

82.      Aware of these facts and risks, Defendants knowingly attempted to direct monies

into the United States securities markets and undertook investment activities in the United States.

**C.      Defendants' Activities in Connection with Its BLMIS Feeder Fund Investments
Were Directed to New York and the United States**

83.      Defendants and their agents undertook purposeful acts aimed at New York and the

United States as part of Defendants' Fairfield Funds' investments.

84.      The January 2007 Agreement listed Peter Sprecher, the U.S.-based founder of

Platinum Management, as the "advisor with respect to this subscription." The January 2007

Agreement listed Scott Nevin, an FGG Managing Director based in New York, as the professional

"with whom this subscription is associated."

85.      Platinum representatives met with FGG representatives in New York to effectuate

the transactions with the Fairfield Funds.  In April 2007, Christopher Streit, Executive Director of

Platinum Management, met with Scott Nevin of FGG in New York.

86.      On two separate occasions, in 2004 and 2006, Fortis conducted due diligence visits

with Madoff in New York.  Fortis IOM and the Fortis network of entities used the findings of these

visits as support for approving transactions with BLMIS.

87.      Fortis IOM maintained regular contact with New York entities and individuals

regarding BLMIS, including direct communications with BLMIS itself in New York.  In addition,

Fortis IOM collaborated with its New York Fortis affiliate, Fortis Prime Fund Solutions (USA)

LLC, to review BLMIS trade confirmations and analyze BLMIS's purported trading.  In 2006,

Fortis Prime Fund Solutions (USA) LLC sought approval for a credit facility with another BLMIS

Feeder Fund with Defendant Fortis IOM serving as administrator for this facility.  From at least

November 2005 through December 2008, Fortis IOM and FPFS IOM acted as administrator for

BLMIS Feeder Fund Harley International (Cayman) Limited, which was managed and operated out of New York.

### D.    Defendants Used New York Bank Accounts for Its BLMIS Feeder Fund Investments

88.    The Fairfield Sentry subscription agreements provided that all money for the purchase of Fairfield Sentry shares be directed to an HSBC bank account located in New York. As set forth above, Defendants knew and intended that these funds would be then invested with BLMIS in New York.  From Fairfield Sentry's bank account, the funds were deposited into BLMIS's account at JPMorgan Chase Bank in New York.

89.    Defendants utilized a New York-based bank account at Northern Trust International Banking Corporation (the "New York Account") to receive the redemption payments from Fairfield Sentry, including the subsequent transfers of customer property the Trustee seeks to recover in this action.

90.    Defendants thus derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

91.    Defendants should therefore reasonably expect to be and are subject to personal jurisdiction pursuant to the New York Civil Practice Law and Rules 301 and 302 (McKinney 2003) and Rule 7004 of the Federal Rules of Bankruptcy Procedure.

## VII.    RECOVERY OF SUBSEQUENT TRANSFERS TO DEFENDANTS

### A.    Initial Transfers From BLMIS To Fairfield Sentry

92.    The Trustee commenced a separate adversary proceeding against Fairfield Sentry and other defendants in this Court under the caption, *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (CGM), seeking to avoid and recover initial transfers of customer property from

BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").

93.     By orders dated June 7 and June 10, 2011, this Court approved a settlement among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a consent judgment in favor of the Trustee and against Fairfield Sentry in the amount of $3,054,000,000 ("Judgment Amount") [ECF No. 109].

94.     The Fairfield Sentry Initial Transfers are set forth in the attached Exhibits A and B. The Fairfield Sentry Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

95.     On August 28, 2020, the Trustee filed a second amended complaint in the *Fairfield Sentry Ltd.* proceeding ("Second Amended Complaint") [ECF No. 286] seeking in part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

96.     As alleged in the Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the BLMIS fraud.  The Trustee incorporates by reference the allegations contained in the Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, 315-16.

97.     Of the Judgment Amount, $2,895,000,000 was transferred to Fairfield Sentry during the six years preceding the Filing Date (the "Fairfield Sentry Six Year Transfers").  Each of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code

and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

98.     Of the Fairfield Sentry Six Year Transfers, $1,580,000,000 was transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Transfers").  Each of the Fairfield Sentry Two Year Transfers is avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**B.     Subsequent Transfers From Fairfield Sentry To Defendants**

99.     Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to Defendants.  Based on the Trustee's investigation to date, the subsequent transfers to Defendants total $104,605,052 ("Sentry Subsequent Transfers"). Specifically, (i) Defendants Platinum and/or Fortis IOM received $103,541,099 of subsequent transfers of customer property; and (ii) Defendant Fortis IOM received $1,063,953 of subsequent transfers of customer property.  Charts setting forth the presently known Sentry Subsequent Transfers are attached as Exhibits C and D, respectively.

100.    On June 6, 2012, the Trustee filed this action seeking recovery of subsequent transfers from the Fairfield Funds.

101.    The Sentry Subsequent Transfers are recoverable from Defendants under § 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**C.     Subsequent Transfers From Fairfield Sentry To Fairfield Sigma And Subsequently To Defendant Fortis IOM**

102.    Based on the Trustee's investigation to date, prior to the Filing Date, Fairfield Sentry subsequently transferred at least $789,152,864 of the Fairfield Sentry Initial Transfers directly to Fairfield Sigma ("Sigma Subsequent Transfers").  A chart setting forth the presently known Sigma Subsequent Transfers by date and amount is attached as Exhibit E.

103.    Thereafter, Fairfield Sigma transferred at least $214,549 to Defendant Fortis IOM (the "Sigma-IOM Subsequent Transfers").  A chart setting forth the presently known Sigma-IOM Subsequent Transfers by date and amount is attached as Exhibit F.

104.    The Sigma-IOM Subsequent Transfers are recoverable from Defendant Fortis IOM under § 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly  § 78fff-2(c)(3).

105.    The Sentry Subsequent Transfers and Sigma-IOM Subsequent Transfers represent redemptions of equity interests by Defendants as shareholders in Fairfield Sentry and Fairfield Sigma.  Because Fairfield Sentry and Fairfield Sigma invested all or substantially all of their assets into the BLMIS Ponzi scheme, each of Fairfield Sentry and Fairfield Sigma was insolvent when it made, respectively, the Sentry Subsequent Transfers and Sigma-IOM Subsequent Transfers to Defendants upon redemption of its interests.

106.    As defined above, the Sentry Subsequent Transfers and the Sigma-IOM Subsequent Transfers are collectively referred to as the "Subsequent Transfers."

107.    The Trustee's discovery and investigation is ongoing and the Trustee reserves the right to: (i) supplement the information on the initial and Subsequent Transfers discussed above, and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

---

## COUNT ONE

### RECOVERY OF SUBSEQUENT TRANSFERS
### 11 U.S.C. §§ 105(a) AND 550

108.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

109.    The Subsequent Transfers are recoverable from Defendants under 11 U.S.C. § 550(a) and 15 U.S.C. § 78fff-2(c)(3).

110.    Defendants are immediate or mediate transferees of the Subsequent Transfers from the Fairfield Funds.

111.    As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendants: (a) recovering the Subsequent Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on Count One in favor of the Trustee and against Defendants as follows:

a)    Recovering the Subsequent Transfers, or the value thereof, from Defendants for the benefit of the estate;

b)    If Defendants challenge the avoidability of the Fairfield Sentry Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such transfers are avoidable pursuant to SIPA § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and §§ 273-279 of the N.Y. Debt. & Cred. Law, as applicable, and as necessary to recover the Subsequent Transfers pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3);

c)    Awarding the Trustee prejudgment interest from the date on which the Subsequent Transfers were received by Defendants; and

d)    Awarding the Trustee fees and all applicable costs and disbursements, and such other, further, and different relief as the Court deems just, proper and equitable.

Dated: November 3, 2022
     New York, New York

/s/ Regina L. Griffin

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Regina L. Griffin
Email: rgriffin@bakerlaw.com
Elizabeth McCurrach
Email: emccurrach@bakerlaw.com
Anat Maytal
Email: amaytal@bakerlaw.com
Shade Quailey
Email: squailey@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee
for the substantively consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and the Chapter 7 Estate of
Bernard L. Madoff*