**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | |
| v. | SIPA LIQUIDATION |
| | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 12-01577 (CGM) |
| Plaintiff, | |
| v. | |
| UBS EUROPE SE, formerly known as UBS Deutschland AG, as successor in interest to Dresdner Bank Lateinamerika AG, and LGT BANK (SWITZERLAND) LTD. as successor in interest to Dresdner Bank (Schweiz) AG, | **TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT UBS EUROPE SE'S MOTION TO DISMISS** |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

**Page**

I. PRELIMINARY STATEMENT ................................................................... 1

II. FACTUAL BACKGROUND ..................................................................... 2

    A. The BLMIS Ponzi Scheme and its Feeder Funds .................................... 2

    B. The Fairfield Funds ...................................................................... 3

    C. Defendant and Its Investment in the Fairfield Funds ............................. 4

III. THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANT .................... 5

    A. Legal Standard .......................................................................... 5

    B. Exhibits Attached to Defendant's Motion Prove UBS Europe Directly
       Initiated Most of the Transfers ........................................................ 7

    C. The Post-May 2005 Subsequent Transfers .......................................... 10

        1. Defendant's Own Documents Show That UBS Europe Received
           All of the Post-May 2005 Transfers .......................................... 11

        2. This Court Has Jurisdiction Over UBS Europe Under *BLI* ................ 12

        3. The Direct Contacts of UBS Europe with New York Give Rise
           to Personal Jurisdiction ........................................................ 13

    D. The Pre-May 2005 Transfers of Customer Property ............................... 19

        1. Defendant Does Not Dispute DBLA's Substantial Jurisdictional
           Contacts with the Forum ...................................................... 20

        2. Defendant's Exhibits Are Insufficient to Support a Motion to
           Dismiss the Pre-May 2005 Transfers .......................................... 22

        3. The Exercise of Personal Jurisdiction Over UBS Europe Is
           Reasonable ...................................................................... 25

        4. In the Alternative, the Trustee Is Entitled to Jurisdictional Discovery
           and, If Needed, the Opportunity to Amend the Complaint ............... 28

IV. 546(E) SAFE HARBOR ...................................................................... 29

    A. The Trustee Sufficiently Alleged Sentry Had Actual Knowledge of Madoff's
       Fraud ...................................................................................... 30

    B. Section 546(e) Does Not Apply Independently to Recovery Actions ............. 30

V. UBS EUROPE'S ASSERTION OF A MERE CONDUIT DEFENSE IS IMPROPER
   AT THIS STAGE ............................................................................. 31

    A. The Pleadings Establish Defendant Is a Transferee ............................... 32

    B. Mere Conduit is an Affirmative Defense, and Defendant's Burden to Plead ....... 33

i

C.     Mere Conduit Defense Inappropriate for a Motion to Dismiss ........................... 34

D.     Even if Analysis of the Mere Conduit Defense Is Appropriate, Defendant's
       Motion Fails To Allege Any Facts in Support of the Defense ........................... 35

VI.    THE SECTION 550(B) GOOD FAITH AFFIRMATIVE DEFENSE IS SIMILARLY
       IMPROPER FOR A MOTION TO DISMISS ................................................................. 37

VII.   CONCLUSION ............................................................................................................. 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Rushaid v. Pictet & Cie*,
68 N.E.3d 1 (N.Y. 2016)...................................................................................18

*Ashcroft v. Iqbal*,
556 U.S. 552 (2009)....................................................................................5, 22

*Authentic Fitness Corp. v. Dobbs Temp. Help Servs., Inc.* (*In re The Warnaco Group, Inc.*), No. 01 B 41643 (RLB), 01-03628 (RLB), 03 Civ. 4201 (DAB),
2006 WL 278152 (S.D.N.Y. Feb. 2, 2006)...................................................34

*Bear, Stearns Sec. Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*),
397 B.R. 1 (S.D.N.Y. 2007)......................................................................34, 36

*Bonded Fin. Servs., Inc. v. Eur. Am. Bank*,
838 F.2d 890 (7th Cir. 1988) .........................................................................34

*In re Bozel S.A.*,
434 B.R. 86 (Bankr. S.D.N.Y. 2010).............................................................20

*Burger King v. Rudzewicz*,
471 U.S. 462 (1985)...................................................................................6, 28

*Chloé v. Queen Bee of Beverly Hills, LLC*,
616 F.3d 158 (2d Cir. 2010).......................................................................6, 26

*Citibank, N.A. v. Tele/Resources, Inc.*,
724 F.2d 266 (2d Cir. 1983)...........................................................................16

*In re CVEO Corp.*,
327 B.R. 210 (Bankr. D. Del. 2005) ..............................................................35

*Dorchester Fin. Sec. Inc. v. Banco BRJ, S.A.*,
722 F.3d 81 (2d Cir. 2013)...........................................................................5, 7

*In re Enron Corp.*,
361 B.R. 36 (Bankr. S.D.N.Y. 2006) ..............................................................36

*In re Enron*,
379 B.R. 425 (Bankr. S.D.N.Y, 2007) ......................................................16, 17

*In re Finley*,
130 F.3d 52 (2d Cir. 1997).................................................................34, 35, 36

*In re Glob. Crossing, Ltd.*,
   385 B.R. 52 (Bankr. S.D.N.Y. 2008)......................................................................34

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945)..........................................................................................6

*Isaiah v. JPMorgan Chase Bank*,
   960 F.3d 1296 (11th Cir. 2020) ........................................................................34

*In Re J.P. Jeanneret Assoc., Inc.*,
   769 F. Supp. 2d 340 (S.D.N.Y. 2011).................................................................5

*Kiobel v. Royal Dutch Petroleum Co.*,
   No. 02 Civ. 7618 (KMW)(HBP), 2009 WL 3817590 (S.D.N.Y. Nov. 16,
   2009) ............................................................................................................28

*Licci v. Lebanese Canadian Bank, SAL*,
   984 N.E.2d 893 (N.Y. 2012)...........................................................................18

*In re Lyondell Chem. Co.*,
   503 B.R. 348 (Bankr. S.D.N.Y. 2014)...............................................................35

*Malloy v. Citizens Bank of Sapulpa* (*In re First Sec. Mortg. Co.*),
   33 F.3d 42 (10th Cir. 1994) .............................................................................34

*Mariash v. Morrill*,
   496 F.2d 1138 (2d Cir. 1974)...........................................................................21

*McKenna v. Wright*,
   386 F.3d 432 (2d Cir. 2004)........................................................................32, 39

*Menotte v. United States* (*In re Custom Contractors, LLC*),
   745 F.3d 1342 (11th Cir. 2014) ........................................................................35

*Meoli v. Huntington Nat'l Bank*,
   848 F.3d 716 (6th Cir. 2017) ...........................................................................34

*In re Mervyn's Holdings, LLC*,
   426 B.R. 96 (Bankr. D. Del. 2010) ....................................................................35

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
   84 F.3d 560 (2d Cir. 1996)...............................................................................6

*Nordberg v. Societe Generale* (*In re Chase & Sanborn Corp.*),
   848 F.2d 1196 (11th Cir. 1988) ........................................................................35

*Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*,
   640 B.R. 604 (S.D.N.Y. 2022)..........................................................................18

*In re Palm Beach Finance Partners, L.P.*,
    488 B.R. 758 (Bankr. S.D. Fla. 2013) ............................................................34

*Picard v. ABN Ireland (In re BLMIS)*,
    No. 20-CV-02586 (CM), 2022 WL 1304589 (S.D.N.Y. May 2, 2022)
    (McMahon, J.) ..........................................................................................37, 38

*Picard v. Bureau of Labor Ins. (In re BLMIS)*,
    480 B.R. 501 (Bankr. S.D.N.Y. 2012) ................................................7, 12, 13

*Picard v. Chais (In re Bernard L. Madoff Inv. Sec. LLC)*,
    440 B.R. 274 (Bankr. S.D.N.Y. 2010) ............................................................19

*Picard v. Citibank, N.A. (In re BLMIS)*,
    12 F.4th 171 (2d. Cir. 2021), *cert denied sub nom. Citibank, N.A. v. Picard*,
    142 S.Ct. 1209 (2022) ..........................................................3, 32, 33, 37

*Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*,
    418 B.R. 75 (Bankr. S.D.N.Y. 2009) ................................................19, 29, 30, 31

*Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*,
    627 B.R. 546 (Bankr. S.D.N.Y. 2021) ................................................ *passim*

*Picard v. Fairfield Inv. Fund Ltd. (In re BLMIS)*,
    No. 09-01239 (CGM), Adv. Pro. No. 09-01239, 2021 WL 3477479 (Bankr.
    S.D.N.Y. Aug. 6, 2021) ............................................................3, 30, 39

*Picard v. Keller Family Trust (In re BLMIS)*,
    634 B.R. 39 (Bankr. S.D.N.Y. 2021), (aff'd, No. 1:21-cv-08678-JPO
    (S.D.N.Y. Sept. 30, 2022)) ..........................................................34, 35, 36

*Picard v. Lion Global Invs. Ltd.*, Adv. Pro. No. 12-01194 (CGM) (Bankr.
    S.D.N.Y. Oct. 19, 2022) ................................................................28

*Picard v. Merkin (In re BLMIS)*,
    440 B.R. 243 (Bankr. S.D.N.Y. 2010) ................................................7, 38, 39

*Picard v. Miller (In re BLMIS)*,
    631 B.R. 1 (Bankr. S.D.N.Y. July 2, 2021) ............................................34

*Picard v. Multi-Strategy*,
    641 B.R. 78 (Bankr. S.D.N.Y. 2022) .................................................. *passim*

*Picard v. Multi-Strategy Fund, Ltd.*,
    No. 22-cv-06502-JSR, 2022 WL 16647767 (S.D.N.Y. Nov. 3, 2022) ............29, 30

*Picard v. UBS Deutschland AG, et al.*,
    Case No. 12-cv-09380-JSR, ECF No. 18 ............................................29

*In re Picard*,
   917 F.3d 85 (2d Cir. 2019)...........................................................................27, 31

*Rupp v. Markgraf*,
   95 F.3d 936 (10th Cir. 1996) ...................................................................35

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
   624 F.3d 123 (2d Cir. 2010).........................................................................5

*Sarachek v. Schochet* (*In re Agriprocessors*),
   Adv. No. 10-09190, 2012 WL 4059897 (Bankr. N.D. Iowa Sept. 14, 2012)...........................34

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
   501 B.R. 26 (S.D.N.Y. 2013) (Rakoff, J.) ...................................................31

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
   594 B.R. 167 (Bankr. S.D.N.Y. 2018).........................................................5, 19, 32

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
   No. 12-MC-115, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) (Rakoff, J.) ...................29, 31

*Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*,
   234 B.R. 293 (Bankr. S.D.N.Y. 1999)...........................................................35

*Super Vision Int'l, Inc. v. Mega Int'l Com. Bank Co.*,
   534 F. Supp. 2d 1326 (S.D. Fla. 2008) .......................................................35

*Sweatland v. Park Corp.*,
   181 A.D.2d 243, 587 N.Y.S.2d 54 (N.Y. App. Div., 4th Dept. 1992) ...................28

*United Teamster Fund v. MagnaCare Admin. Servs., LLC*,
   39 F. Supp. 3d 461 (S.D.N.Y. 2014)...........................................................38

**Statutes**

11 U.S.C. § 546(e) ..............................................................................29, 30, 31

11 U.S.C. § 550...................................................................................30, 31, 32

German Act........................................................................................24

German Transformation Act .......................................................................24

Securities Investor Protection Act, 15 U.S.C. §§ 78aaa-*lll*........................................1

**Other Authorities**

Fed. R. Bankr. P. 7012 .................................................................................................................5

Fed. R. Civ. P. 8(a)(2) ................................................................................................................5

Fed. R. Civ. P. 12(b)(2).........................................................................................................7, 23

Fed. R. Civ. P. 550(b) ..............................................................................................................32

Plaintiff Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa-*lll* ("SIPA"), and the substantively consolidated chapter 7 estate of Bernard L. Madoff ("Madoff"), by and through the Trustee's undersigned counsel, respectfully submits this Memorandum of Law in Opposition to Defendant UBS Europe SE's ("UBS Europe" or "Defendant")[1] Motion to Dismiss the Amended Complaint ("Motion").

## I.    PRELIMINARY STATEMENT

This adversary proceeding is part of the Trustee's continuing efforts in this SIPA liquidation proceeding to recover BLMIS Customer Property that was stolen as part of Madoff's Ponzi scheme. In this action, the Trustee seeks to recover at least $9,296,416 in subsequent transfers that UBS Europe, both directly and in its capacity as successor in interest to Dresdner Bank LateinAmerika ("DBLA"), received from Fairfield Sentry Limited ("Sentry") and Fairfield Sigma Limited ("Sigma," with Sentry the "Fairfield Funds"). Despite this Court's guidance in no fewer than 25 decisions in 25 similar adversary proceedings in this SIPA liquidation proceeding, UBS Europe nevertheless moves to dismiss the Amended Complaint on four grounds: (1) this Court lacks personal jurisdiction over it; (2) it is shielded by the 546(e) safe harbor; (3) the Trustee failed to allege facts demonstrating UBS Europe was not a mere conduit; and (4) its good faith is apparent from the face of the Amended Complaint. All of UBS Europe's arguments fail.

As to personal jurisdiction, the documents UBS Europe references in support of its Motion prove that it owned shares of the Fairfield Funds and had substantial contacts with New York and the United States when it received nearly all the transfers the Trustee seeks to recover. Thus, UBS

---

[1] "UBS Europe" includes UBS Europe as well its predecessor in interest and former corporate forms.

Europe's primary argument with respect to those transfers—that the DBLA transaction was not a merger—is moot.

UBS Europe's argument that successor jurisdiction is not present for the remaining transfers also fails. The documents UBS Europe attached to its Motion are incomplete and, quite simply, neither show what Defendant purports nor provide conclusive support for Defendant's argument that the transaction was not a merger such that DBLA's jurisdictional contacts cannot be imputed to UBS Europe.

For the reasons set forth in the plethora of decisions of this Court and the district court, as well as the reasons set forth more fully herein, the Trustee respectfully requests that the Court deny Defendant's Motion.

## II.    FACTUAL BACKGROUND

### A.    The BLMIS Ponzi Scheme and its Feeder Funds

Madoff founded and operated BLMIS from New York until its collapse in 2008. *See* Amended Complaint ("Am. Compl."), ECF No. 105, at ¶ 56. BLMIS was a securities broker-dealer registered with the United States Securities and Exchange Commission (the "SEC") beginning in January 1960. *Id.* BLMIS purportedly operated three principal business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business (the "IA Business"). *Id.* ¶ 58. For its IA Business customers, BLMIS purportedly executed a split-strike conversion strategy (the "SSC Strategy"), which involved investing in United States common stocks, options, and treasury bills. *Id.* ¶¶ 66, 70. In reality, BLMIS operated its IA Business as a Ponzi scheme. *Id.* ¶ 62. On December 11, 2008, Madoff's fraud was publicly revealed, and he was arrested for, and subsequently pleaded guilty to, criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. *Id.* ¶ 40.

2

The extent of damage Madoff caused was made possible by BLMIS "feeder funds"—large investment funds created to funnel investors' funds into BLMIS. *See Picard v. Citibank, N.A. (In re BLMIS)*, 12 F.4th 171, 179 (2d. Cir. 2021), *cert denied sub nom. Citibank, N.A. v. Picard*, 142 S.Ct. 1209 (2022) ("*Citibank*").

## B. The Fairfield Funds

The Fairfield Funds were controlled by the Fairfield Greenwich Group ("FGG"), a de facto partnership with its principal place of business in New York. *See Picard v. Fairfield Inv. Fund Ltd. (In re BLMIS)*, No. 09-01239 (CGM), Adv. Pro. No. 09-01239, 2021 WL 3477479, at *9 (Bankr. S.D.N.Y. Aug. 6, 2021) ("*Fairfield Inv. Fund*"). Sentry was a U.S. dollar-denominated fund that invested 95% of its assets with BLMIS. Am. Compl. ¶ 2; Second Amended Complaint, *Fairfield Inv. Fund*, ECF No. 286, at ¶ 89 ("Fairfield SAC"). Sigma invested 100% of its assets in Sentry. Am. Compl. ¶¶ 2, 8.

Following BLMIS's collapse, the Trustee filed an adversary proceeding against the Fairfield Funds and related defendants to avoid and recover fraudulent transfers of Customer Property in the amount of approximately $3 billion. *Id.* ¶ 92; *see also* Fairfield SAC. In 2011, the Trustee settled with the Fairfield Funds and Sentry consented to a judgment in the amount of $3.054 billion. *Id.* ¶ 93. Sigma separately consented to a judgment in the amount of $752.3 million. *See* Sigma Consent Judgment, *Picard. v. Fairfield Sentry Ltd. (In Liquidation)*, Adv. Pro. No. 09-01239 (CGM) (Bankr. S.D.N.Y. May 18, 2009), ECF No. 110. As a feeder fund that invested in BLMIS indirectly through Sentry, the $752.3 million represents a portion of Sentry's $3.054 billion in withdrawals from BLMIS. *Id.* at 4–5. Following the settlement, the Trustee commenced a number of adversary proceedings against defendants, like UBS Europe, to recover the approximately $3 billion in stolen Customer Property.

### C.    Defendant and Its Investment in the Fairfield Funds

DBLA was a subsidiary of Dresdner Bank AG, one of Germany's largest banks. Am. Compl. ¶ 7. At some point in late 2004 or early 2005,[2] DBLA transferred its Private Banking Division to a new entity (NewCo), doing business as UBS Lateinamerika GmbH ("UBS Lateinamerika"). *See* King Decl. Ex. 1 at the Preamble and ¶¶ 1.2, 1.4, ECF No. 116-1 (DBLA Hive-Down Plan dated April 20, 2005). UBS Lateinamerika then became part of UBS Wealth Management AG ("UBS Wealth Management"), a subsidiary of UBS Deutschland AG ("UBS Deutschland") (this series of transactions is referred to herein as the "Combination"). All named UBS entities merged into what is now Defendant, UBS Europe. *See* King Decl. Ex. 3 at 3, ECF No. 116-3; Suppl. Corporate Ownership Statement of UBS Europe SE, at 1, ECF No. 103.

Prior to the Combination, DBLA became a shareholder in the Fairfield Funds and Defendant does not contest that these shares were among the assets transferred to UBS Europe. After the Combination, UBS Europe maintained the shares with the Fairfield Funds, became the assignee of DBLA's signed subscription agreements[3], executed redemption requests, and otherwise continued to conduct business with FGG using the name DBLA, as set forth in the Amended Complaint. Am. Compl. ¶¶ 99–102; *see also infra* Section III.C.3.b.

Both DBLA and UBS Europe voluntarily invested significant sums in and redeemed significant funds from the Fairfield Funds, knowing at all times that nearly all of the money was intended to be invested with BLMIS in New York.

---

[2] The documents attached to the Declaration of Marshall R. King and the Declaration of Dean D. Hunt demonstrate a lack of clarity about the date of this transaction. Per Exhibit 1 to the Motion, titled "Hive-Down Plan of Dresdner Bank Lateinamerika AG" and dated April 20, 2005, (the "Hive Down Plan"), the effective date of the Combination was either October 1, 2004 or January 1, 2005. Per an email from DBLA employee, Guido Lucke, the effective date was May 2, 2005. *See* King Decl. Ex. 1 ¶¶ 5.1, 5.3; Hunt Decl. Ex. 1.

[3] If discovery shows the relevant date of the Combination is October 1, 2004, as Exhibit 3 to the King Declaration states, based on the limited information available to the Trustee at this stage of these proceedings, at least one subscription agreement was executed after the Combination.

III.  **THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANT**

A.  **Legal Standard**

When considering a Rule 12 motion to dismiss, applicable to an adversary proceeding under FED. R. BANKR. P. 7012, "the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in the Trustee's favor." *In Re J.P. Jeanneret Assoc., Inc.*, 769 F. Supp. 2d 340, 353 (S.D.N.Y. 2011) (citing *Cargo Partner AG v. Albatrons, Inc.*, 352 F.3d 41, 44 (2d Cir. 2003); *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007)). To survive the motion to dismiss, the pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). At the pleadings stage, the allegations need only meet the "plausibility" standard, such that they "nudge[] [the] claims . . . 'across the line from conceivable to plausible.'" *Ashcroft v. Iqbal*, 556 U.S. 552, 680 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).

The Trustee need only show a *prima facie* case that personal jurisdiction exists. *Dorchester Fin. Sec. Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013). The *prima facie* showing "may be established solely by allegations." *Id.* at 84–85. The Trustee may also establish a *prima facie* case of jurisdiction through affidavits and supporting materials that contain averments of facts outside the pleadings that, "if credited, would suffice to establish jurisdiction over the defendant." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 594 B.R. 167, 188 (Bankr. S.D.N.Y. 2018) ("*BNP*") (citing *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001)); *see also S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (a *prima facie* case of jurisdiction may be established through affidavits and supporting materials that contain averments of facts outside the pleadings). The pleadings and affidavits must be construed in the

light most favorable to the Trustee, resolving all doubts in the Trustee's favor. *See Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010).

Specific jurisdiction exists where the defendant purposefully directed its activities into the forum and the underlying cause of action arises out of or relates to those activities. *See Picard v. Fairfield Greenwich Grp.* (*In re Fairfield Sentry Ltd.*), 627 B.R. 546, 566 (Bankr. S.D.N.Y. 2021). The court first determines whether the defendant purposefully availed itself of the privilege of conducting activities with the forum. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Burger King v. Rudzewicz*, 471 U.S. 462, 475–76 (1985). Next, the court determines if the claims "arise out of or relate to the defendant's contacts" with the forum. *Picard v. Multi-Strategy*, 641 B.R. 78, 87–88 (Bankr. S.D.N.Y. 2022) ("*Multi-Strategy*") (citing *Ford Motor Co. v. Montana Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1025–26 (2021)).

Finally, the court conducts a "reasonableness" inquiry to determine that its exercise of jurisdiction will not offend the traditional notions of "fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 320. To determine if jurisdiction is reasonable, the court considers "the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most effective resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Multi-Strategy*, 641 B.R. at 88; *see also Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996). Where a plaintiff has alleged purposeful availment, the burden shifts to the defendant to present a "compelling case" that jurisdiction would be unreasonable. *In re Fairfield Sentry Ltd.*, 627 B.R. at 567 (citing *Burger King*, 471 U.S. at 472–73).

This Court has found repeatedly in similar adversary proceedings in this SIPA liquidation proceeding that it has jurisdiction over a "party [that] purposefully avails itself of the benefits and protections of New York laws by knowing, intending and contemplating that the substantial majority of funds invested in Fairfield Sentry would be transferred to BLMIS in New York to be invested in the New York securities market." *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501, 517 (Bankr. S.D.N.Y. 2012) ("*BLI*"); *Picard v. Societe Generale Private Banking (Suisse) S.A.*, Adv. Pro. No. 12-01677 (CGM), 2022 WL 6237071 (Bankr. S.D.N.Y. Oct. 17, 2022) ("*Société Générale*"); Memorandum Decision, *Picard v. First Gulf Bank*, Adv. Pro. No. 11-02541 (CGM) (Bankr. S.D.N.Y. July 18, 2022), ECF No. 100, at *6–7 ("*First Gulf*"); *Multi-Strategy*, 641 B.R. 78; Memorandum Decision, *Picard v. Banque Lombard Odier & Cie SA*, Adv. Pro. No. 12-01693 (CGM) (Bankr. S.D.N.Y. June 30, 2022), ECF No. 115, at *6 ("*Lombard*").

The Amended Complaint sets forth in full the elements of the Trustee's claims, pleading Defendant's intent to invest with BLMIS through New York-based FGG, as well as receipt of subsequent transfers made to Defendant and its predecessor, thus demonstrating this Court's jurisdiction over Defendant. Further, Defendant's Motion and supporting exhibits are not sufficient to refute Trustee's *prima facie* showing of personal jurisdiction and dismiss the case under Rule 12(b)(2). Defendant's Motion should be denied. *See Picard v. Merkin (In re BLMIS),* 440 B.R. 243, 254–71, 273 (Bankr. S.D.N.Y. 2010).

### B.    Exhibits Attached to Defendant's Motion Prove UBS Europe Directly Initiated Most of the Transfers

The Trustee sued UBS Europe as the successor in interest to DBLA and seeks a judgment that UBS Europe is liable as a subsequent transferee of twelve transfers totaling $7,418,486 from Sentry and one transfer from Sigma in the amount of $1,877,930 between May 2004 and November 2008. *See* Am. Compl. Exs. C and F. Defendant does not dispute, and UBS Europe's

correspondence with FGG shows, that the shares of Fairfield Funds in question transferred to UBS Europe at the time of the Combination. *See* Mot. at 9 (citing King Decl. Ex. 1 Preamble). Instead, it argues that because of the nature of the transaction, DBLA's jurisdictional contacts cannot be used to assert jurisdiction over UBS Europe.

The documents attached to Defendant's Motion and documents produced to the Trustee in other litigation in this SIPA liquidation proceeding offer three possible dates on which the Combination may have occurred and UBS Europe may have acquired the accounts. Sometime between October 1, 2004 (King Decl. Ex. 1 § 5.1 and Preamble ¶ 4) and May 2, 2005 (King Decl. Ex. 1 §5.3, Hunt Decl. Ex. 1), UBS Europe acquired DBLA's Sentry and Sigma accounts[4] through what UBS's 2005 filing with the SEC describes as a "combination" with DBLA's Private Banking Division.[5] The discrepancy in the dates is tied to the timing of the "entry of the transaction in the commercial register of the [sic] DBLA." (King. Decl. Ex. 1, § 5.3).[6] Whether or when that may have occurred is a fact that is not provided in the Motion or the exhibits to the King Declaration and not otherwise available to the Trustee outside of discovery.

UBS Europe argues the Combination was not a merger and therefore the jurisdictional contacts of the acquired entity cannot be attributed to the acquirer, UBS Europe. Mot. at 8–11.

---

[4] The "Hive Down Plan" attached as Ex. 1 of the Declaration of Marshall R. King, ECF No. 116-1, says the transition of the Sentry accounts had an effective date of either October 1, 2004 (§5.1 and Preamble, ¶ 4), or January 1, 2005 (¶ 5.3), or sometime between October 1, 2004 and May 31, 2005 (¶ 5.3).

[5] King Decl. Ex. 3, UBS AG United States Securities and Exchange Commission Form 20-F for the year ending December 31, 2005, at 362 n.37, ECF No. 116-3 ("UBS SEC Report"). "During 2005, UBS completed several acquisitions that were accounted for as business combinations. None of the acquisitions was individually significant to the financial statements, and therefore they are presented in aggregate for each of Financial Businesses and Industrial Holdings".

[6] It is notable that the Hive Down Plan states that from October 1, 2004 "onwards, the actions of DBLA shall be deemed to have been taken for the account of NewCo insofar as they relate to the [Private Banking] division which has been hived down pursuant to this deed. . . . Any compensation for this period will not be granted by DBLA." King Decl. Ex. 1 ¶ 5.1. This suggests that the actions of DBLA would be attributed to UBS Europe as of the Hive Down date, even if the "completion date" was later. *See id.* ("A separate accounting presentation for the hived-down business division . . . is not possible for the period **between the effective hive-down date and the completion date**." (emphasis added)).

8

UBS Europe attempts to distract the Court by focusing on the type of transaction rather than the relevant facts and timeline. As discussed below, the way UBS Europe acquired the accounts does not matter for the single Sigma Transfer or for nine of the twelve Sentry Transfers because, according to Defendant's Exhibits, the shares were owned by UBS Europe—not DBLA—at the time of those transfers and UBS Europe received them directly.

The following timeline shows each of the subsequent transfers to Defendant that Trustee is aware of, in relation to the range of possible Combination dates reflected in the gray area below:



For the one to three Sentry transfers that DBLA received before UBS Europe acquired the accounts, Defendant's exhibits purporting to prove that the Combination was an asset sale rather than a merger are incomplete and ambiguous. So, even for the transfers that occurred before the Combination, (i) there is substantial undisputed evidence supporting jurisdiction with respect to DBLA and (ii) UBS Europe fails to conclusively establish that the transfer was not part of a merger as alleged by the Trustee.

C.    **The Post-May 2005 Subsequent Transfers**

Turning first to the subsequent transfers of stolen Customer Property that UBS Europe received directly:

Correspondence received by the Trustee and Defendant's own Exhibits indicate the Combination occurred sometime between October 2004 and May 2005. Using the latter—the date most favorable to Defendant based on its successor jurisdiction argument—the documents attached to Defendant's Motion confirm that UBS Europe is directly liable as the subsequent transferee of nine of the twelve transfers totaling $6,499,221 received from Sentry and $1,877,930 received from Sigma (the "Post-May 2005 Transfers"). Those transfers occurred <u>after</u> UBS Europe acquired the Sentry and Sigma accounts from DBLA.[7] *See* Am. Compl. Exs. C and F.

The Trustee's records support this Court's personal jurisdiction over UBS Europe, because for all of the Post-May 2005 Transfers, UBS Europe employees had substantial contacts with the United States related to the Fairfield Funds. After the Combination, UBS Europe continued to avail itself of the benefits of doing business with New York, maintained the investments in the Fairfield Funds, continued communicating with the same individuals at FGG, and redeemed the investments after May 2005 using United States bank accounts, despite the fact UBS Europe chose not to change the name on the accounts from DBLA to UBS Europe.[8]

UBS Europe took ownership and control of the Sentry and Sigma accounts and, after doing so, purposefully availed itself of the benefits and privileges of investing in New York. The exercise

---

[7] If the October 2004 date is used, UBS Europe owned the shares of Sentry at the time of all but one of the transfers, for a total of $6,549,174 directly received by UBS Europe from Sentry and $1,877,930 from Sigma. If the May 2005 date is used, the amount for which UBS Europe is directly liable is $6,499,223 in transfers from Sentry and $1,877,930 from Sigma.

[8] It is notable that UBS Europe carried on under DBLA's name at all relevant times, despite the Hive Down Plan's proscription of that exact thing. King Decl. Ex. 1 at 13 ¶ 12.1 ("NewCo agrees to cease all use of the DBLA company names and logos set out in **Annex 12.1** or any variations thereof after the expiry of 30 days from the execution date.").

of jurisdiction over UBS Europe with respect to the Post-May 2005 transfers of stolen Customer

Property does not require the Court to consider the legal implications of successor jurisdiction

raised in Defendant's Motion.

        **1.**      **Defendant's Own Documents Show That UBS Europe Received All of the Post-May 2005 Transfers**

Defendant wants this Court to dismiss the Amended Complaint because the Trustee alleged

that DBLA—not UBS Europe—received the subsequent transfers. UBS Europe spends much of

its brief discussing its assertion that, while it may be liable for the subsequent transfers, DBLA's

contacts cannot be attributed to UBS Europe for purposes of personal jurisdiction. However, UBS

Europe fails to advise the Court that (i) UBS Europe acquired DBLA's Fairfield shares before it

received the Post-May 2005 Transfers, (ii) while UBS Europe kept the shares under the name

DBLA, the shares transferred to UBS Europe as a part of the Combination,[9] and (iii) UBS Europe

itself—not DBLA—maintained the relevant contacts with the United States after May 2005 that

establish personal jurisdiction. *See* Hunt Decl. Ex. 1 (email from DBLA employee to FGG NY

that UBS Wealth Management acquired the Private Banking department of DBLA).

After the Combination, UBS Europe continued to maintain the Fairfield shares under the

DBLA moniker. But it was UBS Europe that invested in the Fairfield Funds through New York-

based FGG and it was UBS Europe that received all of the Post-May 2005 Transfers. Because

UBS Europe owned the shares when it redeemed them and engaged in many of the relevant

jurisdictional contacts, UBS Europe is subject to this Court's jurisdiction.

---

[9] King Decl. Ex. 1 Section 2.

## 2. This Court Has Jurisdiction Over UBS Europe Under *BLI*

UBS Europe purposefully availed itself of the benefits and protections of New York when it acquired the shares and chose to continue doing business with FGG related to the Fairfield Funds with the objective of accessing New York-based BLMIS in U.S. markets. As long as it was making money through its investments in BLMIS in New York through the Fairfield Funds, UBS Europe availed itself of the benefits and protections of doing so. Defendant cannot now claim this Court lacks personal jurisdiction because the investment did not work out as planned. This Court's opinion in *Picard v. BLI* confirms that this Court has personal jurisdiction. *See Irving H. Picard v. Bureau of Labor Insurance* ("*BLI*"), 480 B.R. 501, 517 (Bankr. S.D.N.Y. 2012).

In *BLI*, as here, the Trustee's suit was "based upon [the subsequent transferee's] investment of tens of millions of dollars in Sentry with the specific goal of having funds invested in BLMIS in New York, with intent to profit therefrom." *Id*. at 506. Similarly, UBS Europe took on the commitments and obligations set out in the Private Placement Memoranda ("PPMs") and subscription agreements that established the investment's BLMIS-centric purpose. *Id*. at 507–08. *See infra* Section III.C.3.b.

This Court has already concluded that Sentry investors like UBS Europe are subject to personal jurisdiction in this Court. *Id*. at 516–18. *BLI* holds that the defendant in *BLI*, just like Defendant here, "purposefully availed itself of the benefits and protections of New York laws by knowing, intending and contemplating that the substantial majority of funds invested in Sentry would be transferred to BLMIS in New York to be invested in the New York securities market." *Multi-Strategy*, 641 B.R. at 86 (citing *BLI*, 480 B.R. at 517); *see also Picard v. JPMorgan Chase & Co.*, Adv. Pro. No. 08-99000 (SMB), 2014 WL 5106909, at *9 (Bankr. S.D.N.Y. Oct. 10, 2014) (courts in this SIPA liquidation proceeding "confirm[ing] that defendants who invested directly or indirectly with BLMIS and received payments from BLMIS as an initial transferee or subsequent

transferee of those initial transfers were subject to the Court's personal jurisdiction"). "BLI intentionally tossed a seed from abroad to take root and grow as a new tree in the Madoff money orchard in the United States and reap the benefits therefrom." *BLI*, 480 B.R. at 506; *Multi-Strategy*, 641 B.R. at 87. Because UBS Europe intentionally assumed DBLA's Fairfield Fund shares, it is similarly situated to the defendants in *BLI* and *Multi-Strategy* with respect to the fundamental purpose of its investment. Thus, this Court has jurisdiction over UBS Europe.

### 3. The Direct Contacts of UBS Europe with New York Give Rise to Personal Jurisdiction

a. UBS Europe's Employees Regularly Corresponded with FGG's New York Office Regarding its Investments in the Fairfield Funds, Giving Rise to Personal Jurisdiction

Defendant's contacts with New York include regular correspondence with FGG personnel in New York after it acquired the shares to further its investments and profit from those investments through redemptions. These contacts directly relate to the transfers the Trustee seeks to recover.

UBS Europe employees directly contacted FGG's New York office to seek information regarding subscriptions in the Fairfield Funds, to discuss the transition from DBLA to UBS Europe, and to request redemptions from the Fairfield Funds for the shares it had acquired from DBLA. In April 2005, the employee who managed the Sentry investments for DBLA and for UBS Europe after the Combination—Guido Lucke—emailed FGG personnel in New York to inform them of the Combination. Lucke acknowledged to FGG New York employees Lauren Ross and Philip Toub that he was moving to UBS Lateinamerika (n/k/a UBS Europe) effective May 2, 2005, but everything else "will be the same." Hunt Decl. Ex. 1. Lucke unequivocally confirmed that "all clients," will move to UBS Lateinamerika. *Id.* Lucke specifically noted that the "orderrouting," the IT platform, and "all former contacts regarding the business will remain the same." *Id.* Continuing "business as usual" with everything remaining the same would include the types of

13

ongoing business activities representing a targeted business dialog with New York as described in detail in Section III.d.1 below. Lucke also requested all product information continue to be sent to him and to also send pricing information to DBLA-Hamburg-Orderexecution@dbla.com. *Id.*

He continued to email FGG New York regarding the accounts after they were transferred to UBS Europe *using his UBS email account. See, e.g.*, Hunt Decl. Ex. 4. Lucke maintained the same communications and contacts he had while working with DBLA, and regularly emailed FGG employees about the Sentry and Sigma investments. Hunt Decl. Exs. 5–7 (Defendant—FGG NY email correspondent regarding fund transactions); *see also* Hunt Decl. Ex. 8 (Defendant corresponding with FGG NY regarding Defendant's Madoff exposure). Moreover, records show that, long after UBS Europe acquired DBLA's shares, Lucke had access to the FGG website and downloaded tear sheets for Sentry in early 2008 using his DBLA email. Hunt Decl. Exs. 9-a, 9-b, 9-c.

> b.     The Subscription Agreements that Govern UBS Europe's
> Redemptions of Customer Property Are Compelling Jurisdictional
> Contacts

DBLA signed at least two subscription agreements for investments in the Fairfield Funds (together, "DBLA Subscription Agreements"). Hunt Decl. Exs. 10–11. Depending on the Combination date, one of the DBLA Subscription Agreements may have been executed by UBS Europe after the Combination, using the DBLA name.[10] Hunt Decl. Ex. 10. Regardless of the Combination date, however, all of DBLA's subscription agreements were assigned to UBS Europe as part of the Combination. The Subscription Agreements incorporate the PPMs by reference and all of the requirements for the redemptions the Trustee seeks to recover here, including the

---

[10] This subscription agreement with Sigma was executed under the DBLA name on November 15, 2004. If the Combination date is October 1, 2004, as the Hive Down Plan states, UBS Europe directly entered into this transaction with Sigma using the DBLA name. *See* Hunt Decl. Ex. 10; King Decl. Ex. 1 at 8.

procedures to redeem and the form to be used, are set forth in the PPMs. Hunt Decl. Ex. 12.

Therefore, the Trustee's claims arise out of the DBLA Subscription Agreements and the PPMs

they incorporate. *See In re Fairfield Sentry Ltd.*, 627 B.R. at 566.

Taking it at face value, the Hive Down Plan shows that "the transfer . . . includes all

contracts with financial advisors, referral agents and external portfolio managers which DBLA has

entered into or will enter into by the Completion Date," and "[c]ontracts of DBLA with third

parties which are not listed in [the annexes] and which are attributable to" DBLA. King Decl.

Ex. 1 §§ 3.5–3.6. Undoubtedly, the DBLA Subscription Agreements fall within these categories,

and Defendant does not dispute that the DBLA Subscription Agreements transferred in the

Combination. Defendant intended to acquire the DBLA Subscription Agreements in the

Combination, and it knowingly stayed invested in BLMIS in New York under the DBLA name.

Moreover, the DBLA Subscription Agreements state:

> Binding Nature of Agreement This Agreement shall be binding upon Subscriber
> and its heirs, representatives, **successors and permitted assigns**, and **shall inure
> to the benefit of the Fund's successors and assigns**. The Agreement shall survive
> the acceptance of the subscription.

Hunt Decl. Ex. 10 (Sigma Agreement) ¶ 16 (emphasis added); Hunt Decl. Ex. 11 (Sentry

Agreement) ¶ 15 (emphasis added).

The PPM that the DBLA Subscription Agreements incorporate by reference states:

> Any sale or transfer of a shareholder's entire interest in any Shares or any transfer
> of Shares by operation of law **must be submitted to the Fund for consent and
> will not be effective until such consent is given by the Fund**. Any other dealing
> with Shares **by way of assignment**, pledge, mortgage or otherwise is prohibited
> unless consented to by the Fund and any attempt to do so without **first obtaining
> the consent of the Fund** will constitute grounds for compulsory redemption of the
> Shares concerned.

Hunt Decl. Ex. 12 at 26 (PPM) (emphasis added). Therefore, the DBLA Subscription Agreements and the PPM give rise to two more avenues by which this Court has personal jurisdiction over Defendant.

First, the DBLA Subscription Agreements transferred to UBS Europe with the Combination, and the rights and obligations thereunder, appear to have been assigned to UBS Europe. King Decl. Ex. 1 §§ 3.5–3.6; Hunt Decl. Ex. 1. "Where it is possible, courts are inclined to hold that rights under a contract are assignable to third parties." *Citibank, N.A. v. Tele/Resources, Inc.*, 724 F.2d 266, 268 (2d Cir. 1983) (citing *Portuguese-American Bank v. Welles*, 242 U.S. 7, 11 (1916); 3 *Williston on Contracts*, 3d ed. § 412, at 47). This is especially true when the underlying agreement provides for the assignment or transfer of the agreement. *See id.* (finding assignee can enforce contract where underlying contract that was assigned provided that the assignor "might assign or otherwise transfer the Agreement"). As laid out above, the DBLA Subscription Agreements clearly allow for assignment. Hunt Decl. Ex. 10 (Sigma Agreement) ¶ 16; Hunt Decl. Ex. 11 (Sentry Agreement) ¶ 15.

An "assignment does not modify the terms of the underlying contract. It . . . merely transfers the assignor's contract rights, leaving them in full force and effect as to the party charged." *Citibank,* 724 F.2d at 269. In other words, "an assignee stands in the shoes of the assignor and subject to all equities against the assignor" and "takes with it whatever limitations it had in the hands of the assignor." *In re Enron*, 379 B.R. 425, 432 (Bankr. S.D.N.Y, 2007) (quoting *Goldie v. Cox*, 130 F.2d 695, 720 (8th Cir. 1942); *Caribbean S.S. Co., S.A. v. Sommez Denizcilik Ve Ticaret A.S.*, 598 F.2d 1264. 1266–67 (2d Cir. 1979)) (internal quotations omitted). Because UBS Europe, as assignee of the DBLA Subscription Agreements, is bound by its terms, UBS Europe is bound by the DBLA Subscription Agreements' (1) New York forum selection clauses, (2) New York

choice-of-law clauses, and (3) provisions stating that U.S. counsel would act as "counsel to the Fund[s]." *See id*; Hunt Decl. Exs. 10–11 [subscription agreements].

Second, the PPMs required Defendant to initiate contact with FGG to facilitate the sale or transfer of the Shareholder's entire interest in any Shares or assignment of the DBLA Subscription Agreements. Thus, it does not matter how the deal was structured – UBS Europe was contractually obligated to work with New York to facilitate the transfer. The incorporated PPM required Defendant to submit a request to the Fairfield Funds seeking ratification of the assumption of the rights and obligations under the Subscription Agreements. Hunt Decl. Ex. 12 at 26. The email from Lucke discussed above shows (and Defendant does not dispute) this contact was made with FGG's New York-based personnel and that the rights and obligations of the DBLA Subscription Agreements were, in fact, assigned to Defendant following assumption of the obligations from DBLA.[11] Hunt Decl. Ex. 1. Simply put, for the assumption and subsequent assignments to be consummated, Defendant was required to purposefully avail itself of this forum's laws by requesting ratification from the Fairfield Funds—which were run from FGG's New York office, and which were almost entirely invested in New York-based BLMIS. *See* Am. Compl. ¶¶ 2, 21. Defendant knowingly assumed the DBLA Subscription Agreements and incorporated PPM and bound itself to obtain consent for an assignment thereof which required working through FGG's New York offices—and Lucke's email confirms that is what happened.

All of the requirements for the redemptions the Trustee seeks to recover here, including the procedures to redeem and the form to be used, are set forth in the PPMs. *See, e.g.*, Hunt Decl. Ex. 12. Therefore, the Trustee's claims related to the DBLA Subscription Agreements, and the

---

[11] The agent on the Sentry DBLA Subscription Agreement Trustee is Philip Toub, who worked in FGG's New York office. Hunt. Decl. Ex. 11 at 4.

PPMs they incorporate, are additional, strong jurisdictional contacts with the forum. *See In re Fairfield Sentry Ltd.*, 627 B.R. at 566.

> c.    UBS Europe Instructed Sentry to Send Redemptions to New York Correspondent Accounts

This Court also has jurisdiction because of UBS Europe's purposeful use of New York bank accounts to redeem from Sentry. A defendant's use of a domestic bank account in connection with the activity alleged is sufficient to establish jurisdiction. *See Licci v. Lebanese Canadian Bank, SAL*, 984 N.E.2d 893, 899–900 (N.Y. 2012) (leading case, holding defendant's purposeful "use of a correspondent bank account in New York, even if no other contacts between the defendant and New York can be established" suffices to show defendant transacted business in New York); *Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 640 B.R. 604, 617-18 (S.D.N.Y. 2022) (foreign defendants subject to jurisdiction based solely on their designation and use of New York correspondent accounts to receive preferential transfers); *Al Rushaid v. Pictet & Cie*, 68 N.E.3d 1, 6–11 (N.Y. 2016) (same, in connection with money laundering scheme).

UBS Europe (after the Combination and using DBLA's name) authorized and instructed use of a New York bank account for the redemption payments the Trustee seeks to recover. UBS Europe's use of New York banks was purposeful and at its direction. Hunt Decl. Ex. 13.

On April 28, 2005, a wire transfer instruction expressly requested Sentry "pay the respective amount to our acct. at Citibank N.Y." Hunt Decl. Ex. 13 at ANWAR-CFSE-00874562. The available records confirm that UBS Europe received that transfer. *Id.* Other Citco redemption confirmations show that Defendant made similar redemptions as its course of dealing. *See* Hunt Decl. Ex. 14 (Citco confirmations of Defendant's redemptions of Sentry shares). UBS Europe purposely authorized and directed Sentry to use New York bank accounts to wire the transfers of

18

stolen Customer Property the Trustee seeks to recover to a New York bank account, demonstrating an "essential element" of the Trustee's claim. *See Multi-Strategy*, 641 B.R. at 87 (citing *Multi-Strategy*, ECF No. 97, ¶¶ 97, 110–13 ("Defendant sent wiring instructions specifically designating a New York-based bank account to which defendant directed FGG to wire defendant's redemption payments from Fairfield Sentry.")).[12]

In this SIPA liquidation proceeding, this Court, on multiple occasions, has found jurisdiction where subsequent transferee defendants received the transfers at issue from a BLMIS feeder fund into a U.S. bank account. *See BNP*, 594 B.R. at 191 (jurisdiction over subsequent transferee defendant that sent subscriptions to, and received redemptions from, feeder fund's New York bank account); *Picard v. Chais (In re Bernard L. Madoff Inv. Sec. LLC)*, 440 B.R. 274, 279–80 (Bankr. S.D.N.Y. 2010) (same, plus defendants used their California bank account to receive transfers); *Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 418 B.R. 75, 80 (Bankr. S.D.N.Y. 2009) (jurisdiction over initial transferee defendants that made "financial transactions to and from their New York BLMIS bank accounts"). Therefore, this contact, alone, supports personal jurisdiction over UBS Europe.

### D.    The Pre-May 2005 Transfers of Customer Property

Turning next to personal jurisdiction for transfers made before the Combination:

The Trustee only seeks to recover three subsequent transfers of Customer Property that pre-date May 2005: May 10, 2004, in the amount of $869,312; January 20, 2005, in the amount of $24,274; and April 27, 2005, in the amount of $25,677 (the "Pre-May 2005 Transfers").[13]

---

[12] Defendant also received fees into a Dresdner Bank AG New York branch. *See* Hunt Decl. Exs. 22 (email correspondence between Defendant and FGG New York regarding fees paid to Defendant in New York bank account), 28 (same), 31 (agreement between DBLA and Fairfield Greenwich Limited to send fees to DBLA in Citibank New York account for promoting Fairfield funds).

[13] The latter two transfers fall within the gray area of the Range of Possible Combination Dates, so it is unclear if they were initiated by DBLA or UBS Europe.

Defendant does not provide a factually supported basis for the Court to dismiss the Trustee's claims to recover the Pre-May 2005 Transfers. Rather than contesting the Trustee's jurisdictional allegations, Defendant claims that DBLA's contacts cannot be imputed to UBS Europe by way of successor jurisdiction because the Combination was not a merger as pled by the Trustee in the Amended Complaint. *See* Am. Compl. at 54.

### 1.    Defendant Does Not Dispute DBLA's Substantial Jurisdictional Contacts with the Forum

UBS Europe does not dispute that DBLA's contacts with New York establish jurisdiction. There is a reason for this. Until the Combination, DBLA purposefully directed its investment activities to New York-based BLMIS, through the Fairfield Funds, and the Trustee's action to recover transfers received by DBLA directly relates to those investment activities.

First, DBLA maintained a United States office in Miami, Florida where it would conduct business with FGG. *See* Hunt Decl. Ex. 15 (FGG email showing FGG meeting at "Miami office at Dresdner Bank Latin America"); Hunt Decl. Ex. 29 (internal FGG email showing meeting at DBLA's Miami office resulted in DBLA's investment in Sentry); Hunt Decl. Ex. 16 (email where Lucke explains history of DBLA Miami office); Hunt Decl. Ex. 17 (showing DBLA's Miami, Florida address on field Uniform Commercial Code filing); Hunt Decl. Ex. 18 (showing DBLA's registration with the Florida Division of Corporations under Miami, Florida address with a registered agent in Miami); Hunt Decl. Ex. 19 (A report by Florida's Office of the Property Appraiser showing "Dresdner Lateinamerika Fin LLC" as owner of building with mailing address in Miami, Florida). Because courts must consider nationwide contacts in bankruptcy proceedings, this physical presence is a notable contact. *In re Bozel S.A.*, 434 B.R. 86, 99 (Bankr. S.D.N.Y. 2010) (citing *In re Bernard L. Madoff Inv. Sec. LLC*, 418 B.R. 75, 79 (Bankr. S.D.N.Y. 2009); *In re Enron Corp.*, 316 B.R. 434, 445 (Bankr. S.D.N.Y. 2004); *Deak & Co.*, 63 B.R. 422, 430–31

(Bankr. S.D.N.Y. 1986)) ("[I]t is well established that in the context of bankruptcy proceedings, the minimum contacts analysis should evaluate the defendant's contacts with the United States as a whole, not merely contacts with the forum state."); *see also Mariash v. Morrill*, 496 F.2d 1138, 1142–43 (2d Cir. 1974) (finding that where Congress authorized nationwide service of process, "[i]t is not the State of New York but the United States 'which would exercise its jurisdiction over . . . the defendants'").

FGG also met with DBLA in Miami regarding Fairfield Fund subscriptions. In June of 2003, the Miami office employees of DBLA reached out to FGG employee Lourdes Barreneche about investing with FGG. Hunt Decl. Ex. 15. This resulted in a meeting later that same month between FGG and DBLA in Miami to discuss FGG funds, including Sentry. Hunt Decl. Exs. 20, 29 (internal FGG US emails recapping Miami meeting). This meeting was directly tied to investments into Sentry. *See* Hunt Decl. Exs. 20, 29. In October 2003, Lauren Ross of FGG New York emailed Guido Lucke, then with DBLA, providing subscription documents for Sentry and in response, Lucke requested a subscription for an additional $330,000. Hunt Decl. Ex. 21.

In October of 2003, DBLA executed a Sentry subscription agreement wherein it agreed to wire subscription funds to an account at a New York branch of HSBC Bank USA. Hunt Decl. Ex. 11 ¶ 3. In that same subscription agreement, DBLA also agreed that New York law would govern, that Sentry had U.S. counsel, and that any "suit, action or proceeding" with respect to the agreement may be brought in New York and submitted to the jurisdiction of New York. Hunt Decl. Ex. 11 ¶ 3.

Lucke and DBLA routinely communicated with FGG regarding DBLA's investments in the Fairfield Funds. *See* Hunt Decl. Exs. 21–25, 30. These in-person meetings, telephone calls, subscription agreements, and routine correspondence concerned the very transfers the Trustee

seeks to recover here. As such, these contacts sufficiently demonstrate that DBLA purposefully availed itself of the investment opportunity with BLMIS through the New York-based Fairfield Funds and that the Trustee's claims relate directly to those investments.

> **2.    Defendant's Exhibits Are Insufficient to Support a Motion to Dismiss the Pre-May 2005 Transfers**

With no factual basis to contest jurisdiction, Defendant asks this Court to hold that the Combination was a simple asset purchase and not a merger, as pleaded by the Trustee in his Complaint. Am. Compl. ¶ 54. Defendant's incomplete exhibits do not prove this fact and do not refute personal jurisdiction.[14] At the pleadings stage, the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in the Trustee's favor. The limited incomplete and internally inconsistent records provided with the Motion do not defeat the "plausibility" standard articulated by Justice Kennedy in *Ashcroft*. 556 U.S. at 680. Defendant's Motion and supporting exhibits are not sufficient to refute Trustee's *prima facie* showing of personal jurisdiction.

As detailed below, Defendant attaches a few pages from an article summarizing a presentation by a German professor at a 2016 symposium in Japan and UBS's United States SEC filing describing the deal "as a combination" as support for its request to dismiss for lack of personal jurisdiction. These documents are incomplete, carefully excerpted apparently to omit potentially relevant portions, and only summarize the Hive Down Plan without allowing the Trustee or this Court to obtain discovery related to and analyze any documents evidencing the final terms of the Combination, including, for example, the Asset and Share Purchase Agreement

---

[14] In fact, the document that Defendant chose not to include as an exhibit is titled "Asset **and Share** Purchase Agreement." King Decl. Ex.1 Preamble ¶ 5 (emphasis added).

referenced in the Preamble to Ex. 1 to the King Declaration. These documents fall short of establishing Defendant's burden under Rule 12(b)(2).

The documents selectively omit necessary information. Specifically, Defendant chose not to attach any of the "annexes" referenced in the Hive Down Plan identifying which assets were transferred and how and when the transfer was accomplished. *See, e.g.*, King Decl. Ex. 1 at 5, ¶ 3.1 (stating unattached Annex 3.1a shows the "transferring employees"); *Id.* at 7, ¶ 3.5 (stating unattached Annex 3.5 shows a list of "all contracts with financial advisors, referral agents and external portfolio managers which DBLA has entered into or will enter into by the Completion Date" which will transfer to UBS Lateinamerika). According to the Hive Down Plan, these annexes lay out the details of the employees, contracts, customers, real property, and more that transferred with the transaction. *See, e.g.*, *id.* ¶¶ 3.1, 3.5, 4.6, 6.3.

The Hive Down Plan is not the Combination's operative contract. Rather, it appears to be an internal DBLA document that purportedly summarizes how the Combination might have been constructed. Such a summary may, or may not, accurately depict the details of the deal. Defendant does not provide the remainder of the documents related to the Combination, some of which are referenced in the Hive Down Plan's Preamble, which could provide insight to the type of transaction that occurred. *See id.* at the Preamble. Because the Court must construe all pleadings in favor of the Trustee at the motion to dismiss stage, the Hive Down Plan fails to refute personal jurisdiction.

UBS Europe attaches an excerpt of an article that summarizes a presentation at a 2016 symposium in Japan. King Decl. Ex. 2, ECF No. 116-2. Defendant asks this Court to rely on the article to rule that DBLA's jurisdictional contacts cannot be attributed to UBS Europe, but the article appears to be a general overview of the author's understanding of corporate structures under

the German Transformation Act (the "German Act"). Defendant chose not to provide the entire

article, merely the table of contents, the first ten pages of the cited article, and the list of contributor

biographies. King Decl. Ex. 2. Defendant cut off the article in mid-sentence and in the middle of

a paragraph that appears to lead into discussion regarding the duty of companies in providing

security to creditors involved in a merger. *Id.* at 21. Defendant also selectively omitted the next

section of the article titled "Liability Arising From a Division" which appears to be what Defendant

is alleging is the relevant issue the Court should be addressing here. *Id.*

Relying on the article excerpt, Defendant asks this Court to interpret and issue a ruling

based on the German Act. *See* King Decl. Ex. 2; Mot. at 9. But this is neither a peer-reviewed

article nor an article from an authoritative source, and it does not provide the text of the German

Act or cite to any cases analyzing the German Act. It is not persuasive or legally binding on this

Court to prove the Combination was not a merger. The authority of the author who gives his

opinion of the law in Germany in 2016 or 2017 is not substantiated. In short, UBS Europe's claims

that an article summarizing a speech that was given eleven years after the Combination has any

weight in a determination whether the Combination was or was not a merger is absurd, particularly

at this stage of the proceedings. Construing the pleadings in the Trustee's favor, this article does

not rebut the *prima facie* case for personal jurisdiction over Defendant.

Finally, Defendant points to the UBS SEC Report as evidence that the Combination was

paid for in cash, rather than stock, and it was therefore an asset sale rather than a merger. *See* Mot.

at 11. The UBS SEC Report, filed with United States regulators, does not tell us anything about

how the UBS Europe/DBLA transaction was structured. Rather, it describes the Combination as a

"business combination," and provides the "cost of the acquisition" in Swiss francs. King Decl.

Ex. 3 at 362. Nothing in the description indicates that this was a cash transaction.[15] Instead, it simply lists the *value* of the sale in terms of the Swiss francs. It does not say how such value was provided and it certainly does not say "cash." Neither the Hive Down Plan nor the UBS SEC Report are sales agreements or other definitive deal documents that would show some of the details of the transaction. In fact, the UBS SEC Report explicitly states that "[n]one of the acquisitions was individually significant to the financial statements, and therefore they are presented in aggregate." *Id.* Thus, even if the type of transaction mattered, the UBS SEC Report does not provide adequate details to show that it was an asset sale and does not adequately refute Trustee's *prima facie* personal jurisdiction claim.

In summary, the documents referenced by Defendant do not say what Defendant alleges. Snippets of a symposium summary, generalized statements in an SEC filing, and a "plan" that does not include any of its referenced exhibits or the actual contracts memorializing the transaction are insufficient grounds for this Court to determine how the deal was structured or how it would be viewed under German or U.S. law. Thus, dismissal of the Pre-May 2005 transfers is unwarranted, particularly without discovery about the details of the Combination. Allowing targeted discovery regarding the circumstances of the Combination is particularly warranted because it only affects, at most, three of the transfers at issue (and less than $1 million of the total of nearly $9.3 million of subsequent transfers) and jurisdiction is clearly proper with respect to all of the others.

### 3.    The Exercise of Personal Jurisdiction Over UBS Europe Is Reasonable

Where the plaintiff has alleged purposeful availment, as the Trustee does here, this Court has correctly held that the burden shifts to the defendant to present a "compelling case" that

---

[15] Defendant claims that the fact the SEC filing says the "cost of the acquisition was approximately 136 CHF million" means that it was a cash sale, which, of course is not what it says. *See* Mot. at 17; King Decl. Ex. 3 at 362.

jurisdiction would be unreasonable. *In re Sentry Ltd.*, 627 B.R. at 567 (citing *Burger King*, 471 U.S. at 472–73). UBS Europe has not satisfied this burden.

As this Court has found in multiple prior adversary proceedings in this SIPA liquidation proceeding, the exercise of jurisdiction will not offend traditional notions of "fair play and substantial justice" under the circumstances of the particular case. *See, e.g.*, *Société Generale*, Adv. Pro. No. 12-01677 (CGM), 2022 WL 6237071, at *10–11 (finding that the exercise over a subsequent transferee is reasonable after weighing the "forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies" (citing *Burger King*, 471 U.S. at 477)); Memorandum Decision, *Picard v. Barfield Nominees Ltd.*, Adv. Pro. No. 12-01669 (CGM) (Bankr. S.D.N.Y. Sept. 28, 2022), ECF No. 105, at *9–10 (same); Memorandum Decision, *Picard v. Quilvest Finance Ltd.*, Adv. Pro. No. 11-02538 (CGM) (Bankr. S.D.N.Y. Sept. 27, 2022), ECF No. 122, at *9–10 (same). UBS Europe does not present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Chloé*, 616 F.3d at 165 (quoting *Burger King*, 471 U.S. at 477).

As this Court found in 25 previous denials of defendants' motions to dismiss in this SIPA liquidation proceeding, the exercise of jurisdiction over UBS Europe would be reasonable because UBS Europe is "not burdened by this litigation. Defendant has actively participated in this Court's litigation for over ten years. It is represented by U.S. counsel." *Multi-Strategy*, 641 B.R. at 10. Moreover, UBS Europe "'irrevocably' submitted to the jurisdiction of New York courts through the assignment of the subscription agreements with the Fairfield Funds." *Multi-Strategy*, 641 B.R. at 10; *Banca Carige*, Adv. Pro. No. 11-02570 (CGM), 2022 WL 2387522, at *8–9; *Lombard*, ECF

No. 115, at *9; *First Gulf*, ECF No. 100, at *10; *Banque SYZ*, ECF No. 167, at *9 (adding that the

defendant "filed a claim in this SIPA litigation"). And, as this Court held in *Multi-Strategy*, "[t]he

forum and the Trustee both have a strong interest in litigating BLMIS adversary proceedings in

this Court." *Multi-Strategy*, 641 B.R. at 88–89 (citing *Picard v. Maxam Absolute Return Fund,

L.P.* (*In re BLMIS*), 460 B.R. 106, 117, 119 (Bankr. S.D.N.Y. 2011), aff'd, 474 B.R. 76 (S.D.N.Y.

2012); *Picard v. Chais (In re BLMIS)*, 440 B.R. 274, 278 (Bankr. S.D.N.Y. 2010); *Picard v.

Cohmad Sec. Corp.* (*In re BLMIS*), 418 B.R. 75, 82 (Bankr. S.D.N.Y. 2009); *Picard v. Fairfield

Greenwich Grp.*, *(In re Fairfield Sentry Ltd.),* 627 B.R. 546, 568 (Bankr. S.D.N.Y. 2021)); *see

also In re Picard*, 917 F.3d 85, 103 (2d Cir. 2019) ("The United States has a compelling interest

in allowing domestic estates to recover fraudulently transferred property."). Therefore, it is beyond

doubt that this adversary proceeding is not now suddenly burdensome for Defendant to litigate.[16]

According to Defendant's own Hive Down Plan, Defendant combined DBLA's private

banking division, which "operated through . . . DLFA, Miami, Florida, USA, and its subsidiaries,"

with its UBS Wealth Management business operations. King Decl. Ex. 1 at 3.[1] The Hive Down

Plan explains that, through the hive down, UBS Europe would acquire DBLA's customer

relationships, employees, and "contracts with financial advisors, referral agents and external

portfolio managers." King Decl. Ex. 1 at 3–5, 7. Defendant knowingly assumed DBLA's activities

within the U.S., including investments in New York-based BLMIS through the Fairfield Funds,

---

[16] It is also notable that UBS Europe's parent company, UBS AG, had a "main office" in the forum and many others in the United States. Suppl. Corporate Ownership Statement of UBS Europe SE, at 1, ECF No. 103; Hunt Decl. Ex. 26 (UBS's website showing its New York location). In fact, the Connecticut location served as a correspondent bank to investors in the Fairfield Funds. *See* Hunt Decl. Ex. 27. UBS AG also sponsored and promoted a BLMIS feeder fund and corresponded directly with BLMIS for face-to-face meetings. Trustee's Mem. of Law in Opposition to Defs.' Mots. to Dismiss the Second Am. Compl., *Madoff v. UBS AG*, Adv. Pro. No. 10-04285 (CGM) (Bankr. S.D.N.Y. 2022), ECF No. 307, at *33–34. Defendant's parent company did extensive business with BLMIS in New York and the rest of the United States, exposing itself to litigation there. Defendant's reliance on a filing with the United States SEC in support of its arguments further demonstrates its strong relationship with the forum.

and then continued to correspond and transact with FGG employees in the forum regarding these accounts. Hunt Decl. Ex. 1. Therefore, it "comport[s] with fair play and substantial justice" to pursue Defendant where it knowingly did business.[1] *Burger King*, 471 U.S. at 477.

### 4.    In the Alternative, the Trustee Is Entitled to Jurisdictional Discovery and, If Needed, the Opportunity to Amend the Complaint

If this Court finds the Trustee has not yet made a *prima facie* showing of jurisdiction, the Trustee has certainly made a "threshold showing" warranting jurisdictional discovery, and respectfully requests that here. *Kiobel v. Royal Dutch Petroleum Co.*, No. 02 Civ. 7618 (KMW)(HBP), 2009 WL 3817590, at *4 (S.D.N.Y. Nov. 16, 2009); *see also Sweatland v. Park Corp.*, 181 A.D.2d 243, 245, 587 N.Y.S.2d 54, (N.Y. App. Div., 4th Dept. 1992) (where the plaintiff raised "an issue of material fact . . . regarding whether the transaction constituted a de facto merger" a motion for summary judgment was improper and further discovery was warranted). As this Court recently noted in the *Lion Global* case, "a plaintiff may obtain discovery in connection with issues related to the court's jurisdiction." Transcript of Hearing on Def.'s Mot. to Dismiss at 56:25–57:2, *Picard v. Lion Global Invs. Ltd.*, Adv. Pro. No. 12-01194 (CGM) (Bankr. S.D.N.Y. Oct. 19, 2022) (citing *Haber v. United States*, 823 F.3d 746 (2d Cir. 2016)). "If a plaintiff presents factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts between the parties in the forum state, the plaintiff's right to conduct jurisdictional discovery must be sustained." *Id.* The fact that Defendant chose to provide incomplete documents and insufficient details about the Hive Down and transaction between DBLA and UBS Europe, invites discovery on these issues.

Further, if the Court finds it necessary, the Trustee can replead with more specificity, based on the new documents Defendant attached to the King Declaration and once the correct effective

date of the Hive Down Plan and other relevant terms of the transaction between DBLA and UBS

Europe are determined.

## IV.    546(e) SAFE HARBOR

In *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12-MC-115, 2013 WL

1609154, at *1 (S.D.N.Y. Apr. 15, 2013) (Rakoff, J.) ("*Cohmad*"),[17] the District Court held that

an initial transferee's actual knowledge of Madoff's fraud precluded application of the

Section 546(e) safe harbor, thereby allowing the Trustee to avoid transfers made by BLMIS prior

to the two-year period referenced in Section 548(a)(1)(A). Defendant attempts to argue that

Section 546(e) bars recovery from it, notwithstanding Sentry's actual knowledge. *See* Mot. at 13.

However, as made clear in the District Court's recent denial of seven motions for leave for an

interlocutory appeal on the applicability of Section 546(e)'s safe harbor for similarly situated

defendants, this issue is fact-intensive and "do[es] not appear answerable on the pleadings." *Picard*

*v. Multi-Strategy Fund, Ltd.*, No. 22-cv-06502-JSR, 2022 WL 16647767, at *8-9 (S.D.N.Y. Nov.

3, 2022) ("*Multi-Strategy II*").

In *Multi-Strategy II*, the District Court ruled that this Court has handled the issue correctly

at the pleadings stage. Where the Trustee has pled Sentry's actual knowledge, *Multi-Strategy II*

confirms that any further analysis of Section 546(e) is inappropriate at the pleadings stage because

it is Defendant's burden to plead and prove, on a complete record, whether the Section 546(e) safe

harbor applies to the transfers the Trustee seeks to recover from Defendant. *See id.* at *9

("Questions that turn on factual allegations that have not yet been subject to any discovery or

---

[17] The decision in *Cohmad* finding that when a transferee, initial or otherwise, had knowledge of the fraud, does not fall under the protections of Section 546(e) issued in connection with consolidated proceedings before the District Court as to the application of Section 546(e). Defendant participated in those consolidated District Court proceedings and the District Court's review of this issue. *See* Opinion and Order ("546(e) Opinion"), *Picard v. UBS Deutschland AG, et al.*, Case No. 12-cv-09380-JSR, ECF No. 18; Mem. of Law in Supp. of Def. UBS Deutschland AG's Mot. to Withdraw the Reference, ECF No. 16. As such, Defendant is bound by *Cohmad* and that decision is law of the case.

summary judgment motion practice but simply have to be taken most favorably to the plaintiff in their current state are better addressed after discovery is complete . . . .”). These facts are not known at this stage of the litigation and certainly cannot be determined from the pleadings, or Defendant's Motion.

A.      **The Trustee Sufficiently Alleged Sentry Had Actual Knowledge of Madoff's Fraud**

This Court has previously found the Trustee has sufficiently pled that the initial transferee, Sentry, had actual knowledge of Madoff's fraud and that such initial transfers are avoidable. *Picard v. Fairfield Inv. Fund Ltd.*, No. 09-01239 (CGM), 2021 WL 3477479, at *4 (Bankr. S.D.N.Y. Aug. 6, 2021). In *Multi-Strategy II*, the District Court clarified that "Section 546(e) could not be read to protect payments received by persons or entities who knew they were not 'settlement payments' or transfers made in connection with a securities contract." *Multi-Strategy II,* 2022 WL 16647767, at *6 (citing *Cohmad*, No. 12-MC-115, 2013 WL 1609154, at *3). The court further expounded on its decision in *Cohmad* finding that the avoidability of the initial transfers does not turn on the "subjective mental knowledge" of the subsequent transferee, and the Trustee is not required to plead actual knowledge of the subsequent transferee. *Id.* at *5-7 (defendants' "lack of knowledge of Madoff's fraud cannot render unavoidable the otherwise avoidable initial transfer from Madoff Securities to Fairfield").

B.      **Section 546(e) Does Not Apply Independently to Recovery Actions**

Under its plain language, Section 546(e) applies to the avoidance of initial transfers, not the recovery of subsequent transfers under Section 550. *See* 11 U.S.C. § 546(e); *Multi-Strategy II,* 2022 WL 16647767, at *5 (confirming this Court's finding that "by its terms, the Section 546(e) safe harbor is a defense to the avoidance of the <u>initial</u> transfer.") (internal citations omitted) (emphasis in original)). This is consistent with the well-established principle that "the concepts of

avoidance and recovery are separate and distinct." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 501 B.R. 26, 30 (S.D.N.Y. 2013) (Rakoff, J.). It is also consistent with the understanding that the Bankruptcy Code's avoidance provisions protect against depletion of the debtor's estate, while Section 550 is a "utility provision," intended to execute on that purpose by "tracing the fraudulent transfer to its ultimate resting place." *See In re Picard*, 917 F.3d 85, 98 (2d Cir. 2019).

*Cohmad* confirmed that Section 546(e) does not provide an independent safe harbor for Section 550 recovery actions against subsequent transferees. The District Court withdrew the reference on whether or not Section 546(e) barred recovery of a subsequent transfer pursuant to Section 550.[18] However, in its decision, the court specifically limited the safe harbor to avoidance claims based on the plain language of Section 546(e). *See Cohmad*, No. 12-MC-115, 2013 WL 1609154, at *4, *9 (applying the "plain terms" of Section 546(e)); *id.* at *7 (recognizing that subsequent transferees can raise initial transferees' defenses to *avoidance*); *id.* at *10 ("[B]oth initial transferees and subsequent transferees are entitled to raise a defense based on the application of Section 546(e) to the *initial* transfer from Madoff Securities." (emphasis added)).

## V.    UBS EUROPE'S ASSERTION OF A MERE CONDUIT DEFENSE IS IMPROPER AT THIS STAGE

Defendant improperly tried to shift its burden to plead an affirmative defense that it was a mere conduit under Section 550 of the Bankruptcy Code. As recognized by this Court, whether a transferee is a mere conduit is an affirmative defense, and an affirmative defense cannot be established on the face of a complaint, unless under the "limited exception" where "the facts supporting the defense appear on the face of the complaint," and "it appears beyond doubt that the

---

[18] *See* Section 546(e) Briefing Order, *In re Madoff Sec.*, No. 12-MC-115, ECF No. 119 (S.D.N.Y. May 16, 2012) (withdrawing the reference on issue of "whether application of Section 546(e) to an initial or mediate Transfer bars recovery by the Trustee of any subsequent Transfer pursuant to Section 550").

plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). Defendant has not and cannot do that here.

### A.    The Pleadings Establish Defendant Is a Transferee

To recover a subsequent transfer under Section 550(a), the Trustee must show "that the transfer was avoided and that the defendant is an initial or subsequent transferee." *Picard v. Citibank*, 12 F. 4th 171, 197 (2d Cir. 2021) (citing COLLIER ON BANKRUPTCY ¶ 550.05 (16th ed. 2021)). The Trustee must also "allege the 'necessary vital statistics—the who, when, and how much—of the purported transfers to establish an entity as a subsequent transferee of the funds.'" *Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018) (citations omitted). At the pleadings stage, this "'does not require dollar-for-dollar accounting' of the exact funds at issue." *Id.*

In compliance with Rule 550(b)'s pleading requirements, the Trustee alleges that Defendant's predecessor, DBLA, was a shareholder in the Fairfield Funds and received subsequent transfers of stolen BLMIS Customer Property as redemptions of its equity interests. Am. Compl. ¶¶ 2, 3, 5, 25, 101, 112. The Trustee alleges that DBLA purposefully invested in and received redemption payments from the Fairfield Funds and entered into subscription agreements, designating specific New York bank accounts (at least one of which was in DBLA's name), to receive subsequent transfers. *Id.* ¶¶ 5, 10, 16, 19, 23; *see also* Am. Compl. ¶¶ 7, 24, 91, 99, 101, 104. The Trustee alleges the necessary vital statistics of the Transfers he seeks to recover in exhibits to the Amended Complaint. Am. Compl. Exs. C and F. And, based on the Hive Down Plan, it appears that Defendant itself actually received at least 10 and up to 13 of those transfers after the Combination. *See supra* Section III.B. The Trustee also alleges that the transfers from BLMIS to Fairfield Sentry are avoidable. Am. Compl. ¶¶ 97, 98. Therefore, the Trustee has met his pleading burden under Section 550.

Additionally, nothing on the face of the Amended Complaint supports an argument that Defendant, or its predecessor, was a mere conduit. The Trustee, for example, does not allege that Defendant received lacked control over the subsequent transfers. Defendant distorts paragraph 7 of the Amended Complaint claiming it says that "the Trustee's factual allegations indicate that the funds were received on behalf of its 'private and business [banking] clients,'" but that is not what it says. Paragraph 7 unequivocally alleges Defendant was the subsequent transferee stating: "[w]hen Defendant received the subsequent transfers of BLMIS customer property." The rest of paragraph 7 discusses the general nature of Defendant's business. Paragraph 54, also cited by Defendant, similarly provides no support for the argument DBLA was a mere conduit. That paragraph merely addresses the changes to DBLA in becoming UBS Europe.

### B.    Mere Conduit is an Affirmative Defense, and Defendant's Burden to Plead

Regardless of how it frames the argument in its Motion, what Defendant really wants is to have this Court shift the burden of pleading its affirmative defense to the Trustee, and require the Trustee to plead facts necessary to support Defendant's affirmative defense by making the elements of the defense and element of the Trustee's 550 claim. *See* Mot. at 22–23. Defendant is wrong. Negating a mere conduit affirmative defense is not an element of a 550 claim, and it is the Defendant's burden to plead that defense.

The Second Circuit was clear in *Picard v. Citibank*, 12 F.4th 171 (2d Cir. 2021) that the party seeking the protection of an affirmative defense has the burden to plead that defense. Defendant is asking this Court to disregard *Citibank*, contort the pleading obligations under Section 550(b), find it is the Trustee's burden to negate the mere conduit affirmative defense at the pleadings stage, and dismiss the Amended Complaint. *See* Mot. at 23. Defendant argues that in order to plead it was a transferee, the Trustee must show not only receipt of the transferred funds, but also that Defendant held the legal right of control and use of those transferred funds.

Mot. at 21–23. Defendant is wrong on the legal standard and ignores the Trustee's allegations that it—not its unnamed clients—submitted the redemption requests and Defendant—not its unnamed clients—was a subsequent transferee of stolen Customer Property. Now, it is Defendant's burden to establish the fact-intensive mere conduit defense. *See Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296, 1304 (11th Cir. 2020) ("[T]he mere conduit defense is an affirmative defense that must be proved by the defendant seeking its protection."); *In re Palm Beach Finance Partners, L.P.*, 488 B.R. 758, 771 (Bankr. S.D. Fla. 2013) ("The defendant's burden of pleading an affirmative defense means that it will rarely be appropriate for a court to grant a motion to dismiss based upon an affirmative defense. This is especially true when the affirmative defense is comprised of factually intensive elements.").

### C.    Mere Conduit Defense Inappropriate for a Motion to Dismiss

Because of the many factual questions inherent in resolving it, courts rarely address the mere conduit defense at the pleadings stage. *See, e.g.*, *In re Glob. Crossing, Ltd.*, 385 B.R. 52, 57, n.1 (Bankr. S.D.N.Y. 2008) (denying a defendant's motion to dismiss and noting that the assertion of the mere conduit defense in "better addressed on summary judgment."); *Picard v. Miller* (*In re BLMIS*), 631 B.R. 1, 14 (Bankr. S.D.N.Y. July 2, 2021) (same); *Sarachek v. Schochet* (*In re Agriprocessors*), Adv. No. 10-09190, 2012 WL 4059897, at *10 (Bankr. N.D. Iowa Sept. 14, 2012) (denying motions to dismiss and for summary judgment to provide "[a]dditional time . . . necessary to further develop the factual record"). It is not surprising that the vast majority of the cases cited by Defendant address the issue at the summary judgment stage or later.[19] In fact, depending on the

---

[19] *See In re Finley*, 130 F.3d 52 (2d Cir. 1997) (ruling on motion for summary judgment); *Keller*, 634 B.R. 39 (same); *Authentic Fitness Corp. v. Dobbs Temp. Help Servs., Inc.* (*In re The Warnaco Group, Inc.*), No. 01 B 41643 (RLB), 01-03628 (RLB), 03 Civ. 4201 (DAB), 2006 WL 278152 (S.D.N.Y. Feb. 2, 2006) (affirming decision granting partial summary judgment); *Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d 890, 896 (7th Cir. 1988) (same); (*Bear, Stearns Sec. Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*), 397 B.R. 1 (S.D.N.Y. 2007) (ruling on motion for summary judgment); *Meoli v. Huntington Nat'l Bank*, 848 F.3d 716 (6th Cir. 2017) (ruling on an appeal following two trials and multiple opinions, including a ruling on a motion for summary judgment); *Malloy v. Citizens Bank of*

facts at issue, the conduit defense may not even be resolvable through summary judgment. *See, e.g.*, *In re CVEO Corp.*, 327 B.R. 210, 217–18 (Bankr. D. Del. 2005) (holding that genuine issues of material fact preclude entry of summary judgment on mere conduit defense to preference claims).

The scarcity of caselaw applying the mere conduit defense at the pleadings stage makes sense, as the defense would need to be apparent on the face of the complaint—which was the case in very few of the citations upon which Defendant relies.[20] Those cases differ greatly from the situation here where the Amended Complaint alleges specifically that Defendant received the Customer Property at issue, sending the funds to bank accounts held in its own name.

### D.    Even if Analysis of the Mere Conduit Defense Is Appropriate, Defendant's Motion Fails To Allege Any Facts in Support of the Defense

To establish a mere conduit defense, Defendant must show that it or its predecessor lacked dominion and control over all transactions at issue. *See Christy v. Alexander & Alexander of N.Y. Inc.* (*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*), 130 F.3d 52, 57–58 (2d Cir. 1997) ("*In re Finley*") (summary judgment decision); *Picard v. Keller Family Trust* (*In re BLMIS*), 634 B.R. 39, 44, 49–52 (Bankr. S.D.N.Y. 2021) (summary judgment decision), (aff'd, No. 1:21-cv-08678-JPO (S.D.N.Y. Sept. 30, 2022)).

---

*Sapulpa* (*In re First Sec. Mortg. Co.*), 33 F.3d 42 (10th Cir. 1994) (appeal of judgment); *Rupp v. Markgraf*, 95 F.3d 936 (10th Cir. 1996) (ruling on motion for judgment as a matter of law following the close of the trustee's case); *Menotte v. United States* (*In re Custom Contractors, LLC*), 745 F.3d 1342 (11th Cir. 2014) (ruling on an appeal after trial); *Nordberg v. Societe Generale* (*In re Chase & Sanborn Corp.*), 848 F.2d 1196 (11th Cir. 1988) (same).

[20] *See, e.g.*, *Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293 (Bankr. S.D.N.Y. 1999) (dismissing complaint because the mere conduit defense was apparent on the face of complaint alleging that defendant CFO took money from the debtor and transferred it to debtor's principal but did not allege defendant received any of the subject payments, benefitted from them, or was the intended beneficiary); *In re Mervyn's Holdings, LLC*, 426 B.R. 96 (Bankr. D. Del. 2010) (dismissing defendant bank in multi-defendant action that acted as the trustee for an identified trust holding mortgage pass-through certificates, loans, and liens generated in connection with the sale of the debtor). Defendant also cites to *Super Vision Int'l, Inc. v. Mega Int'l Com. Bank Co.*, 534 F. Supp. 2d 1326 (S.D. Fla. 2008) and *In re Lyondell Chem. Co.*, 503 B.R. 348 (Bankr. S.D.N.Y. 2014). However, *Super Vision* is a non-bankruptcy case alleging RICO claims and *Lyondell* arose out of leverage buyout payments. Moreover, in both cases, unlike the case here, the complaints established the mere conduit defense on their face.

"Mere" means "mere." While asking this Court to rule preemptively, even Defendant, through the cases it cites, recognizes that the extent to which a recipient has legal rights to the redemption payments is a relevant consideration. *Bear, Stearns Securities Corp. v. Gredd* (*In re Manhattan Investment Fund Ltd.*), 397 B.R. 1, 17–19 (Bankr. S.D.N.Y. 2007) (if a recipient is subject to some restrictions on the use of the funds, it is not a conduit) (summary judgment decision); *In re Enron Corp.*, 361 B.R. 36, 48 (Bankr. S.D.N.Y. 2006) (summary judgment determining whether entity was mere conduit required resolution of whether it had legal title to the payments); *Nisselson v. Salim* (*In re Big Apple Volkswagen, LLC*), Adv. Pro. No. 11–2251 (JLG), 2016 WL 1069303, at *1, 17 (Bankr. S.D.N.Y. Mar. 17, 2016) (finding on summary judgment that defendant was not a conduit where transfers were received without restriction into bank account in her name). The question of Defendant's dominion and control will turn on information Defendant possesses, including: (i) the specific requirements of any agreements among the Defendant, the transferor, and the purported ultimate recipients; (ii) communications related to the transfers; (iii) how and whether the Defendant received fees; and (iv) the relationship between the transferor and the Defendant, and between the Defendant and the alleged ultimate recipients.

Defendant's Motion fails to even allege that it received the funds on behalf of any "private and business clients" or identify anyone for whom they claim to have acted as a conduit and for which transfers. *See, e.g.*, *In re Finley*, 130 F.3d at 58–59 (engaging in a detailed analysis of the relationship between the defendant and the supposed ultimate recipient of the funds in order to resolve the mere conduit issue); *Keller*, 634 B.R. at 51–52 (similar). Defendant merely notes that the Amended Complaint "fails to allege facts . . . that DBLA was acting, in connection with these transfers, as anything other than a mere conduit for the customers of its 'banking and wealth

36

management operations,'" without affirmatively alleging that it was acting on behalf of any such "customers" or "clients" or identify the supposed ultimate recipients of the funds. Mot. at 2, 23.

At this stage, only Defendant knows what it did with the stolen Customer Property after it received it from Sentry. If Defendant intends to assert the mere conduit defense, the Trustee has the right to know who was on the receiving end of the purported conduit and explore Defendant's relationship with its purported end-user clients. Consideration of this defense clearly must wait for another day.

## VI.    THE SECTION 550(B) GOOD FAITH AFFIRMATIVE DEFENSE IS SIMILARLY IMPROPER FOR A MOTION TO DISMISS

Just as Defendant's fact-dependent mere conduit arguments are inappropriate for determination at the pleadings stage, so too is Defendant's assertion of the 550(b) good faith affirmative defense. Although it is not the Trustee's burden to plead good faith, as expressly found by the Second Circuit in *Citibank*, Defendant nevertheless attempts to make an unsupportable argument that its good faith is established as a matter of law on the facts of the Amended Complaint. *See* Mot. at 23–27.

This Court should reject Defendant's attempt to raise this affirmative defense on a motion to dismiss, just as it and the District Court recently did. *Banque Syz*, 2022 WL 2135019, at *11; *First Gulf*, 2022 WL 3354955, at *11; *Picard v. ABN Ireland (In re BLMIS)*, No. 20-CV-02586 (CM), 2022 WL 1304589, at *3 (S.D.N.Y. May 2, 2022) (McMahon, J.) ("*ABN Ireland*"). Like Defendant here, the defendants in *Banque Syz*, *First Gulf*, and *ABN Ireland* argued that the complaint allegations established their good faith defense. *Banque Syz*, 2022 WL 2135019, at *11; *First Gulf*, 2022 WL 3354955, at *11; *ABN Ireland*, 2022 WL 1304589, at *3. Both this Court and the District Court rejected that argument and concluded that the good faith affirmative defense could not be resolved at the pleadings stage. *ABN Ireland*, 2022 WL 1304589, at *3; *Banque Syz*,

2022 WL 2135019, at *11 ("The burden of proving good faith falls squarely on [the defendants] and this Court cannot make a determination on [the defendants'] affirmative defense until after a fact-intensive inquiry."); *First Gulf*, 2022 WL 3354955, at *11 (same).

As discussed above, by their very nature, affirmative defenses are fact-driven and require the presentation and analysis of evidence. *United Teamster Fund v. MagnaCare Admin. Servs.*, *LLC*, 39 F. Supp. 3d 461, 475 (S.D.N.Y. 2014) ("Affirmative defenses 'often require[ ] consideration of facts outside the complaint and thus [are] inappropriate to resolve on a motion to dismiss.'") (quoting *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013)). In its rejection of the defendants' good faith argument, the court in *ABN Ireland* highlighted the fact that the good faith inquiry notice standard is "a fact-intensive inquiry to be determined on a case-by-case basis, which naturally takes into account the disparate circumstances of differently-situated transferees." *ABN Ireland*, 2022 WL 1304589, at *3 (quoting *Citibank*, 12 F.4th at 194).

As such, even if this Court were to consider Defendant's fact-intensive affirmative defense, there are myriad unknown facts critical to opposing a good faith defense, which the Trustee must be given the opportunity to uncover through discovery. *See ABN Ireland*, 2022 WL 1304589, at *3. ("The Trustee rightfully points out that such a fact-based determination 'can only be made based on the entirety of the factual record after discovery which has not occurred here, not from isolated documents cherry-picked by Appellees and factual inferences Appellees improperly seek to have drawn in their favor.'"); *Merkin I*, 440 B.R. at 257 ("[W]hether the Moving Defendants acted in good faith when they allegedly accepted hundreds of millions of dollars in transfers of BLMIS funds is a disputed issue that this Court can properly determine only upon consideration of all of the relevant evidence obtained through the discovery process.").

Tellingly, Defendant fails to cite to a single case in which a court has granted a motion to dismiss at the pleadings stage based on a good faith defense. Defendant clearly cannot prevail on the good faith affirmative defense on a motion to dismiss unless it can show that the Trustee is unable to prove any set of facts to support his claim. *See McKenna*, 386 F.3d at 436; *Merkin I*, 440 B.R. at 256 (characterizing the assertion of an affirmative defense at the pleadings stage as a "limited exception to the general rule"). Defendant does not meet that standard here.

Arguments concerning value are also inappropriate for a motion to dismiss barring highly unusual circumstances, which Defendant has failed to show exist here. *See, e.g.*, *Fairfield Inv. Fund*, 2021 WL 3477479, at *9 ("Whether the Defendants gave value is a question of fact to be resolved either at the summary judgment stage or at trial."). And, indeed, this Court has previously concluded that "[a]s to whether the Defendant 'gave value' in the form of surrendering shares in the Fairfield Funds, such a determination cannot be made as a matter of law or fact at this stage." *Id.*

VII.    **CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests that the Court deny Defendant's Motion in its entirety. Alternatively, should the Court conclude it is necessary and appropriate, the Trustee respectfully requests the opportunity to conduct jurisdictional discovery related to the transaction between DBLA and UBS Europe and, if necessary, amend his complaint.

Dated:  November 14, 2022
        New York, New York


Of Counsel:

**Baker & Hostetler LLP**
811 Main Street, Suite 1100
Houston, Texas 77002
Telephone: (713) 751-1600
Facsimile: (713) 751-1717
Dean D. Hunt
Marie L. Carlisle

/s/ David J. Sheehan
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Torello Calvani

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the Chapter 7 Estate of*
*Bernard L. Madoff*