**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 10-04285 (CGM) |
| UBS AG, UBS (Luxembourg) SA, et al., | |
| Defendants. | |

**MEMORANDUM DECISION DENYING THE ACCESS DEFENDANTS' MOTION TO DISMISS**

**A P P E A R A N C E S :**

KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Plaza
New York, New York 1002
*Attorneys for Defendants Access International Advisors LLC, Access International Advisors Ltd., Access Management Luxembourg SA, Access Partners SA, Patrick Littaye, Claudine Magon de la Villehuchet, and Groupement Financier Ltd.*
By:     Anthony Paccione, Esq.

BAKER HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of*
*Bernard L. Madoff*
By:    Jessica Fernandez, Esq.

**CECELIA G. MORRIS**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is Defendants', Access International Advisors, LLC ("Access

LLC"), Access International Advisors, Ltd. ("Access Ltd." or "AIA Ltd.[1]"), Access Management

(Luxembourg), S.A. (f/k/a Access International Advisors (Luxembourg) S.A. ("AIA (Lux)"))

("AML"), Access Partners, S.A ("AP (Lux)"), Patrick Littaye ("Littaye") and Claudine Magon

de la Villehuchet individually and in the capacities ascribed to her in the caption above and

Groupement Financier Ltd. ("Groupement Financier") (together the "Access Defendants[2]"),

motion to dismiss the complaint of Irving Picard, the trustee ("Trustee") for the liquidation of

Bernard L. Madoff Investment Securities LLC ("BLMIS") seeking to recover subsequent

transfers allegedly consisting of BLMIS customer property. (Mot. Dismiss, ECF No. 290). The

Access Defendants seek dismissal for failure to state a claim due to the "safe harbor" provision

of the Bankruptcy Code; for failure to plead actual intent to defraud on the part of BLMIS; and

for failure to allege that they received BLMIS customer property. Some of the Access

Defendants have also moved to dismiss for lack of personal jurisdiction. For the reasons set

forth herein, the motion to dismiss is denied in its entirety.

---

[1] The Trustee has abbreviated Access International Advisors, Ltd. as "AIA Ltd." in the Complaint. The Court uses the Trustee's abbreviation of AIA Ltd. when quoting the Complaint.
[2] The "Access Defendants" are defined differently in the Trustee's Complaint.

## Jurisdiction

This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08-CV-10791, and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O). This Court has subject matter jurisdiction over these adversary proceedings pursuant to 28 U.S.C. §§ 1334(b) and 157(a), the District Court's Standing Order of Reference, dated July 10, 1984, and the Amended Standing Order of Reference, dated January 31, 2012. In addition, the District Court removed the SIPA liquidation to this Court pursuant to SIPA § 78eee(b)(4), (*see* Order, Civ. 08– 01789 (Bankr. S.D.N.Y. Dec. 15, 2008) ("Main Case"), at ¶ IX (ECF No. 1)), and this Court has jurisdiction under the latter provision. Personal jurisdiction has been contested by several Defendants and will be addressed *infra*.

## Background

The Court assumes familiarity with the background of the BLMIS Ponzi scheme operated by Bernard L. Madoff ("Madoff") and its SIPA proceeding. *See Picard v. Citibank, N.A. (In re BLMIS),* 12 F.4th 171, 178–83 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard,* 142 S. Ct. 1209, 212 L. Ed. 2d 217 (2022).

This adversary proceeding was filed on November 23, 2010. (Compl., ECF[3] No. 1). The Trustee filed an amended complaint on February 28, 2022 ("Complaint"). (Am. Compl., ECF No. 274). Via the Complaint, the Trustee is seeking to recover transfers of customer property allegedly made by BLMIS to Defendants, Luxalpha SICAV ("Luxalpha") and Groupement Financier.

Luxalpha and Groupement Financier (collectively, the "Feeder Funds") were investment vehicles that fed into BLMIS. (Am. Compl. ¶ 16). It is alleged that the Feeder Funds were created to invest in BLMIS with full knowledge of BLMIS' fraud. (*Id.* ¶ 6) ("Defendants knew BLMIS was operating a fraud."); (*id.* ¶¶ 233, 352, 397). The knowledge of BLMIS's fraud ultimately stems from a close friendship between Madoff and Littaye that dates back to 1985. (*Id.* ¶¶ 1, 109). Littaye and Thierry Magon de la Villehuchet ("Villehuchet") started an investment firm called Access International Advisors ("Access"). (*Id.* ¶ 2). Access is comprised of a series of investment companies, including Access International Advisors, Inc., Access LLC, Access Ltd., AIA (Lux), and AP (Lux). (*Id.*). The Feeder Funds were established by Access as two of several BLMIS feeder funds. (*Id.* ¶¶ 2, 110).

Prior to establishing the Feeder Funds, Littaye and Villehuchet had established several other BLMIS feeder funds through Access. (*Id.* ¶ 109). One of those funds was called Oreades SICAV ("Oreades"). (*Id.* ¶ 3). In order to operate as an "Undertakings for Collective Investments in Transferable Securities" ("UCITS") under Luxembourg law (*id.*¶ 98), a fund needed to have "a promoter, or sponsor, playing a key role in the creation, launch, and management/administration of the fund." (*Id.* ¶ 166). The sponsor was required to be experienced and financially sound, and "would be liable to third parties for damages in the event

---

[3] Citations to this Court's electronic docket refer to the docket of adversary case number 10-04285 unless otherwise noted.

faults, omissions, or deficiencies were committed in the management or administration of the fund." (*Id.* ¶ 166). Oreades opened BLMIS accounts in November 1997 and continued to operate as a BLMIS feeder fund until March of 2004, when its sponsor, BNP Paribas, determined that the relationship between Oreades and BLMIS was too risky to continue. (*Id.* ¶ 112–13).

BNP Paribas advised Access about several concerns that it had about BLMIS. (*Id.* ¶ 121). These included BLMIS' refusal to disclose its role as Oreades' asset manger to Luxembourg regulator, the Commission de Surveillance du Secteur Financier ("CSSF"); BLMIS' simultaneous roles as Oreades' custodian, broker-dealer, and investment adviser; the inexistence of a segregated Oreades's account at BLMIS; BLMIS' use of asynchronous faxed and mailed statements to deliver trading activity; and BLMIS' deliberate choice to evade United States and Luxembourg regulations and the scrutiny that accompanies such regulation. (*Id.* ¶ 113–22). BNP Paribas did not want to be liable to Oreades's investors. (*Id.* ¶ 122). Shortly after raising these concerns, Oreades was shut down and its BLMIS accounts closed. (*Id.* ¶ 121). BNP Paribas' exit from BLMIS investments was not the first time Access became aware of BLMIS' way of doing business. (*Id.* ¶ 278) ("In 2000 Access instructed that Madoff should not appear in any official document. In a 2004 document, Littaye wrote, '[w]e underline the confidentiality of the product, and insist on the fact that [Madoff's] name must never be published.'") (cleaned up). In order to continue operating as a BLMIS feeder fund, BNP Paribas needed to be replaced as the fund's sponsor. (*Id.* ¶ 123).

**Luxalpha**

One week after Oreades' BLMIS accounts were closed, in March 2004, Luxalpha opened BLMIS accounts with UBS Europe SE (f/k/a UBS (Luxembourg) S.A.) ("UBS SA[4]") as its

---

[4] The Complaint refers to UBS AG, UBS SA, UBS Fund Services (Luxembourg) S.A., and UBS Third Party Management Company S.A. collectively as "UBS," or the "UBS Defendants." (Am. Compl. ¶ 5).

sponsor, despite Access and UBS SA allegedly having knowledge of BNP Paribas' concerns

regarding BLMIS and other "warnings of fraud."  (Am. Compl. ¶¶ 125, 130, 159).  Internally at

Access, the closing of Oreades and opening of Luxalpha was referred to as a "name change" and

a "switch." (*Id.* ¶ 129).  Luxalpha was initially funded with withdrawals from Oreades.  (*Id.* ¶

128).  "At least eleven of Oreades's investors withdrew approximately $330 million from

Oreades and promptly reinvested those sums in Luxalpha."  (*Id.* ¶ 128).  During the transition

from Oreades to Luxalpha, a UBS AG employee "expressed deep reservations" about BLMIS.

(*Id.* ¶ 131) ("We normally have to give 'NO' as the answer in cases like Madoff.") (cleaned up).

Despite this, UBS decided that the income it could generate through BLMIS outweighed the risk

of fraud.  (*Id.* ¶¶ 132–33).

BLMIS' fee structure was not customary in the industry and was structured in order to

entice hedge fund managers and entities like Access and UBS to invest in BLMIS.  Instead of

charging the customary investment advisory fee of "1% to 2% of assets under management plus

a performance fee of 10% to 20% of profits earned by the investment," BLMIS charged "$1 per

option contract and $0.04 per equity share traded."  (*Id.* ¶ 274).  This left "hundreds of millions,

if not billions, of dollars on the table" that could be collected by hedge funds as management

fees.  (*Id.*)  The Trustee has alleged that the generation of such fees was one of the primary

purposes that Defendants operated the Feeder Funds.  (*Id.* ¶ 91) ("AIA Ltd. is described in

Access's internal documents as an offshore 'money box' set up for the 'prime purpose [of] … the

receipt of fees' on behalf of Access."); (*id.* ¶ 111) ("Littaye's and Madoff's relationship also

allowed Access to obtain fees derived from BLMIS investments, through which Littaye and

Villehuchet enriched themselves."); (*id.* ¶ 204) ("The net effect of the operating procedures put

in place for Luxalpha was to allow UBS SA and UBSFSL[5], two sophisticated financial

institutions that appeared to the public to be directly involved in the operation of Luxalpha, to

earn fees for serving in roles that actually provided no real oversight or protection for Luxalpha's

assets . . . ."). None of the issues raised by BNP Paribas were corrected before Luxalpha began

investing in BLMIS. (*Id.* ¶ 4).

According to the Complaint, Access used UBS as a "front" or "window dressing" to give

the appearance of compliance with Luxembourg law and "to deflect regulatory scrutiny by

interposing a large, reputable, international bank between Luxalpha and BLMIS." (*Id.* ¶¶ 169–

71. In exchange for allowing Access to use its reputation in this way, additional protections were

put in place "to shield UBS from potential liability." (*Id.* ¶ 4). Littaye and Villehuchet allegedly

used a network of Access-related entities and shell corporations to service BLMIS feeder funds,

including Luxalpha. (*Id.* ¶ 77). One such shell entity, Access International Advisors

(Luxembourg) S.A.[6] ("AIA (Lux)"), that nominally served as Luxalpha's portfolio manager and

portfolio advisor (*id.* ¶ 93), entered into a series of indemnity agreements with UBS SA and

Luxalpha's directors (who were also UBS SA employees). (*Id.* ¶ 158). The indemnity

agreements "purported to indemnify and hold harmless the directors and UBS SA for any

liabilities resulting from their involvement with Luxalpha." (*Id.*). The parties to the agreement

acknowledged and agreed that USB SA would "act as a figure head to third parties in the

sponsorship and in the management[]" of Luxalpha. (*Id.* ¶ 159). And that AIA Lux would

assume UBS SA's liability for "damages resulting from proved irregularities, inadequacies, or

omissions in the administration or management" of Luxalpha." (*Id.*). In addition to the

---

[5] The Complaint defines UBS Fund Services (Luxembourg) S.A. as "UBSFSL."

[6] AIA (Lux) eventually became Access Management Luxembourg S.A. ("AML"). (Am. Compl. ¶ 92). "Upon AML's appointment as Luxalpha's manager in November 2008, it entered into substantially similar indemnity agreements with UBS SA and the Luxalpha directors. Through these indemnity agreements, the UBS Defendants continued to limit the liability to which Luxalpha exposed them." (Am. Compl. ¶ 161).

indemnity agreements, USB SA "demanded that Access provide a 'hold harmless' letter from Luxalpha's investors for loss resulting from BLMIS's failure" and "required Access to obtain and pay for an insurance policy covering Luxalpha's risks." (*Id.* ¶ 160).

Luxalpha's board of directors consisted of senior UBS and Access personnel, and its service providers were UBS and Access entities. (*Id.* ¶ 134). Even though UBS SA formally served as Luxalpha's custodian, UBS SA "entered into a separate agreement with BLMIS that explicitly designated BLMIS as the sub-custodian of Luxalpha's assets, unbeknownst to Luxalpha's investors and the Luxembourg regulators." (*Id.* ¶ 126).

**Groupement Financier**

Access established Groupement Financier as a BLMIS feeder fund in February 2003. (Am. Compl. ¶ 135). Groupement Financier is a British Virgin Islands ("BVI") investment fund that invested 100% of its assets directly with BLMIS. (*Id.* ¶ 104).

In 2005, UBS serviced Groupement Financier and, it is alleged that the UBS and Access Defendants operated both Luxalpha and Groupement Financier. (*Id.* ¶ 6). The BLMIS Feeder Funds shared information, officers, and directors. (*Id.*) UBS SA was Groupement Financier's "prime bank," or sponsor, and in this role "was responsible for the receipt of the fund's subscription monies and the subsequent transfer of those monies to the Bank of Bermuda, which acted as Groupement Financier's beneficiary bank." (*Id.* ¶ 72). "UBS SA was also responsible for maintaining a mirror book-keeping of all transactions reported by BLMIS so as to enable UBSFSL, the fund's administrator, to calculate the fund's net asset value ('NAV')." *Id.* AIA (Lux) and AP (Lux) served nominally as Groupement Financier's investment adviser. (*Id.* ¶ 138). In reality, this role was allocated to BLMIS. (*Id.* ¶ 138).

**Trustee's Complaint**

In his Complaint, the Trustee asserts eight counts.  (Am. Compl. ¶ 348–99).  Counts one

and eight are asserted only against Luxalpha.  (*Id.* ¶¶ 355, 399).  Via counts one and eight, the

Trustee is seeking to subordinate and disallow Luxalpha's customer claim.  *Id.*  Counts two,

three, four, five, and six are asserted only against the Feeder Funds.  (*Id.* ¶¶ 356–88).  In counts

two through six, the Trustee is seeking to recover transfers of BLMIS customer property that

BLMIS made to the Feeder Funds (the "Initial Transfers").  *Id.*

**Initial Transfers**

According to the Complaint, "[t]he Feeder Fund Defendants collectively invested

approximately $2 billion with BLMIS through more than 150 separate transfers via check and

wire directly into the [JPMorgan Chase in New York, Account No. xxxxxxxxxxx1703 (the "703

Account")]."  (Am. Compl. ¶ 326).  The Trustee is seeking to avoid at least $1.1 billion in

transfers paid from BLMIS to the Feeder Funds within six years of the filing date of this SIPA

case (the "Six Year Transfers").  (*Id.* ¶ 327).  Of the Six Year Transfers, $1.01 billion was

transferred from BLMIS to the Feeder Funds during the two years preceding the filing of this

SIPA case ("the Two Year Transfers").  (*Id.* ¶ 328).  "The Two Year Transfers included transfers

of approximately $735 million to Luxalpha and approximately $275 million to Groupement

Financier."  (*Id.*).

**Subsequent Transfers**

Count seven is asserted against all of the other Defendants—referred to as the

"Subsequent Transferee Defendants."  (Am. Compl. ¶ 332); (*id.* ¶¶ 332–40) (explaining the

subsequent transfers to each Subsequent Transferee in detail); (*id.* ¶¶ 389–92).  In count seven,

the Trustee is seeking to recover subsequent transfers of BLMIS customer property that was

initially transferred from BLMIS to the Feeder Funds and then subsequently transferred from the Feeder Funds to the Subsequent Transfer Defendants.  (*Id.* ¶¶ 332–40).

   On April 22, 2022, the Access Defendants filed a motion to dismiss the Trustee's complaint against them.  In the motion to dismiss, these Defendants argue that: § 546(e) of the Bankruptcy Code, known as the "the safe harbor" bars the Trustee from avoiding initial transfers from BLMIS to the Feeder Funds made more than two years before the petition date; the Trustee cannot use the Ponzi scheme presumption to assert "actual fraudulent intent" on the part of BLMIS, which precludes him from avoiding the transfers made within two years of filings; and the Trustee has failed to establish personal jurisdiction over Access Ltd., AML, AP (Lux), and Littaye.  *See* Mem. L., ECF No. 286.  The Trustee has opposed the motion.  The Court heard oral argument on these issues on September 14, 2022.  (9/14/2022 Hr'g Tr., ECF No. 326).

**Discussion**

**Personal Jurisdiction**

   Access Ltd., AML, AP (Lux), and Patrick Littaye (the "PJ Defendants")—all foreign entities or persons—seek dismissal for lack of personal jurisdiction.  The Trustee argues that the PJ Defendants have waived their objection to personal jurisdiction in this adversary proceeding and that if they have not, there is specific jurisdiction over them.

**Waiver of Personal Jurisdiction**

   The Trustee argues that the PJ Defendants failed to raise the issue of personal jurisdiction in their first Rule 12 motion, thereby waiving the argument and impliedly consenting to jurisdiction.  Rule 12 of the Federal Rules of Civil Procedure states that a party waives a personal jurisdiction defense by omitting it from an earlier motion in which it could have been raised.  Fed. R. Civ. P. 12(h)(1)(A).  In the PJ Defendants' motion to join, they included the following

language: "[t]he Joining Defendants submit this notice and join in the Motion without prejudice
to or waiver of any rights or defenses including, without limitation, defenses based on lack of
subject matter jurisdiction and lack of personal jurisdiction." *See* Joinder at 4, *Picard v. UBS
Fund Services (Luxembourg) SA (In re BLMIS)*, No. 1:11-sv-04212-CM (S.D.N.Y. Aug. 1,
2011).

"[T]o preserve the defense of lack of personal jurisdiction, a defendant need only state
the defense in its first responsive filing and need not articulate the defense with any rigorous
degree of specificity." *Mattel, Inc. v. Barbie-Club.com*, 310 F.3d 293, 307 (2d Cir. 2002). "To
waive or forfeit a personal jurisdiction defense, a defendant must give a plaintiff a reasonable
expectation that it will defend the suit on the merits or must cause the court to go to some effort
that would be wasted if personal jurisdiction is later found lacking." *Beverly Hills Teddy Bear
Co. v. Best Brands Consumer Prod., Inc.*, No. 1:19-CV-3766-GHW, 2021 WL 2534000, at *5
(S.D.N.Y. June 21, 2021) (quoting *Corporacion Mexicana de Mantenimiento Integral, S. de R.L.
de C.V. v. Pemex-Exploracion y Produccion*, 832 F.3d 92, 102 (2d Cir. 2016)).

The statement provided in their Joinder was enough for the PJ Defendants to have
preserved their defense to personal jurisdiction.

**Specific Jurisdiction**

In the Complaint, the Trustee argues that the PJ Defendants maintained minimum
contacts with New York in connection with the claims in this adversary proceeding. (Am.
Compl. ¶ 22).

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2)
of the Federal Rules of Civil Procedure, the Trustee "must make a prima facie showing that
jurisdiction exists." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting

*Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)). A trial court has

considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2).

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013). "'It may

determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the

motion; or it may conduct an evidentiary hearing on the merits of the motion.'" *Dorchester Fin.*

*Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Marine Midland Bank,*

*N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)); *see also Picard v. BNP Paribas S.A.* (*In re*

*BLMIS*), 594 B.R. 167, 187 (Bankr. S.D.N.Y. 2018) (same).

"Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the

motion by pleading in good faith, legally sufficient allegations of jurisdiction." *Dorchester Fin.*,

722 F.3d at 84–85 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d

Cir. 1990)); *Picard v. Fairfield Greenwich Grp.* (*In re Fairfield Sentry Ltd.*), 627 B.R. 546, 565

(Bankr. S.D.N.Y. 2021) (same). At the pre-discovery stage, the allegations need not be factually

supported. *See Dorchester Fin. Securities Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d. Cir.

2013) (explaining that an averment of facts is necessary only after discovery).

In order to be subjected to personal jurisdiction in the United States, due process requires

that a defendant have sufficient minimum contacts with the forum in which defendant is sued

"'such that the maintenance of the suit does not offend traditional notions of fair play and

substantial justice.'" *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501 (Bankr.

S.D.N.Y. 2012), 480 B.R. 501, 516 (Bankr. S.D.N.Y. 2012) (quoting *Int'l Shoe Co. v.*

*Washington*, 326 U.S. 310, 316 (1945)). The pleadings and affidavits are to be construed "'in

the light most favorable to the plaintiffs, resolving all doubts in their favor.'" *Chloé v. Queen*

*Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (quoting *Porina v. Marward*

*Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)); *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594

B.R. 167, 187 (Bankr. S.D.N.Y. 2018).

> The Supreme Court has set out three conditions for the exercise of specific
> jurisdiction over a nonresident defendant.  First, the defendant must have
> purposefully availed itself of the privilege of conducting activities within the
> forum State or have purposefully directed its conduct into the forum State.
> Second, the plaintiff's claim must arise out of or relate to the defendant's forum
> conduct.  Finally, the exercise of jurisdiction must be reasonable under the
> circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (cleaned up).

**Purposeful Availment**

"[M]inimum contacts . . . exist where the defendant purposefully availed itself of the

privilege of doing business in the forum and could foresee being haled into court there." *Charles

Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018).  "Although a defendant's

contacts with the forum state may be intertwined with its transactions or interactions with the

plaintiff or other parties, a defendant's relationship with a third party, standing alone, is an

insufficient basis for jurisdiction."  *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150

(2d Cir. 2019) (cleaned up).  "It is insufficient to rely on a defendant's random, fortuitous, or

attenuated contacts or on the unilateral activity of a plaintiff with the forum to establish specific

jurisdiction." *Id.*

The PJ Defendants argue that the Trustee has not alleged that they have sufficient

contacts with New York.  Mem. L. 13–16, ECF No. 286.  The Complaint suggests otherwise.

**Patrick Littaye**

Littaye is a French citizen. (Am. Compl. ¶ 101).  The Complaint sets forth the following

contacts with New York and the United States.  Littaye had a close social and professional

relationship with Madoff, dating back to at least 1985.  (*Id.* ¶ 109).  They regularly played tennis

together and Access communicated with BLMIS only through Littaye. (*Id.* ¶¶ 81, 178). Littaye opened or introduced at least BLMIS managed accounts. (*Id.* ¶ 110). Littaye established the Feeder Funds with the purpose of investing with BLMIS in New York. (*Id.* ¶ 2).

Littaye was the primary contact between Access and BLMIS. (*Id.* ¶ 178). He visited Madoff at Madoff's New York office quarterly to discuss Access' client's BLMIS accounts. (*Id.* ¶ 80). He was the only person at Access who met with and spoke to Madoff on a regular basis. (*Id.* ¶ 178). He relayed information from Madoff to Access' New York employees. (*Id.* ¶ 80). He spoke to Madoff on the phone regarding the Feeder Funds' accounts with BLMIS. (*Id.* ¶ 261). He held meetings in New York regarding the Feeder Fund's BLMIS accounts. (*Id.* ¶ 268).

Littaye assisted Madoff and BLMIS in avoiding regulatory scrutiny. (*Id.* ¶ 97). Littaye was in charge of doing due diligence on BLMIS for the Feeder Funds. (*Id.* ¶ 179). He assisted Madoff in maintaining his demand for secrecy. (*Id.* ¶¶ 278–79). And he purposefully concealed evidence that BLMIS was not trading securities. (*Id.* ¶ 227).

**Access Ltd.**

Defendant Access Ltd. is a Bahamas limited company. (Am. Compl. ¶ 88). Access Ltd. was, nominally, Groupement Financier's investment manager until July 2007 as well as Groupement Financier's operator and investment advisor. (*Id.* ¶ 89). It is alleged to be a shell entity with no physical presence in any jurisdiction. (*Id.* ¶ 91). Access Ltd. was considered "an offshore money box set up for the prime purpose of the receipt of fees on behalf of Access." (*Id.*) (cleaned up). Access Ltd. was incorporated offshore in the Bahamas to accommodate "Bernie Madoff[, who] want[ed] to only deal with offshore entities related to [the Access] accounts." (*Id.*). Access Ltd. allegedly received approximately $69.3 million in fees from BLMIS customer property. (*Id.* ¶ 334a).

Access Ltd. was aware that Luxalpha[7] and Groupement Financier were "100% U.S. traded" by "BMI."  *See* BMI: Monthly Manager Rep. (Feb. 2004), Beckerlegge Decl., Ex. 5, ECF No. 308 ("Prepared by Access International Advisors, Inc. [located in New York] for Access International Advisors Limited"); *see also* BMI: Monthly Manager Rep. (Sept. 2004), Beckerlegge Decl., Ex. 6 (describing Groupement Financier's trading activities as "directed by a highly regarded long established US broker dealer."); BMI: Monthly Manager Rep. (Nov. 2004), Beckerlegge Decl., Ex. 7 (describing Luxalpha's trading activities as "directed by a highly regarded long established US broker dealer.").

Access Ltd. regularly communicated with its parent company in New York.  *See* BMI: Monthly Manager Rep. (Feb. 2004), Beckerlegge Decl., Ex. 5, ECF No. 308 ("Prepared by Access International Advisors, Inc. [located in New York] for Access International Advisors Limited").  It also directed its activities to BLMIS in New York.  Its alleged purpose was to assist Madoff in the commission of his fraud by avoiding U.S. regulatory scrutiny.  (Am. Compl. ¶ 91).  In exchange for this, Madoff compensated Access Ltd. through the fee structure set up between BLMIS and Access.  (Am. Compl. ¶¶ 274, 334).

**AML (f/k/a AIA (Lux))**

AML is a Luxembourg limited liability company.  (Am. Compl. ¶ 92).  AML was a shell entity with no employees.  (*Id.* ¶ 94).  "AML was nominally Luxalpha's portfolio manager from November 17, 2008 through its liquidation, but entered into an Investment Advisory Agreement with AP (Lux). AML ultimately delegated the management of Luxalpha's portfolio to BLMIS." (*Id.* ¶ 93).  The purpose of AML was to receive funds in order to "spread the AIA Lux incomes." (*Id.* ¶ 94).  Upon "AML's appointment as Luxalpha's manager in November 2008, it entered into substantially similar indemnity agreements with UBS SA and the Luxalpha directors. Through

---

[7] The February 2004 report refers to Luxalpha's predecessor, Oreades.

these indemnity agreements, the UBS Defendants continued to limit the liability to which Luxalpha exposed them." (*Id.* ¶ 161). In exchange for its services, AML received over $2.4 million in fees from BLMIS customer property. (*Id.* ¶ 334d).

The Trustee has sufficiently alleged that, even though AML was a shell entity, it directed its activities to BLMIS in New York. Indeed, its alleged purpose was to collect fees generated by the Feeder Funds investments with BLMIS while deflecting liability away from the "real" actors.

**AP (Lux)**

AP (Lux) is a Luxembourg limited liability company. (Am. Compl. ¶ 95). AP (Lux) was Luxalpha's investment advisor from February 13, 2007 though BLMIS's collapse. (*Id.* ¶ 96). It was also the nominal advisor of Groupement Financier. (*Id.*). "Access used AP (Lux) as a shell entity [that was created] to protect Luxalpha and BLMIS from U.S. regulatory scrutiny." (*Id.* ¶ 97). In exchange for these services, AP (Lux) received at least $28.7 million dollars in fees from BLMIS customer property. (*Id.* ¶ 334c).

The Trustee has sufficiently alleged that, even though AP (Lux) was a shell entity, it directed its activities to BLMIS in New York. Indeed, its alleged purpose was to protect BLMIS from U.S. regulatory scrutiny.

The Trustee has alleged sufficient contacts by the PJ Defendants on an individual basis. Additionally, the Trustee alleges that Access Ltd, AML, and AP (Lux), were "in reality, a single business enterprise or alter egos of each other," and that "Littaye and Villehuchet coordinated, dominated, and controlled that enterprise." (*Id.* ¶ 77). The PJ Defendants argue that the Trustee should not be permitted to use group pleading to assert jurisdiction over them. Mem. L. 8–9, ECF No. 286.

Under the federal law governing the exercise of in personam jurisdiction, if a corporation is the alter ego of an individual defendant, or one corporation the alter ego of another, the Court may pierce the corporate veil jurisdictionally and attribute contacts accordingly. It is well established that the exercise of personal jurisdiction over an alter ego corporation does not offend due process.

*Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 543 B.R. 127, 141 (Bankr. S.D.N.Y. 2016).

Federal common law allows piercing of the corporate veil where (1) a corporation uses its alter-ego status to perpetrate a fraud or (2) where it so dominates and disregards its alter-ego's corporate form that the alter-ego was actually carrying on the controlling corporation's business instead of its own.

With respect to the second prong, a plaintiff demonstrates that an entity is the alter ego of another entity for jurisdictional purposes when one entity exerts greater than normal control over the other or one entity is merely an empty shell. A plaintiff need not show that the allegedly sham corporate structure laid out in a complaint was used for an evil purpose, but must demonstrate that it would be unfair under the circumstances not to disregard the corporate form.

While traditionally alter ego jurisdiction is used to obtain personal jurisdiction over a foreign parent that exercises control over affiliated entities within the forum, the reverse is also possible, and a parent's contacts with a forum can be imputed to a subsidiary to obtain personal jurisdiction over that subsidiary. Federal courts have also found that an individual shareholder's contacts can be imputed to an alter ego corporation.

*Id.* at 141–42 (internal citations and quotations omitted). The Trustee has alleged sufficient allegations of fraud and misuse of Access corporate entities to survive a motion to dismiss on this ground.

Specific jurisdiction may also exist where an out-of-forum defendant purposefully directed the wrongful conduct at the forum. This theory of personal jurisdiction is typically invoked

where the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff. In such circumstances, the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum.

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 CIV. 5263 (AKH), 2017

WL 3600425, at *7 (S.D.N.Y. Aug. 18, 2017) (quoting *Licci ex rel. Licci v. Lebanese Canadian*

*Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013)).   The Trustee may allege personal jurisdiction

over the PJ Defendants even if their conduct took place outside of the forum as long as he alleges

that they "purposefully directed . . . activities at residents of the forum."  *In re Terrorist Attacks*

*on Sept. 11, 2001*, 714 F.3d 659, 674 (2d Cir. 2013) (quoting *Burger King Corp. v. Rudzewicz*,

471 U.S. 462, 472-73 (1985)).

The Complaint is replete with allegations that Access Ltd., AML, and AP (Lux)

purposefully directed their wrongdoings at BLMIS.  These allegations are legally sufficient to

constitute a prima facie showing of jurisdiction.  *Dorchester Fin. Securities Inc. v. Banco BRJ,*

*S.A.*, 722 F.3d 81, 85 (2d. Cir. 2013).  "[A]lthough physical presence in the forum is not a

prerequisite to jurisdiction, physical entry into the State—either by the defendant in person or

through an agent, goods, mail, or some other means—is certainly a relevant contact."  *Walden v.*

*Fiore*, 571 U.S. 277, 285 (2014).  Defendants "intentionally tossed a seed from abroad to take

root and grow as a new tree in the Madoff money orchard in the United States and reap the

benefits therefrom."  *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501, 506 (Bankr.

S.D.N.Y. 2012).  Defendant's alleged contacts with New York are not random, isolated, or

fortuitous.

**Arise out of or relate to the defendant's forum conduct**

As to the second prong, the suit must "arise out of *or relate to* the defendant's contacts

with the forum."  *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, __ U.S. __, 141 S. Ct. 1017,

1026, 209 L. Ed. 2d 225 (2021) (emphasis in original).  "[P]roof that a plaintiff's claim came

about because of the defendant's in-state conduct" is not required.  *Id.* at 1027.  Instead, the court

need only find "an affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.") (internal quotations omitted).

Here, the Trustee is asserting subsequent transfer claims against PJ Defendants for monies they received from the BLMIS Feeder Funds. (Am. Compl. ¶¶ 54–58). These allegations are directly related to their investment activities with BLMIS through Access. *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 191 (Bankr. S.D.N.Y. 2018) (finding that the redemption and other payments the defendants received as direct investors in a BLMIS feeder fund were the proximate cause of the injuries that the Trustee sought to redress and arose from the New York contacts such as sending subscription agreements to New York, wiring funds in U.S. dollars to New York, sending redemption requests to New York, and receiving redemption payments from a Bank of New York account in New York).

The suit is affiliated with the alleged in-state conduct. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

**Reasonableness**

Having found sufficient minimum contacts, the Court must determine if exercising personal jurisdiction over the Defendants is reasonable and "comport[s] with fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (internal quotations omitted). Factors the Court may consider include the burden on the defendants, the

forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies. *Id.* at 477.

The exercise of jurisdiction is reasonable. Defendants are not burdened by this litigation. Defendants actively participated in this Court's litigation for over twelve years. They are represented by U.S. counsel and have continually associated with the other New York based Access Defendants. The forum and the Trustee both have a strong interest in litigating BLMIS adversary proceedings in this Court. *Picard v. Maxam Absolute Return Fund, L.P. (In re BLMIS)*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 76 (S.D.N.Y. 2012); *Picard v. Chais (In re BLMIS)*, 440 B.R. 274, 278 (Bankr. S.D.N.Y. 2010); *Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 418 B.R. 75, 82 (Bankr. S.D.N.Y. 2009); *Picard v. Fairfield Greenwich Grp., (In re Fairfield Sentry Ltd.)*, 627 B.R. 546, 568 (Bankr. S.D.N.Y. 2021); *see also In re Picard*, 917 F.3d 85, 103 (2d Cir. 2019) ("The United States has a compelling interest in allowing domestic estates to recover fraudulently transferred property.").

By alleging that PJ Defendants intentionally targeted their activities at BLMIS, the Trustee has met his burden of alleging jurisdiction as to each subsequent transfer that originated with BLMIS. As recognized by the Second Circuit, "[w]hen these [subsequent transfer] investors chose to buy into feeder funds that placed all or substantially all of their assets with Madoff Securities, they knew where their money was going." *In re Picard*, 917 F.3d 85, 105 (2d Cir. 2019). Here, they did more than simply "buy into" feeder funds. They created BLMIS Feeder Funds and assisted Madoff in "introducing Madoff to new sources of investment capital,

which he needed to keep his Ponzi scheme alive." (Am. Compl. ¶ 109). The Trustee has made a prima facie showing of personal jurisdiction.

**12(b)(6) standard**

"To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The claim is facially plausible when a plaintiff pleads facts that allow the Court to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."). In deciding a motion to dismiss, the Court should assume the factual allegations are true and determine whether, when read together, they plausibly give rise to an entitlement of relief. *Iqbal*, 556 U.S. at 679. "And, of course, a well-pl[ed] complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A complaint is "deemed to include any written instrument attached to it as an exhibit[,] . . . documents incorporated in it by reference[,]" and other documents "integral" to the complaint.

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (citations omitted).  A

document is "integral" to a complaint when the plaintiff has "actual notice" of the extraneous

information and relied on it in framing the complaint.  *DeLuca v. AccessIT Grp., Inc.*, 695 F.

Supp. 2d 54, 60 (S.D.N.Y. 2010) (citing *Chambers*, 282 F.3d at 153).

> While the Trustee must allege that the initial transfer from BLMIS to Feeder Fund

Defendants are avoidable, he is not required to avoid the transfers received by the initial

transferees before asserting an action against subsequent transferees.  *IBT Int'l Inc. v. Northern

(In re Int'l Admin Servs., Inc.)*, 408 F.3d 689, 706-07 (11th Cir. 2005).  The Trustee is free to

pursue any of the immediate or mediate transferees, and nothing in the statute requires a different

result.  *IBT Int'l, Inc. v. Northern* (*In re Int'l Admin. Servs., Inc.*), 408 F.3d 689, 706–07 (11th

Cir. 2005).

**The Safe Harbor does not bar the avoidance of the Initial Transfers to the Feeder Funds**

> The Access Defendants have raised the "safe harbor" defense, found in § 546(e), to the

Trustee's allegations.  Section 546(e) is referred to as the safe harbor because it protects a

transfer that is a "settlement payment ... made by or to (or for the benefit of) a ... financial

institution [or] financial participant," or that is "made by or to (or for the benefit of) a ... financial

institution [or] financial participant ... in connection with a securities contract."  11 U.S.C. §

546(e).  By its terms, the safe harbor is a defense to the avoidance of the Initial Transfers—those

transfers from BLMIS to the Feeder Fund Defendants.  *Picard v. BNP Paribas S.A.* (*In re

BLMIS*), 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018).  The Subsequent Transferee Defendants are

also entitled to raise a § 546(e) defense against Trustee's recovery of the initial transfer funds.

*Picard v. Fairfield Inv. Fund* (*In re BLMIS*), No. 08-01789 (CGM), Adv. No. 09-01239 (CGM),

2021 WL 3477479, at *3 (Bankr. S.D.N.Y. Aug. 6, 2021).  To the extent that the safe harbor bars

the Trustee from collecting the initial transfer, he would also be barred from collecting any

subsequent transfers.

    In *Fishman*, the Court of Appeals for the Second Circuit determined that, in many of the

Trustee's avoidance actions, § 546(e) applied because BLMIS' transfers to its customers

qualified as payments made "in connection with" securities contracts between BLMIS and its

customers. *See Picard v. Ida Fishman Recoverable Trust (In re BLMIS)*, 773 F.3d 411, 422 (2d

Cir. 2014). However, the safe harbor does not apply, by its plain terms, to transfers where the

transferee is complicit in BLMIS' fraud. *Picard v. Multi-Strategy Fund Ltd. (In re BLMIS)*, No.

22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022). This is because "any

transferee who knew the transfers it received from Madoff Securities contained only stolen

proceeds also knew those transfers were neither settlement payments [n]or transfers in

connection with a security agreement" and therefore, § 546(e) cannot apply.[8] *Id.*

> The safe harbor was intended, among other things, to promote the reasonable
> expectations of legitimate investors. If an investor knew that BLMIS was not
> actually trading securities, he had no reasonable expectation that he was signing a
> contract with BLMIS for the purpose of trading securities for his account. In that
> event, the Trustee can avoid and recover preferences and actual and constructive
> fraudulent transfers to the full extent permitted under state and federal law.

    *Picard v. Legacy Capital Ltd. (In re BLMIS)*, 548 B.R. 13, 28 (Bankr. S.D.N.Y. 2016)

(internal citations omitted), *vacated and remanded on other grounds, Picard v. Citibank, N.A. (In

re BLMIS)*, 12 F.4th 171 (2d Cir. 2021)). By holding that the affirmative defense provided by §

546(e) is not applicable in situations such as the one alleged here, "sham" securities contracts do

not prevent the Trustee from clawing back complicit parties' ill-gotten gains. The district court

---

[8] While this is sometimes referred to as the "knowledge exception" to the safe harbor, "*Cohmad* did not carve out
any atextual but equitable exception to an otherwise applicable Section 546(e) defense; rather, it simply concluded
that, in circumstances in which a transferee was complicit in Madoff Securities' fraud, Section 546(e) did not apply
as a matter of its express terms." *Picard v. Multi-Strategy Fund Ltd. (In re BLMIS)*, No. 22-CV-06502 (JSR), 2022
WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022).

has already determined that "those defendants who claim the protections of Section 546(e) through a Madoff Securities account agreement but who actually knew that Madoff Securities was a Ponzi scheme are not entitled to the protections of the Section 546(e) safe harbor, and their motions to dismiss the Trustee's claims on this ground must be denied." *Cohmad*, No. 12 MC 115(JSR), 2013 WL 1609154, at \*10 (S.D.N.Y. Apr. 15, 2013); *see also Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR), 2022 WL 16647767, at \*7 (S.D.N.Y. Nov. 3, 2022) ("[I]n circumstances in which a transferee was complicit in Madoff Securities' fraud, Section 546(e) d[oes] not apply as a matter of its express terms.").

This Court is powerless to reconsider this issue, agrees with the district court's reasoning, and finds the district court's holding consistent with *dicta* set forth by the Court of Appeals for the Second Circuit. *See Picard v. Ida Fishman Revocable Trust* (*In re Bernard L. Madoff Inv. Sec. LLC*), 773 F.3d 411, 420 (2d Cir. 2014) ("The clawback defendants, having every reason to believe that BLMIS was actually engaged in the business of effecting securities transactions, have every right to avail themselves of all the protections afforded to the clients of stockbrokers, including the protection offered by § 546(e).").

Whether the safe harbor applies to the initial transfers under the theory that BLMIS' transfers to the Feeder Funds were made in connection with the Feeder Fund's contracts with its customers (rather than the Feeder Funds' contracts with BLMIS) is not answerable on the pleadings. If such a fact-specific determination is needed, the Court will make it with the benefit of a "full factual record." *Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR), 2022 WL 16647767, at \*9 (S.D.N.Y. Nov. 3, 2022).

**The Feeder Fund Defendants' Had Actual Knowledge that BLMIS was Not Trading Securities**

Here the Trustee has pleaded sufficient allegations of the Feeder Fund Defendants' actual knowledge that no securities were being traded.  (Am. Compl. ¶ 329).  These allegations that the Feeder Fund Defendants were complicit in BLMIS's fraud, prevents the Court from dismissing the case on account of the Access Defendants' affirmative § 546(e) defense.  The Trustee has alleged that Luxalpha was aware of BLMIS's impossible trading activity and performance.  (*Id.* ¶ 13).

The Feeder Funds are not natural persons and, as such, act only through "the instrumentality of their officers or other duly authorized agents."  *45 John Lofts, LLC v. Meridian Capital Grp., LLC* (*In re 45 John Lofts, LLC*), 599 B.R. 730, 743 (Bankr. S.D.N.Y. 2019).  An agent's knowledge and acts are imputed to a corporate defendant.  *Id.*; (Am. Compl. ¶ 315–323) (alleging imputation of knowledge).  UBS, Littaye, Villehuchet, and all of the Access Defendants are agents or officers of Luxalpha whose knowledge can be imputed to Luxalpha. (Am. Compl. ¶ 125) (UBS SA was Luxalpha's agent); (*id.* ¶ 180) ("UBS SA was, by law, responsible for both the safekeeping and the supervision of [Luxalpha]'s assets."); (*id.* ¶ 101) (Littaye was a director of Luxalpha); (*id.* ¶ 102) (Delandmeter was a director of Luxalpha); (*id.* ¶ 322) ("Access Defendants and UBS Defendants were Luxalpha's and Groupement Financier's agents, and their conduct and/or direct knowledge of fraud at BLMIS is imputed to these two funds.").  Similarly, Littaye, Villehuchet, Delandmeter, and all of the UBS and Access Defendants are agents or officers of Groupement Financier.  (*Id.* ¶ 106) (Littaye and Villehuchet were directors of Groupement Financier); (*id.* ¶ 107) (Delandmeter was a Legal Adviser to Groupement Financier); (*id.* ¶ 323) ("The Access Defendants and UBS Defendants were Luxalpha's and Groupement Financier's agents, and their conduct and/or direct knowledge of

fraud at BLMIS is imputed to these two funds.").   Their knowledge of BLMIS' fraud can be
imputed to Groupement Financier.

In the Complaint, the Trustee has alleged that UBS SA knew Madoff's returns were
"impossible" prior to the formation of Luxalpha.  (*Id.* ¶¶ 143, 147).  UBS SA assisted Madoff in
evading applicable laws and regulations.  (*Id.* ¶ 180).  UBS SA knew that they had no way of
verifying whether BLMIS was making trades.  (*Id.* ¶¶ 208–09).  UBS SA removed all references
to Madoff from UBS audit reports.  (*Id.* ¶ 280).  UBS knew it was operating as a "front" for
Luxalpha. (*Id.* ¶ 169).  It routinely lied to protect Luxalpha and BLMIS.  (*Id.* ¶¶ 147–52).  A
UBS subsidiary concluded that Madoff was engaging in fraud.  (*Id.* ¶ 148).

Littaye was friends with Madoff and the only person who could contact Madoff directly
regarding BLMIS investments.  (*Id.* ¶¶ 1, 178).  "Littaye actively impeded any inquiry into . . .
signs of fraud by quashing or deflecting questions and by purposely omitting the names 'BLMIS'
and 'Madoff' from prospectuses and regulatory filings."  (*Id.* ¶ 11).  Littaye knowingly assisted
BLMIS in evading the SEC.  (*Id.* ¶ 97).  He prevented Access from doing due diligence on
BLMIS.  (*Id.* ¶ 179).  Littaye knew that BNP Paribas suspected that BLMIS did not segregate
funds, could not determine where BLMIS customer funds were held, and was unable to verify
any trades were taking place.  (*Id.* ¶ 115).  Littaye knew Madoff was using a disreputable
accounting form and quashed any inquiry into it.  (*Id.* ¶ 283).  He insisted that Madoff's name
never be published.  (*Id.* ¶ 278–79).

In 2006, Theodore Dumbald ("Dumbauld"), an Access Defendant and a Partner at AIA
LLC and its Chief Investment Officer, investigated Madoff on Villehuchet's request.  (*Id.* ¶ 220–
21).  He concluded that Madoff's was not trading options as he claimed.  (*Id.* ¶¶ 221-22)
("Dumbauld confirmed that the trades being reported by BLMIS did not show up anywhere in

the O[ptions] C[learing] C[orporation] database.").  Based on this, Access hired a third-party

consultant, Chris Culter, and within four days, Cutler discovered evidence of BLMIS' fraud.  (*Id.*

¶¶ 224–25).  Culter found that BLMIS was not trading on the Options Clearing Corporation

database and that the volume of BLMIS' purported options trades exceeded[9] the volume of all of

the options trades on CBOE.[10]  (*Id.* ¶226).  Cutler could not identify any counterparties to

BLMIS' trades.  (*Id.* ¶ 257).  Cutler advised the Access Defendants that, based on his

investigation, it appeared that Madoff did not understand his own strategy.  (*Id.* ¶ 235).  Cutler's

review matched Access' own 1999 investigation that showed BLMIS providing Oreades' with

"no negative months and very stable positive performance"—the classic hallmarks of a Ponzi

scheme.  (*Id.* ¶ 245); (*id.* ¶ 242) (including AIA, LLC's chart comparing Luxalpha's returns

against the S&P 500 with the distinctive performance curve of every Ponzi scheme—a straight

line).  Cutler also concluded that if Madoff were really executing trades, he would move the

market.  (*Id.* ¶ 249).  Even Access' clients knew that trading at such volumes was impossible.

(*Id.* ¶ 253).  Cutler presented evidence of BLMIS' fraud to Access, Littaye, Villehuchet, and

Dumbauld and advised Access to exit BLMIS; the Access Defendants suppressed his findings.

(*Id.* ¶¶ 219, 267).

Here, the Trustee has sufficiently plead the Feeder Funds (and most of the subsequent

transferees[11]) had actual knowledge that BLMIS was not trading securities, which makes the safe

---

[9] "There were 473 instances over the lifetime of Luxalpha and Groupement Financier where BLMIS's purported trading for Luxalpha and Groupement Financier exceeded the total CBOE volume. In 362 of these instances, the volume traded was at least twice the CBOE; in 151 instances, the volume traded was at least ten times the volume traded on the CBOE." (Am. Compl. ¶ 231).  "The statements and trade confirmations revealed that in 52% of the instances when Madoff purported to trade options for Luxalpha, or Groupement Financier, he purported to trade more than 100% of such options that were traded on the entire CBOE on that day."  (*Id.* ¶ 232).
[10] The CBOE is the Chicago Board Options Exchange.  The exchange listed on the trade confirmations sent by BLMIS.  (Am. Compl. ¶ 305).
[11] Where § 546(e) does not "embrace the initial transfer, the subjective knowledge of a subsequent transferee cannot retroactively render it applicable."  *Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022).

harbor inapplicable by its express terms. *Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022).

**Whether BLMIS's Initial Transfers Are Avoidable as Intentionally Fraudulent Conveyances?**

In relevant part, § 548(a)(1)(A) allows the Trustee to avoid any transfer made within two years before the filing date of this SIPA action, if BLMIS made the transfer with "actual intent to hinder, delay, or defraud." 11 U.S.C. § 548(a)(1)(A). The Access Defendants argue that BLMIS' initial transfers to the Feeder Fund Defendants, made within two years of the SIPA filing date, are not avoidable because the Trustee has failed to plead BLMIS' actual fraudulent intent with respect to each transfer and that the Ponzi scheme presumption cannot be used to plead BLMIS' actual fraudulent intent. Mem. L. 28–29, ECF No. 286.

Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

> Where the actual fraudulent transfer claim is asserted by a bankruptcy trustee, applicable Second Circuit precedent instructs courts to adopt a more liberal view since a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge. Moreover, in a case such as this one, where the Trustee's lack of personal knowledge is compounded with complicated issues and transactions that extend over lengthy periods of time, the trustee's handicap increases, and even greater latitude should be afforded.

*Picard v. Cohmad Secs. Corp.,* (*In re BLMIS*), 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011) (cleaned up).

Because the Trustee has pleaded that BLMIS operated a Ponzi scheme, the Trustee's burden of pleading actual fraudulent intent is satisfied. (Am. Compl. ¶ 42– 62); (*id.* ¶ 28) ( Madoff pleaded guilty to operating a Ponzi scheme through BLMIS). The "Ponzi scheme presumption" allows courts to presume actual intent to defraud on part of the operator of the

Ponzi scheme. *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) ("The mere existence of a

Ponzi scheme is sufficient to establish actual intent to defraud."). In this case, the Ponzi scheme

presumption allows the Court to presume that BLMIS made the initial transfers with actual intent

to defraud because Madoff has admitted to operating a Ponzi scheme.

The mere existence of a Ponzi scheme "demonstrates actual intent as matter of law

because transfers made in the course of a Ponzi scheme could have been made for no purpose

other than to hinder, delay or defraud creditors." *Bear Stearns Secs. Corp. v. Gredd* (*In re*

*Manhattan Inv. Fund Ltd.*), 397 B.R. 1, 8 (S.D.N.Y. 2007). The "Ponzi scheme presumption"

makes perfect sense in cases such as this one. BLMIS had no legitimate assets and therefore

every transfer made by BLMIS was made with actual intent to defraud in order to ensure that

Ponzi scheme would survive.

The Trustee has pleaded that BLMIS operated a Ponzi scheme and as such, BLMIS'

actual fraudulent intent is presumed via the Ponzi scheme presumption. (Am. Compl. ¶¶ 42–

62). Intent to defraud is established as debtor operated a Ponzi scheme. *Picard v. Cohen*, Adv.

Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *5 (Bankr. S.D.N.Y. Apr. 25, 2016) (citing

*Omnibus Good Faith Decision*, 531 B.R. at 471) ("the Trustee is entitled to rely on the Ponzi

scheme presumption pursuant to which all transfers are deemed to have been made with actual

fraudulent intent"); *Picard v. Cohmad Sec. Corp.*, 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011)

("the fraudulent intent on the part of the debtor/transferor . . . is established as a matter of law

by virtue of the 'Ponzi scheme presumption'"). That BLMIS operated as a Ponzi scheme is

well-established and the Court relies on earlier findings of same and holds that the Trustee has

met its burden of pleading BLMIS' actual intent on this issue. *See Picard v. Legacy Capital*

*Ltd.*, 603 B.R. 682, 688-93 (Bankr. S.D.N.Y. 2019) (discussing in detail that BLMIS was a

Ponzi scheme and why the Trustee is permitted to rely on the Ponzi scheme presumption to prove intent as a matter of law); *see also Bear Stearns Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 11 (S.D.N.Y. 2007) ("[T]he Ponzi scheme presumption remains the law of this Circuit.").

The Ponzi scheme presumption saves the Trustee and the courts time and resources by presuming that each transfer was made with actual fraudulent intent. Without the presumption, Defendants would not be "off-the-hook" for the two-year transfers because the Trustee would meet (and, in this case, has met) his pleading burden by pleading the "badges of fraud" with respect to BLMIS.

> Badges of fraud include (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the event and transactions under inquiry.

*See Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582-83 (2d Cir. 1983). The "concealment of facts and false pretenses by the transferor" is also a circumstance from which courts have inferred intent to defraud. *Id.* at 1582 (quoting 4 *Collier on Bankruptcy* ¶ 548.02[5] at 548–34 to 38 (L. King 15th ed. 1983)). The existence of several badges can "constitute conclusive evidence of an actual intent to defraud." *Kirschner v. Fitzsimons (In re Tribune Co. Fraudulent Conveyance Litig.)*, No. 11-md-2296 (RJS), 2017 WL 82391, at *13 (S.D.N.Y. Jan. 6, 2017) (citation omitted); *Picard v. Nelson (In re BLMIS)*, 610 B.R. 197, 235 (Bankr. S.D.N.Y. 2019).

BLMIS' actual fraudulent intent is well-pleaded in the Complaint. (Am. Compl. ¶¶ 36–62). The Court need not infer intent to defraud because Madoff has admitted that he had actual intent to defraud when he admitted under oath that he operated a Ponzi scheme. (*Id.* ¶ 28). In

addition to this, the Trustee has alleged that "BLMIS's website omitted the I[nvestment]
A[dvisory] Business entirely.  BLMIS did not register as an investment adviser with the SEC
until 2006, following an investigation by the SEC, which forced Madoff to register."  (*Id.* ¶ 39).
For more than 20 years preceding that registration, the financial reports BLMIS filed with the
SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed
through its I[nvestment] A[dvisory] Business.  (*Id.* ¶ 40).  BLMIS lied to the SEC in reports
regarding the number of accounts it has and "grossly understated" the amount of assets under
management.  (*Id.* ¶ 41).  BLMIS had no legitimate business operations and produced no profits
or earnings.  (*Id.*)  "Madoff was assisted by several family members and a few employees,
including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and
others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud."  (*Id.*
¶ 42).  BLMIS used its fraudulent investment advisory business to prop up its proprietary trading
business, which also incurred significant losses.  (*Id.* ¶ 43).  "BLMIS reported falsified trades
using backdated trade data on monthly account statements sent to BLMIS customers that
typically reflected impossibly consistent gains on the customers' principal investments."  (*Id.* ¶
50).  "There are no records to substantiate Madoff's sale of call options or purchase of put
options in any amount, much less in billions of notional dollars."  (*Id.* ¶ 55).  "Madoff could not
be using the SSC Strategy because his returns drastically outperformed the market. BLMIS
showed only 16 months of negative returns over the course of its existence compared to 82
months of negative returns in the S&P 100 Index over the same time period. Not only did
BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it
would also regularly show gains when the S&P 100 Index was down (at times significantly).
Such results were impossible if BLMIS had actually been implementing the SSC Strategy."  (*Id.*

¶ 57). "There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities." (*Id.* ¶ 58). Though unnecessary, the Trustee has sufficiently pleaded the badges of fraud.

The Trustee has successfully pleaded badges 2, 3, 4, 5, and 6. The Trustee need not plead all six badges of fraud to meet his burden of pleading actual fraudulent intent. *In re May*, 12 B.R. 618, 627 (N.D. Fla. 1980) ("Such indicators or badges, when established either singularly, but more often in combination, may justify the inference of the requisite intent to hinder, delay or defraud creditors.").

## BLMIS Customer Property

The Access Defendants argue that the Trustee has failed to plead facts that create a plausible inference that the subsequent transfers made to the Access Defendants by the Feeder Fund Defendants consisted of customer property. Mem. L. 36, ECF No. 286. Rule 8(a) governs the Trustee's pleading burden and a short and plain statement that the pleader is entitled to relief is all that is required. Fed. R. Civ. P. 8(a). This standard of pleading is meant to ensure that the defendant has proper notice of the claim, while recognizing the limitations a plaintiff may have in setting out each detail of the claim before discovery. *In re Enron Corp.*, No. 01-16034 AJG, 2006 WL 2400369, at *4 (Bankr. S.D.N.Y. May 11, 2006). In a subsequent transfer claim, this means only that a defendant must be adequately apprised of the subsequent transfers that the Trustee seeks to recover. *Picard v. Cohmad* (*In re BLMIS*), 454 B.R. 317, 340 (Bankr. S.D.N.Y. 2011) ("*Cohmad II*"). In the Complaint, the Trustee provides the Subsequent Transfer

Defendants with the "who, when, and how much" of the purported transfers. *Cohmad II*, 454

B.R. at 340; (Am. Compl. ¶¶ 332–40).

334. Based on the Trustee's investigation to date, AIA Ltd., AIA LLC, AP (Lux), and AML (f/k/a AIA (Lux)) received at least $100.6 million in Subsequent Transfers, including but not limited to:

a. AIA Ltd. received at least $25.4 million in fees from UBS SA pursuant to a February 5, 2004 "Consulting and Exclusive Introducing Agreement," which consisted of fees received by UBS SA from Luxalpha for serving as Luxalpha's official manager. AIA Ltd. also received at least $28.5 million in fees from UBSTPM under an August 1, 2006 "Client Introducer Agreement," which consisted of fees received by UBSTPM from Luxalpha for serving as Luxalpha's official manager. AIA Ltd. further received at least $15 million in fees from Groupement Financier for serving as the official manager of Groupement Financier from 2003 to December 2008. AIA Ltd. received at least $400,000 in fees for serving as the official manager of Groupement Levered from 2003 to December 2008.

b. AIA LLC received at least $189,000 in fees from UBS SA in connection with its role as official portfolio adviser to Luxalpha from August 2004 to August 2006, which consisted of fees received by UBS SA for serving as Luxalpha's official manager. These fees were pursuant to a contract entered into between UBS SA and AIA LLC which contains a New York choice of law provision.

c. AP (Lux) received at least $17.8 million in fees from UBSTPM for serving as the investment adviser to Luxalpha from 2007 to December 2008, consisting of fees received by UBSTPM from Luxalpha for serving as Luxalpha's official manager. AP (Lux) also received at least $8.4 million in fees from Groupement Financier for serving as the official investment adviser to Groupement Financier from 2007 to December 2008. AP (Lux) received an additional $2.5 million in fees from Groupement Levered for serving as the official investment adviser to Groupement Levered from 2007 to December 2008.

d. AML (f/k/a AIA (Lux)) received at least $2.4 million in fees from Groupement Financier for serving as the investment adviser to Groupement Financier from 2003 to 2007, and received at least $50,000 for serving as the investment adviser to Groupement Levered from 2003 to 2007. In addition, AML (f/k/a AIA (Lux)) received fees from UBS SA in connection with its role as official portfolio adviser to Luxalpha from February 2004 to August 2004, which consisted of fees received by UBS SA from Luxalpha for serving as Luxalpha's official manager, in an amount to be proven at trial.

335. Based on the Trustee's investigation to date, Littaye, Villehuchet, and Ms. Villehuchet received millions of dollars of Subsequent Transfers, in an amount to

be proven at trial. At all relevant times, each of AIA Ltd., AIA LLC, AP (Lux), and AML (f/k/a AIA (Lux)) was either completely or nearly completely owned by Littaye and Villehuchet. At various times, Littaye and Villehuchet each also served as a director of AIA Ltd., AP (Lux), and AML (f/k/a AIA (Lux)). A significant amount of the Subsequent Transfers received by AIA Ltd., AIA LLC, AP (Lux), and AML (f/k/a AIA (Lux)) was subsequently transferred to Littaye and Villehuchet, either directly or indirectly, in the form of distributions, payments, or other transfers of value. Among other transfers, Villehuchet received $6.5 million in compensation paid from bank accounts controlled by Access's New York office from 2004 through 2008, and, upon information and belief, his co-owner Littaye received at least the same amount of compensation paid from other Access-controlled bank accounts. The transfers Villehuchet received are recoverable from Ms. Villehuchet, as the executrix and sole beneficiary of Villehuchet's will.

336. Based on the Trustee's investigation to date, Delandmeter received approximately $350,000 in Subsequent Transfers from Luxalpha, in connection with Delandmeter's purported provision of legal services to Luxalpha. Delandmeter also received Subsequent Transfers from Groupement Financier in connection with Delandmeter's purported provision of legal services to Groupement Financier, in an amount to be proven at trial. Upon information and belief, a portion of the Luxalpha, Groupement Financier, and Groupement Levered-related Subsequent Transfers received by AIA Ltd., AIA LLC, AP (Lux), and AML (f/k/a AIA (Lux)) were subsequently transferred to Delandmeter, directly or indirectly, in compensation for Luxalpha, Groupement Financier and Groupement Levered-related services Delandmeter provided to Access, in an amount to be proven at trial.

337. Based on the Trustee's investigation to date, a portion of the Subsequent Transfers received by AIA Ltd., AIA LLC, AP (Lux), and AML (f/k/a AIA (Lux)) were subsequently transferred to Dumbauld, in an amount to be proven at trial. At minimum, Dumbauld received $1.25 million in compensation paid from bank accounts controlled by Access's New York office from 2004 through 2007. Dumbauld received these transfers as distributions, payments, or other transfers of value in connection with his role as Access partner and Chief Investment Officer.

(*Id.*)

The Trustee has alleged that Luxalpha was established entirely with BLMIS customer property that was withdrawn from the Oreades' BLMIS account. (*Id.* ¶ 4). And that the Feeder Fund Defendants invested 100% of their assets directly with BLMIS. (9/14/2022 Hr'g Tr. 74:25–75:4) ("[A]s to [Groupment and Luxalpha], they were . . . a hundred percent invested in Madoff."); (Am. Compl. ¶ 104) ("Groupement Financier . . . invested 100% of its assets directly

with BLMIS.").  The Trustee also alleges that BLMIS customer property accounts for 92% of

Access' total revenue.  (*Id.* ¶ 79).  As such, any and all subsequent transfers made from the

Feeder Fund Defendants to Access Defendants are very likely comprised of BLMIS customer

property.

 As has previously been stated by this Court,

> the Trustee is an outsider to these transactions and will need discovery to identify
> the specific subsequent transfers by date, amount and the manner in which they
> were effected. The Moving Defendants are a group of interrelated individuals and
> entities .... Whether they additionally received Subsequent Transfers of BLMIS
> funds from one another is a question to which they, and they alone, have the
> requisite information to respond.

*Picard v. Mayer (In re BLMIS)*, No. 08-01789, Adv. No. 20-01316, 2021 WL 4994435, at *5

(Bankr. S.D.N.Y. Oct. 27, 2021).

These allegations provide more than enough detail to apprise the Access Defendants of

the subsequent transfers the Trustee is seeking to collect.

## Conclusion

For the foregoing reasons, the Access Defendants' motion to dismiss is denied. The

Trustee shall submit a proposed order within fourteen days of the issuance of this decision,

directly to chambers (via E-Orders), upon not less than two days' notice to all parties, as required

by Local Bankruptcy Rule 9074-1(a).

/s/ Cecelia G. Morris
_____
**Dated: November 18, 2022**
**Poughkeepsie, New York**



**Hon. Cecelia G. Morris**
**U.S. Bankruptcy Judge**