# **<u>EXHIBIT 3</u>**

CITCO

*Citco Bank Nederland N.V.*

**Dated: August 25, 2003**

## KBC INVESTMENTS LTD.

**and**

## CITCO BANK NEDERLAND N.V.
## DUBLIN BRANCH

**and**

## CITCO GLOBAL CUSTODY N.V.

---

**BROKERAGE
AND
CUSTODY AGREEMENT**

---

**CITCO BANK NEDERLAND N.V.
Dublin Branch
Custom House Plaza Block 6
International Financial Services Centre
Dublin 1
Ireland**





**CITCO**

*Citco Bank Nederland N.V.*

**THIS AGREEMENT** is made this 25th day of August 2003

**BETWEEN:**  **KBC INVESTMENTS LTD.**
111 Old Broad Street
London EC2N 1FP
United Kingdom          ("the Customer")


**AND:**  **CITCO BANK NEDERLAND N.V.
DUBLIN BRANCH**
Custom House Plaza Block 6
International Financial Services Centre
Dublin 1
Ireland          ("the Bank")

**AND:**  **CITCO GLOBAL CUSTODY N.V.**
c/o Custom House Plaza Block 6
International Financial Services Centre
Dublin 1
Ireland          ("the Custodian")

**WHEREAS:**

(A)   The Customer wishes to be provided with brokerage and custody services and the Bank and the Custodian are willing to provide such brokerage and custody services to the Customer on the terms and subject to the conditions contained in this Agreement.

(B)   The Customer has opened and currently maintains a bank account number ▮▮▮▮▮▮ with the Bank.

**NOW IT IS HEREBY AGREED** as follows:

1    **Interpretation**

1.1     Unless the context otherwise requires:

"**Account**" means the bank account number ▮▮▮▮ held by the Customer with the Bank.

"**Agreement**" means this Brokerage and Custody Agreement.

"**Brokerage Services**" shall include (i) the effecting of transactions of and/or relating to the purchase and sale of and dealing in Securities in the name and for the account of the Customer; (ii) the effecting of transactions of and/or relating to the purchase and sale of and dealing in Securities in the name of the Bank, or of the Custodian, or any nominee for the account of the Customer; and (iii) any services ancillary thereto as set out in this Agreement.





**CITCO**

*Citco Bank Nederland N.V.*

"**Instructions**" means instructions provided from time to time to the Bank and/or to the Custodian by the Customer or by such persons as the Customer has authorised to give instructions, as more particularly described in Clause 14 hereof, in respect of the services and duties performed by the Bank and/or the Custodian pursuant to this Agreement.

"**Readily Marketable Securities**" means open ended collective investment schemes with unrestricted access on clearly defined periodic dealing cycles next to shares, units, bonds, futures contracts, currencies, money instruments, options, commodities, any derivative instruments based on the foregoing and any other financial instruments and other assets or property which are freely and publicly traded on a daily basis on a stock exchange or other exchange or recognised market place, and in respect of which the Bank and/or the Custodian agree to provide Brokerage Services and/or other services pursuant to this Agreement.

"**Non-Readily Marketable Securities**" means shares, units, bonds, futures contracts, currencies, money instruments, options, commodities, any derivative instruments based on the foregoing and any other financial instruments and other assets or property, including shares, units or other financial instruments of any unlisted collective investment schemes, for which there is no publicly available market or which are not freely or publicly traded on a daily basis on a stock exchange or other exchange or recognised market place, and in respect of which the Bank and/or the Custodian agree to provide Brokerage Services and/or other services pursuant to this Agreement.

"**Regularly Settled Securities**" means Securities that normally effect settlement within five business days of the Net Asset Value Date or Trade Date (or equivalent) as defined in its Offering Memorandum (or equivalent).

"**Non-Regularly Settled Securities**" means Securities that normally effect settlement after five business days of the Net Asset Value Date or Trade Date (or equivalent) as defined in its Offering Memorandum (or equivalent).

"**Securities**" means, where the context so admits, both Readily Marketable Securities and Non-Readily Marketable Securities.

"**Service Level Agreement**" means any agreement between the Bank and the Customer from time to time in force for the service level specified in such agreement and which is expressed to be a Service Level Agreement. Reference herein to the Brokerage and Custody Agreement shall (where the context so permits) be construed as including a reference to any such Service Level Agreement, a draft of which is set out in Schedule Three to this Agreement.

1.2 References herein to Clauses are references to clauses of this Agreement. Headings are inserted for convenience only and shall not be used in construing this Agreement.

## PART 1 - BROKERAGE SERVICES

2 **Appointment and Performance of Brokerage Services**

2.1 The Customer hereby appoints and authorises the Bank to provide Brokerage Services on behalf of the Customer which appointment and authorisation are hereby accepted by the Bank, subject to the terms and conditions of this Agreement.

2.2 The Bank shall, on Instructions of the Customer and on the basis of this Agreement, provide Brokerage Services to the Customer. The Customer hereby authorises the Bank to comply with any Instructions given or purported to be given by the Customer and the Bank shall be entitled to act for the Customer upon any such Instructions.

2.3 The Customer will provide the Bank with Instructions in respect of all transactions in Securities to be performed by the Bank on the Customer's behalf as follows:





**CITCO**

*Citco Bank Nederland N.V.*

2.3.1    for transactions in Readily Marketable Securities, Instructions must be provided to the Bank at least 90 minutes before the dealing deadline for such transactions. Instructions received thereafter will be executed on a best effort basis. In the case where the dealing deadline is after the close of business in the Bank's office on a particular trading day, Instructions should be received at least 30 minutes prior to close of business in the Bank's office. For this purpose close of business shall be 6pm CET on any working day.

2.3.2    for transactions in Non-Readily Marketable Securities, Instructions must be provided to the Bank at least two clear business days prior to the trade date for the applicable transaction in the Non-Readily Marketable Security. However, in case where a market or suitable counterparty is identified by the Customer Clause 2.3.1 shall apply.

2.3.3    for transactions in Non-Readily Marketable Securities, Instructions received by the Bank with less than two clear business days prior to the trade date, will be performed on a best efforts basis.

2.3.4    for transactions in Non-Readily Marketable Securities, which require a prescribed notice period, Instructions received by the Bank with less than two clear business days prior to the notice period date, will be performed on a best efforts basis.

The Bank shall perform all such Instructions which are so given by the Customer provided that sufficient funds or Securities, as applicable, are at the relevant time held by the Bank or by the Custodian or other nominee on behalf of the Customer, or the Customer has made other arrangements for settlement, such arrangements being satisfactory to the Bank.

2.4    The Bank may in its absolute discretion refuse to execute any Instruction given by or on behalf of the Customer and shall use reasonable endeavours to notify the Customer forthwith of any such decision.

2.5    The Customer understands and agrees that:

2.5.1    the Bank shall effect settlement of rights and/or obligations resulting from transactions effected pursuant to the Brokerage Services, such as but not limited to settlement of and payment for and delivery of Securities, in accordance with the laws, regulations and market practices in the jurisdictions in which the transactions occur- and/or in accordance with the terms of the transactions effected hereby;

2.5.2    any losses resulting from the market's failure to settle any transaction to the entire satisfaction of the Bank will be borne solely by the Customer; and

2.5.3    the Bank, in its absolute discretion, may refuse to effect the settlement of and payment for Securities when there are insufficient immediately available moneys recorded as standing to the credit of the Account.

2.5.4    in order to avoid unnecessary delays, the Bank, in its absolute discretion, may open any further Accounts in the currency needed to effect settlement of and payment for Securities, without the prior approval of the Customer.

2.6    The Bank hereby agrees to credit the Account or such other account to be agreed from time to time in the event that the Bank receives any dividend and/or interest entitlements on Securities held by or on behalf of the Customer or its nominee/custodian.

2.7    The Bank shall only make delivery of cash and/or any of the property of the Customer:

2.7.1    in the course of settlement of transactions notified to the Bank;

2.7.2    on the Instructions of the Customer;

2.7.3    pursuant to any security and/or pledge arrangement agreed hereunder or otherwise between the Customer and the Bank.





2.8     In executing Instructions for the Brokerage Services, the Bank shall be entitled at its option, to deal with itself or with third parties as the other party. Notwithstanding the provisions of Clause 10 hereof, the Bank shall not be liable for any shortcomings of such third parties if it has exercised due care in selecting these third parties.

2.9     The Customer shall be solely responsible for compliance with any investment policies, guidelines, restrictions on ownership or other restrictions whatsoever in relation to Securities, which may from time to time be binding on the Customer and/or the Bank when providing Brokerage Services. The Bank shall at no time be responsible for monitoring the aforementioned investment policies, guidelines or other restrictions.

2.10    The Customer confirms that the Bank's obligations under Part I of this Agreement relate solely to the Brokerage Services and that the Bank is under no obligation to advise the Customer in respect of the suitability of investments and related activities connected to the Brokerage Services.

## 3      Contract Notes and Other Statements

3.1     The Bank shall send to the Customer a contract note in respect of each executed order.

3.2     The Bank shall send to the Customer, whenever appropriate, a confirmation note in respect of any other services rendered to the Customer.

3.3     A contract note (or a confirmation note) shall, in the absence of manifest error, be conclusive and deemed acknowledged by the Customer as correct, unless the Bank receives written notice to the contrary within two business days of delivery of the contract note (or confirmation note) or the Bank notifies the Customer of an error therein within the same period.

3.4     The Bank shall send to the customer a monthly statement in respect of each account of the Customer within 15 business days after the end of each such monthly period, unless no transactions have taken place during such period. The Bank shall in any event send to the Customer such a statement once a year.

3.5     The Bank shall make available to the Customer and its auditors all such information, records and statements as they may reasonably require to the extent that the same relate to the Customer at all reasonable times and on reasonable notice.

## PART II - CUSTODIAN SERVICES

## 4      Appointment of Bank and Custodian

4.1     The Customer hereby appoints the Custodian as custodian of the Customer on the terms and subject to the conditions hereof, which appointment is hereby accepted by the Custodian.

4.2     The Bank and Custodian agree to provide the services herein set out, subject to the provisions of this Agreement.

## 5      Appointment of Sub-Custodians

5.1     In the performance of their duties under this Part II of the Agreement, the Bank and/or Custodian may act through agents, sub-custodians or any other third party which the Bank and/or Custodian may, in their absolute discretion, deem necessary. The Bank and/or Custodian are hereby authorised by the Customer to enter into further agreements for the appointment of the aforementioned agents, sub-custodians and/or third parties.

5.2     The Bank and/or Custodian shall not be responsible for any act or omission or for the solvency of any sub-custodian, agent or third party appointed pursuant to Clause 5.1 hereof, provided that the Bank or Custodian can demonstrate that due care was taken in the selection of any such sub-custodian, agent or third party.



CBN (DUBLIN) BROKERAGE AND CUSTODY AGREEMENT
PAGE 4



6        **Duties of the Customer**

6.1        Subject to the provisions of, and in addition to any of the services provided by the Bank pursuant to Clause 2 of this Agreement, the Customer shall deliver or cause to be delivered to the Custodian from time to time the following:

6.1.1        Securities which the Customer now owns or may hereafter acquire, and of which the Custodian agrees to retain custody.

6.1.2        any other property or assets of the Customer of which the Custodian, in its absolute discretion, may agree to accept custody.

6.2        The Customer acknowledges that there may be significant delays in the registration or re-registration in the name of the Custodian, or in the name of any sub-custodian or nominee, of Non-Readily Marketable Securities, which have been delivered to the Bank pursuant to Clause 6.1 hereof. In the absence of any negligence or undue delay on the part of the Bank and/or the Custodian, neither the Bank nor the Custodian shall be under any obligation to execute any instructions by the Customer in respect of such Non-Readily Marketable Securities until registration or re-registration in the name of the Custodian or in the name of any sub-custodian or nominee is completed.

6.3        The Customer shall timely and accurately give Instructions to the Bank or procure that the Bank will be given timely and accurate Instructions of all transactions which involve the Bank and/or Custodian.

6.4        The Customer shall be solely responsible for compliance with any investment policies, guidelines, restrictions on ownership or other restrictions whatsoever in relation to Securities, which may from time to time be binding on the Customer and/or the Bank and/or the Custodian when providing Custodian Services. The Bank shall at no time be responsible for monitoring the aforementioned investment policies, guidelines or other restrictions.

7        **Powers and Duties of the Bank and Custodian**

7.1        The Bank and Custodian shall have and perform the following powers and duties and such other powers and duties as the parties shall from time to time agree:

7.1.1        to register the Securities, other than physically held bearer shares, in the name of the Custodian or any sub-custodian and to keep the Securities in the custody of the Custodian or procure that they are kept in the custody of any sub-custodian, provided however that, if instructed to do so by the Customer, the Bank and/or Custodian may deposit any of the Securities in a depository or clearing system;

7.1.2        to deposit in the Account all moneys received from or for the account of the Customer;

7.1.3        when instructed to do so by the Customer and subject to the provisions of Clause 6.2, to make settlement of transactions undertaken by or for the account of the Customer, delivering or receiving the Securities or other assets of the Customer and making or receiving payments for the account of the Customer. The Bank and/or Custodian are not obliged to deliver securities or assets which cannot be covered by securities or assets which they hold for the Customer or to make any payments other than from the Account;

7.1.4        to collect and deposit in the Account all income and other payments in connection with the Securities;

7.1.5        unless instructed to do so by the Customer, the Bank, Custodian and/or any sub-custodian shall not vote on or in respect of the Securities or deliver any executed form of proxy to vote thereon or in respect thereof;

7.1.6        to employ any legal, financial or other experts which the Bank and/or Custodian deem necessary to comply with their duties and obligations under this Agreement the costs of which will be reimbursed to the Bank and/or Custodian by the Customer, if reasonable and duly evidenced by appropriate documents;





7.1.7    when instructed to do so by or on behalf of the Customer, to remit money to banks or others for the account of the Customer and to pay or procure the payment of any invoices or other financial obligations of the Customer;

7.1.8    to deliver and surrender any bonds or other instruments as and when the same fall due for payment or repayment and to pay all calls and debit the accounts of the Customer accordingly and to effect all necessary or appropriate exchanges of bonds or other instruments;

7.1.9    to deliver to the Customer all forms of proxy and all notices of meetings and any other notices or announcements in connection with the Securities;

7.2    The Securities held at any one time by the Custodian or any sub-custodian shall be recorded in and ascertainable from the books and/or ledgers of the Bank and the Custodian and such books and ledgers shall constitute conclusive evidence of the Securities retained on behalf of the Customer.

7.3    The Customer recognises that in certain circumstances in order to preserve or safeguard the Securities or other assets of the Customer, the Bank and/or Custodian may be required to act without first obtaining instructions from the Customer. In such cases, the Bank and/or Custodian may act at their own absolute and unfettered discretion and shall not be liable, in the absence of negligence, wilful misfeasance, reckless disregard or fraud, for any loss to the Customer whatsoever.

# PART III - GENERAL PROVISIONS

## 8   Payment for Securities

8.1    All Securities, which have been purchased for the Customer by the Bank, will be transferred to the Custodian, or to any sub-custodian or nominee, as custodian, or registered in the name of the Custodian or a sub-custodian or nominee, as the case may be. Such transfer and registration will be subject, however, to payment in full of all moneys due in connection with such purchase (including, for the avoidance of doubt, the gross purchase price). If such indebtedness is not satisfied by the Customer within 5 days of the date the same became due, such Securities will not be transferred to nor held by the Custodian on behalf of the Customer, but will be freely available to the Bank.

8.2    If, pursuant to Clause 8.1 hereof, the Securities will not be transferred to or held by the Custodian on behalf of the Customer, the Customer is not released from his obligation to pay the Bank. Such payment obligations will be reduced to the extent that the net proceeds of the sale of such Securities are available to the Bank.

8.3    The Custodian will be under no obligation whatsoever vis-à-vis the Customer in connection with Securities referred to above unless and until the Customer has satisfied its payment obligations vis-à-vis the Bank in full.

## 9   Representations and Warranties of the Customer

9.1    The Customer represents and warrants to the Bank and to the Custodian that it will at all times have full power and authority (corporate and otherwise) to enter into this Agreement and to exercise its rights and perform its obligations under the terms and conditions of this Agreement and any contract in connection therewith or pursuant thereto, and that it has obtained and will maintain all authorisations and consents necessary for it so to enter, exercise rights and perform such obligations, and that such authorisations and consents are and will at all times be in full force and effect. The Customer will forthwith upon demand by the Bank from time to time deliver such evidence of such authorisations and consents and compliance therewith as the Bank may reasonably require.

9.2    The Customer furthermore represents and warrants to the Bank that it has full power and authority (i) to authorise third parties to give instructions on behalf of the Customer or its nominee/custodian, and (ii) to perform all its obligations hereunder.

9.3    The Customer hereby expressly declares that it is aware of and that it accepts the investment risks attached to Securities and the consequences entailed by the provision of Brokerage Services.





CITCO

*Citco Bank Nederland N.V.*

## 10     Liability and Indemnification of Bank and Custodian

10.1    The Customer shall bear all risks of investing in Securities or holding cash denominated in a particular currency and the Customer hereby agrees to be solely responsible for any losses resulting from any transactions in Securities or cash in any currency in connection with transactions effected through the Bank.

10.2    The Bank and Custodian hereby agree to use their best efforts and judgement and due care in performing their obligations and duties pursuant to this Agreement; provided however that the Bank, Custodian, their directors, officers, employees and/or agents shall not be liable for any action taken or failure to act in the course of performing the services hereunder or for any loss suffered by the Customer in connection with the subject matter of this Agreement unless such loss arises from wilful misfeasance, fraud, bad faith or negligence in the performance of the Bank's and/or Custodian's obligations and duties or by reason of the Bank's and/or Custodian's reckless disregard of their obligations and duties hereunder.

10.3    In the absence of wilful misfeasance, fraud, bad faith, negligence or reckless disregard, the Bank and/or Custodian shall not be liable for any shortfall in the number of securities held by the Custodian on behalf of the Customer.

10.4    In particular, in the absence of wilful misfeasance, fraud, bad faith, negligence or reckless disregard, the Bank and/or Custodian shall not be liable for any losses which may arise howsoever as a result of any of the prices or values for any of the Securities which are provided to or obtained by the Bank and/or Custodian being provisional, inaccurate, false or misleading.

10.5    In the event of any loss to the Customer by reason of the failure of the Bank or the Custodian to utilise reasonable care (including but not limited to, in connection with the Bank and the Custodian acting in accordance with Instructions received from the Customer) the Bank and the Custodian shall be liable to the Customer only to the extent of the Customer's direct damages, to be determined based on the market value of the Securities or other property which is the subject of the loss at the date of discovery of such loss and without reference to any special conditions or circumstances. The Bank and the Custodian shall have no liability whatsoever for any consequential, special, indirect or speculative loss or damages (including, but not limited to, lost profits) suffered by the Customer in connection with the transactions contemplated hereby and the relationship established hereby even if the Bank or the Custodian has been advised as to the possibility of the same and regardless of the form of the action.

10.6    The Bank and Custodian shall be without liability to, and shall be indemnified by, the Customer for any action taken or omitted by them, whether pursuant to Instructions or otherwise, within the scope hereof if such act or omission was in good faith, without wilful misfeasance, fraud, bad faith, negligence or reckless disregard. In performing their obligations hereunder, the Bank and Custodian may rely on the genuineness of any document, which it believes in good faith to have been validly executed by or on behalf of the Customer.

10.7    The Customer shall pay for and hold the Bank and the Custodian harmless from any liability or loss resulting from the imposition or assessment of any taxes or other governmental charges, and any related expenses with respect to any transactions in or income from Securities.

10.8    Without limiting the foregoing, the Bank and the Custodian shall not be liable for any loss which results from: (i) the general risk of investing, or (ii) investing or holding Securities in a particular country including, but not limited to, losses resulting from malfunction, interruption of or error in the transmission of information caused by any machines or system or interruption of communication facilities, abnormal operating conditions, nationalisation, expropriation or other governmental actions, regulation of the banking or securities industry, currency restrictions, devaluations or fluctuations, and market conditions which prevent the orderly execution of Securities transactions or affect the value of the Securities.

10.9    The Customer shall indemnify and hold harmless the Bank and the Custodian, their directors, officers, employees and agents from and against any losses, expenses, liabilities, obligations, damages, penalties, judgements, actions, suits, taxation or costs howsoever imposed on, asserted against or incurred by them in the performance of the Bank's and Custodian's obligations and duties hereunder; provided, however,





that none of them shall be indemnified for their wilful misfeasance, fraud, bad faith, negligence or reckless disregard.

10.10 In the event that any document of title relating to a security is lost, the Bank or Custodian shall use reasonable endeavours to obtain a duplicate copy if such a duplicate copy is available. When the person or body issuing such a duplicate copy requires an indemnity, the Customer agrees to provide to the Bank or Custodian such counter-indemnity as the Bank or Custodian may require, unless the loss is due to the Custodian or Bank's wilful misfeasance, fraud, bad faith, negligence or reckless disregard.

## 11 Fees and Expenses

11.1 In consideration of the services of the Bank and Custodian hereunder the Customer shall pay to the Bank the fees and expenses as set out in Schedule One hereto.

11.2 The Bank shall be entitled to charge to the Customer the fees of all sub-custodians, agents and third parties appointed by the Bank and/or Custodian pursuant to clause 5 hereof together with all other reasonable costs, expenses and disbursements incurred by the Bank and/or Custodian under this Agreement. All transaction fees payable to the Bank shall be in the currency of the executed transaction.

11.3 The Customer hereby authorises the Bank to debit from the Account all amounts due to the Bank pursuant to this Agreement.

11.4 In the event of any dispute as to any amounts payable to the Bank under this clause, an excerpt from the Bank's records signed by the Bank shall serve as prima facie evidence of any amounts due subject to rebuttal evidence produced by the Customer. At the Customer's request the Bank shall provide the Customer with the documents and/or information supporting the Bank's records.

## 12 Non-Exclusivity

12.1 The provision of services by the Bank and the Custodian hereunder shall not preclude the Bank and the Custodian from providing similar services to any other third party and the Customer hereby agrees that the Bank will not be liable to account to the Customer for any profit earned from such third party transactions or by such third party.

12.2 Without prejudice to the generality of Clause 12.1 hereof, the Customer agrees that the Bank may match any transactions made on behalf of the Customer with those made by the Bank on behalf of itself or on behalf of any third party.

## 13 Confidentiality

Unless under a legal, regulatory or generally accepted obligation to do so, no party shall divulge or communicate to any person not authorised by any other to receive the same, with the exception of its advisers and accountants, any confidential information of any other party of which it is or shall hereafter become possessed, relating to the Securities or to the business of such other party.

## 14 Instructions

14.1 Receipt of Instructions by the Bank and/or Custodian from the Customer may be deemed by the Bank and/or Custodian to be proper and authorised Instructions in respect of any of their obligations and duties hereunder.

14.2 A signed copy of a power of attorney executed by the authorised representative of the Customer authorising a third party to give Instructions to the Bank and/or Custodian may be accepted by the Bank or Custodian as conclusive evidence of the authority of such a person to so act on behalf of the Customer. The Customer shall deliver or cause to be delivered to the Bank or Custodian a certified copy of the signature of any person authorised to act as aforesaid.

14.3 Instructions by or on behalf of the Customer shall be conveyed to the Bank or Custodian by the following methods only:





14.3.1  registered or recorded delivery mail, tested telex or authenticated SWIFT transmission;

14.3.2  telephone, or facsimile provided that the Customer has entered into an undertaking in the form as set out in Schedule Two hereof.

14.3.3  provided that the Customer has entered into an Online Access Agreement in the form set out in Schedule Four hereof, by electronic transmission through CFN (as defined in the Online Access Agreement) pursuant to the terms thereof.

14.4  The Bank and/or Custodian shall not be liable for any loss arising from:

14.4.1  non-delivery or delay of mail;

14.4.2  non-delivery or mistaken or incomplete transmission of tested telex, facsimile, electronic transmission or authenticated SWIFT transmission;

14.4.3  misunderstanding or misinterpretation of instructions provided by telephone.

14.5  Neither the Bank nor Custodian is obliged to enquire into the validity, genuineness or accuracy of any Instruction properly received from the Customer.

## 15  Service Level Agreement

The Bank and the Customer will enter into a Service Level Agreement, by signing the agreement set out in Schedule Three.

## 16  Termination

16.1  This Agreement shall continue in full force and effect until terminated by any party giving sixty days' prior written notice to the others.

16.2  This Agreement shall terminate with immediate effect in any of the following circumstances:

16.2.1  a material breach by any party of its obligations under this Agreement which, if capable of being remedied, is not remedied within ten (10) days of receipt of notice;

16.2.2  the failure of the Customer to pay its debts to the Bank and/or Custodian when they become due; or

16.2.3  the Customer or the Bank and/or Custodian (i) requests to be or is declared bankrupt (*faillet*), (ii) requests to be or is granted a suspension of payments (*surséance van betaling*), (iii) if it is a credit institution, becomes subject to the emergency measures (*bijzondere voorzieningen*) as referred to in Chapter VII of the Credit System Supervision Act 1995 (*Wet Toezicht Effectenverkeer 1995*), (iv) any similar action is taken as referred to in (i) through (iii) under the laws of The Netherlands or the laws of any other jurisdiction, (v) the Customer or the Broker (as disappearing entity) will be merged with another entity, or (vi) a resolution is adopted to dissolve or liquidate the Customer or the Bank and/or Custodian.

16.3  If the Bank and/or Custodian or Customer is not aware of automatic termination pursuant to Clause 16.2 the automatic termination will be delayed until the day it becomes aware thereof

16.4  On the termination of this Agreement howsoever occasioned the Bank and Custodian shall forthwith deliver up to the Customer all Securities and documents of title thereto in their possession or control pursuant to this Agreement save that they shall not be required to make such delivery until full payment has been made by the Customer to the Bank of all amounts due in respect of transactions which have not been settled at the date of termination and until full payment has been made for all outstanding fees and expenses due to the Bank and Custodian for services provided under the terms of this Agreement.





**17 Assignment**

Neither the benefit nor burden of this Agreement may be assigned by any party save with the prior written consent of the others.

**18 Notice**

18.1 Any notice given under this Agreement shall be served:

18.1.1 by registered or recorded delivery mail, tested telex , or authenticated SWIFT transmission;

18.1.2 by facsimile transmission;

18.1.3 by any other means which one party specifies by notice to the other.

18.2 Each party's address for the service of notice shall be the above mentioned address or such other address as one party specifies by notice to the others.

18.3 A notice shall be deemed to have been given:

18.3.1 if it was served by post, upon receipt by the party to whom addressed;

18.3.2 if it was served in person, at the time of service;

18.3.3 if it was served by tested telex, or by authenticated SWIFT or facsimile transmission, at the time of receipt by the party to whom addressed.

**19 Custodian's obligation secured**

The Bank guarantees to the Customer that the obligations of the Custodian vis-à-vis the Customer hereunder will be properly fulfilled.

**20 Alteration of Provisions**

20.1 No variation, amendment, discharge, waiver or discontinuance of any of the provisions of this Agreement shall be valid unless in writing and signed by all parties.

20.2 The Bank or Custodian may amend or vary any provision of this agreement by giving one week's notice to the Customer prior to the date that the variation or amendment is to take effect, in case such an amendment or variation is required due to changes in the law or regulations applicable to the Bank and/or Custodian.

**21 Incorporation General Conditions and Schedules**

The General Conditions of the Bank regulating the relationship between the Customer and the Bank as amended from time to time, shall apply correspondingly to the relationship between the Customer and the Bank and Custodian insofar as they do not differ from the terms of this Agreement.

**22 Governing Law and Jurisdiction**

22.1 This Agreement shall be governed by and construed in accordance with the laws of The Netherlands.

22.2 All parties agree that the courts of The Netherlands are to have jurisdiction to settle any disputes which may arise out of or in connection with this Agreement and that accordingly any suit, action or proceeding arising out of or in connection with this Agreement may be brought in such courts. Any proceedings or claims brought by the Customer against the Bank and/or the Custodian and/or their affiliates, arising out of or related to this Agreement or to the Brokerage Services shall be brought exclusively in Amsterdam, The Netherlands.





22.3   Nothing in this Clause 22 shall limit the right of the Bank and/or Custodian to take proceedings against the Customer in any other court of competent jurisdiction, nor shall the taking of proceedings by the Bank and/or the Custodian in one or more jurisdictions preclude the taking of proceedings in any other jurisdiction, whether concurrently or not.

**IN WITNESS WHEREOF** the parties hereto have executed this Agreement the day and year first above written.

.....................................

**KBC INVESTMENTS LTD.**

.....................................
**CITCO BANK NEDERLAND N.V.**
**DUBLIN BRANCH**

.....................................
**CITCO GLOBAL CUSTODY N.V.**



## SCHEDULE ONE

## FEES AND EXPENSES

**Custody fee**

Custody fees will be charged quarterly at a rate of:

| | |
|---|---|
| 0.04% (4 basis points) | USD 0 up to and including USD 750,000,000 |
| 0.03% (3 basis points) | USD 750,000,000 or above |

per annum of the Average net assets (the "Average Net Assets") of the holdings of the Customer over the preceding three months, with a minimum of US$ 1,250.00 per quarter. The Average Net Assets is calculated as the average of the net assets across the above-mentioned Accounts the Customer, for each of the 3 month ends in the quarter.

**Transaction fee**

For regularly settled securities: USD 100.00
For non-regularly settled securities: USD 350.00

**Transfer fee**

For a delivery or receipt of securities free of payment to or from another bank or custodian a fee of US$ 75.00 will be charged.

**Conversion charges**

Where the Customer switches a position of shares within the same group of funds, the transaction fee will be charged for either the sale or the purchase only.

**Cancellation fee**

In case a transaction or a transfer instruction is cancelled a flat fee of US$ 100.00 will be charged.

**Disbursements**

All disbursements and out-of-pocket expenses will be charged separately to the account of the Customer.




Pg 16 of 24

CITCO

*Citco Bank Nederland N.V.*

# SCHEDULE TWO

**Citco Bank Nederland N.V.**
**Dublin Branch**
Custom House Plaza Block 6
International Financial Services Centre
Dublin 1
Ireland

## INSTRUCTIONS BY TELEPHONE, TELEX OR FACSIMILE

In consideration of your agreeing as per our request to act upon unauthenticated telephone or facsimile instructions purporting to be given by me/us or on my/our behalf in respect of our account(s) and/or other dealings with you, I/We hereby:

a) agree to indemnify you and to keep you indemnified from and against all claims, demands, liabilities, costs, charges, damages, losses, expenses and consequences of whatever nature which may be brought or preferred against you or that you may suffer, incur or sustain by reason or on account of your having so acted whether wrongly or mistakenly or not, or of your failing to act wholly or in part in accordance with such instructions;

b) agree not to make any claim against you by reason of or on account of your having so acted or of your having acted wrongly or mistakenly or of your failing to act wholly or in part in accordance with such instructions;

c) confirm that such instructions, if accepted by you, result in agreements which are binding upon me/us;

d) agree that you may debit any account in my/our name(s) with any sums payable by me/us as a result of such instructions, and

e) agree that I/we will immediately send you written confirmation of any such instructions.

Date:

KBC INVESTMENTS LTD.

Signatures





# SCHEDULE THREE

SERVICE LEVEL AGREEMENT

**THIS AGREEMENT** is made this 25th day of August 2003

between

**Citco Bank Nederland N.V. Dublin Branch**    and    **KBC Investments Ltd.**

| | | | | |
|---|---|---|---|---|
| address: | Custom House Plaza Block 6<br>International Financial Services Centre<br>Dublin 1<br>Ireland | | address: | 111 Old Broad Street<br>London EC 2N 1FP<br>United Kingdom |
| phone<br>fax<br>BIC | : 00 353 1 636 7100<br>: 00 353 1 636 7102<br>: CITC IE 2D | | phone<br>fax<br>BIC | :<br>:<br>: |

referred to herein as "Bank"          referred to herein as " Customer"

**Operative provision:**

All the terms of the Brokerage and Custody Agreement shall apply to and form part of this Service Level Agreement as if the same were set out in extenso herein. In the event of a conflict between the conditions contained in the Brokerage and Custody Agreement and the conditions contained in the Service Level Agreement the conditions contained in this Service Level Agreement shall prevail.

## 1    Trading

### 1.1    Orders

Orders to *buy/subscribe* or *sell/redeem* are sent by the Customer to the Bank in accordance with clause 14.3 of the Brokerage and Custody Agreement. The Customer will supply following information for each trade:

1/ Full name of Fund
2/ Security identification (ISIN, SSN, Cusip or Telekurs symbol)
3/ *Subscription/purchase* or *Redemption/sale*
4/ Customer reference no. (if any)
5/ Quantity of shares or currency and amount
6/ Cash- or Reinvest option (if nothing is mentioned the Cash option prevails)

The Bank will place the trade in accordance with clause 2.3 of the Brokerage and Custody Agreement.

### 1.2    Order confirmations / Pre-Advice

The Bank issues an order-confirmation by Fax/Swift MT 509 (Trade Status Message) within 24 hours upon having received the order, which will include following information:

1/ Full name of Fund
2/ Fund's reference (if appropriate)
3/ Bank's reference
4/ Securities a/c
5/ Securities Identification





**CITCO**

*Citco Bank Nederland N.V.*

6/ Amount/currency/approx. no. of shares
7/ Expected trade date *
8/ Expected settlement date by the Bank (final booking)*

**\* non-binding Information**

<u>Note</u>
**Please check the information contained in this advice and notify us immediately of any errors or discrepancies.**
**Your acceptance of the above transaction will automatically be confirmed if you do not respond to the contrary, within 48 hours after receipt of this confirmation.**

If part of the above information is not available, a preliminary order confirmation will be issued within 24 hours, indicating when a final order confirmation will be issued.

Orders which cannot be placed or executed for reasons such as fiscal, legal, fund ownership restrictions, non-daily traded funds etc. will be advised by the Bank to Customer within 24 hours from the time the order was received by the Bank.

1.3     <u>Pre-advice on subscriptions in Non Daily Traded Funds</u>

In addition to the above MT 509 the Bank will send an MT 599 two business days prior to the preliminary payment being made to the Fund Administrator, provided the order is received at least 3 business days prior to the payment date. If the order is not received in time, an MT 599 will be sent the same date the payment is executed.

    1.3.1     Upon receipt of a preliminary trade confirmation from the Fund/Broker the Bank will send a fax / MT 599 confirming the trade details.

        **Note: A final confirmation will be sent upon delivery of shares to our nominee or sub-custodian or, in case of a redemption, upon receipt of redemption proceeds and contract note.**

1.4     <u>Final subscription</u>

The final execution will be advised by fax/MT 515 (Customer confirmation) to the Customer within 48 hours from the receipt of the final confirmation from the Fund/Broker.

    1.4.1     <u>Partial redemptions</u>

        The Bank will confirm partial redemptions by Fax / MT 599 indicating the percentage of the redemption proceeds paid and the estimated Net Asset Value.

    1.4.2.     <u>Final redemptions</u>

        The final execution will be advised by fax / MT 515 (Customer confirmation) to the Customer within 48 hours from the receipt of both the Fund confirmation and redemption proceeds from the Fund / Broker.

1.5     <u>Overdue Settlements</u>

The Bank will contact every Fund / Broker in respect of trades which are more than 48 hours overdue from the expected Bank settlement date, reported on the Order Confirmation or on the Pre-Advice. In all cases the Bank will advise the Customer by fax / Swift of the status of the trade.



**CITCO**

*Citco Bank Nederland N.V.*

**2  Third party receipts / deliveries**

### 2.1  Instructions to *receive* or *deliver*

The Customer may instruct the Bank in accordance with clause 14.3 of the Brokerage and Custody Agreement.

In case Swift is used the following messages can be handled:

- MT 520 Receive Free
- MT 521 Receive against Payment
- MT 522 Deliver Free
- MT 523 Deliver against payment

### 2.2

The Bank will issue transfer deeds or instructions within 48 hours from receipt of instructions from the Customer, and mail the documentation to the Funds. After 10 business days the Funds are contacted by the Bank to confirm the following:

- Receipt of the instructions
- Correctness of the documentation and instructions
- Receipt of counterparty instructions
- Indication of expected settlement date of the re-registration

### 2.3

Acknowledgment will be sent to the Customer confirming receipt of their instructions within 24 hours.

### 2.4

The Bank will send a Status report to the Customer by fax for all receipts / deliveries which have not been executed within 15 business days of receipt of the instructions.

**3  Settlement**

### 3.1  Settlement Confirmation

The Customer will receive confirmations of settlements by fax / Swift.

In case Swift is used the following messages can be handled:

- MT 530 Confirmation of Receipt Free
- MT 531 Confirmation of Receipt against Payment
- MT 532 Confirmation of Delivery Free
- MT 533 Confirmation of Delivery against Payment

**4  Corporate Actions**

### 4.1  Pre Advice

On a best efforts basis, the Bank will send to the Customer a pre-advice by fax detailing the event announced, provided the Bank receives the information in time.

### 4.2  Dividends/distributions to the Customer's "Cash"-account

The Bank will distribute the cash proceeds in accordance with the Customer's standing instructions for that security.

If the dividend or distribution is in the form of shares, the Bank is unable to apply the "Cash" standing instruction and will credit the shares to the Customer's account. Only then is the Customer able to sell these shares by sending an instruction to the bank. The Bank will credit the cash proceeds within three business days after receiving both the corporate action advice and the cash proceeds.





4.3      Dividends/distributions to the Customer's "Reinvest"-account

The Bank will distribute the shares in accordance with the Customer's standing instructions for that security.

If the dividend or distribution is in the form of cash, the Bank is unable to apply the "Reinvest" standing instruction and will credit the cash proceeds to the Customer's account. Only then is the Customer able to buy shares by sending an instruction to the Bank. The Bank will credit the shares within three business days of receiving the corporate action advice.

## 5 Reconciliation

The Bank will send each month two statements of holdings to the Customer. The first statement will be sent around the 2nd business day of the month, detailing the Customer's position in each security. The second statement will be sent around the 16th of the month, mentioning both the Customer's position and the latest prices available.

## 6 Cash movements

Cash movements will be booked through the appropriate account(s) and advised by fax or MT 950 the following day, with good value.

## 7 Amendments

Any provision of this Agreement may be amended only, if such amendment is in writing and signed by both the Bank and the Customer.

## 8 Governing Law and Jurisdiction

This Agreement shall be governed by the laws of the Netherlands. The exclusive place of jurisdiction shall be Amsterdam, The Netherlands.

**IN WITNESS WHEREOF** the parties thereto have executed this Agreement the day and year first above written.

.........................................

**KBC INVESTMENTS LTD.**

.........................................

**CITCO BANK NEDERLAND N.V.**
**DUBLIN BRANCH**



CITCO

*Citco Bank Nederland N.V.*

## SCHEDULE FOUR

### ONLINE ACCESS AGREEMENT

**THIS AGREEMENT** is made this 25th day of August 2003

between

**Citco Bank Nederland N.V. Dublin Branch**        and        **KBC Investments Ltd.**

address:  Custom House Plaza Block 6
International Financial Services Centre
Dublin 1
Ireland

address:  111 Old Broad Street
London EC 2N 1FP
United Kingdom

phone   : 00 353 1 636 7100
fax       : 00 353 1 636 7102
BIC      : CITC IE 2D

phone   :
fax       :
BIC      :

referred to herein as "Bank"

referred to herein as " Customer"

**Operative provision:**

All the terms of the Brokerage and Custody Agreement shall apply to and form part of this Online Access Agreement as if the same were set out in extenso herein. In the event of a conflict between the conditions contained in the Brokerage and Custody Agreement and the conditions contained in the Online Access Agreement, the conditions contained in this Online Access Agreement shall prevail.

**WHEREAS:**

(A) The Customer desires to access and use the Citco Funds Net on the Internet at www.citcofunds.net ("CFN") (i) to receive information on Securities and (ii) to give the Bank instructions in respect of the Customer's account(s) and to have the Bank act upon such instructions as set forth on Attachment A (the "Online Services"); and

(B) The Bank is willing to provide such information and accept such instructions through CFN on the terms and conditions set forth herein.

**NOW IT IS HEREBY AGREED** as follows:

1.  <u>Right to Access</u>. The Bank hereby grants Customer the right to access and use CFN in accordance with the terms and conditions of this Agreement to perform the Online Services. Except as provided herein, the Online Services shall be subject to the same terms, conditions, warranties and representations as all other Brokerage Services.

2.  <u>Authorised Persons</u>. Customer will select persons authorised to use the Online Services on its behalf ("Authorised Persons") and identify such persons to the Bank. The Bank will assign an identifier and password to each such Authorised Person. The Bank will take all reasonable security measures, including means within CFN to limit access to Online Services only to Authorised Persons. Customer and Authorised Persons will maintain such identifiers and passwords in confidence. Customer will familiarise Authorised Persons with all of Customer's obligations under the Brokerage and Custody Agreement, including this Online Access Agreement and will assure that they are qualified to engage in Brokerage Services for the Customer. Customer shall not permit any Authorised Person to engage in any Brokerage Service unless such Authorised Person meets all applicable legal requirements and any eligibility criteria, whether established by the Bank or a third party, including, without limitation, criteria established by the broker or manager of any Security, applicable to such Brokerage Service. Customer understands and agrees that it is responsible for any and all information, including messages and instructions, entered, transmitted or received under identifiers and passwords of Authorised Persons, and





for the trading and other consequences thereof. If any third party shall access Customer's account through CFN using the identifier and password of an Authorised Person, Customer will indemnify and hold harmless the Bank against any liability, costs or damages arising out of claims by Customer or such third parties based upon or relating to such access.

3.   Confidentiality and Ownership.  Customer acknowledges that all information on CFN, including but not limited to the databases thereon, and the selection, co-ordination, and arrangement of the contents thereof (collectively, the "Information"), are trade secrets, proprietary to the Bank. Customer agrees to keep such Information confidential and to utilise such Information solely for its own trading activities. Customer further agrees to take or cause to be taken all reasonable precautions to maintain the secrecy and confidentiality of such Information. Customer shall not disclose, and shall use reasonable efforts not to permit the disclosure of, any part of such Information to any other person. Customer will not use or permit the use of CFN or any of the Information for any illegal purpose. Customer further acknowledges that CFN and all intellectual property rights therein, including the Information, are the property of the Bank, and that Customer will have no right to reproduce, sell, license, or distribute any Information or any portion of CFN without the prior approval thereof by the Bank.

4.   Website System Changes.  Customer acknowledges and agrees that, without prior notice and without the advice to or consent of Customer, the form and content of any display on CFN may be modified at any time and in any way, including terminating any information or service provided thereon.

5.   No Online Investment Advice.  Customer understands that the information available on CFN is not investment advice of any kind, nor does CFN purport to offer any opinion with respect to the nature, potential value or suitability of any particular Securities transaction or investment strategy.

6.   Online Instructions.  With respect to instructions in respect of Customer's account(s) received by the Bank using CFN:

   6.1   Customer shall indemnify and hold the Bank harmless from and against all claims, demands, liabilities, costs, charges, damages, losses, expenses and consequences of whatever nature which may be brought or preferred against the Bank or that may be suffered, incurred or sustained by the Bank by reason or on account of having acted in accordance with such instructions, whether wrongly or mistakenly given or not;

   6.2   Customer shall not make any claim against the Bank by reason of or on account of the Bank having so acted in accordance with such instructions;

   6.3   Customer acknowledges and confirms that such instructions, if accepted by the Bank, result in agreements that are binding upon the Customer; and

   6.4   Customer agrees that the Bank may debit any account in Customer's name(s) with any sums payable by the Customer as a result of such instructions.

7.   Internet-Related Difficulties.  Customer shall indemnify and hold the Bank harmless from and against all claims, demands, liabilities, costs, charges, damages, losses, expenses and consequences of whatever nature that may be brought or preferred against the Bank or that may be suffered, incurred or sustained by the Bank by reason or on account of equipment failure, communication line failure, system failure, security failure on the Internet, unauthorised access, or theft, or any problem, technological or otherwise, that might prevent Customer from accessing CFN. Customer further agrees that it will not be compensated for "lost opportunity," including but not limited to, for inability to enter an order online due to technical difficulties, where the desired Security increased in value or a Security held decreased in value.

8.   DISCLAIMER.  ALL INFORMATION PROVIDED ON CFN IS "AS IS," WITHOUT WARRANTIES, CONDITIONS, OR REPRESENTATIONS OF ANY KIND, INCLUDING WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. CUSTOMER ACKNOWLEDGES AND AGREES THAT THERE IS NO ASSURANCE THAT INFORMATION ON CFN IS TIMELY, ACCURATE OR COMPLETE. IN PARTICULAR, BUT WITHOUT LIMITING THE FOREGOING, CUSTOMER UNDERSTANDS THAT THE BANK AND THE CUSTODIAN DEPEND, AMONGST OTHER THINGS, ON THE SELLERS OF NON-



**C I T C O**

*Citco Bank Nederland N.V.*

READILY MARKETABLE SECURITIES OR OTHER THIRD PARTY PROVIDERS FOR MOST OR ALL OF THE INFORMATION CONCERNING THOSE SECURITIES AND THAT ERRORS ALSO OCCUR IN INFORMATION COMPILED OR PREPARED BY THE BANK OR ITS AFFILIATES. CUSTOMER UNDERSTANDS THAT THERE WILL BE A DELAY BETWEEN THE TIME THAT THE CUSTODIAN AND THE BANK RECEIVE CHANGES TO THIS INFORMATION AND THE CORRESPONDING CHANGE TO THE INFORMATION ON CFN, AND THAT THE BANK DOES NOT VERIFY THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION. IN NO EVENT SHALL THE BANK OR THE CUSTODIAN BE LIABLE FOR INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST DATA OR LOST PROFITS, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, ARISING OUT OF OR RELATING TO THIS AGREEMENT.

9.    Amendments.  Any provision of this Agreement may be amended only, if such amendment is in writing and signed by both the Bank and the Customer.

10.   Governing Law and Jurisdiction.  This Agreement shall be governed by the laws of the Netherlands. The exclusive place of jurisdiction shall be Amsterdam, The Netherlands.

**IN WITNESS WHEREOF** the parties thereto have executed this Agreement the day and year first above written.

KBC INVESTMENTS LTD.

CITCO BANK NEDERLAND N.V.
DUBLIN BRANCH

CITCO

Citco Bank Nederland N.V.

**Attachment A - Online Services**

**The following services shall be covered by the Online Access Agreement:**

**1) to receive information on Securities**

**2) to give the Bank Instructions in respect of the Customer's account**

**CBN (DUBLIN) BROKERAGE AND CUSTODY AGREEMENT**
**PAGE 21**