HERBERT SMITH FREEHILLS NEW YORK LLP
Scott S. Balber
Jonathan C. Cross
450 Lexington Avenue
New York, New York 10017
Telephone: (917) 542-7600
scott.balber@hsf.com
jonathan.cross@hsf.com

*Attorneys for Defendants Bank Hapoalim B.M. and Hapoalim (Switzerland) Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>      Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>      Defendant. | Adv. Pro. No. 08-01789 (CGM)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>      Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>      Plaintiff,<br><br>v.<br><br>BANK HAPOALIM B.M. AND BANK HAPOALIM (SWITZERLAND) LTD.,<br><br>      Defendants. | Adv. Pro. No. 12-1216 (CGM)<br><br>**ANSWER TO COMPLAINT AND JURY DEMAND** |

Defendants Bank Hapoalim B.M. and Hapoalim (Switzerland) Ltd., by their undersigned

attorneys Herbert Smith Freehills New York LLP, as and for their answer (the "Answer") to the

Complaint, of plaintiff Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff

Investment Securities LLC (the "Trustee" or the "Plaintiff") (the "Complaint"), state as follows:

## RESPONSES TO SPECIFIC ALLEGATIONS

## I.    NATURE OF THE ACTION[1]

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover
BLMIS Customer Property that was stolen as part of the massive Ponzi scheme perpetrated by
Bernard L. Madoff ("Madoff") and others.

**ANSWER**:  The allegations of paragraph 1 constitute legal conclusions to which no

response is required.  To the extent a response is deemed to be required, Defendants deny the

allegations of paragraph 1.

2.    With this Complaint, the Trustee seeks to recover approximately $27,637,884 in
subsequent transfers of Customer Property collectively made to the Hapoalim Defendants. The
subsequent transfers were derived from investments with BLMIS made by Fairfield Sentry
Limited ("Fairfield Sentry") and Kingate Global Fund Ltd. ("Kingate Global"), which were
Madoff feeder funds (collectively, the "Feeder Funds"). The Feeder Funds are British Virgin
Islands ("BVI") companies that are in liquidation in the BVI.  The Feeder Funds had direct
customer accounts with BLMIS's investment advisory business ("IA Business") for the purpose
of investing assets with BLMIS.  Each of the Feeder Funds maintained in excess of 95% of its
assets in BLMIS customer accounts.

**ANSWER**:  Defendants deny the allegations of paragraph 2, except (a) admit: (i) on

information and belief, that the Feeder Funds are BVI companies currently in liquidation in the

BVI, and (ii) that, following entry of a stipulation and order on February 7, 2022 (ECF No. 113)

(the "Kingate Stipulation"), the Trustee dismissed Count One of the Complaint, concerning all

claims and allegations relating to Kingate Global, and those claims and allegations thus do not

---

[1] Defendants deem the section headings and subheadings in the Complaint not to constitute allegations of the
Complaint.  To the extent any section headings are allegations, Defendants admit or deny them consistent with their
responses to the allegations contained in the numbered paragraphs of the Complaint.

require a response; and (b) deny knowledge or information sufficient to form a belief as to the truth

of the allegations concerning whether the Feeder Funds had direct customer accounts with

BLMIS's IA Business.

3.      When the Hapoalim Defendants received subsequent transfers of BLMIS Customer
Property, Hapoalim B.M. was a global private bank with branches, subsidiaries, and representative
offices in North and Latin America, Europe, the Far East, and Australia where it engaged in trade,
corporate finance, private banking and retail banking.

**ANSWER**:  Defendants deny the allegations of paragraph 3, except aver that at the time

the Complaint alleges that the Hapoalim Defendants received subsequent transfers of BLMIS

Customer Property, Hapoalim B.M. was a bank, which provided banking services.

## II.    JURISDICTION AND VENUE

4.      The Trustee brings this adversary proceeding pursuant to his statutory authority
under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3); sections 105(a), 544, 550(a), and 551 of title
11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code"); and the New
York Fraudulent Conveyance Act (New York Debtor & Creditor Law) ("NYDCL") §§ 273-279
(McKinney 2001), to obtain avoidable and recoverable transfers received by the Hapoalim
Defendants as subsequent transferees of funds originating from BLMIS.

**ANSWER**:  The allegations of paragraph 4 constitute legal conclusions to which no

response is required.  To the extent a response is deemed to be required, Defendants deny the

allegations of paragraph 4, except admit that the Trustee has brought this adversary proceeding,

purportedly pursuant to the cited statutes.

5.      This is an adversary proceeding brought in this Court, in which the main underlying
substantively consolidated SIPA case, No. 08-01789 (BRL) (the "SIPA Case"), is pending. The
SIPA Case was originally brought in the United States District Court for the Southern District of
New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff
Investment Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding").  This Court
has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), and 15 U.S.C. §
78eee(b)(2)(A), (b)(4).

**ANSWER**:  The allegations of paragraph 5 constitute legal conclusions to which no

response is required.  To the extent a response is deemed to be required, Defendants deny the

allegations of paragraph 5, except: (a) admit that the main substantively consolidated SIPA case

(No. 08-01789 (CGM)) is pending in this Court; and (b) admit, on information and belief, that the

District Court Proceeding was commenced in the District Court.  Without limitation, Defendants

deny that this Court has jurisdiction to enter a final order or judgment in this proceeding.

6.      The Hapoalim Defendants are subject to personal jurisdiction in this judicial district
because they purposely availed themselves of the laws and protections of the United States and
the state of New York by, among other things, knowingly directing funds to be invested with New
York-based BLMIS through the Feeder Funds. The Hapoalim Defendants knowingly received
subsequent transfers from BLMIS by withdrawing money from the Feeder Funds.

**ANSWER**:  The allegations of paragraph 6 contain legal conclusions to which no response

is required.  To the extent a response is deemed to be required, Defendants deny the allegations of

paragraph 6, except: (a) admit that on certain occasions one or more of Defendants (i) made

investments in the Feeder Funds, and (ii) redeemed portions of their investments in the Feeder

Funds; and (b) state that to the extent the allegations of paragraph 6 concern claims and allegations

relating to Kingate Global, the Trustee has dismissed such claims and allegations via the Kingate

Stipulation and thus no response is required.

7.      By directing their investments through Fairfield Sentry, a Fairfield Greenwich
Group ("FGG") managed feeder fund, Hapoalim Switzerland knowingly accepted the rights,
benefits, and privileges of conducting business and/or transactions in the United States and New
York. Upon information and belief, Hapoalim Switzerland entered into a subscription agreement
with Fairfield Sentry under which it submitted to New York jurisdiction, sent a copy of the
subscription agreement to FGG's New York City office, and wired funds to Fairfield Sentry
through a bank in New York. Further, upon information and belief, Hapoalim Switzerland
maintained a bank account at JP Morgan Chase Bank in New York which it used to receive
redemption proceeds from Fairfield Sentry. Hapoalim Switzerland thus derived significant
revenue from New York and maintained minimum contacts and/or general business contacts with
the United States and New York in connection with the claims alleged herein.

**ANSWER**:  The allegations of paragraph 7 contain legal conclusions to which no response

is required.  To the extent a response is deemed to be required, Defendants deny the allegations of

paragraph 6, except: (a) admit, upon information and belief, that Fairfield was an investment fund

managed by FGG; (b) admit, upon information and belief, that FGG had a New York office; (c) admit that Hapoalim Switzerland entered into subscription agreements with Fairfield Sentry, and refer to such documents for their full and accurate contents; and (d) admit that Hapoalim Switzerland maintained a bank account at JP Morgan Chase Bank in New York.

8.    Hapoalim Switzerland should reasonably expect to be subject to New York jurisdiction and are subject to personal jurisdiction pursuant to New York Civil Practice Law & Rules § 302 (McKinney 2001) and Bankruptcy Rule 7004.

**ANSWER**: The allegations of paragraph 8 constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Defendants deny the allegations of paragraph 8.

9.    Hapoalim B.M. maintains a business address in New York and is thus subject to New York jurisdiction pursuant to NY CPLR § 301 and Bankruptcy Rule § 7004

**ANSWER**: The allegations of paragraph 9 constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Defendants deny the allegations of paragraph 9, except admit that Hapoalim B.M. maintains a business address in New York.

10.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).

**ANSWER**: The allegations of paragraph 10 constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Defendants deny the allegations of paragraph 10, state that they do not consent to the issuance of entry of final orders or judgments by the Bankruptcy Court and demand trial by jury of all issues that may be tried by a jury.

11.    Venue in this District is proper under 28 U.S.C. § 1409.

**ANSWER**: The allegations of paragraph 11 constitute legal conclusions to which no response is required.

III.    **BACKGROUND**

12.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the U.S. Securities and Exchange Commission ("SEC") commenced the District Court Proceeding against Madoff and BLMIS. The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS. The District Court Proceeding remains pending.

**ANSWER**:  Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 12, except admit, on information and belief, that: (a) Madoff was arrested on or about December 11, 2008; and (b) the SEC filed a civil complaint against Madoff and BLMIS on or about December 11, 2008.

13.    On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards as receiver for the assets of BLMIS.

**ANSWER**:  Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 13, and refer to the District Court's Order dated December 12, 2008 for a full and accurate statement of its contents.

14.    On December 15, 2008, under § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, under § 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

**ANSWER**:  Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 14, and refer to the application filed by SIPC, to which reference is made in paragraph 14, for a full and accurate statement of its contents.

15.    Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order under SIPA (known as the "Protective Decree"), which, in pertinent part:

        a.    removed the receiver and appointed the Trustee for the liquidation of the business of BLMIS and under SIPA § 78eee(b)(3);
        b.    appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA § 78eee(b)(3); and

     c.    removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under § 78eee(b)(4) of SIPA.

**ANSWER**:  Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 15, and refer to the District Court's Order dated December 15, 2008, for a full and accurate statement of its contents.

16.    By orders dated December 23, 2008, and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

**ANSWER**:  Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 16, and refer this Court to its Orders dated December 23, 2008 and February 4, 2009, respectively, for full and accurate statements of their contents.

17.    At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." *Id.* at 23. Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id.* On June 29, 2009, Madoff was sentenced to 150 years in prison.

**ANSWER**:  Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 17, except admit on information and belief that: (a) Madoff pleaded guilty to a criminal information filed against him by the United States Attorney's Office for the Southern District of New York on or about March 12, 2009; and (b) Madoff was sentenced to a term of imprisonment on or about June 29, 2009. Defendants refer to the transcript of the Plea Hearing for a full and accurate statement of its contents and to the relevant judgment of conviction entered in the District Court (and subsequent orders and judgments relating thereto, if any) for a full and accurate statement of the sentence imposed on Madoff.

18.    On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a plea hearing on August 11, 2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug.

11, 2009), DiPascali pled guilty to a ten-count criminal information. Among other things, DiPascali admitted that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s. *Id.* at 46.

**ANSWER**:  Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 18, except admit on information and belief that Frank

DiPascali pleaded guilty to a criminal information filed against him by the United States

Attorney's Office for the Southern District of New York on or about August 11, 2009, and refer

to the transcript of that hearing for a full and accurate statement of its contents.

**IV.    TRUSTEE'S POWERS AND STANDING**

19.    As Trustee appointed under SIPA, the Trustee is charged with recovering and paying out Customer Property to BLMIS customers, assessing claims, and liquidating any other assets of BLMIS for the benefit of the estate and its creditors. The Trustee is in the process of marshaling BLMIS's assets, and this liquidation is well underway. However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years. Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recoveries, including those from individuals and entities that received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

**ANSWER**:  Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 19, except state that the allegations concerning the

Trustee's responsibilities and authority under SIPA and the Bankruptcy Code constitute legal

conclusions to which no response is required; to the extent a response is deemed to be required,

Defendants deny those allegations.

20.    Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under section 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

**ANSWER**:  The allegations of paragraph 20 constitute legal conclusions to which no response is required.  To the extent a response is deemed to be required, Defendants deny the allegations of paragraph 20.

21.     Under SIPA §§ 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

**ANSWER**:  The allegations of paragraph 21 constitute legal conclusions to which no response is required.  To the extent a response is deemed to be required, Defendants deny the allegations of paragraph 21.

22.     The Trustee has standing to bring these claims under § 78fff-1(a) of SIPA and the Bankruptcy Code, including sections 323(b), 544 and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

**ANSWER**:  The allegations of paragraph 22 constitute legal conclusions to which no response is required.  To the extent a response is deemed to be required, Defendants deny the allegations of paragraph 22.

## V.    <u>DEFENDANTS</u>

23.     Defendant Hapoalim B.M. is a private bank maintaining an address at 104 Hayarkon Street, Tel Aviv 63432, Israel. Defendant Hapoalim B.M. maintains a New York branch at 1177 Avenue of the Americas, New York, New York.

**ANSWER**:  Defendants deny the allegations of paragraph 23.

24.     Defendant Hapoalim Switzerland is a Swiss private bank maintaining an address at Stockerstrasse 33, P.O. Box 1801, CH-8027 Zurich, Switzerland. Defendant Hapoalim Switzerland maintains branches in Geneva, Luxembourg, and Singapore.

**ANSWER**:  Defendants deny the allegations of paragraph 24.

## VI.    <u>THE PONZI SCHEME</u>

25.     BLMIS was founded by Madoff in 1959 and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several

08-01789-cgm    Doc 22610    Filed 11/21/22    Entered 11/21/22 16:44:16    Main Document
Pg 10 of 30

of his friends and family members. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). By virtue of that registration, BLMIS was a member of SIPC. BLMIS had three business units: market making, proprietary trading, and the IA Business.

**ANSWER**:  Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 25, except admit on information and belief that Madoff founded and operated BLMIS from a date prior to December 2008 until approximately December 2008.

26.    Outwardly, Madoff ascribed the consistent success of the IA Business to the so-called split-strike conversion strategy ("SSC Strategy"). Under that strategy, Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100")—a collection of the 100 largest publicly traded companies. Madoff claimed that his basket of stocks would mimic the movement of the S&P 100. He also asserted that he would carefully time purchases and sales to maximize value, and BLMIS customers' funds would, intermittently, be out of the equity markets.

**ANSWER**:  Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 26.

27.    The second part of the SSC Strategy was a hedge of Madoff's stock purchases with options contracts. Those option contracts acted as a "collar" to limit both the potential gains and losses on the basket of stocks. Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options. Madoff told BLMIS customers that when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual funds holding Treasury bills. Madoff also told customers that he would enter and exit the market between six and ten times each year.

**ANSWER**:  Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 27.

28.    BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never made the investments he promised clients, who believed they were invested with him in the SSC Strategy. He further admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts. In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform on

which BLMIS reasonably could have traded securities. Instead, investors' funds were principally deposited into the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxxxx703.

**ANSWER**:  Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 28, and refer to the transcript of the Plea Hearing for a full

and accurate statement of its contents.

29.    Prior to his arrest, Madoff assured clients and regulators that he purchased and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than through any listed exchange. Based on the Trustee's investigation to date, there is no evidence that the IA Business ever entered into any OTC options trades on behalf of IA Business account holders.

**ANSWER**:  Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 29.

30.    For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options, but rather used to pay withdrawals and to make other avoidable transfers. Madoff also used his customers' investments to enrich himself, his associates, and his family.

**ANSWER**:  Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 30.

31.    The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion of new investments to fulfill payment requests or withdrawals from other BLMIS accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

**ANSWER**:  Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 31.

32.    It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in demand, investigation, the filing of a claim, and disclosure of the fraud.

**ANSWER**:  Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 32.

33.    Madoff's scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

**ANSWER**:  Defendants admit, upon information and belief, that Madoff's scheme

collapsed in or about December 2008, and deny knowledge or information sufficient to form a

belief as to the truth of the remaining allegations of paragraph 33.

34.    Based upon the Trustee's ongoing investigation, it now appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. By the time the Ponzi scheme came to light on December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

**ANSWER**:  Defendants admit, upon information and belief, that Madoff was arrested on

or about December 11, 2008, and deny knowledge or information sufficient to form a belief as to

the truth of the remaining allegations of paragraph 34.

35.    Thus, at all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

**ANSWER**:  Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations in paragraph 35.

## VII.    THE TRANSFERS

36.    The Feeder Funds received initial transfers of BLMIS Customer Property.  Some or all of those transfers were subsequently transferred directly or indirectly to the Hapoalim Defendants.

**ANSWER**:  Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations in paragraph 36.  To the extent the allegations of paragraph 36 concern

claims and allegations relating to Kingate Global, the Trustee has dismissed such claims and allegations via the Kingate Stipulation and thus no response is required.

## A. KINGATE GLOBAL

### 1. Initial Transfers From BLMIS to Kingate Global

37.    The Trustee has filed an adversary proceeding against Kingate Global and other defendants in the Bankruptcy Court under the caption *Picard v. Kingate Global Fund, et al.*, Adv. Pro. No. 09-01161 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Kingate Global in the amount of approximately $437,501,112 (the "Kingate Complaint"). The Trustee incorporates by reference the allegations contained in the Kingate Global Complaint as if fully set forth herein.

**ANSWER**:  Defendants state that because the Trustee has dismissed all claims and allegations relating to Kingate Global via the Kingate Stipulation, no response is required to the allegations of paragraph 37.

38.    During the six years preceding the Filing Date, BLMIS made transfers to Kingate Global of approximately $398,704,065 (the "Kingate Global Six Year Initial Transfers"). The Kingate Global Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:  Defendants state that because the Trustee has dismissed all claims and allegations relating to Kingate Global via the Kingate Stipulation, no response is required to the allegations of paragraph 38.

39.    The Kingate Global Six Year Initial Transfers include approximately $163,447,509 which BLMIS transferred to Kingate Global during the two years preceding the Filing Date (the "Kingate Global Two Year Initial Transfers"). The Kingate Global Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 548(a), 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:  Defendants state that because the Trustee has dismissed all claims and allegations relating to Kingate Global via the Kingate Stipulation, no response is required to the allegations of paragraph 39.

40.    The Kingate Global Two Year Initial Transfers include approximately $101,753,145 which BLMIS transferred to Kingate Global during the 90 days preceding the Filing Date (the "Kingate Global Preference Period Initial Transfers").  The Kingate Global Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:  Defendants state that because the Trustee has dismissed all claims and

allegations relating to Kingate Global via the Kingate Stipulation, no response is required to the

allegations of paragraph 40.

41.    The Kingate Global Six Year Initial Transfers, the Kingate Global Two Year Initial Transfers, and the Kingate Global Preference Period Initial Transfers are collectively defined as the "Kingate Global Initial Transfers." Charts setting forth these transfers are attached as Exhibits A and B.

**ANSWER**:  Defendants state that because the Trustee has dismissed all claims and

allegations relating to Kingate Global via the Kingate Stipulation, no response is required to the

allegations of paragraph 41.

## 2.    Subsequent Transfers From Kingate Global to Hapoalim Switzerland

42.    A portion of the Kingate Global Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Hapoalim Switzerland and is recoverable pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $5,878,675 of the money transferred from BLMIS to Kingate Global was subsequently transferred by Kingate Global to Hapoalim Switzerland (the "Kingate Global Subsequent Transfers").  A chart setting forth the presently known Kingate Global Subsequent Transfers is attached as Exhibit C.

**ANSWER**:  Defendants state that because the Trustee has dismissed all claims and

allegations relating to Kingate Global via the Kingate Stipulation, no response is required to the

allegations of paragraph 42.

43.    The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Kingate Global Initial Transfers, the Kingate Global Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER**: Defendants state that because the Trustee has dismissed all claims and allegations relating to Kingate Global via the Kingate Stipulation, no response is required to the allegations of paragraph 43.

**B.    FAIRFIELD SENTRY**

**1.    Initial Transfers From BLMIS to Kingate Global**

44.    The Trustee has filed an adversary proceeding against Fairfield Sentry and other defendants in the Bankruptcy Court under the caption *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Fairfield Sentry in the amount of approximately $3 billion (the "Fairfield Amended Complaint"). The Trustee incorporates by reference the allegations contained in the Fairfield Amended Complaint as if fully set forth herein.

**ANSWER**: Defendants: (a) admit that the Trustee filed an adversary proceeding in this Court styled as *Picard v. Fairfield Sentry Ltd., et al.*, No. 09-01239 (BRL) (the "Fairfield Action"); (b) deny knowledge or information sufficient to form a belief as to which of the three complaints filed in the Fairfield Action the Trustee purports to incorporate by reference in the Complaint; and (c) deny that the alleged initial transfers of Customer Property from BLMIS to Fairfield Sentry were avoided or are avoidable.   To the extent necessary to support the foregoing denials, Defendants further state that they: (i) deny knowledge or information sufficient to form a belief as to the truth of the allegations in each of the three complaints filed in the Fairfield Action upon which the Trustee relies to support his claim that any initial transfers of alleged Customer Property to Fairfield Sentry are or were avoided or avoidable; and (ii) object to (A) the Trustee's purported incorporation by reference of all other paragraphs and allegations of the three complaints filed in the Fairfield Action (and therefore do not answer such allegations) and (B) the inclusion in this adversary proceeding of any issue implicated by any of the three complaints in the Fairfield Action other than as to the alleged avoidance or avoidability of what the Trustee characterizes as initial transfers of Customer Property.   Defendants reserve their right to rely on and introduce any

allegations in any of the Trustee's three complaints filed in the Fairfield Action or in the exhibits thereto as party admissions. To the extent that any further response is deemed to be required, Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 44.

45.     During the six years preceding the Filing Date, BLMIS made transfers to Fairfield Sentry of approximately $3 billion (the "Fairfield Sentry Six Year Initial Transfers"). The Fairfield Sentry Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**: Defendants deny knowledge or information sufficient to form a belief as to the allegations of the first sentence of paragraph 45. Defendants state that the allegations of the second sentence of paragraph 45 constitute legal conclusions to which no response is required. To the extent a response to such allegations is deemed to be required, Defendants deny knowledge or information sufficient to form a belief as to the truth of those allegations.

46.     The Fairfield Sentry Six Year Initial Transfers include approximately $1.6 billion which BLMIS transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Initial Transfers"). The Fairfield Sentry Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 548(a), 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**: Defendants deny knowledge or information sufficient to form a belief as to the allegations of the first sentence of paragraph 46. Defendants state that the allegations of the second sentence of paragraph 46 constitute legal conclusions to which no response is required. To the extent a response to such allegations is deemed to be required, Defendants deny knowledge or information sufficient to form a belief as to the truth of those allegations.

47.     The Fairfield Sentry Two Year Initial Transfers include approximately $1.1 billion which BLMIS transferred to Fairfield Sentry during the 90 days preceding the Filing Date (the "Fairfield Sentry Preference Period Initial Transfers"). The Fairfield Sentry Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4),

and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:  Defendants deny knowledge or information sufficient to form a belief as to the allegations of the first sentence of paragraph 47.  Defendants state that the allegations of the second sentence of paragraph 47 constitute legal conclusions to which no response is required.  To the extent a response to such allegations is deemed to be required, Defendants deny knowledge or information sufficient to form a belief as to the truth of those allegations.

48.    The Fairfield Sentry Six Year Initial Transfers, the Fairfield Sentry Two Year Initial Transfers, and the Fairfield Sentry Preference Period Initial Transfers are collectively defined as the "Fairfield Sentry Initial Transfers." Charts setting forth these transfers are attached as Exhibits D and E.

**ANSWER**:  Defendants deny the allegations of paragraph 48, except: (a) admit that the Trustee defines the term "Fairfield Sentry Initial Transfers" as set forth therein; and (b) refer to Exhibits D and E to the Complaint for their full and accurate contents (while denying that they correctly state what the Trustee claims to be set forth therein).

49.    Pursuant to the Bankruptcy Court's June 7 and June 10, 2011 orders, the Bankruptcy Court approved a settlement among the Trustee, Fairfield Sentry, and others (the "Settlement Agreement"). As part of the Settlement Agreement, on July 13, 2011, the Bankruptcy Court entered a consent judgment granting the Trustee a judgment in the amount of $3,054,000,000. Fairfield Sentry is obligated to pay $70,000,000 to the Trustee under the terms of the Settlement Agreement.

**ANSWER**:  Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 49 and refer to the Settlement Agreement and this Court's orders dated June 7, 2011, June 10, 2011, and July 13, 2011, to which reference is made in paragraph 49, for their full and accurate contents.

## 2.    Subsequent Transfers From Fairfield Sentry to Hapoalim Switzerland

50.    A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Hapoalim Switzerland and is recoverable pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's

investigation to date, approximately $20,047,109 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Hapoalim Switzerland (the "Fairfield Sentry-Switzerland Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry-Switzerland Subsequent Transfers is attached as Exhibit F.

**ANSWER**: Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations concerning the prior status of the funds allegedly transferred from

Fairfield Sentry to Hapoalim Switzerland. Defendants state that the remaining allegations of

paragraph 50 contain legal conclusions to which no response is required. To the extent a response

is deemed to be required, Defendants deny the allegations of paragraph 50 and refer to Exhibit F

for its full and accurate contents (while denying that it correctly states what the Trustee claims is

set forth therein).

51.     The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Sentry-Switzerland Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER**: Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 51.

### 3.     Subsequent Transfers From Fairfield Sentry to Hapoalim Switzerland

52.     A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Hapoalim B.M. and is recoverable pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $1,712,100 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Hapoalim B.M. (the "Fairfield Sentry-B.M. Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry-B.M. Subsequent Transfers is attached as Exhibit G.

**ANSWER**: Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations concerning the prior status of the funds allegedly transferred from

Fairfield Sentry to Hapoalim B.M. Defendants state that the remaining allegations of paragraph

52 contain legal conclusions to which no response is required. To the extent a response is deemed

to be required, Defendants deny the allegations of paragraph 52 and refer to Exhibit G for its full

and accurate contents (while denying that it correctly states what the Trustee claims is set forth

therein).

53.    The Trustee's investigation is ongoing and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Sentry-B.M. Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER**:  Defendants deny knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 53.

54.    The Fairfield Sentry-Switzerland Subsequent Transfers and the Fairfield Sentry-BM are collectively defined as the "Fairfield Subsequent Transfers."

**ANSWER**:  Defendants deny the allegations of paragraph 54, except admit that the Trustee

defines the term "Fairfield Subsequent Transfers" as set forth therein.

## COUNT ONE
## RECOVERY OF KINGATE GLOBAL SUBSEQUENT TRANSFERS – 11 U.S.C. §§ 550(a) AND 551 AND NYDCL § 278

55.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

**ANSWER**:  Defendants state that because the Trustee has dismissed all claims and

allegations relating to Kingate Global via the Kingate Stipulation, no response is required to the

allegations of paragraph 55.

56.    Hapoalim Switzerland received the Kingate Global Subsequent Transfers, totaling approximately $5,878,675, which are recoverable pursuant to section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

**ANSWER**:  Defendants state that because the Trustee has dismissed all claims and

allegations relating to Kingate Global via the Kingate Stipulation, no response is required to the

allegations of paragraph 56.

57.    Each of the Fairfield Subsequent Transfers was made directly or indirectly to, or for the benefit of, Hapoalim Switzerland.

**ANSWER**:  Defendants state that because the Trustee has dismissed all claims and allegations relating to Kingate Global via the Kingate Stipulation, no response is required to the allegations of paragraph 57.

58.    Hapoalim Switzerland is an immediate or mediate transferee of the Fairfield Sentry Initial Transfers.

**ANSWER**:  Defendants state that because the Trustee has dismissed all claims and allegations relating to Kingate Global via the Kingate Stipulation, no response is required to the allegations of paragraph 58.

59.    As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Hapoalim Switzerland recovering the Kingate Global Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER**:  Defendants state that because the Trustee has dismissed all claims and allegations relating to Kingate Global via the Kingate Stipulation, no response is required to the allegations of paragraph 59.

## COUNT TWO
## RECOVERY OF FAIRFIELD SENTRY SUBSEQUENT TRANSFERS –
## 11 U.S.C. §§ 550(a) AND 551 AND NYDCL § 278

60.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

**ANSWER**:  Defendants incorporate and reassert their responses to the allegations contained in all of the previous paragraphs of this Complaint with the same force and effect as if fully set forth herein.

61.    Hapoalim Switzerland received the Fairfield Sentry-Switzerland Subsequent Transfers, totaling approximately $20,047,109, and Hapoalim B.M. received the Fairfield Sentry-BM Subsequent Transfers, totaling approximately $1,712,100 (collectively, as defined above, the "Fairfield Subsequent Transfers"). The Fairfield Subsequent Transfers, totaling approximately

$21,759,209, are recoverable pursuant to section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

**ANSWER**: The allegations of paragraph 61 constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Defendants deny the allegations of paragraph 61.

62. Each of the Fairfield Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Hapoalim Defendants.

**ANSWER**: The allegations of paragraph 62 constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Defendants deny the allegations of paragraph 62.

63. The Hapoalim Defendants are immediate or mediate transferees of the Fairfield Sentry Initial Transfers.

**ANSWER**: The allegations of paragraph 63 constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Defendants deny the allegations of paragraph 63.

64. As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Hapoalim Defendants recovering the Fairfield Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER**: The allegations of paragraph 64 constitute legal conclusions to which no response is required. To the extent a response is deemed to be required, Defendants deny the allegations of paragraph 64.

## <u>RESPONSE TO REQUEST FOR RELIEF</u>

Defendants deny that the Trustee is entitled to the judgment in his favor and against Defendants, in whole or in part. Defendants further deny that this Court has jurisdiction to enter any such judgment. To the extent that the Request for Relief concerns claims and allegations

relating to Kingate Global, Defendants state that the Trustee has dismissed such claims and allegations via the Kingate Stipulation, and thus no response is required.

## AFFIRMATIVE DEFENSES

Defendants assert the following defenses without assuming the burden of proof or any other burden if, as a matter of law, such burdens would otherwise be on Plaintiff.  Defendants reserve the right to amend this Answer to assert additional defenses, as well as the right to assert counterclaims or claims against third parties based on discovery in this adversary proceeding or otherwise.  The following defenses are set forth cumulatively and in the alternative.

### FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Claim for Relief)

The Complaint fails to state a claim upon which relief can be granted, including without limitation for the reasons stated in Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint (ECF No. 115).

### SECOND AFFIRMATIVE DEFENSE
### (Dismissed Claims)

The Trustee's claims are barred to the extent they and/or any allegations on which they are based have been or may in the future be dismissed or stricken by the Court, or are based on theories or allegations that may in the future be rejected by this Court or by another court on appeal from any orders of this Court.

### THIRD AFFIRMATIVE DEFENSE
### (11 U.S.C. § 546(e): Securities Safe Harbor)

Pursuant to 11 U.S.C. § 546(e) ("Section 546(e)"), the Trustee may not avoid any alleged Fairfield Sentry Initial Transfers, or pursue under 11 U.S.C. §550(a) any recovery claims against Defendants premised upon the alleged avoidance or avoidability of any alleged Fairfield Sentry

Initial Transfers, except to the extent that the Trustee can establish that such transfers were made with actual intent to defraud within two years before the Filing Date.

Except to such extent, the alleged Fairfield Sentry Initial Transfers are subject to the Section 546(e) safe harbor. Therefore, the Trustee may neither avoid initial such transfers nor maintain claims for recovery against Defendants. In particular: (a) any such transfers were made "in connection with securities contracts" – *i.e.*, (i) BLMIS-Fairfield Sentry account agreements and (ii) other agreements (including Fairfield Sentry's Articles of Association governing Defendants' redemptions of shares); (b) additionally or alternatively, any such transfers were "settlement payments" made by BLMIS in response to Fairfield Sentry's requests for withdrawals; and (c) the alleged Fairfield Sentry Initial Transfers were made by, to and for the benefit of entities covered by Section 546(e) – namely (a) BLMIS, the alleged initial transferor, which was at all relevant times a "stockbroker"; and (b) each Defendant, which was at all relevant times a "financial institution"; and (c) additionally or alternatively, Fairfield Sentry was at all relevant times a "financial institution."

<u>**FOURTH AFFIRMATIVE DEFENSE**</u>
<u>**(Mere Conduit/Lack of Dominion or Control)**</u>

The Trustee's claims are barred because none of Defendants was a transferee, for purposes of 11 U.S.C. § 550(a), of any of the alleged Fairfield Subsequent Transfers, as defined in the Complaint.

To the extent that any Defendant received any alleged Fairfield Subsequent Transfers, it did so in good faith, acting in its capacity as a bank, and for the account and benefit of one or more of its customers.

No Defendant had dominion or control, or the right to assert dominion or control, over any alleged Fairfield Subsequent Transfer or any proceeds thereof, or the right to use any part of any

alleged Fairfield Subsequent Transfer or the proceeds thereof for its own purposes. Rather, Defendants were obligated to credit the proceeds of any alleged Fairfield Subsequent Transfer to the account(s) of and for the benefit of one or more of its customers, who had the right to assert dominion and control over said alleged Fairfield Subsequent Transfers.

Therefore, to the extent that any Defendant received any alleged Fairfield Subsequent Transfers or proceeds thereof, it did so as a mere conduit for third parties rather than as a transferee from which the Trustee may recover under 11 U.S.C. § 550(a). Such initial transfers would be barred by the safe harbor under § 546(e) of the Bankruptcy Code and Defendants may retain the amount they received pursuant to § 548 of the Bankruptcy Code because they took the transfers for value and in good faith.

## FIFTH AFFIRMATIVE DEFENSE
### (Defendants as Initial Transferees – Mere Conduit/Lack of Dominion or Control)

In the alternative, Fairfield Sentry was a mere conduit, and therefore the alleged Fairfield Subsequent Transfers were initial transfers from BLMIS to Defendants. As the Trustee has previously observed, Fairfield Sentry's "sole purpose was to funnel money to BLMIS" and "no arm's length relationship exist[ed] between [Sentry] and BLMIS." *Picard v. Grosvenor Inv. Mgmt. Ltd.*, No. 12-1021, ECF No. 115, at 3, 6 (Bankr. S.D.N.Y. June 15, 2022).

## SIXTH AFFIRMATIVE DEFENSE
### (11 U.S.C. § 550(b) and NYDCL § 278(1):
### Value, Good Faith and Without Knowledge of Voidability)

To the extent that any Defendant received any alleged Fairfield Subsequent Transfers or any proceeds thereof, such property or funds may not be recovered because Defendants took for value, in good faith, and without knowledge of the voidability of the alleged Fairfield Subsequent Transfers within the meaning of 11 U.S.C. § 550(b) and/or as a purchaser for fair consideration

without knowledge of the fraud at the time of the purchase or actual fraudulent intent within the meaning of NYDCL §§ 278(1) and 278(2).

To the extent that any Defendants received any alleged Fairfield Subsequent Transfers or any proceeds thereof, they took for value because those transfers were made in exchange for Fairfield Sentry's redemption of its own shares from Defendants.

To the extent that any Defendants received any alleged Fairfield Subsequent Transfers or any proceeds thereof, they took in good faith because: (i) they lacked knowledge that BLMIS was not trading securities or was conducting a fraud, or of any fraudulent purpose behind the alleged Fairfield Subsequent Transfers; (ii) they lacked knowledge of the voidability of any alleged Fairfield Initial Transfers at the time they allegedly received any alleged Fairfield Subsequent Transfers; (iii) they lacked actual fraudulent intent at the time they allegedly received any alleged Fairfield Subsequent Transfers; (iv) they lacked knowledge of facts suggestive of any alleged fraud that would have caused a reasonable person in Defendants' position to conduct further inquiry; and (v) even if Defendants were on inquiry notice, a diligent inquiry would not have discovered the allegedly fraudulent purpose of any transfers at issue or that BLMIS was not trading securities or was conducting a fraud.

At all relevant times, Defendants had access to and were aware of only publicly available information about Fairfield Sentry and BLMIS and general information disseminated by Fairfield Sentry. Neither Defendants nor anyone acting on their behalf ever had personal access to Madoff or BLMIS, or met or communicated with them.

At all relevant times, Defendants understood and believed that: Fairfield Sentry invested in U.S. securities primarily through an account that Fairfield Sentry held at BLMIS; Fairfield Sentry had reported consistent, positive, and generally above-market returns; that BLMIS was

founded and operated by Madoff, who was a well-respected member of the investment community and former chair of NASDAQ; BLMIS was one of the largest market makers in NASDAQ stocks and reported delivering consistently high returns on investment; BLMIS was regulated by the National Association of Securities Dealers (predecessor to the Financial Industry Regulatory Authority) and registered with the U.S. Securities and Exchange Commission ("SEC") as a broker-dealer and investment advisor; and BLMIS claimed to use a "split strike conversion" strategy to obtain these results, which Defendants did not know then to be false.

Any alleged Fairfield Subsequent Transfers received by Defendants were routine transfers made by Fairfield Sentry in exchange for redemption of Defendants' investments in Fairfield Sentry and did not have a fraudulent purpose.  This exchange was for fair consideration as Defendants surrendering of their shares in Fairfield Sentry constituted a fair equivalent of the property received by Defendants. A reasonable person with the knowledge in Defendants' possession at the time of each of the alleged Fairfield Subsequent Transfers would not have been on inquiry notice of any fraudulent purpose behind any alleged transfers; nor would knowing those facts have led a reasonable person to conduct further inquiry into whether there was a fraudulent purpose to them, or whether BLMIS was not in fact trading securities or was a Ponzi scheme.

Had Defendants had been on inquiry notice of the allegedly fraudulent purposes of any alleged transfers or of facts that would have led a reasonable person to conduct further inquiry, a diligent inquiry by Defendants would not have discovered the Ponzi scheme.  Other entities with vastly greater investigatory capabilities than Defendants, and with a far more significant level of access to BLMIS personnel and documents than Defendants, investigated BLMIS but failed to uncover that it was a Ponzi scheme before December 2008, including the U.S. Securities and Exchange Commission.  Foreign entities with no investigatory power over BLMIS such as

26

Defendants, could not possibly have discovered information that U.S. regulators could not discover.

If, as the Trustee alleges, the Fairfield Sentry Initial Transfers are avoidable, Defendants had no knowledge of such avoidability.

## SEVENTH AFFIRMATIVE DEFENSE
### (11 U.S.C. § 550(d)—Single Satisfaction and NYDCL § 278(1)(a))

Under 11 U.S.C. § 550(d), the Trustee "is entitled to only a single satisfaction under" 11 U.S.C. § 550(a).

Under NYDCL § 278(1)(a), the Trustee may only set aside a conveyance "to the extent necessary to satisfy his claim."

Accordingly, to the extent the Trustee has recovered, or will recover, from Fairfield Sentry or from any other immediate or mediate transferee the amount of any avoided initial transfer that includes Customer Property that the Trustee alleges was received by one of the Defendants, the Trustee is barred from recovering any such alleged Fairfield Subsequent Transfer (or its proceeds) from a Defendant.

## EIGHTH AFFIRMATIVE DEFENSE
### (Extraterritoriality)

The Trustee's claims to recover from Defendants subsequent transfers allegedly made to them by Fairfield Sentry constitute an impermissible extraterritorial application of 11 U.S.C. § 550(a) and NYDCL § 278.

## NINTH AFFIRMATIVE DEFENSE
### (Comity)

The Trustee's claims to recover from Defendants subsequent transfers allegedly made to them by Fairfield Sentry violate principles of international comity.

### TENTH AFFIRMATIVE DEFENSE
### (Lack of Subject Matter Jurisdiction)

This Court lacks jurisdiction under Article III of the U.S. Constitution to enter final orders or judgments in this proceeding.

### ELEVENTH AFFIRMATIVE DEFENSE
### (Not Customer Property)

The alleged Fairfield Subsequent Transfers did not constitute BLMIS customer property. Specifically, for the reasons stated in Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint, many of the alleged Fairfield Subsequent Transfers could not have been sourced from BLMIS customer property because prior allegedly avoidable transfers from BLMIS to Fairfield Sentry had been distributed by Fairfield Sentry to its affiliates or other institutions prior to the alleged Fairfield Subsequent Transfers.

### TWELFTH AFFIRMATIVE DEFENSE
### (Initial Transfer Not Avoided)

The Trustee may not recover the alleged Fairfield Subsequent Transfers because he has not avoided the alleged Fairfield Sentry Initial Transfers.

### THIRTEENTH AFFIRMATIVE DEFENSE
### (Sufficient SIPC Funds)

The Trustee's claims should be dismissed if he has recovered, or during the pendency of this action recovers, sufficient funds to reimburse SIPC for all payments that SIPC has made to satisfy allowed claims of BLMIS customers.

### FOURTEENTH AFFIRMATIVE DEFENSE
### (British Virgin Islands Proceedings)

The Trustee's claims are barred, in whole or in part, based upon rulings, judgments, orders, or decisions entered in the Fairfield Sentry liquidation proceedings before the Eastern Caribbean

High Court of Justice, Commercial Division, British Virgin Islands, including any associated

appellate rulings, judgments, orders, or decisions.

### FIFTEENTH AFFIRMATIVE DEFENSE
### (No Interest)

The Trustee is not entitled to an award of interest.

### SIXTEENTH AFFIRMATIVE DEFENSE
### (Statute of Limitations)

The Trustee's claims are barred by the statute of limitations.

### SEVENTEENTH AFFIRMATIVE DEFENSE
### (Estoppel)

The Trustee's claims are barred by estoppel.

### EIGHTEENTH AFFIRMATIVE DEFENSE
### (Unreasonable Delay)

The Trustee's delay in bringing and prosecuting his claim, which was brought over ten

years ago and concerns transfers made as far back as over 17 years ago, is unreasonable and

unfairly prejudices Defendants' ability to defend themselves.

### NINETEENTH AFFIRMATIVE DEFENSE
### (Double Recovery)

The Trustee entered into a settlement agreement with the Liquidators of Fairfield Sentry

and other Fairfield funds, which was ultimately incorporated into the consent judgment entered

against Fairfield Sentry on July 13, 2011.  That agreement provides for the sharing of recoveries

on the Trustee's and the Fairfield Sentry Liquidators' claims against defendants who allegedly

received transfers of BLMIS customer property from Fairfield Sentry.  To the extent that the

Fairfield Sentry Liquidators recover from Defendants via settlement or otherwise, the Trustee is

barred from recovering because he is not entitled to a double recovery, nor should Defendants be

subject to recover of the same monies by two separate plaintiffs.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 9015 of the Federal Rules of Bankruptcy Procedure, Defendants hereby demand a jury trial on all claims and issues that may be tried to a jury.

## STATEMENT PURSUANT TO FED. R. BANKR. P. 7012(b)

Defendants do not consent, but instead object, to the entry of a final order or Judgment against them by the Bankruptcy Court.

**WHEREFORE**, Defendants request that this Court dismiss the Complaint with prejudice, award Defendants their attorneys' fees, costs and disbursements incurred in connection with this adversary proceeding, and grant Defendants such other and further relief as the Court deems just and proper.

Dated: New York, New York
November 21, 2022

**HERBERT SMITH FREEHILLS**
**NEW YORK LLP**

By:    */s/Scott S. Balber*
Scott S. Balber
Jonathan C. Cross
450 Lexington Avenue
New York, New York 10017
Telephone: (917) 542-7600
jonathan.cross@hsf.com
scott.balber@hsf.com

*Attorneys for Defendants Bank Hapoalim, B.M. and Hapoalim (Switzerland) Ltd.*