**Davis Polk & Wardwell LLP**
Elliot Moskowitz
Andrew Ditchfield
450 Lexington Avenue
New York, New York 10017
Tel: (212) 450-4000
Fax: (212) 701-5800
elliot.moskowitz@davispolk.com
andrew.ditchfield@davispolk.com

*Attorneys for the Eurizon Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff, | Adv. Pro. No. 12-01680 (CGM) |
| Plaintiff, | |
| v. | **ANSWER TO COMPLAINT AND JURY DEMAND** |
| INTESA SANPAOLO SPA (AS SUCCESSOR IN INTEREST TO BANCA INTESA SPA), EURIZON CAPITAL SGR SPA (AS SUCCESSOR IN INTEREST TO EURIZON INVESTIMENTI SGR SPA, F/K/A NEXTRA INVESTMENT MANAGEMENT SGR SPA, AND EURIZON ALTERNATIVE INVESTMENTS SGR SPA, FKA NEXTRA ALTERNATIVE INVESTMENTS SGR SPA), | |

> EURIZON LOW VOLATILITY F/K/A
> NEXTRA LOW VOLATILITY, EURIZON
> LOW VOLATILITY II F/K/A NEXTRA
> LOW VOLATILITY II, EURIZON LOW
> VOLATILITY PB F/K/A NEXTRA LOW
> VOLATILITY PB, EURIZON MEDIUM
> VOLATILITY F/K/A NEXTRA MEDIUM
> VOLATILITY, EURIZON MEDIUM
> VOLATILITY II F/K/A NEXTRA MEDIUM
> VOLATILITY II, EURIZON TOTAL
> RETURN F/K/A NEXTRA TOTAL
> RETURN,
>
> Defendants.

Defendants Eurizon Capital SGR SpA ("Eurizon Capital"), Eurizon Low Volatility ("Low Volatility"), and Eurizon Medium Volatility ("Medium Volatility" and, together with Eurizon Capital and Low Volatility, the "Eurizon Defendants"),[1] respond to the Complaint of Irving H. Picard, Trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the substantively consolidated estate of Bernard L. Madoff, as follows:

## **GENERAL DENIAL**

Except as expressly admitted herein, the Eurizon Defendants deny each and every allegation in the Complaint. The Eurizon Defendants state that the headings and sub-headings throughout the Complaint do not constitute well-pleaded allegations of fact and therefore require no response. To the extent a response is required, the allegations of the headings and sub-headings in the Complaint are denied. In answering the Complaint's allegations, the Eurizon Defendants do not intend to waive, and do not waive, any and all applicable objections to the relevance, admissibility, or prejudicial effect of any allegation. To the extent it is later

---

[1] The Complaint was amended by stipulation and order entered on March 29, 2022 [ECF No. 93] (the "Kingate Stipulation"), to (i) dismiss Count Two; and (ii) dismiss Defendants Intesa Sanpaolo SpA, Eurizon Low Volatility II, Eurizon Low Volatility PB, Eurizon Medium Volatility II, and Eurizon Total Return. As used herein, "Eurizon Defendants" refers solely to remaining defendants and not to any dismissed defendants, and "Fund Defendants" refers solely to Medium Volatility and Low Volatility and not to any dismissed defendants.

determined that a response is required to any allegation, the Eurizon Defendants deny any such

allegation. The Eurizon Defendants expressly reserve the right to amend and/or supplement the

Answer.

## RESPONSES TO SPECIFIC ALLEGATIONS

### I.    NATURE OF THE ACTION

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS Customer Property [2] that was stolen as part of the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff") and others.

**ANSWER:**    This paragraph contains legal conclusions to which no response is

required. To the extent a response is required, the Eurizon Defendants deny the allegations of

this paragraph, except admit that the Trustee purports to bring this adversary proceeding as part

of its continuing efforts to recover certain property.

2.    With this Complaint, the Trustee seeks to recover at least $105,315,424 in subsequent transfers of Customer Property collectively made to the Eurizon Defendants by Fairfield Sentry Limited ("Fairfield Sentry"), Kingate Global Fund Ltd. ("Kingate Global"), and Kingate Euro Fund Ltd. ("Kingate Euro"), which were Madoff feeder funds (collectively, the "Feeder Funds"). The Feeder Funds are British Virgin Islands ("BVI") companies that are in liquidation in the BVI. The Feeder Funds had direct customer accounts with BLMIS's investment advisory business ("IA Business") for the purpose of investing assets with BLMIS, and each of the Feeder Funds maintained in excess of 95% of their assets in their BLMIS customer accounts.

**ANSWER:**    The first sentence of this paragraph contains legal conclusions to

which no response is required. To the extent a response is required, the Eurizon Defendants

deny the allegations of the first sentence of the paragraph, except admit that the Complaint seeks

to recover certain funds. The second sentence of this paragraph contains legal conclusions to

which no response is required. To the extent a response is required, the Eurizon Defendants lack

---

[2] Footnote 1 of the Complaint states: "SIPA § 78*lll*(4) defines 'Customer Property' as cash and securities at any time received, acquired, or held by, or for the account of, a debtor from, or for, the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted." The Eurizon Defendants respectfully refer the Court to the quoted statute for a complete and accurate statement of its contents.

knowledge or information sufficient to form a belief about the truth of the allegations of the

second sentence of this paragraph and deny them on that basis. The Eurizon Defendants lack

knowledge or information sufficient to form a belief about the truth of the allegations of the third

sentence of this paragraph and deny them on that basis.

3.      Upon information and belief, when the Eurizon Defendants received the
subsequent transfers of BLMIS Customer Property, Banca Intesa SpA ("Banca Intesa"), the
predecessor in interest of Defendant Intesa, was the largest bank in Italy and was a global
provider of investment management and financial services to corporations, institutions, and high
net worth individuals. Upon information and belief, during the period of time when the Eurizon
Defendants received the subsequent transfers of BLMIS Customer Property, Defendant Eurizon
Capital and its predecessors in interest, Eurizon Alternative Investments SGR SpA ("Eurizon
AI"), formerly known as Nextra Alternative Investments SGR SpA ("Nextra AI"), and Eurizon
Investimenti SGR SpA ("Eurizon Investimenti"), formerly known as Nextra Investment
Management SGR SpA ("Nextra Investment"), were the asset management divisions of Banca
Intesa SpA and/or joint ventures of Banca Intesa SpA and Credit Agricole Asset Management
("Credit Agricole"), a subsidiary of French bank Credit Agricole S.A. Upon information and
belief, when the Eurizon Defendants received the subsequent transfers of BLMIS Customer
Property, the Fund Defendants were investment funds managed and/or controlled by Defendant
Eurizon Capital and/or its predecessors in interest.

ANSWER:   The first sentence of this paragraph contains legal conclusions to

which no response is required. To the extent a response is required, the Eurizon Defendants

deny the allegations of the first sentence of this paragraph, except admit that Intesa was formed

by the merger of Banca Intesa SpA and Sanpaolo IMI SpA and that Banca Intesa SpA was a

large bank in Italy and a global provider of investment management and financial services to

corporations, institutions, and high net worth individuals. The second sentence of this paragraph

contains legal conclusions to which no response is required. To the extent a response is required,

the Eurizon Defendants deny the allegations of the second sentence of this paragraph, except

admit that Eurizon Capital and certain of its predecessors, Eurizon Alternative Investments SGR

SpA ("Eurizon AI"), formerly known as Nextra Alternative Investments SGR SpA ("Nextra AI"),

and Eurizon Investimenti SGR SpA ("Eurizon Investimenti"), formerly known as Nextra

Investment Management SGR SpA ("Nextra Investment"), were the asset management divisions

of Banca Intesa SpA and/or joint ventures of Banca Intesa SpA and Credit Agricole Asset

Management ("Credit Agricole"), a subsidiary of French bank Credit Agricole S.A.  The third

sentence of this paragraph contains legal conclusions to which no response is required.  To the

extent a response is required, the Eurizon Defendants deny the allegations of the third sentence

of this paragraph, except admit that the Fund Defendants were investment funds and that the

assets of the Fund Defendants were managed and promoted by Defendant Eurizon Capital and/or

certain of its predecessors.

## II.    <u>JURISDICTION AND VENUE</u>

4.    The Trustee brings this adversary proceeding pursuant to his statutory
authority under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3); sections 105(a), 544, 550(a), and
551 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.* (the "<u>Bankruptcy Code</u>"); and
the New York Fraudulent Conveyance Act (New York Debtor & Creditor Law) ("<u>NYDCL</u>")
§§ 273–279 (McKinney 2001), to obtain avoidable and recoverable transfers received by the
Eurizon Defendants as subsequent transferees of funds originating from BLMIS.

**ANSWER:**    This paragraph contains legal conclusions to which no response is

required.  To the extent a response is required, the Eurizon Defendants deny the allegations of

this paragraph, except admit that the Trustee purports to bring this adversary proceeding to

recover certain property.

5.    This is an adversary proceeding brought in this Court, in which the main
underlying substantively consolidated SIPA case, Adv. Pro. No. 08-01789 (BRL) (the "<u>SIPA
Case</u>"), is pending.  The SIPA Case was originally brought in the United States District Court for
the Southern District of New York (the "<u>District Court</u>") as *Securities Exchange Commission v.
Bernard L. Madoff Investment Securities LLC, et al.*, No. 08 CV 10791 (the "<u>District Court
Proceeding</u>").  This Court has jurisdiction over this adversary proceeding under 28 U.S.C.
§ 1334(b), and 15 U.S.C. § 78eee(b)(2)(A), (b)(4).

**ANSWER:**    The Eurizon Defendants admit the allegations of the first and

second sentences of this paragraph.  The third sentence of this paragraph contains legal

conclusions to which no response is required.  To the extent a response is required, the Eurizon

Defendants deny the allegations of the third sentence of this paragraph.

6.    Upon information and belief, Defendant Intesa maintains a branch office at 1 William Street, New York, New York 10004, is registered as a foreign bank branch with the New York Department of Financial Services, and is subject to examination by the Federal Reserve Bank.

**ANSWER:**    The Eurizon Defendants admit the allegations of this paragraph, except deny that Intesa is a defendant.

7.    The Eurizon Defendants are subject to personal jurisdiction in this judicial district because they purposely availed themselves of the laws and protections of the United States and the state of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through the Feeder Funds. The Eurizon Defendants knowingly received subsequent transfers from BLMIS by withdrawing money from the Feeder Funds.

**ANSWER:**    This paragraph contains legal conclusions to which no response is required.  To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

8.    By directing investments through Fairfield Sentry, a Fairfield Greenwich Group ("FGG") managed Madoff feeder fund, the Eurizon Defendants knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York.  Upon information and belief, the Eurizon Defendants entered into a subscription agreement with Fairfield Sentry under which they submitted to New York jurisdiction, sent a copy of the agreement to FGG's New York City office, and wired funds to Fairfield Sentry through a bank in New York.  Representatives of the Eurizon Defendants also communicated with their FGG account representatives in FGG's New York City office.  Certain payments from Fairfield Sentry to Defendants Low Volatility redemptions of their interests in Fairfield Sentry were made to the Eurizon Defendants at Defendant Intesa's New York location.  The Eurizon Defendants thus derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

**ANSWER:**    The first sentence of this paragraph contains legal conclusions to which no response is required.  To the extent a response is required, the Eurizon Defendants deny the allegations of the first sentence of this paragraph.  The allegations of the second sentence of this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, the Eurizon Defendants deny the allegations of the second sentence of this paragraph.  The Eurizon Defendants lack knowledge or information sufficient to form a

belief about the truth of the allegations of the third and fourth sentences of this paragraph and

deny them on that basis.  The allegations of the fifth sentence of this paragraph contain legal

conclusions to which no response is required.  To the extent a response is required, the Eurizon

Defendants deny the allegations of the fifth sentence of this paragraph.

9.    The Eurizon Defendants should reasonably expect to be subject to New
York jurisdiction and are subject to personal jurisdiction pursuant to New York Civil Practice
Law & Rules §§ 301 and 302 (McKinney 2001) and Rule 7004 of the Federal Rules of
Bankruptcy Procedure (the "Bankruptcy Rules").

**ANSWER:**    This paragraph contains legal conclusions to which no response is

required.  To the extent a response is required, the Eurizon Defendants deny the allegations of

this paragraph.

10.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H),
and (O).

**ANSWER:**    This paragraph contains legal conclusions to which no response is

required.  To the extent a response is required, the Eurizon Defendants deny the allegations of

this paragraph.

11.    Venue in this District is proper under 28 U.S.C. § 1409.

**ANSWER:**    This paragraph contains legal conclusions to which no response is

required.  To the extent a response is required, the Eurizon Defendants deny the allegations of

this paragraph.

## III.    **BACKGROUND**

12.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by
federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud,
investment adviser fraud, and mail and wire fraud.  Contemporaneously, the U.S. Securities and
Exchange Commission ("SEC") commenced the District Court Proceeding against Madoff and
BLMIS.  The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the
investment adviser activities of BLMIS.  The District Court Proceeding remains pending.

**ANSWER:**    The Eurizon Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph and deny them on that basis, except admit that Madoff was arrested on or about December 11, 2008, and that the SEC filed a complaint against Madoff and BLMIS.

13.    On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards as receiver for the assets of BLMIS.

**ANSWER:**    The Eurizon Defendants respectfully refer the Court to the order issued by Judge Stanton on December 12, 2008, for a complete and accurate statement of its contents and otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph and deny them on that basis.

14.    On December 15, 2008, under § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC").  Thereafter, under § 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

**ANSWER:**    The Eurizon Defendants respectfully refer the Court to the application filed by SIPC alleged in this paragraph for a complete and accurate statement of its contents and otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph and deny them on that basis.

15.    Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order under SIPA (known as the "Protective Decree"), which, in pertinent part:

a.    removed the receiver and appointed the Trustee for the liquidation of the business of BLMIS under SIPA § 78eee(b)(3);

b.    appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA § 78eee(b)(3); and

c.    removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under § 78eee(b)(4) of SIPA.

8

**ANSWER:**    The Eurizon Defendants respectfully refer the Court to the order issued by Judge Stanton on December 15, 2008, for a complete and accurate statement of its contents and otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph and deny them on that basis.

16.    By orders dated December 23, 2008, and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

**ANSWER:**    The Eurizon Defendants respectfully refer the Court to the orders issued by the Court on December 23, 2008, and February 4, 2009, for a complete and accurate statement of their contents and otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations of the first sentence of this paragraph and deny them on that basis.  The allegations of the second sentence of this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, the Eurizon Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of the second sentence of this paragraph and deny them on that basis.

17.    At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York.  At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  *Id*. at 1.  Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal."  *Id*.  On June 29, 2009, Madoff was sentenced to 150 years in prison.

**ANSWER:**    The Eurizon Defendants respectfully refer the Court to the transcript of the March 12, 2009 plea hearing for a complete and accurate statement of its contents.  The Eurizon Defendants otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph and deny them on that basis.

18.    On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme.  At a plea hearing on August 11, 2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), DiPascali pled guilty to a ten-count criminal information.

**ANSWER:**    The Eurizon Defendants respectfully refer the Court to the transcript of the August 11, 2009 plea hearing for a complete and accurate statement of its contents.  The Eurizon Defendants otherwise lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph and deny them on that basis.

## IV.    TRUSTEE'S POWERS AND STANDING

19.    As Trustee appointed under SIPA, the Trustee is charged with recovering and paying out Customer Property to BLMIS customers, assessing claims, and liquidating any other assets of BLMIS for the benefit of the estate and its creditors.  The Trustee is in the process of marshaling BLMIS's assets, and this liquidation is well underway.  However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years.  Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recoveries, including those from individuals and entities that received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

**ANSWER:**    The first sentence of this paragraph contains legal conclusions to which no response is required.  To the extent a response is required, the Eurizon Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of the first sentence of this paragraph and deny them on that basis.  The Eurizon Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of the second and third sentences of this paragraph and deny them on that basis.  The allegations of the fourth and fifth sentences of this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, the Eurizon Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of the fourth and fifth sentences of this paragraph and deny them on that basis.

20.     Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under § 78fff-1(b).    Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

**ANSWER:**    This paragraph contains legal conclusions to which no response is required.  To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

21.     Under SIPA §§ 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

**ANSWER:**    This paragraph contains legal conclusions to which no response is required.  To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

22.     The Trustee has standing to bring these claims under § 78fff-1(a) of SIPA and the Bankruptcy Code, including sections 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

**ANSWER:**    This paragraph contains legal conclusions to which no response is required.  To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

## V.    <u>THE DEFENDANTS</u>

23.     Upon information and belief, Defendant Intesa is an Italian *società per azioni* that maintains a place of business at 1 William Street, New York, New York 10004. Defendant Intesa also maintains a place of business at Piazza San Carlo 156, 10121 Turin, Italy. Upon information and belief, Defendant Intesa is the successor in interest to a 2007 merger of Banca Intesa SpA and Sanpaolo IMI SpA.

**ANSWER:**    The Eurizon Defendants deny the allegations of the first sentence of this paragraph, except admit that non-party Intesa is an Italian *società per azioni* that maintains a branch office at 1 William Street, New York, New York 10004.    The Eurizon

Defendants deny the allegations of the second sentence of this paragraph, except admit that non-

party Intesa has its registered office at Piazza San Carlo 156, 10121 Turin, Italy. The allegations

of the third sentence of this paragraph contain legal conclusions to which no response is required.

To the extent a response is required, the Eurizon Defendants deny the allegations of the third

sentence of this paragraph, except admit that non-party Intesa was formed by the 2007 merger of

Banca Intesa SpA and Sanpaolo IMI SpA.

24.     Upon information and belief, Defendant Eurizon Capital is an Italian *società per azioni* that maintains a place of business at Piazzetta Giordano Dell'Amore 3, 20121 Milan, Italy. Upon information and belief: (i) Defendant Eurizon Capital is currently a wholly owned subsidiary of Defendant Intesa; (ii) Defendant Eurizon Capital is a successor in interest to Eurizon Investimenti, formerly Nextra Investments, and Eurizon AI, formerly Nextra AI; (iii) in 2006 Banca Intesa sold a controlling interest in Nextra Investments and Nextra AI to Credit Agricole and those entities became known as Eurizon Investimenti and Eurizon AI; (iv) in 2007, following the merger of Banca Intesa and Sanpaolo IMI, Eurizon Investimenti became Defendant Eurizon Capital; and (v) in 2011 Eurizon AI merged into Defendant Eurizon Capital.

**ANSWER:**     This paragraph contains legal conclusions to which no response is

required. To the extent a response is required, the Eurizon Defendants state as follows: The

Eurizon Defendants deny the allegations of the first sentence of this paragraph, except admit that

Defendant Eurizon Capital is an Italian *società per azioni* that has its legal headquarters and

registered office at Piazzetta Giordano Dell'Amore 3, 20121 Milan, Italy. The Eurizon

Defendants admit the allegations of subpart (i) of the second sentence of this paragraph. The

Eurizon Defendants deny the allegations of subpart (ii) of the second sentence of this paragraph,

except admit that Defendant Eurizon Capital is a successor to Eurizon Investimenti, formerly

Nextra Investments, and Eurizon AI, formerly Nextra AI. The Eurizon Defendants deny the

allegations of subpart (iii) of the second sentence of this paragraph, except admit that in 2005,

Intesa Holding Asset Management S.p.A., a wholly owned subsidiary of Banca Intesa, sold an

interest in Nextra Investments, and as a consequence, indirectly sold an interest in Nextra AI to

Credit Agricole, and that those entities changed their company names in 2007 to Eurizon

Investimenti and Eurizon AI, respectively.   The Eurizon Defendants deny the allegations of subpart (iv) of the second sentence of this paragraph, except admit that in 2008, Eurizon Investimenti became Defendant Eurizon Capital.  The Eurizon Defendants admit the allegations of subpart (v) of the second sentence of this paragraph.

25.    Defendant Low Volatility is an Italian *fondo commune investimento* that has a business address of Piazzetta Giordano Dell'Amore 3, 20121 Milan, Italy, c/o Eurizon Capital SGR SpA.  Upon information and belief: (i) Defendant Low Volatility is managed and/or controlled by Defendant Eurizon Capital; (ii) Defendant Low Volatility was previously known as Nextra Low Volatility prior to Banca Intesa's 2006 sale of a controlling interest of Nextra Investments and Nextra AI to Credit Agricole.

**ANSWER:**    This paragraph contains legal conclusions to which no response is required.  To the extent a response is required the Eurizon Defendants state as follows:  The Eurizon Defendants deny the allegations of the first sentence of this paragraph, except admit that Defendant Low Volatility is an Italian *fondo comune di investimento* that has a business address of Piazzetta Giordano Dell'Amore 3, 20121 Milan, Italy, c/o Eurizon Capital SGR SpA.  The Eurizon Defendants deny the allegations of the second sentence of this paragraph, except admit that the assets of Defendant Low Volatility are managed and promoted by Defendant Eurizon Capital, and that Nextra Low Volatility changed its name to Eurizon Low Volatility as of July 1, 2008.

26.    Defendant Low Volatility II is an Italian *fondo commune investimento* that has a business address of Piazzetta Giordano Dell'Amore 3, 20121 Milan, Italy, c/o Eurizon Capital SGR SpA.  Upon information and belief: (i) Defendant Low Volatility II is managed and/or controlled by Defendant Eurizon Capital; (ii) Defendant Low Volatility II was previously known as Nextra Low Volatility II prior to Banca Intesa's 2006 sale of a controlling interest of Nextra Investments and Nextra AI to Credit Agricole.

**ANSWER:**    This paragraph contains legal conclusions to which no response is required.  To the extent a response is required the Eurizon Defendants deny the allegations of this paragraph, except admit that Nextra Low Volatility II changed its name to Eurizon Low Volatility II as of July 1, 2008.

13

27.    Defendant Low Volatility PB is an Italian *fondo commune investimento* that has a business address of Piazzetta Giordano Dell'Amore 3, 20121 Milan, Italy, c/o Eurizon Capital SGR SpA.  Upon information and belief: (i) Defendant Low Volatility PB is managed and/or controlled by Defendant Eurizon Capital; (ii) Defendant Low Volatility PB was previously known as Nextra Low Volatility PB prior to Banca Intesa's 2006 sale of a controlling interest of Nextra Investments and Nextra AI to Credit Agricole.

**ANSWER:**    This paragraph contains legal conclusions to which no response is required.  To the extent a response is required the Eurizon Defendants deny the allegations of this paragraph, except admit that Nextra Low Volatility PB changed its name to Eurizon Low Volatility PB as of July 1, 2008.

28.    Defendant Medium Volatility is an Italian *fondo commune investimento* that has a business address of Piazzetta Giordano Dell'Amore 3, 20121 Milan, Italy, c/o Eurizon Capital SGR SpA.  Upon information and belief: (i) Defendant Medium Volatility is managed and/or controlled by Defendant Eurizon Capital; (ii) Defendant Medium Volatility was previously known as Nextra Medium Volatility prior to Banca Intesa's 2006 sale of a controlling interest of Nextra Investments and Nextra AI to Credit Agricole.

**ANSWER:**    This paragraph contains legal conclusions to which no response is required.  To the extent a response is required the Eurizon Defendants deny the allegations of this paragraph, except admit that Nextra Medium Volatility changed its name to Eurizon Medium Volatility as of July 1, 2008.

29.    Defendant Medium Volatility II is an Italian *fondo commune investimento* that has a business address of Piazzetta Giordano Dell'Amore 3, 20121 Milan, Italy, c/o Eurizon Capital SGR SpA.  Upon information and belief: (i) Defendant Medium Volatility II is managed and/or controlled by Defendant Eurizon Capital; (ii) Defendant Medium Volatility II was previously known as Nextra Medium Volatility II prior to Banca Intesa's 2006 sale of a controlling interest of Nextra Investments and Nextra AI to Credit Agricole.

**ANSWER:**    This paragraph contains legal conclusions to which no response is required.  To the extent a response is required the Eurizon Defendants deny the allegations of the paragraph, except admit that Nextra Medium Volatility II changed its name to Eurizon Medium Volatility II as of July 1, 2008.

30.    Defendant Total Return is an Italian *fleoondo commune investimento* that has a business address of Piazzetta Giordano Dell'Amore 3, 20121 Milan, Italy, c/o Eurizon

Capital SGR SpA.  Upon information and belief: (i) Defendant Total Return is managed and/or controlled by Defendant Eurizon Capital; (ii) Defendant Total Return was previously known as Nextra Total Return prior to Banca Intesa's 2006 sale of a controlling interest of Nextra Investments and Nextra AI to Credit Agricole.

**ANSWER:**    This paragraph contains legal conclusions to which no response is required.  To the extent a response is required the Eurizon Defendants deny the allegations of this paragraph, except admit that Nextra Total Return changed its name to Eurizon Total Return as of July 1, 2008.

31.    Upon information and belief, each individual Fund Defendant and Eurizon Capital functioned and continue to function as one entity for all of the purposes herein.

**ANSWER:**    This paragraph contains legal conclusions to which no response is required.  To the extent a response is required the Eurizon Defendants deny the allegations of this paragraph.

## VI.    THE PONZI SCHEME

32.    BLMIS was founded by Madoff in 1959 and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several of his friends and family members.  BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b).  By virtue of that registration, BLMIS was a member of SIPC.  BLMIS had three business units: market making, proprietary trading, and the IA Business.

**ANSWER:**    The Eurizon Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph and deny them on that basis.

33.    Outwardly, Madoff ascribed the consistent success of the IA Business to the so-called split-strike conversion strategy ("SSC Strategy").  Under that strategy, Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100")—a collection of the 100 largest publicly traded companies. Madoff claimed that his basket of stocks would mimic the movement of the S&P 100.  He also asserted that he would carefully time purchases and sales to maximize value, and BLMIS customers' funds would, intermittently, be out of the equity markets.

**ANSWER:**    The Eurizon Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph and deny them on that basis.

15

34.    The second part of the SSC Strategy was a hedge of Madoff's stock purchases with options contracts.  Those option contracts acted as a "collar" to limit both the potential gains and losses on the basket of stocks.  Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options.  Madoff told BLMIS customers that when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual funds holding Treasury bills.  Madoff also told customers that he would enter and exit the market between six and ten times each year.

ANSWER:    The Eurizon Defendants lack knowledge or information sufficient

to form a belief as to the truth of the allegations of this paragraph and deny them on that basis.

35.    BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts.  The securities purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious.  At the Plea Hearing, Madoff admitted that he never made the investments he promised clients, who believed they were invested with him in the SSC Strategy.  He further admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts.  In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform on which BLMIS reasonably could have traded securities.  Instead, investors' funds were principally deposited into the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxxx703.

ANSWER:    The Eurizon Defendants respectfully refer the Court to the

transcript of the March 12, 2009 plea hearing for a complete and accurate statement of its

contents.  The Eurizon Defendants otherwise lack knowledge or information sufficient to form a

belief about the truth of the allegations of this paragraph and deny them on that basis.

36.    Prior to his arrest, Madoff assured clients and regulators that he purchased and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than through any listed exchange.  Based on the Trustee's investigation to date, there is no evidence that the IA Business ever entered into any OTC options trades on behalf of IA Business account holders.

ANSWER:    The Eurizon Defendants lack knowledge or information sufficient

to form a belief about the truth of the allegations of this paragraph and deny them on that basis.

37.    For all periods relevant hereto, the IA Business was operated as a Ponzi scheme.  The money received from investors was not invested in stocks and options, but rather used to pay withdrawals and to make other avoidable transfers.  Madoff also used his customers' investments to enrich himself, his associates, and his family.

16

**ANSWER:** The allegations of the first sentence of this paragraph contain legal conclusions to which no response is required. To the extent a response is required, the Eurizon Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of the first sentence of this paragraph and deny them on that basis. The Eurizon Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of the second and third sentences of this paragraph and deny them on that basis.

38.     The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion of new investments to fulfill payment requests or withdrawals from other BLMIS accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

**ANSWER:** The Eurizon Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph and deny them on that basis.

39.     It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in demand, investigation, the filing of a claim, and disclosure of the fraud.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, the Eurizon Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph and deny them on that basis.

40.     Madoff's scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

**ANSWER:** The Eurizon Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph and deny them on that basis.

41.     Based upon the Trustee's ongoing investigation, it now appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had

approximately $65 billion invested through BLMIS.  In reality, BLMIS had assets on hand worth only a fraction of that amount.  Customer accounts had not accrued any real profits because virtually no investments were ever made.  By the time the Ponzi scheme came to light on December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

> **ANSWER:**    The Eurizon Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph and deny them on that basis.

42.    Thus, at all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets.  BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

> **ANSWER:**    The allegations of this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, the Eurizon Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph and deny them on that basis.

## VII.    THE TRANSFERS

43.    The Feeder Funds received initial transfers of BLMIS Customer Property. Some or all of those initial transfers were subsequently transferred directly or indirectly to the Eurizon Defendants.

> **ANSWER:**    This paragraph contains legal conclusions to which no response is required.  To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

### A.    FAIRFIELD SENTRY

#### 1.    Initial Transfers from BLMIS to Fairfield Sentry

44.    The Trustee filed an adversary proceeding against Fairfield Sentry and other defendants in the Bankruptcy Court under the caption *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Fairfield Sentry in the amount of approximately $3 billion (the "Fairfield Amended Complaint").  The Trustee incorporates by reference the allegations contained in the Fairfield Amended Complaint as if fully set forth herein.

**ANSWER:**    The Eurizon Defendants admit that the Trustee filed an action in the Bankruptcy Court under the caption *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (BRL), and otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of this paragraph and deny them on that basis. The second sentence of this paragraph contains legal conclusions to which no response is required. To the extent a response is required, the Eurizon Defendants deny the allegations of the second sentence of this paragraph. The Eurizon defendants further object to the Trustee's purported attempt to incorporate by reference the allegations contained in a 798-paragraph complaint from a different proceeding to which the Eurizon Defendants are not a party regarding matters not relevant to this action without any attempt to identify which allegations may be relevant in this action, if any. The Eurizon Defendants have no obligation to respond to the allegations in that complaint. To the extent a response is required, the Eurizon Defendants lack knowledge or information sufficient to form a belief about the truth of such allegations and deny them on that basis.

45.    During the six years preceding the Filing Date, BLMIS made transfers to Fairfield Sentry of approximately $2,985,136,619 (the "Fairfield Sentry Six Year Initial Transfers"). The Fairfield Sentry Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:**    The Eurizon Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of the first sentence of this paragraph and deny them on that basis. The allegations of the second sentence of this paragraph contain legal conclusions to which no response is required. To the extent a response is required, the Eurizon Defendants deny the allegations of the second sentence of this paragraph.

46.    The Fairfield Sentry Six Year Initial Transfers include approximately $1,614,067,088 which BLMIS transferred to Fairfield Sentry during the two years preceding the

Filing Date (the "Fairfield Sentry Two Year Initial Transfers"). The Fairfield Sentry Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

ANSWER: The Eurizon Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of the first sentence of this paragraph and deny them on that basis. The allegations of the second sentence of this paragraph contain legal conclusions to which no response is required. To the extent a response is required, the Eurizon Defendants deny the allegations of the second sentence of this paragraph.

47. The Fairfield Sentry Two Year Initial Transfers include approximately $1,134,628,244 which BLMIS transferred to Fairfield Sentry during the 90 days preceding the Filing Date (the "Fairfield Sentry Preference Period Initial Transfers"). The Fairfield Sentry Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

ANSWER: The Eurizon Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of the first sentence of this paragraph and deny them on that basis. The allegations of the second sentence of this paragraph contain legal conclusions to which no response is required. To the extent a response is required, the Eurizon Defendants deny the allegations of the second sentence of this paragraph.

48. The Fairfield Sentry Six Year Initial Transfers, the Fairfield Sentry Two Year Initial Transfers, and the Fairfield Sentry Preference Period Initial Transfers are collectively defined as the "Fairfield Sentry Initial Transfers." Charts setting forth these transfers are attached as **Exhibits A and B**.

ANSWER: The Eurizon Defendants deny the allegations of the first sentence of this paragraph, except admit that the term "Fairfield Sentry Initial Transfers" is defined as set forth in this sentence. The Eurizon Defendants deny the allegations of the second sentence of this paragraph, except admit that Exhibits A and B are attached to the Complaint and respectfully refer the Court to those exhibits for a complete and accurate statement of their contents.

49.    Pursuant to the Bankruptcy Court's June 7 and June 10, 2011 orders, the Bankruptcy Court approved a settlement among the Trustee, Fairfield Sentry, and others (the "Settlement Agreement").    As part of the Settlement Agreement, on July 13, 2011, the Bankruptcy Court entered a consent judgment granting the Trustee a judgment in the amount of $3,054,000,000.  Under the terms of the Settlement Agreement, Fairfield Sentry is obligated to pay $70,000,000 to the Trustee for the benefit of the consolidated BLMIS estate.

ANSWER:    The Eurizon Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations of this paragraph and deny them on that basis, except admit that the Bankruptcy Court approved a settlement among certain parties including the Trustee and Fairfield Sentry and that Fairfield Sentry is obligated to pay some amount to the Trustee.  The Eurizon Defendants respectfully refer the Court to the Settlement Agreement and the June 7, 2011, June 10, 2011, and July 13, 2011 orders referenced in this paragraph for a complete and accurate statement of their contents.

### 2.    Subsequent Transfers from Fairfield Sentry to Low Volatility

50.    A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Low Volatility and is recoverable from Defendant Low Volatility pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL.  Based on the Trustee's investigation to date, approximately $7,913,079 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Defendant Low Volatility (the "Fairfield Sentry Low Volatility Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry Low Volatility Subsequent Transfers is attached as **Exhibit C**.

ANSWER:    This paragraph contains legal conclusions to which no response is required.  To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph, except admit that Exhibit C is attached to the Complaint and respectfully refer the Court to that exhibit for a complete and accurate statement of its contents.

### 3.    Subsequent Transfers from Fairfield Sentry to Medium Volatility

51.    A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Medium Volatility and is recoverable from Defendant Medium Volatility pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL.  Based on the Trustee's investigation to date, approximately $3,740,436 of the money transferred from BLMIS to Fairfield Sentry was subsequently

transferred by Fairfield Sentry to Defendant Medium Volatility (the "Fairfield Sentry Medium Volatility Subsequent Transfers," together with the Fairfield Sentry Low Volatility Subsequent Transfers, the "Fairfield Sentry Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry Medium Volatility Subsequent Transfers is attached as **Exhibit D**.

ANSWER:    This paragraph contains legal conclusions to which no response is required. To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph, except admit that Exhibit D is attached to the Complaint and respectfully refer the Court to that exhibit for a complete and accurate statement of its contents.

52.    The Trustee's investigation is on-going, and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, Fairfield Sentry Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

ANSWER:    This paragraph contains legal conclusions to which no response is required. To the extent a response is required, the Eurizon Defendants respond as follows: The Eurizon Defendants deny the allegations of this paragraph, except lack knowledge or information sufficient to form a belief about the truth of the allegations that the Trustee's investigation is ongoing and deny them on that basis.

B.    **KINGATE GLOBAL**

1.    **Initial Transfers from BLMIS to Kingate Global**

53.    The Trustee has filed an adversary proceeding against Kingate Global, Kingate Euro, and other defendants in the Bankruptcy Court under the caption *Picard v. Kingate Global Fund, et al.*, Adv. Pro. No. 10-05310 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Kingate Global in the amount of approximately $437,501,112 (the "Kingate Global Complaint"). The Trustee incorporates by reference the allegations contained in the Kingate Global Complaint as if fully set forth herein.

ANSWER:    On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) [*see* ECF No. 93]. Accordingly, no response is required to the

22

allegations of this paragraph. To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

54.     During the six years preceding the Filing Date, BLMIS made transfers to Kingate Global of approximately $398,704,065 (the "Kingate Global Six Year Initial Transfers"). The Kingate Global Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:**     On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) [*see* ECF No. 93]. Accordingly, no response is required to the allegations of this paragraph. To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

55.     The Kingate Global Six Year Initial Transfers include approximately $163,447,509 which BLMIS transferred to Kingate Global during the two years preceding the Filing Date (the "Kingate Global Two Year Initial Transfers"). The Kingate Global Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:**     On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) [*see* ECF No. 93]. Accordingly, no response is required to the allegations of this paragraph. To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

56.     The Kingate Global Two Year Initial Transfers include approximately $101,753,145 which BLMIS transferred to Kingate Global during the 90 days preceding the Filing Date (the "Kingate Global Preference Period Initial Transfers"). The Kingate Global Preference Period Initial Transfers were and continue to be Customer Property within the

meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

    **ANSWER:** On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) [*see* ECF No. 93].   Accordingly, no response is required to the allegations of this paragraph.  To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

    57. The Kingate Global Six Year Initial Transfers, the Kingate Global Two Year Initial Transfers, and the Kingate Global Preference Period Initial Transfers are collectively defined as the "Kingate Global Initial Transfers."  Charts detailing these transfers are attached as **Exhibits E and F**.

    **ANSWER:** On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) [*see* ECF No. 93].   Accordingly, no response is required to the allegations of this paragraph.  To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

    **2.**  **Subsequent Transfers from Kingate Global to Intesa**

    58. A portion of the Kingate Global Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Intesa and is recoverable from Defendant Intesa pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL.  Based on the Trustee's investigation to date, approximately $5,286,438 of the money transferred from BLMIS to Kingate Global was subsequently transferred by Kingate Global to Defendant Intesa (the "Kingate Global Intesa Subsequent Transfers").  A chart setting forth the presently known Kingate Global Intesa Subsequent Transfers is attached as **Exhibit G**.

    **ANSWER:** On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling

approximately $93,661,909) and dismiss Intesa from this action [*see* ECF No. 93].  Accordingly, no response is required to the allegations of this paragraph.  To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

### 3.    Subsequent Transfers from Kingate Global to Low Volatility

59.    A portion of the Kingate Global Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Low Volatility and is recoverable from Defendant Low Volatility pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL.  Based on the Trustee's investigation to date, approximately $16,971,921 of the money transferred from BLMIS to Kingate Global was subsequently transferred by Kingate Global to Defendant Low Volatility (the "Kingate Global Low Volatility Subsequent Transfers").  A chart setting forth the presently known Kingate Global Low Volatility Subsequent Transfers is attached as **Exhibit H**.

**ANSWER:**    On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) [*see* ECF No. 93].  Accordingly, no response is required to the allegations of this paragraph.  To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

### 4.    Subsequent Transfers from Kingate Global to Low Volatility II

60.    A portion of the Kingate Global Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Low Volatility II and is recoverable from Defendant Low Volatility II pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL.  Based on the Trustee's investigation to date, approximately $22,964,092 of the money transferred from BLMIS to Kingate Global was subsequently transferred by Kingate Global to Defendant Low Volatility II (the "Kingate Global Low Volatility II Subsequent Transfers").  A chart setting forth the presently known Kingate Global Low Volatility II Subsequent Transfers is attached as **Exhibit I**.

**ANSWER:**    On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) and dismiss Low Volatility II from this action [*see* ECF No. 93].

Accordingly, no response is required to the allegations of this paragraph. To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

### 5.    Subsequent Transfers from Kingate Global to Low Volatility PB

61.    A portion of the Kingate Global Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Low Volatility PB and is recoverable from Defendant Low Volatility PB pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $934,488 of the money transferred from BLMIS to Kingate Global was subsequently transferred by Kingate Global to Defendant Low Volatility PB (the "Kingate Global Low Volatility PB Subsequent Transfers"). A chart setting forth the presently known Kingate Global Low Volatility PB Subsequent Transfers is attached as **Exhibit J**.

**ANSWER:**    On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) and dismiss Low Volatility PB from this action [*see* ECF No. 93]. Accordingly, no response is required to the allegations of this paragraph. To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

### 6.    Subsequent Transfers from Kingate Global to Medium Volatility

62.    A portion of the Kingate Global Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Medium Volatility and is recoverable from Defendant Medium Volatility pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $15,678,480 of the money transferred from BLMIS to Kingate Global was subsequently transferred by Kingate Global to Defendant Medium Volatility (the "Kingate Global Medium Volatility Subsequent Transfers"). A chart setting forth the presently known Kingate Global Medium Volatility Subsequent Transfers is attached as **Exhibit K**.

**ANSWER:**    On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) [*see* ECF No. 93]. Accordingly, no response is required to the

allegations of this paragraph.  To the extent a response is required, the Eurizon Defendants deny

the allegations of this paragraph.

### 7.    Subsequent Transfers from Kingate Global to Medium Volatility II

63.    A portion of the Kingate Global Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Medium Volatility II and is recoverable from Defendant Medium Volatility II pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL.  Based on the Trustee's investigation to date, approximately $8,520,013 of the money transferred from BLMIS to Kingate Global was subsequently transferred by Kingate Global to Defendant Medium Volatility II (the "<u>Kingate Global Medium Volatility II Subsequent Transfers</u>").  A chart setting forth the presently known Kingate Global Medium Volatility II Subsequent Transfers is attached as **Exhibit L**.

**ANSWER:**    On March 29, 2022, the Court entered the Kingate Stipulation

amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover

subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling

approximately $93,661,909) and dismiss Medium Volatility II from this action [*see* ECF No. 93].

Accordingly, no response is required to the allegations of this paragraph.  To the extent a

response is required, the Eurizon Defendants deny the allegations of this paragraph.

### 8.    Subsequent Transfers from Kingate Global to Total Return

64.    A portion of the Kingate Global Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Total Return and is recoverable from Defendant Total Return pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL.  Based on the Trustee's investigation to date, approximately $6,452,160 of the money transferred from BLMIS to Kingate Global was subsequently transferred by Kingate Global to Defendant Total Return (the "<u>Kingate Global Total Return Subsequent Transfers</u>," collectively with the Kingate Global Intesa Subsequent Transfers, the Kingate Global Low Volatility Subsequent Transfers, the Kingate Global Low Volatility II Subsequent Transfers, the Kingate Global Low Volatility PB Subsequent Transfers, the Kingate Global Medium Volatility Subsequent Transfers, and the Kingate Global Medium Volatility II Subsequent Transfers, the "<u>Kingate Global Subsequent Transfers</u>").  A chart setting forth the presently known Kingate Global Total Return Subsequent Transfers is attached as **Exhibit M**.

**ANSWER:**    On March 29, 2022, the Court entered the Kingate Stipulation

amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover

subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling

approximately $93,661,909) and dismiss Total Return from this action [*see* ECF No. 93].

Accordingly, no response is required to the allegations of this paragraph.  To the extent a

response is required, the Eurizon Defendants deny the allegations of this paragraph.

65.    The Trustee's investigation is on-going, and the Trustee reserves the right
to: (i) supplement the information on the Kingate Global Initial Transfers, Kingate Global
Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional
transfers.

**ANSWER:**    On March 29, 2022, the Court entered the Kingate Stipulation

amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover

subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling

approximately $93,661,909) [*see* ECF No. 93].   Accordingly, no response is required to the

allegations of this paragraph.  To the extent a response is required, the Eurizon Defendants deny

the allegations of this paragraph.

### C.    KINGATE EURO

### 1.    Initial Transfers from BLMIS to Kingate Euro

66.    The Trustee has filed an adversary proceeding against Kingate Global,
Kingate Euro, and other defendants in the Bankruptcy Court under the caption *Picard v. Kingate
Global Fund, et al.*, Adv. Pro. No. 10-05310 (BRL), in which, in part, the Trustee sought to
avoid and recover initial transfers of Customer Property from BLMIS to Kingate Euro in the
amount of approximately $538,040,617 (as previously defined, the "Kingate Global Complaint").
The Trustee incorporates by reference the allegations contained in the Kingate Global Complaint
as if fully set forth herein.

**ANSWER:**    On March 29, 2022, the Court entered the Kingate Stipulation

amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover

subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling

approximately $93,661,909) [*see* ECF No. 93].   Accordingly, no response is required to the

allegations of this paragraph.  To the extent a response is required, the Eurizon Defendants deny

the allegations of this paragraph.

28

67.     During the six years preceding the Filing Date, BLMIS made transfers to Kingate Euro of approximately $475,485,759 (the "Kingate Euro Six Year Initial Transfers"). The Kingate Euro Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:**    On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) [*see* ECF No. 93].   Accordingly, no response is required to the allegations of this paragraph.  To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

68.     The Kingate Euro Six Year Initial Transfers include approximately $248,979,674 which BLMIS transferred to Kingate Euro during the two years preceding the Filing Date (the "Kingate Euro Two Year Initial Transfers").  The Kingate Euro Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:**    On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) [*see* ECF No. 93].   Accordingly, no response is required to the allegations of this paragraph.  To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

69.     The Kingate Euro Two Year Initial Transfers include approximately $155,606,833 which BLMIS transferred to Kingate Euro during the 90 days preceding the Filing Date (the "Kingate Euro Preference Period Initial Transfers").  The Kingate Euro Preference Period Initial Transfers were and are Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:**    On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) [*see* ECF No. 93].    Accordingly, no response is required to the allegations of this paragraph.  To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

70.    The Kingate Euro Six Year Initial Transfers, the Kingate Euro Two Year Initial Transfers, and the Kingate Euro Preference Period Initial Transfers are collectively defined as the "<u>Kingate Euro Initial Transfers</u>."  Charts setting forth these transfers are attached as **<u>Exhibits N and O</u>**.

**ANSWER:**    On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) [*see* ECF No. 93].    Accordingly, no response is required to the allegations of this paragraph.  To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

71.    The Kingate Global Initial Transfers and the Kingate Euro Initial Transfers are collectively referred to as the "<u>Kingate Initial Transfers</u>."

**ANSWER:**    On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) [*see* ECF No. 93].    Accordingly, no response is required to the allegations of this paragraph.  To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

### 2.      Subsequent Transfers from Kingate Euro to Defendant Low Volatility

72.      A portion of the Kingate Euro Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Low Volatility and is recoverable from Defendant Low Volatility pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL.  Based on the Trustee's investigation to date, approximately $10,245,248 of the money transferred from BLMIS to Kingate Euro was subsequently transferred by Kingate Euro to Defendant Low Volatility (the "Kingate Euro Low Volatility Subsequent Transfers," together with the Kingate Global Low Volatility Subsequent Transfers, the "Kingate Low Volatility Subsequent Transfers").  A chart setting forth the presently known Kingate Euro Low Volatility Subsequent Transfers is attached as **Exhibit P**.

ANSWER:      On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) [*see* ECF No. 93].  Accordingly, no response is required to the allegations of this paragraph.  To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

### 3.      Subsequent Transfers from Kingate Euro to Defendant Low Volatility II

73.      A portion of the Kingate Euro Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Low Volatility II and is recoverable from Defendant Low Volatility II pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL.  Based on the Trustee's investigation to date, approximately $5,732,227 of the money transferred from BLMIS to Kingate Euro was subsequently transferred by Kingate Euro to Defendant Low Volatility II (the "Kingate Euro Low Volatility II Subsequent Transfers," together with the Kingate Global Low Volatility II Subsequent Transfers, the "Kingate Low Volatility II Subsequent Transfers").  A chart setting forth the presently known Kingate Euro Low Volatility II Subsequent Transfers is attached as **Exhibit Q**.

ANSWER:      On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) and dismiss Low Volatility II from this action [*see* ECF No. 93].

Accordingly, no response is required to the allegations of this paragraph. To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

### 4.    Subsequent Transfers from Kingate Euro to Defendant Low Volatility PB

74.    A portion of the Kingate Euro Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Low Volatility PB and is recoverable from Defendant Low Volatility PB pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $876,842 of the money transferred from BLMIS to Kingate Euro was subsequently transferred by Kingate Euro to Defendant Low Volatility PB (the "<u>Kingate Euro Low Volatility PB Subsequent Transfers</u>," collectively with the Kingate Euro Low Volatility Subsequent Transfers and the Kingate Euro Low Volatility II Subsequent Transfers, the "<u>Kingate Euro Subsequent Transfers</u>"). The Kingate Euro Low Volatility PB Subsequent Transfers and the Kingate Global Low Volatility PB Subsequent Transfers are collectively known as the "<u>Kingate Low Volatility PB Subsequent Transfers</u>." A chart setting forth the presently known Kingate Euro Low Volatility PB Subsequent Transfers is attached as **<u>Exhibit R</u>**.

**ANSWER:**    On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) and dismiss Low Volatility PB from this action [*see* ECF No. 93]. Accordingly, no response is required to the allegations of this paragraph. To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

75.    The Trustee's investigation is on-going, and the Trustee reserves the right to: (i) supplement the information on the Kingate Euro Initial Transfers, Kingate Euro Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER:**    On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) [*see* ECF No. 93]. Accordingly, no response is required to the

allegations of this paragraph.  To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

76.    The Kingate Euro Subsequent Transfers and the Kingate Global Subsequent Transfers are collectively referred to as the "Kingate Subsequent Transfers."

**ANSWER:**    On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) [*see* ECF No. 93].   Accordingly, no response is required to the allegations of this paragraph.  To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

**COUNT ONE**
**RECOVERY OF FAIRFIELD SENTRY SUBSEQUENT TRANSFERS –**
**11 U.S.C. §§ 550 AND 551 AND NYDCL § 278**

77.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

**ANSWER:**    The Eurizon Defendants incorporate and reassert their responses to the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

78.    Defendants Low Volatility and Medium Volatility (together, the "Fairfield Sentry Defendants") received the Fairfield Sentry Subsequent Transfers, totaling approximately $11,653,515.  Specifically, Defendant Low Volatility received approximately $7,913,079 and Defendant Medium Volatility received approximately $3,740,436. These transfers are recoverable pursuant to section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

**ANSWER:**    The allegations of this paragraph contain legal conclusions to which no response is required.  To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

79.    Each of the Fairfield Sentry Subsequent Transfers was made directly or indirectly to, or for the benefit of, the relevant Fairfield Sentry Defendant.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

80. The Fairfield Sentry Defendants are immediate or mediate transferees of the relevant Fairfield Sentry Initial Transfers.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

81. As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against each Fairfield Sentry Defendant recovering the relevant Fairfield Sentry Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER:** This paragraph contains legal conclusions to which no response is required. To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

## COUNT TWO
## RECOVERY OF KINGATE SUBSEQUENT TRANSFERS–
## 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

82. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

**ANSWER:** The Eurizon Defendants incorporate and reassert their responses to the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

83. The Eurizon Defendants received the Kingate Subsequent Transfers, totaling approximately $93,661,909. Specifically, Defendant Intesa received $5,286,438, Defendant Low Volatility received $27,217,169, Defendant Low Volatility II received $28,696,319, Defendant Low Volatility PB received $1,811,330, Defendant Medium Volatility received $15,678,480, Defendant Medium Volatility II received $8,520,013, and Defendant Total Return received $6,452,160. These transfers are recoverable pursuant to section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

**ANSWER:** On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) [*see* ECF No. 93]. Accordingly, no response is required to the allegations of this paragraph. This paragraph further contains legal conclusions to which no response is required. To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

84.    Each of the Kingate Subsequent Transfers was made directly or indirectly to, or for the benefit of, the relevant Eurizon Defendant.

**ANSWER:** On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) [*see* ECF No. 93]. Accordingly, no response is required to the allegations of this paragraph. This paragraph further contains legal conclusions to which no response is required. To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

85.    The Eurizon Defendants are immediate or mediate transferees of the relevant Kingate Initial Transfers.

**ANSWER:** On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) [*see* ECF No. 93]. Accordingly, no response is required to the allegations of this paragraph. This paragraph further contains legal conclusions to which no response is required. To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

86.    As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Eurizon Defendants recovering the relevant Kingate Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER:**    On March 29, 2022, the Court entered the Kingate Stipulation amending the Complaint to, *inter alia*, dismiss Count Two (the Trustee's claims to recover subsequent transfers that the Defendants allegedly received from the Kingate Funds, totaling approximately $93,661,909) [*see* ECF No. 93].    Accordingly, no response is required to the allegations of this paragraph.    This paragraph further contains legal conclusions to which no response is required.    To the extent a response is required, the Eurizon Defendants deny the allegations of this paragraph.

## RESPONSE TO REQUEST FOR RELIEF

The Request for Relief contains legal conclusions to which no response is required.    To the extent a response is required, the Eurizon Defendants deny that the Trustee is entitled to his requested relief or to any other relief.

## AFFIRMATIVE DEFENSES

The Eurizon Defendants assert the following defenses without assuming the burden of proof or any other burden if such burdens would otherwise be on Plaintiff.    In the event that subsequent legal developments change the availability or nature of claims asserted by the Trustee, the Eurizon Defendants hereby preserve each and every defense at law, in equity, or otherwise, available under federal and state law, including common law.    Further, the Eurizon Defendants reserve the right to amend this Answer to assert any other and further defenses, cross-claims, and/or third party claims when and if, in the course of investigation, discovery, or preparation for trial, it becomes appropriate to do so.    These defenses are set forth cumulatively and in the alternative.

## FIRST AFFIRMATIVE DEFENSE

### Bankruptcy Code Safe Harbor (11 U.S.C. § 546(e))

The Trustee's claims are barred, in whole or in part, because the alleged subsequent transfers to the Eurizon Defendants, if any, may not be recovered because the alleged initial transfers, if any, are subject to the safe harbor in Section 546(e) of the Bankruptcy Code, 11 U.S.C. § 546(e).

## SECOND AFFIRMATIVE DEFENSE

### No Customer Property (15 U.S.C. § 78fff-2(c)(3))

The Trustee's claims are barred, in whole or in part, because any property that the Eurizon Defendants received from Fairfield Sentry was not Customer Property, or proceeds of Customer Property, that BLMIS transferred to Fairfield Sentry, and therefore any such property is not recoverable by the Trustee from the Eurizon Defendants.

## THIRD AFFIRMATIVE DEFENSE

### For Value, in Good Faith, and Without Knowledge of Voidability
### (11 U.S.C. § 550(b))

The Trustee's claims are barred, in whole or in part, because the Eurizon Defendants took any funds it received from Fairfield Sentry for value, in good faith, and without knowledge of the voidability of any alleged initial transfers from BLMIS to Fairfield Sentry, and thus the alleged transfers to the Eurizon Defendants, if any, may not be recovered pursuant to 11 U.S.C. § 550(b).

## FOURTH AFFIRMATIVE DEFENSE

### Lack of Subject Matter Jurisdiction
### (U.S. Const. art. III; Fed. R. Civ. P. 12(b)(l); Fed. R. Bankr. P. 7012(b))

The Trustee's claims are barred, in whole or in part, because this Court lacks jurisdiction under Article III of the U.S. Constitution to enter final orders or judgment in this proceeding.

## FIFTH AFFIRMATIVE DEFENSE

### Failure to State a Claim (Fed. R. Civ. P. 12(b)(6); Fed. R. Bankr. P. 7012(b))

The Trustee's claims are barred, in whole or in part, because the Complaint fails to state a claim upon which relief can be granted, including for each of the reasons stated in the Eurizon Defendants' Motion to Dismiss the Complaint, filed on April 15, 2022, in this adversary proceeding [*see* ECF No. 95] and proceedings thereon.

## SIXTH AFFIRMATIVE DEFENSE

### Personal Jurisdiction (Fed. R. Civ. P. 12(b)(2); Fed. R. Bankr. P. 7012(b))

The Trustee's claims are barred, in whole or in part, because this Court lacks personal jurisdiction over the Eurizon Defendants, and the Eurizon Defendants have not consented to a decision by this Court or to this Court's authority to hear and determine this action.

## SEVENTH AFFIRMATIVE DEFENSE

### Initial Transfer Not Avoided (11 U.S.C. § 550(a))

The Trustee's claims are barred, in whole or in part, because the Trustee may not recover the alleged transfers from Fairfield Sentry to the Eurizon Defendants, if any, because he has not avoided the alleged initial transfers from BLMIS to Fairfield Sentry.

## EIGHTH AFFIRMATIVE DEFENSE

### No Ponzi Scheme Presumption

The Trustee's claims are barred, in whole or in part, because the Trustee may not rely on a "Ponzi scheme presumption" to prove that the alleged initial transfers from BLMIS to Fairfield Sentry that he seeks to recover from the Eurizon Defendants were made with actual intent to hinder, delay, or defraud any BLMIS creditor.

## NINTH AFFIRMATIVE DEFENSE

### The Eurizon Defendants as Initial Transferee-Mere Conduit Defense

The Trustee's claims are barred, in whole or in part, because Fairfield Sentry was a mere conduit, and consequently, any claimed transfers were initial transfers from BLMIS to the Eurizon Defendants.

## TENTH AFFIRMATIVE DEFENSE

### Fairfield Sentry as Initial Transferee-Mere Conduit Defense

In the alternative, the Trustee's claims are barred, in whole or in part, because the Eurizon Defendants were not transferees of any transfers claimed by the Trustee to be subsequent transfers.

## ELEVENTH AFFIRMATIVE DEFENSE

### New York Debtor and Creditor Law

The Trustee's claims are barred, in whole or in part, because the Trustee failed to plead all of the elements of fraudulent transfer under section 544 of the Bankruptcy Code and sections 273, 274, 275, 276, 276-a, 278 and/or 279 of the New York Debtor and Creditor Law with sufficient particularity and factual support.

## TWELFTH AFFIRMATIVE DEFENSE

### Section 278(1) of New York Debtor and Creditor Law

The Trustee's claims are barred, in whole or in part, because the alleged Fairfield Sentry Initial Transfers were taken, if at all, for fair consideration and without knowledge of the fraud, as provided by section 278(1) of the New York Debtor and Creditor Law.

## THIRTEENTH AFFIRMATIVE DEFENSE

### Section 278(2) of New York Debtor and Creditor Law

The Trustee's claims are barred, in whole or in part, because the alleged Fairfield Sentry Initial Transfers were taken, if at all, without actual fraudulent intent and for fair consideration, as provided by section 278(2) of the New York Debtor and Creditor Law.

## FOURTEENTH AFFIRMATIVE DEFENSE

### Sufficient SIPC Funds

The Trustee's claims are barred, in whole or part, because the Trustee or Plaintiff has recovered, or during the pendency of this action recovers, sufficient funds to reimburse SIPC for all payments that SIPC has made to satisfy allowed claims of BLMIS customers.

## FIFTEENTH AFFIRMATIVE DEFENSE

### Failure to Mitigate

The Trustee's claims are barred, in whole or part, because the Trustee or Plaintiff has failed to mitigate, minimize or avoid damages, if any.

## SIXTEENTH AFFIRMATIVE DEFENSE

### British Virgin Island Proceedings

The Trustee's claims are barred, in whole or in part, based upon rulings, judgments, orders, or decisions entered in the liquidation proceedings of Fairfield Sentry before

the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands,

including any related appellate rulings, judgments, orders, or decisions.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### No Interest

The Trustee is not entitled to an award of interest under 11 U.S.C. § 548.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### Statute of Limitations

The Trustee's claims are barred, in whole or in part, by the statute of limitations.

## NINETEENTH AFFIRMATIVE DEFENSE

### Estoppel

The Trustee's claims are barred, in whole or in part, by estoppel.

## TWENTIETH AFFIRMATIVE DEFENSE

### Unreasonable Delay / Laches

The Trustee's claims are barred, in whole or in part, because the delay in bringing

and prosecuting his claim, which was brought more than a decade ago, lay dormant for years and

concerns alleged transfers made nearly 20 years ago, is unreasonable and unfairly prejudices the

Eurizon Defendants' ability to defend themselves, including, without limit, with respect to any

claim by the Trustee for interest accruing from after the date of the filing of Complaint.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### Violation of Due Process (U.S. Const. Amend. V)

The Trustee's claims are barred, in whole or in part, to the extent the doctrine of

law of the case has been applied to the Eurizon Defendants based on rulings made in other

adversary proceedings to which they were not a party and in which they did not participate,

which violates the Eurizon Defendants' right to due process of law as guaranteed by the Fifth Amendment to the U.S. Constitution.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

### Single Satisfaction (11 U.S.C. § 550(d))

The Trustee's claims are barred, in whole or in part, because, pursuant to 11 U.S.C. § 550(d), the Trustee may not recover any alleged subsequent transfer from the Eurizon Defendants to the extent he has recovered the amount of the initial transfers from Fairfield Sentry or any other immediate or mediate transferee, and the amount of the avoided initial transfers is included in the alleged Customer Property that the Trustee alleges the Eurizon Defendants received.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

### Preservation of Rights (11 U.S.C. § 502(h))

To the extent the Trustee recovers from the Eurizon Defendants, the Eurizon Defendants reserves their right to assert a claim arising from such recovery under 11 U.S.C. § 502(h).

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

### Double Recovery

The Trustee's claims are barred, in whole or in part, to the extent that any other entity recovers from the Eurizon Defendants based on the conduct alleged in the Complaint in settlement or otherwise, because the Trustee is not entitled to double recovery, nor should the Eurizon Defendants be subject to recovery of identical funds from two separate entities.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 9015 of the Federal Rules of Bankruptcy Procedure, the Eurizon Defendants demand a trial by jury on all issues that may be tried by a jury.

## STATEMENT PURSUANT TO FED. R. BANKR. P. 7012(b)

The Eurizon Defendants do not consent to entry of final orders or judgment by the Bankruptcy Court.

## DEFENDANTS' REQUEST FOR RELIEF

WHEREFORE, the Eurizon Defendants demand judgment dismissing the Complaint with prejudice, together with an award of attorneys' fees, costs, disbursements, and such other relief as the Court deems just and appropriate.


Dated: November 21, 2022
    New York, New York


*/s/ Andrew Ditchfield*
Elliot Moskowitz
Andrew Ditchfield
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Tel:    (212) 450-4000
Fax:    (212) 701-5800
elliot.moskowitz@davispolk.com
andrew.ditchfield@davispolk.com

*Attorneys for the Eurizon Defendants*