**Hearing Date: April 19, 2023**
**Objection Date: January 20, 2023**
**Reply Date: February 20, 2023**

Pamela A. Miller
Amber L. Covucci
O'MELVENY & MYERS LLP
Seven Times Square
New York, New York 10036
Telephone: (212) 326-2000
E-mail:  pmiller@omm.com
           acovucci@omm.com
*Attorneys for Merrill Lynch Bank (Suisse) SA*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff, | Adv. Pro. No. 11-02910 (CGM) |
| Plaintiff, | |
| v. | |
| MERRILL LYNCH BANK (SUISSE) SA, n/k/a BANK JULIUS BÄR & CO. AG a/k/a BANK JULIUS BAER & CO. LTD., | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MERRILL LYNCH BANK (SUISSE) SA'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ............................................................................................. 4

    A.    MLBS ..................................................................................... 4

    B.    The Funds ............................................................................... 5

    C.    The Amended Complaint and Related Proceedings ................................ 5

ARGUMENT ................................................................................................ 7

    I.    THE AMENDED COMPLAINT SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION UNDER RULE 12(B)(2) ............................. 7

    A.    The Court lacks general jurisdiction over MLBS ..................................... 8

    B.    MLBS did not consent to personal jurisdiction in New York. .................. 9

        1.    MLBS did not consent to personal jurisdiction by entering into subscription agreements governed by New York law. ........... 9

        2.    By filing customer claims, MLBS did not submit to jurisdiction before this Court for anything other than claims adjudication. ........................................................................ 10

    C.    The Court lacks specific jurisdiction over MLBS. ................................. 10

        1.    Vague and conclusory allegations cannot support jurisdiction ...................................................................... 11

        2.    Maintenance of a New York bank account for Sentry redemptions is insufficient to establish jurisdiction ................... 12

        3.    MLBS's investments in the Funds do not establish jurisdiction. ...................................................................... 14

        4.    Communications with FGG in New York do not establish jurisdiction. ...................................................................... 17

    D.    Exercise of Jurisdiction Over MLBS Would Not Comport With Due Process .......................................................................... 18

    II.    THE AMENDED COMPLAINT FAILS TO CONTAIN A "SHORT AND PLAIN STATEMENT OF THE CLAIM" IN VIOLATION OF RULE 8(A)(2) ................................................................................... 20

    III.    THE AMENDED COMPLAINT DOES NOT PLAUSIBLY ALLEGE THAT THE MLBS REDEMPTIONS WERE BLMIS PROPERTY ................. 22

    A.    The Trustee does not adequately allege that the funds transferred to MLBS originated with BLMIS .............................................. 23

## TABLE OF CONTENTS
(continued)

|   |   | Page |
|---|---|---|
| B. | Based on the Trustee's own allegations, it is implausible that all of the MLBS Redemptions contain BLMIS customer property. | 24 |
| IV. | THE NEW YORK FRAUDULENT TRANSFER, CONSTRUCTIVE FRAUDULENT TRANSFER, AND PREFERENCE CLAIMS ARE BARRED UNDER BANKRUPTCY CODE SECTION 546(e) | 26 |
| A. | The Initial Transfers Were Made By and To Entities Covered by Section 546(e). | 27 |
| 1. | The Alleged Initial Transfers Were Made by a Stockbroker. | 27 |
| 2. | The Alleged Initial Transfers Were Made to a Financial Institution. | 27 |
| 3. | The Alleged Initial Transfers Were "Transfers In Connection With A Securities Contract." | 28 |
| 4. | The Alleged Initial Transfers Were "Settlement Payments." | 28 |
| V. | THE COURT SHOULD DISMISS THE SECTION 548(A)(1)(A) CLAIMS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED. | 28 |
| VI. | THE AMENDED COMPLAINT ESTABLISHES THAT MLBS IS ENTITLED TO THE GOOD FAITH DEFENSE. | 31 |
| A. | MLBS Received the Redemptions for Value. | 31 |
| B. | MLBS Received the Redemptions in Good Faith. | 32 |
| 1. | The facts available to MLBS were not sufficient to put MLBS on inquiry notice (steps 1 and 2). | 33 |
| 2. | More diligent inquiry by MLBS would not have discovered the fraudulent purpose of the transfers (step 3). | 38 |
| C. | The Good Faith Defense is Particularly Warranted For The Preference Claims. | 39 |
| CONCLUSION | | 40 |

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Affiliated FM Ins. Co. v. Kuehne + Nagel, Inc.*,
    328 F. Supp.3d 329 (S.D.N.Y. 2018) .................................................................. 10

*Amidax Trading Grp. v. S. W.I.F.T. SCRL*,
    671 F.3d 140 (2d Cir.2011) ................................................................................ 11

*Anwar v. Fairfield Greenwich Ltd.*,
    286 F.R.D. 258 (S.D.N.Y. 2012) ................................................................... 35, 36

*Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano cnty.*,
    480 U.S. 102 (1987) ...................................................................................... 16, 18

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................................... 11, 22

*Beacon Enters., Inc. v. Menzies*,
    715 F.2d 757 (2d Cir. 1983) ............................................................................... 18

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................................... 22, 25

*Best Van Lines, Inc. v. Walker*,
    490 F.3d 239 (2d Cir. 2007) ............................................................................... 17

*Bos. Trading Grp., Inc. v. Burnazos*,
    835 F.2d 1504 (1st Cir. 1987) ............................................................................ 39

*Bristol-Myers Squibb v. Super. Ct. of Cal.*,
    137 S. Ct. 1773 (2017) .................................................................................. 11, 13

*Charles Schwab Corp. v. Bank of Am. Corp.*,
    883 F.3d 68 (2d Cir. 2018) ........................................................................ 7, 8, 13

*Chirag v. MT Marida Marguerite Schiffahrts*,
    604 F. App'x 16 (2d Cir. 2015) .......................................................................... 11

*Citigroup Inc. v. City Holding Co.*,
    97 F. Supp. 2d 549 (S.D.N.Y. 2000) .................................................................. 17

*Constellation Energy Commodities Grp. v. Transfield ER Cape, Ltd.*,
    801 F. Supp. 2d 211 (S.D.N.Y. 2011) ................................................................ 22

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014) .................................................................................... 8, 10

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Daniel v. Tootsie Roll Indus., LLC*,
17 Civ. 7541 (NRB), 2018 WL 3650015 (S.D.N.Y. Aug. 1, 2018) ..................................... 13

*Davidson v. Honeywell Int'l*,
No. 14 Civ. 3886(LGS), 2015 WL 1399891 (S.D.N.Y. Mar. 26, 2015) .............................. 16

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. (In Re Enron Creditors
Recovery Corp.)*,
651 F.3d 329 (2d Cir. 2011)............................................................................................. 28

*Fairfield Sentry Limited (In Liquidation), v. Citibank, N.A. London*,
No. 19-CV-3911 (VSB), 2022 WL 3644436 (S.D.N.Y. Aug. 24, 2022) ............... 2, 9, 14, 25

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
No. 10-03496, 2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020) .................................. 27

*Fairfield Sentry Ltd., (In Liquidation), et al., v. Theodoor GGC Amsterdam, et al.*,
No. Adv. Pro. No. 10-03496, ECF No. 799-2 (July 19, 2012) ............................................ 19

*Finn v. Alliance Bank*,
860 N.W.2d 638 (Minn. 2015)................................................................................. 29, 30, 31

*Garfinkle v. Conf. on Jewish Material Claims Against Ger., Inc.*,
2020 WL 6323462 (S.D.N.Y. Oct. 28, 2020) ....................................................................... 25

*Gucci Am., Inc. v. Weixing Li*,
768 F.3d 122 (2d Cir. 2014)................................................................................................... 8

*Gundlach v. Int'l Bus. Mach. Corp.*,
No. 11–CV–846, 2012 WL 1520919 (S.D.N.Y. May 1, 2012), aff'd 594 F.
App'x 8 (2d Cir. 2014)............................................................................................................ 8

*Hau Yin To v. HSBC Holdings, PLC*,
No. 15CV3590, 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017), *aff'd* 700 F.
App'x 66 (2d Cir. 2017).................................................................................................. 12, 18

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984)............................................................................................................. 16

*Henry v. City of New York*,
No. 05 CV 6023 (SJ)(RML), 2007 WL 1062519 (E.D.N.Y. Mar. 30, 2007)...................... 36

*Hill v. HSBC Bank plc*,
207 F.Supp.3d 333 (S.D.N.Y. 2016).......................................................................... 12, 14, 17

*In re Bernard L. Madoff Inv. Sec.*, LLC,
440 B.R. 243 (Bankr. S.D.N.Y. 2010) ................................................................................. 29

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*In re Dreier LLP*,
   453 B.R. 499 (Bankr. S.D.N.Y. 2011) .................................................................. 35

*In re Mexican Gov't Bonds Antitrust Litig.*,
   2020 WL 7046837 (S.D.N.Y. Nov. 30, 2020) ....................................................... 16

*In re Morrison*,
   375 B.R. 179 (Bankr. W.D. Pa. 2007) ................................................................. 21

*In re Picard v. BNP Paribas S.A.*, (*In re BLMIS*),
   594 B.R. 167 (Bankr. S.D.N.Y. 2018) ........................................................... passim

*In re Terrorist Attacks on September 11, 2001*,
   714 F.3d 659 (2d Cir. 2013) ................................................................................ 10

*In re Tribune Co. Fraudulent Conv. Litig.*,
   946 F.3d 66, 90 (2d Cir. 2019) ........................................................................... 26

*In re Tribune Co. Fraudulent Conveyance Litig.*,
   No. 11MD2296 (DLC), 2019 WL 1771786 (S.D.N.Y. Apr. 23, 2019), *aff'd*, 10
   F.4th 147 (2d Cir. 2021) ...................................................................................... 4

*In re Unified Com. Cap., Inc.*,
   260 B.R. 343 (Bankr. W.D.N.Y. 2001), *aff'd sub nom. In re Unified Com.
   Cap.*, No. 01-MBK-6004L, 2002 WL 32500567 (W.D.N.Y. June 21, 2002) .......... 29, 30, 31

*Int'l Customs Assocs., Inc. v. Ford Motor Co.*,
   893 F. Supp. 1251 (S.D.N.Y. 1995) .................................................................... 18

*Irving Tr. Co. v. Chase Nat'l Bank*,
   65 F.2d 409 (2d Cir. 1933) ............................................................................ 39, 40

*J. McIntyre Mach., Ltd. v. Nicastro*,
   564 U.S. 873 (2011) ............................................................................................ 16

*Jones v. Nat'l Comms. & Surveillance Networks*,
   266 F. App'x 31 (2d Cir. 2008) ........................................................................... 20

*LaMonica v. CEVA Group PLC (In re CIL Ltd.)*,
   582 B.R. 46 (Bankr. S.D.N.Y. 2018) ................................................................... 18

*Lehigh Val. Indus., Inc. v. Birenbaum*,
   527 F.2d 87 (2d Cir. 1975) ............................................................................ 12, 14

*Lehman Bros. Special Fin. Inc. v. Bank of Am. Nat. Assoc. (In re Lehman Bros.
   Holdings, Inc.)*,
   544 B.R. 16 (Bankr. S.D.N.Y. 2015) ................................................................... 10

**TABLE OF AUTHORITIES**
**(continued)**

                                                                                            **Page(s)**

*Maranga v. Vira,*
   386 F. Supp. 2d 299 (S.D.N.Y. 2005) ............................................................................ 18

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.,*
   138 S. Ct. 883 (2018) .................................................................................................... 26

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.,*
   84 F.3d 560 (2d Cir. 1996) ...................................................................................... 19, 20

*Nicholsen v. Feeding Tree Style, Inc.,*
   No. 12 CIV. 6236 JPO, 2014 WL 476355 (S.D.N.Y. Feb. 6, 2014) .................................... 11

*Nycomed U.S. Inc. v. Glenmark Generics Ltd.,*
   No. 08-CV-5023, 2010 WL 1257803 (E.D.N.Y. Mar. 26, 2010) ...................................... 21

*Pen. Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.,*
   712 F.3d 705 (2d Cir. 2013) .......................................................................................... 25

*Picard v. ABN Amro Bank N.A. (Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv.*
   *Sec. LLC),*
   No. AP 08-01789, 2020 WL 1584491, at  (Bankr. S.D.N.Y. Mar. 31, 2020) ...................... 32

*Picard v. Banque SYZ (In re BLMIS),*
   No. 08-01789, 2022 WL 2135019 (Bankr. S.D.N.Y. 2022) .................................................. 32

*Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC),*
   12 F.4th 171 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard,*
   142 S. Ct. 1209 (2022) ............................................................................................ passim

*Picard v. Estate (Succession) of Doris Igoin (In re BLMIS),*
   525 B.R. 871 (Bankr. S.D.N.Y. 2015) .............................................................................. 10

*Picard v. Fairfield Sentry Limited, et al.,*
   No. 08-01789 (BRL), Adv. Proc. No. 09-01239, ECF No. 23, ¶ 22 ...................................... 5

*Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC),*
   773 F.3d 411 (2d Cir. 2014) ...................................................................................... 27, 28

*Picard v. Shapiro (In re Madoff),*
   542 B.R. 100 (Bankr. S.D.N.Y. 2015) .......................................................................... 23, 24

*Salahuddin v. Cuomo,*
   861 F.2d 40 (2d Cir. 1988) ............................................................................................ 20

*Saltz v. First Frontier, LP,*
   782 F. Supp. 2d 61 (S.D.N.Y. 2010), *aff'd sub nom. Saltz v. First Frontier,*
   *L.P.,* 485 F. App'x 461 (2d Cir. 2012) ............................................................................ 37

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Sapia v. Home Box Off., Inc.*,
    No. 18 CIV. 1317, 2018 WL 6985223 (S.D.N.Y. Dec. 17, 2018)........................................ 26

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    No. 12 MC 115, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ............................................ 26

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    No. AP 08-01789 (SMB), 2020 WL 1584491 (Bankr. S.D.N.Y. Mar. 31,
    2020) ..................................................................................................................................... 35

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*,
    403 F.3d 43 (2d Cir. 2005).................................................................................. 29, 31, 39, 40

*Siddiqui v. Athene Holding Ltd.*,
    806 F. App'x 50 (2d Cir. 2020) ....................................................................................... 9, 14

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*,
    476 B.R. 715 (S.D.N.Y. 2012), *aff'd sub nom. Picard v. Ida Fishman*
    *Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411 (2d
    Cir. 2014) .............................................................................................................................. 27

*Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*,
    277 F.Supp.3d 521 (S.D.N.Y. 2017)...................................................................................... 8

*SPV Osus Ltd. v. UBS AG*,
    882 F.3d 333 (2nd Cir. 2018)............................................................................................... 17

*Stephenson v. Citco Grp. Ltd.*,
    700 F. Supp. 2d 599 (S.D.N.Y. 2010), *aff'd Stephenson*, 482 F. App'x 618 ....................... 37

*Stephenson v. PricewaterhouseCoopers, LLP*,
    768 F. Supp. 2d 562 (S.D.N.Y. 2011), *aff'd,* 482 F. App'x 618 (2d Cir. 2012),
    as amended (June 13, 2012)................................................................................................... 37

*Stoebner v. Opportunity Fin., LLC*,
    909 F.3d 219 (8th Cir. 2018) ................................................................................................ 30

*Sunward Elec., Inc. v. McDonald*,
    362 F.3d 17 (2d Cir. 2004)..................................................................................................... 8

*Tamam v. Fransabank Sal*,
    677 F. Supp. 2d 720 (S.D.N.Y. 2010).................................................................................. 12

*U.S. Philips Corp. v. ATI Techs., Inc.*,
    No. 05CIV.8176, 2008 WL 2073928 (S.D.N.Y. May 8, 2008).............................................. 34

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*U.S. v. Int'l Longshoremen's Association*,
   518 F. Supp. 2d 422 (E.D.N.Y. 2007) ................................................................... 22

*Vasquez v. H.K. & Shanghai Banking Corp. Ltd.*,
   No. 18 CIV. 1876, 2019 WL 2327810 (S.D.N.Y. May 30, 2019) ......................... 13

*Volkswagenwerk AG v. Beech Aircraft Corp.*,
   751 F.2d 117 (2d Cir. 1984) .................................................................................... 8

*Walden v. Fiore*,
   571 U.S. 277 (2014) ........................................................................................ 11, 16

*Waldman v. Palestine Liberation Org.*,
   835 F.3d 317 (2d Cir. 2016) .................................................................................... 7

*Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*,
   543 B.R. 127 (Bankr. S.D.N.Y. 2016) .................................................................... 8

*Youngers v. Virtus Inv. Partners Inc.*,
   No. 15CV8262, 2017 WL 5991800 (S.D.N.Y. Dec. 4, 2017) ............................... 34

*Zim Integrated Shipping Servs. Ltd. v. Bellwether Design Techs. LLC*,
   No. 19-cv-3444, 2020 WL 5503557 (S.D.N.Y. Sept. 10, 2020) ........................... 17

**Statutes**

11 U.S.C. § 548(a)(1)(A) ............................................................................................ 28

11 U.S.C. § 550(a) ...................................................................................................... 23

11 U.S.C. § 550(a)(2) .................................................................................................. 26

11 U.S.C. § 550(b) ...................................................................................................... 31

**Other Authorities**

Merrill Lynch Bank (Suisse SA), D&B Business Directory, *available at*
   https://www.dnb.com/business-directory/company-
   profiles.merrill_lynch_bank_(suisse)_sa.7a4cb8af9f859509f693632260c8418
   b.html ....................................................................................................................... 4

Wright & Miller, 5 Fed. Prac. and Proc. § 1282, at 422 (4th ed. 2021) .................... 20

**Rules**

Fed. R. Civ. P. 9(b) ..................................................................................................... 30

Defendant MLBS,[1] by and through its undersigned counsel, submits this memorandum of law in support of its motion to dismiss the Amended Complaint ("Amended Complaint" or "Am. Compl.,") [ECF No. 115][2] filed by Plaintiff Irving H. Picard ("Trustee"), trustee for the liquidation of BLMIS and the substantially consolidated estate of Bernard L. Madoff, under Federal Rules of Civil Procedure (the "Rules") 12(b)(2) and 12(b)(6), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7012.

## PRELIMINARY STATEMENT

MLBS was never a direct investor in BLMIS. Instead, MLBS bought shares in the Fairfield Funds and Fairfield, in turn, entrusted most of its money to BLMIS. In fact the Trustee does not allege that MLBS invested on its own behalf, vaguely asserting that "MLBS would act as agent for its customers" in connection with investments in the Fairfield Funds. Am. Compl. ¶ 33. MLBS and, in turn, its customers were left with significant losses when BLMIS' Ponzi scheme came to light and both BLMIS and the Fairfield Funds collapsed. Despite these losses, the Trustee demands MLBS and its customers forfeit all redemptions from the Funds, which would result in them losing every single dollar they invested in the funds even if they did not receive offsetting redemptions. The Amended Complaint provides no basis to support that extreme and inequitable result.

The transfers the Trustee seeks to avoid all took place outside of the United States, among non-United States entities. The Trustee does not allege that MLBS—a Swiss bank—is subject to general jurisdiction in the United States. And the Amended Complaint pleads no facts about the transfers that would give rise to specific jurisdiction: the Trustee concedes MLBS invested in, and

---

[1] Capitalized terms not otherwise defined shall have the same meaning as in the Amended Complaint. "Covucci Decl." refers to the Attorney Declaration of Amber L. Covucci in Support of Defendant Merrill Lynch Bank (Suisse) SA's Motion to Dismiss, filed with this brief.

[2] Unless otherwise noted, references to "ECF No. __" refer to Adv. Proc. No. 11-02910 (Bankr. S.D.N.Y.). Unless otherwise noted, internal citations and quotation marks in case references are omitted.

redeemed shares from, two British Virgin Islands hedge funds. The Trustee cites, but does not

attach to the Amended Complaint, agreements it alleges support specific jurisdiction: subscription

agreements between MLBS and the Funds and a Customer Agency and Shareholder Services

Agreement Relating to the Private Placement of Funds between MLBS and the Funds (the

"Customer Agency Agreement"). The Southern District of New York recently affirmed that

subscription agreements with the Funds cannot give rise to personal jurisdiction.[3] The same

reasoning applies to the Customer Agency Agreement, because the Trustee does not allege that

agreement has anything to do with redemptions. Numerous courts have also held that allegations

similar to the Trustee's other allegations—MLBS's customer claims, MLBS's limited

communications with Fairfield, MLBS's New York correspondent bank account, and the Fairfield

Funds' investments in BLMIS—are insufficient to establish specific jurisdiction. Exercising

personal jurisdiction over MLBS, a foreign entity, based on entirely foreign transactions would be

unreasonable and contrary to both this Circuit's precedent and due process requirements. The

Amended Complaint should be dismissed for that reason alone.

The Amended Complaint also fails because it does not comply with Rule 8(a)'s

requirement that a complaint contain a "short and plain state statement of the claim showing that

the pleader is entitled to relief." To support its allegations that the initial transfers from BLMIS to

Sentry were avoidable—an essential element of the subsequent transfer claims against MLBS—

the Trustee purports to incorporate by reference a 105 page complaint, attaching 23 exhibits, in an

entirely separate action to which MLBS is not even a party.[4] Rule 8(a) forbids the Trustee from

taking such opaque and confusing pleading shortcuts.

---

[3] *Fairfield Sentry Limited (In Liquidation) v. Citibank, N.A. London*, No. 19-CV-3911 (VSB), 2022 WL 3644436, at *11–12 (S.D.N.Y. Aug. 24, 2022).
[4] Am. Compl. ¶ 74 (incorporating *Picard v. Fairfield Sentry Ltd., et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 09-1239 ECF No. 286 (the "Fairfield Second Amended Complaint"))

Further, the Amended Complaint does not sufficiently allege that the subsequent transfers to MLBS contained BLMIS customer property. The Amended Complaint makes the conclusory allegations that the total sum transferred to MLBS includes: "(a) $42,980,708 fraudulently transferred by BLMIS to Fairfield Sentry and then subsequently transferred to MLBS; and (b) $1,913,567 fraudulently transferred by BLMIS to Fairfield Sentry, then subsequently transferred from Fairfield Sentry to Fairfield Sigma, and then subsequently transferred from Fairfield Sigma to MLBS." Am. Compl. ¶ 2. But the Trustee makes no attempt to trace the funds from BLMIS to the Fairfield Funds to MLBS. This is not a mere formality: the Trustee has acknowledged that the Fairfield Funds at times used customers' subscription fees to pay other customers' redemptions, so at least some redemptions never came from BLMIS property at all. In fact, the Trustee seeks to recover roughly $2 billion more from subsequent transferees of Sentry than it alleges BLMIS transferred to Sentry in the first place. The Trustee's allegations are not simply implausible, but mathematically impossible.

Further, under prior judgments of this Court, the District Court, and the Second Circuit, Bankruptcy Code section 546(e)'s safe harbor applies to the Trustee's claims for redemptions other than intentional fraudulent conveyance subject to 548(a)(1)(A). BLMIS is a "stockbroker" and Sentry a "financial institution" within the meaning of section 546(e); the transfers were made in connection with Sentry's accounts with BLMIS, a "securities contract"; and BLMIS's redemption payments to its customers constitute "settlement payments." The intentional fraudulent conveyance claims similarly fail, because the Amended Complaint does not plead any specific facts showing that the initial transfers were made with "intent to defraud."

Even if the Trustee had made a prima facie showing of both jurisdiction and the elements of his fraudulent conveyance and preference claims, which he has not, the Amended Complaint

3

demonstrates an additional reason to dismiss: MLBS is entitled to the good faith defense under 11 U.S.C. § 550(b). The Amended Complaint does not argue, and the facts do not support, that MLBS should have suspected and investigated one of the largest frauds in history—a fraud that the entire banking industry and even the SEC failed to detect for decades. The Amended Complaint does not plead that MLBS knew of the scheme or any facts that could have put it on inquiry notice, nor that it could have discovered the scheme even with further diligence. Most powerfully, MLBS's investment in the Funds belies that notion. MLBS lost money on BLMIS's scheme and has filed customer claims to recoup those losses, as the Trustee acknowledges. Compounding MLBS's losses by clawing back its remaining principal would be contrary to the facts and the law. The Amended Complaint should be dismissed in its entirety.

## BACKGROUND

### A.    MLBS

At all times relevant to this litigation, MLBS was a société anonyme based in Geneva, Switzerland. *See* Am. Compl. ¶ 12. MLBS's place of incorporation and principal place of business was Geneva, Switzerland. *Id.*; Covucci Decl. Ex. F at 1.[5] MLBS's principal business was to act as a private bank. *Id.* MLBS offered wealth management services to its clients, which involved holding and investing funds on its clients' behalf.[6] *See* Am. Compl. ¶ 33 ("MLBS would act as agent for its customers [when investing in the Funds] in exchange for fees."); Covucci Decl. Ex. F (MLBS operated "a bank mainly active in the field of wealth management.").

MLBS was merged into Bank Julius Baer & Co. Ltd ("BJB") on May 31, 2013. *Id.* BJB is headquartered in, and its principal place of business is, Zurich, Switzerland. Am Compl. ¶ 13.

---

[5] This Court may take judicial notice of "relevant matters of public record." *In re Tribune Co. Fraudulent Conveyance Litig.*, No. 11MD2296 (DLC), 2019 WL 1771786, at *5 (S.D.N.Y. Apr. 23, 2019), *aff'd*, 10 F.4th 147 (2d Cir. 2021).
[6] Merrill Lynch Bank (Suisse SA), D&B Business Directory, *available at* https://www.dnb.com/business-directory/company-profiles.merrill_lynch_bank_(suisse)_sa.7a4cb8af9f859509f693632260c8418b.html.

4

B.    **The Funds**

Sentry and Sigma (together, the "Funds") are hedge funds based in the British Virgin Islands (BVI). Am. Compl. ¶ 3. Sentry maintained customer accounts at BLMIS and was one of BLMIS's sources of investor principal, and Sigma was entirely invested in Sentry. *Id*. On July 21, 2009, the Eastern Caribbean Supreme Court in the High Court of Justice of the British Virgin Islands placed both Funds in liquidation. *Id*; *Picard v. Fairfield Sentry Limited, et al.*, No. 08-01789 (BRL), Adv. Proc. No. 09-01239, ECF No. 23, ¶ 22.

The Trustee filed a complaint against, and eventually settled with, the Liquidators of Sentry and Sigma. *See* Covucci Decl. Ex. A (Fairfield Am. Compl.); *Id* Ex. B (the "Fairfield Settlement Agreement"). The parties stipulated to the entry of a judgment in favor of the BLMIS Estate (of approximately $3 billion for Sentry and approximately $750 million for Sigma). *See* Fairfield Settlement Agreement, at 4. The Fairfield Settlement Agreement provided for cooperation and information sharing between the joint liquidators for the Funds and the Trustee concerning, *inter alia*, claims against parties that redeemed shares from Sentry and Sigma. *See id*. ¶ 14. Under that Agreement, the Trustee has had access to the Funds' books and records for well over a decade. *Id.*

C.    **The Amended Complaint and Related Proceedings**

The Trustee filed the initial complaint on November 22, 2011. On consent, the Trustee filed an Amended Complaint more than a decade later on October 7, 2022.

The Trustee relies upon, but does not attach, agreements between MLBS and the Funds for the Amended Complaint's core factual allegations. The Amended Complaint alleges MLBS entered into subscription agreements governing the terms of MLBS's investments with the Funds. Am. Compl. ¶ 19. It alleges the subscription agreements are governed by New York law and include an agreement to jurisdiction in New York. *Id*. But the Trustee does not attach those agreements to the Amended Complaint, quote the provisions on which it relies, or even include

5

basic information about them such as the dates and amounts of the subscriptions. Further, the Amended Complaint suggests MLBS and Fairfield Greenwich Group ("FGG") entered into a Customer Agency Agreement. *Id* ¶ 33. It alleges the agreement provided that FGG would make shares in the Funds available to MLBS customers, and "MLBS would act as an agent for its customers in exchange for fees." *Id.* It also states that the agreement was governed by New York law. *Id*. But just as for the subscription agreements, the Trustee does not attach the Customer Agency Agreement, quote it, or provide even the most basic information about it such as the date.

Moreover, despite having access to the Funds' books and records for over a decade, (*supra* Background Sec. B), the Amended Complaint does not provide the date or amount of any single investment in the Funds. In fact, it is not clear whether MLBS itself invested in the Funds on its own behalf, or whether MLBS's customers (whose identities are protected by Swiss bank secrecy laws) were the actual investors. Rather, the Amended Complaint generally alleges that MLBS invested in the Funds "through Merrill Lynch's Global Private Client Group" and does not clarify how such transactions took place or even if MLBS (as opposed to MLBS's customers) made *any* direct investments in the Funds. Am. Compl. ¶¶ 7, 33.

The Amended Complaint also makes generalized allegations about the Merrill Lynch corporate family. It broadly alleges that "Merrill Lynch was an integrated organization, [whose] umbrella groups . . . share[d] knowledge across the organization," without addressing the relationship between any particular Merrill Lynch entities, or stating what information, if any, other Merrill Lynch entities shared with MLBS. *Id.* ¶ 16.

The Trustee seeks to recover at least $44,894,275 that MLBS (or its customers) allegedly received from the Funds. *Id*. ¶ 2. The Trustee alleges that MLBS's redemptions from Sentry are avoidable because $42,980,708 of BLMIS's initial transfers to Sentry was subsequently transferred

to MLBS to fund its redemptions. *Id* . Similarly, the Amended Complaint alleges that MLBS's redemption of $1,913,567 from Sigma is avoidable because it was derived from payments from BLMIS to Sentry, subsequently transferred to Sigma, and finally to MLBS. *Id.* However, despite having had access to Sentry's books and records for more than a decade and ample time to investigate, the Trustee does not specifically trace any of the MLBS redemptions to BLMIS. Rather, the Trustee attaches an exhibit comprising seventy-three pages listing thousands of transactions between BLMIS and Sentry. *See Id* Exs. A, B. The exhibits show that the payments were made from BLMIS bank accounts designated for the benefit of Sentry. *Id.*

The Amended Complaint similarly contains no specific allegations about the initial transfers from BLMIS to Sentry; rather, it purports to incorporate by reference the allegations of the Fairfield Second Amended Complaint in the Trustee's case against various parties related to the Funds. *Id*. ¶ 86. MLBS is not a party to the Fairfield Second Amended Complaint and the Trustee does not identify which allegations or paragraphs it intends to incorporate by reference.

The Fairfield Second Amended Complaint broadly alleges that BLMIS's operations were characterized by secrecy and a lack of transparency. *See* Covucci Decl. Ex. C. It also alleges that the Fairfield Funds lied to clients and the SEC about BLMIS. *Id* ¶¶ 5–10, 166, 236–262; *Infra* Sec. VI.B.2.

## ARGUMENT

### I.    THE AMENDED COMPLAINT SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION UNDER RULE 12(B)(2)

The Trustee bears the "burden of establishing jurisdiction over the defendant." *Waldman v. Palestine Liberation Org*., 835 F.3d 317, 334 (2d Cir. 2016). At the motion to dismiss stage, the Trustee "must make a prima facie showing that jurisdiction exists" consistent with due process. *Charles Schwab Corp. v. Bank of Am. Corp*., 883 F.3d 68, 81 (2d Cir. 2018). "Such a showing

entails making legally sufficient allegations of jurisdiction, including an averment of facts that, if

credited[,] would suffice to establish jurisdiction over the defendant." *Id.* Jurisdiction must be

established as to each specific claim asserted in the action. *See Sonterra Cap. Master Fund Ltd. v.

Credit Suisse Grp. AG*, 277 F.Supp.3d 521, 586 (S.D.N.Y. 2017) (citing *Sunward Elec. Inc. v.

McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)).

### A.    The Court lacks general jurisdiction over MLBS

MLBS is not subject to the Court's general jurisdiction. A party is subject to general

personal jurisdiction only when it is essentially "at home" in the forum by virtue of its place of

incorporation or principal place of business. *See, e.g., Daimler AG v. Bauman*, 571 U.S. 117, 136–

37 (2014); *see also Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014) (court had no

general jurisdiction over Bank of China, which had New York offices but was "incorporated and

headquartered elsewhere" and conducted only a small portion of its business in the forum.). It is

undisputed that BJB's principal place of business has never been in the United States, nor did

MLBS have its principle place of business in the United States. *See*  Am. Compl. ¶ 12–13; Covucci

Decl. Ex. F. And jurisdiction cannot arise from the mere existence of corporate affiliates in the

United States. *See Volkswagenwerk AG v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984)

("presence of a local corporation does not create jurisdiction over a related, but independently

managed, foreign corporation"); *accord Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 543

B.R. 127, 141 (Bankr. S.D.N.Y. 2016), *Gundlach v. Int'l Bus. Mach. Corp.*, No. 11–CV–846, 2012

WL 1520919, at *9 (S.D.N.Y. May 1, 2012), *aff'd* 594 F. App'x 8 (2d Cir. 2014).

B.    **MLBS did not consent to personal jurisdiction in New York.**

1.    **MLBS did not consent to personal jurisdiction by entering into subscription agreements governed by New York law.**

As the District Court for the Southern District of New York recently affirmed, allegations like those in the Amended Complaint that MLBS "entered into subscription agreements [with the Funds] that were governed by New York law and included agreements to submit to venue in New York and the jurisdiction of the New York courts," cannot give rise to personal jurisdiction. Am Compl. ¶ 19; *Citibank,* 2022 WL 3644436, at *11–12. The subscription agreements govern MLBS's *investments* with the funds, but the Amended Complaint is based on *redemptions.* In *Citibank,* the District Court affirmed this Court's holding that, because the Funds' subscription agreements do not govern redemption payments, "the forum selection clause [in the subscription agreements] cannot establish the Bankruptcy Court's personal jurisdiction" over claims arising from redemptions. 2022 WL 3644436, at *11–12.; *see also Siddiqui v. Athene Holding Ltd*., 806 F. App'x 50, 53 (2d Cir. 2020) (forum selection clause inapplicable where claims did not relate to the contract containing the clause). That logic applies equally to the Trustee's allegation that MLBS entered into the Customer Agency Agreement "governed by New York law." Am. Compl. ¶ 33. The Trustee's allegation about the Customer Agency Agreement makes personal jurisdiction even more attenuated, because MLBS invested only as an agent for customers, not on its own behalf. And based on the Trustee's vague allegations about that agreement—which is not attached to the Amended Complaint—it, like the subscription agreements, does not govern redemptions. *Id*. It is therefore inapplicable to the claims in the Amended Complaint, which are based on alleged redemptions. *See Citibank,* 2022 WL 3644436, at *11–12.

Moreover, the Trustee has not alleged that it is a party to the subscription agreements or the Customer Agency Agreement and thus cannot invoke those agreements' forum selection

9

clauses. *See Affiliated FM Ins. Co. v. Kuehne + Nagel, Inc.*, 328 F. Supp.3d 329, 338–39 (S.D.N.Y. 2018) (forum selection clause unenforceable by parties not subject to it).

> ### 2.    By filing customer claims, MLBS did not submit to jurisdiction before this Court for anything other than claims adjudication.

The Trustee also alleges MLBS "invoke[ed] the jurisdiction of this Court" by filing customer claims with the Trustee. Am. Compl. ¶ 38. This is a red herring. As an initial matter, the Trustee once again fails to describe, quote, or attach the alleged customer claims despite presumably having access to them for over a decade. Even if the Trustee had adequately substantiated its allegations regarding the customer claims, the claims would not establish jurisdiction. Filing a claim subjects the claimant to the court's jurisdiction only for purposes of adjudicating that claim. *See Picard v. Estate (Succession) of Doris Igoin (In re BLMIS)*, 525 B.R. 871, 888 (Bankr. S.D.N.Y. 2015) (where an "adversary proceeding d[id] not implicate the claims allowance process," parties "did not subject themselves to personal jurisdiction with respect to the Trustee's fraudulent transfer action by filing SIPA claims"); *Lehman Bros. Special Fin. Inc. v. Bank of Am. Nat. Assoc. (In re Lehman Bros. Holdings, Inc.)*, 544 B.R. 16, 34-36 (Bankr. S.D.N.Y. 2015) (filing a claim constitutes "submission to the jurisdiction of the Court only with respect to litigation concerning the claims allowance process"). Because the Amended Complaint has nothing to do with adjudication of any customer claim of MLBS, this allegation is irrelevant to personal jurisdiction.

> ### C.    The Court lacks specific jurisdiction over MLBS.

In the absence of general jurisdiction, the Trustee must plead facts supporting specific jurisdiction. *See Daimler AG*, 571 U.S. at 136–37. To do so, the Trustee must assert (1) the claims arise out of MLBS's sufficient "minimum contacts" with New York and (2) "the exercise of jurisdiction is reasonable in the circumstances." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d

659, 673 (2d Cir. 2013). The minimum contacts inquiry focuses on "the relationship among the defendant, the forum, and the litigation," which "must arise out of contacts that the defendant himself creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014); *see also Bristol-Myers Squibb v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1781 (2017) (no personal jurisdiction where "a connection between the forum and *the specific claims at issue*" was missing). "A prima facie case requires non-conclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place." *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19 (2d Cir. 2015). The Trustee has failed to meet this burden.

### 1. Vague and conclusory allegations cannot support jurisdiction

When assessing jurisdiction "the court need not accept '[t]hreadbare recitals of the elements of [jurisdiction] which are essentially legal conclusions." *Nicholsen v. Feeding Tree Style, Inc.*, No. 12 CIV. 6236 JPO, 2014 WL 476355, at *1 (S.D.N.Y. Feb. 6, 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Amidax Trading Grp. v. S. W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir.2011) (applying plausibility standard to facial attack on subject matter jurisdiction)).

The Trustee's blanket allegations that MLBS "purposely availed itself of the laws and protections of the United States and the state of New York by undertaking significant commercial activities in New York," "knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York," and "maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims" are no more than a recitation of the jurisdictional test. Am. Compl. ¶¶ 17–18. The Amended Complaint is devoid of any detail regarding the "business" or "commercial activities" allegedly conducted by MLBS "in New York" and is not even clear on whether MLBS or its customers were the ultimate investors in the Funds. Such generalized, boilerplate allegations are insufficient to establish jurisdiction where there "are no allegations of specific facts which would

11

connect [MLBS] with any New York activity." *Lehigh Val. Indus., Inc. v. Birenbaum*, 527 F.2d 87, 93–94 (2d Cir. 1975); *see also Lyondell*, 543 B.R. at 137 ("conclusory allegations are not enough to establish personal jurisdiction.").

### 2.    Maintenance of a New York bank account for Sentry redemptions is insufficient to establish jurisdiction.

The Amended Complaint's allegations that MLBS used New York bank accounts (*see* Am. Compl. ¶ 21) are similarly insufficient to confer personal jurisdiction on this Court. *See Hau Yin To v. HSBC Holdings, PLC*, No. 15CV3590, 2017 WL 816136, at *6 (S.D.N.Y. Mar. 1, 2017), *aff'd* 700 F. App'x 66 (2d Cir. 2017) (transmission of information and funds "to and from BLMIS . . . [as an] incidental consequence[] of fulfilling a foreign contract" did not establish jurisdiction); *Hill v. HSBC Bank plc*, 207 F.Supp.3d 333, 339-340 (S.D.N.Y. 2016) (such transmissions did "not amount to 'purposeful availment' of the laws of" the forum or "project" defendants into New York); *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 727 (S.D.N.Y. 2010) ("Courts in this district have routinely held that merely maintaining a New York correspondent bank account is insufficient to subject a foreign bank to personal jurisdiction.") (collecting cases)).

Amazingly, although the Trustee had access to Sentry's records for over 10 years, including information about the relevant transfers, the Amended Complaint does not specify which of the relevant redemption payments were received by MLBS and/or its customers in a New York bank account. *See* Am. Compl., Exs. C, E (listing transfers from the Funds to MLBS, but omitting bank account information). Nor does the Amended Complaint indicate who allegedly decided to transfer redemption funds to a New York bank account. The Amended Complaint simply avers that MLBS received "most of its redemption payments for the BLMIS transactions from its bank account . . . at Northern Trust International Banking Corp. in New York." Am. Compl. ¶ 21. The Amended Complaint also vaguely alleges that the "Bank of New York received $2,413,304 for MLBS in

12

redemption payments for the BLMIS transactions." *Id*. But the Trustee does not indicate who

owned that account, which (if any) of the redemptions it seeks to recover were deposited there, or

how (if at all) MLBS or its customers used that account. The Amended Complaint is similarly

devoid of detail about the Merrill Lynch "house account" that allegedly held some "Sentry shares

in MLBS's name." *Id* ¶ 22. Thus the Trustee fails to connect the allegations about MLBS's alleged

maintenance of a New York bank account to the claims at issue, falling short of the Trustee's

obligation to establish jurisdiction with respect to each of the subsequent transfers. *See Picard v.*

*BNP Paribas S.A.*, (*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Each transfer is a

separate claim . . . and the Trustee must establish the court's jurisdiction with respect to each claim

asserted."); *accord Bristol-Myers Squibb*, 137 S. Ct. at 1781; *Charles Schwab Corp. v. Bank of*

*Am. Corp*., 883 F.3d at 83; *Daniel v. Tootsie Roll Indus., LLC*, 17 Civ. 7541, 2018 WL 3650015,

at *8 (S.D.N.Y. Aug. 1, 2018).

Worse, the Trustee does not specify who ultimately received the redemptions. The Trustee

alleges MLBS acted as agent for its customers, who invested in the Funds. Am. Compl. ¶ 33. But

the Amended Complaint is unclear on whether the redemption payments were received by MLBS

on its own behalf or as agent for its customers. Thus, MLBS may have received funds in a New

York bank account solely in its role as agent for its clients, further attenuating any connection

between MLBS and this forum. Without details of each redemption, including how and to what

extent a correspondent bank account came to be used in the transactions at issue, the allegation

that MLBS used a correspondent back account cannot establish jurisdiction. *See Vasquez v. H.K.*

*& Shanghai Banking Corp. Ltd.*, No. 18 CIV. 1876, 2019 WL 2327810, at *12 (S.D.N.Y. May 30,

2019) (Court could not find jurisdiction without information on: "(1) whether the use of the

correspondent account is cheaper or easier for the foreign bank than other alternatives; (2) how

13

often the correspondent account was used on behalf of the specific customer at issue; (3) the amount of money transferred through the account on behalf of that customer; and (4) the extent to which the customer specifically requested the use of the correspondent account.").

The Trustee also alleges that MLBS agreed, through the subscription agreements, that "all subscription payments from MLBS to [] Sentry were required to be made in U.S. dollars and sent to [] Sentry's HSBC bank account, located in New York," and MLBS directed funds to that account "in connection with its investments in [] Sentry." Am. Compl. ¶ 20. As explained in section I.B.I, the subscription agreements are irrelevant to whether the Court has personal jurisdiction over this action arising from MLBS's redemptions. *Citibank*, 2022 WL 3644436, at *11; *Siddiqui*, 806 F. App'x at 53. To the extent that the subscription agreements have any relevance at all, they show only that Sentry—not MLBS—requested that redemptions be made in U.S. dollars through a New York bank account and therefore are not evidence that MLBS intentionally created contact with New York. *See Hill*, 207 F.Supp.3d at 339-340 (transmission of funds to and from BLMIS were "incidental consequences of fulfilling a foreign contract" which did not establish jurisdiction).

### 3.    MLBS's investments in the Funds do not establish jurisdiction.

MLBS's investments with the Funds do not amount to sufficient connections with New York to establish jurisdiction. The Amended Complaint makes conclusory and unsupported allegations that MLBS "knowingly directed funds to be invested with" BLMIS through the Funds, "knew and intended that FGG would invest MLBS's money with BLMIS in New York," and knew, by investing with Sentry, its "investments were ultimately being directed to BLMIS in New York." Am. Compl. ¶¶ 17, 28, 34. These statements cannot support personal jurisdiction without "allegations of specific facts" to support them. *Lehigh Val. Indus.*, 527 F.2d at 93–94. And these conclusory allegations are particularly unavailing if MLBS was simply placing investments at the behest of its customers; in that case, it is the customer's—not MLBS's —intent that is relevant.

14

The only support for these claims in the Amended Complaint comes from vague allegations about MLBS's knowledge purportedly gleaned from documents received from the Funds. But MLBS received those documents—including tear sheets, semi-annual update letters, weekly fund reports and monthly fund reports—*only after* its initial investment. Am. Compl. ¶¶ 30, 25. The Trustee alleges that, on the basis of documents received from the Funds, MLBS was aware that "Sentry invested substantially all of its assets with New York-based BLMIS," "BLMIS was the executing broker for the Fairfield Funds' investments," and "BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and Treasury Bills," and decisions on purchasing securities "were made by BLMIS in New York." *Id.* ¶¶ 31. But despite his obligation to establish jurisdiction over each subsequent transfer, the Trustee does not allege that MLBS received these documents before any particular investment, or explain when "MLBS knew [of the alleged] facts indicating that they were transacting business in New York in connection with their investments in the Fairfield Funds." *Id.*; *BNP Paribas*, 594 B.R. at 190; *supra* at 13.

With respect to Sigma specifically, the Trustee does not allege that MLBS knew Sigma invested substantially all of its assets in Sentry, let alone that MLBS's investments in Sigma would subsequently be transferred to BLMIS through Sentry. The Trustee simply alleges that "Fairfield Sigma was 100% invested in Fairfield Sentry" and the "Fairfield Sigma PPM contained similar representations regarding the SSC strategy and BLMIS's role as investment advisor, executing broker, and custodian." Am. Compl. ¶¶ 3, 27. Notably, the Trustee does not even allege that MLBS read or received a copy of the Fairfield Sigma PPM. Those allegations fall far short of suggesting that MLBS knew that Sigma would necessarily invest in BLMIS in New York.

At its core, the Amended Complaint conflates the *Funds'* actions with the actions of *MLBS*. But Supreme Court precedent forbids jurisdiction premised on the acts of an intermediary. *See*

*Walden*, 571 U.S. at 289. To hold otherwise would "impermissibly allow[] a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Id.*;*see also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984) ("unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction.") (collecting cases); *Asahi Metal Indus. Co., Ltd. v. Sup. Ct of Cal., Solano Cnty.*, 480 U.S. 102, 112 (1987) ("[A] finding of minimum contacts [for personal jurisdiction] must come about by an action of the defendant purposefully directed toward the forum.").

And MLBS's contact with New York is even more remote if, as the Trustee suggests, MLBS received the redemptions as agent for its customers. *Id.* ¶ 33. In that case, MLBS's customers acted through MLBS (in Switzerland) to invest with the Funds (two BVI entities), which in turn made investments with BLMIS (in New York). That attenuated contact is a far cry from the "purposeful availment" required to establish jurisdiction. *Asahi Metal Indus.*, 480 U.S. at 112.

Finally, the law does not support the Trustee's expansive view that an investment company can sue its investors in any jurisdiction where that investment company itself decides to make investments. That is nothing more than the "stream of commerce" theory of personal jurisdiction rejected by the Supreme Court. *See J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882, 886 (2011) ("[I]t is not enough that [a] defendant might have predicted that its goods will reach the forum," rather the defendant must "engage[] in conduct purposefully directed at [the forum]."); *In re Mexican Gov't Bonds Antitrust Litig.*, 2020 WL 7046837, at *3-4 (S.D.N.Y. Nov. 30, 2020) (neither an attempt to profit from conduct underlying the claim nor foreseeability of a harm in the forum were sufficient to establish jurisdiction in the absence of a defendant's contact with forum); *Davidson v. Honeywell Int'l*, 2015 WL 1399891, at *3 (S.D.N.Y. Mar. 26, 2015) (merely placing

16

goods into the stream of commerce "does not establish purposeful availment" because the defendant must "purposefully direct[]" conduct toward the forum).

#### 4. Communications with FGG in New York do not establish jurisdiction.

The Trustee's vague allegations that MLBS communicated with FGG cannot support jurisdiction as there are no facts tying those communications to the relevant redemptions. The Trustee alleges vaguely that those communications concerned MLBS's "investments," "questions from MLBS representatives concerning BLMIS's trading activities and responses from FGG with information concerning strategy reviews and tear sheets," and "retrocession fees payable to MLBS based on its Fairfield investments." Am. Compl. ¶ 29. But the Trustee does not suggest the communications related to the redemptions, the subject matter of the Amended Complaint. Any communications thus lack the nexus required to support jurisdiction. *See Zim Integ. Shipping Servs. Ltd. v. Bellwether Design Techs. LLC*, No. 19-cv-3444, 2020 WL 5503557, at *5 (S.D.N.Y. Sept. 10, 2020) (New York contacts "generally involving [defendant's] business" did not support jurisdiction where they did not "give rise to [Plaintiff's] cause of action"); *accord Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 564 (S.D.N.Y. 2000), *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 253 (2d Cir. 2007).

Even if the Trustee explained how MLBS's communications with FGG were relevant to the claims at issue, they would still be insufficient to establish jurisdiction. As the Second Circuit held in *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 345 (2nd Cir. 2018) a "handful of communications and transfer of funds . . . are insufficient to allow the exercise of specific personal jurisdiction over [Foreign] Defendants". *See also, e.g., Hill*, 207 F. Supp. 3d 333, 339–40 (allegations that foreign defendants "communicated with and transmitted information and funds to and from BLMIS

17

located in New York" were "insufficient to 'project' the Foreign Defendants into New York");

*Hau Yin To*, 2017 WL 816136, at *6 (same.).[7]

### D.    Exercise of Jurisdiction Over MLBS Would Not Comport With Due Process.

Even if the Trustee established that MLBS had sufficient contacts to enable this Court to

exercise personal jurisdiction, which it has not, this Court would still have to find the exercise of

jurisdiction reasonable under the circumstances. *Terrorist Attacks on September 11, 2001*, 714

F.3d at 673; *see also Waldman*, 835 F.3d at 331. When evaluating the reasonableness of personal

jurisdiction, courts assess: "(1) the burden that the exercise of jurisdiction will impose on the

defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in

obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining

the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering

social substantive policies." *LaMonica v. CEVA Group PLC (In re CIL Ltd.)*, 582 B.R. 46, 79

(Bankr. S.D.N.Y. 2018); *Asahi Metal Indus.*, 480 U.S. at 113. Where a defendant's connections

with the forum are weak, the bar for showing reasonableness is high. *LaMonica,* 582 B.R. at 79

("the weaker the plaintiff's showing on minimum contacts, the less a defendant needs to show in

terms of unreasonableness to defeat jurisdiction").

The Trustee relies on the most incidental of contacts to establish jurisdiction. *See supra*

Sec. I.C. The Trustee must therefore make a *stronger showing* that exercise of jurisdiction would

be reasonable. But the relevant factors weigh *against* jurisdiction. *First*, forcing MLBS to defend

a suit in the United States would impose a substantial burden on MLBS. Cross-border discovery

---

[7] More generally, "'New York courts have consistently refused to sustain section 302(a)(1) jurisdiction solely on the basis of defendant's communication from another locale with a party in New York.'" *Maranga v. Vira*, 386 F. Supp. 2d 299, 306 (S.D.N.Y. 2005) (quoting *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 766 (2d Cir. 1983)); *see also, e.g., Int'l Customs Assocs., Inc. v. Ford Motor Co.*, 893 F. Supp. 1251, 1261 (S.D.N.Y. 1995) ("Telephone calls and correspondence sent into New York, by a non-domiciliary defendant who is outside New York, generally are insufficient to establish personal jurisdiction.") (collecting cases).

18

would be particularly burdensome as the Amended Complaint is wholly concerned with the

activities of entities and actors who are not present in the United States. S*upra* at 4–5. MLBS is a

Swiss entity, and discovery of documents in the United States would involve cross-border

discovery issues, implicating foreign laws. *See* Bench Ruling Granting in Part and Denying in Part

the Foreign Reps. Mot. Seeking Limited Relief, *Fairfield Sentry Ltd., (In Liquidation), et al., v.

Theodoor GGC Amsterdam, et al.*, No. Adv. Pro. No. 10-03496, ECF No. 799-2 (July 19, 2012)

("The various respondents have described . . . the strong and undeniable interest of many nations

in enforcing their banking secrecy laws. Thus, yielding to the Foreign Representative's Disclosure

Request implicates the significant bank customer confidentiality laws of no fewer than 30

countries."). In addition to the foreign law concerns, cross-border discovery would impose

financial and logistical burdens on MLBS as "none of [MLBS's] records, files, or witnesses with

information about the litigation are located" in the United States. *Metro. Life Ins. Co. v. Robertson-

Ceco Corp.*, 84 F.3d 560, 574 (2d Cir. 1996).

The *second* and *third* factors—respectively, the United States' interest and the availability

of a more appropriate forum elsewhere—are closely related and both weigh against the exercise

of jurisdiction here. The dispute concerns a foreign defendant and "transaction[s] that took place

almost entirely outside of the United States." *LaMonica*, 582 B.R. at 80. The United States' interest

in adjudicating this transaction is thus minimal at best. And effective relief is available to the

Trustee where the transactions *did* occur, including in Switzerland. Convenience to the Trustee

alone cannot tip the balance in favor of an exercise of jurisdiction. *Id.* at 80 ("While there is

undoubtedly an interest in the plaintiff obtaining convenient and effective relief, the dismissal . . .

based on lack of personal jurisdiction does not mean that the Trustee would not be able to continue

this Adversary Proceeding and ultimately obtain effective relief.").

*Finally*, forcing cross-border discovery involving records dating back at least 19 years, predominately located on the other side of the Atlantic, would place a heavy burden on MLBS and witnesses. *See* Am. Compl., Exs. C, E (listing transfers from the Funds to MLBS dating back to 2003). This is particularly so if, as the Amended Complaint suggests, MLBS invested in the Funds on behalf of its clients in Switzerland. Am. Compl. ¶ 33. Efficient resolution of this case is better served by adjudication in a Swiss Court, where the majority of the witnesses and records implicated by the Amended Complaint lie. *See Metro Life Ins*., 84 F.3d at 574 (in evaluating the efficient resolution of the case, courts "generally consider where witnesses and evidence are likely to be located"). This factor weighs heavily against the exercise of jurisdiction. *LaMonica*, 582 B.R at 80 (jurisdiction unreasonable where litigation involved "mostly foreign defendants over a transaction that took place almost entirely outside of the United States"). These factors compel a finding that jurisdiction would be unreasonable.

## II.      THE AMENDED COMPLAINT FAILS TO CONTAIN A "SHORT AND PLAIN STATEMENT OF THE CLAIM" IN VIOLATION OF RULE 8(A)(2)

Even if jurisdiction is established, the Amended Complaint fails because it lacks "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2) ("Rule 8"). Rule 8 is intended to avoid "plac[ing] an unjustified burden on the [Court] and the party who must respond to it because they are forced to ferret out the relevant material from a mass of verbiage." Wright & Miller, 5 Fed. Prac. and Proc. § 1282, at 422 (4th ed. 2021). When a complaint fails to comply with the "short and plain" requirement, the court may "strike any portions that are redundant or immaterial or to dismiss the complaint." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988); *see also Jones v. Nat'l Comms. & Surveillance Networks*, 266 F. App'x 31, 33 (2d Cir. 2008) (affirming dismissal of "single-spaced 58-page complaint with 87 additional pages of attachments, alleging over twenty separate causes of action against more than 40 defendants").

While incorporation by reference is permitted, it is "always accompanied by the requirement that it be done with a degree of specificity and clarity which would enable a responding party to easily determine the nature and extent of the incorporation." *In re Morrison*, 375 B.R. 179, 193 (Bankr. W.D. Pa. 2007). "Putting together the puzzle of matching the bare-bones allegations with the meat of the attached materials is the job of the Plaintiffs, not of the Debtor or the Court." *In re Geiger*, 446 B.R at 679–80 (dismissing complaint under rule 8(a)(2)).

Rather than provide sufficient details in the Amended Complaint, the Trustee incorporated by reference an entirely different complaint filed in another proceeding to which MLBS and the Funds are not party. *See* Am. Compl. ¶ 86. The incorporated Fairfield Second Amended Complaint contains 406 paragraphs spanning 105 pages, with 23 accompanying exhibits, asserting a panoply of claims including recovery of subsequent transfers, disgorgement, and constructive trust, all against numerous defendants, *none of which is MLBS*, nor even Sentry or Sigma. The Trustee relies on this morass to plead an essential element of its claim against MLBS: the avoidability of the initial transfers from BLMIS to the Funds. *See, e.g.* Am. Compl. ¶¶ 85–88.

Moreover, this wholesale incorporation violates the Rules. While Rule 10(c) provides that "[a] statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading," it does not permit a party to adopt wholesale an entirely separate pleading. *See, e.g.*, *Nycomed U.S. Inc. v. Glenmark Generics Ltd.*, No. 08-CV-5023, 2010 WL 1257803, at *4 (E.D.N.Y. Mar. 26, 2010) ("A Rule 10(c) adoption clause that does little more than make wholesale reference to the contents of a prior pleading exemplifies the kind of incorporation that fails to give the requisite guidance to the responding party."). That is all the more true where, as here, a party attempts to incorporate an entire pleading filed in a *separate action*. *See, e.g.*, *Constellation Energy Commodities Grp. v. Transfield ER Cape, Ltd.*, 801 F. Supp. 2d 211, 223

21

(S.D.N.Y. 2011) ("A pleading may not adopt other pleadings from a wholly separate action.");
*U.S. v. Int'l Longshoremen's Association*, 518 F. Supp. 2d 422, 463 (E.D.N.Y. 2007) (dismissing
civil RICO complaint after concluding that "the Government's proposed method of pleading
necessary elements of its RICO claim by incorporating factual allegations contained in several
prior lengthy criminal and civil RICO pleadings is . . . a blatant violation of Rule 8(a)(2)'s direction
that a civil plaintiff provide a 'short and plain statement of the claim.'").

The Trustee's reference to 245 paragraphs in the Fairfield Second Amended Complaint
"without limitation" does nothing to limit the breadth of the purported incorporation. Am. Compl.
¶ 86. MLBS cannot be expected to parse the Fairfield Second Amended Complaint, against parties
not relevant to this action, to determine which allegations it should respond to when the Trustee
has been unable to specify with certainty or clarity the extent of the purported incorporation.

For all these reasons, the Court should reject the Trustee's attempt to incorporate the
Fairfield Second Amended Complaint by reference. Without the incorporated complaint, this
Trustee's pleadings are conclusory at best and do not adequately plead the avoidability of the initial
transfers from BLMIS to Sentry—an essential element of the claims to recover the MLBS
Subsequent Transfers. Accordingly, the Amended Complaint should be dismissed.

## III.     THE AMENDED COMPLAINT DOES NOT PLAUSIBLY ALLEGE THAT THE MLBS REDEMPTIONS WERE BLMIS PROPERTY

Even excusing these facial deficiencies, dismissal is appropriate because the Amended
Complaint does not state a plausible claim for relief as required by the Supreme Court's holdings
in *Iqbal* and *Twombly. See Iqbal*, 556 U.S. at 678; *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,
547 (2007) (plausibility requires "more than a sheer possibility that a defendant has acted
unlawfully").

A.    **The Trustee does not adequately allege that the funds transferred to MLBS originated with BLMIS**

The single count in the Amended Complaint relies on Bankruptcy Code section 550(a) and SIPA § 78fff-2(c)(3) to avoid the redemption payments as subsequent transfers of BLMIS property. The applicability of both those sections turns on whether the subsequent transfer sought to be avoided contained estate property. *See* 11 U.S.C. § 550(a) (permitting recovery of estate property from subsequent transferee); SIPA § 78fff-2(c)(3) ("trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property"). The Trustee must identify which of the funds transferred to MLBS originated with BLMIS. In *Picard v. Shapiro (In re Madoff)*, 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015) the Court set forth precisely what facts the Trustee must plead to assert a subsequent transferee claim:

> The Trustee must allege facts that support the inference that the funds at issue originated with . . . BLMIS, and contain the "necessary vital statistics"—the "who, when, and how much" of the transfers to establish that an entity was a subsequent transferee of the funds. At the pleading stage, the Trustee is not required to provide a "dollar-for-dollar accounting" of the exact funds at issue. However, barebones allegations that the funds at issue were transferred to the Subsequent Transferees, without more detail, are insufficient.

The Amended Complaint, however, contains no details regarding the "who, when, and how much" of the subsequent transfers allegedly made to MLBS. Instead, the Trustee simply asserts that "Sentry subsequently transferred prior to the Filing Date a portion of the Fairfield Sentry Initial Transfers to MLBS . . . total[ing] $42,980,708" and "Sigma transferred at least $1,913,567 to MLBS," derived from funds initially transferred from BLMIS to Sentry, and then Sentry to Sigma. Am. Compl. ¶¶ 89, 93–94. Exhibits A and B do not substantiate these allegations: they simply list transfers made from BLMIS to Sentry, without tying those transfers to the payment of any redemption request from MLBS.

More specifically, the Amended Complaint does not specify the legal basis for avoiding each initial transfer from BLMIS to Sentry alleged to have been subsequently transferred to MLBS. The Amended Complaint simply states that "[e]ach of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code, applicable provisions of the N.Y. Debt. & Cred. Law, . . . and applicable provisions of SIPA" and "[e]ach of the Fairfield Sentry Two Year Transfers is avoidable under Bankruptcy Code section 548 and applicable provisions of SIPA." Am. Compl. ¶¶ 87–88. But these allegations refer to the universe of transfers between BLMIS and Sentry. The Amended Complaint does not specify whether the subsequent transfers to MLBS derived from the "Fairfield Sentry Six Year Transfers" or the "Fairfield Sentry Two Year Transfers." Thus it is unclear which, if any, of the subsequent transfers to MLBS implicate Bankruptcy Code section 548. These "barebones" and conclusory allegations are insufficient to support the claims. *See Shapiro*, 542 B.R. at 119 ("The SAC does not tie any initial transfer to any subsequent transfer or Subsequent Transferee. Moreover, it does not plausibly imply that the initial transferees even made subsequent transfers to the Subsequent Transferees as opposed to third parties, or that they made the subsequent transfers rather than simply keep the initial transfers for themselves.")

**B.    Based on the Trustee's own allegations, it is implausible that all of the MLBS Redemptions contain BLMIS customer property.**

The Trustee's allegations are not only unsupported, they are mathematically impossible. The Trustee alleges that BLMIS transferred approximately $2.9 billion to Sentry in the six years preceding the Petition. Am. Compl. ¶ 87. But the Trustee seeks to "recover" $5 billion total. First, the Trustee seeks approximately $4 billion of alleged subsequent transfers of customer property in the form of redemption payments made to dozens of defendants who redeemed from Sentry, including Sigma. *See* Covucci Decl. ¶¶ 6–8, Exs. C (Fairfield Second Am. Compl., Exs. 5 and 6),

24

E. Second, the Trustee seeks to recover, also as alleged subsequent transfers of customer property from Sentry, another approximately $1 billion allegedly paid by Sentry to the Fairfield Greenwich Group defendants in a separate action. *See id.* ¶¶ 8–9, Ex. C (Fairfield Second Amended Complaint, Exs. 8, 10, 12, 13, 14 and 21). In other words, the Trustee is attempting to recover $2 billion more in subsequent transfers than he alleges BLMIS transferred to Sentry. As such, the Trustee's theory that all of the redemption payments are customer property is facially implausible.

The Trustee's own pleadings make clear why Sentry distributed far more to its investors than BLMIS transferred to Sentry: Sentry was receiving funds from several sources, including not just BLMIS, but also its own investors. *See e.g.* Am. Compl. ¶ 7 ("MLBS invested in the Fairfield Funds"). To make redemption payments, Sentry sometimes used subscription payments from other investors, rather than withdrawing any funds from BLMIS accounts. *See* Covucci Decl. Ex. D, First Amended Complaint, *Fairfield Sentry Ltd. v. Citco Global Custody NV*, No. 19-1122 (Bankr. S.D.N.Y. Nov. 26, 2019), ECF 19, ¶ 63 ("From time to time, to make Redemption Payments, Sentry (and Sigma and Lambda through Sentry). . . utilized subscription monies of other investors on hand."). This is an "obvious alternative explanation" for the source of the redemption funds, which demonstrates the facial implausibility of the Trustee's theory. *See Garfinkle v. Conf. on Jewish Material Claims Against Ger., Inc.*, 2020 WL 6323462, at *5 (S.D.N.Y. Oct. 28, 2020); *Twombly*, 550 U.S. at 567–68.

This pleading failure cannot be excused for lack of information. Here, the Trustee, rather than MLBS, possesses all the records relevant to establishing whether and to what extent Sentry's transfers to Sigma and MLBS included any BLMIS customer property. Under the document-sharing provisions of the Fairfield Settlement, the Trustee had access to Sentry's books and records for over a decade prior to filing the Amended Complaint. *See* Covucci Decl. Ex. B (Fairfield

25

Settlement) ¶ 14. Nonetheless, the Trustee fails to allege precisely what transfers to MLBS contain customer property, and from which initial transfer that transfer originates. That failure alone is grounds for dismissal. *See Pen. Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 709, 723 (2d Cir. 2013) (affirming dismissal, finding "such imprecise pleading is particularly inappropriate here, where the plaintiffs necessarily have access, without discovery, to plan documents and reports that provide specific information from which to fashion a suitable complaint"); *Sapia v. Home Box Off., Inc.*, No. 18 CIV. 1317, 2018 WL 6985223, at *8 (S.D.N.Y. Dec. 17, 2018) (dismissing claim where plaintiffs failed to precisely plead necessary facts that were "uniquely in [p]laintiffs' possession").

## IV.    THE NEW YORK FRAUDULENT TRANSFER, CONSTRUCTIVE FRAUDULENT TRANSFER, AND PREFERENCE CLAIMS ARE BARRED UNDER BANKRUPTCY CODE SECTION 546(e)

Section 546(e) bars the Trustee's fraudulent transfer claims, except those based on 548(a)(1)(A). The Trustee asserts these claims under Bankruptcy Code section 550(a), which provides that avoided transfers can be recovered from a subsequent "transferee of such initial transferee." 11 U.S.C. § 550(a)(2). But these transfers are protected from clawback under the "securities safe harbor" of Section 546(e). *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 889 (2018). Under section 546(e), a trustee may not avoid a transfer "made by or to (or for the benefit of)" a qualifying entity, including a "stockbroker, financial institution, financial participant, or securities clearing agency" "in connection with a securities contract," or a "settlement payment," except under section 548(a)(1)(A) (i.e., those based on federal intentional fraudulent conveyance claims). *See* 11 U.S.C. § 546(e). The safe harbor protections extend to state law claims, including those brought under New York's Debtor and Creditor Law. *See In re Tribune Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 90 (2d Cir. 2019) (Section 546(e) preempts state-law

claims that have the same effect as a fraudulent transfer claim that would otherwise be barred by section 546(e).

As an alleged subsequent transferee, MLBS is entitled to raise a section 546(e) defense. *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 12 MC 115, 2013 WL 1609154, at *10 (S.D.N.Y. Apr. 15, 2013) ("both initial transferees and subsequent transferees are entitled to raise a defense based on the application of Section 546(e).") Dismissal of the fraudulent transfer and preference claims is warranted because the initial transfers were made by a stockbroker in connection with a securities contract.

### A.    The Initial Transfers Were Made By and To Entities Covered by Section 546(e).

#### 1.    The Alleged Initial Transfers Were Made by a Stockbroker.

The District Court has already found that BLMIS is a stockbroker for purposes of section 546(e). *See SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 719 (S.D.N.Y. 2012), *aff'd sub nom. Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411 (2d Cir. 2014) ("even assuming the truth of the allegation that [BLMIS] never traded securities on behalf of clients, Madoff Securities nonetheless qualifies as a stockbroker by virtue of the trading conducted by its market making and proprietary trading divisions.").

#### 2.    The Alleged Initial Transfers Were Made to a Financial Institution.

In addition, Judge Bernstein has already held that the Funds are "financial institutions within the meaning of 11 U.S.C. § 546(e)" as "customers of Citco Bank who acted as their agents in connection with the securities contracts pursuant to which the redemption payments were made." *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, No. 10-03496, 2020 WL 7345988, at *7 (Bankr. S.D.N.Y. Dec. 14, 2020). That holding applies with equal

force here, because the Trustee alleges that the Initial Transfers were made from BLMIS accounts

entitled "Citco Global Custody N V FBO Fairfield Sentry Ltd." *See* Am. Compl. Exs. A, B.

### 3.    The Alleged Initial Transfers Were "Transfers In Connection With A Securities Contract."

The Second Circuit has also held that account opening documents of BLMIS customers

constituted securities contracts for purposes of section 546(e). *Picard v. Ida Fishman Revocable*

*Trust* (*In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 418 (2d Cir. 2014). As Sentry

"maintained customer accounts with BLMIS," it held securities contracts with BLMIS. Am.

Compl. ¶ 3. The Initial Transfers from Sentry's BLMIS accounts were "in connection with" those

securities contracts. As the Second Circuit has held, "Section 546(e) only requires that a covered

transfer be broadly related to a 'securities contract,' not that it be connected to an actual securities

transaction." *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 420 (2d Cir. 2014). The Initial

Transfers easily satisfy this "low bar." *Id.* at 422.

### 4.    The Alleged Initial Transfers Were "Settlement Payments."

Finally, as the Second Circuit held in *Fishman*, "[e]ach time a customer requested a

withdrawal from BLMIS . . . each transfer in respect of such an order or request constituted a

settlement payment." 773 F.3d at 422 (citing *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de*

*C.V. (In Re Enron Creditors Recovery Corp.)*, 651 F.3d 329, 334 (2d Cir. 2011)). That reasoning

applies here, and is an additional reason the initial transfers are protected under section 546(e).

As the alleged transfers meet the requirements of section 546(e), all fraudulent transfer and

preference claims, except those made under section 548(a)(1)(A), should be dismissed.

## V.    THE COURT SHOULD DISMISS THE SECTION 548(A)(1)(A) CLAIMS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

The Amended Complaint states that "[i]f MLBS challenges the avoidability of the Fairfield

Sentry Initial Transfers, the Trustee seeks a judgment . . . declaring that such transfers are

28

avoidable" pursuant to *inter alia*, Bankruptcy Code section 548(a), the only exception to the safe

harbor rule.[8] Am. Compl. at 22. That provision allows the Trustee to avoid transfers made "within

2 years before" the bankruptcy petition was filed if the debtor "made such transfer . . . with actual

intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted." 11

U.S.C. § 548(a)(1)(A). Because "'actual intent to hinder, delay or defraud' constitutes fraud it must

be pled with specificity, as required by Fed. R. Civ. P. 9(b)." *Sharp Int'l Corp. v. State St. Bank &*

*Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005); *In re Bernard L. Madoff Inv.*

*Sec.*, LLC, 440 B.R. 243, 258 (Bankr. S.D.N.Y. 2010) ("To adequately plead intent, the Trustee

must allege "facts that give rise to a strong inference of fraudulent intent.").

Both the Amended Complaint and the 105 page Fairfield Second Amended Complaint are

devoid of *any specific* allegation regarding BLMIS's actual intent to hinder, delay, or defraud. In

the absence of such allegations, the Trustee appears to rely on the "Ponzi scheme presumption," a

judicially-created shortcut that bypasses pleading requirements and "presume[s] that transfers

from a debtor in furtherance of a Ponzi scheme are made with fraudulent intent rather than to

satisfy an antecedent debt." *Picard v. Citibank, N.A.* (*In re Bernard L. Madoff Inv. Sec. LLC*), 12

F.4th 171, 201 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard*, 142 S. Ct. 1209

(2022) (Menashi J., concurring).

The presumption is not settled law. *In re Unified Com. Cap., Inc.*, 260 B.R. 343, 350

(Bankr. W.D.N.Y. 2001), *aff'd sub nom.* No. 01-MBK-6004L, 2002 WL 32500567 (W.D.N.Y.

June 21, 2002); *Finn v. Alliance Bank*, 860 N.W.2d 638, 647 (Minn. 2015). The Second Circuit

has not definitively spoken on the presumption, applying it only where it is uncontested. *See e.g.,*

*Citibank, N.A.* 12 F.4th at 181, n.7 ("parties do not dispute the applicability of the Ponzi scheme

---

[8] Section 546(e) prevents the Trustee from avoiding certain transfers "except under section 548(a)(1)(A) of this title."
11 U.S.C. § 546(e).

presumption here" and "we do not address—whether the Ponzi scheme presumption is well-founded.") Thus, there is no binding precedent compelling its application here.

In *Citibank* Judge Menashi explained that the "Ponzi scheme presumption" represents a "questionable" application of fraudulent transfer statutes. *Id*. at 202 (Menashi, J., concurring). Several cogent reasons support this observation all of which apply here and militate against the application of the presumption on these facts.

*First*, the presumption "obscures the essential distinction between fraudulent transfers and preferences. It uses fraudulent transfer law rather than the law relating to preferences to promote an equal distribution among creditors." *Id*. at 202. On this basis, some courts have rejected the presumption. *Id* at 201; *see also Unified*, 260 B.R. at 350 ("By forcing the square peg facts of a 'Ponzi' scheme into the round holes of the fraudulent conveyance statutes in order to accomplish a further reallocation and redistribution to implement a policy of equality of distribution in the name of equity, I believe that many courts have done a substantial injustice to those statutes and have made policy decisions that should be made by Congress."). In the case of BLMIS, the presumption would essentially permit—subject to other defenses—the clawback of all property transferred from BLMIS within two years before the bankruptcy filing, effectively expanding the preference period by 21 months (i.e. from 90 days to 2 years).

*Second*, 548(a)(1)(A) focuses on the debtor's mindset at the time of making *particular* transactions "rather than a pattern of transactions that are part of a greater 'scheme.'" *Finn*, 860 N.W.2d at 647 (construing Minnesota UFTA) *cited with approval in Citibank*, 12 F.4th at 201 (Menashi J., concurring). The statute therefore necessitates an "asset-by-asset and transfer-by-transfer" inquiry, which "requires a creditor to prove the elements of a fraudulent transfer with respect to each transfer, rather than relying on a presumption related to the form or structure of the

30

entity making the transfer." *Finn*, 860 N.W.2d at 647; *see also Stoebner v. Opportunity Fin., LLC*, 909 F.3d 219, 226 (8th Cir. 2018). Allowing the Trustee to avoid that "asset-by-asset" analysis is particularly inappropriate here, where the Trustee has not even specified the relevant transfers at issue making it virtually impossible to infer intent at the time of any one of those transfers.

*Third*, the Ponzi scheme presumption abrogates Rule 9(b)'s pleading requirements, which require "actual intent" to hinder, delay, or defraud to be pled "with particularity." Fed. R. Civ. P. 9(b), *see Sharp*, 403 F.3d at 56. A judicially created exception to the Rules runs counter to Congress' intent. *Finn,* 860 N.W.2d at 647 (concluding "there is no statutory justification for relieving the Receiver of its burden of proving—or for preventing the transferee from attempting to disprove—fraudulent intent" under the "Ponzi-scheme presumption" and that a creditor must "prove the elements of a fraudulent transfer with respect to each transfer"); *see also Unified*, 260 B.R. at 350 (cited approvingly in *Citibank*, 12 F.4th at 202 (Menashi J. concurring)).

## VI.     THE AMENDED COMPLAINT ESTABLISHES THAT MLBS IS ENTITLED TO THE GOOD FAITH DEFENSE.

Under section 550(b), a trustee may not recover from a subsequent transferee who took "for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b). MLBS took for value, in good faith, and without knowledge of the voidability of the transfers. In fact, the Trustee's own allegations establish that MLBS could never have discovered the BLMIS fraud. MLBS is thus entitled to the good faith defense with respect to all claims.

### A.     MLBS Received the Redemptions for Value.

To establish "value" the Code simply requires that a redemption is "sufficient to support a simple contract, analogous to the 'value' required under state law to achieve the status of a bona fide purchaser for value." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08-01789,

2021 WL 3477479, at *9 (Bankr. S.D.N.Y. Aug. 6, 2021). Here, the Amended Complaint clearly shows the redemption payments were in exchange for MLBS "[s]urrendering equity interests" which "constitutes value for purposes of section 550(b)." *Picard v. ABN Amro Bank N.A. (Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC)*, No. AP 08-01789, 2020 WL 1584491, at *9 (Bankr. S.D.N.Y. Mar. 31, 2020); *see also Fairfield Sentry Ltd. v. Migani*, [2014] UKPC. Am. Compl. ¶¶ 92, 96 ("The Fairfield Sentry-MLBS Subsequent Transfers represent a redemption of equity interests by MLBS as a shareholder in Fairfield Sentry" and the "Fairfield-Sigma Subsequent Transfers represent a redemption of equity interests by MLBS as a shareholder in Fairfield Sigma."). Further, as explained *infra* Sec. VI.B., the Trustee's allegations support the conclusion that at the time MLBS made the redemptions, it did not know "that the redemption prices were based on fictitious assets." *See Picard v. Banque SYZ (In re BLMIS)*, No. 08-01789, 2022 WL 2135019, at *11 (Bankr. S.D.N.Y. 2022). Accordingly, it is clear from the face of the Amended Complaint that MLBS received the transfers for value.

### B.    MLBS Received the Redemptions in Good Faith.

The Second Circuit has recently concluded that "good faith" in the context of fraudulent transfers under the Bankruptcy Code "embraces an inquiry notice standard." *Citibank*, 12 F.4th at 188. Whether a defendant was on inquiry notice of fraud involves a three-step inquiry:

- *First*, a court must examine what facts the defendant knew, a subjective inquiry;
- *Second*, a court must determine whether these facts put the transferee on inquiry notice of the fraudulent purpose behind a transaction—that is, whether the facts the transferee knew would have led a reasonable person in the transferee's position to conduct further inquiry into a debtor-transferor's possible fraud;
- *Third*, the Court must ascertain whether diligent inquiry by the transferee would have discovered the fraudulent purpose of the transfer.

*Id.* at 191–92. An objective "reasonable person" standard applies in the second and third steps. *Id.*

1.    **The facts available to MLBS were not sufficient to put MLBS on inquiry notice (steps 1 and 2).**

From any perspective, the Trustee has not pled facts that "a reasonable person in [MLBS's] position [would have] conduct[ed] further inquiry into [BLMIS's] possible fraud." *Id* at 191–92.

(1)    The alleged knowledge of other Merrill Lynch entities is not relevant to the analysis of MLBS's inquiry notice.

As a threshold matter, the relevant knowledge for purposes of the good faith defense is the defendant MLBS's, not (as the Trustee indicates) unspecified "Merrill Lynch entities" or corporate affiliates. *See Citibank*, 12 F.4th at 191 ("a court must examine what facts *the defendant* knew; this is a subjective inquiry and not 'a theory of constructive notice.'"); Am. Compl. ¶¶ 71–81.

The Amended Complaint alleges that "[t]o the world . . . there was only one Merrill Lynch" and "Merrill Lynch was an integrated organization, [whose] umbrella groups . . . share[d] knowledge across the organization." *Id*. ¶ 16. Relying on that alleged interconnectedness, it sets forth a hodge-podge of allegations from various, and sometimes undefined, Merrill Lynch entities, as follows:

- "Merrill Lynch barred any investments related to Madoff." Am. Compl. ¶ 5;
- A former executive in Merrill Lynch's New York office and member of Merrill Lynch's Global Markets & Investment Bank group ("GMI"), and later Merrill Lynch Investment Managers group ("MLIM"), stated that "Merrill Lynch had identified 'many, many, many red flags' at BLMIS and said that 'the whole thing smelled.'" *Id*. ¶ 6.
- "Merrill Lynch had robust due diligence capabilities" *Id*. ¶ 73.
- Merrill Lynch created monthly performance analysis reports on Fairfield Sentry" and "calculated Fairfield Sentry's downside deviation." *Id*. ¶¶ 75–76, 79.

33

But general statements about what other Merrill employees in other offices and on other continents may have known or said are irrelevant to the good faith inquiry regarding *MLBS's* notice of fraud. They say nothing of MLBS's knowledge at the time of any investments or redemptions.

This Court's opinion in *BNP Paribas* is instructive. There, the trustee alleged that "various third parties expressed concern to one or more of the Defendants about BLMIS or refused to do business with BLMIS." 594 B.R. at 200. In particular, the trustee claimed a member of the defendant's asset management group, "shared its knowledge that Madoff was illegitimate, as well as its prohibitions against investing with Madoff" with the defendant, while others shared concerns, including "generally known" red flags. *Id.* The Court held that warnings or concerns of third parties, including other BNP Paribas entities, were not relevant to the defendant's knowledge and amounted to no more than "pleading by innuendo." *Id* at 202. Here, unlike *BNP Paribas*, the Trustee does not even allege that other Merrill Lynch entities shared knowledge or concerns about BLMIS with MLBS or that MLBS knew of those alleged concerns. That other Merrill Lynch entities are affiliated with MLBS, does not change the analysis. The Trustee may not simply impute alleged knowledge among separate corporate entities. *Youngers v. Virtus Inv. Partners Inc.*, No. 15CV8262, 2017 WL 5991800, at *5 (S.D.N.Y. Dec. 4, 2017) ("a parent-subsidiary relationship 'is not on its own sufficient to impute the scienter of the subsidiary to the parent or affiliate.'"); *U.S. Philips Corp. v. ATI Techs., Inc.*, No. 05CIV.8176, 2008 WL 2073928, at *2 (S.D.N.Y. May 8, 2008) (a parent's knowledge will not be imputed to a subsidiary unless it is "shown that the parent's employees informed of the [information] were under a duty to report that information to the subsidiary."). The Trustee does not allege that other Merrill Lynch entities conveyed any concerns or specific information about Madoff to MLBS, or that they were obligated to do so.

34

**(2)**    The facts known to MLBS were insufficient to put MLBS on inquiry notice that BLMIS was a Ponzi scheme.

Stripped of its improper imputation of alleged knowledge across various Merrill Lynch entities, the Amended Complaint demonstrates that MLBS was *not* on inquiry notice that BLMIS was a Ponzi scheme.

**MLBS's knowledge.** The Amended Complaint does not make a single specific allegation about MLBS's actual knowledge at the time of making the redemptions at issue. To support a claim that a defendant was on inquiry notice, the plaintiff must allege that the defendant at least had actual knowledge of the "red flags." *Anwar v. Fairfield Greenwich Ltd.*, 286 F.R.D. 258, 260 (S.D.N.Y. 2012) (dismissing claims based on "red flags" where the complaint failed to "allege facts plausibly suggesting that defendants were aware of these red flags, or that if they were aware, they then translated those red flags into a suspicion of fraud."). The Trustee fails on that count.

The Amended Complaint contains only one vague allegation that a single MLBS employee knew of red flags. It alleges that an MLBS executive described in an email "several red flags . . . around the[] funds.'" Am. Compl. ¶ 81. Crucially, the Amended Complaint does not state *when* the unnamed executive sent that email or what "red flags" he or she claimed to have identified, aside from the BLMIS feeders' return rate (which was public knowledge). *See id.* Presumably, if that email was sent before Madoff's fraud was uncovered, the Trustee would have said so. A hindsight observation from one employee that does not even identify the so-called "red flags" or explain when, if at all, they were observed cannot support the Amended Complaint's allegations that MLBS was aware of red flags at the time of the alleged redemptions. *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. AP 08-01789 (SMB), 2020 WL 1584491, at *11 (Bankr. S.D.N.Y. Mar. 31, 2020) (hindsight observations insufficient to establish knowledge of fraud).

35

The Amended Complaint alleges that MLBS "act[ed] as agent for its customers in exchange for fees" in placing investments in the Funds. Am. Compl. ¶ 33. To the extent MLBS invested in the Funds only on behalf of clients, in exchange for fees, this allegation counsels strongly in favor of MLBS' good faith. *In re Dreier LLP*, 453 B.R. 499 (Bankr. S.D.N.Y. 2011) is instructive on this point. Applying the inquiry notice standard, the Court held that it was facially implausible that the defendant bank would have knowingly chosen to facilitate the fraudulent scheme just to earn fees, and while it may not have accurately assessed Dreier as a credit risk, this did not amount to inquiry notice such that it could not satisfy the good faith test. *Id.* at. 514. As in *Dreier*, it is facially implausible to conclude that MLBS suspected BLMIS was a Ponzi scheme, yet *knowingly* chose to facilitate investments in BLMIS through the Funds to earn fees much smaller than its ultimate losses.

Further, MLBS's redemptions were made over time, between 2003 and 2008, consistent with routine market conduct on behalf of customers, not suspicion of a Ponzi scheme. *See* Am. Compl. Ex. C, E; *Henry v. City of New York*, No. 05 CV 6023 (SJ)(RML), 2007 WL 1062519, at *4 (E.D.N.Y. Mar. 30, 2007) ("routine [actions] do not give rise to the inference of fraud."); *Herlihy v. City of New York*, No. 06 CV 407 (SJ)(RML), 2007 WL 1062593, at *3 (E.D.N.Y. Mar. 30, 2007), *aff'd*, 654 F. App'x 40 (2d Cir. 2016) (same).

**Generic allegations of "red flags" available to all investors.** The Trustee describes several hindsight indicators that BLMIS was engaged in fraud. Am. Compl. ¶¶ 45–67. The Trustee does not suggest that MLBS was aware of any of these facts at the time of its redemptions or that they support an inference that MLBS was on inquiry notice of BLMIS's fraud. *See Anwar*, 286 F.R.D. at 260 (dismissing claims where complaint failed to "allege facts plausibly suggesting that defendants were aware of these red flags" or that if they were, they "translated those red flags into

a suspicion of fraud"); *see also Citibank*, 12 F.4th at 191 ("a court must examine what facts the defendant knew; this is a subjective inquiry and not 'a theory of constructive notice.'").

Even if the Trustee did argue MLBS was aware of those red flags at the time of its redemptions, this Court has previously held that "red flag" allegations, such as those in the Amended Complaint, do not support an inference that defendants believed BLMIS was not trading securities. In *BNP Paribas*, this Court rejected "the Trustee's attempt to plead, in hindsight, a defendant's subjective knowledge by showing trading impossibilities in BLMIS account statements." 594 B.R. at 199. The Court found allegations that "returns of BLMIS feeder funds were too consistent," "Defendants received trade confirmations for BLMIS feeder funds with prices above the daily high or below the daily low," "BLMIS timed trades too consistently," "BLMIS option volumes were too high," and "BLMIS made trades that were inconsistent with the SSC Strategy" did not support an inference defendants believed BLMIS was not trading securities. *Id. See also Saltz v. First Frontier, LP*, 782 F. Supp.2d 61, 72 (S.D.N.Y. 2010), *aff'd* 485 F. App'x 461 (2d Cir. 2012) ("An inference of scienter based on publicly available red flags is simply not as cogent and compelling as the opposing inference of nonfraudulent intent."); *Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 577–78 (S.D.N.Y. 2011), *aff'd,* 482 F. App'x 618 (2d Cir. 2012), as amended (June 13, 2012) *Stephenson*, 768 F. Supp. 2d at 577–78 (allegation Madoff's trades could not be accomplished without a market footprint did not establish an inference PWC knew market data did not reflect transactions BLMIS reported, nor establish PWC would have learned those aspects of the fraudulent funds on diligent inquiry); *Stephenson v. Citco Grp. Ltd*., 700 F. Supp. 2d 599, 624 (S.D.N.Y. 2010), *aff'd Stephenson*, 482 F. App'x 618 (allegations the auditor "was small, not well known, and not properly certified" were insufficient as plaintiffs failed to allege defendants knew of this).

37

### 2.    More diligent inquiry by MLBS would not have discovered the fraudulent purpose of the transfers (step 3).

Finally, even if MLBS was on notice that something was amiss at BLMIS, the Amended Complaint itself demonstrates that further "diligent inquiry" would not have led MLBS to "discover[] the fraudulent purpose of the transfer[s]." *Citibank*, 12 F.4th at 192. BLMIS was founded in 1960 and operated a Ponzi scheme "since at least the 1980's." Am. Compl. ¶ 39; Fairfield Second Am. Compl. ¶ 72. In December 2008 it had "over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM" Am. Compl. ¶ 44. Yet the fraud went undiscovered for decades, even by its numerous and sophisticated customers.

Moreover, while the Trustee should not be permitted to incorporate by reference the entire Fairfield Second Amended Complaint, *see supra* Sec. II, in the event the Court does consider that complaint, its allegations only underscore how futile any further inquiry would have been. The Fairfield Second Amended Complaint alleges that BLMIS was highly secretive and that the Funds "covered for Madoff in deliberate efforts to get investors and regulators off the scent," "needed Madoff to enrich themselves and were willing to lie to protect their relationship" and "spun information to pacify existing FGG investors and to encourage new investment." *Id.* ¶¶ 5–6. It continues that the Funds "protected BLMIS from inquiry," "lied to clients about BLMIS's practices" and "knowingly misled the SEC at Madoff's direction." *Id* ¶¶ 8–9. It asserts that every step taken by the Funds was "a calculated effort to maintain the viability of the BLMIS Ponzi scheme despite knowing Madoff was not engaged in the trading of securities." *Id.* ¶ 10.

Both the Amended Complaint and the Fairfield Second Amended Complaint assert that BLMIS filed fraudulent financial reports with the SEC, "omit[ing] the existence of billions of dollars of customer funds BLMIS managed through its IA Business." *Id.* ¶ 31–32; Am. Compl. ¶ 42. BLMIS even managed to deceive the SEC, despite its investigative tools, broad resources and

power to subpoena documents and information. Fairfield Second Am. Compl. ¶¶ 166, 236–262 (discussing SEC investigations that failed to uncover fraud and alleging the Funds strategized with Madoff to deceive the SEC).

The Second Circuit has recognized that the Madoff Ponzi scheme was "a fraud of 'unparalleled magnitude.'" *Sec. Inv. Prot. Corp.*, 2021 WL 3477479, at *1. That MLBS could have discovered this highly secretive, longstanding, Ponzi scheme while thousands of other market participants and the SEC did not is simply inconceivable.

**C.    The Good Faith Defense is Particularly Warranted For The Preference Claims.**

Even if the Court finds that the face of the Amended Complaint does not demonstrate that MLBS is entitled to the good faith defense for the fraudulent transfer claims, to the extent the Trustee pleads the transfers are subject to preference claims, they should be dismissed. Am. Compl. at 22 ("If MLBS challenges the avoidabilty of the Fairfield Sentry Initial Transfers, the Trustee seeks a judgment . . . that such transfers are avoidable pursuant to . . . [Bankruptcy Code section] 547(b)"). The Second Circuit limited its *Citibank* holding to fraudulent transfer claims under Bankruptcy Code sections 548 and 550 and in doing so expressly distinguished preference claims from fraudulent transfer claims. *See id* at 191 ("[T]he absence of an inquiry notice standard in the preferential transfers context simply has no bearing on the meaning of good faith here.").

Under Second Circuit precedent, "[a] mere preference between creditors does not constitute bad faith . . . Nor does it matter that the preferred creditor knows that the debtor is insolvent." *In re Sharp Intern. Corp.*, 403 F.3d 43, 54 (2d Cir. 2005). A creditor is not "subject to attack" on grounds of bad faith "by reason of knowledge on the part of the transferee that the transferor is preferring him to other creditors" and where no ground exists to "collapse" a transfer into other "bad-faith maneuvers." *Id.* at 54–55. The Court in *Sharp* relied on the First Circuit

decision in *Boston Trading Group*, which held that bad faith centers on a defendant's "'state of mind,' his subjective appreciation of the situation" and may be found "where the transferee participates in the original dishonesty." *Bos. Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1512 (1st Cir. 1987). This is consistent with the Second Circuit's decision in *Irving Tr. Co.*, which declined to avoid preferential transfers where the transferee did not "knowingly aid[] the debtor to defeat equal distribution," and was not "privy to the grantor's purpose." 65 F.2d at 410–411. Accordingly, the good faith standard only requires a transferee to show that it did not "knowingly aid" the debtor-transferor in defeating equal distribution among creditors. *See Irving Tr. Co. v. Chase Nat'l Bank*, 65 F.2d 409, 410 (2d Cir. 1933).

It is clear from the face of the Amended Complaint that MLBS had no actual knowledge of BLMIS's scheme, much less any knowing participation in it. *Supra* Sec. VI.B. There is no suggestion that MLBS engaged directly with BLMIS at any point, or that it conspired with the feeder funds to defraud other creditors or obtain preferential transfers to their detriment. As such, the Trustee cannot show MLBS acted in bad faith with respect to the preference claims and they should be dismissed. *Sharp*, 403 F.3d at 54.

## CONCLUSION

For the reasons discussed above, the Court should dismiss the Amended Complaint.

Dated: November 21, 2022

New York, New York

Respectfully submitted,

O'MELVENY & MYERS LLP

By: /s/ *Pamela A. Miller*
Pamela A. Miller
Amber L. Covucci
O'MELVENY & MYERS LLP
Seven Times Square
New York, New York 10036
Telephone: (212) 326-2000
E-mail:  pmiller@omm.com
         acovucci@omm.com

*Attorneys for Merrill Lynch Bank (Suisse)*
*SA*

41