JONES DAY
Thomas E. Lynch
250 Vesey Street
New York, New York 10281
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
telynch@jonesday.com

*Attorneys for QS Finance Ltd.*
*(formerly known as Quilvest Finance Ltd.)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>        Plaintiff-Applicant,<br><br>    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Defendant. | Adv. Pro. No. 08-01789 (CGM)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>        Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>QUILVEST FINANCE LTD.,<br><br>        Defendant. | Adv. Pro. No. 11-02538 (CGM) |

**ANSWER OF DEFENDANT QS FINANCE LTD.**

Defendant QS Finance Ltd. ("QSF") (formerly known as Quilvest Finance Ltd.),

by and through its undersigned counsel, as and for its Answer to the Complaint filed

August 18, 2011 (the "Complaint") in this proceeding by Plaintiff Irving H. Picard as the

Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC (the "Trustee"

or "Plaintiff"), states as follows:

Complaint ¶ 1:  This adversary proceeding is part of the Trustee's continuing efforts to recover
BLMIS Customer Property that was stolen as part of the massive Ponzi scheme perpetrated by
Bernard L. Madoff ("Madoff") and others.

Complaint ¶ 1, Footnote 1:  SIPA § 78lll(4) defines "Customer Property" as cash and securities
at any time received, acquired, or held by, or for the account of, a debtor from, or for, the
securities accounts of a customer, and the proceeds of any such property transferred by the
debtor, including property unlawfully converted.

**Answer ¶ 1:**  The allegations in paragraph 1 of the Complaint contain legal conclusions to which

no response is required.  To the extent a response is required, QSF denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 1 and

therefore denies those allegations, except QSF admits that Plaintiff purports to bring this action

as trustee for the liquidation of BLMIS and the substantively consolidated estate of Bernard L.

Madoff ("Madoff") pursuant to the Securities Investor Protection Act ("SIPA").

Complaint ¶ 2:  With this Complaint, the Trustee seeks to recover approximately $37,800,115 in
subsequent transfers made to Defendant Quilvest.  The subsequent transfers were derived from
investments with BLMIS made by Fairfield Sentry Limited ("Fairfield Sentry"), which was a
Madoff feeder fund.  Fairfield Sentry is currently in liquidation in the British Virgin Islands
("BVI").  It was a BVI company that had direct customer accounts with BLMIS's investment
advisory business ("IA Business") for the purpose of investing assets with BLMIS.  Fairfield
Sentry maintained in excess of 95% of its assets in BLMIS customer accounts.

**Answer ¶ 2:**  The allegations in paragraph 2 of the Complaint contain legal conclusions to which

no response is required.  To the extent a response is required, QSF denies the allegations in

paragraph 2, except QSF denies knowledge or information sufficient to form a belief as to the

allegations about Fairfield Sentry's accounts with BLMIS and QSF admits on information and

belief that: (a) Fairfield Sentry is a BVI company currently in liquidation in the BVI;

(b) Plaintiff seeks to recover approximately $34,198,293 that it alleges were subsequent transfers

from Fairfield Sentry to QSF.


**Complaint ¶ 3:** When Defendant Quilvest received subsequent transfers of BLMIS Customer
Property, Defendant Quilvest was a subsidiary of Quilvest S.A., a leading global independent
wealth and private equity manager. According to its website, Quilvest S.A. has nearly $16
billion in assets under management and a 120-year heritage in investing. The website further
provides that Quilvest S.A. maintains strict investment discipline and a commitment to due
diligence, and that Quilvest S.A. screens and monitors its recommended investments and
investment managers. See Exhibit A.

**Answer ¶ 3:** The allegations in paragraph 3 of the Complaint contain legal conclusions to which

no response is required. To the extent a response is required, QSF denies the allegations in

paragraph 3, except QSF admits that QSF was an indirect subsidiary of Quilvest S.A. during time

relevant to Plaintiff's allegations and Quilvest S.A. is a wealth and private equity manager.

To the extent Paragraph 3 refers to a document, QSF respectfully refers to that document for a

complete and accurate statement of its contents.


**Complaint ¶ 4:** The Trustee brings this adversary proceeding pursuant to his statutory authority
under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3); sections 105(a), 544, 550(a), and 551 of
title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code"); and the
New York Fraudulent Conveyance Act (New York Debtor & Creditor Law) ("NYDCL")
§§ 273-279 (McKinney 2001), to obtain avoidable and recoverable transfers received by
Defendant Quilvest as a subsequent transferee of funds originating from BLMIS.

**Answer ¶ 4:** The allegations in paragraph 4 of the Complaint contain legal conclusions to which

no response is required. To the extent a response is required, QSF denies the allegations

in paragraph 4, except QSF admits that the Trustee has brought this adversary proceeding,

purportedly pursuant to the cited statutes.

Complaint ¶ 5:  This is an adversary proceeding brought in this Court, in which the main underlying substantively consolidated SIPA case, No. 08-01789 (BRL) (the "SIPA Case"), is pending.  The SIPA Case was originally brought in the United States District Court for the Southern District of New York (the "District Court") as Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al., No. 08 CV 10791 (the "District Court Proceeding").   This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), and 15 U.S.C. § 78eee(b)(2)(A), (b)(4).

**Answer ¶ 5:**  The allegations in paragraph 5 of the Complaint contain legal conclusions to which

no response is required.  To the extent a response is required, QSF denies the allegations in

paragraph 5, except QSF denies knowledge or information sufficient to form a belief as to where

the main substantively consolidated SIPA case (Adv. Pro. No. 08-01789) was originally brought,

and QSF admits that (i) the main substantively consolidated SIPA case (Adv. Pro. No. 08-01789)

is pending in this Court and (ii) this is an adversary proceeding pending in this Court.


Complaint ¶ 6:  Defendant Quilvest is subject to personal jurisdiction in this judicial district because it purposely availed itself of the laws and protections of the United States and the state of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through Fairfield Sentry.  Defendant Quilvest knowingly received transfers of Customer Property from BLMIS.  The Trustee's investigation to date reveals that Defendant Quilvest obtained this Customer Property by withdrawing money from Fairfield Sentry, a Fairfield Greenwich Group ("FGG") managed Madoff feeder fund.  By directing its investment through FGG, Defendant Quilvest knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York.  Upon information and belief, Defendant Quilvest entered into a subscription agreement with Fairfield Sentry under which it submitted to New York jurisdiction, sent a copy of the subscription agreement to FGG's New York City office, wired funds to Fairfield Sentry through a bank in New York, and regularly communicated by email and telephone with its Fairfield Sentry account representatives located in the United States.  Defendant Quilvest thus derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

**Answer ¶ 6:**  The allegations in paragraph 6 of the Complaint contain legal conclusions to which

no response is required.  To the extent a response is required, QSF denies the allegations in

paragraph 6 except admits on information and belief that: (a) Fairfield Sentry was a

fund managed by FGG and (b) FGG had a New York office, and admits that: (a) QSF had an

agreement with Fairfield Sentry; (b) funds were transferred to and received from Fairfield Sentry

for the account in the name of QSF; and (c) funds related to the account in the name of QSF were

wired through a bank in New York.

**Complaint ¶ 7:** Defendant Quilvest should reasonably expect to be subject to New York
jurisdiction and are subject to personal jurisdiction pursuant to New York Civil Practice Law
& Rules § 302 (McKinney 2001) and Bankruptcy Rule 7004.

**Answer ¶ 7:** The allegations in paragraph 7 of the Complaint contain legal conclusions to which

no response is required. To the extent a response is required, QSF denies the allegations in

paragraph 7.

**Complaint ¶ 8:** This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).

**Answer ¶ 8:** The allegations in paragraph 8 of the Complaint contain legal conclusions to which

no response is required. To the extent a response is required, QSF denies the allegations in

Paragraph 8, states that it does not consent to the issuance or entry of final orders or judgments

by the Bankruptcy Court, and demands a trial by jury of all issues that may be tried by a jury.

**Complaint ¶ 9:** Venue in this District is proper under 28 U.S.C. § 1409.

**Answer ¶ 9:** The allegations in paragraph 9 of the Complaint contain legal conclusions to which

no response is required.

**Complaint ¶ 10:** On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal
agents for violation of the criminal securities laws, including, inter alia, securities fraud,
investment adviser fraud, and mail and wire fraud. Contemporaneously, the U.S. Securities and
Exchange Commission ("SEC") commenced the District Court Proceeding against Madoff and
BLMIS. The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the
investment adviser activities of BLMIS. The District Court Proceeding remains pending.

**Answer ¶ 10.** QSF denies knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 10 of the Complaint and therefore denies those allegations, except

QSF admits on information and belief that Madoff was arrested on or about December 11, 2008

and that the SEC filed a complaint against Madoff and BLMIS.

Complaint ¶ 11:  On December 12, 2008, The Honorable Louis L. Stanton of the District Court
entered an order appointing Lee S. Richards as receiver for the assets of BLMIS.

**Answer ¶ 11.**  QSF denies knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 11 of the Complaint and therefore denies those allegations.

To the extent Paragraph 11 refers to a document, QSF respectfully refers to that document for a

complete and accurate statement of its contents.

Complaint ¶ 12:  On December 15, 2008, under § 78eee(a)(4)(A), the SEC consented to a
combination of its own action with an application of the Securities Investor Protection
Corporation ("SIPC").  Thereafter, under § 78eee(a)(4)(B) of SIPA, SIPC filed an application in
the District Court alleging, inter alia, that BLMIS was not able to meet its obligations to
securities customers as they came due and, accordingly, its customers needed the protections
afforded by SIPA.

**Answer ¶ 12.**  QSF denies knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 12 of the Complaint and therefore denies those allegations.

To the extent Paragraph 12 refers to a document, QSF respectfully refers to that document for a

complete and accurate statement of its contents.

Complaint ¶ 13:  Also on December 15, 2008, Judge Stanton granted the SIPC application and
entered an order under SIPA (known as the "Protective Decree"), which, in pertinent part:
a. removed the receiver and appointed the Trustee for the liquidation of the business of BLMIS
under SIPA § 78eee(b)(3); b. appointed Baker & Hostetler LLP as counsel to the Trustee
under SIPA § 78eee(b)(3); and c. removed the case to the United States Bankruptcy Court for the
Southern District of New York (the "Bankruptcy Court") under § 78eee(b)(4) of SIPA

**Answer ¶ 13.**  QSF denies knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 13 of the Complaint and therefore denies those allegations.

To the extent Paragraph 13 refers to a document, QSF respectfully refers to that document for a complete and accurate statement of its contents.

Complaint ¶ 14: By orders dated December 23, 2008, and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

**Answer ¶ 14.** QSF denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14 of the Complaint and therefore denies those allegations.

To the extent Paragraph 14 refers to documents, QSF respectfully refers to those documents for complete and accurate statements of their contents.

Complaint ¶ 15: At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned United States v. Madoff, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." Id. at 23. Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." Id. On June 29, 2009, Madoff was sentenced to 150 years in prison.

**Answer ¶ 15.** QSF denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15 of the Complaint and therefore denies those allegations.

To the extent Paragraph 15 refers to a document, QSF respectfully refers to that document for a complete and accurate statement of its contents.

Complaint ¶ 16: On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a plea hearing on August 11, 2009, in the case entitled United States v. DiPascali, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), DiPascali pled guilty to a ten-count criminal information. Among other things, DiPascali admitted that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s. Id. at 46.

**Answer ¶ 16.** QSF denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16 of the Complaint and therefore denies those allegations.

To the extent Paragraph 16 refers to a document, QSF respectfully refers to that document for a

complete and accurate statement of its contents.


**Complaint ¶ 17:** As Trustee appointed under SIPA, the Trustee is charged with recovering and paying out Customer Property to BLMIS customers, assessing claims, and liquidating any other assets of BLMIS for the benefit of the estate and its creditors. The Trustee is in the process of marshaling BLMIS's assets, and this liquidation is well underway. However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years. Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recoveries, including those from individuals and entities that received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

**Answer ¶ 17.** The allegations in paragraph 17 of the Complaint contain legal conclusions to

which no response is required. To the extent a response is required, QSF denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 17 of the

Complaint and therefore denies those allegations.


**Complaint ¶ 18:** Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under § 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

**Answer ¶ 18.** The allegations in paragraph 18 of the Complaint contain legal conclusions to

which no response is required. To the extent a response is required, QSF denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 18 of the

Complaint and therefore denies those allegations.


**Complaint ¶ 19:** Under SIPA §§ 78fff(b) and 78lll(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

**Answer ¶ 19.**  The allegations in paragraph 19 of the Complaint contain legal conclusions to

which no response is required.  To the extent a response is required, QSF denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 19 of the

Complaint and therefore denies those allegations.


Complaint ¶ 20:  The Trustee has standing to bring these claims under § 78fff-1(a) of SIPA and
the Bankruptcy Code, including sections 323(b), 544 and 704(a)(1), because the Trustee has the
power and authority to avoid and recover transfers under sections 544, 547, 548, 550(a), and 551
of the Bankruptcy Code and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

**Answer ¶ 20.**  The allegations in paragraph 20 of the Complaint contain legal conclusions to

which no response is required.  To the extent a response is required, QSF denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 20 of the

Complaint and therefore denies those allegations.


Complaint ¶ 21:  Defendant Quilvest is a British Virgin Islands registered entity whose
registered office is at Craigmuir Chambers, P.O. Box 71, Road Town, Tortola VG1110, British
Virgin Islands.  Defendant Quilvest is a subsidiary of Quilvest S.A., a Luxembourg société
anonyme.

**Answer ¶ 21.**  QSF denies the allegations in paragraph 21 of the Complaint, except QSF admits

that: (a) QSF is a British Virgin Islands registered entity with a registered office at Craigmuir

Chambers, Road Town, Tortola VG1110, British Virgin Islands; and (b) QSF is an indirect

subsidiary of Quilvest S.A., a Luxembourg société anonyme.


Complaint ¶ 22:  BLMIS was founded by Madoff in 1959 and, for most of its existence, operated
from its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as
founder, chairman, chief executive officer, and sole owner, operated BLMIS together with
several of his friends and family members.  BLMIS was registered with the SEC as a securities
broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b).
By virtue of that registration, BLMIS was a member of SIPC.  BLMIS had three business units:
market making, proprietary trading, and the IA Business.

**Answer ¶ 22.**  QSF denies knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 22 of the Complaint and therefore denies those allegations.


Complaint ¶ 23:  Outwardly, Madoff ascribed the consistent success of the IA Business to the so-
called split-strike conversion strategy ("SSC Strategy").  Under that strategy, Madoff purported
to invest BLMIS customers' funds in a basket of common stocks within the Standard & Poor's
100 Index ("S&P 100")—a collection of the 100 largest publicly traded companies.  Madoff
claimed that his basket of stocks would mimic the movement of the S&P 100.  He also asserted
that he would carefully time purchases and sales to maximize value, and BLMIS customers'
funds would, intermittently, be out of the equity markets.

**Answer ¶ 23.**  QSF denies knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 23 of the Complaint and therefore denies those allegations.


Complaint ¶ 24:  The second part of the SSC Strategy was a hedge of Madoff's stock purchases
with options contracts.  Those option contracts acted as a "collar" to limit both the potential
gains and losses on the basket of stocks.  Madoff purported to use proceeds from the sale of S&P
100 call options to finance the cost of purchasing S&P 100 put options.  Madoff told BLMIS
customers that when he exited the market, he would close out all equity and option positions and
invest all the resulting cash in United States Treasury bills or in mutual funds holding Treasury
bills.  Madoff also told customers that he would enter and exit the market between six and ten
times each year.

**Answer ¶ 24.**  QSF denies knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 24 of the Complaint and therefore denies those allegations.


Complaint ¶ 25:  BLMIS's IA Business customers received fabricated monthly or quarterly
statements showing that securities were held in, or had been traded through, their accounts.  The
securities purchases and sales shown in the account statements never occurred, and the profits
reported were entirely fictitious.  At the Plea Hearing, Madoff admitted that he never made the
investments he promised clients, who believed they were invested with him in the SSC Strategy.
He further admitted that he never purchased any of the securities he claimed to have purchased
for the IA Business's customer accounts.  In fact, there is no record of BLMIS having cleared a
single purchase or sale of securities in connection with the SSC Strategy on any trading platform
on which BLMIS reasonably could have traded securities.  Instead, investors' funds were
principally deposited into the BLMIS account at JPMorgan Chase & Co., Account
#xxxxxxxxxxxx703.

**Answer ¶ 25.**  QSF denies knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 25 of the Complaint and therefore denies those allegations.


Complaint ¶ 26:  Prior to his arrest, Madoff assured clients and regulators that he purchased and
sold the put and call options on the over-the-counter ("OTC") market after hours, rather than
through any listed exchange.  Based on the Trustee's investigation to date, there is no evidence
that the IA Business ever entered into any OTC options trades on behalf of IA Business account
holders.

**Answer ¶ 26.**  QSF denies knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 26 of the Complaint and therefore denies those allegations.


Complaint ¶ 27:  For all periods relevant hereto, the IA Business was operated as a Ponzi
scheme.  The money received from investors was not invested in stocks and options, but rather
used to pay withdrawals and to make other avoidable transfers.  Madoff also used his customers'
investments to enrich himself, his associates, and his family.

**Answer ¶ 27.**  QSF denies knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 27 of the Complaint and therefore denies those allegations.


Complaint ¶ 28:  The falsified monthly account statements reported that the accounts of the IA
Business customers had made substantial gains, but in reality, due to the siphoning and diversion
of new investments to fulfill payment requests or withdrawals from other BLMIS
accountholders, BLMIS did not have the funds to pay investors for those new investments.
BLMIS only survived as long as it did by using the stolen principal invested by customers to pay
other customers.

**Answer ¶ 28.**  QSF denies knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 28 of the Complaint and therefore denies those allegations.


Complaint ¶ 29:  It was essential for BLMIS to honor requests for payments in accordance with
the falsely inflated account statements, because failure to do so promptly could have resulted in
demand, investigation, the filing of a claim, and disclosure of the fraud.

**Answer ¶ 29.**  QSF denies knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 29 of the Complaint and therefore denies those allegations.

Complaint ¶ 30:  Madoff's scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

**Answer ¶ 30.**  QSF denies knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 30 of the Complaint and therefore denies those allegations.

Complaint ¶ 31:  Based upon the Trustee's ongoing investigation, it now appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme.  In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS.  In reality, BLMIS had assets on hand worth only a fraction of that amount.  Customer accounts had not accrued any real profits because virtually no investments were ever made.  By the time the Ponzi scheme came to light on December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

**Answer ¶ 31.**  QSF denies knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 31 of the Complaint and therefore denies those allegations.

Complaint ¶ 32:  Thus, at all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets.  BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

**Answer ¶ 32.**  QSF denies knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 32 of the Complaint and therefore denies those allegations.

Complaint ¶ 33:  Defendant Quilvest received subsequent transfers of Customer Property from Fairfield Sentry, which maintained customer accounts with BLMIS.

**Answer ¶ 33.**  QSF denies the allegations in paragraph 33 of the Complaint.

Complaint ¶ 34:  The Trustee has filed an adversary proceeding against Fairfield Sentry and other defendants in the Bankruptcy Court under the caption Fairfield Sentry Ltd., et al., Adv. Pro. No. 09-01239, in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Fairfield Sentry in the amount of approximately $3 billion

(the "Fairfield Amended Complaint").  The Trustee incorporates by reference the allegations
contained in the Fairfield Amended Complaint as if fully set forth herein.

**Answer ¶ 34.**  The allegations in paragraph 34 refer to proceedings in another litigation to which

QSF is not a party, and QSF respectfully refers the Court to the docket and filings in that action

for complete and accurate statements of their contents.  To the extent a further response is

required, QSF states that it is not and has not been a party to Adv. Pro. 09-01239 (the

"Fairfield Adversary Proceeding") and QSF objects to the purported incorporation by reference

of a pleading from another litigation.  To the extent a further response is required, QSF denies

knowledge or information sufficient to form a belief as to the truth of the allegations in

Paragraph 34 of the Complaint, except QSF: (a) admits that the Trustee filed an action under the

caption *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (BRL); (b) specifically

denies knowledge or information sufficient to form a belief as to which of the three complaints

filed in Adv. Pro. No. 09-01239 or to which portions of those pleadings the Trustee purports to

incorporate by reference in the complaint in this action; and (c) specifically denies knowledge or

information sufficient to form a belief as to the truth of the allegations in Adv. Pro. No. 09-01239

regarding purported transfers from BLMIS to Fairfield Sentry and regarding claims that any

initial transfer of Customer Property from BLMIS to Fairfield Sentry are or were avoided or

avoidable, and therefore denies that alleged initial transfers of Customer Property from BLMIS

to Fairfield Sentry were avoided or are avoidable.

Complaint ¶ 35:  During the six years preceding the Filing Date, BLMIS made transfers to
Fairfield Sentry of approximately $3 billion (the "Fairfield Sentry Six Year Initial Transfers").
The Fairfield Sentry Six Year Initial Transfers were and continue to be Customer Property within
the meaning of SIPA § 78lll(4), are avoidable, and recoverable under sections 544, 550, and 551
of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA,
particularly SIPA § 78fff-2(c)(3).

13

**Answer ¶ 35.**  The allegations in paragraph 35 of the Complaint contain legal conclusions to

which no response is required.  To the extent a response is required, QSF denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 35 of the

Complaint and therefore denies those allegations.

Complaint ¶ 36:  The Fairfield Sentry Six Year Initial Transfers include approximately $1.6
billion which BLMIS transferred to Fairfield Sentry during the two years preceding the Filing
Date (the "Fairfield Sentry Two Year Initial Transfers").  The Fairfield Sentry Two Year Initial
Transfers were and continue to be Customer Property within the meaning of SIPA § 78lll(4), are
avoidable, and recoverable under sections 548(a), 550, and 551 of the Bankruptcy Code, and
applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**Answer ¶ 36.**  The allegations in paragraph 36 of the Complaint contain legal conclusions to

which no response is required.  To the extent a response is required, QSF denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 36 of the

Complaint and therefore denies those allegations.


Complaint ¶ 37:  The Fairfield Sentry Two Year Initial Transfers include approximately $1.1
billion which BLMIS transferred to Fairfield Sentry during the 90 days preceding the Filing Date
(the "Fairfield Sentry Preference Period Initial Transfers").  The Fairfield Sentry Preference
Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA
§ 78lll(4), are avoidable, and recoverable under sections 547, 550, and 551 of the Bankruptcy
Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**Answer ¶ 37.**  The allegations in paragraph 37 of the Complaint contain legal conclusions to

which no response is required.  To the extent a response is required, QSF denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 37 of the

Complaint and therefore denies those allegations.

Complaint ¶ 38:  The Fairfield Sentry Six Year Initial Transfers, the Fairfield Sentry Two Year
Initial Transfers, and the Fairfield Sentry Preference Period Initial Transfers are collectively
defined as the "Fairfield Sentry Initial Transfers."  Charts detailing these transfers are attached as
Exhibits B and C.

**Answer ¶ 38.**  QSF denies knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 38 of the Complaint, except QSF admits that Exhibits B and C are

attached to the Complaint.  To the extent Paragraph 38 refers to documents, QSF respectfully

refers to those documents for complete and accurate statements of their contents.


Complaint ¶ 39: Pursuant to the Bankruptcy Court's June 7 and Jun 10, 2011 orders, the
Bankruptcy Court approved a settlement among the Trustee, Fairfield Sentry, and others (the
"Settlement Agreement").  As part of the Settlement Agreement, on July 13, 2011, the
Bankruptcy Court entered a consent judgment granting the Trustee a judgment in the amount of
$3,054,000,000.  Fairfield Sentry is obligated to pay $70,000,000 to the Trustee under the terms
of the Settlement Agreement.

**Answer ¶ 39.**  QSF denies knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 39 of the Complaint and therefore denies those allegations.  To the

extent Paragraph 39 refers to documents, QSF respectfully refers to those documents for

complete and accurate statements of their contents.


Complaint ¶ 40:  Based on the Trustee's investigation to date, approximately $37,800,115 of the
money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield
Sentry to Defendant Quilvest (the "Fairfield Sentry Subsequent Transfers").  A chart setting forth
the presently known Fairfield Sentry Subsequent Transfers is attached as Exhibit D.

**Answer ¶ 40.**  The allegations in paragraph 40 of the Complaint contain legal conclusions to

which no response is required.  To the extent a response is required, QSF denies the allegations

in paragraph 40, except that QSF denies knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 40 regarding the prior status of funds allegedly

transferred from Fairfield Sentry to QSF, and to the extent Paragraph 40 refers to a document,

QSF respectfully refers to that document for a complete and accurate statement of its contents

while denying the Trustee's allegations related to that document.

Complaint ¶ 41:  As set forth in paragraph 40, a portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Quilvest and is recoverable from Defendant Quilvest pursuant to section 550 of the Bankruptcy Code.

**Answer ¶ 41.**  The allegations in paragraph 41 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, QSF denies the allegations in paragraph 41.

Complaint ¶ 42:  The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, Fairfield Sentry Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**Answer ¶ 42.**  QSF denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 42 and therefore denies those allegations.

Complaint ¶ 43:  The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

**Answer ¶ 43.**  QSF incorporates by reference and restates as if fully set forth herein its responses to the allegations of the Complaint contained in each of the previous paragraphs of this Answer.

Complaint ¶ 44.  Defendant Quilvest received the Fairfield Sentry Subsequent Transfers, totaling approximately $37,800,115, which are recoverable pursuant to Section 550 of the Bankruptcy Code.

**Answer ¶ 44.**  The allegations in paragraph 44 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, QSF denies the allegations in paragraph 44.

Complaint ¶ 45:  Each of the Fairfield Sentry Subsequent Transfers was made directly or indirectly to, or for the benefit of, Defendant Quilvest.

16

**Answer ¶ 45.**  The allegations in paragraph 45 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, QSF denies the allegations in paragraph 45.

Complaint ¶ 46:  Defendant Quilvest is an immediate or mediate transferee of the Fairfield Sentry Initial Transfers.

**Answer ¶ 46.**  The allegations in paragraph 46 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, QSF denies the allegations in paragraph 46.

Complaint ¶ 47:  As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant Quilvest recovering the Fairfield Sentry Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**Answer ¶ 47.**  The allegations in paragraph 47 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, QSF denies the allegations in paragraph 47.

48.     In response to the Trustee's "Wherefore" clause and requests for relief, QSF denies that the Trustee is entitled to his requested judgment in favor of the Trustee and against QSF, in whole or in part.  QSF further denies that the Court has jurisdiction to enter any such judgment.

49.     QSF states that the headings and subheadings throughout the Complaint do not constitute allegations of fact and therefore require no response.  To the extent responses are required, QSF states that its responses to the headings and subheadings are the same as the admissions and denials set forth in QSF's responses to the allegations set forth in the corresponding numbered paragraphs of the Complaint.

50.     To the extent that any of the allegations in the Complaint are not addressed in the

preceding paragraphs, such allegations are expressly denied.

51.     In responding to the allegations in the Complaint, QSF does not intend to waive, and

does not waive, any and all applicable objections to the relevance, admissibility, or prejudicial

effect of any of the allegations in the Complaint.

52.     Capitalized terms not separately defined in this Answer have the meaning set forth in

the Complaint.

53.     QSF expressly reserves the right to amend and/or supplement the Answer.

## AFFIRMATIVE DEFENSES

54.     QSF asserts the following defenses without assuming the burden of proof or any other

burden if such burdens would otherwise be on Plaintiff.  By designating these matters as

defenses, QSF does not intend to suggest that the Trustee does not bear the burden of proof as

to such matters or that such matters are not elements of the Trustee's *prima facie* claims against

QSF.  Also, QSF reserves the right to assert any other defenses as discovery in this litigation

proceeds or any counterclaims or third-party claims of which it may become aware through

discovery or other investigation as may be appropriate at a later time, in this adversary

proceeding or otherwise.

## FIRST AFFIRMATIVE DEFENSE

55.     This Court lacks personal jurisdiction over QSF for each of the reasons stated in

QSF's Memorandum of Law in Support of Defendant's Motion to Dismiss Plaintiff's

Complaint (ECF 107), filed on April 12, 2022 in this adversary proceeding. QSF has not

consented to a decision by this Court or to this Court's authority to hear and determine this

action.

## SECOND AFFIRMATIVE DEFENSE

56.     The Complaint fails to state a claim upon which relief can be granted, including for the

reasons stated in QSF's Memorandum of Law in Support of Defendant's Motion to Dismiss

Plaintiff's Complaint (ECF 107), filed on April 12, 2022 in this adversary proceeding.

## THIRD AFFIRMATIVE DEFENSE

57.     Plaintiff's claims are barred to the extent they and/or any allegations on which they are

based have been or may be dismissed or released by the Trustee or the Court or are based on

theories or allegations that have been or may be dismissed by the Trustee or the Court.

## FOURTH AFFIRMATIVE DEFENSE

58.     To the extent that QSF received any alleged Fairfield Sentry Subsequent Transfer or any

proceeds thereof, such property or funds may not be recovered because QSF took for value,

in good faith, and without knowledge of the avoidability of any transfer within the meaning of

11 U.S.C. § 550(b) and/or as a purchaser for fair consideration without knowledge of the fraud

at the time of the purchase or actual fraudulent intent within the meaning of NYDCL §§ 278(1)

and 278(2). To the extent QSF received any Fairfield Sentry Subsequent Transfer, QSF took

in good faith because it lacked knowledge that BLMIS was not trading securities or was

perpetrating a fraud or a Ponzi scheme, or of any fraudulent purpose behind the alleged

Fairfield Sentry Subsequent Transfers. QSF lacked knowledge of the voidability of any alleged

Fairfield Initial Transfers at the time it allegedly received any Fairfield Sentry Subsequent

Transfers.  QSF lacked actual fraudulent intent at the time it allegedly received any Fairfield

Sentry Subsequent Transfer.  QSF lacked knowledge of facts suggestive of any alleged fraud

that would have caused a reasonable person in its position to conduct further inquiry into

BLMIS about any possible fraud.  Any alleged Fairfield Sentry Subsequent Transfers received

by QSF were routine transfers made by Fairfield Sentry, taken for value, in exchange for

redemptions of investments in Fairfield Sentry and did not have a fraudulent purpose.  Any

such exchange was also for fair consideration, as a surrender of shares in Fairfield Sentry

constituted a fair equivalent of the property received.  Moreover, a reasonable person with the

facts in QSF's possession at the time of the alleged Fairfield Sentry Subsequent Transfers

would not have been on inquiry notice of any fraudulent purpose behind the Fairfield Sentry

Initial Transfers, nor would those facts have led such a person to conduct further inquiry into

whether there was a fraudulent purpose to them, into whether BLMIS was trading securities,

or into whether they related to a fraud or a Ponzi scheme.  Even if QSF had been on inquiry

notice of a possible fraudulent purpose behind the Fairfield Sentry Initial Transfers or of facts

that would have led a reasonable person to conduct further inquiry into whether BLMIS was

trading securities or was a fraud or a Ponzi scheme, a diligent inquiry by QSF would not have

discovered the allegedly fraudulent purpose of any transfer or that BLMIS was not trading

securities or was a fraud or a Ponzi scheme.  Other entities with vastly greater investigatory

tools and resources than QSF, and with more access to BLMIS personnel and documentation

that QSF, investigated BLMIS but failed to uncover that it was a Ponzi scheme before

December 2008.  This includes the United States Securities and Exchange Commission, which

began an investigation into BLMIS in 2006 but could not determine BLMIS's fraudulent

purpose.  QSF did not have the capability of discovering what U.S. federal regulators could not,

and QSF would not have discovered any fraudulent purpose of the Fairfield Sentry Initial

Transfers. Additionally, QSF did not have knowledge of the alleged voidability of the Fairfield

Sentry Initial Transfers at the time of the alleged Fairfield Sentry Subsequent Transfers.

## FIFTH AFFIRMATIVE DEFENSE

59.    Pursuant to 11 U.S.C. § 546(e), the Trustee may not avoid any alleged Fairfield Sentry

Initial Transfers, or pursue under 11 U.S.C. § 550(a) any recovery claims against QSF premised

upon the alleged avoidance or avoidability of any alleged Fairfield Sentry Initial Transfers,

except to the extent that the Trustee can establish that such transfers were made with actual

intent to defraud within two years before the Filing Date. Thus, the Trustee may neither avoid

the Fairfield Sentry Initial Transfers relevant to QSF nor maintain claims for recovery against

QSF because: (a) the relevant transfers were settlement payments and/or transfers made "in

connection with securities contracts" (*i.e.*, the BLMIS-Fairfield Sentry account agreements and

other agreements, including the Fairfield Sentry Articles of Association governing redemptions

of shares in Fairfield Sentry); (b) any relevant transfers were made by BLMIS in response to

Fairfield Sentry's requests for withdrawals; and (c) the alleged Fairfield Sentry Initial Transfers

were made by, to and for the benefit of entities covered by 11 U.S.C. § 546(e). QSF had no

actual knowledge that BLMIS was not trading securities or was perpetrating a fraud or a Ponzi

scheme, and all of the alleged Fairfield Sentry Initial Transfers preceding the alleged Fairfield

Sentry Subsequent Transfers were more than two years before the Filing Date.

## SIXTH AFFIRMATIVE DEFENSE

60.    The alleged Fairfield Sentry Subsequent Transfers may not be avoided or recovered

because QSF was not a transferee under any section of the U.S. Bankruptcy Code and was only

a mere conduit.  As such, QSF had no economic interest, dominion or control over the proceeds

of the alleged Fairfield Sentry Subsequent Transfers.

## SEVENTH AFFIRMATIVE DEFENSE

61.    The Trustee's claims are barred, in whole or in part, because Fairfield Sentry was a mere

conduit, and consequently, the alleged Fairfield Sentry Subsequent Transfers were initial

transfers from BLMIS.

## EIGHTH AFFIRMATIVE DEFENSE

62.    The alleged Fairfield Sentry Subsequent Transfers may not be recovered from QSF

because the alleged initial transfers from BLMIS to Fairfield Sentry have not been avoided.

## NINTH AFFIRMATIVE DEFENSE

63.    The property, if any, that QSF received from Fairfield Sentry was not customer property

of BLMIS or proceeds of customer property that BLMIS allegedly transferred to Fairfield

Sentry.  For reasons, including those set forth in QSF's Memorandum of Law in Support of

Defendant's Motion to Dismiss Plaintiff's Complaint (ECF 107), filed on April 12, 2022 in this

adversary proceeding, many of the alleged Fairfield Sentry Subsequent Transfers could not

have been sourced from BLMIS customer property because prior allegedly avoidable transfers

from BLMIS to Fairfield Sentry had been distributed by Fairfield Sentry to other entities prior

to the alleged Fairfield Sentry Subsequent Transfers.  Thus, alleged transfers from Fairfield

Sentry to QSF are not recoverable by the Plaintiff.

TENTH AFFIRMATIVE DEFENSE

64.    The Trustee's claims are barred, in whole or in part, because the Trustee fails to plead

all of the elements of fraudulent transfer under section 544 of the Bankruptcy Code and sections

273, 273-a, 274, 275, 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law.

ELEVENTH AFFIRMATIVE DEFENSE

65.    The Trustee's claims are barred, in whole or in part, by the applicable statute of

limitations.

TWELFTH AFFIRMATIVE DEFENSE

66.    Under section 550(d) of the Bankruptcy Code, the Trustee "is entitled to only a single

satisfaction" under 11 U.S.C. § 550(a).  Under NYDCL § 278, the Trustee may only set aside a

conveyance "to the extent necessary to satisfy his claim."  Accordingly, the Trustee may not

recover any subsequent transfer received by QSF to the extent the Trustee has recovered, or will

recover, from Fairfield Sentry or any other immediate or mediate transferee the amount of an

allegedly avoided initial transfer that included the customer property that Plaintiff alleges QSF

received.

THIRTEENTH AFFIRMATIVE DEFENSE

67.    This Court lacks jurisdiction under Article III of the U.S. Constitution to entire final

orders or judgments in this proceeding.

## FOURTEENTH AFFIRMATIVE DEFENSE

68.    Plaintiff's recovery from QSF of any transfer from Fairfield Sentry would constitute an impermissible extraterritorial application of U.S. law.

## FIFTEENTH AFFIRMATIVE DEFENSE

69.    Plaintiff's recovery from QSF of any transfer from Fairfield Sentry would violate principles of international comity.

70.    Plaintiff's recovery from QSF of any transfer from Fairfield Sentry would be inconsistent with the rulings, orders, decisions, and judgments entered in the liquidation proceeding of Fairfield Sentry in the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands, including related appellate rulings, orders, decisions, and judgments.

## SIXTEENTH AFFIRMATIVE DEFENSE

71.    The trustee is not entitled to an award of interest.

## SEVENTEENTH AFFIRMATIVE DEFENSE

72.    The Trustee stands in the shoes of BLMIS, which committed the alleged frauds that resulted in the alleged losses the Trustee seeks to recover from QSF.  The Trustee is barred from recovering such losses from QSF because BLMIS's acts and omissions are attributed to the Trustee by the doctrines of *in pari delicto* and unclean hands.

## EIGHTEENTH AFFIRMATIVE DEFENSE

73.    The Trustee's claims are barred, in whole or in part, because the Plaintiff has failed to mitigate, minimize, or avoid damages, if any.

## NINETEENTH AFFIRMATIVE DEFENSE

74.    The Trustee's claims should be dismissed if there are recovered, now or during the

pendency of this action, sufficient funds to reimburse SIPC for all payments that SIPC has

made to satisfy allowed claims of BLMIS customers.

## TWENTIETH AFFIRMATIVE DEFENSE

75.    To the extent the Trustee recovers from QSF, QSF reserves the right to assert a claim

arising from such recovery under 11 U.S.C. § 502(h).

## TWENTY-FIRST AFFIRMATIVE DEFENSE

76.    The use of the doctrine of law of the case to apply to QSF rulings made in other

adversary proceedings to which it was not a party and in which it did not participate violates

QSF's rights to due process of law.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

77.    The Trustee's claims against QSF are barred by the doctrine of laches.  The Trustee's

unreasonable delay in bringing and prosecuting claims which were brought more than a decade

ago and concern transfers allegedly made more than fifteen years ago has unreasonably and

unfairly prejudiced QSF.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

78.    The Trustee's claims are barred by estoppel.

79.     QSF reserves the right to amend this Answer to assert other and further defenses,

crossclaims, and/or third-party claims when and if, in the course of discovery, investigation, or

preparation for trial, it becomes appropriate to do so.

## JURY TRIAL DEMAND

80.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, made applicable to this

proceeding by Rule 9015 of the Federal Rules of Bankruptcy Procedure, QSF hereby demands

a jury trial on all claims and issues that may be tried to a jury.

## FINAL ORDER OR JUDGMENT STATEMENT

81.     QSF objects and does not consent to the entry of final orders or judgments against QSF

by the Bankruptcy Court.

## REQUEST FOR RELIEF

WHEREFORE, QSF requests judgment dismissing the Complaint with prejudice,

together with an award of attorneys' fees, costs, disbursements, and such other relief as the Court

deems just and appropriate.

Dated: November 30, 2022
New York, New York

By: _/ s / Thomas E. Lynch_____
Thomas E. Lynch
JONES DAY
250 Vesey Street
New York, New York 10281
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Email:  telynch@jonesday.com

*Attorneys for QS Finance Ltd.*
*(formerly known as Quilvest Finance Ltd.)*