**KOBRE & KIM LLP**
800 Third Avenue
New York, New York 10022
Telephone: (212) 488-1200
Zachary.Rosenbaum@kobrekim.com
Adam.Lavine@kobrekim.com
Donna.Xu@kobrekim.com

*Attorneys for Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01690 (CGM) |
| Plaintiff, | |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT** |
| EFG BANK S.A., f/k/a EFG Private Bank S.A., EFG BANK (MONACO) S.A.M., f/k/a EFG Eurofinancière d'Investissements S.A.M., and EFG BANK & TRUST (BAHAMAS) LIMITED, as successor-in interest to Banco Atlántico (Bahamas) Bank & Trust Limited, | |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ..................................................................................................... 4

   I.   General Background Regarding BLMIS and the Fairfield Funds ....................... 4

   II.   The Adversary Proceeding Against the EFG Defendants.................................... 5

   III.   The Trustee's Complaints Against Other Alleged Subsequent Transferees....................... 7

ARGUMENT .......................................................................................................... 7

   I.   The Court Lacks Personal Jurisdiction Over the EFG Defendants..................... 7

     A.   The Amended Complaint Fails to Allege Sufficient Minimum Contacts with New York and the United States .............................................................. 8

        1. EFG Monaco Lacks Sufficient Minimum Contacts ..................................... 8

        2. EFG Bahamas Lacks Sufficient Minimum Contacts ................................... 16

        3. EFG Bank Lacks Sufficient Minimum Contacts.......................................... 18

     B.   The Exercise of Personal Jurisdiction Over the EFG Defendants Would Be Unreasonable ............................................................................................. 19

   II.   The Trustee's Claim Is Barred By 11 U.S.C. § 546(e) ..................................... 21

     A.   The Initial Transfers Were Settlement Payments and Made in Connection with a Securities Contract.............................................................................. 22

     B.   The Initial Transfers Were Made By or to a Covered Entity ......................... 24

        1. The Initial Transfers Were Made By a Stockbroker .................................. 24

        2. The Initial Transfers Were Made To (Or For the Benefit Of) A Financial Institution 25

     C.   Sentry's Alleged Knowledge of Madoff's Fraud Does Not Defeat the EFG Defendants' Ability to Invoke the 546(e) Safe Harbor .............................................. 26

   III.   The Amended Complaint Fails to Plausibly Allege that the EFG Defendants Received BLMIS Customer Property ..................................................................... 28

   IV.   The Trustee's Own Allegations Establish that the EFG Defendants Are Entitled to the Application of the Good Faith Defense................................................................. 32

     A.   The EFG Defendants Gave Value in Exchange for the Redemption Payments ........... 32

     B.   The EFG Defendants Acted in Good Faith and Could Not Have Discovered Madoff's Fraud Where So Many Others Failed .................................................... 33

     C.   The EFG Defendants Lacked Knowledge of Voidability ............................. 35

   CONCLUSION...................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Rushaid v. Pictet & Cie,*
 28 N.Y.3d 316 (2016) ........................................................................................... 16

*Angell v. BER Care, Inc (In re Caremerica, Inc.),*
 409 B.R. 737 (Bankr. E.D.N.C. 2009) ................................................................. 36

*Picard v. Citibank, N.A. (In re BLMIS),*
 12 F.4th 171 (2d Cir. 2021) .................................................................... 10, 40, 42

*Asahi Metal Indus. Co. v. Superior Court,*
 480 U.S. 102 (1987) ....................................................................................... 17, 27

*Atherton v. F.D.I.C.,*
 519 U.S. 213 (1997) .............................................................................................. 39

*Bell Atl. Corp. v. Twombly,*
 550 U.S. 544 (2007) ......................................................................................... 36, 38

*SIPC v. Bernard L. Madoff Inv. Sec. LLC,*
 476 B.R. 715 (S.D.N.Y. 2012) .............................................................................. 32

*Bernard L. Madoff Inv. Sec. LLC,*
 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ........................................... 30, 31, 34

*Burger King Corp. v. Rudzewicz,*
 471 U.S. 462 (1985) .............................................................................................. 17

*Charles Schwab Corp. v. Bank of Am. Corp.,*
 883 F.3d 68 (2d Cir. 2018) .............................................................................. 18, 23

*City of Long Beach v. Total Gas & Power N. Am. Inc.,*
 465 F. Supp. 3d 416 (S.D.N.Y. 2020) ................................................................... 18

*Comm. of Unsecured Creditors of Arcapita Bank v. Bahrain Islamic Bank,*
 549 B.R. 56 (S.D.N.Y. 2016) ................................................................................ 15

*Cooper v. Parsky,*
 1997 WL 242534 (S.D.N.Y. Jan. 8, 1997) ...................................................... 18, 23

*Cooper v. Parsky,*
 140 F.3d 433 (2d Cir. 1998) .................................................................................. 18

*Daimler AG v. Bauman,*
 571 U.S. 117 (2014) .............................................................................................. 14

*Enron Corp. v. Bear, Stearns Int'l Ltd. (In re Enron Corp.),*
 323 B.R. 857 (Bankr. S.D.N.Y. 2005) .................................................................. 32

*Fairfield Sentry Ltd. v. Citibank, N.A. London,*
2022 WL 4391023 (S.D.N.Y. Sep. 22, 2022) .......................................................... 19

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.),*
2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ................................................ 19

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.),*
2020 WL 7345988 (Bankr. S.D.N.Y. Dec. 14, 2020) .............................................. 28

*Ferrante Equip. Co. v. Lasker-Goldman Corp.,*
31 A.D.2d 355 (1969) ............................................................................................... 17

*Ferrante Equip. Co.,*
26 N.Y.2d ............................................................................................................ 17, 18

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.,*
141 S. Ct. 1017 (2021) ............................................................................................. 26

*Garfinkle v. Conf. on Jewish Material Claims Against Germany, Inc.,*
2020 WL 6323462 (S.D.N.Y. Oct. 28, 2020) .......................................................... 38

*Grow Grp., Inc. v. Jandernoa,*
1996 WL 31848 (S.D.N.Y. Jan. 26, 1996) ............................................................... 21

*Hau Yin To v. HSBC Holdings, PLC,*
2017 WL 816136. (S.D.N.Y. Mar. 1, 2017) ............................................................. 20

*Hill v. HSBC Bank plc,*
207 F.Supp. 3d 333 .................................................................................................. 20

*HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.,*
2021 WL 918556 (S.D.N.Y. Mar. 10, 2021) ........................................................... 22

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.,*
529 F. Supp. 3d 111 (S.D.N.Y. 2021) ..................................................................... 22

*In re Amaranth Natural Gas Commodities Litig.,*
587 F. Supp. 2d 513 (S.D.N.Y. 2008) ..................................................................... 16

*In re Mexican Gov't Bonds Antitrust Litig.,*
2020 WL 7046837 (S.D.N.Y. Nov. 30, 2020) ......................................................... 19

*In re SSA Bonds Antitrust Litig.,*
420 F. Supp. 3d 219 (S.D.N.Y. 2019) ..................................................................... 22

*In re Terrorist Attacks on September 11, 2001,*
714 F.3d 659 (2d Cir. 2013) .................................................................................... 14

*In re Trib. Co. Fraudulent Conv. Litig.,*
10 F.4th 147 (2d Cir. 2021) ..................................................................................... 31

*In re Trib. Co. Fraudulent Conv. Litig.,*
946 F.3d 66 (2d Cir. 2019) ................................................................................ 29, 32

iv

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re BLMIS*),
   531 B.R. 439 (Bankr. S.D.N.Y. 2015) ................................................................... 36

*J. McIntyre Mach., Ltd. v. Nicastro*,
   564 U.S. 873 (2011) .............................................................................................. 19

*Jesner v. Arab Bank, PLC*,
   138 S. Ct. 1386 (2018) .......................................................................................... 21

*Khan v. Mahia* (*In re Khan*),
   2014 WL 4956676 (Bankr. E.D.N.Y. Sept. 30, 2014) ......................................... 38

*LaMonica v. CEVA Grp., PLC* (*In re CIL Ltd.*),
   582 B.R. 46 (Bankr. S.D.N.Y. 2018) ................................................................... 27

*Lavazza Premium Coffees Corp. v. Prime Line Dis-trib. Inc.*,
   2021 WL 5909976 (S.D.N.Y. Dec. 10, 2021) ..................................................... 21

*Law v. Siegel*,
   571 U.S. 415 (2014) .............................................................................................. 34

*Leema Enters., Inc. v. Willi*,
   575 F. Supp. 1533 (S.D.N.Y. 1983) ..................................................................... 24

*Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A.* (*In re Lehman Bros. Holdings Inc.*),
   469 B.R. 415 (Bankr. S.D.N.Y. 2012) ................................................................. 30

*Letom Mgmt. Inc. v. Centaur Gaming, LLC*,
   2017 WL 4877426 (S.D.N.Y. Oct. 27, 2017) ..................................................... 20

*Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*,
   12 N.E.3d 456 (N.Y. 2014) ................................................................................... 21

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
   138 S. Ct. 883 (2018) ..................................................................................... 28, 34

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
   84 F.3d 560 (2d Cir. 1996) ................................................................................... 28

*Nat'l Ass'n v. Bank of Am. N.A.*,
   916 F.3d 143 (2d Cir. 2019) ................................................................................. 16

*Neewra, Inc. v. Manakh Al Khaleej Gen. Trading and Contracting Co.*,
   2004 WL 1620874 (S.D.N.Y. July 20, 2004) ...................................................... 16

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) .............................................................................................. 33

*O'Toole v. Myplace Dev. Sp. Z O.O.* (*In re Sledziejowski*),
   2016 WL 6155929 (Bankr. S.D.N.Y. Oct. 21, 2016) ......................................... 24

*Picard v. ABN AMRO Bank N.A.* (*In re BLMIS*),
   2020 WL 1584491 (Bankr. S.D.N.Y. Mar. 31, 2020) ......................................... 39

*Picard v. Banque SYZ & Co., SA* (*In re BLMIS*),
  2022 WL 2135019 (Bankr. S.D.N.Y. 2022).............................................................. 8

*Picard v. BNP Paribas S.A.* (*In re BLMIS*),
  594 B.R. 167 (Bankr. S.D.N.Y. 2018)..................................................................... 15

*Picard v. Fairfield Inv. Fund* (*In re BLMIS*),
  2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021).......................................... 28, 29

*Picard v. Ida Fishman Revocable Trust* (*In re BLMIS*),
  773 F.3d 411 (2d Cir. 2014) .......................................................... 29, 30, 31, 32

*Picard v. Merkin* (*In re BLMIS*),
  515 B.R. 117 (Bankr. S.D.N.Y. 2014)................................................................ 35, 37

*Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*),
  2022 WL 2137073 (CGM) ....................................................................................... 8

*Picard v. Shapiro* (*In re BLMIS*),
  542 B.R. 100 (Bankr. S.D.N.Y. 2015)................................................................ 35, 36

*Porina v. Marward Shipping Co.*,
  2006 WL 2465819 (S.D.N.Y. Aug. 24, 2006)........................................................ 28

*Brandt v. Horseshoe Hammond, LLC* (*In re Equip. Acq. Res., Inc.*)
  803 F.3d 835 (7th Cir. 2015) ................................................................................ 42

*Rocky Mountain Chocolate Factory v. Arellano*,
  2017 WL 4697503 (D. Colo. Oct. 19, 2017)......................................................... 27

*Rosenblatt v. Coutts & Co. AG*,
  2017 WL 3493245 (S.D.N.Y. Aug. 14, 2017)......................................................... 21

*Silverman v. Actrade Capital, Inc.* (*In re Actrade*),
  337 B.R. 791 (Bankr. S.D.N.Y. 2005)..................................................................... 34

*SPV OSUS Ltd. v. UBS AG*,
  114 F. Supp. 3d 161 (S.D.N.Y. 2015) ..................................................................... 16

*Strandberg v. State Farm Mutual Auto Ins. Co.*,
  2016 WL 614401 (D. Nev. Feb. 16, 2016)............................................................. 35

*Tamam v. Fransabank Sal*,
  677 F. Supp. 2d 720 (S.D.N.Y. 2010) ..................................................................... 20

*Taylor v. Sturgell*,
  553 U.S. 880 (2008) .............................................................................................. 33

*Tera Group, Inc. v. Citigroup, Inc.*,
  2018 WL 4732426 (S.D.N.Y. Sept. 28, 2018) .................................................. 15, 22

*Universal Trading & Inv. Co. v. Tymoshenko*,
  2012 WL 6186471 (S.D.N.Y. 2012) ........................................................................ 21

*Walden v. Fiore,*
    571 U.S. 277 (2014) ................................................................ 17

*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286, 297 (1980) ........................................................ 26

*Zim Integrated Shipping Servs. Ltd. v. Bellwether Design Techs. LLC,*
    2020 WL 5503557 (S.D.N.Y. Sept. 10, 2020) ........................ 16


**Statutes**

11 U.S.C. § 101(22)(A) ................................................................ 32

11 U.S.C. § 550(a)(1), (2) ............................................................ 28

11 U.S.C. § 741(7)(A)(i) .............................................................. 31

11 U.S.C. §§ 101(22) ............................................................ 32, 33

Bankruptcy Code Section 546(e) ........................................... *passim*

Section 550 of Title 11 of the United States Code ......................... 8

Section 550(a) of the Bankruptcy Code ............................... 28, 37

Section 550(b) of the Bankruptcy Code ..................................... 39


**Rules**

Fed. R. Bankr. P. 7004 ................................................................ 15

Fed. R. Civ. P. 12(b)(2) ................................................................ 8

Fed. R. Civ. P. 12(b)(6) ........................................................ 8, 29

N.Y. C.P.L.R. § 302 .................................................................... 15

N.Y.C.P.L.R. § 302(a)(1) ............................................................ 16

EFG Bank S.A. (a/k/a EFG Bank AG) ("EFG Bank"), EFG Bank (Monaco) S.A.M. ("EFG Monaco"), and EFG Bank & Trust (Bahamas) Limited ("EFG Bahamas," and collectively, the "EFG Defendants,"), by the undersigned, respectfully submit this memorandum of law in support of their motion to dismiss, with prejudice, the Amended Complaint filed by plaintiff Irving H. Picard (the "Trustee"), as trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure.[1]

## PRELIMINARY STATEMENT

The EFG Defendants and their customers are victims of the fraud perpetuated by BLMIS and Bernard L. Madoff.  Nevertheless, the Trustee seeks to impose even greater losses by clawing back redemptions withdrawn by the EFG Defendants' customers in the six years prior to the BLMIS bankruptcy filing.[2]

Although the Trustee often claims that he brings suits such as this one to ensure equitable treatment amongst similarly situated victims of the Madoff fraud, that simply is not true with respect to the EFG Defendants.  Because the EFG Defendants had no direct privity with BLMIS, and because they were investing on behalf of individual customers of the EFG Defendants, *they stand to lose vastly more than other victims of the Madoff fraud.*  This is because most Madoff victims are able to access recoveries of at least seventy percent or more, either by participating in recoveries made available by the Trustee and the BLMIS estate, by the Madoff Victim Fund, or

---

[1] The EFG Defendants acknowledge that the Court has rejected arguments similar to those raised in this motion in related cases. *See e.g.*, *Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), Adv. Pro. No. 12-01205, 2022 WL 2137073 (CGM) (Bankr. S.D.N.Y. 2022); *Picard v. Banque SYZ & Co., SA* (*In re BLMIS*), Adv. Pro. No. 11-02149 (CGM), 2022 WL 2135019 (Bankr. S.D.N.Y. 2022).  The EFG Defendants advance these arguments to preserve their arguments on appeal and because, as to personal jurisdiction, this motion warrants a different outcome due to the particular facts of the case.

[2] Specifically, the Trustee alleges that the EFG Defendants received transfers of approximately $298.44 million from Fairfield Sentry Limited ("Sentry"), Fairfield Sigma Limited ("Sigma"), and Fairfield Lambda Limited ("Lambda," and together with Sentry and Sigma, the "Fairfield Funds") in the six years prior to BLMIS's bankruptcy, and that such funds are recoverable under Section 550 of Title 11 of the United States Code (the "Bankruptcy Code") because the EFG Defendants were alleged subsequent transferees of alleged fraudulent transfers made by BLMIS.

by both.  The EFG Defendants, however, have been barred from participating in those meaningful recoveries, chiefly because their clients, who were also foreign, made investments through beneficial ownership of equity positions in foreign vehicles—*i.e.*, shares in the Fairfield Funds.[3]

Many of the foreign aspects of the alleged transfers, however, coupled with other pleading deficiencies in the Trustee's amended complaint, demonstrate that the Trustee's claims should not be allowed to proceed. Declaration of Paul Kanellopoulos ("Kanellopoulos Decl.") Ex. 1 (the "Amended Complaint" or "Am. Compl.").  Indeed, the Amended Complaint contains four separate pleading deficiencies, each independently warranting dismissal of either the entire Amended Complaint or, at the very least, the majority of claims asserted therein.

*First*, the Court lacks personal jurisdiction over the EFG Defendants.  The Trustee seeks to hail into court three foreign entities that engaged in no transactions in the United States, merely because their clients invested in securities issued by foreign funds that, in turn, invested in the United States.  In doing so, the Trustee would have this Court disavow precedent holding that a third party's connections to the forum state (such as the Fairfield Funds') cannot be used to establish personal jurisdiction over a foreign defendant, such as EFG Bank, EFG Monaco, and EFG Bahamas.  The Trustee's other personal jurisdiction allegations concerning the EFG Defendants' alleged connections to the U.S. do not withstand scrutiny.

*Second*, Bankruptcy Code Section 546(e) prevents the Trustee from avoiding the majority of the alleged transfers at issue in this case.  Section 546(e) prohibits the Trustee from avoiding a transfer (1) that was either a settlement payment or a transfer in connection with a securities

---

[3] The Fairfield Funds themselves have also refused to provide the EFG Defendants with any recoveries to date. Instead, they are suing them.  *See Fairfield Sentry Limited* (*In Liquidation*) *et al. v. Theodoor GGC Amsterdam et al.* (*In re Fairfield Sentry Ltd.*), Adv. Pro. No. 10-03496 (CGM); *Fairfield Sentry Limited* (*In Liquidation*) *et al v. Theodoor GGC Amsterdam et al.* (*In re Fairfield Sentry Ltd.*), Adv. Pro No. 10-03635 (CGM); *Fairfield Sentry Limited* (*In Liquidation*) *et al v. Theodoor GGC Amsterdam et al.* (*In re Fairfield Sentry Ltd.*), Adv. No. 10-03636 (CGM).

2

contract, and (2) that was made by or to (or for the benefit of) a covered entity such as a stockbroker, financial institution, or financial participant. As is discussed below in detail, the transfers alleged in the Amended Complaint fall within the plain text of Section 546(e)'s safe harbor, thus barring the Trustee from recovering redemptions more than two years before BLMIS's December 11, 2008 bankruptcy filing. Not applying the safe harbor here as written would undermine the very securities markets Section 546(e) was designed to protect.

*Third*, the Amended Complaint makes no attempt to tie the funds allegedly received by the EFG Defendants to transfers first made from BLMIS to Sentry. Although the Trustee alleges that specific amounts were transferred on specific dates, what those allegations purport to show is implausible: that investors such as clients of the EFG Defendants (and others) received from Sentry approximately $2 billion *more* of purported BLMIS customer property than BLMIS ever transferred to Sentry. The Trustee's own allegations also *establish* that, at particular times, Sentry transferred millions more to the EFG Defendants than it had on hand from BLMIS. As a result, the Trustee's allegations that all of the funds he seeks to claw back are BLMIS customer property are not only implausible; they are impossible.

*Fourth*, the Trustee's Amended Complaint makes clear that the EFG Defendants are entitled to dismissal because they acted in good faith and provided value in exchange for their receipt of redemption payments. As the Second Circuit recently held in *Picard v. Citibank, N.A. (In re BLMIS)*, 12 F.4th 171 (2d Cir. 2021), to lose the protections afforded by the good faith defense, a defendant must have been able to reasonably discover the Madoff fraud, even if that defendant was on inquiry notice of suspicious facts. Here, the Amended Complaint demonstrates that the EFG Defendants could not realistically have discovered Madoff's fraud from their position as foreign entities whose clients invested in the Fairfield Funds without direct accounts at BLMIS.

3

Among other things, the Amended Complaint outlines an extraordinarily complex and effective fraud that duped thousands of investors, not to mention highly sophisticated regulators with subpoena powers, like the SEC. As a result, it was not objectively reasonable to expect that the EFG Defendants could have discovered that fraud.

For these reasons and as explained further below, the EFG Defendants respectfully request that the Amended Complaint be dismissed with prejudice.

## BACKGROUND

### I. General Background Regarding BLMIS and the Fairfield Funds

On December 11, 2008 (the "Filing Date"), the U.S. Securities and Exchange Commission commenced proceedings in the District Court for the Southern District of New York against BLMIS. Am. Compl. ¶ 8. The District Court appointed the Trustee for the liquidation of BLMIS and removed the action to the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Id. ¶ 9.

In 2009, the Trustee commenced an adversary proceeding in the Bankruptcy Court against Sentry, styled as Picard v. Fairfield Sentry Ltd., Adv. Pro. No. 09-01239 (the "Fairfield Action"), seeking to avoid and recover approximately $3 billion in transfers of alleged customer property from BLMIS to Sentry (the "Initial Transfers"). Id. ¶ 85. Sentry was an investment fund organized under the laws of the British Virgin Islands, which sold shares directly to foreign investors. Second Amended Complaint (the "Second Amended Fairfield Complaint"), Fairfield Action, Dkt. No. 286 ¶ 12 (Kanellopoulos Decl. Ex. 2).

On July 20, 2010, the Trustee amended the complaint in the Fairfield Action to, among other things, seek to recover approximately $752.3 million in subsequent transfers from Sentry to Sigma and approximately $52.9 million in subsequent transfers from Sentry to Lambda. First Amended Complaint, Fairfield Action, Dkt. No. 23 ¶¶ 53, 58 ("First Amended Fairfield

Complaint") (Kanellopoulos Decl. Ex. 3).  As alleged by the Trustee, Sigma and Lambda were British Virgin Islands International Business Companies wholly invested in Sentry.  Second Amended Fairfield Complaint ¶¶ 96, 97.

On May 9, 2011, the Trustee settled with Kenneth Krys and Charlotte Caulfield, the then-liquidators of the Fairfield Funds (the "Fairfield Liquidators").  *See* Settlement Agreement (the "Fairfield Settlement"), Fairfield Action, Dkt. No. 69-2 (Kanellopoulos Decl. Ex. 4).  On July 13, 2011, this Court entered consent judgments in favor of the Trustee against Sentry for $3.054 billion, Consent Judgment, Fairfield Action, Dkt. No. 109 (Kanellopoulos Decl. Ex. 5, at 5), against Sigma for $752.3 million, Consent Judgment, Fairfield Action, Dkt. No. 110 (Kanellopoulos Decl. Ex. 6, at 5), and against Lambda for $52.9 million, Consent Judgment, Fairfield Action, Dkt No. 108 (Kanellopoulos Decl. Ex. 7, at 5).  In the Fairfield Settlement, the Trustee and the Fairfield Liquidators "each agree[d] to provide reasonable access to the other's documents, data, and other information . . . ."  Fairfield Settlement ¶ 14.

On August 28, 2020, the Trustee filed the Second Amended Fairfield Complaint, which the Trustee incorporates by reference in the Amended Complaint, seeking to recover, as BLMIS customer property, *inter alia*, approximately $1 billion in amounts allegedly paid by Sentry to certain individuals and entities connected to Fairfield Greenwich Group ("FGG").  *See* Exhibits 8, 10, 12, 13, 14, and 21 to the Second Amended Fairfield Complaint, Fairfield Action, Dkt. Nos. 286-8, 286-10, 286-12, 286-13, 286-14, and 286-21 (Kanellopoulos Decl. Ex. 8).

## II.    The Adversary Proceeding Against the EFG Defendants

On June 6, 2012, the Trustee commenced this adversary proceeding against the EFG Defendants by filing the Complaint, which was amended on October 14, 2022.  The Amended Complaint alleges that the EFG Defendants were three separate entities: (1) EFG Bank an *aktiengesellschaft* located in Switzerland; (2) EFG Monaco a *société anonyme* located in Monaco;

5

and (3) EFG Bahamas a Bahamian company located in the Bahamas, all of which offered private banking services.  Am. Compl. ¶¶ 53–55.  The Amended Complaint further alleges that EFG Bahamas' predecessor was Banco Atlántico, which was first acquired by Banco Sabadell in 2004 before being transferred to EFG Bahamas in or about June 2005.  According to the Amended Complaint, all of the EFG Defendants "collectively functioned as one entity for the purposes alleged herein," throughout the relevant period for EFG Bank and EFG Monaco, and after its creation in June 2005 for EFG Bahamas.  *Id.* ¶¶ 55, 58–62.

According to the Amended Complaint, when the EFG Defendants redeemed their clients' investments in the Fairfield Funds, they collectively received from those Fairfield Funds approximately $298.4 million in subsequent transfers of purported customer property (the "Subsequent Transfers").  *Id.* ¶ 2.  The Trustee alleges that, on particular dates in the six-year period preceding the Filing Date, Sentry transferred in the form of redemption payments: $187,418,854 to EFG Bank (Am. Compl. ¶ 92 & Ex. C); $5,045,022 to EFG Monaco (*id.* ¶ 106 & Ex. H); and $96,152,343 to EFG Bahamas (*id.* ¶ 110 & Ex. I).  The Trustee further alleges that, during the same time period, Sigma transferred in the form of redemption payments: $789,152,864 to EFG Bank (*id.* ¶ 96 & Ex. D); and $1,802,938 to EFG Bahamas (*id.* ¶ 114 & Ex. J).  The Trustee further alleges that Lambda transferred in the form of redemption payments $657,379 to EFG Bank (*id.* ¶ 102 & Ex. G).

The Trustee does not identify any details concerning the source of these redemption payments.  He does not tie any specific portion of the Initial Transfers to the EFG Defendants.  Nor does he indicate what portions of the Subsequent Transfers to the EFG Defendants were sourced from BLMIS.  The Trustee, instead, speaks only in broad generalities, alleging generically

6

that Sentry, Sigma, and Lambda transferred to the EFG Defendants a "portion of" the Initial

Transfers from BLMIS to Sentry. *Id.* ¶¶ 92, 106, 110, 114.

## III.    The Trustee's Complaints Against Other Alleged Subsequent Transferees

In addition to the claims against the EFG Defendants, the Trustee has commenced dozens

of actions against other alleged subsequent transferees of Sentry, seeking to recover payments that

the alleged subsequent transferee defendants received for redeeming their shares in the Fairfield

Funds.   *See* Trustee's Twenty-Eighth Interim Report for the Period April 1, 2022 through

September 30, 2022 filed in the substantively consolidated SIPA liquidation proceeding captioned

*Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC*, Adv. Pro.

No. 08-01789, Dkt. No. 22500 (Kanellopoulos Decl. Ex. 9).   In those actions, the Trustee seeks to

recover at least $3.4 billion from defendants who allegedly received redemption payments from

Sentry on top of the $1.8 billion of subsequent transfers alleged in the Fairfield Action.

(Kanellopoulos Decl. ¶ 18 & Ex. 8; First Amended Fairfield Complaint ¶¶ 53, 58).

## ARGUMENT

## I.    The Court Lacks Personal Jurisdiction Over the EFG Defendants

The Trustee does not assert any basis for general personal jurisdiction over the EFG

Defendants.   Because the EFG Defendants are not alleged to be "at home" in the United States,

the Trustee must demonstrate that the Court can appropriately exercise specific jurisdiction over

them. *See Daimler AG v. Bauman*, 571 U.S. 117, 136–37 (2014).   To do so, the Trustee must

establish that (1) his claims arose out of the EFG Defendants' sufficient "minimum contacts with

the relevant forum," and (2) "the exercise of jurisdiction is reasonable in the circumstances." *In

re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (internal quotation

marks omitted).[4]  As set forth below, the Amended Complaint does not sufficiently allege either requirement for specific jurisdiction.

A.  The Amended Complaint Fails to Allege Sufficient Minimum Contacts with New York and the United States

As Judge Bernstein held, each redemption payment is a separate claim for jurisdictional purposes.  *See Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Each transfer is a separate claim, and the Trustee must establish the court's jurisdiction with respect to each claim asserted.").  Accordingly, the Trustee must establish the Court's jurisdiction over each of the EFG Defendants for each individual redemption.  *See Tera Group, Inc. v. Citigroup, Inc.*, No. 17-CV-4302 (RJS), 2018 WL 4732426, at *3 (S.D.N.Y. Sept. 28, 2018) (holding that jurisdictional allegations must be pled as to each defendant). The Amended Complaint fails to allege sufficient minimum contacts against EFG Monaco, EFG Bahamas, or EFG Bank to confer specific jurisdiction.

1.  *EFG Monaco Lacks Sufficient Minimum Contacts*

The Amended Complaint makes no specific allegations that EFG Monaco had contacts with the United States.  Instead, the Trustee asserts personal jurisdiction based on the assertions that (1) "Defendants" knew that Sentry might invest EFG Monaco's funds in the United States securities market through BLMIS, (2) "Defendants" executed subscription agreements consenting to jurisdiction in New York and with a New York choice of law provision, (3) "Defendants" directed subscription payments to Sentry through a correspondent bank account located in the United States, (4) contacts by other EFG Defendants can be imputed to EFG Monaco, and (5) EFG

---

[4] The Trustee bases personal jurisdiction on New York's long-arm statute, N.Y. C.P.L.R. § 302, and Federal Rule of Bankruptcy Procedure 7004.  Am. Compl. ¶ 84.  The federal jurisdictional analysis "closely resemble[s]" New York's long-arm statute and due process requirements, so the analyses are largely interchangeable.  *Off. Comm. of Unsecured Creditors of Arcapita Bank v. Bahrain Islamic Bank*, 549 B.R. 56, 68 (S.D.N.Y. 2016).

Capital, who allegedly acted on behalf of EFG Monaco, had contacts with the United States. Each of these theories fails as a matter of law.[5]

*First*, the alleged basis for liability is not EFG Monaco's decision to subscribe for shares in Sentry or to gain exposure to BLMIS and Madoff's trading strategy. Rather, the Trustee seeks the recovery of a single subsequent transfer to EFG Monaco and the alleged basis for EFG Monaco's liability is the redemption of Sentry shares that gave rise to that subsequent transfer. *See* Am. Compl. ¶¶ 106, 109. Each aspect of EFG Monaco's conduct with respect to that alleged redemption was foreign—a Monegasque entity sent instructions from Monaco on behalf of a foreign customer to redeem shares held in an entity located in the British Virgin Islands. Accordingly, there is no connection between the forum and the specific claims at issue. *See also In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 536–37 (S.D.N.Y. 2008) (finding that defendant lacked the requisite minimum contacts with the forum where "[t]he only connection between [Defendant] and the forum is that the company invested in a foreign hedge fund located in the Cayman Islands but managed by plaintiffs" and "never allegedly directed any activity toward the United States."); *Zim Integrated Shipping Servs. Ltd. v. Bellwether Design Techs. LLC*, No. 19-CV-3444 (VSB), 2020 WL 5503557, at *5 (S.D.N.Y. Sept. 10, 2020) (various contacts with New York are insufficient to confer personal jurisdiction under N.Y.C.P.L.R. § 302(a)(1) where none gave rise to plaintiff's cause of action); *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 323 n.4 (2016) (to establish jurisdiction, the cause of action must arise from the very transactions that are relied upon to provide the contact with the forum).

---

[5] The Trustee also alleges that EFG Bank and EFG Monaco invested in Kingate Global Fund Limited ("Kingate Global"). Kingate investments have no relevance this case and the Trustee's claims do not "arise out of or relate to" those investments. *U.S. Bank. Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019); *SPV OSUS Ltd. v. UBS AG*, 114 F. Supp. 3d 161, 170 (S.D.N.Y. 2015), *aff'd*, 882 F.3d 333 (2d Cir. 2018) (no personal jurisdiction where contacts related to a contract not at issue in the claim); *Neewra, Inc. v. Manakh Al Khaleej Gen. Trading and Contracting Co.*, No. 03-CV-2936 (MBM), 2004 WL 1620874, at *3–5 (S.D.N.Y. July 20, 2004) (no personal jurisdiction where the purported contacts did not relate to the specific payments at issue in the transaction at issue).

**Second**, EFG Monaco's knowledge that its investments in Sentry, an overseas entity, may be directed to the United States is not a valid basis to confer specific jurisdiction. Personal jurisdiction is not measured by third-party contacts, but on contacts "the Defendant himself creates." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). Accordingly, the Trustee's assertion that EFG Monaco "knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York" by "directing . . . investments through" Sentry fails as a matter of law. Am. Compl. ¶ 64,

As the Supreme Court explained in *Walden*, tying personal jurisdiction to foreseeability "impermissibly allows a plaintiff's contacts with the defendant and the forum to drive the jurisdictional analysis." *Walden*, 571 U.S. at 289. The Supreme Court instead has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State." *Id.* at 284; *see also Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 112 (1987) ("The substantial connection . . . between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the internal forum State*.") (internal quotation marks omitted) (emphasis in original).

Indeed, even when a foreign defendant contracts directly with a forum resident, that alone does not suffice to show purposeful availment. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) ("If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot."); *Ferrante Equip. Co. v. Lasker-Goldman Corp.*, 31 A.D.2d 355, 356 (1969), *aff'd*, 26 N.Y.2d 280 (1970) ("The mere receipt by a nonresident of

10

benefit or profit from a contract performed by others in New York is clearly not an act by the recipient in this State sufficient to confer jurisdiction under our longarm statute.").

Nor can the Trustee establish personal jurisdiction by way of his allegations regarding EFG Monaco's ownership of shares in Sentry. The corporate form is respected for jurisdictional purposes and, therefore, the fact that a foreign defendant owns shares in a company that purposefully avails itself of the privilege of conducting business in New York does not suffice to establish jurisdiction. The Trustee has not alleged that Sentry was an alter ego or acted as an agent as required to impute Sentry's contacts to EFG Monaco. *See City of Long Beach v. Total Gas & Power N. Am. Inc.*, 465 F. Supp. 3d 416, 437–39 (S.D.N.Y. 2020) (alter ego or agent); *Cooper v. Parsky*, No. 95-CV-10543 (JGK), 1997 WL 242534, at *14 (S.D.N.Y. Jan. 8, 1997) (dismissing the claim against shareholder for lack of personal jurisdiction due to lack of alter ego allegations justifying piercing the corporate veil), *aff'd in relevant part, vacated in part on other grounds*, 140 F.3d 433 (2d Cir. 1998); *Ferrante Equip. Co.*, 26 N.Y.2d at 283 ("The mere fact that respondent is a controlling shareholder in . . . a corporation concededly doing business in New York . . . will not subject respondent . . . to in personam jurisdiction . . . unless the record would justify our piercing the corporate veil.").[6]

Consequently, the Trustee's allegations that EFG Monaco knew that Sentry would invest with BLMIS fall far short of what is needed to subject EFG Monaco to personal jurisdiction in this Court. The Trustee's allegation that Sentry's contacts can be converted into contacts by EFG Monaco due to mere knowledge alone is nothing more than a repackaging of the type of "stream

---

[6] An alter ego finding requires grounds for piercing the corporate veil, which have not and cannot be alleged here. *See Cooper*, 1997 WL 242534, at *14 (merely alleging investment in a New York-based company "does not justify piercing the corporate veil"). An agency finding requires the plaintiff to show that the corporation "acted in New York for the benefit of, with the knowledge and consent of, and under some control by," the defendant shareholder. *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018).

of commerce" theory of personal jurisdiction rejected by the Supreme Court. *See J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882, 886 (2011) ("[I]t is not enough that [a] defendant might have predicted that its goods will reach the forum," but rather the defendant must "engage[] in conduct purposefully directed at [the forum]."); *In re Mexican Gov't Bonds Antitrust Litig.*, No. 18-CV-2830 (JPO), 2020 WL 7046837, at *3–4 (S.D.N.Y. Nov. 30, 2020) (holding neither an attempt to profit from conduct underlying claim nor foreseeability of a harm in forum were sufficient to establish jurisdiction in absence of a defendant's contact with forum).

**Third,** the Trustee cannot assert jurisdiction based on the Sentry subscription agreements. In *Fairfield Sentry Ltd. v. Migani*, the UK Privy Council held that the Sentry subscription agreement does not govern redemptions from Sentry, nor does it make New York law applicable to redemptions; instead, the redemptions are governed by Sentry's Articles of Association and BVI law. [2014] UKPC 9, ¶¶ 10, 17, 20 (Kanellopoulos Decl. Ex. 10). Following *Migani*, this Court held that a suit by the Liquidators of Sentry to recover a redemption payment is not a suit "with respect to [the Subscription] Agreement" and therefore not within the scope of its forum selection clause. *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam* (*In re Fairfield Sentry Ltd.*), No. 10-13164 (SMB), 2018 WL 3756343, at *11–12 (Bankr. S.D.N.Y. Aug. 6, 2018) ("*Fairfield I*"). That decision was recently upheld by the District Court on appeal. *Fairfield Sentry Ltd. v. Citibank, N.A. London*, No. 19-CV-3911 (VSB), 2022 WL 4391023, at *10 (S.D.N.Y. Sep. 22, 2022). In particular, Judge Broderick noted that the Subscription Agreement "protects the members' expectation by specifically naming the type of claims that will drag them into New York," and held that claims related to redemptions are not one of those types of claims because they are governed by Sentry's Articles of Association and BVI law. *Id.*

12

Even if the Trustee's claims were within the scope of the Sentry subscription agreement (which they are not), the Trustee could not enforce that agreement against EFG Monaco because neither he nor BLMIS were parties to, or third-party beneficiaries, of such agreement. *See Lavazza Premium Coffees Corp. v. Prime Line Dis-trib. Inc.*, No. 20 Civ. 9993 (KPF), 2021 WL 5909976, at *7 (S.D.N.Y. Dec. 10, 2021) (rejecting enforcement of forum selection clause for a non-party plaintiff bringing claims outside of the clause's scope).

**Fourth**, it is settled law that sending "payments to New York merely to ensure compliance with contract terms negotiated and executed outside of New York do[es] not 'project' a defendant into the state sufficiently to confer personal jurisdiction." *Letom Mgmt. Inc. v. Centaur Gaming, LLC*, No. 17-CV-3793 (PAE), 2017 WL 4877426, at *7 (S.D.N.Y. Oct. 27, 2017) (fact that contract required payments to New York bank account did not establish specific jurisdiction). The incidental use of a correspondent bank account in the United States to facilitate U.S. dollar-denominated payments to settle a foreign securities transaction—here, the investment in and the redemption of shares in a British Virgin Islands company by a Monegasque shareholder—does not give rise to personal jurisdiction. *See Hau Yin To v. HSBC Holdings, PLC*, No. 15-CV-3590 (LTS), 2017 WL 816136, at *6. (S.D.N.Y. Mar. 1, 2017), *aff'd*, 700 F. App'x 66 (2d Cir. 2017) (rejecting personal jurisdiction over foreign defendants because their alleged connection to the forum was the transmission of information and funds "to and from BLMIS . . . [as an] incidental consequence[] of fulfilling a foreign contract"); *Hill*, 207 F.Supp. 3d 333, 339–40 (finding that transmission of information and funds to and from BLMIS to be "incidental consequences of fulfilling a foreign contract . . . insufficient to 'project' the Foreign Defendants into New York" and not amounting "to 'purposeful availment' of the laws of [the forum]"); *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 727 (S.D.N.Y. 2010) ("[C]ourts in this district have routinely held that

13

merely maintaining a New York correspondent bank account is insufficient to subject a foreign

bank to personal jurisdiction.") (collecting cases); *Rosenblatt v. Coutts & Co. AG*, No. 17-CV-

3528 (AKH), 2017 WL 3493245, at \*4 (S.D.N.Y. Aug. 14, 2017) (foreign defendant's act of

sending payment to plaintiff's New York bank account pursuant to an agreement negotiated and

executed outside the United States was not purposeful availment).[7]

**Fifth,** the Trustee's theory that contacts by other EFG Defendants can be imputed to EFG

Monaco fails on its face because it is premised on improper group pleading. Indeed, there are no

allegations that any specific EFG Defendant acted on behalf of EFG Monaco with respect to its

Sentry investments. Instead, the Trustee alleges only, and without further support, that the EFG

Defendants "collectively functioned as one entity for the purposes alleged herein." Am Compl.

¶ 58. On the basis of this allegation, the Trustee then attempts to characterize the alleged U.S.

contacts of one EFG Defendant as the contacts of another.

Case law is clear that personal jurisdiction cannot be established against a defendant like

EFG Monaco based upon such improper "group pleading" allegations. *See Grow Grp., Inc. v.*

*Jandernoa*, No. 94-CV-5679 (RPP), 1996 WL 31848, at \*5 (S.D.N.Y. Jan. 26, 1996) ("It is well

settled that in determining personal jurisdiction each individual's contact with the forum must be

evaluated individually" and that "considering the defending parties by *group* and aggregating their

---

[7] Hundreds of thousands of foreign dollar transactions valued at over $1.5 trillion are cleared in New York each day. *See generally Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1395 (2018) ("In New York each day, on average, about 440,000 of these transfers [Clearing House Interbank Payments System . . . the system used for most large banking transactions], occur, in dollar amounts totaling about $1.5 trillion."). Were the incidental use of U.S.-based accounts sufficient to confer personal jurisdiction over foreign entities, New York would become a forum for any foreign commercial dispute, contrary to federal and state policy, merely because global transactions are frequently cleared in U.S. dollars in New York. *See Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*, 12 N.E.3d 456, 459–60 (N.Y. 2014) ("Our state's interest in the integrity of its banks . . . is not significantly threatened every time one foreign national, effecting what is alleged to be a fraudulent transaction, moves dollars through a bank in New York."); *see also Universal Trading & Inv. Co. v. Tymoshenko*, No. 11-CV-7877 (PAC), 2012 WL 6186471, at \*3 (S.D.N.Y. 2012) ("[C]ourts have long recognized that there are significant policy reasons which caution against the exercise of personal jurisdiction based only on . . . a correspondent bank account.") (internal quotation marks omitted).

14

forum contacts in determining jurisdiction is plainly unconstitutional."); *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 233 (S.D.N.Y. 2019) ("Allegations in the form of a group pleading are insufficient, even for affiliated corporate entities."); *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 143 (S.D.N.Y. 2021) ("As an initial matter, many of lead plaintiff's jurisdictional allegations with respect to Fokas are nothing more than group pleading regarding the 'Company Defendants,' 'Officer Defendants,' 'management,' and the 'Board.' 'Such conclusory labels and allegations will not do.'") (citation omitted); *HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*, No. 20-CV-00967 (LJL), 2021 WL 918556, at *15 (S.D.N.Y. Mar. 10, 2021) ("In relying only on group pleadings, in which it conflates multiple parties and fails to provide specific allegations, Plaintiff neglects its burden of establishing personal jurisdiction over each defendant."); *Tera Grp., Inc. v. Citigroup, Inc.*, No. 17-CV-4302 (RJS), 2018 WL 4732426, at *2 (S.D.N.Y. Sept. 28, 2018) ("This group pleading – conflating UBS AG and UBS Securities LLC as 'UBS' – fails to establish personal jurisdiction over 'each defendant.'").

***Finally***, the Amended Complaint's allegation that EFG Capital's contacts can be imputed to EFG Monaco fails as a matter of law. According to the Amended Complaint, EFG Capital's contacts are attributable to EFG Monaco because EFG Capital allegedly carried out certain acts on behalf of "Defendants," such as meeting with FGG, executing subscription agreements, and signing redemption requests. *See* Am. Compl. ¶¶ 66, 67, 76–82. These allegations—like the "group pleading" allegations referenced above—are insufficient because the Trustee never alleges any specifics to support the allegation that EFG Capital acted on behalf of EFG Monaco in particular. Further, even assuming EFG Capital acted on behalf of all "Defendants," the Amended Complaint lacks sufficient facts to allege imputation because there are no allegations supporting an alter ego or agency relationship. As explained above, the personal jurisdiction inquiry respects

15

the corporate form and the actions of affiliates are not attributable to a defendant absent such allegations. The Amended Complaint contains no specific allegations that would justify piercing the corporate veil between EFG Capital and EFG Monaco, *see Cooper*, 1997 WL 242534, at *14, or warrant a finding that EFG Capital acted as an agent with the knowledge and consent of, and control by, EFG Monaco, *Charles Schwab Corp.*, 883 F.3d, at *85.

For all these reasons, the Amended Complaint lacks sufficient facts to allege specific jurisdiction against EFG Monaco.

### 2. EFG Bahamas Lacks Sufficient Minimum Contacts

The Amended Complaint alleges many of the same bases for exercising personal jurisdiction over EFG Bahamas as it does for exercising personal jurisdiction over EFG Monaco. Those alleged bases include: (1) knowledge that Sentry would invest its funds in BLMIS; (2) execution of subscription agreements with New York forum selection and choice of law provisions; (3) direction of subscription payments to Sentry through a correspondent bank account located in the United States; and (4) imputation of contacts by other EFG Defendants and EFG Capital. Each of these bases for personal jurisdiction fails against EFG Bahamas for the same reasons described above in the section concerning EFG Monaco.

The only additional personal jurisdiction allegations asserted against EFG Bahamas concern Banco Atlántico, an entity the Trustee asserts is a predecessor to EFG Bahamas. *See* Am. Compl. ¶ 55. For example, according to the Amended Complaint, Banco Atlántico allegedly received redemption payments into a bank account in New York, met with FGG and Madoff in New York, and reviewed BLMIS trade confirmations listing BLMIS as regulated by the SEC. *Id.* ¶¶ 66, 73, 74, 76, 77, 82.

However, none of these alleged U.S. contacts of Banco Atlántico can be attributed to EFG Bahamas. At the time of these events, EFG Bahamas was not even in existence. Indeed, EFG

16

Bahamas was specifically created at a later date to acquire Banco Atlántico's private banking business through an asset sale, with limited acquisition of liabilities. Critically, the transfer of such business pursuant to the asset sale did not include any liabilities associated with the claims brought in this proceeding. (Kanellopoulos Decl. ¶ 16). For these reasons, allegations concerning Banco Atlántico's contacts in New York (*e.g.*, meetings between Banco Atlántico and FGG personnel) have no bearing on whether this Court can assert personal jurisdiction over EFG Bahamas.

Because EFG Bahamas acquired Banco Atlántico's private banking business through an asset sale that did not include liabilities associated with the claims at issue in this case, the Trustee lacks any basis to allege that EFG Bahamas knowingly directed investments towards the United States or received funds in a United States bank account for the approximately $92.1 million in redemptions received prior to February 16, 2006, the closing date of the asset sale.

As for the transfers alleged to have been received by EFG Bahamas after the closing date, the Trustee makes no allegations that EFG Bahamas attended meetings in the United States, communicated with individuals in the United States, or otherwise purposefully directed activity towards the United States. The *only* jurisdictional fact alleged specifically against EFG Bahamas (as opposed to Banco Atlántico) is that EFG Bahamas received redemption proceeds in a bank account at the Bank of New York after "acquiring Banco Atlántico." Am. Compl. ¶ 74. But, as established above in the section concerning EFG Monaco, the "mere maintenance" of a U.S. bank account and the "knowing receipt of funds" through the account does not establish personal jurisdiction. *See, e.g., O'Toole v. Myplace Dev. Sp. Z O.O.* (*In re Sledziejowski*), No. 13-22050 (RDD), 2016 WL 6155929, at *7 (Bankr. S.D.N.Y. Oct. 21, 2016); *Leema Enters., Inc. v. Willi*, 575 F. Supp. 1533, 1537 (S.D.N.Y. 1983).

17

Therefore, the Amended Complaint lacks sufficient facts to allege specific jurisdiction against EFG Bahamas.

### 3. EFG Bank Lacks Sufficient Minimum Contacts

In addition to the contacts addressed above, the Trustee alleges that specific jurisdiction exists over EFG Bank because it (1) sent subscriptions payments and received redemption proceeds from a bank account at UBS AG in Stamford, Connecticut, (2) met with FGG and Madoff in the United States, (3) had contacts with the United States through EFG Capital, who allegedly acted on behalf of EFG Bank with respect to its Fairfield investments, and (4) entered into an agreement for payment of retrocession fees with New York choice of law and forum selection provisions that directed Fairfield Greenwich Limited to pay those fees to EFG Bank's UBS AG account in Stamford, Connecticut.

Although these facts are more specific than those alleged against EFG Monaco and EFG Bahamas, these alleged connections to the United States do not establish that the basis for liability alleged by the Trustee—redemption requests by clients of EFG Bank—arose from EFG Bank purposefully availing itself of the benefits of the United States. To the contrary, the Trustee's claims arise from EFG Bank's foreign contacts—namely, its foreign customers' exercise of purely foreign contractual rights with respect to foreign investments into offshore entities governed by foreign law.[8]

The very Private Placement Memorandum ("PPM") cited by the Trustee provides that the transactions upon which his claims are based will take place between "non-U.S. Persons,"

---

[8] For this very reason, the Trustee has consistently taken the position that parties such as the EFG Defendants cannot assert customer claims against BLMIS because their real legal relationship was with Fairfield—not BLMIS. The Trustee cannot have it both ways. He cannot claim that the Court has jurisdiction over the EFG Defendants for purposes of his clawback claim, while at the same time asserting that foreign defendants who invested indirectly through the Fairfield Funds have no statutory right to assert customer claims against BLMIS precisely because of their indirect foreign investment structure. This is fundamentally unfair and serves to highlight that the EFG Defendants did not purposefully avail themselves of the privileges and benefits of doing business in New York.

18

Supplemental Declaration of Thomas L. Long in Support of the Trustee's Sur-Reply, Exhibit 1, *Picard v. Bureau of Labor Insurance*, Adv. Pro. No. 11-2732 (SMB) (Bankr. S.D.N.Y.), Dkt. No. 46-1 at 1, 13 (Kanellopoulos Decl. Ex. 11), and that the Fairfield Funds will use Investment Managers located in Bermuda, Placement Agents located in the Grand Cayman, an Administrator and Transfer Agent and Depository located in the Netherlands, Auditors located in the Netherlands, and a Custodian Bank located in Ireland. *Id*. at 2, 3, 7 and Fund Directory. The PPM also expressly confirms that the Fairfield Funds and its representatives are all outside the U.S. for the purpose of, among other things, falling into a safe harbor" pursuant to which a "non-U.S. corporation [i.e. the Funds] *will not be deemed to be engaged in a U.S. trade or business*." *Id*. at 28 (emphasis added). Exercising personal jurisdiction under these circumstances would destroy a defendant's ability to "'structure [its] primary conduct' to lessen or avoid exposure to a given State's courts." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

Therefore, the Amended Complaint lacks sufficient facts to allege specific jurisdiction against EFG Bank.

B. <u>The Exercise of Personal Jurisdiction Over the EFG Defendants Would Be Unreasonable</u>

The Court's exercise of jurisdiction must be reasonable under the circumstances for it to be consistent with due process. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) ("The Due Process Clause . . . gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.") (citation omitted). Courts apply a "sliding scale" in assessing whether jurisdiction is consistent with due process: "the weaker the plaintiff's showing on minimum contacts, the less a defendant needs to show in terms of

19

unreasonableness to defeat jurisdiction." *LaMonica v. CEVA Grp., PLC* (*In re CIL Ltd.*), 582 B.R. 46, 79 (Bankr. S.D.N.Y. 2018) (internal quotation marks and citation omitted); *see also Porina v. Marward Shipping Co.*, No. 5-CV-5621 (RPP), 2006 WL 2465819, at *6 (S.D.N.Y. Aug. 24, 2006) ("[I]f a defendant's contacts with the United States are weak, the plaintiff has to make a stronger showing of reasonableness in order to show that jurisdiction over the defendant is proper."). In evaluating the reasonableness of exercising personal jurisdiction, "[a] court must consider the burden on defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Asahi*, 480 U.S. at 113.

Each of the factors that the Court must assess in weighing reasonableness weighs against jurisdiction: the burden on the EFG Defendants in litigating here is high, and the Trustee cannot show that New York is more reasonable than other available fora, namely Switzerland, Monaco, and the Bahamas, where the EFG Defendants have their principal place of business and most of the evidence regarding the claims is located.[9]

The imposition of personal jurisdiction is not warranted in circumstances, like this one, where even assuming defendants' contacts with the forum only "barely satisf[y] the minimum contacts standard," "a majority of the reasonableness factors weigh against the exercise of jurisdiction." *Rocky Mountain Chocolate Factory v. Arellano*, No. 17-CV-582 (WJM), 2017 WL 4697503, at *11 (D. Colo. Oct. 19, 2017) (citation omitted). The same result is warranted in this case, since exercising jurisdiction over the EFG Defendants would not "comport[] with 'traditional

---

[9] In addition, the interest of the United States in tracing the flow of funds from BLMIS is not superior to Switzerland's interests. Switzerland's Federal Act on Private International Law ("PILA") requires that all claims for avoidance against entities domiciled in Switzerland be asserted in Swiss proceedings. Avoidance claims can only be recognized and enforced on Swiss based assets if the Defendant does not have his domicile in Switzerland. As such, the Trustee has no authority to act in Switzerland and any judgment he obtains in these proceedings are not recognizable there either. PILA Article 174c; Message of the Swiss Federal Council, FF 3863 ss, p. 3880. Under these circumstances, the Trustee cannot show that it would be more reasonable to litigate his claim against the EFG Bank in New York than Switzerland, where the EFG Bank is located and where Swiss courts can address the issue.

20

notions of fair play and substantial justice,'" *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d

560, 578 (2d Cir. 1996) (citation omitted), and the Amended Complaint should be dismissed with

prejudice.

## II.    The Trustee's Claim Is Barred By 11 U.S.C. § 546(e)

The Trustee's sole cause of action against the EFG Defendants is asserted under Section

550(a) of the Bankruptcy Code, which provides that, to the extent a transfer is avoided, "the trustee

may recover, for the benefit of the estate, the property transferred," or its value, from "the initial

transferee" or any subsequent "transferee of such initial transferee."  11 U.S.C. § 550(a)(1), (2).

"The Code sets out a number of limits on the exercise of [the Trustee's] avoiding powers,"

including the safe harbor of Section 546(e).  *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S.

Ct. 883, 889 (2018) ("*Merit*").  Section 546(e) bars the Trustee from avoiding (other than under

section 548(a)(1)(A) with a limited reach-back period of two years) a transfer, *inter alia*, (1) that

was either a settlement payment or a transfer in connection with a securities contract; and (2) made

by or to (or for the benefit of) a covered entity such as a stockbroker, financial institution, or

financial participant.[10]

"[T]he application of Section 546(e) presents a straightforward question of statutory

interpretation of the type that is appropriately resolved on the pleadings."  *Fairfield Sentry Ltd. v.*

*Theodoor GGC Amsterdam* (*In re Fairfield Sentry Ltd.*), No. 10-13164 (SMB), 2020 WL 7345988

(Bankr. S.D.N.Y. Dec. 14, 2020) ("*Fairfield III*") (quotation marks and citation omitted).  The

Second Circuit has instructed courts to enforce Section 546(e)'s safe harbor whenever it applies

by its terms, explaining that "in enacting the Bankruptcy Code, Congress struck careful balances

---

[10] The Section 546(e) safe harbor is available as a defense by subsequent transferees. *See Picard v. Fairfield Inv. Fund* (*In re BLMIS*), No. 08-1789 (CGM), 2021 WL 3477479, at *3 (Bankr. S.D.N.Y. Aug. 6, 2021) ("Where the initial transferee fails to raise a § 546(e) defense against the Trustee's avoidance of certain transfers, . . . the subsequent transferee is nonetheless entitled to raise a § 546(e) defense against recovery of those funds.").

between the need for an equitable result for the debtor and its creditors, and the need for finality."

*Picard v. Ida Fishman Revocable Trust* (*In re BLMIS*), 773 F.3d 411, 423 (2d Cir. 2014) (citation

omitted) ("*Fishman*"). In particular, "by enacting §546(e), Congress provided that, for a very

broad range of securities-related transfers, the interest in finality is sufficiently important that they

cannot be avoided by a bankruptcy trustee at all, except as actual fraudulent transfers under

§ 548(a)(1)(A)." *Id.* "Unwinding settled securities transactions . . . would seriously

undermine . . . markets in which certainty, speed, finality, and stability are necessary to attract

capital." *In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 90 (2d Cir. 2019).

This case falls within the scope of the Section 546(e) safe harbor, requiring the dismissal

of all claims asserted against the EFG Defendants that are based on any initial transfer made more

than two years before the Filing Date. *Fishman*, 773 F.3d at 415 (affirming dismissal of relevant

claims under Rule 12(b)(6) because they were shielded by 11 U.S.C. § 546(e)).[11]

A.  The Initial Transfers Were Settlement Payments and Made in Connection with a
     Securities Contract

The Second Circuit has already ruled that initial transfers from BLMIS to its customers

pursuant to account agreements were settlement payments and were made in connection with a

securities contract (*i.e.*, the account agreements between BLMIS and its customers), so as to come

within the protection of section 546(e). *Fishman*, 773 F.3d at 417, 418–23. In doing so, the Court

rejected the Trustee's argument that the safe harbor did not apply because Madoff did not actually

carry out the promised securities transactions with BLMIS's customers. *Id.* at 419–20.

Section 546(e) also applies to a transfer "in connection with *a* securities contract,"

(emphasis added), not just to a transfer *under the* securities contract between the initial transferor

---

[11] Although Section 546(e) is an affirmative defense, a court can dismiss based on Section 546(e) if its applicability
is established on the face of the complaint or documents incorporated by reference into or integral to the complaint.
*See Fairfield Inv. Fund*, 2021 WL 3477479, at *2.

and transferee.  For example, if the initial transferee withdrew funds from BLMIS to make

settlement payments under securities contracts between the initial transferee and the subsequent

transferees, then the withdrawal from BLMIS also would be a settlement payment made "in

connection with a securities contract" between the initial transferee and the subsequent transferees.

This plain reading of Section 546(e) is underscored by the legislative choice to use the decidedly

broad phrase "*in connection with*" instead of narrower wording.  *SIPC v. Bernard L. Madoff Inv.*

*Sec. LLC*, No. 12-MC-115 (JSR), 2013 WL 1609154, at *9 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*"),

("[A] broader reading of the securities contracts covered by the Section 546(e) safe harbor is

implied by the Second Circuit's decision in *Enron*, which reads Section 546(e) broadly to suggest

that a transfer can be part of a chain of payments that together constitute a settlement payment.  By

analogy, then, the definition of a transfer made 'in connection with a securities contract' must be

similarly broad."); *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A.* (*In re Lehman*

*Bros. Holdings Inc.*), 469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012) ("It is proper to construe the

phrase 'in connection with' broadly to mean 'related to.'").

     Moreover, as Judge Rakoff stated:

> Take, for example, a hypothetical situation in which the Trustee alleges that a
> withdrawal of funds by an investment fund from its Madoff Securities customer
> account occurred because an investor in that fund sought redemption of its
> investment under the terms of its investment contract.  Assuming that either the
> investment fund or the investor qualifies as a financial institution or financial
> participant, and barring other circumstances that may appear on the facts of a given
> case, that situation appears to fit within the plain terms of Section 546(e): an initial
> transfer that was "made by or to (or for the benefit of) a . . . financial institution [or]
> financial participant . . . in connection with a securities contract."

*Cohmad*, 2013 WL 1609154, at *9 (footnote omitted); *see Fishman*, 773 F.3d at 422 ("Section

546(e) sets a low bar for the required relationship between the securities contract and the transfer

sought to be avoided.").

The definition of "securities contract" under section 741(7) of the Bankruptcy Code is also "broad." *See Fishman*, 773 F.3d at 419. It not only includes "a contract for the purchase, sale, or loan of a security," 11 U.S.C. § 741(7)(A)(i), but also "any other agreement or transaction that is similar to an agreement or transaction that is similar to" such a contract, *id.* § 741(7)(A)(vii). *See Fishman*, 773 F.3d at 419 (noting that Congress intended to "sweep broadly" and that "[f]ew words in the English language are as expansive as 'any' and 'similar'"). Accordingly, "the definition of securities contract . . . includes . . . redemption requests." *Cohmad*, 2013 WL 1609154, at *8.

Here, redemption requests were governed by Sentry's Articles of Association. (Kanellopoulos Decl. Ex. 12, at Exhibit F; Kanellopoulos Decl. Ex. 10 ¶¶ 10, 17, 20); *see also Fairfield I*, 2018 WL 3756343, at *11 (Bankr. S.D.N.Y. Aug. 6, 2018) (explaining that the Privy Council "concluded that the terms of the redemption of shares were found in the Articles").[12]

Therefore, the redemption requests that Sentry honored under those Articles are securities contracts within the meaning of Section 546(e), and the payment of the redemption amounts is a settlement payment.

B. <u>The Initial Transfers Were Made By or to a Covered Entity</u>

The Initial Transfers were made by or to (or for the benefit of) an entity covered by section 546(e) both because the Initial Transfers were made by a stockbroker and because they were made to or for the benefit of a financial institution, though either of those facts alone would be sufficient.

*1. The Initial Transfers Were Made By a Stockbroker*

In a prior adversary proceeding in this SIPA case, the District Court concluded:

Overall, Madoff Securities, which was registered as a stockbroker with the SEC, clearly engaged in securities transactions . . . [E]ven assuming the truth of the

---

[12] This Court may consider the Articles of Association in connection with this motion because, as the basis for the challenged redemption, they are integral to the Complaint. *See In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 176 (2d Cir. 2021) ("Here, the documents the district court relied on were the contracts that set forth the relationship between Tribune and CTC, and they were therefore integral to the complaint.").

allegation that Madoff Securities' investment advisory division never traded securities on behalf of clients, Madoff Securities nonetheless qualifies as a stockbroker by virtue of the trading conducted by its market making and proprietary trading divisions.

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 719 (S.D.N.Y. 2012) (footnote and citation omitted), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411 (2d Cir. 2014).

As the Second Circuit noted on appeal, "[i]t is not disputed [by the Trustee] that BLMIS was a 'stockbroker' for the purposes of § 546(e)." *Fishman*, 773 F.3d at 417; see Br. for Pl.-Appellant Irving H. Picard at i-ii, 5, *In re Bernard L. Madoff Inv. Sec. LLC*, No. 12- 2557 (2d Cir. May 15, 2013), Dkt. No. 145 (not challenging stockbroker finding on appeal).

> ## 2. The Initial Transfers Were Made To (*Or For the Benefit Of*) A Financial Institution

Section 101(22) defines "financial institution" to include not only "an entity that is a commercial or savings bank," but also the customer of such a bank "when [it] is acting as agent or custodian for a customer . . . in connection with a securities contract." 11 U.S.C. § 101(22)(A). In *Fairfield III*, this Court held that the Fairfield Funds (Sentry, Sigma, and Lambda) were "financial institutions" because they were customers of Citco Bank Nederland N.V. Dublin Branch ("Citco Bank"), a bank regulated by the Central Bank of the Netherlands and registered with the Central Bank of Ireland. *Fairfield III*, 2020 WL 7345988, at *6 & n.11.[13] Citco Bank acted as the

---

[13] *See* De Nederlandsche Bank, Information Detail: Citco Bank Nederland N.V., https://www.dnb.nl/en/public-register/information-detail/?registerCode=WFTKF&relationNumber=B0275 (last visited Jun. 21, 2022) (identifying Citco Bank Nederland N.V. as "[c]arrying on the business of a bank," including "[a]cceptance of deposits and other repayable funds"); Central Bank of Ireland, Financial Service Provider Profile: Citco Bank Nederland NV Dublin Branch, http://registers.centralbank.ie/FirmDataPage.aspx?firmReferenceNumber=C27278 (last visited Jun. 20, 2022) (classifying Citco Bank as a "credit institution . . . whose business is to receive deposits or other repayable funds from the public and to grant credits for its own account"). This Court can take judicial notice of information from such public registries. *See Tribune*, 946 F.3d at 78; *Enron Corp. v. Bear, Stearns Int'l Ltd.* (*In re Enron Corp.*), 323 B.R. 857, 869 (Bankr. S.D.N.Y. 2005).

Fairfield Funds' agent in connection with the securities contracts under which the BLMIS transfers

to Sentry were made. *Id*. at *7. As this Court found in *Fairfield III*:

> [T]he [Fairfield] Liquidators' admission that redemptions were paid by Citco Bank
> establishes the necessary agency. It is implausible to infer that Citco Bank made
> the redemption payments to specific redeemers in specific amounts absent the
> [Fairfield] Funds' directions to do so. Moreover, Citco Bank accepted those
> directions by executing the redemption payments. Based on the foregoing, the
> Funds were customers of Citco Bank who acted as their agents in connection with
> the securities contracts pursuant to which the redemption payments were made, and
> the Funds were, therefore "financial institutions" within the meaning of 11 U.S.C.
> § 546(e).

*Id.*, at *7 (footnote omitted). This Court's holding in *Fairfield III* binds the Trustee because he

was in privity with the Fairfield Liquidators. Even if not, there is no reason for this Court to deviate

from Judge Bernstein's well-reasoned *Fairfield III* decision.[14]

As conceded in the Amended Complaint, the EFG Defendants are (or were) also "private

banking" institutions. Am. Compl. ¶ 52. Therefore, the alleged transfers here were similarly made

for the benefit of financial institutions (or their customers). 11 U.S.C. §§ 101(22), 546(e).

C.  Sentry's Alleged Knowledge of Madoff's Fraud Does Not Defeat the EFG
Defendants' Ability to Invoke the 546(e) Safe Harbor

The Trustee of course will respond that the safe harbor does not apply here because the

initial transferee, Sentry, allegedly knew of Madoff's fraud and thus knew that there was no actual

"settlement payment" or "securities contract." Nothing in the language of Section 546(e) permits

---

[14] As described above, the Fairfield Settlement Agreement provides for the sharing of recoveries on the parties' claims
for recovery of property that Sentry transferred, cooperation and consultation on bringing those claims, and a joint
interest agreement. The Trustee's and the Liquidators' agreed joint interest in any such recovered BLMIS customer
property constitutes a "preexisting 'substantive legal relationship,'" focused on a successive or concurrent interest in
property, of the kind recognized by the Supreme Court to give rise to non-party issue preclusion. *Taylor v. Sturgell*,
553 U.S. 880, 894 (2008). Because the trustee is in privity with the Liquidators in actions to recover alleged BLMIS
customer property, such as the actions at issue in *Fairfield III*, and because the issue of Sentry's "financial institution"
status was "actually litigated" and "essential" to the final judgments dismissing numerous such actions on the ground
of the section 546(e) safe harbor, this Court's finding in *Fairfield III* that Sentry was a "financial institution" in
connection with redemption payments from Sentry to its subscribers is binding on the trustee. *See New Hampshire v.
Maine*, 532 U.S. 742, 748–49 (2001) (stating requirements for issue preclusion).

depriving an innocent subsequent transferee who meets all of the requirements of the statute of its ability to invoke the safe harbor. The *only* exception to section 546(e) is a claim under section 548(a)(1)(A), which is inapplicable to most of the transfers here. *See Silverman v. Actrade Capital, Inc.* (*In re Actrade Fin. Techs. Ltd.*), 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005) (under § 548(a)(1)(A) "it is the intent of the transferor and not the transferee that is relevant") (citations omitted). Where the Code creates an exemption or safe harbor and specifies exceptions, a court is not free to create additional exceptions, even when doing so is motivated by alleged wrongdoing. *See Law v. Siegel*, 571 U.S. 415, 424–25 (2014) ("The Code's meticulous—not to say mind-numbingly detailed—enumeration of exemptions and exceptions to those exemptions confirms that courts are not authorized to create additional exceptions."). The courts must adhere to "the plain meaning of the language" of the statute, *Merit* 138 S. Ct. at 897, and the judicially created rule that an initial transferee with knowledge of the fraud cannot invoke the safe harbor is itself unsupported by the plain text of Section 546(e).

Additionally, even if the "securities contract" between BLMIS and Sentry was voidable, that would not affect the separate securities contracts between the Fairfield Funds and their investors. As Judge Rakoff ruled in *Cohmad*, even if the initial transferee knew BLMIS was a fraud and was not trading securities, if the initial transferee withdrew funds from BLMIS to make a payment under a securities contract between the initial transferee and the subsequent transferee, then the withdrawal from BLMIS would be a transfer made in connection with the securities contract between the initial transferee (Sentry) and the subsequent transferee (the EFG Defendants), and would not be avoidable. *Cohmad*, 2013 WL 1609154, at *7.

Therefore, the Court should dismiss all claims asserted against the EFG Defendants that are based on any initial transfer made more than two years before the Filing Date.

27

III.    **The Amended Complaint Fails to Plausibly Allege that the EFG Defendants Received BLMIS Customer Property**

The Trustee must allege facts creating a plausible inference that the redemption payments were subsequent transfers of BLMIS customer property and that "liability necessarily, not only possibly, follows." *Strandberg v. State Farm Mutual Auto Ins. Co.*, No. 2:15-CV-02468 (RCJ), 2016 WL 614401, at *1 (D. Nev. Feb. 16, 2016). In particular, to establish subsequent transferee liability:

> The Trustee must allege facts that support the inference that the funds at issue originated with the BLMIS, and contain the 'necessary vital statistics'—the "who, when, and how much" of the transfers to establish that an entity was a subsequent transferee of the funds. At the pleading stage, the Trustee is not required to provide a "dollar-for-dollar accounting" of the exact funds at issue. However, barebones allegations that the funds at issue were transferred to the Subsequent Transferees, without more detail, are insufficient.

*Picard v. Shapiro* (*In re BLMIS*), 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015); *Picard v. Merkin* (*In re BLMIS*), 515 B.R. 117, 149–50 (Bankr. S.D.N.Y. 2014) ("To satisfy his burden to recover the subsequent transfer, the complaint must allege facts that support the inference that the funds at issue originated with the debtor, and contain the necessary vital statistics[.]") (Internal quotation marks omitted).

In *Shapiro*, the trustee alleged only generically that (i) BLMIS transferred funds to certain accounts and (ii) the "Initial Transferee Defendants subsequently transferred a portion of the $53,778,486 received from BLMIS" to defendants who held an account at BLMIS which was funded largely, if not completely, with subsequent transfers. *Picard v. Shapiro*, Adv. Proc. No. 10-5383 (Bankr. S.D.N.Y. July 8, 2014), Dkt. No. 33, ¶¶ 110, 43. The Court dismissed the complaint because it did not "tie any initial transfer to any subsequent transfer or Subsequent Transferee" and did "not plausibly imply that the initial transferees even made subsequent transfers to the Subsequent Transferees as opposed to third parties, or that they made the subsequent

28

transfers rather than simply keep the initial transfers for themselves." *Shapiro*, 542 B.R. at 119; *see also Angell v. BER Care, Inc* (*In re Caremerica, Inc.*), 409 B.R. 737, 750–51 (Bankr. E.D.N.C. 2009) (court dismissed a preference claim under *Twombly* and *Iqbal* because the trustee's factual allegations included allegations about transfers into and out of an account and amounts received by the supposed transferees, but nothing to tie them together).

Here, the Amended Complaint fails to set forth facts that plausibly support the inference that the Subsequent Transfers actually originated with BLMIS, so as to "tie [the alleged] initial transfers to any subsequent transfer or [alleged] Subsequent Transferee." *Shapiro*, 542 B.R. at 119. Rather, the Amended Complaint merely "allege[s] the initial transfers and assert[s], in conclusory fashion, that the [alleged] subsequent transferee defendants received subsequent transfers." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re BLMIS*), 531 B.R. 439, 474 (Bankr. S.D.N.Y. 2015). The Amended Complaint alleges that during the six years preceding the Filing Date, BLMIS transferred approximately $3 billion to Sentry, Am. Compl. ¶ 85, and that "a portion of" those transfers was subsequently transferred, either directly or indirectly to, or for the benefit of, the EFG Defendants, *id.* ¶¶ 92, 97, 102, 106, 110, 114. Essentially, the Trustee is asking the Court to make an illogical assumption that: (1) because BLMIS transferred a large amount of money to Sentry over a long period of time; (2) any money Sentry transferred to the EFG Defendants must have come from BLMIS and can be recovered.

These "barebones allegations" are facially implausible. For instance, the Trustee alleges that BLMIS transferred approximately $3 billion to Sentry. Yet, at the same time he seeks to "recover," all as alleged subsequent transfers of customer property from Sentry: an aggregate of approximately $3.4 billion in payments made to dozens of defendants who redeemed from Sentry; approximately $824 million in payments to Sigma and Lambda, and another approximately $1

29

billion in payments to individuals and entities connected to FGG. (Kanellopoulos Decl. ¶ 18 & Ex. 8; First Amended Fairfield Complaint ¶¶ 53, 58). In other words, the Trustee is endeavoring to recover over $2 billion more than the total amount that the Trustee himself alleges that BLMIS transferred to Sentry. As such, the Trustee's theory that all of the redemption payments are customer property is not merely implausible, it is mathematically impossible.

The Trustee's theory further collapses when looking at other details of the alleged subsequent transfers made by Sentry. As an illustration, pages 18–19 of Exhibit B to the Amended Complaint show that the first three cash withdrawals (labeled "Check Wire") from Sentry's BLMIS accounts within the six-year lookback period—namely, the withdrawals that occurred on May 9, July 11, and July 22, 2003—totaled $120 million. *See* Am. Compl. Ex. B., at 18–19.[15] The Trustee further alleges that between May 9, 2003 and September 18, 2003, Sentry paid out $192.2 million to other entities, $72.2 million more than it had received from BLMIS and thus more than exhausting those transfers. (Kanellopoulos Decl. ¶ 19). The next alleged transfer from BLMIS to Sentry does not occur until April 1, 2005. *See* Am. Compl. Ex. B, at 20–22 ("CHECK WIRE" entries). So when the Trustee alleges that the EFG Defendants received approximately $56.9 million in redemptions between October 14, 2003 and March 15, 2005, (Kanellopoulos Decl. ¶ 20), those redemptions could not possibly have been BLMIS customer property because the

---

[15] Since the statute of limitations under New York's Debtor and Creditor Law for fraudulent conveyances is six years, *see Khan v. Mahia* (*In re Khan*), No. 10-46901, 2014 WL 4956676, at *52 (Bankr. E.D.N.Y. Sept. 30, 2014), the Trustee cannot avoid transfers from BLMIS to Fairfield Sentry that occurred before December 11, 2002 (the "lookback period"). Thus, he cannot recover any subsequent transfers of those transfers under Section 550(a). Accordingly, the Court may only consider alleged initial transfers after December 11, 2002 (the first of which was on May 9, 2003) in determining whether an alleged subsequent transfer was in fact a transfer of recoverable customer property; any earlier initial transfers alleged in the Complaint must be excluded from consideration.

amount of money Sentry had paid to investors by September 18, 2003 far exceeded the total it took from BLMIS.[16]

According to the Trustee, when Sentry received its first transfer from BLMIS in nearly two years on April 1, 2005 in the amount of $175 million, Sentry three days later paid $200 million to a single recipient. *Id*. ¶ 21. After that transfer, Sentry next received $85 million from BLMIS on July 6, 2005 and paid out at least $114 million to other parties by July 25, 2005, again exhausting all conceivable funds received from BLMIS. *Id*. Despite the absence of available funds according to his own allegations, the Trustee nonetheless seeks to recover approximately $7.4 million received by the EFG Defendants almost a month later on August 15, 2005. *Id*. ¶ 22.

In sum, these illustrations show there is at least $64.3 million in alleged subsequent transfers to the EFG Defendants that could not have contained customer property based on the Trustee's own allegations. How could Sentry have paid out more to defendants than it received from BLMIS? Sentry has stated that "[f]rom time to time, to make Redemption Payments, Sentry . . . utilized subscription monies of other investors on hand that were directed for investment in BLMIS." First Amended Complaint ¶ 63, *Fairfield Sentry Ltd. v. Citco Global Custody NV*, Adv. Pro. No. 19-1122 (Bankr. S.D.N.Y. Nov. 26, 2019), Dkt. No. 19. Because "[t]here is an 'obvious alternative explanation'" for the source of the redemption, "that explanation renders [plaintiff's] competing explanation 'conceivable [but not] plausible.'" *Garfinkle v. Conf. on Jewish Material Claims Against Germany, Inc.*, No. 19-CV-7007 (JPO), 2020 WL 6323462, at *5 (S.D.N.Y. Oct. 28, 2020) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567, 570 (2007)).

---

[16] That many of these redemptions took place over a year after Sentry last received funds from BLMIS further underscores the implausibility that the redemption payment contains BLMIS "customer property." *Cf. Merkin*, 515 B.R., at 150–51 (inferring linkage where alleged "subsequent transfers took place contemporaneously or shortly after an initial transfer" or at most two or three months later).

Therefore, the Court should dismiss the Amended Complaint for failure to plausibly allege

that the EFG Defendants received BLMIS customer property.[17]

IV.    **The Trustee's Own Allegations Establish that the EFG Defendants Are Entitled to the Application of the Good Faith Defense**

Under section 550(b)(1), a trustee may not recover from a subsequent transferee who took

for value, in good faith, and without knowledge of the voidability of the transfer.

A.    The EFG Defendants Gave Value in Exchange for the Redemption Payments

Collier describes what is required to show "value":

> The "value" required to be paid by the secondary transferee is merely consideration sufficient to support a simple contract, analogous to the "value" required under state law to achieve the status of a bona fide purchaser for value.  There is no requirement that the value given by the transferee be a reasonable or fair equivalent.  The term "value" in this subsection is different from and does not mean value to the debtor[.]

5 Collier on Bankruptcy ¶ 550.03[1] (16th ed. 2021) (footnotes omitted); *accord Picard v. ABN*

*AMRO Bank N.A.* (*In re BLMIS*), Adv. Pro. No. 08-01789 (SMB), 2020 WL 1584491, at *8

(Bankr. S.D.N.Y. Mar. 31, 2020) (quoting the above passage).

The Amended Complaint seeks recovery of transfers from Sentry for "redemption of equity

interests" by the EFG Defendants as "shareholder[s]" in such funds.  Am. Compl. ¶¶ 95, 100, 105,

109, 113, 116.  In other words, the EFG Defendants tendered their shares in Sentry in exchange

for the redemption payments at issue in this case.  The surrender of those shares constitutes

sufficient "value" under section 550(b) of the Bankruptcy Code.  As a British Virgin Islands

company, Sentry's corporate relationship with its shareholders is governed by the law of the British

Virgin Islands under the internal affairs doctrine.  *Atherton v. F.D.I.C.*, 519 U.S. 213, 224 (1997);

---

[17] The Trustee's failure to tie the EFG Defendants' transfers to any particular transfers from BLMIS to Sentry cannot be excused on the ground that the Trustee lacks access to sufficient information, since the Trustee, by virtue of the document-sharing provisions of the Fairfield Settlement Agreement, had access to Sentry's records at the time he filed the original Complaint and for nearly a decade since.  *See* Fairfield Settlement Agreement, Fairfield Action, Dkt. No. 69-2, ¶ 14 (Trustee and Liquidators "each agree to provide reasonable access to the other's documents, data, and other information relating to, or beneficial to the pursuit of, the Sharing Claims").

*see Migani*, [2014] UKPC 9, ¶ 10 ("the terms of the subscriber's membership of the Fund, which govern the redemption of its shares . . . are to be found in the Articles of Association of the Fund"). The Eastern Caribbean Court of Appeal has held that a Sentry investor's surrender of Sentry shares upon Sentry's redemption of the shares for cash gives good consideration to support the exchange. *Migani*, [2014] UKPC ¶¶ 8, 87; *Quilvest Finance Ltd. v. Fairfield Sentry Ltd.*, Case Nos. HCVAP 2011/041-062. (Kanellopoulos Decl. Ex. 13, at 9). Therefore, the Amended Complaint and related proceedings show that the "value" element of the affirmative defense is satisfied with respect to transfers from Sentry.

B.    The EFG Defendants Acted in Good Faith and Could Not Have Discovered Madoff's Fraud Where So Many Others Failed

Under the Second Circuit's recent articulation of the standard for the good faith defense, even if the alleged transferee: (1) knew actual facts that; (2) would put it on inquiry notice of the fraudulent purpose underlying a transfer, the transferee still takes the transfer in good faith if; (3) a diligent inquiry would not have discovered the fraudulent purpose of the transfer. *Citibank,* (*In re BLMIS*), 12 F.4th at 178. The Second Amended Fairfield Complaint establishes that upon a diligent inquiry, none of the EFG Defendants could have reasonably discovered the fraudulent purpose of the transfers.

The Second Amended Fairfield Complaint alleges that some consultants and market analysts opined, at various times, that BLMIS may have been involved in improper activities. But most of those suspicions related to lack of transparency, potential self-dealing, or improper trading activities. Only a very small handful of outliers suspected a Ponzi scheme, while *thousands* of other market participants, many extremely sophisticated, disagreed with these opinions and invested in BLMIS, either directly or through funds like the Fairfield Funds.

Even if a reasonable investor might have suspected that something was amiss at BLMIS, the Second Amended Fairfield Complaint shows that a diligent inquiry could not reasonably have discovered the fraudulent purpose underlying the transfers from BLMIS.  The Second Amended Fairfield Complaint alleges that BLMIS operated under a cloak of secrecy and that Sentry's management: "were willing to lie to protect their relationship" with Madoff, ¶ 5; "spun information to pacify existing FGG investors," *id.*; "omitted material information about Madoff from their representations," *id.*; "covered for Madoff in deliberate efforts to get investors and regulators off the scent," *id.* ¶ 6; "suppressed . . . observations about BLMIS's inexplicable operations," *id.* ¶ 7; "protected BLMIS from inquiry," *id.* ¶ 8; "lied to clients about BLMIS's practices in order to keep the money flowing and their fees growing," *id.* ¶ 9; "advanced various stories to attempt to defuse investor concerns," *id.* ¶ 153; "had privileged access to Madoff," *id.* ¶ 162; "prevent[ed] prospective investors from contacting Madoff directly," *id.* ¶ 164; "downplay[ed] Madoff's role," *id.* ¶ 165; "evad[ed] investor inquiries" and "deliberately tried to conceal Madoff's role with the FGG feeder funds," *id.* ¶ 166; "guarded the relationship with Madoff," *id.* ¶ 166; were "unwilling to release" information, ¶ 177; "provided evasive answers," ¶ 183; and in 2004, "scrubbed references to BLMIS from FGG materials to avoid disclosure of Madoff's role," *id.* ¶ 237.

The Second Amended Fairfield Complaint alleges that the SEC began an investigation in 2005 into whether BLMIS was a Ponzi scheme or engaged in other illegal activity, but that the SEC was stymied by the efforts of BLMIS and Sentry insiders to hinder the government investigation through false statements and refusal to hand over responsive documents. *Id.* ¶¶ 236– 62.  Notably, the Second Amended Fairfield Complaint explicitly argues that these efforts prevented the SEC from "gain[ing] an accurate understanding of FGG's operations and relationship with BLMIS," *id.* ¶ 248; gave "the appearance of cooperating with the SEC [without]

disclos[ing] information useful to the SEC's investigation," *id.* ¶ 251; and "mislead[] the SEC to believe that it was FG Bermuda, not BLMIS, that made the investment decisions," *id.* ¶ 255.

If the SEC, with its powerful investigative tools, expansive subpoena powers, and broad resources could not determine the fraud during their investigations, how could a once-or-twice-removed Fairfield Fund investor, which did not even have a direct relationship with BLMIS, do so?  As Judge Rakoff pondered, as a practical matter, how might a direct investor even "launch an investigation of his broker's internal practices—and how could he do so anyway?"  *Picard v. Katz*, 4625 B.R. 447, 455 (S.D.N.Y. 2011), *vacated and remanded*; *Citibank*, 12 F.4th at 195.

The Trustee's own Fairfield Second Amended Complaint convincingly shows that a diligent inquiry would not have enabled the EFG Defendants to discover the fraudulent purpose of the transfers, and, therefore, the EFG Defendants may avail themselves of the good faith defense, even on a motion to dismiss.

C.   The EFG Defendants Lacked Knowledge of Voidability

In applying this element of the affirmative defense, the court must test the subsequent transferee's knowledge of the voidability of the initial transfer, not of the subsequent transfer. *Brandt v. Horseshoe Hammond, LLC* (*In re Equip. Acq. Res., Inc.*), 803 F.3d 835 (7th Cir. 2015). The courts construe "without knowledge of the voidability of the transfer" the same as good faith, so a transferee who is found to be in good faith is also found to be without knowledge of voidability.  As Judge Rakoff noted, "[i]n light of the legislative history, the most plausible reading is that this third requirement is merely one specific type of subjective knowledge required. . . ." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 516 B.R.18, 23 n.3 (S.D.N.Y. 2014). Therefore, this element of the defense also has been established.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Amended Complaint.

Dated:  December 13, 2022
        New York, New York

                                        /s/ Adam M. Lavine

                                        **KOBRE & KIM LLP**
                                        Zachary D. Rosenbaum
                                        Adam M. Lavine
                                        Donna (Dong Ni) Xu
                                        800 Third Avenue
                                        New York, New York 10022
                                        Telephone: (212) 488-1200
                                        Zachary.Rosenbaum@kobrekim.com
                                        Adam.Lavine@kobrekim.com
                                        Donna.Xu@kobrekim.com

                                        *Attorneys for Defendants*