# EXHIBIT A

FOR REFERENCE USE ONLY

# THE
# LAW & PRACTICE
# OF OFFSHORE
# BANKING & FINANCE

*Edmund M. A. Kwaw*

Q

Quorum Books

WESTPORT, CONNECTICUT • LONDON

BROOKLYN PUBLIC
LIBRARY

APR 23 1997

BUSINESS LIBRARY

**Library of Congress Cataloging-in-Publication Data**

Kwaw, Edmund M. A.
    The law and practice of offshore banking and finance  /  Edmund M. A.
Kwaw
        p.    cm.
    Includes bibliographical references and index.
    ISBN  0–89930–930–5 (alk. paper)
    1.  Banks and banking, International—Law and legislation.
2.  International finance—Law and legislation.  3.  Banks and
banking, International—Law and legislation—United States.
I.  Title.
    K1088.K933   1996
    341.7′51—dc20        95–38765

British Library Cataloguing in Publication Data is available.

Copyright © 1996 by Edmund M. A. Kwaw

All rights reserved. No portion of this book may
be reproduced, by any process or technique, without the
express written consent of the publisher.

Library of Congress Catalog Card Number: 95–38765
ISBN: 0–89930–930–5

First published in 1996

Quorum Books, 88 Post Road West, Westport, CT 06881
An imprint of Greenwood Publishing Group, Inc.

Printed in the United States of America



The paper used in this book complies with the
Permanent Paper Standard issued by the National
Information Standards Organization (Z39.48–1984).

10  9  8  7  6  5  4  3  2  1

without

*Chapter 2*

# The Structure of Eurocurrency Deposits and Interbank Placements

## 2.00 Introduction

This chapter, as well as Chapters 3, 4, and 5, is concerned with the nature of the deposit side of the eurocurrency market, as well as the legal rules that govern eurocurrency deposits.

There are two segments of the deposit side of the eurocurrency market: (1) the market dealing primarily with the deposit of short-term funds by customer-depositors and the loaning of these funds to borrowers, and (2) the market dealing with the interbank, or bank-to-bank, placement of funds where commercial banks borrow and lend, or trade eurocurrency among themselves. This chapter discusses the structure of both of these segments of the deposit side of the market.

## 2.00[1] The Use of Intermediary Correspondent Banks

Correspondent banking differs from financial intermediation. Financial intermediation is the process where financial intermediaries, in most cases commercial banks, place themselves between the suppliers of funds and the users. More often than not, financial intermediation in the interbank market takes place as an integral part of the interbank offshore currency placement process.

Correspondent banking takes place in the interbank market as part of the eurocurrency deposit and placement process when an initial deposit is placed in the interbank market by a depository bank instead of being loaned directly

to the borrower. Correspondent banking differs from financial intermediation in the sense that it refers to the system of "reciprocal bank accounts between participating institutions"[1] created to facilitate receipts and payments in foreign currency.[2] Usually, domestic banks with substantial international affairs open accounts in their names with banks overseas. These accounts are referred to as correspondent accounts.

For example, a bank situated in the United Kingdom, X Bank, and one situated in the United States, Y Bank, enter into a correspondent bank relationship with each other. As a result, payments in U.S. dollars to X Bank may be made into its correspondent account with Y Bank. Likewise, payments in pounds sterling to the U.S. bank, Y Bank, may be made into its correspondent account with X Bank. These correspondent accounts are referred to as *nostro* and *vostro* accounts in Europe,[3] or "due from" and "due to" accounts respectively in North America.[4] *Nostro* account means our account maintained at another institution, while *vostro* account means your account with us. Thus, if Y Bank has deposits of eurosterling with X Bank, then its nostro (due from) account is the account on its own books which reflects the amount of eurosterling on deposit with its United Kingdom correspondent.[5] Likewise, from the perspective of X Bank, its vostro (due to) account is the account on its own books which reflects the amount of eurosterling that its U.S. correspondent maintains with it.[6] The process of debiting or crediting correspondent accounts in the countries of issue is facilitated by the use of automated or electronic funds transfer systems.

## 2.00[1][i] International Funds Transfer Mechanisms

The eurocurrency market works essentially through a network of telecommunication lines that link various eurocurrency centers and banks. Although other methods of funds transfer exist, such as the use of airmail and bank checks and drafts, a large percentage of international interbank eurocurrency transfers are effected by electronic means.[7] There are various reasons why electronic funds transfers are preferred to other forms of funds transfers. First, since the eurocurrency market deals in large quantities of funds with relatively short-term maturities, it is necessary to use a method of funds transfer that combines speed with security.[8] Second, because eurocurrency transactions usually involve parties separated from each other by long distances, the use of electronic transfer eliminates the problems that would arise because of the lack of proximity. Furthermore, since eurocurrency funds are denominated in currency held on the books of banks outside the country of issue, except those eurodollars held in IBFs, the financial institutions concerned do not have access to those currencies.[9] This means that there is the need for correspondent banks in the countries of issue. The use of electronic funds transfers helps to link the correspondent banks in the countries of issue, which have direct access to

funds, with the depositary institutions outside the countries of issue. The role of electronic funds transfer systems is thus to link financial institutions separated by time and space in order to facilitate international financial transactions.

International funds transfers are processed by a variety of network organizations. These network organizations may be divided into two categories, namely (1) networks which merely transmit financial information, and (2) networks which, in addition to transmitting financial information, are also clearing and settlement systems. The international financial telecommunications network which is most widely used to transmit financial information alone is the Society for Worldwide Interbank Financial Telecommunications or SWIFT. SWIFT is an international communications network for all currencies. Examples of financial telecommunications networks which are also clearing and settlement systems are (1) the Clearing House Interbank Payments System, or CHIPS, the private clearing system for the U.S. dollar, (2) the Clearing House Automated Payments System, or CHAPS, the U.K. payment system for incoming large-value funds denominated in pounds sterling, and (3) the International Interbank Payments System, or IIPS, the Canadian system concerned with incoming large-value funds denominated in Canadian dollars.[10]

### [a] SWIFT

SWIFT,[11] a nonprofit cooperative company organized under Belgian law,[12] was founded in 1973 by 239 European, American, and Canadian banks[13] and is currently owned by about 1,650 member banks.[14] Each year the members of SWIFT elect a Board of Directors, which in turn chooses a General Manager who is vested with the authority to make decisions concerning the use of the facilities of SWIFT. Membership in SWIFT is open to organizations engaged in the business of banking and in the transmission of financial messages. Currently, the facilities of SWIFT are used by over 2,600 financial institutions in over sixty-five countries.[15]

SWIFT is not a funds transfer system, but facilitates the transfer of funds by the provision of a reliable and fast telecommunications network for transmitting messages concerning funds.[16] Since the primary purpose of SWIFT is to transmit messages for its members, the members of SWIFT use its network not only to transmit messages concerning funds transfer in a variety of currencies, but also for other operations including debit and credit advices, statements, foreign exchange operations, money market confirmations, collections, documentary credits, interbank securities trading, and balance reporting. In the context of the transmission of payment messages, the actual settlement of payment between banks is effected by debits and credits to accounts of those banks or to correspondent bank accounts.[17]

*The Law and Practice of Offshore Banking and Finance*

Prior to the emergence of the new SWIFT configuration (SWIFT II), the SWIFT system (SWIFT I) operated through two main centers, the upper level of the system, located in the Netherlands and the United States.[18] Each member of SWIFT was linked to one of these main centers via a specific regional processor. For example, banks in the United Kingdom were linked to the main Amsterdam center via their national switching center located in Edgware,[19] and banks in Canada were linked to the main center in the United States via the regional processor in Montreal.[20] Since 1990, however, a more advanced SWIFT configuration (SWIFT II) capable of unlimited growth has taken over.[21] The regional processors which characterized SWIFT I have now been replaced by what are referred to as SWIFT Access Points or SAPs.[22] Currently, messages sent via SWIFT II proceed through the SAPs via slice processors and not through the upper level of the SWIFT system, as was characteristic of the old system under SWIFT I.[23] The upper level of the current SWIFT II system is made up of a system control processor located in the original operating centers. The current function of the upper level of the system is not to facilitate the transmission of messages, but rather to monitor and control the system.[24]

The actual mechanics involved in the operation of a current SWIFT transmission may be illustrated in the following manner. Assume the existence of two financial institutions, "English Bank Plc" located in the United Kingdom and "American Bank" located in the United States. Assuming a customer of English Bank Plc wants to make a payment to a person located in the United States, it will instruct its bank English Bank Plc to make the relevant payment. The message is then transmitted by English Bank Plc over a public switch or private leased line to the U.K.'s SWIFT Access Point (SAP) where it then enters the SWIFT system.[25] This SWIFT message is transmitted in standardized format,[26] sending out all the relevant information, including an input sequence number, the sending and receiving banks' code numbers, the name and address of the transferee, the amount involved, the date on which the receiving bank obtains the use of the funds and the date of payment to the beneficiary.[27] Prior to entering the SWIFT system, the message sent by English Bank Plc in the United Kingdom will be acknowledged by its SAP, encrypted, and then passed on over leased international lines to the slice processor.[28] The slice processor will decrypt and encrypt the message and transmit it over leased international lines to the SAP in the United Kingdom which will transmit it via SWIFT to the SAP in the United States. The payment message is then decrypted by the U.S. SAP and forwarded to the terminal of American Bank over a public or private leased line. Unlike the situation in SWIFT I, the operating centers under SWIFT II are in no way involved in the process of transferring the message. The receiving bank, American Bank, then acknowledges receipt of the message. Where the message is not sent directly to the terminal of American Bank but rather to a correspondent bank, for example Chase Bank, for transmission to American Bank, the role of SWIFT ceases when the message is transmitted to the terminal of the

correspondent bank (Chase Bank). The subsequent transmission of the message of payment via the correspondent bank is executed via the particular interbank transfer mechanism used in the United States.[29]

## [b] CHIPS

CHIPS is a department of the New York Clearing House Association and is the international private clearing system for large dollar transfers.[30] This means that all wholesale international transactions involving the use of the dollar go through CHIPS.[31] Theoretically, transfers of U.S. dollars may also be effected via another U.S. funds transfer system, Fedwire. Fedwire is the national electronic communications network of the Federal Reserve System. While CHIPS provides same-day funds, Fedwire provides immediately available [Fed] funds. Although there are no restrictions regarding which funds transfer system may be used in any particular situation, Fedwire attracts securities transactions, while CHIPS attracts foreign exchange transactions. CHIPS is thus a settlement as well as a communications network.[32]

Under its constitution,[33] the New York Clearing House Association is vested with the power to make rules and regulations concerning all matters which are not dealt with in the constitution[34] and is specifically authorized to manage a computer department to facilitate payments and funds transfers between its members.[35] CHIPS, which was set up pursuant to this authority and with this objective in mind, is therefore governed by the Rules Governing the Clearing House Interbank Payments System.[36]

There are two categories of banks which participate in CHIPS: (1) settling participants and (b) nonsettling participants.[37] The Rules Governing the Clearing House Interbank Payments System defines a settling participant as a "participant which settles for its own account and which may also settle for any other participant's account."[38] CHIPS closes daily at 4:30 PM.[39] At that time, the CHIPS central computer brings together all transactions and balances the debits and credits for each participant to obtain a net position for a participant in relation to all other participants.[40] When this is done, the settling participants, who are provided with initial settlement balance reports, then have the responsibility of reconciling the different net positions.[41] In the process, nonsettling participants settle for either a net surplus (credit to their account) or a net debit position with their respective settling participants by 6:00 PM. Settlement between the settling participants and the nonsettling participants is effected by crediting and debiting their correspondent accounts. After this, the settling participants settle among themselves, utilizing a CHIPS settlement account opened for that purpose at the Federal Reserve Bank of New York. The process of settlement is itself broken down into two phases. First, each debtor-settling participant transfers into the CHIPS settlement account its aggregate net-net balance. Then, the Federal Reserve Bank of New York (or the Clearing

House as its agent) effects a transfer of the aggregate net-net balance of a creditor-settling participant from the CHIPS settlement account to an account of the creditor-settling participant.[42]

Since the CHIPS network is the clearing system for eurodollar transactions, its role is limited to transmitting payment messages concerning dollar transactions between payor-sending-bank participants and payee-receiving-bank participants in the New York interbank payments system. Almost invariably, therefore, a transaction or payments message which originates outside the New York interbank payments system and involves the use of dollars originates as a SWIFT message and is eventually settled in New York via CHIPS. CHIPS facilitates same day net-net settlement. This means that while bilateral and multilateral netting may take place throughout the day, it is only at the end of the day that net-net balances are settled over reserve accounts.[43] It is important to note that, at this stage, the settlement/payment is not made in real money but clearing house funds.[44] The rationale for this is that the payments process involves settlement over time as opposed to instantaneous or immediate settlement as is characteristic of Fedwire. Settlement over time creates the possibility that out-payments may exceed in-payments. Also, banks may even make multiple out-payments without receiving any in-payment. It is thus important that all payments go through CHIPS to facilitate the efficient correlation of in-payments with out-payments. The use of CHIPS thus enables counterparties to settle on a net basis with the clearing system rather than settling on an individual basis. In such a situation the use of CHIPS also involves the understanding, by all participants, that due to possible disparities payment can only be made in the interim in clearing house funds, not real money. This ensures certainty in the payments process.[45] It also ensures that the various parties are provided with timely and accurate accounting with respect to the transaction.

The structure of a eurodollar transaction involving the use of CHIPS may take place in the following manner. Assume again, the existence of two trading partners, one in England and the other in New York. Englishco in England purchases goods worth $10 million from Americanco in the U.S. and has to pay in U.S. dollars. Englishco maintains an account with a U.K. bank (Abbey Bank) but has no account in the United States. To effect the payment, Englishco will ask its bank to transfer $10 million from its account to the account of Americanco maintained at Chase Bank in New York. If Abbey Bank has no correspondent account relationship with Chase Bank, but has such a relationship with another U.S. bank, Citizens Bank, Abbey Bank will have to employ the services of Citizens Bank to effect the transfer because Abbey Bank has no direct access to the amount of U.S. dollars required. To effect payment, then, Abbey Bank will debit Englishco's account with U.S.$10 million and will instruct its correspondent bank in the United States (Citizens Bank) to transfer U.S.$10 million from Abbey Bank's account to the account of Americanco in Chase Bank. Abbey Bank will then credit the vostro account of Citizens Bank with the relevant

amount and debit its own nostro account. The payment instruction from Abbey will be sent via a funds transfer system including the use of SWIFT. The correspondent, Citizens Bank, would then acknowledge the message and would initiate a CHIPS payment message from its CHIPS terminal. The CHIPS message, like the SWIFT message, will contain all the relevant information in standardized format, including the identifying codes for the party originating the transfer (Englishco), the intermediary-receiving bank (Citizens Bank), the destination bank (Chase Bank), and the party for whom the receiving bank is receiving the transfer.[46] This information is then transferred to the CHIPS central computer. The computer files and retains the message and causes the message to be typed at the terminal of Citizens Bank for approval. If approved the message is retransmitted.[47] At that point the central computer in the Clearing House causes credit and debit tickets to be printed at the terminals of Chase Bank and Citizens Bank respectively. The CHIPS computer then credits the clearing house account of the receiving bank, Chase Bank, while it debits that of the sending bank, Citizens Bank. The funds thus received, although being clearing house funds, are made available to Americanco which is capable of drawing upon them to discharge its obligations.[48] At the end of the day, the CHIPS central computer then correlates all payments made, nets out the debits and credits, and calculates the net balance for each participant.[49] The process of settlement will involve the Federal Reserve Bank of New York, the settling participants, and the Clearing House. As described earlier, settling participants then settle among themselves, using their accounts at the Federal Reserve of New York.[50]

### [c] CHAPS

CHAPS, or the Clearing House Automated Payments System, is the U.K.'s automated or electronic system for handling incoming large-value funds denominated in pounds sterling. Unlike CHIPS, which is operated by the New York Clearing House Association, CHAPS is not operated by any central organization.[51] CHAPS, which was first introduced in 1984 as a replacement to Town Clearing, is nothing more than a set of communications protocols for sending payment messages via private telecommunications networks. The communications protocols are implemented using shared software.[52] The communications protocols which govern the transmission and receipt of payment messages via CHAPS are defined by the CHAPS Clearing Rules. In general, CHAPS is a network which makes it possible for the clearing banks in England to receive and transmit payments in sterling. The clearing banks may transmit and receive such payments either on their own account or on behalf of their customers. CHAPS is an immediate funds transfer system in the sense that it guarantees same-day value sterling payments. CHAPS has two categories of users: the settlement members and the participant members. In general, settlement members are those banks which operate the system and also settle at the

Bank of England. Participant members on the other hand employ the services of settlement members with which they maintain correspondent accounts to effect payments.[53] The communication of payments via CHAPS is effected through CHAPS gateways. Only the settlement members of CHAPS possess gateways and one gateway may be used by more than one settlement member. Participant members who need to effect large-value wire payments do so by communicating directly with the gateway of their sponsoring settlement member. It is possible for a participant member to have an account with more than one settlement member. Payment instructions are sent from one gateway to another via British Telecom's Packet Switching Stream Service (PSSS). The process involving a large-value sterling wire payment which is effected via CHAPS may be described in the following manner.

Assume that a bank in the United States, Chase Bank, wants to transfer a large amount of sterling into a bank (Natwest Bank) in the United Kingdom. According to the CHAPS rules, any payment message or instruction must be directed to either (1) an office of a settlement member which is registered as CHAPS addressable or (2) an office of a nonsettlement member which has made arrangements with a settlement member and is, in that respect, CHAPS addressable. A foreign payor wishing to make a sterling payment may thus have access to CHAPS either via (1) a settlement member, (2) a foreign correspondent of either a settlement member or a nonsettlement member which has made arrangements with a settlement member, or (3) a nonsettlement member which has made arrangements with a settlement member.

Assuming that Chase Bank has no correspondent account with Natwest Bank but has a correspondent account with another U.K. bank, Abbey Bank, it may employ the services of its correspondent. The payment message from Chase Bank to Abbey Bank will initially originate as a SWIFT message. The nature of the funds transfer process after this will depend on whether Natwest Bank, the receiving/beneficiary bank, is a settlement member or a nonsettlement member which has made arrangements with a settlement member, or an organization which does not have any arrangements with a settlement member. Assuming Abbey Bank is a nonsettlement member which has made arrangements with a settlement member, Natwest Bank, after the message is received by Abbey Bank, Abbey Bank will send the message to its sending gateway. The sending gateway, after acknowledging receipt of the message and confirming the selection of the receiving gateway of the bank concerned (Natwest Bank), will send the message via British Telecom's PSSS to the receiving gateway of Natwest Bank. Both gateways maintain a record of amounts received from and amounts paid to each settlement member which operates through it.

However, if Abbey Bank, the intermediary bank, is neither a settlement member nor a nonsettlement member which has made arrangements with a settlement member, the payment message is sent to the gateway of another

settlement member whose identity is determined in accordance with a routing table. When the payment message is received at the gateway of this payee settlement member, it is transferred to the relevant branch or head office.

The CHAPS system closes at 3:00 PM each business day. At closing, the gateway of each settlement member transmits the net effect of that day's transactions, in the form of debit and credit balances between that bank and other banks, to the CHAPS gateway of the Bank of England. The Bank of England, after processing these messages, adjusts the credit balances of the respective settlement banks.

### [d] IIPS

IIPS, the International Interbank Payments System, is the Canadian system which is used to effect large incoming wire payments denominated in Canadian dollars. The Canadian system, unlike the other domestic systems such as CHIPS and CHAPS, is not premised on the use of the transmission facilities of private-domestic leased lines. For instance, it will be recalled that the transmission of a payment message from one bank in the United Kingdom to another via CHAPS is dependent on the use of British Telecom's Packet Switching Stream Service. Likewise, the transmission of a payment message between two U.S. banks via CHIPS is effected via leased private-domestic telecommunications lines. The transmission of a payment message from one Canadian bank to another via IIPS, however, is dependent on the use of SWIFT.[54] Thus a payment message from one Canadian bank to another first goes through a SWIFT Access Point or SAP before it reaches the destination bank or beneficiary bank. This necessarily means that payment messages from one Canadian bank to another always take the form of a SWIFT message. Settlement of the relevant accounts is then effected at accounts maintained at the Bank of Canada.

### 2.00[2] The Eurocurrency Deposit Operation

A typical situation of the deposit and transfer of funds denominated in U.S. dollars in the eurocurrency market could take place as follows. Assume that a commercial bank in Ghana, the Ghana Commercial Bank, which has its office in the Republic of Ghana, maintains a U.S. dollar account with a U.S. based bank (Citizens Bank) into which it receives payment in U.S dollars. The current balance of this account of Ghana Commercial Bank stands at U.S.$10 million. Assume that Ghana Commercial Bank decides, that instead of letting the funds sit idle in the U.S. bank, it could be transferred into a eurodollar account in the United Kingdom at an advantageous rate of interest, and that it concludes such a deal with a U.K. bank (Abbey Bank). In concrete terms, the eurodollar deal will take place in the following manner. Citizens Bank will inform Abbey Bank of the credit instructions via SWIFT. Assuming that Abbey

Bank has no account with Citizens Bank, but has a correspondent bank relationship with National Bank in the United States, Citizens Bank on the instructions of Abbey Bank will transfer the funds to National Bank for the account of Abbey Bank.[55] The transfer of funds between the two U.S. based banks, Citizens Bank—the originating bank, and National Bank—the receiving bank—will be effected via CHIPS. When the CHIPS central computer credits the CHIPS account of National Bank, National Bank will also credit the vostro account of Abbey Bank. The actual transfer of funds from Citizens Bank to National Bank is effected by the transfer of funds from Citizens Bank's account with the Federal Reserve, to National Bank's account with the Federal Reserve. National Bank will then notify Abbey Bank of the transfer of funds from Citizens Bank to the account of Abbey Bank. Upon being informed, Abbey Bank will credit the account of Ghana Commercial Bank.

The accounting entries which result from the above transaction will include the following. The books of Abbey Bank will show a credit in favor of Ghana Commercial Bank in the amount of U.S.$10 million and a corresponding liability on its own part. The nostro or due from account of Abbey Bank will also show a credit of U.S.$10 million. In the books of National Bank the vostro or due to account of Abbey Bank will be credited with the amount of U.S.$10 million, while the books of Citizens Bank will show a debit of the same amount. The book entries made with Abbey Bank in the United Kingdom reflect the corresponding entries made in the books of its correspondent in the United States, National Bank, which in turn reflect the changing nature of the claims involved. The accounts are not independent accounts and are sometimes referred to as mirror accounts.[56] By giving up its claim against Citizens Bank, Ghana Commercial Bank now acquires a claim against a U.K. bank, Abbey Bank. Likewise, the original claim held by Ghana Commercial Bank against Citizens Bank now becomes a claim of the U.K. bank, Abbey Bank, against the U.S. bank, National Bank. This eurodollar deposit operation is illustrated in Figure 2.1.

The figure shows that although Ghana Commercial Bank regards itself as holding dollars in Abbey Bank in the United Kingdom, the funds which are the subject matter of the deposit and transfer operation, never in fact leave the United States. All that happens is, that because Abbey Bank possesses a correspondent account with a bank in the United States, National Bank, a transfer from the reserve account of Citizens Bank to that of National Bank, at the Federal Reserve Bank in New York, operates to transfer the funds from Citizens Bank in the United States to Abbey Bank in the United Kingdom. Based on this kind of transfer operation then, it is possible to make the argument that in the funds transfer process involving the clearing and settlement systems of countries of issue, eurocurrencies never leave the country of issue.[57] The scenario and Figure 2.1 illustrate what has come to be accepted as the usual practice of the eurodollar deposit operation in particular and offshore currency operations in general.[58]

**Figure 2.1**
**Creation of a Eurodollar Deposit**

**Stage 1:** Ghana Commercial Bank withdraws U.S.$10 million from its account with Citizens Bank and deposits it in Abbey Bank (U.K.).

### Ghana Commercial Bank

| | |
|---|---|
| Demand deposits with Citizens Bank (U.S.) -$10 million | |
| Eurodollar time deposit with Abbey Bank (U.K.) +$10 million | |

**Stage 2:** Citizens Bank deposits $10 million in Abbey Bank's account with National Bank by transferring $10 million from its reserve account with the Federal Reserve to National Bank's account with the Federal Reserve.

| Citizens Bank U.S. | | National Bank U.S. | |
|---|---|---|---|
| Reserves -$10 million | Demand deposit Ghana Commercial Bank -$10 million | Reserves +$10 million | Due to item or vostro account from National to Abbey +$10 million |

**Stage 3:** Abbey Bank (U.K.) credits the account of Ghana Commercial Bank with $10 million and credits the nostro or due from account with National Bank (U.S.).

### Abbey Bank United Kingdom

| | |
|---|---|
| Abbey Bank's nostro account, that is, due from National Bank to Abbey +$10 million | Eurodollar time deposit Ghana Commercial Bank +$10 million |

**Stage 4:** Settlement of accounts at the Federal Reserve. Citizens Bank (U.S.) loses reserves while National Bank (U.S.) gains reserves.

### Federal Reserve Bank of New York

| | |
|---|---|
| | Reserves Citizens Bank -$10 million |
| | Reserves National Bank +$10 million |

## 2.00[2][i] Repaying the Deposit

There are two main methods of repaying eurocurrency deposits such as the deposit of U.S.$10 million in the previous example: (1) repayment may be effected by causing acts which take place in the country of issue of the currency concerned,[59] and (2) payments may be effected via in-house and correspondent bank transfers which avoid the clearing system of the country of issue.[60]

## [a] Payment via the Clearing System of Countries of Issue

Payment may take place in the country of issue according to the rules of its clearing system. This is the usual practice in the eurocurrency market. In the previous scenario, the repayment obligation of the U.K. based Abbey Bank will, according to current practice, be performed in the United States by the delivery and collection of dollars at the U.S. based National Bank or another bank in the United States nominated by the customer, Ghana Commercial Bank. Assuming that Ghana Commercial Bank wants to be repaid its U.S.$10 million, and payment is effected via the U.S. clearing system, this will be the scenario: Ghana Commercial Bank will demand payment from the U.K. branch of Abbey Bank where the eurodollar account is maintained. Upon the demand being made, Abbey Bank will send a funds transfer message via SWIFT to its correspondent in the United States, National Bank, instructing it to transfer the funds to the account of Ghana Commercial Bank at Citizens Bank. National Bank will then initiate a CHIPS message containing all the relevant information needed to effect the transfer.[61] This message is then sent to the CHIPS central computer which causes debit and credit tickets to be printed at the terminals of National Bank and Citizens Bank respectively and credits and debits the clearing house accounts of Citizens Bank and National Bank respectively with U.S.$10 million. Although the funds are clearing house funds at this point, Citizens Bank may make the funds available to Ghana Commercial Bank by crediting the account of the latter. The use of the clearing system to repay a eurocurrency deposit is thus a reversal of the original deposit process.

The use of the clearing system of the country of issue to effect payment is the general approach. Because this method of effecting payment is so widely used, it is possible to argue that it is an implied term of the eurocurrency deposit contract that such a method of payment be used.[62] This method of effecting payment is also dictated by practical considerations. Only a globally organized system for clearing and netting large sums in a variety of currencies will lead to an efficient functioning of the repayment process.[63] Since no such organization exists, all payments of eurocurrency have to go through the only systems which currently possess the facilities for collecting and netting large sums of foreign currency: the clearing systems of countries of issue.[64] This process of making payment in the eurocurrency market can be divided into three phases. First, the customer makes a demand for payment at the eurobank where the account is maintained. Second, the eurobank prepares to facilitate payment by transmitting a payment message to the beneficiary bank. Third, actual payment, that is, the delivery of funds, takes place in the country of issue. While all three stages may be condensed into two stages and take place at the same bank in the domestic context, only the first two stages take place at the eurobank in the eurocurrency deposit context. Thus in the previous scenario, the demand by Ghana Commercial Bank to be repaid its deposit in the United

Kingdom at the branch of Abbey Bank where the deposit is maintained is the first stage in the process of repayment. Since Abbey Bank does not have access to the funds, it can only instruct its correspondent in the country of issue to credit the account of Ghana Commercial Bank against a promise by Abbey Bank to subsequently provide cover.[65] Abbey Bank consequently effects a transfer message for that purpose. This is the second stage in the process of repaying eurocurrency, or the preparation to make repayment. The third stage, the actual delivery of the funds, payment per se, although capable of avoiding the clearing system of the United States, will, in most cases, take place in the United States. The account of Ghana Commercial Bank in the United States is then credited and the corresponding debits and credits are effected in the accounts of Citizens Bank and National Bank at the clearing house and subsequently at the Federal Reserve Bank.

### [b] Payment via In-House Transfers

An in-house transfer generally refers to the transfer of funds between accounts held at either the same branch of a bank or at different branches of the same bank. Where two parties, A and B, maintain accounts at the same branch, and A wants to make payment to B, an in-house transfer may be used to effect payment. The bank concerned merely debits the account of A, and credits the account of B. In the international context, the use of an in-house transfer to effect payment may take place with or without the intermediary assistance of a correspondent bank. If Ghana Commercial Bank wishes to be repaid its U.S.$10 million held at Abbey Bank in the United Kingdom, an in-house transfer without the assistance of a correspondent bank could be used to effect payment. This is possible where both Abbey Bank and Ghana Commercial Bank have correspondent account relationships with the same bank. Suppose both Ghana Commercial Bank and Abbey Bank maintain accounts with a bank in Zurich, Zurich Bank Ltd. All that is necessary to repay the deposit of Ghana Commercial Bank is for Abbey Bank to debit the account of Ghana Commercial Bank and then instruct Zurich Bank Ltd. to transfer the funds from its account into that of Ghana Commercial Bank. Zurich Bank Ltd. will then debit the vostro account of Abbey Bank and credit the vostro account of Ghana Commercial Bank. The transfer of funds between accounts maintained at the same bank is the in-house transfer.

### [c] Repayment by Correspondent Bank Transfers

In the international context, where the banks or parties concerned do not maintain an account with the same branch of a bank, the services of a correspondent bank is usually required to facilitate the transfer of funds from payor to payee at the different banks. Correspondent banking, it may be

recalled, refers to the system of reciprocal bank account relationships between banks. In a very simple correspondent bank transfer, upon the receipt of instructions from its customer, a sending or originating bank will effect a transfer message to another bank (the receiving bank) to make payment to a payee who maintains an account at the receiving bank. Payment between the sending or originating bank and the receiving bank is effected by corresponding debit and credit entries to correspondent accounts maintained with each other. This usually means that the originating or sending bank must have sufficient funds to cover the amount of the transfer in its correspondent account with the receiving bank.

In international banking transactions and eurocurrency transactions, correspondent banks may be used to send and receive funds for (1) parties who hold funds with banks outside countries of issue or (2) parties who hold funds with banks inside countries of issue. In the latter situation, this usually involves the use of the clearing and settlement system of the country of issue.

## 2.00[2][ii] The Eurocurrency Interbank Placement

Taking the scenario further assuming Abbey Bank does not want the funds to lie idle in the United Kingdom, it may decide to place it in the interbank market by depositing it with another eurobank in France (Banque Internationale) which is prepared to pay a higher rate for the funds. If Banque Internationale cannot find immediate use for these funds it will also deposit them in the interbank market. At each stage in this process, the next bank pays a slightly higher rate than the previous bank does. The margins involved in the interbank market are usually very small. It is important to note that the redepositing of the funds in the interbank market does not add to the final extension of credit in the financial markets, but only involves the passing of funds from bank to bank.

The mechanics of the interbank placement operation involving some or all of the above parties could take place in the following manner: Abbey Bank will contact Banque Internationale over the phone and request the latter to provide it with its bid, or deposit rates, for deposits of various maturities in both France and England. Assuming the rate available in the Paris branch of Banque Internationale is higher, Abbey Bank will negotiate with Banque Internationale to place the $10 million for one month in the Paris branch of the latter bank. After an agreement is reached, the relevant book entries are made. Since Banque Internationale also cannot find immediate use for the funds, it may decide to deposit it with its London branch, which may decide to take the deposit on its books at approximately $\frac{1}{32}$ of 1 percent over the rate paid by the Paris branch. In this case, the second funds placement takes place between two branches of the same bank.

Interbank placement operations can also take place with the assistance of brokerage firms. For example, if the London branch of Banque Internationale

decides to invest the $10 million deposited with it at a profit, it may seek to lend the funds at as high a rate as possible. The use of brokerage firms becomes indispensable in this context. Since it is generally difficult to find the appropriate bank willing to pay the appropriate rate, brokers, who possess a comparative advantage in the possession of information, act as intermediaries between banks in the interbank market. Thus the London branch of the Banque Internationale may request a brokerage firm to provide it with the bid or deposit rates offered by various banks for call—7-day, 30-day, 90-day,180-day, and 270-day deposits— denominated in a variety of currencies. On this basis, Banque Internationale (London) is able to make an informed decision as to whether it wants to place the funds or swap currencies. Assuming it decides to place the funds in a Japanese bank (Sumitomo Bank), it conveys this decision to the broker, who then contacts the eurocurrency dealing department of Sumitomo Bank by phone or telex to close the deal. The broker earns a fee of about $\frac{1}{32}$ of 1 percent. Confirmation of the deal is transmitted to Banque Internationale (London) and the message to transfer funds to the Japanese bank is transmitted via SWIFT to correspondent banks in Japan, which then effect the transfer.

### 2.00[2][iii] Aspects of Market Practice

The nature of the market practice concerning eurocurrency deposits is influenced by the division of the deposit side of the market into a deposit of funds and the bank-to-bank placement of funds.

### [a] Call and Fixed Term/Time Deposits

For the purposes of withdrawal, bank deposits may be classified into those which are withdrawable or transferable by the depositor without notice, usually called demand deposits, and those which can only be withdrawn at a fixed future date, usually referred to as the maturity date. This latter category of deposits is usually referred to as a fixed term or time deposit.

Another kind of deposit which is available in the eurocurrency market is the call deposit. This category of deposits are so called because they are said to be on call, that is, withdrawable at short notice. Call deposits or call money may be same day value, 2-day notice, and 7-day notice. The interest rates applicable to call deposits differ according to the period of notice required. However, call money is very attractive to various investors because of its comparative liquidity, vis-à-vis other deposits of a fixed term nature. Although the deposit is in essence a loan to the bank, call deposits are generally not secured.

The other category of deposits available in the eurocurrency deposit market are time or fixed term deposits. These are generally interest bearing deposits with a fixed period or maturity date. Time deposits are usually placed for periods ranging from one to twelve months. It may be possible in certain jurisdictions

for time deposits to be placed for longer than one year. In the United Kingdom, it is the general practice to secure time or fixed term deposits against general bank assets.

### [b] Certificates of Deposit

Time deposits may be evidenced by a certificate of deposit (CD). The certificate of deposit is a document confirming an interest bearing deposit of funds for a fixed period in the institution concerned. The difference between an ordinary time deposit and one evidenced by a certificate of deposit is that the issue of a certificate permits its negotiability. Interest payable on a certificate of deposit may be calculated on a 365- or 360-day year basis. In the United States, the certificate of deposit is referred to as a negotiable certificate of deposit.[66]

### [c] Relevant Documentation

According to market practice, before the actual deposit of funds (as opposed to an interbank placement), it is usual for the depositor/customer to complete certain account opening documents. The account opening documents provide a record of all or any of the following: (1) the name, nationality and status of the depositor, (2) the type of account, (3) the currency involved, (4) the current authorized signatories, and (4) any indemnity relating to instructions given by telephone, telex, or facsimile.

It is usual for a eurocurrency deposit, as opposed to an interbank placement, to be formally documented pursuant to negotiations between a customer and the depositary eurobank, and after the signing of the account opening documentation. Depending on the negotiations between the eurobank and the customer, and the kind of deposit, the documentation of the eurocurrency deposit per se, may relate to one of the following: a (1) time or fixed term deposit evidenced by a written contract or (2) time or fixed term deposit evidenced by a certificate of deposit. A necessary and final safeguard against the possibility of dealing errors is provided by the exchange of confirmations between the various participants. In general, a confirmation sent by a receiving bank to the depositor does not constitute an acknowledgment of funds received by the receiving bank. The terms negotiated between the depositor and the receiving/depository bank are documented on the confirmation form and become effective only upon the receipt of the funds by the receiving bank. According to current practice, where the fixed term/time deposit is not evidenced by a certificate of deposit, the confirmation sent to the depositor by the eurobank is the only documentation showing funds held at the eurobank. This confirmation constitutes a fixed term deposit contract between the bank and customer. Upon the receipt of funds by the receiving bank, the confirmation, in addition to being (1) a confirmation of the transfer, and (2) an

acceptance by the receiving bank of the terms, also constitutes (3) the fixed term or time deposit contract. The terms of the time deposit contract usually include the (1) currency of account, (2) duration of the deposit, (3) interest rate, (4) date of the deal, (5) value date and maturity date, (6) amount of interest, (7) the place of repayment, and (8) payment mechanisms and processes.

According to current practice however, call deposits are neither evidenced by formal documentation nor standardized confirmations. The only form of documentation of call accounts are the statements which are sent upon request by the depositary bank via SWIFT to the depositor. The reason why call deposits are not formally documented is that, being the fastest moving sector of the interbank deposit market, the issuance and safekeeping of formal documentation becomes too cumbersome as well as expensive.

Between banks, however, the entire interbank placement operation is carried out informally—neither account opening documents nor the kind of formal documentation relating to noneurobank customer accounts are available. All transactions are carried out informally via the telephone, telex, or fax and only confirmations of the deal are exchanged. Confirmations of financial deals may be made by telephone, in writing, or electronic media. These confirmations are usually the only documents showing monies held at the other banks which the banks placing the funds will receive. Since the process of making an interbank placement of funds is internationally accepted market practice by the eurobanks, the confirmations are regarded as contracts.

There is also no standardized format for such confirmations. For banks and other financial institutions operating in the London wholesale markets, the *London Code of Conduct*[67] recommends that all confirmations include all the details of their transactions.[68] The current practice is that banks participating in the international money markets usually include on the confirmations their own terms and conditions of trading in addition to the details of the deal. For example, a Royal Bank of Canada (RBC) standing order[69] provides that when offshore branches of the RBC issue confirmations of deposit deals (whether by telephone or in writing), they must include: (1) the bank's full name and address, and telephone and fax numbers, (2) the type of transaction, (3) the counterparty's full name and address, (4) the amounts and currencies involved, (5) the value and maturity dates, (6) the interest rates agreed upon, including the basis of calculation, that is, whether 360 or 365 days, and (7) details concerning payment.

## 2.00[3] Legal Relationships

The eurocurrency deposit and interbank placement operation described above gives rise to certain legal relationships between the parties involved. These parties include the depositor of the funds, the depositary bank, the correspondent-intermediary banks, the other banks in the interbank market,

the eurobank which is the beneficiary of the transfer, and the network/clearing systems which are used to effect the transfer of funds. In order to understand the principles of law which govern these relationships, it is important to determine their precise nature.

Eurocurrency deposits and interbank placement operations involve a combination of international funds transfers between various institutions and the creation of account relationships between these institutions. The process of effecting the transfer of funds is described as international because it involves commercial banks which are located in more than one country. At least one of the banks is located in a country which is not the country of the currency of issue. Using the scenario involving the deposit and placement of a hypothetical eurodollar deposit previously described, the legal relationships which arise may be outlined in the following manner.

The first legal relationship is that between Ghana Commercial Bank (GCB), the owner of the funds, and Citizens Bank (CB), the bank with which GCB maintains the dollar account. The legal relationship between these two parties arises in two stages. The first stage concerns the ordinary banker-customer deposit relationship which is purely contractual. The second stage of the relationship arises when GCB asks CB to effect the transfer of funds to the nominated eurodollar account. At this stage of the relationship, the ordinary banker-customer contractual relationship may be modified by this demand. Furthermore, the original contractual relationship may be modified by special terms relating to electronic funds transfer operations.

It will be recalled from the previous description of the eurocurrency deposit, that since CB did not have a correspondent account relationship with the nominated bank, Abbey Bank (AB), CB had to effect a transfer to the correspondent account which AB maintained with another U.S. bank, National Bank (NB). As was mentioned above, this transfer is effected by debit and credit entries to the clearing house accounts which both CB and NB maintain with CHIPS. The process of effecting a transfer via CHIPS gives rise to a legal relationship between, on the one hand, CB and CHIPS, and on the other hand, NB and CHIPS. Both these relationships are contractual. The contracts between CHIPS and each institution may have terms concerning the message format, details of communication protocols, the law which governs the funds transfer, the extent to which CHIPS guarantees that the message will be communicated accurately and correctly, and the liability of the parties.

When NB, AB's correspondent bank, receives the funds and then effects a transfer, a legal relationship of a contractual nature arises between, on the one hand, NB and AB, and on the other hand, between NB and the funds transfer network, in this case SWIFT. There are two stages in the legal relationship between NB and AB. The first stage arises when NB receives the funds from CB in the form of a credit to its clearing house account. The contract which arises between NB and AB at this stage concerns the temporary deposit of funds

into the correspondent account of AB. The contract, at this stage, is nothing more than the banker-customer contract. The second stage takes place when NB effects the funds transfer message via SWIFT to AB. At this stage, the banker-customer contract between NB and AB is modified by terms relating to electronic funds transfers.

When NB initiates the process of transferring the funds via SWIFT, a contractual relationship arises between NB and SWIFT (the network provider). Essentially, the terms of this contract will relate to the format of the message, the allocation of risk, and the liability of either NB or SWIFT.

Once AB receives the message and credits the account of GCB, another contractual relationship arises between GCB and AB. This contract is similar to the normal banker-customer relationship. It is however different in certain respects. First, unlike the normal banker-customer contract, the subject matter of the contract, that is, the currency of denomination, is not the currency of the country in which the beneficiary-eurobank is located. This gives rise to unique issues concerning the conflict of laws and the repayment of the deposit. In addition to these relationships, there may also be certain relationships of a

**Figure 2.2**
**Contractual Relationships in Eurocurrency Deposits**



contractual nature between GCB (the sending customer) and NB. The interbank placement of funds in the interbank market also gives rise to contractual relationships between the placing bank and the receiving or beneficiary bank. The contractual relationships are illustrated in Figure 2.2. The nature of the legal principles governing these contractual relationships and international funds transfers is the subject of the subsequent chapters.

## NOTES

1. Dominique Carreau, "Legal Aspects of International Deposit Contracts," in *International Contracts*, ed. Hans Smit, Nina Galvaston, & Serge Levitsky (Albany, N.Y.: Matthew Bender, 1981), p. 157.

2. Donald E. Baker & Ronald E. Brandel, *The Law of Electronic Funds Transfers*, 2nd ed. (Boston: Warren, Gorham, and Lamont, 1988), p. 29.

3. Ibid.

4. Marcia Stigum, *The Money Market*, 3rd ed. (Homewood, Ill.: Dow Jones Irwin, 1990), p. 202.

5. Baker & Brandel, *Electronic Funds Transfers*, see note 2.

6. Ibid.

7. "Banking Technology: The Interbank Networks," *Euromoney*, p. 128 (1987). For an extensive discussion of the law of electronic funds transfers, see Benjamin Geva, *The Law of Electronic Funds Transfers* (Albany, N.Y.: Matthew Bender, 1992), hereinafter Geva, *Law of EFT*.

8. Benjamin Geva, "International Funds Transfers: Performance by Wire Payment," 4 *Banking and Finance Law Review* 111, pp. 113–114 (1990).

9. Daniel Urech, "Elements of Contractual Law in Euromoney Dealings," 1 *Journal of International Banking Law* 11, p. 16 (1988); Carreau, "International Deposit Contracts," p. 148, see note 1.

10. Benjamin Geva, "CHIPS Transfer of Funds," 4 *Journal of International Banking Law*, pp. 208–216 (1987); Geva, *Law of EFT*, p. 23, see note 7. For a discussion of CHAPS, see the following: Chris Reed, *Electronic Finance Law* (London: Woodhead-Faulkner, 1991), p. 4; Eliahu Peter Ellinger, *Modern Banking Law* (Oxford: Clarendon Press, 1987), pp. 356–357; and Geva, *Law of EFT*, ch. 4, p. 78, see note 7. For other more detailed discussion of IIPS, see Geva, *Law of EFT*, ch. 4, p. 70, see note 7.

11. For other discussion of SWIFT and related aspects of its operations, see generally Ezra U. Byler & James C. Baker, "SWIFT: A Fast Method to Facilitate International Financial Transactions," 17 *Journal of World Trade Law*, pp. 458–464 (September–October 1983); Jeffrey S. Tallackson & Norma Vallejo, "International Commercial Wire Transfers: The Lack of Standards," 11 *North Carolina Journal of International Law and Commercial Regulation*, pp. 639–666 (1986); John S. Santa Lucia, "Exchange Losses from International Electronic Funds Transfers: Time to Unify the Law," 8 *Northwestern Journal of International Law and Business*, pp. 759–787 (1988); Herbert Lingl, "Risk Allocation in International Interbank Electronic Funds Transfers: CHIPS and SWIFT," 22 *Harvard International Law Journal*, pp. 621–660 (1981); Geva, *Law of EFT*, ch. 41, pp. 37–63, see note 7.

12. Article 4 of the General Terms and Conditions of the Society for Worldwide Interbank Financial Telecommunication, provides that "the members intend to cause the company to work on a nonprofit basis. Therefore if there would remain at the end of any financial year of the company, a credit balance, the members undertake to apply at least 5 percent of the credit

balance to the legal reserve fund until this amounts to 10 percent of the outstanding share capital of the company. The remaining balance shall be applied as determined by the General Meeting taking into account the proposal of the Board of Directors." Cited in Lingl, "CHIPS and SWIFT," p. 622, n. 4, see note 11; Geva, *Law of EFT*, ch. 4, p. 40, see note 7.

13. David Robinson, "The Structure and Characteristics of the Principal Electronic Banking Systems," in *Electronic Banking: The Legal Implications*, ed. Roy M. Goode (London: Centre for Commercial Law Studies, 1985), p. 12.

14. Lingl, "CHIPS and SWIFT," see note 11; Geva, *Law of EFT*, ch. 4, p. 40, see note 7.

15. Geva, *Law of EFT*, p. 36, see note 7.

16. Geva, "International Funds Transfers," p. 116, see note 8; Geva, *Law of EFT*, ch. 4, p. 40, see note 7.

17. Geva, "International Funds Transfers," p. 112, see note 8.

18. Ibid., p. 117.

19. Anu Arora, *Electronic Banking and the Law* (London: IBF Financial Books, 1988), p. 161.

20. Geva, "International Funds Transfers," p. 118, see note 8; Geva, *Law of EFT*, ch. 4, p. 43, see note 7.

21. According to Professor Geva, in December 1991, the availability of the SWIFT II system reached 99.72 percent. See Geva, *Law of EFT*, ch. 4, p. 43, see note 7.

22. Geva, *Law of EFT*, see note 7.

23. Ibid.

24. Ibid. There are currently four system control processors, two each in the United States and the Netherlands, but only one is in control of the system at any point in time with the rest on standby.

25. Geva, *Law of EFT*, ch. 4, p. 43 (see note 7) notes that it is the policy of SWIFT to connect each country to a SAP either by installing a SAP in the country concerned or assigning a SAP to a country. Where the country is a low volume country, in terms of message transfers, it is connected to a cross-border SAP in a high volume country by a miniprocessor.

26. Lingl, "CHIPS and SWIFT," p. 625, see note 11; Geva, *Law of EFT*, ch. 4, p. 49 (see note 7) notes that the SWIFT message is made up of (1) a header, (2) a text, (3) an authenticator, and (4) a trailer. There are currently ten kinds of message categories embracing more than 120 message types which are designed to meet the exact data requirements of the kind of message which is being transmitted. These ten categories of messages are customer transfers, bank transfers, foreign exchange loans and deposits, collections, securities, syndications, documentary credits and guarantees, traveler's checks, special messages, and common messages.

27. Lingl, "CHIPS and SWIFT," see note 11.

28. Geva, *Law of EFT*, ch. 4, p. 45, see note 7. Unlike the situation which existed under the SWIFT I system, the message is not sent to the operating center because the respective SAPs are not controlled by the operating centers.

29. See, for example, the use of CHIPS—Clearing House Interbank Payments System of the New York Clearing House Association—discussed below for payment transactions involving the U.S. dollar. Other clearing systems include CHAPS—Clearing House Automated Payments System—in the United Kingdom, and IIPS—International Interbank Payments System—in Canada.

30. For other discussion concerning the use of CHIPS and implications, see Deborah S. Prutzman, "CHIPS and the Proposed Uniform New Payments Code," 10 *Rutgers Computer and Technology Law Journal*, pp. 1–36 (1983); Geva, "CHIPS Transfer of Funds," see note 10; Geva, *Law of EFT*, ch. 3, see note 7.

31. Eugene Sarver, *Eurocurrency Market Handbook* (New York: Prentice Hall, 1988), p. 207; Lingl, "CHIPS and SWIFT," p. 626, see note 11; Geva, *Law of EFT*, ch. 3, p. 27, see note 7.

32. Geva, *Law of EFT*, ch. 3, p. 27, see note 7. For a more detailed description of Fedwire, see Geva, *Law of EFT*, ch. 3, see note 7.

33. *Constitution of the New York Clearing House*, hereinafter *Constitution*.

34. *Constitution*, article 6, para. 3(B), cited in Geva, *Law of EFT*, p. 24, para. 3.03[1], see note 7.

35. Ibid. See also Lingl, "CHIPS and SWIFT," p. 626, n. 25, see note 11.

36. Geva, *Law of EFT*, ch. 3, p. 29, see note 7.

37. Lingl, "CHIPS and SWIFT," see note 11; Sarver, *Handbook*, p. 207, see note 31; Geva, *Law of EFT*, ch. 3, p. 49, see note 7.

38. Rule 1(d) of the *Rules Governing the Clearing House Interbank Payment System*, New York Clearing House Association.

39. Geva, "CHIPS Transfer of Funds," p. 214, see note 10.

40. Lingl, "CHIPS and SWIFT," p. 628, see note 11.

41. Under rule 12, the initial settlement report contains an aggregate balance as well as the net balances of the settling participant and other nonsettling participants with whom the settling participant is to settle.

42. Geva, *Law of EFT*, ch.3, pp. 54–55, see note 7.

43. Ibid., ch. 3, p. 49, para. 3.03[3], see note 7.

44. Carreau, "International Deposit Contracts," p. 162, see note 1; Lingl, "CHIPS and SWIFT," p. 628, see note 11.

45. John Hoffman & Ian Giddy, "Lessons from the Iranian Experience: National Currencies as International Money," 3 *Journal of Comparative Corporate Law and Securities Regulation*, pp. 73–88 (1981).

46. See also the description of a typical CHIPS transaction by Judge Broderick in *Delbrueck & Co. v Manufacturers Hanover Trust Co.* 464 F. Supp. 989, p. 922, note 5; *aff'd*, in 609 F. 2d 1047 (2nd Cir. 1979).

47. Lingl, "CHIPS and SWIFT," p. 628, see note 11.

48. *Delbrueck & Co.*, see note 46.

49. Lingl, "CHIPS and SWIFT," p. 627, see note 11.

50. Geva, "CHIPS Transfer of Funds," p. 215, see note 10.

51. Although there is no central organization, like the New York Clearing House which operates CHIPS, there is nevertheless a body, the CHAPS & Town Clearing Co. Ltd., which sets policy guidelines, the CHAPS rules, and manages the system. The CHAPS & Town Clearing Co. Ltd. is responsible to the settlement members.

52. In reality, incoming foreign large-value wire transfers may also be handled by Town Clearing. The difference between CHAPS and Town Clearing is that while the former is an automated or electronic payments system, Town Clearing is a paper-based debit transfer system. The mechanics of Town Clearing will not be discussed in this work.

53. See Reed, *Electronic Finance Law*, p. 4, see note 10; Geva, *Law of EFT*, ch. 4, p. 85, see note 7.

54. See this work, pp. 17–19 for an account of the mechanics of a SWIFT wire transfer.

55. If Abbey Bank has a correspondent relationship with Citizens Bank, the transfer operation will take place in the same bank, that is, by an in-house transfer.

56. Carreau, "International Deposit Contracts," p. 160, see note 1.

57. Stigum, *The Money Market*, p. 200, see note 4; Andreas Haindl, *The Euromoney Market* (Zurich: Verlag Paul Haupt Bern and Stuttgart, 1991), p. 50.

58. Roy M. Goode, "Concepts of Payment in Relation to the Expropriation or Freezing of Bank Deposits," 2 *Journal of International Banking Law*, pp. 82–83 (1987). See also Marco A. Jagmeti, "Money and Payment," 9 *International Business Lawyer*, p. 95 (1981).

59. Goode, "Concepts of Payment," see note 58; Jagmeti, "Money and Payment," see note 58; Carreau, "International Deposit Contracts," pp. 161–163, see note 1; Hoffman & Giddy, "Iranian Experience," p. 273, see note 45.

60. Hal Scott, "Where are the Eurodollars?—Offshore Funds Transfers," 3 *Banking and Finance Law Review*, pp. 282–286 (1988–1989).

61. *Delbrueck & Co.*, see note 46.

62. Goode, "Concepts of Payment," p. 82, see note 58.

63. Ibid.; Carreau, "International Deposit Contracts," p. 161, see note 1; Hoffman & Giddy, "Iranian Experience," see note 45. See also the similar arguments of John E. Hoffman, "The Iranian Assets Litigation," in *Private Investors Abroad: Problems and Solutions in International Business in 1980* (New York: Matthew Bender, 1980), p. 350.

64. Carreau, "International Deposit Contracts," p. 157, see note 1; Hoffman, "The Iranian Assets Litigation," see note 63.

65. Urech, "Elements of Contractual Law," p. 16, see note 9.

66. Fixed term time deposits have not always been evidenced by negotiable certificates of deposit (CDs), and currently, may not always be so evidenced. Time deposits began to be evidenced by CDs when banks located in London, compelled by the desire to satisfy the demands of their customers for liquidity, began to issue dollar denominated CDs. Currently, CDs issued in the London money market are denominated in a variety of currencies, including Yen, Can$, Aus$, SDR, ECU, NZ$, Lire, N.Kr., and D.Kr. See generally, Bank of England, *The London Code of Conduct: For Principals and Broking Firms in the Wholesale Markets* (London: Bank of England, 1992), p. 20.

67. Ibid.

68. Ibid., p. 9.

69. Royal Bank of Canada, *Royal Bank of Canada: Standing Order #8.05, Deal Confirmations*, revised (London: Royal Bank of Canada, 1992).