ALLEGAERT BERGER & VOGEL LLP
John F. Zulack
Lauren J. Pincus
David A. Shaiman
111 Broadway, 20th Floor
New York, New York 10006
Tel. No.: 212-571-0550
Email: jzulack@abv.com
Email: lpincus@abv.com
Email: dshaiman@abv.com

MAYER BROWN LLP
Steven Wolowitz
Christopher J. Houpt
Bradley A. Cohen
1221 Avenue of the Americas
New York, New York 10020
Tel. No.: 212-506-2500
Email: swolowitz@mayerbrown.com
Email: choupt@mayerbrown.com
Email: bacohen@mayerbrown.com

*Attorneys for Societe Generale S.A. as Successor in Interest to Banque de Reescompte et de Placement a/k/a Barep and to Societe Generale Asset Management Banque d/b/a Barep*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation (Substantively Consolidated) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant, | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the | Adv. Pro. No. 12-01677 (CGM) |

Substantively Consolidated SIPA Liquidation of
Bernard L. Madoff Investment Securities LLC
and Bernard L. Madoff,

                        Plaintiff,

        v.

SOCIETE GENERALE PRIVATE BANKING
(SUISSE) S.A. (*f/k/a* SG Private Banking Suisse
S.A.), individually and as successor in interest to
Societe Generale Private Banking (Lugano-
Svizzera) S.A.; SOCGEN NOMINEES (UK)
LIMITED; LYXOR ASSET MANAGEMENT
INC. (*f/k/a* SG Asset Management, Inc.), as
General Partner of SG AM AI Premium Fund
L.P.; SG AUDACE ALTERNATIF (*f/k/a*
SGAM AI Audace Alternatif), now acting by
and through its manager, Lyxor Asset
Management S.A.S.; SGAM AI EQUILIBRIUM
FUND (*f/k/a* SGAM Alternative Diversified
Fund), now acting by and through its liquidator,
KPMG Advisory Sarl; LYXOR PREMIUM
FUND (*f/k/a* SGAM Alternative Multi Manager
Diversified Fund), now acting by and through its
trustee, Societe Generale S.A.; SOCIETE
GENERALE S.A., as Trustee for Lyxor
Premium Fund and Successor in Interest to
Banque de Reescompte et de Placement a/k/a
Barep and to Societe Generale Asset
Management Banque d/b/a Barep; SOCIETE
GENERALE LUXEMBOURG (*f/k/a* Societe
Generale Bank & Trust S.A.); OFI MGA
ALPHA PALMARES (*f/k/a* Oval Alpha
Palmares); OVAL PALMARES EUROPLUS;
and UMR SELECT ALTERNATIF,

                        Defendants.

**ANSWER TO COMPLAINT AND
JURY DEMAND**

Defendant Societe Generale S.A. ("SG"), as Successor in Interest to Banque de
Reescompte et de Placement a/k/a Barep and to Societe Generale Asset Management Banque
d/b/a Barep ("Barep"), by its undersigned counsel Allegaert Berger & Vogel LLP and Mayer
Brown LLP, as and for its Answer to the Complaint dated May 30, 2012, of Plaintiff Irving H.

Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff

Investment Securities LLC and the estate of Bernard L. Madoff (the "Trustee" or the "Plaintiff")

(the "Complaint")[1], states as follows:[2]

## **GENERAL DENIAL**

Except as otherwise expressly admitted herein, SG denies each and every

allegation in the Complaint.  SG states that the headings and sub-headings throughout the

Complaint do not constitute well-pleaded allegations of fact and therefore require no response.

---

[1] A Stipulation and Order entered on April 18, 2022, ECF 133 (the "2022 Stipulation and Order"), between Plaintiff and defendants Société Générale Private Banking (Suisse) S.A. (*f/k/a* SG Private Banking Suisse S.A.) ("SGPBS"), individually and as successor in interest to Societe Generale Private Banking (Lugano-Svizzera) S.A. ("SG Lugano" and, collectively, "SG Suisse"), Socgen Nominees (UK) Limited ("SG UK"), Lyxor Asset Management Inc. (*f/k/a* SG Asset Management, Inc.) ("Lyxor Asset"), as General Partner of SG AM AI Premium Fund L.P. ("SG Premium"), SG Audace Alternatif (*f/k/a* SGAM AI Audace Alternatif), now acting by and through its manager, Lyxor Asset Management S.A.S. ("SG Audace"), SGAM AI Equilibrium Fund (*f/k/a* SGAM Alternative Diversified Fund), now acting by and through its liquidator, KPMG Advisory Sarl ("SG Equilibrium"), Lyxor Premium Fund (*f/k/a* SGAM Alternative Multi Manager Diversified Fund), now acting by and through its trustee, Societe Generale S.A. ("Lyxor Premium"), SG, as Trustee for Lyxor Premium Fund and Successor in Interest to Barep; and Societe Generale Luxembourg (*f/k/a* Societe Generale Bank & Trust S.A.) ("SG Luxembourg") (collectively, the "SG Defendants"), OFI MGA Alpha Palmares (*f/k/a* Oval Alpha Palmares) ("OFI"), Oval Palmares Europlus ("Palmares"), UMR Select Alternatif ("UMR"), and Bank Audi S.A.M.- Audi Saradar Group (*f/k/a* Dresdner Bank Monaco S.A.M.)("Bank Audi"), amended the Complaint (1) to amend various names of the SG Defendants, (2) to substitute certain SG Defendants in place of defendants originally named in the Complaint, including substituting SG as successor in interest to Barep and stating that the Complaint incorrectly named Lyxor Asset Management S.A. and Societe Generale Holding de Participations S.A. as successors in interest to Barep; (3) to dismiss the Trustee's claims against SG Premium and Bank Audi, and (4) to dismiss the Trustee's claims to recover alleged subsequent transfers that the SG Defendants allegedly received from Kingate Global Fund, Ltd. (*i.e.*, Count Four).  For clarity, unless stated otherwise herein, (1) SG's responses in this Answer are made in its capacity as successor in interest to Barep and (2) where the 2022 Stipulation and Order amended the name or status of any defendant originally named in the Complaint, the responses in this Answer refer to the current SG Defendant as described in the 2022 Stipulation and Order.

[2] Capitalized terms not defined herein have the meaning set forth in the Complaint.

To the extent a response is required, the allegations in the headings and subheadings in the

Complaint are denied.  In answering the allegations in the Complaint, SG does not intend to

waive, and does not waive, any and all applicable objections to the relevance, admissibility, or

prejudicial effect of any of the allegations in the Complaint.  To the extent it is later determined

that a response is required to any allegation SG avers has been mooted by a prior dismissal of the

Trustee's claims, SG denies any such allegation.  SG expressly reserves the right to amend

and/or supplement this Answer.

## RESPONSES TO SPECIFIC ALLEGATIONS

## I.    NATURE OF THE ACTION

1.    This adversary proceeding is part of the Trustee's continuing efforts to
recover BLMIS Customer Property[3] that was stolen as part of the massive Ponzi scheme
perpetrated by Bernard L. Madoff ("Madoff") and others.

**ANSWER**:    The allegations of paragraph 1 contain legal conclusions to which

no response is required.  To the extent a response is required, SG denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 1 of the

Complaint, except admits that Plaintiff purports to bring this action as trustee for the

substantively consolidated liquidation of BLMIS and the estate of Bernard L. Madoff ("Madoff")

pursuant to the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, and that

Madoff perpetrated a Ponzi scheme through BLMIS.

2.    The Trustee seeks to recover from Defendants subsequent transfers of
Customer Property from BLMIS feeder funds Fairfield Sentry Limited ("Fairfield Sentry"),
Fairfield Sigma Limited ("Fairfield Sigma") and Fairfield Lambda Limited ("Fairfield Lambda")
(together, the "Fairfield Funds") and Kingate Global Fund, Ltd. ("Kingate") totaling

---

[3] Footnote 1 of the Complaint states: "SIPA § 78*lll*(4) defines 'Customer Property' as cash and
securities at any time received, acquired, or held by, or for the account of, a debtor from, or for,
the securities accounts of a customer, and the proceeds of any such property transferred by the
debtor, including property unlawfully converted."

$162,888,559. Charts setting forth the subsequent transfers are attached here as Exhibits E, G, I and M.

      **ANSWER**:    The allegations of paragraph 2 contain legal conclusions to which

no response is required.  To the extent a response is required, SG denies the allegations in

paragraph 2 of the Complaint as to itself, except admits that the Trustee seeks to recover from the

defendants the amount of alleged subsequent transfers alleged in the Complaint, as amended by

the 2022 Stipulation and Order, and respectfully refers the Court to the Complaint, Exhibits E, G,

I and M thereto and the 2022 Stipulation and Order for their complete and accurate contents.[4]

SG denies knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in paragraph 2 of the Complaint and therefore denies such allegations.

      3.    The subsequent transfers followed avoidable initial transfers from BLMIS to the Fairfield Funds or Kingate.  The Trustee has filed separate actions to avoid the initial transfers, namely *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (BRL) as to the Fairfield Funds and *Picard v. Kingate Global Fund, Ltd., et al.*, Adv. Pro. No. 09-01161 (BRL), Case Nos. 11-CV-07256 (JSR) and 11-CV-07134 (JSR) as to Kingate.  The Fairfield and Kingate complaints are attached here as Exhibits A and J, respectively.

      **ANSWER**:    On April 18, 2022, the Court entered the 2022 Stipulation and

Order amending the Complaint which, *inter alia,* dismissed Count Four against the SG

Defendants related to subsequent transfers they allegedly received from Kingate Global [*see* ECF

No. 133]; accordingly, no response is required to the allegations of paragraph 3 of the Complaint

concerning Kingate.  The remaining allegations of paragraph 3 contain legal conclusions to

which no response is required or refer to proceedings in an action to which SG is not a party.  SG

respectfully refers the Court to the docket and filings in Adv. Pro. No. 09-01239 (the "Fairfield

Action") for their contents and Exhibit A to the Complaint for its complete and accurate

---

[4] As set forth in Footnote 1 hereto, pursuant to the 2022 Stipulation and Order, the Trustee's claims to recover alleged subsequent transfers that the Defendants allegedly received from Kingate Global Fund, Ltd. (*i.e.*, Count Four), were dismissed.

contents.  To the extent a further response is required, SG denies that "[t]he subsequent transfers

followed avoidable initial transfers from BLMIS to the Fairfield Funds" and further denies

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

in paragraph 3 of the Complaint and therefore denies such allegations.

## II.    THE TRANSFEREES AND DEFENDANTS

4.    Initial transferee Fairfield Sentry Limited ("Fairfield Sentry") maintained
customer accounts at BLMIS and was one of BLMIS' largest feeder funds. Fairfield Sentry
invested all or substantially all of its assets with BLMIS and was managed by New York-based
parent Fairfield Greenwich Group ("FGG").

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 4 of the Complaint and therefore denies such

allegations.

5.    Fairfield Sigma and Fairfield Lambda, affiliates of Fairfield Sentry, acted
as foreign currency feeder funds, facilitating Euro (Fairfield Sigma) or Swiss Franc (Fairfield
Lambda) investments with BLMIS. Each fund invested 100% of its assets with Fairfield Sentry
and was a subsequent transferee of BLMIS transfers by virtue of this relationship.  Fairfield
Sigma and Fairfield Lambda were both managed by FGG.

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 5 of the Complaint and therefore denies such

allegations.

6.    Initial transferee Kingate maintained a customer account at BLMIS and
was a large BLMIS feeder fund.  Kingate invested all or substantially all of its assets with
BLMIS.

**ANSWER**:    On April 18, 2022, the Court entered the 2022 Stipulation and

Order amending the Complaint which, *inter alia,* dismissed Count Four against the SG

Defendants related to subsequent transfers allegedly received from Kingate Global [*see* ECF No.

133]; accordingly, no response is required to the allegations of paragraph 6 of the Complaint

concerning Kingate.

7.      The Fairfield Funds and Kingate are currently in liquidation.

**ANSWER**:      On April 18, 2022, the Court entered the 2022 Stipulation and

Order amending the Complaint which, *inter alia,* dismissed Count Four against the SG

Defendants related to subsequent transfers allegedly received from Kingate Global [*see* ECF No.

133]; accordingly, no response is required to the allegations of paragraph 7 of the Complaint

concerning Kingate.  SG admits that the Fairfield Funds are currently in liquidation.

8.      Defendant SG Suisse entered into one or more subscription agreements
with Fairfield Sentry, Fairfield Sigma, Fairfield Lambda and Kingate and received subsequent
transfers from the feeder funds.  SG Suisse is a *société anonyme* organized under the laws of
Switzerland, and has its principal office at Rue de la Corraterie 6, CH-1211 Geneva, Switzerland,
and a representative office at 701 Brickell Avenue, Suite 2410, Miami, Florida 33131.

**ANSWER**:      On April 18, 2022, the Court entered the 2022 Stipulation and

Order amending the Complaint which, *inter alia,* dismissed Count Four against the SG

Defendants related to subsequent transfers allegedly received from Kingate Global [*see* ECF No.

133]; accordingly, no response is required to the allegations of paragraph 8 of the Complaint

concerning Kingate.  SG denies knowledge or information sufficient to form a belief as to the

truth of the remaining allegations in paragraph 8 of the Complaint and therefore denies such

allegations, except admits that, at certain times, SGPBS was a Swiss *société anonyme* and

maintained a place of business at Rue du Rhone 8, CH-1204 Geneva, Switzerland and

maintained a representative office at 701 Brickell Avenue, Suite 2410, Miami, Florida 33131.

9.      Defendant SG Lugano entered into one or more subscription agreements
with Fairfield Sentry and Fairfield Sigma and received subsequent transfers from the feeder
funds.  SG Lugano is a *société anonyme* organized under the laws of Switzerland, and its
registered address is Viale Stefano Franscini 22, CH-6901 Lugano, Switzerland.

**ANSWER**:      SG denies knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 9 of the Complaint and therefore denies such

allegations, except admits that, at certain times, SG Lugano was a Swiss *société anonyme* and SG

Lugano's registered address was Viale Stefano Franscini 30, CH-6900 Lugano, Switzerland.

10.    Defendant SG UK entered into one or more subscription agreements with
Fairfield Sentry and received subsequent transfers from the feeder fund.  SG UK is a limited
company organized under the laws of the United Kingdom, and its registered address is c/o
Group Legal at SG House, 41 Tower Hill, London, United Kingdom, EC3N 4SG.

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 10 of the Complaint and therefore denies such

allegations, except admits that, at certain times, SG UK was a limited company organized under

the laws of England and Wales and its registered address was 41 Tower Hill, London, United

Kingdom, EC3N 4SG.

11.    Barep entered into one or more subscription agreements with Fairfield
Sentry and received a subsequent transfer from the feeder fund. Barep, a *société anonyme*
organized under the laws of France, deregistered sometime after it received the subsequent
transfer.

**ANSWER**:    SG denies the allegations of paragraph 11 of the Complaint, except

(1) admits that Barep entered into one or more subscription agreements with Fairfield Sentry and

refers the Court to those documents for their contents, (2) admits that, on occasion, Barep

received transfers from Fairfield Sentry for its customers as depository bank and/or in other

capacities, and (3) admits that, at certain times, Barep was a French *société anonyme* until it was

dissolved in 2007.

12.    Defendant Lyxor SA is a successor in interest to Barep.  Lyxor SA is a
*société anonyme* organized under the laws of France, and its registered address is 17 Cours
Valmy, 92987 Paris La Défense, France.

**ANSWER**:    On April 18, 2022, the Court entered the 2022 Stipulation and

Order amending the Complaint which, *inter alia,* substituted SG in place of and as successor to

Barep and stating that Lyxor SA was incorrectly named in the Complaint as successor in interest

to Barep; accordingly, no response is required to the allegations in the first sentence of paragraph

12 of the Complaint.  SG denies the remaining allegations in paragraph 12 of the Complaint,

except admits that at certain times, Lyxor SA was a *société par actions simplifiée à associé*

*unique* organized under the laws of France, and its registered address was 17 Cours Valmy,

92800 Puteaux, France.

13.    Defendant SG Holding is also a successor in interest to Barep.  SG
Holding is a *société anonyme* organized under the laws of France, and its registered address is
170 Place Henri Regnault, 92400 Courbevoie, France.

**ANSWER**:    On April 18, 2022, the Court entered the 2022 Stipulation and

Order amending the Complaint which, *inter alia,* substituted SG in place of and as successor to

Barep and stating that SG Holding was incorrectly named in the Complaint as successor in

interest to Barep; accordingly, no response is required to the allegations in the first sentence of

paragraph 13 of the Complaint.  SG denies the remaining allegations in paragraph 13 of the

Complaint, except admits that, at certain times, SG Holding was a *société anonyme* organized

under the laws of France, and its registered address was 170 Cours Valmy, 92800 Puteaux,

France.

14.    Defendant SG Premium entered into one or more subscription agreements
with Fairfield Sentry and received a subsequent transfer from the feeder fund. SG Premium, a
limited partnership organized under the laws of Delaware with an address c/o Lyxor Asset
Management Inc. at 1251 Avenue of the Americas, New York, NY 10020, began winding up in
or around 2007.

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 14 of the Complaint and therefore denies such

allegations, except admits that, at certain times, SG Premium was a limited partnership organized

under the laws of Delaware.

15.     Defendant Lyxor Asset is the general partner of SG Premium.  Lyxor Asset is a corporation organized under the laws of Delaware, and it maintains a place of business at 1251 Avenue of the Americas, New York, NY 10020.

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15 of the Complaint and therefore denies such allegations, except admits that, at certain times, Lyxor Asset was a corporation organized under the laws of Delaware and maintained a place of business at 1251 Avenue of the Americas, New York, NY 10020.

16.     Defendant SG Audace entered into one or more subscription agreements with Fairfield Sentry and received a subsequent transfer from the feeder fund.  SG Audace is a *fonds commun de placement* organized under the laws of France, and its registered address is c/o Lyxor Asset Management S.A. at 17 Cours Valmy, 92987 Paris La Défense, France.

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16 of the Complaint and therefore denies such allegations, except admits that, at certain times, SG Audace was a *fonds commun de placement* organized under the laws of France and its registered address was c/o Lyxor Asset Management S.A. at 17 Cours Valmy, 92987 Paris La Défense, France.

17.     Defendant SG Equilibrium entered into one or more subscription agreements with Fairfield Sentry and Kingate and received a subsequent transfer from each of the feeder funds.  SG Equilibrium is a *Societe d'Investissement a Capital Variable* organized under the laws of Luxembourg, and its registered address is 16 boulevard Royale, L-2449 Luxembourg.  SG Equilibrium is in liquidation and is represented by its liquidator, KPMG Advisory Sarl, which is located at 9 allee Scheffer, L-2520 Luxembourg.

**ANSWER**:    On April 18, 2022, the Court entered the 2022 Stipulation and Order amending the Complaint which, *inter alia,* dismissed Count Four against the SG Defendants related to subsequent transfers allegedly received from Kingate Global [*see* ECF No. 133]; accordingly, no response is required to the allegations of paragraph 17 of the Complaint concerning Kingate.  SG denies knowledge or information sufficient to form a belief as to the

truth of the remaining allegations in paragraph 17 of the Complaint and therefore denies such

allegations, except (1) admits that, at certain times, SG Equilibrium was a *Societe*

*d'Investissement a Capital Variable* organized under the laws of Luxembourg and its registered

address was 28-32 Place de la gare, L-1616 Luxembourg, and (2) SG Equilibrium is in

liquidation and is represented by its liquidator, KPMG Advisory Sarl, which, at certain times,

was located at 9 allee Scheffer, L-2520 Luxembourg.

18.    Defendant Lyxor Premium entered into one or more subscription
agreements with Fairfield Sentry and received a subsequent transfer from the feeder fund.  Lyxor
Premium is a unit trust organized under the laws of Ireland, and its registered address is c/o
Lyxor Asset Management (Ireland) Limited at International Financial Service Centre, 3rd Floor,
Dublin 1, Ireland.

**ANSWER**:    SG denies the allegations in paragraph 18 of the Complaint, except

(1) admits that Lyxor Premium entered into one or more subscription agreements with Fairfield

Sentry and refers the Court to those documents for their contents, (2) admits that Lyxor Premium

received a transfer from the feeder fund, and (3) admits that, at certain times, Lyxor Premium

was a unit trust organized under the laws of Ireland, and its registered address was c/o Lyxor

Asset Management (Ireland) Limited at International Financial Service Centre, 3rd Floor, Dublin

1, Ireland.

19.    Defendant SG is the trustee for Lyxor Premium, and is named in this
Complaint solely in its capacity as trustee.  SG is a *société anonyme* organized under the laws of
France, and its corporate headquarters is at 29 Boulevard Haussmann, 75009 Paris, France.

**ANSWER**:    SG denies the allegations in paragraph 19 of the Complaint, except

(1) admits that, at certain times, SG was the trustee for Lyxor Premium, and (2) admits that SG is

a *société anonyme* organized under the laws of France, and its corporate headquarters is at 29

Boulevard Haussmann, 75009 Paris, France.

20.    Defendant SGBT on its own entered into one or more subscription
agreements with Fairfield Sentry and Fairfield Sigma and received subsequent transfers from the

feeder funds.  SGBT is a *societe anonyme* organized under the laws of Luxembourg, and its registered address is 11 Avenue Emile Reuter, L-2420 Luxembourg. SGBT is sometimes referred to as "SGBT Lux."

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20 of the Complaint and therefore denies such allegations, except (1) admits that, at certain times, SGBT was a *societe anonyme* organized under the laws of Luxembourg, and its registered address was 11 Avenue Emile Reuter, L-2420 Luxembourg, and (2) avers that, as described in the 2022 Stipulation and Order, SGBT changed its name to Societe Generale Luxembourg in 2020.

21.    SGBT also entered into subscriptions agreements and received transfers from the feeder funds together with other Defendants.

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21 of the Complaint and therefore denies such allegations.

22.    Defendants OFI and SGBT entered into one or more subscription agreements with Fairfield Sentry and received subsequent transfers from the feeder fund in the name of "SGBT Lux/Oval Alpha Palmares."  OFI is a *fonds commun de placement* organized under the laws of France, and its address is c/o OFI Asset Management at 1 rue Vernier, 75017 Paris, France.

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22 of the Complaint and therefore denies such allegations.

23.    Defendants Palmares and SGBT entered into one or more subscription agreements with Fairfield Sentry and received a subsequent transfer from the feeder fund in the name of "SGBT Lux/Palmares Europlus."  Palmares is a *fonds commun de placement* organized under the laws of France, and its address is c/o OFI Asset Management at 1 rue Vernier, 75017 Paris, France.

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 23 of the Complaint and therefore denies such allegations.

24.    Defendants UMR and SGBT entered into one or more subscription agreements with Fairfield Sentry and received a subsequent transfer from the feeder fund in the name of "SGBT Lux/UMR."  UMR is a fund of funds organized under the laws of France, and its address is c/o Union Mutualiste Retraite at 3 Square Max Hymans, 75015 Paris, France.

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 24 of the Complaint and therefore denies such allegations.

25.    Defendants Bank Audi and SGBT entered into one or more subscription agreements with Kingate and received a subsequent transfer from the feeder fund in the name of "SGBT Lux/Dresdner Monaco."  Bank Audi is a *société anonyme* organized under the laws of Monaco, and its registered address is Villa de Lotus, 24 Boulevard des Moulins, Monte Carlo, Monaco.

**ANSWER**:    On April 18, 2022, the Court entered the 2022 Stipulation and Order amending the Complaint which, *inter alia,* dismissed Count Four against the SG Defendants related to subsequent transfers allegedly received from Kingate Global and dismissed the Trustee's claims against Bank Audi [*see* ECF No. 133]; accordingly, no response is required to the allegations of paragraph 25 of the Complaint concerning Kingate or Bank Audi.

## III.    JURISDICTION AND VENUE

26.    The Trustee brings this adversary proceeding pursuant to his statutory authority and power to avoid and recover transfers under SIPA §§ 78fff(b), 78fff-1(a) and 78fff-2(c)(3); 11 U.S.C. §§ 101 *et. seq.* (the "Bankruptcy Code"), including Sections 105(a), 323(b), 544, 548, 550(a), 551 and 704(a)(1); New York Debtor & Creditor Law ("NYDCL") §§ 273-279; and N.Y. C.P.L.R. 203(g) and 213(8).

**ANSWER**:    The allegations of paragraph 26 contain legal conclusions to which no response is required.  To the extent a response is required, SG denies the allegations of paragraph 26 of the Complaint.

27.     The main, underlying substantively-consolidated SIPA case, Adv. Pro. No. 08-01789 (BRL) (the "SIPA Case"), is pending in this Court. The SIPA Case was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, Case No. 08-CV-10791 (LLS) (the "District Court Proceeding").

**ANSWER**:     SG denies the allegations of paragraph 27 of the Complaint, except

admits that the main substantively consolidated SIPA case (No. 08-01789 (CGM)) is pending in

this Court and denies knowledge or information sufficient to form a belief as to where that case

was originally brought.

28.     This Court has jurisdiction over the instant adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. § 78eee(b)(2)(A), (b)(4).

**ANSWER**:     The allegations in paragraph 28 contain legal conclusions to which

no response is required. To the extent that a response is required, SG denies the allegations of

paragraph 28 of the Complaint.

29.     This Court has personal jurisdiction over Defendants pursuant to N.Y. C.P.L.R. 301 and 302 and Bankruptcy Rule 7004. Where a federal statute provides for nationwide service of process, as does Rule 7004, a federal court has personal jurisdiction over any defendant with minimum contacts with the United States.

**ANSWER**:     The allegations of paragraph 29 contain legal conclusions to which

no response is required. To the extent a response is required, SG denies the allegations of

paragraph 29 of the Complaint as to itself and denies knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in paragraph 29 of the Complaint and

therefore denies such allegations.

30.     Defendants have the required minimum contacts with the United States under Bankruptcy Rule 7004 either through their own contacts or business dealings, or contacts or business dealings that can be attributed or imputed to them in their capacity as a successor in interest, general partner or trustee.

**ANSWER**:     The allegations of paragraph 30 contain legal conclusions to which

no response is required. To the extent a response is required, SG denies the allegations of

paragraph 30 of the Complaint as to itself and denies knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in paragraph 30 of the Complaint and

therefore denies such allegations.

31.    Defendants, directly or through acts attributed or imputed to them, purposely availed themselves of the laws and protections of the United States and the State of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through the Fairfield Funds or Kingate, and then receiving transfers from these funds (the subsequent transfers).

**ANSWER**:    On April 18, 2022, the Court entered the 2022 Stipulation and

Order amending the Complaint which, *inter alia,* dismissed Count Four against the SG

Defendants related to subsequent transfers allegedly received from Kingate Global [*see* ECF No.

133]; accordingly, no response is required to the allegations of paragraph 31 of the Complaint

concerning Kingate.  The remaining allegations of paragraph 31 contain legal conclusions to

which no response is required.  To the extent a response is required, SG denies the allegations of

paragraph 31 of the Complaint as to itself and denies knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in paragraph 31 of the Complaint and

therefore denies such allegations.

32.    Through their investments and receipt of transfers, Defendants, directly or through acts attributed or imputed to them: (i) knowingly accepted the rights, benefits and privileges of conducting business or transactions in the United States and New York; (ii) derived significant revenue from the United States and New York; and (iii) maintained minimum contacts or general business contacts with the United States and New York.

**ANSWER**:    The allegations of paragraph 32 contain legal conclusions to which

no response is required.  To the extent a response is required, SG denies the allegations of

paragraph 32 of the Complaint as to itself and denies knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in paragraph 32 of the Complaint and

therefore denies such allegations.

33.    SG Suisse, SG Lugano, SG UK, Barep, SG Premium, SG Audace, SG Equilibrium, Lyxor Premium, SGBT, OFI, Palmares and UMR entered into one or more subscription agreements with the Fairfield Funds agreeing not only that New York law would govern their dealings, but also that any related suit, action or proceeding would be brought in New York.  Thus, they agreed to irrevocably submit to the jurisdiction of the New York courts and to forego any claim that the New York courts are an inconvenient forum.

**ANSWER**:    The allegations of paragraph 33 contain legal conclusions to which no response is required.  To the extent a response is required, SG denies the allegations of paragraph 33 of the Complaint as to itself and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 33 of the Complaint and therefore denies such allegations, except admits that Barep and Lyxor Premium, respectively, entered into one or more subscription agreements with the Fairfield Funds and refers the Court to those documents for their contents.

34.    SG Suisse, SG Lugano, SG UK, Barep, SG Premium, SG Audace, SG Equilibrium, Lyxor Premium, SGBT, OFI, Palmares and UMR certified that they were professional investors when they entered into subscription agreements with the Fairfield Funds. The subscription agreements, as well as Fairfield Fund private placement memoranda, also confirmed that substantially all of the funds' assets would be invested with New York-based BLMIS, a United States-registered broker-dealer that used a non-traditional options trading strategy described as a "split-strike conversion."  These documents deemed BLMIS and its personnel, who were located in New York, "essential" to the Fairfield Funds and their profitability.  Fairfield Sentry instructed its subscribers to send subscription monies to a bank account in New York.  Several of the subscribers to the Fairfield Funds also communicated regularly with FGG account representatives located in New York City.

**ANSWER**:    The allegations of paragraph 34 contain legal conclusions to which no response is required.  To the extent a response is required, SG denies the allegations of paragraph 34 of the Complaint as to itself and denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 34 of the Complaint and therefore denies such allegations, except admits that Barep and Lyxor Premium, respectively, entered into one or more subscription agreements with the Fairfield Funds and refers the Court to those documents for their contents.

35.    SG Suisse, SG Equilibrium, SGBT and Bank Audi entered into one or
more subscription agreements with Kingate, and sent their subscription monies to a New York
bank account, as Kingate instructed.  The Kingate subscription agreements and associated
information memoranda did not mention New York-based BLMIS or Madoff by name, but the
memoranda confirmed that the fund would have an "Investment Advisor" that was based in New
York, invested "primarily" in the United States and used a non-traditional "split-strike
conversion" trading strategy -- a reference to BLMIS and Madoff.

**ANSWER**:    On April 18, 2022, the Court entered the 2022 Stipulation and

Order amending the Complaint which, *inter alia,* dismissed Count Four against the SG

Defendants related to subsequent transfers allegedly received from Kingate Global [*see* ECF No.

133]; accordingly, no response is required to the allegations of paragraph 35 of the Complaint

concerning Kingate.

36.    Defendants have other strong ties to the United States and New York apart
from the contacts specific to the causes of action in this Complaint. SG is one of the largest
foreign banking organizations in the United States, with approximately 2,500 professionals
working in 13 cities across the United States.  SG maintains a branch office at 1221 Avenue of
the Americas, New York, NY 10020 and registers this branch with the New York State
Department of Financial Services and the Federal Reserve Bank.  SG Suisse, SG Lugano, SG
UK, Lyxor SA, SG Holding, Lyxor Asset and SGBT are all wholly-owned subsidiaries of SG.
Lyxor SA, in turn, manages the operations of SG Premium, SG Audace, SG Equilibrium and
Lyxor Premium.

**ANSWER**:    SG denies the allegations of paragraph 36 of the Complaint as to

itself, and denies knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in paragraph 36 of the Complaint and therefore denies such allegations,

except (1) admits that, at the time the Complaint was filed, SG had approximately 1,900

employees in the United States, (2) admits that, at certain times, SG maintained a branch office

at 1221 Avenue of the Americas, New York, NY 10020 and registered this branch with the

Federal Reserve Bank, (3) admits that, at certain times, SG registered a branch office located in

New York with the New York State Department of Financial Services, (4) admits that SG is the

ultimate parent corporation of SG Suisse, SG Luxembourg, SG UK, and SG Holding, (5) admits

that, until June 2022, SG was the ultimate parent of Lyxor SA and Lyxor Asset, (6) admits that,

at certain times, Lyxor SA managed the operations of SG Audace, Lyxor Premium and SG

Equilibrium, and (7) states that Lyxor Asset, not Lyxor SA, managed the operations of SG

Premium.

37.     Several other Defendants maintain offices or regularly conduct business in
the United States or New York. SG Suisse maintains a representative office in Florida that is
registered with the Florida Office of Financial Services.  Lyxor Asset, a Delaware corporation
based in New York, is registered with the National Futures Association as a Commodity Pool
Operator and conducts business through New York entities SG Americas Securities LLC and
Societe Generale New York.  Lyxor Asset and Lyxor Premium have filed forms with the U.S.
Securities and Exchange Commission (the "SEC") in connection with their dealings in the
United States.

**ANSWER**:     SG denies knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 37 of the Complaint and therefore denies such

allegations, except (1) admits that, at certain times, Société Générale Private Banking (Suisse)

S.A. (*f/k/a* SG Private Banking Suisse S.A.) maintained a representative office in Florida, and (2)

admits that, at certain times, Lyxor Asset was a corporation organized under the laws of

Delaware, and (3) admits that, at certain times, Lyxor Premium filed forms with the U.S.

Securities and Exchange Commission and respectfully refers the Court to those documents for a

complete and accurate statement of their contents.

38.     This Court has personal jurisdiction over Defendants based on all of these
specific and general contacts with the United States and New York.  Defendants should
reasonably expect to be subject to jurisdiction based on these contacts.

**ANSWER**:     The allegations of paragraph 38 contain legal conclusions to which

no response is required.  To the extent a response is required, SG denies the allegations of

paragraph 38 of the Complaint as to itself and denies knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in paragraph 38 of the Complaint and

therefore denies such allegations.

39. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).

**ANSWER**:    The allegations of paragraph 39 contain legal conclusions to which

no response is required.  To the extent a response is required, SG denies the allegations of

paragraph 39 of the Complaint.

40.    Pursuant to Local Bankruptcy Rule 7008-1, the Trustee consents to the
entry of final orders or judgment by this Court if it is determined that this Court, absent consent
of the parties, cannot enter final orders or judgment consistent with Article III of the United
States Constitution.

**ANSWER**:    The allegations of paragraph 40 contain legal conclusions to which

no response is required.  To the extent a response is required, SG denies the allegations of

paragraph 40 of the Complaint and objects to the entry of final orders or judgment against SG.

41. Venue in this District is proper under 28 U.S.C. § 1409.

**ANSWER**:    The allegations of paragraph 41 contain a legal conclusion to

which no response is required.  To the extent a response is required, SG denies the allegations of

paragraph 41 of the Complaint.

## IV.    **BACKGROUND**

### A.    **THE MAIN CASE**

42.    Madoff was arrested by federal agents on December 11, 2008 (the "Filing
Date") for violation of the criminal securities laws, including for, among other things, securities
fraud, investment adviser fraud and mail and wire fraud.  At about the same time, the SEC
commenced the District Court Proceeding against Madoff and BLMIS.  The SEC complaint
alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of
BLMIS.  The District Court Proceeding is still pending.

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 42 of the Complaint and therefore denies such

allegations, except admits on information and belief that Madoff was arrested on December 11,

2008, and that the SEC filed a complaint against Madoff and BLMIS and respectfully refers the

Court to that document for a complete and accurate statement of its contents.

43.     The Honorable Louis L. Stanton of the District Court entered an order on December 12, 2008 appointing Lee S. Richards as receiver for the assets of BLMIS.

**ANSWER**:     SG denies knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 43 of the Complaint and therefore denies such

allegations, and respectfully refers the Court to the order dated December 12, 2008 for a

complete and accurate statement of its contents.

44.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC") under SIPA § 78eee(a)(4)(B).  The SIPC application alleged, among other things, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

**ANSWER**:     SG denies knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 44 of the Complaint and therefore denies such

allegations, and respectfully refers the Court to the application filed by SIPC referred to in

paragraph 44 of the Complaint for a complete and accurate statement of its contents.

45.     Judge Stanton granted the SIPC application and included in the order a SIPA decree (known as the "Protective Decree"), which, in pertinent part:

a.  removed the receiver and appointed the Trustee for the liquidation of the business of BLMIS under SIPA § 78eee(b)(3);

b.  appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA § 78eee(b)(3); and

c.  removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under SIPA § 78eee(b)(4).

**ANSWER**:     SG denies knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 45 of the Complaint and therefore denies such

allegations, and respectfully refers the Court to the order issued by Judge Stanton referred to in

paragraph 45 of the Complaint for a complete and accurate statement of its contents.

      46.     By orders dated December 23, 2008 and February 4, 2009, respectively,
the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested
person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of
BLMIS.

      **ANSWER**:    SG denies knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 46 of the Complaint and therefore denies such

allegations, and respectfully refers the Court to the Bankruptcy Court orders dated December 23,

2008 and February 4, 2009 for a complete and accurate statement of their contents.

      47.     At a plea hearing on March 12, 2009 in the criminal case captioned *United
States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. Mar. 12, 2009) (Docket No. 50), Madoff
pled guilty to an eleven-count criminal information filed against him by the United States
Attorney's Office for the Southern District of New York.  Madoff admitted that he "operated a
Ponzi scheme through the investment advisory side of [BLMIS]."  *Id.* at 23.  He further admitted,
"[A]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal."  *Id.*  Then
District Court Judge Denny Chin sentenced Madoff on June 29, 2009 to 150 years in prison.

      **ANSWER**:    SG denies knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 47 of the Complaint and therefore denies such

allegations, except admits on information and belief that Bernard L. Madoff pled guilty at a plea

hearing on March 12, 2009 and respectfully refers the Court to the transcript of that hearing for a

complete and accurate statement of its contents.

      48.     Former BLMIS employee Frank DiPascali is awaiting sentencing after
pleading guilty on August 11, 2009 to participating in and conspiring to perpetuate the Ponzi
scheme.  In the case, entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS) (S.D.N.Y.
Aug. 11, 2009), DiPascali admitted that, among other things, the Ponzi scheme had been ongoing
at BLMIS since at least the 1980s.  *Id.* at 46.

      **ANSWER**:    SG denies knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 48 of the Complaint and therefore denies such

allegations, and respectfully refers the Court to the transcript of the plea hearing of Frank

DiPascali on August 11, 2009 for a complete and accurate statement of its contents.

       49.     Former BLMIS trader David Kugel is awaiting sentencing after pleading guilty on November 21, 2011 to charges that he participated in the Ponzi scheme. See *United States v. Kugel*, Case No. 10-CR-00228 (LTS) (S.D.N.Y. Nov. 21, 2011). Kugel stated under oath that the scheme began in the early 1970s, and he admitted that he worked with two other BLMIS employees, JoAnn Crupi and Annette Bongiorno, to create false trades.

       **ANSWER**:    SG denies knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 49 of the Complaint and therefore denies such

allegations, and respectfully refers the Court to the docket and filings in Case No. 10-CR-00228

(LTS) for a complete and accurate statement of their contents.

## B.    TRUSTEE'S POWER AND STANDING

       50.     The Trustee has a responsibility under SIPA to recover and pay out Customer Property to BLMIS customers, assess claims and liquidate any other assets of BLMIS for the benefit of the estate and its creditors. The Trustee is in the process of marshaling BLMIS's assets, and this liquidation is well underway. However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years and lost. Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recoveries, including those from individuals and entities that received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi scheme. Absent the instant case and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

       **ANSWER**:    SG denies knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 50 of the Complaint and therefore denies such

allegations, except states that the allegations concerning the Trustee's responsibilities and

authority under SIPA and the Bankruptcy Code contain legal conclusions to which no response is

required.

       51.     Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under § 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

**ANSWER**:    The allegations of paragraph 51 contain legal conclusions to which

no response is required.  To the extent a response is required, SG denies the allegations of

paragraph 51 of the Complaint.

52.    Under SIPA §§ 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be
the date of the filing of the petition within the meaning of Section 548 of the Bankruptcy Code
and the date of commencement of the case within the meaning of Section 544 of the Bankruptcy
Code.

**ANSWER**:    The allegations of paragraph 52 contain legal conclusions to which

no response is required.  To the extent a response is required, SG denies the allegations of

paragraph 52 of the Complaint.

53.    The Trustee has standing to bring the claims in this adversary proceeding
pursuant to his statutory authority and power to avoid and recover transfers under SIPA §§
78fff(b), 78fff-1(a) and 78fff-2(c)(3); Bankruptcy Code Sections 105(a), 323(b), 544, 547, 548,
550(a), 551 and 704(a)(1); NYDCL §§ 273-279; and N.Y. C.P.L.R. 203(g) and 213(8).

**ANSWER**:    The allegations of paragraph 53 contain legal conclusions to which

no response is required.  To the extent a response is required, SG denies the allegations of

paragraph 53 of the Complaint.

## V.    THE PONZI SCHEME

54.    BLMIS was founded by Madoff in 1959 and, for most of its existence,
operated from its principal place of business at 885 Third Avenue, New York, New York.
Madoff, as founder, chairman, chief executive officer and sole owner, operated BLMIS together
with several of his friends and family members.  BLMIS was registered with the SEC as a
securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. §
78*o*(b).  By virtue of that registration, BLMIS was a member of SIPC.  BLMIS had three
business units: market making, proprietary trading and the investment advisory business (the "IA
Business").

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 54 of the Complaint and therefore denies such

allegations.

55.    Outwardly, Madoff ascribed the consistent success of the IA Business to the so-called split-strike conversion strategy (the "SSC Strategy").  Under this strategy, Madoff purported to invest BLMIS customer funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100") -- a collection of the 100 largest publicly-traded companies. Madoff claimed that his basket of stocks would mimic the movement of the S&P 100.  He also claimed he would carefully time purchases and sales to maximize value, and BLMIS customer funds would, intermittently, be out of the equity markets.

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 55 of the Complaint and therefore denies such allegations.

56.    The second part of the SSC Strategy was a hedge of Madoff's stock purchases with options contracts.  Those option contracts acted as a "collar" to limit both the potential gains and losses on the basket of stocks.  Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options.

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 56 of the Complaint and therefore denies such allegations.

57.    Madoff told BLMIS customers that, when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual funds holding Treasury bills.  Madoff also told customers that he would enter and exit the market between six and ten times each year.

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 57 of the Complaint and therefore denies such allegations.

58.    BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts.  The securities purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious.  Madoff admitted at his plea hearing that he never made the investments he promised clients, who believed they were invested with him in the SSC Strategy. He further admitted (as later confirmed by Frank DiPascali and David Kugel) that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts.  In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform on which BLMIS

reasonably could have traded securities.  Instead, investors' funds were principally deposited into the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxxx703.

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 58 of the Complaint and therefore denies such allegations, and respectfully refers the Court to the transcript of the plea hearing referred to in paragraph 58 for a complete and accurate statement of its contents.

59.    Madoff assured clients and regulators prior to his arrest that he purchased and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than through any listed exchange.  Based on the Trustee's investigation to date, there is no evidence that the IA Business ever entered into any OTC options trades on behalf of IA Business account holders.

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 59 of the Complaint and therefore denies such allegations.

60.    For all relevant periods, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options; rather it was used to pay withdrawals and to make other avoidable transfers.  Madoff also used his customers' investments to enrich himself and his associates and family.

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 60 of the Complaint and therefore denies such allegations.

61.    The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion of new investments to fulfill payment requests or withdrawals from other BLMIS accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 61 of the Complaint and therefore denies such allegations.

62.    It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in a demand, investigation, the filing of a claim and disclosure of the fraud.

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 62 of the Complaint and therefore denies such allegations.

63.    Madoff's scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

**ANSWER**:    SG admits that the Ponzi scheme collapsed in December 2008 but denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 63 of the Complaint and therefore denies such allegations.

64.    It now appears based upon the Trustee's ongoing investigation that there were more than 8,000 customer accounts at BLMIS over the life of the scheme. BLMIS generated account statements in early December 2008 for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. By the time the Ponzi scheme came to light on December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 64 of the Complaint and therefore denies such allegations.

65.    Thus, at all relevant times, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of all transfers, BLMIS was left with insufficient capital.

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 65 of the Complaint and therefore denies such allegations.

## VI.    THE TRANSFERS

66.    Fairfield Sentry and Kingate each received initial transfers of Customer Property from BLMIS.  Some or all of those initial transfers were subsequently transferred to, or for the benefit of, Defendants, either directly or through Fairfield Sigma or Fairfield Lambda as set forth in more detail below.

**ANSWER**:    On April 18, 2022, the Court entered the 2022 Stipulation and

Order amending the Complaint which, *inter alia,* dismissed Count Four against the SG

Defendants related to subsequent transfers allegedly received from Kingate Global [*see* ECF No.

133]; accordingly, no response is required to the allegations of paragraph 66 of the Complaint

concerning Kingate.  SG denies the remaining allegations of paragraph 66 of the Complaint as to

itself and denies knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in paragraph 66 of the Complaint and therefore denies such allegations.

### A.    FAIRFIELD

### *The Fairfield Action*

67.    The Trustee filed a complaint in which he sought to avoid and recover initial and subsequent transfers of Customer Property from BLMIS to Fairfield Sentry, Fairfield Sigma, Fairfield Lambda and others.  See *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (BRL) (the "Fairfield Action").  The Trustee incorporates by reference the allegations in the Fairfield complaint as if fully set forth in this Complaint.  A copy of the Fairfield Amended Complaint (without exhibits) is attached here as Exhibit A.

**ANSWER**:    The allegations of paragraph 67 refer to proceedings in another

litigation to which SG was not a party.  SG respectfully refers the Court to the docket and filings

in that action for their contents.  To the extent a further response is required, SG states that it was

never a party to the Fairfield Action.  SG objects to the purported wholesale incorporation by

reference of a pleading from another litigation as a violation of Rule 8 of the Federal Rules of

Civil Procedure as incorporated by Rule 7008 of the Federal Rules of Bankruptcy Procedure.  To

the extent a further response is required, SG denies knowledge or information sufficient to form

a belief as to the truth of the allegations in paragraph 67 of the Complaint and therefore denies

such allegations, and respectfully refers the Court to Exhibit A to the Complaint for its complete

and accurate contents.

68.    Pursuant to orders dated June 7 and June 10, 2011, the Bankruptcy Court approved a settlement among the Trustee, Fairfield Sentry, Fairfield Sigma and Fairfield Lambda (the "Settlement Agreement").  As part of the approved resolution, the Bankruptcy Court entered consent judgments for the Trustee in the amount of $3,054,000,000 against Fairfield Sentry, $752,300,000 against Fairfield Sigma and $52,900,000 against Fairfield Lambda.  The judgments represented the settled amounts of the Trustee's "Avoiding Power Claims."  See Settlement Agreement (without exhibits), attached here as Exhibit B, at p. 4, section 1.

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as

to the truth of the allegations in paragraph 68 of the Complaint and respectfully refers the Court

to Exhibit B to the Complaint and the referenced orders dated June 7 and June 10, 2011, for their

complete and accurate contents.

### *Initial Transfers from BLMIS to Fairfield Sentry*

69.    During the six years preceding the Filing Date, BLMIS made transfers to Fairfield Sentry of $2,985,136,619 (the "Fairfield Sentry Six Year Initial Transfers").  The Fairfield Sentry Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under Sections 544, 550 and 551 of the Bankruptcy Code; §§ 273-279 of the NYDCL; and applicable provisions of SIPA, particularly SIPA § 78fff- 2(c)(3).

**ANSWER**:    The allegations of paragraph 69 contain legal conclusions to which

no response is required.  To the extent a response is required, SG denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 69 of the

Complaint and therefore denies such allegations.

70.    The Fairfield Sentry Six Year Initial Transfers include $1,614,067,088 that BLMIS transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Initial Transfers").  The Fairfield Sentry Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under Sections 548, 550 and 551 of the Bankruptcy Code; §§ 273-279 of the NYDCL; and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:    The allegations of paragraph 70 contain legal conclusions to which

no response is required.  To the extent a response is required, SG denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 70 of the

Complaint and therefore denies such allegations.

71.    The Fairfield Sentry Two Year Initial Transfers include $1,134,628,244
that BLMIS transferred to Fairfield Sentry during the 90 days preceding the Filing Date (the
"Fairfield Sentry Preference Period Initial Transfers").  The Fairfield Sentry Preference Period
Initial Transfers were and continue to be Customer Property within the meaning of SIPA §
78*lll*(4), and are avoidable and recoverable under Sections 547, 550 and 551 of the Bankruptcy
Code and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:    The allegations of paragraph 71 contain legal conclusions to which

no response is required.  To the extent a response is required, SG denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 71 of the

Complaint and therefore denies such allegations.

72.    The Fairfield Sentry Six Year Initial Transfers, Fairfield Sentry Two Year
Initial Transfers and Fairfield Sentry Preference Period Initial Transfers are collectively defined
as the "Fairfield Sentry Initial Transfers."  A chart setting forth the BLMIS accounts from which
the Fairfield Sentry Initial Transfers were made is attached here as Exhibit C.  A chart setting
forth the transfers is attached here as Exhibit D.

**ANSWER**:    The allegations of paragraph 72 contain legal conclusions to which

no response is required.  To the extent a response is required, SG denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 72 of the

Complaint and therefore denies such allegations and respectfully refers the Court to Exhibits C

and D for their complete and accurate contents.

***Subsequent Transfers from Fairfield Sentry to Defendants SG Suisse, SG
Lugano, SG UK, Lyxor SA, SG Holding, SG Premium, Lyxor Asset, SG
Audace, SG Equilibrium, Lyxor Premium, SG, SGBT, OFI, Palmares and
UMR***

73.    A portion of the Fairfield Sentry Initial Transfers was subsequently
transferred to, or for the benefit of, Defendants SG Suisse; SG Lugano; SG UK; Lyxor SA and

SG Holding through their predecessor Barep; SG Premium; Lyxor Asset as the general partner of SG Premium; SG Audace; SG Equilibrium; Lyxor Premium; SG as trustee for Lyxor Premium; SGBT; OFI; Palmares; and UMR. These parties are referred to below as the "SG Sentry Defendants." The subsequent transfers are recoverable from the SG Sentry Defendants pursuant to Section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, $128,678,138 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to, or for the benefit of, the SG Sentry Defendants (the "Fairfield Sentry Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry Subsequent Transfers is attached here as Exhibit E.

     **ANSWER**:  The allegations of paragraph 73 contain legal conclusions to which

no response is required. To the extent a response is required, SG denies the allegations of

paragraph 73 of the Complaint as to itself and denies knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in paragraph 73 of the Complaint and

therefore denies such allegations, and respectfully refers the Court to Exhibit E to the Complaint

for its complete and accurate contents.

     *Subsequent Transfers from Fairfield Sentry to Fairfield Sigma and then to*
     *Defendants SG Suisse, SG Lugano and SGBT*

     74.  A portion of the Fairfield Sentry Initial Transfers was subsequently transferred through Fairfield Sigma to, or for the benefit of, Defendants SG Suisse, SG Lugano and SGBT (the "SG Sigma Defendants"), and is recoverable from them pursuant to Section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, $752,273,917 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Fairfield Sigma. A chart setting forth those transfers is attached here as Exhibit F. Fairfield Sigma, in turn, transferred the equivalent of $2,090,254 of the money it received from Fairfield Sentry to, or for the benefit of, the SG Sigma Defendants (the "Fairfield Sigma Subsequent Transfers"). A chart setting forth the presently known Fairfield Sigma Subsequent Transfers is attached here as Exhibit G.

     **ANSWER**:  The allegations of paragraph 74 contain legal conclusions to which

no response is required. To the extent a response is required, SG denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 74 of the

Complaint and therefore denies such allegations, and respectfully refers the Court to Exhibits F

and G to the Complaint for their complete and accurate contents.

75.    A portion of the Fairfield Sentry Initial Transfers was subsequently transferred through Fairfield Lambda to, or for the benefit of, Defendant SG Suisse and is recoverable from SG Suisse pursuant to Section 550 of the Bankruptcy Code and § 278 of the NYDCL.  Based on the Trustee's investigation to date, $52,935,000 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Fairfield Lambda.  A chart setting forth those transfers is attached here as Exhibit H.  Fairfield Lambda, in turn, transferred the equivalent of $6,287,866 of the money it received from Fairfield Sentry to, or for the benefit of, Defendant SG Suisse (the "Fairfield Lambda Subsequent Transfers").  A chart setting forth the presently known Fairfield Lambda Subsequent Transfers is attached here as Exhibit I.

**ANSWER**:    The allegations of paragraph 75 contain legal conclusions to which no response is required.  To the extent a response is required, SG denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 75 of the Complaint and therefore denies such allegations, and respectfully refers the Court to Exhibits H and I to the Complaint for their complete and accurate contents.

76.    The Trustee's investigation is ongoing, and he reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, Fairfield Sentry Subsequent Transfers, Fairfield Sigma Subsequent Transfers and Fairfield Lambda Subsequent Transfers; and (ii) seek the recovery of any additional transfers.

**ANSWER**:    SG denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 76 of the Complaint and therefore denies such allegations.

B.    **KINGATE**

*The Kingate Action*

77.    The Trustee filed a complaint in which he sought to avoid and recover initial transfers of Customer Property from BLMIS to Kingate and others.  See *Picard v. Kingate Global Fund, Ltd., et al.*, Adv. Pro. No. 09-01161 (BRL) (the "Kingate Action"); see also District Court Case Nos. 11-CV-07256 (JSR) and 11-CV-07134 (JSR).  The Trustee incorporates by reference the allegations in the Kingate complaint as if fully set forth in this Complaint.  A copy of the Kingate Third Amended Complaint (without exhibits) is attached here as Exhibit J. The Kingate Action is still pending.

**ANSWER**:    On April 18, 2022, the Court entered the 2022 Stipulation and

Order amending the Complaint which, *inter alia,* dismissed Count Four against the SG

Defendants related to subsequent transfers allegedly received from Kingate Global [*see* ECF No.

133]; accordingly, no response is required to the allegations of paragraph 77 of the Complaint.

### *Initial Transfers from BLMIS to Kingate*

78.    Over the lifetime of Kingate's account with BLMIS, from its inception to
the Filing Date, BLMIS made transfers to Kingate in the amount of $437,501,112 (the "Kingate
Lifetime Initial Transfers").  The Kingate Lifetime Initial Transfers were and continue to be
Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable
under Sections 544, 550 and 551 of the Bankruptcy Code; §§ 273-279 of the NYDCL; applicable
provisions of SIPA, particularly SIPA § 78fff-2(c)(3); and N.Y. C.P.L.R. 203(g) and 213(8).

**ANSWER**:    On April 18, 2022, the Court entered the 2022 Stipulation and

Order amending the Complaint which, *inter alia,* dismissed Count Four against the SG

Defendants related to subsequent transfers allegedly received from Kingate Global [*see* ECF No.

133]; accordingly, no response is required to the allegations of paragraph 78 of the Complaint.

79.    The Kingate Lifetime Initial Transfers include $398,704,065 that BLMIS
transferred to Kingate during the six years preceding the Filing Date (the "Kingate Six Year
Initial Transfers").  The Kingate Six Year Initial Transfers were and continue to be Customer
Property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under Sections
544, 550 and 551 of the Bankruptcy Code; §§ 273-279 of the NYDCL; and applicable provisions
of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:    On April 18, 2022, the Court entered the 2022 Stipulation and

Order amending the Complaint which, *inter alia,* dismissed Count Four against the SG

Defendants related to subsequent transfers allegedly received from Kingate Global [*see* ECF No.

133]; accordingly, no response is required to the allegations of paragraph 79 of the Complaint.

80.    The Kingate Six Year Initial Transfers include $163,447,509 that BLMIS
transferred to Kingate during the two years preceding the Filing Date (the "Kingate Two Year
Initial Transfers").  The Kingate Two Year Initial Transfers were and continue to be Customer
Property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under Sections
544, 548, 550 and 551 of the Bankruptcy Code; §§ 273-279 of the NYDCL; and applicable
provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:    On April 18, 2022, the Court entered the 2022 Stipulation and

Order amending the Complaint which, *inter alia,* dismissed Count Four against the SG

Defendants related to subsequent transfers allegedly received from Kingate Global [*see* ECF No.

133]; accordingly, no response is required to the allegations of paragraph 80 of the Complaint.

81.    The Kingate Two Year Initial Transfers include $101,753,145 that BLMIS
transferred to Kingate during the 90 days preceding the Filing Date (the "Kingate Preference
Period Initial Transfers").  The Kingate Preference Period Initial Transfers were and are
Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable
under Sections 547, 550 and 551 of the Bankruptcy Code and applicable provisions of SIPA,
particularly SIPA § 78fff-2(c)(3).

**ANSWER**:    On April 18, 2022, the Court entered the 2022 Stipulation and

Order amending the Complaint which, *inter alia*, dismissed Count Four against the SG

Defendants related to subsequent transfers allegedly received from Kingate Global [*see* ECF No.

133]; accordingly, no response is required to the allegations of paragraph 81 of the Complaint.

82.    The Kingate Lifetime Initial Transfers, Kingate Six Year Initial Transfers,
Kingate Two Year Initial Transfers and Kingate Preference Period Initial Transfers are
collectively defined as the "Kingate Initial Transfers."  A chart setting forth the BLMIS account
from which the Kingate Initial Transfers were made is attached here as Exhibit K.  A chart
setting forth the transfers is attached here as Exhibit L.

**ANSWER**:    On April 18, 2022, the Court entered the 2022 Stipulation and

Order amending the Complaint which, *inter alia*, dismissed Count Four against the SG

Defendants related to subsequent transfers allegedly received from Kingate Global [*see* ECF No.

133]; accordingly, no response is required to the allegations of paragraph 82 of the Complaint.

### *Subsequent Transfers from Kingate to Defendants SG Suisse, SG Equilibrium, SGBT and Bank Audi*

83.    A portion of the Kingate Initial Transfers was subsequently transferred
directly or indirectly to, or for the benefit of, Defendants SG Suisse, SG Equilibrium, SGBT and
Bank Audi.  These parties are referred to below as the "SG Kingate Defendants."  The
subsequent transfers are recoverable from the SG Kingate Defendants pursuant to Section 550 of
the Bankruptcy Code and § 278 of the NYDCL.  Based on the Trustee's investigation to date,

$25,832,301 of the money transferred from BLMIS to Kingate was subsequently transferred by Kingate to, or for the benefit of, the SG Kingate Defendants (the "Kingate Subsequent Transfers"). A chart setting forth the presently known Kingate Subsequent Transfers is attached here as Exhibit M.

**ANSWER**:     On April 18, 2022, the Court entered the 2022 Stipulation and

Order amending the Complaint which, *inter alia*, dismissed Count Four against the SG

Defendants related to subsequent transfers allegedly received from Kingate Global [*see* ECF No.

133]; accordingly, no response is required to the allegations of paragraph 83 of the Complaint.

84.     The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Kingate Initial Transfers and Kingate Subsequent Transfers; and (ii) seek the recovery of any additional transfers.

**ANSWER**:     On April 18, 2022, the Court entered the 2022 Stipulation and

Order amending the Complaint which, *inter alia*, dismissed Count Four against the SG

Defendants related to subsequent transfers allegedly received from Kingate Global [*see* ECF No.

133]; accordingly, no response is required to the allegations of paragraph 84 of the Complaint.

<u>COUNT ONE</u>
<u>RECOVERY OF FAIRFIELD SENTRY SUBSEQUENT TRANSFERS–</u>
<u>11 U.S.C. §§ 550 AND 551 AND NYDCL § 278</u>

**(SG Suisse, SG Lugano, SG UK, Lyxor SA, SG Premium, Lyxor Asset, SG Holding, SG Audace, SG Equilibrium, Lyxor Premium, SG, SGBT, OFI, Palmares and UMR)**

85.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten here.

**ANSWER**:     SG incorporates and reasserts its responses to the allegations

contained in the previous paragraphs of this Complaint as though set forth fully herein.

86.     The SG Sentry Defendants received the Fairfield Sentry Subsequent Transfers, which totaled at least $128,678,138 and are recoverable by the Trustee under Section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

**ANSWER**:     The allegations of paragraph 86 contain legal conclusions to which

no response is required. To the extent a response is required, SG denies the allegations in

34

paragraph 86 of the Complaint as to itself and denies knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in paragraph 86 of the Complaint and

therefore denies such allegations.

87.     Each of the Fairfield Sentry Subsequent Transfers was made to, or for the benefit of, an SG Sentry Defendant.

**ANSWER**:     The allegations of paragraph 87 contain legal conclusions to which

no response is required.  To the extent a response is required, SG denies the allegations in

paragraph 87 of the Complaint as to itself and denies knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in paragraph 87 of the Complaint and

therefore denies such allegations.

88.     The SG Sentry Defendants are immediate or mediate transferees of the Fairfield Sentry Initial Transfers, which are avoidable and recoverable as set forth in the Fairfield Action.

**ANSWER**:     The allegations of paragraph 88 contain legal conclusions to which

no response is required.  To the extent a response is required, SG denies the allegations in

paragraph 88 of the Complaint as to itself and denies knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in paragraph 88 of the Complaint and

therefore denies such allegations.

89.     As a result of the foregoing, pursuant to Sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment (i) against Defendants SG Suisse, SG Lugano, SG UK, Lyxor SA, SG Premium, Lyxor Asset, SG Holding, SG Audace, SG Equilibrium, Lyxor Premium, SGBT, OFI, Palmares and UMR recovering the Fairfield Sentry Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS; and (ii) directing Defendant SG to effect or facilitate the surrender and transfer of the Fairfield Sentry Subsequent Transfer received by Defendant Lyxor Premium, or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER**:     The allegations of paragraph 89 contain legal conclusions to which

no response is required.  To the extent a response is required, SG denies the allegations in

paragraph 89 of the Complaint as to itself and denies knowledge or information sufficient to

form a belief as to the truth of the remaining allegations in paragraph 89 of the Complaint and

therefore denies such allegations.

## COUNT TWO
## RECOVERY OF FAIRFIELD SIGMA SUBSEQUENT TRANSFERS–
## 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

### (SG Suisse, SG Lugano and SGBT)

90.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten here.

**ANSWER**:    SG incorporates and reasserts its responses to the allegations

contained in the previous paragraphs of this Complaint as though set forth fully herein.

91.    The SG Sigma Defendants received the Fairfield Sigma Subsequent Transfers, which totaled at least $2,090,254 and are recoverable by the Trustee under Section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

**ANSWER**:    The allegations of paragraph 91 contain legal conclusions to which

no response is required.  To the extent a response is required, SG denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 91 of the

Complaint and therefore denies such allegations.

92.    Each of the Fairfield Sigma Subsequent Transfers was made to, or for the benefit of, an SG Sigma Defendant.

**ANSWER**:    The allegations of paragraph 92 contain legal conclusions to which

no response is required.  To the extent a response is required, SG denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 92 of the

Complaint and therefore denies such allegations.

93.    The SG Sigma Defendants are immediate or mediate transferees of the Fairfield Sentry Initial Transfers, which are avoidable and recoverable as set forth in the Fairfield Action.

**ANSWER**:    The allegations of paragraph 93 contain legal conclusions to which

no response is required.  To the extent a response is required, SG denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 93 of the

Complaint and therefore denies such allegations.

94.    As a result of the foregoing, pursuant to Sections 550(a) and 551 of the
Bankruptcy Code, § 278 of the NYDCL and SIPA § 78fff-2(c)(3), the Trustee is entitled to a
judgment against the SG Sigma Defendants recovering the Fairfield Sigma Subsequent
Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER**:    The allegations of paragraph 94 contain legal conclusions to which

no response is required.  To the extent a response is required, SG denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 94 of the

Complaint and therefore denies such allegations.

<u>COUNT THREE</u>
<u>RECOVERY OF FAIRFIELD LAMBDA SUBSEQUENT TRANSFERS–</u>
<u>11 U.S.C. §§ 550 AND 551 AND NYDCL § 278</u>

**(SG Suisse)**

95.    The Trustee incorporates by reference the allegations contained in the
previous paragraphs of this Complaint as if fully rewritten here.

**ANSWER**:    SG incorporates and reasserts its responses to the allegations

contained in the previous paragraphs of this Complaint as though set forth fully herein.

96.    Defendant SG Suisse received the Fairfield Lambda Subsequent Transfers,
which totaled at least $6,287,866 and are recoverable by the Trustee under Section 550(a) of the
Bankruptcy Code and § 278 of the NYDCL.

**ANSWER**:    The allegations of paragraph 96 contain legal conclusions to which

no response is required.  To the extent a response is required, SG denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 96 of the

Complaint and therefore denies such allegations.

97.     Each of the Fairfield Lambda Subsequent Transfers was made to, or for the benefit of, Defendant SG Suisse.

**ANSWER**:     The allegations of paragraph 97 contain legal conclusions to which no response is required.  To the extent a response is required, SG denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 97 of the Complaint and therefore denies such allegations.

98.     Defendant SG Suisse is an immediate or mediate transferee of the Fairfield Sentry Initial Transfers, which are avoidable and recoverable as set forth in the Fairfield Action.

**ANSWER**:     The allegations of paragraph 98 contain legal conclusions to which no response is required.  To the extent a response is required, SG denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 98 of the Complaint and therefore denies such allegations.

99.     As a result of the foregoing, pursuant to Sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant SG Suisse recovering the Fairfield Lambda Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER**:     The allegations of paragraph 99 contain legal conclusions to which no response is required.  To the extent a response is required, SG denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 99 of the Complaint and therefore denies such allegations.

## RESPONSE TO REQUEST FOR RELIEF

SG denies that the Trustee is entitled to his requested judgment in favor of the Trustee and against SG.

## AFFIRMATIVE DEFENSES

SG asserts the following defenses without assuming the burden of proof or any other burden if such burdens would otherwise be on Plaintiff.  SG reserves the right to assert any

other defenses as discovery in this litigation proceeds or any counterclaims that it becomes aware

of through discovery or other investigation as may be appropriate at a later time.  Further, SG

also reserves the right to amend this Answer to assert cross-claims and/or third-party claims

when and if, in the course of investigation, discovery, or preparation for trial, it becomes

appropriate to do so.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

The Complaint must be dismissed because the Court lacks personal jurisdiction

over SG.

## THIRD AFFIRMATIVE DEFENSE

The Trustee's claims are barred to the extent they have been or may in the future

be dismissed by the Court or are based on allegations that have been or may in the future be

dismissed by the Court or are based on theories or allegations that have been or may in the future

be rejected by this Court or by another court on appeal from any orders of this Court.

## FOURTH AFFIRMATIVE DEFENSE

The alleged Fairfield Sentry Subsequent Transfers may not be avoided or

recovered because, to the extent that SG received redemption payments from the Fairfield Funds,

it did so in exchange for value and in good faith within the meaning of 11 U.S.C. § 550(b).  SG

did not have knowledge that BLMIS was not trading securities, did not know facts that would

have prompted a reasonable person in its position to conduct further inquiry into BLMIS's

possible fraud, and even if SG had conducted a diligent inquiry, it would not have discovered the

fraudulent purpose of the Fairfield Sentry Initial Transfers and that BLMIS was not trading securities.

A reasonable person with the facts in SG's possession at the time of the Fairfield Sentry Subsequent Transfers would not have been on inquiry notice of the fraudulent purpose behind the Fairfield Sentry Initial Transfers, nor would those facts have led such a person to conduct further inquiry into whether BLMIS was trading securities or was a fraud or a Ponzi scheme.

Even if SG had been on inquiry notice of the possible fraudulent purpose behind the Fairfield Sentry Initial Transfers or of facts that would have led a reasonable person to conduct further inquiry into whether BLMIS was trading securities or was a fraud or a Ponzi scheme, a diligent inquiry by SG would not have discovered that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Indeed, other entities with vastly greater investigatory tools and resources than SG, and with more access to BLMIS personnel and documentation than SG, investigated BLMIS but failed to uncover that it was a Ponzi scheme before December 2008. This includes the SEC, which began an investigation into BLMIS in 2006, but could not discern BLMIS's fraudulent purpose. Unlike U.S. federal regulatory agencies, SG did not have the ability to compel the production of information from third parties that would have been necessary to establish that BLMIS was committing fraud and did not have the capability of discovering what U.S. federal regulators could not. SG could not have discovered the fraudulent purpose of the Fairfield Sentry Initial Transfers.

## FIFTH AFFIRMATIVE DEFENSE

The alleged Fairfield Sentry Initial Transfers may not be avoided because they were not made with actual intent to defraud and were settlement payments made by or to, or for

the benefit of, a financial institution or financial participant or were transfers made by or to, or

for the benefit of, a financial institution or financial participant in connection with a securities

contract within the meaning of 11 U.S.C. § 546(e).  In addition, at the time of the alleged

Fairfield Sentry Subsequent Transfers, SG had no actual knowledge that Madoff or BLMIS were

not trading securities or that they were perpetrating a Ponzi scheme.

## SIXTH AFFIRMATIVE DEFENSE

On May 9, 2011, the Trustee entered into a Settlement Agreement (the "Fairfield

Settlement Agreement") with the Liquidators of Fairfield Sentry Limited and other Fairfield

funds.  This Court approved the Fairfield Settlement Agreement on June 7, 2011, and it was

incorporated into the consent judgment entered against Fairfield Sentry on July 13, 2011 (the

"Consent Judgment").  The Fairfield Settlement Agreement provides for the sharing of

recoveries on the Trustee's and the Liquidators' claims for recovery of property that Fairfield

Sentry transferred.  To the extent that the Liquidators recover from SG in settlement or

otherwise, the Trustee is barred from recovering on the ground that he is not entitled to double

recovery, nor should SG be subject to recovery of identical funds from two separate entities.

## SEVENTH AFFIRMATIVE DEFENSE[5]

To the extent that the alleged Fairfield Sentry Subsequent Transfers, or any

portion thereof, alleged to have been received by SG were not Customer Property under 15

U.S.C. § 78fff-2(c)(3) or any other section of the U.S. Bankruptcy Code that BLMIS transferred

to the Fairfield Funds, such funds are not recoverable by the Trustee from SG.

---

[5] By asserting the Seventh Affirmative Defense SG does not, in any way, acknowledge or
concede that it has the burden of proof for any issues as to which applicable law places such
burden of proof on Plaintiff.

## JURY TRIAL DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, made applicable

to this proceeding by Rule 9015 of the Federal Rules of Bankruptcy Procedure, SG hereby

demands a jury trial on all claims and issues that may be tried by a jury.

## FINAL ORDER

SG objects to the entry of a final order or judgment against SG by the Bankruptcy

Court.

WHEREFORE, SG requests that this Court dismiss the Complaint with

prejudice, award SG its costs incurred in connection with this action and grant such other and

further relief as the Court deems just and proper.

Dated:  December 21, 2022
      New York, New York

ALLEGAERT BERGER & VOGEL LLP

By: */s/ John F. Zulack*

John F. Zulack
Lauren J. Pincus
David A. Shaiman
111 Broadway, 20th Floor
New York, New York 10006
Tel No.: 212-571-0550
Email: jzulack@abv.com
Email: lpincus@abv.com
Email: dshaiman@abv.com

MAYER BROWN LLP

By: */s/ Christopher J. Houpt*

Steven Wolowitz
Christopher J. Houpt
Bradley A. Cohen
1221 Avenue of the Americas
New York, New York 10020
Tel. No.: 212-506-2500

Email: swolowitz@mayerbrown.com
Email: choupt@mayerbrown.com
Email: bacohen@mayerbrown.com

*Counsel for Societe Generale S.A. as Successor in*
*Interest to Banque de Reescompte et de Placement*
*a/k/a Barep and to Societe Generale Asset*
*Management Banque d/b/a Barep*