**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br>                 Plaintiff-Applicant, <br><br>     v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br>                 Defendant. | Adv. Pro. No. 08-01789 (CGM) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br> BERNARD L. MADOFF, <br>                 Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff, <br>                 Plaintiff, <br>     v. <br><br> CREDIT SUISSE AG; CREDIT SUISSE AG, NASSAU BRANCH; CREDIT SUISSE (LUXEMBOURG) SA; CREDIT SUISSE INTERNATIONAL; CREDIT SUISSE NOMINEES (GUERNSEY) LIMITED; CREDIT SUISSE LONDON NOMINEES LIMITED; AND CREDIT SUISSE (UK) LIMITED, <br>                 Defendants. | Adv. Pro. No. 11-02925 (CGM) <br><br> **ANSWER TO COMPLAINT AND JURY DEMAND** |

Defendants Credit Suisse AG; Credit Suisse AG, Nassau Branch; Credit Suisse (Luxembourg) SA; Credit Suisse International; Credit Suisse Nominees (Guernsey) Limited; Credit Suisse London Nominees Limited; and Credit Suisse (UK) Limited (collectively, "Credit Suisse"), by their undersigned attorneys, O'Melveny & Myers LLP hereby answer the Complaint. This Answer is based on information reasonably known to Credit Suisse as of January 20, 2023. Credit's Suisse's investigation is ongoing, and as such, Credit Suisse expressly reserves the right to seek to amend this Answer as may be necessary.

## PRELIMINARY STATEMENT

As set forth in the Stipulation and Order entered on March 29, 2022, ECF No. 101, the

Trustee has dismissed all claims against Credit Suisse relating to transfers from BLMIS to the

Kingate Funds.  As such, Credit Suisse denies any allegation in the Complaint regarding the

dismissed transfers and that the Trustee is entitled to recover these dismissed Kingate transfers.

Except as otherwise expressly stated herein, Credit Suisse denies each and every allegation

in the Complaint, including, without limitation, any allegations contained in the Complaint's

preamble, headings and subheadings (which are included herein for convenience and

organizational purposes only), or footnotes, and denies any liability to the Trustee and to any party

on whose behalf the Trustee seeks recovery.  If Credit Suisse inadvertently fails to respond to any

allegations of the Complaint, they are denied.

Pursuant to Rule 8(b)(6) of the Federal Rules of Civil Procedure, averments in the

Complaint to which no responsive pleading is required shall be deemed denied.

## RESPONSES TO SPECIFIC ALLEGATIONS

### I.    NATURE OF THE ACTION[1]

1.    This adversary proceeding is part of the Trustee's continuing
efforts to recover BLMIS Customer Property[2] that was stolen as part
of the massive Ponzi scheme perpetrated by Bernard L. Madoff
("Madoff") and others.

---

[1] Credit Suisse deems the section headings in the Complaint not to constitute allegations of the Complaint.  To the extent any section headings are allegations, Credit Suisse admits or denies them consistent with its responses to the allegations contained in the numbered paragraphs of the Complaint.

[2] Footnote 1 alleges that SIPA § 78*lll*(4) defines "Customer Property" as cash and securities at any time received, acquired, or held by, or for the account of, a debtor from, or for, the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.  **ANSWER** to FN 1: Credit Suisse admits that SIPA § 78*lll*(4) sets forth a definition of "Customer Property" and respectfully refers the Court to the cited statute for its full and correct contents.

**ANSWER**:    Credit Suisse admits that the Trustee asserts that this action is part of an

effort to recover customer property lost in Bernard L. Madoff's Ponzi scheme.

2.    The Trustee seeks to recover subsequent transfers of Customer Property from certain BLMIS feeder funds to Defendants totaling $375,468,983. The subsequent transfers, which occurred when Defendants received transfers from the feeder funds, followed avoidable initial transfers from BLMIS to the funds. The Trustee has filed separate actions to avoid the initial transfers.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 2, except admits that the

Trustee has filed separate actions seeking to avoid the alleged "initial transfers."

## II.    THE INITIAL AND SUBSEQUENT TRANSFEREES

3.    Initial transferee Fairfield Sentry Limited ("Fairfield Sentry") maintained customer accounts at BLMIS and was one of BLMIS's largest feeder funds. Fairfield Sentry invested all or substantially all of its assets with BLMIS and was managed by New York-based parent Fairfield Greenwich Group ("FGG").

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 3.

4.    Fairfield Sigma Limited ("Fairfield Sigma") and Fairfield Lambda Limited ("Fairfield Lambda"), affiliates of Fairfield Sentry, acted as foreign currency feeder funds, facilitating Euro (Fairfield Sigma) or Swiss Franc (Fairfield Lambda) investments with BLMIS. Each fund invested 100% of its assets with Fairfield Sentry and was a subsequent transferee of BLMIS transfers by virtue of this relationship. Fairfield Sigma and Fairfield Lambda were both managed by FGG. Fairfield Sentry, Fairfield Sigma and Fairfield Lambda are collectively referred to as "Fairfield."

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 4.

5.    Initial transferee Kingate Global Fund, Ltd. ("Kingate Global") maintained a customer account at BLMIS and was a large BLMIS feeder fund. Kingate Global invested all or substantially all

of its assets with BLMIS and was managed by Kingate Management
Limited ("KML").

**ANSWER**:    Credit Suisse avers that no response is required to the allegations of

Paragraph 5 because all Kingate-related allegations have been dismissed.  To the extent a response

is required, Credit Suisse denies knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 5.

> 6.    Initial transferee Kingate Euro Fund, Ltd. ("Kingate Euro")
> maintained a customer account at BLMIS and was also a large
> BLMIS feeder fund. Kingate Euro invested all or substantially all of
> its assets with BLMIS and was managed by KML. Kingate Global
> and Kingate Euro are collectively referred to as "Kingate."

**ANSWER**:    Credit Suisse avers that no response is required to the allegations of

Paragraph 6 because all Kingate-related allegations have been dismissed.  To the extent a response

is required, Credit Suisse denies knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 6.

> 7.    The Fairfield and Kingate funds are currently in liquidation.

**ANSWER**:    Credit Suisse avers that no response to the Kingate-related allegations is

required because the Trustee has voluntarily dismissed all Kingate-related claims.  To the extent a

response to the Kingate-related allegation is required, and as to the Fairfield-related allegation,

Credit Suisse admits the allegations in Paragraph 7.

> 8.    Defendant and subsequent transferee Credit Suisse AG ("CS
> AG") entered into one or more subscription agreements with
> Fairfield Sentry, Fairfield Sigma, Fairfield Lambda, Kingate Global
> and Kingate Euro, and received transfers from those funds. CS AG
> may have also received transfers from Fairfield Sentry, Fairfield
> Sigma, Fairfield Lambda or Kingate Global through Credit Suisse
> London Nominees Limited, as indicated in Paragraph 16 below. CS
> AG is a corporate entity organized under the laws of Switzerland
> and has its registered address at Paradeplatz 8, 8070 Zurich,

Switzerland. CS AG is referred to as "Credit Suisse Zurich" in certain documents reviewed by the Trustee.

**ANSWER**:    Credit Suisse avers that no response to the Kingate-related allegations is required because the Trustee has voluntarily dismissed all Kingate-related claims; to the extent that a response is required, Credit Suisse denies those allegations.  Credit Suisse denies the remaining allegations in Paragraph 8, except (i) admits that CS AG is organized under the laws of Switzerland and has its registered address at Paradeplatz 8, 8070 Zurich, Switzerland, that CS AG entered into one or more subscription agreements with Fairfield Sentry, Fairfield Sigma, and Fairfield Lambda, that it received transfers from those funds, and that certain affiliates of Credit Suisse received transfers from Fairfield Sentry, Fairfield Sigma, or Fairfield Lambda through Credit Suisse London Nominees Limited; and (ii) denies knowledge or information sufficient to form a belief as to what the documents allegedly reviewed by the Trustee may say.

> 9.    Defendant and subsequent transferee Credit Suisse AG, Nassau Branch (*f/k/a* Credit Suisse (Bahamas) Ltd.) ("CS Nassau") entered into one of more subscription agreements with Fairfield Sentry, Fairfield Lambda and Kingate Global, and received transfers from those funds. CS Nassau is a corporate entity organized under the laws of the Bahamas and has its registered address at P.O. Box N-4928, Shirley & Charlotte Streets, Nassau, New Providence, Bahamas. CS Nassau is a branch of CS AG.

**ANSWER**:    Credit Suisse avers that no response to the Kingate-related allegations is required because the Trustee has voluntarily dismissed all Kingate-related claims; to the extent that a response is required, Credit Suisse denies those allegations.  Credit Suisse denies the remaining allegations in Paragraph 9, except (i) admits that CS Nassau is a branch of CS AG, that CS Nassau entered into one or more subscription agreements with Fairfield Sentry, that certain affiliates of Credit Suisse entered into one or more subscription agreements with Fairfield Lambda, and that certain affiliates of Credit Suisse received transfers from Fairfield Sentry and Fairfield Lambda; and (ii) avers that CS Nassau is licensed under the laws of the Bahamas and has its

registered address at Bahamas Financial Centre, 4th Floor, P.O. Box N-4928, Shirley & Charlotte Streets, Nassau, Bahamas.

> 10.    Defendant and subsequent transferee Credit Suisse AG, Nassau Branch Wealth Management ("CS Wealth Management") entered into one or more subscription agreements with Fairfield Sentry, and received transfers from that fund. CS Wealth Management is a corporate entity organized under the laws of the Bahamas and has its registered address at P.O. Box N-4801, Shirley & Charlotte Streets, Nassau, New Providence, Bahamas. CS Wealth Management is a department of CS Nassau.

**ANSWER**:    Credit Suisse avers that CS Wealth Management is no longer a Defendant in this Action because Credit Suisse AG, Nassau Branch was substituted for CS Wealth Management under the Stipulation and Order in this adversary proceeding entered March 29, 2022, ECF 101, so no response to the allegations in Paragraph 10 is required.  To the extent any response is required, Credit Suisse denies the allegations in Paragraph 10, except admits that CS Wealth Management is or was a department of CS Nassau, and that certain affiliates of Credit Suisse entered into one or more subscription agreements with Fairfield Sentry and received transfers from that fund.

> 11.    Defendant and subsequent transferee Credit Suisse AG, Nassau Branch LATAM Investment Banking (*f/k/a* Credit Suisse Investment Bank (Bahamas) Limited) ("CS Investment") entered into one or more subscription agreements with Fairfield Sentry, and received transfers from that fund. CS Investment is a corporate entity organized under the laws of the Bahamas and has its registered address at P.O. Box N-3721, Shirley & Charlotte Streets, Nassau, New Providence, Bahamas. CS Investment is a department of CS Nassau.

**ANSWER**:    Credit Suisse avers that CS Investment is no longer a Defendant in this Action because Credit Suisse AG, Nassau Branch was substituted for CS Investment under the Stipulation and Order in this adversary proceeding entered March 29, 2022, ECF 101, so no response to the allegations in Paragraph 11 is required.  To the extent any response is required,

Credit Suisse denies the allegations in Paragraph 11, except admits that CS Investment is or was a

department of CS Nassau, and that certain affiliates of Credit Suisse entered into one or more

subscription agreements with Fairfield Sentry and received transfers from that fund.

> 12.    Defendant and subsequent transferee Credit Suisse Wealth
> Management Limited ("CS Management") entered into one or more
> subscription agreements with Fairfield Sentry, and received
> transfers from that fund. CS Management is a corporate entity
> organized under the laws of the Bahamas and has its registered
> address at P.O. Box N-4801, Shirley & Charlotte Streets, Nassau,
> New Providence, Bahamas. CS Wealth Management is a branch of
> CS Nassau.

**ANSWER**:    Credit Suisse avers that CS Management is no longer a Defendant in this

Action because Credit Suisse AG, Nassau Branch was substituted for CS Management under the

Stipulation and Order in this adversary proceeding entered March 29, 2022, ECF 101, so no

response to the allegations in Paragraph 12 is required.  To the extent any response is required,

Credit Suisse denies the allegations in Paragraph 12, except admits that CS Management entered

into one or more subscription agreements with Fairfield Sentry, and that certain affiliates of Credit

Suisse received transfers from Fairfield Sentry.

> 13.    Defendant and subsequent transferee Credit Suisse
> (Luxembourg) SA ("CS Luxembourg") entered into one or more
> subscription agreements with Fairfield Sentry and Fairfield Sigma,
> and received transfers from those funds. CS Luxembourg is a
> corporate entity organized under the laws of Luxembourg and has
> its registered address at 56, Grand Rue, BP 40, L-1660 Luxembourg.
> CS Luxembourg is a majority-owned subsidiary of CS AG.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 13, except (i) admits that

CS Luxembourg entered into one or more subscription agreements with Fairfield Sentry, that

certain affiliates of Credit Suisse entered into one or more subscription agreements with Fairfield

Sentry, and that certain affiliates of Credit Suisse received transfers from Fairfield Sentry and

Fairfield Sigma; and (ii) avers that CS Luxembourg is organized under the laws of the Grand

Duchy of Luxembourg and has its registered address at 5, rue Jean Monnet, L-2180 Luxembourg,

Grand Duchy of Luxembourg, and that CS Luxembourg is principally owned by CS AG and Credit

Suisse Group AG.

> 14.    Defendant and subsequent transferee Credit Suisse International Limited (*f/k/a* Credit Suisse First Boston International Limited) ("CS International") entered into one or more subscription agreements with Fairfield Sigma, and received transfers from that fund. CS International is a corporate entity organized under the laws of the United Kingdom and has its registered address at One Cabot Square, London, E14 4QJ, United Kingdom. CS International is a majority-owned subsidiary of CS AG.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 14, except (i) admits that

CS International is organized under the laws of the United Kingdom and has its registered address

at One Cabot Square, London, E14 4QJ, United Kingdom, that CS International entered into one

or more subscription agreements with Fairfield Sigma, and that it received transfers from that fund;

and (ii) avers that CS International is principally owned by CS AG and Credit Suisse Group AG.

> 15.    Defendant and subsequent transferee Credit Suisse Nominees (Guernsey) Limited ("CS Guernsey") entered into one or more subscription agreements with Fairfield Sentry, Fairfield Sigma, Fairfield Lambda and Kingate Global, and received transfers from those funds. CS Guernsey is a corporate entity organized under the laws of the Channel Islands and has its registered address at P.O. Box 368, Helvetia Court, Les Echelons, South Esplanade, St. Peter Port, Guernsey GYI 3YJ, Channel Islands. CS Guernsey is a wholly-owned subsidiary of CS AG.

**ANSWER**:    Credit Suisse avers that no response to the Kingate-related allegations is

required because the Trustee has voluntarily dismissed all Kingate-related claims; to the extent

that a response is required, Credit Suisse denies those allegations.  Credit Suisse denies the

remaining allegations in Paragraph 15, except (i) admits that CS Guernsey is a wholly-owned

subsidiary of CS AG, that CS Guernsey entered into one or more subscription agreements with

Fairfield Sentry and Fairfield Sigma, that certain affiliates of Credit Suisse entered into one or

more subscription agreements with Fairfield Lambda, and that certain affiliates of Credit Suisse

received transfers from Fairfield Sentry, Fairfield Sigma, and Fairfield Lambda; and (ii) avers that

CS Guernsey is organized under the laws of Guernsey and has its registered address at Helvetia

Court, Les Echelons, South Esplanade, St. Peter Port, Guernsey GYI 3YJ, Channel Islands.

> 16.     Defendant and subsequent transferee Credit Suisse London
> Nominees Limited ("CS London") entered into one or more
> subscription agreements with Fairfield Sentry, Fairfield Sigma,
> Fairfield Lambda and Kingate Global, and received transfers from
> those funds. Subscription documents indicate that CS London may
> have provided custody services at times to Defendants CS AG or
> Credit Suisse (UK) Limited. CS London is a corporate entity
> organized under the laws of the Channel Islands and has its
> registered address at Five Cabot Square, London, E14 4QR, United
> Kingdom. CS London is a wholly-owned subsidiary of CS AG.

**ANSWER**:     Credit Suisse avers that no response to the Kingate-related allegations is

required because the Trustee has voluntarily dismissed all Kingate-related claims; to the extent

that a response is required, Credit Suisse denies those allegations.   Credit Suisse denies the

remaining allegations in Paragraph 16, except (i) admits that CS London has its registered address

at Five Cabot Square, London, E14 4QR, United Kingdom and is an indirect wholly-owned

subsidiary of CS AG, that CS London entered into one or more subscription agreements with

Fairfield Sentry, Fairfield Sigma, and Fairfield Lambda, and that it received transfers from those

funds; (ii) denies knowledge or information sufficient to form a belief as to the truth of the

allegations in the second sentence of Paragraph 16; and (iii) avers that CS London is organized

under the laws of the United Kingdom.

> 17.     Defendant and subsequent transferee Credit Suisse (UK)
> Limited ("CS UK") may have received transfers from Fairfield
> Sentry, Fairfield Sigma, Fairfield Lambda or Kingate Global
> through CS London. CS UK is a corporate entity organized under
> the laws of the United Kingdom and has its registered address at
> Five Cabot Square, London, E14 4QR, United Kingdom. CS UK is
> a wholly-owned subsidiary of CS AG.

**ANSWER**:    Credit Suisse avers that no response to the Kingate-related allegations is required because the Trustee has voluntarily dismissed all Kingate-related claims; to the extent that a response is required, Credit Suisse denies those allegations.  Credit Suisse denies remaining the allegations in Paragraph 17, except (i) admits that CS UK is organized under the laws of the United Kingdom and is a wholly-owned subsidiary of CS AG; (ii) avers that the first sentence of Paragraph 17 includes no factual allegations, only speculation concerning what "may have" occurred, and thus no response is required (but to the extent a response is required, denies those allegations); and (iii) avers that CS UK has its registered address at One Cabot Square, London, E14 4QR, United Kingdom.

> 18.    Defendant and subsequent transferee Credit Suisse Securities (USA) LLC ("CS USA") entered into one or more subscription agreements with Kingate Euro, and received transfers from that fund. CS USA is a corporate entity organized under the laws of Delaware and has its registered address at Eleven Madison Avenue, New York, New York 10010. CS USA is a wholly-owned subsidiary of CS AG.

**ANSWER**:    CS USA was dismissed as a Defendant in this action as set forth in the Stipulation and Order in this adversary proceeding entered March 29, 2022, ECF 101, so no response to the allegations in Paragraph 18 is required.  To the extent any further response is required, Credit Suisse denies the allegations in Paragraph 18.

### III.    JURISDICTION AND VENUE

> 19.    The Trustee brings this adversary proceeding pursuant to his statutory authority and power to avoid and recover transfers under SIPA §§ 78fff(b), 78fff-1(a) and 78fff-2(c)(3); 11 U.S.C. §§ 101 *et. seq*. (the "Bankruptcy Code"), including Sections 105(a), 323(b), 544, 547, 548, 550(a), 551 and 704(a)(1); New York Debtor & Creditor Law ("NYDCL") §§ 273-279; and N.Y. C.P.L.R. 203(g) and 213(8).

**ANSWER**:    Credit Suisse avers that the allegations in Paragraph 19 state legal conclusions to which no response is required.

20.    This is an adversary proceeding brought in this Court, in which the main, underlying substantively-consolidated SIPA case, Adv. Pro. No. 08-01789 (BRL) (the "SIPA Case"), is pending. The SIPA Case was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange* Commission *v. Bernard L. Madoff Investment Securities LLC, et al.*, No. 08-CV-10791 (the "District Court Proceeding"). This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. § 78eee(b)(2)(A), (b)(4).

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 20 and denies that this Court has jurisdiction under 28 U.S.C. § 1334(b) and 15 U.S.C. § 78eee(b)(2)(A), (b)(4), except admits that the Trustee has brought this adversary proceeding in this Court, in which the SIPA Case is pending, and that the SIPA Case was originally brought in the District Court as the District Court Proceeding.  Credit Suisse avers that the United States District Court for the Southern District of New York has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and SIPA § 78eee(b)(2)(A)((iii) and (b)(4)) and this Court has jurisdiction over this adversary proceeding to the extent provided in SIPA § 78eee(b)(4).

21.    This Court has personal jurisdiction over Defendants pursuant to N.Y. C.P.L.R. 301 and 302 and Bankruptcy Rule 7004. Where a federal statute provides for nationwide service of process, as does Rule 7004, a federal court has personal jurisdiction over any defendant with minimum contacts with the United States. Defendants purposely availed themselves of the laws and protections of the United States and the State of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through Fairfield or Kingate, and then receiving transfers from Fairfield or Kingate funds (the subsequent transfers).

**ANSWER**:    Credit Suisse avers that no response to the Kingate-related allegations is required because the Trustee has voluntarily dismissed all Kingate-related claims; to the extent that a response is required, Credit Suisse denies those allegations.  Credit Suisse avers that the

remaining allegations in Paragraph 21 state legal conclusions to which no response is required.  To

the extent any response is required, Credit Suisse denies the allegations in Paragraph 21.

> 22.     Through their investments and receipt of transfers, Defendants: (i) knowingly accepted the rights, benefits and privileges of conducting business or transactions in the United States and New York; (ii) derived significant revenue from the United States and New York; and (iii) maintained minimum contacts or general business contacts with the United States and New York.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 22.

> 23.     CS AG, CS Nassau, CS Wealth Management, CS Investment, CS Management, CS Luxembourg, CS International, CS Guernsey, CS London and CS UK (together, the "Fairfield Investor Defendants") entered into one or more subscription agreements with Fairfield Sentry, Fairfield Sigma or Fairfield Lambda, agreeing not only that New York law would govern their dealings with the funds, but also that any related suit, action or proceeding could be brought in New York. The Fairfield Investor Defendants agreed to irrevocably submit to the jurisdiction of the New York courts and to forego any claim that the New York courts are an inconvenient forum.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 23, except admits that the

Fairfield Investor Defendants, other than those dismissed under the Stipulation and Order in this

adversary proceeding entered March 29, 2022, ECF 101, entered into subscription agreements with

the Fairfield Funds and respectfully refers the Court to those subscription agreements for their full

and complete contents.

> 24.     The Fairfield Investor Defendants certified that they were professional investors when they entered into the subscription agreements. The subscription agreements, as well as Fairfield private placement memoranda, also confirmed that substantially all of the funds' assets would be invested with New York-based BLMIS, a United States-registered broker-dealer that used a non-traditional options trading strategy described as a "split-strike conversion." These documents deemed BLMIS and its personnel, who were located in New York, "essential" to the Fairfield funds and their profitability. Fairfield Sentry instructed its subscribers to send subscription monies to a bank account in New York.

-12-

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 24, except admits that the Fairfield Investor Defendants, other than those dismissed under the Stipulation and Order in this adversary proceeding entered March 29, 2022, ECF 101, entered into subscription agreements with the Fairfield Funds.  Credit Suisse respectfully refers the Court to those subscription agreements for their full and correct contents.

> 25.    Upon information and belief, CS AG, CS Nassau, CS Guernsey, CS London, CS UK and CS USA (together, the "Kingate Investors") certified that they were professional investors when they entered into one or more subscription agreements with Kingate. The Kingate subscription agreements and associated information memoranda also confirmed that the funds would be managed by an unnamed "Investment Advisor" that was based in New York, invested "primarily" in the United States and used a non-traditional options trading strategy described as a "split-strike conversion" -- a reference to BLMIS. Kingate Global instructed its subscribers to send subscription monies to a bank account in New York.

**ANSWER**:    Because the Trustee has dismissed all claims against Credit Suisse relating to transfers from BLMIS to the Kingate Funds, as set forth in the Stipulation and Order in this adversary proceeding entered March 29, 2022, ECF 101, no response to the allegations in Paragraph 25 is required. To the extent any response is required, Credit Suisse denies the allegations in Paragraph 25.

> 26.    CS AG has strong ties to the United States and New York. Most significantly, CS AG maintains a branch at Eleven Madison Avenue, New York, New York 10010, where it holds approximately $75 million in assets. CS AG and its subsidiaries have thousands of employees in the United States and are regulated by several United States and New York agencies. CS AG files forms annually with the Securities and Exchange Commission, issues publicly registered debt securities that trade on the New York Stock Exchange, holds warrants in the United States, is licensed as a foreign banking organization by the New York Department of Financial Services and is subject to examination by the Federal Reserve Bank. Each of the other Defendants is a branch, department or subsidiary of CS AG.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 26, except admits that CS AG (i) maintains a branch at Eleven Madison Avenue, New York, New York 10010; (ii) is regulated by agencies of the governments of the United States and the state of New York; (iii) files forms with the Securities and Exchange Commission; (iv) has publicly registered debt securities and warrants in the United States; (v) is licensed by the New York Superintendent of Financial Services; (vi) is subject to examination by the Federal Reserve Bank; and (vii) that each of the other Defendants is or was a branch, department, or subsidiary of CS AG.

> 27.    In sum, this Court has personal jurisdiction over each Defendant based on these numerous and significant contacts with the United States and New York. Defendants should reasonably expect to be subject to jurisdiction here.

**ANSWER**:    Credit Suisse avers that the allegations in Paragraph 27 state legal conclusions to which no response is required.  To the extent a response is required, Credit Suisse denies the allegations in Paragraph 27.

> 28.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 28.  Credit Suisse does not consent to issuance or entry of final orders or judgments by the Bankruptcy Court and demands trial by jury of all issues that may be tried by a jury.

> 29.    Venue in this District is proper under 28 U.S.C. § 1409.

**ANSWER**:    Credit Suisse admits the allegations in Paragraph 29.

## IV.    BACKGROUND

### A.    THE MAIN CASE

> 30.    Madoff was arrested by federal agents on December 11, 2008 (the "Filing Date") for violation of the criminal securities laws, including for, among other things, securities fraud, investment adviser fraud and mail and wire fraud. At about the same time, the U.S. Securities and Exchange Commission (the "SEC") commenced

-14-

the District Court Proceeding against Madoff and BLMIS. The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS. The District Court Proceeding remains pending.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30, and therefore denies the allegations in Paragraph 30, except admits upon information and belief that Madoff was arrested on or around the Filing Date and that the SEC filed a complaint against BLMIS.

31.    The Honorable Louis L. Stanton of the District Court entered an order on December 12, 2008 appointing Lee S. Richards as receiver for the assets of BLMIS.

**ANSWER**:    Credit Suisse admits that on December 12, 2008 the District Court entered an Order in *S.E.C. v. Madoff*, Case No. 08-cv-10791, (S.D.N.Y. Dec. 12, 2008), and respectfully refers the Court to the District Court's Order for its full and correct contents.

32.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC") under SIPA § 78eee(a)(4)(B). The SIPC application alleged, among other things, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

**ANSWER**:    Credit Suisse admits that on December 15, 2008, the SEC filed an Application in *S.E.C. v. Madoff* and respectfully refers the Court to the SEC's Application for its full and correct contents.

33.    Judge Stanton granted the SIPC application and included in the order a SIPA decree (known as the "Protective Decree"), which, in pertinent part:

a.    removed the receiver and appointed the Trustee for the liquidation of the business of BLMIS under SIPA § 78eee(b)(3);

    b.   appointed Baker & Hostetler LLP as counsel[3] to the Trustee under SIPA § 78eee(b)(3); and

    c.   removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under SIPA § 78eee(b)(4).

**ANSWER**:   Credit Suisse admits that on December 15, 2008, the District Court entered an Order and Protective Decree in *S.E.C. v. Madoff* and respectfully refers the Court to the District Court's Order for its full and correct contents.

    34.   By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

**ANSWER**:   Credit Suisse (i) admits that on December 23, 2008 and February 4, 2009, this Court entered Orders in *SIPC v. BLMIS*, Adv. Pro. No. 08-01789, and respectfully refers the Court to said Orders for their full and correct contents; and (ii) avers that the allegations in the second sentence of Paragraph 34 state legal conclusions to which no response is required; to the extent a response is required, Credit Suisse denies those allegations.

    35.   At a plea hearing on March 12, 2009 in the criminal case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. Mar. 12, 2009) (Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." *Id.* at 23. He further admitted, "[A]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." Id. District Court Judge Denny Chin sentenced Madoff on June 29, 2009 to 150 years in prison.

---

[3] Footnote 2 alleges that this Court later entered an order, on July 16, 2009, also approving the retention of Windels Marx Lane & Mittendorf, LLP as special counsel to the Trustee. **ANSWER** to FN 2: Credit Suisse admits that on July 16, 2009, this Court entered an Order in *SIPC v. BLMIS*, Adv. Pro. No. 08-01789, and respectfully refers the Court to said Order for its full and correct contents.

**ANSWER**:    Credit Suisse admits that on March 12, 2009, a Plea Allocution was entered in *United States v. Madoff*, Case No. 09-CR-213, (DC) (S.D.N.Y. Mar. 12, 2009) (Docket No. 50), and respectfully refers the Court to the Plea Allocution for its full and correct contents.

> 36.    On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty in a separate criminal case to participating in and conspiring to perpetuate the Ponzi scheme. In the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), DiPascali admitted that, among other things, the Ponzi scheme had been ongoing at BLMIS since at least the 1980s. *Id.* at 46.

**ANSWER**:    Credit Suisse admits that on August 11, 2009, the District Court entered a Minute Entry in *United States v. DiPascali*, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), and respectfully refers the Court to the Minute Entry for its full and correct contents.

> 37.    Former BLMIS trader David Kugel pled guilty on November 21, 2011 to charges that he participated in the Ponzi scheme. *See* United States v. Kugel, Case No. 10-CR-00228 (LTS) (S.D.N.Y. Nov. 21, 2011). Kugel stated under oath that the scheme began in the early 1970s, and he admitted that he worked with two other BLMIS employees, JoAnn Crupi and Annette Bongiorno, to create false trades.

**ANSWER**:    Credit Suisse admits that on November 21, 2011, the District Court entered a Stipulation and Order in *United States v. Kugel*, Case No. 10-CR-00228 (LTS) (S.D.N.Y. Nov. 21, 2011), and respectfully refers the Court to the Stipulation and Order for its full and correct contents.

### B.    TRUSTEE'S POWERS AND STANDING

> 38.    The Trustee is charged under SIPA with recovering and paying out Customer Property to BLMIS customers, assessing claims and liquidating any other assets of BLMIS for the benefit of the estate and its creditors. The Trustee is in the process of marshaling BLMIS's assets, and this liquidation is well underway. However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years and lost. Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to

pursue recoveries, including those from individuals and entities that received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

**ANSWER**:    Credit Suisse avers that the allegations in Paragraph 38 state legal conclusions to which no response is required.  To the extent any response is required, Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38 and therefore denies such allegations.

39.    Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under § 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

**ANSWER**:    Credit Suisse avers that the allegations in Paragraph 39 state legal conclusions to which no response is required.

40.    Under SIPA §§ 78fff(b) and 78lll(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of Section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of Section 544 of the Bankruptcy Code.

**ANSWER**:    Credit Suisse avers that the allegations in Paragraph 40 state legal conclusions to which no response is required.

41.    The Trustee has standing to bring the claims in this adversary proceeding pursuant to his statutory authority and power to avoid and recover transfers under SIPA §§ 78fff(b), 78fff-1(a) and 78fff-2(c)(3); Bankruptcy Code Sections 105(a), 323(b), 544, 547, 548, 550(a), 551 and 704(a)(1); NYDCL §§ 273-279; and N.Y. C.P.L.R. 203(g) and 213(g).

**ANSWER**:    Credit Suisse avers that the allegations in Paragraph 41 state legal conclusions to which no response is required.

## V.    THE PONZI SCHEME

42.    BLMIS was founded by Madoff in 1959 and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, chief executive officer and sole owner, operated BLMIS together with several of his friends and family members. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). By virtue of that registration, BLMIS was a member of SIPC. BLMIS had three business units: market making, proprietary trading and the investment advisory business (the "IA Business").

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 42 and therefore denies those allegations.

43.    Outwardly, Madoff ascribed the consistent success of the IA Business to the so-called split-strike conversion strategy (the "SSC Strategy"). Under this strategy, Madoff purported to invest BLMIS customer funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100") -- a collection of the 100 largest publicly-traded companies. Madoff claimed that his basket of stocks would mimic the movement of the S&P 100. He also claimed he would carefully time purchases and sales to maximize value, and BLMIS customer funds would, intermittently, be out of the equity markets.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 43 and therefore denies those allegations.

44.    The second part of the SSC Strategy was a hedge of Madoff's stock purchases with options contracts. Those option contracts acted as a "collar" to limit both the potential gains and losses on the basket of stocks. Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 44 and therefore denies those allegations.

45.    Madoff told BLMIS customers that, when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual

funds holding Treasury bills. Madoff also told customers that he would enter and exit the market between six and ten times each year.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45 and therefore denies those allegations.

46.    BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious. Madoff admitted at his plea hearing that he never made the investments he promised clients, who believed they were invested with him in the SSC Strategy. He further admitted (as later confirmed by Frank DiPascali and David Kugel) that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts. In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform on which BLMIS reasonably could have traded securities. Instead, investors' funds were principally deposited into the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxx703.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46 and therefore denies those allegations.

47.    Madoff assured clients and regulators prior to his arrest that he purchased and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than through any listed exchange. Based on the Trustee's investigation to date, there is no evidence that the IA Business ever entered into any OTC options trades on behalf of IA Business account holders.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47 and therefore denies those allegations.

48.    For all relevant periods, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options; rather it was used to pay withdrawals and to make other avoidable transfers. Madoff also used his customers' investments to enrich himself and his associates and family.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48 and therefore denies those allegations.

49.    The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion of new investments to fulfill payment requests or withdrawals from other BLMIS accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49 and therefore denies those allegations.

50.    It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in a demand, investigation, the filing of a claim and disclosure of the fraud.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50 and therefore denies those allegations.

51.    Madoff's scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51 and therefore denies those allegations.

52.    It now appears based upon the Trustee's ongoing investigation that there were more than 8,000 customer accounts at BLMIS over the life of the scheme. BLMIS generated account statements in early December 2008 for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. By the time the Ponzi scheme came to light on December

11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

**ANSWER**:   Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 52 and therefore denies those allegations.

53.   Thus, at all relevant times, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of all transfers, BLMIS was left with insufficient capital.

**ANSWER**:   Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53 and therefore denies those allegations.

## VI.    THE TRANSFERS

54.   Fairfield Sentry, Kingate Global and Kingate Euro each received initial transfers of Customer Property from BLMIS. Some or all of those initial transfers were subsequently transferred to, or for the benefit of, Defendants either directly or through Fairfield Sigma or Fairfield Lambda as set forth in more detail below.

**ANSWER**:   Credit Suisse avers that no response to the Kingate-related allegations is required because the Trustee has voluntarily dismissed all Kingate-related claims; to the extent that a response is required, Credit Suisse denies those allegations.  Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 54 and therefore denies those allegations.

### A.    FAIRFIELD SENTRY

#### *The Fairfield Action*

55.   The Trustee filed an action against Fairfield Sentry, Fairfield Sigma, Fairfield Lambda and others in the Bankruptcy Court (*Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (BRL)) (the "Fairfield Action") where he sought to avoid and recover, among other things, initial transfers of Customer Property from BLMIS to Fairfield Sentry in the amount of approximately $3 billion, some of which was subsequently transferred to Fairfield Sigma and Fairfield Lambda. The Trustee incorporates by reference

the allegations in that action as if fully set forth here. A copy of the
Fairfield Amended Complaint (without exhibits) is attached here as
Exhibit A.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 55, except (a) admits that

the Trustee filed an action styled as *Picard v. Fairfield Sentry Limited, et al.*, Adv. Pro. No. 09-

01239 (the "Fairfield Action"), (b) denies knowledge or information sufficient to form a belief as

to which of the three complaints filed in the Fairfield Action the Trustee seeks to incorporate by

reference in the complaint in this action and therefore denies such allegations, (c) denies

knowledge or information sufficient to form a belief as to the truth of the allegations in each and

every paragraph of each of the three complaints filed in the Fairfield Action that allegedly supports

the claim that any initial transfers of Customer Property to Sentry are or were avoided or avoidable,

and (d) objects to the incorporation by reference of, and therefore does not answer, each and every

other paragraph and allegation in the three complaints in the Fairfield Action and to the inclusion

in this adversary proceeding of any issue implicated by any of the three complaints in the Fairfield

Action other than the issue of the avoidance or avoidability of the initial transfers of Customer

Property; Credit Suisse nevertheless reserves the right to rely on and introduce any allegations in

the referenced "Fairfield Amended Complaint" or its exhibits as opposing party admissions

admissible for the truth of their contents.  To the extent any further response is required, Credit

Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations

in Paragraph 55 and therefore denies such allegations.

56.    Pursuant to the orders dated June 7 and June 10, 2011, the
Bankruptcy Court approved a settlement among the Trustee,
Fairfield Sentry, Fairfield Sigma and Fairfield Lambda (the
"Settlement Agreement"). As part of the approved resolution, the
Bankruptcy Court entered consent judgments for the Trustee in the
amount of $3,054,000,000 against Fairfield Sentry, $752,300,000
against Fairfield Sigma and $52,900,000 against Fairfield Lambda.
The judgments represented the settled amounts of the Trustee's

"Avoiding Power Claims." *See* Settlement Agreement (without exhibits), attached here as Exhibit B, at p. 4, section 1.

**ANSWER**:    Credit Suisse admits that on June 7 and June 10, 2011, this Court entered

Orders in *Picard v. Fairfield Sentry Ltd*., Adv. Pro. No. 09-1239, and respectfully refers the Court

to those Orders and the Settlement Agreement for their full and correct contents.

### *Initial Transfers from BLMIS to Fairfield Sentry*

57.    During the six years preceding the Filing Date, BLMIS made transfers to Fairfield Sentry of $2,985,136,619 (the "Fairfield Sentry Six Year Initial Transfers"). The Fairfield Sentry Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under Sections 544, 550 and 551 of the Bankruptcy Code; §§ 273-279 of the NYDCL; and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as

to the truth of the allegations in the first sentence of Paragraph 57 and therefore denies such

allegations. The remaining allegations in Paragraph 57 state legal conclusions to which no

response is required.  To the extent that any further response is required, Credit Suisse denies the

allegations in Paragraph 57.

58.    The Fairfield Sentry Six Year Initial Transfers include $1,614,067,088 that BLMIS transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Initial Transfers"). The Fairfield Sentry Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under Sections 548, 550 and 551 of the Bankruptcy Code; §§ 273-279 of the NYDCL; and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as

to the truth of the allegations in the first sentence of Paragraph 58 and therefore denies such

allegations.  The remaining allegations in Paragraph 58 state legal conclusions to which no

response is required.  To the extent that any further response is required, Credit Suisse denies the

allegations in Paragraph 58.

> 59.    The Fairfield Sentry Two Year Initial Transfers include $1,134,628,244 that BLMIS transferred to Fairfield Sentry during the 90 days preceding the Filing Date (the "Fairfield Sentry Preference Period Initial Transfers"). The Fairfield Sentry Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under Sections 547, 550 and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as

to the truth of the allegations in the first sentence of Paragraph 59 and therefore denies such

allegations.  The remaining allegations in Paragraph 59 state legal conclusions to which no

response is required.  To the extent that any further response is required, Credit Suisse denies the

allegations in Paragraph 59.

> 60.    The Fairfield Sentry Six Year Initial Transfers, Fairfield Sentry Two Year Initial Transfers and Fairfield Sentry Preference Period Initial Transfers are collectively defined as the "Fairfield Sentry Initial Transfers." A chart setting forth the BLMIS accounts from which the Fairfield Sentry Initial Transfers were made is attached here as Exhibit C. A chart listing those transfers is attached here as Exhibit D.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 60 and therefore denies such allegations.

> ### *Subsequent Transfers from Fairfield Sentry to Defendants CS AG, CS Nassau, CS Wealth Management, CS Investment, CS Management, CS Luxembourg, CS Guernsey, CS London or CS UK*

> 61.    A portion of the Fairfield Sentry Initial Transfers was subsequently transferred to, or for the benefit of, CS AG, CS Nassau, CS Wealth Management, CS Investment, CS Management, CS Luxembourg, CS Guernsey, CS London or CS UK (the "CS Sentry Transferees") and is recoverable from them pursuant to Section 550 of the Bankruptcy Code and § 278 of the NYDCL.

Based on the Trustee's investigation to date, $256,629,645 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to, or for the benefit of, the CS Sentry Transferees (the "Fairfield Sentry Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry Subsequent Transfers is attached here as Exhibit E.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 61 and therefore denies such allegations, except admits that it or certain of its affiliates received funds from Fairfield Sentry, but denies that such funds were in the amounts identified in Exhibit E, and denies knowledge or information sufficient to form a belief as to whether any of such funds constitute subsequent transfers of Customer Property or of any other property transferred from BLMIS to Fairfield Sentry.

### *Subsequent Transfers from Fairfield Sentry to Fairfield Sigma and then to Defendants CS AG, CS Luxembourg, CS International, CS Guernsey, CS London or CS UK*

62.    A portion of the Fairfield Sentry Initial Transfers was subsequently transferred through Fairfield Sigma to, or for the benefit of, CS AG, CS Luxembourg, CS International, CS Guernsey, CS London or CS UK (the "CS Sigma Transferees") and is recoverable from them pursuant to Section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, $752,273,917 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Fairfield Sigma. A chart setting forth those transfers is attached here as Exhibit F. Fairfield Sigma, in turn, transferred the equivalent of $73,182,103 of the money it received from Fairfield Sentry to, or for the benefit of, the CS Sigma Transferees (the "Fairfield Sigma Subsequent Transfers"). A chart setting forth the presently known Fairfield Sigma Subsequent Transfers is attached here as Exhibit G.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as to the amounts identified in Exhibit F and to the truth of the allegations of the amounts, if any, transferred from BLMIS to Fairfield Sentry and from Fairfield Sentry to Fairfield Sigma and therefore denies such allegations.  Credit Suisse admits that it or certain of its affiliates received funds from Fairfield Sigma, but denies that such funds were in the amounts identified in Exhibit

G, and denies knowledge or information sufficient to form a belief as to whether any of such funds

constitute subsequent transfers of Customer Property or of any other property.

### *Subsequent Transfers from Fairfield Sentry to Fairfield Lambda and then to Defendants CS AG, CS Nassau, CS Guernsey, CS London or CS UK*

63.     A portion of the Fairfield Sentry Initial Transfers was subsequently transferred through Fairfield Lambda to, or for the benefit of, CS AG, CS Nassau, CS Guernsey, CS London or CS UK (the "CS Lambda Transferees") and is recoverable from them pursuant to Section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, $52,935,000 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Fairfield Lambda. A chart setting forth those transfers is attached here as Exhibit H. Fairfield Lambda, in turn, transferred the equivalent of $3,485,823 of the money it received from Fairfield Sentry to, or for the benefit of, the CS Lambda Transferees (the "Fairfield Lambda Subsequent Transfers"). A chart setting forth the presently known Fairfield Lambda Subsequent Transfers is attached as Exhibit I.

**ANSWER**:     Credit Suisse denies knowledge or information sufficient to form a belief as

to the amounts identified in Exhibit H and to the truth of the allegations of the amounts, if any,

transferred from BLMIS to Fairfield Sentry and from Fairfield Sentry to Fairfield Lambda and

therefore denies such allegations.  Credit Suisse admits that it or certain of its affiliates received

funds from Fairfield Lambda, but denies that such funds were in the amounts identified in Exhibit

I, and denies knowledge or information sufficient to form a belief as to whether any of such funds

constitute subsequent transfers of Customer Property or of any other property.

64.     The Trustee's investigation is ongoing, and he reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, Fairfield Sentry Subsequent Transfers, Fairfield Sigma Subsequent Transfers and Fairfield Lambda Subsequent Transfers; and (ii) seek recovery of any additional transfers.

**ANSWER**:    Credit Suisse avers that Paragraph 64 includes no factual allegations, and thus no response is required.  To the extent any response is required, Credit Suisse denies the allegations of Paragraph 64.

### B.    KINGATE

*The Kingate Action*

65.    The Trustee filed an action against Kingate Global, Kingate Euro and others in the Bankruptcy Court where he sought to avoid and recover initial transfers of Customer Property from BLMIS to Kingate Global and Kingate Euro (the "Kingate Action"). *See Picard v. Kingate Global Fund, Ltd., et al.*, Adv. Pro. No. 09-1161 (BRL); *see also* District Court Case Nos. 11- CV-07256 and 11-CV-07134. The Trustee incorporates by reference the allegations in that action as if fully set forth here. A copy of the Kingate Third Amended Complaint (without exhibits) is attached here as Exhibit J. The Kingate Action is still pending.

**ANSWER**:    Because the Trustee has dismissed all claims against Credit Suisse relating to transfers from BLMIS to the Kingate Funds, as set forth in the Stipulation and Order in this adversary proceeding entered March 29, 2022, ECF 101, no response to the allegations in Paragraph 65 is required.  To the extent any response is required, Credit Suisse denies the allegations of Paragraph 65.

*Initial Transfers from BLMIS to Kingate Global*

66.    During the six years preceding the Filing Date, BLMIS made transfers to Kingate Global of $398,704,065 (the "Kingate Global Six Year Initial Transfers"). The Kingate Global Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under Sections 544, 550 and 551 of the Bankruptcy Code; §§ 273-279 of the NYDCL; and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:    Because the Trustee has dismissed all claims against Credit Suisse relating to transfers from BLMIS to the Kingate Funds, as set forth in the Stipulation and Order in this adversary proceeding entered March 29, 2022, ECF 101, no response to the allegations in

Paragraph 66 is required.  To the extent any response is required, Credit Suisse denies the allegations of Paragraph 66.

> 67.    The Kingate Global Six Year Initial Transfers include $163,447,509 that BLMIS transferred to Kingate Global during the two years preceding the Filing Date (the "Kingate Global Two Year Initial Transfers"). The Kingate Global Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under Sections 548(a), 550 and 551 of the Bankruptcy Code; §§ 273-279 of the NYDCL; and applicable provisions of SIPA, particularly SIPA § 78fff- 2(c)(3).

**ANSWER**:    Because the Trustee has dismissed all claims against Credit Suisse relating to transfers from BLMIS to the Kingate Funds, as set forth in the Stipulation and Order in this adversary proceeding entered March 29, 2022, ECF 101, no response to the allegations in Paragraph 67 is required.  To the extent any response is required, Credit Suisse denies the allegations of Paragraph 67.

> 68.    The Kingate Global Two Year Initial Transfers include $101,753,145 that BLMIS transferred to Kingate Global during the 90 days preceding the Filing Date (the "Kingate Global Preference Period Initial Transfers"). The Kingate Global Preference Period Initial Transfers were and are Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under Sections 547, 550 and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:    Because the Trustee has dismissed all claims against Credit Suisse relating to transfers from BLMIS to the Kingate Funds, as set forth in the Stipulation and Order in this adversary proceeding entered March 29, 2022, ECF 101, no response to the allegations in Paragraph 68 is required.  To the extent any response is required, Credit Suisse denies the allegations of Paragraph 68.

> 69.    The Kingate Global Six Year Initial Transfers, Kingate Global Two Year Initial Transfers and Kingate Global Preference Period Initial Transfers are collectively defined as the "Kingate

Global Initial Transfers." A chart setting forth the BLMIS account from which the Kingate Global Initial Transfers were made is attached here as Exhibit K. A chart listing those transfers is attached here as Exhibit L.

**ANSWER**:    Because the Trustee has dismissed all claims against Credit Suisse relating to transfers from BLMIS to the Kingate Funds, as set forth in the Stipulation and Order in this adversary proceeding entered March 29, 2022, ECF 101, no response to the allegations in Paragraph 69 is required.  To the extent any response is required, Credit Suisse denies the allegations of Paragraph 69.

### *Subsequent Transfers from Kingate Global to CS AG, CS Nassau, CS Guernsey, CS London or CS UK*

70.    A portion of the Kingate Global Initial Transfers was subsequently transferred to, or for the benefit of, CS AG, CS Nassau, CS Guernsey, CS London or CS UK (the "CS Global Transferees") and is recoverable from them pursuant to Section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation, $37,428,974 of the money transferred from BLMIS to Kingate Global was subsequently transferred by Kingate Global to, or for the benefit of, the CS Global Transferees (the "Kingate Global Subsequent Transfers"). A chart setting forth the presently known Kingate Global Subsequent Transfers is attached here as Exhibit M.

**ANSWER**:    Because the Trustee has dismissed all claims against Credit Suisse relating to transfers from BLMIS to the Kingate Funds, as set forth in the Stipulation and Order in this adversary proceeding entered March 29, 2022, ECF 101, no response to the allegations in Paragraph 70 is required.  To the extent any response is required, Credit Suisse denies the allegations of Paragraph 70.

### *Initial Transfers from BLMIS to Kingate Euro*

71.    During the six years preceding the Filing Date, BLMIS made transfers to Kingate Euro of $475,485,759 (the "Kingate Euro Six Year Initial Transfers"). The Kingate Euro Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are

recoverable under Sections 544, 550 and 551 of the Bankruptcy
Code; §§ 273-279 of the NYDCL; and applicable provisions of
SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:    Because the Trustee has dismissed all claims against Credit Suisse relating

to transfers from BLMIS to the Kingate Funds, as set forth in the Stipulation and Order in this

adversary proceeding entered March 29, 2022, ECF 101, no response to the allegations in

Paragraph 71 is required.    To the extent any response is required, Credit Suisse denies the

allegations of Paragraph 71.

72.    The Kingate Euro Six Year Initial Transfers include
$248,979,674 that BLMIS transferred to Kingate Euro during the
two years preceding the Filing Date (the "Kingate Euro Two Year
Initial Transfers"). The Kingate Euro Two Year Initial Transfers
were and continue to be Customer Property within the meaning of
SIPA § 78*lll*(4) and are avoidable, should be avoided, and are
recoverable under Sections 548(a), 550 and 551 of the Bankruptcy
Code; §§ 273-279 of the NYDCL; and applicable provisions of
SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:    Because the Trustee has dismissed all claims against Credit Suisse relating

to transfers from BLMIS to the Kingate Funds, as set forth in the Stipulation and Order in this

adversary proceeding entered March 29, 2022, ECF 101, no response to the allegations in

Paragraph 72 is required.    To the extent any response is required, Credit Suisse denies the

allegations of Paragraph 72.

73.    The Kingate Euro Two Year Initial Transfers include
$155,606,833 that BLMIS transferred to Kingate Euro during the 90
days preceding the Filing Date (the "Kingate Euro Preference Period
Initial Transfers"). The Kingate Euro Preference Period Initial
Transfers were and are Customer Property within the meaning of
SIPA § 78*lll*(4) and are avoidable, should be avoided, and are
recoverable under Sections 547, 550 and 551 of the Bankruptcy
Code and applicable provisions of SIPA, particularly SIPA § 78fff-
2(c)(3).

**ANSWER**:    Because the Trustee has dismissed all claims against Credit Suisse relating

to transfers from BLMIS to the Kingate Funds, as set forth in the Stipulation and Order in this

adversary proceeding entered March 29, 2022, ECF 101, no response to the allegations in
Paragraph 73 is required. To the extent any response is required, Credit Suisse denies the
allegations of Paragraph 73.

> 74.    The Kingate Euro Six Year Initial Transfers, Kingate Euro
> Two Year Initial Transfers and Kingate Euro Preference Period
> Initial Transfers are collectively defined as the "Kingate Euro Initial
> Transfers." A chart setting forth the BLMIS account from which the
> Kingate Euro Initial Transfers were made is attached here as Exhibit
> N. A chart listing those transfers is attached here as Exhibit O.

**ANSWER**:    Because the Trustee has dismissed all claims against Credit Suisse relating

to transfers from BLMIS to the Kingate Funds, as set forth in the Stipulation and Order in this

adversary proceeding entered March 29, 2022, ECF 101, no response to the allegations in

Paragraph 74 is required. To the extent any response is required, Credit Suisse denies the

allegations of Paragraph 74.

### *Subsequent Transfers from Kingate Euro to CS AG or CS USA*

> 75.    A portion of the Kingate Euro Initial Transfers was
> subsequently transferred to, or for the benefit of, CS AG or CS USA
> (the "CS Euro Transferees") and is recoverable from them pursuant
> to Section 550 of the Bankruptcy Code and § 278 of the NYDCL.
> Based on the Trustee's investigation, $4,742,438 of the money
> transferred from BLMIS to Kingate Euro was subsequently
> transferred by Kingate Euro to, or for the benefit of, the CS Euro
> Transferees (the "Kingate Euro Subsequent Transfers"). A chart
> setting forth the presently known Kingate Euro Subsequent
> Transfers is attached here as Exhibit P.

**ANSWER**:    Because the Trustee has dismissed all claims against Credit Suisse relating

to transfers from BLMIS to the Kingate Funds, as set forth in the Stipulation and Order in this

adversary proceeding entered March 29, 2022, ECF 101, no response to the allegations in

Paragraph 75 is required. To the extent any response is required, Credit Suisse denies the

allegations of Paragraph 75.

76.     The Trustee's investigation is ongoing, and he reserves the right to: (i) supplement the information on the Kingate Global Initial Transfers, Kingate Global Subsequent Transfers, Kingate Euro Initial Transfers and Kingate Euro Subsequent Transfers; and (ii) seek recovery of any additional transfers.

**ANSWER**:     Because the Trustee has dismissed all claims against Credit Suisse relating to transfers from BLMIS to the Kingate Funds, as set forth in the Stipulation and Order in this adversary proceeding entered March 29, 2022, ECF 101, no response to the allegations in Paragraph 76 is required.  Credit Suisse avers that Paragraph 76 includes no factual allegations, and thus no response is required.  To the extent any response is required, Credit Suisse denies the allegations of Paragraph 76.

### COUNT ONE
### RECOVERY OF FAIRFIELD SENTRY SUBSEQUENT TRANSFERS–
### 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

**(CS AG, CS Nassau, CS Wealth Management, CS Investment, CS Management, CS Luxembourg, CS Guernsey, CS London and CS UK)**

77.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten here.

**ANSWER**:     Credit Suisse incorporates by reference its responses to the allegations in each of the previous paragraphs of this Complaint as if fully rewritten in this paragraph.

78.     The CS Sentry Transferees received the Fairfield Sentry Subsequent Transfers, which totaled at least $256,629,645 and are recoverable by the Trustee under Section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

**ANSWER**:     Credit Suisse avers that the allegations in Paragraph 78 state legal conclusions to which no response is required.  To the extent any further response is required, Credit Suisse denies the allegations in Paragraph 78.

79.    Each of the Fairfield Sentry Subsequent Transfers was made to, or for the benefit of, a CS Sentry Transferee.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 79.

80.    The CS Sentry Transferees are immediate or mediate transferees of the Fairfield Sentry Initial Transfers, which are avoidable and recoverable as set forth in the Fairfield Action.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 80.

81.    As a result of the foregoing, pursuant to Sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the CS Sentry Transferees recovering the Fairfield Sentry Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 81.

## COUNT TWO
## RECOVERY OF FAIRFIELD SIGMA SUBSEQUENT TRANSFERS–
## 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

### (CS AG, CS Luxembourg, CS International, CS Guernsey, CS London and CS UK)

82.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten here.

**ANSWER**:    Credit Suisse incorporates by reference its responses to the allegations in each of the previous paragraphs of this Complaint as if fully rewritten in this paragraph.

83.    The CS Sigma Transferees received the Fairfield Sigma Subsequent Transfers, which totaled at least $73,182,103 and are recoverable by the Trustee under Section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

**ANSWER**:    Credit Suisse avers that the allegations in Paragraph 83 state legal conclusions to which no response is required.  To the extent any further response is required, Credit Suisse denies the allegations in Paragraph 83.

-34-

84.     Each of the Fairfield Sigma Subsequent Transfers was made to, or for the benefit of, a CS Sigma Transferee.

**ANSWER**:     Credit Suisse denies the allegations in Paragraph 84.

85.     The CS Sigma Transferees are immediate or mediate transferees of the Fairfield Sentry Initial Transfers, which are avoidable and recoverable as set forth in the Fairfield Action.

**ANSWER**:     Credit Suisse denies the allegations in Paragraph 85.

86.     As a result of the foregoing, pursuant to Sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the CS Sigma Transferees recovering the Fairfield Sigma Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER**:     Credit Suisse denies the allegations in Paragraph 86.

## COUNT THREE
## RECOVERY OF FAIRFIELD LAMBDA SUBSEQUENT TRANSFERS–
## 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

### (CS AG, CS Nassau, CS Guernsey, CS London and CS UK)

87.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten here.

**ANSWER**:     Credit Suisse incorporates by reference its responses to the allegations in each of the previous paragraphs of this Complaint as if fully rewritten in this paragraph.

88.     The CS Lambda Transferees received the Fairfield Lambda Subsequent Transfers, which totaled at least $3,485,823 and are recoverable by the Trustee under Section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

**ANSWER**:     Credit Suisse avers that the allegations in Paragraph 88 state legal conclusions to which no response is required.  To the extent any further response is required, Credit Suisse denies the allegations in Paragraph 88.

89.    Each of the Fairfield Lambda Subsequent Transfers was made to, or for the benefit of, a CS Lambda Transferee.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 89.

90.    The CS Lambda Transferees are immediate or mediate transferees of the Fairfield Sentry Initial Transfers, which are avoidable and recoverable as set forth in the Fairfield Action.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 90.

91.    As a result of the foregoing, pursuant to Sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the CS Lambda Transferees recovering the Fairfield Lambda Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 91.

## COUNT FOUR
## RECOVERY OF KINGATE GLOBAL SUBSEQUENT TRANSFERS–11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

### (CS AG, CS Nassau, CS Guernsey, CS London and CS UK

92.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

**ANSWER**:    Credit Suisse incorporates by reference its responses to the allegations in each of the previous paragraphs of this Complaint as if fully rewritten in this paragraph.

93.    The CS Global Transferees received the Kingate Global Subsequent Transfers, which totaled at least $37,428,974 and are recoverable by the Trustee under Section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

**ANSWER**:    Claims arising from BLMIS transfers to Kingate Funds have been dismissed by the Trustee, and therefore no response is required to those allegations.  To the extent any response is required, Credit Suisse denies the allegations in Paragraph 93.

-36-

94.    Each of the Kingate Global Subsequent Transfers was made to, or for the benefit of, a CS Global Transferee.

**ANSWER**:    Claims arising from BLMIS transfers to Kingate Funds have been dismissed by the Trustee, and therefore no response is required to those allegations.  To the extent any response is required, Credit Suisse denies the allegations in Paragraph 94.

95.    The CS Global Transferees are immediate or mediate transferees of the Kingate Global Initial Transfers, which are avoidable, should be avoided, and are recoverable as set forth in the Kingate Action.

**ANSWER**:    Claims arising from BLMIS transfers to Kingate Funds have been dismissed by the Trustee, and therefore no response is required to those allegations.  To the extent any response is required, Credit Suisse denies the allegations in Paragraph 95.

96.    As a result of the foregoing, pursuant to Sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the CS Global Transferees recovering the Kingate Global Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER**:    Claims arising from BLMIS transfers to Kingate Funds have been dismissed by the Trustee, and therefore no response is required to those allegations.  To the extent any response is required, Credit Suisse denies the allegations in Paragraph 96.

**COUNT FIVE**
**RECOVERY OF KINGATE EURO SUBSEQUENT**
**TRANSFERS–11 U.S.C. §§ 550 AND 551 AND NYDCL § 278**

**(CS AG and CS USA)**

97.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

**ANSWER**:    Credit Suisse incorporates by reference its responses to the allegations in each of the previous paragraphs of this Complaint as if fully rewritten in this paragraph.

98.    The CS Euro Transferees received the Kingate Euro Subsequent Transfers, which totaled at least $4,472,438 and are recoverable by the Trustee under Section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

**ANSWER**:    Claims arising from BLMIS transfers to Kingate Funds have been dismissed by the Trustee, and therefore no response is required to those allegations.  To the extent any response is required, Credit Suisse denies the allegations in Paragraph 98.

99.    Each of the Kingate Euro Subsequent Transfers was made to, or for the benefit of, a CS Euro Transferee.

**ANSWER**:    Claims arising from BLMIS transfers to Kingate Funds have been dismissed by the Trustee, and therefore no response is required to those allegations.  To the extent any response is required, Credit Suisse denies the allegations in Paragraph 99.

100.    The CS Euro Transferees are immediate or mediate transferees of the Kingate Euro Initial Transfers, which are avoidable, should be avoided, and are recoverable as set forth in the Kingate Action.

**ANSWER**:    Claims arising from BLMIS transfers to Kingate Funds have been dismissed by the Trustee, and therefore no response is required to those allegations.  To the extent any response is required, Credit Suisse denies the allegations in Paragraph 100.

101.    As a result of the foregoing, pursuant to Sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the CS Euro Transferees recovering the Kingate Euro Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER**:    Claims arising from BLMIS transfers to Kingate Funds have been dismissed by the Trustee, and therefore no response is required to those allegations.  To the extent any response is required, Credit Suisse denies the allegations in Paragraph 101.

## RESPONSE TO REQUEST FOR RELIEF

The allegations contained in Plaintiff's request for relief are legal conclusions to which no response is required. To the extent a response is required, Credit Suisse denies the allegations and denies that Plaintiff is entitled to the relief requested.

## DEFENSES

### First Defense — Counts One, Two, and Three

### (Failure to State A Claim for Relief)

Each Count of the Complaint fails to state a claim upon which relief can be granted, including for each of the reasons stated in Credit Suisse's Motion To Dismiss the Trustee's Complaint, filed on June 15, 2022 in this adversary proceeding, ECF No. 106, and proceedings thereon.

### Second Defense — Counts Four and Five

### (Dismissed Claims)

The Trustee's claims are barred to the extent they have been dismissed by the Trustee or the Court or are based on allegations that have been dismissed by the Trustee or the Court, including any claims relating to transfers to or from the Kingate Funds, as set forth in the Stipulation and Order in this adversary proceeding entered March 29, 2022, ECF No. 101.

### Third Defense – Count One

### (Mere Conduit/Lack of Dominion or Control—Fairfield Sentry Subsequent Transfers)

The Trustee's claims are barred under the "mere conduit" defense, because Credit Suisse was not a transferee of the Fairfield Sentry Subsequent Transfers. *See Finley v. Alexander (In re Finley)*, 130 F.3d 52, 57 (2d Cir. 1997). To the extent Credit Suisse received any Fairfield Sentry Subsequent Transfers, Credit Suisse (a) received each Fairfield Sentry Subsequent Transfers in

good faith, in a nominee capacity, and for the account and benefit of one or more of its customers, (b) did not have dominion or control or the right to assert dominion or control over the Fairfield Sentry Subsequent Transfers or the proceeds thereof or to use the Fairfield Sentry Subsequent Transfers or the proceeds thereof for its own purposes, (c) was a mere conduit for its customers, and (d) was obligated to credit the Fairfield Sentry Subsequent Transfers to the account and for the benefit of one or more of its customers, who alone had the right to assert dominion and control over the Fairfield Sentry Subsequent Transfers received by Credit Suisse for their benefit.

## Fourth Defense – Count Two

### (Mere Conduit/Lack of Dominion or Control – Fairfield Sigma Subsequent Transfers)

The Trustee's claims are barred under the "mere conduit" defense, because Credit Suisse was not a transferee of the Fairfield Sigma Subsequent Transfers. *See Finley v. Alexander (In re Finley)*, 130 F.3d 52, 57 (2d Cir. 1997).   To the extent Credit Suisse received any Fairfield Sigma Subsequent Transfers, Credit Suisse (a) received each Fairfield Sigma Subsequent Transfers in good faith, in a nominee capacity, and for the account and benefit of one or more of its customers, (b) did not have dominion or control or the right to assert dominion or control over the Fairfield Sigma Subsequent Transfers or the proceeds thereof or to use the Fairfield Sentry Subsequent Transfers or the proceeds thereof for its own purposes, (c) was a mere conduit for its customers, and (d) was obligated to credit the Fairfield Sigma Subsequent Transfers to the account and for the benefit of one or more of its customers, who alone had the right to assert dominion and control over the Fairfield Sigma Subsequent Transfers received by Credit Suisse for their benefit.

## Fifth Defense – Count Three

### (Mere Conduit/Lack of Dominion or Control – Fairfield Lambda Subsequent Transfers)

The Trustee's claims are barred under the "mere conduit" defense, because Credit Suisse was not a transferee of the Fairfield Lambda Subsequent Transfers. *See Finley v. Alexander (In re Finley)*, 130 F.3d 52, 57 (2d Cir. 1997). To the extent Credit Suisse received any Fairfield Lambda Subsequent Transfers, Credit Suisse (a) received each Fairfield Lambda Subsequent Transfers in good faith, in a nominee capacity, and for the account and benefit of one or more of its customers, (b) did not have dominion or control or the right to assert dominion or control over the Fairfield Lambda Subsequent Transfers or the proceeds thereof or to use the Fairfield Sentry Subsequent Transfers or the proceeds thereof for its own purposes, (c) was a mere conduit for its customers, and (d) was obligated to credit the Fairfield Lambda Subsequent Transfers to the account and for the benefit of one or more of its customers, who alone had the right to assert dominion and control over the Fairfield Lambda Subsequent Transfers received by Credit Suisse for their benefit.

## Sixth Defense—Count One

## (Section 550(b)—Value, Good Faith, Without Knowledge of Voidability: Fairfield Sentry Subsequent Transfers)

To the extent, if any, that Credit Suisse received any Fairfield Sentry Subsequent Transfers, such Fairfield Sentry Subsequent Transfers may not be recovered because Credit Suisse took such Fairfield Sentry Subsequent Transfers for value and in good faith and without knowledge of the voidability of the Fairfield Initial Transfers within the meaning of 11 U.S.C. § 550(b).

*Value*. To the extent, if any, that Credit Suisse received any Fairfield Sentry Subsequent Transfers, Credit Suisse took the Fairfield Sentry Subsequent Transfers in exchange for Fairfield Sentry's redemption of its own shares from Credit Suisse and therefore took for value.

*Good Faith.* To the extent, if any, that Credit Suisse received any Fairfield Sentry Subsequent Transfers, at the time each Fairfield Sentry Subsequent Transfers was made, Credit

Suisse was aware only of the publicly available information about Fairfield Sentry and about BLMIS, including that some investment professionals had raised concerns about the transparency of BLMIS and the lack of separation between its asset management, brokerage, and custodian administration. On or before the date of the last of the Fairfield Sentry Subsequent Transfers (if any), Credit Suisse did not have access to non-public information regarding BLMIS. Credit Suisse handled its Fairfield Sentry account consistently with other industry professionals based on publicly known information about Fairfield Sentry and about BLMIS. To the best of its knowledge, none of the communications Credit Suisse had with Fairfield Sentry or its directors, officers, or employees or with BLMIS or any of its officers or employees on or before the date of the last of the Fairfield Sentry Subsequent Transfers (if any) revealed or suggested that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Fairfield Sentry or its directors, officers, or employees suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

To the best of Credit Suisse's knowledge, at no time on or before the date of the last Fairfield Sentry Subsequent Transfers (if any) was any director, officer, employee, agent, or consultant of Credit Suisse aware that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Fairfield Sentry or its directors, officers, employees, agents, or consultants knew or suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

The Fairfield Sentry Subsequent Transfers (if any) did not have a fraudulent purpose but were routine transfers in exchange for redemption of shares in the Fairfield Sentry. A reasonable person with the facts in Credit Suisse's possession when each of the Fairfield Sentry Subsequent Transfers (if any) occurred would not have been on inquiry notice of any fraudulent purpose behind such Fairfield Sentry Subsequent Transfers nor would those facts have led such a person to conduct further inquiry into whether there was a fraudulent purpose to such Fairfield Sentry Subsequent

Transfers or the Fairfield Initial Transfers or whether BLMIS was trading securities or was a fraud or a Ponzi scheme.

A diligent inquiry by Credit Suisse would not have discovered that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Other entities with greater investigatory tools and resources than Credit Suisse, and with more access to BLMIS personnel and documentation than Credit Suisse, investigated BLMIS but failed to uncover that it was a Ponzi scheme before December 2008, including the SEC, which began an investigation into BLMIS in 2006 but could not determine BLMIS's fraudulent purpose. Credit Suisse did not have the capability of discovering what United States government regulators could not and would not have discovered as the fraudulent purpose of the Fairfield Initial Transfers or, if there were any fraudulent purpose of the Fairfield Sentry Subsequent Transfers (if any), of such fraudulent purpose, and as an entity without privity with BLMIS or Madoff before the opening, did not have any reasonable ability to conduct a diligent investigation into the BLMIS, including into its IA business, that could have led to a discovery of the fraudulent purpose of the Fairfield Initial Transfers.

*Without Knowledge of the Voidability of the Fairfield Initial Transfers.* Credit Suisse did not have knowledge of the voidability of the Fairfield Initial Transfers when it received each of the Fairfield Sentry Subsequent Transfers (if any).

### Seventh Defense—Count Two

### (Section 550(b)—Value, Good Faith, Without Knowledge of Voidability:

### Fairfield Sigma Subsequent Transfers)

To the extent, if any, that Credit Suisse received any Fairfield Sigma Subsequent Transfers, the property received by Credit Suisse as part of the Fairfield Sigma Subsequent Transfers may not be recovered because Credit Suisse took such Fairfield Sigma Subsequent Transfers for value,

in good faith, and without knowledge of the voidability of the Fairfield Initial Transfers within the meaning of 11 U.S.C. § 550(b).

*Value.* To the extent, if any, that Credit Suisse received any Fairfield Sigma Subsequent Transfers, Credit Suisse took such Fairfield Sigma Subsequent Transfers in exchange for Sigma's redemption of its own shares from Credit Suisse and therefore took for value.

*Good Faith.* To the extent, if any, that Credit Suisse received any Fairfield Sigma Subsequent Transfers, at the time each of the Fairfield Sigma Subsequent Transfers was made, Credit Suisse was aware only of the publicly available information about Fairfield Sentry and Fairfield Sigma and about BLMIS, including that some investment professionals had raised concerns about the transparency of BLMIS and the lack of separation between its asset management, brokerage, and custodian administration. On or before the date of the last of the Fairfield Sigma Subsequent Transfers (if any), Credit Suisse did not have access to non-public information regarding BLMIS. Credit Suisse handled its Fairfield Sigma account consistently with other industry professionals based on publicly known information about Fairfield Sigma and about BLMIS. To the best of its knowledge, none of the communications Credit Suisse had with Fairfield Sigma or its directors, officers, or employees or with BLMIS or any of its officers or employees on or before the date of the last of the Fairfield Sigma Subsequent Transfers (if any) revealed or suggested that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Fairfield Sigma or its directors, officers, or employees suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

To the best of Credit Suisse's knowledge, at no time on or before the date of the last Fairfield Sigma Subsequent Transfers (if any) was any director, officer, employee, agent, or consultant of Credit Suisse aware that BLMIS was not trading securities or was a fraud or a Ponzi

scheme or that Fairfield Sigma or its directors, officers, employees, agents, or consultants knew or suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

The Fairfield Sigma Subsequent Transfers (if any) did not have a fraudulent purpose but were routine transfers in exchange for redemption of shares in the Fairfield Sigma. A reasonable person with the facts in Credit Suisse's possession when each of the Fairfield Sigma Subsequent Transfers (if any) occurred would not have been on inquiry notice of any fraudulent purpose behind such Fairfield Sigma Subsequent Transfers nor would those facts have led such a person to conduct further inquiry into whether there was a fraudulent purpose to such Fairfield Sigma Subsequent Transfers or the Fairfield Initial Transfers or whether BLMIS was trading securities or was a fraud or a Ponzi scheme.

A diligent inquiry by Credit Suisse would not have discovered that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Other entities with greater investigatory tools and resources than Credit Suisse, and with more access to BLMIS personnel and documentation than Credit Suisse, investigated BLMIS but failed to uncover that it was a Ponzi scheme before December 2008, including the SEC, which began an investigation into BLMIS in 2006 but could not determine BLMIS's fraudulent purpose. Credit Suisse did not have the capability of discovering what United States government regulators could not and would not have discovered as the fraudulent purpose of the Fairfield Initial Transfers or, if there were any fraudulent purpose of the Fairfield Sigma Subsequent Transfers (if any), of such fraudulent purpose, and as an entity without privity with BLMIS or Madoff before the opening, did not have any reasonable ability to conduct a diligent investigation into the BLMIS, including into its IA business, that could have led to a discovery of the fraudulent purpose of the Fairfield Initial Transfers.

*Without Knowledge of the Voidability of the Fairfield Initial Transfers.* Credit Suisse did not have knowledge of the voidability of the Fairfield Initial Transfers when it received each of the Fairfield Sigma Subsequent Transfers (if any).

### Eight Defense—Count Three

### (Section 550(b)—Value, Good Faith, Without Knowledge of Voidability:

### Fairfield Lambda Subsequent Transfers)

To the extent, if any, that Credit Suisse received any Fairfield Lambda Subsequent Transfers, the property received by Credit Suisse as part of the Fairfield Lambda Subsequent Transfers may not be recovered because Credit Suisse took such Fairfield Lambda Subsequent Transfers for value, in good faith, and without knowledge of the voidability of the Fairfield Initial Transfers within the meaning of 11 U.S.C. § 550(b).

*Value.* To the extent, if any, that Credit Suisse received any Fairfield Lambda Subsequent Transfers, Credit Suisse took such Fairfield Lambda Subsequent Transfers in exchange for Lambda's redemption of its own shares from Credit Suisse and therefore took for value.

*Good Faith.* To the extent, if any, that Credit Suisse received any Fairfield Lambda Subsequent Transfers, at the time each of the Fairfield Lambda Subsequent Transfers was made, Credit Suisse was aware only of the publicly available information about Fairfield Sentry and Fairfield Lambda and about BLMIS, including that some investment professionals had raised concerns about the transparency of BLMIS and the lack of separation between its asset management, brokerage, and custodian administration. On or before the date of the last of the Fairfield Lambda Subsequent Transfers (if any), Credit Suisse did not have access to non-public information regarding BLMIS. Credit Suisse handled its Fairfield Lambda account consistently with other industry professionals based on publicly known information about Fairfield Lambda

-46-

and about BLMIS.  To the best of its knowledge, none of the communications Credit Suisse had

with Fairfield Lambda or its directors, officers, or employees or with BLMIS or any of its officers

or employees on or before the date of the last of the Fairfield Lambda Subsequent Transfers (if

any) revealed or suggested that BLMIS was not trading securities or was a fraud or a Ponzi scheme

or that Fairfield Lambda or its directors, officers, or employees suspected that BLMIS was not

trading securities or was a fraud or a Ponzi scheme.

        To the best of Credit Suisse's knowledge, at no time on or before the date of the last

Fairfield Lambda Subsequent Transfers (if any) was any director, officer, employee, agent, or

consultant of Credit Suisse aware that BLMIS was not trading securities or was a fraud or a Ponzi

scheme or that Fairfield Lambda or its directors, officers, employees, agents, or consultants knew

or suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

        The Fairfield Lambda Subsequent Transfers (if any) did not have a fraudulent purpose but

were routine transfers in exchange for redemption of shares in the Fairfield Lambda.  A reasonable

person with the facts in Credit Suisse's possession when each of the Fairfield Lambda Subsequent

Transfers (if any) occurred would not have been on inquiry notice of any fraudulent purpose behind

such Fairfield Lambda Subsequent Transfers nor would those facts have led such a person to

conduct further inquiry into whether there was a fraudulent purpose to such Fairfield Lambda

Subsequent Transfers or the Fairfield Initial Transfers or whether BLMIS was trading securities

or was a fraud or a Ponzi scheme.

        A diligent inquiry by Credit Suisse would not have discovered that BLMIS was not trading

securities or was a fraud or a Ponzi scheme.  Other entities with greater investigatory tools and

resources than Credit Suisse, and with more access to BLMIS personnel and documentation than

Credit Suisse, investigated BLMIS but failed to uncover that it was a Ponzi scheme before

December 2008, including the SEC, which began an investigation into BLMIS in 2006 but could

not determine BLMIS's fraudulent purpose.   Credit Suisse did not have the capability of

discovering what United States government regulators could not and would not have discovered

as the fraudulent purpose of the Fairfield Initial Transfers or, if there were any fraudulent purpose

of the Fairfield Lambda Subsequent Transfers (if any), of such fraudulent purpose, and as an entity

without privity with BLMIS or Madoff before the opening, did not have any reasonable ability to

conduct a diligent investigation into the BLMIS, including into its IA business, that could have led

to a discovery of the fraudulent purpose of the Fairfield Initial Transfers.

*Without Knowledge of the Voidability of the Fairfield Initial Transfers.* Credit Suisse did

not have knowledge of the voidability of the Fairfield Initial Transfers when it received each of

the Fairfield Lambda Subsequent Transfers (if any).

### Ninth Defense—Counts One, Two, and Three

### (Non-Avoidability of Fairfield Initial Transfers Under Section 546(e)—

### Settlement Payment)

Under Bankruptcy Code section 546(e), the Fairfield Six-Year Transfers (excluding the

Fairfield Two-Year Transfers) are not avoidable because they were settlement payments, as

defined in Bankruptcy Code section 101 or 741, made before the commencement of the case by or

to (or for the benefit of) BLMIS, which was then a stockbroker, or Fairfield Sentry, which was

then a financial institution or financial participant and, on information and belief, did not have

actual knowledge that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

Because the Fairfield Six-Year Transfers (excluding the Fairfield Two-Year Transfers) are not

avoidable, property received by Credit Suisse (if any) as part of the Fairfield Six-Year Transfers

(excluding the Fairfield Two-Year Transfers) is not recoverable from Credit Suisse.  In addition,

at the time of the transfer from Fairfield Sentry to Credit Suisse, Suisse had no actual knowledge that BLMIS was not trading securities or that it was a fraud or a Ponzi scheme.

**Tenth Defense—Counts One, Two, and Three**

**(Non-Avoidability of Fairfield Initial Transfers Under Section 546(e)—Securities Contract)**

Under Bankruptcy Code section 546(e), the Fairfield Six-Year Transfers (excluding the Fairfield Two-Year Transfers) were not avoided and are not avoidable because they were transfers made before the commencement of the case by or to (or for the benefit of) BLMIS, which was then a stockbroker, or Fairfield Sentry, which was then a financial institution or financial participant, and, on information and belief, did not have actual knowledge that BLMIS was not trading securities or was a fraud or a Ponzi scheme, in connection with a securities contract, as defined in Bankruptcy Code section 741(7), between BLMIS and Fairfield Sentry or between Fairfield Sentry and Credit Suisse. Because the Fairfield Six-Year Transfers (excluding the Fairfield Two-Year Transfers) are not avoidable, property received by Credit Suisse (if any) as part of the Fairfield Six-Year Transfers (excluding the Fairfield Two-Year Transfers) is not recoverable from Credit Suisse. In addition, at the time of the transfer (if any) from Fairfield Sentry to Credit Suisse, Credit Suisse had no actual knowledge that BLMIS was not trading securities or that it was a fraud or a Ponzi scheme.

**Eleventh Defense—Counts One, Two, and Three**

**(Not Customer Property—Fairfield Initial Transfers)**

The property, if any, that Credit Suisse received from the Fairfield Funds was not Customer Property, or proceeds of Customer Property, that BLMIS transferred to the Fairfield Funds, and therefore the property is not recoverable by the Trustee from Credit Suisse.

-49-

**Twelfth Defense—Counts One, Two, and Three**

**(Proceeds Not Recoverable—Fairfield Initial Transfers)**

In the alternative, to the extent that the property, if any, that Credit Suisse received from the Fairfield Funds were proceeds of Customer Property or other property that BLMIS transferred to the Fairfield Funds, it is not recoverable by the Trustee from Credit Suisse under Bankruptcy Code section 550(a)(2).

**Thirteenth Affirmative Defense—Counts One, Two, and Three**

**(Section 550(d)—Single Satisfaction Fairfield Six-Year Transfers)**

Under Bankruptcy Code section 550(d), the trustee may not recover any subsequent transfer from Credit Suisse to the extent he has recovered from the Fairfield Funds or any other immediate or mediate transferee the amount of the avoided initial transfer that included the customer property that the trustee alleges Credit Suisse received.

**Fourteenth Affirmative Defense—Counts One, Two, and Three**

**(Extraterritoriality)**

The Trustee's recovery from Credit Suisse of any transfer from the Fairfield Funds constitute an impermissible extraterritorial application of U.S. law.

**Fifteenth Affirmative Defense—Counts One, Two, and Three**

**(Comity)**

The Trustee's recovery from Credit Suisse of any transfer from the Fairfield Funds would violate principles of comity.

## DEMAND FOR JURY TRIAL

Credit Suisse does not consent to issuance or entry of final orders or judgments by the Bankruptcy Court and, under Rule 38(b) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 9015 of the Federal Rules of Bankruptcy Procedure, demands trial by jury before the District Court of all issues that may be tried by a jury.

**WHEREFORE**, Credit Suisse requests that this Court dismiss the Complaint with prejudice, award Credit Suisse its attorneys' fees, costs and disbursements incurred in connection with this adversary proceeding, and grant Credit Suisse such other and further relief as the Court deems just and proper.

Dated:  January 20, 2023
       New York, New York

**O'MELVENY & MYERS LLP**

By: */s/ William J. Sushon*
    William J. Sushon
    Daniel S. Shamah
    Kayla N. Haran
    7 Times Square
    New York, New York 10036
    Telephone: (212) 326-2000
    Facsimile: (212) 326-2061
    wsushon@omm.com
    dshamah@omm.com
    kharan@omm.com

*Attorneys for Credit Suisse AG; Credit Suisse AG, Nassau Branch; Credit Suisse (Luxembourg) SA; Credit Suisse International; Credit Suisse Nominees (Guernsey) Limited; Credit Suisse London Nominees Limited; and Credit Suisse (UK) Limited*