**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff, | |
| Plaintiff, | Adv. Pro. No. 12-01676 (BRL) |
| v. | |
| CREDIT SUISSE AG, as successor-in-interest to Clariden Leu AG and Bank Leu AG; | **ANSWER TO FIRST AMENDED COMPLAINT AND JURY DEMAND** |
| Defendant. | |

Defendant Credit Suisse AG ("Credit Suisse"), the named defendant as successor-in-interest to Clariden Leu AG (f/k/a Clariden Bank AG) ("Clariden Leu") and Bank Leu AG ("Bank Leu"), by its undersigned attorneys, O'Melveny & Myers LLP hereby answers the First Amended Complaint ("FAC"). This Answer is based on information reasonably known to Credit Suisse as of January 20, 2023. Credit's Suisse's investigation is ongoing, and as such, Credit Suisse expressly reserves the right to seek to amend this Answer as may be necessary.

## PRELIMINARY STATEMENT

As set forth in the Stipulation and Order entered on April 14, 2022, ECF No. 84, the Trustee has dismissed all claims against Credit Suisse relating to transfers from BLMIS to the Kingate Funds. As such, Credit Suisse denies any allegation in the FAC regarding the dismissed transfers and that the Trustee is entitled to recover these dismissed Kingate transfers.

Except as otherwise expressly stated herein, Credit Suisse denies each and every allegation in the FAC, including, without limitation, any allegations contained in the FAC's preamble, headings and subheadings (which are included herein for convenience and organizational purposes only), or footnotes, and denies any liability to the Trustee and to any party on whose behalf the Trustee seeks recovery. If Credit Suisse inadvertently fails to respond to any allegations of the FAC, they are denied.

Pursuant to Rule 8(b)(6) of the Federal Rules of Civil Procedure, averments in the FAC to which no responsive pleading is required shall be deemed denied.

## RESPONSES TO SPECIFIC ALLEGATIONS

### I.    NATURE OF THE ACTION[1]

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS Customer Property[2] that was stolen as part of the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff") and others.

---

[1] Credit Suisse deems the section headings in the FAC not to constitute allegations of the FAC. To the extent any section headings are allegations, Credit Suisse admits or denies them consistent with its responses to the allegations contained in the numbered paragraphs of the FAC.

[2] Footnote 1 alleges that SIPA § 78*lll*(4) defines "Customer Property" as cash and securities at any time received, acquired, or held by, or for the account of, a debtor from, or for, the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted. **ANSWER** to FN 1: Credit Suisse admits that SIPA § 78*lll*(4) sets forth a definition of "Customer Property" and respectfully refers the Court to the cited statute for its full and correct contents.

**ANSWER**:    Credit Suisse admits that the Trustee asserts that this action is part of an

effort to recover customer property lost in Bernard L. Madoff's Ponzi scheme.

> 2.    The Trustee seeks to recover from Credit Suisse subsequent
> transfers of Customer Property from BLMIS feeder funds Fairfield
> Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited
> ("Fairfield Sigma") and Fairfield Lambda Limited ("Fairfield
> Lambda") (together, the "Fairfield Funds") and Kingate Global
> Fund, Ltd. ("Kingate") totaling $49,135,288. Charts setting forth the
> subsequent transfers are attached here as Exhibits E, G, I and M.

**ANSWER**:    Credit Suisse avers that no response to the Kingate-related allegations is

required because the Trustee has voluntarily dismissed all Kingate-related claims; to the extent

that a response is required, Credit Suisse denies those allegations.    Credit Suisse denies the

remaining allegations in Paragraph 2, except admits that it or certain of its affiliates received funds

from the Fairfield Funds, but denies that such funds were in the amounts identified in Exhibits E,

G, and I, and denies knowledge or information sufficient to form a belief as to whether any of such

funds constitute subsequent transfers of Customer Property or of any other property.

> 3.    The subsequent transfers followed avoidable initial transfers
> from BLMIS to the Fairfield Funds or Kingate. The Trustee has filed
> separate actions to avoid the initial transfers, namely *Picard v.
> Fairfield Sentry Ltd., et al*., Adv. Pro. No. 09-01239 (BRL) as to the
> Fairfield Funds and *Picard v. Kingate Global Fund, Ltd., et al*., Adv.
> Pro. No. 09-01161 (BRL), Case Nos. 11-CV-07256 (JSR) and 11-
> CV-07134 (JSR) as to Kingate. The Fairfield and Kingate
> complaints are attached here as Exhibits A and J, respectively.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 3, except admits that the

Trustee has filed separate actions to avoid the alleged "initial transfers," and respectfully refers the

Court to the complaints referenced in Paragraph 3 for their full and correct contents.

## II.    THE TRANSFEREES AND CREDIT SUISSE

> 4.    Initial transferee Fairfield Sentry Limited ("Fairfield
> Sentry") maintained customer accounts at BLMIS and was one of
> BLMIS' largest feeder funds. Fairfield Sentry invested all or

substantially all of its assets with BLMIS and was managed by New York-based parent Fairfield Greenwich Group ("FGG").

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 4.

5.    Fairfield Sigma and Fairfield Lambda, affiliates of Fairfield Sentry, acted as foreign currency feeder funds, facilitating Euro (Fairfield Sigma) or Swiss Franc (Fairfield Lambda) investments with BLMIS. Each fund invested 100% of its assets with Fairfield Sentry and was a subsequent transferee of BLMIS transfers by virtue of this relationship. Fairfield Sigma and Fairfield Lambda were both managed by FGG.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 5.

6.    Initial transferee Kingate maintained a customer account at BLMIS and was a large BLMIS feeder fund. Kingate invested all or substantially all of its assets with BLMIS.

**ANSWER**:    Credit Suisse avers that no response is required to the allegations of Paragraph 6 because all Kingate-related allegations have been dismissed.  To the extent a response is required, Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6.

7.    The Fairfield Funds and Kingate are currently in liquidation.

**ANSWER**:    Credit Suisse avers that no response to the Kingate-related allegations is required because the Trustee has voluntarily dismissed all Kingate-related claims.  To the extent a response to the Kingate-related allegation is required, and as to the Fairfield-related allegation, Credit Suisse admits the allegations in Paragraph 7.

8.    Clariden Leu, formerly a wholly-owned subsidiary of Credit Suisse, entered into one or more subscription agreements with Fairfield Sentry, Fairfield Sigma and Fairfield Lambda and received subsequent transfers from the feeder funds. Clariden Leu was an *aktiengesellschaft* organized under the laws of Switzerland, and its

registered address was Bahnhofstrasse 32, CH-8001, Zurich, Switzerland.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 8, except (i) admits that Clariden Leu was an *aktiengesellschaft* organized under the laws of Switzerland and had its registered address at Bahnhofstrasse 32, CH-8001, Zurich, Switzerland, that Clariden Leu subscribed in Fairfield Sentry, Fairfield Sigma, and Fairfield Lambda through Citco Bank Nederland N.V. ("Citco"), and that it received transfers from those funds; and (ii) avers that, prior to Clariden Leu's merger into Credit Suisse AG on April 2, 2012, Clariden Leu was a wholly-owned subsidiary of Credit Suisse Group AG.

> 9.    Bank Leu, another formerly wholly-owned subsidiary of Credit Suisse, entered into one or more subscription agreements with Fairfield Sentry, Fairfield Sigma and Kingate and received subsequent transfers from the feeder funds. Bank Leu was an *aktiengesellschaft* organized under the laws of Switzerland until it merged with Clariden Bank AG and others in January 2007. Clariden Leu, the renamed entity after the merger, then became Bank Leu's successor- in-interest.

**ANSWER**:    Credit Suisse avers that no response to the Kingate-related allegations is required because the Trustee has voluntarily dismissed all Kingate-related claims; to the extent that a response is required, Credit Suisse denies those allegations.  Credit Suisse avers that the allegations in the last sentence of Paragraph 9 state legal conclusions to which no response is required; to the extent a response is required, Credit Suisse denies those allegations.  Credit Suisse denies the remaining allegations in Paragraph 9, except (i) admits that Bank Leu was an *aktiengesellschaft* organized under the laws of Switzerland until it merged with Clariden Bank AG and others in January 2007, and that certain affiliates of Clariden Leu subscribed in Fairfield Sentry and Fairfield Sigma and received transfers from those funds; and (ii) avers that, prior to Clariden Leu's merger into Credit Suisse AG on April 2, 2012, Clariden Leu was a wholly-owned subsidiary of Credit Suisse Group AG.

10.     Credit Suisse became Clariden Leu's and Bank Leu's successor-in-interest when it legally merged with Clariden Leu on April 2, 2012 (the "Merger"), acquiring all of Clariden Leu's assets and liabilities and assuming all of Clariden Leu's rights and obligations. Credit Suisse is an *aktiengesellschaft* organized under the laws of Switzerland, and its registered address is Paradeplatz 8, 8070 Zurich, Switzerland.

**ANSWER**:     Credit Suisse avers that the allegations in the first sentence of Paragraph 10 state legal conclusions to which no response is required, to the extent a response is required, Credit Suisse denies those allegations, except admits that Clariden Leu was merged out of existence as of April 2, 2012 into Credit Suisse.  Credit Suisse admits the remaining allegations in Paragraph 10.

## III.    JURISDICTION AND VENUE

11.     The Trustee brings this adversary proceeding pursuant to his statutory authority and power to avoid and recover transfers under SIPA §§ 78fff(b), 78fff-1(a) and 78fff-2(c)(3); 11 U.S.C. §§ 101 *et. seq.* (the "Bankruptcy Code"), including Sections 105(a), 323(b), 544, 548, 550(a), 551 and 704(a)(1); New York Debtor & Creditor Law ("NYDCL") §§ 273-279 and N.Y. C.P.L.R. 203(g) and 213(8).

**ANSWER**:     Credit Suisse avers that the allegations in Paragraph 11 state legal conclusions to which no response is required.

12.     The main, underlying substantively-consolidated SIPA case, Adv. Pro. No. 08-01789 (BRL) (the "SIPA Case"), is pending in this Court. The SIPA Case was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, Case No. 08-CV-10791 (LLS) (the "District Court Proceeding").

**ANSWER**:     Credit Suisse admits the allegations in Paragraph 12.

13.   This Court has jurisdiction over the instant adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. § 78eee(b)(2)(A), (b)(4).

**ANSWER**:   Credit Suisse denies the allegations in Paragraph 13 and denies that this

Court has jurisdiction under 28 U.S.C. § 1334(b) and 15 U.S.C. § 78eee(b)(2)(A), (b)(4).  Credit

Suisse avers that the United States District Court for the Southern District of New York has

jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and SIPA §

78eee(b)(2)(A)((iii) and (b)(4)) and this Court has jurisdiction over this adversary proceeding to

the extent provided in SIPA § 78eee(b)(4).

14.   This Court has personal jurisdiction over Credit Suisse pursuant to N.Y. C.P.L.R. 301 and 302 and Bankruptcy Rule 7004. Where a federal statute provides for nationwide service of process, as does Rule 7004, a federal court has personal jurisdiction over any defendant with minimum contacts with the United States.

**ANSWER**:   Credit Suisse avers that the allegations in Paragraph 14 state legal

conclusions to which no response is required.  To the extent any response is required, Credit Suisse

denies the allegations in Paragraph 14.

15.   Credit Suisse has the required minimum contacts with the United States under Bankruptcy Rule 7004 either through its own contacts or business dealings, or contacts or business dealings that can be attributed or imputed to it as a successor-in-interest to Clariden Leu and Bank Leu.

**ANSWER**:   Credit Suisse avers that the allegations in Paragraph 15 state legal

conclusions to which no response is required.

16.   Credit Suisse, through the attributable or imputable acts of Clariden Leu or Bank Leu, purposely availed itself of the laws and protections of the United States and the State of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through the Fairfield Funds or Kingate, and then receiving transfers from these funds (the subsequent transfers).

**ANSWER**:    Credit Suisse avers that no response to the Kingate-related allegations is required because the Trustee has voluntarily dismissed all Kingate-related claims; to the extent that a response is required, Credit Suisse denies those allegations.  Credit Suisse avers that the remaining allegations in Paragraph 16 state legal conclusions to which no response is required.  To the extent any response is required, Credit Suisse denies the allegations in Paragraph 16.

> 17.    Through Clariden Leu's or Bank Leu's Fairfield Fund or Kingate investments and redemptions, Credit Suisse: (i) knowingly accepted the rights, benefits and privileges of conducting business or transactions in the United States and New York; (ii) derived significant revenue from the United States and New York; and (iii) maintained minimum contacts or general business contacts with the United States and New York.

**ANSWER**:    Credit Suisse avers that no response to the Kingate-related allegations is required because the Trustee has voluntarily dismissed all Kingate-related claims; to the extent that a response is required, Credit Suisse denies those allegations.  Credit Suisse denies the remaining allegations in Paragraph 17.

> 18.    Clariden Leu and Bank Leu entered into one or more subscription agreements with the Fairfield Funds agreeing not only that New York law would govern their dealings, but also that any related suit, action or proceeding would be brought in New York. Thus, they agreed to irrevocably submit to the jurisdiction of the New York courts and to forego any claim that the New York courts are an inconvenient forum.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 18, except admits that Clariden Leu and certain of its affiliates subscribed in the Fairfield Funds through Citco and respectfully refers the Court to those subscription agreements for their full and complete contents.

> 19.    Clariden Leu and Bank Leu certified that they were professional investors when they entered into subscription agreements with the Fairfield Funds. The subscription agreements, as well as Fairfield Fund private placement memoranda, also confirmed that substantially all of the funds' assets would be invested with New York-based BLMIS, a United States-registered broker-dealer that used a non-traditional options trading strategy

described as a "split-strike conversion." These documents deemed BLMIS and its personnel, who were located in New York, "essential" to the Fairfield Funds and their profitability. Fairfield Sentry instructed its subscribers to send subscription monies to a bank account in New York. Clariden Leu also communicated regularly with FGG account representatives located in New York City.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 19, except admits that

Clariden Leu and certain of its affiliates subscribed in the Fairfield Funds through Citco and

respectfully refers the Court to those subscription agreements for their full and correct contents.

20.    Bank Leu entered into one or more subscription agreements with Kingate, and sent subscription monies to a New York bank account, as Kingate instructed. The Kingate subscription agreements and associated information memoranda did not mention New York-based BLMIS or Madoff by name, but the memoranda confirmed that the fund would have an "Investment Advisor" that was based in New York, invested "primarily" in the United States and used a non-traditional "split-strike conversion" trading strategy -- a reference to BLMIS and Madoff.

**ANSWER**:    Credit Suisse avers that no response to the Kingate-related allegations is

required because the Trustee has voluntarily dismissed all Kingate-related claims; to the extent

that a response is required, Credit Suisse denies those allegations.

21.    Credit Suisse has other strong ties to the United States and New York apart from the attributable or imputable contacts specific to the causes of action in this First Amended Complaint. Credit Suisse maintains a branch at Eleven Madison Avenue, New York, New York 10010 and, along with its subsidiaries, has thousands of employees in the United States and is regulated by several United States and New York agencies. Credit Suisse files forms annually with the U.S. Securities and Exchange Commission (the "SEC"), issues publicly registered debt securities that trade on the New York Stock Exchange, holds warrants in the United States, is licensed as a foreign banking organization by the New York Department of Financial Services and is subject to examination by the Federal Reserve Bank.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 21, except admits that

Credit Suisse (i) maintains a branch at Eleven Madison Avenue, New York, New York 10010, that

it is regulated by agencies of the governments of the United States and the state of New York;

(ii) files forms with the Securities and Exchange Commission; (iii) has issued publicly registered

debt securities that trade on the New York Stock Exchange; (iv) holds warrants in the United

States; (v) is licensed as a foreign banking organization by the New York Department of Financial

Services; and (vi) is subject to examination by the Federal Reserve Bank.

> 22.    Clariden Leu has also filed forms with the SEC.

**ANSWER**:    Credit Suisse admits the allegation in Paragraph 22.

> 23.    This Court has personal jurisdiction over Credit Suisse based
> on all of these specific and general contacts with the United States
> and New York. Credit Suisse should reasonably expect to be subject
> to jurisdiction based on these contacts.

**ANSWER**:    Credit Suisse avers that the allegations in Paragraph 23 state legal

conclusions to which no response is required.  To the extent a response is required, Credit Suisse

denies the allegations in Paragraph 23.

> 24.    This is a core proceeding pursuant to 28 U.S.C.
> § 157(b)(2)(A), (F), (H), and (O).

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 24.  Credit Suisse does not

consent to issuance or entry of final orders or judgments by the Bankruptcy Court and demands

trial by jury of all issues that may be tried by a jury.

> 25.    Pursuant to Local Bankruptcy Rule 7008-1, the Trustee
> consents to the entry of final orders or judgment by this Court if it
> is determined that this Court, absent consent of the parties, cannot
> enter final orders or judgment consistent with Article III of the
> United States Constitution.

**ANSWER**:    Credit Suisse avers that Paragraph 25 includes no factual allegations, and

thus no response is required.  To the extent a response is required, Credit Suisse denies knowledge

or information sufficient to form a belief as to the truth of the allegations in Paragraph 25.

26.     Venue in this District is proper under 28 U.S.C. § 1409.

**ANSWER**:    Credit Suisse admits the allegations in Paragraph 26.

IV.    **BACKGROUND**

A.    **THE MAIN CASE**

27.     Madoff was arrested by federal agents on December 11,
2008 (the "Filing Date") for violation of the criminal securities laws,
including for, among other things, securities fraud, investment
adviser fraud and mail and wire fraud. At about the same time, the
SEC commenced the District Court Proceeding against Madoff and
BLMIS. The SEC complaint alleges that Madoff and BLMIS
engaged in fraud through the investment adviser activities of
BLMIS. The District Court Proceeding is still pending.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 27, and therefore denies the allegations in Paragraph

27, except admits upon information and belief that Madoff was arrested on or around the Filing

Date and that the SEC filed a complaint against BLMIS.

28.     The Honorable Louis L. Stanton of the District Court entered
an order on December 12, 2008 appointing Lee S. RichardVs as
receiver for the assets of BLMIS.

**ANSWER**:    Credit Suisse admits that on December 12, 2008 the District Court entered

an Order in *S.E.C. v. Madoff*, Case No. 08-cv-10791, (S.D.N.Y. Dec. 12, 2008), and respectfully

refers the Court to the District Court's Order for its full and correct contents.

29.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the
SEC consented to a combination of its own action with an
application of the Securities Investor Protection Corporation
("SIPC") under SIPA § 78eee(a)(4)(B). The SIPC application
alleged, among other things, that BLMIS wasV not able to meet its
obligations to securities customers as they came due and,
accordingly, its customers needed the protections afforded by SIPA.

**ANSWER**:    Credit Suisse admits that on December 15, 2008, the SEC filed an

Application in *S.E.C. v. Madoff* and respectfully refers the Court to the SEC's Application for its

full and correct contents.

> 30.    Judge Stanton granted the SIPC application and included in the order a SIPA decree (known as the "Protective Decree"), which, in pertinent part:
>
> > a.    removed the receiver and appointed the Trustee for the liquidation of the business of BLMIS under SIPA § 78eee(b)(3);
> >
> > b.    appointed Baker & Hostetler LLP as counsel[3] to the Trustee under SIPA § 78eee(b)(3); and
> >
> > c.    removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under SIPA § 78eee(b)(4).

**ANSWER**:    Credit Suisse admits that on December 15, 2008, the District Court entered

an Order and Protective Decree in *S.E.C. v. Madoff* and respectfully refers the Court to the District

Court's Order for its full and correct contents.

> 31.    By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

**ANSWER**:    Credit Suisse (i) admits that on December 23, 2008 and February 4, 2009,

this Court entered Orders in *SIPC v. BLMIS*, Adv. Pro. No. 08-01789, and respectfully refers the

Court to said Orders for their full and correct contents; and (ii) avers that the allegations in the

second sentence of Paragraph 31 state legal conclusions to which no response is required; to the

extent a response is required, Credit Suisse denies those allegations.

---

[3] Footnote 2 alleges that this Court later entered an order, on July 16, 2009, also approving the retention of Windels Marx Lane & Mittendorf, LLP as special counsel to the Trustee.  **ANSWER** to FN 2: Credit Suisse admits that on July 16, 2009, this Court entered an Order in *SIPC v. BLMIS*, Adv. Pro. No. 08-01789, and respectfully refers the Court to said Order for its full and correct contents.

32.    At a plea hearing on March 12, 2009 in the criminal case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. Mar. 12, 2009) (Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." *Id*. at 23. He further admitted, "[A]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id*. Then District Court Judge Denny Chin sentenced Madoff on June 29, 2009 to 150 years in prison.

**ANSWER**:    Credit Suisse admits that on March 12, 2009, a Plea Allocution was entered

in *United States v. Madoff*, Case No. 09-CR-213, (DC) (S.D.N.Y. Mar. 12, 2009) (Docket No. 50),

and respectfully refers the Court to the Plea Allocution for its full and correct contents.

33.    Former BLMIS employee Frank DiPascali is awaiting sentencing after pleading guilty on August 11, 2009 to participating in and conspiring to perpetuate the Ponzi scheme. In the case, entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), DiPascali admitted that, among other things, the Ponzi scheme had been ongoing at BLMIS since at least the 1980s. *Id*. at 46.

**ANSWER**:    Credit Suisse admits that on August 11, 2009, the District Court entered a

Minute Entry in *United States v. DiPascali*, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009),

and respectfully refers the Court to the Minute Entry for its full and correct contents.

34.    Former BLMIS trader David Kugel is awaiting sentencing after pleading guilty on November 21, 2011 to charges that he participated in the Ponzi scheme. *See United States v. Kugel*, Case No. 10-CR-00228 (LTS) (S.D.N.Y. Nov. 21, 2011). Kugel stated under oath that the scheme began in the early 1970s, and he admitted that he worked with two other BLMIS employees, JoAnn Crupi and Annette Bongiorno, to create false trades.

**ANSWER**:    Credit Suisse admits that on November 21, 2011, the District Court entered

a Stipulation and Order in *United States v. Kugel*, Case No. 10-CR-00228 (LTS) (S.D.N.Y. Nov.

21, 2011), and respectfully refers the Court to the Stipulation and Order for its full and correct

contents.

### B.    TRUSTEE'S POWERS AND STANDING

35.    The Trustee has a responsibility under SIPA to recover and pay out Customer Property to BLMIS customers, assess claims and liquidate any other assets of BLMIS for the benefit of the estate and its creditors. The Trustee is in the process of marshaling BLMIS's assets, and this liquidation is well underway. However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years and lost. Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recoveries, including those from individuals and entities that received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi scheme. Absent the instant case and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

**ANSWER**:    Credit Suisse avers that the allegations in Paragraph 35 state legal conclusions to which no response is required. To the extent any further response is required, Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35 and therefore denies such allegations.

36.    Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under § 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

**ANSWER**:    Credit Suisse avers that the allegations in Paragraph 36 state legal conclusions to which no response is required.

37.    Under SIPA §§ 78fff(b) and 78lll(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of Section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of Section 544 of the Bankruptcy Code.

**ANSWER**:    Credit Suisse avers that the allegations in Paragraph 37 state legal conclusions to which no response is required.

38.     The Trustee has standing to bring the claims in this adversary proceeding pursuant to his statutory authority and power to avoid and recover transfers under SIPA §§ 78fff(b), 78fff-1(a) and 78fff-2(c)(3); Bankruptcy Code Sections 105(a), 323(b), 544, 547, 548, 550(a), 551 and 704(a)(1); NYDCL §§ 273-279; and N.Y. C.P.L.R. 203(g) and 213(8).

**ANSWER**:    Credit Suisse avers that the allegations in Paragraph 38 state legal

conclusions to which no response is required.

## V.    THE PONZI SCHEME

39.     BLMIS was founded by Madoff in 1959 and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, chief executive officer and sole owner, operated BLMIS together with several of his friends and family members. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). By virtue of that registration, BLMIS was a member of SIPC. BLMIS had three business units: market making, proprietary trading and the investment advisory business (the "IA Business").

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 39 and therefore denies those allegations.

40.     Outwardly, Madoff ascribed the consistent success of the IA Business to the so-called split-strike conversion strategy (the "SSC Strategy"). Under this strategy, Madoff purported to invest BLMIS customer funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100") -- a collection of the 100 largest publicly-traded companies. Madoff claimed that his basket of stocks would mimic the movement of the S&P 100. He also claimed he would carefully time purchases and sales to maximize value, and BLMIS customer funds would, intermittently, be out of the equity markets.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 40 and therefore denies those allegations.

41.     The second part of the SSC Strategy was a hedge of Madoff's stock purchases with options contracts. Those option contracts acted as a "collar" to limit both the potential gains and losses on the basket of stocks. Madoff purported to use proceeds

from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 41 and therefore denies those allegations.

42.    Madoff told BLMIS customers that, when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual funds holding Treasury bills. Madoff also told customers that he would enter and exit the market between six and ten times each year.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 42 and therefore denies those allegations.

43.    BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious. Madoff admitted at his plea hearing that he never made the investments he promised clients, who believed they were invested with him in the SSC Strategy. He further admitted (as later confirmed by Frank DiPascali and David Kugel) that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts. In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform on which BLMIS reasonably could have traded securities. Instead, investors' funds were principally deposited into the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxx703.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 43 and therefore denies those allegations.

44.    Madoff assured clients and regulators prior to his arrest that he purchased and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than through any listed exchange. Based on the Trustee's investigation to date, there is no

evidence that the IA Business ever entered into any OTC options trades on behalf of IA Business account holders.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44 and therefore denies those allegations.

45.    For all relevant periods, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options; rather it was used to pay withdrawals and to make other avoidable transfers. Madoff also used his customers' investments to enrich himself and his associates and family.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45 and therefore denies those allegations.

46.    The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion of new investments to fulfill payment requests or withdrawals from other BLMIS accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46 and therefore denies those allegations.

47.    It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in a demand, investigation, the filing of a claim and disclosure of the fraud.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47 and therefore denies those allegations.

48.    Madoff's scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48 and therefore denies those allegations.

49.    It now appears based upon the Trustee's ongoing investigation that there were more than 8,000 customer accounts at BLMIS over the life of the scheme. BLMIS generated account statements in early December 2008 for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. By the time the Ponzi scheme came to light on December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49 and therefore denies those allegations.

50.    Thus, at all relevant times, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of all transfers, BLMIS was left with insufficient capital.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50 and therefore denies those allegations.

## VI.    THE TRANSFERS

51.    Fairfield Sentry and Kingate each received initial transfers of Customer Property from BLMIS. Some or all of those initial transfers were subsequently transferred to, or for the benefit of, Credit Suisse, as successor-in-interest to Clariden Leu or Bank Leu, either directly or through Fairfield Sigma or Fairfield Lambda as set forth in more detail below. Credit Suisse, acting in its capacity as successor-in-interest to Clariden Leu or Bank Leu, will be referred to below as the "Defendant."

**ANSWER**:    Credit Suisse avers that no response to the Kingate-related allegations is required because the Trustee has voluntarily dismissed all Kingate-related claims; to the extent that a response is required, Credit Suisse denies those allegations.  Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 51 and therefore denies those allegations.

-18-

### A.    FAIRFIELD

*The Fairfield Action*

52.    The Trustee filed a complaint in which he sought to avoid and recover initial and subsequent transfers of Customer Property from BLMIS to Fairfield Sentry, Fairfield Sigma, Fairfield Lambda and others. *See Picard v. Fairfield Sentry Ltd., et al*., Adv. Pro. No. 09-01239 (BRL) (the "Fairfield Action"). The Trustee incorporates by reference the allegations in the Fairfield complaint as if fully set forth in this First Amended Complaint. A copy of the Fairfield Amended Complaint (without exhibits) is attached here as Exhibit A.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 52, except (a) admits that the Trustee filed an action styled as *Picard v. Fairfield Sentry Limited, et al*., Adv. Pro. No. 09-01239 (the "Fairfield Action"); (b) denies knowledge or information sufficient to form a belief as to which of the three complaints filed in the Fairfield Action the Trustee seeks to incorporate by reference in the complaint in this action and therefore denies such allegations; (c) denies knowledge or information sufficient to form a belief as to the truth of the allegations in each and every paragraph of each of the three complaints filed in the Fairfield Action that allegedly supports the claim that any initial transfers of Customer Property to Sentry are or were avoided or avoidable; and (d) objects to the incorporation by reference of, and therefore does not answer, each and every other paragraph and allegation in the three complaints in the Fairfield Action and to the inclusion in this adversary proceeding of any issue implicated by any of the three complaints in the Fairfield Action other than the issue of the avoidance or avoidability of the initial transfers of Customer Property; Credit Suisse nevertheless reserves the right to rely on and introduce any allegations in the referenced "Fairfield Amended Complaint" or its exhibits as opposing party admissions admissible for the truth of their contents.  To the extent any further response is required, Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 52 and therefore denies such allegations.

-19-

53.    Pursuant to orders dated June 7 and June 10, 2011, the Bankruptcy Court approved a settlement among the Trustee, Fairfield Sentry, Fairfield Sigma and Fairfield Lambda (the "Settlement Agreement"). As part of the approved resolution, the Bankruptcy Court entered consent judgments for the Trustee in the amount of $3,054,000,000 against Fairfield Sentry, $752,300,000 against Fairfield Sigma and $52,900,000 against Fairfield Lambda. The judgments represented the settled amounts of the Trustee's "Avoiding Power Claims." *See* Settlement Agreement (without exhibits), attached here as Exhibit B, at p. 4, section 1.

**ANSWER**:    Credit Suisse admits that on June 7 and June 10, 2011, this Court entered

Orders in *Picard v. Fairfield Sentry Ltd*., Adv. Pro. No. 09-1239, and respectfully refers the Court

to those Orders and the Settlement Agreement for their full and correct contents.

### *Initial Transfers from BLMIS to Fairfield Sentry*

54.    During the six years preceding the Filing Date, BLMIS made transfers to Fairfield Sentry of $2,985,136,619 (the "Fairfield Sentry Six Year Initial Transfers"). The Fairfield Sentry Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under Sections 544, 550 and 551 of the Bankruptcy Code; §§ 273-279 of the NYDCL; and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as

to the truth of the allegations in the first sentence of Paragraph 54 and therefore denies such

allegations. The remaining allegations in Paragraph 54 state legal conclusions to which no

response is required.  To the extent that any further response is required, Credit Suisse denies the

allegations in Paragraph 54.

55.    The Fairfield Sentry Six Year Initial Transfers include $1,614,067,088 that BLMIS transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Initial Transfers"). The Fairfield Sentry Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under Sections 548, 550 and 551 of the Bankruptcy Code; §§ 273-

279 of the NYDCL; and applicable provisions of SIPA, particularly
SIPA § 78fff-2(c)(3).

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as

to the truth of the allegations in the first sentence of Paragraph 55 and therefore denies such

allegations.   The remaining allegations in Paragraph 55 state legal conclusions to which no

response is required.  To the extent that any further response is required, Credit Suisse denies the

allegations in Paragraph 55.

56.    The Fairfield Sentry Two Year Initial Transfers include
$1,134,628,244 that BLMIS transferred to Fairfield Sentry during
the 90 days preceding the Filing Date (the "Fairfield Sentry
Preference Period Initial Transfers"). The Fairfield Sentry
Preference Period Initial Transfers were and continue to be
Customer Property within the meaning of SIPA § 78*lll*(4), and are
avoidable and recoverable under Sections 547, 550 and 551 of the
Bankruptcy Code and applicable provisions of SIPA, particularly
SIPA § 78fff-2(c)(3).

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as

to the truth of the allegations in the first sentence of Paragraph 56 and therefore denies such

allegations.   The remaining allegations in Paragraph 56 state legal conclusions to which no

response is required.  To the extent that any further response is required, Credit Suisse denies the

allegations in Paragraph 56.

57.    The Fairfield Sentry Six Year Initial Transfers, Fairfield
Sentry Two Year Initial Transfers and Fairfield Sentry Preference
Period Initial Transfers are collectively defined as the "Fairfield
Sentry Initial Transfers." A chart setting forth the BLMIS accounts
from which the Fairfield Sentry Initial Transfers were made is
attached here as Exhibit C. A chart setting forth the transfers is
attached here as Exhibit D.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as

to the truth of the allegations in Paragraph 57 and therefore denies such allegations.

-21-

### Subsequent Transfers from Fairfield Sentry to the Defendant

58.    A portion of the Fairfield Sentry Initial Transfers was subsequently transferred to, or for the benefit of, the Defendant. The subsequent transfers are recoverable from the Defendant pursuant to Section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, $35,838,401 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to, or for the benefit of, the Defendant (the "Fairfield Sentry Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry Subsequent Transfers is attached here as Exhibit E.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 58 and therefore denies such allegations, except admits that it or certain of its affiliates received funds from Fairfield Sentry, but denies that such funds were in the amounts identified in Exhibit E, and denies knowledge or information sufficient to form a belief as to whether any of such funds constitute subsequent transfers of Customer Property or of any other property transferred from BLMIS to Fairfield Sentry.

### Subsequent Transfers from Fairfield Sentry to Fairfield Sigma and then to the Defendant

59.    A portion of the Fairfield Sentry Initial Transfers was subsequently transferred through Fairfield Sigma to, or for the benefit of, the Defendant. The subsequent transfers are recoverable from the Defendant pursuant to Section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, $752,273,917 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Fairfield Sigma. A chart setting forth those transfers is attached here as Exhibit F. Fairfield Sigma, in turn, transferred the equivalent of $10,992,932 of the money it received from Fairfield Sentry to, or for the benefit of, the Defendant (the "Fairfield Sigma Subsequent Transfers"). A chart setting forth the presently known Fairfield Sigma Subsequent Transfers is attached here as Exhibit G.

**ANSWER**:    Credit Suisse denies knowledge or information sufficient to form a belief as to the amounts identified in Exhibit F and to the truth of the allegations of the amounts, if any, transferred from BLMIS to Fairfield Sentry and from Fairfield Sentry to Fairfield Sigma and

therefore denies such allegations.  Credit Suisse admits that it or certain of its affiliates received

funds from Fairfield Sigma, but denies that such funds were in the amounts identified in Exhibit

G, and denies knowledge or information sufficient to form a belief as to whether any of such funds

constitute subsequent transfers of Customer Property or of any other property.

### *Subsequent Transfer from Fairfield Sentry to Fairfield Lambda and then to the Defendant*

60.     A portion of the Fairfield Sentry Initial Transfers was subsequently transferred through Fairfield Lambda to, or for the benefit of, the Defendant. The subsequent transfer is recoverable from the Defendant pursuant to Section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, $52,935,000 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Fairfield Lambda. A chart setting forth those transfers is attached here as Exhibit H. Fairfield Lambda, in turn, transferred the equivalent of $68,983 it received from Fairfield Sentry to, or for the benefit of, the Defendant (the "Fairfield Lambda Subsequent Transfer"). A chart setting forth the presently known Fairfield Lambda Subsequent Transfer is attached here as Exhibit I.

**ANSWER**:     Credit Suisse denies knowledge or information sufficient to form a belief as

to the amounts identified in Exhibit H and to the truth of the allegations of the amounts, if any,

transferred from BLMIS to Fairfield Sentry and from Fairfield Sentry to Fairfield Lambda and

therefore denies such allegations.  Credit Suisse admits that it or certain of its affiliates received

funds from Fairfield Lambda, but denies that such funds were in the amounts identified in Exhibit

I, and denies knowledge or information sufficient to form a belief as to whether any of such funds

constitute subsequent transfers of Customer Property or of any other property.

61.     The Trustee's investigation is ongoing, and he reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, Fairfield Sentry Subsequent Transfers, Fairfield Sigma

Subsequent Transfers and Fairfield Lambda Subsequent Transfer; and (ii) seek the recovery of any additional transfers.

**ANSWER**:    Credit Suisse avers that Paragraph 61 includes no factual allegations, and thus no response is required.  To the extent a response is required, Credit Suisse denies the allegations of paragraph 61.

### B.    KINGATE

*The Kingate Action*

62.    The Trustee filed a complaint in which he sought to avoid and recover initial transfers of Customer Property from BLMIS to Kingate and others. *See Picard v. Kingate Global Fund, Ltd., et al.*, Adv. Pro. No. 09-01161 (BRL) (the "Kingate Action"); *see also* District Court Case Nos. 11-CV-07256 (JSR) and 11-CV-07134 (JSR). The Trustee incorporates by reference the allegations in the Kingate complaint as if fully set forth in this First Amended Complaint. A copy of the Kingate Third Amended Complaint (without exhibits) is attached here as Exhibit J. The Kingate Action is still pending.

**ANSWER**:    Because the Trustee has dismissed all claims against Credit Suisse relating to transfers from BLMIS to the Kingate Funds, as set forth in the Stipulation and Order in this adversary proceeding entered April 14, 2022, ECF 84, no response to the allegations in Paragraph 62 is required.  To the extent any response is required, Credit Suisse denies the allegations of Paragraph 62.

*Initial Transfers from BLMIS to Kingate*

63.    Over the lifetime of Kingate's account with BLMIS, from its inception to the Filing Date, BLMIS made transfers to Kingate in the amount of $437,501,112 (the "Kingate Lifetime Initial Transfers"). The Kingate Lifetime Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under Sections 544, 550 and 551 of the Bankruptcy Code; §§ 273-279 of the NYDCL; applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3); and N.Y. C.P.L.R. 203(g) and 213(8).

**ANSWER**:    Because the Trustee has dismissed all claims against Credit Suisse relating to transfers from BLMIS to the Kingate Funds, as set forth in the Stipulation and Order in this adversary proceeding entered April 14, 2022, ECF 84, no response to the allegations in Paragraph 63 is required.  To the extent any response is required, Credit Suisse denies the allegations of Paragraph 63.

> 64.    The Kingate Lifetime Initial Transfers include $398,704,065 that BLMIS transferred to Kingate during the six years preceding the Filing Date (the "Kingate Six Year Initial Transfers"). The Kingate Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under Sections 544, 550 and 551 of the Bankruptcy Code; §§ 273-279 of the NYDCL; and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:    Because the Trustee has dismissed all claims against Credit Suisse relating to transfers from BLMIS to the Kingate Funds, as set forth in the Stipulation and Order in this adversary proceeding entered April 14, 2022, ECF 84, no response to the allegations in Paragraph 64 is required.  To the extent any response is required, Credit Suisse denies the allegations of Paragraph 64.

> 65.    The Kingate Six Year Initial Transfers include $163,447,509 that BLMIS transferred to Kingate during the two years preceding the Filing Date (the "Kingate Two Year Initial Transfers"). The Kingate Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under Sections 544, 548, 550 and 551 of the Bankruptcy Code; §§ 273-279 of the NYDCL; and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:    Because the Trustee has dismissed all claims against Credit Suisse relating to transfers from BLMIS to the Kingate Funds, as set forth in the Stipulation and Order in this adversary proceeding entered April 14, 2022, ECF 84, no response to the allegations in Paragraph 65 is required.  To the extent any response is required, Credit Suisse denies the allegations of Paragraph 65.

66.    The Kingate Two Year Initial Transfers include $101,753,145 that BLMIS transferred to Kingate during the 90 days preceding the Filing Date (the "Kingate Preference Period Initial Transfers"). The Kingate Preference Period Initial Transfers were and are Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under Sections 547, 550 and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**:    Because the Trustee has dismissed all claims against Credit Suisse relating to transfers from BLMIS to the Kingate Funds, as set forth in the Stipulation and Order in this adversary proceeding entered April 14, 2022, ECF 84, no response to the allegations in Paragraph 66 is required.  To the extent any response is required, Credit Suisse denies the allegations of Paragraph 66.

67.    The Kingate Lifetime Initial Transfers, Kingate Six Year Initial Transfers, Kingate Two Year Initial Transfers and Kingate Preference Period Initial Transfers are collectively defined as the "Kingate Initial Transfers." A chart setting forth the BLMIS account from which the Kingate Initial Transfers were made is attached here as Exhibit K. A chart setting forth the transfers is attached here as Exhibit L.

**ANSWER**:    Because the Trustee has dismissed all claims against Credit Suisse relating to transfers from BLMIS to the Kingate Funds, as set forth in the Stipulation and Order in this adversary proceeding entered April 14, 2022, ECF 84, no response to the allegations in Paragraph 67 is required.  To the extent any response is required, Credit Suisse denies the allegations of Paragraph 67.

### *Subsequent Transfers from Kingate to the Defendant*

68.    A portion of the Kingate Initial Transfers was subsequently transferred directly or indirectly to, or for the benefit of, the Defendant. The subsequent transfers are recoverable from the Defendant pursuant to Section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, $2,234,972 of the money transferred from BLMIS to Kingate was subsequently transferred by Kingate to, or for the benefit of, the Defendant (the "Kingate Subsequent Transfers"). A chart setting

-26-

forth the presently known Kingate Subsequent Transfers is attached here as Exhibit M.

**ANSWER**:    Because the Trustee has dismissed all claims against Credit Suisse relating to transfers from BLMIS to the Kingate Funds, as set forth in the Stipulation and Order in this adversary proceeding entered April 14, 2022, ECF 84, no response to the allegations in Paragraph 68 is required.  To the extent any response is required, Credit Suisse denies the allegations of Paragraph 68.

69.    The Trustee's investigation is ongoing, and the Trustee reserves the right to:  (i) supplement the information on the Kingate Initial Transfers and Kingate Subsequent Transfers; and (ii) seek the recovery of any additional transfers.

**ANSWER**:    Because the Trustee has dismissed all claims against Credit Suisse relating to transfers from BLMIS to the Kingate Funds, as set forth in the Stipulation and Order in this adversary proceeding entered April 14, 2022, ECF 84, no response to the allegations in Paragraph 69 is required.  To the extent any response is required, Credit Suisse denies the allegations of Paragraph 69.

## COUNT ONE
## RECOVERY OF FAIRFIELD SENTRY SUBSEQUENT TRANSFERS–
## 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

70.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this First Amended Complaint as if fully rewritten here.

**ANSWER**:    Credit Suisse incorporates by reference its responses to the allegations contained in each of the previous paragraphs of this FAC as if fully rewritten in this paragraph.

71.    The Defendant received the Fairfield Sentry Subsequent Transfers, which totaled at least $35,838,401 and are recoverable by

the Trustee under Section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

**ANSWER**:    Credit Suisse avers that the allegations in Paragraph 71 state legal conclusions to which no response is required. To the extent any further response is required, Credit Suisse denies the allegations in Paragraph 71.

72.    Each of the Fairfield Sentry Subsequent Transfers was made to, or for the benefit of, the Defendant.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 72.

73.    The Defendant is an immediate or mediate transferee of the Fairfield Sentry Initial Transfers, which are avoidable and recoverable as set forth in the Fairfield Action.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 73.

74.    As a result of the foregoing, pursuant to Sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Defendant recovering the Fairfield Sentry Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 74.

## COUNT TWO
## RECOVERY OF FAIRFIELD SIGMA SUBSEQUENT TRANSFERS–
## 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

75.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this First Amended Complaint as if fully rewritten here.

**ANSWER**:    Credit Suisse incorporates by reference its responses to the allegations contained in each of the previous paragraphs of this FAC as if fully rewritten in this paragraph.

76.    The Defendant received the Fairfield Sigma Subsequent Transfers, which totaled at least $10,992,932 and are recoverable by the Trustee under Section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

-28-

**ANSWER**:    Credit Suisse avers that the allegations in Paragraph 76 state legal conclusions to which no response is required. To the extent any further response is required, Credit Suisse denies the allegations in Paragraph 76.

77.    Each of the Fairfield Sigma Subsequent Transfers was made to, or for the benefit of, the Defendant.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 77.

78.    The Defendant is an immediate or mediate transferee of the Fairfield Sentry Initial Transfers, which are avoidable and recoverable as set forth in the Fairfield Action.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 78.

79.    As a result of the foregoing, pursuant to Sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Defendant recovering the Fairfield Sigma Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 79.

## COUNT THREE
## RECOVERY OF FAIRFIELD LAMBDA SUBSEQUENT TRANSFER–
## 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

80.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this First Amended Complaint as if fully rewritten here.

**ANSWER**:    Credit Suisse incorporates by reference its responses to the allegations contained in each of the previous paragraphs of this FAC as if fully rewritten in this paragraph.

81.    The Defendant received the Fairfield Lambda Subsequent Transfer, which totaled at least $68,983 and is recoverable by the

Trustee under Section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

**ANSWER**:    Credit Suisse avers that the allegations in Paragraph 81 state legal conclusions to which no response is required.  To the extent any further response is required, Credit Suisse denies the allegations in Paragraph 81.

82.    The Fairfield Lambda Subsequent Transfer was made to, or for the benefit of, the Defendant.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 82.

83.    The Defendant is an immediate or mediate transferee of the Fairfield Sentry Initial Transfers, which are avoidable and recoverable as set forth in the Fairfield Action.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 83.

84.    As a result of the foregoing, pursuant to Sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Defendant recovering the Fairfield Lambda Subsequent Transfer, or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER**:    Credit Suisse denies the allegations in Paragraph 84.

## COUNT FOUR
## RECOVERY OF KINGATE SUBSEQUENT
## TRANSFERS–11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

85.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this First Amended Complaint as if fully rewritten herein.

**ANSWER**:    Credit Suisse incorporates by reference its responses to the allegations contained in each of the previous paragraphs of this FAC as if fully rewritten in this paragraph.

86.    The Defendant received the Kingate Subsequent Transfers, which totaled at least $2,234,972 and are recoverable by the Trustee

under Section 550(a) of the Bankruptcy Code and § 278 of the
NYDCL.

**ANSWER**:     Claims arising from BLMIS transfers to Kingate Funds have been dismissed

by the Trustee, and therefore no response is required to those allegations.   To the extent any

response is required, Credit Suisse denies the allegations in Paragraph 86.

87.     Each of the Kingate Subsequent Transfers was made to, or
for the benefit of, the Defendant.

**ANSWER**:     Claims arising from BLMIS transfers to Kingate Funds have been dismissed

by the Trustee, and therefore no response is required to those allegations.   To the extent any

response is required, Credit Suisse denies the allegations in Paragraph 87.

88.     The Defendant is an immediate or mediate transferee of the
Kingate Initial Transfers, which are avoidable and recoverable as set
forth in the Kingate Action.

**ANSWER**:     Claims arising from BLMIS transfers to Kingate Funds have been dismissed

by the Trustee, and therefore no response is required to those allegations.   To the extent any

response is required, Credit Suisse denies the allegations in Paragraph 88.

89.     As a result of the foregoing, pursuant to Sections 550(a) and
551 of the Bankruptcy Code, § 278 of the NYDCL and SIPA § 78fff-
2(c)(3), the Trustee is entitled to a judgment against the Defendant
recovering the Kingate Subsequent Transfers, or the value thereof,
for the benefit of the estate of BLMIS.

**ANSWER**:     Claims arising from BLMIS transfers to Kingate Funds have been dismissed

by the Trustee, and therefore no response is required to those allegations.   To the extent any

response is required, Credit Suisse denies the allegations in Paragraph 89.

## RESPONSE TO REQUEST FOR RELIEF

The allegations contained in Plaintiff's request for relief are legal conclusions to which no

response is required.  To the extent a response is required, Credit Suisse denies the allegations and

denies that Plaintiff is entitled to the relief requested.

## DEFENSES

### First Defense — Counts One, Two, and Three

### (Failure to State A Claim for Relief)

Each Count of the First Amended Complaint fails to state a claim upon which relief can be granted, including for each of the reasons stated in Credit Suisse's Motion To Dismiss The First Amended Complaint, filed on June 29, 2022 in this adversary proceeding, ECF No. 88, and proceedings thereon.

### Second Defense — Count Four

### (Dismissed Claims)

The Trustee's claims are barred to the extent they have been dismissed by the Trustee or the Court or are based on allegations that have been dismissed by the Trustee or the Court, including any claims relating to transfers to or from the Kingate Funds, as set forth in the Stipulation and Order in this adversary proceeding entered April 14, 2022, ECF No. 84.

### Third Defense – Count One

### (Mere Conduit/Lack of Dominion or Control – Fairfield Sentry Subsequent Transfers)

The Trustee's claims are barred under the "mere conduit" defense, because Credit Suisse was not a transferee of the Fairfield Sentry Subsequent Transfers. *See Finley v. Alexander (In re Finley)*, 130 F.3d 52, 57 (2d Cir. 1997). To the extent Credit Suisse received any Fairfield Sentry Subsequent Transfers, Credit Suisse (a) received each Fairfield Sentry Subsequent Transfers in good faith, in a nominee capacity, and for the account and benefit of one or more of its customers, (b) did not have dominion or control or the right to assert dominion or control over the Fairfield Sentry Subsequent Transfers or the proceeds thereof or to use the Fairfield Sentry Subsequent Transfers or the proceeds thereof for its own purposes, (c) was a mere conduit for its customers,

and (d) was obligated to credit the Fairfield Sentry Subsequent Transfers to the account and for the benefit of one or more of its customers, who alone had the right to assert dominion and control over the Fairfield Sentry Subsequent Transfers received by Credit Suisse for their benefit.

### Fourth Defense – Count Two

### (Mere Conduit/Lack of Dominion or Control – Fairfield Sigma Subsequent Transfers)

The Trustee's claims are barred under the "mere conduit" defense, because Credit Suisse was not a transferee of the Fairfield Sigma Subsequent Transfers. *See Finley v. Alexander (In re Finley)*, 130 F.3d 52, 57 (2d Cir. 1997).   To the extent Credit Suisse received any Fairfield Sigma Subsequent Transfers, Credit Suisse (a) received each Fairfield Sigma Subsequent Transfers in good faith, in a nominee capacity, and for the account and benefit of one or more of its customers, (b) did not have dominion or control or the right to assert dominion or control over the Fairfield Sigma Subsequent Transfers or the proceeds thereof or to use the Fairfield Sentry Subsequent Transfers or the proceeds thereof for its own purposes, (c) was a mere conduit for its customers, and (d) was obligated to credit the Fairfield Sigma Subsequent Transfers to the account and for the benefit of one or more of its customers, who alone had the right to assert dominion and control over the Fairfield Sigma Subsequent Transfers received by Credit Suisse for their benefit.

### Fifth Defense – Count Three

### (Mere Conduit/Lack of Dominion or Control – Fairfield Lambda Subsequent Transfers)

The Trustee's claims are barred under the "mere conduit" defense, because Credit Suisse was not a transferee of the Fairfield Lambda Subsequent Transfers. *See Finley v. Alexander (In re Finley)*, 130 F.3d 52, 57 (2d Cir. 1997).   To the extent Credit Suisse received any Fairfield Lambda Subsequent Transfers, Credit Suisse (a) received each Fairfield Lambda Subsequent Transfers in good faith, in a nominee capacity, and for the account and benefit of one or more of its customers,

(b) did not have dominion or control or the right to assert dominion or control over the Fairfield

Lambda Subsequent Transfers or the proceeds thereof or to use the Fairfield Sentry Subsequent

Transfers or the proceeds thereof for its own purposes, (c) was a mere conduit for its customers,

and (d) was obligated to credit the Fairfield Lambda Subsequent Transfers to the account and for

the benefit of one or more of its customers, who alone had the right to assert dominion and control

over the Fairfield Lambda Subsequent Transfers received by Credit Suisse for their benefit.

### Sixth Defense—Count One

### (Section 550(b)—Value, Good Faith, Without Knowledge of Voidability:

### Fairfield Sentry Subsequent Transfers)

To the extent, if any, that Credit Suisse received any Fairfield Sentry Subsequent Transfers,

such Fairfield Sentry Subsequent Transfers may not be recovered because Credit Suisse took such

Fairfield Sentry Subsequent Transfers for value and in good faith and without knowledge of the

voidability of the Fairfield Initial Transfers within the meaning of 11 U.S.C. § 550(b).

*Value*. To the extent, if any, that Credit Suisse received any Fairfield Sentry Subsequent

Transfers, Credit Suisse took the Fairfield Sentry Subsequent Transfers in exchange for Fairfield

Sentry's redemption of its own shares from Credit Suisse and therefore took for value.

*Good Faith.* To the extent, if any, that Credit Suisse received any Fairfield Sentry

Subsequent Transfers, at the time each Fairfield Sentry Subsequent Transfers was made, Credit

Suisse was aware only of the publicly available information about Fairfield Sentry and about

BLMIS, including that some investment professionals had raised concerns about the transparency

of BLMIS and the lack of separation between its asset management, brokerage, and custodian

administration. On or before the date of the last of the Fairfield Sentry Subsequent Transfers (if

any), Credit Suisse did not have access to non-public information regarding BLMIS.  Credit Suisse

handled its Fairfield Sentry account consistently with other industry professionals based on publicly known information about Fairfield Sentry and about BLMIS. To the best of its knowledge, none of the communications Credit Suisse had with Fairfield Sentry or its directors, officers, or employees or with BLMIS or any of its officers or employees on or before the date of the last of the Fairfield Sentry Subsequent Transfers (if any) revealed or suggested that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Fairfield Sentry or its directors, officers, or employees suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

To the best of Credit Suisse's knowledge, at no time on or before the date of the last Fairfield Sentry Subsequent Transfers (if any) was any director, officer, employee, agent, or consultant of Credit Suisse aware that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Fairfield Sentry or its directors, officers, employees, agents, or consultants knew or suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

The Fairfield Sentry Subsequent Transfers (if any) did not have a fraudulent purpose but were routine transfers in exchange for redemption of shares in the Fairfield Sentry.  A reasonable person with the facts in Credit Suisse's possession when each of the Fairfield Sentry Subsequent Transfers (if any) occurred would not have been on inquiry notice of any fraudulent purpose behind such Fairfield Sentry Subsequent Transfers nor would those facts have led such a person to conduct further inquiry into whether there was a fraudulent purpose to such Fairfield Sentry Subsequent Transfers or the Fairfield Initial Transfers or whether BLMIS was trading securities or was a fraud or a Ponzi scheme.

A diligent inquiry by Credit Suisse would not have discovered that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Other entities with greater investigatory tools and resources than Credit Suisse, and with more access to BLMIS personnel and documentation than

Credit Suisse, investigated BLMIS but failed to uncover that it was a Ponzi scheme before December 2008, including the SEC, which began an investigation into BLMIS in 2006 but could not determine BLMIS's fraudulent purpose.   Credit Suisse did not have the capability of discovering what United States government regulators could not and would not have discovered as the fraudulent purpose of the Fairfield Initial Transfers or, if there were any fraudulent purpose of the Fairfield Sentry Subsequent Transfers (if any), of such fraudulent purpose, and as an entity without privity with BLMIS or Madoff before the opening, did not have any reasonable ability to conduct a diligent investigation into the BLMIS, including into its IA business, that could have led to a discovery of the fraudulent purpose of the Fairfield Initial Transfers.

*Without Knowledge of the Voidability of the Fairfield Initial Transfers.* Credit Suisse did not have knowledge of the voidability of the Fairfield Initial Transfers when it received each of the Fairfield Sentry Subsequent Transfers (if any).

### Seventh Defense—Count Two

### (Section 550(b)—Value, Good Faith, Without Knowledge of Voidability:

### Fairfield Sigma Subsequent Transfers)

To the extent, if any, that Credit Suisse received any Fairfield Sigma Subsequent Transfers, the property received by Credit Suisse as part of the Fairfield Sigma Subsequent Transfers may not be recovered because Credit Suisse took such Fairfield Sigma Subsequent Transfers for value, in good faith, and without knowledge of the voidability of the Fairfield Initial Transfers within the meaning of 11 U.S.C. § 550(b).

*Value.* To the extent, if any, that Credit Suisse received any Fairfield Sigma Subsequent Transfers, Credit Suisse took such Fairfield Sigma Subsequent Transfers in exchange for Sigma's redemption of its own shares from Credit Suisse and therefore took for value.

*Good Faith.* To the extent, if any, that Credit Suisse received any Fairfield Sigma Subsequent Transfers, at the time each of the Fairfield Sigma Subsequent Transfers was made, Credit Suisse was aware only of the publicly available information about Fairfield Sentry and Fairfield Sigma and about BLMIS, including that some investment professionals had raised concerns about the transparency of BLMIS and the lack of separation between its asset management, brokerage, and custodian administration. On or before the date of the last of the Fairfield Sigma Subsequent Transfers (if any), Credit Suisse did not have access to non-public information regarding BLMIS. Credit Suisse handled its Fairfield Sigma account consistently with other industry professionals based on publicly known information about Fairfield Sigma and about BLMIS. To the best of its knowledge, none of the communications Credit Suisse had with Fairfield Sigma or its directors, officers, or employees or with BLMIS or any of its officers or employees on or before the date of the last of the Fairfield Sigma Subsequent Transfers (if any) revealed or suggested that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Fairfield Sigma or its directors, officers, or employees suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

To the best of Credit Suisse's knowledge, at no time on or before the date of the last Fairfield Sigma Subsequent Transfers (if any) was any director, officer, employee, agent, or consultant of Credit Suisse aware that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Fairfield Sigma or its directors, officers, employees, agents, or consultants knew or suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

The Fairfield Sigma Subsequent Transfers (if any) did not have a fraudulent purpose but were routine transfers in exchange for redemption of shares in the Fairfield Sigma. A reasonable person with the facts in Credit Suisse's possession when each of the Fairfield Sigma Subsequent

Transfers (if any) occurred would not have been on inquiry notice of any fraudulent purpose behind such Fairfield Sigma Subsequent Transfers nor would those facts have led such a person to conduct further inquiry into whether there was a fraudulent purpose to such Fairfield Sigma Subsequent Transfers or the Fairfield Initial Transfers or whether BLMIS was trading securities or was a fraud or a Ponzi scheme.

A diligent inquiry by Credit Suisse would not have discovered that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Other entities with greater investigatory tools and resources than Credit Suisse, and with more access to BLMIS personnel and documentation than Credit Suisse, investigated BLMIS but failed to uncover that it was a Ponzi scheme before December 2008, including the SEC, which began an investigation into BLMIS in 2006 but could not determine BLMIS's fraudulent purpose.  Credit Suisse did not have the capability of discovering what United States government regulators could not and would not have discovered as the fraudulent purpose of the Fairfield Initial Transfers or, if there were any fraudulent purpose of the Fairfield Sigma Subsequent Transfers (if any), of such fraudulent purpose, and as an entity without privity with BLMIS or Madoff before the opening, did not have any reasonable ability to conduct a diligent investigation into the BLMIS, including into its IA business, that could have led to a discovery of the fraudulent purpose of the Fairfield Initial Transfers.

*Without Knowledge of the Voidability of the Fairfield Initial Transfers.* Credit Suisse did not have knowledge of the voidability of the Fairfield Initial Transfers when it received each of the Fairfield Sigma Subsequent Transfers (if any).

### Eight Defense—Count Three

### (Section 550(b)—Value, Good Faith, Without Knowledge of Voidability:

### Fairfield Lambda Subsequent Transfers)

To the extent, if any, that Credit Suisse received any Fairfield Lambda Subsequent Transfers, the property received by Credit Suisse as part of the Fairfield Lambda Subsequent Transfers may not be recovered because Credit Suisse took such Fairfield Lambda Subsequent Transfers for value, in good faith, and without knowledge of the voidability of the Fairfield Initial Transfers within the meaning of 11 U.S.C. § 550(b).

*Value.* To the extent, if any, that Credit Suisse received any Fairfield Lambda Subsequent Transfers, Credit Suisse took such Fairfield Lambda Subsequent Transfers in exchange for Lambda's redemption of its own shares from Credit Suisse and therefore took for value.

*Good Faith.* To the extent, if any, that Credit Suisse received any Fairfield Lambda Subsequent Transfers, at the time each of the Fairfield Lambda Subsequent Transfers was made, Credit Suisse was aware only of the publicly available information about Fairfield Sentry and Fairfield Lambda and about BLMIS, including that some investment professionals had raised concerns about the transparency of BLMIS and the lack of separation between its asset management, brokerage, and custodian administration.  On or before the date of the last of the Fairfield Lambda Subsequent Transfers (if any), Credit Suisse did not have access to non-public information regarding BLMIS. Credit Suisse handled its Fairfield Lambda account consistently with other industry professionals based on publicly known information about Fairfield Lambda and about BLMIS.  To the best of its knowledge, none of the communications Credit Suisse had with Fairfield Lambda or its directors, officers, or employees or with BLMIS or any of its officers or employees on or before the date of the last of the Fairfield Lambda Subsequent Transfers (if any) revealed or suggested that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Fairfield Lambda or its directors, officers, or employees suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

-39-

To the best of Credit Suisse's knowledge, at no time on or before the date of the last Fairfield Lambda Subsequent Transfers (if any) was any director, officer, employee, agent, or consultant of Credit Suisse aware that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Fairfield Lambda or its directors, officers, employees, agents, or consultants knew or suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

The Fairfield Lambda Subsequent Transfers (if any) did not have a fraudulent purpose but were routine transfers in exchange for redemption of shares in the Fairfield Lambda. A reasonable person with the facts in Credit Suisse's possession when each of the Fairfield Lambda Subsequent Transfers (if any) occurred would not have been on inquiry notice of any fraudulent purpose behind such Fairfield Lambda Subsequent Transfers nor would those facts have led such a person to conduct further inquiry into whether there was a fraudulent purpose to such Fairfield Lambda Subsequent Transfers or the Fairfield Initial Transfers or whether BLMIS was trading securities or was a fraud or a Ponzi scheme.

A diligent inquiry by Credit Suisse would not have discovered that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Other entities with greater investigatory tools and resources than Credit Suisse, and with more access to BLMIS personnel and documentation than Credit Suisse, investigated BLMIS but failed to uncover that it was a Ponzi scheme before December 2008, including the SEC, which began an investigation into BLMIS in 2006 but could not determine BLMIS's fraudulent purpose. Credit Suisse did not have the capability of discovering what United States government regulators could not and would not have discovered as the fraudulent purpose of the Fairfield Initial Transfers or, if there were any fraudulent purpose of the Fairfield Lambda Subsequent Transfers (if any), of such fraudulent purpose, and as an entity without privity with BLMIS or Madoff before the opening, did not have any reasonable ability to

conduct a diligent investigation into the BLMIS, including into its IA business, that could have led to a discovery of the fraudulent purpose of the Fairfield Initial Transfers.

*Without Knowledge of the Voidability of the Fairfield Initial Transfers.* Credit Suisse did not have knowledge of the voidability of the Fairfield Initial Transfers when it received each of the Fairfield Lambda Subsequent Transfers (if any).

## Ninth Defense—Counts One, Two, and Three

## (Non-Avoidability of Fairfield Initial Transfers Under Section 546(e)—

## Settlement Payment)

Under Bankruptcy Code section 546(e), the Fairfield Six-Year Transfers (excluding the Fairfield Two-Year Transfers) are not avoidable because they were settlement payments, as defined in Bankruptcy Code section 101 or 741, made before the commencement of the case by or to (or for the benefit of) BLMIS, which was then a stockbroker, or Fairfield Sentry, which was then a financial institution or financial participant and, on information and belief, did not have actual knowledge that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Because the Fairfield Six-Year Transfers (excluding the Fairfield Two-Year Transfers) are not avoidable, property received by Credit Suisse (if any) as part of the Fairfield Six-Year Transfers (excluding the Fairfield Two-Year Transfers) is not recoverable from Credit Suisse. In addition, at the time of the transfer from Fairfield Sentry to Credit Suisse, Suisse had no actual knowledge that BLMIS was not trading securities or that it was a fraud or a Ponzi scheme.

## Tenth Defense—Counts One, Two, and Three

## (Non-Avoidability of Fairfield Initial Transfers Under Section 546(e)—Securities Contract)

Under Bankruptcy Code section 546(e), the Fairfield Six-Year Transfers (excluding the Fairfield Two-Year Transfers) were not avoided and are not avoidable because they were transfers

made before the commencement of the case by or to (or for the benefit of) BLMIS, which was then

a stockbroker, or Fairfield Sentry, which was then a financial institution or financial participant,

and, on information and belief, did not have actual knowledge that BLMIS was not trading

securities or was a fraud or a Ponzi scheme, in connection with a securities contract, as defined in

Bankruptcy Code section 741(7), between BLMIS and Fairfield Sentry or between Fairfield Sentry

and Credit Suisse.  Because the Fairfield Six-Year Transfers (excluding the Fairfield Two-Year

Transfers) are not avoidable, property received by Credit Suisse (if any) as part of the Fairfield

Six-Year Transfers (excluding the Fairfield Two-Year Transfers) is not recoverable from Credit

Suisse.  In addition, at the time of the transfer (if any) from Fairfield Sentry to Credit Suisse, Credit

Suisse had no actual knowledge that BLMIS was not trading securities or that it was a fraud or a

Ponzi scheme.

### Eleventh Defense—Counts One, Two, and Three

### (Not Customer Property—Fairfield Initial Transfers)

The property, if any, that Credit Suisse received from the Fairfield Funds was not Customer

Property, or proceeds of Customer Property, that BLMIS transferred to the Fairfield Funds, and

therefore the property is not recoverable by the Trustee from Credit Suisse.

### Twelfth Defense—Counts One, Two, and Three

### (Proceeds Not Recoverable—Fairfield Initial Transfers)

In the alternative, to the extent that the property, if any, that Credit Suisse received from

the Fairfield Funds was proceeds of Customer Property or other property that BLMIS transferred

to the Fairfield Funds, it is not recoverable by the Trustee from Credit Suisse under Bankruptcy

Code section 550(a)(2).

**Thirteenth Defense—Counts One, Two, and Three**

**(Section 550(d)—Single Satisfaction Fairfield Six-Year Transfers)**

Under Bankruptcy Code section 550(d), the trustee may not recover any subsequent transfer from Credit Suisse to the extent he has recovered from the Fairfield Funds or any other immediate or mediate transferee the amount of the avoided initial transfer that included the customer property that the trustee alleges Credit Suisse received.

**Fourteenth Defense—Counts One, Two, and Three**

**(Extraterritoriality)**

The Trustee's recovery from Credit Suisse of any transfer from the Fairfield Funds constitute an impermissible extraterritorial application of U.S. law.

**Fifteenth Defense—Counts One, Two, and Three**

**(Comity)**

The Trustee's recovery from Credit Suisse of any transfer from the Fairfield Funds would violate principles of comity.

**DEMAND FOR JURY TRIAL**

Credit Suisse does not consent to issuance or entry of final orders or judgments by the Bankruptcy Court and, under Rule 38(b) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 9015 of the Federal Rules of Bankruptcy Procedure, demands trial by jury before the District Court of all issues that may be tried by a jury.

**WHEREFORE**, Credit Suisse requests that this Court dismiss the FAC with prejudice, award Credit Suisse its attorneys' fees, costs and disbursements incurred in connection with this adversary proceeding, and grant Credit Suisse such other and further relief as the Court deems just and proper.

Dated:  January 20, 2023
        New York, New York

**O'MELVENY & MYERS LLP**

By: */s/ William J. Sushon*
   William J. Sushon
   Daniel S. Shamah
   Kayla N. Haran
   7 Times Square
   New York, New York 10036
   Telephone: (212) 326-2000
   Facsimile: (212) 326-2061
   wsushon@omm.com
   dshamah@omm.com
   kharan@omm.com

*Attorneys for Credit Suisse AG, as successor-in-interest to Clariden Leu AG and Bank Leu AG*