**WUERSCH & GERING LLP**
Gregory F. Hauser
Joshua A. Dachs
100 Wall Street, 10th Floor
New York, New York 10005
Telephone: (212) 509-5050
Gregory.Hauser@WG-Law.com
Joshua.Dachs@WG-Law.com
*Counsel for Defendants Bank Vontobel AG f/k/a Bank J.*
*Vontobel & Co. AG and Vontobel Asset Management Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>*Plaintiff-Applicant*,<br><br>-v-<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>*Defendant.* | **Adv. Pro. No. 08-01789 (CGM)**<br><br>**SIPA Liquidation**<br><br>**(Substantively Consolidated)** |
| In re:<br><br>BERNARD L. MADOFF,<br><br>*Debtor.* | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>*Plaintiff*,<br><br>-v-<br><br>BANK VONTOBEL AG f/k/a BANK J. VONTOBEL & CO. AG and VONTOBEL ASSET MANAGEMENT, INC.,<br><br>*Defendants*. | **Adv. Pro. No. 12-01202 (CGM)**<br><br>**ANSWER TO COMPLAINT AND JURY DEMAND** |

Defendants Bank Vontobel AG f/k/a Bank J. Vontobel & Co. AG ("Bank Vontobel") and

Vontobel Asset Management Inc. ("Vontobel Management") (together, with Bank Vontobel,

"Defendants" or the "Vontobel Defendants")[1], by and through their undersigned counsel, Wuersch

& Gering LLP, as and for their Answer (the "Answer") to the Complaint (the "Complaint") of

Plaintiff Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities

LLC (the "Trustee" or "Plaintiff"), state as follows:

## I.    NATURE OF THE ACTION[2]

1.    This adversary proceeding is part of the Trustee's continuing efforts to avoid and recover transfers of BLMIS Customer Property[3] that was stolen as part of the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff") and others.

**ANSWER**: The allegations contained in paragraph 1 constitute legal conclusions, to which

no response is required.  To the extent a response is deemed necessary, the Vontobel Defendants

deny the allegations of paragraph 1.

2.    With this Complaint, the Trustee seeks to recover approximately $29,752,214 in subsequent transfers of Customer Property collectively made to the Vontobel Defendants. The subsequent transfers were derived from investments with BLMIS made by Fairfield Sentry Limited ("Fairfield Sentry") and Kingate Global Fund Ltd. ("Kingate Global"), which were Madoff feeder funds (collectively, the "Feeder Funds"). The Feeder Funds are British Virgin Islands ("BVI") companies that are in liquidation in the BVI.  The Feeder Funds had direct customer accounts with BLMIS's investment advisory business ("IA Business") for the purpose of investing assets with BLMIS.  Each of the Feeder Funds maintained in excess of 95% of its

---

[1]    Defendant Vontobel Absolute Return Fund was voluntarily dismissed from this action on May 13, 2013. *See* Dkt. 34 (Notice of Voluntary Dismissal).  Accordingly, to the extent the Complaint refers to Vontobel Absolute Return Fund, no response is required.

[2]    The Vontobel Defendants deem the section headings in the Complaint not to constitute allegations of the Complaint. To the extent any section headings are allegations, the Vontobel Defendants admit or deny them consistent with its responses to the allegations contained in the numbered paragraphs of the Complaint.

[3]    SIPA § 78*lll*(4) defines "Customer Property" as cash and securities at any time received, acquired, or held by, or for the account of, a debtor from, or for, the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.

1

assets in BLMIS customer accounts. Some of the subsequent transfers from Fairfield Sentry came through Fairfield Sigma Limited ("Fairfield Sigma"), which invested 100% of its assets in Fairfield Sentry.  Fairfield Sigma is also in liquidation in the BVI.

**ANSWER**: The Vontobel Defendants deny the allegation that the Trustee seeks to recover approximately $27,637,884 in subsequent transfers made to the Vontobel Defendants because, following the entry of a stipulation and order on April 25, 2022 (Dkt. 109) (the "Kingate Stipulation") the Trustee dismissed Counts One, Two and certain portions of Count Three of the Complaint concerning all claims relating to transfers from Kingate Global Fund Ltd. and Kingate Euro Fund Ltd., and such claims do not, therefore, require a response. The Vontobel Defendants admit, for the limited purpose of referring to it in this Answer, the definition of "Feeder Fund" contained in paragraph 2.  The Vontobel Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations concerning whether the Feeder Funds had direct customer accounts with BLMIS' IA Business.  The Vontobel Defendants deny all other allegations of paragraph 2, including that the Vontobel Defendants received subsequent transfers of customer property from BLMIS or any Feeder Fund.

3.      When the Vontobel Defendants received the subsequent transfers of BLMIS Customer Property, the Vontobel Defendants were part of Vontobel Holding AG, which is a Swiss independent private bank and international asset manager.

**ANSWER**:  The Vontobel Defendants admit that they are a part of Vontobel Holding AG. The Vontobel Defendants deny the remaining allegations contained in paragraph 3.

## II.      **JURISDICTION AND VENUE**

4.      The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3); sections 105(a), 550(a), and 551 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq*. (the "Bankruptcy Code"); and the New York Fraudulent Conveyance Act (New York Debtor & Creditor Law) ("NYDCL") §§ 273-279 (McKinney 2001), to obtain avoidable and recoverable transfers received by the Vontobel Defendants as subsequent transferees of funds originating from BLMIS.

2

**ANSWER**: The allegations contained in paragraph 4 constitute legal conclusions, to which no response is required.  To the extent a response is deemed necessary, the Vontobel Defendants deny the allegations of paragraph 4, except to admit that the Trustee has brought this adversary proceeding.

5.    This is an adversary proceeding brought in this Court, in which the main underlying substantively consolidated SIPA case, Adv. Pro. No. 08-01789 (BRL) (the "SIPA Case"), is pending. The SIPA Case was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding"). This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), and 15 U.S.C. §78eee(b)(2)(A), (b)(4).

**ANSWER**: The allegations contained in paragraph 5 constitute legal conclusions, to which no response is required.  To the extent a response is deemed necessary, the Vontobel Defendants deny the allegations of paragraph 5, except to admit that (a) the main underlying substantively consolidated SIPA case (Case No. 08-01789 (CGM)) is pending in this Court; and (b) upon information and belief, the District Court Proceeding was commenced in the District Court.  The Vontobel Defendants deny the remaining allegations of paragraph 5, including that this Court has jurisdiction to enter a final order or judgment in this proceeding.

6.    The Vontobel Defendants are subject to personal jurisdiction in this judicial district because they purposely availed themselves of the laws and protections of the United States and the state of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through the Feeder Funds. The Vontobel Defendants knowingly received subsequent transfers from BLMIS by withdrawing money from the Feeder Funds.

**ANSWER**: The allegations contained in paragraph 6 constitute legal conclusions, to which no response is required.  To the extent a response is determined to be required, the Vontobel Defendants deny the allegations of paragraph 6, except to admit that the Vontobel Defendants made investments in the Feeder Funds and redeemed portions of their investments from the Feeder Funds.

3

7.      By directing their investments through Fairfield Sentry, a Fairfield Greenwich Group ("FGG") managed feeder fund, Bank Vontobel and Vontobel Fund knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York. Upon information and belief, Bank Vontobel and Vontobel Fund entered into a subscription agreement with Fairfield Sentry under which they submitted to New York jurisdiction, sent a copy of the subscription agreement to FGG's New York City office, and wired funds to Fairfield Sentry through a bank in New York. Additionally, Bank Vontobel regularly communicated by e-mail with its Fairfield Sentry account representatives located in FGG's New York City office. Bank Vontobel thus derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

**ANSWER**: The allegations contained in paragraph 7 constitute legal conclusions, to which no response is required. To the extent a response is determined to be required, the Vontobel Defendants deny the allegations of paragraph 7, except to admit that (a) upon information and belief, Fairfield was an investment fund managed by Fairfield Greenwich Group ("FGG"); (b) upon information and belief, FGG had an office in New York; (c) the Vontobel Defendants entered into subscription agreements with Fairfield Sentry; and, (d) the Vontobel Defendants maintained a bank account in New York.

8.      Vontobel Management maintains a business address in New York and is thus subject to New York jurisdiction pursuant to New York Civil Practice Law & Rules ("NY CPLR") § 301 (McKinney 2001) and Bankruptcy Rule 7004.

**ANSWER**: The allegations contained in paragraph 8 constitute legal conclusions, to which no response is required. To the extent a response is determined to be required, Vontobel Management admits the allegations contained in paragraph 8.

9.      Bank Vontobel and Vontobel Fund should reasonably expect to be subject to New York jurisdiction, and are subject to personal jurisdiction pursuant to NY CPLR § 302 and Bankruptcy Rule 7004.

**ANSWER**: Defendant Vontobel Absolute Return Fund was voluntarily dismissed from this action on May 13, 2013. *See* Dkt. 34 (Notice of Voluntary Dismissal). Accordingly, to the extent the Complaint refers to Vontobel Absolute Return Fund, no response is required.

4

The remaining allegations contained in paragraph 9 constitute legal conclusions, to which no response is required. To the extent a response is determined to be required, Bank Vontobel denies the allegations contained in paragraph 9.

10.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).

**ANSWER**: The allegations contained in paragraph 10 constitute legal conclusions, to which no response is required. To the extent a response is required, the Vontobel Defendants deny the allegations of Paragraph 10. Furthermore, the Vontobel Defendants do not consent to the issuance of entry of final orders or judgments by the Bankruptcy Court and demand a trial by jury of all issues that may be tried by a jury.

11.     Venue in this District is proper under 28 U.S.C. § 1409.

**ANSWER**: The allegations contained in paragraph 11 constitute legal conclusions, to which no response is required.

### III.     BACKGROUND

12.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia,* securities fraud, investment adviser fraud and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding against Madoff and BLMIS. The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS. The District Court Proceeding remains pending.

**ANSWER**: Upon information and belief, the Vontobel Defendants admit that Madoff was arrested on or around December 11, 2008, and that, on that same date, the Securities and Exchange Commission ("SEC") filed a civil complaint against Madoff and BLMIS in the District Court. The Vontobel Defendants lack knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 12, and therefore deny the remaining allegations in paragraph 12.

13.     On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards (the "Receiver") as receiver for the assets of BLMIS.

**ANSWER**: The Vontobel Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 13 and, therefore, deny the allegations contained in paragraph 13. The Vontobel Defendants refer to the District Court's December 12, 2008 Order for a full statement of its contents.

14.    On December 15, 2008, under §78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, under §78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

**ANSWER**: The Vontobel Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 14 and, therefore, deny the allegations contained in paragraph 14. The Vontobel Defendants refer to the SIPC application referenced in paragraph 14 for a full statement of its contents.

15.    Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order under SIPA (known as the 'Protective Decree'), which, in pertinent part:
      a.  removed the receiver and appointed the Trustee for the liquidation of the business  of BLMIS under SIPA section 78eee(b)(3);
      b.  appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA section 78eee(b)(3); and
      c.  removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under § 78eee(b)(4) of SIPA.

**ANSWER**: The Vontobel Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 15, and therefore deny the allegations contained in paragraph 15. The Vontobel Defendants refer to the District Court's December 15, 2008 Order for a full statement of its contents.

16.    By orders dated December 23, 2008, and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

**ANSWER**: The Vontobel Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 16 and, therefore, deny the allegations contained in paragraph 16.  The Vontobel Defendants refer to the District Court's December 23, 2008 and February 4, 2009 Orders for a full statement of the contents therein.

17.    At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." *Id.* at 23. Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id*. On June 29, 2009, Madoff was sentenced to 150 years in prison.

**ANSWER**: The Vontobel Defendants admit, upon information and belief, that on or about March 12, 2009, Madoff pleaded guilty to the charges filed against him by the United States Attorney's Office for the Southern District of New York and that on or about June 29, 2009 Madoff was sentenced to a term of 150 years in prison.   The Vontobel Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 17 and, therefore, deny the remaining allegations contained in paragraph 17.

18.    On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a plea hearing on August 11, 2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), DiPascali pled guilty to a ten-count criminal information. Among other things, DiPascali admitted that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s. *Id*. at 46.

**ANSWER**:  The Vontobel Defendants admit, upon information or belief, that on or about August 11, 2009, Frank DiPascali pleaded guilty to the charges brought against him by the United States Attorney's Office for the Southern District of New York.  The Vontobel Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 18 and, therefore, deny the remaining allegations contained in paragraph 18.

7

## IV.    **TRUSTEE'S POWERS AND STANDING**

19.    As Trustee appointed under SIPA, the Trustee is charged with recovering and paying out Customer Property to BLMIS customers, assessing claims, and liquidating any other assets of BLMIS for the benefit of the estate and its creditors. The Trustee is in the process of marshalling BLMIS's assets, and this liquidation is well underway. However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years. Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recoveries, including those from individuals and entities that received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA section 78fff-2(c)(1).

**ANSWER**: The allegations contained in paragraph 19 constitute legal conclusions, to which no response is required. To the extent a response is determined to be required, the Vontobel Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 19 and, therefore, deny the allegations contained in paragraph 19.

20.    Under SIPA section 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under section 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

**ANSWER**: The allegations contained in paragraph 20 constitute legal conclusions, to which no response is required. To the extent a response is determined to be required, the Vontobel Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 20 and, therefore, deny the allegations contained in paragraph 20.

21.    Under SIPA §§ 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

**ANSWER**: The allegations contained in paragraph 21 constitute legal conclusions, to which no response is required. To the extent a response is determined to be required, the Vontobel

8

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations contained in paragraph 21 and, therefore, deny the allegations contained in paragraph

21.

22.     The Trustee has standing to bring these claims under section 78fff-1(a) of SIPA
and the Bankruptcy Code, including sections 323(b), 544 and 704(a)(1), because the Trustee has
the power and authority to avoid and recover transfers under §§ 554, 547, 548, 550(a), and 551 of
the Bankruptcy Code and SIPA 78fff-2(c)(3).

**ANSWER**: The allegations contained in paragraph 22 constitute legal conclusions, to

which no response is required.  To the extent a response is determined to be required, the Vontobel

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations contained in paragraph 22 and, therefore, deny the allegations contained in paragraph

22.

## V.     THE DEFENDANTS

23.     Defendant Bank Vontobel is a Swiss private bank with headquarters located at
Gothardstrasse 43, CH 8002, Zurich, Switzerland.

**ANSWER**: Defendant Bank Vontobel denies the allegations contained in paragraph 23 of

the Complaint, except admits that it is a Swiss private bank with headquarters located at

Gothardstrasse 43, CH 8022, Zurich, Switzerland.

24.     Defendant Vontobel Fund was a hedge fund domiciled in the Cayman Islands.
Defendant Vontobel Fund is currently in liquidation in the Cayman Islands and the liquidator
maintains an address of Walker Corporate Services Limited c/o Anthony Johnson, Walker House
87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands.

**ANSWER**: Defendant Vontobel Fund was dismissed from the action on or about May 13,

2013. *See* Dkt. 34.  Accordingly, no response is required to the allegations contained in paragraph

24.  To the extent a response is required, the Vontobel Defendants deny the allegations in paragraph

24.

25.     Defendant Vontobel Management is a New York corporation and maintains an
address at 1540 Broadway, 38th floor, New York, New York 10036.

**ANSWER**: Defendant Vontobel Management admits the allegations contained in

paragraph 25.

## VI.   THE PONZI SCHEME

26.    BLMIS was founded by Madoff in 1959 and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several of his friends and family members. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). By virtue of that registration, BLMIS was a member of SIPC. BLMIS had three business units: market making, proprietary trading, and the IA Business.

**ANSWER**: The Vontobel Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations contained in paragraph 26, and therefore deny the allegations

contained in paragraph 26.

27.    Outwardly, Madoff ascribed the consistent success of the IA Business to the so-called split-strike conversion strategy ("SSC Strategy"). Under that strategy, Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100") – a collection of the 100 largest publicly traded companies. Madoff claimed that his basket of stocks would mimic the movement of the S&P 100. He also asserted that he would carefully time purchases and sales to maximize value, and BLMIS customers' funds would, intermittently, be out of the equity markets.

**ANSWER**: The Vontobel Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations contained in paragraph 27, and therefore deny the allegations

contained in paragraph 27.

28.    The second part of the SSC Strategy was a hedge of Madoff's stock purchases with options contracts. Those option contracts acted as a "collar" to limit both the potential gains and losses on the basket of stocks. Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options. Madoff told BLMIS customers that when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual funds holding treasury bills. Madoff also told customers that he would enter and exit the market between six and ten times each year.

10

**ANSWER**: The Vontobel Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations contained in paragraph 28, and therefore deny the allegations

contained in paragraph 28.

29.    BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never made the investments he promised clients, who believed they were invested with him in the SSC Strategy. He further admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts. In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform on which BLMIS reasonably could have traded securities. Instead, investors' funds were principally deposited into the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxxx703.

**ANSWER**: The Vontobel Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations contained in paragraph 29, and therefore deny the allegations

contained in paragraph 29.

30.    Prior to his arrest, Madoff assured clients and regulators that he purchased and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than through any listed exchange. Based on the Trustee's investigation to date, there is no evidence that the IA Business ever entered into any OTC options trades on behalf of IA Business account holders.

**ANSWER**: The Vontobel Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations contained in paragraph 30, and therefore deny the allegations

contained in paragraph 30.

31.    For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options, but rather used to pay withdrawals and to make other avoidable transfers. Madoff also used his customers' investments to enrich himself, his associates, and his family.

**ANSWER**: The Vontobel Defendants admit, upon information and belief, that BLMIS

claimed to invest the money deposited by its customer in stocks and options. The Vontobel

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

11

remaining allegations contained in paragraph 31, and therefore deny the remaining allegations

contained in paragraph 31.

      32.    The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion of new investments to fulfill payment requests or withdrawals from other BLMIS accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

      **ANSWER**: The Vontobel Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations contained in paragraph 32, and therefore deny the allegations

contained in paragraph 32.

      33.    It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in demand, investigation, the filing of a claim, and disclosure of the fraud.

      **ANSWER**: The Vontobel Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations contained in paragraph 33, and therefore deny the allegations

contained in paragraph 33.

      34.    Madoff's scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

      **ANSWER**: The Vontobel Defendants admit, upon information and belief, that BLMIS

continued to operate until December 2008. The Vontobel Defendants lack knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in

paragraph 34, and therefore deny the remaining allegations contained in paragraph 34.

      35.    Based upon the Trustee's ongoing investigation, it now appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. By the time the Ponzi scheme came to light on December

11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

**ANSWER**: The Vontobel Defendants admit, upon information and belief, that Madoff was arrested on or about December 11, 2008.  The Vontobel Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 35, and therefore deny the remaining allegations contained in paragraph 35.

36.     Thus, at all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets.  BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

**ANSWER**: The Vontobel Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 36, and therefore deny the allegations contained in paragraph 36.

## VII.   THE TRANSFERS

37.     The Feeder Funds received initial transfers of BLMIS Customer Property.  Some or all of those transfers were subsequently transferred directly or indirectly to the Vontobel Defendants.

**ANSWER**: The Vontobel Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 37, and therefore deny the allegations contained in paragraph 37.

### A.   KINGATE GLOBAL

#### 1.     Initial Transfers FROM BLMIS to Kingate Global

38.     The Trustee has filed an adversary proceeding against Kingate Global, Kingate Euro and other defendants in the Bankruptcy Court under the caption *Picard v. Kingate Global Fund, et al.,* Adv. Pro. No. 09-01161 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Kingate Global in the amount of approximately $437,501,112 (the "Kingate Complaint").  The Trustee incorporates by reference the allegations contained in the Kingate Global Complaint as if fully set forth herein.

13

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109),

the Trustee has dismissed all claims and allegations concerning Kingate Global. Accordingly, the

Vontobel Defendants aver that no response is required to the allegations of paragraph 38.

39.     Over the lifetime of Kingate Global's account with BLMIS, from its inception to
the Filing Date, BLMIS made transfers to Kingate Global of approximately $437,501,112 (the
"Kingate Global Lifetime Initial Transfers"). The Kingate Global Lifetime Initial Transfers were
and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable
and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the
NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109),

the Trustee has dismissed all claims and allegations concerning Kingate Global. Accordingly, the

Vontobel Defendants aver that no response is required to the allegations of paragraph 39.

40.     During the six years preceding the Filing Date, BLMIS made transfers to Kingate
Global of approximately $398,704,065 (the "Kingate Global Six Year Initial Transfers"). The
Kingate Global Six Year Initial Transfers were and continue to be Customer Property within the
meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under sections 544, 550, and
551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA,
particularly SIPA § 78fff-2(c)(3).

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109),

the Trustee has dismissed all claims and allegations concerning Kingate Global. Accordingly, the

Vontobel Defendants aver that no response is required to the allegations of paragraph 40.

41.     The Kingate Global Six Year Initial Transfers include approximately
$163,447,509 which BLMIS transferred to Kingate Global during the two years preceding
the Filing Date (the "Kingate Global Two Year Initial Transfers"). The Kingate Global Two
Year Initial Transfers were and continue to be Customer Property within the meaning of
SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 548, 550, and 551 of the
Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly
SIPA § 78fff-2(c)(3).

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109),

the Trustee has dismissed all claims and allegations concerning Kingate Global. Accordingly, the

Vontobel Defendants aver that no response is required to the allegations of paragraph 41.

14

42.     The Kingate Global Two Year Initial Transfers include approximately $101,753,145 which BLMIS transferred to Kingate Global during the 90 days preceding the Filing Date (the "Kingate Global Preference Period Initial Transfers"). The Kingate Global Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109),

the Trustee has dismissed all claims and allegations concerning Kingate Global. Accordingly, the

Vontobel Defendants aver that no response is required to the allegations of paragraph 42.

43.     The Kingate Global Lifetime Initial Transfers, the Kingate Global Six Year Initial Transfers, the Kingate Global Two Year Initial Transfers, and the Kingate Global Preference Period Initial Transfers are collectively defined as the "Kingate Global Initial Transfers." Charts setting forth these transfers are attached as Exhibits A and B.

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109),

the Trustee has dismissed all claims and allegations concerning Kingate Global. Accordingly, the

Vontobel Defendants aver that no response is required to the allegations of paragraph 43.

### 2.     Subsequent Transfers From Kingate Global to Bank Vontobel

44.     A portion of the Kingate Global Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Bank Vontobel and is recoverable from Bank Vontobel pursuant to Section 550 of the Bankruptcy Code and § 278 of the NYDCL.  Based on the Trustee's investigation to date, approximately $1,889,529 of the money transferred from BLMIS to Kingate Global was subsequently transferred by Kingate Global to Bank Vontobel (the "Kingate Global Subsequent Transfers").  A chart setting forth the presently known Kingate Global Subsequent Transfers is attached as Exhibit C.

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109),

the Trustee has dismissed all claims and allegations concerning Kingate Global. Accordingly, the

Vontobel Defendants aver that no response is required to the allegations of paragraph 44.

45.     The Trustee's investigation is on-going, and the Trustee reserves the right to: (i) supplement the information on the Kingate Global Initial Transfers, the Kingate Global Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109), the Trustee has dismissed all claims and allegations concerning Kingate Global. Accordingly, the Vontobel Defendants aver that no response is required to the allegations of paragraph 45. Furthermore, to the extent the Trustee purports to reserve a right, such reservation is a legal position to which no response is required.

B.   **KINGATE EURO**

1.   **Initial Transfers From BLMIS to Kingate Euro**

1.   Over the lifetime of Kingate Euro's account with BLMIS, from its inception to the Filing Date, BLMIS made transfers to Kingate Euro of approximately $538,040,617 (the "Kingate Euro Lifetime Initial Transfers"). The Kingate Euro Lifetime Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).[4]

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109), the Trustee has dismissed all claims and allegations concerning Kingate Euro. Accordingly, the Vontobel Defendants aver that no response is required to the allegations of paragraph 1 (sic).

2.   During the six years preceding the Filing Date, BLMIS made transfers to Kingate Euro of approximately $475,485,759 (the "Kingate Euro Six Year Initial Transfers"). The Kingate Euro Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78lll(4) and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109), the Trustee has dismissed all claims and allegations concerning Kingate Euro. Accordingly, the Vontobel Defendants aver that no response is required to the allegations of paragraph 2 (sic).

46.   The Kingate Euro Six Year Initial Transfers include approximately $248,979,674 which BLMIS transferred to Kingate Euro during the two years preceding

---

[4]   For ease of reference, this Answer reflects the paragraph numbers as set forth in the Complaint. The adoption of the numbering set forth in the Complaint shall in no way be deemed an admission or response.

the Filing Date (the "Kingate Euro Two Year Initial Transfers"). The Kingate Euro Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78lll(4) and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109),

the Trustee has dismissed all claims and allegations concerning Kingate Euro. Accordingly, the

Vontobel Defendants aver that no response is required to the allegations of paragraph 46.


47.    The Kingate Euro Two Year Initial Transfers include approximately $155,606,833 which BLMIS transferred to Kingate Euro during the 90 days preceding the Filing Date (the "Kingate Euro Preference Period Initial Transfers"). The Kingate Euro Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109),

the Trustee has dismissed all claims and allegations concerning Kingate Euro. Accordingly, the

Vontobel Defendants aver that no response is required to the allegations of paragraph 47.


48.    The Kingate Euro Lifetime Initial Transfers, the Kingate Euro Six Year Initial Transfers, the Kingate Euro Two Year Initial Transfers, and the Kingate Euro Preference Period Initial Transfers are collectively defined as the "Kingate Euro Initial Transfers." Charts setting forth these transfers are included as Exhibits D and E.

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109),

the Trustee has dismissed all claims and allegations concerning Kingate Euro. Accordingly, the

Vontobel Defendants aver that no response is required to the allegations of paragraph 48.

### 2.    Subsequent Transfers From Kingate Euro to Bank Vontobel

49.    A portion of the Kingate Euro Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Bank Vontobel and is recoverable from Bank Vontobel pursuant to Section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, the equivalent of at least $306,373 of the money transferred from BLMIS to Kingate Euro was subsequently transferred by Kingate Euro to Bank Vontobel (the "Kingate Euro Subsequent Transfers"). A chart setting forth the presently known Kingate Euro Subsequent Transfers is attached as Exhibit F.

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109), the Trustee has dismissed all claims and allegations concerning Kingate Euro. Accordingly, the Vontobel Defendants aver that no response is required to the allegations of paragraph 46.

50.     The Trustee's investigation is on-going, and the Trustee reserves the right to: (i) supplement the information on the Kingate Euro Initial Transfers, the Kingate Euro Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109), the Trustee has dismissed all claims and allegations concerning Kingate Euro. Accordingly, the Vontobel Defendants aver that no response is required to the allegations of paragraph 50.  To the extent the Trustee purports to reserve a right, such reservation is a legal position to which no response is required.

51.     The Kingate Global Subsequent Transfers and the Kingate Euro Subsequent Transfers are collectively referred to as the "Kingate Subsequent Transfers."

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109), the Trustee has dismissed all claims and allegations concerning Kingate Global and Kingate Euro. Accordingly, the Vontobel Defendants aver that no response is required to the allegations of paragraph 51.

## C.     FAIRFIELD SENTRY

### 1.     Initial Transfers From BLMIS to Fairfield Sentry

52.     The Trustee has filed an adversary proceeding against Fairfield Sentry and other defendants in the Bankruptcy Court under the caption *Picard v. Fairfield Sentry Ltd., et al.,* Adv. Pro. No. 09-01239 (BRL), in which, in part, the Trustee sought to avoid and recover the initial transfers of Customer Property from BLMIS to Fairfield Sentry in the amount of approximately $3 billion (the "Fairfield Amended Complaint").  The Trustee incorporates by reference the allegations contained in the Fairfield Amended Complaint as if fully set forth herein.

**ANSWER**: The Vontobel Defendants admit that the Trustee filed an adversary proceeding in this Court styled as *Picard v. Fairfield Sentry Ltd., et al.*, No. 09-01239 (BRL) (the

"Fairfield Action"). The Vontobel Defendants deny knowledge or information sufficient to

form a belief as to which of the three complaints filed in the Fairfield Action the Trustee purports

to incorporate by reference in the Complaint. The Vontobel Defendants deny that the alleged

initial transfers of Customer Property from BLMIS to Fairfield Sentry were, or are, avoidable.

In addition to the foregoing, the Vontobel Defendants further their objection to the

Trustee's purported incorporation by reference of all other paragraphs and allegations of one or

more of the three complaints filed in the Fairfield Action, and, therefore, do not answer such

allegations. The Vontobel Defendants further object to the inclusion in this adversary

proceeding of any issue implicated by the incorporation of any of the three complaints in the

Fairfield Action, other than as to the alleged avoidance or avoidability of the alleged initial

transfers of Customer Property.

The Vontobel Defendants reserve their right to rely on and introduce any allegations in

any of the Trustee's three complaints filed in the Fairfield Action or in the exhibits thereto as

party admissions. To the extent that any further response is deemed to be required, the Vontobel

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations contained in paragraph 52, and therefore deny the allegations contained in paragraph

52.

53.    During the six years preceding the Filing Date, BLMIS made transfers to Fairfield
Sentry of approximately $3 billion (the "Fairfield Sentry Six Year Initial Transfers"). The
Fairfield Sentry Six Year Initial Transfers were and continue to be Customer Property
within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided and recoverable
under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of NYDCL, and applicable
provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**: The Vontobel Defendants state that the allegations contained in the second

sentence of paragraph 53 are legal conclusions, to which no response is required. To the extent a

response is determined to be required, the Vontobel Defendants lack knowledge or information

sufficient to form a belief as to the truth of the allegations contained in the second sentence of

paragraph 53, and therefore deny those allegations. As to the remaining allegations contained in

paragraph 53, the Vontobel Defendants lack knowledge or information sufficient to form a belief

as to the truth of the remaining allegations contained in paragraph 53, and therefore deny the

remaining allegations contained in paragraph 53.

54.     The Fairfield Sentry Six Year Initial Transfers include approximately $1.6 billion which BLMIS transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Two Year Initial Transfers"). The Fairfield Sentry Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, §§ 273-279 of NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**: The Vontobel Defendants state that the allegations contained in the second

sentence of paragraph 54 are legal conclusions, to which no response is required.  To the extent a

response is determined to be required, the Vontobel Defendants lack knowledge or information

sufficient to form a belief as to the truth of the allegations contained in the second sentence of

paragraph 54, and therefore deny those allegations. As to the remaining allegations contained in

paragraph 54, the Vontobel Defendants lack knowledge or information sufficient to form a belief

as to the truth of the remaining allegations contained in paragraph 54, and therefore deny the

remaining allegations contained in paragraph 54.

55.     The Fairfield Sentry Two Year Initial Transfers include approximately $1.1 billion which BLMIS transferred to Fairfield Sentry during the 90 days preceding the Filing Date (the "Fairfield Sentry Preference Period Initial Transfers").  The Fairfield Sentry Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**: The Vontobel Defendants state that the allegations contained in the second

sentence of paragraph 55 are legal conclusions, to which no response is required.  To the extent a

response is determined to be required, the Vontobel Defendants lack knowledge or information

sufficient to form a belief as to the truth of the allegations contained in the second sentence of paragraph 55, and therefore deny those allegations. As to the remaining allegations contained in paragraph 55, the Vontobel Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 55, and therefore deny the remaining allegations contained in paragraph 55.

56.     The Fairfield Sentry Six Year Initial Transfers, the Fairfield Sentry Two Year Initial Transfers and the Fairfield Sentry Preference Period Initial Transfers are collectively defined as the "Fairfield Sentry Initial Transfers." Charts setting forth these transfers are attached as Exhibits G and H.

**ANSWER**: The Vontobel Defendants admit that the Trustee defines the term "Fairfield Sentry Initial Transfers" as set forth above and refer to Exhibits G and H for a full statement of the contents therein. The Vontobel Defendants deny any and all remaining allegations in paragraph 56.

57.     Pursuant to the Bankruptcy Court's June 7 and June 10, 2011 orders, the Bankruptcy Court approved a settlement among the Trustee, Fairfield Sentry, and others (the "Settlement Agreement"). As part of the Settlement Agreement, on July 13, 2011, the Bankruptcy Court entered a consent judgment granting the Trustee a judgment against Fairfield Sentry in the amount of $3,054,000,000. Fairfield Sentry is obliged to pay $70,000,000 to the Trustee under the terms of the Settlement Agreement.

**ANSWER**: The Vontobel Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 57 and, therefore, deny the allegations in paragraph 57. The Vontobel Defendants refer to the June 7, 2011 and June 10, 2011 Orders and the July 13, 2011 Consent Judgment for a full statement of the contents therein.

### 2.     Subsequent Transfers From Fairfield Sentry to Bank Vontobel

58.     A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Bank Vontobel and is recoverable from Bank Vontobel pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $8,470,371 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Bank Vontobel (the

"Fairfield Sentry-Bank Vontobel Subsequent Transfers").  A chart setting forth the presently known Fairfield Sentry-Bank Vontobel Subsequent Transfers is attached as Exhibit I.

**ANSWER**: Bank Vontobel admits that it received funds from Fairfield Sentry but lacks

knowledge or information sufficient to form a belief as to the truth of the allegations concerning

the prior status of the funds and, therefore, denies such allegations. Bank Vontobel states that the

remaining allegations contained in paragraph 58 contain legal conclusions to which no response is

required.  To the extent a response is required, Bank Vontobel denies the allegations contained in

paragraph 58 and refers to Exhibit I for a full statement of the contents therein.

59.     The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Sentry-Bank Vontobel Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER**: To the extent the Trustee purports to reserve a right, such reservation is a legal

position to which no response is required.  The Vontobel Defendants lack knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in

paragraph 59 and, therefore, deny the allegations in paragraph 59.

**3.**      **Subsequent Transfers From Fairfield Sentry to Vontobel Fund and/or Vontobel Management**

60.     A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Vontobel Fund and/or Vontobel Management and is recoverable from Vontobel Fund and/or Vontobel Management pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL.  Based on the Trustee's investigation to date, approximately $17,922,008 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Vontobel Fund and/or Vontobel Management (the "Fairfield Sentry-Vontobel Fund Subsequent Transfers").  A chart setting forth the presently known Fairfield Sentry-Vontobel Fund Subsequent Transfers is attached as Exhibit J.

**ANSWER**: Defendant Vontobel Absolute Return Fund was voluntarily dismissed from

this action on May 13, 2013. *See* Dkt. 34 (Notice of Voluntary Dismissal).  Accordingly, to the

extent the Complaint refers to Vontobel Absolute Return Fund, no response is required.

22

Vontobel Management admits that it received funds from Fairfield Sentry but lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning the prior status of the funds and, therefore, denies such allegations. Vontobel Management states that the remaining allegations contained in paragraph 60 contain legal conclusions to which no response is required. To the extent a response is required, Vontobel Management denies the allegations contained in paragraph 60 and refers to Exhibit J for a full statement of the contents therein.

61.     The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Sentry- Vontobel Fund Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER**: To the extent the Trustee purports to reserve a right, such reservation is a legal position to which no response is required. The Vontobel Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 61 and, therefore, deny the allegations in paragraph 61.

### 4.     Subsequent Transfers From Fairfield Sentry to Fairfield Sigma and Subsequently to Bank Vontobel

62.     A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Bank Vontobel through Fairfield Sigma and is recoverable from the Bank Vontobel pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $752,273,917 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Fairfield Sigma. Thereafter, the equivalent of at least $1,163,932 was transferred by Fairfield Sigma to Bank Vontobel (the "Fairfield Sigma Subsequent Transfers"). Charts setting forth the presently known Fairfield Sigma Subsequent Transfers are attached as Exhibits K and L.

**ANSWER**: Bank Vontobel admits that it received funds from Fairfield Sigma but lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning the prior status of the funds and, therefore, denies such allegations. Bank Vontobel states that the remaining allegations contained in paragraph 62 contain legal conclusions to which no response is

required.  To the extent a response is required, Bank Vontobel denies the allegations contained in

paragraph 62 and refers to Exhibits K and L for a full statement of the contents therein.

65.     The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i)
supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Sigma
Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional
transfers.

**ANSWER**:  To the extent the Trustee purports to reserve a right, such reservation is a legal

position to which no response is required.  The Vontobel Defendants lack knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in

paragraph 63 and, therefore, deny the allegations in paragraph 63.

64.     The Fairfield Sentry-Bank Vontobel Subsequent Transfers, Fairfield Sentry-
Vontobel Fund Subsequent Transfers, and the Fairfield Sigma Subsequent Transfers are
collectively defined as the "Fairfield Subsequent Transfers."

**ANSWER**: The Vontobel Defendants deny the allegations of paragraph 64, except to admit

that the Trustee defines the term "Fairfield Subsequent Transfers" as set forth above.

**COUNT ONE**
**RECOVERY OF KINGATE GLOBAL SUBSEQUENT TRANSFERS -**
**11 U.S.C. §§ 550 AND 551 AND NYDCL § 278**

65.     The Trustee incorporates by reference the allegations contained in the previous
paragraphs of this Complaint as if fully rewritten herein.

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109),

the Trustee has dismissed all claims and allegations concerning Kingate Global. Accordingly, the

Vontobel Defendants aver that no response is required to the allegations of paragraph 65.

66.     Bank Vontobel received the Kingate Global Subsequent Transfers, totaling
approximately $1,889,529, which are recoverable pursuant to section 550(a) of the Bankruptcy
Code and § 278 of the NYDCL.

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109),

the Trustee has dismissed all claims and allegations concerning Kingate Global. Accordingly, the

Vontobel Defendants aver that no response is required to the allegations of paragraph 66.

67.     Each of the Kingate Global Subsequent Transfers was made directly or indirectly

to, or for the benefit of, Bank Vontobel.

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109),

the Trustee has dismissed all claims and allegations concerning Kingate Global. Accordingly, the

Vontobel Defendants aver that no response is required to the allegations of paragraph 67.

68.     Bank Vontobel is an immediate or mediate transferee of the Kingate Global Initial

Transfers.

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109),

the Trustee has dismissed all claims and allegations concerning Kingate Global. Accordingly, the

Vontobel Defendants aver that no response is required to the allegations of paragraph 68.

69.     As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy
Code, § 278 of the NYDCL, and SIPA 78fff-2(c)(3), the Trustee is entitled to a judgment against
Bank Vontobel recovering the Kingate Global Subsequent Transfers, or the value thereof, for the
benefit of the estate of BLMIS.

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109),

the Trustee has dismissed all claims and allegations concerning Kingate Global. Accordingly, the

Vontobel Defendants aver that no response is required to the allegations of paragraph 69.

## COUNT TWO
## RECOVERY OF KINGATE EURO SUBSEQUENT TRANSFERS -
## 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

1.     The Trustee incorporates by reference the allegations contained in the previous
paragraphs of this Complaint as if fully rewritten herein.

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109),

the Trustee has dismissed all claims and allegations concerning Kingate Euro. Accordingly, the

Vontobel Defendants aver that no response is required to the allegations of paragraph 1.

2.      Bank Vontobel received the Kingate Euro Subsequent Transfers, totaling
approximately $306,373, which are recoverable pursuant to section 550(a) of the Bankruptcy Code
and § 278 of the NYDCL.

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109),

the Trustee has dismissed all claims and allegations concerning Kingate Euro. Accordingly, the

Vontobel Defendants aver that no response is required to the allegations of paragraph 2.

3.      Each of the Kingate Euro Subsequent Transfers was made directly or indirectly to,
or for the benefit of, Bank Vontobel.

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109),

the Trustee has dismissed all claims and allegations concerning Kingate Euro. Accordingly, the

Vontobel Defendants aver that no response is required to the allegations of paragraph 3.

4.      Bank Vontobel is an immediate or mediate transferee of the Kingate Euro Initial
Transfers.

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109),

the Trustee has dismissed all claims and allegations concerning Kingate Euro. Accordingly, the

Vontobel Defendants aver that no response is required to the allegations of paragraph 4.

5.      As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy
Code, § 278 of the NYDCL, and SIPA 78fff-2(c)(3), the Trustee is entitled to a judgment against
Bank Vontobel recovering the Kingate Euro Subsequent Transfers, or the value thereof, for the
benefit of the estate of BLMIS.

**ANSWER**: Following the entry of the Kingate Stipulation on April 25, 2022 (Dkt. 109),

the Trustee has dismissed all claims and allegations concerning Kingate Euro.  Accordingly, the

Vontobel Defendants aver that no response is required to the allegations of paragraph 5.

## COUNT THREE
## RECOVERY OF FAIRFIELD SENTRY SUBSEQUENT TRANSFERS –
## 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

6.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

**ANSWER**: The Vontobel Defendants incorporate and reassert their responses to the

allegations contained in all of the previous paragraphs of this Complaint with the same force and

effect as if fully set forth herein.

7.    The Vontobel Defendants received the Fairfield Sentry Subsequent Transfers, totaling approximately $26,392,379, and Bank Vontobel received the Fairfield Sigma Subsequent Transfers, totaling the equivalent of approximately $1,163,932 (collectively, as defined above, the "Fairfield Subsequent Transfers"). The Fairfield Subsequent Transfers, totaling approximately $27,556,311, are recoverable pursuant to section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

**ANSWER**: The allegations contained in paragraph 7 constitute legal conclusions to which

no response is required. To the extent a response is required, the Vontobel Defendants deny the

allegations contained in paragraph 7.

8.    Each of the Fairfield Sentry Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Vontobel Defendants.

**ANSWER**: The allegations contained in paragraph 8 constitute legal conclusions to which

no response is required. To the extent a response is required, the Vontobel Defendants deny the

allegations contained in paragraph 8.

9.    The Vontobel Defendants are immediate or mediate transferees of the Fairfield Sentry Initial Transfers.

**ANSWER**: The allegations contained in paragraph 9 constitute legal conclusions to which

no response is required. To the extent a response is required, the Vontobel Defendants deny the

allegations contained in paragraph 9.

10.    As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA 78fff-2(c)(3), the Trustee is entitled to a judgment against

the Vontobel Defendants recovering the Fairfield Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER**: The allegations contained in paragraph 10 constitute legal conclusions to which no response is required.  To the extent a response is required, the Vontobel Defendants deny the allegations contained in paragraph 10.

## RESPONSE TO THE TRUSTEE'S REQUEST FOR RELIEF

The Vontobel Defendants deny that the Trustee is entitled to the judgment in his favor as against the Vontobel Defendants, in whole or in part.  The Vontobel Defendants further deny that this Court has jurisdiction to enter any such judgment.  Furthermore, to the extent that the Request for Relief concerns claims or allegations relating to Kingate Global or Kingate Euro, the Vontobel Defendants state that the Trustee has previously dismissed such claims, and thus no response is required.

## AFFIRMATIVE DEFENSES

The Vontobel Defendants assert the following defenses without assuming the burden of proof or any other burden if, as a matter of law, such burdens would otherwise be on the Trustee. The Vontobel Defendants reserve the right to amend this Answer to assert additional defenses, as well as the right to assert counterclaims or claims against third parties based on discovery in this adversary proceeding, or otherwise.

The following defenses are set forth cumulatively and in the alternative:

## FIRST AFFIRMATIVE DEFENSE
### (Personal Jurisdiction)

As set forth in the Vontobel Defendants' Motion to Dismiss the Complaint, filed on July 8, 2022, in this adversary proceeding (Dkt. 114), this Court lacks personal jurisdiction over Bank Vontobel.  Bank Vontobel has not consented to the authority of this Court.

28

## SECOND AFFIRMATIVE DEFENSE
### (Failure to State a Claim for Relief)

The Complaint fails to state a claim upon which relief can be granted, including

without limitation for the reasons stated in the Vontobel Defendants' Memorandum of Law

in Support of their Motion to Dismiss the Complaint (Dkts. Nos. 119, 125).

## THIRD AFFIRMATIVE DEFENSE
### (Dismissed Claims)

The Trustee's claims are barred to the extent they, and/or any allegations on which they are

based, have been or may in the future be dismissed or stricken by the Court, or are based on theories

or allegations that may in the future be rejected by this Court or by another court on appeal from

any orders of this Court.

## FOURTH AFFIRMATIVE DEFENSE
### (Safe Harbor: 11 U.S.C. § 546(e))

Pursuant to 11 U.S.C. § 546(e), the Trustee may not avoid any alleged Fairfield Sentry

Initial Transfers, or pursue under 11 U.S.C. §550(a) any recovery claims against Defendants

premised upon the alleged avoidance or avoidability of any alleged Fairfield Sentry Initial

Transfers, except to the extent that the Trustee can establish that such transfers were made with

actual intent to defraud within two years before the Filing Date.

## FIFTH AFFIRMATIVE DEFENSE
### (No Customer Property: 15 U.S.C. § 78fff-2(c)(3))

The alleged Fairfield Subsequent Transfers did not constitute BLMIS customer property.

As set forth in the Vontobel Defendants' Memorandum of Law in Support of their Motion to

Dismiss the Complaint, many of the alleged Fairfield Subsequent Transfers could not have been

sourced from BLMIS customer property because the allegedly avoidable transfers from BLMIS to

Fairfield Sentry had been distributed by Fairfield Sentry to its affiliates or other institutions prior to

the alleged Fairfield Subsequent Transfers.

## SIXTH AFFIRMATIVE DEFENSE
### (Initial Transfer Not Avoided: 11 U.S.C. 550(a))

The Trustee may not recover the alleged Fairfield Subsequent Transfers because the alleged Fairfield Sentry Initial Transfers have not been avoided.

## SEVENTHAFFIRMATIVE DEFENSE
### (Good Faith: 11 U.S.C. 550(b) and NYDCL §278(1))

To the extent that the Vontobel Defendants received any alleged Fairfield Subsequent Transfers or any proceeds thereof, such funds may not be recovered because the Vontobel Defendants took for value, in good faith, and without knowledge of the voidability of the alleged Fairfield Subsequent Transfers within the meaning of 11 U.S.C. § 550(b) and/or as a purchaser for fair consideration, without knowledge of the fraud at the time of the purchase or actual fraudulent intent within the meaning of NYDCL §§ 278(1) and (2).  Any such taking was made for value because those transfers were made in exchange for Fairfield Sentry's redemption of its own shares from the Vontobel Defendants.

To the extent that the Vontobel Defendants received any alleged Fairfield Subsequent Transfers or any proceeds thereof, they took in good faith because: (i) they lacked knowledge that BLMIS was not trading securities or was conducting a fraud, or of any fraudulent purpose behind the alleged Fairfield Subsequent Transfers; (ii) they lacked knowledge of the voidability of any alleged Fairfield Initial Transfers at the time they allegedly received any alleged Fairfield Subsequent Transfers; (iii) they lacked actual fraudulent intent at the time they allegedly received any alleged Fairfield Subsequent Transfers; (iv) they lacked knowledge of facts suggestive of any alleged fraud that would have caused a reasonable person in the Vontobel Defendants' position to conduct further inquiry; and (v) even if the Vontobel Defendants were on inquiry notice, a diligent inquiry would not have discovered the allegedly fraudulent purpose of any transfers at

issue or that BLMIS was not trading securities or was conducting a fraud. At all relevant times, the Vontobel Defendants had access to, and were aware of, only publicly available information about Fairfield Sentry and BLMIS, including the general information disseminated by Fairfield Sentry. Neither Defendants nor anyone acting on their behalf ever had personal access to Madoff or BLMIS, or met or communicated with them.

If, as the Trustee alleges, the Fairfield Sentry Initial Transfers are avoidable, the Vontobel Defendants had no knowledge of such avoidability.

## EIGTH AFFIRMATIVE DEFENSE
### (Single Satisfaction: 11 U.S.C. § 550(d) and NYDCL § 278(1)(a))

Under 11 U.S.C. 550(d), the Trustee "is entitled to only a single satisfaction under" 11 U.S.C. § 550(a). Under NYDCL § 278(1)(a), the Trustee may only set aside a conveyance "to the extent necessary to satisfy his claim."

Accordingly, to the extent that the Trustee has recovered, or will recover, from Fairfield Sentry or from any other immediate or mediate transferee the amount of any avoided initial transfer that includes Customer Property that the Trustee alleges was received by any of the Defendants, the Trustee is barred from recovering any such alleged transfer (or its proceeds) from a Defendant.

## NINTH AFFIRMATIVE DEFENSE
### (Mere Conduit/ Lack of Dominion or Control)

The Trustee's claims are barred because neither of the Vontobel Defendants was a transferee, for purposes of 11 U.S.C. § 550(a), of any of the alleged Fairfield Subsequent Transfers, as defined in the Complaint. To the extent that either Vontobel Defendant received any alleged Fairfield Subsequent Transfers, it did so in good faith, acting in its capacity as a bank and for the account and benefit of one or more of its customers. Neither Vontobel Defendant had dominion or control, or the right to assert dominion or control, over anyalleged Fairfield Subsequent Transfer or any proceeds thereof, or the right to use any part of any alleged Fairfield Subsequent Transfer

or the proceeds thereof for its own purposes. Rather, the Vontobel Defendants were obligated to credit the proceeds of any alleged Fairfield Subsequent Transfer to the account(s) of and for the benefit of one or more of its customers, who had the right to assert dominion and control over said alleged Fairfield Subsequent Transfers. Accordingly, to the extent that either Vontobel Defendant received any alleged Fairfield Subsequent Transfers or proceeds thereof, it did so as a mere conduit for third parties rather than as a transferee from which the Trustee may recover under 11 U.S.C. § 550(a). Such initial transfers would be barred by the safe harbor under § 546(e) of the Bankruptcy Code and the Vontobel Defendants may retain the amount they received pursuant to § 548 of the Bankruptcy Code because they took the transfers for value and in good faith.

## TENTH AFFIRMATIVE DEFENSE
### (British Virgin Islands Proceedings)

The Trustee's claims are barred, in whole or in part, based upon rulings, judgments, orders, or decisions entered in the Fairfield Sentry liquidation proceedings before the Eastern Caribbean High Court of Justice, Commercial Division, British Virgin Islands, including any associated appellate rulings, judgments, orders, or decisions.

## ELEVENTH AFFIRMATIVE DEFENSE
### (Extraterritoriality)

The Trustee's claims to recover from the Vontobel Defendants subsequent transfers allegedly made to them by Fairfield Sentry and Fairfield Sigma constitute an impermissible extraterritorial application of 11 U.S.C. § 550(a) and NYDCL § 278.

## TWELFTH AFFIRMATIVE DEFENSE
### (Comity)

The Trustee's claims to recover from the Vontobel Defendants subsequent transfers allegedly made to them by Fairfield Sentry and Fairfield Sigma violate principles of international comity.

## THIRTEENTH AFFIRMATIVE DEFENSE
### (Subject Matter Jurisdiction)

This Court lacks jurisdiction under Article III of the U.S. Constitution to enter final orders or judgments in this proceeding.

## FOURTEENTH AFFIRMATIVE DEFENSE
### (Unreasonable Delay)

The Trustee's delay in prosecuting his claims, which were brought more than a decade ago and concerns transfers made more than seventeen (17) years ago, is unreasonable and unfairly prejudices the Vontobel Defendants' ability to defend themselves.

## FIFTEENTH AFFIRMATIVE DEFENSE
### (Double Recovery)

On or about July 13, 2011, the Trustee entered into a settlement agreement with the Liquidators of Fairfield Sentry and other Fairfield funds. That agreement provides for the sharing of recoveries on the Trustee's and the Fairfield Sentry Liquidators' claims against defendants who allegedly received transfers of BLMIS customer property from Fairfield Sentry. The agreement was ultimately incorporated into the consent judgment entered against Fairfield Sentry.

To the extent that the Fairfield Sentry Liquidators recover from the Vontobel Defendants via settlement or otherwise, the Trustee is barred from recovering because he is not entitled to a double recovery, nor should the Vontobel Defendants be subject to recovery of the same monies by two separate plaintiffs.

## SIXTEENTH AFFIRMATIVE DEFENSE
### (Estoppel)

The Trustee's claim is barred by estoppel.

## SEVENTEENTH AFFIRMATIVE DEFENSE
### (No Ponzi Scheme Presumption)

33

The Trustee is not entitled to rely upon a "Ponzi scheme presumption" to prove that the initial transfers from BLMIS to Fairfield Sentry, which he seeks to recover from the Vontobel Defendants, were made with actual intent to hinder, delay or defraud any BLMIS creditor.

### EIGHTEENTH AFFIRMATIVE DEFENSE
### (Violation of Due Process (Amendment V to the U.S. Const.))

The use of the doctrine of law of the case to apply rulings made in other adversary proceedings of which they were not a party and did not otherwise participate in to the Vontobel Defendants violates the Vontobel Defendants right to due process of law, as garuanteed by the Fifth Amendment to the U.S. Constitution.

### NINTEENTH AFFIRMATIVE DEFENSE
### (Statute of Limitations)

The Trustee's claim is barred by the statute of limitations.

### TWENTIETH AFFIRMATIVE DEFENSE
### (No Interest)

To the extent the Trustee recovers from the Vontobel Defendants, the Trustee is not entitled to an award of interest.

### TWENTY-FIRST AFFIRMATIVE DEFENSE
### (Preservation of Rights: 11 U.S.C. § 502(h))

To the extent the Trustee recovers from the Vontobel Defendants, the Vontobel Defendants reserve their rights to assert a claim arising from any such recovery under 11 U.S.C. § 502(h).

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 9015 of the Federal Rules of Bankruptcy Procedure, Defendants hereby demand a jury trial on all claims and issues that may be tried by a jury.

## STATEMENT PURSUANT TO FED. R. BANKR. P. 7012(b)

The Vontobel Defendants do not consent, but instead object, to the entry of a final Order or Judgment against them by the Bankruptcy Court.

**WHEREFORE**, the Vontobel Defendants request that this Court dismiss the Complaint with prejudice, award the Vontobel Defendants their attorneys' fees, costs and disbursements incurred in connection with this adversary proceeding, and grant Defendants such other and further relief as the Court deems just and proper.

Dated: January 20, 2023                    Respectfully submitted,

**WUERSCH & GERING LLP**

*/s/ Gregory F. Hauser*
Gregory F. Hauser
Joshua A. Dachs
100 Wall Street, 10th Floor
New York, New York 10005
Telephone: (212) 509-5050
Gregory.Hauser@WG-Law.com
Joshua.Dachs@WG-Law.com
***Counsel for Defendants Bank Vontobel
AG f/k/a Bank J. Vontobel & Co. AG and
Vontobel Asset Management Inc.***

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 20th day of January, 2023, a true and correct PDF copy

of the foregoing has been electronically filed with the Clerk of the Court using the CM/ECF

system, which will send a notice of electronic filing to all counsel of record.


*/s/ Gregory F. Hauser*
Gregory F. Hauser