# Exhibit 26

# FAIRFIELD GREENWICH GROUP

# Fairfield Sentry Limited

Client Contact:

Gordon McKenzie
Fairfield Greenwich (Bermuda) Ltd
12 Church Street
Suite 606
Hamilton, Bermuda HM 11

Tel:      1 (441) 292-5401
Fax:      1 (441) 292-5413
E-mail:   gordon@fggbm.com

**New York** Main Office
919 Third Avenue
11th Floor
New York, NY 10022
Tel: 1 (212) 319-6060
Fax: 1 (212) 319-0450
E-mail: main@fggus.com

**London** Office
Pollen House
10-12 Cork Street
London W1S 3NP
Tel: +44 20 7534 9244
Fax: +44 20 7534 9245
E-mail: main@fgguk.com

**Bermuda** Office
12 Church Street
Suite 606
Hamilton, Bermuda HM 11
Tel: 1 (441) 292-5401
Fax: 1 (441) 292-5413
E-mail: main@fggbm.com

**Greenwich** Office
2 Soundview Drive
Greenwich, CT 06830
Tel: 1 (203) 629-8494
Fax: (203) 629-1395
E-mail: main@fggus.com

**Miami** Office
80 S.W. 8th Street
Suite 2018
Miami, FL 33130
Tel: (305) 373-8123
Fax: (305) 373-8113
E-mail: main@fggus.com

**Rio** Office
Ataulfo de Paiva 482
Suite 603
Leblon 22440-030
Rio de Janeiro, RJ Brazil
Tel: 55 21 2511 5783/5909
Fax: 55 21 2249 9505

**Lugano** Office
Via Maderno 6
6900 Lugano
Switzerland
Tel: 41 91 912 1069
Fax: 41 91 912 1066

**Madrid** Representative Office
Invercounsel, S.L.
Salustiano Olozago #4
Bajo Derecha
28001 Madrid, Spain
Tel: (3491) 578-1804
Fax: (3491) 577-3043
Email:
ordonez.counsel@terra.es

**Rotterdam** Representative
Office
Stockpart B.V.
Veerhaven 16
3016 CJ Rotterdam
The Netherlands
Tel: (3110) 436-3634
Fax: (3110) 436-0095
Email: fgg@planet.nl

www.fggus.com

FGANW005087359
FG-05234888

# TABLE OF CONTENTS

**1)      General Organizational Information   3**

A)    ADDRESS AND CONTACT INFORMATION ................................................................................ 3
B)    OWNERSHIP, EMPLOYEES AND COMPENSATION ................................................................... 5
C)    REGISTRATIONS, DOCUMENTS AND LEGAL PROCEEDINGS .................................................. 11
D)    RECENT ORGANIZATIONAL CHANGES ................................................................................ 12
E)    CLIENT PROFILE ................................................................................................................ 12
F)    MARKETING, CLIENT SERVICE AND REPORTING ................................................................ 13

**2)      Investment Strategy and Risk Control 14**

A)    INVESTMENT STRATEGY ..................................................................................................... 14
B)    RISK CONTROL AND PORTFOLIO CONSTRUCTION ............................................................... 17
C)    MARGIN DEBT, COUNTERPARTIES AND SECURITIES LENDING ............................................ 19
D)    USE OF DERIVATIVES ......................................................................................................... 20
E)    USE OF PRIVATE SECURITIES ............................................................................................. 21

**3)      Performance, Valuation and Fees      21**

A)    INVESTMENT PERFORMANCE ............................................................................................. 21
B)    VALUATION AND PRICING .................................................................................................. 22
C)    FEES ................................................................................................................................. 23

**4)      Trading, Operations, Technology and Compliance      24**

A)    TRADING AND COMMISSIONS ............................................................................................. 24
B)    OPERATIONS (BACK OFFICE) ............................................................................................. 25
C)    ADMINISTRATION ............................................................................................................... 26
D)    TECHNOLOGY .................................................................................................................... 27
E)    COMPLIANCE ..................................................................................................................... 27
F)    PERSONAL TRADING .......................................................................................................... 29

**5)      Authentication      29**

Fairfield Greenwich

2

FGANW005087360
FG-05234889

1) General Organizational Information

## *A) Address and Contact Information*

1.      Investment Manager Name:  Fairfield Greenwich (Bermuda) Ltd. - FGBL
   (Affiliate of the Fairfield Greenwich Group ("FGG"))

2.      Primary Address:

            12 Church Street
            Suite 606
            Hamilton, Bermuda HM 11

3.      Telephone Number:    1-(441) 292-5401

4.      Fax Number:    1-(441) 292-5413

5.      E-mail:    main@fggbm.com

6.      Internet address:    www.fggbm.com

7.      Primary Marketing/Client Contact:
            Gordon McKenzie, CPA

8.      Telephone Number:
            1 (441) 292-5401

9.      Primary Investment Management Contact:
            Amit Vijayvergiya, CFA, FRM

10.      Telephone Number:
             1 (441) 292-5401

11.      Name of person filling in questionnaire:
             Amit Vijayvergiya, CFA, FRM

12.      Telephone Number:
             1 (441) 292-5401

13.      Fairfield Greenwich Group Total Assets:
    Approximately $9.1 billion as of 03-31-2005
    (100% of assets are invested in hedge funds)

14.      Fairfield Greenwich (Bermuda) Ltd. Assets:
    Approximately $5.9 billion as of 03-31-2005

15.      Number of employees at Firm:
    FGG has 68 employees as of 03-31-2005

Fairfield Greenwich

3

CONFIDENTIAL

16.       Firm's branch offices :

Fairfield Greenwich (Bermuda) Ltd. ("FGBL") is an affiliate of the Fairfield
Greenwich Group ("FGG") and a wholly owned subsidiary of Fairfield
Greenwich Limited ("FGL").  FGG maintains its principal office in New York,
with a significant presence in London and Bermuda.  FGG also has
representation in the United States, South America, Asia and Europe.

17.       Contact information for the Investment Manager, the Administrator, the
Custodian, Legal Counsel, and the Auditor.

INVESTMENT MANAGER

Fairfield Greenwich (Bermuda) Ltd.
12 Church Street
Suite 606
Hamilton, Bermuda HM 11
Telephone: 1 (441) 292 - 5401
Facsimile:  1 (441) 292 – 5413

ADMINISTRATOR/CUSTODIAN/REGISTRAR/TRANSFER AGENT

Citco Fund Services (Europe) B.V.
Telestone 8 – Teleport
Naritaweg 165
1043 BWAmsterdam
P.O. Box 7241  1007 JE Amsterdam
The Netherlands
Telephone: (31-20) 572-2100
Facsimile:  (31-20) 675-0881

U.S. COUNSEL TO THE FUND

Law Offices of Andrew E. Goldstein
488 Madison Avenue, 16th Floor
New York, New York 10022
USA

U.S. COUNSEL TO THE INVESTMENT MANAGER

Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
USA

Gardner Carton & Douglas LLP

Fairfield Greenwich

4

CONFIDENTIAL

FGANW005087362
FG-05234891

191 North Wacker Drive
Suite 3700
Chicago, Illinois 60606-1698

BRITISH VIRGIN ISLANDS COUNSEL TO THE FUND AND THE
INVESTMENT MANAGER

Conyers Dill & Pearman
Romasco Place, Wickhams Cay 1
P.O. Box 3140
Road Town, Tortola
British Virgin Islands

AUDITOR

PriceWaterhouseCoopers
Marten Meesweg 25
3068 AV Rotterdam
The Netherlands

## B) Ownership, Employees and Compensation

1.    Please provide a brief history of the organization.

In 1983 Walter M. Noel, Jr. established a consulting firm to advise offshore
clients in connection with their investments in U.S. based alternative assets. Mr.
Noel had previously completed stints in the management consulting business
with Arthur D. Little & Co. and the international private banking business with
Citibank and Chemical Bank. At Chemical, he created the international private
banking group in 1977 and helped establish a network of asset management
offices throughout the world, until his departure in 1983.

Following the establishment of his consulting business, Mr. Noel developed a
number of relationships with investment managers, e.g. Martin Zweig, Tweedy,
Brown & Co., Morgans, Waterfalls & Vintiadis, who he determined had the
capital preservation, low volatility characteristics appropriate for his client base.

In 1987, Fred Kolber and Jeffrey Tucker, tenants in Mr. Noel's office space,
launched the Greenwich Options Fund ("GOF"), a domestic hedge fund. Mr.
Kolber had built a successful business during the prior 25 years managing his
own money in a variety of hedge and arbitrage strategies. GOF marked Mr.
Kolber's entry into the money management business as he sought to extend to
passive investors the opportunity to participate in his trading activities, then
focused on market-making in equity and equity index options using a market
neutral posture in most positions.

Mr. Tucker had previously been engaged in the practice of law for 17 years, and
Mr. Kolber was a client of his firm. In 1987 Tucker joined Kolber as a minority

Fairfield Greenwich

5

CONFIDENTIAL

FGANW005087363
FG-05234892

partner of the fund management business, providing assistance in the administration and marketing of GOF.

In 1988 Messrs. Noel, Kolber and Tucker created Fairfield Investment Fund, Ltd. ("FIF"), an offshore counterpart of GOF. The precipitous growth of assets in the funds and the changes being experienced in the equity options markets, i.e. declining liquidity and the increasing influence of the professionals, necessitated a reduction of assets in GOF and FIF. Consequently, Noel, Kolber and Tucker sought and received a mandate from their clients to outsource the management of a portion of the funds. Thereafter, Noel and Tucker embarked upon an effort to identify managers meeting their capital preservation, low volatility approach to investing. Contemporaneous with this effort, the three formed Fairfield Greenwich Group (FGG).

In 1989, FGG became acquainted with the split-strike conversion strategy. As the strategy employed "tight" stops (put and call strikes fairly close together) it appeared appropriate for FGG clients. In April 1989, FGG started its relationship with Bernard L. Madoff Investment Securities, Inc., and it incorporated the strategy into a multi-strategy fund. And, in December 1990 the Fairfield Sentry Limited Fund ("Sentry" or the "Fund") was officially launched as a single-strategy fund employing the split-strike conversion strategy.

In 1997 the firm was merged with Littlestone Associates of New York City. Following the merger, Littlestone's principal, Andres Piedrahita, established a London office for the UK subsidiary, and became the third partner in the Fairfield Greenwich Group, in addition to Walter Noel and Jeffrey Tucker.

Today the firm's personnel are deployed in New York, Greenwich, London, Miami, Madrid, Rio de Janeiro, Lugano, Bermuda, and Holland. The New York office of the firm is responsible for the review and monitoring of the portfolios of the existing managers, for the identification of possible additional managers, and the marketing the firm's investment products. Fairfield Greenwich Group manages more than $9.0 billion for over 900 holders of record representing over 10,000 investors worldwide. FGG offers single manager hedge fund, multi-strategy hedge funds, and fund of hedge funds, as well as related alternative asset investment products.

2.   What is the current legal and ownership structure of the managing organization ?

Fairfield Greenwich (Bermuda) Ltd. is a corporation organized under the laws of Bermuda. It is a wholly owned subsidiary of Fairfield Greenwich Limited, an exempted company organized under the laws of the Cayman Islands. The Fairfield Sentry Limited Fund is domiciled in the BVI, and was incorporated in 1990 as an International Business Company under the International Business Companies Act of the British Virgin Islands.

Fairfield Greenwich

6

CONFIDENTIAL

FGANW005087364
FG-05234893

3.    List all related entities and the role of each one:

The Investment Manager and its affiliates currently serve as investment or administrative manager to numerous funds, and have exclusive distribution arrangements with several others.  The following entities are wholly owned subsidiaries of Fairfield Greenwich Limited:

- Fairfield Greenwich Advisors LLC is registered with the SEC as an investment advisor
- Fairfield Greenwich (UK) Limited is licensed by the Financial Services Authority (FSA)
- Fairfield Heathcliff Capital LLC, an affiliate of FGL, is registered with the SEC and NASD as a broker-dealer
- Fairfield Greenwich Limited is registered with the CFTC (as a Commodity Pool Operator) and is a member of the NFA (National Futures Association)

Fairfield Greenwich Limited, which is registered in the Cayman Islands, is the holding company for:  Fairfield Greenwich Advisors LLC, Fairfield Greenwich Partners LLC, Fairfield Greenwich (Bermuda) Ltd, and Fairfield Greenwich (UK) Limited.  Fairfield Heathcliff Capital LLC is an affiliated broker-dealer.

4.    List all key employees, and the role of each one:

Investment idea generation/Research :
Walter Noel, Andres Piedrahita, Jeffrey Tucker, Harold Greisman, Amit Vijayvergiya.

Trading :

The Investment Manager has established non-discretionary accounts for the Fund at a registered broker-dealer in New York.  This broker-dealer executes a strategy described as "split-strike conversion", to which the Investment Manager allocates the predominant portion of the Fund's assets.

Risk Control:
Amit Vijayvergiya, Charles Oddy

Finance and Operations:
Rob Blum, Dan Lipton, Nancy Ng, Gordon McKenzie

Legal:
Mark McKeefry, Anthony Dell'Arena, John Donachie

Client Service:
clientservice@fggus.com

Fairfield Greenwich

7

CONFIDENTIAL

FGANW005087365
FG-05234894

5.        Provide brief biographies (education and prior employment) of key personnel, including all those listed in being in charge of an area.

**Walter Noel**

Mr. Noel, a Founding Partner of FGG in 1983, continues with his long-time partners, Jeffrey Tucker and Andres Piedrahita, to oversee all of the firm's activities. He is a member of FGG's Executive Committee, serves as a Director for many FGG funds and management company entities, and has focused on marketing and the client side of the business. Prior to FGG, he was a Senior Vice President for seven years at Chemical Bank where he headed the International Private Banking Department.

He worked as a Vice President in a similar area at Citibank from 1974 to 1977. He began his international private banking career as President from 1972 to 1974 of Bahag Banking, Lausanne, Switzerland. Earlier, for twelve years, Mr. Noel was a consultant in the Management Services Division of Arthur D. Little, Inc. He received a Bachelor of Arts degree from Vanderbilt University in 1952, a Master of Arts in Economics from the Harvard Graduate School in 1953, and an LL.B from the Harvard Law School in 1959. He is based in the Greenwich office.

**Andres Piedrahita**

Mr. Piedrahita is a Founding Partner of FGG with over 23 years experience in the investment business. He is also is a member of FGG's Executive Committee, and serves as a Director for many FGG funds and management company entities. He founded Littlestone Associates in 1991 where he was owner and CEO. In 1997 Littlestone merged with Fairfield Greenwich Group, where Mr. Piedrahita has remained. He is currently responsible for FGG's European and Latin American activities and is based in London and Madrid. Prior to Littlestone, Mr. Piedrahita worked as a Financial Consultant at Prudential Bache Securities Inc. (1981 to 1987). He was then Vice President of Shearson Lehman Hutton from 1987 to 1990. Mr. Piedrahita received his Bachelor's Degree from the Boston University School of Communications.

**Jeffrey Tucker**

Mr. Tucker is a Founding Partner of FGG and is a member of FGG's Executive Committee, directing the firm's business and operations activity. He also serves as a Director for many FGG funds and management company entities. Prior to FGG, he was a General Partner of Fred Kolber & Co. L.P. ("FKC"), a broker-dealer that merged with FGG in 1989, where he helped develop an options trading fund. From 1978 to 1987, he was a Partner in the law firm of Tucker, Globerman & Feinsand P.C., where he specialized in advising on direct participation offerings and limited partnership interests. Mr. Tucker began his career in the Securities and Exchange Commission's Division of Enforcement in 1970 and became Assistant Regional Administrator of the New York Regional Office in 1975. Mr. Tucker received his Bachelor of Arts

Fairfield Greenwich

8

CONFIDENTIAL

FGANW005087366
FG-05234895

degree from Syracuse University in 1966 and his Juris Doctor degree from Brooklyn Law School in 1969. He is based in the New York office.

**Robert Blum**

Mr. Blum is Managing Partner of FGG, overseeing or assisting in all aspects of its activities, and is a member of FGG's Executive Committee. He is also a Director of Fairfield Straits Lion Asset Management Limited, the Singapore-based joint venture of FGG and Straits Lion Asset Management Limited, as well as of a number of other FGG funds and management company entities. Mr. Blum has over 20 years of directly relevant operational and legal experience in the alternative asset management arena. He previously worked at CIBC Oppenheimer Corp. (1989 to 1999) where he was a Managing Director, a member of the firm's Management and Operating Committees, and served in various roles during his career, including Deputy General Counsel. At CIBC Oppenheimer, Mr. Blum had extensive business responsibility (including management and operational roles) and legal involvement in the development of a wide range of transactions and businesses in the alternative and conventional asset management areas. Mr. Blum began his career as an associate in the law firm of Fulbright & Jaworski (1984 to 1989). Mr. Blum received his Bachelor of Arts degree from the University of Pennsylvania and his JD from the University of Chicago Law School. He is based in the New York office..

**Harold Greisman**

Mr. Greisman, Partner, serves as FGG's Chief Investment Officer and is a member of FGG's Executive Committee; he also focuses on manager selection and risk oversight. He has over 20 years of experience in the investment business. Prior to joining FGG in 1990, Mr. Greisman was an Associate in the Capital Markets Group of Continental Bank (1984 to 1985) and then a Vice-President for DNB Capital Corporation (1985 to 1990), a proprietary private equity & venture capital operation controlled by Den Norske Bank. He began his career at Johnson & Higgins, a large industrial insurance brokerage (1978 to 1982). Mr. Greisman received his Bachelor of Arts degree from Tufts University and his Master of Business Administration degree from the Stern School of Business at New York University. He is based in the New York office.

**Richard Landsberger**

Mr. Landsberger, Partner, is responsible for business development and general management issues in Europe and Asia and directly markets products to a global institutional client base. He is also a member of FGG's Executive Committee and a Director of Fairfield Straits Lion Asset Management Limited, the Singapore-based joint venture of FGG and Straits Lion Asset Management Limited. He has over 20 years of experience in capital markets. Prior to joining FGG in 2001, Mr. Landsberger was Managing Director of Fixed Income Sales at PaineWebber (1993 to 2000). He was previously Managing Director and Head of Fixed Income Government Trading & Sales at Citicorp

Fairfield Greenwich

9

CONFIDENTIAL

Securities (1989 to 1992). Mr. Landsberger received his Bachelor of Arts degree from Boston University and his Master of Business Administration Degree from Cornell University. He is based in the London office.

**Mark McKeefry**

Mr. McKeefry, Partner, is General Counsel for FGG. He joined FGG in 2003, after eight years in private practice in New York and California, where he advised broker-dealers and investment advisors on regulatory and compliance issues for onshore and offshore funds. He is the author of several articles on hedge fund compliance issues and investment advisor trading practices. Mr. McKeefry received his Bachelor of Science degree from Carnegie Mellon University and his Juris Doctor degree from Fordham University, where he was a member of the Law Review. Prior to attending law school, he was a professional engineer, licensed by the State of California as a civil engineer. Mr. McKeefry is admitted to the bars of California and New York.

**Daniel Lipton**

Mr. Lipton, Partner, serves as FGG's Chief Financial Officer; he also assists in managing FGG's operations. He joined FGG in 2002 after nine years at Ernst & Young, where he was a Senior Manager in the Financial Services Assurance and Advisory Business Services Department, in charge of auditing and consulting engagements, specializing in alternative assets, private equity, venture capital, and domestic and offshore funds. Mr. Lipton has also taught seminars on financial products and hedge funds. He received his Bachelor of Arts degree in Economics from Tufts University and his Master of Business Administration dual degrees in Accounting and Finance from New York University's Stern School of Business; he is also a Certified Public Accountant.

**Amit Vijayvergiya**

Mr. Vijayvergiya is Vice President and the Head of Risk Management of the Investment Manager and focuses on manager selection and risk management for the firm. He has been employed by the Investment Manager since 2003. Mr. Vijayvergiya has over 11 years of experience in asset management, risk management and operations research. Prior to joining the Investment Manager, from 2000 to 2003, Mr. Vijayvergiya managed a family office investing in traditional and alternative investment managers. From 1998 to 2000, he was the General Manager of LOM Asset Management ("LOM AM"), where he oversaw the management of $160 million in assets. At LOM AM, Mr. Vijayvergiya structured and managed several multi-manager funds and served on the firm's management and investment committees. Mr. Vijayvergiya holds a Master of Business Administration degree from Schulich School of Business at York University, a Bachelors of Science in Statistics from the University of Manitoba and a Bachelors of Arts in Economics from the University of Western Ontario. Mr. Vijayvergiya holds the Chartered Financial Analyst designation and the Financial Risk Manager certification.

Fairfield Greenwich

10

CONFIDENTIAL

6.      Are all employees potentially eligible to become owners/partners? What
        determines eligibility for ownership/partnership?

        Yes. The criteria are subjective, but based upon individuals' demonstrated
        ability to enhance enterprise value.  Currently, 14 employees are shareholders.

7.      Do any of the owners or employees invest their personal capital in the firm's
        investments?

        The Partners of FGG seek to align their interests more fully with those of the
        firm's clients by investing a significant portion of their own shareholders'
        capital with the Fund.

8.      Do any of the firm's principals have other business involvements?  If so, what
        fraction of their professional time is allocated to the firm ?

        No.

## C) Registrations, Documents and Legal Proceedings

1.  Which regulatory agencies (i.e. SEC, IMRO) has the organization registered with?
    What is the date of registration for each ?

        Fairfield Greenwich (UK) Limited is licensed by the Financial Services
        Authority (FSA).  FGGUK was authorized and regulated from October 1998
        under IMRO, Investment Management Regulatory Organization, which was
        merged in December 2001 into the Financial Services Authority. (FSA)
        Fairfield Heathcliff Capital LLC, an affiliate of FGL, is registered with the SEC
        and NASD as a broker-dealer (April 2001)

        Fairfield Greenwich Advisors LLC is registered with the SEC as a Registered
        Investment Advisor in 2004.

2.   Does the company have any other registration?

        Yes, FGL is registered with the CFTC as a Commodity Pool Operator.  It is also
        registered with the National Futures Association.

3.  Is any material, criminal, civil or administrative proceeding pending or threatened
    against the firm, its funds, or any of its principals? If so, please provide a detailed
    explanation.

        No.

4.  Has any material, criminal, civil or administrative proceeding been settled by the
    firm, its funds, or any of its principals in the past ? If so, please provide a detailed
    explanation.

        No

Fairfield Greenwich

11

CONFIDENTIAL

5. Copies of the following documentation can be obtained from your FGG representative upon request.

   a) Offering Memorandum
   b) Subscription Document
   c) Audited Financial Statements, Auditors Reports and Management Letter
   d) Form ADV (all parts) if applicable
   e) Organizational Chart
   f) Written policies regarding insider trading
   g) Insurance (Fidelity, D&O, Errors and Omissions). List amounts and carrier (AIG, XL, Travelers, HCC - $5MN each)

## D) Recent Organizational Changes

1. Have you had any significant changes to your organization over the past year such as a merger, a strategic alliance, or an internal reorganization?

   On May 18, 2004, the Board of Directors of Fairfield Sentry Limited ("Sentry" or the "Fund") authorized the introduction of a 1% per annum management fee on the Class A shares of the Company. Commencing October 1, 2004, the Company's Class A shares were subject to a 1% per annum management fee. The fee of the Company's Class B shares remained unchanged. As such Class B shareholders will be issued shares of Fairfield Sentry Limited at the September 30, 2004 net asset value of the Class A shares. There is only one class of shares issued going forward.

2. Summarize the gains and losses of employees over the past five years.

|                  | 2004 | 2003 | 2002 | 2001 | 2000 |
|------------------|------|------|------|------|------|
| Employees added  | 17   | 19   | 13   | 10   | 5    |
| Employees lost   | 2    | 5    | 1    | 0    | 0    |
| Total year end # | 70   | 41   | 29   | 19   | 14   |

3. Plans for expansion in the near future (next two years):

   As AUM grow and FGG adds managers and rolls out new product offerings, analysts, accounting, risk, and client services personnel may be added.

## E) Client Profile

1. Do you have domestic qualified plan (ERISA or similar) investors in your offshore funds?

   FGG has a number of pension fund clients in some of its offshore funds.

Fairfield Greenwich

12

2.    Do you accept money in your offshore funds from domestic (i.e. onshore) funds of funds that are composed entirely of qualified plan (ERISA or similar) investors?

No.

3.    Summarize your client base.

FGG has more than 900 holders of record representing private and commercial banks, insurance companies, government authorities, financial advisors, family offices, and other institutional investors. An estimated 1/3 are institutional investors.

4.    Do you manage separate accounts?

FGG does manage separate accounts for various non-Sentry funds. To justify the time and effort, account minimum is usually US $50 million.

5.    Are separate account investors allowed to choose a custodian/prime broker? If yes, which prime brokers are you most comfortable working with?

This request will be considered on a case by case basis.

6.    List the amount of firm assets gained/lost over the past 5 years:

| Year End | Total FGG Assets | Est. # Clients |
|----------|------------------|----------------|
| 2004 | 8.2 Billion | 900 |
| 2003 | 5.8 Billion | 700 |
| 2002 | 5.2 Billion | 600 |
| 2001 | 4.3 Billion | 585 |
| 2000 | 3.2 Billion | 530 |
| 1999 | 2.5 Billion | 450 |

The Fairfield Greenwich Group in its underlying funds has over 900 holders of record representing banks, family offices, government authorities, and institutional investors. These relationships may represent over 10,000 individual investors.

## F)    *Marketing, Client Service and Reporting*

1.    How are the funds marketed? Are any third party marketers used to market the funds? How are they reimbursed?

The Fairfield Greenwich Group has been marketing the Fund. While the Fund may engage a placement agent to market the fund, due to the limited capacity of this Fund, third party sales have become limited.

Fairfield Greenwich

13

CONFIDENTIAL

2.  List all reports and correspondence that are sent routinely to clients. How often are they sent?

> Weekly NAV Estimates (produced by Fairfield Greenwich (Bermuda) Ltd.)
> Monthly NAV (provided by CITCO)
> Monthly aggregated risk reports (confidentiality agreement must be signed)
> Monthly Tear Sheets
> Annual and semi-annual Report with audited financial statements
> Semi-annual investor letter

3.  What level of transparency is routinely offered to clients?

> Aggregated risk transparency is provided to meet the clients' needs, with some restrictions determined on a case-by-case basis. A confidentiality agreement must first be signed.

4.  Additional services?

> Additional analyses and periodic communications are sent to clients as required.

## 2)    Investment Strategy and Risk Control

### A)    *Investment Strategy*

1.  Do you employ a single investment strategy or is your fund a multi-strategy fund? Explain your strategy.

> Fairfield Sentry Limited ("Sentry" or the "Fund") primarily employs a single investment strategy that seeks to obtain capital appreciation of assets through the utilization of a market timing strategy described as a modified "split-strike conversion," to which the Fund allocates the predominant portion of its assets. This strategy has defined risk and profit parameters, which may be ascertained when a particular position is established. Set forth below is a description of the "split-strike conversion" strategy ("SSC Investments").
>
> The construction of a typical position entails the following transactions: (i) the purchase of a basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the simultaneous purchase of out-of-the-money index put options in a notional amount that approximates the market value of the stock basket, and (iii) the sale of an equal and equivalent number of out-of-the-money index call options. An index call option is out-of-the-money when its strike price is greater than the current price of the index; an index put option is out-of-the-money when the strike price is lower than the current price of the index.
>
> The logic of this strategy is that once a long stock position has been established, selling a call against such long position will increase the standstill rate of return, while allowing upward movement to the short call strike price. The purchase of an out-of-the-money put, funded with part or all of the call premium, protects the equity position from downside risk.

Fairfield Greenwich

14

The options transactions executed for the benefit of the Fund may be effected in the over-the-counter market or on a registered options exchange.

The Investment Manager, in its sole and exclusive discretion, may allocate a portion of the Fund's assets (never to exceed, in the aggregate, 5% of the Fund's Net Asset Value at the time of investment) to alternative investment opportunities other than its modified "split-strike conversion" investments (the "Non-SSC Investments"). It is anticipated that the Non-SSC Investments will be allocated to new investment vehicles managed by experienced management teams establishing themselves in new investment businesses ("Emerging Managers"), with no single allocation exceeding $50 million at the time it is made. These arrangements may include "lock-up" provisions of varying durations of these assets in such investments, subject to early release for breach of risk control or performance guidelines, or for cause. FGBL and the Fund generally share in fees received by portfolio managers of Non-SSC Investments from investors other than the Fund. The Fund will pay fees with respect to the Non-SSC Investments at a rate that will not exceed the Fund's rate of fees (in certain cases, this may be accomplished by FGBL subsidizing, from its own moneys, the fees charged on these assets by Non-SSC Investment managers).

2.  Are the market inefficiencies you exploit present continuously or do they appear sporadically? What market environments favor or hinder the availability of investment opportunities?

    This strategy performs best in a market with an upward bias with moderate volatility. The strategy requires modest market volatility for opportunistic implementation in a tactical sense.

    A relatively unfavorable situation would be a stagnant market with very little volatility and poor market participation.

3.  How are investment ideas generated and how are they implemented? What are your primary sources of research? What securities and instruments are used to implement your views?

    The Fund's investment process is not driven by fundamental research, but rather market timing.

4.  Do you use any external investment sub-advisors? If you do, identify them, describe their contribution to your investment process, and describe how their performance and compliance with your investment guidelines are monitored.

    Sub-advisors' are not used for the split-strike conversion strategy to which the Fund allocates at least 95% of assets, however, the Fund may seed new managers with up to 5% of the Fund's assets (not to exceed $50 million per manager). These managers undergo an extensive due diligence process and investment parameters are jointly developed with the Investment Manager. These parameters are closely monitored on an ongoing basis by the risk team. As a requirement of the seeding agreement, these managers must provide full position transparency.

Fairfield Greenwich

15

CONFIDENTIAL

5. Describe your criteria for a new investment. Are your investment criteria purely objective (i.e. all investments that meet a fixed set of criteria are entered into) or are they partially or wholly subjective (i.e. investment criteria are not entirely pre-determined and/or each investment is considered on its own merits possibly using its own unique set of criteria)

The Investment Manager will remain in cash if an opportunity is not identified. A fixed set of criteria and investment parameters are in place and non-discretionary brokerage accounts have been established at an NASD-registered broker dealer in New York. This broker dealer has discretion with respect to price and timing only.

6. Are new investments considered in isolation (i.e. purely as a good long holding) or as part of a hedged basket (e.g. as one leg of a market neutral pair)?

When a decision is made to implement the strategy, the stock basket and put options are purchased concurrently. One is never purchased in isolation of the other. The purpose of the short call transactions is to largely finance the put hedge and to enhance the "stand still" rate of return of the overall strategy. The calls are normally sold at the same time as the stocks and puts are purchased. The Investment Manager tries to take advantage of each investment opportunity within this structure.

7. What is the expected return of the portfolio? How do you arrive at this number?

Historically, the Fund has returned about 400 to 500 basis points above one month USD LIBOR on a net-to-client basis. This spread over LIBOR has been quite consistent over the past ten years and across different market conditions.

8. How and when are existing positions in the portfolio closed out?

If at some time subsequent to an implementation of the SSC strategy, it was determined that little or no opportunity existed for further appreciation of the portfolio, the stock and options positions would be unwound and the Fund would be completely invested in short-dated U.S. Treasuries.

9. What level of turnover do you experience? What is your average holding period?

In general, the Fund implements the split-strike conversion strategy about 6-8 times each year. The investment horizon of a typical implementation cycle may range from 2 to 8 weeks, though it may on occasion be more or less than this.

10. What fraction of a day's trading volume do you limit your positions and trades to?

There is no stated limit because the Fund trades only in highly liquid stocks that included in the S&P 100 Index.

11. What is the capacity of your strategy, and what is the primary determinant of this? At what level of assets will the fund be closed to new investors? At what level of assets will the fund be closed to existing investors?

Fairfield Greenwich

16

**The Fund has been closed to net new investment since 2000, however, the Fund currently recycles redemptions with subscriptions.** FGG's multi-strategy funds can, however, continue to access the Fund.

On May 18, 2004, the Board of Directors of Fairfield Sentry Limited ("Sentry" or the "Fund") authorized the introduction of a 1% per annum management fee on the Class A shares of the Fund. Commencing October 1, 2004, the Fund's Class A shares are subject to a 1% per annum management fee. The fee of the Fund's Class B shares will remain unchanged. As such, Class B shareholders were issued shares of Fairfield Sentry Limited at the September 30, 2004 net asset value of the Class A shares. There is only one Class of shares going forward, Fairfield Sentry Limited.

12. Do you hold any illiquid securities such as 144a stock?

No.

13. What is the minimum, average and maximum exposure to cash? How is cash managed?

This strategy can be invested up to 100% in cash when not invested in the split-strike conversions. This can be for a significant portion of time while the Fund protects capital during unfavorable market conditions.

14. What are your borrowing costs and what do you earn from your short rebate?

Not applicable in this strategy.

The Investment Manager of Fairfield Sentry Limited has established non-discretionary trading accounts for the Fund at a broker dealer in New York. The cash accounts do not permit the use of margin or borrowings against assets in the accounts and are segregated from other non-Sentry accounts.

## B) *Risk Control and Portfolio Construction*

1. How do you view risk and how is it controlled? Do you have a risk manager? Do you use quantitative tools for risk control? If so, how are they used?

Due to the collar used in the split-strike conversion strategy, the portfolio has defined risk/reward parameters. The portfolio would not normally be subject to extreme market movements due to the nature of the long protective put and the short call position. However, risk is measured and monitored both qualitatively and quantitatively using a number of in-house and third party risk tools. The risk team monitors positions and this risk data to determine that the portfolio is within investment guidelines. Investment risk is monitored for all FGG moderate return, low volatility strategies. To that end, FGG oversight determines that all investments are within pre-determined investment guidelines.

This holds true for all non-SSC managers in the Fund as well. Extensive due diligence is performed on these managers due to the strategic alliances formed between them and FGG, allowing for full transparency and disclosure of investment,

FairfieldGreenwich

17

business and operating risk. Additionally, they have operating guidelines that provide a peak to trough drawdown limit of 10%.

Also, should the Fund's aggregate position in all non-SSC managers be in deficit, at the end of any annual period, against their original investment amount, Fairfield Greenwich (Bermuda) Ltd. will temporarily forego receipt of all performance fees that it would otherwise receive on the overall appreciation of Fairfield Sentry Limited in subsequent fee periods until such time as Fairfield Sentry Limited's initial investment level in those non-SCC funds is recovered from fees foregone by FGBL and/or subsequent aggregate Non-SCC fund investment appreciation. FGBL will recapture the previously delayed performance fees to the extent that there is subsequent aggregate Non-SCC fund investment appreciation.

2.  Do you calculate VaR and do you Stress Test the portfolio?

    Yes. Every month, FGG performs Monte Carlo VaR calculations with a 95% confidence interval and a one-month time horizon. In addition, to determine the portfolios sensitivity to extreme market events , FGG applies a number of stress tests to the portfolio. These reports are calculated at several levels of aggregation in order to develop a comprehensive understanding of the sources of risk in the portfolio. Risk numbers are also tracked over time to determine a "risk profile" for each FGG manager and to evaluate risk results against realized returns.

3.  Do you have risk limits for market risk?

    No, we do not have a defined limit, but we do monitor the risk profile of the portfolio over time through many calculations. FGG's main concern is not with a particular risk number as much as a major variation in the profile of the Fund.

4.  How are hedges constructed? Does each long position have a corresponding short position or do you view the portfolio as a long basket offset by a short basket?

    The hedging of the portfolio of long-only stocks is created with an options collar. When a basket of stocks is purchased, a protective collar is always purchased, with the notional value of the long put options that approximates the market value of the underlying basket. The sale of an out of the money call finances the purchase of the protective put and enhances the "stand still" rate of return.

5.  What is the range of permissible gross exposure to a single industry or sector?

    The basket of stocks consists of U.S. equities represented on the S&P100 index, and is constructed in such a manner to replicate the performance of the Index with minimal tracking error.

6.  Is the portfolio beta neutral in each sector? If not, is there an allowable range of sector betas?

    The portfolio does not aim to be beta neutral in each sector.

Fairfield Greenwich

18

FGANW005087376
FG-05234905

7.  What is the allowable range for the net market exposure (minimum/maximum/historical average) of the portfolio?

Gross exposure of the Fund ranges from 0% to 100%, as the Fund is either in cash or fully invested. However, the Fund is not normally subject to extreme market movements due to the nature of the option coverage.

8.  What level of leverage (minimum/maximum/historical average) do you employ? How do you define leverage? Does it include off balance sheet items?

No leverage is used on the portion of the Fund's assets invested in the split-strike conversion strategy portion (95%+).  However, non-SSC managers to which the Fund may allocate up to 5% of its capital may use leverage.  The non-SCC investment vehicles in which the Fund invests may borrow funds in connection with their investment strategies.  However, all FGG managers must still adhere to the FGG leverage limits that are low relative to competitors.

9.  What is the volatility (minimum/maximum/historical average, measured by annualized standard deviation) of the portfolio?

The standard deviation of the Fund is under 3% since inception of the Fund.

10. Approximately how long does it take to sell all portfolio securities for redemption request?

The Fund invests in S&P 100 stocks which are extremely liquid. Redemptions require a 15-day notice period and can be accommodated in an orderly manner with no disruption expected to the Fund or other investors.  In addition, because there are over 900 investors of record representing thousands of underlying investors, the likelihood that the entire portfolio would be redeemed is extremely low.

11. Maximum Drawdown?

In November 1994, the Fund incurred its largest drawdown of -0.64%. Recovery took only 1 month.

12. How often is the portfolio rebalanced?

Once the split-strike conversion strategy has been implemented, it is under constant review to ensure that the investment guidelines have not been violated.

## C)    *Margin Debt, Counterparties and Securities Lending*

1.  Who are your lenders for margin, and what relationship if any do they have to the firm, its principals, or any of the firm's funds? Do you have multiple prime brokers?

A registered broker dealer in New York acts as the prime broker for at least 95+% of the assets invested in the split-strike conversion strategy. Each seedling manager may select their own prime broker.

Fairfield Greenwich

CONFIDENTIAL

FGANW005087377
FG-05234906

2. Do you use exchange traded instruments or OTC? List a breakdown of which instruments are exchange traded or OTC.

The strategy employs S&P 100 stocks and OTC options.

3. How do you evaluate counterparties and how do you monitor counterparty risks? Do your counterparties have trading limits? How often are counterparties reviewed?

For the OTC options, there is a list of approved counterparties. Only well capitalized investment banks are used as counterparties. There are counterparty trading limits and the bank's creditworthiness is reviewed regularly.

4. Do you engage in securities lending? If so, please provide us with a written set of lending guidelines. What fraction of the portfolio's return can be attributed to securities lending?

No.

## D)    *Use of Derivatives*

1. Do you use derivatives to implement your investment decisions?

The Fund uses put and call options as an integral part of the split-strike conversion strategy.

2. If you do use derivatives, do you maintain a written derivatives policy statement?

The use of options is an integral part of the strategy and strict but simple guidelines dictate the use of these options. When the basket of stocks is purchased, out of the money put options must be purchased with a notional value that approximates the market value of the long stock basket. Out of the money calls are sold to finance the purchase of the puts and to increase the "stand still" rate of return of the portfolio.

3. Please list all derivative instruments that are used and explain why are they used instead of physicals. Can you quantify the benefit of using derivatives instead of physicals?

A collaring strategy is used to hedge the portfolio by overlaying the basket of stocks with long put options and short call options. The put options, funded in part with the proceeds of the sale of the calls and any dividend stream, protect the equity position from downside risk beyond the strike price of the puts. The dollar value underlying these option positions approximates the market value of the basket of stocks at the time of trade completion.

4. If futures are used, are they used expressly for hedging or are they used to generate unhedged returns as well? Furthermore, is the aggregate open interest monitored?

No other derivatives are used.

Fairfield Greenwich

20

CONFIDENTIAL

### E)    Use of Private Securities

1.  Do you invest in private securities or private placements of public securities?  Do you invest in such securities only when no public equivalent exists?

    The SSC portion of the Fund invests only in liquid public securities.  The non-SSC portion may invest with managers invest in a very small amount of private securities.

2.  If you invest in private securities, estimate the expected advantage to the portfolio relative to holding a similar public security.

    N/A

3.  What is the range of permissible gross exposure (minimum/maximum/historical average) to private securities?

    N/A

4.  Where are private securities held?

    N/A

5.  How are private securities valued and how is their risk estimated?

    N/A

6.  What is the average holding period for private securities and what exit strategies are used to dispose of them?

    N/A

## 3)    Performance, Valuation and Fees

### A)    Investment Performance

1.  Please provide the monthly performance history for the product, from inception, net of all fees and expenses.

Fairfield Greenwich

21

FGANW005087379
FG-05234908

Please ask your FGG representative for a current copy.

2. Does the performance history represent actual investment results? Is any portion of it simulated?

The Fund's performance results are net of all fees and expenses. Effective October 1, 2004, the Fund began charging investors a 1% management fee plus a 20% performance fee. Returns prior to October 1, 2004 have been restated to reflect the current fee structure.

3. Was any portion of the performance history generated at a prior employer? If so, can the track record be substantiated?

No.

4. Do the performance records reflect the investment decisions of a single individual or a team? If an individual made the decisions, identify that individual. If made by a team, identify the team. If there have been changes to the individual or the team over the course of the track record, attribute the track record appropriately.

The investment committee mentioned earlier makes investment decisions.

5. Are your returns AIMR compliant? If the returns are AIMR compliant, are they compliant at Level I or Level II?

No.

6. Who computes the performance and the NAVs for the funds? If you manage separate accounts, who computes the performance of the composite?

FGG employs a common fund administrator, Citco Fund Services (Europe) B.V (CITCO). CITCO independently computes monthly performance and NAVs for FGG funds as well as separate accounts. However, weekly estimated NAV numbers are calculated by the Finance Group at FGG.

7. What index is the portfolio benchmarked to, and what are the expected and realized tracking errors relative to the benchmark?

Fairfield Sentry Limited is an absolute return strategy whose target return is 2 to 3 times the risk-free rate.

## B.    *Valuation and Pricing*

1. What is the frequency of valuation for liquid instruments? Is pricing performed using an independent source? If so, please indicate the source. Is pricing corroborated by independent sources (e.g. administrator and prime broker)?

Liquid instruments, S&P 100 stocks, make up over 95% of the portfolio. The portfolio is priced daily by the prime broker and the Investment Manager. Weekly

Fairfield Greenwich

22

estimated NAVs for the Fund are calculated by the Finance Group at FGG. Pricing is independently verified by the Fund's administrator, CITCO, who issues an NAV, monthly. The NAV is verified and approved each month by the Finance Group at FGG.

2. How are individual securities valued (i.e. bid, ask, midpoint, primary exchange closing price, composite closing price)?

   S&P 100 stock prices are readily available and are priced at the exchange closing bid prices.

3. How is collateral valued?

   Usually cash.

4. How is the dealer priced portion of the portfolio substantiated? Who substantiates it, and how are discrepancies in estimated value resolved? Is the value recorded at the bid, the ask or the mid-point?

   N/A.

5. What is the average bid/ask spread for dealer-valued securities in your portfolio?

   N/A

6. What is the frequency of valuation for illiquid instruments? Please describe your procedure for valuing them. Are these valuations adjusted to reflect for the cost of trading the security?

   Liquid instruments make up over 95% of the portfolio of the Fund. Seedling managers may invest in illiquid securities. Currently one seedling manager invests in these types of securities which are valued daily by the prime broker and manager and independently verified by a third party pricing source.

7. How are ratings assigned to unrated securities? How are these ratings reviews?

   N/A

## C.    Fees

1. What is the minimum level of investment in your funds for an institutional (ERISA) investor?

   Minimum investment in Fairfield Sentry Limited is $100,000.

Fairfield Greenwich

23

CONFIDENTIAL

2.  Describe all fee arrangements with existing clients in your onshore funds, offshore funds and separate accounts. Include management fees, performance fees (including any hurdle rates and/or high water marks), subscription and redemption fees and any other fees that apply, and the corresponding frequency at which they are paid. Does a minimum level of fees apply?

    Subscribers to Fairfield Sentry Limited pay the following fees:

    Management Fee:  1%
    Performance Fee:  20%
    Subscription and Redemption Fees:  None

    Additional fee structure information:

    High Water Mark:  Yes
    Hurdle Rate:      None

3.  When does a client pay management fees and performance fees?

    Management and performance fees are paid on a quarterly basis.

4.  Describe your withdrawal and lock-up policies.  Are they different for your domestic and offshore funds?

    The Fund and the domestic version of the Fund offer monthly redemptions and subscriptions.  There are no lock ups.   However, the domestic fund may in the future adopt a lock-up policy.

# 4)   Trading, Operations, Technology and Compliance

## *A)     Trading and Commissions*

1.  Who among the Firm's employees can authorize a trade?  Who among the firm's employees can actually execute a trade?

    Amit Vijayvergiya, Andres Piedrahita, Jeffrey Tucker, Rob Blum, Dan Lipton

2.  How are authorized trades communicated to the trader?  What instructions are given, and how are unauthorized trades prevented and/or detected?

    Trades require two signatures. The Investment Manager maintains a non-discretionary brokerage account with a registered broker dealer in New York that has strict trading parameters outlined. This broker dealer has discretion only with respect to price and timing. Trade confirms are reconciled immediately.

FairfieldGreenwich

24

3. How are the primary back office functions (trading, accounting, settlement and custody) segregated among the back office staff? How do you ensure that back office professionals cannot execute jobs that they are not authorized to perform (e.g. a trader settling a trade)?

The Fund's NAV is computed independently by CITCO, the Fund's third party administrator. CITCO independently verifies pricing and trading and reconciles the prime broker and Manager on a monthly basis. The Finance group at FGG also recalculates the NAV and verifies for accuracy.

4. What sources of liquidity are used to execute a trade?

Since the split-strike conversion portfolio is comprised of extremely liquid securities, liquidity is not much of a concern. However, the we seek to execute trades in a manner so as to minimize market impact. Both electronic and traditional trading systems are used.

5. How are trades communicated to the custodian/prime broker? If you have more than one prime broker, you have a tri-party agreement in place? How and why are trades allocated between prime brokers?

In the hedge fund community, the prime broker is usually the custodian. In the case of Sentry, the Investment Manager does not use separate executing brokers and executes all trades at the prime broker.

6. What are your brokerage policies? Do you have a preferred list of brokers? What is your average level of commission?

Trades are executed through a registered broker-dealer in New York. It is the view of the Investment Manager that the Fund is being charged a competitive commission by the broker dealer for executing the trades.

7. Do you ever share in commissions by accepting a rebate?

No.

8. Do you use soft dollars? If so, what do you use them for? Are all your soft dollar expenses permissible under Section 28-E's safe harbor ruling?

No.

9. Do you allow clients to direct brokerage?

No.

## B)    *Operations (Back Office)*

1. Are trades confirmed by your firm or by your prime broker? Who receives telephone confirmation of fills? Are written confirms reviewed manually, and if so how?

Fairfield Greenwich

CONFIDENTIAL

FGANW005087383
FG-05234912

With regard to the Fund, prime broker and executing broker are the same. Trades are confirmed back to the Investment Manager.  All written confirms are reviewed manually.

2.  What controls are in place to ensure that none of your funds or accounts is treated preferentially?

Equal treatment is ensured through computer driven allocations among accounts.

3.  How often are portfolio holdings reconciled?  What software, if any, is used to perform reconciliations?

Portfolio holdings are reconciled daily. Proprietary software is used.

4.  How often are accrued interest, dividends and short interest rebates reconciled?

Accrued interest, dividends and short interest rebates are reconciled weekly by the investment Manager and monthly by the administrator.

5.  Are monthly broker statements reconciled with custodial records before monthly performance calculations are performed?  How are unreconciled items dealt with?

Yes, with regard to Sentry, the executing broker and the prime broker are the same and reconcile with the Investment Manager and the administrator.

6.  What records of order placement are maintained and for how long?

Records are maintained indefinitely.

7.  Who authorizes the movement of cash and securities?  Is this done completely independently of the reconciliation function?

Andres Piedrahita or Amit Vijayvergiya have authorization. This function is completely independent of reconciliation.

8.  What mechanisms are in place to facilitate the availability of funds for redemption?

Due largely to the liquidity of the portfolio, the Investment Manager is able to raise significant amounts of cash for redemptions.

## C)    Administration

1.  Do you administer your funds internally or do you have an administrator?

Citco Fund Services (Europe) B.V.  is the Fund's administrator.

Fairfield Greenwich

26

CONFIDENTIAL

2.  If you use an administrator

   a)  Do they independently compute the NAV?  How do they get values for
       dealer priced and illiquid securities?  Do they work with one or more prime
       brokers to verify valuations for dealer priced and illiquid securities?

       Citco has a pricing unit that prices all securities independently. The
       portfolios are in liquid securities, which are generally easier to price.
       Citco rechecks all dealer prices using three pricing sources:  Reuters,
       Bloomberg, and IDC.  These prices are reconciled with the prime broker
       and Investment Manager and verified by the Finance Group at FGG.

   b)  What software platform do they use?

       Citco uses an internally developed platform - NTAS.

3.  Are accounts maintained on a cash or accrual basis?

   Accrual basis.

4.  How many days after the end of each month is an NAV or a performance report
    available?

    By the 15th business day of the following month, the NAV is available.  Estimates
    are also available on a weekly basis.

## D)    *Technology*

1.  Does the investment process require computer technology to allow its
    implementation or can it be performed manually in large part?

    The implementation of the split-strike conversion strategy requires sophisticated
    trade execution systems.

2.  How often are computer systems backed up? Are backup tapes maintained off-site?

    All fund accounting and agent payment systems are housed at Citco Fund Services,
    which is subject to its own extensive disaster recovery procedures audited by
    PricewaterhouseCoopers.   For internal systems, FGG has two datacenters located in
    New York and London.  Data is replicated between the sites at no greater than 30
    minute intervals.  Additionally, FGG deploys tape backup systems in both locations.
    Tapes are exchanged between sites as well as stored monthly at Iron Mountain Inc..
    All e-mail is archived as received according to SEC Rule 17a.  All remote sites
    connect directly into one of the two FGG data centers.  In the event of disaster, FGG
    is prepared to relocate essential personnel to its Greenwich Connecticut site which is
    connected directly to its London office.  Additionally, all FGG personnel are able to
    work remotely from any computer with an Internet connection.  They are able to
    access both our New York and London sites at any time.

Fairfield Greenwich

27

3.  Is there a formal disaster recovery plan? Where and what facilities does it provide?

    There is a formal disaster recovery and business continuity plan that meets requirements as stated by NASD Rule 3500. The system is tested routinely by nature of the fact that is incorporated into FGG's daily business practices. As stated above, key FGG New York office personnel are able to work from FGG's Greenwich Connecticut office, or from any computer that has an available Internet connection (including dial-up.)

4.  Are your computer systems maintained by in-house IT staff or is this function outsourced?

    FGG's main datacenters are maintained by an in-house IT staff. We also utilize several consultants to provide additional coverage or expertise in critical areas. Remote offices receive desktop support from external vendors.


## E)      Compliance

1.  Who is responsible for regulatory compliance?

    Rob Blum, Mark McKeefry, Anthony Dell'Arena, and John Donachie are responsible for legal and compliance issues regarding the Fairfield Greenwich Group.

2.  What procedures are in place to ensure regulatory compliance?

    FGG has a Chief Compliance Officer and General Counsel, Mark McKeefry, and a Director of Compliance, Anthony Dell'Arena, who oversee the regulatory compliance of the Fund and the Investment Manager.

3.  How are compliance violations handled?

    Every violation is internally investigated, reviewed and documented by the relevant personnel, such as the Risk Manager, the Director of Compliance, the Chief Compliance Officer, and the Chief Financial Officer, for remedial action and to detect and prevent reoccurrences. Repeated violations, or violations that the Chief Compliance Officer deems to be of a serious nature, will be reported directly to FGG's Executive Committee.

4.  Have you been the subject of any investigations, public or private, by the SEC, NASD, CFTC, NFA, any exchange, or any state, federal or foreign authority?

    No.

5.  Have you had any correspondence with the SEC, NASD, CFTC, NFA, any exchange, or any state, federal or foreign authority other than routine registration correspondence?

Fairfield Greenwich

28

CONFIDENTIAL

No.

6. Have you ever been audited by the SEC, NASD, CFTC, NFA, any exchange, or any state, federal or foreign authority?

No.

7. Has any regulatory action ever been taken against the firm?

No.

8. Has the firm ever settled any insurance claims?

No.

9. Have all relevant Blue Sky filings been made?

Yes.

## F) *Personal Trading*

1. Do principals and employees trade for their own accounts? Is this monitored and are records maintained?

Yes, personal accounts are permitted. However, monthly statements from outside brokerage firms need to be reported monthly to ensure compliance.

2. Are any proprietary (i.e. house) or employee orders placed along with client orders?

No.

3. Do you have policies that govern personal and proprietary trading? If so, describe them or attach a copy of a document containing them.

Yes, see appendix.

## 5) Authentication

I certify that all the statements made above are true to the best of my knowledge.

Signature of person who filled this form:  Gordon McKenzie / Amit Vijayvergiya

Name of person who filled this form:          Gordon McKenzie / Amit Vijayvergiya

Date:       April 25, 2005

Fairfield Greenwich

29

CONFIDENTIAL

FGANW005087387
FG-05234916

*Appendix:   Insider Trading; Personal Account Trading section from FGG Employee Manual*

A critical extension of the confidentiality policies discussed above (within the FGG Employee Manual) involves the knowledge and trading use of material inside information regarding a public company, also known as insider trading.   Insider trading is a matter of paramount importance to regulators and the credibility of the capital markets.  Use of inside information can result in criminal and civil penalties to both you and the firm and are grounds for immediate dismissal.  The problem of insider trading is often attributable to intentional or negligent leaks of confidential information to market participants and their agents (lawyers, accountants, etc.). Material non-public information generally takes two forms: (1) information about events or circumstances relating to a public company's business, assets, revenues or earning power or plans which is known only to corporate management and its confidants, and which can reasonably be expected to impact materially the market price of the company's securities ("inside information"), and (2) information about events or circumstances which affect the company or its market but which emanates from sources or events outside of the company, i.e. significant block transactions, tender offers, etc…("market information").

Generally, information with respect to earnings, losses, lawsuits, mergers, tenders, market transactions and substantial financing has been considered material.  Additionally, front running (see Section 2.1, above) is a prohibited activity that, in certain instances, may be analogous to insider trading.   Any employee or consultant who believes that he/she may have acquired material inside information cannot use such information and should promptly disclose it to appropriate FGG senior management personnel.

In addition to these principles, you should be mindful of other personal trading limitations or conditions that may have been separately communicated to you by the Company including, for FSA-regulated employees, manager pre-approval of personal trades, and for NASD-regulated employees, providing copies of brokerage account statements.

Fairfield Greenwich

30

CONFIDENTIAL