**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the Chapter 7 Estate of*
*Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (CGM) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, <br><br> Plaintiff, <br><br> v. <br><br> NATIXIS S.A. and TENSYR LTD., <br><br> Defendants. | Adv. Pro. No. 10-05353 (CGM) <br><br> <u>**AMENDED COMPLAINT**</u> |

Irving H. Picard ("Trustee"), as the trustee for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C.

§§ 78aaa–*lll* ("SIPA"), substantively consolidated with the chapter 7 estate of Bernard L. Madoff

(individually, "Madoff"), by and through his undersigned counsel, for his Amended Complaint

against defendants Natixis S.A. (individually and as successor-in-interest to IXIS Corporate &

Investment Bank) and Tensyr Ltd. ("Tensyr," and together with Natixis S.A., "Defendants"),

alleges the following:

## I.      NATURE OF THE ACTION

1.      This adversary proceeding is part of the Trustee's continuing efforts to recover

"customer property," as defined by SIPA § 78*lll*(4)), that was stolen as part of Madoff's infamous

Ponzi scheme.

2.      Madoff sustained his scheme with massive capital infusions from various BLMIS

feeder funds (the "Feeder Funds")—single-purpose investment vehicles that pooled investors'

assets to invest with BLMIS's investment advisory business ("IA Business") in New York.

3.      Defendant Natixis S.A. worked together with a New York-based *de facto*

partnership, the Fairfield Greenwich Group ("FGG"), to exploit Madoff's returns by creating and

operating Defendant Tensyr, an investment vehicle that invested entirely in the Fairfield Sentry

Limited fund ("Fairfield Sentry").

4.      Fairfield Sentry was the largest of all BLMIS Feeder Funds, and was created,

operated, and controlled by FGG in New York.

5.      From November 1990 through December 2008, Fairfield Sentry maintained

customer accounts with BLMIS's IA Business, investing virtually all of its assets in its BLMIS

customer accounts.  Fairfield Sentry ultimately received more than $2.8 billion in avoidable

transfers from BLMIS.

6.      In 2006, Natixis S.A., FGG, and Tensyr created a structured notes program (the "Tensyr Transaction") through which they provided investors with returns linked to Fairfield Sentry's performance.  As part of this notes program, Tensyr purchased shares in, and redeemed shares from, Fairfield Sentry.

7.      By creating and operating Tensyr, Natixis S.A. and FGG received millions of dollars in related fees, and Tensyr received approximately $35 million in customer property.

8.      Beginning in or around 2007, Natixis S.A. worked with FGG again to create and market other notes programs, not involving Tensyr, that also provided a return linked to Fairfield Sentry's performance.  As part of these notes programs, Natixis S.A. purchased shares in Fairfield Sentry, redeemed from Fairfield Sentry, and ultimately received approximately $179 million in customer property.

9.      In this action, the Trustee seeks to recover more than $214 million in subsequent transfers of customer property that were made to Tensyr and Natixis S.A.

II.     **SUBJECT MATTER JURISDICTION AND VENUE**

10.     This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

11.     This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).  The Trustee consents to the entry of final orders or judgment by this Court if it is determined that

consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

12.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

13.    This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

## III.    DEFENDANTS

### A.    Natixis S.A.

14.    Defendant Natixis S.A. is a corporate and investment bank organized under the laws of France as a *société anonyme à conseil d'administration*.    Natixis S.A. operates and oversees its numerous affiliates and subsidiaries, which provide retail banking, corporate and investment banking, and other services, such as asset and private wealth management.

15.    Natixis S.A. was created in 2006 and is the result of various mergers and acquisitions between various French banking groups.

16.    In the late 1990s, Groupe Banque Populaire, a conglomerate of French cooperative banks, acquired "Natexis S.A.," a French investment bank.    During the same time period, Caisse des Dépôts et Consignations, a French bank dating back to the 1800s, created various subsidiaries with the moniker "CDC IXIS," to be responsible for its investment banking.

17.    By 2004, Caisse Nationale des Caisses d'Épargne, another French banking group, acquired and renamed the CDC IXIS entities and created the IXIS Corporate & Investment Bank, the direct predecessor to Defendant Natixis S.A.

18.    In 2006, Caisse Nationale des Caisses d'Épargne and Groupe Banque Populaire merged IXIS Corporate & Investment Bank, the renamed IXIS entities, and Natexis S.A. to create Natixis S.A.    The relevant transfers at issue in this complaint were received by Natixis S.A. after these acquisitions and name changes.

19.      By 2008, Natixis S.A. employed more than 22,000 people in 68 countries and was a top-15 asset management company worldwide, with nearly €556 billion in total assets and €6.4 billion in income from its banking operations.  Its stock was listed on the Euronext Paris stock market, was valued at €3.6 billion at the end of 2008, and 2.4 billion of its shares traded on the exchange that year.

**B.      Tensyr**

20.      Defendant Tensyr is a special purpose investment vehicle formed in 2006 as a limited company under the laws of Jersey by Natixis S.A. and FGG.  At all relevant times, Tensyr had no employees of its own and functioned through Natixis S.A. and New York-based FGG.

**IV.      PERSONAL JURISDICTION**

21.      Natixis S.A. and Tensyr are subject to personal jurisdiction in this judicial district because each routinely conducted business in New York, purposely availed themselves of the laws of the State of New York by undertaking significant commercial activities in New York, and derived significant revenue from New York.

**A.      <u>FGG and Natixis S.A. Created and Operated Tensyr In and Through New York</u>**

22.      Tensyr (an anagram for Sentry) was created by Natixis S.A. and New York-based FGG as an investment vehicle to profit from New York-based BLMIS's returns by investing in Fairfield Sentry and issuing notes linked to Fairfield Sentry's performance.  Tensyr was an "orphan" entity with no employees of its own.  Rather, Tensyr was operated by Natixis S.A. and FGG.

23.      FGG agreed to act as manager and information agent for Tensyr.

24.      Tensyr's subscription agreements with Fairfield Sentry were signed by FGG executives, who were based in FGG's New York headquarters.

25.    When Tensyr made redemptions from Fairfield Sentry, redemption confirmations were sent "C/O FAIRFIELD GREENWICH GROUP" at 919 Third Avenue in New York, New York, with New York-based FGG general counsel Mark McKeefry's name and email address listed.

26.    When Tensyr made redemption requests, FGG partners, including McKeefry, Jeffrey Tucker, Walter Noel, and Daniel Lipton—all of whom were based in New York—signed the requests on Tensyr's behalf.

27.    For its part, Natixis S.A. structured the Tensyr Transaction, underwrote the tranches of the transaction, and selected and liaised with New York-based rating agencies, legal advisors, and other service providers.

28.    Natixis S.A. also took the lead in drafting a memorandum provided to New York-based ratings agencies evaluating the Tensyr Transaction (the "Tensyr Ratings Memo"), with input from and review by FGG personnel in New York.

**B.    <u>Defendants Purposely Invested with Madoff in New York</u>**

29.    Defendants invested in Fairfield Sentry knowing and intending that their investments would be investments with New York-based BLMIS.

30.    Defendants purchased shares of Fairfield Sentry and intended that the funds they invested in Fairfield Sentry would be used to purchase securities in the United States through New York-based BLMIS.

31.    On each occasion that they purchased shares of Fairfield Sentry, Defendants executed subscription agreements through which they affirmed having "received and read" a Fairfield Sentry private placement memorandum (the "PPM").

32.    Based on the PPMs they received and read, Defendants knew the following facts indicating that they were transacting business in New York in connection with their Fairfield Sentry investments:

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS;

- BLMIS was Fairfield Sentry's investment adviser;

- BLMIS was registered with the U.S. Securities and Exchange Commission (the "SEC");

- BLMIS was the executing broker for Fairfield Sentry's investments;

- BLMIS's "split-strike conversion" trading strategy ("SSC Strategy") purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury securities ("Treasury Bills") traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase, and when to make them, were made by BLMIS in New York;

- BLMIS was the custodian of Fairfield Sentry's investments with BLMIS; and

- BLMIS was "essential to the continued operation of" Fairfield Sentry.

33.    The Tensyr Ratings Memo, which was primarily drafted by Natixis S.A. personnel and which was furnished to rating agencies on behalf of Tensyr, contained detailed information about New York-based BLMIS, as well as New York-based Madoff's and New York-based FGG's involvement in Fairfield Sentry.

34.    For example, the Tensyr Ratings Memo referenced BLMIS's New York location and operations, including BLMIS's registration with the SEC and National Association of Securities Dealers, execution of trades and provision of "order flow" for United States and New York-based securities, and 275 employees in New York City. The Tensyr Ratings Memo also stated that FGG was "headquartered in New York."

35.    The Tensyr Ratings Memo also discussed the U.S.-listed investments in which BLMIS purported to invest. For example, the Tensyr Ratings Memo touted "[BLMIS's]

6

proprietary model-based strategy intended to capture short-term (5 to 10 business days) upward movements of highly liquid stocks of the largest U.S. companies . . . known as split-strike conversion [i.e., the SSC Strategy]."

36.    The Tensyr Ratings Memo made clear that the SSC Strategy involved "purchasing put options and selling call options on the S&P 100 [Index]," as well as, in certain instances, holding "short-term U.S. Treasury Bills."

37.    In connection with the Tensyr Transaction, Natixis S.A. personnel requested a purported BLMIS option trade ticket from FGG regarding Fairfield Sentry.  The trade ticket that FGG provided was for Fairfield Sentry and the top of the ticket referenced BLMIS and its 885 Third Avenue office in New York, New York.

### C.    Defendants' Activities in Connection with Their Fairfield Sentry Investments Were Directed to New York and the United States

38.    Defendants undertook purposeful acts aimed at New York and the United States as part of Defendants' Fairfield Sentry investments.

39.    In addition to executing subscription agreements for and receiving redemption confirmations from Fairfield Sentry investments in New York, FGG met with at least two rating agencies at FGG's office in New York in an effort to obtain the highest rating for Tensyr.

40.    Natixis S.A.—on its own behalf and for Tensyr—also had numerous meetings in New York regarding Tensyr, including with FGG personnel.

41.    At one New York meeting, for example, Natixis S.A. first presented FGG with a potential CFO structure on the Sentry fund:  Tensyr.

42.    Together, Natixis S.A. and FGG drafted and revised talking points for a meeting with Madoff in New York to convince "Uncle Bernie" to "give[ ] the OK" to the Tensyr Transaction, which Madoff ultimately did.

43.      Natixis S.A. also extensively communicated via emails and phone calls with FGG personnel in New York regarding Madoff, Fairfield Sentry, and Tensyr—including revisions to the Tensyr Ratings Memo and how to convince Madoff to agree to the creation of Tensyr.

44.      Natixis S.A. also worked with and entered into agreements with third parties based in New York, including three New York-based rating agencies and United States-based law firms, when creating and operating Tensyr.

45.      Natixis S.A. also communicated and worked with FGG in New York to create and market other structured notes programs where Fairfield Sentry served as the reference fund.

### D.    Defendants Executed Fairfield Sentry Subscription Agreements with New York Jurisdiction, Forum Selection, Service of Process, and Choice of Law Provisions

46.      Defendants entered into subscription agreements for Fairfield Sentry shares that included New York choice of law, venue, service of process, and jurisdiction provisions.  In the subscription agreements, Defendants (i) "agree[d] that any suit, action or proceeding . . . with respect to this Agreement and [Fairfield Sentry] may be brought in New York," (ii) "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding," (iii) "consent[ed] to the service of process out of any New York court," and (iv) agreed that "[t]his Agreement shall be governed and enforced in accordance with the laws of New York."

47.      Defendants voluntarily executed these subscription agreements each time they invested in Fairfield Sentry.

### E.    Defendants Used New York Bank Accounts for Their Fairfield Sentry Investments

48.      By executing their Fairfield Sentry subscription agreements, Defendants agreed to deliver their subscription funds to an HSBC Bank USA correspondent bank account in New York for deposit into Fairfield Sentry's bank account.  Defendants in fact delivered funds to this

HSBC Bank USA account in connection with their investments in Fairfield Sentry. From the HSBC USA account, the funds were deposited into BLMIS's account at JP Morgan Chase Bank in New York.

49.     In its subscription agreements, Natixis S.A. designated and used a New York bank account in the name of a New York-based subsidiary at Deutsche Bank Trust Company Americas (the "DB Americas Account") to send subscription payments to and receive redemption payments from Fairfield Sentry. Natixis S.A. received redemption payments in the DB Americas Account.

50.     In its subscription agreements, Tensyr designated and used a correspondent bank account at The Bank of New York in New York  (the "Bank of New York Account") to send subscription payments to and receive redemption payments from Fairfield Sentry. Tensyr received redemption payments in the Bank of New York Account.

51.     Defendants thus maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein. Defendants should reasonably expect to be, and are, subject to the jurisdiction of the Bankruptcy Court pursuant to Bankruptcy Rule 7004, the United States Constitution, and N.Y. C.P.L.R. § 302.

## V.     BACKGROUND, THE TRUSTEE AND STANDING

52.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the SEC commenced the District Court Proceeding.

53.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court

alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

54.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

      a.     appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

      b.     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

      c.     removed the case to this Court pursuant to SIPA § 78eee(b)(4).

55.    By orders dated December 23, 2008, and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

56.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

57.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

58.    At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

59.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

60.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

61.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

62.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

63.     The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers

under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## VI.   BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.   BLMIS

64.     Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker-dealer with the SEC.  In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company.  At all relevant times, Madoff controlled BLMIS, first as its sole member and thereafter as its chairman and chief executive.

65.     In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status.  SIPC membership is contingent on registration of the broker-dealer with the SEC.

66.     For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units:  a proprietary trading desk, a broker-dealer operation, and the IA Business.

67.     BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry.  BLMIS's website omitted the IA Business entirely.  BLMIS did not register as an

investment adviser with the SEC until 2006, following an investigation by the SEC, which forced
Madoff to register.

68.     For more than 20 years preceding that registration, the financial reports BLMIS
filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds
BLMIS managed through its IA Business.

69.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment
Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total
assets under management ("AUM") of $11.7 billion.  BLMIS filed its last Form ADV in January
2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1
billion.  In reality, Madoff grossly understated these numbers.  In December 2008, BLMIS had
over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM.
At all times, BLMIS's Form ADVs were publicly available.

**B.     The Ponzi Scheme**

70.     At all relevant times, Madoff operated the IA Business as a Ponzi scheme using
money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had
no legitimate business operations and produced no profits or earnings.  Madoff was assisted by
several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David
Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of,
assisting Madoff in carrying out the fraud.

71.     BLMIS's proprietary trading desk was also engaged in pervasive fraudulent
activity.  It was funded, in part, by money taken from the BLMIS customer deposits, but
fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial
statements and other regulatory reports filed by BLMIS.  The proprietary trading business was

incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

72.     To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York.  Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

73.     On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

C.     **Madoff's Investment Strategy**

74.     In general, BLMIS purported to execute two primary investment strategies for BLMIS customers:  the convertible arbitrage strategy and the SSC Strategy.  For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

75.     All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank.  These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

76.     The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time.  In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

77.     From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

78.     BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

79.     By 1992, the SSC Strategy purported to involve:  (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

80.     The put options were to limit the downside risk of sizeable price changes in the basket.  The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option should have entailed a loss for BLMIS.

81.     The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone

outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

82.    The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar."  The collar provides downside protection while limiting the upside.

83.    If Madoff was putting on the same baskets of equities across all BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

84.    Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call or put option notional value to support the Madoff SSC Strategy.

85.    Madoff could not be using the SSC Strategy because his returns drastically outperformed the market.  BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly).  Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

D.     **BLMIS's Fee Structure**

86.     BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits.  By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

E.     **BLMIS's Market Timing**

87.     Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he succeeded at market timing by intermittently entering and exiting the market.  During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

88.     As a registered broker-dealer, BLMIS was required, pursuant to 17 C.F.R. § 240.17a-5, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS reportedly exited the market completely at ever year end and every quarter end starting in 2003.  These quarterly and year-end exits were undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.  It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

89.     BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

### F.    BLMIS Execution

90.    BLMIS's execution showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

### G.    No Evidence of BLMIS Trading

91.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

92.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

### H.    The Collapse of the Ponzi Scheme

93.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

94.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

95.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## VII.    STRUCTURED NOTES

96.    A structured note is a debt security generally issued by a financial institution.  Its return is based on a reference fund, index, or security.  The purchaser of a structured note typically pays fees to the financial institution, e.g., for administering the note program and providing any leverage.  In return, the financial institution agrees to pay the purchaser an amount linked to a multiple of the reference asset's performance at the note's future maturity date.  The performance may be limited to upside only.  In order to hedge its promise to pay the leveraged cumulative positive return at the note's future maturity date, the financial institution typically purchases shares of the reference fund, index, or security.

97.    Between 2006 and 2008, Tensyr and Natixis S.A. issued a number of structured notes linked to Fairfield Sentry's returns.

### A.    The Tensyr Notes Program

98.    In 2006, Natixis S.A. and FGG worked together to establish a leveraged structure in the form of a collateralized fund obligation called Tensyr, which served as an investment vehicle to sell notes, offered in three different classes, that provided a return linked to Fairfield Sentry's performance.

99.    In April 2006, FGG and Natixis S.A. representatives met in New York to discuss the deal, and by the end of the month, Natixis S.A. provided FGG with a draft engagement letter stating, among other things, that Natixis S.A. and FGG would collaborate to set up Tensyr.

100.    In October 2006, Natixis S.A. explained in an email to FGG that "[t]he sole investor in the Fairfield Sentry fund will be an 'orphan' SPV [special purpose vehicle] (Tensyr Ltd.), to be created under [FGG]'s instruction, established for the sole purpose of this transaction and that has no employees."

101.    In November 2006, Natixis S.A. and FGG sought Madoff's direct authorization to form Tensyr, which he ultimately gave.  As FGG's partner Andres Piedrahita explained in an email to his FGG partners:  "After months and hundreds of hours of work . . . lot[s] of sleepless nights . . . Uncle Bernie has given us the OK to go forward with the [transaction]."

102.    With "Uncle Bernie's" blessing, Tensyr moved forward.

103.    FGG touted Tensyr as "Fairfield Greenwich Group's ('FGG') first Collateralized Fund Obligation to be brought to market."

104.    Tensyr had no employees of its own, and once established, functioned solely at the direction of Natixis S.A. and FGG, both of which maintained active roles in Tensyr's administration and ongoing operations.

105.    Tensyr purchased and redeemed shares of Fairfield Sentry in order to hedge Tensyr's obligation to pay noteholders.

106.    Through the Tensyr notes program, Tensyr received more than $35 million of customer property.

**B.    The Natixis Sentry and Natixis Alpha Notes Programs**

107.    From about late 2006 through 2008, Natixis S.A. also worked with FGG to sell other structured notes linked to Fairfield Sentry's performance.

108.    Natixis issued six of these notes that directly referenced Fairfield Sentry (the "Natixis Sentry Notes"), and which FGG helped market.

109.    The Natixis Sentry Notes had nearly identical terms and conditions.  The return on the Natixis Sentry Notes was the performance of a four times (4x) leveraged investment in the referenced Fairfield Sentry shares, less financing costs.  At maturity, investors were to receive a

payout based on the product of the number of units of the notes purchased and the quotient of the final note index level over the initial note index, less any redemption discounts (penalties).

110.    The Natixis Sentry Notes' leverage was achieved through financing at 100 basis points over the respective applicable LIBOR rate (i.e., 1.0% over LIBOR, the benchmark interest rate for which global banks engage in interbank lending for short-term loans).  Natixis S.A. earned other fees and revenue streams, including a setup or structuring fee, a selling fee, and early redemption penalties.

111.    In addition to the Natixis Sentry Notes described, in the summer of 2008, Natixis S.A. issued notes (the "Natixis Alpha Notes") that referenced a fund called the Volatility Alpha Enhanced Fund Limited ("Volatility Alpha Fund").  As with the Natixis Sentry Notes, FGG helped market the Natixis Alpha Notes.

112.    The return on the Natixis Alpha Notes was three times (3x) the performance of the Volatility Alpha Fund.  The Volatility Alpha Fund invested substantially all of its assets in a swap with IXIS Corporate & Investment Bank that provided leveraged access to the performance of Fairfield Sentry.

113.    Natixis S.A. hedged its exposure to holders of the Natixis Sentry Notes and Natixis Alpha Notes by purchasing and redeeming shares of Fairfield Sentry.

114.    Through the Natixis Sentry Notes and Natixis Alpha Notes, Natixis S.A. received at least $179 million of customer property.

## VIII.    RECOVERY OF SUBSEQUENT TRANSFERS TO DEFENDANTS

### A.    Initial Transfers from BLMIS to Fairfield Sentry

115.    The Trustee commenced a separate adversary proceeding against Fairfield Sentry and other defendants in this Court under the caption, *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (CGM), seeking to avoid and recover initial transfers of customer property from

BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").

116.    By orders dated June 7 and June 10, 2011, this Court approved a settlement among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a consent judgment in favor of the Trustee and against Fairfield Sentry in the amount of $3,054,000,000 ("Judgment Amount") [ECF No. 109].

117.    The Fairfield Sentry Initial Transfers are set forth in the attached Exhibits A and B. The Fairfield Sentry Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

118.    On August 28, 2020, the Trustee filed a second amended complaint in the Fairfield Sentry Ltd. proceeding ("Second Amended Complaint") [ECF No. 286] seeking in part the recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and the entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

119.    As alleged in the Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the BLMIS fraud.  The Trustee incorporates by reference the allegations contained in the Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, 315-16.

120.    Of the Judgment Amount, $2,895,000,000 was transferred to Fairfield Sentry during the six years preceding the Filing Date (the "Fairfield Sentry Six Year Transfers").  Each of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code

and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

121.    Of the Fairfield Sentry Six Year Transfers, $1,580,000,000 was transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Transfers").  Each of the Fairfield Sentry Two Year Transfers is avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**B.    Subsequent Transfers From Fairfield Sentry to Natixis S.A.**

122.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Sentry Initial Transfers, directly or indirectly, to Natixis S.A. (the "Sentry-Natixis S.A. Subsequent Transfers").  Based on the Trustee's investigation to date, the Sentry-Natixis S.A. Subsequent Transfers total approximately $179,009,456.  A chart setting forth the presently known Sentry-Natixis S.A. Subsequent Transfers is attached as Exhibit C.

123.    On December 8, 2010, the Trustee filed this action seeking recovery of the Sentry-Natixis S.A. Subsequent Transfers.

124.    The Sentry-Natixis S.A. Subsequent Transfers are recoverable from Natixis S.A. under section 550(a) of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

125.    The Sentry-Natixis S.A. Subsequent Transfers represent a redemption of equity interests by Natixis S.A. as a shareholder in Fairfield Sentry.  Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Sentry-Natixis S.A. Subsequent Transfers upon redemption of its interests.

**C.    Subsequent Transfers From Fairfield Sentry to Tensyr**

126.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Sentry Initial Transfers, directly or indirectly, to Tensyr (the "Sentry-Tensyr Subsequent

Transfers").  Based on the Trustee's investigation to date, the Sentry-Tensyr Subsequent Transfers total approximately $35,190,115.  A chart setting forth the presently known Sentry-Tensyr Subsequent Transfers is attached as Exhibit D.

127.    On December 8, 2010, the Trustee filed this action seeking recovery of the Sentry-Tensyr Subsequent Transfers.

128.    The Sentry-Tensyr Subsequent Transfers are recoverable from Tensyr under section 550(a) of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

129.    The Sentry-Tensyr Subsequent Transfers represent a redemption of equity interests by Tensyr as a shareholder in Fairfield Sentry.  Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Sentry-Tensyr Subsequent Transfers upon redemption of its interests.

130.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to:  (i) supplement the information on the Fairfield Sentry Initial Transfers, the Sentry-Natixis S.A. Subsequent Transfers, the Sentry-Tensyr Subsequent Transfers, and/or any additional transfers, and (ii) seek avoidance and recovery of such transfers.

## COUNT ONE
### RECOVERY OF SENTRY-NATIXIS S.A. SUBSEQUENT TRANSFERS
### 11 U.S.C. §§ 105(a) AND 550(a)

131.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

132.    The Sentry-Natixis S.A. Subsequent Transfers are recoverable from Natixis S.A. under 11 U.S.C. § 550(a) and SIPA § 78fff-2(c)(3).

133.    Natixis S.A. is an immediate or mediate transferee of the Sentry-Natixis S.A. Subsequent Transfers.

134.    As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Natixis S.A.:  (a) recovering the Sentry-Natixis S.A. Subsequent Transfers, or the value thereof, from Natixis S.A. for the benefit of the estate of BLMIS; and (b) awarding any other relief that the Court deems appropriate.

## COUNT TWO
## RECOVERY OF SENTRY-TENSYR SUBSEQUENT TRANSFERS
### 11 U.S.C. §§ 105(a) AND 550(a)

135.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

136.    The Sentry-Tensyr Subsequent Transfers are recoverable from Tensyr under 11 U.S.C. § 550(a) and SIPA § 78fff-2(c)(3).

137.    Tensyr is an immediate or mediate transferee of the Sentry-Tensyr Subsequent Transfers.

138.    As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Tensyr:  (a) recovering the Sentry-Tensyr Subsequent Transfers, or the value thereof, from Tensyr for the benefit of the estate of BLMIS; and (b) awarding any other relief that the Court deems appropriate.

_____

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on Count One and Count Two in favor of the Trustee and against Defendants as follows:

a)      On the First Claim for Relief, recovering the Sentry-Natixis S.A. Subsequent Transfers, or the value thereof, from Natixis S.A. for the benefit of the estate;

b)      On the Second Claim for Relief, recovering the Sentry-Tensyr Subsequent Transfers, or the value thereof, from Tensyr for the benefit of the estate;

c)      On all Claims for Relief, if Natixis S.A. and/or Tensyr challenge the avoidability of the Fairfield Sentry Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such Transfers are avoidable pursuant to SIPA § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and N.Y. Debt. & Cred. Law §§ 273-279, as applicable, and as necessary to recover the Sentry-Natixis S.A. Subsequent Transfers and/or Sentry-Tensyr Subsequent Transfers pursuant to section 550 of the Bankruptcy Code and SIPA § 78fff-2(c)(3);

d)      On all Claims for Relief, awarding the Trustee prejudgment interest from the date on which the Sentry-Natixis S.A. Subsequent Transfers were received by Natixis S.A. and/or the date on which the Sentry-Tensyr Subsequent Transfers were received by Tensyr; and

e)      On all Claims for Relief, awarding the Trustee fees and all applicable costs and disbursements, and such other, further, and different relief as the Court deems just, proper, and equitable.

Dated:  January 31, 2023
New York, New York

*/s/   Joanna Wasick*

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Joanna F. Wasick
Email: jwasick@bakerlaw.com
Carlos Ramos-Mrosovsky
Email: cramosmrosovsky@bakerlaw.com
Michelle N. Tanney
Email: mtanney@bakerlaw.com
Matthew B. Friedman
Email: mfriedman@bakerlaw.com
Tara E. Turner
Email: tturner@bakerlaw.com
Madison Gaudreau
Email: mgaudreau@bakerlaw.com

Baker & Hostetler LLP
200 Civic Center Drive, Suite 1200
Columbus, Ohio 43215
Telephone:  (614) 228-1541
Facsimile:  (614) 462-2616
Douglas A. Vonderhaar
Email: dvonderhaar@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities
LLC and the Chapter 7 Estate of Bernard L.
Madoff*