**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and*
*the Chapter 7 Estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (CGM) <br><br> SIPA LIQUIDATION <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, <br><br> Plaintiff, <br><br> v. <br><br> KBC INVESTMENTS LIMITED <br><br> Defendant. | Adv. Pro. No. 11-02761 (CGM) |

## TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT KBC INVESTMENTS LIMITED'S MOTION TO DISMISS THE TRUSTEE'S AMENDED COMPLAINT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF FACTS ...........................................................................................2

I.      THE BLMIS PONZI SCHEME AND ITS FEEDER FUNDS..............................2

II.     THE INITIAL TRANSFEREE ACTION AND JUDGMENT ..............................3

III.    KBC AND ITS INVESTMENTS IN HARLEY ......................................................4

I.      THIS COURT HAS PERSONAL JURISDICTION OVER KBC ........................6

        A.      KBC Purposefully Availed Itself of the Laws and Privileges of
                Conducting Business in New York by Investing in Harley ........................8

                1.      KBC's Investments in BLMIS Through Harley Establish
                        Minimum Contacts............................................................................9

                2.      KBC's Purposeful Use of New York Bank Accounts
                        Establishes Specific Personal Jurisdiction .....................................13

                3.      KBC's New York Affiliate's Communications and Actions
                        Regarding BLMIS Feeder Funds Provides Another
                        Jurisdictional Contact......................................................................17

        B.      The Exercise of Personal Jurisdiction Is Reasonable ...............................20

        C.      At Minimum, the Trustee Is Entitled to Jurisdictional Discovery ............21

II.     THE ADDITIONAL SUBSEQUENT TRANSFERS IN THE AMENDED
        COMPLAINT RELATE BACK TO THE INITIAL COMPLAINT....................22

        A.      The Additional Subsequent Transfers Were Made as Part of the Same
                Course of Conduct as the Transfers Alleged in the Initial Complaint.......23

        B.      The Initial Complaint Provided Notice to Defendant That the Trustee
                Would Sue for Any Additional Subsequent Transfers ..............................26

        C.      The Amended Complaint Seeks to Recover Less Money Than the
                Initial Complaint ......................................................................................28

CONCLUSION.........................................................................................................29

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelphia Recovery Tr. v. Bank of Am., N.A.*,
  624 F. Supp. 2d 292 (S.D.N.Y. 2009)............................................................25, 28

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*,
  98 F.3d 25 (2d Cir. 1996)........................................................................................7

*Al Rushaid v. Pictet & Cie*,
  28 N.Y.3d 316 (2016) ...........................................................................................14

*Ayyash v. Bank Al-Madina*,
  No. 04 Civ. 9201(GEL), 2006 WL 587342 (S.D.N.Y. Mar. 9, 2006) ....................21

*Bahrain Islamic Bank, BisB v. Arcapita Bank, B.S.C.(C) (In re Arcapita Bank B.S.C.(C))*,
  640 B.R. 604 (S.D.N.Y. 2022)..............................................................................15

*Berdeaux v. OneCoin Ltd.*,
  561 F. Supp. 3d 379 (S.D.N.Y. 2021)....................................................................16

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)......................................................................................7, 8, 20

*In re Chaus Sec. Litig.*,
  801 F. Supp. 1257 (S.D.N.Y. 1992).......................................................................24

*Chloé v. Queen Bee of Beverly Hills, LLC*,
  616 F.3d 158 (2d Cir. 2010)..........................................................................6, 7, 20

*Cromer Fin. Ltd. v. Berger*,
  137 F. Supp. 2d 452 (S.D.N.Y. 2001)......................................................................7

*Dandong v. Pinnacle Performance Ltd.*,
  966 F. Supp. 2d 374 (S.D.N.Y. 2013).....................................................................14

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
  722 F.3d 81 (2d Cir. 2013).......................................................................................6

*Eldesouky v. Aziz*,
  No. 11-CV-6986 (JLC), 2014 WL 7271219 (S.D.N.Y. Dec. 19, 2014).................13

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,
  397 F. Supp. 3d 323 (S.D.N.Y. 2019), *aff'd in part, vacated in part on other
  grounds*, 40 F.4th 56 (2d Cir. 2022) ...................................................................8, 16

ii

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
    141 S. Ct. 1017 (2021) ..........................................................................................11

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank*, *N.A.*,
    No. 16 CIV. 5263 (AKH), 2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) .............11

*Goldberg v. Halbert (In re Woodbridge Grp. of Companies, LLC)*, Adv. Pro. No.
    19-51027 (JKS), 2021 WL 5774217 (Bankr. D. Del. Dec. 6, 2021) ......................24

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
    425 F.3d 158 (2d Cir. 2005)......................................................................................7

*Hill v. Oria (In re Juliet Homes, LP)*,
    No. 07-36424, 2011 WL 6817928 (Bankr. S.D. Tex. Dec. 28, 2011) .........23, 24, 28

*HSH Nordbank AG N.Y. Branch v. Street*,
    No. 11 Civ. 9405 (DLC), 2012 WL 2921875 (S.D.N.Y. July 18, 2012)................14

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945).............................................................................................7, 8

*Kiobel v. Royal Dutch Petroleum Co.*,
    No. 02 Civ. 7618 (KMW)(HBP), 2009 WL 3817590
     (S.D.N.Y. Nov. 16, 2009) ......................................................................................21

*Leema Enters., Inc. v. Willi*,
    575 F. Supp. 1533 (S.D.N.Y. 1983).......................................................................15

*Letom Mgmt. Inc. v. Centaur Gaming, LLC*,
    No. 17 CIV. 3793 (PAE), 2017 WL 4877426 (S.D.N.Y. Oct. 27, 2017) ...............15

*Licci v. Lebanese Canadian Bank, SAL*,
    20 N.Y.3d 327 (2012) ............................................................................................14

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996).......................................................................................8

*O'Toole v. MyPlace Dev. SP. Z O.O. (In re Sledziejowski)*,
    No. 13–22050 (RDD), 2016 WL 6155929 (Bankr. S.D.N.Y. Oct. 21, 2016) .........15

*Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*,
    549 B.R. 56 (S.D.N.Y. 2016).............................................................................13, 14

*Pereira v. Hong Kong & Shanghai Banking Corp. (In re Kam Kuo Seafood Corp.)*,
    67 B.R. 304 (Bankr. S.D.N.Y. 1986) ......................................................................26

*Picard v. Bank Julius Baer & Co. Ltd.*,
  Adv. Pro. No. 11-02922 (CGM), 2022 WL 17726520
  (Bankr. S.D.N.Y. Dec. 15, 2022)................................................................22, 23, 28

*Picard v. Banque Lombard Odier & Cie SA*, Adv. Pro. No. 12-01693 (CGM),
  2022 WL 2387523 (Bankr. S.D.N.Y. June 30, 2022), *leave to appeal denied*
  *sub nom. In re Bernard L. Madoff Inv. Secs. LLC*, No. 22 Civ. 6561 (LGS),
  2023 WL 395225 (S.D.N.Y. Jan. 25, 2023) ................................................. *passim*

*Picard v. BNP Paribas S.A.*,
  594 B.R. 167 (Bankr. S.D.N.Y. 2018)...............................................................15, 20

*Picard v. Bureau of Labor Ins.*,
  480 B.R. 501 (Bankr. S.D.N.Y. 2012) ..............................................................10, 11

*Picard. v. Citibank, N.A. (In re BLMIS)*,
  12 F.4th 171 (2d. Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard*,
  142 S. Ct. 1209 (2022)...................................................................................................3

*Picard v. The Est. (Succession) of Doris Igoin (In re BLMIS)*,
  525 B.R. 871 (Bankr. S.D.N.Y. 2015)...............................................................13, 16

*Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*,
  627 B.R. 546 (Bankr. S.D.N.Y. 2021)...................................................................7, 8

*Picard v. Fairfield Inv. Fund (In re BLMIS)*,
  No. 08-01789 (CGM), Adv. No. 09-01239 (CGM), 2021 WL 3477479
  (Bankr. S.D.N.Y. Aug. 6, 2021) ..................................................23, 25, 26, 27

*Picard v. JPMorgan Chase & Co. (In re BLMIS)*,
  Adv. Pro. Nos. 08-01789 (SMB), 10-04932 (SMB), 2014 WL 5106909
  (Bankr. S.D.N.Y. Oct. 10, 2014) ............................................................................10

*Picard v. Kookmin Bank*,
  Adv. Pro. No. 12-01194 (CGM), 2022 WL 17574763
  (Bankr. S.D.N.Y. Dec. 9, 2022)...........................................................12, 13, 15, 21

*Picard v. Korea Exch. Bank*,
  Adv. Pro. No. 11-02572 (CGM), 2022 WL 4371908
  (Bankr. S.D.N.Y. Sept. 21, 2022) .......................................................12, 13, 14, 21

*Picard v. Maxam Absolute Return Fund, L.P.*,
  460 B.R. 106 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 76 (S.D.N.Y. 2012) .....................7, 21

*Picard v. Mayer*,
  Adv Pro. No. 20-01316 (CGM), 2021 WL 4994435
  (Bankr. S.D.N.Y. Oct. 27, 2021) .............................................................................6

*Picard v. Multi-Strategy Fund Ltd.*,
  641 B.R. 78 (Bankr. S.D.N.Y. 2022) ........................................................................11, 13, 21

*Picard v. Peter Madoff (In re BLMIS)*,
  468 B.R. 620 (Bankr. S.D.N.Y. 2012) ......................................................................22, 25, 28

*Picard v. Standard Chartered Fin. Servs. (Luxembourg) S.A.*,
  Adv. Pro. No. 12-01565 (CGM), 2023 WL 118787
  (Bankr. S.D.N.Y. Jan. 6, 2023) ....................................................................................... *passim*

*Picard v. UBS AG*,
  Adv. Pro. No. 10-04285 (CGM), 2022 WL 17968924
  (Bankr. S.D.N.Y. Dec. 27, 2022) ......................................................................................11, 12

*In re Picard*,
  917 F.3d 85 (2d Cir. 2019) ..............................................................................................12, 21

*Porina v. Marward Shipping Co.*,
  521 F.3d 122 (2d Cir. 2008) ..................................................................................................6

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
  624 F.3d 123 (2d Cir. 2010) ..................................................................................................6

*Siegel v. Converters Transp., Inc.*,
  714 F.2d 213 (2d Cir. 1983) ................................................................................................23

*Tamam v. Fransabank SAL*,
  677 F. Supp. 2d 720 (S.D.N.Y. 2010) ................................................................................16

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*,
  916 F.3d 143 (2d Cir. 2019) ..................................................................................................7

*Walden v. Fiore*,
  571 U.S. 277 (2014) ............................................................................................................11

*Waldman v. Palestine Liberation Org.*,
  835 F.3d 317 (2d Cir. 2016) ................................................................................................20

**Statutes**

15 U.S.C. §§ 78aaa-*lll* ................................................................................................................1

**Rules**

Fed. R. Civ. P. 15(a)(2) ............................................................................................................26

Fed. R. Civ. P. 15(c)(1)(B) ......................................................................................................22

Plaintiff Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa-*lll* ("SIPA"), and the substantively consolidated chapter 7 estate of Bernard L. Madoff ("Madoff"), by and through the Trustee's undersigned counsel, respectfully submits this memorandum of law and the supporting declaration of Eric R. Fish ("Fish Decl.") in opposition to KBC Investments Limited's ("KBC") motion to dismiss the Amended Complaint ("Motion" or "Mot.").

## PRELIMINARY STATEMENT

This adversary proceeding is part of the Trustee's continuing efforts in this SIPA liquidation proceeding to recover BLMIS customer property that was stolen as part of Madoff's Ponzi scheme. In this action, the Trustee seeks to recover at least $86 million in subsequent transfers that KBC received from investments with BLMIS through Harley International (Cayman) Ltd. ("Harley"), one of the largest BLMIS feeder funds. KBC moves to dismiss the Trustee's Amended Complaint on the grounds that this Court does not have personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). KBC also moves to dismiss as time-barred two additional subsequent transfers from Harley to KBC alleged in the Amended Complaint that were not included in the initial complaint. Both of these arguments fail, and KBC's Motion should be denied in its entirety.

*First,* this Court has personal jurisdiction over KBC because KBC knowingly and intentionally directed monies into and redeemed from BLMIS in New York through Harley, among other BLMIS feeder funds. Specifically, KBC invested in Harley, which acted primarily through a New York manager and invested virtually all of its assets with BLMIS in New York. Although KBC portrays itself as a passive investor with a foreign investment in Harley, KBC knew

1

that its funds would be placed with BLMIS in New York.  Indeed, KBC invested with multiple BLMIS feeder funds, so any argument that KBC was unaware of the implications of placing funds with Harley is not plausible.  Investing with BLMIS was the entire point.  KBC also had other jurisdictional contacts, including using the New York banking system to send subscriptions to and receive redemptions from Harley, and working closely with KBC's New York affiliate in connection with its BLMIS feeder fund investments.  KBC contends that its personal jurisdiction arguments are different than those made by other subsequent transfer defendants because Harley is the initial transferee (as opposed to Fairfield Sentry Fund Limited ("Fairfield Sentry")) and because KBC purportedly did not make investment decisions, but KBC's arguments are akin to those made by other subsequent transfer defendants whose motions have been denied.

*Second*, the Trustee's claims to recover the additional subsequent transfers are timely under Federal Rule of Civil Procedure 15 because they relate back to the claims in the initial complaint (ECF No. 1) ("Initial Compl.").  The transfers arose out of the same course of conduct and the initial complaint provided KBC with sufficient notice that the Trustee would be seeking all transfers it received from Harley originating from BLMIS.

For the reasons set forth herein and articulated in the Court's previous Memoranda Decisions, the Trustee respectfully requests that the Court deny KBC's Motion.

## STATEMENT OF FACTS

### I.    THE BLMIS PONZI SCHEME AND ITS FEEDER FUNDS

Madoff founded and operated BLMIS in New York until its collapse in 2008.  *See* Amended Complaint, ECF No. 104 ("Am. Compl.") ¶¶ 22, 51.  BLMIS was a securities broker-dealer registered with the U.S. Securities and Exchange Commission (the "SEC") beginning in January 1960. *Id.* ¶ 22.  BLMIS purported to operate three principal business units: (i) a proprietary trading business; (ii) a market-making business; and (iii) an investment advisory business (the "IA

Business"). *Id.* ¶ 24. For its IA Business customers, BLMIS purportedly executed a split-strike conversion strategy, which involved (a) investing in a basket of common stocks from the Standard & Poor's 100 Index; (b) buying put options and selling call options to hedge against price changes in the underlying basket of stocks; and (c) purchasing U.S. treasury bills when the money was out of the market. *Id.* ¶¶ 32, 35, 37, 45. In reality, BLMIS operated a Ponzi scheme through its IA Business. *Id.* ¶ 28. On December 11, 2008, Madoff's fraud was publicly revealed, and he was arrested for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. *Id.* ¶ 10.

The extent of damage Madoff caused was made possible by BLMIS "feeder funds"—large investment funds created for the express purpose of funneling investors' funds into BLMIS. *See Picard. v. Citibank, N.A. (In re BLMIS)*, 12 F.4th 171, 179 (2d. Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard*, 142 S. Ct. 1209 (2022). KBC invested in several of these feeder funds, including Harley, which—acting primarily through a manager in New York—invested all or substantially all of its assets with BLMIS. *See* Am. Compl. ¶¶ 2, 57, 59.

## II.    THE INITIAL TRANSFEREE ACTION AND JUDGMENT

Following BLMIS's collapse, the Trustee filed an adversary proceeding against Harley to avoid and recover fraudulent transfers of stolen customer property in the amount of over $1 billion. *Id.* ¶¶ 4, 73. On November 10, 2010, the Bankruptcy Court entered summary judgment against Harley in the amount of $1,066,800,000 and a default judgment against Harley in the amount of $6,020,000—for a total judgment against Harley in the amount of $1,072,820,000. *Id.* ¶¶ 4, 74. The Trustee thereafter commenced multiple adversary proceedings against defendants like KBC to recover the more than $1 billion in unrecovered stolen customer property.

3

### III.    KBC AND ITS INVESTMENTS IN HARLEY

The Trustee's Amended Complaint against KBC arises from KBC's receipt of subsequent transfers of BLMIS customer property from Harley.  Harley acted primarily through Fix Asset Management Services, Inc., an institutional fund of funds manager with a principal place of business in New York and incorporated under New York law.  *Id.* ¶ 59.  KBC invested substantial sums with Harley, which, in turn, invested nearly all its funds with BLMIS.  *Id.* ¶¶ 2, 57, 80.  Between February 2008 and June 2008, KBC received at least three transfers from Harley totaling at least $146 million, of which the Trustee alleges at least $86 million consisted of customer property.  *Id.* ¶ 78, Ex. C.[1]  For each transfer, the Amended Complaint sets forth the subsequent transferor (Harley), the subsequent transferee (KBC), the date of the subsequent transfer, and the amount of the subsequent transfer.  *Id.*

Investors in Harley received a Confidential Explanatory Memorandum (the "PPM") regarding the fund.  *Id.* ¶ 63.  The PPM described how the fund "invests its assets with a single money manager" who invests "primarily in a basket of S&P 100 stocks."  *See, e.g.*, Fish Decl., Ex. A at NATSAA00000076.1.  The PPM made clear that an investment in Harley was an investment in the U.S. securities market.  Moreover, the PPM bound investors to Harley's Articles of Association, which provided that all disputes among Harley and its shareholders were subject to binding arbitration in New York pursuant to the rules established by the American Arbitration Association.  Am. Compl. ¶ 63; Fish Decl., Ex. A at NATSAA00000076.1, Ex. B at NATSAA00001549.1.  The Articles of Association, as well as the Memorandum of Association, included other references to New York and the U.S., including noting that the "capital of the

---

[1] The Trustee does not seek to recover more from KBC than the amount that was initially transferred to Harley from BLMIS.  Although Harley transferred a total of $146 million to KBC, the Trustee is seeking at least $86 million—the portion of the total transfer amount consisting of customer property.

Company" is in U.S. dollars and referencing U.S. government securities. Fish Decl., Ex. B at

NATSAA00001493.1, NATSAA00001499.1. The PPM further provided that Harley investors

would receive copies of annual audited financial statements. Am. Compl. ¶ 66; Fish Decl., Ex. A

at NATSAA00000090.1. In fact, Harley's 2004-2007 audited financial statements explained that

BLMIS acted as Harley's custodian, holding virtually all of Harley's assets in New York, and

Harley also used a strategy that purportedly required trading "in a basket of U.S. equity securities

commonly listed on the S&P 100 Index, equity index related options and U.S. Treasury Bills."

Am. Compl. ¶ 66; Fish Decl., Exs. C, D, E.

Harley investors, including KBC, agreed to send subscription payments to Harley's New

York correspondent bank accounts at JP Morgan Chase, New York (the "JP Morgan NY Account")

or the Northern Trust Banking Corporation ("Northern Trust NY Account"). Am. Compl. ¶ 64.

From Harley's bank account, the funds were placed in BLMIS's bank account in New York. *Id.*

Although KBC contends that its investments in Harley were actually held in accounts belonging

to Citco Global Custody, N.V. ("Citco Custody"), KBC nevertheless admits that any such custody

accounts *were established by KBC*. Declaration of Jatin Tosar, ECF No. 111 ("Tosar Decl.") ¶ 20.

KBC's agreement with Citco Custody also confirms that Citco Custody was KBC's agent in

connection with the Harley investments and acted only in accordance with KBC's instructions.[2]

*See id.*, Ex. 3. Moreover, Citco Custody utilized a bank account at HSBC Bank USA in New York

("HSBC NY Account") to receive redemption payments from Harley for the benefit of—and that

went to—KBC. Am. Compl. ¶ 65; Fish Decl., Exs. F, G, H. KBC concedes the receipt of all three

---

[2] For instance, according to the custody agreement: (1) the services provided included "the effecting of transactions of and/or relating to the purchase and sale of and dealing in Securities in the name and for the account of [KBC]"; (2) KBC authorized Citco Custody "to comply with any Instructions given or purported to be given by [KBC] and [Citco Custody] shall be entitled to act for [KBC] on any such Instructions"; and (3) "Orders to *buy/subscribe* or *sell/redeem* [were] sent by [KBC] to [Citco Custody] . . . ." Tosar Decl., Ex. 3 at ¶¶ 1.1, 2.2, Schedule Three ¶ 1.1.

transfers at issue, which were deposited into Citco Custody's bank account in New York on behalf of KBC. Tosar Decl. ¶¶ 25, 29–30, 31, 35–36, 37, 41–42. In other words, there is no doubt that KBC received the transfers at issue that traveled from BLMIS to Harley and then to KBC's custody account—through New York bank accounts.

Harley was not KBC's only BLMIS feeder fund investment. Indeed, as part of its fund derivatives business, KBC sought to profit from Madoff in multiple feeder funds, including Fairfield Sentry, Rye Select Broad Market Portfolio Limited, Rye Select Broad Market XL Portfolio Limited, and Kingate Global Fund Limited. Am. Compl. ¶ 69. KBC worked closely with its affiliate in New York, KBC Financial Products USA, Inc. ("KBC USA"), in managing its BLMIS-related investments. *Id.* ¶¶ 55, 67–68.

## ARGUMENT

## I.    THIS COURT HAS PERSONAL JURISDICTION OVER KBC

To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff need only show a *prima facie* case that personal jurisdiction exists. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013). A *prima facie* showing of jurisdiction "may be established solely by allegations." *Id.* at 84–85 ("Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction."). A plaintiff may also establish a *prima facie* case of jurisdiction through affidavits and supporting materials that contain averments of fact outside the pleadings. *See S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010); *Picard v. Mayer*, Adv Pro. No. 20-01316 (CGM), 2021 WL 4994435, at *3 (Bankr. S.D.N.Y. Oct. 27, 2021). These pleadings and affidavits are to be construed "in the light most favorable to plaintiffs, resolving all doubts in their favor." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (quoting *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)).

6

Depending on the nature of a defendant's contacts with the forum, a court may exercise general or specific jurisdiction. *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 473 (S.D.N.Y. 2001). Relevant here, specific jurisdiction exists where the defendant purposely directs its activities into the forum and the underlying cause of action arises out of or relates to those activities. *See Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*, 627 B.R. 546, 566 (Bankr. S.D.N.Y. 2021).

The specific jurisdiction analysis is a two-step inquiry. First, the court assesses whether the defendant established "minimum contacts" in the forum, such that the defendant purposely availed itself of the privilege of conducting activity in the forum. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–76 (1985). The defendant's activities need not have taken place within the forum, "and a single transaction with the forum will suffice." *Picard v. Maxam Absolute Return Fund, L.P.*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 76 (S.D.N.Y. 2012). Moreover, minimum contacts may be found when a "defendant's allegedly culpable conduct involves at least in part financial transactions that touch the forum." *In re Fairfield Sentry Ltd.*, 627 B.R. at 566 (quoting *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 151 (2d Cir. 2019)).

In determining whether a defendant's contacts establish personal jurisdiction, the court must look at the "totality of the circumstances" rather than analyze each contact in isolation. *See Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996); *see also Chloé*, 616 F.3d at 164 (analyzing totality of defendants' contacts to determine jurisdiction under New York's long-arm statute and the U.S. Constitution's Due Process Clause); *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005) ("No single event or contact connecting defendant to the forum state need be demonstrated; rather, the *totality of all defendant's*

7

*contacts* with the forum state must indicate that the exercise of jurisdiction would be proper." (citation omitted) (emphasis in original)).

Second, the Court conducts a "reasonableness" inquiry to determine that its exercise of jurisdiction will not offend traditional notions of "fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 320.  To determine whether jurisdiction is reasonable, courts consider the following:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996).  Where the plaintiff has alleged purposeful availment, however, the burden shifts to the defendant to present a "compelling case" that jurisdiction would be unreasonable.  *In re Fairfield Sentry Ltd.*, 627 B.R. at 567 (citing *Burger King*, 471 U.S. at 472–73).

## A.    KBC Purposefully Availed Itself of the Laws and Privileges of Conducting Business in New York by Investing in Harley

KBC had numerous and substantive contacts with New York that establish this Court's jurisdiction.  KBC: (i) invested in Harley, whose assets were effectively managed by Madoff from BLMIS's offices in New York, custodied by BLMIS in New York, and purportedly placed in U.S. investments; (ii) utilized New York banks to transact with Harley and its own clients; and (iii) invested in multiple BLMIS feeder funds as part of a business strategy to profit from investments in BLMIS.  KBC's knowing investment in BLMIS through Harley alone supports jurisdiction, and its contacts in their totality leave no doubt that KBC purposefully directed its activities to the United States and New York specifically.  *See Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 397 F. Supp. 3d 323, 344 (S.D.N.Y. 2019), *aff'd in part, vacated in part on other grounds*, 40 F.4th 56 (2d Cir. 2022) ("When all [defendant]'s Agreement-related contacts are

8

considered together, it is clear [the defendant] purposely availed itself of the forum."). KBC disregards this "totality of the circumstances" standard in favor of explaining why various specific contacts in isolation fail to confer jurisdiction. But KBC's approach of evaluating and dismissing all of these contacts leads to the opposite conclusion: the totality of KBC's contacts favors personal jurisdiction.

### 1. KBC's Investments in BLMIS Through Harley Establish Minimum Contacts

KBC intentionally invested with BLMIS through Harley—a known BLMIS feeder. The allegation that KBC knowingly directed funds to be invested with BLMIS "alone is sufficient to establish a prima facie showing of jurisdiction over Defendant in the pre-discovery phase of litigation. . . ." *Picard v. Banque Lombard Odier & Cie SA*, Adv. Pro. No. 12-01693 (CGM), 2022 WL 2387523, at *2 (Bankr. S.D.N.Y. June 30, 2022) ("*Banque Lombard I*"), *leave to appeal denied sub nom. In re Bernard L. Madoff Inv. Secs. LLC*, No. 22 Civ. 6561 (LGS), 2023 WL 395225, at *4 (S.D.N.Y. Jan. 25, 2023) ("*Banque Lombard II*") (noting "the Bankruptcy Court correctly held, applying settled precedent, that by intentionally investing in a New York-based investment fund, Defendant 'purposefully availed itself of the privilege of' doing business in New York.") (citation omitted). KBC attempts to distinguish itself from other subsequent transfer defendants on the basis that it purportedly invested in Harley on behalf of others rather than itself. This argument ignores reality and other decisions of this Court. Indeed, the materials KBC submits in support of its Motion demonstrate that KBC profited from BLMIS by leveraging Harley investments—and, in turn, BLMIS—and received redemptions from those investments. *See* Tosar Decl., Exs. 1, 5–12.

Based on the demonstrated intention to invest with BLMIS in New York through a feeder fund, this Court has already concluded that investors like KBC are subject to personal jurisdiction

in New York. *See Picard v. Bureau of Labor Ins.*, 480 B.R. 501, 516–18 (Bankr. S.D.N.Y. 2012)

(Lifland, J.) ("*BLI*"). In *BLI*, as here, the Trustee's suit was "based upon [the subsequent

transferee's] investment of tens of millions of dollars in [a feeder fund] with the specific goal of

having funds invested in BLMIS in New York, with intent to profit therefrom." *Id.* at 506. KBC

knew New York-based BLMIS served as an investment adviser and custodian for Harley and that

control of Harley's investments rested entirely with New York-based BLMIS. KBC also knew

BLMIS purportedly invested Harley's assets in U.S. equities, U.S. options, and U.S. Treasury

Bills. As a result, KBC placed funds into the Harley feeder fund with the intent of investing in the

U.S. market.

KBC makes a similar argument as the defendant in *BLI*, where the subsequent transferee

argued that the foreseeability of its investment ending up in a BLMIS account was insufficient to

support personal jurisdiction. *Id.* at 516 n.14. Not only did the Court reject this argument, Judge

Lifland called it "disingenuous," explaining that:

> BLI's investments in Fairfield Sentry did not merely "end up" in an
> account at BLMIS as a result of happenstance or coincidence.
> Rather, BLI purposefully availed itself of the benefits and
> protections of New York laws by knowing, intending and
> contemplating that the substantial majority of funds invested in
> Fairfield Sentry would be transferred to BLMIS in New York to be
> invested in the New York securities market.

*Id.* at 517; *see also Picard v. JPMorgan Chase & Co. (In re BLMIS)*, Adv. Pro. Nos. 08-01789

(SMB), 10-04932 (SMB), 2014 WL 5106909, at *9 (Bankr. S.D.N.Y. Oct. 10, 2014) (noting courts

in this liquidation proceeding have already "confirmed that defendants who invested directly or

indirectly with BLMIS and received payments from BLMIS as initial transferees or as subsequent

transferees of those initial transferees were subject to the Court's personal jurisdiction").

"[Defendant] intentionally tossed a seed from abroad to take root and grow as a new tree in the

Madoff money orchard in the United States and reap the benefits therefrom." *BLI*, 480 B.R. at 506.

KBC cites to the Supreme Court's decision in *Walden v. Fiore*, 571 U.S. 277 (2014), to argue that personal jurisdiction must be established by "contacts that the 'defendant himself' creates with the forum State. . . . " Mot. at 18 (quoting *Walden*, 571 U.S. at 284–85). But that is precisely what KBC did when it sent Harley millions of dollars to be custodied and invested by BLMIS in New York. KBC "expressly aimed its conduct at the forum" by placing investments with BLMIS through a known feeder fund, making the exercise of jurisdiction constitutionally permissible. *Picard v. UBS AG*, Adv. Pro. No. 10-04285 (CGM), 2022 WL 17968924, at *7 (Bankr. S.D.N.Y. Dec. 27, 2022) (citing *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 CIV. 5263 (AKH), 2017 WL 3600425, at *7 (S.D.N.Y. Aug. 18, 2017)). Moreover, "proof that the plaintiff's claim came about because of the defendant's in-state conduct" is not required. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021). This Court therefore already has declared that *Walden* is of "no assistance" to a subsequent transferee like KBC who invested in a feeder fund with the specific goal of having funds invested with BLMIS in New York. *See Picard v. Multi-Strategy Fund Ltd.*, 641 B.R. 78, 87 (Bankr. S.D.N.Y. 2022). As the District Court recently found, "Defendant's *own* intentional contacts with New York [in investing in a BLMIS feeder fund] create the requisite connection." *Lombard II*, 2023 WL 395225, at *4.

KBC also contends that it invested on behalf of others and "did not anticipate obtaining profits from Harley's transactions with BLMIS." Mot. at 17. Not only is this assertion a question of fact, it also ignores the reality that KBC—as part of a global fund derivatives group—made a strategic business decision to leverage one of Madoff's largest feeder funds to profit from BLMIS

in New York. Much like Fairfield Sentry, Harley was an offshore fund—managed from New York—whose sole purpose was to invest with BLMIS. Am. Compl. ¶¶ 2–3, 57, 59. The holding in *BLI* does not exclude investors like KBC who found a new way to profit from BLMIS in New York by leveraging BLMIS's largest feeder funds.

Confronted with similar recent arguments, this Court held in *Korea Exchange Bank* and *Kookmin Bank* that jurisdiction was appropriate where the defendants submitted declarations contending they invested on behalf of others as a trustee or custodian, did not direct the investments, and did not know BLMIS was the ultimate investment. *Picard v. Korea Exch. Bank*, Adv. Pro. No. 11-02572 (CGM), 2022 WL 4371908, at *3 (Bankr. S.D.N.Y. Sept. 21, 2022); *Picard v. Kookmin Bank*, Adv. Pro. No. 12-01194 (CGM), 2022 WL 17574763, at *3–4 (Bankr. S.D.N.Y. Dec. 9, 2022). The same decision should be reached here: KBC's deliberate targeting of BLMIS and the New York securities market—through entities expressly constituted for that purpose—is dispositive. "When these [subsequent transferee] investors chose to buy into feeder funds that placed all or substantially all of their assets with Madoff Securities, they knew where their money was going." *In re Picard*, 917 F.3d 85, 105 (2d Cir. 2019); *see also UBS AG*, 2022 WL 17968924, at *10.

KBC's demonstrated intent to place investments with, and profit from, BLMIS is bolstered by its investments in other BLMIS feeder funds, including Fairfield Sentry, Rye Select Broad Market Portfolio Limited, Rye Select Broad Market XL Portfolio Limited, and Kingate Global Fund Limited. Am. Compl. ¶ 69. KBC thus had a "deep involvement with Madoff" and implemented a business strategy of profiting from BLMIS. *UBS AG*, 2022 WL 17968924, at *2. Moreover, KBC's subscription agreement with Fairfield Sentry is in the name of "Citco Global Custody (NA) N.V. as custodian for KBC Investments Limited . . . ." Fish Decl., Ex. I at

12

CFSSAL0008424. Although KBC now contends that it did not execute the Harley subscription agreement and that the investment was held in an offshore account by Citco Custody, Tosar Decl. ¶ 20, if the Fairfield Sentry subscription is any indication, Citco Custody likely signed the Harley subscription agreement on behalf of KBC—which controlled the Harley investment under its custody and, as is uncontested, received the transfers at issue.[3] *See Picard v. The Est. (Succession) of Doris Igoin (In re BLMIS)*, 525 B.R. 871, 884 (Bankr. S.D.N.Y. 2015) (explaining that conduct of agent is attributed to principal for purposes of jurisdictional analysis).

In summary, this Court's recent decisions in *Multi-Strategy*, *Banque Lombard*, *Korea Exchange Bank*, *Kookmin Bank*, and others confirm that *BLI* applies to confer personal jurisdiction here because KBC is similarly situated to the defendants in those cases. "Defendant's alleged contacts with New York [were] not random, isolated, or fortuitous." *Multi-Strategy*, 641 B.R. at 87; *Korea Exch. Bank*, 2022 WL 4371908, at *4.

### 2. KBC's Purposeful Use of New York Bank Accounts Establishes Specific Personal Jurisdiction

This Court also has jurisdiction over KBC because it purposefully used the New York banking system in investing with and receiving redemptions from Harley. Am. Compl. ¶¶ 64–65; Fish Decl., Exs. F, G, H; *Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56, 70 & n.18 (S.D.N.Y. 2016) ("Because [defendant] directed the wire transfers to a specifically designated New York account for its own advantage, the receipt of the funds in New York is a 'contact' properly attributed to [defendant]."). Courts have often held that a defendant's purposeful use of a domestic bank account is sufficient to establish personal jurisdiction. *See, e.g., Eldesouky v. Aziz*, No. 11-CV-6986 (JLC), 2014 WL 7271219, at *6–7 (S.D.N.Y. Dec. 19, 2014)

---

[3] The Trustee does not possess KBC's subscription agreement with Harley, but KBC describes an arrangement in which it controlled the Citco Custody account and the Harley investment.

13

(finding jurisdiction under New York long-arm statute based solely on defendant's use of New York account to receive payment at issue); *HSH Nordbank AG N.Y. Branch v. Street*, No. 11 Civ. 9405 (DLC), 2012 WL 2921875, at \*4 (S.D.N.Y. July 18, 2012) (same); *Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp. 2d 374, 382–83 (S.D.N.Y. 2013) (same). This Court has similarly found jurisdiction in this SIPA liquidation proceeding where initial and subsequent transferee defendants invested through and received transfers from U.S. bank accounts. *See, e.g.*, *Korea Exch. Bank*, 2022 WL 4371908, at \*4 ("Where a defendant chooses to use a United States bank account to receive[] funds, exercising personal jurisdiction over the defendant for causes of action relating to those transfers is constitutional.").

That the JP Morgan NY Account, the Northern Trust NY Account, or the HSBC NY Account may have been correspondent accounts does not change the analysis. Purposeful use of correspondent accounts can confer personal jurisdiction. In the leading case, *Licci v. Lebanese Canadian Bank, SAL*, the New York Court of Appeals held that a defendant's use of a correspondent bank account in New York supports a finding of jurisdiction "even if no other contacts between the defendant and New York can be established" provided that such use was "purposeful." 20 N.Y.3d 327, 338 (2012) (citation omitted); *Arcapita*, 549 B.R. at 67–69 (finding jurisdiction based on designation and use of New York correspondent accounts to receive transfers); *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 322–29 (2016) (same).

KBC's use of these bank accounts was "purposeful" and not coincidental or passive. *See Licci*, 20 N.Y.3d at 338–39; *Al Rushaid*, 28 N.Y. 3d at 328 (choice of the New York correspondent bank made the connection to New York "volitional"). KBC voluntarily directed payments into and redemptions out of Harley, thereby using the JP Morgan NY Account, the Northern Trust NY Account, and Citco Custody's HSBC NY Account to facilitate the investments and redemptions

14

at issue. This was not passive or merely coincidental. *See Bahrain Islamic Bank, BisB v. Arcapita Bank, B.S.C.(C) (In re Arcapita Bank B.S.C.(C))*, 640 B.R. 604, 617 (S.D.N.Y. 2022) (affirming personal jurisdiction on appeal from Bankruptcy Court where defendant in a commercial transaction "designated correspondent bank accounts in New York to receive the fund transfers"). KBC's use of New York bank accounts is "directly related to its investment activities with [the feeder fund] and BLMIS." *See Lombard I*, 2022 WL 2387523, at *4 (citing *Picard v. BNP Paribas S.A.*, 594 B.R. 167, 191 (Bankr. S.D.N.Y. 2018)); *Kookmin Bank*, 2022 WL 17574763, at *4 (same).

The use of the New York bank accounts went beyond "mere maintenance," as KBC was a knowing participant in the underlying transactions and directed the movement of funds through these accounts. Moreover, the cases KBC cites are distinguishable. *See, e.g.*, *O'Toole v. MyPlace Dev. SP. Z O.O. (In re Sledziejowski)*, No. 13–22050 (RDD), 2016 WL 6155929, at *7-11 (Bankr. S.D.N.Y. Oct. 21, 2016) (finding personal jurisdiction not established based on unilateral transfer from non-debtor in U.S. to defendant in Poland, but allowing jurisdictional discovery); *Leema Enters., Inc. v. Willi*, 575 F. Supp. 1533, 1537 (S.D.N.Y. 1983) (finding that, unlike here, correspondent bank accounts were "unrelated to the fraud alleged"); *Letom Mgmt. Inc. v. Centaur Gaming, LLC*, No. 17 CIV. 3793 (PAE), 2017 WL 4877426, at *7 (S.D.N.Y. Oct. 27, 2017) (finding planned payments in connection with a foreign contract to book a venue insufficient to establish specific jurisdiction).[4]

---

[4] The cases cited to by KBC pertaining to disputes between parties arising out of a foreign service contract are inapposite because this action is not analogous to a dispute between parties who entered into a foreign services contract. Rather, this is a SIPA liquidation proceeding to recover fraudulent subsequent transfers from an investor whose investments of funds were made for the sole purpose of profiting from their investment with a New York-based broker-dealer purportedly trading in U.S. securities.

KBC also argues that because the use of a correspondent bank account was "incidental" to "settle a foreign securities transaction," such use does not give rise to personal jurisdiction. *See* Mot. at 14. But once again, the cases KBC relies upon for such an argument are inapposite because the transactions in those cases were unrelated to the subject matter of the action. *See Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720, 727–28 (S.D.N.Y. 2010) ("It is clear that the events giving rise to the physical injuries and deaths for which Plaintiffs seek redress are missile attacks in Israel, not funds transfers in New York"); *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 409-10 (S.D.N.Y. 2021) (declining to find jurisdiction because there was no allegation that the defendant played a role in directing the transfer of funds through the New York bank account). By contrast, the Trustee is seeking to recover the very transfers that went through these bank accounts. "Unlike in the cases cited by Defendant, New York is not just where Defendant's money happened to end up." *Banque Lombard II*, 2023 WL 395225, at *5.

The fact that Citco Custody, as agent for KBC, used the JP Morgan NY Account, the Northern Trust NY Account, or the HSBC NY Account also does not change the analysis. KBC's claim that any use of correspondent bank accounts by Citco Custody was unknown to KBC, Tosar Decl. ¶¶ 30, 36, 42, is both implausible and irrelevant. Citco Custody purposely used these New York accounts as KBC's agent in connection with the Harley investment, taking its instructions from KBC and acting on KBC's behalf. *See* Tosar Decl, Ex. 3 at Schedule Three ¶ 1.1 ("Orders to *buy/subscribe* or *sell/redeem* are sent by [KBC] to [Citco Custody]"). The conduct of Citco Custody—KBC's agent—is thus attributable to KBC—the principal—for purposes of jurisdiction analysis. *Igoin*, 525 B.R. 871 at 884. "[T]he point is not whether [defendant] owns the accounts, it is that they made purposeful use of them for reasons related to the underlying dispute." *Esso Expl. & Prod. Nigeria*, 397 F. Supp. at 346. As the recipient of the transfers through its custody

relationship with Citco Custody, KBC is thus responsible for the use of these New York bank accounts.

Finally, in trying to explain its business model of providing leveraging of investment returns related to Harley, KBC's motion papers reveal the use of its own JP Morgan Chase Bank account in New York for accepting payments as part of its leveraging agreement, thus bolstering even further its jurisdictional contacts related to the Harley investment.  *See* Tosar Decl., Ex. 1 at 15.

### 3. KBC's New York Affiliate's Communications and Actions Regarding BLMIS Feeder Funds Provides Another Jurisdictional Contact

KBC also utilized its affiliates, including KBC USA in New York, in matters related to its BLMIS feeder fund investments.  Am. Compl. ¶¶ 55, 67–68.  KBC contends that "the Trustee makes conclusory allegations without any factual support concerning conduct of KBC Investments' corporate affiliates."  Mot. at 11.  To the contrary, KBC used a number of related entities to conduct transactions and invest with Harley and other BLMIS feeder funds, and the various entities are significantly more interconnected than KBC admits them to be.  The reality is that KBC's investment in Harley was part and parcel of a larger business strategy by KBC and its corporate affiliates to profit from BLMIS feeder fund investments.  As the Trustee alleges, KBC purposefully placed funds with Harley, as well as other BLMIS feeder funds, and utilized its corporate affiliates, including KBC USA in New York—all as part of its fund derivatives business to profit from Madoff.  Am. Compl. ¶¶ 67–69; *see also* Tosar Decl. ¶ 5 (disclosing that KBC "provided funding to its offshore clients ('Clients') to enable those Clients to leverage their investment returns.").

At the outset, Mr. Tosar's declaration in support of KBC's motion shows that KBC—a subsidiary of KBC Financial Products, which has offices in New York, London, and Hong Kong—

17

utilized various corporate affiliates with respect to the Harley investments at issue. For instance, representatives at KBC Financial Products communicated regarding KBC's redemptions. *See, e.g.*, Tosar Decl., Exs. 9, 14. KBC also utilized its affiliates in leveraging the Harley investment. *Id.* ¶ 12 ("KBC Investments utilized KBC Investments Cayman Islands V Ltd. . . . to book client-facing offshore derivatives transactions with KBC Investments fund derivatives Clients."); *Id.*, Ex. 1 at 1 ("KBC Financial Products UK Limited has arranged this Transaction for [KBC Investments Cayman Islands V Ltd.]").

Despite Mr. Tosar's tepid denials that KBC's U.S. affiliate assisted KBC with the Harley investment, the limited number of documents in the Trustee's possession show that KBC USA in New York assisted KBC with its BLMIS feeder fund investments. For example, Fairfield Sentry redemption documents from 2007 list KBC USA as the account contact and the documents were faxed to KBC USA's New York office. Fish Decl., Exs. J, K. In addition, 2007 correspondence from Citco Banking designated KBC USA as an authorized contact for another Citco Custody account for KBC in a BLMIS feeder fund managed by Tremont. *Id.*, Ex. L. And, in July 2008, KBC USA contacted Tremont regarding KBC's swap with Lehman Brothers and its investment in one of Tremont's feeder funds. *Id.*, Ex. M.

KBC's use of KBC USA for its BLMIS-related investments is consistent with a global business strategy. In an October 2007 email and attached presentation from Mark Rinaldo of "KBC Financial Products" in New York—*i.e.*, KBC USA—Rinaldo touted the interconnectedness of the KBC Financial Products entities. *Id.*, Ex. N. Rinaldo described "KBC Financial Products" as a global business and stated: "The core business within my product group at KBC FP is establishing credit lines and providing leverage for portfolios of Hedge Funds and Fund of Funds" and that "KBC is one of the largest players in this space globally." *Id.* at ACCSAC00779576.

18

This description of "KBC Financial Products" also comports with Mr. Tosar's description of KBC itself as "provid[ing] funding to its offshore clients . . . to enable those Clients to leverage their investment returns." Tosar Decl. ¶ 5.

All of these documents suggest that KBC was a part of a larger operation that invested with various BLMIS feeder funds. Harley was merely one aspect of KBC's multi-faceted relationship with BLMIS feeder funds and KBC's use of its global platform to profit from those feeder funds. KBC should not be able to escape jurisdiction by downplaying its investments and use of U.S.-based corporate affiliates.

Mr. Tosar's declaration also does not contradict the above-referenced documents or even the substance of the Trustee's allegations. Mr. Tosar merely submits that KBC USA, though another "indirect subsidiary of KBC Bank" along with KBC—but not a "subsidiary or parent" of KBC—"did not direct or make any investment decisions with respect to any of the transactions alleged in the Amended Complaint." *Id.* ¶ 14. But the Trustee does not allege that KBC USA was KBC's parent or subsidiary or that it made any investment decisions. Rather, the Trustee points to KBC USA as an affiliate that worked closely with KBC, assisted KBC with managing the BLMIS investments, and communicated frequently with feeder funds and attended meetings in New York. Am. Compl. ¶¶ 55–56, 67–68. Notably, Mr. Tosar states that KBC USA and another affiliate, KBC Asset Management Ltd., "did not frequently communicate or attend meetings in New York on behalf of or for the benefit of KBC Investments," Tosar Decl. ¶ 15, but Mr. Tosar does not *deny* that these communications or meetings took place. The term "frequently" may be subject to interpretation, but the Trustee is in possession of documents showing that KBC USA contacted Fairfield Greenwich Group in February 2004 and visited its New York office. Fish

Decl., Exs. O, P.[5]  The Trustee's well-pleaded allegations and above documents thus demonstrate

that KBC USA had a role with KBC's BLMIS feeder fund investments such that KBC is subject

to personal jurisdiction in New York.

### B.    The Exercise of Personal Jurisdiction Is Reasonable

KBC is unable to present a compelling reason why jurisdiction would be unreasonable.

This is because jurisdiction is indeed reasonable here.  "The reasonableness inquiry requires the

court to determine whether the assertion of personal jurisdiction . . . comports with 'traditional

notions of fair play and substantial justice' under the circumstances of the particular case."

*Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (citations omitted).

Where a plaintiff has made a threshold showing of minimum contacts, a defendant must present a

"compelling case that the presence of some other considerations would render jurisdiction

unreasonable."  *Chloé*, 616 F.3d at 165 (quoting *Burger King*, 471 U.S. at 477).  This Court has

found that "it would be a 'rare' case where the defendant's minimum contacts with the forum

support the exercise of personal jurisdiction but it is unreasonable to force the defendant to defend

the action in that forum."  *BNP*, 594 B.R. at 188.

This is not that "rare" case.  KBC contends that "even if the Trustee has met his burden

with respect to the first two requirements for exercising jurisdiction over KBC Investments, the

reasonableness factors weight against the Court doing so."  Mot. at 22.  But as discussed above,

the various contacts were purposeful and also at the heart of the Trustee's claims that KBC received

subsequent transfers of stolen customer property.  Moreover, any argument that the U.S.'s interest

is not greater than that of another jurisdiction disregards the interests of the SIPA Trustee and this

Court.  "The forum and the Trustee both have a strong interest in litigating BLMIS adversary

---

[5] In light of the Fairfield Sentry redemption documents, KBC USA's outreach on BLMIS and Fairfield Sentry were
likely done on behalf of, and for the benefit of KBC.

proceedings in this Court." *Multi-Strategy*, 641 B.R. at 89; *Korea Exch. Bank*, 2022 WL 4371908, at *5; *see also In re Picard*, 917 F.3d at 103 (noting the "compelling interest in allowing domestic estates to recover fraudulently transferred property").

On the other hand, the burden on KBC is minimal. Neither litigation costs nor travel inconveniences undermine the strong interest in litigating this matter in this Court. *See Maxam*, 460 B.R. at 119 (finding New York counsel and conveniences of modern communication and transportation minimize any such burden). Moreover, Harley shareholders were expected to submit to binding arbitration in New York for all disputes, making a New York forum anticipated. *See* Am. Compl. ¶ 63; Fish Decl., Ex. B at NATSAA00001549.1. Thus, KBC "is not burdened by this litigation." *Kookmin Bank*, 2022 WL 17574763, at *5 (noting that the defendant actively participated in the litigation for over ten years, is represented by competent U.S. counsel, and submitted to New York courts in signing subscription agreements).

### C. At Minimum, the Trustee Is Entitled to Jurisdictional Discovery

If this Court finds that the Trustee has not made a *prima facie* showing of jurisdiction, the Trustee respectfully requests jurisdictional discovery. "Such discovery may be authorized where a plaintiff has made a threshold showing that there is some basis for the assertion of jurisdiction." *Kiobel v. Royal Dutch Petroleum Co.*, No. 02 Civ. 7618 (KMW)(HBP), 2009 WL 3817590, at *4 (S.D.N.Y. Nov. 16, 2009) (internal citation marks and quotation omitted). The Trustee has shown how: (i) KBC, *inter alia*, knowingly received subsequent transfers of customer property from Harley, a known BLMIS feeder fund; (ii) KBC used U.S. bank accounts to redeem out of, and at times, subscribe into Harley; and (iii) KBC utilized its New York affiliate in its various feeder fund investments. At a minimum, these facts establish a "threshold showing" of jurisdiction sufficient for discovery. *Id.* at *6; *see also Ayyash v. Bank Al-Madina*, No. 04 Civ. 9201(GEL), 2006 WL 587342, at *6 (S.D.N.Y. Mar. 9, 2006) (granting discovery because allegations of wire

transfers through United States made a "sufficient start" toward establishing jurisdiction). The Trustee is not in possession of documents from Harley, who never appeared in this Court or responded to the Trustee's subpoenas, and therefore he has had to rely on a small set of information pointing to KBC's receipt of subsequent transfers and its role in receiving them. *See* Fish Decl. ¶ 2. KBC's arguments regarding its role in the investment, at a minimum, also raise questions requiring discovery, whether on the merits or jurisdictional. To the extent the Court finds the Trustee has not made a *prima facie* showing of personal jurisdiction, the Trustee should at least be provided jurisdictional discovery to learn more about the nature of the Harley investment and KBC's relationship with its own clients.

## II.    THE ADDITIONAL SUBSEQUENT TRANSFERS IN THE AMENDED COMPLAINT RELATE BACK TO THE INITIAL COMPLAINT

Contrary to KBC's arguments, the Trustee's claim to recover the additional subsequent transfers is timely because the additional subsequent transfers relate back to the initial complaint.

Under Rule 15, "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B).

Courts in the Second Circuit, including this Court, have "liberally construed" Rule 15, which "does not set a high bar for relation back, so long as the claims attempted to be asserted in the new complaint share a reasonable measure of common ground with the allegations in the original pleading." *Picard v. Bank Julius Baer & Co. Ltd.*, Adv. Pro. No. 11-02922 (CGM), 2022 WL 17726520, at *15 (Bankr. S.D.N.Y. Dec. 15, 2022) (citation omitted); *Picard v. Standard Chartered Fin. Servs. (Luxembourg) S.A.*, Adv. Pro. No. 12-01565 (CGM), 2023 WL 118787, at *5 (Bankr. S.D.N.Y. Jan. 6, 2023) (same); *Picard v. Peter Madoff (In re BLMIS)*, 468 B.R. 620,

633 (Bankr. S.D.N.Y. 2012) ("*Peter Madoff*") (same); *see also Siegel v. Converters Transp., Inc.*, 714 F.2d 213, 216 (2d Cir. 1983). This is because "[t]he purpose of Rule 15 is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities." *Picard v. Fairfield Inv. Fund (In re BLMIS)*, No. 08-01789 (CGM), Adv. No. 09-01239 (CGM), 2021 WL 3477479, at *12 (Bankr. S.D.N.Y. Aug. 6, 2021) (quoting *Siegel*, 714 F.2d at 217). Thus, "the principal inquiry is whether the general fact situation alleged in the original pleading provides adequate notice to the opposing party of the matters raised in the amended pleading." *Bank Julius Baer*, 2022 WL 17726520, at *15 (cleaned up); *Standard Chartered*, 2023 WL 118787, at *5 (same).

Additional fraudulent subsequent transfer claims against existing defendants "relate back to the original pleading where the newly alleged transfers occurred as part of the same course of conduct as the originally alleged transfers." *Bank Julius Baer*, 2022 WL 17726520, at *15 (cleaned up); *Standard Chartered*, 2023 WL 118787, at *5 (same). "When examining 'conduct' under Rule 15, courts typically analyze whether 'the new transfers occurred as part of the same course of conduct as the transfers alleged in the original complaint,' and whether 'the original complaint gave sufficient notice to the defendants that the Trustee may sue for additional transfers that were part of the same course of conduct.'" *Bank Julius Baer*, 2022 WL 17726520, at *15 (quoting *Hill v. Oria (In re Juliet Homes, LP)*, No. 07-36424, 2011 WL 6817928, at *7 (Bankr. S.D. Tex. Dec. 28, 2011)); *Standard Chartered*, 2023 WL 118787, at *5 (same).

### A.    The Additional Subsequent Transfers Were Made as Part of the Same Course of Conduct as the Transfers Alleged in the Initial Complaint

Relation back should be permitted because the facts here are no different than those in *Bank Julius Baer* and *Standard Chartered*, where this Court recently held relation back to be appropriate. *Bank Julius Baer*, 2022 WL 17726520, at *15–16; *Standard Chartered*, 2023 WL

118787, at *5–6. Specifically, the Trustee has alleged an underlying common course of conduct involving KBC's investing into and redeeming from Madoff's fraud through BLMIS feeder funds in both the initial complaint and the Amended Complaint. The additional subsequent transfers are being sought under the same legal theories and as part of the same set of facts as set forth in the initial complaint. Both sets of transfers are being sought under Section 550(a) and are subsequent transfers of customer property received by KBC in 2008 from the same BLMIS feeder fund, Harley. Thus, any defense KBC might have regarding the additional subsequent transfers will likely be the same as or similar to the defenses to the original transfers. The additional subsequent transfers are no different in form or substance to the subsequent transfers alleged in the initial complaint, and therefore they relate back.

Despite KBC's protestations, courts have found relation back on the grounds that the additional amounts sought are part of the same Ponzi scheme as those originally alleged. *See, e.g.*, *Goldberg v. Halbert (In re Woodbridge Grp. of Companies, LLC)*, Adv. Pro. No. 19-51027 (JKS), 2021 WL 5774217, at *9–11 (Bankr. D. Del. Dec. 6, 2021) (finding relation back of amended claims to recover principal, where original complaint just sought interest, because "both the initial and amended claims arise from the Defendant's investment in the Woodbridge Ponzi Scheme," and as an investor defendant was on notice that any of his transfers might be subject to clawback); *In re Juliet Homes*, 2011 WL 6817928, at *7 ("The fraudulent transfers alleged in the original complaint, along with the new transfers alleged in the [proposed amended complaint], are alleged to have been part of this overall Ponzi scheme. Both the original and the newly alleged fraudulent transfers therefore arose as part of the same course of alleged conduct."); *In re Chaus Sec. Litig.*, 801 F. Supp. 1257, 1264 (S.D.N.Y. 1992) (holding allegations in amended complaint related back

as part of same basic scheme even though events were distinct from those alleged in the original complaint).

Here, not only are the additional subsequent transfers and those in the initial complaint part of the same Ponzi scheme, but (i) the relevant defendant, (ii) its investments with BLMIS through and receipt of transfers from Harley, and (iii) the underlying legal basis for seeking the additional subsequent transfers, are all the same as in the initial complaint. *See Peter Madoff*, 468 B.R. at 633–34 (permitting relation back where original and amended complaints alleged transfers under the "same legal theories"); *Adelphia Recovery Tr. v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 333–34 (S.D.N.Y. 2009) (permitting relation back where additional transfers related to the same alleged fraudulent loan transactions); *Fairfield Inv. Fund*, 2021 WL 3477479, at *12–13 (permitting relation back for subsequent transferees out of FGG feeder funds where the relevant entities were named as subsequent transferee defendants in the original complaint). The only difference is the amount of the total transfers being sought.

KBC contends that the additional subsequent transfers "do not relate back to the Initial Complaint because they were identified for the first time when the Trustee filed the Amended Complaint . . . more than a decade after the filing of the Initial Complaint." Mot. at 24. KBC explains that the additional subsequent transfers "are not the same subsequent transfer alleged in the Initial Complaint and permitting two additional subsequent transfers to relate back to the 2011 Initial Complaint would eviscerate the statute of limitations altogether." Mot. at 25. This contention should be rejected. First, KBC ignores the procedural posture of this case, in which KBC never answered the complaint and the complaint was dismissed for several years. Second, KBC cites no authority for its assertion that the additional subsequent transfers should not be allowed merely because of the passage of time. This is because such an assertion is wrong. *See*

*Fairfield Inv. Fund*, 2021 WL 3477479, at *15 ("Rule 15 places no time bar on making motions

to amend pleadings and permits the amending of pleadings 'when justice so requires.'" (quoting

Fed. R. Civ. P. 15(a)(2)).    Third, KBC ignores the fact that the additional subsequent transfers are

based on the same common core set of facts as in the initial complaint.

> **B.      The Initial Complaint Provided Notice to Defendant That the Trustee Would
>         Sue for Any Additional Subsequent Transfers**

The initial complaint put KBC on notice that it would be asked to account for the additional

subsequent transfers.   Indeed, the initial complaint indicated the Trustee's intention to pursue all

subsequent transfers to KBC, including those not known at the time of filing.   As this Court has

stated, "[t]he primary consideration in determining whether the proposed amendment to the

Complaint should relate back is whether the Complaint put the defendant on notice that additional

transfers may be pursued at a later date." *Fairfield Inv. Fund*, 2021 WL 3477479, at *12; *see also*

*Pereira v. Hong Kong & Shanghai Banking Corp. (In re Kam Kuo Seafood Corp.)*, 67 B.R. 304,

306 (Bankr. S.D.N.Y. 1986) ("[I]f the original complaint indicates an intention to pursue all

transactions, the adding of such transactions will relate back.").

For example, in *Standard Chartered*, this Court held that the following language in the

prior complaint was sufficient to give defendants notice:

> A portion of the Fairfield Sentry Initial Transfers was subsequently
> transferred either directly or ***indirectly*** to, or for the benefit of,
> Defendant Standard Chartered Luxembourg, and upon information
> and belief Defendant Standard Chartered Luxembourg transferred
> some or all of those subsequent transfers to Defendant Standard
> Chartered USA and/or Defendant Standard Chartered Americas (the
> "Fairfield Sentry Subsequent Transfers").   Based on the Trustee's
> investigation to date, the Fairfield Sentry Subsequent Transfers total
> approximately $275,267,978 and are recoverable from the Standard
> Chartered Defendants pursuant to section 550 of the Bankruptcy
> Code and § 278 of the NYDCL.   A chart setting forth the ***presently***
> ***known*** Fairfield Sentry Subsequent Transfers is attached as Exhibit
> F.

2023 WL 118787, at *6 (emphasis in original).  The prior complaint in *Standard Chartered* further

stated: "The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i) supplement

the information on the Fairfield Sentry Initial Transfers, the Fairfield Sentry Subsequent Transfers,

and any additional transfers, and (ii) seek recovery of such additional transfers."  *Id.*

This Court reasoned that the Trustee, as an outsider to the transactions, need not include

every subsequent transfer in the initial complaint:

> [T]he Trustee is an outsider to these transactions and will need
> discovery to identify the specific subsequent transfers by date,
> amount and the manner in which they were effected.  The Moving
> Defendants are a group of interrelated individuals and entities ....
> Whether they additionally received Subsequent Transfers of BLMIS
> funds from one another is a question to which they, and they alone,
> have the requisite information to respond.

*Id*. (quoting *Fairfield Inv. Fund*, 2021 WL 3477479, at *13).

The initial complaint here includes the following allegation:

> A portion of the Harley Initial Transfers was subsequently
> transferred either directly or indirectly to, or for the benefit of,
> Defendant KBC and is recoverable from Defendant KBC pursuant
> to section 550 of the Bankruptcy Code and § 278 of the NYDCL.
> Based on the Trustee's investigation to date, approximately
> $110,000,000 of the money transferred from BLMIS to Harley was
> subsequently transferred by Harley to Defendant KBC (the "Harley
> Subsequent Transfers").  A chart setting forth the presently known
> Harley Subsequent Transfers is attached as Exhibit C.

Initial Compl., ¶ 40.  The initial complaint further states: "The Trustee's investigation is on-going,

and the Trustee reserves the right to: (i) supplement the information on the Harley Initial Transfers,

Harley Subsequent Transfers, and any additional transfers; and (ii) seek recovery of such

additional transfers."  *Id.* ¶ 41.

That language is virtually identical to the language in *Standard Chartered*, which this Court

ruled sufficient for relation back.  *Standard Chartered*, 2023 WL 118787, at *6.  KBC therefore

"was adequately appraised that the Trustee intended to collect any additional subsequent transfers that were uncovered. The new transfers 'relate back' and are properly brought." *Bank Julius Baer*, 2022 WL 17726520, at \*16; *Standard Chartered*, 2023 WL 118787, at \*6; *see also Peter Madoff*, 468 B.R. at 633–34 (finding sufficient for relation back purposes language stating "*[a]t this time*, the Trustee has identified at least $198,743,299 of customer funds"); *In re Juliet Homes*, 2011 WL 6817928, at \*7 (finding that defendants were on notice the trustees would likely view any transfers from debtors as potentially fraudulent in light of Ponzi scheme allegations); *Adelphia*, 624 F. Supp. 2d at 333–34 (permitting relation back where the original pleading sought all payments from margin loans).

KBC neither cites the applicable cases nor tries to distinguish them. But based on the Trustee's express allegations in the initial complaint, KBC was similarly aware that the Trustee would be continuing his investigation and may identify additional transfers to recover. *See* Initial Compl. ¶¶ 40–41 (stating that the subsequent transfers being sought are those "presently known" and that the Trustee's investigation was "on-going," and the Trustee reserved the right to seek recovery of additional transfers). The Trustee therefore not only included the transfers of which he had knowledge, he specifically and unambiguously put KBC on notice that he would seek to add any additional subsequent transfers that he later uncovered in his investigation.

### C.    The Amended Complaint Seeks to Recover Less Money Than the Initial Complaint

Finally, the Trustee may have added subsequent transfers to the Amended Complaint, but the amount he seeks overall is approximately $23 million less than the amount in the initial complaint. The amount being sought in the Amended Complaint is at least $86 million, compared to the $110 million sought in the initial complaint. The Trustee made this decision to adjust the total amount being sought after consultation with defense counsel. Therefore, although the

Amended Complaint seeks recovery of additional subsequent transfers, the amount at issue is

actually lower than in the initial complaint. KBC is not prejudiced whatsoever from the additional

subsequent transfers in the Amended Complaint, as they are based on the same core facts and the

Trustee is actually seeking to recover less from KBC than before.

## **CONCLUSION**

For the foregoing reasons, the Trustee respectfully requests that the Court deny KBC's

Motion.

Respectfully submitted,

Dated: February 3, 2023  
      New York, New York

/s/ *Eric R. Fish*  
Baker & Hostetler LLP  
45 Rockefeller Plaza  
New York, New York  
Tel.: (212) 589-4200  
Fax: (212) 589-4201  
David J. Sheehan  
Email: dsheehan@bakerlaw.com  
Eric R. Fish  
Email: efish@bakerlaw.com  
Patrick T. Campbell  
Email: pcampbell@bakerlaw.com  
Megan A. Corrigan  
Email: mcorrigan@bakerlaw.com  
Kayley B. Sullivan  
Email: kbsullivan@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for*  
*the Substantively Consolidated SIPA*  
*Liquidation of Bernard L. Madoff*  
*Investment Securities LLC and Chapter 7*  
*Estate of Bernard L. Madoff*