# EXHIBIT A

**CONFIDENTIAL EXPLANATORY MEMORANDUM**

**REDEEMABLE PREFERRED SHARES**

OF

# HARLEY INTERNATIONAL (CAYMAN) LIMITED

An Exempted Company organized in accordance with the laws of
the Cayman Islands

January 2006

THIS CONFIDENTIAL EXPLANATORY MEMORANDUM (THE "MEMORANDUM") IS SUBMITTED TO YOU ON A CONFIDENTIAL BASIS SOLELY IN CONNECTION WITH YOUR CONSIDERATION OF AN INVESTMENT IN REDEEMABLE PREFERRED SHARES OF HARLEY INTERNATIONAL (CAYMAN) LIMITED (THE "FUND"), A CAYMAN ISLANDS COMPANY. DUE TO THE CONFIDENTIAL NATURE OF THIS MEMORANDUM, ITS USE FOR ANY OTHER PURPOSE MIGHT INVOLVE SERIOUS LEGAL CONSEQUENCES. CONSEQUENTLY, THIS MEMORANDUM MAY NOT BE REPRODUCED IN WHOLE OR IN PART, AND MAY NOT BE DELIVERED TO ANY PERSON (OTHER THAN YOUR FINANCIAL ADVISOR) WITHOUT THE PRIOR WRITTEN CONSENT OF THE FUND'S DIRECTORS.

Memorandum Copy Number: _____

NAT000068
NATSAA00000068.1

Offer for sal  of Redeemable Pref rred shares, par value $0.01 (U.S.) per share (the "Redeemable Preferred Shares"), of HARLEY INTERNATIONAL (CAYMAN) LIMITED, an investment company organized under the laws of the Cayman Islands (the "Fund"). The minimum subscription is $1,000,000 (U.S.) subject to increase or decrease at the discretion of the Fund, provided that no investment shall be for an amount less than $50,000 (U.S.).

Price:      Offered at the Offering Price (as defined herein) per Redeemable Preferred Share.

Th  Redeemable Preferred Shares of the Fund are speculative securities intended for a limited number of experienced and sophisticated investors. The Redeemable Preferred Shares will be offered primarily to persons who are neither citizens nor residents of the United States and to a limited number of United States investors, consisting primarily of pension and profit sharing trusts, charities and other tax-exempt entities. The Redeemable Preferred Shares will not be offered to persons who are members of the public in the Cayman Islands.

THIS MEMORANDUM HAS BEEN PREPARED IN CONNECTION WITH THE OFFER AND SALE OUTSIDE OF THE UNITED STATES, ITS TERRITORIES OR POSSESSIONS, OF REDEEMABLE PREFERRED SHARES OF THE FUND TO PERSONS WHO ARE NOT MEMBERS OF THE PUBLIC IN THE CAYMAN ISLANDS AND WHO ARE NEITHER CITIZENS NOR RESIDENTS OF THE UNITED STATES OF AMERICA.  IT IS ALSO OFFERED WITHIN THE UNITED STATES TO A LIMITED NUMBER OF UNITED STATES INVESTORS CONSISTING PRIMARILY OF TAX-EXEMPT ENTITIES. THIS MEMORANDUM MAY NOT BE REPRODUCED.

NO REGISTRATION STATEMENT HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES AUTHORITY WITH RESPECT TO THIS OFFERING.  THE REDEEMABLE PREFERRED SHARES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933 (THE "ACT") AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED DIRECTLY OR INDIRECTLY TO ANY UNITED STATES CITIZEN OR RESIDENT OR TO ANY CORPORATION, FUND, TRUST OR OTHER ENTITY CHARTERED OR ORGANIZED UNDER THE LAWS OF ANY JURISDICTION IN THE UNITED STATES OF AMERICA, ITS TERRITORIES OR POSSESSIONS OTHER THAN A LIMITED NUMBER OF UNITED STATES TAX-EXEMPT INVESTORS.

THE DISTRIBUTION OF THIS MEMORANDUM AND THE OFFER AND SALE OF THE REDEEMABLE PREFERRED SHARES IN CERTAIN JURISDICTIONS MAY BE RESTRICTED BY LAW.  THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY REDEEMABLE PREFERRED SHARES IN ANY JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE WOULD BE UNLAWFUL OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER IN ANY JURISDICTION.  NO ACTION HAS BEEN OR WILL BE TAKEN TO PERMIT A PUBLIC OFFERING IN ANY JURISDICTION WHERE ACTION WOULD BE REQUIRED FOR THAT PURPOSE.  ACCORDINGLY, THE REDEEMABLE PREFERRED SHARES MAY NOT BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, AND THIS MEMORANDUM MAY NOT BE DISTRIBUTED, IN ANY JURISDICTION, EXCEPT IN ACCORDANCE WITH THE LEGAL REQUIREMENTS APPLICABLE IN SUCH JURISDICTION.   PURCHASERS SHOULD INFORM THEMSELVES AS TO THE LEGAL REQUIREMENTS WITHIN THEIR OWN COUNTRIES FOR THE PURCHASE OF REDEEMABLE PREFERRED SHARES AND TO ANY TAXATION OR EXCHANGE CONTROL LEGISLATION APPLICABLE TO THEM.

AN INVESTMENT IN THE FUND MAY BE DEEMED SPECULATIVE AND IS NOT INTENDED AS A COMPLETE INVESTMENT PROGRAM.   IT IS DESIGNED ONLY FOR EXPERIENCED AND SOPHISTICATED PERSONS WHO ARE ABLE TO BEAR THE RISK OF THE SUBSTANTIAL IMPAIRMENT OR LOSS OF THEIR INVESTMENT IN THE FUND.   THE PRICE OF UNITS OR SHARES MAY GO DOWN AS WELL AS UP.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, INVESTMENT OR TAX ADVICE.  IF YOU ARE IN ANY DOUBT ABOUT THE CONTENTS OF THIS OFFERING DOCUMENT, EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS PERSONAL COUNSEL, ACCOUNTANTS AND OTHER ADVISORS AS TO THE LEGAL, TAX,

2

NAT000069
NATSAA00000069.1

ECONOMIC AND RELATED ASPECTS OF THE INVESTMENT DESCRIBED HEREIN AND AS TO ITS SUITABILITY FOR SUCH INVESTOR.

NO INVITATION MAY BE MADE TO THE PUBLIC IN THE CAYMAN ISLANDS TO PURCHASE ANY OF THE REDEEMABLE PREFERRED SHARES. REDEEMABLE PREFERRED SHARES MAY NOT BE SOLD OR TRANSFERRED TO ANY RESIDENTS OF THE CAYMAN ISLANDS UNLESS THE FUND IS FIRST LISTED ON THE CAYMAN ISLANDS STOCK EXCHANGE, EXCEPT TO AN EXEMPTED OR ORDINARY NON-RESIDENT COMPANY INCORPORATED IN THE CAYMAN ISLANDS.

THE REDEEMABLE PREFERRED SHARES ARE OFFERED ONLY ON THE BASIS OF THE INFORMATION CONTAINED IN THIS MEMORANDUM. ANY FURTHER INFORMATION OR REPRESENTATIONS GIVEN OR MADE BY ANY DEALER, BROKER OR OTHER PERSON SHOULD BE DISREGARDED AND ACCORDINGLY SHOULD NOT BE RELIED UPON. NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION IN CONNECTION WITH THE OFFERING OF THE REDEEMABLE PREFERRED SHARES OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED ON AS HAVING BEEN AUTHORIZED BY THE FUND, THE DIRECTORS, THE INVESTMENT MANAGER, THE CUSTODIAN OR THE ADMINISTRATOR. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR THE ISSUE OF REDEEMABLE PREFERRED SHARES SHALL UNDER ANY CIRCUMSTANCES CREATE ANY IMPLICATION OR CONSTITUTE ANY REPRESENTATION THAT THE AFFAIRS OF THE FUND HAVE NOT CHANGED SINCE THE DATE HEREOF.

THE DIRECTORS OF THE FUND WHOSE NAMES APPEAR IN THIS MEMORANDUM ACCEPT RESPONSIBILITY FOR THE INFORMATION CONTAINED IN THIS DOCUMENT. TO THE BEST OF THE KNOWLEDGE AND BELIEF OF THE DIRECTORS (WHO HAVE TAKEN ALL REASONABLE CARE TO ENSURE THAT SUCH IS THE CASE), THE INFORMATION CONTAINED IN THIS DOCUMENT IS IN ACCORDANCE WITH THE FACTS AND DOES NOT OMIT ANYTHING LIKELY TO AFFECT THE IMPORT OF SUCH INFORMATION. THE DIRECTORS ACCEPT RESPONSIBILITY ACCORDINGLY.

HARLEY INTERNATIONAL (CAYMAN) LIMITED IS NOT SUBJECT TO ANY FORM OF REGULATION AND IS NOT THE SUBJECT OF ANY STATUTORY COMPENSATION SCHEME IN THE ISLE OF MAN.

3

NAT000070
NATSAA00000070.1

## SUMMARY OF TERMS

The following is a summary of the Confidential Explanatory Memorandum (the "Memorandum") and other documents relating to the Fund and is qualified in its entirety by reference to the Memorandum and related agreements. The Memorandum and related agreements should be reviewed carefully for more information with respect to the Fund.

| | |
|---|---|
| **The Fund** | HARLEY INTERNATIONAL (CAYMAN) LIMITED, an exempted company incorporated in the Cayman Islands (the "Fund"), will offer Redeemable Preferred shares ("Redeemable Preferred Shares") to persons who are neither citizens nor residents of the United States and to a limited number of United States investors, consisting primarily of pension and profit sharing trusts, charities and other tax-exempt entities. Redeemable Preferred Shares will not be offered to persons who are members of the public in the Cayman Islands. The authorized Redeemable Preferred Shares of the Fund consist of 400,000 Redeemable Preferred Shares having a par value of $.01 (U.S.) per share, which Redeemable Preferred Shares may be designated as either Class A Redeemable Preferred Shares (the "Class A shares"), Class C Redeemable Preferred Shares (the "Class C shares"), or Class J Redeemable Preferred Shares (the "Class J shares"). |
| **Investment Objective** | The investment objective of the Fund is to achieve capital appreciation by investing the assets of the Fund with one money manager, either directly by way of a managed account or by investing in an investment vehicle managed by such money manager. Fund assets will typically be invested either directly or indirectly in a large number (20-50) U.S. equity securities and equity index related options. The Fund will not use leverage. |
| **Th Investment Manager** | The Investment Manager of the Fund is Euro-Dutch Management Limited ("Euro-Dutch"). The principals of Euro-Dutch have considerable experience related to the establishment, operation, and allocation of investment products. |
| **Th Sub-Advisor** | Aspen International Investment Limited, a company existing and operating under the laws of Bermuda, has been appointed as sub-advisor. |
| **Administrator** | The Fund has entered into an administration agreement with Fortis Prime Fund Solutions (IOM) Limited (the "Administrator"). The Fund will pay the Administrator a fee based on the net assets of the Fund for services as provided for in the Administration Agreement. |
| **Management Fee** | Class J Redeemable Preferred Shares will be charged an annual management fee (the "Management Fee") of one percent (1.00%) calculated monthly on the net assets of such Class on the last day of each month, prior to deduction of the Incentive Fee, if any. These fees will be shared by the Investment Manager and the Sub-Advisor according to agreement betw en th m, which will be communicated to the |

4

NAT000071
NATSAA00000071.1

Directors of the Fund. No Management Fees shall be charged in respect of the Class A or Class C Shares.

**Incentive Fee**

The Investment Manager will receive a monthly incentive fee (the "Incentive Fee") equal to 10% of the net profits (including unrealized gains and losses), if any, allocable to the Class A Redeemable Preferred Shares and the Class J Redeemable Preferred Shares. Each is subject to a loss carryforward provision. No Incentive Fees will be charged in respect of Class C Shares. The Incentive Fee is assessed and payable monthly. The Investment Manager may, however, elect to defer receipt of all or a part of the Incentive Fee.

**Expenses**

The Investment Manager will render the services set forth in the Investment Management Agreement between the Investment Manager and the Fund, and will be responsible for the payment of all overhead expenses associated with rendering such services, including all general overhead expenses. The Fund will pay all other expenses, including the fees paid to the Investment Manager and the Administrator, custody fees, accounting, audit and legal expenses, organizational expenses; investment expenses such as commissions, research fees and expenses (including research-related travel fees and expenses); interest on margin accounts and other indebtedness; borrowing charges on securities sold short; custodial fees; and any other expenses reasonably related to the purchase, sale or transmittal of Fund assets.

**Risk Factors**

An investment in the Fund involves significant risks and is suitable only for those persons who can bear the economic risk of the loss of their investment and who have limited need for liquidity in their investment. There can be no assurance that the Fund will achieve its investment objective. An investment in the Fund carries with it the inherent risks associated with investments in securities and other instruments. See "Risk Factors" below. Each prospective investor should carefully review this Memorandum and the agreements referred to herein before deciding to invest in the Fund.

**The Offering**

The minimum investment in the Fund is $1,000,000 (U.S.), subject to change at the discretion of the Fund, provided that no investment shall be for an amount less than $50,000 (U.S.). Subscriptions are permitted monthly on the first business day of each calendar month (and at such other times as are permitted by the Fund's Directors). Redeemable Preferred Shares of the Fund are speculative securities intended for persons who are experienced and sophisticated investors. For purposes of this Memorandum, a "business day" shall mean any day that banks are open for business in New York, the Cayman Islands and the Isle of Man.

**R demptions**

Any holder of Redeemable Preferred Shares has the right, in accordance with and subject to the applicable provisions of the Articles of Association of the Fund, to have all or a portion of his shares r deem d as of the last business day of each

5

NAT000072
NATSAA00000072.1

|  | calendar month pursuant to writt n notice which must be received by the Administrator on behalf of the Fund at least 30 days (or such shorter notice period as the Fund's Directors shall, in their discretion, permit) prior to such redemption date. |
|---|---|
| **Valuation** | Fund investments will be marked-to-market and will include realized and unrealized gains and losses. Fund investments will generally be valued at their last sales price, provided, however, that to the extent deemed appropriate, valuations may be based on quotes from independent dealers or other pricing services. |
| **R ports** | Each investor will receive unaudited performance information of the Fund monthly, and will receive audited year-end financial statements annually. |
| **Board of Directors** | The Directors of the Fund consist of Mr. Anthony L.M. Inder Rieden and Mrs. Dawn E. Davies. Mr. Inder Rieden and Mrs. Davies are also Directors of the Investment Manager. |
| **Tax Status** | The Fund will not be subject to any income, withholding or capital gains taxes in the Cayman Islands. The Fund is not expected to be subject to any United States income taxes (other than United States withholding taxes on dividends and certain interest income derived from United States sources). Shareholders of the Fund who are not otherwise subject to United States taxation by reason of their residence, nationality or other particular circumstances should not become subject to any such taxation by reason of the ownership, transfer or redemption of Redeemable Preferred Shares. Shareholders should consult their own advisors as to the tax consequences to them of an investment in the Fund. |
| **Purchase of Shares** | Any investor desiring to subscribe for Redeemable Preferred Shares of the Fund will be asked to sign two copies of a "Subscription Agreement" in the form furnished by the Fund, to purchase a specified dollar amount of Redeemable Preferred Shares, and to send two such signed copies by facsimile and by mail, to: HARLEY INTERNATIONAL (CAYMAN) LIMITED, c/o Fortis Prime Fund Solutions (IOM) Limited, PO Box 156, 18 – 20 North Quay, Douglas, Isle of Man, IM99 1NR. ) Subscriptions are pursuant to receipt of cleared funds and written notice which must be received by the Administrator on behalf of the Fund at least 5 business days (or such shorter notice period as the Fund's Directors shall, in their discretion, permit) prior to such subscription date.   Payment in the amount of the subscription in United States dollars should be made in accordance with the terms of the Subscription Agreement. |
| **Auditors** | Ernst & Young, Georgetown, Cayman Islands. |

6

NAT000073
NATSAA00000073.1

## DIRECTORY

| | |
|---|---|
| Registered Office: | **HARLEY INTERNATIONAL (CAYMAN) LIMITED**<br>Grand Pavilion Commercial Centre<br>P.O. Box 2003 GT, 802 West Bay Road<br>Grand Cayman<br>Cayman Islands<br>B.W.I. |
| Investment Manager: | **EURO-DUTCH MANAGEMENT LIMITED**<br>Grand Pavilion Commercial Centre<br>P.O. Box 2003 GT, 802 West Bay Road<br>Grand Cayman<br>Cayman Islands<br>B.W.I. |
| Sub-Advisor: | **ASPEN INTERNATIONAL INVESTMENT LIMITED**<br>Clarendon House<br>2 Church Street<br>Hamilton<br>Bermuda |
| Administrator: | **FORTIS PRIME FUND SOLUTIONS (IOM) LIMITED**<br>P O Box 156<br>18 – 20 North Quay<br>Douglas<br>Isle of Man<br>IM99 1NR<br><br>Phone:  44 (0) 1624 688300<br>Fax:      44 (0) 1624 688334 |
| Banker | **FORTIS PRIME FUND SOLUTIONS BANK (IRELAND) LIMITED**<br>Plaza 2,<br>Custom House Plaza,<br>International Financial Services Centre,<br>Dublin 1<br>Ireland |
| Auditors | **ERNST & YOUNG**<br>P.O. Box 510 GT<br>2nd Floor, Leeward 4<br>Regatta Office Park<br>West Bay Road,<br>Grand Cayman<br>Cayman Islands<br>British West Indies |

7

NAT000074
NATSAA00000074.1

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Summary of Terms | | 4 |
| Directory | | 7 |
| 1. | The Fund | 9 |
| 2. | Investment Objective and Investment Program | 9 |
| 3. | Investment Management | 10 |
| 4. | Investment Management Agreement | 10 |
| 5. | Risk Factors | 12 |
| 6. | Description of Redeemable Preferred Shares | 14 |
| 7. | Offering of Redeemable Preferred Shares | 14 |
| 8. | Redemptions | 15 |
| 9. | Net Asset Value | 16 |
| 10. | Taxation and ERISA Matters | 17 |
| 11. | Fund Administrator | 20 |
| 12. | Board of Directors | 21 |
| 13. | Banker | 22 |
| 14. | Other Terms of the Fund | 22 |
| 15. | Anti Money Laundering Procedures | 24 |
| 16. | Data Protection | 24 |
| 17. | Termination of the Fund | 25 |
| 18. | Cayman Islands Mutual Funds Law | 25 |

8

## 1.   THE FUND

HARLEY INTERNATIONAL (CAYMAN) LIMITED (formally Harley International Limited, the "Fund") was formed as an "open-ended" investment company under the laws of the Bahamas with limited liability on September 1, 1992. During 2003 the Fund transferred its domicile, administrator and investment manager to the Cayman Islands. The Fund was incorporated as an exempted company in the Cayman Islands on August 7, 2003, at the same time the Fund changed its name to Harley International (Cayman) Limited. The registered address of the Fund is Grand Pavilion Commercial Centre, P.O. Box 2003 GT, 802 West Bay Road, Grand Cayman, Cayman Islands, B.W.I.. The Fund will invest in a broad range of financial instruments and other investments. Euro-Dutch Management Limited, the Fund's Investment Manager, is a Cayman Islands incorporated company (the "Investment Manager"). The Fund's new Administrator, Fortis Prime Fund Solutions (IOM) Limited, a company registered in the Isle of Man, has an Investment Business Licence issued under Section 3 of the Isle of Man Investment Business Act 1981.

An investment in the Fund may be deemed speculative and is not intended as a complete investment program. It is designed only for experienced and sophisticated persons who are able to bear the risk of the substantial impairment or loss of their investment in the Fund. Redeemable Preferred Shares of the Fund will be offered to persons who are neither citizens nor residents of the United States and to a limited number of United States investors, consisting primarily of pension and profit sharing trusts, charities and other tax-exempt entities. Redeemable Preferred Shares will not be offered to persons who are members of the public resident in the Cayman Islands.

All shareholders are entitled to the benefit of, are bound by and are deemed to have notice of the provisions of the Memorandum and Articles of Association of the Fund, which include, *inter alia*, the following provisions:  any amendments to the provisions of the Memorandum and Articles of Association require a special resolution of shareholders, except for certain amendments in relation to alterations of the share capital, which require an ordinary resolution of the shareholders.

Resolutions of directors or shareholders which are passed as written resolutions must be unanimous; the liquidation of the Fund or its transfer by way of continuation to another jurisdiction each require a special resolution of shareholders; the rights attaching to any class of shares (unless otherwise provided by the terms of issue of the shares of that class) may, whether or not the Fund is being wound up, be varied with the consent in writing of the holders by a majority (two-thirds) of the issued shares of that class, or with the sanction of a resolution passed by a majority (two-thirds) of the holders of the issued shares of that class at a separate meeting of the holders of the shares of that class.

## 2.   INVESTMENT OBJECTIVE AND INVESTMENT PROGRAM

### Investment Objective

The investment objective of the Fund is capital appreciation and to be profitable both in rising and in declining markets.

There can be no assurances that the Fund's investment objective will be achieved.

### Investment Program

The Fund invests its assets with a single money manager.  The manager invests primarily in a basket of S&P 100 stocks.  The manager also employs an index option overlay as a hedge against adverse market movements and to preserve existing investor capital.  The strategy is quantitative in nature and seeks to achieve consistent mid-teen annual returns over a long-term horizon.

Th  foregoing description is general and is not intended to be exhaustive.  Investors must recognize that there are inherent limitations on all descriptions of trading methods due to the complexity, confidentiality and, in the case of the discretionary features of such approaches, the indefinite nature of such methods. In addition, the description of trading strategies must be qualified by the fact that trading approaches are continually changing, as are the markets traded by the Fund.

9

NAT000076
NATSAA00000076.1

THE FUND MAY BE DEEMED TO BE A HIGHLY SPECULATIVE INVESTMENT AND IS NOT INTENDED
AS A COMPLETE INVESTMENT PROGRAM. IT IS DESIGNED ONLY FOR SOPHISTICATED PERSONS
WHO CAN BEAR THE ECONOMIC RISK OF THE LOSS OF THEIR INVESTMENT IN THE FUND AND
WHO HAVE LIMITED NEED FOR LIQUIDITY.   PAST INVESTMENT PERFORMANCE IS NOT AN
INDICATION OF THE FUND'S FUTURE PERFORMANCE.   THERE CAN BE NO ASSURANCES THAT
THE FUND WILL ACHIEVE ITS INVESTMENT OBJECTIVE.

## 3.    INVESTMENT MANAGEMENT

Th  Investment Manager of the Fund is Euro-Dutch Management Limited, a company formed under the
laws of the Cayman Islands. The Investment Manager will be responsible for the allocation of the assets of
the Fund to the money manager.  The directors of the Investment Manager are Mr. Anthony L.M. Inder
Rieden and Mrs. Dawn E. Davies.

Mr. Anthony L. M. Inder Rieden.  Mr. Inder Rieden has been Managing Director of Euro-Dutch Trust
Company (Bahamas) Limited, the Fund's previous investment manager, a Bahamian licensed trust
company, since 1975.  From September 1996 to April 2002, he also served as a Director of Fortis Fund
Services (Bahamas) Limited, the Fund's previous administrator.   From 1973 to 1975, he was l gal
counsel to Property Resources Ltd., a Bahamian company engaged in real estate investments.   From
1967 to 1973, he was Managing Director of Curacao International Trust Company (Citco).   Mr. Inder
Rieden holds a law degree from the University of Leiden in the Netherlands.

Mrs. Dawn E. Davies.   Mrs. Davies retired as Deputy Managing Director of the Fund's previous
administrator, Fortis Fund Services (Bahamas) Limited in September 2000, an office she held from 1996.
From 1987 to 1996, she was Executive Vice President of Euro-Dutch Trust Company (Bahamas) Limited.
From 1983 to 1987 she worked at S.F.E. Bank and Trust (Bahamas) Limited, serving as a Director and
Vice President responsible for the operation of the Bank's Trust Department from 1986, and prior to that
as Assistant Vice President.  From 1977 to 1983 she was Assistant Manager, Secretary and Treasurer of
Allied Bank and Trust Company (Bahamas) Limited.  From 1967 to 1977 Mrs. Davies worked at Bahamas
Commonwealth Bank Limited.  She is a graduate of the University of Strathclyde in Scotland and
obtained her M.B.A. from the University of Miami, Florida.  Currently, Mrs. Davies serves as a Director of
Euro-Dutch Trust Company (Bahamas) Limited and a number of investment companies.

The Investment Manager will use its best efforts in connection with the purposes and objectives of the Fund
and will devote as much of its time and effort to the affairs of the Fund as may, in its judgment, be necessary
to accomplish the purposes of the Fund.  The Investment Management Agreement specifically provides that
the Investment Manager (or any of its members, officers, employees and affiliates) may conduct any other
business including any business within the securities industry whether or not such business is in competition
with the Fund.  Without limiting the generality of the foregoing, the Investment Manager (or any of its
members, officers, employees and affiliates) may act as investment advisor or investment manager for
others, may manage funds or capital for others, may have, make and maintain investments in its own name
or through other entities and may serve as an officer, director, consultant, partner or stockholder of one or
more investment funds, partnerships, securities firms or advisory firms.

Aspen International Investment Limited. ("Aspen"), a company existing and operating under the laws of
Bermuda, has been appointed as sub-advisor.  Aspen will act as sub-advisor to Euro-Dutch in connection
with Euro-Dutch's management of the Fund.   Aspen shall be compensated solely from Euro-Dutch's
investment management fees.   Aspen shall have no discretionary authority or control over investment
management decisions of the Fund.  The directors of Aspen are Walter Stresemann and Gregory Elias.

## 4.    INVESTMENT MANAGEMENT AGREEMENT

Under the Investment Management Agreement between the Investment Manager and the Fund (the
"Investment Management Agreement"), th  Investment Manager allocates the assets of the Fund in
accordance with the objectives and policies of the Fund set forth above.  Under the terms of the

10

NAT000077
NATSAA00000077.1

Investment Management Agreem nt, the Fund pays to the Investment Manager, for its services as an investment manager, a "Management Fee" and an "Incentive Fee" as described below.

## Management Fee

The Investment Manager will receive an annual Management Fee on the Class J Redeemable Preferred Shares equal to one percent (1.0%) of the net assets of such Class. This fee will be calculated monthly on the last day of each month, prior to deduction of the Incentive Fee, if any. The Management Fee will b deducted in computing the net profit or net loss of the Fund. No Management Fees will be charged in respect of the Class A or Class C Shares.

## Incentive Fee

The Incentive Fee is payable to the Investment Manager. The Incentive Fee on the Class A and Class J Redeemable Preferred Shares for any month is an amount equal to ten percent (10%) of the net profits (including net unrealized gains), if any, allocable to the Class A Redeemable Preferred Shares and the Class J Redeemable Preferred Shares during such month. The Incentive Fee is subject to a losscarryforward provision.   No Incentive Fees will be charged in respect of Class C Shares. Notwithstanding the foregoing, certain shareholders that are affiliated with the Investment Manager, the Sub-Advisor or certain large or strategic Fund investors may, upon the consent of the Investment Manager, receive an annual return in the form of additional Redeemable Preferred Shares or cash payment of the portion of the Incentive Fee indirectly borne by them but waived by the Investment Manager in its sole discretion.

The Investment Management Agreement provides, unless the Investment Manager elects to defer receipt of the Incentive Fee as further described below, that the Investment Manager will be paid the Incentive Fee monthly. In the event that the Investment Management Agreement is terminated or shares are redeemed prior to the last day of a month, the Incentive Fee will be computed as though such date were the last day of the month.

## Def rral of Fees

The Investment Manager and/or the Sub-Advisor may elect to defer payment of all or any portion of any Management Fee or Incentive Fee payable to them. Upon such election by the Investment Manager or Sub- Advisor, the payment of any deferral amount to each of them will be automatically deferred until the earlier of such future dates as the recipient of each deferred amount may specify in its notice to the Fund or (b) the dissolution of the Fund. As long as the payment of fees is deferred, they constitute a "phantom share class", which appreciates or depreciates in parallel with the net asset value of Class C Shares.

## Other Terms of the Investment Management Agreement

The Investment Management Agreement provides that it shall remain in effect indefinitely except that the Investment Manager or the Fund may terminate the Investment Management Agreement by giving the other party not less than 90 days prior written notice. The Fund may terminate the Investment Management Agreement only if such termination is approved by the unanimous vote of all the outstanding Ordinary Shares of the Fund.

The Investment Management Agreement recognizes that the Investment Manager, its members, officers, employees and affiliates may be or become associated with other investment entities and engage in investment management for others, see Section 5 "Risk Factors - Potential Conflicts of Interest." Except to the extent necessary to perform its obligations under the Investment Management Agreement, the Investment Manager, its members, officers, employees and affiliates are not limited or restricted from engaging in or devoting time and attention to the management of any other business, whether of a similar or dissimilar nature, or to render services of any kind to any other corporation, firm, individual or association.

Under the Investment Management Agreement, the Fund will indemnify the Investment Manager, its members, officers, employees and affiliates, against all expenses, including legal fees, and against all

11

NAT000078
NATSAA00000078.1

judgments, fines and amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings, except that the Investment Manager, its members, officers, employees and affiliates will not be indemnified against any liability to which they would otherwise be subject by reason of their willful misfeasance, bad faith or gross negligence in the performance of their duties, or reckless disregard of their obligations and duties under the Investment Management Agreement. To the extent legally permissible, the Fund shall, at the request of the Investment Manager, advance amounts and/or pay expenses as incurred in connection with its indemnification obligation; provided, however, that if it is later determined that any amounts advanced or paid by the Fund should not have been advanced or paid, then the indemnified party shall promptly return any such amounts to the Fund.

## 5.    RISK FACTORS

The Fund may be deemed to be a highly speculative investment and is not intended as a complete investment program. It is designed only for sophisticated investors who are able to bear the economic risk of the loss of their investment in the Fund and who have limited need for liquidity. The following risks should be carefully evaluated before making an investment in the Fund:

**General Trading Risks**. Substantial risks are involved in trading in U.S. securities and the various other financial instruments and investments which the Fund trades. The prices of these investments are volatile, market movements are difficult to predict and financing sources and related interest and exchange rates are subject to rapid change. One or more markets in which the Fund trades may move against the positions held by it, thereby causing substantial losses.

**Concentration**. The Fund is not subject to any material concentration or diversification restrictions and may hold a limited number of investment positions.

**Portfolio Turnover**. The investment strategy of the Fund may involve the taking of frequent trading positions, and, as a result, turnover and brokerage commission expenses of the Fund may significantly exceed those of other investment entities of comparable size.

**Options**. Purchasing put and call options, as well as writing such options, are highly specialized activities and entail greater than ordinary investment risks.

**Short Sales.** Short sales can, in certain circumstances, substantially increase the impact of adverse price movements on the Fund's portfolio. A short sale involves the risk of a theoretically unlimited increase in the market price of the particular investment sold short, which could result in an inability to cover the short position and a theoretically unlimited loss. There can be no assurance that securities necessary to cover a short position will be available for purchase.

**Counterparty Risks.**    Options transactions effected on behalf of the Fund may be executed in the over-the-counter market. Trading equity and index options in the over-the-counter market is subject to counterparty credit risk and is without the protections afforded by transactions effected through the Options Clearing Corporation, a registered clearing facility.

**Custody Risk**. Brokerage firms, banks and dealers will have custody of the Fund's assets and may hold such assets in "street name". Bankruptcy or fraud at one of these entities could impair the operational capabilities or the capital position of the Fund.

**Growth in Assets Under Management**. The assets under management by the money manager may grow substantially in the future. There can be no assurance that the money manager will be able to provide returns consistent with the Fund's past performance or objectives given such increases in assets under management.

**Valuation of Fund Investments**. Valuation of the Fund's securities and other investments (which will determine th   amount of the Incentive Fee) may involve uncertainties and judgmental determinations, and if such valuations should prove to be incorrect, the shareholders could be adversely affected.

12

NAT000079
NATSAA00000079.1

Independent pricing information may not at times be available with respect to certain of the Fund's securities and other investments. Accordingly, while best efforts will be made to value all investments in the Fund fairly, certain investments may be difficult to value and may be subject to varying interpretations of value.

**Reliance on the Money Manager.** The Fund relies exclusively on the money manager for the management of its investment portfolio. There could be adverse consequences to the Fund in the event that the money manager ceases to be available to the Fund. The success of the Fund is therefore expected to be significantly dependent upon the expertise and efforts of the money manager.

**Illiquidity of Investment in the Fund.** Because of the limitation on redemption rights and the fact that shares are not tradeable, an investment in the Fund is a relatively illiquid investment and involves a high degree of risk. An investment in the Fund should be considered only by persons financially able to maintain their investment and who can afford the loss of all or a substantial part of such investment.

**Charges to the Fund.** The Fund is obligated to pay brokerage commissions, custody fees, "dealer spreads," other costs associated with the acquisition and disposition of investments, certain operating costs, and Management Fees regardless of whether it realizes profits. In addition, increases in net profits are subject to an Incentive Fee to the Investment Manager.

**Inc ntive Fee.** The Incentive Fee to the Investment Manager may create an incentive for the Investment Manager to cause the Fund to make investments that are riskier or more speculative than would be the case in the absence of a fee based on the performance of the Fund. Since the Incentive Fee is calculated on a basis which includes unrealized appreciation of the Fund's assets, such Incentive Fee may be greater than if it were based solely on realized appreciation.

**Potential Conflicts of Interest.** The Investment Manager, its members, officers, employees and affiliates engage in a wide variety of investment activities and will continue to do so in the future, including conducting investment activities for their own accounts and for other entities and accounts. Such other entities or accounts may have investment objectives or may implement investment strategies similar to those of the Fund. In addition, the Investment Manager, its members, officers, employees and affiliates may have investments in their own names and in certain of the entities managed by the Investment Manager. As a result of the foregoing, the Investment Manager, its members, officers, employees and affiliates may have conflicts of interest in allocating their time and activity between the Fund and other entities, in allocating investments among the Fund and other entities and in effecting transactions between the Fund and other entities, including ones in which the Investment Manager, its officers, employees and affiliates may have a greater financial interest.

The Investment Manager, its members, officers, employees and affiliates may give advice or take action with respect to such other entities or accounts that differs from the advice given with respect to the Fund. To the extent a particular investment is suitable for both the Fund and other clients of the Investment Manager, its members, officers, employees and affiliates, such investments will be allocated between the Fund and the other clients pro rata based on assets under management or in some other manner which the Investment Manager determines is fair and equitable under the circumstances to all clients, including the Fund. From the standpoint of the Fund, simultaneous identical portfolio transactions for the Fund and the other clients may tend to decrease the prices received, and increase the prices required to be paid, by the Fund for its portfolio sales and purchases.

13

NAT000080
NATSAA00000080.1

## 6.    DESCRIPTION OF REDEEMABLE PREFERRED SHARES

The authorized Redeemable Preferred Shares of the Fund consist of 400,000 Redeemable Preferred Shares having a par value of $.01 (U.S.) per share, which Redeemable Preferred Shares may be designated as either Class A Redeemable Preferred Shares (the "Class A shares"), Class C Redeemable Preferred Shares (the "Class C shares"), or Class J Redeemable Preferred Shares (the "Class J shares"). The Class A, Class C, and Class J shares are collectively referred to herein as "Redeemable Preferred Shares". Class A shares and Class J shares may only be purchased by direct investors, and Class C shares may only be purchased by funds of funds or by managed accounts advised or managed by managers with which the Sub-Advisor of the Fund is affiliated. Class A, Class C, and Class J shares have equal dividend, distribution and liquidation rights.

The Fund's Redeemable Preferred Shares have no voting rights. All voting rights are vested in the holders of the 100,000 authorized Ordinary Shares owned by Aspen International Investment Limited. Ordinary Shares voting for the election of Directors will elect all of the Directors.

From time to time, the Fund, by an ordinary resolution of the holder of Ordinary Shares, may increase the authorized Redeemable Preferred Shares in order to have a substantial number of Redeemable Preferred Shares available at all times for issuance. The Board of Directors also reserves the right to issue other classes of shares.

## 7.    OFFERING OF REDEEMABLE PREFERRED SHARES

The Fund will be conducting an offering of its Redeemable Preferred Shares to a number of investors who meet the requirements set forth in the "Subscription Agreement". The minimum subscription for each investor is $1,000,000 (U.S.), subject to increase or decrease at the discretion of the Fund, provided that no investment shall be for an amount less than $50,000 (U.S.). Subscriptions for Redeemable Preferred Shares may be made in cash or, at the discretion of the Board of Directors, in securities acceptable to the Board of Directors. In general, Redeemable Preferred Shares may be purchased monthly on the first business day of each calendar month (or at such other times designated by the Board of Directors). The proper documentation necessary to purchase Redeemable Preferred Shares must be received by the Administrator on behalf of the Fund at least five business days prior to the purchase date unless waived by the Fund.

Where subscription funds are received in the account of the Fund which is operated by the Administrator prior to the first business day of each calendar month, the Administrator must, upon the instructions of the Directors or the Investment Manager, transfer the subscription funds to an account of the Fund at one of its brokers. In the event that the Administrator makes such transfer, the Administrator shall be fully indemnified by the Fund and shall attract no liability in respect of any losses arising from this transfer of subscription funds prior to the issue of Redeemable Preferred Shares.

Redeemable Preferred Shares will be offered solely to qualified investors. Investors interested in subscribing for Redeemable Preferred Shares should follow the procedures set forth in the Subscription Agreement attached hereto.

Persons interested in purchasing Redeemable Preferred Shares of the Fund should inform themselves as to (i) the legal requirements within their own countries for the purchase of such shares and (ii) any foreign exchange restrictions which they might encounter.

The Investment Manager may pay (or cause to be paid) fees to persons (whether or not affiliated with the Investment Manager) who are instrumental in the sale of Redeemable Preferred Shares. Any such fees will in no event be payable by or chargeable to the Fund or any shareholder or prospective shareholder.

14

NAT000081
NATSAA00000081.1

**Off ring Price**

R deemable Preferred Shares are offered at the net asset value as of the close of business on the last day of the immediately preceding month (the "Valuation Date").

**8.    REDEMPTIONS**

Any holder of Redeemable Preferred Shares has the right, in accordance with and subject to the applicable provisions of the Articles of Association of the Fund, to have all or a portion of his shares redeemed as of the last business day of any calendar month.  The shareholder must request such redemption in writing, which request must be received by the Administrator on behalf of the Fund at least 30 days (or such shorter notice period as the Fund's Directors shall, in their discretion, permit) prior to such redemption date.

Redeemable Preferred Shares will be redeemed at the Redemption Price (as described below) as of the close of business on such redemption date (as determined in accordance with the applicable redemption provisions set forth in the Articles of Association).  The Redemption Price is computed after deduction of the accrued Incentive Fee payable to the Investment Manager attributable to the Redeemable Preferred Shares redeemed.  Redemptions shall be paid in cash (in U.S. dollars) or, in the sole discretion of the Board of Directors (in consultation with the Investment Manager), in securities, or partly in cash and partly in securities.  A partially redeeming shareholder will generally be paid within 30 days; provided, however, that if a shareholder redeems at least 90% of its Redeemable Preferred Shares, it shall be paid the redemption amount thereon in the same manner as a completely redeeming shareholder.  At redemption, shareholders will be paid the net asset value of the Redeemable Preferred Shares on the date of redemption.

Redemption requests must be made by mail and facsimile.  If the request is made by facsimile, the original redemption request must be received by the Administrator prior to disbursement of proceeds.  If by mail, the shareholder's request should be made by letter addressed to HARLEY INTERNATIONAL (CAYMAN) LIMITED, c/o Fortis Prime Fund Solutions (IOM) Limited, P O Box 156, 18 – 20 North Quay, Douglas, Isle of Man, IM99 1NR ..  If by facsimile, the original redemption request must be received by the Administrator prior to disbursement of proceeds.  Payment of the Redemption Price to a shareholder upon complete redemption will be made as soon as practicable.  The shareholder will receive 90% of the Redemption Price no later than thirty days following the date of redemption.  Promptly after the Fund has determined the net asset value of the Redeemable Preferred Shares as of the date of redemption (which in the Fund's discretion may be after the Fund's independent public accountants have completed their examination of the Fund's annual financial statements), the Fund will pay to such shareholder the balance, if any, of the amount to which such shareholder is entitled, or such shareholder will be obligated to repay the Fund the excess, if any, of the amount previously paid over the amount to which such shareholder is entitled, in each case together with interest thereon, to the extent permitted by applicable law.  Such interest shall accrue from the date of such redemption to the date of the payment of such excess at an annual rate equal to the then-existing federal funds rate.  The Fund has the right to make payment of such redemption in securities owned by the Fund.  The payment of the Redemption Price to a shareholder who is redeeming all of his shares shall be subject to the retention of a reserve for Fund liabilities in such amount as shall be determined by the Fund in its discretion.  If the reserve (or portion thereof) is later determined to have been in excess of the amount required, the proportionate amount of the excess shall be returned to the redeemed shareholder with interest thereon at the then-existing federal funds rate.

**Compulsory Redemption**

If the Board of Directors determine that a possible tax benefit to the Fund or any shareholder might be lost, or that it is in the best interests of the Fund, or that any of the representations given by a holder of shares was not true or has ceased to be true, as to such facts, as the directors shall from time to time decide that it shall be desirable to ascertain in order to avoid the loss of a contemplated tax benefit to the Fund or any shareholder thereof and in order to ascertain that no violation shall occur of any securities law of the United States or any other relevant jurisdiction including the Securities Act of 1933, the

15

NAT000082
NATSAA00000082.1

Investment Company Act of 1940 and the Investment Advisers Act of 1940, the Fund (to the extent it lawfully can do so) may redeem any or all of the shares of such shareholder by giving not less than 30 days notice to the holder of the shares involved.

Notwithstanding the above, the Board of Directors in their absolute discretion, with or without cause, may at any time redeem any or all of the shares of such shareholder on any redemption date by giving not less than 30 days notice in writing to the holder of the shares involved.

## Suspension of Redemption Rights

The Board of Directors may suspend the right of the shareholders of the Fund to require the Fund to redeem Redeemable Preferred Shares during any period when:

(a) any market, which is the principal market on which a material part of the Fund's investments at the time are quoted, is closed, other than for ordinary holidays or has substantially restricted or suspended dealings;

(b) there exists any state of affairs which constitutes a state of emergency as a result of which disposal of a substantial part of the investments of the Fund would not be reasonably practical and might seriously prejudice the shareholders of the Fund or it is not reasonably practicable for the Fund fairly to determine the value of its net assets;

(c) for any reason, including a breakdown in the means of communication normally employed in determining the value of the Fund's investments, such value cannot be promptly and accurately ascertained; or

(d) remittance of monies which will or may be involved in the realization of any of the Fund's investments is not possible.

## 9. NET ASSET VALUE

The net asset value of a share of the Fund's Redeemable Preferred Shares at any date shall be the total net assets of the relevant class of the Fund divided by the number of Redeemable Preferred Shares of the relevant class then outstanding. The total net assets of the relevant class of the Fund at any date shall be determined using International Accounting Standards as a guideline, unless otherwise deemed appropriate at the discretion of the Fund, and in accordance with the following:

(a) no value will be assigned to goodwill;

(b) accrued investment management and incentive fees and other fees will be treated as liabilities;

(c) dividends payable on the Redeemable Preferred Shares after the date as of which the total net assets are being determined to shareholders of record prior to such date will be treated as liabilities;

(d) the market value of positions in securities shall be as follows: securities that are listed on a stock exchange and are freely transferable shall be valued at their last sales price on the date of determination on the stock exchange which is the principal exchange for such securities, or, if no sales occurred on such day, at the "bid" price on such exchange at the close of business on such day if held long and at the "asked" price at the close of business on such day if sold short. Securities traded over the counter which are freely transferable shall be valued at the last sales price on the date of determination, or, if no sales occurred on such day, at the "bid" price at the close of business on such day if h ld long and at the "asked" price at the close of business on such day if sold short. Notwithstanding

16

NAT000083
NATSAA00000083.1

th foregoing, if in the r asonabl judgment of the Board of Directors at its discretion, the listed price for any security held by the Fund does not accurately reflect the value of such security, the Board of Directors may value such security at a price which is greater or less than the quoted market price for such security;

(e) the market value of a future, forward or similar contract or any option on any such instrument traded on an exchange shall be the most recent available closing quotation on such exchange; provided that if the Board of Directors determines that such closing price does not accurately reflect market value due to price limit constraints, such contract or option shall be valued at fair market value as determined by the Board of Directors;

(f) in valuing the Fund's investments in other investment entities, the Fund shall be entitled to rely on the last unaudited or audited financial statement or performance report of any such investment entity, unless the Fund determines in its sole discretion that some other valuation is appropriate;

(g) all other assets and liabilities of the Fund shall be valued in the manner determined by the Board of Directors of the Fund to reflect their fair market value.

(h) The Administrator, in calculating the net asset value of the Fund and the Redeemable Preferred Shares of the Fund, shall rely without further enquiry upon prices and valuations supplied to it in accordance with the foregoing and shall have no liability to the Fund nor any shareholder in respect of such reliance.

In connection with the determination of the net asset value of shares, the Board of Directors may consult with and is entitled to rely upon the advice of the Fund's custodians or Investment Manager. In no event and under no circumstances shall the Board of Directors, the Administrator, the custodians or the Investment Manager incur any individual liability or responsibility for any determination made or other action taken or omitted by them in good faith.

The determination of net asset value may be suspended whenever Fund redemptions are suspended.

## 10. TAXATION AND ERISA MATTERS

The tax status of the Fund and its shareholders under the tax laws of the Cayman Islands and the United States is summarized below. The summary is based on the assumption that the Fund is owned, managed and operated as contemplated. The summary is considered to be a correct interpretation of existing laws as applied at the date of this Memorandum, but no representation is made or intended by the Fund (i) that changes in such laws or their application or interpretation will not be made in the future or (ii) that the United States Internal Revenue Service will agree with the interpretation as applied to the method of operation of the Fund. Persons interested in subscribing for the Fund's Redeemable Preferred Shares should consult their own tax advisors with respect to the tax consequences, including the income tax consequences, if any, to them of the purchase, holding, redemption, sale or transfer of the Redeemable Preferred Shares.

### Cayman Islands Taxes

Fund Level. There are at present no corporation, income, capital gains, profits or other taxes in the Cayman Islands which would apply to the profits of the Fund. Nor are there gift, estate or inheritance taxes in the Cayman Islands. The Fund has received from the Governor-in-Council of the Cayman Islands an undertaking that for a period of 20 years from the date of that undertaking:

(a) No law which is thereafter enacted in the Cayman Islands imposing any tax to be levied on the profits, income, gains or appreciations shall apply to the Fund or its operations; and

17

(b) No such tax nor any tax in the nature of estate duty or inheritance tax will be payable by the Fund: (i) on or in respect of the shares, debentures or other obligations of the Fund; or (ii) by way of the withholding in whole or in part of any relevant payment as defined in Section 6(3) of the Tax Concessions Law (1999 Revision) of the Cayman Islands.

Shareholder Level. Shareholders will not be subject to any income, withholding or capital gains taxes in the Cayman Islands, with respect to the Redeemable Preferred Shares of the Fund owned by them and dividends received on such Redeemable Preferred Shares, nor will they be subject to any estate or inheritance taxes in the Cayman Islands.

## U.S. Federal Income Taxes

Taxation of the Fund. A non-U.S. corporation that is engaged (directly or through a partnership) in the conduct of a trade or business within the U.S. (a **"U.S. Business"**) generally is subject to federal income tax on a net basis with respect to income it derives that is treated as "effectively connected" with such U.S. Business (as well as a branch profits tax on its effectively connected earnings and profits deemed withdrawn from the U.S. Business). However, the Code contains a statutory "safe harbor" that provides that trading in stocks, securities, and certain commodities by a taxpayer for its own account (whether by the taxpayer, its employees, or its agents) will not be considered to be a U.S. Business provided that the taxpayer is not a "dealer" in such stocks, securities or commodities. All activities of the Fund are generally intended to constitute, or be incidental to, the trading in stocks, securities, or such commodities interests for the Fund's own account. The Fund also believes that the activities of the investment vehicles in which it will invest that are treated as partnerships for U.S. federal income tax purposes will generally constitute trading in stocks, securities or such commodities interests for the investment vehicles' own accounts.

Thus, the Fund believes that its activities, as well as those of the investment vehicles in which it will invest that are treated as partnerships for U.S. federal income tax purposes, should generally qualify for the safe harbor described above, and consequently income earned by the Fund from its trading activities should generally not be subject to U.S. federal income tax on a net basis. The foregoing principles applicable to the Fund will generally apply to the investment vehicles in which it invests that are treated as foreign corporations for U.S. federal income tax purposes.

A non-U.S. corporation also can be subject to a 30% U.S. federal withholding tax (**"federal withholding tax"**) imposed on certain types of U.S. source income (e.g., certain interest or dividends). However, interest from certain debt instruments is exempt from federal withholding tax (e.g., certain "portfolio interest" obligations or certain original interest discount obligations with an original maturity of 183 days or less). The Fund and the investment vehicles in which it invests may receive U.S.-source dividends with respect to the securities they hold and may receive other payments that will be subject to the 30% withholding tax.

The Fund (or any investment vehicle in which it invests) will be subject to U.S. federal income tax on gain realized on the disposition of any interest in U.S. real property or any interest (other than solely as a creditor) in a U.S. corporation that is a "U.S. real property holding corporation" (**"USRPHC"**), a corporation generally at least 50% of whose real estate and trade or business assets, measured by fair market value, constitute U.S. real property. The Fund does not expect to invest in U.S. real property or USRPHCs.

The Fund expects to be treated, for federal income tax purposes, as a passive foreign investment company (a **"PFIC"**).

Taxation of Non-U.S. Shareholders. A shareholder that is not a U.S. person within the meaning of Section 7701(a)(30) of the Code (a **"U.S. Tax Person"**) should not be subject to U.S. federal income tax with respect to gains derived from the sale or exchange (including a redemption) of, or any dividends received in respect of, Redeemable Preferred Shares, provided that such shareholder does not have certain present or former connections with the U.S. (e.g., holding the Redeemable Preferred Shares in connection with the conduct of a U.S. Business, or, in the case of gains, an individual shareholder's being

18

NAT000085
NATSAA00000085.1

present in the U.S. for 183 days or more during the taxable year of sale or exchange), which connections will not exist solely by reason of investing in the Fund.

Taxation of Tax-Exempt U.S. Shareholders. The Code provides for a tax on the unrelated business taxable income ("**UBTI**") of a tax-exempt entity. While interest, dividends and gains from the sale, exchange or other disposition of property (other than "dealer" property) are generally not treated as UBTI, this is not true to the extent such income is derived from "debt-financed property." Because the Fund may, and the investment vehicles in which it invests will, utilize leverage in their investment programs, if a tax-exempt U.S. shareholder were to invest directly in the underlying portfolio, a portion of the income derived from its investment would include UBTI. However, since the Fund will be treated as a corporation for U.S. federal income tax purposes, distributions from the Fund and gains from the sale or exchange, or redemption, of Redeemable Preferred Shares should not be treated as income from debt-financed property, assuming that the shareholder did not incur indebtedness to acquire its Redeemable Preferred Shares. Moreover, a tax-exempt U.S. shareholder will not be subject to the special tax imposed by Section 1291 upon excess distributions received by shareholders of a PFIC unless a dividend from the PFIC would be subject to tax as UBTI (i.e., if it were debt-financed income).

Accordingly, a tax-exempt U.S. shareholder should not be subject to U.S. federal income tax on distributions from the Fund or on gains from the sale or exchange, or redemption, of Redeemable Preferred Shares, assuming that the shareholder did not incur indebtedness to acquire its Redeemable Preferred Shares.

Taxation of Taxable U.S. Shareholders. Since the Fund will be a PFIC and may invest in PFICs, a U.S. Tax Person that is a shareholder or, in certain cases, a direct or indirect owner of a shareholder, will be subject to the adverse tax consequences of investing in a PFIC (and, to the extent the hedge funds in which the Fund invests are PFICs, the additional adverse tax consequences arising therefrom). Accordingly, the Fund has determined that Redeemable Preferred Shares are not a suitable investment for U.S. persons who are subject to tax.

## Other Taxation

The manner and rate at which income of the Fund would be subject to tax in the countries in which the investment vehicles in which the Fund invests are resident or invest will be a factor evaluated by the Advisor. In general, the Fund anticipates that the income of the Fund will be taxable, if at all, in countries in which the issuers of securities acquired by the Fund (or acquired by the investment vehicles in which the Fund invests) are resident only by way of withholding. The rate at which taxes are withheld on interest, dividends and capital gains will vary by jurisdiction. Any withholding of tax suffered by the Fund will have the effect of reducing the investment return on Redeemable Preferred Shares. Prospective investors should consult their own tax advisors regarding the impact of withholding and any other taxes imposed directly or indirectly on their investment in the Fund.

*The foregoing is only a brief and general summary of certain income tax considerations with respect to the purchase, holding and disposition of the Redeemable Preferred Shares. Investors are urged to consult their own tax advisors to gain a full understanding of any state, local and foreign tax considerations that would apply as a result of their individual situations.*

*Any discussion of the United States federal tax issues set forth in this Confidential Explanatory Memorandum was written to support the promotion and marketing of the transactions described herein. Such discussion was not intended or written to be used, and it cannot be used, by any person for the purpose of avoiding any tax penalties that may be imposed on such person. Each investor should seek advice based on its particular circumstances from an independent tax advisor.*

## ERISA Matters

Before purchasing any class of Redeemable Preferred Shares, a fiduciary of a prospective investor that is an employee b n fit plan subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA") (an "ERISA Plan") should determine whether an investment in class of Redeemable Preferred

19

NAT000086
NATSAA00000086.1

Shares is consistent with the fiduciary requirements of Section 404 of ERISA, and in particular whether the investment is prudent and whether the investment would result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code.

In determining whether an investment in class of Redeemable Preferred Shares would satisfy the fiduciary requirements of ERISA or result in a prohibited transaction, the fiduciary should consider whether the assets of the Fund will be considered "plan assets" within the meaning of United States Department of Labor Regulation 29 C.F.R. § 2510.3-101 (the "Plan Asset Regulation"). Under the Plan Asset Regulation, the assets of an entity in which an ERISA Plan acquires an "equity interest" that is neither a "publicly offered" security nor a security issued by an investment company registered under the Investment Company Act of 1940, as amended, are considered to be assets of the ERISA Plan for purposes of the fiduciary requirements and prohibited transaction rules unless the entity is an "operating company," or investments in each class of equity interests in the entity by ERISA Plans and other "benefit plan investors" ("Benefit Plan Investors") are not "significant." Benefit Plan Investors include (i) employee benefit plans (as d fined in Section 3(3) of ERISA) whether or not subject to Title I of ERISA, (ii) plans described in Section 4975(e)(1) of the Code (e.g., IRAs), and (iii) entities whose underlying assets include plan assets by reason of an employee benefit plan's or a plan's investment in such entities. Investments by Benefit Plan Investors in a class of equity interests will generally not be deemed "significant" if less than 25% of such class is held by such investors (the "25% Test"). In addition, the 25% Test is applied by disregarding the value of any equity interests held by a person (other than a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person.

The Fund intends to limit purchases of each class of Redeemable Preferred Shares by Benefit Plan Investors, transfers of Redeemable Preferred Shares to Benefit Plan Investors and redemptions of Redeemable Preferred Shares so that the 25% Test is satisfied. Assuming that the Fund at all times limits investments by Benefit Plan Investors and redemptions in compliance with the 25% Test, the assets of the Fund will not be considered to be assets of any investor which is an ERISA Plan for purposes of the fiduciary responsibility or prohibited transaction provisions of ERISA or the Code.

Employee benefit plans that are governmental plans (as defined in Section 3(32) of ERISA) and certain church plans (as defined in Section 3(33) of ERISA) are not subject to the fiduciary responsibility or prohibited transaction provisions of ERISA or the Code but may be subject to restrictions under state or local law.

*The above discussion is a summary of some of the material ERISA considerations applicable to prospective Investors that are ERISA Plans. It is not intended to be a complete discussion nor to be construed as legal advice or a legal opinion. Prospective Investors should consult their own counsel on these matters.*

## 11. FUND ADMINISTRATOR

Fortis Prime Fund Solutions (IOM) Limited (the "Administrator") has been retained by the Fund to perform administrative services and to act as registrar and transfer agent for the Fund. Pursuant to an administration agreement entered into between the Fund and the Administrator (as amended from time to time, the "Administration Agreement"), the Administrator is responsible for, among other things: (i) maintaining the register of shareholders of the Fund and generally performing all actions related to the issuance and transfer of shares of the Company (ii) reviewing and accepting subscriptions for shares and accepting payment therefore (iii) publishing and furnishing the net asset value of the Fund's shares, (iv) performing all acts related to redemption of shares, (v) keeping the accounts of the Fund and such financial books and records as are required by law or otherwise for the proper conduct of the financial affairs of the Fund, (vi) providing secretarial services to the Fund and ancillary services and (vii) performing all other matters necessary in connection with the administration of the Fund as directed by the Directors of the Fund.

The Administration Agreement provides for exculpation of liability of the Administrator in that the Administrator shall not be liable to the Fund for any loss or damage whatsoever suffered or incurred by the

20

NAT000087
NATSAA00000087.1

Fund as a cons quence of any services rendered by the Administrator to the Fund, provided that, the Administrator shall be liable to the Fund for any and all losses, damages, liabilities or expenses arising out of the gross negligence or willful breach of duty of the Administrator, its directors, servants, agents or delegates. The Fund shall, out of the assets of the Fund, indemnify the Administrator to the fullest extent permitted by law against any and all actions, costs, claims, damages, demands or expenses (including but without limitation any reasonable attorneys' fees) suffered or incurred by the Administrator in its capacity as the administrator of the Fund, except to the extent that such actions, costs, claims, damages, demands or expenses result from gross negligence or willful breach of duty on the part of the Administrator. Further, the Fund has agreed to indemnify and hold harmless the Administrator against any liability, actions, proceedings, claims, demands, costs or expenses whatsoever, which the Administrator may incur or be subject to, solely in consequence of relying upon prices, fair values and any other information relating to the net asset value of the Fund or of whatever nature, provided to the Administrator by the Investment Manager, the Fund, the custodian, any manager of underlying fund investments or discretionary managed accounts, Bloomberg or a similar financial data provider, or any other person, firm or corporation.

The Administration Agreement provides that the Fund will pay the Administrator an administration fee, as agreed between the Fund and the Administrator, from time to time. In addition, all reasonable out-of-pocket expenses incurred by the Administrator on behalf of the Fund will be reimbursed to the Administrator on a quarterly basis. The Administration Agreement may be terminated at any time without penalty by either of the parties upon not less than 90 days' notice (or such shorter period as may be agreed by both parties). The Administration Agreement may be amended with the written consent of the parties.

Th Administrator is a company registered in the Isle of Man and has an Investment Business Licence issued under Section 3 of the Investment Business Act 1981 of the Isle of Man. The Administrator is a part of the Fortis Group.

The Administrator is a service provider to the Fund and, as such, bears no responsibility for the content of this Memorandum, the investments of the Fund, the performance of the Fund or any underlying funds nor any matter other than as specified in the Administration Agreement.

The Administrator and its directors, officers, employees, agents and nominees and their respective personal representatives, successors in title and estates shall be indemnified and held harmless by the Fund against all liability, loss, damage, claims, actions, accounts, proceedings, and demands and any costs and expenses whatsoever which may be incurred or suffered by the Administrator arising out of its appointment EXCEPT where same shall arise through the dishonesty, willful default, fraud or gross negligence of the Administrator.

## 12.   BOARD OF DIRECTORS

The Board of Directors of the Fund consists of Anthony L.M. Inder Rieden and Dawn E. Davies.

Anthony L. M. Inder Rieden.   Mr. Inder Rieden has been Managing Director of Euro-Dutch Trust Company (Bahamas) Limited, a Bahamian licensed trust company, since 1975. From September 1996 to April 2002, he also served as a Director of Fortis Fund Services (Bahamas) Limited, the Fund's previous Administrator. From 1973 to 1975, he was legal counsel to Property Resources Ltd., a Bahamian company engaged in real estate investments. From 1967 to 1973, he was Managing Director of Curacao International Trust Company (Citco). Mr. Inder Rieden holds a law degree from the University of Leiden in the Netherlands.

Dawn E. Davies.   Mrs. Davies retired as Deputy Managing Director of Fortis Fund Services (Bahamas) Limited in September 2000, an office she held from 1996. From 1987 to 1996 she was Executive Vice President of Euro-Dutch Trust Company (Bahamas) Limited. From 1983 to 1987 she worked at S.F.E. Bank and Trust (Bahamas) Limited, serving as a Director and Vice President responsible for the operation of the Bank's Trust Department from 1986, and prior to that as Assistant Vice President. From

21

NAT000088
NATSAA00000088.1

1977 to 1983 she was Assistant Manager, S cretary and Treasurer of Allied Bank and Trust Company (Bahamas) Limited. From 1967 to 1977 Mrs. Davies worked at Bahamas Commonwealth Bank Limited. She is a graduate of the University of Strathclyde in Scotland and obtained her M.B.A. from the University of Miami, Florida. Currently, Mrs. Davies serves as a Director of Euro-Dutch Trust Company (Bahamas) Limited and a number of investment companies.

The Directors shall remove the Administrator if:

- the Administrator goes into liquidation, becomes bankrupt or has a receiver appointed over its assets;

- for good and sufficient reason, the Directors are of the opinion and so state in writing that a change of Administrator is desirable in the interests of the shareholders;

- where holders in value of at least fifty percent of the Ordinary Shareholders deliver to the Directors a written request to dismiss the Administrator.

The Board of Directors may from time to time and at any time by agreement under hand or seal appoint any one or more company, firm or person or any body of persons, whether nominated directly or indirectly by the Board of Directors to be an investment manager or investment advisor for the Fund upon such terms and conditions as the Board of Directors in its absolute discretion determines.

The Board of Directors may delegate to the Investment Manager and/or the Sub-Advisor, without being liable for any consequential loss, discretion to manage the Fund's investments or any part thereof pursuant to the terms of the appointment.

The Board of Directors shall be under no duty to keep themselves informed concerning the business or affairs of any Investment Manager and/or the Sub-Advisor or to interfere in the management, administration, operation or activities of any Investment Manager and/or the Sub-Advisor provided the Board of Director shall not have any knowledge of any wrongdoing or impropriety by the Investment Manager and/or the Sub-Advisor .

The Articles of Association do not stipulate a retirement age for the Directors and do not provide for retirement of the Directors by rotation. There is no shareholding qualification for the Directors. The Directors are empowered to exercise all of the borrowing powers of the Fund.

## 13.    BANKER

Fortis Prime Fund Solutions Bank (Ireland) Limited provides banking services on behalf of The Fund. To the extent deemed desirable, the Fund may appoint or redirect custodial services to other institutions which are international, reputable and creditworthy financial institutions and which are paid fees at normal commercial rates. Assets placed with money managers through discretionary investment accounts shall remain in the custody of the money manager's selected custodian. Such manager shall undertake such procedures as it deems necessary to ensure the safekeeping of those assets.

Cash forming part of the property of the Fund may be placed as deposits with the custodian or their connected persons (being a bank) so long as that bank pays interest thereon at no lower rate than is, in accordance with normal banking practice, the commercial rate for deposits of this kind, size and for the term of the deposit in question negotiated at arm's length.

## 14.    OTHER TERMS OF THE FUND

**Expenses.** The Investment Manager will render the services set forth in the Investment Management Agreement between the Investment Manager and the Fund, and will be responsible for the payment of all overhead expenses associated with rendering such services, including all general overhead expenses. The Fund will pay all other expenses, including the fees paid to the Investment Manager and the Administrator, accounting, audit and legal expenses, custody fees (estimated to be less than 0.50% per

22

NAT000089
NATSAA00000089.1

annum), organizational expenses; investment expenses such as commissions, res arch fees and expenses (research-related travel fees and expenses); interest on margin accounts and other indebtedness; borrowing charges on securities sold short; custodial fees; and any other expenses reasonably related to the purchase, sale or transmittal of Fund assets.

**Fiscal Year and Fiscal Periods.** The fiscal year of the Fund ends on December 31 of each year. Since Redeemable Preferred Shares may be sold and redeemed by the Fund during the course of a fiscal year, the Fund's Articles of Association provide for fiscal periods, which are portions of a fiscal year, for the purpose of allocating net profits and net losses to the Redeemable Preferred Shares. A new fiscal period will commence on the date next following the date of any redemption of Redeemable Preferred Shares and the date of any sale of Redeemable Preferred Shares (i.e., the date of any capital contribution), and the prior fiscal period will terminate on the date immediately preceding the first day of a new fiscal period.

**Financial Statements.** Each year, shareholders will be sent audited financial statements within four months of the end of the fiscal year-end. Monthly, the Fund sends an unaudited report to each shareholder setting forth the net asset value of its shares.

**Auditors.** Ernst & Young have been appointed as auditors for the Fund. The Fund may change the auditors without further notice to shareholders.

**Transferability of Redeemable Preferred Shares.** Redeemable Preferred Shares may be transferred only if the proposed transferee of the Redeemable Preferred Shares obtains the prior written approval of the Fund. In this regard, the proposed transferee will be required to make the representations and warranties required of a subscriber in form and substance satisfactory to the Fund. The Fund will have full discretion to approve or disapprove any proposed transferee. The Directors of the Fund may, in their absolute discretion and without giving any reason, refuse to register the transfer of the shares to any person. No proposed transfer will be recognized until the documents relating to it have been approved by the Fund. The Fund need not approve any transfer that is not or may not be consistent with any representation or warranty that the transferor of the Redeemable Preferred Shares may have given to the Fund.

**Indemnification.** Among other things, the Articles of Association provide certain rights of indemnification in favor of directors, officers, employees and agents of the Fund against legal liability and expenses if such persons have acted in accordance with certain standards of conduct and, in connection with the matter giving rise to a particular claim, did not engage in willful misfeasance, bad faith or gross negligence.

Every Director, alternate Director, officer or liquidator of the Fund and their respective personal representatives, successors in title and estates (together "Indemnitee") shall be indemnified and held harmless by the Fund against all liability, loss, damage, claims, actions, accounts, proceedings and demands and any costs and expenses whatsoever which may be incurred or suffered by the Indemnitee arising out of its appointment EXCEPT where same shall arise through the dishonesty, willful default, fraud or gross negligence of the Indemnitee.

No Director, alternate Director or officer shall be liable for the acts, receipts, neglects, or defaults of any other Director, alternate Director or officer, or for joining in any receipt or other act for conformity, or for any loss or expense incurred by the Fund as a result of the insufficiency or deficiency of title to any property acquired by order of the Directors for or on behalf of the Fund, or for the insufficiency or deficiency of any security in or upon which any of the moneys of the Fund shall be advanced or invested, or for any loss or damage arising out of the bankruptcy, insolvency or tortious or criminal act or omission of any person with whom any money, securities or effects shall be deposited, or for any loss occasioned by an error of judgment, omission, default, or oversight on his part, or for any other loss, damage or misfortune whatever which shall happen in the execution of his office or in relation thereto, except the same shall happen through his own dishonesty.

23

NAT000090
NATSAA00000090.1

## 15.    ANTI MONEY LAUNDERING PROCEDURES

As part of the Fund's responsibility for the prevention of money laundering, the Fund or the Administrator on the Fund's behalf may require detailed verification of a subscriber's identity and source of payment.

The Fund or the Administrator on the Fund's behalf reserve the right to request such information as they deem necessary (having regard to the applicable laws and in particular, the anti-money laundering legislation of the Cayman Islands and the Isle of Man) to verify the identity of a subscriber.  In the event of delay or failure by a subscriber to produce any information required for verification purposes, the Fund or the Administrator on the Fund's behalf may refuse to accept the subscription and the subscription monies relating thereto, or require mandatory redemption of the subscriber's shares.

The Fund or the Administrator on the Fund's behalf also reserve the right to refuse to make any redemption payment to a subscriber if the Fund or the Administrator suspect or are advised that the payment of redemption proceeds to such subscriber might result in a breach of applicable anti-money laundering or other laws or regulations by any person in any relevant jurisdiction or if such refusal is considered necessary or appropriate to ensure the compliance by the Fund with any such laws or regulations in any relevant jurisdiction.

If any person who is resident in the Cayman Islands (including the Fund and the Administratror) knows or suspects that another person is engaged in money laundering, such person is required to report such knowledge or suspicion pursuant to The Proceeds of Criminal Conduct Law (2005 Revision) of the Cayman Islands and such report shall not be treated as a breach of any restriction upon the disclosure of information imposed by any enactment or otherwise.

**Complete Description.**  All shareholders are entitled to the benefit of, are bound by and are deemed to have notice of, the provisions of the Memorandum and Articles of Association of the Fund.

This Memorandum does not purport to be and should not be construed as a complete description of the Memorandum and Articles of Association of the Fund, the Investment Management Agreement or the Administration Agreement, copies of which may be inspected free of charge at, or purchased from, the Fund's registered office.

## 16.    DATA PROTECTION

In accordance with the Isle of Man Data Protection Act 2002, it should be noted that the Administrator may hold and process information comprising "personal data" obtained from or about investors in relation to their investments in the Fund. (In this context "investors" includes individual Directors, Officers, Authorised Signatories and Beneficial Owners of Corporate investors; individual Trustees, Settlors, Protectors and Beneficiaries of Trust investors; individual Limited Partners and General Partners of Limited Partnerships and any other person whose personal data is provided to the Administrator in connection with an investment in the Fund).

This personal data may be utilised by the Administrator: (a) to properly identify the investor in accordanc with Anti-Money Laundering regulatory requirements; (b) to properly record the investor's interest in th Fund in accordance with relevant corporate laws and regulations; (c) to advise the investor of matters relative to his/her investment in the Fund, including current values and changes to Fund documentation etc; (d) unless the investor notifies the Administrator otherwise, to advise the investor of other investment opportunities that may be or become available from the Fund's sponsors. Telephone calls to Fortis Prime Fund Solutions (IOM) Limited may be monitored or recorded for security, confirmation and/or training purposes.

By agreeing to invest in the Fund, investors acknowledge and accept that the Administrator may hold and process personal data for the purposes outlined above and further acknowledge and accept that the Administrator may, in order to fulfil its duties to the Fund and comply with regulatory requirements: (i) retain such personal data for prescribed periods after the investor has redeemed his/her holding in the

24

NAT000091
NATSAA00000091.1

Fund; (ii) transfer such personal data, by any method including electronically, to the Fund's registered agent in its country of incorporation, including countries which may not have enacted data protection legislation equivalent to that in the Isle of Man; (iii) transfer such information to the Directors, Investment Manager or Sub-Advisor, legal advisor or any other agent of the Fund entitled to receive such information; (iv) transfer such personal data to any person or entity to which the Administrator has a legal obligation to disclose such information; (v) maintain such information on proprietary Fortis Group computer systems which may be based or maintained in countries which have not enacted data protection legislation equivalent to that in the Isle of Man.

## 17.   TERMINATION OF THE FUND

Th  Fund shall be wound up on the passing by the shareholders of a special resolution by a two-thirds majority to wind up the Fund.

## 18.   CAYMAN ISLANDS MUTUAL FUNDS LAW

Th  Fund will fall within the definition of a "mutual fund" in terms of the Mutual Funds Law (2003 Revision) of the Cayman Islands (the "Law") and accordingly will be regulated in terms of that Law.  However the Fund is not required to be licensed or to employ a licensed mutual fund administrator since the minimum interest purchasable by a prospective investor in the Fund exceeds CI$40,000 (US$50,000) or its equivalent in any other currency.  Accordingly the obligations of the Fund are (a) to register the Fund with the Cayman Islands Monetary Authority (the "Monetary Authority") appointed in terms of the Law, (b) to file with the Monetary Authority prescribed details of this Memorandum and any changes to it, (c) to file annually with the Monetary Authority accounts audited by an approved auditor and (d) to pay a prescribed registration fee.

As a regulated mutual fund, the Fund will be subject to the supervision of the Monetary Authority and the Monetary Authority may at any time instruct the Fund to have its accounts audited and to submit them to the Monetary Authority within such time as the Monetary Authority specifies.  In addition the Monetary Authority may ask the Directors to give the Monetary Authority such information or such explanation in respect of the Fund as the Monetary Authority may reasonably require to enable him to carry out its duty under the Law.

The Directors must give the Monetary Authority access to or provide at any reasonable time all records relating to the Fund and the Monetary Authority may copy or take an extract of a record it is given access to.  Failure to comply with these requests by the Monetary Authority may result in substantial fines being imposed on the Directors and may result in the Monetary Authority applying to the court to have the Fund wound up.

The Monetary Authority is prohibited by the Law from disclosing any information relating to the affairs of a mutual fund other than disclosure required for the effective regulation of a mutual fund or when required to by law or by the court.

The Monetary Authority may take certain actions if it is satisfied that a regulated mutual fund is or is likely to become unable to meet its obligations as they fall due or is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors.  The powers of the Monetary Authority include inter alia the power to require the substitution of Directors, to appoint a person to advise the Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Fund.  There are other remedies available to the Monetary Authority including the ability to apply to the court for approval of other actions.

25

NAT000092
NATSAA00000092.1

**SUBSCRIPTION / REDEMPTION / TRANSFER**

**Subscription**

*This Offering is limited to non-U.S. Persons with the financial capacity to invest in high-risk securities and for whom such a purchase is suitable in light of such person's financial condition. The Fund will require as a condition to the acceptance of a subscription that the subscriber represent and warrant that he is not a U.S. Person.*

Prospective subscribers should inform themselves as to the legal requirements within their countries for the purchase of Shares and any foreign exchange or tax considerations relevant to such purchase.

In order to subscribe for Shares:

- **All Subscribers** must

(A)   Complete the attached Share Application Form (Exhibit A)

(B)   Complete the attached Declaration Form (Exhibit B)

(C)   Complete the attached New Issue Questionnaire (Exhibit C)

(D)   Complete the attached ERISA Questionnaire (Exhibit D)

(E)   Attach all relevant identification documents as set out in the section *'Identification of Subscribers – Requirements'* (Exhibit E).

**All completed documents must be forwarded to HARLEY INTERNATIONAL (CAYMAN) LIMITED, c/o Fortis Prime Fund Solutions (IOM) Limited, P.O. Box 156 18-20 North Quay, Douglas, Isle of Man, IM99 1NR.**

NAT000093
**NATSAA00000093.1**

Exhibit A (USD)

# HARLEY INTERNATIONAL (CAYMAN) LIMITED

(minimum subscription USD 1,000,000)

The undersigned (hereinafter referred to as the "Subscriber") hereby subscribes, in accordance with the terms of the Private Placement Memorandum for Shares of HARLEY INTERNATIONAL (CAYMAN) LIMITED, (the "Fund") - Class ____ US Dollar Shares at the Net Asset Value per Share at the ............... day of ............................................................................. 200..... Payment of the total purchase price in the amount of USD ...................................... (amount in capital letters   : ...............................................................................................) is enclosed herewith (minimum USD 1,000,000). The subscription is irrevocable by the Subscriber except under the terms of the Private Placement Memorandum dated October 2005 and may be accepted if, as and when received. The Fund reserves the right to reject without cause all subscriptions up to the time the Shares are issued.

The Subscriber requests that the Shares be registered in the following name:

...........................................................................................

...........................................................................................

and that the correspondence will be sent to:

...........................................................................................

...........................................................................................

...........................................................................................

| |
|---|
| The Subscription amount must be received at least five business days before the first day of the month as of which Shares are to be purchased. |

The Northern Trust Banking Corporation, 40 Broad Street, 10th floor, New York, NY 10004, USA

| | |
|---|---|
| SWIFT: | CNORUS33 |
| ABA: | 026-001-122 |
| Account Name: | Fortis Prime Fund Solutions (IOM) – Client Account |
| Account Number: | Redacted 0010 |
| Narrative: | Subscription to Harley International (Cayman) Limited re: (Please insert name of subscriber) |

The Subscriber has read the Private Placement Memorandum (and all amendments and supplements thereto) and understands and accepts the objectives and risks of Harley International (Cayman) Limited, as described therein.

Date.............................................................................................

Name of Subscriber – please print clearly

.............................................................................................

.............................................................................................

Mailing address: (please print clearly)

.............................................................................................

.............................................................................................

Telephone Number / Fax Number

.............................................................................................

Email Address...........................................................................

Signature of Subscriber / (Joint Subscriber if applicable)

.............................................................................................

.............................................................................................

| | |
|---|---|
| New Issue Restricted person | ___ |
| New Issue not Restricted person | ___ |
| US Investor | ___ |
| Non US Investor | ___ |
| To be completed by the Administrator of the Fund | |

| |
|---|
| **\*Note\*** |
| Fax this form to the Administrator at: +44 1624 688334 The original must be mailed to the Administrator at: PO Box 156 18-20 North Quay Douglas Isle of Man IM99 1NR British Isles |

| | |
|---|---|
| **Agent involved:** | **Yes / No** |
| **FAM Agent involved:** | **Yes / No** |
| **Code of Agent:** | _____ |

**Subscription Approved**...........................................................
(internal use only)

NAT000094
NATSAA00000094.1

Exhibit B Declaration

**DECLARATIONS**

By signing this application form:

1    I/We declare that I am/we are not a "United States person" (within the meaning of Regulation S of the United
     States Securities Act) and that I am/we are not applying for Shares as nominees(s) for or on behalf of any such
     person(s). I/We will notify the Fund immediately if I/we become a United States person.

2    I/We represent that I/we have not been solicited to purchase Shares while present in the United States, its
     territories or possessions nor have the funds to be utilised for such purchase been obtained from any United
     States person.

3    I/We represent that the Shares are being acquired for investment purposes and that neither the Shares nor any
     interest therein will be transferred to a United States person or be transferred within the United States, its
     territories or possessions.

4    I/We hereby irrevocably apply for such number of Shares (including fractions) at a price determined in
     accordance with this Memorandum. I/We acknowledge that the Fund reserves the right to reject any application
     in whole or in part.

5    I/We warrant that all action necessary to authorise this subscription has been duly taken and that this subscription
     is validly and lawfully made.

6    I am/We are acquiring Shares for investment purposes and solely for my/our own account and not with a view to
     or a present intention of reselling them.

7    We hereby confirm that the Fund, the Directors and the Administrator are each authorised and instructed to
     accept and execute any instructions in respect of the Shares to which this application relates given by me/us by
     facsimile. If instructions are given by me/us by facsimile, I/we undertake to confirm them in writing. I/We
     hereby indemnify the Fund, the Directors and the Administrator and agree to keep each of them indemnified,
     against any loss of any nature whatsoever arising to each of them as a result of any of them acting on facsimile
     instructions. The Fund, the Directors and the Administrator may rely conclusively upon and shall incur no
     liability in respect of any action taken upon any notice, consent, request, instructions or other instrument
     believed, in good faith, to be genuine or to be signed by properly authorised persons.

8    I/We have read the Memorandum and understand and accept the information contained in the Memorandum and
     the risks of investing in the Fund. I am/We are aware that the Fund's assets are subject to fluctuations in value
     and to risks inherent in all investments and that the price of Shares and the income arising from them may go
     down as well as up. I am/We are aware that the assets of the Fund may be subject to volatile price movements
     which may result in capital loss.

9    I/We confirm that I/we understand that the Fund is not subject to any form of regulation or approval in the Isle of
     Man, and investors in the Fund are not protected by any statutory compensation arrangement in the event of the
     Fund's failure.

10   I/We acknowledge that, other than as set out in the Memorandum, no representations or warranties have been
     made to me/us by the Fund, or by any agent, employee or representative of the Fund, and in entering into this
     transaction I am/we are not relying upon any information, other than that contained in the Memorandum and the
     results of my/our own independent investigation.

11   I/We have made an independent determination of the investment, accounting, legal and tax aspects of acquiring
     the Shares and have depended on the advice of my/our own counsel and accountants and agree that the Fund has
     no responsibility with respect to such matters and such advice.

12   I/We acknowledge that the Administrator may hold and process personal data relating to me / us in accordance
     with my / our application and holding of Shares in the Fund.

13   I/We agree to indemnify and hold harmless the Fund, the Administrator, the Investment Manager, their affiliates
     and any officer, director (executive, non-executive and managing), principal, employee or affiliate of the Fund,
     the Administrator or the Investment Manager or their affiliates against any loss, liability, cost or expense

NAT000095
NATSAA00000095.1

Exhibit B Declaration

(including attorneys' fees, taxes and penalties) which may result, directly or indirectly, from any misrepresentation or breach of any warranty, condition, covenant or agreement set forth herein or in any other document delivered by me/us to the Fund.

14    I/We understand and accept that in the event that the Fund accepts my/our subscription prior to confirmation of identification to the satisfaction of the Fund and the Administrator, and such confirmation is not forthcoming, the Shares allotted to me/us will be compulsorily redeemed and the proceeds returned to the Bank account from which the original subscription was remitted, at my/our expense and I/we hereby indemnify the Fund and the Administrator in respect of any loss that I/we should suffer as a result of such action being taken.

15    I/We further understand and accept that the Fund and Administrator will not issue confirmation of the acceptance of my/our investment, or details of the number of Shares allotted to me/us until such time as the Administrator has received the documentation verifying my/our identity to its satisfaction.

16    I/We acknowledge that the Administrator and the Fund shall be held harmless and indemnified against any loss arising as a result of a delay or failure to process this application if any information required by such parties has not been provided.

17    The application for Shares and remittance of the associated funds will not breach in any manner, any rules and regulations designed to prevent money laundering.

18    I/We will provide additional verification of identity if requested by the Administrator in accordance with the requirements, present or future, of the Isle of Man or any other jurisdiction whose regulations apply to the Fund.

19    I/We are not named on a list of prohibited countries, territories, entities and individuals maintained by the US Treasury Department's Office of Foreign Assets Control ("OFAC").

20    I/We are not a senior political figure, or an immediate family member or close associate of a senior political figure, and I/we are not acting on behalf of a senior political figure.

21    I/We agree that subscription is being made and any Shares hereby subscribed for will be held subject to the terms and conditions of this Memorandum, the Memorandum and Articles of Association of the Fund, as amended from time to time, and this Share Application Form.

22    I am/We are not a member of the public in the Cayman Islands.

23    I/we acknowledge and understand that if, as a result of any information or other matter which comes to its attention, any person resident in the Cayman Islands (including the Fund and its Directors) knows or suspects that any payment to the Fund (by way of subscription or otherwise) is the proceeds of criminal conduct, such person is required to report such information or other matter pursuant to The Proceeds of Criminal Conduct Law (2004 Revision) of the Cayman Islands, and such report will not be treated as a breach of any restriction upon the disclosure of information imposed by law or otherwise.

24    I/we agree that any representations made herein will be deemed to be reaffirmed at any time I/we purchase or otherwise acquire additional Shares of the Fund and such purchase or acquisition will be evidence of such reaffirmation, and if any such representations cease to be true, I/we will promptly notify the Fund of the facts pertaining to such changed circumstances.

25    This Share application and declaration shall be binding upon me/us and my/our successors and permitted assigns and shall inure to the benefit of the Fund's successors and assigns.

26    If any provision hereof shall be found invalid or unenforceable under any applicable law, it shall be deemed inoperable to that extent and its invalidity or inoperability shall not affect any other provision hereof.

27    This Share application shall be governed by and construed in accordance with the laws of the Cayman Islands.

NAT000096
NATSAA00000096.1

Exhibit C – New Issue

## *"New Issue" Questionnaire*

### *All Applicants MUST complete this form and return it with their Application Form*

The National Association of Securities Dealers, Inc. (the "NASD") has adopted and the U.S. Securities and Exchange Commission has approved NASD Rule 2790 (the "New Issue Rule") governing the purchase and sale of certain equity securities in initial public offerings. Consequently, all Applicants into the Fund MUST complete this Questionnaire in full and return it with their application form. Failure to do so may result in either the application monies being returned or the Applicant being deemed a "Restricted Person" (as defined below) if the subscription is accepted. It is therefore an absolute necessity that this form is completed, both for your and the Fund's benefit.

For ALL questions, this Questionnaire must be completed by the Applicant by initialling those statements below which apply to it and, if the Applicant is a corporation, partnership, trust or other entity acting as nominee for another person, which apply to the beneficial owner(s) for which the Applicant is acting as nominee:

**A.    Exempt Persons:**

*(Initial as Appropriate)*

_____   1.   The Applicant is an investment company registered under the United States Investment Company Act of 1940.

_____   2.   The Applicant is a common trust fund or similar fund as described in Section 3(a)(12)(A)(iii) of the Securities Exchange Act of 1934 and it (a) has investments from 1,000 or more accounts, and (b) does not limit beneficial interests in the fund principally to trust accounts of persons listed in section B, below ("Restricted Persons").

_____   3.   The Applicant is an insurance company general, separate or investment account, and (a) the account is funded by premiums from 1,000 or more policyholders, or, if a general account, the insurance company has 1,000 or more policyholders; and (b) the insurance company does not limit the policyholders whose premiums are used to fund the account principally to Restricted Persons, or, if a general account, the insurance company does not limit its policyholders principally to Restricted Persons.

_____   4.   The Applicant is a corporation, partnership, trust or other entity and the beneficial interests[1] of Restricted Persons do not exceed in the aggregate 10% of such entity (the "De Minimis Exemption"). An Applicant who limits the participation by Restricted Persons in the aggregate to no more than 10% of the profits and losses of new issues may initial this statement.

_____   5.   **The Applicant is a publicly traded entity (other than a broker-dealer or an affiliate of a broker-dealer where such broker-dealer is authorized to engage in the public offering of new issues either as a selling group member or underwriter) that: (a) is listed on a national securities exchange, (b) is traded on the Nasdaq National Market, or (c) is a foreign issuer whose securities meet the quantitative designation criteria for listing on a national securities exchange or trading on the Nasdaq National Market.**

_____   6.   The Applicant is an investment company organized under the laws of a foreign jurisdiction and (a) the investment company is listed on a foreign exchange or authorized for sale to the public by a foreign regulatory authority, and (b) no person owning more than 5% of the Shares of the investment company is a Restricted Person.

_____   7.   The Applicant is an Employee Retirement Income Security Act benefits plan that is qualified under Section 401(a) of the Internal Revenue Code and such plan is not sponsored solely by a broker-dealer.

_____   8.   The Applicant is a state or municipal government benefits plan that is subject to state and/or municipal regulation.

---

[1]   The term "beneficial interest" as used herein means any economic interest, such as the right to share in gains or losses. The receipt of a management or performance based fee for operating a collective investment account, or other fee for acting in a fiduciary capacity, is not considered a beneficial interest in the account.

Exhibit C – New Issue

_____ 9. The Applicant is a tax exempt charitable organization under Section 501(c)(3) of the Internal Revenue Code.

_____ 10. The Applicant is a church plan under Section 414(e) of the Internal Revenue Code.

_____ 11. The Applicant is a broker-dealer, or owner of a broker-dealer, organized as an investment vehicle, that restricts participation of Restricted Persons in profits and losses of new issues in accordance with the De Minimis Exemption set forth above.

OR

_____ 12. None of the above statements are applicable.

*If you initialled item 12 above, please complete Section B. If you initialled any of items 1-11 above, you are deemed an EXEMPT (or NON-RESTRICTED) Person. In this case please skip Section B, although you still need to sign the Certification at the end of this Questionnaire. If you are a fund, you must also complete Section C.*

**B.    Restricted Persons:**

*(Initial as Appropriate)*

_____ 1. The Applicant, or a person having a beneficial interest in the Applicant, is a member of the NASD, or a domestic or foreign broker-dealer.

_____ 2. The Applicant, or a person having a beneficial interest in the Applicant, is an officer, director, general partner, associated person[2] or employee of any NASD member or of any domestic or foreign broker-dealer. (other than a limited business broker-dealer[3]).

_____ 3. The Applicant, or a person having a beneficial interest in the Applicant, is an agent of any NASD member or of any domestic or foreign broker-dealer (other than a limited business broker-dealer) that is engaged in the investment banking or securities business.

_____ 4. The Applicant, or a person having a beneficial interest in the Applicant, is an immediate family member[4] of a person described in item 2 or 3 above and such person (a) materially supports[5], or receives material support from the immediate family member; or (b) is employed by or associated with the broker-dealer, or an affiliate of the broker-dealer selling the new issue to the family member or c) has an ability to control the allocation of the new issue.

_____ 5. The Applicant, or a person having a beneficial interest in the Applicant, acts as a finder or acts in a fiduciary capacity (including, among others, attorneys, accountants and financial consultants) to managing underwriters in new issue offerings.

---

[2] The NASD By-Laws define a person "associated with a member" as every sole proprietor, partner, officer, director or branch manager of any member, or any natural person occupying a similar status or performing similar functions, or any natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by such member, whether or not any person is registered or exempt from registration with the NASD.

[3] A "limited business broker-dealer" is a broker-dealer engaged solely in the purchase or sale of investment company/variable contracts securities or direct participation program securities.

[4] For purposes of the New Issue Rule, the term "immediate family" includes parents, mother-in-law or father-in-law, husband or wife, brother or sister, brother-in-law or sister-in-law, son-in-law or daughter-in-law, children and any other person to whom the person provides "material support" as defined in footnote 5, below.

[5] For purposes of the New Issue Rule, the term "material support" means the direct or indirect provision of more than 25% of a person's income in the prior calendar year. Members of the immediate family living in the same household are deemed to be providing each other with material support.

NAT000098
NATSAA00000098.1

Exhibit C – New Issue

_____ 6.  The Applicant, or a person having a beneficial interest in the Applicant, has the authority to buy or sell securities for a bank, savings and loan institution, insurance company, investment company, investment advisor, or collective investment account[6], domestic or foreign.

_____ 7.  The Applicant, or a person having a beneficial interest in the Applicant, is an immediate family member of a person described in item 5 or 6 above and such person materially supports, or receives material support from such person.

_____ 8.  The Applicant, or a person having a beneficial interest in the Applicant[7], is a person listed, or required to be listed, in Schedule A of a Form BD (other than with respect to a limited business broker-dealer), except persons identified by an ownership code of less than 10%.

_____ 9.  The Applicant, or a person having a beneficial interest in the Applicant, is a person listed, or required to be listed, in Schedule B of a Form BD (other than with respect to a limited business broker-dealer), except persons whose listing on Schedule B relates to an ownership interest in a person listed on Schedule A identified by an ownership code of less than 10%.

_____ 10.  The Applicant, or a person having a beneficial interest in the Applicant, is a person listed, or required to be listed, in Schedule C of a Form BD that meets the criteria of items 8 and 9 above.

_____ 11.  The Applicant, or a person having a beneficial interest in the Applicant, is a person that (a) directly or indirectly owns 10% or more of a public reporting company listed, or required to be listed, in Schedule A of a Form BD, or (b) directly or indirectly owns 25% or more of a public reporting company listed, or required to be listed, in Schedule B of a Form BD, (other than a reporting company that is listed on a national securities exchange or is traded on the Nasdaq National Market, and other than with respect to a limited business broker-dealer).

_____ 12.  The Applicant, or a person having a beneficial interest in the Applicant, is an immediate family member of a person specified in items 8-11 above, provided that the Applicant should not initial this item 12 if the person owning the broker-dealer (specified in items 8-11):

   (a)   does not materially support, or receive material support from such person;

   (b)   is not an owner of the NASD member or an affiliate of the NASD member selling the new issue to the immediate family member; and

   (c)   has no ability to control the allocation of the new issue.

_____ 13.  The Applicant, or a person having a beneficial interest in the Applicant, is a domestic or foreign bank or trust company acting for the account of any person described in items 1-12 above.

_____ 14.  Persons described in any of the items 1-13 above own in the aggregate more than 10% of the Applicant's beneficial interests.

       **OR**
_____ 15.  None of the above statements are applicable.

*If you initialled any of items 1-14 above, you are deemed a RESTRICTED Person. The Fund may still benefit from investments in New Issues pursuant to the New Issue Rule. If you initialled item 15 above, you are deemed a NON-RESTRICTED Person even if you did not fall within one of the general exemptions set out in Part A. Please note that you still need to sign the Certification at the end of this Questionnaire.*

**Investment Funds Must Complete Section C, Below**

---

[6]   For purposes of the New Issue Rule, the term "collective investment account" means any hedge fund, investment partnership, investment corporation, or any other collective investment vehicle that is engaged primarily in the purchase and/or sale of securities. The term does not include an investment club where a group of individuals pool their money and are collectively responsible for investment decisions, or a family investment vehicle owned solely by immediate family members.

[7]   Items 8-11 pertain to "owners" of broker-dealers. The NASD has stated that an owner of a broker-dealer will be viewed as having a "beneficial interest" in an account held by a subsidiary (e.g., a sister company of the broker-dealer). Accordingly, an affiliate of a broker-dealer may be a Restricted Person.

NAT000099
NATSAA00000099.1

Exhibit C – New Issue

**C.    Investment Fund Applicants:**

    **If the Applicant is a "fund of funds," a feeder fund or a similar type of investment fund, please complete the following:**

Restricted Persons own, in the aggregate, ____% of the beneficial interest of the Applicant.

### *CERTIFICATION*

To the best of my knowledge and belief, the above information is true and complete in all respects. I understand that if the foregoing representations are or ever become untrue in any respect that the Fund may be affected materially and adversely, and the Applicant will be fully responsible for the consequences. I agree to notify the Administrator promptly in writing if any of these representations is or ever becomes untrue in any respect. I understand that the information being furnished in this Questionnaire is required to enable the Fund to purchase securities subject to the New Issue Rule and to comply with certain provisions of U.S. federal and state laws applicable to investment advisers and private investment companies. To the extent the Fund requires additional information or further documentation to verify the Applicant's status under the New Issue Rule, the Applicant will provide such information or documentation to the Fund.

I acknowledge that it is a regulatory requirement that the above information will also have to be verified on an annual basis and agree to complete such Questionnaires and provide such information as the Fund may request.

Date: _____, 20__

                    _____
                    **Signature**

                    _____
                    **Name**

                    _____
                    **Address**

                    _____
                    **Class of Shares**

NAT000100
NATSAA00000100.1

Exhibit D – ERISA Questionnaire

**THE FOLLOWING SHOULD BE COMPLETED BY AN AUTHORISED SIGNATORY**

1.  **Are the shares held by one of the following persons or entities (PLEASE ANSWER EACH QUESTION)?**

(a)   A natural person resident in the US*                                                                  Yes _____   No _____

(b)   A partnership or corporation or other entity (other than a trust or estate) organised or   Yes _____   No _____
incorporated in the US

(c)   A partnership or corporation or other entity (other than a trust or estate) having its   Yes _____   No _____
principal office and place of business in the US*

(d)   An estate of which an executor or administrator is a US Person*                              Yes _____   No _____

(e)   An estate the income of which is subject to US federal income tax, regardless of its   Yes _____   No _____
source

(f)   A trust of which any trustee is a US Person*                                                          Yes _____   No _____

(g)   An agency or branch of a non-US entity located in the US                                       Yes _____   No _____

(h)   A non-discretionary account or similar account (other than a trust or estate) held by a   Yes _____   No _____
dealer or other fiduciary for the benefit or account of a US Person*

(i)   A discretionary account or similar account (other than a trust or estate) held by a dealer   Yes _____   No _____
or other fiduciary organised, incorporated, or (if an individual) resident in the US

(j)   A partnership or corporation organised or incorporated under the laws of a non-US   Yes _____   No _____
jurisdiction if formed by a US person principally for the purpose of investing in
securities that are not registered under the US Securities Act of 1933, as amended,
unless it is organised or incorporated, and owned by "accredited investors" (as defined
in Rule 501(a) under that Act) who are not natural persons, estates or trusts

(k)   An entity organised outside the US principally for passive investment, such as a   Yes _____   No _____
commodity pool, investment company or other similar entity (other than an employee
benefit plan or a pension plan for the employees, officers or principals of an entity
organised and with its principal place of business outside the US):

   i.   in which any US persons hold units of participation representing in aggregate
        10% or more of the beneficial interest in the entity; or

   ii.   which has as a principal purpose the facilitating of investment by a US person
         in a commodity pool with respect to which the operator is exempt from certain
         requirements of Part 4 of the regulations of the US Commodity Futures
         Trading Commission by virtue of its participants being non-US persons

(l)   A pension plan for the employees, officers or principals of an entity organized or with   Yes _____   No _____
its principal place of business in the US

2.  **Are the shares held by a "private fund" as defined by Rule 203(b)(3)-1(d) of the**   Yes _____   No _____
**US Investment Advisers Act of 1940, as amended?**

3.  **Are the shares held by an "employee benefit plan" as defined in Section 3(3) of**   Yes _____   No _____
**the US Employee Retirement Income Security Act of 1974, as amended**
**("ERISA"), any "plan" as defined Section 4975 of the US Internal Revenue Code**
**of 1986, as amended or an entity whose underlying assets include "plan assets"**

---
* Noted for internal purposes.

Exhibit D – ERISA Questionnaire

within the meaning of the US Department of Labor Regulation 2510.3-101(f), regardless of whether or not subject to ERISA?

4.   If you answered "yes" to question 3., check any of the following statements that apply.

(a)   The shareholder is an employee benefit plan subject to ERISA.   _____

(b)   The shareholder is an entity the assets of which are considered to be "plan assets" within the meaning of the US Department of Labor Regulation 2510.3-101(f).   _____

(c)   The shareholder is an Individual Retirement Account (IRA).   _____

(d)   The shareholder is a Keogh Plan, the only participants of which are self-employed persons or their spouses.   _____

(e)   The shareholder is a "governmental plan" within the meaning of section 3(32) of ERISA, or another US employee benefit plan not subject to ERISA.   _____

(f)   The shareholder is a non-US employee benefit plan.   _____

(g)   The shareholder is none of the above.   _____

*Please note that investors may be required to provide additional information relevant to their status under certain US regulations depending on responses provided to the above questions.*

Signed   _____

Name and Title of Signatory   _____

Date   _____

NAT000102
NATSAA00000102.1

Exhibit E – Identification of Subscribers

## IDENTIFICATION OF SUBSCRIBERS

### ANTI-MONEY LAUNDERING

It is a condition of each subscription that, to ensure compliance with Isle of Man laws and regulations designed to avoid money laundering, the Administrator will require verification of identity of any applicant subscribing for Shares. The making of an application to subscribe for Shares will constitute a warranty from the applicant that such application, and the related remittance of the necessary funds, will not in any way breach any rules and regulations designed to avoid money laundering. Each applicant must undertake, at the time of initial investment, to provide verification of identity to the satisfaction of the Administrator, and further undertake to provide any additional verification or information that may become necessary under any changes to the relevant legislation. Any obligation of the Fund to allot Shares to an applicant is conditional on the Administrator being provided with such evidence within one month after a request therefore.

Accordingly, in the event that this condition is not fulfilled, the application by, and any allotment of Shares to, the applicant will be deemed to have lapsed and the funds remitted by the applicant will be returned (without interest) less any loss in value arising whilst invested in the Fund and wire transfer charges, to the account of the bank from which the funds were originally received.

It is a further condition of each subscription that neither the Fund nor the Administrator shall be responsible, or have any liability for, loss or damage (whether actual or alleged) arising from a decision by the Fund to treat any application as lapsed as a result of the applicant failing to provide evidence of identity to the satisfaction of the Administrator **within one month** of the Administrator having requested such information.

Applicants should note that confirmation of investment, and details of the Shares allotted **will NOT be issued** until verification is completed to the satisfaction of the Administrator, and completion of the following requirements at the time of initial application will assist the Administrator in promptly processing the application.

### REQUIREMENTS

All applicants are requested to complete both the Fund **Share Application Form** and **Subscriber Declaration**, and to provide the following documents:-

### A. INDIVIDUAL APPLICANTS

(1) Passport (*Certified copy of photo & signature page/s)
   *Please note that colour copies are NOT acceptable for UK passport holders*

(2) Utility Bill – for example an electricity bill (Original or *Certified copy)
   *Please note that a mobile phone bill is NOT acceptable*

(3) Details of Occupation and the Source of funds

*The certifier must be either:-
   *a lawyer, accountant, director or manager of an authorised credit or financial institution, a director, company secretary or manager of a licensed Corporate Service Provider, notary public, member of the judiciary, a senior civil servant or a serving police officer.*

The certifier must sign and date the copy document (printing his/her name clearly in capitals underneath) and clearly indicate his/her position or capacity on it. The certification must be original.
**For applications in joint names, please enclose the above documents for both /all parties.**

NAT000103
NATSAA00000103.1

Exhibit E – Identification of Subscribers

## B. CORPORATIONS AND PRIVATE COMPANIES

1. A certified copy of the Certificate of Incorporation or Certificate of Good Standing

2. A copy of the Board Resolution authorising the account signatories

3. Identification of two Directors (Certified copies as detailed above)
   If the directors are not signatories, we require identification of two signatories as well

4. Identification of Beneficial Owners (Certified copies as detailed above)

5. Nature of the Company's business and source of funds.

## C. LIMITED PARTNERSHIPS / LIMITED LIABILITY COMPANIES

1. A certified copy of the Certificate of Limited Partnership / Certificate of Formation

2. A certified copy of the Operating Agreement

3. Identification documents for the General Partner / Managing Member (Certified copies as detailed above).

   *If the General Partner / Managing Member is an entity, please supply 'Corporate' due-diligence on this entity.*

4. Identification documents for the beneficial owner (Certified copies as detailed above).

5. Nature of the Company's business and source of funds.

## D. TRUSTS

1. Certified extracts from the Trust Deed detailing:
   i. Details of the settlor
   ii. Details of any named beneficiaries
   iii. Nature and purpose of the fund, including the source of the assets.

2. Identification documents for i) and ii), certified as detailed above.

## E. INDIVIDUALS OR CORPORATIONS LICENSED OR AUTHORISED TO CONDUCT BANKING OR INVESTMENT SERVICES (who do not need to complete the attached declaration)

1. Individuals or other entities who are regulated in respect of banking or investment services in a country which is a member of the European Union or the Financial Action Task Force (FATF *see below), who are investing in their own name or the name of a wholly-owned nominee company should complete an 'Acceptable Applicant's Certificate' available from the Administrator.

**PLEASE NOTE that the Administrator reserves the right to request additional documentation or verification at its discretion.**

Exhibit E – Identification of Subscribers

**MEMBERS OF THE FINANCIAL ACTION TASK FORCE ("FATF"), and countries and territories with equivalent legislation and financial sector procedures:**

Australia, Austria, Belgium, Canada, Denmark, Finland, France, Germany, Gibraltar, Greece, Guernsey, Hong Kong, Iceland, Ireland, Italy, Japan, Jersey, Luxembourg, Netherlands, New Zealand, Norway, Portugal, Singapore, South Africa, Spain, Sweden, Switzerland, United Kingdom, United States of America. *

*(* as at January 2004 – the list may change from time to time)*

**Individual Applicants** .................................................................................................

.............................................................................................................................

.............................................................................................................................

*(if joint application both/all parties should sign)*

**Corporations/Trusts – Insert Name** ..........................................................................

.............................................................................................................

Authorised Signatory/ies .........................................................................................

.............................................................................................................

Date ...........................................

**Please note this declaration should be <u>fully</u> completed and returned to the Administrator together with the relevant Application Form AND whenever possible with the necessary documentation verifying identity.**

NAT000105
NATSAA00000105.1

Exhibit F – Redemptions USD

### HARLEY INTERNATIONAL (CAYMAN) LIMITED
Request for Redemption
#### (To be completed by the Registered Investor)

Harley International (Cayman) Limited
c/o Fortis Prime Fund Solutions (IOM) Limited,
18-20 North Quay
Douglas
Isle of Man
IM99 1NR

The undersigned _____ hereby requests redemption of
_____ (insert the number of Shares or the amount in US Dollars to be redeemed)
of HARLEY INTERNATIONAL (CAYMAN) LIMITED (the "Fund") – Class _____ US Dollar Shares at
the ........ day of .........................., 200... The undersigned hereby represents and warrants:

a) That he or she is the true and lawful owner of the Fund's Shares with full power and authority to
   request redemption of such Shares.

b) That he or she is the registered owner holding the Shares, who has full power and authority to
   request redemption of such Shares for the beneficial owner of the Fund's Shares.

c) That such Shares are not subject to any pledge or otherwise encumbered in any fashion.

Please remit redemption proceeds by wire transfer to the Remitting Bank, details as set out below:

Name of Bank : _____

ABA Number/Bank Sort Code/BLZ Number : _____

For the Account of : _____

Account Number : _____

Individual / Joint Investor:

Signature of Investor (Joint if applicable)

_____

Date

| | | |
|---|---|---|
| | New Issue Restricted person | ___ |
| | New Issue not Restricted person | ___ |
| Agent involved:   Yes / No | US Investor | ___ |
| | Non US Investor | ___ |
| FAM Agent involved:   Yes / No | To be completed by the Administrator of the Fund | |

Code of Agent: _____

Redemption Approved...............................................
(internal use only)

---

**\*Note\***

Fax this form to Fortis Prime Fund Solutions (IOM) Limited at + 1624 688 334 and mail it to 18-20 North Quay, Douglas,
Isle of Man, IM99 1NR.

NAT000106
NATSAA00000106.1

Exhibit G – Transfers USD

**HARLEY INTERNATIONAL (CAYMAN) LIMITED**
Request for Transfer
**(To be completed by the Registered Investor)**

Harley International (Cayman) Limited
c/o Fortis Prime Fund Solutions (IOM) Limited,
18-20 North Quay
Douglas
Isle of Man
IM99 1NR

The undersigned ("Transferor") hereby requests transfer of _____
(insert the number of Shares to be transferred) of HARLEY INTERNATIONAL (CAYMAN) LIMITED
(the "Fund") - Class____ US Dollar Shares at the ........... day of ......................................., 200... The
undersigned hereby represents and warrants:

a) That he or she is the true and lawful owner of the Fund's Shares with full power and authority to
   request transfer of such Shares.                                                                    ☐

b) That he or she is the register owner holding the Shares, who has full power and authority to request
   transfer of such Shares for the beneficial owner of the Fund's Shares.                              ☐

c) That such Shares are not subject to any pledge or otherwise encumbered in any fashion.             ☐

Name of Transferor    : _____

Name of Transferee    : _____

Address               : _____

                        _____

By signing this form, the Transferee do hereby agree to take the said Shares subject to the same conditions :

**TRANSFEROR**                                      **TRANSFEREE**

_____                     _____
Signature of Transferor (Joint if applicable)       Signature of Transferee (Joint if applicable)

_____                     _____
Date                                                Date

FAM Agent involved     ☐                            | New Issue Restricted person              ____ |

Code of Agent _____                           | New Issue not Restricted person          ____ |

Transfer Approved...............................    | US Investor                              ____ |
(internal use only)                                 | Non US Investor                          ____ |

                                                    To be completed by the Administrator of the Fund

**\*Note\***
Fax this form to Fortis Prime Fund Solutions (IOM) Limited at + 1624 688 334 and mail it to 18-20 North Quay, Douglas, Isle
of Man, IM99 1NR..

NAT000107
**NATSAA00000107.1**

TAB III

NAT000108
**NATSAA00000108.1**

HARLEY INTERNATIONAL (CAYMAN) LIMITED
(formerly Harley International Limited)
Audited Financial Statements
Years ended December 31, 2004 and 2003
with Report of Independent Auditors

NAT000109
NATSAA00000109.1

# Harley International (Cayman) Limited

## Audited Financial Statements

Years ended December 31, 2004 and 2003

## **Contents**

Report of Independent Auditors ........................................................................................................... 1
General Information ............................................................................................................................... 2

**Audited Financial Statements**

Statements of Assets and Liabilities ..................................................................................................... 3
Statements of Operations ...................................................................................................................... 4
Statements of Changes in Net Assets ................................................................................................... 5
Statements of Cash Flows ..................................................................................................................... 6
Notes to Financial Statements .............................................................................................................. 7

NAT000110
NATSAA00000110.1

Harley International (Cayman) Limited

Statements of Changes in Net Assets
(Stated in United States Dollars)

Years ended December 31, 2004 and 2003

|  | 2004 | 2003 |
|---|---|---|
| **Operations** | | |
| Net investment income | $ 14,187,544 | $ 7,242,764 |
| Net realized gain from investments | 81,683,168 | 62,806,706 |
| Net change in unrealized appreciation (depreciation) on investments | (80,717) | 122,526 |
| Appreciation of deferred compensation | (175,425) | (117,920) |
| Net change in net assets resulting from operations | 95,614,570 | 70,054,076 |
| **Capital share transactions** | | |
| Class C Common Shares issued | 379,836,136 | 190,430,008 |
| Class J Common Shares issued | 299,999 | - |
| Class A Common Shares redeemed | (7,775,630) | (43,852,268) |
| Class C Common Shares redeemed | (76,877,088) | (39,950,005) |
| Class J Common Shares redeemed | (18,453,417) | - |
| Net change in net assets resulting from capital share transactions | 277,030,000 | 106,627,735 |
| Net change in net assets | 372,644,570 | 176,681,811 |
| Net assets at beginning of year | 839,794,379 | 663,112,568 |
| Net assets at end of year | $1,212,438,949 | $839,794,379 |

*The accompanying notes form an integral part of the financial statements.*

5

NAT000111
NATSAA00000111.1

# Harley International (Cayman) Limited

## Statements of Cash Flows
(Stated in United States Dollars)

Years ended December 31, 2004 and 2003

|  | 2004 | 2003 |
|---|---|---|
| **Operating activities** | | |
| Net change in net assets resulting from operations | $95,614,570 | $70,054,076 |
| Adjustments to reconcile net change in net assets resulting from operations to net cash used in operating activities: | | |
| Net change in unrealized depreciation (appreciation) on investments | 80,717 | (122,526) |
| Net change in net assets resulting from operations adjusted for non-cash items | 95,695,287 | 69,931,550 |
| Changes in operating assets and liabilities: | | |
| Net purchases of Trading securities, at cost | (351,815,654) | (182,029,862) |
| Accrued dividend receivable | 168,397 | (168,397) |
| Other receivable | (2,000,000) | - |
| Management and incentive fees payable | (6,880) | (12,000) |
| Deferred incentive and management fees | 540,928 | 921,570 |
| Administration fee payable | 300,000 | 125,000 |
| Accrued expenses | 40,433 | (2,856) |
| Net cash used in operating activities | (257,077,489) | (111,234,995) |
| **Financing activities** | | |
| Proceeds from issuance of shares | 375,968,385 | 190,430,008 |
| Payments for redemption of shares | (109,606,135) | (77,302,273) |
| Net cash provided by financing activities | 266,362,250 | 113,127,735 |
| Net change in cash and cash equivalents | 9,284,761 | 1,892,740 |
| Cash and cash equivalents at beginning of year | 2,043,374 | 150,634 |
| Cash and cash equivalents at end of year | $11,328,135 | $2,043,374 |
| **Supplemental cash flow information** | | |
| Interest and dividends received | $15,092,617 | $ 8,214,893 |

*The accompanying notes form an integral part of the financial statements.*

6

NAT000112
NATSAA00000112.1

## Harley International (Cayman) Limited

### Notes to Financial Statements

December 31, 2004 and 2003

### 1. Organization

Harley International (Cayman) Limited (formerly Harley International Limited) (the "Fund") was formed as an open-ended investment company under the laws of the Bahamas with limited liability on September 1, 1992. On August 7, 2003, the Fund transferred its domicile, administrator and investment manager to the Cayman Islands and incorporated as an exempted company in the Cayman Islands. At the same time the Fund changed its name to Harley International (Cayman) Limited. Effective April 29, 2004 the Fund became registered under the Cayman Islands Mutual Funds Law.

The investment objective of the Fund is to achieve capital appreciation by investing the assets of the Fund with one or more money managers, either directly by way of a managed account or by investing in an investment vehicle managed by such money manager. Fund assets will typically be invested either directly or indirectly in U.S. equity securities and equity index related options on a completely non-leverage basis.

The Fund's financial statements were authorized for issue on April 22, 2005 by the Director.

The Fund employed no employees at December 31, 2004.

### 2. Significant Accounting Policies

#### Basis of Preparation

The financial statements of the Fund have been prepared in accordance with International Financial Reporting Standards issued by the International Accounting Standards Board and interpretations issued by the International Financial Reporting Interpretations Committee of the International Accounting Standards Board.

The financial statements have been prepared on a historical cost basis except for the measurement at fair value of trading investments in securities.

The Fund's measurement and presentation currency is the United States Dollar, which is representative for the markets in which the Fund operates.

7

## Harley International (Cayman) Limited

### Notes to Financial Statements (continued)

#### 2.  Significant Accounting Policies (continued)

**Trading Securities**

The Fund applies IAS 39 and classifies all of its investment securities as trading securities. Those securities, acquired or incurred principally for the purpose of generating a profit from short-term fluctuation in price and dealer's margin are classified as trading securities. Management determines the appropriate classification of its investment securities at the time of the purchase and re-evaluates such designation on a regular basis.

All investment securities are initially recognized at cost, being the fair value of the consideration given, including acquisition charges associated with the investment security. The amortized cost, which approximates the market value of U.S. government securities, is used to determine the cost of these securities. After initial recognition, all investment securities are measured at fair value with unrealized gains or losses recognized in income. These investments in securities which include U.S. Treasury Bills are determined by reference to Stock Exchange quoted market bid prices at the close of business on the statements of assets and liabilities date.

**Investment Transactions and Related Investment Income**

Investment transactions are accounted for on a trade date basis with unrealized gains and losses reflected in the statement of operations. Interest is recorded on the accrual basis and dividends are recorded on the ex-dividend date. Discounts and premiums on securities purchased are amortized, over the lives of the respective securities, by using the effective rate method of amortization. Realized gains and losses are recorded on a first-in, first-out basis.

Interest revenue is recognized as the interest accrues unless collectibility is in doubt. Dividend revenue is recognized when the shareholders' right to receive the payment is established, except for those securities for which collection is doubtful, for which dividend income is recognized on a cash basis.

**Cash and Cash Equivalents**

Cash includes amounts due from banks on demand and interest bearing deposits with original maturities of three months or less.

8

NAT000114
NATSAA00000114.1

## Harley International (Cayman) Limited

### Notes to Financial Statements (continued)

#### 2.   Significant Accounting Policies (continued)

**Net Asset Value per Share**
The net asset value per share is calculated by dividing the net assets per Class of shares by the number of the outstanding shares per Class of shares at the end of the year.

**Taxation**
There is currently no taxation imposed on income or capital gains by the Government of the Cayman Islands. The only taxes payable by the Fund are withholding taxes of other countries applicable to certain investment income. As a result, no tax liability or expense has been recorded in the financial statements.

**Expenses**
Expenses are accounted for on accrual basis. Expenses are charged to the statement of operations except for expenses incurred on the acquisition of an investment which are included within the cost of that investment. Expenses arising on the disposal of investments are deducted from the disposal proceeds.

**Fair Value of Financial Instruments**
International Accounting Standard No. 32, "Financial Instruments: Disclosure and Presentation," requires the disclosure of fair value information about financial instruments, whether or not recognized in the statements of assets and liabilities, for which it is practicable to estimate the value. The carrying amounts of all financial instruments in the statements of assets and liabilities are reasonable estimates of fair values.

9

NAT000115
NATSAA00000115.1

Harley International (Cayman) Limited

Notes to Financial Statements (continued)

### 3. Trading Securities

As at December 31, 2004, the Fund held the following investments:

#### Trading securities (Treasury bills)

| Security name | Unit holdings | Trade currency | Cost in USD | Fair value in USD |
|---|---|---|---|---|
| US Treasury Bill due 04/07/05 | 100,825,000 | USD | 100,222,295 | 100,216,017 |
| US Treasury Bill due 04/14/05 | 100,825,000 | USD | 100,161,959 | 100,155,522 |
| US Treasury Bill due 04/21/05 | 100,700,000 | USD | 99,983,488 | 99,976,974 |
| US Treasury Bill due 04/28/05 | 100,700,000 | USD | 99,931,181 | 99,924,610 |
| US Treasury Bill due 05/05/05 | 100,700,000 | USD | 99,867,880 | 99,861,169 |
| US Treasury Bill due 05/12/05 | 100,700,000 | USD | 99,816,556 | 99,809,812 |
| US Treasury Bill due 05/19/05 | 100,700,000 | USD | 99,769,228 | 99,762,483 |
| US Treasury Bill due 05/26/05 | 100,700,000 | USD | 99,709,898 | 99,703,070 |
| US Treasury Bill due 06/02/05 | 100,700,000 | USD | 99,645,559 | 99,638,622 |
| US Treasury Bill due 06/09/05 | 100,700,000 | USD | 99,592,218 | 99,585,251 |
| US Treasury Bill due 06/16/05 | 100,700,000 | USD | 99,543,880 | 99,536,915 |
| US Treasury Bill due 06/23/05 | 100,700,000 | USD | 99,485,529 | 99,478,509 |
| **Total trading securities** | | | 1,197,729,671 | 1,197,648,954 |

### 4. Risk Management

**Market Risk**

Market risk represents the potential loss that can be caused by a change in the market value of the financial instrument. The Fund's exposure to market risk is determined by a number of factors, including interest rates, foreign currency exchange rates and market volatility. The Investment Manager continuously monitors the Fund's exposure to market risk. At December 31, 2004, the exposure to market risk is low as the investments in securities consist solely of U.S. Treasury bills which costs approximate their market values.

10

NAT000116
NATSAA00000116.1

## Harley International (Cayman) Limited

### Notes to Financial Statements (continued)

#### 4.  Risk Management (continued)

**Credit Risk**

Financial assets, which potentially expose the Fund to credit risk consist principally of cash and cash equivalents and investments in securities. The Fund seeks to mitigate its exposure to credit risk by placing its cash and cash equivalents and transacting its securities activity with large financial institutions.

Credit risk arising from the inability of a counter party to meet the terms of the Fund's financial instrument contracts is limited as it is the Fund's policy to enter into financial instruments with a diversity of creditworthy counter parties. The extent of the Fund's exposure to credit risk in respect of these financial assets approximates their carrying value as recorded in the Fund's statements of assets and liabilities.

**Concentrations of Credit Risk**

Concentrations of credit risk exist when changes in economic, industry or geographic factors similarly affect groups of counter parties whose aggregate credit exposure is significant in relation to the Fund's total credit exposure. The Fund's portfolio is not diversified along industry, product and transactions but are entered into with diverse creditworthy counter parties, thereby mitigating any significant concentration of credit risk.

**Interest Rate Risk**

The Fund's exposure to market risk for changes in interest rates relates solely to the Fund's debt securities in the investment portfolio. The Fund does not use derivative financial instruments to hedge its investment portfolio. The Investment Manager continuously monitors the Fund's exposure to interest rate risk.

**Exchange Rate Risks**

Exchange rate risk represents the risk that the exchange rate of the United States Dollar relative to other currencies may change in a manner, which has an adverse effect on the reported value of assets, which are denominated in currencies other than the United States Dollar. Exchange rate exposure is low, because the Fund solely invests in USD-securities. As at December 31, 2004, the Fund had no outstanding forward currency contracts.

11

NAT000117
NATSAA00000117.1

Harley International (Cayman) Limited

Notes to Financial Statements (continued)

#### 4.  Risk Management (continued)

**Liquidity Risk**
Management believes that the Fund has sufficient resources to meet the present and foreseeable needs of its business operations. Management's guiding policies are to maintain conservative levels of liquidity to ensure that the Fund has the ability to meet its obligations under all conceivable circumstances. Further, most of the Fund's securities are considered to be readily realizable.

#### 5.  Net Gain on Investments

|  | 2004 | 2003 |
|---|---|---|
| Net realized gains on investments in trading securities | $  81,683,168 | $   62,806,706 |
| Net change in unrealized appreciation (depreciation) on investments in trading securities | (80,717) | 122,526 |
|  | $  81,602,451 | $   62,929,232 |

#### 6.  Other Receivable

Other receivable for the amount of $2,000,000 as of December 31, 2004, represents a balance due from Santa Clara Holdings Ltd. in connection with a cancellation of a redemption in the Fund.

#### 7.  Investment Management Fees

The Fund has appointed Euro-Dutch Management Limited (the "Investment Manager") as its investment manager. The Investment Manager is responsible for executing the investment strategy of the Fund. The Investment Manager is paid incentive fees equal to 10% of net profits, as defined. The incentive fees are charged only to the Class A and J shareholders and are payable monthly based on the net asset growth applicable to the Class A and J shares.  Incentive fees earned in 2004 are $226,662 (2003: $606,706).

The Investment Manager is also paid a management fee of 1% per annum, based on the net asset value of the Class J shares only.  Management fees are payable monthly and in arrears. Management fees incurred during 2004 totaled $133,628 (2003: $196,944).

Pursuant to a deferred fee agreement (the "Agreement"), the Investment Manager may elect to defer all, or a portion of either or both of the incentive fee and management fee earned, as defined in the Agreement.

12

## Harley International (Cayman) Limited

### Notes to Financial Statements (continued)

#### 7. Investment Management Fees (continued)

The Investment Manager has elected to defer all of its current incentive fee and management fee. The total deferred fees, which are credited to separate accounts for the benefit of the Investment Manager, are currently invested in the same manner as the Company's Class C shares, and therefore shares in profits and losses of the Fund. This investment produced income of $175,425 for the year ended December 31, 2004 (2003: $117,920) which is recorded as appreciation of deferred compensation within the statement of operations with a related deferred income liability on the statements of assets and liabilities.

The Fund has appointed Aspen International Investments Limited ("Aspen"), a company incorporated in Bermuda, as its sub-advisor. Aspen will act as a sub-advisor to the Investment Manager, and will be compensated solely from the Investment Manager's fees.

#### 8. Administrator, Registrar and Transfer Agent

The Fund has appointed Fortis Fund Services (Cayman) Limited (the "Administrator"), a company incorporated in the Cayman Islands, as its administrator. The Administrator is paid a fee of 0.0125% of each quarter end net asset value which is subject to a maximum annual fee of $300,000. During the year 2003, Fortis Fund Services (Curaçao) N.V. was appointed as sub-administrator, registrar and transfer agent of the Fund.

#### 9. Directors fee

Effective January 1, 2002, the Directors will be paid each an annual director's fee of $5,000. Total fees charged during the 2004 amounts to $10,000 (2003: $20,000) for which $10,000 has been paid during the year.

#### 10. Share Capital

The Fund's authorized capital consists of 100,000 Ordinary Shares and 400,000 Redeemable Preferred Shares, each having a par value of $0.01. Redeemable Preferred Shares may be designated as either Class A Redeemable Preferred Shares (the "Class A shares"), Class C redeemable Preferred Shares (the "Class C shares") or Class J Redeemable Preferred Shares (the "Class J shares"). The Class A, Class C and Class J shares are collectively referred to as "Redeemable Preferred shares". Class A shares and Class J shares may only be purchased by direct investors, and Class C shares may only be purchased by fund of funds or by managed accounts advised or managed by managers with which the sub-advisor of the Fund is affiliated.

13

NAT000119
NATSAA00000119.1

Harley International (Cayman) Limited

Notes to Financial Statements (continued)

## 10. Share Capital (continued)

The Fund's Redeemable Preferred shares have no voting rights. All voting rights are vested in the holders of the 100,000 authorized Ordinary Shares owned by the Investment Manager.

The initial offering price of the Class A and C shares was $1,000. The Class J shares were initially offered at a price equal to the July 31, 2000 net asset value per share for the Class A shares. Valuations are determined on the last business day of each month.

The minimum investment in the fund is $1,000,000, subject to change at the discretion of the Fund, provided that no investment shall be for an amount less than $50,000. Redeemable Preferred Shares may be purchased monthly on the first business day of each calendar month and at such other times as are permitted by the Fund's directors. The proper documentation necessary to subscribe must be received by the fund at least two business days prior to the purchase date unless waived by the Fund. Redeemable Preferred Shares are offered at the net asset value as of the close of business on the last day of the immediately preceding month (the "Valuation Date").

Any holder of Redeemable Preferred Shares has the right to have all or a portion of his shares redeemed as of the last business day of any calendar month. The Fund must receive the redemption request at least 30 days prior to such redemption date or such shorter notice period at the discretion of the Directors. Redeemable Preferred Shares will be redeemed at the net asset value as of the close of business on such redemption date.

Preferred Shares transactions for the years ended December 31, 2004 and 2003 were as follows:

|  | Class A | Class C | Class J |
|---|---|---|---|
| Shares outstanding at December 31, 2002 | 21,962.716 | 221,212.470 | 7,476.243 |
| Conversion of shares | - | (75.187) | 80.137 |
| Shares issued | - | 66,789.953 | - |
| Shares redeemed | (16,203.578) | (14,314.725) | - |
| Shares outstanding at December 31, 2003 | 5,759.138 | 273,612.511 | 7,556.380 |
| Shares issued | - | 124,571.306 | 109.906 |
| Shares redeemed | (2,664.800) | (24,990.409) | (6,556.340) |
| Shares outstanding at December 31, 2004 | 3,094.338 | 373,193.408 | 1,109.946 |

14

NAT000120
NATSAA00000120.1

## Harley International (Cayman) Limited

### Notes to Financial Statements (continued)

#### 11. Related Party Transactions

Mr Anthony L.M. Inder Rieden and Mrs. Dawn E. Davies, members of the Board of Directors, are also directors of the Investment Manager of the Fund.

#### 12. Contingencies

In the normal course of business, the Fund has entered into contracts, which provide a variety of general indemnifications. Such contracts include those with the Fund's Administrator and Investment Manager. Any exposure to the Fund under these arrangements would involve future claims that may be made against the Fund. No such claims have occurred, nor are they expected to occur. Therefore, the Fund has not accrued any liability in connection with such indemnifications.

#### 13. Subsequent Events

During the period January 1, 2005 till July 22, 2005, 13,676.149 shares were redeemed for the amount of $44,396,048. The total shares subscribed during this period was 435,998.405 for the amount of $1,402,549,667.

15

NAT000121
NATSAA00000121.1