# EXHIBIT A

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>         Plaintiff-Applicant,<br><br>  v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>         Defendant. | Adv. Pro. No. 08-01789 (CGM)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated). |
| In re:<br><br>BERNARD L. MADOFF,<br><br>         Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff,<br><br>         Plaintiff,<br><br>  v.<br><br>UNIFORTUNE ASSET MANAGEMENT SGR SPA, on behalf of itself, Unifortune Conservative Fund, and Unifortune Conservative Fund–Side Pocket, and UNIFORTUNE CONSERVATIVE FUND,<br><br>         Defendants. | Adv. Pro. No. 11-02553 (CGM)<br><br><br><br>**AMENDED COMPLAINT** |

Irving H. Picard, as trustee (the "Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa-lll ("SIPA"), substantively consolidated with the chapter 7 estate of Bernard L. Madoff ("Madoff"), by and through his undersigned counsel, for his Amended Complaint against Unifortune Asset Management SGR S.p.A, now known as Unifortune Asset Management S.r.l ("Management"), on behalf of itself and Unifortune Conservative Fund ("Conservative Fund") and Unifortune Conservative Fund–Side Pocket ("Conservative Fund–Side Pocket"), and Conservative Fund as the real party in interest with respect to certain subsequent transfers (collectively referred to as "Defendants") alleges the following:

## I.    NATURE OF THE PROCEEDING

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS Customer Property, as defined by SIPA § 78lll(4), that was stolen as part of the massive Ponzi scheme perpetrated by Madoff and others. This adversary proceeding was commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending.

2.    In 2001, Management created the Conservative Fund—a fund of hedge funds promoted and managed by Management—as a vehicle to obtain access to BLMIS. Conservative Fund invested in BLMIS feeder funds Fairfield Sentry Limited ("Sentry") and Fairfield Sigma Limited ("Sigma," collectively with Sentry, the "Fairfield Funds"). BLMIS feeder funds were special purpose entities that invested all or substantially all of their assets with BLMIS's investment advisory business (the "IA Business").

3.    The Fairfield Funds are British Virgin Islands companies that are in liquidation.

4.      Sentry was the largest BLMIS feeder fund. Sentry invested in excess of 95% of its assets in BLMIS from November 1990 until Madoff's arrest in December 2008.

5.      Sigma, a Sentry sister fund, was a "currency fund" which accepted subscriptions in Euros, converted the money to U.S. Dollars, and then invested 100% of its assets in Sentry.

6.      The Fairfield Funds were created, operated, and controlled by Fairfield Greenwich Group ("FGG"), a *de facto* partnership founded by U.S. citizens and residents Walter Noel and Jeffrey Tucker. FGG maintained its principal place of business in New York.

7.      Defendants purposefully invested in the Fairfield Funds in order to profit from BLMIS in New York, and this adversary proceeding arises from Defendants' deliberate investment in New York-based funds.

8.      The Trustee seeks to recover at least $16,522,413 in subsequent transfers (the "Subsequent Transfers") of stolen BLMIS Customer Property made to Conservative Fund by the Fairfield Funds and now held, in part, by Conservative Fund–Side Pocket.

9.      Conservative Fund received BLMIS Customer Property by redeeming shares of the Fairfield Funds. Conservative Fund's purchases, and later redemptions, of the shares in the Fairfield Funds were governed by the subscription agreements that Defendants entered into with the Fairfield Funds. The subscription agreements governed the time, manner, and circumstances under which Management could make redemptions on behalf of Conservative Fund.

10.     Conservative Fund received at least $6,161,319 of stolen BLMIS Customer Property from Sentry between November 2005 and October 2007, and at least $10,361,245 from Sigma in March and October 2006.

11.     Management, a sophisticated asset management company with significant expertise in hedge fund investments, created, promoted, and managed Conservative Fund, including

Conservative Fund's investment in the Fairfield Funds. As an asset manager, Management was a fiduciary obligated by Italian securities laws to perform meaningful due diligence, including the duty to ensure assets were appropriately invested and safeguarded by the Fairfield Funds and BLMIS.

12.     In February 2009, during the pendency of this SIPA Proceeding, Management's board of directors set up Conservative Fund–Side Pocket with some of the assets of Conservative Fund and, upon information and belief, Management insiders received cash and shares in Conservative Fund–Side Pocket equal to those they held in Conservative Fund.

## II.    **DEFENDANTS**

13.     Management was an Italian SGR (*società di gestione del risparmio*, i.e., an asset management company) incorporated under the form of S.p.A. (*società per azioni*, i.e., a joint stock company), with an address at Via Donizetti 53, Milano 20122, Italy. In January 2018, Management filed for voluntary liquidation in Italy and changed its legal designation to an Italian S.r.l (*società a responsabilità limitata*, i.e., a limited liability company). Management is still in voluntary liquidation. Management's shareholders are Unifortune Asset Management SA, Franco Brunello, Patrizia Cavazzini, and the heirs of Alberto Giovannini (one of the founders of Management): as co-owners Patrizia Cavazzini, Tommaso Giovannini, Camilla Giovannini, and Federico Giovannini. Management received fees for managing Conservative Fund and received direct payments of retrocession fees from Sentry in return for soliciting and introducing new investors into Sentry.

14.     Conservative Fund, also located at Via Donizetti 53, Milano 20122, Italy, was a fund of hedge funds created, promoted, and managed by Management on behalf of investors. It invested in the Fairfield Funds. In February 2009, recognizing its exposure and upon advice of

counsel, Management created closed-end mutual fund Conservative Fund–Side Pocket from the partial demerger of Conservative Fund. Management facilitated the transfer of certain assets of Conservative Fund, including, upon information and belief, BLMIS Customer Property, into Conservative Fund–Side Pocket after the SIPA Proceeding was filed.

15.     Under Italian law (i.e., art. 36 of the Consolidated Law on Financial Intermediation), an investment fund "constitutes an autonomous asset, distinct from the assets of the management company and from that of each shareholder, as well as from any other assets managed by the same company; for the obligations contracted on behalf of the fund, the management company is liable exclusively with the fund's assets." Accordingly, the assets of Conservative Fund were required to be segregated from those of Management, but Management had the exclusive substantive and procedural right to act on behalf of Conservative Fund, and the formal ownership of Conservative Fund's assets, including those it later moved to Conservative Fund–Side Pocket.

16.     Defendants are subject to suit for the Subsequent Transfers and Conservative Fund's assets, including those transferred to insiders and Conservative Fund–Side Pocket, may be attached to a judgment in this adversary proceeding.

## III.    <u>SUBJECT MATTER JURISDICTION AND VENUE</u>

17.     The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities & Exchange Commission v. Bernard L. Madoff Investment Securities LLC*, *et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

18.     This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (F), (H) and (O). The

Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

19.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

20.    This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

## IV.    PERSONAL JURISDICTION

21.    Defendants are subject to the jurisdiction of the Bankruptcy Court under Bankruptcy Rule 7004 and the United States Constitution, as well as N.Y. C.P.L.R. § 302, because Conservative Fund and Management, on behalf of itself, Conservative Fund and Conservative Fund–Side Pocket, purposely availed themselves of the laws and protections of the United States and the State of New York.

22.    Defendants transacted business in New York, and the Trustee's claims arise from those business activities.

23.    Defendants derived significant revenue from New York and maintained minimum contacts and/or general business contacts in the United States and the State of New York in connection with the claims alleged herein.

24.    The Fairfield Funds were single-purpose funds whose sole purpose was to invest in BLMIS. Management, on behalf of itself and Conservative Fund, knowingly directed funds to be invested with and then redeemed from New York-based BLMIS through Sentry and Sigma. At all relevant times, the Fairfield Funds' principal place of business was in New York. By transacting with BLMIS and FGG, Conservative Fund and Management, on behalf of itself and as representative of Conservative Fund, knowingly accepted the rights, benefits, and privileges of conducting business and transactions in the United States and, specifically, New York.

25.     Management, on behalf of itself and Conservative Fund, knew and intended that the money it invested in Sigma would be invested by Sentry in New York.

26.     Defendants entered into a subscription agreement for each investment in the Fairfield Funds. These agreements incorporated each Fairfield Fund's private placement memoranda ("PPM") by reference. Defendants affirmed that they received and read the PPM in effect at the time and agreed to be bound by the terms of the PPMs. Based on these contracts, Defendants acknowledged the following facts that they were transacting in New York:

- Sentry invested at least 95% of its assets with New York-based BLMIS;

- FGG maintained its principal office in New York;

- The PPM would be governed and enforced in accordance with the laws of New York;

- Any suit, action or proceeding with respect to the PPM and Sentry may be brought in New York and irrevocably submitted to the jurisdiction of the New York courts in any proceeding with respect to the PPM;

- BLMIS's Split Strike Conversion ("SSC") Strategy purportedly involved the purchase of U.S. equities and U.S. put and call options traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;

- BLMIS was the sub-custodian of Sentry's investments with BLMIS; and

- BLMIS was "essential to the continued operation of" Sentry.

27.     Defendants used New York bank accounts to transfer money for subscriptions to and receive redemptions from the Fairfield Funds. The Sentry subscription agreements required that all subscription payments to Sentry be deposited in a HSBC Bank USA, N.A. ("HSBC") bank account in New York. From Sentry's bank account, the funds were deposited into BLMIS's account at JPMorgan Chase Bank in New York. Management, on behalf of Conservative Fund, received redemption payments from Sentry through at least six separate wire transfers from the same HSBC account.

28.    In at least two of the Sentry subscription agreements, Defendants agreed that the subscription agreements would be governed and enforced in accordance with the laws of New York, that any action or proceeding with respect to the agreements and Sentry may be brought in New York, and Defendants submitted to the jurisdiction of the New York courts and service of process.

29.    In addition, Management received fees under an April 2004 rebate agreement between Conservative Fund and New York-based FGG. A portion of the transfers to Management stemmed from this agreement from which it received rebates for investments with Sentry in an amount equal to 40 basis points of Sentry's management fee. The agreement was signed by Dan Lipton, an FGG partner who worked in New York.

30.    Management also received money in the form of retrocession fees, incentive fees, management and performance fees, or other compensation and remuneration related to, arising from, or concerning the Subsequent Transfers. Management availed itself of doing business in New York when it signed a Letter of Understanding with Fairfield Greenwich Limited of New York in November 2005. In the Letter of Understanding, Management agreed to solicit and introduce new investors in exchange for fees paid to Management in shares of Sentry and Sigma. Management also agreed that New York law governed the Letter of Understanding.

31.    Management's Portfolio Fund Manager, Manuela Cedarmas, and Head of Research, Ryan McRandal, had multiple direct interactions with FGG's New York personnel regarding Conservative Fund's investments in the Fairfield Funds.

32.    Cedarmas and McRandal corresponded with and talked to FGG's New York personnel frequently about Conservative Fund's investments in BLMIS through the Fairfield Funds.

33.    Between 2004 and 2006, Cedarmas or McRandal travelled to New York at least three times to meet with FGG executives, including Jeffrey Tucker and Amit Vijayvergiya, to probe the Fairfield Funds.

34.    At a 2004 in-person meeting in New York, FGG and Cedarmas explored a broad range of topics relating to Management's investment on behalf of Conservative Fund in BLMIS, including the history of FGG's relationship with Madoff, Sentry's correlation with market indexes, the SSC Strategy's assets under management, and BLMIS's execution of the SSC Strategy.

35.    In March 2005, Cedarmas flew back to New York to meet with FGG again. During this meeting, Cedarmas and FGG reviewed Sentry's 2004 returns, portfolio composition and risk profile, and BLMIS's assets under management.

36.    In January 2006, McRandal went to New York to meet with FGG where he was given a "corporate overview" of Sentry's operations. McRandal asked FGG substantive questions about BLMIS's SSC Strategy, including why Madoff hedged the strategy if his market timing was so good and why no one was able to replicate the strategy with the same degree of success as Madoff. McRandal asked to visit BLMIS's New York offices and meet Madoff, however, FGG refused. FGG's notes from the meeting indicate that Management was skeptical about Madoff. Later that year, McRandal asked to speak to FGG again because he "had heard the usual rumors on Madoff."

37.    Management, on behalf of Conservative Fund, engaged New York-based counsel and relied on that counsel's advice in creating Conservative Fund–Side Pocket and segregating certain assets of Conservative Fund into Conservative Fund–Side Pocket.

## V.    BACKGROUND

38.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents

for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding against Madoff and BLMIS. The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS.

39.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

40.     Also, on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

a.      appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

b.      appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

c.      removed the case to this Court pursuant to SIPA § 78eee(b)(4).

41.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

42.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

43.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC) (S.D.N.Y. March 12, 2009) (Docket No. 50), Madoff pleaded guilty to

an eleven-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." *Id*. at 23. Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id*. On June 29, 2009, Madoff was sentenced to 150 years in prison.

44.    At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. Among other things, DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS's IA Business customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s. *Id*. at 46.

45.    At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

46.    On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS's IA Business.

## VI.    THE TRUSTEE'S POWERS AND STANDING

47.    As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing Customer Property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors.

The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by BLMIS or Madoff to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

48.    Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of Chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

49.    The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code §§ 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## VII.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.    BLMIS

50.    Madoff founded BLMIS in or about 1960 as a sole proprietorship and registered as a broker-dealer with the SEC. In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company. At all relevant times, Madoff controlled BLMIS first as its sole member, and thereafter as its chairman and chief executive.

51.    In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a single broker-dealer from 1960 through 2008. Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer from January

19, 1960 through December 31, 2008. At all times, BLMIS was assigned CRD No. 2625. SIPC's

Membership Management System database also reflects BLMIS's registration with the SEC as a

securities broker-dealer beginning on January 19, 1960. On December 30, 1970, BLMIS became

a member of SIPC and continued its membership without any change in status until the Filing

Date. SIPC membership is contingent on registration of the broker-dealer with the SEC.

52.    For most of its existence, BLMIS's principal place of business was 885 Third

Avenue in New York City, where Madoff operated three principal business units: a proprietary

trading desk, a broker-dealer operation, and the IA Business. Madoff, as founder, sole owner,

chairman, and chief executive officer, operated BLMIS with several family members and other

employees, including DiPascali and Kugel, who pleaded guilty to helping Madoff carry out the

fraudulent scheme.

53.    BLMIS's website publicly boasted about the sophistication and success of its

proprietary trading desk and broker-dealer operations, which were well known in the financial

industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an

investment adviser with the SEC until 2006, following an investigation by the SEC, which forced

Madoff to register.

54.    For more than 20 years preceding that registration, the financial reports BLMIS

filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds

BLMIS managed through its IA Business.

55.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment

Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total

assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January

2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1

billion. In reality, Madoff grossly understated these numbers. In 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

### B.    The Ponzi Scheme

56.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

57.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the IA Business customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

58.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

59.     On or about November 3, 2009, David Friehling, the sole proprietor of Friehling &

Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for

Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these

fictitious annual audited financial statements prepared by Friehling & Horowitz.

1.     <u>Madoff's Investment Strategy</u>

60.     BLMIS purported to execute two primary investment strategies for IA Business

customers: the convertible arbitrage strategy and the SSC Strategy. For a limited group of IA

Business customers, primarily consisting of Madoff's close friends and their families, Madoff also

purportedly purchased securities that were held for a certain time and then purportedly sold for a

profit. At all relevant times, BLMIS conducted no legitimate business operations using any of

these strategies.

61.     All funds received from IA Business customers were commingled in a single

BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to

trade securities, but rather to make distributions to, or payments for, other customers, to benefit

Madoff and his family personally, and to prop up BLMIS's proprietary trading business.

62.     The convertible arbitrage investment strategy was supposed to generate profits by

taking advantage of the pricing mismatches that can occur between the equity and bond/preferred

equity markets. Investors were told they would gain profits from a change in the expectations for

the stock or convertible security over time. In the 1970s, this strategy represented a significant

portion of the total IA Business accounts, but by the early 1990s, the strategy was purportedly used

in only a small percentage of IA Business accounts.

63.     From the early 1990s forward, Madoff began telling IA Business customers that

BLMIS employed the SSC Strategy for their accounts, even though in reality BLMIS never traded

any securities for its IA Business customers. BLMIS reported falsified trades using backdated trade

data on monthly account statements sent to IA Business customers that typically reflected substantial consistent gains on the customers' principal investments.

64.     By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options, and (iii) the sale of out-of-the-money S&P 100 Index call options.

65.     The put options were to limit the downside risk of sizeable price changes in the basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option would entail a loss for BLMIS.

66.     The sale of call options would partially offset the costs associated with acquiring puts, but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

67.     The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protection while limiting the upside.

68.     If Madoff was putting on the same baskets of equities across *all* BLMIS Accounts, as he claimed, the total notional value of the puts purchased and calls sold had to equal the market value of the equities in the basket. For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in

billions of notional dollars.

69.     Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call or put option notional value to support the BLMIS SSC Strategy.

70.     Sophisticated or professional investors knew Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P Index over the same time period. Not only did BLMIS post gains that exceed (at times, significantly) the S&P 100 Index's performance, it would regularly show gains when the S&P 100 Index was down (at times, significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

### 2.     BLMIS's Fee Structure

71.     BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM and profits respectively. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

### 3.     BLMIS's Market Timing

72.     Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he succeeded market timing by intermittently entering and exiting the market. During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

73.     As a registered broker-dealer, BLMIS was required, pursuant to 17 C.F.R. §

240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS reportedly exited the market completely at every year end and the end of every quarter starting in 2003. These quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time. Yet this is precisely what BLMIS's customer statements reported.

74.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

4.    No Evidence of BLMIS Trading

75.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

76.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

5.    The Collapse of the Ponzi Scheme

77.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests

for redemptions overwhelmed the flow of new investments.

78.     Based on the Trustee's investigation, it appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. At the time the Ponzi scheme came to light in December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

79.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements, and that the IA Business operated as a Ponzi scheme.

80.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

VIII.   **MANAGEMENT AND CONSERVATIVE FUND**

81.     In February 1998, Italy passed Legislative Decree No. 58, Consolidated Law on Finance (the "1998 Decree") that, for the first time, made it legal to operate a hedge fund in Italy.

82.     Management was founded under the 1998 Decree by Italian brothers, Vittorio and Dr. Franco Brunello. It was one of the first SGRs to offer hedge funds as investment options in Italy.

83.     An SGR, like Management, was authorized by the Bank of Italy to provide collective investment management services. As required by Italian law, Management's exclusive

purpose was the establishment and management of hedge funds like Conservative Fund.

84.    Management opened Conservative Fund in 2001.

85.    Under the 1998 Decree and subsequent amendments, Conservative Fund lacks an autonomous legal existence, and is a separate asset of Management, which has formal ownership of and is entitled to take action in court to ascertain the rights pertaining to the assets of Conservative Fund. Conservative Fund's assets are distinct from the assets of Management and from that of each participant, as well as any other assets managed by Management. Accordingly, Conservative Fund is the real party in interest with respect to the Subsequent Transfers of stolen Customer Property that it received.

86.    The promotion, institution, and organization of Conservative Fund was entrusted to Management. It took on the role of "promoting company" (with tasks such as promotion, establishment and organization of Conservative Fund, as well as the management of relationships with its participants) and as "manager" (with the task of managing the assets of Conservative Fund and handling the respective investments).

87.    Specifically, as the manager of Conservative Fund, Management was required to comply with the regulations governing SGRs, which are designed to ensure sound and prudent management based on diligence, fairness, and transparency. The SGR must provide itself with adequate technology, qualified human resources, and it must adopt policies and procedures to, among other things, evaluate the managed funds' assets, identify and manage of any conflicts of interest, and direct the investment and divestment process.

88.    Management had complete control over directing and managing Conservative Fund. Management certified to the Bank of Italy and the Commissione Nazionale per le Società e la Borsa (CONSOB)—both Italian supervisory authorities—that it was competent to perform

adequate due diligence and had systems in place to identify fraud. Management was the formal

legal "owner" of the assets comprising Conservative Fund. It was nevertheless responsible for

assuring that the assets of Conservative Fund were not subjected to the dominion or will of

Management's interest to the detriment of Conservative Fund.

IX.    **DEFENDANTS' INVESTMENT ACTIVITIES**

89.    The stated objective of Conservative Fund was to preserve capital while increasing

absolute performance over time. The Conservative Fund's marketing materials highlighted this

strategy, touting a reduced volatility profile.

90.    The BLMIS SSC Strategy outwardly met this criteria and Management, on behalf

of itself and Conservative Fund, initially gained access to BLMIS through a BLMIS feeder fund

purportedly executing the SSC Strategy called Kingate Global Ltd. ("Kingate Global").

91.    In 2004, Management continued to expand its investments by subscribing to two

other BLMIS single purpose feeder funds—Sentry and Sigma—that offered the same SSC

Strategy that Kingate Global marketed.

92.    Management redeemed Conservative Fund's investments with Sentry ($6,141,167)

between November 2005 and October 2007.

93.    Management redeemed Conservative Fund's investment with Sigma ($10,417,327)

in March and October 2006.

94.    Following Madoff's arrest and the Filing Date, Management took steps to shield

Conservative Fund's assets from the Trustee's recovery effort.

95.    Specifically, in February 2009, Management's board of directors set up a closed-

end mutual fund called "Unifortune Conservative Fund–Side Pocket," originating from some of

the assets of Conservative Fund. Those assets, which include Customer Property, remain in

Conservative Fund–Side Pocket.

## X.    RECOVERY OF SUBSEQUENT TRANSFERS

### A.    Initial Transfers from BLMIS to Sentry

96.    The Trustee commenced a separate adversary proceeding against Sentry and other defendants in this Court under the caption, *Picard v. Fairfield Sentry, Ltd., et al.*, Adv. Pro. No. 09-01239 (SMB), seeking to avoid and recover initial transfers of Customer Property from BLMIS to Sentry in the approximate amount of $3,000,000,000 (the "Sentry Initial Transfers"). Sentry held multiple accounts with BLMIS, as set forth in Exhibit A. The Sentry Initial Transfers are set forth in the attached Exhibit B.

97.    The Sentry Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4).

98.    Under the Bankruptcy Court's June 7 and June 10, 2011 orders, the Bankruptcy Court approved a settlement among the Trustee, Sentry, and others, and on July 13, 2011, the Bankruptcy Court entered a consent judgment granting the Trustee a judgment in the amount of $3,054,000,000 ("Judgment Amount"). *Id.*, ECF No. 109.

99.    On August 28, 2020, the Trustee filed a second amended complaint in the *Sentry Ltd.* proceeding ("Second Amended Complaint") seeking, in part, recovery of the Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a declaratory judgment that the Sentry Initial Transfers comprising the Judgment Amount are avoided. *Id.* (Bankr. S.D.N.Y. Aug. 28, 2020), ECF No. 286.

100.    As alleged in the Second Amended Complaint, Sentry received each of the Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Sentry to inquire further into the BLMIS fraud. The Trustee

incorporates by reference the allegations contained in the Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, and 315-16.

101.    Of the Judgment Amount, $2,895,000,000 was transferred to Sentry during the six years preceding the Filing Date (the "Sentry Six Year Transfers"). Each of the Sentry Six Year Transfers is avoidable under Bankruptcy Code § 544, the applicable provisions of the New York Fraudulent Conveyance Act ("N.Y. Debt. & Cred. Law"), particularly §§ 273-279, and SIPA, particularly § 78fff-2(c)(3).

102.    Of the Sentry Six Year Transfers, $1,580,000,000 was transferred to Sentry during the two years preceding the Filing Date (the "Sentry Two Year Transfers"). Each of the Sentry Two Year Transfers is avoidable under Bankruptcy Code § 548, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**B.    Subsequent Transfers from Sentry to Defendants**

103.    Based on the Trustee's investigation to date, prior to the Filing Date, Sentry subsequently transferred a portion of the Sentry Initial Transfers to Conservative Fund. Such subsequent transfers were accepted by Management on behalf of Conservative Fund. Based on the Trustee's investigation to date, the subsequent transfers of Customer Property to Conservative Fund total $6,161,319 ("Conservative Fund-Sentry Subsequent Transfers"). A chart setting forth the presently known Conservative Fund-Sentry Subsequent Transfers by date and amount is attached as Exhibit C.

104.    The Conservative Fund-Sentry Subsequent Transfers are recoverable from Defendants under Bankruptcy Code § 550(a), and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

105.    The Conservative Fund-Sentry Subsequent Transfers represent a redemption of equity interests by Defendants as shareholders in Sentry. Because Sentry invested all or

substantially all of its assets into the BLMIS Ponzi scheme, Sentry was insolvent when it made the Sentry Subsequent Transfers to Defendants upon redemption of their interests.

106.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Initial and Conservative Fund-Sentry Subsequent Transfers discussed above, and any additional subsequent transfers; (ii) seek avoidance and recovery of such transfers; and (iii) trace and recover any post-December 2008 transfers of the assets of Conservative Fund transferred to Conservative Fund–Side Pocket or Management insiders by Management.

### C.    Subsequent Transfers from Sentry to Sigma and Subsequently to Defendants

107.    Prior to the Filing Date, Sentry subsequently transferred Customer Property of at least $801,106,773 of the Sentry Initial Transfers to Sigma ("Sigma Subsequent Transfers"). A chart setting forth the presently known Sigma Subsequent Transfers is attached as Exhibit D.

108.    Thereafter, Sigma transferred at least $10,361,245 of Customer Property to Conservative Fund (the "Conservative Fund-Sigma Subsequent Transfers"). A chart setting forth the presently known Conservative Fund-Sigma Subsequent Transfers is attached as Exhibit E.

109.    The Conservative Fund-Sigma Subsequent Transfers are recoverable from Defendants under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

110.    The Conservative Fund-Sigma Subsequent Transfers represent a redemption of equity interests by Defendants as shareholders in Sigma. Because Sigma invested all or substantially all its assets into the BLMIS Ponzi scheme, Sigma was insolvent when it made the Conservative Fund-Sigma Subsequent Transfers to Defendants upon redemption of its interests.

111.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Sigma Subsequent Transfers and Conservative

Fund-Sigma Subsequent Transfers discussed above, and any additional subsequent transfers; (ii)

seek avoidance and recovery of such transfers; and (iii) trace and recover any post-December 2008

transfers of the assets of Conservative Fund transferred to Conservative Fund–Side Pocket or

Management insiders by Management.

112.    The Conservative Fund-Sentry Subsequent Transfers and the Conservative Fund-

Sigma Subsequent Transfers, as defined above, are collectively referred to as the "Subsequent

Transfers."

**COUNT ONE**
**RECOVERY OF SUBSEQUENT TRANSFERS**
**11 U.S.C. §§ 105(a) AND 550(a)**

113.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten herein.

114.    The Subsequent Transfers are recoverable from Defendants under Bankruptcy

Code § 550(a) and SIPA § 78fff-2(c)(3).

115.    Each of the Subsequent Transfers was made directly or indirectly to Defendants,

thus, Defendants are immediate or mediate transferees of the Initial Transfers from Sentry and

Subsequent Transfers from Sigma.

116.    As a result of the foregoing, pursuant to Bankruptcy Code §§ 105(a) and 550(a),

and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendants: (a) recovering

the Subsequent Transfers, or the value thereof, from Defendants for the benefit of the estate of

BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on the

Count in favor of the Trustee and against Defendants as follows:

a.      Recovering the Subsequent Transfers, or the value thereof, from Conservative Fund, including those transferred to Conservative Fund–Side Pocket or Management insiders by Management, for the benefit of the estate of BLMIS;

b.      If Defendants challenge the avoidability of the Sentry Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such transfers are avoidable pursuant to SIPA § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and §§ 273-279 of the N.Y. Debt. & Cred. Law, as applicable, and as necessary to recover the Transfers pursuant to Bankruptcy Code §550(a) and (b) and SIPA § 78fff-2(c)(3);

c.      Awarding the Trustee fees and all applicable costs and disbursements of this adversary proceeding;

d.      Awarding the Trustee prejudgment interest from the date on which the Subsequent Transfers were received; and

e.      Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.


Dated:  _____          /s/ David J. Sheehan___
        New York, New York            **Baker & Hostetler LLP**
                                      45 Rockefeller Plaza
                                      New York, New York 10111
Of Counsel:                           Telephone: (212) 589-4200
                                      Facsimile: (212) 589-4201
**Baker & Hostetler LLP**             David J. Sheehan
811 Main Street, Suite 1100           Torello Calvani
Houston, Texas 77002
Telephone: (713) 751-1600             *Attorneys for Irving H. Picard, Trustee*
Facsimile: (713) 751-1717             *for the Substantively Consolidated SIPA*
Dean D. Hunt                          *Liquidation of Bernard L. Madoff*
Farrell A. Hochmuth                   *Investment Securities LLC and the*
Sarah M. Hayes                        *Chapter 7 Estate of Bernard L. Madoff*