**BAKER & HOSTETLER LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01690 (CGM) |
| Plaintiff, | **TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS TRUSTEE'S AMENDED COMPLAINT** |
| v. | |
| EFG BANK S.A., f/k/a EFG Private Bank S.A., EFG BANK (MONACO) S.A.M., f/k/a EFG Eurofinancière d'Investissements S.A.M., EFG BANK & TRUST (BAHAMAS) LIMITED, as successor-in-interest to Banco Atlántico (Bahamas) Bank & Trust Limited, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ....................................................................................4

I.      THE BLMIS PONZI SCHEME AND ITS FEEDER FUNDS............................................4

II.     DEFENDANTS INVESTED WITH BLMIS THROUGH THE FAIRFIELD
        FUNDS ..............................................................................................5

III.    THE FAIRFIELD SETTLEMENT...........................................................................7

ARGUMENT ..............................................................................................7

I.      THE COURT HAS SPECIFIC PERSONAL JURISDICTION OVER EACH
        DEFENDANT............................................................................................7

        A.      Defendants Purposefully Availed Themselves of the Laws and Privileges
                of New York by Investing in BLMIS through the Fairfield Funds ........................ 8

                1.      Defendants' Intentional Investments with BLMIS through the
                        Fairfield Funds Establish Minimum Contacts ...............................................9

                        a.      *BLI* and Recent Decisions of this Court Establish
                                Jurisdiction....................................................................10

                        b.      *Walden* Does Not Save Defendants from this Court's
                                Jurisdiction...................................................................11

                2.      Defendants' Additional Contacts with New York in Connection
                        with Their Investments also Establish Minimum Contacts .......................14

                        a.      Defendants Directed Communications Regarding Their
                                Investments with BLMIS Through Feeder Funds to New
                                York .........................................................................14

                                i)       In addition to visiting and regularly communicating
                                         with FGG, EFG Bank employees met with Madoff..........14

                                ii)      After acquiring part of Banco Atlántico, EFG
                                         Bahamas employees regularly corresponded with
                                         FGG..................................................................15

                                iii)     EFG Monaco employees met with Madoff and
                                         regularly corresponded with FGG .....................................16

b.    Defendants' Purposeful Use of New York Bank Accounts Supports Specific Jurisdiction.......................................................17

c.    The Subscription Agreements Evidence a Strong Nexus with New York................................................................................22

d.    Defendants' Contacts Through EFG Capital Support Specific Jurisdiction......................................................................23

3.    Defendants' Contacts with the Forum are Sufficiently Related to the Trustee's Claims .................................................................25

4.    Defendants' Remaining Arguments Against Jurisdiction Are Unavailing........................................................................................26

B.    The Exercise of Personal Jurisdiction over Defendants Is Reasonable ................ 27

C.    In the Alternative, the Trustee Is Entitled to Jurisdictional Discovery................ 28

II.    THE TRUSTEE'S CLAIMS ARE NOT BARRED UNDER 11 U.S.C. § 546(e) ...........28

A.    The Fairfield Funds Had Actual Knowledge of Madoff's Fraud ..............29

B.    Section 546(e) Does Not Apply Independently to Recovery Actions ...........................................................................................30

III.    THE TRUSTEE'S AMENDED COMPLAINT STATES A PLAUSIBLE CAUSE OF ACTION FOR RECOVERY OF BLMIS CUSTOMER PROPERTY UNDER SECTION 550(a) ....................................................................................................31

A.    Defendants Misstate the Trustee's Pleading Burden ................................32

B.    Defendants' Other Implausibility Arguments Fail on a Motion to Dismiss.......................................................................................33

IV.    THE SECTION 550(B) GOOD FAITH AFFIRMATIVE DEFENSE CANNOT BE RESOLVED AT THE MOTION TO DISMISS STAGE ...........................................36

CONCLUSION...................................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*,
    599 B.R. 730 (Bankr. S.D.N.Y. 2019) ................................................................32, 33

*Al Rushaid v. Pictet & Cie*,
    28 N.Y.3d 316 (N.Y. 2016) ..............................................................................13, 19

*In re Amaranth Nat. Gas Commodities Litig.*,
    587 F. Supp. 2d 513 (S.D.N.Y. 2008), *aff'd sub nom. Gracey v. J.P. Morgan*
    *Chase & Co. (In re Amaranth Nat. Gas Commodities Litig.)*, 730 F.3d 170
    (2d Cir. 2013) ......................................................................................................12

*Angell v. Ber Care, Inc. (In re Caremerica, Inc.)*,
    409 B.R. 737 (Bankr. E.D.N.C. 2009) ..................................................................33

*Ayyash v. Bank Al-Madina*,
    No. 04 Civ. 9201(GEL), 2006 WL 587342 (S.D.N.Y. Mar. 9, 2006) ....................28

*Bahrain Islamic Bank v. Arcapita Bank (In re Arcapita Bank B.S.C.(C))*,
    640 B.R. 604 (S.D.N.Y. 2022) ........................................................................18, 21

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
    902 F.2d 194 (2d Cir. 1990) ............................................................................7, 8

*In re Bernard L. Madoff Inv. Sec. LLC (Picard v. Ida Fishman Revocable Tr.)*,
    773 F.3d 411 (2d Cir. 2014) ................................................................................29

*In re Bernard L. Madoff Secs. LLC*, No. 20-CV-02586 (CM), 2022 WL 1304589
    (S.D.N.Y. May 2, 2022) ("*ABN Ireland*") ................................................36, 38, 39

*Bulova Watch Co. v. Hattori & Co.*,
    508 F. Supp. 1322 (E.D.N.Y. 1981) ....................................................................24

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ........................................................................................23, 27

*Chase Manhattan Bank v. Banque Generale Du Com.*,
    No. 96-cv-5184 (KMW), 1997 WL 266968 (S.D.N.Y. May 20, 1997) ..................23

*Chloé v. Queen Bee of Beverly Hills, LLC*,
    616 F.3d 158 (2d Cir. 2010) ............................................................................8, 27

*CNB Int'l Inc. v. Kelleher (In re CNB Int'l, Inc.)*,
    393 B.R. 306 (Bankr. W.D.N.Y. 2008) ................................................................34

*Dahar v. Jackson (In re Jackson)*,
  318 B.R. 5 (Bankr. D.N.H. 2004) ........................................................................ 34

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
  722 F.3d 81 (2d Cir. 2013) .................................................................................... 7

*Dorfman v. Marriott Int'l Hotels, Inc.*,
  No. 99 CIV 10496 (CSH), 2002 WL 14363 (S.D.N.Y. Jan. 3, 2002) .................... 24

*In re Dreier LLP*,
  452 B.R. 391 (Bankr. S.D.N.Y. 2011) .................................................................. 37

*Eldesouky v. Aziz*,
  No. 11-cv-6986 (JLC), 2014 WL 7271219 (S.D.N.Y. Dec. 19, 2014) .................. 18

*Fairfield Sentry Ltd. v. Migani*
  [2014] UKPC 9 ...................................................................................................... 22

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
  No. 10-13164 (SMB), Adv No. 10-03496 (SMB), 2018 WL 3756343 (Bankr.
  S.D.N.Y. Aug. 6, 2018), *aff'd sub nom.*, *Fairfield Sentry Ltd. v. Citibank, N.A.
  London*, No. 19-CV-3911 (VSB), 2022 WL 4391023
  (S.D.N.Y. Sept. 22, 2022) (amended) ............................................................. 22, 23

*Ferrante Equip. Co. v. Lasker-Goldman Corp.*,
  31 A.D.2d 355 (N.Y. App. Div. 1969), *aff'd*, 26 N.Y.2d 280 (N.Y. 1970) ............ 13

*Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*,
  141 S. Ct. 1017 (2021) .................................................................................. *passim*

*Frummer v. Hilton Hotels Int'l, Inc.*,
  19 N.Y.2d 533 (N.Y. 1967) .................................................................................. 24

*Garfinkle v. Conference on Jewish Material Claims Against Germany, Inc.*,
  No. 19-CV-7007 (JPO), 2020 WL 6323462 (S.D.N.Y. Oct. 28, 2020) .................. 34

*Golden Archer Invs., LLC v. Skynet Fin. Sys.*,
  No. 11 Civ. 3673 (RJS), 2012 WL 123989 (S.D.N.Y. Jan. 3, 2012) ...................... 14

*Hau Yin To v. HSBC Holdings PLC*,
  No. 15CV3590-LTS-SN, 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017) ............... 20, 21

*Hill v. HSBC Bank PLC*,
  207 F. Supp. 3d 333 (S.D.N.Y. 2016) .............................................................. 20, 21

*Howell, III v. Fulford (In re S. Home & Ranch Supply, Inc.)*,
  Nos. 11-12755, 13-1043, 2013 WL 7393247 (Bankr. N.D. Ga. 2013) .................. 33

*HSH Nordbank AG N.Y. Branch v. Street*,
No. 11 Civ. 9405 (DLC), 2012 WL 2921875 (S.D.N.Y. July 18, 2012)................................19

*IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*,
408 F.3d 689 (11th Cir. 2005) ..............................................................................................35

*Int'l Shoe Co. v. State of Washington*,
326 U.S. 310 (1945)...............................................................................................................26

*J. McIntyre Mach., Ltd. v. Nicastro*,
564 U.S. 873 (2011)...............................................................................................................13

*Jesner v. Arab Bank, PLC*,
138 S. Ct. 1386 (2018)...........................................................................................................21

*Kelly–Brown v. Winfrey*,
717 F.3d 295 (2d Cir. 2013)...................................................................................................37

*King Cnty., Wash. v. IKB Deutsche Industriebank AG*,
712 F. Supp. 2d 104 (S.D.N.Y. 2010)....................................................................................23

*Kiobel v. Royal Dutch Petroleum Co.*,
No. 02 Civ. 7618 (KMW) (HBP), 2009 WL 3817590
(S.D.N.Y. Nov. 16, 2009) ......................................................................................................28

*Leema Enters., Inc. v. Willi*,
575 F. Supp. 1533 (S.D.N.Y. 1983).......................................................................................19

*Letom Mgmt. Inc. v. Centaur Gaming, LLC*,
No. 17-CV-3793 (PAE), 2017 WL 4877426 (S.D.N.Y. Oct. 27, 2017)..................................19

*Liberatore v. Calvino*,
293 A.D.2d 217 (N.Y. App. Div. 2002) .................................................................................14

*Licci v. Lebanese Canadian Bank, SAL*,
20 N.Y.3d 327 (N.Y. 2012) ...................................................................................................19

*Licci ex rel Licci v. Lebanese Canadian Bank, SAL*,
673 F.3d 50 (2d Cir. 2012).....................................................................................................19

*Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*,
12 N.E.3d 456 (N.Y. 2014).....................................................................................................21

*In re Mexican Gov't Bonds Antitrust Litig.*,
No. 18-CV-2830 (JPO), 2020 WL 7046837 (S.D.N.Y. Nov. 30, 2020) .................................13

*In re Motors Liquidation Co.*,
565 B.R. 275 (Bankr. S.D.N.Y. 2017).....................................................................................21

*O'Toole v. MyPlace Dev. SP. Z O.O. (In re Sledziejowski)*,
 Adv. Pro. No. 15-08207 (SHL), 2016 WL 6155929
 (Bankr. S.D.N.Y. Oct. 21, 2016) ...................................................................................19

*Off. Comm. Of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*,
 549 B.R. 56 (S.D.N.Y. 2016).................................................................................18, 25

*Palmieri v. Estefan*,
 793 F. Supp. 1182 (S.D.N.Y. 1992)...............................................................................24

*Picard v. Avellino (In re BLMIS)*,
 557 B.R. 89 (Bankr. S.D.N.Y. 2016) .............................................................................38

*Picard v. Banca Carige S.P.A. (In re Bernard L. Madoff)*,
 No. 11-02570 (CGM), 2022 WL 2387522 (Bankr. S.D.N.Y. June 30, 2022)................. *passim*

*Picard v. Bank Julius Baer & Co. (In re BLMIS)*,
 No. 11-02922 (CGM), 2022 WL 17726520 (Bankr. S.D.N.Y. Dec. 15, 2022)............... *passim*

*Picard v. Bank Vontobel (In re Bernard L. Madoff)*,
 No. 12-01202 (CGM), 2022 WL 17087560 (Bankr. S.D.N.Y. Nov. 18, 2022).............. *passim*

*Picard v. Banque SYZ & Co., SA (In re Bernard L. Madoff)*,
 No. 11-02149 (CGM), 2022 WL 2135019 (Bankr. S.D.N.Y. June 14, 2022)................. *passim*

*Picard v. BNP Paribas S.A. (In re BLMIS)*,
 594 B.R. 167 (Bankr. S.D.N.Y. 2018) .............................................................. *passim*

*Picard v. Bureau of Labor Ins. (In re BLMIS)*,
 480 B.R. 501 (Bankr. S.D.N.Y. 2012) (Lifland, J.)....................................................... *passim*

*Picard v. Cathay Life Ins. Co. (In re Bernard L. Madoff)*,
 No. 11-02568 (CGM), 2022 WL 16626325 (Bankr. S.D.N.Y. Nov. 1, 2022) ........2, 10, 31, 32

*Picard v. Charles Ellerin Rev. Tr. (In re BLMIS)*,
 No. 10-04398 (BRL), 2012 WL 892514 (Bankr. S.D.N.Y. Mar. 14, 2012).....................32, 34

*Picard v. Citibank, N.A. (In re BLMIS)*,
 12 F.4th 171 (2d Cir. 2021) ....................................................................................4, 38

*Picard v. Cohmad Secs. Corp. (In re BLMIS)*,
 454 B.R. 317 (Bankr. S.D.N.Y. 2011) .............................................................................35

*Picard v. Credit Suisse AG, as successor-in-interest to Clariden Leu AG and Bank
 Leu AG (In re Bernard L. Madoff)*, No. 12-01676 (CGM), 2022 WL 17098739
 (Bankr. S.D.N.Y. Nov. 21, 2022) ..........................................................................2, 36, 38, 39

*Picard v. Credit Suisse AG (In re Bernard L. Madoff)*,
   No. 11-02925 (CGM), 2022 WL 17098676 (Bankr. S.D.N.Y. Nov. 21, 2022) ............2, 36, 37

*Picard v. Delta Nat'l Bank and Tr. Co. (In re Bernard L. Madoff)*,
   No. 11-02551 (CGM), 2022 WL 3365256 (Bankr. S.D.N.Y. Aug. 12, 2022) ....................2, 36

*Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*,
   627 B.R. 546 (Bankr. S.D.N.Y. 2021) ..................................................................................8, 25

*Picard v. Fairfield Inv. Fund, Ltd.*, *(In re Bernard L. Madoff)*,
   Adv. Pro. No. 09-01239 (CGM), 2021 WL 3477479
   (Bankr. S.D.N.Y. Aug. 6, 2021) ..................................................................................... *passim*

*Picard v. First Gulf Bank (In re Bernard L. Madoff)*,
   No. 11-02541 (CGM), 2022 WL 3354955 (Bankr. S.D.N.Y. July 18, 2022) .........2, 36, 38, 39

*Picard v. Korea Exch. Bank (In re Bernard L. Madoff)*,
   No. 11-02572 (CGM), 2022 WL 4371908 (Bankr. S.D.N.Y. Sept. 21, 2022)........2, 26, 30, 33

*Picard v. Lombard Odier & Cie SA (In re Bernard L. Madoff)*,
   No. 12-01693 (CGM), 2022 WL 2387523 (Bankr. S.D.N.Y. June 30, 2022)....................2, 11

*Picard v. Maxam Absolute Return Fund, L.P. (In re BLMIS)*,
   460 B.R. 106 (Bankr. S.D.N.Y. 2011) ....................................................................................27

*Picard v. Meritz Fire & Marine Ins. Co. (In re Bernard L. Madoff)*,
   No. 11-02539 (CGM), 2022 WL 3273044 (Bankr. S.D.N.Y. Aug. 10, 2022) ..............2, 14, 18

*Picard v. Merkin (In re BLMIS)*,
   515 B.R. 117 (Bankr. S.D.N.Y. 2014) ...............................................................31, 33, 35, 36

*Picard v. Merkin (In re BLMIS)*,
   440 B.R. 243 (Bankr. S.D.N.Y. 2010) ..............................................................................37, 39

*Picard v. Merkin (In re BLMIS)*,
   581 B.R. 370 (Bankr. S.D.N.Y. 2017)......................................................................................36

*Picard v. Multi-Strategy Fund Ltd. (In re Bernard L. Madoff)*,
   641 B.R. 78 (Bankr. S.D.N.Y. 2022)............................................................................. *passim*

*Picard v. Multi-Strategy Fund Ltd.*,
   No. 22-CV-06502 (JSR), 2022 WL 16647767 (S.D.N.Y. Nov. 3, 2022)..............28, 29, 30, 31

*Picard v. Parson Fin. Panama S.A. (In re Bernard L. Madoff)*,
   No. 11-02542 (CGM), 2022 WL 3094092 (Bankr. S.D.N.Y. Aug. 3, 2022) ................2, 14, 18

*Picard v. Pub. Inst. for Soc. Sec. (In re Bernard L. Madoff)*,
   No. 12-01002 (CGM), 2022 WL 3458962 (Bankr. S.D.N.Y. Aug. 17, 2022) ...................2, 14

*Picard v. Société Générale Private Banking (Suisse) S.A. (In re BLMIS)*,
No. 12-01677, 2022 WL 4349859 (Bankr. S.D.N.Y. Sept. 19, 2022)............................10, 11

*Picard v. Union Sec. Inv. Trust Co. (In re BLMIS)*,
No. 12-01211 (CGM), 2022 WL 3572509 (Bankr. S.D.N.Y. Aug. 18, 2022)
(amended) ....................................................................................................................2, 14

*In re Picard*,
917 F.3d 85 (2d Cir. 2019)......................................................................................................9

*Rosenblatt v. Coutts & Co. AG*,
No. 17-cv-3528 (AKH), 2017 WL 3493245 (S.D.N.Y. Aug. 14, 2017) ................................20

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
624 F.3d 123 (2d Cir. 2010)....................................................................................................8

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
516 B.R. 18 (S.D.N.Y. 2014)..................................................................................................38

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
No. 12-MC-115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013).............................30, 31

*Southmark Corp. v. Schulte Roth & Zabel (In re Southmark Corp.)*,
239 F.3d 365, 2000 WL 1741550 (5th Cir. Dec. 11, 2000)....................................................35

*SPV Osus Ltd. v. UBS AG*,
114 F. Supp. 3d 161 (S.D.N.Y. 2015)....................................................................................21

*Tamam v. Fransabank Sal*,
677 F. Supp. 2d 720 (S.D.N.Y. 2010)....................................................................................20

*Tera Grp., Inc. v. Citigroup, Inc.*,
No. 17-cv-4302 (RJS), 2018 WL 4732426 (S.D.N.Y. Sept. 28, 2018) ...............................8, 26

*Tousa Homes, Inc. v. Palm Beach Newspapers, Inc. (In re TOUSA, Inc.)*,
442 B.R. 852 (Bankr. S.D. Fla. 2010)....................................................................................33

*United States v. Henshaw*,
388 F.3d 738 (10th Cir. 2004)................................................................................................35

*United States v. Space Hunters, Inc.*,
429 F.3d 416 (2d Cir. 2005)....................................................................................................37

*United Teamster Fund v. MagnaCare Admin. Servs., LLC*,
39 F. Supp. 3d 461 (S.D.N.Y. 2014).................................................................................36, 37

*Universal Trading & Inv. Co. v. Tymoshenko*,
No. 11-CV-7877 (PAC), 2012 WL 6186471 (S.D.N.Y. 2012) ...............................................21

*Walden v. Fiore*,
571 U.S. 277 (2014)...........................................................................................11, 12, 13, 14

*Waldman v. Palestine Liberation Org.*,
835 F.3d 317 (2d Cir. 2016)..........................................................................................27

*Wiwa v. Royal Dutch Petrol. Co.*,
226 F.3d 88 (2d Cir. 2000).............................................................................................24

*Zim Integrated Shipping Servs. v. Bellwether Design Techs. LLC*,
No. 19-CV-3444 (VSB), 2020 WL 5503557 (S.D.N.Y. Sept. 10, 2020) ...............................12

*Zucker v. Oconee Reg'l Healthcare Found., Inc. (In re Oconee Reg'l Health Sys.,
Inc.)*, 621 B.R. 64 (Bankr. M.D. Ga. 2020) ...........................................................................33

**Statutes**

11 U.S.C. § 546(e) ...................................................................................... *passim*

11 U.S.C. § 548(a)(1)(A) .........................................................................................30

11 U.S.C. § 550...........................................................................................................30

11 U.S.C. § 550(a) ...........................................................................................3, 30, 33, 34

11 U.S.C. § 550(a)(2) ................................................................................................34

11 U.S.C. § 550(b) ...........................................................................................2, 3, 36, 38

11 U.S.C. § 550(d) ....................................................................................................33

**Rules**

CPLR 302(a)(1) ........................................................................................................13

Irving H. Picard, as trustee ("Trustee") for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa-*lll* ("SIPA"), and the chapter 7 estate of Bernard L. Madoff ("Madoff"), respectfully submits this memorandum of law and the Declaration of Shawn P. Hough ("Hough Decl.") in opposition to the motion to dismiss (the "Motion" or "Mot.") the Trustee's Amended Complaint (ECF No. 100; the "Amended Complaint" or "Am. Compl.")[1] filed by Defendants EFG Bank S.A., f/k/a EFG Private Bank S.A. ("EFG Bank"), EFG Bank (Monaco) S.A.M., f/k/a EFG Eurofinancière d'Investissements S.A.M. ("EFG Monaco"), and EFG Bank & Trust (Bahamas) Limited ("EFG Bahamas"), as successor-in-interest to Banco Atlántico (Bahamas) Bank & Trust Limited ("Banco Atlántico") (collectively, the "Defendants").[2]

## PRELIMINARY STATEMENT

As part of the Trustee's continuing efforts in this SIPA liquidation proceeding to recover BLMIS customer property that was stolen as part of Madoff's Ponzi scheme, this action seeks to recover at least $298,443,562 in subsequent transfers that Defendants received from Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Fairfield Sigma"), and Fairfield Lambda Limited ("Fairfield Lambda," and together with Fairfield Sentry and Fairfield Sigma, the "Fairfield Funds"). For years Defendants invested with and received transfers from BLMIS

---

[1] Unless otherwise indicated, all ECF references herein refer to the case captioned *Picard v. EFG Bank S.A., et al.*, No. 12-01690 (CGM) (Bankr. S.D.N.Y.).

[2] The Amended Complaint also contains allegations concerning two non-parties. Non-party EFG International AG is the ultimate parent company of each of the Defendants. Am. Compl. ¶56. Non-party EFG Capital, an indirect subsidiary of EFG International, is U.S.-based and acted as Defendants' agent for the subsequent transfers alleged in the Amended Complaint. *Id.* ¶¶57, 60, 78, 80.

through the Fairfield Funds—investment funds created for the express purpose of funneling investors' money to BLMIS in New York. Nonetheless, Defendants contend that the claims against them should be dismissed, arguing that (i) this Court does not have personal jurisdiction over Defendants; (ii) the safe harbor under Section 546(e) bars recovery; (iii) the Trustee failed to plausibly allege that Defendants received transfers of customer property; and (iv) Defendants are entitled to prevail under the good faith defense of Section 550(b). This Court has already rejected these arguments in numerous other subsequent transfer cases.[3] For the reasons set forth below, Defendants' arguments likewise fail.

*First*, Defendants purposefully invested in the Fairfield Funds knowing that BLMIS in New York was the *de facto* investment manager, broker-dealer, and custodian of the Fairfield Funds' investments. Defendants knew that the Fairfield Funds fed substantially all of their assets to BLMIS and that BLMIS was essential to the funds' investments. Investing with BLMIS was the entire point. Defendants designated and used bank accounts in New York to make subscription payments in and receive redemptions from the Fairfield Funds. Defendants'

---

[3] *See, e.g., Picard v. Multi-Strategy Fund Ltd. (In re Bernard L. Madoff)*, 641 B.R. 78 (Bankr. S.D.N.Y. 2022) ("*Multi-Strategy I*"); *Picard v. Banque SYZ & Co., SA (In re Bernard L. Madoff)*, No. 11-02149 (CGM), 2022 WL 2135019 (Bankr. S.D.N.Y. June 14, 2022) ("*Banque SYZ*"); *Picard v. Banca Carige S.P.A. (In re Bernard L. Madoff)*, No. 11-02570 (CGM), 2022 WL 2387522 (Bankr. S.D.N.Y. June 30, 2022) ("*Carige*"); *Picard v. Lombard Odier & Cie SA (In re Bernard L. Madoff)*, No. 12-01693 (CGM), 2022 WL 2387523 (Bankr. S.D.N.Y. June 30, 2022) ("*Lombard*"); *Picard v. First Gulf Bank (In re Bernard L. Madoff)*, No. 11-02541 (CGM), 2022 WL 3354955 (Bankr. S.D.N.Y. July 18, 2022) ("*First Gulf*"); *Picard v. Parson Fin. Panama S.A. (In re Bernard L. Madoff)*, No. 11-02542 (CGM), 2022 WL 3094092 (Bankr. S.D.N.Y. Aug. 3, 2022) ("*Parson*"); *Picard v. Meritz Fire & Marine Ins. Co. (In re Bernard L. Madoff)*, No. 11-02539 (CGM), 2022 WL 3273044 (Bankr. S.D.N.Y. Aug. 10, 2022) ("*Meritz*"); *Picard v. Delta Nat'l Bank and Tr. Co. (In re Bernard L. Madoff)*, No. 11-02551 (CGM), 2022 WL 3365256 (Bankr. S.D.N.Y. Aug. 12, 2022) ("*Delta*"); *Picard v. Pub. Inst. for Soc. Sec. (In re Bernard L. Madoff)*, No. 12-01002 (CGM), 2022 WL 3458962 (Bankr. S.D.N.Y. Aug. 17, 2022) ("*PIFSS*"); *Picard v. Union Sec. Inv. Trust Co. (In re Bernard L. Madoff)*, No. 12-01211 (CGM), 2022 WL 3572509 (Bankr. S.D.N.Y. Aug. 18, 2022) (amended) ("*Union Sec.*"); *Picard v. Korea Exch. Bank (In re Bernard L. Madoff)*, No. 11-02572 (CGM), 2022 WL 4371908 (Bankr. S.D.N.Y. Sept. 21, 2022) ("*KEB*"); *Picard v. Cathay Life Ins. Co.*, No. 11-02568 (CGM), 2022 WL 16626325 (Bankr. S.D.N.Y. Nov. 1, 2022) ("*Cathay Life*"); *Picard v. Bank Vontobel (In re Bernard L. Madoff)*, No. 12-01202 (CGM), 2022 WL 17087560 (Bankr. S.D.N.Y. Nov. 18, 2022) ("*Vontobel*"); *Picard v. Credit Suisse AG (In re Bernard L. Madoff)*, No. 11-02925 (CGM), 2022 WL 17098676 (Bankr. S.D.N.Y. Nov. 21, 2022) ("*Credit Suisse I*"); *Picard v. Credit Suisse AG, as successor-in-interest to Clariden Leu AG and Bank Leu AG, (In re Bernard L. Madoff)*, No. 12-01676 (CGM), 2022 WL 17098739 (Bankr. S.D.N.Y. Nov. 21, 2022) ("*Credit Suisse*

employees regularly communicated with New York-based Fairfield Greenwich Group ("FGG")
regarding their investments in the Fairfield Funds. Moreover, EFG Bank employees met with
FGG in New York, and employees from EFG Bank, EFG Monaco, and Banco Atlántico met
with Madoff. These facts, plus additional contacts detailed herein, establish personal jurisdiction.

*Second*, the Trustee has plausibly alleged the Fairfield Funds' actual knowledge of
Madoff's fraud, and therefore, under controlling law, the safe harbor for settlement payments
pursuant to securities contracts under Section 546(e) is inapplicable and does not bar recovery of
the subsequent transfers to Defendants. Defendants' arguments—including that there is no actual
knowledge exception to the Section 546(e) safe harbor—misinterpret and directly conflict with
the plain language of the statute and controlling precedent.

*Third*, the Trustee has plausibly alleged that Defendants received customer property
under Section 550(a) by outlining the relevant pathways through which customer property was
transferred from BLMIS to the Fairfield Funds and subsequently to Defendants. The Trustee has
also alleged the necessary vital statistics (i.e., the "who, when, and how much") for each
subsequent transfer. Nothing more is required at this stage of the litigation.

*Finally*, the Section 550(b) "good faith" defense available to subsequent transferees is a
fact-intensive affirmative defense that is premature and plainly inappropriate to assert on a
motion to dismiss. As this Court found in numerous cases, it is Defendants' burden to plead this
affirmative defense in an answer and prove it with evidence. Defendants cannot establish their
purported good faith on the face of the Amended Complaint.

For these reasons, Defendants' Motion should be denied.

---

*II*"); *Picard v. Bank Julius Baer & Co. (In re BLMIS)*, No. 11-02922 (CGM), 2022 WL 17726520 (Bankr. S.D.N.Y.
Dec. 15, 2022) ("*BJB*").

## STATEMENT OF FACTS

### I.    THE BLMIS PONZI SCHEME AND ITS FEEDER FUNDS

Madoff founded and operated BLMIS from New York until its collapse in 2008. *See* Am. Compl. ¶¶22, 49. BLMIS was registered as a securities broker-dealer with the U.S. Securities and Exchange Commission (the "SEC"). *Id.* ¶¶20-21. BLMIS purportedly operated three principal business units: (i) a proprietary trading business; (ii) a broker-dealer operation; and (iii) an investment advisory business (the "IA Business"). *Id.* ¶22. For its IA Business customers, BLMIS purportedly executed a split-strike conversion strategy (the "SSC Strategy"), which involved (i) investing in a basket of common stocks from the S&P 100 Index, (ii) buying put options and selling call options to hedge against price changes in the underlying basket of stocks, and (iii) purchasing U.S. treasury bills when the money was out of the market. *Id.* ¶¶33-35, 43. In reality, BLMIS operated a Ponzi scheme through its IA Business. *Id.* ¶¶13, 26. On December 11, 2008, Madoff's fraud was publicly revealed, and he was arrested for criminal violations of federal securities laws. *Id.* ¶8.

The extensive financial damage Madoff caused was made possible by BLMIS "feeder funds"—large investment funds created for the express purpose of funneling investors' funds into BLMIS. *See Picard v. Citibank, N.A. (In re BLMIS)*, 12 F.4th 171, 179 (2d Cir. 2021) ("*Citibank*"). The Fairfield Funds were the largest BLMIS feeder funds. *See* Fairfield Second Am. Compl. ¶295.[4] They were created, managed, and controlled by FGG, a *de facto* partnership with its principal place of business in New York. *See* Fairfield Second Am. Compl. ¶¶11, 118-20. Fairfield Sentry was a U.S. dollar-denominated fund that invested all or substantially all of its assets with BLMIS. Am. Compl. ¶3. Fairfield Sigma and Fairfield Lambda acted as foreign

---

[4] Second Amended Complaint, *Picard v. Fairfield Inv. Fund Ltd.*, No. 09-01239 (Bankr. S.D.N.Y. Aug. 28, 2020), ECF No. 286 (the "Fairfield Second Am. Compl.").

currency feeder funds, respectively facilitating euro and Swiss franc investments with BLMIS and investing all of their assets with Sentry. *Id.* Defendants invested in each of the Fairfield Funds, which they knew were BLMIS feeder funds. *Id.* ¶¶2, 64-65.

## II.    DEFENDANTS INVESTED WITH BLMIS THROUGH THE FAIRFIELD FUNDS

Defendants are part of a sophisticated financial entity that provides private banking services and products. Am. Compl. ¶52. Defendants are located in Switzerland (EFG Bank), Monaco (EFG Monaco), and the Bahamas (EFG Bahamas).[5] *Id.* ¶¶53-55.

Defendants invested with BLMIS through the Fairfield Funds and received subsequent transfers of stolen BLMIS customer property from the Fairfield Funds.[6] *Id.* ¶¶64, 92-118. Defendants entered into subscription agreements with Fairfield Sentry.[7] *Id.* ¶68. By executing these agreements, Defendants agreed to New York choice of law and jurisdictional provisions.[8] Am. Compl. ¶¶69-70. Fairfield Sentry's subscription agreements also required Defendants to direct all of their subscription payments to bank accounts at either Republic National Bank of New York or New York HSBC Bank USA. *Id.* ¶71. Subscription payments were then deposited into BLMIS's account at JPMorgan Chase Bank in New York. *Id.* ¶31. Defendants further used New York bank accounts in connection with their Fairfield Fund investments:

---

[5] Between 2003 and 2007, Banco Atlántico or EFG Bahamas received subsequent transfers of BLMIS customer property from Fairfield Sentry and/or Fairfield Sigma. *See* Am. Compl. ¶ 55, Exs. I, J. On February 16, 2006, EFG Bahamas acquired Banco Atlántico's private banking business in The Bahamas. Mot. at 17; Am. Compl. ¶55.

[6] EFG Bank invested in and received redemptions from all three Fairfield Funds. Am. Compl. ¶¶92, 97, 102, Exs. C-D. EFG Monaco invested in and received a redemption from Fairfield Sentry. *Id.* ¶106, Ex. H. EFG Bahamas invested in and received redemptions from Fairfield Sentry and Fairfield Sigma. *Id.* ¶¶110, 114, Exs. I-J.

[7] Defendants had to execute a subscription agreement before investing in any of the Fairfield Funds. The Trustee possesses "long-form" Fairfield Sentry subscription agreements executed by EFG Bank and Banco Atlántico. The Trustee also possesses a Fairfield Sentry "short-form" subscription agreement for EFG Monaco, which required EFG Monaco to attest that it "previously delivered a fully executed Subscription Agreement to the Fund" and to reaffirm "each and every representation and covenant made . . . in the original Subscription Agreement." Hough Decl. ¶30.

[8] EFG Bank also executed a Letter of Understanding with New York-based Fairfield Greenwich Limited ("FGL"), a member of the FGG *de facto* partnership. Am. Compl. ¶81. This agreement contained a New York choice of law provision and directed FGL to pay retrocession fees to EFG Bank's account at UBS AG in Connecticut. *Id.*

- EFG Bank utilized its own account at UBS AG in New York to wire subscriptions to and receive redemptions proceeds from Fairfield Sigma. Am. Compl. ¶75.

- Banco Atlántico selected and used its New York bank account at the Bank of New York to wire subscriptions to and receive redemption proceeds from Fairfield Sentry. *Id.* ¶73.

- After acquiring Banco Atlántico's private banking business in February 2006 (Mot. at 17), EFG Bahamas received redemption proceeds from Fairfield Sentry in a New York bank account at the Bank of New York. *Id.* ¶74.

- EFG Monaco's redemption proceeds from Fairfield Sentry were directed to a New York-based bank account at HSBC Bank USA. Hough Decl. ¶29.

Defendants intentionally invested in U.S. markets through a New York investment manager, broker-dealer, and custodian. Defendants were furnished with Fairfield Sentry's private placement memorandum ("PPM"), which identified the many different ways Defendants were transacting business in New York by investing in Fairfield Sentry. Am. Compl. ¶65. Moreover, employees from each of the Defendants visited and/or regularly communicated with the Fairfield Funds' New York-based representatives. *Id.* ¶76; Hough Decl. ¶¶4-17, 20-28. EFG Bank, EFG Monaco, and Banco Atlántico employees also met with Madoff. Am. Compl. ¶77; Hough Decl. ¶18.

Finally, during the relevant period, Defendants maintained significant and continuous operations as to their Fairfield Fund investments through non-party EFG Capital, a Delaware corporation that operated from offices in New York and Miami, Florida. Am. Compl. ¶¶57, 60, 78. In fact, the relationship between Defendants and Fairfield Sentry was "born in Miami" at EFG Capital. *Id.* ¶79. Representatives from EFG Capital's Miami office coordinated Defendants' transfers to and from the Fairfield Funds by, among other things: (i) executing Fairfield Sentry subscription agreements as "attorneys-in-fact"; (ii) signing Fairfield Lambda redemption requests; (iii) transmitting Fairfield Sigma subscription agreements to FGG in New York; (iv) meeting with FGG; (vi) corresponding with Defendants regarding FGG, the Fairfield Funds,

6

and BLMIS. *Id.* ¶¶76, 80. On behalf of Defendants, EFG Capital also made multiple visits to BLMIS's offices in New York. *Id.* ¶¶77, 80.

## III.    THE FAIRFIELD SETTLEMENT

Following BLMIS's collapse, the Trustee filed an adversary proceeding against the Fairfield Funds and related defendants to avoid and recover fraudulent transfers of stolen customer property in the amount of approximately $3 billion. Am. Compl. ¶85; *see also Picard v. Fairfield Sentry Ltd.,* Adv. Pro. No. 09-01239 (Bankr. S.D.N.Y. Aug. 28, 2020), ECF No. 286. In 2011, the Trustee settled with the Fairfield Funds. *Id.* ¶86. As part of the settlement, Fairfield Sentry consented to a judgment in the amount of $3.054 billion but repaid only $70 million to the BLMIS customer property estate. *Id.*; *Picard v. Fairfield Inv. Fund, Ltd.*, *(In re Bernard L. Madoff)*, Adv. Pro. No. 09-01239 (CGM), 2021 WL 3477479, at *3 (Bankr. S.D.N.Y. Aug. 6, 2021). Fairfield Sigma and Fairfield Lambda separately consented to judgments in the amounts of $752.3 million and $52.9 million, respectively. Fairfield Sigma Consent Judgment, *Picard v. Fairfield Sentry Ltd.*, No. 09-01239 (BRL) (Bankr. S.D.N.Y. July 13, 2011), ECF No. 110; Fairfield Lambda Consent Judgment, *id.*, ECF No. 108. As Fairfield Sigma and Fairfield Lambda were feeder funds that invested in BLMIS indirectly through Fairfield Sentry, their consent judgment amounts represent a portion of Sentry's $3.054 billion in withdrawals from BLMIS. *See id.* The Trustee then commenced a number of adversary proceedings, including this proceeding, to recover the approximately $3 billion in stolen customer property.

## <u>ARGUMENT</u>

## I.    THE COURT HAS SPECIFIC PERSONAL JURISDICTION OVER EACH DEFENDANT

To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff need only make a prima facie showing that personal jurisdiction exists. *Dorchester Fin. Sec., Inc. v. Banco*

*BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013). A prima facie showing of jurisdiction "may be established solely by allegations." *Id.* at 84-85 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990) ("Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction.")). A plaintiff also may establish a prima facie case of jurisdiction through affidavits and supporting materials that contain averments of facts outside the pleadings. *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010). These pleadings and affidavits are to be construed in the light most favorable to the plaintiff, resolving all doubts in plaintiff's favor. *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010).

Specific jurisdiction is a two-step inquiry and exists where the defendant purposefully directs its activities into the forum and the underlying cause of action arises out of or relates to those activities. *See Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*, 627 B.R. 546, 566 (Bankr. S.D.N.Y. 2021). This Court has articulated the appropriate jurisdictional standard in its recent decisions in the Trustee's cases, describing the minimum contacts necessary to establish the Court's specific jurisdiction over a nonresident defendant. *See, e.g.*, *Carige*, 2022 WL 2387522, at *2-5. Accordingly, the requirements for purposeful availment, relatedness, and reasonableness will not be repeated at length here.

### A.    Defendants Purposefully Availed Themselves of the Laws and Privileges of New York by Investing in BLMIS through the Fairfield Funds

Defendants' numerous and purposeful contacts with New York establish this Court's jurisdiction.[9] Each of the Defendants: (i) targeted the New York securities market by investing

---

[9] The Motion argues, incorrectly, that the Trustee relies on "improper 'group pleading.'" Mot. at 14-15. While the Trustee's allegations assert that "Defendants" engaged in purposeful contacts with the forum, the Amended Complaint makes clear how each defendant purposely availed themselves of the forum. *See infra* Section I.A.2. In this respect, Defendants' reliance on cases like *Tera Grp., Inc. v. Citigroup, Inc.*, No. 17-cv-4302 (RJS), 2018 WL 4732426, at *2 (S.D.N.Y. Sept. 28, 2018) is unavailing. Mot. at 15. Unlike here, the *Tera* complaint contained

with BLMIS through the Fairfield Funds, knowing that their assets were managed and custodied by BLMIS in New York; (ii) directed communications regarding their investments with BLMIS through the Fairfield Funds to New York; (iii) used New York banks to transact with Fairfield Sentry; and (iv) agreed to New York jurisdiction and choice of law provisions related to their investments. While many of these contacts can establish personal jurisdiction independently, in their totality, these contacts demonstrate that Defendants availed themselves of the forum.

      *1.*      *Defendants' Intentional Investments with BLMIS through the Fairfield Funds Establish Minimum Contacts*

Defendants' knowing and intentional investment with BLMIS through the Fairfield Funds establishes a prima facie showing of jurisdiction. Am. Compl. ¶64; *Carige*, 2022 WL 2387522, at *2 (finding the allegation that defendant "'knowingly direct[ed] funds to be invested with New York-based BLMIS through Fairfield Sentry' . . . alone is sufficient to establish a prima facie showing of jurisdiction over Defendant in the pre-discovery stage of litigation"); *Vontobel*, 2022 WL 17087560, at *2 (same). As the Second Circuit recognized, "[w]hen these [subsequent transfer] investors chose to buy into feeder funds that placed all or substantially all of their assets with [BLMIS], they knew where their money was going." *In re Picard*, 917 F.3d 85, 105 (2d Cir. 2019) ("*ET Decision*").

Fairfield Sentry's PPM, meetings with Madoff, and/or communications with FGG demonstrate that *each* Defendant knew: (i) Fairfield Sentry invested at least 95% of its assets with BLMIS, and Fairfield Sigma and Fairfield Lambda invested substantially all of their assets with BLMIS through Fairfield Sentry; (ii) New York-based BLMIS was the custodian of Fairfield Sentry's investments with BLMIS; (iii) any returns on investment in the Fairfield Funds

---

"scant facts" and "fail[ed] to make even the most basic showing that [of] personal jurisdiction over *any* UBS entity." *Id*. at *2 (emphasis added).

would purportedly be earned by BLMIS in New York through its execution of the SSC Strategy; (iv) BLMIS's SSC Strategy purportedly involved the purchase and sale of U.S. securities, U.S. options, and U.S. Treasury Bills; (v) BLMIS performed all investment management duties for the Fairfield Funds, and the decisions regarding when and which U.S. securities to purportedly purchase were made by BLMIS in New York; and (vi) BLMIS was "essential to the continued operation of" Fairfield Sentry. Am. Compl. ¶¶3, 35, 43, 65-67, 76-77. Investing with BLMIS was the whole point of Defendants' investments in the Fairfield Funds.

a.      *BLI and Recent Decisions of this Court Establish Jurisdiction*

This Court has already concluded that subsequent transferees like Defendants are subject to personal jurisdiction where the Trustee has alleged facts demonstrating they intended to invest with BLMIS through BLMIS feeder funds. *See Picard v. Bureau of Labor Ins. (In re BLMIS)*, 480 B.R. 501, 516-18 (Bankr. S.D.N.Y. 2012) (Lifland, J.) ("*BLI*"). Moreover, on January 25, 2023, the District Court denied Swiss-based defendant Banque Lombard Odier & Cie SA's request for leave to appeal from a non-final order of this Court denying defendant's motion to dismiss for lack of personal jurisdiction. *In re Bernard L. Madoff Inv. Sec. LLC*, No. 22-CV-06561 (LGS) (S.D.N.Y. Jan. 25, 2023), ECF No. 14 (the "*Lombard* Interlocutory Decision") ("[T]he Bankruptcy Court correctly held, applying settled precedent, that by intentionally investing in a New York-based investment fund, Defendant purposefully availed itself of the privilege of doing business in New York.") (cleaned up). Thus, Defendants' deliberate targeting of BLMIS and the New York securities market through the Fairfield Funds is dispositive. *See Cathay Life*, 2022 WL 16626325, at *4 ("By alleging that Defendant intentionally invested in BLMIS, the Trustee has met his burden of alleging jurisdiction as to the subsequent transfer that originated with BLMIS."); *Picard v. Société Générale Private Banking (Suisse) S.A. (In re*

*BLMIS)*, No. 12-01677, 2022 WL 4349859, at *6 (Bankr. S.D.N.Y. Sept. 19, 2022) (same) ("*Société Générale*"); *Carige*, 2022 WL 2387522, at *4 (same).

This Court has upheld and applied the *BLI* analysis in multiple decisions. *See, e.g.*, *Multi-Strategy I*, 641 B.R. at 86-87; *Carige*, 2022 WL 2387522, at *3. In those cases, as here, the Trustee asserted allegations that the ultimate purpose of the feeder fund investments was investment with BLMIS. *See, e.g.*, *Multi-Strategy I*, 641 B.R. at 86-87. Based on those allegations, this Court found that "Defendant's alleged contacts with New York [were] not random, isolated, or fortuitous." *Id.* at 87. This Court has further clarified that the Trustee is deemed to have sufficiently alleged jurisdiction "simply by stating that [defendant] 'knowingly direct[ed] funds to be invested with New York-based BLMIS through Fairfield Sentry,'" and that "[t]his allegation alone is sufficient to establish a prima facie showing of jurisdiction over [d]efendant in the pre-discovery stage of litigation." *Carige*, 2022 WL 2387522, at *2; *see also, e.g.*, *Lombard*, 2022 WL 2387523, at *2.

In short, Defendants "intentionally tossed a seed from abroad to take root and grow as a new tree in the Madoff money orchard in the United States and reap the benefits therefrom." *Société Générale*, 2022 WL 4349859, at *5 (quoting *BLI*, 480 B.R. at 506). As such, the foregoing cases are controlling and defeat Defendants' personal jurisdiction defense without the need for inquiry into their additional U.S. contacts.

   b.      *Walden Does Not Save Defendants from this Court's Jurisdiction*

Seeking to sidestep *BLI*, Defendants cite *Walden v. Fiore*, 571 U.S. 277 (2014) in arguing that the Trustee's theory of jurisdiction relies on third parties' contacts with New York. *See, e.g.*, Mot. at 10 (as to EFG Monaco) and 16 (as to EFG Bahamas). But as this Court has found, *Walden* is of "no assistance" to subsequent transferees like Defendants who invested in a feeder fund with the specific goal of having funds invested with BLMIS in New York. *See Multi-*

*Strategy I*, 641 B.R. at 87. Defendants were not passive shareholders uninvolved in the decision to invest with BLMIS in New York.

This case is nothing like *Walden*. Quoting the Supreme Court, Defendants argue that personal jurisdiction must be established by "contacts 'the 'Defendant himself' creates." Mot. at 10 (quoting *Walden*, 571 U.S. at 284-85). That is precisely what Defendants did when they sent the Fairfield Funds millions of dollars with the intent that they be custodied and invested by BLMIS in New York. Again, Defendants cannot downplay their deliberate and purposeful investments targeting the forum as some sort of happenstance. Mot. at 2, 10, 13, 16, 18; *BLI*, 480 B.R. at 517 (rejecting the "happenstance or coincidence" argument as disingenuous); *see also Lombard* Interlocutory Decision at 8 (distinguishing *Walden* and noting that where Trustee alleged that subsequent transferee defendant intentionally invested in BLMIS, "Defendant's *own* intentional contacts with New York create the requisite connection," not Sentry's contacts).[10]

Under the facts of *this* case—where Defendants have entered into subscription agreements with the Fairfield Funds expressly indicating Defendants' intent to direct custody and control over their funds to a specific U.S. broker-dealer in order to knowingly profit from the U.S. securities markets—Defendants have purposefully availed themselves of the laws and protections of the United States. *See Walden*, 571 U.S. at 286 (recognizing that "a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the

---

[10] Contrary to their argument, Defendants' conduct as to the redemptions at issue was *not* foreign. Mot. at 9, 16, 18. Because the Trustee alleges contacts with New York that were in support of Defendants' Fairfield Fund investments that resulted in the transfers at issue (Am. Compl. ¶¶63-84), and attaches additional evidence in the Hough Declaration, the cases cited by Defendants are inapposite. *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 536-37 (S.D.N.Y. 2008), *aff'd sub nom. Gracey v. J.P. Morgan Chase & Co. (In re Amaranth Nat. Gas Commodities Litig.)*, 730 F.3d 170 (2d Cir. 2013) (denying jurisdiction because plaintiffs never actually alleged that defendant directed any activity toward the United States); *Zim Integrated Shipping Servs. v. Bellwether Design Techs. LLC*, No. 19-CV-3444 (VSB), 2020 WL 5503557 (S.D.N.Y. Sept. 10, 2020) (no specific jurisdiction where contacts did not give rise to cause of action or have "anything to do with this dispute other than generally involving [defendant's] business"). Again, unlike those cases, the Trustee is not alleging that jurisdiction exists due to unrelated business contacts or happenstance.

plaintiff or other parties"); *see also Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1031-32 (2021) (rejecting defendant's contention that *Walden* "shows that a plaintiff's residence and place of injury can never support jurisdiction" and explaining that "[t]hose places still may be relevant in assessing the link between the defendant's forum contacts and the plaintiff's suit"). Indeed, contrary to Defendants' misinterpretation of *Walden*, Defendants' connections to the forum must never be viewed in a vacuum. Mot. at 10-19; *see supra*, Section I.

Finally, Defendants' efforts to analogize their intentional investing into the U.S. markets to contracting with a plaintiff that performed in New York falls flat. Mot. at 10-12, 18. Unlike in *Ferrante Equip. Co. v. Lasker-Goldman Corp.*, the Trustee is not alleging that Defendants' connections to the forum are limited to the benefits they received from a plaintiff's or third party's activities in the forum. 31 A.D.2d 355, 356 (N.Y. App. Div. 1969), *aff'd*, 26 N.Y.2d 280 (N.Y. 1970). Nor is the Trustee arguing that the Court has jurisdiction over Defendants based on a foreseeability or "stream-of-commerce" theory. Mot. at 11-12.[11] Rather, the Trustee is alleging that Defendants—including EFG Monaco and EFG Bahamas—themselves took actions both in, and intentionally toward, the forum. The fact that many of these actions involved a BLMIS feeder fund does not defeat jurisdiction. Defendants' contacts with New York were "intertwined with [their] transactions or interactions" with the Fairfield Funds and thus support jurisdiction. *See Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 322 (N.Y. 2016) (the "transacts any business" under CPLR 302(a)(1) is satisfied where defendant purposefully "avails itself of the privilege of

---

[11] For this argument, Defendants rely on two cases where, unlike here, the foreign entity did not target the forum. *See J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882, 886 (2011) (ruling that foreign entity did not engage in conduct "purposefully directed" at forum); *In re Mexican Gov't Bonds Antitrust Litig.*, No. 18-CV-2830 (JPO), 2020 WL 7046837, at *3-4 (S.D.N.Y. Nov. 30, 2020) (ruling foreign banks' conduct was not aimed at forum and alleged conduct arose from "agreements [that] occurred in Mexico alone"). Defendants' summary of *In re Mexican Gov't Bonds Antitrust Litig.* concedes the same. Mot. at 12 (noting "absence of defendant's contact with forum").

conducting activities within the forum state, thus invoking the benefits and protections of its laws").

    2.    *Defendants' Additional Contacts with New York in Connection with Their Investments also Establish Minimum Contacts*

    a.    *Defendants Directed Communications Regarding Their Investments with BLMIS Through Feeder Funds to New York*

While a defendant's "physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact.'" *Parson*, 2022 WL 3094092, at \*5 (quoting *Walden*, 571 U.S. at 285); *Banque SYZ*, 2022 WL 2135019, at \*4 (same). Meetings, telephone calls, and email communications can also support a finding of personal jurisdiction. *See Parson*, 2022 WL 3094092, at \*4-5 (finding defendant's meetings in New York and email communications with FGG demonstrate that defendant purposefully availed itself of the benefits of doing business in the forum); *Meritz*, 2022 WL 3273044, at \*4 (same); *PIFSS*, 2022 WL 3458962, at \*14 (same); *Union Sec.*, 2022 WL 3572509, at \*4 (same); *see also Golden Archer Invs., LLC v. Skynet Fin. Sys.*, No. 11 Civ. 3673 (RJS), 2012 WL 123989, at \*5 (S.D.N.Y. Jan. 3, 2012) (finding email, telephone, and video communications with a company in New York subjected defendant to personal jurisdiction); *Liberatore v. Calvino*, 293 A.D.2d 217, 221 (N.Y. App. Div. 2002) (holding that jurisdiction may be found solely on the basis of telephone, mail, and electronic communications) (citing cases).

As detailed below, each of the Defendants had similar U.S. contacts.

    i)    In addition to visiting and regularly communicating with FGG, EFG Bank employees met with Madoff

Between 2003 and 2006, EFG Bank's executives met with FGG in New York at least four times. Am. Compl. ¶76. For example, in February 2003, Mats Pehrsson, EFG Bank's Senior

Vice President, met with FGG at FGG's offices in New York to discuss Fairfield Sentry, Madoff,

BLMIS, and the SSC Strategy. *Id*. ¶¶67, 76. Jerome Schonbachler, EFG Bank's Senior Vice

President, met with Madoff in 2005. *Id*. ¶77. EFG Bank also regularly communicated with

FGG's New York personnel regarding its investments in the Fairfield Funds. *Id*. ¶76.

ii)    After acquiring part of Banco Atlántico, EFG Bahamas
employees regularly corresponded with FGG

EFG Bahamas' representatives regularly communicated with New York-based FGG

regarding its investments with Fairfield Sentry. Hough Decl. ¶¶4-16. This was a continuation of

Banco Atlántico's visits and communications with FGG and Madoff in New York. Am. Compl.

¶¶66, 76. For example, in 2003, Sergio Miguez Martin (Banco Atlántico's Director General) and

Miguel Coello (Banco Atlántico's General Manager) met with FGG at FGG's office in New

York and then with Madoff at BLMIS's office in New York to discuss Fairfield Sentry. *Id*. ¶77.

Many of EFG Bahamas' contacts with FGG in New York involved Karen Pinder, vice

president of EFG Bahamas:

- On May 23, 2006, Pinder emailed a FGG representative in New York, stating that "Banco Atlantico has sold its 'book of business' to EFG Bank & Trust Bahamas Ltd." Pinder requested, and received, access to FGG's website for her and her colleagues so that EFG Bahamas could track FGG fund performance. She and the FGG representative also spoke via telephone regarding these issues. *See* Hough Decl. ¶5.

- FGG representatives in New York sent separate emails to Pinder attaching Fairfield Sentry's tear sheets for December 2006, April 2007, August 2007, March 2008, May 2008, and June 2008. *See id*. ¶¶6-11. FGG representatives in New York and Pinder also discussed other Fairfield Sentry tear sheets and additional capacity in Fairfield Sentry. *See id*. ¶¶9-12.

- On February 5, 2007, a New York-based FGG representative sent Pinder updated information on various FGG funds, including Fairfield Sentry. The email also notified EFG Bahamas of capacity for additional subscriptions and touted that Fairfield Sentry "has a total of sixteen years of track record with only 13 down months since inception." This email followed a telephone conversation between the FGG representative and Pinder. *See id*. ¶13.

15

- On February 6, 2008, FGG in New York sent Pinder a detailed update regarding the Fairfield Funds, including Fairfield Sentry's recent performance. *See id.* ¶14.

- On March 18, 2008, FGG in New York sent Pinder an update regarding Fairfield Sentry and noted that the SSC Strategy invested in the S&P 100 Index. *See id.* ¶15.

- On October 6, 2008, FGG in New York sent Pinder a summary of information relevant to Fairfield Sentry, including recent performance and noted that the "split strike conversion strategy is currently invested in . . . US T-bills." *See id.* ¶16.

    iii)    EFG Monaco employees met with Madoff and regularly corresponded with FGG

EFG Monaco had its own direct and purposeful contacts with the forum.[12] On May 21, 2008, George Catsiapis, managing director of EFG Monaco and a member of EFG International AG's International Policy Committee, visited BLMIS's offices in New York. Hough Decl. ¶18. Also, between at least 2002 and 2008, EFG Monaco had numerous contacts with New York-based FGG and at least one visit to BLMIS's New York offices. Many of these contacts involved EFG Monaco's FUNDEX Department, which offered hedge fund investing services. *Id.* ¶19.

- In a 2003 email, a U.S.-based FGG representative stated that he "spoke with Catsiapis last fall about his visiting FGG to meet senior partners in New York, but have not yet succeeded in doing so." *See id.* ¶20.

- On January 26, 2005, FGG in New York sent EFG Monaco Fairfield Sentry's PPM and a subscription document. *See id.* ¶21.

- On January 28, 2005, Sallie Graham, head of EFG Monaco's FUNDEX Department, and a New York-based FGG representative exchanged at least 10 emails regarding "monies" and "subscription documents" for one of EFG Monaco's subscriptions into Fairfield Sentry. *See id.* ¶¶22, 23.

---

[12] The Motion argues, incorrectly, that the Amended Complaint makes no specific allegations that EFG Monaco had contacts with the United States and that the Trustee relies on group pleading. Mot. at 14-16. But EFG Monaco is not outside this Court's jurisdiction merely because the Trustee alleged that "Defendants"—a defined term in the Amended Complaint that includes EFG Monaco—engaged in purposeful contacts with the forum. The Trustee alleges that EFG Monaco intentionally invested in BLMIS, executed subscription agreements with New York choice-of-law and jurisdictional provisions, and directed Fairfield Sentry subscription payments to New York-bank accounts. Am. Compl. ¶¶64, 68-69, 71. The Hough Declaration bolsters these allegations and demonstrates the routine and purposeful contacts between EFG Monaco and New York. The Trustee has thus met his burden of alleging jurisdiction as to each subsequent transfer that originated with BLMIS. *BJB*, 2022 WL 17726520, at *6.

- On August 23, 2006, Graham spoke with a New York-based FGG representative, who then followed with an email attaching various Fairfield Sentry materials (marketing presentation, due diligence questionnaire, return profile analysis, and tear sheet). The FGG representative also sent Graham "contacts at Fairfield Greenwich Group ('FGG'), New York, to address any information related to FGG investment funds" and promised to send "[monthly] performance updates on FGG investment funds" in the future. *See id.* ¶24.

- In November 2006, Graham accepted an offer from FGG in New York to meet with two of FGG's managing directors during their trip to Monaco and to discuss various FGG funds, including Fairfield Sentry. *See id.* ¶25.

- On November 6, 2006, following a telephone conversation with Graham, a FGG representative in New York emailed Catsiapis in an effort to "expand" the relationship between FGG and EFG Monaco. The email included tear sheets for Fairfield Sentry and other FGG investment Funds. *See id.* ¶26.

- On February 6, 2007, a FGG representative in New York sent Graham information on various FGG funds, including Fairfield Sentry. The email also notified EFG Monaco of capacity for additional subscriptions and touted that Fairfield Sentry "has a total of sixteen years of track record with only 13 down months since inception." *See id.* ¶27.

- On April 8, 2008, a FGG representative in New York emailed Graham and the FUNDEX Department to see if they wanted to meet with Amit Vijayvergiya, FGG's Chief Risk Officer, during his trip to Monaco. The email added that Fairfield Sentry is "one of the approved products for EFG Bank's advisory platform" and attached a Fairfield Sentry tear sheet. *See id.* ¶28.

    b.    *Defendants' Purposeful Use of New York Bank Accounts Supports Specific Jurisdiction*

Defendants purposefully used the New York banking system to invest with BLMIS through Fairfield Sentry. Fairfield Sentry's subscription agreement required Defendants to direct all of their subscription payments to either a Republic National Bank of New York or New York HSBC Bank USA correspondent bank account for ultimate deposit in Fairfield Sentry's bank account. Am. Compl. ¶71. EFG Bank used its account at UBS AG in New York to wire subscriptions to and receive redemption proceeds from Fairfield Sigma. *Id.* ¶75. EFG Monaco, EFG Bahamas, and Banco Atlántico also used New York Bank accounts to receive subsequent transfers of stolen BLMIS customer property from Fairfield Sentry. *Id.* ¶¶73, 74 ("Between 2003

17

and 2006, at least 20 subsequent transfers from Fairfield Sentry, totaling approximately $41.5 million, were directed to and received in Banco Atlántico's account at the Bank of New York."); Hough Decl. ¶29 (EFG Monaco's Fairfield Sentry redemption was received in a New York bank account).

Defendants' purposeful use of New York bank accounts to receive subsequent transfers confers jurisdiction over Defendants for purposes of recovering those same transfers. *See Parson*, 2022 WL 3094092, at *4 (citing *Off. Comm. Of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56, 71 (S.D.N.Y. 2016); *Bahrain Islamic Bank v. Arcapita Bank (In re Arcapita Bank B.S.C.(C))*, 640 B.R. 604, 618 (S.D.N.Y. 2022)); *see also Eldesouky v. Aziz*, No. 11-cv-6986 (JLC), 2014 WL 7271219, at *6-7 (S.D.N.Y. Dec. 19, 2014) (finding jurisdiction under New York long-arm statute based solely on defendant's use of a New York account to receive payment at issue: "receiving Plaintiffs' money at a New York bank account suffices to establish personal jurisdiction over [defendant]"). "Because [defendant] directed the wire transfers to a specifically designated New York account for its own advantage, the receipt of the funds in New York is a 'contact' properly attributed to [defendant]." *Arcapita*, 549 B.R. at 70, n.18.

As this Court recently held, "[w]here a defendant chooses to use a United States bank account to receive[] funds, exercising personal jurisdiction over the defendant for causes of action relating to those transfers is constitutional." *Meritz*, 2022 WL 3273044, at *3 (citing *Arcapita*, 549 B.R. at 71); *Parson*, 2022 WL 3094092, at *4 (same); *see also Multi-Strategy I*, 641 B.R. at 87 (finding jurisdiction over a subsequent transferee defendant that "received payments and sold shares through its New York based bank account," which gave it access to BLMIS through Sentry); *Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 191 (Bankr.

S.D.N.Y. 2018) ("*BNP*") (finding jurisdiction over subsequent transferee defendants that sent

subscriptions to and received redemptions from a feeder fund's New York bank account).

That Defendants received some of these redemption payments in a correspondent account

does not change the analysis. Mot. at 13. The purposeful use of a correspondent bank account is

sufficient to establish personal jurisdiction. *See, e.g.*, *Licci v. Lebanese Canadian Bank, SAL*, 20

N.Y.3d 327, 338 (N.Y. 2012) (defendant's use of a correspondent bank account in New York

supports a finding of jurisdiction "even if no other contacts between the defendant and New

York can be established," provided that such use was "purposeful") (cleaned up); *HSH Nordbank*

*AG N.Y. Branch v. Street*, No. 11 Civ. 9405 (DLC), 2012 WL 2921875, at *4 (S.D.N.Y. July 18,

2012) ("District courts in this Circuit have upheld personal jurisdiction based upon a defendant's

use of a correspondent bank account in New York where the use of that account was held to lay

at the very root of the plaintiff's action.") (quoting *Licci ex rel Licci v. Lebanese Canadian Bank,*

*SAL*, 673 F.3d 50, 66 (2d Cir. 2012)); *Al Rushaid*, 28 N.Y.3d at 322 (finding jurisdiction based

on designation and use of New York correspondent accounts to receive transfers).

The use of the New York bank accounts went beyond "mere maintenance," as

Defendants were knowing participants in the underlying transactions and directed the movement

of funds through these accounts. Mot. at 13-15, 17. Moreover, the cases Defendants cite are

distinguishable. *O'Toole v. MyPlace Dev. SP. Z O.O.* (*In re Sledziejowski*), Adv. Pro. No. 15-

08207 (SHL), 2016 WL 6155929, at *7 (Bankr. S.D.N.Y. Oct. 21, 2016) (finding no personal

jurisdiction based on third-party transfer to defendant sent from U.S.); *Leema Enters., Inc. v.*

*Willi*, 575 F. Supp. 1533, 1537 (S.D.N.Y. 1983) (finding that, unlike here, correspondent bank

accounts were "unrelated to the fraud alleged"); *Letom Mgmt. Inc. v. Centaur Gaming, LLC*,

No. 17-CV-3793 (PAE), 2017 WL 4877426, at *1-2 (S.D.N.Y. Oct. 27, 2017) (considering

"totality of the circumstances" and finding "planned payments" under a foreign contract

containing an Indiana choice-of-law clause insufficient to establish specific jurisdiction).[13] In

contrast, here, Defendants sent subscription payments to Fairfield Sentry's bank accounts in New

York and designated and used at least three New York-based bank accounts to receive the

redemption payments that form the basis of the Trustee's action.

Moreover, Defendants' reliance on two cases asserting common law claims brought

against fund service providers is unavailing for the proposition that the New York contacts

identified by the Trustee are insufficient. Mot. at 13-14 (citing *Hill v. HSBC Bank PLC*, 207 F.

Supp. 3d 333 (S.D.N.Y. 2016) and *Hau Yin To v. HSBC Holdings PLC*, No. 15CV3590-LTS-

SN, 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017). This Court has already determined that this line

of cases is not relevant to the Trustee's actions against investors in BLMIS feeder funds, like

Defendants. *See BNP*, 594 B.R. at 192 ("*Hill* has no bearing on the issue of personal jurisdiction

arising from the Defendants' redemptions as investors in the Tremont Funds which arose from

their New York contacts with the Tremont Funds."). This is not a dispute between two parties

about services owed under a foreign contract, like the breach of fiduciary duty and other claims

---

[13] Defendants' other cases are inapplicable for similar reasons. Mot. at 13-14. Unlike here, the transactions in those cases were unrelated to the action's subject matter of the action. *Rosenblatt v. Coutts & Co. AG*, No. 17-cv-3528 (AKH), 2017 WL 3493245, at *4 (S.D.N.Y. Aug. 14, 2017) (foreign defendant's act of sending payment to plaintiff's New York bank account pursuant to agreement negotiated and executed in Switzerland, concerning property and funds in Switzerland, and contract subject to Swiss law was not purposeful availment); *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 727 (S.D.N.Y. 2010) ("It is clear that the events giving rise to the physical injuries and deaths for which Plaintiffs seek redress are missile attacks in Israel, not funds transfers in New York"). Defendants' reliance on *Tamam* is also unavailing because there the court noted that the use—as opposed to "maintenance" or "mere existence"—of a correspondent bank account can give rise to specific jurisdiction. 677 F. Supp. 2d at 727 ("Courts have found [a] substantial relationship between correspondent bank accounts and the plaintiff's claim where the use of the correspondent account was 'at the very root of the action.'").

in *Hill* and *Hau Yin To*.[14] This is an adversary proceeding brought by the SIPA Trustee in the

BLMIS SIPA liquidation proceeding to recover fraudulent transfers from investors whose use of

New York bank accounts to place money with BLMIS demonstrates a clear intent to direct

activity toward the U.S. securities market. *See BLI*, 480 B.R. at 513 ("This movement of money

to and from BLMIS in the United States, as contemplated by the Agreements, was not fortuitous

or incidental; instead, it was 'the ultimate objective' and the 'raison d'etre' of the Agreement

between BLI and Fairfield Sentry.").[15]

Similar reasoning applies to Defendants' use of Fairfield Sentry's Republic National

Bank of New York or New York HSBC Bank USA account to make subscription payments. Am.

Compl. ¶71. It is irrelevant that the Fairfield Sentry PPM mandated that subscribers use Sentry's

New York account because ultimately, Defendants were "free to accept or reject the proposed

terms." *In re Arcapita*, 640 B.R. at 617-18 (holding defendant's acceptance of contractual term

---

[14] Citing *SPV Osus Ltd. v. UBS AG*, 114 F. Supp. 3d 161 (S.D.N.Y. 2015), which found no specific jurisdiction because plaintiff's injury was not caused by defendants' contacts, Defendants argue that EFG Bank's and EFG Monaco's investments with Kingate Global Fund Limited are irrelevant. Mot. at 9, n.5. As an initial matter, the Trustee cites EFG Bank's and EFG Monaco's investments in Kingate Global Fund Limited, a fund that invested all of its assets with BLMIS, to further demonstrate that Defendants knowingly directed funds to BLMIS in New York. Moreover, Defendants' reliance on *SPV Osus* is questionable following *Ford Motor Co.*, in which the Supreme Court held that causation is not a prerequisite for jurisdiction, and instead, a lawsuit can "relate to" the defendant's contacts with the forum. 141 S. Ct. at 1026-30. Finally, *SPV Osus*'s finding that a "handful of communications and transfer of funds" do not support specific jurisdiction is not availing here given Defendants' significant additional jurisdictional contacts.

[15] Defendants' policy argument that New York would become a forum for any foreign commercial dispute if courts conferred jurisdiction merely because global transactions are cleared in New York is unpersuasive. Mot. at 14, n. 7. That argument is premised on the "incidental use" of U.S. bank accounts without any purposeful contacts with the forum state. Moreover, the argument relies on cases that are inapplicable here. *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1395 (2018) (involving foreign nationals suing foreign banks based on CHIPS transactions in context of Alien Tort Statute); *Mashreqbank PSC v. Ahmed Hamad Al Gosaibi & Bros. Co.*, 12 N.E.3d 456, 459-60 (N.Y. 2014) (analyzing forum non conveniens issues in a United Arab Emirates bank's action against a Saudi Arabian partnership and noting that New York courts cannot be used for "a lawsuit with little or no apparent contact with New York"). And one of Defendants' cases recognized that courts have asserted jurisdiction where defendant's use of a correspondent bank account is "purposeful" and not the "only" reason for asserting jurisdiction. *See Universal Trading & Inv. Co. v. Tymoshenko*, No. 11-CV-7877 (PAC), 2012 WL 6186471, at *3 (S.D.N.Y. 2012).

designating New York correspondent account supported finding of personal jurisdiction); *see also In re Motors Liquidation Co.*, 565 B.R. 275, 288-89 (Bankr. S.D.N.Y. 2017) (finding defendant's use of a correspondent account purposeful even where payment in New York was dictated by agreement).

c.    The Subscription Agreements Evidence a Strong Nexus with
New York

As this Court has recognized, a defendant's subscription agreements with the Fairfield Funds further evidence a "strong nexus with New York" that supports jurisdiction. *See BLI*, 480 B.R. at 517 n.15; *Multi-Strategy I*, 641 B.R. at 88 n.3 (finding that defendant's irrevocable submission to the jurisdiction of New York courts when it signed its subscription agreements with Fairfield Sentry is "certainly a relevant factor" in determining whether jurisdiction is reasonable). When Defendants invested in the Fairfield Funds, they signed subscription agreements through which they submitted to the jurisdiction of New York courts and the application of New York law. Am. Compl. ¶¶68-70.

Defendants cite to *Fairfield Sentry Ltd. v. Migani* [2014] UKPC 9 and *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, No. 10-13164 (SMB), Adv No. 10-03496 (SMB), 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018), *aff'd sub nom.*, *Fairfield Sentry Ltd. v. Citibank, N.A. London*, No. 19-CV-3911 (VSB), 2022 WL 4391023 (S.D.N.Y. Sept. 22, 2022) (amended) in arguing that the Fairfield Sentry subscription agreements cannot provide consent to a suit by the Trustee over redemptions. Mot. at 12-13. This argument misses the mark because the Trustee does not contend that Defendants are bound to litigate here because of their agreements to do so in the Fairfield Sentry subscription agreements. Rather, the Trustee argues that Defendants' agreements to New York law, jurisdiction, and forum in contracts integral to this case provides a strong jurisdictional contact with New York.

22

Further, the decisions in those cases only have relevance "to the extent that personal jurisdiction is based solely on the forum selection clause in the Subscription Agreements." *Theodoor GGC Amsterdam*, 2018 WL 3756343, at \*1. The Court in *Theodoor GGC Amsterdam* made clear that its decision "does not resolve the Foreign Defendants' jurisdictional objections" and "[u]pon further analysis, [the Court] may indisputably have personal jurisdiction over at least one defendant in every adversary proceeding." *Id.* at \*12. As discussed *supra*, the Fairfield Sentry subscription agreement, and any Defendants likely would have subsequently signed, is but one category of jurisdictional contacts the Trustee offers to establish personal jurisdiction over Defendants. *See* Am. Compl. ¶¶63-84.

Additionally, "a choice of law provision may constitute a 'significant contact' with the forum state" and "is relevant in determining whether a defendant has purposefully availed itself of a particular forum's laws[.]" *Chase Manhattan Bank v. Banque Generale Du Com.*, No. 96-cv-5184 (KMW), 1997 WL 266968, at \*2 (S.D.N.Y. May 20, 1997) (cleaned up); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 482 (1985) (finding jurisdiction where choice of law provision "reinforced [defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there"). For example, in *BLI*, the Court, without addressing the issue of whether defendants consented to jurisdiction, found that the clauses in the subscription agreements "further evidence[d] the strong nexus with New York." 480 B.R. at 517 n.15. Also, the subscription agreements plainly relate to the Trustee's claims and evidence a strong nexus between this case and New York. *Ford Motor Co.*, 141 S. Ct. at 1026.

               d.       *Defendants' Contacts Through EFG Capital Support Specific Jurisdiction*

Where a foreign party is not present in the district, the jurisdictional presence of a related party may be imputed to it through agency principles. *King Cnty., Wash. v. IKB Deutsche*

*Industriebank AG*, 712 F. Supp. 2d 104, 110 (S.D.N.Y. 2010). "To establish that a corporation doing business in New York is an agent of a related foreign corporation, the plaintiff must show that the former does all the business which [the foreign corporation] could do were it here by its own officials." *Dorfman v. Marriott Int'l Hotels, Inc.*, No. 99 CIV 10496 (CSH), 2002 WL 14363, at *3 (S.D.N.Y. Jan. 3, 2002) (cleaned up); *see also Palmieri v. Estefan*, 793 F. Supp. 1182, 1190 (S.D.N.Y. 1992). The New York entity must "render[] services on behalf of the foreign corporation that go beyond mere solicitation and are sufficiently important to the foreign entity that the corporation itself would perform equivalent services if no agent were available." *Wiwa v. Royal Dutch Petrol. Co.*, 226 F.3d 88, 95 (2d Cir. 2000). Common ownership "gives rise to a valid inference as to the broad scope of the agency." *Frummer v. Hilton Hotels Int'l, Inc.*, 19 N.Y.2d 533, 537 (N.Y. 1967) (noting that "[w]hen their activities abroad, either directly or through an agent, become as widespread and energetic as the activities in New York conducted by [defendant], they receive considerable benefits from such foreign business and may not be heard to complain about the burdens."). Ultimately, for the agency test, courts "look to realities rather than to formal relationships." *Bulova Watch Co. v. Hattori & Co.*, 508 F. Supp. 1322, 1334 (E.D.N.Y. 1981).

Defendants are also subject to the Court's jurisdiction because they maintained significant and continuous operations as to their Fairfield Fund investments in New York through non-party EFG Capital, a Delaware corporation that operated from offices in New York and Florida and that shared common ownership with Defendants. Am. Compl. ¶¶56-57, 78. EFG Capital's president testified that the relationship between Defendants and Fairfield Sentry was "born in Miami" at EFG Capital. *Id*. By at least 2003, Defendants' relationships with FGG were managed by EFG Capital. *Id*. ¶79.

To that end, EFG Capital acted as Defendants' agent with respect to their Fairfield Fund investments. EFG Capital employees met with Madoff in New York and FGG in New York on behalf of Defendants. *Id.* ¶¶66, 76-77. Representatives from EFG Capital's Miami office coordinated Defendants' transfers to and from the Fairfield Funds by, among other things, executing Fairfield Sentry subscription agreements as "attorneys-in-fact," signing Fairfield Lambda redemption requests, and transmitting Fairfield Sigma subscription agreements to FGG in New York. *Id.* ¶80. EFG Capital employees also regularly corresponded with Defendants regarding FGG, the Fairfield Funds, and BLMIS. *Id.* These contacts further support jurisdiction over Defendants.

### 3.    *Defendants' Contacts with the Forum are Sufficiently Related to the Trustee's Claims*

This Court has repeatedly held that the Trustee's recovery actions against subsequent transferees similarly situated to Defendants are "directly related to [their] investment activities with Fairfield and BLMIS." *Multi-Strategy I*, 641 B.R. at 88; *Vontobel*, 2022 WL 17087560, at *4. As the Supreme Court recently held, the "arise out of or relate to" test does not require a causal relationship. *See Ford Motor Co.*, 141 S. Ct. at 1026-30. Rather, this test may be satisfied if the defendant's conduct involves "financial transactions that touch the forum." *In re Fairfield Sentry Ltd.*, 627 B.R. at 566; *see also Arcapita*, 549 B.R. at 68-71 (requiring only that the claim is not completely "unmoored" from transaction).

Here, Defendants' employees met with and/or regularly communicated with FGG personnel in New York regarding issues directly related to Madoff, BLMIS, the SSC Strategy, and Defendants' investments in the Fairfield Funds. Am. Compl. ¶¶67, 76; Hough Decl. ¶¶4-17, 20-21, 23-28. EFG Bank, EFG Monaco, EFG Capital, and Banco Atlántico employees also met with Madoff in New York. Am. Compl. ¶77; Hough Decl. ¶18. Moreover, Defendants relied on

U.S.-based EFG Capital to coordinate their transfers to and from the Fairfield Funds. Am. Compl. ¶80. Finally, Defendants used New York bank accounts to invest in Fairfield Sentry (*id.* ¶71), and EFG Bahamas and EFG Monaco used New York bank accounts to receive some of the subsequent transfers from Fairfield Sentry that the Trustee seeks to recover here.[16] *Id.* ¶¶73-74; Hough Decl. ¶29. Defendants are no different than the many subsequent transferee defendants whose activities have previously been found by this Court to be related to the Trustee's claims.

4.    *Defendants' Remaining Arguments Against Jurisdiction Are Unavailing*

Defendants argue that the Trustee must make a jurisdictional showing as to each claim in the Amended Complaint and that "each redemption payment is a separate claim for jurisdictional purposes." Mot. at 8 (citing *BNP*, 594 B.R. at 190). But Defendants misconstrue the requirements for personal jurisdiction and this Court's decision in *BNP*.[17] Courts have personal jurisdiction over *defendants*, not *redemption payments. Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945). Likewise, as Defendants recognize, courts must assess a *defendant's* contacts with the forum, not a transfer's contacts. *See* Mot. at 8, 15 (citing *Tera Grp.*, 2018 WL 4732426, at *3 for the proposition that jurisdictional allegations must be pled as to each defendant). Where a defendant's minimum contacts with the forum support specific jurisdiction, the court may adjudicate any claims related to those contacts. *See Ford Motor Co.*, 141 S. Ct. at 1026-28, 1032.

---

[16] EFG Bank also used New York bank accounts to send subscription payments to and receive redemption proceeds from Fairfield Sigma. Am. Compl. ¶75.

[17] The Court in *BNP* did not look at each transfer to determine jurisdiction. The Court assessed each defendant, focused on the overall contacts and relationships with the initial transferees in New York, and determined it had jurisdiction. *BNP*, 594 B.R. at 191 (finding jurisdiction for "any fraudulent transfer claims resulting from redemptions by the Defendants from their accounts with the Tremont Funds"); *see also KEB*, 2022 WL 4371908, at *5 ("By alleging that Defendant intentionally invested in BLMIS, the Trustee has met his burden of alleging jurisdiction as to each subsequent transfer that originated with BLMIS.").

Defendants also cite to various alter ego and veil piercing cases to assert the Trustee has not alleged that Fairfield Sentry was an alter ego or acted as an agent to impute Fairfield Sentry's contacts to Defendants. Mot. at 11. Defendants again miss the point. The Fairfield Funds were Defendants' means to accessing BLMIS and the U.S. securities market, which is different than any alter ego or agency theories.

**B.    The Exercise of Personal Jurisdiction over Defendants Is Reasonable**

Defendants fail to present a compelling reason why jurisdiction would be unreasonable. "The reasonableness inquiry requires the court to determine whether the assertion of personal jurisdiction over the defendant comports with 'traditional notions of fair play and substantial justice' under the circumstances of the particular case." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (cleaned up). Where a plaintiff has made a threshold showing of minimum contacts, a defendant must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Chloé*, 616 F.3d at 165 (quoting *Burger King*, 471 U.S. at 477). Indeed, this Court has found "it would be a 'rare' case where the defendant's minimum contacts with the forum support the exercise of personal jurisdiction, but it is unreasonable to force the defendant to defend the action in that forum." *BNP*, 594 B.R. at 188 (cleaned up).

This is not that "rare" case. The burden on Defendants is minimal. *See Picard v. Maxam Absolute Return Fund, L.P. (In re BLMIS)*, 460 B.R. 106, 119 (Bankr. S.D.N.Y. 2011) (finding New York counsel and conveniences of modern communication and transportation minimize any such burden). As this Court has found, Defendants "[are] not burdened by this litigation" because they "[have] actively participated in this Court's litigation for over ten years," they are represented by U.S. counsel, and voluntarily submitted to the jurisdiction of New York courts and the application of New York law when they signed their subscription agreements with the

27

Fairfield Funds. *See, e.g.*, *Multi-Strategy I*, 641 B.R. at 88. Defendants also participated in the omnibus motion to dismiss the Trustee's complaints on extraterritoriality grounds. *See, e.g.*, ECF Nos. 39 and 55.

Finally, Defendants' argument that the U.S.'s interests are not greater than Switzerland's interests (Mot. at 20 n.9), disregards the interests of the Trustee and this Court. This "forum and the Trustee both have a strong interest in litigating BLMIS adversary proceedings in this Court." *See, e.g.*, *Multi-Strategy I*, 641 B.R. at 88-89; *Banque SYZ*, 2022 WL 2135019, at *5 (same); *Lombard* Interlocutory Decision at 10-11 (crediting this Court's findings that the forum has a strong interest in adjudicating the liquidation of funds for the benefit of creditors).

### C.    In the Alternative, the Trustee Is Entitled to Jurisdictional Discovery

If this Court finds that the Trustee has not made a prima facie showing of jurisdiction, the Trustee respectfully requests jurisdictional discovery. "Such discovery may be authorized where a plaintiff has made a threshold showing that there is some basis for the assertion of jurisdiction." *Kiobel v. Royal Dutch Petroleum Co.*, No. 02 Civ. 7618 (KMW) (HBP), 2009 WL 3817590, at *4 (S.D.N.Y. Nov. 16, 2009) (cleaned up); *Ayyash v. Bank Al-Madina*, No. 04 Civ. 9201(GEL), 2006 WL 587342, at *6 (S.D.N.Y. Mar. 9, 2006) (granting discovery because allegations of wire transfers through United States made a "sufficient start" toward establishing jurisdiction). The Trustee has made that showing here.

### II.    THE TRUSTEE'S CLAIMS ARE NOT BARRED UNDER 11 U.S.C. § 546(e)

Defendants argue that Section 546(e) bars all of the Trustee's claims to avoid or recover transfers made by BLMIS prior to the two-year period, even though the Trustee has pled the Fairfield Funds' actual knowledge. Mot. at 21-27. This argument has been repeatedly rejected by this Court, *see, e.g.*, *Multi-Strategy I*, 641 B.R. at 92-95, and the District Court. In November 2022, Judge Rakoff issued a decision denying interlocutory appeal of this Court's decisions

denying seven motions to dismiss on the Section 546(e) issue, finding no reasonable grounds for disagreement as to the Bankruptcy Court's orders. *Picard v. Multi-Strategy Fund Ltd.*, No. 22-CV-06502 (JSR), 2022 WL 16647767 (S.D.N.Y. Nov. 3, 2022) ("*Multi-Strategy II*"). These decisions are controlling here and Defendants cannot distinguish them.

### A.    The Fairfield Funds Had Actual Knowledge of Madoff's Fraud

Defendants set forth at length the requirements of Section 546(e) and how they are presumably met in this case with respect to the initial transfers from BLMIS. Mot. at 21-27. Most of Defendants' discussion on this point—i.e., whether BLMIS is a stockbroker, whether the transfers are to a financial institution, or whether the transfers are settlement payments or made in connection with a securities contract—relies on *In re Bernard L. Madoff Inv. Sec. LLC (Picard v. Ida Fishman Revocable Tr.)*, 773 F.3d 411 (2d Cir. 2014). None of this matters.[18] This Court has previously held that the Trustee has sufficiently pled that Sentry had actual knowledge of Madoff's fraud. *Multi-Strategy I*, 641 B.R. at 92-93 (citing *Fairfield Inv. Fund*, 2021 WL 3477479, at *4). As such, Section 546(e) does not bar the avoidance of initial transfers made to Fairfield Sentry, and those transfers may be recovered from Defendants regardless of whether the Fairfield Funds or Defendants qualify as financial institutions, their agreements qualify as securities contracts, or their transfers qualify as settlement payments.[19]

---

[18] The Trustee does not concede that any agreements or transfers between the Fairfield Funds and Defendants activate the safe harbor under Section 546(e) or that any transferor or transferee is a financial institution or participant. Such information is simply not relevant, because whether the initial transfers from BLMIS to Fairfield Sentry are avoidable turns on Fairfield Sentry's actual knowledge of fraud at BLMIS. Among other things, the Trustee does not concede—by alleging that the subsequent transfers were customer property—that the initial transfers were "in connection with" the subscription agreements with Defendants or "for the benefit of" Defendants.

[19] Defendants also argue that Section 546(e) applies based on separate agreements between Defendants and the Fairfield Funds, but this similarly provides no basis for granting their Motion. Mot. at 27. Judge Rakoff addressed this hypothetical and confirmed that any such application of the Section 546(e) safe harbor is "fact-intensive," not "answerable on the pleadings," and best addressed "with a full factual record" before the court. *Multi-Strategy II*, 2022 WL 16647767, at *8-9.

**B.      Section 546(e) Does Not Apply Independently to Recovery Actions**

Defendants are also wrong when they assert that the Section 546(e) safe harbor applies

unless the Trustee alleges that Defendants themselves had actual knowledge of Madoff's fraud.

Mot. at 22. As this Court recently held, defendants "[are] not permitted to raise the safe harbor

defense on [their] own behalf as . . . subsequent transferee[s]" and the 546(e) "safe harbor is not

applicable to subsequent transfers." *Multi-Strategy I*, 641 B.R. at 94-95; *see also Vontobel*, 2022

WL 17087560, at *9.

By its plain language, Section 546(e) applies to the avoidance of initial transfers, not the

recovery of subsequent transfers under Section 550. 11 U.S.C. § 546(e) ("[T]he trustee may not

*avoid a transfer* . . . except under section 548(a)(1)(A) of this title." (emphasis added)); *see also*

*BNP*, 594 B.R. at 197 ("The Trustee does not . . . 'avoid' the subsequent transfer; he recovers the

value of the avoided initial transfer from the subsequent transferee under 11 U.S.C. § 550(a), and

the safe harbor does not refer to the recovery claims under section 550."); *Multi-Strategy II*, 2022

WL 16647767, at *5 (confirming this Court's finding that "by its terms, the Section 546(e) safe

harbor is a defense to the avoidance of the <u>initial</u> transfer") (cleaned up).

The District Court confirmed that Section 546(e) does not provide an independent safe

harbor for Section 550 recovery actions against subsequent transferees. *Sec. Inv. Prot. Corp. v.*

*Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, No. 12-MC-115 (JSR), 2013 WL 1609154

(S.D.N.Y. Apr. 15, 2013) ("*Cohmad*"). The District Court specifically limited the safe harbor to

avoidance claims based on the plain language of Section 546(e). *See id.* at *7 (recognizing that

subsequent transferees can raise initial transferees' defenses to avoidance). Consistent with

*Cohmad*, this Court has held that "a subsequent transferee may raise the safe harbor as a defense

. . . only in so far as the avoidance of the initial transfer is concerned." *KEB*, 2022 WL 4371908,

at *10; *see also Multi-Strategy II*, 2022 WL 16647767, at *5 (confirming *Cohmad* did not

provide subsequent transferees the right to independently assert Section 546(e) where initial

transferee is sufficiently alleged to have actual knowledge). Put simply: "The safe harbor is not

applicable to subsequent transfers." *Cathay Life*, 2022 WL 16626325, at \*9.

In *Multi-Strategy II*, the District Court confirmed its holding in *Cohmad* that avoidability

of initial transfers does not turn on the "subjective mental knowledge" of the subsequent

transferee and that the Trustee is not required to plead actual knowledge of the subsequent

transferee. *Multi-Strategy II*, 2022 WL 16647767, at \*5-6 (Defendants' "lack of knowledge of

Madoff's fraud cannot render unavoidable the otherwise avoidable initial transfer from Madoff

Securities to Fairfield."). As such, Defendants cannot assert Section 546(e) protections where the

Trustee has adequately pleaded Fairfield Sentry's actual knowledge.

Defendants ignore the *Cohmad* and *Multi-Strategy II* decisions, and do not even attempt

to reconcile their argument with this Court's numerous applications of these decisions. In any

event, subsequent transferees like Defendants cannot assert Section 546(e) protections where the

Trustee has adequately pleaded Sentry's actual knowledge, as here. *See Multi-Strategy II*, 2022

WL 16647767, at \*6 (Defendants' "lack of knowledge of Madoff's fraud cannot render

unavoidable the otherwise avoidable initial transfer from Madoff Securities to Fairfield.").

## III.    THE TRUSTEE'S AMENDED COMPLAINT STATES A PLAUSIBLE CAUSE OF ACTION FOR RECOVERY OF BLMIS CUSTOMER PROPERTY UNDER SECTION 550(a)

The Trustee's Amended Complaint plausibly pleads that Defendants received subsequent

transfers of BLMIS customer property. To plead a subsequent transfer claim, the Trustee must

allege facts that support an inference "that the funds at issue originated with the debtor." *Picard*

*v. Merkin (In re BLMIS)*, 515 B.R. 117, 149-50 (Bankr. S.D.N.Y. 2014) ("*Merkin II*") (cleaned

up). The Trustee is not required to perform a tracing analysis or to present a "dollar-for-dollar

accounting of the exact funds at issue." *Multi-Strategy I*, 641 B.R. at 90 (quoting *BNP*, 594 B.R.

at 195); *Banque SYZ*, 2022 WL 2135019, at *7 (same); *see also Merkin II*, 515 B.R. at 149-50

(quoting *Picard v. Charles Ellerin Rev. Tr. (In re BLMIS)*, No. 10-04398 (BRL), 2012 WL

892514, at *3 (Bankr. S.D.N.Y. Mar. 14, 2012)). Rather, "the Trustee need only allege sufficient

facts to show the relevant pathways through which the funds were transferred from BLMIS to

[the subsequent transferee] . . . ." *Charles Ellerin*, 2012 WL 892514, at *3; *see also 45 John

*Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*, 599 B.R. 730, 747 (Bankr.

S.D.N.Y. 2019). Also, the Trustee "must allege the necessary vital statistics—the who, when,

and how much—of the purported transfers to establish an entity as a subsequent transferee of the

funds." *Multi-Strategy I*, 641 B.R. at 90 (quoting *BNP*, 594 B.R. at 195).

The Trustee's Amended Complaint meets these requirements by alleging that Defendants

received transfers, identified by date and amount in accompanying exhibits, from Fairfield

Sentry, and that Fairfield Sentry invested all or substantially all of its funds with BLMIS. Am.

Compl. ¶¶65, 95, 109, 113, Exs. C, H, I. The Amended Complaint also alleges that Defendants

received transfers, identified by date and amount in accompanying exhibits, from Fairfield Sigma

and Fairfield Lambda, and that Fairfield Sigma and Fairfield Lambda invested all of their funds

with Fairfield Sentry. *Id.* ¶¶3, 100, 105, 109, 116, Exs. E, G, J. Nothing more is required. As this

Court recently held in numerous decisions, these "exhibit[s] provide[] [defendants] with the

'who, when, and how much' of each transfer." *See, e.g.*, *Multi-Strategy I*, 641 B.R. at 95; *Banque*

*SYZ*, 2022 WL 2135019, at *12.

### A.    Defendants Misstate the Trustee's Pleading Burden

Unable to argue that the Trustee fails to meet the pleading burden, Defendants argue for a

new one, asserting that the Trustee must trace and tie each subsequent transfer Defendants

received to a specific initial transfer from BLMIS. Mot. at 29. But that is not the Trustee's

pleading burden. *See Cathay Life*, 2022 WL 16626325, at *7 ("The Trustee need not prove the

path that each transfer took from BLMIS to Fairfield Sentry and subsequently to each redeeming shareholder."); *Merkin II*, 515 B.R. at 150 (refusing to dismiss subsequent transfer claims even though the complaint "[did] not connect each of the subsequent transfers with an initial, voidable transfer emanating from BLMIS"); *see also 45 John Lofts, LLC*, 599 B.R. at 747 (finding no "requirement to trace individual dollar amounts from the transferor to the transferees to survive a motion to dismiss"). The Court also rejected the argument that the Trustee must detail which and what portion of each subsequent transfer comprises customer property. *See Merkin II*, 515 B.R. at 152-53 (refusing to dismiss complaint where "at least some of the subsequent transfers . . . may be recoverable"); *see also KEB*, 2022 WL 4371908, at *11 (refusing to "hold a pre-discovery trial on all of the subsequent transfers actions to determine which transfers were made from the $3 billion of BLMIS customer property and which were not").[20]

## B.    Defendants' Other Implausibility Arguments Fail on a Motion to Dismiss

Defendants argue that it is implausible that the transfers to Defendants contained BLMIS customer property because the Trustee's claims are "mathematically impossible," as the Trustee is seeking more money from all of Sentry's subsequent transferees than the fund withdrew from BLMIS. Mot. at 29-30. Defendants' argument misses the point. As this Court has stated, "[t]here is no dispute that the Trustee is limited to 'a single satisfaction' under § 550(a)." *Multi-Strategy*

---

[20] Defendants' reliance on *Angell v. Ber Care, Inc. (In re Caremerica, Inc.)*, 409 B.R. 737 (Bankr. E.D.N.C. 2009) is also unpersuasive. Unlike the Trustee's action, *Caremerica* involved preferential transfers from a non-debtor bank account where the trustee failed to "rebut the alternative and reasonable possibility that the funds . . . originated from sources other than the debtors." 409 B.R. at 751. The heightened pleading standard applied in *Caremerica* is disfavored in many jurisdictions and irrelevant here. *Zucker v. Oconee Reg'l Healthcare Found., Inc. (In re Oconee Reg'l Health Sys., Inc.)*, 621 B.R. 64, 71-72 (Bankr. M.D. Ga. 2020) (heightened pleading standard for preference claims is inconsistent with the liberal fair notice pleading standard and Supreme Court's mandate complaint does not need detailed factual allegations (footnote omitted)); *Howell, III v. Fulford (In re S. Home & Ranch Supply, Inc.)*, Nos. 11-12755, 13-1043, 2013 WL 7393247, at *5 (Bankr. N.D. Ga. 2013) (referencing "*Caremerica* and its progeny, which has not been followed in this Circuit"); *Tousa Homes, Inc. v. Palm Beach Newspapers, Inc. (In re TOUSA, Inc.)*, 442 B.R. 852, 855-56 (Bankr. S.D. Fla. 2010) (*Caremerica*'s pleading requirement inconsistent with the liberal pleading standard promulgated in *Twombly* and *Iqbal* and in the court rules).

*I*, 641 B.R. at 95 (citing § 550(d)). "He may nevertheless pursue any and all subsequent transferees in order to achieve that satisfaction." *Id*. at 95-96 (citing § 550(a)(2)). And, under § 550(a), "a trustee may recover [an avoided] transfer from a subsequent transferee of those funds, without the necessity for allocation among all [the] subsequent transferees." *CNB Int'l Inc. v. Kelleher (In re CNB Int'l, Inc.)*, 393 B.R. 306, 333 (Bankr. W.D.N.Y. 2008). Thus, until the Trustee recovers the full amount of the approximately $3 billion in fraudulent transfers received by Fairfield Sentry, the Trustee may simultaneously seek recovery from Defendants in this action and from defendants in other actions in this SIPA liquidation proceeding, even in an aggregate amount that exceeds initial transfers. *See Fairfield Inv. Fund*, 2021 WL 3477479, at *12. "Calculation of whether the Trustee is fully satisfied is a factual finding to be made by this Court at a later stage of litigation." *Multi-Strategy I*, 641 B.R. at 96.

In attempting to argue that commingling of funds is an "alternative explanation" to the Trustee's plausible claims, Defendants rely on a case that did not involve commingling or recovery proceedings in a SIPA liquidation. Mot. at 31 (citing *Garfinkle v. Conference on Jewish Material Claims Against Germany, Inc.*, No. 19-CV-7007 (JPO), 2020 WL 6323462, at *1, 4-5 (S.D.N.Y. Oct. 28, 2020) (finding plaintiff failed to show defendant's "sole purpose to harm" plaintiff, as required for tortious interference claim, where the court found an "obvious alternative explanation"). Commingling may add a layer of complication to the tracing of customer property from BLMIS, but it does not require dismissal of the Trustee's subsequent transfer claims. *See Dahar v. Jackson (In re Jackson)*, 318 B.R. 5, 25 (Bankr. D.N.H. 2004) ("[T]he mere commingling of the Defendant's property with the proceeds of property fraudulently transferred by the Debtor is not sufficient to defeat tracing."); *Charles Ellerin*, 2012 WL 892514, at *3 (at the summary judgment stage it is not necessary for the Trustee to specify

what portion of the subsequent transfers, which were paid from commingled funds, were derived from BLMIS).

Defendants' arguments are also, absent discovery, premature. The circumstances of the transfers, including the purposes of the transfers and the parties' intent, are relevant to the equitable principles applied to tracing. *See Southmark Corp. v. Schulte Roth & Zabel (In re Southmark Corp.),* 239 F.3d 365, 2000 WL 1741550, at *5 (5th Cir. Dec. 11, 2000) (the court's "task here is to look beyond the particular transfers in question to the entire circumstance of the transactions") (cleaned up). Because money is fungible, "[t]he goal of tracing is not to trace anything at all in many cases, but rather to serve as an equitable substitute for the impossibility of specific identification." *United States v. Henshaw*, 388 F.3d 738, 741 (10th Cir. 2004) (cleaned up). And "[i]t is undeniable that equity will follow a fund through any number of transmutations, and preserve it for the owner as long as it can be identified." *IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689, 709 (11th Cir. 2005).

"[I]n a case such as this one, where 'the Trustee's lack of personal knowledge is compounded with complicated issues and transactions [that] extend over lengthy periods of time, the trustee's handicap increases,' and 'even greater latitude' should be afforded." *Picard v. Cohmad Secs. Corp. (In re BLMIS)*, 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011).[21] This is one reason why this Court in *Merkin II* denied defendants' motion to dismiss, finding "[t]he subsequent transfer claim must ultimately be proved through the books and records of the

---

[21] Defendants claim that due to the "document-sharing provisions" of the Fairfield Settlement Agreement, the Trustee should have been able to tie the EFG Defendants' transfers to particular transfers from BLMIS to Fairfield Sentry. Mot. 32 n.17. This contention is untrue and based on nothing more than a generic provision in a settlement agreement. The Trustee does not have all of FGG's and Fairfield Sentry's books and records, and discovery in the Trustee's actions against the FGG defendants is ongoing. *See, e.g.*, Stipulated Am. Case Mgmt. Order, *Picard v. Fairfield Inv. Fund Ltd.*, No. 09-01239 (CGM) (Bankr. S.D.N.Y. May 17, 2022), ECF No. 355 (setting November 22, 2023, deadline for fact discovery and August 23, 2024, deadline for expert discovery). Nor does the Trustee have Defendants' books and records concerning their investments in Fairfield Sentry, requests for redemptions, and transfers to and from Fairfield Sentry.

defendants." 515 B.R. at 151. And even after fact discovery, expert opinion is necessary to determine what portion of the subsequent transfer stemmed from the initial transfer where the subsequent transfers originated from commingled accounts. *Picard v. Merkin (In re BLMIS)*, 581 B.R. 370, 386 (Bankr. S.D.N.Y. 2017). As such, equity weighs against cutting the Trustee off at the pleading stage.

## IV.    THE SECTION 550(B) GOOD FAITH AFFIRMATIVE DEFENSE CANNOT BE RESOLVED AT THE MOTION TO DISMISS STAGE

Defendants argue that the Court should dismiss the Amended Complaint as a matter of law because the face of the Amended Complaint and related proceedings establish Defendants' purported good faith. Mot. at 32-35. This Court has already rejected the "good faith" affirmative defense as inappropriate and untimely on a motion to dismiss, and should similarly reject Defendants' efforts here to recycle the same arguments. *See Banque SYZ*, 2022 WL 2135019, at *10-11 (holding that it is a defendant's burden to plead value, good faith, and lack of knowledge "in an answer, and prove it with evidence; it cannot be established in a complaint"); *Vontobel*, 2022 WL 17087560, at *11-12; *Credit Suisse I*, 2022 WL 17098676, at *8; *Credit Suisse II*, 2022 WL 17098739, at *8-10; *First Gulf*, 2022 WL 3354955, at *10-11; *BJB*, 2022 WL 17726520, at *17; *see also In re Bernard L. Madoff Secs. LLC*, No. 20-CV-02586 (CM), 2022 WL 1304589, at *1-3 (S.D.N.Y. May 2, 2022) ("*ABN Ireland*"); *Delta*, 2022 WL 3365256, at *6.

Affirmative defenses are fact-driven, requiring factual analyses and a presentation of evidence. *ABN Ireland*, 2022 WL 1304589, at *3 ("The Trustee rightfully points out that such a fact-based determination can only be made based on the entirety of the factual record after discovery (which has not occurred here), not from isolated documents cherry-picked by Appellees and factual inferences Appellees improperly seek to have drawn in their favor.") (cleaned up); *see also United Teamster Fund v. MagnaCare Admin. Servs., LLC*, 39 F. Supp. 3d

461, 475 (S.D.N.Y. 2014) ("Affirmative defenses 'often require[ ] consideration of facts outside

of the complaint and thus [are] inappropriate to resolve on a motion to dismiss.'") (quoting

*Kelly–Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013)). That sort of factual analysis is not

appropriate at this stage, particularly with respect to a good faith defense. *See, e.g.*, *Picard v.*

*Merkin (In re BLMIS)*, 440 B.R. 243, 257 (Bankr. S.D.N.Y. 2010) ("*Merkin I*") ("[W]hether the

Moving Defendants acted in good faith . . . is a disputed issue that this Court can properly

determine only upon consideration of all of the relevant evidence obtained through the discovery

process."); *In re Dreier LLP*, 452 B.R. 391, 426 (Bankr. S.D.N.Y. 2011) ("Determining the

Defendants' good faith is an indisputably factual inquiry to be undertaken by the Court after the

close of discovery and need not be resolved at the motion to dismiss stage.").

Defendants make an unsupportable argument that their good faith has been established as

a matter of law on the face of the Amended Complaint. Mot. at 3, 32-35. As recognized in

*Merkin I*, such an argument applies only as a "limited exception to the general rule" that good

faith cannot be established on a motion to dismiss. 440 B.R. at 256. To prevail under this limited

exception, Defendants must show there is an "insuperable bar to securing relief" set forth on the

face of the Amended Complaint. *Dreier*, 452 B.R. at 426 (cleaned up); *see also United States v.*

*Space Hunters, Inc.*, 429 F.3d 416, 426 (2d Cir. 2005) (denying motion to dismiss unless "the

facts supporting the defense appear on the face of the complaint, and it appears beyond doubt

that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief")

(cleaned up). Tellingly, Defendants fail to cite a single case where a court has dismissed an

action at the pleading stage based on a good faith defense, and their argument that a diligent

inquiry into BLMIS would have been futile fails this standard. *See, e.g.*, *Credit Suisse I*, 2022

WL 17098676, at *8 ("Credit Suisse does not meet this [stringent] standard and it does not provide any cases where good faith was successfully plead on a motion to dismiss.").

Defendants further incorrectly argue that based on (i) the Trustee's Fairfield Complaint-related allegations and (ii) the fact that others did not discover the fraud, diligent inquiry by Defendants would have been futile. Mot. at 33-35. Defendants cannot rely on an assortment of cherry-picked allegations as to BLMIS's and FGG's secrecy, and factual inferences they wish this Court to draw in their favor. *Id.*; *see ABN Ireland*, 2022 WL 1304589, at *3. Even were it appropriate to consider such arguments at this stage, the SEC's failure to detect Madoff's fraud, for instance, is not dispositive as to a defendant's good faith. *See Picard v. Avellino (In re BLMIS)*, 557 B.R. 89, 120 (Bankr. S.D.N.Y. 2016) (finding no inconsistency between the Trustee's allegations regarding defendants' knowledge of Madoff's fraud and failure by others—including the SEC—to detect the Ponzi scheme). Defendants are sophisticated parties who did their own investigations and diligence on investments—facts which by their nature will come to light during discovery.

Defendants make similar arguments with regard to value.[22] Mot. at 32-33. Value, however, is also a fact-driven element of the affirmative defense to be addressed later in the litigation. *See, e.g.*, *Fairfield Inv. Fund*, 2021 WL 3477479, at *9 (stating that "[w]hether the Defendants gave value is a question of fact to be resolved either at the summary judgment stage or at trial"). As was true in *Banque SYZ*, *BJB*, *Vontobel*, *First Gulf*, and *Credit Suisse II*, the

---

[22] Defendants do not specifically address knowledge of voidability, but instead assert that this prong of the Section 550(b) affirmative defense is to be construed "the same as good faith." *See* Mot. at 35 (citing *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 516 B.R. 18, 23 n.3 (S.D.N.Y. 2014). Defendants' only support for this contention is a footnote in the District Court's good faith decision, which was directly superseded by the Second Circuit's good faith decision. *Citibank*, 12 F.4th at 178. The Trustee takes no position on this contention for purposes of this opposition but reserves his right to argue at the appropriate time, following discovery, that the absence of knowledge of voidability is a distinct element of the affirmative defense requiring a showing separate from good faith.

Amended Complaint does not mention Defendants exchanging shares for consideration, and the value defense is therefore not pleaded on the face of the Amended Complaint. *Banque SYZ*, 2022 WL 2135019, at *10; *BJB*, 2022 WL 17726520, at *16; *Vontobel*, 2022 WL 17087560, at *11-12; *First Gulf*, 2022 WL 3354955, at *10; *Credit Suisse II*, 2022 WL 17098739, at *8. Moreover, to the extent Defendants argue value exists because the payments they received were given in exchange for their redemption of shares from the Fairfield Funds, this too cannot be decided on a motion to dismiss. *Banque SYZ*, 2022 WL 2135019, at *11; *BJB*, 2022 WL 17726520, at *16; *Vontobel*, 2022 WL 17087560, at *11-12; *First Gulf*, 2022 WL 3354955, at *11; *Credit Suisse II*, 2022 WL 17098739, at *9; *see also Fairfield Inv. Fund*, 2021 WL 3477479, at *9 (holding that whether subsequent transfer defendants "'gave value' in the form of surrendering shares in the Fairfield Funds . . . cannot be made as a matter of law or fact at this stage").

Even if this Court were to consider Defendants' fact-intensive affirmative defense, the Trustee must be given the opportunity to pursue discovery of those facts. *ABN Ireland*, 2022 WL 1304589, at *3 (finding that such a fact-based defense must be based on the entirety of the factual record after discovery); *Merkin I*, 440 B.R. at 257 ("[W]hether the Moving Defendants acted in good faith when they allegedly accepted hundreds of millions of dollars in transfers of BLMIS funds is a disputed issue that this Court can properly determine only upon consideration of all of the relevant evidence obtained through the discovery process."); *see also Banque SYZ*, 2022 WL 2135019, at *11; *Vontobel*, 2022 WL 17087560, at *12; *First Gulf*, 2022 WL 3354955, at *11; *Credit Suisse II*, 2022 WL 17098739, at *9.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests the Court deny the Motion.

Dated: February 13, 2023
New York, New York

*/s/ Brian W. Song*

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Brian W. Song
Shawn P. Hough

200 Civic Center Drive, Suite 1200
Columbus, Ohio 43215
Telephone: (614) 462-4732
Facsimile: (614) 462-2616
Douglas A. Vonderhaar

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff*

40