**KOBRE & KIM LLP**
800 Third Avenue
New York, New York 10022
Telephone: (212) 488-1200
Zachary.Rosenbaum@kobrekim.com
Adam.Lavine@kobrekim.com
Donna.Xu@kobrekim.com

*Attorneys for BSI AG*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                         Plaintiff-Applicant,<br><br>          v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                         Defendant. | Adv. Pro. No. 08-01789 (CGM)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                         Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>                         Plaintiff,<br><br>          v.<br><br>BSI AG, individually and as successor in interest to BANCO DEL GOTTARDO AG,<br><br>                         Defendant. | Adv. Pro. No. 12-01209 (CGM)<br><br><br><br>**ANSWER TO AMENDED COMPLAINT WITH JURY DEMAND** |

BSI AG ("BSI"), individually and as alleged successor-in-interest to Banca del Gottardo

AG ("BDG"), by its undersigned counsel, as and for its Answer to the Amended Complaint filed

by plaintiff Irving H. Picard (the "Trustee"), as trustee for the Liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS") (the "Complaint"), states as follows:[1]

## **GENERAL DENIAL**

Except as otherwise expressly admitted herein, BSI denies each and every allegation in the

Complaint. BSI states that the headings and sub-headings throughout the Complaint do not constitute

well-pleaded allegations of fact and therefore require no response. To the extent a response is required,

the allegations in the headings and subheadings in the Complaint are denied. In answering the

allegations in the Complaint, BSI does not intend to waive, and does not waive, any and all applicable

objections to the relevance, admissibility, or prejudicial effect of any of the allegations in the

Complaint. BSI expressly reserves the right to amend and/or supplement this Answer.

## **RESPONSES TO SPECIFIC ALLEGATIONS**

### I.   **NATURE OF THE ACTION**

1.      This adversary proceeding is part of the Trustee's continuing efforts to recover
BLMIS customer property, as defined by SIPA § 78lll(4), stolen as part of the massive Ponzi
scheme perpetrated by Madoff and others.

**ANSWER:**    The allegations of paragraph 1 contain legal conclusions to which no

response is required. To the extent a response is required, BSI denies knowledge or information

sufficient to form a belief as to the truth of the allegations in paragraph 1 of the Complaint, except

admits that Plaintiff purports to bring this action as trustee for the substantively consolidated

liquidation of BLMIS and the estate of Bernard L. Madoff ("Madoff") pursuant to the Securities

Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*

---

[1] Capitalized terms not defined herein have the meaning set forth in the Complaint.

2.      With this Amended Complaint, the Trustee seeks to recover at least $60,904,246 in subsequent transfers of BLMIS customer property made to BSI, both directly and as the successor in interest to BDG from 2003 through 2008 (the "Transfers"). The Trustee seeks to recover all of the Transfers from BSI, as BDG was acquired by and integrated into BSI in 2008.

**ANSWER:**    The allegations of paragraph 2 contain legal conclusions to which no response is required. To the extent a response is required, BSI denies the allegations in paragraph 2 of the Complaint, except admits that (i) the Trustee seeks to recover from BSI the amount of alleged subsequent transfers alleged in the Complaint, and (ii) BDG merged with and was integrated into BSI in 2008.

3.      At all relevant times, BSI and BDG each were multi-billion-dollar private banks, employing sophisticated and experienced investment management specialists and offering services in, among other areas, alternative investments, including the selection of hedge funds.

**ANSWER:**    BSI denies the allegations in paragraph 3, except admits that: (i) from May 4, 1957 to June 26, 2008, BDG was registered as a "*società anonima*" and, during that time period, operated as, and provided services consistent with, a private bank; (ii) from March 11, 1992 through at least December 15, 2008 (*i.e.*, the date of commencement of the SIPA Proceeding), BSI was registered as a  "*società anonima*" and, during that time period, operated as, and provided service consistent with, a private bank; and (iii) the total assets under management of BSI and BDG varied from time to time, and was reported to be approximately CHF 100 billion in the aggregate in November 2007.

4.      BSI, beginning at least as early as 1996, and BDG, beginning at least as early as 2003, each invested in BLMIS feeder funds Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Fairfield Sigma" and, together with Fairfield Sentry, the "Fairfield Funds"), Kingate Global Fund, Ltd. ("Kingate Global"), and Kingate Euro Fund, Ltd. ("Kingate Euro" and, together with Kingate Global, the "Kingate Funds") (collectively, the "BLMIS Feeder Funds"). Each of these BLMIS Feeder Funds invested all or substantially all of its assets with BLMIS's investment advisory business (the "IA Business"). Fairfield Sigma invested all its assets in Fairfield Sentry, which in turn invested these assets with BLMIS.

**ANSWER:**    BSI denies the allegations contained in the first sentence of Paragraph 4 relating to the Fairfield Funds, and states that, upon information and belief, (i) certain customers

2

of BSI began investing in one or more of the Fairfield Funds in 1999, and (ii) certain customers of

BDG began investing in one or more of the Fairfield Funds at least as early as 2003.  BSI denies

knowledge or information sufficient to form a belief as to the truth of the allegations of the

remainder of the first sentence, as well as the entirety of the second and third sentences, of

paragraph 4 of the Complaint and therefore denies each and every such allegation.

5.    The Trustee now seeks to recover subsequent transfers to BSI and BDG from the Fairfield Funds.[2]

**ANSWER:**    The allegations of paragraph 5 contain legal conclusions to which no

response is required. To the extent a response is required, BSI admits that the Trustee purports to

seek recovery of alleged subsequent transfers allegedly received by BSI and BDG and otherwise

denies the allegations of paragraph 5.

## II.    SUBJECT MATTER JURISDICTION AND VENUE

6.    This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

**ANSWER:**    BSI admits the allegations of the first sentence of paragraph 6 of the

Complaint. BSI denies knowledge or information sufficient to form a belief as to the truth of the

allegations of the second sentence of paragraph 6. BSI states that the third sentence of paragraph

6 sets forth legal conclusions to which no response is required, but to the extent that a response is

---

[2] Footnote 1 of the Complaint states: "BSI and BDG also received approximately $24 million in transfers of BLMIS customer property from the Kingate Funds. The Trustee is not seeking to recover those transfers in light of the settlement in the Kingate case. *See* Adv. Pro. No. 09-1161, Dkt. 413, 417."  The allegations in the first sentence of Footnote 1 contain legal conclusions to which no response is required, but to the extent a response is required, BSI denies such allegations.

required, BSI denies that this Court has jurisdiction to enter a final order or judgment in this proceeding.

7.      This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (F), (H) and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

**ANSWER**:      The allegations of paragraph 7 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, BSI denies the allegations of paragraph 7 and objects to the entry of final orders or judgments against BSI.

8.      Venue in this judicial district is proper under 28 U.S.C. § 1409.

**ANSWER**:      The allegations of paragraph 8 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, BSI denies the allegations of paragraph 8 of the Complaint.

9.      This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

**ANSWER**:      The allegations of paragraph 9 of the Complaint contain legal conclusions and/or purported characterizations to which no response is required. To the extent a response is required, BSI admits solely that the Trustee purports to bring this adversary proceeding under the statutory provisions cited in paragraph 9.

## III.    **BACKGROUND, THE TRUSTEE AND STANDING**

10.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment advisor fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission (the "SEC") commenced the District Court Proceeding.

**ANSWER:**      BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10 of the Complaint and therefore denies such allegations, except BSI admits on information and belief that Madoff was arrested on December 11, 2008, and

that the SEC filed a complaint against Madoff and BLMIS and respectfully refers the Court to that

document for a complete and accurate statement of its contents.

11.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 11 of the Complaint and therefore denies such allegations, and

respectfully refers the Court to the application filed by SIPC referred to in paragraph 11 of the

Complaint for a complete and accurate statement of its contents.

12.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

> a. appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

> b. appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

> c. removed the case to this Court pursuant to SIPA § 78eee(b)(4).

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 12 of the Complaint and therefore denies such allegations, and

respectfully refers the Court to the order issued by Judge Stanton referred to in paragraph 12 of

the Complaint for a complete and accurate statement of its contents.

13.    By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 13 of the Complaint and therefore denies such allegations, and

respectfully refers the Court to the Bankruptcy Court orders dated December 23, 2008, and

February 4, 2009, referred to in paragraph 13 of the Complaint for a complete and accurate statement of their contents.

14.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14 of the Complaint and therefore denies such allegations, and respectfully refers the Court to the bankruptcy petition filed on April 13, 2009, and the Bankruptcy Court order dated June 9, 2009, referred to in paragraph 14 of the Complaint for a complete and accurate statement of their contents.

15.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15 of the Complaint and therefore denies such allegations, except admits on information and belief that Bernard L. Madoff pled guilty at a plea hearing on March 12, 2009, and respectfully refers the Court to the transcript of that hearing for a complete and accurate statement of its contents.

16.    At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16 of the Complaint and therefore denies such allegations, and respectfully refers the Court to the transcript of the plea hearing of Frank DiPascali on August 11, 2009, for a complete and accurate statement of its contents.

17.    At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 17 of the Complaint and therefore denies such allegations, and

respectfully refers the Court to the docket and filings in Case No. 10-CR-228 (LTS) for a complete

and accurate statement of their contents.

18.    On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 18 of the Complaint and therefore denies such allegations.

19.    As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

**ANSWER**:    The allegations of paragraph 19 of the Complaint contain legal conclusions

to which no response is required.  To the extent an answer is required, BSI denies knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 19 of the

Complaint and therefore denies such allegations.

20.    Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

**ANSWER**:    The allegations of paragraph 20 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, BSI denies the allegations of paragraph 20 of the Complaint.

21.    The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

**ANSWER**:    The allegations of paragraph 21 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, BSI denies the allegations of paragraph 20 of the Complaint.

## IV.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A. BLMIS

22.    Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker dealer with the SEC. In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company. At all relevant times, Madoff controlled BLMIS first as its sole member, and thereafter as its chairman and chief executive.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22 of the Complaint and therefore denies such allegations.

23.    In compliance with SIPA § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008. Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation. At all times, BLMIS was assigned CRD No. 2625. SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning in January 19, 1960. On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status. SIPC membership is contingent on registration of the broker-dealer with the SEC.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 23 of the Complaint and therefore denies such allegations.

24.    For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and the IA Business.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 24 of the Complaint and therefore denies such allegations.

25.    BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 25 of the Complaint and therefore denies such allegations.

26.    For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 26 of the Complaint and therefore denies such allegations.

27.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 27 of the Complaint and therefore denies such allegations.

## B.  THE PONZI SCHEME

28.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 28 of the Complaint and therefore denies such allegations.

29.     BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 29 of the Complaint and therefore denies such allegations.

30.     To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 30 of the Complaint and therefore denies such allegations.

31.     On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 31 of the Complaint and therefore denies such allegations.

**C.  MADOFF'S INVESTMENT STRATEGY**

32.     In general, BLMIS purported to execute two primary investment strategies for BLMIS customers: the convertible arbitrage strategy and the split strike conversion strategy ("SSC Strategy"). For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit. At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

**ANSWER**:    BSI lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in paragraph 32 of the Complaint and therefore denies such allegations.

33.    All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 33 of the Complaint and therefore denies such allegations.

34.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets. Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time. In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 34 of the Complaint and therefore denies such allegations.

35.    From the early 1990s, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 35 of the Complaint and therefore denies such allegations.

36.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 36 of the Complaint and therefore denies such allegations. To

the extent paragraph 36 purports to characterize the contents of documents, BSI respectfully refers

the Court to those documents for a complete and accurate statement of their contents.

37.    By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-

the-money S&P 100 Index put options, and (iii) the sale of out-of-the-money S&P 100 Index call options.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 37 of the Complaint and therefore denies such allegations.

38.    The put options were to limit the downside risk of sizable price changes in the basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option should have entailed a loss for BLMIS.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 38 of the Complaint and therefore denies such allegations.

39.    The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 39 of the Complaint and therefore denies such allegations.

40.    The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protection while limiting the upside.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 40 of the Complaint and therefore denies such allegations.

41.    If Madoff was putting on the same baskets of equities across all BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket. For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 41 of the Complaint and therefore denies such allegations.

42.     Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough put and call option notional value to support the Madoff SSC strategy.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 42 of the Complaint and therefore denies such allegations.

43.     Madoff could not have been using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 43 of the Complaint and therefore denies such allegations.

BLMIS's Fee Structure

44.     BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 44 of the Complaint and therefore denies such allegations.

BLMIS's Market Timing

45.     Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he succeeded at market timing by intermittently entering and exiting the market. During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 45 of the Complaint and therefore denies such allegations.

46.     As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS's reported quarterly and year-end exits were

undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time. Yet this is precisely what BLMIS's customer statements reported.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 46 of the Complaint and therefore denies such allegations.

The first sentence of paragraph 46 also contains legal conclusions to which no response is required.

47.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 47 of the Complaint and therefore denies such allegations.

<u>BLMIS Execution</u>

48.    BLMIS's execution, as reported on its BLMIS customer statements, showed a consistent ability to buy low and sell high, an ability so uncanny that it was statistically impossible.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 48 of the Complaint and therefore denies such allegations.

<u>No Evidence of BLMIS Trading</u>

49.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 49 of the Complaint and therefore denies such allegations.

50.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 50 of the Complaint and therefore denies such allegations.

<u>The Collapse of the Ponzi Scheme</u>

51.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests
for redemptions overwhelmed the flow of new investments.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 51 of the Complaint and therefore denies such allegations,

except admits upon information and belief that Madoff was arrested on December 11, 2008, and

that the SEC filed a complaint against Madoff and BLMIS on the same day.

52.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none
of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through
its IA Business operated as a Ponzi scheme.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 52 of the Complaint and therefore denies such allegations,

and respectfully refers the Court to the transcripts of the plea hearings of Bernard Madoff and

Frank DiPascali for a complete and accurate statement of their contents.

53.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less
than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at
the time of the transfers alleged herein, BLMIS was left with insufficient capital.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 53 of the Complaint and therefore denies such allegations.

**V.    THE DEFENDANT AND BDG, ITS PREDECESSOR IN INTEREST**

54.    BSI is a société anonyme, a type of joint stock corporation, with a place of business
at Palazzo Botta, Viale Franscini 8, 6901 Lugano, Switzerland.

**ANSWER**:    BSI admits that it has a place of business at Viale Stefano Franscini n. 8,

CH 6901 Lugano, Switzerland and that it is registered as a "*società anonima*."  BSI otherwise

denies the allegations in paragraph 54 of the Complaint.

55.    Founded in 1873 as Banca della Svizzera Italiana, BSI is now a wholly owned subsidiary of EFG International AG, a global private banking group headquartered in Zurich, Switzerland. EFG International AG acquired BSI in 2016 from Brazilian bank Grupo BTG Pactual SA, which acquired BSI in 2015 from Assicurazioni Generali SpA ("Generali"), a major Italian insurance and financial services company. During the relevant time period of this action, BSI was a wholly owned subsidiary of Generali.

**ANSWER**:    BSI admits the allegations contained in the first sentence of paragraph 55.

BSI denies the allegations contained in the second and third sentences of paragraph 55, except

admits, that (i) EFG International AG acquired BSI in 2016 from Brazilian bank Grupo BTG

Pactual SA, which acquired BSI in 2014 from Assicurazioni Generali SpA, and (ii) Assicurazioni

Generali SpA owned BSI from at least 2003 through the date of BSI's acquisition by Grupo BTG

Pactual SA.

56.    Prior to its acquisition by BSI, BDG was also a *société anonyme* with a place of business in Lugano, Switzerland and was one of Switzerland's largest private banks.[3] BDG was similarly a leading international private bank, with over a thousand employees, billions of dollars of assets under management, and expertise in alternative investments. BDG was a 100%-owned subsidiary of the Swiss Life Group—Switzerland's largest life insurance company and a leading European provider of pensions and financial security products—and it managed its own capital-protected hedge fund for high-net-worth clients.

**ANSWER**:    BSI admits that, prior to the cancellation of its registration, BDG was a

"*società anonima*" and had a place of business at Viale Stefano Franscini n. 8, CH 6901 Lugano,

Switzerland.  BSI further admits that (i) BDG operated as, and provided services consistent with,

a private bank; (ii) BDG's employees and total assets under management varied from time to time;

and (iii) BDG was a wholly-owned subsidiary of the Swiss Life Group prior to BDG's acquisition

by BSI; and (iv) BSI relocated its headquarters to BDG's former headquarters in 2017. BSI

otherwise denies the allegations of paragraph 56 of the Complaint.

---

[3] Footnote 2 of the Complaint states: "PUBLIC0617633-634 at 633 (Securiton.ch Website page re: BSI) (it appears that BSI adopted BDG's headquarters as its own after the acquisition)."

57.    In March 2008, BSI acquired BDG. In order to complete the acquisition BSI created a new société anonyme, retained the BSI AG name, assumed all of the rights and liabilities of BDG, and integrated BDG's operations with BSI's operations.

**ANSWER**:    BSI admits the allegations of paragraph 57 of the Complaint, except states that BSI acquired BDG in November 2007 and that BDG merged with and was integrated into BSI pursuant to a merger agreement dated May 29, 2008.

58.    The 2008 acquisition of BDG by BSI consolidated the two largest private banks in Italian-speaking Switzerland into the surviving BSI entity.

**ANSWER**:    BSI denies the allegations of paragraph 58 of the Complaint, except admits that the 2008 merger of BDG with BSI resulted in BSI remaining the surviving entity.

## VI.    **PERSONAL JURISDICTION**

59.    BSI (individually and as successor in interest to BDG) is subject to personal jurisdiction in this judicial district because it purposely availed itself of the laws and protections of the United States and the State of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through Fairfield Sentry.

**ANSWER**:    The allegations of paragraph 59 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, BSI denies the allegations of paragraph 59 of the Complaint.

60.    Through their employees and agents, BSI and BDG each operated in the United States and the State of New York with respect to the transactions relating to the Transfers. For example, at least six BSI employees located in New York communicated with the Fairfield Greenwich Group ("FGG"), which operated the Fairfield Funds, with respect to BSI's investments in the Fairfield Funds.

**ANSWER**:    BSI denies the allegations contained in the first sentence of paragraph 60 of the Complaint. BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 60 of the Complaint and therefore denies the allegations contained in the second sentence of paragraph 60 of the Complaint, except admits that certain BSI employees communicated with individuals associated with FGG with respect to the Fairfield Funds.

61.    BSI's asset manager subsidiary Thalia SA ("Thalia")—which was charged with evaluating hedge fund investments for BSI's asset management and private banking businesses— had an advisory office in New York that provided BSI with advice with respect to the BLMIS Funds. FGG referred to New York-based Bob Puccio as influential and an "excellent contact."

**ANSWER**:    BSI denies the allegations contained in the first sentence of paragraph 61 of

the Complaint, except BSI (i) admits that Thalia SA was an entity formed in 2003 to act as an

investment manager/advisor for certain funds of funds in which BSI clients could invest, and

(ii) states that it lacks knowledge or information sufficient to form a belief as to whether Thalia

SA had an "advisory office in New York" and, therefore, denies such allegation.  BSI denies

knowledge or information sufficient to form a belief as to the truth of the allegations contained in

the second sentence of paragraph 61 of the Complaint and therefore denies such allegations.

62.    Similarly, BDG communicated with New York-based FGG employees regularly and BDG employees met with a number of FGG personnel, including FGG co-founder, Jeffrey Tucker in New York, regarding BDG's investments in the Fairfield Funds.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 62 of the Complaint and therefore denies such allegations,

except admits that certain BDG employees communicated with certain FGG personnel concerning

the Fairfield Funds.

63.    Like BSI, BDG also used U.S.-based advisers in connection with its investments in the Fairfield Funds. After meeting with BDG on November 24, 2004, FGG Partner Yanko Della Schiava ("Della Schiava") reported that BDG had appointed "Richecourt" as an additional due diligence adviser regarding the Fairfield Funds, and that previously BDG's adviser regarding hedge fund investments had been "Towers in NY." "Richcourt" is an apparent reference to New York-based Richcourt Fund Advisors Inc., and "Towers in NY" is an apparent reference to New York-based Towers Perrin.

**ANSWER**:    BSI denies the allegations in the first sentence of paragraph 63 of the

Complaint.  BSI denies knowledge or information sufficient to form a belief as to the truth of the

allegations in the second and third sentences of paragraph 63 of the Complaint and therefore denies

such allegations.  BSI further states that, upon information and belief, (i) the Funds Research Team

18

based in Lugano, Switzerland was principally responsible for BDG's diligence into investment

funds, such as bond funds and hedge funds, (ii) no other business groups within BDG were

principally responsible for evaluating hedge funds, and (iii) Richcourt Fund Advisors Inc. and

Towers Perrin would not have been appointed by the Funds Research Team as due diligence

advisors regarding the Fairfield Funds.

64.    Moreover, by directing their investments through Fairfield Sentry—a fund
primarily managed in New York that invested with BLMIS, also in New York—BSI and BDG
knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions
in the United States and New York.

**ANSWER**:    The allegations of paragraph 64 of the Complaint contain legal conclusions

to which no response is required.  To the extent a response is required, BSI denies the allegations

of paragraph 64 of the Complaint.

65.    BSI and BDG each subjected itself to U.S. law and jurisdiction in connection with
its Fairfield Fund investments. Each time BSI and BDG invested in Fairfield Sentry or Fairfield
Sigma, it signed a subscription agreement through which it submitted to venue in New York, the
jurisdiction of the New York courts, the service of process out of the New York courts, and the
application of New York law. Specifically, BSI and BDG each (i) "agree[d] that any suit, action
or proceeding . . . with respect to this Agreement and the Fund may be brought in New York," (ii)
"irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any
[p]roceeding," (iii) "consent[ed] to the service of process out of any New York court," and (iv)
agreed that "[t]his Agreement shall be governed and enforced in accordance with the laws of New
York . . . ."

**ANSWER**:    The allegations in the first sentence of paragraph 65 of the Complaint

contain legal conclusions to which no response is required.  To the extent a response is required,

BSI denies the allegations in the first sentence of paragraph 65 of the Complaint.  BSI denies the

allegations contained in the second and third sentences of paragraph 65 of the Complaint, and BSI

further: (i) states that, upon information and belief, Citco Global Custody N.V. may have signed a

subscription agreement with one or more of the Fairfield Funds; and (ii) respectfully refers the

Court to any such subscription agreements for a complete and accurate statement of their contents.

66. In the subscription agreements, BSI and BDG each affirmed that they received and read the relevant Fairfield Fund's information memo or Private Placement Memoranda ("PPM"). Based on these documents, BSI and BDG each knew that BLMIS acted as the investment adviser, broker-dealer, and custodian for Fairfield Sentry. At least one PPM applicable to BSI's and BDG's investments specifically mentioned that BLMIS would serve as sub-custodians for certain assets of Fairfield Sentry and that BLMIS held approximately 95% of the fund's assets.

**ANSWER**:    BSI denies the allegations in paragraph 66 of the Complaint and BSI further:

(i) states that, upon information and belief, Citco Global Custody N.V. may have signed a

subscription agreement with one or more of the Fairfield Funds; and (ii) respectfully refers the

Court to any such subscription agreements, and any Private Placement Memoranda or other

information memo for the Fairfield Funds for a complete and accurate statement of their contents.

67. At all relevant times, Fairfield Sentry was operated from FGG's New York headquarters. FGG's New York personnel monitored Fairfield Sentry's investments; managed Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and other service provider contracts on behalf of Fairfield Sentry; directed investments into and out of BLMIS; and conducted various other due diligence and risk management activities. Until Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New York.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 67 of the Complaint and therefore denies such allegations.

68. Based on the information contained in the PPM, BSI and BDG each also knew the following facts indicating that they were transacting in New York:

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS, and Fairfield Sigma invested 100% of its assets with Fairfield Sentry;

- BLMIS was the executing broker for Fairfield Sentry's investments, and purportedly operated and executed the SSC Strategy on Fairfield Sentry's behalf;

- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury securities ("Treasury Bills") traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;

- BLMIS was registered with the SEC;

- BLMIS was the custodian of the Fairfield Funds' investments with BLMIS; and

- BLMIS was "essential to the continued operation of" Fairfield Sentry.

**ANSWER**:     The allegations in paragraph 68 purport to describe the contents of a Private Placement Memorandum, which speaks for itself, and thus no response is required. To the extent a response is required, at this time, BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 68 of the Complaint and therefore denies the allegations in paragraph 68, and refers the Court to any such Private Placement Memoranda for a complete and accurate statement of their contents.  Further, BSI denies that the contents of the Private Placement Memoranda establish BSI's and BDG's knowledge of facts allegedly set forth in such Private Placement Memoranda.

69.     In addition, BSI and BDG received at least 195 Fairfield Sentry redemption payments into correspondent accounts at HSBC USA in New York.

**ANSWER**:     At this time, BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 69 of the Complaint and therefore denies such allegations.  Plaintiffs have contended that the HSBC USA correspondent account belonged to Fairfield Sentry Limited, not BSI.  *See Trustee's Memorandum of Law in Opposition to Defendant's Motion to Dismiss the Amended Complaint* (Dkt. No. 129) at 6–7.

70.     BSI and BDG each directed subscription payments to Fairfield Sentry's designated U.S. bank accounts, from which the funds were then ultimately deposited into BLMIS's account at JPMorgan Chase Bank NA in New York.

**ANSWER**:     BSI denies the allegation that "BSI and BDG each directed subscription payments to Fairfield Sentry's designated U.S. bank accounts."  Upon information and belief, subscription payments made on behalf of customers of BSI and BDG were transferred to Citco Bank Nederland N.V. in The Netherlands.  BSI denies knowledge or information sufficient to form a belief as to the extent to which those payments "were then ultimately deposited into BLMIS's

account at JPMorgan Chase Bank NA" and therefore denies the remaining allegations contained in paragraph 70 of the Complaint.

71.     In addition, BSI and BDG each entered into a distribution and fee-sharing agreement with Fairfield Greenwich Limited ("FG Limited"), which compensated BSI and BDG for bringing investments into BLMIS. FG Limited served as an investment management and placement agent for certain FGG-created funds, was registered to do business in New York and listed its principal executive office as that of FGG in New York. FG Limited's typical fee-sharing agreements with respect to the Fairfield Funds expressly stated that they were governed by New York law. BSI also received fees from FGG pursuant to a verbal agreement made by FGG partners Philip Toub and Lourdes Barreneche, both of whom were based in New York.

**ANSWER**:     BSI admits that the following agreements were executed: (i) Letter of Understanding, dated July 5, 2007, between BSI and FG Limited; (ii) Letter re: Conditions for Trailer Fees, dated January 18, 2005, between BDG and FG Limited; and (iii) Letter re: Condition for Trailer Fees, executed June 7, 2007, between BDG and FG Limited. BSI refers the Court to such agreements for a complete and accurate statement of their contents. At this time, BSI otherwise denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 71 of the Complaint and therefore denies such allegations.

72.     Through these FGG fee arrangements, BSI and BDG each received fees in connection with Fairfield Sentry investments from FGG entities at least every quarter from the first quarter of 2003 through the third quarter of 2008.

**ANSWER**:     At this time, BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 72 of the Complaint and therefore denies such allegations.

73.     FG Limited also signed a similar fee-sharing agreement with Genesis Investment Advisors LLC (f/k/a BSI Investment Advisors LLC) ("Genesis"). Genesis was founded as a Delaware corporation registered in New York in May 2000 and in Florida in December 2002, and was spun off from BSI in 2005.

**ANSWER**:     At this time, BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 73 of the Complaint and therefore denies such allegations.

74.    Genesis executive Harvey Glover worked closely with FGG regarding BSI's investments in the Fairfield Funds. In 2005 Glover left Genesis for FGG, continuing to focus on the FGG/BSI relationship.

**ANSWER**:    BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 74 of the Complaint and therefore denies such allegations.

75.    Lastly, both BSI's and BDG's primary contacts at FGG were New York-based FGG executives.

**ANSWER**:    At this time, BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 75 of the Complaint and therefore denies such allegations.

76.    BSI and BDG each transacted business within New York, and the Trustee's claims against BSI arise from those business activities. BSI and BDG each derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

**ANSWER**:    The allegations of paragraph 76 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, BSI denies the allegations of paragraph 76 of the Complaint.

77.    BSI (individually and as successor in interest to BDG) should reasonably expect to be subject to New York jurisdiction and is subject to personal jurisdiction pursuant to NYCPLR § 302 (McKinney 2001) and Bankruptcy Rule 7004.

**ANSWER**:    The allegations of paragraph 77 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, BSI denies the allegations of paragraph 77 of the Complaint.

## VII.    RECOVERY OF TRANSFERS TO BSI AND BDG

### A.  INITIAL TRANSFERS FROM BLMIS TO FAIRFIELD SENTRY

78.    The Trustee commenced a separate adversary proceeding against Fairfield Sentry and other defendants in this Court under the caption, *Picard v. Fairfield Investment Fund Limited, et al.*, Adv. Pro. No. 09-01239, seeking to avoid and recover initial transfers of customer property from BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").

**ANSWER**:    The allegations of paragraph 78 contain legal conclusions to which no response is required. The allegations of paragraph 78 of the Complaint refer to proceedings in another litigation to which BSI and BDG are not a party.  To the extent a response is required, BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 78 of the Complaint and therefore denies such allegations, and respectfully refers the Court to the docket and filings in the action captioned *Picard v. Fairfield Sentry Ltd. Et al.*, Adv. Pro. No. 09-01239 (CGM) for a complete and accurate statement of their contents.

79.    By orders dated June 7 and June 10, 2011, this Court approved a settlement among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a consent judgment in favor of the Trustee and against Fairfield Sentry in the amount of $3,054,000,000 ("Judgment Amount") [ECF No. 109].

**ANSWER**:    The allegations of paragraph 79 contain legal conclusions to which no response is required. The allegations of paragraph 79 of the Complaint refer to proceedings in another litigation to which BSI and BDG are not a party.  To the extent a response is required, BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 79 of the Complaint and therefore denies such allegations, and respectfully refers the Court to the June 7, June 10, and July 13, 2011 orders referred to in paragraph 79 of the Complaint for a complete and accurate statement of their contents.

80.    The Fairfield Sentry Initial Transfers are set forth in the attached Exhibits A and B. The Fairfield Sentry Initial Transfers were and continue to be customer property within the meaning of SIPA § 78lll(4).

**ANSWER**:    The allegations in paragraph 80 contain legal conclusions to which no response is required. To the extent a response is required, BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 80 of the Complaint and therefore denies such allegations.

81.    On August 28, 2020, the Trustee filed a second amended complaint in the Fairfield Investment Fund Ltd. Proceeding ("Second Amended Complaint") [ECF No. 286] seeking in part

recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

**ANSWER**:    The allegations of paragraph 81 contain legal conclusions to which no response is required. The allegations of paragraph 81 of the Complaint also refer to proceedings in another litigation to which BSI and BDG are not a party.  To the extent a response is required, BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 81 of the Complaint and therefore denies such allegations, and respectfully refers the Court to the August 28, 2020 Second Amended Complaint referred to in paragraph 81 of the Complaint for a complete and accurate statement of its contents.

82.    As alleged in the Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the BLMIS fraud. The Trustee incorporates by reference the allegations contained in the Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, and 315-16.

**ANSWER**: The allegations of paragraph 82 contain legal conclusions to which no response is required. The allegations of paragraph 82 of the Complaint refer to proceedings in another litigation to which BSI and BDG are not a party. BSI respectfully refers the Court to the docket and filings in the action referenced in paragraph 82 of the Complaint for a complete and accurate statement of their contents. To the extent a response is required, BSI objects to the purported wholesale incorporation by reference of a pleading from another litigation as a violation of Rule 8 of the Federal Rules of Civil Procedure as incorporated by Rule 7008 of the Federal Rules of Bankruptcy Procedure. To the extent a further response is required, BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 82 of the Complaint and therefore denies such allegations, and respectfully refers the Court to the Second Amended Complaint for a complete and accurate statement of its contents.

83.    Of the Judgment Amount, $2,895,000,000 was transferred to Fairfield Sentry during the six years preceding to the Filing Date (the "Fairfield Sentry Six Year Transfers"). Each of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

**ANSWER**:    The allegations of paragraph 83 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 83 of the Complaint and therefore denies such allegations.

84.    Of the Fairfield Sentry Six Year Transfers, $1,580,000,000 was transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Transfers"). Each of the Fairfield Sentry Two Year Transfers is avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER**:    The allegations of paragraph 84 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 84 of the Complaint and therefore denies such allegations.

**B.  SUBSEQUENT TRANSFERS FROM FAIRFIELD SENTRY TO BSI AND BDG**

### 1. Transfers to BSI

85.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to BSI (the "Fairfield Sentry-BSI Subsequent Transfers"). Based on the Trustee's investigation to date, the Fairfield Sentry-BSI Subsequent Transfers total at least $27,315,638. A chart setting forth the presently known Fairfield Sentry-BSI Subsequent Transfers by date and amount is attached as Exhibit C.

**ANSWER**:    The allegations of paragraph 85 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 85 of the Complaint and therefore denies such allegations, and respectfully refers the Court to Exhibit C of the Complaint for its complete and accurate contents.

86.     On March 23, 2012, the Trustee filed this action seeking recovery of subsequent transfers.

**ANSWER**:     The allegations of paragraph 86 contain legal conclusions to which no response is required. To the extent a response is required, BSI admits that the Trustee filed this action on March 23, 2012, and that the Trustee purports to seek the recovery of subsequent transfers.

87.     The Fairfield Sentry-BSI Subsequent Transfers are recoverable from BSI under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER**:     The allegations of paragraph 87 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, BSI denies the allegations of paragraph 87 of the Complaint.

88.     The Fairfield Sentry-BSI Subsequent Transfers represent a redemption of equity interests by BSI as a shareholder in Fairfield Sentry. Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Fairfield Sentry-BSI Subsequent Transfers upon redemption of BSI's interests.

**ANSWER**:     To the extent the allegations in Paragraph 88 characterize the Fairfield Sentry-BSI Subsequent Transfers and Fairfield Sentry's solvency status, the allegations state legal conclusions to which no response is required; to the extent a response is required, BSI denies the allegations. At this time, BSI lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 88 and therefore denies the remaining allegations in Paragraph 88.

## 2. Transfers to BDG

89.     Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to BDG (the "Fairfield Sentry-BDG Subsequent Transfers"). Based on the Trustee's investigation to date, the Subsequent Transfers total at least $20,270,860. A chart setting forth the presently known Fairfield Sentry-BDG Subsequent Transfers by date and amount is attached as Exhibit D.

**ANSWER**:    The allegations of paragraph 89 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 89 of the Complaint and therefore denies such allegations, and respectfully refers the Court to Exhibit D of the Complaint for a complete and accurate statement of its contents.

90.    The Fairfield Sentry-BDG Subsequent Transfers are recoverable from BSI, as the successor to BDG, under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER**:    The allegations of paragraph 90 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, BSI denies the allegations of paragraph 90 of the Complaint.

91.    The Fairfield Sentry-BDG Subsequent Transfers represent a redemption of equity interests by BDG as a shareholder in Fairfield Sentry. Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Fairfield Sentry-BDG Subsequent Transfers upon redemption of BDG's interests.

**ANSWER**:    To the extent the allegations in Paragraph 91 characterize the Fairfield Sentry-BDG Subsequent Transfers and Fairfield Sentry's solvency status, the allegations state legal conclusions to which no response is required; to the extent a response is required, BSI denies the allegations. At this time, BSI lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 91 and therefore denies the remaining allegations in Paragraph 91.

### C.  SUBSEQUENT TRANSFERS FROM FAIRFIELD SENTRY TO FAIRFIELD SIGMA AND SUBSEQUENTLY TO BSI AND BDG

<u>1. Transfers to BSI</u>

92.    Prior to the Filing Date, Fairfield Sentry subsequently transferred at least $772,690,257 of the Fairfield Sentry Initial Transfers directly to Fairfield Sigma. A chart setting forth the presently known such transfers by date and amount is attached as Exhibit E.

**ANSWER**:    The allegations of paragraph 92 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 92 of the Complaint and therefore denies such allegations, and respectfully refers the Court to Exhibit E of the Complaint for a complete and accurate statement of its contents.

93.    Thereafter, Fairfield Sigma transferred at least $8,695,673 to BSI (the "Sigma-BSI Subsequent Transfers").  A chart setting forth the presently known Sigma-BSI Subsequent Transfers is attached as Exhibit F.

**ANSWER**:    The allegations of paragraph 93 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 93 of the Complaint and therefore denies such allegations, and respectfully refers the Court to Exhibit F of the Complaint for a complete and accurate statement of its contents.

94.    The Sigma-BSI Subsequent Transfers are recoverable from BSI under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER**:    The allegations of paragraph 94 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, BSI denies the allegations of paragraph 94 of the Complaint.

95.    The Sigma-BSI Subsequent Transfers represent a redemption of equity interests by BSI as a shareholder in Fairfield Sigma. Because Fairfield Sigma invested all or substantially all of its assets into the BLMIS Ponzi scheme via Fairfield Sentry, Fairfield Sigma was insolvent when it made the Sigma-BSI Subsequent Transfers upon redemption of BSI's interests.

**ANSWER**:    To the extent the allegations in Paragraph 95 characterize the Fairfield Sigma Subsequent Transfers and Fairfield Sigma's solvency status, the allegations state legal conclusions to which no response is required; to the extent a response is required, BSI denies the allegations. At this time, BSI lacks knowledge or information sufficient to form a belief as to the

truth of the remaining allegations in Paragraph 95 and therefore denies the remaining allegations

in Paragraph 95.

<u>2. Transfers to BDG</u>

96.     Fairfield Sigma transferred at least $4,622,074 of the Fairfield Sigma Subsequent
Transfers to BDG (the "Sigma-BDG Subsequent Transfers").[4] A chart setting forth the presently
known Sigma-BDG Subsequent Transfers is attached as Exhibit G.

**ANSWER**:    The allegations of paragraph 96 of the Complaint contain legal conclusions

to which no response is required.  To the extent a response is required, BSI denies knowledge or

information sufficient to form a belief as to the truth of the allegations of paragraph 96 of the

Complaint and therefore denies such allegations, and respectfully refers the Court to Exhibit G of

the Complaint for a complete and accurate statement of its contents.

97.     The Sigma-BDG Subsequent Transfers are recoverable from BSI under section
550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER**:    The allegations of paragraph 97 of the Complaint contain legal conclusions

to which no response is required.  To the extent a response is required, BSI denies the allegations

of paragraph 97 of the Complaint.

98.     The Sigma-BDG Subsequent Transfers represent a redemption of equity interests
by BDG as a shareholder in Fairfield Sigma. Because Fairfield Sigma invested all or substantially
all of its assets into the BLMIS Ponzi scheme via Fairfield Sentry, Fairfield Sigma was insolvent
when it made the Sigma-BDG Subsequent Transfers upon redemption of BDG's interests.

**ANSWER**:    To the extent the allegations in Paragraph 98 characterize the Fairfield

Sigma Subsequent Transfers and Fairfield Sigma's solvency status, the allegations state legal

conclusions to which no response is required; to the extent a response is required, BSI denies the

allegations. At this time, BSI lacks knowledge or information sufficient to form a belief as to the

---

[4] Footnote 3 of the Complaint states: "The Fairfield Sentry-BSI Subsequent Transfers, the Fairfield Sentry-BDG
Subsequent Transfers, the Sigma-BSI Subsequent Transfers and the Sigma-BDG Subsequent Transfers are
collectively, and as defined above, the 'Transfers'."

truth of the remaining allegations in Paragraph 98 and therefore denies the remaining allegations in Paragraph 98.

## COUNT ONE

### RECOVERY OF SUBSEQUENT TRANSFERS - 11 U.S.C. §§ 105(a) AND 550(a)

99.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

**ANSWER**:    BSI incorporates by reference and reasserts its responses to the allegations contained in each of the previous paragraphs of this Complaint as though set forth fully herein.

100.    The Transfers are recoverable from BSI under section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

**ANSWER**:    The allegations in paragraph 100 of the Complaint state legal conclusions to which no response is required. To the extent any further response is required, BSI denies the allegations in paragraph 100 of the Complaint.

101.    BSI and BDG are immediate or mediate transferees of the Transfers.

**ANSWER**:    The allegations in paragraph 101 of the Complaint state legal conclusions to which no response is required. To the extent any further response is required, BSI denies the allegations in paragraph 101 of the Complaint.

102.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against BSI: (a) recovering the Transfers, or the value thereof, from BSI for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**ANSWER**:    The allegations in paragraph 102 of the Complaint state legal conclusions to which no response is required. To the extent any further response is required, BSI denies the allegations in paragraph 102 of the Complaint.

103.    The Trustee's discovery and investigation are ongoing, and the Trustee reserves the right to: (i) supplement the information on the initial and subsequent transfers discussed herein, and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

**ANSWER**:    The allegations in paragraph 103 of the Complaint state legal conclusions to which no response is required. To the extent any further response is required, BSI denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 103 of the Complaint, and therefore denies such allegations.  To the extent any further response is required, BSI objects to any attempt by the Trustee to amend the Complaint to seek avoidance and recovery of any additional transfers that are not already alleged in the Complaint as a violation of Federal Rule of Civil Procedure 15, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7015.

**RESPONSE TO PLAINTIFF'S REQUEST FOR RELIEF**

BSI denies that the Trustee is entitled to his requested judgment in favor of the Trustee and against BSI.

**AFFIRMATIVE DEFENSES**

BSI asserts the following defenses without assuming the burden of proof or any other burden if such burdens would otherwise be on Plaintiff. By designating these matters "defenses," BSI does not intend to suggest either that the Trustee does not bear the burden of proof as to such matters or that such matters are not elements of the Trustee's prima facie case against BSI. BSI reserves the right to assert any other defenses as discovery in this litigation proceeds or any counterclaims that it becomes aware of through discovery or other investigation as may be appropriate at a later time. Further, BSI also reserves the right to amend this Answer to assert cross-claims and/or third-party claims when and if, in the course of investigation, discovery, or preparation for trial, it becomes appropriate to do so.

**FIRST AFFIRMATIVE DEFENSE**

The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

The allegations of actual fraudulent transfer as to the Fairfield Sentry Initial Transfers do not comply with Rule 9(b) and are not pled with sufficient particularity.

## THIRD AFFIRMATIVE DEFENSE

This Court lacks jurisdiction under Article III of the U.S. Constitution to enter final orders or judgments in this proceeding.

## FOURTH AFFIRMATIVE DEFENSE

The Complaint must be dismissed because the Court lacks personal jurisdiction over BSI, individually and as alleged successor to BDG.

## FIFTH AFFIRMATIVE DEFENSE

The Fairfield Sentry Two Year Transfers are not avoidable under Section 548(a)(1)(A) of the Bankruptcy Code because such transfers were not made with actual intent to hinder, delay, or defraud creditors. The Trustee may not rely on a "Ponzi scheme presumption" to prove that the alleged initial transfers from BLMIS to Fairfield Sentry that he seeks to recover from BSI were made with actual intent to hinder, delay, or defraud creditors, and the Trustee has not otherwise sufficiently pleaded the requisite level of intent. The Ponzi scheme presumption itself is extra-statutory and improper, but even if that were not the case, the presumption cannot apply to the alleged initial transfers from BLMIS to Fairfield Sentry to the extent the initial transfers were repayments of Fairfield Sentry's principal investments in BLMIS. The repayment of a customer's investment principal constitutes the repayment of a valid contractual antecedent debt, not a payment made in furtherance of the Ponzi scheme. To the extent, if any, that BSI or BDG received subsequent transfers arising from the unavoidable Fairfield Sentry Two Year Transfers, such

subsequent transfers are not recoverable under Section 550(a) of the Bankruptcy Code or 15 U.S.C.

§ 78fff-2(c)(3).

<u>**SIXTH AFFIRMATIVE DEFENSE**</u>

The claims against BSI are barred, in whole or in part, because the Trustee failed to plead

all of the elements of an avoidable fraudulent transfer under Section 544 of the Bankruptcy Code

and Sections 273, 273-a, 274, 275, 276, 276-a, 278 and/or 279 of the New York Debtor and

Creditor Law[5] with sufficient particularity and factual support.

<u>**SEVENTH AFFIRMATIVE DEFENSE**</u>

The Trustee's claims are barred, in whole or in part, because the alleged Fairfield Sentry

Six Year Transfers and the transfers from Fairfield Sentry to Fairfield Sigma (as alleged in

paragraph 92 of the Complaint) were taken, if at all, for fair consideration and without knowledge

of the fraud, as provided by N.Y. Debt. & Cred. Law § 272-275, 278.

<u>**EIGHTH AFFIRMATIVE DEFENSE**</u>

The Fairfield Sentry Six Year Transfers are subject to the safe harbor provision in Section

546(e) of the Bankruptcy Code because such alleged initial transfers were: (i) settlement payments

and/or made in connection with securities contracts, such as Fairfield Sentry's account agreement

with BLMIS and Fairfield Sentry's Articles of Association; and (ii) made by or to (or for the

benefit of) an entity covered by Section 546(e) because: (a) "[i]t is not disputed [by the Trustee] that

BLMIS was a 'stockbroker' for the purposes of § 546(e)," *Picard v. Ida Fishman Revocable Trust*

(*In re Bernard L. Madoff Inv. Sec. LLC*), 773 F.3d 414, 417 (2d Cir. 2014), and/or (b) the Fairfield

Funds, BSI, and BDG are each financial institutions. *See Fairfield Sentry Ltd. v. Theodoor GGC*

*Amsterdam* (*In re Fairfield Sentry Ltd.*), No. 10-13164 (SMB), 2020 WL 7345988, at *6 & n.11

---

[5] References to the N.Y. Debt. & Cred. Law are to the prior version of the law that existed before passage of the Uniform Voidable Transactions Act, which became effective on April 4, 2020 but does not apply retroactively.

(Bankr. S.D.N.Y. Dec. 14, 2020) (holding that the Fairfield Funds were "financial institutions" because they were customers of Citco Bank Nederland N.V. Dublin Branch); Am. Compl. ¶¶ 3, 55, 56, 58 (conceding BSI and BDG were "private banks").  The Fairfield Sentry Six Year Transfers were not made with actual intent to defraud and, pursuant to Section 546(e) of the Bankruptcy Code, they are not avoidable under Section 548(a)(1)(B) of the Bankruptcy Code or section 544 of the Bankruptcy Code and certain provisions of the N.Y. Debt. & Cred. Law, including §§ 273-279, or 15 U.S.C. § 78fff-2(c)(3).

## **NINTH AFFIRMATIVE DEFENSE**

To the extent, if any, that BSI or BDG received Fairfield Sentry-BSI Subsequent Transfers or Fairfield Sentry-BDG Subsequent Transfers, such transfers are not recoverable because BSI and BDG took such transfers for value and in good faith, and therefore without knowledge of the voidability of the transfer avoided within the meaning of 11 U.S.C. § 550(b).

BSI and BDG took for value any transfers received from Fairfield Sentry, if any, because any such transfers were made in exchange for the surrender of shares in Fairfield Sentry by BSI and BDG and of the rights attendant to those shares.

BSI and BDG received Fairfield Sentry-BSI Subsequent Transfers and Fairfield Sentry-BDG Subsequent Transfers, if any, in good faith.  BSI and BDG had no knowledge that BLMIS was not trading securities, and did not know facts that would have prompted a reasonable person in their position to conduct further inquiry into BLMIS's possible fraud.  Indeed, a reasonable person with the facts in the possession of BSI and BDG at the time of the Transfers would not have been on inquiry notice of the alleged fraudulent purpose behind the Fairfield Sentry Initial Transfers, nor would those facts have led such a person to conduct further inquiry into whether BLMIS was trading securities or was a fraud or a Ponzi scheme.

Even if BSI or BDG had been on inquiry notice of the alleged fraudulent purpose behind the Fairfield Sentry Initial Transfers or of facts that would have led a reasonable person to conduct further inquiry into whether BLMIS was trading securities or was a fraud or a Ponzi scheme, BSI and BDG conducted a reasonably diligent investigation sufficient under the circumstances and/or a diligent inquiry by BSI or BDG would not have discovered the alleged fraudulent purpose of the Fairfield Sentry Initial Transfers and would not have discovered that BLMIS was allegedly not trading securities or was an alleged fraud or Ponzi scheme. Indeed, other entities with vastly greater investigatory tools and resources than BSI and BDG, and with more access to BLMIS personnel and documentation than BSI and BDG, investigated BLMIS before December 2008 but failed to uncover any fraud. This includes the SEC, which began an investigation into BLMIS in 2006. Unlike U.S. federal regulatory agencies, neither BSI nor BDG had the ability to compel the production of information from third parties that would have been necessary to establish that BLMIS was committing fraud. Neither BSI nor BDG could have discovered the alleged fraudulent purpose of the Fairfield Sentry Initial Transfers.

## **TENTH AFFIRMATIVE DEFENSE**

To the extent, if any, that BSI or BDG received Fairfield Sigma-BSI Subsequent Transfers or Fairfield Sigma-BDG Subsequent Transfers, such transfers are not recoverable because BSI and BDG were alleged subsequent transferees of subsequent transferees that took such transfers in good faith within the meaning of 11 U.S.C. § 550(b)(2).

BSI and BDG had no knowledge that BLMIS was not trading securities, and did not know facts that would have prompted a reasonable person in their position to conduct further inquiry into BLMIS's possible fraud. Indeed, a reasonable person with the facts in the possession of BSI and BDG at the time of the Transfers would not have been on inquiry notice of the alleged

36

fraudulent purpose behind the Fairfield Sentry Initial Transfers, nor would those facts have led such a person to conduct further inquiry into whether BLMIS was trading securities or was a fraud or a Ponzi scheme.

Even if BSI or BDG had been on inquiry notice of the alleged fraudulent purpose behind the Fairfield Sentry Initial Transfers or of facts that would have led a reasonable person to conduct further inquiry into whether BLMIS was trading securities or was a fraud or a Ponzi scheme, BSI and BDG conducted a reasonably diligent investigation sufficient under the circumstances and/or a diligent inquiry by BSI or BDG would not have discovered the alleged fraudulent purpose of the Fairfield Sentry Initial Transfers and would not have discovered that BLMIS was allegedly not trading securities or was an alleged fraud or Ponzi scheme.  Indeed, other entities with vastly greater investigatory tools and resources than BSI and BDG, and with more access to BLMIS personnel and documentation than BSI and BDG, investigated BLMIS before December 2008 but failed to uncover any fraud. This includes the SEC, which began an investigation into BLMIS in 2006.  Unlike U.S. federal regulatory agencies, neither BSI nor BDG had the ability to compel the production of information from third parties that would have been necessary to establish that BLMIS was committing fraud.  Neither BSI nor BDG could have discovered the alleged fraudulent purpose of the Fairfield Sentry Initial Transfers.

In addition, to the extent it is necessary under 11 U.S.C. § 550(b) for BSI to establish that it and BDG received the Fairfield Sigma-BSI Subsequent Transfers and the Fairfield Sigma-BDG Subsequent Transfers without knowledge of the voidability of transfers avoided, BSI asserts that it and BDG had no such knowledge for the same reasons as set forth in the immediately proceeding paragraphs.

In addition, to the extent it is necessary under 11 U.S.C. § 550(b) for BSI to establish that it and BDG received the Fairfield Sigma-BSI Subsequent Transfers and the Fairfield Sigma-BDG Subsequent Transfers for value, BSI and BDG took any such transfers from Fairfield Sigma for value because any such transfers were made in exchange for the surrender of shares in Fairfield Sigma by BSI and BDG.

In the alternative, if and to the extent necessary for BSI to establish the defense under 11 U.S.C. §550(b)(2), BSI asserts that each subsequent transferee within the alleged chain of transfers ending with BSI's and BDG's alleged receipt of the Fairfield Sigma-BSI Subsequent Transfers and Fairfield Sigma-BDG Subsequent Transfers received such transfers for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfers avoided.

## ELEVENTH AFFIRMATIVE DEFENSE

The Trustee's claims should be dismissed if Plaintiff has recovered, or during the pendency of this action recovers, sufficient funds to reimburse SIPC for all payments that SIPC has made to satisfy allowed claims of BLMIS customers.

## TWELFTH AFFIRMATIVE DEFENSE

The Trustee's claims are barred to the extent they have been or may in the future be dismissed by the Court or are based on allegations that have been or may in the future be dismissed by the Court or are based on theories or allegations that have been or may in the future be rejected by this Court or by another court on appeal from any orders of this Court.

## THIRTEENTH AFFIRMATIVE DEFENSE

On May 9, 2011, the Trustee entered into a Settlement Agreement (the "Fairfield Settlement Agreement") with the Liquidators of Fairfield Sentry Limited and other Fairfield funds

(the "Liquidators"). This Court approved the Fairfield Settlement Agreement on June 7, 2011, *see*

Bench Memorandum and Order, *Picard v. Fairfield Sentry Ltd.*, No. 09-1239 (Bankr. S.D.N.Y.

June 7, 2011), Dkt. No. 92, and it was incorporated into the consent judgment entered against

Fairfield Sentry on July 13, 2011, *see* Consent Judgment, *Picard v. Fairfield Sentry Ltd.*, No. 09-

1239 (Bankr. S.D.N.Y. July 13, 2011), Dkt. No. 109. The Fairfield Settlement Agreement provides

for the sharing of recoveries on the Trustee's and the Liquidators' claims for recovery of property

that Fairfield Sentry transferred. To the extent that the Liquidators recover from BSI in settlement

or otherwise, the Trustee is barred from recovering on the ground that he is not entitled to double

recovery, nor should BSI be subject to recovery of identical funds from two separate entities.

## FOURTEENTH AFFIRMATIVE DEFENSE

To the extent that the alleged Transfers, or any portion thereof, alleged to have been

received by BSI or BDG were not customer property under 15 U.S.C. § 78fff-2(c)(3) or any other

section of the U.S. Bankruptcy Code that BLMIS transferred to the Fairfield Funds, such Transfers

(or portions thereof) are not recoverable by the Trustee from BSI.

## FIFTHTEENTH AFFIRMATIVE DEFENSE

The Trustee's claims are barred because neither BSI nor BDG was a transferee of the

Transfers. To the extent that BSI and BDG received any subsequent transfer, BSI and BDG

(a) received each subsequent transfer in good faith, in its capacity as nominee or custodian, and

for the account and benefit of one or more of its customers; (b) did not have dominion or control

or the right to assert dominion or control over the subsequent transfers or the proceeds thereof or

to use the subsequent transfers or the proceeds thereof for its own purposes; (c) was a mere conduit

for its customers; and (d) was obligated to credit the subsequent transfers to the account and for

the benefit of one or more of its customers, who alone had the right to assert dominion and control over the subsequent transfers received by BSI and BDG for their benefit.

## SIXTEENTH AFFIRMATIVE DEFENSE

The Trustee's claims are barred, in whole or part, because the Trustee has failed to mitigate, minimize or avoid damages, if any.

## SEVENTEENTH AFFIRMATIVE DEFENSE

The Trustee's claims are barred, in whole or in part, based upon rulings, judgments, orders, or decisions entered in the liquidation proceedings of Fairfield Sentry before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands, including any related appellate rulings, judgments, orders, or decisions, or based upon other rulings, judgments, orders, or decisions entered in other proceedings in the British Virgin Islands or its appellate courts.

## EIGHTEENTH AFFIRMATIVE DEFENSE

The Trustee is not entitled to an award of interest.

## NINETEENTH AFFIRMATIVE DEFENSE

The Trustee's claims are barred by the applicable statute of limitations, including but not limited to 11 U.S.C. §§ 546(a), 548(a), 550(f), or N.Y.C.P.L.R. §§ 203, 213.

## TWENTIETH AFFIRMATIVE DEFENSE

The Trustee's claims are barred by estoppel.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

Applying or using the against BSI the doctrine of law of the case based on rulings made in other adversary proceedings to which BSI was not a party and in which BSI did not participate violates BSI's rights to due process of law as guaranteed by the Fifth Amendment to the U.S. Constitution.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

The Trustee's claims are barred by the doctrine of laches and similar doctrines. The Trustee's unreasonable delay in bringing and prosecuting his claims, which was brought more than a decade ago and concerns transfers made more than 15 years ago, has unreasonably and unfairly prejudiced BSI's ability to defend itself.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

The Trustee's claims against BSI are barred by the doctrines of *in pari delicto* and unclean hands, because a trustee, standing in the shoes of the debtor, cannot recover for a wrong that the debtor itself took part in.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

The Trustee may not recover the alleged Transfers, if any, because he has not avoided the alleged initial transfers from BLMIS to Fairfield Sentry.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

Pursuant to 11 U.S.C. § 550(d), the Trustee may not recover any subsequent transfer from BSI to the extent he has recovered the amount of the initial transfers from Fairfield Sentry or any other immediate or mediate transferee the amount of the avoided initial transfers that included the customer property that the Trustee alleges BSI received.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

To the extent the Trustee recovers from BSI, BSI reserves the right to assert a claim arising from such recovery under section 502(h) of the Bankruptcy Code.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

In the alternative, Fairfield Sentry and Fairfield Sigma were mere conduits, and consequently, the Transfers were initial transfers from BLMIS to BSI. As the Trustee stated in

*Picard v. Grosvenor Investment Management Ltd.*, No. 12-1021 (Bankr. S.D.N.Y. June 15, 2022), Fairfield Sentry's "sole purpose was to funnel money to BLMIS" and "no arm's length relationship exist[ed] between [Sentry] and BLMIS" (internal quotation marks and citation omitted). 12-1021 ECF 115, at 3, 6. As a result, the redemptions received by BSI and BDG were initial transfers from BLMIS that are subject to the safe harbor under 11 U.S.C. § 546(e); any Trustee proceeding to avoid the transfers is untimely; and BSI and BDG may retain the amounts they received pursuant to 11 U.S.C. § 548(c) and 11 U.S.C. § 548(d)(2)(B) because they took the transfers for value and in good faith.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

The Trustee's claims to recover from BSI subsequent transfers allegedly made to BSI and BDG by Fairfield Sentry and Fairfield Sigma constitute an impermissible extraterritorial application of 11 U.S.C. § 550(a) and N.Y. Debt. & Cred. Law § 273–279.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

The Trustee's claims to recover from BSI subsequent transfers allegedly made to BSI and BDG by Fairfield Sentry and Fairfield Sigma violate principles of international comity.

## JURY TRIAL DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 9015 of the Federal Rules of Bankruptcy Procedure, BSI hereby demands a jury trial on all claims and issues that may be tried by a jury.

## STATEMENT PURSUANT TO FED. R. BANKR. P. 7012(b)

BSI does not consent to entry of final orders or judgments by the Bankruptcy Court.

## BSI'S PRAYER FOR RELIEF

WHEREFORE, BSI requests that this Court dismiss the Complaint with prejudice, award BSI its costs incurred in connection with this action and grant such other and further relief as the Court deems just and proper.

Dated: February 28, 2023
      New York, New York

                                       */s/ Adam M. Lavine*

                                       **KOBRE & KIM LLP**
                                       Zachary D. Rosenbaum
                                       Adam M. Lavine
                                       Donna (Dong Ni) Xu
                                       800 Third Avenue
                                       New York, New York 10022
                                       Telephone: (212) 488-1200
                                       Zachary.Rosenbaum@kobrekim.com
                                       Adam.Lavine@kobrekim.com
                                       Donna.Xu@kobrekim.com

                                       *Attorneys for BSI AG*