**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the Chapter 7 Estate of*
*Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (CGM) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, <br><br> Plaintiff, <br><br> v. <br><br> NATIXIS FINANCIAL PRODUCTS LLC and BLOOM ASSET HOLDINGS FUND, <br><br> Defendants. | Adv. Pro. No. _____ (CGM) <br><br> **COMPLAINT** |

Irving H. Picard, as trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment

Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–*lll*

("SIPA"), substantively consolidated with the chapter 7 estate of Bernard L. Madoff (individually,

"Madoff"), by and through his undersigned counsel, for his Complaint against defendants

(i) Natixis Financial Products LLC (individually and together with its predecessors-in-interest

Natixis Financial Products Inc., CDC IXIS Financial Products, f/k/a IXIS Financial Products Inc.,

f/k/a CDC Financial Products Inc.) ("Natixis FP") and (ii) Bloom Asset Holdings Fund ("Bloom,"

and together with Natixis FP, "Defendants"), alleges the following:

## I.    NATURE OF THE ACTION

1.      This adversary proceeding is part of the Trustee's continuing efforts to recover

"customer property," as defined by SIPA § 78*lll*(4), that was stolen as part of Madoff's infamous

Ponzi scheme.

2.      Madoff sustained his scheme with massive capital infusions from various single-

purpose investment vehicles ("Feeder Funds") that pooled assets for investment with BLMIS's

fraudulent investment advisory business ("IA Business").

3.      Defendants Natixis FP and Bloom respectively participated in swap and related

hedging transactions involving Feeder Funds fueling Madoff's fraud until BLMIS collapsed in late

2008.  Defendants had by that time received subsequent transfers of hundreds of millions of dollars

of customer property due to their involvement with Feeder Funds, including, as relevant to this

Complaint, through Groupement Financier Limited ("Groupement"), a British Virgin Islands

investment fund that invested 100% of its assets directly with BLMIS and received approximately

$352 million in avoidable initial transfers of customer property from BLMIS.  The Trustee has

sued to avoid and recover those initial transfers of customer property in *Picard v. UBS AG*, Adv.

Pro. No. 10-04285 (CGM) (Bankr. S.D.N.Y.) (the "Luxalpha Action").

4.      Starting in 2003, Natixis FP entered into swap transactions with a Groupement Affiliate, Groupement Financier Levered Limited ("GFLL"), for which the underlying reference asset was Groupement.  Because Groupement was closed to U.S. investors, Natixis FP's affiliate Bloom invested in Groupement on behalf of Natixis FP, hedging Natixis FP's exposure to Groupement and ensuring Natixis FP's ability to provide GFLL with the corresponding returns.

5.      In this action, the Trustee seeks to recover at least $234 million in subsequent transfers of customer property that Defendants received from Groupement and GFLL pursuant to this arrangement.

## II.     SUBJECT MATTER JURISDICTION AND VENUE

6.      This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities & Exchange Commission v. Bernard L. Madoff Investment Securities LLC*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

7.      This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (F), (H) and (O).  The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

8.      Venue in this judicial district is proper under 28 U.S.C. § 1409.

9.      This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550 (the "Bankruptcy Code"), and other applicable law.

III.    **DEFENDANTS**

A.    **Natixis FP**

10.    Defendant Natixis FP is a Delaware corporation and financial services company with its principal place of business in New York, New York.

B.    **Bloom**

11.    Defendant Bloom is an Irish umbrella trust that was at all relevant times operated and controlled by its New York-based affiliates, Natixis FP and Natixis Securities North America Inc. (now Natixis North America LLC) ("Natixis Securities North America"). For example, Natixis FP's managing director served as Bloom's Financial Industry Regulatory Authority registered representative of record.

12.    Bloom was at all relevant times wholly owned by affiliates of Natixis FP, had the same ultimate parent company as Natixis FP, and used Natixis Securities North America as its investment adviser. Bloom made investments in Feeder Funds and other funds that did not permit direct investments by U.S. persons. Bloom held these assets through a sub-fund called Blossom Asset Holdings Fund.

IV.    **PERSONAL JURISDICTION**

13.    Natixis FP is subject to personal jurisdiction in this judicial district because it is at home in New York. Natixis FP is a Delaware corporation that routinely conducts business in New York, purposely avails itself of the laws of the State of New York by undertaking significant commercial activities in New York, derives significant revenue from New York, and has its principal place of business in the Southern District of New York. Natixis FP is registered as a foreign LLC in New York and has an agent for service of process in New York. The swap transactions between Natixis FP and GFLL pursuant to which Natixis FP received subsequent transfers of BLMIS customer property were governed by a New York choice of law clause.

3

14.     Bloom is subject to personal jurisdiction in this judicial district because it regularly conducted business in New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activities in New York, and derived significant revenue from New York.

15.     Bloom was operated and managed, in relevant part, by New York-based employees of Natixis FP and non-party Natixis Securities North America in New York, who directed its investments in and redemptions from Groupement and other Feeder Funds.  In connection with its investments in Groupement, Bloom paid fees to New York-based Natixis Securities North America, the parent company to Natixis FP.  Any return on Bloom's investments in Groupement would result from BLMIS purportedly engaging in the purchase and sale of securities in New York.  The purpose of Bloom's hedging investments in Groupement was to enable Natixis FP to enter into swap transactions in New York governed by New York law.

16.     Defendants maintained minimum contacts and/or general business contacts with the United States and New York in connection with the transactions alleged herein and that were ultimately predicated on Groupement's investments in BLMIS which Defendants knew to be based in New York.  Defendants should reasonably expect to be, and are, subject to the jurisdiction of the Bankruptcy Court pursuant to Bankruptcy Rule 7004, the United States Constitution, and N.Y. C.P.L.R. § 302.

## V.     BACKGROUND, THE TRUSTEE AND STANDING

17.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

18.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

19.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

    (a)    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

    (b)    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

    (c)    removed the case to this Court pursuant to SIPA § 78eee(b)(4).

20.    By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

21.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

22.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

23.    At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to

perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

24.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

25.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

26.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

27.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

28.     The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code §§ 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## VI.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.     BLMIS

29.     Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker dealer with the SEC.  In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company.  At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

30.     In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status.  SIPC membership is contingent on registration of the broker-dealer with the SEC.

31.     For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and the IA Business.

32.     BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry.  BLMIS's website omitted the IA Business entirely.  BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

33.     For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

34.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion.  BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion.  In reality, Madoff grossly understated these numbers.  In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

**B.      The Ponzi Scheme**

35.     At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

36.     BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.  It was funded, in part, by money taken from the BLMIS customer deposits, but

fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

37.     To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

38.     On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

### C.     <u>Madoff's Investment Strategy</u>

39.     In general, BLMIS purported to execute two primary investment strategies for BLMIS customers: the convertible arbitrage strategy and the split-strike conversion strategy (the "SSC Strategy"). For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit. At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

40.     All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade

securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

41.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time.  In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

42.    From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

43.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

44.    By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

45.    The put options were to limit the downside risk of sizeable price changes in the basket.  The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option should have entailed a loss for BLMIS.

46.    The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains.  The call options would

make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

47.    The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar."  The collar provides downside protection while limiting the upside.

48.    If Madoff had been putting on the same baskets of equities across all BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold would have had to equal the market value of the equities in the basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

49.    Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call or put option notional value to support the Madoff SSC Strategy.

50.    Madoff could not have been using the SSC Strategy because his returns drastically outperformed the market.  BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, but BLMIS also regularly showed gains when the S&P 100 Index was down (at times significantly).  Such results would have been impossible if BLMIS had actually been implementing the SSC Strategy.

D.      **BLMIS's Fee Structure**

51.     BLMIS charged commissions on purportedly executed trades when it would have been industry-standard instead to charge management and performance fees based on AUM or profits. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

E.      **BLMIS's Market Timing**

52.     Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he succeeded at market timing by intermittently entering and exiting the market.  During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

53.     As a registered broker-dealer, BLMIS was required, pursuant to 17 C.F.R. § 240.17a-5, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS reportedly exited the market completely at every year end and every quarter end starting in 2003.  These quarterly and year-end exits were undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.  It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

54.     BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

F.    **BLMIS Execution**

55.    BLMIS's execution, as reported on its BLMIS customer statements, showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

G.    **No Evidence of BLMIS Trading**

56.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

57.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

H.    **The Collapse of the Ponzi Scheme**

58.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

59.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

60.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## VII.    THE GROUPEMENT SWAP

61.    A swap is a financial transaction in which a party "swaps" the cash flows derived from an asset (the "reference asset") for another set of cash flows from its counterparty.  Swaps can be used to create arrangements by which one party receives the returns from an underlying reference asset without actually owning that asset, in exchange for fees paid to the other party.  Parties to such a swap do not transfer actual ownership of the underlying reference asset, but only the cash flows representing the returns that reference asset generates.

62.    Swaps can be used to reproduce the economics of a leveraged investment (i.e., one made with borrowed money).  A financial institution such as Natixis FP provides this kind of simulated or "synthetic" leverage by paying to its counterparty cash flows equal to a multiple of the return on an amount notionally invested in a reference asset.  In exchange the financial institution receives collateral and fees from the party seeking leverage.  The fees serve the function of interest payments on an "implied loan" – except that instead of actually loaning the leverage amount, the financial institution simply pays its counterparty the returns that the counterparty would have received had it actually borrowed the money and invested it in the underlying asset, less the agreed fees.

63.    As a hedge to ensure its ability to pay the agreed returns on a notional investment in a reference asset, a financial institution (or its affiliate) will typically acquire a corresponding position in the underlying reference asset for its own account.

64.    Between 2003 and 2008, Natixis FP and GFLL engaged in swap transactions for which Groupement was the reference asset (the "Groupement Swap").

65.    Pursuant to a November 5, 2003 Master Agreement governed by New York law, the Groupement Swap provided for Natixis FP to pay returns to GFLL based on the performance of a notional investment in Groupement.  In exchange, GFLL provided Natixis FP with collateral

14

of approximately half the amount to be notionally invested in the reference asset, and paid Natixis

FP a floating rate based on LIBOR.

66.    The Groupement Swap thus allowed GFLL to receive returns equivalent to a two-

times (2X) leveraged investment in Groupement—and by extension in BLMIS.

67.    As a U.S. entity, however, Natixis FP could not itself invest in Groupement to

hedge its liability to GFLL.  Instead, Bloom, as an Irish entity, acquired Groupement shares equal

to GFLL's notional leveraged investment.  Natixis FP and Bloom entered into an agreement that

required all positive returns on Bloom's investment in Groupement to be transferred to Natixis FP,

less applicable fees.  Over the course of the Groupement Swap, Bloom received several

redemptions from Groupement.

68.    When entering into the Groupement Swap and related transactions, Natixis FP and

Bloom knew that Groupement was a BLMIS feeder fund and that BLMIS was based—and

purporting to engage in securities transactions in—New York.

69.    Natixis FP and GFLL extended the Groupement Swap for another five years in

November 2007.  However, the Groupement Swap was terminated between July and October of

2008 at GFLL's request.  This was done through the in-kind transfer directly to GFLL of the

Groupement shares that had been held by Bloom as a hedge for Natixis FP's obligations under the

Groupement Swap.  GFLL thereupon redeemed Groupement shares in order to pay back to

Natixis FP the "implied loan" that it had received pursuant to the Groupement Swap with more

than $153 million in funds ultimately obtained from BLMIS.  This process was completed and the

Groupement Swap finally settled on October 1, 2008.

## VIII.   INITIAL TRANSFERS FROM BLMIS TO GROUPEMENT

70.    The Trustee commenced a separate adversary proceeding in this Court against

Groupement and numerous other defendants in the Luxalpha Action.  Through the Luxalpha

Action, the Trustee seeks to avoid and recover initial transfers of customer property from BLMIS to Groupement in the approximate amount of $352 million during the six years prior to the Filing Date (the "Groupement Six Year Initial Transfers"). This Court denied Groupement's motion to dismiss his Second Amended Complaint on December 1, 2022. Order Denying The Access Defendants' Motion To Dismiss The Second Amended Complaint, Adv. Pro. No. 10-04285 (Bankr. S.D.N.Y. Dec. 1, 2022), ECF No. 337.

71.     Of the Groupement Six Year Initial Transfers, approximately $275 million was transferred to Groupement during the two years prior to the Filing Date (the "Groupement Two Year Initial Transfers").

72.     Each of the Groupement Six Year Initial Transfers is avoidable under section 544 of the Bankruptcy Code, applicable provisions of the N.Y. Debt. & Cred. Law including §§ 273–279, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

73.     Each of the Groupement Two Year Initial Transfers is avoidable under section 548 of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff(c)-2(c)(3).

74.     On February 28, 2022, the Trustee filed a Second Amended Complaint in the Luxalpha Action (the "Luxalpha Complaint"), ECF No. 274, seeking recovery of the Groupement Six Year and Two Year Initial Transfers and entry of a declaratory judgment that the Groupement Six Year and Two Year Initial Transfers are avoided.

75.     As alleged in the Luxalpha Complaint, Groupement received each of the Groupement Six Year and Two Year Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Groupement to inquire further into the BLMIS fraud. The Trustee incorporates by reference the allegations contained in paragraphs 1–17, 68–340 and 356–392 of the Luxalpha Complaint as if fully set forth herein.

76.    The Groupement Six Year Initial Transfers and Groupement Two Year Initial Transfers are set forth in the attached Exhibits A and B.  The Groupement Six Year Initial Transfers and Groupement Two Year Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

IX.    **SUBSEQUENT TRANSFERS FROM GROUPEMENT TO DEFENDANTS**

77.    Based on the Trustee's investigation to date, at least $234 million was transferred by Groupement, directly or indirectly, to Defendants pursuant to the Groupement Swap.

78.    Based on the Trustee's investigation to date, at least $80.9 million was transferred from Groupement to Bloom pursuant to the hedging structure created to support the Groupement Swap.  All of these transfers occurred within six years of the Filing Date. These transfers (the "Bloom Subsequent Transfers") were subsequent transfers of BLMIS customer property.  A chart setting forth details of the Bloom Subsequent Transfers is attached hereto as Exhibit C.

79.    Based on the Trustee's investigation to date, at least $153 million was transferred from GFLL to Natixis FP.  GFLL obtained these funds by redeeming the Groupement shares that had been previously held by Bloom to hedge the Groupement Swap.  GFLL then transferred the amounts received from its redemption of Groupement shares and thus indirectly from BLMIS to Natixis FP in settlement of the Groupement Swap.  This transfer (the "Natixis FP Subsequent Transfer") was a subsequent transfer of BLMIS customer property.  A chart setting forth details of the Natixis FP Subsequent Transfer is attached hereto as Exhibit D and incorporated by reference.

80.    The Bloom Subsequent Transfers and the Natixis FP Subsequent Transfer are recoverable from Natixis FP and Bloom under Section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

81.    The Trustee's discovery and investigation is ongoing.  The Trustee therefore reserves the right to supplement his allegations as to the Groupement Six Year Initial Transfers

and Groupement Two Year Initial Transfers as well as the Bloom Subsequent Transfers and the

Natixis FP Subsequent Transfer.  It is possible that additional transfers of customer property may

be identified after discovery in this action and in the Luxalpha Action, including of comprehensive

bank records of Defendants in both proceedings, which are not currently available to the Trustee.

The Trustee accordingly reserves the right seek avoidance and recovery of all such transfers.

**COUNT ONE (AGAINST NATIXIS FP)**
**RECOVERY OF THE NATIXIS FP SUBSEQUENT TRANSFER**
**11 U.S.C. §§ 105(a) AND 550(a)**

82.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

83.     The Natixis FP Subsequent Transfer is recoverable from Natixis FP under

11 U.S.C. § 550(a) and SIPA § 78fff-2(c)(3).

84.     Natixis FP is an immediate or mediate subsequent transferee of the Natixis FP

Subsequent Transfer from GFLL and Groupement respectively.

85.     As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and SIPA

§ 78fff-2(c)(3), the Trustee is entitled to a judgment against Natixis FP: (a) recovering the Natixis

FP Subsequent Transfer, or the value thereof, from Natixis FP for the benefit of the estate of

BLMIS; and (b) awarding any other relief that the Court deems appropriate.

**COUNT TWO (AGAINST BLOOM)**
**RECOVERY OF THE BLOOM SUBSEQUENT TRANSFERS**
**11 U.S.C. §§ 105(a) AND 550(a)**

86.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

87.     The Bloom Subsequent Transfers are recoverable from Bloom under 11 U.S.C. §

550(a) and SIPA § 78fff-2(c)(3).

18

88.     Bloom is an immediate or mediate subsequent transferee of the Bloom Subsequent Transfers from Groupement.

89.     As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Bloom: (a) recovering the Bloom Subsequent Transfers, or the value thereof, from Bloom for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on Counts One and Two in favor of the Trustee and against Defendants as follows:

a)     Recovering the Natixis FP Subsequent Transfer from Natixis FP for the benefit of the estate;

b)     Recovering the Bloom Subsequent Transfers from Bloom for the benefit of the estate;

c)     If Natixis FP or Bloom challenge the avoidability of the Groupement Two Year Initial Transfers or Groupement Six Year Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such Transfers are avoidable pursuant to SIPA § 78fff-2(c)(3), §§ 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and N.Y. Debt. & Cred. Law §§ 273-279, as applicable, and as necessary to recover the Natixis FP Subsequent Transfer and Bloom Subsequent Transfers pursuant to section 550(b) of the Bankruptcy Code and SIPA § 78fff-2(c)(3);

d)     Awarding the Trustee prejudgment interest from the date on which the Natixis FP Subsequent Transfer and the Bloom Subsequent Transfers were received by Natixis FP and Bloom, respectively; and

e)    Awarding the Trustee fees and all applicable costs and disbursements, and such

other, further, and different relief as the Court deems just, proper, and equitable.

Dated: March 1, 2023                  */s/ David J. Sheehan*
   New York, New York      **Baker & Hostetler LLP**
                 45 Rockefeller Plaza
                 New York, New York 10111
                 Telephone:  (212) 589-4200
                 Facsimile:  (212) 589-4201
                 David J. Sheehan
                 Email: dsheehan@bakerlaw.com
                 Oren J. Warshavsky
                 Email: owarshavsky@bakerlaw.com
                 Joanna F. Wasick
                 Email: jwasick@bakerlaw.com
                 Carlos Ramos-Mrosovsky
                 Email: cramosmrosovsky@bakerlaw.com
                 Michelle N. Tanney
                 Email: mtanney@bakerlaw.com
                 Matthew B. Friedman
                 Email: mfriedman@bakerlaw.com

                 Baker & Hostetler LLP
                 200 Civic Center Drive, Suite 1200
                 Columbus, Ohio 43215
                 Telephone: (614) 228-1541
                 Facsimile: (614) 462-2616
                 Douglas A. Vonderhaar
                 Email: dvonderhaar@bakerlaw.com

                 *Attorneys for Irving H. Picard, Trustee for the*
                 *Substantively Consolidated SIPA Liquidation*
                 *of Bernard L. Madoff Investment Securities*
                 *LLC and the Chapter 7 Estate of Bernard L.*
                 *Madoff*