<u>NOT FOR PUBLICATION</u>

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>          Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>          Defendant. | No. 08-01789 (CGM)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>          Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>          Plaintiff,<br><br>v.<br><br>ABN AMRO Bank N.V. (presently known as NATWEST MARKETS N.V.)<br><br>          Defendant. | Adv. Pro. No. 10-05354 (CGM) |

**MEMORANDUM DECISION DENYING DEFENDANT'S MOTION TO DISMISS**

**A P P E A R A N C E S :**

*Attorneys For the Defendant, ABN AMRO Bank N.V. (presently known as NatWest Markets, N.V.)*
REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
750 Third Avenue, Suite 2400
New York, NY 10017
By:    Michael S. Feldberg

*Attorneys for Irving H. Picard, Trustee for the Substantively*
*Consolidated SIPA Liquidation of Bernard L. Madoff Investment*
*Securities LLC and the Chapter 7 Estate of Bernard L. Madoff*
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
By:    Patrick T. Campbell
       David J. Sheehan
       Camille C. Bent
       Elizabeth G. McCurrach
       Matthew K. Cowherd

**CECELIA G. MORRIS**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is Defendant's, ABN AMRO Bank N.V. (presently known as

NatWest Markets, N.V.), ("NatWest" or the "Defendant"), motion to dismiss the complaint of

Irving Picard, the trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment

Securities LLC ("BLMIS") seeking to recover subsequent transfers allegedly consisting of

BLMIS customer property.  Defendant seeks dismissal for failure to plausibly allege the

avoidability of the transfers under § 548(a)(1) of the Bankruptcy Code.  Defendant has raised the

defenses of good faith and the § 546 "safe harbor."  For the reasons set forth herein, the motion

to dismiss is denied.

### Jurisdiction

This is an adversary proceeding commenced in this Court, in which the main underlying

SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The

SIPA Proceeding was originally brought in the United States District Court for the Southern

District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L.*

*Madoff Investment Securities LLC et al.*, No. 08-CV-10791, and has been referred to this Court.

This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1),

and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O). This Court has subject matter jurisdiction over these adversary proceedings pursuant to 28 U.S.C. §§ 1334(b) and 157(a), the District Court's Standing Order of Reference, dated July 10, 1984, and the Amended Standing Order of Reference, dated January 31, 2012. In addition, the District Court removed the SIPA liquidation to this Court pursuant to SIPA § 78eee(b)(4), (*see* Order, Civ. 08–01789 (Bankr. S.D.N.Y. Dec. 15, 2008) ("Main Case"), at ¶ IX (ECF No. 1)), and this Court has jurisdiction under the latter provision. Personal jurisdiction has not been contested by Defendant.

## **Background**

This proceeding was commenced on December 8, 2010. (Compl., ECF[1] No. 1). On March 22, 2022, the Trustee filed the Consolidated Second Amended Complaint (the "Complaint") against the Defendant, ABN AMRO Bank N.V., presently known as NatWest Markets N.V. (Am. Compl., ECF No. 220). Defendant was a Dutch financial institution that maintained offices in the United States. (*Id.* ¶ 31).

Via the Complaint, The Trustee, "seeks to recover at least $308,113,826 that Defendant received as subsequent transfers of BLMIS customer property" from various investment funds. (*Id.* ¶ 2). Of that amount, $286,313,906 was received from funds managed by Tremont Group Holdings, Inc. and its management arm, Tremont Partners, Inc. (collectively, "Tremont"). (*Id.* ¶ 3). The remainder is alleged to have been received from a fund managed by Harley International (Cayman) Ltd. ("Harley"). (*Id.* ¶ 12).

According to the Complaint, Defendant was familiar with BLMIS and its various feeder funds. (*Id.* ¶ 35) (alleging that various high-ranking employees of Defendant who "cultivated

---

[1] Unless otherwise indicated, all references to "ECF" are references to this Court's electronic docket in adversary proceeding 10-05354-cgm.

ABN AMRO's relationship with BLMIS feeder funds remained employed" with Defendant

through its acquisition by the Royal Bank of Scotland Group plc). David Schwartz, an executive

directive of Defendant's subsidiary, ABN Inc., operated as a primary contact between Tremont

and Defendant by exchanging emails and calls and meeting Tremont representatives in person.

(*Id.* ¶¶ 50–51). The focus of these interactions was frequently the potential for Defendant to gain

access to BLMIS. (*Id.* ¶ 51). Tremont disclosed information on its relationship to BLMIS,

Bernard Madoff, and the Madoff's investment strategies to Schwartz and Defendant. (*Id.* ¶¶ 52,

58). Schwartz asked for and was given more detailed information on the BLMIS accounts of one

Tremont-managed fund, Rye Select Broad Market Portfolio Limited ("Rye Portfolio Limited").

(*Id.* ¶ 53). Defendant is alleged to have sought further information on BLMIS investments via

Fairfield Greenwich Group-related funds, including Fairfield Sentry Limited. (*Id.* ¶ 54).

"Defendant considered BLMIS in New York so 'central' to its transactions with the Tremont

funds, that it negotiated provisions specifically conditioned upon BLMIS-related events." (*Id.* ¶

56). Defendant's negotiated terms with Rye Portfolio Limited that allowed it to terminate the

agreement should BLMIS stop managing Rye Portfolio Limited's accounts or should BLMIS

become the focus of U.S. investigators. (*Id.* ¶¶ 60, 62).

Defendant invested with Harley with the same purpose of gaining access to BLMIS. (*Id.*

¶ 64) ("Defendant knew that Harley invested all of its assets with BLMIS in New York and that

BLMIS would use the SSC Strategy."). The Defendant's contract with Harley similarly

identified BLMIS as the account manager, stipulated that Harley's funds would be invested in

BLMIS, and allowed Defendant to terminate the contract should BLMIS stop acting as account

manager or be the subject of government proceedings for wrongdoing. (*Id.* ¶ 65). The private

placement memoranda Defendant executed with Harley made clear that investments with Harley

would "be earned in New York by BLMIS engaging in the purchase and sale of U.S. securities, options, and U.S. Treasuries." (*Id.* ¶ 66).

The Complaint alleges that Tremont managed and controlled numerous feeder funds, including Rye Portfolio Limited, Rye Select Broad Market Fund L.P. ("Rye Broad Market"), Rye Select Broad Market Insurance Portfolio LDC ("Rye Insurance"), Rye Select Broad Market Prime Fund, L.P. ("Rye Prime Fund") (collectively, the "Rye Funds"). (*Id.* ¶¶ 4, 8, 10). The Rye Funds invested "all or substantially all of their assets with BLMIS's investment advisory business." (*Id.* ¶ 49). "Harley invested all of its assets with BLMIS in New York." (*Id.* ¶ 64).

The Rye Funds and Harley are considered "feeder funds" of BLMIS because the intention of the funds was to invest in BLMIS. (*Id.* ¶¶ 12, 39). Madoff was able to sustain his Ponzi scheme due to the investment from these feeder funds and from entities like Defendant who sought out feeder funds with an "appetite for 'Madoff risk.'" (*Id.* ¶¶ 13–14).

Tremont further managed and controlled indirect feeder funds, including Rye Select Broad Market XL Portfolio, Ltd. ("Rye XL Portfolio"), and Rye Select Broad Market XL Fund L.P. ("Rye Broad Market XL") (collectively, the "XL Funds"). (*Id.* ¶¶ 5, 40, 110). The XL Funds did not have direct BLMIS accounts. (*Id.* ¶ 5). Instead, they would indirectly feed into BLMIS by providing investors with returns linked to the performance of BLMIS and by providing entities, like Defendant, with collateral, which was invested directly with BLMIS. (*Id.* ¶¶ 5–6).

<u>Swaps and Hedges</u>

The subsequent transfers at issue originated from three sets of investments the Defendant made in 2006 to 2008. These investments were comprised of a total return swap agreement

("Swap Agreement") with an XL Fund[2] and a subsequent investment with a Rye Fund or Harley, which hedged the Defendant's risk under the Swap Agreement.  (*Id.* ¶¶ 6–12).

Under each of the Swap Agreements, Defendant received cash collateral and earned fees from one of the XL Funds.  (*Id.* ¶ 6).  In exchange, the agreement required the Defendant to provide that XL Fund with returns from a hypothetical investment with a Rye Fund equal to "three times the amount of collateral the XL Funds provided to Defendant."  (*Id.* ¶¶ 6, 40).  Defendant was not obligated to invest any amount with the Rye Funds but was expected to do so.  (*Id.* ¶ 41).  These Swaps earned Defendant millions of dollars in fees.  (*Id.*).

As was expected, Defendant hedged its risks under the Swap Agreements by actually investing in Rye Funds.  (*Id.* ¶ 7).  Through these hedges, the Defendant ultimately redeemed millions of dollars of BLMIS customer property.  (*Id.* ¶¶ 9, 11–12).

In 2006, under the first Swap Agreement, Defendant received at least $217 million in collateral from Rye XL Portfolio.  (*Id.* ¶ 8).  Of this, $84,616,573 was comprised of BLMIS customer property that Rye XL Portfolio received from Rye Portfolio Limited and Rye Insurance LDC.  (*Id.* ¶¶ 8, 199–202.).

The Defendant then hedged this 2006 swap agreement by "investing three times the collateral value it received from XL Portfolio Limited in Rye Portfolio Limited."  (*Id.* ¶ 9).  The Defendant ultimately redeemed $104,464,000 from Rye Portfolio Limited, "which Rye Portfolio Limited satisfied by withdrawing funds from its BLMIS customer account."  (*Id.*).  These redemptions were comprised of BLMIS customer property.  (*Id.*).

In 2007, under a second Swap Agreement, Defendant received $95,833,333 in customer property as collateral payment from Rye Broad Market XL.  (*Id.* ¶ 10).  These payments

---

[2] In the case of the Defendant's 2008 agreement with Harley, the Complaint identifies an unspecified "Counterparty."  (*Id.* ¶ 12).

originated from transfers BLMIS made to Rye Prime Fund and Rye Broad Market, which in turn transferred the funds to Rye Broad Market XL.  (*Id.*).

The Defendant again hedged this Swap Agreement by investing "three times the collateral value it received from XL Broad Market in Rye Broad Market."  (*Id.* ¶ 11).  The Defendant later redeemed $1,400,000 from Rye Broad Market, "which Rye Broad Market satisfied by withdrawing funds from its BLMIS customer account."  (*Id.*).  These redemptions were comprised of BLMIS customer property.  (*Id.*).

In 2008, the Defendant entered into a Swap Agreement with an unspecified counterparty.  (*Id.* ¶ 12.).  This Swap earned Defendant fees and interest in exchange for the future performance of a 3.7 times levered exposure to Harley.  (*Id.*).  Defendant hedged this Swap by investing with Harley.  (*Id.*).  It eventually redeemed $21,799,920 from Harley, which satisfied the redemptions by withdrawing funds from its customer account with BLMIS.  (*Id.*).

The Complaint contains five counts, each seeking to recover from the Defendant subsequent transfers of BLMIS customer property.  (*Id.* ¶¶ 220–39).  Count one seeks to recover $104,464,000 of the subsequent transfers received from Rye Portfolio Limited from the Defendant's 2006 hedge investment.  (*Id.* ¶¶ 203, 220).  Count two seeks to recover $84,616,573 of payments received from Rye XL Portfolio under the 2006 swap agreement.  (*Id.* ¶¶ 202, 225).  Count three seeks to recover $1,400,000 of the subsequent transfers received from Rye Broad Market under the Defendant's 2007 hedge investment.  (*Id.* ¶¶ 208, 229).  Count four seeks to recover $95,833,333 of payments received from Rye Broad Market XL under the 2007 swap agreement.  (*Id.* ¶¶ 207, 233).  Count five seeks to recover $21,799,920 of the subsequent transfers received from Harley.  (*Id.* ¶¶ 217, 237).

The Defendant argues that the Complaint should be dismissed as to counts two and four as it has already returned money to BLMIS.  The Defendant further argues that the Trustee has failed to plausibly allege that the monies received were of BLMIS customer property, that the claims are barred by the safe harbor provision under § 546 of the Bankruptcy Code, and that the Trustee has failed to plead fraudulent intent of each transfer.  Defendant argues that it is entitled to the affirmative defense of good faith.  The Trustee has opposed the motion to Dismiss.  Oral arguments were held on December 14, 2022.  (H'rg Tr. Dec. 14, 2022, ECF No. 253).

**Discussion**

**12(b)(6) standard**

"To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).  The claim is facially plausible when a plaintiff pleads facts that allow the Court to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.").  In deciding a motion to dismiss, the Court should assume the factual allegations are true and determine whether, when read together, they plausibly give rise to an entitlement of relief.  *Iqbal*, 556 U.S. at 679.  "And, of course, a well-pl[ed] complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A complaint is "deemed to include any written instrument attached to it as an exhibit[,] . . . documents incorporated in it by reference[,]" and other documents "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (citations omitted). A document is "integral" to a complaint when the plaintiff has "actual notice" of the extraneous information and relied on it in framing the complaint. *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (citing *Chambers*, 282 F.3d at 153).

The Trustee is seeking to recover subsequent transfers made to Defendant by Rye Portfolio Limited, Rye XL Portfolio Limited, Rye Broad Market, Rye XL Broad Market, and Harley.

**Recovery of Subsequent Transfers**

Pursuant to § 550(a) of the Bankruptcy Code, a trustee is entitled to recover avoided transfers of customer property from initial transferees as well as from "any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a). "To plead a subsequent transfer claim, the Trustee must plead that the initial transfer is avoidable, and the defendant is a subsequent transferee of that initial transferee, that is, that the funds at issue originated with the debtor." *Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018); *see also SIPC v. BLMIS (In re Consol. Proc. On 11 U.S.C. § 546(e))*, No. 12 MC 115, 2013 WL 1609154, at *7 (S.D.N.Y. Apr. 15, 2013). "Federal Civil Rule 9(b) governs the portion of a claim to avoid an initial intentional fraudulent transfer and Rule 8(a) governs the portion of a

claim to recover the subsequent transfer." *BNP Paribas*, 594 B.R. at 195 (*citing Sharp Int'l Corp. v. State St. Bank & Trust Co., (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005).

The Trustee only needs to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The plaintiff's burden at the pleading stage does not require exact accounting of the funds at issue. *BNP Paribas*, 594 B.R. at 195. Rather "[t]he plaintiff must allege the necessary vital statistics – the who, when, and how much – of the purported transfers to establish an entity as a subsequent transferee of the funds." *Id.* However, the plaintiff's burden at the pleading stage does not require dollar-for-dollar accounting of the exact funds at issue." *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018).

While the Trustee must allege that the initial transfers from BLMIS to the Rye Funds and to Harley are avoidable, he is not required to avoid the transfers received by the initial transferees before asserting an action against subsequent transferees. *IBT Int'l Inc. v. Northern (In re Int'l Admin Servs., Inc.)*, 408 F.3d 689, 706-07 (11th Cir. 2005). The Trustee is free to pursue any of the immediate or mediate transferees, and nothing in the statute requires a different result. *IBT Int'l, Inc. v. Northern* (*In re Int'l Admin. Servs., Inc.*), 408 F.3d 689, 706–07 (11th Cir. 2005).

The Trustee pleaded the avoidability of the initial transfer from BLMIS to the Rye Funds and Harley by adopting by reference the entirety of the complaint filed against Tremont and related defendants in adversary proceeding 10-5310 ("Tremont Complaint"), by adopting by reference the entirety of the complaint filed against Harley in adversary proceeding 09-01187 ("Harley Complaint"), and through additional allegations in the Complaint. (Am. Compl. ¶ 109, ECF No. 220) ("The Trustee incorporates by reference the factual allegations in the Tremont

Complaint."); (*Id.* ¶ 212) ("The Trustee incorporates by reference the allegations contained in the Harley Avoidance Action complaint as if fully set forth herein.").  Defendant has not objected to the Trustee's adoption by reference of the Tremont and Harley Complaints.

**Whether the Transfers are Recoverable as Subsequent Transfers of Initial Transfers of BLMIS Customer Property**

The Trustee is seeking to recover approximately $308,113,826 in subsequent transfers made to the Defendant by the Rye Funds, the XL Funds, and Harley.  (Am. Compl. ¶ 2).  Section 550(a) of the Bankruptcy Code states:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> (2) any immediate or mediate transferee of such initial transferee.

"To plead a subsequent transfer claim, the Trustee must plead that the initial transfer is avoidable, and the defendant is a subsequent transferee of that initial transferee, that is, that the funds at issue originated with the debtor." *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018); *see also SIPC v. BLMIS* (*In re Consolidated Proceedings on 11 U.S.C. § 546(e)*), No. 12 MC 115(JSR), 2013 WL 1609154, at *7 (S.D.N.Y. Apr. 15, 2013) (consolidated proceedings on 11 U.S.C. § 546(e)).  "Federal Civil Rule 9(b) governs the portion of a claim to avoid an initial intentional fraudulent transfer and Rule 8(a) governs the portion of a claim to recover the subsequent transfer. *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018) (citing *Sharp Int'l Corp. v. State St. Bank & Trust Co.*, (*In re Sharp Int'l Corp.*), 403 F.3d 43, 56 (2d Cir. 2005) and *Picard v. Legacy Capital Ltd. (In re*

*BLMIS)*, 548 B.R. 13, 36 (Bankr. S.D.N.Y. 2016), *rev'd on other grounds*, *Picard v. Citibank, N.A.* (*In re BLMIS*), 12 F.4th 171 (2d Cir. 2021)).

The Trustee need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The plaintiff's burden at the pleading stage does not require exact accounting of the funds at issue. *BNP Paribas*, 594 B.R. at 195. Rather, "[t]he plaintiff must allege the necessary vital statistics—the who, when, and how much—of the purported transfers to establish an entity as a subsequent transferee of the funds. However, the plaintiff's burden at the pleading stage does not require dollar-for-dollar accounting of the exact funds at issue." *Id.* (cleaned up).

While the Trustee must allege that the initial transfer from BLMIS to the particular feeder fund is avoidable, he is not required to avoid the transfer received by the initial transferee before asserting an action against subsequent transferees. The Trustee is free to pursue any of the immediate or mediate transferees, and nothing in the statute requires a different result. *IBT Int'l, Inc. v. Northern* (*In re Int'l Admin. Servs., Inc.*), 408 F.3d 689, 706–07 (11th Cir. 2005).

The Tremont Complaint, filed against Tremont Group Holdings in adversary proceeding 10-05310 and incorporated by reference in the Complaint, alleges that Rye Funds were "close to 100% invested with BLMIS." (Tremont Compl. ¶ 8, Adv. Pro. No. 10-05310, ECF No. 1); (*id.* ¶ 36) ("During all relevant times, almost all of the monies invested in the Broad Market Fund were given to Madoff and deposited with BLMIS."); (*id.* ¶ 38) ("[V]irtually 100% of the monies invested in the Prime Fund were given to Madoff and invested with BLMIS."); (*Id.* ¶ 39) ("[V]irtually 100% of the monies invested in the Portfolio Limited Fund were given to Madoff and deposited with BLMIS."); (*id.* ¶ 40) ("Virtually 100% of the monies invested in the Insurance Portfolio LDC Fund were given to Madoff and deposited with BLMIS.).

The Trustee has included similar allegations in the Complaint. (Am. Compl., ¶ 39, ECF No. 220) ("At all relevant times, nearly all of the monies invested in each of the Tremont Initial Transfer Funds was invested directly or indirectly with BLMIS."). The Complaint further alleges the avoidability of the Harley initial transfers when it states that Harley "invested all of its assets with BLMIS in New York." (*Id.* ¶ 43). The Complaint plausibly alleges that the Rye Funds and Harley did not have any assets that were not BLMIS customer property.

The Trustee's allegations that Defendant received BLMIS customer property from these funds is plausible because these funds had no other property to give—the Rye Funds and Harley were fully invested with BLMIS. The Court finds that the Trustee has plausibly alleged Defendant received BLMIS customer property.

**Whether the Subsequent Transfers made to the Defendant are Traceable to BLMIS**

Defendant argues that the Complaint fails to plausibly allege that the Defendant "was a 'subsequent transferee' of BLMIS property." (Def.'s Mem. 6, ECF No. 225). The Defendant argues that the Complaint must be dismissed for failure to tie collateral payments from the XL Funds to "any particular 'initial transfer' out of BLMIS." (*Id.* 7).

The Complaint alleges that the XL Funds received hundreds of millions of dollars of BLMIS customer property to fund collateral payments. (Am. Compl. ¶¶ 199–208). The Trustee has attached exhibits to the Complaint identifying the date and amount of these transfers from the Rye Funds. (*Id.* Exs. D, G, K, N). These exhibits provide the Defendant with the "necessary vital statistics—the who, when, and how much– of the purported transfers" required to establish the XL Funds as transferees of the funds. *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018). ([T]he plaintiff's burden at the pleading stage does not require dollar-for-dollar accounting of the exact funds at issue.").

In order to determine how the XL Funds spent the money they received from BLMIS, this Court would need review financial documents in order to trace the monies to all of Tremont-related Funds' principals, insiders, creditors, and customers. Undoubtedly, the Court will trace and calculate how the XL Funds spent their BLMIS (and any non-BLMIS) funds through litigation at a later stage. At this stage, the Trustee need only assert allegations that make it plausible that Defendant received BLMIS monies.

Defendant argues that a portion of the transfers are not traceable to BLMIS as the initial transfers to XL Portfolio came after the transfers to Defendant. (Def.'s Mem. 10); (H'rg Tr. Dec. 14, 2022, 16:8–12, ECF No. 146) ("For $32 million of the alleged transfers of BLMIS customer property from XL Portfolio to NatWest, the only 10 alleged transfers to XL Portfolio came after the transfers from XL Portfolio to NatWest. The alleged subsequent transfer came before the initial transfers.").

Taking all allegations as true and reading them in the light most favorable to the Trustee, the Complaint plausibly pleads that the subsequent transferee received customer property because the initial transferees did not have other property to give. The calculation of the initial transferee's customer property and what funds it used to make redemption payments are issues of fact better resolved at a later stage of this proceeding. *See, e.g.*, *Picard v. Parson Fin. Panama S.A.* (*In re BLMIS*), No. 08-01789 (CGM), 2022 WL 3094092, at *10–11 (Bankr. S.D.N.Y. Aug. 3, 2022).

Accepting the allegations as true, the gap between the initial and subsequent transfer is of no consequence as virtually all assets of the Rye Funds are allegedly BLMIS customer property. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (court must accept factual allegations as true). The

$32,000,000 in subsequent transfer funds that the Trustee seeks to recover from Defendant more plausibly came from BLMIS customer property than from some other unnamed source.

**Whether the Initial Transfers Are Avoidable as Intentionally Fraudulent Conveyances**

The Defendant argues that the Trustee has failed to plead that BLMIS made each initial transfer with actual intent to hinder, delay, or defraud.

Because the Trustee has pleaded that BLMIS operated a Ponzi scheme, the Trustee's burden of pleading actual fraudulent intent is satisfied. (Am. Compl. ¶ 24, ECF No. 220) (stating that Madoff pled guilty to operating a Ponzi scheme through BLMIS); (*Id.* ¶ 83) ("At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities."). The "Ponzi scheme presumption" allows courts to presume actual intent to defraud on part of the operator of the Ponzi scheme. *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) ("The mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud."). In this case, the Ponzi scheme presumption allows the Court to presume that BLMIS made the initial transfers with actual intent to defraud because he has admitted to operating a Ponzi scheme.

The Trustee has pleaded that BLMIS operated a Ponzi scheme and as such, BLMIS' actual fraudulent intent is presumed via the Ponzi scheme presumption. (Am. Compl. ¶¶ 1, 24–28, 83–108). Intent to defraud is established as debtor operated a Ponzi scheme. *Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *5 (Bankr. S.D.N.Y. Apr. 25, 2016) (citing *Omnibus Good Faith Decision*, 531 B.R. at 471) ("the Trustee is entitled to rely on the Ponzi scheme presumption pursuant to which all transfers are deemed to have been made with actual fraudulent intent"); *Picard v. Cohmad Sec. Corp.*, 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011) ("the fraudulent intent on the part of the debtor/transferor . . . is established as a

matter of law by virtue of the 'Ponzi scheme presumption'").  That BLMIS operated as a Ponzi

scheme is well-established, the Court relies on earlier findings of same, and holds that the

Trustee has met its burden of pleading BLMIS' actual intent on this issue.  *See Picard v. Legacy*

*Capital Ltd.*, 603 B.R. 682, 688-93 (Bankr. S.D.N.Y. 2019) (discussing in detail that BLMIS was

a Ponzi scheme and why the Trustee is permitted to rely on the Ponzi scheme presumption to

prove intent as a matter of law); *see also Bear Stearns Secs. Corp. v. Gredd* (*In re Manhattan*

*Inv. Fund Ltd.*), 397 B.R. 1, 11 (S.D.N.Y. 2007) ("[T]he Ponzi scheme presumption remains the

law of this Circuit.").

The Defendant relies on Judge Menashi's concurrence in *Picard v. Citibank, N.A., et al.*

(*In re BLMIS*), 12 F.4th 171, 200–04 (2d Cir. 2021), in which he questions the use of the Ponzi

scheme presumption and fraudulent transfer law in cases such as this.  (Def.'s Mem. 27, ECF

No. 225).

This Court finds Judge Menashi's concurrent opinion to be unpersuasive.  The Ponzi

scheme presumption does not turn would-be preferences into fraudulent transfers.  All the Ponzi

scheme presumption does is save the Trustee and the courts time and resources by presuming

that each transfer was made with actual fraudulent intent.  Without the presumption, Defendant

would not be "off-the-hook" for the two-year transfers because the Trustee would meet (and, in

this case, has met) his pleading burden by pleading the "badges of fraud" with respect to BLMIS.

> Badges of fraud include (1) the lack or inadequacy of consideration; (2) the family,
> friendship or close associate relationship between the parties; (3) the retention of
> possession, benefit or use of the property in question; (4) the financial condition of
> the party sought to be charged both before and after the transaction in question; (5)
> the existence or cumulative effect of a pattern or series of transactions or course of
> conduct after the incurring of debt, onset of financial difficulties, or pendency or
> threat of suits by creditors; (6) the general chronology of the event and transactions
> under inquiry.

*See Salomon v. Kaiser* (*In re Kaiser*), 722 F.2d 1574, 1582–83 (2d Cir. 1983).  The

"concealment of facts and false pretenses by the transferor" is also a circumstance from which

courts have inferred intent to defraud. *Id.* at 1582 (quoting 4 COLLIER ON BANKRUPTCY ¶

548.02[5] at 548–34 to 38 (L. King 15th ed. 1983)).  The existence of several badges can

"constitute conclusive evidence of an actual intent to defraud." *Kirschner v. Fitzsimons* (*In re

Tribune Co. Fraudulent Conveyance Litig.*), No. 11-md-2296 (RJS), 2017 WL 82391, at *13

(S.D.N.Y. Jan. 6, 2017) (citation omitted); *Picard v. Nelson* (*In re BLMIS*), 610 B.R. 197, 235

(Bankr. S.D.N.Y. 2019).

    BLMIS' actual fraudulent intent is well-plead in detail in the Complaint.  (Am. Compl. ¶¶

83–108, ECF No. 220).  The Court need not infer intent to defraud because Madoff has admitted

that he had actual intent to defraud when he admitted under oath that he operated a Ponzi

scheme.  (*Id.* ¶ 24).  In addition to this, the Trustee has alleged that "BLMIS's website omitted

the investment advisory business entirely. BLMIS did not register as an investment adviser with

the SEC until 2006, following an investigation by the SEC, which forced Madoff to register."

(*Id.* ¶ 80).  For more than 20 years preceding that registration, the financial reports BLMIS filed

with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS

managed through its investment advisory business.  (*Id.* ¶ 81).  BLMIS lied to the SEC in reports

regarding the number of accounts it has and "grossly understated" the amount of assets under

management.  (*Id.* ¶ 82).  BLMIS had no legitimate business operations and produced no profits

or earnings.  (*Id.* ¶ 83).  "Madoff was assisted by several family members and a few employees,

including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and

others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud."  (*Id.*)

BLMIS used its fraudulent investment advisory business to prop up its proprietary trading

business, which also incurred significant losses. (*Id.* ¶ 84). "BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments." (*Id.* ¶ 91). "There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars." (*Id.* ¶ 96). "Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy." (*Id.* ¶ 98). "There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities." (*Id.* ¶ 104). Though unnecessary, the Trustee has sufficiently pleaded the badges of fraud.

The Trustee has successfully pleaded badges 2, 3, 4, 5, and 6. The Trustee need not plead all six badges of fraud to meet his burden of pleading actual fraudulent intent. *In re May*, 12 B.R. 618, 627 (N.D. Fla. 1980) ("Such indicators or badges, when established either singularly, but more often in combination, may justify the inference of the requisite intent to hinder, delay or defraud creditors.").

**Whether the Trustee's Claim Against the Defendant Should Be Dismissed Because the Defendant Allegedly Returned the Money to BLMIS.**

NatWest argues that it should not have to repay the subsequent transfer it allegedly received as collateral payments, under counts two and four, because it "immediately returned all of the collateral payments to BLMIS." (Def.'s Mem. 13, ECF No. 225). The Defendant explains that, in accordance with the terms of the swap agreements, the Defendant invested three times the amount of collateral it received from the XL Funds into the Rye Funds. *Id.* ("That means, that NatWest transferred back the money it supposedly received indirectly from BLMIS—the collateral payments have already been 'recovered' from NatWest.")

Pending before the Court is a motion to dismiss and, as such, the Court is required to accept the facts pleaded in the Complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Trustee has not pleaded that Defendant repaid any monies to BLMIS. Since NatWest's factual defense is not apparent on the face of this Complaint, the Court cannot find in its favor on a motion to dismiss. *United States v. Space Hunters, Inc.*, 429 F.3d 416, 426 (2d Cir. 2005) ("A court may dismiss a claim on the basis of an affirmative defense only if the facts supporting the defense appear on the face of the complaint, and it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.").

**Whether the Defendant May Utilize the § 546 Safe Harbor Defense with Respect to the Initial Transfers.**

The Defendant argues that § 546(e) and (g) bar the avoidance of the alleged initial transfers. (Def.'s Mem. 14, ECF No. 225). Section 546(e) is referred to as the safe harbor because it protects a transfer that is a "settlement payment . . . made by or to (or for the benefit of) a . . . financial institution [or] financial participant," or that is "made by or to (or for the

benefit of) a . . . financial institution [or] financial participant . . . in connection with a securities contract." 11 U.S.C. § 546(e).

The Defendant relies on the District Court's 2013 opinion in *SIPC v. BLMIS* (*In re Consolidated Proceedings on 11 U.S.C. § 546(e)*), No. 12-MC-115(JSR), 2013 WL 1609154, at *10 (S.D.N.Y. Apr. 15, 2013) ("*Cohmad*"), to argue that § 546(e) requires dismissal.  In *Cohmad*, the court laid out the requirement for recovery of a fraudulent transfer from a subsequent transferee: "the Trustee must first show that the initial transfer of that property by the debtor is subject to avoidance under one of the Bankruptcy Code's avoidance provisions (*e.g.*, 11 U.S.C. §§ 544, 547 & 548)." *Id.*  This requirement is subject to a rule allowing a subsequent transferee to raise a § 546(e) defense "even if the initial (or mediate) transferee fails to raise a Section 546(e) defense." *Id.*  There is "one caveat" to this rule: "to the extent that an innocent customer transferred funds to a subsequent transferee who had actual knowledge of Madoff Securities' fraud, that subsequent transferee cannot prevail on a motion to dismiss on the basis of Section 546(e)'s safe harbor." *Id.*  As  the court explained, this caveat follows from the general principles of recovery: "[a] defendant cannot be permitted to in effect launder what he or she knows to be fraudulently transferred funds through a nominal third party and still obtain the protections of Section 546(e)." *Id.* (citing *In re Int'l Admin. Servs., Inc.*, 408 F.3d 689, 707 (11th Cir. 2005)).

The District Court has further clarified the inapplicability of the safe harbor to transfers such as those made to the Defendant.  *Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022) ("[*Cohmad*] simply concluded that, in circumstances in which a transferee was complicit in Madoff Securities' fraud, Section 546(e) did not apply as a matter of its express terms.").  Where § 546(e) does not

"embrace the initial transfer, the subjective knowledge of a subsequent transferee cannot retroactively render it applicable." *Id.* To the extent that the Defendant seeks to apply § 546(e) to a transfer made in connection with a securities contract between it and the Rye Funds not involving BLMIS, this issue is "fact-intensive" and better addressed at a later stage of litigation. *Id.* *8.

Where the "Trustee's complaint demonstrate[s] on its face that the Section 546(e) appear[s] to apply, it also [falls] to the Trustee to plead additional circumstances demonstrating why the facially applicable defense [does] not in fact preclude his suit." *Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR), 2022 WL 16647767, at *3 n.3 (S.D.N.Y. Nov. 3, 2022). The Trustee has chosen not to contest the applicability of the safe harbor. (Opp'n 24 n.6, ECF No. 226) ("Harley's knowledge of Madoff's fraud is not at issue here, because all of the BLMIS initial transfers that funded Harley's subsequent transfers to Defendant occurred within Section 548(a)(1)(A)'s two-year lookback period.").

To the extent that the Trustee seeks to rely on any transfers to Harley that occurred outside of the two-year lookback period, as listed in Exhibit R to the Complaint, the Court deems the § 546(e) safe harbor applicable and agrees with the Defendant that the Trustee is limited to only avoid transfers pursuant to Section 548(a)(1)(A).[3]

The Complaint alleges that Tremont received the initial transfers with "actual knowledge of fraud at BLMIS, or, at minimum, while aware of suspicious facts that would have led Tremont to inquire further into the BLMIS fraud." (Am. Compl. ¶ 186, ECF No. 220).

---

[3] Exhibit R details over fourteen years of transfers between BLMIS and Harley. (Compl. Ex. R, ECF No. 220). This includes approximately $1,066,800,000 transferred from BLMIS to Harley within two years of the filing date. (*Id.*); (Am. Compl. ¶ 215) ("Of the Harley Six Year Initial Transfers, approximately $1,066,800,000 was transferred to Harley during the two years preceding the Filing Date. . . .").

Sandra Manzke, Tremont's founder and former CEO, had regular meetings and calls with Madoff and Frank DiPascali. (*Id.* ¶ 113). Robert Schulman, as co-CEO and then sole CEO of Tremont, touted his "special relationship" with Bernard Madoff. (*Id.*). Others described this relationship in similar terms. In 2003, Tremont told its auditor, Ernst & Young, that "Bob Schulman periodically visits [BLMIS's] facilities throughout the year . . ." and in June 2006, a Tremont vice president informed a potential investor that Schulman was "'intimately familiar' with Madoff based on 'a 10+ year relationship.'" (*Id.*). An investor in two Tremont feeder funds wrote to Schulman to 2001, "I know you are sick of answering this but man is it hot out there with the Bernie [Madoff] fraud rumors." (*Id.* ¶ 115). In 2007, a potential client met with officers of Tremont and discussed whether BLMIS's business was fraudulent and perhaps a Ponzi scheme. (*Id.* ¶ 122–23). When the potential clients followed up by email with questions about BLMIS, a Tremont officer responded internally that they should "give answers by phone rather than email . . . ." (*Id.* ¶ 124).

Tremont continued to receive warnings from potential investors who were concerned about whether Madoff's strategy involved "trades actually tak[ing] place." (*Id.* ¶ 127). Tremont's own reports showed that BLMIS's reported trades were impossible. (*Id.* ¶ 98). Tremont's estimates showed that there was "insufficient volume for dozens, if not hundreds of the trades Madoff purported to complete." (*Id.* ¶ 129). Tremont chose to shield BLMIS from inquiries, "with fabrications of its own, which changed depending on who was asking." (*Id.* ¶ 161). All of this was overlooked because Tremont, admittedly, made a lot of money for doing nothing other than allowing investors access to BLMIS. (*Id.* ¶¶ 171–75).

The Tremont Complaint, which is adopted by reference into the Complaint, alleges that the Tremont Group was repeatedly advised of BLMIS trading impossibilities and other indicia of

fraud.  (Tremont Compl., Adv. Pro. 10-05310, ¶ 158, ECF No. 1) (2003 email alerting Tremont

management to BLMIS practices consistent with fraud); (*id.* ¶ 194) (Internal Tremont email

scoffing at potential investor "concerned about Tremont's relationship with Madoff, saying that

there was no transparency there and that it was prone to a blow-up that would destabilize

Tremont. . . ."); (*id.* ¶ 194) (Tremont more concerned with "feeding 'a lot of money' to Madoff,

as opposed to actually understanding what Madoff was doing with that money"); (*id.* ¶ 197)

(client unable to reconcile different results from investments with BLMIS directly versus through

a Rye fund); (*id.* ¶ 215) (internal Tremont emails questioned use of auditor to investigate

BLMIS).  Tremont officers failed to confirm or question information given to it by Madoff

regarding the counterparty to trades and "at times also falsely led others to believe they knew the

counterparties."  (*Id.* ¶ 190).  "The Rye Funds received trade confirmations from BLMIS

reflecting securities transactions that could not have occurred, because they took place outside of

the range of stock and options prices for such securities traded in the market on the days in

question."  (*Id.* ¶ 181).  Tremont failed to question over 600 instances of this out-of-range

information.  (*Id.* ¶¶ 181–83).  Tremont was "consciously chose to do nothing in response" to

highly irregular and suspicious requirements set by Madoff.  (*Id.* ¶ 211).

     Here, the Trustee has sufficiently plead the actual knowledge of the Tremont-managed

Rye Funds that BLMIS was not trading securities, which makes the safe harbor inapplicable by

its express terms.  *Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR),

2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022).

     The safe harbor is not applicable to subsequent transfers.  "By its terms, the safe harbor is

a defense to the avoidance of the *initial* transfer."  *Picard v. BNP Paribas S.A. (In re BLMIS)*,

594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018) (emphasis in original); *see also* 11 U.S.C. § 546(e)

(failing to include § 550 in its protections).  Since there must be an initial transfer in order for the Trustee to collect against a subsequent transferee, a subsequent transferee may raise the safe harbor as a defense—but only in so far as the avoidance of the initial transfer is concerned.  The safe harbor cannot be used as a defense by the subsequent transferee because the Trustee is not "avoiding" a subsequent transfer, "he recovers the value of the avoided initial transfer from the subsequent transferee under 11 U.S.C. § 550(a), and the safe harbor does not refer to the recovery claims under section 550."  *Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018).

The Trustee has adequately pleaded, with particularity, the avoidability of the initial transfers due to Tremont's knowledge of BLMIS' fraud.  (Am. Compl. ¶¶ 109–81).  The Complaint and the adopted Tremont Complaint contain sufficient allegations of the initial transferee's actual knowledge to defeat the safe harbor defense on a Rule 12(b)(6) motion.

### *Res Judicata* **Prevents Relitigation of § 546(g)**

The Defendant argues that the District Court, in *Picard v. ABN AMRO Bank (Ireland) Ltd. (In re BLMIS)*, 505 B.R. 135 (S.D.N.Y. 2013) ("*ABN AMRO*"), has already precluded the avoidance of redemption requests made by the Defendant with respect to the Rye Funds and Harley due to § 546(g).  Section 546(g) protects a transfer "made by or to (or for the benefit of) a swap participant or financial participant, under or in connection with any swap agreement and that is made before the commencement of the case, except under section 548(a)(1)(A) of this title."  11 U.S.C. § 546(g).  Section 546(g) protects only an initial transfer and not subsequent transfers.  *ABN AMBRO* 505 B.R. at 143 ("reject[ing] the defendants' assertion that section 546(g)'s safe harbor should be extended to apply to subsequent transfers sought to be recovered by the Trustee under section 550").  Subsequent transferees are entitled to "raise § 546(g) as a

defense to the avoidability of the initial transfers that they eventually received even if the initial

transferees of those funds failed to raise the defense." *Id.* at 144.

The Defendant has pointed to $25 million of redemption payments from Rye Portfolio

Limited and $125 million of transfers from Rye XL Portfolio that may fall outside of the two-

year period. Of the $104,464,000 of redemption payments from Rye Portfolio Limited to the

Defendant, which the Trustee seeks to recover under count one, a $25 million transfer to the

Defendant was not proceeded by an initial transfer from BLMIS to Rye Portfolio Limited within

the two-year period. (Am. Compl. Ex. J, ECF No. 220); (Def.'s Reply 11, ECF No. 230) ("All

transfers from BLMIS to Rye Portfolio Limited either occurred more than two years prior to the

filing date, and therefore fall outside the scope of Section 548(a)(1)(A), or occurred after the

September 4, 2007 redemption and therefore could not have been the source of that transfer.").

As an initial matter, the Complaint does not show on its face that the initial transfers fall

within the 546(g) safe harbor. The Trustee has provided account statements showing hundreds

of millions of dollars of cash withdrawals from BLMIS by Rye Portfolio Limited within the two-

year period. (Am. Compl. Ex. I). Any one of the withdrawals from the customer account could

have funded the September 4, 2007 subsequent transfer to the Defendant. Discovery may show

that the Rye Funds withdrew from BLMIS weeks or even months after a redemption request was

made by a subsequent transferee like the Defendant. This fact-intensive accounting problem is

an issue to be decided at a later stage of litigation.

The Defendant misunderstands the District Court's decision in *ABN AMBRO*. Judge

Rakoff explained that § 546(g) requires the Court to consider "only whether the initial transfer is

protected by § 546(g); that is, the relevant question is whether the initial transfer was made 'in

connection with' a swap agreement and 'by or to (or for the benefit of) a swap participant or

financial participant.'" *ABN AMRO*, 505 B.R. at 144. The District Court held that "the most plausible inference from the factual context of these swap transactions" is that the investment funds "withdrew money from their Madoff Securities accounts in order to benefit themselves by receiving leveraged returns on their assets." *Id.* at 150. The benefit to a counterparty such as Defendant was "of little concern to these initial transferees." *Id.* The Court agrees with the reasoning of the District Court in *ABN AMRO* that the collateral payment withdrawal was not "for the benefit" of the Defendant, and accordingly, 546(g) does not protect the Defendant. *Id.*

The District Court found in *ABN AMRO* that the transfers at issue from Rye Portfolio Limited appeared to "have occurred within the reach-back period of Section 548(a)(1)(A)." *Id.* at 150. The District Court specified that the $25 million redemption payment at issue here "may be avoidable under section 548(a)(1)(A)," and rejected the Defendant's motion to dismiss under § 546(g). *Id.* at 151 (including among the counts that are not safe-harbored under 546(g) "AC(6878) ¶¶ 227, 247-51 & Ex. J"); *see also* Am. Complaint Ex. J, *Picard v. ABN AMRO Bank N.V.*, No. 11 Civ. 6878, ECF No. 32 (S.D.N.Y. filed Aug. 8, 2012) (listing the September 4, 2007 $25 million subsequent transfer from Rye Portfolio Limited to Defendant). The District Court directed what remained of this case to this Court for further proceedings. *ABN AMRO*, 505 B.R. at 151.

The District Court has already denied the Defendant's motion to dismiss under § 546(g) as it relates to the transfers from the Rye Funds. "The law of the case doctrine forecloses reconsideration of issues that were decided—or that could have been decided—during prior proceedings in the same case." *United States v. Vale*, 596 F. App'x 34, 34 (2d Cir. 2015).

The Court has already determined that the safe harbor under § 546(e) limits the Trustee to avoidance under § 548(a)(1)(A) with respect to recovery of transfers from Harley outside of the

two-year lookback period.  A determination of whether the safe harbor under § 546(g) also applies to these transfers is unnecessary.

**Other Defenses**

The Defendant has raised the "good faith defense" under § 550(b), arguing that this Court should dismiss the Trustee's complaint because "it took 'for value' and 'in good faith.'"  (Def.'s Mem. 30, ECF No. 225).

"An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint."  *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998).  "Not only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."  *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (cleaned up).  A "plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the [affirmative] defense."  *Id.*

*i.*    **For Value**

The "value" that a subsequent transferee must provide is "merely consideration sufficient to support a simple contract, analogous to the 'value' required under state law to achieve the status of a bona fide purchaser for value."  *Picard v. Legacy Capital Ltd.* (*In re BLMIS*), 548 B.R. 13, 37 (Bankr. S.D.N.Y. 2016) (citation omitted); *accord Enron Corp. v. Ave. Special Situations Fund II, L.P.* (*In re Enron Corp.*), 333 B.R. 205, 236 (Bankr. S.D.N.Y. 2005).  In addition, the "value" element under § 550(b)(1) looks to what the transferee gave up rather than what the transferor received.  The Complaint contains no mention of the Defendant exchanging

shares for consideration.  (*See* Am. Compl. ¶¶ 204–19, ECF No. 116).  Therefore, the "value"

defense is not asserted on the face of the Complaint.

    Defendant argues that the payments it received were given "as part of swap transactions

in exchange for a promise to pay leveraged returns," or "were equity redemptions."  (Mem. L. 30

n.16, ECF No. 225).  If Defendant knew at the time it redeemed its shares and entered into the

Swap Agreements that investments with BLMIS were worthless, then it did not receive the

subsequent transfer funds "for value" as is required under § 550.  *See Fairfield Sentry Ltd. v.*

*Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 301 (Bankr. S.D.N.Y.

2018), *aff'd sub nom. Fairfield Sentry Ltd. v. Citibank, N.A. London*, No. 19-CV-3911 (VSB),

2022 WL 4391023 (S.D.N.Y. Sept. 22, 2022) ("The only exception concerns the Knowledge

Defendants that received redemption payments with the knowledge that the NAV was wrong.  In

those circumstances, the Liquidators may seek to impose a constructive trust.").  It has not yet

been determined whether Defendant knew if the shares it redeemed from the Rye Funds had

value.

    "Value" is Defendant's burden to plead and prove.  *Picard v. BNP Paribas S.A. (In re*

*BLMIS)*, 594 B.R. 167, 198 (Bankr. S.D.N.Y. 2018).  Whether the Defendant gave value is a

question of fact to be resolved either at the summary judgment stage or at trial.  *Picard v.*

*Fairfield Inv. Fund (In re BLMIS)*, No. 08-01789 (CGM), Adv. No. 09-01239 (CGM), 2021 WL

3477479, at *9 (Bankr. S.D.N.Y. Aug. 6, 2021).

### ii.    *Good Faith*

    The District Court recently explained that good faith is a fact-intensive inquiry that

almost always requires a trial: "The Second Circuit made clear in its decision in [*Picard v.*]

*Citibank*[*, N.A. (In re BLMIS)*, 12 F.4th 171 (2d Cir. 2021), *cert. denied* No. 21-1059 (Feb. 28,

2022),] that the inquiry notice standard requires a 'fact-intensive inquiry to be determined on a case-by-case basis, which naturally takes into account the disparate circumstances of differently-situated transferees.'" *In re BLMIS, LLC*, Dec. & Order, 20-cv-02586(CM) (May 2, 2022). And that "such a fact-based determination can only be made based on the entirety of the factual record after discovery . . . ." *Id.* (internal quotation omitted).

Given the allegations of Defendant's connections to both the Tremont-managed Rye Funds and Harley, (Am. Compl. ¶¶ 34–35, 50–66, ECF No. 220) it is plausible that discovery will reveal Defendant had knowledge of BLMIS' fraud—either independently or via its relationship with those funds. In any case, the burden of proving good faith falls squarely on Defendant, and this Court cannot make a determination on Defendant's affirmative defense until after a fact-intensive inquiry.

## <u>Conclusion</u>

For the foregoing reasons, Defendant's motion to dismiss is denied. The Trustee shall submit a proposed order within fourteen days of the issuance of this decision, directly to chambers (via E-Orders), upon not less than two days' notice to all parties, as required by Local Bankruptcy Rule 9074-1(a).



**Dated: March 3, 2023**
**Poughkeepsie, New York**

**/s/ Cecelia G. Morris**
_____
**Hon. Cecelia G. Morris**
**U.S. Bankruptcy Judge**