**McKool Smith, P.C.**
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York 10001
Telephone: (212) 402-9400
Facsimile: (212) 402-9444

*Counsel for Bank Julius Baer & Co. Ltd.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-1789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff, | Adv. Pro. No. 11-2922 (CGM) |
| Plaintiff, | |
| v. | |
| BANK JULIUS BAER & CO. LTD., | |
| Defendant. | |

## BANK JULIUS BAER & CO. LTD.'S
## ANSWER TO AMENDED COMPLAINT AND JURY TRIAL DEMAND

Defendant Bank Julius Baer & Co. Ltd., ("BJB") answers the claims of Plaintiff Irving H.

Picard (the "Trustee") as follows:

## GENERAL DENIAL

Except as otherwise expressly admitted herein, BJB denies each and every allegation in the

Trustee's Amended Complaint. BJB states that the headings and sub-headings throughout the

Complaint do not constitute well-pleaded allegations of fact and therefore require no response.

To the extent a response is required, the allegations in the headings and subheadings in the

Amended Complaint are denied. In answering the allegations in the Amended Complaint, BJB

does not intend to waive, and does not waive, any and all applicable objections to the relevance,

admissibility, or prejudicial effect of any of the allegations in the Amended Complaint. BJB

expressly reserves the right to amend and/or supplement this Answer with Affirmative Defenses.

## I.    NATURE OF THE PROCEEDING

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover

BLMIS customer property, as defined by SIPA § 78lll(4), that was stolen by BLMIS as part of

the massive Ponzi scheme perpetrated by Madoff and others.

**Response:**  The allegations in Paragraph 1 contain legal conclusions to which no

response is required. To the extent a response is required, BJB denies each and every allegation

in Paragraph 1, except BJB admits that the Trustee purports to bring this adversary proceeding as

part of the Trustee's efforts to recover BLMIS Customer Property and, upon information and

belief, that Madoff and others perpetrated a Ponzi scheme.

2.    The Trustee seeks to recover at least $64,576,233 in subsequent transfers of BLMIS

customer property (the "Transfers") that BJB received by redeeming shares it owned in BLMIS

feeder funds Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Fairfield

Sigma"), and Fairfield Lambda Limited ("Fairfield Lambda" and, together with Fairfield Sentry

and Fairfield Sigma, the "FGG Feeder Funds").

**Response:** The allegations in Paragraph 2 contain legal conclusions to which no response

is required. To the extent a response is required, BJB denies each and every allegation in

Paragraph 2, except BJB admits that the Trustee purports to seek to recover "at least

$64,576,233" from BJB.

3.      BJB is a Swiss private bank, organized as a limited company, which offers asset

and wealth management, financial planning, and portfolio management services.  At all relevant

times, BJB was a sophisticated entity with significant expertise in hedge fund investments,

including with respect to the FGG Feeder Funds, other BLMIS feeder funds, and BLMIS itself.

**Response:** BJB denies each and every allegation in Paragraph 3, except BJB admits that

it is a Swiss bank organized as a limited company, which offers asset and wealth management,

financial planning, and portfolio management services.

4.      BLMIS feeder funds were single-purpose entities that invested all or substantially

all of their assets with BLMIS's investment advisory business (the "IA Business").  The FGG

Feeder Funds were the largest group of BLMIS feeder funds, and were created, operated, and

controlled by Fairfield Greenwich Group ("FGG"), a New York-based *de facto* partnership.  From

November 1990 through December 2008, Fairfield Sentry maintained direct customer accounts

with BLMIS; Fairfield Sigma and Fairfield Lambda were "currency funds," meaning they accepted

subscriptions in euros and Swiss francs, respectively, converted the money to U.S. dollars, and

then invested 100% of their assets in Fairfield Sentry.

**Response:** The allegations in Paragraph 4 contain legal conclusions to which no response

is required. To the extent a response is required, BJB denies knowledge or information sufficient

to form a belief as to the truth of the allegations contained in Paragraph 4 and on that basis

denies each and every allegation in Paragraph 4.

## II.    SUBJECT MATTER JURISDICTION AND VENUE

5.    This is an adversary proceeding commenced in this Court, in which the main

underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is

pending.  The SIPA Proceeding was originally brought in the United States District Court for the

Southern District of New York as *Securities & Exchange Commission v. Bernard L. Madoff*

*Investment Securities LLC*, *et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been

referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C.

§ 1334(b) and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

**Response:** The allegations in Paragraph 5 constitute legal conclusions to which no

response is required. To the extent a response is required, BJB denies each and every allegation

in Paragraph 5, except (a) admits that the SIPA Proceeding is pending in this Court; and (b)

admits, on information and belief, that the District Court Proceeding was commenced in the

District Court. Without limitation, BJB denies that this Court has jurisdiction to enter a final

order or judgment in this proceeding.

6.    This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (F), (H) and (O).  The

Trustee consents to the entry of final orders or judgment by this Court if it is determined that

consent of the parties is required for this Court to enter final orders or judgment consistent with

Article III of the U.S. Constitution.

**Response:** The allegations in Paragraph 6 constitute legal conclusions to which no

response is required. To the extent a response is required, BJB denies each and every allegation

in Paragraph 6, including that the Court has jurisdiction to enter a final order or judgment in this

proceeding, states that it does not consent to the issuance of entry of final orders or judgments by

the Bankruptcy Court, and demands trial by jury of all issues that may be tried by a jury.

7.      Venue in this judicial district is proper under 28 U.S.C. § 1409.

**Response:** The allegations in Paragraph 7 constitute legal conclusions to which no

response is required.

8.      This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11

U.S.C. §§ 105(a) and 550, and other applicable law.

**Response:** The allegations in Paragraph 8 constitute legal conclusions to which no

response is required. To the extent a response is required, BJB denies each and every allegation

in Paragraph 8, except BJB admits that the Trustee purports to bring this adversary proceeding

under SIPA 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

## III.    **PERSONAL JURISDICTION**

9.      BJB is subject to the jurisdiction of this Court pursuant to Federal Rule of

Bankruptcy Procedure 7004 and the United States Constitution, as well as section 302 of the New

York Civil Practice Law and Rules, because it purposely availed itself of the laws and protections

of the United States and the State of New York.

**Response:** The allegations in Paragraph 9 constitute legal conclusions to which no

response is required. To the extent a response is required, BJB denies each and every allegation

in Paragraph 9.

10.     The Trustee's claims against BJB arise from business it transacted within New

York.  BJB derived significant revenue from New York and maintained minimum contacts and/or

general business contacts with the United States and New York in connection with the claims

alleged herein.

**Response:** The allegations in Paragraph 10 constitute legal conclusions to which no

response is required. To the extent a response is required, BJB denies each and every allegation

in Paragraph 10.

11.    BJB conducted a significant portion of its FGG Feeder Funds business out of its

New York branch, through personnel employed by BJB and/or its co-located affiliate, Julius Baer

Investment Management LLC ("JBIM"), as agent for BJB.  These persons played essential roles

in BJB's FGG Feeder Funds transactions, as well as other BLMIS feeder fund transactions.

**Response:** BJB denies each and every allegation in Paragraph 11, except BJB admits that

it had a New York branch, which closed in 2006.

12.    BJB's and JBIM's New York-based personnel, among other things, (i) were

responsible for approving BJB's investments in the FGG Feeder Funds, (ii) met and communicated

with New York-based FGG personnel in New York in connection with BJB's FGG Feeder Fund

investments, including at least five meetings during the time period 1999 through 2003 with FGG

executives Jeffrey Tucker, Philip Toub, Cornelis Boele, Harold Greisman, and/or Robert Blum,

and numerous other communications, and (iii) met with Madoff himself at BLMIS's offices in

New York on at least three occasions during the time period 1998 through 2003, in connection

with all of BJB's BLMIS feeder fund investments.

**Response:** BJB denies each and every allegation in Paragraph 12, except BJB admits that

BJB personnel met and communicated with FGG personnel and with Madoff.

13.    Accordingly, BJB's and FGG's relationship was primarily established and

maintained in New York by New York-based BJB and FGG personnel.

**Response:** BJB denies each and every allegation in Paragraph 13.

14.    In addition, foreign-based employees of BJB met and corresponded with New

York-based FGG personnel regarding BJB's investments in the FGG Feeder Funds.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth

5

of the allegations contained in Paragraph 14 and on that basis denies each and every allegation in

Paragraph 14, except BJB admits that BJB personnel met and communicated with FGG

personnel.

15.     BJB invested in the FGG Feeder Funds for the purpose of profiting from BLMIS

in New York, and relinquished control over investment decisions and their implementation to

Madoff in New York.

**Response:** BJB denies each and every allegation in Paragraph 15.

16.     BJB knowingly directed funds to be invested with, and then redeemed from,

New York-based BLMIS, via the FGG Feeder Funds.  By transacting with New York-based

BLMIS and New York-based FGG, BJB knowingly accepted the rights, benefits, privileges, and

responsibilities of conducting business and transactions in the United States and New York.

**Response:** The allegations in Paragraph 16 constitute legal conclusions to which no

response is required. To the extent a response is required, BJB denies each and every allegation

in Paragraph 16.

17.     BJB voluntarily executed a subscription agreement each time it invested in an FGG

Feeder Fund.  In these agreements, BJB affirmed that it received and read the fund's information

memorandum or private placement memorandum ("PPM").  Based on these documents, BJB knew

the following facts indicating that it was transacting in New York:

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS, and Fairfield Sigma and Fairfield Lambda invested 100% of their assets with Fairfield Sentry;

- BLMIS performed all investment management duties for these assets;

- BLMIS was registered with the U.S. Securities and Exchange Commission (the "SEC");

- BLMIS was the executing broker for Fairfield Sentry's investments, and purportedly operated and executed the split-strike conversion strategy (the "SSC Strategy") on the fund's behalf;

- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury securities ("Treasury Bills"), and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;

- Fairfield Sentry's investment documents provided that subscription payments be wired in U.S. dollars to New York;

- BLMIS was the custodian of Fairfield Sentry's investments with BLMIS; and

- BLMIS was "essential to the continued operation of" Fairfield Sentry.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17 and on that basis denies each and every allegation in Paragraph 17, and refers to the referenced documents for the true and complete contents thereof.

18.    The Fairfield Sentry subscription agreements provided that all money for the purchase of Fairfield Sentry shares be directed to a New York correspondent bank account. As set forth above, BJB knew and intended that these funds would be then invested with BLMIS in New York. From Fairfield Sentry's bank account, the funds were deposited into BLMIS's account at JPMorgan Chase Bank in New York.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 18 and on that basis denies each and every allegation in Paragraph 18, and refers to the referenced subscription agreements for the true and complete contents thereof.

19.    BJB directed funds to Fairfield Sentry on at least 251 occasions over the course of at least 12 years.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 19 and on that basis denies each and every allegation in

Paragraph 19, except BJB admits that it facilitated transactions with Fairfield Sentry on behalf of clients over a span of a number of years.

20.    It was also BJB's practice to use New York bank accounts to receive redemptions (i.e., the Transfers) from Fairfield Sentry.  In subscription agreements, BJB designated a bank account in its own name at JPMorgan Chase Bank in New York as the situs for receiving redemptions, and BJB used this account to receive dozens of Transfers.  BJB also used an HSBC Bank USA correspondent account in New York via Citco Global Custody NV, as its agent, to receive a number of additional Transfers.

**Response:** The allegations in Paragraph 20 contain legal conclusions to which no response is required. To the extent a response is required, BJB denies each and every allegation in Paragraph 20, except BJB admits to receiving certain redemptions from Fairfield Sentry through Citco and certain other redemptions from Fairfield Sentry through JPMorgan Chase Bank in New York.

21.    In its FGG Feeder Funds subscription agreements, BJB submitted to New York jurisdiction, venue, service of process, and law.  Specifically, BJB (i) "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding," (ii) "agree[d] that any suit, action or proceeding . . . with respect to this Agreement and the Fund may be brought in New York," (iii) "consent[ed] to the service of process out of any New York court," and (iv) agreed that "[t]his Agreement shall be governed and enforced in accordance with the laws of New York"

**Response:** The allegations in Paragraph 21 constitute legal conclusions to which no response is required. To the extent a response is required, BJB denies each and every allegation in Paragraph 21, and refers to the referenced subscription agreements for the true and complete contents thereof.

22.    BJB also entered into at least one distribution and fee-sharing agreement with Fairfield Greenwich Limited ("FG Limited"), an FGG management entity, which agreement compensated BJB for investments it placed in Fairfield Sentry.  Pursuant to this agreement, BJB received quarterly fee payments (commonly known as retrocession fees) from FG Limited from at least 2005-2007.

**Response:**  BJB denies each and every allegation in Paragraph 22, except BJB admits that it entered into an agreement with FG Limited, and refers to the referenced agreement for the true and complete contents thereof.

23.    FG Limited was registered to do business in New York and listed its principal executive office as that of FGG in New York.  FG Limited's fee-sharing agreements with respect to FGG funds typically provided that the agreement is governed by New York law.  For instance, a New York governing-law clause was included in the similar fee agreements that were negotiated by BJB and FGG in connection with FGG funds Chester Global Strategy Fund Limited and Irongate Global Strategy Fund Limited.

**Response:**  BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 23 and on that basis denies each and every allegation in Paragraph 23, and refers to the referenced agreements for the true and complete contents thereof.

## IV.    BACKGROUND, THE TRUSTEE AND STANDING

24.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the SEC commenced the District Court Proceeding.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 24 and on that basis denies each and every allegation in

Paragraph 24, except BJB admits, on information and belief, that Madoff was arrested on or near

the Filing Date and that the SEC filed a complaint against BLMIS.

25.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to

combining its action with an application by the Securities Investor Protection Corporation

("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court

alleging, among other things, that BLMIS could not meet its obligations to securities customers as

they came due and its customers needed the protections afforded by SIPA.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 25 and on that basis denies each and every allegation in

Paragraph 25, and otherwise refers to the referenced SIPC application for the true and complete

contents thereof.

26.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered

an order pursuant to SIPA, which, in pertinent part:

       a.       appointed the Trustee for the liquidation of the business of BLMIS
                   pursuant to SIPA § 78eee(b)(3);

       b.       appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to
                   SIPA § 78eee(b)(3); and

       c.       removed the case to this Court pursuant to SIPA § 78eee(b)(4).

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 26 and on that basis denies each and every allegation in

Paragraph 26, and otherwise refers to the referenced order for the true and complete contents

thereof.

27.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court

approved the Trustee's bond and found that the Trustee was a disinterested person.  Accordingly,

the Trustee is duly qualified to serve and act on behalf of the estate.

**Response:** The allegations in Paragraph 27 constitute legal conclusions to which no response is required. To the extent a response is required, BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27 and on that basis denies each and every allegation in Paragraph 27, and otherwise refers to the referenced orders for the true and complete contents thereof.

28.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 28 and on that basis denies each and every allegation in Paragraph 28, and otherwise refers to the referenced petition and order for the true and complete contents thereof.

29.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 29 and on that basis denies each and every allegation in Paragraph 29, except BJB admits, upon information and belief, that Madoff pled guilty to crimes, and otherwise refers to the transcript of the referenced hearing for the true and complete contents thereof.

30.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 30 and on that basis denies each and every allegation in Paragraph 30, and otherwise refers to the transcript of the referenced hearing for the true and complete contents thereof.

31.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 31 and on that basis denies each and every allegation in Paragraph 31, and otherwise refers to the transcript of the referenced hearing for the true and complete contents thereof.

32.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 32 and on that basis denies each and every allegation in Paragraph 32.

33.    As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by BLMIS or Madoff to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

**Response:** The allegations in Paragraph 33 constitute legal conclusions to which no response is required. To the extent a response is required, BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 33 and on that basis denies each and every allegation in Paragraph 33.

34.    Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

**Response:** The allegations in Paragraph 34 constitute legal conclusions to which no response is required. To the extent a response is required, BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 34 and on that basis denies each and every allegation in Paragraph 34.

35.     The Trustee has standing to bring the avoidance and recovery claims under SIPA§ 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff- 2(c)(3).

**Response:** The allegations in Paragraph 35 constitute legal conclusions to which no response is required. To the extent a response is required, BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 35 and on that basis denies each and every allegation in Paragraph 35.

## V.     BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.     BLMIS

36.     Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker-dealer with the SEC.  In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company.  At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 36 and on that basis denies each and every allegation in Paragraph 36.

37.     In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning

on January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status.  SIPC membership is contingent on registration of the broker-dealer with the SEC.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 37 and on that basis denies each and every allegation in Paragraph 37.

38.    For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker-dealer operation, and the IA Business.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 38 and on that basis denies each and every allegation in Paragraph 38, except BJB admits, upon information and belief, that BLMIS's principal place of business was in New York, New York.

39.    BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry.  BLMIS's website omitted the IA Business entirely.  BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 39 and on that basis denies each and every allegation in Paragraph 39.

40.    For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds

BLMIS managed through its IA Business.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 40 and on that basis denies each and every allegation in Paragraph 40.

41.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion.  BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion.  In reality, Madoff grossly understated these numbers.  In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM.  At all times, BLMIS's Form ADVs were publicly available.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 41 and on that basis denies each and every allegation in Paragraph 41.

**B.      The Ponzi Scheme**

42.     At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 42 and on that basis denies each and every allegation in Paragraph 42, except BJB admits, upon information and belief, that Madoff operated a Ponzi

scheme.

43.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.  It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.  The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

**Response:**  BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 43 and on that basis denies each and every allegation in Paragraph 43.

44.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York.  Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

**Response:**  BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 44 and on that basis denies each and every allegation in Paragraph 44.

45.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these

fictitious annual audited financial statements prepared by Friehling & Horowitz.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 45 and on that basis denies each and every allegation in Paragraph 45.

1.    Madoff's Investment Strategy

46.    In general, BLMIS purported to execute two primary investment strategies for BLMIS customers:  the convertible arbitrage strategy and the SSC Strategy.  For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 46 and on that basis denies each and every allegation in Paragraph 46.

47.    All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 47 and on that basis denies each and every allegation in Paragraph 47.

48.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  Investors were told they would gain profits from a change in the expectations for

the stock or convertible security over time.  In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

**Response**: BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 48 and on that basis denies each and every allegation in Paragraph 48.

49.     From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

**Response**: BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 49 and on that basis denies each and every allegation in Paragraph 49.

50.     BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

**Response**: BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 50 and on that basis denies each and every allegation in Paragraph 50.

51.     By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

**Response**: BJB denies knowledge or information sufficient to form a belief as to the truth

19

of the allegations contained in Paragraph 51 and on that basis denies each and every allegation in

Paragraph 51.

52.    The put options were to limit the downside risk of sizeable price changes in the

basket.  The exercise of put options could not turn losses into gains, but rather could only put a

floor on losses.  By definition, the exercise of a put option should have entailed a loss for BLMIS.

**Response**: BJB denies knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 52 and on that basis denies each and every allegation in

Paragraph 52.

53.    The sale of call options would partially offset the costs associated with acquiring

puts but would have the detrimental effect of putting a ceiling on gains.  The call options would

make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone

outperform the market, because in a rising market, calls would have been expected to be exercised

by the counterparty.

**Response**: BJB denies knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 53 and on that basis denies each and every allegation in

Paragraph 53.

54.    The simultaneous purchase of puts and sale of calls to hedge a securities position

is commonly referred to as a "collar."  The collar provides downside protection while limiting the

upside.

**Response**: BJB admits the allegations in Paragraph 54.

55.    If Madoff was putting on the same baskets of equities across *all* BLMIS accounts,

as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the

market value of the equities in the basket.  For example, to properly implement a collar to hedge

the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the

purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are

no records to substantiate Madoff's sale of call options or purchase of put options in any amount,

much less in billions of notional dollars.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 55 and on that basis denies each and every allegation in

Paragraph 55.

56.    Moreover, at all times that BLMIS reported its total AUM, publicly available

information about the volume of exchange-traded options showed that there was simply not

enough call option notional value to support the SSC Strategy.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 56 and on that basis denies each and every allegation in

Paragraph 56.

57.    Madoff could not be using the SSC Strategy because his returns drastically

outperformed the market.  BLMIS showed only 16 months of negative returns over the course of

its existence compared to 82 months of negative returns in the S&P 100 Index over the same time

period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's

performance, it would also regularly show gains when the S&P 100 Index was down (at times

significantly).  Such results were impossible if BLMIS had actually been implementing the SSC

Strategy.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 57 and on that basis denies each and every allegation in

Paragraph 57.

2.    BLMIS's Fee Structure

58.    BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits.  By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 58 and on that basis denies each and every allegation in Paragraph 58.

3.    BLMIS's Market Timing

59.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he succeeded at market timing by intermittently entering and exiting the market.  During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 59 and on that basis denies each and every allegation in Paragraph 59.

60.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.  It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

**Response:** The allegations in Paragraph 60 constitute legal conclusions to which no

response is required. To the extent a response is required, BJB denies knowledge or information

sufficient to form a belief as to the truth of the allegations contained in Paragraph 60 and on that

basis denies each and every allegation in Paragraph 60.

61.    BLMIS's practice of exiting the market at fixed times, regardless of market

conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does

not depend on exiting the market in a particular month.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 61 and on that basis denies each and every allegation in

Paragraph 61.

4.    BLMIS Execution

62.    BLMIS's execution showed a consistent ability to buy low and sell high, an ability

so uncanny that any sophisticated or professional investor would know it was statistically

impossible.

**Response:** BJB denies each and every allegation in Paragraph 62.

5.    No Evidence Of BLMIS Trading

63.    There is no record of BLMIS clearing a single purchase or sale of securities in

connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing

house for such transactions, its predecessors, or any other trading platform on which BLMIS could

have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded

securities using the SSC Strategy.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 63 and on that basis denies each and every allegation in

Paragraph 63.

64.     All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 64 and on that basis denies each and every allegation in Paragraph 64.

### 6.     The Collapse Of The Ponzi Scheme

65.     The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 65 and on that basis denies each and every allegation in Paragraph 65, except BJB admits, upon information and belief, that Madoff's Ponzi scheme collapsed in December 2008.

66.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 66 and on that basis denies each and every allegation in Paragraph 66, and otherwise refers to the transcripts of the referenced hearings for the true and complete contents thereof.

67.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at

the time of the transfers alleged herein, BLMIS was left with insufficient capital.

**Response:** The allegations in Paragraph 67 constitute legal conclusions to which no response is required. To the extent a response is required, BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 67 and on that basis denies each and every allegation in Paragraph 67.

## VI.    DEFENDANT AND RELEVANT NON-PARTY AFFILIATES

68.    Defendant BJB is a Swiss limited company that provides global private banking and investment services for individual and institutional clients. BJB is the third largest Swiss bank and maintains its principal office at Bahnhofstrasse 36, 8010 Zurich, Switzerland. BJB has numerous branches and representative offices throughout the world.

**Response:** BJB admits the allegations in Paragraph 68.

69.    BJB is the principal operating company of Julius Baer Group Ltd. ("Julius Baer Group"), one of the top 30 largest publicly-traded Swiss companies. Julius Baer Group is headquartered in Zurich, Switzerland.

**Response:** BJB admits the allegations in Paragraph 69.

70.    From 1984 through April 2006, BJB maintained a New York branch at 330 Madison Avenue, New York, NY 10017.

**Response:** BJB admits that it maintained a New York branch at 330 Madison Avenue from approximately 1984 to approximately 2006.

71.    At all relevant times, non-defendant JBIM was a wholly-owned subsidiary of Julius Baer Group and an affiliate of BJB, and was also located at 330 Madison Avenue, New York, NY 10017. JBIM's personnel were among those responsible for vetting and approving BJB's investments in third-party funds such as the FGG Feeder Funds. In this regard, JBIM acted as agent to BJB.

25

**Response:** The allegations in Paragraph 71 constitute legal conclusions to which no response is required. To the extent a response is required, BJB denies each and every allegation in Paragraph 71, except BJB admits that JBIM was previously owned, at least in part, by Julius Baer Group.

## VII.    RECOVERY OF SUBSEQUENT TRANSFERS TO BJB

### A.    Initial Transfers From BLMIS To Fairfield Sentry

72.    The Trustee commenced a separate adversary proceeding against Fairfield Sentry and other defendants in this Court under the caption, *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (CGM), seeking to avoid and recover initial transfers of customer property from BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 72 and on that basis denies each and every allegation in Paragraph 72, except BJB admits, upon information and belief, that the Trustee commenced a separate adversary proceeding against Fairfield Sentry and other defendants in this Court, and otherwise refers to the pleadings in that proceeding for the true and complete contents thereof.

73.    By orders dated June 7 and June 10, 2011, this Court approved a settlement among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a consent judgment in favor of the Trustee and against Fairfield Sentry in the amount of $3,054,000,000 ("Judgment Amount") [ECF No. 109].

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 73 and on that basis denies each and every allegation in Paragraph 73, except BJB admits, upon information and belief, that the Trustee and Fairfield Sentry entered a settlement which the Court approved, and otherwise refers to the referenced

orders, settlement agreement, and judgment for the true and complete contents thereof.

74.     The Fairfield Sentry Initial Transfers are set forth in the attached Exhibits A and

B. The Fairfield Sentry Initial Transfers were and continue to be customer property within the

meaning of SIPA § 78lll(4).

**Response:** The allegations in Paragraph 74 constitute legal conclusions to which no

response is required. To the extent a response is required, BJB denies each and every allegation

in Paragraph 74, except BJB admits that the attached Exhibit A purports to list certain BLMIS

account names and numbers and Exhibit B purports to list various transfers from BLMIS to

Fairfield Sentry.

75.     On August 28, 2020, the Trustee filed a second amended complaint in the *Fairfield*

*Sentry Ltd.* proceeding ("Second Amended Complaint") [ECF No. 286] seeking in part recovery

of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a

declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount

are avoided.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth

of the allegations contained in Paragraph 75 and on that basis denies each and every allegation in

Paragraph 75, except BJB admits, upon information and belief, that the Trustee filed a second

amended complaint in the Fairfield Sentry proceeding and other defendants in this Court, and

otherwise refers to the referenced Second Amended Complaint for the true and complete

contents thereof.

76.     As alleged in the Second Amended Complaint, Fairfield Sentry received each of

the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum,

while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the

BLMIS fraud. The Trustee incorporates by reference the allegations contained in the Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, 315-16.

**Response:** The allegations in Paragraph 76 contain legal conclusions to which no response is required. To the extent a response is required, BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 76 and on that basis denies each and every allegation in Paragraph 76, denies that the referenced Second Amended Complaint sufficiently alleges Fairfield Sentry's actual knowledge of fraud at BLMIS or that it was aware of suspicious facts that would have led Fairfield Sentry to inquire further into the BLMIS fraud, denies knowledge or information sufficient to form a belief as to the truth of any of the other allegations of the referenced Second Amended Complaint and on that basis denies each and every allegation in the Second Amended Complaint, but reserves the right to rely on and introduce any allegations in the referenced Second Amended Complaint or its exhibits as opposing party admissions admissible for the truth of their contents.

77.    Of the Judgment Amount, $2,895,000,000 was transferred to Fairfield Sentry during the six years preceding the Filing Date (the "Fairfield Sentry Six Year Transfers"). Each of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law (the "NYDCL"), particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

**Response:** The allegations in Paragraph 77 contain legal conclusions to which no response is required. To the extent a response is required, BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 77 and on that basis denies each and every allegation in Paragraph 77.

78.    Of the Fairfield Sentry Six Year Transfers, $1,580,000,000 was transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Transfers"). Each of the Fairfield Sentry Two Year Transfers is avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**Response:** The allegations in Paragraph 78 contain legal conclusions to which no response is required. To the extent a response is required, BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 78 and on that basis denies each and every allegation in Paragraph 78.

### B.    **Subsequent Transfers From Fairfield Sentry To BJB**

79.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to BJB. Based on the Trustee's investigation to date, the subsequent transfers to BJB total at least $52,949,944 (the "Fairfield Sentry-BJB Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry-BJB Subsequent Transfers is attached as **Exhibit C**.

**Response:** BJB denies each and every allegation in Paragraph 79, except BJB admits that it received funds from Fairfield Sentry and that attached Exhibit C purports to list transfers from Fairfield Sentry to BJB.

80.    On December 8, 2011, the Trustee filed this action against BJB seeking recovery of subsequent transfers from Fairfield Sentry.

**Response:** BJB denies each and every allegation in Paragraph 80, except BJB admits that the Trustee filed this action on December 8, 2011.

81.    The Fairfield Sentry-BJB Subsequent Transfers are recoverable from BJB under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**Response:** The allegations in Paragraph 81 contain legal conclusions to which no response is required. To the extent a response is required, BJB denies each and every allegation in Paragraph 81.

82.    The Fairfield Sentry-BJB Subsequent Transfers represent redemptions of equity interests by BJB as a shareholder in Fairfield Sentry.  Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Fairfield Sentry-BJB Subsequent Transfers upon redemption of BJB's interests.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 82 and on that basis denies each and every allegation in Paragraph 82, except BJB admits that it received payments from Fairfield Sentry for redemption of shares in Fairfield Sentry.

C.    **Subsequent Transfers From Fairfield Sentry To Fairfield Sigma And Subsequently To BJB**

83.    Based on the Trustee's investigation to date, prior to the Filing Date, Fairfield Sentry subsequently transferred at least $772,690,257 of the Fairfield Sentry Initial Transfers directly to Fairfield Sigma (the "Fairfield Sigma Subsequent Transfers").  A chart setting forth the presently known Fairfield Sigma Subsequent Transfers by is attached as **Exhibit D**.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 83 and on that basis denies each and every allegation in Paragraph 83, except BJB admits that attached Exhibit D purports to list transfers from Fairfield Sentry to Fairfield Sigma.

84.    Thereafter, Fairfield Sigma transferred at least $11,262,340 to BJB (the "Fairfield Sigma-BJB Subsequent Transfers").  A chart setting forth the presently known Fairfield Sigma-BJB Subsequent Transfers is attached as **Exhibit E**.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 84 and on that basis denies each and every allegation in Paragraph 84, except BJB admits that it received funds from Fairfield Sigma and that attached Exhibit E purports to list transfers from Fairfield Sigma to BJB.

85.    The Fairfield Sigma-BJB Subsequent Transfers are recoverable from BJB under section 550(a) of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**Response:** The allegations in Paragraph 85 contain legal conclusions to which no response is required. To the extent a response is required, BJB denies each and every allegation in Paragraph 85.

86.    The Fairfield Sigma-BJB Subsequent Transfers represent redemptions of equity interests by BJB as a shareholder in Fairfield Sigma.  Because Fairfield Sigma invested all of its assets in Fairfield Sentry, and Fairfield Sentry, in turn, invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sigma was insolvent when it made the Fairfield Sigma-BJB Subsequent Transfers upon redemption of BJB's interests.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 86 and on that basis denies each and every allegation in Paragraph 86, except BJB admits that it received payments from Fairfield Sigma for redemption of shares in Fairfield Sigma.

D.    **Subsequent Transfers From Fairfield Sentry To Fairfield Lambda And Subsequently To BJB**

87.    Based on the Trustee's investigation to date, prior to the Filing Date, Fairfield Sentry subsequently transferred at least $51,991,017 of the Fairfield Sentry Initial Transfers directly to Fairfield Lambda (the "Fairfield Lambda Subsequent Transfers").  A chart setting forth

the presently known Fairfield Lambda Subsequent Transfers by is attached as **Exhibit F**.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 87 and on that basis denies each and every allegation in Paragraph 87, except BJB admits that attached Exhibit F purports to list transfers from Fairfield Sentry to Fairfield Lambda.

88.    Thereafter, Fairfield Lambda transferred at least $363,949 to BJB (the "Fairfield Lambda-BJB Subsequent Transfers"). A chart setting forth the presently known Fairfield Lambda-BJB Subsequent Transfers is attached as **Exhibit G**.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 88 and on that basis denies each and every allegation in Paragraph 88, except BJB admits that it received funds from Fairfield Lambda and that attached Exhibit G purports to list transfers from Fairfield Lambda to BJB.

89.    The Fairfield Lambda-BJB Subsequent Transfers are recoverable from BJB under section 550(a) of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**Response:** The allegations in Paragraph 89 contain legal conclusions to which no response is required. To the extent a response is required, BJB denies each and every allegation in Paragraph 89.

90.    The Fairfield Lambda-BJB Subsequent Transfers represent redemptions of equity interests by BJB as a shareholder in Fairfield Lambda.  Because Fairfield Lambda invested all of its assets in Fairfield Sentry, and Fairfield Sentry, in turn, invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Lambda was insolvent when it made the Fairfield Lambda-BJB Subsequent Transfers upon redemption of BJB's interests.

**Response:** BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 90 and on that basis denies each and every allegation in Paragraph 90, except BJB admits that it received payments from Fairfield Lambda for redemption of shares in Fairfield Lambda.

91.     The Fairfield Sentry-BJB Subsequent Transfers, Fairfield Sigma-BJB Subsequent Transfers, and Fairfield Lambda-BJB Subsequent Transfers together constitute the Transfers, as defined above.

**Response:** The allegations in Paragraph 91 set forth defined terms for purposes of the Amended Complaint to which no response is required. To the extent a response is required, BJB denies each and every allegation in Paragraph 91, except BJB admits that the Trustee defines the Fairfield Sentry-BJB Subsequent Transfers, Fairfield Sigma-BJB Subsequent Transfers, and Fairfield Lambda-BJB Subsequent Transfers as the Transfers.

92.     The Trustee's discovery and investigation is ongoing and the Trustee reserves the right to: (i) supplement the information on the initial and subsequent transfers discussed above, and any additional transfers; and (ii) seek avoidance and recovery of such transfers.

**Response:** The allegations in Paragraph 92 contain purported reservations of rights to which no response is required. To the extent a response is required, BJB denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 92 and on that basis denies each and every allegation in Paragraph 92.

## COUNT ONE

## RECOVERY OF THE TRANSFERS 11 U.S.C. §§ 105(a) AND 550

93.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

**Response:** BJB incorporates by reference its answers to the allegations contained in the

previous paragraphs of the Amended Complaint as if fully rewritten herein.

94.    The Transfers are recoverable from BJB under 11 U.S.C. § 550(a) and SIPA § 78fff-2(c)(3).

**Response:** The allegations in Paragraph 94 contain legal conclusions to which no response is required. To the extent a response is required, BJB denies each and every allegation in Paragraph 94.

95.    BJB is an immediate or mediate transferee of the Transfers from the FGG Feeder Funds.

**Response:** The allegations in Paragraph 95 contain legal conclusions to which no response is required. To the extent a response is required, BJB denies each and every allegation in Paragraph 95.

96.    As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against BJB: (a) recovering the Transfers, or the value thereof, from BJB for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**Response:** The allegations in Paragraph 96 contain legal conclusions to which no response is required. To the extent a response is required, BJB denies each and every allegation in Paragraph 96.

## RESPONSE TO PLAINTIFF'S REQUEST FOR RELIEF

BJB denies that the Trustee is entitled to his requested judgment in favor of the Trustee and against BJB or to any of the relief described herein.

## AS TO HEADINGS AND SUBHEADINGS

BJB is not required to respond to headings or subheadings within the Amended Complaint. To the extent that a response is required, BJB denies any averments in the headings

or subheadings of the Amended Complaint.

## DEFENSES

BJB asserts the following defenses without assuming the burden of proof or any other burden if such burdens would otherwise be on Plaintiff. BJB reserves the right to amend this Answer to assert other and further defenses, as well as any counterclaims, cross-claims, and/or third party claims, when and if, in the course of investigation, discovery, or preparation for trial, it becomes appropriate to do so. The following defenses are set forth cumulatively and in the alternative.

## FIRST DEFENSE

### Failure to State a Claim for Relief
### (Fed. R. Civ. P. 12(b)(6); Fed. R. Bankr. P. 7012(b))

The Trustee's claim is barred, in whole or in part, because the Amended Complaint fails to state a claim upon which relief can be granted, including without limitation for the reasons stated in BJB's Memorandum of Law in Support of its Motion to Dismiss the Trustee's Amended Complaint [ECF 115], filed on July 7, 2022 in this adversary proceeding.

## SECOND DEFENSE

### Lack of Personal Jurisdiction
### (Fed. R. Civ. P. 12(b)(2); Fed. R. Bankr. P. 7012(b))

The Trustee's claim is barred, in whole or in part, because this Court lacks personal jurisdiction over BJB, including without limitation for the reasons stated in BJB's Memorandum of Law in Support of its Motion to Dismiss the Trustee's Amended Complaint [ECF 115], filed on July 7, 2022 in this adversary proceeding. BJB has not consented to the exercise of jurisdiction over it by this Court, to entry of any decision by this Court against it, or to this Court's authority to hear and determine any claims asserted as against it in this action.

## THIRD DEFENSE

**Lack of Subject Matter Jurisdiction**
**(U.S. Const. Art. III; Fed. R. Civ. P. 12(b)(1); Fed. R. Bankr. P. 7012(b))**

This Court lacks jurisdiction under Article III of the U.S. Constitution to enter final

orders or judgment in this proceeding.

## FOURTH DEFENSE

**Statute of Limitations**

The Trustee's claim is barred, in whole or in part, by the applicable statute of limitations.

## FIFTH DEFENSE

**Violation of Due Process**
**(U.S. Const. Amend. V)**

The Trustee's claim is barred, in whole or in part, to the extent the doctrine of law of the

case has been applied to BJB based on rulings made in other adversary proceedings to which it

was not a party and in which it did not participate, which violates BJB's right to due process of

law as guaranteed by the Fifth Amendment to the U.S. Constitution.

## SIXTH DEFENSE

**Extraterritoriality**

The Trustee's claim is barred, in whole or in part, because the Trustee's recovery from

BJB of any of the alleged transfers would constitute an impermissible extraterritorial application

of U.S. law.

## SEVENTH DEFENSE

**Comity**

The Trustee's claim is barred, in whole or in part, because the Trustee's recovery from

BJB of any of the alleged transfers would violate principals of international comity.

## EIGHTH DEFENSE

### British Virgin Island Proceedings

The Trustee's claim is barred, in whole or in part, based upon rulings, judgments, orders, or decisions entered in the liquidation proceedings of Fairfield Sentry before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands, including any related appellate rulings, judgments, orders, or decisions.

## NINTH DEFENSE

### Estoppel/Waiver

The Trustee's claim is barred, in whole or in part, by estoppel, waiver, or other related equitable doctrines.

## TENTH DEFENSE

### Unreasonable Delay/Laches

The Trustee's claim is barred, in whole or in part, because the delay in bringing and prosecuting his claim, which was brought more than a decade ago, lay dormant for years and concerns alleged transfers made 15 to 20 years ago, is unreasonable and unfairly prejudices BJB's ability to defend itself, including, without limit, with respect to any claim by the Trustee for interest accruing from after the date of the filing of the Complaint.

## ELEVENTH DEFENSE

### 11 U.S.C. § 544/ N.Y. Debtor and Creditor Law §§ 273-276, 278-279

The Trustee's claim is barred, in whole or in part, because the Trustee fails to plead all of the elements of fraudulent transfer under section 544 of the Bankruptcy Code and sections 273, 274, 275, 276, 276-a, 278 and/or 279 of the New York Debtor and Creditor Law with sufficient particularity and factual support, and the Trustee cannot prove such elements at trial.

## TWELFTH DEFENSE

**Fair Consideration Without Knowledge of Fraud
(N.Y. Debtor and Creditor Law § 278(1))**

The Trustee's claim is barred, in whole or in part, because the alleged transfers were

taken, if at all, for fair consideration and without knowledge of the fraud, as provided by New

York Debtor and Creditor Law § 278(1).

## THIRTEENTH DEFENSE

**No Actual Fraudulent Intent and For Fair Consideration
(N.Y. Debtor and Creditor Law § 278(2))**

The Trustee's claim is barred, in whole or in part, because the alleged transfers were

taken, if at all, without actual fraudulent intent and for fair consideration, as provided by New

York Debtor and Creditor Law § 278(2).

## FOURTEENTH DEFENSE

**Bankruptcy Code Safe Harbor
(11 U.S.C. § 546(e))**

The Trustee's claim is barred, in whole or in part, because the alleged subsequent

transfers to BJB, if any, may not be recovered because the alleged initial transfers, if any, are

subject to the safe harbor in Section 546(e) of the Bankruptcy Code, 11 U.S.C. § 546(e). Any

such alleged initial transfers were (i) made by or to (or for the benefit of) a stockbroker

(BLMIS), financial institution (Fairfield Sentry or BJB), financial participant (BJB), or other

covered entity; (ii) a settlement payment and/or a transfer made in connection with a securities

contract (between BLMIS and Fairfield Sentry or between Fairfield Sentry and BJB); and (iii)

made more than two years before the petition date and thus not recoverable under 11 U.S.C. §

548(a)(1)(A). On information and belief, Fairfield Sentry had no actual knowledge that Madoff

or BLMIS were not trading securities or that they were perpetrating a Ponzi scheme. In addition,

BJB had no actual knowledge that Madoff or BLMIS were not trading securities or that they were perpetrating a Ponzi scheme, neither at the time of the alleged transfers from BLMIS to Fairfield Sentry nor at the time of the alleged transfers from the Fairfield Funds to BIB.

## FIFTEENTH DEFENSE

### Initial Transfer Not Avoided
### (11 U.S.C. § 550(a))

The Trustee's claim is barred, in whole or in part, because under 11 U.S.C. § 550(a), the Trustee may not recover the alleged subsequent transfers because he has not avoided the alleged initial transfers from BLMIS to Fairfield Sentry.

## SIXTEENTH DEFENSE

### For Value, in Good Faith, and Without Knowledge of Voidability
### (11 U.S.C. § 550(b))

The Trustee's claim is barred, in whole or in part, because to the extent BJB received any of the alleged subsequent transfers, or any proceeds thereof, the Trustee may not recover such transfers or proceeds pursuant to 11 U.S.C. § 550(b), because BJB took any funds it received for value, in good faith, and without knowledge of the voidability of the alleged initial transfers from BLMIS to Fairfield Sentry.

BJB took for value because the alleged transfers it received, if any, were made in exchange for BJB's surrender of its shares in Fairfield Sentry, Fairfield Sigma, and Fairfield Lambda, respectively.

The alleged transfers were routine transfers in exchange for redemption of shares in the Fairfield Funds. BJB did not have actual knowledge of any fraudulent purpose behind the transfers it received, if any. BJB did not know facts that would have prompted a reasonable person in BJB's position to conduct further inquiry into whether there was any fraudulent purpose behind any alleged transfers.

Even if BJB had been on inquiry notice of a possible fraudulent purpose behind any alleged transfers it received, a diligent inquiry by BJB would not have discovered such a fraudulent purpose. Other entities, including the United States Securities and Exchange Commission, with greater investigatory tools and resources than BJB, and with more access to BLMIS personnel and documentation than BJB, repeatedly examined and investigated BLMIS but failed to uncover Madoff's fraud before December 2008. BJB did not have the ability to compel the production of information from third parties that would have been necessary to establish that BLMIS was committing fraud. Diligent inquiry by BJB would not have discovered the fraudulent purpose of any alleged transfers.

BJB did not have knowledge of the voidability of any alleged transfers from BLMIS to Fairfield Sentry when it received the alleged subsequent transfers, if any.

## SEVENTEENTH DEFENSE

### BJB as Initial Transferee

The Trustee's claim is barred, in whole or in part, because Fairfield Sentry was a mere conduit, and consequently, any claimed transfers were initial transfers from BLMIS to BJB. As the Trustee stated in *Picard v. Grosvenor Investment Management Ltd.*, No. 12-1021, 2022 WL 17098716 (Bankr. S.D.N.Y. Nov. 21, 2022), Fairfield Sentry's "sole purpose was to funnel money to BLMIS" and "no arm's length relationship exist[ed] between [Sentry] and BLMIS" (internal quotation marks and citation omitted). 12-1021 ECF 115, at 3, 6. As a result, any redemptions received by BJB were initial transfers from BLMIS to BJB that are subject to the safe harbor under 11 U.S.C. § 546(e); any Trustee proceeding to avoid the alleged transfers is untimely; and BJB may retain the amount it received, if any, pursuant to 11 U.S.C. § 548(c) and 11 U.S.C. § 548(d)(2)(B) because it took any alleged transfers for value and in good faith.

## EIGHTEENTH DEFENSE

### No Ponzi Scheme Presumption

The Trustee's claim is barred, in whole or in part, because the Trustee is not entitled to rely on a

"Ponzi scheme presumption" to prove that the alleged initial transfers from BLMIS to Fairfield

Sentry that he seeks to recover from BJB were made with actual intent to hinder, delay or

defraud any BLMIS creditor.

## NINETEENTH DEFENSE

### No Customer Property
### (15 U.S.C. § 78fff-2(c)(3))

The Trustee's claim is barred, in whole or in part, because the alleged subsequent

transfers did not constitute BLMIS customer property under 15 U.S.C. § 78fff2(c)(3) or any

other applicable law, for a number of reasons, including for reasons set forth in BJB's

Memorandum of Law in Support of its Motion to Dismiss the Trustee's Amended Complaint

[ECF 115], filed on July 7, 2022 in this adversary proceeding. Among other things, on

information and belief, some or all of the redemption payments BJB received from the Fairfield

Funds were sourced from subscription payments made to the Fairfield Funds by other Fairfield

investors. Additionally, on information and belief, some or all of the redemption payments BJB

received from the Fairfield Funds could not have been sourced from BLMIS customer property

because prior allegedly avoidable transfers from BLMIS to Fairfield Sentry had been distributed

by Fairfield Sentry to other persons or entities prior to the alleged transfers to BJB.

## TWENTIETH DEFENSE

### Proceeds Not Recoverable

In the alternative, to the extent that the property, if any, that BJB received from

Fairfield was proceeds of customer property that BLMIS transferred to Fairfield Sentry, it is not

recoverable by the Trustee from BJB under section 550(a)(2) of the Bankruptcy Code.

### TWENTY-FIRST DEFENSE

**No Interest**

The Trustee is not entitled to an award of interest.

### TWENTY-SECOND DEFENSE

**Failure to Mitigate**

The Trustee's claim is barred, in whole or in part, because the Plaintiff has failed to

mitigate, minimize, or avoid damages, if any.

### TWENTY-THIRD DEFENSE

**Sufficient SIPC Funds**

The Trustee's claim should be dismissed if there are recovered, now or during the

pendency of this action, sufficient funds to reimburse the Securities Investor Protection

Corporation ("SIPC") for all payments that SIPC has made to satisfy allowed claims of BLMIS

customers.

### TWENTY-FOURTH DEFENSE

**Single Satisfaction**
**(11 U.S.C. § 550(d); N.Y. Debtor and Creditor Law § 278(1)(a))**

The Trustee's claim is barred, in whole or in part, because under 11 U.S.C. § 550(d), the

Trustee "is entitled to only a single satisfaction under [11 U.S.C. 550(a)]." Under NYDCL §

278(1)(a), Plaintiff may only set aside a conveyance "to the extent necessary to satisfy his

claim." The Trustee may not recover any alleged subsequent transfer from BJB to the extent that

the Trustee has recovered from Fairfield Sentry or any other immediate or mediate transferee the

amount of any avoided initial transfer that included customer property that the Trustee alleges

BJB received.

### TWENTY-FIFTH DEFENSE

**No Double Recovery**

The Trustee's claim is barred, in whole or in part, to the extent that any other entity, including but not limited to the Fairfield Liquidators, recovers from BJB based on the conduct alleged in the Amended Complaint in settlement or otherwise, because the Trustee is not entitled to double recovery, nor should BJB be subject to recovery of identical funds from two separate entities.

On May 9, 2011, the Trustee entered into a Settlement Agreement (the "Fairfield Settlement Agreement") with the Liquidators of Fairfield Sentry Limited and other Fairfield funds. This Court approved the Fairfield Settlement Agreement on June 7, 2011 and it was incorporated into the consent judgment entered against Fairfield on July 13, 2011. The Fairfield Settlement Agreement provides for the sharing of recoveries on the Trustee's and the Fairfield Liquidators' claims for recovery of property that Fairfield transferred, but the Trustee and the Fairfield Liquidators cannot both recover the same funds.

### TWENTY-SIXTH DEFENSE

**Preservation of Rights**
**(11 U.S.C. § 502(h))**

To the extent the Trustee recovers from BJB, BJB reserves the right to assert claims arising from such recovery under 11 U.S.C. § 502(h).

### TWENTY-SEVENTH DEFENSE

**Additional Defenses**

BJB has insufficient knowledge or information upon which to form a belief as to whether it may have additional yet unstated defenses. BJB reserves the right to assert any additional defenses as may be discovered during the conduct of this litigation.

43

## JURY TRIAL DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 9015 of the Federal Rules of Bankruptcy Procedure, BJB hereby demands a jury trial on all claims and issues that may be tried by a jury.

## STATEMENT PURSUANT TO FED. R. BANKR. P. 7012(b)

BJB does not consent to the entry of final orders or judgment by the Bankruptcy Court.

## DEFENDANT'S REQUEST FOR RELIEF

**WHEREFORE**, BJB requests that this Court dismiss the Complaint with prejudice, award BJB attorneys' fees, costs, and disbursements incurred in connection with this action, and grant such other and further relief as the Court deems just and proper.

DATED:  New York, New York
             March 3, 2023

MCKOOL SMITH, P.C.

By:    /s/ Eric B. Halper
         Eric B. Halper
         Hal M. Shimkoski

         One Manhattan West
         395 9th Avenue, 50th floor
         New York, NY 10036
         T: (212) 402-9400
         F: (212) 402-9444
         ehalper@mckoolsmith.com
         hshimkoski@mckoolsmith.com

         *Attorneys for Defendant*
         *Bank Julius Baer & Co. Ltd.*