**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

| | |
|---|---|
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 12-01565 (CGM) |
| Plaintiff, | **ANSWER TO COMPLAINT AND JURY DEMAND** |
| v. | |
| STANDARD CHARTERED FINANCIAL SERVICES (LUXEMBOURG) S.A. (f/k/a AMERICAN EXPRESS FINANCIAL SERVICES (LUXEMBOURG) S.A. and f/k/a AMERICAN EXPRESS BANK (LUXEMBOURG) S.A.), as represented by its Liquidator HANSPETER KRÄMER, HANSPETER KRÄMER, in his capacities as liquidator and representative of STANDARD CHARTERED FINANCIAL SERVICES (LUXEMBOURG) S.A., STANDARD CHARTERED BANK INTERNATIONAL (AMERICAS) LTD., f/k/a AMERICAN EXPRESS BANK INTERNATIONAL, and STANDARD CHARTERED HOLDINGS INC. (as successor in interest to STANDARD CHARTERED INTERNATIONAL (USA) LTD., f/k/a AMERICAN EXPRESS BANK LTD.), | |
| Defendants. | |

Defendants Standard Chartered Financial Services (Luxembourg) S.A. ("AEB Lux/SCFS"), Standard Chartered Bank International (Americas) Ltd. ("AEB Miami/SCBI"), and Standard Chartered Holdings Inc. (as successor in interest to Standard Chartered International (USA) Ltd. ("AEB New York/SCI")) (together, the "SCB Defendants"), by and through their undersigned counsel, hereby answer the Amended Complaint of plaintiff Irving H. Picard (the "Trustee" or "Plaintiff"), Trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the Chapter 7 Estate of Bernard L. Madoff on current information and belief as follows.  The SCB Defendants reserve the right to supplement and amend this Answer as may be necessary.

## RESPONSES TO SPECIFIC ALLEGATIONS

### I.    NATURE OF THE ACTION

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS customer property, as defined by SIPA § 78lll (4), stolen as part of Madoff's massive Ponzi scheme.  Specifically, the Trustee seeks to recover at least $289,232,434 of BLMIS customer property transferred to Defendants: $274,029,164 by Fairfield Sentry Limited ("Fairfield Sentry"), and $15,203,270 from Fairfield Sigma Limited ("Fairfield Sigma," and together with Fairfield Sentry, the "Fairfield Funds").

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 1.

2.    Fairfield Sentry was a U.S. Dollar-based fund that had customer accounts with BLMIS's investment advisory business ("IA Business").  Fairfield Sentry invested in excess of 95% of its assets in its BLMIS customer accounts.  Fairfield Sigma was a Euro-denominated currency fund that invested all its assets in Fairfield Sentry.  The Fairfield Funds are British Virgin Islands ("BVI") companies, currently in liquidation.  They were created, marketed, managed, and operated by the Fairfield Greenwich Group ("FGG"), a de facto partnership in New York.

**ANSWER:**    The SCB Defendants admit that the Fairfield Funds are British Virgin Island companies that are currently in liquidation, and deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 2.

3.      AEB Lux purchased and redeemed shares in the Fairfield Funds on behalf of itself and the other Defendants.  Defendants acted collectively as part of a single enterprise and were agents and alter egos of each other for purposes of their investments in, and redemptions from, the Fairfield Funds.

**ANSWER:**    The SCB Defendants deny the allegations in paragraph 3.

4.      AEB Lux also purchased shares in Kingate Global Fund Ltd. ("Kingate Global"), another fund that invested 100% of its assets in BLMIS customer accounts, on behalf of itself and the other Defendants.  The Fairfield Funds and Kingate Global are collectively referred to as the "BLMIS Feeder Funds."

**ANSWER:**    Because the Trustee has voluntarily dismissed all claims against the SCB Defendants relating to transfers from BLMIS to Kingate Global, no response to the allegations set forth in paragraph 4 is required.  To the extent a response is required, the SCB Defendants deny the allegations set forth in paragraph 4.

5.      The Trustee commenced an adversary proceeding against Kingate Global, among other defendants, captioned *Picard v. Ceretti, et al*, Adv. Pro. No. 09-01161 (SMB).  On August 6, 2019, the Court approved a settlement between the Trustee and the Kingate Funds' Joint Liquidators and other entities and individuals, resulting in the Trustee recovering all the initial transfers.  As a result of that settlement, the Trustee does not seek recovery of any of those subsequent transfers in this action.

**ANSWER:**    The SCB Defendants admit the allegations set forth in paragraph 5.

6.      Defendants recognized various abnormalities associated with BLMIS as two American Express Bank ("AEB") executives went so far as to that Fairfield Sentry would "explode" because it was a "scam" and "not possible to achieve such high returns with such low volatility."  Nevertheless, Defendants continued to invest in BLMIS through Fairfield Sentry and reap the profits.  For Defendants, the promise of fees from BLMIS exceeded the obvious risk of fraud.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 6.

7.      This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.  This Court has

jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

**ANSWER:**    The SCB Defendants admit the allegations set forth in the first and second sentences of paragraph 7.    The allegations set forth in the third sentence constitute legal conclusions as to which no response is required.    To the extent a response is required, the SCB Defendants deny the allegations set forth in the third sentence of paragraph 7.

8.    This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

**ANSWER:**    The first sentence of paragraph 8 constitutes a legal conclusion as to which no response is required, but to the extent a response is required, the SCB Defendants deny the allegations set forth in the first sentence of paragraph 8.    The SCB Defendants admit that the Trustee consents to entry of final orders or judgments by the Bankruptcy Court if it is determined that the consent of the parties is required for this Court to enter final orders or judgments consistent with Article III of the U.S. Constitution, but aver that the SCB Defendants do not so consent.

9.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

**ANSWER:**    The allegations set forth in paragraph 9 constitute legal conclusions as to which no response is required.    To the extent a response is required, the SCB Defendants admit the allegations set forth in paragraph 9.

10.    This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

**ANSWER:**    The allegations set forth in paragraph 10 constitute legal conclusions as to which no response is required.    To the extent that a response is required, the SCB Defendants admit that the Trustee has purported to bring this proceeding under SIPA §§ 78fff(b) and 78fff-2(c)(3),

-4-

11 U.S.C. §§ 105(a) and 550, but deny that those provisions authorize the Trustee's claims or that

the Trustee's claims are brought under "other applicable law."

11.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

**ANSWER:**    The SCB Defendants admit the allegations set forth in paragraph 11.

12.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

**ANSWER:**    The SCB Defendants admit the allegations set forth in paragraph 12.

13.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:
    a.     appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);
    b.     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and
    c.     removed the case to this Court pursuant to SIPA § 78eee(b)(4).

**ANSWER:**    The SCB Defendants admit the allegations set forth in paragraph 13.

14.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

**ANSWER:**    The SCB Defendants admit that on December 23, 2008 and February 4, 2009, the Court approved the Trustee's bond and found the Trustee "disinterested pursuant to the provisions of Section 78eee(b)(6) of SIPA, Bankruptcy Code Section 327(a) and Federal Rule of Bankruptcy Procedure 2014(a)." The SCB Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the second sentence of paragraph 14.

15.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

**ANSWER:**     The SCB Defendants admit the allegations set forth in paragraph 15.

16.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

**ANSWER:**     The SCB Defendants admit the allegations set forth in the first sentence of paragraph 16.  The SCB Defendants also admit that Mr. Madoff stated during his March 12, 2009 plea allocution that he "operated a Ponzi scheme through the investment advisory side of [his], business, Bernard L. Madoff Securities LLC," but deny that the allegations set forth in the second sentence of paragraph 16 provide a complete and accurate summary of Mr. Madoff's statements and respectfully refer the Court to the plea hearing transcript for its full and correct contents.

17.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

**ANSWER:**     The SCB Defendants admit the allegations set forth in the first sentence of paragraph 17.  The SCB Defendants also admit that Mr. DiPascali stated during an August 11, 2009 plea hearing that "[i]n the late '80s or early '90s" "[n]o purchases of sales of securities were actually taking place in [BLMIS customers'] accounts," but deny that the allegations set forth in the second sentence of paragraph 17 provide a complete and accurate summary of Mr. DiPascali's statements and respectfully refer the Court to the plea hearing transcript for its full and correct contents.

18.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

**ANSWER:**     The SCB Defendants admit the allegations set forth in the first sentence of paragraph 18.  The SCB Defendants also admit that Mr. Kugel stated during a November 21, 2011 plea hearing that he "provided historical trade information to other BLMIS employees, which was used to create false, profitable trades in the Investment Advisory clients' accounts at BLMIS," but deny that the allegations set forth in the second sentence of paragraph 18 provide a complete and accurate summary of Mr. Kugel's statements and respectfully refer the Court to the plea hearing transcript for its full and correct contents.

19.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

**ANSWER:**     The SCB Defendants admit the allegations set forth in paragraph 19.

20.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors.  The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme.  Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

**ANSWER:**     The allegations set forth in paragraph 20 constitute legal conclusions as to which no response is required.  To the extent a response is required, the SCB Defendants deny the allegations set forth in paragraph 20.

21.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers

granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

**ANSWER:**    The SCB Defendants admit the allegations set forth in paragraph 21.

22.    Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker dealer with the United States Securities and Exchange Commission.  In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company.  At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

**ANSWER:**    The SCB Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22, except admit that BLMIS was registered as a broker-dealer.

23.    In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning in January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status.  SIPC membership is contingent on registration of the broker-dealer with the SEC.

**ANSWER:**    The SCB Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 23, except admit that BLMIS operated as a registered broker-dealer.

24.    For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and an investment advisory business (the "IA Business").

**ANSWER:**    The SCB Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 24, except admit that BLMIS maintained an office at 885 Third Avenue in New York City.

25. BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

**ANSWER:** The SCB Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 25, except admit that BLMIS registered as an investment advisor with the SEC in 2006.

26. For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

**ANSWER:** The SCB Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 26.

27. In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

**ANSWER:** The SCB Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27.

28. At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

**ANSWER:** The SCB Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28, except admit that Bernard L. Madoff, Frank

DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, and JoAnn Crupi pleaded guilty to, or

were found guilty of, federal crimes in connection with their work at BLMIS.

> 29.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent
> activity. It was funded, in part, by money taken from the BLMIS customer deposits,
> but fraudulently reported that funding as trading revenues and/or commissions on
> BLMIS's financial statements and other regulatory reports filed by BLMIS. The
> proprietary trading business was incurring significant net losses beginning in at
> least mid-2002 and thereafter, and thus required fraudulent infusions of cash from
> the IA Business to continue operating.

**ANSWER:**    The SCB Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 29.

> 30.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed
> Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which
> accepted BLMIS's fraudulently reported trading revenues and/or commissions on
> its financial statements and other regulatory reports that BLMIS filed. Friehling &
> Horowitz was a three-person accounting firm based out of a strip mall in Rockland
> County, New York. Of the three employees at the firm, one was a licensed CPA,
> one was an administrative assistant, and one was a semi-retired accountant living
> in Florida.

**ANSWER:**    The SCB Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 30, except admit that the accounting firm

Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") acted as an auditor of BLMIS.

> 31.    On or about November 3, 2009, David Friehling, the sole proprietor of
> Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and
> filing false tax returns for Madoff and others. BLMIS's publicly available SEC
> Form X-17A-5 included copies of these fictitious annual audited financial
> statements prepared by Friehling & Horowitz.

**ANSWER:**    The SCB Defendants admit that Mr. Friehling pleaded guilty to filing false

audit reports with the SEC and to tax law violations, but deny that the allegations set forth in the

first sentence of paragraph 31 provide a complete and accurate summary of Mr. Friehling's

statements and respectfully refer the Court to the plea hearing transcript for its full and correct

contents. The SCB Defendants also admit that Friehling & Horowitz issued one or more audit

opinions with respect to BLMIS's financial statements. The SCB Defendants otherwise deny the

allegations set forth in the second sentence of paragraph 31.

>32.    In general, BLMIS purported to execute two primary investment strategies for BLMIS customers: the convertible arbitrage strategy and the SSC Strategy. For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit. At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

**ANSWER:**    The SCB Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 32, except admit that BLMIS purported to

execute an investment strategy called the split-strike conversion strategy for certain BLMIS

customers.

>33.    All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

**ANSWER:**    The SCB Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 33.

>34.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets. Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time. In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

**ANSWER:**    The SCB Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 34.

>35.    From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

**ANSWER:** The SCB Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 35, except admit that Mr. Madoff and BLMIS purported to employ the split-strike conversion strategy for certain BLMIS customers.

36.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

**ANSWER:** The SCB Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 36, except admit that BLMIS reported trading on monthly account statements sent to BLMIS customers.

37.    By 1992, the SSC Strategy purported to involve:  (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

**ANSWER:** The SCB Defendants admit to the allegations set forth in paragraph 37, except deny knowledge or information sufficient to form a belief as to the year by which BLMIS purported to execute the split-strike conversion strategy.

38.    The put options were to limit the downside risk of sizeable price changes in the basket.  The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option should have entailed a loss for BLMIS.

**ANSWER:** The SCB Defendants deny the allegations set forth in paragraph 38.

39.    The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

**ANSWER:** The SCB Defendants deny the allegations set forth in paragraph 39.

40.    The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar."  The collar provides downside protection while limiting the upside.

**ANSWER:**    The SCB Defendants admit the allegations set forth in paragraph 40.

41.    If Madoff was putting on the same baskets of equities across all BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket. For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

**ANSWER:**    The SCB Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations set forth in paragraph 41.

42.    Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the Madoff SSC Strategy.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 42.

43.    Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 43.

44.    BLMIS charged commissions on purportedly executed trades rather than industry standard management and performance fees based on AUM or profits. By using a commission based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 44, except

admit that BLMIS purported to charge commissions on executed trades.

45.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he succeeded at market timing by intermittently entering and exiting the market. During the times when Madoff purported to be out of the market, he purported to

invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills. BLMIS's customer statements also showed, without fail, a total withdrawal from the market at every year end and at every quarter end starting in 2003.

**ANSWER:**     The SCB Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations set forth in paragraph 45.

46.     As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time. Yet this is precisely what BLMIS's customer statements reported.

**ANSWER:**     The SCB Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations set forth in paragraph 46.

47.     BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

**ANSWER:**     The SCB Defendants deny the allegations set forth in paragraph 47.

48.     BLMIS's execution, as reported on its BLMIS customer statements, showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

**ANSWER:**     The SCB Defendants deny the allegations set forth in paragraph 48.

49.     There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

**ANSWER:**     The SCB Defendants deny the allegations set forth in paragraph 49.

50.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

**ANSWER:**    The SCB Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 50.

51.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

**ANSWER:**    The SCB Defendants admit that BLMIS collapsed in December 2008, but deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 51.

52.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

**ANSWER:**    The SCB Defendants admit the allegations set forth in paragraph 52.

53.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

**ANSWER:**    The SCB Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 53.

54.    Each Defendant is a wholly owned subsidiary of Standard Chartered Bank.

**ANSWER:**    The SCB Defendants admit the allegations set forth in paragraph 54.

55.    During all times relevant to this Amended Complaint, AEB New York was an Agreement Corporation under the Federal Reserve Act.  Agreement Corporations are corporations chartered by a state to engage in international banking that enter into agreements with the Federal Reserve Board of Governors to limit themselves to certain permitted activities.

**ANSWER:**    The SCB Defendants admit that from at least 2002 through 2008, AEB New York/SCI operated as an agreement corporation under the Federal Reserve Act, and that agreement

corporations are corporations chartered by a state to engage in international banking that enter into agreements with the Federal Reserve Board of Governors to limit themselves to certain permitted activities. The SCB Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 55 "[d]uring all times relevant to this Amended Complaint."

56.     AEB New York was originally incorporated under the laws of Connecticut but changed into an Agreement Corporation when Standard Chartered PLC acquired AEB New York in February 2008. It later changed its name from American Express Bank Ltd. to Standard Chartered International (USA) Ltd. AEB New York's principal place of business has been located in New York City since its establishment in 1919. As of October 31, 2017, AEB New York changed its corporate status to a Delaware limited liability company. AEB New York was liquidated in 2021, and its successor in interest is SCHI. AEB New York maintained an office located at 1095 Avenue of the Americas, New York, New York 10036. SCHI's current registered office is located at 1209 Orange Street, Wilmington, Delaware 19801.

**ANSWER:**     The SCB Defendants admit the allegations set forth in paragraph 56.

57.     AEB Miami is an Edge Act corporation organized under the laws of the United States of America. Edge Act corporations are organizations chartered by the Federal Reserve to engage in international banking and financial operations. After being acquired by Standard Chartered PLC, AEB Miami changed its name from American Express Bank International to Standard Chartered Bank International (Americas) Limited.

**ANSWER:**     The SCB Defendants admit the allegations set forth in paragraph 57.

58.     Standard Chartered Bank International (Americas) Limited is in liquidation and its assets and liabilities will be transferred to SCHI.

**ANSWER:**     The SCB Defendants admit the allegations set forth in paragraph 58.

59.     AEB Miami maintained offices in Miami and New York City throughout its involvement with the BLMIS Feeder Funds. Its current principal place of business is located at 1111 Brickell Avenue, Miami, Florida 33131.

**ANSWER:** The SCB Defendants deny the allegations set forth in paragraph 59, except admit that prior to December 2017, AEB Miami/SCBI maintained its principal office in Miami, Florida, and thereafter, SCBI's principal office has been in New York, New York.

> 60. AEB Lux was incorporated and organized under the laws of the Grand Duchy of Luxembourg as a société anonyme, a type of public limited company common in civil law countries. AEB Lux's registered office is located at 26 boulevard Royal, L-2449 Luxembourg. AEB Lux changed its name from American Express Bank (Luxembourg) S.A. to American Express Financial Services (Luxembourg) S.A. in 2005, then to Standard Chartered Financial Services (Luxembourg) S.A., after being acquired by Standard Chartered PLC. AEB Lux is currently in liquidation under the laws of the Grand Duchy of Luxembourg and is represented by its liquidator, Mr. Hanspeter Krämer, located at 30 rue Schrobilgen, L-2526 Luxembourg. Hanspeter Krämer is a defendant in his capacity as the court-appointed liquidator and representative of AEB Lux, and as representative of AEB Lux's investors and creditors. Allegations and references to Defendant AEB Lux herein include Mr. Krämer.

**ANSWER:** The SCB Defendants deny the allegations set forth in paragraph 60, except admit that (i) AEB Lux was incorporated and organized under the laws of the Grand Duchy of Luxembourg as a société anonyme; (ii) AEB Lux maintained its principal office in Luxembourg, Luxembourg; (iii) Standard Chartered Financial Services (Luxembourg) S.A. was formerly known as American Express Financial Services (Luxembourg) S.A.; and (iv) AEB Lux is currently in liquidation under the laws of the Grand Duchy of Luxembourg and is represented by its liquidator, Mr. Hanspeter Krämer, who has been named a defendant in this action as the court-appointed liquidator and representative of AEB Lux and AEB Lux's investors and creditors.

> 61. Prior to being acquired by Standard Chartered PLC, AEB New York managed AEB Miami and AEB Lux, which operated together as a single enterprise. AEB Miami marketed the Fairfield Funds and coordinated the client relationships with its U.S. affiliates, AEB New York, and AEB Lux. As part of this single enterprise AEB Lux entered into the subscription agreements with the Fairfield Funds and distribution agreements with FG Limited.

**ANSWER:** The SCB Defendants deny the allegations set forth in paragraph 61.

62.     AEB Lux is subject to personal jurisdiction in this district because it purposely availed itself of the laws and protections of the United States of America and the State of New York by, among other things:

a.     Acting under the direction of AEB New York as the investor in Fairfield Sentry;

b.     Purposefully and knowingly directing funds to be invested with New York- based BLMIS through the Fairfield Funds, which each had operations or principal places of business in New York;

c.     Investing on behalf of AEB and the other Defendants pursuant to subscription agreements with the Fairfield Funds and distribution agreements with FG Limited governed by New York law, and through which AEB Lux agreed to be subject to the jurisdiction of New York courts;

d.     Knowingly sending Fairfield Sentry subscription payments in U.S. dollars to New York bank accounts for ultimate deposit in BLMIS's New York bank account;

e.     Designating and using New York bank accounts, including a correspondent account with the Bank of New York, to receive subsequent transfers on behalf of AEB and the other Defendants from BLMIS in the form of redemptions of Fairfield Sentry shares, as well as rebates and fees from FG Limited in New York, all in U.S. dollars on numerous occasions; and

f.     Investing in Fairfield Funds with regular communications and contact with FGG employees in New York.

**ANSWER:**     The SCB Defendants deny the allegations set forth in paragraph 62, except admit that certain transactions in the Fairfield Funds were routed through AEB Lux/SCFS between 2003 and 2008.

63.     Accordingly, AEB Lux knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States of America and the State of New York.

**ANSWER:**     The allegations set forth in paragraph 63 constitute legal conclusions as to which no response is required.  To the extent a response is required, the SCB Defendants deny the allegations set forth in paragraph 63.

64.     AEB Lux acknowledged in the Fairfield Sentry subscription agreements that it received and reviewed a copy of Fairfield Sentry's private placement memorandum ("PPM"), which disclosed:

a.     Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS;

b.    BLMIS performed all investment management duties for these assets;

c.    BLMIS was registered with the SEC;

d.    BLMIS was the executing broker for Fairfield Sentry's investments, and purportedly operated and executed the SSC Strategy on the fund's behalf;

e.    BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and Treasury Bills, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;

f.    BLMIS was the custodian of Fairfield Sentry's investments with BLMIS;

g.    BLMIS was "essential to the continued operation of" Fairfield Sentry;

h.    Fairfield Sentry's initial investment manager was Fairfield Greenwich Limited, an FGG company whose principal place of business was FGG's office in New York; and

i.    Fairfield Sentry retained U.S. counsel in New York.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 64.

65.    AEB Lux entered into subscription agreements with Fairfield Sigma that were nearly identical to the Fairfield Sentry subscription agreements. In particular, pursuant to the Fairfield Sigma subscription agreements, AEB Lux agreed the transaction would be governed by New York law, submitted to the jurisdiction of the courts of the State of New York, and acknowledged that it received and reviewed a copy of Fairfield Sigma's PPM.

**ANSWER:**    The SCB Defendants deny the allegations set forth in Paragraph 65.

66.    AEB New York received Fairfield Sigma's PPM, which described how, among other things: (a) Fairfield Sigma invested exclusively in Fairfield Sentry, receiving investments in Euros and converting them to U.S. Dollars to invest in Fairfield Sentry, with a small currency hedge; and (b) FG Limited in New York was Fairfield Sigma's initial investment manager.

**ANSWER:**    The SCB Defendants admit that AEB New York/SCI received Fairfield Sigma's private placement memorandum, but deny the characterization of the private placement memorandum set forth in Paragraph 66 and respectfully refer the Court to that document for a complete and accurate description of its contents.

67.    AEB New York directed AEB Lux's purchase of the Fairfield Funds shares and with AEB Miami negotiated and entered into distribution agreements with Fairfield Greenwich Limited in New York pursuant to which AEB received a percentage of management fees paid to FGG entities by the Fairfield Funds. These

agreements were governed by the laws of the State of New York and were addressed to AEB's New York office.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 67, except

admit that AEB New York/SCI entered into one or more distribution agreements with Fairfield

Greenwich Limited and respectfully refer the Court to that document for a complete and accurate

description of its contents.

68.    Consistent with the distribution agreements, AEB Miami was identified as AEB Lux's agent on performance and management fee reports prepared by Fairfield Sentry's administrator, which detailed the fees AEB Miami received for AEB's purchases of Fairfield Funds shares.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 68.

69.    On February 29, 2008, Standard Chartered PLC acquired each Defendant, assumed their liabilities, and continued their business operations with respect to the BLMIS Feeder Funds (the "Acquisition"). Following the Acquisition, Defendants' corporate structure was reorganized such that AEB Miami and AEB Lux were no longer subsidiaries of AEB New York. Defendants are all now wholly owned subsidiaries of Standard Chartered Bank.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 69, except

admit that Standard Chartered PLC acquired AEB Lux/SCFS, AEB New York/SCI, and AEB

Miami/SCBI on or about February 29, 2008, and following the closing of that acquisition each

SCB Defendant became a wholly-owned subsidiary of Standard Chartered Bank.

70.    Each Defendant, highlighted in the figure below, should reasonably expect to be subject to New York jurisdiction and is subject to personal jurisdiction pursuant to New York Civil Practice Law and Rules 301 and 302 (McKinney 2003) and Rule 7004 of the Federal Rules of Bankruptcy Procedure and the United States Constitution

**ANSWER:**    The allegations set forth in paragraph 70 constitute legal conclusions as to

which no response is required. To the extent a response is required, the SCB Defendants deny

the allegations set forth in paragraph 70.

71.     Each Defendant was part of the American Express Company's international banking business, which was headquartered in New York and comprised of offices worldwide that all used the marketing name "American Express Bank" ("AEB").

**ANSWER:**     The SCB Defendants deny the allegations set forth in paragraph 71, except admit that prior to February 2008, American Express Company operated an international banking business.

72.     Both before and after the Acquisition and the change in their corporate names, Defendants continued their same operations and held themselves out to the public as AEB by using the "American Express Bank" and "American Express Private Bank" marketing names.

**ANSWER:**     The SCB Defendants deny the allegations set forth in paragraph 72.

73.     Certain AEB New York groups and committees managed and oversaw AEB's promotion of the BLMIS Feeder Funds.  Although these groups and committees were centered in New York, they also included executives from other AEB offices, including AEB Miami.  This reporting structure and the key employees responsible for the investments in the BLMIS Feeder Funds remained in place after the Acquisition.  As described more fully below, Defendants deviated from their standard policies, procedures, and controls that would have confirmed Madoff was a fraud even after two of their executives issued separate warnings that BLMIS's returns were "not possible" and that Fairfield Sentry was a "scam" and would "explode."

**ANSWER:**     The SCB Defendants deny the allegations set forth in paragraph 73.

74.     AEB New York's Executive Director, Robert Friedman, was the head of the Global Investment Group, which also included several other executives from AEB New York and AEB's Geneva office.

**ANSWER:**     The SCB Defendants admit that from at least 2002 through 2008, Robert Friedman was head of AEB New York/SCI's Global Investment Group, and that at various times during that period the Global Investment Group included persons based in New York and Geneva. The SCB Defendants otherwise deny the allegations set forth in paragraph 74.

75.     AEB's Global Investment Group was responsible for AEB's diligence of hedge funds into which AEB invested its clients' funds, including the BLMIS Feeder Funds.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 75, except admit that AEB New York/SCI maintained a group, sometimes referred to as "Global Investment Group," that was tasked with developing and managing proprietary investment products, as well as evaluating, on an initial and ongoing basis, certain investment products offered to private banking clients, including the Fairfield Funds.

76.    AEB New York's Client Investment Committee was responsible for approving and reviewing investment products that AEB promoted to its clients.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 76, except admit that AEB New York/SCI maintained a Client Investment Committee, which acted as the governing committee for certain investment products offered to AEB New York/SCI's clients globally.

77.    Many Client Investment Committee members were AEB New York employees, including Friedman.  Other AEB executives from its offices in New York, Miami, Geneva, London, France, India, Hong Kong, and Singapore, including Rodolfo Pages, the head of sales at AEB Miami, also attended the Client Investment Committee's quarterly meetings.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 77, except admit that from time to time certain members of the Client Investment Committee were employees of AEB New York/SCI.

78.    In October 2003, the Client Investment Committee reviewed and approved Fairfield Sentry on the recommendation of the Global Investment Group, namely Friedman and Joseph Hardiman.

**ANSWER:**    The SCB Defendants admit that at a meeting held on or about October 30, 2003, AEB New York/SCI's Client Investment Committee approved the offering, on a direct basis, of the Fairfield Greenwich Group's Fairfield Sentry Ltd. to private banking clients.  The SCB Defendants otherwise deny the allegations set forth in paragraph 78.

79.    AEB New York's Product Approval Committee vetted and approved new investment products that AEB created and promoted.  In January 2003, based on the recommendation of Friedman and Samuel Perruchoud with the Global Investment Group, the Product Approval Committee approved the Concentrated Elite Managers Fund of Funds Portfolio ("Concentrated Elite Fund"), a fund of funds that allocated 25% of its assets to purchase Fairfield Sentry shares.

**ANSWER:**    The SCB Defendants admit that (i) AEB New York/SCI maintained a Product Approval Committee to consider and approve new categories of products to be offered to private banking clients; and (ii) at a meeting held on or about January 7, 2003, the Product Approval Committee approved the Concentrated Elite Managers Fund of Funds Portfolio, a fund of funds that allocated up to 25% of its assets in Fairfield Sentry Ltd.  The SCB Defendants otherwise deny the allegations set forth in paragraph 79.

80.    AEB New York's Risk Management Committee oversaw every AEB investment product.  Both the Global Investment Group and Client Investment Committee separately reported to the Risk Management Committee about AEB's investment products.  The Risk Management Committee thus oversaw the Global Investment Group's and Client Investment Committee's responsibilities for the BLMIS Feeder Funds.

**ANSWER:**    The SCB Defendants admit that from time to time the Product Approval Committee and the Client Investment Committee reported to AEB New York/SCI's Risk Management Committee about investment products offered to private banking clients.  The SCB Defendants otherwise deny the allegations set forth in paragraph 80.

81.    Robert Friedman was the Executive Director of AEB New York, the head of the Global Investment Group, and a member of the Client Investment Committee and the Product Approval Committee.  He was responsible for "integrat[ing] [AEB's] global investment product offerings" and "organiz[ing] [its] investment staff around the world into a cohesive team."  Friedman was identified as the "Utility Head" in the Global Investment Group's memorandum to the Client Investment Committee recommending Fairfield Sentry.  He was the "gatekeeper" and decision-maker for all AEB investment products both before and after the Acquisition.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 81, except admit that (i) Mr. Friedman was head of a head of the group within AEB New York/SCI that was responsible for, among other things, conducting and reviewing, on an initial and ongoing basis, the investment products offered to private banking clients; (ii) this group had been known at various times as the Global Investment Group; and (iii) Mr. Friedman was listed as the "Utility Head" or "LOB/Utility Head" in memoranda seeking approval from the Client Investment Committee to offer Fairfield Sentry Ltd. to private banking clients through a fund of funds and later directly.

> 82.    Samuel Perruchoud was the Chief Investment Officer of Funds of Hedge Funds for AEB in Geneva.  Perruchoud was the Global Investment Group member primarily responsible for conducting due diligence on Fairfield Sentry and, along with Friedman, recommended Fairfield Sentry.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 82, except admit that (i) from approximately 2000 to 2007, Samuel Perruchoud headed a hedge fund of funds team for AEB New York/SCI, and was based in Geneva, Switzerland; (ii) Mr. Perruchoud reported to Mr. Friedman; (iii) the hedge fund of funds team managed AEB New York/SCI's proprietary fund of funds and monitored third-party funds; and (iv) the fund of funds team conducted due diligence on Fairfield Sentry Ltd.

> 83.    Arnaud Heymann was a Senior Director and Global Co-Head of Hedge Fund investments for AEB in Geneva.  Heymann participated in three of four Client Investment Committee meetings in 2008.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 83, except admit that (i) Arnaud Heymann was a member of the hedge fund of funds team at AEB New York/SCI, and in or about 2007 became co-head of the hedge fund of funds team; and (ii) Mr. Heymann participated in portions of Client Investment Committee meetings held on February 7, 2008, May 8, 2008, and August 7, 2008.

84.    Joseph Hardiman was a Senior Director of Hedge Fund Products from 1999 to 2007, at which point he became the Chief Operating Officer ("COO") and Managing Director of AEB New York.

**ANSWER:**    The SCB Defendants admit that Joseph Hardiman was a managing director of AEB New York/SCI and was employed by AEB New York/SCI from approximately 1999 through 2009.  The SCB Defendants otherwise deny the allegations set forth in paragraph 84.

85.    In 2003 AEB New York initiated AEB's purchase of Fairfield Sentry shares.  AEB initially purchased the Fairfield Sentry shares for its own use in creating the Concentrated Elite Fund.  Later AEB expanded the purchase of Fairfield Sentry for clients.  Eventually, AEB further expanded its role with BLMIS Feeder Funds by agreeing to distribute structured notes linked to the performance of the BLMIS Feeder Funds.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 85, except admit that (i) from approximately January 2003 through 2005, Fairfield Sentry was offered to private banking clients as part of fund of funds called the Concentrated Elite Manager Fund of Funds; and (ii) beginning in approximately October 2003, Fairfield Sentry Ltd. was also offered to private banking clients directly.

86.    AEB New York directed AEB Lux to sign the subscription agreements and hold the shares in the BLMIS Feeder Funds for AEB because investments in those funds were foreclosed to U.S. taxpayers.  AEB Miami then sold the BLMIS Feeder Funds shares to AEB clients.  AEB Lux thereafter received the subsequent transfers on behalf of AEB and the other Defendants.  As part of the single enterprise, Defendants acted as agents and alter egos of each other in connection with their investments in the BLMIS Feeder Funds.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 86, except admit that AEB Miami/SCBI offered private banking clients investments in Fairfield Sentry Ltd. and Fairfield Sigma Ltd.

87.    Prior to AEB investing with the BLMIS Feeder Funds, Perruchoud reported the anomalies and risks associated with BLMIS to the Global Investment Group, pointing to Madoff's secrecy and the inability to independently verify his trades. Following investment, and after reviewing Fairfield Sentry's November 2004 trade confirmations and account statements Perruchoud warned his colleagues that

Fairfield Sentry would "explode" because it was "not possible to achieve such high returns with such low volatility."  Later, after his own review of Fairfield Sentry, Heymann reached the same conclusion as Peruchoud and told Friedman the Fairfield Funds were "a scam" that could "explode" at any time.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 87.

88.    In December 2002, Perruchoud visited FGG's New York office to review the performance and operations of Fairfield Sentry and, effectively, BLMIS. Perruchoud reported that Madoff purportedly traded in "15% of the volume of listed stocks in the US" but did not allow financial institutions to meet with him.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 88, except admit that (i) in December 2002, Mr. Perruchoud visited Fairfield Greenwich Group's office in New York to conduct due diligence on Fairfield Sentry Ltd., among other funds; and (ii) Mr. Perruchoud generated a written call report concerning the visit.  The SCB Defendants respectfully refer the Court to that written call report for its full and correct contents.

89.    Perruchoud also noted the lack of any independent verification that Madoff actually had the assets and traded them as he reported, in direct contrast with the two other non-Madoff FGG funds in the Concentrated Elite Fund that each had independent prime brokers.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 89.

90.    The Global Investment Group recommended the creation of the Concentrated Elite Fund, a fund of funds with 25% of its assets used to purchase Fairfield Sentry shares, that would be sold to AEB's clients with AEB earning fees for managing and selling the fund.  Perruchoud indicated that the inclusion of Fairfield Sentry in AEB's fund of funds portfolio would attract substantial sales. He also recognized that investing in single-manager hedge funds—like BLMIS— "entails significant 'manager risk'" relating to the "integrity of the underlying managers themselves."

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 90, except admit that from approximately 2003 to 2005, AEB New York/SCI offered to private banking clients a fund of funds called the Concentrated Elite Managers Fund of Funds Portfolio, which allocated a portion of its assets in Fairfield Sentry Ltd.

91.    At that time, Perruchoud admitted time that, despite AEB's concerns, AEB did not follow the Defendants' standard review process because they did "not have access to Madoff for due diligence purposes."

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 91.

92.    Nevertheless, Perruchoud and Friedman continued to profit from the fees buoyed by BLMIS's impossible returns.    While spearheading BLMIS-related investments in 2003, Perruchoud was promoted to "head the alternative group for Amex globally."

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 92.

93.    At the January 2003 meeting attended by Friedman and Hardiman, the Product Approval Committee specifically recognized that the Concentrated Elite Fund involved "Manager Risk."    The meeting minutes noted that AEB's pre-investment review process "cannot guarantee against an individual manager blowing up."

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 93, except admit that (i) the Product Approval Committee approved the Concentrated Elite Managers Fund of Funds Portfolio at a meeting held on or about January 7, 2003; (ii) the minutes from that meeting include risks that had been identified and mitigated, including "Manager Risk"; and (iii) Mr. Friedman and Mr. Hardiman attended portions or all of that meeting.

94.    In September 2003, the Global Investment Group prepared a memorandum to the Client Investment Committee, recommending that AEB market Fairfield Sentry directly to its clients.    Hardiman and Friedman headed this effort.    The Global Investment Group identified Fairfield Sentry as a "particularly attractive product" with high returns, low volatility, and over 96% positive months during a 13-year period.    All the while, no one at AEB could explain how Madoff was achieving BLMIS's high returns with such low volatility.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 94, except admit that the group within AEB New York/SCI, known at times as the Global Investment Group, prepared a memorandum to the Client Investment Committee dated September 2003 seeking approval to offer Fairfield Sentry Ltd. directly to private banking clients and respectfully refer the Court to the memorandum for a complete and accurate description of its contents.

95.     The Global Investment Group and Client Investment Committee continued their perfunctory review of Fairfield Sentry, Fairfield Sigma, and Kingate Global throughout AEB's investment in the BLMIS Feeder Funds.

**ANSWER:**     The SCB Defendants deny the allegations set forth in paragraph 95, except admit that the Client Investment Committee and the group within AEB New York/SCI known at times as the Global Investment Group conducted ongoing monitoring of Fairfield Sentry Ltd. and Fairfield Sigma Ltd.

96.     Hardiman, on behalf of Friedman, asked FGG in April 2004 to arrange a meeting between AEB and Madoff.  However, because Madoff refused to meet with FGG clients, FGG offered to let AEB visit FGG's office to review FGG's records.

**ANSWER:**     The SCB Defendants deny the allegations set forth in paragraph 96, except admit that (i) Mr. Hardiman contacted the Fairfield Greenwich Group in or about April 2004 to request a meeting with Bernard L. Madoff regarding Fairfield Sentry Ltd.; (ii) Fairfield Greenwich Group responded by stating that Mr. Madoff was not meeting with clients at that time; and (iii) Fairfield Greenwich Group offered a visit to its office to review trading records.

97.     In December 2004, Perruchoud took FGG up on its offer and conducted a review of Fairfield Sentry's November 2004 portfolio and trade confirmations in FGG's New York office.

**ANSWER:**     The SCB Defendants deny the allegations set forth in paragraph 97, except admit that in or about December 2004, Mr. Perruchoud visited the office of Fairfield Greenwich Group in New York and conducted, among other things, a review of Fairfield Sentry Ltd.'s portfolio and trade activity from November 2004.

98.     Shortly after his December 2004 meeting Perruchoud told his colleague Sebastian Gonzalez that Fairfield Sentry would "explode" because it was "not possible to achieve such high returns with such low volatility."

**ANSWER:**     The SCB Defendants deny the allegations set forth in paragraph 98.

99.    Prior to acquiring AEB in February 2008, Standard Chartered PLC had conducted its own review of certain BLMIS-related investment products but did not invest in any of them.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 99.

100.    After the acquisition, Standard Chartered insisted that FGG arrange a meeting between AEB and Madoff to comply with its own internal review requirements.  AEB was Fairfield Sentry's largest shareholder, with holdings over $500 million, and yet AEB had never met with Madoff.  Within a week of this request, FGG scheduled a meeting for AEB with Madoff for later that month.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 100,

except admit that a meeting with Mr. Madoff was scheduled in 2008.

101.    On April 15, 2008, Friedman and two other members of the Global Investment Group met with Madoff and two FGG partners at BLMIS's office in New York.  Previously FGG told Perruchoud that the volume of SSC accounts was affecting returns.  Although BLMIS's Form ADV as of December 2007 reported that it had $17.1 billion in assets under management, Madoff told AEB during their meeting that he managed between $20 and $50 billion, and in contrast to what FGG had said, Madoff claimed the outsized amount of assets under management was not causing diminished returns.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 101, except

admit that on or about April 15, 2018, Mr. Friedman, Jeffrey Haindl and Gordon Townsend from

AEB New York/SCI met with Mr. Madoff, as well as Jeffrey Tucker and Lourdes Barreneche from

Fairfield Greenwich Group.

102.    The Trustee commenced a separate adversary proceeding against Fairfield Sentry and other defendants in this Court under the caption, *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (CGM), seeking to avoid and recover initial transfers of customer property from BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").  The Trustee incorporates by reference the allegations contained in the Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, 315-16.

**ANSWER:**    The SCB Defendants:  (i) admit that the Trustee filed an action styled as

*Picard* v. *Fairfield Sentry Limited, et al*., Adv. Pro. No. 09-01239 (the "Fairfield Action");

(ii) deny knowledge or information sufficient to form a belief as to the truth of the allegations in

each and every paragraph of the Second Amended Complaint in the Fairfield Action; and

(iii) object to the incorporation by reference of, and therefore do not answer, each and every other

paragraph and allegation in the Second Amended Complaint in the Fairfield Action and to the

inclusion in this adversary proceeding of any issue implicated by the Second Amended Complaint

in the Fairfield Action other than the issue of the avoidance or avoidability of the initial transfers

of BLMIS customer property; the SCB Defendants nevertheless reserve the right to rely on and

introduce any allegations in the Second Amended Complaint in the Fairfield Action or its exhibits

as opposing party admissions admissible for the truth of their contents.  To the extent any further

response is required, the SCB Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 102, and therefore deny the allegations set

forth in paragraph 102.

> 103.    By orders dated June 7 and June 10, 2011, this Court approved a settlement
> among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a
> consent judgment in favor of the Trustee and against Fairfield Sentry in the amount
> of $3,054,000,000 ("Judgment Amount") [ECF No. 109].  The Trustee's litigation
> against the entities and certain individuals responsible for the management and
> operation of the Fairfield Funds is ongoing.

**ANSWER:**    The SCB Defendants admit that the Court approved a settlement described

in paragraph 103 and entered a judgment as described in paragraph 103 on or about the dates

alleged therein, and refer to the referenced settlement agreement and the referenced judgment for

their full and correct contents.

> 104.    The Fairfield Sentry Initial Transfers are set forth in the attached Exhibits
> A and B.  The Fairfield Sentry Initial Transfers were and continue to be customer
> property within the meaning of SIPA § 78lll(4).

**ANSWER:**    The SCB Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations set forth in paragraph 104.

105.    On August 28, 2020, the Trustee filed a second amended complaint in the Fairfield Sentry Ltd. proceeding ("Second Amended Complaint") [ECF No. 286] seeking in part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

**ANSWER:**    The SCB Defendants admit that the Trustee filed a Second Amended Complaint in the *Fairfield Sentry Ltd.* proceeding on or about the date alleged and respectfully refer the Court to the referenced Second Amended Complaint and its exhibits for its full and correct contents.  SCB Defendants otherwise deny the allegations set forth in paragraph 105.

106.    As alleged in the Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the BLMIS fraud.

**ANSWER:**    Upon information and belief, the SCB Defendants deny that Fairfield Sentry had actual knowledge of fraud at BLMIS, and deny that the Second Amended Complaint sufficiently alleges Fairfield Sentry's actual knowledge of fraud at BLMIS or knowledge of suspicious facts that would have led Fairfield Sentry to inquire further.  The SCB Defendants reserve the right to rely on and introduce any allegations in the Second Amended Complaint or its exhibits as opposing party admissions admissible for the truth of their contents.

107.    Of the Judgment Amount, approximately $2,895,000,000 was transferred to Fairfield Sentry during the six years preceding the Filing Date (the "Fairfield Sentry Six Year Transfers").  Each of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

**ANSWER:**    The SCB Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in first sentence of paragraph 107.  The second sentence of paragraph 107 constitutes a legal conclusion as to which no response is required.  To

the extent a response is required, the SCB Defendants deny the allegations set forth in the second

sentence of paragraph 107.

> 108.    Of the Fairfield Sentry Six Year Transfers, at least $1,667,125,000 was
> transferred to Fairfield Sentry during the two years preceding the Filing Date (the
> "Fairfield Sentry Two Year Transfers").  Each of the Fairfield Sentry Two Year
> Transfers is avoidable under section 548 of the Bankruptcy Code and applicable
> provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER:**  The SCB Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations set forth in first sentence of paragraph 108.  The second

sentence of paragraph 108 constitutes a legal conclusion as to which no response is required.  To

the extent a response is required, the SCB Defendants deny the allegations set forth in the second

sentence of paragraph 108.

> 109.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion
> of the Fairfield Sentry Initial Transfers to Defendants.  Based on the Trustee's
> investigation to date, the subsequent transfers to AEB Lux, which received those
> transfers collectively for all the Defendants, total $274,029,164 ("Subsequent
> Transfers").  A chart setting forth the presently known Subsequent Transfers is
> attached as Exhibit C.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 109.

> 110.    On April 26, 2012, the Trustee filed this action seeking recovery of the
> Subsequent Transfers.

**ANSWER:**    The SCB Defendants admit the Trustee filed this action on April 26, 2012,

and otherwise deny the allegations set forth in paragraph 110.

> 111.    The Subsequent Transfers are recoverable from Defendants under section
> 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly
> § 78fff-2(c)(3).

**ANSWER:**    The allegations set forth in paragraph 111 constitute legal conclusions as to

which no response is required.  To the extent a response is required, the SCB Defendants deny the

allegations set forth in paragraph 111.

112.     The Subsequent Transfers represent a redemption of equity interests by AEB Lux on behalf of Defendants as a shareholder in Fairfield Sentry.  Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Subsequent Transfers to Defendants upon redemption of their interests.

**ANSWER:**     The SCB Defendants deny the allegations set forth in the first sentence of paragraph 112, and deny knowledge or information sufficient to form a belief as to the truth of the second sentence of paragraph 112.

113.     Based on the Trustee's investigation to date, prior to the Filing Date, Fairfield Sentry subsequently transferred at least $772,690,257 of the Fairfield Sentry Six Year Transfers directly to Fairfield Sigma ("Fairfield Sentry-Fairfield Sigma Subsequent Transfers").  A chart setting forth the presently known Fairfield Sentry-Fairfield Sigma Subsequent Transfers by date and amount is attached as Exhibit D.

**ANSWER:**     The SCB Defendants deny knowledge or information sufficient to form a belief as to the truth of paragraph 113.

114.     Thereafter, Fairfield Sigma transferred at least $15,203,270 to AEB Lux, which received those transfers on behalf of the other Defendants (the "Fairfield Sigma Subsequent Transfers").  A chart setting forth the presently known Fairfield Sigma Subsequent Transfers by date and amount is attached as Exhibit E.

**ANSWER:**     The SCB Defendants deny the allegations set forth in paragraph 114.

115.     The Fairfield Sigma Subsequent Transfers are recoverable from Defendants under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER:**     The allegations set forth in paragraph 115 constitute legal conclusions as to which no response is required.  To the extent a response is required, the SCB Defendants deny the allegations set forth in paragraph 115.

116.     The Fairfield Sigma Subsequent Transfers represent a redemption of equity interests by AEB Lux on behalf of Defendants as a shareholder in Fairfield Sigma. Because Fairfield Sigma invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sigma was insolvent when it made the Fairfield Sigma Subsequent Transfers to AEB Lux upon redemption of Defendants' interests.

**ANSWER:**    The SCB Defendants deny the allegations set forth in the first sentence of paragraph 116, and deny knowledge or information sufficient to form a belief as to the truth of the second sentence of paragraph 116.

117.    The Subsequent Transfers and Fairfield Sigma Subsequent Transfers are collectively referred to herein as the Fairfield Subsequent Transfers.

**ANSWER:**    The SCB Defendants deny the allegations set forth in paragraph 117, except admit that the Amended Complaint refers to the Subsequent Transfers and Fairfield Sigma Subsequent Transfers as the Fairfield Subsequent Transfers.

118.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to:  (i) supplement the information on the initial and Subsequent Transfers discussed above, and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

**ANSWER:**    The SCB Defendants deny knowledge or information sufficient to form a belief as to the truth of paragraph 118.

## RESPONSE TO REQUEST FOR RELIEF

The Request for Relief contains legal conclusions as to which no response is required.  To the extent a response is required, the SCB Defendants deny that the Trustee is entitled to his requested relief or to any other relief.

## DEFENSES

The SCB Defendants assert the following defenses without assuming the burden of proof or any other burden if such burdens would otherwise be on Plaintiff.  In the event that subsequent legal developments change the availability or nature of claims asserted by the Trustee, the SCB Defendants hereby preserve each and every defense at law, in equity, or otherwise, available under federal and state law, including common law.  Further, the SCB Defendants reserve the right to amend this Answer to assert any other and further defenses, cross-claims, and/or third

party claims when and if, in the course of investigation, discovery, or preparation for trial, it becomes appropriate to do so. These defenses are set forth cumulatively and in the alternative.

## FIRST DEFENSE

### Lack of Dominion or Control (11 U.S.C. § 550(a))

The Trustee's claims are barred, in whole or in part, because the SCB Defendants lacked dominion and control over funds allegedly received from the so-called Fairfield Subsequent Transfers and the SCB Defendants were therefore not transferees for purposes of 11 U.S.C. § 550(a)(2).

## SECOND DEFENSE

### Good Faith (11 U.S.C. 550(b))

To the extent that the SCB Defendants received any so-called Fairfield Subsequent Transfers, the Trustee may not recover the transfers under 11 U.S.C. § 550(b) because the SCB Defendants took the transfers, if any, from Fairfield Sentry and Fairfield Sigma for value, in good faith, and without knowledge of the voidability of the transfers from BLMIS to Fairfield Sentry.

*First*, the SCB Defendants gave value in the form of investment principal, in exchange for the redemption payments.

*Second*, the SCB Defendants did not have actual knowledge of any fraudulent purpose behind the transfers, if any, received. The SCB Defendants did not know facts that would have prompted a reasonable person in their position to conduct further inquiry into whether there was any fraudulent purpose behind the transfers.

Even if the SCB Defendants had been on inquiry notice of a possible fraudulent purpose behind the transfers, if any, received, a diligent inquiry by the SCB Defendants would not have discovered such a fraudulent purpose. Other entities, including the United States Securities

and Exchange Commission, with greater investigatory tools and resources than the SCB Defendants, and with more access to BLMIS personnel and documentation than the SCB Defendants, repeatedly examined and investigated BLMIS but failed to uncover Madoff's fraud before December 2008. The SCB Defendants did not have the ability to compel the production of information from third parties that would have been necessary to establish that BLMIS was committing fraud. Diligent inquiry by the SCB Defendants would not have discovered the fraudulent purpose of the transfers.

*Finally*, the SCB Defendants did not have knowledge of the alleged voidability of the transfers from BLMIS to Fairfield Sentry.

### THIRD DEFENSE

### Bankruptcy Code Safe Harbor (11 U.S.C. 546(e))

The Trustee's claims are barred, in whole or in part, because the alleged subsequent transfers to the SCB Defendants, if any, may not be recovered because the alleged initial transfers, if any, are subject to the safe harbor in Section 546(e) of the Bankruptcy Code, 11 U.S.C. § 546(e).

### FOURTH DEFENSE

### No Customer Property (15 U.S.C. § 78fff-2(c)(3))

The Trustee's claims are barred, in whole or in part, because any property that the SCB Defendants received from the so-called Fairfield Subsequent Transfers was not BLMIS customer property, or proceeds of BLMIS customer property, that BLMIS transferred to Fairfield Sentry or Fairfield Sigma, and therefore any such property is not recoverable by the Trustee from the SCB Defendants.

## FIFTH DEFENSE

### Initial Transfer Not Avoided (11 U.S.C. § 550(a))

The Trustee's claims are barred, in whole or in part, because the Trustee may not

recover the alleged Fairfield Subsequent Transfers because he has not avoided the alleged initial

transfers from BLMIS to Fairfield Sigma or Fairfield Sentry.

## SIXTH DEFENSE

### No Ponzi Scheme Presumption

The Trustee's claims are barred, in whole or in part, because the Trustee may not

rely on a "Ponzi scheme presumption" to prove that the alleged initial transfers from BLMIS to

Fairfield Sigma or Fairfield Sentry that he seeks to recover from the SCB Defendants were made

with actual intent to hinder, delay, or defraud any BLMIS creditor.

## SEVENTH DEFENSE

### Lack of Subject Matter Jurisdiction (U.S. Const. Art. III; Fed. R. Civ. P. 12(b)(1); Fed. R. Bankr. P. 7012(b))

This Court lacks jurisdiction under Article III of the U.S. Constitution to enter final

orders or judgment in this proceeding.

## EIGHTH DEFENSE

### Failure to State a Claim (Fed. R. Civ. P. 12(b)(6); Fed. R. Bankr. P. 7012(b))

The Amended Complaint fails to state a claim upon which relief can be granted.

## NINTH DEFENSE

### Statute of Limitations

The Trustee's claims are barred in whole or in part by the statute of limitations.

## TENTH DEFENSE

**Unreasonable Delay / Laches**

The Trustee's delay in bringing and prosecuting his claims, which were brought more than a decade ago and concern transfers made more than 15 years ago, is unreasonable and unfairly prejudices the SCB Defendants' ability to defend themselves.

## ELEVENTH DEFENSE

**Extraterritoriality**

The Trustee's recovery of any alleged transfers to the SCB Defendants would constitute an impermissible extraterritorial application of U.S. law.

## TWELFTH DEFENSE

**Comity**

The Trustee's recovery of any alleged transfers to the SCB Defendants would violate principles of comity.

## THIRTEENTH DEFENSE

**Violation of Due Process (U.S. Const. Amend. V)**

The use of the doctrine of law of the case to apply to the SCB Defendants rulings made in other adversary proceedings to which it was not a party and in which it did not participate violates the SCB Defendants' right to due process of law as guaranteed by the Fifth Amendment to the U.S. Constitution.

## FOURTEENTH DEFENSE

**Single Satisfaction (11 U.S.C. § 550(d))**

Pursuant to 11 U.S.C. § 550(d), the Trustee may not recover any alleged subsequent transfer from the SCB Defendants to the extent he has recovered from Fairfield Sentry or any other

immediate or mediate transferee the amount of the avoided initial transfer that included the customer property that the Trustee alleges the SCB Defendants received.

## FIFTEENTH DEFENSE

### Indemnification

The SCB Defendants are entitled to recover indemnity and/or contribution from others for any liability they incur to the Trustee.

## SIXTEENTH DEFENSE

### Preservation of Rights (11 U.S.C. § 502(h))

To the extent the Trustee recovers from the SCB Defendants, the SCB Defendants reserve their right to assert a claim arising from such recovery under 11 U.S.C. § 502(h).

## SEVENTEENTH DEFENSE

### No Double Recovery

The Trustee's claim is barred, in whole or in part, to the extent that any other entity, including but not limited to the Liquidators of Fairfield Sentry Ltd. and related funds, recover any amounts based on the conduct alleged in the Amended Complaint, because the Trustee is not entitled to double recovery, nor should the SCB Defendants be subject to recovery of identical funds from two separate entities.

On May 9, 2011, the Trustee entered into a Settlement Agreement (the "Fairfield Settlement Agreement") with the Liquidators of Fairfield Sentry Limited and related Fairfield funds. This Court approved the Fairfield Settlement Agreement on June 7, 2011 and it was incorporated into the consent judgment entered against Fairfield on July 13, 2011. The Fairfield Settlement Agreement provides for the sharing of recoveries on the Trustee's and the Fairfield

Liquidators' claims for recovery of property that Fairfield transferred, but the Trustee and the Fairfield Liquidators cannot both recover the same funds.

## EIGHTEENTH DEFENSE

### Sufficient SIPC Funds

The Trustee's claim should be dismissed if there are recovered, now or during the pendency of this action, sufficient funds to reimburse the SIPC for all payments that SIPC has made to satisfy allowed claims of BLMIS customers.

## NINETEENTH DEFENSE

### No Interest

To the extent the Trustee recovers from the SCB Defendants, the Trustee is not entitled to an award of interest under the facts and equities of this action.

## JURY DEMAND

The SCB Defendants demand a trial by jury on all issues that may be tried by a jury.

## STATEMENT PURSUANT TO FED. R. BANKR. P. 7012(b)

The SCB Defendants do not consent to entry of final orders or judgment by the Bankruptcy Court.

## DEFENDANT'S REQUEST FOR RELIEF

WHEREFORE, the SCB Defendants demand judgment dismissing the Amended Complaint with prejudice, and awarding SCB Defendants' attorneys' fees, costs, disbursements, and any further relief as the Court deems just and proper.

Dated:  March 7, 2023
      New York, New York

Respectfully Submitted,

/s/  *Andrew J. Finn*
Andrew J. Finn
Mark A. Makar
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
Email:  finna@sullcrom.com
Email:  makarm@sullcrom.com

Diane L. McGimsey (*pro hac vice*)
1888 Century Park East
Los Angeles, California  90067
Telephone:  (310) 712-6600
Facsimile:  (310) 712-8800
Email:  mcgimseyd@sullcrom.com

*Attorneys for the SCB Defendants*