# EXHIBIT 1

*Private Placement Memorandum*

### FAIRFIELD SENTRY LIMITED

*A British Virgin Islands International Business Company*

*Securities Offered: Redeemable, Voting Shares*

*Minimum Investment per Subscriber: U.S. $100,000*

*Purchase Price per Share: Net Asset Value per Share*

**Investment Manager**
*Fairfield Greenwich (Bermuda) Ltd.*

**Administrator**
*Citco Fund Services (Europe) B.V.*

**Placement Agent**
*Fairfield Greenwich Limited*

*SHARES OF THE FUND MAY BE OFFERED TO PERSONS WHO ARE NEITHER CITIZENS NOR RESIDENTS OF THE UNITED STATES AND TO A LIMITED NUMBER OF UNITED STATES INVESTORS CONSISTING OF PENSION AND PROFIT SHARING TRUSTS, CHARITIES AND OTHER TAX-EXEMPT ENTITIES.*

*THE SHARES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF RISK. THEY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES LAWS OF ANY JURISDICTION AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF SUCH LAWS. THE SHARES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE FUND'S ARTICLES OF ASSOCIATION. THE SHARES HAVE NOT BEEN APPROVED OR DISAPPROVED BY ANY REGULATORY AUTHORITY, NOR HAS ANY SUCH AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM.*

*The date of this Private Placement Memorandum is as of August 14, 2006.*

**Fairfield Greenwich (Bermuda) Ltd.**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE002428267
SECSEV3005218

**COMMODITY POOL OPERATOR NO-ACTION RELIEF**

THE INVESTMENT MANAGER HAS FILED A CLAIM OF EXEMPTION FROM REGISTRATION AS A COMMODITY POOL OPERATOR ("CPO") WITH THE UNITED STATES COMMODITY FUTURES TRADING COMMISSION ("CFTC") IN CONNECTION WITH PRIVATE INVESTMENT FUNDS WHOSE PARTICIPANTS ARE ACCREDITED INVESTORS, AS DEFINED IN REGULATION D UNDER THE SECURITIES ACT OF 1933, CERTAIN FAMILY TRUSTS AND CERTAIN PERSONS AFFILIATED WITH THE INVESTMENT MANAGER. AT ALL TIMES, THE FUND WILL UTILIZE FUTURES SUCH THAT EITHER (1) NO MORE THAN 5% OF ITS ASSETS ARE USED TO ESTABLISH COMMODITY INTEREST POSITIONS OR (2) THE NOTIONAL VALUE OF ITS COMMODITY INTEREST POSITIONS DOES NOT EXCEED 100% OF THE FUND'S LIQUIDATION VALUE.

UNLIKE A REGISTERED CPO, THE INVESTMENT MANAGER IS NOT REQUIRED TO DELIVER A DISCLOSURE DOCUMENT AND A CERTIFIED ANNUAL REPORT TO PARTICIPANTS IN THE FUND. THE CFTC HAS NOT REVIEWED OR APPROVED THIS OFFERING OR ANY DISCLOSURE DOCUMENT FOR THE FUND.

## CERTAIN GENERAL INFORMATION

The Shares offered hereby (the "Shares") will be issued only on the basis of the information in this Private Placement Memorandum and any attachments hereto (the "Memorandum").  No other information about Fairfield Sentry Limited (the "Fund") has been authorized.  Any investment in the Fund on the basis of information that is not contained, or which is inconsistent with, the information herein shall be solely at your risk.  The delivery of this Memorandum does not imply that any information herein is correct at any time after the date hereof.

You should inform yourself of the legal requirements and tax consequences within the countries of your residence or domicile for the purchase, holding or sale of the Shares, and any foreign exchange restrictions.  Shares that are bought by persons not entitled to hold them in accordance with the provisions herein may be compulsorily redeemed.  No Shares may be transferred without the prior written consent of the Directors.

The distribution of this Memorandum may be restricted by law in certain countries.  You must inform yourself of and observe any such restrictions.  You should review the Country-Specific Notices contained herein for any applicable notices for your countries of residence or domicile.  This Memorandum does not constitute an offer or solicitation to any person in any jurisdiction in which the offer or solicitation is not authorized, or to any person to whom it is unlawful to make the offer or solicitation.

No person is authorized to give any information with respect to the Fund unless authorized by the Directors.  This Memorandum supersedes any written or verbal information relating to the Fund.

You should not construe this Memorandum as legal or investment advice.  You should consult your own attorneys, accountants and other advisers regarding this investment.

This Memorandum describes certain documents relating to this investment, including various executed and unexecuted documents and certain statutes, rulings and regulations.  Such summaries do not purport to be complete and are qualified in their entirety by reference to the full text of those documents, statutes, rulings and regulations.

You and your investment representatives are invited to ask questions of and to obtain additional information from the Administrator (Citco Fund Services (Europe) B.V.) or Investment Manager (Fairfield Greenwich (Bermuda) Ltd.) concerning the Fund, including additional information to verify the completeness or accuracy of the information in this Memorandum.

All references herein to $ are to United States dollars.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED

The Fund is incorporated as an International Business Company under the International Business Companies Act of the British Virgin Islands. The Fund constitutes a "professional fund" as defined in the Mutual Funds Act, 1996 (as amended) of the British Virgin Islands (the "BVI Act") and as such is required to be and is recognized as a "professional fund" under the provisions of the BVI Act. Such recognition does not entail supervision of the investment performance or portfolio of the Fund by the Financial Services Commission of the British Virgin Islands (the "BVI"), which accepts no responsibility for the financial soundness of the Fund or the correctness of any statements or opinions expressed herein. There is no financial obligation or compensation scheme imposed on or by the Financial Services Commission of the BVI in favor of or available to the investors in the Fund.

As an entity regulated under the BVI Act, the Fund will be subject to the supervision of the Financial Services Commission in the BVI, which is authorized by the BVI Act to direct the Fund to furnish information or provide access to any records, books or other documents which it deems necessary to ascertain compliance with the BVI Act or any regulations made under the BVI Act.

The BVI Act provides that the Fund's certificate of recognition may be cancelled if, among other things, the Fund has breached the BVI Act or any regulations or codes of conduct, or conditions of its certificate, has been convicted of an offense, is carrying on business in a manner detrimental to its investors or to the public interest, or is declared bankrupt or is being wound up or dissolved.

Because the Fund is a professional fund under the BVI Act, whose shares are listed on the Irish Stock Exchange, the Shares may be held only by persons who are "professional investors" within the meaning of the BVI Act and the Irish Stock Exchange, and on the basis that the initial investment in the Fund by each of its shareholders is not less than $100,000. A professional investor is any person whose ordinary business involves, whether for his own account or for the account of others, the acquisition or disposal of property of the same kind as the property, or a substantial part of the property, of the Fund (in this case, investment instruments), or who has signed a declaration that he, whether individually or jointly with his spouse, has a net worth in excess of $1,000,000, or, if an institution, $5,000,000 or its equivalent in any other currency, and that he consents to being treated as a professional investor. In addition, in order to comply with rules of the Irish Stock Exchange, an investor will have to represent that he has knowledge and expertise in financial matters sufficient to evaluate the risks involved in an investment in the Fund, that he is aware of such risks and can bear the loss of the entire investment.

This Memorandum may not be reproduced or used for any other purpose other than making an investment in the Fund. Any distribution of this Memorandum in whole or in part, or the divulgence of any of its contents, is unauthorized. By accepting delivery of this Memorandum, you agree to return it to the Fund if you do not invest.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE002428270
SECSEV3005221

## TABLE OF CONTENTS

**Page**

CERTAIN GENERAL INFORMATION ......................................................................................... iii

FUND DIRECTORY ............................................................................................................ vi

MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS ........................................ 6

INVESTMENT POLICIES ................................................................................................... 9

OFFERING OF THE SHARES ............................................................................................. 11

FEES, COMPENSATION AND EXPENSES ...................................................................... 14

BANK, CUSTODIAN AND BROKERAGE ........................................................................ 16

ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT .......................................... 17

RISK FACTORS ................................................................................................................. 17

POTENTIAL CONFLICTS OF INTEREST ......................................................................... 22

DESCRIPTION OF SHARES .............................................................................................. 23

DIVIDEND POLICY ........................................................................................................... 23

TRANSFERS, REDEMPTIONS AND TERMINATION .................................................... 23

ANTI-MONEY LAUNDERING REGULATIONS .............................................................. 25

ANTI-MONEY LAUNDERING POLICIES ........................................................................ 25

TAX CONSIDERATIONS AND EXCHANGE CONTROL AND ERISA .......................... 27

LEGAL MATTERS ............................................................................................................. 32

MISCELLANEOUS ............................................................................................................ 32

COUNTRY-SPECIFIC NOTICES ...................................................................................... 36

APPENDIX A        INVESTMENT MANAGERS FORM ADV PART II

APPENDIX B        SUBSCRIPTION DOCUMENTS

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE002428271
SECSEV3005222

## FUND DIRECTORY

| | |
|---|---|
| THE FUND | Fairfield Sentry Limited<br>c/o Codan Trust Company (B.V.I.) Ltd.<br>P.O. Box 3140<br>Romasco Place, Wickhams Cay<br>Road Town, Tortola<br>British Virgin Islands |
| INVESTMENT MANAGER | Fairfield Greenwich (Bermuda) Ltd.<br>12 Church Street<br>Suite 606<br>Hamilton, Bermuda<br>Telephone:  441-292-5401<br>Facsimile:  441-292-5413 |
| PLACEMENT AGENT | Fairfield Greenwich Limited<br>c/o Offices of Charles Adams, Ritchie & Duckworth<br>Second Floor, Zephyr House, Mary Street<br>P.O. Box 709<br>George Town, Grand Cayman<br>Cayman Islands |
| ADMINISTRATOR; REGISTRAR<br>AND TRANSFER AGENT | Citco Fund Services (Europe) B.V.<br>Telestone 8 -Teleport<br>Naritaweg 165<br>1043 BW Amsterdam<br>The Netherlands<br>Telephone: (31-20) 572-2850<br>Facsimile:  (31-20) 572-2610 |
| U.S. COUNSEL | Law Offices of Andrew E. Goldstein<br>488 Madison Avenue, 16th Floor<br>New York, New York 10022<br>USA |
| BRITISH VIRGIN ISLANDS COUNSEL | Conyers Dill & Pearman<br>Romasco Place, Wickhams Cay 1<br>P.O. Box 3140<br>Road Town, Tortola<br>British Virgin Islands |
| AUDITORS | PricewaterhouseCoopers<br>Marten Meesweg 25<br>3068 AV Rotterdam<br>Amsterdam<br>The Netherlands |

CUSTODIAN BANK                          Citco Bank Nederland, N.V. Dublin Branch
                                        Custom House Plaza, Block 6
                                        International Financial Services Centre
                                        P.O. Box 6639
                                        Dublin 1
                                        Ireland

DEPOSITORY                              Citco Global Custody N.V.
                                        Telestone 8 – Teleport
                                        Naritaweg 165
                                        1043 BV Amsterdam
                                        The Netherlands
                                        Telephone: (31-20) 572-2200
                                        Telecopier: (31-20) 572-2625

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE002428273

SECSEV3005224

## SUMMARY

*The following Summary is intended to highlight certain basic information which is set forth more fully elsewhere in this Private Placement Memorandum and in the Memorandum of Association and Articles of Association of the Fund. This should be read in conjunction with such detailed information.*

### THE OFFERING

| | |
|---|---|
| **Issuer** | Fairfield Sentry Limited (the "Fund") is organized as an international business company under the laws of the Territory of the British Virgin Islands ("BVI"). The registered office of the Fund is located in the BVI. |
| **Securities Offered** | The Fund's redeemable, voting shares (the "Shares") were offered on November 30, 1990 at an initial offering price of U.S. $200 per Share and thereafter have been offered at a price equal to the Net Asset Value (as hereinafter defined) as of the opening of business on the date of issuance. |
| **Offerees** | Shares may be offered only to experienced and sophisticated investors who are neither citizens nor residents of the United States ("Non-U.S. Persons") and to a limited number of United States investors that are tax-exempt entities ("U.S. Tax Exempt Investors"). See "OFFERING OF THE SHARES". |
| **Minimum Subscription** | The minimum initial subscription per investor is U.S. $100,000. Following his initial investment, a shareholder may make additional investments in amounts of not less than U.S. $50,000. |
| **Maximum Capitalization** | The Fund will not accept a subscription tendered at a time when the number of its outstanding Shares is 10,000,000. |
| **Subscription Procedures** | It is preferable that subscriptions be made by wire transfer. However, subscriptions may be made by mail if necessary. Subscriptions received during any monthly period prior to the third to the last business day of the month will ordinarily be accepted, subject to the sole discretion of the Investment Manager (as defined below), as of the first business day of the following monthly period, i.e., subscriptions received between December 28 and January 28, assuming the 29th-31st are business days, will be accepted as of February 1. Subscriptions will become irrevocable to the subscriber on the third to the last business day of the month in which such subscription is received by the Fund. |

1

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED

| | |
|---|---|
| **Solicitation of Subscriptions** | The Fund may use the assistance of affiliated or unaffiliated placement agents and money managers, including FGL (as defined below), to place the Shares. Such placement agents and intermediaries may charge their clients a placement fee of up to 5% of the total amount of the subscription for Shares sold with their assistance, and/or share in the fees earned from the Fund, which they may rebate to their clients. Placement fees charged directly by FGL will not exceed 3%. In certain instances, the Fund may deduct the amount of the placement fee from the subscription amount to pay to the placement agent and such amounts will not constitute part of the assets of the Fund. |
| **Business Objective** | The Fund seeks to obtain capital appreciation of its assets principally through the utilization of a nontraditional options trading strategy described as "split strike conversion", to which the Fund allocates the predominant portion of its assets. See "INVESTMENT POLICIES". |
| **Investment Manager** | Fairfield Greenwich (Bermuda) Ltd. ("FGBL" or the "Investment Manager"), a corporation organized under the laws of Bermuda, serves as the Fund's investment manager. It is the wholly-owned subsidiary of Fairfield Greenwich Limited which previously served as the investment manager of the Fund and currently serves as the Fund's Placement Agent. Jeffrey H. Tucker, Walter M. Noel, Jr. and Andres Piedrahita are the main principals of FGL. Mr. Noel (see also a Director of the Fund (see "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS"). Effective April 20, 2006, FGBL registered as an investment adviser with the United States Securities and Exchange Commission pursuant to the Investment Advisers Act of 1940, as amended. The Investment Manager has claimed an exemption under Commodity Futures Trading Commission ("CFTC") Rule 4.13(a)(3) from registration with the CFTC as a commodity pool operator and, accordingly, is not subject to certain regulatory requirements with respect to the Fund that would otherwise be applicable absent such an exemption. |
| **Placement Agent** | Fairfield Greenwich Limited, an exempted company incorporated under the laws of the Cayman Islands "FGL" or the "Placement Agent"), is the Fund's Placement Agent. FGL oversees the marketing of the Shares and is an affiliate of the Investment Manager. FGBL and FGL are member companies of the Fairfield Greenwich Group ("FGG"), which was established in 1983 and had, as of May 1, 2006, more than $9.0 billion employed in alternative asset management funds. Throughout its history, FGG has internally managed its own alternative asset funds and selectively identified external managers for affiliations where it serves as a managerial and distribution partner. |
| **Directors** | Walter M. Noel, Jr., Jan R. Naess and Peter P. Schmid are the Directors of the Fund. Mr. Noel is also a Director of FGL, an affiliate of the Investment Manager. |

2

| | |
|---|---|
| **Citco** | Citco Fund Services (Europe) B.V., an affiliate of The Citco Group Ltd., acts as administrator, registrar and transfer agent for the Fund. The Fund's escrow account is maintained at Citco Bank Nederland, N.V. Dublin Branch. Pursuant to a custodial services agreement, Citco Bank Nederland N.V., Dublin Branch and Citco Global Custody N.V. have agreed to provide custodial services to the Fund. |
| **Dividend Policy** | It is anticipated that the Fund will not declare any dividends; rather, income will be reinvested and will be reflected in the Net Asset Value of the Shares. |

## SALE AND REDEMPTION OF SHARES

| | |
|---|---|
| **Redemption at the Option of a Shareholder** | A shareholder of the Fund, on fifteen (15) calendar days' notice, may cause his Shares to be redeemed as of the last business day (being any day not a Saturday or a Sunday, that is not a public holiday or a day on which banks are generally authorized or obliged by law or regulation to close in the Netherlands, the Republic of Ireland, Canada or the United States of America) of any month. There is no minimum period of time that Shares must be held in order for a shareholder to redeem his Shares. |
| **Compulsory Redemption** | The Fund reserves the right to call all or a part of a shareholder's Shares for redemption at any time. This right will only be exercised as to Shares where the continued holding of which would result in regulatory, pecuniary, legal, taxation, or material administrative disadvantage for the Fund or the shareholders as a whole. |
| **Sales** | Subscriptions received during any monthly period prior to the third to the last business day of the month will ordinarily be accepted, subject to the sole discretion of the Investment Manager, as of the first business day of the following monthly period, i.e., subscriptions received between December 28 and January 28 will be accepted as of February 1. Subscriptions will become irrevocable to the subscriber on the third to the last business day of the month in which such subscription is received by the Fund. |
| **Exchange Listing** | The Fund was admitted to the Official List of the Irish Stock Exchange in Dublin, Ireland on January 12, 1995 and has been issued SEDOL number 0330934. It is unlikely that a public trading market will develop for the Fund's shares and none has developed to date. Shareholder redemption rights are not affected by this listing. |

3

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE002428276

SECSEV3005227

## COMPENSATION AND EXPENSES

**Expenses**

The Fund will bear, for each year, all continuing offering costs; all ordinary legal and auditing fees; all registrar, transfer agent and administration fees; all insurance expenses; all expenses in maintaining the Fund's office and all other expenses incurred in the operation of the Fund, if any, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund, as well as all fees and all ordinary and necessary expenses related to the Fund's investment and trading activities.

FGL will pay the Investment Manager a fixed fee for providing certain managerial services to the Fund, as more fully described in the Investment Manager's Form ADV Part II, which is attached to this Memorandum as Appendix B.

**Management Fee**

FGL will receive a monthly management fee in an amount equal to one-twelfth of one percent (0.0833%) (approximately 1% per annum) of the Net Asset Value of the Fund before Performance Fees (as hereinafter defined) as calculated at the opening of the first day of the month, which will include subscriptions for Shares accepted by the Fund as of the first day of such month. This fee is payable monthly in arrears. FGL may pay a portion of the Management Fee to an affiliate of FGL and the Investment Manager in consideration of the affiliate providing certain administrative services and back-office support to the Fund.

**Performance Fee**

FGL will receive, for each calendar quarter, a performance fee (the "Performance Fee") with respect to each Share outstanding during such calendar quarter in an aggregate amount equal to 20% of the net realized and net unrealized appreciation in the Net Asset Value of each Share in such calendar quarter ("Net Profits"), if any; subject to reduction in connection with certain offsets with respect to each Share, provided, however, that if a Share has a loss chargeable to it during any calendar quarter or quarters ("Unrecouped Loss") and during any succeeding calendar quarters there are Net Profits allocable to the Share, there will be no Performance Fee payable with respect to such Share until the amount of the Unrecouped Loss allocated to such Share has been recouped. If Shares are redeemed during a calendar quarter, the Unrecouped Loss relating to such Shares will be reduced in the same proportion as the reduction in the Net Asset Value of such Shares caused by such redemption. Shares which are either purchased or redeemed during a calendar quarter shall be subject to the payment of a Performance Fee only for the portion of the calendar quarter during which such Shares were outstanding. The Performance Fee will only be paid on "new appreciation" in the Fund's Net Asset Value allocable to the Shares.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED    FGGE002428277

SECSEV3005228

In certain circumstances, the Performance Fee may be reduced for particular calendar quarters and the amount of the reduction repaid in subsequent calendar quarters (see "FEES, COMPENSATION AND EXPENSES – Performance Fee").

FGL and the Fund may enter into an agreement pursuant to which FGL may elect to defer payment of all or a portion of its Management Fees and/or Performance Fees.

5

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED
FGGE002428278
SECSEV3005229

# THE FUND

Description

The Fund was incorporated in the Territory of the British Virgin Islands ("BVI") as an international business company on October 30, 1990. The registered office of the Fund is located in Road Town, Tortola, British Virgin Islands.

Shareholders will have the right to redeem part or all of their Shares as of the last business day of any month (See "TRANSFERS, REDEMPTIONS AND TERMINATION").

## MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS

The Fund

The Fund's Board of Directors has overall management responsibility for the Fund, including establishing investment, dividend and distribution policy, and having the authority to select and replace the Fund's administrator, registrar and transfer agent, custodian, any officers of the Fund and other persons or entities with management or administrative responsibilities to the Fund. None of the Fund's Directors own an equity interest in the Fund.

The Directors of the Fund are as follows:

**Walter Noel** has over thirty years of experience in the investment business. From 1959 to 1972, he was associated with the Management Services Division of Arthur D. Little Inc., an industrial and management consulting firm. From 1972 to 1974, Mr. Noel was President of Bahag Banking Ltd., in Lausanne, Switzerland. In 1974, Mr. Noel became Vice President of the International Private Banking Department of Citibank, N.A., where he remained until 1977 when he became Senior Vice President of the International Private Banking Department of Chemical Bank. Mr. Noel remained at Chemical Bank until 1983, where he shared primary responsibility for developing its international private banking business. He founded The Fairfield Greenwich Group, an affiliate of the Fund's investment manager, Fairfield Greenwich (Bermuda) Ltd., in 1983. Since founding The Fairfield Greenwich Group, Mr. Noel has been a director or general partner for a variety of its funds.

**Jan R. Naess** received a Bachelor of Arts degree in 1981 and a Masters degree in Economics in 1983 from the University of Oslo. From 1983 to 1987, he was employed in the Economic Research Department of R.S. Platou a.s. in Oslo, a leading shipbrokering firm. In 1987, Mr. Naess joined with R.S. Platou a.s. to form R.S. Platou Asset Management a.s., which was instrumental in the sale and purchase of 15 bulk carriers from 1987 to 1989. In 1989, Mr. Naess liquidated his interest in R.S. Platou Asset Management a.s. and formed PAN Shipping Ltd., a shipowning/operating and project development fund, which merged with Northern Navigation International Limited ("NNI") in 1991. Mr. Naess is a Vice President of NNI, a Liberian corporation, which is in the business of investing in and managing shipping assets.

**Peter P. Schmid** received a Swiss Federal Certificate of Capacity in 1968. Mr. Schmid was employed by Credit Suisse from 1968 to 1986. From 1975 to 1977, he was employed in Credit Suisse's International Portfolio Management Department in Zurich. After a brief posting in Credit Suisse's New York office, Mr. Schmid was in charge of the bank's representative office in Rio de Janeiro from 1977 to 1984. From 1984 to 1986, Mr. Schmid was Vice President in charge of Credit Suisse's Latin American Private Banking Desk in Geneva. Mr. Schmid has been an independent investment adviser since April 1986. He

6

is President of Peter Schmid (Portfolio Management), P. Schmid & Associés, S.A. and Armor S.A. Mr. Schmid is a Director of Inter Asset Management Inc.

## The Investment Manager

The Fund's investment manager is Fairfield Greenwich (Bermuda) Ltd., a corporation organized under the laws of Bermuda ("FGBL" or the "Investment Manager"), which was incorporated on June 13, 2003. It is responsible for the management of the Fund's investment activities, the selection of the Fund's investments, monitoring its investments and maintaining the relationship between the Fund and its custodian, administrator, registrar and transfer agent. The Investment Manager is the wholly-owned subsidiary of Fairfield Greenwich Limited, an exempted company organized under the laws of the Cayman Islands ("FGL"), which previously served as the investment manager of the Fund and currently serves as the Fund's Placement Agent.

FGBL and FGL are member companies of the Fairfield Greenwich Group ("FGG"), which was established in 1983 and had, as of May 1, 2006, more than $9.0 billion employed in alternative asset management funds. Throughout its history, FGG has internally managed its own alternative asset funds and selectively identified external managers for affiliations where it serves as a managerial and distribution partner.

The Investment Manager and its affiliates currently serve as investment or administrative manager to more than twenty funds, and have exclusive distribution arrangements with several others. FGG maintains its principal office in New York, with a significant presence in London and Bermuda. Marketing and client support offices exist in other locations in the United States, Europe, and Latin America. FGG's London entity is licensed and subject to the supervision of the United Kingdom Financial Services Authority (the "FSA"). An affiliate of FGG is registered as a broker-dealer in the United States.

Effective April 20, 2006, the Investment Manager registered as an investment adviser with the Securities and Exchange Commission under the Investment Advisers Act of 1940, as amended. In addition, the Investment Manager has claimed an exemption under Commodity Futures Trading Commission ("CFTC") Rule 4.13(a)(3) from registration with the CFTC as a commodity pool operator and, accordingly, is not subject to certain regulatory requirements with respect to the Fund that would otherwise be applicable absent such an exemption.

Pursuant to the Investment Management Agreement between the Fund and the Investment Manager, the Investment Manager and the Placement Agent is not liable for any error of judgment or for any loss incurred by the Fund, except a loss resulting from willful malfeasance, bad faith or gross negligence in the performance of its duties under such agreement. The Investment Management Agreement further provides that the Investment Manager, the Placement Agent, their directors, officers, employees, agents and counsel will be indemnified and held harmless by the Fund against any and all claims, liability and expenses for any loss suffered by the Fund arising out of any act or omission of such indemnified party, except to the extent an act or omission constitutes willful misconduct or reckless disregard of the duties of such indemnified party. The Investment Management Agreement may be terminated by either party thereto on ten days' written notice prior to the end of any calendar quarter.

## The Placement Agent

Fairfield Greenwich Limited ("FGL" or the "Placement Agent"), the Fund's placement agent, oversees the marketing of the Shares.

7

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED
FGGE002428280
SECSEV3005231

The Fund may use the assistance of affiliated or unaffiliated placement agents and money managers, including FGL, to place the Shares. Such placement agents and intermediaries may charge their clients a placement fee of up to 5% of the total amount of the subscription for Shares sold with their assistance, and/or share in the fees earned from the Fund, which they may rebate to their clients. Placement fees charged directly by FGL will not exceed 3%. In certain instances, the Fund may deduct the amount of the placement fee from the subscription amount to pay to the placement agent and such amounts will not constitute part of the assets of the Fund.

Following is biographical information on the founders, principal officers and certain other key employees of FGG:

**Walter M. Noel, Jr.**  His background is summarized above under "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS - The Fund".

**Andres Piedrahita** founded Littlestone Associates in 1991, which merged with FGG in 1997. Mr. Piedrahita directs FGG's European and Latin American activities. Mr. Piedrahita has over fifteen years of experience in the investment business. Prior to the merger, Mr. Piedrahita was the Director and President of Littlestone Associates, Inc. (1991-1997). He was previously a Vice President at Shearson Lehman Hutton, specializing in money management consulting for non-U.S. institutions and individuals (1987-1990). Before joining Shearson, Mr. Piedrahita was a financial consultant with Prudential Bache Securities Inc. in New York (1981-1987). He received his Bachelor of Arts degree from Boston University's School of Communications.

**Jeffrey Tucker** has over thirty years of experience in investment related businesses. Mr. Tucker was an attorney with the Securities and Exchange Commission from 1970 to 1978. From 1975 to 1978, he was an Assistant Regional Administrator of the SEC's New York regional office, with supervisory responsibility for approximately half of its enforcement program. Mr. Tucker entered private practice in 1978 as a partner in the law firm Tucker, Globerman & Feinsand, where he remained until 1987. He specialized in securities and transactional matters, with a principal focus on limited partnership offerings. Mr. Tucker entered the securities industry in 1987 as a general partner of Fred Kolber & Co. ("Kolber"), a registered broker-dealer. At Kolber, Mr. Tucker was responsible for the development and administration of the firm's private investment funds. FGG began its association with Kolber at that time as a marketing agent, and the firms subsequently merged activities. Throughout FGG's development, Mr. Tucker has been responsible for directing its business and operational development and has been a director or general partner for a variety of its investment funds. Mr. Tucker received his Bachelor of Arts degree from Syracuse University and his JD from Brooklyn Law School.

FGL and certain of its principals have beneficial interests in the Fund.

The backgrounds of the Directors and key officers of the Investment Manager are set forth below:

**Andres Piedrahita** is a Director and the President of the Investment Manager. His background is set forth above under "MANAGEMENT OF THE FUND AND OTHER RELATIONSHIPS-The Investment Manager".

**Brian Francoeur** is a Director of the Investment Manager. Mr. Francoeur joined Citco Fund Services (Bermuda) Limited in 2001 and currently serves as its Managing Director. From 1999 until joining Citco, he was the Chief Financial Officer of CCS Group Limited, a computer cabling and network company based in Hamilton, Bermuda, and from 1997 to 1999 was a Senior Portfolio Manager with Olympia Capital (Bermuda) Limited, a fund administration company in Bermuda. Mr. Francoeur qualified as a chartered accountant in 1994 and was employed by Ernst & Young in Bermuda from 1995 to 1997.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED    FGGE002428281

SECSEV3005232

**Amit Vijayvergiya** is Managing Director of the Investment Manager and focuses on manager selection and risk management for the Fund. He has been employed by the Investment Manager since 2003. Mr. Vijayvergiya has over 12 years of experience in asset management, risk management and operations research. Prior to joining the Investment Manager, from 2000 to 2003, Mr. Vijayvergiya managed MAV Hedge Advisors, a family office investing in traditional and alternative investment managers. From 1998 to 2000, he was the General Manager of LOM Asset Management ("LOM AM"), where he oversaw the management of $160 million in assets. At LOM AM, Mr. Vijayvergiya structured and managed several multi-manager funds and served on the firm's management and investment committees. He began his business career in 1994 with a position in operations research at Canadian National Railways. Mr. Vijayvergiya received a Masters in Business Administration from Schulich School of Business at York University, a Bachelors of Science in Statistics from the University of Manitoba and a Bachelors of Arts in Economics from the University of Western Ontario. Mr. Vijayvergiya holds the Chartered Financial Analyst designation and the Financial Risk Manager certification.

## INVESTMENT POLICIES

The Fund seeks to obtain capital appreciation of its assets principally through the utilization of a nontraditional options trading strategy described as "split strike conversion", to which the Fund allocates the predominant portion of its assets. Set forth below is a description of the "split strike conversion" strategies ("SSC Investments").

The establishment of a typical position entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with a notional value that approximately equals the market value of the basket of equity securities. An index call option is out-of-the-money when its strike price is greater than the current price of the index; an index put option is out-of-the-money when the strike price is lower than the current price of the index. The basket typically consists of between 35 to 50 stocks in the S&P 100 Index.

The primary purpose of the long put options is to limit the market risk of the stock basket at the strike price of the long puts. The primary purpose of the short call options is to largely finance the cost of the put hedge and to increase the stand-still rate of return.

This position in its entirety could be characterized as a bull spread which, presuming the stock basket highly correlates to the S&P 100 Index, is intended to work as follows: (i) it sets a floor value below which further declines in the value of the stock basket is offset by gains in the put options, (ii) it sets a ceiling value beyond which further gains in the stock basket are offset by increasing liability of the short calls, and (iii) defines a range of potential market gain or loss, depending on how tightly the options collar is struck.

The degree of bullishness of the strategy can be expressed at implementation by the selection of the strike prices in the S&P 100 Index put and call options. The farther away the strike prices are from the price of the S&P 100 Index, the more bullish the strategy.

The Split Strike Conversion strategy is implemented by Bernard L. Madoff Investment Securities LLC ("BLM"), a broker-dealer registered with the Securities and Exchange Commission, through accounts maintained by the Fund at that firm. The accounts are subject to certain guidelines which, among other things, impose limitations on the minimum number of stocks in the basket, the minimum market

9

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE002428282
SECSEV3005233

capitalization of the equities in the basket, the minimum correlation of the basket against the S&P 100 Index, and the permissible range of option strike prices. Subject to the guidelines, BLM is authorized to determine the price and timing of stock and option transactions in the account. The services of BLM and its personnel are essential to the continued operation of the Fund, and its profitability, if any.

The options transactions executed for the benefit of the Fund may be effected in the over-the-counter market or on a registered options exchange.

## Other Investments

The Investment Manager, in its sole and exclusive discretion, may allocate a portion of the Fund's assets (never to exceed, in the aggregate, 5% of the Fund's Net Asset Value, measured at the time of investment) to alternative investment opportunities other than its "split strike conversion" investments (the "Non-SSC Investments"). It is anticipated that the Non-SSC Investments will be allocated to new investment vehicles managed by experienced management teams establishing themselves in new investment businesses ("Emerging Managers"), with no single allocation exceeding $50 million, measured at the time of investment. These arrangements may include "lock-up" provisions of varying durations of these assets in such investments, subject to early release for breach of risk control or performance guidelines, or for cause. FGBL and the Fund generally share in fees received by Emerging Managers from investors other than the Fund. The Fund will pay fees with respect to the Emerging Managers at a rate that will not exceed the Fund's rate of fees (in certain cases, this may be accomplished by FGBL subsidizing, from its own moneys, the fees charged on these assets by Non-SSC Investment managers). Non-SSC Investments may also include strategic allocations to experienced managers in established funds.

In certain circumstances, the Performance Fee may be reduced for particular calendar quarters for certain Non-SSC Investment Losses. See "POTENTIAL CONFLICTS OF INTEREST" and "FEES, COMPENSATION AND EXPENSES –Performance Fee".

In order to ensure that the Fund will not be subject to United States federal income taxation on trading gains from the disposition of certain investments, it is expected that the Fund will not invest in any "United States real property interest" (including, for example, certain interests in any U.S. Corporation that is a "United States real property holding corporation"), as such terms are defined under the U.S. Internal Revenue Code of 1986 (the "Code") and the Treasury Regulations promulgated thereunder. (See "TAX CONSIDERATIONS AND EXCHANGE CONTROL.")

The Fund may invest some of its assets in short-term U.S. government obligations, certificates of deposit, short-term high grade commercial paper and other money market instruments, including repurchase agreements with respect to such obligations, money market mutual funds and short term bond funds. In order to ensure that substantially all of the interest earned by the Fund will not be subject to United States federal withholding taxes, any investment in an obligation of a U.S. person or entity (other than in certificates of deposits in banks) primarily will be in an instrument (i) which is issued and purchased at a discount from its face amount, which is not otherwise interest bearing, and which has a term of no more than 183 days from the date of issuance or (ii) which is in registered form and which is issued after July 18, 1984. (See "TAX CONSIDERATIONS AND EXCHANGE CONTROL.")

## Investment Restrictions

The Fund will observe the investment restrictions set forth in the Fund's Articles of Association which are summarized here:

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE002428283

SECSEV3005234

a)   no more than 10% of the Net Asset Value of the Fund will be invested in the securities of any one issuer (other than any government or governmental agency);

b)   the Fund may not hold more than 10% of the issued securities of any one class of securities in any issuer (other than any government or governmental agency);

c)   no more than 10% of the gross assets of the Fund may be exposed to the creditworthiness or solvency of a single counterparty (other than any government or governmental agency), in each case calculated at the time of investment;

d)   no more than 10% of the Net Asset Value of the Fund may be invested in securities of countries where immediate repatriation rights are not available;

e)   the Fund will not invest in the securities of any issuer if the directors and officers of the Fund and the Investment Manager collectively own in excess of 5% of such securities;

f)   the Fund will not take or seek to take legal or management control of the issuer of underlying investments;

g)   the Fund will adhere to the general principle of diversification in respect of all of its assets;

h)   the Fund will not invest directly in real property;

i)   the Fund will not make any loans (except to the extent that the acquisition of any investment in securities or commodity interests described herein may constitute a loan) to any one issuer (other than any government or governmental agency) except with the consent of the custodian of the Fund's assets; and

j)   no more that 10% of the Net Asset Value of the Fund will be invested in physical commodities.

The investment restriction set out in (c) above will not apply to transactions with any counterparty which advances full and appropriate collateral to the Fund in respect of such transactions.

## OFFERING OF THE SHARES

The Fund is offering up to 10,000,000 Shares.  The initial offering price was U.S. $200 per Share on November 30, 1990.  The Shares are currently offered at a price equal to the Net Asset Value per Share (as hereinafter defined) as of the opening of business on the date of issuance.

Shares may be offered only to experienced and sophisticated investors who are neither citizens nor residents of the United States ("Non-U.S. Investors") and to a limited number of United States investors that are tax-exempt entities ("U.S. Tax-Exempt Investors").

The minimum initial purchase by each subscriber is U.S. $100,000.  The Fund may reject any subscription, in whole or in part, in its discretion.  All subscriptions, once made, are irrevocable to the subscriber.

All proceeds from the sale of Shares will be received by the Fund in trust and will be deposited by the Fund into a segregated interest bearing account in the Fund's name at the Fund's bank, Citco Bank Nederland N.V. Dublin Branch.  There are no underwriting arrangements with respect to the offering of Shares.  The Fund may use the assistance of affiliated or unaffiliated placement agents and money

11

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE002428284

SECSEV3005235

managers, including FGL, to place the Shares. Such placement agents and intermediaries may charge their clients a placement fee of up to 5% of the total amount of the subscription for Shares sold with their assistance, and/or share in the fees earned from the Fund, which they may rebate to their clients. Placement fees charged directly by FGL will not exceed 3%. In certain instances, the Fund may deduct the amount of the placement fee from the subscription amount to pay to the unaffiliated placement agent and such amounts will not constitute part of the assets of the Fund.

The Fund will offer its Shares on a continuous basis at a price equal to its Net Asset Value as of the opening of business on the date of issuance of such Shares. Subscriptions received during any month prior to the third to the last business day of the month will be accepted, subject to the sole discretion of the Investment Manager, as of the first business day of the following month. Thus, for example, subscriptions received between January 1 and January 28 shall be accepted as of February 1, assuming the 29th-31st are business days. The Fund reserves the right, in its discretion, to accept any subscription prior to such first day. Subscriptions shall become irrevocable to the subscriber on the third to the last business day of the month in which such subscription is received by the Fund.

The Fund was admitted to the Official List of the Irish Stock Exchange, Dublin, Ireland on January 12, 1995 and has been issued SEDOL number 0330934. It is unlikely that a trading market in the Fund's Shares will develop and none has developed to date. The listing does not affect shareholder redemption rights.

**Net Asset Value Defined**

The Net Asset Value of the Shares is the value of the Fund's assets as calculated in accordance with the International Financial Reporting Standards and the Memorandum and Articles of Association of the Fund.

Notwithstanding the foregoing:

> (i)       in the case of extraordinary circumstances which warrant a different valuation of any securities, such as an inability to liquidate existing positions, such securities will be valued at such prices as the Directors shall determine; and

> (ii)      the amount of any distribution or dividend made shall be a liability of the Fund from the day when the distribution or dividend is declared until it is paid.

All decisions on the valuation of assets and liabilities and determination of Net Asset Value shall be made by the Fund's Board of Directors.

Net Asset Value per Share is defined as the Net Asset Value divided by the number of Shares then outstanding.

The Net Asset Value of the Fund will be calculated on a monthly basis by the Fund's administrator, Citco Fund Services (Europe) B.V., which will promptly notify the Irish Stock Exchange of the results of each such Net Asset Value calculation.

Pursuant to the Fund's Articles of Association, the Fund may suspend the calculation of its Net Asset Value for the whole or any part of any period:

> (a)      during which any stock exchange or over-the-counter market on which any significant portion of the investments of the Fund are listed, quoted, traded or dealt

12

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE002428285

SECSEV3005236

in is closed (other than customary weekend and holiday closing) or trading on any such stock exchange or over-the-counter market is restricted; or

(b)   when circumstances exist as a result of which in the opinion of the Directors it is not reasonably practicable for the Fund to dispose of investments or as a result of which any such disposal would be materially prejudicial to the shareholders; or

(c)   when a breakdown occurs in any of the means normally employed in ascertaining the value of investments or when for any other reason the value of any of the investments or other assets of the Fund cannot reasonably or fairly be ascertained; or

(d)   during which the Fund is unable to repatriate funds required for the purpose of making payments due on redemption of Shares or during which any transfer of funds involved in the realization or acquisition of investments or payments due on redemptions of Shares cannot in the opinion of the Directors be effected at normal rates of exchange.

Any such suspension shall take effect at such time as the Directors shall declare but not later than the close of business on the business day next following the declaration, and thereafter there shall be no determination of the Net Asset Value per Share of the Fund until the Directors shall declare the suspension at an end, except that such suspension shall terminate in any event on the first business day on which (a) the condition giving rise to the suspension shall have ceased to exist; and (b) no other condition under which suspension is authorized under the Fund's Articles of Association shall exist.  Each declaration by the Directors pursuant to this paragraph shall be consistent with such official rules and regulations (if any) relating to the subject matter thereof as shall have been promulgated by any authority having jurisdiction over the Fund and as shall be in effect at the time.  To the extent not inconsistent with such official rules and regulations, the determination of the Directors shall be conclusive.  Whenever the Directors shall declare a suspension of the determination of the Net Asset Value per Share, then as soon as may be practicable after any such declaration, the Directors shall give notice to all shareholders stating that such declaration has been made.  At the end of any period of suspension as aforementioned the Directors shall give notice to all shareholders stating that the period of suspension has ended.

### Who Should Purchase/Subscription Procedure

This offering is limited to non-U.S. persons and to a limited number of United States investors that are tax-exempt entities all of whom have the ability to speculate in high risk securities and for whom such a purchase is suitable in light of such person's financial condition.  The Fund will require as a condition to the acceptance of a subscription that the subscriber represent and warrant that he has a net worth in excess of U.S. $1,000,000.

Prospective subscribers should inform themselves as to the legal requirements within their own countries for the purchase of Shares and any foreign exchange or tax considerations relevant to such purchase.

As part of the Fund's responsibility for the prevention of money laundering, the Fund will require detailed verification of a prospective investor's identity to be included with its subscription application.

An individual will be required to produce a certified copy of a passport or identification card. Corporate applicants will be required to produce a certified copy of the certificate of incorporation (and any change of name), memorandum and articles of association (or other documents evidencing the existence of the

13

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE002428286

SECSEV3005237

legal entity), the register of directors or an excerpt from the trade register held at the relevant chamber of commerce and the signatory card verifying the authority of officers to sign on behalf of the corporate entity. Trusts and other entities which subscribe to the Fund must demonstrate organizational documents which verify the existence of the entity and which verify the authority of one or more signatories to sign subscriptions on behalf of the entity.

The Fund reserves the right to request such further information as is necessary to verify the identity of an applicant. In the event of delay or failure by the applicant to produce any information required for verification purposes, the Fund may refuse to accept the application and the subscription moneys relating thereto.

In order to subscribe for Shares, subscribers must complete and sign the Subscription Agreement included in the Subscription Documents which accompany this Private Placement Memorandum (the "Memorandum"), and mail them to Fairfield Sentry Limited, c/o Citco Fund Services (Europe) B.V., Telestone 8-Teleport, Naritaweg 165, 1043BW Amsterdam, The Netherlands; fax number (31-20) 572-2610. Subscription funds should be wire transferred to the Fund's escrow account at:

> *Intermediary Bank - Field 56*
> HSBC Bank, New York
> BIC: MRMDUS33
> Fed Wire: 021001088

> *Account with Institution - Field 57*
> Account Name: Citco Bank Nederland N.V. Dublin Branch
> Account Number: [Redacted]6487
> BIC: CITCIE2D

> *Beneficiary Customer - Field 59*
> Beneficiary Account Name: Fairfield Sentry Limited
> Beneficiary International Bank Account Number (IBAN):
> **Redacted** 0501

> *Reference - SWIFT Field 70*: Name and Full Address of Subscriber:

### FEES, COMPENSATION AND EXPENSES

#### Expenses

The Fund will bear, for each year, all continuing offering costs; all ordinary legal and auditing fees; all registrar, transfer agent and administration fees; all insurance expenses; all expenses in maintaining the Fund's office and all other expenses incurred in the operation of the Fund, if any, including any legal and auditing fees that relate to extraordinary circumstances, such as tax examinations or litigation involving the Fund, as well as all fees and all ordinary and necessary expenses related to the Fund's investment and trading activities.

FGL will pay the Investment Manager a fixed fee for providing certain managerial services to the Fund, as more fully described in the Investment Manager's Form ADV Part II, which is attached to this Memorandum as Appendix B.

14

## Management Fee

FGL will receive for each month a management fee (the "Management Fee") in an amount equal to one-twelfth of one percent (0.0833%) (approximately 1% per annum) of the Net Asset Value of the Fund before Performance Fees (as hereinafter defined) as calculated at the open of the first day of the month (which would include any subscriptions for Shares accepted by the Fund as of the first day of such month). The Management Fee is payable monthly in arrears. FGL may pay a portion of the Management Fee to an affiliate of FGL and the Investment Manager in consideration of the affiliate providing certain administrative services and back-office support to the Fund.

## Performance Fee

FGL will receive, for each calendar quarter, a performance fee (the "Performance Fee") in an amount equal to 20% of the net realized and net unrealized appreciation in the Net Asset Value of each Share in such calendar quarter ("Net Profits"), if any; provided, however, that if a Share has a loss chargeable to it during any calendar quarter or quarters ("Unrecouped Loss") and during any succeeding calendar quarters there are Net Profits allocable to the Share, there will be no Performance Fee payable with respect to such Share until the amount of the Unrecouped Loss allocated to such Share has been recouped. If Shares are redeemed during a calendar quarter, the Unrecouped Loss relating to such Shares will be reduced in the same proportion as the reduction in the Net Asset Value of such Shares caused by such redemption. No Share will be subject to the payment of a Performance Fee until such Share has recouped its loss carryover, i.e., until the Net Asset Value of such Shares is at least as high as the previous highest Net Asset Value per Share. IN OTHER WORDS, PERFORMANCE FEES WILL ONLY BE PAID ON "NEW APPRECIATION" IN THE NET ASSET VALUE OF THE SHARES. Shares which were either purchased or redeemed during a calendar quarter will be subject to the payment of a Performance Fee only for the portion of the calendar quarter during which such shares were outstanding. FGL will reduce any Performance Fees otherwise payable to it by offsetting it against an amount equal to the "Shared Cash Flow Amount" as defined in "POTENTIAL CONFLICTS OF INTEREST", below) attributable to Non-SSC Investments.

Notwithstanding the foregoing, in the event that, as at the end of any calendar year, the aggregate amount of original investments in Non-SSC Investment vehicles exceeds the aggregate net asset value of the Fund's interests in Non-SSC Investment vehicles (before deduction of the Fund's share of fees payable by the Non-SSC Investment vehicles) (such excess being the "Non-SSC Investment Loss") FGL will reduce its Performance Fee payable at subsequent quarter-end by an amount equal to the Non-SSC Investment Loss. The portion of the Performance Fee that is reduced to cover the Non-SSC Investment Loss will be carried forward. In the event that the Non-SSC Investment Loss is, in part or in whole, subsequently recouped by Non-SSC Investment vehicles, the Fund will pay FGL such portion of the Performance Fee that was previously reduced to cover Non-SSC Investment Losses in addition to Performance Fees otherwise payable for any quarter.

Pursuant to its agreement with the Fund, FGL may elect to defer payment of all or a portion of its Performance Fee.

## Salaries and Other Personnel Expenses

Mr. Noel will not be compensated for serving as a Director of the Fund, but he and representatives of the Investment Manager will be reimbursed by the Fund for any out-of-pocket expenses they may incur in attending meetings of the Board of Directors or of shareholders. The Directors not affiliated with the Investment Manager, of which there are at the present time two, will each be paid a fee of $25,000 per

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE002428288

SECSEV3005239

annum by the Fund together with his out-of-pocket expenses in attending meetings of the Board of Directors or of shareholders.

## BANK, CUSTODIAN AND BROKERAGE

### Bank and Custodian

Pursuant to a custodian agreement (the "Custody Agreement"), Citco Bank Nederland N.V., Dublin Branch ("Citco Bank") and Citco Global Custody N.V. ("Citco Depository") have agreed to provide custodial services to the Fund.  Citco Bank shall, to the extent it deems necessary, appoint and Citco Depository shall make use of sub-custodians with respect to certain securities of the Fund. Citco Bank will not be liable for any act or omission or for the solvency of such sub-custodians, provided Citco Bank exercised due care in selecting the sub-custodians. Citco Depository will not be liable for any act or omission or for the solvency of such sub-custodians.  Citco Bank will exercise reasonable skill, care and diligence in the selection of a suitable sub-custodian and shall be responsible to the Fund for the duration of the sub-custody arrangement for satisfying itself as to the ongoing suitability of the sub-custodian to provide custodial services to the Fund.  Citco Bank will maintain an appropriate level of supervision over the sub-custodian(s) and make appropriate enquiries, periodically, to confirm that the obligations of the sub-custodian(s) continue to be competently discharged.

As a result of the Investment Manager's selection of Bernard L. Madoff Investment Securities, LLC ("BLM") as execution agent of the split strike conversion strategy, substantially all of the Fund's assets will be held in segregated accounts at BLM, a U.S. registered broker-dealer and qualified custodian. Accordingly, BLM will be a sub-custodian of the Fund.

The underlying assets of the Non-SSC Investments are held pursuant to custodial arrangements with other qualified entities.

### Brokerage

It is expected that the Investment Manager and the Non-SSC Investment managers will generally allocate brokerage business on the basis of best available execution and in consideration of such brokers' provision of brokerage and research services.  The Investment Manager and the Non-SSC Investment managers may also utilize brokers with which the Non-SSC Investment managers are affiliated.

In selecting brokers or dealers to execute transactions, the Investment Manager and the Non-SSC Investment managers typically will not solicit competitive bids and will not have an obligation to seek the lowest available commission cost.  It generally will not be the practice of the Investment Manager or the Non-SSC Investment managers to negotiate "execution only" commission rates, and thus the Fund may be deemed to be paying for research and other services provided by the broker which are included in the commission rate.  Research furnished by brokers may include, but is not limited to, written information and analyses concerning specific securities, companies or sectors; market, financial and economic studies and forecasts; financial publications; statistic and pricing services, as well as discussions with research personnel, along with hardware, software, data bases and other technical and telecommunication services and equipment utilized in the investment management process.  Research services obtained by the use of commissions arising from such transactions may be used by the Investment Manager or the Non-SSC Investment managers in their other investment activities.

The Investment Manager and the Non-SSC Investment managers may also be paying for services other than research that are included in the commission rate.  These other services may include, without limitation, office space, facilities and equipment; administrative and accounting support; supplies and

16

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED
FGGE002428289
SECSEV3005240

stationery; telephone lines, usage and equipment and other items which might otherwise be treated as an expense of the Investment Manager or the Non-SSC Investment managers. To the extent the Investment Manager or the Non-SSC Investment managers utilize commissions to obtain items which would otherwise be an expense of the Investment Manager or the Non-SSC Investment managers, such use of commissions in effect constitutes additional compensation to the Investment Manager or the Non-SSC Investment managers, as the case may be. Certain of the foregoing commission arrangements are outside the parameters of Section 28(e) of the Securities Exchange Act of 1934, as amended which permits the use of commissions or "soft dollars" to obtain "research and execution" services. Finally, since commission rates are generally negotiable, selecting brokers on the basis of considerations which are not limited to applicable commission rates may result in higher transaction costs than would otherwise be obtainable.

## ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT

Pursuant to an administration agreement, dated February 20, 2003, between Citco Fund Services (Europe) B.V. ("Citco") and the Fund (the "Administration Agreement"), Citco serves as the administrator for the Fund, under the overall direction of the Fund's Board of Directors. As administrator, Citco has the responsibility for furnishing the day-to-day administrative services which the Fund may require, such as: accounting services; maintaining the Fund's books and records; preparation of reports and accounts; calculation of Net Asset Value and fees; communications with shareholders and/or governmental bodies; paying the Fund's expenses; providing suitable facilities and procedures for handling dividends and distributions (if any) and the orderly liquidation and dissolution of the Fund, if required. In consideration of its services, Citco receives a monthly fee based on the Net Asset Value of the Fund as of the last business day of each month at a commercially reasonable rate.

To the extent that Citco relies on information supplied by the Fund, any investee fund of the Fund or any brokers engaged by the Fund, in connection with making any of the aforementioned calculations, Citco's liability for the accuracy of such calculations is limited to the accuracy of its computations. Citco shall not be liable for the accuracy of the underlying data provided to it.

Pursuant to the Administration Agreement, the Fund has agreed to indemnify Citco, its subsidiaries, affiliates, directors and other officers, shareholders, servants, employees, agents and permitted delegates under the Administration Agreement, against any and all liabilities, obligations, losses, judgments and expenses of any kind or nature whatsoever (collectively, the "Claims" and, individually, a "Claim") which may be imposed on, incurred by or asserted against any of them arising (other than by reason of negligence, bad faith, fraud or dishonesty on the part of Citco or such other indemnified party) out of the provision of services under the Administration Agreement. Similarly, Citco will indemnify the Fund from and against any Claim which arises directly out of the negligence, bad faith, fraud or dishonesty of its obligations on the part of Citco in connection with its provision of services under the Administration Agreement. The Administration Agreement may be terminated by either party on 90 days' prior written notice; provided, however, that the Administration Agreement may be terminated forthwith by notice in writing by either party if the other party (a) commits a material breach of the Administration Agreement and fails to cure such breach within 30 days after notice from the non-defaulting party; or (b) enters into involuntary liquidation or if a receiver is appointed over any of its assets.

## RISK FACTORS

The purchase of Shares in the Fund involves substantial risks that are incident to the Fund's allocation of assets to SSC and Non-SSC Investments.

17

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED     FGGE002428290

SECSEV3005241

1.    **Trading Risks**.  Substantial risks are involved in the trading of equity securities and options.  Market movements can be volatile and are difficult to predict.  U.S. Government activities, particularly those of the Federal Reserve Board, can have a profound effect on interest rates which, in turn, substantially affect securities and options prices, as well as the liquidity of such markets.  Politics, recession, inflation, employment levels, trade policies, international events, war and other unforeseen events can also have significant impact upon the prices of securities and options.  A variety of possible actions by various government agencies also can inhibit the profitability of the Fund's business or can result in losses.  Such events, which can result in huge market movements and volatile market conditions, create the risk of catastrophic losses for the Fund.

Various techniques are employed to attempt to reduce a portion of the risks inherent in the trading strategies utilized by or on behalf of the Fund.  The ability to achieve the desired effect through a particular technique is dependent upon many factors, including the liquidity of the market at the desired time of execution.  Thus, substantial risk remains that the techniques employed by or on behalf of the Fund cannot always be implemented or effective in reducing losses.  At various times, the markets for exchange-listed equity securities and options and/or other securities may be "thin" or illiquid, making purchases or sales of securities at desired prices or in desired quantities difficult or impossible. In addition, options prices are extremely volatile.  The volume and volatility of trading in these markets depends in part on general public interest and public opinion concerning economic conditions as well as the liquidity provided by market-makers and specialists.  The liquidity of the market may also be affected by a halt in trading on a particular futures or securities exchange or exchanges.  Illiquid markets may make it difficult to get an order executed at a desired price.

2.    **Trading Strategies May Not be Successful**.  There can be no assurance that any trading method employed by or on behalf of the Fund will produce profitable results, and the past performance of the Fund is not necessarily indicative of its future profitability.  In that regard, certain of the managers receiving Non-SSC Investment allocations may not have investment records compiled while managing assets on their own.  Profitable trading is often dependent on anticipating trends or trading patterns.  In addition, markets experiencing random price fluctuations, rather than defined trends or patterns, may generate a series of losing trades.  There have been periods in the past when the markets have been subject to limited and ill-defined price movements, and such periods may recur.  Any factor which may lessen major price trends (such as governmental controls affecting the markets) may reduce the prospect for future trading profitability.  Any factor which would make it difficult to execute trades, such as reduced liquidity or extreme market developments resulting in prices moving the maximum amount allowed in a single day, could also be detrimental to profits or cause losses.

3.    **Dependence upon Principals and Key Employees of the Investment Manager and BLM**.  The services of the Investment Manager's principals and key employees and BLM are essential to the continued operations of the Fund.  If their services were no longer available, their absence would have an adverse impact upon an investment in the Fund. The key employees of the Investment Manager will allocate a small portion of the Fund's assets between and among the Non-SSC Investment managers.  The Fund will be dependent on the continued presence of these key employees in connection with identification of the recipients of these allocations and the monitoring of the Non-SSC Investments.

4.    **Incentive Compensation**.  The payment of a percentage of the Fund's net profits to FGL (an affiliate of the Investment Manager) may create an incentive for the Investment Manager to cause the Fund to make investments that are riskier or more speculative than would be the case if this payment were not made.  Since the fee is calculated on a basis that includes unrealized appreciation of assets, such fee may be greater than if it were based solely on realized gains.

18

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE002428291

SECSEV3005242

In addition, the Non-SSC Investment managers will generally be compensated through incentive arrangements. Under these arrangements, the Non-SSC Investment managers may benefit from appreciation, including unrealized appreciation in the value of the Non-SSC Investment, but may not be similarly penalized for decreases in the value of such investment vehicle. Such fee arrangements may create an incentive for the Non-SSC Investment managers to make purchases that are unduly risky or speculative. In most cases, however, the Fund anticipates that it will invest in Non-SSC Investments where the manager is required to recoup prior losses before any performance-type fee is payable in respect of current gains.

To the extent that an accrual for an incentive fee is reflected in the net asset value of shares of a Non-SSC Investment vehicle, then if such accrual is reversed by the Non-SSC Investment vehicle as a result of subsequent depreciation, all of the Shares of the Fund will benefit from the reversal of the accrual, including Shares purchased after the Non-SSC Investment vehicle made the accrual. Further, to the extent that the Performance Fee is reduced by the Non-SSC Investment Loss amount, then if such reduction is repaid in part or in whole by the Fund due to recoupment of losses by Non-SSC Investment vehicles, the Net Asset Value of all Shares of the Fund then outstanding will be reduced, including Shares purchased after the reduction of the Performance Fee.

> 5. **Conflicts of Interest**. The Investment Manager and the Non-SSC Investment managers receiving allocations of the Fund's assets, and their respective principals and affiliates, are presently affiliated with and may in the future form and manage, or provide other services to, other investment entities (including without limitation investment partnerships, investment companies and mutual funds) with substantially the same or different objectives as those of the Fund. They may also make investments in securities for their own accounts. In addition, the Investment Manager functions as the investment manager for private investment funds in addition to the Fund. Such activities could detract from the time that the Investment Manager and its principals allocate to the affairs of the Fund. The Investment Manager will obtain certain business and financial benefits from the Fund's investments in the Non-SSC Investments which may result in a conflict of interest between the Investment Manager and the Fund in the selection of, and allocation of assets between and among, the Non-SSC Investments. See "POTENTIAL CONFLICTS OF INTEREST".

> 6. **Custodian/Clearing Firm Loss or Insolvency**. If a custodian or clearing firm utilized in connection with accounts maintained on behalf of the Fund were to become insolvent, the Fund could have some or all of these positions closed out without its consent. In addition, all of the Fund's positions may not be closed out under these circumstances, yet delays or other difficulties may be experienced in attempting to close out or exercise options positions. Widespread insolvency among clearing firms that clear securities options could also impair the ability of the Options Clearing Corp. (the "OCC") to honor all exercises, in spite of the system of safeguards which the OCC has in place. Such widespread insolvency, or of a particular custodian, could result in substantial losses to the Fund.

> 7. **Competition**. The securities industry, including market-making activities and transactions effected in connection therewith, are very competitive. Competition from other persons or entities involved in activities similar to those of the Fund can restrict the ability of the Fund to acquire positions at the prices deemed most beneficial to its overall trading strategies. Many such competing persons or entities are better capitalized and have more experience in trading than the Fund. Moreover, the widespread use of computer-assisted trading systems for trading strategies can alter trading patterns or affect execution of trades to the detriment of the Fund.

> 8. **Over-the-Counter Options Transactions.** Options transactions effected on behalf of the Fund may utilize the over-the-counter market for their execution. Trading index options in

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE002428292

SECSEV3005243

the over-the-counter market is subject to counter-party risk and is without the protections afforded by transactions effected through the OCC, a registered options exchange.

9.  **Option Buyer's Risk of Loss of Entire Investment**.  An option is a wasting asset which becomes worthless when the option expires.  As the remaining life of an option shortens with the passage of time, its value is reduced until it reaches zero upon expiration.  This means that the option buyer who neither sells it in the secondary market nor exercises it prior to expiration will lose his entire investment in the option.

10.  **Arbitrage Transactions**.  Among the many risks of arbitrage transactions are that two or more buy or sell orders may not be able to be executed simultaneously at the desired prices, resulting in a loss being incurred on both sides of a multiple trade arbitrage transaction.  Also, the transaction costs of arbitrage transactions can be especially significant because separate costs are incurred on each component of the combination.  Consequently, a substantial favorable price movement may be required before a profit can be realized.

11.  **Combination Transactions**.  At various times, the Fund may engage in spreads or other combination options transactions involving the purchase and sale of related options contracts, in various combinations.  Such transactions are considerably more complex than the purchase or writing of a single option.  The following are among the many risks of combination option transactions: the difficulty that may be involved in attempting to execute simultaneously two or more buy or sell orders at the desired prices; the possibility that a loss could be incurred on both sides of a multiple options transaction; and the possibility of significantly increased risk exposure resulting from the hedge against loss inherent in most spread positions being lost as a result of the assignment of an exercise to the short leg of a spread while the long leg remains outstanding.  Also, the transaction costs of combination options transactions can be especially significant because separate costs are incurred on each component of the combination.  This can have the effect of requiring a substantial favorable price movement before a profit can be realized.

12.  **Trading Decisions Based on Trend Analysis**.  Certain of the trading decisions of the Fund are based on the use of computer pricing models to identify apparently overpriced or underpriced options in relationship to an assumed norm.  In addition, analyses of price and other fluctuations over time may be relied upon which utilize charts and computers in order to discern and predict trends.  Trading based on such analyses is subject to the risks that options premiums will not increase or decrease as predicted by the analyses, or that trades dictated by the analyses may not be executed in time to take advantage of the price disparities.  This latter risk is likely to materialize when numerous market makers use similar analyses, all of which dictate the desirability of executing identical or similar contracts.  In the past, there have been periods without identifiable trends and, presumably, such periods will continue to occur.  Trading models or analyses that depend upon the forecasting of trends will not be profitable if there are not identifiable trends of the kind that the models or analyses seek to follow.  Any factor which would make it more difficult to execute trades in accordance with the models or analyses signals, such as a significant lessening of liquidity in a particular market, would also be detrimental to profitability.

13.  **Assignment of Puts or Calls**.  Substantial losses may result under certain circumstances if a hedged position becomes a long or short position due to the assignment of the short put or short call portion of the hedged position.  Under normal market conditions, the remaining portion of the previously hedged portion may be liquidated or otherwise adjusted to limit exposure to price changes.  Suspension of trading of the option class or underlying securities followed by a price gap at the reopening of trading might result in substantial losses.  The same would be true given an illiquid market such as that of October 1987.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE002428293

SECSEV3005244

14. **Prohibition of Exercise Rights**.  The options markets have the authority to prohibit the exercise of particular options. If a prohibition on exercise is imposed at a time when trading in the option has also been halted, holders and writers of that option will be locked into their positions until one of the two restrictions has been lifted.

15. **Absence of Regulatory Oversight**.  While the Fund may be considered similar to an investment company, it does not intend to register as such under the U.S. Investment Company Act of 1940, as amended, in reliance upon an exemption available to privately offered investment companies, and, accordingly, the provisions of that Act (which, among other matters, require investment companies to have disinterested directors, require securities held in custody to at all times be individually segregated from the securities of any other person and marked to clearly identify such securities as the property of such investment company and regulate the relationship between the adviser and the investment company) will not be afforded to the Fund or the shareholders.  Effective April 20, 2006, the Investment Manager registered as an investment adviser under the Advisers Act.

16. **Risks of Leverage**.  The Non-SSC Investment vehicles in which the Fund invests may borrow funds in connection with their investment strategies.  A particular Non-SSC Investment vehicle may not be subject to any limitation in the amount of its borrowings, and the amount of borrowings that the Non-SSC Investment vehicle may have outstanding at any time may be substantial in comparison to its capital.

The use of leverage may provide the Non-SSC Investment vehicle with the opportunity for greater capital appreciation, but at the same time will increase the Non-SSC Investment vehicle's, and indirectly the Fund's, exposure to capital risk and higher current expenses.  Moreover, if the assets of the Non-SSC Investment vehicle are not sufficient to pay the principal of, and interest on, the Non-SSC Investment vehicle's debt when due, the Fund could sustain a total loss of its investment in the Non-SSC Investment vehicle.

17. **Possibility of Misappropriation of Assets**.  When the Fund invests utilizing the "split strike conversion" strategy or in a Non-SSC Investment vehicle, it will not have custody of the assets so invested.  Therefore, there is always the risk that the personnel of any entity with which the Fund invests could misappropriate the securities or funds (or both) of the Fund.

18. **Sole Proprietor Non-SSC Investment Managers**.  Some of the Non-SSC Investment vehicles to which the Fund may allocate capital may consist of investment operations with only one principal.  In such cases, if that individual's services became unavailable to the Non-SSC Investment vehicle, the Fund might sustain losses.

19. **Experience of Non-SSC Investment Managers**.  While certain of the Non-SSC Investment managers have had extensive experience in trading securities generally and within their specific investment strategies, they may have had little experience in investing and trading on behalf of a pooled investment vehicle, in utilizing certain of the investment strategies to be employed on behalf of the Fund or in managing an account as large as that anticipated for the Non-SSC Investments.  In that regard, as the assets of the Non-SSC Investment vehicles increase, it is not known what effect, if any, this will have on the trading strategies utilized on their behalf or their investment results.

20. **Emerging Managers**.  As the Non-SSC Investment vehicles generally will be in an early stage of formation or operation, this can pose a number of operational and other issues.  For example, in its early stages the Non-SSC Investment manager may have little capital available to cover expenses and, accordingly, may have difficulty attracting qualified personnel.  Competing investment

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED      FGGE002428294

SECSEV3005245

managers have a larger number of qualified management and technical personnel and benefit from a larger capital base.

21.    **Lack of Liquidity**.    Certain of the Fund's investments in the Non-SSC Investments will be subject to lock-up provisions any of which will limit the ability of the Fund to withdraw capital from such investment. While such lock-up period may be subject to early release for breach of risk control or performance guidelines or for cause, there can be no assurance that the Fund will not sustain additional losses while such lock-up period remains in effect.

22.    **Non-Disclosure of Positions**. In an effort to protect the confidentiality of its positions, the Fund generally will not disclose all of its positions to shareholders on an ongoing basis, although the Fund, in its sole discretion, may permit such disclosure on a select basis to certain shareholders, if it determines that there are sufficient confidentiality agreements and procedures in place.

23.    **Exchange Rate Risk**. The Fund will maintain its assets in U.S. dollars. The Net Asset Value per Share is determined in U.S. dollars.  Non-dollar investors are subject to possible reduction in the value of their Shares due to changes in the rate of exchange between the U.S. dollar and their native currency.  In addition, a hedge may be established in anticipation of new subscribers.  In the event such subscriptions are not made, the hedge position will be unwound and the transactions will be borne by the existing shareholders.

## POTENTIAL CONFLICTS OF INTEREST

The Investment Manager, the Non-SSC Investment managers and their respective affiliates, officers and employees may form and manage other investment entities (including without limitation investment partnerships, investment companies, mutual funds and offshore funds) and provide investment services to clients other than the Fund in the future with substantially the same or different objectives as those of the Fund. They may also make investments in securities for their own accounts. Such activities could detract from the time they allocate to the affairs of the Fund and negatively impact the Fund's investment opportunities. Similarly, Messrs. Naess and Schmid, the non-affiliated Directors, have other business interests and will not devote their entire time to the Fund's affairs.

The Investment Manager and its related persons might have an incentive to favor one or more of their other clients over the Fund, for example with regard to the selection of certain investments for those clients because those clients might pay the Investment Manager more for its services than the Fund.  The Investment Manager and its related persons will act in a fair and reasonable manner in allocating suitable investment opportunities among their client and proprietary accounts.  No assurance can be given, however, that (i) the Fund will participate in all investment opportunities in which other client or proprietary accounts of such persons participate, (ii) particular investment opportunities allocated to client or proprietary accounts other than the Fund will not outperform investment opportunities allocated to the Fund, or (iii) equality of treatment between the Fund, on the one hand, and other client and proprietary accounts of such persons, on the other hand, will otherwise be assured.

In connection with the investment of Fund assets in Non-SSC Investments, the Investment Manager and its affiliates may obtain financial and business benefits, including but not limited to: (i) additional investment capacity in Non-SSC Investments, which may be made available to other clients of the Investment Manager, (ii) compensation from Emerging Managers in connection with placement of such additional investment capacity, and/or (iii) sharing in the equity or cash flows of the entire investment business (Fund and non-Fund related) of such Emerging Managers.  The Investment Manager, or an affiliate, will share with the Fund annually, through Performance Fee offset, an amount equal to the greater of (i) 50% of cash flows generated by equity held by the Investment Manager or an affiliate

22

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED    FGGE002428295

SECSEV3005246

thereof in the businesses of Emerging Managers or (ii) 10% of all revenues accruing to the Investment Manager or an affiliate thereof directly from its association with Non-SSC Investment vehicles (the "Shared Cash Flow Amount"). Despite this sharing, however, the arrangements described in this paragraph may result in a conflict of interest between the Investment Manager and the Fund.

Because the Fund was organized by affiliates of FGL, the fees paid by the Fund to FGL were not the result of arms-length negotiation.

The Fund may engage other placement agents and enter into other sales relationships to market the Fund. If a shareholder is introduced to the Fund by an agent, such shareholder should expect the agent to be paid by FGL for the introduction out of the fees FGL receives from the Fund. The agent will have an incentive to recommend that such shareholder remain an investor in the Fund, since the agent will likely be paid a portion of FGL's fees each year that the shareholder remains an investor.

Because Mr. Noel is a principal of FGL, an affiliate of the Investment Manager, as well as a Director of the Fund, he may have an incentive to take actions as a Director that favors the Investment Manager over the Fund.

Each service provider to the Fund shall pay regard to its obligation to act in the best interest of the Fund and the Directors of the Fund will ensure that all such potential conflicts of interest are resolved fairly and in the interest of the shareholders. When allocating investment opportunities, the Investment Manager will ensure that all such investments are allocated in a fair and equitable manner.

## DESCRIPTION OF SHARES

The Fund is authorized to issue up to 10,000,000 shares in one class, with a par value of U.S. $.01. The Fund has an authorized share capital of U.S. $100,000. The Shares will be issued in registered form. Each Share, when issued, will be fully paid and non-assessable.

Holders of Shares are entitled to one vote per Share and will participate on a pro rata basis in the assets of the Fund on liquidation and in dividends and other distributions as declared.

## DIVIDEND POLICY

Since the business objective of the Fund is directed toward achieving capital appreciation, it is anticipated that the Fund will not declare any dividends or make any distributions to its shareholders. Subject to the foregoing and to applicable law, the Fund's Board of Directors will have sole discretion in determining the amount and frequency of dividend distributions, if any. Any distributions made will be in accordance with the policies of the Irish Stock Exchange, which provide that a dividend payment may only be made out of the Fund's accumulated net income plus the net of accumulated realized and unrealized capital gains and accumulated net realized and unrealized capital losses.

## TRANSFERS, REDEMPTIONS AND TERMINATION

### Transfers

NO SALE OR TRANSFER OF SHARES WILL BE PERMITTED WITHOUT THE FUND'S CONSENT; HOWEVER, SHARES MAY BE REDEEMED AS OF THE LAST DAY OF EACH MONTH ON FIFTEEN (15) CALENDAR DAYS' NOTICE TO THE FUND.

23

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE002428296

SECSEV3005247

Any sale or transfer of a shareholder's entire interest in any Shares or any transfer of Shares by operation of law must be submitted to the Fund for consent and will not be effective until such consent is given by the Fund. Any other dealing with Shares by way of assignment, pledge, mortgage or otherwise is prohibited unless consented to by the Fund and any attempt to do so without first obtaining the consent of the Fund will constitute grounds for compulsory redemption of the Shares concerned. Such consent may only be withheld if the transfer would result in regulatory, pecuniary, legal, taxation or material administrative disadvantages for the Fund or its shareholders as a whole. Any application to record a transfer of Shares, including an application to record a transfer by operation of law, if not approved by the Fund within 30 days, also will be treated as an application to redeem the Shares in question as of the next permissible redemption date and will be subject to a processing charge per share of 2% of the Net Asset Value per Share. The processing charge will be retained by the Fund.

THE DISPOSITION OF SHARES TO U.S. PERSONS (INCLUDING U.S. TAX-EXEMPT INVESTORS AS DEFINED UNDER "OFFERING OF THE SHARES") WITHOUT THE PRIOR WRITTEN APPROVAL OF THE FUND IS EXPRESSLY PROHIBITED, AND THE FUND SHALL HAVE THE RIGHT TO COMPULSORILY AND IMMEDIATELY REDEEM ANY SHARES HELD FOR ANY REASON BY U.S. PERSONS.

### Redemptions at the Option of the Shareholders

A shareholder may cause part or all of his Shares to be redeemed as of the last business day (i.e., any day not a Saturday or a Sunday, that is not a public holiday or a day on which banks are generally authorized or obliged by law or regulation to close in the Netherlands, the Republic of Ireland, Canada or the United States of America) of any month, provided that the Fund shall be in receipt of written notice of redemption for at least fifteen (15) calendar days prior to such redemption date. In the Fund's discretion, a shareholder requesting redemption of part of his Shares may be required to redeem all of his Shares unless such shareholder notifies the Fund to cancel the redemption.

### Compulsory Redemption

The Fund reserves the right to make compulsory redemptions where the holding of Shares may result in regulatory, pecuniary, legal, taxation or material administrative disadvantages for the Fund or its shareholders as a whole. Except as set forth above, no processing charge will be imposed with respect to any Shares so compulsorily redeemed.

### Redemptions - General Information

Redemptions will be at the Net Asset Value per Share, subject to any applicable processing charge, as described above. If notice of intent to voluntarily redeem is not received by the Fund within the prescribed period of time, then, in the Fund's discretion, the redemption date may be deferred to the end of the next following permissible redemption period, unless the shareholder notifies the Fund to cancel the redemption and the Directors consent to such cancellation. With respect to a total redemption of Shares, except in the case of extraordinary circumstances, such as an inability to liquidate existing positions, or the default or delay in payments due the Fund from brokers, banks or other persons, payment on redemptions will be made within 30 days after the redemption date. The Fund will not pay interest to the redeeming shareholders on any payment.

Partial redemptions will be paid in full within 30 days after the redemption date.

Shareholders bear the risk of any decline in Net Asset Value from the date notice of intent to redeem is given until the redemption date. In addition, the Fund may temporarily suspend any redemption during

24

any period that the Fund has suspended the calculation of its Net Asset Value (see "OFFERING OF THE SHARES- Net Asset Value Defined"). Requests for redemption can be made by use of the form included in the Subscription Documents which accompany this Memorandum.

### Termination

The shareholders may, by a majority vote, elect to wind up and dissolve the Fund at any time. If the Fund's Board of Directors determines that it would be in the best interests of the Fund to wind up and dissolve the Fund at any time, it will recommend to the shareholders that they vote to do so, and will submit a plan of dissolution for approval by the shareholders.

## ANTI-MONEY LAUNDERING REGULATIONS

As part of the Fund's or Administrator's responsibility for the prevention of money laundering, the Investment Manager and its affiliates, subsidiaries or associates may require a detailed verification of a shareholder's identity, any beneficial owner underlying the account and the source of the payment.

The Investment Manager reserves the right to request such information as is necessary to verify the identity of a subscriber and the underlying beneficial owner of a subscriber's or a shareholder's Shares in the Fund. In the event of delay or failure by the subscriber or shareholder to produce any information required for verification purposes, the Investment Manager may refuse to accept a subscription or may cause the redemption of any such shareholder from the Fund. The Fund, without notice, may suspend the redemption rights of such shareholder if the Fund or the Investment Manager reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Fund, the Investment Manager or any of the Fund's other service providers.

Each subscriber and shareholder shall be required to make such representations to the Fund as the Fund and the Investment Manager shall require in connection with such anti-money laundering programs, including without limitation, representations to the Fund that such subscriber or shareholder is not a prohibited country, territory, individual or entity listed on the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") website and that it is not directly or indirectly affiliated with, any country, territory, individual or entity named on an OFAC list or prohibited by any OFAC sanctions programs. Such shareholder shall also represent to the Fund that amounts contributed by it to the Fund were not directly or indirectly the proceeds of criminal conduct or derived from activities that may contravene U.S. federal, state or international laws and regulations, including anti-money laundering laws and regulations.

## ANTI-MONEY LAUNDERING POLICIES

To ensure compliance with statutory and other generally accepted principles aimed at the prevention of money-laundering, the Fund and/or the Administrator may require a detailed verification of a prospective investor's identity. Although the Fund and/or the Administrator reserve the right to request a detailed verification of a prospective investor's identity, a detailed verification should not be necessary if:

- the prospective investor makes a subscription payment from an account held in their own name at a Qualified Financial Institution (a "QFI"); or

- the prospective investor is introduced by a QFI and that QFI provides written assurance to the Fund and/or the Administrator that it has established the identity of the prospective investor and holds evidence of that identity.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE002428298

SECSEV3005249

A QFI is defined as a financial institution which is:

- established in a European Union (EU) member state and subject to the EU Money Laundering Directives; or

- established in one of the countries which make up the Financial Action Task Force ("FATF") and/or is subject to regulation which complies with the FATF Recommendations.  Such countries are Argentina, Australia, Austria, Belgium, Brazil, Canada, Denmark, Finland, France, Germany, Greece, Hong Kong, Ireland, Italy, Japan, Luxembourg, Mexico, the Netherlands, New Zealand, Norway, Portugal, Russian Federation, Singapore, South Africa, Spain, Sweden, Switzerland, Turkey, the United Kingdom, and the United States.

Subscription payments will not be accepted unless made from an account held in the name of the prospective investor.  In addition, prospective investors who **DO NOT** make the subscription payment from an account held at a QFI and who are **NOT** introduced by a QFI will be required to provide the following documentation, as relevant to their status.

**Individual Investors** will be required to provide the following information:

- full name;

- permanent address;

- a certified copy of their passport or national identity card;

- a bank reference letter; and

- verification of address.

**Partnerships** will be required to provide the following information:

- a mandate from the partnership authorizing the subscription and conferring authority on those persons executing the subscription agreement; and

- the identities of at least two partners and of all those authorized to issue instructions.

**Corporate entities** that are quoted on a stock exchange in an EU member country or in one of the QFI prescribed countries or that are known to be the subsidiary of such a quoted company will be required to provide the following information:

- the original or certified copy of the certificate of incorporation or similar document;

- a list of the directors' names, occupations, addresses and dates of birth; and

- properly authorized mandate of directors authorizing the subscription and conferring authority on those persons executing the subscription form.

Where the prospective investor to the transaction is a corporation that is a private company, the following additional information will need to be provided:

26

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED    FGGE002428299
SECSEV3005250

- certified passport copies or national identity card copies of at least two directors; and

- a list of names and addresses of shareholders holding 10% or more of the issued share capital of the company and in the case of individual shareholders, their occupations and dates of birth.

When a significant shareholder of a private company (25% or more) is a body corporate, information will need to be provided from the company regarding the ultimate beneficial ownership of that particular body corporate. If the ultimate beneficial owner(s) of that particular body corporate is (are) individual(s), such individual(s) will need to provide the information that is required from individual investors and outlined above.

Furthermore, subscriptions will be cross checked against lists held by various international agencies in order to establish that the persons or entities subscribing have not been blacklisted or wanted in connection with a criminal investigation. Such international agencies include the Bahamas Financial Intelligence Unit, the Central Bank of Ireland, the FBI, the Bank of England and the US Treasury Department's Office of Foreign Assets Control (OFAC). Other agencies will be consulted as and when appropriate.

Finally, it should be noted that redemption payments will only be paid to a bank account held in the name of the registered owner of the Shares and that any transferee will have to furnish the same information (and enter into a subscription agreement) which would be required in connection with a direct subscription in order for a transfer application to be considered by the Administrator.

Pending the provision of evidence satisfactory to the Administrator as to the identity of any prospective investor, the evidence of title in respect of Shares may be retained at the absolute discretion of the Administrator. If, within a reasonable period of time following a request for verification of identity, the Administrator has not received evidence satisfactory to it as aforesaid, it may, in its absolute discretion, refuse to allot the Shares applied for in which event application moneys will be returned without interest to the account from which such moneys were originally debited.

Financial institutions which have been duly qualified and authorized to exercise their activity in their respective countries as a bank and which are subject to internationally recognized anti money-laundering legislation may subscribe for Shares on behalf of their clients.

### TAX CONSIDERATIONS AND EXCHANGE CONTROL AND ERISA

**CIRCULAR 230 NOTICE. THE FOLLOWING NOTICE IS BASED ON U.S. TREASURY REGULATIONS GOVERNING PRACTICE BEFORE THE U.S. INTERNAL REVENUE SERVICE: (1) ANY U.S. FEDERAL TAX ADVICE CONTAINED HEREIN, INCLUDING ANY OPINION OF COUNSEL REFERRED TO HEREIN, IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER; (2) ANY SUCH ADVICE IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS DESCRIBED HEREIN (OR IN ANY SUCH OPINION OF COUNSEL); AND (3) EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

THE DISCUSSION HEREIN IS FOR INFORMATIONAL PURPOSES ONLY AND IS A DISCUSSION PRIMARILY OF THE U.S. TAX CONSEQUENCES TO PROSPECTIVE

27

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE002428300

SECSEV3005251

SHAREHOLDERS.    EACH PROSPECTIVE SHAREHOLDER SHOULD CONSULT ITS
PROFESSIONAL TAX ADVISER WITH RESPECT TO THE TAX ASPECTS OF AN INVESTMENT
IN THE FUND.  TAX CONSEQUENCES MAY VARY DEPENDING UPON THE PARTICULAR
STATUS OF A PROSPECTIVE SHAREHOLDER.  IN ADDITION, SPECIAL CONSIDERATIONS
(NOT DISCUSSED HEREIN) MAY APPLY TO PERSONS WHO ARE NOT DIRECT
SHAREHOLDERS IN THE FUND BUT WHO ARE DEEMED TO OWN SHARES AS A RESULT OF
THE APPLICATION OF CERTAIN ATTRIBUTION RULES.

The Fund has not sought a ruling from the U.S. Internal Revenue Service (the "Service") or any other
U.S. federal, state or local agency with respect to any of the tax issues affecting the Fund, nor has the
Fund obtained an opinion of counsel with respect to any tax issues.

The following is a summary of certain potential U.S. federal tax consequences which may be relevant to
prospective shareholders.  The discussion contained herein is not a full description of the complex tax
rules involved and is based upon existing laws, judicial decisions and administrative regulations, rulings
and practices, all of which are subject to change, retroactively as well as prospectively.  A decision to
invest in the Fund should be based upon an evaluation of the merits of the trading program, and not upon
any anticipated U.S. tax benefits.

BASED ON THE STRUCTURE AND OPERATIONS OF THE FUND, THE FUND GENERALLY
SHOULD NOT BE SUBJECT TO U.S. INCOME TAX, EXCEPT AS PROVIDED BELOW.

U.S. Trade or Business

Section 864(b)(2) of the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), provides a safe
harbor (the "Safe Harbor") applicable to a non-U.S. corporation (other than a dealer in securities) that
engages in the U.S. in trading securities (including contracts or options to buy or sell securities) for its
own account pursuant to which such non-U.S. corporation will not be deemed to be engaged in a U.S.
trade or business.  The Safe Harbor also provides that a non-U.S. corporation (other than a dealer in
commodities) that engages in the U.S. in trading commodities for its own account is not deemed to be
engaged in a U.S. trade or business if "the commodities are of a kind customarily dealt in on an organized
commodity exchange and if the transaction is of a kind customarily consummated at such place."

The Fund intends to conduct its business in a manner so as to meet the requirements of the Safe Harbor.
Thus, the Fund's securities and commodities trading activities should not constitute a U.S. trade or
business and, except in the case of certain U.S. real estate investments that the Fund does not intend to
make, the Fund should not be subject to the regular U.S. income tax on any of its trading profits.

The Fund's gains from its investments in or trading in stocks, options or other investments should not be
subject to United States federal income, branch or withholding taxes because the Fund expects that it will
not be engaged (or treated as engaged) in a "trade or business" in the United States, or treated as a
personal holding company, for United States federal income tax purposes.  Any dividend income received
by the Fund from U.S. corporations generally will be subject to United States federal withholding taxes.
Although substantially all of the interest earned by the Fund from sources within the United States is
expected to be of the type which will not be subject to United States federal income, branch or
withholding taxes, the Fund may earn interest from time to time that could be subject to United States
federal income, branch or withholding taxes (although it is not expected that the amount of such taxes
would be material).  In addition, with respect to Shares held by non-U.S. persons who are not engaged in
a "trade or business" in the United States (as defined under the Code), such persons should not be subject
to United States federal income, branch or withholding taxes (i) on dividends paid to them by the Fund
and (ii) on the redemption of their Shares by the Fund.  The Fund expects that it will not be subject to

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE002428301

SECSEV3005252

state and local taxes in the United States on its income or capital. Because of the absence of full guidance under state and local law, however, this result is not entirely clear. The conclusions in this paragraph are based on the Code and existing laws, judicial decisions and administrative regulations, rulings and practice in the United States, all of which are subject to change.

U.S. Withholding Tax

In general, under Section 881 of the IRC, a non-U.S. corporation which does not conduct a U.S. trade or business is nonetheless subject to tax at a flat rate of 30% (or lower tax treaty rate) on the gross amount of certain U.S. source income which is not effectively connected with a U.S. trade or business, generally payable through withholding. Income subject to such a flat tax rate is of a fixed or determinable annual or periodic nature, including dividends and certain interest income. There is presently no tax treaty between the U.S. and the Cayman Islands.

Certain types of income are specifically exempted from the 30% tax and thus withholding is not required on payments of such income to a non-U.S. corporation. The 30% tax does not apply to U.S. source capital gains (whether long or short-term) or to interest paid to a non-U.S. corporation on its deposits with U.S. banks. The 30% tax also does not apply to interest which qualifies as portfolio interest. The term "portfolio interest" generally includes interest (including original issue discount) on an obligation in registered form which has been issued after July 18, 1984 and with respect to which the person who would otherwise be required to deduct and withhold the 30% tax receives the required statement that the beneficial owner of the obligation is not a U.S. person within the meaning of the IRC. Under certain circumstances, interest on bearer obligations may also be considered portfolio interest.

Redemption of Shares

Gain realized by shareholders who are not U.S. persons within the meaning of the IRC ("non-U.S. shareholders") upon the sale, exchange or redemption of Shares held as a capital asset should generally not be subject to U.S. federal income tax provided that the gain is not effectively connected with the conduct of a trade or business in the U.S. However, in the case of nonresident alien individuals, such gain will be subject to the 30% (or lower tax treaty rate) U.S. tax if (i) such person is present in the U.S. for 183 days or more during the taxable year (on a calendar year basis unless the nonresident alien individual has previously established a different taxable year) and (ii) such gain is derived from U.S. sources.

Generally, the source of gain upon the sale, exchange or redemption of Shares is determined by the place of residence of the shareholder. For purposes of determining the source of gain, the IRC defines residency in a manner that may result in an individual who is otherwise a nonresident alien with respect to the U.S. being treated as a U.S. resident only for purposes of determining the source of income. Each potential individual shareholder who anticipates being present in the U.S. for 183 days or more (in any taxable year) should consult his tax adviser with respect to the possible application of this rule.

Gain realized by a non-U.S. shareholder engaged in the conduct of a U.S. trade or business will be subject to U.S. federal income tax upon the sale, exchange or redemption of Shares if such gain is effectively connected with its U.S. trade or business.

Non-U.S. shareholders may be required to make certain certifications to the Fund as to the beneficial ownership of the Shares and the non-U.S. status of such beneficial owner, in order to be exempt from U.S. information reporting and backup withholding on a redemption of Shares.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE002428302
SECSEV3005253

Tax-Exempt U.S. Persons

The term "Tax-Exempt U.S. Person" means a U.S. person within the meaning of the IRC that is exempt from payment of U.S. federal income tax. Generally, a Tax-Exempt U.S. Person is exempt from federal income tax on certain categories of income, such as dividends, interest, capital gains and similar income realized from securities investment or trading activity. This type of income is exempt even if it is realized from securities trading activity which constitutes a trade or business. This general exemption from tax does not apply to the "unrelated business taxable income" ("UBTI") of a Tax-Exempt U.S. Person. Generally, except as noted above with respect to certain categories of exempt trading activity, UBTI includes income or gain derived from a trade or business, the conduct of which is substantially unrelated to the exercise or performance of the Tax-Exempt U.S. Person's exempt purpose or function. UBTI also includes (i) income derived by a Tax-Exempt U.S. Person from debt-financed property and (ii) gains derived by a Tax-Exempt U.S. Person from the disposition of debt-financed property.

In 1996, Congress considered whether, under certain circumstances, income derived from the ownership of the shares of a non-U.S. corporation should be treated as UBTI to the extent that it would be so treated if earned directly by the shareholder. Subject to a narrow exception for certain insurance company income, Congress declined to amend the IRC to require such treatment. Accordingly, based on the principles of that legislation, a Tax-Exempt U.S. Person investing in a non-U.S. corporation such as the Fund should not realize UBTI with respect to an unleveraged investment in Shares. Tax-Exempt U.S. Persons are urged to consult their own tax advisors concerning the U.S. tax consequences of an investment in the Fund.

There are special considerations which should be taken into account by certain beneficiaries of charitable remainder trusts that invest in the Fund. Charitable remainder trusts should consult their own tax advisers concerning the tax consequences of such an investment on their beneficiaries.

Reporting Requirements for U.S. Persons

Any U.S. person within the meaning of the IRC owning 10% or more (taking certain attribution rules into account) of either the total combined voting power or total value of all classes of the shares of a non-U.S. corporation such as the Fund will likely be required to file an information return with the Service containing certain disclosure concerning the filing shareholder, other shareholders and the corporation. The Fund has not committed to provide all of the information about the Fund or its shareholders needed to complete the return. In addition, a U.S. person within the meaning of the IRC that transfers cash to a non-U.S. corporation will likely be required to report the transfer to the Service if (i) immediately after the transfer, such person holds (directly, indirectly or by attribution) at least 10% of the total voting power or total value of such corporation or (ii) the amount of cash transferred by such person (or any related person) to such corporation during the twelve-month period ending on the date of the transfer exceeds $100,000.

Furthermore, certain U.S. persons within the meaning of the IRC will have to file Form 8886 ("Reportable Transaction Disclosure Statement") with their U.S. tax return, and submit a copy of Form 8886 with the Office of Tax Shelter Analysis of the Service if the Fund engages in certain "reportable transactions" within the meaning of recently issued U.S. Treasury Regulations. Shareholders required to file this report include a U.S. person within the meaning of the IRC if the Fund is treated as a "controlled foreign corporation" and such U.S. person owns a 10% voting interest. In certain situations, there may also be a requirement that a list be maintained of persons participating in such reportable transactions, which could be made available to the Service at its request. Moreover, if a U.S. person within the meaning of the IRC recognizes a loss upon a disposition of Shares, such loss could constitute a

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE002428303

SECSEV3005254

"reportable transaction" for such shareholder, and such shareholder would be required to file Form 8886. Under new legislation, a significant penalty is imposed on taxpayers who fail to make the required disclosure. The penalty is generally $10,000 for natural persons and $50,000 for other persons (increased to $100,000 and $200,000, respectively, if the reportable transaction is a "listed" transaction). Shareholders who are U.S. persons within the meaning of the IRC (including Tax-Exempt U.S. Persons) are urged to consult their own tax advisors concerning the application of these reporting obligations to their specific situations and the new penalty discussed above.

Estate and Gift Taxes

Individual holders of Shares who are neither present or former U.S. citizens nor U.S. residents (as determined for U.S. estate and gift tax purposes) are not subject to U.S. estate and gift taxes with respect to their ownership of such Shares.

## BVI Tax Considerations and Exchange Control

As of the date of this Memorandum, the Fund is exempt from all provisions of the Income Tax Act of the BVI, including with respect to all dividends, interests, rents, royalties, compensation and other amounts payable by the Fund to persons who are not persons resident in the BVI.    Capital gains realized with respect to any shares, debt obligation or other securities of the Fund by persons who are not persons resident in the BVI are also exempt from the provisions of the Income Tax Act of the BVI.  No estate, inheritance, succession or gift tax, rate, duty, levy or other charge is payable by persons who are not persons resident in the BVI with respect to any shares, debt obligations or other securities of the Fund.

There are no exchange control restrictions in the BVI.  Accordingly, the Fund will be free to acquire, to hold and to sell any foreign currency and securities without restriction.

## ERISA

The Fund may accept subscriptions from individual retirement accounts ("IRAs"), Keogh plans, pension or profit-sharing plans, governmental plans, entities that invest the assets of such accounts or plans and/or other benefit plan investors (all such entities are herein referred to as "Benefit Plan Investors").  The Fund does not anticipate that its assets will be subject to ERISA because it intends to limit the investments in the Fund by Benefit Plan Investors (both U.S. and non-U.S.) to less than 25% of the value of any class of equity interests of the Fund, excluding from this calculation any non-Benefit Plan Investor interest of that class held by the Investment Manager, persons affiliated with the Investment Manager or their employees. No subscriptions for Shares made by Benefit Plan Investors will be accepted and no transfers of Shares will be permitted to the extent that the investment or transfer would result in the Fund exceeding this 25% limit.  In addition, because the 25% limit is to be calculated upon every subscription to or redemption from the Fund, the Fund has the authority to require the redemption of all or some of the Shares held by any Benefit Plan Investor if the continued holding of such Shares, in the opinion of the Directors, could result in the Fund being subject to ERISA.


## PROXY VOTING POLICY

The Fund invests a portion of its assets in equity securities offered by publicly traded entities.  From time to time, such entities may ask their investors to vote their interests in the entities with regard to

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE002428304

SECSEV3005255

corporate governance and other matters. The Investment Manager, as the investment manager of the Fund has authority to vote such proxies and other securities on behalf of the Fund and may delegate such authority to custodians or sub-custodians of its assets. In addition, the managers of the Non-SSC Investments will vote proxies relating to those investments.

The Fund and the Investment Manager have developed a proxy voting policy which they believe ensures that the Investment Manager votes proxy proposals, amendments, consents or resolutions relating to the Fund's securities (collectively, "proxies") in a manner that best serves the interests of the Fund. They have reviewed the proxy voting policies of the custodians, sub-custodians and Non-SSC Investments managers. The following factors are elements of the proxy voting policies of each of the foregoing:

- the impact on short-term and long-term value;
- the preservation and increase in capital of the Fund;
- the costs and benefits associated with the proposal;
- the effect on the liquidity of the Fund; and
- the customary industry and business practices.

With respect to proxies, the Investment Manager will:

- maintain accurate records as to voting proxies;
- with the Fund, periodically review voting procedures employed and actions taken on individual voting situations;
- have procedures in place for reconciling proxies;
- take reasonable steps to ensure that proxies for which it is responsible are received and, where appropriate, voted; and
- comply with all current applicable proxy laws, rules and regulations.

## LEGAL MATTERS

Legal matters in connection with this offering have been passed upon for the Fund in the United States by Andrew E. Goldstein, Esq., 488 Madison Avenue, 16th Floor, New York, New York 10022. Matters with respect to the laws of the British Virgin Islands have been passed upon by Conyers Dill & Pearman, Romasco Place, Wickhams Cay 1, P.O. Box 3140, Road Town, Tortola, British Virgin Islands.

## MISCELLANEOUS

### Reports and Financial Statements

The Fund's fiscal year will end on December 31, except that the Fund's final fiscal year will terminate on the date the Fund commences to wind up and dissolve. The Fund will keep its books on an accrual basis. Audited financial statements of the Fund will be mailed to shareholders at their registered addresses and the Irish Stock Exchange, normally within 120 days after year-end. At the same time, each shareholder shall be furnished with an annual report of the Fund, which will include the Net Asset Value of the Fund and the Net Asset Value per Share at the end of the year, and such other information as the Fund, in its discretion, determines to be necessary or appropriate. Shareholders also will receive an unaudited interim report with respect to the Fund's financial performance within four months from the end of June of each year.

1) **General**

32

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED       FGGE002428305

SECSEV3005256

a)  No Share or loan capital of the Fund is under option or agreed, conditionally or unconditionally, to be put under option.

b)  Shares in the Fund are in registered form.  Temporary documents of title will not be issued.

c)  Except for their ownership of Shares, none of the Directors or any connected person has any interest in the Shares or loan capital of the Fund, the existence of which is known to, or could with reasonable diligence be ascertained by, the relevant Director.

d)  None of the Directors has a service contract with the Fund and no such contract is proposed, although, Walter M. Noel, Jr. is a principal of FGL, an affiliate of the Investment Manager.

e)  No loan or guarantee has been granted or provided by the Fund to or for the benefit of any Director.

f)  None of the Directors or any member of their respective immediate families has or has had any interest in any transaction or transactions which are or were unusual in their nature or conditions or significant in the business of the Fund and which have been effected by the Fund since its incorporation.

g)  As of the date of this Memorandum, the Fund has commenced operations, but no dividends have been declared.

h)  The Fund has no loan capital outstanding, no loan capital created but unissued, no loans or any other borrowing or indebtedness or any contingent liabilities, nor has it given any guarantees.

**2)  Litigation and Arbitration**

The Fund is not engaged in any legal or arbitration proceedings and no legal or arbitration proceedings are known to the Directors to be threatened by or against the Fund.

**3)  Memorandum and Articles of Association**

Pursuant to Paragraph 4 of the Fund's Memorandum of Association, the Fund may engage in any act or activity that is not prohibited under any law for the time being in force in the BVI.  As such, the Fund may carry on business as an investment company.  The Fund's Memorandum and Articles of Association may be amended by a resolution of Directors or a resolution of shareholders.

The Memorandum and Articles of Association of the Fund provide that no director or officer of the Fund shall be liable for the acts, receipts, neglects or defaults of any other director or officer, or for joining in any receipt or act for conformity, or for any loss or expense happening to the Fund through the insufficiency of deficiency of title to any property acquired by order of the directors for or on behalf of the Fund, or for the insufficiency or deficiency of any security in or upon which any of the moneys of the Fund shall be invested, or for any loss or damage arising from the bankruptcy, insolvency, or tortious act of any person with whom any moneys, securities or effects shall be deposited, or for any loss occasioned by any error of judgment, omission, default, or oversight on his part, or for any other loss, damage, or misfortune whatever which shall happen in relation to the execution of the duties of his office or in relation thereto, to the extent permitted by law.

The Memorandum and Articles of Association of the Fund further provide that each director or officer of the Fund shall be indemnified by the Fund against, and it shall be the duty of the directors

33

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED      FGGE002428306
SECSEV3005257

out of the funds of the Fund to pay, all costs, losses, and expenses which any director or officer may incur or become liable for by reason of any contract entered into, or act or thing done by him as such director or officer, or in any way in the discharge of his duties, and the amount for which such indemnity is provided shall immediately attach as a lien on the property of the Fund, and have priority as between the shareholders over all other claims but only if such director or officer acted honestly and in good faith with a view to the best interests of the Fund and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

4) **Directors**

a) The number of Directors shall not be less than one (1) more than twenty (20).

b) The remuneration of Directors shall be fixed from time to time by the Board.    Currently the Director who is affiliated with the Investment Manager does not receive compensation as a Director.  The two Directors not affiliated with the Investment Manager are each paid $25,000 per annum.

c) None of the Directors has a service contract, existing or proposed with the Fund, although Walter M. Noel, Jr. is a principal of FGL, an affiliate of the Investment Manager.

d) There is no retirement age for Directors.

e) The Directors may vote on any transaction in which they have a material interest if they first disclose the nature of their interest to the Fund.

f) The Directors may, by resolution of Directors, fix the emoluments of the Directors with respect to services to be rendered in any capacity to the Fund.

g) The Directors may exercise the powers of the Fund to borrow money and to mortgage or charge its undertakings, property and uncalled capital or any part thereof, to issue debentures, debenture stock and offer securities whenever money is borrowed as security for any debt, liability or obligation of the Fund.

h) No Director has

- any unspent convictions in relation to indictable offenses;

- been adjudged a bankrupt, entered into a voluntary arrangement with creditors or had a receiver appointed to oversee any asset of such Director;

- been the director of any company which, while he was a director with an executive function or after 12 months after he ceased to be director with an executive function, had a receiver appointed or went into compulsory liquidation, creditors voluntary liquidation, administration or company voluntary arrangements, or made a composition or arrangements with its creditors generally or with any class of its creditors;

- been a partner of any partnership which, while he was partner or within 12 months after he ceased to be a partner, went into compulsory liquidation, administration or partnership voluntary arrangement or had a receiver appointed to oversee any partnership asset;

34

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED

FGGE002428307
SECSEV3005258

- had any public criticism by statutory or regulatory authorities (including recognized professional bodies); or

- been disqualified by a court from acting as a director or from acting in the management or affairs of any company.

## 5) Borrowing Powers

The Board may exercise all the powers of the Fund to borrow money, give guarantees and to mortgage, pledge or charge all or part of its undertaking, property and uncalled capital and to issue debentures and other securities, whether outright or as collateral security for any liability or obligation of the Fund.

## Documents Available for Inspection

Copies of the following documents will be available for inspection at the offices of the Fund's registered office in the British Virgin Islands and the offices of the sponsoring broker during usual business hours on any weekday (Saturdays, Sundays and holidays excepted):

a) the Memorandum and Articles of Association of the Fund;

b) the material contracts of the Fund with the Investment Manager, the Administrator, Registrar and Transfer Agent;

c) the British Virgin Islands Mutual Funds Act, 1996;

d) when available, the latest financial statements of the Fund;

e) audited accounts as of the close of the last immediately fiscal year;

f) Auditors letter of consent; and

g) a list of all past and present directorships and partnerships held by each Director over the past five years.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED     FGGE002428308

SECSEV3005259

## COUNTRY-SPECIFIC NOTICES

<u>Australia</u>.  No offer for subscription or purchase of the Shares offered hereby, nor any invitation to subscribe for or buy such Shares, has been made or issued in Australia, otherwise than by means of an excluded issue, excluded offer or excluded invitation within the meaning of Section 66(2) or 66(3) of the Corporations Law.  Accordingly, the Memorandum has not been lodged with the Australian Securities Commission.  Further, the Shares offered hereby may not be resold in Australia within a period of six (6) months after the date of issue otherwise than by means of an excluded offer or excluded invitation as described above.

<u>Bahamas</u>.  The Shares may not be offered or sold or otherwise disposed of in any manner to persons deemed by the Central Bank of the Bahamas as resident for exchange control purposes, unless such persons deemed as resident obtain the prior approval of the Central Bank of the Bahamas.

<u>Belgium</u>.  The information in this Memorandum may not be disclosed to the public in Belgium, the Shares may not be offered, sold, transferred or delivered in or from Belgium as part of their initial distribution or at any time thereafter, directly or indirectly, other than to persons or entities mentioned in Article 3 of the Royal Decree of January 9, 1991 Relating to the Public Characteristic of Operations Calling for Savings and on the Assimilation of Certain Operations to a Public Offer (Belgian Official Journal of January 12, 1991).  Therefore, the Shares are exclusively designed for credit institutions, stock exchange companies, collective investment funds, companies or institutions, insurance companies, and/or pension funds acting for their own account only.

<u>Brazil</u>.  The Shares have not been, and will not be, registered with the Comissao de Valores Mobiliarios and may not be offered or sold in Brazil except in circumstances which do not constitute a public offering or distribution under Brazilian laws and regulations.

<u>British Columbia and Ontario, Canada</u>.  The Memorandum constitutes an offering of the securities described therein only in those jurisdictions and to those persons where and to whom they may be lawfully offered for sale, and therein only by persons permitted to sell such securities. The Memorandum is not, and under no circumstances is to be construed as, an advertisement or a public offering of the securities described therein in Canada.  No securities commission or similar authority in Canada has reviewed or in any way passed upon the Memorandum or the merits of the securities described therein, and any representation to the contrary is an offense.  If the Memorandum, together with any amendment thereto, contains an untrue statement of a material fact or omits to state a material fact that is required to be stated or is necessary in order to make any statement therein not misleading in the light of the circumstances in which it was made (a "Misrepresentation") and it was a Misrepresentation on the date of purchase, purchasers in British Columbia and Ontario to whom the Memorandum was sent or delivered and who purchase Shares shall have a right of action against the Fund for rescission (while still the owner of such shares) or alternatively, for damages, exercisable on written notice given not more than 90 days subsequent to the date of purchase, provided that the Fund will not be liable: (a) if the purchaser purchased such Shares with knowledge of the Misrepresentation; (b) for all or any portion of any damages that the Fund proves do not represent the depreciation in value of such Shares as a result of the Misrepresentation; and (c) for amounts in excess of the price at which such Shares were sold to the purchaser.  The foregoing summary is subject to the express provisions of either the Securities Act (British Columbia) or the Securities Act (Ontario), whichever the case may be, and reference is made to the complete text of such provisions.

36

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED    FGGE002428309

SECSEV3005260

British Virgin Islands.  The Shares offered hereby may not be sold to or purchased by persons resident in the British Virgin Islands, but may be sold to British Virgin Islands international business companies.

Cayman Islands.  No invitation may be made to the public in the Cayman Islands to subscribe for the Shares unless the Fund is listed on the Cayman Islands stock exchange.  Cayman Islands exempted and ordinary non-resident companies and certain other persons engaged in offshore business, however, may be permitted to acquire Shares.

Chile.  The Shares have not been, and will not be, registered with the Superintendencia de Valores y Seguros (the Chilean Securities Commission) and may not be offered and sold in Chile except in circumstances which do not constitute a public offering or distribution under Chilean laws and regulations.

Republic of China.  No invitation to offer for, or sale of, the Shares shall be made to the public in China or by any means that would be deemed public under the laws of China.  The offer of Shares is personal to the investor to whom the Memorandum has been addressed by the Fund.  Business entities incorporated under the laws of China (excluding foreign investment business entities) shall apply for approval from the Chinese government authorities before purchasing the Shares.  Furthermore, all business entities incorporated under the laws of China and Chinese citizens residing in China shall obtain prior approval from the Chinese Foreign Exchange Authority before purchasing Shares.

Costa Rica.  The Shares have not been, and will not be, registered with the Comision Nacional de Valores (the Costa Rican Securities Commission) and may not be offered or sold in Costa Rica except in circumstances which do not constitute a public offering or distribution under Costa Rican laws and regulations.

Ecuador.  The Shares have not been, and will not be, registered with the Superintendencia de Companias del Ecuador (the Ecuadorian Securities and Exchange Commission) and may not be offered and sold in Ecuador except in circumstances which do not constitute a public offering or distribution under Ecuadorian laws and regulations.  This communication is for informative purposes only; it does not constitute a public offering of any kind.

France.  "Cette note d'information n'a pas été soumise au visa de la Commission des Opérations de Bourse.  Par conséquent, ni cette note d'information, ni tout autre document promotionnel se rapportant aux intérêts ne pourront être communiqués au public ou utilisés dans la cadre de toute offre de souscription ou de vente des intérêts en France et les intérêts ne peuvent être émis, offerts ou cédés de toute facon en France.  Les investisseurs doivent agir pour leur propre compte.  Le vente, directe ou indirecte, au public des instruments financiers acquis sera faite conformément aux dispositions les concernant."  This Memorandum has not been submitted to the Commission des Operations de Bourse in France.  Accordingly, neither this Memorandum nor any other offering materials relating to the Shares may be available to the public or used in connection with any other offer for subscription or sale of the Shares in France, and the Shares may not be issued, offered or otherwise sold in France, investors should act for their own account.  The sale, direct or indirect, in the public of the purchased financial instruments will be made in compliance with all requirements in relation thereto.

Germany.  Any person who is in possession of the Memorandum understands that no action has or will be taken which would allow an offering of the Shares to the public in Germany.  Accordingly, the Shares may not be offered, sold or delivered and neither the Memorandum nor any other offering materials relating to the Shares may be distributed or made available to the public in Germany.  Individual

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE002428310

SECSEV3005261

sales of the Shares to any person in Germany may only be made according to German securities, tax and other applicable laws and regulations.

Greece.  The Shares may not be offered or sold in any manner that constitutes an offer or sale to the public in the Hellenic Republic within the laws and regulations from time to time applicable to public offers or sales of securities.

Hong Kong.  No action has been taken to permit an offering of the Shares to the public in Hong Kong and, accordingly, no copy of this Memorandum may be issued, circulated or distributed in Hong Kong other than (i) exclusively to persons whose business involves the acquisition, disposal or holding of securities, whether as principal or agent, or (ii) otherwise in circumstances that do not constitute an invitation to the public for the purpose of the Protection of Investors Ordinance (Chapter 335 of the Laws of Hong Kong).

Ireland.  It is not the intention of the Fund to advertise or market the Shares in Ireland, and no such marketing will take place without the prior approval in writing of the Central Bank of Ireland.

Isle of Man.  The Fund is not a recognized collective investment scheme for the purposes of Sections 12 or 13 of the Financial Services Act 1988 (the "FS Act") of the Isle of Man and is accordingly subject to the prohibition on the promotion of collective investment schemes as contained in Section 1(1) of the FS Act.  Accordingly, the Memorandum may only be issued or passed on to any person in the Isle of Man by way of the two limited exceptions to this general prohibition contained in Section 1(2) of the FS Act and the Financial Supervision (Promotion of Unregulated Schemes (Exemption)) FS Regulations 1992 (the "Exemption Regulations").   Under Regulation 3(2) of the Exemption Regulations, any advertisement issued in the Isle of Man in connection with the Fund must contain a statement either (a) that participants in the Fund are not protected by any statutory compensation scheme; or (b) that participants in the Fund are protected by a statutory compensation scheme and particulars sufficient to identify the compensation arrangements.

Israel.  The Shares are offered to a limited number of sophisticated investors, in all cases under circumstances designed to preclude a distribution which would be other than a private placement.  The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.  Israeli residents, other than those considered "exemption holders" under the General Currency Control Permit, 1978, require a special permit from the Israeli Controller of Foreign Currency in order to purchase the Shares.

Italy.  This Memorandum may not be distributed to members of the public in Italy.  The Italian Commission Nazionale per la Societa e la Borsa has not authorized any offering of the subscription of Shares in the Fund; accordingly, Shares may not be offered or sold in Italy or to residents thereof except as permitted by Italian law.  With respect to any potential purchaser or transaction subject to Italian law, this Memorandum is for the sole use of the person who has requested it and whose name appears on the cover page hereof (the "Prospective Buyer") and may not be disclosed, in whole or in part, to any person other than the Prospective Buyer and the Prospective Buyer's authorized agents.  This Memorandum may not be copied in whole or in part.  The Prospective Buyer, by accepting delivery of the Memorandum, agrees to return it to the Fund if such Prospective Buyer does not undertake to purchase the securities offered hereby.

Japan.  Under Article 23-14 Paragraph 1 of the Securities Exchange Law (the "SEL"), the purchase of Shares cannot be made unless the purchaser agrees to the condition that it will not make an assignment of the Shares to any person other than a non-resident of Japan (having the same meanings as defined in Article 6, Paragraph 1(6) of the Foreign Exchange and Foreign Trade Control Laws), except

38

for the case that all the Shares (excluding the Shares assigned to non-residents of Japan) are assigned to one person. Furthermore, disclosure under the SEL has not been made. The Shares will not be registered under the SEL. The offer and sale of the Shares in Japan may be made only in accordance with an exemption available under the SEL and with all other applicable laws and regulations of Japan.

Jersey. The Memorandum relates to a private placement and does not constitute an offer to the public in Jersey to subscribe for the Shares offered hereby. No regulatory approval has been sought for the offer in Jersey. The offer of the Shares is personal to the person to whom the Memorandum is being delivered by or on behalf of the Fund, and a subscription for the Shares will be accepted only from such person. The Memorandum may not be produced or used for any other purpose, nor be furnished to any other person other than those to whom it has been so delivered.

Korea. The Memorandum is not, and under no circumstance is to be construed as, a public offering of securities in Korea. Neither the Fund nor the investment manager is making any representation with respect to the eligibility of any recipients of the Memorandum to acquire the Shares under the laws of Korea, including without limitation the Foreign Exchange Management Act and regulations thereunder. The Shares have not been registered under the Securities and Exchange Act of Korea and none of the Shares may be offered, sold or delivered, or offered or sold to any person for re-offering or resale, in Korea or to any resident of Korea except pursuant to applicable laws and regulations of Korea.

Liechtenstein. The Shares are offered to a narrowly defined category of investors, in all cases under circumstances designed to preclude a public solicitation. The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.

Luxembourg. The Shares are offered to a limited number of sophisticated investors, in all cases under circumstances designed to preclude a distribution that would be other than a private placement. The Memorandum may not be reproduced or used for any other purpose, nor be furnished to any other person other than those to whom copies have been sent.

Netherlands. The Shares may not be solicited, acquired or offered, directly or indirectly, in or from the Netherlands, and this Memorandum may not be circulated in the Netherlands to any individuals or legal entities as part of the initial distribution or anytime thereafter, except to individuals or legal entities who or which trade or invest in subjects of investment ("Beleggingsobjecten") in the conduct of a profession or trade, including banks, brokers, securities institutions, insurance companies, pension funds, investment institutions, other institutional investors and other parties, including treasury departments of commercial enterprises and finance companies which are regularly active in the financial markets in a professional manner (a "Professional Market Party" and/or "Professional Market Parties") investing in subjects of investment as described in Article 1 of the Exemption Regulation of October 9, 1990 issued pursuant to Article 14 of the Investment Institutions Supervision Act (Wet Toezicht Beleggingsinstellingen) of June 27, 1990, as amended from time to time (the "Investment Institutions Act"), and the respective accompanying Memoranda thereto of the Minister of Finance of the Netherlands. In the event of a solicitation, acquisition or offering made to or by Professional Market Parties and therefore exempt from the general prohibition as provided for in the Investments Institutions Act, no subsequent offering of the Shares in a "secondary offering" by such Professional Market Parties to persons other than such Professional Market Parties may be made.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE002428312

SECSEV3005263

New Zealand. The Memorandum has been prepared solely for and the offer made in it is made solely to habitual investors (being persons defined in Section 3(2)(a)(ii) of the New Zealand Securities Act 1978).

Norway. The Memorandum has not been filed with the Oslo Stock Exchange in accordance with the Norwegian Securities Trading Act, Section 5-1, and may therefore not be distributed to more than fifty potential investors in Norway.

Oman. The Memorandum and the Shares are not available to any member of the public and are restricted to investors having an existing business relationship with the Fund. Application for the Shares made by or on behalf of investors not having an existing relationship with the investment manager will not be accepted. Any investor that considers purchasing the Shares offered by the Memorandum should consult a professional adviser before doing so.

Panama. The Shares have not and will not be registered with the Comision Nacional de Valores (the National Securities Commission) of the Republic of Panama under Cabinet Decree No. 247 of 1970 ("Panama's Securities Laws") and may not be offered or sold in a primary offering within Panama, except in certain transactions exempt from the registration requirements of Panama's Securities Laws.

Russia. The Shares are not intended to be sold or offered in (or on the territory of) the Russian Federation or to Russian residents and the Memorandum has not been registered with, and will not be registered with, the Federal Securities Markets Commission of the Russian Federation.

Singapore. The Memorandum has not been registered with the Registrar of Companies in Singapore and the Shares will be offered in Singapore pursuant to an exemption invoked under Sections 106c and 106d of the Companies Act, Chapter 50 of Singapore ("Singapore Act"). Accordingly, the Shares may not be offered or sold, nor may the Memorandum or any other offering document or material relating to the Shares be circulated or distributed, directly or indirectly, to the public or any member of the public other than (1) to an institutional investor or other body or person specified in Section 106c of the Singapore Act, or (2) to a sophisticated investor specified in Section 106d of the Singapore Act, or (3) otherwise pursuant to, and in accordance with the conditions of, Section 106e(2) of the Singapore Act or any other applicable exemption invoked under Division 5a of Part IV of the Singapore Act.

South Africa. The Shares are for your acceptance only and may not be offered or become available to persons other than yourself and may not be publicly offered, sold or advertised in South Africa and the Memorandum may only be circulated to selected individuals.

Spain. This Memorandum has not been and will not be registered with la Comision Nacional del Mercado de Valores of Spain and may not be distributed in Spain in connection with the offering and sale of participations without complying with all legal and regulatory requirements in relation thereto.

Switzerland. This Memorandum has been prepared for private information purposes of interested investors only. It may not be used for and shall not be deemed a public offering of Shares. No application has been made under Swiss law to publicly market the Fund in or out of Switzerland. The Shares are not subject to the Swiss Investment Fund Act and are therefore not subject to supervision by the Federal Banking Commission and, accordingly, may not be advertised publicly. Therefore, no public offer of the Shares or public distribution of this Memorandum may be made in or out of Switzerland. This Memorandum is strictly for private use by its holders and may not be passed on to third parties.

United Kingdom. The Fund is an unrecognized collective investment scheme for the purposes of the Financial Services and Markets Act 2000 of the United Kingdom (the "Act"). The promotion of the

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED    FGGE002428313

SECSEV3005264

Fund and the distribution of this Memorandum in the United Kingdom is consequently restricted by law.

This Memorandum is being issued by the Fund where permitted by applicable law to persons who are of a kind to whom the Fund may lawfully be promoted by a person authorized under the Act by virtue of the Financial Services and Markets Act 2000 (Promotion of Collective Investment Schemes (Exemptions) Order 2001 and Annex 5 to Chapter 3 of the FSA's Conduct of Business Sourcebook or as otherwise permitted by applicable law and regulation.

The Fund is not regulated by the FSA and investors will not have the benefit of the Financial Services Compensation Scheme and may not have the benefit of other protections afforded by the Act or any of the rules and regulations made thereunder.

The Shares are not dealt in on a recognized or designated investment exchange for the purposes of the Act, and it may therefore be difficult for an investor to dispose of his Shares otherwise than by way of redemption or to obtain reliable information about the extent of the risks to which his investment is exposed.

Acquiring Shares may expose an investor to a significant risk of losing all of the amount invested. The Fund is a limited liability company and any person who acquires Shares will not thereby be exposed to any significant risk of incurring additional liability.  Any person who is in any doubt about investing in the Fund should consult an authorized person specializing in advising on such investments.

Uruguay.  The Shares correspond to a private issue and are not registered with the Central Bank of Uruguay.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE002428314

SECSEV3005265

**APPENDIX A**

**FORM ADV PART II**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE002428315

SECSEV3005266

**FORM ADV**

OMB APPROVAL
OMB Number          3235-0049
Expires:          July 31 2008
Estimated average burden
hours per response:          9.402

### Uniform Application For Investment Adviser Registration

**Part II - Page 1**

| Name of Investment Adviser: | |
|---|---|
| **Fairfield Greenwich (Bermuda) Ltd.** | |
| **Address:**   (Number and Street)   (City)   (State)   (Zip Code) | **Telephone Number:** |
| **Principal Office:**  131 Front Street, 1st Floor, Hamilton, Bermuda HM 11 <br> **Mailing Address:**  12 Church Street, Suite 606, Hamilton, Bermuda HM 11 | **(441) 292-5401** |

**This part of Form ADV gives information about the investment adviser and its business for the use of clients. The information has not been approved or verified by any governmental authority.**

### Table of Contents

| Item Number | Item | Page |
|---|---|---|
| 1 | Advisory Services and Fees | 2 |
| 2 | Types of Clients | 2 |
| 3. | Types of Investments | 3 |
| 4. | Methods of Analysis, Sources of Information and Investment Strategies | 3 |
| 5. | Education and Business Standards | 4 |
| 6. | Education and Business Background | 4 |
| 7. | Other Business Activities | 4 |
| 8. | Other Financial Industry Activities of Affiliations | 4 |
| 9. | Participation or Interest in Client Transactions | 5 |
| 10. | Conditions for Managing Accounts | 5 |
| 11. | Review of Accounts | 5 |
| 12. | Investment or Brokerage Discretion | 6 |
| 13. | Additional Compensation | 6 |
| 14. | Balance Sheet | 6 |
| | Continuation Sheet | Schedule F |
| | Balance Sheet, if required | Schedule G |

**(Schedules A, B. C. D and E are included with Part I of this Form, for the use of regulatory bodies, and are not distributed to clients.)**

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

| FORM ADV | Applicant: | SEC File Number: | Date: |
|---|---|---|---|
| **Part II - Page 2** | **Fairfield Greenwich (Bermuda) Ltd.** | **801-66439** | **March 27, 2008** |

**1.    A.    Advisory Services and Fees.** (check the applicable boxes)

For each type of service provided, state the approximate % of total advisory billings from that service. (See instruction below.)

Applicant:

☒ (1) Provides investment supervisory services .................................................................................................... **100** %

☐ (2) Manages investment advisory accounts not involving investment supervisory services .............................. _____ %

☐ (3) Furnishes investment advice through consultations not included in either service described above ............ _____ %

☐ (4) Issues periodicals about securities by subscription ...................................................................................... _____ %

☐ (5) Issues special reports about securities not included in any service described above ................................... _____ %

☐ (6) Issues, not as part of any service described above, any charts, graphs, formulas, or other devices which clients may use to evaluate securities ......................................................................................................... _____ %

☐ (7) On more than an occasional basis, furnishes advice to clients on matters not involving securities ............ _____ %

☐ (8) Provides a timing service ............................................................................................................................... _____ %

☐ (9) Furnishes advice about securities in any manner not described above ........................................................ _____ %

(Percentages should be based on applicant's last fiscal year. If applicant has not completed its first fiscal year, provide estimates of advisory billings for that year and state that the percentages are estimates.)

B.    Does applicant call any of the services it checked above financial planning or some similar term?    Yes ☐    No ☒

C.    Applicant offers investment advisory services for: (check all that apply)

☒ (1) A percentage of assets under management        ☐ (4) Subscription fees

☐ (2) Hourly charges        ☐ (5) Commissions

☒ (3) Fixed fees (not including subscription fees)        ☒ (6) Other

D.    For each checked box in A above, describe on Schedule F:

- the services provided, including the name of any publication or report issued by the adviser on a subscription basis or for a fee

- applicant's basic fee schedule, how fees are charged and whether its fees are negotiable

- when compensation is payable, and if compensation is payable before service is provided, how a client may get a refund or may terminate an investment advisory contract before its expiration date

**2.    Types of Clients.** Applicant generally provides investment advice to: (check those that apply)

☐ A. Individuals        ☒ E. Trusts, estates, or charitable organizations

☐ B. Banks or thrift institutions        ☐ F. Corporations or business entities other than those listed above

☐ C. Investment companies        ☒ G. Other (Describe on Schedule F)

☐ D. Pension and profit sharing plans

*Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1).*

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED        FGGE002428317

SECSEV3005268

| FORM ADV | Applicant: | SEC File Number: | Date: |
|---|---|---|---|
| Part II - Page 3 | Fairfield Greenwich (Bermuda) Ltd. | 801-66439 | March 27, 2008 |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

---

**3.    Types of Investments.** Applicant offers advice on the following: (check those that apply) –

A.   Equity securities
  ☒ (1) exchange-listed securities
  ☒ (2) securities traded over-the-counter
  ☒ (3) foreign issuers

☒ B.   Warrants

☒ C.   Corporate debt securities
      (other than commercial paper)

☒ D.   Commercial paper

☒ E.   Certificates of deposit

☐ F.   Municipal securities

G.   Investment company securities:
  ☐ (1) variable life insurance
  ☐ (2) variable annuities
  ☒ (3) mutual fund shares

☒ H.   United States government securities

I.   Options contracts on:
  ☒ (1) securities
  ☐ (2) commodities

J.   Futures contracts on:
  ☒ (1) tangibles
  ☐ (2) intangibles

K.   Interests in partnerships investing in:
  ☐ (1) real estate
  ☐ (2) oil and gas interests
  ☐ (3) other (explain on Schedule F)

☒ L.   Other (explain on Schedule F)

---

**4.    Methods of Analysis, Sources of Information, and Investment Strategies.**

A.   Applicant's security analysis methods include: (check those that apply)

  (1) ☐ Charting
  (2) ☐ Fundamental
  (3) ☐ Technical
  (4) ☐ Cyclical
  (5) ☒ Other (explain on Schedule F)

B.   The main sources of information applicant uses include:  (check those that apply)

  (1) ☐ Financial newspaper and magazines
  (2) ☐ Inspections of corporate activities
  (3) ☐ Research materials prepared by others
  (4) ☐ Corporate rating services
  (5) ☐ Timing services
  (6) ☐ Annual reports, prospectuses, filings with the Securities and Exchange Commission
  (7) ☐ Company press releases
  (8) ☒ Other (explain on Schedule F)

C.   The investment strategies used to implement any investment advice given to clients include:  (check those that apply)

  (1) ☐ Long term purchases
      (securities held at least a year)
  (2) ☐ Short term purchases
      (securities sold within a year)
  (3) ☐ Trading (securities sold within 30 days)
  (4) ☐ Short sales
  (5) ☐ Margin transactions
  (6) ☐ Option writing, including covered options, uncovered options or spreading strategies
  (7) ☒ Other (explain on Schedule F)

---

Answer all items.  Complete amended pages in full, circle amended items and file with execution page (page 1).

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE002428318

SECSEV3005269

| FORM ADV | Applicant: | SEC File Number: | Date: |
|---|---|---|---|
| Part II - Page 4 | Fairfield Greenwich (Bermuda) Ltd. | 801-66439 | March 27, 2008 |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

---

**5.   Education and Business Standards.**

Are there any general standards of education or business experience that applicant requires of those involved in determining or giving investment advice to clients?........................................................................................................................   Yes ☒   No ☐

(If yes, describe these standards on Schedule F.)

---

**6.   Education and Business Background.**

For:
- each member of the investment committee or group that determines general investment advice to be given to clients, or
- if the applicant has no investment committee or group, each individual who determines general investment advice given to clients (if more than five, respond only for their supervisors)
- each principal executive officer of applicant or each person with similar status or performing similar functions.

On Schedule F, give the:
- name
- year of birth

- formal education after high school
- business background for the preceding five years

---

**7.   Other Business Activities.**  (Check those that apply)

☐  A.   Applicant is actively engaged in a business other than giving investment advice.

☐  B.   Applicant sells products or services other than investment advice to clients.

☐  C.   The principal business of applicant or its principal executive officers involves something other than providing investment advice.

(For each checked box describe the other activities, including the time spent on them, on Schedule F.)

---

**8.   Other Financial Industry Activities or Affiliations.**  (check those that apply)

☐  A.   Applicant is registered (or has an application pending) as a securities broker/dealer.

☐  B.   Applicant is registered (or has an application pending) as a futures commission merchant, commodity pool operator or commodity trading adviser.

C.   Applicant has arrangements that are material to its advisory business or its clients with a related person who is a:

☒  (1)  broker-dealer                              ☐  (7)   accounting firm

☐  (2)  investment company                         ☐  (8)   law firm

☒  (3)  other investment adviser                   ☐  (9)   insurance company or agency

☐  (4)  financial planning firm                    ☐  (10)  pension consultant

☒  (5)  commodity pool operator, commodity trading ☐  (11)  real estate broker or dealer
        adviser or futures commission merchant

☐  (6)  banking or thrift institution              ☐  (12)  entity that creates or packages
                                                            limited partnerships

(For each checked box in C, on Schedule F identify the related person and describe the relationship and the arrangements.)

D.   Is applicant or a related person a general partner in any partnership in which clients are solicited to invest?   Yes ☒   No ☐

(If yes, describe on Schedule F the partnerships and what they invest in)

---

Answer all items.  Complete amended pages in full, circle amended items and file with execution page (page 1).

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE002428319

SECSEV3005270

| FORM ADV<br>Part II - Page 5 | Applicant:<br>**Fairfield Greenwich (Bermuda) Ltd.** | SEC File Number:<br>**801-66439** | Date:<br>**March 27, 2008** |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

9. **Participation or Interest in Client Transactions.**

Applicant or a related person: (check those that apply)

☒ A.  As principal, buys securities for itself from or sells securities it owns to any client.

☐ B.  As broker or agent effects securities transactions for compensation for any client.

☐ C.  As broker or agent for any person other than a client effects transactions in which client securities are sold to or bought from a brokerage customer.

☒ D.  Recommends to clients that they buy or sell securities or investment products in which the applicant or a related person has some financial interest.

☒ E.  Buys or sells for itself securities that it also recommends to clients.

(For each box checked, describe on Schedule F when the applicant or a related person engages in these transactions and what restrictions, internal procedures, or disclosures are used for conflicts of interest in those transactions.)

Describe, on Schedule F, your code of ethics, and state that you will provide a copy of your code of ethics to any client or prospective client upon request.

10. **Conditions for Managing Accounts.** Does the applicant provide investment supervisory services, manage investment advisory accounts or hold itself out as providing financial planning or some similarly termed services *and* impose a minimum dollar value of assets or other conditions for starting or maintaining an account?

Yes ☒  No ☐

(If yes, describe on Schedule F.)

11. **Review of Accounts.** If applicant provides investment supervisory services, manages investment advisory accounts, or holds itself out as providing financial planning or some similarly termed services:

A.  Describe below the reviews and reviewers of the accounts. **For reviews**, include their frequency, different levels, and triggering factors. **For reviewers**, include the number of reviewers, their titles and functions, instructions they receive from applicant on performing reviews, and number of accounts assigned each.

## See Schedule F.

B.  Describe below the nature and frequency of regular reports to clients on their accounts.

## See Schedule F.

*Answer all items.  Complete amended pages in full, circle amended items and file with execution page (page 1).*

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE002428320
SECSEV3005271

| FORM ADV | Applicant: | SEC File Number: | Date: |
|---|---|---|---|
| Part II - Page 6 | **Fairfield Greenwich (Bermuda) Ltd.** | **801-66439** | **March 27, 2008** |

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

---

**12.     Investment or Brokerage Discretion.**

    A.     Does applicant or any related person have authority to determine, without obtaining specific client consent, the:

                                                       Yes  No

        (1)    securities to be bought or sold? ..................................................................................................... ☒  ☐

                                                        Yes  No

        (2)    amount of the securities to be bought or sold? ............................................................................... ☒  ☐

                                                        Yes  No

        (3)    broker or dealer to be used? ......................................................................................................... ☒  ☐

                                                        Yes  No

        (4)    commission rates paid? ................................................................................................................ ☒  ☐

---

                                                        Yes  No

    B.     Does applicant or a related person suggest brokers to clients? ................................................................ ☒  ☐

        For each yes answer to A describe on Schedule F any limitations on the authority.  For each yes to A(3), A(4) or B, describe on Schedule F the factors considered in selecting brokers and determining the reasonableness of their commissions.  If the value of products, research and services given to the applicant or a related person is a factor, describe:

-   the products, research and services

-   whether clients may pay commissions higher than those obtainable from other brokers in return for those products and services

-   whether research is used to service all of applicant's accounts or just those accounts paying for it; and

-   any procedures the applicant used during the last fiscal year to direct client transactions to a particular broker in return for products and research services received.

---

**13.   Additional Compensation.**

    Does the applicant or a related person have any arrangements, oral or in writing, where it:

                                                        Yes  No

    A.     is paid cash by or receives some economic benefit (including commissions, equipment or non-research services) from a non-client in connection with giving advice to clients? ............................................................ ☒  ☐

                                                        Yes  No

    B.     directly or indirectly compensates any person for client referrals? ........................................................... ☒  ☐

                    (For each yes, describe the arrangements on Schedule F.)

---

**14.   Balance Sheet**.  Applicant must provide a balance sheet for the most recent fiscal year on Schedule G if applicant:

-   has custody of client funds or securities (unless applicant is registered or registering only with the Securities and Exchange Commission); or

-   requires prepayment of more than $500 in fees per client and 6 or more months in advance

                                                        Yes  No

        Has applicant provided a Schedule G balance sheet? ................................................................................ ☐  ☒

---

**Answer all items.  Complete amended pages in full, circle amended items and file with execution page (page 1).**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED     FGGE002428321

SECSEV3005272

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant:<br><br>Fairfield Greenwich (Bermuda) Ltd. | SEC File Number:<br><br>801-66439 | Date:<br><br>March 27, 2008 |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV:<br><br>Fairfield Greenwich (Bermuda) Ltd. | IRS Empl. Ident. No.: |
|---|---|---|

| Item of Form (identify) | Answer |
|---|---|
| **Items 1.D. and 2.G.** | Fairfield Greenwich (Bermuda) Ltd. ("FGBL" or "Applicant"), an exempted company incorporated under the laws of Bermuda on June 13, 2003, provides managerial services to three (3) private investment funds established in the British Virgin Islands (the "Offshore Funds"), and serves as the general partner to two (2) private investment funds established in the U.S., (the "Onshore Funds"), (collectively, the "FGBL Funds").<br><br>FGBL is a wholly-owned subsidiary of Fairfield Greenwich Limited ("FGL", collectively with other affiliates listed in Schedule F, Item 8, Fairfield Greenwich Group, or "FGG"), an exempted company incorporated in the Cayman Islands on October 24, 2001. FGL serves as placement agent for the Offshore Funds and generally is paid by the applicable Offshore Fund (i) an annual management fee of up to 1% of net assets, payable quarterly, and (ii) a performance fee of 20% of the net profits, charged quarterly or annually subject to adjustment for unrecouped losses.<br><br>Another wholly-owned subsidiary of FGL, Fairfield Heathcliff Capital LLC ("FHC"), a limited liability company incorporated in the state of Delaware, and an affiliate of FGBL, serves as placement agent for the Onshore Funds.   FGBL does not provide tailored investment advice to individual investors for a fee.<br><br>Similar to the Offshore Funds, FGBL generally is paid by the Onshore Funds (i) an annual management fee of up to 1% of net assets, payable quarterly, and (ii) an incentive allocation of 20% of net profits, charged quarterly or annually subject to adjustment for unrecouped losses.   Some or all of such fees can be waived at the discretion of the general partner.<br><br>Investors in the FGBL Funds generally have the right to redeem all or a portion of their investment in an FGBL Fund at least quarterly, subject to applicable advance notice requirements. If an investor redeems or withdraws from an FGBL Fund, the investor will be entitled to any unearned, prepaid portion of the management fee.  To the extent required under the U.S. Investment Advisers Act of 1940, performance-based compensation payable to FGBL, or any of its affiliates, will be in compliance with Rule 205-3 under such Act. |
| **Item 3.L.** | The establishment of a typical position in the FGBL Funds entails (i) the purchase of a group or basket of equity securities that are intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options with a notional value that approximately equals the market value of the basket of equity securities, and (iii) the sale of out-of-the-money S&P 100 Index call options with a notional value that approximately equals the market value of the basket of equity securities (i.e., the "Split-Strike Conversion strategy").   The Offshore Funds also utilize a small portion of their assets (up to 5%) away from the Split Strike Conversion strategy to seed a small number of hedge fund management groups with varying and diverse types of investments. These various types of investments and investment strategies are noted under Item 3. Certain of the hedge fund managers allocated to may be managed by an affiliate of FGBL. For a more detailed explanation, see **Item 4.C.(7)** below. |
| **Items 4.A.(5) and 4.B.(8)** | An affiliate of FGBL, Fairfield Risk Services Ltd. ("FRS"), also a wholly owned subsidiary of FGL, shares office space with FGBL and serves as FGG's Risk Management team, which, as noted, includes FGBL. A Director of FGBL, Amit Vijayvergiya, serves both FGBL and FRS and manages both teams. FRS primarily conducts both the pre- and post-investment quantitative analyses of hedge fund managers, monitors the market risk and provides the quantitative analyses supporting the asset allocation decisions across the firm's multi-strategy funds. The risk infrastructure at FRS supporting these activities incorporates a number of systems and tools – including internally developed systems, off the shelf vendor solutions, and some customized applications built to meet FGG's business needs. An important component |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED

FGGE002428322
SECSEV3005273

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant:  Fairfield Greenwich (Bermuda) Ltd. | SEC File Number:  801-66439 | Date:  March 27, 2008 |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV:  **Fairfield Greenwich (Bermuda) Ltd.** | IRS Empl. Ident. No.: |
|---|---|---|

| Item of Form (identify) | Answer |
|---|---|
|  | of the FGG product platform is the position level transparency that we receive from all single managers which are included in our multi-strategy funds. Position information is transmitted via secure channels to our systems.  FRS's core risk management engine utilizes the flexible ASP version of the RiskManager product from RiskMetrics. This system is populated by detailed position information and further supplemented by an extensive market and terms and conditions database. The FRS team regularly evaluates the market risk of its single and multi-strategy funds by producing strategy and fund specific risk reports. These reports are customizable to present risk measures and tests most appropriate to each portfolio's strategy. The FRS team prepares a monthly suite of reports using RiskManager that are carefully reviewed and discussed by FGG's Investment Committee at a formal monthly risk meeting. The reports organized along the following dimensions: Exposures, Sensitivities, Scenarios and Stress Tests, VaR, Correlations Analysis and Attribution Analysis. The review includes the full suite of VaR analytics (including marginal, incremental and relative VaR) and careful evaluation of the sensitivity of our managers to important risk factors (such as increasing or decreasing equity markets, volatilities, interest rate shocks/twists, FX movements and other factors). |
| Item 4.C.(7) | FGBL's core product business model is the investment management and oversight of the split strike conversion strategy, implemented through an Offshore Fund (with two currency feeder funds), and two Onshore Funds. The Offshore Fund also utilizes a small portion of its assets (up to 5%) away from the Split Strike Conversion strategy to seed a small number of hedge fund management groups with varying and diverse investment methodologies. Working with one of its affiliates (Fairfield Greenwich Advisors LLC, SEC registrant 801-62504), FGBL conducts a detailed manager selection and due diligence process, analyzing such important issues as liquidity management, market and credit risks, management quality (which includes on-site visit(s), background, and reference checks), and operational, compliance, and regulatory risks. At the conclusion of the manager selection process, allocation of assets from the Offshore Fund to a successful hedge fund manager (which may be managed by an affiliate of FGBL) candidate will be determined based on a qualitative and quantitative analysis of each manager's potential for long-term risk-adjusted performance, relationship with other manager's previously seeded, and expected contribution to the targeted risk/return profile. |
| Item 5 | FGBL generally requires a college degree and preferably an advanced degree for its professional personnel. Along with these educational requirements, FGBL prefers relevant securities industry experience. |
| Item 6 | Anthony Dell'Arena  Chief Compliance Officer  YOB: 1964 | **Business Background for Past 5 Years**:  Mr. Dell'Arena joined FGG in 2005. Prior to such, he was employed by JPMorgan Chase & Co.'s Private Banking division, where he was a Vice President and Assistant General Counsel from 2002 to 2005.  **Education**:  Mr. Dell'Arena was awarded his Juris Doctor degree from the University of Arkansas School of Law, and holds Master's and Bachelor's degrees in History from Rutgers University. He is admitted to the bar of New Jersey, and is based in the New York office.  Mr. Dell'Arena holds FINRA licenses |

Answer all items.  Complete amended pages in full, circle amended items and file with execution page (page 1).

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant: Fairfield Greenwich (Bermuda) Ltd. | SEC File Number: 801-66439 | Date: March 27, 2008 |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: | IRS Empl. Ident. No.: |
|---|---|---|
| | **Fairfield Greenwich (Bermuda) Ltd.** | |

| Item of Form (identify) | | Answer |
|---|---|---|
| | | Series 7, 24, 63, and 65, and is a member of National Society of Compliance Professionals. |
| | Daniel E. Lipton<br>Asst Secretary and Chief Financial Officer<br>YOB: 1971 | **Business Background for Past 5 Years**:<br>Mr. Lipton joined FGG in 2002 after nine years at Ernst & Young, where he was a Senior Manager in the Financial Services Assurance and Advisory Business Services Department, in charge of auditing and consulting engagements, specializing in alternative assets, private equity, venture capital, and domestic and offshore funds.<br><br>**Education**:<br>Mr. Lipton received his Bachelor of Arts degree in Economics from Tufts University and his Master of Business Administration dual degrees in Accounting and Finance from New York University's Stern School of Business; he is also a Certified Public Accountant. |
| | Mark J. McKeefry<br>Director, Asst Secretary and Chief Legal Officer<br>YOB: 1961 | **Business Background For Past 5 Years**:<br>Mr. McKeefry joined FGG in 2003. Prior, he was an Associate at Buchalter Nemer, where he advised broker-dealers and investment advisors on regulatory and compliance issues for onshore and offshore funds.<br><br>**Education**:<br>Mr. McKeefry received his Bachelor of Science degree from Carnegie Mellon University and his Juris Doctor degree from Fordham University, where he was a member of the Law Review. Prior to attending law school, he was a professional engineer, licensed by the State of California as a civil engineer. Mr. McKeefry is admitted to the bars of California and New York. He holds FINRA licenses Series 7, 24, 63, 65 and 3. |
| | Andrés Piedrahita<br>Director and President<br>YOB: 1959 | **Business Background for Past 5 Years**:<br>Mr. Piedrahita has been with FGBL since 1997.<br><br>**Education**:<br>Mr. Piedrahita received his Bachelor's Degree from the Boston University School of Communications. |
| | Amit Vijayvergiya<br>Director, Vice President and Chief Risk Officer<br>YOB: 1969 | **Business Background for Past 5 Years**:<br>Mr. Vijayvergiya has over 12 years of experience in asset management, risk management, finance, and operations research. Prior to joining FGBL, from 2000 to 2003 Mr. Vijayvergiya managed a family office investing in traditional and alternative investment managers.<br><br>**Education**: |

Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1).

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant:<br><br>**Fairfield Greenwich (Bermuda) Ltd.** | SEC File Number:<br><br>**801-66439** | Date:<br><br>**March 27, 2008** |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: | IRS Empl. Ident. No.: |
|---|---|---|
| | **Fairfield Greenwich (Bermuda) Ltd.** | |

| Item of Form (identify) | Answer |
|---|---|
| | Mr. Vijayvergiya received a Masters in Business Administration from Schulich School of Business at York University, a Bachelors of Science in Statistics from the University of Manitoba, and a Bachelors of Arts in Economics from the University of Western Ontario. Mr. Vijayvergiya holds the Chartered Financial Analyst designation and the Financial Risk Manager certification. |
| **Item 8.C.(1) and 8.D.** | An affiliate of FGBL, Fairfield Heathcliff Capital LLC ("FHC"), is registered with the Securities and Exchange Commission as a broker-dealer and is a member of the Financial Industry Regulatory Authority. It does not have a trading desk, nor does it open broker-dealer accounts or custody cash or securities. FHC's license is limited to selling limited partnership interests. FHC serves as U.S. placement agent for the FGG Funds and will bear its costs associated with such activities. |
| **Item 8.C.(3) and 8.D.** | FGBL, Fairfield Greenwich (UK) Limited ("FGUK"), and Fairfield Greenwich Advisors LLC ("FGA"), are each wholly-owned subsidiaries of Fairfield Greenwich Limited ("FGL", and collectively, FGG). FGA is based in the U.S. and is registered with the Securities and Exchange Commission as a registered investment adviser (SEC File No. 801-62504). FGUK is authorized and regulated by the Financial Services Authority, and serves as investment manager to a Luxembourg-registered SICAV and offshore fund-of-funds. FGG has also entered into a joint venture with Lion Capital Management Limited to create Lion Fairfield Capital Management Limited ("LFC"), a hedge fund management and client servicing platform in Asia. LFC holds a capital markets services license issued by the Monetary Authority of Singapore under the provisions of the Securities and Futures Act (Cap 289). FGA is the general partner of four (4) Delaware limited partnerships. No fund on the FGG platform is solicited to invest in any of them. FGBL is the general partner of two (2) Delaware limited partnerships. Certain other FGG funds have been solicited to invest in them. |
| **Item 8.C.(5)** | FGL is registered with the Commodity Futures Trading Commission as a commodity pool operator and is a member of the National Futures Association. |
| **Item 9.A.** | While FGBL does not as a matter of course engage in principal transactions, a related person of FGBL, an affiliate, Fairfield Greenwich (UK) Limited ("FGUK"), as Investment Manager of the Chester Global Strategy Fund Limited (the "Chester Fund"), has in February 2008 transferred certain securities held by the Chester Fund (i.e., interests in underlying hedge funds) to the Banif Fairfield Impala Fund (the "Banif Fund"), which is domiciled in Spain. Another affiliate of FGBL (and of FGUK), Fairfield Greenwich Advisors LLC ("FGA"), serves as the Banif Fund's sub-adviser. To establish the Banif Fund, FGA arranged for the parent of both it and FGUK, Fairfield Greenwich Limited ("FGL"), to contribute approximately half of the Banif Fund's initial capital, approximately $5 million Euro. The remaining initial seed money of $5 million Euro was contributed by Banco Banif S.A. As a result of this proprietary ownership, (i) the Banif Fund is deemed a principal account for certain U.S. regulatory purposes, (ii) FGUK is deemed to have acted as principal when selling the Assets from the Chester Fund to the Banif Fund and (iii) FGUK had to obtain consent from the Chester Fund in connection with the proposed transfer of Assets. In order to mitigate the conflict of interest inherent in the principal transaction, and to address the potential for self dealing, the consent of the Chester Fund shareholders was obtained prior to settlement of the transactions, who determined that the transactions served their best interest. Should FGBL seek to engage in a principal transaction, this same methodology would be followed. |

**Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1).**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE002428325

SECSEV3005276

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant: Fairfield Greenwich (Bermuda) Ltd. | SEC File Number: 801-66439 | Date: March 27, 2008 |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: | IRS Empl. Ident. No.: |
|---|---|---|
| | **Fairfield Greenwich (Bermuda) Ltd.** | |

| Item of Form (identify) | Answer |
|---|---|
| **Item 9.D.** | FGBL and its affiliates may solicit clients to invest in the FGBL Funds, or those funds of FGBL's affiliates (collectively, the "FGG Funds"). In the event of limited capacity in a particular FGG Fund, FGBL and its affiliates are committed to allocating investment opportunities and dispositions in the particular FGG Fund fairly among clients or vehicles. FGBL and certain of its affiliates and their officers may have financial interests as general partners, limited partners, shareholders, directors, investment managers, administrative manager, investment adviser or otherwise in such FGG Funds. Management and/or performance fees for such individuals and their family members may be waived in certain instances. |
| **Item 9.E.** | FGBL and its affiliates may purchase or sell shares or interest of a single manager fund for the accounts of multi-strategy funds. FGBL and certain of its affiliates and other multi-strategy funds may have a position in such Single Manager Fund. |
| | With respect to standards of professional conduct, a Code of Ethics (the "Code") has been adopted by FGBL in order to comply with Rule 204A-1 (the "Rule") promulgated under the Investment Advisers Act of 1940, as amended. Rule 204A-1 requires every Investment Adviser registered with the Securities and Exchange Commission to adopt and enforce a written code of ethics applicable to its supervised persons. The Rule was designed to prevent fraud by reinforcing fiduciary principles that must govern the conduct of advisory firms and their personnel. The Code contains a provision reminding employees of their obligations to clients as well as a provision requiring the reporting of personal securities transactions and holdings. In order to ensure that FGBL's employees are made aware of its standards, the Rule requires FGBL to obtain (and keep) a written acknowledgement from each employee confirming that he or she received a copy of the Code and any amendments. |
| | Further, pursuant to the Rule, FGBL has deemed certain of its employees to be "Access Persons." An "Access Person" is an employee of FGBL who has access to nonpublic information regarding any clients' purchase or sale of securities, or nonpublic information regarding the portfolio holdings of any reportable fund, or who is involved in making securities recommendations to clients, or who has access to such recommendation that are nonpublic. FGBL Access Persons are required to provide FGBL with personal (which includes household) securities account information and FGBL thus arranges for the delivery to its office for its review duplicate copies of confirmations and statements of any personal trading activity. FGBL Access Persons are not free to trade without having first pre-cleared trades with FGBL. In all cases, FGBL will attempt to resolve any conflicts of interest by exercising the good faith required of fiduciaries. FGBL reviews the personal investment activities of its Access Persons to ensure that the following general fiduciary principles are met: |
| |     (a) the duty at all times to place the interests of clients of FGBL first;<br>    (b) the duty to prevent the misuse of material nonpublic information which includes client securities holdings and transactions;<br>    (c) the requirement that all personal securities transactions be conducted in such a manner as to avoid any actual or potential conflict of interest or any abuse of an individual's position of trust and responsibility; and<br>    (d) the fundamental standard that FGBL personnel may not take inappropriate advantage of their position. |
| | Investors may request a copy of the Code by contacting FGBL at the address or telephone number listed on the first page of this document. |

**Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1).**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED

| Schedule F of FORM ADV Continuation Sheet for Form ADV Part II | Applicant: Fairfield Greenwich (Bermuda) Ltd. | SEC File Number: 801-66439 | Date: March 27, 2008 |
|---|---|---|---|

(Do not use this Schedule as a continuation sheet for Form ADV Part I or any other schedules.)

| 1. | Full name of applicant exactly as stated in Item 1A of Part I of Form ADV: | IRS Empl. Ident. No.: |
|---|---|---|
| | **Fairfield Greenwich (Bermuda) Ltd.** | |

| Item of Form (identify) | Answer |
|---|---|
| **Item 10** | The FGBL Funds impose various initial minimum investment amounts, ranging between US$100,000 and US$1,000,000, and in equivalent amounts in different currencies including Euro and Swiss Franc. The FGG Funds may accept investment in lesser amounts. Generally, investors are required to have a net worth of at least US$1,500,000. |
| **Item 11.A.** | Portfolios are reviewed at the individual security level from independent sources discussed among members of the FRS team, FGBL and FGA several times each month (see, e.g., Schedule F, Item 4.B.8). FRS, FGBL and FGA utilize a number of independent, sophisticated quantitative measurement tools to monitor the performance of its managers, compliance with investment guidelines, and risk analysis. FRS, FGBL and FGA personnel review changes in a variety of factors, including changes in organization, investment process, the manager's view of the relevant markets, and their portfolio's position with respect to those views. The findings are discussed at regular meetings. |
| **Item 11.B.** | Investors will receive audited financial statements of the applicable Fund annually, and unaudited performance reports at least monthly. In addition, investors may also receive quarterly or semi-annual letters regarding their investments.<br><br>FGBL is committed to maintaining the privacy of our clients and to the safeguarding of their personal information. Our privacy policy is distributed to clients in accordance with Regulation S-P on an initial and annual basis, to help clients understand what personal information we collect, how that information is protected, and why, in certain cases, the information may be shared. |
| **Item 12** | For certain of the FGG Funds, FGBL or an affiliate has full discretion and authority to make all investment decisions with respect to the types of securities to be bought and sold, and the amount of securities to be bought or sought for such Fund, and there are no limitations as to which broker dealer is used or as to the commission rates paid. However, portfolio transactions will be allocated to brokers on the basis of best execution and in consideration of brokerage and research services (e.g., research ideas, investment strategies, special execution and block positioning capabilities, clearance, settlement and custodial services), financial stability, reputation and efficiency of such broker-dealers. Broker-dealers providing such services may be paid commissions in excess of those that other broker-dealers not providing such services might charge. |
| **Item 13.A.** | A related person of FGBL receives research reports from various brokers, but neither the related person nor FGBL currently have any "soft dollar" arrangements outside the parameters of Section 28(e) of the Securities Exchange Act of 1934, as amended, in effect. |
| **Item 13.B.** | From time to time, FGL, or an affiliate, may enter into agreements to compensate third party and/or certain internal agents, providing for cash compensation for securing clients which may be in the form of a placement fee or participation in the sharing of the management and/or performance fees. |

**Answer all items. Complete amended pages in full, circle amended items and file with execution page (page 1).**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY FAIRFIELD GREENWICH LIMITED          FGGE002428327