Richard A. Cirillo
CIRILLO LAW OFFICE
246 East 33rd Street – # 1
New York, NY 10016-4802
Telephone: 917-541-6778
E-mail: rcirillo@cirillo-law.com
*Attorney for Defendant Kookmin Bank*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | No. 08-01789 (CGM)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>Plaintiff,<br><br>v.<br><br>KOOKMIN BANK,<br><br>Defendant. | Adv. Pro. No. 12-01194 (CGM) |

**KOOKMIN BANK'S ANSWER AND DEFENSES**

Defendant Kookmin Bank ("KB") answers the Complaint filed on March 22, 2012, by Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the substantively consolidated estate of Bernard L. Madoff, and asserts defenses, as follows:

## I.    NATURE OF THE ACTION[*]

1. This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS Customer Property[**] that was stolen as part of the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff") and others.

ANSWER TO ¶ 1:  KB admits that this paragraph states the Trustee's view of his goal in filing this proceeding and denies that KB received any "Customer Property" (as defined) and that the Trustee is entitled to recover any amount from or obtain any relief against KB.

2. With this Complaint, the Trustee seeks to recover approximately $42,010,303 in subsequent transfers of Customer Property made to Defendant Kookmin Bank. The subsequent transfers were derived from investments with BLMIS made by Fairfield Sentry Limited ("Fairfield Sentry"). Fairfield Sentry is a British Virgin Islands ("BVI") company that is in liquidation in the BVI. Fairfield Sentry had direct customer accounts with BLMIS's investment advisory business ("IA Business") for the purpose of investing assets with BLMIS, and maintained in excess of 95% of its assets in its BLMIS customer accounts.

ANSWER TO ¶ 2:  KB admits that the Trustee seeks to recover approximately $42,010,303 KB allegedly received from Fairfield Sentry and that Fairfield Sentry is a BVI corporation now in liquidation before BVI courts; denies that the Trustee is entitled to any recovery or relief from KB; and states that it lacks knowledge or information sufficient to form a belief about the truth of the other allegations of this paragraph.

---

[*] For the purpose of its answer and defenses, KB is treating the captions in the complaint as conveniences and not allegations requiring an answer.

[**] Footnote 1 alleges that SIPA § 78lll(4) defines "Customer Property" as cash and securities at any time received, acquired, or held by, or for the account of, a debtor from, or for, the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted. As its answer to Footnote 1, KB states that the footnote accurately but incompletely quotes the cited statute and that the meaning of Customer Property for purposes of this action also requires reference to other provisions of SIPA and other statutes and to decisional law.

1

3.  When Defendant Kookmin Bank received the subsequent transfers of BLMIS Customer Property, Defendant Kookmin Bank was South Korea's largest bank.

ANSWER TO ¶ 3:  KB admits that it was a large South Korean commercial bank when it received amounts from Fairfield Sentry for redemption of Fairfield Sentry shares that KB held in its capacity as trustee for certain Korean investment trusts; denies it received BLMIS Customer Property; and states it lacks knowledge or information sufficient to form a belief about the truth of the other allegations of this paragraph.

II.    JURISDICTION AND VENUE

4.  The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3); sections 105(a), 544, 550(a), and 551 of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code"); and the New York Fraudulent Conveyance Act (New York Debtor & Creditor Law) ("NYDCL") §§ 273-279 (McKinney 2001), to obtain avoidable and recoverable transfers received by Defendant Kookmin Bank as subsequent transferees of funds originating from BLMIS.

ANSWER TO ¶ 4:  KB admits that the Trustee brings this adversary proceeding pursuant to and under the cited statutes; denies the Trustee is entitled to exercise any statutory authority to avoid and/or recover any transfer to KB received from any source; and states that the remainder of this paragraph consists of contentions of law to which no answer is required and, if any answer is required, denies them.

5.  This is an adversary proceeding brought in this Court, in which the main underlying substantively consolidated SIPA case, No. 08-01789 (BRL) (the "SIPA Case"), is pending. The SIPA Case was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding"). This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), and 15 U.S.C. § 78eee(b)(2)(A), (b)(4).

ANSWER TO ¶ 5:  KB admits the first and second sentences of this paragraph and states that the third sentence is a contention of law to which no answer is required and, if an answer is required, denies it.

2

6. Defendant Kookmin Bank is subject to personal jurisdiction in this judicial district because it purposely availed itself of the laws and protections of the United States and the state of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through Fairfield Sentry. Defendant Kookmin Bank knowingly received subsequent transfers from BLMIS by withdrawing money from Fairfield Sentry.

ANSWER TO ¶ 6: KB denies the allegations of this paragraph concerning its knowledge and actions and states the remaining allegations are contentions of law to which no answer is required and, if an answer is required, denies them.

7. By directing investments through Fairfield Sentry, a Fairfield Greenwich Group ("FGG") managed Madoff feeder fund, Defendant Kookmin Bank knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York. Upon information and belief, Defendant Kookmin Bank entered into a subscription agreement with Fairfield Sentry under which it submitted to New York jurisdiction, sent a copy of the agreement to FGG's New York City office, and wired funds to Fairfield Sentry through a bank in New York. Representatives of Defendant Kookmin Bank regularly communicated via email with its FGG account representatives in FGG's New York City office. Representatives of Defendant Kookmin Bank also travelled to New York City to meet with its FGG account representatives. Defendant Kookmin Bank thus derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

ANSWER TO ¶ 7: KB denies the allegations in the first sentence of this paragraph. As to the second sentence, KB admits that, solely in its capacity as trustee for certain Korean investment trusts, it entered into a subscription agreement with Fairfield Sentry and denies that the allegations correctly describe that agreement; denies it sent a copy of the agreement to FGG's New York City office; admits it wired dollar funds from its Seoul, Korea, account to a Citco entity's account in Dublin, Ireland, as required by the subscription agreement, through New York intermediary banks and otherwise denies the allegations in that sentence. KB denies the allegations of the third and fourth sentences of this paragraph.

8. Defendant Kookmin Bank should reasonably expect to be subject to New York jurisdiction and are subject to personal jurisdiction pursuant to New York Civil Practice Law & Rules § 302 (McKinney 2001) and Bankruptcy Rule 7004.

ANSWER TO ¶ 8: KB denies the allegations of this paragraph.

3

9.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).

ANSWER TO ¶ 9:  This is a contention of law to which no answer is required and, if an

answer is required, denies it.

10.  Venue in this District is proper under 28 U.S.C. § 1409.

ANSWER TO ¶ 10:  This is a contention of law to which no answer is required. KB states

that it contests the Court's personal jurisdiction over KB and its subject matter jurisdiction

over the proceeding but not venue in this District if a finding of jurisdiction were to be made

and upheld.

### III.    BACKGROUND

11.  On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for
violation of the criminal securities laws, including, inter alia, securities fraud, investment adviser
fraud, and mail and wire fraud. Contemporaneously, the U.S. Securities and Exchange
Commission ("SEC") commenced the District Court Proceeding against Madoff and BLMIS.
The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment
adviser activities of BLMIS. The District Court Proceeding remains pending.

ANSWER TO ¶ 11:  KB admits that the allegations in this paragraph present information that

became available to KB and others through public sources after they occurred and otherwise

states it lacks knowledge or information sufficient to form a belief about their truth.

12.  On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an
order appointing Lee S. Richards as receiver for the assets of BLMIS.

ANSWER TO ¶ 12:  KB admits that the allegations in this paragraph present information that

became available to KB through public sources after they occurred and otherwise states that

it lacks knowledge or information sufficient to form a belief about their truth.

13.  On December 15, 2008, under § 78eee(a)(4)(A), the SEC consented to a combination of
its own action with an application of the Securities Investor Protection Corporation ("SIPC").
Thereafter, under § 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court
alleging, inter alia, that BLMIS was not able to meet its obligations to securities customers as
they came due and, accordingly, its customers needed the protections afforded by SIPA.

ANSWER TO ¶ 13:  KB admits that the allegations in this paragraph present information that

became available to KB from public sources after they occurred but lacks knowledge or

information sufficient to form a belief about their truth.

14.  Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an
order under SIPA (known as the "Protective Decree"), which, in pertinent part: (a) removed the
receiver and appointed the Trustee for the liquidation of the business of BLMIS under SIPA §
78eee(b)(3); (b) appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA §
78eee(b)(3); and (c) removed the case to the United States Bankruptcy Court for the Southern
District of New York (the "Bankruptcy Court") under § 78eee(b)(4) of SIPA.

ANSWER TO ¶ 14:  KB admits that the allegations in this paragraph present information that

became available to KB from public sources after they occurred and states that it lacks

knowledge or information sufficient to form a belief about their truth.

15.  By orders dated December 23, 2008, and February 4, 2009, respectively, the Bankruptcy
Court approved the Trustee's bond and found the Trustee was a disinterested person.
Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

ANSWER TO ¶ 15:  KB admits that the allegations in this paragraph present information that

became available to KB from public sources after they occurred and lacks knowledge or

information sufficient to form a belief about their truth.

16.  At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned *United
States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50),
Madoff pled guilty to an eleven-count criminal information filed against him by the United
States Attorney's Office for the Southern District of New York. At the Plea Hearing, Madoff
admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."
Id. at 23. Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I was doing
[was] wrong, indeed criminal." Id. On June 29, 2009, Madoff was sentenced to 150 years in
prison.

ANSWER TO ¶ 16:  KB admits that the allegations in this paragraph present information that

became available to KB from public sources after they occurred and lacks knowledge or

information sufficient to form a belief about their truth.

17.  On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to
participating in and conspiring to perpetuate the Ponzi scheme. At a plea hearing on August 11,

5

2009, in the case entitled United States v. DiPascali, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), DiPascali pled guilty to a ten-count criminal information. Among other things, DiPascali admitted that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s. Id. at 46.

ANSWER TO ¶ 17: KB admits that the allegations in this paragraph present information that became available to KB from public sources after they occurred and lacks knowledge or information sufficient to form a belief about their truth.

## IV.   TRUSTEE'S POWERS AND STANDING

18. As Trustee appointed under SIPA, the Trustee is charged with recovering and paying out Customer Property to BLMIS customers, assessing claims, and liquidating any other assets of BLMIS for the benefit of the estate and its creditors. The Trustee is in the process of marshaling BLMIS's assets, and this liquidation is well underway. However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years. Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recoveries, including those from individuals and entities that received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

ANSWER TO ¶ 18: KB admits the allegations of the first and second sentences of this paragraph and states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations in the remaining sentences of this paragraph.

19. Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under § 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

ANSWER TO ¶ 19: KB states that the allegations of this paragraph are legal contentions to which no answer is required.

20. Under SIPA §§ 78fff(b) and 78lll(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

ANSWER TO ¶ 20:  KB states that the allegations of this paragraph are legal contentions to

which no answer is required, but it does not contest them.

21.  The Trustee has standing to bring these claims under § 78fff-1(a) of SIPA and the
Bankruptcy Code, including sections 323(b), 544, and 704(a)(1), because the Trustee has the
power and authority to avoid and recover transfers under sections 544, 547, 548, 550(a), and 551
of the Bankruptcy Code and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

ANSWER TO ¶ 21: KB states that there are no claims that the Trustee may bring against KB

and no transfers received by KB that the Trust may avoid or recover from KB and that the

remaining allegations of this paragraph are legal contentions to which no answer is required

and, if an answer is required, denies them.

## V.    THE DEFENDANT

22.  Defendant Kookmin Bank is a bank organized under the laws of South Korea with
its principal place of business located at 9-1, Namdaemunno 2-GA, Jung-gu, Seoul 100-703,
South Korea.  Non-party KB Financial Group Inc. wholly owns Defendant Kookmin Bank.

ANSWER TO ¶ 22: KB admits that this paragraph correctly states the principal executive

office address of KB and the owner of KB at the time the complaint was filed.

## VI.    THE PONZI SCHEME

23.  BLMIS was founded by Madoff in 1959 and, for most of its existence, operated from its
principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder,
chairman, chief executive officer, and sole owner, operated BLMIS together with several of his
friends and family members. BLMIS was registered with the SEC as a securities broker-dealer
under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). By virtue of
that registration, BLMIS was a member of SIPC. BLMIS had three business units: market
making, proprietary trading, and the IA Business.

ANSWER TO ¶ 23: KB lacks knowledge or information sufficient to form a belief about the

truth of the allegations in this paragraph except admits that BLMIS was at one time

registered with the United States Securities and Exchange Commission as a broker-dealer.

24.  Outwardly, Madoff ascribed the consistent success of the IA Business to the so-called
split-strike conversion strategy ("SSC Strategy"). Under that strategy, Madoff purported to invest

BLMIS customers' funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100")—a collection of the 100 largest publicly traded companies. Madoff claimed that his basket of stocks would mimic the movement of the S&P 100. He also asserted that he would carefully time purchases and sales to maximize value, and BLMIS customers' funds would, intermittently, be out of the equity markets.

ANSWER TO ¶ 24: KB lacks knowledge or information sufficient to form a belief about the

truth of the allegations in this paragraph.

25.  The second part of the SSC Strategy was a hedge of Madoff's stock purchases with options contracts. Those option contracts acted as a "collar" to limit both the potential gains and losses on the basket of stocks. Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options. Madoff told BLMIS customers that when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual funds holding Treasury bills. Madoff also told customers that he would enter and exit the market between six and ten times each year.

ANSWER TO ¶ 25: KB lacks knowledge or information sufficient to form a belief about the

truth of the allegations in this paragraph.

26.  BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never made the investments he promised clients, who believed they were invested with him in the SSC Strategy. He further admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts. In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform on which BLMIS reasonably could have traded securities.   Instead, investors' funds were principally deposited into the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxxx703.

ANSWER TO ¶ 26: KB lacks knowledge or information sufficient to form a belief about the

truth of the allegations in this paragraph.

27.  Prior to his arrest, Madoff assured clients and regulators that he purchased and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than through any listed exchange. Based on the Trustee's investigation to date, there is no evidence that the IA Business ever entered into any OTC options trades on behalf of IA Business account holders.

ANSWER TO ¶ 27: KB lacks knowledge or information sufficient to form a belief about the

truth of the allegations in this paragraph.

28.  For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options, but rather used to pay withdrawals and to make other avoidable transfers. Madoff also used his customers' investments to enrich himself, his associates, and his family.

ANSWER TO ¶ 28: KB lacks knowledge or information sufficient to form a belief about the

truth of the allegations in this paragraph.

29.  The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion of new investments to fulfill payment requests or withdrawals from other BLMIS accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

ANSWER TO ¶ 29: KB lacks knowledge or information sufficient to form a belief about the

truth of the allegations in this paragraph.

30.  It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements because failure to do so promptly could have resulted in demand, investigation, the filing of a claim, and disclosure of the fraud.

ANSWER TO ¶ 30: KB lacks knowledge or information sufficient to form a belief about the

truth of the allegations in this paragraph.

31.  Madoff's scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

ANSWER TO ¶ 31: KB lacks knowledge or information sufficient to form a belief about the

truth of the allegations in this paragraph.

32.  Based upon the Trustee's ongoing investigation, it now appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no

investments were ever made. By the time the Ponzi scheme came to light on December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

ANSWER TO ¶ 32: KB lacks knowledge or information sufficient to form a belief about the

truth of the allegations in this paragraph.

33.  Thus, at all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

ANSWER TO ¶ 33: KB lacks knowledge or information sufficient to form a belief about the

truth of the allegations in this paragraph.

## VII.    THE TRANSFERS

34.  Fairfield Sentry received initial transfers of BLMIS Customer Property.  Some or all of those initial transfers were subsequently transferred directly or indirectly to Defendant Kookmin Bank.

ANSWER TO ¶ 34:  KB lacks knowledge or information sufficient to form a belief about the

truth of the allegations in this paragraph except denies it received BLMIS Customer Property.

### A.    Initial Transfers From BLMIS To Fairfield Sentry

35.  The Trustee filed an adversary proceeding against Fairfield Sentry and other defendants in the Bankruptcy Court under the caption *Picard v. Fairfield Sentry Ltd.*, Adv. Pro. No. 09-01239 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Fairfield Sentry in the amount of approximately $3 billion (the "Fairfield Amended Complaint"). The Trustee incorporates by reference the allegations contained in the Fairfield Amended Complaint as if fully set forth herein.

ANSWER TO ¶ 35:  KB admits the first sentence of this paragraph.  KB acknowledges that

the Trustee purports to incorporate the Fairfield Amended Complaint into this Complaint by

reference and states that such incorporation is impermissible under the Federal Rules of Civil

Procedure and prejudicial to KB's rights.

36.  During the six years preceding the Filing Date, BLMIS made transfers to Fairfield Sentry of approximately $3 billion (the "Fairfield Sentry Six Year Initial Transfers"). The Fairfield Sentry Six Year Initial Transfers were and continue to be Customer Property within the

meaning of SIPA § 78lll(4), are avoidable, and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

ANSWER TO ¶ 36: KB lacks knowledge or information sufficient to form a belief about the truth of allegations of the first sentence of this paragraph; states that the second sentence is a legal contention to which no answer is required and, if an answer is required, denies it; and denies that the Trustee may avoid or recover any transfer made to KB.

37.  The Fairfield Sentry Six Year Initial Transfers include approximately $1.6 billion which BLMIS transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Initial Transfers"). The Fairfield Sentry Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78lll(4), are avoidable, and recoverable under sections 548(a), 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

ANSWER TO ¶ 37: KB lacks knowledge or information sufficient to form a belief about the truth of allegations of the first sentence of this paragraph; states that the second sentence is a legal contention to which no answer is required and, if an answer is required, denies it; and denies that the Trustee may avoid or recover any transfer made to KB.

38.  The Fairfield Sentry Two Year Initial Transfers include approximately $1.1 billion which BLMIS transferred to Fairfield Sentry during the 90 days preceding the Filing Date (the "Fairfield Sentry Preference Period Initial Transfers"). The Fairfield Sentry Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78lll(4), are avoidable, and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

ANSWER TO ¶ 38: KB lacks knowledge or information sufficient to form a belief about the truth of allegations of the first sentence of this paragraph; states that the second sentence is a legal contention to which no answer is required and, if an answer is required, denies it; and denies that the Trustee may avoid or recover any transfer made to KB.

39.  The Fairfield Sentry Six Year Initial Transfers, Fairfield Sentry Two Year Initial Transfers, and the Fairfield Sentry Preference Period Initial Transfers are collectively defined as

the "Fairfield Sentry Initial Transfers." Charts setting forth these transfers are included as Exhibits A and B.

ANSWER TO ¶ 39:  KB admits that the Trustee adopts the terminology in the first sentence

of this paragraph and states that it lacks knowledge or information sufficient to form a belief

about the truth of allegations about what Exhibits A and B show or purport to show.

40.  Pursuant to the Bankruptcy Court's June 7 and June 10, 2011 orders, the Bankruptcy Court approved a settlement among the Trustee, Fairfield Sentry, and others (the "Settlement Agreement"). As part of the Settlement Agreement, on July 13, 2011, the Bankruptcy Court entered a consent judgment granting the Trustee a judgment in the amount of $3,054,000,000. Under the terms of the Settlement Agreement, Fairfield Sentry is obligated to pay $70,000,000 to the Trustee for the benefit of the consolidated BLMIS estate.

ANSWER TO ¶ 40: KB admits the allegations of this paragraph but also states that they are

an incomplete description of the referenced orders, Settlement Agreement, and consent

judgment.

B.    Subsequent Transfers From Fairfield Sentry To Defendant Kookmin Bank

41.  A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Kookmin Bank and is recoverable from Defendant Kookmin Bank pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $42,010,303 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Defendant Kookmin Bank (the "Fairfield Sentry Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry Subsequent Transfers is attached as Exhibit C.

ANSWER TO ¶ 41: KB admits that from time to time, solely in its capacity as trustee of

certain Korean investment trusts for which it acted as trustee, it received from a Citco entity

payments for redemptions of Fairfield Sentry shares made at the direction of the trusts' asset

managers totaling approximately $42,010,303 over a period of time; denies that any part of

the amount received is recoverable from KB by the Trustee pursuant to section 550 of the

Bankruptcy Code, § 278 of the NYDCL, or otherwise; states that it lacks knowledge or

information sufficient to form a belief about the truth of the remaining allegations of this

paragraph; and, as to allegations that are contentions of law, states that no answer is required

and, if an answer is required, it denies them.

42.  The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Sentry Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

ANSWER TO ¶ 42: KB acknowledges that the Trustee says his investigation is ongoing

and that he reserves certain rights but denies that the Trustee has any rights to reserve for

purposes of seeking recovery of any transfers made to KB.

COUNT ONE

RECOVERY OF SUBSEQUENT TRANSFERS – 11
U.S.C. §§ 550 AND 551 AND NYDCL § 278

43.  The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

ANSWER TO ¶ 43: KB incorporates by reference its answers to the previous paragraphs of

the complaint as if fully rewritten herein.

44.  Defendant Kookmin Bank received the Fairfield Sentry Subsequent Transfers totaling approximately $42,010303, which are recoverable pursuant to Section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

ANSWER TO ¶ 44:  KB admits that from time to time, solely in its capacity as trustee of

certain Korean investment trusts for which it acted as trustee, it received from a Citco entity

payments totaling approximately $42,010,303 over a period of time for redemptions of

Fairfield Sentry shares made at the direction of the trusts' asset managers; and denies that the

Trustee is entitled to recover any part of that amount.

45.  Each of the Fairfield Sentry Subsequent Transfers was made directly or indirectly to, or for the benefit of, Defendant Kookmin Bank.

ANSWER TO ¶ 45: KB denies that any transfer to it by Fairfield Sentry was made for KB's benefit directly or indirectly.

46.  Defendant Kookmin Bank is an immediate or mediate transferee of the Fairfield Sentry Initial Transfers.

ANSWER TO ¶ 46: KB denies the allegations in this paragraph.

47.  As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant Kookmin Bank recovering the Fairfield Sentry Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

ANSWER TO ¶ 47:  KB denies that the Trustee is entitled to a judgment against KB in any amount pursuant to the cited statutes or otherwise.

### KB'S ANSWER TO THE TRUSTEE'S PRAYER FOR RELIEF

The Trustee is not entitled to any judgment against or relief from KB.

### KB'S DEFENSES TO THE TRUSTEE'S CLAIM AGAINST KB

KB, without accepting the burden of proof on any issue or element that is the Trustee's burden, states the following defenses to the Trustee's claim. KB incorporates herein by reference the contents of its memorandum, reply memorandum, and declaration in support of KB's motion to dismiss the complaint in this action as if fully rewritten herein.

FIRST
(KB Was a Mere Conduit)

1.      The Trustee may not recover from KB for any transfer of funds to KB because KB was not a mediate or intermediate transferee of any initial transfer of property within the meaning of Section 550(a) of the Bankruptcy Code.

2.      KB acted solely in the capacity of the trustee of certain Korean investment trusts when it purchased and redeemed Fairfield Sentry shares on behalf of the trusts and acted solely at the direction of the trusts' asset managers.

14

3.      KB did not have or exercise any discretion or decision-making as to the purchases or redemptions of Fairfield Shares and did not have or exercise any dominion or control over the trusts' funds used to invest in, or over the payments it received on behalf of the trusts in exchange for the trusts' redemptions of, Fairfield Sentry shares.

4.      KB had no right to and did not control the trusts' funds used to purchase Fairfield Sentry shares or received for redemptions of such shares and was required to pay funds only in conformity with the trust documents when and as directed by the trusts' asset managers.

5.      KB had no right to use any of the trusts' funds for its own purposes. KB did not invest any of its own money in Fairfield Sentry shares, did not own any Fairfield Sentry shares, including the shares it purchased and redeemed on behalf of the trusts, and did not have any right to and did not receive any gain or suffer any loss on the trusts' investments in Fairfield Sentry shares.

6.      KB had only bare legal title to and had no beneficial ownership of the Fairfield Sentry shares it held for the trusts, the trusts' funds used to purchase such shares, or payments it received upon redeeming the Fairfield Sentry shares on the trusts' behalf.

7.      KB derived no benefit from the trusts' investments and was paid only a modest fee for its ministerial, administrative services as trustee.

## SECOND
### (KB Acted in Good Faith)

8.      The Trustee may not recover from KB because KB took all the transfers in good faith and without knowledge of the alleged voidability of the transfers within the meaning of Bankruptcy Code § 550(b) of the Bankruptcy Code.

15

9.    KB took transfers for value within the meaning of Bankruptcy Code § 550(b) because the payments KB received as trustee on behalf of the trusts for redemptions of the Fairfield Sentry shares were in exchange for the surrender of the trusts' shares being redeemed.

10.    At the times when KB received transfers from Fairfield Sentry, KB had no knowledge of fraud by Madoff, BLMIS, Fairfield Sentry, or any of their respective affiliates, officers, directors, employees, agents, or other personnel, and did not know or suspect that Madoff and BLMIS were not making securities trades or that they or Fairfield Sentry were engaged in fraud.

11.    KB did not know facts at the times when it purchased or redeemed Fairfield Sentry shares on behalf of the trusts at the trusts' investment managers' direction that would have led a reasonable person to inquire into whether there was fraud behind the transfers.

12.    Even if KB had been on inquiry notice of possible fraud, it would not have discovered or obtained knowledge of fraud by investigation.

13.    This is evidenced by the fact that, upon information and belief, many substantial investors that provided funds for or in connection with purchases and holding of Fairfield Sentry shares, financial consultants, advisors, and others companies conducted diligent and thorough investigations and did not obtain knowledge of the fraud.

14.    Similarly, significant independent public auditing companies with substantial incentive to inquire into the financial position of Fairfield Sentry and other so-called "Madoff feeder funds" did not, upon information and belief, discover or obtain knowledge of fraud and certified Fairfield Sentry's and other "feeder funds'" financial statements as fairly presenting their respective financial positions.

16

15.    In addition, one or more government entities did not, upon information and belief,

discover or obtain knowledge of fraud, including a government agency that reportedly received

detailed third-party analyses of BLMIS' activities on two occasions and conduct actual

regulatory inquiries into BLMIS and Madoff.

## THIRD
(Transfers to KB Were Not BLMIS Customer Property)

16.    All or some of the transfers received by KB from Fairfield Sentry, upon

information and belief, did not consist in whole or part of BLMIS Customer Property and,

accordingly, may not be avoided and recovered by the Trustee from KB.

17.    The information contained in the Exhibits to the complaint and the complaints in

similar adversary proceedings in case number 08-ap-01789 (the "Exhibits") show that some or

all the transfers by Fairfield Sentry to KB did not originate with BLMIS, must have originated

from other sources, and are not BLMIS Customer Property.

18.    Those other sources include, upon information and belief, proceeds Fairfield

Sentry received from selling shares to new investors, which it used to make payments for

redemptions of shares by existing Fairfield Sentry shareholders, without ever remitting the new

share proceeds to BLMIS.  Such funds paid to redeeming Fairfield Sentry shareholders are not

BLMIS Customer Property.

## FOURTH
(Transfers to KB Are Protected by the Safe Harbor)

19.    KB received all redemption payments for Fairfield Sentry shares more than two

years prior to the Filing Date and are protected from avoidance and recovery by the safe harbor

provided by Bankruptcy Code § 546(e).

17

20.    BLMIS, Fairfield Sentry, and KB were at all relevant times covered entities under that statute, being stockbrokers, financial institutions, financial participants, and/or otherwise covered entities.

21.    All the transfers received by KB were received in connection with or relation to a securities agreement between BLMIS and Fairfield and/or between Fairfield and KB.

22.    None of the transfers was made with intent to hinder, delay, or defraud BLMIS' or Fairfield Sentry's creditors. The so-called "Ponzi scheme presumption" does not meet the "intent to hinder, delay or defraud" element because it is based on faulty legal and factual reasoning and has not been adopted by the Second Circuit Court of Appeals or the Supreme Court.

23.    At the times when KB received transfers from Fairfield Sentry, KB had no knowledge of fraud committed by Madoff, BLMIS, Fairfield Sentry, or any of their respective affiliates, officers, directors, employees, agents, or other personnel, and it did not know or suspect that Madoff and BLMIS were not making securities trades or were engaged in a fraud.

FIFTH
(State Claims Under NY Debtor & Creditor Law Barred)

25.    The Trustee's claim under Bankruptcy Code § 544 that relies on the New York Debtor & Creditor Law is barred because the transfers to KB were taken for fair consideration, without knowledge of the fraud, and without actual fraudulent intent, within the meaning of § 278(1) and (2), respectively.

SIXTH
(*In Pari Delicto*—Unclean Hands)

26.    The Trustee stands in the shoes of BLMIS and Madoff, who committed the alleged frauds that resulted in the alleged losses the Trustee seeks to recover from KB. The

18

Trustee is barred from recovering such losses from KB because BLMIS' and Madoff's acts and omissions are attributed to the Trustee by the doctrines of *in pari delicto* and unclean hands.

## SEVENTH
### (Predicate Initial Transfer Not Avoided)

27.    The Trustee may not recover transfers from KB until and unless transfers between BLMIS and Fairfield have been avoided, which has not occurred and may not occur.

## EIGTH
### (Single Satisfaction)

28.    If and to the extent the Trustee recovers from another mediate or immediate transferee the amount of any avoided initial transfer that includes customer property the Trustee alleges KB received, the Trustee is barred from recovering that amount from KB by virtue of Bankruptcy Code § 550(d).

## NINTH
### (Recovery from Liquidators)

29.    If and to the extent the Trustee recovers from the Liquidators of Fairfield Sentry all or any portion of the amount it seeks from KB pursuant to the sharing provisions of the settlement agreement into which the Trustee and Liquidators entered and the Court approved in 2011, or otherwise, the Trustee may not recover the same amount from KB because it would constitute an impermissible double recovery for a single loss.

## TENTH
### (Reservation of Possible Claim)

30.    KB reserves its rights of claim and recovery under Bankruptcy Code § 502(h) if and to the extent the Trustee were to recover from KB.

## ELEVENTH
### (Trustee Not Entitled to Interest)

19

31.    In the event the Trustee were to recover from KB, he would not be entitled to prejudgment interest.

TWELFTH
(Lack of Personal Jurisdiction)

32.    This Court lacks personal jurisdiction over KB because KB did not purposefully avail itself of the privilege of conducting activities within the forum State and did not invoke the benefits and protections of its laws.

KB'S JURY TRIAL DEMAND

KB demands a jury trial on all claims and issues that may be tried by a jury pursuant to Federal Rule of Civil Procedure 38(b) made applicably by Federal Rule of Bankruptcy Procedure 9015.

KB'S RULE 7012(b) STATEMENT

KB does not consent to entry of final orders or judgment by the Bankruptcy Court.

WHEREFORE, KB respectfully asks this Court to dismiss the complaint and this action with prejudice and award KB its legal and expert fees and expenses, court costs, and such other relief as may be just and equitable.

Dated:  New York, NY
March 14, 2023

Respectfully submitted,

CIRILLO LAW OFFICE

/s/ Richard A. Cirillo

_____

Richard A. Cirillo
246 East 33rd Street – # 1
New York, NY 10016-4802
Telephone:  917-541-6778
E-mail: rcirillo@cirillo-law.com
*Attorney for Defendant Kookmin Bank*