JENNER & BLOCK LLP
Richard Levin
Carl Wedoff
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600

Vincent E. Lazar
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350

*Counsel for Defendants Uniofortune Asset
Management S.r.l and Uniofortune Conservative Fund*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                    *Plaintiff-Applicant,*<br><br>          v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br>                    *Defendant.* | Adv. Proc. No. 08-01789 (CGM)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re<br><br>BERNARD L. MADOFF,<br><br>                    *Debtor.* | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff,<br><br>                    *Plaintiff,*<br><br>          v.<br><br>UNIOFORTUNE ASSET MANAGEMENT SGR SPA, on behalf of itself, Uniofortune Conservative Fund, and Uniofortune Conservative Fund–Side Pocket, and UNIOFORTUNE CONSERVATIVE FUND,<br><br>                    *Defendants.* | Adv. Proc. No. 11-02553 (CGM)<br><br>**DEFENDANTS' ANSWER TO THE COMPLAINT; DEMAND FOR JURY TRIAL** |

**ANSWER**

Defendants Unifortune Asset Management SGR S.p.A, now known as Unifortune Asset Management S.r.l ("**Management**") and Unifortune Conservative Fund ("**Conservative Fund**," and together with Management, the "**Defendants**"), answer the claims of Plaintiff Irving H. Picard (the "**Trustee**") in the Trustee's Amended Complaint ("**Complaint**") [Adv. Dkt. 114]. Defendants **deny** that Management is properly named as a defendant "on behalf" of Conservative Fund or Unifortune Conservative Fund-Side Pocket ("**Side Pocket**").

## I.    <u>NATURE OF THE PROCEEDING</u>[1]

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS Customer Property, as defined by SIPA § 78*lll*(4), that was stolen as part of the massive Ponzi scheme perpetrated by Madoff and others. This adversary proceeding was commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (SMB) (the "SIPA Proceeding"), is pending.

**ANSWER:**   Defendants **admit** that the Trustee purports to bring this adversary proceeding as part of the Trustee's efforts to recover BLMIS customer property within the meaning of 15 U.S.C. §§ 78*lll*(4) that Madoff perpetrated a Ponzi scheme through BLMIS and **deny** the remaining allegations in Paragraph 1.

2.    In 2001, Management created the Conservative Fund—a fund of hedge funds promoted and managed by Management—as a vehicle to obtain access to BLMIS. Conservative Fund invested in BLMIS feeder funds Fairfield Sentry Limited ("Sentry") and Fairfield Sigma Limited ("Sigma," collectively with Sentry, the "Fairfield Funds"). BLMIS feeder funds were special purpose entities that invested all or substantially all of their assets with BLMIS's investment advisory business (the "IA Business").

---

[1] Defendants deem the section headings in the Complaint not to constitute allegations of the Complaint. To the extent any section headings are allegations, Defendants admit or deny them consistent with their responses to the allegations contained in the numbered paragraphs of the Complaint.

2

**ANSWER:**  Defendants **admit** that Management created the Conservative Fund in 2001, **deny** Conservative Fund was created as a vehicle to obtain access to BLMIS, and **admit** that Conservative Fund invested in Sentry and Sigma. Defendants otherwise **lack knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 2 and therefore **deny** those allegations.

3.    The Fairfield Funds are British Virgin Islands companies that are in liquidation.

**ANSWER:**  Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 3 and therefore **deny** those allegations.

4.    Sentry was the largest BLMIS feeder fund. Sentry invested in excess of 95% of its assets in BLMIS from November 1990 until Madoff's arrest in December 2008.

**ANSWER:**  Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 4 and therefore **deny** those allegations.

5.    Sigma, a Sentry sister fund, was a "currency fund" which accepted subscriptions in Euros, converted the money to U.S. Dollars, and then invested 100% of its assets in Sentry.

**ANSWER:**  Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 5 and therefore **deny** those allegations.

6.    The Fairfield Funds were created, operated, and controlled by Fairfield Greenwich Group ("**FGG**"), a *de facto* partnership founded by U.S. citizens and residents Walter Noel and Jeffrey Tucker. FGG maintained its principal place of business in New York.

**ANSWER:**  Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 6 and therefore **deny** those allegations.

7.    Defendants purposefully invested in the Fairfield Funds in order to profit from BLMIS in New York, and this adversary proceeding arises from Defendants' deliberate investment in New York-based funds.

**ANSWER:**  Defendants **deny** the allegations in Paragraph 7.

8.    The Trustee seeks to recover at least $16,522,413 in subsequent transfers (the "Subsequent Transfers") of stolen BLMIS Customer Property made to

Conservative Fund by the Fairfield Funds and now held, in part, by Conservative Fund–Side Pocket.

**ANSWER:** Defendants **admit** that the Trustee seeks to recover subsequent transfers in this adversary proceeding but otherwise **deny** the allegations in Paragraph 8.

9.    Conservative Fund received BLMIS Customer Property by redeeming shares of the Fairfield Funds. Conservative Fund's purchases, and later redemptions, of the shares in the Fairfield Funds were governed by the subscription agreements that Defendants entered into with the Fairfield Funds. The subscription agreements governed the time, manner, and circumstances under which Management could make redemptions on behalf of Conservative Fund.

**ANSWER:** Defendants **deny** the allegations in Paragraph 9.

10.    Conservative Fund received at least $6,161,319 of stolen BLMIS Customer Property from Sentry between November 2005 and October 2007, and at least $10,361,245 from Sigma in March and October 2006.

**ANSWER:** Defendants **admit** that Conservative Fund received funds from Sentry and Sigma but **deny** that such funds were in the amounts identified in Exhibit C, **deny** that any of such funds constitute subsequent transfers of Customer Property or of any other property transferred from BLMIS to Sentry, and **deny** any remaining allegations of Paragraph 10.

11.    Management, a sophisticated asset management company with significant expertise in hedge fund investments, created, promoted, and managed Conservative Fund, including Conservative Fund's investment in the Fairfield Funds. As an asset manager, Management was a fiduciary obligated by Italian securities laws to perform meaningful due diligence, including the duty to ensure assets were appropriately invested and safeguarded by the Fairfield Funds and BLMIS.

**ANSWER:** Defendants **admit** that Management is an asset management company that created, promoted, and managed Conservative Fund, including Conservative Fund's investment in the Fairfield Funds. Defendants **aver** that the remaining allegations in Paragraph 11 state legal conclusions to which no response is required. To the extent any further response is required, Defendants lack knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 11 and therefore **deny** such allegations.

12.    In February 2009, during the pendency of this SIPA Proceeding, Management's board of directors set up Conservative Fund–Side Pocket with some of the assets of Conservative Fund and, upon information and belief, Management insiders received cash and shares in Conservative Fund–Side Pocket equal to those they held in Conservative Fund.

**ANSWER:**    Defendants **admit** that Management's board of directors set up Conservative Fund–Side Pocket with some of the assets of Conservative Fund and **deny** the remaining allegations in Paragraph 12.

## II.  DEFENDANTS

13.    Management was an Italian SGR (società di gestione del risparmio, i.e., an asset management company) incorporated under the form of S.p.A. (società per azioni, i.e., a joint stock company), with an address at Via Donizetti 53, Milano 20122, Italy. In January 2018, Management filed for voluntary liquidation in Italy and changed its legal designation to an Italian S.r.l (società a responsabilità limitata, i.e., a limited liability company). Management is still in voluntary liquidation. Management's shareholders are Unifortune Asset Management SA, Franco Brunello, Patrizia Cavazzini, and the heirs of Alberto Giovannini (one of the founders of Management): as co-owners Patrizia Cavazzini, Tommaso Giovannini, Camilla Giovannini, and Federico Giovannini. Management received fees for managing Conservative Fund and received direct payments of retrocession fees from Sentry in return for soliciting and introducing new investors into Sentry.

**ANSWER:**    Defendants **deny** the allegation that Management received direct payments of retrocession fees from Sentry in return for soliciting and introducing new investors into Sentry and **admit** the remaining allegations in Paragraph 13.

14.    Conservative Fund, also located at Via Donizetti 53, Milano 20122, Italy, was a fund of hedge funds created, promoted, and managed by Management on behalf of investors. It invested in the Fairfield Funds. In February 2009, recognizing its exposure and upon advice of counsel, Management created closed-end mutual fund Conservative Fund–Side Pocket from the partial demerger of Conservative Fund. Management facilitated the transfer of certain assets of Conservative Fund, including, upon information and belief, BLMIS Customer Property, into Conservative Fund–Side Pocket after the SIPA Proceeding was filed.

**ANSWER:**    Defendants **admit** that Conservative Fund was a fund of hedge funds located at Via Donizetti 53, Milano 20122 that was created, promoted, and managed by Management and that invested in the Fairfield Funds, and **admit** that Management

facilitated the transfer of certain assets of Conservative Fund. Defendants **deny** the remaining allegations in Paragraph 14.

15.     Under Italian law (i.e., art. 36 of the Consolidated Law on Financial Intermediation), an investment fund "constitutes an autonomous asset, distinct from the assets of the management company and from that of each shareholder, as well as from any other assets managed by the same company; for the obligations contracted on behalf of the fund, the management company is liable exclusively with the fund's assets." Accordingly, the assets of Conservative Fund were required to be segregated from those of Management, but Management had the exclusive substantive and procedural right to act on behalf of Conservative Fund, and the formal ownership of Conservative Fund's assets, including those it later moved to Conservative Fund–Side Pocket.

**ANSWER:** Defendants **aver** that the allegations in Paragraph 15 state legal conclusions to which no response is required. To the extent any further response is required, **deny** the allegations in Paragraph 15.

16.     Defendants are subject to suit for the Subsequent Transfers and Conservative Fund's assets, including those transferred to insiders and Conservative Fund–Side Pocket, may be attached to a judgment in this adversary proceeding.

**ANSWER:** Defendants **aver** that the allegations in Paragraph 15 state legal conclusions to which no response is required. To the extent any further response is required, **deny** the allegations in Paragraph 16.

## III.    <u>SUBJECT MATTER JURISDICTION AND VENUE</u>

17.     The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as Securities & Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al., No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

**ANSWER:** Defendants **deny** that this Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. §§ 78eee(b)(2)(A), (b)(4). Defendants state that the United States District Court for the Southern District of New York has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and SIPA § 78eee(b)(2)(A)((iii) and (b)(4) and this Court has jurisdiction over this adversary proceeding

to the extent provided in SIPA § 78eee(b)(4). Defendants **admit** the remaining allegations in Paragraph 17.

18.    This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (F), (H) and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

**ANSWER:**    Defendants **admit** this adversary proceeding is of a kind specified as a core proceeding in 28 U.S.C. §§ 157(b)(2)(H) and **deny** the remaining allegations in Paragraph 18. Defendants **do not consent** to issuance or entry of final orders or judgments by the Bankruptcy Court and demand trial by jury of all issues that may be tried by a jury.

19.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

**ANSWER:**    Defendants **admit** the allegations in Paragraph 19.

20.    This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

**ANSWER:**    Defendants **aver** that the allegations in Paragraph 20 state legal conclusions to which no response is required. To the extent any further response is required, Defendants **admit** that the Trustee has brought this adversary proceeding, but **deny** the remaining allegations in Paragraph 20.

## IV.    PERSONAL JURISDICTION

21.    Defendants are subject to the jurisdiction of the Bankruptcy Court under Bankruptcy Rule 7004 and the United States Constitution, as well as N.Y. C.P.L.R. § 302, because Conservative Fund and Management, on behalf of itself, Conservative Fund and Conservative Fund–Side Pocket, purposely availed themselves of the laws and protections of the United States and the State of New York.

**ANSWER:**    Defendants **deny** the allegations in Paragraph 21.

22.    Defendants transacted business in New York, and the Trustee's claims arise from those business activities.

**ANSWER:**    Defendants **deny** the allegations in Paragraph 22.

23. Defendants derived significant revenue from New York and maintained minimum contacts and/or general business contacts in the United States and the State of New York in connection with the claims alleged herein.

**ANSWER:** Defendants **deny** the allegations in Paragraph 23.

24. The Fairfield Funds were single-purpose funds whose sole purpose was to invest in BLMIS. Management, on behalf of itself and Conservative Fund, knowingly directed funds to be invested with and then redeemed from New York-based BLMIS through Sentry and Sigma. At all relevant times, the Fairfield Funds' principal place of business was in New York. By transacting with BLMIS and FGG, Conservative Fund and Management, on behalf of itself and as representative of Conservative Fund, knowingly accepted the rights, benefits, and privileges of conducting business and transactions in the United States and, specifically, New York.

**ANSWER:** Defendants lack knowledge sufficient to form a belief as to the truth of the allegations that the Fairfield Funds were single-purpose funds whose sole purpose was to invest in BLMIS and that the Fairfield Funds' principle place of business was in New York at all relevant times, and therefore **deny** those allegations. Defendants **deny** the remaining allegations in Paragraph 24.

25. Management, on behalf of itself and Conservative Fund, knew and intended that the money it invested in Sigma would be invested by Sentry in New York.

**ANSWER:** Defendants **deny** the allegations in Paragraph 25.

26. Defendants entered into a subscription agreement for each investment in the Fairfield Funds. These agreements incorporated each Fairfield Fund's private placement memoranda ("PPM") by reference. Defendants affirmed that they received and read the PPM in effect at the time and agreed to be bound by the terms of the PPMs. Based on these contracts, Defendants acknowledged the following facts that they were transacting in New York:

- Sentry invested at least 95% of its assets with New York-based BLMIS;

- FGG maintained its principal office in New York;

- The PPM would be governed and enforced in accordance with the laws of New York;

- Any suit, action or proceeding with respect to the PPM and Sentry may be brought in New York and irrevocably submitted to the jurisdiction of the New York courts in any proceeding with respect to the PPM;

- BLMIS's Split Strike Conversion ("SSC") Strategy purportedly involved the purchase of U.S. equities and U.S. put and call options traded on U.S. exchanges, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;

- BLMIS was the sub-custodian of Sentry's investments with BLMIS; and

- BLMIS was "essential to the continued operation of" Sentry.

**ANSWER:**    Defendants **refer to** the subscription agreements and PPMs referred to in paragraph 26 of the Complaint for their true and complete contents, and otherwise **deny** the allegations in paragraph 26.

27.    Defendants used New York bank accounts to transfer money for subscriptions to and receive redemptions from the Fairfield Funds. The Sentry subscription agreements required that all subscription payments to Sentry be deposited in a HSBC Bank USA, N.A. ("HSBC") bank account in New York. From Sentry's bank account, the funds were deposited into BLMIS's account at JPMorgan Chase Bank in New York. Management, on behalf of Conservative Fund, received redemption payments from Sentry through at least six separate wire transfers from the same HSBC account.

**ANSWER:**    Defendants **deny** that they used New York bank accounts to transfer money for subscriptions to and receive redemptions from the Fairfield Funds. Defendants **refer to** the Sentry subscription agreements referred to in paragraph 27 of the Complaint for their true and complete contents. Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegation that Sentry deposited funds into BLMIS's account, and therefore **deny** this allegation. Defendants **admit** that Management received redemption payments from Sentry through six wire transfers. Defendants otherwise **deny** the allegations in Paragraph 27.

28.    In at least two of the Sentry subscription agreements, Defendants agreed that the subscription agreements would be governed and enforced in accordance with the laws of New York, that any action or proceeding with respect to the agreements and Sentry may be brought in New York, and Defendants submitted to the jurisdiction of the New York courts and service of process.

**ANSWER:** Defendants **refer to** the subscription agreements referred to in Paragraph 28 of the Complaint for their true and complete contents, and otherwise **deny** the allegations in Paragraph 28.

29.    In addition, Management received fees under an April 2004 rebate agreement between Conservative Fund and New York-based FGG. A portion of the transfers to Management stemmed from this agreement from which it received rebates for investments with Sentry in an amount equal to 40 basis points of Sentry's management fee. The agreement was signed by Dan Lipton, an FGG partner who worked in New York.

**ANSWER:**    Defendants **deny** the allegations in Paragraph 29.

30.    Management also received money in the form of retrocession fees, incentive fees, management and performance fees, or other compensation and remuneration related to, arising from, or concerning the Subsequent Transfers. Management availed itself of doing business in New York when it signed a Letter of Understanding with Fairfield Greenwich Limited of New York in November 2005. In the Letter of Understanding, Management agreed to solicit and introduce new investors in exchange for fees paid to Management in shares of Sentry and Sigma. Management also agreed that New York law governed the Letter of Understanding.

**ANSWER:**    Defendants **deny** the allegations in Paragraph 30.

31.    Management's Portfolio Fund Manager, Manuela Cedarmas, and Head of Research, Ryan McRandal, had multiple direct interactions with FGG's New York personnel regarding Conservative Fund's investments in the Fairfield Funds.

**ANSWER:**    Defendants **admit** that Cedarmas and McRandal interacted with Fairfield Funds personnel regarding investments in the Fairfield Funds and **deny** the remaining allegations in Paragraph 31.

32.    Cedarmas and McRandal corresponded with and talked to FGG's New York personnel frequently about Conservative Fund's investments in BLMIS through the Fairfield Funds.

**ANSWER:**    Defendants **admit** that Cedarmas and McRandal corresponded with FGG's New York personnel about Conservative Fund's investments and **deny** the remaining allegations in Paragraph 32.

33.    Between 2004 and 2006, Cedarmas or McRandal travelled to New York at least three times to meet with FGG executives, including Jeffrey Tucker and Amit Vijayvergiya, to probe the Fairfield Funds.

**ANSWER:** Defendants **admit** that Cedarmas or McRandal traveled to New York three times to meet with FGG executives and **deny** the remaining allegations in Paragraph 33.

34. At a 2004 in-person meeting in New York, FGG and Cedarmas explored a broad range of topics relating to Management's investment on behalf of Conservative Fund in BLMIS, including the history of FGG's relationship with Madoff, Sentry's correlation with market indexes, the SSC Strategy's assets under management, and BLMIS's execution of the SSC Strategy.

**ANSWER:** Defendants **admit** that at a 2004 in-person meeting in New York, Jeffrey Tucker explained to Cedarmas how Fairfield Sentry controlled the trades, the strategy of Fairfield Sentry, and CITCO's (as administrator for Sentry) methodology to verify the pricing of the options in the strategy. Defendants **deny** the remaining allegations in Paragraph 34.

35. In March 2005, Cedarmas flew back to New York to meet with FGG again. During this meeting, Cedarmas and FGG reviewed Sentry's 2004 returns, portfolio composition and risk profile, and BLMIS's assets under management.

**ANSWER:** Defendants **admit** that Cedarmas flew to New York in March 2005 where he met with Jeffrey Tucker, who explained to Cedarmas the strategy and new seeding activities of Sentry in a fund named Briscoe investing in senior secured loans made to U.S. corporations and a negative experience in a seeding project in another fund named Schlarbaum. Defendants **deny** the remaining allegations in Paragraph 35.

36. In January 2006, McRandal went to New York to meet with FGG where he was given a "corporate overview" of Sentry's operations. McRandal asked FGG substantive questions about BLMIS's SSC Strategy, including why Madoff hedged the strategy if his market timing was so good and why no one was able to replicate the strategy with the same degree of success as Madoff. McRandal asked to visit BLMIS's New York offices and meet Madoff, however, FGG refused. FGG's notes from the meeting indicate that Management was skeptical about Madoff. Later that year, McRandal asked to speak to FGG again because he "had heard the usual rumors on Madoff."

**ANSWER:**  Defendants **admit** that McRandal visited New York in January 2006 and met with Fairfield Fund executives and **deny** the remaining allegations in Paragraph 36.

37.    Management, on behalf of Conservative Fund, engaged New York-based counsel and relied on that counsel's advice in creating Conservative Fund–Side Pocket and segregating certain assets of Conservative Fund into Conservative Fund–Side Pocket.

**ANSWER:**  Defendants **admit** that Conservative Fund-Side Pocket was created in February 2009 to segregate certain investments of Conservative Fund in certain other funds, not including any Fairfield Funds, that implemented lock ups in redemptions. Defendants **deny** the remaining allegations in Paragraph 37.

## V.    BACKGROUND

38.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding against Madoff and BLMIS. The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS.

**ANSWER:**  Defendants **admit** on information and belief that Madoff was arrested on or around the Filing Date and that the SEC filed a complaint against BLMIS. Defendants **lack knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 38, and therefore **deny** the remaining allegations in Paragraph 38.

39.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

**ANSWER:**  Defendants **lack knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 39, and therefore **deny** the remaining allegations in Paragraph 39.

40.    Also, on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

a.  appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

b.  appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

c.  removed the case to this Court pursuant to SIPA § 78eee(b)(4).,

**ANSWER:**  Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 40, and therefore **deny** the allegations in Paragraph 40.

41.    By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

**ANSWER:**  Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 41, and therefore **deny** the allegations in Paragraph 41.

42.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

**ANSWER:**  Defendants **admit** the allegations in Paragraph 42.

43.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC) (S.D.N.Y. March 12, 2009) (Docket No. 50), Madoff pleaded guilty to an eleven-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."*Id.* at 23. Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id.* On June 29, 2009, Madoff was sentenced to 150 years in prison.

**ANSWER:**  Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 43, and therefore **deny** the allegations in Paragraph 43.

44.    At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. Among other things, DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS's IA Business customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s. *Id.* at 46.

**ANSWER:**  Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 44, and therefore **deny** the allegations in Paragraph 44.

45.    At a plea hearing on November 21, 2011, in the case captioned United States v. Kugel, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

**ANSWER:**  Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 45, and therefore **deny** the allegations in Paragraph 45.

46.    On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS's IA Business.

**ANSWER:**  Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 46, and therefore **deny** the allegations in Paragraph 46.

## VI.    THE TRUSTEE'S POWERS AND STANDING

47.    As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing Customer Property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by BLMIS or Madoff to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

**ANSWER:**  Defendants **aver** that the allegations in Paragraph 47 state legal conclusions to which no response is required. To the extent any further response is required, Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 47 and therefore **deny** such allegations.

48.    Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of Chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b) .

**ANSWER:**  Defendants **aver** that the allegations in Paragraph 48 state legal conclusions to which no response is required. To the extent any further response is required,

Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in

Paragraph 48 and therefore **deny** such allegations.

49.    The Trustee has standing to bring the avoidance and recovery claims under
SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§
323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and
recover transfers under Bankruptcy Code §§ 544, 547, 548, 550(a), and 551, and SIPA §§
78fff-1(a) and 78fff- 2(c)(3).

**ANSWER:**    Defendants **aver** that the allegations in Paragraph 49 state legal

conclusions to which no response is required. To the extent any further response is required,

Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in

Paragraph 49 and therefore **deny** such allegations.

## VII.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.    BLMIS

50.    Madoff founded BLMIS in or about 1960 as a sole proprietorship and registered
as a broker-dealer with the SEC. In 2001, Madoff changed the corporate form of BLMIS from
a sole proprietorship to a New York limited liability company. At all relevant times, Madoff
controlled BLMIS first as its sole member, and thereafter as its chairman and chief executive.

**ANSWER:**    Defendants **lack knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 50 and therefore **deny** such allegations.

51.    In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless
of its business form, BLMIS operated as a single broker-dealer from 1960 through 2008.
Public records obtained from the Central Registration Depository of the Financial Industry
Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-
dealer from January 19, 1960 through December 31, 2008. At all times, BLMIS was assigned
CRD No. 2625. SIPC's Membership Management System database also reflects BLMIS's
registration with the SEC as a securities broker-dealer beginning on January 19, 1960. On
December 30, 1970, BLMIS became a member of SIPC and continued its membership without
any change in status until the Filing Date. SIPC membership is contingent on registration of
the broker-dealer with the SEC.

**ANSWER:**    Defendants **lack knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 51 and therefore **deny** such allegations.

52.    For most of its existence, BLMIS's principal place of business was 885 Third
Avenue in New York City, where Madoff operated three principal business units: a
proprietary trading desk, a broker-dealer operation, and the IA Business. Madoff, as founder,

sole owner, chairman, and chief executive officer, operated BLMIS with several family members and other employees, including DiPascali and Kugel, who pleaded guilty to helping Madoff carry out the fraudulent scheme.

**ANSWER:**    Defendants **lack knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 52 and therefore **deny** such allegations.

53.    BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

**ANSWER:**    Defendants **lack knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 53 and therefore **deny** such allegations.

54.    For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

**ANSWER:**    Defendants **lack knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 54 and therefore **deny** such allegations.

55.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available. as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

**ANSWER:**    Defendants **lack knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 55 and therefore **deny** such allegations.

**B.    The Ponzi Scheme**

56.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

**ANSWER:** Defendants **admit** upon information and belief that BLMIS claimed to invest money deposited by customers in securities, but otherwise **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 56 and therefore **deny** such allegations.

57.     BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the IA Business customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

**ANSWER:** Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 57 and therefore **deny** such allegations.

58.     To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

**ANSWER:** Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 58 and therefore **deny** such allegations.

59.     On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

**ANSWER:** Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 59 and therefore **deny** such allegations.

60.     BLMIS purported to execute two primary investment strategies for IA Business customers: the convertible arbitrage strategy and the SSC Strategy. For a limited group of IA Business customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit. At all relevant times, BLMIS conducted no legitimate business operations using any of these strategies.

**ANSWER:** Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 60 and therefore **deny** such allegations.

61.    All funds received from IA Business customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up BLMIS's proprietary trading business.

**ANSWER:** Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 61 and therefore **deny** such allegations.

62.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets. Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time. In the 1970s, this strategy represented a significant portion of the total IA Business accounts, but by the early 1990s, the strategy was purportedly used in only a small percentage of IA Business accounts.

**ANSWER:** Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 62 and therefore **deny** such allegations.

63.    From the early 1990s forward, Madoff began telling IA Business customers that BLMIS employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its IA Business customers. BLMIS reported falsified trades using backdated trade data on monthly account statements sent to IA Business customers that typically reflected substantial consistent gains on the customers' principal investments.

**ANSWER:** Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 63 and therefore **deny** such allegations.

64.    By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of- the-money S&P 100 Index put options, and (iii) the sale of out-of-the-money S&P 100 Index call options.

**ANSWER:** Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 64 and therefore **deny** such allegations.

65.    The put options were to limit the downside risk of sizeable price changes in the basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option would entail a loss for BLMIS.

**ANSWER:**    Defendants **lack knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 65 and therefore **deny** such allegations.

66.    The sale of call options would partially offset the costs associated with acquiring puts, but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

**ANSWER:**    Defendants **lack knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 66 and therefore **deny** such allegations.

67.    The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protection while limiting the upside.

**ANSWER:**    Defendants **lack knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 67 and therefore **deny** such allegations.

68.    If Madoff was putting on the same baskets of equities across all BLMIS Accounts, as he claimed, the total notional value of the puts purchased and calls sold had to equal the market value of the equities in the basket. For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

**ANSWER:**    Defendants **lack knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 68 and therefore **deny** such allegations.

69.    Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call or put option notional value to support the BLMIS SSC Strategy.

**ANSWER:**    Defendants **lack knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 69 and therefore **deny** such allegations.

70.    Sophisticated or professional investors knew Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P Index over the same time period. Not only did BLMIS post gains that exceed (at times, significantly) the S&P 100 Index's performance, it would regularly

show gains when the S&P 100 Index was down (at times, significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

**ANSWER:** Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 70 and therefore **deny** such allegations.

71.    BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM and profits respectively. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

**ANSWER:** Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 71 and therefore **deny** such allegations.

72.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he succeeded market timing by intermittently entering and exiting the market. During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

**ANSWER:** Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 72 and therefore **deny** such allegations.

73.    As a registered broker-dealer, BLMIS was required, pursuant to 17 C.F.R. § 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS reportedly exited the market completely at every year end and the end of every quarter starting in 2003. These quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time. Yet this is precisely what BLMIS's customer statements reported.

**ANSWER:** Defendants **aver** that the allegations in Paragraph 73 state legal conclusions to which no response is required. To the extent any further response is required, Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 73 and therefore **deny** such allegations.

74.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

**ANSWER:** Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 74 and therefore **deny** such allegations.

75. There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

**ANSWER:** Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 75 and therefore **deny** such allegations.

76. All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

**ANSWER:** Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 76 and therefore **deny** such allegations.

77. The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

**ANSWER:** Defendants **admit** that BLMIS's business continued until December 2008, but otherwise **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 77 and therefore **deny** such allegations.

78. Based on the Trustee's investigation, it appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. At the time the Ponzi scheme came to light in December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

**ANSWER:** Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 78 and therefore **deny** such allegations.

79.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements, and that the IA Business operated as a Ponzi scheme.

**ANSWER:**   Defendants **lack knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 79 and therefore **deny** such allegations.

80.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

**ANSWER:**   Defendants **lack knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 80 and therefore **deny** such allegations.

## VIII.   <u>MANAGEMENT AND CONSERVATIVE FUND</u>

81.     In February 1998, Italy passed Legislative Decree No. 58, Consolidated Law on Finance (the "1998 Decree") that, for the first time, made it legal to operate a hedge fund in Italy.

**ANSWER:**   Defendants **aver** that the allegations in Paragraph 81 state legal

conclusions to which no response is required. To the extent any response is required,

Defendants **lack knowledge** sufficient to form a belief as to the allegations in Paragraph 81

and therefore **deny** such allegations.

82.     Management was founded under the 1998 Decree by Italian brothers, Vittorio and Dr. Franco Brunello. It was one of the first SGRs to offer hedge funds as investment options in Italy.

**ANSWER:**   Defendants **admit** that Management was founded under the 1998

Decree by Italian brothers, Vittorio and Dr. Franco Brunello. Defendants **lack knowledge**

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 82 and

therefore **deny** such allegations.

83.     An SGR, like Management, was authorized by the Bank of Italy to provide collective investment management services. As required by Italian law, Management's exclusive purpose was the establishment and management of hedge funds like Conservative Fund.

**ANSWER:** Defendants **admit** that Management was authorized by the Bank of Italy to provide collective investment management services. Defendants **aver** that the remaining allegations in Paragraph 83 state legal conclusions to which no response is required. To the extent any further response is required, Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 83 and therefore **deny** such allegations.

84.    Management opened Conservative Fund in 2001.

**ANSWER:** Defendants **admit** the allegations in Paragraph 84.

85.    Under the 1998 Decree and subsequent amendments, Conservative Fund lacks an autonomous legal existence, and is a separate asset of Management, which has formal ownership of and is entitled to take action in court to ascertain the rights pertaining to the assets of Conservative Fund. Conservative Fund's assets are distinct from the assets of Management and from that of each participant, as well as any other assets managed by Management. Accordingly, Conservative Fund is the real party in interest with respect to the Subsequent Transfers of stolen Customer Property that it received.

**ANSWER:** Defendants **aver** that the allegations in Paragraph 85 state legal conclusions to which no response is required. To the extent any further response is required, Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 85 and therefore **deny** such allegations.

86.    The promotion, institution, and organization of Conservative Fund was entrusted to Management. It took on the role of "promoting company" (with tasks such as promotion, establishment and organization of Conservative Fund, as well as the management of relationships with its participants) and as "manager" (with the task of managing the assets of Conservative Fund and handling the respective investments).

**ANSWER:** Defendants **admit** the allegations of Paragraph 86.

87.    Specifically, as the manager of Conservative Fund, Management was required to comply with the regulations governing SGRs, which are designed to ensure sound and prudent management based on diligence, fairness, and transparency. The SGR must provide itself with adequate technology, qualified human resources, and it must adopt policies and procedures to, among other things, evaluate the managed funds' assets, identify and manage of any conflicts of interest, and direct the investment and divestment process.

**ANSWER:** Defendants **aver** that the allegations in Paragraph 87 state legal conclusions to which no response is required. To the extent any further response is required, Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 87 and therefore **deny** such allegations.

88.    Management had complete control over directing and managing Conservative Fund. Management certified to the Bank of Italy and the Commissione Nazionale per le Società e la Borsa (CONSOB)—both Italian supervisory authorities—that it was competent to perform adequate due diligence and had systems in place to identify fraud. Management was the formal legal "owner" of the assets comprising Conservative Fund. It was nevertheless responsible for assuring that the assets of Conservative Fund were not subjected to the dominion or will of Management's interest to the detriment of Conservative Fund.

**ANSWER:** Defendants **admit** that Management had complete control over directing and managing Conservative Fund and that Management certified to the Bank of Italy and the Commissione Nazionale per le Società e la Borsa (CONSOB)—both Italian supervisory authorities—that it was competent to perform adequate due diligence and had systems in place to identify fraud. Defendants **aver** that the remaining allegations in Paragraph 88 state legal conclusions to which no response is required. To the extent any further response is required, Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 88 and therefore **deny** such allegations.

## IX.    DEFENDANTS' INVESTMENT ACTIVITIES

89.    The stated objective of Conservative Fund was to preserve capital while increasing absolute performance over time. The Conservative Fund's marketing materials highlighted this strategy, touting a reduced volatility profile.

**ANSWER:** Defendants **admit** the allegations in Paragraph 89.

90.    The BLMIS SSC Strategy outwardly met this criteria and Management, on behalf of itself and Conservative Fund, initially gained access to BLMIS through a BLMIS feeder fund purportedly executing the SSC Strategy called Kingate Global Ltd. ("Kingate Global").

**ANSWER:**    Defendants **admit** that Management invested with Kingate Global and **lack knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 90 and therefore **deny** those allegations.

91.    In 2004, Management continued to expand its investments by subscribing to two other BLMIS single purpose feeder funds—Sentry and Sigma—that offered the same SSC Strategy that Kingate Global marketed.

**ANSWER:**    Defendants **admit** that Management invested with Sentry and Sigma in 2004 and **lack knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 91 and therefore **deny** those allegations.

92.    Management redeemed Conservative Fund's investments with Sentry ($6,141,167) between November 2005 and October 2007.

**ANSWER:**    Defendants **admit** that Management redeemed all Conservative Fund's investments with Sentry in November 2005 and later redeemed a small amount of rebate shares and **deny** the remaining allegations in Paragraph 92.

93.    Management redeemed Conservative Fund's investment with Sigma ($10,417,327) in March and October 2006.

**ANSWER:**    Defendants **admit** that Management redeemed all Conservative Fund's investments with Sigma in March 2006 and later redeemed a small amount of rebate shares and **deny** the remaining allegations in Paragraph 93.

94.    Following Madoff's arrest and the Filing Date, Management took steps to shield Conservative Fund's assets from the Trustee's recovery effort.

**ANSWER:**    Defendants **deny** the allegations in Paragraph 94.

95.    Specifically, in February 2009, Management's board of directors set up a closed-end mutual fund called "Unifortune Conservative Fund–Side Pocket," originating from some of the assets of Conservative Fund. Those assets, which include Customer Property, remain in Conservative Fund–Side Pocket.

**ANSWER:**    Defendants **admit** that Management's board of directors set up a closed-end mutual fund called "Unifortune Conservative Fund-Side Pocket" and **deny** the remaining allegations in Paragraph 95.

25

## X.    RECOVERY OF SUBSEQUENT TRANSFERS

96.    The Trustee commenced a separate adversary proceeding against Sentry and other defendants in this Court under the caption, *Picard v. Fairfield Sentry, Ltd., et al.*, Adv. Pro. No. 09-01239 (SMB), seeking to avoid and recover initial transfers of Customer Property from BLMIS to Sentry in the approximate amount of $3,000,000,000 (the "Sentry Initial Transfers"). Sentry held multiple accounts with BLMIS, as set forth in Exhibit A. The Sentry Initial Transfers are set forth in the attached Exhibit B.

**ANSWER:**    Defendants (a) **admit** that the Trustee filed an action styled as *Picard v. Fairfield Sentry Limited, et al.*, Adv. Pro. No. 09-01239 (the "**Sentry Action**"), (b) **deny** that the initial transfers of Customer Property from BLMIS to Sentry the Trustee seeks to avoid and recover in the Sentry Action were avoided or are avoidable, and (c) **lack knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 96 and therefore **deny** such allegations.

97.    The Sentry Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4).

**ANSWER:**    Defendants **aver** that the allegations in Paragraph 97 state legal conclusions to which no response is required. To the extent any response is required, Defendants **deny** the allegations in Paragraph 97.

98.    Under the Bankruptcy Court's June 7 and June 10, 2011 orders, the Bankruptcy Court approved a settlement among the Trustee, Sentry, and others, and on July 13, 2011, the Bankruptcy Court entered a consent judgment granting the Trustee a judgment in the amount of $3,054,000,000 ("Judgment Amount"). *Id.*, ECF No. 109.

**ANSWER:**    Defendants **admit** upon information and belief that the Court approved the settlement described in paragraph 98 of the Complaint and entered a judgment as described in paragraph 98 on or about the dates alleged therein, and **refer to** the referenced settlement agreement and the referenced judgment for their true and complete contents.

99.    On August 28, 2020, the Trustee filed a second amended complaint in the Sentry Ltd. proceeding ("Second Amended Complaint") seeking, in part, recovery of the Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a declaratory judgment that the Sentry Initial Transfers comprising the Judgment Amount are avoided. Id. (Bankr. S.D.N.Y. Aug. 28, 2020), ECF No. 286.

**ANSWER:**   Defendants **admit** that the Trustee filed a second amended complaint in the Sentry proceeding on or about the date alleged, **refer to** the referenced second amended complaint, including its exhibits, for a statement of their complete and accurate contents, and otherwise **deny** the allegations of paragraph 99 of the Complaint.

100.   As alleged in the Second Amended Complaint, Sentry received each of the Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Sentry to inquire further into the BLMIS fraud. The Trustee incorporates by reference the allegations contained in the Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, and 315-16.

**ANSWER:**   Defendants (a) upon information and belief, **deny** that Sentry had actual knowledge that Madoff or BLMIS were not trading securities or that they were perpetrating a Ponzi scheme, (b) **deny** that the referenced Second Amended Complaint sufficiently alleges Sentry's actual knowledge of fraud at BLMIS, (c) **object** to the incorporation by reference of, and therefore does not answer, each and every paragraph and allegation in the Second Amended Complaint and to the inclusion in this adversary proceeding of any issue implicated by the Second Amended Complaint other than the issue of the avoidance or avoidability of the initial transfers of Customer Property, and (d) **lack knowledge** sufficient to form a belief as to the truth of any of the other allegations of the referenced Second Amended Complaint, but reserve the right to rely on and introduce any allegations in the Second Amended Complaint or its exhibits as opposing party admissions admissible for the truth of their contents, and otherwise **deny** the allegations of paragraph 100 of the Amended Complaint.

101.   Of the Judgment Amount, $2,895,000,000 was transferred to Sentry during the six years preceding the Filing Date (the "Sentry Six Year Transfers"). Each of the Sentry Six Year Transfers is avoidable under Bankruptcy Code § 544, the applicable provisions of the New York Fraudulent Conveyance Act ("N.Y. Debt. & Cred. Law"), particularly §§ 273-279, and SIPA, particularly § 78fff-2(c)(3).

**ANSWER:** Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegation of the timing and amounts of the alleged transfers alleged in Paragraph 101 and therefore denies such allegations. Defendants **aver** that the remaining allegations in Paragraph 101 state legal conclusions to which no response is required. To the extent that any further response is required, Defendants **deny** the allegations in Paragraph 101.

102.    Of the Sentry Six Year Transfers, $1,580,000,000 was transferred to Sentry during the two years preceding the Filing Date (the "Sentry Two Year Transfers"). Each of the Sentry Two Year Transfers is avoidable under Bankruptcy Code § 548, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER:** Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegation of the timing and amounts of the alleged transfers alleged in Paragraph 102 and therefore denies such allegations. Defendants **aver** that the remaining allegations in Paragraph 102 state legal conclusions to which no response is required. To the extent that any further response is required, Defendants **deny** the allegations in Paragraph 102.

103.    Based on the Trustee's investigation to date, prior to the Filing Date, Sentry subsequently transferred a portion of the Sentry Initial Transfers to Conservative Fund. Such subsequent transfers were accepted by Management on behalf of Conservative Fund. Based on the Trustee's investigation to date, the subsequent transfers of Customer Property to Conservative Fund total $6,161,319 ("Conservative Fund-Sentry Subsequent Transfers"). A chart setting forth the presently known Conservative Fund-Sentry Subsequent Transfers by date and amount is attached as Exhibit C.

**ANSWER:** Defendants **admit** that Conservative Fund received funds from Sentry but **deny** that such funds were in the amounts identified in Exhibit C, **deny** that any of such funds constitute subsequent transfers of Customer Property or of any other property transferred from BLMIS to Sentry, and **deny** any remaining allegations of Paragraph 103.

104.    The Conservative Fund-Sentry Subsequent Transfers are recoverable from Defendants under Bankruptcy Code § 550(a), and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER:** Defendants **aver** that the allegations in Paragraph 104 state legal conclusions to which no response is required. To the extent any further response is required, Defendants **deny** the allegations in Paragraph 104.

105.    The Conservative Fund-Sentry Subsequent Transfers represent a redemption of equity interests by Defendants as shareholders in Sentry. Because Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Sentry was insolvent when it made the Sentry Subsequent Transfers to Defendants upon redemption of their interests.

**ANSWER:** Defendants **admit** that the payments from Sentry to Conservative Fund represent redemptions of equity interests by Defendants as shareholders in Sentry and **lack knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 105 and therefore **deny** such allegations.

106.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Initial and Conservative Fund-Sentry Subsequent Transfers discussed above, and any additional subsequent transfers; (ii) seek avoidance and recovery of such transfers; and (iii) trace and recover any post-December 2008 transfers of the assets of Conservative Fund transferred to Conservative Fund–Side Pocket or Management insiders by Management.

**ANSWER:** Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 106 and therefore **deny** these allegations.

107.    Prior to the Filing Date, Sentry subsequently transferred Customer Property of at least $801,106,773 of the Sentry Initial Transfers to Sigma ("Sigma Subsequent Transfers"). A chart setting forth the presently known Sigma Subsequent Transfers is attached as Exhibit D.

**ANSWER:** Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegation of the timing and amounts of the alleged transfers alleged in Paragraph 107 and therefore **deny** such allegations.

108.    Thereafter, Sigma transferred at least $10,361,245 of Customer Property to Conservative Fund (the "Conservative Fund-Sigma Subsequent Transfers"). A chart setting forth the presently known Conservative Fund-Sigma Subsequent Transfers is attached as Exhibit E.

**ANSWER:** Defendants **admit** that Conservative Fund received funds from Sigma but **deny** that such funds were in the amounts identified in Exhibit E, **deny** that any of such

funds constitute subsequent transfers of Customer Property or of any other property transferred from BLMIS to Sigma, and **deny** any remaining allegations of Paragraph 108.

109.    The Conservative Fund-Sigma Subsequent Transfers are recoverable from Defendants under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:**    Defendants **aver** that the allegations in Paragraph 109 state legal conclusions to which no response is required. To the extent any further response is required, Defendants **deny** the allegations in Paragraph 109.

110.    The Conservative Fund-Sigma Subsequent Transfers represent a redemption of equity interests by Defendants as shareholders in Sigma. Because Sigma invested all or substantially all its assets into the BLMIS Ponzi scheme, Sigma was insolvent when it made the Conservative Fund-Sigma Subsequent Transfers to Defendants upon redemption of its interests.

**ANSWER:**    Defendants **admit** that the payments from Sigma to Conservative Fund represent redemptions of equity interests by Defendants as shareholders in Sigma and otherwise **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 110 and therefore **deny** the allegations in Paragraph 110.

111.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Sigma Subsequent Transfers and Conservative Fund-Sigma Subsequent Transfers discussed above, and any additional subsequent transfers; (ii) seek avoidance and recovery of such transfers; and (iii) trace and recover any post-December 2008 transfers of the assets of Conservative Fund transferred to Conservative Fund–Side Pocket or Management insiders by Management.

**ANSWER:**    Defendants **lack knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 111 and therefore **deny** these allegations.

112.    The Conservative Fund-Sentry Subsequent Transfers and the Conservative Fund-Sigma Subsequent Transfers, as defined above, are collectively referred to as the "Subsequent Transfers."

**ANSWER:**    Defendants **aver** that the allegations in Paragraph 112 introduce a defined term to which no response is required. To the extent any further response is required, Defendants **deny** the allegations in Paragraph 112.

## COUNT ONE
## RECOVERY OF SUBSEQUENT TRANSFERS
### 11 U.S.C. §§ 105(a) AND 550(a)

113.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

**ANSWER:**    Defendants **incorporate by reference** their responses to the allegations contained in each of the previous paragraphs of this Complaint as if fully rewritten in this paragraph.

114.    The Subsequent Transfers are recoverable from Defendants under Bankruptcy Code § 550(a) and SIPA § 78fff-2(c)(3).

**ANSWER:**    Defendants **aver** that the allegations in Paragraph 114 state legal conclusions to which no response is required. To the extent any further response is required, Defendants **deny** the allegations in Paragraph 114.

115.    Each of the Subsequent Transfers was made directly or indirectly to Defendants, thus, Defendants are immediate or mediate transferees of the Initial Transfers from Sentry and Subsequent Transfers from Sigma.

**ANSWER:**    Defendants **aver** that the allegations in Paragraph 115 state legal conclusions to which no response is required. To the extent any further response is required, Defendants **deny** the allegations in Paragraph 115.

116.    As a result of the foregoing, pursuant to Bankruptcy Code §§ 105(a) and 550(a), and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendants: (a) recovering the Subsequent Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**ANSWER:**    Defendants **aver** that the allegations in Paragraph 116 state legal conclusions to which no response is required. To the extent any further response is required, Defendants **deny** the allegations in Paragraph 116.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense
### (Personal Jurisdiction)

1.      This Court lacks personal jurisdiction over Defendants with respect to the claim asserted in the Complaint. Defendants do **not** consent to a decision by this Court or to this Court's authority to hear and determine this action.

### Second Affirmative Defense
### (Failure to State a Claim for Relief)

2.      The Complaint fails to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable under Rule 7012(b) of the Federal Rules of Bankruptcy Procedure.

### Third Affirmative Defense
### (Section 550(b)—Value, Good Faith, Without Knowledge of Voidability: Conservative Fund-Sentry Subsequent Transfers)

3.      To the extent, if any, that Defendants received any Conservative Fund-Sentry Subsequent Transfers, such Conservative Fund-Sentry Subsequent Transfers may not be recovered because Defendants took such Conservative Fund-Sentry Subsequent Transfers for value and in good faith and without knowledge of the voidability of the Sentry Initial Transfers within the meaning of 11 U.S.C. § 550(b).

4.      **Value.** To the extent, if any, that Defendants received any Conservative Fund-Sentry Subsequent Transfers, Defendants took the Conservative Fund-Sentry Subsequent Transfers in exchange for Sentry's redemption of its own shares from Defendants and therefore took for value.

5.      **Good Faith.** Defendants began investing in Sentry in 2004. At the time each of the Conservative Fund-Sentry Subsequent Transfers was made, Defendants understood that Sentry invested in U.S. securities primarily through an account that Sentry held at BLMIS, and had reported consistent, positive, and generally above-market returns, that

BLMIS was founded and operated by Bernard L. Madoff, that Madoff was a well-respected member of the investment community and former chair of NASDAQ, that BLMIS was one of the largest market makers in NASDAQ stocks and reported delivering consistently high returns on investment, and that BLMIS claimed to use a split strike conversion strategy to obtain these results, which Defendants did not then know to be false.

6.     To the extent, if any, that Defendants received any Conservative Fund-Sentry Subsequent Transfers, at the time each Conservative Fund-Sentry Subsequent Transfers was made, Defendants were aware of only the publicly available information about Sentry and about BLMIS, including that some investment professionals had raised concerns about the transparency of BLMIS and the lack of separation between its asset management, brokerage, and custodian administration. On or before the date of the last of the Conservative Fund-Sentry Subsequent Transfers (if any), Defendants did not have access to non-public information regarding BLMIS. Defendants handled their Sentry account consistent with other industry professionals based on publicly known information about Sentry and about BLMIS. None of the communications Defendants had with Sentry or its directors, officers, or employees or with BLMIS or any of its officers or employees on or before the date of the last of the Conservative Fund-Sentry Subsequent Transfers (if any) revealed or suggested that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Sentry or its directors, officers, or employees suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

7.     At no time on or before the date of the last Conservative Fund-Sentry Subsequent Transfers (if any) was any director, officer, employee, agent, or consultant of Defendants aware that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Sentry or its directors, officers, employees, agents, or consultants knew or suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

8.      The Conservative Fund-Sentry Subsequent Transfers (if any) did not have a fraudulent purpose but were routine transfers in exchange for redemption of shares in Sentry. A reasonable person with the facts in Defendants' possession at the time of each of the Conservative Fund-Sentry Subsequent Transfers (if any) would not have been on inquiry notice of any fraudulent purpose behind such Conservative Fund-Sentry Subsequent Transfers nor would those facts have led such a person to conduct further inquiry into whether there was a fraudulent purpose to such Conservative Fund-Sentry Subsequent Transfers or the Sentry Initial Transfers or whether BLMIS was trading securities or was a fraud or a Ponzi scheme.

9.      A diligent inquiry by Defendants would not have discovered that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Other entities with greater investigatory tools and resources than Defendants, and with more access to BLMIS personnel and documentation than Defendants, investigated BLMIS but failed to uncover that it was a Ponzi scheme before December 2008, including the SEC, which began an investigation into BLMIS in 2006 but could not determine BLMIS's fraudulent purpose. Defendants did not have the capability of discovering what United States government regulators could not and would not have discovered as the fraudulent purpose of the Sentry Initial Transfers or, if there were any fraudulent purpose of the Conservative Fund-Sentry Subsequent Transfer (if any), of such fraudulent purpose, and as an entity without privity with BLMIS or Madoff, did not have any reasonable ability to conduct a diligent investigation into BLMIS, including into its IA business, that could have led to a discovery of the fraudulent purpose of the Sentry Initial Transfers.

10.      **Without Knowledge of the Voidability of the Sentry Initial Transfers.** Defendants did not have knowledge of the voidability of the Sentry Initial Transfers when they received each of the Conservative Fund-Sentry Subsequent Transfers (if any).

**Fifth Affirmative Defense—Count One**
(Section 550(b)—Value, Good Faith, Without Knowledge of Voidability: Conservative Fund-
Sigma Subsequent Transfers)

11.     To the extent, if any, that Defendants received any Conservative Fund-Sigma
Subsequent Transfers, the property received by Defendants as part of the Conservative
Fund-Sigma Subsequent Transfers may not be recovered because Defendants took such
Conservative Fund-Sigma Subsequent Transfers for value, in good faith, and without
knowledge of the voidability of the Sentry Initial Transfers within the meaning of 11 U.S.C.
§ 550(b).

12.     **Value.** To the extent, if any, that Defendants received any Conservative Fund-
Sigma Subsequent Transfers, Defendants took such Conservative Fund-Sigma Subsequent
Transfers in exchange for Sigma's redemption its own shares from Defendants and therefore
took for value.

13.     **Good Faith.** Defendants began investing in Sigma in 2004. At the time each
of the Conservative Fund-Sigma Subsequent Transfers was made, Defendants understood
that Sigma invested in U.S. securities primarily through its investment in Sentry, which had
an account at BLMIS, that Sentry had reported consistent, positive, and generally above-
market returns, that BLMIS was founded and operated by Bernard L. Madoff, that Madoff
was a well-respected member of the investment community and former chair of NASDAQ,
that BLMIS was one of the largest market makers in NASDAQ stocks and reported delivering
consistently high returns on investment, and that BLMIS claimed to use a split strike
conversion strategy to obtain these results, which Defendants did not then know to be false.

14.     To the extent, if any, that Defendants received any Conservative Fund-Sigma
Subsequent Transfers, at the time each of the Conservative Fund-Sigma Subsequent
Transfers was made, Defendants were aware of only the publicly available information about
Sentry and Sigma and about BLMIS, including that some investment professionals had

raised concerns about the transparency of BLMIS and the lack of separation between its asset management, brokerage, and custodian administration. On or before the date of the last of the Conservative Fund-Sigma Subsequent Transfers (if any), Defendants did not have access to non-public information regarding BLMIS. Defendants handled their Sigma account consistent with other industry professionals based on publicly known information about Sigma and about BLMIS. Defendants did not have any communications with BLMIS or its officers or employees or Madoff on or before the date of the last of the Conservative Fund-Sigma Subsequent Transfers (if any). None of the communications Defendants had with Sigma or its directors, officers, or employees or with BLMIS or any of its officers or employees on or before the date of the last of the Conservative Fund-Sigma Subsequent Transfers (if any) revealed or suggested that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Sigma or its directors, officers, or employees suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

15.     At no time on or before the date of the last Conservative Fund-Sigma Subsequent Transfers (if any) was any director, officer, employee, agent, or consultant of Defendants aware that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Sigma or its directors, officers, employees, agents, or consultants knew or suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

16.     The Conservative Fund-Sigma Subsequent Transfers (if any) did not have a fraudulent purpose but were routine transfers in exchange for redemption of shares in the Sigma. A reasonable person with the facts in Defendants' possession at the time of each of the Conservative Fund-Sigma Subsequent Transfers (if any) would not have been on inquiry notice of any fraudulent purpose behind such Conservative Fund-Sigma Subsequent Transfers nor would those facts have led such a person to conduct further inquiry into whether there was a fraudulent purpose to such Conservative Fund-Sigma Subsequent

Transfers or the Sentry Initial Transfers or whether BLMIS was trading securities or was a fraud or a Ponzi scheme.

17.    A diligent inquiry by Defendants would not have discovered that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Other entities with greater investigatory tools and resources than Defendants, and with more access to BLMIS personnel and documentation than Defendants, investigated BLMIS but failed to uncover that it was a Ponzi scheme before December 2008, including the SEC, which began an investigation into BLMIS in 2006 but could not determine BLMIS's fraudulent purpose. Defendants did not have the capability of discovering what United States government regulators could not and would not have discovered as the fraudulent purpose of the Sentry Initial Transfers or, if there were any fraudulent purpose of the Conservative Fund-Sigma Subsequent Transfer (if any), of such fraudulent purpose, and as an entity without privity with BLMIS or Madoff before the opening, solely as custodian, of the Isos Fund Ltd. account in March 2007, did not have any reasonable ability to conduct a diligent investigation into the BLMIS, including into its IA business, that could have led to a discovery of the fraudulent purpose of the Sentry Initial Transfers.

18.    **Without Knowledge of the Voidability of the Sentry Initial Transfers.** Defendants did not have knowledge of the voidability of the Sentry Initial Transfers when they received each of the Conservative Fund-Sigma Subsequent Transfers (if any).

### Sixth Affirmative Defense
<u>(Non-Avoidability of Sentry Six Year Transfers Under Section 546(e)—Settlement Payment)</u>

19.    Under section 546(e) of the Bankruptcy Code, the Sentry Six Year Transfers (excluding the Sentry Two Year Transfers) are not avoidable because they were settlement payments, as defined in section 101 or 741 of the Bankruptcy Code, made before the commencement of the case by or to (or for the benefit of) BLMIS, which was then a

stockbroker, or Sentry, which was then a financial institution or financial participant and, on information and belief, did not have actual knowledge that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Because the Sentry Six Year Transfers (excluding the Sentry Two Year Transfers) are not avoidable, property received by Defendants (if any) as part of the Sentry Six Year Transfers (excluding the Sentry Two Year Transfers) is not recoverable from Defendants. In addition, at the time of the transfer from Sentry to Defendants, Defendants had no actual knowledge that BLMIS was not trading securities or that it was a fraud or a Ponzi scheme.

**Seventh Affirmative Defense**
<u>(Non-Avoidability of Sentry Initial Transfers Under Section 546(e)—Securities Contract)</u>

20.    Under section 546(e) of the Bankruptcy Code, the Sentry Six Year Transfers (excluding the Sentry Two Year Transfers) were not avoided and are not avoidable because they were transfers made before the commencement of the case by or to (or for the benefit of) BLMIS, which was then a stockbroker, or Sentry, which was then a financial institution or financial participant, and, on information and belief, did not have actual knowledge that BLMIS was not trading securities or was a fraud or a Ponzi scheme, in connection with a securities contract, as defined in section 741(7) of the Bankruptcy Code, between BLMIS and Sentry or between Sentry and Defendants. Because the Sentry Six Year Transfers (excluding the Sentry Two Year Transfers) are not avoidable, property received by Defendants (if any) as part of the Sentry Six Year Transfers (excluding the Sentry Two Year Transfers) is not recoverable from Defendants. In addition, at the time of the transfer (if any) from Sentry to Defendants, Defendants had no actual knowledge that BLMIS was not trading securities or that it was a fraud or a Ponzi scheme.

### Eighth Affirmative Defense
### (Not Customer Property—Sentry Initial Transfers)

21.    The property, if any, that Defendants received from Sentry was not Customer Property, or proceeds of Customer Property, that BLMIS transferred to Sentry, and therefore the property is not recoverable by the Trustee from Defendants.

### Ninth Affirmative Defense
### (Proceeds Not Recoverable—Sentry Initial Transfers)

22.    In the alternative, to the extent that the property, if any, that Defendants received from Sentry or Sigma was proceeds of Customer Property or other property that BLMIS transferred to Sentry or Sigma, it is not recoverable by the Trustee from Defendants under section 550(a)(2) of the Bankruptcy Code.

### Tenth Affirmative Defense
### (Section 550(d)—Single Satisfaction—Sentry Six Year Transfers)

23.    Under section 550(d) of the Bankruptcy Code, the trustee may not recover any subsequent transfer from Defendants to the extent he has recovered from Sentry or any other immediate or mediate transferee the amount of the avoided initial transfer that included the customer property that the trustee alleges Defendants received.

### Eleventh Affirmative Defense
### (Extraterritoriality)

24.    The Trustee's recovery from Defendants of any transfer from Sentry or Sigma would constitute an impermissible extraterritorial application of U.S. law.

### Twelfth Affirmative Defense
### (Comity)

25.    The Trustee's recovery from Defendants of any transfer from Sentry or Sigma would violate principles of comity.

### Thirteenth Affirmative Defense
(Limitation on Liability)

26.    The Trustee's recovery from Defendants is limited to assets of Conservative Fund.

### DEMAND FOR JURY TRIAL

Defendants **do not consent** to issuance or entry of final orders or judgments by the Bankruptcy Court and **demand trial by jury** before the District Court of all issues that may be tried by a jury.

**WHEREFORE** Defendant Defendants prays that Plaintiff trustee take nothing by his complaint and that the Court grant Defendants such other relief, including an award of attorneys' fees, costs, and disbursements, as may be just.

Dated: March 31, 2023                Respectfully submitted,

By: _/s/ Richard Levin_____

JENNER & BLOCK LLP
Richard Levin
Carl Wedoff
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600

Vincent E. Lazar
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350

*Counsel for Defendants Unifortune Asset Management S.r.l and Unifortune Conservative Fund*