Richard A. Cirillo
CIRILLO LAW OFFICE
246 East 33rd Street – # 1
New York, NY 10016-4802
Telephone:  917-541-6778
E-mail: rcirillo@cirillo-law.com
*Attorney for Defendants National Bank
of Kuwait S.A.K. and NBK Banque Privée
(Suisse) S.A.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 11-02554 (CGM) |
| Plaintiff, | |
| v. | |
| NATIONALBANK OF KUWAIT S.A.K. AND NBK BANQUE PRIVÉE (SUISSE) S.A., | |
| Defendants. | |

**ANSWER AND DEFENSES OF DEFENDANTS
NATIONAL BANK OF KUWAIT S.A.K.
AND NBK BANQUE PRIVÉE (SUISSE) S.A.
TO AMENDED COMPLAINT**

Defendants National Bank of Kuwait S.A.K. (now P.S.A.K.) ("NBK") and NBK Banque

Privée (Suisse) S.A. ("NBK Suisse")[*] answer the Amended Complaint filed on July 11, 2022, by

Irving H. Picard (the "Trustee") as trustee for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS") and the substantively consolidated estate of Bernard L.

Madoff ("Madoff") and assert defenses as follows:

## I.    NATURE OF THE PROCEEDING[**]

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS
customer property, as defined by SIPA § 78*lll*(4), that was stolen as part of the massive Ponzi
scheme perpetrated by Madoff and others.

ANSWER TO ¶ 1:  Defendants admit that this paragraph states the Trustee's view of his goal

in filing this proceeding and deny that either Defendant stole any BLMIS customer property

and that the Trustee is entitled to recover anything from or obtain any relief against either of

them.

2.    With this Amended Complaint, the Trustee seeks to recover $19,175,523 in
subsequent transfers of BLMIS customer property Defendants received from Fairfield Sentry
Limited ("Fairfield Sentry") during the period of July 2007 through November 2008.

ANSWER TO ¶ 2:  Defendants admit that the Trustee seeks approximately $19,175,523 from

the Defendants based on the allegations in his Amended Complaint, deny the Trustee is

entitled to any recovery or relief from either Defendant, and state that they lack knowledge or

information sufficient to form a belief about the truth of the other allegations in this

paragraph.

3.    Defendant NBK received at least $17,585,510 in subsequent transfers of customer
property from Fairfield Sentry that the Trustee seeks to recover with this Amended Complaint.

---

[*]  NBK and NBK Suisse may each be referred to herein as a "Defendant" and together as the "Defendants."

[**] For the purpose of this answer, captions are treated as convenient references rather than allegations requiring a
response.

ANSWER TO ¶ 3:  Defendants admit that the Trustee seeks to recover approximately

$17,585,510 based on the allegations in his Amended Complaint, deny that the Trustee is

entitled to any recovery or relief from either Defendant, and state that they lack knowledge or

information sufficient to form a belief about the truth of the other allegations in this

paragraph.

4.  Defendant NBK Suisse received at least $1,590,013 in subsequent transfers of customer property from Fairfield Sentry that the Trustee seeks to recover with this Amended Complaint.

ANSWER TO ¶ 4:  Defendants admit that the Trustee seeks to recover approximately

$1,590,013 based on the allegations in his Amended Complaint, deny that the Trustee is

entitled to any recovery or relief from either Defendant, and state that they lack knowledge or

information sufficient to form a belief about the truth of the other allegations in this

paragraph.

## II.  SUBJECT MATTER JURISDICTION AND VENUE

5.  This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities & Exchange Commission v. Bernard L. Madoff Investment Securities LLC*, *et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

ANSWER TO ¶ 5:  Defendants admit the allegations in this paragraph.

6.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).  The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

ANSWER TO ¶ 6:  Defendants state that the allegations in the first sentence of this

paragraph are contentions of law to which no answer is required and, if an answer is required,

deny them; admit the Trustee consents to entry of final orders or judgments by this Court and

state that Defendants do not consent to entry of final orders or judgments by this Court.

7.   Venue in this judicial district is proper under 28 U.S.C. § 1409.

ANSWER TO ¶ 7:  This allegation is a legal conclusion to which no answer is required and,

if an answer is required, Defendants deny it. Defendants contest personal and subject matter

jurisdiction but do not contest venue in this District if jurisdiction is found and upheld.

8.   This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C.
§§ 105(a) and 550, and other applicable law.

ANSWER TO ¶ 8:  Defendants admit that the Trustee purports to bring this proceeding under

the cited statutes and otherwise deny the allegations in the paragraph.

### III.  BACKGROUND, THE TRUSTEE, AND STANDING

9.   On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for
criminal violations of federal securities laws, including securities fraud, investment adviser
fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission
("SEC") commenced the District Court Proceeding.

ANSWER TO ¶ 9:  Defendants admit that the allegations in this paragraph present

information that became available to Defendants and others through public sources after they

occurred and otherwise state that they lack knowledge or information sufficient to form a

belief about their truth but do not contest them.

10.  On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to
combining its action with an application by the Securities Investor Protection Corporation
("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court
alleging, among other things, that BLMIS could not meet its obligations to securities customers as
they came due and its customers needed the protections afforded by SIPA.

ANSWER TO ¶ 10:  Defendants admit that the allegations in this paragraph present

information that became available to Defendants and others through public sources after they

occurred and otherwise state that they lack knowledge or information sufficient to form a

belief about their truth but do not contest them.

11.  Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part: (a) appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3); (b) appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and (c) removed the case to this Court pursuant to SIPA § 78eee(b)(4).

ANSWER TO ¶ 11:  Defendants admit that the allegations in this paragraph present

information that became available to Defendants and others through public sources after they

occurred and otherwise state that they lack knowledge or information sufficient to form a belief

about their truth but do not contest them.

12.  By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

ANSWER TO ¶ 12:  Defendants admit that the allegations in this paragraph present

information that became available to Defendants and others through public sources after they

occurred and otherwise state that they lack knowledge or information sufficient to form a belief

about their truth but do not contest them.

13.  On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

ANSWER TO ¶ 13:  Defendants admit that the allegations in this paragraph present

information that became available to Defendants and others through public sources after they

occurred and otherwise state that they lack knowledge or information sufficient to form a belief

about their truth but do not contest them.

14.  At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

ANSWER TO ¶ 14:  Defendants admit that the allegations in this paragraph present

information that became available to Defendants and others through public sources after they

occurred and otherwise state that they lack knowledge or information sufficient to form a belief about their truth but do not contest them.

15. At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

ANSWER TO ¶ 15: Defendants admit that the allegations in this paragraph present

information that became available to Defendants and others through public sources after they

occurred and otherwise state that they lack knowledge or information sufficient to form a belief

about their truth but do not contest them.

16. At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

ANSWER TO ¶ 16: Defendants admit that the allegations in this paragraph present

information that became available to Defendants and others through public sources after they

occurred and otherwise state that they lack knowledge or information sufficient to form a belief

about their truth but do not contest them.

17. On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

ANSWER TO ¶ 17: Defendants admit that the allegations in this paragraph present

information that became available to Defendants and others through public sources after they

occurred and otherwise state that they lack knowledge or information sufficient to form a

belief about their truth but do not contest them.

18. As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering, and distributing customer property to BLMIS's customers holding allowed customer

claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

ANSWER TO ¶ 18: Defendants admit that the first sentence of this paragraph identifies

some of the Trustee's duties and responsibilities, state that they lack knowledge or

information sufficient to form a belief about the truth of the allegations in the second and

third sentences, and deny that the Trustee may avoid or recover from either of them any

payouts of fictitious profits and/or other transfers.

19. Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

ANSWER TO ¶ 19: Defendants state that the allegations in this paragraph are legal

conclusions to which no answer is required and, if an answer is required, Defendants deny

them.

20. The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

ANSWER TO ¶ 20: Defendants state that the allegations in this paragraph are legal

conclusions to which no answer is required and, if an answer is required, Defendants deny

them. Defendants state that the Trustee has no avoidance and recovery claims to bring

against either Defendant.

## IV. THE DEFENDANTS AND NON-PARTIES

A. Defendant NBK

21. Defendant NBK is an international bank organized under the laws of Kuwait with a

registered address at P.O. Box 95, Safat, 13001 Kuwait. In addition to maintaining offices worldwide, NBK is the largest private sector institution in Kuwait, with a well-established franchise and market leadership in all business segments.

ANSWER TO ¶ 21: Defendants admit the allegations in the first sentence of this paragraph and deny the allegations in the second sentence except admit that NBK maintains offices or branches in many countries, is the largest private sector banking institution in Kuwait, and that it has established banking and financial relationships and is a market leader in various banking and finance business segments.

22. Established in 1952 as the first national bank in Kuwait and the entire Arabian Gulf region, NBK quickly became a financial leader in the Middle East, billing itself as "The Bank You Know and Trust." Throughout the years, NBK built an advanced banking institution and obtained extensive expertise in financial products for both individuals and companies, publicly touting its ability to offer clients a full spectrum of innovative financial and investment services.

ANSWER TO ¶ 22: Defendants deny the allegations in this paragraph except admit that NBK was incorporated in 1952 as Kuwait's first indigenous bank and the first shareholding company in the entire Gulf region; has been known as "The Bank You Know and Trust;" is recognized for the excellence of its very stable management and its unequivocal strategy, consistent profitability, high asset quality and strong capitalization; has throughout the years build an advanced banking institution that offers a full spectrum of innovative and unrivalled financial and investment services and solutions to individual, corporate and institutional clients.

23. In addition to its dominance in the Middle East, NBK had and continues to have a sophisticated global network comprised of 150 branches, subsidiaries, and representative offices in 16 countries on four continents, including a branch in New York. Through this network, NBK provided and continues to provide services, including hedge fund management, private banking, investment banking, and asset management, to consumer, private, corporate, and institutional clients.

ANSWER TO ¶ 23: Defendants deny the allegations in the first sentence of this paragraph except admit that NBK believes it holds a dominant market share with a large local and

8

regional clientele and Kuwait's largest overseas branch network spanning many world

financial and business centers.

24. According to its 2007 Annual Report, NBK leveraged its "cooperation among business units and greater synergy" to maximize its expertise. The "[c]ollaboration" within business units, specifically private banking, corporate, treasury and investment banking, and across borders enabled NBK to provide a sophisticated and global service.

ANSWER TO ¶ 24: Defendants admit that NBK issued a 2007 Annual Report that contains

these and other descriptive statements about its business and refers to the Report for its entire

contents and context of the quoted statements.

25. At all relevant times, NBK worked hand-in-hand with NBK Suisse to effectuate and manage its investments in Fairfield Sentry. NBK Suisse assisted with the day-to-day oversight and administration of NBK's investments in Fairfield Sentry and was authorized and directed to correspond with Fairfield Sentry, negotiate transactions and fees, and otherwise act on behalf of and for the benefit of NBK. Furthermore, NBK Suisse managed an investment committee, which approved investment decisions on behalf of NBK, including NBK's investments in Fairfield Sentry.

ANSWER TO ¶ 25: Defendants deny the allegations in this paragraph.

26. NBK was and continues to be a sophisticated investor with expertise in asset management and investment funds.

ANSWER TO ¶ 26: Defendants admit the allegations in this paragraph.

B. Defendant NBK Suisse

27. Defendant NBK Suisse is a wholly owned subsidiary of NBK based in Switzerland with an address at Quai du Mont Blanc 21, P.O. Box 1923, 1211 Geneva, Switzerland.

ANSWER TO ¶ 27: Defendants admit the allegations in this paragraph except note that NBK

Suisse has recently changed its headquarters address to Rue de la Corraterie 5, Case Postale

3271,1211 Genève 3, Suisse.

28. NBK Suisse was registered in Switzerland in September 1984. Originally named NBK Finance (SA), from 1984 to 1999, NBK Suisse operated as a financial services provider and independent investment company, managing portfolios for clients based in Kuwait and Saudi Arabia.

ANSWER TO ¶ 28: Defendants admit the allegations in this paragraph.

29. In 1999, NBK Suisse obtained a Swiss banking license and became a full-fledged Swiss Bank operating under the name National Bank of Kuwait (Suisse) S.A.

ANSWER TO ¶ 29:  Defendants admit the allegations in this paragraph.

30. In 2006, NBK Suisse changed its name to NBK Banque Privée (Suisse) S.A. Currently, NBK Suisse offers traditional banking, portfolio management, advisory, and custody services to institutions and high net worth individuals.

ANSWER TO ¶ 30:  Defendants admit the allegations in this paragraph.

31. NBK Suisse and NBK shared information about BLMIS and Fairfield Sentry, collaborated to conduct their BLMIS-related transactions, and operated as a cohesive unit with respect to their investments in and redemptions from Fairfield Sentry that resulted in the subsequent transfers of customer property at issue here.

ANSWER TO ¶ 31:  Defendants deny the allegations in this paragraph.

32. NBK Suisse was and continues to be a sophisticated investor with expertise in asset management and investment funds.

ANSWER TO ¶ 32:  Defendants admit the allegations in this paragraph.

C.    Non-Party Fairfield Greenwich Group

33. Non-party Fairfield Greenwich Group ("FGG"), founded in 1983 by United States citizen and resident, Walter Noel, is a New York-based *de facto* partnership that created, operated, and controlled Fairfield Sentry.

ANSWER TO ¶ 33:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

D.    Non-Party Fairfield Sentry

34. Non-party Fairfield Sentry was a BLMIS feeder fund incorporated in the British Virgin Islands ("BVI") that invested substantially all of its assets with BLMIS in New York.  At all relevant times, Fairfield Sentry was operated almost entirely by personnel at FGG's New York City headquarters who maintained final control of Fairfield Sentry's bank accounts, relationships with Fairfield Sentry's back office service providers, and Fairfield Sentry's investments with BLMIS.  Fairfield Sentry is currently in liquidation proceedings in the BVI and the United States.

ANSWER TO ¶ 34:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph except admit that Fairfield Sentry was a

BVI corporation.

## V.  PERSONAL JURISDICTION

A.  Defendant NBK

35.  NBK is subject to personal jurisdiction in this judicial district because it purposefully availed itself of the laws and protections of the United States and the State of New York and knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York.

ANSWER TO ¶ 35:  NBK states that the allegations in this paragraph are legal conclusions to

which no response is required and that, if a response is required, it denies them. NBK Suisse

lacks knowledge or information sufficient to form a belief about the truth of the allegations in

this paragraph.

36. NBK invested in Fairfield Sentry, which was created, operated, and controlled by FGG, a *de facto* partnership based in New York, with the specific purpose of having funds invested with BLMIS in New York and profiting therefrom.

ANSWER TO ¶ 36:  NBK denies it invested in Fairfield Sentry and lacks information and

belief sufficient to form a belief about the truth of the remaining allegations in this paragraph.

NBK Suisse lacks knowledge or information sufficient to form a belief about the truth of the

allegations in this paragraph.

37. NBK knew that Fairfield Sentry invested at least 95% of its assets in accounts managed by New York-based BLMIS.

ANSWER TO ¶ 37:  NBK denies the allegations in this paragraph. NBK Suisse lacks

knowledge or information sufficient to form a belief about the truth of the allegations in this

paragraph.

38. NBK knew that any return on its investments in Fairfield Sentry would be earned in New York through BLMIS purportedly engaging in the purchase and sale of U.S. securities, options, and Treasurys.

ANSWER TO ¶ 38: NBK denies the allegations in this paragraph, including that it invested

in Fairfield Sentry. NBK Suisse lacks knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

39. By investing in Fairfield Sentry, NBK intentionally directed investments to BLMIS in New York, giving BLMIS custody of substantially all of the assets NBK invested in Fairfield Sentry.

ANSWER TO ¶ 39: NBK denies the allegations in this paragraph, including that it invested

in Fairfield Sentry. NBK Suisse lacks knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

40. To invest in Fairfield Sentry, NBK executed subscription agreements through which it affirmed having received and read Fairfield Sentry's private placement memorandum ("PPM"). The PPM informed NBK that BLMIS served as the investment advisor, prime broker, and actual custodian of the assets in Fairfield Sentry's BLMIS investment advisory accounts.

ANSWER TO ¶ 40: NBK denies the allegations in this paragraph, including that it invested

in Fairfield Sentry. NBK Suisse lacks knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

41. The Fairfield Sentry PPM set forth the roles BLMIS performed on behalf of Fairfield Sentry. Before investing in Fairfield Sentry, NBK received and reviewed the August 14, 2006 Fairfield Sentry PPM, which contained the following terms: (a) "[t]he Split Strike Conversion strategy is implemented by Bernard L. Madoff Investment Securities LLC ('BLM')"; (b) "BLM is authorized to determine the price and timing of stock and options transactions in [Fairfield Sentry's] account"; and (c) "substantially all of the Fund's assets will be held in segregated accounts at BLM, a U.S. registered broker-dealer and qualified custodian. Accordingly, BLM will be a sub-custodian of [Fairfield Sentry]."

ANSWER TO ¶ 41: NBK denies the allegations in this paragraph, including that it invested

in Fairfield Sentry, and refers to the referenced document for its entire contents and context.

NBK Suisse lacks knowledge or information sufficient to form a belief about the truth of the

allegations in this paragraph.

42. Moreover, NBK knew from the PPM that Fairfield Sentry's performance depended on BLMIS and its personnel in New York. Specifically, the PPM disclosed that: (a) "[t]he services of BLM and its personnel are essential to the continued operation of the Fund [Fairfield Sentry], and its profitability, if any;" and (b) "their absence would have an adverse impact upon an investment in the Fund [Fairfield Sentry]."

ANSWER TO ¶ 42: NBK denies the allegations in this paragraph and refers to the

referenced document for its entire contents and context. NBK Suisse lacks knowledge or

information sufficient to form a belief about the truth of the allegations in this paragraph.

43. By executing the Fairfield Sentry subscription agreements, NBK voluntarily submitted to venue in New York, the jurisdiction of the New York courts, the service of process out of New York courts, and the application of New York law with respect to any proceeding arising out of those agreements.

ANSWER TO ¶ 43:  NBK states that the allegations in this paragraph are legal conclusions to which no response is required and that, if a response is required, denies them. NBK Suisse lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

44. When NBK executed a Fairfield Sentry subscription agreement in March 2007, NBK "irrevocably submit[ed] to the jurisdiction of New York courts" and agreed "that any suit, action or proceeding . . . with respect to this Agreement and the Fund [Fairfield Sentry] may be brought in New York" and "shall be governed and enforced in accordance with New York law, without giving effect to its conflict of law provisions."

ANSWER TO ¶ 44:  NBK denies the allegations in this paragraph and refers to the referenced document for its entire contents and context. NBK Suisse lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

45. The Fairfield Sentry subscription agreements that NBK executed required NBK to direct its subscription payments to an HSBC Bank, New York correspondent bank account for ultimate deposit in Fairfield Sentry's bank account.  From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank NA ("JPMorgan") in New York.

ANSWER TO ¶ 45:  NBK denies the allegations in this paragraph, refers to the documents referenced in this paragraph for their entire contents and context, and states that it transmitted its customers' purchase money from and received their redemption money in its bank account in Kuwait City, Kuwait. NBK Suisse lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

46. Further, NBK used other New York bank accounts to receive transfers of BLMIS customer property through Fairfield Sentry. NBK used its custodial bank Euroclear Bank S.A./Fundsettle's account at The Bank of New York in New York to receive redemptions from Fairfield Sentry.  In this account, NBK received at least 28 redemption payments, all of which the

Trustee seeks to recover from NBK as subsequent transfers of customer property.

ANSWER TO ¶ 46:  NBK denies the allegations in this paragraph and states that it sent its customers' purchase money from and received their redemption money in its bank account in Kuwait City, Kuwait, and further states that Euroclear/Fundsettle maintained the electronic trading platform on which NBK's customers' orders to purchase and redeem Fairfield Sentry shares were executed and held shares as a nominee. NBK Suisse lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

47.  NBK maintains a New York branch, located at 299 Park Avenue, New York, New York, which was central to its investments with Fairfield Sentry. NBK completed a USA PATRIOT Act Certification warranting that NBK's New York branch is "a resident of the United States at the following street address: 299 Park Avenue, 17th Floor, NY 10171-0023."

ANSWER TO ¶ 47:  NBK admits the allegations in this paragraph except denies that the New York branch had any role concerning Fairfield Sentry and denies it had investments in or with Fairfield Sentry. NBK Suisse lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

48.  In January 2007, NBK negotiated and entered into a Letter of Understanding with New York-based FGG management company Fairfield Greenwich Limited ("FG Limited") that included a New York choice of law provision.  FGG partner Daniel Lipton executed the agreement in New York on behalf of FG Limited and sent the executed copy to NBK from FGG's New York headquarters.

ANSWER TO ¶ 48:  NBK admits it entered into a Letter of Understanding with FGG and refers to it for its entire contents and context and otherwise lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. NBK Suisse lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

49.  According to the terms of the Letter of Understanding, NBK and FG Limited agreed that their relationship was governed by New York law: the "rights and obligations of the parties hereto shall be governed and construed in accordance with the laws of the State of New York." NBK received retrocession payments for placing money with Fairfield Sentry as an incentive for

investing.  FG Limited paid NBK 40 basis points of the 1% per annum management fee FG Limited charged for investing in Fairfield Sentry.  NBK received at least six retrocession payments totaling $451,124 over the 21-month life of NBK's investment in Fairfield Sentry, all of which the Trustee seeks to recover from NBK as subsequent transfers of customer property in this proceeding.

ANSWER TO ¶ 49:  NBK admits that the referenced document provides for New York law to govern the agreement (not the relationship except under the agreement), admits it received payments totaling approximately $451,124 that the Trustee seeks to recover in this proceeding, refers to the document for its entire contents and context, and otherwise denies the allegations in this paragraph. NBK Suisse lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

50.  Under the terms of the Letter of Understanding, these retrocession payments were to be paid to an account at NBK's New York branch in the name of "National Bank of Kuwait, New York[.]"

ANSWER TO ¶ 50:  NBK admits the allegations in this paragraph except states that the account name for any such payments was specified as "National Bank of Kuwait, Kuwait." NBK Suisse lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph. NBK Suisse lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

51.  Additionally, under the terms of the Letter of Understanding, notices were to be sent to Dan Lipton at Fairfield Greenwich Limited, 919 Third Avenue, New York, NY 10022 or by telephone or fax at New York telephone numbers.

ANSWER TO ¶ 51:  NBK admits the allegations in this paragraph except states that it sent no notices and there is no provision by telephone notice. NBK Suisse lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

52.  NBK directed Fairfield Sentry and BLMIS-related activities towards New York. NBK knew Fairfield Sentry was managed and operated from FGG's headquarters in New York. In connection with its Fairfield Sentry investments, NBK directed telephone and email communications regarding its investments in Fairfield Sentry to FGG's New York headquarters.

ANSWER TO ¶ 52:  NBK denies the allegations in this paragraph, including that it had

investments in Fairfield Sentry, except admits that on rare occasions an employee had a

telephone conversation or e-mail exchange with persons associated with FGG. NBK Suisse

lacks knowledge or information sufficient to form a belief about the truth of the allegations in

this paragraph.

53. Philip Toub, an FGG partner based in New York, was responsible for managing FGG's relationship with NBK. Toub operated as NBK's primary contact regarding its investments in and redemptions from Fairfield Sentry. NBK personnel also communicated with FGG's New York-based representatives Lauren Ross, who served as FGG's Senior Vice President for Investor Relations, and Lina Pava regarding NBK's Fairfield Sentry investments. Additionally, NBK received marketing materials, PPMs, a Letter of Understanding, subscription agreements, and weekly fund reports on the SSC Strategy's purported performance from FGG's New York office.

ANSWER TO ¶ 53:  NBK lacks knowledge or information sufficient to form a belief about

the truth of the allegations in the first sentence of this paragraph; as to the second and third

sentences, NBK admits it had occasional contact with Philip Toub and one or more others

associated with FGG; and as to the fourth sentence, NBK admits having received a few

documents from FGG relating to Fairfield Sentry and periodic fund reports from time to time.

NBK Suisse lacks knowledge or information sufficient to form a belief about the truth of the

allegations in this paragraph.

54. NBK is also subject to the jurisdiction of this Court because it filed a customer claim with the Trustee. In accordance with the claims procedure order, the Trustee determined and denied NBK's customer claim.  In its objection to the Trustee's denial of its claim, NBK indicated its "express purpose" for investing in Fairfield Sentry was to direct assets to BLMIS in New York. Elsewhere in its objection, NBK maintained that it "may not have 'deposited cash with' BLMIS in the sense of handing it directly to BLMIS, but the facts indisputably show that [NBK] handed [its] cash to [Fairfield Sentry] specifically for deposit with and management by BLMIS."

ANSWER TO ¶ 54:  NBK admits that it filed a claim in the BLMIS and Madoff bankruptcy

proceeding with respect to Fairfield Sentry shares that were not redeemed, denies it is subject

to the jurisdiction of the Court for that or any other reason, refers to the legal briefs,

containing the arguments of its legal counsel filed after the Trustee denied NBK's claim, for

their entire context and contents, and otherwise denies the allegations in this paragraph.

NBK Suisse lacks knowledge or information sufficient to form a belief about the truth of the

allegations in this paragraph.

55.   NBK thus derived significant revenue from New York and maintained minimum contacts and general business contacts with the United States and New York in connection with the claims alleged herein.

ANSWER TO ¶ 55:  Defendants state that the allegations in this paragraph are legal

conclusions to which no answer is required and, if an answer is required, deny them.

56.   NBK should therefore reasonably expect to be and is subject to personal jurisdiction pursuant to New York Civil Practice Law and Rules 301 and 302 (McKinney 2003) and Rule 7004 of the Federal Rules of Bankruptcy Procedure.

ANSWER TO ¶ 56:  Defendants state that the allegations in this paragraph are legal

conclusions to which no answer is required and, if an answer is required, Defendants deny

them.

B.  Defendant NBK Suisse

57.   NBK Suisse is subject to personal jurisdiction in this judicial district because it purposefully availed itself of the laws and protections of the United States and the State of New York and knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York.

ANSWER TO ¶ 57:  NBK Suisse states that the allegations in this paragraph are legal

conclusions to which no response is required and that, if a response is required, it denies

them. NBK lacks knowledge or information sufficient to form a belief about the truth of the

allegations in this paragraph.

58.   NBK Suisse invested in Fairfield Sentry, which was created, operated, and controlled by FGG, a *de facto* partnership based in New York, with the specific purpose of having funds invested with BLMIS in New York and profiting therefrom.

ANSWER TO ¶ 58:  NBK Suisse denies it invested in Fairfield Sentry and lacks information

and belief sufficient to form a belief about the truth of the remaining allegations in this

paragraph. NBK lacks knowledge or information sufficient to form a belief about the truth of

the allegations in this paragraph.

59. NBK Suisse knew that Fairfield Sentry invested at least 95% of its assets in accounts managed by New York-based BLMIS.

ANSWER TO ¶ 59:  NBK Suisse denies the allegations in this paragraph. NBK lacks

knowledge or information sufficient to form a belief about the truth of the allegations in this

paragraph.

60. NBK Suisse knew that any return on its investments in Fairfield Sentry would be earned in New York through BLMIS purportedly engaging in the purchase and sale of U.S. securities, options, and Treasurys.

ANSWER TO ¶ 60: NBK Suisse denies the allegations in this paragraph, including that it

invested in Fairfield Sentry. NBK lacks knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

61. By investing in Fairfield Sentry, NBK Suisse intentionally directed investments to BLMIS in New York, giving BLMIS custody of substantially all of the assets NBK Suisse invested in Fairfield Sentry.

ANSWER TO ¶ 61:  NBK Suisse denies the allegations in this paragraph, including that it

invested in Fairfield Sentry. NBK lacks knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

62. To invest in Fairfield Sentry, NBK Suisse, through its agents, executed subscription agreements through which NBK Suisse affirmed having received and read Fairfield Sentry's PPM. The PPM informed NBK Suisse that BLMIS served as the investment advisor, prime broker, and actual custodian of the assets in Fairfield Sentry's BLMIS investment advisory accounts.

ANSWER TO ¶ 62:  NBK Suisse denies the allegations in this paragraph, including that it

invested in Fairfield Sentry. NBK lacks knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

63. The Fairfield Sentry PPM set forth the roles BLMIS performed on behalf of Fairfield Sentry. Before investing in Fairfield Sentry, NBK Suisse received and reviewed the August 14, 2006 Fairfield Sentry PPM, which contained the following terms: (a) "[t]he Split Strike

Conversion strategy is implemented by Bernard L. Madoff Investment Securities LLC ('BLM')"; (b) "BLM is authorized to determine the price and timing of stock and options transactions in [Fairfield Sentry's] account"; and (c) "substantially all of the Fund's assets will be held in segregated accounts at BLM, a U.S. registered broker-dealer and qualified custodian. Accordingly, BLM will be a sub-custodian of [Fairfield Sentry]."

ANSWER TO ¶ 63: NBK Suisse denies the allegations in this paragraph, including that it

invested in Fairfield Sentry, and refers to the referenced document for its entire contents and

context. NBK lacks knowledge or information sufficient to form a belief about the truth of

the allegations in this paragraph.

64. Moreover, NBK Suisse knew from the PPM that Fairfield Sentry's performance depended on BLMIS and its personnel in New York. Specifically, the PPM disclosed that: (a) "[t]he services of BLM and its personnel are essential to the continued operation of the Fund [Fairfield Sentry], and its profitability, if any;" and (b) "their absence would have an adverse impact upon an investment in the Fund [Fairfield Sentry]."

ANSWER TO ¶ 64: NBK Suisse denies the allegations in this paragraph and refers to the

referenced document for its entire contents and context. NBK lacks knowledge or

information sufficient to form a belief about the truth of the allegations in this paragraph.

65. By executing Fairfield Sentry subscription agreements through its agents, NBK Suisse voluntarily submitted to venue in New York, the jurisdiction of the New York courts, the service of process out of New York courts, and the application of New York law with respect to any proceeding arising out of those agreements.

ANSWER TO ¶ 65: NBK Suisse states that the allegations in this paragraph are legal

conclusions to which no response is required and that, if a response is required, it denies

them. NBK lacks knowledge or information sufficient to form a belief about the truth of the

allegations in this paragraph.

66. The Fairfield Sentry subscription agreement required NBK Suisse to "irrevocably submit to the jurisdiction of New York courts" and agree "that any suit, action or proceeding . . . with respect to this Agreement and the Fund [Fairfield Sentry] may be brought in New York" and "shall be governed and enforced in accordance with New York law, without giving effect to its conflict of law provisions."

ANSWER TO ¶ 66: NBK Suisse denies the allegations in this paragraph and refers to the

document referenced in this paragraph for its entire contents and context. NBK lacks

knowledge or information sufficient to form a belief about the truth of the allegations in this

paragraph.

67.  The Fairfield Sentry subscription agreements required NBK Suisse to direct its
subscription payments to an HSBC Bank, New York correspondent bank account for ultimate
deposit in Fairfield Sentry's bank account.  From Fairfield Sentry's bank account, the funds were
deposited in BLMIS's account at JPMorgan in New York.

ANSWER TO ¶ 67:  NBK Suisse denies the allegations in this paragraph, refers to the

documents referenced in this paragraph for their entire contents and context, and states that it

transmitted its customers' purchase money from and received their redemption money in its

bank account in Geneva, Switzerland. NBK lacks knowledge or information sufficient to

form a belief about the truth of the allegations in this paragraph.

68.  In October 2008, NBK Suisse negotiated and entered into a Letter of Understanding with
New York-based FGG management company FG Limited that included a New York choice of
law provision.  New York-based FGG Executive Director and Chief Operating Officer Mark
McKeefry executed the agreement on behalf of FG Limited.

ANSWER TO ¶ 68:  NBK Suisse admits it entered into a Letter of Understanding with FGG

and refers to it for its entire contents and context and otherwise lacks knowledge or

information sufficient to form a belief about the truth of the allegations in this paragraph.

NBK lacks knowledge or information sufficient to form a belief about the truth of the

allegations in this paragraph.

69.  According to the terms of the Letter of  Understanding, NBK Suisse and FG Limited
agreed that their relationship was governed by New York law: the "rights and obligations of the
parties hereto shall be governed and construed in accordance with the laws of the State of New
York."  Under the agreement, FG Limited paid NBK Suisse for placing money with Fairfield
Sentry as an incentive for investing.  FG Limited agreed to pay NBK Suisse 40 basis points of the
1% per annum management fee FG Limited charged for investing in Fairfield Sentry.

ANSWER TO ¶ 69:  NBK Suisse admits that the Letter of Understanding provides for New

York law to govern the agreement (not the relationship except under the agreement), denies

that it received any money under or in relation to the document, refers to the document for its

entire contents and context, and otherwise denies the allegations in this paragraph. NBK lacks

knowledge or information sufficient to form a belief about the truth of the allegations in this

paragraph.

70.  Under the terms of the Letter of Understanding, these retrocession payments were to be paid to an account at NBK's New York branch in the name of "National Banque Privee Suisse SA[.]"

ANSWER TO ¶ 70:  NBK Suisse admits the allegations in this paragraph but states that no

payments were made or received.  NBK lacks knowledge or information sufficient to form a

belief about the truth of the allegations in this paragraph.

71.  Additionally, under the terms of the Letter of Understanding, notices were to be sent to Mark McKeefry at Fairfield Greenwich Limited, 55 East 52nd Street 33rd Floor, New York, NY 10055 or by telephone or fax at New York telephone numbers.

ANSWER TO ¶ 71:  NBK Suisse admits the allegations in this paragraph, but states that it

sent no notices. NBK lacks knowledge or information sufficient to form a belief about the

truth of the allegations in this paragraph.

72.  NBK Suisse directed its Fairfield Sentry and BLMIS-related activities towards New York. NBK Suisse knew Fairfield Sentry was managed and operated from FGG's headquarters in New York.  In connection with its Fairfield Sentry investments, NBK Suisse directed telephone and email communications regarding its investments in Fairfield Sentry to FGG's New York headquarters.

ANSWER TO ¶ 72:  NBK Suisse denies the allegations in this paragraph, including that

invested in Fairfield Sentry. NBK lacks knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

73. Toub and Pava, who were both based in New York, operated as NBK Suisse's primary contacts regarding its investments in and redemptions from Fairfield Sentry.  Additionally, NBK Suisse personnel received PPMs, Letters of Understanding, and subscription documents from FGG's New York office.

ANSWER TO ¶ 73:  NBK Suisse denies the allegations in this paragraph, including that it

invested in Fairfield Sentry. NBK lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

74. NBK Suisse is also subject to the jurisdiction of this Court because it filed a customer claim with the Trustee.  In accordance with the claims procedure order, the Trustee determined and denied NBK Suisse's customer claim.  In its objection to the Trustee's denial of its claim, NBK Suisse indicated its "express purpose" for investing in Fairfield Sentry was to direct assets to BLMIS in New York.  Elsewhere in its objection, NBK Suisse maintained that it "may not have 'deposited cash with' BLMIS in the sense of handing it directly to BLMIS, but the facts indisputably show that [NBK Suisse] handed [its] cash to [Fairfield Sentry] specifically for deposit with and management by BLMIS."

ANSWER TO ¶ 74:  NBK Suisse admits that it filed a claim in the BLMIS and Madoff bankruptcy proceeding with respect to Fairfield Sentry shares that were not redeemed, denies it is subject to the jurisdiction of the Court for that or any other reason, refers to the legal briefs, containing the arguments of its legal counsel filed after the Trustee denied NBK's claim, for their entire context and contents, and otherwise denies the allegations in this paragraph.  NBK lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph.

75. NBK Suisse thus derived significant revenue from New York and maintained minimum contacts and general business contacts with the United States and New York in connection with the claims alleged herein.

ANSWER TO ¶ 75:  The allegations in this paragraph are legal conclusions to which no answer is required and, if an answer is required, Defendants deny them.

76. NBK Suisse should therefore reasonably expect to be and is subject to personal jurisdiction pursuant to New York Civil Practice Law and Rules 301 and 302 (McKinney 2003) and Rule 7004 of the Federal Rules of Bankruptcy Procedure.

ANSWER TO ¶ 76:  The allegations in this paragraph are legal conclusions to which no answer is required and, if an answer is required, Defendants deny them.

## VI.  BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.  BLMIS

77.  Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker dealer with the United States Securities and Exchange Commission. In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company.  At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

ANSWER TO ¶ 77:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph except admit that BLMIS was at one time

registered with the United States Securities and Exchange Commission as a broker-dealer.

78.  In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status.  SIPC membership is contingent on registration of the broker-dealer with the SEC.

ANSWER TO ¶ 78:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph except admit that BLMIS was at one time

registered with the United States Securities and Exchange Commission as a broker-dealer.

79.  For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and an investment advisory business (the "IA Business").

ANSWER TO ¶ 79:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

80.  BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry.  BLMIS's website omitted the IA Business entirely.  BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

ANSWER TO ¶ 80:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

81.  For more than 20 years preceding that registration, the financial reports BLMIS filed

with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

ANSWER TO ¶ 81:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

82.  In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion.  BLMIS filed its last Form ADV in January 2008, reporting  that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion.  In reality, Madoff grossly understated these numbers.  In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

ANSWER TO ¶ 82:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

B.  The Ponzi Scheme

83.  At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

ANSWER TO ¶ 83:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph but do not contest that Frank  DiPascali,

Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to,

or were found guilty of criminal offenses.

84. BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

ANSWER TO ¶ 84:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

85.   To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

ANSWER TO ¶ 85:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

86.   On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

ANSWER TO ¶ 86:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph but do not contest that David Friehling

pleaded guilty to criminal offenses.

Madoff's Investment Strategy

87.   In general, BLMIS purported to execute two primary investment strategies for BLMIS customers: the convertible arbitrage strategy and the SSC Strategy.  For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

ANSWER TO ¶ 87:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

88.   All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank.  These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

ANSWER TO ¶ 88:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

89.   The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity

markets.  Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time.  In the 1970s, this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s, the strategy was purportedly used in only a small percentage of BLMIS accounts.

ANSWER TO ¶ 89:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

90.  From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

ANSWER TO ¶ 90: Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

91.  BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

ANSWER TO ¶ 91:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

92.  By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

ANSWER TO ¶ 92:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

93.  The put options were to limit the downside risk of sizeable price changes in the basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option should have entailed a loss for BLMIS.

ANSWER TO ¶ 93:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

94.  The sale of call options would partially offset the costs associated with acquiring puts, but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

ANSWER TO ¶ 94:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

95.  The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar."  The collar provides downside protection while limiting the upside.

ANSWER TO ¶ 95:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

96.  If Madoff was putting on the same baskets of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

ANSWER TO ¶ 96:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

97.  Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the Madoff SSC Strategy.

ANSWER TO ¶ 97:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

98.  Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

ANSWER TO ¶ 98:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

BLMIS's Fee Structure

99.  BLMIS charged commissions on purportedly executed trades rather than industry-

standard management and performance fees based on AUM or profits. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

ANSWER TO ¶ 99:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

BLMIS's Market Timing

100.  Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he succeeded at market timing by intermittently entering and exiting the market. During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

ANSWER TO ¶ 100:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

101.  As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

ANSWER TO ¶ 101:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

102.  BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

ANSWER TO ¶ 102:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

BLMIS Execution

103.  BLMIS's execution showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

ANSWER TO ¶ 103:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

No Evidence of BLMIS Trading

104.  There is no record of BLMIS clearing a single purchase or sale of securities in
connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing
house for such transactions, its predecessors, or any other trading platform on which BLMIS could
have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded
securities using the SSC Strategy.

ANSWER TO ¶ 104:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

105.  All exchange-listed options relating to the companies within the S&P 100 Index,
including options based upon the S&P 100 Index itself, clear through the Options Clearing
Corporation ("OCC"). The OCC has no records showing that BLMIS cleared any trades in any
exchange-listed options.

ANSWER TO ¶ 105:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

The Collapse of the Ponzi Scheme

106.  The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests or
redemptions overwhelmed the flow of new investments.

ANSWER TO ¶ 106:  Defendants admit that, in and after December 2008, public sources

disclosed that Madoff had admitted he had run his company as a Ponzi scheme and lack

knowledge or information sufficient to form a belief about the truth of the remaining

allegations in this paragraph.

107.  At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of
the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its
IA Business operated as a Ponzi scheme.

ANSWER TO ¶ 107:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph and refer to the transcripts of Madoff's and

DiPascali's plea hearings for the contents and context of their statements.

108. At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

ANSWER TO ¶ 108:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

## VII.  RECOVERY OF SUBSEQUENT TRANSFERS TO DEFENDANTS

### A.  Initial Transfers from BLMIS to Fairfield Sentry

109. The Trustee commenced a separate adversary proceeding against Fairfield Sentry and other defendants in this Court under the caption, *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (CGM), seeking to avoid and recover initial transfers of customer property from BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").

ANSWER TO ¶ 109:  Defendants admit the allegations in this paragraph.

110. By orders dated June 7 and June 10, 2011, this Court approved a settlement among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a consent judgment in favor of the Trustee and against Fairfield Sentry in the amount of $3,054,000,000 ("Judgment Amount") [ECF No. 109].

ANSWER TO ¶ 110:  Defendants admit the allegations in this paragraph.

111. The Fairfield Sentry Initial Transfers are set forth in the attached Exhibits A and B. The Fairfield Sentry Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

ANSWER TO ¶ 111:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph or the basis or contents of Exhibits A or B.

112. On August 28, 2020, the Trustee filed a second amended complaint in the *Fairfield Sentry Ltd.* proceeding ("Second Amended Complaint") [ECF No. 286] seeking in part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

ANSWER TO ¶ 112:  Defendants admit that the Trustee filed the Second Amended

Complaint and refer to it for its contents and context and otherwise state that they lack

knowledge or information sufficient to form a belief about the truth of the allegations in this

paragraph or in the Second Amended Complaint.

113.  As alleged in the Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the BLMIS fraud. The Trustee incorporates by reference the allegations contained in the Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, 315-16.

ANSWER TO ¶ 113:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph or in the Second Amended Complaint, refer to

the Second Amended Complaint for its contents and context, and state that procedural rules

prohibit incorporating the entirety or major portions of the Second Amended Complaint by

reference into the Amended Complaint in this action.

114.  Of the Judgment Amount, approximately $2,900,000,000 was transferred to Fairfield Sentry during the six years preceding the Filing Date (the "Fairfield Sentry Six Year Transfers").  Each of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

ANSWER TO ¶ 114:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

115.  Of the Fairfield Sentry Six Year Transfers, $1,580,000,000 was transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Transfers").  Each of the Fairfield Sentry Two Year Transfers is avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

ANSWER TO ¶ 115:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph.

B.  Subsequent Transfers from Fairfield Sentry to NBK

116.  Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to NBK. Based on the Trustee's investigation to date, the subsequent transfers to NBK total $17,585,510 ("NBK Subsequent Transfers"). A chart setting forth the presently known NBK Subsequent Transfers is attached as Exhibit C.

ANSWER TO ¶ 116:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph or the basis or contents of Exhibit C.

117. On August 25, 2011, the Trustee filed this action seeking recovery of the NBK Subsequent Transfers.

ANSWER TO ¶ 117:  Defendants admit the allegations in this paragraph except deny that the Trustee is entitled to any recovery.

118. The NBK Subsequent Transfers are recoverable from NBK under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

ANSWER TO ¶ 118:  Defendants deny the allegations in this paragraph.

119. The NBK Subsequent Transfers represent a redemption of equity interests by NBK as a shareholder in Fairfield Sentry.  Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the NBK Subsequent Transfers to NBK upon redemption of its interests.

ANSWER TO ¶ 119:  Defendants deny the allegations in this paragraph.

120. The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the initial and NBK Subsequent Transfers discussed above, and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

ANSWER TO ¶ 120:  Defendants admit that the Trustee seeks to reserve the stated rights and

deny that the Trustee has any rights to reserve or that the Trustee may seek avoidance and

recovery of any alleged NBK Subsequent Transfers.

C.  Subsequent Transfers from Fairfield Sentry to NBK Suisse

121. Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to NBK Suisse. Based on the Trustee's investigation to date, the subsequent transfers to NBK Suisse total $1,590,013 ("NBK Suisse Subsequent Transfers" and along with the NBK Subsequent Transfers, "Subsequent Transfers"). A chart setting forth the presently known NBK Suisse Subsequent Transfers is attached as Exhibit D.

ANSWER TO ¶ 121:  Defendants lack knowledge or information sufficient to form a belief

about the truth of the allegations in this paragraph or the basis or contents of Exhibit D.

122. The NBK Suisse Subsequent Transfers are recoverable from NBK Suisse under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

ANSWER TO ¶ 122:  Defendants deny the allegations in this paragraph.

123. The NBK Suisse Subsequent Transfers represent a redemption of equity interests by

NBK Suisse as a shareholder in Fairfield Sentry. Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the NBK Suisse Subsequent Transfers to NBK Suisse upon redemption of its interests.

ANSWER TO ¶ 123:  Defendants deny the allegations in this paragraph.

124.  The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the initial and NBK Suisse Subsequent Transfers discussed above, and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

ANSWER TO ¶ 124:  Defendants admit that the Trustee seeks to reserve the stated rights and

deny that the Trustee has any rights to reserve or that the Trustee may seek avoidance and

recovery from NBK of any alleged NBK Suisse Subsequent Transfers.

COUNT ONE
RECOVERY OF THE SUBSEQUENT TRANSFERS
11 U.S.C. §§ 105(a) AND 550

125.  The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

ANSWER TO ¶ 125:  Defendants incorporate by reference their answers to the previous

paragraphs of the Amended Complaint as if fully rewritten herein.

126.  The Subsequent Transfers are recoverable from Defendants under 11 U.S.C. § 550(a) and 15 U.S.C. § 78fff-2(c)(3).

ANSWER TO ¶ 126:  Defendants deny the allegations in this paragraph.

127.  Defendants are immediate or mediate transferees of the Subsequent Transfers from Fairfield Sentry.

ANSWER TO ¶ 127:  Defendants deny the allegations in this paragraph.

128.  As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendants: (a) recovering the Subsequent Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

ANSWER TO ¶ 128:  Defendants deny the allegations in this paragraph.

<u>ANSWER TO THE TRUSTEE'S PRAYER FOR RELIEF</u>

The Trustee is not entitled to any judgment against or relief from Defendants.

<u>DEFENSES TO THE TRUSTEE'S CLAIMS</u>

Defendants, without accepting the burden of proof on any issue or element that is the Trustee's burden, state the following defenses to the Trustee's claim. Defendants incorporate herein by reference the contents of their memorandum, reply memorandum, and declaration in support of their motion to dismiss the Amended Complaint as if fully rewritten herein.

FIRST
(Defendants Were Mere Conduits)

1.      The Trustee may not recover from either Defendant for any transfer of funds to it because neither of the Defendants was a mediate or intermediate transferee of any initial transfer of property within the meaning of Section 550(a) of the Bankruptcy Code.

2.      Defendants acted solely to execute customers' orders to buy and redeem shares when they purchased and redeemed Fairfield Sentry shares on the customers behalf and acted solely at the customers' direction.

3.      Neither Defendant had or exercised any discretion or decision-making as to purchases or redemptions of Fairfield Shares and neither had or exercised any dominion or control over shares or the customers' funds used to invest in, or over the payments received in exchange for redemptions of, Fairfield Sentry shares.

4.      Neither Defendant had any right to, and neither did, control the funds used to purchase Fairfield Sentry shares or received for redemptions of such shares and was required to pay funds only to the customers on behalf of which the Defendants executed orders.

5.      Neither Defendant had any right to use for its own purposes any of the funds used to purchase Fairfield Sentry shares or received in redemption for such shares or exercised dominion or control over them. Neither Defendant invested its own money in Fairfield Sentry shares, owned any Fairfield Sentry shares, including the shares it purchased and redeemed on

behalf of its customers, or had or have any right to receive any gain or any obligation to sustain any loss on any investment in Fairfield Sentry shares.

6.      Each Defendant held only bare legal title to and had no beneficial ownership of the Fairfield Sentry shares it purchased, redeemed, or held for its customers, the customer funds used to purchase such shares, or payments it received upon redeeming the Fairfield Sentry shares on the customers' behalf.

7.      Neither Defendant derived any benefit from the investments and were paid only modest fees, if anything, for their ministerial, administrative services for their customers.

SECOND
(Defendants Acted in Good Faith)

8.      The Trustee may not recover from either Defendant because each Defendant took all alleged transfers in good faith and without knowledge of their alleged voidability within the meaning of Bankruptcy Code § 550(b) of the Bankruptcy Code.

9.      Each Defendant took all alleged transfers for value within the meaning of Bankruptcy Code § 550(b) because payments Defendants allegedly received for redemptions of Fairfield Sentry shares were in exchange for the surrender of the shares being redeemed.

10.     At any time when either Defendant received an alleged transfer from Fairfield Sentry, it had no knowledge of fraud by Madoff, BLMIS, Fairfield Sentry, or any of their respective affiliates, officers, directors, employees, agents, or other personnel, and did not know or suspect that Madoff and BLMIS were not making securities trades or that they or Fairfield Sentry were engaged in fraud.

11.     Neither Defendant knew facts at the times when it purchased or redeemed Fairfield Sentry shares that would have led a reasonable person to inquire into whether there was fraud behind the transfers.

35

12.    Even if either Defendant had been on inquiry notice of possible fraud, it would not have discovered or obtained knowledge of fraud by investigation.

13.    This is evidenced by the fact that, upon information and belief, many substantial investors that provided funds for or in connection with purchases and holding of Fairfield Sentry shares, financial consultants, advisors, and other companies conducted diligent and thorough investigations and did not obtain knowledge of the fraud.

14.    Similarly, significant independent public auditing companies with substantial incentive to inquire into the financial position of Fairfield Sentry and other so-called "Madoff feeder funds" did not, upon information and belief, discover or obtain knowledge of fraud and certified Fairfield Sentry's and other "feeder funds'" financial statements as fairly presenting their respective financial positions.

15.    In addition, one or more government entities, upon information and belief, conducted investigations of BLMIS and Madoff based in part on received detailed, factual third-party analyses of  BLMIS' activities and yet did not discover or obtain knowledge of their fraud.

### THIRD
(Transfers to Defendants Were Not BLMIS Customer Property)

16.    All or some of the transfers allegedly received by Defendants from Fairfield Sentry, upon information and belief, did not consist in whole or part of BLMIS Customer Property and, accordingly, may not be avoided and recovered by the Trustee from Defendants.

17.    The information contained in the Exhibits to the complaint and the complaints in similar adversary proceedings before this Court in case 08-ap-01789 (the "Exhibits") show that some or all the transfers by Fairfield Sentry to Defendants did not originate with BLMIS, must have originated from other sources, and are not BLMIS Customer Property.

18.     Those other sources include, upon information and belief, proceeds Fairfield

Sentry received from selling shares to new investors that it used to make payments for

redemptions of shares by existing Fairfield Sentry shareholders without ever remitting the new

share proceeds to BLMIS.  Such funds paid to redeeming Fairfield Sentry shareholders are not

BLMIS Customer Property.

FOURTH
(Transfers to Defendants Are Protected by the Safe Harbor)

19.     Defendants' receipt of any redemption payments for Fairfield Sentry shares more

than two years prior to the Filing Date and are protected from avoidance and recovery by the safe

harbor provided by Bankruptcy Code § 546(e).

20.     BLMIS, Fairfield Sentry, and both Defendants were at all relevant times covered

entities under that statute, being stockbrokers, financial institutions, financial participants, and/or

otherwise covered entities.

21.     All alleged transfers received by each Defendant were received in connection

with or relation to a securities agreement between BLMIS and Fairfield and/or between Fairfield

and each Defendant.

22.     None of the alleged transfers was made with intent to hinder, delay, or defraud

BLMIS' or Fairfield Sentry's creditors. The so-called "Ponzi scheme presumption" does not

meet the "intent to hinder, delay or defraud" element because it is based on faulty legal and

factual reasoning and has not been adopted by the Second Circuit Court of Appeals or the

Supreme Court.

23.     At the times when each Defendant received alleged transfers from Fairfield

Sentry, it had no knowledge of fraud committed by Madoff, BLMIS, Fairfield Sentry, or any of

their respective affiliates, officers, directors, employees, agents, or other personnel, and did not

know or suspect that Madoff and BLMIS were not making securities trades or were engaged in a fraud.

### FIFTH
#### (State Claims Under NY Debtor & Creditor Law Barred)

25.     The Trustee's claim under Bankruptcy Code § 544 that relies on the New York Debtor & Creditor Law is barred because the alleged transfers to Defendants were taken for fair consideration, without knowledge of the fraud, and without actual fraudulent intent, within the meaning of § 278(1) and (2), respectively.

### SIXTH
#### (*In Pari Delicto*—Unclean Hands)

26.     The Trustee stands in the shoes of BLMIS and Madoff, who committed the alleged frauds that resulted in the alleged losses the Trustee seeks to recover from Defendants. The Trustee is barred from recovering such losses from Defendants because BLMIS' and Madoff's acts and omissions are attributed to the Trustee by the doctrines of *in pari delicto* and unclean hands.

### SEVENTH
#### (Predicate Initial Transfer Not Avoided)

27.     The Trustee may not recover transfers from Defendants until and unless transfers between BLMIS and Fairfield have been avoided, which has not occurred and may not occur.

### EIGHTH
#### (Single Satisfaction)

28.     If and to the extent the Trustee recovers from another mediate or immediate transferee the amount of any avoided initial transfer that includes customer property the Trustee alleges either Defendant received, the Trustee is barred from recovering that amount from either Defendant by virtue of Bankruptcy Code § 550(d).

## NINTH
### (Recovery from Liquidators)

29.     If and to the extent the Trustee recovers from the Liquidators of Fairfield Sentry

all or any portion of the amount it seeks from either Defendant pursuant to the sharing provisions

of the settlement agreement into which the Trustee and Liquidators entered and the Court

approved in 2011, or otherwise, the Trustee may not recover the same amount from either or

both Defendants because it would constitute an impermissible double recovery for a single loss.

## TENTH
### (Reservation of Possible Claim)

30.     Each Defendant reserves its right of claim and recovery under Bankruptcy Code §

502(h) if and to the extent the Trustee were to recover from either Defendant.

## ELEVENTH
### (Trustee Not Entitled to Interest)

31.     In the event the Trustee were to recover from either or both Defendants, he would

not be entitled to prejudgment interest.

## TWELFTH
### (Lack of Personal Jurisdiction)

32.     This Court lacks personal jurisdiction over Defendants because neither

purposefully availed itself of the privilege of conducting activities within the United States or

forum State or invoked the benefits and protections of their laws in relation to the claims asserted

by the Trustee and the United States and forum state are not either one's "home."

## DEFENDANTS' JURY TRIAL DEMAND

Each Defendant demands a jury trial on all claims and issues that may be tried by a jury

pursuant to Federal Rule of Civil Procedure 38(b) made applicably by Federal Rule of

Bankruptcy Procedure 9015.

DEFENDANTS' RULE 7012(b) STATEMENT

Neither Defendant consents to entry of final orders or judgment by the Bankruptcy Court.

WHEREFORE, each Defendant respectfully asks this Court to dismiss the Amended Complaint and this proceeding with prejudice and to award each Defendant its legal fees, expert fees, expenses, court costs, and such other relief as may be just and equitable.

Dated:  New York, NY
         April 14, 2023

Respectfully submitted,

CIRILLO LAW OFFICE

/s/ Richard A. Cirillo

_____

Richard A. Cirillo
246 East 33rd Street – # 1
New York, NY 10016-4802
Telephone:  917-541-6778
E-mail: rcirillo@cirillo-law.com

*Attorney for Defendants National Bank of Kuwait S.A.K. and NBK Banque Privée (Suisse) S.A.*