**WUERSCH & GERING LLP**
Gregory F. Hauser
Jascha D. Preuss
100 Wall Street, 10th Floor
New York, New York 10005
Telephone: (212) 509-5050
gregory.hauser@wg-law.com
jascha.preuss@wg-law.com
*Counsel for Defendant LGT Bank*
*in Liechtenstein Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                    *Plaintiff-Applicant*,<br><br>-v-<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                    *Defendant.* | **Adv. Pro. No. 08-01789 (CGM)**<br><br>**SIPA Liquidation**<br><br>**(Substantively Consolidated)** |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                    *Debtor.* | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities and the Chapter 7 Estate of Bernard L. Madoff,<br><br>                    *Plaintiff*,<br><br>-v-<br><br>LGT BANK IN LIECHTENSTEIN LTD.,<br><br>                    *Defendant*. | **Adv. Pro. No. 11-02929 (CGM)**<br><br>**ANSWER TO COMPLAINT AND JURY DEMAND** |

Defendant LGT Bank in Liechtenstein Ltd. ("Defendant" or "LGT Liechtenstein"), by and

through its undersigned counsel, Wuersch & Gering LLP, as and for its Answer (the "Answer") to

the Complaint (the "Complaint") of Plaintiff Irving H. Picard, Trustee for the Liquidation of

Bernard L. Madoff Investment Securities LLC (the "Trustee" or "Plaintiff"), states as follows:

## I.    NATURE OF THE ACTION[1]

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover
BLMIS Customer Property[2] that was stolen as part of the massive Ponzi scheme perpetrated by
Bernard L. Madoff ("Madoff") and others.

**ANSWER**: The allegations contained in paragraph 1 constitute legal conclusions, to which

no response is required.  To the extent a response is deemed necessary, LGT Liechtenstein denies

the allegations of paragraph 1.

2.    With this Complaint, the Trustee seeks to recover approximately $10,461,871 in
subsequent transfers of Customer Property made to Defendant LGT Liechtenstein by Fairfield
Sentry Limited ("Fairfield Sentry"), which was a Madoff feeder fund. Fairfield Sentry is currently
in liquidation in the British Virgin Islands ("BVI").  It was a company that had direct customer
accounts with BLMIS's investment advisory business ("IA Business") for the purpose of investing
assets with BLMIS.  Fairfield Sentry maintained in excess of 95% of its assets in its BLMIS
customer accounts. Some of the subsequent transfers from Fairfield Sentry came through Fairfield
Sigma Limited ("Fairfield Sigma"), which invested 100% of its assets in Fairfield Sentry.  Fairfield
Sigma is also in liquidation in the BVI.

**ANSWER**: LGT Liechtenstein admits, for the limited purpose of referring to it in this

Answer, the legal descriptions of "Fairfield Sentry" and "Fairfield Sigma" contained in paragraph

2. LGT Liechtenstein denies knowledge or information sufficient to form a belief as to the truth

---

[1]    LGT Liechtenstein deems the section headings in the Complaint not to constitute
allegations of the Complaint. To the extent any section headings are allegations, LGT
Liechtenstein admits or denies them consistent with its responses to the allegations contained
in the numbered paragraphs of the Complaint.

[2]    SIPA § 78*lll*(4) defines "Customer Property" as cash and securities at any time received,
acquired, or held by, or for the account of, a debtor from, or for, the securities accounts of a
customer, and the proceeds of any such property transferred by the debtor, including property
unlawfully converted.

of the allegations concerning whether Fairfield Sentry had direct customer accounts with BLMIS'

IA Business and, therefore, denies these allegations.    LGT Liechtenstein denies all other

allegations of paragraph 2, including that LGT Liechtenstein received subsequent transfers of

customer property from BLMIS or Fairfield Sentry or, directly or indirectly, Fairfield Sigma.

3.    When Defendant LGT Liechtenstein received the subsequent transfers of BLMIS
Customer Property, Defendant LGT Liechtenstein was a subsidiary of the LGT Group, a global
wealth and asset management group that offered wealth management services for private and
institutional investors.

**ANSWER**:  LGT Liechtenstein lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 3 and, therefore, denies the allegations

contained in paragraph 3.

## II.    JURISDICTION AND VENUE

4.    The Trustee brings this adversary proceeding pursuant to his statutory authority
under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3); sections 105(a), 550(a), and 551 of title 11 of
the United States Code, 11 U.S.C. §§ 101 *et. seq.* (the "Bankruptcy Code"); and the New York
Fraudulent Conveyance Act (New York Debtor & Creditor Law) ("NYDCL") §§ 273-279
(McKinney 2001), to obtain avoidable and recoverable transfers received by Defendant LGT
Liechtenstein as a subsequent transferee of funds originating from BLMIS.

**ANSWER**: The allegations contained in paragraph 4 constitute legal conclusions, to which

no response is required.  To the extent a response is deemed necessary, LGT Liechtenstein denies

the allegations of paragraph 4, except to admit that the Trustee has brought this adversary

proceeding.

5.    This is an adversary proceeding brought in this Court, in which the main underlying
substantively consolidated SIPA case, Adv. Pro. No. 08-01789 (BRL) (the "SIPA Case"), is
pending. The SIPA Case was originally brought in the United States District Court for the
Southern District of New York (the "District Court") as *Securities Exchange Commission v.
Bernard L. Madoff Investment Securities LLC, et al.*, No. 08 CV 10791 (the "District Court
Proceeding"). This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §
1334(b), and 15 U.S.C. §78eee(b)(2)(A), (b)(4).

2

**ANSWER**: The allegations contained in paragraph 5 constitute legal conclusions, to which

no response is required.  To the extent a response is deemed necessary, LGT Liechtenstein denies

the allegations of paragraph 5, except to admit that (a) the main underlying substantively

consolidated SIPA case (Case No. 08-01789 (CGM)) is pending in this Court; and (b) upon

information and belief, the District Court Proceeding was commenced in the District Court.  LGT

Liechtenstein denies the remaining allegations of paragraph 5, including that this Court has

jurisdiction to enter a final order or judgment in this proceeding.

6.    Defendant LGT Liechtenstein is subject to personal jurisdiction in this judicial
district because it purposely availed itself of the laws and protections of the United States and
the state of New York by, among other things, knowingly directing funds to be invested with New
York-based BLMIS through Fairfield Sentry. Defendant LGT Liechtenstein knowingly received
subsequent transfers from BLMIS by withdrawing money from Fairfield Sentry and Fairfield
Sigma, both Fairfield Greenwich Group ("FGG") managed feeder funds.

**ANSWER**: The allegations contained in paragraph 6 constitute legal conclusions, to which

no response is required.  To the extent a response is determined to be required, LGT Liechtenstein

denies the allegations of paragraph 6, except to admit that LGT Liechtenstein made investments

in Fairfield Sentry and Fairfield Sigma and redeemed portions of its investments from those funds.

LGT Liechtenstein lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in the second sentence of paragraph 6 regarding the management of Fairfield Sentry

and Fairfield Sigma and, therefore, denies the remaining allegations in paragraph 6.

7.    By directing investments through FGG, D e f e n d a n t  LGT Liechtenstein
knowingly accepted the rights, benefits, and privileges of conducting business and/or
transactions in the United States and New York. Upon information and belief, Defendant LGT
Liechtenstein entered into a subscription agreement with Fairfield Sentry under which it
submitted to New York jurisdiction, sent a copy of this agreement to FGG's New York City
office, and wired funds to Fairfield Sentry through a bank in New York. Defendant LGT
Liechtenstein thus derived  significant revenue from New York and maintained minimum
contacts and/or general business contacts with the United States and New York in connection with
the claims alleged herein.

**ANSWER**:  The allegations contained in the first sentence of paragraph 7 constitute legal conclusions, to which no response is required.  To the extent a response is determined to be required, LGT Liechtenstein denies the allegations in the first sentence of paragraph 7.  LGT Liechtenstein denies the remaining allegations of paragraph 7, except to admit that upon information and belief, affiliates of Fairfield Sentry and Fairfield Sigma had offices in New York.

8.    Defendant LGT Liechtenstein should reasonably expect to be subject to New York jurisdiction and is subject to personal jurisdiction pursuant to New York Civil Practice Law & Rules § 302 (McKinney 2001) and Bankruptcy Rule 7004.

**ANSWER**: The allegations contained in paragraph 8 constitute legal conclusions, to which no response is required.  To the extent a response is determined to be required, LGT Liechtenstein denies the allegations contained in paragraph 8.

9.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).

**ANSWER**: The allegations contained in paragraph 9 constitute legal conclusions, to which no response is required.  To the extent a response is required, LGT Liechtenstein denies the allegations of Paragraph 9.  Furthermore, LGT Liechtenstein does not consent to the issuance of entry of final orders or judgments by the Bankruptcy Court and demands a trial by jury of all issues that may be tried by a jury.

10.    Venue in this District is proper under 28 U.S.C. § 1409.

**ANSWER**: The allegations contained in paragraph 10 constitute legal conclusions, to which no response is required.  To the extent a response is determined to be required, LGT Liechtenstein denies the allegations of paragraph 10.

## III.    BACKGROUND

11.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia,* securities fraud, investment adviser fraud and  mail  and  wire  fraud. Contemporaneously, the Securities and Exchange

Commission ("SEC") commenced the District Court Proceeding against Madoff and BLMIS. The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS. The District Court Proceeding remains pending.

**ANSWER**:  Upon information and belief, LGT Liechtenstein admits that Madoff was arrested on or around December 11, 2008, and that, on that same date, the Securities and Exchange Commission ("SEC") filed a civil complaint against Madoff and BLMIS in the District Court. LGT Liechtenstein lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 11 and, therefore, denies the remaining allegations in paragraph 11.

12.     On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards (the "Receiver") as receiver for the assets of BLMIS.

**ANSWER**: LGT Liechtenstein lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 12 and, therefore, denies the allegations contained in paragraph 12.  LGT Liechtenstein refers to the District Court's December 12, 2008 Order for a full statement of its contents.

13.     On December 15, 2008, under §78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, under §78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

**ANSWER**: LGT Liechtenstein lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 13 and, therefore, denies the allegations contained in paragraph 13.  LGT Liechtenstein refers to the SIPC application referenced in paragraph 13 for a full statement of its contents.

14.     Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order under SIPA (known as the 'Protective Decree'), which, in pertinent part:
    a.  removed the receiver and appointed the Trustee for the liquidation of the business  of BLMIS under SIPA section 78eee(b)(3);

   b. appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA section 78eee(b)(3); and

   c. removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under § 78eee(b)(4) of SIPA.

  **ANSWER**: LGT Liechtenstein lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 14 and, therefore, denies the allegations

contained in paragraph 14.  LGT Liechtenstein refers to the District Court's December 15, 2008

Order for a full statement of its contents.

  15. By orders dated December 23, 2008, and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

  **ANSWER**: LGT Liechtenstein lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 15 and, therefore, denies the allegations

contained in paragraph 15.  LGT Liechtenstein refers to the District Court's December 23, 2008

and February 4, 2009 Orders for a full statement of the contents therein.

  16. At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." *Id.* at 23. Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id*. On June 29, 2009, Madoff was sentenced to 150 years in prison.

  **ANSWER**: LGT Liechtenstein admits, upon information and belief, that on or about

March 12, 2009, Madoff pleaded guilty to the charges filed against him by the United States

Attorney's Office for the Southern District of New York and that on or about June 29, 2009,

Madoff was sentenced to a term of 150 years in prison.  LGT Liechtenstein lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in

paragraph 16 and, therefore, denies the remaining allegations contained in paragraph 16.

17.     On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a plea hearing on August 11, 2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), DiPascali pled guilty to a ten-count criminal information. Among other things, DiPascali admitted that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s. *Id*. at 46.

**ANSWER**:  LGT Liechtenstein admits, upon information or belief, that on or about August

11, 2009, Frank DiPascali pleaded guilty to the charges brought against him by the United States

Attorney's Office for the Southern District of New York.  LGT Liechtenstein lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in

paragraph 17 and, therefore, denies the remaining allegations contained in paragraph 17.

## IV.     TRUSTEE'S POWERS AND STANDING

18.     As Trustee appointed under SIPA, the Trustee is charged with recovering and paying out Customer Property to BLMIS customers, assessing claims, and liquidating any other assets of BLMIS for the benefit of the estate and its creditors. The Trustee is in the process of marshalling BLMIS's assets, and this liquidation is well underway. However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years. Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recoveries, including those from individuals and entities that received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA section 78fff-2(c)(1).

**ANSWER**: The allegations contained in paragraph 18 constitute legal conclusions, to

which no response is required.  To the extent a response is determined to be required, LGT

Liechtenstein lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations contained in paragraph 18 and, therefore, denies the allegations contained

in paragraph 18.

19.     Under SIPA section 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under section 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

**ANSWER**: The allegations contained in paragraph 19 constitute legal conclusions, to which no response is required. To the extent a response is determined to be required, LGT Liechtenstein lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 19 and, therefore, denies the allegations contained in paragraph 19.

20.    Under SIPA §§ 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

**ANSWER**: The allegations contained in paragraph 20 constitute legal conclusions, to which no response is required. To the extent a response is determined to be required, LGT Liechtenstein lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 20 and, therefore, denies the allegations contained in paragraph 20.

21.    The Trustee has standing to bring these claims under section 78fff-1(a) of SIPA and the Bankruptcy Code, including sections 323(b), 544 and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under §§ 554, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA 78fff-2(c)(3).

**ANSWER**: The allegations contained in paragraph 21 constitute legal conclusions, to which no response is required. To the extent a response is determined to be required, LGT Liechtenstein lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 21 and, therefore, denies the allegations contained in paragraph 21.

## V.    **THE DEFENDANT**

22.    Defendant LGT Liechtenstein is a private bank that maintains a place of business at Herrengasse 12, FL-9490 Vaduz, Liechtenstein. Defendant LGT Liechtenstein is a subsidiary of the LGT Group, a wealth and asset management group owned by the Princely House of Liechtenstein.

**ANSWER**: Defendant LGT Liechtenstein admits that it is a private bank with a place of business at Herrengasse 12 in Vaduz, Liechtenstein. Defendant LGT Liechtenstein lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 22 and, therefore, denies the remaining allegations contained in paragraph 22.

## VI.    THE PONZI SCHEME

23.    BLMIS was founded by Madoff in 1959 and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several of his friends and family members. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). By virtue of that registration, BLMIS was a member of SIPC. BLMIS had three business units: market making, proprietary trading, and the IA Business.

**ANSWER**: LGT Liechtenstein lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 23 and, therefore, denies the allegations contained in paragraph 23.

24.    Outwardly, Madoff ascribed the consistent success of the IA Business to the so-called split-strike conversion strategy ("SSC Strategy"). Under that strategy, Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100") – a collection of the 100 largest publicly traded companies. Madoff claimed that his basket of stocks would mimic the movement of the S&P 100. He also asserted that he would carefully time purchases and sales to maximize value, and BLMIS customers' funds would, intermittently, be out of the equity markets.

**ANSWER**: LGT Liechtenstein lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 24 and, therefore, denies the allegations contained in paragraph 24.

25.    The second part of the SSC Strategy was a hedge of Madoff's stock purchases with options contracts. Those option contracts acted as a "collar" to limit both the potential gains and losses on the basket of stocks. Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options. Madoff told BLMIS customers that when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual funds holding Treasury bills.

Madoff also told customers that he would enter and exit the market between six and ten times each year.

**ANSWER**: LGT Liechtenstein lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 25 and, therefore, denies the allegations

contained in paragraph 25.

26.    BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never made the investments he promised clients, who believed they were invested with him in the SSC Strategy. He further admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts. In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform on which BLMIS reasonably could have traded securities.  Instead, investors' funds were principally deposited into the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxxx703.

**ANSWER**: LGT Liechtenstein lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 26 and, therefore, denies the allegations

contained in paragraph 26.

27.    Prior to his arrest, Madoff assured clients and regulators that he purchased and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than through any listed exchange. Based on the Trustee's investigation to date, there is no evidence that the IA Business ever entered into any OTC options trades on behalf of IA Business account holders.

**ANSWER**: LGT Liechtenstein lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 27 and, therefore, denies the allegations

contained in paragraph 27.

28.    For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options, but rather used to pay withdrawals and to make other avoidable transfers. Madoff also used his customers' investments to enrich himself, his associates, and his family.

**ANSWER**: LGT Liechtenstein admits, upon information and belief, that BLMIS claimed to invest the money deposited by its customer in stocks and options.  LGT Liechtenstein otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 28 and, therefore, denies the allegations contained in paragraph 28.

29.     The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning  and  diversion of   new   investments   to   fulfill   payment   requests   or withdrawals from other BLMIS accountholders, BLMIS did not have the funds to pay investors for those new investments.  BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

**ANSWER**: LGT Liechtenstein lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 29 and, therefore, denies the allegations contained in paragraph 29.

30.     It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in demand, investigation, the filing of a claim, and disclosure of the fraud.

**ANSWER**: LGT Liechtenstein lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 30 and, therefore, denies the allegations contained in paragraph 30.

31.     Madoff's scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

**ANSWER**: LGT Liechtenstein admits, upon information and belief, that BLMIS continued to operate until December 2008. LGT Liechtenstein lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 31 and, therefore, otherwise denies the remaining allegations contained in paragraph 31.

32.     Based upon the Trustee's ongoing investigation, it now appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts.

11

When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. By the time the Ponzi scheme came to light on December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

**ANSWER**: LGT Liechtenstein admits, upon information and belief, that Madoff was

arrested on or about December 11, 2008.  LGT Liechtenstein lacks knowledge or information

sufficient to form a belief as to the truth of the allegations contained in paragraph 32 and, therefore,

otherwise denies the allegations contained in paragraph 32.

33.    Thus, at all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

**ANSWER**: LGT Liechtenstein lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 33 and, therefore, denies the allegations

contained in paragraph 33.

## VII.    THE TRANSFERS

34.    Fairfield Sentry received initial transfers of BLMIS Customer Property.  Some or all of those initial transfers were subsequently transferred directly or indirectly to Defendant LGT Liechtenstein.

**ANSWER**: LGT Liechtenstein lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 34, and therefore denies the allegations

contained in paragraph 34.

### A.    Initial Transfers From BLMIS to Fairfield Sentry

35.    The Trustee filed an adversary proceeding against Fairfield Sentry, Fairfield Sigma and other defendants in the Bankruptcy Court under the caption *Picard v. Fairfield Sentry Ltd., et al.,* Adv. Pro. No. 09-01239 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Fairfield Sentry in the amount of approximately $3 billion (the "Fairfield Amended Complaint").  The Trustee incorporates by reference the allegations contained in the Fairfield Amended Complaint as if fully set forth herein.

**ANSWER**: LGT Liechtenstein admits that the Trustee filed an adversary proceeding in this Court styled as *Picard v. Fairfield Sentry Ltd., et al.*, No. 09-01239 (BRL) (the "Fairfield Action"). LGT Liechtenstein denies knowledge or information sufficient to form a belief as to which of the three complaints filed in the Fairfield Action the Trustee purports to incorporate by reference in the Complaint and, therefore, denies the allegations in these complaints. LGT Liechtenstein denies that the alleged initial transfers of Customer Property from BLMIS to Fairfield Sentry were, or are, avoidable.

In addition to the foregoing, LGT Liechtenstein furthers its objection to the Trustee's purported incorporation by reference of all other paragraphs and allegations of one or more of the three complaints filed in the Fairfield Action, and, therefore, does not answer such allegations. LGT Liechtenstein further objects to the inclusion in this adversary proceeding of any issue implicated by the incorporation of any of the three complaints in the Fairfield Action.

The statements in paragraph 35 as to the nature of certain transfers, the characterization of certain funds as Customer Property, and transfers allegedly sought to be avoided and recovered constitute legal conclusions and thus no response is required. To the extent a response is determined to be required, LGT Liechtenstein lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 35 and, therefore, denies the allegations contained in paragraph 35.

LGT Liechtenstein reserves the right to rely on and introduce any allegations in any of the Trustee's three complaints filed in the Fairfield Action or in the exhibits thereto as party admissions. To the extent that any further response is deemed to be required, LGT Liechtenstein lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 35 and, therefore, denies the allegations contained in paragraph 35.

13

36.     During the six years preceding the Filing Date, BLMIS made transfers to Fairfield Sentry of approximately \$3 billion (the "Fairfield Sentry Six Year Initial Transfers"). The Fairfield Sentry Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**: The allegations contained in the second sentence of paragraph 36 constitute

legal conclusions, to which no response is required.  To the extent a response is determined to be

required, LGT Liechtenstein lacks knowledge or information sufficient to form a belief as to the

truth of the allegations contained in the second sentence of paragraph 36, and therefore denies

those allegations.  LGT Liechtenstein lacks knowledge or information sufficient to form a belief

as to the truth of the remaining allegations contained in paragraph 36 and, therefore, denies the

remaining allegations contained in paragraph 36.

37.     The Fairfield Sentry Six Year Initial Transfers include approximately \$1.6 billion which BLMIS transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Two Year Initial Transfers"). The Fairfield Sentry Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, §§ 273-279 of NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**: The allegations contained in the second sentence of paragraph 37 constitute

legal conclusions, to which no response is required.  To the extent a response is determined to be

required, LGT Liechtenstein lacks knowledge or information sufficient to form a belief as to the

truth of the allegations contained in the second sentence of paragraph 37, and therefore denies

those allegations.  LGT Liechtenstein lacks knowledge or information sufficient to form a belief

as to the truth of the remaining allegations contained in paragraph 37 and, therefore, denies the

remaining allegations contained in paragraph 37.

38.     The Fairfield Sentry Two Year Initial Transfers include approximately \$1.1 billion which BLMIS transferred to Fairfield Sentry during the 90 days preceding the Filing Date (the "Fairfield Sentry Preference Period Initial Transfers"). The Fairfield Sentry Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA §

78*lll*(4) and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**: The allegations contained in the second sentence of paragraph 38 constitute legal conclusions, to which no response is required.  To the extent a response is determined to be required, LGT Liechtenstein lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of paragraph 38, and therefore denies those allegations.  LGT Liechtenstein lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 38 and, therefore, denies the remaining allegations contained in paragraph 38.

39.    The Fairfield Sentry Six Year Initial Transfers, the Fairfield Sentry Two Year Initial Transfers and the Fairfield Sentry Preference Period Initial Transfers are collectively defined as the "Fairfield Sentry Initial Transfers."  Charts setting forth these transfers are attached as Exhibits A and B.

**ANSWER**: LGT Liechtenstein admits that the Trustee defines the term "Fairfield Sentry Initial Transfers" as set forth above and refers to Exhibits A and B for a full statement of the contents therein.  LGT Liechtenstein denies any and all remaining allegations in paragraph 39.

40.    Pursuant to the Bankruptcy Court's June 7 and June 10, 2011 orders, the Bankruptcy Court approved a settlement among the Trustee, Fairfield Sentry, and others (the "Settlement Agreement").  As part of the Settlement Agreement, on July 13, 2011, the Bankruptcy Court entered a consent judgment granting the Trustee a judgment against Fairfield Sentry in the amount of $3,054,000,000.  Under the terms of the Settlement Agreement, Fairfield Sentry is obliged to pay $70,000,000 to the Trustee for the benefit of the consolidated BLMIS estate.

**ANSWER**: LGT Liechtenstein lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 40 and, therefore, denies the allegations in paragraph 40.  LGT Liechtenstein refers to the June 7, 2011 and June 10, 2011 Orders and the July 13, 2011 Consent Judgment for a full statement of the contents therein.

**B. Subsequent Transfers from Fairfield Sentry to Defendant LGT Liechtenstein**

15

41.     A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, LGT Liechtenstein and is recoverable from Defendant LGT Liechtenstein pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL.  Based on the Trustee's investigation to date, approximately $10,350,118 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Defendant LGT Liechtenstein (the "Fairfield Sentry Subsequent Transfers").  A chart setting forth the presently known Fairfield Sentry Subsequent Transfers is attached as Exhibit C.

**ANSWER**: LGT Liechtenstein admits that it received funds from Fairfield Sentry but lacks

knowledge or information sufficient to form a belief as to the truth of the allegations concerning

the prior status of the funds and, therefore, denies such allegations. The remaining allegations

contained in paragraph 41 constitute legal conclusions to which no response is required.  To the

extent a response is required, LGT Liechtenstein denies the allegations contained in paragraph 41,

including the allegations set forth in Exhibit C, and refers to Exhibit C for a full statement of the

contents therein.

42.     The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Sentry Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER**:  To the extent the Trustee purports to reserve a right, such reservation is a legal

position to which no response is required.  LGT Liechtenstein lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 42

and, therefore, denies the allegations in paragraph 42.

## C.        Subsequent Transfers from Fairfield Sentry to Fairfield Sigma and Subsequently to Defendant LGT Liechtenstein

43.     A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant LGT Liechtenstein through Fairfield Sigma and is recoverable from Defendant LGT Liechtenstein pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL.  Based on the Trustee's investigation to date, approximately $752,273,917 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Fairfield Sigma.  Thereafter, the equivalent of at least $111,753 was transferred by Fairfield Sigma to Defendant LGT Liechtenstein (the "Fairfield

Sigma Subsequent Transfers").   Charts setting forth the presently known Fairfield Sigma
Subsequent Transfers are attached as Exhibits D and E.

**ANSWER**: LGT Liechtenstein admits that it received funds from Fairfield Sigma but lacks

knowledge or information sufficient to form a belief as to the truth of the allegations concerning

the prior status of the funds and, therefore, denies such allegations. The remaining allegations

contained in paragraph 43 constitute legal conclusions to which no response is required.  To the

extent a response is required, LGT Liechtenstein denies the allegations contained in paragraph 43

and refers to Exhibits D and E for a full statement of the contents therein.

44.   The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i)
supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Sigma
Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional
transfers.

**ANSWER**:  To the extent the Trustee purports to reserve a right, such reservation is a legal

position to which no response is required.  LGT Liechtenstein lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 44

and, therefore, denies the allegations in paragraph 44.

45.   The Fairfield Sentry Subsequent Transfers and the Fairfield Sigma Subsequent
Transfers are collectively defined as the "Fairfield Subsequent Transfers."

**ANSWER**: LGT Liechtenstein denies the allegations of paragraph 45, except to admit that

the Trustee defines the term "Fairfield Subsequent Transfers" as set forth above.

## COUNT ONE
## RECOVERY OF FAIRFIELD SENTRY SUBSEQUENT TRANSFERS –
## 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

46.   The Trustee incorporates by reference the allegations contained in the previous
paragraphs of the Complaint as if fully rewritten herein.

**ANSWER**: LGT Liechtenstein incorporates and reasserts its responses to the allegations contained in all of the previous paragraphs of the Complaint with the same force and effect as if fully set forth herein.

47.     Defendant LGT Liechtenstein received the Fairfield Sentry Subsequent Transfers, totaling approximately $10,350,118, and the Fairfield Sigma Subsequent Transfers, totaling the equivalent of at least $111,753 (collectively, as defined above, the "Fairfield Subsequent Transfers"). The Fairfield Subsequent Transfers, totaling the equivalent of at least $10.461,871, are recoverable pursuant to section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

**ANSWER**: The allegations contained in paragraph 47 constitute legal conclusions to which no response is required. To the extent a response is required, LGT Liechtenstein denies the allegations contained in paragraph 47.

48.     Each of the Fairfield Sentry Subsequent Transfers was made directly or indirectly to, or for the benefit of, Defendant LGT Liechtenstein.

**ANSWER**: The allegations contained in paragraph 48 constitute legal conclusions to which no response is required. To the extent a response is required, LGT Liechtenstein denies the allegations contained in paragraph 48.

49.     Defendant LGT Liechtenstein is an immediate or mediate transferee of the Fairfield Sentry Initial Transfers.

**ANSWER**: The allegations contained in paragraph 49 constitute legal conclusions to which no response is required. To the extent a response is required, LGT Liechtenstein denies the allegations contained in paragraph 49.

50.     As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant LGT Liechtenstein recovering the Fairfield Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER**: The allegations contained in paragraph 50 constitute legal conclusions to which no response is required. To the extent a response is required, LGT Liechtenstein denies the allegations contained in paragraph 50.

## RESPONSE TO THE TRUSTEE'S REQUEST FOR RELIEF

LGT Liechtenstein denies that the Trustee is entitled to judgment in his favor as against LGT Liechtenstein, in whole or in part, or any relief of any nature whatsoever.  LGT Liechtenstein further denies that this Court has jurisdiction to enter any such judgment or relief.

## AFFIRMATIVE DEFENSES

LGT Liechtenstein asserts the following defenses without assuming the burden of proof or any other burden if, as a matter of law, such burdens would otherwise be on the Trustee.  LGT Liechtenstein reserves the right to amend this Answer to assert additional defenses, as well as the right to assert counterclaims or claims against third parties based on discovery in this adversary proceeding, or otherwise.

The following defenses are set forth cumulatively and in the alternative:

## FIRST AFFIRMATIVE DEFENSE
### (Personal Jurisdiction)

As set forth in LGT Liechtenstein's Motion to Dismiss the Complaint, filed on September 29, 2022, in this adversary proceeding (Dkts. 99-101 and 113), this Court lacks personal jurisdiction over LGT Liechtenstein.  LGT Liechtenstein has not consented to the authority of this Court.

## SECOND AFFIRMATIVE DEFENSE
### (Failure to State a Claim for Relief)

The Complaint fails to state a claim upon which relief can be granted, including without limitation for the reasons stated in LGT Liechtenstein's Memorandum of Law in Support of its Motion to Dismiss the Complaint (Dkts. 100 and 113).

## THIRD AFFIRMATIVE DEFENSE
### (Dismissed Claims)

19

The Trustee's claims are barred to the extent they, and/or any allegations on which they are

based, have been or may in the future be dismissed or stricken by the Court, or are based on theories

or allegations that may in the future be rejected by this Court or by another court on appeal from

any orders of this Court.

### FOURTH AFFIRMATIVE DEFENSE
### (Safe Harbor: 11 U.S.C. § 546(e))

Pursuant to 11 U.S.C. § 546(e), the Trustee may not avoid any alleged Fairfield Sentry

Initial Transfers, or pursue under 11 U.S.C. §550(a) any recovery claims against Defendant

premised upon the alleged avoidance or avoidability of any alleged Fairfield Sentry Initial

Transfers, except to the extent that the Trustee can establish that such transfers were made with

actual intent to defraud within two years before the Filing Date.

### FIFTH AFFIRMATIVE DEFENSE
### (No Customer Property: 15 U.S.C. § 78fff-2(c)(3))

The alleged Fairfield Subsequent Transfers did not constitute BLMIS customer property.

As set forth in LGT Liechtenstein's Memorandum of Law in Support of its Motion to Dismiss the

Complaint (Dkt. 100) and other filings, many of the alleged Fairfield Subsequent Transfers could

not have been sourced from BLMIS customer property because the allegedly avoidable transfers

from BLMIS to Fairfield Sentry had been distributed by Fairfield Sentry to its affiliates or other

institutions prior to the alleged Fairfield Subsequent Transfers.

### SIXTH AFFIRMATIVE DEFENSE
### (Initial Transfer Not Avoided: 11 U.S.C. § 550(a))

The Trustee may not recover the alleged Fairfield Subsequent Transfers because the

alleged Fairfield Sentry Initial Transfers have not been avoided.

### SEVENTHAFFIRMATIVE DEFENSE
### (Good Faith: 11 U.S.C. § 550(b) and NYDCL § 278(1))

To the extent that LGT Liechtenstein received any alleged Fairfield Subsequent Transfers or any proceeds thereof, such funds may not be recovered because LGT Liechtenstein took for value, in good faith, and without knowledge of the voidability of the alleged Fairfield Subsequent Transfers within the meaning of 11 U.S.C. § 550(b) and/or as a purchaser for fair consideration, without knowledge of the fraud at the time of the purchase or actual fraudulent intent within the meaning of NYDCL §§ 278(1) and (2). Any such taking was made for value because those transfers were made in exchange for Fairfield Sentry's redemption of its own shares from LGT Liechtenstein.

To the extent that LGT Liechtenstein received any alleged Fairfield Subsequent Transfers or any proceeds thereof, it took in good faith because: (i) it lacked knowledge that BLMIS was not trading securities or was conducting a fraud, or of any fraudulent purpose behind the alleged Fairfield Subsequent Transfers; (ii) it lacked knowledge of the voidability of any alleged Fairfield Initial Transfers at the time that it allegedly received any alleged Fairfield Subsequent Transfers; (iii) it lacked actual fraudulent intent at the time they allegedly received any alleged Fairfield Subsequent Transfers; (iv) it lacked knowledge of facts suggestive of any alleged fraud that would have caused a reasonable person in LGT Liechtenstein's position to conduct further inquiry; and (v) even if LGT Liechtenstein was on inquiry notice, a diligent inquiry would not have discovered the allegedly fraudulent purpose of any transfers at issue or that BLMIS was not trading securities or was conducting a fraud. At all relevant times, LGT Liechtenstein had access to, and was aware of, only publicly available information about Fairfield Sentry and BLMIS, including the general information disseminated by Fairfield Sentry. LGT Liechtenstein did not have personal access to Madoff or BLMIS, or ever met or communicated directly with either of them.

21

If, as the Trustee alleges, the Fairfield Sentry Initial Transfers are avoidable, LGT Liechtenstein had no knowledge of such avoidability.

### EIGHTH AFFIRMATIVE DEFENSE
### (Single Satisfaction: 11 U.S.C. § 550(d) and NYDCL § 278(1)(a))

Under 11 U.S.C. 550(d), the Trustee "is entitled to only a single satisfaction under" 11 U.S.C. § 550(a). Under NYDCL § 278(1)(a), the Trustee may only set aside a conveyance "to the extent necessary to satisfy his claim."

Accordingly, to the extent that the Trustee has recovered, or will recover, from Fairfield Sentry or from any other immediate or mediate transferee the amount of any avoided initial transfer that includes Customer Property that the Trustee alleges was received by the Defendant, the Trustee is barred from recovering any such alleged transfer (or its proceeds) from the Defendant.

### NINTH AFFIRMATIVE DEFENSE
### (Mere Conduit/ Lack of Dominion or Control)

The Trustee's claims are barred because LGT Liechtenstein was not a transferee, for purposes of 11 U.S.C. § 550(a), of any of the alleged Fairfield Subsequent Transfers, as defined in the Complaint. To the extent that LGT Liechtenstein received any alleged Fairfield Subsequent Transfers, it did so in good faith, acting in its capacity as a bank and for the account and benefit of one or more of its customers. LGT Liechtenstein did not have dominion or control, or the right to assert dominion or control, over any alleged Fairfield Subsequent Transfer or any proceeds thereof, or the right to use any part of any alleged Fairfield Subsequent Transfer or the proceeds thereof for its own purposes. Rather, LGT Liechtenstein was obligated to credit the proceeds of any alleged Fairfield Subsequent Transfer to the account(s) of and for the benefit of one or more of its customers, who had the right to assert dominion and control over said alleged Fairfield Subsequent Transfers. Accordingly, to the extent that LGT Liechtenstein received any alleged Fairfield Subsequent Transfers or proceeds thereof, it did so as a mere conduit for third parties

22

rather than as a transferee from which the Trustee may recover under 11 U.S.C. § 550(a). Such initial transfers would be barred by the safe harbor under § 546(e) of the Bankruptcy Code and LGT Liechtenstein may retain the amount it received pursuant to § 548 of the Bankruptcy Code because it took the transfers for value and in good faith.

### TENTH AFFIRMATIVE DEFENSE
### (British Virgin Islands Proceedings)

The Trustee's claims are barred, in whole or in part, based upon rulings, judgments, orders, or decisions entered in the Fairfield Sentry liquidation proceedings before the Eastern Caribbean High Court of Justice, Commercial Division, British Virgin Islands, including any associated appellate rulings, judgments, orders, or decisions.

### ELEVENTH AFFIRMATIVE DEFENSE
### (Extraterritoriality)

The Trustee's claims to recover from LGT Liechtenstein subsequent transfers allegedly made to it by Fairfield Sentry and Fairfield Sigma constitute an impermissible extraterritorial application of 11 U.S.C. § 550(a) and NYDCL § 278.

### TWELFTH AFFIRMATIVE DEFENSE
### (Comity)

The Trustee's claims to recover from LGT Liechtenstein subsequent transfers allegedly made to it by Fairfield Sentry and Fairfield Sigma violate principles of international comity.

### THIRTEENTH AFFIRMATIVE DEFENSE
### (Subject Matter Jurisdiction)

This Court lacks jurisdiction under Article III of the U.S. Constitution to enter final orders or judgments in this proceeding.

### FOURTEENTH AFFIRMATIVE DEFENSE
### (Unreasonable Delay)

The Trustee's delay in prosecuting his claims, which were brought more than a decade ago and concern transfers made more than seventeen (17) years ago, is unreasonable and unfairly prejudices LGT Liechtenstein's ability to defend itself.

## FIFTEENTH AFFIRMATIVE DEFENSE
### (Double Recovery)

On or about July 13, 2011, the Trustee entered into a settlement agreement with the Liquidators of Fairfield Sentry and other Fairfield funds.  That agreement provides for the sharing of recoveries on the Trustee's and the Fairfield Sentry Liquidators' claims against defendants who allegedly received transfers of BLMIS customer property from Fairfield Sentry.   The agreement was ultimately incorporated into the consent judgment entered against Fairfield Sentry.

To the extent that the Fairfield Sentry Liquidators recover from LGT Liechtenstein via settlement or otherwise, the Trustee is barred from recovering because he is not entitled to a double recovery, nor should LGT Liechtenstein be subject to recovery of the same monies by two separate plaintiffs.

## SIXTEENTH AFFIRMATIVE DEFENSE
### (Estoppel)

The Trustee's claim is barred by estoppel.

## SEVENTEENTH AFFIRMATIVE DEFENSE
### (No Ponzi Scheme Presumption)

The Trustee is not entitled to rely upon a "Ponzi scheme presumption" to prove that the initial transfers from BLMIS to Fairfield Sentry, which he seeks to recover from LGT Liechtenstein, were made with actual intent to hinder, delay or defraud any BLMIS creditor.

## EIGHTEENTH AFFIRMATIVE DEFENSE
### (Violation of Due Process (Amendment V to the U.S. Const.))

24

The use of the doctrine of law of the case to apply rulings made in other adversary proceedings of which they were not a party and did not otherwise participate in to LGT Liechtenstein violates LGT Liechtenstein's right to due process of law, as guaranteed by the Fifth Amendment to the U.S. Constitution.

### NINTEENTH AFFIRMATIVE DEFENSE
### (Statute of Limitations)

The Trustee's claim is barred by the statute of limitations.

### TWENTIETH AFFIRMATIVE DEFENSE
### (No Interest)

To the extent the Trustee recovers from LGT Liechtenstein, the Trustee is not entitled to an award of interest.

### TWENTY-FIRST AFFIRMATIVE DEFENSE
### (Preservation of Rights: 11 U.S.C. § 502(h))

To the extent the Trustee recovers from LGT Liechtenstein, LGT Liechtenstein reserves the right to assert a claim arising from any such recovery under 11 U.S.C. § 502(h).

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 9015 of the Federal Rules of Bankruptcy Procedure, Defendant LGT Liechtenstein hereby demands a jury trial on all claims and issues that may be tried by a jury.

### STATEMENT PURSUANT TO FED. R. BANKR. P. 7012(b)

LGT Liechtenstein does not consent, but instead objects, to the entry of a final Order or Judgment against them by the Bankruptcy Court.

**WHEREFORE**, Defendant LGT Bank in Liechtenstein Ltd. requests that this Court dismiss the Complaint with prejudice, award LGT Liechtenstein its attorneys' fees, costs and

disbursements incurred in connection with this adversary proceeding, and grant LGT Liechtenstein

such other and further relief as the Court deems just and proper.

Dated: April 17, 2023                    Respectfully submitted,

                                         **WUERSCH & GERING LLP**

                                         */s/ Gregory F. Hauser*
                                         Gregory F. Hauser
                                         Jascha D. Preuss
                                         100 Wall Street, 10th Floor
                                         New York, New York 10005
                                         Telephone: (212) 509-5050
                                         gregory.hauser@wg-law.com
                                         jascha.preuss@wg-law.com
                                         ***Counsel for Defendant LGT Bank in
                                         Liechtenstein Ltd.***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 17th day of April, 2023, a true and correct PDF copy of

the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which

will send a notice of electronic filing to all counsel of record.

*/s/ Gregory F. Hauser*
Gregory F. Hauser

27