# EXHIBIT 3

10-05353-smb  Doc 23  Filed 12/08/10  Entered 12/08/10 19:29:30  Main Document
Pg 2 of 82

08-01789-cgm  Doc 23116-3  Filed 04/17/23  Entered 04/17/23 19:00:45  Exhibit
2010 Initial Complaint against Natixis   Pg 2 of 83

**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Ryan P. Farley
Mark A. Kornfeld
Keith R. Murphy
Marc Skapof
Thomas L. Long
Catherine E. Woltering

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | **COMPLAINT** |
| Debtor. | **FILE UNDER SEAL** |

<table>
<tr><td>

IRVING H. PICARD, Trustee for the
Liquidation of Bernard L. Madoff Investment
Securities LLC,

                Plaintiff,

                v.

NATIXIS, NATIXIS CORPORATE &
INVESTMENT BANK (f/n/a IXIS
CORPORATE & INVESTMENT BANK),
NATIXIS FINANCIAL PRODUCTS, INC.,
BLOOM ASSET HOLDINGS FUND, and
TENSYR LIMITED,

                Defendants.

</td><td>

Adv. Pro. No. _____ (BRL)

</td></tr>
</table>

Irving H. Picard (the "Trustee"), as Trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"), and the substantively consolidated estate of Bernard L. Madoff, individually, under the Securities Investor Protection Act ("SIPA"), §§ 15 U.S.C. 78aaa *et seq.*, for this Complaint against NATIXIS, Natixis Corporate & Investment Bank ("Natixis CIB") (f/n/a IXIS Corporate & Investment Bank ("IXIS CIB")), Natixis Financial Products, Inc. ("Natixis FP"), Bloom Asset Holdings Fund ("BLOOM") and Tensyr Limited ("Tensyr") (NATIXIS, Natixis CIB/IXIS CIB, Natixis FP, Natixis NA and BLOOM are collectively referred to herein as "Natixis" or "Defendants"), alleges the following:

## I. <u>NATURE OF THE ACTION</u>

1. This adversary proceeding is part of the Trustee's continuing efforts to avoid transfers of and return BLMIS Customer Property[1] that was lost as part of the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff") and others.

---

[1] SIPA § 78*lll*(4) defines "Customer Property" as cash and securities at any time received, acquired or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.

2.      With this Complaint, the Trustee seeks to recover approximately $400 million in

subsequent transfers made to Natixis, a sophisticated, global financial institution, and $30

million from Tensyr, a collateralized fund obligation created by Natixis and the Fairfield

Greenwich Group.   These transfers or Customer Property originated from BLMIS.   This

Customer Property was transferred to Natixis and Tensyr in connection with alternative

investment products offered by them, including total return swaps and structured notes.  As part

of these structured products, Natixis and Tensyr hedged their exposures to investors by

purchasing and subsequently redeeming shares of various Madoff Feeder Funds[2] having one or

more BLMIS investment advisory accounts.

3.      At the times when Natixis and Tensyr received the subsequent transfers of

BLMIS Customer Property from the Madoff Feeder Funds, they were armed with both public

and considerable non-public information about Madoff and BLMIS, which raised numerous red

flags of possible fraud at BLMIS.

### A.      Leverage And The Madoff Ponzi Scheme

4.      For nearly a decade before Madoff's arrest, at a time when many, if not most

investment firms were regularly using borrowed money in making their investments or loaning

money to customers to make securities investments, it was widely known to money managers,

investment bankers, institutional lenders, feeder funds, funds of funds, fund service providers,

the hedge fund industry, and the financial community at large, that Madoff was adamantly

opposed to the use of leverage.  Madoff told his customers and prospective customers he did not

personally use leverage, and claimed he would return their investments if they used leverage to

---

[2]       As used herein, and in other similar actions brought by the Trustee, a Madoff (or BLMIS) Feeder Fund is
an investment vehicle which invested assets through BLMIS via direct customer accounts with BLMIS's IA
Business.

3

invest through BLMIS.

5.      Inasmuch as Madoff could have made huge personal gains by simply borrowing money and investing it using his "split strike conversion" strategy (the "SSC Strategy"), and also could have substantially increased his commissions by permitting his customers to utilize leverage to increase the amount of funds they invested through BLMIS, Madoff's purported resistance to leverage was viewed for years by many industry participants as a red flag that he and others were possibly engaged in fraudulent activity.  Madoff's explanations for not wanting to employ leverage personally made no logical sense and were seen by many sophisticated financial institutions as extremely suspicious.  In truth, upon information and belief, Madoff attempted to limit the use of leverage because he feared sophisticated financial institutions like Natixis would conduct due diligence on BLMIS's investment strategy and operations, increasing the likelihood his fraud would be exposed to the world.

6.      Madoff Feeder Funds, however, wanted to use leverage to increase the amount of assets invested through Madoff, which would increase their management and performance fees. The use of leverage also made sense given the extraordinarily consistent and low volatility of Madoff's historic, fictitious returns.  Madoff Feeder Funds found very eager leverage-provider partners in large financial institutions, like Natixis, which created various alternative investment products designed for the same purpose – to exploit Madoff's "success" for their own institutional gains.  For fees paid to financial institutions like Natixis, investors could make large "synthetic investments" into Madoff Feeder Funds using the bank's balance sheet with reduced upfront capital outlay by investors in relation to the promised returns.

7.      A synthetic investment simulates the return of an actual investment, but the return is actually created by using one or a combination of financial instruments, typically including derivatives

such as option contracts or an equity index and debt securities, rather than a single conventional investment.

8.      These synthetic investments led to a seemingly "win-win-win" situation for those seeking to capitalize on Madoff's returns.   The financial institutions providing the leverage earned significant structuring and steady financing fees; the Madoff Feeder Funds, into which these financial institutions made sizeable investments to hedge their promised returns to investor swap counterparties and noteholders, earned even more management and performance fees; and finally, the swap counterparties and noteholders earned multiples on the returns they would have earned based on the amount of capital they actually had available to invest.

9.      Such alternative investment products created and offered by entities like Natixis included total return swaps and structured notes.   These alternative investment financial instruments promised an opportunity for lucrative future returns for investors based upon the performance of a designated Madoff Feeder Fund, which in structured products like swaps and notes, is most often referred to as a "reference fund."  By investing in these structured products, institutional investors could potentially multiply their returns.

10.     A swap is a bilateral financial transaction where one counterparty "swaps" the cash flows of a single asset or basket of assets in exchange for cash flows from the other counterparty.  As a result, a swap allows the party receiving the total return to gain exposure and the upside returns from a reference fund without actually having to own it.   A key feature of a swap is that the parties do not transfer actual ownership of the reference assets.   This feature allows for greater flexibility and reduced up-front capital outlay to execute a potentially valuable trade.

11.     In order to hedge its exposure to pay the return to the other party, typically a

financial institution like Natixis uses cash collateral from the swap party and its own money to purchase the underlying asset – in this case, Madoff Feeder Fund shares. In exchange for promising to provide the total return based on the feeder fund shares, the financing institution often charges the swap counterparty a higher "borrowing" rate than if the bank had simply lent money to the investor.

12.    Total return swaps can be highly leveraged, making them a favorite of hedge funds. The swap market is mostly institutional and over-the-counter ("OTC"). Market participants often include, among others, investment banks, commercial banks, mutual funds, hedge funds, funds of funds, private equity funds and pension funds. Swaps have been historically, and continue to be, very popular with hedge funds because they receive the benefit of a large potential upside gain with a reduced cash outlay at inception of the trade.

13.    Total return swaps were frequently used by foreign investors to avoid the IRS tax rule for sourcing income. By investing in certain derivative products an investor may avoid the 30% withholding tax by avoiding the receipt of U.S. sourced income. These tax implications meant it was financially more advantageous for foreign investors to enter into a total return swap than to invest directly in the underlying asset. This savings was amplified when leveraged.

14.    The other structured product developed and offered by financial institutions like Natixis is a structured note. With a structured note, in general terms, a financial institution issues a note – a debt instrument – that pays a return at some future date based upon the performance of a reference fund or index. A structured note also permits an investor to use "borrowed" funds for securities investment purposes. Another motivation for an investor to purchase leveraged notes is to obtain the potential for higher returns than would be available through a conventional investment.

10-05953-smb   Doc 231-6-3   Filed 12/08/10   Entered 12/08/10 19:29:30   Main Document
2010 Initial Complaint against Natixis   Pg 8 of 83
08-01789-cgm   Doc 23116-3   Filed 04/17/23   Entered 04/17/23 19:00:45   Exhibit
Page 8 of 82   Pg 8 of 83

15.     Under a structured note program, an investor typically pays to the financial institution an amount of money, the original principal, for the investment at the outset of the trade.  The investor often is charged fees by the financial institution for administering the note program, as well as a fee for providing leverage (the money essentially "loaned" to the investor noteholder).  In return, the financial institution agrees to pay some multiple of the referenced fund's or the index's cumulative positive performance at the note's future maturity date.  For example, a three times (3x) levered note would have the investor investing $100, but ultimately receiving a return as if the investor had invested $300 in the reference fund or index.

16.     Even though they were not required to do so, to hedge its promise to pay the leveraged cumulative positive return at the note's future maturity date, a financial institution usually purchases shares of the reference fund(s).  However, the financial institution is free to sell its hedging shares at any time.  If the financial institution believes the reference fund's or index's value is falling, the financial institution can redeem its hedging shares preventing any loss to the financial institution.  In contrast, the investor must wait until the maturity date of the note to unwind the transaction, unless the investor is willing to incur substantial financial penalties to break the trade.  A note program typically requires investors to commit a minimum investment amount for a specific term – *e.g.*, three to seven years.

17.     Unless they are designated as principal protected or guaranteed, structured notes do not guarantee the return of the investor's original investment with the financial institution.  If the value of the reference fund or index falls below a specified level, at the note's maturity date, the financial institution owes nothing to the investor.

18.     In the immediate aftermath of Madoff's arrest, Natixis made public statements and issued a press release stating that it had not made proprietary investments in hedge funds

7

managed by Madoff.  The statements were misleading.  Natixis purchased hundreds of millions of dollars of shares of several Madoff Feeder Funds to hedge exposures resulting from swaps executed and notes issued by Natixis.  Natixis used its own money, at least in part, to purchase these Madoff Feeder Fund shares.  In fact, upon information and belief, Natixis purchased in excess of $600 million of one particular Madoff Feeder Fund alone in connection with Natixis structured products.  Natixis also purchased hundreds of millions of dollars of other Madoff Feeder Funds' shares in connection with Natixis structured products.

19.     In the six years leading up to December 10, 2008, Natixis submitted redemptions for shares of various Madoff Feeder Funds, and received multi-million dollar transfers of money from them, at times when Natixis knew or should have known of BLMIS's fraud.  Specifically, upon information and belief, Natixis received approximately $210 million in transfers from its redemptions of one fund's shares and another approximately $190 million in transfers from its redemptions of another fund's shares.  The funds used to pay for those redemptions are Customer Property recoverable by the Trustee as subsequent transfers of avoidable initial transfers from BLMIS.

**B.     The Natixis Swaps**

20.     Between 2003 and 2008, a Natixis entity was a party to at least eight swaps that provided a return based on the performance of various Madoff Feeder Funds.  Upon information and belief, Natixis hedged its exposure under the various swaps by purchasing and holding for its own benefit shares of the various Madoff Feeder Funds that comprised the referenced funds for the swaps.

**C.     The Natixis Notes**

21.     Between October 2007 and July 2008, Natixis also sold structured notes that

10-05953-smb   Doc 231-3   Filed 12/08/10   Entered 12/08/10 19:29:30   Main Document
2010 Initial Complaint Against Natixis   Pg 10 of 83

08-01789-cgm   Doc 23116-3   Filed 04/17/23   Entered 04/17/23 19:00:45   Exhibit
Pg 99 of 82

provided a return based on the performance of Madoff Feeder Fund Fairfield Sentry Limited ("Sentry"). Specifically, the NATIXIS Notes (defined below), at maturity, provided four times (4x) leveraged exposure to the performance of Sentry. Natixis sold the notes mostly to European institutional investors in an original principal amount in excess of $105 million. Upon information and belief, the $105 million in aggregate original principal, multiplied by the applicable leverage amount, resulted in Natixis investing $415 million in Sentry – with $105 million coming from the investors, and $310 million from Natixis.

| Original Principal Amount | Currency Conversion Factor | Equity Total | Leverage Amount | Total with Leverage |
|---|---|---|---|---|
| $7,500,000.00 | 1 | $7,500,000.00 | 4 | $30,000,000.00 |
| $6,350,000.00 | 1 | $6,350,000.00 | 4 | $25,400,000.00 |
| $14,480,000.00 | 1 | $14,480,000.00 | 4 | $57,920,000.00 |
| $8,300,000.00 | 1 | $8,300,000.00 | 4 | $33,200,000.00 |
| € 15,000,000.00 | 1.4405 | $21,607,500.00 | 4 | $86,430,000.00 |
| $15,000,000.00 | 1 | $15,000,000.00 | 4 | $60,000,000.00 |
| € 15,000,000.00 | 1.5679 | $23,518,500.00 | 4 | $94,074,000.00 |
| € 6,000,000.00 | 1.557 | $9,342,000.00 | 3 | $28,026,000.00 |
| **ORIGINAL PRINCIPAL TOTAL:** | | $106,098,000.00 | **LEVERAGED TOTAL:** | $415,050,000.00 |

### D.    The Tensyr Notes

22.    Tensyr is a collateralized fund obligation, upon information and belief, created by Natixis and the Fairfield Greenwich Group ("FGG"), which managed Sentry. Tensyr issued hundreds of millions of dollars of notes linked directly to the performance of Sentry. Natixis was the co-arranger for the issuance of the Tensyr notes. The two primary beneficiaries of the Tensyr transaction were Natixis and FGG, as Natixis received fees from the noteholders and FGG's management companies received management fees based on Natixis's purchases of Sentry shares. Tensyr, upon information and belief, invested approximately $450 million in Sentry. Upon information and belief, Tensyr, either acting alone or in combination with Natixis or FGG, redeemed at least $30 million of Sentry shares at a time when Tensyr and Natixis had knowledge of numerous red flags of possible fraudulent activity by Madoff. The funds used to

pay for those redemptions are Customer Property recoverable by the Trustee as subsequent transfers of avoidable initial transfers from BLMIS.

23.     Based upon information and belief, to pay for the Natixis and Tensyr redemptions, Sentry withdrew and/or utilized funds from its BLMIS accounts and transferred those funds to Natixis and Tensyr.  The Trustee has filed suit against the "Fairfield Greenwich" funds, including Sentry, Fairfield Investment Fund Limited ("FIFL") and other Fairfield-related defendants to avoid initial and certain subsequent transfers of Customer Property.  *See Picard v. Fairfield Sentry Ltd., et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 09-1239 (Bankr. S.D.N.Y filed May 18, 2009) (as amended on July 20, 2010) (the "Fairfield Amended Complaint").  For the reasons set forth in the Trustee's complaint in that action, the transfers between BLMIS and Sentry are avoidable.  For the reasons set forth herein, the subsequent transfers, or the value thereof, between Sentry and Natixis and Sentry and Tensyr are recoverable and the Customer Property should be returned to the BLMIS estate.

24.     The Trustee has also filed suit against Groupement Financier Limited ("Groupement") and other Groupement-related defendants to avoid initial and certain subsequent transfers of Customer Property.  *See Picard v. UBS AG, et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 10- 04285 (Bankr. S.D.N.Y filed Nov. 24, 2010) (the "Groupement Complaint").  For the reasons set forth in the Trustee's complaint in that action, the transfers between BLMIS and Groupement are avoidable.  For the reasons set forth herein, the subsequent transfers between Groupement, or the value thereof, and Natixis are recoverable and the Customer Property should be returned to the BLMIS estate.

25.     The Trustee has also filed suit against Harley International (Cayman) Limited ("Harley") to avoid initial and certain subsequent transfers of Customer Property.  *See Picard v.*

*Harley International (Cayman) Limited, et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 09-1187 (Bankr. S.D.N.Y filed May 12, 2009) (the "Harley Complaint"). Harley defaulted in that action after failing to appear to answer the Trustee's allegations in the Harley Complaint. On or about November 10, 2010, Judge Lifland entered a default judgment against Harley in the amount of $1,072,820.00. For the reasons set forth in the Trustee's complaint in that action, and set forth in Judge Lifland's November 10, 2010 order that specifically identifies the Harley transfers avoided, the transfers between BLMIS and Harley have been avoided. For the reasons set forth herein, the subsequent transfers between Harley and Natixis, or the value thereof, are recoverable and the Customer Property should be returned to the BLMIS estate.

26.    The Trustee has also filed suit against the Alpha Prime Fund Limited ("Alpha Prime") and other Alpha Prime-related defendants to avoid initial and certain subsequent transfers of Customer Property. *See Picard v. Alpha Prime Fund Limited, et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 09-1364 (Bankr. S.D.N.Y filed July 15, 2009) (the "Alpha Prime Complaint"). Alpha Prime defaulted in that action after failing to appear to answer the Trustee's allegations in the Alpha Prime Complaint. By agreement, that default was vacated. On or about December 5, 2010, the Trustee filed another Complaint against Alpha Prime and other defendants. *See Picard v. HSBC plc, et al., (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 09-1364 (BRL) (Bankr. S.D.N.Y filed December 5, 2010) (the "Amended Alpha Prime Complaint"). For the reasons set forth in the Trustee's complaint in that action, the transfers between BLMIS and Alpha Prime are avoidable. For the reasons set forth herein, the subsequent transfers between the Alpha Prime and Natixis, or the value thereof, are recoverable and the Customer Property should be returned to the BLMIS estate.

10-05953-smb   Doc 231-3   Filed 12/08/10   Entered 12/08/10 19:29:30   Main Document
2010 Initial Complaint against Natixis   Pg 13 of 83

08-01789-cgm   Doc 23116-3   Filed 04/17/23   Entered 04/17/23 19:00:45   Exhibit
Page 13 of 82

## II.   <u>JURISDICTION AND VENUE</u>

27.     The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3), 11 U.S.C. §§ 105(a), 544, 547, 548, 550(a), and 551 of 11 U.S.C. §§ 101 *et. Seq.* (the "Bankruptcy Code"), to recover money improperly received by these Defendants as subsequent transferees from Madoff Feeder Funds directly invested in BLMIS and certain other funds indirectly invested in BLMIS.

28.     This is an adversary proceeding brought in this Court, in which the main underlying substantively consolidated SIPA case, No. 08-01789 (BRL) (the "SIPA Case"), is pending.   The SIPA Case was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission vs. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding").   This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), Federal Rules of Bankruptcy Procedure 7001(1), (2), (7), (8), and (9), and 15 U.S.C. §§ 78eee(b)(2)(A), (b)(4).

29.     This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (F), (H) and (O).

30.     Venue in this District is proper under 28 U.S.C. § 1409.

31.     NATIXIS is subject to personal jurisdiction in this judicial district because it routinely conducts business in New York, purposely avails itself of the laws of the State of New York by undertaking significant commercial activities in New York, and derives significant revenue from New York.   NATIXIS also has subsidiaries or affiliates domiciled and doing business in New York.   NATIXIS entered into agreements with Sentry governed by New York law, through which it conducted significant commercial activity in New York.

32.     Natixis CIB/IXIS CIB is subject to personal jurisdiction in this judicial district

12

because it routinely conducts business in New York, purposely avails itself of the laws of the State of New York by undertaking significant commercial activities in New York, and derives significant revenue from New York. Natixis CIB/IXIS CIB also has subsidiaries or affiliates domiciled and doing business in New York. Natixis CIB/IXIS CIB also entered into agreements with Sentry governed by New York law, through which it conducted significant commercial activity in New York.

33.     Natixis FP is subject to personal jurisdiction in this judicial district because it routinely conducts business in New York, purposely avails itself of the laws of the State of New York by undertaking significant commercial activities in New York, derives significant revenue from New York, and at all times relevant hereto maintained its principal place of business in New York, New York.

34.     BLOOM is subject to personal jurisdiction in this judicial district because it routinely conducts business in New York, purposely avails itself of the laws of the State of New York by undertaking significant commercial activities in New York, and derives significant revenue from New York. BLOOM also entered into agreements with Sentry governed by New York law, through which it conducted significant commercial activity in New York.

35.     Tensyr is subject to personal jurisdiction in this judicial district because it routinely conducted business in New York, purposely availed itself of the laws of the State of New York by undertaking significant commercial activities in New York, and derived significant revenue from New York. Tensyr also entered into agreements with Sentry governed by New York law, through which it conducted significant commercial activity in New York.

36.     This Court has personal jurisdiction over all of the Defendants captioned herein pursuant to N.Y. C.P.L.R. §§ 301 and 302 and Bankruptcy Rule 7004. All Defendants have

maintained minimum contacts with New York in connection with the claims alleged herein. Thus, this Court has personal jurisdiction over all of the Defendants based upon their contacts with the United States.

## III.   **BACKGROUND**

37.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violations of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud.   Contemporaneously, the SEC filed a District Court Proceeding against Madoff.   The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the BLMIS IA Business.

38.    On December 12, 2008, The Honorable Louis L. Stanton entered an order appointing Lee S. Richards, Esq. as receiver for the assets of BLMIS (the "Receiver").

39.    On December 15, 2008, pursuant to SIPA § 78eee(a)(4)(B), the Securities Investor Protection Corporation ("SIPC") filed an application in the District Court alleging, *inter alia*, BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.   On that same date, pursuant to SIPA § 78eee(a)(4)(A), the SEC consented to a combination of its own action with SIPC's application.

40.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

(a)    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

(b)    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3);

10-05033-smb   Doc 23   Filed 12/08/10   Entered 12/08/10 19:29:30   Main Document
2010 Initial Complaint against Natixis   Pg 16 of 83

08-01789-cgm   Doc 23116-3   Filed 04/17/23   Entered 04/17/23 09:00:45   Exhibit
Pg 16 of 83

(c)     removed the case to this Bankruptcy Court pursuant to SIPA § 78eee(b)(4); and

(d)     released in effect the Receiver for BLMIS.

41.     Pursuant to SIPA § 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of sections 547 and 548 of the Bankruptcy Code and the date of the commencement of the case within the meaning of section 544 of the Bankruptcy Code.

42.     By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

### THE PONZI SCHEME

43.     BLMIS was founded in 1959 by Madoff and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, chief executive officer and sole owner, operated BLMIS together with several of his friends and family members. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, SIPA § 78o(b). By virtue of that registration, BLMIS is a member of SIPC. BLMIS had three business units: the Investment Advisory ("IA") Business, market-making and proprietary trading.

44.     Outwardly, Madoff ascribed the consistent success of the IA Business to his so-called SSC Strategy. Pursuant to his SSC Strategy, Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the Standard & Poor's 100 Index (the "S&P 100 Index"), which is a capitalization-weighted index of 100 stocks from a broad range of industries. The component stocks are weighted according to the total market value of their

outstanding shares.  The impact of a component's price change is proportional to the issue's total market value, which is the share price times the number of shares outstanding.

45.     Madoff also asserted that he would carefully time purchases and sales to maximize value, and correspondingly, BLMIS customers' funds would, intermittently, be out of the equity markets.  While out of the market, those funds were purportedly invested in United States Treasury bills or in mutual funds holding Treasury bills.  The second part of the SSC Strategy was the hedge of Madoff's stock purchases with S&P 100 Index option contracts ("OEX options").  Those option contracts functioned as a "collar," limiting both the potential gains and the potential losses.  Madoff purported to use proceeds from the sale of OEX call options to finance the cost of purchasing OEX put options.  Madoff also told IA Business customers, including Feeder Funds and financial institutions, that he would enter and exit the market between six and ten times each year.

46.     BLMIS IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their BLMIS accounts.  The securities purchases and sales shown in such account statements never occurred and the profits reported were entirely fictitious.  In fact, Madoff's SSC Strategy was entirely fictitious.

47.     At times prior to his arrest, Madoff generally assured customers and regulators that he purchased and sold the OEX put and call options over-the-counter ("OTC"), rather than through an exchange.  Yet, like the underlying securities, the Trustee has yet to uncover any evidence that Madoff ever purchased or sold any of the options described in customer statements.  The Options Clearing Corporation, which clears all option contracts based upon the stocks of S&P 100 companies, has no record of the BLMIS IA Business having ever bought or

sold any exchange-listed options on behalf of any of the IA Business customers.  Nor are there

any BLMIS records of OTC OEX options contracts settled with any domestic or foreign

counterparties in connection with the SSC Strategy.

48.    For all periods relevant hereto, the BLMIS IA Business was operated as a Ponzi

scheme.  The money received from investors was not invested in stocks and options.  Rather,

BLMIS used its IA Business customers' deposits to pay withdrawals by other customers, and to

make other transfers, which are, of course, avoidable by the Trustee.  Many of these transfers

were to enrich Madoff, his associates and his family.

49.    The falsified monthly account statements reported that the accounts of IA

Business customers had made substantial gains, but, in reality, because it was a Ponzi scheme,

BLMIS did not have the funds to pay investors on account of their new investments.  BLMIS

was only able to survive for as long as it did by using the stolen principal invested by some

customers to pay other customers.

50.    The payments BLMIS made to investors constituted an intentional

misrepresentation of fact regarding their underlying BLMIS accounts and were an integral and

essential part of the fraud.  The payments were necessary to validate the BLMIS false monthly

account statements, and were made to avoid detection of the fraud, to retain existing investors

and to lure other investors into the Ponzi scheme.

51.    At a Plea Hearing on March 12, 2009 in the case captioned *United States v.*

*Madoff*, Madoff pleaded guilty to an eleven-count criminal information filed against him by the

United States Attorneys' Office for the Southern District of New York.  At the Plea Hearing,

Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of

[BLMIS]."  Plea Allocution of Bernard L. Madoff at 23, *United States v. Madoff*, No. 09-CR-213

(DC) (S.D.N.Y. March 12, 2009) (Docket No. 50) ("Madoff Plea Allocution"). Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id.* Madoff was sentenced on June 29, 2009 to 150 years in prison.

52.     On August 11, 2009, a former BLMIS employee, Frank DiPascali, also pleaded guilty to participating in and conspiring to perpetuate the Ponzi scheme. At the Plea Hearing in the case entitled *United States v. DiPascali*, DiPascali pleaded guilty to a ten-count criminal information. Among other things, DiPascali admitted that the Ponzi scheme had operated at BLMIS since at least the 1980's. Plea Allocution of Frank DiPascali at 46, *United States v. DiPascali*, No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) (Docket No. 11).

53.     Based upon the Trustee's ongoing investigation, it now appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. By the time the Ponzi scheme came to light on December 11, 2008 with Madoff's arrest, investors had already lost approximately $20 billion in principal.

54.     As Madoff admitted at his Plea Hearing, he never purchased any of the securities, options or Treasurys for the BLMIS IA Business and the returns he reported to customers were entirely fictitious.[3]

---

[3]     Madoff did a "*de minimis*" amount of securities trading outside of the SSC Strategy – such trading is not at issue in the Trustee's allegations herein.

08-01789-cgm Doc 23116-3 Filed 04/17/23 Entered 04/17/23 19:09:45 Exhibit Page 8 of 82 Pg 20 of 83

55.     At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets.  BLMIS was insolvent in that:  (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

56.     Madoff's scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

57.     This Complaint and similar complaints are being filed to recover subsequent transfers of Customer Property from BLMIS.  All Customer Property recovered by the BLMIS estate shall first be distributed pro rata among BLMIS's customers in accordance with SIPA § 78fff-2(c)(1).

## IV.     TRUSTEE'S POWERS AND STANDING

58.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code.  SIPA 78fff(b), chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code are also applicable to this case to the extent consistent with SIPA.

59.     By virtue of his appointment under SIPA, the Trustee has the responsibility to recover and pay out Customer Property to BLMIS customers, assess claims and liquidate any other assets of BLMIS for the benefit of the estate and its creditors.  The Trustee is in the process of marshalling BLMIS's assets, but they will not be sufficient to fully reimburse BLMIS customers for the billions of dollars they invested through BLMIS.  Consequently, the Trustee must use his broad authority as expressed and intended by both SIPA and the Bankruptcy Code to pursue recovery for BLMIS accountholders and their subsequent transferees.

10-05353-smb    Doc 231-3    Filed 12/08/10    Entered 12/08/10 19:29:30    Main Document
2010 Initial Complaint against Natixis    Pg 21 of 83

08-01789-cgm    Doc 23116-3    Filed 04/17/23    Entered 04/17/23 19:09:45    Exhibit
Page 21 of 82

60.    In addition to the powers of a bankruptcy trustee, the Trustee has broader powers granted by SIPA.

61.    The Trustee is a real party in interest and has standing to bring these claims pursuant to SIPA § 78fff-1 and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

(a)    NATIXIS, Natixis CIB/IXIS CIB, Natixis FP, BLOOM and Tensyr received "Customer Property" as defined in SIPA § 78*lll*(4);

(b)    BLMIS incurred losses as a result of the conduct set forth herein;

(c)    BLMIS customers were injured as a result of the conduct detailed herein;

(d)    SIPC cannot by statute advance funds to the Trustee to fully reimburse all customers for all of their losses;

(e)    the Trustee will not be able to fully satisfy all claims;

(f)    the Trustee, as bailee of Customer Property, can sue on behalf of the customer-bailors;

(g)    as of this date, the Trustee has received multiple, express assignments of certain claims of the applicable accountholders, which they could have asserted.  As assignee, the Trustee stands in the shoes of persons who have suffered injury-in-fact, and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages;

(h)    SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding.  SIPC has expressly conferred upon the Trustee enforcement of its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds; and

(i)    the Trustee has the power and authority to avoid and recover transfers pursuant to sections 544, 547, 548 and 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

## V.    THE DEFENDANTS

62.    NATIXIS is a French corporate and investment bank created from the merger of the asset management and investment banking operations of Natexis Banque Populaire (Banque Populaire group) and IXIS (Groupe Caisse d'Epargne).  NATIXIS is majority-owned in equal shares by Caisse Nationale des Caisses d'Epargne et de Prévoyance ("CNCEP") and Banque Fédérale des Banques Populaires ("Banque Populaires"), each of which is a French bank organized as a société anonyme à directoire et conseil de surveillance.  The two main shareholders, CNEP and Banque Populaires, together own more than 70% of NATIXIS, while the remaining shares are listed on the Paris Stock Exchange.  NATIXIS acquired its interest in IXIS from CNCEP on November 17, 2006.

63.    Natixis CIB (formerly "IXIS CIB") is an investment and corporate bank based in Paris, France.  Natixis CIB became a subsidiary of NATIXIS as of November 17, 2006 as the result of the merger of the investment banking capabilities and asset management of Natexis Banque Poplaire and IXIS, the investment banking arm of the Caisse d'Epargne group.  Prior to its acquisition by NATIXIS, IXIS CIB provided investment banking services worldwide.

64.    Natixis FP is a Delaware corporation with its principal place of business at 9 West 57th Street, 36th Floor, New York, New York 10019.  Natixis FP is a wholly owned subsidiary of Natixis Capital Markets Inc., which is a subsidiary of Natixis CIB.  Natixis FP trades in U.S. Treasury bills and mortgage-backed securities, municipal bonds and other fixed-income instruments, derivatives and other structured products and participates in other financing

activities in the capital markets. Natixis FP was known as IXIS Financial Products Inc. until March 2007.

65.    BLOOM is an Irish umbrella trust that is wholly owned by NATIXIS. BLOOM functioned as an investment vehicle for Califano Investments Limited, an affiliate of Natixis FP. BLOOM had a sub-fund called Blossom Asset Holdings Fund in which all of BLOOM's assets were held, including Madoff Feeder Fund shares held for the benefit of Natixis FP.

66.    Tensyr is a collateralized fund obligation issuer incorporated under the laws of Jersey. Upon information and belief, Tensyr is either wholly or partially owned by, or at least affiliated with, FGG and/or Natixis.

## VI.    FACTUAL ALLEGATIONS

67.    As early as 2004, Natixis had identified fundamental problems with Sentry and BLMIS, putting it on notice of possible fraudulent activities at BLMIS. In a June 2004 e-mail between FGG employees, FGG's Kim Perry stated, "I had another conversation with my friend at Natexis. He says that [there are] two fundamental problems that bother him," one of which was "Why is Sentry making so much money on the options when it is supposed to be a hedge." Perry continued to say that her Natexis contact "had two PhD quants . . . at the meeting [about Sentry and BLMIS] and they are of the opinion that something else is going on that they don't understand. Apparently the theory was raised that Sentry is providing liquidity to Madoff's securities business and getting compensated for it."

68.    Even before Natixis made the first investment in Sentry in connection with structured products, Natixis had already spotted an important red flag of possible fraud – in that Madoff's alleged options trading did not make sense, and it certainly did not conform to the options trading strategy articulated by Madoff.

10-05953-smb   Doc 231-3   Filed 12/08/10   Entered 12/08/10 19:29:30   Main Document
2010 Initial Complaint against Natixis   Pg 23 of 82

08-01789-cgm   Doc 23116-3   Filed 04/17/23   Entered 04/17/23 19:00:45   Exhibit
Pg 24 of 83

69.     Natixis ignored these and other red flags of possible fraud or other illegitimate trading activity at BLMIS and issued structured products, such as swaps and notes underlying certain Madoff Feeder Funds which generated millions of dollars in fees.  In connection with the structured product transactions, Natixis made significant investments – hundreds of millions of dollars – in the underlying Madoff Feeder Funds.  In the aggregate, upon information and belief, at its peak, Natixis held total investments in the Madoff Feeder Funds approaching $1 billion.

A.     **STRUCTURE OF THE NATIXIS FP SWAPS**

70.     Pursuant to various swap transactions, Natixis provided leveraged financing to institutional clients that sought to gain exposure or increase their current exposure to Madoff Feeder Funds.

71.     Natixis FP entered into total return swap transactions with institutional investors that sought leveraged exposure to hedge funds or funds of funds (the "Financing Swaps").  As described herein, most, but not all, of the Financing Swaps were entered into by Natixis FP or its predecessor entities.   These Financing Swaps provided institutional investors (the "Swap Counterparties" or the "Swap Counterparty") with returns that matched, on a leveraged basis, any positive returns on a referenced security or portfolio of securities (the "Reference Securities").

72.     In each swap transaction, Natixis FP received an initial cash or securities payment from the Swap Counterparty at the time a Financing Swap was executed.   Thereafter, all cumulative positive returns on the Reference Securities, net of financing costs, were paid by Natixis FP to the Swap Counterparty at maturity.   Under the Financing Swaps, the Swap Counterparty had no obligation to compensate Natixis FP in the event there was a cumulative negative return on the Reference Securities at maturity.

10-05953-smb    Doc 231-6-3    Filed 12/08/10    Entered 12/08/10 19:29:30    Main Document
2010 Initial Complaint against Natixis    Pg 25 of 83
08-01789-cgm    Doc 23116-3    Filed 04/17/23    Entered 04/17/23 09:00:45    Exhibit
Page 25 of 82    Pg 25 of 83

73.    Although it was not required to do so, to hedge its exposure with respect to the promised returns on the Reference Securities under Financing Swaps, in cases where the terms of the Reference Securities permitted purchases of their shares by a U.S. person, Natixis FP acquired the Reference Securities for its own account.  In cases where the Reference Securities did not permit purchases of shares by U.S. persons ("Offshore Reference Securities"), Natixis FP hedged its exposure via an existing and corresponding total return swap (the "Second Swap") with a third party, Califano Investments Limited ("Califano"), an affiliate of Natixis FP and Natixis Securities North America, Inc. ("Natixis NA").[4]

74.    To complete this hedging structure with respect to Offshore Reference Securities, Califano (or its predecessor entity) wholly owned the offshore investment vehicle BLOOM, which, in turn, would acquire and hold all such underlying Offshore Reference Securities for which the Second Swap.

75.    Natixis NA was the investment advisor for BLOOM and directed the purchase of the Offshore Reference Securities for the account of BLOOM so that, via the Second Swap between Califano and Natixis FP, Natixis FP had effectively hedged its exposure to the Offshore Reference Securities under the related Financing Swaps.

76.    Natixis NA and/or Natixis North America, Inc. may have also received transfers of funds from Natixis FP in connection with the Financing Swaps.

77.    Because Natixis FP was obligated under the Second Swap to make Califano whole for any negative returns on the Second Swap's reference securities, which were based on the performance of the Offshore Reference Securities, Natixis FP bore the risk of any downside

---

[4]    Natixis NA (formerly IXIS Securities North America Inc.,) is a US-registered broker-dealer and wholly owned subsidiary of Natixis Capital Markets Inc.

in the Offshore Reference Securities in excess of the initial cash or collateral payment from the Swap Counterparty at the time such Financing Swap was executed.

78.     Natixis FP, Califano and BLOOM are each indirect, wholly owned subsidiaries of NATIXIS.  NATIXIS is also the indirect parent company of Natixis NA.  As described above, Natixis structured the hedging of these Financing Swaps using these various Natixis subsidiaries.



## B.     THE NATIXIS FINANCING SWAPS

79.     Natixis FP entered into three Financing Swaps with hedge fund Swap Counterparties in which the Reference Securities were the following Madoff Feeder Funds:  (i) Groupement, (ii) Harley, and (iii) initially Alpha Prime, and later, after substitution of the reference fund at the Swap Counterparty's request, Herald Fund SPC ("Herald").

80.     Upon information and belief, in one additional instance, Natixis FP provided a Financing Swap on Reference Securities which were a basket of funds that included, among others, Harley.

81.     In two further instances, Natixis FP entered into Financing Swaps on Reference Securities which were funds of hedge funds[5] that included Sentry, or other FGG funds that invested in Sentry.

82.     In each of these six instances, upon information and belief, Natixis FP's exposure to the Reference Securities under these Financing Swaps was hedged directly with purchases of the relevant Reference Securities or via the Califano/BLOOM structure (or its predecessor entity) pursuant to which Natixis NA, in its capacity as investment advisor, directed the purchases of the relevant Reference Securities—shares of the Madoff feeder funds—for the account of BLOOM.

83.     In two additional total return swaps, either NATIXIS or IXIS CIB entered into transactions with an entity called FIF4X, Ltd., with the reference fund (or the Reference Securities) being FIFL.

### 1.     The Groupement Swap

84.     Upon information and belief, one of the most senior Natixis executives in France was close friends with Rene-Thierry Magon de la Villehuchet, the founder of the hedge fund complex Access International Advisors ("AIA") who committed suicide in the immediate aftermath of the Madoff scandal becoming public. The "Groupement" entities were part of the AIA complex.

85.     In 2003, CDC Financial Products Inc. ("CDC"), which later became Natixis FP ("Party B"), began exploring the possibility of entering into a swap with a Swap Counterparty called Groupement Financier Levered Limited ("GFLL") ("Party A"), for which the reference fund was Groupement, a Madoff feeder fund (the "Groupement Swap"). The confirmation for

---

[5]     The two funds of funds were part of FGG. The two funds were FIFL and Fairfield Greenwich Fund (Luxembourg) Subfund Guardian II Fund ("FGF Luxembourg").

the Groupement Swap was dated November 5, 2003.  The initial payment amount by GFLL to

CDC was $17 million and the leverage provided by CDC to GFLL was $17 million, resulting in

a contemplated payout of two times (2x) the leveraged performance of Groupement.  The

Leverage Charge to GFLL was one month LIBOR plus 145 basis points.  The termination date

of the Groupement Swap was November 5, 2007.

86.    In the Groupement Swap, CDC acknowledged and agreed that:

(A)((i) Party B or any of its Affiliates may hedge the market risk exposure
of Party B with respect to this Transaction on a dynamic, static or portfolio basis,
which hedging may include without limitation acquisition of Hedging Positions, in
its sole discretion, (ii) at any time before, during, or after, the termination of this
Transaction, Party B or any of its Affiliates may establish, change, terminate, or
re-establish any Hedging Position in its sole discretion, and (iii) Party B and its
Affiliates will have no obligation to purchase, own, or terminate, or to refrain from
purchasing, owning, or terminating the Hedging Positions at any time . . . . *any
hedge position established by Party B or any of its Affiliates is a proprietary
trading position and activity of Party B or such Affiliate; and (b) Party B or
such Affiliate is not holding the hedge positions or engaging in the hedging
activities on behalf of or for the account of or as agent or fiduciary for Party A,
and Party A will not have any direct economic or other interest in, or beneficial
ownership of, the hedge positions or hedging activities*.  (emphasis added)

87.    Leading up to the execution of the Groupement Swap, internal Natixis

memoranda described the proposed trade to various departments within Natixis, including the

credit and risk departments.  The reference fund, Groupement, was described in internal Natixis

documents as having a sole asset of a managed account with BLMIS.  AIA was the investment

manager for Groupement and, according to Natixis, earned a 1% management fee on a monthly

basis and a 15% performance fee on a quarterly basis.

88.    Before entering into the swap transaction, AIA met with Natixis representatives

and provided them with considerable information regarding Madoff and BLMIS.  Among other

information provided to Natixis by AIA was information concerning Madoff's SSC Strategy,

which involved Madoff trading equities approximately six to ten times per year, and the rest of

the year being in U.S. Treasury bills or mutual funds holding treasury bills. Natixis also learned that the strategy involved the purchase of a basket of stocks, the sale of "out of the money" call options and the purchase of "at or out of the money" put options.

89.     Prior to entering into the Groupement Swap, AIA provided Natixis with other information concerning BLMIS and Madoff. Of particular note, AIA provided Natixis with Erin E. Arvelund's 2001 article in Barron's titled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum," which article raised certain questions about the BLMIS IA Business. Similarly, AIA appears to have provided Natixis with the May 2001 MarHedge Article on Madoff called "Madoff tops charts; skeptics ask how," which also raised questions about Madoff's improbably consistent returns and discussed the lack of transparency into the BLMIS IA Business. Together, these articles questioned the legitimacy of BLMIS and Madoff and their ability to achieve the IA Business returns they purportedly had achieved using the investment strategy Madoff claimed to employ for most clients. Upon information and belief, Natixis conducted no reasonable and independent due diligence on Madoff and BLMIS notwithstanding the issues raised by these articles.

90.     Natixis also received from AIA copies of Groupement's monthly account statements from BLMIS, Groupement's account opening documentation with BLMIS and BLMIS's Form ADV, which did not reflect BLMIS having filed as a registered investment advisor with the Securities and Exchange Commission ("SEC").

91.     Internal Natixis documents also claimed that Natixis would have full transparency into the underlying trading on a daily basis with an asset correlation greater than 80% to the S&P 100 Index. Natixis did not, however, have daily transparency and the returns under the SSC Strategy did not correlate to the S&P 100 Index at greater than 80%.

92.      Natixis was also provided with BLMIS's audited financial statements, which were prepared by an audit "firm" called Friehling & Horowitz ("F&H") of Four High Tor Road, New City, New York 10956.  In those supposedly audited financial statements, BLMIS claimed total assets of approximately $805 million.  Internal Natixis documents from 2003, however, state that BLMIS was believed to be managing over $6 billion in separate accounts.  The BLMIS audited financial statements provided to Natixis do not show receivables and payables to BLMIS IA Business customers consistent with multiple customer accounts in excess of $6 billion.

93.      Natixis knew or should have known that Madoff's auditor was not legitimate and independent, nor reasonably capable of performing the required domestic and international auditing functions for Madoff, and his billions of dollars under management.  BLMIS, which had tens of billions of dollars under management, was audited not by one of the major audit firms, but by F&H, an accounting "firm" of three employees, including a secretary and a (semi-retired) certified public accountant living in Florida.  F&H's offices were located in a strip mall in suburban Rockland County, New York.  The size and qualifications of F&H and the nature of the services they provided were readily accessible to Natixis.

94.      Natixis knew or should have known that all accounting firms that perform audit work must enroll in the American Institute of Certified Public Accountants' ("AICPA") peer review program.  This program involves having experienced auditors assess a firm's audit quality each year.  The results of these peer reviews are on public file with the AICPA.  F&H never appeared on the public peer review list because Friehling had notified the AICPA that F&H did not perform audits.  F&H's absence on the list was another major red flag of possible fraud at BLMIS.

95.     No experienced investment professional could have reasonably believed it possible for any firm such as F&H to have competently and independently audited an entity the size of BLMIS.  Simple investigation would have confirmed F&H's inability to properly audit and certify BLMIS's accounting records.

96.     Such a simple investigation is exactly what Aksia, LLC ("Aksia"), an independent hedge fund research and advisory firm, did when it sent an investigator to F&H's office.  What Aksia discovered was a simple office with what appeared to be a few chairs, a reception desk, one office and a conference table.  Further, F&H's neighbors told Aksia's investigator that the office did not have regular hours.  Having determined that it was hardly a facility from which one would expect the auditor of a multi-billion dollar fund to operate, Aksia advised its clients against investing with BLMIS, Madoff, or any of his feeder funds.

97.     According to the head of the Natixis structured fund products trading group in New York, no one from Natixis met with Madoff or anyone else from BLMIS before Natixis entered into the 2003 Groupement Swap.

98.     According to the same Natixis group head, Natixis relied almost exclusively on information provided by AIA and performed no independent analysis of Groupement or Madoff before entering into the 2003 Groupement Swap.

99.     According to the same Natixis group head, Natixis performed no back-testing or any other quantitative analysis of Madoff's alleged returns before entering into the 2003 Groupement Swap.

100.     The Natixis New York employee in charge of the structured fund products group did not conduct any meaningful inquiry into Groupement or Madoff, and did not make any

inquiries of anyone, even though Natixis was provided with information revealing significant red flags of fraudulent conduct by Madoff.

101.    A new total return swap was entered into on November 5, 2007 between Natixis FP (formerly known as CDC Financial Products Inc. and IXIS Financial Products Inc.) and Groupement Financier II Limited ("GFII") (formerly known as Groupement Financier Levered Limited) (the "2007 Groupement Swap"). The termination date for the 2007 Groupement Swap was November 1, 2012. The reference fund continued to be Groupement. The original equity value of the transaction was $224,294,981.

102.    Upon information and belief, GFII paid $111,497,551 to Natixis FP as initial collateral, and Natixis FP provided the same amount in leverage. The swap contemplated a payout on the two times (2x) leveraged performance of Groupement. The Leverage Charge was one month LIBOR plus 110 basis points. The remaining terms of the 2007 Groupement Swap were substantially the same or similar to those in the Groupement Swap, as amended and restated in 2005.

103.    Upon information and belief, Natixis FP or BLOOM purchased shares of Groupement (or some other Madoff feeder fund) to hedge Natixis FP's exposure in the Groupement Swap and the 2007 Groupement Swap.

104.    By the time Natixis FP or BLOOM purchased hundreds of millions of dollars of Groupement shares, they were on inquiry notice of possible fraud at BLMIS in connection with the SSC Strategy.

## 2.    The Harley Swap

105.    In December 2005, Natixis FP, then known as IXIS FP, sought internal approval to enter into a $132 million total return swap with Santa Clara Holdings Ltd., an open-ended

Bahamian investment company ("Santa Clara"). The reference fund for the proposed swap transaction was Harley. Harley's sole asset was a managed account at BLMIS. The effective leverage for the swap transaction was 4 to 1. Under the final terms of this swap with Santa Clara (the "Harley Swap"), the effective date was February 1, 2006 with a termination date of February 1, 2011. The confirmation was amended and restated by a confirmation dated April 28, 2006. The initial payment by Santa Clara to Natixis FP was $15,000,000. The Leverage Charge was one month LIBOR plus 115 basis points.

106.   The  amended and restated confirmation for the Harley Fund Swap provides the following:

> (A) Party B [Santa Clara] acknowledges and agrees that, except as otherwise expressly agreed in writing, (i) Party A [Natixis] may hedge the market risk exposure of Party A with respect to this Transaction on a dynamic, static or portfolio basis, which hedging may include without limitation acquisition of Hedging Positions (directly or through a Hedging Entity), in its sole discretion, (ii) at any time before, during, or after, the termination of this Transaction, Party A, or the Hedging Entity may establish, change terminate, or re-establish any Hedging Position in its sole discretion, and (iii) Party A and the Hedging Entity will have no obligation to purchase, own, or terminate, or to refrain from purchasing, owning, or terminating the Hedging Positions at any time . . . . *any hedge position established by Party A or the Hedging Entity is a proprietary trading position and activity of Party A or the Hedging Entity; and (b) Party A or the Hedging Entity is not holding the hedge positions or engaging in the hedging activities on behalf of or for the account of or as agent or fiduciary for Party B, and Party B will not have any direct economic or other interest in, or beneficial ownership of, the hedge positions or hedging activities*. (emphasis added)

107.   In internal Natixis documents in January 2006 seeking approval for the Harley Swap, Natixis identified Madoff as the ultimate money manager and indicated that the risks are similar to other Madoff transactions executed by Natixis. Notwithstanding Natixis's knowledge of numerous red flags of possible Madoff fraud, Natixis increased its exposure to Madoff by conducting even more transactions with Madoff Feed Funds.

10-05933-smb   Doc 231-6-3   Filed 04/17/23   Entered 04/17/23 19:09:45   Exhibit
2010 Initial Complaint against Natixis   Pg 34 of 83

08-01789-cgm   Doc 23116-3   Filed 12/08/19   Entered 12/08/19 19:29:09   Main Document
Pg 33 of 82

108.   Upon information and belief, Natixis FP or BLOOM purchased shares of Harley to hedge Natixis FP's exposure to Santa Clara under the Harley Swap.

109.   After the Harley Swap was executed, upon information and belief, Santa Clara wished to increase the size of the swap to reach an amount equal to hundreds of millions of dollars.

110.   Previously, there was virtually no due diligence undertaken by Natixis in connection with its investments in Madoff Feeder Funds.   However, given Santa Clara's requested substantial increase in size of the Harley Swap, Eric Raiten, then the head of the trading for the Natixis Structured Fund Products Group in New York, asked Santa Clara to arrange for a meeting between Madoff and himself.   According to Raiten, the Madoff meeting was difficult to arrange, as he was told that Madoff does not typically take meetings with bankers.   The additional "due diligence" meeting between Raiten and Madoff lasted less than an hour and Madoff did not provide Raiten with any documents during the meeting.   Despite its knowledge of red flags of possible fraud at BLMIS, apart from this lone meeting with Madoff, Natixis did not perform any other independent due diligence on Madoff and BLMIS in connection with any of its Financing Swaps or structured notes.

### 3.   The Alpha Prime Swap

111.   In January 2006, Natixis FP began exploring the possibility of entering into a total return swap with FMG Select Fund ("FMG") with the reference fund being Alpha Prime, a Madoff Feeder Fund.   The swap's contemplated terms included FMG contributing $15 million in equity with Natixis FP providing leverage of $45 million, with the total $60 million proceeds being invested in Madoff's SSC Strategy through Alpha Prime.

10-05953-smb    Doc 231-6-3   Filed 12/08/10   Entered 12/08/10 19:29:30   Main Document
2010 Initial Complaint against Natixis    Pg 35 of 83

08-01789-cgm   Doc 23116-3   Filed 04/17/23   Entered 04/17/23 19:00:45   Exhibit
Pg 35 of 82

112.    In seeking approval of the swap, one Natixis employee noted, "For analyzing this transaction, we examine[d or sic] the performance of the particular strategy by Madoff.  Their performance has been consistent and has been accompanied by low volatility.  In particular, its 12 M rolling volatility has ranged between 1-4%."  The incredibly consistent returns and low volatility should have been a red flag of possible Madoff fraud to Natixis.

113.    The Natixis employee also claimed that the "transaction benefits from daily liquidity and transparency."  That statement was false.  Upon information and belief, Natixis did not conduct adequate and reasonable due diligence into FMG's claim that it had transparency into Madoff's trading as Madoff did not provide any of his investors daily transparency.

114.    Another internal credit memorandum noted that the available information for Madoff was limited to information from Madoff's website and that produced by Alpha Prime.  It was further observed by Natixis that "BMI will trade the account as principal and will earn a bid/offer spread on transactions" and "BMI seeks to anticipate direction from knowledge form [sic] the orders it manages as a leading market maker who transacts roughly $1.4 bio of transaction per year."  If Natixis believed Madoff was successful in his investment advisory business because he traded on information learned on the market-making side of BLMIS, illegal front running, that too would have been a red flag of potential Madoff fraud.

115.    The FMG swap was executed by a confirmation dated January 23, 2006, with trade and effective dates January 26, 2006 (the "Alpha Prime Swap").  The termination date was February 1, 2011.  The initial payment from FMG to Natixis FP was $2,999,944.21.  The initial loaned amount was $9,000,056 for a total equity notional value of $12 million – 4x leveraged exposure.  The Leverage Charge was one month LIBOR plus 115 basis points.

116.    After completion of the Alpha Prime Swap in 2006, Natixis FP's total exposure to Madoff, taking the Harley Swap and the Groupement Swap also into consideration, was approximately $252 million.

117.    On October 31, 2007, the terms of the Alpha Prime Swap were amended and restated to change the parties from FMG to FMG Select Fund SPC Ltd. and to note IXIS Financial Products Inc.'s name change to Natixis FP.  All other terms and conditions remained the same.

118.    The terms and conditions of the Alpha Prime Swap (in the original and as amended) also included language not obligating Natixis FP to hedge its exposure through purchase and retention of Alpha Prime shares and acknowledging that any position Natixis FP took with respect to the Alpha Prime shares was Natixis FP's proprietary position and was not undertaken for the benefit of the FMG entities.

119.    Upon information and belief, Alpha Prime was later substituted with Herald as the reference fund for the Alpha Prime Swap.

120.    Upon information and belief, Natixis FP or BLOOM purchased shares of Alpha Prime or Herald (or some other Madoff feeder fund) to hedge its exposure to its FMG or FMG Select Funds PC Ltd.

### 4.    The Fairfield Swaps

121.    On or about October 25, 2006, Natixis FP then known as IXIS Financial Products Inc. entered into a total return swap transaction with Enhanced Fairfield Investment Fund, Ltd. ("EFIFL").  The reference fund was FIFL, which was advised by Fairfield Greenwich Advisors LLC, another FGG entity.  The total equity notional value of the swap transaction was $60 million.  The initial payment from EFIFL to Natixis FP was $15 million.  The leverage supplied

by Natixis FP was $45 million and the Leverage Charge was one month LIBOR plus 105 basis points. The termination date of the swap was November 1, 2011. On or about October 26, 2006, FIFL, the reference fund, had approximately 14 percent (14%) of its assets under management invested directly or indirectly in Sentry.

122.   On or about November 24, 2006, Natixis FP, then known as IXIS Financial Products Inc., entered into a total return swap transaction with Enhanced Guardian II Fund, Ltd. ("Guardian"). The reference fund was FGF Luxembourg. The total equity notional value of the swap transaction was $15 million. The initial payment from Guardian to Natixis FP was $5 million. The leverage amount was $10,000,000 and the Leverage Charge was one month LIBOR plus 102.5 basis points. The termination date of the swap was November 1, 2011. On or about November 24, 2006, FGF Luxembourg had approximately 8 percent (8%) of its assets under management invested in Sentry.

123.   Both of the October and November swaps with these Fairfield entities included language acknowledging that any hedge position taken by Natixis FP was a proprietary position belonging to Natixis FP and was not for the benefit of the Swap Counterparties.

124.   Upon information and belief, a Natixis entity purchased shares of FGF Luxembourg or Sentry to hedge Natixis FP's exposure to its Swap Counterparties.

### 5.   Other Natixis Swaps (Not Initiated by Natixis U.S. Entities)

125.   On or about December 27, 2007, Natixis CIB, then known as IXIS CIB, entered into a total return swap with FIF 4X, Ltd. relating to the shares of FIFL. The initial payment from FIF 4X, Ltd. was $1,995,000. The leverage provided by Natixis CIB was $5,985,000 for a total original notional value of $7,980,000. The Leverage Charge was one month LIBOR plus 95 basis points and the termination date was December 27, 2012. As of December 31, 2007,

FIFL, the reference fund, had approximately 11 percent (11%) of its assets under management

invested directly or indirectly in Sentry.

126.    On or about February 27, 2008, NATIXIS entered into a total return swap with

FIF 4X, Ltd. relating to the shares of FIFL.  The initial payment from FIF 4X, Ltd. to NATIXIS

was €872,056.  The leverage provided by NATIXIS was €2,616,168 for a total equity notional

value of €3,488,224.  The Leverage Charge was one month European LIBOR plus 95 basis

points and the termination date was February 28, 2013.  As of February 2008, FIFL, the

reference fund, had approximately 11 percent (11%) of its assets under management invested

directly or indirectly in Sentry.

127.    Upon information and belief, a Natixis entity purchased shares of FIFL to hedge

its exposure to FIF 4X, Ltd. under both of these swaps.

## C.    THE NATIXIS NOTES

128.    Between October 29, 2007 and July 25, 2008, Natixis CIB then known as IXIS

CIB issued a number of structured notes (the "NATIXIS Notes") linked to the performance of

Sentry.  Upon information and belief, there were a total of seven NATIXIS Notes.  The maturity

dates were set for different dates in 2012 and 2013.  The aggregate original principal for the

NATIXIS Notes was approximately $82 million.

129.    The NATIXIS Notes had similar terms and conditions.  From an economic

perspective, the return on the NATIXIS Notes was four times (4x) the leveraged performance of

the referenced Sentry shares, less financing costs.  At maturity, investors were to receive a

payout based on the product of:  (i) the original principal invested and (ii) the quotient of the

final Net Asset Value ("NAV") over the initial NAV, less (iii) any redemption discounts

(penalties).    Assuming cumulative positive returns, investors received back their initial

10-05393-smb    Doc 231-3    Filed 12/08/10    Entered 12/08/10 19:29:30    Main Document
2010 Initial Complaint against Natixis    Pg 39 of 83

08-01789-cgm    Doc 23116-3    Filed 04/17/23    Entered 04/17/23 19:00:45    Exhibit
Pg 39 of 83

investment plus an amount equal to four times the performance of Sentry during the note program, less any outstanding fees or charges owed to NATIXIS.

130.    The NATIXIS Notes' leverage was achieved through financing at 100 basis points over the respective LIBOR rate.

131.    The NATIXIS Notes did not provide any guarantees with respect to the invested principal.  If the value of the respective reference fund or index decreased, investors stood to lose all or a portion of their original investment.  If the value of the Sentry shares dropped by 25% or more, investors would lose their entire original investment at the maturity of the note.

132.    In addition to the financing charge, Natixis earned other fees and revenue streams, including a set up or structuring fee, a selling fee and early redemption penalties.

133.    Upon information and belief, Natixis CIB hedged its exposure to holders of NATIXIS Notes by investing its own money, in addition to money received from noteholder investors, in shares of Sentry.

### D.    OTHER NOTES

134.    In addition to the seven NATIXIS Notes described above, NATIXIS was also the issuer of notes linked to shares of Volatility Alpha Enhanced Fund Limited ("Volatility Alpha Fund"), which, upon information and belief, was linked to the performance of Sentry.  Upon information and belief, NATIXIS issued these "Alpha" notes in the Summer of 2008, and, upon information and belief, the largest single purchaser of the "Alpha" notes was Unigestion, a leading European asset management firm.

135.    From an economic perspective, the payoff on the "Alpha" notes was three times (3x) the performance of the Volatility Alpha Fund.  The Volatility Alpha Fund invested "substantially all of its assets in a swap with IXIS Corporate & Investment Bank (IXIS CIB)"

that provided leveraged access to the performance of Sentry.  The Volatility Alpha Fund was nearly 100% invested in Sentry.  Effectively, the payoff on the "Alpha" notes was three times (3x) the performance of Sentry.

136.    In connection with the issuance of the "Alpha" notes, upon information and belief, Unigestion purchased $27 million of "Alpha" notes, which, in turn, prompted NATIXIS to hedge its position by investing three times that amount in Sentry, or approximately $81 million of Sentry shares.

**E.    TENSYR**

137.    Over the course of nearly a year in 2006, NATIXIS and/or Natixis CIB, then known as IXIS CIB, and FGG, worked together to create a structured product with an underlying fund of Sentry.  After much consideration, the entities determined that creating a Collateralized Fund Obligation ("CFO") would best satisfy the collective goals of providing leveraged investments in Sentry, earning Natixis CIB considerable structuring fees, while also increasing Sentry's assets under management, and thereby increasing the performance and management fees FGG earned.

138.    CFOs are often rated by one or more of several rating agencies.  This process required Tensyr, the issuer, to submit a "Rating Memorandum" to the various rating agencies, describing the role played by each party associated with the CFO and how the various risks of the structure could be analyzed and mitigated.

139.    Tensyr's Rating Memorandum, which was prepared by Natixis CIB, discussed FGG's history, Sentry's investment strategy, Fairfield Greenwich (Bermuda) Ltd.'s ("FGB") role as Sentry's Investment Manager, and Madoff's role as Sentry's so-called Execution Agent. Natixis and Tensyr both knew, however, that Madoff really was the investment advisor for

10-05953-smb   Doc 231-3   Filed 04/17/23   Entered 04/17/23 19:00:45   Exhibit
2010 Initial Complaint against Natixis    Pg 41 of 83

08-01789-cgm   Doc 23116-3   Filed 12/08/19   Entered 12/08/19 09:00:45   Main Document
Pg 41 of 82

Sentry.

140.    Upon information and belief, FGG worked extensively with Natixis CIB to draft Tensyr's rating memoranda, which required disclosure of large amounts of sensitive and non-public information regarding BLMIS and Madoff.    Additionally, during the process of negotiating, structuring and rating the CFO, FGG shared considerable amounts of information with Natixis CIB about Sentry, its strategy, historical performance, relationship with Madoff and many other aspects of Sentry's dealings with Madoff.    Natixis already had, however, considerable information about Madoff and BLMIS by virtue of its swaps linked to numerous Madoff Feeder Funds.

141.    Finally, on December 15, 2006, Natixis CIB and/or FGG formally created an entity named "Tensyr Limited" to issue notes linked to shares of Sentry.    Tensyr issued three levels of notes with varying returns and seniority.    The return on the most subordinated classes of the notes was linked to the performance of Sentry.    The returns on the other levels were based on financing costs.    The most senior class of notes, Class S, received first priority on interest and principal payments.    Holders of Class S notes received a semi-annual payment based on the six-month LIBOR rate plus 70 basis points.    The Class M mezzanine notes were the second most senior class in the structure.    After Class S notes received interest and principal payments, Class M received semi-annual payments based on the six-month LIBOR rate plus 85 basis points.    The Class P notes rank *pari passu* to the Class S and Class M notes and have the lowest seniority of the structure.    The Class P notes were to receive a payment, at maturity, equivalent to the leveraged returns of Fairfield Sentry.    At each payment date from November 2009 through the final payment date in May 2013, the holders of Class P notes could redeem their notes by effectively collapsing the Tensyr structure and paying off the debt tranches.

142.    From an economic perspective, the payoff of the Class P of Tensyr was achieved through the issuance of structured notes on the leveraged performance of Sentry shares.  These instruments allowed for leveraged exposure to the performance of Sentry.

143.    This leverage was achieved by the issuance of Class M mezzanine and Class S senior tranches of Tensyr, which provided their investors with a simple LIBOR based return.  Thus, unlike with other Natixis leveraged swap and note structures, Natixis had arranged for the leverage to be provided by outside investors, rather than directly from itself, thereby permitting Natixis to reduce its risk.  Even though it could have relied on outside investors, Natixis CIB was the primary investor in the Class S notes, providing more than 80% of the equity Tensyr invested with Sentry.

144.    Tensyr's notes did not provide any guarantees with respect to the principal of the notes.  If the value of the Sentry shares fell, investors of all classes of notes stood to potentially lose some portion of their original investment.  The lower the seniority of the notes, the greater the risks that an investor would lose principal.   In addition, investors with the senior and mezzanine debt tranches were exposed to downside "jump" risk, *i.e.*, exposure to adverse events of substantial magnitude (*e.g.*, fraud associated with any of the funds comprising the respective reference index).

145.    The initial leverage of the Class P Tensyr Notes was five times (5x).

146.    As the arranger of the deal, Natixis CIB received on each payment date through November 25, 2011, an amount equal to 0.25% (25 basis points) multiplied by the total principal amount of the deal ($426.5 million).  Additionally, Natixis CIB, as the primary investor in Class S notes, also received semi-annual payments based on the six-month LIBOR rate plus 70 basis points.

147.    Upon information and belief, Tensyr purchased approximately $456 million worth of Sentry shares (approximately 338,000 shares) using approximately $86 million in original principal from the investors who purchased the Tensyr notes, with the remaining amount of approximately $370 million supplied by Natixis CIB.

## VII.    NATIXIS WAS ON INQUIRY NOTICE OF POSSIBLE FRAUD BY MADOFF BY VIRTUE OF EXECUTING THE VARIOUS SWAPS AND NOTES AND THROUGH THE TENSYR RATING PROCESS

148.    In addition to the information Natixis learned about Madoff in connection with the Financing Swaps, the NATIXIS Notes and the "Alpha" notes, Natixis was provided with a wealth of additional information about Madoff and Sentry, one of the largest Madoff Feeder Funds, in connection with the Tensyr transaction described above.

149.    Because Tensyr was a single-purpose entity without its own balance sheet and credit history, it needed favorable ratings from at least one of the major ratings agencies to sell the notes.

150.    As discussed above, Natixis worked very closely with FGG in putting together the Tensyr CFO.  By virtue of such a close working relationship with FGG, Natixis was privy to considerable non-public information about Madoff.   New information was also learned by Natixis during its efforts to convince the rating agencies to favorably rate Tensyr's debt.

151.    By July 2006, IXIS CIB had had some success in lining up investors for the proposed CFO and was working diligently to secure a favorable rating from rating agencies – Fitch and Moody's – which were already working on the project.  In furtherance of those efforts, IXIS CIB's Emmanuel Lefort requested that FGG's Amit Vijayvergiya send IXIS CIB "the contracts with BLM (from which you can remove any part you do not want to disclose), but we need to see how the assets are segregated at BLM (i.e., what happens if BLM is bankrupt ?)."

10-05933-smb    Doc 231-3    Filed 12/08/10    Entered 12/08/10 19:29:30    Main Document
2010 Initial Complaint against Natixis    Pg 44 of 83
Pg 33 of 82

08-01789-cgm    Doc 23116-3    Filed 04/17/23    Entered 04/17/23 19:09:45    Exhibit
3    Pg 45 of 45

152.    Upon information and belief, at least one senior Natixis FP employee in New York had discussions with one or more IXIS CIB or NATIXIS employees in Paris about questions that had been raised concerning the volume of options trading reported by Madoff and whether the trades were being done on listed exchanges or OTC.  Natixis specifically raised the question whether the volume of options trading on the CBOE could accommodate Madoff's purported options trading given the size of Madoff's assets under management.  Accordingly, Natixis entities on both sides of the Atlantic were keenly aware of this red flag of possible fraud at BLMIS.

153.    On September 25, 2006, FGG's Vijayvergiya forwarded to Natixis's Lefort BLMIS's SEC Form X-17A-51, which was BLMIS's annual "Statement of Financial Condition" filed with the SEC.  Patrick Mabille, also of IXIS CIB, asked Vijayvergiya for BLMIS's income statement, and Vijayvergiya claimed that this particular SEC form was the only BLMIS financial information available.  It should have been a red flag to Natixis that BLMIS was unable or unwilling to provide its income statement.  If the BLMIS IA Business was legitimate, its income statement would have shown hundreds of millions of dollars in receivables and payables between BLMIS and its IA Business customers.

154.    Mabille sent Vijayvergiva a long e-mail discussing communications Natixis (presumably IXIS CIB) had been having with two of the ratings agencies, Moody's and Fitch, concerning the proposed Tensyr CFO, which Natixis and FGG wanted rated to attract more investors.  Among other things, Natixis advised FGG that Fitch wanted a list of the usual counterparties for the OTC options.

155.    Updating Vijayvergiya on the status of the rating process, Lefort sent another e-mail on September 27, 2006:

Hi Amit,

Fitch is challenging us a bit on the counterparty risk created by the options.

They think that in very adverse market condition you could be in a situation whre [sic] one of the counterparties is bankrupt and you cannot replace the put at a fair cost.

We need to respond quickly to them and have a few questions that now need to be answered:

   - is there systematicaly [sic] an ISDA/CSA contract with the counterparties
    - are there margin calls
    - are there rating minimas [sic] for the counterparty
    - is there a limit size for each of the counterparty

Anything you can provide us should be helpful
Thanks
Emmanuel

156.    On that same day, Mabille e-mailed Vijayvergiya with additional requests to assist in expediting the rating process:  "Amit, Fitch has said again that they [sic] a sine qua non condition to give a rating to the CFO will be to meet with BLM in order to have more comfort on their operational process.  They will send us a bunch of questions they will ask BLM in order for you to adapt them and prepare the meeting (they fully understand the problem but this visit is a strong requirement).  The meeting with Fairfield could be set up before this meeting with BLM."

157.    In yet another update, Lefort emailed Vijavergiya a few days later with further updates on obtaining a rating for Tensyr:

Hi Amit,
    It turns out that the three rating agencies are challenging us on the puts (and the calls) re counterparty risk.   The typical question is "what if the counterparty of the put goes bankrupt" ?

*In order to buld [sic] a good answer*, we really need to know as soon as possible :
    - who is contractually the owner of the put : is it BLM ?  is it BLM through the margin account ?  Is it the fund itself ?

- under what documentation are those options traded (ISDA ?) – can we see a sample one ?
- are there rating criteria to select the counterparties ?
- are there margin calls ?  Are these m/c dependent on the rating ?
- are the short calls legally collateralized by the stocks ?
The scenario currently analysed by Fitch and [M]oody's is that one or two counterparties are bankrupt in a very bear market, that they do not pay for their short put and that you cannot replace them at an efficient cost (high imp. volatility for example . . . .)

We really need your urgent help here.  (emphasis added)

158.    FGG's Vijayvergiya could not provide Lefort with the requested answers, because Madoff refused to identify his supposed options counterparties to anyone, including FGG.

159.    Madoff's and FGG's refusal to indentify options counterparties was a huge red flag of potential fraudulent trading activity at BLMIS.  Natixis had specific knowledge of this red flag and failed to properly or reasonably investigate.  Natixis was hedging hundreds of millions of dollars of exposure in connection with its structured products based on the performance of BLMIS and the Madoff Feeder Funds, knowing that those funds were parties to hundreds of millions, if not billions, of dollars in options transactions.   Yet, Natixis had no idea of the identity of counterparties, their liquidity, capitalization, or creditworthiness or the likelihood of default, which would expose Natixis and the Madoff Feeder Funds to massive potential losses.

160.    On October 9, 2006, Lefort informed Vijayvergiya that Fitch "confirmed that they will not rate the transaction if they cannot visit BLM."  Lefort then let Vijayvergiya know that there were additional queries for BLM, including (1) whether the stocks are fully segregated, (ii) who is the beneficial owner of the options, (iii) what happens if BLM disappears, (iv) why is there a margin account if there are no margin calls, and (v) if the fund actually has to pay under the call contract, where does the money come from?

161.    Despite FGG's requests, Madoff refused to allow the rating agencies to visit BLMIS, effectively halting Tensyr's ability to obtain a rating.  Following Madoff's refusal, an October 12, 2006, an internal FGG e-mail to Vijayvergiya said:  "Dear Amit, I'm so sorry the result with Bernie was not what we wanted.  We all worked hard, but I and everyone else knows how especially long and hard you personally worked on this transaction.  Stay positive, remember the loan possibility with them.  It aint [sic] over yet!  Andres has a great relationship with Laurent.  We will get something out of all this ixis work, I feel it!"

162.    On December 1, 2006, Lefort e-mailed Vijayvergiya the "final version" of the Tensyr Rating Memorandum that was sent to Moody's, Fitch and Standard & Poor's (the "Rating Memo").  The Rating Memo described the role of each of the parties to the CFO, and how the various risks of the structure could be analyzed and mitigated.  The Rating Memo prepared by Natixis (Natixis CIB/IXIS CIB), not only deliberately ignored the many red flags of possible fraudulent activities at BLMIS which Natixis had identified, but in the zealous quest for ratings approval for the Tensyr transaction, Natixis, in fact, made many exaggerated and misleading statements in the Rating Memo, which were either false and/or demonstrated Natixis was on notice of possible fraud being perpetrated by BLMIS.

163.    Natixis represented that FGB has had "an ongoing relationship with [BLMIS] for more than 17 years, with weekly contacts and at least quarterly on-site visits . . . during which FGG CFO conducts its own due diligence, and produces internal reports; during those visits, [BLMIS] is requested to show reports of existence of all the trades from Sentry books down to DTCC."  In fact, upon information and belief, FGG's CFO did not conduct any independent due diligence from Sentry's books down to DTCC and Natixis also did not perform independent or reasonable diligence into trades.

164.    Natixis represented that "PWC the auditor of the Sentry Fund conducts every two years its own evaluation of [BLMIS] systems."  This representation was false.  Upon information and belief, Pricewaterhouse Coopers ("PwC") visited Madoff only twice over the course of many years, attending information gathering sessions at BLMIS in 2002 and 2004, in connection with its engagement for several Madoff feeder funds.  After each visit, PwC summarized its findings and explained in writing that it had not conducted audits of BLMIS.   After 2004, upon information and belief, PwC did not conduct any visit, inquiry, or investigation of BLMIS in association with any Sentry engagement.   PwC's biannual "evaluation" of BLMIS systems essentially consisted of nothing more than a brief meeting with Madoff during which PwC asked Madoff if everything was fine at BLMIS.

165.    Natixis further represented that BLMIS "serves both as Broker/Dealer and Sub-Custodian for the Fund."   In fact, Natixis and Tensyr knew full well Madoff was also the investment adviser.   Because BLMIS purportedly held physical custody over all assets as the sub-custodian, BLMIS had a serious conflict of interest where there was no independent verification over the existence or segregation of the assets.   This was a red flag of possible fraud at BLMIS known to Natixis.

166.    Natixis also stated BLMIS's assets in the IA Business "are estimated to exceed $12 billion in the aggregate."   Given the reported size of BLMIS's assets under management, Madoff's trading should have left a market footprint.   The lack of any market footprint, and the lack of any evidence of anyone trading with BLMIS, was a red flag of possible fraud at BLMIS known by Natixis.

167.    Natixis also noted that "OTC American put options on the S&P 100 Index are purchased from various major global banks (8 to 12)."   The fact that Natixis did not know the

identity, and did no independent diligence to learn the identity of these 8 to 12 "major global banks" was a red flag to Natixis, itself a "major global bank." Madoff's refusal to provide any details concerning the alleged options trading, or to identify them on trade confirmations, was a clear red flag of possible fraudulent activities at BLMIS known to Natixis.

168.   Natixis further noted the lack of any market impact by BLMIS trading in the Rating Memo: "Given the amount of stocks to be purchased and to prevent any adverse market movement, the portfolio of stocks and the hedge are typically purchased over several trading days." In fact, even entering or exiting the market over the course of several trading days would not be sufficient to avoid adverse market movement in light of the huge volume of stocks allegedly purchased or sold by BLMIS. Again, the lack of any evidence of Madoff trading equities or options in the marketplace was a red flag of possible fraud at BLMIS known to Natixis.

169.   Natixis represented that BLMIS "must report on a daily basis the position of each of the accounts it holds for its customers so that, in case of bankruptcy, the SIPC trustee can transfer within a few days these accounts to a safe broker/dealer. [BLMIS] also confirms any transaction they do on behalf of the Fund." In fact, BLMIS did not report trading positions on a daily basis. The fact that Natixis was not provided with daily trade information was a red flag of possible Madoff fraud known to Natixis.

170.   Natixis knew that Madoff's compensation system was suspicious. Natixis reported Sentry's annual earnings are "around 130,000,000 US$ per year" based on a 1% management fee and a 20% performance fee and BLMIS's "only income is a brokerage fee of 4cts [sic] per share of stock and $1 per option contract, resulting in estimated annual revenues derived from execution of SSC transactions of . . . approximately 108,000,000 US$," or about

10-05953-smb    Doc 231-3    Filed 12/08/10    Entered 12/08/10 19:29:30    Main Document
2010 Initial Complaint against Natixis    Pg 50 of 83

08-01789-cgm    Doc 23116-3    Filed 04/17/23    Entered 04/17/23 19:09:45    Exhibit
Page 8 of 82

20% less than Sentry's annual earnings off of its SSC investments. This compensation structure was not the investment management industry standard and was in fact highly atypical. Madoff utilized this atypical structure to co-opt Feeder Funds, which profited greatly from their relationships with Madoff. This unusual compensation structure was a red flag of potential Madoff fraud known to Natixis. Upon information and belief, Natixis performed no reasonable or independent inquiry as to why Madoff would leave hundreds of millions, if not billions, on the table for feeder funds like Sentry to charge their investors, even though feeder funds like Sentry did little more than hand over the fresh capital they secured directly to Madoff.

171.    Natixis further represented in the Rating Memo that Sentry's "accounts at [BLMIS] represent approximately 40% of the accounts on which [BLMIS] executes the SSC Strategy." Accordingly, Natixis had a very good sense of the massive size of the BLMIS IA Business.

172.    In the Rating Memo, Natixis stated that trades were "post-verified" by the trustee, "FGG/Citco" within a "few hours" of being made. In fact, Natixis's statement was false and was not independently verified by Natixis. BLMIS trade confirmations were mailed three to four days after the alleged trades were made because Madoff needed time to backdate trades. Moreover, upon information and belief, FGG did no "post-verification" of Madoff's trades, nor did Natixis inquire how FGG allegedly conducted "post-verification" of Madoff's trades.

173.    In the Rating Memo, Natixis represented that Sentry's assets "are segregated" at BLMIS. In fact, Natixis had no independent basis for making this claim because there was no segregation of cash at BLMIS, and the securities did not even exist. Upon information and belief, Natixis performed no independent, reasonable or meaningful due diligence on whether assets were segregated.

174.    On December 6, 2006, Lefort e-mailed Vijayvergiya about continuing requests from Moody's to Natixis.  Among other things, Lefort advised Vijayvergiya that "if Bernie refuses to give data, there will be no rating . . . ."

175.    On December 7, 2006, Lefort let FGG know that Fitch still would not give a full rating for the CFO unless they were allowed to visit BLMIS.

176.    The same day, FGG's General Counsel e-mailed Natixis BLMIS's Form ADV Parts 1 and 2, as well as some additional information on BLMIS.

177.    Soon thereafter, Lefort e-mailed FGG with the following message:  "Just had a long call with Fitch and they eventually won't rate the transaction (or not AAA) due to 'non-measurable operational risk at Madoff level.'  They were not capable of describing what kind of scenario they were afraid of, by the answer is still no.  I think this mainly comes from the refusal of Madoff which they see as 'suspicious.'"  Notwithstanding the fact that Fitch, a rating agency of the highest order at the time, had identified red flags to Natixis concerning Madoff, Natixis and FGG still wanted "good answers" for Standard & Poor's in order to be "convincing," and so they could get Tensyr rated favorably in order to sell hundreds of millions in notes.

178.    Armed with knowledge of these highly suspicious red flags, Natixis was on notice of possible Madoff fraud and was required to conduct independent, meaningful and reasonable diligence on Madoff.  Natixis instead blindly relied upon unverified information provided by the Madoff Feeder Funds whom were largely, if not entirely, dependent upon the BLMIS IA Business for fees and profit.

179.    In addition to learning of red flags associated with Madoff and BLMIS in connection with the process of attempting to secure a rating for Tensyr from the ratings agencies, Natixis knew of indicia of possible fraud associated with Madoff from third parties.  For

10-05933-smb Doc 231-3 Filed 12/08/10 Entered 12/08/10 19:29:09 Main Document
Pg 52 of 83

08-01789-cgm Doc 23116-3 Filed 04/17/23 Entered 04/17/23 19:00:45 Exhibit
2010 Initial Complaint against Natixis Pg 52 of 83

example, in March 2008, AIA met with representatives of another Natixis entity. During that meeting, it was reported to AIA, which also managed significant Madoff feeder funds, that "[t]hey are out of BM and won't come back. They are out of BM mainly because everything is done at BM level. They want a separation btw custodian . . ." Likewise, one of NATIXIS's most significant noteholders, Unigestion, in late July 2008, advised Natixis and FGG that it wanted to redeem its entire position in the "Alpha" notes, or approximately $27 million, due to "concerns about Madoff risk."

180. Upon information and belief, Unigestion told Natixis that Unigestion was troubled by: the lack of audits on BLMIS; insufficient access to information which would allow a meaningful evaluation of Madoff risk; operational due diligence concerns at BLMIS; and the conflict of interest arising from Madoff's role broker/dealer, investment advisor and custodian.

## VIII. NATIXIS HAD THE KNOWLEDGE AND RED FLAG EVIDENCE NECESSARY TO IDENTIFY POSSIBLE FRAUD AT BLMIS

181. Through the process of structuring swap transactions and issuing notes, Natixis learned a wealth of information that placed it on inquiry notice of possible fraud at BLMIS. In particular, pursuant to the Groupement Swap and other structured products linked to Sentry, Natixis received month-end BLMIS account statements that, either facially or upon basic, industry-standard quantitative, due diligence analysis, signposted fraud. Natixis, a sophisticated financial and trading institution, should have discovered such anomalies.

182. **Options Trading Volumes**: Natixis knew or should have known that the options trading volumes reported by BLMIS were impossible if exchange-traded. To implement this strategy, BLMIS purportedly purchased OEX options, which are traded on the Chicago Board Options Exchange ("CBOE"). If Natixis had performed minimal due diligence and checked the

10-05933-smb    Doc 1    Filed 12/08/10    Entered 12/08/10 19:29:30    Main Document
2010 Initial Complaint against Natixis    Pg 53 of 83

08-01789-cgm    Doc 23116-3    Filed 04/17/23    Entered 04/17/23 19:00:45    Exhibit
Pg 53 of 82

number of listed options in the BLMIS accounts for Groupement Financier or Sentry, to which it received or had access to, against the number of the same options actually traded on the CBOE, it would have been abundantly clear that Madoff's claimed trading strategy was impossible due to market volume alone.

183.    The options volumes reported by BLMIS to have been traded for the FGG accounts (including Sentry) alone would have exceeded the total options available on the CBOE nearly **97.6 %** of the time.  A graphical display of the options needed to hedge *just* FGG's BLMIS investment is illuminating.



184.    The volume of OEX put options BLMIS purported to trade on behalf of FGG (the red line) completely dwarfs the volume of OEX put options traded on the entire CBOE (the black line).

185.    Natixis knew, or should have known, that BLMIS purported to allocate trades to all BLMIS IA Business customers on a pro-rata basis, and that Sentry alone was approximately 40% of the total IA Business (in terms of assets under management).   Through an easy extrapolation, Natixis had a clear picture of BLMIS's options trading volumes for all customers based on its knowledge of Sentry's trading volume – *i.e.*, 2.5 times Sentry's volume equaled the total BLMIS customer volume.

186.    As shown below, the volumes of OEX put options BLMIS purportedly traded on behalf of all its customers (the red line) reveals there was rarely, if ever, a time when BLMIS traded fewer OEX put options than were actually traded on the CBOE (the black line).



Estimated Option Activity for all BLMIS Accounts compared to CBOE 2001-2008  (Puts Only)

Red line indicates Estimated BLMIS Option Volume (based on a 2.4x multiplier of Fairfield Greenwich Group Option Volume)
Black line indicates CBOE Option Volume

187.    Natixis also should have known that there is always less liquidity in OTC markets

than on exchanges.  Accordingly, if Madoff's reported options volumes exceeded the CBOE's

capacity, there was virtually no chance that the OTC market could support the options trading

volumes Madoff reported.

188.    Natixis also knew or should have known that trading options in the OTC market

would likely have been more expensive than trading on the CBOE.  A simple review of Sentry's

BLMIS account statements would reveal that this alleged cost did not appear to be on the

account statements.   The absence of such costs, together with reported trading at impossible
volumes of options in the OTC market, were clearly signs on possible fraudulent trading activity
at BLMIS.

189.   **Unidentified Options Counterparties**:  Natixis also knew or should have known
that fraud was a possibility due to the absence of any identification of Madoff's purported OTC
option counterparties and the lack of any evidence in the marketplace of anyone doing any
trading with Madoff.

190.   In the OTC marketplace, where Natixis knew that Madoff claimed he was trading,
each transaction requires a private contract between the two parties.  Madoff refused, however,
to identify the options counterparties, and the trade confirmations did not identify them.  By not
disclosing the alleged options counterparties, Madoff prevented his clients from dealing directly
with their counterparties.  Madoff sometimes stated that the counterparties supposedly were 8-12
large European financial institutions.  Natixis knew or should have known that Madoff's refusal
to identify these options counterparties was a red flag of possible fraud at BLMIS.

191.   With the massive purported volume of BLMIS-related options trades, there were
only a limited number of institutions that could have satisfied Madoff's trading needs.  Upon
information and belief, Natixis, based in Europe, regularly communicated with many large
European financial institutions – the alleged options trading counterparties.  Despite its regular
contacts with institutions that fit Madoff's options counterparty profile, upon information and
belief, Natixis never asked any of these institutions if they were trading options with Madoff and
never saw any evidence of any trading by them.  Given Natixis's huge exposure to Madoff, it
was unreasonable for Natixis not to inquire further into the identity of the options counterparties.

192.    If Madoff had actually transacted billions of dollars worth of OTC options trades with undisclosed counterparties in Europe, those entities would have needed to hedge their risks by entering into other offsetting options or futures contracts.  The most likely place to enter into such contracts was the CBOE.  Natixis, however, never saw any of Madoff's alleged options counterparties laying off their exposure to BLMIS's customers by entering into opposite options contracts on the CBOE because no such trades ever occurred.

193.    **No Market Impact**:  Natixis knew or should have known that Madoff's alleged trades could not be legitimately accomplished without any impact on the price of the securities bought and sold, without any market footprint, and without anyone in the industry knowing or even hearing about Madoff's alleged trading activity.

194.    The SSC Strategy marketed by BLMIS involved moving money into the market over the course of one or more days, and then selling off all of those securities over a similar time span.  Therefore, over the course of many years, tens of billions of dollars would have moved into and then out of the U.S. stock and options markets over the course of just a few days, three-to-four times a year.  Sales of tens of billions of dollars of stocks in a short period of time would have resulted in decreased prices of those stocks, cutting into the alleged profits from the sales of such stock.  Further, when Madoff exited the market, he claimed to have placed his customers' assets in Treasurys or mutual funds invested in Treasurys.  The movement of tens of billions of dollars in and out of the market should have materially affected the price of Treasurys. The lack of any impact on the markets by Madoff's purported trading was yet another red flag of possible fraud at BLMIS.

195.   **Unusual Fee Structure**:  Additionally, and as discussed above, Natixis was on notice that the fees structure between Madoff and the Madoff feeder funds was atypical of the hedge fund industry and was a red flag of potential fraud at BLMIS.

196.   Other industry professionals with less access to information on Madoff than Natixis, realized that Madoff's highly unusual fee structure was a serious red flag of possible fraud.  In fact, London due diligence firm Albourne Partners ("Albourne") recognized that by not charging management or performance fees for his services, Madoff left hundreds of millions of dollars of money on the table each year.  Identifying this as a red flag of possible fraud, Albourne urged its clients to avoid Madoff-related funds.  Natixis likewise should have been aware of this red flag of fraud.

197.   **No Segregation of Assets**:  Natixis knew or should have known that accounts at BLMIS were not segregated, and therefore not subject to independent verification.  Adequate segregation allows independent checks and balances throughout the trading cycle, the movement of cash and the custody process, and is a fundamental area of inquiry for those performing independent and reasonable due diligence on investment managers.  Natixis failed to perform reasonable diligence into BLMIS's practices surrounding the segregation of assets.  The absence of such segregation was a red flag of potential fraud.

198.   **Lack of Independent Verification That The Assets Existed**:  Natixis knew that BLMIS functioned as investment advisor, prime broker and the "in-fact" custodian of the purported securities.  This structure – unusual for the hedge-fund industry - eliminated a key check and balance in investment management by excluding an independent custodian of securities from the process.  This lack of independence over custody furthered the lack of transparency of BLMIS.

199. By functioning in so many roles, BLMIS had no segregation between those who were responsible for trading and those were are responsible for recording trade activities, nor was there segregation of signing authority and authority over cash and securities transfers, deposits and withdrawals. This is a clear conflict of interest and the complete lack of segregation of duties was on its face a red flag of possible fraud identified by numerous other industry professionals who performed basic due diligence on Madoff.

200. **Improbable Returns**: Natixis knew or should have known that BLMIS produced returns that were simply too good to be true, reflecting a pattern of abnormal profitability, both in terms of consistency and amounts that were simply not credible. Returns this good could not be reproduced by other skilled hedge fund managers, and those managers who attempted to employ the split-strike conversion strategy purportedly used by BLMIS consistently failed even to approximate its results. Such returns would have required Madoff to perfectly time the market for over 20 years. Numerous industry professionals viewed Madoff's alleged perfect timing based on market flow as indicative of illegitimate and illegal trading activity.

201. Madoff's trading purportedly involved the purchase of a basket of 30 to 40 S&P 100 stocks, most correlated to the S&P 100 Index, the sale of out-of-the-money calls on the index and the purchase of out-of-the-money puts on the index. The sale of the calls was designed to increase the rate of return, while allowing upward movement of the stock portfolio to the strike price of the calls. The puts, funded in large part by the sale of the calls, limited the portfolio's downside. Among options traders, Madoff's alleged trading strategy was typically known as a "split-strike conversion" strategy. The strategy, in effect, created a "collar" on a stock, limiting its upside while at the same time protecting against a sharp decline in the share price. When done correctly, this so-called market-neutral strategy produced positive returns no

matter which way the market goes.  By design, Madoff's returns should have been highly correlated to the performance of the S&P 100 Index which it was not, and which Natixis easily could have discovered.

202.    For example, the Sentry Monthly Tear Sheets included the following rates of returns:

| Year | Sentry Rate of Return |
|------|----------------------|
| 1990 | 2.77% |
| 1991 | 17.64% |
| 1992 | 13.72% |
| 1993 | 10.75% |
| 1994 | 10.57% |
| 1995 | 12.04% |
| 1996 | 12.08% |
| 1997 | 13.10% |
| 1998 | 12.52% |
| 1999 | 13.29% |
| 2000 | **10.67%** |
| 2001 | **9.82%** |
| 2002 | **8.43%** |
| 2003 | 7.27% |
| 2004 | 6.44% |
| 2005 | **7.26%** |
| 2006 | 9.38% |
| 2007 | 7.34% |
| 2008[6] | **4.50%** |

203.    When reviewed side-by-side with returns for the S&P 100, the Sentry Monthly Tear Sheets showed that Sentry was immune from any number of market catastrophes, enjoying steady rates of return at times when the rest of the market was experiencing financial crises.  As shown below, Sentry and BLMIS maintained consistent and seemingly impossible positive rates of return during events that otherwise devastated the S&P 100 – the performance of which

---

[6]    Through October 2008.

10-05953-smb   Doc 231-3   Filed 12/08/10   Entered 12/08/10 19:28:30   Main Document
2010 Initial Complaint against Natixis     Pg 61 of 83

08-01789-cgm   Doc 23116-3   Filed 04/17/23   Entered 04/17/23 19:00:45   Exhibit
Pg 61 of 82

formed the core tenet of the SSC Strategy.  In fact, between 1996 and 2008, Sentry and its sister

fund, Fairfield Sigma Limited ("Sigma"), did not experience a single quarter of negative returns.

| Year | Sentry/Sigma Rate of Return | S&P 100 Rate of Return |
|------|------|------|
| 1990 | 2.77% | (5.74%) |
| 1991 | 17.64% | 24.19% |
| 1992 | 13.72% | 2.87% |
| 1993 | 10.75% | 8.28% |
| 1994 | 10.57% | (0.19%) |
| 1995 | 12.04% | 36.69% |
| 1996 | 12.08% | 22.88% |
| 1997 | 13.10% | 27.76% |
| 1998 | 12.52% | 31.33% |
| 1999 | 13.29% | 31.26% |
| 2000 | **10.67%** | (13.42%) |
| 2001 | **9.82%** | (14.88%) |
| 2002 | **8.43%** | (23.88%) |
| 2003 | 7.27% | 23.84% |
| 2004 | 6.44% | 4.45% |
| 2005 | **7.26%** | (0.92%) |
| 2006 | 9.38% | 15.86% |
| 2007 | 7.34% | 3.82% |
| 2008[7] | **4.50%** | (32.30%) |

204.    For example, during the burst of the dotcom "bubble" in 2000, the September 11,

2001 terrorists attack, and the recession and housing crisis of 2008, Sentry purported to produce

positive returns, outperforming the S&P 100 by 20 to 40 percent in each instance where the S&P

100 suffered double-digit losses.  Had Natixis performed any reasonable quantitative review of

Madoff's purported utilization of the SSC Strategy, it would have revealed that Madoff's

performance was simply impossible.

205.    Additionally, BLMIS continued to generate a purported positive return on

investments even during the last 14 months of BLMIS's existence.  Namely, in November 2008,

---

[7]    Through October 2008.

the S&P 100 was down yet Madoff showed positive returns.  These returns should have been a red flag of possible fraud at BLMIS to Natixis.

206.  **Paper Confirmations**:  Natixis also blindly accepted Madoff's and the feeder funds' explanation for why Madoff issued paper trade confirmations mailed out days after trades purportedly occurred.  It was well known in the securities industry Madoff was purportedly a pioneer in electronic over-the-counter trading mechanisms, but in BLMIS's IA business, Madoff provided all his customers with only paper information.  Of course, Madoff issues delayed paper tickets to hide the fact that he was backdating his trades (so that he could pretend that they were always profitable).  Madoff forged these phony confirmations already knowing the movements of the market.  These paper confirmation and monthly account statements were also a red flag of potential fraud at BLMIS.

*        *        *

207.  Natixis failed to properly respond to any of these indicia of possible fraudulent activity at BLMIS.  Additionally, the due diligence performed by Natixis both before and after its Madoff feeder fund investments was not reasonable, independent or adequate in light of the red flags Natixis identified.

208.  Natixis had the motive and opportunity to consciously or recklessly disregard possible fraud at BLMIS.  Natixis's motivation to turn a blind eye to the numerous indicia of illegitimate trading activity and fraud included the receipt of substantial fees in relation to swaps and structured notes underlying Madoff feeder funds.  Natixis was further motivated to disregard possible fraud at BLMIS because of Madoff's high, consistent annual returns of 11-16%.  Natixis knew, and was on notice of, numerous irregularities and problems concerning the trades reported by BLMIS, and strategically chose to ignore them.

10-05953-smb Doc 231-3 Filed 12/08/10 Entered 12/08/10 19:29:30 Main Document
2010 Initial Complaint against Natixis Pg 63 of 82

08-01789-cgm Doc 23116-3 Filed 04/17/23 Entered 04/17/23 09:00:45 Exhibit
Pg 63 of 83

209.    Natixis had a unique opportunity to gain access to extensive information about the operations of BLMIS by virtue of its relationships with multiple Madoff feeder funds underlying the Natixis swaps and notes.  In this capacity, Natixis was an important and necessary investor to the feeder funds, which, in turn, enabled Natixis to obtain information that other investors were denied.

210.    In the aggregate, upon information and belief, Natixis had investments with BLMIS through Madoff feeder funds approaching \$1 billion (at its zenith).  Natixis, upon information and belief, was paid tens of millions of dollars in fees and other charges in connection with its Madoff-related transactions.

## IX.    THE TRANSFERS

### A.    INITIAL TRANSFERS FROM BLMIS TO NON-PARTY FUNDS

211.    NATIXIS, Natixis CIB, IXIS CIB, Natixis FP, BLOOM, and Tensyr (the "Defendants") received subsequent transfers from Madoff Feeder Funds that are not named as defendants herein, including Sentry, FIFL, Groupement, Alpha Prime, and Harley (collectively, the "Non-Party Funds")—each of which maintained one or more accounts with BLMIS.

212.    The Trustee has filed the Fairfield Amended Complaint to avoid and recover the initial transfers of Customer Property from Sentry, and to recover the subsequent transfers of Customer Property from FIFL.  *See Picard v. Fairfield Sentry Ltd., et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 09-1239 (Bankr. S.D.N.Y filed May 18, 2009), as amended on July 20, 2010 (the "Fairfield Amended Complaint").  The Trustee incorporates by reference the allegations contained in the Fairfield Amended Complaint as if fully rewritten herein.

213.    During the six years preceding the Filing Date, BLMIS made transfers to Sentry (account numbers 1FN012 and 1FN045) of approximately \$3 billion (the "Sentry Six Year Initial Transfers").  The Sentry Six Year Initial Transfers include approximately \$1.6 billion that

BLMIS transferred to Sentry during the two years preceding the Filing Date (the "Sentry Two Year Initial Transfers"). The Sentry Six Year Initial Transfers and Sentry Two Year Initial Transfers include approximately $1.1 billion which BLMIS transferred to Sentry during the 90 days preceding the Filing Date (the "Sentry Preference Period Initial Transfers"). The Sentry Six Year Initial Transfers, the Sentry Two Year Initial Transfers, and the Sentry Preference Period Initial Transfers (collectively, the "Sentry Initial Transfers") are set forth more fully in Exhibits A and B.

214.    A portion of the Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, FIFL (the "FIFL Transfers").

215.    The FIFL Transfers are recoverable from FIFL pursuant to section 550 of the Bankruptcy Code.

216.    The Trustee has filed the Groupement Complaint to avoid and recover the initial transfers of Customer Property. *See Picard v. UBS AG, et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 10- 04285 (Bankr. S.D.N.Y filed Nov. 24, 2010) (the "Groupement Complaint"). The Trustee incorporates by reference the allegations contained in the Groupement Complaint as if fully rewritten herein.

217.    During the six years preceding the Filing Date, BLMIS made transfers to Groupement (account numbers 1FN087 and 1FR096) of approximately $356 million (the "Groupement Six Year Initial Transfers"). The Groupement Six Year Initial Transfers include approximately $277 million that BLMIS transferred to Groupement during the two years preceding the Filing Date (the "Groupement Two Year Initial Transfers"). The Groupement Six Year Initial Transfers and Groupement Two Year Initial Transfers include approximately $260 million which BLMIS transferred to Groupement during the 90 days preceding the Filing Date

(the "Groupement Preference Period Initial Transfers"). The Groupement Six Year Initial Transfers, the Groupement Two Year Initial Transfers, and the Groupement Preference Period Initial Transfers (collectively, the "Groupement Initial Transfers") are set forth more fully in Exhibits C and D.

218. The Trustee has filed the Harley Complaint to avoid and recover the initial transfers of Customer Property. *See Picard v. Harley International (Cayman) Limited, et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 09-1187 (Bankr. S.D.N.Y filed May 12, 2009) (the "Harley Complaint"). The Trustee incorporates by reference the allegations contained in the Harley Complaint as if fully rewritten herein.

219. During the six years preceding the Filing Date, BLMIS made transfers to Harley (account number 1FN094) of approximately $1.1 billion (the "Harley Six Year Initial Transfers"). The Harley Six Year Initial Transfers include approximately $1.08 billion that BLMIS transferred to Harley during the two years preceding the Filing Date (the "Harley Two Year Initial Transfers"). The Harley Six Year Initial Transfers and Harley Two Year Initial Transfers include approximately $427 million which BLMIS transferred to Harley during the 90 days preceding the Filing Date (the "Harley Preference Period Initial Transfers"). The Harley Six Year Initial Transfers, the Harley Two Year Initial Transfers, and the Harley Preference Period Initial Transfers (collectively, the "Harley Initial Transfers") are set forth more fully in Exhibits E and F.

220. The Trustee has filed the Alpha Prime Complaint to avoid and recover the initial transfers of Customer Property. *See Picard v. HSBC plc, et al. (In re Bernard L. Madoff Inv. Sec. LLC)*, No. 09-1364 (BRL) (Bankr. S.D.N.Y filed Dec. 5, 2010). The Trustee incorporates by reference the allegations contained in the Alpha Prime Complaint as if fully rewritten herein.

221.    During the six years preceding the Filing Date, BLMIS made transfers to Alpha Prime (account number 1FR097) of approximately $86 million (the "Alpha Prime Six Year Initial Transfers"). The Alpha Prime Six Year Initial Transfers include approximately $78 million that BLMIS transferred to Alpha Prime during the two years preceding the Filing Date (the "Alpha Prime Two Year Initial Transfers"). The Alpha Prime Six Year Initial Transfers and Alpha Prime Two Year Initial Transfers include approximately $49 million which BLMIS transferred to Alpha Prime during the 90 days preceding the Filing Date (the "Alpha Prime Preference Period Initial Transfers"). The Alpha Prime Six Year Initial Transfers, the Alpha Prime Two Year Initial Transfers, and the Alpha Prime Preference Period Initial Transfers (collectively, the "Alpha Prime Initial Transfers") are set forth more fully in Exhibits G and H.

222.    The Sentry Initial Transfers, the Groupement Initial Transfers, the Harley Initial Transfers and the Alpha Prime Initial Transfers (collectively, the "Non-Party Initial Transfers"), were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided, and are recoverable under sections 544, 547, 548(a)(1), 550, and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3), and sections 273-279 of New York Debtor and Creditor Law.

### B.    SUBSEQUENT TRANSFERS FROM THE NON-PARTY FUNDS TO THE DEFENDANTS

223.    A sizeable portion of the money transferred from BLMIS to the Non-Party Funds subsequently was transferred by the Non-Party Funds to the Defendants.

224.    A portion of the Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Defendants (the "Sentry Subsequent Transfers").

10-05933-smb   Doc 231-3   Filed 12/08/10   Entered 12/08/10 19:29:30   Main Document
2010 Initial Complaint against Natixis   Pg 67 of 83
08-01789-cgm   Doc 231-3   Filed 04/17/23   Entered 04/17/23 19:00:45   Exhibit
Pg 66 of 82   Pg 67 of 83

225.    A portion of the FIFL Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Defendants (the "FIFL Subsequent Transfers").

226.    A portion of the Groupement Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Defendants (the "Groupement Subsequent Transfers").

227.    A portion of the Harley Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Defendants (the "Harley Subsequent Transfers").

228.    A portion of the Alpha Prime Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Defendants (the "Alpha Prime Subsequent Transfers").

229.    The Sentry Subsequent Transfers, the FIFL Subsequent Transfers, the Groupement Portfolio Subsequent Transfers, the Harley Portfolio Subsequent Transfers and the Alpha Prime Subsequent Transfers (collectively, the "Subsequent Transfers") are recoverable from the Defendants pursuant to section 550 of the Bankruptcy Code.

### C.    SUBSEQUENT TRANSFERS BETWEEN THE DEFENDANTS

230.    A sizeable portion of the money transferred from BLMIS to the Non-Party Funds subsequently was transferred by the Non-Party Funds to the Defendants, and subsequently among the Defendants themselves.

231.    A portion of the Sentry Subsequent Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Defendants (the "Sentry Secondary Subsequent Transfers").

232.    A portion of the FIFL Subsequent Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Defendants (the "FIFL Secondary Subsequent Transfers").

233.    A portion of the Groupement Subsequent Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Defendants (the "Groupement Secondary Subsequent Transfers").

234.    A portion of the Harley Subsequent Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Defendants (the "Harley Secondary Subsequent Transfers").

235.    A portion of the Alpha Prime Subsequent Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, the Defendants (the "Alpha Prime Secondary Subsequent Transfers").

236.    The Sentry Secondary Subsequent Transfers, the FIFL Secondary Subsequent Transfers, the Groupement Secondary Subsequent Transfers, the Harley Secondary Subsequent Transfers and the Alpha Prime Secondary Subsequent Transfers (collectively, the "Secondary Subsequent Transfers") are recoverable from the Defendants pursuant to section 550 of the Bankruptcy Code.

## X.    NATURE OF THE CLAIMS

### COUNT ONE:
### PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREE)
### 11 U.S.C. §§ 547(b), 550(a), AND 551

*Against the Defendants*

237.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

238.    At the time of each of the Sentry Preference Period Initial Transfers, the Groupement Preference Period Initial Transfers, the Harley Preference Period Initial Transfers and the Alpha Prime Preference Period Initial Transfers (collectively, the "Non-Party Preference Period Initial Transfers"), the Non-Party Funds were a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

239.    Each of the Non-Party Preference Period Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

240.    Each of the Non-Party Preference Period Initial Transfers was to or for the benefit of the Non-Party Funds.

241.    Each of the Non-Party Preference Period Initial Transfers was made for or on account of an antecedent debt owed by BLMIS to the Non-Party Funds before such transfer was made.

242.    Each of the Non-Party Preference Period Initial Transfers was made while BLMIS was insolvent.

243.    Each of the Non-Party Preference Period Initial Transfers was made during the 90-day preference period under section 547(b)(4) of the Bankruptcy Code.

244.    Each of the Non-Party Preference Period Initial Transfers enabled the Non-Party Funds to receive more than they would receive if:  (i) this case was a case under chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) such transferee received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

245.    Each of the Non-Party Preference Period Initial Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code.

10-05093-smb    Doc 231-6-3    Filed 12/08/10    Entered 12/08/10 19:29:30    Main Document
2010 Initial Complaint against Natixis    Pg 70 of 83

08-01789-cgm    Doc 23116-3    Filed 04/17/23    Entered 04/17/23 19:00:45    Exhibit
Pg 68 of 82

246.    The Trustee has filed a lawsuit against the Non-Party Funds to avoid the Non-Party Preference Period Initial Transfers pursuant to section 547(b) of the Bankruptcy Code, and to recover the Non-Party Preference Period Initial Transfers, or the value thereof, from the Non-Party Defendants pursuant to section 550(a) of the Bankruptcy Code.

247.    Upon information and belief, the Defendants were an immediate or mediate transferee of some portion of the Non-Party Preference Period Initial Transfers, which are recoverable pursuant to section 550(a) of the Bankruptcy Code (the "Preference Period Subsequent Transfers").

248.    Upon information and belief, the Defendants were an immediate or mediate transferee of some portion of the Preference Period Subsequent Transfers by virtue of receiving some portion of the Preference Period Subsequent Transfers from other Defendants, which are recoverable pursuant to section 550(a) of the Bankruptcy Code (the "Preference Period Secondary Subsequent Transfers").

249.    Each of the Preference Period Subsequent Transfers and the Preference Period Secondary Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

250.    As a result of the foregoing, pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment recovering the Preference Period Subsequent Transfers and the Preference Period Secondary Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

10-05933-smb    Doc 231-6-3    Filed 12/08/10    Entered 12/08/10 19:28:30    Main Document
2010 Initial Complaint against Natixis    Pg 71 of 83

08-01789-cgm    Doc 23116-3    Filed 04/17/23    Entered 04/17/23 19:00:45    Exhibit
Page 82    Pg 71 of 83

## COUNT TWO:
## FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE)
## 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551

### *Against the Defendants*

251.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

252.    Each of the Sentry Two Year Initial Transfers, the Groupement Two Year Initial Transfers, the Harley Two Year Initial Transfers and the Alpha Prime Two Year Initial Transfers (collectively, the "Non-Party Two Year Initial Transfers") was made on or within two years before the Filing Date.

253.    Each of the Non-Party Two Year Initial Transfers constituted a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

254.    Each of the Non-Party Two Year Initial Transfers was made by BLMIS with the actual intent to hinder, delay or defraud some or all of BLMIS' then existing or future creditors. BLMIS made the Non-Party Two Year Initial Transfers to or for the benefit of the Non-Party Funds in furtherance of a fraudulent investment scheme.

255.    Each of the Non-Party Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-(2)(c)(3).

256.    The Trustee has filed a lawsuit against the Non-Party Funds to avoid the Non-Party Two Year Initial Transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code, and to recover the Non-Party Two Year Initial Transfers, or the value thereof, from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

257.    Upon information and belief, the Defendants were an immediate or mediate transferee of some portion of the Non-Party Two Year Initial Transfers, which are recoverable pursuant to section 550(a) of the Bankruptcy Code (the "Two Year Subsequent Transfers").

258.    Upon information and belief, the Defendants were an immediate or mediate transferee of some portion of the Two Year Subsequent Transfers by virtue of receiving some portion of the Two Year Subsequent Transfers from other Defendants, which are recoverable pursuant to section 550(a) of the Bankruptcy Code (the "Two Year Secondary Subsequent Transfers").

259.    Each of the Two Year Subsequent Transfers and the Two Year Secondary Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

260.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 550(a) and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) recovering the Two Year Subsequent Transfers and the Two Year Secondary Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate.

## COUNT THREE:
## FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE)
## 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551

### *Against the Defendants*

261.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

262.    Each of the Non-Party Two Year Initial Transfers was made on or within two years before the Filing Date.

263.    Each of the Non-Party Two Year Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

10-05353-smb   Doc 231-3   Filed 12/08/10   Entered 12/08/10 19:28:30   Main Document
2010 Initial Complaint against Natixis    Pg 73 of 83

08-01789-cgm   Doc 23116-3   Filed 04/17/23   Entered 04/17/23 19:00:45   Exhibit
Pg 73 of 82

264.    BLMIS received less than a reasonably equivalent value in exchange for each of the Non-Party Two Year Initial Transfers.

265.    At the time of each of the Non-Party Two Year Initial Transfers, BLMIS was insolvent, or became insolvent as a result of each of the Non-Party Two Year Initial Transfers.

266.    At the time of each of the Non-Party Two Year Initial Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

267.    At the time of each of the Non-Party Two Year Initial Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

268.    Each of the Non-Party Two Year Initial Transfers constitute a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-(2)(c)(3).

269.    The Trustee has filed a lawsuit against the Non-Party Funds to avoid the Non-Party Two Year Initial Transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code, and to recover the Non-Party Two Year Initial Transfers, or the value thereof, from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

270.    Upon information and belief, the Defendants were an immediate or mediate transferee of some portion of the Two Year Subsequent Transfers pursuant to section 550(a) of the Bankruptcy Code, which are recoverable pursuant to section 550(a) of the Bankruptcy Code.

271.    Upon information and belief, the Defendants were an immediate or mediate transferee of some portion of the Two Year Secondary Subsequent Transfers by virtue of

receiving some portion of the Two Year Subsequent Transfers from other Defendants, which are
recoverable pursuant to section 550(a) of the Bankruptcy Code.

272.   Each of the Two Year Subsequent Transfers and the Two Year Secondary
Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

273.   As a result of the foregoing, the Trustee is entitled to a judgment pursuant to
sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3)
recovering the Two Year Subsequent Transfers and the Two Year Secondary Subsequent
Transfers, or the value thereof, from the Defendants for the benefit of the estate.

## COUNT FOUR:
### FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE)
### NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278
### AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

### *Against the Defendants*

274.   The Trustee incorporates by reference the allegations contained in the previous
paragraphs of this Complaint as if fully rewritten herein.

275.   At all times relevant to the Sentry Six Year Initial Transfers, the Groupement Six
Year Initial Transfers, the Harley Six Year Initial Transfers and the Alpha Prime Six Year Initial
Transfers (collectively, the "Non-Party Six Year Initial Transfers"), there have been one or more
creditors who have held and still hold matured or unmatured unsecured claims against BLMIS
that were and are allowable under section 502 of the Bankruptcy Code or that were and are not
allowable only under section 502(e).

276.   Each of the Non-Party Six Year Initial Transfers constituted a conveyance by
BLMIS as defined under DCL section 270.

277.   The Non-Party Six Year Initial Transfers was made by BLMIS with the actual
intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Non-Party Six Year

Initial Transfers to or for the benefit of the Non-Party Funds in furtherance of a fraudulent investment scheme.

278.    Each of the Non-Party Six Year Initial Transfers were received by the Non-Party Funds with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each of the Non-Party Six Year Initial Transfers, and/or future creditors of BLMIS.

279.    Each of the Non-Party Funds received each of the Non-Party Six Year Initial Transfers with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each of the Non-Party Six Year Initial Transfers, and/or future creditors of BLMIS.

280.    The Trustee has filed a lawsuit against the Non-Party Funds to avoid the Non-Party Six Year Initial Transfers pursuant to section 544 of the Bankruptcy Code, and sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, and to recover the Non-Party Six Year Initial Transfers, or the value thereof, and attorneys' fees from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

281.    Upon information and belief, the Defendants were an immediate or mediate transferee of some portion of the Non-Party Initial Transfers, which are recoverable pursuant to section 550(a) of the Bankruptcy Code (the "Six Year Subsequent Transfers").

282.    Upon information and belief, the Defendants were an immediate or mediate transferee of some portion of the Six Year Subsequent Transfers by virtue of receiving some portion of the Six Year Subsequent Transfers from other Defendants, which are recoverable pursuant to section 550(a) of the Bankruptcy Code (the "Six Year Secondary Subsequent Transfers").

283.    Each of the Six Year Subsequent Transfers and the Six Year Secondary Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

284.    Each of the Defendants received the Six Year Subsequent Transfers with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each of the Six Year Subsequent Transfers, and/or future creditors of BLMIS.

285.    Each of the Defendants received the Six Year Secondary Subsequent Transfers with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each of the Six Year Secondary Subsequent Transfers, and/or future creditors of BLMIS.

286.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Six Year Subsequent Transfers and the Six Year Secondary Subsequent Transfers, or the value thereof, and attorneys' fees from the Defendants for the benefit of the estate.

## COUNT FIVE:
### FRAUDULENT TRANSFER (SUBSEQUENT TRANSFEREE) NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

### *Against the Defendants*

287.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

288.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

289.    Each of the Non-Party Six Year Initial Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

290.    BLMIS did not receive fair consideration for the Non-Party Six Year Initial Transfers.

291.    BLMIS was insolvent at the time it made each of the Non-Party Six Year Initial Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Non-Party Six Year Initial Transfers.

292.    The Trustee has filed a lawsuit against the Non-Party Funds to avoid the Non-Party Six Year Initial Transfers pursuant to section 544 of the Bankruptcy Code, and sections 273, 278, and/or 279 of the New York Debtor and Creditor Law, and to recover the Non-Party Six Year Initial Transfers, or the value thereof, from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

293.    Upon information and belief, the Defendants were an immediate or mediate transferee of some portion of the Six Year Subsequent Transfers, which are recoverable pursuant to section 550(a) of the Bankruptcy Code.

294.    Upon information and belief, the Defendants were an immediate or mediate transferee of some portion of the Six Year Secondary Subsequent Transfers by virtue of receiving some portion of the Six Year Subsequent Transfers from other Defendants, which are recoverable pursuant to section 550(a) of the Bankruptcy Code.

295.    Each of the Six Year Subsequent Transfers and the Six Year Secondary Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

296.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 273, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Six Year

Subsequent Transfers and the Six Year Secondary Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate.

### COUNT SIX:
### FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE)
### NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278,
### AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

#### *Against the Defendants*

297.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

298.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

299.    Each of the Non-Party Six Year Initial Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

300.    BLMIS did not receive fair consideration for the Non-Party Six Year Initial Transfers.

301.    At the time BLMIS made each of the Non-Party Six Year Initial Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Non-Party Six Year Initial Transfers was an unreasonably small capital.

302.    The Trustee has filed a lawsuit against the Non-Party Funds to avoid the Non-Party Six Year Initial Transfers pursuant to section 544 of the Bankruptcy Code, and sections 274, 278, and/or 279 of the New York Debtor and Creditor Law, and to recover the Non-Party

Initial Transfers, or the value thereof, from the Non-Party Funds pursuant to section 550(a) of the

Bankruptcy Code and SIPA § 78fff-2(c)(3).

303. Upon information and belief, the Defendants were an immediate or mediate

transferee of some portion of the Six Year Subsequent Transfers, which are recoverable pursuant

to section 550(a) of the Bankruptcy Code.

304. Upon information and belief, the Defendants were an immediate or mediate

transferee of some portion of the Six Year Secondary Subsequent Transfers by virtue of

receiving some portion of the Six Year Subsequent Transfers from other Defendants, which are

recoverable pursuant to section 550(a) of the Bankruptcy Code.

305. Each of the Six Year Subsequent Transfers and the Six Year Secondary

Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

306. As a result of the foregoing, the Trustee is entitled to a judgment pursuant to

sections 274, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b),

550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Six Year

Subsequent Transfers and the Six Year Secondary Subsequent Transfers, or the value thereof,

from the Defendants for the benefit of the estate.

## COUNT SEVEN:
### FRAUDULENT TRANSFERS (SUBSEQUENT TRANSFEREE)
### NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278,
### AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

### *Against the Defendants*

307. The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Complaint as if fully rewritten herein.

308. At all relevant times there was and is at least one or more creditors who held and

hold matured or unmatured unsecured claims against BLMIS that were and are allowable under

section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

309.    Each of the Non-Party Six Year Initial Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

310.    BLMIS did not receive fair consideration for the Non-Party Six Year Initial Transfers.

311.    At the time BLMIS made each of the Non-Party Six Year Initial Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

312.    The Trustee has filed a lawsuit against the Non-Party Funds to avoid the Non-Party Six Year Initial Transfers pursuant to section 544 of the Bankruptcy Code, and sections 275, 278, and/or 279 of the New York Debtor and Creditor Law, and to recover Non-Party Six Year Initial Transfers, or the value thereof, from the Non-Party Funds pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

313.    Upon information and belief, the Defendants were an immediate or mediate transferee of some portion of the Six Year Subsequent Transfers, which are recoverable pursuant to section 550(a) of the Bankruptcy Code.

314.    Upon information and belief, the Defendants were an immediate or mediate transferee of some portion of the Six Year Secondary Subsequent Transfers by virtue of receiving some portion of the Six Year Subsequent Transfers from other Defendants, which are recoverable pursuant to section 550(a) of the Bankruptcy Code.

315.    Each of the Six Year Subsequent Transfers and the Six Year Secondary Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Defendants.

10-05353-smb    Doc 23116-3    Filed 12/08/10    Entered 12/08/10 19:29:30    Main Document
2010 Initial Complaint against Natixis    Pg 81 of 83

08-01789-cgm    Doc 23116-3    Filed 04/17/23    Entered 04/17/23 19:00:45    Exhibit
Page 81 of 82

316.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 275, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) recovering the Six Year Subsequent Transfers and the Six Year Secondary Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against NATIXIS, Natixis CIB, IXIS CIB, Natixis FP, BLOOM, and Tensyr on counts one through seven as follows:

(a)    On the First Claim for Relief, pursuant to sections 547(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment recovering the Preference Period Subsequent Transfers and the Preference Period Secondary Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

(b)    On the Second Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) the Trustee is entitled to a judgment recovering the Two Year Subsequent Transfers and the Two Year Secondary Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate;

(c)    On the Third Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) the Trustee is entitled to a judgment recovering the Two Year Subsequent Transfers and the Two Year Secondary Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate;

(d)    On the Fourth Claim for Relief, pursuant to sections 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) the Trustee is entitled to a judgment recovering the Six Year

10-05353-smb  Doc 23-116-3  Filed 12/08/10  Entered 12/08/10 19:28:09  Main Document
2010 Initial Complaint against Natixis    Pg 82 of 83

08-01789-cgm  Doc 23116-3  Filed 04/17/23  Entered 04/17/23 19:00:45  Exhibit
Pg 82 of 82

Subsequent Transfers and the Six Year Secondary Subsequent Transfers, or the value thereof, and attorneys' fees from the Defendants for the benefit of the estate;

(e) On the Fifth Claim for Relief, pursuant to sections 273, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) the Trustee is entitled to a judgment recovering the Six Year Subsequent Transfers and the Six Year Secondary Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate;

(f) On the Sixth Claim for Relief, pursuant to sections 274, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) the Trustee is entitled to a judgment recovering the Six Year Subsequent Transfers and the Six Year Secondary Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate;

(g) On the Seventh Claim for Relief, pursuant to sections 275, 278, and/or 279 of the New York Debtor and Creditor Law, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3) the Trustee is entitled to a judgment recovering the Six Year Subsequent Transfers and the Six Year Secondary Subsequent Transfers, or the value thereof, from the Defendants for the benefit of the estate;

(h) Awarding the Trustee all applicable attorneys' fees, interest, costs, and disbursements of this action; and

(i) Granting the Trustee such other, further and different relief as the Court deems just, proper and equitable.

10-05353-smb    Doc 23-1    Filed 12/08/10    Entered 12/08/10 19:23:30    Exhibit
2010 Initial Complaint against Natixis    Pg 83 of 82

08-01789-cgm    Doc 23116-3    Filed 04/17/23    Entered 04/17/23 19:00:45    Exhibit
Pg 83 of 83    Main Document

Dated:  New York, New York
      December 8, 2010

Of Counsel:

Deborah H. Renner
Oren J. Warshavsky
Gonzalo S. Zeballos
Timothy S. Pfeifer
Seanna R. Brown
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111

/s/ David J. Sheehan
 /s/ Keith R. Murphy
 /s/ Marc Skapof
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Ryan P. Farley
Mark A. Kornfeld
Keith R. Murphy
Marc Skapof

Thomas L. Long
Catherine E. Woltering
**Baker & Hostetler LLP**
65 East State Street, Suite 2100
Columbus, Ohio 43215
Telephone: (614) 228-1541
Facsimile: (614) 462-2616

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and Bernard L. Madoff*