# EXHIBIT 6

**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>             Plaintiff-Applicant,<br><br>    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>             Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br>BERNARD L. MADOFF,<br><br>             Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff,<br><br><br>             Plaintiff,<br><br>    v.<br><br>NATIXIS FINANCIAL PRODUCTS LLC,<br><br>             Defendant. | Adv. Pro. No. 10-05353 (SMB)<br><br>**PROPOSED**<br>**<u>AMENDED COMPLAINT</u>** |

# TABLE OF CONTENTS

I.   **BACKGROUND** .................................................................................................... **5**

    A.   Jurisdiction and Venue .............................................................................. 5

    B.   Background, the Trustee, and Standing ...................................................... 6

    C.   BLMIS, the Ponzi Scheme, and Madoff's Investment Strategy ................. 8

II.  **DEFENDANT, THE NATIXIS GROUP, AND RELEVANT DEALS** .......................... **15**

    A.   Relevant Entities ...................................................................................... 15

    B.   Relevant Deals ........................................................................................ 16

    C.   Imputation ............................................................................................... 17

III. **BEFORE ENTERING THE GROUPEMENT DEAL, DEFENDANT
SUBJECTIVELY IDENTIFIED DISCREPANCIES AND INDICIA OF FRAUD
CONCERNING BLMIS** ...................................................................................... **23**

    A.   Defendant Reviewed Conflicting Information About BLMIS Trading that It
Never Clarified ....................................................................................... 23

    B.   Defendant Recognized the Opportunity for Fraud Created by BLMIS
Simultaneously Serving as Broker, Custodian, and Investment Manager ................. 26

IV.  **FOLLOWING THE GROUPEMENT DEAL, DEFENDANT AMASSED
ADDITIONAL EVIDENCE THAT BLMIS WAS NOT ENGAGED IN THE
TRADING ACTIVITY IT REPORTED** ................................................................ **27**

    A.   Defendant Saw and Appreciated Evidence that BLMIS Was Not Trading the
Options It Reported ................................................................................. 27

    B.   Defendant Reviewed Standard Industry Performance Measures Indicating
BLMIS Was Not Employing the SSC Strategy ......................................... 31

    C.   After the Groupement Deal, Defendant Performed No Due Diligence .................... 38

V.   **DEFENDANT DELIBERATELY HID ITS SUSPICIONS TO REALIZE
FINANCIAL INCENTIVES** ................................................................................. **40**

    A.   Defendant and its Executives Were Motivated to Ignore Evidence of Fraud ........... 40

    B.   Defendant Structured the Defendant Deals and Took Other Measures to
Minimize Any Potential Loss ................................................................... 41

    C.   Defendant Calculated that Even Before It Cashed in its Insurance, It Was
Exceptionally Unlikely to Lose Money with Madoff ................................. 42

**VI.    IXIS-PARIS SUBJECTIVELY INDENTIFIED INDICIA OF FRAUD, WILLFULLY BLINDED ITSELF, AND PREVENTED THE RATING AGENCIES FROM LEARNING THE TRUTH** ............................................................... **43**

    A.   Rating Agency Inquiries Highlighted Facts and Circumstances Suggesting a High Probability of Fraud at BLMIS .......................................................... 44

    B.   IXIS-Paris Turned a Blind Eye to Facts and Circumstances It Subjectively Understood Created a High Probability of Fraud at BLMIS While Blocking Access to Madoff and Lying to the Rating Agencies ................................................ 50

**VII.    DOMESTICITY OF THE TRANSFERS** ...................................................... **57**

**VIII.    THE TRUSTEE MAY AVOID AND RECOVER THE TRANSFERS** ..................... **57**

    A.   Initial Transfers from BLMIS to Groupement .......................................................... 57

    B.   Subsequent Transfers from Groupement To Defendant ........................................... 59

Irving H. Picard (the "**Trustee**"), as trustee for the liquidation of Bernard L. Madoff

Investment Securities LLC ("**BLMIS**") and the substantively consolidated estate of Bernard L.

Madoff, individually, under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq.*

("**SIPA**"), by and through his undersigned counsel, for this Amended Complaint against Natixis

Financial Products LLC (as successor-in-interest to Natixis Financial Products Inc., f/k/a IXIS

Financial Products Inc., f/k/a CDC Financial Products Inc.) ("**Defendant**") alleges the following:

## NATURE OF THE ACTION

1.    This adversary proceeding is part of the Trustee's efforts to recover BLMIS

customer property (as defined by SIPA § 78*lll*(4)) that Madoff stole through BLMIS's investment

advisory business (the "**IA Business**").   Madoff sustained his scheme with massive capital

infusions largely from funds that solicited clients for BLMIS (the "**Feeder Funds**").   Defendant

was an equity investor in several Feeder Funds.   With this Amended Complaint, the Trustee seeks

to recover $148.1 million Defendant received in subsequent transfers of BLMIS customer property

from Feeder Fund Groupement Financier Limited ("**Groupement**").[1]

2.    Defendant and its affiliates employed options and equities experts who analyzed

Madoff's split-strike conversion strategy (the "**SSC Strategy**").   For years, in BLMIS's monthly

customer statements, trade tickets, and other sources, Defendant saw mounting evidence that

BLMIS's reported trades were fictitious.

---

[1] The Trustee reserves the right to amend this complaint to pursue the entities and claims dismissed by this Court's extraterritoriality decision if it is overturned in whole or relevant part by the Trustee's pending appeal. *See SIPC v. BLMIS (In re BLMIS)*, Adv. Pro. No. 08-01789 (SMB), 2016 WL 6900689 (Bankr. S.D.N.Y. Nov. 22, 2016) (dismissing transfers Natixis S.A., Tensyr Limited, and Bloom Asset Holdings Fund received from Fairfield Sentry Limited and Harley International (Cayman) Limited on international comity basis and dismissing transfers Bloom Asset Holdings Fund received from Groupement and Alpha Prime Fund Ltd. on extraterritoriality basis); *see also In re Irving H. Picard*, No. 17-02292 (2d Cir. Jan. 10, 2018), ECF Nos. 496, 497.   The Trustee reserves the right to appeal the measure and burden of proof imposed on the Trustee in connection with its avoidance and recovery claims under 11 U.S.C. §§ 544(b)(1), 547, 548, 550, and 551, and applicable provisions of the New York Fraudulent Conveyance Act (N.Y. Debtor & Creditor Law §§ 270 *et seq.*).

3.    When credit and risk departments required diligence on BLMIS for deal approval, Defendant's executives and senior employees, motivated by the allure of rising bonuses directly tied to Feeder Fund deals, pointed exclusively to a stale, facially self-serving marketing piece Groupement's manager, Access International Advisors ("**Access**"), had created in 2002 (the "**Access Madoff Deck**").  Defendant reviewed it and knew that as to fundamental questions about BLMIS's trades, the Access Madoff Deck internally contradicted itself, publicly available information, and Groupement trade tickets Defendant reviewed.

4.    Reviewing BLMIS's public website (which contained absolutely no mention of the IA Business) and the Access Madoff Deck constituted the full measure of "diligence" Defendant undertook prior to entering numerous multimillion-dollar Feeder Fund deals.  Defendant gave lip service to diligence, while deliberately ignoring facts, circumstances, and inconsistencies that revealed a high probability of fraud at BLMIS.  These facts included, among others, the following:

5.    *First*, Defendant knew Madoff purported to trade options in volumes that were impossible.  For example, in a one-year period for just one Feeder Fund, Defendant knew more than 80% of Madoff's reported options trading exceeded the listed exchange's entire volume, in many instances by over 10,000% and in at least one instance, over 26,000%.  During that same year, Defendant knew more than 95% of Madoff's reported options trades for another Feeder Fund exceeded the exchange's volume.

6.    A Defendant managing director recognized this as obviously impossible.  In response, he called his colleague at Defendant's parent company to question how this could be. He received a facially bogus answer but conducted no further investigations as to how BLMIS could be doing the impossible.

10-05353-smb    Doc 170-16    Filed 12/26/18    Entered 12/26/18 23:07:07    Exhibit
                                              Pg 7 of 242

7.    *Second*, Defendant knew BLMIS generated a risk/return profile that was virtually unmatched, including by managers using similar split-strike conversion strategies, such as Gateway Option Income Fund ("**Gateway Fund**"), an entity related to Defendant. Defendant knew that no financial measure designed to analyze risk and return could explain how Madoff generated BLMIS's purported returns.

8.    *Third*, Defendant knew BLMIS violated industry norms by serving as investment advisor, broker, and custodian for all IA Business assets. This structure eliminated all independent checks and created a fertile field for fraud.

9.    *Fourth*, even though Madoff had custody of the IA Business assets, no contracts governing such custody existed, something Defendant's parent company, Natixis S.A., individually and as successor-in-interest to IXIS Corporate & Investment Bank (together with Natixis S.A., "**IXIS-Paris**"), knew was "very bizarre." As explained herein, the knowledge IXIS-Paris had about BLMIS's fraud is imputed to Defendant.

10.    *Fifth*, Defendant and IXIS-Paris received and reviewed contradictory information about BLMIS's purported trading and operational structure, including that BLMIS: (i) materially misstated to the SEC its assets under management ("**AUM**"); (ii) told conflicting and bizarre stories about how it purported to earn money; and (iii) stated it did not use third-party fundraisers, when Defendant knew that raising money for BLMIS was the Feeder Funds' sole purpose.

11.    *Sixth*, by the fall of 2006, IXIS-Paris knew that BLMIS purportedly traded options over-the-counter ("**OTC**"). It also knew Madoff, though bound by federal securities laws and industry standards, refused to divulge any purported BLMIS trading counterparties' names. Despite this, IXIS-Paris never attempted to verify a single trade BLMIS reported or confirm the identity of a single counterparty. Defendant and IXIS-Paris knew that whether BLMIS was

purportedly trading options OTC or on the exchange, neither provided BLMIS with sufficient volume to execute its purported trades. When Defendant questioned IXIS-Paris regarding this impossibility, IXIS-Paris could not provide a legitimate explanation, because none existed.

12.    *Seventh*, IXIS-Paris conspired with Fairfield Greenwich Group ("**Fairfield**"), which operated the largest Feeder Fund, Fairfield Sentry Limited ("**Sentry**"), to shield Madoff from third-party investigations and to craft for the major rating agencies a false story about Madoff's trading practices and operational structure. In return for shielding Madoff, IXIS-Paris was able to launch Tensyr Ltd. ("**Tensyr**"), an investment vehicle that invested entirely in Sentry, from which IXIS-Paris received millions of dollars in fees.

13.    Defendant and IXIS-Paris realized significant profits and expanded their businesses by entering nearly $1 billion in Feeder Fund deals. Whether BLMIS's returns were real was irrelevant to their success, and these monies extended the length and depth of BLMIS's fraud.

14.    Defendant and IXIS-Paris acted with confidence, having calculated that there was practically no downside to their turning a blind eye to BLMIS's fictitious trading. To eliminate most risk, Defendant structured its half-dozen Feeder Fund deals (the "**Defendant Deals**") to avoid up to 50% of any losses it might incur due to BLMIS's fraud. Defendant and IXIS-Paris also maintained insurance policies to cover civil liability for themselves and their officers and employees. These policies incentivized them to ignore indicia of fraud at BLMIS because the insurance would significantly reduce or even eliminate financial consequences they might face when BLMIS eventually imploded.

15.    Rather than investigate to confirm or allay its suspicions, Defendant deliberately ignored the evidence of BLMIS's fraud. In later years, without hesitation, IXIS-Paris's executives resorted to lying to rating agencies about BLMIS and Madoff to profit from his scheme.

16.     By willfully blinding themselves from the fraud, denying others the ability to independently investigate BLMIS, and delivering to Madoff hundreds of millions of dollars over the years, Defendant and IXIS-Paris significantly extended and deepened the Ponzi scheme.

## I.    BACKGROUND

### A.    <u>Jurisdiction and Venue</u>

17.     This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, Adv. Pro. No. 08-01789 (SMB) (the "**SIPA Proceeding**"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities & Exchange Commission v. BLMIS*, No. 08-cv-10791 (the "**District Court Proceeding**") and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

18.     This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).  The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

19.     Venue in this judicial district is proper under 28 U.S.C. § 1409.

20.     This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") §§ 105(a), 502(d), 544(b), 548(a), 550(a) and 551, the New York Fraudulent Conveyance Act (N.Y. Debtor & Creditor Law ("**NYDCL**") §§ 270 *et seq.*), the New York Civil Practice Law and Rules, and other applicable law.

### B.   Background, the Trustee, and Standing

21.     On December 11, 2008 (the "**Filing Date**"), federal agents arrested Madoff for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the SEC commenced the District Court Proceeding.

22.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("**SIPC**").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

23.     Also, on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

     i.    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

     ii.    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

     iii.    removed the case to this Court pursuant to SIPA § 78eee(b)(4).

24.     By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

25.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

26.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, No. 09-cr-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed against him

by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

27. At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, No. 09-cr-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

28. At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, No. 10-cr-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

29. On March 24, 2014, Daniel Bonventre, Annette Bongiorno, Jo Ann Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of the IA Business.

30. As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme.

Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

31.    Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

32.    The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code §§ 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

### C.    BLMIS, the Ponzi Scheme, and Madoff's Investment Strategy

#### 1.    BLMIS

33.    Madoff founded BLMIS in 1960 as a sole proprietorship.  In 2001, Madoff registered BLMIS as a New York limited liability company.  At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

34.    In compliance with 15 U.S.C. § 78$o$(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a single broker-dealer from 1960 through 2008.  Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer from January 19, 1960 through December 31, 2008.  At all times, BLMIS was assigned Central Registration Depository No. 2625.  SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer from January 19, 1960 through December 31, 2008.  On December 30, 1970, BLMIS became a member of SIPC and continued its

membership without any change in status until the Filing Date.  SIPC membership is contingent on registration of the broker-dealer with the SEC.

35.    For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker-dealer operation, and the IA Business.

36.    BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry.  BLMIS's website omitted the IA Business entirely.  BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

37.    For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

38.    In 2006, BLMIS filed its first Form ADV (a required registered investment adviser filing) with the SEC, reporting that BLMIS had 23 customer accounts with total AUM of $11.7 billion.  BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion.  In reality, Madoff grossly understated these numbers.  In 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM.  At all times, BLMIS's Form ADVs were publicly available.

## 2.    The Ponzi Scheme

39.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David

Kugel, Annette Bongiorno, Jo Ann Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

40.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the IA Business customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

41.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("**Friehling & Horowitz**") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one employee was an administrative assistant, and one was a semi-retired accountant living in Florida.

42.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

### 3.    Madoff's Investment Strategy

43.    BLMIS purported to execute two primary investment strategies for IA Business customers: the convertible arbitrage strategy and the SSC strategy. For a limited group of IA Business customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a

profit. At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

44.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets. Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time. In the 1970s this strategy represented a significant portion of the total IA Business accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of IA Business accounts.

45.    From 1992 onward, Madoff claimed to employ the SSC Strategy for IA Business accounts, though in reality, BLMIS never traded any securities for its IA Business customers. All funds received from IA Business customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

46.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to IA Business customers that typically reflected substantial gains on the customers' principal investments.

47.    The SSC Strategy purported to involve: (i) the purchase of a group or basket of equities (the "**Basket**") intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P Index call options. Madoff purportedly made all these trades *pari passu* for his IA Business customers.

48.    The put options were to control the downside risk of price changes in the Basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option would entail a loss for BLMIS.

49.    The sale of call options would partially offset the costs associated with acquiring puts, but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to outperform the market, because in a rising market, calls would be exercised by the counterparty.

50.    The simultaneous purchase of puts and calls to hedge a securities position is commonly referred to as a "collar."  The purpose of the collar is to limit exposure to volatility in the stock market and flatten out returns on investment.

51.    For the SSC Strategy to be deployed as Madoff claimed, the total value of each of the puts and calls purchased for the Basket had to equal the notional value of the Basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's purchase of call and put options in any amount, much less in billions of dollars.

52.    For the SSC Strategy to be deployed as Madoff claimed, the total value of each of the puts and calls purchased for the Basket had to equal the notional value of the Basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase of call and put options, each with a notional value of $11.7 billion.  There are no records to substantiate Madoff's purchase of call and put options in any amount, much less in billions of dollars.

53.     At all times that BLMIS reported its total AUM, publicly available information
about the volume of exchange-traded options showed that the volume of options contracts
necessary to form the collar and implement the SSC Strategy exceeded the available options.

54.     Sophisticated or professional investors like Defendant knew Madoff could not be
using the SSC Strategy because his returns drastically outperformed the market.  BLMIS showed
(net of all BLMIS-level charges and Feeder Fund fees) only 12 months of negative returns over
the course of Groupement's existence, compared to 45 months of negative returns in the S&P 100
Index over the same time, nearly four times as often.  Such results were impossible if BLMIS was
actually implementing the SSC Strategy.

### 4.     BLMIS's Fee Structure

55.     BLMIS charged commissions on purported equity trades rather than management
and performance fees based on AUM; by using a commission-based structure, including not
earning any commissions on purported options trades, Madoff inexplicably walked away from
hundreds of millions of dollars in fees.  Madoff also purported not to charge *anything* for executing
the options trades, another inexplicably altruistic gesture.

### 5.     BLMIS's Market Timing

56.     Madoff also falsely told customers that he carefully timed securities purchases and
sales to maximize value.  Madoff explained that he achieved market timing by intermittently taking
customer funds out of the market.   During those times, Madoff purported to invest BLMIS
customer funds in U.S. Treasury securities or mutual funds invested in those instruments.

57.     BLMIS's market timing, as reported on its customer statements, showed an
uncanny ability to buy low and sell high, an ability so superhuman that any professional investor,
including Defendant, could see it was statistically impossible.  BLMIS's customer statements also
showed, without fail, a total withdrawal from the market at every quarter and year end.

58.    As a registered broker-dealer, BLMIS was required, pursuant to § 240.17a-5 of the

Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed,

among other things, financial information on customer activity, cash on hand, and assets and

liabilities at the time of reporting.  BLMIS's reported quarterly and year-end exits were undertaken

to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-

prevailing market conditions.  It would be impossible to automatically sell all positions at fixed

times, independent of market conditions, and win every time.  Yet this is precisely what BLMIS's

customer statements reported.

59.    BLMIS's practice of exiting the market at fixed times, regardless of market

conditions, was completely at odds with the SSC Strategy, which relied on holding long positions

rather than on short-term speculative trading.

60.    There is no record of BLMIS clearing a single purchase or sale of securities in

connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing

house for such transactions, its predecessors, or any other trading platform on which BLMIS could

have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded

securities using the SSC strategy.

61.    All exchange-listed options relating to the companies within the S&P 100 Index,

including options based upon the S&P 100 Index itself, clear through the Options Clearing

Corporation.  The Options Clearing Corporation has no records showing that BLMIS's IA

Business cleared any trades in any exchange-listed options.

**6.    The Ponzi Scheme's Collapse**

62.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests

for redemptions overwhelmed the flow of new investments.

63.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements, and that the IA Business operated as a Ponzi scheme.

64.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## II.    DEFENDANT, THE NATIXIS GROUP, AND RELEVANT DEALS

### A.    <u>Relevant Entities</u>

65.    **Defendant** is a Delaware corporation and financial services company with a principal place of business in New York, New York.

66.    **Non-party Natixis S.A.** (previously defined as IXIS-Paris individually and as successor-in-interest to IXIS Corporate & Investment Bank) is Defendant's ultimate parent company.

67.    The Natixis Group's Corporate and Investment Banking Division (the "**CIB Division**") focused on advisory services, structured financing, capital markets, global transaction banking, and economic research.  IXIS-Paris and Defendant were both part of the CIB Division and the integrated, global company that Natixis S.A. headed (the "**Natixis Group**").

68.    **Non-party Natexis Bleichroeder Inc.** ("**Natexis**") is an IXIS-Paris subsidiary, a member of the CIB Division, a U.S.-registered broker-dealer, and an investment adviser.

69.    **Non-party Fairfield** is a *de facto* partnership that operated from its headquarters in New York, New York.  Fairfield-related companies and personnel, largely in New York, operated and managed Sentry, a hedge fund incorporated in the British Virgin Islands.

70.    **Non-party Tensyr Ltd.** ("**Tensyr**") (an anagram for Sentry) is an investment vehicle formed as a limited company under the laws of Jersey.  IXIS-Paris and Fairfield jointly

created and controlled Tensyr as an "orphan" entity with no employees.  Tensyr issued certain

notes that provided purchasers levered Sentry returns.

71.    **Non-party Groupement** is an investment fund organized under the laws of the

British Virgin Islands.

72.    **Non-party Access** comprises several entities that operated and managed

Groupement and other Feeder Funds from its New York headquarters.

**B.**    **Relevant Deals**

73.    Within the CIB Division, Defendant and IXIS-Paris specialized in developing

structured financial products.  Defendant had advanced financial engineering capabilities and

infrastructure to evaluate, create, and monitor derivative products like the Defendant Deals.  These

Defendant Deals' reference assets (*i.e.*, the instruments on which the deal's leveraged returns were

based) were various Feeder Funds.

74.    In 2003, Defendant invested as an equity shareholder in Groupement (the

"**Groupement Deal**"), its first Defendant Deal.  Between 2003 and 2008, Defendant and its

affiliate, non-party Bloom Asset Holdings Fund, received from Groupement approximately $508.4

million in subsequent transfers of BLMIS customer property, of which the Trustee is seeking to

recover $148.1 million.

75.    Defendant invested in other Feeder Funds, including Harley International

(Cayman) Limited ("**Harley**") and Alpha Prime Fund Ltd ("**Alpha Prime**").  In 2006, Defendant

entered deals with Harley (the "**Harley Deal**") and Alpha Prime (the "**Alpha Prime Deal**"), from

which Defendant and Bloom Asset Holdings Fund together received approximately $142 million in BLMIS customer property.[2]

### C. **Imputation**

76.      IXIS-Paris's and Natexis's knowledge of indicia of fraud at BLMIS is imputed to Defendant.  Defendant, IXIS-Paris, and Natexis were all CIB Division members.

77.      CIB Division executives, employees, officers, and directors worked together on the Feeder Fund deals and in the ordinary course of business shared information on Madoff and BLMIS.  The singular, global approach is highlighted by the role officers from both Defendant and IXIS-Paris served in creating, approving, and monitoring deals involving Madoff.

78.      The CIB Division's role was to provide "clients with an extensive range of solutions encompassing loans, structured finance, capital markets products, cash management products, leasing, securitization, advisory services, financial engineering and research."  Through its officers, directors, and other employees, the CIB Division controlled its members': (i) financial reporting; (ii) oversight responsibilities, including risk management; and (iii) committee structure for new product approval, including credit, risk, and operational approvals.

79.      IXIS Corporate & Investment Bank's 2006 Annual Report said its control mechanisms involved the "use of a tight-knit system of committees designed to ensure the overall management of risks.  Underpinned by collegial and horizontal analyses, these committees provide a framework for decision-making, [and] ensure standardized operational processes" and the CIB Division "controls risk through a unified Risk department, which comprises the credit, market and operational risk teams and oversees all of [its] activities in its Paris headquarters and offices

---

[2] Pursuant to the single satisfaction rule, this Amended Complaint does not seek to recover the approximately $18 million in subsequent transfers that Defendant received from Alpha Prime.  Order, *Picard v. HSBC Bank plc (In re BLMIS)*, Adv. Pro. No. 09-01364 (SMB), ECF No. 497 (Bankr. S.D.N.Y. Mar. 27, 2018).

abroad." This ensured "consistent methods and controls [were] applied across all [the Natixis Group's] activities with respect to market risk, counterparty credit risk and operational risk."

80. In addition to the support provided by its CIB Division affiliates, Defendant further benefited from this structure because it marketed services and products as part of the larger AAA-rated Natixis Group, which it included in its marketing materials. Defendant's business cards also stated that Defendant was "[a]n Affiliate of IXIS Corporate & Investment Bank," and its employees' email signature blocks made similar statements.

81. The IXIS Corporate & Investment Bank 2004 Annual Report stated that the credit risk department set lending limits based on use of company capital by the various business lines, not by the individual legal entities in them, and functioned across the entire Natixis Group, including "monitoring all risks to which [IXIS-Paris] and its operational subsidiaries are exposed."

82. The report also stated that the credit risk department reported directly to Anthony Orsatelli, who was the Chairman of IXIS-Paris's Executive Board, among other roles. And the "Credit Committee and other credit-risk bodies was [sic] enhanced in 2004, by involving senior bankers and taking steps to enable the Executive Board to devote itself to examining the most sensitive risks during the twice-weekly meeting of the Bank's Credit Committee." The credit risk department produced daily and weekly risk reports for Orsatelli's review. As Chairman, Orsatelli made "decisions regarding the Bank's principal commitments, monitors developments in loans outstanding, and conducts an annual revision of risk limits and ratings."

83. The flow of information between the CIB Division entities was further supported by the significant overlap in their senior leadership. For example, Orsatelli served, among other roles, as: (i) Chairman of IXIS-Paris's Executive Board; (ii) Defendant's Chairman of the Board; and (iii) a member of Natexis's Board. Nicolas Fourt simultaneously was, among other things: (i)

co-head of IXIS-Paris's front office; (ii) a member of IXIS-Paris's Executive Board; (iii) a member

of Defendant's Board of Directors.; and (iv) head of the CIB Division's Capital Markets group.

84.     Similarly, Luc de Clapiers served as the CEO and President of both Defendant and

Natexis.  In this role, he maintained direct oversight over all CIB Division functions instrumental

to the Feeder Fund deals, including the credit and risk control departments.

85.     As part of their unified transactional and risk management approach, CIB Division

members entered into agreements for their mutual benefit.  For example, IXIS-Paris guaranteed

Defendant's payment obligations under all deals into which Defendant entered, including the

Defendant Deals.  Just days before the Groupement Deal closed, Orsatelli signed this guarantee in

his capacity as IXIS-Paris's Executive Board Chairman.

86.     The top-level authorized signatories who could contractually bind Defendant and

sanction its fund transfers and payments included executives from Defendant and IXIS-Paris.

87.     To fully integrate its risk and deal approval systems for structured products, the

CIB Division established the Structured Fund Products Group (the "**SFPG**").  The SFPG was a

global, cross-entity group responsible for comprehensive risk management for structured products

the CIB Division created and sold, including all Feeder Fund deals.

88.     Eric Raiten was the SPFG's U.S. head and IXIS-Paris's Laurent Dubois was the

global head.  In their CIB Division roles, Raiten and Dubois reported directly to Fourt, an IXIS-

Paris Executive Committee member.  SFPG member Emmanuel Lefort, an IXIS-Paris senior

manager who reported directly to Dubois, was responsible for shepherding Tensyr into existence.

Dubois was involved in the Tensyr deal from the beginning (signing the initial non-disclosure

agreement with Fairfield) to the middle (staying informed through Lefort about the Tensyr rating

process) to the end (involved in the deal's final structure).  While not directly involved, Raiten was aware that his IXIS-Paris SFPG colleagues launched Tensyr.

89.    In the SFPG's ordinary course of business, Defendant and IXIS-Paris shared information regarding clients and transactions across offices.  According to Raiten, "there were periodic contacts between New York and Paris … generally organizing ourselves … on a global basis."  This included sharing information on transactions the SFPG committee considered and approved.  For example, IXIS-Paris compliance vetted and granted approval for the Groupement Deal.

90.    Defendant's SFPG representatives regularly assisted their IXIS-Paris counterparts on transactions, including those involving Madoff.  For example, in 2001, a Defendant employee emailed Tremont founder Sandra Manzke about investing in a Feeder Fund, but lamented that things were not moving forward because of holdups in both New York and Paris.

91.    In 2003, Defendant began working on a possible deal with Ascot Partners, L.P., a Feeder Fund run by J. Ezra Merkin.  Defendant's Raiten coordinated the CIB Division's efforts to try to set up this deal.  Among other things, Raiten organized a meeting at Merkin's offices and brought with him Sophie Souliac Deschamps, the CIB Division's co-head of Structured Alternative Investments (and, on information and belief, part of the SFPG), and others from CIB Division affiliates.  Under the proposed structure, IXIS-Paris would have provided the leverage for the deal and then assigned its exposure to Defendant.

92.    This potential deal contained nearly the same terms as Tensyr.  Among other similarities: (i) a Natixis Group entity collaborated with a Feeder Fund to create a leveraged investment with a New York-based multibillion-dollar Feeder Fund as the underlying asset; (ii) a

Natixis Group entity would be the leverage provider; (iii) the deal size would be several hundred million dollars; and (iv) the proposed investment vehicle would sell both notes and equity.

93.     The deal with Merkin ultimately did not move forward because Madoff would not bless it; two years later, however, as more fully explained below, when presented with nearly the same transaction, Madoff said yes to Tensyr.  On information and belief, IXIS-Paris created Tensyr using the knowledge it gained when setting up the potential Merkin deal.  This comports with IXIS-Paris's understanding that the Feeder Funds were fungible; in 2004, it told Fairfield that if it could not get capacity with Sentry, it would simply "try for other Madoff feeders."

94.     In another example, in 2004, New York-based SFPG member Bernard Abdo used his relationship with Access to assist IXIS-Paris with a proposed Groupement transaction, separate from the already-existing Groupement Deal.  Abdo was Access's point person and primary contact for all negotiations, diligence requests, and final deal approval. Under the proposed transaction, Natixis would issue a Groupement-linked note while Defendant would provide leverage.  Abdo worked with Access to obtain information on BLMIS that was needed by "our Paris office for vetting."  When issues arose coordinating the deal, Abdo emailed Access assuring it that New York "coordinate[s] with the Paris office."

95.     Also in 2004, Defendant and IXIS-Paris had many conversations about a potential deal between them and Access.  Souliac Deschamps reached out to Raiten to discuss a new potential deal involving an Access Feeder Fund.  Raiten forwarded the communication to Abdo who communicated directly with a representative at Access to "see what [he] can find out."

96.     In 2005, Souliac Deschamps emailed Access about reaching an agreement on a structured product.  Souliac Deschamps referenced teams in New York assisting her with the product and stated that "everything is rolling."  Dubois, Raiten, Abdo, Souliac Deschamps, and

others from IXIS-Paris and Defendant worked together on the potential deal with Access.  Dubois later directed Souliac Deschamps to communicate with Access about a transaction with IXIS Corporate & Investment Bank.

97.    In 2008, an Access employee attempted to get Defendant to invest more money, but Defendant rebuffed Access, claiming capacity constraints.  In response, an Access representative said she would "harass" Dubois, whom she called the "boss."

98.    In October 2006, Raiten executed an ISDA confirmation on Defendant's behalf, under which Defendant entered a transaction with a Fairfield fund-of-funds that invested in Sentry. The next month, during Tensyr's creation, Dubois and Fourt met with Fairfield co-founder Andres Piedrahita for lunch.  Following that meeting, Fourt spoke with Piedrahita about the possibility of IXIS-Paris purchasing a 25% stake in Fairfield.

99.    Defendant's larger deals required IXIS-Paris's direct consent.  For example, in exploring a potential deal with Fairfield, Defendant revealed that any such deals required it to "go back to the head office in Paris for approval."

100.    To gain funding approval for each Defendant Deal, Defendant drafted for the CIB Division's review certain approval memoranda (the "**Approval Memos**") that included information the Feeder Funds provided on the SSC Strategy, BLMIS's track record and correlation with the S&P 100 Index, and BLMIS's purported trades.  The Approval Memos nominally allowed the CIB Division to assess Defendant's and IXIS-Paris's risk associated with BLMIS.  For example, Defendant's managing director Raiten prepared and sent the Groupement, Harley, and Alpha Prime Approval Memos to de Clapiers and Ramine Rouhani, to whom Raiten directly reported in Paris and who eventually became an IXIS-Paris Executive Committee member.

101.    The CIB Division's consolidated approach to Feeder Fund investment approval provided its members, including Defendant, IXIS-Paris, and Natexis, with specific facts concerning qualitative and quantitative irregularities at BLMIS.

## III.    BEFORE ENTERING THE GROUPEMENT DEAL, DEFENDANT SUBJECTIVELY IDENTIFIED DISCREPANCIES AND INDICIA OF FRAUD CONCERNING BLMIS

102.    In 2003, in addition to Groupement's BLMIS account opening documents and trade tickets, Access gave Defendant the Access Madoff Deck, a marketing piece about Madoff and BLMIS that included two background memoranda that Access's head of new product development prepared (the "**Dumbauld Memos**"); a brief legal opinion from Access's outside counsel solely based on information Access provided it; industry publications questioning Madoff's legitimacy; BLMIS's corporate filings; pertinent securities laws and regulations; and other publicly available reports on BLMIS and Madoff.

103.    Defendant's Groupement Approval Memo indicated that it fully reviewed the Access Madoff Deck and Groupement's BLMIS account opening documents. This document reflected Defendant's awareness of obvious indicia of fraud at BLMIS.

### A.    Defendant Reviewed Conflicting Information About BLMIS Trading that It Never Clarified

104.    The Access Madoff Deck and the BLMIS account opening documents contained blatantly inconsistent information.  Defendant reviewed and saw those inconsistencies firsthand and was aware of other information that contradicted both sources.

105.    *First*, the Access Madoff Deck's description of how BLMIS purported to make money facially made no sense.  The Access Madoff Deck's legal opinion stated that BLMIS would "be earning only ordinary BD [broker-dealer] compensation on the trades conducted in the Account.  Furthermore, the provision of investment advice should be viewed as 'solely

incidental.'"  This was obviously untrue: IA Business customers were paying for Madoff's purported security selection and timing of the SSC Strategy trades, not their simple execution.

106.    The Dumbauld Memos provided another obvious indication that BLMIS's fee structure was highly unusual: BLMIS reportedly made "no money from the options executions" conducted for its IA Business customers.  By not charging anything for the purported option trades, Madoff inexplicably gave up hundreds of millions in potential revenues for executing billions of dollars in notional trades.

107.    The Access Madoff Deck was internally inconsistent regarding how BLMIS was compensated and further differed from external sources' information on this issue.  The Access Madoff Deck stated that BLMIS "is solely compensated by the bid/offer spread on each trade."  In a 1997 *Traders Magazine* article, "The Madoff Mystery," attached as an exhibit to the Access Madoff Deck, Madoff stated that he was not charging commissions on trades but that BLMIS's profits were also not solely derived from the bid/ask spread.  In contrast, another Access Madoff Deck exhibit, an article from industry publication *MAR/Hedge* entitled, "Madoff Tops Charts; Skeptics Ask How" (the "**MAR/Hedge Article**"), quoted Madoff as saying that BLMIS's "role … is to provide the investment strategy and execute the trades, for which it generates commission revenue."  And some, but not all, of the option trade tickets Access provided to Defendant identified commissions.

108.    Despite knowing that the Access Madoff Deck, two industry publications, and the trade tickets all conflicted, Defendant prepared and circulated an Approval Memo in January 2006 that asserted that Madoff "will earn a bid/offer spread on transactions."  Instead of seeking clarification on how Madoff was purporting to earn money, Defendant simply picked one of the conflicting answers.

109.    *Second,* the Dumbauld Memos contained contradictory information related to BLMIS's purported trade execution for managed accounts.  These memos first claimed BLMIS separated its IA Business from its trading business to prevent conflicts of interest or fraud.  The Dumbauld Memos, however, contradicted that statement in the next sentence, which claimed that BLMIS "execute[d] the stock basket trades with [BLMIS]'s market making traders."

110.    The Access Madoff Deck included further inconsistencies about BLMIS purported trade execution.  The legal memo's first page explicitly stated that BLMIS traded "as principal," but the Dumbauld Memos claimed the opposite: BLMIS purportedly traded "as an agent and fiduciary."  When entering the Defendant Deals, Defendant pointed to two sources in the same document that contradicted each other on this issue.

111.    *Third,* Defendant knew that the SSC Strategy purportedly relied on purchasing and selling options whose notional value was at least 95% of the Basket's value.  Groupement's BLMIS account opening documents required Madoff to make only listed trades and the Access Madoff Deck indicated that BLMIS only traded publicly and never in private, OTC transactions, yet. the MAR/Hedge Article that Defendant reviewed stated, "[t]hroughout the entire period Madoff has managed the assets," he employed the SSC Strategy, as part of which he "claim[ed] to use OTC options almost entirely."  As discussed below, Defendant knew it was impossible for BLMIS to be trading on either the exchange or OTC, given neither had sufficient capacity to allow Madoff to execute all his purported trades and Defendant knew Madoff only claimed to trade in one manner or another, not both.

112.    In both 2003 and 2005, Access provided Defendant with the Access Madoff Deck, which Defendant reviewed and used to obtain CIB Division committee approval for at least three Defendant Deals.  Without acknowledging (much less attempting to reconcile) the discrepancies,

Defendant used the Access Madoff Deck as "due diligence" and parroted in its Approval Memos whichever of the inconsistent facts seemed to best suit its needs.

B.     <strong><u>Defendant Recognized the Opportunity for Fraud Created by BLMIS Simultaneously Serving as Broker, Custodian, and Investment Manager</u></strong>

113.    From 2003 on, Defendant, IXIS-Paris, and the CIB Division knew that BLMIS simultaneously served as broker, custodian, and investment manager for all Feeder Fund assets, which, as a public rating agency described to IXIS-Paris, meant that "everything [was] on BLM[IS]'s shoulders" for Tensyr and each of the Defendant Deals.

114.    The Access Madoff Deck unambiguously stated that BLMIS functioned as Groupement's custodian, investment advisor, and executing broker. Defendant and the CIB Division's compliance committee each reviewed the Access Madoff Deck and understood that Madoff's overlapping roles created an environment ripe for misappropriation of customer funds.

115.    Such a lack of operational independence is why the Autorité des Marchés Financiers (the "**AMF**"), a French financial regulatory body overseeing IXIS-Paris, requires investment managers to use an independent custodian. In 2006, IXIS-Paris raised this concern in an email to Fairfield, saying, "I have a problem concerning the AMF's criteria[]. My problem concerns the criterion nº4: 'The responsibility for custody of the assets of the fund must be entrusted to one or more companies, separate from the portfolio management company, regulated for this purpose and identified in the prospectus.'"

116.    The Access Madoff Deck highlighted BLMIS's lack of operational independence by claiming that the "continual presence of six supervisors" controlled critical operational risk at BLMIS. But Defendant knew that three of those supervisors were Madoff family members. Defendant also knew that having family members in key compliance positions further

compromised, rather than enhanced, the independence required by AMF regulations (and common sense), thereby *increasing* operational risk at BLMIS.

117.    BLMIS's lack of independent oversight created a gross conflict of interest and promoted an environment ripe for fraud.  Instead of seeking independent verification of BLMIS's supposed trading, Defendant accepted Madoff family "control."

## IV.    FOLLOWING THE GROUPEMENT DEAL, DEFENDANT AMASSED ADDITIONAL EVIDENCE THAT BLMIS WAS NOT ENGAGED IN THE TRADING ACTIVITY IT REPORTED

### A.    Defendant Saw and Appreciated Evidence that BLMIS Was Not Trading the Options It Reported

118.    It only took a few months after closing the Groupement Deal for Defendant to develop suspicions about options trading. In February 2004, a CIB Division representative responsible for regularly reviewing Groupement's BLMIS trades forwarded Access "the latest Access-Madoff risk report" which identified potential trading parameter violations in Groupement's account.  This was the not the last time Defendant and the CIB Division identified suspicious options trades that BLMIS reported.

119.    Raiten, the SFPG's U.S. head, testified in a deposition taken in this case that CIB Division middle office personnel reviewed "each and every" trade reported on the Feeder Fund monthly statements and confirmations Defendant received.  An email from SFPG member Abdo to Access stated that the middle office demanded all future risk reports include "the market value of the stock portfolio so that [we] can compare that to the notional value of the call options." Through these reviews, Defendant found BLMIS's customer statements reflected fictitious trades.

120.    As explained below, through the above-described review process and its options expertise, Defendant knew it was facially impossible for anyone to trade options in volumes vastly

exceeding the total number of available options on the Chicago Board Options Exchange (the "**CBOE**"), the only exchange in the world that lists the options BLMIS purportedly traded.

121.    Over time, the CIB Division's middle office was increasingly concerned that BLMIS was not making the trades reported on its customer statements.  For example, from May 2005 to May 2006, Groupement reported 42 option trades; for 40 of them (over 95%), Groupement's account statements reflected BLMIS purported to trade options at a volume that exceeded those available on the entire exchange, including seven instances where Groupement's statements reported Madoff traded more than 1,000% of the CBOE's volume, and 15 where Madoff reported trading more than 200% of the CBOE's volume.

122.    The CIB Division's middle office also reviewed all trades BLMIS reported on Harley's customer statements from May 2005 to May 2006.  For this period, BLMIS reported making 117 options trades on Harley's behalf, of which 95 (over 81%) exceeded the CBOE's volume.  Of these 95 instances, 21 involved trading between 1,000% and 4,999% of the CBOE's volume, 8 involved trading over 5,000% of the listed volume, 3 involved trading more than 10,000% of the exchange's volume, and on December 16, 2005, BLMIS reported trading options for Harley that exceeded 26,000% of the CBOE's available volume.

123.    Therefore, in a one-year period, Defendant knew that each of these 135 of 159 trades it reviewed (85%) could not have been made, was therefore impossible, and did not exist.

124.    With concerns about the available volume and size of the options market, Raiten called an asset management colleague at IXIS-Paris, who told Raiten that Madoff was trading OTC.  Raiten, however, testified at his deposition that both he and "most market participants" would agree that there is "more liquidity in the exchange instrument than in the OTC instrument."

125.    While Raiten claimed at his deposition that this call with IXIS-Paris provided "satisfaction" to his concerns, this is blatantly inconsistent and illogical given Raiten knew there is more volume on the CBOE than the OTC market and BLMIS never claimed to use a combination of OTC and exchange traded options—just one or the other.    Accordingly, Raiten's supposed "satisfaction," on Defendant's behalf, was illogical and insincere: he knew it was impossible for BLMIS to trade such volumes on either the CBOE (because Madoff's reported volumes, even for individual accounts greatly exceeded the reported listed volume) or OTC (because the OTC market's volume does not exceed the CBOE's), meaning the trades could never have taken place as reported.

126.    As Defendant's counsel represented at a February 8, 2018 hearing before this Court, Raiten was not just "any employee; [he] was the employee who was the head of the [SPFG] that designed the financial products at issue; [he] was the employee who did the due diligence; and [he] was the employee who did the monitoring of the feeder funds after the hedging funds were purchased."[3]

127.    Raiten, ultimately responsible for Defendant's Groupement and Harley Deals, knew that the story his colleague told him was wrong and his questions remained unanswered. Raiten and Defendant, however, did not take any action to end Defendant's involvement with BLMIS's increasingly suspicious activities or actually "satisfy" their concerns.

128.    Defendant understood that BLMIS required an impossibly large volume of options to hedge a single IA Business account, meaning that BLMIS did not—and could not—make the trades it reported on BLMIS customer statements.

---

[3] *See* Hr'g Tr., at 40:3–8, *SIPC v. BLMIS (In re BLMIS)*, Adv. Pro. No. 08-01789, ECF No. 17438 (Bankr. S.D.N.Y. Feb. 8, 2018).

129.   By late 2006, after the impossible Groupement and Harley options trades purportedly took place, were reported, and were reviewed by Defendant, IXIS-Paris understood that Madoff claimed to trade options OTC instead of on the CBOE.   Unlike with OTC options trading, the Options Clearing Corporation guarantees fulfillment of exchange-traded options. Partly because of this, industry practice holds that OTC option counterparties are listed on trade tickets so that the customer can assess its counterparty risk.   Federal security regulations require a client's broker-dealer to provide the counterparties' identities at the client's request.   OTC option counterparties' identities became an issue when Madoff began purportedly trading OTC.

130.   Not knowing the counterparties' identities meant customers were exposed to unquantifiable and potentially significant risk.   As more fully described below, while creating Tensyr, IXIS-Paris knew Madoff refused to reveal his purported counterparties.   Instead of attempting to find out the counterparties' identities, IXIS-Paris crafted a fictionalized narrative about who they were and then told this story to the public rating agencies as if it were the truth.

131.   From 2003 to 2008, Defendant and IXIS-Paris reviewed and analyzed Feeder Funds' BLMIS trade tickets and account statements, including Groupement.   None of these documents identified any BLMIS option counterparties.

132.   Defendant, moreover, reviewed BLMIS's obviously illegitimate OTC option trade tickets.   As a sophisticated financial company, Defendant knew exchange-traded options receive a Committee on Uniform Security Identification Procedures ("**CUSIP**") identification number, which provides a common reference point for anyone seeking to trade that security.   In contrast, OTC options are almost never assigned CUSIP numbers because the parties would be required to request a CUSIP number for each trade made, which would be slow, expensive, and unnecessary: only parties to those specific contracts need to identify the instrument being traded.   Yet each

BLMIS option trade ticket Defendant and IXIS-Paris reviewed contained a CUSIP number.

Neither Defendant nor IXIS-Paris ever raised this issue with BLMIS or anyone else.

133.    Regardless of whether BLMIS was purportedly trading options OTC or on the

CBOE, Defendant and IXIS-Paris identified irregularities and irreconcilable inconsistencies

suggesting fraud or falsification in the options transactions BLMIS reported.

**B.    Defendant Reviewed Standard Industry Performance Measures Indicating
BLMIS Was Not Employing the SSC Strategy**

134.    By reviewing BLMIS's monthly account statements and trade information for

Groupement, Harley, and Alpha Prime and by applying industry-standard statistical analyses like

correlation and the Sharpe ratio, Defendant and IXIS-Paris saw that BLMIS's returns were

objectively inconsistent with the stated SSC Strategy.  But Defendant turned a blind eye to *how*

BLMIS was able to avoid virtually any volatility or downturn in the market.

135.    Beyond these statistical measures, in 2004, the CIB Division's suspicions

surrounding Madoff were discussed at Fairfield.  Internal Fairfield emails between its Chief Risk

Officer and a sales agent reveal that the agent just had "another conversation with my friend at

Natexis," who told her he had "two fundamental problems that bother him" about Sentry:

> 1) Why has the performance been declining over the past few years. I have
> shown him the LIBOR analysis and he does not buy it. Can you think of
> any other explanation. 2) Why is Sentry making so much money on the
> options when it is supposed to be a hedge. He had two PhD quants from
> [Natexis] at the meeting and they are of the opinion that something else is
> going on that they don't understand.  Apparently the theory was raised that
> Sentry is providing liquidity to Madoff's securities business and getting
> compensated for it.

136.    This reflects that the CIB Division identified that BLMIS's reported returns were

not the result of its reported trading, and instead hypothesized to be from Sentry's providing

BLMIS with liquidity in exchange for favorable returns.  Defendant did nothing to further

determine whether BLMIS's returns were fictionalized as these analysts had determined.

### 1.    Correlation

137.    In the finance industry, correlation is used to measure how closely an investment's performance mirrors a benchmark.  In the case of BLMIS, Defendant used correlation to measure how closely BLMIS's returns mirrored the S&P 100 Index, or the very similar S&P 500 Index.

138.    By 2003, Defendant understood that the SSC Strategy involved buying a Basket containing 30–50 of the largest S&P 100 Index stocks (that were required to be highly correlated to the index).  For example, the first Dumbauld Memo in the Access Madoff Deck stated that the SSC Strategy's Basket was "chosen to closely replicate the payoff patterns of the S&P100" Index, meaning the stocks would be highly correlated to that index.

139.    Defendant also understood the SSC Strategy purportedly involved putting on an options collar.  Defendant knew the collar was purportedly designed to reduce volatility but was revenue-neutral, meaning it should not have reduced the correlation between BLMIS's returns and the S&P 100 Index's returns.

140.    As noted above, the CIB Division had personnel dedicated to verifying BLMIS's compliance with the SSC Strategy's trading parameters.  As such, Defendant regularly (at least monthly) reviewed all trades BLMIS reported on customer statements for at least Groupement, Harley, and Alpha Prime, and saw that BLMIS purported to generate improbably consistent, positive returns that were uncorrelated with the S&P 100 Index, especially when the market dropped strongly.

141.    Defendant knew in real time from its review of the Access Madoff Deck (and all Feeder Fund marketing materials it subsequently reviewed) that BLMIS's returns were not correlated to the S&P 100 Index.  IXIS-Paris also knew from a Tensyr investor presentation in November 2006 that since inception, Sentry had "[l]ow correlation to the S&P 100 Index."

142.    Defendant's January 2006 Harley Deal Approval Memo reported that Harley had a 6-year track record, during which its "average return was nearly 1% per month, with ~13% per year since its inception. The maximum drawdown [*i.e.*, the largest drop from peak to trough] was -0.35% for 2 months." This greatly differed from the S&P 100 and 500 Indices' returns, which are widely reported and known to Wall Street professionals like Defendant. The Tensyr investor presentation stated that since inception, Sentry's maximum drawdown was "-0.64% vs. -49.37% for the S&P 100 Index."

143.    Defendant also received and reviewed the April 2007 performance summary for Feeder Fund Herald USA Segregated Portfolio ("**Herald**"), which included several metrics demonstrating the SSC Strategy did not correlate to the S&P 500 Index. This included highlighting the striking contrast between Herald's worst drawdown at -0.71%, and the S&P 500 Index's -44.72% drawdown during the same period. The summary also featured a chart showing that even when Herald posted negative returns, those declines were minuscule compared to the decline the S&P 500 Index experienced:

| 03/1996 - 03/2007 | %Yr. Avg. | %Months Up | Best Month | Worst Month | Drawdown (Max.Loss) |
|---|---|---|---|---|---|
| HERALD USA | 10,95% | 92,48% | 3,66% | -0,53% | -0,71% |
| Hedge Funds | | | | | |
| HFR Equity Mket Neutral | 7,49% | 81,20% | 3,59% | -1,67% | -2,72% |
| USA | | | | | |
| Government Bills (T-bills) | 3,82% | 100,00% | 0,53% | 0,07% | 0,00% |
| Stocks (S&P 500) | 8,93% | 63,16% | 9,78% | -14,44% | -44,72% |

144.    The performance summary also detailed Herald's lifetime monthly returns:

| Performance* | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | | 3.22% | 0.93% | 2.54% | 2.71% | 2.64% | -0.17% | -0.53% | 0.89% | 0.48% | 0.74% | 0.26% |
| February | | 0.58% | 1.52% | 0.06% | 0.05% | 0.00% | 0.47% | -0.14% | 0.39% | 0.13% | -0.01% | -0.37% |
| March | 1.49% | 1.15% | 2.42% | 2.99% | 2.19% | 1.25% | 0.59% | 2.42% | 0.00% | 0.51% | 1.45% | 1.87% |
| April | 0.57% | 2.97% | 0.40% | 0.23% | 0.25% | 1.46% | 0.86% | -0.07% | 0.29% | 0.07% | 0.95% | 0.97% |
| May | 1.99% | 1.20% | 2.19% | 1.89% | 1.44% | 0.22% | 2.89% | 0.78% | 0.56% | 0.70% | 0.64% | |
| June | 0.29% | 1.75% | 1.34% | 2.20% | 0.80% | 0.13% | 0.16% | 1.01% | 1.26% | 0.37% | 0.58% | |
| July | 2.20% | 0.61% | 0.76% | 0.33% | 0.59% | 0.31% | 3.66% | 1.57% | -0.05% | 0.07% | 1.18% | |
| August | 0.12% | 0.06% | 0.06% | 0.71% | 1.52% | 1.03% | 0.31% | 0.09% | 1.42% | 0.11% | 0.71% | |
| September | 1.28% | 1.69% | 0.83% | 0.54% | 0.10% | 0.66% | 0.04% | 1.01% | 0.97% | 0.86% | 0.69% | |
| October | 2.08% | 0.28% | 1.91% | 0.89% | 0.67% | 1.45% | 0.66% | 1.42% | -0.05% | 1.91% | 0.42% | |
| November | 1.40% | 1.48% | 0.61% | 1.49% | 0.48% | 1.05% | 0.00% | -0.30% | 0.71% | 0.60% | 0.73% | |
| December | 0.24% | 0.21% | 0.18% | 0.21% | 0.28% | 0.11% | -0.04% | 0.28% | 0.19% | 0.56% | 0.87% | |
| Yearly Return | 12.25% | 16.26% | 13.95% | 14.97% | 11.61% | 10.79% | 9.76% | 7.76% | 6.77% | 6.55% | 9.30% | 2.74% |

145.   Herald's April 2007 performance summary showed that fund went 70 months, from inception until 2002, without a single negative monthly return.  In comparison, during the same 70-month period, the S&P 100 Index experienced 30 down months, or approximately 48% of the time.  Defendant knew it was a virtual impossibility for any fund—let alone one designed to correlate to the market—to generate such returns.

146.   This was not new information: Defendant had reviewed monthly BLMIS account statements since at least 2003 each reflecting positive months, one after the other.  Defendant analyzed Herald marketing materials touting Madoff's purported ability to generate "exceptional consistency even during severe down markets."  Defendant knew the S&P 100 Index experienced approximately 51 down months during the period covered by Herald's April 2007 monthly performance summary, meaning the index generated positive monthly returns just 58% of the time. Defendant understood no Feeder Fund—inclusive of fees—ever reported a negative quarter.

147.    Defendant also knew that when the S&P 100 Index experienced returns worse than -13%, -14%, and -23% in 2000, 2001, and 2002, respectively, Herald reported gains of nearly of 11%, 10%, and 8%, respectively.   Aggregating these returns, the SSC Strategy—which, by definition, was designed to correlate to the S&P 100 Index—outperformed the S&P 100 Index by almost 80 percentage points in just three years.

148.    Herald also praised Madoff's apparent imperviousness to market turmoil:



149.    This showed Defendant that during the S&P 500 Index's ten worst-performing months, Herald (and by extension, Madoff) never lost money but outperformed the S&P 500 Index by over 91 percentage points.

150.    Defendant and IXIS-Paris knew that other funds employing similar strategies could not come close to duplicating Madoff's results.   IXIS-Paris owned (and still owns) the manager of one such fund, Gateway Fund, and Defendant and IXIS-Paris were familiar with its operations.   In

fact, as early as 2003, both received and reviewed the MAR/Hedge Article that highlighted the incongruity of Gateway Fund's returns compared BLMIS's, stating that Gateway Fund "has experienced far greater volatility and lower returns during the same period" than the Feeder Funds.

151.    The charts below compare key performance metrics for Gateway Fund and Groupement from April 2003 through November 2008. When viewed together, they reveal inexplicable discrepancies:



152.    Gateway Fund's metrics reflect actual trading and returns, revealing a portfolio that moved in tandem with its benchmark, the S&P 100 Index, with a 0.91 correlation coefficient, which is a very high, approaching "perfect" correlation.  By comparison, Groupement's correlation coefficient was 0.11, meaning it bore virtually no relation to the S&P 100 Index.

153.    The chart below compares Gateway Fund's returns (the bottom line) and the returns BLMIS purported to generate for Sentry (the top line):



**Comparison of Hedge Fund Performance**

154.    While Gateway Fund's performance reflects periods of significant volatility that corresponded with broader market volatility, especially from 2000 to 2002, BLMIS's performance reflects impossibly consistent growth, immune to market fluctuations.    From its industry experience and review of the MAR/Hedge Article (and because IXIS-Paris owns Gateway Fund's manager) IXIS-Paris was aware of Sentry's conspicuous deviation from Gateway Fund, and that Sentry's returns could not have been achieved using the SSC Strategy.

### 2.    Sharpe Ratio

155.    The Sharpe ratio measures how well a trading strategy compensates an investor for risk taken.    A positive Sharpe ratio indicates that an investment is producing positive returns relative to risk; the higher the Sharpe ratio, the better the returns are relative to the risk.

156.    Because the Basket was supposed to be 95% correlated to the S&P 100 Index (and the options collar was supposed to be revenue-neutral), the strategy should have produced Sharpe ratios like those the S&P 100 Index generated.

157.    Based on their review of the Access Madoff Deck and their understanding that Gateway Fund executed a virtually identical investment strategy, IXIS-Paris and Defendant knew that BLMIS's and Gateway Fund's Sharpe ratios should have mirrored both the S&P 100 and S&P 500 Indices' Sharpe ratios and each other's.  But that was not the case: Gateway Fund produced a Sharpe ratio of 0.2, the S&P 500 Index a Sharpe ratio of 0.55 (meaning Gateway Fund's was slightly worse than the Index); and the SSC Strategy produced a 2.73 Sharpe ratio.

158.    Inexplicably, the SSC Strategy produced a Sharpe ratio five times better than the S&P 100 Index (something not reasonably possible if Madoff had traded as he purported to) further demonstrating to Defendant the fictitious nature of BLMIS's trades.

159.    Defendant was aware of the Sharpe ratio abnormality before investing in Harley (if not before) and not only acknowledged but used it in the Harley Approval Memo as a significant metric and basis for the Harley Deal's approval.

160.    Defendant also received Herald's April 2007 tear sheet that lauded its incredible Sharpe ratio of 2.90 since inception, compared to 0.59 over the same approximate period for the S&P 500 Index.  The Tensyr investor presentation from November 2006 stated that since inception, Sentry's Sharpe ratio was 2.80, compared to the S&P 100 Index's 0.51.

161.     Defendant knew from several sources that BLMIS's could not achieve its inexplicable Sharpe ratio through the equity-heavy trading strategy Madoff purported to use.

### C.    After the Groupement Deal, Defendant Performed No Due Diligence

162.    Despite its subjective identification of mounting facts and circumstances suggesting fraud in the IA Business and fictitious trades BLMIS reported on its customer statements, Defendant submitted Approval Memos in January 2006 and entered the Harley Deal with Harley's manager, Fix Asset Management.  Defendant did so without conducting any further investigation of the indicia of fraud it had already identified.

163.    These Approval Memos stated the scope of Defendant's credit department's due diligence was limited to an inquiry on Fix Asset Management rather than BLMIS.  An Approval Memo noted that "[t]he Credit Department, in particular, did not investigate and offers no opinion on the past or expected future performance of" BLMIS, "an entity that Credit *is not uncomfortable with* based on the information available.  However, the available information for Madoff was limited to information from Madoff's website" and the Access Madoff Deck. (Emphasis added).  A closer inspection of the credit department's information sources reveals it conducted no actual diligence: by this time, the Access Madoff Deck was over three years stale and Madoff's website excluded even a mention of the IA Business and the SSC Strategy.  The credit department let Defendant go ahead with the Harley Deal, regardless.

164.    Defendant's effort to limit diligence hit a snag when Fix Asset Management later requested an increase the Harley Deal's size.  Because this would increase the deal size beyond the pre-approved CIB Division limits, Raiten, the executive in charge of the Defendant Deals and responsible for ordering due diligence and obtaining committee approval, knew an increase would be denied if he was unable to secure a meeting with Madoff at BLMIS's offices.

165.    Raiten obtained a one-hour meeting with Madoff in or around 2006.  Raiten met with no one else from BLMIS and asked Madoff no questions about BLMIS's impossible returns, trading anomalies, or inconsistencies that Defendant had identified over the years.  In fact, Raiten requested no documentation from Madoff whatsoever.  Raiten made no report of the meeting, but merely checked the box that the meeting occurred, a successful exercise to obtain approval to expand the size of the Harley Deal and the fees it would generate for the CIB Division.

166.    When Defendant decided to invest in Alpha Prime, the CIB Division's credit department admitted again, as with the Harley Deal, that the only "diligence" it conducted on

BLMIS was a review of BLMIS's website and the Access Madoff Deck, but the credit department gave Defendant the green light anyway.

167.    In its 2009 production to FINRA in response to the regulator's BLMIS investigation, Defendant confirmed it did not conduct any other diligence beyond reviewing the Access Madoff Deck and the BLMIS website.  Defendant told FINRA that it produced "all files concerning due diligence conducted by [Defendant] of funds directly or indirectly invested in B[L]MIS accounts, including … all memoranda or reports concerning the results of the review."

168.    The FINRA production contains no evidence Defendant performed any independent due diligence on BLMIS, Madoff, or the SSC Strategy.  Rather, the FINRA production confirms that Defendant entered the Defendant Deals while relying on the same recycled, and facially inaccurate, information it received from Access in 2003.

## V.    DEFENDANT DELIBERATELY HID ITS SUSPICIONS TO REALIZE FINANCIAL INCENTIVES

### A.    Defendant and its Executives Were Motivated to Ignore Evidence of Fraud

169.    Incentivized by financial gain received from closing hundreds of millions of dollars' worth of BLMIS-related deals and aware that the CIB Division would bear any downside risk long after it paid annual bonuses, Defendant's executives knowingly ignored the high probability of fraud at BLMIS.

170.    For example, in 2004, Fourt, the global head of the CIB Division's Capital Markets Group and a member of Defendant's board, was paid just over €1.03 million.  With a 45% increase from 2004 to 2005 in IXIS-Paris's revenue from structured products on hedge funds (like the Feeder Funds), Fourt saw a commensurate 47% increase in his compensation, rising to almost €1.52 million.  The CIB Division also guaranteed his compensation for 2007 and 2008, meaning if Madoff's scheme imploded, Fourt would still be paid.  Defendant and IXIS-Paris each carried

insurance policies that covered their executives, shielding them from civil liability for allowing the entities to invest in fraudulent investments.

171.    These financial awards and protections provided ample reason for Defendant, operated by its executives and senior employees, to turn a blind eye to Madoff's fraud.

### B.    Defendant Structured the Defendant Deals and Took Other Measures to Minimize Any Potential Loss

172.    Beyond financial incentives for themselves and their executives, Defendant and IXIS-Paris believed they could comfortably ignore the indicia of fraud because they structured their Feeder Fund deals so clients bore the first risk of loss, and because Defendant and IXIS-Paris each had fraud insurance policies that would, respectively, cover up to $75 million and $100 million in losses.

173.    Defendant structured the Defendant Deals so it would avoid loss unless the underlying Feeder Funds' net asset values rapidly and precipitously fell.  For example, Groupement's net asset value would have had to drop by more than 50% before any Defendant money was exposed to loss under the Groupement Deal.  Defendant also negotiated provisions with each Feeder Fund that allowed it to redeem its investments ahead of other equity shareholders.

174.    IXIS Corporate & Investment Bank declared in its 2006 Annual Report that "risk of theft and fraud are [] covered by two blanket policies … for the entire" Natixis Group.  This provided Defendant with comfort that in the event of fraud or theft, it could avoid most or all potential losses.

175.    Through their Feeder Fund deal structures and fraud insurance policies, Defendant and IXIS-Paris created a likelihood that they would not lose money, regardless of Madoff's fraud.

**C.    Defendant Calculated that Even Before It Cashed in its Insurance, It Was Exceptionally Unlikely to Lose Money with Madoff**

176.    Defendant calculated using standard deviation that it would be highly unlikely to lose money on the Defendant Deals and highlighted this fact in an Approval Memo.

177.    In the financial industry, standard deviation is a measure of volatility and, thus, risk. The more unpredictable the price of a security, index, or portfolio, the greater the risk. Financial professionals routinely use standard deviation to predict how likely a given price or outcome is.

178.    In the Alpha Prime Approval Memo from January 2006, Defendant determined that based on standard deviation, its loss risk was a 19-standard deviation event; it also calculated that a "knockout" (*i.e.*, where Alpha Prime's net asset value dropped so much that Defendant could immediately cancel the Alpha Prime Deal without penalty) required a 24-standard deviation event.

179.    Defendant, therefore, calculated that based on BLMIS's purported returns and how it structured the Alpha Prime Deal, the chance it would lose money was significantly less than one in one septillion or, put numerically, less than 1 in 1,000,000,000,000,000,000,000,000. As to a knockout, the chance a 25-standard deviation event occurs is about the same as a person winning the lottery 21 or 22 times *in a row*.

180.    The standard deviation analysis was important to Defendant, making it a deal point in the Alpha Prime Approval Memo—twice. Defendant capitalized on the math showing the chance of losing money on a Defendant Deal was so improbable that its investment was statistically risk-free, ignoring that the same calculation showed the Feeder Funds' stability was so improbable that it was statistically virtually impossible.

181.    By its nature, equity investing (even hedged investing), like Madoff purported to do, carries risk. Defendant knew that it was inconceivable to invest in equities without any risk, yet did nothing to investigate how the SSC Strategy was reporting to do just that. As such,

Defendant recognized that BLMIS's standard deviation demonstrated a high probability of fraud at BLMIS or that the trades reported on BLMIS's monthly customer statements were fictitious.

## VI.    IXIS-PARIS SUBJECTIVELY INDENTIFIED INDICIA OF FRAUD, WILLFULLY BLINDED ITSELF, AND PREVENTED THE RATING AGENCIES FROM LEARNING THE TRUTH

182.    Defendant's and the CIB Division's intention to ignore indicia of fraud and put profit ahead of investors is reflected in IXIS-Paris's creating and selling interests in Tensyr.  As explained above, IXIS-Paris's knowledge is imputed to Defendant.

183.    Lefort, a senior IXIS-Paris employee working in tandem with Dubois (the SFPG's global head) and under Orsatelli (IXIS-Paris's Chairman), was primarily responsible for structuring the Tensyr deal.

184.    IXIS-Paris and Fairfield agreed in April 2006 to create and manage Tensyr. Fairfield indemnified IXIS-Paris for any losses incurred in connection with the Tensyr deal.  In this way, IXIS-Paris minimized its financial risk in the event its subjective fears of fraud at BLMIS were realized.

185.    As part of creating Tensyr, IXIS-Paris worked to obtain the highest possible investment rating for Tensyr from the major rating agencies, Moody's Investor Services ("**Moody's**"), Fitch Group Inc. ("**Fitch**"), and Standard and Poor's ("**S&P**" and, together with Moody's and Fitch, the "**Rating Agencies**").  IXIS-Paris and Fairfield each understood such a rating was necessary to maximize the profits flowing to both entities.

186.    From the start, the Rating Agencies confronted IXIS-Paris with questions about IA Business operations irregularities and trading impossibilities.  This presented IXIS-Paris with a problem, in that it either could not obtain answers to these questions or knew that honestly answering them would result in the Rating Agencies denying Tensyr a rating.

187.    IXIS-Paris solved this dilemma by crafting a believable, yet wholly false story to mollify the Rating Agencies and divert others from confirming Madoff's fraud.  IXIS-Paris did so by drafting and submitting to the Rating Agencies responses to their questions concerning the Tensyr deal in a memorandum (the "**Tensyr Rating Memo**"), a copy of which is attached hereto as Exhibit A.  IXIS-Paris made many knowing, material misstatements in the Tensyr Rating Memo regarding Madoff and BLMIS.

A.    **Rating Agency Inquiries Highlighted Facts and Circumstances Suggesting a High Probability of Fraud at BLMIS**

188.    The Rating Agencies focused their diligence inquiries on BLMIS's SSC Strategy and the IA Business's operations.  To respond to these queries, IXIS-Paris gathered information, including what Defendant had acquired from earlier Defendant Deals.

189.    The CIB Division's compliance department knew Fairfield could supply some of the formal documentation needed to satisfy the Rating Agencies' questions.  Just prior to Tensyr's closing (and after funding began) in December 2006, Lefort sought documents from Fairfield.  His email stated that if BLMIS were to be vetted before closing," he would need basic corporate documents about BLMIS "for our compliance department," but Lefort also commented that such a review was "a mere formality."  Thus, three years after closing the first Defendant Deal, the CIB Division's compliance department still had not actually investigated BLMIS; and given this was just "a mere formality," it had no intention of doing so before authorizing IXIS-Paris to give Madoff another several hundred million dollars.

190.    Fairfield provided IXIS-Paris with access to people and information.  This included Sentry's BLMIS account opening papers and internal documents about BLMIS and Madoff, which went far beyond what Fairfield shared with other Sentry investors.  Defendant provided more information about BLMIS and Madoff, which IXIS-Paris requested.

191.    Fairfield also provided to IXIS-Paris BLMIS's 2006 Form ADV.  IXIS-Paris knew

from its review of other information it received from Fairfield, including Sentry's BLMIS account

documents, that the Form ADV made material misrepresentations (which, according to the bold

type at the top of the form, subjected BLMIS to civil and criminal liability for making such

misstatements).  The misrepresentations included the following:

192.    *First*, the Form ADV stated BLMIS had no discretion to choose the broker-dealer

through which trades were executed or the commissions the broker-dealer charged.  IXIS-Paris

knew this was false because Madoff's contracts with the Feeder Funds dictated that BLMIS serve

as broker-dealer, in addition to being custodian and advisor.  If they did not agree to those terms,

Madoff would not open an account.  IXIS-Paris also knew there was no contractual provision or

regulatory explanation compelling Madoff to charge $0.04 per share (or, as some trade tickets

reflected, the bid/offer spread).

193.    *Second*, the Form ADV said no firms or persons solicited advisory clients on

BLMIS's behalf.  IXIS-Paris knew this was false because it was then engaging with Sentry (and

had previously considered investing in several other Feeder Funds), each designed and operated

to solicit clients for BLMIS.  The MAR/Hedge Article also explicitly contradicted the Form ADV,

stating that "feeder funds … provide all the … marketing for [BLMIS], raise the capital and deal

with investors, says Madoff."  IXIS-Paris itself contradicted the Form ADV, writing in the Tensyr

Rating Memo that Madoff "has teamed up with a dozen management companies … and family

offices" to bring in investors and raise capital for BLMIS.

194.    *Third*, page 6 of the Form ADV reported that BLMIS provided investment advisory

services to zero customers.  IXIS-Paris knew that was false because on page 7 of the same report,

BLMIS reported it had 23 IA Business accounts to which, by definition, Madoff provided advisory

services.  Only those providing advisory services, moreover, must file a Form ADV; if Madoff
was not providing advisory services to any customers, he would not have filed it.

195.    *Fourth*, BLMIS's 2006 Form ADV Part II explicitly stated that BLMIS "and its
employees have no access to the advisory accounts' activity.  An independent system is used for
advisory clients' trading strategies as well as the execution of those clients' transactions." In
contrast, in January 2006, Defendant submitted an Approval Memo, in which it represented that
BLMIS "execute[d] the stock basket trades with [Madoff's] market making traders."

196.    *Fifth*, BLMIS's 2006 Form ADV stated BLMIS had $11.7 billion in AUM.
Between them, IXIS-Paris and Defendant knew that just from the Feeder Funds through which
they invested or considered investing, BLMIS had at least $14 billion in AUM.

197.    IXIS-Paris reviewed the Form ADV and saw these internally incongruous
statements and unexplainable contradictions but ignored this evidence indicating a high probability
of fraud at BLMIS.

    **1.**  **The Rating Agencies Highlighted Operational Risks at BLMIS that
Strongly Suggested Fraud at BLMIS**

198.    The Rating Agencies expressed reservations about providing Tensyr with any credit
rating based on, among other things, the lack of transparency into BLMIS's operations.  To the
Rating Agencies, this prevented verification that BLMIS actually held the IA Business customers'
assets or was trading as it reported.

199.    The Rating Agencies expressed concerns to IXIS-Paris about BLMIS's operations
and lack of transparency, including: its refusal to identify its purported OTC option counterparties
or even their risk profiles; its serving as prime broker, investment advisor, and custodian; the lack
of contract between Sentry's nominal custodian and BLMIS as its sub-custodian; and Madoff's
"suspicious" refusal to meet the Rating Agencies.

200.     While IXIS-Paris was already aware of at least some of these issues, the Rating Agencies' inquiries corroborated IXIS-Paris's suspicions that BLMIS was reporting fictitious trades, among other self-evident badges of fraud.

201.     Not willing to risk an inferior (or no) rating, IXIS-Paris knew it had to come up with answers adequate to overcome the Rating Agencies' "serious risk concerns."

### 2.      BLMIS Did Not Follow Industry Standards to Safeguard Assets

202.     As noted above, finance industry standards call for having separate entities take on the distinct custodian and executing broker roles.   Without this, it is impossible to conduct independent asset and trade verification.   Industry standards also provide that when delegating custodial duties, the parties enter into a contract outlining the scope of their respective duties for safeguarding assets.

203.     Sentry reported that its custodian was Citco Bank Nederland, NV ("**Citco**"), which would purportedly provide an independent check on BLMIS as the funds' broker. While Sentry said BLMIS was their sub-custodian, Citco ultimately did not custody any assets and BLMIS custodied them all.

204.     In August 2006, to satisfy the Rating Agencies' questions, IXIS-Paris requested from Fairfield copies of Sentry's contracts with BLMIS to verify how Madoff purportedly segregated customer assets.

205.     Fairfield failed to forward Sentry's contracts by mid-September.   Lefort then narrowed his request for a copy of the sub-custody agreement between BLMIS and Citco.  Instead, Fairfield Chief Risk Officer and partner Amit Vijayvergiya provided a Sentry-Citco agreement. Lefort reiterated the inquiry: "we are looking for the sub-custody agreement between Citco and [BLMIS].  Is there any such document?"

206.    After not receiving an answer, IXIS-Paris's Patrick Mabille emailed Vijayvergiya, asking, "isn't there any agreement between BLM[IS] and Citco or BLM[IS] and Fairfield (other than the 'Customer Agreement' you already have sent us?)"

207.    Just prior to launching Tensyr, Fairfield informed IXIS-Paris that no such agreement existed.  Lefort followed up, saying to Vijayvergiya that Citco and BLMIS not having a sub-custody agreement was "very bizarre as in numerous examples with CITCO we always saw a sub-custody agreement if there w[as] a sub-custodian."

208.    With BLMIS, and not Citco, serving as the custodian, IXIS-Paris knew it could not (and no third party could) verify (i) how BLMIS maintained custody, (ii) how the assets would be handled if BLMIS became insolvent, or (iii) whether the assets even existed.

209.    Knowing in advance of investing that BLMIS presented "very bizarre" operational risk, IXIS-Paris turned a blind eye and directed at least $432 million to Sentry through Tensyr.

**3.    IXIS-Paris Knew BLMIS's Refusal to Disclose Counterparties Violated Securities Laws and BLMIS's own Terms and Conditions**

210.    In October 2006, IXIS-Paris emailed Fairfield explaining that because IXIS-Paris was seeking a top, "AAA" rating for Tensyr, the Rating Agencies needed to assess the credit risk associated with BLMIS and its purported options counterparties.  Multiple times, the Rating Agencies "challenged" IXIS-Paris on the obvious "counterparty risk."

211.    IXIS-Paris emailed Fairfield to confirm its understanding "that you don't have [the counterparties'] names," and to remind Fairfield that in order to obtain a AAA rating, the Rating Agencies would need to have a "written answer to some legal issues," including about the counterparties' identities.  IXIS-Paris explained the "way this risk is handled in other AAA-rated transaction[s] is simply by monitoring the rating of the counterparties and not letting them go below a certain level (usually 'A') without being replaced within 30 days."  This meant the Rating

Agencies would not give a AAA rating to Tensyr without knowing BLMIS's purported counterparties were at least A-rated. IXIS-Paris then conceded, "here we cannot apply this technique as Madoff is not rated (and not even listed). Same thing for the put counterparties as we understand that you don't have their names." Because of this, IXIS-Paris had multiple concerns.

212.    *First*, having reviewed BLMIS trade tickets, IXIS-Paris knew that each BLMIS trade ticket explicitly stated that BLMIS acted as agent and that it would reveal its counterparties' names if asked. IXIS-Paris knew that Madoff, regardless, did not divulge their identities.

213.    *Second*, based in part from its review of the Access Madoff Deck, IXIS-Paris understood federal securities law requires broker-dealers to disclose counterparty names. Again, IXIS-Paris could not square this requirement with the fact that BLMIS would not give this information to Fairfield.

214.    *Third*, IXIS-Paris understood that if an OTC put counterparty failed to perform, Sentry would be unable to exercise its rights under the option contract and its assets would be exposed to downside risk. This would eliminate the protection of the collar and could lead to devastating losses. Fairfield, nonetheless, did not have any information about the counterparties.

215.    Despite knowing BLMIS's refusal to disclose this information violated applicable securities laws and BLMIS's terms and conditions and that it could not assess the counterparty risk, IXIS-Paris ignored the danger and moved forward with the Tensyr deal.

### 4.    IXIS-Paris Knew BLMIS's Fee Structure Was Suspicious

216.    As noted, BLMIS's fee structure was highly unusual and suggested illegitimacy, as BLMIS only collected commissions as executing broker and did not charge for its purported investment advisory services, a far more significant role with respect to the SSC Strategy. By not charging advisory fees, BLMIS allowed the Feeder Funds to collect billions of dollars in management and performance fees without providing any advisory services.

217.    In the Tensyr Rating Memo, Natixis acknowledged that in 2006, Fairfield received over $130 million in management and performance fees simply by shuttling Sentry's funds to BLMIS, which was 20% more revenue than BLMIS generated from Sentry.

218.    The Tensyr Rating Memo calculated Madoff collected commissions equivalent to a fee between 0.90% to 1.00% of AUM.  If Madoff charged a standard 2% management fee instead, Madoff could have realized $132 million per year in additional revenue on the $12 billion in AUM the Tensyr Rating Memo stated BLMIS managed.

219.    By not charging a standard performance fee, Madoff also waived collecting hundreds of millions of dollars in revenue each year.  Again, the Access Madoff Deck, which IXIS-Paris reviewed and later gave to Fairfield, confirmed BLMIS did not charge anything for its purported options trades, amounting to many more millions in forfeited income.

220.    As such, IXIS-Paris knew BLMIS walked away from industry-standard fees (and millions in waived option commissions) to which it would normally be entitled, amounting to several billion dollars over time.  This is something no legitimate money manager would do.

**B.    IXIS-Paris Turned a Blind Eye to Facts and Circumstances It Subjectively Understood Created a High Probability of Fraud at BLMIS While Blocking Access to Madoff and Lying to the Rating Agencies**

**1.    IXIS-Paris Hid BLMIS's Relationship to Tensyr**

221.    IXIS-Paris faced an early hurdle in getting Tensyr off the ground: Madoff's blessing.  It knew Madoff threatened to close clients' accounts if he found out they used leverage, so IXIS-Paris could not risk moving forward without Madoff's express approval, and Madoff had previously rejected a similar deal the CIB Division tried to launch with Merkin in 2003.

222.    Fairfield scheduled a meeting with Madoff in October 2006 to try to reassure him that no Rating Agency would conduct any independent due diligence on him or BLMIS.  Prior to this meeting, IXIS-Paris drafted and sent Fairfield a list of "[non-leakage] arguments about how

to use [Tensyr's Sentry] capacity without the market knowing it." This included assuring Madoff that there would be "no public information," that any rating "won't be published or announced," and that BLMIS itself would not be rated.

223.    IXIS-Paris undertook these efforts to ensure Madoff's secrecy demands were met, which ensured no third party would learn the same facts and circumstances IXIS-Paris had already identified that indicated a high probability of fraud at BLMIS, further helping his fraud.

224.    Eventually, Madoff was convinced his secrecy would be preserved. Fairfield co-founder Andres Piedrahita emailed all Fairfield partners exclaiming, "Absolutely fantastic news! … Uncle Bernie has given us the OK to go forward" with Tensyr.

## 2.    IXIS-Paris and Fairfield Blocked Access to BLMIS and Madoff

225.    Once Madoff was convinced no Rating Agencies would bother him, IXIS-Paris then faced the challenge of keeping that promise while persuading the Rating Agencies to issue a rating. Time and again, the Rating Agencies demanded a meeting with Madoff at his offices; Fitch called this a "sine qua non condition" to rate Tensyr. IXIS-Paris, remembering its vow to Madoff, rejected each request.

226.    When Fitch's repeated meeting requests were denied, it told IXIS-Paris that Madoff's refusal to meet was "suspicious." As a result, Fitch told Lefort that it would not rate Tensyr or, at a minimum, would not grant Tensyr the AAA rating IXIS-Paris and Fairfield sought.

227.    To quell Fitch's concerns, Fairfield offered to have Fitch come to its offices for a meeting. Fairfield warned IXIS-Paris, however, that it would rebuff Fitch's demand to see Sentry's BLMIS contracts. Fairfield also told IXIS-Paris that Fitch was unlikely to rate Tensyr without meeting Madoff. Lefort said that Fairfield might change Fitch's mind but would have to be "convincing enough on your own due dil[igence]/relationship with" BLMIS. Lefort also noted that "[n]either Moody's nor S&P will visit [BLMIS]."

51

228.    On multiple occasions over the next several months, Fitch demanded a Madoff meeting and IXIS-Paris countered with a Fairfield meeting instead.  After IXIS-Paris's many refusals to arrange a Madoff meeting, Fitch told IXIS-Paris that it would not rate the deal "due to 'non-measurable risk at Madoff level,'" which Lefort attributed to Fitch's not being able to visit BLMIS.  Instead of following up on Fitch's concerns and facilitating a meeting Madoff, IXIS-Paris told Fairfield, "we have fired Fitch."  Lefort warned that because Fitch refused to rate Tensyr, an upcoming meeting between S&P and Fairfield "needs to be convincing."

229.    Though Fitch later agreed to restart its rating process, IXIS-Paris never allowed Fitch to meet Madoff or see Sentry's BLMIS account documents and Fitch refused to publicly rate Tensyr. In mid-December 2006, Fitch instead issued a private "shadow rating," which "does not constitute a credit rating by Fitch and is not intended for publication or distribution."  This rating expressly excluded BLMIS's operational and bankruptcy risks.

230.    IXIS-Paris successfully prevented the Rating Agencies from interacting with Madoff and helped conceal the ongoing fraud.  Instead of following up on Fitch's concerns and acquiring additional information about BLMIS's operations, IXIS-Paris fired Fitch to protect Tensyr and its profits.  To IXIS-Paris, these financial incentives were more important than confirming or allaying its suspicions of fraud at BLMIS.

### 3.    IXIS-Paris Made False Statements and Material Misrepresentations to the Rating Agencies

231.    Having blocked the Rating Agencies and their independent diligence, IXIS-Paris was free to paint its own picture of BLMIS.  To secure a top rating for Tensyr, IXIS-Paris prepared and submitted to the Rating Agencies the Tensyr Rating Memo, replete with intentional misrepresentations and materially false information about Madoff and BLMIS.

232.    Among other things, IXIS-Paris knew it had to craft a plausible story to get the Rating Agencies to ignore the critical issue of Madoff's refusal to name any of his purported counterparties. IXIS-Paris, therefore fabricated a story about them.

233.    IXIS-Paris knew it was the Rating Agencies' standard procedure to only give top ratings to entities whose counterparties maintained a minimum "A" rating.  At the same time, IXIS-Paris did not know who BLMIS's purported counterparties were and knew Sentry's BLMIS options agreement contained no minimum counterparty rating provision.  To "get around" the counterparty issue and give false comfort to the Rating Agencies, IXIS-Paris drummed up a total falsehood.

234.    IXIS-Paris submitted the Tensyr Rating Memo with the false representations that BLMIS's "internal credit policy is to only deal with A or above rated counterparties on the OTC American put options" and that it purportedly purchased put options "from various major global banks (8 to 12)."  IXIS-Paris knew it had no basis in fact to tell this to the Rating Agencies.

235.    IXIS-Paris also lied about BLMIS's discretion over the IA Business accounts. IXIS-Paris knew from Fairfield that this was a Rating Agency concern and IXIS-Paris deceived them on this issue.

236.    The Tensyr Rating Memo misrepresented that BLMIS only had "time and price" discretion (*i.e.*, BLMIS merely had the right to choose when and at what value it traded those securities its clients pre-selected), which IXIS-Paris and Fairfield described as "almost 100% computerized."  IXIS-Paris made this representation under the guise that BLMIS was obligated to adhere to specific conditions described in a power of attorney Sentry granted to BLMIS.  The Tensyr Rating Memo indicated that this power of attorney "unambiguously sets forth which stock or option must be purchased and their respective amount," a total falsehood IXIS-Paris created.

237.    IXIS-Paris knew the statements about BLMIS's "limited discretion" were false because Sentry had no input as to BLMIS's purported investment decisions, including security selection and position size, and the timing of any trades, and Fairfield stated many times that BLMIS's trading decisions were not computer-driven.

238.    To better sell the ruse, the Tensyr Rating Memo defined Fairfield as the "Fund Manager" and BLMIS as the "Execution Agent," making it appear that Fairfield had significant responsibility and there was independent oversight.  The Tensyr Rating Memo then said that this division of labor diminished "the management risk customarily associated with single-manager funds."  Fairfield's "Fund Manager" title was in name only; as IXIS-Paris knew, Fairfield provided zero management services but simply gave money to BLMIS.

239.    The Rating Agencies were also concerned with Sentry's custodial arrangement. IXIS-Paris hid behind technicalities and titles to mislead the Rating Agencies about this issue. The Tensyr Rating Memo said Citco was Sentry's "independent custodian," which IXIS-Paris knew was untrue: BLMIS was the actual custodian and no independent custodian existed.

240.    IXIS-Paris misled the Rating Agencies to prevent them from learning that Citco never custodied Sentry's assets and that BLMIS was not an "independent" sub-custodian because it also simultaneously served as broker and investment advisor.

241.    IXIS-Paris also knowingly made false statements regarding trade verification. Before writing the Tensyr Rating Memo, IXIS-Paris reviewed paper trade tickets that BLMIS mailed to Sentry.  IXIS-Paris therefore knew that Fairfield could not review purported trades until days after Madoff said the transactions occurred or even settled.  Instead of revealing this to Rating Agencies, IXIS-Paris told them something more assuring, but decidedly false.

242. Two weeks before finalizing the Tensyr Rating Memo, Lefort sent Fairfield a draft, which stated Fairfield verified BLMIS's trades within a few hours. Fairfield replied that there were errors in the draft, including that trades were not "post-verified' by a trustee (*i.e.*, Fairfield or Citco) within a "few hours" of their execution and that BLMIS did not report trades daily.

243. IXIS-Paris, however, ignored Fairfield's proposed revisions and submitted the Tensyr Rating Memo with both blatant fabrications, knowing they were false.

244. IXIS-Paris submitted the Tensyr Rating Memo with a further misrepresentation about trade verification: "Citco and [a Fairfield affiliate] have notification of the trades at the end of each trading day on which a trade occurs (under SEC Rule 10b-10, [BLMIS] is required to provide written confirmation of any transaction on or before completion of such transaction.)" Again, based on its review of Sentry's trade tickets and what Fairfield explicitly told it, IXIS-Paris knew this was wholly false.

245. IXIS-Paris and Tensyr also knew that Fairfield and Citco were incapable of providing "independent" verification of BLMIS's purported trades because BLMIS fully controlled Sentry's assets, including by purportedly: (i) maintaining custody of Sentry's cash; (ii) selecting stocks that would be purchased; (iii) effecting the purchase; (iv) settling the trades; and (v) maintaining the custody of the stock. No third party could independently verify anything BLMIS reported, as IXIS-Paris knew, but it made and stood by these false representations in its Tensyr Rating Memo.

246. IXIS-Paris also made false statements about account segregation and refused to correct them. On December 10, 2006, IXIS-Paris submitted the Tensyr Rating Memo that falsely stated Sentry maintained accounts at BLMIS that were "segregated from [the BLMIS] bankruptcy

estate." After this submission and just hours before Tensyr was due to receive its ratings and initial

funding, Lefort told Fairfield that this was a misrepresentation, but he did not want to correct it:

> It would furthermore be extremely risky as probably catching Moody's and
> S&P eyes back on these bankruptcy issues. The memo we sent states the
> accounts are segregated and that the risk incurred by the Sentry fund is only
> a delivery risk and not a credit risk[, but] we think that this is a misrep.

247.    Lefort elected to not correct the lies in the Tensyr Rating Memo. Instead, in that

same email, Lefort pressed Fairfield to sell the remaining capacity in Tensyr's lowest note tranche,

knowing those investors would be the first to face losses in the event of BLMIS's insolvency.

248.    After Tensyr's launch, IXIS-Paris remained silent about the likelihood of fraud at

BLMIS, but rather continued investing Tensyr's assets with BLMIS through Sentry. IXIS-Paris

kept this up even when in September 2008, Fitch dropped its Tensyr shadow rating from AAA to

BBB, a sudden drop of three rating levels. According to Fairfield, Fitch "complained they don't

have enough data, they don't understand the floors and collars, they are not comfortable at AAA,

at best BBB based on the information they have now." Lefort's reaction was to tell Fairfield that

Tensyr's existing investors were simply "stuck with the paper" (*i.e.*, had no recourse) and any

rating change would not impact Tensyr's structure. This development also did not cause IXIS-

Paris to conduct any further investigation or convince Fitch to change its mind.

249.    IXIS-Paris's campaign to shield Madoff and then create and deliver to the Rating

Agencies the convincing, yet wholly false Tensyr Rating Memo paid off: IXIS-Paris collected

millions in fees directly connected to Tensyr's launch and ongoing management. Tensyr's launch

was so significant to the Natixis Group's brand that IXIS-Paris touted this new venture in its 2006

Annual Registration Statement.

## VII.    DOMESTICITY OF THE TRANSFERS

250.    The Trustee alleges the facts in the following paragraphs from his Proffered

Allegations Pertaining to the Extraterritoriality Issue as if fully set forth herein (Adv. Pro. No. 10-

05353 (SMB), ECF No. 102 (Bankr. S.D.N.Y. June 27, 2015):

| Subpart to ¶ 250 | Proffer Allegation ¶ | Subpart to ¶ 250 | Proffer Allegation ¶ | Subpart to ¶ 250 | Proffer Allegation ¶ |
|---|---|---|---|---|---|
| (a) | 1 | (w) | 44 | (ss) | 82 |
| (b) | 2 | (x) | 50 | (tt) | 83 |
| (c) | 3 | (y) | 59 | (uu) | 84 |
| (d) | 10 | (z) | 60 | (vv) | 85 |
| (e) | 11 | (aa) | 62 | (ww) | 86 |
| (f) | 12 | (bb) | 63 | (xx) | 87 |
| (g) | 13 | (cc) | 64 | (yy) | 88 |
| (h) | 14 | (dd) | 65 | (zz) | 89 |
| (i) | 15 | (ee) | 68 | (aaa) | 90 |
| (j) | 16 | (ff) | 69 | (bbb) | 91 |
| (k) | 17 | (gg) | 70 | (ccc) | 92 |
| (l) | 18 | (hh) | 71 | (ddd) | 93 |
| (m) | 19 | (ii) | 72 | (eee) | 94 |
| (n) | 20 | (jj) | 73 | (fff) | 95 |
| (o) | 21 | (kk) | 74 | (ggg) | 96 |
| (p) | 22 | (ll) | 75 | (hhh) | 116 |
| (q) | 23 | (mm) | 76 | (iii) | 117 |
| (r) | 24 | (nn) | 77 | (jjj) | 118 |
| (s) | 40 | (oo) | 78 | (kkk) | 144 |
| (t) | 41 | (pp) | 79 | (lll) | 145 |
| (u) | 42 | (qq) | 80 | (mmm) | 146 |
| (v) | 43 | (rr) | 81 | | |

## VIII.   THE TRUSTEE MAY AVOID AND RECOVER THE TRANSFERS

### A.    Initial Transfers from BLMIS to Groupement

251.    The Trustee commenced an adversary proceeding against Groupement, its primary

service providers, a variety of entities run as Access and UBS, and others (the "**UBS Avoidance**

**Action**") to avoid and recover initial transfers of customer property from BLMIS to Groupement

in the approximate amount of $356 million (the "**Initial Transfers**").[4]  The Trustee filed a

Proffered Amended Complaint in the UBS Avoidance Action (the "**Proffered UBS Amended**

**Complaint**"),[5] a copy of which is attached hereto as Exhibit B.  The Trustee incorporates by

reference the Proffered UBS Amended Complaint, which contains irrefutable allegations that the

initial transfers BLMIS made to Groupement are avoidable.

252.    Of the Initial Transfers, BLMIS transferred to Groupement approximately $356

million during the six years prior to the Filing Date (the "**Six Year Initial Transfers**").  Each Six

Year Initial Transfer is avoidable under Bankruptcy Code § 544 and applicable NYDCL

provisions, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

253.    Of the Six Year Initial Transfers, BLMIS transferred to Groupement approximately

$277 million during the two years prior to the Filing Date (the "**Two Year Initial Transfers**").

Each Two Year Initial Transfer is avoidable under Bankruptcy Code § 548 and applicable

provisions of SIPA, particularly § 78fff(c)(3).

254.    Of the Two Year Initial Transfers, BLMIS transferred to Groupement

approximately $260 million during the 90 days prior to the Filing Date (the "**Preference Period**

**Initial Transfers**").  Each Preference Period Initial Transfer is avoidable under Bankruptcy Code

§ 547, and applicable provisions of SIPA, particularly § 78fff(c)(3).

255.    Groupement received each Initial Transfer with knowledge of fraud at BLMIS, or

with willful blindness to circumstances suggesting a high probability of fraud at BLMIS.

256.    Charts setting forth the Initial Transfers are included as Exhibits C and D.  The

Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

---

[4] *Picard v. UBS AG*, Adv. Pro. No. 10-04285 (SMB) (Bankr. S.D.N.Y.).

[5] *Id.*, ECF No. 210 (Bankr. S.D.N.Y. June 26, 2015).

### B.    Subsequent Transfers from Groupement To Defendant

257.    Prior to the Filing Date, Groupement subsequently transferred a portion of the Groupement Initial Transfers, directly or indirectly, to Defendant (the "**Subsequent Transfers**"). Based on the Trustee's investigation to date, the Subsequent Transfers total approximately $148.1 million.  A chart setting forth the presently known Subsequent Transfers is attached as Exhibit E.

258.    The Subsequent Transfers are recoverable from Defendant under Bankruptcy Code § 550(a) and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

259.    Defendant received each Subsequent Transfer while willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

## COUNT ONE:  RECOVERY OF GROUPEMENT SUBSEQUENT TRANSFERS
## 11 U.S.C. §§ 105(a) AND 550(a)

260.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

261.    Each of the Subsequent Transfers is recoverable from Defendant under Bankruptcy Code § 550(a) and SIPA § 78fff-2(c)(3).

262.    Defendant is an immediate or mediate transferee of the Subsequent Transfers from Groupement.

263.    Defendant received each Subsequent Transfer when it was willfully blind to circumstances suggesting a high probability of fraud at BLMIS.

264.    As a result of the foregoing, pursuant to Bankruptcy Code §§ 105(a) and 550(a) and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant: (a) recovering the Subsequent Transfers, or the value thereof, from Defendant for the benefit of the estate of BLMIS; (b) directing Defendant to disgorge to the Trustee all profits, including any and all retrocession

fees, incentive fees, or other compensation and/or remuneration received by Defendant related to, arising from, or concerning the Subsequent Transfers; (c) recovering attorneys' fees and costs from Defendant; and (d) awarding any other relief as the Court deems appropriate.

265.    If any of the recovery counts are inconsistent with each other, they are to be treated as being pleaded in the alternative.

266.    The Trustee's discovery and investigation is ongoing and the Trustee reserves the right to: (i) supplement the information on the initial and subsequent transfers discussed above, and any additional transfers; and (ii) seek avoidance and recovery of such transfers.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on Count One and in favor of the Trustee and against Defendant as follows:

a)    Recovering the Subsequent Transfers, or the value thereof, from Defendant for the benefit of the estate, and directing Defendant to disgorge to the Trustee all profits, including any and all retrocession fees, incentive fees or other compensation and/or remuneration received by Defendant related to, arising from, or concerning the Subsequent Transfers;

b)    If Defendant challenges the avoidability of the Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such Initial Transfers are avoidable pursuant to SIPA § 78fff-2(c)(3), Bankruptcy Code §§ 105(a), 544(b), 547(b), 548(a), and 551, and NYDCL §§ 273-279, as applicable, and as necessary to recover the Subsequent Transfers pursuant to Bankruptcy Code § 550(a) and (b) and SIPA § 78fff-2(c)(3);

c)    Awarding the Trustee attorneys' fees and all applicable interest, costs, and disbursements of this proceeding;

d)    Awarding the Trustee prejudgment interest from the date on which Defendant received the Subsequent Transfers; and

e)    Granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: December 28, 2018    /s/ Catherine E. Woltering
      New York, New York    **Baker & Hostetler LLP**
     45 Rockefeller Plaza
     New York, New York 10111
     Telephone: (212) 589-4200
     Facsimile: (212) 589-4201
     David J. Sheehan
     Catherine E. Woltering
     Jonathan D. Blattmachr
     Matthew B. Friedman

     **Baker & Hostetler LLP**
     200 Civic Center Drive, Suite 1200
     Columbus, Ohio 43215
     Telephone: (614) 228-1541
     Facsimile: (614) 462-2616
     Douglas A. Vonderhaar

     *Attorneys for Irving H. Picard, Trustee*
     *for the substantively consolidated SIPA*
     *Liquidation of Bernard L. Madoff*
     *Investment Securities LLC and the Estate*
     *of Bernard L. Madoff*