**FRESHFIELDS BRUCKHAUS DERINGER US LLP**
601 Lexington Avenue, 31st Floor
New York, New York 10022
Telephone: (212) 277-4000
Facsimile: (212) 277-4001
timothy.harkness@freshfields.com
david.livshiz@freshfields.com
christian.vandergeest@freshfields.com

*Attorneys for Tensyr Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 10-05353 (CGM) |
| Plaintiff, | |
| v. | |
| NATIXIS S.A. and TENSYR LTD., | |
| Defendants. | |

**DEFENDANT TENSYR LIMITED'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ................................................................................................. 4

      A.     Tensyr. ......................................................................................... 4

      B.     This Action. .................................................................................. 6

ARGUMENT ....................................................................................................... 7

    I.     The Claims Against Tensyr Must Be Dismissed Pursuant To Rule 12(b)(2) for Lack of Personal Jurisdiction. ........................................................ 8

      A.     Tensyr Is Not Subject to General Jurisdiction. ........................... 9

      B.     Tensyr Is Not Subject to Specific Jurisdiction. .......................... 9

      C.     The Exercise of Jurisdiction over Tensyr Does Not Comport with Due Process. ............................................................................... 18

    II.    The Initial Transfers Cannot Be Avoided Because They Are Protected By the Safe Harbor Provision of 11 U.S.C. § 546(e). ................................. 19

      A.     Section 546(e) Protects the Initial Transfers from Avoidance. ................. 19

      B.     Section 546(e) Does Not Contain a Knowledge Exception and Even If It Does, the Trustee Does Not Sufficiently Allege "Actual Knowledge." ................................................................................ 21

      C.     The Initial Transfers Are Not Avoidable Under 11 U.S.C. § 548(a)(1)(A) Because the Trustee Does Not Allege Actual Intent to Defraud and Cannot Rely on the "Ponzi-Scheme Presumption." ............ 23

    III.   The Complaint Establishes that Tensyr Is Entitled to the 11 U.S.C. § 550(b) Good Faith Defense. ............................................................... 27

      A.     Tensyr Received the Redemptions for Value. ........................... 27

      B.     Tensyr Received the Redemptions in Good Faith and Without Knowledge of the Voidability of the Transfers. ....................... 28

    IV.   The Trustee Fails to Plead Receipt of Customer Property. ................. 31

CONCLUSION ................................................................................................... 35

## TABLE OF AUTHORITIES

CASES                                                                                PAGE(S)

Achtman v. Kirby, McInerney & Squire, LLP,
    464 F.3d 328 (2d Cir. 2006)......................................................................4

Asahi Metal Indus. Co., Ltd. v. Superior Ct. of Cal., Solano Cnty.,
    480 U.S. 102 (1987)................................................................................18

Ashcroft v. Iqbal,
    556 U.S. 662 (2009)......................................................................8, 32, 33

Barrett v. Tema Dev. (1988), Inc.,
    463 F. Supp. 2d 423 (S.D.N.Y. 2006)....................................................4

Bayou Group, LLC,
    439 B.R. 284 (S.D.N.Y. 2021)..............................................................28

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007)............................................................................8, 33

Bernard L. Madoff Inv. Sec. LLC,
    548 B.R. 13 (Bankr. S.D.N.Y. 2016)....................................................29

Bristol-Myers Squibb Co. v. Superior Ct. of California,
    582 U.S. 255 (2017)................................................................................9

Burger King Corp. v. Rudzewicz,
    471 U.S. 462 (1985)....................................................................9, 13, 17

Charles Schwab Corp. v. Bank of Am. Corp.,
    883 F.3d 68 (2d Cir. 2018)..................................................7, 11, 12, 14

Daimler AG v. Bauman,
    571 U.S. 117 (2014)................................................................................9

DiStefano v. Carozzi N. Am., Inc.,
    281 F. 3d 81 (2d. Cir. 2001)...................................................................7

Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.,
    651 F.3d 329 (2d Cir. 2011)..................................................................22

In re Fairfield Sentry Ltd.,
    627 B.R. 546 (Bankr. S.D.N.Y. 2021)..................................................17

Fairfield Sentry Ltd. (In Liquidation) by & through Krys v. Citibank, N.A.
London,
    No. 19-CV-3911 (VSB), 2022 WL 4391023 (S.D.N.Y. Sept. 22, 2022) .........................14, 15

| CASES | PAGE(S) |
|---|---|

Fairfield Sentry Ltd. v. Migani,
    [2014] UKPC 9 ..................................................................................................15

Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.),
    No. 10-13164 (SMB), 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018)...........15

Finn v. Alliance Bank,
    860 N.W.2d 638 (Minn. 2015)......................................................................26, 27

Garfinkle v. Conf. on Jewish Material Claims Against Germany, Inc.,
    No. 19-CV-7007 (JPO), 2020 WL 6323462 (S.D.N.Y. Oct. 28, 2020)..................33

In re Geltzer,
    502 B.R. 760 (Bankr. S.D.N.Y. 2013) ...............................................................26

Hanson v. Denckla,
    357 U.S. 235 (1958) ..........................................................................................9

Helicopteras Nacionales de Colombia, S.A. v. Hall,
    466 U.S. 408 (1984) ..........................................................................................9

Hau Yin To v. HSBC Holdings, PLC,
    2017 WL 816136 (S.D.N.Y. Mar. 1, 2017) .....................................................11, 12

Hill v. HSBC Bank plc,
    207 F. Supp.3d 333 (S.D.N.Y. 2016); ............................................................11, 16

J. McIntyre Mach., Ltd. v. Nicastro,
    564 U.S. 873 (2011)..........................................................................................14

Jonas v. Estate of Leven,
    116 F. Supp. 3d 314 (S.D.N.Y. 2015).................................................................4

King Cnty. v. IKB Deutsche Industriebank AG,
    769 F. Supp. 2d 309 (S.D.N.Y 2011)..................................................................7

L. v. Siegel,
    571 U.S. 415 (2014)........................................................................................22

LaMonica v. CEVA Grp PLC (In re CIL Ltd.),
    582 B.R. 46 (Bankr. S.D.N.Y. 2018).............................................................18, 19

Langenberg v. Sofair,
    No. 03 CV 8339 KMK, 2006 WL 2628348 (S.D.N.Y. Sept. 11, 2006)...................8

| CASES | PAGE(S) |
|---|---|

In re Leff,
    631 B.R. 106 (E.D.N.Y. 2021) ...................................................................................29

Lehigh Val. Indus., Inc. v. Birenbaum,
    527 F.2d 87 (2d Cir. 1975)...........................................................................................10

Metro Life Ins. Co. v. Robertson-Ceco Corp.,
    84 F.3d 560 (2d Cir. 1996)...........................................................................................19

Nationwide Mut. Ins. Co. v. Morning Sun Bus Co.,
    2011 WL 381612 (E.D.N.Y. Feb. 2, 2011)..................................................................10

Pani v. Empire Blue Cross Blue Shield,
    152 F.3d 67 (2d Cir. 1998)...........................................................................................27

Pen. Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.,
    712 F.3d 705 (2d Cir. 2013)..........................................................................................35

Picard v. ABN Amro Bank N.A. (In re Bernard L. Madoff Inv. Sec. LLC),
    No. AP 08-01789, 2020 WL 1584491 (Bankr. S.D.N.Y. Mar. 31, 2020) ...............27

Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC),
    557 B.R. 89 (Bankr. S.D.N.Y. 2016)......................................................................22, 23

Picard v. BNP Paribas S.A. (In re BLMIS),
    594 B.R. 167 (Bankr. S.D.N.Y. 2018).....................................................................10, 12, 13

Picard v. Citibank (In re Bernard L. Madoff Inv. Secs. LLC),
    12 F.4th 171 (2d Cir. 2021) ................................................................25, 27, 29, 30

Picard v. Cohen (In re Bernard L. Madoff Inv. Sec. LLC),
    No. 08-01789, 2016 WL 1695296 (Bankr. S.D.N.Y. Apr. 25, 2016)......................28

Picard v. Fairfield Inv. Fund Ltd. (In re Bernard L. Madoff Inv. Sec. LLC),
    No. 08-01789 (CGM), 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) ........20, 23, 27, 31

Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC),
    773 F.3d 411 (2d Cir. 2014)......................................................................................20, 21

Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC),
    515 B.R 117 (Bankr. S.D.N.Y. 2014)..........................................................................34

Picard v. Multi-Strategy Fund Ltd. (In re Bernard L. Madoff Inv. Sec. LLC),
    No. 22-CV-06502, 2022 WL 16647767 (S.D.N.Y. Nov. 3, 2022)..................20, 21, 22

Picard v. Quilvest Fin. Ltd. (In re Bernard L. Madoff Inv. Sec. LLC),
    Nos. 08-01789 (CGM), 2022 WL 4493184 (Bankr. S.D.N.Y. Sep. 27, 2022) ......................22

| CASES | PAGE(S) |
|---|---|

Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC),
   542 B.R. 100 (Bankr. S.D.N.Y. 2015) ......................................................................32

Picard v. UBS Europe SE (In re Bernard L. Madoff Inv. Sec. LLC),
   Adv. No. 12-01577 (CGM), 2023 WL 2290822 (Bankr. S.D.N.Y. Feb. 28,
   2023) ......................................................................................................................25

Rush v. Savchuk,
   444 U.S. 320 (1980) ................................................................................................8

Sapia v. Home Box Off., Inc.,
   No. 18 CIV. 1317, 2018 WL 6985223 (S.D.N.Y.) ....................................................35

Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L.
   Madoff Inv. Sec. LLC),
   531 B.R. 439 (Bankr. S.D.N.Y. 2015) ......................................................................32

Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,
   No. 08-01789 (CGM), 2023 WL 2667531 (Bankr. S.D.N.Y. Mar. 28, 2023) ..........19

Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inc. Secs. LLC,
   516 B.R. 18 (S.D.N.Y. 2014) ....................................................................................28

Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC,
   460 B.R. 106 (Bankr. S.D.N.Y. 2011) ......................................................................10

Secs. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,
   No. 12 MC 115 JSR, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ..................21, 22

Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co.,
   Kommanditgesellschaft v. Navimpex Centrala Navala,
   989 F.2d 572 (2d Cir. 1993) ................................................................................8, 11

Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.),
   403 F.3d 43 (2d Cir. 2005) ..........................................................................24, 25, 27

In re Sledziejowski,
   No. 13–22050 (RDD), 2016 WL 6155929 (Bankr. S.D.N.Y. Oct. 21, 2016) ..........11

In re Terrorist Attacks on September 11, 2001,
   714 F.3d 659 (2d Cir. 2013) ..................................................................................9, 18

U.S. v. International Longshoremen's Ass'n,
   518 F. Supp. 2d 422 (E.D.N.Y. 2007) ......................................................................23

CASES                                                                        PAGE(S)

Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.,
   191 A.D.2d 86 (N.Y. App. Div. 1st Dep't 1993)....................................................25

In re Unified Com. Cap., Inc.,
   260 B.R. 343 (Bankr. W.D.N.Y. Mar. 29, 2001)............................................26, 27

Union Bank v. Wolas,
   502 U.S. 151 (1991).................................................................................................26

In re Verestar, Inc.,
   343 B.R. 444 (Bankr. S.D.N.Y. 2006) ...............................................................24, 26

Walden v. Fiore,
   571 U.S. 277 (2014)...............................................................................9, 11, 13, 18

Waldman v. Palestine Liberation Org.,
   835 F.3d 317 (2d Cir. 2016)............................................................................10, 16

World-Wide Volkswagen Corp. v. Woodson,
   444 U.S. 286 (1980)..........................................................................................9, 18

Zuckerman v. Metro. Museum of Art,
   928 F.3d 186 (2d Cir. 2019)...................................................................................29

STATUTES AND RULES

11 U.S.C. § 546 ........................................................................................... *passim*

11 U.S.C. § 548.................................................................................21, 23, 24, 26, 27

11 U.S.C. § 550 ........................................................................................... *passim*

15 U.S.C. § 78 .....................................................................................................7, 31

Fed. R. Bankr. P. 7004 ............................................................................................10

Fed. R. Civ. P. 8 ......................................................................................................23

Fed. R. Civ. P.  9 .....................................................................................................27

Fed. R. Civ. P. 12 .................................................................................................4, 8

Defendant Tensyr Limited ("Tensyr") submits this memorandum of law in support of its Motion to Dismiss the Amended Complaint filed in the above-captioned proceeding by Plaintiff Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS"). See Am. Compl., Picard v. Natixis S.A. et al., Adv. Pro. No. 10-05353 (Bankr. S.D.N.Y. Jan. 1, 2023), ECF No. 193 ("Complaint" or "Compl.").

## PRELIMINARY STATEMENT

Tensyr, a limited company incorporated and based in the Bailiwick of Jersey with no connections to the United States, is a victim of the Ponzi scheme perpetrated by Bernard L. Madoff. Just two years before Madoff's fraud was discovered, Tensyr entrusted more than $400 million to Fairfield Sentry Limited ("Fairfield Sentry"). Fairfield, in turn, invested in Madoff. As a result, Tensyr lost almost everything, receiving back only an alleged $35 million of its own principal with which to repay its noteholders.

Despite Tensyr's staggering loss, the Trustee now seeks to claw back the few funds that Tensyr recovered from Fairfield Sentry. In seeking to claw back these funds, the Trustee apparently believes that Tensyr could have, and should have, discovered Madoff's fraud where the Securities and Exchange Commission and thousands of other investors failed, and that Tensyr should be held responsible for accepting transfers from Fairfield Sentry totaling *hundreds of millions of dollars* less than the value of Tensyr's invested principal (which is now forever lost).

The Trustee's attempt to claw back the alleged subsequent transfers from Tensyr fails, for at least four independent reasons.

*First*, Tensyr is not subject to this Court's jurisdiction. Tensyr is a Jersey entity that did (and does) no business in New York. The Trustee alleges only that Tensyr (i) invested in Fairfield Sentry, a British Virgin Islands ("BVI") company, knowing that Fairfield Sentry would invest in BLMIS; (ii) entered into a subscription agreement with Fairfield Sentry with New York choice of law, venue, service of process, and jurisdiction provisions—provisions which do not govern this dispute; and (iii) sent and received transfers from its bank account in Brussels to Fairfield Sentry's account in Dublin using New York correspondent accounts. These alleged contacts do not, as a matter of law, constitute purposeful availment of New York and are insufficient to drag Tensyr into court there. This is particularly the case where, as here, the Trustee cannot even allege facts sufficient to show that the transfers Tensyr received were comprised of funds originating from New York.

*Second*, the Trustee cannot recover the alleged subsequent transfers from Fairfield Sentry to Tensyr because the alleged underlying initial transfers are not avoidable. The initial transfers fall squarely within the statutory safe harbor established by 11 U.S.C. § 546(e) to shield securities contracts and settlement payments from avoidance, and the Trustee cannot fall back on a judicially-created exception that Fairfield Sentry had "actual knowledge" of Madoff's Ponzi scheme. Furthermore, the Trustee has not adequately pleaded that the initial transfers from BLMIS to Fairfield Sentry were made with fraudulent intent, such that they would be exempted from the safe harbor's protection.

*Third*, the Trustee's allegations establish that Tensyr is entitled to the "good faith defense" under 11 U.S.C. § 550(b). Tensyr took for value because, as the Trustee alleges, Tensyr's redemption payments were "a redemption of equity interests." Tensyr's good faith and lack of knowledge of Madoff's fraud is apparent on the face of the Complaint, which makes *no*

*allegations whatsoever* that Tensyr had any inkling about Madoff's fraud—which was regardless undiscoverable to Tensyr, a small Jersey investor with limited investigatory capabilities.

*Finally*, the Complaint makes no attempt to tie the transfers allegedly received by Tensyr to initial transfers from BLMIS to Sentry. Although the Trustee alleges that specific amounts were transferred to Tensyr on specific dates, he does not allege facts that tie those transfers to any transfers that Fairfield Sentry received from BLMIS. In fact, the Trustee's allegations in this action and other subsequent transfer clawback actions defy the laws of mathematics: the Trustee seeks to recover $2 billion of BLMIS customer property allegedly transferred by Fairfield Sentry *that BLMIS never transferred to* Sentry (as the Trustee admits). Indeed, the Trustee's own allegations show that, at particular times, Fairfield Sentry transferred millions more to Tensyr than it had from BLMIS. Since the Trustee is required to plead that the transfers he seeks to recover originated with BLMIS, his failure to trace the transfers Tensyr received to those BLMIS made is fatal to his Section 550 claims. The Trustee's allegations that all of the transfers received by Tensyr are BLMIS customer property are not only implausible, they are also—in a word—impossible.

For these reasons and as explained further below, Tensyr respectfully requests that the allegations against it be dismissed with prejudice.

## BACKGROUND[1]

### A.    Tensyr.

Tensyr is a limited company formed on November 27, 2006 under the Companies (Jersey) Law 1991, and is owned by a Jersey charitable trust.  See Chislett Decl. ¶ 4; id. Ex. A (Certificate of Incorporation).  Under Tensyr's Articles of Association, Tensyr operates by and through its directors, who are authorized to manage the business of the Company.  See id. Ex. B (Articles of Association) ¶ 17.1.  None of Tensyr's directors are U.S. citizens and none have resided in the United States.  Id. ¶ 5.

Tensyr issued three classes of notes to investors with a promised return linked to the performance of Fairfield Sentry, an investment fund organized under the laws of the British Virgin Islands.  See Compl. ¶ 98; Vandergeest Decl. Ex. B (Fairfield Amended Complaint) ¶ 12. To hedge its obligations under these notes, Tensyr invested more than $400 million in Fairfield Sentry.  See Compl. ¶ 105; Complaint ¶ 22, Dec. 8, 2010, ECF No. 1 (alleging Tensyr "invested approximately $450 million in Sentry"); Chislett Decl. Ex. E (Subscription Agreement) at 1. Fairfield Sentry, in turn, allegedly invested its funds with BLMIS.

Tensyr's contacts with New York have only ever been, at most, incidental.  It has

---

[1]    Many facts set forth in this section are drawn from the allegations contained in the Complaint, which Tensyr accepts as true for the purposes of its arguments under Federal Rules of Civil Procedure ("FRCP") 12(b)(6) only.  Tensyr also refers to the contents of documents filed in other legal proceedings before this Court, which the Court may judicially notice, see Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 338 (2d Cir. 2006), some of which are submitted for this Court's convenience as exhibits to the accompanying Declaration of Christian J. Vandergeest ("Vandergeest Decl."). Finally, for the purposes of Tensyr's jurisdictional arguments, it refers to the Vandergeest Declaration and the Declaration of Ellen Chislett, a director of Tensyr ("Chislett Decl."), and their accompanying exhibits.  See Jonas v. Estate of Leven, 116 F. Supp. 3d 314, 323 (S.D.N.Y. 2015) (in evaluating their jurisdiction, courts may consider materials outside the pleadings); see also Barrett v. Tema Dev. (1988), Inc., 463 F. Supp. 2d 423, 425 n.3 (S.D.N.Y. 2006) ("In reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) . . . a court may look to evidence outside the pleadings.").

never maintained an office in New York, done business in New York, or had any employees in

New York. Chislett Decl. ¶ 6. The Trustee does not (and cannot) allege that employees of

Tensyr entered New York or conducted any affirmative actions in New York that are relevant to

the claims at issue.[2]  Rather, the Trustee merely alleges that Tensyr purchased shares in Fairfield

Sentry, a BVI investment fund, knowing that Fairfield Sentry was heavily invested in New York-

based BLMIS. Compl. ¶ 32.

       None of Tensyr's service providers were New York entities. For example, Tensyr

contracted with Ogier SPV Services Limited, a Jersey company, to provide certain corporate

administration services, and with Citco Financial Products (London) Limited, an English entity,

to provide certain investment monitoring services. Chislett Decl. ¶ 7. Tensyr's bank account

was located in Brussels, Belgium. See id. Ex. E (Subscription Agreement) ¶ 30(g). Fairfield

Greenwich Limited ("FGL")—a company incorporated and located in the Cayman Islands, see,

e.g., id. Ex. D (Leverage Management Agreement) at 4—also provided certain services.

       Specifically, in December 2006, Tensyr entered into two contracts with FGL. See

Chislett Decl. ¶¶ 9–10. *First*, under an "Information Agency Agreement," FGL was required to

provide Tensyr with regular reports on the value of Tensyr's shares in Fairfield Sentry. See id.

Ex. C (Information Agency Agreement) ¶ 4. *Second*, under a "Leverage Management

Agreement," FGL agreed to manage Tensyr's investments in Fairfield Sentry, including by

"effecting redemptions of [Fairfield Sentry] shares." Id. Ex. D (Leverage Management

---

[2]    Tensyr sent the funds for its subscription in Fairfield Sentry from its account in Brussels to the Dublin branch of Citco Bank Nederland N.V. See Chislett Decl. Ex. F (Bank Statement). The transfer was effected via a correspondent bank account in New York designated by Fairfield Sentry. See id. Ex. E (Subscription Agreement) ¶ 3; Compl. ¶ 48. Redemption payments were sent from Fairfield Sentry to Tensyr's bank account in Brussels, also via a correspondent bank account in New York. See Chislett Decl. Ex. E (Subscription Agreement) ¶ 30(g); Compl. ¶ 50.

Agreement) ¶ 4.1.  The Leverage Management Agreement expressly barred FGL from delegating any responsibility to another person or entity without Tensyr's prior written approval.  See id. ¶ 3.4.  Both agreements are governed by English law.  See id. Ex. C (Information Agency Agreement) ¶ 30.1; id. Ex. D (Leverage Management Agreement) ¶ 26.1.  The Trustee does not allege that either agreement was negotiated or executed in New York.[3]

Unable to identify actual New York contacts by Tensyr, the Trustee creates them from whole cloth, arguing that Tensyr transacted with a non-existent entity, the "Fairfield Greenwich Group" ("FGG")—a supposed "New York-based *de facto* partnership."  Compl. ¶¶ 3, 23.  Regardless of whether any legal entity "FGG" existed (the Trustee does not allege that FGG was ever incorporated or registered in any jurisdiction), Tensyr never entered into any contract with FGG.  Chislett Decl. ¶ 7.

**B.    This Action.**

On December 11, 2008 (the "Filing Date"), the U.S. Securities and Exchange Commission commenced proceedings against BLMIS in the District Court for the Southern District of New York.  Compl. ¶ 10.  The District Court appointed the Trustee for the liquidation of BLMIS and referred the action (the "SIPA Proceeding") to the Bankruptcy Court.  Id.

Fairfield Sentry allegedly invested its assets with BLMIS.  Compl. ¶ 125.  In 2009, the Trustee sued Fairfield Sentry to avoid approximately $3 billion in transfers of alleged "customer property" from BLMIS to Fairfield Sentry (the "Initial Transfers").  See Picard v. Fairfield Sentry Ltd., Adv. Pro. No. 09-01239 (Bankr. S.D.N.Y. May 18, 2009).  On May 9, 2011, the Trustee settled its claims against Fairfield Sentry, and this Court later entered a consent

---

[3]    Natixis S.A. ("Natixis"), a bank organized under the laws of France, allegedly assisted with Tensyr's creation and with structuring Tensyr's notes.  See Compl. ¶¶ 14, 22, 27–28.

judgment in favor of the Trustee for $3.054 billion.  See Compl. ¶ 116; Vandergeest Decl. Ex. A

(Settlement Agreement).  In the settlement, the Trustee and the liquidators of Fairfield Sentry

"each agree[d] to provide reasonable access to the other's documents, data, and other

information."  Vandergeest Decl. Ex. A (Settlement Agreement) ¶ 14.  On August 28, 2020, the

Trustee filed the Fairfield Amended Complaint, which the Trustee seeks to incorporate by

reference into the Complaint in this proceeding.  See Compl. ¶¶ 118–19.

Notwithstanding that, by the Trustee's own admission, Fairfield Sentry only

received $3 billion from BLMIS, the Trustee seeks recovery through various litigations of more

than $5 billion (i.e., $2 billion more than Sentry ever received) of alleged subsequent transfers of

BLMIS customer property from Fairfield Sentry.  See Vandergeest Declaration ¶ 6.  Tensyr is

but one of these subsequent transferees.  Here, the Trustee alleges that in the two years prior to

the Filing Date, Fairfield Sentry transferred a portion of the Initial Transfers—approximately $35

million—to Tensyr.  Compl. ¶ 126; id. Ex. D.  According to the Trustee, these transfers were "a

redemption of equity interests by Tensyr as a shareholder in Fairfield Sentry."  Compl. ¶ 129.

The Trustee seeks recovery of these alleged subsequent transfers under 11 U.S.C. § 550(a) and

15 U.S.C. § 78fff-2(c)(3), which provide for recovery of BLMIS "customer property."  Compl.

¶ 136.

## ARGUMENT

On a Rule 12(b)(2) motion, the Trustee "bears the burden of establishing that the

court has jurisdiction" over each defendant, for each claim.  DiStefano v. Carozzi N. Am., Inc.,

281 F.3d 81, 84 (2d. Cir. 2001); see also King Cnty., Wash v. IKB Deutsche Industriebank AG,

769 F. Supp. 2d 309, 315 (S.D.N.Y 2011) (jurisdiction must be established over "each individual

defendant"); Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 83 (2d Cir. 2018)

(plaintiff "must establish the court's jurisdiction with respect to each claim asserted"), and

contacts cannot be "aggregate[ed]" between defendants, <u>Rush v. Savchuk</u>, 444 U.S. 320, 331–32 (1980); <u>see also</u> <u>Langenberg v. Sofair</u>, No. 03 CV 8339 KMK, 2006 WL 2628348, at *6 (S.D.N.Y. Sept. 11, 2006) ("[J]urisdiction cannot be implied or imputed from one defendant to another."). The Trustee's jurisdictional allegations need only be accepted "to the extent they are uncontroverted by the defendant's affidavits." <u>Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala</u>, 989 F.2d 572, 580 (2d Cir. 1993), <u>as amended</u> (May 25, 1993).

This Court must dismiss a claim under FRCP 12(b)(6) "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 558 (2007). Plaintiff's allegations "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" and provide "more than a sheer possibility that a defendant has acted unlawfully." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 556, 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 555).

## I.    THE CLAIMS AGAINST TENSYR MUST BE DISMISSED PURSUANT TO RULE 12(b)(2) FOR LACK OF PERSONAL JURISDICTION.

As against Tensyr, the Complaint's jurisdictional allegations boil down to three arguments: that Tensyr (i) invested in Fairfield Sentry knowing that Sentry would invest in BLMIS; (ii) entered a subscription agreement with Fairfield Sentry with New York-law provisions; and (iii) sent and received transfers from Fairfield Sentry using New York correspondent accounts. Even if true, these allegations are, as a matter of law, insufficient to force Tensyr into court in New York, particularly where the Trustee has failed to establish that the transfers Tensyr allegedly received originated from New York.

A.    **Tensyr Is Not Subject to General Jurisdiction.**

Tensyr is not subject to this Court's general jurisdiction.  A party is subject to general personal jurisdiction only in the forum where it is incorporated or maintains its principal place of business.  See, e.g., Daimler AG v. Bauman, 571 U.S. 117, 136–37 (2014).  Tensyr is incorporated under the laws of, and has its principal place of business in, Jersey.  See Compl. ¶ 20; Chislett Decl. ¶¶ 4, 6.  As such, this court lacks general jurisdiction over Tensyr.

B.    **Tensyr Is Not Subject to Specific Jurisdiction.**

A court may exercise specific personal jurisdiction only if it determines that the defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum State," Hanson v. Denckla, 357 U.S. 235, 253 (1958), and that the plaintiff's claims "arise out of or relate to" that in-forum conduct, Bristol-Myers Squibb Co. v. Superior Ct. of California, 582 U.S. 255, 262 (2017) (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984)).  Here, the Trustee's claims arise from Tensyr's alleged receipt of redemption payments from Fairfield Sentry, and so the Trustee must identify United States-based conduct relating to Tensyr's receipt of those transfers.  Furthermore, in Walden v. Fiore, the U.S. Supreme Court clarified that jurisdiction "must arise out of contacts that the 'defendant *himself*' creates with the forum[.]"  571 U.S. 277, 277 (2014) (emphasis in original) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)).  In other words, the plaintiff (here, BLMIS) "cannot be the only link between the defendant and the forum." Id.

Finally, the Trustee must also show that the exercise of jurisdiction is reasonable such that due process is satisfied.  See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) ("[T]he defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there."); In re Terrorist Attacks on September 11, 2001, 714 F.3d 659, 673 (2d Cir. 2013) (the exercise of personal jurisdiction must

be "reasonable in the circumstances").[4]  Here, the Trustee fails to establish that Tensyr's "suit-related conduct"—i.e., the conduct relating to the transfers that the Trustee now seeks to recover from Tensyr—"create[d] a substantial connection with" the United States, or that the exercise of jurisdiction would be reasonable, and so Tensyr cannot be subject to personal jurisdiction. Picard v. BNP Paribas S.A. (In re BLMIS), 594 B.R. 167, 189–90 (Bankr. S.D.N.Y. 2018).

### 1.    The Complaint Does Not Plead Minimum Contacts with New York Relating to Tensyr's Redemption Payments.[5]

The Trustee's claims as against Tensyr are an attempt to recover from Tensyr allegedly voidable transfers made by BLMIS to Fairfield Sentry.  Thus, "the jurisdictional analysis focuses on [Tensyr's] U.S. contacts related to the receipt of the . . . subsequent transfers at issue." BNP Paribas, 594 B.R. at 190.  Yet, the Trustee fails to establish jurisdiction—as is his

---

[4]    While to establish specific jurisdiction, a plaintiff must usually show (i) a statutory basis for specific jurisdiction; and (ii) that the exercise of such jurisdiction comports with due process, see Waldman v. Palestine Liberation Org., 835 F.3d 317, 327 (2d Cir. 2016), here the Trustee alleges personal jurisdiction under Bankruptcy Rule 7004(f), which permits the exercise of personal jurisdiction when such exercise "is consistent with the Constitution and laws of the United States," and so only a constitutional analysis is necessary.  See, e.g., Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC, 460 B.R. 106, 116 (Bankr. S.D.N.Y. 2011), aff'd, 474 B.R. 76 (S.D.N.Y. 2012).

[5]    The Trustee first alleges that Tensyr "routinely conducted business" in New York, "purposefully availed [itself] of the law of New York by undertaking significant commercial activities in New York," and "derived significant revenue from New York." Compl. ¶ 21.  But, the Trustee identifies no New York-based "conduct[]" on which he relies in making this argument and absent specific facts and instances of such conduct, these allegations are a mere recitation of the legal elements and do not satisfy the Trustee's pleading burden.  See Nationwide Mut. Ins. Co. v. Morning Sun Bus Co., 2011 WL 381612, at *3 (E.D.N.Y. Feb. 2, 2011) (no jurisdiction where a plaintiff alleged that defendant had employees, property, and business in New York but failed to include any detail or relationship to claims); see also Lehigh Val. Indus., Inc. v. Birenbaum, 527 F.2d 87, 93–94 (2d Cir. 1975) (generalized, boilerplate allegations are insufficient to establish jurisdiction).  Moreover, Tensyr has never "conducted business" or "undertaken commercial activities" in New York, nor has it "derived revenue" from New York. Chislett Decl. ¶ 6.  Tensyr's sole business activity has always been its investment in Fairfield Sentry, a BVI-incorporated investment fund.  Id.

burden, See transport, 989 F.2d at 580—by alleging facts sufficient to establish that the transfers

Tensyr received (the focus of the jurisdictional inquiry) in fact originated from, or had any

connection with, the United States.

    As a threshold matter, the transfers that Tensyr received in Brussels originated

from BVI-incorporated Fairfield Sentry's bank account in Dublin.  See Chislett Decl. Ex. E

(Subscription Agreement) ¶¶ 3, 30(g); id. Ex. F (Bank Statement).  The Trustee does not allege

otherwise, which is important because "activities in [Dublin and Brussels] do not constitute

[New York] contacts," and so cannot satisfy the Trustee's jurisdictional burden.  Charles

Schwab, 883 F.3d at 83 (citing Walden, 571 U.S. at 284).

    To avoid this pleading defect, the Trustee attempts to satisfy his burden by

pointing to Tensyr's use of correspondent banking.  Compl. ¶ 50.  It is well-established that the

mere "knowing receipt of funds in a [correspondent] bank account is insufficient to establish

jurisdiction" over the account holder.  In re Sledziejowski, No. 13–22050 (RDD), 2016 WL

6155929, at *7 (Bankr. S.D.N.Y. Oct. 21, 2016).  In fact, the Trustee's correspondent banking

theory has already been rejected by numerous courts in other Madoff-related cases where, as

here, such correspondent bank account "payments were incidental consequences of fulfilling a

foreign contract" and are therefore "insufficient to 'project' the [defendant] into New York."

Hill v. HSBC Bank plc, 207 F. Supp.3d 333, 339–40 (S.D.N.Y. 2016); see also Hau Yin To v.

HSBC Holdings, PLC, 2017 WL 816136, at *6–7 (S.D.N.Y. Mar. 1, 2017) ("incidental" use of

U.S. bank accounts did not support jurisdiction); aff'd, 700 F. App'x 66 (2d Cir. 2017).  The

alleged transfers here were made from BVI-incorporated Fairfield Sentry's bank account in

Dublin to Jersey-incorporated Tensyr's bank account in Brussels.  See Chislett Decl. Ex. E

(Subscription Agreement) ¶¶ 3, 30(g); id. Ex. F (Bank Statement).  The use of New York

correspondent bank accounts was "incidental" to those transfers and—like the transfers themselves—cannot support jurisdiction. Hau Yin To, 2017 WL 816136 at *6–7.

Nor has the Trustee established (and, he cannot establish) the "substantial connection" between Tensyr's redemptions and the United States by identifying any specific transfer made by BLMIS to Fairfield Sentry that was connected to Tensyr's transfers. Despite the fact that the Trustee has had access to Fairfield Sentry's "documents, data, and other information relating to" Tensyr for more than a decade, see Vandergeest Decl. Ex. A (Settlement Agreement) ¶ 14, the Trustee merely alleges that the fifteen transfers Tensyr allegedly accepted were "a portion of the" Initial Transfers Fairfield Sentry received from BLMIS, Compl. ¶ 126; id. Ex. D. This pleading does not suffice: "[e]ach transfer is a separate claim and the Trustee must establish the court's jurisdiction with respect to each claim asserted." BNP Paribas, 594 B.R. at 190 (citing Charles Schwab, 883 F.3d at 83). To support jurisdiction over each transfer, the Trustee must make "legally sufficient allegations" supporting the inference that each transfer was comprised of property originating from New York that was ultimately transferred to Tensyr. Charles Schwab, 883 F.3d at 81. The Trustee has not done so here.

In fact, the Trustee's own allegations in this proceeding and the facts established by Tensyr's affiants foreclose any attempt by the Trustee to show the transfers originated in New York. As described in more detail below, infra section IV, it is mathematically impossible that all the transfers allegedly received by Tensyr and other defendants originated with BLMIS. The Trustee seeks to claw back $5 billion dollars from various subsequent transferees, but admits that BLMIS only transferred $3 billion to Fairfield Sentry. Compare Compl. ¶ 120 with Vandergeest Decl. ¶ 6. In other words, the Trustee makes no effort to account for the origin of nearly $2 billion of transfers that he seeks to claw back. This conclusion belies any claim that the Trustee

12

has pleaded a "prima facie" case that *each transfer* alleged by the Trustee involved BLMIS property from New York.  Even worse, as also detailed below, <u>infra</u> section IV, the Trustee seeks to recover alleged subsequent transfers made to Tensyr months—or even *more than a year*— after Fairfield Sentry received any transfer from BLMIS.  <u>See</u> Compl. Exs. A, B; Vandergeest Decl. ¶ 10.  It is implausible that these redemption payments contained money originating from BLMIS in New York, and the Trustee has likewise failed to allege facts connecting the remaining transfers that the Trustee seeks to claw back to BLMIS or the United States.  For these reasons, the Trustee has not made a "prima facie showing with respect to [each] subsequent transfer" that those transfers had a "substantial connection" to New York.  <u>BNP Paribas</u>, 594 B.R. at 189–90.  The Trustee's failure to allege facts establishing a link between *Tensyr's* U.S. contacts and the redemption transfers that Tensyr allegedly received requires dismissal of the complaint for want of jurisdiction.

### 2. Tensyr's Alleged "Knowing" Investment into BVI-based Fairfield Sentry Does Not Support Jurisdiction.

Unable to establish U.S. connections between Tensyr and its redemptions from Fairfield Sentry, the Trustee argues that jurisdiction is proper because Tensyr "invested in Fairfield Sentry knowing and intending" that Fairfield Sentry would then invest those assets with BMLIS.  Compl. ¶¶ 29–30.  But, as noted above, personal jurisdiction cannot be based on third party contacts—it must be based on contacts "the 'defendant *himself*' creates."  <u>Walden</u>, 571 U.S. at 284 (emphasis in original) (citing <u>Burger King</u>, 471 U.S. at 475); <u>see also</u> <u>id.</u> at 291 ("[I]t is the defendant, not the plaintiff or third parties, who must create contacts with the forum state.").  This is true regardless of whether Tensyr knew or intended those third-party contacts with the forum would occur.  <u>Id.</u> at 289 (defendant "did not create sufficient contacts with [the forum] simply because he allegedly directed his conduct at plaintiffs whom he knew had [forum]

connections"). The Trustee's allegation that Tensyr *knew* its investment into Fairfield Sentry would eventually end up in New York is merely a variation of the "stream of commerce" theory of personal jurisdiction that U.S. courts have repeatedly rejected. See, e.g., J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 882 (2011) (plurality opinion) ("[I]t is not enough that [a] defendant might have predicted that its goods will reach the forum"); see also Charles Schwab, 883 F.3d at 87 (holding that foreseeability of "direct effect" in the forum was insufficient to exercise jurisdiction).

### 3. Tensyr's Execution of the Fairfield Sentry Subscription Agreement Does Not Support Jurisdiction.

The Trustee otherwise suggests that Tensyr can be subject to personal jurisdiction based on its redemptions from Fairfield Sentry because it "executed a Fairfield Sentry subscription agreement with New York jurisdiction, forum selection, service of process, and choice of law provisions."[6] Compl. ¶ 46. But numerous courts in this District have already rejected this very theory. See Fairfield Sentry Ltd. (In Liquidation) by & through Krys v. Citibank, N.A. London, No. 19-CV-3911 (VSB), 2022 WL 4391023, at *9 (S.D.N.Y. Sept. 22, 2022) (claims to recover transfers were not "with respect to" Subscription Agreement and therefore forum selection clause could not establish personal jurisdiction); Lavazza Premium Coffees Corp. v. Prime Line Distributors Inc., 575 F. Supp. 3d 445, 459–61 (S.D.N.Y. 2021) (rejecting enforcement of forum selection clause by non-party plaintiff alleging claims outside clause's scope).

Nor, as the Trustee may argue, is the Subscription Agreement a jurisdictionally-relevant contact with New York, because Tensyr's redemptions from Fairfield Sentry are not governed by terms of the Subscription Agreement. The Subscription Agreement covers only an

---

[6]    The Trustee does not allege that the Subscription Agreement was signed in New York.

"action or proceeding with respect to" the Subscription Agreement—i.e., Tensyr's investment into Sentry; not the redemption of that investment.  See Chislett Decl. Ex. E (Subscription Agreement) ¶ 20.  The transfer of funds from Fairfield Sentry to Tensyr is governed by a different contract, Fairfield Sentry's Articles of Association, as the District Court and the UK Privy Council (the highest court to consider questions of BVI law) have already held.  See Fairfield Sentry Ltd. v. Migani, [2014] UKPC 9, ¶¶ 10, 17, 20 (redemptions are governed by Fairfield Sentry's Articles of Association and BVI law) (Vandergeest Decl. Ex. C); Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.), No. 10-13164 (SMB), 2018 WL 3756343, at *11–12 (Bankr. S.D.N.Y. Aug. 6, 2018) (suit by Fairfield Sentry to recover a redemption payment is not a suit "with respect to [the Subscription] Agreement"), aff'd, 2022 WL 4391023 at *11 (claims to recover transfers "are not 'with respect to' the Subscription Agreement").  The Trustee's apparent argument that Tensyr "purposefully availed" itself of the protections of New York law by entering into the Subscription Agreement fails because the Trustee's claims here—the alleged redemption payments from Fairfield Sentry to Tensyr—do not implicate that agreement.

### 4. The Alleged Contacts of Natixis and FGG Do Not Support Jurisdiction.

In an effort to buttress its jurisdictional argument against Tensyr, the Trustee appears to rely on third-party contacts by Natixis and FGG, and presumably will argue that these third-party contacts should be imputed to Tensyr.[7]  Any such argument must fail.  As noted

---

[7] See, e.g., Compl. ¶ 33 ("The Tensyr Ratings Memo . . . was primarily drafted by Natixis"); id. ¶ 39 ("FGG met with at least two rating agencies at FGG's office in New York . . ."); id. ¶ 40 ("Natixis S.A. . . . also had numerous meetings in New York . . ."); id. ¶ 42 ("Together, Natixis S.A. and FGG drafted and revised talking points for a meeting with Madoff in New York . . ."); id. ¶ 43 ("Natixis S.A. also extensively communicated via emails and phone calls with FGG . . ."); id. ¶ 44 ("Natixis S.A. also worked with and entered into agreements with third parties based in New York . . ."); id.

above, the forum contacts of third parties are not relevant for a finding of personal jurisdiction, see supra section I(B)(2); Waldman, 835 F.3d at 335 (jurisdiction "must arise out of contacts that the defendant *himself* creates with the forum" (emphasis in original)).  Moreover, Natixis' and FGG's alleged contacts cannot be imputed to Tensyr.

For starters, many of the Trustee's allegations regarding Tensyr's interactions with Natixis and FGG are demonstrably incorrect.

*First*, Tensyr contracted with FGL, an entity incorporated and located in the Cayman Islands, to act as its "information agent" and "leverage manager" with regard to its Fairfield Sentry investment.  See Chislett Decl. Ex. C (Information Agency Agreement) at 4; id. Ex. D (Leverage Management Agreement) at 4.  The Trustee has not alleged that these English-law-governed agreements were negotiated or signed in New York, and FGL is a company organized under Cayman Islands law, see Fairfield Amended Complaint ¶ 13, which means by contracting with FGL, Tensyr did *not* "'project' [itself] into New York," Hill, 207 F. Supp.3d at 339–40.

Aware that Tensyr's contracts with FGL create no jurisdictional contacts with New York, the Trustee seeks to create an entity that does not exist:  FGG, an alleged "New York-based *de facto* partnership." Compl. ¶ 3.  In fact, Tensyr had no knowing dealing with FGG, the entity alleged by the Trustee.  Compl. ¶ 7.  Rather, Tensyr's dealings were with FGL. Compare Compl. ¶¶ 23–26 ("FGG agreed to act as manager and information agent for Tensyr;" Tensyr's subscription agreements and redemption requests "were signed by FGG executives;" and Tensyr's redemption confirmations from Fairfield Sentry were sent to FGG) with Chislett Decl. Ex. C (Information Agency Agreement) ¶¶ 11, 15, 16 and id. Ex. D (Leverage

---

¶ 45 ("Natixis S.A. also communicated and worked with FGG in New York . . .").

Management Agreement) ¶ 4 (contracts for provision of all these services).  Regardless of whether any entity named "FGG" actually existed, see In re Fairfield Sentry Ltd., 627 B.R. 546, 563–65 (Bankr. S.D.N.Y. 2021) (finding allegations of FGG's existence "pled with sufficient detail" despite contention that "FGG is not a true defendant"), the Trustee's jurisdictional allegations regarding FGG fail here because all of Tensyr's alleged contacts with FGG were *actually* with FGL, the Cayman Islands entity, and the Trustee does not, and cannot, establish that Tensyr knew that FGG would perform any services connected with its redemptions from Fairfield Sentry so as to satisfy the Trustee's jurisdictional burden.  Meanwhile, Tensyr's contracts with FGL create no New York contacts.

      *Second*, the Complaint blithely asserts that Tensyr was an "orphan entity" that was "operated by Natixis S.A. and FGG." Compl. ¶ 22.  This is incorrect.  Tensyr was (and is) an independent company incorporated under the Companies (Jersey) Law 1991 and operated through its directors, which are authorized to manage the business of the Company.  See Chislett Decl. ¶ 4; id. Ex. A (Certificate of Incorporation); id. Ex. B (Articles of Association) ¶ 17.1.  Nor was Tensyr "operated by" FGL:  that relationship was governed by contracts approved by Tensyr's board of directors in accordance with its Articles of Association.  See Chislett Decl. ¶ 5.  Those contracts were arms-length, limited in scope, and explicitly disclaimed the existence of any agency relationship.  See Chislett Decl. Ex. C (Information Agency Agreement) ¶ 10; id. Ex. D (Leverage Management Agreement) ¶ 15.  In any event, any relations with FGL, a Cayman Islands entity, and Natixis, a bank organized under the laws of France, Compl. ¶ 14, do not support jurisdiction in New York.  See Burger King, 471 U.S. at 474–76.

      *Finally*, the Trustee incorrectly suggests that certain contacts with New York that occurred *before Tensyr existed* can support personal jurisdiction over Tensyr.  For example, the

Complaint alleges that "[a]t one New York meeting . . . Natixis S.A. first presented FGG with a potential CFO structure on the Sentry fund: Tensyr"; and that Natixis and FGG had a "meeting with Madoff in New York to convince 'Uncle Bernie' to 'give the OK'" to the creation of Tensyr. Compl. ¶¶ 41–42. No theory supports imputation of such contacts from before Tensyr's existence. See Walden, 571 U.S. at 291 ("the defendant . . . must create contacts with the forum State"). The New York contacts of Natixis or FGG is no basis for this Court to exercise jurisdiction over Tensyr.

### C. The Exercise of Jurisdiction over Tensyr Does Not Comport with Due Process.

Even if this Court found that the Complaint alleges sufficient facts to establish personal jurisdiction (it does not), this Court would still have to find the exercise of jurisdiction to be "reasonable" under the circumstances. See World-Wide Volkswagen, 444 U.S. at 297; In re Terrorist Attacks, 714 F.3d at 673 (exercise of jurisdiction must not "offend the traditional notions of fair play and substantial justice."). When evaluating reasonableness, courts assess the burden on the defendant, the interests in the forum, and the plaintiff's interest in obtaining convenient and effective relief. See Asahi Metal Indus. Co., Ltd. v. Superior Ct. of Cal., Solano Cnty., 480 U.S. 102, 113 (1987) (listing factors); LaMonica v. CEVA Grp PLC (In re CIL Ltd.), 582 B.R. 46, 79 (Bankr. S.D.N.Y. 2018) (same). "[T]he weaker the plaintiff's showing on minimum contacts, the less a defendant needs to show in terms of unreasonableness to defeat jurisdiction." LaMonica, 582 B.R. at 79. Since the contacts that the Trustee alleges that Tensyr formed with New York are weak, the bar for demonstrating reasonableness is high—and is not one that the Trustee can clear. See id.

*First*, forcing Tensyr to defend itself in New York—more than 3000 miles from home—would impose a substantial burden on Tensyr, a Jersey company that has never had

employees or conducted business in the United States.  See Chislett Decl. ¶ 6.  The financial and

logistical burdens of litigation in New York are substantial, as "none of [Tensyr's] records, files,

or witnesses" are located there.  Metro Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 574

(2d Cir. 1996); Chislett Decl. ¶ 8.  *Second*, New York has little connection to this case:  the

subsequent transfers alleged by the Trustee took place between Fairfield Sentry, a BVI entity,

and Tensyr, a Jersey entity, and Tensyr engaged in no activities in New York.  *Third*,

convenience to the Trustee alone cannot tip the balance in favor of jurisdiction in New York

where, as here, it could bring suit in Jersey instead.[8]  See LaMonica, 582 B.R. at 80 ("dismissal

. . . based on lack of personal jurisdiction does not mean that the Trustee would not be able to . . .

ultimately obtain effective relief.").  Taken as a whole, these factors lead to the conclusion that

the exercise of jurisdiction over Tensyr would be unreasonable.

## II.    THE INITIAL TRANSFERS CANNOT BE AVOIDED BECAUSE THEY ARE PROTECTED BY THE SAFE HARBOR PROVISION OF 11 U.S.C. § 546(e).

### A.    Section 546(e) Protects the Initial Transfers from Avoidance.

Section 546(e) provides that the Trustee "may not avoid a transfer . . . made by or

to (or for the benefit of) a . . . stockbroker, financial institution, [or] financial participant . . . in

connection with a securities contract . . . ."  11 U.S.C. § 546(e).  Even if the initial transferee fails

to raise this defense, "the subsequent transferee is nonetheless entitled to raise [it] against the

recovery of [the initial transfer]," as Tensyr does here.  Picard v. Fairfield Inv. Fund Ltd. (In re

Bernard L. Madoff Inv. Sec. LLC), No. 08-01789 (CGM), 2021 WL 3477479, at *3 (Bankr.

---

[8]    The Trustee has for years litigated in jurisdictions around the world, including Luxembourg, Israel, England, and the British Virgin Islands.  See Trustee's Twenty-Eighth Interim Report for the Period April 1, 2022 through September 30, 2022 at 77–81, In re Bernard L. Madoff Inv. Sec. LLC), No. 08-01789 (CGM) (Dec. 11, 2008), ECF No. 22500; see also, e.g., Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, No. 08-01789 (CGM), 2023 WL 2667531, at *10 (Bankr. S.D.N.Y. Mar. 28, 2023) (Trustee has litigated in Israel for six years).

S.D.N.Y. Aug. 6, 2021).

The Section 546(e) safe harbor applies here.  Under Second Circuit precedent, transfers from BLMIS to its feeder funds—including Fairfield Sentry—constitute "settlement payments" made "by or to (or for the benefit of) a . . . stockbroker, financial institution, [or] financial participant . . . in connection with a securities contract."  Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC), 773 F.3d 411, 422 (2d Cir. 2014); see also Picard v. Multi-Strategy Fund Ltd. (In re Bernard L. Madoff Inv. Sec. LLC), No. 22-CV-06502, 2022 WL 16647767, at *2 (S.D.N.Y. Nov. 3, 2022) ("[T]he liabilities of [BLMIS] customers are subject to the 'safe harbor' set forth in section 546(e).").  The Initial Transfers were made by BLMIS to Fairfield Sentry, Compl. ¶¶ 45, 115, and thus are immune from avoidance.  11 U.S.C. § 546(e).

Moreover, as alleged by the Trustee, the Initial Transfers were also made "in connection with" the Subscription Agreement between Fairfield Sentry and Tensyr, a "securities contract," creating a second, independent basis for Tensyr's invocation of the Section 546(e) safe harbor here.  See Multi-Strategy, 2022 WL 16647767 at *8.  That is, because on the face of the Complaint it is apparent that "transfers from [BLMIS] to Fairfield [Sentry] were undertaken 'in connection with securities contracts between Fairfield [Sentry] and [Tensyr]," the Section 546(e) exception applies.  Id.  The Trustee alleges precisely this:

- Tensyr allegedly "purchased shares of Fairfield Sentry" by "execut[ing] subscription agreements" and then "made redemption requests," Compl. ¶¶ 26, 31; see also Compl. ¶ 46, thus meeting the definition of a "securities contract," which "includes, inter alia, investment fund subscription agreements and redemption requests, margin loans, and total return swaps coupled with a securities sale transaction."  Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC ("Cohmad"), No. 12 MC 115 JSR, 2013 WL 1609154, at *8 (S.D.N.Y. Apr. 15, 2013) (citing 11 U.S.C. § 741(7)(A)(i), (iv), (vi) & (xiii)).

- The Subscription Agreement was allegedly "in connection with" the Initial Transfers from BLMIS to Fairfield Sentry, because, inter alia, the alleged subsequent transfers from Fairfield Sentry to Tensyr are alleged to be traceable to the alleged initial transfers from BLMIS. Compl. ¶ 126. Further, the Trustee alleges that "Fairfield Sentry invested at least 95% of its assets with [BLMIS]," Compl. ¶ 32, and Tensyr's "funds were deposited [by Fairfield Sentry] into BLMIS's account at JP Morgan Chase Bank," Compl. ¶ 48.

As the Second Circuit has held, "Section 546(e) only requires that a covered transfer be broadly related to a 'securities contract,' not that it be connected to an actual securities transaction." In re Bernard L. Madoff Inv. Sec. LLC, 773 F.3d 411, 420 (2d Cir. 2014). The Initial Transfers from BLMIS to Fairfield Sentry, as alleged by the Trustee, are "broadly related" to the alleged securities contract with Tensyr, and so easily satisfy this "low bar." Id. at 422.

**B.  Section 546(e) Does Not Contain a Knowledge Exception and Even If It Does, the Trustee Does Not Sufficiently Allege "Actual Knowledge."**

The Trustee may argue that Section 546(e)'s safe harbor is inapplicable here because Fairfield Sentry had "actual knowledge" of Madoff's fraud. Cohmad, 2013 WL 1609154 at *3; see also Multi-Strategy, 2022 WL 16647767 at *3. That is incorrect.

*First*, the text of Section 546(e) does not have an "actual knowledge" exception. The only exception to Section 546(e) is a claim under Section 548(a)(1)(A), which involves the fraudulent intent of the *transferor*. See § 546(e); § 548(a)(1)(A); Fishman, 773 F.3d at 423 ("[B]y enacting § 546(e), Congress provided that, for a very broad range of securities-related transfers, the interest in finality is sufficiently important that they cannot be avoided by a bankruptcy trustee at all, *except as actual fraudulent transfers under § 548(a)(1)(A)*") (emphasis added). Nowhere does the plain language of Section 546(e) suggest that its protection turns on the knowledge of the *transferee* (i.e., Fairfield Sentry). A court is not free to create additional exceptions or exemptions to the protections offered by the Bankruptcy Code. See L. v. Siegel, 571 U.S. 415, 424–25 (2014) (holding that "[t]he Code's meticulous . . . enumeration of

exemptions and exceptions to those exemptions confirms that courts are not authorized to create additional exceptions"); see also Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V., 651 F.3d 329, 335 (2d Cir. 2011) (rejecting extratextual "proposed limitations on the definition of settlement payment" and the Section 546(e) safe harbor). Permitting a knowledge exception would be contrary to the plain language of Section 546(e).

Second, as described above, the Initial Transfers fall under the Section 546(e) safe harbor because they were made "in connection with" a securities contract between Fairfield Sentry and Tensyr, to which any "knowledge exception" cannot apply because the Trustee does not allege any such "actual knowledge" on the part of Tensyr. As Judge Rakoff wrote in Multi-Strategy, "it is hard to see why the initial transferee's knowledge of Madoff's fraud would render a Section 546(e) defense based on a securities contract between the initial and subsequent transferee unavailable." 2022 WL 16647767 at *7 n.7 (citing Cohmad, 2013 WL 1609154 at *3, 9–10). The Trustee does not allege that Tensyr had any knowledge, actual or otherwise, of Madoff's fraud. As a result, the Section 546(e) safe harbor bars the Trustee's claims here.

Finally, the Trustee has failed to plead that Fairfield Sentry, as a recipient of the Initial Transfers from BLMIS, had actual knowledge of BLMIS's Ponzi scheme. "Actual knowledge"—a high bar—requires allegations that Fairfield Sentry knew that "there were no actual securities transactions being conducted." See Picard v. Quilvest Fin. Ltd. (In re Bernard L. Madoff Inv. Sec. LLC), Nos. 08-01789 (CGM), 11-02538 (CGM), 2022 WL 4493184, at *8 (Bankr. S.D.N.Y. Sep. 27, 2022). To allege "actual knowledge," the Trustee must plead facts showing that the transferee had "a state of mind in which [the transferee] ha[d] no substantial doubt about the existence of a fact"—the fact being that there were no securities transactions taking place. See Picard v. Avellino (In re Bernard L. Madoff Inv. Sec. LLC), 557 B.R. 89, 113

(Bankr. S.D.N.Y. 2016).  The Trustee has not met this high bar here because the Complaint does

not anywhere allege Fairfield Sentry's state of mind.[9]

> ### C.    The Initial Transfers Are Not Avoidable Under 11 U.S.C. § 548(a)(1)(A) Because the Trustee Does Not Allege Actual Intent to Defraud and Cannot Rely on the "Ponzi-Scheme Presumption."

Section 546(e) bars the Trustee from avoiding all initial transfers other than actual

fraudulent transfers under Section 548(a)(1)(A).  As a result, "the Trustee may only proceed . . .

insofar as he seeks to recover those subsequent transfers under § 550(a) as to which he could

have avoided the initial transfer under § 548(a)(1)(A)."  Fairfield Inv. Fund, 2021 WL 3477479

at *4.  Here, however, the Trustee cannot avoid the BLMIS-Sentry Initial Transfers under

Section 548(a)(1)(A) because the Complaint fails to allege that the Initial Transfers were made

with "actual intent to hinder, delay, or defraud," as required by that provision, and the Trustee

cannot rely on the Ponzi scheme presumption to bypass his pleading burden.

---

[9]    Tensyr recognizes that the Court has elsewhere held that the Trustee has adequately pleaded that Fairfield Sentry had the required knowledge.  See, e.g., Fairfield Inv. Fund., 2021 WL 3477479 at *4–6.  Nonetheless, Tensyr respectfully submits that the Trustee has not met his burden of proof in the Complaint, and hereby adopts and incorporates the arguments made by Natixis.  See Memorandum of Law in Support of Defendant Natixis S.A.'s Motion to Dismiss at 23–25.  In short, any allegations of Fairfield Sentry's knowledge are not stated in the Complaint, but instead are supposedly incorporated *en masse* from the Fairfield Amended Complaint, see Compl. ¶ 119, leaving Tensyr with no guidance on which specific allegations (out of the four hundred-paragraph complaint) are supposedly incorporated to plead actual knowledge.  See U.S. v. International Longshoremen's Ass'n, 518 F. Supp. 2d 422, 463–64, 466 (E.D.N.Y. 2007) (reasoning that an attempt to incorporate by reference hundreds of pages of prior pleadings "with no guidance as to which specific allegations are intended to be deemed incorporated" "imposes an unduly heavy burden on [the defendants'] ability to adequately reply").  This is contrary to the "short and plain statement of the claim" requirement of Federal Rule of Civil Procedure 8(a)(2) and would unfairly require Tensyr "to select the relevant material from the mass of verbiage."  Id. at 463–66 (holding that incorporating by reference hundreds of pages "fails to satisfy even the relatively light burden" of FRCP 8(a)).  This purposed incorporation of the Fairfield Amended Complaint must therefore be rejected.  Further, and regardless, the Trustee has not sufficiently alleged that Fairfield Sentry had *no doubt* that the transfers were not actual securities transactions, as required for him to meet the high pleading burden for "actual knowledge."  See Avellino, 557 B.R. at 113.

23

1.    **The Trustee Does Not Sufficiently Allege Actual Intent to Defraud.**

The Trustee does not sufficiently plead actual intent to defraud to avoid the Initial

Transfers under Section 548(a)(1)(A).  Actual intent to defraud under Section 548 "must be pled

with the specificity required by [FRCP] 9(b)," and the burden of proving actual intent lies with

the Trustee.  Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.), 403 F.3d

43, 56 (2d Cir. 2005).  Under Rule 9(b), "an alleged overall 'pattern of inappropriate transfers'

and 'general chronology of events,'" are not sufficient, because they are "conclusory allegations

that do not evidence fraudulent intent with respect to the specific transfers challenged."  In re

Verestar, Inc., 343 B.R. 444, 468 (Bankr. S.D.N.Y. 2006).  Instead, for each initial transfer, the

Trustee must plead "badges of fraud that are characteristic of intentionally fraudulent transfers or

allege facts from which one could find fraudulent intent."  Id. at 469; see also Sharp, 403 F.3d at

56 (badges of fraud are "circumstances so commonly associated with fraudulent transfers that

their presence gives rise to an inference of intent").

Here, the Trustee makes no effort to allege, with specificity or otherwise, that

BLMIS had the actual intent to "hinder, delay, or defraud" creditors when it made the specific

Initial Transfers to Fairfield Sentry—in fact, as shown below, infra section IV, the Trustee makes

no effort to even identify the specific transfers made by BLMIS that supposedly were

subsequently transferred on to Tensyr.  Further, the Complaint's bare allegations that BLMIS

transferred money to Fairfield Sentry is insufficient to allege a fraudulent transfer, particularly

when Fairfield Sentry was itself a "net loser" from the BLMIS scheme—it invested more than it

withdrew from BLMIS, and so any funds it received were merely a return of principal invested.

See Vandergeest Decl. Ex. A (Fairfield Settlement) at 2 (noting Fairfield Sentry had a net loss of

$1.2 billion from its investments in BLMIS).  Such transfers by definition cannot be fraudulent.

See Sharp, 403 F.3d at 54 ("A conveyance which satisfies an antecedent debt made while the

24

debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another.") (quoting Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A., 191 A.D.2d 86, 90–91 (N.Y. App. Div. 1st Dep't 1993)); Picard v. Citibank (In re Bernard L. Madoff Inv. Secs. LLC), 12 F.4th 171, 201 (2d Cir. 2021) (Menashi, J., concurring) ("that payment is considered a preference, not a fraudulent transfer").

### 2. The Trustee Cannot Rely on The Ponzi Scheme Presumption to Plead Actual Intent to Defraud.

Rather than allege a fraudulent intent with respect to specific enumerated transfers, a burden the Trustee cannot meet, the Trustee will no doubt attempt to rely on the Ponzi scheme presumption. According to this presumption, "the existence of a Ponzi scheme demonstrates actual intent as [a] matter of law because transfers made in the course of a Ponzi scheme could have been made for no other purpose than to hinder, delay or defraud creditors." Citibank, 12 F.4th at 181. While this presumption has been applied by this Court and district courts in other BLMIS cases, Judge Menashi's recent concurrence in Citibank clarified that this "questionable" presumption has not been accepted by the Second Circuit, see Citibank, 12 F.4th at 202 (Menashi J., concurring), and it should not be applied here.[10]

*First*, the Ponzi scheme presumption improperly treats preferences as fraudulent transfers. See id. at 201–02 (reasoning that the presumption "obscures the essential distinction between fraudulent transfers and preferences"). Payments to creditors are normally treated as preferences, not fraudulent transfers. See id. at 200; see also Union Bank v. Wolas, 502 U.S.

---

[10]    This Court has noted in a recent decision that it finds Judge Menashi's argument "unpersuasive." Picard v. UBS Europe SE (In re Bernard L. Madoff Inv. Sec. LLC), Adv. Pro. No. 12-01577 (CGM), 2023 WL 2290822, at *26 (Bankr. S.D.N.Y. Feb. 28, 2023). The Ponzi scheme presumption is currently the subject of a request for an interlocutory appeal, Picard v. Citibank, N.A., et al. (In re Bernard L. Madoff Inv. Sec. LLC), Adv. Pro. No. 10-05345, ECF No. 248 (Bankr. S.D.N.Y. Nov. 2, 2022), on appeal, 22-CV-09597, ECF No. 1 (S.D.N.Y. Nov. 9, 2022), and Tensyr respectfully reserves the right to address the presumption further upon the determination of that appeal.

151, 161 (1991) ("the preference provisions" serve the "policy of equality of distribution among creditors of the debtor") (quoting H.R. Rep. No. 95-595, at 177–78 (1977)).  This is particularly the case here, where Fairfield Sentry was a "net loser."  The purported justification for the Ponzi scheme presumption is that "it is unfair, unjust and against public policy for an innocent investor victim of a 'Ponzi' scheme to receive [returns on their investment] when other investors have not recovered all of their principal."  In re Unified Com. Cap., Inc., 260 B.R. 343, 350–351 (Bankr. W.D.N.Y. Mar. 29, 2001).  If, however, an investor has recovered only a fraction of its initial investment, then the Trustee is seeking to claw back the defendant's recovered *principle*, not profit.  See In re Geltzer, 502 B.R. 760, 770 (Bankr. S.D.N.Y. 2013) (reasoning that "a trustee is not permitted to sue innocent investors in a Ponzi scheme . . . for the return of their principal because transfers of an investor's principal are 'for value'").  The Trustee's use of the Ponzi scheme presumption in this case, where Fairfield Sentry was a net loser, distorts the fraudulent transfer provision's intended purpose.  See id. ("Recovery of an innocent investor's principal would contradict the purpose of a bankruptcy proceeding, which is to provide investors with as great a return of their principal as possible.").

*Second*, proving fraudulent intent under Section 548(a)(1)(A) requires an individualized, asset-by-asset transfer inquiry rather than a focus on "a pattern of transactions that are part of a greater scheme."  Finn v. All. Bank, 860 N.W.2d 638, 647 (Minn. 2015) (construing Minnesota UFTA provision that is virtually identical to Section 548(a)(1)(A)); see also Verestar, 343 B.R. at 468 ("alleged 'pattern of inappropriate transfers' . . . do not evidence fraudulent intent with respect to the specific transfers challenged").  Fraudulent intent under Section 548(a)(1)(A) must be pleaded with the specificity required by FRCP 9(b).  See Sharp, 403 F.3d at 56.  The Ponzi scheme presumption 'presumes away' this critical element of Section

26

548(a)(1)(A), creating a judge-made exception to the Bankruptcy Code and FRCP 9(b) for Ponzi schemes. Such exceptions should be created by Congress, not the courts. See Citibank, 12 F.4th at 201–02 (Menashi J., concurring); Finn, 860 N.W.2d at 647 ("there is no statutory justification" for the presumption); Unified Com. Cap., 260 B.R. at 350 (noting that "many courts have done a substantial injustice to those statutes and have made policy decisions that should be made by Congress"). The Trustee cannot rely on the Ponzi scheme presumption to excuse its failure to plead actual intent to defraud under Section 548(a)(1)(A).

## III. THE COMPLAINT ESTABLISHES THAT TENSYR IS ENTITLED TO THE 11 U.S.C. § 550(b) GOOD FAITH DEFENSE.

Under Section 550(b), a trustee may not recover from a subsequent transferee who took "for value, including satisfaction of or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b). Tensyr's entitlement to this defense is apparent "on the face of the Complaint," Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74 (2d Cir. 1998), and so this Court should dismiss all the subsequent transfer claims against Tensyr.

### A. Tensyr Received the Redemptions for Value.

"Value" under Section 550(b) requires only that a transfer is "sufficient to support a simple contract, analogous to the 'value' required under state law to achieve the status of a bona fide purchaser for value." Fairfield Inv. Fund, 2021 WL 3477479 at *9. The Complaint states that the transfers from Fairfield Sentry to Tensyr were "a redemption of equity interests," Compl. ¶ 129—that is, the transfers were made in exchange for Tensyr surrendering its equity interest in Fairfield Sentry. Such "[s]urrendering [of] equity interests constitutes value for purposes of section 550(b)." Picard v. ABN Amro Bank N.A. (In re Bernard L. Madoff Inv. Sec. LLC), No. AP 08-01789, 2020 WL 1584491, at *9 (Bankr. S.D.N.Y. Mar. 31, 2020). Moreover,

as Tensyr was a "net loser" in its dealings with Fairfield Sentry, *all* of the redemptions received by Tensyr were for value.  Compare Compl. ¶ 126 (Tensyr allegedly received approximately $35 million in subsequent transfers) with Complaint ¶ 22, Dec. 8, 2010, ECF No. 1 (alleging Tensyr "invested approximately $450 million in Sentry"); see In re Bayou Group, LLC, 439 B.R. 284, 309 (S.D.N.Y. 2021) (investors in Ponzi scheme "gave value in the form of their initial investment"); Picard v. Cohen (In re Bernard L. Madoff Inv. Sec. LLC), No. 08-01789, 2016 WL 1695296, at *10, 14 (Bankr. S.D.N.Y. Apr. 25, 2016) ("A transferee does not give value beyond his deposits of principal.").

### B.    Tensyr Received the Redemptions in Good Faith and Without Knowledge of the Voidability of the Transfers.[11]

To determine whether a transferee took a transfer in "good faith" under Section 550(b), courts examine three factors:

1.    What facts the defendant actually knew, a subjective inquiry;

2.    Whether these facts put the transferee on inquiry notice of the alleged fraudulent purpose behind a transaction—that is, whether the facts the transferee knew would have led a reasonable person in the transferee's position to conduct further inquiry into a debtor's possible fraud; and

3.    Whether such a diligent inquiry by the transferee would have discovered the alleged fraudulent purpose of the transfer.

---

[11]    Since the "good faith" analysis depends on "what facts the defendant knew," Citibank, 12 F.4th at 191, a transferee found to have taken a transfer in good faith has, by definition, met Section 550(b)'s requirement that it have no knowledge of a transfer's voidability. See Sec. Inv. Protect. Corp. v. Bernard L. Madoff Inc. Secs. LLC, 516 B.R. 18, 23 n.3 (S.D.N.Y. 2014) ("In light of the legislative history, the most plausible reading is that this third requirement [of Section 550(b)(1)] is merely one specific type of subjective knowledge required . . .").

See Citibank, 12 F.4th at 191–92.    An objective "reasonable person" standard applies in the

second and third steps.    Id.    Both the first and third steps compel dismissal at this stage of the

litigation.

        *First*, the alleged "facts the defendant knew" were not sufficient to put Tensyr on

inquiry notice.    Citibank, 12 F.4th at 191.    In fact, the Complaint fails to allege that Tensyr knew

*any* facts that would put Tensyr on inquiry notice.[12]    While good faith is an affirmative defense,

Citibank, 12 F.4th at 196–97, this Court may find such a defense "apparent on the face of the

complaint" when the plaintiff "nowhere contends" a key fact.    Zuckerman v. Metro. Museum of

Art, 928 F.3d 186, 193 (2d Cir. 2019).    If the Trustee could have pleaded any fact supporting

Tensyr's bad faith or knowledge of Madoff's fraud, it certainly would have included it in the

Complaint, and the failure to do so permits dismissal here.    See In re Leff, 631 B.R. 106, 127

(E.D.N.Y. 2021) (dismissing case where there was no indication "Defendants had knowledge of

such facts that could have put them on notice").    Moreover, the Trustee's own allegations in this

case establish that Tensyr was a net loser in the Madoff scheme, losing more than $400 million.

See Complaint ¶ 22, Dec. 8, 2010, ECF No. 1 (alleging Tensyr "invested approximately $450

million in Sentry").    It is not plausible that Tensyr would have invested over $400 million in

Fairfield Sentry if it had any reason to believe that Fairfield Sentry would invest its money in a

Ponzi scheme.    See In re Bernard L. Madoff Inv. Sec. LLC, 548 B.R. 13, 32 (Bankr. S.D.N.Y.

2016) ("[I]t is not plausible that the average financial professional owing fiduciary duties to its

own clients and investors would knowingly invest their money in a Ponzi scheme that is doomed

to collapse.").

---

[12]    Indeed, the Trustee's initial complaint—in which the Trustee attempted to plead that Tensyr was on inquiry notice—also failed to allege that Tensyr was aware of any facts that would have put Tensyr on inquiry notice.    See generally Complaint, Dec. 8, 2010, ECF No. 1.

*Second*, even if Tensyr were on notice that something was amiss at BLMIS (it was not), the Complaint itself demonstrates that further "diligent inquiry" would not have led Tensyr to "discover[] the fraudulent purpose of the transfer[s]." Citibank, 12 F.4th at 192. The Trustee's own allegations underscore how futile any further inquiry would have been: according to the Complaint, BLMIS was founded in 1960 and was operating a Ponzi scheme undiscovered "since at least the 1980s." Compl. ¶¶ 58, 64. "In December of 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in [assets under management]." Compl. ¶ 69. None of these customers detected the scheme, which went undetected for decades until the scheme collapsed in December 2008. Compl. ¶ 93. The Trustee further alleges that FGG was "willing to lie to protect" its relationship with Madoff and BLMIS, and "spun information to pacify existing FGG investors . . . ," Fairfield Amended Complaint ¶ 5; "omitted material information about Madoff from their representations;" id.; "covered for Madoff in deliberate efforts to get investors and regulators off the scent," id. ¶ 6; "suppressed . . . observations about BLMIS's inexplicable operations," id. ¶ 7; "protected BLMIS from inquiry," id. ¶ 8; "lied to clients about BLMIS's practices in order to keep the money flowing and their fees growing," id. ¶ 9; "adopted [a] policy of trying to prevent prospective investors from contacting Madoff directly," id. ¶ 164; "downplay[ed] Madoff's role," id. ¶ 165; "evad[ed] investor inquiries" and "deliberately tried to conceal Madoff's role with the Feeder Funds," id. ¶ 166; and "guarded the relationship with Madoff," id. ¶ 170, including by "scrubb[ing] references to BLMIS from FGG materials to avoid disclosure of Madoff's role," id. ¶ 237. Through false statements and refusals to hand over responsive documents, BLMIS and FGG were allegedly also able to deceive the Securities and Exchange Commission ("SEC"), despite its investigative tools, broad resources, and its power to subpoena documents and information. Id.

at ¶¶ 236–62; see also, e.g., id. ¶ 248 (Madoff coached FGG personnel to "provide inexact answers [to the SEC] so that the SEC would not gain an accurate understanding of FGG's operations and relationship with BLMIS").  To posit that Tensyr, a small investor organized and operated from Jersey, thousands of miles away from Madoff, could detect a fraud that the SEC, with its power of compulsion, could not, is—to say the least—implausible.

The Second Circuit has recognized that the Madoff Ponzi scheme was a "fraud of 'unparalleled magnitude.'"    Fairfield Inv. Fund, 2021 WL 3477479 at *1.  Tensyr, a twice-removed Fairfield Sentry investor incorporated in Jersey with no direct relationship with BLMIS, could not reasonably have been expected to succeed in discovering Madoff's fraud when so many entities better positioned to do so failed.  The Complaint (and the Fairfield Amended Complaint) thus plead facts showing that a diligent inquiry would not have uncovered the transfers' alleged fraudulent purpose and thereby establish Tensyr's good faith defense.  See Citibank, 12 F4th at 191.

## IV.    THE TRUSTEE FAILS TO PLEAD RECEIPT OF CUSTOMER PROPERTY.[13]

To state a claim for recovery of any of the alleged subsequent transfers listed in Exhibit D to the Complaint, the Trustee must plausibly allege that the transfer Tensyr received originated with BLMIS and was therefore BLMIS customer property that was transferred from BLMIS to Sentry.  See 11 U.S.C. § 550(a) (estate property may be recovered from subsequent transferee); 15 U.S.C. § 78fff-2(c)(3) ("the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property . . .").  To meet this burden, the Complaint must plead facts showing "more than a sheer possibility" that each

---

[13]    Tensyr acknowledges that the Court has rejected similar arguments in related cases.  See e.g., Picard v. Banque SYZ & Co., SA (In re Bernard L. Madoff Inv. Sec. LLC), Adv. Pro. No. 11-02149 (CGM), 2022 WL 2135019, at *12 (Bankr. S.D.N.Y. 2022).  Tensyr nonetheless respectfully contends that Trustee has not adequately pleaded receipt of customer property in the Complaint.

transfer was once BLMIS customer property, Iqbal, 556 U.S. at 678, a standard described in

Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC), 542 B.R. 100, 119 (Bankr. S.D.N.Y.

2015):

> The Trustee must allege facts that support the inference that the funds at
> issue originated with . . . BLMIS, and contain the "necessary vital
> statistics"—the "who, when, and how much" of the transfers to establish
> that an entity was a subsequent transferee of the funds. At the pleading
> stage, the Trustee is not required to provide a "dollar-for-dollar
> accounting" of the exact funds at issue. However, barebones allegations
> that the funds at issue were transferred to the Subsequent Transferees
> without more detail, are insufficient.

In this case, the Trustee fails to plausibly allege that the funds transferred to Tensyr originated

with BLMIS.

First¸ the Complaint does not "tie [the alleged] initial transfers to any subsequent

transfer or [alleged] Subsequent Transferee." Shapiro, 542 B.R. at 119. Instead, the Complaint

merely alleges that "$2,895,000,000 was transferred to Fairfield Sentry during the six years

preceding the Filing Date," Compl. ¶ 120, and speculates that "Fairfield Sentry subsequently

transferred a portion of [those transfers], directly or indirectly, to Tensyr," Compl. ¶ 126.

Exhibit D to the Complaint, titled "Subsequent Transfers from Fairfield Sentry to Tensyr

Limited," is just a list of transfers from Fairfield Sentry to Tensyr, with no information from

which this Court could infer that the transfers were comprised of property received from BLMIS.

See Compl. Ex. D. This "barebones allegation," Shapiro 542 B.R. at 119, asks this Court to

assume that because Fairfield Sentry received customer property from BLMIS at some point

prior to making transfers to Tensyr, the transfers to Tensyr were comprised of customer property.

In other words, the Complaint merely "allege[s] the initial transfers and assert[s], in conclusory

fashion, that the subsequent transferee defendants received subsequent transfers," Sec. Inv. Prot.

Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC), 531 B.R.

439, 474 (Bankr. S.D.N.Y. 2015), without providing any basis for this Court to infer "more than a sheer possibility" that each transfer was BLMIS customer property, Iqbal, 556 U.S. at 678. This is not sufficient.

Second, the Trustee's allegations are not only unsupported, but are also mathematically implausible.  The Trustee alleges that BMLIS transferred approximately $3 billion to Fairfield Sentry, see Compl. ¶ 120, but is attempting to "recover" more than $5 billion in transfers from Fairfield Sentry to other alleged subsequent transfer defendants in this proceeding, see Vandergeest Decl. ¶ 6.  In other words, the Trustee is attempting to recover $2 billion more in subsequent transfers than he alleges BLMIS ever transferred to Fairfield Sentry. Since it likely that at least some of the transfers Tensyr allegedly received were comprised of this unexplained $2 billion, the Trustee cannot show "more than a sheer possibility" that each transfer to Tensyr was BLMIS customer property.  Iqbal, 556 U.S. at 678.  Fairfield Sentry itself has stated that "[f]rom time to time, to make Redemption Payments, [Fairfield] Sentry . . . utilized subscription monies of other investors on hand that were directed for investment in BLMIS."  First Amended Complaint ¶ 63, Fairfield Sentry Ltd. v. Citco Global Custody NV, Adv. Pro. No. 19-1122 (Bankr. S.D.N.Y. Nov. 26, 2019), ECF No. 19.  Because "[t]here is an 'obvious alternative explanation'" for the source of the extra $2 billion of alleged redemptions, "that explanation renders [the Trustee's] competing explanation 'conceivable [but not] plausible.'"  Garfinkle v. Conf. on Jewish Material Claims Against Ger., Inc., No. 19-CV-7007 (JPO), 2020 WL 6323462, at *5 (S.D.N.Y. Oct. 28, 2020) (quoting Twombly, 550 U.S. at 567, 570).

Third, the exhibits to the Complaint confirm the implausibility of the Trustee's allegations.  The Trustee repeatedly seeks to recover alleged subsequent transfers made to Tensyr

months or more than a year after Fairfield Sentry received any transfer from BLMIS.  <u>See</u>
Compl. Exs. A, B.  For example, the Trustee alleges that Tensyr received a subsequent transfer
of $15,600,000 from Fairfield Sentry on July 19, 2007, <u>see</u> Compl. Ex. D, at which point it had
been *more than a year* since the last time that Fairfield Sentry had received any transfer from
BLMIS, <u>see</u> Compl. Ex. B at 25 (showing a transfer of $120,000,000 on April 13, 2006).   In
complaints filed in other recovery actions, the Trustee has pleaded that in the intervening
period—between April 13, 2006 and July 19, 2007—Fairfield Sentry made more than 750 other
subsequent transfers to other defendants, worth more than $470,000,000—or nearly *four times
greater* than the $120,000,000 Sentry received from BLMIS.  <u>See</u> Vandergeest Decl. ¶ 10; <u>see
also</u> Compl. Ex. B.  No matter what creative legal theory the Trustee puts forward, it cannot
stretch that initial transfer from BLMIS to cover the alleged subsequent transfer to Tensyr more
than a year later, underscoring the implausibility that the redemption payment contains BLMIS
"customer property."  <u>Cf.</u> <u>Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)</u>, 515 B.R.
117, 150–51 (Bankr. S.D.N.Y. 2014) (inferring linkage where alleged "subsequent transfers took
place contemporaneously or shortly after an initial transfer," or at most two or three months
later).

      Finally, the Trustee cannot be excused from its failure to adequately plead that
Tensyr received customer property by claiming it needs more information.   The Trustee's
settlement with Fairfield Sentry, signed in 2011, provided the Trustee with access to Fairfield
Sentry's books and records.  <u>See</u> Vandergeest Decl. Ex. A (Settlement Agreement) ¶ 14.  The
Trustee has used that detailed financial information to amend its pleadings in this case, including
to expand the number of alleged subsequent transfers it seeks to recover.  <u>Compare</u> Complaint
Ex. D (alleging approximately $35 million in transfers) <u>with</u> Complaint ¶ 2, Dec. 8, 2010, ECF

34

No. 1 (alleging approximately $30 million in transfers).  Having had access to all of Fairfield

Sentry's financial information for more than a decade, the Trustee cannot now avoid dismissal

for failure to adequately plead information "uniquely in [its] possession."  <u>Sapia v. Home Box

Off., Inc.</u>, No. 18 Civ. 1317 (CM), 2018 WL 6985223, at *8 (S.D.N.Y. Dec. 17, 2018); <u>see also</u>

<u>Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.</u>, 712 F.3d 705, 709, 723 (2d Cir.

2013) ("imprecise pleading is particularly inappropriate . . . where the plaintiffs necessarily have

access, without discovery, to . . . specific information from which to fashion a suitable

complaint").

<b>CONCLUSION</b>

For the reasons above, this Court should dismiss the Complaint.


Dated: New York, New York
      April 17, 2023

Respectfully submitted,

FRESHFIELDS BRUCKHAUS DERINGER US LLP

By:   <u>*s/ David Y. Livshiz*</u>
     Timothy P. Harkness
     David Y. Livshiz
     Christian Vandergeest

601 Lexington Avenue, 31st Floor
New York, New York 10022
Telephone: (212) 277-4000
Facsimile: (212) 277-4001
timothy.harkness@freshfields.com
david.livshiz@freshfields.com
christian.vandergeest@freshfields.com

*Attorneys for Defendant Tensyr Limited*