# Exhibit C

EXECUTION COPY

19 December, 2006

**TENSYR LIMITED**
(as Issuer)

**FAIRFIELD GREENWICH LIMITED**
(as Information Agent and Leverage Manager)

**CITCO FINANCIAL PRODUCTS (LONDON) LIMITED**
(as Verification Agent)

and

**BNY CORPORATE TRUSTEE SERVICES LIMITED**
(as Note Trustee and Security Trustee)

---

**INFORMATION AGENCY AGREEMENT**

---

**SIDLEY AUSTIN**

WOOLGATE EXCHANGE
25 BASINGHALL STREET
LONDON EC2V 5HA
TELEPHONE 020 7360 3600
FACSIMILE 020 7626 7937
REF: SJS/MW/JR/EAP/20401-30090

## CONTENTS

1.  DEFINITIONS AND INTERPRETATION.................................................................. 1

2.  CONDITIONS OF APPOINTMENT ...................................................................... 2

3.  APPOINTMENT OF INFORMATION AGENT ...................................................... 2

4.  INFORMATION AGENCY SERVICES................................................................... 2

5.  OBLIGATIONS OF INFORMATION AGENT........................................................ 3

6.  APPOINTMENT OF VERIFICATION AGENT ...................................................... 4

7.  VERIFICATION AGENCY SERVICES................................................................... 4

8.  REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE
    INFORMATION AGENT AND VERIFICATION AGENT ...................................... 6

9.  CONFLICTS OF INTEREST ................................................................................ 7

10. NO PARTNERSHIP OR JOINT VENTURE ......................................................... 8

11. SERVICES NON-EXCLUSIVE ............................................................................ 8

12. THIRD PARTY ADVICE..................................................................................... 8

13. VERIFICATION AGENCY FEES ......................................................................... 8

14. COSTS, EXPENSES AND INDEMNITY................................................................ 9

15. LIMITS OF INFORMATION AGENT RESPONSIBILITY ...................................... 9

16. INDEMNITY.................................................................................................... 11

17. DISCLOSURE OF INFORMATION ................................................................... 12

18. INFORMATION AGENCY TERM AND TERMINATION ..................................... 12

19. VERIFICATION AGENCY TERM AND TERMINATION ..................................... 14

20. ASSIGNMENTS AND TRANSFERS.................................................................... 15

21. THE SECURITY TRUSTEE ............................................................................... 15

22. FURTHER ASSURANCES ................................................................................. 16

23. LIMITED RECOURSE; NON-PETITION............................................................ 16

24. AMENDMENTS .............................................................................................. 17

25. NOTICES ....................................................................................................... 17

i

26.    PARTIAL INVALIDITY ................................................................ 17

27.    ENTIRE AGREEMENT ................................................................ 17

28.    CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999 .................................... 18

29.    COUNTERPARTS ................................................................ 18

30.    GOVERNING LAW AND JURISDICTION ................................................ 18

SCHEDULE FUND REPORT INFORMATION .................................................. 20

EXECUTION PAGES .................................................................. 21

**THIS INFORMATION AGENCY AGREEMENT** (this "**Agreement**") is made on 19 December, 2006

**BETWEEN:**

(1)    **TENSYR LIMITED**, a private company incorporated with limited liability under the laws of Jersey (with registered number 95248) having its registered office at Whiteley Chambers, Don Street, St Helier, Jersey JE4 9WG, Channel Islands (the "**Issuer**");

(2)    **FAIRFIELD GREENWICH LIMITED**, whose principal office is at c/o Offices of Charles Adams, Ritchie & Duckworth, Second Floor, Zephyr House, Mary Street, P.O. Box 709, George Town, Grand Cayman KY1-1107, Cayman Islands, in its capacity as information agent (the "**Information Agent**");

(3)    **FAIRFIELD GREENWICH LIMITED**, whose principal office is at c/o Offices of Charles Adams, Ritchie & Duckworth, Second Floor, Zephyr House, Mary Street, P.O. Box 709, George Town, Grand Cayman KY1-1107, Cayman Islands, in its capacity as leverage manager (the "**Leverage Manager**");

(4)    **CITCO FINANCIAL PRODUCTS (LONDON) LIMITED**, whose principal office is at 7 Albermarle Street, London, W1S 4HQ, in its capacity as verification agent (the "**Verification Agent**");

(5)    **BNY CORPORATE TRUSTEE SERVICES LIMITED**, whose principal office is at One Canada Square, London E14 5AL, England, in its capacity as note trustee (the "**Note Trustee**"); and

(6)    **BNY CORPORATE TRUSTEE SERVICES LIMITED**, whose principal office is at One Canada Square, London E14 5AL, England, in its capacity as security trustee (the "**Security Trustee**").

**WHEREAS:**

(A)    The Issuer intends to invest in Fund Shares.

(B)    The Issuer intends to fund its investment in Fund Shares by issuing the Notes.

(C)    The Information Agent has agreed to act as agent for the Issuer and to provide certain information to the Issuer, the Note Trustee, Leverage Manager, the Verification Agent, the Class S Noteholders, the Class M Noteholders and the Rating Agencies on the terms set out herein.

**IT IS AGREED** as follows:

1.      **DEFINITIONS AND INTERPRETATION**

Capitalised terms defined in Clause 1 (*Definitions*) of the master definitions and construction schedule dated on or about the Closing Date and signed for identification purposes by, among others, the parties to this Agreement (the "**Master Definitions Schedule**") shall have the same meanings in this Agreement (including the recitals hereto) except in so far as the context otherwise requires or unless otherwise defined in this Agreement or the recitals hereto.  This Agreement shall be construed in

1

accordance with the interpretations and construction provisions set out in Clause 2 (*Principles of Interpretation and Construction*) of the Master Definitions Schedule and such provisions shall be incorporated by reference into this Agreement as if set out in full in this Agreement.

2.    **CONDITIONS OF APPOINTMENT**

The appointment of each of the Information Agent and the Verification Agent under this Agreement as agent of the Issuer is conditional upon the issue of the Notes having taken place and shall take effect (subject to the foregoing) upon and from the Closing Date automatically and without further action on the part of any party hereto. If such conditions have not been satisfied on the Closing Date, this Agreement shall cease to be of further effect save for the purpose of enforcing accrued rights of action (if any) which may have arisen prior to this Agreement ceasing to have effect and save for the provisions of Clause 15 (*Limits of Information Agent Responsibility*), Clause 16 (*Indemnity*) and Clause 23 (*Limited Recourse; Non-Petition*) which shall survive the termination of this Agreement.

3.    **APPOINTMENT OF INFORMATION AGENT**

3.1    The Issuer hereby appoints the Information Agent to act as its agent to carry out and perform the services, duties and obligations of the Information Agent provided in Clause 4 (*Information Agency Services*) (the "**Information Agency Services**") on the terms and subject to the conditions set forth in this Agreement. The Information Agent hereby accepts such appointment.

3.2    At any time after a Note Event of Default or a Potential Note Event of Default has occurred, the Security Trustee may, by written notice to the Issuer and the Information Agent, require the Information Agent, until notified in writing by the Security Trustee to the contrary, to the fullest extent permitted by any applicable law or by any regulation having general application, to act thereafter on behalf of the Security Trustee in relation to the Information Agency Services under this Agreement on the same terms that the Information Agent acts for the Issuer under this Agreement (provided that the Security Trustee's liability under any provision of this Agreement for the indemnification, remuneration and expenses of the Information Agent shall be limited to amounts held by the Security Trustee on the terms of the Security Documents) and upon receipt of such written notice, the Information Agent hereby agrees to so act as Information Agent under this Agreement on behalf of the Security Trustee.

3.3    The Information Agent shall not delegate any of its duties or obligations under this Agreement to any other person without the prior written consent of the Issuer and the Security Trustee, provided that the Information Agent may delegate its duties to any Affiliate of the Information Agent who is able to perform the obligations of the Information Agent under this Agreement and the Information Agent remains liable for the obligations of the delegate.

4.    **INFORMATION AGENCY SERVICES**

4.1    On each Information Day, the Information Agent shall calculate the Maximum LTV.

4.2    On each Information Day, the Information Agent shall deliver or make available to the Issuer, the Note Trustee, the Leverage Manager, the Class S Noteholders, the Class M Noteholders and the Rating Agencies a Fund Report which includes the information set forth in the Schedule (*Fund Report Information*).

4.3    On each day falling three Business Days after each Official Share Value Date, the Information Agent shall notify the Verification Agent of the Gross Share Value and the Maximum LTV as of such Official Share Value Date.

4.4    If a Verification Period commences in accordance with Clause 7.3 (*Verification Agency Services*), the Information Agent shall deliver to the Verification Agent on each Information Day during such Verification Period the Information Agent's calculations of the Gross Share Value, the Net Share Value and the Maximum LTV as of close of business in New York City on the preceding Business Day.

## 5.    OBLIGATIONS OF INFORMATION AGENT

5.1    The Information Agent shall notify the Issuer, the Leverage Manager, the Note Trustee and the Security Trustee as soon as reasonably practicable:

(a)    after learning of any adverse change with respect to the condition, financial or otherwise, of CITCO Bank Nederland N.V., CITCO Global Custody N.V. or BLM which could reasonably be expected to have a material adverse affect on the performance or liquidity of the Fund Shares;

(b)    of any material adverse change that has occurred since the Closing Date with respect to the Fund, which change could be expected to result, directly or indirectly in:

(i)    reduced or impaired liquidity of the Fund Shares;

(ii)    BLM not being able to execute the option trading strategy described in the Private Placement Memorandum for the benefit of the Fund for the next 12 months; or

(iii)    reduced or impaired rights of the Fund Shares (including, without limitation, the creation of a Security Interest in favour of third parties over a material portion of the Fund Assets);

(c)    if it ceases to be the information agent of the Issuer;

(d)    of a change in the identity of the Account Bank, the Fund prime-broker, the Fund custodian or the Fund Administrator; and

(e)    it shall provide prior written notice to the Issuer, the Collateral Administrator and the Security Trustee of any proposed amendment to the Investment Guidelines and shall not amend the Investment Guidelines without the prior written approval of the Rating Agencies.

5.2    On the date of this Agreement, the Information Agent shall deliver the Investment Guidelines to the Verification Agent and notify the Verification Agent of any changes to such Investment Guidelines.

5.3 The Information Agent shall promptly deliver the Investment Guidelines to any replacement Verification Agent and notify it of any changes to such Investment Guidelines.

5.4 The Information Agent shall co-operate with the Leverage Manager and the Collateral Administrator and provide such information to the Leverage Manager and the Collateral Administrator concerning the Fund Shares from time to time as it may reasonably request in the performance of its duties and obligations under the Leverage Management Agreement, in the case of the Leverage Manager, and the Collateral Administration and Account Bank Agreement, in the case of the Collateral Administrator.

6. **APPOINTMENT OF VERIFICATION AGENT**

6.1 The Issuer hereby appoints the Verification Agent to act as its agent to carry out and perform the services, duties and obligations of the Verification Agent provided in Clause 7 (*Verification Agency Services*) (the "**Verification Agency Services**") on the terms and subject to the conditions set forth in this Agreement. The Verification Agent hereby accepts such appointment.

6.2 At any time after a Note Event of Default or a Potential Note Event of Default has occurred, the Security Trustee may, by written notice to the Issuer and the Verification Agent, require the Verification Agent, until notified in writing by the Security Trustee to the contrary, so far as permitted by any applicable law or by any regulation having general application, to act thereafter on behalf of the Security Trustee in relation to the Verification Agency Services under this Agreement on the same terms that the Verification Agent acts for the Issuer under this Agreement (provided that the Security Trustee's liability under any provision of this Agreement for the indemnification, remuneration and expenses of the Verification Agent shall be limited to amounts held by the Security Trustee on the terms of the Security Documents) and upon receipt of such written notice, the Verification Agent hereby agrees to so act as Verification Agent under this Agreement on behalf of the Security Trustee.

6.3 The Verification Agent shall not delegate any of its duties or obligations under this Agreement to any other person without the prior written consent of the Issuer and the Security Trustee.

7. **VERIFICATION AGENCY SERVICES**

7.1 Upon the receipt by the Verification Agent of the Maximum LTV from the Information Agent pursuant to Clause 4.3 (*Information Agency Services*), the Verification Agent shall compare such Maximum LTV to its own calculation of the Maximum LTV, calculated on the basis of information available to it.

7.2 As soon as the Fund Administrator has determined and published the Official Gross Share Value of one Fund Share and the Verification Agent has received the same as contemplated by Clauses 8.3 (*Representations, Warranties and Covenants of the Information Agent and Verification Agent*) and 8.4 (*Representations, Warranties and Covenants of the Information Agent and Verification Agent*), the Verification Agent shall compare such Official Gross Share Value to the Gross Share Value notified to it

4

by the Information Agent pursuant to Clause 4.3 (*Information Agency Services*).

7.3    If the Verification Agent determines that there is a difference of more than:

(a)    0.5 per cent. between the Official Gross Share Value published by it and the Gross Share Value notified to it by the Information Agent pursuant to Clause 4.3 (*Information Agency Services*); or

(b)    0.0025 between its own computation of the Maximum LTV and the Maximum LTV notified to it by the Information Agent pursuant to Clause 4.3 (*Information Agency Services*),

it shall promptly notify the Issuer, the Information Agent, the Collateral Administrator, the Leverage Manager and the Note Trustee of the discrepancy and that a Verification Period has commenced.

7.4    On each Information Day during a Verification Period, the Verification Agent shall determine the Gross Share Value, the Net Share Value and the Maximum LTV using its own calculations.

7.5    Within three Business Days of the Verification Agent's receipt of the Gross Share Value, Net Share Value and the Maximum LTV from the Information Agent pursuant to Clause 4.4 (*Information Agency Services*), the Verification Agent shall compare such Gross Share Value, Net Share Value and Maximum LTV against its own determination of the Gross Share Value, the Net Share Value and the Maximum LTV for such Information Day (and all determinations shall be made as of the same time with respect to any Business Day).

7.6    If on any Business Day during a Verification Period, the Verification Agent determines that there is a difference of more than (x) 0.5 per cent. between the Gross Share Value determined by it and the Gross Share Value provided by the Information Agent to it or (y) 0.0025 between the Maximum LTV determined by it and the Maximum LTV provided by the Information Agent to it:

(a)    the Verification Agent shall so notify the Issuer, the Collateral Administrator, the Information Agent and the Note Trustee;

(b)    the appointment of the Information Agent shall terminate automatically pursuant to Clause 18 (*Information Agency Term and Termination*); and

(c)    the Verification Agent will be automatically appointed by the Issuer as a replacement Information Agent under this Agreement and the Verification Agent accepts such automatic appointment and agrees to perform all the obligations of the Information Agent under this Agreement, except for those obligations in Clause 4.3 (*Information Agency Services*), 4.4 (*Information Agency Services*), paragraphs (a), (b), (d) and (e) of Clause 5.1 (*Obligations of Information Agent*) and Clause 5.4 (*Obligations of Information Agent*) on behalf of the Issuer upon the terms and subject to the conditions of this Agreement, such appointment and acceptance not to be rescinded until after the Scheduled Maturity Date.

5

8.  **REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE INFORMATION AGENT AND VERIFICATION AGENT**

8.1  As of the date of this Agreement and each Payment Date, each of the Information Agent and the Verification Agent hereby represents and warrants to the Issuer, the Security Trustee and the Note Trustee that:

    (a)   (i)   it is duly incorporated with full power and authority for it to carry on its business as it is being conducted, and to execute, sign, deliver and perform the transactions contemplated in the Transaction Documents to which it is a party; and

          (ii)   the Transaction Documents to which it is a party constitute its legal, valid and binding obligations, enforceable against it in accordance with their terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding at equity or at law));

    (b)   neither the signing and delivery of this Agreement nor any other Transaction Document to which it is a party contravenes or constitutes a default under, or causes to be exceeded any limitation on it or the powers of its directors imposed by or contained in:

          (i)   any law or regulation by which it or any of its assets is bound or affected;

          (ii)   its constitutional documents; or

          (iii)   any agreement to which it is a party or by which it or any of its assets is bound,

the violation of which could reasonably be expected to have a material adverse effect on its business operations or its ability to perform its obligations under the Transaction Documents;

    (c)   it has duly obtained or made each authorisation, approval, consent, licence, exemption, registration or declaration required for or in connection with the execution, delivery, performance, validity and enforceability, and admissibility in evidence in England, Jersey, Belgium, the Cayman Islands of this Agreement, each of the Transaction Documents to which it is a party and any obligations contemplated thereby and such authorisations, approvals, consents, licences, exemptions, registrations and declarations have been unconditionally obtained, are in full force and effect and there has been no default in the observance of any conditions or restrictions imposed in, or in connection with the same;

    (d)   it is not a party to any litigation, arbitration or administrative proceedings and, to its knowledge, no relevant litigation, arbitration or administrative proceedings are pending or threatened against it that is likely to affect the

legality, validity or enforceability against it of this Agreement or its ability to perform its obligations under this Agreement;

(e)     no Insolvency Event has occurred in respect of it;

(f)     all information delivered or provided by it under this Agreement is accurate in all material respects as of the date of such information and conforms to that required by this Agreement; and

(g)     in the performance of its obligations under this Agreement it is an independent agent of the Issuer acting in the ordinary course of its business.

8.2     As at the date of this Agreement and each Payment Date, the Information Agent hereby represents and warrants to the Issuer, the Security Trustee and the Note Trustee that the Investment Guidelines provided to the Verification Agent pursuant to Clause 5.2 (*Obligations of Information Agent*) have been approved by the Rating Agencies.

8.3     As at the date of this Agreement and each Payment Date, the Verification Agent hereby represents and warrants that it is entitled to receive from the Fund Administrator (without any breach of a duty of confidentiality or breach of any contract on the part of the Fund Administrator) any necessary information (the **"Sensitive Information"**) in order to calculate the Maximum LTV, the Net Share Value or the Gross Share Value as at the date they are due to be calculated.

8.4     The Verification Agent covenants with the Issuer to use its best endeavours to obtain the Sensitive Information from the Fund Administrator on each Information Day.

8.5     The parties hereto agree that the Verification Agent may rely on the information provided to it by the Fund Administrator and will have no obligation to verify such information and shall not be liable for any error in such information.

9.     **CONFLICTS OF INTEREST**

9.1     The Information Agent and its Affiliates and their directors, officers and employees have multiple advisory, transactional and financial and other interests in the Fund.

9.2     In certain circumstances, the interests of the Issuer or the Noteholders with respect to matters as to which the Information Agent is acting on behalf of the Issuer, may conflict with the interests of the Information Agent and its Affiliates. Each of the Issuer, the Note Trustee and the Security Trustee hereby acknowledges that various potential and actual conflicts of interest may exist with respect to the Information Agent and its Affiliates (including, without limitation, those described in the Private Placement Memorandum) and that the Information Agent, its Affiliates, their respective directors, officers or employees may engage in other business and furnish investment management and advisory services to others including, without limitation, the Fund or persons who may own obligations or securities issued by the Fund. The Information Agent shall be free, in its sole discretion, to make recommendations to others, which may be the same as or different from those given to the Issuer.

10.    **NO PARTNERSHIP OR JOINT VENTURE**

None of the Issuer, the Information Agent or the Verification Agent are partners and do not constitute or form part of a joint venture with each other and nothing in this Agreement shall be construed to make them such partners or constitute or form a joint venture or impose any liability as such on either of them. Each of the Information Agent and the Verification Agent shall be, for all purposes herein, deemed to be an independent contractor and shall, except as otherwise expressly provided herein or authorised by the Issuer from time to time, have no authority to act for or represent the Issuer or otherwise be deemed an agent of the Issuer.

11.    **SERVICES NON-EXCLUSIVE**

Nothing in this Agreement shall prevent either the Information Agent or the Verification Agent from rendering services similar to those provided for in this Agreement to other persons, firms or companies carrying on business similar to or in competition with the business of the Issuer.

12.    **THIRD PARTY ADVICE**

Each of the parties hereto agrees that each of the Information Agent and the Verification Agent may, in respect of this Agreement, engage and pay for the advice or services of any banker, banking company, accountant, lawyer, valuer or any other professional advisers or experts whose advice or services may seem necessary, expedient or desirable to it and, except in the case of manifest error, rely and act upon any advice so obtained for the performance of their respective duties and services under this Agreement and shall not be responsible for any loss occasioned by so acting.

13.    **VERIFICATION AGENCY FEES**

13.1    In consideration of the provision of the Verification Agency Services pursuant to this Agreement, the Issuer shall pay to the Verification Agent the following fees:

(a)    **"Standard Verification Agency Fee"** of USD [ 70,000] per annum. The Standard Verification Agency Fee will accrue from day to day from and including the Closing Date up to and excluding the earlier to occur of (i) the Scheduled Maturity Date, (ii) the date on which the Verification Agent is appointed by the Issuer as the replacement Information Agent pursuant to Clause 7.6 and shall be payable semi-annually in arrear on each Payment Date and (iii) the date the Verification Agent is replaced pursuant to Clause 19 (*Verification Agency Term and Termination*)

(b)    a **"Verification Period Fee"** of USD [100,000] per Verification Period. The Verification Period Fee will accrue from day to day during each Verification Period, provided no such Verification Period Fee shall accrue from the date on which the Verification Agent is appointed by the Issuer as replacement Information Agent pursuant to Clause 7.6, and shall be payable in arrear on each Payment Date falling during such Verification Period or, if accrued after the final Payment Date falling in such Verification Period or if there is no

Payment Date falling in such Verification Period, on the first Payment Date falling after the end of the Verification Period; and

(c) a "**Replacement Event Agency Fee**" of USD [140,000] per annum. The Replacement Event Agency Fee will accrue from day to day from and including the date on which the Verification Agent is appointed by the Issuer as the replacement Information Agent pursuant to Clause 7.6 to but excluding the Scheduled Maturity Date and shall be payable semi-annually in arrear on each Payment Date.

13.2   All amounts payable pursuant to this Clause 13 shall be determined on the basis of the number of days in the relevant period (including the first day of such period but excluding the last) divided by 360. All amounts payable by the Issuer to the Verification Agent shall be payable in accordance with and subject to the applicable Priority of Payments.

## 14.   COSTS, EXPENSES AND INDEMNITY

14.1   The Issuer shall but only if and to the extent that there are funds available following application of amounts standing to the credit of the Cash Account in accordance with the relevant Priority of Payments, pay all out-of-pocket costs and expenses (including without limitation legal fees properly incurred by the Information Agent or the Verification Agent, as the case may be) in the performance of the Information Agency Services and the Verification Agency Services.

14.2   The Issuer shall, subject to the terms of the Deed of Charge and Assignment, to the relevant Priority of Payments and to Clause 23 (*Limited Recourse; Non-Petition*), from time to time on written demand of the Information Agent or the Verification Agent, indemnify and hold harmless the Information Agent or the Verification Agent, as the case may be, against any liabilities, losses, damages, actions, proceedings, claims or demands which it may incur or be subject to in direct consequence of this Agreement or as a direct result of the performance of the functions and services provided for under this Agreement, except as a result of the gross negligence, wilful default or fraud of the Information Agent or the Verification Agent, as the case may be.

14.3   The indemnities provided in this Clause 14 (*Costs, Expenses and Indemnity*) in favour of the Information Agent shall automatically terminate on any entity other than Fairfield Greenwich Limited or any of its Affiliates being appointed as Information Agent pursuant to this Agreement.

## 15.   LIMITS OF INFORMATION AGENT RESPONSIBILITY

15.1   In the performance by the Information Agent of the Information Agency Services it:

(a)   shall not be responsible for:

(i)   any action it takes on behalf of the Issuer, the Note Trustee or the Security Trustee in compliance with this Agreement; or

(ii)   any action that it is permitted to take pursuant to this Agreement,

provided that nothing in this paragraph (a) shall affect any liability the Information Agent incurs as a result of any Information Agent Breach (as defined in Clause 15.2) or any other breach of this Agreement, or its own gross negligence, wilful default or fraud;

(b)    shall not be responsible in any event for any action or inaction by the Issuer, the Leverage Manager or any other person in declining to follow or failing to follow any direction or instruction of any other person, including the Information Agent (except in the case of directions or instructions issued by the Information Agent which contain a manifest error);

(c)    shall not, in the absence of manifest error, incur liability to anyone in acting upon any signature, instrument, statement, notice, resolution, request, direction, consent, order, report, opinion, bond or other document, paper or data reasonably believed by it to be genuine and reasonably believed by it to be properly executed or signed or originated by the proper party or parties; and

(d)    shall be entitled to rely, in the absence of manifest error, upon the accuracy and completeness (in accordance with this Agreement), of notices and information supplied by the Leverage Manager or the Collateral Administrator.

15.2    The Information Agent and its Affiliates, its delegates and their respective managers, directors, officers, partners, agents and employees shall not be liable (whether directly or indirectly, in contract or in tort or otherwise) to the Issuer, any Secured Party or the Noteholders or any other person for any losses, costs, claims, damages, judgments, interest on judgments, assessments, fees, charges, expenses, demands, penalties and amounts paid in settlement or other liabilities (collectively, "**Liabilities**") incurred by the Issuer, any Secured Party or the Noteholders or any other person as a result of or arising out of or in connection with the actions taken, or any acts or omissions, by the Information Agent, its Affiliates, its delegates, and their respective managers, directors, officers, partners, agents or employees under or in connection with this Agreement, provided that nothing shall relieve the Information Agent from Liabilities incurred by any such person:

(a)    by reason of acts or omissions constituting fraud, bad faith, wilful misconduct or gross negligence in the performance of the obligations of the Information Agent under this Agreement or reckless disregard with respect to its obligations under this Agreement;

(b)    with respect to any unauthorised offers or solicitations of offers for the Notes to investors by the Information Agent or any of its Affiliates; or

(c)    by reason of any other breach by the Information Agent of its obligations, representations or warranties under this Agreement or any other Transaction Document to which it is a party,

save that in no circumstances shall the Information Agent be liable to the Issuer, any Secured Party or the Noteholders or any other person for (x) any Liabilities which comprise special, indirect, consequential or punitive loss or damages (as opposed to direct loss or damages) or (y) any Liability which is excluded pursuant to paragraphs

10

(a) to (d) of Clause 15.1, inclusive.

The matters described in paragraphs (a), (b) and (c) above, subject to the exceptions listed in paragraphs (x) and (y) above, are collectively referred to for purposes of this Clause 15 as **"Information Agent Breaches"**.

16.    **INDEMNITY**

16.1    In the event that the Issuer or any of its directors (the Issuer and its directors, each being an **"Indemnified Party"**) suffers or incurs Liabilities (including, without limitation, any expenses of litigation or preparation therefor whether or not the Indemnified Party is a party thereto) as a result of an Information Agent Breach or alleged Information Agent Breach, provided such allegation is not frivolously or vexatiously made and is withdrawn or discharged within 21 days of such allegation, the Information Agent shall (subject to the terms of this Agreement and in particular this Clause 16) indemnify and hold harmless each Indemnified Party against any and all Liabilities (including, without limitation, any expenses of litigation or preparation therefor whether or not the Indemnified Party is a party thereto) and all reasonable fees and expenses, of any nature whatsoever, properly incurred and paid by each such Indemnified Party (including reasonable legal fees and expenses) as a result of any Information Agent Breach or alleged Information Agent Breach, provided such allegation is not frivolously or vexatiously made and is withdrawn or discharged within 21 days of such allegation, provided that the aggregate amount payable by the Information Agent under this Clause 16, together with any amounts payable by any Affiliate thereof under any indemnity obligation pursuant to the Transaction Documents shall not exceed USD 70,000,000.

16.2    An Indemnified Party shall give written notice to the Information Agent of such claim promptly and in any event within 30 days if the Indemnified Party receives a notice of any actual loss, claim, damage or liability giving rise to a claim for indemnification under this Clause 16, which notice shall specify in reasonable detail the nature of the claim and the amount (or an estimate of the amount) of the claim, provided that failure to notify the Information Agent shall not relieve the Information Agent from its obligations under Clause 16.1, unless such failure impairs the ability of the Information Agent at its own cost, to mitigate or defend against such loss, claim, damage or liability.

16.3    The obligations of the Information Agent under this Clause 16 shall survive the termination of this Agreement but, in any event, shall terminate on the day falling one year and one day after the Final Maturity Date.

16.4    The rights of the Issuer under this Clause 16 are in addition to and not exclusive of any other rights that the Issuer may have against the Information Agent and the limitation of the amount of any indemnity payments under Clause 16 shall not limit the amount the Issuer may claim or recover in exercise of such other rights.

16.5    The indemnities provided in this Clause 16 shall automatically terminate on any entity other than Fairfield Greenwich Limited or any of its Affiliates being appointed as Information Agent pursuant to this Agreement, provided that such indemnities shall survive with respect to Fairfield Greenwich Limited and its Affiliates.

17.    **DISCLOSURE OF INFORMATION**

The parties to this Agreement shall, during the continuance of this Agreement and after its termination, keep confidential and not disclose to any person whatsoever (except with the authority of the other parties to this Agreement) any information which that party has acquired under or in connection with this Agreement other than:

(a)    the disclosure of any information to any person as expressly permitted by the Transaction Documents;

(b)    if required to do so by an order of a court of competent jurisdiction whether in pursuance of any procedure for discovering documents or otherwise;

(c)    pursuant to any law or regulation or requirement of any governmental agency in accordance with which that party is required or accustomed to act (including, without limitation, any official bank examiners or regulators or any stock exchange on which any Notes of the Issuer are listed from time to time);

(d)    to any governmental, banking or taxation authority of competent jurisdiction;

(e)    to its auditors or legal or other professional advisers; or

(f)    to any Rating Agency, any information which such Rating Agency may require to be disclosed to it,

provided that the above restriction shall not apply to:

(i)    disclosures to employees, officers or agents of any of the parties referred to in paragraph (a) above any part of whose functions are or may be in any way related to this Agreement, provided that such persons are subject to the provisions of this Clause 17;

(ii)    information already known to a recipient otherwise than in breach of this Clause 17;

(iii)    information also received from another source on terms not requiring it to be kept confidential; and

(iv)    information which is or becomes publicly available otherwise than in breach of this Clause 17.

18.    **INFORMATION AGENCY TERM AND TERMINATION**

18.1    The Information Agent's appointment under this Agreement shall terminate automatically on:

(a)    the determination by the Verification Agent on any Information Day during a Verification Period that there is a difference of more than 0.5 per cent. between the Gross Share Value calculated by it pursuant to Clause 7.4 (*Verification Agency Services*) and the Gross Share Value provided by the Information Agent to it pursuant to Clause 4.4 (*Information Agency Services*);

(b)    the determination by the Verification Agent on any Information Day during a Verification Period that there is a difference of more than 0.0025 between the Maximum LTV determined by it pursuant to Clause 7.4 (*Verification Agency Services*) and the Maximum LTV provided by the Information Agent to it pursuant to Clause 4.4 (*Information Agency Services*); and

(c)    the insolvency, liquidation or winding-up of the Information Agent.

18.2    Each of the Issuer and, following the occurrence of a Note Event of Default or as otherwise expressly permitted under the terms of the Transaction Documents, the Security Trustee may by written notice to the Information Agent, and subject to the Information Agent Termination Condition (defined below), terminate the Information Agent's appointment under this Agreement with immediate effect upon the occurrence of any of the following events:

(a)    the Information Agent fails to comply with or perform any of its material obligations under this Agreement;

(b)    any representation or warranty made in this Agreement by the Information Agent proves to have been false or misleading in any material respect as of the time it was made;

(c)    any action taken by the Information Agent constitutes fraud against the Issuer; or

(d)    any act or omission on the part of the Information Agent which was undertaken in bad faith or which constituted gross negligence, wilful misconduct or wilful disregard of its obligations under this Agreement,

provided that each of the Issuer and, following the occurrence of a Note Event of Default or as otherwise expressly permitted under the terms of the Transaction Documents, the Security Trustee shall have the power to waive any of the events described above if it determines in its sole discretion that such waiver would be in the best interests of the Issuer.

18.3    In addition, each of the Issuer and, following the occurrence of a Note Event of Default or as otherwise expressly permitted under the terms of the Transaction Documents, the Security Trustee may, by not less than 90 day's prior written notice to the Information Agent and subject to the Information Agent Termination Condition, without cause terminate the Information Agent's appointment under this Agreement.

18.4    The Information Agent may, with or without cause and subject to the Information Agent Termination Condition, resign from its obligations, under this Agreement on not less than 90 days' prior written notice to the Issuer and the Note Trustee (with a copy to the Security Trustee and the Leverage Manager).

18.5    Other than as a result of an automatic termination of the appointment of the Information Agent, no termination of the appointment of the Information Agent shall become effective until the appointment of a replacement Information Agent (the **"Information Agent Termination Condition"**), provided that if no replacement Information Agent has been appointed by the 30th calendar day after the Information

13

Agent's appointment has effectively terminated in accordance with Clauses 18.2, 18.3 or 18.4 above, then the Information Agent may appoint a successor Information Agent in its absolute discretion. The appointment of a replacement administrator shall be subject to satisfaction of the Rating Condition.

19.  **VERIFICATION AGENCY TERM AND TERMINATION**

19.1  The appointment of the Verification Agent under this Agreement shall terminate automatically on the earlier to occur of the insolvency, liquidation or winding-up of the Verification Agent.

19.2  Each of the Issuer and, following the occurrence of a Note Event of Default or as otherwise expressly permitted under the terms of the Transaction Documents, the Security Trustee may by written notice to the Verification Agent, and subject to the Verification Agent Termination Condition (defined below), terminate the Verification Agent's appointment under this Agreement with immediate effect upon the occurrence of any of the following events:

(a)  the Verification Agent fails to comply with or perform any of its material obligations under this Agreement;

(b)  any representation or warranty made in this Agreement by the Verification Agent proves to have been false or misleading as of the time it was made;

(c)  any action taken by the Verification Agent constitutes fraud against the Issuer; or

(d)  any act or omission on the part of the Verification Agent which was undertaken in bad faith or which constituted negligence, wilful misconduct or wilful disregard of its obligations under this Agreement,

provided that each of the Issuer and, following the occurrence of a Note Event of Default or as otherwise expressly permitted under the terms of the Transaction Documents, the Security Trustee shall have the power to waive any of the events described above if it determines in its sole discretion that such waiver would be in the best interests of the Issuer.

19.3  In addition, each of the Issuer and, following the occurrence of a Note Event of Default or as otherwise expressly permitted under the terms of the Transaction Documents, the Security Trustee may, by not less than 90 days' prior written notice to the Verification Agent and subject to the Verification Agent Termination Condition, without cause terminate the Verification Agent's appointment under this Agreement.

19.4  The Verification Agent may, with or without cause and subject to the Verification Agent Termination Condition, resign from its obligations under this Agreement on not less than 90 days' prior written notice to the Issuer and the Note Trustee (with a copy to the Security Trustee and the Leverage Manager).

19.5  Other than as a result of an automatic termination of the appointment of the Verification Agent, no termination of the appointment of the Verification Agent shall become effective until the appointment of a replacement Verification Agent (the "**Verification Agent Termination Condition**"), provided that if no replacement

14

Verification Agent has been appointed by the 30th calendar day after the Verification Agent's appointment has effectively terminated in accordance with Clauses 19.2, 19.3 or 19.4 above, then the Verification Agent may appoint a successor Verification Agent in its absolute discretion.  The appointment of a replacement Verification Agent shall be subject to satisfaction of the Rating Condition.

## 20. ASSIGNMENTS AND TRANSFERS

20.1  Neither the Information Agent nor the Verification Agent shall be entitled to assign or transfer all or part of its rights and benefits or obligations under this Agreement unless:

(a)  each of the other parties to this Agreement (in the case of the Issuer, acting on the instructions of the Controlling Class) consents in writing to the assignment or transfer (such consent not to be unreasonably withheld or delayed);

(b)  the assignee or transferee agrees in writing to be bound by the terms of this Agreement as if it were the Information Agent or Verification Agent (as applicable); and

(c)  the Rating Condition is satisfied.

20.2  Other than in accordance with Condition 9(b) (*Substitution of Issuer*), the Issuer may only transfer or assign the benefit of this Agreement to the Security Trustee by way of security pursuant to the Deed of Charge and Assignment.

## 21. THE SECURITY TRUSTEE

21.1  In the event that there is any change in the identity of the Security Trustee or any appointment of a substitute security trustee in accordance with the terms of the Deed of Charge and Assignment, each of the parties to this Agreement shall execute such documents and take such actions as the outgoing or, as the case may be, the existing Security Trustee or such substitute trustee may reasonably require for the purpose of vesting in such trustee the rights, powers and obligations of the Security Trustee under this Agreement and the Deed of Charge and Assignment and releasing the retiring Security Trustee from further obligations under this Agreement and the Deed of Charge and Assignment and, while any Notes remain outstanding, the Issuer shall give notice in writing thereof to the Rating Agencies.

21.2  Any corporation or association into which the Verification Agent, the Note Trustee, the Security Trustee or the Information Agent may be merged or converted or with which any of them may be consolidated, or any corporation or association resulting from any merger, conversion or consolidation to which the Verification Agent, the Note Trustee, the Security Trustee or the Information Agent shall be a party, or any corporation or association to which all or substantially all of the corporate trust and agency business of any of them may be sold or otherwise transferred, shall be the successor under this Agreement without any further act.

21.3  The parties to this Agreement (other than the Note Trustee and the Security Trustee) agree and acknowledge that nothing herein contained shall impose any obligation or liability on the Note Trustee or the Security Trustee to assume or perform any of the

obligations of the Issuer, the Information Agent, the Leverage Manager or the Verification Agent under this Agreement or render it liable for any breach thereof.

21.4    Each of the Note Trustee and the Security Trustee has agreed, save as expressly provided herein, to become a party to this Agreement solely for the purposes of taking the benefit of this Agreement and agreeing to amendments to this Agreement pursuant to Clause 24 (*Amendments*) and this Clause 21 and the Note Trustee and the Security Trustee shall assume no obligations or liabilities whatsoever to the Issuer, the Information Agent, the Leverage Manager or the Verification Agent by virtue of the provisions hereof.

## 22.    FURTHER ASSURANCES

22.1    The parties to this Agreement agree that they shall co-operate fully to do all such further acts and things and execute any further documents (at the cost of the Issuer) as may be necessary or reasonably desirable to give full effect to the arrangements contemplated by this Agreement.

22.2    The Issuer or (in the circumstances set out in Clause 3.2 (*Appointment of Information Agent*)) the Security Trustee shall, upon written request by the Information Agent as soon as practicable, give to the Information Agent such written authorisations or mandates and instruments as are reasonably necessary to enable the Information Agent to perform its obligations under this Agreement, provided that the Information Agent shall, subject to Clause 15 (*Limits of Information Agent Responsibility*), not be liable for any failure to perform its services under this Agreement as a result of such written authorisations, mandates or instruments not having been given to it.

## 23.    LIMITED RECOURSE; NON-PETITION

23.1    The Information Agent, Leverage Manager and the Verification Agent agree with the Security Trustee and the Issuer to be bound by the terms of the Deed of Charge and Assignment and, in particular, confirm that no amount, whether in respect of fees, costs, indemnities and expenses payable to the Information Agent, the Leverage Manager or the Verification Agent, as the case may be, shall be due and payable by the Issuer except in accordance with Clause 6 (*Enforcement; Limited Recourse and Subordination*) of the Deed of Charge and Assignment, unless and until all sums required to be paid or provided for in priority thereto pursuant to the Deed of Charge and Assignment, have been paid, provided for or discharged in full and all rights to receive any amounts from the Issuer after realisation of the security constituted by the Security Documents and application of the proceeds thereof in accordance with the Deed of Charge and Assignment shall be extinguished. No recourse may be had in respect of any obligation, covenant or agreement arising out of or based upon the Notes or the Transaction Documents or implied from them against any shareholder, Affiliate, employee, officer or director of the Issuer.

23.2    The Information Agent, Leverage Manager and the Verification Agent agree with the Issuer and the Security Trustee that only the Security Trustee may enforce the security created in favour of the Security Trustee by or pursuant to the Security Documents in accordance with the provisions of the Security Documents and none of the Information Agent, the Leverage Manager nor the Verification Agent shall take any steps for the purpose of recovering any debts whatsoever owing to it by the Issuer or

enforcing any of its rights arising out of this Agreement against the Issuer or taking or procuring Insolvency Proceedings against the Issuer or any similar insolvency procedure in any applicable jurisdiction in respect of any of its liabilities whatsoever except to the extent expressly permitted by the provisions of the Deed of Charge and Assignment. The Security Trustee may prove or lodge a claim in liquidation of the Issuer initiated by another party and the Security Trustee may take proceedings to obtain a declaration or similar judgment or order as to the obligations and the liabilities of the Issuer under this Agreement and the Deed of Charge and Assignment.

23.3    This Clause 23 shall survive the termination of this Agreement, the Deed of Charge and Assignment and the other Transaction Documents.

## 24.    AMENDMENTS

24.1    This Agreement may only be amended in writing by all the parties hereto, and provided that the Rating Condition is met.

24.2    The Issuer shall procure that a copy of each proposed amendment relating to this Agreement is delivered to the Rating Agencies promptly after such amendment is proposed and in any event in time for the Rating Condition to be met prior to such amendment becoming effective.

## 25.    NOTICES

Save as specifically otherwise provided in this Agreement any notice, demand or other communication to be served under this Agreement must be given in accordance with Clause 3 (*Notices*) of the Master Definitions Schedule.

## 26.    PARTIAL INVALIDITY

26.1    If a provision of this Agreement is or becomes invalid, illegal or unenforceable in any respect in any jurisdiction, then insofar as it is illegal, invalid or unenforceable, it shall have no effect and shall be deemed not to be included in this Agreement and shall not affect:

(a)    the validity or enforceability in that jurisdiction of any other provision of this Agreement; or

(b)    the validity or enforceability in any other jurisdiction of that or any other provision of this Agreement.

26.2    The parties shall then use all reasonable endeavours to replace the illegal, invalid or unenforceable provision with a legal, valid and enforceable provision, the meaning, intent and effect of which is as close as possible to the intended effect of the illegal, invalid or unenforceable provision.

## 27.    ENTIRE AGREEMENT

27.1    This Agreement constitutes the entire agreement and understanding between the parties relating to its subject matter.

27.2    This Agreement supersedes all prior oral or written agreements, representations and

warranties. Any liabilities for and any remedies in respect of any such agreements, representations or warranties made are excluded save only in respect of such as are expressly made or repeated in this Agreement.

27.3   No party has entered into this Agreement in reliance on any oral or written agreement, representation or warranty of any other party or any other person which is not made or repeated in this Agreement.

27.4   For the avoidance of doubt nothing in this Clause 27 shall operate to exclude liability for any fraudulent statement or act.

## 28.   CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999

A person who is not a party or signatory to this Agreement (other than the Indemnified Parties not a party to this Agreement) has no rights under the Contracts (Right of Third Parties) Act 1999 (the "**Act**") to enforce any term of this Agreement, but this does not affect any right or remedy of any person which exists or is available apart from that Act.

## 29.   COUNTERPARTS

This Agreement may be executed (manually or by facsimile) in one or more counterparts, and each such counterpart (when executed) shall be an original. Such counterparts shall together constitute one and the same instrument.

## 30.   GOVERNING LAW AND JURISDICTION

30.1   This Agreement is governed by, and shall be construed in accordance with, the laws of England.

30.2   Each party hereto hereby agrees for the benefit of the other parties that the courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with this Agreement and that accordingly any suit, action or proceedings (together referred to as "**Proceedings**") arising out of or in connection with this Agreement may be brought in such courts.

30.3   Each of the Issuer, the Information Agent, the Leverage Manager and the Verification Agent irrevocably submits to the jurisdiction of such courts and waives any objection to any Proceedings in such courts whether on the grounds of venue or forum inconveniens. This submission is for the benefit of the Note Trustee and the Security Trustee and shall not limit the right of any of the Note Trustee or the Security Trustee to take Proceedings in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not).

30.4   (a)   The Issuer irrevocably appoints Ogier Corporate Services (UK) Limited at 3rd Floor, Equitable House, 47 King William Street, London EC4R 9JD;

(b)   The Information Agent irrevocably appoints Fairfield Greenwich (UK) Limited at Pollen House, 10-12 Cork Street, London W1S 3NP, England; and

    (c)    The Leverage Manager irrevocably appoints Fairfield Greenwich (UK) Limited at Pollen House, 10-12 Cork Street, London W1S 3NP, England,

as its agent for service of process in England in respect of any Proceedings in relation to the Notes, this Agreement and any other Transaction Document. If for any reason any such agent shall cease to be such agent for service of process, the Issuer, the Information Agent, the Leverage Manager and the Verification Agent, as the case may be, shall forthwith, on the request of the Note Trustee, appoint a new agent for service of process in England acceptable to the Note Trustee and deliver to the Note Trustee a copy of the new agent's acceptance of that appointment within 30 days.

30.5    Nothing in this Clause 30 shall affect the right to serve process in any other manner permitted by law.

**IN WITNESS WHEREOF** this Agreement has been entered into on the day and year first written above.

19

**SCHEDULE**
**FUND REPORT INFORMATION**

On each Information Day:

1.    The Gross Share Value as of close of business on the second Business Day preceding such Information Day.

2.    The Net Share Value as of close of business on the second Business Day preceding such Information Day.

3.    The Maximum LTV as of the close of business on the second Business Day preceding such Information Day.

In no event shall the Fund Report contain any disclosure relating to specific Fund positions.

**EXECUTION PAGES**

**ISSUER**

Signed on behalf of                              )
**TENSYR LIMITED**                           )

Name:
Title:    **Simon Willing**
          **Alternate Director**

**INFORMATION AGENT**

Signed on behalf of                              )
**FAIRFIELD GREENWICH**                   )
**LIMITED**                                    )

Name: _____
Title:

**LEVERAGE MANAGER**

Signed on behalf of                              )
**FAIRFIELD GREENWICH LIMITED**        )

Name: _____
Title:

**VERIFICATION AGENT**

Signed on behalf of                              )
**CITCO FINANCIAL PRODUCTS**             )
**(LONDON) LIMITED**

Name: _____
Title:

**NOTE TRUSTEE**

Signed on behalf of                              )
**BNY CORPORATE TRUSTEE**                )
**SERVICES LIMITED**                         )

Name: _____
Title:

### EXECUTION PAGES

**ISSUER**

Signed on behalf of                              )
**TENSYR LIMITED**                               )    _____

Name:
Title:


**INFORMATION AGENT**

Signed on behalf of                              )
**FAIRFIELD GREENWICH**                          )
**LIMITED**                                      )

Name:  JEFFREY TUCKER
Title:  DIRECTOR – PRESIDENT


**LEVERAGE MANAGER**

Signed on behalf of                              )
**FAIRFIELD GREENWICH LIMITED**                  )

Name:  JEFFREY TUCKER
Title:  DIRECTOR – PRESIDENT


**VERIFICATION AGENT**

Signed on behalf of                              )
**CITCO FINANCIAL PRODUCTS**                     )    _____
**(LONDON) LIMITED**

Name:
Title:


**NOTE TRUSTEE**

Signed on behalf of                              )
**BNY CORPORATE TRUSTEE**                        )
**SERVICES LIMITED**                             )    _____

Name:
Title:


21

# EXECUTION PAGES

**ISSUER**

Signed on behalf of                                           )
**TENSYR LIMITED**                                    )
                                                                      _____
                                                                      Name:
                                                                      Title:


**INFORMATION AGENT**

Signed on behalf of                                           )
**FAIRFIELD GREENWICH**                       )
**LIMITED**                                               )
                                                                      _____
                                                                      Name:
                                                                      Title:


**LEVERAGE MANAGER**

Signed on behalf of                                           )
**FAIRFIELD GREENWICH LIMITED**       )
                                                                      _____
                                                                      Name:
                                                                      Title:


**VERIFICATION AGENT**

Signed on behalf of                                           )
**CITCO FINANCIAL PRODUCTS**            )
**(LONDON) LIMITED**
                                                                      _____
                                                                      Name:  PAUL SYMONDS
                                                                      Title: DIRECTOR


**NOTE TRUSTEE**

Signed on behalf of                                           )
**BNY CORPORATE TRUSTEE**               )
**SERVICES LIMITED**                              )
                                                                      _____
                                                                      Name:
                                                                      Title:


21

**EXECUTION PAGES**

**ISSUER**

Signed on behalf of                                      )
**TENSYR LIMITED**                                    )
                                                                    _____
                                                                    Name:
                                                                    Title:

**INFORMATION AGENT**

Signed on behalf of                                      )
**FAIRFIELD GREENWICH**                         )
**LIMITED**                                                  )
                                                                    _____
                                                                    Name:
                                                                    Title:

**LEVERAGE MANAGER**

Signed on behalf of                                      )
**FAIRFIELD GREENWICH LIMITED**         )
                                                                    _____
                                                                    Name:
                                                                    Title:

**VERIFICATION AGENT**

Signed on behalf of                                      )
**CITCO FINANCIAL PRODUCTS**             )
**(LONDON) LIMITED**
                                                                    _____
                                                                    Name:
                                                                    Title:

**NOTE TRUSTEE**

Signed on behalf of                                      )
**BNY CORPORATE TRUSTEE**                  )
**SERVICES LIMITED**                               )
                                                                    _____
                                                                    Name: Jason P. Vickers
                                                                    Title: Vice President

21

**SECURITY TRUSTEE**

Signed on behalf of                                    )
**BNY CORPORATE TRUSTEE**                  )
**SERVICES LIMITED**                              )

Name: Jason P. Vickers

Title: Vice President

22

UK1 1334371