# Exhibit D

EXECUTION COPY

19 December, 2006

**TENSYR LIMITED**
(as Issuer)

**FAIRFIELD GREENWICH LIMITED**
(as Leverage Manager)

**THE BANK OF NEW YORK**
(as Collateral Administrator)

and

**BNY CORPORATE TRUSTEE SERVICES LIMITED**
(as Note Trustee and Security Trustee)

---

**LEVERAGE MANAGEMENT AGREEMENT**

---

# SIDLEY AUSTIN

WOOLGATE EXCHANGE
25 BASINGHALL STREET
LONDON EC2V 5HA
TELEPHONE 020 7360 3600
FACSIMILE 020 7626 7937
REF: SJS/MW/JR/EAP/20401-30090

# CONTENTS

1.  DEFINITIONS AND INTERPRETATION.................................................................. 1

2.  CONDITIONS OF APPOINTMENT ..................................................................... 2

3.  APPOINTMENT OF LEVERAGE MANAGER AND STANDARD OF CARE ....... 2

4.  LEVERAGE MANAGEMENT SERVICES ............................................................. 3

5.  LTV VERIFICATION ...................................................................................... 8

6.  OBLIGATIONS OF LEVERAGE MANAGER ...................................................... 8

7.  NOTIFICATION ............................................................................................. 11

8.  REPRESENTATIONS AND WARRANTIES OF THE LEVERAGE MANAGER. 12

9.  CONFLICTS OF INTEREST ............................................................................ 13

10.  RECORDS; CONFIDENTIALITY ................................................................... 14

11.  LEVERAGE MANAGER FEE ........................................................................ 15

12.  LIMITS OF LEVERAGE MANAGER RESPONSIBILITY ................................. 15

13.  INDEMNITY ................................................................................................ 17

14.  TERM AND TERMINATION; LEVERAGE MANAGER ...................................... 18

15.  NO PARTNERSHIP OR JOINT VENTURE ...................................................... 21

16.  ASSIGNMENTS AND TRANSFERS ............................................................... 21

17.  THE SECURITY TRUSTEE ........................................................................... 21

18.  FURTHER ASSURANCES ............................................................................. 22

19.  LIMITED RECOURSE; NON-PETITION ......................................................... 22

20.  AMENDMENTS ........................................................................................... 23

21.  NOTICES .................................................................................................... 23

22.  PARTIAL INVALIDITY ................................................................................ 23

23.  ENTIRE AGREEMENT ................................................................................. 24

24.  CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999 .................................. 24

25.  COUNTERPARTS ........................................................................................ 24

26.  GOVERNING LAW AND JURISDICTION ....................................................... 24

EXECUTION PAGE.................................................................................................................26

**THIS LEVERAGE MANAGEMENT AGREEMENT** (this **"Agreement"**) is made on 19 December, 2006

**BETWEEN:**

(1)     **TENSYR LIMITED**, a private company incorporated with limited liability under the laws of Jersey (with registered number 95248) having its registered office at Whiteley Chambers, Don Street, St Helier, Jersey JE4 9WG, Channel Islands (the **"Issuer"**); and

(2)     **FAIRFIELD GREENWICH LIMITED**, whose principal office is at c/o Offices of Charles Adams, Ritchie & Duckworth, Second Floor, Zephyr House, Mary Street, P.O. Box 709, George Town, Grand Cayman KY1-1107, Cayman Islands, in its capacity as leverage manager (the **"Leverage Manager"**);

(3)     **THE BANK OF NEW YORK**, a U.S. banking corporation acting through its office in London at One Canada Square, London E14 5AL, England, in its capacity as collateral administrator (the **"Collateral Administrator"**);

(4)     **BNY CORPORATE TRUSTEE SERVICES LIMITED**, whose principal office is at One Canada Square, London E14 5AL, England, in its capacity as note trustee (the **"Note Trustee"**); and

(5)     **BNY CORPORATE TRUSTEE SERVICES LIMITED**, whose principal office is at One Canada Square, London E14 5AL, England, in its capacity as security trustee (the **"Security Trustee"**).

**WHEREAS:**

(A)     The Issuer intends to invest in Fund Shares.

(B)     The Issuer intends to fund its investment in Fund Shares by issuing the Notes.

(C)     The Leverage Manager has agreed to act as independent agent for each of the Issuer and, in certain circumstances, the Security Trustee and to perform certain leverage management duties and services on the terms set forth herein.

**IT IS AGREED** as follows:

1.     **DEFINITIONS AND INTERPRETATION**

Capitalised terms defined in Clause 1 (*Definitions*) of the master definitions and construction schedule dated the Closing Date and signed for identification purposes by, among others, the parties to this Agreement (the **"Master Definitions Schedule"**) shall have the same meanings in this Agreement (including the recitals hereto) except in so far as the context otherwise requires or unless otherwise defined in this Agreement. This Agreement shall be construed in accordance with the interpretations and construction provisions set out in Clause 2 (*Principals of Interpretation and Construction*) of the Master Definitions Schedule and such provisions shall be incorporated by reference into this Agreement as if set out in full in this Agreement.

1

2.    **CONDITIONS OF APPOINTMENT**

The appointment of the Leverage Manager under this Agreement as agent of the Issuer is conditional upon the issue of the Notes having taken place and shall take effect (subject to the foregoing) upon and from the Closing Date (or such later date as may be agreed between parties hereto) automatically and without further action on the part of any party hereto.  If such conditions have not been satisfied on the Closing Date or by such later date as the parties may agree, this Agreement shall cease to be of further effect save for the purpose of enforcing accrued rights of action (if any) which may have arisen prior to this Agreement ceasing to have effect and provided that the provisions of Clause 10 (*Records; Confidentiality*), Clause 12 (*Limits of Leverage Manager Responsibility*), Clause 13 (*Indemnity*) and Clause 19 (*Limited Recourse; Non Petition*) shall survive the termination of this Agreement in accordance with their respective terms.

3.    **APPOINTMENT OF LEVERAGE MANAGER AND STANDARD OF CARE**

3.1    The Issuer hereby appoints the Leverage Manager as agent to carry out and perform the services, duties and obligations of the Leverage Manager set forth in Clause 4 (*Leverage Management Services*) (the "**Leverage Management Services**") on the terms and subject to the conditions set forth in this Agreement.  The Leverage Manager hereby accepts such appointment.

3.2    At any time after a Note Event of Default or a Potential Note Event of Default has occurred, the Security Trustee, by written notice to the Issuer and the Leverage Manager, may require the Leverage Manager, until the Issuer and the Leverage Manager are notified in writing by the Security Trustee to the contrary, to the fullest extent permitted by any applicable law or by any regulation having general application, to act thereafter as Leverage Manager on behalf of the Security Trustee in relation to the Leverage Management Services under this Agreement on the same terms that the Leverage Manager acts for the Issuer under this Agreement (provided that the Security Trustee's liability under any provision of this Agreement for the indemnification, remuneration and expenses of the Leverage Manager shall be limited to amounts held by the Security Trustee under the terms of the Security Documents) and upon receipt of such written notice, the Leverage Manager hereby agrees to so act as Leverage Manager under this Agreement on behalf of the Security Trustee.

3.3    The Leverage Manager hereby undertakes with the Issuer and (in the circumstances set out in Clause 3.2) the Security Trustee that in performing the Leverage Management Services and its obligations under this Agreement, and in exercising its judgements, powers and discretions under this Agreement, the Leverage Manager shall comply with the terms of this Agreement and the terms of the Deed of Charge and Assignment and perform its obligations under this Agreement with reasonable skill and care and in the course of such performance shall at all times:

(a)    act in compliance with all applicable legal or regulatory requirements relating directly to the performance by it of the Leverage Management Services;

(b)    employ appropriately qualified personnel and commercially reasonable standards, policies and procedures;

(c)    act in good faith and in a prudent and commercially reasonable manner; and

(d)    use reasonable endeavours in the course of carrying out its obligations under and in accordance with this Agreement (including, without limitation, Clause 9 *(Conflicts of Interest)*, to protect the interests of the Issuer and (in the circumstances set out in Clause 3.2) the Security Trustee (th e **"Leverage Manager Standard of Care"**).

3.4    The Leverage Manager shall not delegate any of its powers, or responsibilities under this Agreement to any person except with the prior written approval of the Issuer, the Security Trustee and the Note Trustee.

4.    **LEVERAGE MANAGEMENT SERVICES**

4.1    The Leverage Manager shall, on behalf of the Issuer, subject to and in accordance with the terms of this Agreement, manage the Issuer's investments in Fund Shares so that at all times the Issuer's holding of Fund Shares is as large as it can be, without exceeding the Maximum LTV, and effect redemptions of Fund Shares to ensure that the Issuer has sufficient funds available from its investments to meet its payment obligations under the Notes and the Transaction Documents as and when they fall due from time to time.

4.2    *Subscription on Issue of Notes:* On behalf of the Issuer, the Leverage Manager shall apply the proceeds of:

(a)    the issue of the Notes on the Closing Date in the following order:

    (i)    to fund the initial subscription of Fund Shares by the Issuer for an aggregate amount of USD 400,000,000 through the submission of a Subscription Order on the Business Day next following the Closing Date, such subscription to be funded on 29 December 2006; and

    (ii)    in payment of the fees and expenses associated with the establishment of the Issuer and fees and expenses incurred by the Issuer in connection with the issue of the Notes; and

(b)    the issue of any Further Notes on any subsequent Issue Date in the following order:

    (i)    in payment of the fees and expenses incurred by the Issuer in connection with the issue of such Further Notes; and

    (ii)    the remainder (or such lesser amount as shall ensure that the Maximum LTV is not exceeded and that the Debt Coverage Condition is satisfied) shall be applied in the subscription of Fund Shares.

The subscriptions for Fund Shares made pursuant to this Clause 4.2 are independent of any subscription for Fund Shares made pursuant to Clause 4.7 *(Mandatory Releverage)* and shall not be made if such subscription would conflict with the objective of any redemption of Fund Shares made pursuant to Clauses 4.5 *(Mandatory Deleverage; LTV Condition)* and 4.6 *(Mandatory Deleverage; Debt Coverage Condition)*.

3

4.3    *Information Day Determinations:*  On each Information Day the Leverage Manager shall determine, and deliver or make available, in the form of an electronic file, to the Note Trustee, the Security Trustee, the Collateral Administrator, the Class S Noteholders and the Class M Noteholders the following (based on the information contained in the Fund Report delivered by the Information Agent on such Information Day):

    (a)    the Aggregate Net Share Value;

    (b)    the Aggregate Gross Share Value;

    (c)    the Actual Investment Ratio;

    (d)    the Net Liquidity, the Debt Coverage Reserve, whether the Debt Coverage Condition is satisfied and, if not, the resulting Shortfall;

    (e)    the Net Accrued Liabilities;

    (f)    the LTV and whether the LTV exceeds the Maximum LTV; and

    (g)    the Net Worth and whether a Minimum Net Worth Test Trigger Event has occurred.

4.4    *Partial Liquidation Assets Determination:*  After 4.00 p.m. (New York City time) on the fourth Business Day prior to a Partial Redemption Date, the Leverage Manager shall determine the Partial Liquidation Assets (for the avoidance of doubt, having made all the underlying determinations necessary to determine the Partial Liquidation Assets) and promptly notify the same to the Issuer, the Collateral Administrator, the Note Trustee and S&P.

4.5    *Mandatory Deleverage; LTV Condition*

    (a)    If on any Information Day, the Leverage Manager determines that the LTV is higher than the Maximum LTV, the Leverage Manager shall promptly (and in any event not later than 6:00 p.m. (New York City time) on such Information Day), submit a Redemption Order of Fund Shares for an amount ("A") such that the resulting LTV, on the basis of the information available to the Leverage Manager on the immediately preceding Business Day, would be equal to the Back LTV.

        Where :

        A = (NAL – (Back LTV x ANSV)) / (1 – (Back LTV x Actual Investment Ratio))

    (b)    As soon as the Leverage Manager determines that a Business Day is the third consecutive Disrupted Day to occur, it shall immediately reduce the Maximum LTV and the Back LTV by 0.05 and if the LTV is higher than the reduced Maximum LTV, submit a Redemption Order for an amount calculated pursuant to the formula contained in paragraph (a) above, such that the resulting LTV, on the basis of the information most recently available to the Leverage Manager, would be equal to such reduced Back LTV.

(c)    As soon as the Leverage Manager determines that a Business Day is the seventh consecutive Disrupted Day to occur, it shall immediately reduce the Maximum LTV and the Back LTV by an additional 0.05 below the Maximum LTV and Back LTV calculated in paragraph (b) above, and if the LTV is higher than the reduced Maximum LTV, submit a Redemption Order for an amount calculated pursuant to the formula contained in paragraph (a) above, such that the resulting LTV, on the basis of the information most recently available to the Leverage Manager, would be equal to such reduced Back LTV.

(d)    Following a further reduction of the Maximum LTV and the Back LTV pursuant to paragraph (c) above, the Maximum LTV and the Back LTV shall remain at such levels until ten consecutive non-Disrupted Days have occurred.

(e)    If Clause 5.2 (*LTV Verification*) applies, the Leverage Manager shall reduce the Maximum LTV and the Back LTV by 0.05 and if the LTV is higher than the reduced Maximum LTV, submit a Redemption Order for an amount calculated pursuant to the formula contained in paragraph (a) above, such that the resulting LTV, on the basis of the information most recently available to the Leverage Manager, would be equal to the reduced Back LTV.

4.6    *Mandatory Deleverage; Debt Coverage Condition:* If on any Information Day, the Leverage Manager determines that the Debt Coverage Condition is not met and such Shortfall exceeds USD 1,000,000, it shall not later than 6:00 p.m. (New York City time) on the next following Business Day, submit a Redemption Order for an amount to equal the Shortfall.

4.7    *Mandatory Releverage:* After the first Information Day falling in March 2007 and provided no Purchase Stop Event exists, if on any Information Day, the Leverage Manager determines that:

(a)    the LTV is lower than the Base LTV;

(b)    the Net Liquidity is greater than USD 5,000,000; and

(c)    the LTV was lower than the Base LTV on each Information Day during the three months preceding such Business Day,

the Leverage Manager shall promptly (and in any event not later than 6:00 p.m. (New York City) time on the next following Business Day) submit a Subscription Order of Fund Shares for an amount ("B") such that the resulting LTV, on the basis of the information available to the Leverage Manager on the immediately preceding Business Day, is lower than or equal to the Base LTV.

For the avoidance of doubt, the Leverage Manager shall liaise with the Account Bank to ensure that there is or would be enough cash standing to the credit of the Cash Account or from redeeming the appropriate amount of Eligible Investments to fund such subscription, and if the Leverage Manager determines that there would not be enough cash standing to the credit of the Cash Account the Leverage Manager's duty under this Clause 4.7 shall be limited to the amount of available cash in the Cash Account.

5

Where :

B = Min [Net Liquidity, ((Base LTV x ANSV) - NAL) / (1 − (Base LTV x Actual Investment Ratio))]

4.8   *Duties in relation to Mandatory Redemption Events:* Upon the Leverage Manager obtaining actual knowledge that a Mandatory Redemption Event has occurred, the Leverage Manager shall as soon as reasonably practicable, give notice of the occurrence of such Mandatory Redemption Event to the Issuer, the Note Trustee, the Security Trustee, the Collateral Administrator, the Paying Agent, the Information Agent and the Rating Agencies in accordance with Clause 21 (*Notices*) and shall immediately deliver, or procure the delivery of, a Redemption Order to the Fund Administrator in respect of all the Fund Shares then held by the Issuer.

4.9   *Duties in relation to an Optional Redemption Event:* Upon the Leverage Manager obtaining actual knowledge that an Optional Redemption Event has occurred, the Leverage Manager shall as soon as reasonably practicable give notice of the occurrence of such Optional Redemption Event to the Issuer, the Note Trustee, the Collateral Administrator, the Paying Agent, the Information Agent and the Rating Agencies in accordance with Clause 21 (*Notices*). As soon as reasonably practicable upon receipt by the Leverage Manager of notice from the Note Trustee that the Notes have become subject to early redemption in accordance with Condition 7(c) (*Redemption and Purchase*), the Leverage Manager shall deliver a Redemption Order in respect of all the Fund Shares then held by the Issuer.

4.10   *Duties in relation to Class P Call Options:* Upon the Leverage Manager receiving notice from the Collateral Administrator on any Cut-Off Date that the Notes shall be subject to a partial redemption on the next following Payment Date and specifying the Redemption Ratio calculated by the Collateral Administrator, the Leverage Manager shall immediately deliver or procure the delivery of a Partial Redemption Order to the Fund Administrator in respect of the number of Fund Shares equal to the product of the Redemption Ratio and the number of Fund Shares then held by the Issuer. For the avoidance of doubt, if a Redemption Order has been submitted by the Leverage Manager, but not fulfilled, prior to the delivery of a Partial Redemption Order, such Redemption Order may not be cancelled.

4.11   *Duties in relation to Clean-Up Call Events:* Upon the Leverage Manager receiving notice from the Collateral Administrator on any Cut-Off Date that a Clean-Up Call Event has occurred, the Leverage Manager shall immediately deliver a Redemption Order to the Fund Administrator in respect of all Fund Shares then held by the Issuer.

4.12   *Duties in relation to the Scheduled Maturity Date:* The Leverage Manager shall ensure that a Redemption Order is submitted for all remaining Fund Shares held by the Issuer such that the proceeds from such redemption are received on or immediately prior to the Scheduled Maturity Date, taking into account all reasonable delays usually taken into account by the Fund or the Fund Administrator for each remittance.

4.13   *Requests for Information:* If the Collateral Administrator requests that the Leverage Manager provide it with instructions in connection with its obligations under the Collateral Administration and Account Bank Agreement, the Leverage Manager

6

undertakes to give the required instructions to the Collateral Administrator promptly and in any event within the earlier of three days after receiving such request and unless the Leverage Manager has notified the Collateral Administrator that it is unable to provide instructions on a more expedited basis, such time as to provide sufficient time for the Collateral Administrator to carry out its obligations under the Collateral Administration and Account Bank Agreement.

4.14    *Eligible Investments*: In the event that there are sums standing to the credit of the Cash Account pending their application pursuant to the applicable Priority of Payments, the Leverage Manager hereby gives the Collateral Administrator standing instructions to purchase Eligible Investments, provided always that all Eligible Investments shall mature or be liquidated at least two Business Days prior to the Payment Date next following the date of the relevant Eligible Investment. The Leverage Manager shall notify the Collateral Administrator from time to time in writing of the types of Eligible Investments to be acquired pursuant to the standing instructions set forth in this Clause 4.14.

4.15    *Authorised Signatories*: The Leverage Manager shall on the date of this Agreement deliver to the Account Bank a certificate setting out the persons authorised by the Leverage Manager (the Leverage Manager being authorised by way of Issuer power of attorney) to withdraw sums from the Cash Account solely for the purpose of purchasing Fund Shares (each an "**Authorised Signatory**") and their specimen signatures. The Leverage Manager agrees that if any Authorised Signatory ceases to be authorised to operate any account of the Issuer or any other person becomes so authorised by the Issuer, it shall promptly deliver to the Account Bank an updated certificate identifying all the Authorised Signatories as at such time and setting out their specimen signatures.

4.16    In the performance of certain functions under this Agreement, the Leverage Manager is, or shall be, only able to fulfil its duties following receipt from the Collateral Administrator or the Information Agent of certain assistance, determinations and/or confirmations. In the event the Collateral Administrator or the Information Agent fails to give any such assistance, confirmation or determination (other than a failure resulting from the Leverage Manager being in breach of its obligations and duties under this Agreement), the Leverage Manager shall not incur any liability for failing to comply with its obligations under this Agreement to such extent. The Leverage Manager shall be entitled to rely upon the accuracy and completeness of (x) information supplied by the Information Agent to the Leverage Manager and (y) determinations made by the Collateral Administrator, in any Future Payment Report, notices and instructions the Collateral Administrator or the Information Agent is required to supply to the Leverage Manager in accordance with this Agreement and any other Transaction Document (other than in respect of any inaccuracies or incompleteness resulting from information provided by the Leverage Manager, or which the Leverage Manager has failed to provide in breach of its obligations or duties under this Agreement or in the event and to the extent that the Leverage Manager has actual knowledge of any inaccuracies or incompleteness of such information) and the Leverage Manager shall incur no liability to anyone as a result of such permitted reliance.

5.    **LTV VERIFICATION**

5.1   On each LTV Verification Date, the Collateral Administrator shall recalculate the LTV as of each Information Day of the preceding month (each a "**Verification LTV**"). If any Verification LTV is different by more than 0.02 to the LTV determined by the Leverage Manager pursuant to Clause 4.3 (*Leverage Management Services*), the Leverage Manager and the Collateral Administrator shall promptly attempt to reconcile their calculations.

5.2   If the Leverage Manager and the Collateral Administrator fail to reconcile their LTV calculations pursuant to Clause 5.1 by the 15th day of the month in which the relevant LTV Verification Date occurred, the Leverage Manager shall:

      (a)   take the actions specified in paragraph (e) of Clause 4.5; and

      (b)   appoint, at the cost of the Issuer, a third party auditor to calculate within 30 days of such 15th day of such month, such LTV, the result of which shall be binding on all parties to this Agreement.

6.    **OBLIGATIONS OF LEVERAGE MANAGER**

6.1   Subject to the terms of Clause 12 (*Limits of Leverage Manager Responsibility*), the Leverage Manager shall ensure that no action (save for any action which the Leverage Manager is under an obligation to take under this Agreement) is taken by it which would:

      (a)   cause the Leverage Manager to knowingly, after due enquiry, violate any law, rule or regulation of any governmental body or agency of Jersey having jurisdiction over the Issuer or of any other jurisdiction in or from which the Leverage Manager performs its functions under this Agreement and which in the judgement of the Leverage Manager made in good faith or as advised by the Issuer, is applicable to the Issuer;

      (b)   cause the Leverage Manager to knowingly, after due enquiry, violate the Constitutive Documents;

      (c)   result in the Issuer being in breach of the terms of the Transaction Documents or the Notes; or

      (d)   adversely affect in a material respect the Issuer (other than as expressly permitted or contemplated under this Agreement).

6.2   If the Leverage Manager is required or requested by the Issuer or any party acting pursuant to a Transaction Document to take any action which is, in the Leverage Manager's judgement, reasonably likely to have one or more of the consequences set forth in Clause 6.1 above, the Leverage Manager may disregard such requirement or request, but shall as soon as reasonably practicable so notify the Issuer, the Collateral Administrator, the Note Trustee, the Security Trustee and each Rating Agency then rating the Notes. Notwithstanding such notification, if the Leverage Manager is again requested to take such action by the Issuer or by such party acting pursuant to a Transaction Document and, in each such case, if the Note Trustee has consented thereto in writing, the Leverage Manager shall take such action provided, however,

8

that the Leverage Manager need not take such action if such action would constitute or give rise to any breach of applicable law, rule or regulation described in paragraph (a) of Clause 6.1. The Leverage Manager shall have no liability to any person for any action taken after following the procedures set forth in this Clause 6.2 and it and its officers, directors and employees shall be fully indemnified by the Issuer for any losses, costs, expenses, charges, fees (including legal fees), and damages sustained in connection therewith as the same are incurred.

6.3    The Leverage Manager covenants that:

(a)    it shall comply in all material respects with applicable laws and regulations relating to the performance of its obligations under this Agreement;

(b)    it shall comply, to the extent possible and except as otherwise provided in this Agreement, with any reasonable directions, orders and instructions which the Issuer or (in the circumstances set out in Clause 3.2 (*Appointment of Leverage Manager and Standard of Care*)) the Security Trustee may from time to time give to it pursuant to the provisions of this Agreement provided, in the case of conflicting directions, orders or instructions from the Issuer and the Security Trustee, those of the Security Trustee shall in all circumstances prevail;

(c)    subject to Clause 12 (*Limits on Leverage Manager Responsibility*) it shall comply with the terms and conditions of this Agreement, including without limitation, the Leverage Manager Standard of Care and any applicable legal or regulatory requirements relating directly to the performance of the Leverage Management Services;

(d)    it shall keep and maintain in force all licences (including without limitation all software licences and sub-licences), approvals, consents, exemptions, registrations or declarations and authorisations (regulatory or otherwise) which may be reasonably necessary in connection with (or to enable it to perform) its duties and obligations pursuant to this Agreement and to carry on its business as it is conducted as of the date hereof;

(e)    it shall deliver to the Issuer a copy of each Subscription Order and Redemption Order promptly and in any event, within five Business Days, after delivering the same to the Fund Administrator;

(f)    it shall not, by reason of the performance of its duties under this Agreement or anything else which it may do in connection with the Issuer, cause the Issuer to be liable to tax in any jurisdiction, in circumstances in which the Leverage Manager ought reasonably to have been aware of this consequence;

(g)    it shall not cause any Fund Shares to be acquired on behalf of the Issuer if such acquisition, holding and possible disposal would cause the Issuer to be liable to, or receive payments subject to, the withholding of any tax imposed by any jurisdiction with which the Fund, or with which any person in respect of which the Fund maintains a direct or indirect investment, is connected, including (without limitation):

9

(i)    tax on income, whether imposed by way of withholding or direct assessment;

(ii)    tax on capital gains; and

(iii)    stamp duties or transfer taxes; and

(h)    it shall, after acquiring any Fund Shares on behalf of the Issuer, take account of whether the continued holding or possible disposal of the Fund Shares shall cause the Issuer to be liable to, or receive payments subject to, the withholding of any tax of the kind described in paragraph (g) above, and the Leverage Manager shall take any such action as shall be in the best interest of the Issuer to mitigate the effect of such tax upon learning the same, provided that the Leverage Manager shall, be entitled in doing so to seek and rely on any legal, tax or other professional advice from an adviser of recognised standing in each case addressed to each of the Issuer and the Leverage Manager (the reasonable costs of which shall be the responsibility of the Issuer) and shall have no liability for action taken or inaction in reliance of such advice.

6.4    The Leverage Manager agrees to deliver to the Issuer, the Collateral Administrator, the Note Trustee, the Security Trustee and the Rating Agencies:

(a)    notice (as soon as reasonably practicable) of any:

(i)    amendment to the main body of the Private Placement Memorandum;

(ii)    amendment to the constitutional documents of the Fund; or

(iii)    document (or amendment of such document) pursuant to which the Fund takes on any Financial Indebtedness to any third person (whether or not for borrowed money),

together, in each case, with a copy of such amendment or amended document; and

(b)    as soon as reasonably practicable upon request therefor, such other information concerning the Fund (other than information relating to any specific investment made by the Fund) to the extent that it relates to the Fund Shares as is reasonably requested by:

(i)    the Issuer, the Note Trustee, the Security Trustee or the Collateral Administrator, as applicable, from time to time, in connection with or in relation to the proper exercise of their respective rights or the proper performance of their respective duties and obligations under the Transaction Documents; or

(ii)    any of the Rating Agencies from time to time and subject to any legal or regulatory restriction to which it is subject,

and in each case such information to be subject to the provisions of Clause 10.3 (*Records; Confidentiality*).

10

6.5     The Leverage Manager agrees to notify all parties to this Agreement and each Rating Agency as soon as reasonably practicable if:

(a)     Fairfield Greenwich (Bermuda) Ltd. ceases to be the Fund Manager of the Fund; or

(b)     of a change in the identity of the fund administrator for the Fund.

6.6     The Leverage Manager agrees to notify all parties to this Agreement and each Rating Agency as soon as reasonably practicable if it becomes aware of any breach by it of any of its obligations or its representations, warranties or covenants under this Agreement.

6.7     The Leverage Manager shall use its reasonable endeavours to determine whether the Fund Administrator or the Fund has complied with the investment restrictions set out in the Private Placement Memorandum, and to properly notify all parties to this Agreement in the event of any failure to so comply.

7.      **NOTIFICATION**

7.1     The Leverage Manager shall notify the Issuer, the Note Trustee, the Security Trustee and the Collateral Administrator, as soon as reasonably practicable, in the event that:

(a)     a material adverse change in its business operations has occurred or is continuing; or

(b)     there is a change in the laws and regulations applicable to it,

such that, as a result of such change, the Leverage Manager no longer has the ability to perform its obligations as Leverage Manager under this Agreement.

7.2     If the Leverage Manager acquires actual knowledge that, as a result of the provision of services by the Leverage Manager under this Agreement, the Issuer is subject to tax in any jurisdiction other than Jersey or there is a reasonable likelihood that such a liability to tax in a jurisdiction other than Jersey, shall arise, the Leverage Manager shall notify the Issuer, the Note Trustee, the Security Trustee and the Collateral Administrator as soon as is reasonably practicable.

7.3     If the Leverage Manager receives a notice of assessment under which the Issuer or the Leverage Manager as the Issuer's representative is assessed for corporation tax in any jurisdiction, whether or not as a result of the provision of services by the Leverage Manager under this Agreement, the Leverage Manager shall:

(a)     notify the Issuer, the Note Trustee, the Security Trustee and the Collateral Administrator as soon as is reasonably practicable;

(b)     provide the Issuer, the Note Trustee, the Security Trustee and the Collateral Administrator with a written copy of the notice of assessment; and

(c)     take such action as the Issuer or the Security Trustee (in the circumstances set out in Clause 3.2 (*Appointment of Leverage Manager and Standard of Care*)) may reasonably request in writing.

11

The Issuer shall, promptly on demand, reimburse to the Leverage Manager all costs and expenses properly incurred in connection with any such action as is referred to at paragraph (c) above.

7.4    If the Issuer requests in accordance with paragraph (c) of Clause 7.3 that any form of tax return be completed by the Leverage Manager, or if the Leverage Manager determines that any such return should be completed in respect of the Issuer's affairs, then the Issuer shall promptly on request provide to the Leverage Manager all such information and supporting documents as may reasonably be required for the timely completion of such return and on demand, reimburse to the Leverage Manager all costs and expenses incurred in connection with the completion of such return, other than those costs and expenses incurred by the Leverage Manager as a result of an error or omission on the part of the Leverage Manager.

7.5    The Leverage Manager shall procure that a copy of any notification made pursuant to this Clause 7, shall be sent to each Rating Agency.

8.    **REPRESENTATIONS AND WARRANTIES OF THE LEVERAGE MANAGER**

As at the date of this Agreement and, other than in respect of paragraph (e), the first Business Day of each month and the date of each subscription for Fund Shares by the Issuer, the Leverage Manager hereby represents and warrants to the Issuer, the Security Trustee and the Note Trustee and, without prejudice to any of its specific obligations under this Agreement, that:

(a)    (i)    it is duly incorporated with full power and authority for it to carry on its business as it is being conducted, and to execute, sign, deliver and perform the transactions contemplated in the Transaction Documents to which it is a party; and

(ii)    the Transaction Documents to which it is a party constitute its legal, valid and binding obligations, enforceable against it in accordance with their terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding at equity or at law));

(b)    neither the signing and delivery of this Agreement nor any other Transaction Document to which it is a party contravenes or constitutes a default under, or causes to be exceeded any limitation on it or the powers of its directors imposed by or contained in:

(i)    any law or regulation by which it or any of its assets is bound or affected;

(ii)    its constitutional documents; or

(iii)    any agreement to which it is a party or by which it or any of its assets is bound,

12

the violation of which could reasonably be expected to have a material adverse effect on the business operations of the Leverage Manager or the ability of the Leverage Manager to perform its obligations under the Transaction Documents;

(c)   it has duly obtained or made each authorisation, approval, consent, licence, exemption, registration or declaration required for or in connection with the execution, delivery, performance, validity and enforceability, and admissibility in evidence in England, Jersey, Belgium and the Cayman Islands, of this Agreement, each of the Transaction Documents to which it is a party and any obligations contemplated thereby and such authorisations, approvals, consents, licences, exemptions, registrations and declarations have been unconditionally obtained, are in full force and effect and there has been no default in the observance of any conditions or restrictions imposed in, or in connection with the same;

(d)   it is not a party to any litigation, arbitration or administrative proceedings and, to its knowledge, no relevant litigation, arbitration or administrative proceedings are pending or threatened against it that is likely to affect the legality, validity or enforceability against it of this Agreement or its ability to perform its obligations under this Agreement;

(e)   no Insolvency Event has occurred in respect of it;

(f)   in the performance of its obligations under this Agreement it is an independent agent of the Issuer acting in the ordinary course of its business; and

(g)   all information delivered or provided by the Leverage Manager as contemplated by this Agreement is complete in accordance with this Agreement and accurate in all material respects as at the date of such information and conforms to that required by this Agreement.

## 9.   CONFLICTS OF INTEREST

9.1   The Leverage Manager and its Affiliates and their directors, officers and employees have multiple advisory, transactional and financial and other interests in the Fund.

9.2   In certain circumstances, the interests of the Issuer or the Noteholders with respect to matters as to which the Leverage Manager is acting on behalf of the Issuer, may conflict with the interests of the Leverage Manager and its Affiliates. Each of the Issuer, the Note Trustee and the Security Trustee hereby acknowledges that various potential and actual conflicts of interest may exist with respect to the Leverage Manager and its Affiliates (including, without limitation, those described in the Private Placement Memorandum) and that the Leverage Manager, its Affiliates, their respective directors, officers or employees may engage in other business and furnish investment management and advisory services to others including, without limitation, the Fund or persons who may own obligations or securities issued by the Fund. The Leverage Manager shall be free, in its sole discretion, to make recommendations to others, which may be the same as or different from those given to the Issuer.

13

10.    **RECORDS; CONFIDENTIALITY**

10.1    The Leverage Manager shall maintain appropriate books of account and records relating to the performance of its respective obligations under this Agreement, and as required by any applicable law, and provided the Security Trustee, the Issuer and the Note Trustee (as applicable) shall, subject to any restriction imposed by any applicable law or regulation, agree to keep such books of account and records confidential, such books of account and records shall be accessible for inspection by a representative of the Security Trustee, the Issuer and the Note Trustee at any time during normal business hours and, prior to a Note Event of Default occurring, on not less than three Business Days' prior notice. The Leverage Manager shall retain all agreements and other instruments and records related to its performance as Leverage Manager of the Issuer.

10.2    The Leverage Manager shall keep confidential any and all information obtained in connection with the services rendered under this Agreement and shall not disclose any such information to third parties which are not either their Affiliates, their delegates, the Security Trustee, the Note Trustee, the Collateral Administrator, the Information Agent, the Fund Administrator, the Verification Agent or a Rating Agency except:

(a)    to the extent required by this Agreement or permitted in writing by the Issuer;

(b)    as required by law, regulation, court order or the rules, regulations or directives of any central bank, governmental or other regulatory or taxation authority, self-regulatory organisation, body or official having jurisdiction over the Leverage Manager;

(c)    to their professional advisers (including, without limitation, its auditors and accountants);

(d)    in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Issuer;

(e)    such information as shall have been publicly disclosed other than in violation of this Agreement;

(f)    such information as the Rating Agencies shall reasonably request in connection with the rating of any of the Notes, provided that the information disclosed does not relate to any specific Fund position and that the provision of such information is not prohibited as a matter of law; or

(g)    as agreed between each of the parties hereto in writing,

and provided that to the extent any such information is disclosed to any of its Affiliates or delegates, the Leverage Manager shall use its reasonable efforts to procure that such Affiliates or delegates shall be bound by the same duty of confidentiality as the Leverage Manager as set out in this Agreement.

10.3    The parties to this Agreement (other than the Leverage Manager, who shall comply with the provisions of Clause 10.2) shall, during the continuance of this Agreement and after its termination, keep confidential and not disclose to any person whatsoever (except with the authority of the other parties to this Agreement) any information

which that party has acquired under or in connection with this Agreement other than:

(a)     the disclosure of any information to any person as expressly permitted by the Transaction Documents;

(b)     if required to do so by an order of a court of competent jurisdiction whether in pursuance of any procedure for discovering documents or otherwise;

(c)     pursuant to any law or regulation or requirement of any governmental agency in accordance with which that party is required or accustomed to act (including, without limitation, any official bank examiners or regulators or any stock exchange on which any Notes of the Issuer are listed from time to time);

(d)     to any governmental, banking or taxation authority of competent jurisdiction;

(e)     to its auditors or legal or other professional advisers; or

(f)     to any Rating Agency, any information which such Rating Agency may require to be disclosed to it,

provided that the above restriction shall not apply to:

(i)     disclosures to employees, officers or agents of any of the parties referred to in paragraph (a) above any part of whose functions are or may be in any way related to this Agreement, provided that such persons are subject to the provisions of this Clause 10;

(ii)    information already known to a recipient otherwise than in breach of this Clause 10;

(iii)   information also received from another source on terms not requiring it to be kept confidential; and

(iv)    information which is or becomes publicly available otherwise than in breach of this Clause 10.

## 11.   LEVERAGE MANAGER FEE

On each Payment Date, the Issuer shall pay to the Leverage Manager a leverage management fee of (i) 0.05 per cent. multiplied by (ii) the aggregate Principal Amount Outstanding of the Notes immediately prior to such Payment Date.

## 12.   LIMITS OF LEVERAGE MANAGER RESPONSIBILITY

12.1    In the performance by the Leverage Manager of the Leverage Management Services it:

(a)     shall not be responsible for:

(i)     any action it takes on behalf of the Issuer in compliance with this Agreement; or

(ii)    any action that it is permitted to take pursuant to this Agreement,

provided that nothing in this paragraph (a) shall affect any liability the Leverage Manager incurs as a result of any Leverage Manager Breach (as defined in Clause 12.2) or any other breach of this Agreement or the Deed of Charge and Assignment, or its own gross negligence, wilful default or fraud;

(b)    shall not be responsible in any event for any action or inaction by the Issuer, the Collateral Administrator, the Note Trustee or the Security Trustee or any other person, in declining to follow or failing to follow any direction or instruction of any other person, including the Leverage Manager (except in the case of directions or instructions issued by the Leverage Manager which contain a manifest error);

(c)    shall not, in the absence of manifest error, incur liability to anyone in acting upon any signature, instrument, statement, notice, resolution, request, direction, consent, order, report, opinion, bond or other document, paper or data reasonably believed by it to be genuine and reasonably believed by it to be properly executed or signed or originated by the proper party or parties; and

(d)    shall be entitled to rely, in the absence of manifest error, upon the accuracy and completeness in accordance with this Agreement of notices and information supplied by the Information Agent and the Collateral Administrator.

12.2    The Leverage Manager and its Affiliates, its delegates and their respective managers, directors, officers, partners, agents and employees shall not be liable (whether directly or indirectly, in contract or in tort or otherwise) to the Issuer, any Secured Party or the Noteholders or any other person for any losses, costs, claims, damages, judgments, interest on judgments, assessments, fees, charges, expenses, demands, penalties and amounts paid in settlement or other liabilities (collectively, **"Liabilities"**) incurred by the Issuer, any Secured Party or the Noteholders or any other person as a result of or arising out of or in connection with the actions taken, or any acts or omissions, by the Leverage Manager, its Affiliates, its delegates, and their respective managers, directors, officers, partners, agents or employees under or in connection with this Agreement, provided that nothing shall relieve the Leverage Manager from Liabilities incurred by any such person solely:

(a)    by reason of acts or omissions constituting fraud, bad faith, wilful misconduct or gross negligence in the performance of the obligations of the Leverage Manager under this Agreement or reckless disregard with respect to its obligations under this Agreement;

(b)    with respect to any unauthorised offers or solicitations of offers for the Notes to investors by the Leverage Manager or any of its Affiliates; or

(c)    by reason of any breach by the Leverage Manager of its obligations, representations or warranties under this Agreement or any other Transaction Document to which it is a party,

16

save that in no circumstances shall the Leverage Manager be liable to the Issuer, any Secured Party or the Noteholders or any other person for (x) any Liabilities which comprise special, indirect, consequential or punitive loss or damages (as opposed to direct loss or damages) or (y) any Liability which is excluded pursuant to paragraphs (a) to (d) of Clause 12.1, inclusive.

The matters described in paragraphs (a), (b) and (c) above, subject to the exceptions listed in paragraphs (x) and (y) above, are collectively referred to for purposes of this Clause 12 as **"Leverage Manager Breaches"**.

12.3    The provisions of this Clause 12 shall survive any termination of this Agreement.

13.    **INDEMNITY**

13.1    In the event that the Issuer or any of its directors, (the Issuer and each of its directors, each being an **"Indemnified Party"**) suffers or incurs Liabilities (including, without limitation, any expenses of litigation or preparation therefor whether or not the Indemnified Party is a party thereto) as a result of a Leverage Manager Breach or alleged Leverage Manager Breach, provided such allegation is not frivolously or vexatiously made and is withdrawn or discharged within 21 days of such allegation, the Leverage Manager shall (subject to the terms of this Agreement and in particular this Clause 13) indemnify and hold harmless each Indemnified Party against any and all Liabilities (including, without limitation, any expenses of litigation or preparation therefor whether or not the Indemnified Party is a party thereto) and all reasonable fees and expenses, of any nature whatsoever, properly incurred and paid by each such Indemnified Party (including reasonable legal fees and expenses) as a result of any Leverage Manager Breach or alleged Leverage Manager Breach, provided such allegation is not frivolously or vexatiously made and is withdrawn or discharged within 21 days of such allegation, provided that the aggregate amount payable by the Leverage Manager under this Clause 13, together with any amounts payable by any Affiliate thereof under any indemnity obligation pursuant to the Transaction Documents shall not exceed USD 70,000,000.

13.2    The Leverage Manager shall not be required to indemnify an Indemnified Party under Clause 13.1 for any liability relating to tax except to the extent that:

(a)    the tax liability results from any acts or omissions of the Leverage Manager constituting a Leverage Manager Breach with respect to the obligations of the Leverage Manager in paragraphs (f), (g) and (h) of Clause 6.3 (*Obligations of Leverage Manager*); and

(b)    the Indemnified Party would not have been liable for the relevant tax or for a cost equal to the tax but for such Leverage Manager Breach with respect to the obligations of the Leverage Manager in paragraphs (f), (g) and (h) of Clause 6.3 (*Obligations of Leverage Manager*).

13.3    An Indemnified Party shall give written notice to the Leverage Manager of such claim promptly and in any event within 30 days if the Indemnified Party receives a notice of any actual loss, claim, damage or liability giving rise to a claim for indemnification under this Clause 13, which notice shall specify in reasonable detail the nature of the claim and the amount (or an estimate of the amount) of the claim, provided that

failure to notify the Leverage Manager shall not relieve the Leverage Manager from its obligations under Clause 13.1, unless such failure impairs the ability of the Leverage Manager at its own cost, to mitigate or defend against such loss, claim, damage or liability.

13.4   The obligations of the Leverage Manager under this Clause 13 shall survive the termination of this Agreement but, in any event, shall terminate on the day falling one year and one day after the Final Maturity Date.

13.5   The rights of the Issuer under this Clause 13 are in addition to and not exclusive of any other rights that the Issuer may have against the Leverage Manager and the limitation of the amount of any indemnity payments under Clause 13.1 shall not limit the amount the Issuer may claim or recover in exercise of such other rights.

## 14.   TERM AND TERMINATION; LEVERAGE MANAGER

14.1   The Leverage Manager's appointment under this Agreement shall terminate and, subject to certain surviving obligations, the Leverage Manager shall cease to have any rights or obligations under this Agreement, upon the earlier to occur of:

(a)   the redemption of all the Fund Shares owned by the Issuer and the distribution of the proceeds therefrom in accordance with the Transaction Documents;

(b)   the termination date set out in any notice delivered by the Issuer or the Security Trustee (as applicable) terminating the appointment of the Leverage Manager, as described below (provided that, at such time, a substitute leverage manager to such Leverage Manager has been appointed); and

(c)   the effectiveness of the resignation of the Leverage Manager as agent of the Issuer under this Agreement (provided that, at such time, a substitute manager to such Leverage Manager has been appointed).

14.2   The Issuer or, following the occurrence of a Note Event of Default, the Security Trustee (acting at the direction of the Controlling Class, as notified to the Security Trustee by the Note Trustee), shall notify the Leverage Manager, the Collateral Administrator, the Rating Agencies, the Security Trustee (if applicable), the Paying Agent, the Account Bank, the Information Agent and the Note Trustee of its intention to terminate the appointment of the Leverage Manager as of the termination date set out in the notice provided in paragraph (b) of Clause 14.1 in the event:

(a)   the Leverage Manager wilfully breaches, or takes any action that it knows violates, any provision of this Agreement applicable to it which could reasonably be expected to have a material adverse effect on the business, operations, assets or financial condition of the Issuer;

(b)   the Leverage Manager commits a material breach of its obligations under this Agreement and, if capable of remedy, such material breach has not, within 30 days of the earlier to occur of:

(i)   the Leverage Manager being notified of such material breach; and

(ii)   the Leverage Manager becoming aware of such material breach,

18

either (x) been waived by the Issuer or, as applicable, the Security Trustee (acting on the instructions of the Controlling Class, as notified to the Security Trustee by the Note Trustee) or (y) been remedied to the reasonable satisfaction of the Issuer or, as applicable, the Security Trustee (acting on the instructions of the Controlling Class, as notified to the Security Trustee by the Note Trustee);

(c)    the Leverage Manager ceases to have all necessary consents, licences, approvals, exemptions, registrations, declarations and authorisations required in order to:

    (i)    perform its obligations under this Agreement; or

    (ii)    carry on its business as it is being conducted as at the date hereof (except to the extent of any changes in the scope of the Leverage Manager's permitted business which would not reasonably be expected to have a material adverse effect on the Noteholders or the Issuer's ability to make payments under the Notes);

(d)    (i)    any litigation, arbitration or administrative proceedings are commenced or threatened against the Leverage Manager which is reasonably likely to be adversely determined and, if adversely determined, is reasonably likely to materially affect the legality, validity or enforceability against the Leverage Manager of this Agreement or the Leverage Manager's ability to perform its obligations under this Agreement; or

    (ii)    the Transaction Documents to which the Leverage Manager is a party otherwise cease to constitute its legal, valid and binding obligations, enforceable against it;

(e)    an Insolvency Event occurs with respect to the Leverage Manager;

(f)    the Leverage Manager in its performance of its obligations under this Agreement ceases to be an independent agent of the Issuer acting in the ordinary course of its business;

(g)    any representation, warranty, certification or statement made or given by the Leverage Manager pursuant to the Transaction Documents shall prove to have been incorrect in any material respect at the time it was made or given and, if capable of remedy, the Leverage Manager fails, within 30 days of the Leverage Manager being notified of or discovering such error, whichever occurs first, to take such action so that the facts (after giving effect to such action) conform in all material respects to such representation, warranty, certificate or statement;

(h)    (i)    the occurrence of an act by the Leverage Manager or any of its officers, directors, employees, agents, delegates or attorneys that constitutes fraud or criminal activity in the performance of the obligations of the Leverage Manager under this Agreement; or

    (ii)    the Leverage Manager or any of its officers, directors, employees, agents, delegates or attorneys being indicted for a criminal offence based upon dishonesty or fraudulent actions materially related to the respective asset management and investment advisory business of the Leverage Manager; or

(i)    the Leverage Manager consolidates or amalgamates with or merges with or into, or transfers all or substantially all its assets to, another person and either:

    (i)    at the time of such consolidation, amalgamation, merger or transfer, the resulting, surviving or transferee person fails to assume all the obligations of such party under this Agreement by the operation of law or pursuant to an agreement reasonably satisfactory to the Issuer and the Security Trustee (acting on the instructions of the Controlling Class, as notified to the Security Trustee by the Note Trustee); or

    (ii)    the resulting, surviving or transferee person lacks the capacity to perform the obligations of the Leverage Manager under this Agreement in the sole discretion of the Issuer or the Security Trustee (acting on the instructions of the Controlling Class, as notified to the Security Trustee by the Note Trustee).

14.3    In addition to Clause 14.2, the Issuer (at the direction or with the consent of the Controlling Class) or, following the occurrence of a Note Event of Default at the direction of the Controlling Class, as notified to the Security Trustee by the Note Trustee, the Security Trustee, may, with or without cause, notify the Leverage Manager in writing (with a copy to the Rating Agencies, the Security Trustee (if applicable), the Collateral Administrator and the Note Trustee) of its intention to terminate the appointment of the Leverage Manager as of the termination date set out in such notice, which date shall (except in the case of a notice delivered by the Security Trustee after the occurrence of a Note Event of Default) be not less than 90 days from the date of delivery of such notice.

14.4    In addition to the foregoing, the Leverage Manager may, with or without cause, resign from its appointment as Leverage Manager upon not less than 30 days' prior written notice to each of the Issuer and the Security Trustee (with a copy to the Rating Agencies, the Note Trustee and the Collateral Administrator) provided that such resignation shall not take effect until a substitute Leverage Manager with all the necessary licences, consents and authorisations required under applicable law in order to perform the obligations of the Leverage Manager under this Agreement has agreed to be bound by the terms of this Agreement and the Rating Condition has been satisfied in respect of such change of Leverage Manager. In the event that the Leverage Manager wishes to resign from its appointment under this Agreement, it shall use all reasonable endeavours to find a replacement Leverage Manager that satisfies the requirements of this Clause 14.4. All costs and expenses incurred by the Issuer and the Note Trustee in connection with any resignation under this Clause 14.4 shall be for the account of the Leverage Manager.

15.    **NO PARTNERSHIP OR JOINT VENTURE**

The Issuer and the Leverage Manager are not partners and do not constitute or form part of a joint venture with each other and nothing herein shall be construed to make them such partners or constitute or form a joint venture or impose any liability as such on either of them. The Leverage Manager shall be, for all purposes herein, deemed to be an independent contractor and shall, except as otherwise expressly provided herein or authorised by the Issuer from time to time, have no authority to act for or represent the Issuer or otherwise be deemed an agent of the Issuer.

16.    **ASSIGNMENTS AND TRANSFERS**

16.1    The Leverage Manager shall not be entitled to assign or transfer all or part of its rights and benefits or obligations under this Agreement unless:

(a)    (i)    each of the Note Trustee, the Security Trustee and the Issuer (acting on the instructions of the Controlling Class) consents in writing to the assignment or transfer (such consent not to be unreasonably withheld or delayed); or

(ii)    a transaction of the type contemplated in paragraph (i) of Clause 14.2 (*Term and Termination; Leverage Manager*) occurs and the appointment of the Leverage Manager is not terminated;

(b)    the assignee or transferee agrees in writing to be bound by the terms of this Agreement as if it were the Leverage Manager; and

(c)    the Rating Condition is satisfied.

16.2    Other than in accordance with Condition 9(b) (*Substitution of Issuer*), the Issuer may only transfer or assign the benefit of this Agreement to the Security Trustee by way of security pursuant to the Deed of Charge and Assignment.

17.    **THE SECURITY TRUSTEE**

17.1    In the event that there is any change in the identity of the Security Trustee or any appointment of a substitute security trustee in accordance with the terms of the Deed of Charge and Assignment, each of the parties to this Agreement shall execute such documents and take such actions as the case may be, the existing Security Trustee or such substitute trustee may reasonably require for the purpose of vesting in such trustee the rights, powers and obligations of the Security Trustee under this Agreement and the Deed of Charge and Assignment and releasing the retiring Security Trustee from further obligations under this Agreement and the Deed of Charge and Assignment and, while any Notes remain outstanding, the Issuer shall give notice in writing thereof to the Rating Agencies.

17.2    Any corporation or association into which the Note Trustee, the Security Trustee or the Collateral Administrator may be merged or converted or with which any of them may be consolidated, or any corporation or association resulting from any merger, conversion or consolidation to which the Note Trustee, the Security Trustee or the Collateral Administrator shall be a party, or any corporation or association to which all or substantially all of the corporate trust and agency business of any of them may

21

be sold or otherwise transferred, shall be the successor under this Agreement without any further act.

17.3    The parties to this Agreement (other than the Note Trustee and the Security Trustee) agree and acknowledge that nothing herein contained shall impose any obligation or liability on the Note Trustee or the Security Trustee to assume or perform any of the obligations of the Issuer, the Leverage Manager or the Collateral Administrator under this Agreement or render it liable for any breach thereof.

17.4    Each of the Note Trustee and the Security Trustee has agreed, save as expressly provided herein, to become a party to this Agreement solely for the purposes of taking the benefit of this Agreement and agreeing to amendments to this Agreement pursuant to Clause 20 (*Amendments*) and this Clause 17 and the Security Trustee and the Note Trustee shall assume no obligations or liabilities whatsoever to the Issuer, the Leverage Manager or the Collateral Administrator by virtue of the provisions hereof.

## 18.    FURTHER ASSURANCES

18.1    The parties to this Agreement agree that they shall co-operate fully to do all such further acts and things and execute any further documents (at the cost of the Issuer) as may be necessary or reasonably desirable to give full effect to the arrangements contemplated by this Agreement.

18.2    The Issuer or (in the circumstances set out in Clause 3.2 (*Appointment of Leverage Manager and Standard of Care*)) the Security Trustee shall, upon written request by the Leverage Manager as soon as practicable, give to the Leverage Manager such written authorisations or mandates and instruments as are reasonably necessary to enable the Leverage Manager to perform its obligations under this Agreement, provided that the Leverage Manager shall, subject to Clause 12 (*Limits of Leverage Manager Responsibility*), not be liable for any failure to perform its services under this Agreement as a result of such written authorisations, mandates or instruments not having been given to it.

## 19.    LIMITED RECOURSE; NON-PETITION

19.1    The Leverage Manager and the Collateral Adminsitrator agree with the Security Trustee and the Issuer to be bound by the terms of the Deed of Charge and Assignment and, in particular, confirms that no amount, whether in respect of fees, costs, indemnities and expenses payable to the Leverage Manager or the Collateral Administrator, shall be due and payable by the Issuer except in accordance with Clause 6 (*Enforcement; Limited Recourse and Subordination*) of the Deed of Charge and Assignment, unless and until all sums required to be paid or provided for in priority thereto pursuant to the Deed of Charge and Assignment, have been paid, provided for or discharged in full and all rights to receive any amounts from the Issuer after realisation of the security constituted by the Security Documents and application of the proceeds thereof in accordance with the Deed of Charge and Assignment shall be extinguished.  No recourse may be had in respect of any obligation, covenant or agreement arising out of or based upon the Notes or the Transaction Documents or implied from them against any shareholder, Affiliate, employee, officer or director of the Issuer.

19.2 The Leverage Manager and the Collateral Administrator agree with the Issuer and the Security Trustee that only the Security Trustee may enforce the security created in favour of the Security Trustee by or pursuant to the Security Documents in accordance with the provisions of the Security Documents and neither the Leverage Manager nor the Collateral Administrator shall take any steps for the purpose of recovering any debts whatsoever owing to it by the Issuer or enforcing any of its rights arising out of this Agreement against the Issuer or taking or procuring Insolvency Proceedings against the Issuer or any similar insolvency procedure in any applicable jurisdiction in respect of any of its liabilities whatsoever except to the extent expressly permitted by the provisions of the Deed of Charge and Assignment. The Security Trustee may prove or lodge a claim in liquidation of the Issuer initiated by another party and the Security Trustee may take proceedings to obtain a declaration or similar judgment or order as to the obligations and the liabilities of the Issuer under this Agreement and the Deed of Charge and Assignment.

19.3 This Clause 19 shall survive the termination of this Agreement, the Deed of Charge and Assignment and the other Transaction Documents.

20. **AMENDMENTS**

20.1 This Agreement may only be amended in writing by all the parties hereto, and provided that the Rating Condition is met.

20.2 The Issuer shall procure that a copy of each proposed amendment relating to this Agreement is delivered to the Rating Agencies promptly after such amendment is proposed and in any event in time for the Rating Condition to be met prior to such amendment becoming effective.

21. **NOTICES**

Save as specifically otherwise provided in this Agreement any notice, demand or other communication to be served under this Agreement must be given in accordance with Clause 3 (*Notices*) of the Master Definitions Schedule.

22. **PARTIAL INVALIDITY**

22.1 If a provision of this Agreement is or becomes invalid, illegal or unenforceable in any respect in any jurisdiction, then insofar as it is illegal, invalid or unenforceable, it shall have no effect and shall be deemed not to be included in this Agreement and shall not affect:

(a) the validity or enforceability in that jurisdiction of any other provision of this Agreement; or

(b) the validity or enforceability in any other jurisdiction of that or any other provision of this Agreement.

22.2 The parties shall then use all reasonable endeavours to replace the illegal, invalid or unenforceable provision with a legal, valid and enforceable provision, the meaning, intent and effect of which is as close as possible to the intended effect of the illegal, invalid or unenforceable provision.

23

23.    **ENTIRE AGREEMENT**

23.1    This Agreement constitutes the entire agreement and understanding between the parties relating to its subject matter.

23.2    This Agreement supersedes all prior oral or written agreements, representations and warranties relating to the subject matter of this Agreement. Any liabilities for and any remedies in respect of any such agreements, representations or warranties made are excluded save only in respect of such as are expressly made or repeated in this Agreement.

23.3    No party has entered into this Agreement in reliance on any oral or written agreement, representation or warranty of any other party or any other person which is not made or repeated in this Agreement.

23.4    For the avoidance of doubt nothing in this Clause 23 shall operate to exclude liability for any fraudulent statement or act.

24.    **CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999**

A person who is not a party or signatory to this Agreement (other than the Indemnified Parties not a party to this Deed) has no rights under the Contracts (Right of Third Parties) Act 1999 (the "**Act**") to enforce any term of this Agreement, but this does not affect any right or remedy of any person which exists or is available apart from that Act.

25.    **COUNTERPARTS**

This Agreement may be executed (manually or by facsimile) in one or more counterparts, and each such counterpart (when executed) shall be an original. Such counterparts shall together constitute one and the same instrument.

26.    **GOVERNING LAW AND JURISDICTION**

26.1    This Agreement is governed by, and shall be construed in accordance with, the laws of England.

26.2    Each party hereto hereby agrees for the benefit of the other parties that the courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with this Agreement and that accordingly any suit, action or proceedings (together referred to as "**Proceedings**") arising out of or in connection with this Agreement may be brought in such courts.

26.3    Each of the Issuer, the Leverage Manager and the Collateral Administrator irrevocably submits to the jurisdiction of such courts and waives any objection to any Proceedings in such courts whether on the grounds of venue or forum inconveniens. This submission is for the benefit of the Note Trustee and the Security Trustee and shall not limit the right of any of the Note Trustee or the Security Trustee to take Proceedings in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not).

26.4   (a)    The Issuer irrevocably appoints Ogier Corporate Services (UK) Limited at 3rd Floor, Equitable House, 47 King William Street, London EC4R 9JD; and

      (b)    the Leverage Manager irrevocably appoints Fairfield Greenwich (UK) Limited at Pollen House, 10-12 Cork Street, London W1S 3NP,

as its agent for service of process in England in respect of any Proceedings in relation to the Notes, this Agreement and any other Transaction Document. If for any reason any such agent shall cease to be such agent for service of process, the Issuer or the Leverage Manager, as the case may be, shall forthwith, on the request of the Note Trustee, appoint a new agent for service of process in England acceptable to the Note Trustee and deliver to the Note Trustee a copy of the new agent's acceptance of that appointment within 30 days.

26.5   Nothing in this Clause 26 shall affect the right to serve process in any other manner permitted by law.

**IN WITNESS WHEREOF** this Agreement has been entered into on the day and year first written above.

25

**EXECUTION PAGE**

**ISSUER**

Signed on behalf of                    )
**TENSYR LIMITED**                      )

Name:
Title:

**LEVERAGE MANAGER**

Signed on behalf of                    )
**FAIRFIELD GREENWICH**                 )
**LIMITED**                             )

Name:
Title:

**COLLATERAL ADMINISTRATOR**

Signed on behalf of                    )
**THE BANK OF NEW YORK**                )

Name:
Title:

**NOTE TRUSTEE**

Signed on behalf of                    )
**BNY CORPORATE TRUSTEE**               )
**SERVICES LIMITED**                    )

Name:
Title:

**SECURITY TRUSTEE**

Signed on behalf of                    )
**BNY CORPORATE TRUSTEE**               )
**SERVICES LIMITED**                    )

Name:
Title:

26

UK1 1330673

## EXECUTION PAGE

**ISSUER**

Signed on behalf of                              )
**TENSYR LIMITED**                               )
                                                        _____
                                                        Name:
                                                        Title:

**LEVERAGE MANAGER**

Signed on behalf of                              )
**FAIRFIELD GREENWICH**                          )
**LIMITED**                                      )
                                                        Name:   JEFFREY TUCKER
                                                        Title:   DIRECTOR

**COLLATERAL ADMINISTRATOR**

Signed on behalf of                              )
**THE BANK OF NEW YORK**                         )
                                                        _____
                                                        Name:
                                                        Title:

**NOTE TRUSTEE**

Signed on behalf of                              )
**BNY CORPORATE TRUSTEE**                        )
**SERVICES LIMITED**                             )
                                                        _____
                                                        Name:
                                                        Title:

**SECURITY TRUSTEE**

Signed on behalf of                              )
**BNY CORPORATE TRUSTEE**                        )
**SERVICES LIMITED**                             )
                                                        _____
                                                        Name:
                                                        Title:

26

## EXECUTION PAGE

**ISSUER**

Signed on behalf of                    )
**TENSYR LIMITED**                     )
                                       )    _____
                                            Name:
                                            Title:


**LEVERAGE MANAGER**

Signed on behalf of                    )
**FAIRFIELD GREENWICH**                )
**LIMITED**                            )    _____
                                            Name:
                                            Title:


**COLLATERAL ADMINISTRATOR**

Signed on behalf of                    )
**THE BANK OF NEW YORK**               )
                                            Name: Rachael Owen
                                            Title: AVP


**NOTE TRUSTEE**

Signed on behalf of                    )
**BNY CORPORATE TRUSTEE**              )
**SERVICES LIMITED**                   )
                                            Name: Rachael Owen
                                            Title: AVP


**SECURITY TRUSTEE**

Signed on behalf of                    )
**BNY CORPORATE TRUSTEE**              )
**SERVICES LIMITED**                   )
                                            Name: Rachael Owen
                                            Title: AVP


26

UK1-1330673