**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 23-XXXXX (CGM) |
| Plaintiff, | |
| v. | |
| MALCOLM SAGE and LYNNE FLORIO, | |
| Defendants. | |

## <u>COMPLAINT</u>

Irving H. Picard, as trustee (the "Trustee") for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C.

§§ 78aaa–78*lll* ("SIPA"),[1] substantively consolidated with the chapter 7 estate of Bernard L.

Madoff ("Madoff," and with BLMIS, "Debtors"), by and through his undersigned counsel, for his

complaint (the "Complaint") against Malcolm Sage and Lynne Florio ("Defendants"), alleges the

following:

## NATURE OF PROCEEDING

1.      This adversary proceeding is part of the Trustee's continuing efforts to recover

BLMIS "customer property," as defined by SIPA § 78*lll*(4), that was stolen by BLMIS as part of

the massive Ponzi scheme perpetrated by Madoff and others.

2.      Defendants were beneficiaries of the Ponzi scheme.  In the two-year period prior to

BLMIS's collapse, Defendants received, through numerous BLMIS customer accounts in which

one or both held interests, in excess of $4.75 million in subsequent transfers of fictitious profits

from the Ponzi scheme.  The Trustee seeks to recover these transfers of stolen customer property

from Defendants so that the property can be equitably distributed to whom it rightfully belongs—

customers with allowed claims against BLMIS who have yet to be made whole.

3.      This adversary proceeding is brought pursuant to SIPA §§ 78fff(b), 78fff-1(a), and

78fff-2(c)(3) and sections 105(a) and 550(a) of the United States Bankruptcy Code, 11 U.S.C. §§

101–1532 (the "Bankruptcy Code").

## JURISDICTION AND VENUE

4.      This is an adversary proceeding commenced in this Court, in which the main

underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is

pending.  The SIPA Proceeding was originally brought in the United States District Court for the

---

[1] For convenience, further references to SIPA will omit title 15 and be cited as SIPA §___.

Southern District of New York (the "District Court") as *Securities & Exchange Commission v. Bernard L. Madoff Investment Securities LLC*, No. 08 CV 10791 (S.D.N.Y.) (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1) and SIPA § 78eee(b)(2)(A) and (b)(4).

5.    This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H) and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

6.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

## DEFENDANTS

7.    Defendants reside in New York, New York. Lynne Florio is married to Malcolm Sage, and they each held an interest in one or more BLMIS customer accounts. *See* Exhibit A.

## BACKGROUND, THE TRUSTEE, AND STANDING

8.    On December 11, 2008, Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

9.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

10.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

    (a)    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

    (b)    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

    (c)    removed the case to this Court pursuant to SIPA § 78eee(b)(4).

11.    By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

12.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

13.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

14.    At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

15.    At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records

of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

16.    On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS's investment advisory business ("IA Business").

17.    As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

18.    Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

19.    The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including Bankruptcy Code §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code §§ 544, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## I.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A. BLMIS

20.     Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker dealer with the SEC under file number 8-8132.  In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company.  The BLMIS file number 8-8132 remained the same.  At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

21.     In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration under SEC file number 8-8132 as a securities broker-dealer during its operation.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status.  SIPC membership is contingent on registration of the broker-dealer with the SEC.

22.     For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and the IA Business.

23.     BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry.  BLMIS's website omitted the IA Business entirely.  BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

24.     For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

25.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

**B.      The Ponzi Scheme**

26.     At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

27.     BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

28.     To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling

& Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

29. On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

### 1. Madoff's Investment Strategy

30. In general, BLMIS purported to execute two primary investment strategies for BLMIS customers: the convertible arbitrage strategy and the split-strike conversion strategy (the "SSC Strategy"). For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit. At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

31. All funds received from IA Business customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

32. The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets. Investors were told they would gain profits from a change in the expectations for

the stock or convertible security over time. In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

33.     BLMIS falsified the trades purportedly executed for the convertible arbitrage investment strategy, using backdated trade data to fabricate the trades reported on monthly account statements and trade confirmations sent to customers.

34.     From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

35.     BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

36.     By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

37.     The put options were to limit the downside risk of sizeable price changes in the basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option should have entailed a loss for BLMIS.

38.     The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

39.     The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar."  The collar provides downside protection while limiting the upside.

40.     If Madoff was putting on the same baskets of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

41.     Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call or put option notional value to support the Madoff SSC Strategy.

42.     Madoff could not be using the SSC Strategy because his returns drastically outperformed the market.  BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly).  Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

**2.      BLMIS's Fee Structure**

43.     BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits.  By using a commission-

based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

### 3.    BLMIS's Market Timing

44.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he succeeded at market timing by intermittently entering and exiting the market.  During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in U.S. Treasury securities ("Treasury Bills") or mutual funds invested in Treasury Bills.

45.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS reportedly exited the market completely at every year end and every quarter end starting in 2003.  These quarterly and year-end exits were undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.  It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

46.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

### 4.    BLMIS Execution

47.    BLMIS's execution showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

### 5.    No Evidence of BLMIS Trading

48.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

49.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

50.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

51.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

52.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## THE PRIOR AVOIDANCE ACTIONS

53.     On November 30, 2010, the Trustee commenced separate adversary proceedings in this Court against, among others, two partnerships, Sage Associates and Sage Realty. *Picard v. Sage Associates*, Adv. Pro. No. 10-04362 (CGM) ("*Sage Associates*") and *Picard v. Sage Realty*, Adv. Pro. No. 10-04400 (CGM) ("*Sage Realty*") (together, the "Adversary Proceedings"). Malcolm Sage was a general partner in both Sage Associates and Sage Realty. Lynne Sage was a general partner of Sage Realty.

54.     In *Sage Associates*, the Trustee sought, among other relief, to avoid and recover, pursuant to Bankruptcy Code §§ 548(a)(1)(A) and 550(a), transfers of fictitious profits from the Ponzi scheme totaling $13,510,000 made by BLMIS to Sage Associates in the two-year period prior to BLMIS's collapse (the "SA Initial Transfers"). Complaint, *Sage Associates*, ECF No. 1. The Trustee alleged five SA Initial Transfers as follows:

a)     $1,800,000 on or about April 10, 2007;

b)     $900,000 on or about June 4, 2007;

c)     $450,000 on or about September 12, 2007;

d)     $360,000 on or about December 14, 2007; and

e)     $10,000,000 on or about April 4, 2008.

*Id.* A chart setting forth the SA Initial Transfers is attached as Exhibit B.

55.     In *Sage Realty*, the Trustee sought, among other relief, to avoid and recover, pursuant to Bankruptcy Code §§ 548(a)(1)(A) and 550(a), fraudulent transfers of fictitious profits from the Ponzi scheme totaling $3,370,000 made by BLMIS to Sage Realty in the two-year period prior to BLMIS's collapse (the "SR Initial Transfers" and, together with the SA Initial Transfers, the "Initial Transfers"). Complaint, *Sage Realty*, ECF No. 1. The Trustee alleged six SR Initial Transfers as follows:

a)      $150,000 on or about December 13, 2006;

b)      $150,000 on or about February 9, 2007;

c)      $75,000 on or about April 10, 2007;

d)      $50,000 on or about September 12, 2007;

e)      $275,000 on or about January 23, 2008; and

f)      $2,670,000 on or about April 4, 2008.

*Id.* A chart setting forth the SR Initial Transfers is attached as Exhibit B.

56.     On May 18, 2022, the District Court withdrew the reference of each of the Adversary Proceedings to this Court.  Memorandum and Opinion Order, *Picard v. Sage Associates*, No. 20-CV-10057 (AJN) (S.D.N.Y. May 18, 2022), ECF No. 19 ("*Sage Associates District Action*") & *Picard v. Sage Realty*, No. 20-CV-10109 (AJN) (S.D.N.Y. May 18, 2022), ECF No. 20 ("*Sage Realty District Action*").  The *Sage Associates District Action* and *Sage Realty District Action* were thereafter consolidated for trial before the District Court (the "Consolidated Actions").  Stipulation and Order for Consolidation, *Sage Associates District Action*, ECF No. 25 & *Sage Realty District Action*, ECF No. 26.

57.     Over the course of numerous days in early 2022, the Consolidated Actions were tried to the District Court.  On April 15, 2022, the District Court issued its Findings of Fact and Conclusions of Law in the trial of the Consolidated Actions, wherein the District Court concluded that the Initial Transfers consisted entirely of fictitious profits from Madoff's Ponzi scheme.  The District Court found that the Trustee satisfied his burden by a preponderance of the evidence for avoidance of Initial Transfers under section 548(a)(1)(A) and that Sage Associates and Sage Realty failed to establish an affirmative defense under section 548(c), resulting in the avoidance of the SA Initial Transfers and the SR Initial Transfers.  *See Sage Associates District Action*, ECF No. 111 & *Sage Realty District Action*, ECF No. 67.  The District Court thereafter entered judgment

against, among others, Sage Associates in the total amount of the SA Initial Transfers and entered

judgement against, among others, Sage Realty in the total amount of the SR Initial Transfers. *See*

Clerk's Judgment, *Sage Associates District Action*, ECF No. 114 & *Sage Realty District Action*,

ECF No. 70.[2]  Upon information and belief, both Sage Associates and Sage Realty are no longer

ongoing entities and have no assets through which to satisfy, in part or in whole, the judgments

which have been entered respectively against them.

## THE SA SUBSEQUENT TRANSFERS

58.    Within a week or two of receipt of each of the SA Initial Transfers, Sage Associates

transferred one-third of each of the SA Initial Transfers to Malcolm Sage via check or wire transfer

(the "SA Subsequent Transfers").  The SA Subsequent Transfers known to date are as follows:

a)    $600,000 on or about April 16, 2007;

b)    $300,000 on or about June 8, 2007;

c)    $150,000 on or about September 17, 2007;

d)    $120,000 on or about December 20, 2007; and

e)    $3,333,333.33 on or about April 8, 2008.

A chart setting forth the presently known SA Subsequent Transfers is attached as Exhibit C.

Malcolm Sage deposited each of the SA Subsequent Transfers into either a checking or savings

account that he held at JPMorgan Chase.

---

[2] Malcolm Sage appealed the District Court's judgment to the United States Court of Appeals for the Second Circuit which, as of the date of this filing, remains pending.  *Picard v. Sage Associates*, No. 22-1107(L) (2d Cir.); *Picard v. Sage Realty*, No. 22-1110(Con.) (2d Cir.).

## FURTHER TRANSFERS OF THE SA SUBSEQUENT TRANSFERS

59.     After receiving the SA Subsequent Transfer of $600,000 on or about April 16,

2007, Malcolm Sage thereafter transferred certain portions thereof to taxing authorities as follows:

a)      a transfer of $156,410 to the New York Income Tax authority ("N.Y. Tax Department") on or about April 23, 2007, representing payment toward the tax liability reported on the New York State Resident Income Tax Return for the 2006 calendar year which Defendants jointly filed (the "2006 Joint State Return");

b)      a transfer of $45,780 to the N.Y. Tax Department on or about April 24, 2007, representing payment toward the tax liability reported on the New York State Resident Income Tax Return for the 2007 calendar year which Defendants jointly filed (the "2007 Joint State Return");

c)      a transfer of $197,180 to the United States Treasury ("U.S. Treasury") on or about April 23, 2007, representing payment toward the tax liability reported on the U.S. Individual Income Tax Return for the 2006 calendar year which Defendants jointly filed (the "2006 Joint Federal Return"); and

d)      a transfer of $66,910 to the U.S. Treasury on or about April 23, 2007, representing payment toward the tax liability reported on the U.S. Individual Income Tax Return for the 2007 calendar year which Defendants jointly filed (the "2007 Joint Federal Return").

60.     After receiving the SA Subsequent Transfer of $300,000 on or about June 8, 2007,

Malcolm Sage thereafter transferred certain portions thereof to taxing authorities as follows:

a)      a transfer of $50,000 to the N.Y. Tax Department on or about June 20, 2007, representing payment toward the tax liability reported on the 2007 Joint State Return; and

b)      a transfer of $70,000 to the U.S. Treasury on or about June 25, 2007, representing payment toward the tax liability reported on the 2007 Joint Federal Return.

61.     After receiving the SA Subsequent Transfer of $150,000 on or about September 17,

2007, Malcolm Sage thereafter transferred certain portions thereof to taxing authorities as follows:

a)      a transfer of $45,780 to the N.Y. Tax Department on or about September 21, 2007, representing payment of the tax liability reported on the 2007 Joint State Return; and

      b)    a transfer of $66,910 to the U.S Treasury on or about September 25, 2007, representing payment toward the tax liability reported on the 2007 Joint Federal Return.

62.    After receiving the SA Subsequent Transfer of $120,000 on or about December 20, 2007, Malcolm Sage thereafter transferred certain portions thereof to taxing authorities as follows:

      a)    a transfer of $45,780 to the N.Y. Tax Department on or about January 22, 2008 representing payment toward the tax liability reported on the 2007 Joint State Return; and

      b)    a transfer of $66,910 to the U.S. Treasury on or about January 23, 2008, representing payment toward the tax liability reported on the 2007 Joint Federal Return.

63.    After receiving the SA Subsequent Transfer of $3,333,333.33 on or about April 8, 2008, Malcolm Sage thereafter transferred certain portions thereof to taxing authorities as follows:

      a)    a transfer of $1,188,429 to the N.Y. Tax Department on or about April 22, 2008, representing payment toward the tax liability reported on the 2007 Joint State Return; and

      b)    a transfer of $1,706,953 to the U.S. Treasury on or about April 29, 2008, representing payment toward the tax liability reported on the 2007 Joint Federal Return.

## **THE TAX REFUNDS ISSUED TO DEFENDANTS**

### ***The 2006 Federal Tax Refund***

64.    In their 2006 Joint Federal Return, Defendants reported a total tax liability of $401,327. After the collapse of BLMIS, Defendants jointly filed an Amended U.S. Individual Income Tax Return for the 2006 calendar year (the "2006 Joint Amended Federal Return") in which they reported a total tax liability of only $165,823 and sought a refund of $235,504 (the "2006 Federal Tax Refund") based on the following: "Taxpayer [sic] is filing this claim for refund based on the following. All income and gains from Bernard L. Madoff are being eliminated from taxable income due to the arrest of Mr. Madoff and the announcement that any income reported from the investments with Mr. Madoff are fictitious."

65.    Upon information and belief, Defendants jointly received the 2006 Federal Tax Refund of which $197,180 constituted return of the payment made on or about April 23, 2007 toward the tax liability reported on the 2006 Joint Federal Return, as described in Paragraph 59(a) above.

### *The 2006 State Tax Refund*

66.    Upon information and belief, in their 2006 Joint State Return, the tax liability reported by Defendants included the tax liability associated with certain income and gains from the BLMIS accounts held by Sage Associates and Sage Realty.  Upon information and belief, Defendants jointly filed an Amended New York State Resident Income Tax Return for the 2006 calendar year in which they sought a refund in an unknown amount of at least $156,410 (the "2006 State Tax Refund") on the same basis on which they sought the 2006 Federal Tax Refund.

67.    Upon information and belief, Defendants jointly received the 2006 State Tax Refund of which $156,410 constituted return of the payment made on or about April 23, 2007 toward the tax liability reported on the 2006 Joint State Return, as described in Paragraph 59(c) above.

### *The 2007 Federal Tax Refund*

68.    In their 2007 Joint Federal Return, Defendants reported a total tax liability of $2,153,969.  After the collapse of BLMIS, Defendants jointly filed an Amended U.S. Individual Income Tax Return for the 2007 calendar year (the "2007 Joint Amended Federal Return") in which they reported a total tax liability of only $172,620 and sought a refund of $1,981,349 (the "2007 Federal Tax Refund") based on the following: "Taxpayer [sic] is filing this claim for refund based on the following.  All income and gains from Bernard L. Madoff are being eliminated from taxable income due to the arrest of Mr. Madoff and the announcement that any income reported

from the investments with Mr. Madoff are fictitious. Taxpayer [sic] seeks to preserve their rights to a refund of all taxes paid relating to their investment with Mr. Madoff."

69. Upon information and belief, Defendants jointly received the 2007 Federal Tax Refund of which: (i) $66,910 constituted return of the payment made on or about April 23, 2007 toward the tax liability reported on the 2007 Joint Federal Return, as described in Paragraph 59(b) above; (ii) $70,000 constituted return of the payment made on or about June 25, 2007 toward the tax liability reported on the 2007 Joint Federal Return, as described in Paragraph 60(b) above; (iii) $66,910 constituted return of the payment made on or about September 25, 2007 toward the tax liability reported on the 2007 Joint Federal Return, as described in Paragraph 61(b) above; (iv) $66,910 constituted return of the payment made on or about January 23, 2008 toward the tax liability reported on the 2007 Joint Federal Return, as described in Paragraph 62(b) above; and (v) $1,706,953 constituted return of the payment made on or about April 29, 2008 toward the tax liability reported on the 2007 Joint Federal Return, as described in Paragraph 63(b) above.

### *The 2007 State Tax Refund*

70. Upon information and belief, in their 2007 Joint State Return, the tax liability reported by Defendants included the tax liability associated with certain income and gains from the BLMIS accounts held by Sage Associates and Sage Realty. Upon information and belief, Defendants jointly filed an Amended New York State Resident Income Tax Return for the 2006 calendar year in which they sought a refund in an unknown amount of at least $1,375,769 (the "2006 State Tax Refund") on the same basis on which they sought the 2007 Federal Tax Refund.

71. Upon information and belief, Defendants subsequently jointly received the 2007 State Tax Refund of which: (i) $45,780 constituted return of the payment made on or about April 24, 2007 toward the tax liability reported on the 2007 Joint State Return, as described in Paragraph 59(d) above; (ii) $50,000 constituting return of the payment made on or about June 20, 2007 toward

the tax liability reported on the 2007 Joint State Return, as described in Paragraph 60(a) above; (iii) $45,780 constituted return of the payment made on or about September 21, 2007 toward the tax liability reported on the 2007 Joint State Return, as described in Paragraph 61(a) above; (iv) $45,780 constituted return of the payment made on or about January 22, 2008 toward the tax liability reported on the 2007 Joint State Return, as described in Paragraph 62(a) above; and (v) $1,188,429 constituted return of the payment made on or about April 22, 2008 toward the tax liability reported on the 2007 Joint State Return, as described in Paragraph 63(a) above.

## THE SR SUBSEQUENT TRANSFERS

72.    Within a week or two of receipt of each of the SR Initial Transfers, Sage Realty subsequently transferred certain portions of the SR Initial Transfers to either Malcolm Sage or Lynne Florio via check or wire transfer (the "SR Subsequent Transfers").  The SR Subsequent Transfers known to date are as follows:

a)    $20,000 on or about December 19, 2006 to Lynne Florio;

b)    $150,000 on or about February 13, 2007 to Malcolm Sage;

c)    $50,000 on or about January 25, 2008 to Lynne Florio; and

d)    $35,000 on or about January 25, 2008 to Malcolm Sage.

A chart setting forth the presently known SR Subsequent Transfers is attached as Exhibit D.

73.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement his allegations regarding the initial and subsequent transfers discussed above, and/or allege further transfers; and (ii) seek recovery of such transfers.

## COUNT ONE

## RECOVERY OF SUBSEQUENT TRANSFERS
### 11 U.S.C. §§ 105(a) AND 550(a)

74.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

75.     The SA Initial Transfers and the SR Initial Transfers have been avoided by entry of judgment.

76.     Each of the SA Subsequent Transfers are recoverable from Malcolm Sage under section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).  Malcolm Sage is an immediate or mediate transferee of each of the SA Subsequent Transfers.

77.     Each of those portions of the SA Subsequent Transfers, which were paid to the U.S. Treasury or the N.Y. Tax Department and then returned jointly to Malcolm Sage and Lynne Florio, are recoverable from Lynne Florio under section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).  Lynne Sage is an immediate or mediate transferee of each of those portions of the SA Subsequent Transfers.

78.     Each of the SR Subsequent Transfers received by Malcolm Sage are recoverable from Malcolm Sage under section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3). Malcolm Sage is an immediate or mediate transferee of each of these SR Subsequent Transfers.

79.     Each of the SR Subsequent Transfers received by Lynne Sage are recoverable from Lynne Florio under section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).  Lynne Florio is an immediate or mediate transferee of each of these SR Subsequent Transfers.

80.     As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Malcolm Sage: (a) recovering each of the SA Subsequent Transfers, or the value thereof, from Malcolm Sage; (b) recovering each of those portions of the SA Subsequent Transfers paid to the U.S. Treasury or the N.Y. Tax

Department and then returned jointly to Malcolm Sage and Lynne Florio, or the value thereof, from Lynne Florio; (c) recovering each of the SR Subsequent Transfers received by Malcolm Sage, or the value thereof, from Malcolm Sage; (d) recovering each of the SR Subsequent Transfers received by Lynne Florio, or the value thereof, from Lynne Florio; and (e) awarding any other relief as the Court deems appropriate.

## COUNT TWO

### DECLARATORY JUDGMENT AGAINST LYNNE FLORIO
### 28 U.S.C. § 2201(a) & FED. R. CIV. P. 57

81.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

82.     During all relevant periods, Lynne Florio and certain others, including Malcolm Sage, Martin Sage, and Ann Passer, were general partners of Sage Realty, a New York partnership. Lynne Florio and her husband filed their 2006 Joint Federal Return and their 2007 Joint Federal Return under penalty of perjury, declaring to the Internal Revenue Service that they were general partners of Sage Realty.

83.     The SR Initial Transfers have been avoided by entry of judgment.

84.     Judgment also was entered in favor of the Trustee and jointly and severally against Sage Realty and three of its general partners, Malcolm Sage, Martin Sage, and Ann Passer, in the amount of $3,370,000.

85.     Sage Realty is no longer an ongoing entity, has no assets, and therefore cannot pay, either in whole or in part, any of its debts or obligations, including the money judgment entered in favor of the Trustee against Sage Realty in the amount of $3,370,000.

86.     As a general partner of Sage Realty, Lynne Florio is jointly and severally liable for the debts and obligations of Sage Realty, including the money judgment entered in favor of the Trustee in the amount of $3,370,000 against Sage Realty.

87.    The Trustee seeks a declaratory judgment against Lynne Florio finding that she is a general partner of Sage Realty and she therefore is jointly and severally liable for its debts and obligations which it cannot satisfy either in whole or in part, including the money judgment entered in favor of the Trustee in the amount of $3,370,000 against Sage Realty.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on Count One in favor of the Trustee and against Malcolm Sage and Lynne Florio, and enter judgment on Count Two in favor of the Trustee and against Lynne Florio as follows:

i.        Recovering each of the SA Subsequent Transfers, or the value thereof, from Malcolm Sage for the benefit of the estate;

ii.       Recovering each of those portions of the SA Subsequent Transfers paid to the U.S. Treasury or the N.Y. Tax Department and then returned jointly to Malcolm Sage and Lynne Florio, or the value thereof, from Lynne Florio for the benefit of the estate;

iii.      Recovering each of the SR Subsequent Transfers received by Malcolm Sage, or the value thereof, from Malcolm Sage for the benefit of the estate;

iv.       Recovering each of the SR Subsequent Transfers received by Lynne Florio, or the value thereof, from Lynne Florio for the benefit of the estate;

v.        Awarding the Trustee prejudgment interest from the date of the avoidance of the Initial Transfers on April 20, 2022;

vi.       Entering of a declaratory judgment in favor of the Trustee and against Lynne Florio finding that she is a general partner of Sage Realty and therefore is jointly and severally liable for its debts and obligations which it cannot satisfy either in whole or in part, including the money judgment entered in favor of the Trustee in the amount of $3,370,000 against the partnership; and

vii.    Awarding the Trustee fees and all applicable costs and disbursements, and such

other, further, and different relief as the Court deems just, proper, and equitable, incurred in this

proceeding.

Date:  April 19, 2023
       New York, New York

Of Counsel:                      By: */s/ Nicholas J. Cremona*

**BAKER & HOSTETLER LLP**        **BAKER & HOSTETLER LLP**
127 Public Square                   45 Rockefeller Plaza
Cleveland, Ohio 44114             New York, New York 10111
Telephone:  (216) 621-0200       Telephone:  (212) 589-4200
Facsimile:  (216) 696-0740        Facsimile:  (212) 589-4201
James H. Rollinson                David J. Sheehan
Email:  jrollinson@bakerlaw.com    Email:  dsheehan@bakerlaw.com
                                  Nicholas J. Cremona
                                  Email:  ncremona@bakerlaw.com
                                  Lan Hoang
                                  Email:  lhoang@bakerlaw.com

                                  *Attorneys for Irving H. Picard, Trustee for the*
                                  *Substantively Consolidated SIPA Liquidation*
                                  *of Bernard L. Madoff Investment Securities*
                                  *LLC and the Chapter 7 Estate of Bernard L.*
                                  *Madoff*