**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-01789 (CGM) |
| v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 12-01670 (CGM) |
| CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK d/b/a CRÉDIT AGRICOLE PRIVATE BANKING MIAMI, f/k/a CALYON S.A. d/b/a CRÉDIT AGRICOLE MIAMI PRIVATE BANK SUCCESSOR IN INTEREST TO CRÉDIT LYONNAIS S.A., | **ANSWER TO COMPLAINT AND JURY DEMAND** |
| Defendant. | |

Defendant Crédit Agricole Corporate and Investment Bank d/b/a Crédit Agricole Private

Banking Miami, f/k/a Calyon S.A. d/b/a Crédit Agricole Miami Private Bank successor in

interest to Crédit Lyonnais S.A. ("Crédit Agricole Miami" or "Defendant"), by its undersigned

counsel, hereby responds to the Complaint[1] of Irving H. Picard, Trustee for the Liquidation of

Bernard L. Madoff Investment Securities LLC and the substantively consolidated estate of

Bernard L. Madoff ("Plaintiff" or "Trustee"), as follows:

## PRELIMINARY STATEMENT

Except as otherwise expressly admitted herein, Crédit Agricole Miami denies each and

every allegation in the Complaint.  Crédit Agricole Miami states that the headings and sub-

headings throughout the Complaint do not constitute well-pleaded allegations of fact and

therefore require no response.  To the extent that a response is required, the allegations in the

headings and subheadings in the Complaint are denied.  In answering the allegations in the

Complaint, Crédit Agricole Miami does not intend to waive, and does not waive, any and all

applicable objections to the relevance, admissibility, or prejudicial effect of any of the

allegations in the Complaint.  To the extent it is later determined that a response is required to

any allegation Crédit Agricole Miami claims has been mooted by a prior dismissal of the

Trustee's claims, Crédit Agricole Miami denies any such allegation.  Crédit Agricole Miami

expressly reserves the right to amend and/or supplement this Answer.

## RESPONSES TO SPECIFIC ALLEGATIONS

I.    **NATURE OF THE ACTION**

1.  This adversary proceeding is part of the Trustee's continuing efforts
to recover BLMIS Customer Property[2] that was stolen as part of the
massive Ponzi scheme perpetrated by Bernard L. Madoff
("Madoff") and others.

---

[1] The Complaint in *Picard v. Crédit Agricole Corporate and Investment Bank*, Adv. Pro. 12-01670 (Bankr. S.D.N.Y.), ECF No. 1, was filed May 25, 2012.  Unless otherwise specified, all "ECF No. __" citations refer to Adv. Pro. No. 12-01670.

[2] SIPA § 78*lll*(4) defines "Customer Property" as cash and securities at any time received, acquired, or held by, or for the account of, a debtor from, or for, the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.

**ANSWER:** The allegations in paragraph 1 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, Crédit Agricole Miami denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1 and therefore denies those allegations, except that Crédit Agricole Miami admits that the Trustee purports to bring this action as trustee for the liquidation of BLMIS[3] and the substantively consolidated estate of Bernard L. Madoff ("Madoff") pursuant to the Securities Investor Protection Act ("SIPA").

> 2.      With this Complaint, the Trustee seeks to recover at least $6,741,013 in subsequent transfers of Customer Property made to Credit Agricole Miami and its predecessor in interest, Credit Lyonnais, by Brown Brothers Harriman & Co. ("BBH"), which, in turn, received transfers of this Customer Property from Fairfield Sentry Limited ("Fairfield Sentry"), which was a Madoff feeder fund. Fairfield Sentry is a British Virgin Islands ("BVI") company that is in liquidation in the BVI. Fairfield Sentry had direct customer accounts with BLMIS's investment advisory business ("IA Business") for the purpose of investing assets with BLMIS, and maintained in excess of 95% of its assets in its BLMIS customer accounts.

**ANSWER:** The allegations in paragraph 2 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, Crédit Agricole Miami denies the allegations in paragraph 2, except that Crédit Agricole Miami denies knowledge or information sufficient to form a belief as to the allegations about Fairfield Sentry's accounts with BLMIS, and Crédit Agricole Miami admits on information and belief that: (i) Fairfield Sentry is a BVI company currently in liquidation in the BVI; and (ii) Trustee seeks to recover approximately $6,741,013 that it alleges were subsequent transfers from Fairfield Sentry to Crédit Agricole Miami and its predecessor in interest, Crédit Lyonnais S.A.

---

[3] Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Complaint.

3.      Upon information and belief, when Credit Lyonnais, the predecessor in interest of Defendant Credit Agricole Miami, received subsequent transfers of BLMIS Customer Property, it was a French *société anonyme* and a subsidiary of Credit Agricole, S.A., a French *société anonyme* and one of the largest banks in Europe. Upon information and belief, when Defendant Credit Agricole Miami received the subsequent transfers of BLMIS Customer Property, it was a French *société anonyme* that provided investment banking and private banking services.

**ANSWER:** The allegations in paragraph 3 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, Crédit Agricole Miami denies the allegations in paragraph 3, except Crédit Agricole Miami admits that: (i) Credit Lyonnais S.A. was a predecessor in interest of Crédit Agricole Miami; (ii) Credit Lyonnais S.A. was a French *société anonyme* and a subsidiary of Crédit Agricole S.A.; (iii) Crédit Agricole, S.A. was a *société anonyme*; and (iv) Crédit Agricole Miami was a French *société anonyme* that provided investment banking and private banking services.

## II.    JURISDICTION AND VENUE

4.      The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b), 78fff-l(a), and 78fff-2(c)(3); sections 105(a), 544, 550(a), and 551 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.* (the "<u>Bankruptcy Code</u>"); and the New York Fraudulent Conveyance Act (New York Debtor & Creditor Law) ("<u>NYDCL</u>") §§ 273-279 (McKinney 2001), to obtain avoidable and recoverable transfers received by Defendant Credit Agricole Miami as subsequent transferee of funds originating from BLMIS.

**ANSWER:** The allegations in paragraph 4 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, Crédit Agricole Miami denies the allegations in paragraph 4, except that Crédit Agricole Miami admits that the Trustee has brought this adversary proceeding, purportedly pursuant to the cited statutes.

5.      This is an adversary proceeding brought in this Court, in which the main underlying substantively consolidated SIPA case, Adv. Pro. No. 08-01789 (BRL) (the "<u>SIPA Case</u>"), is pending. The

SIPA Case was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.,* No. 08 CV 10791 (the "District Court Proceeding"). This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), and 15 U.S.C. § 78eee(b)(2)(A), (b)(4).

**ANSWER:** The allegations in paragraph 5 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, Crédit Agricole Miami denies the allegations in paragraph 5, except that Crédit Agricole Miami denies knowledge or information sufficient to form a belief as to where the main substantively consolidated SIPA case (Adv. Pro. No. 08-01789) was originally brought, and Crédit Agricole Miami admits that: (i) the main substantively consolidated SIPA case (Adv. Pro. No. 08-01789) is pending in this Court; and (ii) this is an adversary proceeding pending in this Court.

6.    Upon information and belief, Defendant Credit Agricole Miami maintains an office at 1301 Avenue of the Americas, New York, New York 10019, is registered with the New York Department of Financial Services as foreign bank branch, and is subject to examination by the Federal Reserve Bank. Defendant Credit Agricole Miami thus derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

**ANSWER:** Crédit Agricole Miami admits that Crédit Agricole Miami: (i) maintains a branch at 1301 Avenue of the Americas, New York, New York 10019; (ii) is licensed as a foreign banking organization by the New York Department of Financial Services; and (iii) is subject to examination by the Federal Reserve Bank. The remainder of paragraph 6 of the Complaint states legal conclusions to which no response is required. To the extent that a response is required Crédit Agricole Miami denies the allegations in the remainder of paragraph 6.

5

7.    Upon information and belief, Defendant Credit Agricole
Miami is also subject to personal jurisdiction in this judicial district
because it purposely availed itself of the laws and protections of the
United States and the state of New York by, among other things,
knowingly directing funds to be invested with New York-based
BBH. Upon information and belief, Defendant Credit Agricole
Miami knowingly received subsequent transfers from New York-
based BLMIS by withdrawing money from or redeeming interests
in BBH.

**ANSWER:** Paragraph 7 of the Complaint states legal conclusions to which no response

is required.  To the extent that a response is required, Crédit Agricole Miami denies the

allegations in paragraph 7.

8.    Defendant Credit Agricole Miami should reasonably expect
to be subject to New York jurisdiction and is subject to personal
jurisdiction pursuant to New York Civil Practice Law & Rules §§
301 and/or 302 (McKinney 2001) and Rule 7004 of the Federal
Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**ANSWER:** The allegations in paragraph 8 of the Complaint contain legal conclusions to

which no response is required.  To the extent that a response is required, Crédit Agricole Miami

denies the allegations in paragraph 8.

9.    This is a core proceeding pursuant to 28 U.S.C.
§ 157(b)(2)(A), (F), (H), and (O).

**ANSWER:** The allegations in paragraph 9 of the Complaint contain legal conclusions to

which no response is required.  To the extent that a response is required, Crédit Agricole Miami

denies the allegations in paragraph 9, states that it does not consent to the issuance or entry of

final orders or judgments by the Bankruptcy Court, and demands a trial by jury of all issues that

may be tried by a jury.

10.    Venue in this District is proper under 28 U.S.C. § 1409.

**ANSWER:** The allegations in paragraph 10 of the Complaint contain legal conclusions

to which no response is required.  To the extent that a response is required, Crédit Agricole

Miami denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 10 and therefore denies those allegations.

### III.    BACKGROUND

> 11.    On December 11, 2008 (the "<u>Filing Date</u>"), Madoff was
> arrested by federal agents for violation of the criminal securities
> laws, including, *inter alia,* securities fraud, investment adviser
> fraud, and mail and wire fraud. Contemporaneously, the U.S.
> Securities and Exchange Commission ("<u>SEC</u>") commenced the
> District Court Proceeding against Madoff and BLMIS. The SEC
> complaint alleges that Madoff and BLMIS engaged in fraud through
> the investment adviser activities of BLMIS. The District Court
> Proceeding remains pending.

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 11 of the Complaint and therefore denies

those allegations, except that Crédit Agricole Miami admits on information and belief that

Madoff was arrested on or about December 11, 2008 and that the SEC filed a complaint against

Madoff and BLMIS on or about December 11, 2008.

> 12.    On December 12, 2008, The Honorable Louis L. Stanton of
> the District Court entered an order appointing Lee S. Richards as
> receiver for the assets of BLMIS.

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 12 of the Complaint and therefore denies

those allegations, and respectfully refers the Court to the referenced order for a complete and

accurate statement of its contents.

> 13.    On December 15, 2008, under § 78eee(a)(4)(A), the SEC
> consented to a combination of its own action with an application of
> the Securities Investor Protection Corporation ("<u>SIPC</u>"). Thereafter,
> under § 78eee(a)(4)(B) of SIPA, SIPC filed an application in the
> District Court alleging, *inter alia,* that BLMIS was not able to meet
> its obligations to securities customers as they came due and,
> accordingly, its customers needed the protections afforded by SIPA.

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 of the Complaint and therefore denies those allegations, and respectfully refers the Court to the referenced application for a complete and accurate statement of its contents.

14. Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order under SIPA (known as the "Protective Decree"), which, in pertinent part:

  a. removed the receiver and appointed the Trustee for the liquidation of the business of BLMIS under SIPA § 78eee(b)(3);

  b. appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA § 78eee(b)(3); and

  c. removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under § 78eee(b)(4) of SIPA.

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14 of the Complaint and therefore denies those allegations, and respectfully refers the Court to the referenced order for a complete and accurate statement of its contents.

15. By orders dated December 23, 2008, and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15 of the Complaint and therefore denies those allegations, and respectfully refers the Court to the referenced orders for a complete and accurate statement of their contents.

16. At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New

> York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." *Id.* at 1. Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id.* On June 29, 2009, Madoff was sentenced to 150 years in prison.

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16 of the Complaint and therefore denies those allegations, except admits, on information and belief, that Madoff pled guilty to crimes and was sentenced to prison. Crédit Agricole Miami respectfully refers the Court to the referenced criminal information and transcript of the plea hearing for a complete and accurate statement of their contents.

> 17.    On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a plea hearing on August 11, 2009, in the case entitled *United States v. DiPascali,* Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), DiPascali pled guilty to a ten-count criminal information.

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17 of the Complaint and therefore denies those allegations, and respectfully refers the Court to the referenced criminal information and transcript of the plea hearing for a complete and accurate statement of their contents.

## IV.   TRUSTEE'S POWERS AND STANDING

> 18.    As Trustee appointed under SIPA, the Trustee is charged with recovering and paying out Customer Property to BLMIS customers, assessing claims, and liquidating any other assets of BLMIS for the benefit of the estate and its creditors. The Trustee is in the process of marshaling BLMIS's assets, and this liquidation is well underway. However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years. Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recoveries, including those from individuals and entities that received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi

scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(l).

**ANSWER:** The allegations in paragraph 18 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, Crédit Agricole Miami denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18 of the Complaint and therefore denies those allegations.

19. Under SIPA § 78fff-l(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under § 78fff-l(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

**ANSWER:** The allegations in paragraph 19 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, Crédit Agricole Miami denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19 of the Complaint and therefore denies those allegations.

20. Under SIPA §§ 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

**ANSWER:** The allegations in paragraph 20 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, Crédit Agricole Miami denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20 of the Complaint and therefore denies those allegations.

21. The Trustee has standing to bring these claims under § 78fff-1(a) of SIPA and the Bankruptcy Code, including sections 323(b), 544, and 704(a)(l), because the Trustee has the power and authority to avoid and recover transfers under sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA §§ 78fff-l(a) and 78fff-2(c)(3).

**ANSWER:** The allegations in paragraph 21 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, Crédit Agricole Miami denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21 of the Complaint and therefore denies those allegations.

## V.    THE DEFENDANT

22.    Upon information and belief, Defendant Credit Agricole Miami is a French *societe anonyme* that maintains a place of business at 1301 Avenue of the Americas, New York, New York 10019. Upon information and belief, Defendant Credit Agricole Miami also maintains an office at 600 Brickell Avenue, 37th Floor, Miami, Florida 33131. Upon information and belief, Defendant Defendant Credit Agricole Miami Credit was formerly known as Calyon S.A. d/b/a Credit Agricole Miami Private Bank. Upon information and belief, Defendant Credit Agricole Miami is the successor in interest to Credit Lyonnais S.A. following a 2003 acquisition of Credit Lyonnais S.A. by Credit Agricole S.A.

**ANSWER:** Crédit Agricole Miami admits that: (i) Crédit Agricole Miami is a French *société anonyme* that maintains a place of business at 1301 Avenue of the Americas, New York, New York 10019; (ii) as of the date of the Complaint, Crédit Agricole Miami maintained an office at 600 Brickell Avenue, 37th Floor, Miami, Florida 33131; (iii) Crédit Agricole Miami was formerly known as Calyon S.A. d/b/a Crédit Agricole Miami Private Bank; and (iv) Crédit Agricole Miami is the successor in interest to Crédit Lyonnais S.A. following a 2003 acquisition of Crédit Lyonnais S.A. by Crédit Agricole S.A.

## VI.    THE PONZI SCHEME

23.    BLMIS was founded by Madoff in 1959 and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several of his friends and family members. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). By virtue of that registration, BLMIS was a member of SIPC. BLMIS had three

business units: market making, proprietary trading, and the IA
Business.

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 23 of the Complaint and therefore denies

those allegations.

24.     Outwardly, Madoff ascribed the consistent success of the IA
Business to the so-called split-strike conversion strategy ("SSC
Strategy"). Under that strategy, Madoff purported to invest BLMIS
customers' funds in a basket of common stocks within the Standard
& Poor's 100 Index ("S&P 100")—a collection of the 100 largest
publicly traded companies. Madoff claimed that his basket of stocks
would mimic the movement of the S&P 100. He also asserted that
he would carefully time purchases and sales to maximize value, and
BLMIS customers' funds would, intermittently, be out of the equity
markets.

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 24 of the Complaint and therefore denies

those allegations.

25.     The second part of the SSC Strategy was a hedge of
Madoff's stock purchases with options contracts. Those option
contracts acted as a "collar" to limit both the potential gains and
losses on the basket of stocks. Madoff purported to use proceeds
from the sale of S&P 100 call options to finance the cost of
purchasing S&P 100 put options. Madoff told BLMIS customers
that when he exited the market, he would close out all equity and
option positions and invest all the resulting cash in United States
Treasury bills or in mutual funds holding Treasury bills. Madoff also
told customers that he would enter and exit the market between six
and ten times each year.

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 25 of the Complaint and therefore denies

those allegations.

26.     BLMIS's IA Business customers received fabricated
monthly or quarterly statements showing that securities were held
in, or had been traded through, their accounts. The securities

purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never made the investments he promised clients, who believed they were invested with him in the SSC Strategy. He further admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts. In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform on which BLMIS reasonably could have traded securities. Instead, investors' funds were principally deposited into the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxxx703.

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26 of the Complaint and therefore denies such allegations, and respectfully refers the Court to the transcript of the Plea Hearing for a complete and accurate statement of its contents.

27.     Prior to his arrest, Madoff assured clients and regulators that he purchased and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than through any listed exchange. Based on the Trustee's investigation to date, there is no evidence that the IA Business ever entered into any OTC options trades on behalf of IA Business account holders.

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27 of the Complaint and therefore denies those allegations.

28.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options, but rather used to pay withdrawals and to make other avoidable transfers. Madoff also used his customers' investments to enrich himself, his associates, and his family.

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28 of the Complaint and therefore denies those allegations.

29.    The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion of new investments to fulfill payment requests or withdrawals from other BLMIS accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29 of the Complaint and therefore denies those allegations.

30.    It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in demand, investigation, the filing of a claim, and disclosure of the fraud.

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30 of the Complaint and therefore denies those allegations.

31.    Madoff's scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31 of the Complaint and therefore denies those allegations.

32.    Based upon the Trustee's ongoing investigation, it now appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. By the time the Ponzi scheme came to light on December

11, 2008, with Madoffs arrest, investors had already lost approximately $20 billion in principal.

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32 of the Complaint and therefore denies those allegations.

33.    Thus, at all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33 of the Complaint and therefore denies those allegations.

## VII.    THE TRANSFERS

34.    Fairfield Sentry received initial transfers of BLMIS Customer Property. Some or all of those initial transfers were subsequently transferred directly or indirectly to Defendant Credit Agricole Miami.

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34 and therefore denies those allegations.

### A.    Initial Transfers from BLMIS to Fairfield Sentry

35.    The Trustee filed an adversary proceeding against Fairfield Sentry and other defendants in the Bankruptcy Court under the caption *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Fairfield Sentry in the amount of approximately $3 billion (the "Fairfield Amended Complaint"). The Trustee incorporates by reference the allegations contained in the Fairfield Amended Complaint as if fully set forth herein.

**ANSWER:** Crédit Agricole Miami: (i) admits that the Trustee filed an action styled as *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro No. 09-01239 (BRL) (the "Sentry Action"); (ii)

15

lacks knowledge or information sufficient to form a belief as to the truth of the allegation of the

amounts of the transfers alleged in paragraph 35 and therefore denies such allegations; (iii) lacks

knowledge or information sufficient to form a belief as to which of the three complaints filed in

the Sentry Action the Trustee purports to incorporate by reference in the Complaint in this action

and therefore denies such allegations; (iv) denies knowledge or information sufficient to form a

belief as to the truth of the allegations in each and every paragraph of each of the three

complaints filed in the Sentry Action that allegedly supports the claim that any initial transfers of

Customer Property to Fairfield Sentry are or were avoided or avoidable; and (v) objects to the

incorporation by reference of, and therefore does not answer, each and every other paragraph and

allegation in the three complaints in the Sentry Action and to the inclusion in this adversary

proceeding of any issue implicated by any of the three complaints in the Sentry Action other than

the issue of the avoidance or avoidability of the initial transfers of Customer Property, but

reserves the right to rely on and introduce any allegations in the referenced "Fairfield Amended

Complaint" or its exhibits as opposing party admissions admissible for the truth of their contents.

To the extent that any further response is required, Crédit Agricole Miami denies knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in paragraph 35

of the Complaint and therefore denies such allegations.

> 36.    During the six years preceding the Filing Date, BLMIS made transfers to Fairfield Sentry of approximately $2,985,136,619 (the "Fairfield Sentry Six Year Initial Transfers"). The Fairfield Sentry Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a

belief as to the truth of the allegations in the first sentence of paragraph 36 and therefore denies

16

such allegations. The remaining allegations in paragraph 36 state legal conclusions to which no

response is required. To the extent that any further response is required, Crédit Agricole Miami

denies the allegations in paragraph 36.

> 37.     The Fairfield Sentry Six Year Initial Transfers include
> approximately $1,614,067,088 which BLMIS transferred to
> Fairfield Sentry during the two years preceding the Filing Date (the
> "Fairfield Sentry Two Year Initial Transfers"). The Fairfield Sentry
> Two Year Initial Transfers were and continue to be Customer
> Property within the meaning of SIPA § 78*lll*(4), and are avoidable
> and recoverable under sections 544, 548, 550, and 551 of the
> Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable
> provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a

belief as to the truth of the allegations in the first sentence of paragraph 37 and therefore denies

such allegations. The remaining allegations in paragraph 37 state legal conclusions to which no

response is required. To the extent that any further response is required, Crédit Agricole Miami

denies the allegations in paragraph 37.

> 38.     The Fairfield Sentry Two Year Initial Transfers include
> approximately $1,134,628,244 which BLMIS transferred to
> Fairfield Sentry during the 90 days preceding the Filing Date (the
> "Fairfield Sentry Preference Period Initial Transfers"). The Fairfield
> Sentry Preference Period Initial Transfers were and continue to be
> Customer Property within the meaning of SIPA § 78*lll*(4), and are
> avoidable and recoverable under sections 547, 550, and 551 of the
> Bankruptcy Code, and applicable provisions of SIPA, particularly
> SIPA § 78fff-2(c)(3).

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a

belief as to the truth of the allegations in the first sentence of paragraph 38 and therefore denies

such allegations. The remaining allegations in paragraph 38 state legal conclusions to which no

response is required. To the extent that any further response is required, Crédit Agricole Miami

denies the allegations in Paragraph 38.

39.    The Fairfield Sentry Six Year Initial Transfers, the Fairfield Sentry Two Year Initial Transfers, and the Fairfield Sentry Preference Period Initial Transfers are collectively defined as the "Fairfield Sentry Initial Transfers." Charts setting forth these transfers are attached as **Exhibits A and B**.

**ANSWER:** Crédit Agricole Miami lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 39 of the Complaint and therefore denies such allegations, except admits that Exhibits A and B are attached to the Complaint.

40.    Pursuant to the Bankruptcy Court's June 7 and June 10, 2011 orders, the Bankruptcy Court approved a settlement among the Trustee, Fairfield Sentry, and others (the "Settlement Agreement"). As part of the Settlement Agreement, on July 13, 2011, the Bankruptcy Court entered a consent judgment granting the Trustee a judgment in the amount of $3,054,000,000. Under the terms of the Settlement Agreement, Fairfield Sentry is obligated to pay $70,000,000 to the Trustee for the benefit of the consolidated BLMIS estate.

**ANSWER:** Crédit Agricole Miami admits, on information and belief, that the Court entered orders and a judgment as described in paragraph 40 on or about the dates alleged therein, and respectfully refers the Court to the referenced orders and the referenced judgment for the complete and accurate contents thereof.

## B.    Subsequent Transfers from Fairfield Sentry to BBH

41.    A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, BBH. Based on the Trustee's investigation to date, approximately $26,121,583 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred either directly by Fairfield Sentry to BBH or indirectly from Fairfield Sentry to BBH through Six Sis AG, a corporate entity functioning as a securities depository and specializing in securities settlement and custody services (the "Fairfield Sentry BBH Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry BBH Subsequent Transfers is attached as **Exhibit C**.

**ANSWER:** The allegations in paragraph 41 of the Complaint contain legal conclusions to which no response is required.  To the extent that a response is required, Crédit Agricole

Miami denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 41 of the Complaint and therefore denies such allegations.  To the extent

that paragraph 41 refers to a document, Crédit Agricole Miami respectfully refers the Court to

that document for a complete and accurate statement of its contents, while denying the Trustee's

allegations related to that document.

### C.    Subsequent Transfers from BBH to Credit Agricole Miami

> 42.    A portion of the Fairfield Sentry BBH Subsequent Transfers
> was subsequently transferred either directly or indirectly to, or for
> the benefit of, Defendant Credit Agricole Miami and is recoverable
> from Defendant Credit Agricole Miami pursuant to section 550 of
> the Bankruptcy Code and § 278 of the NYDCL. Based on the
> Trustee's investigation to date, approximately $6,741,013 of the
> money transferred from BLMIS to Fairfield Sentry and from
> Fairfield Sentry to BBH was subsequently transferred to Defendant
> Credit Agricole Miami (the "Fairfield Sentry Credit Agricole Miami
> Subsequent Transfers," together with the Fairfield Sentry BBH
> Subsequent Transfers, the "Fairfield Sentry Subsequent Transfers").
> A chart setting forth the presently known Fairfield Sentry Credit
> Agricole Miami Subsequent Transfers is attached as **Exhibit D**.

**ANSWER:**  The allegations in paragraph 42 of the Complaint contain legal conclusions

to which no response is required.  To the extent that a response is required, Crédit Agricole

Miami denies the allegations in paragraph 42, except that Crédit Agricole Miami denies

knowledge or information sufficient to form a belief as to the truth of the allegations in

paragraph 42 regarding the prior status of funds allegedly transferred from BBH to Crédit

Agricole Miami, and to the extent that paragraph 42 refers to a document, Crédit Agricole Miami

respectfully refers the Court to that document for a complete and accurate statement of its

contents, while denying the Trustee's allegations related to that document.

> 43.    The Trustee's investigation is on-going, and the Trustee
> reserves the right to: (i) supplement the information on the Fairfield
> Sentry Initial Transfers, Fairfield Sentry Subsequent Transfers, and
> any additional transfers, and (ii) seek recovery of such additional
> transfers.

**ANSWER:** Crédit Agricole Miami denies knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 43 and therefore denies those allegations.

## COUNT ONE
## RECOVERY OF FAIRFIELD SENTRY CREDIT AGRICOLE MIAMI SUBSEQUENT TRANSFERS - 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

44.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

**ANSWER:** Crédit Agricole Miami incorporates by reference and reasserts as if fully set

forth herein its responses to the allegations of the Complaint contained in each of the previous

paragraphs of this Answer.

45.    Defendant Credit Agricole Miami received the Fairfield Sentry Credit Agricole Miami Subsequent Transfers, totaling approximately $6,741,013. These transfers are recoverable pursuant to section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

**ANSWER:** The allegations in paragraph 45 of the Complaint contain legal conclusions

to which no response is required.  To the extent that a response is required, Crédit Agricole

Miami denies the allegations in paragraph 45.

46.    Each of the Fairfield Sentry Subsequent Transfers was made directly or indirectly to, or for the benefit of, Defendant Credit Agricole Miami.

**ANSWER:** The allegations in paragraph 46 of the Complaint contain legal conclusions

to which no response is required.  To the extent that a response is required, Crédit Agricole

Miami denies the allegations in paragraph 46.

47.    Defendant Credit Agricole Miami is the immediate or mediate transferee of the Fairfield Sentry Initial Transfers.

**ANSWER:** The allegations in paragraph 47 of the Complaint contain legal conclusions

to which no response is required.  To the extent that a response is required, Crédit Agricole

Miami denies the allegations in paragraph 47.

48.     As a result of the foregoing, pursuant to sections 550(a) and
551 of the Bankruptcy Code,§ 278 of the NYDCL, and SIPA
§ 78fff-2(c)(3), the Trustee is entitled to a judgment against
Defendant Credit Agricole Miami recovering the Fairfield Sentry
Credit Agricole Miami Subsequent Transfers, or the value thereof,
for the benefit of the estate of BLMIS.

**ANSWER:** The allegations in paragraph 48 of the Complaint contain legal conclusions

to which no response is required.  To the extent that a response is required, Crédit Agricole

Miami denies the allegations in paragraph 48.

## RESPONSE TO REQUEST FOR RELIEF

The Request for Relief sets forth legal conclusions to which no response is required.  To

the extent that a response is required, Crédit Agricole Miami denies that the Trustee is entitled to

his requested relief or to any other relief.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

### 11 U.S.C. § 546(e) – Bankruptcy Code Safe Harbor

Pursuant to 11 U.S.C. § 546(e), the Trustee may not avoid any alleged Fairfield Sentry

Initial Transfers, or pursue under 11 U.S.C. § 550(a) any recovery claims against Crédit Agricole

Miami premised upon the alleged avoidance or avoidability of any alleged Fairfield Sentry Initial

Transfers, except to the extent that the Trustee can establish that such transfers were made with

actual intent to defraud within two years before the Filing Date.  Thus, the Trustee may neither

avoid the Fairfield Sentry Initial Transfers relevant to Crédit Agricole Miami nor maintain

claims for recovery against Crédit Agricole Miami because: (i) the relevant transfers were

settlement payments and/or transfers made "in connection with . . . securities contract[s]," 11

U.S.C. § 546(e), (i.e., the BLMIS-Fairfield Sentry account agreements and other agreements,

including the Fairfield Sentry Articles of Association governing redemptions of shares in

Fairfield Sentry); (ii) any relevant transfers were made by BLMIS in response to Fairfield

Sentry's requests for withdrawals; and (iii) the alleged Fairfield Sentry Initial Transfers were

made by, to, and for the benefit of entities covered by 11 U.S.C. § 546(e). Crédit Agricole

Miami had no actual knowledge that BLMIS was not trading securities or was perpetrating a

fraud or a Ponzi scheme, and Crédit Agricole Miami took any funds received from Fairfield

Sentry for value and in good faith. Because the alleged transfers are not avoidable, property

received by Crédit Agricole Miami as part of the alleged Fairfield Sentry Initial Transfers, if any,

is not recoverable from Crédit Agricole Miami.

## Second Affirmative Defense

### Not Customer Property

The property, if any, that Crédit Agricole Miami received from Fairfield Sentry was not

customer property of BLMIS or proceeds of customer property that BLMIS allegedly transferred

to Fairfield Sentry. For reasons including those set forth in Crédit Agricole Miami's

Memorandum of Law in Support of the Motion to Dismiss, ECF 64, filed on July 18, 2022 in

this adversary proceeding, many of the alleged Fairfield Sentry Subsequent Transfers could not

have been sourced from BLMIS customer property because prior allegedly avoidable transfers

from BLMIS to Fairfield Sentry had been distributed by Fairfield Sentry to other entities prior to

the alleged Fairfield Sentry Subsequent Transfers. Thus, alleged transfers from Fairfield Sentry

to Crédit Agricole Miami are not recoverable by the Trustee.

## Third Affirmative Defense

### Double Recovery

On May 9, 2011, the Trustee entered into a Settlement Agreement (the "Fairfield

Settlement Agreement") with the Liquidators of Fairfield Sentry Limited and other Fairfield

funds.  This Court approved the Fairfield Settlement Agreement on June 7, 2011, and it was

incorporated into the consent judgment entered against Fairfield Sentry on July 13, 2011 (the

"Consent Judgment").  The Fairfield Settlement Agreement provides for the sharing of

recoveries on the Trustee's and the Liquidators' claims for recovery of property that Fairfield

Sentry transferred.  To the extent that the Liquidators recover from Crédit Agricole Miami in

settlement or otherwise, the Trustee is barred from recovering on the ground that he is not

entitled to double recovery, nor should Crédit Agricole Miami be subject to recovery of identical

funds from two separate entities.

**Fourth Affirmative Defense**

**Mere Conduit/Lack of Dominion or Control**

The Trustee's claims are barred under the "mere conduit" defense, because Crédit

Agricole Miami was not a transferee of the Fairfield Sentry Subsequent Transfers.  *See Finley v.*

*Alexander & Alexander of N.Y. Inc. (In re Finley)*, 130 F.3d 52, 57–58 (2d Cir. 1997).  To the

extent that Crédit Agricole Miami received any Fairfield Sentry Subsequent Transfers, Crédit

Agricole Miami: (i) received each Fairfield Sentry Subsequent Transfer in good faith, in a

nominee capacity, and for the account and benefit of one or more of its customers; (ii) did not

have dominion or control or the right to assert dominion or control over the Fairfield Sentry

Subsequent Transfers or the proceeds thereof or to use the Fairfield Sentry Subsequent Transfers

or the proceeds thereof for its own purposes; (iii) was a mere conduit for its customers; and (iv)

was obligated to credit the Fairfield Sentry Subsequent Transfers to the account and for the

benefit of one or more of its customers, who alone had the right to assert dominion and control

over the Fairfield Sentry Subsequent Transfers received by Crédit Agricole Miami for their

benefit.  Therefore, to the extent that Crédit Agricole Miami received any alleged Fairfield

23

Sentry Subsequent Transfers or proceeds thereof, it did so as a mere conduit for third parties rather than as a transferee from which the Trustee may recover under 11 U.S.C. § 550(a).

## Fifth Affirmative Defense

### Crédit Agricole Miami as Initial Transferee – Mere Conduit/Lack of Dominion or Control

In the alternative, Fairfield Sentry and BBH were mere conduits, and consequently, any claimed transfers were initial transfers from BLMIS to Crédit Agricole Miami. As the Trustee stated in *Picard v. Grosvenor Investment Management Ltd.*, Fairfield Sentry's "sole purpose was to funnel money to BLMIS," Trustee's Mem. of Law in Opp'n to Def.'s Mot. to Dismiss the Compl. at 3, *Picard v. Grosvenor Inv. Mgmt. Ltd.*, No. 12-01021 (Bankr. S.D.N.Y. June 15, 2022), ECF 115, and "no arm's length relationship exist[ed] between [Sentry] and BLMIS." *Id.* at 6 (internal quotation marks and citation omitted). As a result, any redemptions received by Crédit Agricole Miami were initial transfers from BLMIS to Crédit Agricole Miami that are subject to the safe harbor under 11 U.S.C. § 546(e); any Trustee proceeding to avoid the alleged transfers is untimely; and Crédit Agricole Miami may retain the amount it received, if any, pursuant to 11 U.S.C. §§ 548(c) and 548(d)(2)(B) because it took any alleged transfers for value and in good faith.

## Sixth Affirmative Defense

### 11 U.S.C. § 550(d) – Single Satisfaction and N.Y. Debt. & Cred. Law § 278(1)(a)

Under 11 U.S.C. § 550(d), "[t]he [T]rustee is entitled to only a single satisfaction under [11 U.S.C. § 550(a)]." Under N.Y. Debt. & Cred. Law § 278(1)(a), the Trustee may only set aside a conveyance "to the extent necessary to satisfy his claim." N.Y. Debt. & Cred. Law §

278(1)(a) (McKinney 2020).[4]  Accordingly, the Trustee may not recover any subsequent transfer

received by Crédit Agricole Miami to the extent that the Trustee has recovered, or will recover,

from Fairfield Sentry or any other immediate or mediate transferee, the amount of an allegedly

avoided initial transfer that included the customer property that the Trustee alleges that Crédit

Agricole Miami received.

**Seventh Affirmative Defense**

**11 U.S.C. 550(b) and N.Y. Debt. & Cred. Law 278(1), 278(2) – Value, Good Faith,**

**and Without Knowledge of Voidability**

To the extent that Crédit Agricole Miami received any alleged Fairfield Sentry

Subsequent Transfer or any proceeds thereof, such property or funds may not be recovered

because Crédit Agricole Miami took for value, in good faith, and without knowledge of the

avoidability of any transfer within the meaning of 11 U.S.C. § 550(b) and/or as a purchaser for

fair consideration without knowledge of the fraud at the time of the purchase or actual fraudulent

intent within the meaning of N.Y. Debt. & Cred. Law §§ 278(1) and 278(2).

To the extent that Crédit Agricole Miami received any Fairfield Sentry Subsequent

Transfer, Crédit Agricole Miami took in good faith because it lacked knowledge that BLMIS

was not trading securities or was perpetrating a fraud or a Ponzi scheme, or of any fraudulent

purpose behind the alleged Fairfield Sentry Subsequent Transfers.  Crédit Agricole Miami lacked

knowledge of the voidability of any alleged Fairfield Sentry Initial Transfers at the time it

allegedly received any Fairfield Sentry Subsequent Transfers.  Crédit Agricole Miami lacked

---

[4] N.Y. Debt. & Cred. Law § 278 was amended pursuant to New York's adoption of the Uniform Voidable Transactions Act ("UVTA"), effective April 4, 2020.  However, the law implementing those revisions provides that they "shall not apply to a transfer made or obligation incurred before such effective date, nor shall it apply to a right of action that has accrued before such effective date."  2019 N.Y. Laws Ch. 580, § 7.  Because all of the alleged transfers at issue took place, and/or any alleged right of action relating to the alleged transfers accrued, prior to the UVTA's enactment, this Answer cites to the version of § 278 in effect prior to the April 4, 2020 revisions.

25

actual fraudulent intent at the time it allegedly received any Fairfield Sentry Subsequent

Transfer.  Crédit Agricole Miami lacked knowledge of facts suggestive of any alleged fraud that

would have caused a reasonable person in its position to conduct further inquiry into BLMIS

about any possible fraud.

Any alleged Fairfield Sentry Subsequent Transfers received by Crédit Agricole Miami

were routine transfers made by Fairfield Sentry and BBH, taken for value, in exchange for

redemptions of investments in Fairfield Sentry or BBH and did not have a fraudulent purpose.

Any such exchange was also for fair consideration, as a surrender of shares in Fairfield Sentry or

BBH constituted a fair equivalent of the property received.

Moreover, a reasonable person with the facts in Crédit Agricole Miami's possession at

the time of the alleged Fairfield Sentry Subsequent Transfers would not have been on inquiry

notice of any fraudulent purpose behind the Fairfield Sentry Initial Transfers, nor would those

facts have led such a person to conduct further inquiry into whether there was a fraudulent

purpose to them, into whether BLMIS was trading securities, or into whether they related to a

fraud or a Ponzi scheme.  Even if Crédit Agricole Miami had been on inquiry notice of a possible

fraudulent purpose behind the Fairfield Sentry Initial Transfers or of facts that would have led a

reasonable person to conduct further inquiry into whether BLMIS was trading securities or was a

fraud or a Ponzi scheme, a diligent inquiry by Crédit Agricole Miami would not have discovered

the allegedly fraudulent purpose of any transfer or that BLMIS was not trading securities or was

a fraud or a Ponzi scheme.  Other entities with vastly greater investigatory tools and resources

than Crédit Agricole Miami, and with more access to BLMIS personnel and documentation than

Crédit Agricole Miami, investigated BLMIS but failed to uncover that it was a Ponzi scheme

prior to December 2008.

Additionally, Crédit Agricole Miami did not have knowledge of the alleged voidability of the Fairfield Sentry Initial Transfers at the time of the alleged Fairfield Sentry Subsequent Transfers.

## Eighth Affirmative Defense

## Extraterritoriality

The Trustee's recovery from Crédit Agricole Miami of any transfer from Fairfield Sentry would constitute an impermissible extraterritorial application of U.S. law.

## Ninth Affirmative Defense

## Comity

The Trustee's recovery from Crédit Agricole Miami of any transfer from Fairfield Sentry would violate principles of comity.

## Tenth Affirmative Defense

## No Interest

The Trustee is not entitled to an award of interest.

## Eleventh Affirmative Defense

## Lack of Subject Matter Jurisdiction

## (U.S. Const. art. III; Fed. R. Civ. P. 12(b)(1); Fed. R. Bankr. P. 7012(b))

This Court lacks jurisdiction under Article III of the U.S. Constitution to enter final orders or judgments in this proceeding.

## Twelfth Affirmative Defense

## Statute of Limitations

The Trustee's claims are barred by the statute of limitations.

### Thirteenth Affirmative Defense

### Estoppel

The Trustee's claims are barred by estoppel.

### Fourteenth Affirmative Defense

### Lack of Personal Jurisdiction

### (Fed. R. Civ. P. 12(b)(2); Fed. R. Bankr. P. 7012(b))

This Court lacks personal jurisdiction over Crédit Agricole Miami, including for each of the reasons stated in Crédit Agricole Miami's Memorandum of Law in Support of the Motion to Dismiss the Complaint, filed on July 18, 2022 in this adversary proceeding, ECF 64, and proceedings thereon, and Crédit Agricole Miami has not consented to a decision by this Court or this Court's authority to hear and determine the action.

### Fifteenth Affirmative Defense

### Preservation of Rights (11 U.S.C. § 502(h))

To the extent that the Trustee recovers from Crédit Agricole Miami, Crédit Agricole Miami reserves its right to assert a claim arising from such recovery under 11 U.S.C. § 502(h).

### Sixteenth Affirmative Defense

### Failure to Mitigate

The Trustee's claims are barred, in whole or in part, because the Trustee has failed to mitigate, minimize, or avoid damages, if any.

### Seventeenth Affirmative Defense

### Unreasonable Delay / Laches

The Trustee's claims against Crédit Agricole Miami are barred by the doctrine of laches.

## Eighteenth Affirmative Defense

## Failure to State a Claim for Relief

The Complaint fails to state a claim upon which relief can be granted, including, without limitation, for each of the reasons stated in Crédit Agricole Miami's Memorandum of Law in Support of the Motion to Dismiss the Complaint, filed on July 18, 2022 in this adversary proceeding, ECF 64, and proceedings thereon.

## Nineteenth Affirmative Defense

## Initial Transfer Not Avoided (11 U.S.C. § 550(a))

The Trustee may not recover the alleged transfers from Fairfield Sentry to Crédit Agricole Miami, if any, because he has not avoided the alleged initial transfers from BLMIS to Fairfield Sentry.

## Twentieth Affirmative Defense

## Sufficient SIPC Funds

The Trustee's claims should be dismissed if the Trustee has recovered, or during the pendency of this action recovers, sufficient funds to reimburse SIPC for all payments that SIPC has made to satisfy allowed claims of BLMIS customers.

## Twenty-First Affirmative Defense

## British Virgin Island Proceedings

The Trustee's claims are barred, in whole or in part, based upon rulings, judgments, orders, or decisions entered in the liquidation proceedings of Fairfield Sentry before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands, including any related appellate rulings, judgments, orders, or decisions.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 9015 of the Federal Rules of Bankruptcy Procedure, Crédit Agricole Miami hereby demands a jury trial on all claims and issues that may be tried to a jury.

**STATEMENT PURSUANT TO FED. R. BANKR. P. 7012(B)**

Crédit Agricole Miami objects and does not consent to the entry of final orders or judgments against Crédit Agricole Miami by the Bankruptcy Court.

**DEFENDANT'S REQUEST FOR RELIEF**

WHEREFORE, Crédit Agricole Miami requests judgment dismissing the Complaint with prejudice, together with an award of attorneys' fees, costs, disbursements, and such other relief as the Court deems just and appropriate.

Dated:        April 19, 2023
              New York, New York

                                        Respectfully submitted,

                                        **CLEARY GOTTLIEB STEEN &
                                        HAMILTON LLP**

                                        By:  _/s/ Elizabeth Vicens_____

                                        One Liberty Plaza
                                        New York, New York 10006
                                        Telephone: 212.225.2000
                                        Facsimile: 212.225.3999
                                        Elizabeth Vicens
                                        Email:  evicens@cgsh.com
                                        Jessica Metzger
                                        Email:  jmetzger@cgsh.com

                                        _Attorneys for Crédit Agricole Corporate and
                                        Investment Bank d/b/a Crédit Agricole Private
                                        Banking Miami, f/k/a Calyon S.A. d/b/a Crédit
                                        Agricole Miami Private Bank successor in
                                        interest to Crédit Lyonnais S.A._