**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-01789 (CGM) |
| v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, and Bernard L. Madoff, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 12-01022 (CGM) |
| CRÉDIT AGRICOLE (SUISSE) S.A., and CRÉDIT AGRICOLE S.A., a/k/a BANQUE DU CRÉDIT AGRICOLE, | **ANSWER TO COMPLAINT AND JURY DEMAND** |
| Defendants. | |

Defendant Crédit Agricole (Suisse) S.A. ("C.A. Suisse" or "Defendant")[1], by its

undersigned counsel, hereby responds to the Complaint, as amended, of Irving H. Picard, Trustee

---

[1] The Complaint, ECF No. 1, was filed January 12, 2012.  It was amended by stipulation and order entered on February 24, 2022, ECF No. 110 (the "Stipulation and Order").  Unless otherwise specified, all "ECF No. __" citations refer to Adv. Pro. No. 12-01022.

for the Liquidation of Bernard L. Madoff Investment Securities LLC and the substantively

consolidated estate of Bernard L. Madoff ("Plaintiff" or "Trustee") as follows:

## PRELIMINARY STATEMENT

As set forth in the Stipulation and Order entered on February 24, 2022, ECF No. 110 by

and among the Trustee, C.A. Suisse and Crédit Agricole S.A., a/k/a Banque du Crédit Agricole

("C.A.S.A."), the Trustee: (i) dismissed two alleged transfers from Fairfield Sentry[2] to C.A.

Suisse; (ii) dismissed the alleged Kingate-related transfers that were dismissed pursuant to that

certain settlement agreement (the "Kingate Settlement") by and among the Trustee, Kingate

Global Fund Ltd. ("Kingate Global") and Kingate Euro Fund Ltd. ("Kingate Euro", and together

with Kingate Global, the "Kingate Funds"); and (iii) dismissed all claims against C.A.S.A., also

pursuant to the Kingate Settlement. Accordingly, C.A. Suisse avers that no response to the

Kingate-related allegations is required because the Trustee has voluntarily dismissed all Kingate-

related claims; to the extent that a response is required, C.A. Suisse denies the remaining

allegations.

Except as otherwise expressly admitted herein, C.A. Suisse denies each and every

allegation in the Complaint. C.A. Suisse states that the headings and sub-headings throughout

the Complaint do not constitute well-pleaded allegations of fact and therefore require no

response. To the extent that a response is required, the allegations in the headings and

subheadings in the Complaint are denied. In answering the allegations in the Complaint, C.A.

Suisse does not intend to waive, and does not waive, any and all applicable objections to the

relevance, admissibility, or prejudicial effect of any of the allegations in the Complaint. To the

extent it is later determined that a response is required to any allegation C.A. Suisse claims has

---

[2] Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Complaint.

been mooted by a prior dismissal of the Trustee's claims, C.A. Suisse denies any such allegation.

C.A. Suisse expressly reserves the right to amend and/or supplement this Answer.

## RESPONSES TO SPECIFIC ALLEGATIONS

### I.    NATURE OF THE ACTION

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS Customer Property[3] that was stolen as part of the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff") and others.

**ANSWER:** The allegations in paragraph 1 of the Complaint contain legal conclusions to

which no response is required.  To the extent that a response is required, C.A. Suisse denies

knowledge or information sufficient to form a belief as to the truth of the allegations in

paragraph 1 and therefore denies those allegations, except that C.A. Suisse admits that the

Trustee purports to bring this action as trustee for the liquidation of BLMIS and the substantively

consolidated estate of Bernard L. Madoff ("Madoff") pursuant to the Securities Investor

Protection Act ("SIPA").

2.    With this Complaint, the Trustee seeks to recover approximately $30,560,968 in subsequent transfers of Customer Property made to the Agricole Defendants. The subsequent transfers were derived from investments with BLMIS made by Fairfield Sentry Limited ("Fairfield Sentry"), Kingate Global Fund Ltd. ("Kingate Global"), and Kingate Euro Fund Ltd. ("Kingate Euro"), which were Madoff feeder funds (collectively, the "Feeder Funds"). The Feeder Funds are British Virgin Islands ("BVI") companies that are in liquidation in the BVI. The Feeder Funds had direct customer accounts with BLMIS's investment advisory business ("IA Business") for the purpose of investing assets with BLMIS. Each of the Feeder Funds maintained in excess of 95% of its assets in its BLMIS customer accounts. Some of the subsequent transfers from Fairfield Sentry came through Fairfield Sigma

---

[3] SIPA § 78*lll*(4) defines "Customer Property" as cash and securities at any time received, acquired, or held by, or for the account of, a debtor from, or for, the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.

Limited ("Fairfield Sigma"), which invested 100% of its assets in Fairfield Sentry. Fairfield Sigma also is in liquidation in the BVI.

**ANSWER:** C.A. Suisse states that because the Trustee has dismissed all claims and allegations against C.A.S.A., no response is required to the allegations concerning C.A.S.A. C.A. Suisse avers that no response to the allegations relating to the Kingate Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate Funds; to the extent that a response is required, C.A. Suisse denies those allegations. The remaining allegations in paragraph 2 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, C.A. Suisse denies the allegations in paragraph 2, except that C.A. Suisse denies knowledge or information sufficient to form a belief as to the allegations about: (i) Fairfield Sentry's accounts with BLMIS; and (ii) Fairfield Sigma's investments in Fairfield Sentry, and C.A. Suisse admits on information and belief that: (i) Fairfield Sentry is a BVI company currently in liquidation in the BVI; (ii) Fairfield Sigma is in liquidation in the BVI; and (iii) the Trustee seeks to recover assets that it alleges were subsequent transfers from Fairfield Sentry to C.A. Suisse.

> 3.    When the Agricole Defendants received subsequent transfers of BLMIS Customer Property, Defendant Agricole was a French *société anonyme* and one of the largest banks in Europe, and Defendant Agricole Suisse was a Swiss *société anonyme* that provided private banking services.

**ANSWER:** C.A. Suisse states that because the Trustee has dismissed all claims and allegations against C.A.S.A., no response is required to the allegations concerning C.A.S.A. The remaining allegations in paragraph 3 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, C.A. Suisse denies the allegations in paragraph 3, except C.A. Suisse admits that Crédit Agricole (Suisse) S.A. was a Swiss *société anonyme* that provided private banking services.

4

## II.   JURISDICTION AND VENUE

4.     The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3); sections 105(a), 550(a), and 551 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.* (the "Bankruptcy Code"); and the New York Fraudulent Conveyance Act (New York Debtor & Creditor Law) ("NYDCL") §§ 273-279 (McKinney 2001), to obtain avoidable and recoverable transfers received by the Agricole Defendants as subsequent transferees of funds originating from BLMIS.

**ANSWER:** C.A. Suisse states that because the Trustee has dismissed all claims and allegations against C.A.S.A., no response is required to the allegations concerning C.A.S.A. C.A. Suisse avers that no response to the allegations relating to the Kingate Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate Funds; to the extent that a response is required, C.A. Suisse denies those allegations.  The remaining allegations in paragraph 4 of the Complaint contain legal conclusions to which no response is required.  To the extent that a response is required, C.A. Suisse denies the allegations in paragraph 4, except that C.A. Suisse admits that the Trustee has brought this adversary proceeding, purportedly pursuant to the cited statutes.

5.     This is an adversary proceeding brought in this Court, in which the main underlying substantively consolidated SIPA case, Adv. Pro. No. 08-01789 (BRL) (the "SIPA Case"), is pending. The SIPA Case was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding"). This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), and 15 U.S.C. § 78eee(b)(2)(A), (b)(4).

**ANSWER:** The allegations in paragraph 5 of the Complaint contain legal conclusions to which no response is required.  To the extent that a response is required, C.A. Suisse denies the allegations in paragraph 5, except that C.A. Suisse denies knowledge or information sufficient to

form a belief as to where the main substantively consolidated SIPA case (Adv. Pro. No. 08-01789) was originally brought, and C.A. Suisse admits that: (i) the main substantively consolidated SIPA case (Adv. Pro. No. 08-01789) is pending in this Court; and (ii) this is an adversary proceeding pending in this Court.

> 6.      The Agricole Defendants are subject to personal jurisdiction in this judicial district because they purposely availed themselves of the laws and protections of the United States and the state of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through the Feeder Funds. The Agricole Defendants knowingly received subsequent transfers from BLMIS by withdrawing money from the Feeder Funds.

**ANSWER:**  C.A. Suisse states that because the Trustee has dismissed all claims and allegations against C.A.S.A., no response is required to the allegations concerning C.A.S.A. C.A. Suisse avers that no response to the allegations relating to the Kingate Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate Funds; to the extent that a response is required, C.A. Suisse denies those allegations.  The remaining allegations in paragraph 6 of the Complaint state legal conclusions to which no response is required.  To the extent that a response is required, C.A. Suisse denies the allegations in paragraph 6.

> 7.      By directing its investments through Fairfield Sentry and Fairfield Sigma, both Fairfield Greenwich Group ("FGG") managed feeder funds, Defendant Agricole Suisse knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York. Upon information and belief, Defendant Agricole Suisse entered into a subscription agreement with Fairfield Sentry under which it submitted to New York jurisdiction, sent a copy of the subscription agreement to FGG's New York City office, and wired funds to Fairfield Sentry through a bank in New York. Defendant Agricole Suisse thus derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

**ANSWER:** The allegations in paragraph 7 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, C.A. Suisse denies the allegations in paragraph 7 except admits on information and belief that: (i) Fairfield Sentry and Fairfield Sigma were funds managed by FGG; and (ii) FGG had a New York office.

> 8.    The Agricole Defendants should reasonably expect to be subject to New York jurisdiction and are subject to personal jurisdiction pursuant to New York Civil Practice Law & Rules § 302 (McKinney 2001) and Bankruptcy Rule 7004.

**ANSWER:** C.A. Suisse states that because the Trustee has dismissed all claims and allegations against C.A.S.A., no response is required to the allegations concerning C.A.S.A. The remaining allegations in paragraph 8 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, C.A. Suisse denies the allegations in paragraph 8.

> 9.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).

**ANSWER:** The allegations in paragraph 9 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, C.A. Suisse denies the allegations in paragraph 9, states that it does not consent to the issuance or entry of final orders or judgments by the Bankruptcy Court, and demands a trial by jury of all issues that may be tried by a jury.

> 10.    Venue in this District is proper under 28 U.S.C. § 1409.

**ANSWER:** The allegations in paragraph 10 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10 and therefore denies those allegations.

### III.    BACKGROUND

11.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the U.S. Securities and Exchange Commission ("SEC") commenced the District Court Proceeding against Madoff and BLMIS. The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS. The District Court Proceeding remains pending.

**ANSWER:**  C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11 of the Complaint and therefore denies those allegations, except that C.A. Suisse admits on information and belief that Madoff was arrested on or about December 11, 2008 and that the SEC filed a complaint against Madoff and BLMIS on or about December 11, 2008.

12.    On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards as receiver for the assets of BLMIS.

**ANSWER:**  C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12 of the Complaint and therefore denies those allegations and respectfully refers the Court to the referenced order for a complete and accurate statement of its contents.

13.    On December 15, 2008, under § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, under § 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

**ANSWER:**  C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 of the Complaint and therefore denies those

allegations and respectfully refers the Court to the referenced application for a complete and

accurate statement of its contents.

> 14.    Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order under SIPA (known as the "Protective Decree"), which, in pertinent part:
>> a. removed the receiver and appointed the Trustee for the liquidation of the business of BLMIS under SIPA § 78eee(b)(3);
>> b. appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA § 78eee(b)(3); and
>> c. removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under § 78eee(b)(4) of SIPA.

**ANSWER:** C.A. Suisse denies knowledge or information sufficient to form a belief as to

the truth of the allegations in paragraph 14 of the Complaint and therefore denies those

allegations and respectfully refers the Court to the referenced order for a complete and accurate

statement of its contents.

> 15.    By orders dated December 23, 2008, and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

**ANSWER:** C.A. Suisse denies knowledge or information sufficient to form a belief as to

the truth of the allegations in paragraph 15 of the Complaint and therefore denies those

allegations, and respectfully refers the Court to the referenced documents for complete and

accurate statements of their contents.

> 16.    At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." *Id.* at 23. Additionally, Madoff admitted "[a]s I engaged in my fraud,

I knew what I was doing [was] wrong, indeed criminal." *Id.* On June 29, 2009, Madoff was sentenced to 150 years in prison.

**ANSWER:** C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16 of the Complaint and therefore denies those allegations, except admits, on information and belief, that Madoff pled guilty to crimes and was sentenced to prison. C.A. Suisse respectfully refers the Court to the referenced criminal information and transcript of the plea hearing for a complete and accurate statement of their contents.

17.    On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a plea hearing on August 11, 2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), DiPascali pled guilty to a ten-count criminal information. Among other things, DiPascali admitted that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s. *Id.* at 46.

**ANSWER:** C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17 of the Complaint and therefore denies those allegations, and respectfully refers the Court to the referenced criminal information and transcript of the plea hearing for a complete and accurate statement of their contents.

## IV.    TRUSTEE'S POWERS AND STANDING

18.    As Trustee appointed under SIPA, the Trustee is charged with recovering and paying out Customer Property to BLMIS customers, assessing claims, and liquidating any other assets of BLMIS for the benefit of the estate and its creditors. The Trustee is in the process of marshaling BLMIS's assets, and this liquidation is well underway. However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years. Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recoveries, including those from individuals and entities that received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be

unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

**ANSWER:** The allegations in paragraph 18 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18 of the Complaint and therefore denies those allegations.

19. Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under § 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

**ANSWER:** The allegations in paragraph 19 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19 of the Complaint and therefore denies those allegations.

20. Under SIPA §§ 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

**ANSWER:** The allegations in paragraph 20 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20 of the Complaint and therefore denies those allegations.

21. The Trustee has standing to bring these claims under § 78fff-1(a) of SIPA and the Bankruptcy Code, including sections 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under §§ 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

**ANSWER:** The allegations in paragraph 21 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21 of the Complaint and therefore denies those allegations.

## V.    THE DEFENDANT

22.    Defendant Agricole Suisse is a Swiss *société anonyme* and maintains a place of business at Quai Général-Guisan 4, 1204 Geneva, Switzerland.

**ANSWER:** C.A. Suisse admits that Crédit Agricole (Suisse) S.A. was a Swiss *société anonyme* and maintained a place of business at Quai Général-Guisan 4, 1204 Geneva, Switzerland.

23.    Defendant Agricole is a French *société anonyme* and maintains a place of business at 91-93 Boulevard Pasteur, 75015 Paris, France.

**ANSWER:** C.A. Suisse states that because the Trustee has dismissed all claims and allegations against C.A.S.A., no response is required to the allegations of paragraph 23.

## VI.    THE PONZI SCHEME

24.    BLMIS was founded by Madoff in 1959 and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several of his friends and family members. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). By virtue of that registration, BLMIS was a member of SIPC. BLMIS had three business units: market making, proprietary trading, and the IA Business.

**ANSWER:** C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 24 of the Complaint and therefore denies those allegations.

25.    Outwardly, Madoff ascribed the consistent success of the IA Business to the so-called split-strike conversion strategy ("SSC Strategy"). Under that strategy, Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100")—a collection of the 100 largest publicly traded companies. Madoff claimed that his basket of stocks would mimic the movement of the S&P 100. He also asserted that he would carefully time purchases and sales to maximize value, and BLMIS customers' funds would, intermittently, be out of the equity markets.

**ANSWER:**  C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25 of the Complaint and therefore denies those allegations.

26.    The second part of the SSC Strategy was a hedge of Madoff's stock purchases with options contracts. Those option contracts acted as a "collar" to limit both the potential gains and losses on the basket of stocks. Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options. Madoff told BLMIS customers that when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual funds holding Treasury bills. Madoff also told customers that he would enter and exit the market between six and ten times each year.

**ANSWER:**  C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26 of the Complaint and therefore denies those allegations.

27.    BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never made the investments he promised clients, who believed they were invested with him in the SSC Strategy. He further admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts. In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform on which BLMIS reasonably

could have traded securities. Instead, investors' funds were principally deposited into the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxxx703.

**ANSWER:** C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27 of the Complaint and therefore denies such allegations, and respectfully refers the Court to the transcript of the Plea Hearing for a complete and accurate statement of its contents.

28.     Prior to his arrest, Madoff assured clients and regulators that he purchased and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than through any listed exchange. Based on the Trustee's investigation to date, there is no evidence that the IA Business ever entered into any OTC options trades on behalf of IA Business account holders.

**ANSWER:** C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28 of the Complaint and therefore denies those allegations.

29.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options, but rather used to pay withdrawals and to make other avoidable transfers. Madoff also used his customers' investments to enrich himself, his associates, and his family.

**ANSWER:** C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29 of the Complaint and therefore denies those allegations.

30.     The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion of new investments to fulfill payment requests or withdrawals from other BLMIS accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

**ANSWER:** C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30 of the Complaint and therefore denies those allegations.

> 31.     It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in demand, investigation, the filing of a claim, and disclosure of the fraud.

**ANSWER:** C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31 of the Complaint and therefore denies those allegations.

> 32.     Madoff's scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

**ANSWER:** C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32 of the Complaint and therefore denies those allegations.

> 33.     Based upon the Trustee's ongoing investigation, it now appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. By the time the Ponzi scheme came to light on December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

**ANSWER:** C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33 of the Complaint and therefore denies those allegations.

15

34.    Thus, at all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

**ANSWER:**  C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34 of the Complaint and therefore denies those allegations.

## VII.    THE TRANSFERS

35.    The Feeder Funds received initial transfers of BLMIS Customer Property. Some or all of those transfers were subsequently transferred directly or indirectly to the Agricole Defendants.

**ANSWER:**  C.A. Suisse states that because the Trustee has dismissed all claims and allegations against C.A.S.A., no response is required to the allegations concerning C.A.S.A. C.A. Suisse avers that no response to the allegations relating to the Kingate Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate Funds; to the extent that a response is required, C.A. Suisse denies those allegations.  C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 35 and therefore denies those allegations.

### A.    KINGATE GLOBAL

#### 1.    Initial Transfers From BLMIS To Kingate Global

36.    The Trustee has filed an adversary proceeding against Kingate Global, Kingate Euro, and other defendants in the Bankruptcy Court under the caption *Picard v. Kingate Global Fund Ltd., et al.,* Adv. Pro. No. 09-01161 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Kingate Global in the amount of approximately $437,501,112 (the "Kingate Global Complaint"). The Trustee incorporates by reference the allegations contained in the Kingate Global Complaint as if fully set forth herein.

**ANSWER:** C.A. Suisse avers that no response to the allegations relating to the Kingate

Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate

Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

37.    Over the lifetime of Kingate Global's account with BLMIS, from its inception to the Filing Date, BLMIS made transfers to Kingate Global of approximately $437,501,112 (the "Kingate Global Lifetime Initial Transfers"). The Kingate Global Lifetime Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:** C.A. Suisse avers that no response to the allegations relating to the Kingate

Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate

Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

38.    The Kingate Global Lifetime Initial Transfers include approximately $398,704,065 which BLMIS transferred to Kingate Global during the six years preceding the Filing Date (the "Kingate Global Six Year Initial Transfers"). The Kingate Global Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff- 2(c)(3).

**ANSWER:** C.A. Suisse avers that no response to the allegations relating to the Kingate

Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate

Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

39.    The Kingate Global Six Year Initial Transfers include approximately $163,447,509 which BLMIS transferred to Kingate Global during the two years preceding the Filing Date (the "Kingate Global Two Year Initial Transfers"). The Kingate Global Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:**  C.A. Suisse avers that no response to the allegations relating to the Kingate

Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate

Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

> 40.    The Kingate Global Two Year Initial Transfers include approximately $101,753,145 which BLMIS transferred to Kingate Global during the 90 days preceding the Filing Date (the "Kingate Global Preference Period Initial Transfers"). The Kingate Global Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:**  C.A. Suisse avers that no response to the allegations relating to the Kingate

Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate

Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

> 41.    The Kingate Global Lifetime Initial Transfers, the Kingate Global Six Year Initial Transfers, the Kingate Global Two Year Initial Transfers, and the Kingate Global Preference Period Initial Transfers are collectively defined as the "Kingate Global Initial Transfers." Charts setting forth these transfers are attached as Exhibits A and B.

**ANSWER:**  C.A. Suisse avers that no response to the allegations relating to the Kingate

Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate

Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

### 2.    Subsequent Transfers From Kingate Global To Agricole Suisse

> 42.    A portion of the Kingate Global Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Agricole Suisse and is recoverable from Defendant Agricole Suisse pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $10,932,893 of the money transferred from BLMIS to Kingate Global was subsequently transferred by Kingate Global to Defendant Agricole Suisse (the "Kingate Global-Agricole Suisse Subsequent Transfers"). A chart

setting forth the presently known Kingate Global-Agricole Suisse Subsequent Transfers is attached as Exhibit C.

**ANSWER:** C.A. Suisse avers that no response to the allegations relating to the Kingate

Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate

Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

43.    The Trustee's investigation is on-going, and the Trustee reserves the right to: (i) supplement the information on the Kingate Global Initial Transfers, the Kingate Global-Agricole Suisse Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER:** C.A. Suisse avers that no response to the allegations relating to the Kingate

Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate

Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

### 3.    Subsequent Transfers From Kingate Global To Defendant Agricole

44.    A portion of the Kingate Global Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Agricole and is recoverable from Defendant Agricole pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $3,349,536 of the money transferred from BLMIS to Kingate Global was subsequently transferred by Kingate Global to Defendant Agricole (the "Kingate Global-Agricole Subsequent Transfers"). A chart setting forth the presently known Kingate Global-Agricole Subsequent Transfers is attached as Exhibit D.

**ANSWER:** C.A. Suisse avers that no response to the allegations relating to the Kingate

Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate

Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

45.    The Trustee's investigation is on-going, and the Trustee reserves the right to: (i) supplement the information on the Kingate Global Initial Transfers, the Kingate Global-Agricole Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

19

**ANSWER:** C.A. Suisse avers that no response to the allegations relating to the Kingate Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

46.    The Kingate Global-Agricole Suisse Subsequent Transfers and the Kingate Global-Agricole Subsequent Transfers are collectively defined as the "Kingate Global Subsequent Transfers."

**ANSWER:** C.A. Suisse avers that no response to the allegations relating to the Kingate Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

### B.    KINGATE EURO

#### 1.    Initial Transfers From BLMIS To Kingate Euro

47.    The Trustee has filed an adversary proceeding against Kingate Global, Kingate Euro, and other defendants in the Bankruptcy Court under the caption *Picard v. Kingate Global Fund Ltd., et al.,* Adv. Pro. No. 09-01161 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Kingate Euro in the amount of approximately $538,040,617 (as previously defined, the "Kingate Global Complaint"). The Trustee incorporates by reference the allegations contained in the Kingate Global Complaint as if fully set forth herein.

**ANSWER:** C.A. Suisse avers that no response to the allegations relating to the Kingate Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

48.    Over the lifetime of Kingate Euro's account with BLMIS, from its inception to the Filing Date, BLMIS made transfers to Kingate Euro of approximately $538,040,617 (the "Kingate Euro Lifetime Initial Transfers"). The Kingate Euro Lifetime Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:** C.A. Suisse avers that no response to the allegations relating to the Kingate Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

49.    The Kingate Euro Lifetime Initial Transfers include approximately $475,485,759 which BLMIS transferred to Kingate Euro during the six years preceding the Filing Date (the "Kingate Euro Six Year Initial Transfers"). The Kingate Euro Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:** C.A. Suisse avers that no response to the allegations relating to the Kingate Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

50.    The Kingate Euro Six Year Initial Transfers include approximately $248,979,674 which BLMIS transferred to Kingate Euro during the two years preceding the Filing Date (the "Kingate Euro Two Year Initial Transfers"). The Kingate Euro Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:** C.A. Suisse avers that no response to the allegations relating to the Kingate Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

51.    The Kingate Euro Two Year Initial Transfers include approximately $155,606,833 which BLMIS transferred to Kingate Euro during the 90 days preceding the Filing Date (the "Kingate Euro Preference Period Initial Transfers"). The Kingate Euro Preference Period Initial Transfers were and are Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:** C.A. Suisse avers that no response to the allegations relating to the Kingate Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

52.    The Kingate Euro Lifetime Initial Transfers, the Kingate Euro Six Year Initial Transfers, the Kingate Euro Two Year Initial Transfers, and the Kingate Euro Preference Period Initial Transfers are collectively defined as the "Kingate Euro Initial Transfers." Charts setting forth these transfers are attached as Exhibits E and F.

**ANSWER:** C.A. Suisse avers that no response to the allegations relating to the Kingate Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

53.    The Kingate Global Initial Transfers and the Kingate Euro Initial Transfers are collectively referred to as the "Kingate Initial Transfers."

**ANSWER:** C.A. Suisse avers that no response to the allegations relating to the Kingate Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

## 2.    Subsequent Transfers From Kingate Euro To Defendant Agricole Suisse

54.    A portion of the Kingate Euro Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Agricole Suisse and is recoverable from Defendant Agricole Suisse pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $26,748 of the money transferred from BLMIS to Kingate Euro was subsequently transferred by Kingate Euro to Defendant Agricole Suisse (the "Kingate Euro Subsequent Transfers"). A chart setting forth the presently known Kingate Euro Subsequent Transfers is attached as Exhibit G.

**ANSWER:** C.A. Suisse avers that no response to the allegations relating to the Kingate Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

> 55. The Trustee's investigation is on-going, and the Trustee reserves the right to: (i) supplement the information on the Kingate Euro Initial Transfers, the Kingate Euro Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER:** C.A. Suisse avers that no response to the allegations relating to the Kingate Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

> 56. The Kingate Global Subsequent Transfers and the Kingate Euro Subsequent Transfers are collectively referred to as the "Kingate Subsequent Transfers."

**ANSWER:** C.A. Suisse avers that no response to the allegations relating to the Kingate Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

## C.    FAIRFIELD SENTRY

### 1.    Initial Transfers From BLMIS To Fairfield Sentry

> 57. The Trustee has filed an adversary proceeding against Fairfield Sentry, Fairfield Sigma, and other defendants in Bankruptcy Court under the caption *Picard v. Fairfield Sentry Ltd., et al.,* Adv. Pro. No. 09-01239 (BRL), in which, in part, the Trustee sought to avoid and recover the initial transfers of Customer Property from BLMIS to Fairfield Sentry in the amount of approximately $3 billion (the "Fairfield Amended Complaint"). The Trustee incorporates by reference the allegations contained in the Fairfield Amended Complaint as if fully set forth herein.

**ANSWER:** C.A. Suisse: (i) admits that the Trustee filed an action styled as *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro No. 09-01239 (BRL) (the "Sentry Action"); (ii) lacks knowledge or information sufficient to form a belief as to the truth of the allegation of the

amounts of the transfers alleged in paragraph 57 and therefore denies such allegations; (iii) lacks

knowledge or information sufficient to form a belief as to which of the three complaints filed in

the Sentry Action the Trustee purports to incorporate by reference in the Complaint in this action

and therefore denies such allegations; (iv) denies knowledge or information sufficient to form a

belief as to the truth of the allegations in each and every paragraph of each of the three

complaints filed in the Sentry Action that allegedly supports the claim that any initial transfers of

Customer Property to Fairfield Sentry are or were avoided or avoidable; and (v) objects to the

incorporation by reference of, and therefore does not answer, each and every other paragraph and

allegation in the three complaints in the Sentry Action and to the inclusion in this adversary

proceeding of any issue implicated by any of the three complaints in the Sentry Action other than

the issue of the avoidance or avoidability of the initial transfers of Customer Property, but

reserves the right to rely on and introduce any allegations in the referenced "Fairfield Amended

Complaint" or its exhibits as opposing party admissions admissible for the truth of their contents.

To the extent that any further response is required, C.A. Suisse denies knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in paragraph 57 of the

Complaint and therefore denies such allegations.

> 58.     During the six years preceding the Filing Date, BLMIS made
> transfers to Fairfield Sentry of approximately $3 billion (the
> "Fairfield Sentry Six Year Initial Transfers"). The Fairfield Sentry
> Six Year Initial Transfers were and continue to be Customer
> Property within the meaning of SIPA § 78*lll*(4), and are avoidable
> and recoverable under sections 544, 550, and 551 of the Bankruptcy
> Code, §§ 273-279 of the NYDCL, and applicable provisions of
> SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:** C.A. Suisse denies knowledge or information sufficient to form a belief as to

the truth of the allegations in the first sentence of paragraph 58 and therefore denies such

allegations.  The remaining allegations in paragraph 58 state legal conclusions to which no

response is required.  To the extent that any further response is required, C.A. Suisse denies the

allegations in paragraph 58.

> 59.    The Fairfield Sentry Six Year Initial Transfers include approximately $1.6 billion which BLMIS transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Initial Transfers"). The Fairfield Sentry Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:**  C.A. Suisse denies knowledge or information sufficient to form a belief as to

the truth of the allegations in the first sentence of paragraph 59 and therefore denies such

allegations.  The remaining allegations in paragraph 59 state legal conclusions to which no

response is required.  To the extent that any further response is required, C.A. Suisse denies the

allegations in paragraph 59.

> 60.    The Fairfield Sentry Two Year Initial Transfers include approximately $1.1 billion which BLMIS transferred to Fairfield Sentry during the 90 days preceding the Filing Date (the "Fairfield Sentry Preference Period Initial Transfers"). The Fairfield Sentry Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:**  C.A. Suisse denies knowledge or information sufficient to form a belief as to

the truth of the allegations in the first sentence of paragraph 60 and therefore denies such

allegations.  The remaining allegations in paragraph 60 state legal conclusions to which no

response is required.  To the extent that any further response is required, C.A. Suisse denies the

allegations in paragraph 60.

> 61.    The Fairfield Sentry Six Year Initial Transfers, the Fairfield Sentry Two Year Initial Transfers, and the Fairfield Sentry Preference Period Initial Transfers are collectively defined as the

"Fairfield Sentry Initial Transfers." Charts setting forth these transfers are attached as Exhibits H and I.

**ANSWER:** C.A. Suisse lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 61 of the Complaint and therefore denies such allegations, except admits that Exhibits H and I are attached to the Complaint.

> 62.    Pursuant to the Bankruptcy Court's June 7 and June 10, 2011 orders, the Bankruptcy Court approved a settlement among the Trustee, Fairfield Sentry, and others (the "Settlement Agreement"). As part of the Settlement Agreement, on July 13, 2011, the Bankruptcy Court entered a consent judgment granting the Trustee a judgment against Fairfield Sentry in the amount of $3,054,000,000. Fairfield Sentry is obliged to pay $70,000,000 to the Trustee under the terms of the Settlement Agreement.

**ANSWER:** C.A. Suisse admits, on information and belief, that the Court entered orders and a judgment as described in paragraph 62 on or about the dates alleged therein, and respectfully refers the Court to the referenced orders and the referenced judgment for the complete and accurate contents thereof.

### 2.    Subsequent Transfers From Fairfield Sentry To Defendant Agricole Suisse

> 63.    A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Agricole Suisse and is recoverable from Defendant Agricole Suisse pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $15,654,127 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Defendant Agricole Suisse (the "Fairfield Sentry Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry Subsequent Transfers is attached as Exhibit J.

**ANSWER:** The allegations in paragraph 63 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, C.A. Suisse denies knowledge or information sufficient to form a belief as to the truth of the allegations in

paragraph 63 and therefore denies such allegations.  To the extent that paragraph 63 refers to a

document, C.A. Suisse respectfully refers the Court to that document for a complete and accurate

statement of its contents while denying the Trustee's allegations related to that document.

> 64.    The Trustee's investigation is ongoing, and the Trustee
> reserves the right to: (i) supplement the information on the Fairfield
> Sentry Initial Transfers, the Fairfield Sentry Subsequent Transfers,
> and any additional transfers, and (ii) seek recovery of such
> additional transfers.

**ANSWER:** C.A. Suisse denies knowledge or information sufficient to form a belief as to

the truth of the allegations in paragraph 64 and therefore denies those allegations.

### 3. Subsequent Transfers From Fairfield Sentry To Fairfield Sigma And Subsequently To Defendant Agricole Suisse

> 65.    A portion of the Fairfield Sentry Initial Transfers was
> subsequently transferred either directly or indirectly to, or for the
> benefit of, Defendant Agricole Suisse through Fairfield Sigma and
> is recoverable from Defendant Agricole Suisse pursuant to section
> 550 of the Bankruptcy Code and § 278 of the NYDCL. Based on the
> Trustee's investigation to date, approximately $752,273,917 of the
> money transferred from BLMIS to Fairfield Sentry was
> subsequently transferred by Fairfield Sentry to Fairfield Sigma.
> Thereafter, the equivalent of approximately $597,664 was
> transferred by Fairfield Sigma to Defendant Agricole Suisse (the
> "Fairfield Sigma Subsequent Transfers"). Charts setting forth the
> presently known Fairfield Sigma Subsequent Transfers are attached
> as Exhibits K and L.

**ANSWER:** The allegations in paragraph 65 of the Complaint contain legal conclusions

to which no response is required.  To the extent that a response is required, C.A. Suisse denies

the allegations in paragraph 65, except that C.A. Suisse denies knowledge or information

sufficient to form a belief as to the truth of the allegations in paragraph 65 regarding the prior

status of funds allegedly transferred from Fairfield Sigma to C.A. Suisse, and to the extent that

paragraph 65 refers to a document, C.A. Suisse respectfully refers the Court to that document for

a complete and accurate statement of its contents, while denying the Trustee's allegations related

to that document.

> 66.    The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Sigma Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER:** C.A. Suisse denies knowledge or information sufficient to form a belief as to

the truth of the allegations in paragraph 66 and therefore denies those allegations.

> 67.    The Fairfield Sentry Subsequent Transfers and the Fairfield Sigma Subsequent Transfers are collectively defined as the "Fairfield Subsequent Transfers."

**ANSWER:** C.A. Suisse denies the allegations of paragraph 67, except admits that the

Trustee defines the term "Fairfield Subsequent Transfers" as set forth therein.

## COUNT ONE
## RECOVERY OF KINGATE SUBSEQUENT TRANSFERS –
## 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

> 68.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

**ANSWER:** C.A. Suisse incorporates by reference and reasserts as if fully set forth

herein its responses to the allegations of the Complaint contained in each of the previous

paragraphs of this Answer.

> 69.    Defendant Agricole Suisse received the Kingate Global-Agricole Suisse Subsequent Transfers and the Kingate Euro Subsequent Transfers, totaling approximately $10,959,641, and Defendant Agricole received the Kingate Global-Agricole Subsequent Transfers, totaling approximately $3,349,536 (collectively, as defined above, the "Kingate Subsequent Transfers"). The Kingate Subsequent Transfers are recoverable pursuant to section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

**ANSWER:** C.A. Suisse states that because the Trustee has dismissed all claims and allegations against C.A.S.A., no response is required to the allegations concerning C.A.S.A. C.A. Suisse avers that no response to the allegations relating to the Kingate Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

70.      Each of the Kingate Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Agricole Defendants.

**ANSWER:** C.A. Suisse states that because the Trustee has dismissed all claims and allegations against C.A.S.A., no response is required to the allegations concerning C.A.S.A. C.A. Suisse avers that no response to the allegations relating to the Kingate Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

71.      The Agricole Defendants are immediate or mediate transferees of the Kingate Initial Transfers.

**ANSWER:** C.A. Suisse states that because the Trustee has dismissed all claims and allegations against C.A.S.A., no response is required to the allegations concerning C.A.S.A. C.A. Suisse avers that no response to the allegations relating to the Kingate Funds is required because the Trustee has voluntarily dismissed all claims relating to the Kingate Funds; to the extent that a response is required, C.A. Suisse denies those allegations.

72.      As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Agricole Defendants recovering the Kingate Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER:** C.A. Suisse states that because the Trustee has dismissed all claims and allegations against C.A.S.A., no response is required to the allegations concerning C.A.S.A. C.A. Suisse avers that no response to the allegations relating to the Kingate Funds is required

because the Trustee has voluntarily dismissed all claims relating to the Kingate Funds; to the

extent that a response is required, C.A. Suisse denies those allegations.

## COUNT TWO
## RECOVERY OF FAIRFIELD SUBSEQUENT TRANSFERS –
## 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

73.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

**ANSWER:**  C.A. Suisse incorporates by reference and reasserts as if fully set forth

herein its responses to the allegations of the Complaint contained in each of the previous

paragraphs of this Answer.

74.    Defendant Agricole Suisse received the Fairfield Sentry Subsequent Transfers and the Fairfield Sigma Subsequent Transfers, totaling approximately $16,251,791 (as defined above, the "Fairfield Subsequent Transfers"). The Fairfield Subsequent Transfers are recoverable pursuant to section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

**ANSWER:**  The allegations in paragraph 74 of the Complaint contain legal conclusions

to which no response is required.  To the extent that a response is required, C.A. Suisse denies

the allegations in paragraph 74.

75.    Each of the Fairfield Subsequent Transfers was made directly or indirectly to, or for the benefit of, Defendant Agricole Suisse.

**ANSWER:**  The allegations in paragraph 75 of the Complaint contain legal conclusions

to which no response is required.  To the extent that a response is required, C.A. Suisse denies

the allegations in paragraph 75.

76.    Defendant Agricole Suisse is an immediate or mediate transferee of the Fairfield Initial Transfers.

**ANSWER:** The allegations in paragraph 76 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, C.A. Suisse denies the allegations in paragraph 76.

> 77.    As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendant Agricole Suisse recovering the Fairfield Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER:** The allegations in paragraph 77 of the Complaint contain legal conclusions to which no response is required. To the extent that a response is required, C.A. Suisse denies the allegations in paragraph 77.

### RESPONSE TO REQUEST FOR RELIEF

The Request for Relief sets forth legal conclusions to which no response is required. To the extent that a response is required, C.A. Suisse denies that the Trustee is entitled to his requested relief or to any other relief.

### AFFIRMATIVE DEFENSES

### First Affirmative Defense

### 11 U.S.C. § 546(e) – Bankruptcy Code Safe Harbor

Pursuant to 11 U.S.C. § 546(e), the Trustee may not avoid any alleged Fairfield Sentry Initial Transfers, or pursue under 11 U.S.C. § 550(a) any recovery claims against C.A. Suisse premised upon the alleged avoidance or avoidability of any alleged Fairfield Sentry Initial Transfers, except to the extent that the Trustee can establish that such transfers were made with actual intent to defraud within two years before the Filing Date. Thus, the Trustee may neither avoid the Fairfield Sentry Initial Transfers relevant to C.A. Suisse nor maintain claims for recovery against C.A. Suisse because: (i) the relevant transfers were settlement payments and/or transfers made "in connection with . . . securities contract[s]," 11 U.S.C. § 546(e), (i.e., the

31

BLMIS-Fairfield Sentry account agreements and other agreements, including the Fairfield Sentry Articles of Association governing redemptions of shares in Fairfield Sentry); (ii) any relevant transfers were made by BLMIS in response to Fairfield Sentry's requests for withdrawals; and (iii) the alleged Fairfield Sentry Initial Transfers were made by, to, and for the benefit of entities covered by 11 U.S.C. § 546(e). C.A. Suisse had no actual knowledge that BLMIS was not trading securities or was perpetrating a fraud or a Ponzi scheme, and C.A. Suisse took any funds received from Fairfield Sentry for value and in good faith. Because the alleged transfers are not avoidable, property received by C.A. Suisse as part of the alleged Fairfield Sentry Initial Transfers, if any, is not recoverable from C.A. Suisse.

**Second Affirmative Defense**

**Not Customer Property**

The property, if any, that C.A. Suisse received from Fairfield Sentry was not customer property of BLMIS or proceeds of customer property that BLMIS allegedly transferred to Fairfield Sentry. For reasons including those set forth in C.A. Suisse's Memorandum of Law in Support of the Motion to Dismiss, ECF 118, filed on July 18, 2022 in this adversary proceeding, many of the alleged Fairfield Subsequent Transfers could not have been sourced from BLMIS customer property because prior allegedly avoidable transfers from BLMIS to Fairfield Sentry had been distributed by Fairfield Sentry to other entities prior to the alleged Fairfield Subsequent Transfers. Thus, alleged transfers from Fairfield Sentry to C.A. Suisse are not recoverable by the Trustee.

### Third Affirmative Defense

### Double Recovery

On May 9, 2011, the Trustee entered into a Settlement Agreement (the "Fairfield Settlement Agreement") with the Liquidators of Fairfield Sentry Limited and other Fairfield funds. This Court approved the Fairfield Settlement Agreement on June 7, 2011, and it was incorporated into consent judgments entered against Fairfield Sentry and other Fairfield funds on July 13, 2011 (the "Consent Judgments"). The Fairfield Settlement Agreement provides for the sharing of recoveries on the Trustee's and the Liquidators' claims for recovery of property that Fairfield Sentry transferred. To the extent that the Liquidators recover from C.A. Suisse in settlement or otherwise, the Trustee is barred from recovering on the ground that he is not entitled to double recovery, nor should C.A. Suisse be subject to recovery of identical funds from two separate entities.

### Fourth Affirmative Defense

### Mere Conduit/Lack of Dominion or Control

The Trustee's claims are barred under the "mere conduit" defense, because C.A. Suisse was not a transferee of the Fairfield Subsequent Transfers. *See Finley v. Alexander & Alexander of N.Y. Inc. (In re Finley)*, 130 F.3d 52, 57–58 (2d Cir. 1997). To the extent that C.A. Suisse received any Fairfield Subsequent Transfers, C.A. Suisse: (i) received each Fairfield Subsequent Transfer in good faith, in a nominee capacity, and for the account and benefit of one or more of its customers; (ii) did not have dominion or control or the right to assert dominion or control over the Fairfield Subsequent Transfers or the proceeds thereof or to use the Fairfield Subsequent Transfers or the proceeds thereof for its own purposes; (iii) was a mere conduit for its customers; and (iv) was obligated to credit the Fairfield Subsequent Transfers to the account and for the

33

benefit of one or more of its customers, who alone had the right to assert dominion and control over the Fairfield Subsequent Transfers received by C.A. Suisse for their benefit. Therefore, to the extent that C.A. Suisse received any alleged Fairfield Subsequent Transfers or proceeds thereof, it did so as a mere conduit for third parties rather than as a transferee from which the Trustee may recover under 11 U.S.C. § 550(a).

### Fifth Affirmative Defense

### C.A. Suisse as Initial Transferee – Mere Conduit/Lack of Dominion or Control

In the alternative, Fairfield Sentry and Fairfield Sigma were mere conduits, and consequently, any claimed transfers were initial transfers from BLMIS to C.A. Suisse. As the Trustee stated in *Picard v. Grosvenor Investment Management Ltd.*, Fairfield Sentry's "sole purpose was to funnel money to BLMIS," Trustee's Mem. of Law in Opp'n to Def.'s Mot. to Dismiss the Compl. at 3, *Picard v. Grosvenor Inv. Mgmt. Ltd.*, No. 12-01021 (Bankr. S.D.N.Y. June 15, 2022), ECF 115, and "no arm's length relationship exist[ed] between [Sentry] and BLMIS." *Id.* at 6 (internal quotation marks and citation omitted). As a result, any redemptions received by C.A. Suisse were initial transfers from BLMIS to C.A. Suisse that are subject to the safe harbor under 11 U.S.C. § 546(e); any Trustee proceeding to avoid the alleged transfers is untimely; and C.A. Suisse may retain the amount it received, if any, pursuant to 11 U.S.C. §§ 548(c) and 548(d)(2)(B) because it took any alleged transfers for value and in good faith.

### Sixth Affirmative Defense

### 11 U.S.C. § 550(d) – Single Satisfaction and N.Y. Debt. & Cred. Law § 278(1)(a)

Under 11 U.S.C. § 550(d), "[t]he [T]rustee is entitled to only a single satisfaction under [11 U.S.C. § 550(a)]." Under N.Y. Debt. & Cred. Law § 278(1)(a), the Trustee may only set aside a conveyance "to the extent necessary to satisfy his claim." N.Y. Debt. & Cred. Law §

278(1)(a) (McKinney 2020).[4]  Accordingly, the Trustee may not recover any subsequent transfer received by C.A. Suisse to the extent that the Trustee has recovered, or will recover, from Fairfield Sentry or any other immediate or mediate transferee, the amount of an allegedly avoided initial transfer that included the customer property that the Trustee alleges that C.A. Suisse received.

**Seventh Affirmative Defense**

**11 U.S.C. 550(b) and N.Y. Debt. & Cred. Law 278(1), 278(2) – Value, Good Faith, and Without Knowledge of Voidability**

To the extent that C.A. Suisse received any alleged Fairfield Subsequent Transfer or any proceeds thereof, such property or funds may not be recovered because C.A. Suisse took for value, in good faith, and without knowledge of the avoidability of any transfer within the meaning of 11 U.S.C. § 550(b) and/or as a purchaser for fair consideration without knowledge of the fraud at the time of the purchase or actual fraudulent intent within the meaning of N.Y. Debt. & Cred. Law §§ 278(1) and 278(2).

To the extent that C.A. Suisse received any Fairfield Subsequent Transfer, C.A. Suisse took in good faith because it lacked knowledge that BLMIS was not trading securities or was perpetrating a fraud or a Ponzi scheme, or of any fraudulent purpose behind the alleged Fairfield Subsequent Transfers.  C.A. Suisse lacked knowledge of the voidability of any alleged Fairfield Sentry Initial Transfers at the time it allegedly received any Fairfield Subsequent Transfers. C.A. Suisse lacked actual fraudulent intent at the time it allegedly received any Fairfield

---

[4] N.Y. Debt. & Cred. Law § 278 was amended pursuant to New York's adoption of the Uniform Voidable Transactions Act ("UVTA"), effective April 4, 2020.  However, the law implementing those revisions provides that they "shall not apply to a transfer made or obligation incurred before such effective date, nor shall it apply to a right of action that has accrued before such effective date."  2019 N.Y. Laws Ch. 580, § 7.  Because all of the alleged transfers at issue took place, and/or any alleged right of action relating to the alleged transfers accrued, prior to the UVTA's enactment, this Answer cites to the version of § 278 in effect prior to the April 4, 2020 revisions.

Subsequent Transfer.  C.A. Suisse lacked knowledge of facts suggestive of any alleged fraud that would have caused a reasonable person in its position to conduct further inquiry into BLMIS about any possible fraud.

Any alleged Fairfield Subsequent Transfers received by C.A. Suisse were routine transfers made by Fairfield Sentry and Fairfield Sigma, taken for value, in exchange for redemptions of investments in Fairfield Sentry or Fairfield Sigma and did not have a fraudulent purpose.  Any such exchange was also for fair consideration, as a surrender of shares in Fairfield Sentry or Fairfield Sigma constituted a fair equivalent of the property received.

Moreover, a reasonable person with the facts in C.A. Suisse's possession at the time of the alleged Fairfield Subsequent Transfers would not have been on inquiry notice of any fraudulent purpose behind the Fairfield Sentry Initial Transfers, nor would those facts have led such a person to conduct further inquiry into whether there was a fraudulent purpose to them, into whether BLMIS was trading securities, or into whether they related to a fraud or a Ponzi scheme.  Even if C.A. Suisse had been on inquiry notice of a possible fraudulent purpose behind the Fairfield Sentry Initial Transfers or of facts that would have led a reasonable person to conduct further inquiry into whether BLMIS was trading securities or was a fraud or a Ponzi scheme, a diligent inquiry by C.A. Suisse would not have discovered the allegedly fraudulent purpose of any transfer or that BLMIS was not trading securities or was a fraud or a Ponzi scheme.  Other entities with vastly greater investigatory tools and resources than C.A. Suisse, and with more access to BLMIS personnel and documentation than C.A. Suisse, investigated BLMIS but failed to uncover that it was a Ponzi scheme prior to December 2008.

Additionally, C.A. Suisse did not have knowledge of the alleged voidability of the Fairfield Sentry Initial Transfers at the time of the alleged Fairfield Subsequent Transfers.

**Eighth Affirmative Defense**

**Extraterritoriality**

The Trustee's recovery from C.A. Suisse of any transfer from Fairfield Sentry would constitute an impermissible extraterritorial application of U.S. law.

**Ninth Affirmative Defense**

**Comity**

The Trustee's recovery from C.A. Suisse of any transfer from Fairfield Sentry would violate principles of comity.

**Tenth Affirmative Defense**

**No Interest**

The Trustee is not entitled to an award of interest.

**Eleventh Affirmative Defense**

**Lack of Subject Matter Jurisdiction**

**(U.S. Const. art. III; Fed. R. Civ. P. 12(b)(1); Fed. R. Bankr. P. 7012(b))**

This Court lacks jurisdiction under Article III of the U.S. Constitution to enter final orders or judgments in this proceeding.

**Twelfth Affirmative Defense**

**Statute of Limitations**

The Trustee's claims are barred by the statute of limitations.

**Thirteenth Affirmative Defense**

**Estoppel**

The Trustee's claims are barred by estoppel.

### Fourteenth Affirmative Defense

### Lack of Personal Jurisdiction

### (Fed. R. Civ. P. 12(b)(2); Fed. R. Bankr. P. 7012(b))

This Court lacks personal jurisdiction over C.A. Suisse, including for each of the reasons stated in C.A. Suisse's Memorandum of Law in Support of the Motion to Dismiss the Complaint, filed on July 18, 2022 in this adversary proceeding, ECF 118, and proceedings thereon, and C.A. Suisse has not consented to a decision by this Court or this Court's authority to hear and determine the action.

### Fifteenth Affirmative Defense

### Preservation of Rights (11 U.S.C. § 502(h))

To the extent that the Trustee recovers from C.A. Suisse, C.A. Suisse reserves its right to assert a claim arising from such recovery under 11 U.S.C. § 502(h).

### Sixteenth Affirmative Defense

### Failure to Mitigate

The Trustee's claims are barred, in whole or in part, because the Trustee has failed to mitigate, minimize, or avoid damages, if any.

### Seventeenth Affirmative Defense

### Unreasonable Delay / Laches

The Trustee's claims against C.A. Suisse are barred by the doctrine of laches.

### Eighteenth Affirmative Defense

### Failure to State a Claim for Relief

The Complaint fails to state a claim upon which relief can be granted, including, without limitation, for each of the reasons stated in C.A. Suisse's Memorandum of Law in Support of the

Motion to Dismiss the Complaint, filed on July 18, 2022 in this adversary proceeding, ECF 118, and proceedings thereon.

### Nineteenth Affirmative Defense

### Initial Transfer Not Avoided (11 U.S.C. § 550(a))

The Trustee may not recover the alleged transfers from Fairfield Sentry to C.A. Suisse, if any, because he has not avoided the alleged initial transfers from BLMIS to Fairfield Sentry.

### Twentieth Affirmative Defense

### Sufficient SIPC Funds

The Trustee's claims should be dismissed if the Trustee has recovered, or during the pendency of this action recovers, sufficient funds to reimburse SIPC for all payments that SIPC has made to satisfy allowed claims of BLMIS customers.

### Twenty-First Affirmative Defense

### British Virgin Island Proceedings

The Trustee's claims are barred, in whole or in part, based upon rulings, judgments, orders, or decisions entered in the liquidation proceedings of Fairfield Sentry before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands, including any related appellate rulings, judgments, orders, or decisions.

### Twenty-Second Affirmative Defense

### Dismissed Claims

The Trustee's claims are barred to the extent that they and/or any allegations on which they are based have been or may be dismissed or released by the Trustee or the Court or are based on theories or allegations that have been or may be dismissed or rejected by the Trustee or the Court or by another court on appeal from any orders of this Court.

### JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 9015 of the Federal Rules of Bankruptcy Procedure, C.A. Suisse hereby demands a jury trial on all claims and issues that may be tried to a jury.

### STATEMENT PURSUANT TO FED. R. BANKR. P. 7012(B)

C.A. Suisse objects and does not consent to the entry of final orders or judgments against C.A. Suisse by the Bankruptcy Court.

### DEFENDANT'S REQUEST FOR RELIEF

WHEREFORE, C.A. Suisse requests judgment dismissing the Complaint with prejudice, together with an award of attorneys' fees, costs, disbursements, and such other relief as the Court deems just and appropriate.

Dated:    April 19, 2023
          New York, New York

Respectfully submitted,

**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**

By: */s/ Elizabeth Vicens*

One Liberty Plaza
New York, New York 10006
Telephone: 212.225.2000
Facsimile: 212.225.3999
Elizabeth Vicens
Email:  evicens@cgsh.com
Jessica Metzger
Email:  jmetzger@cgsh.com

*Attorneys for Defendant Crédit Agricole
(Suisse) S.A.*