**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-01789 (CGM)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff,<br><br>Plaintiff,<br><br>v.<br><br>SNS BANK N.V. and SNS GLOBAL CUSTODY B.V.,<br><br>Defendants. | Adv. Pro. No. 12-01046 (CGM) |

**<u>ANSWER TO COMPLAINT AND JURY DEMAND</u>**

Defendants SNS Bank N.V. and SNS Global Custody B.V. (the "SNS Defendants"), by

and through their undersigned counsel, as and for their Answer (the "Answer") to the Complaint

(the "Complaint") of Plaintiff Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff

Investment Securities LLC (the "Trustee" or "Plaintiff"), state as follows:

## I.   NATURE OF THE ACTION[1]

1.   This adversary proceeding is part of the Trustee's continuing efforts to avoid and
recover transfers of BLMIS Customer Property[2] that was stolen as part of the massive Ponzi
scheme perpetrated by Bernard L. Madoff ("Madoff") and others.

**ANSWER**: The allegations contained in paragraph 1 constitute legal conclusions, to

which no response is required.  To the extent a response is determined to be required, the SNS

Defendants deny the allegations of paragraph 1.

2.   With this Complaint, the Trustee seeks to recover approximately $74,468,402 in
subsequent transfers of Customer Property made to the SNS Defendants by Fairfield Sentry
Limited ("Fairfield Sentry"), which was a Madoff feeder fund. Fairfield Sentry is currently in
liquidation in the British Virgin Islands ("BVI"). It was a BVI company that had direct customer
accounts with BLMIS's investment advisory business ("IA Business") for the purpose of
investing assets with BLMIS. Fairfield Sentry maintained in excess of 95% of its assets in its
BLMIS customer accounts. Some of the subsequent transfers from Fairfield Sentry came through
Fairfield Sigma Limited ("Fairfield Sigma") and Fairfield Lambda Limited ("Fairfield
Lambda"), which each invested 100% of their assets in Fairfield Sentry. Fairfield Sigma and
Fairfield Lambda also are in liquidation in the BVI.

**ANSWER**: The SNS Defendants admit the allegation that the Trustee seeks to recover

approximately $74,468,402 in subsequent transfers made to the SNS Defendants.  The SNS

Defendants admit, for the limited purpose of referring to it in this Answer, the description of

---

[1] The SNS Defendants deem the section headings in the Complaint not to constitute allegations of
the Complaint. To the extent any section headings are allegations, the SNS Defendants admit or
deny them consistent with its responses to the allegations contained in the numbered paragraphs
of the Complaint.

[2] SIPA § 78*lll*(4) defines "Customer Property" as cash and securities at any time received, acquired,
or held by, or for the account of, a debtor from, or for, the securities accounts of a customer, and
the proceeds of any such property transferred by the debtor, including property unlawfully
converted.

2

"Fairfield Sentry" contained in paragraph 2. The SNS Defendants deny knowledge or

information sufficient to form a belief as to the truth of the allegations concerning whether

Fairfield Sentry had direct customer accounts with BLMIS' IA business. The SNS Defendants

deny knowledge or information sufficient to form a belief as to the truth of the allegations

contained in the third and fourth sentences of paragraph 2. On information and belief, the SNS

Defendants admit the allegations in the last sentence of paragraph 2. The SNS Defendants deny

all other allegations of paragraph 2, including that the SNS Defendants received subsequent

transfers of customer property from BLMIS or Fairfield Sentry.

3.      When the SNS Defendants received the subsequent transfers of BLMIS Customer
Property, Defendant SNS Bank was the banking and financial services arm of SNS Reaal N.V., a
global bank insurer and investment advisory institution. Also at that time, Defendant SNS
Global Custody was an affiliate of Defendant SNS Bank.

**ANSWER**: The SNS Defendants admit the allegations contained in paragraph 3, except

that the SNS Defendants do not admit and thereby deny, on the basis that they constitute or

incorporate legal conclusions, that the SNS Defendants "received" any payments or that such

payments constitute "subsequent transfers."[3]

## II.    JURISDICTION AND VENUE

4.      The Trustee brings this adversary proceeding pursuant to his statutory authority
under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3); sections 105(a), 544, 550(a), and 551 of
title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.* (the "Bankruptcy Code"); and the
New York Fraudulent Conveyance Act (New York Debtor & Creditor Law) ("NYDCL") §§
273-279 (McKinney 2001), to obtain avoidable and recoverable transfers received by the SNS
Defendants as subsequent transferees of funds originating from BLMIS.

**ANSWER**: The allegations contained in paragraph 4 constitute legal conclusions, to

which no response is required. To the extent a response is determined to be required, the SNS

---

[3] SNS Bank N.V. has been renamed de Volksbank N.V. since January 1, 2017, but all matters relevant to this
Answer relate to the time period before such date.

Defendants deny the allegations of paragraph 4, except to admit that the Trustee has brought this adversary proceeding.

5.    This is an adversary proceeding brought in this Court, in which the main underlying substantively consolidated SIPA case, Adv. Pro. No. 08-01789 (BRL) (the "SIPA Case"), is pending.  The SIPA Case was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding").  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), and 15 U.S.C. §78eee(b)(2)(A), (b)(4).

**ANSWER**: The allegations contained in paragraph 5 constitute legal conclusions, to which no response is required.  To the extent a response is determined to be required, the SNS Defendants deny the allegations of paragraph 5, except to admit that (a) the main underlying substantively consolidated SIPA case (Case No. 08-01789 (CGM)) is pending in this Court; and (b) upon information and belief, the District Court Proceeding was commenced in the District Court.  The SNS Defendants deny the remaining allegations of paragraph 5, including that this Court has jurisdiction to enter a final order or judgment in this proceeding.

6.    The SNS Defendants are subject to personal jurisdiction in this judicial district because they purposely availed themselves of the laws and protections of the United States and the state of New York by, among other things, knowingly directing funds to be invested with New York-based BLMIS through Fairfield Sentry, Fairfield Sigma, and Fairfield Lambda. The SNS Defendants knowingly received subsequent transfers from BLMIS by withdrawing money from Fairfield Sentry, Fairfield Sigma, and Fairfield Lambda, all Fairfield Greenwich Group ("FGG") managed Madoff feeder funds.

**ANSWER**: The allegations contained in paragraph 6 constitute legal conclusions, to which no response is required.  To the extent a response is determined to be required, the SNS Defendants deny the allegations of paragraph 6, except to admit that the SNS Defendants made, caused to be made, or directed investments in Fairfield Sentry, Fairfield Sigma, and Fairfield Lambda and redeemed, caused to be redeemed, or directed redemption of portions of investments in Fairfield Sentry, Fairfield Sigma, and Fairfield Lambda.

7.      By directing investments through FGG, the SNS Defendants knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York. Upon information and belief, the SNS Defendants entered into subscription agreements with Fairfield Sentry and Fairfield Sigma under which they submitted to New York jurisdiction, sent a copy of the agreements to FGG's New York City office, and wired funds to Fairfield Sentry through a bank in New York. Defendant SNS Bank also regularly communicated with its FGG account representatives located in FGG's New York City office. The SNS Defendants thus derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

**ANSWER**: The allegations contained in paragraph 7 constitute legal conclusions, to

which no response is required.  To the extent a response is determined to be required, the SNS

Defendants deny the allegations of paragraph 7, except to admit that (a) upon information and

belief, Fairfield was an investment fund managed by Fairfield Greenwich Group ("FGG"); (b)

upon information and belief, FGG had an office in New York; (c) the SNS Defendants entered

into subscription agreements with Fairfield Sentry and Fairfield Sigma and sent copies of such

subscription agreements to one or more entities affiliated with Fairfield Sentry and Fairfield

Sigma; (d) the SNS Defendants maintained a bank account in New York; and (e) the SNS

Defendants made certain transfers of funds to New York bank accounts.

8.      The SNS Defendants should reasonably expect to be subject to New York jurisdiction and are subject to personal jurisdiction pursuant to New York Civil Practice Law & Rules § 302 (McKinney 2001) and Bankruptcy Rule 7004.

**ANSWER**: The allegations contained in paragraph 8 constitute legal conclusions, to

which no response is required.  To the extent a response is determined to be required, the SNS

Defendants deny the allegations contained in paragraph 8.

9.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).

**ANSWER**: The allegations contained in paragraph 9 constitute legal conclusions, to

which no response is required.  To the extent a response is required, the SNS Defendants deny

the allegations of paragraph 9.  Furthermore, the SNS Defendants do not consent to the issuance

of entry of final orders or judgments by the Bankruptcy Court and demand a trial by jury of all

issues that may be tried by a jury.

10.    Venue in this District is proper under 28 U.S.C. § 1409.

**ANSWER**: The allegations contained in paragraph 10 constitute legal conclusions, to

which no response is required.

## III.    BACKGROUND

11.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents
for violation of the criminal securities laws, including, *inter alia,* securities fraud, investment
adviser fraud and mail and wire fraud.  Contemporaneously, the Securities and Exchange
Commission ("SEC") commenced the District Court Proceeding against Madoff and BLMIS.
The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment
adviser activities of BLMIS.  The District Court Proceeding remains pending.

**ANSWER**: Upon information and belief, the SNS Defendants admit that Madoff was

arrested on or around December 11, 2008, and that, on that same date, the Securities and

Exchange Commission ("SEC") filed a civil complaint against Madoff and BLMIS in the

District Court.  The SNS Defendants lack knowledge sufficient to form a belief as to the truth of

the remaining allegations in paragraph 11, and therefore deny the remaining allegations in

paragraph 11.

12.    On December 12, 2008, The Honorable Louis L. Stanton of the District Court
entered an order appointing Lee S. Richards (the "Receiver") as receiver for the assets of
BLMIS.

**ANSWER**: The SNS Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations contained in paragraph 12 and, therefore, deny the

allegations contained in paragraph 12.  The SNS Defendants refer to the District Court's

December 12, 2008 Order for a full statement of its contents.

13.    On December 15, 2008, under §78eee(a)(4)(A), the SEC consented to a
combination of its own action with an application of the Securities Investor Protection
Corporation ("SIPC").  Thereafter, under §78eee(a)(4)(B) of SIPA, SIPC filed an application in
the District Court alleging, *inter alia,* that BLMIS was not able to meet its obligations to

securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

**ANSWER**: The SNS Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations contained in paragraph 13 and, therefore, deny the

allegations contained in paragraph 13. The SNS Defendants refer to the SIPC application

referenced in paragraph 13 for a full statement of its contents.

14.     Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order under SIPA (known as the "Protective Decree"), which, in pertinent part:

> a.  removed the receiver and appointed the Trustee for the liquidation of the business of BLMIS under SIPA section 78eee(b)(3);
> b.  appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA section 78eee(b)(3); and
> c.  removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under § 78eee(b)(4) of SIPA.

**ANSWER**: The SNS Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations contained in paragraph 14, and therefore deny the

allegations contained in paragraph 14. The SNS Defendants refer to the District Court's

December 15, 2008 Order for a full statement of its contents.

15.     By orders dated December 23, 2008, and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

**ANSWER**: The SNS Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations contained in paragraph 15 and, therefore, deny the

allegations contained in paragraph 15. The SNS Defendants refer to the District Court's

December 23, 2008 and February 4, 2009 Orders for a full statement of the contents therein.

16.     At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." *Id.* at 23. Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I was doing

[was] wrong, indeed criminal." *Id*. On June 29, 2009, Madoff was sentenced to 150 years in prison.

      **ANSWER**: The SNS Defendants admit, upon information and belief, that on or about

March 12, 2009, Madoff pleaded guilty to the charges filed against him by the United States

Attorney's Office for the Southern District of New York and that on or about June 29, 2009

Madoff was sentenced to a term of 150 years in prison. The SNS Defendants lack knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in

paragraph 16 and, therefore, deny the remaining allegations contained in paragraph 16.

      17.     On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a plea hearing on August 11, 2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), DiPascali pled guilty to a ten-count criminal information. Among other things, DiPascali admitted that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s. *Id*. at 46.

      **ANSWER**: The SNS Defendants admit, upon information or belief, that on or about

August 11, 2009, Frank DiPascali pleaded guilty to the charges brought against him by the

United States Attorney's Office for the Southern District of New York. The SNS Defendants

lack knowledge or information sufficient to form a belief as to the truth of the remaining

allegations contained in paragraph 17 and, therefore, deny the remaining allegations contained in

paragraph 17.

## IV.    <u>TRUSTEE'S POWERS AND STANDING</u>

      18.     As Trustee appointed under SIPA, the Trustee is charged with recovering and paying out Customer Property to BLMIS customers, assessing claims, and liquidating any other assets of BLMIS for the benefit of the estate and its creditors. The Trustee is in the process of marshalling BLMIS's assets, and this liquidation is well underway. However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years. Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recoveries, including those from individuals and entities that received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA section 78fff-2(c)(1).

**ANSWER**: The allegations contained in paragraph 18 constitute legal conclusions, to which no response is required. To the extent a response is determined to be required, the SNS Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 18 and, therefore, deny the allegations contained in paragraph 18.

19. Under SIPA section 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under section 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

**ANSWER**: The allegations contained in paragraph 19 constitute legal conclusions, to which no response is required. To the extent a response is determined to be required, the SNS Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 19 and, therefore, deny the allegations contained in paragraph 19.

20. Under SIPA §§ 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

**ANSWER**: The allegations contained in paragraph 20 constitute legal conclusions, to which no response is required. To the extent a response is determined to be required, the SNS Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 20 and, therefore, deny the allegations contained in paragraph 20.

21. The Trustee has standing to bring these claims under section 78fff-1(a) of SIPA and the Bankruptcy Code, including sections 323(b), 544 and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under §§ 554, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA 78fff-2(c)(3).

**ANSWER**: The allegations contained in paragraph 21 constitute legal conclusions, to which no response is required. To the extent a response is determined to be required, the SNS

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations contained in paragraph 21 and, therefore, deny the allegations contained in paragraph

21.

## V.    THE DEFENDANTS

22.    Defendant SNS Bank is a Dutch public limited company that maintains a place of
business at Croeselaan 1, Utrecht 3521 BJ, Netherlands.

**ANSWER**: Defendant SNS Bank admits the allegations in paragraph 22.

23.    Defendant SNS Global Custody is a Dutch private limited company that
maintains a place of business at Graadt van Roggenweg 500, Utrecht 3531 AH, Netherlands.

**ANSWER**: Defendant SNS Global Custody admits the allegations in paragraph 23.

## VI.    THE PONZI SCHEME

24.    BLMIS was founded by Madoff in 1959 and, for most of its existence, operated
from its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as
founder, chairman, chief executive officer, and sole owner, operated BLMIS together with
several of his friends and family members.  BLMIS was registered with the SEC as a securities
broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b).
By virtue of that registration, BLMIS was a member of SIPC.  BLMIS had three business units:
market making, proprietary trading, and the IA Business.

**ANSWER**: The SNS Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations contained in paragraph 24, and therefore deny the

allegations contained in paragraph 24.

25.    Outwardly, Madoff ascribed the consistent success of the IA Business to the so-
called split-strike conversion strategy ("SSC Strategy").  Under that strategy, Madoff purported
to invest BLMIS customers' funds in a basket of common stocks within the Standard & Poor's
100 Index ("S&P 100") - a collection of the 100 largest publicly traded companies.  Madoff
claimed that his basket of stocks would mimic the movement of the S&P 100.  He also asserted
that he would carefully time purchases and sales to maximize value, and BLMIS customers'
funds would, intermittently, be out of the equity markets.

**ANSWER**: The SNS Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations contained in paragraph 25, and therefore deny the

allegations contained in paragraph 25.

26.     The second part of the SSC Strategy was a hedge of Madoff's stock purchases with options contracts. Those option contracts acted as a "collar" to limit both the potential gains and losses on the basket of stocks. Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options. Madoff told BLMIS customers that when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual funds holding treasury bills. Madoff also told customers that he would enter and exit the market between six and ten times each year.

**ANSWER**: The SNS Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations contained in paragraph 26, and therefore deny the

allegations contained in paragraph 26.

27.     BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never made the investments he promised clients, who believed they were invested with him in the SSC Strategy. He further admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts. In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform on which BLMIS reasonably could have traded securities. Instead, investors' funds were principally deposited into the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxx703.

**ANSWER**: The SNS Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations contained in paragraph 27, and therefore deny the

allegations contained in paragraph 27.

28.     Prior to his arrest, Madoff assured clients and regulators that he purchased and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than through any listed exchange. Based on the Trustee's investigation to date, there is no evidence that the IA Business ever entered into any OTC options trades on behalf of IA Business account holders.

**ANSWER**: The SNS Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations contained in paragraph 28, and therefore deny the

allegations contained in paragraph 28.

29.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options, but rather used to pay

withdrawals and to make other avoidable transfers.  Madoff also used his customers' investments to enrich himself, his associates, and his family.

**ANSWER**: The SNS Defendants admit, upon information and belief, that BLMIS

claimed to invest the money deposited by its customers in stocks and options.  The SNS

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

remaining allegations contained in paragraph 29, and therefore deny the remaining allegations

contained in paragraph 29.

30.    The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion of new investments to fulfill payment requests or withdrawals from other BLMIS accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

**ANSWER**: The SNS Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations contained in paragraph 30, and therefore deny the

allegations contained in paragraph 30.

31.    It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in demand, investigation, the filing of a claim, and disclosure of the fraud.

**ANSWER**: The SNS Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations contained in paragraph 31, and therefore deny the

allegations contained in paragraph 31.

32.    Madoff's scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

**ANSWER**: The SNS Defendants admit, upon information and belief, that BLMIS

continued to operate until December 2008.  The SNS Defendants lack knowledge or information

sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 32,

and therefore deny the remaining allegations contained in paragraph 32.

33.    Based upon the Trustee's ongoing investigation, it now appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. By the time the Ponzi scheme came to light on December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

**ANSWER**: The SNS Defendants admit, upon information and belief, that Madoff was

arrested on or about December 11, 2008. The SNS Defendants lack knowledge or information

sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 33,

and therefore deny the remaining allegations contained in paragraph 33.

34.    Thus, at all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

**ANSWER**: The SNS Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations contained in paragraph 34, and therefore deny the

allegations contained in paragraph 34.

## VII.    THE TRANSFERS

35.    Fairfield Sentry received initial transfers of BLMIS Customer Property. Some or all of those initial transfers were subsequently transferred directly or indirectly to the SNS Defendants.

**ANSWER**: The SNS Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations contained in paragraph 35, and therefore deny the

allegations contained in paragraph 35.

### A.    Initial Transfers From BLMIS to Fairfield Sentry

36.    The Trustee filed an adversary proceeding against Fairfield Sentry, Fairfield Sigma, Fairfield Lambda, and other defendants in the Bankruptcy Court under the caption Picard v. Fairfield Sentry Ltd., et al., Adv. Pro. No. 09-01239 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Fairfield

Sentry in the amount of approximately $3 billion (the "Fairfield Amended Complaint"). The Trustee incorporates by reference the allegations contained in the Fairfield Amended Complaint as if fully set forth herein.

**ANSWER**: The SNS Defendants admit that the Trustee filed an adversary proceeding in this Court styled as *Picard v. Fairfield Sentry Ltd., et al.*, No. 09-01239 (BRL) (the "Fairfield Action"). The SNS Defendants deny knowledge or information sufficient to form a belief as to which of the three complaints filed in the Fairfield Action the Trustee purports to incorporate by reference in the Complaint. The SNS Defendants deny that the alleged initial transfers of Customer Property from BLMIS to Fairfield Sentry were, or are, avoidable.

In addition to the foregoing, the SNS Defendants further their objection to the Trustee's purported incorporation by reference of all other paragraphs and allegations of one or more of the three complaints filed in the Fairfield Action, and, therefore, do not otherwise respond to such allegations. The SNS Defendants further object to the inclusion in this adversary proceeding of any issue implicated by the incorporation of any of the three complaints in the Fairfield Action, other than as to the alleged avoidance or avoidability of the alleged initial transfers of Customer Property, and, therefore, do not otherwise respond to allegations in such complaints.

The SNS Defendants reserve their right to rely on and introduce any allegations in any of the Trustee's three complaints filed in the Fairfield Action or in the exhibits thereto as party admissions.

To the extent that any further response is determined to be required to the allegations contained in or purported to be incorporated in paragraph 36, the SNS Defendants lack knowledge or information sufficient to form a belief as to the truth of such allegations, and therefore deny such allegations.

14

37.    During the six years preceding the Filing Date, BLMIS made transfers to Fairfield Sentry of approximately $3 billion (the "Fairfield Sentry Six Year Initial Transfers").  The Fairfield Sentry Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable, should be avoided and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**: The SNS Defendants state that the allegations contained in the second

sentence of paragraph 37 are legal conclusions, to which no response is required.  To the extent a

response is determined to be required, the SNS Defendants lack knowledge or information

sufficient to form a belief as to the truth of the allegations contained in the second sentence of

paragraph 37, and therefore deny those allegations.  As to the remaining allegations contained in

paragraph 37, the SNS Defendants lack knowledge or information sufficient to form a belief as

to the truth of the remaining allegations contained in paragraph 37, and therefore deny the

remaining allegations contained in paragraph 37.

38.    The Fairfield Sentry Six Year Initial Transfers include approximately $1.6 billion which BLMIS transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Two Year Initial Transfers").  The Fairfield Sentry Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under sections 544, 548, 550, and 551 of the Bankruptcy Code, §§ 273-279 of NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**: The SNS Defendants state that the allegations contained in the second

sentence of paragraph 38 are legal conclusions, to which no response is required.  To the extent a

response is determined to be required, the SNS Defendants lack knowledge or information

sufficient to form a belief as to the truth of the allegations contained in the second sentence of

paragraph 38, and therefore deny those allegations.  As to the remaining allegations contained in

paragraph 38, the SNS Defendants lack knowledge or information sufficient to form a belief as

to the truth of the remaining allegations contained in paragraph 38, and therefore deny the

remaining allegations contained in paragraph 38.

39.     The Fairfield Sentry Two Year Initial Transfers include approximately $1.1 billion which BLMIS transferred to Fairfield Sentry during the 90 days preceding the Filing Date (the "Fairfield Sentry Preference Period Initial Transfers").  The Fairfield Sentry Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4) and are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER**: The SNS Defendants state that the allegations contained in the second

sentence of paragraph 39 are legal conclusions, to which no response is required.  To the extent a

response is determined to be required, the SNS Defendants lack knowledge or information

sufficient to form a belief as to the truth of the allegations contained in the second sentence of

paragraph 39, and therefore deny those allegations.  As to the remaining allegations contained in

paragraph 39, the SNS Defendants lack knowledge or information sufficient to form a belief as

to the truth of the remaining allegations contained in paragraph 39, and therefore deny the

remaining allegations contained in paragraph 39.

40.     The Fairfield Sentry Six Year Initial Transfers, the Fairfield Sentry Two Year Initial Transfers and the Fairfield Sentry Preference Period Initial Transfers are collectively defined as the "Fairfield Sentry Initial Transfers." Charts setting forth these transfers are attached as Exhibits A and B.

**ANSWER**: The SNS Defendants admit that the Trustee defines the term "Fairfield

Sentry Initial Transfers" as set forth above and refer to Exhibits A and B for a full statement of

the contents therein.  The SNS Defendants deny any and all remaining allegations in paragraph

40.

41.     Pursuant to the Bankruptcy Court's June 7 and June 10, 2011 orders, the Bankruptcy Court approved a settlement among the Trustee, Fairfield Sentry, and others (the "Settlement Agreement").  As part of the Settlement Agreement, on July 13, 2011, the Bankruptcy Court entered a consent judgment granting the Trustee a judgment against Fairfield Sentry in the amount of $3,054,000,000.  Fairfield Sentry is obliged to pay $70,000,000 to the Trustee under the terms of the Settlement Agreement.

**ANSWER**: The SNS Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations contained in paragraph 41 and, therefore, deny the

16

allegations in paragraph 41.  The SNS Defendants refer to the June 7, 2011 and June 10, 2011

Orders and the July 13, 2011 Consent Judgment for a full statement of the contents therein.

**B.      Subsequent Transfers From Fairfield Sentry to the SNS Defendants**

42.      A portion of the Fairfield Sentry Initial Transfers was subsequently transferred
either directly or indirectly to, or for the benefit of, the SNS Defendants and is recoverable from
the SNS Defendants pursuant to section 550 of the Bankruptcy Code and § 278 of the NYDCL.
Based on the Trustee's investigation to date, approximately $21,060,551 of the money
transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to
the SNS Defendants (the "Fairfield Sentry Subsequent Transfers"). Upon information and belief,
Defendant SNS Global Custody received the Fairfield Sentry Subsequent Transfers for its own
benefit and/or as custodian and agent for Defendant SNS Bank. A chart setting forth the
presently known Fairfield Sentry Subsequent Transfers is attached as Exhibit C.

**ANSWER**: The SNS Defendants admit that they were sent funds from Fairfield Sentry in

the approximate amounts alleged in paragraph 42, but lack knowledge or information sufficient

to form a belief as to the truth of the allegations concerning the prior status of the funds and,

therefore, deny such allegations.  The SNS Defendants state that the remaining allegations

contained in paragraph 42 contain legal conclusions to which no response is required.  To the

extent a response is required, the SNS Defendants deny the allegations contained in paragraph 42

and refers to Exhibit C for a full statement of the contents therein.

43.      The Trustee's investigation is on-going, and the Trustee reserves the right to: (i)
supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Sentry
Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional
transfers.

**ANSWER**: To the extent the Trustee purports to reserve a right, such reservation is a

legal position to which no response is required.  The SNS Defendants lack knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in

paragraph 43 and, therefore, deny the allegations in paragraph 43.

**C.      Subsequent Transfers From Fairfield Sentry to Fairfield Sigma and
          Subsequently to the SNS Defendants**

44.     A portion of the Fairfield Sentry Initial Transfers was subsequently transferred
either directly or indirectly to, or for the benefit of, the SNS Defendants through Fairfield Sigma
and is recoverable from the SNS Defendants pursuant to section 550 of the Bankruptcy Code and
§ 278 of the NYDCL. Based on the Trustee's investigation to date, approximately $752,273,917
of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by
Fairfield Sentry to Fairfield Sigma. Thereafter, the equivalent of approximately $41,540,842 was
transferred by Fairfield Sigma to the SNS Defendants (the "Fairfield Sigma Subsequent
Transfers"). Upon information and belief, Defendant SNS Global Custody received the Fairfield
Sigma Subsequent Transfers for its own benefit and/or as custodian and agent for Defendant
SNS Bank. Charts setting forth the presently known Fairfield Sigma Subsequent Transfers are
attached as Exhibits D and E.

**ANSWER**: The SNS Defendants admit that they were sent funds from Fairfield Sigma

but lack knowledge or information sufficient to form a belief as to the truth of the allegations

concerning the prior status of the funds and, therefore, deny such allegations.  The SNS

Defendants state that the remaining allegations contained in paragraph 44 contain legal

conclusions to which no response is required.  To the extent a response is required, the SNS

Defendants deny the allegations contained in paragraph 44 and refers to Exhibits D and E for a

full statement of the contents therein.

45.     The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i)
supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Sigma
Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional
transfers.

**ANSWER**: To the extent the Trustee purports to reserve a right, such reservation is a

legal position to which no response is required.  The SNS Defendants lack knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in

paragraph 45 and, therefore, deny the allegations in paragraph 45.

D.     **Subsequent Transfers from Fairfield Sentry to Fairfield Lambda and
        Subsequently to the SNS Defendants**

46.     A portion of the Fairfield Sentry Initial Transfers was subsequently transferred
either directly or indirectly to, or for the benefit of, the SNS Defendants through Fairfield
Lambda and is recoverable from the SNS Defendants pursuant to section 550 of the Bankruptcy
Code and § 278 of the NYDCL. Based on the Trustee's investigation to date, approximately
$52,935,000 of the money transferred from BLMIS to Fairfield Sentry was subsequently

18

transferred by Fairfield Sentry to Fairfield Lambda. Thereafter, the equivalent of approximately $11,867,009 was transferred by Fairfield Lambda to the SNS Defendants (the "Fairfield Lambda Subsequent Transfers"). Upon information and belief, Defendant SNS Global Custody received the Fairfield Lambda Subsequent Transfers for its own benefit and/or as custodian and agent for Defendant SNS Bank. Charts setting forth the presently known Fairfield Lambda Subsequent Transfers are attached as Exhibits F and G.

**ANSWER**: The SNS Defendants admit that they were sent funds from Fairfield Lambda but lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning the prior status of the funds and, therefore, deny such allegations.  The SNS Defendants state that the remaining allegations contained in paragraph 46 contain legal conclusions to which no response is required.  To the extent a response is required, the SNS Defendants deny the allegations contained in paragraph 46 and refer to Exhibits F and G for a full statement of the contents therein.

47.     The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the Fairfield Lambda Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER**: To the extent the Trustee purports to reserve a right, such reservation is a legal position to which no response is required.  The SNS Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 47 and, therefore, deny the allegations in paragraph 47.

48.     The Fairfield Sentry Subsequent Transfers, the Fairfield Sigma Subsequent Transfers, and the Fairfield Lambda Subsequent Transfers are collectively defined as the "Fairfield Subsequent Transfers."

**ANSWER**: The SNS Defendants deny the allegations of paragraph 48, except to admit that the Trustee defines the term "Fairfield Subsequent Transfers" as set forth above.

## COUNT ONE
## RECOVERY OF FAIRFIELD SENTRY SUBSEQUENT TRANSFERS -
## 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

49.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

**ANSWER**: The SNS Defendants incorporate and reassert their responses to the allegations contained in all of the previous paragraphs of this Complaint with the same force and effect as if fully set forth herein.

50.     The SNS Defendants received the Fairfield Sentry Subsequent Transfers, totaling approximately $21,060,551; the Fairfield Sigma Subsequent Transfers, totaling the equivalent of approximately $41,540,842; and the Fairfield Lambda Subsequent Transfers, totaling the equivalent of approximately $11,867,009 (collectively, as defined above, the "Fairfield Subsequent Transfers"). The Fairfield Subsequent Transfers, totaling approximately $74,468,402, are recoverable pursuant to section 550(a) of the Bankruptcy Code and § 278 of the NYDCL.

**ANSWER**: The SNS Defendants admit that they were sent funds from Fairfield Sentry, Fairfield Sigma, and Fairfield Lambda in the approximate amounts alleged in paragraph 50. The remaining allegations contained in paragraph 50 constitute legal conclusions to which no response is required.  To the extent a response is required, the SNS Defendants deny the remaining allegations contained in paragraph 50.

51.     Each of the Fairfield Sentry Subsequent Transfers was made directly or indirectly to, or for the benefit of, the SNS Defendants.

**ANSWER**: The allegations contained in paragraph 51 constitute legal conclusions to which no response is required.  To the extent a response is required, the SNS Defendants deny the allegations contained in paragraph 51.

52.     The SNS Defendants are immediate or mediate transferees of the Fairfield Sentry Initial Transfers.

**ANSWER**: The allegations contained in paragraph 52 constitute legal conclusions to

which no response is required.  To the extent a response is required, the SNS Defendants deny

the allegations contained in paragraph 52.

53.     As a result of the foregoing, pursuant to sections 550(a) and 551 of the
Bankruptcy Code, § 278 of the NYDCL, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a
judgment against the SNS Defendants recovering the Fairfield Subsequent Transfers, or the
value thereof, for the benefit of the estate of BLMIS.

**ANSWER**: The allegations contained in paragraph 10 constitute legal conclusions to

which no response is required.  To the extent a response is required, the SNS Defendants deny

the allegations contained in paragraph 53.

## RESPONSE TO THE TRUSTEE'S REQUEST FOR RELIEF

The SNS Defendants deny that the Trustee is entitled to the judgment in his favor as

against the SNS Defendants, in whole or in part.  The SNS Defendants further deny that this

Court has jurisdiction or authority to enter any such judgment.

## AFFIRMATIVE DEFENSES

The SNS Defendants assert the following defenses without assuming the burden of proof

or any other burden if, as a matter of law, such burdens would otherwise be on the Trustee.  The

SNS Defendants reserve the right to amend this Answer to assert additional defenses, as well as

the right to assert counterclaims or claims against third parties based on discovery in this

adversary proceeding, or otherwise.

The following defenses are set forth cumulatively and in the alternative:

## FIRST AFFIRMATIVE DEFENSE
### (Personal Jurisdiction)

As set forth in the SNS Defendants' Memorandum of Law in Support of their Motion to

Dismiss the Complaint (the "SNS Motion to Dismiss"), filed on October 14, 2022, in this

21

adversary proceeding (Dkt. 112), this Court lacks personal jurisdiction over the SNS Defendants.

The SNS Defendants have not consented to the jurisdiction or authority of this Court.

## SECOND AFFIRMATIVE DEFENSE

### (Failure to State a Claim for Relief)

The Complaint fails to state a claim upon which relief can be granted, including without

limitation for the reasons stated in the SNS Motion to Dismiss.

## THIRD AFFIRMATIVE DEFENSE

### (Dismissed Claims)

The Trustee's claims are barred to the extent they, and/or any allegations on which they

are based, have been or may in the future be dismissed or stricken by the Court, or are based on

theories or allegations that may in the future be rejected by this Court or by another court on

appeal from any orders of this Court.

## FOURTH AFFIRMATIVE DEFENSE

### (Safe Harbor: 11 U.S.C. § 546(e))

Pursuant to 11 U.S.C. § 546(e), the Trustee may not avoid any alleged Fairfield Sentry

Initial Transfers, or pursue under 11 U.S.C. §550(a) any recovery claims against the SNS

Defendants premised upon the alleged avoidance or avoidability of any alleged Fairfield Sentry

Initial Transfers, except to the extent that the Trustee can establish that such transfers were made

with actual intent to defraud within two years before the Filing Date.

## FIFTH AFFIRMATIVE DEFENSE

### (No Customer Property: 15 U.S.C. § 78fff-2(c)(3))

The alleged Fairfield Subsequent Transfers did not constitute BLMIS customer property.

As set forth in the SNS Motion to Dismiss, many of the alleged Fairfield Subsequent Transfers

could not have been sourced from BLMIS customer property because the allegedly avoidable

transfers from BLMIS to Fairfield Sentry had been distributed by Fairfield Sentry to its affiliates or other institutions prior to the alleged Fairfield Subsequent Transfers.

## SIXTH AFFIRMATIVE DEFENSE

### (Initial Transfer Not Avoided: 11 U.S.C. 550(a))

The Trustee may not recover the alleged Fairfield Subsequent Transfers because the alleged Fairfield Sentry Initial Transfers have not been avoided.

## SEVENTH AFFIRMATIVE DEFENSE

### (Good Faith: 11 U.S.C. 550(b) and NYDCL §278(1))

To the extent that the SNS Defendants received any alleged Fairfield Subsequent Transfers or any proceeds thereof, such funds may not be recovered because the SNS Defendants took for value, in good faith, and without knowledge of the voidability of the alleged Fairfield Subsequent Transfers within the meaning of 11 U.S.C. § 550(b) and/or as a purchaser for fair consideration, without knowledge of the fraud at the time of the purchase or actual fraudulent intent within the meaning of NYDCL §§ 278(1) and (2).  Any such taking was made for value because those transfers were made in exchange for Fairfield Sentry's redemption of its own shares from the SNS Defendants.

To the extent that the SNS Defendants received any alleged Fairfield Subsequent Transfers or any proceeds thereof, they took in good faith because: (i) they lacked knowledge that BLMIS was not trading securities or was conducting a fraud, or of any fraudulent purpose behind the alleged Fairfield Subsequent Transfers; (ii) they lacked knowledge of the voidability of any alleged Fairfield Initial Transfers at the time they allegedly received any alleged Fairfield Subsequent Transfers; (iii) they lacked actual fraudulent intent at the time they allegedly received any alleged Fairfield Subsequent Transfers; (iv) they lacked knowledge of facts suggestive of any alleged fraud that would have caused a reasonable person in the SNS

Defendants' position to conduct further inquiry; and (v) even if the SNS Defendants were on inquiry notice, a diligent inquiry would not have discovered the allegedly fraudulent purpose of any transfers at issue or that BLMIS was not trading securities or was conducting a fraud.  Upon information and belief, at all relevant times, the SNS Defendants had access to, and were aware of, only publicly available information about Fairfield Sentry and BLMIS, including the general information disseminated by Fairfield Sentry.  Upon information and belief, neither the SNS Defendants nor anyone acting on their behalf ever had personal access to Madoff or BLMIS, or met or communicated with them.

If, as the Trustee alleges, the Fairfield Sentry Initial Transfers are avoidable, the SNS Defendants had no knowledge of such avoidability.

## EIGHTH AFFIRMATIVE DEFENSE

## (Single Satisfaction: 11 U.S.C. § 550(d) and NYDCL § 278(1)(a))

Under 11 U.S.C. 550(d), the Trustee "is entitled to only a single satisfaction under" 11 U.S.C. § 550(a).  Under NYDCL § 278(1)(a), the Trustee may only set aside a conveyance "to the extent necessary to satisfy his claim."

Accordingly, to the extent that the Trustee has recovered, or will recover, from Fairfield Sentry or from any other immediate or mediate transferee the amount of any avoided initial transfer that includes Customer Property that the Trustee alleges was received by any of the Defendants, the Trustee is barred from recovering any such alleged transfer (or its proceeds) from a Defendant.

## NINTH AFFIRMATIVE DEFENSE

## (Mere Conduit/ Lack of Dominion or Control)

The Trustee's claims are barred because neither of the SNS Defendants was a transferee, for purposes of 11 U.S.C. § 550(a), of any of the alleged Fairfield Subsequent Transfers, as

defined in the Complaint. To the extent that either SNS Defendant received any alleged Fairfield Subsequent Transfers, it did so in good faith, acting in its capacity as a bank and for the account and benefit of one or more of its customers. Neither SNS Defendant had dominion or control, or the right to assert dominion or control, over any alleged Fairfield Subsequent Transfer or any proceeds thereof, or the right to use any part of any alleged Fairfield Subsequent Transfer or the proceeds thereof for its own purposes. Rather, the SNS Defendants were obligated to credit the proceeds of any alleged Fairfield Subsequent Transfer to the account(s) of and for the benefit of one or more of its customers, who had the right to assert dominion and control over said alleged Fairfield Subsequent Transfers. Accordingly, to the extent that either SNS Defendant received any alleged Fairfield Subsequent Transfers or proceeds thereof, it did so as a mere conduit for third parties rather than as a transferee from which the Trustee may recover under 11 U.S.C. § 550(a). Such initial transfers would be barred by the safe harbor under § 546(e) of the Bankruptcy Code and the SNS Defendants may retain the amount they received pursuant to § 548 of the Bankruptcy Code because they took the transfers for value and in good faith.

## TENTH AFFIRMATIVE DEFENSE

### (Extraterritoriality)

The Trustee's claims to recover from the SNS Defendants subsequent transfers allegedly made to them by Fairfield Sentry, Fairfield Sigma, and Fairfield Lambda constitute an impermissible extraterritorial application of 11 U.S.C. § 550(a) and NYDCL § 278.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Comity)

The Trustee's claims to recover from the SNS Defendants subsequent transfers allegedly made to them by Fairfield Sentry, Fairfield Sigma, and Fairfield Lambda violate principles of international comity.

## TWELFTH AFFIRMATIVE DEFENSE

### (Final Judgment)

This Court lacks authority under Article III of the U.S. Constitution to enter final orders or judgments in this proceeding.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Double Recovery)

On or about July 13, 2011, the Trustee entered into a settlement agreement with the Liquidators of Fairfield Sentry and other Fairfield funds. That agreement provides for the sharing of recoveries on the Trustee's and the Fairfield Sentry Liquidators' claims against defendants who allegedly received transfers of BLMIS customer property from Fairfield Sentry. The agreement was ultimately incorporated into the consent judgment entered against Fairfield Sentry.

To the extent that the Fairfield Sentry Liquidators recover from the SNS Defendants via settlement or otherwise, the Trustee is barred from recovering because he is not entitled to a double recovery, nor should the SNS Defendants be subject to recovery of the same monies by two separate plaintiffs.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Estoppel)

The Trustee's claim is barred by estoppel.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (No Ponzi Scheme Presumption)

The Trustee is not entitled to rely upon a "Ponzi scheme presumption" to prove that the initial transfers from BLMIS to Fairfield Sentry, which he seeks to recover from the SNS Defendants, were made with actual intent to hinder, delay or defraud any BLMIS creditor.

26

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Violation of Due Process (Amendment V to the U.S. Const.))

The use of the doctrine of law of the case to apply rulings made in other adversary proceedings of which they were not a party and did not otherwise participate in to the SNS Defendants violates the SNS Defendants' right to due process of law, as guaranteed by the Fifth Amendment to the U.S. Constitution.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (No Interest)

To the extent the Trustee recovers from the SNS Defendants, the Trustee is not entitled to an award of interest.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Preservation of Rights: 11 U.S.C. § 502(h))

To the extent the Trustee recovers from the SNS Defendants, the SNS Defendants reserve their rights to assert a claim arising from any such recovery under 11 U.S.C. § 502(h).

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 9015 of the Federal Rules of Bankruptcy Procedure, the SNS Defendants hereby demand a jury trial on all claims and issues that may be tried by a jury.

## STATEMENT PURSUANT TO FED. R. BANKR. P. 7012(b)

The SNS Defendants do not consent, but instead object, to the entry of a final Order or Judgment against them by the Bankruptcy Court.

**WHEREFORE**, the SNS Defendants request that this Court dismiss the Complaint with prejudice, award the SNS Defendants their attorneys' fees, costs and disbursements incurred in

connection with this adversary proceeding, and grant the SNS Defendants such other and further

relief as the Court deems just and proper.


Dated: April 20, 2023                    Respectfully Submitted,
      New York, New York

                              WILMER CUTLER PICKERING HALE AND
                              DORR LLP

                              By: */s/ George W. Shuster, Jr.*
                              George W. Shuster, Jr.
                              7 World Trade Center
                              250 Greenwich Street
                              New York, New York 10007
                              Telephone: 212-230-8800
                              Facsimile: 212 230-8888
                              Email: george.shuster@wilmerhale.com

                              *Counsel for Defendants SNS Bank N.V. and SNS*
                              *Global Custody B.V.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 20th day of April, 2023, a true and correct copy of the foregoing *Answer to Complaint and Jury Demand* was served upon all counsel of record using the Court's CM/ECF system.

<u>*/s/ George W. Shuster, Jr.*</u>
George W. Shuster, Jr.