JENNER & BLOCK LLP
Richard Levin
Carl Wedoff
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600

Vincent E. Lazar
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350

*Counsel for Defendant Trincastar Corporation*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> *Plaintiff-Applicant*, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> *Defendant*. | Adv. Proc. No. 08-01789 (CGM) <br><br> SIPA LIQUIDATION <br><br> (Substantively Consolidated) |
| In re <br><br> BERNARD L. MADOFF, <br><br> *Debtor*. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> *Plaintiff*, <br><br> v. <br><br> TRINCASTAR CORPORATION, <br><br> *Defendant*. | Adv. Proc. No. 11-02731 (CGM) <br><br> **TRINCASTAR CORPORATION'S ANSWER TO THE COMPLAINT; DEMAND FOR JURY TRIAL** |

Defendant Trincastar Corporation ("**Trincastar**"), answers the claims of Plaintiff

Irving H. Picard (the "**Trustee**") in the Trustee's Complaint ("**Complaint**") [Adv. Dkt. 1].[1]

## I.   NATURE OF THE ACTION[2]

1.     This adversary proceeding is part of the Trustee's continuing efforts to recover
BLMIS Customer Property that was stolen as part of the massive Ponzi scheme perpetrated
by Bernard L. Madoff ("Madoff") and others.

**ANSWER:**  Trincastar **admits** that the Trustee purports to bring this adversary

proceeding as part of the Trustee's efforts to recover BLMIS customer property within the

meaning of 15 U.S.C. §§ 78*lll*(4) that Madoff perpetrated a Ponzi scheme through BLMIS and

**denies** the remaining allegations in Paragraph 1.[3]

2.     With this Complaint, the Trustee seeks to recover approximately $13,311,800
in subsequent transfers of Customer Property made to Defendant Trincaster. The subsequent
transfers were derived from investments with BLMIS made by Fairfield Sentry Limited
("Fairfield Sentry"), which was a Madoff feeder fund. Fairfield Sentry is currently in
liquidation in the British Virgin Islands ("BVI"). It was a BVI company that had direct
customer accounts with BLMIS's investment advisory business ("IA Business") for the
purpose of investing assets with BLMIS. Fairfield Sentry maintained in excess of 95% of its
assets in BLMIS customer accounts.

**ANSWER:**  Trincastar **admits** that the Trustee seeks to recover approximately

$13,311,800 from Trincastar, that Fairfield Sentry was a "feeder fend" as that term is used

---

[1] Trincastar's name was misspelled in the caption, throughout the Complaint, and on the docket as
"Trincaster Corporation." The spelling was corrected to "Trincastar Corporation," and the Complaint
was deemed so amended, under a stipulation and order entered by the Court on May 4, 2022. [Adv.
Dkt. 102.]

[2] Defendants deem the section headings in the Complaint not to constitute allegations of the
Complaint. To the extent any section headings are allegations, Trincastar admits or denies them
consistent with their responses to the allegations contained in the numbered paragraphs of the
Complaint.

[3] Footnote 1 in the Complaint provides: "SIPA § 78*lll*(4) defines "Customer Property" as cash and
securities at any time received, acquired, or held by, or for the account of, a debtor from or, for, the
securities accounts of a customer, and the proceeds of any such property transferred by the debtor,
including property unlawfully converted." Trincastar **avers** that Footnote 1 restates statutory text to
which no response is required. To the extent any further response is required, Trincastar **admits** the
allegations in Footnote 1.

in Paragraph 2, is currently in liquidation in the British Virgin Islands, that it was a BVI

company that had direct customer accounts with BLMIS, and **denies** all other allegations of

Paragraph 2, including that Trincastar received subsequent transfers of customer property

from BLMIS or any Madoff Feeder Fund and that the Trustee is entitled to recover any

amount from Trincastar.

## II.   JURISDICTION AND VENUE

3.     The Trustee brings this adversary proceeding pursuant to his statutory
authority under SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3); sections 105(a), 544, 550(a), and
551 of title 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code");
and the New York Fraudulent Conveyance Act (New York Debtor & Creditor Law)
("NYDCL") §§ 273-279 (McKinney 2001) to obtain avoidable and recoverable transfers
received by Defendant Trincaster as a subsequent transferee of funds originating from
BLMIS.

**ANSWER:**   Trincastar **avers** that the allegations in Paragraph 3 state legal

conclusions to which no response is required. To the extent any further response is required,

Trincastar **admits** that the Trustee has brought this adversary proceeding pursuant to the

statutes listed in Paragraph 3 for the purpose stated in Paragraph 3, but **denies** the

remaining allegations in Paragraph 3, including any allegations that transfers received by

Trincastar are avoidable or recoverable or that the Trustee is entitled to recover any amount

from Trincastar.

4.     This is an adversary proceeding brought in this Court, in which the
main underlying substantively consolidated SIPA case, No. 08-01789 (BRL) (the
"SIPA Case"), is pending. The SIPA Case was originally brought in the United States
District Court for the Southern District of New York (the "District Court") as
Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC,
et al., No. 08 CV 10791 (the "District Court Proceeding"). This Court has jurisdiction
over this adversary proceeding under 28 U.S.C. § 1334(b), and 15 U.S.C.
§ 78eee(b)(2)(A), (b)(4).

**ANSWER:**   Trincastar **denies** that this Court has jurisdiction over this adversary

proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. §§ 78eee(b)(2)(A), (b)(4). Trincastar

**states** that the United States District Court for the Southern District of New York has

jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and SIPA § 78eee(b)(2)(A)((iii) and (b)(4) and this Court has jurisdiction over this adversary proceeding to the extent provided in SIPA § 78eee(b)(4). Trincastar **admits** the remaining allegations in Paragraph 4.

5.     Defendant Trincaster is subject to personal jurisdiction in this judicial district because it purposely availed itself of the laws and protections of the United States and the state of New York by, among other things, knowingly directing funds to be invested with New York- based BLMIS through Fairfield Sentry. Defendant Trincaster knowingly received transfers of Customer Property from BLMIS. The Trustee's investigation to date reveals that Defendant Trincaster obtained this Customer Property by withdrawing money from Fairfield Sentry, a Fairfield Greenwich Group ("FGG") managed Madoff feeder fund. By directing its investment through FGG, Defendant Trincaster knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York. Upon information and belief, Defendant Trincaster entered into a subscription agreement with Fairfield Sentry under which Trincaster submitted to New York jurisdiction, sent a copy of the subscription agreement to FGG's New York City office, and wired funds to Fairfield Sentry through a bank in New York. Defendant Trincaster thus derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

**ANSWER:**     Trincastar **denies** the allegations in Paragraph 5.

6.     Defendant Trincaster should reasonably expect to be subject to New York jurisdiction and is subject to personal jurisdiction pursuant to New York Civil Practice Law & Rules § 301 (McKinney 2001) and Bankruptcy Rule 7004.

**ANSWER:**     Trincastar **denies** the allegations in Paragraph 6.

7.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).

**ANSWER:**     Trincastar **admits** this adversary proceeding is of a kind specified as a core proceeding in 28 U.S.C. §§ 157(b)(2)(H) and **denies** the remaining allegations in Paragraph 7. Trincastar **does not consent** to issuance or entry of final orders or judgments by the Bankruptcy Court and **demands trial by jury** of all issues that may be tried by a jury.

8.     Venue in this District is proper under 28 U.S.C. § 1409.

**ANSWER:**    Trincastar **admits** the allegations in Paragraph 8.

## III.    <u>BACKGROUND</u>

9.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for violation of the criminal securities laws, including, inter alia, securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding against Madoff and BLMIS. The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS. The District Court Proceeding remains pending.

**ANSWER:**    Trincastar **admits** on information and belief that Madoff was arrested

on or around the Filing Date and that the SEC filed a complaint against BLMIS. Trincastar

**lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in

Paragraph 9 and therefore denies the remaining allegations in Paragraph 9.

10.    On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards as receiver for the assets of BLMIS.

**ANSWER:**    Trincastar **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 10 and therefore **denies** the allegations in Paragraph 10.

11.    On December 15, 2008, under § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, under § 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, inter alia, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

**ANSWER:**    Trincastar **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 11 and therefore **denies** the allegations in Paragraph 11.

12.    Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order under SIPA (known as the "Protective Decree"), which, in pertinent part:

    a.    removed the receiver and appointed the Trustee for the liquidation of the business of BLMIS under SIPA § 78eee(b)(3);

    b.    appointed Baker & Hostetler LLP as counsel to the Trustee under SIPA § 78eee(b)(3); and

     c.    removed the case to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under § 78eee(b)(4) of SIPA.

**ANSWER:**   Trincastar **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 12 and therefore **denies** the allegations in Paragraph 12.

13.    By orders dated December 23, 2008, and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

**ANSWER:**   Trincastar **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 13 and therefore **denies** the allegations in Paragraph 13.

14.    At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned United States v. Madoff, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." Id. at 23. Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." Id. On June 29, 2009, Madoff was sentenced to 150 years in prison.

**ANSWER:**   Trincastar **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 14 and therefore **denies** the allegations in Paragraph 14.

15.    On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a plea hearing on August 11, 2009, in the case entitled United States v. DiPascali, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), DiPascali pled guilty to a ten-count criminal information. Among other things, DiPascali admitted that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s. Id. at 46.

**ANSWER:**   Trincastar **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 15 and therefore **denies** the allegations in Paragraph 15.

## IV.   TRUSTEE'S POWERS AND STANDING

16.    As Trustee appointed under SIPA, the Trustee is charged with recovering and paying out Customer Property to BLMIS customers, assessing claims, and liquidating any other assets of BLMIS for the benefit of the estate and its creditors. The Trustee is in the process of marshaling BLMIS's assets, and this liquidation is well underway. However, the estate's present assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years. Consequently, the Trustee must use his broad authority under SIPA and the Bankruptcy Code to pursue recoveries, including those

from individuals and entities that received preferences and fraudulent transfers to the detriment of defrauded customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

**ANSWER:** Trincastar **avers** that the allegations in Paragraph 16 state legal conclusions to which no response is required. To the extent any further response is required, Trincastar **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 16 and therefore **denies** such allegations.

17.    Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code, in addition to the powers granted by SIPA under § 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this case to the extent consistent with SIPA.

**ANSWER:** Trincastar **avers** that the allegations in Paragraph 17 state legal conclusions to which no response is required. To the extent any further response is required, Trincastar **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 17 and therefore **denies** such allegations.

18.    Under SIPA §§ 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

**ANSWER:** Trincastar **avers** that the allegations in Paragraph 18 state legal conclusions to which no response is required. To the extent any further response is required, Trincastar **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 18 and therefore **denies** such allegations.

19.    The Trustee has standing to bring these claims under § 78fff-1(a) of SIPA and the Bankruptcy Code, including sections 323(b), 544 and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

**ANSWER:** Trincastar **avers** that the allegations in Paragraph 19 state legal conclusions to which no response is required. To the extent any further response is required,

Trincastar **lacks knowledge** sufficient to form a belief as to the truth of the allegations in

Paragraph 19 and therefore **denies** such allegations.

## V.   THE DEFENDANT

20.   Upon information and belief, Defendant Trincaster is a corporation with a principal point of contact at Credit Suisse Trust, which is located at Bleicherweg 33, 8002 Zurich, Switzerland.

**ANSWER:**   Trincastar **admits** that it is a corporation and **denies** the remaining

allegations in Paragraph 20.

## VI.   THE PONZI SCHEME

21.   BLMIS was founded by Madoff in 1959 and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several of his friends and family members. BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). By virtue of that registration, BLMIS was a member of SIPC. BLMIS had three business units: market making, proprietary trading, and the IA Business.

**ANSWER:**   Trincastar **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 21 and therefore **denies** those allegations.

22.   Outwardly, Madoff ascribed the consistent success of the IA Business to the so-called split-strike conversion strategy ("SSC Strategy"). Under that strategy, Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100")—a collection of the 100 largest publicly traded companies. Madoff claimed that his basket of stocks would mimic the movement of the S&P 100. He also asserted that he would carefully time purchases and sales to maximize value, and BLMIS customers' funds would, intermittently, be out of the equity markets.

**ANSWER:**   Trincastar **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 22 and therefore **denies** those allegations.

23.   The second part of the SSC Strategy was a hedge of Madoff's stock purchases with options contracts. Those option contracts acted as a "collar" to limit both the potential gains and losses on the basket of stocks. Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options. Madoff told BLMIS customers that when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual funds holding Treasury bills. Madoff also told customers that he would enter and exit the market between six and ten times each year.

**ANSWER:** Trincastar **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 23 and therefore **denies** those allegations.

24.    BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never made the investments he promised clients, who believed they were invested with him in the SSC Strategy. He further admitted that he never purchased any of the securities he claimed to have purchased for the IA Business's customer accounts. In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform on which BLMIS reasonably could have traded securities. Instead, investors' funds were principally deposited into the BLMIS account at JPMorgan Chase & Co., Account #xxxxxxxxxxxx703.

**ANSWER:** Trincastar **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 24 and therefore **denies** those allegations.

25.    Prior to his arrest, Madoff assured clients and regulators that he purchased and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than through any listed exchange. Based on the Trustee's investigation to date, there is no evidence that the IA Business ever entered into any OTC options trades on behalf of IA Business account holders.

**ANSWER:** Trincastar **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 25 and therefore **denies** those allegations.

26.    For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options, but rather used to pay withdrawals and to make other avoidable transfers. Madoff also used his customers' investments to enrich himself, his associates, and his family.

**ANSWER:** Trincastar **admits** upon information and belief that BLMIS claimed to invest money deposited by customers in securities**,** but otherwise **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 26 and therefore **denies** those allegations.

27.    The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion of new investments to fulfill payment requests or withdrawals from other BLMIS accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

**ANSWER:**   Trincastar **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 27 and therefore **denies** those allegations.

28.    It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in demand, investigation, the filing of a claim, and disclosure of the fraud.

**ANSWER:**   Trincastar **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 28 and therefore **denies** those allegations.

29.    Madoff's scheme continued until December 2008, when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

**ANSWER:**   Trincastar **admits** that BLMIS's business continued until December 2008, but otherwise **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 29 and therefore **denies** those allegations.

30.    Based upon the Trustee's ongoing investigation, it now appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. By the time the Ponzi scheme came to light on December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

**ANSWER:**   Trincastar **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 30 and therefore **denies** those allegations.

31.    Thus, at all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets. BLMIS was insolvent in that: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

**ANSWER:**   Trincastar **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 31 and therefore **denies** those allegations.

## VII.    THE TRANSFERS

32.    Defendant Trincaster received subsequent transfers of Customer Property from Fairfield Sentry, which maintained customer accounts with BLMIS.

**ANSWER:** Trincastar **denies** the allegations in Paragraph 32.

A.    **Initial Transfers From BLMIS To Fairfield Sentry**

33.    The Trustee filed an adversary proceeding against Fairfield Sentry and other defendants in the Bankruptcy Court under the caption Picard v. Fairfield Sentry Ltd., et al., Adv. Pro. No. 09-01239 (BRL), in which, in part, the Trustee sought to avoid and recover initial transfers of Customer Property from BLMIS to Fairfield Sentry in the amount of approximately $3 billion (the "Fairfield Amended Complaint"). The Trustee incorporates by reference the allegations contained in the Fairfield Amended Complaint as if fully set forth herein.

**ANSWER:** Trincastar (a) **admits** that the Trustee filed an action styled as

*Picard v. Fairfield Sentry Limited, et al.*, No. 08-01789 (BRL), Adv. Pro. No. 09-01239 (the

"**Fairfield Sentry Action**"), (b) **lacks knowledge** sufficient to form a belief as to which of

the three complaints filed in the Fairfield Sentry Action the Trustee purports to incorporate

by reference in the complaint in this action and therefore **denies** such allegations, (c) **denies**

that the initial transfers of Customer Property to Fairfield Sentry the Trustee seeks to avoid

and recover in the Fairfield Sentry Action were avoided or are avoidable, (d) to the extent

necessary to support such denial, **denies** for lack of knowledge sufficient to form a belief as

to the truth of the allegations, each and every paragraph of each of the three complaints filed

in the Fairfield Sentry Action that supports the claim that any initial transfers of Customer

Property to Fairfield Sentry are or were avoided or avoidable, and (e) **objects** to the

incorporation by reference of, and therefore does not answer, each and every paragraph and

allegation in the three complaints in the Fairfield Sentry Action and to the inclusion in this

adversary proceeding of any issue implicated by any of the three complaints in the Fairfield

Sentry Action other than the issue of the avoidance or avoidability of the initial transfers of

Customer Property, but reserves the right to rely on and introduce any allegations in the

referenced "Fairfield Amended Complaint" or its exhibits as opposing party admissions

admissible for the truth of their contents. To the extent any further response is required,

Trincastar **lacks knowledge** sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 33 and therefore **denies** such allegations.

34.    During the six years preceding the Filing Date, BLMIS made transfers to Fairfield Sentry of approximately $3 billion (the "Fairfield Sentry Six Year Initial Transfers"). The Fairfield Sentry Six Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), are avoidable, and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, sections 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:**    Trincastar **lacks knowledge** sufficient to form a belief as to the truth

of the allegation of the timing and amounts of the alleged transfers alleged in Paragraph 34

and therefore **denies** such allegations. Trincastar **avers** that the remaining allegations in

Paragraph 34 state legal conclusions to which no response is required. To the extent that any

further response is required, Trincastar **denies** the allegations in Paragraph 34.

35.    The Fairfield Sentry Six Year Initial Transfers include approximately $1.6 billion which BLMIS transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Initial Transfers"). The Fairfield Sentry Two Year Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), are avoidable, and recoverable under sections 548(a), 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:**    Trincastar **lacks knowledge** sufficient to form a belief as to the alleged

timing and amounts of the transfers alleged in Paragraph 35 and therefore **denies** such

allegations. Trincastar **avers** that the remaining allegations in Paragraph 35 state legal

conclusions to which no response is required. To the extent that any further response is

required, Trincastar **denies** the allegations in Paragraph 35.

36.    The Fairfield Sentry Two Year Initial Transfers include approximately $1.1 billion which BLMIS transferred to Fairfield Sentry during the 90 days preceding the Filing Date (the "Fairfield Sentry Preference Period Initial Transfers"). The Fairfield Sentry Preference Period Initial Transfers were and continue to be Customer Property within the meaning of SIPA § 78*lll*(4), are avoidable and recoverable under sections 547, 550, and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

**ANSWER:**    Trincastar **lacks knowledge** sufficient to form a belief as to the alleged

timing and amounts of the transfers alleged in Paragraph 36 and therefore **denies** such

allegations. Trincastar **avers** that the remaining allegations in Paragraph 36 state legal conclusions to which no response is required. To the extent that any further response is required, Trincastar **denies** the allegations in Paragraph 36.

37.    The Fairfield Sentry Six Year Initial Transfers, the Fairfield Sentry Two Year Initial Transfers, and the Fairfield Sentry Preference Period Initial Transfers are collectively defined as the "Fairfield Sentry Initial Transfers." Chart detailing these transfers are attached as Exhibits A and B.

**ANSWER:** Trincastar **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 37 and therefore **denies** such allegations.

38.    Pursuant to the Bankruptcy Court's June 7 and June 10, 2011 orders, the Bankruptcy Court approved a settlement among the Trustee, Fairfield Sentry, and others (the "Settlement Agreement"). As part of the Settlement Agreement, on July 13, 2011, the Bankruptcy Court entered a consent judgment granting the Trustee a judgment against Fairfield Sentry in the amount of $3,054,000,000. Fairfield Sentry is obligated to pay $70,000,000 to the Trustee under the terms of the Settlement Agreement.

**ANSWER:** Trincastar **admits** upon information and belief that the Court approved the settlement described in paragraph 38 of the Complaint and entered a judgment as described in paragraph 38 on or about the dates alleged therein, and **refers to** the referenced settlement agreement and the referenced judgment for their true and complete contents.

**B.    Subsequent Transfers From Fairfield Sentry To Defendant Trincaster**

39.    A portion of the Fairfield Sentry Initial Transfers was subsequently transferred either directly or indirectly to, or for the benefit of, Defendant Trincaster and is recoverable from Defendant Trincaster pursuant to section 550 of the Bankruptcy Code. Based on the Trustee's investigation to date, approximately $13,311,800 of the money transferred from BLMIS to Fairfield Sentry was subsequently transferred by Fairfield Sentry to Defendant Trincaster (the "Fairfield Sentry Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry Subsequent Transfers is attached as Exhibit C.

**ANSWER:** Trincastar **admits** that it received funds from Fairfield Sentry but **denies** that such funds were in the amounts identified in Exhibit C, **denies** that any of such funds constitute subsequent transfers of Customer Property or of any other property

transferred from BLMIS to Fairfield Sentry, and **denies** any remaining allegations of Paragraph 39.

40.    The Trustee's investigation is on-going and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, Fairfield Sentry Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER:**    Trincastar **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 40 and therefore **denies** such allegations and denies that the Trustee is entitled to any reservation of rights as stated in Paragraph 40.

<u>**COUNT ONE**</u>
**RECOVERY OF SUBSEQUENT TRANSFERS**
**11 U.S.C. §§ 550 AND 550(a)**

41.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

**ANSWER:**    Trincastar **incorporates by reference** its responses to the allegations contained in each of the previous paragraphs of this Complaint as if fully rewritten in this paragraph.

42.    Defendant Trincaster received the Fairfield Sentry Subsequent Transfers, totaling approximately $13,311,800, which are recoverable pursuant to section 550(a) of the Bankruptcy Code.

**ANSWER:**    Trincastar **avers** that the allegations in Paragraph 42 state legal conclusions to which no response is required. To the extent any further response is required, Trincastar **denies** the allegations in Paragraph 42.

43.    Each of the Fairfield Sentry Subsequent Transfers was made directly or indirectly to, or for the benefit of, Defendant Trincaster.

**ANSWER:**    Trincastar **denies** the allegations in Paragraph 43.

44.    Defendant Trincaster is an immediate or mediate transferee of the Fairfield Sentry Initial Transfers.

**ANSWER:**    Trincastar **denies** the allegations in Paragraph 44.

45.     As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Defendant Trincaster recovering the Fairfield Sentry Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**ANSWER:**    Trincastar **avers** that the allegations in Paragraph 45 state legal conclusions to which no response is required. To the extent any further response is required, Trincastar **denies** the allegations in Paragraph 45.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense
### (Personal Jurisdiction)

1.     This Court lacks personal jurisdiction over Trincastar with the respect to the claims asserted in the Complaint. Trincastar **does not consent** to a decision by this Court or to this Court's authority to hear and determine this action.

### Second Affirmative Defense
### (Failure to State a Claim for Relief)

2.     The Complaint fails to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable under Rule 7012(b) of the Federal Rules of Bankruptcy Procedure.

### Third Affirmative Defense
### (Section 550(b)—Value, Good Faith, Without Knowledge of Voidability: Fairfield Sentry
### Subsequent Transfers)

3.     To the extent, if any, that Trincastar received any Fairfield Sentry Subsequent Transfers, such Fairfield Sentry Subsequent Transfers may not be recovered because Trincastar took such Fairfield Sentry Subsequent Transfers for value and in good faith and without knowledge of the voidability of the Fairfield Sentry Initial Transfers within the meaning of 11 U.S.C. § 550(b).

4.     **Value.** To the extent, if any, that Trincastar received any Fairfield Sentry Subsequent Transfers, Trincastar took the Fairfield Sentry Subsequent Transfers in

exchange for Sentry's redemption of its own shares from Trincastar and therefore took for value.

5.      **Good Faith.** Trincastar began investing in Fairfield Sentry in 1993. At the time each of the Fairfield Sentry Subsequent Transfers was made, Trincastar understood that Fairfield Sentry invested in U.S. securities primarily through an account that Fairfield Sentry held at BLMIS and had reported consistent, positive, and generally above-market returns, that BLMIS was founded and operated by Bernard L. Madoff, that Madoff was a well-respected member of the investment community and former chair of NASDAQ, that BLMIS was one of the largest market makers in NASDAQ stocks and reported delivering consistently high returns on customer accounts that it managed, and that BLMIS claimed to use a split strike conversion strategy to obtain these results, which Trincastar did not then know to be false.

6.      To the extent, if any, that Trincastar received any Fairfield Sentry Subsequent Transfers, at the time each Fairfield Sentry Subsequent Transfers was made, Trincastar was aware of only the publicly available information about Fairfield Sentry and about BLMIS, including that some investment professionals had raised concerns about the transparency of BLMIS and the lack of separation between its asset management, brokerage, and custodian administration. On or before the date of the last of the Fairfield Sentry Subsequent Transfers (if any), Trincastar did not have access to non-public information regarding BLMIS. Trincastar handled its Fairfield Sentry account consistent with other industry professionals based on publicly known information about Fairfield Sentry and about BLMIS. None of the communications Trincastar had with Fairfield Sentry or its directors, officers, or employees or with BLMIS or any of its officers or employees on or before the date of the last of the Fairfield Sentry Subsequent Transfers (if any) revealed or suggested that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Fairfield Sentry or its directors,

16

officers, or employees suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

7.    At no time on or before the date of the last Fairfield Sentry Subsequent Transfers (if any) was any director, officer, employee, agent, or consultant of Trincastar aware that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Fairfield Sentry or its directors, officers, employees, agents, or consultants knew or suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

8.    The Fairfield Sentry Subsequent Transfers (if any) did not have a fraudulent purpose but were routine transfers in exchange for redemption of shares in Fairfield Sentry. A reasonable person with the facts in Trincastar's possession at the time of each of the Fairfield Sentry Subsequent Transfers (if any) would not have been on inquiry notice of any fraudulent purpose behind such Fairfield Sentry Subsequent Transfers nor would those facts have led such a person to conduct further inquiry into whether there was a fraudulent purpose to such Fairfield Sentry Subsequent Transfers or the Fairfield Sentry Initial Transfers or whether BLMIS was trading securities or was a fraud or a Ponzi scheme.

9.    A diligent inquiry by Trincastar would not have discovered that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Other entities with greater investigatory tools and resources than Trincastar, and with more access to BLMIS personnel and documentation than Trincastar, investigated BLMIS but failed to uncover that it was a Ponzi scheme before December 2008, including the SEC, which began an investigation into BLMIS in 2006 but did not determine BLMIS's fraudulent purpose. Trincastar did not have the capability of discovering what United States government regulators could not and would not have discovered as the fraudulent purpose of the Fairfield Sentry Initial Transfers or, if there were any fraudulent purpose of the Fairfield Sentry Subsequent Transfer (if any), of such fraudulent purpose, and as an entity without privity with BLMIS or Madoff, did not

17

have any reasonable ability to conduct a diligent investigation into BLMIS, including into its IA business, that could have led to a discovery of the fraudulent purpose of the Fairfield Sentry Initial Transfers.

10.    **Without Knowledge of the Voidability of the Fairfield Sentry Initial Transfers.** Trincastar did not have knowledge of the voidability of the Fairfield Sentry Initial Transfers when it received each of the Fairfield Sentry Subsequent Transfers (if any).

**Fourth Affirmative Defense**
(Non-Avoidability of Fairfield Sentry Six Year Initial Transfers Under Section 546(e)—
Settlement Payment)

11.    Under section 546(e) of the Bankruptcy Code, the Fairfield Sentry Six Year Transfers (excluding the Fairfield Sentry Two Year Transfers) are not avoidable because they were settlement payments, as defined in sections 101 or 741 of the Bankruptcy Code, made before the commencement of the case by or to (or for the benefit of) BLMIS, which was then a stockbroker, or Fairfield Sentry, which was then a financial institution or financial participant and, on information and belief, did not have actual knowledge that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Because the Fairfield Sentry Six Year Transfers (excluding the Fairfield Sentry Two Year Transfers) are not avoidable, property received by Trincastar (if any) as part of the Fairfield Sentry Six Year Transfers (excluding the Fairfield Sentry Two Year Transfers) is not recoverable from Trincastar. In addition, at the time of the transfer from Fairfield Sentry to Trincastar, Trincastar had no actual knowledge that BLMIS was not trading securities or that it was a fraud or a Ponzi scheme.

**Fifth Affirmative Defense**
(Non-Avoidability of Fairfield Sentry Six Year Transfers Under Section 546(e)—Securities
Contract)

12.    Under section 546(e) of the Bankruptcy Code, the Fairfield Sentry Six Year Transfers (excluding the Fairfield Sentry Two Year Transfers) were not avoided and are not

avoidable because they were transfers made before the commencement of the case by or to

(or for the benefit of) BLMIS, which was then a stockbroker, or Fairfield Sentry, which was

then a financial institution or financial participant, and, on information and belief, did not

have actual knowledge that BLMIS was not trading securities or was a fraud or a Ponzi

scheme, in connection with a securities contract, as defined in section 741(7) of the

Bankruptcy Code, between BLMIS and Fairfield Sentry or between Fairfield Sentry and

Trincastar. Because the Fairfield Sentry Six Year Transfers (excluding the Fairfield Sentry

Two Year Transfers) are not avoidable, property received by Trincastar (if any) as part of the

Fairfield Sentry Six Year Transfers (excluding the Fairfield Sentry Two Year Transfers) is

not recoverable from Trincastar. In addition, at the time of the transfer (if any) from Fairfield

Sentry to Trincastar, Trincastar had no actual knowledge that BLMIS was not trading

securities or that it was a fraud or a Ponzi scheme.

### Sixth Affirmative Defense
#### (Not Customer Property—Fairfield Sentry Initial Transfers)

13.    The property, if any, that Trincastar received from Fairfield Sentry was not

Customer Property, or proceeds of Customer Property, that BLMIS transferred to Fairfield

Sentry, and therefore the property is not recoverable by the Trustee from Trincastar.

### Seventh Affirmative Defense
#### (Proceeds Not Recoverable—Fairfield Sentry Initial Transfers)

14.    In the alternative, to the extent that the property, if any, that Trincastar

received from Fairfield Sentry was proceeds of Customer Property or other property that

BLMIS transferred to Fairfield Sentry, it is not recoverable by the Trustee from Trincastar

under section 550(a)(2) of the Bankruptcy Code.

## Eighth Affirmative Defense
### (Section 550(d)—Single Satisfaction—Fairfield Sentry Six Year Initial Transfers)

15.    Under section 550(d) of the Bankruptcy Code, the trustee may not recover any subsequent transfer from Trincastar to the extent he has recovered from Fairfield Sentry or any other immediate or mediate transferee the amount of the avoided initial transfer that included the Customer Property that the trustee alleges Trincastar received.

## Ninth Affirmative Defense
### (Section 550(d)—Single Satisfaction)

16.    Under section 550(d) of the Bankruptcy Code, the trustee may not recover any subsequent transfer from Trincastar to the extent BLMIS received from Fairfield Sentry the amount of any otherwise avoidable initial transfer that included the Customer Property that the trustee alleges Trincastar received.

## Tenth Affirmative Defense
### (Extraterritoriality)

17.    The Trustee's recovery from Trincastar of any transfer from Fairfield Sentry would constitute an impermissible extraterritorial application of U.S. law.

## Eleventh Affirmative Defense
### (Comity)

18.    The Trustee's recovery from Trincastar of any transfer from Fairfield Sentry would violate principles of comity.

## DEMAND FOR JURY TRIAL

Trincastar **does not consent** to issuance or entry of final orders or judgments by the Bankruptcy Court and **demands trial by jury** before the District Court of all issues that may be tried by a jury.

**WHEREFORE**, Trincastar prays that Plaintiff trustee take nothing by his complaint

and that the Court grant Trincastar such other relief, including an award of attorneys' fees,

costs, and disbursements, as may be just.


Dated: April 21, 2023                    Respectfully submitted,

                                         By: */s/ Richard Levin*

                                         JENNER & BLOCK LLP
                                         Richard Levin
                                         Carl Wedoff
                                         1155 Avenue of the Americas
                                         New York, NY 10036
                                         (212) 891-1600
                                         rlevin@jenner.com
                                         cwedoff@jenner.com

                                         Vincent E. Lazar
                                         353 N. Clark Street
                                         Chicago, IL 60654
                                         (312) 222-9350
                                         vlazar@jenner.com

                                         *Counsel for Defendant Trincastar Corporation*