**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br>　　　　　　　　Plaintiff-Applicant,<br><br>　　　v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br>　　　　　　　　Defendant. | Adv. Pro. No. 08-01789 (CGM)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated) |
| In re:<br>BERNARD L. MADOFF,<br>　　　　　　　　Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff,<br>　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>MISTRAL (SPC),<br><br>　　　　　　　　Defendant. | Adv. Pro. No. 12-01273 (CGM)<br><br>**ANSWER TO COMPLAINT AND JURY DEMAND** |

Defendant Mistral (SPC) ("Mistral"), by its undersigned attorneys, O'Melveny & Myers LLP hereby answers the Amended Complaint ("AC"). This Answer is based on information reasonably known to Mistral as of April 28, 2023. Mistral's investigation is ongoing, and as such, Mistral expressly reserves the right to seek to amend this Answer as may be necessary.

## PRELIMINARY STATEMENT

Except as otherwise expressly stated herein, Mistral denies each and every allegation in the AC, including, without limitation, any allegations contained in the AC's preamble, headings and subheadings (which are included herein for convenience and organizational purposes only), or footnotes, and denies any liability to the Trustee and to any party on whose behalf the Trustee

seeks recovery.  If Mistral inadvertently fails to respond to any allegations of the AC, they are

denied.

Pursuant to Rule 8(b)(6) of the Federal Rules of Civil Procedure, averments in the AC to

which no responsive pleading is required shall be deemed denied.

## RESPONSES TO SPECIFIC ALLEGATIONS

### I.    NATURE OF THE ACTION[1]

1.    This adversary proceeding is part of the Trustee's continuing
efforts to recover BLMIS "customer property," as defined by SIPA
§ 78*lll*( 4), that was stolen by BLMIS as part of the massive Ponzi
scheme perpetrated by Madoff and others.

**ANSWER:**  Mistral admits that the Trustee asserts that this action is part of an effort to

recover customer property lost in Bernard L. Madoff's Ponzi scheme.

2.    The Trustee seeks to recover at least $3,200,000 in
subsequent transfers of BLMIS customer property (the "Transfers")
made to Defendant. Defendant obtained the Transfers by redeeming
interests it held in BLMIS feeder fund Rye Select Broad Market
Portfolio Limited (*f/k/a* American Masters Broad Market Fund II
Limited) ("Rye Portfolio Limited"). BLMIS feeder funds were
entities that invested all or substantially all of their assets with
BLMIS's investment advisory business (the "IA Business").

**ANSWER:**  Mistral denies the allegations in Paragraph 2, except admits that it received

transfers from Rye Select Broad Market Portfolio Limited, and denies knowledge or information

sufficient to form a belief as to whether any of such funds constitute subsequent transfers of

Customer Property or of any other property.

3.    Defendant also invested in, and in certain cases received
transfers out of, other BLMIS feeder funds; such transfers are not
being sought in this Amended Complaint.

---

[1] Mistral deems the section headings in the AC not to constitute allegations of the AC.  To the extent any section
headings are allegations, Mistral admits or denies them consistent with its response to the allegations contained in
the numbered paragraphs of the AC.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3.

> 4.      Defendant is a proprietary hedge fund of, and is 100% indirectly owned and managed by, non-party Credit Suisse Group AG ("CS Group"). CS Group's affiliated companies, including Defendant, invested hundreds of millions of dollars with at least ten BLMIS feeder funds. This recovery action is one of several commenced by the Trustee for transfers received in connection with those investments.[2] At all relevant times, Defendant was part of the global Credit Suisse enterprise, a highly sophisticated financial organization consisting of CS Group and its subsidiaries, all of which operated under the master brand name "Credit Suisse" (with the enterprise collectively referred to herein as "Credit Suisse").

**ANSWER:** Mistral denies the allegations in Paragraph 4, except admits that (i) it was a tracking portfolio of the CSFB/Tremont Investable Hedge Fund Index; (ii) 100% of its equity interests were owned by Credit Suisse International during the relevant time period; (iii) Credit Suisse International is principally owned by Credit Suisse AG and Credit Suisse Group AG; and (iv) the Trustee has filed separate actions seeking to recover transfers in connection with investments in BLMIS feeder funds.

## II.    BACKGROUND, THE TRUSTEE AND STANDING

> 5.      On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission (the "SEC") commenced the District Court Proceeding.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 5, and therefore denies the allegations in Paragraph 5, except

---

[2] Other recovery actions commenced by the Trustee against Credit Suisse entities invested with BLMIS feeder funds include *Picard v. Credit Suisse AG, et al*. (Adv. Pro. No. 11-02925); *Picard v. Solon Capital, Ltd*. (Adv. Pro. No. 12-01025) (since dismissed); *Picard v. Zephyros, Ltd*. (Adv. Pro. No. 12-01278); *Picard v. Credit Suisse AG (as successor in interest to Clariden Leu AG and Bank Leu AG)* (Adv. Pro. No. 12-01676); and *Picard v. Trincastar Corporation* (Adv. Pro. No. 11-02731 ).  **ANSWER to FN 2:** Mistral admits the allegations in Footnote 2.

admits upon information and belief that Madoff was arrested on or around the Filing Date and that

the SEC filed a complaint against BLMIS.

> 6.      On December 15, 2008, under SIPA § 78eee(a)(4)(A), the
> SEC consented to combining its action with an application by the
> Securities Investor Protection Corporation ("SIPC"). Thereafter,
> under SIPA § 78eee(a)(4)(B), SIPC filed an application in the
> District Court alleging, among other things, that BLMIS could not
> meet its obligations to securities customers as they came due and its
> customers needed the protections afforded by SIPA.

**ANSWER:**  Mistral admits that on December 15, 2008, the SEC filed an Application in

*S.E.C. v. Madoff* and respectfully refers the Court to the SEC's Application for its full and correct

contents.

> 7.      Also on December 15, 2008, Judge Stanton granted SIPC's
> application and entered an order pursuant to SIPA, which, in
> pertinent part:
>
> (a) appointed the Trustee for the liquidation of the business of
>     BLMIS pursuant to SIPA § 78eee(b)(3); and\
>
> (b) removed the case to this Court pursuant to SIP A §
>     78eee(b)(4).

**ANSWER:**  Mistral admits that on December 15, 2008, the District Court entered an Order

and Protective Decree in *S.E.C. v. Madoff* and respectfully refers the Court to the District Court's

Order for its full and correct contents.

> 8.      By orders dated December 23, 2008 and February 4, 2009,
> respectively, this Court approved the Trustee's bond and found that
> the Trustee was a disinterested person. Accordingly, the Trustee is
> duly qualified to serve and act on behalf of the estate.

**ANSWER:**  Mistral (i) admits that on December 23, 2008 and February 4, 2009, this Court

entered Orders in *SIPC v. BLMIS*, Adv. Pro. No. 08-01789, and respectfully refers the Court to the

Orders for their full and correct contents, and (ii) avers that the allegations in the second sentence

of Paragraph 8 state legal conclusions to which no response is required; to the extent a response is

required, Mistral denies those allegations.

> 9.      On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

**ANSWER:** Mistral admits that on April 13, 2009, a petition was filed against Madoff, and

on June 9, 2009 this Court entered an Order in *SIPC v. BLMIS*, and respectfully refers the court to

the filings for their full and correct contents.

> 10.      At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

**ANSWER:** Mistral admits that on March 12, 2009, a Plea Allocution was entered in

*United States v. Madoff*, Case No. 09-CR-213, (DC) (S.D.N.Y. Mar. 12, 2009) (Docket No. 50),

and respectfully refers the Court to the Plea Allocution for its full and correct contents.

> 11.      On July 16, 2009, this Court entered an order granting the Trustee's motion to retain Windels Marx Lane & Mittendorf, LLP as special counsel on behalf of the consolidated estate, nunc pro tune as of June 9, 2009.

**ANSWER:** Mistral admits that on July 16, 2009 this Court entered an Order in *SIPC v.*

*BLMIS*, and respectfully refers the court to the Order for its full and correct contents.

> 12.      At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

**ANSWER:** Mistral admits that on August 11, 2009, the District Court entered a Minute Entry in *United States v. DiPascali*, Case No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009), and respectfully refers the Court to the Minute Entry for its full and correct contents.

> 13.    At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

**ANSWER:** Mistral admits that on November 21, 2011, the District Court entered a Stipulation and Order in *United States v. Kugel*, Case No. 10-CR-00228 (LTS) (S.D.N.Y. Nov. 21, 2011), and respectfully refers the Court to the Stipulation and Order for its full and correct contents.

> 14.    On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

**ANSWER:** Mistral admits that on March 24, 2014, the Federal Bureau of Investigation issued a press release regarding the convictions of Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara in connection with the BLMIS fraud, and respectfully refers the Court to the press release for its full and correct contents.

> 15.    As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIP A and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2( c )(1 ).

**ANSWER:** Mistral avers that the allegations in Paragraph 15 state legal conclusions to which no response is required. To the extent any further response is required, Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 and therefore denies such allegations.

> 16.     Pursuant to SIPA § 78fff-l(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIP A pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIP A pursuant to SIP A § 78fff(b ).

**ANSWER:** Mistral avers that the allegations in Paragraph 16 state legal conclusions to which no response is required.

> 17.     The Trustee has standing to bring the avoidance and recovery claims under SIP A § 78fff-l(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(l), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544,547,548, 550(a), and 551,and SIPA §§ 78fffl(a) and 78fff-2(c)(3).

**ANSWER:** Mistral avers that the allegations in Paragraph 17 state legal conclusions to which no response is required.

### III.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

#### A.    BLMIS

> 18.     Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker dealer with the SEC. In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company. At all relevant times, Madoff controlled BLMIS first as its sole member, and thereafter as its chairman and chief executive.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 and therefore denies those allegations.

19.    In compliance with 15 U.S.C. § 78o(b)(l) and SEC Rule 15bl-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008. Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation. At all times, BLMIS was assigned CRD No. 2625 . SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960. On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status. SIPC membership is contingent on registration of the broker-dealer with the SEC.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 and therefore denies those allegations.

20.    For most of its existence, BLMIS's principal place of business was 885 Third A venue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker-dealer operation, and the IA Business.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 and therefore denies those allegations.

21.    BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21 and therefore denies those allegations.

22.    For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 and therefore denies those allegations.

23.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

**ANSWER:**  Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 23 and therefore denies those allegations.

### B.     The Ponzi Scheme

24.     At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

**ANSWER:**  Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 24 and therefore denies those allegations.

25.     BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

**ANSWER:**  Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 25 and therefore denies those allegations.

26.     To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently

reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26 and therefore denies those allegations.

27.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC Form X-17 A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27 and therefore denies those allegations.

1.    Madoff's Investment Strategy

28.    In general, BLMIS purported to execute two primary investment strategies for BLMIS customers: the convertible arbitrage strategy and the split-strike conversion strategy (the "SSC Strategy"). For a limited group of BLMIS customers, primarily consisting of Madoffs close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit. At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28 and therefore denies those allegations.

29.    All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoffs proprietary trading business.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 29 and therefore denies those allegations.

> 30. The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets. Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time. In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 30 and therefore denies those allegations.

> 31. From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 31 and therefore denies those allegations.

> 32. BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 32 and therefore denies those allegations.

> 33. By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the- money S&P 100 Index put options; and, (iii) the sale of out-of-the-money S&P 100 Index call options.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 33 and therefore denies those allegations.

> 34. The put options were to limit the downside risk of sizeable price changes in the basket. The exercise of put options could not

tum losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option should have entailed a loss for BLMIS.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34 and therefore denies those allegations.

35.    The sale of call options would partially offset the costs associated with acquiring puts, but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35 and therefore denies those allegations.

36.    The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protection while limiting the upside.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36 and therefore denies those allegations.

37.    If Madoff was putting on the same baskets of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold, had to equal the market value of the equities in the basket. For example, to properly implement a collar to hedge the $11. 7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff s sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37 and therefore denies those allegations.

38.    Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the SSC Strategy.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 38 and therefore denies those allegations.

39. Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 39 and therefore denies those allegations.

### 2. BLMIS's Fee Structure

40. BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees .

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 40 and therefore denies those allegations.

### 3. BLMIS's Market Timing

41. Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he succeeded at market timing by intermittently entering and exiting the market. During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in U.S. Treasury securities ("Treasury Bills") or mutual funds invested in Treasury Bills.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 41 and therefore denies those allegations.

42. As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed,

among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42 and therefore denies those allegations.

43.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43 and therefore denies those allegations.

4.    BLMIS Execution

44.    BLMIS's execution showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44 and therefore denies those allegations.

5.    No Evidence of BLMIS Trading

45.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45 and therefore denies those allegations.

46.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100

Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 46 and therefore denies those allegations.

### 6.    The Collapse of the Ponzi Scheme

47.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 47 and therefore denies those allegations.

48.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 48 and therefore denies those allegations.

49.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 49 and therefore denies those allegations.

### IV.    DEFENDANT

50.    Defendant is a corporate entity organized under the laws of the Cayman Islands and has its registered address at MaplesFS Limited, P.O. Box 1093, Queensgate House, 113 South Church Street, Cayman Islands. Defendant shared its registered address with other entities, including another proprietary hedge fund owned and operated by Credit Suisse, Zephyros Limited ("Zephyros").

**ANSWER:** Mistral admits the allegations in Paragraph 50.

51.    Defendant was a segregated portfolio company formed by Credit Suisse in September 2004 as a proprietary investment vehicle. As of at least 2015 and upon information and belief, at all relevant times, Defendant was 100% directly owned by Credit Suisse International and indirectly owned 100% by CS Group. At all relevant times, Defendant was a hedge fund of funds managed by New York-based Credit Suisse Index Co., Inc. (f/k/a Credit Suisse First Boston Index Co., Inc.) (the "CS Manager"), a Delaware corporation. The CS Manager's officers were shared with other Credit Suisse subsidiaries, based in Credit Suisse's New York offices at 11 Madison A venue.

**ANSWER:**  Mistral denies the allegations in Paragraph 51, except admits that (i) it was a segregated portfolio company registered in September 2004; (ii) 100% of its equity interests were owned by Credit Suisse International during the relevant time period; (iii) Credit Suisse International is principally owned by Credit Suisse AG and Credit Suisse Group AG; (iv) it was an index tracking portfolio managed by Credit Suisse Index Co., Inc. (f/k/a Credit Suisse First Boston Index Co., Inc.) and Tremont Capital Management Inc. during the relevant time period; (v) Credit Suisse Index Co., LLC (f/k/a Credit Suisse Index Co., Inc.) is a Delaware limited liability company; and (vi) Credit Suisse Index Co., Inc.'s principal place of business was located at 11 Madison Avenue, New York, NY 10010.

52.    Defendant had no employees of its own and its only operations were its investments, which consisted of BLMIS feeder funds and other hedge funds tracked by a prominent hedge fund index known as the Credit Suisse/Tremont Hedge Fund Index (*f/k/a* CSFB/Tremont Hedge Fund Index) (the "CS/Tremont Index").

**ANSWER:**  Mistral denies the allegations in Paragraph 52, except admits that it had no employees and that it functioned as an index tracking portfolio for the CS/Tremont Index, which itself tracked hedge funds.

53.    The CS/Tremont Index was, as announced in a 1999 Credit Suisse press release, a joint venture between Credit Suisse and Tremont Group Holdings, Inc. (f/k/a Tremont Capital Management, Inc. f/k/a Tremont Advisers, Inc., "Tremont Group" and together with affiliates, including Tremont Partners, Inc. "Tremont Partners,"

collectively "Tremont") formed and thereafter owned by Credit
Suisse Tremont Index LLC (the "CS/Tremont Partnership"), a
Delaware limited liability company. The CS Manager and New
York-based Tremont Group jointly operated the CS/Tremont Index,
including jointly selecting the funds for inclusion and reviewing,
analyzing and reporting on the funds' performance.

**ANSWER:** Mistral denies the allegations in Paragraph 53, except admits that (i) on

November 16, 1999 Credit Suisse announced the launch of the CS/Tremont Index in a press

release; (ii) Credit Suisse First Boston Tremont Index LLC was a joint venture between Credit

Suisse First Boston Index Co., Inc. and Tremont Capital Management, Inc.; and (iii) personnel

from Credit Suisse First Boston Index Co., Inc. and Tremont Capital Management, Inc. operated

the CS/Tremont Index including by constructing and calculating the Index and managing its

portfolios.  Mistral respectfully refers the Court to the press release for its full and correct contents.

54.     Defendant's purpose was to provide investors with a vehicle
to invest in hedge funds tracked by the CS/Tremont Index. Credit
Suisse created funds such as Defendant, Zephyros and Solon
Capital, Ltd. ("Solon") -all operated by the CS Manager from New
York-specifically to invest in funds that were tracked by the
CS/Tremont Index. The chart below details the relationships
between Defendant, CS Group, the CS Manager, and the
CS/Tremont Partnership:



**ANSWER:** Mistral denies the allegations in Paragraph 54, except admits (i) that it was a

tracking portfolio of the CSFB/Tremont Investable Hedge Fund Index; (ii) that Zephyros Ltd., and

Solon Capital, Ltd. were also tracking portfolios of the CSFB/Tremont Investable Hedge Fund

Index; and (iii) that Mistral, Zephyros, and Solon were managed by Credit Suisse Index Co., Inc.

(f/k/a Credit Suisse First Boston Index Co., Inc.) and Tremont Capital Management Inc. during

the relevant time period.

## V.    SUBJECT MATTER JURISDICTION AND VENUE

> 55.    This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities & Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al*., No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) and (e)(l), and SIPA §§ 78eee(b)(2)(A) and (b)(4).

**ANSWER:**  Mistral avers that the allegations in the last sentence of Paragraph 55 state

legal conclusions to which no response is required; to the extent a response is required, Mistral

denies those allegations. Mistral admits the remaining allegations in Paragraph 55.

> 56.    This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (F), (H) and (0). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

**ANSWER:**  Mistral denies the allegations in Paragraph 56.  Mistral does not consent to

issuance or entry of final orders or judgments by the Bankruptcy Court and demands trial by jury

of all issues that may be tried by a jury.

> 57.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

**ANSWER:**  Mistral admits the allegations in Paragraph 57.

> 58.    This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

**ANSWER:** Mistral avers that the allegations in Paragraph 58 state legal conclusions to which no response is required.

## VI.    PERSONAL JURISDICTION

59.    Defendant is subject to the jurisdiction of this Court pursuant to Bankruptcy Rule 7004 and the United States Constitution, as well as section 302 of the New York Civil Practice Law and Rules because Defendant purposely availed itself of the laws and protections of the United States and the State of New York.

**ANSWER:** Mistral avers that the allegations in Paragraph 59 state legal conclusions to which no response is required. To the extent any response is required, Mistral denies the allegations in Paragraph 59.

60.    The Trustee's claims against Defendant arise from business it transacted within New York. Defendant derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

**ANSWER:** Mistral avers that the allegations in Paragraph 60 state legal conclusions to which no response is required. To the extent any response is required, Mistral denies the allegations in Paragraph 60.

61.    All of Defendant's operations took place in New York. Although organized and registered under the laws of the Cayman Islands, Defendant had no meaningful business operations in the Cayman Islands or elsewhere. As an exempt company under the Cayman Islands Companies Law, Defendant was prohibited from soliciting investors in the Cayman Islands.

**ANSWER:** Mistral denies the allegations in Paragraph 61, except admits that Mistral is organized and registered under the laws of the Cayman Islands, and that its business operations were conducted in New York during the relevant time period.

62.    At all relevant times, Defendant was managed by the New York-based CS Manager. Defendant's only business activities were its investments, which the CS Manager managed using personnel located at Credit Suisse's New York headquarters.

**ANSWER:** Mistral denies the allegations in Paragraph 62, except admits (i) that it was managed by Credit Suisse Index Co., Inc. (f/k/a Credit Suisse First Boston Index Co., Inc.) and Tremont Capital Management Inc. through their joint venture company, Credit Suisse First Boston Tremont Index LLC, during the relevant time period; and (ii) that Credit Suisse First Boston Tremont Index LLC was headquartered at 11 Madison Avenue, New York, NY.

> 63.    The CS/Tremont Partnership marketed the CS/Tremont Index and its underlying fund products-which included Defendant, Zephyros and Solon-from Credit Suisse' s New York headquarters.

**ANSWER:** Mistral denies the allegations in Paragraph 63, except admits (i) that Credit Suisse First Boston Tremont Index LLC constructed and calculated the CS/Tremont Index; (ii) that Credit Suisse Index Co., Inc. (f/k/a Credit Suisse First Boston Index Co., Inc.) and Tremont Capital Management Inc. managed index tracker portfolios including Mistral, Zephyros, and Solon; and (iii) that Credit Suisse First Boston Tremont Index LLC was headquartered at 11 Madison Avenue, New York, NY.

> 64.    KPMG annually audited Defendant in New York based on financial information provided by Credit Suisse personnel operating Defendant in New York.

**ANSWER:** Mistral denies the allegations in Paragraph 64, except admits that KPMG audited Mistral during the relevant time period.

> 65.    Defendant knowingly directed funds to be invested with New York-based BLMIS and knowingly received subsequent transfers of customer property from BLMIS.

**ANSWER:** Mistral denies the allegations in Paragraph 65.

> 66.    Defendant knowingly directed funds to be invested with, and then redeemed from, New York-based BLMIS via Rye Portfolio Limited. New York-based Tremont Group, a Delaware corporation, created, owned, managed and operated the Rye Select family of

BLMIS feeder funds[3] out of Rye, New York, including Rye
Portfolio Limited. Tremont's employees in New York spoke openly
with their investors about their funds being invested with BLMIS
and regularly referred to the Rye Select Funds as "our Madoff fund"
or as a Madoff "feeder." An email to Tremont from a New York-
based Credit Suisse representative who was operating Defendant
referred to Rye Portfolio Limited as "the Bernie Maddof [sic] fund."

**ANSWER:** Mistral denies the allegations in Paragraph 66, except denies knowledge or

information sufficient to form a belief as to the truth of the allegations regarding Tremont or Rye.

**ANSWER:**

67.    Defendant also directed funds to be invested with BLMIS
via Kingate Global Fund Limited ("Kingate Global"), a BLMIS
feeder fund co-managed by Tremont. In a 2006 email, a New York-
based Credit Suisse employee operating Defendant indicated his
team's view that Rye Portfolio Limited and Kingate Global were
"essentially the same fund" but with "different managers."

**ANSWER:** Because the Trustee has dismissed the claim against Mistral relating to

transfers from BLMIS to the Kingate Funds, as set forth in the So-Ordered Stipulation in this

adversary proceeding entered January 19, 2017, ECF 69, no response to the allegations in

Paragraph 67 is required.  To the extent any response is required, Mistral denies the allegations of

Paragraph 67.

68.    By directing its investments to BLMIS through Rye
Portfolio Limited and Kingate Global, Defendant knowingly
accepted the rights, benefits, and privileges of conducting business
and/or transactions in the United States and New York.

**ANSWER:** Mistral avers that the allegations in Paragraph 68 state legal conclusions to

which no response is required.  To the extent a response is required, Mistral denies the allegations

in Paragraph 68.

---

[3] Rye Select Broad Market Fund LP (*f/k/a* American Masters Broad Market Fund, L.P.), Rye Select Broad Market
Prime Fund LP (*f/k/a* American Masters Broad Market Prime Fund, L.P.), and Rye Portfolio Limited (collectively,
the "Rye Select Funds").  **ANSWER** to FN 3: Mistral denies knowledge or information sufficient to form a belief as
to the truth of the allegations in Footnote 3.

69.     Tremont Group, Tremont's holding company, was Defendant's primary contact for Rye Portfolio Limited. The New York-based Credit Suisse personnel operating Defendant and co-operating the CS/Tremont Index regularly communicated with and received information from New York-based Tremont executives in connection with Defendant's Rye Portfolio Limited investments.

**ANSWER:**  Mistral denies the allegations in Paragraph 69, except admits that it was managed by Credit Suisse Index Co., Inc. (f/k/a Credit Suisse First Boston Index Co., Inc.) and Tremont Capital Management Inc. during the relevant time period, and that personnel from both companies performed functions that included the management of Mistral.

70.     The Credit Suisse personnel operating Defendant regularly transacted and corresponded with Tremont personnel, and monitored and reviewed documents related to BLMIS and Rye Portfolio Limited, on Defendant's behalf from Credit Suisse's New York headquarters.

**ANSWER:**  Mistral denies the allegations in Paragraph 70, except admits that it was managed by Credit Suisse Index Co., Inc. (f/k/a Credit Suisse First Boston Index Co., Inc.) and Tremont Capital Management Inc. during the relevant time period, and that personnel from both companies performed functions that included the management of Mistral.

71.     Credit Suisse executives and employees, including those operating Defendant, also met with representatives of BLMIS feeder funds in New York periodically from as early as 2000 through 2008, which included visits to Tremont's New York offices as well as a meeting with Madoff himself at BLMIS's office. As members of groups, committees, and/or business lines within Credit Suisse that oversaw and had responsibility for the organization's BLMIS feeder fund investments, including for Defendant, these Credit Suisse personnel acted on behalf of CS Group, its subsidiaries and affiliates- including Defendant.

**ANSWER:**  Mistral denies the allegations in Paragraph 71.

72.     Defendant signed a subscription agreement each time it invested in Rye Portfolio Limited, in which it affirmed having received and read the fund's prospectus. The prospectus provided that the fund's assets would be invested with a manager using the SSC Strategy. Rye Portfolio Limited investors were also informed

by the Rye Select Funds' due diligence questionnaires ("DDQs") that the Rye Select Funds traded in the "U.S. equity market" and related equity index options, and that cash would be held in "U.S. short term treasury bills." The Rye Select Funds' PPMs and prospectuses confirmed that custody of the securities held on behalf of the Rye Select Funds would be held in "a brokerage account with an NASO registered broker dealer" (i.e. BLMIS). Rye Portfolio Limited investors, including Defendant, knew that a redemption from this account should have resulted in the investment manager liquidating U.S. securities.

**ANSWER:** Mistral denies the allegations in Paragraph 72, except admits that Fortis Bank (Cayman) Limited, in its role as custodian for Mistral and pursuant to the Master Custodian Services Agreement between the parties, signed one or more subscription agreements with Rye Portfolio Limited, and denies that paragraph 72 provides a complete, accurate, in-context description of such agreement(s) or the related private placement memorandums or prospectuses and respectfully refers the Court to those documents for a complete, accurate, in-context description of their contents.

73.    The Transfers themselves also occurred in the United States and New York.

**ANSWER:** Mistral denies the allegations in Paragraph 73.

74.    Defendant received at least two redemptions from Rye Portfolio Limited, which comprise the totality of the transfers sought herein. Defendant designated and used a bank account at the Northern Trust International Banking Corporation in the U.S. (the "U.S. Account") to receive at least one, and upon information and belief, both, redemption payments from Rye Portfolio Limited.

**ANSWER:** Mistral denies the allegations in Paragraph 74, except admits that it received at least two redemption payments from Rye Portfolio Limited, and that Fortis Bank (Cayman) Limited, in its role as custodian for Mistral and pursuant to the Master Custodian Services Agreement between the parties, designated and used a bank account at the Northern Trust International Banking Corporation to receive redemption payments on Mistral's behalf.

75.     Defendant also designated and used the U.S. Account to make subscription payments to Rye Portfolio Limited.

**ANSWER:** Mistral denies the allegations in Paragraph 75, except admits that Fortis Bank (Cayman) Limited, in its role as custodian for Mistral and pursuant to the Master Custodian Services Agreement between the parties, designated and used a bank account at the Northern Trust International Banking Corporation to make subscription payments on Mistral's behalf.

76.     Prior to fall of 2006, Rye Portfolio Limited used a U.S. correspondent bank account at Citibank, N .A. in New York to receive subscription payments from its investors including Defendant, which sent its subscriptions during this period. The moneys were then ultimately deposited into BLMIS's account at JPMorgan Chase Bank in New York.

**ANSWER:** Mistral denies the allegations in Paragraph 76, except admits that Rye Portfolio Limited designated and used a bank account at Citibank, N.A. to receive subscription payments from investors during the relevant time period.

77.     Beginning in the fall of 2006, Rye Portfolio Limited used a U.S. bank account at Bank of New York in New York to send redemptions to its investors, including Defendant.

**ANSWER:** Mistral denies the allegations in Paragraph 77, except admits that Rye Portfolio Limited designated and used a bank account at Bank of New York to receive subscription payments from investors during the relevant time period and that Bank of New York acted as custodian for Rye Portfolio Limited with respect to cash during the relevant time period.

**VII.    TREMONT KNEW THAT BLMIS'S IA BUSINESS WAS A FRAUD**

78.     On December 7, 2010, the Trustee commenced an adversary proceeding against, among others, Tremont Group, Tremont Partners, and several Tremont funds invested wholly or in part with BLMIS (including Rye Portfolio Limited and, collectively, the "Tremont Feeder Funds"), seeking to avoid and recover $2.1 billion of initial transfers from BLMIS that constitute customer property

under SIPA (the "Tremont Complaint").[4] The Trustee incorporates by reference the factual allegations in the Tremont Complaint, as supplemented below.

**ANSWER:**  Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in each and every paragraph of the Tremont Complaint filed in the Tremont Action that allegedly supports the claim that any initial transfers of Customer Property to Rye are or were avoided or avoidable, and objects to the incorporation by reference of, and therefore does not answer, each and every paragraph and allegation in the Tremont Complaint in the Tremont Action and to the inclusion in this adversary proceeding of any issue implicated in the Tremont Complaint in the Tremont Action other than the issue of the avoidance or avoidability of the initial transfers of Customer Property; Mistral nevertheless reserves the right to rely on and introduce any allegations in the referenced "Tremont Complaint" or its exhibits as opposing party admissions admissible for the truth of their contents.  To the extent any further response is required, Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 78 and therefore denies those allegations except admits that on December 7, 2010, the Trustee filed a Complaint in *Picard v. Tremont Group Holdings, Inc., et al.* (In re Bernard L. Madoff Inv. Secs., LLC) ("Tremont Action"), Adv. Pro. No. 10-05310, ECF No. 1 (Bankr. S.D.N.Y. Dec. 7, 2010), and respectfully refers the Court to the Trustee's Complaint for its full and correct contents.

79.    Tremont created, managed, and operated a number of feeder funds that invested directly and indirectly with BLMIS, including Rye Portfolio Limited.

---

[4] *Picard v. Tremont Group Holdings, Inc., et al. (In re Bernard L. Madoff Inv. Secs., LLC)*, Adv. Pro. No. 10-05310, ECF No. 1 (Banla. S.D.N.Y. Dec. 7, 2010). *See* the Tremont Complaint at ¶ 2 for the full names of the defendants. **ANSWER** to FN 4: Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in ¶ 2 of the Tremont Complaint.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 79, and therefore denies those allegations.

> 80.    In a September 22, 2011 order, this Court approved a
> settlement between the Trustee and more than a dozen of the
> Tremont Feeder Funds, Tremont and its affiliates, and a former
> Tremont chief executive (collectively, the "Tremont Settling
> Defendants") that obligated the Tremont Settling Defendants
> collectively to pay the Trustee $1 . 025 billion for the benefit of the
> customer property estate (the "Tremont Settlement"). The Tremont
> Settlement also provides that the transfers made to the Tremont
> Feeder Funds were "deemed avoided."

**ANSWER:** Mistral admits that on September 22, 2011, this court Ordered a settlement in

*Picard v. Tremont Group Holdings, Inc., et al*. and respectfully refers the Court to the Order for

its full and correct contents.

### A.    Tremont's Senior Executives Had a Close Relationship with Madoff

> 81.    Sandra Manzke founded Tremont in the mid-1980s and first
> met Madoff in or around 1991. Until her departure in 2004, Manzke
> served as Tremont's CEO and then co-CEO, helping to select money
> managers, including Madoff. Robert Schulman joined Tremont in
> 1994 and held various high-level positions, including President, co-
> CEO, and ultimately sole CEO.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 81, and therefore denies those allegations.

> 82.    Manzke and Schulman met and had regular calls with both
> Madoff and his top lieutenant Frank DiPascali. Schulman had a
> special relationship with Madoff, which Tremont described as its
> "competitive edge." In fact, Tremont touted Schulman's unusually
> close relationship with Madoff, stating that his "long-standing
> relationships with the principals of our existing managers [BLMIS
> listed first among them] is clearly an edge over any firm
> contemplating a similar business as our ability to negotiate
> preferential terms is related directly to the strength and longevity of
> the relationships." Emphasizing Schulman's special relationship
> with Madoff, in 2003, Tremont told its auditor, Ernst & Young
> ("E&Y") about Schulman's unique access to BLMIS, including that
> "Bob Schulman periodically visits [BLMIS's] facilities throughout
> the year .... " At least once, Madoff even sought Schulman's advice

26

on hiring decisions at BLMIS. In June 2006, Tremont Vice President Chris Cichella explained to a potential investor that Schulman was "intimately familiar" with Madoffbased on "a 10+ year relationship."

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 82, and therefore denies those allegations.

83.    Investors took notice of the relationship between Schulman and Madoff. For example, a prospective investor had a call with Tremont in May 2007 where he referenced the "friendly relationship between Bob and Bernie." He also noted that, "[f]or Tremont, it goes back to the relationship .... Bob has been there many times and has worked w/ Bernie is [sic] business since the 1980s."

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 83, and therefore denies those allegations.

### B.    Tremont Received Repeated, Direct Fraud Warnings About BLMIS's Investment Advisory Business

84.    Tremont received warnings of BLMIS's fraudulent IA Business from clients as early as April 2001, when an investor in two of the Tremont Feeder Funds wrote to Schulman: "I know you are sick of answering this but man is it hot out there with the Bernie fraud rumors." The investor questioned why Madoff "need[ ed] to go to cash at year-end every year" and used such a "small" firm as its auditor.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 84, and therefore denies those allegations.

85.    Less than a month later, Tremont became aware of the *Barron's* and *MARHedge* articles questioning the legitimacy of BLMIS's IA Business and identifying Tremont as offering BLMIS feeder funds to its clients. On May 7, 2001, Tremont Group's Chief Operating Officer (and later President) Barry Colvin emailed a number of Tremont employees alerting them to the articles and instructing them to direct third party questions to Tremont's management.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 85, and therefore denies those allegations.

86.     On April 25, 2003, sales vice president Jim Mitchell relayed to Schulman a discussion Mitchell had with an investor about "associating Madoff with broker-dealer wrongdoing of late." The following month, Mitchell, Schulman, and the investor visited Madoff. The investor's meeting notes (which he shared with Tremont) characterized Madoffs operation as "controversial" and expressed numerous concerns that included: (i) Madoff s unwillingness to meet with investors; (ii) BLMIS's lack of management fees; (iii) Madoffs going to cash at every year end; (iv) the absence of a third party custodian; and (v) BLMIS's "exceptionally stable" returns "with only 7 negative months since 1990."

**ANSWER:**  Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 86, and therefore denies those allegations.

87.     Mitchell retained these notes and years later forwarded them to Tremont vice president and manager responsible for product line management and oversight, Darren Johnston, cautioning: "Don't attach this - but it's an interesting set of notes from a meeting years back ...."

**ANSWER:**  Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 87, and therefore denies those allegations.

88.     In March 2004, the investor who emailed Schulman in 2001 about the "Bernie fraud rumors" emailed him again, this time to redeem his Tremont Feeder Fund investments, explaining:

My motivation for doing this is not due to some new buzz out there for as you know that is a constant din but rather that I can no longer ignore my core instincts as an investor in which I have the [sic] battle the fact that I really don't know what is going on, what a [sic] do know is I am in an investment program that no one else in history has been able to make work, return series is flat out too good given how efficient the underlying securities are priced and he doesn't charge a fee all compounded by it seems every stone I turn over is another multi billion $ [M]adoff feeder. I ... found that my inability to rationalize & be intellectually honest on why I was invested bothered me more than it has in the past ....

**ANSWER:**  Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 88, and therefore denies those allegations.

89.    When Madoffs scheme collapsed, that investor circulated an email among certain of his employees with the subject header "HOLY SH## ! ! ! ! ! ! ! ! ! ! ! ! ! ! ! ! ! ! ! ! ! ! THE WORLD IS NOW RIGHT ! ! ! " and wrote that "Bob Schulman & all the feeder groups could be going to jail over this .... " (Emphasis in original.)

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 89, and therefore denies those allegations.

90.    In May 2004, Cichella emailed Tremont senior vice president Rob Rosenbaum that investment advisory firm RogersCasey (where Tremont personnel, including Manzke, previously worked) was "concerned about Tremont's relationship with Madoff' and would thus recommend that its client not invest with Tremont. Cichella said RogersCasey would not reconsider its position because BLMIS "was prone to a blow-up that would destabilize Tremont .... " Analyzing Tremont for a prospective institutional investor in 2005, the investor's representative James Purnell raised concerns to Tremont's head of Product Management and Investment Advisory board member Stuart Pologe about what he dubbed "the Madoffblack box" including, among other things, whether BLMIS's assets were segregated and being verified by a third party, how Madoff is paid, and whether any written Tremont materials exist mentioning Madoff ( the response was that there were none and there never would be). After Madoff s arrest and the revelation of the fraud, a former coworker of Purnell emailed him and boasted that they were "finally vindicated on Madoff. If it looks too good to be true .... "

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 90, and therefore denies those allegations.

91.    In March 2007, representatives from Tremont's potential client, Agile Group ("Agile"), met with Johnston, product management senior vice president Patrick Kelly, and portfolio manager Brian Marsh as part of its due diligence. Agile's notes from the meeting (the "Agile Notes") reflect that Agile peppered Tremont with numerous questions regarding operational and trading anomalies indicating fraud at BLMIS or its reporting fictional trades. This included queries about its auditors, the lack of information on options trading, identity of counterparties to the purported options transactions, BLMIS's AUM, BLMIS's inexplicable use of paper trade tickets and account statements, the inability to verify BLMIS's assets, and BLMIS's going in and out

of the market in large transactions with no overall effect on the market for the securities it purportedly traded.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 91, and therefore denies those allegations.

92.    The Agile Notes reflect that Agile and Tremont discussed whether BLMIS's IA Business was a fraud and perhaps even a Ponzi scheme. Agile pointed out in the meeting how the fraud would be easy if BLMIS's auditor did "not work so hard" and if the "few key people" operating the IA Business were involved. During the discussion, it was deduced that, "[ e ]ither Madoff owns what he owns or they are fictitious. But if it is a Ponzi scheme, every dollar profit has been realized."

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 92, and therefore denies those allegations.

93.    A month later, Agile employee Mariah Quish sent Tremont follow-up questions concerning BLMIS. Addressing Agile's request, Johnston instructed internally: "We should give answers by phone rather than email .... " After speaking with Johnston and Tremont's vice president of investor services Harry Hodges, Quish reported she found Tremont's "level of secrecy combined with a faith-based view on Madoff difficult to understand."

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 93, and therefore denies those allegations.

94.    In May 2007, Cichella, who worked closely with Johnston and Hodges, forwarded to himself the May 2001 *Barron's* article.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 94, and therefore denies those allegations.

95.    Between 2005 and 2008, three major banks that provided leverage to the Tremont Feeder Funds each saw significant fraud risks associated with BLMIS, and each demanded and received from Tremont extraordinary contractual rights in an attempt to mitigate those risks, such as indemnification for fraud at BLMIS and special redemption rights if Madoff came under investigation for breach of securities laws. As communicated by one such provider, Citibank, to Tremont, Madoffs lack of third party controls and how he

executes his volume of options were, in Johnston's words, "fundamental roadblocks" to Citibank's senior risk management people.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 95, and therefore denies those allegations.

96.    Tremont continued to receive warnings that Madoffs trading was not real as late as October 2008, when Tremont sales representative Adrian Gordon reported to Johnston, Marsh, and Mitchell that a prospective institutional investor was "loathe to give his stamp of approval to [Madoffs] strategy when he has no idea what trades actually take place." A month later, Gordon emailed the Tremont global sales team that another potential investor was "very anti Madoff" and said Madoffwas "probably a pyramid structure." That same month, Cichella once again pulled out the May 2001 *Barron's* article, this time forwarding it to Mitchell, stating, "Enjoy!"

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 96, and therefore denies those allegations.

### C.    Tremont's Own Reporting Showed That BLMIS's Purported Trades Were Impossible

97.    Despite exempting BLMIS from the due diligence it conducted on other managers, Tremont regularly received from BLMIS customer statements, trade tickets, and other information containing an abundance of facts demonstrating that BLMIS reported fictitious trades and that the fraud warnings it received were well founded. Tremont created reports and marketing materials of its own highlighting the impossible trading and performance. For example, Tremont knew from the monthly analytic summaries its senior management prepared based on these BLMIS documents that the positions and prices BLMIS reported differed from prices Bloomberg reported. Tremont's auditor, KPMG, similarly found and reported to Tremont more than 20 such differences in 2006 alone.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 97, and therefore denies those allegations.

98.    Tremont also estimated in its reports the amount BLMIS had in AUM and calculated whether or not there was sufficient volume

31

in each instrument for Madoffto be able to execute such trades. Given that Tremont knew BLMIS had "well in excess of $20 billion" in AUM by May 2003, and that according to Johnston it "monitored all trade activity," Tremont knew there was insufficient volume for dozens, if not hundreds of the trades Madoff purported to complete.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 98, and therefore denies those allegations.

### D.    Tremont Exempted BLMIS From Its High Due Diligence Standards

99.    The majority of Tremont's business involved placing its clients' assets with third-party managers. For managers other than Madoff, Tremont implemented due diligence procedures, investigated the quality of the management personnel, assessed key risk factors associated with the investment, and continuously monitored the investment and the managers.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 99, and therefore denies those allegations.

100.    As a sophisticated manager with industry-leading due diligence standards, Tremont positioned itself at the forefront of initiatives to improve monitoring of investment managers in light of frauds that preceded Madoff Tremont claimed that its comprehensive operational risk evaluation served to mitigate any possibility of misrepresentation or fraudulent activity.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 100, and therefore denies those allegations.

101.    Despite these claims and all of the fraud warnings, Tremont exempted BLMIS from its due diligence standards. In fact, Tremont's executives deliberately prevented transparency into Madoff and BLMIS throughout the Tremont-BLMIS relationship. To ensure that Tremont's employees did not conduct any meaningful due diligence on BLMIS and Madoff, Mitchell laid out in an email three of the most critical questions about Madoff s operations "ya don't ask" about: (1) BLMIS's AUM, (2) how Madoff generated his returns, and (3) Madoffs auditors.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 101, and therefore denies those allegations.

> 102.    According to the SEC-which investigated Tremont after Madoffs arrest-Schulman personally conducted due diligence on Madoff, which was an "outlier" in Tremont's procedures as applied to other managers. The SEC concluded that because "Schulman conducted the due diligence, he would be able to control what areas and information [were] reviewed or not reviewed."

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 102, and therefore denies those allegations.

> 103.    Tremont also did not conduct due diligence on Friehling & Horowitz. Rather, as the SEC found, Tremont's due diligence materials "did not reveal any evidence of conversations with Madoffs auditors." In 2007, Tremont even admitted to Agile that someone from Tremont "anonymously drop[ped] by" Friehling & Horowitz's strip-mall office, just "to make sure they exist."

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 103, and therefore denies those allegations.

> 104.    In an unusually candid response to one strategic consulting firm, Pologe admitted that Tremont had "no manager due dili[gence] process for" its BLMIS investments and referred to Tremont's dealings with BLMIS as "a highly vulnerable, highly profitable business." Pologe noted: "We make a lot of money off this, though."

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 104, and therefore denies those allegations.

### E.    BLMIS Failed Tremont's Requirements for Third-Party Oversight Yet Tremont Made an Exception for Madoff

> 105.    Tremont' s due diligence standards considered independent oversight of its outside managers to be critical. Tremont, however, knowingly made BLMIS an exception to its requirement of third-party oversight of its money managers.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 105, and therefore denies those allegations.

106.    For example, in June 2008, Tremont rejected a potential manager because, as stated in an internal memo, a "key part of any due diligence process is being able to verify the information provided by the Fund with independent parties, in this instance there aren't any independent parties to speak with to verify what the partners of [the fund] are doing."

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 106, and therefore denies those allegations.

107.    The SEC also found Tremont had rejected another outside money manager because of a lack of operational infrastructure and the presence of only one person who was responsible for all operational duties. Yet, the SEC noted, Tremont continued its investment with BLMIS, although "all operational guidelines with respect to trading and execution were controlled by one individual."

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 107, and therefore denies those allegations.

108.    Tremont executives were unwilling to respond in writing to investors' questions about third-party asset verification. This included at least one pointed question from an investor who asked Mitchell, because the BLMIS account statements were "generated by Madoff, how do I get comfort that the money is really there?" This investor also stated, "the accounting firm [Friehling & Horowitz] doing the audit being a small firm made me a bit uneasy." Mitchell took the conversation off-line, replying, "What is your telephone number?"

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 108, and therefore denies those allegations.

109.    Dealing with another investor question about asset verification, Johnston emailed Cichella that this would "lead closer to BLMIS which [Tremont] strictly wants to avoid." Cichella replied: "Keep in mind, they are looking for independent ( of [Tremont] or Madoff) verification of the assets in a tangible form. . .. it would be great if you could convince them" that the assets existed.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 109, and therefore denies those allegations.

34

110.    On or about October 1, 2008, Tremont personnel met with the managers of BLMIS feeder fund Fairfield Sentry concerning a possible investment with BLMIS through Fairfield Sentry, which Tremont understood operated in the same manner as its own BLMIS feeder funds . Tremont's notes acknowledged that Fairfield Sentry did not satisfy Tremont's due diligence requirements, including lack of independent oversight at BLMIS, no third-party prime broker, and Friehling & Horowitz's "material percentage of their annual revenue from Madoff." Evidencing that BLMIS feeder funds did not meet Tremont's usual due diligence standards and were fraught with red flags, the potential Fairfield Sentry investment was referred up the ladder for "an exception approval from the Investment Committee."

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 110, and therefore denies those allegations.

### F.    Tremont Consistently Shielded Madoff From Third Party Due Diligence

111.    Tremont consistently shielded Madoff from questions by third parties conducting their own due diligence on BLMIS, calling it "Firm policy" not to provide access. On January 24, 2004, Mitchell asked Schulman whether a potential client could visit Madoff. Schulman responded: "They cannot and WILL NOT VISIT MADOFF please make it clear that this is OFF the table." (Emphasis in original.)

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 111, and therefore denies those allegations.

112.    In 2005, when Purnell was questioning Pologe about Madoff, Pologe forwarded the questions to Tremont executive Suzanne Hammond, who at first responded "Do not go any further" and then sent a second response, copying Schulman, stating "I hope you have a confidentially [ sp] agreement," before sending vague, one word answers to the questions.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 112, and therefore denies those allegations.

113.    On June 16, 2006, Mitchell, after being informed that an investor had been "relentless on meeting Bernie," emailed Tremont investment relationship assistant vice president Roy Soares, "[o]ur

own analysts don't get to see Madoff-why should [investors]." In swap agreements with three banks providing leverage, Tremont included the provision that if a bank contacted Madoff, Tremont had the right to cancel the swap without paying an early termination fee.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 113, and therefore denies those allegations.

114.    In 2008, Darren Johnston reported internally that he "made absolutely clear" to a major financial institution that it was not to contact Madoff s auditor and that "we do not offer up assistance to investors with Bernie, his staff or his auditor."

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 114, and therefore denies those allegations.

115.    Later in 2008, Mitchell was especially careful about not letting a large new potential investor speak to Madoff, internally acknowledging that "I suspect they will want a meeting, being institutional. We should discourage this .... " Another Tremont employee relayed this to the investor and assured others internally that "this would never happen and we told [the investor] that we have never had an on site meeting with a client and BM."

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 115, and therefore denies those allegations.

116.    Tremont even restricted which of its employees could contact BLMIS. In a September 2002 email, the message was relayed internally: "DON'T SEND ANY CORRESPONDENCE TO BERNARD MADOFF. ONLY [Tremont executives Soares, Schulman and Hammond] ARE ALLOWED TO SEND ANYTHING TO HIM!" (Emphasis in original.)

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 116, and therefore denies those allegations.

117.    Tremont also refused to allow its administrator to receive the Tremont Feeder Fund customer statements and trade tickets directly from BLMIS, as Tremont arranged with its other managers. Tremont also intervened to limit contact between Madoff and Tremont's auditor, E&Y. In May 2006, internal Tremont emails discussing E&Y's request for BLMIS's "internal control letter" and

questioning whether an audit report was prepared for Madoff, revealed that Tremont acted as the go-between "[t]o keep the minimum amount of people contacting Madoff." In so doing, Tremont also misled E&Y, telling it that "Bob Schulman periodically visits [BLMIS's] facilities throughout the year and watches the company trade according to their highly secret strategy"-an obvious fiction given that BLMIS' s IA Business never executed any trades.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 117, and therefore denies those allegations.

118.    This deliberate shielding of Madoff continued when Tremont replaced E& Y with KPMG and reported to potential clients that, other than minimal verification, "there is no contact" between KPMG and BLMIS.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 118, and therefore denies those allegations.

119.    Tremont also lied to investors when presented with concerns about BLMIS's auditors. As set forth in a 2006 internal memo, Tremont's top investment managers knew that Friehling & Horowitz was a "small firm" that was "not specialized in investment firms [ and] broker/dealers." Nevertheless, Johnston and others from Tremont told Agile that Friehling & Horowitz was "usually a name you hear [with] medium size broker dealers."

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 119, and therefore denies those allegations.

### G.    Tremont Avoided Questions and Fabricated Answers About BLMIS's Purported Options Trading

120.    Tremont's senior management knew that the options trades were a central part of the SSC Strategy and were well aware of how the options trading for the strategy worked. In fact, Schulman bragged internally that he taught Madoff how to trade options. Nevertheless, in response to evidence on the face of BLMIS trade tickets that included suspect options trading, Tremont tried to explain away these issues by giving inconsistent and false explanations.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 120, and therefore denies those allegations.

1.    <u>Divergent Answers on Over-the-Counter/Listed Trading Questions</u>

121.    As described in the Tremont Complaint, Tremont knew that Madoff could not be trading options over-the-counter ("OTC") as he represented, in light of (i) the CUSIP numbers on BLMIS's trade confirmations, which indicated the options were traded on an exchange, and (ii) the lack of counterparty information that should be on all OTC trade confirmations.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 121, and therefore denies those allegations.

122.    Tremont also knew that Madoff had not entered into any ISDA agreements with any counterparties-a basic requirement for all OTC options trades.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 122, and therefore denies those allegations.

123.    Rather than openly acknowledge the options trading impossibilities-which were clear from the trade tickets that Tremont analyzed-Tremont would flip-flop on the question of whether BLMIS traded options OTC or traded them on the Chicago Board Options Exchange.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 123, and therefore denies those allegations.

124.    For example, a November 2006 DDQ for one of the Tremont Feeder Funds stated that "options [] are traded on a recognized exchange." In contrast, in November 2007, in response to a statement by HSBC Bank that it was under the impression that BLMIS traded options OTC, Johnston wrote, "our understanding is also that they are OTC." On yet another occasion, Rye Broad Market's July 2007 DDQ equivocated, stating options "may be either listed or OTC."

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 124, and therefore denies those allegations.

125.    As set forth in the Agile Notes, Tremont told Agile in 2007 that Madoff used both OTC and listed options for his strategy, and that Madoff has used OTC options since the beginning. Tremont even went so far as to make up a rationale for Madoff s use of one or the other, telling Agile that Madoff will go to listed options depending on price and that most of the time OTC options have a better price.

**ANSWER:**  Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 125, and therefore denies those allegations.

> 2.    Failure to Conduct Any Diligence on Purported Options Counterparties and Covering Up the Truth with Fabrications

126.    Tremont failed to conduct any diligence on the lack of OTC counterparties on BLMIS's trade confirmations, because it knew there was no legitimate explanation.

**ANSWER:**  Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 126, and therefore denies those allegations.

127.    Tremont senior management stated on certain occasions that Madoff purportedly traded options with the counterparties as agent for the Tremont Feeder Funds. This meant that the Tremont Feeder Funds, not BLMIS, bore the risks involved with trading and settling with those purported counterparties.

**ANSWER:**  Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 127, and therefore denies those allegations.

128.    Tremont senior management knew it had to conduct counterparty due diligence to insulate against default risk. A JPMorgan Chase ("JPM") representative even pointed out to Johnston that the trading counterparties should all have been known to Tremont if Madoff supposedly traded in the name of the account holder (i.e., Tremont's BLMIS Feeder Funds), and not in BLMIS's name. But Tremont never spoke with a single counterparty for Madoffs purported options trading, because there were none.

**ANSWER:**  Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 128, and therefore denies those allegations.

129.    Tremont instead covered up for Madoff s fabrications with fabrications of its own, which changed depending on who was asking. In a March 24, 2006 email, Kelly told Schulman that Citi, one of Tremont's leverage providers, had "asked around" and could not "find anyone who admit[ted] to being [BLMIS's] counterparty." Schulman replied, "He [Madoff] has not disclosed [any counterparty names] to us." Kelly nevertheless later told Agile that Schulman "has seen the counterparty names - he just does not want to disclose it."

**ANSWER:**  Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 129, and therefore denies those allegations.

130.    In October 2006, Soares emailed Fortis Bank, relaying information provided by Schulman that one of the Tremont Feeder Funds had 12 counterparties, "which Madoff must use in relation to his put options trades." Schulman, however, later admitted in sworn testimony that Tremont had never tried to identify any purported counterparties.

**ANSWER:**  Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 130, and therefore denies those allegations.

131.    In a June 2007 email, Kelly told JPM, which was considering a Tremont Feeder Fund investment, that "we do know the [counterparties'] general characteristics such as number and minimum credit rating." A month later, Mitchell told a different investor, "[o]ption counterparties are typical banks," and named JPM-who had just inquired on the identity of the counterparties-as one of them.

**ANSWER:**  Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 131, and therefore denies those allegations.

132.    In April 2008, Johnston told consultant Albourne Partners ("Albourne")-itself in the process of conducting diligence on Tremont Feeder Funds for its clients-that Tremont "has checked with counterparties to make sure they are trading with the Investment Advisor [BLMIS] in the relevant instruments."

**ANSWER:**  Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 132, and therefore denies those allegations.

133.    In October 2008, Alboume emailed Johnston twice, asking about Tremont's counterparty exposure to "MS [Morgan Stanley] or GS [Goldman Sachs]." Johnston "confirm[ ed] that Tremont had "[ a ]bsolutely no exposure" to those companies, which did not make any sense in light of prior statements unless Johnston knew Madoff was not trading options as he purported.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 133, and therefore denies those allegations.

134.    The September 2008 collapse of Lehman Brothers Inc. and its affiliates and subsidiaries (collectively, "Lehman")---one of the largest OTC derivatives counterparts at the time-led to industry and investor panic. Many Tremont clients worried about their Lehman exposure, in light of BLMIS's purported billions of dollars in options holdings.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 134, and therefore denies those allegations.

135.    By contrast, Tremont's senior management was seemingly unconcerned from the outset by these monumental events. They knew that if BLMIS's OTC options positions were real, a crash of a major options counterparty would have catastrophic effects on the Tremont Feeder Funds. For example, in 2007, Mitchell detailed to an investor how, if a counterparty to an options trade such as Bear Steams defaulted, "then the option (otc) is gone."

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 135, and therefore denies those allegations.

136.    Tremont worked to avoid discussions with investors regarding the Lehman collapse. To one client trying to assess its Lehman exposure and exposure to other potentially precariously positioned counterparties, Johnston simply stated, "We are not responding to this ."

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 136, and therefore denies those allegations.

137.    Mitchell crafted an answer to investors asking whether the Tremont Feeder Funds had Lehman risk, stating internally that "the line we should follow is that ... [w]e do not discuss our counterparty

arrangements as we are contractually bound not to." In reply, Johnston went a step further, indicating his certainty that the "answer is 'no exposure' ."

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 137, and therefore denies those allegations.

138.    These statements were misleading by implying Tremont knew of actual counterparty arrangements and could assure the investors that Tremont's counterparties presented no risk. If Tremont's senior management believed its BLMIS options were real, however, the Lehman collapse would have been more than a non-event.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 138, and therefore denies those allegations.

### H.    Tremont's Executives Had a Powerful Motive to Hide What They Knew About BLMIS and Madoff

139.    Tremont's profitability and, as it turned out, its very existence, depended on BLMIS. Tremont and the Tremont Feeder Funds benefitted from BLMIS's incredibly consistent, positive returns, which enhanced their investment track records and ability to attract business partners and clients. This led to the Tremont Feeder Funds' AUM increasing rapidly. For example, from its inception in January 1994 to November 2008, Rye Broad Market's AUM increased from $5 .9 million to approximately $2.35 billion, a 400-fold increase.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 139, and therefore denies those allegations.

140.    Tremont's revenues grew along with its AUM; during this period, Tremont received at least $255 million in fees from its BLMIS-facing products.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 140, and therefore denies those allegations.

141.    Chief Financial Officer Lynn Keeshan noted that Tremont was "highly dependent" on Madoff, which accounted for "all of the profits of the firm." Cichella said Rye Prime Fund's "only reason

for being is as a $2b feeder into Madoff." Pologe said BLMIS was Tremont's "crack addiction business."

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 141, and therefore denies those allegations.

142.    Tremont's parent company concluded that "the economics of Tremont's business [was] Madoff." Tremont did nothing more to earn its fees through its Tremont Feeder Funds than provide access to BLMIS. Pologe acknowledged Tremont "just sell[s] access [to BLMIS] for 2% management fee .... We make a lot of money off this." As Schulman told Mitchell, for some customers, on top of the management fee, Tremont levied "a 50 basis point surcharge for them to access Madoff."

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 142, and therefore denies those allegations.

143.    Fees were a powerful reason for funds like Tremont to close their eyes and hide what they knew about BLMIS's fraud. As noted by Albourne in late 2008, "[w]e have been advised by some of the [funds invested in BLMIS] that they are not interested in knowing more about the product due to the fees they are earning on the product."

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 143, and therefore denies those allegations.

**I.    Tremont Co-Managed Kingate Global**

144.    Tremont also had knowledge of Madoffs fraud based on its tight-knit relationship with the Kingate-related feeder funds and management. [5]

---

[5] The factual allegations in the Trustee's Fourth Amended Complaint against Kingate Global and concerning the role of Kingate Management Limited are incorporated by reference. *Picard v. Ceretti, et al. (In re Bernard L. Madoff Inv. Secs., LLC)*, Adv. Pro. No. 09-01161 (CGM) (Bankr. S.D.N.Y.) (ECF No. 100). **ANSWER** to FN 5: Mistral denies the allegations in FN 5, except (a) admits that the Trustee filed an action styled as *Picard v. Ceretti, et al. (In re Bernard L. Madoff Inv. Secs., LLC)*, Adv. Pro. No. 09-01161 (CGM), (b) denies knowledge or information sufficient to form a belief as to the truth of the allegations in each and every paragraph of the Trustee's Fourth Amended Complaint against Kingate Global that allegedly supports the claim that Tremont had knowledge of Madoff's fraud, and (c) objects to the incorporation by reference of, and therefore does not answer, each and every other paragraph and allegation in the Fourth Amended Complaint and to the inclusion in this adversary proceeding of any issue implicated by this Complaint; Mistral nevertheless reserves the right to rely on and introduce any allegations in the referenced Fourth Amended Complaint or its exhibits as opposing party admissions admissible for

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 144, and therefore denies those allegations.

145.    From the inception of their respective BLMIS investment accounts, Federico Ceretti and Carlo Grosso worked closely with Manzke to create Kingate Global and its manager, Kingate Management Limited (collectively, "Kingate").

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 145, and therefore denies those allegations.

146.    Manzke introduced Ceretti and Grosso to Madoff in 1993 and worked with Ceretti and Grosso as a Kingate Global director and manager from 1995 until 2004.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 146, and therefore denies those allegations.

147.    The Tremont-Kingate relationship continued through the revelation of Madoffs fraud. Kingate Global was co-managed by Kingate Management and Tremont affiliate Tremont (Bermuda) Ltd. ("Tremont Bermuda")-an entity described by Manzke as "a pass through," which delegated management responsibilities to Tremont in New York and shared officers and directors with Tremont Partners, including Schulman and Manzke. Specifically, in or around March 1995, Kingate Management and Tremont executed a co-manager agreement with Kingate Global. Pursuant to the agreement, Kingate Management and Tremont Bermuda were tasked with evaluating and monitoring BLMIS and providing necessary management services to Kingate Global. Manzke and Hammond were listed as "principal decision-makers" in May 2005.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 147, and therefore denies those allegations.

148.    As part of this deal, Kingate Management and Tremont Bermuda also split Kingate Global's management fees, which provided Tremont with significant revenue. Between 1998 and

---

the truth of their contents. To the extent any further response is required, Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Footnote 5 and Paragraph 144 and therefore denies such allegations.

2008, Tremont received over $40 million in fees for funneling investor assets to Kingate Global.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 148, and therefore denies those allegations.

149.    Tremont Bermuda and Kingate Management were co-agents to Kingate Global through their conduct and the operation of the various agreements entered into between the parties. As such, Kingate's knowledge that BLMIS's IA Business was a fraud may be imputed to Tremont.[6]

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 149, and therefore denies those allegations.

## VIII.    RECOVERY OF SUBSEQUENT TRANSFERS TO DEFENDANT

### A.    Initial Transfers from BLMIS to Rye Portfolio Limited

150.    As discussed above, the Trustee commenced a separate adversary proceeding against Rye Portfolio Limited and other funds directly or indirectly invested with BLMIS that were managed by Tremont, seeking to avoid and recover initial transfers of customer property from BLMIS in the amount of $2,140,297,364.

**ANSWER:** Mistral denies the allegations in Paragraph 150, except admits that the Trustee

filed an action styled as *Picard v. Tremont Group Holdings, Inc., et al.* (*In re Bernard L. Madoff*

*Inv. Secs., LLC*) ("Tremont Action"), Adv. Pro. No. 10-05310, ECF No. 1 (Banla. S.D.N.Y. Dec.

7, 2010), and respectfully refers the Court to the Trustee's Complaint for its full and correct

contents.

151.    Also as discussed above, by the Order dated September 22, 2011, this Court approved the Tremont Settlement, under which the Trustee received a settlement payment of $1,025,000,000. The Tremont Settlement specifically states that transfers to subsequent

---

[6] *See Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-1161 (CGM), 2015 WL 4734749, at *13 (Banla. S.D.N.Y. Aug. 11, 2015). **ANSWER** to FN 6: Mistral respectfully refers the Court to the Court's Order in *Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-1161 (CGM), 2015 WL 4734749, at *13 (Banla. S.D.N.Y. Aug. 11, 2015), for its full and correct contents.

transfer defendants were not recovered with the partial payment by
the Tremont Settling Defendants.

**ANSWER:** Mistral admits that on September 22, 2011, this court Ordered a settlement in

*Picard v. Tremont Group Holdings, Inc., et al*. and respectfully refers the Court to the Order for

its full and correct contents.

> 152.    From the inception of Rye Portfolio Limited's account with
> BLMIS to the Filing Date, BLMIS made transfers to Rye Portfolio
> Limited of approximately $620,000,000 (the "Initial Transfers"). Of
> the Initial Transfers, $609,000,000 was transferred to Rye Portfolio
> Limited, Account Number 1FR080, during the six years preceding
> the Filing Date (the "Six Year Transfers"). The Six Year Transfers
> are avoidable under section 544 of the Bankruptcy Code, applicable
> provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279,
> and of SIPA, particularly § 78fff-2( c )(3).

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in the first two sentences of Paragraph 152 and therefore denies those

allegations.   The remaining allegations in Paragraph 152 state legal conclusions to which no

response is required.   To the extent that any further response is required, Mistral denies the

allegations in Paragraph 152.

> 153.    Of the Six Year Transfers, $350,000,000 was transferred to
> Rye Portfolio Limited during the two years preceding the Filing
> Date (the "Two Year Transfers"). The Two Year Transfers are
> avoidable under section 548 of the Bankruptcy Code and applicable
> provisions of SIP A, particularly § 78fff-2( c )(3 ).

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the

truth of the allegations in the first sentence of Paragraph 153 and therefore denies those allegations.

The remaining allegations in Paragraph 153 state legal conclusions to which no response is

required.   To the extent that any further response is required, Mistral denies the allegations in

Paragraph 153.

> 154.    As alleged above in paragraphs 78-149, Rye Portfolio
> Limited received each of the Initial Transfers with actual knowledge

of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Rye Portfolio Limited to inquire further into the BLMIS fraud. *See also* Proffered Second Amended Complaint, *Picard v. HSBC Bank PLC, et al.*, Adv. Pro. No. 09-1364 (CGM), ECF No. 399, ,r,r 425-467 (Bankr. S.D.N.Y. filed June 26, 2015) (detailing Tremont's relationship with BLMIS).

**ANSWER:** Mistral avers that the allegations in Paragraph 154 state legal conclusions to which no response is required.

155.   Charts setting forth the Initial Transfers are included as Exhibits A and B. The Initial Transfers were and continue to be customer property within the meaning of SIP A § 78*lll*(4).

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 155 and therefore denies those allegations.

### B.   Subsequent Transfers from Rye Portfolio Limited to Defendant

156.   Prior to the Filing Date, Rye Portfolio Limited subsequently transferred a portion of the Initial Transfers to Defendant (the Transfers, as defined above). Based on the Trustee's investigation to date, the Transfers to Defendant total at least $3,200,000. A chart setting forth the presently known Transfers is attached as Exhibit C.

**ANSWER:** Mistral denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 156 and therefore denies such allegations, except admits that it received funds from Rye, but denies that such funds were in the amounts identified in Exhibit C, and denies knowledge or information sufficient to form a belief as to whether any of such funds constitute subsequent transfers of Customer Property.

157.   On April 5, 2012, the Trustee filed this action seeking recovery of the Transfers.

**ANSWER:** Mistral admits that on April 5, 2012 the Trustee filed a Complaint initiating this lawsuit, and respectfully refers the Court to the Complaint for its full and correct contents.

158.   The Transfers are recoverable from Defendant under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly§ 78fff-2(c)(3).

**ANSWER:** The allegations in Paragraph 158 state legal conclusions to which no response is required. To the extent that any further response is required, Mistral denies the allegations in Paragraph 158.

> 159. The Transfers represent a redemption of equity interests by Defendant as a shareholder in Rye Portfolio Limited. Because Rye Portfolio Limited invested all or substantially all of its assets into the BLMIS Ponzi scheme, Rye Portfolio Limited was insolvent when it made the Transfers to Defendant upon redemption of its interests.

**ANSWER:** Mistral denies the allegations in Paragraph 159, and denies knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 159 and therefore denies such allegations.

> 160. The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the initial and subsequent transfers discussed above, and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

**ANSWER:** Mistral avers that Paragraph 160 includes no factual allegations, and thus no response is required. To the extent a response is required, Mistral denies the allegations of paragraph 160.

**COUNT ONE**
**RECOVERY OF THE SUBSEQUENT TRANSFERS**
**11 U.S.C. §§ 105(a) AND 550(a)**

> 161. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

**ANSWER:** Mistral incorporates by reference its responses to the allegations contained in each of the previous paragraphs of this AC as if fully rewritten in this paragraph.

> 162. The Transfers are recoverable from Defendant under 11 U.S.C. § 550(a) and SIPA § 78fff-2(c)(3).

**ANSWER:** Mistral avers that the allegations in Paragraph 162 state legal conclusions to which no response is required. To the extent any further response is required, Mistral denies the allegations in Paragraph 162.

163.    Defendant is the immediate or mediate transferee of the Transfers.

**ANSWER:** Mistral denies the allegations in Paragraph 163.

164.    As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and SIP A § 78fff-2( c )(3 ), the Trustee is entitled to a judgment against Defendant: (a) recovering the Transfers, or the value thereof, from Defendant for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**ANSWER:** Mistral denies the allegations in Paragraph 164.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on Count One in favor of the Trustee and against Defendant as follows:

a) Recovering the Transfers, or the value thereof, from Defendant for the benefit of the estate;

b) If Defendant challenges the avoidability of the Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such transfers are avoidable pursuant to SIPA § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and §§ 273-279 of the N.Y. Debt. & Cred. Law, as applicable, and as necessary to recover the Transfers pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3);

c) Awarding the Trustee prejudgment interest from the date on which the Transfers were received by Defendant; and

d) Awarding the Trustee fees and all applicable costs and disbursements, and such other, further, and different relief as the Court deems just, proper, and equitable.

**RESPONSE TO REQUEST FOR RELIEF**

The allegations contained in Plaintiff's request for relief are legal conclusions to which no response is required.  To the extent a response is required, Mistral denies the allegations and denies that Plaintiff is entitled to the relief requested.

**DEFENSES**

**First Defense**

**(Failure to State A Claim for Relief)**

Count one of the AC fails to state a claim upon which relief can be granted, including for each of the reasons stated in Mistral's Motion To Dismiss the AC, filed on August 15, 2022 in this adversary proceeding, ECF No. 119, and proceedings thereon.

**Second Defense**

**(Mere Conduit/Lack of Dominion or Control – Rye Portfolio Limited Subsequent Transfers)**

The Trustee's claims are barred under the "mere conduit" defense, because Mistral was not a transferee of the Rye Portfolio Limited Subsequent Transfers.  *See Finley v. Alexander (In re Finley)*, 130 F.3d 52, 57 (2d Cir. 1997).  To the extent Mistral received any Rye Portfolio Limited Subsequent Transfers, Mistral (a) received each Rye Portfolio Limited Subsequent Transfers in good faith, in a nominee capacity, and for the account and benefit of one or more of its customers, (b) did not have dominion or control or the right to assert dominion or control over the Rye Portfolio Limited Subsequent Transfers or the proceeds thereof or to use the Rye Portfolio Limited Subsequent Transfers or the proceeds thereof for its own purposes, (c) was a mere conduit for its customers, and (d) was obligated to credit the Rye Portfolio Limited Subsequent Transfers to the account and for the benefit of one or more of its customers, who alone had the right to assert

50

dominion and control over the Rye Portfolio Limited Subsequent Transfers received by Mistral

for their benefit.

### Third Defense

### (Section 550(b)—Value, Good Faith, Without Knowledge of Voidability: Rye Portfolio Limited Subsequent Transfers)

To the extent, if any, that Mistral received any Rye Portfolio Limited Subsequent Transfers,

such Rye Portfolio Limited Subsequent Transfers may not be recovered because Mistral took such

Rye Portfolio Limited Subsequent Transfers for value and in good faith and without knowledge of

the voidability of the Rye Portfolio Limited Initial Transfers within the meaning of 11 U.S.C. §

550(b).

*Value*. To the extent, if any, that Mistral received any Rye Portfolio Limited Subsequent

Transfers, Mistral took the Rye Portfolio Limited Subsequent Transfers in exchange for Rye

Portfolio Limited's redemption of its own shares from Mistral and therefore took for value.

*Good Faith.* To the extent, if any, that Mistral received any Rye Portfolio Limited

Subsequent Transfers, at the time each Rye Portfolio Limited Subsequent Transfers was made,

Mistral was aware only of the publicly available information about Rye Portfolio Limited and

about BLMIS, including that some investment professionals had raised concerns about the

transparency of BLMIS and the lack of separation between its asset management, brokerage, and

custodian administration. On or before the date of the last of the Rye Portfolio Limited Subsequent

Transfers (if any), Mistral did not have access to non-public information regarding BLMIS.

Mistral handled its Rye Portfolio Limited account consistently with other industry professionals

based on publicly known information about Rye Portfolio Limited and about BLMIS. To the best

of its knowledge, none of the communications Mistral had with Rye Portfolio Limited or its

directors, officers, or employees or with BLMIS or any of its officers or employees on or before

51

the date of the last of the Rye Portfolio Limited Subsequent Transfers (if any) revealed or suggested that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Rye Portfolio Limited or its directors, officers, or employees suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

To the best of Mistral's knowledge, at no time on or before the date of the last Rye Portfolio Limited Subsequent Transfers (if any) was any director, officer, employee, agent, or consultant of Mistral aware that BLMIS was not trading securities or was a fraud or a Ponzi scheme or that Rye Portfolio Limited or its directors, officers, employees, agents, or consultants knew or suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

The Rye Portfolio Limited Subsequent Transfers (if any) did not have a fraudulent purpose but were routine transfers in exchange for redemption of shares in the Rye Portfolio Limited. A reasonable person with the facts in Mistral's possession when each of the Rye Portfolio Limited Subsequent Transfers (if any) occurred would not have been on inquiry notice of any fraudulent purpose behind such Rye Portfolio Limited Subsequent Transfers nor would those facts have led such a person to conduct further inquiry into whether there was a fraudulent purpose to such Rye Portfolio Limited Subsequent Transfers or the Rye Initial Transfers or whether BLMIS was trading securities or was a fraud or a Ponzi scheme.

A diligent inquiry by Mistral would not have discovered that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Other entities with greater investigatory tools and resources than Mistral, and with more access to BLMIS personnel and documentation than Mistral, investigated BLMIS but failed to uncover that it was a Ponzi scheme before December 2008, including the SEC, which began an investigation into BLMIS in 2006 but could not determine BLMIS's fraudulent purpose. Mistral did not have the capability of discovering what United States

government regulators could not and would not have discovered as the fraudulent purpose of the Rye Initial Transfers or, if there were any fraudulent purpose of the Rye Portfolio Limited Subsequent Transfers (if any), of such fraudulent purpose, and as an entity without privity with BLMIS or Madoff before the opening, did not have any reasonable ability to conduct a diligent investigation into the BLMIS, including into its IA business, that could have led to a discovery of the fraudulent purpose of the Rye Initial Transfers.

*Without Knowledge of the Voidability of the Fairfield Initial Transfers.* Mistral did not have knowledge of the voidability of the Rye Initial Transfers when it received each of the Rye Portfolio Limited Subsequent Transfers (if any).

### Fourth Defense

### (Not Customer Property—Rye Initial Transfers)

The property, if any, that Mistral received from the Rye Funds was not Customer Property, or proceeds of Customer Property, that BLMIS transferred to the Rye Funds, and therefore the property is not recoverable by the Trustee from Mistral.

### Fifth Defense

### (Proceeds Not Recoverable—Rye Initial Transfers)

In the alternative, to the extent that the property, if any, that Mistral received from the Rye Funds was proceeds of Customer Property or other property that BLMIS transferred to the Rye Funds, it is not recoverable by the Trustee from Mistral under Bankruptcy Code section 550(a)(2).

### Sixth Defense

### (Section 550(d)—Single Satisfaction Six-Year Transfers)

Under Bankruptcy Code section 550(d), the trustee may not recover any subsequent transfer from Mistral to the extent he has recovered from the Rye Funds or any other immediate

or mediate transferee the amount of the avoided initial transfer that included the customer property that the trustee alleges Mistral received.

## Seventh Defense

## (Extraterritoriality)

The Trustee's recovery from Mistral of any transfer from the Rye Funds constitute an impermissible extraterritorial application of U.S. law.

## Eighth Defense

## (Comity)

The Trustee's recovery from Mistral of any transfer from the Rye Funds would violate principles of comity.

## DEMAND FOR JURY TRIAL

Mistral does not consent to issuance or entry of final orders or judgments by the Bankruptcy Court and demands trial by jury before the District Court of all issues that may be tried by a jury.

*[Prayer and Signature Page follow on next page]*

Date:   April 28, 2023                          **O'MELVENY & MYERS LLP**
        New York, New York

                                        By:  */s/ William J. Sushon*
                                             William J. Sushon
                                             Daniel S. Shamah
                                             Kayla N. Haran
                                             7 Times Square
                                             New York, New York 10036
                                             Telephone:  (212) 326-2000
                                             Facsimile:  (212) 326-2061
                                             wsushon@omm.com
                                             dshamah@omm.com
                                             kharan@omm.com

                                        *Attorneys for Mistral (SPC)*