**WUERSCH & GERING LLP**
Gregory F. Hauser
Jascha D. Preuss
100 Wall Street, 10th Floor
New York, New York 10005
Telephone: (212) 509-5050
gregory.hauser@wg-law.com
jascha.preuss@wg-law.com
*Counsel for Defendant LGT Bank*
*(Switzerland) Ltd. as successor in*
*interest to Dresdner Bank (Schweiz) AG*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | **Adv. Pro. No. 08-01789 (CGM)** |
| *Plaintiff-Applicant*, | **SIPA Liquidation** |
| -v- | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | **(Substantively Consolidated)** |
| *Defendant.* | |

In re:

BERNARD L. MADOFF,

      *Debtor.*

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities and the Chapter 7 Estate of Bernard L. Madoff, | **Adv. Pro. No. 12-01577 (CGM)** |
| *Plaintiff*, | **ANSWER TO AMENDED COMPLAINT AND JURY DEMAND** |
| -v- | |
| UBS EUROPE SE, formerly known as UBS Deutschland AG, as successor in interest to Dresdner Bank Lateinamerika AG, and LGT BANK (SWITZERLAND) LTD. as successor in interest to Dresdner Bank (Schweiz) AG, | |
| *Defendants*. | |

Defendant LGT Bank (Switzerland) Ltd. ("Defendant" or "LGT Switzerland"), as successor in interest to Dresdner Bank (Schweiz) AG ("Dresdner Schweiz"), by and through its undersigned counsel, Wuersch & Gering LLP, as and for its Answer (the "Answer") to the Amended Complaint (the "Amended Complaint" or "Am. Compl.") of Plaintiff Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC (the "Trustee" or "Plaintiff"), states as follows:

## I.    NATURE OF THE ACTION[1]

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS customer property, as defined by SIPA 78*lll*(4),[2] that was stolen as part of the massive Ponzi scheme perpetrated by Madoff and others.

**ANSWER**: The allegations in paragraph 1 contain legal conclusions, to which no response is required. To the extent a response is required, LGT Switzerland admits that Bernard L. Madoff ("Madoff") perpetrated a Ponzi scheme but denies the remaining allegations of paragraph 1.

2.    With this Complaint, the Trustee seeks to recover approximately $10,392,397 in subsequent transfers of BLMIS customer property made to DBLA and Dresdner Schweiz (collectively, the "Dresdner Defendants") by Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Sigma," collectively with Fairfield Sentry, the "Fairfield Funds"). The Fairfield Funds are British Virgin Islands ("BVI") companies that are in liquidation. The Fairfield Funds had direct customer accounts with BLMIS's investment advisory business ("IA Business") for the purpose of investing assets with BLMIS. Fairfield Sentry maintained in excess of 95% of its assets in BLMIS customer accounts and Sigma invested 100% of its assets in Fairfield Sentry.

---

[1]    LGT Switzerland deems the introductory paragraph and section headings in the Amended Complaint not to constitute allegations of the Amended Complaint. To the extent any section headings or definitions are allegations, LGT Switzerland admits or denies them consistent with its responses to the allegations contained in the numbered paragraphs of the Amended Complaint.

[2]    SIPA § 78*lll*(4) defines "Customer Property" as cash and securities at any time received, acquired, or held by, or for the account of, a debtor from, or for, the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.

**ANSWER**: LGT Switzerland admits, for the limited purpose of referring to it in this Answer, the legal descriptions of the "Fairfield Sentry," "Fairfield Sigma," "Fairfield Funds," "IA Business" and "BVI" contained in paragraph 2. LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning whether the Fairfield Funds had direct customer accounts with BLMIS' IA Business and, therefore, denies these allegations. LGT Switzerland denies all other allegations of paragraph 2, including that LGT Switzerland received subsequent transfers of customer property from BLMIS or the Fairfield Funds.

3.      DBLA received at least $9,296,416 of BLMIS customer property from the Fairfield Funds. It received at least $7,418,486 from Fairfield Sentry, and at least $1,877,930 from Sigma.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3 and, therefore, denies the allegations in paragraph 3.

4.      Dresdner Schweiz received at least $1,095,980 of BLMIS customer property from Fairfield Sentry.

**ANSWER**: The allegations contained in paragraph 4 constitute legal conclusions, to which no response is required. To the extent a response is required, LGT Switzerland denies the allegations in paragraph 4.

5.      The customer property was received by DBLA and Dresdner Schweiz by redeeming, at the reported net asset value on the redemption date, shares of the Fairfield Funds previously purchased by DBLA and Dresdner Schweiz from FGG. The Fairfield Funds were wholly invested in BLMIS. The purchases and later redemptions of the shares in the Fairfield Funds were governed by the subscription agreements each entered into with the Fairfield Funds. The subscription agreements governed the time, manner, and circumstances under which DBLA and Dresdner Schweiz could make redemptions, and the protocol for valuing shares at the time of redemption.

**ANSWER**: The allegations contained in paragraph 5 constitute legal conclusions, to which no response is required. To the extent a response is required, LGT Switzerland lacks knowledge

3

or information sufficient to form a belief as to the truth of the allegations in paragraph 5 and,

therefore, denies the allegations in paragraph 5.

6.      The following chart summarizes the subsequent transfers of customer property at issue in this litigation:

|  | Fairfield Sentry* | Sigma | TOTAL |
|---|---|---|---|
| **DBLA** | $7,418,486 | $1,877,930 | $9,296,416 |
| **Dresdner Schweiz** | $1,095,980 | $0 | $1,095,981 |
| **TOTAL** | $8,514,466 | $1,877,930 | $10,392,397 |

*Amounts subject to rounding

**ANSWER**:  The allegations contained in paragraph 6 constitute legal conclusions, to which

no response is required.  To the extent a response is required, LGT Switzerland lacks knowledge

or information sufficient to form a belief as to the truth of the allegations in paragraph 6 and,

therefore, denies the allegations in paragraph 6.

7.      DBLA and Dresdner Schweiz were sophisticated, international investment entities. When Defendants received the subsequent transfers of BLMIS customer property, each was a subsidiary of Dresdner Bank AG, one of the largest banks in Germany.  According to their respective 2004 annual reports, they were part of a large international banking organization with millions of private and business clients and over 900 offices within Germany and around the world, including in the United States.  The 2004 annual reports also touted their risk analysis and management procedures, as well as their "clearly defined investment process."

**ANSWER**:  The allegations contained in paragraph 7 constitute legal conclusions, to which

no response is required.  To the extent a response is required, LGT Switzerland lacks knowledge

or information sufficient to form a belief as to the truth of the allegations in paragraph 7 and,

therefore, denies the allegations in paragraph 7 and refers to the referenced 2004 annual reports

for full statements of the contents therein.

8.      Fairfield Sentry was the largest of many BLMIS feeder funds ("Feeder Funds") – single-purpose investment funds that pooled their investors' assets to invest with BLMIS's investment advisory business (the "IA Business") in New York, to capitalize on its reported consistent returns. From November 1990 until Madoff's arrest in December 2008, Fairfield Sentry

4

maintained direct customer accounts with BLMIS in New York. Sigma, a Fairfield Sentry sister fund, was a "currency fund," which accepted subscriptions in Euros, converted the money to U.S. Dollars, and then invested 100% of its assets in Fairfield Sentry.

**ANSWER**:  LGT Switzerland lacks knowledge or information sufficient to form a belief

as to the truth of the allegations in paragraph 8 and, therefore, denies the allegations in paragraph

8.

9.     Fairfield Sentry and Sigma were created, operated, and controlled by Fairfield Greenwich Group ("FGG"), a *de facto* partnership founded by U.S. citizens and residents, Walter Noel and Jeffrey Tucker.  FGG maintained its principal place of business in New York.

**ANSWER**: The allegations in paragraph 9 contain legal conclusions, to which no response

is required.  To the extent a response is required, LGT Switzerland lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in paragraph 9 and, therefore, denies the

remaining allegations in paragraph 9.

10.     DBLA and Dresdner Schweiz purposefully invested in Fairfield Sentry and Sigma in order to profit from BLMIS in New York and this adversary proceeding arises from Defendants' deliberate investment in New York-based funds.

**ANSWER**:  LGT Switzerland lacks knowledge or information sufficient to form a belief

as to the truth of the allegations in paragraph 10 and, therefore, denies the allegations in paragraph

10.

## II.   JURISDICTION AND VENUE

11.     This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

**ANSWER**: The allegations in paragraph 11 contain legal conclusions, to which no

response is required.  To the extent a response is required, LGT Switzerland denies the allegations

of paragraph 11, except to admit that (a) the main underlying substantively consolidated SIPA case

(Case No. 08-01789 (CGM)) is pending in this Court; and (b) upon information and belief, the

District Court Proceeding was commenced in the District Court.  LGT Switzerland denies the

remaining allegations of paragraph 11, including that this Court has jurisdiction to enter a final

order or judgment in this proceeding.

12.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O).
The Trustee consents to the entry of final orders or judgment by this Court if it is determined that
consent of the parties is required for this Court to enter final orders or judgment consistent with
Article III of the U.S. Constitution.

**ANSWER**: The allegations contained in paragraph 12 constitute legal conclusions, to

which no response is required.  To the extent a response is required, LGT Switzerland denies the

allegations of paragraph 12.  Furthermore, LGT Switzerland does not consent to the issuance of

entry of final orders or judgments by the Bankruptcy Court and demands a trial by jury on all

issues that may be tried by a jury.

13.     Venue in this judicial district is proper under 28 U.S.C. § 1409.

**ANSWER**: The allegations contained in paragraph 13 constitute legal conclusions, to

which no response is required.  To the extent a response is required, LGT Switzerland denies the

allegations of paragraph 13.

14.     This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11
U.S.C. §§ 105(a) and 550, and other applicable law.

**ANSWER**: The allegations contained in paragraph 14 constitute legal conclusions, to

which no response is required.  To the extent a response is required, LGT Switzerland denies the

allegations of paragraph 14.

### A.  Defendant UBS Europe

6

15.     Defendant UBS Europe is subject to personal jurisdiction in this judicial district as successor in interest to DBLA.  DBLA purposefully availed itself of the laws and protections of the United States and the state of New York.

**ANSWER**: The allegations contained in paragraph 15 constitute legal conclusions, to

which no response is required.  To the extent a response is required, LGT Switzerland lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph

15 and, therefore, denies the allegations in paragraph 15.

16.     DBLA knowingly directed funds to be invested with and then redeemed from New York-based BLMIS through Fairfield Sentry and Sigma.  Specifically, subscription agreements DBLA executed with Fairfield Sentry directed it to wire funds in U.S. dollars to an account with HSBC Bank USA in New York, NY.  In those subscription agreements, DBLA also directed redemptions to be sent to an account in its name at Citibank in New York.  By deliberately directing funds to and from BLMIS through Fairfield Sentry, using bank accounts located in New York, DBLA knowingly accepted the rights, benefits, and privileges of conducting business and transactions in the United States and New York.

**ANSWER**: The allegations in paragraph 16 contain legal conclusions, to which no

response is required.  To the extent a response is required, LGT Switzerland lacks knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 16 and,

therefore, denies the remaining allegations in paragraph 16.

17.     DBLA maintained an office in Miami, Florida.  Employees from the Miami office met with FGG personnel and conducted due diligence on the Feeder Funds, Madoff, and BLMIS.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief

as to the truth of the allegations in paragraph 17 and, therefore, denies the allegations in paragraph

17.

18.     FGG personnel provided DBLA with private placement memoranda ("PPMs") in order to solicit investments in Fairfield Sentry and Sigma.  From the PPMs, DBLA knew that the Fairfield Funds were heavily invested with BLMIS in New York, and that BLMIS purportedly executed Madoff's split-strike conversion investment strategy ("SSC Strategy") by investing Fairfield Sentry's assets in U.S. Standard & Poor's 100 Index ("S&P 100 Index") securities, U.S. options, and U.S. Treasuries, and that all of Sigma's assets were invested in Fairfield Sentry. DBLA also knew that BLMIS was registered with the SEC, was located in New York, served as

the investment adviser, broker-dealer, and custodian for Fairfield Sentry and Sigma, and that control of Fairfield Sentry's and Sigma's investments rested entirely with BLMIS in New York. DBLA also knew that BLMIS was "essential to the continued operation of" Fairfield Sentry.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief

as to the truth of the allegations in paragraph 18 and, therefore, denies the allegations in paragraph

18.

19.     Armed with this knowledge, DBLA voluntarily executed Fairfield Sentry subscription agreements in connection with its investments, which incorporated the Fairfield Sentry PPMs by reference.  By executing the subscription agreements, DBLA submitted to the jurisdiction of New York.  The agreements specified that:

> [A]any suit, action, or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York. Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum.

The agreements further specified that DBLA consented to the service of process out of any New York court in any such Proceeding, the agreements would be "governed and enforced in accordance with the laws of New York," and that Fairfield Sentry was represented by U.S. counsel.

**ANSWER**: The allegations in paragraph 19 contain legal conclusions, to which no

response is required.  To the extent a response is required, LGT Switzerland lacks knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 19 and,

therefore, denies the remaining allegations in paragraph 19.

20.     In executing subscription agreements with Fairfield Sentry, DBLA affirmed that it received and read a copy of the Private Placement Memorandum for the fund which provided that "substantially all of the Fund's assets" were under the custody of New York-based BLMIS.

**ANSWER**: The allegations contained in paragraph 20 constitute legal conclusions, to

which no response is required.  To the extent a response is required, LGT Switzerland lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph

20 and, therefore, denies the allegations in paragraph 20.

21.    DBLA met with individuals in Fairfield's New York City office regarding its investments and corresponded with those individuals repeatedly by email and telephone about its Sentry investments.  Those contacts included emails between DBLA employees Guido Lucke, Katia Gomez, and Christian Kurk and FGG employees Philip Toub, Lourdes Barreneche and Lauren Ross located in FGG's New York office discussing DBLA's investments in the Fairfield Funds.  At all times, the DBLA employees knew the FGG employees were located in New York and intentionally directed their communications, along with their investments, to New York.

**ANSWER**:  LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21 and, therefore, denies the allegations in paragraph 21.

22.    DBLA also voluntarily chose to invest in Sigma and executed subscription agreements, which contained choice of law provisions similar to those in the Fairfield Sentry subscription agreements, including choice of law provisions selecting New York law, identifying U.S. counsel for Sigma, agreeing that any litigation related to the subscription agreements may be brought in New York, and submitting to the jurisdiction of the New York Courts.  DBLA also communicated with New York-based Fairfield employees about its Sigma investment.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22 and, therefore, denies the allegations in paragraph 22.

23.    DBLA used New York bank accounts to transfer money to and from Fairfield Sentry.  When DBLA executed the Fairfield Sentry subscription agreement in connection with its investments, it agreed that all of the subscription payments from DBLA would be directed to a New York HSBC Bank USA correspondent bank account and ultimately deposited in Fairfield Sentry's bank account.  DBLA directed funds to this New York bank account on multiple occasions in connection with investments into Fairfield Sentry.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 23 and, therefore, denies the allegations in paragraph 23.

24.    DBLA also used its Citibank account in New York held in its own name to receive transfers from Fairfield Sentry.  In its Fairfield Sentry subscription agreement, DBLA directed that all its redemptions and other payments be sent to this Citibank account in New York only.  DBLA used this account to receive $7,418,486 in redemption proceeds from Fairfield Sentry.

**ANSWER**: The allegations in paragraph 24 contain legal conclusions, to which no response is required. To the extent a response is required, LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 24 and, therefore, denies the remaining allegations in paragraph 24.

25. Each of the redemptions received by DBLA was a redemption of shares purchased via the subscription agreements, and the terms of those redemptions were expressly governed by the subscription agreement and the PPM which, as noted above, included their submitting to the jurisdiction of the New York court and New York law.

**ANSWER**: The allegations in paragraph 25 contain legal conclusions, to which no response is required. To the extent a response is required, LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25 and, therefore, denies the remaining allegations in paragraph 25.

26. DBLA purposefully directed its investments to New York-based BLMIS, through the Fairfield Funds, using bank accounts located in New York, and consented to the jurisdiction of the New York Courts, as well as the applicability of New York law. DBLA derived significant revenue from New York and maintained minimum contacts and general business contacts with the United States and New York in connection with the claims alleged herein.

**ANSWER**: The allegations contained in paragraph 26 constitute legal conclusions, to which no response is required. To the extent a response is required, LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26 and, therefore, denies the allegations in paragraph 26.

27. UBS Europe, as the successor in interest to DBLA, should reasonably expect to be subject to New York jurisdiction and is subject to personal jurisdiction pursuant to New York Civil Practice Law and Rules ("N.Y. C.P.L.R.") §§ 301 and 302, and Federal Rule of Bankruptcy Procedure 7004 ("Fed. R. Bankr. P.").

**ANSWER**: The allegations contained in paragraph 27 constitute legal conclusions, to which no response is required. To the extent a response is required, LGT Switzerland lacks

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph

27 and, therefore, denies the allegations in paragraph 27.

### B. Defendant LGT Switzerland

28.     Defendant LGT Switzerland is subject to personal jurisdiction in this judicial
district as successor in interest to Dresdner Schweiz.  Dresdner Schweiz purposely availed itself
of the laws and protections of the United States and the state of New York.

**ANSWER**: The allegations contained in paragraph 28 constitute legal conclusions, to

which no response is required.  To the extent a response is required, LGT Switzerland denies the

allegations of paragraph 28, except to admit that it is the successor in interest to Dresdner Schweiz.

29.     Dresdner Schweiz knowingly directed funds to be invested with and then redeemed
from New York-based BLMIS through Fairfield Sentry.  By deliberately directing funds to and
from BLMIS through Fairfield Sentry, Dresdner Schweiz knowingly accepted the rights, benefits,
and privileges of conducting business and transactions in the United States and New York.

**ANSWER**: The allegations contained in paragraph 29 constitute legal conclusions, to

which no response is required.  To the extent a response is required, LGT Switzerland denies the

allegations of paragraph 29.

30.     FGG personnel provided Dresdner Schweiz with PPMs in connection with its
investments in Fairfield Sentry.  From the PPMs, Dresdner Schweiz knew that Fairfield Sentry
was heavily invested with BLMIS in New York, and that BLMIS purportedly operated and
executed Madoff's SSC Strategy by investing Fairfield Sentry's assets in U.S. S&P 100 Index
securities, U.S. options, and U.S. Treasuries.  Dresdner Schweiz also knew BLMIS in New York
served as the investment adviser, broker-dealer, and custodian for Fairfield Sentry, and that control
of Fairfield Sentry's investments rested entirely with BLMIS in New York.  Dresdner Schweiz
also knew that BLMIS was "essential to the continued operation of" Fairfield Sentry.

**ANSWER**: The allegations in paragraph 30 contain legal conclusions, to which no

response is required. To the extent a response is required, LGT Switzerland lacks knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 30 and,

therefore, denies the remaining allegations in paragraph 30.

31.     Armed with this knowledge, Dresdner Schweiz voluntarily executed Fairfield
Sentry subscription agreements in connection with its investments, which incorporated the
Fairfield Sentry PPMs by reference.  By executing the Fairfield Sentry subscription agreements,
Dresdner Schweiz submitted to the jurisdiction of New York.  The agreements specified that:

> [A]ny suit, action, or proceeding ("Proceeding") with respect to this Agreement and
> the Fund may be brought in New York.  Subscriber irrevocably submits to the
> jurisdiction of the New York courts with respect to any Proceeding and consents
> that service of process as provided by New York law may be made upon Subscriber
> in such Proceeding, and may not claim that a Proceeding has been brough [*sic*] in
> an inconvenient forum.

The agreements further specified that Dresdner Bank consented to the service of process out of
any New York court in any such proceeding, the agreements would be "governed and enforced in
accordance with the laws of New York," and that Fairfield Sentry was represented by U.S. counsel.

**ANSWER**: The allegations in paragraph 31 contain legal conclusions, to which no

response is required.  To the extent a response is required, LGT Switzerland denies the remaining

allegations of paragraph 31.

32.     In executing subscription agreements with Fairfield Sentry, Dresdner Schweiz
affirmed that it received and read a copy of the Private Placement Memorandum for the fund which
provided that "substantially all of the Fund's assets" were under the custody of New York-based
BLMIS.

**ANSWER**: The allegations in paragraph 32 contain legal conclusions, to which no

response is required.  To the extent a response is required, LGT Switzerland denies the remaining

allegations of paragraph 32.

33.     Each of the redemptions Dresdner Schweiz received was a redemption of shares
purchased via the subscription agreements, and the terms of those redemptions were expressly
governed by the subscription agreement and the PPM.

**ANSWER**: The allegations in paragraph 33 contain legal conclusions, to which no

response is required.  To the extent a response is required, LGT Switzerland denies the remaining

allegations of paragraph 33.

34.     Dresdner Schweiz knowingly reached out to New York based FGG personnel to
discuss its investments in Fairfield Sentry.  Those communications included emails from Xaver
Kurzen (OPSF of Dresdner Schweiz), Werner Vogt (Assistant Vice President of Dresdner

Schweiz) and Thomas Weckemann (portfolio manager and financial analyst with Dresdner Schweiz) to Lauren Ross located in FGG's New York office regarding its investment in Fairfield Sentry and seeking the retrocession fees owed to Dresdner Schweiz for its investments in the Fairfield Funds. At all times, the Dresdner Schweiz employees knew the FGG employees, including Ms. Ross, were located in New York and intentionally directed their communications, along with their investments, to New York.

**ANSWER**: The allegations contained in paragraph 34 constitute legal conclusions, to

which no response is required. To the extent a response is required, LGT Switzerland denies the

allegations of paragraph 34.

35. Dresdner Schweiz used New York bank accounts to transfer money to and from Fairfield Sentry. Dresdner Schweiz executed short form Fairfield Sentry subscription agreements in connection with its investments, which incorporated the Sentry Fully Executed Subscription Agreements by reference. In the Sentry Fully Executed Subscription Agreements, signatories agree that investments are to be directed to a New York HSBC Bank USA correspondent bank account in U.S. dollars and ultimately deposited in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan in New York.

**ANSWER**: The allegations in paragraph 35 contain legal conclusions, to which no

response is required. To the extent a response is required, LGT Switzerland denies the remaining

allegations of paragraph 35.

36. Dresdner Schweiz also used a New York HSBC Bank USA correspondent bank account to receive transfers from Fairfield Sentry. Pursuant to Dresdner Schweiz's redemption requests, all Dresdner Schweiz's redemptions were directed to this New York HSBC Bank USA account. Dresdner Schweiz used this account to receive $1,095,980 in redemption proceeds from Fairfield Sentry. Dresdner Schweiz directed retrocession fees paid to it by Fairfield Sentry be sent to a bank account held at Dresdner Bank AG, New York Branch.

**ANSWER**: The allegations in paragraph 36 contain legal conclusions, to which no

response is required. To the extent a response is required, LGT Switzerland denies the remaining

allegations of paragraph 36.

37. Dresdner Schweiz purposefully directed its investments to New York-based BLMIS, through the Fairfield Funds, using bank accounts located in New York, and consented to the jurisdiction of the New York Courts, as well as the applicability of New York law. Dresdner Schweiz derived significant revenue from these investments in New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

**ANSWER**: The allegations contained in paragraph 37 constitute legal conclusions, to

which no response is required.  To the extent a response is required, LGT Switzerland denies the

allegations of paragraph 37.

38.     LGT Switzerland, as the successor to Dresdner Schweiz, also filed claims in the
liquidation of BLMIS, thereby consenting to the jurisdiction of this Court for the determination
and adjudication of claims related to its investments in BLMIS.  Specifically, on July 2, 2019,
LGT Switzerland filed Claim Nos. 015023 and 015374, duplicative of one another, seeking to
recover $2,128,043.68 from the BLMIS estate.

**ANSWER**: The allegations contained in paragraph 38 constitute legal conclusions, to

which no response is required.  To the extent a response is required, LGT Switzerland admits that

it filed claims in the liquidation of BLMIS but denies the remaining allegations of paragraph 38.

39.     LGT Switzerland, as the successor in interest to Dresdner Schweiz, should
reasonably expect to be subject to New York jurisdiction and is subject to personal jurisdiction
pursuant to N.Y. C.P.L.R. §§ 301 and 302, and Fed. R. Bankr. P. 7004.

**ANSWER**: The allegations contained in paragraph 39 constitute legal conclusions, to

which no response is required.  To the extent a response is required, LGT Switzerland denies the

allegations of paragraph 39.

## III.   **BACKGROUND**

40.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents
for criminal violations of federal securities laws, including securities fraud, investment adviser
fraud    and    mail    and    wire    fraud. Contemporaneously, the Securities and Exchange
Commission ("SEC") commenced the District Court Proceeding against Madoff and BLMIS. The
SEC complaint alleges that Madoff and BLMIS engaged in fraud through the investment adviser
activities of BLMIS.

**ANSWER**:   Upon information and belief, LGT Switzerland admits that Madoff was

arrested on or around December 11, 2008, and that, on that same date, the Securities and Exchange

Commission ("SEC") filed a civil complaint against Madoff and BLMIS in the District Court.

LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in paragraph 40 and, therefore, denies the remaining allegations in paragraph

40.

41.    On December 15, 2008, under §78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under S I P A §78eee(a)(4)(B), SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 41 and, therefore, denies the allegations contained in paragraph 41. LGT Switzerland refers to the SIPC application referenced in paragraph 41 for a full statement of its contents.

42.    Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order pursuant to SIPA, which, in pertinent part:

        a.      appointed the Trustee for the liquidation of the business of BLMIS under SIPA section 78eee(b)(3);

        b.      appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

        c.      removed the case to this Court pursuant to SIPA § 78eee(b)(4).

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 42 and, therefore, denies the allegations contained in paragraph 42. LGT Switzerland refers to the District Court's December 15, 2008 Order for a full statement of its contents.

43.    By orders dated December 23, 2008, and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 43 and, therefore, denies the allegations

15

contained in paragraph 43.  LGT Switzerland refers to the District Court's December 23, 2008 and

February 4, 2009 Orders for a full statement of the contents therein.

44.     On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 44 and, therefore, denies the allegations

contained in paragraph 44.  LGT Switzerland refers to the District Court's June 9, 2009 Order for

a full statement of the contents therein.

45.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50), Madoff pled guilty to an eleven-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." *Id.* at 23. Additionally, Madoff admitted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id.* On June 29, 2009, Madoff was sentenced to 150 years in prison.

**ANSWER**: LGT Switzerland admits, upon information and belief, that on or about March

12, 2009, Madoff pleaded guilty to the charges filed against him by the United States Attorney's

Office for the Southern District of New York and that on or about June 29, 2009, Madoff was

sentenced to a term of 150 years in prison.   LGT Switzerland lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 45

and, therefore, denies the remaining allegations contained in paragraph 45.

46.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pled guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  Among other things, DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS's investment advisory business ("IA Business") customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s. *Id.* at 46.

**ANSWER**: LGT Switzerland admits, upon information or belief, that on or about August 11, 2009, Frank DiPascali pleaded guilty to the charges brought against him by the United States Attorney's Office for the Southern District of New York. LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 46 and, therefore, denies the remaining allegations contained in paragraph 46.

47.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

**ANSWER**: LGT Switzerland admits, upon information or belief, that on or about November 21, 2011, David Kugel pleaded guilty to the charges brought against him by the United States Attorney's Office for the Southern District of New York. LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 47 and, therefore, denies the remaining allegations contained in paragraph 47.

48.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, Joann Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS's IA Business.

**ANSWER**: LGT Switzerland admits, upon information or belief, that on or about March 24, 2014, Daniel Bonventre, Annette Bongiorno, Joann Crupi, George Perez, and Jerome O'Hara were convicted of the charges brought against them by the United States Attorney's Office for the Southern District of New York. LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 48 and, therefore, denies the remaining allegations contained in paragraph 48.

**IV.    TRUSTEE'S POWERS AND STANDING**

17

49.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. However, the estate's assets will not be sufficient to reimburse BLMIS customers for the billions of dollars they invested with BLMIS over the years. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by BLMIS or Madoff to customers and others to the detriment of defrauded customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA section 78fff-2(c)(1).

**ANSWER**: The allegations contained in paragraph 49 constitute legal conclusions, to

which no response is required.  To the extent a response is required, LGT Switzerland lacks

knowledge or information sufficient to form a belief as to the truth of the allegations contained in

paragraph 49 and, therefore, denies the allegations contained in paragraph 49.

50.     Under SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

**ANSWER**: The allegations contained in paragraph 50 constitute legal conclusions, to

which no response is required.  To the extent a response is required, LGT Switzerland lacks

knowledge or information sufficient to form a belief as to the truth of the allegations contained in

paragraph 50 and, therefore, denies the allegations contained in paragraph 50.

51.     Under SIPA §§ 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of commencement of the case within the meaning of section 544 of the Bankruptcy Code.

**ANSWER**: The allegations contained in paragraph 51 constitute legal conclusions, to

which no response is required.  To the extent a response is required, LGT Switzerland denies the

allegations contained in paragraph 51.

52.     The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including sections 323(b), 544 and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code §§ 554, 547, 548, 550(a), and 551 and SIPA § 78fff-2(c)(3).

**ANSWER**: The allegations contained in paragraph 52 constitute legal conclusions, to

which no response is required.  To the extent a response is required, LGT Switzerland denies the

allegations contained in paragraph 52.

## V.    **DEFENDANT AND RELEVANT NON-PARTIES**

53.    Non-party Dresdner Bank AG ("Dresdner") was a German banking company and
the parent corporation to DBLA and Dresdner Schweiz.  It was established in 1872, and by 1900
had the largest German branch network.  In May 2009 it was acquired by Commerzbank.

**ANSWER**: LGT Switzerland admits the allegations in paragraph 53.

54.    DBLA was a German bank with offices around the world, including Miami,
Florida.  In 2005, DBLA sold its banking and wealth management operations to a subsidiary of
UBS AG ("UBS"), and UBS merged DBLA into UBS Deutschland.  In 2016, UBS Deutschland
AG adopted the legal form of a European stock corporation and changed its name to UBS Europe.
Defendant UBS Europe is the successor in interest to DBLA, is a wholly owned subsidiary of
UBS, and maintains its headquarters at Bockenheimer Landstrasse 2-4, D-60306 Frankfurt am
Main, Germany.  UBS Europe may be served through its counsel of record.

**ANSWER**: The allegations contained in paragraph 54 constitute legal conclusions, to

which no response is required.  To the extent a response is required, LGT Switzerland lacks

knowledge or information sufficient to form a belief as to the truth of the allegations contained in

paragraph 54 and, therefore, denies the allegations contained in paragraph 54.

55.    Dresdner Schweiz was a Swiss bank specializing in providing investment advisory
and private wealth management services.  In 2009, Commerzbank AG acquired Dresdner Schweiz
from Dresdner Bank.  Later in 2009, LGT Group Foundation ("LGT Group") acquired Dresdner
Schweiz and by 2010 merged Dresdner Schweiz into Defendant LGT Switzerland, an indirect,
wholly owned subsidiary of LGT Group, which is wholly owned by Prince of Liechtenstein
Foundation.  LGT Switzerland is the successor in interest to Dresdner Schweiz with a place of
business at Lange Gasse 15, P.O. Box, CH-4002, Basel, Switzerland.  LGT Switzerland can be
served through its counsel of record.

**ANSWER**:  LGT Switzerland admits that it is the successor in interest to Dresdner

Schweiz and that it maintains a place of business at Lange Gasse 15, P.O. Box, CH-4002, Basel,

Switzerland.  LGT Switzerland otherwise lacks knowledge or information sufficient to form a

belief as to the truth of the allegations contained in paragraph 55 and, therefore, denies the

allegations contained in paragraph 55.

## VI.   BLMIS, THE PONZI SCHEME AND MADOFF'S INVESTMENT STRATEGY

### A.   BLMIS

56.   Madoff founded BLMIS in or about 1960 as a sole proprietorship and registered as a broker dealer with the SEC. In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company. At all relevant times, Madoff controlled BLMIS first as its sole member, and thereafter as its chairman and chief executive.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 56 and, therefore, denies the allegations

contained in paragraph 56.

57.   In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a single broker-dealer from 1960 through 2008. Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continual registration as a securities broker-dealer from January 1, 1960 through December 31, 2008. At all times, BLMIS was assigned CRD No. 2625. SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960. On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status. SIPC membership is contingent on registration of the broker-dealer with the SEC.

**ANSWER**: The allegations in paragraph 57 contain legal conclusions, to which no

response is required. To the extent a response is required, LGT Switzerland lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in

paragraph 57 and, therefore, denies the allegations contained in paragraph 57.

58.   For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and the IA Business. Madoff, as founder, sole owner, chairman, and chief executive officer, operated BLMIS with several family members and other employees, including DiPascali and Kugel, who pleaded guilty to helping Madoff carry out the fraudulent scheme.

**ANSWER**: LGT Switzerland admits that, upon information and belief, DiPascali and Kugel pleaded guilty to charges brought against them by the United States Attorney's Office for the Southern District of New York. LGT Switzerland otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 58 and, therefore, denies the remaining allegations contained in paragraph 58.

59.    BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 59 and, therefore, denies the allegations contained in paragraph 59.

60.    For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

**ANSWER**: The allegations contained in paragraph 60 constitute legal conclusions, to which no response is required. To the extent a response is required, LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 60 and, therefore, denies the allegations contained in paragraph 60.

61.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 61 and, therefore, denies the allegations contained in paragraph 61.

### B.   THE PONZI SCHEME

62.   At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including, Irwin Lipkin, David Kugel, Annette Bongiorno, Joann Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 62 and, therefore, denies the allegations contained in paragraph 62, except that LGT Switzerland admits, on information and belief, that Madoff employees Frank DiPascali and Kugel pleaded guilty to charges brought against them by the United States Attorney's Office for the Southern District of New York.

63.   BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.  It was funded, in part, by money taken from the IA Business customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.  The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

**ANSWER**: The allegations in paragraph 63 contain legal conclusions, to which no response is required.  To the extent a response is required, LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 63 and, therefore, denies the allegations contained in paragraph 63.

64.   To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York.  Of the three employees at the firm, one

22

was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 64 and, therefore, denies the allegations contained in paragraph 64.

65.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

**ANSWER**: LGT Switzerland admits that, upon information and belief, David Friehling pleaded guilty to criminal charges brought against him.  LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 65 and, therefore, denies the allegations contained in paragraph 65.

### 1.  Madoff's Investment Strategy

66.    BLMIS purported to execute two primary investment strategies for IA Business customers:  the convertible arbitrage strategy and the SSC Strategy.   For a limited group of IA Business customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 66 and, therefore, denies the allegations contained in paragraph 66.

67.    All funds received from IA Business customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up BLMIS's proprietary trading business.

**ANSWER**: The allegations in paragraph 67 contain legal conclusions to which no answer is required. To the extent an answer is required, LGT Switzerland lacks knowledge or information

23

sufficient to form a belief as to the truth of the allegations contained in paragraph 67 and, therefore,

denies the allegations contained in paragraph 67.

68.     The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time.  In the 1970s this strategy represented a significant portion of the total IA Business accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of IA Business accounts.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 68 and, therefore, denies the allegations

contained in paragraph 68.

69.     From the early 1990's forward, Madoff began telling IA Business customers that BLMIS employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its IA Business customers.  BLMIS reported falsified trades using backdated trade data on monthly account statements sent to IA Business customers that typically reflected impossibly consistent gains on the customers' principal investments.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 69 and, therefore, denies the allegations

contained in paragraph 69.

70.     By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index, (ii) the purchase of out-of-the-money S&P 100 Index put options, and (iii) the sale of out-of-the-money S&P Index call options.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 70 and, therefore, denies the allegations

contained in paragraph 70.

71.     The put options were to limit the downside risk of sizeable price changes in the basket.  The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option should have entailed a loss for BLMIS.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 71 and, therefore, denies the allegations contained in paragraph 71.

72.    The sale of call options would partially offset the costs associated with acquiring puts, but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 72 and, therefore, denies the allegations contained in paragraph 72.

73.    The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar."  The collar provides downside protection while limiting the upside.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 73 and, therefore, denies the allegations contained in paragraph 73.

74.    If Madoff was putting on the same baskets of equities across *all* BLMIS customer accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 74 and, therefore, denies the allegations contained in paragraph 74.

75.    Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call or put option notional value to support the BLMIS SSC Strategy.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 75 and, therefore, denies the allegations

contained in paragraph 75.

76.    Sophisticated or professional investors knew that Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 76 and, therefore, denies the allegations

contained in paragraph 76.

### 2.  BLMIS's Fee Structure

77.    BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM and profits, respectively. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 77 and, therefore, denies the allegations

contained in paragraph 77.

### 3.  BLMIS's Market Timing

78.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he achieved market timing by intermittently entering and exiting the market. During those times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in U.S Treasury Bills or mutual funds invested in Treasury Bills.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 78 and, therefore, denies the allegations

contained in paragraph 78.

79.     As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.  It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win every time.  Yet this is precisely what BLMIS's customer statements reported.

**ANSWER**: The allegations in paragraph 79 contain legal conclusions, to which no

response is required.  To the extent a response is required, LGT Switzerland lacks knowledge or

information sufficient to form a belief as to the truth of the remaining allegations contained in

paragraph 79 and, therefore, denies the allegations contained in paragraph 79.

80.     BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 80 and, therefore, denies the allegations

contained in paragraph 80.

### 4.  No Evidence of BLMIS Trading

81.     There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

27

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 81 and, therefore, denies the allegations contained in paragraph 81.

82.     All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS's IA Business cleared any trades in any exchange-listed options.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 82 and, therefore, denies the allegations contained in paragraph 82.

### 5.  The Collapse of the Ponzi Scheme

83.     The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 83 and, therefore, denies the allegations contained in paragraph 83.

84.     Based on the Trustee's investigation, it appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no investments were ever made. At the time the Ponzi scheme came to light in December 11, 2008, with Madoff's arrest, investors had already lost approximately $20 billion in principal.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 84 and, therefore, denies the allegations contained in paragraph 84.

85.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the IA Business customers' fraudulent statements, and that the IA Business operated as a Ponzi scheme.

**ANSWER**: LGT Switzerland admits, on information and belief, that Madoff employees

Frank DiPascali and Kugel pleaded guilty to charges brought against them by the United States

Attorney's Office for the Southern District of New York. Otherwise, LGT Switzerland lacks

knowledge or information sufficient to form a belief as to the truth of the allegations contained in

paragraph 85 and, therefore, denies the allegations contained in paragraph 85.

86.    Thus, at all relevant times, the liabilities of BLMIS were billions of dollars greater than its assets.  BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 86 and, therefore, denies the allegations

contained in paragraph 86.

## VII.    DEFENDANTS WERE SOPHISTICATED INVESTORS WITH SIGNIFICANT EXPERIENCE IN ASSET MANAGEMENT AND INVESTMENT FUNDS

87.    Defendants and their predecessors, along with the officers, directors, employees, and agents of each, have been active in the global financial services industries for decades.  Each Defendant or its predecessor marketed itself as "one of the leading commercial banks in Germany," represented in "all key financial centres around the globe."  They have considerable experience and expertise in wealth management and investment funds.  In executing PPMs and subscription agreements with the Fairfield Funds, DBLA and Dresdner Schweiz affirmed that each was a sophisticated investor with "such knowledge and experience" necessary to evaluate and assess the risks of investing in the Fairfield Funds.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 87 and, therefore, denies the allegations

contained in paragraph 87.

88.    DBLA was a sophisticated banking entity that touted the attentiveness of its risk management division, explaining in its 2004 annual report that it "identif[ied], independently

measur[ed], analyz[ed], monitor[ed] and comment[ed] on market, liquidity, counterparty and operational risks as well as the aggregation of the various risk categories throughout [DBLA]."

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 88 and, therefore, denies the allegations contained in paragraph 88.

89.     According to its 2004 annual report, Dresdner Schweiz had a "clearly defined investment process" and "disciplined investment strategy." Dresdner Schweiz claimed to "work closely with the portfolio managers" to "continuously monitor and analyse the capital markets in order to identify trends as they emerge . . . . Investment target performances are systematically monitored and evaluated. Dresdner Schweiz claimed its "process and results are transparent" and it had a "robust internal control system" to monitor "key risk indicators."

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 89 and, therefore, denies the allegations contained in paragraph 89 and refers to the referenced 2004 annual report for a full statement of the contents therein.

90.     DBLA and Dresdner Schweiz downloaded and reviewed PPMs from the Fairfield Funds and the performance of the funds from the tear sheets available through FGG's website. A review of the data in the tear sheets demonstrated that the performance of the Fairfield Funds was not correlated to the S&P 100, as purported by the SSC strategy outlined in the Fairfield Funds' PPM. In fact, the BLMIS returns consistently outperformed the S&P 100 Index, a fact apparent on the face of the Fairfield Funds' tear sheets.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 90 and, therefore, denies the allegations contained in paragraph 90.

## VIII.  RECOVERY OF SUBSEQUENT TRANSFERS TO UBS AND LGT SWITZERLAND

91.     The Fairfield Funds received initial transfers of BLMIS Customer Property. Some of those initial transfers were subsequently transferred directly or indirectly to the Dresdner Defendants.

**ANSWER**: The allegations in paragraph 91 contain legal conclusions, to which no response is required.  To the extent a response is determined to be required, LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 91 and, therefore, denies the allegations contained in paragraph 91.

### A.    Fairfield Funds

#### 1.  *Initial Transfers from BLMIS to Fairfield Sentry*

92.    The Trustee commenced a separate adversary proceeding against the Fairfield Funds and other defendants in the Bankruptcy Court under the caption, *Picard v. Fairfield Investment Fund, Ltd., et al.*, Adv. Pro. No. 09-01239 (CGM) (the "Fairfield Sentry Avoidance Action"), in part, seeking to avoid and recover initial transfers of customer property from BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").

**ANSWER**: LGT Switzerland admits that the Trustee filed an adversary proceeding in this Court styled as *Picard v. Fairfield Investment Fund, Ltd., et al.*, Adv. Pro. No. 09-01239 (the "Fairfield Action").  LGT Switzerland denies knowledge or information sufficient to form a belief as to which of the three complaints filed in the Fairfield Action the Trustee purports to incorporate by reference in the Amended Complaint and, therefore, denies the allegations in these complaints.  LGT Switzerland denies that the alleged initial transfers of Customer Property from BLMIS to Fairfield Sentry were, or are, avoidable.

In addition to the foregoing, LGT Switzerland furthers its objection to the Trustee's purported incorporation by reference of all other paragraphs and allegations of one or more of the three complaints filed in the Fairfield Action, and, therefore, does not answer such allegations. LGT Switzerland further objects to the inclusion in this adversary proceeding of any issue implicated by the incorporation of any of the three complaints in the Fairfield Action.

The statements in paragraph 92 as to the nature of certain transfers, the characterization of certain funds as Customer Property, and transfers allegedly sought to be avoided and

recovered constitute legal conclusions and thus no response is required.  To the extent a response

is determined to be required, LGT Switzerland lacks knowledge or information sufficient to

form a belief as to the truth of the allegations contained in paragraph 92 and, therefore, denies

the allegations contained in paragraph 92.

LGT Switzerland reserves the right to rely on and introduce any allegations in any of the

Trustee's three complaints filed in the Fairfield Action or in the exhibits thereto as party

admissions.  To the extent that any further response is deemed to be required, LGT Switzerland

lacks knowledge or information sufficient to form a belief as to the truth of the allegations

contained in paragraph 92 and, therefore, denies the allegations contained in paragraph 92.

93.   Under the Bankruptcy Court's June 7 and June 10, 2011 orders, the Bankruptcy
Court approved a settlement among the Trustee, Fairfield Sentry, and others (the "Fairfield
Settlement Agreement") and, on July 13, 2011, the Bankruptcy Court entered a consent judgment
granting the Trustee a judgment in the amount of $3,054,000,000 ("Judgment Amount") [ECF No.
109].

**ANSWER**:  LGT Switzerland lacks knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 93 and, therefore, denies the allegations in

paragraph 93.  LGT Switzerland refers to June 7, 2011 and June 10, 2011 Orders and the July 13,

2011 Consent Judgment for a full statement of the contents therein.

94.   The Fairfield Sentry Initial Transfers are set forth in the attached Exhibits A and B.
The Fairfield Sentry Initial Transfers were and continue to be customer property within the
meaning of SIPA § 78*lll*(4).

**ANSWER**: The allegations contained in paragraph 94 contain legal conclusions, to which

no response is required.  To the extent a response is required, LGT Switzerland denies the

allegations of paragraph 94 and refers to Exhibits A and B for a full statement of the contents

therein.

95.     On August 28, 2020, the Trustee filed a second amended complaint in the Fairfield Sentry Ltd. proceeding ("Second Amended Complaint") [ECF No. 286] seeking in part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

**ANSWER**: LGT Switzerland admits that the Trustee filed the Second Amended Complaint. The remaining statements in paragraph 95 contain legal conclusions to which no response is required. To the extent a response is required, LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 95 and, therefore, denies the allegations contained in paragraph 95.

96.     As alleged in the Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the BLMIS fraud.  The Trustee incorporates by reference the allegations contained in the Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, 315-16.

**ANSWER**: The statements in paragraph 96 contain legal conclusions, to which no response is required. To the extent response is required, LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 96 and therefore denies the allegations in paragraph 96.  LGT Switzerland objects to the Trustee's purported incorporation by reference of all or substantially all of the allegations of the Second Amended Complaint in paragraph 96 and therefore does not answer each of the allegations in the Second Amended Complaint. Subject to this objection, the allegations in paragraphs 1-10, 79-313 and 315-16 of the Second Amended Complaint contain legal conclusions, to which no answer is required. To the extent an answer is required, LGT Switzerland lacks knowledge or information sufficient to form a belief as to the veracity of the allegations the allegations in paragraphs 1-10, 79-313 and 315-16 of the Second Amended Complaint and, therefore, denies the allegations contained in paragraphs 1-10, 79-313 and 315-

16 of the Second Amended Complaint.  LGT Switzerland further objects to the inclusion in this

adversary proceeding of any issue implicated by the incorporation of the Second Amended

Complaint.

97.    Of the Judgment Amount, $2,895,000,000 was transferred to Fairfield Sentry
during the six years prior to the Filing Date (the "Fairfield Sentry Six Year Transfers").  Each of
the Fairfield Sentry Six Year Transfers is avoidable under Bankruptcy Code § 544, the applicable
provisions of the New York Fraudulent Conveyance Act ("N.Y. Debt. & Cred. Law"), particularly
§§ 273–279, and SIPA, particularly § 78fff-2(c)(3)

**ANSWER**: The allegations contained in paragraph 97 constitute legal conclusions, to

which no response is required.  To the extent a response is required, LGT Switzerland lacks

knowledge or information sufficient to form a belief as to the truth of the allegations contained in

paragraph 97 and, therefore, denies the allegations contained in paragraph 97.

98.    Of the Fairfield Sentry Six Year Transfers, $1,580,000,000 was transferred to
Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year
Transfers").  Each of the Fairfield Sentry Two Year Transfers is avoidable under Bankruptcy Code
section 548, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER**: The allegations contained in paragraph 98 constitute legal conclusions, to

which no response is required.  To the extent a response is required, LGT Switzerland lacks

knowledge or information sufficient to form a belief as to the truth of the allegations contained in

paragraph 98 and, therefore, denies the allegations contained in paragraph 98.

## 2. *Subsequent Transfers from Fairfield Sentry to UBS Europe*

99.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the
Fairfield Sentry Initial Transfers to UBS Europe (the "UBS-Fairfield Sentry Subsequent
Transfers").  Based on the Trustee's investigation to date, the UBS-Fairfield Sentry Subsequent
Transfers are at least $7,418,486.  A chart setting forth the presently known UBS-Fairfield Sentry
Subsequent Transfers by date and amount is attached as Exhibit C.

**ANSWER**: The allegations contained in paragraph 99 constitute legal conclusions, to

which no response is required.  To the extent a response is required, LGT Switzerland lacks

knowledge or information sufficient to form a belief as to the truth of the allegations contained in

paragraph 99 and, therefore, denies the allegations of paragraph 99 and refers to Exhibit C for a

full statement of the contents therein.

100.    The UBS-Fairfield Sentry Subsequent Transfers are recoverable from UBS Europe
under Bankruptcy Code § 550(a) and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER**: The allegations contained in paragraph 100 constitute legal conclusions, to

which no response is required.  To the extent a response is required, LGT Switzerland denies the

allegations of paragraph 100.

101.    The UBS-Fairfield Sentry Subsequent Transfers represent a redemption of equity
interest by UBS Europe as a shareholder in Fairfield Sentry.  Because Fairfield Sentry invested all
or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when
it made the UBS-Fairfield Sentry Subsequent Transfers to UBS Europe upon redemption of its
interests.

**ANSWER**: The allegations contained in paragraph 101 constitute legal conclusions, to

which no response is required.  To the extent a response is required, LGT Switzerland denies the

allegations of paragraph 101.

102.    The Trustee's investigation is on-going, and the Trustee reserves the right to: (i)
supplement the information on the Fairfield Sentry Initial Transfers, the UBS-Fairfield Subsequent
Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER**: To the extent the Trustee purports to reserve a right, such reservation is a legal

position to which no response is required.  LGT Switzerland lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 102

and, therefore, denies the allegations in paragraph 102.

### 3.  *Subsequent Transfers from Fairfield Sentry to Sigma and Subsequently to UBS Europe*

103.    Based on the Trustee's investigation to date, prior to the Filing Date, Fairfield
Sentry subsequently transferred at least $772,690,257 of the Fairfield Sentry Initial Transfers

directly to Sigma ("Sigma Subsequent Transfers").  A chart setting forth the presently known Sigma Subsequent Transfers by date and amount is attached as Exhibit E.

**ANSWER**: The allegations contained in paragraph 103 constitute legal conclusions, to which no response is required.  To the extent a response is required, LGT Switzerland denies the allegations of paragraph 103 and refers to Exhibit E for a full statement of the contents therein.

104.    Thereafter, Sigma transferred at least $1,877,930 to UBS Europe (the "UBS-Sigma Subsequent Transfer," and collectively with the UBS-Fairfield Sentry Subsequent Transfers the "UBS Subsequent Transfers").  A chart setting forth the presently known UBS-Sigma Subsequent Transfers by date and amount is attached as Exhibit F.

**ANSWER**: The allegations contained in paragraph 104 constitute legal conclusions, to which no response is required.  To the extent a response is required, LGT Switzerland denies the allegations of paragraph 104 and refers to Exhibit F for a full statement of the contents therein.

105.    The UBS-Sigma Subsequent Transfer is recoverable from UBS Europe under Bankruptcy Code § 550(a) and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER**: The allegations contained in paragraph 105 constitute legal conclusions, to which no response is required.  To the extent a response is required, LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 105 and, therefore, denies the allegations of paragraph 105.

106.    The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the UBS-Sigma Subsequent Transfer, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER**: To the extent the Trustee purports to reserve a right, such reservation is a legal position to which no response is required.  LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 106 and, therefore, denies the allegations in paragraph 106.

### 4.  *Subsequent Transfers from Fairfield Sentry to LGT Switzerland*

107.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to LGT Switzerland (the "LGT-Fairfield Sentry Subsequent Transfers").  Based on the Trustee's investigation to date, the LGT-Fairfield Sentry Subsequent Transfers are at least $1,095,980.  A chart setting forth the presently known LGT-Fairfield Sentry Subsequent Transfers by date and amount is attached as Exhibit D.

**ANSWER**: LGT Switzerland admits that it received funds from Fairfield Sentry but lacks

knowledge or information sufficient to form a belief as to the truth of the allegations concerning

the prior status of the funds and, therefore, denies such allegations.  The remaining allegations

contained in paragraph 107 constitute legal conclusions, to which no response is required.  To the

extent a response is required, LGT Switzerland denies the remaining allegations of paragraph 107

and refers to Exhibit D for a full statement of the contents therein.

108.    The LGT-Fairfield Sentry Subsequent Transfers are recoverable from LGT Switzerland under Bankruptcy Code § 550(a) and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER**: The allegations contained in paragraph 108 constitute legal conclusions, to

which no response is required.  To the extent a response is required, LGT Switzerland denies the

allegations of paragraph 108.

109.    The LGT-Fairfield Subsequent Transfers represent a redemption of equity interest by LGT Switzerland as a shareholder in Fairfield Sentry.  Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the LGT-Fairfield Subsequent Transfers to LGT Switzerland upon redemption of its interests.

**ANSWER**: The allegations contained in paragraph 109 constitute legal conclusions, to

which no response is required.  To the extent a response is required, LGT Switzerland denies the

allegations of paragraph 109.

110.    The Trustee's investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Fairfield Sentry Initial Transfers, the LGT-Fairfield Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**ANSWER**: To the extent the Trustee purports to reserve a right, such reservation is a legal position to which no response is required. LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 110 and, therefore, denies the allegations in paragraph 110.

## COUNT ONE
## RECOVERY OF THE UBS
## SUBSEQUENT TRANSFERS

111.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

**ANSWER**: LGT Switzerland incorporates and reasserts its responses to the allegations contained in all of the previous paragraphs of the Amended Complaint with the same force and effect as if fully set forth herein.

112.    Defendant UBS Europe received the UBS Subsequent Transfers, totaling $9,296,416.

**ANSWER**: LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 112 and, therefore, denies the allegations in paragraph 112.

113.    Each of the UBS Subsequent Transfers is recoverable from UBS Europe under Bankruptcy Code § 550(a) and SIPA § 78fff-2(c)(3).

**ANSWER**: The allegations contained in paragraph 113 constitute legal conclusions to which no response is required. To the extent a response is required, LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 113 and, therefore, denies the allegations in paragraph 113.

114.    Each of the UBS Subsequent Transfers was made directly or indirectly to UBS Europe, thus, UBS Europe is an immediate or mediate transferee of the UBS Subsequent Transfers.

38

**ANSWER**: The allegations contained in paragraph 114 constitute legal conclusions to which no response is required. To the extent a response is required, LGT Switzerland lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 114 and, therefore, denies the allegations in paragraph 114.

115.   As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against UBS Europe: (a) recovering the UBS Subsequent Transfers, or the value thereof, from UBS Europe for the benefit of the estate of BLMIS; (b) awarding the Trustee prejudgment interest from the Filing Date through the date of entry of judgment; and (c) awarding any other relief as the Court deems appropriate.

**ANSWER**: The allegations contained in paragraph 115 constitute legal conclusions to which no response is required. To the extent a response is required, LGT Switzerland denies the allegations contained in paragraph 115.

**COUNT TWO**
**RECOVERY OF THE LGT-FAIRFIELD SENTRY**
**SUBSEQUENT TRANSFERS**

116.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

**ANSWER**: LGT Switzerland incorporates and reasserts its responses to the allegations contained in all of the previous paragraphs of the Amended Complaint with the same force and effect as if fully set forth herein.

117.   Defendant LGT Switzerland received the LGT-Fairfield Sentry Subsequent Transfers, totaling $1,095,980.

**ANSWER**: The allegations contained in paragraph 117 constitute legal conclusions to which no response is required. To the extent a response is required, LGT Switzerland denies the allegations contained in paragraph 117.

118.   Each of the LGT-Fairfield Sentry Subsequent Transfers is recoverable from LGT Switzerland under Bankruptcy Code § 550(a) and SIPA § 78fff-2(c)(3).

**ANSWER**: The allegations contained in paragraph 118 constitute legal conclusions to which no response is required.  To the extent a response is required, LGT Switzerland denies the allegations contained in paragraph 118.

119.   Each of the LGT-Fairfield Sentry Subsequent Transfers was made directly or indirectly to LGT Switzerland.

**ANSWER**: The allegations contained in paragraph 119 constitute legal conclusions to which no response is required.  To the extent a response is required, LGT Switzerland denies the allegations contained in paragraph 119.

120.   LGT Switzerland is an immediate or mediate transferee of the LGT-Fairfield Sentry Subsequent Transfers.

**ANSWER**: The allegations contained in paragraph 120 constitute legal conclusions to which no response is required.  To the extent a response is required, LGT Switzerland denies the allegations contained in paragraph 120.

121.   As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against LGT Switzerland: (a) recovering the LGT Switzerland-Fairfield Sentry Subsequent Transfers, or the value thereof, from LGT Switzerland for the benefit of the estate of BLMIS; (b) awarding the Trustee prejudgment interest from the Filing Date through the date of entry of judgment; and (c) awarding any other relief as the Court deems appropriate.

**ANSWER**: The allegations contained in paragraph 121 constitute legal conclusions to which no response is required.  To the extent a response is required, LGT Switzerland denies the allegations contained in paragraph 121.

## RESPONSE TO THE TRUSTEE'S REQUEST FOR RELIEF

LGT Switzerland denies that the Trustee is entitled to judgment in his favor as against LGT Switzerland, in whole or in part or to any relief whatsoever.  LGT Switzerland further denies that this Court has jurisdiction to enter any such judgment or relief.

## AFFIRMATIVE DEFENSES

LGT Switzerland asserts the following defenses without assuming the burden of proof or any other burden if, as a matter of law, such burdens would otherwise be on the Trustee. LGT Switzerland reserves the right to amend this Answer to assert additional defenses, as well as the right to assert counterclaims or claims against third parties based on discovery in this adversary proceeding, or otherwise.

The following defenses are set forth cumulatively and in the alternative:

### FIRST AFFIRMATIVE DEFENSE
### (Personal Jurisdiction)

As set forth in LGT Switzerland's Motion to Dismiss the Complaint, filed on September 15, 2022, in this adversary proceeding (Dkts. 109-113, 124), this Court lacks personal jurisdiction over LGT Switzerland. LGT Switzerland has not consented to the authority of this Court.

### SECOND AFFIRMATIVE DEFENSE
### (Failure to State a Claim for Relief)

The Amended Complaint fails to state a claim upon which relief can be granted, including without limitation for the reasons stated in LGT Switzerland's Memorandum of Law in Support of its Motion to Dismiss the Complaint (Dkts. 110, 124).

### THIRD AFFIRMATIVE DEFENSE
### (Dismissed Claims)

The Trustee's claims are barred to the extent they, and/or any allegations on which they are based, have been or may in the future be dismissed or stricken by the Court, or are based on theories or allegations that may in the future be rejected by this Court or by another court on appeal from any orders of this Court.

### FOURTH AFFIRMATIVE DEFENSE
### (Safe Harbor: 11 U.S.C. § 546(e))

Pursuant to 11 U.S.C. § 546(e), the Trustee may not avoid any alleged Fairfield Sentry Initial Transfers, or pursue under 11 U.S.C. §550(a) any recovery claims against Defendant premised upon the alleged avoidance or avoidability of any alleged Fairfield Sentry Initial Transfers, except to the extent that the Trustee can establish that such transfers were made with actual intent to defraud within two years before the Filing Date.

### FIFTH AFFIRMATIVE DEFENSE
### (No Customer Property: 15 U.S.C. § 78fff-2(c)(3))

The alleged Fairfield Subsequent Transfers did not constitute BLMIS customer property. As set forth in LGT Switzerland's Memorandum of Law in Support of its Motion to Dismiss the Complaint [Dkt. 110], many of the alleged Fairfield Subsequent Transfers could not have been sourced from BLMIS customer property because the allegedly avoidable transfers from BLMIS to Fairfield Sentry had been distributed by Fairfield Sentry to its affiliates or other institutions prior to the alleged Fairfield Subsequent Transfers.

### SIXTH AFFIRMATIVE DEFENSE
### (Initial Transfer Not Avoided: 11 U.S.C. 550(a))

The Trustee may not recover the alleged Fairfield Subsequent Transfers because the alleged Fairfield Sentry Initial Transfers have not been avoided.

### SEVENTH AFFIRMATIVE DEFENSE
### (Good Faith: 11 U.S.C. 550(b) and NYDCL §278(1))

To the extent that LGT Switzerland received any alleged Fairfield Sentry Subsequent Transfers or any proceeds thereof, such funds may not be recovered because LGT Switzerland took for value, in good faith, and without knowledge of the voidability of the alleged Fairfield Sentry Subsequent Transfers within the meaning of 11 U.S.C. § 550(b) and/or as a purchaser for fair consideration, without knowledge of the fraud at the time of the purchase or actual fraudulent

intent within the meaning of NYDCL §§ 278(1) and (2).  Any such taking was made for value because those transfers were made in exchange for Fairfield Sentry's redemption of its own shares from LGT Switzerland.

To the extent that LGT Switzerland received any alleged Fairfield Sentry Subsequent Transfers or any proceeds thereof, they took in good faith because:  (i) it lacked knowledge that BLMIS was not trading securities or was conducting a fraud, or of any fraudulent purpose behind the alleged Fairfield Sentry Subsequent Transfers; (ii) it lacked knowledge of the voidability of any alleged Fairfield Sentry Initial Transfers at the time that it allegedly received any alleged Fairfield Sentry Subsequent Transfers; (iii) it lacked actual fraudulent intent at the time they allegedly received any alleged Fairfield Sentry Subsequent Transfers; (iv) it lacked knowledge of facts suggestive of any alleged fraud that would have caused a reasonable person in LGT Switzerland's position to conduct further inquiry; and (v) even if LGT Switzerland was on inquiry notice, a diligent inquiry would not have discovered the allegedly fraudulent purpose of any transfers at issue or that BLMIS was not trading securities or was conducting a fraud.  At all relevant times, LGT Switzerland had access to, and was aware of, only publicly available information about Fairfield Sentry and BLMIS, including the general information disseminated by Fairfield Sentry.  Neither LGT Switzerland nor anyone acting on its behalf ever had personal access to Madoff or BLMIS, or met or communicated with them.

If, as the Trustee alleges, the Fairfield Sentry Initial Transfers are avoidable, LGT Switzerland had no knowledge of such avoidability.

### EIGTH AFFIRMATIVE DEFENSE
### (Single Satisfaction: 11 U.S.C. § 550(d) and NYDCL § 278(1)(a))

Under 11 U.S.C. 550(d), the Trustee "is entitled to only a single satisfaction under" 11 U.S.C. § 550(a).   Under NYDCL § 278(1)(a), the Trustee may only set aside a conveyance "to the extent necessary to satisfy his claim."

Accordingly, to the extent that the Trustee has recovered, or will recover, from Fairfield Sentry or from any other immediate or mediate transferee the amount of any avoided initial transfer that includes Customer Property that the Trustee alleges was received by the Defendant, the Trustee is barred from recovering any such alleged transfer (or its proceeds) from the Defendant.

### NINTH AFFIRMATIVE DEFENSE
### (Mere Conduit/ Lack of Dominion or Control)

The Trustee's claims are barred because LGT Switzerland was not a transferee, for purposes of 11 U.S.C. § 550(a), of any of the alleged Fairfield Sentry Subsequent Transfers, as defined in the Amended Complaint.   To the extent that LGT Switzerland received any alleged Fairfield Sentry Subsequent Transfers, it did so in good faith, acting in its capacity as a bank and for the account and benefit of one or more of its customers.   LGT Switzerland did not have dominion or control, or the right to assert dominion or control, over any alleged Fairfield Sentry Subsequent Transfer or any proceeds thereof, or the right to use any part of any alleged Fairfield Sentry Subsequent Transfer or the proceeds thereof for its own purposes.   Rather, LGT Switzerland was obligated to credit the proceeds of any alleged Fairfield Sentry Subsequent Transfer to the account(s) of and for the benefit of one or more of its customers, who had the right to assert dominion and control over said alleged Fairfield Sentry Subsequent Transfers.   Accordingly, to the extent that LGT Switzerland received any alleged Fairfield Sentry Subsequent Transfers or proceeds thereof, it did so as a mere conduit for third parties rather than as a transferee from which the Trustee may recover under 11 U.S.C. § 550(a).   Such initial transfers would be barred by the safe harbor under § 546(e) of the Bankruptcy Code and LGT Switzerland may retain the

amount it received pursuant to § 548 of the Bankruptcy Code because it took the transfers for value and in good faith.

## TENTH AFFIRMATIVE DEFENSE
### (British Virgin Islands Proceedings)

The Trustee's claims are barred, in whole or in part, based upon rulings, judgments, orders, or decisions entered in the Fairfield Sentry liquidation proceedings before the Eastern Caribbean High Court of Justice, Commercial Division, British Virgin Islands, including any associated appellate rulings, judgments, orders, or decisions.

## ELEVENTH AFFIRMATIVE DEFENSE
### (Extraterritoriality)

The Trustee's claims to recover from LGT Switzerland subsequent transfers allegedly made to it by Fairfield Sentry constitute an impermissible extraterritorial application of 11 U.S.C. § 550(a) and NYDCL § 278.

## TWELFTH AFFIRMATIVE DEFENSE
### (Comity)

The Trustee's claims to recover from LGT Switzerland subsequent transfers allegedly made to it by Fairfield Sentry violate principles of international comity.

## THIRTEENTH AFFIRMATIVE DEFENSE
### (Subject Matter Jurisdiction)

This Court lacks jurisdiction under Article III of the U.S. Constitution to enter final orders or judgments in this proceeding.

## FOURTEENTH AFFIRMATIVE DEFENSE
### (Unreasonable Delay)

The Trustee's delay in prosecuting his claims, which were brought more than a decade ago and concerns transfers made more than seventeen (17) years ago, is unreasonable and unfairly prejudices LGT Switzerland's ability to defend itself.

45

## FIFTEENTH AFFIRMATIVE DEFENSE
### (Double Recovery)

On or about July 13, 2011, the Trustee entered into a settlement agreement with the Liquidators of Fairfield Sentry and other Fairfield funds.  That agreement provides for the sharing of recoveries on the Trustee's and the Fairfield Sentry Liquidators' claims against defendants who allegedly received transfers of BLMIS customer property from Fairfield Sentry.   The agreement was ultimately incorporated into the consent judgment entered against Fairfield Sentry.

To the extent that the Fairfield Sentry Liquidators recover from LGT Switzerland via settlement or otherwise, the Trustee is barred from recovering because he is not entitled to a double recovery, nor should LGT Switzerland be subject to recovery of the same monies by two separate plaintiffs.

## SIXTEENTH AFFIRMATIVE DEFENSE
### (Estoppel)

The Trustee's claim is barred by estoppel.

## SEVENTEENTH AFFIRMATIVE DEFENSE
### (No Ponzi Scheme Presumption)

The Trustee is not entitled to rely upon a "Ponzi scheme presumption" to prove that the initial transfers from BLMIS to Fairfield Sentry, which he seeks to recover from LGT Switzerland, were made with actual intent to hinder, delay or defraud any BLMIS creditor.

## EIGHTEENTH AFFIRMATIVE DEFENSE
### (Violation of Due Process (Amendment V to the U.S. Const.))

The use of the doctrine of law of the case to apply rulings made in other adversary proceedings of which they were not a party and did not otherwise participate in to LGT Switzerland

violates LGT Switzerland's right to due process of law, as guaranteed by the Fifth Amendment to the U.S. Constitution.

## NINTEENTH AFFIRMATIVE DEFENSE
### (Statute of Limitations)

The Trustee's claim is barred by the statute of limitations.

## TWENTIETH AFFIRMATIVE DEFENSE
### (No Interest)

To the extent the Trustee recovers from LGT Switzerland, the Trustee is not entitled to an award of interest.

## TWENTY-FIRST AFFIRMATIVE DEFENSE
### (Preservation of Rights: 11 U.S.C. § 502(h))

To the extent the Trustee recovers from LGT Switzerland, LGT Switzerland reserves the right to assert a claim arising from any such recovery under 11 U.S.C. § 502(h).

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 9015 of the Federal Rules of Bankruptcy Procedure, Defendant LGT Switzerland hereby demands a jury trial on all claims and issues that may be tried by a jury.

## STATEMENT PURSUANT TO FED. R. BANKR. P. 7012(b)

LGT Switzerland does not consent, but instead objects, to the entry of a final Order or Judgment against them by the Bankruptcy Court.

**WHEREFORE**, Defendant LGT Bank (Switzerland) Ltd. as successor in interest to Dresdner Bank (Schweiz) AG requests that this Court dismiss the Amended Complaint with prejudice, award LGT Switzerland its attorneys' fees, costs and disbursements incurred in connection with this adversary proceeding, and grant LGT Switzerland such other and further relief as the Court deems just and proper.

Dated: April 28, 2023                   Respectfully submitted,

**WUERSCH & GERING LLP**

*/s/ Gregory F. Hauser*
Gregory F. Hauser
Jascha D. Preuss
100 Wall Street, 10th Floor
New York, New York 10005
Telephone: (212) 509-5050
gregory.hauser@wg-law.com
jascha.preuss@wg-law.com
***Counsel for Defendant LGT Bank
(Switzerland) Ltd. as successor in
interest to Dresdner Bank (Schweiz) AG***

48

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 28th day of April, 2023, a true and correct PDF copy of

the foregoing has been electronically filed with the Clerk of the Court using the CM/ECF system,

which will send a notice of electronic filing to all counsel of record.


*/s/ Gregory F. Hauser*
Gregory F. Hauser

49