**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, New York 10166
Tel.: (212) 351-4000
Marshall R. King
Gabriel Herrmann
Keith R. Martorana

*Attorneys for the UBS Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (CGM) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, <br><br> Plaintiff, <br><br> v. <br><br> UBS EUROPE SE (f/k/a UBS (LUXEMBOURG) S.A.), UBS FUND SERVICES (LUXEMBOURG) S.A., UBS THIRD PARTY MANAGEMENT COMPANY S.A., M&B CAPITAL ADVISERS SOCIEDAD DE VALORES, S.A., RELIANCE INTERNATIONAL RESEARCH LLC, LUXEMBOURG INVESTMENT FUND AND LUXEMBOURG INVESTMENT FUND U.S. EQUITY PLUS, as represented by their Liquidators MAÎTRE ALAIN RUKAVINA and PAUL LAPLUME, MAÎTRE ALAIN RUKAVINA and | Adv. Proc. No. 10-05311 (CGM) <br><br> **ORAL ARGUMENT REQUESTED** |

PAUL LAPLUME, in their capacities as liquidators
and representatives of LUXEMBOURG
INVESTMENT FUND AND LUXEMBOURG
INVESTMENT FUND U.S. EQUITY PLUS,

Defendants.

### NOTICE OF UBS DEFENDANTS' MOTION
### TO DISMISS THE SECOND AMENDED COMPLAINT

PLEASE TAKE NOTICE that, upon the Memorandum of Law of Defendants UBS Europe SE, Luxembourg Branch (f/k/a UBS (Luxembourg) S.A.) ("**UBS Lux**" or "**UBS SA**"), UBS Fund Services (Luxembourg) S.A. ("**UBSFSL**"), and UBS Third Party Management Company S.A. ("**UBSTPM**") (collectively, "**UBS**" or the "**UBS Defendants**") in Support of the UBS Defendants' Motion to Dismiss the Second Amended Complaint; the Second Amended Complaint filed in the above-captioned adversary proceeding on February 24, 2023 at ECF No. 284 (the "**Second Amended Complaint**") by Plaintiff Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC ("**BLMIS**") and the chapter 7 Estate of Bernard L. Madoff (the "**Trustee**"); and all prior pleadings and proceedings herein, the UBS Defendants will move this Court on September 20, 2023 at 10:00 a.m. (Eastern Time), or as soon thereafter as counsel may be heard, for an order dismissing the Second Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), made applicable by Rule 7012 of the Federal Rules of Bankruptcy Procedure.

PLEASE TAKE FURTHER NOTICE that, pursuant to the Stipulation and Order entered on February 23, 2023 at ECF No. 283, the Trustee shall file any papers in opposition to this motion on or before July 14, 2023, and the UBS Defendants shall file any reply papers in further support of this motion on or before August 18, 2023.

PLEASE TAKE FURTHER NOTICE that, pursuant to Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, the UBS Defendants do not consent to the entry of final orders or judgment by this Court.

Dated: May 5, 2023
     New York, New York

Respectfully Submitted,

**GIBSON, DUNN & CRUTCHER LLP**

*/s/ Marshall R. King*
Marshall R. King
Gabriel Herrmann
Keith R. Martorana

200 Park Avenue
New York, New York 10166
Tel.: (212) 351-4000
mking@gibsondunn.com
gherrmann@gibsondunn.com
kmartorana@gibsondunn.com

*Attorneys for the UBS Defendants*

**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, New York 10166
Tel.: (212) 351-4000
Marshall R. King
Gabriel Herrmann
Keith R. Martorana

*Attorneys for the UBS Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Proc. No. 10-05311 (CGM) |
| Plaintiff, | |
| v. | |
| UBS EUROPE SE (f/k/a UBS (LUXEMBOURG) S.A.), UBS FUND SERVICES (LUXEMBOURG) S.A., UBS THIRD PARTY MANAGEMENT COMPANY S.A., M&B CAPITAL ADVISERS SOCIEDAD DE VALORES, S.A., RELIANCE INTERNATIONAL RESEARCH LLC, LUXEMBOURG INVESTMENT FUND AND LUXEMBOURG INVESTMENT FUND U.S. EQUITY PLUS, as represented by their Liquidators MAÎTRE ALAIN RUKAVINA and PAUL LAPLUME, MAÎTRE ALAIN RUKAVINA and | |

PAUL LAPLUME, in their capacities as liquidators
and representatives of LUXEMBOURG
INVESTMENT FUND AND LUXEMBOURG
INVESTMENT FUND U.S. EQUITY PLUS,

Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF THE UBS DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS.................................................................................. i

TABLE OF AUTHORITIES ........................................................................... i

PRELIMINARY STATEMENT ...................................................................... 1

FACTUAL BACKGROUND............................................................................ 3

ARGUMENT ................................................................................................... 5

I.       Applicable Legal Standards .................................................. 5

II.      The Court Lacks Personal Jurisdiction Over UBSFSL and UBSTPM................ 7

         A.       UBSFSL and UBSTPM Are Not Subject to General Jurisdiction in
                  this Court.................................................................. 8

         B.       UBSFSL and UBSTPM Are Not Subject to Specific Jurisdiction in
                  this Court.................................................................. 9

                  1.       The Trustee Identifies No Jurisdictionally Significant
                           Contacts Between UBSFSL and the United States..................... 11

                  2.       The Trustee Identifies No Jurisdictionally Significant
                           Contacts Between UBSTPM and the United States ................... 13

III.     The Section 546(e) Safe Harbor Shields All of the Alleged Subsequent
         Transfers to the UBS Defendants ........................................ 15

         A.       The Alleged Initial Transfers Were Made by or to a Covered Entity...... 16

         B.       The Alleged Initial Transfers Were Settlement Payments Made in
                  Connection with a Securities Contract.................................... 18

                  1.       The Alleged Initial Transfers Were Settlement Payments
                           Made in Connection with BLMIS Securities Contracts ............. 18

                  2.       The Alleged Initial Transfers Were Made in Connection
                           with Other Securities Contracts ................................ 19

         C.       Section 546(e) Does Not Contain a "Knowledge" Exception ................ 20

IV.      The Section 548(a)(1)(A) Exception to the Section 546(e) Safe Harbor
         Does Not Apply ..................................................... 24

# TABLE OF CONTENTS
## (Continued)

Page

A.  The Trustee Has Failed to Allege Actual Fraudulent Intent as
Required by Section 548(a)(1)(A) and Rule 9(b) .................................... 24

B.  The Trustee Should Not Be Permitted to Rely on the Ponzi Scheme
Presumption to Avoid His Pleading Burden ........................................... 25

V.  The SAC Establishes UBS's Good-Faith Defense ............................................ 27

A.  Value .......................................................................................................... 27

B.  Good Faith ............................................................................................... 28

C.  Without Knowledge of Voidability .......................................................... 31

VI.  The SAC Does Not Plausibly Allege That UBS Received BLMIS
Customer Property ............................................................................................ 31

CONCLUSION ..................................................................................................................... 35

# TABLE OF AUTHORITIES

Page(s)

CASES

*Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*,
   457 F. Supp. 3d 401 (S.D.N.Y. 2020)......................................................................6

*Am. Girl, LLC v. Zembrka*,
   2021 WL 1699928 (S.D.N.Y. Apr. 28, 2021)..........................................................10

*Angell v. Ber Care, Inc. (In re Caremerica, Inc.)*,
   409 B.R. 737 (Bankr. E.D.N.C. 2009).....................................................................34

*Asahi Metal Indus. Co. v. Super. Ct.*,
   480 U.S. 102 (1987).................................................................................................10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................................7, 33

*Austin v. Downs, Rachlin & Martin Burlington St. Johnsbury*,
   270 F. App'x 52 (2d Cir. 2008) ...............................................................................17

*Bah v. Apple Inc.*,
   2021 WL 4894677 (S.D.N.Y. July 26, 2021) ..........................................................10

*Balaber-Strauss v. Lawrence*,
   264 B.R. 303 (S.D.N.Y. 2001)..................................................................................28

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)........................................................................................6, 7, 33

*In re Bernard L. Madoff Inv. Sec. LLC*,
   654 F.3d 229 (2d Cir. 2011).....................................................................................25

*Brandt v. Horseshoe Hammond, LLC (In re Equip. Acq. Res., Inc.)*,
   803 F.3d 835 (7th Cir. 2015) ...................................................................................31

*Charles Schwab Corp. v. Bank of Am. Corp.*,
   883 F.3d 68 (2d Cir. 2018)..........................................................................9, 10, 11

*In re CIL Ltd.*,
   582 B.R. 46 (Bankr. S.D.N.Y. 2018).........................................................................5

*Cromer Finance Ltd. v. Berger*,
   137 F. Supp. 2d 452 (S.D.N.Y. 2001)................................................................12, 13

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) .......................................................................................6, 9

*DiStefano v. Carozzi N. Am., Inc.*,
286 F.3d 81 (2d Cir. 2001) ....................................................................................5

*Finn v. Alliance Bank*,
860 N.W.2d 638 (Minn. 2015) ..........................................................................26

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
141 S. Ct. 1017 (2021) .......................................................................................10

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915 (2011) ...........................................................................................10

*Greenspan v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck, Phleger & Harrison LLP)*,
408 B.R. 318 (Bankr. N.D. Cal. 2009) ..............................................................28

*Gucci Am., Inc. v. Weixing Li*,
768 F.3d 122 (2d Cir. 2014) ..............................................................................5, 6

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984) ..............................................................................................6

*Hydro-Dyne, Inc. v. Ecodyne Corp.*,
812 F.2d 1407, 1987 WL 36573 (6th Cir. 1987) ...............................................22

*Int. Shoe Co. v. Washington*,
326 U.S. 310 (1945) ..............................................................................................5

*Kennedy v. Mondelez Glob. LLC*,
2020 WL 4006197 (E.D.N.Y. July 10, 2020) ....................................................35

*King Cnty. v. IKB Deutsche Industriebank AG*,
769 F. Supp. 2d 309 (S.D.N.Y. 2011) .................................................................5

*Langenberg v. Sofair*,
2006 WL 2628348 (S.D.N.Y. Sept. 11, 2006) .....................................................6

*Law v. Siegel*,
571 U.S. 415 (2014) ............................................................................................23

*In re Lehman Bros. Holdings Inc.*,
535 B.R. 608 (Bankr. S.D.N.Y. 2015) .................................................................6

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Lustig v. Weisz & Assocs. (In re Unified Com. Cap., Inc.)*,
260 B.R. 343 (Bankr. W.D.N.Y. 2001) ..............................................................26, 27

*McGraw-Hill Glob. Educ. Holdings v. Khan*,
323 F. Supp. 3d 488 (S.D.N.Y. 2018)......................................................................14

*Melnick v. Adelson–Melnick*,
346 F. Supp. 2d 499 (S.D.N.Y. 2004).......................................................................5

*Merit Mgmt. Grp. v. FTI Consulting, Inc.*,
138 S. Ct. 883 (2018)...............................................................................................15, 24

*In re Merkin*,
817 F. Supp. 2d 346 (S.D.N.Y. 2011), *vacated in part on other grounds*,
2015 WL 10847318 (S.D.N.Y. Aug. 24, 2015)......................................................21

*Natco Ltd. P'ship v. Moran Towing of Fla., Inc.*,
267 F.3d 1190 (11th Cir. 2001) .......................................................................22, 23

*Off. Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*,
343 B.R. 444 (Bankr. S.D.N.Y. 2006).....................................................................25

*Papasan v. Allain*,
478 U.S. 265 (1986)....................................................................................................7

*Picard v. BNP Paribas S.A. (In re Madoff)*,
594 B.R. 167 (Bankr. S.D.N.Y. 2018)..............................................................10, 11, 22, 34

*Picard v. Bureau of Labor Ins. (In re BLMIS)*,
480 B.R. 501 (Bankr. S.D.N.Y. 2012)................................................................8, 14

*Picard v. Citibank (In re Bernard L. Madoff Inv. Secs. LLC)*,
12 F.4th 171 (2d Cir. 2021) ....................................................25, 26, 27, 28, 29, 31

*Picard v. Fairfield Inv. Fund Ltd. (In re Madoff)*,
2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6, 2021) (Morris, J.)................14, 16, 24

*Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*,
773 F.3d 411 (2d Cir. 2014)...........................................................2, 16, 17, 18, 19

*Picard v. Maxam Absolute Return Fund, L.P.*,
460 B.R. 106 (Bankr. S.D.N.Y. 2011)....................................................................14

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
 515 B.R. 117 (Bankr. S.D.N.Y. 2014) ...............................................................21, 23

*Picard v. Multi-Strategy Fund Ltd.*,
 2022 WL 16647767 (S.D.N.Y. Nov. 3, 2022) ...............................................19, 23

*Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC)*,
 542 B.R. 100 (Bankr. S.D.N.Y. 2015) ...................................................................34

*Rajala v. Spencer Fane LLP (In re Generation Res. Holding Co.)*,
 964 F.3d 958 (10th Cir. 2020) ...............................................................................32

*Rieger v. Drabinsky (In re Livent, Inc. Noteholders Sec. Litig.)*,
 151 F. Supp. 2d 371 (S.D.N.Y. 2001) .....................................................................7

*Rush v. Savchuk*,
 444 U.S. 320 (1980) ................................................................................................6

*Sec. Inv. Protect. Corp. v. Bernard L. Madoff Inv. Secs. LLC*,
 516 B.R. 18 (S.D.N.Y. 2014) ................................................................................31

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*,
 403 F.3d 43 (2d Cir. 2005) ...............................................................................25, 27

*Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Techs. Ltd.)*,
 337 B.R. 791 (Bankr. S.D.N.Y. 2005) ...................................................................23

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*,
 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ...................................17, 19, 20, 21

*SPV OSUS Ltd. v. UBS AG*,
 114 F. Supp. 3d 161 (S.D.N.Y. 2015), *aff'd*, 882 F.3d 333 (2d Cir. 2018) ..........5, 6

*SPV OSUS Ltd. v. UBS AG*,
 882 F.3d 333 (2d Cir. 2018) ....................................................................................8

*Tamam v. Fransabank Sal*,
 677 F. Supp. 2d 720 (S.D.N.Y. 2010) .....................................................................5

*In re Terrorist Attacks on Sept. 11, 2001*,
 714 F.3d 659 (2d Cir. 2013) .....................................................................................6

*In re Trib. Co. Fraudulent Conv. Litig.*,
 946 F.3d 66 (2d Cir. 2019) ...............................................................................16, 24

iv

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Waldman v. Palestine Liberation Org.*,
  835 F.3d 317 (2d Cir. 2016)..................................................................................................10

**STATUTES**

11 U.S.C. § 101(53A) ...........................................................................................................17

11 U.S.C. § 546(e) ..........................................................................................................16, 17

11 U.S.C. § 548(a)(1)(A) .......................................................................................................25

11 U.S.C. § 548(d)(2)(A) .......................................................................................................28

11 U.S.C. § 550(a) .................................................................................................................15

11 U.S.C. § 550(b) .................................................................................................................27

11 U.S.C. § 741(7) ......................................................................................................18, 20, 23

11 U.S.C. § 741(8) .................................................................................................................23

15 U.S.C. § 78*fff*-2(c)(3) ......................................................................................................32

**OTHER AUTHORITIES**

5 *Collier on Bankruptcy* ¶ 550.03[1] (16th ed. 2021)................................................................27

Defendants UBS Europe SE, Luxembourg Branch (f/k/a UBS (Luxembourg) S.A.) ("**UBS Lux**" or "**UBS SA**"), UBS Fund Services (Luxembourg) S.A. ("**UBSFSL**"), and UBS Third Party Management Company S.A. ("**UBSTPM**") (collectively, "**UBS**" or the "**UBS Defendants**") respectfully submit this memorandum of law in support of their motion, pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) (made applicable by Fed. R. Bankr. P. 7012), to dismiss Count Three of the Second Amended Complaint (No. 10-5311, ECF No. 284) (the "**Second Amended Complaint**" or "**SAC**")[1] filed on February 24, 2023, by Plaintiff Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC ("**BLMIS**") and the chapter 7 Estate of Bernard L. Madoff (the "**Trustee**"). In support of their motion, the UBS Defendants respectfully represent as follows:

## PRELIMINARY STATEMENT

The subsequent-transfer claims asserted against the UBS Defendants in the Second Amended Complaint fail for at least four independent reasons.

*First*, insofar as the Trustee purports to assert claims against UBSFSL and UBSTPM, he improperly sues foreign-domiciled entities that are not "at home" in the United States and that lack any suit-related U.S. contacts, making the assertion of personal jurisdiction over them constitutionally impermissible. At most, the SAC alleges these UBS Defendants rendered services overseas to a foreign investment fund that had assets with BLMIS. Thus, the claims against UBSFSL and UBSTPM should be dismissed for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).

*Second*, even setting aside that jurisdictional infirmity, the Trustee fails to state an actionable claim for relief as against any of the UBS Defendants because recovery of the transfers

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the SAC.

he seeks to recoup is barred by the safe harbor of Bankruptcy Code section 546(e).  Permitting the Trustee to proceed with this litigation would undermine the protection of the securities markets that Congress intended and "cause the very displacement that Congress hoped to minimize in enacting § 546(e)."  *Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 420 (2d Cir. 2014).  The alleged transfers were "settlement payments" and made in connection with "securities contract[s]," and are therefore subject to 546(e) in all respects.  Although section 546(e) does not shield transfers that were actually fraudulent under section 548(a)(1)(A), the Trustee does not adequately allege actual fraud under Rule 9(b), and the so-called "Ponzi scheme presumption" does not rectify this failure, as it has no textual support in the Bankruptcy Code or Bankruptcy Rules.

*Third*, the Trustee's claims must be dismissed in any event because the SAC establishes UBS's good-faith defense as a matter of law—i.e., that a diligent inquiry would not have discovered the fraudulent purpose of BLMIS's alleged initial transfers.  Indeed, the Trustee simply wishes away the fact that BLMIS duped thousands of sophisticated customers and operated under the regulatory eye of the SEC, which, even after investigating BLMIS, was unable to unearth Madoff's Ponzi scheme.

*Fourth*, even if avoidance of the relevant initial transfers to LIF-USEP (defined below) could be had, the Trustee's claims against the UBS Defendants fail because the SAC does not plausibly allege that the payments UBS allegedly received from LIF-USEP were "subsequent transfers" of BLMIS customer property.[2]

---

[2]    The UBS Defendants recognize that this Court has denied motions to dismiss in other BLMIS adversary proceedings brought on similar grounds.  The UBS Defendants respectfully request that the Court consider the arguments set forth herein, and seek to preserve their rights.

**FACTUAL BACKGROUND**

In his Second Amended Complaint, the Trustee alleges that Luxembourg Investment Fund U.S. Equity Plus ("**LIF-USEP**") was created as a sub-fund of Luxembourg Investment Fund SICAV ("**LIF**") and as a "Luxalpha clone" with the "sole purpose" of directing investor funds into BLMIS in order to profit therefrom.  SAC ¶¶ 1, 8, 65.  The Trustee alleges that BLMIS made fraudulent "Initial Transfers" to LIF-USEP, which then subsequently transferred "some" of these Initial Transfers to the "Subsequent Transferee Defendants," including the UBS Defendants, as payment for their alleged services to LIF-USEP.  *Id*. ¶¶ 266, 270.

The SAC alleges that LIF, LIF-USEP, and the UBS Defendants are all foreign entities.  It alleges that LIF was an investment fund established under Luxembourg law with a registered office in Luxembourg, *id*. ¶ 64; LIF-USEP was created as a sub-fund of LIF's part II umbrella structure that used the same Luxembourg address, *id*. ¶¶ 65, 68; UBS SA merged with and was absorbed into UBS Europe SE, a Societas Europaea incorporated in Germany, *id*. ¶ 69; and UBSFSL and UBSTPM are both *sociétés anonymes* organized under the laws of Luxembourg with principal places of business in Luxembourg, *id*. ¶¶ 70–71.  The Trustee alleges that UBS SA served as LIF-USEP's custodian and manager, *id*. ¶ 271(a); UBSFSL acted as LIF-USEP's "administrative agent," *id*. ¶ 70; and UBSTPM was LIF-USEP's management company, *id*. ¶ 71.  As "payment" for these "alleged service[s]," the Trustee claims that LIF-USEP subsequently transferred to the UBS Defendants "some" of the Initial Transfers that it received from BLMIS.  *Id*. ¶ 270.

The SAC insinuates that the UBS Defendants should have known of BLMIS's fraud.  Notably, however, it fails to allege that they or LIF-USEP *actually* knew of the fraud, and it tellingly omits relevant factual matters that are in the public record and that the Trustee has alleged in other pleadings—including that BLMIS had duped thousands of sophisticated customers and was under the regulatory ambit of the SEC, which investigated BLMIS extensively and found no

3

wrongdoing (let alone a multi-billion dollar Ponzi scheme). *See Picard v. Fairfield Sentry Ltd.*,

No. 09-01239, ECF No. 23, *Amended Complaint* ¶¶ 4(n), 351, 361 (Bankr. S.D.N.Y. Jul. 20, 2010)

(alleging that Madoff's scheme caused "billions in damages to thousands of customers," that "[i]n

2006, the SEC began an investigation into allegations that BLMIS may have been a Ponzi scheme

or illegally front-running the market," and that Madoff's "scheme to defraud the SEC succeeded"

and "the SEC closed any further investigation of BLMIS").

     The Trustee alleges that, in the two years preceding the Filing Date, BLMIS made transfers

of "at least" $498,300,000 "to or for the benefit of LIF-USEP." *Id.* ¶ 266. Some of these transfers

were then, the Trustee alleges, subsequently transferred to the UBS Defendants "as payment for

their alleged service of LIF-USEP." *Id.* ¶ 270. The SAC alleges that the UBS Defendants received

"at least" $18,537,826 in Subsequent Transfers, which the SAC describes as follows:

   a.  UBS SA received at least $5,162,211 in fees from LIF-USEP for serving as LIF-USEP's
      official custodian from September 2005 to December 2008, and received another $291,368
      in fees for serving as LIF-USEP's official manager from September 2005 through at least
      April 2006.

   b.  UBSFSL received at least $747,560 in fees from LIF-USEP for serving as LIF-USEP's
      official administrator from September 2005 to December 2008.

   c.  UBSTPM received at least $10,590,437 in fees from LIF-USEP for serving as LIF-USEP's
      official manager from May 2006 to December 2008.

*Id.* ¶ 271.

     The Trustee alleges that "the *Initial Transfers* were and continue to be customer property

within the meaning of 15 U.S.C. § 78*lll*(4)," *id.* ¶ 269 (emphasis added), but does not allege that

the *Subsequent Transfers* to the UBS Defendants were of customer property. While the Trustee

has attached to the SAC voluminous tables setting forth the alleged Initial Transfers, he fails to

identify the dates or amounts of any particular Subsequent Transfer, or to specify which, if any, of

the Initial Transfers allegedly were subsequently transferred (in whole or in part) to UBS. Indeed,

though the Trustee alleges that LIF-USEP made payments to the UBS Defendants beginning in

September 2005, he acknowledges that the first Initial Transfer made by BLMIS to LIF-USEP did

not occur until August 2, 2007.  SAC, Ex. B.  The SAC offers no explanation of how transfers

prior to August 2, 2007 could possibly be subsequent transfers of customer property.

## ARGUMENT

## I.    Applicable Legal Standards

"When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction,

the plaintiff bears the burden of establishing that the court has jurisdiction" over "each defendant."

*DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001); *King Cnty. v. IKB Deutsche

Industriebank AG*, 769 F. Supp. 2d 309, 313 (S.D.N.Y. 2011).  "Although ambiguities in the

pleadings should be resolved in the plaintiff's favor, 'conclusory non-fact-specific jurisdictional

allegations or a legal conclusion couched as a factual allegation will not establish a prima facie

showing of jurisdiction.'"  *SPV OSUS Ltd. v. UBS AG*, 114 F. Supp. 3d 161, 167 (S.D.N.Y. 2015),

*aff'd*, 882 F.3d 333 (2d Cir. 2018) (quoting *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 725

(S.D.N.Y. 2010)).  Moreover, "resolving all doubts in the plaintiff's favor is not the same as blindly

crediting all allegations regardless of their factual support."  *Melnick v. Adelson–Melnick*, 346 F.

Supp. 2d 499, 502 n.17 (S.D.N.Y. 2004).

"Since *International Shoe Co. v. Washington*, the touchstone due process principle has

been that, before a court may exercise jurisdiction over a person or an organization . . . that person

or entity must have sufficient 'minimum contacts' with the forum 'such that the maintenance of

the suit does not offend "traditional notions of fair play and substantial justice."'"  *Gucci Am., Inc.

v. Weixing Li*, 768 F.3d 122, 134 (2d Cir. 2014) (quoting *Int. Shoe Co. v. Washington*, 326 U.S.

310, 316 (1945)).  In a bankruptcy proceeding, the relevant forum is the United States.  *See In re

CIL Ltd.*, 582 B.R. 46, 70 (Bankr. S.D.N.Y. 2018).  Thus, an adversary proceeding must be

dismissed if the plaintiff cannot demonstrate that the defendant has sufficient contacts with the United States to establish personal jurisdiction. *See In re Lehman Bros. Holdings Inc.*, 535 B.R. 608, 623 (Bankr. S.D.N.Y. 2015) (noting that "a court cannot enforce a[] . . . judgment against a foreign defendant unless the foreign defendant has the requisite minimum contacts with the United States"). The contacts of each defendant must be assessed individually, without "aggregating" the contacts of other defendants. *See Rush v. Savchuk*, 444 U.S. 320, 331–32 (1980); *see also Langenberg v. Sofair*, 2006 WL 2628348, at *6 (S.D.N.Y. Sept. 11, 2006) (noting that the "jurisdictional requirements" of due process "must be met as to *each defendant* over whom a court exercises jurisdiction").

"In assessing whether a defendant has the requisite 'minimum contacts' with the forum, courts distinguish between 'general' and 'specific' personal jurisdiction." *SPV OSUS Ltd.*, 114 F. Supp. 3d at 167 (citing *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013)). General jurisdiction "permits a court to hear 'any and all claims' against an entity" that is "'essentially at home'" in the forum. *Gucci Am.*, 768 F.3d at 134–35 (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014)). Specific jurisdiction, by contrast, permits the court to exercise jurisdiction "only over issues that 'arise out of or relate to the entity's contacts with the forum.'" *Id.* (alterations omitted) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). In either case, "[t]he plaintiff bears the burden of establishing personal jurisdiction over the defendant." *Allianz Glob. Invs. GmbH v. Bank of Am. Corp.*, 457 F. Supp. 3d 401, 407 (S.D.N.Y. 2020).

The Court must dismiss a claim under Federal Rule of Civil Procedure 12(b)(6) "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). Moreover, the allegations "must contain sufficient

6

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A plausible claim pleads facts "that allow . . . the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

While the Court must accept well-pled factual allegations as true, it need not accept assertions that are unsupported by factual allegations. *Id.* at 678–79. Nor must the Court accept "legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or "conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely," *Rieger v. Drabinsky (In re Livent, Inc. Noteholders Sec. Litig.)*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001).

## II.    The Court Lacks Personal Jurisdiction Over UBSFSL and UBSTPM

As a threshold matter, the Trustee fails to make out a prima facie case of personal jurisdiction over Defendants UBSFSL and UBSTPM.[3] Nowhere in the SAC does the Trustee allege any contacts between UBSFSL and UBSTPM themselves and the United States. Rather, the Trustee attempts to establish jurisdiction on the theory that UBSFSL and UBSTPM, as service providers, provided services to a fund that ultimately directed investments into New York. Thus, the Trustee's theory goes, by providing services to LIF-USEP, which in turn invested through BLMIS, UBSFSL and UBSTPM *themselves* directed conduct into New York. This logic takes a step too far and loses its jurisdictional legs. For while it is true this Court, in other Madoff cases, has previously found that personal jurisdiction applied to defendants that indirectly *invested* with

---

[3]    Pursuant to stipulation so-ordered by the Court on June 18, 2013, UBS Lux agreed not to contest personal jurisdiction in this action. *See* ECF No. 157.

BLMIS, therein lies the key distinction—the UBS Defendants were never themselves investors.

For instance, this Court concluded the suit in another BLMIS proceeding was:

> based upon BLI's investment of tens of millions of dollars in Fairfield Sentry with the specific goal of having funds invested in BLMIS in New York, with intent to profit therefrom. Such investment was not haphazard. Rather, BLI intentionally tossed a seed from abroad to take root and grow as a new tree in the Madoff money orchard in the United States and reap the benefits therefrom.

*Picard v. Bureau of Labor Ins. (In re BLMIS)*, 480 B.R. 501, 506 (Bankr. S.D.N.Y. 2012).

UBSFSL and UBSTPM, on the other hand, have engaged in no such seed-tossing. UBSFSL and UBSTPM never directed their own investments into BLMIS, nor did they set out to ensure that that BLMIS stayed watered with new investments so that theirs could prosper; they are not alleged to be investors in BLMIS or investors in LIF-USEP. Rather, they contracted with LIF-USEP, under contracts governed by foreign law, to provide services to that fund in a foreign country.[4] The Trustee's case for personal jurisdiction thus cannot withstand constitutional scrutiny as applied to UBSFSL and UBSTPM. Accordingly, the Amended Complaint should be dismissed as against UBSFSL and UBSTPM for lack of personal jurisdiction.

### A.    *UBSFSL and UBSTPM Are Not Subject to General Jurisdiction in this Court*

The SAC fails to plead any valid basis for asserting general jurisdiction over UBSFSL and UBSTPM. As the Second Circuit and other courts in this Circuit have uniformly held, "the UBS defendants simply lack sufficient contacts with the United States to allow the exercise of general jurisdiction." *SPV OSUS Ltd. v. UBS AG*, 882 F.3d 333, 344 (2d Cir. 2018). This is in keeping with Supreme Court precedent, which has made clear that a corporation is "at home"—and thus subject to general jurisdiction—only in its place of incorporation and its principal place of

---

[4] While this Court found jurisdiction to be adequately pled in similar circumstances in *Picard v. UBS AG (In re Madoff)*, No. 10-04285 (CGM), ECF. No. 347, 2022 WL 17968924 (Bankr. S.D.N.Y. Dec. 27, 2022), it did not grapple with the distinction between *investors* in foreign feeder funds, and *service providers* to such funds.

business.  *Daimler AG v. Bauman*, 571 U.S. 117, 138 (2014).  Only in an "exceptional case" can

a corporation's operations in another forum be "so substantial and of such a nature as to render the

corporation at home in that State."  *Id*.  Because the Trustee has not advanced any arguments to

the Court that this is such an exceptional action, and because he could not establish it even if he

had tried, his case for jurisdiction must rest solely on principles of specific personal jurisdiction.

### B.    *UBSFSL and UBSTPM Are Not Subject to Specific Jurisdiction in this Court*

The SAC likewise fails to plead any valid basis for asserting specific jurisdiction over

UBSFSL and UBSTPM.  The minimum contacts necessary to support specific jurisdiction "exist

where the defendant purposefully availed itself of the privilege of doing business in the forum and

could foresee being haled into court there."  *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d

68, 82 (2d Cir. 2018).  In an attempt to draw this line, the SAC asserts the UBS Defendants' various

contacts as follows:

> Each Defendant has maintained minimum contacts with New York in connection
> with the claims in this adversary proceeding. . .  [T]he Defendants have or had
> offices in New York, are doing or did business in New York, and/or transact or
> transacted business in New York during the time periods addressed herein. . . . The
> UBS Defendants . . . delivered agreements or caused agreements to be delivered in
> New York, relating to BLMIS.  In addition, certain of the UBS Defendants . . .
> communicated regularly with persons in New York regarding LIF-USEP and/or
> BLMIS, met (directly or through their agents) with BLMIS in New York, and sent
> and/or received funds to and/or from BLMIS in New York, utilizing New York
> banks.

SAC ¶ 17.

These constitute nothing more than conclusory, non-particularized jurisdictional

allegations, improper group pleading of the UBS Defendants' supposed jurisdictional contacts,

and an improper attempt to aggregate those contacts and impute them from one UBS entity to

another—or from other defendants to UBSFSL and UBSTPM.  Indeed, insofar as the Trustee

intends to assert that the jurisdictional contacts of UBS Lux may be imputed to UBSFSL and

UBSTPM, that argument should be summarily rejected. *See infra*.

The exercise of specific jurisdiction also "depends on in-state activity that 'gave rise to the

episode-in-suit.'" *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016)

(quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011)). In the

instant case, the Trustee's claims are based on 11 U.S.C. § 550(a)(2), which authorizes the

recovery of avoidable transfers from subsequent transferees. "Therefore, the jurisdictional

analysis focuses on the Defendants' U.S. contacts related to the receipt of the . . . subsequent

transfers at issue." *Picard v. BNP Paribas S.A. (In re Madoff)*, 594 B.R. 167, 190 (Bankr. S.D.N.Y.

2018). "Each transfer is a separate claim, and the Trustee '*must* establish the court's jurisdiction

with respect to *each* claim asserted.'" *Id.* (emphases added) (quoting *Charles Schwab*, 883 F.3d

at 83).

Thus, to establish specific jurisdiction with respect to each subsequent transfer claim, the

Trustee must demonstrate that the subsequent transfer "arise[s] out of or relate[s] to" the respective

contacts of UBSFSL and UBSTPM with the United States. *Bah v. Apple Inc.*, 2021 WL 4894677,

at *2 (S.D.N.Y. July 26, 2021) (quoting *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S.

Ct. 1017, 1025 (2021)). As the Supreme Court recently reaffirmed in *Ford Motor*, "the phrase

'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum."

141 S. Ct. at 1026. Specifically, the Trustee must show that, with respect to each subsequent

transfer, UBSFSL and UBSTPM "engage[d] in business 'purposefully directed toward'" the

United States. *Am. Girl, LLC v. Zembrka*, 2021 WL 1699928, at *6 (S.D.N.Y. Apr. 28, 2021)

(quoting *Ford*, 141 S. Ct. at 1025 ("Plaintiff must show that the defendant deliberately 'reached

out beyond' its home—by, for example, 'exploi[ting] a market' in the forum State.")); *Asahi Metal*

*Indus. Co. v. Super. Ct.*, 480 U.S. 102, 112 (1987) ("The 'substantial connection' between the defendant and forum State necessary for a finding of minimum contacts must come about by an action of the Defendant purposefully directed toward the forum State." (citation omitted)).

Meanwhile, the Trustee fails even to *identify* the alleged subsequent transfers which he seeks to recover. For it is well-established that "a plaintiff must establish the court's jurisdiction with respect to each claim asserted," *Charles Schwab*, 883 F.3d at 83, and as applied here, this means that the Trustee must establish jurisdiction "with respect to each . . . of the [] subsequent transfers at issue," each of which must be treated "as separate and distinct" claim. *BNP Paribas*, 594 B.R. at 190 (citation omitted). Here, however, the SAC lumps all of the alleged subsequent transfers together, broadly alleging that "LIF-USEP subsequently transferred some of the Initial Transfers to the UBS Defendants . . . as payment for their alleged service of LIF-USEP," with no delineation whatsoever among each individual transfer. SAC ¶ 270. The Trustee cannot possibly meet his burden of establishing jurisdiction "with respect to *each* of the claims asserted," *Charles Schwab*, 883 F.3d at 83 (emphasis added), when he has failed to identify what those claims are in the first place.

       **1.**      **The Trustee Identifies No Jurisdictionally Significant
                  Contacts Between UBSFSL and the United States**

The Trustee has not alleged even remotely sufficient minimum contacts between UBSFSL and the United States. Despite his conclusory allegation that "each" UBS Defendant maintained minimum contacts with New York, the simple facts are that UBSFSL does not and has never had offices New York, did not do and is not doing business in New York, and did not send or receive funds to and/or from BLMIS in New York while utilizing New York banks. UBSFSL is a Luxembourg company, headquartered in Luxembourg, and the Trustee cannot brush past the reality that any of UBSFSL's alleged activities occurred in *Luxembourg*. Moreover, in what is a

11

critical breakdown in its quest for jurisdiction, the SAC does not connect any such activities to any subsequent transfers pled against UBSFSL.

The SAC alleges that UBSFSL acted as LIF-USEP's administrative agent, playing "a critical role" in its operation, management and servicing. SAC ¶ 70. The Trustee argues that as a result of serving in this role, UBSFSL knew that any funds invested in LIF-USEP were to be sent to New York for investment with BLMIS, that any returns or redemptions related to investment emanated from New York, and that the tasks UBSFSL performed "relied upon information received from New York." *Id.* Thus, the sole basis for U.S. jurisdiction that is laid out in the SAC is the notion that UBSFSL "facilitate[d] investment into New York via BLMIS." *Id*. But the SAC ignores that the alleged "investment into New York" was investment made by others—not by UBSFSL. The only conduct the Trustee has actually described here is the allegation that, as a service provider, USBFSL provided services, in a foreign country, to a foreign fund, which allowed that fund to operate and ultimately the fund's investment activities to enter into the U.S. That is simply not enough to establish U.S. jurisdiction over UBSFSL. There are no allegations of fund transfers by UBSFSL to or from the United States, or meetings involving UBSFSL that took place in the United States. None of the tasks undertaken by UBSFSL in its capacity as administrative agent for LIF-USEP is alleged to have been performed in or directed to the United States—let alone to have related in any way to any of the subsequent transfers at issue. Rather, any alleged conduct took place entirely overseas between foreign entities, pursuant to contracts governed by foreign law. These facts clearly distinguish this case from, for example, *Cromer Finance Ltd. v. Berger*, which held that the offshore fund administrators of an investment fund that "was entirely managed out of New York" and "available to United States investors" were subject to jurisdiction for purposes of securities fraud claims brought by investors in the fund. 137 F.

Supp. 2d 452, 476 (S.D.N.Y. 2001).  In *Cromer*, the fund at issue was created, managed, and operated from the United States; there were regular calls and countless mailings by the administrator with investors and others in the US.  *Id.* at 460–61, 476–77.  The Trustee does not—indeed, cannot—allege any comparable contacts here regarding UBSFSL.

### 2.    The Trustee Identifies No Jurisdictionally Significant Contacts Between UBSTPM and the United States

Similarly, the Trustee attempts to argue that the allegation that UBSTPM "facilitated investment activity with BLMIS in New York" is enough of a connection to establish U.S. jurisdiction, and does not even bother to explain how any subsequent transfer allegedly received by UBSTPM "arises out of or relates to" such conduct.  UBSTPM is a Luxembourg company, headquartered in Luxembourg.  Again, despite the Trustee's conclusory allegation that "each" UBS Defendant maintained minimum contacts with New York, the simple facts are that UBSTPM does not and has never had offices New York, did not do and is not doing business in New York, and did not send or receive funds to and/or from BLMIS in New York while utilizing New York banks.

The SAC alleges that UBSTPM was responsible for managing and administering LIF-USEP, including by monitoring investment policies and restrictions, and making investment management decisions.  SAC ¶ 71.  The sole jurisdictional contact under the Trustee's facts is that such management "involved the handing over of investor funds to BLMIS for investment activity undertaken in this jurisdiction."  *Id.*  The SAC vaguely alleges that UBSTPM earned substantial fees in connection with those investments—the Trustee neglects to add, of course, that any such fees paid to UBSTPM as a service provider were paid abroad, under contracts governed by foreign law, in connection with investments to the United States that it did not itself transfer.  Indeed, UBSTPM is not alleged to have even maintained any bank or brokerage accounts in the United

13

States—meaning that it could not possibly have received subsequent transfers in the United States.

And UBSTPM is not itself a fund that "transferr[ed] assets to and from the United States" in order

to invest with BLMIS, *see Picard v. Maxam Absolute Return Fund, L.P.*, 460 B.R. 106, 118

(Bankr. S.D.N.Y. 2011), which distinguishes this case from cases like *Maxam*. There, the

subsequent transferee's indirect investments into BLMIS and withdrawals of its own assets from

BLMIS—effected through another fund that held a BLMIS account—were the very U.S. contacts

out of which the Trustee's subsequent-transfer claim arose. *Id.* at 118. Nor is this a case like

*Picard v. Bureau of Labor Insurance*, where the subsequent transferee had not only received

subsequent transfers but itself "invested tens of millions of dollars" in a BLMIS feeder fund "with

the specific purpose of having funds invested in BLMIS in New York." 480 B.R. at 517.

UBSTPM made no such investments in a feeder fund, much less to the tune of "tens of millions of

dollars." *Id.* Put simply, UBSTPM's conduct was far too attenuated from the United States and

from the subsequent transfers themselves to support the exercise of specific jurisdiction over it.

\*   \*   \*

The Trustee falls far short of his burden to allege that either UBSFSL or UBSTPM had

contacts with the United States that gave rise or relate to the subsequent transfers they allegedly

received. To subject the UBS Defendants to jurisdiction under these circumstances would be to

hale them into court based on "random, fortuitous, or attenuated contacts," *Picard v. Fairfield Inv.

Fund Ltd. (In re Madoff)*, 2021 WL 3477479, at \*13 (Bankr. S.D.N.Y. Aug. 6, 2021) (Morris, J.)—

the very danger that the "stringent" requirements of specific jurisdiction are designed to guard

against, *McGraw-Hill Glob. Educ. Holdings v. Khan*, 323 F. Supp. 3d 488, 495 (S.D.N.Y. 2018)

(citation omitted). The SAC should be dismissed against UBSFSL and UBSTPM for lack of

jurisdiction.

**III.**      **The Section 546(e) Safe Harbor Shields All of the Alleged**
              **Subsequent Transfers to the UBS Defendants**

The Trustee's sole claim against the UBS Defendants is also barred by the "safe harbor" set forth in section 546(e) of the Bankruptcy Code.  That claim seeks to recover subsequent transfers allegedly made to the UBS Defendants pursuant to Bankruptcy Code sections 105(a) and 550(a) and SIPA section 78fff-2(c)(3) (which permits recovery of a transfer "if and to the extent that such transfer is voidable or void under the provisions of title 11").  The Trustee may recover subsequently transferred property, or its value, only to the extent that the initial transfer of such property by the debtor is avoided under the Bankruptcy Code's avoidance provisions.  11 U.S.C. § 550(a).  "The Code sets out a number of limits on the exercise of these avoiding powers," including the securities safe harbor of section 546(e), which bars all recovery sought by the Trustee here.  *Merit Mgmt. Grp. v. FTI Consulting, Inc.*, 138 S. Ct. 883, 889 (2018).

Section 546(e) bars a trustee from avoiding a transfer (other than under section 548(a)(1)(A))[5] if the transfer, *inter alia*, (1) was made by or to a covered entity such as a stockbroker, financial institution, or financial participant; and (2) was either a settlement payment or a transfer in connection with a securities contract:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a . . . settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a . . . stockbroker, financial institution, [or] financial participant, . . . or that is a transfer made by or to (or for the benefit of) a . . . stockbroker, financial institution, [or] financial participant, . . . in connection with a securities contract, as defined in section 741(7), . . . that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.

11 U.S.C. § 546(e).

---

[5]  As discussed in Section IV *infra*, the section 548(a)(1)(A) exception does not apply because the SAC fails to allege actual fraudulent intent as required by section 548(a)(1)(A) and Rule 9(b).

"[I]n enacting the Bankruptcy Code, Congress struck careful balances between the need for an equitable result for the debtor and its creditors, and the need for finality." *Picard v. Ida Fishman Revocable Trust (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 423 (2d Cir. 2014). "[B]y enacting § 546(e), Congress provided that, for a very broad range of securities-related transfers, the interest in finality is sufficiently important that they cannot be avoided by a bankruptcy trustee at all, except as actual fraudulent transfers under § 548(a)(1)(A)." *Id.* "Unwinding settled securities transactions . . . would seriously undermine . . . markets in which certainty, speed, finality, and stability are necessary to attract capital." *In re Trib. Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 90 (2d Cir. 2019). "Permitting the clawback of millions, if not billions, of dollars from BLMIS clients—many of whom are institutional investors and feeder funds— would likely cause the very 'displacement' that Congress hoped to minimize in enacting § 546(e)." *Fishman*, 773 F.3d at 420.

In an action to recover a subsequent transfer, the subsequent transferee may assert any defenses to avoidability of the initial transfer that the initial transferee could have asserted— including the section 546(e) safe harbor. *See Fairfield*, 2021 WL 3477479, at *3. Although section 546(e) is an affirmative defense, a court can dismiss a complaint based on section 546(e) if its applicability is established on the face of the complaint or documents that are incorporated by reference into, or integral to, the complaint. *See id.* at *2.

### A.    *The Alleged Initial Transfers Were Made by or to a Covered Entity*

The alleged initial transfers at issue here were made by or to an entity covered by section 546(e) because those transfers were made by a "stockbroker."[6]  The Bankruptcy Code defines the

---

[6]    UBS reserves for later consideration, if necessary, the questions of (1) whether the transfers were made "to or for the benefit of" a financial institution because any alleged transfers to LIF-USEP were ultimately made to satisfy redemptions made by the funds' investors that were financial institutions, *see SIPC v. Bernard L. Madoff Inv.*

term "stockbroker" to include all entities that "engage[ ] in the business of effecting transactions

in securities." 11 U.S.C. § 101(53A). The District Court in *Fishman* has already concluded that

BLMIS was a stockbroker:

> Overall, Madoff Securities, which was registered as a stockbroker with the SEC,
> clearly engaged in securities transactions. . . . [E]ven assuming the truth of the
> allegation that Madoff Securities' investment advisory division never traded
> securities on behalf of clients, ***Madoff Securities nonetheless qualifies as a
> stockbroker by virtue of the trading conducted by its market making and
> proprietary trading divisions***.

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 719 (S.D.N.Y. 2012) (emphasis added),

*aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411 (2d Cir. 2008). On appeal,

the Second Circuit affirmed the District Court's holding: "It is not disputed [by the Trustee] that

BLMIS was a 'stockbroker' for the purposes of § 546(e)." 773 F.3d at 417. These findings are

binding on the Trustee in this proceeding under the doctrine of collateral estoppel. *See Austin v.

Downs, Rachlin & Martin Burlington St. Johnsbury*, 270 F. App'x 52, 54 (2d Cir. 2008) (summary

order) ("[I]f a litigant has had an opportunity to fully and fairly litigate an issue and lost, then third

parties unrelated to the original action can bar the litigant from relitigating that same issue in a

subsequent suit."). Because BLMIS is a "stockbroker," transfers made by BLMIS, including the

Initial Transfers to LIF-USEP alleged in the SAC, were made by a covered entity under section

546(e).

---

*Sec. LLC,* 2013 WL 1609154, at *9 (S.D.N.Y. Apr. 15, 2013); and (2) whether the transfers were "made by or to
(or for the benefit of) a . . . financial participant," 11 U.S.C. § 546(e).

**B.** ***The Alleged Initial Transfers Were Settlement Payments
Made in Connection with a Securities Contract***

**1.    The Alleged Initial Transfers Were Settlement Payments
Made in Connection with BLMIS Securities Contracts**

Section 546(e) applies to transfers from BLMIS to its account holders and shields them
from avoidance, both because the documents governing BLMIS customers' accounts constituted
securities contracts, and because the payments BLMIS made to those customers were made "in
connection with" those contracts and also constituted "settlement payments." *Fishman*, 773 F.3d
at 417, 418–23. Either of those reasons would suffice to invoke the safe harbor.

A "securities contract" includes "a contract for the purchase, sale, or loan of a security,"
11 U.S.C. § 741(7)(A)(i), as well as "any other agreement or transaction that is similar to an
agreement or transaction referred to in this subparagraph." 11 U.S.C. § 741(7)(A)(vii); *see also
Fishman*, 773 F.3d at 417 (section 741(7) "defines 'securities contract' with extraordinary
breadth").

In *Fishman*, the Second Circuit held that section 546(e) shielded transfers between BLMIS
and its account holders from the Trustee's avoidance powers. 773 F.3d at 417. The Second Circuit
concluded that the documents governing BLMIS customers' accounts constituted securities
contracts, and that the payments BLMIS made to those customers were made "in connection with"
those contracts, and also constituted "settlement payments," *id*. at 418–23, though either of those
findings would have independently sufficed to invoke the safe harbor. The Court rejected the
Trustee's argument that the safe harbor did not apply because Madoff allegedly did not actually
carry out the promised securities transactions. *Id*. at 419–20 ("Section 546(e) only requires that a
covered transfer be broadly related to a 'securities contract,' not that it be connected to an actual
securities transaction.").

18

2.    **The Alleged Initial Transfers Were Made in
Connection with Other Securities Contracts**

Even if the BLMIS Account Opening Agreements did not constitute "securities contracts"
for purposes of section 546(e)—which they clearly do—the alleged initial transfers are still
shielded from avoidance under 546(e) because they were made in connection with LIF-USEP's
securities contracts with its own investors, including investment fund subscription agreements and
redemption requests tendered pursuant thereto.

Section 546(e) applies to all transfers made "in connection with a securities contract," not
just to a transfer in connection with a securities contract that is entered into between the initial
transferor and transferee. Where an initial transfer was caused by a redemption made by a
subsequent transferee pursuant to a securities contract between the initial and subsequent
transferee, then the initial transfer was made "in connection" with a covered securities contract
and the section 546(e) safe harbor would apply. *Securities Investor Protection Corp. v. Bernard
L. Madoff Investment Securities LLC (In re Madoff Securities)*, 2013 WL 1609154 (S.D.N.Y. Apr.
15, 2013) ("**Cohmad**"); *see Picard v. Multi-Strategy Fund Ltd.*, 2022 WL 16647767, at *3–4, 7
n.7 (S.D.N.Y. Nov. 3, 2022) ("securities contracts between Madoff Securities' initial transferees
and their clients might provide an independent basis for applying the Section 546(e) safe harbor");
*Fishman*, 773 F.3d at 422 ("Section 546(e) sets a low bar for the required relationship between the
securities contract and the transfer sought to be avoided.").

LIF-USEP entered into "securities contracts" with its investors pursuant to which the
transfers were made to LIF-USEP, then to the investors, and LIF-USEP's relationships with its
investors—including in respect of redemption payments—were governed by subscription
agreements and associated redemption requests. *See* SAC ¶ 1 (alleging that LIF-USEP was "a new
BLMIS feeder fund" whose "sole purpose was to direct investor funders into BLMIS . . . and to

19

profit therefrom").  The definition of "securities contract" includes "a contract for the purchase, sale, or loan of a security" or "any other agreement or transaction that is similar" to such an agreement, 11 U.S.C. § 741(7)(A)(i)(vii), which "includes . . . investment fund subscription agreements and redemption requests," *Cohmad*, 2013 WL 1609154, at *8.  Thus, LIF-USEP's agreements with its investors were "securities contracts," and any transfers from BLMIS to LIF-USEP were made "in connection with" those securities contracts.

### C.    *Section 546(e) Does Not Contain a "Knowledge" Exception*

The Trustee may argue that section 546(e)'s safe harbor does not apply because LIF-USEP and/or UBS knew there was no actual "settlement payment" or "securities contract" for any of Madoff's fictitious trading.  *See Cohmad*, 2013 WL 1609154, at *3.  This argument fails because section 546(e) contains no such "knowledge" exception and, even if it did, the SAC fails to allege that LIF-USEP and/or UBS had *actual* knowledge of Madoff's scheme.

*First*, as noted above, even if there was no actual securities contract between BLMIS and LIF-USEP, there still were securities contracts between LIF-USEP and its investors, and there is no allegation that those securities contracts were not real.  Thus, even if LIF-USEP, as the initial transferee, knew that BLMIS was not trading securities, if LIF-USEP withdrew funds from BLMIS to make payments under securities contracts with its investors, then—as Judge Rakoff ruled in *Cohmad*—the withdrawal from BLMIS would be a transfer made in connection with the securities contract between the initial transferee (LIF-USEP) and a subsequent transferee (the investors) and would not be avoidable.  *Cohmad*, 2013 WL 1609154, at *7.

*Second*, although the Trustee alleges that LIF-USEP and UBS *should have known* of BLMIS's fraud, he fails to allege that the Defendants *actually* knew of the fraud.  As Judge Bernstein has held, "actual knowledge" requires nonconclusory allegations that a defendant had "a high level of certainty and absence of any substantial doubt" that BLMIS was not trading

securities.  *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117, 139 (Bankr. S.D.N.Y. 2014).  This is a more stringent standard than "willful blindness," which "connotes strong suspicion but *some* level of doubt or uncertainty of the existence of a fact and the deliberate failure to acquire actual knowledge of its existence," *id*. at 140, and which even *Cohmad* makes clear is insufficient to avoid the section 546(e) safe harbor, 2013 WL 1609154, at *4 n.2.  Further, it is well-established that "allegations of Madoff-related red flags do not adequately plead scienter," which is yet a lesser standard.  *See In re Merkin*, 817 F. Supp. 2d 346, 357 (S.D.N.Y. 2011), *vacated in part on other grounds*, 2015 WL 10847318 (S.D.N.Y. Aug. 24, 2015).

Here, the Trustee merely pleads red flags or, at most, willful blindness—but nothing remotely approaching actual knowledge.  *See*, *e.g.*, SAC ¶ 113 ("the resulting memorandum identified a number of red flags"); *id.* ¶ 127 ("Madoff's practice of not charging fees and choosing to receive revenue only from commissions was identified as a red flag").  For instance, the SAC alleges that "UBS did not allow the *possibility* of fraud at BLMIS to get in the way of profiting from BLMIS," *id.* ¶ 7 (emphasis added), and that "UBS would ignore *concerns* about BLMIS, sign on as Luxalpha's service provider, receive fees, and cash in on the fraud," *id.* (emphasis added)— allegations that merely point to risks involved with investing through BLMIS, not to *actual knowledge* that BLMIS was conducting a multi-billion dollar Ponzi scheme.  Similarly, the Trustee alleges that because certain UBS entities previously decided not to invest with BLMIS, this must be indicative of the UBS Defendants' actual knowledge of BLMIS's fraud.  *Id.* ¶¶ 123–29.  Of course, the mere fact that certain unidentified UBS entities may have had different views about BLMIS says nothing about whether the UBS Defendants *knew* that BLMIS was running a multi-billion dollar Ponzi scheme.  *See, e.g.*, *Merkin*, 817 F. Supp. 2d at 357 (holding that "allegations of Madoff-related red flags do not adequately plead scienter").

Moreover, while the Trustee attempts to ascribe ill intent to UBS obtaining indemnification and insurance in connection with services performed for Luxalpha, SAC ¶¶ 7, 129, such a practice is prudent and generally the market standard, *see, e.g.*, *Hydro-Dyne, Inc. v. Ecodyne Corp.*, 812 F.2d 1407 (table), 1987 WL 36573, at *12 (6th Cir. 1987) (Boggs, J., dissenting) (describing indemnity agreements as "commonplace for numerous commercial transactions" because "[t]hey seek to assign anticipatable risks of loss to one or both parties, for commercial convenience in allocating transaction costs"); *Natco Ltd. P'ship v. Moran Towing of Fla., Inc.*, 267 F.3d 1190, 1194 n.4 (11th Cir. 2001) ("broad language is commonly found in indemnification provisions"). And while the Trustee alleges that UBS violated its own internal policies, *id.* ¶¶ 164–67, and applicable Luxembourg law, *id.* ¶¶ 130–163, in its dealings with BLMIS, even accepting such baseless allegations as true for purposes of this motion, a violation of internal policy or applicable law does not equate to actual knowledge of the BLMIS scheme. *See BNP Paribas*, 594 B.R. at 199 ("[a]lthough these allegations . . . imply that [defendants] were willing to overlook legal and regulatory violations to make more money, they do not support the inference that those Defendants believed there was a high probability that BLMIS was not actually trading securities").

The Trustee alleges that UBS "complied with Madoff's demand for secrecy" by omitting Madoff's name from certain documents and reports. *Id.* ¶¶ 227–28. But, again, this is at most a red flag, and not actual knowledge of a Ponzi scheme. The Trustee also implies that Madoff's refusal to meet with UBS analysts, and other unanswered questions, somehow show that UBS must have known about the fraud, *id.* ¶¶ 164–66, but the SAC explains that Madoff justified his refusal to meet by explaining that "if he meets with one client he would be obligated, perhaps even from a regulatory standpoint . . . , to meet with all of them, and he would literally be forced to build an infrastructure to support meetings and devote a huge amount of time to it," *id.* ¶ 166.

22

Further, while the Trustee alleges that the Defendants were aware of certain market impossibilities with BLMIS's purported trades, and that a number of "unusual" practices and "other indicia of fraud" should have revealed the fraud to the Defendants, *id.* ¶¶ 197–256, such allegations fall well short of actual knowledge of Madoff's scheme.  At most, therefore, even if these allegations could be construed to evince "strong suspicion but *some* level of doubt" about BLMIS—and could potentially qualify as willful blindness (which the UBS Defendants dispute)—they do not constitute the "high level of certainty" required to plead actual knowledge.  *Merkin*, 515 B.R. at 139–40.

*Third*, nothing in section 546(e) turns on the knowledge of the transferee.  Indeed, "because the entire point of this theory relates to the bona fide securities contract between the initial transferee and a subsequent transferee, it is hard to see why the initial transferee's knowledge of Madoff's fraud would render a Section 546(e) defense based on a securities contract between the initial and subsequent transferee unavailable."  *Multi-Strategy Fund Ltd.*, 2022 WL 16647767, at *3–4, 7 n.7.  The only exception to section 546(e) is a claim under section 548(a)(1)(A), which involves actual fraudulent intent by the *transferor*.  *See Silverman v. Actrade Cap., Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005) (under § 548(a)(1)(A) "it is the intent of the transferor and not the transferee that is relevant") (citations omitted).  Nor does knowledge play any role in the definitions of "settlement payment" or "securities contract."  11 U.S.C. § 741(7), (8).  Where the Bankruptcy Code creates an exemption or safe harbor and specifies exceptions, a court is not free to create additional exceptions, even when doing so is motivated by a party's alleged wrongdoing.  *See Law v. Siegel*, 571 U.S. 415, 424–25 (2014).  Courts must adhere to the statute's "plain meaning."  *Merit*, 138 S. Ct. at 897.  Permitting transferee knowledge to defeat the safe harbor would be inconsistent with the language and purpose of section

546(e), which reflects a balancing of interests by Congress to avoid "undermin[ing] . . . markets" by "[u]nwinding settled securities transactions." *Tribune*, 946 F.3d at 90.

## IV. <u>The Section 548(a)(1)(A) Exception to the Section 546(e) Safe Harbor Does Not Apply</u>

While section 546(e) bars the Trustee from avoiding transfers *other* than actual fraudulent transfers under section 548(a)(1)(A) made within the two-year lookback period, the Trustee has failed to allege actual fraudulent intent, and the so-called "Ponzi scheme presumption" does not cure the pleading deficiencies. Therefore, the section 546(e) safe harbor shields all of the transfers alleged in the SAC.

### A. <u>*The Trustee Has Failed to Allege Actual Fraudulent Intent as Required by Section 548(a)(1)(A) and Rule 9(b)*</u>

The sole statutory exception to the section 546(e) safe harbor is for transfers avoidable under section 548(a)(1)(A), which has a two-year lookback period. "[W]here § 546(e) applies to the Trustee's claims, the Trustee may only proceed insofar as he seeks to recover those subsequent transfers under § 550(a) as to which he could have avoided the initial transfer under § 548(a)(1)(A)." *Fairfield*, 2021 WL 3477479, at *4. The Trustee, however, has failed to plead the avoidability of any initial transfers under section 548(a)(1)(A), and cannot salvage any part of his claims from the section 546(e) bar.

Section 548(a)(1)(A) requires the Trustee to plead that BLMIS "made" each "transfer" challenged under that provision "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became" indebted "on or after the date that such transfer was made." Because "'actual intent to hinder, delay or defraud' constitutes fraud, it must be pled with specificity, as required by Fed. R. Civ. P. 9(b)." *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) (citation omitted); *see also Off. Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 459–60 (Bankr.

24

S.D.N.Y. 2006). Under Rule 9(b), "conclusory allegations that do not evidence fraudulent intent

with respect to the specific transfers challenged do not suffice," even if "combined with . . .

allegations [about] an alleged overall pattern of inappropriate transfers." *Id.* at 468 (internal

quotation marks omitted).

The SAC lacks any allegations which, if proved, would establish that in making any of the

alleged Initial Transfers, BLMIS acted with the requisite intent to "hinder, delay or defraud"

creditors, as opposed to merely honoring its contractual commitments to LIF-USEP.[7] The Trustee

has pled nothing about BLMIS's intent in making *any* (much less *each*) of the "specific transfers

challenged" here, *id.*, and therefore fails to plead avoidability based on actual intent to defraud at

all, let alone with the particularity Rule 9(b) requires.

**B.**  **The Trustee Should Not Be Permitted to Rely on the Ponzi Scheme Presumption to Avoid His Pleading Burden**

Rather than actually pleading facts establishing the fraudulent intent behind each initial

transfer, as required by section 548(a)(1)(A), the Trustee apparently relies upon the presumption

"that transfers from a debtor in furtherance of a Ponzi scheme are made with fraudulent intent

rather than to satisfy an antecedent debt." *Picard v. Citibank (In re Bernard L. Madoff Inv. Secs.

LLC)*, 12 F.4th 171, 201 (2d Cir. 2021) (Menashi, J., concurring) ("***Citibank***"); *see* SAC ¶ 38.

Although the unchallenged application of the Ponzi scheme presumption has been accepted by this

Court and the District Court in actions commenced by the Trustee, Judge Menashi's concurring

---

[7]  For example, because transfers intended to return capital to LIF-USEP or to satisfy an antecedent debt to LIF-USEP would not have been made with the "actual intent to hinder, delay or defraud" creditors, 11 U.S.C. § 548(a)(1)(A), merely alleging that BLMIS paid money to LIF-USEP is insufficient to establish an actually fraudulent transfer. Such a pleading deficiency is even more egregious here, where the SAC establishes that LIF-USEP was a "net loser" in BLMIS's scheme. *See* SAC Ex. B (alleging that LIF-USEP deposited $758,819,425 but withdrew only $498,300,000); *cf. In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 235 (2d Cir. 2011) (adopting Trustee's Net Investment Method, pursuant to which net losers are afforded priority over net winners).

opinion in *Citibank* makes clear that the issue is not settled at the Circuit level,[8] and explains that

there are several cogent reasons why the Ponzi scheme presumption represents a "questionable"

application of fraudulent transfer statutes. *Id*. at 202. These reasons militate against the application

of the presumption on these facts.

*First*, section 548(a)(1)(A) does not even mention Ponzi schemes, much less authorize

courts to relax the Trustee's pleading burden in such cases.

*Second*, fraudulent transfer cases warrant an "asset-by-asset and transfer-by-transfer"

inquiry—one that requires proof of "the elements of a fraudulent transfer with respect to each

transfer, rather than relying on a presumption related to the form or structure of the entity making

the transfer"—because the statutory focus is "on individual transfers, rather than a pattern of

transactions that are part of a greater 'scheme.'" *Finn v. Alliance Bank*, 860 N.W.2d 638, 647

(Minn. 2015) (construing Minnesota UFTA provision that is virtually identical to section

548(a)(1)(A)); *see also Citibank*, 12 F.4th at 201 (Menashi, J., concurring).

*Third*, the Ponzi scheme presumption "improperly treats preferences as fraudulent

transfers," thereby "obscur[ing] the essential distinction between fraudulent transfers and

preferences." *Citibank*, 12 F.4th at 201–02; *accord Lustig v. Weisz & Assocs. (In re Unified Com.

Cap., Inc.)*, 260 B.R. 343, 350 (Bankr. W.D.N.Y. 2001). While "fraudulent transfer law prevents

preinsolvency transfers to non-creditors or colluding creditors," "preference provisions, by

contrast, . . . serve the policy of equality of distribution among creditors," yet the presumption

"uses fraudulent transfer law rather than the law relating to preferences to promote an equal

distribution among creditors." *Citibank*, 12 F.4th at 201–02 (cleaned up); *see Unified*, 260 B.R.

---

[8]    Although the Second Circuit has on occasion applied the presumption "when its application was uncontested," *Citibank*, 12 F.4th at 202 n.7 (Menashi, J., concurring), it has not sanctioned use of the presumption in any case where the issue was litigated. Nor has the Supreme Court recognized the presumption.

at 350 ("fraudulent conveyance statutes cannot and should not be utilized by courts as a super preference statute to effect a further reallocation and redistribution that should be specifically provided for in a statute enacted by Congress").

*Fourth*, the Ponzi scheme presumption conflicts with Rule 9(b), which requires particularity in pleading how each transfer was made with actual intent to defraud. *See*, *e.g., Sharp*, 403 F.3d at 56. If such exceptions are to be created, Congress—not the courts—should create them. *See Unified*, 260 B.R. at 350, *cited in Citibank*, 12 F.4th at 202 (Menashi, J., concurring).

Without the Ponzi scheme presumption, the SAC alleges nothing whatsoever about BLMIS's intent in making specific Initial Transfers—and certainly not that they were made with the requisite actual fraudulent intent. Accordingly, as demonstrated by application of Judge Menashi's analysis in *Citibank* to the facts alleged here, the Trustee has not adequately pled fraudulent intent, and his section 548(a)(1)(A) claims should be dismissed.

## V.      The SAC Establishes UBS's Good-Faith Defense

The Trustee may not recover from a subsequent transferee who took for value, in good faith, and without knowledge of the voidability of the transfer. 11 U.S.C. § 550(b). The SAC establishes UBS's good faith defense because a diligent inquiry would not have discovered the fraudulent purpose of BLMIS's alleged transfers.

### A.      *Value*

For purposes of the good faith defense, "value" is merely consideration and need not be reasonably equivalent:

> The "value" required to be paid by the secondary transferee is merely consideration sufficient to support a simple contract, analogous to the "value" required under state law to achieve the status of a bona fide purchaser for value. There is no requirement that the value given by the transferee be a reasonable or fair equivalent. The term "value" in this subsection is different from and does not mean value to the debtor.

5 *Collier on Bankruptcy* ¶ 550.03[1] (16th ed. 2021) (footnotes omitted).

Payment received for services is equivalent to "satisfaction or securing of a present or antecedent debt." 11 U.S.C. § 548(d)(2)(A); *Balaber-Strauss v. Lawrence*, 264 B.R. 303, 307–08 (S.D.N.Y. 2001) (mortgage brokerage provided "reasonably equivalent value" by originating mortgages and soliciting additional investors, even for alleged Ponzi scheme); *see also Greenspan v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck, Phleger & Harrison LLP)*, 408 B.R. 318, 341 (Bankr. N.D. Cal. 2009) ("A transfer is for value if one is the quid pro quo of the other."). While the Trustee alleges that the UBS Defendants improperly delegated oversight of LIF-USEP to BLMIS, SAC ¶¶ 159–63, he expressly alleges that the UBS Defendants "played a critical role in LIF-USEP's operation, management, and servicing," *id.* ¶ 70, and that the UBS Defendants allegedly received the Subsequent Transfers "for serving as LIF-USEP's" (1) "official custodian," *id.* ¶ 271(a), (2) "official manager," *id.*, (3) "official administrator," *id.* ¶ 271(b), and (4) "official manager," *id.* ¶ 271(c). Thus, because the UBS Defendants are alleged to have provided services to LIF-USEP, and the Trustee does not allege that such services lacked value, any Subsequent Transfers received by the UBS Defendants were in exchange for value.

> ### B. *Good Faith*

The Second Circuit in *Citibank* set forth a three-step inquiry for establishing a good-faith defense. 12 F.4th at 191–92. A court must examine (1) "what facts the defendant knew; this is a subjective inquiry and not a theory of constructive notice," (2) "whether these facts put the transferee on inquiry notice of the fraudulent purpose behind a transaction—that is, whether the facts the transferee knew would have led a reasonable person in the transferee's position to conduct further inquiry into a debtor-transferor's possible fraud," and (3) "whether diligent inquiry by the transferee would have discovered the fraudulent purpose of the transfer." *Id.* (cleaned up). Thus, under *Citibank*, even if the transferee (1) knew actual facts that (2) would put it on inquiry notice of the fraudulent purpose underlying the transaction or transfer, the transferee still takes the

transfer in good faith if (3) a diligent inquiry would not have discovered the fraudulent purpose of

the transfer. As the face of the SAC establishes, such is the case here because a diligent inquiry

would not have enabled UBS to discover the fraudulent purpose of BLMIS's transfers.

The Trustee alleges various purported "red flags" that he claims should have alerted

investors to the fraudulent purposes of BLMIS's transfers to LIF-USEP. For instance, the Trustee

alleges that consultants and market analysts at various times raised questions about BLMIS's

trading and reporting practices. *See*, *e.g.*, SAC ¶¶ 100–115, 127, 231. But these allegations

amount to, at most, a lack of transparency at BLMIS, potential self-dealing, improper trading

activities, and deviations from utilizing the SSC trading strategy. None of the inquiries resulting

from such questions led to discovery of the BLMIS fraud. Meanwhile, thousands of market

participants with varying degrees of sophistication conducted their own diligence and invested

with BLMIS, either directly or through funds, all while BLMIS was subject to stringent SEC

regulatory oversight and was even investigated by the SEC on a number of occasions—yet never

charged with any impropriety. *See supra* at 3–4.

Moreover, even if UBS actually knew some of these purported facts (as opposed to having

merely constructive knowledge, the standard rejected in *Citibank*), and even if those facts would

have put UBS on inquiry notice, the SAC establishes that even upon a diligent inquiry, investors

could not have discovered the fraudulent purpose of the transfers. As an initial matter, Madoff

successfully deployed practices that prevented even the most sophisticated investigators from

uncovering his scheme. For example, in the SEC Complaint filed against Madoff, No. 08-civ-

10791, ECF No. 1 (S.D.N.Y. Dec. 11, 2008), the SEC alleged that "Madoff ran his investment

adviser business from a separate floor in the New York offices of BMIS," *id.* ¶ 16, "kept the

financial statements for the firm under lock and key, and was 'cryptic' about the firm's investment

29

advisory business when discussing the business with other employees of BMIS," *id.* ¶ 17. These allegations are consistent with those in the SAC and demonstrate that even a diligent inquiry would not have led to discovery of BLMIS's fraud.

Indeed, even a comprehensive SEC investigation failed to uncover BLMIS's fraud and merely led the SEC to impose additional compliance measures. In pleadings filed in related adversary proceedings, the Trustee has alleged that "[t]he SEC collected documents from Madoff in June 2005," *Picard v. Fairfield Sentry Limited*, No. 09-01239, ECF No. 286, *Second Amended Complaint* ¶ 239 (Bankr. S.D.N.Y. Aug. 28, 2020), and "[i]n 2006, the SEC began an investigation into allegations that BLMIS may have been a Ponzi scheme or illegally front-running the market," *id.*, ECF No. 23, *Amended Complaint* ¶ 351 (Bankr. S.D.N.Y. Jul. 20, 2010), but that ultimately, Madoff's "scheme to defraud the SEC succeeded" and "the SEC closed any further investigation of BLMIS," *id.* ¶ 361; *see* SAC ¶ 35 ("BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register."). The SEC's failure to uncover the scheme—even with its powerful investigative tools, expansive subpoena powers, and substantial resources—establishes that any further diligent inquiry by the UBS Defendants would not have discovered the fraud.

Moreover, the Trustee alleges that the Defendants actually *did* conduct diligent inquiries, yet their investigations did not uncover BLMIS's multi-billion dollar Ponzi scheme, merely "identif[ying] a number of red flags." SAC ¶ 113; *see also id.* ¶ 101 ("Optimal had performed 'intensive and thorough due diligence' on its investment targets and BLMIS was no exception."); *id.* ¶ 102 ("They discussed the 'mounting concerns about BLMIS's investment strategy and the risks associated with investing with a broker/dealer who is not a registered investment adviser.'"); *id.* ¶ 104 ("In September 2002, Optimal sent an investigative team to New York to meet with

Madoff and attorneys from several New York law firms."); *id.* ¶ 107 ("Optimal employees also

regularly consulted with other analysts in the investment industry."); *id.* ¶¶ 116–129 (alleging that

UBS "recognized the clear signs of BLMIS's fraud" but describing only alleged red flags that did

not reveal the expansive and multi-decade Ponzi scheme actually perpetrated by Madoff).

Accordingly, because the Trustee's own allegations establish that a diligent inquiry would

not have enabled the UBS Defendants to discover the fraudulent purpose of the BLMIS transfers,

the SAC establishes the UBS Defendants' good faith defense.

### C.    *Without Knowledge of Voidability*

In applying this element of the good faith defense, the Court must test a subsequent

transferee's knowledge of the voidability of the initial transfer, not of the subsequent transfer.

*Brandt v. Horseshoe Hammond, LLC (In re Equip. Acq. Res., Inc.)*, 803 F.3d 835 (7th Cir. 2015).

Courts construe "without knowledge of the voidability of the transfer" the same as good faith, so

a transferee who is found to be in good faith is also found to be without knowledge of voidability.

As Judge Rakoff noted, "[i]n light of the legislative history, the most plausible reading is that this

third requirement is merely one specific type of subjective knowledge required." *Sec. Inv. Protect.*

*Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 516 B.R. 18, 23 n.3 (S.D.N.Y. 2014), *disapproved of*

*on other grounds sub nom. Citibank*, 12 F.4th 171 (2d Cir. 2021).  Thus, this element of the good

faith defense is also met.

### VI.    The SAC Does Not Plausibly Allege That
### UBS Received BLMIS Customer Property

Finally, even if the Initial Transfers to LIF-USEP were subject to avoidance, the

Subsequent Transfers to UBS are not recoverable because the SAC does not plausibly allege that

the Subsequent Transfers were transfers of BLMIS customer property.

Under section 550(a)(2), a trustee may recover from a subsequent transferee only the property that was transferred in the initial transfer or its value. A trustee may not recover proceeds of the transferred property. *Rajala v. Spencer Fane LLP (In re Generation Res. Holding Co.)*, 964 F.3d 958, 965 (10th Cir. 2020). To state a claim against the UBS Defendants, the Trustee must plausibly allege that the alleged Subsequent Transfers to each UBS Defendant were subsequent transfers *of BLMIS customer property* fraudulently transferred from BLMIS to LIF-USEP. *See* 15 U.S.C. § 78*fff*-2(c)(3) ("the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of title 11"). The SAC fails to do this.

Regarding the alleged "Initial Transfers," the SAC alleges that LIF-USEP invested approximately $758,819,425 with BLMIS, and that during the two years preceding the Filing Date, BLMIS made transfers to or for the benefit of LIF-USEP in the collective amount of at least $498,300,000. SAC ¶¶ 265–266; SAC Ex. B. Tables detailing the alleged Initial Transfers (including the dates and amounts) are attached to the SAC as Exhibit B.

As to the alleged "Subsequent Transfers," the SAC is far skimpier, alleging that LIF-USEP "subsequently transferred some of the Initial Transfers to the UBS Defendants . . . as payment for their alleged service[s]." *Id.* ¶ 270. Without linking them to any particular Initial Transfer, the SAC generically describes the Subsequent Transfers as follows:

a.  UBS SA received at least $5,162,211 in fees from LIF-USEP for serving as LIF-USEP's official custodian from September 2005 to December 2008, and received another $291,368 in fees for serving as LIF-USEP's official manager from September 2005 through at least April 2006.

b.  UBSFSL received at least $747,560 in fees from LIF-USEP for serving as LIF-USEP's official administrator from September 2005 to December 2008.

c.  UBSTPM received at least $10,590,437 in fees from LIF-USEP for serving as LIF-USEP's official manager from May 2006 to December 2008.

*Id.* ¶ 271(a)–(c).[9]

While the SAC alleges that "[t]he Initial Transfers were and continue to be customer property within the meaning of 15 U.S.C. § 78*lll*(4)," the SAC does not allege that the *Subsequent Transfers* were of customer property.  SAC ¶ 269.  And unlike the Initial Transfers, the Subsequent Transfers are not broken down by date or amount, and are instead described only vaguely in lump sums spanning multiple years with no delineation.  *See id.* ¶ 271.  Similarly, although Exhibit B to the SAC contains pages and pages of tables in small type listing alleged transactions recorded in LIF-USEP's account at BLMIS, SAC Ex. B, it fails to identify which, if any, of these transactions constituted initial transfers of BLMIS customer property that were allegedly subsequently transferred to UBS.  Accordingly, the Trustee is effectively asking the Court to infer that because BLMIS transferred a large amount of money to LIF-USEP, to the extent LIF-USEP transferred money during that time to UBS, all of that money must have come from BLMIS.

As the Supreme Court has made clear, the Federal Rules of Civil Procedure do not permit such speculative and conclusory pleading.  To survive a motion to dismiss, a claim must not merely be possible, but must be plausible.  *See Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555–57, 570.  As this Court stated in *Picard v. Shapiro (In re Bernard L. Madoff Inv. Sec. LLC)*, 542 B.R. 100 (Bankr. S.D.N.Y. 2015), barebones allegations that customer funds were transferred to the subsequent transferee do not suffice to make the claim plausible:

> The Trustee must allege facts that support the inference that the funds at issue originated with . . . BLMIS, and contain the "necessary vital statistics"—the "who, when, and how much" of the transfers to establish that an entity was a subsequent transferee of the funds.  At the pleading stage, the Trustee is not required to provide a "dollar-for-dollar accounting" of the exact funds at issue.  However, barebones

---

[9]    While the SAC alleges that the UBS defendants received "at least" the amounts listed in paragraph 271, the Court should grant the motion to dismiss to the extent the SAC purports to be based on unspecified transfers in excess of the listed amounts.

33

allegations that the funds at issue were transferred to the Subsequent Transferees, without more detail, are insufficient.

*Id*. at 119; *see also BNP Paribas*, 594 B.R. at 195 (same). Thus, in *Shapiro*, the Court dismissed a conclusory subsequent transferee claim, noting that the complaint "does not tie any initial transfer to any subsequent transfer or Subsequent Transferee." *Id*. The same is true for the SAC here, which fails to tie the Subsequent Transfers to any particular initial transfers from BLMIS to LIF-USEP. *Compare* Second Am. Compl. ¶¶ 108, 110, 162-66 in *Picard v. Shapiro*, No. 10-5383, ECF No. 33 (Bankr. S.D.N.Y. July 8, 2014) *with* SAC ¶ 271; *see also Angell v. Ber Care, Inc. (In re Caremerica, Inc.)*, 409 B.R. 737, 750-51 (Bankr. E.D.N.C. 2009).

The Trustee's failure to tie the alleged UBS transfers to any particular transfer from BLMIS to LIF-USEP cannot be excused on the ground that the Trustee lacks access to information. Prior to filing this adversary proceeding, the Trustee obtained voluminous Rule 2004 discovery from UBS that should have enabled him to adequately allege recovery of subsequent transfers, if such claims actually existed. Indeed, the Trustee purports to know the total amounts paid to UBS, the nature of the payments (*e.g.*, as custodian, prime bank, administrator, or manager), and the broad time frames of such payments—yet he failed (apparently deliberately) to allege specific dates or amounts for any Subsequent Transfer.

Moreover, any claim that Subsequent Transfers from LIF-USEP to UBS consisted of BLMIS customer property (which was not even alleged in the SAC) is not plausible given the facts that the Trustee actually does allege. For example, the SAC alleges that UBS SA received $291,368 in fees for serving as LIF-USEP's official manager "from September 2005 through at least April 2006." SAC ¶ 271(a). However, Exhibit B of the SAC shows that the first Initial Transfer was allegedly made on August 2, 2007, sixteen months *after* the first alleged Subsequent Transfer. *See* SAC Ex. B at 7. Therefore, it is established from the face of the SAC that the

foregoing alleged Subsequent Transfer is *not* customer property that is subject to recovery. Similarly, *all* of the alleged Subsequent Transfers to the UBS Defendants are alleged to have begun before the date of the first Initial Transfer, making the allegations in the SAC not only implausible but impossible.  *See* SAC ¶ 271(a) ("UBS SA received at least $5,162,211 in fees . . . from September 2005 to December 2008"); *id.* ¶ 271(b) ("UBSFSL received at least $747,560 in fees . . . from September 2005 to December 2008"); *id.* ¶ 271(c) ("UBSTPM received at least $10,590,437 in fees . . . from May 2006 to December 2008").

Because the face of the SAC demonstrates that a substantial portion of the transfers the Trustee seeks to avoid could not have been Subsequent Transfers by LIF-USEP, and the SAC does nothing to attempt to tie any Initial Transfer to any payment made by LIF-USEP to UBS, the SAC should be dismissed because it does not plausibly plead that UBS received customer property that was transferred from BLMIS to LIF-USEP in avoidable transfers.  *See Kennedy v. Mondelez Glob. LLC*, 2020 WL 4006197, at *9 (E.D.N.Y. July 10, 2020) ("where the allegations of a complaint are materially inconsistent with the evidence a plaintiff relies on to make those allegations, [a court] may easily conclude that plaintiffs' claims lack the facial plausibility necessary to survive a motion to dismiss") (citation omitted).  At a minimum, the Court should dismiss the claim with respect to any payments to the UBS Defendants made before August 2, 2007.

## CONCLUSION

For all of the foregoing reasons, the UBS Defendants respectfully request that this Court grant the motion to dismiss the Second Amended Complaint with prejudice and provide such other relief as is necessary and just.

Dated:  May 5, 2023
        New York, New York

Respectfully Submitted,

**GIBSON, DUNN & CRUTCHER LLP**

*/s/ Marshall R. King*
Marshall R. King
Gabriel Herrmann
Keith R. Martorana

200 Park Avenue
New York, New York 10166
Tel.: (212) 351-4000
mking@gibsondunn.com
gherrmann@gibsondunn.com
kmartorana@gibsondunn.com

*Attorneys for the UBS Defendants*