# EXHIBIT B

```
                                                    Page 1
 1    UNITED STATES BANKRUPTCY COURT

 2    SOUTHERN DISTRICT OF NEW YORK

 3    Adv. Case No. 08-01789-smb

 4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 5    SECURITIES INVESTOR PROTECTION CORPORATION,

 6            Plaintiff,

 7        v.

 8    BERNARD L. MADOFF INVESTMENT SECURITIES, LLC. Et al,

 9            Defendants.

10    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11    Adv. Case No. 09-01503-smb

12    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

13    IRVING H. PICARD TRUSTEE FOR THE LIQUIDATION OF BERNARD L.

14    MADOFF INVESTMENT SECURITIES LLC,

15            Plaintiff,

16        v.

17    MADOFF, et al,

18            Defendants.

19    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

20

21

22

23

24

25
```

Page 2

1    Adv. Case No. 10-04285-smb

2    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

3    IRVING H. PICARD TRUSTEE FOR THE LIQUIDATION OF BERNARD L.

4    MADOFF INVESTMENT SECURITIES LLC,

5              Plaintiff,

6        v.

7    UBS AG, UBS (LUXEMBOURG) SA et al,

8              Defendants.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   Adv. Case No. 10-05311-smb

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   IRVING H. PICARD TRUSTEE FOR THE SUBSTANTIVELY CONSOLIDATED

13   SIPA LIQUDATION OF BERNARD L. MADOFF INVESTMENT SECURITIES

14   LLC and BERNARD L. MADOFF,

15             Plaintiff,

16       v.

17   UBS AG, UBS (LUXEMBOURG) SA et al,

18             Defendants.

19   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

20

21

22

23

24

25

Page 3

1              U.S. Bankruptcy Court

2              One Bowling Green

3              New York, NY  10004

4              April 27, 2016

5              10:00 AM

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   B E F O R E :

24   HON STUART M. BERNSTEIN

25   U.S. BANKRUPTCY JUDGE

Page 4

1    Hearing re:  08-01789-smb Omnibus Interim Fee Applications

2

3    Hearing re:  08-01789-smb Status Conference Regarding

4    Certain Outstanding Subpoenas

5

6    Hearing re:  09-01503-smb Motion to Extend the Notice of

7    Pendency Filed Against Certain Real Property in New York

8    County Owned by Deceased Defendant Andrew H. Madoff

9

10   Hearing re:  10-04285-smb Status Conference

11

12   Hearing re:  10-05311-smb Status Conference

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

                                                                    Page 5

1    A P P E A R A N C E S :

2

3    PORZIO BROMBERG & NEWMAN P.C.

4         Attorney for Alain Rukavina & Paul Laplume Liquidators

5         for Luxalpha & Luxembourg Investment Fund

6         156 West 56th Street, Suite 803

7         New York, NY 10019

8

9    BY:  BRETT S. MOORE

10

11   SHER TREMONTE LLP

12        Attorney for Theodore Dumbauld

13        90 Broad Street, 13th Floor

14        New York, NY 10004

15

16   BY:  MICHAEL W. GIBALDI

17

18   WINDELS MARX LANE & MITTENDORF, LLP

19        Attorney for the Trustee

20        156 West 56th Street

21        New York, NY 10019

22

23   BY:  ALAN NISSELSON

24        HOWARD SIMON

25

Page 6

```
 1   SEWARD & KISSEL LLP

 2        Attorney for Reliance International Reseach, LLC

 3        One Battery Park Plaza

 4        New York, NY 10004

 5

 6   BY:  MICHAEL B. WEITMAN

 7

 8   BAKER HOSTETLER

 9        Attorney for the Trustee

10        45 Rockefeller Plaza

11        New York, NY 10111

12

13   BY:  KEITH R. MURPHY

14        EDWARD J. JACOBS

15        SEANNA R. BROWN

16        PATRICK T. CAMPBELL

17        KARIN SCHOLZ JENSON

18

19   JENNER & BLOCK

20        Attorney for Defendant M&B Capital Advisors

21        919 Third Avenue

22        New York, NY 10022

23

24   BY:  RICHARD LEVIN

25
```

```
 1   GIBSON, DUNN & CRUTCHER LLP

 2        Attorney for UBS Defendants

 3        200 Park Avenue

 4        New York, NY 10166

 5

 6   BY:  MARSHALL R. KING

 7

 8   SECURITIES INVESTOR PROTECTION CORPORATION

 9        1667 K Street, N.W., Suite 1000

10        Washington, D.C. 20006

11

12   BY:  KEVIN H. BELL

13

14   CHAITMAN LLP

15        Attorney for the Defendants

16        465 Park Avenue

17        New York, NY 10022

18

19   BY:  GREGORY M. DEXTER

20

21   KATTEN MUCHLIN ROSENMAN LLP

22        575 Madison Avenue

23        New York, NY 10022

24

25   BY:  ANTHONY L. PACCIONE
```

Page 8

1    ALSO PRESENT TELEPHONICALLY:

2

3    PATRICK MOHAN

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 9

```
 1                    P R O C E E D I N G S

 2            THE CLERK:  Please be seated.

 3            THE COURT:  Good morning.  Madoff?

 4            MR. JACOBS:  Good morning, Your Honor.

 5            THE COURT:  Good morning.  Why don't we do the fee

 6     applications, first.

 7            MR. JACOBS:  Oh, okay.

 8            MS. BROWN:  Good morning, Your Honor.  Seanna

 9     Brown on behalf of the Trustee.  This is the return date of

10     the 20th interim fee applications by Baker Hostetler for

11     fees and expenses in connection with the Madoff liquidation.

12     In addition, we have also brought applications with regard

13     to all the counsel who work with us throughout the world on

14     the case.

15            At the outset I'd like to note that there were no

16     objections that were filed with regard to any of these

17     applications, and I'd also like to note that SIPC has

18     approved all of the fee applications here this morning.

19            I know Your Honor is fully familiar with our

20     applications and the current events in this case, so I plan

21     to do -- just give a very brief overview of where we are and

22     then I will also defer to Mr. Bell who will speak on behalf

23     of SIPC.

24            Starting with the good faith cases.  As Your Honor

25     knows we filed over 900 good faith cases during the course
```

1    of this proceeding, we have resolve the majority of these

2    cases by settlement or dismissal, bringing the current

3    number of cases down to 394 and we are working to resolve

4    the remaining cases as quickly as possible.

5            With regard to the bad faith and feeder fund

6    cases, we have approximately 116 of those cases currently

7    pending, and many of those cases are involved in the

8    extraterritoriality proceedings which is currently pending

9    before Your Honor.

10           With claims objections, we have approximately

11   1,100 claims objections remaining as of April 15th.  In

12   January, this Court's order on the trustee's sixth and

13   seventh omnibus motions resolved objections related to 149

14   claims.  And last month the trustee filed a motion to

15   resolve objections related to 17 indirect claims, which the

16   Court granted yesterday.

17           On settlements, we have continued to make progress

18   in reaching settlements in this case.  During the

19   compensation period the trustee settled 73 cases for

20   approximately $245 million.  And the trustee also entered

21   into settlements following the compensation period that will

22   bring an additional $226 million into the customer fund.

23           The trustee is engaged in current settlement

24   negotiations that we hope will be concluded shortly.

25           I want to briefly touch on the sixth interim

1    distribution.  The trustee distributed $1.2 billion through

2    April 26th, in connection with that distribution.  In total,

3    the trustee has distributed $9.277 billion to BLMIS

4    customers, which includes SIPC advances in the amount of

5    $836 million.  These amounts represent 56 -- I'm sorry,

6    57.064 percent of each allowed customer claim.

7            Turning to the foreign fee applications.  I just

8    want to highlight four firms that make up the bulk of the

9    hours for the billing period, starting with Brown & Jacobson

10   who is our principal foreign counsel.  Brown Jacobson worked

11   approximately 4,200 hours on behalf of the trustee.  During

12   the compensation period Brown & Jacobson worked on the

13   Vizcaya matter, primarily in connection with the settlement

14   negotiations with the Vizcaya defendants as well as

15   preparing for a hearing before the privy counsel in London.

16   As Your Honor knows, we reached a settlement in the Vizcaya

17   matter and Brown Jacobson was instrumental to the

18   settlement.  Brown & Jacobson also continues to work with

19   Baker Hostetler to prepare pleading in connection with

20   protective actions the trustee is pursuing abroad.  And

21   Brown & Jacobson also advised the trustee, generally, on

22   issues of English law.

23            Soroker - Agmon is a Tel Aviv law firm that's

24   spent approximately 1,700 hours on the trustee's behalf.

25   Soroker advised the trustee on behalf -- on Israeli law and

Page 12

1   also drafted two complaints related to the Magnify

2   defendants.

3           The next firm is Williams Barristers, they're in

4   Bermuda and spent approximately 420 hours on the trustee's

5   behalf.  They advised the trustee on issues of Bermuda law

6   and they also monitored proceedings in the Supreme Court of

7   Bermuda relating to Kingate.

8           Last, but not least, the trustee's Gibraltar

9   counsel, Triay, Stagnetto, Neish spent approximately 350

10  hours on the trustee's behalf.  They advised the trustee on

11  Gibraltar law and represented the trustee in the courts in

12  Gibraltar.  They also assisted the trustee with regard to

13  the Vizcaya settlement and assisted with preparing for the

14  hearing before the privy counsel.

15          So that's the highlights of what's going on with

16  our foreign counsel.

17          And last, but not least, I would like to note that

18  our colleagues at Windels Marx have done a superior job

19  at -- throughout the case. They have been with us since the

20  beginning, and their services have been exemplary and

21  extraordinary helpful.  They have gotten great results, as

22  have our other conflicts counsel, Young & Conaway.

23          The work of all these firms has been instrumental

24  to the trustee's success.  In light of these submissions

25  that were made to Your Honor and having received no

Page 13

1  objections, I respectfully request that Your Honor approve

2  our applications this morning.

3           THE COURT:  Thank you.

4           MS. BROWN:  Thank you.

5           MR. BELL:  Your Honor, good morning.

6           THE COURT:  Good morning.

7           MR. BELL:  Kevin Bell on behalf of the Securities

8  Investor Protection Corporation.  We have filed

9  recommendations in support of all the applications that have

10  been filed for compensation.  We have read all of the

11  underlying time records and have made our comments on those.

12           And as reflected in just two, for example, Windels

13  Marx, at paragraph 3, together with the reduction in the

14  usual billing rate, there has been a reduction in their

15  services in the amount of about 15.09 percent.  And at

16  paragraph 5 of SIPC's recommendation on Baker Hostetler and

17  trustee fees, there's been a reduction of about 13.93

18  percent from the usual billing rates, which reflect the ten

19  percent discount and taking into effect SIPC's suggestion

20  and comment.

21           As the Court knows, the standard is set forth in

22  the SIPA statute, by Congress federal law, §78eee(b)(5)(A) -

23  (5)(C).  The trustee has set forth, in -- trustee in Baker

24  has set forth that there is no reasonable expectation that

25  there will be any funds for the general estate.  At the last

Page 14

1 hearing this Court, after SIPC's comments, talked about the

2 estate being essentially insolvent, I think that's

3 ineluctable at this moment in time.

4 But the important thing is that the services

5 rendered have been extremely helpful so that the trustee is

6 on the cusp of paying 60 cents on the dollar of each of the

7 net loser victims who has an allowed claim, which is a

8 remarkable feat in the largest financial fraud in the

9 history of this country. And the work that has been done by

10 each of these applicants has been helpful in this

11 extraordinary recovery effort. And SIPC recommends that the

12 Court enter an order approving the fees.

13 THE COURT: Thank you.

14 MR. BELL: Do you have any comments, Your Honor?

15 THE COURT: No. Let me ask, is there anyone else

16 who wants to be heard in connection with the applications?

17 The record should reflect there's no response.

18 In light of SIPC's recommendation and the fact

19 that the estate -- there's no reasonable expectation that

20 the customer estate will be solvent, I'll grant the fee

21 applications. You can submit an order. Thank you.

22 MR. BELL: Thank you, Your Honor.

23 THE COURT: All right. I'll do the rest of the

24 calendar now. First is the status conference regarding

25 outstanding subpoenas. I think this is a carryover from the

Page 15

1   last conference.

2           MR. JACOBS:  Good morning, Your Honor.  Ted Jacobs

3   on behalf of the trustee.

4           If the Court recalls, on March 23rd we had a

5   hearing on certain motions filed by Chaitman, LLP regarding

6   Rule 45, bank subpoenas served by the trustee.  In many of

7   those cases the Court denied those motions, and six of those

8   cases the Court continued that conference until today.  And

9   I can provide a very brief update of where we are on each of

10  those six cases, if that pleases the Court.

11          THE COURT:  Go ahead.

12          MR. JACOBS:  The first is the Roth case, where Ms.

13  Roth was in the process of substituting counsel at the time

14  we had our March 23rd hearing.  She -- our understanding is

15  she is now pro se, we have been in communications with her.

16  We believe that we are on track to amicably settle our

17  claims, and accordingly we are holding that subpoena in

18  abeyance, and we would like to continue this hearing for

19  approximately a month to perhaps the next omnibus date or

20  whenever the Court may deem --

21          THE COURT:  When is the next omnibus date?

22          MR. JACOBS:  I'm not sure, Your Honor.  I believe

23  --

24          THE COURT:  There's one about three weeks off, I

25  think, isn't there?

Page 16

```
 1              MR. JACOBS:  Right.  Perhaps we could do a date

 2    after that to allow for a little bit more time, or

 3    approximately 30 days when convenient for the Court.

 4              THE COURT:  When is the June date, do you know?

 5              THE CLERK:  June 15th.

 6              THE COURT:  June 15th?

 7              MR. JACOBS:  All right.

 8              THE COURT:  So we'll adjourn that to June 15th.

 9              MR. JACOBS:  Great.  Thank you, Your Honor.

10              There are four additional cases.  They're the

11    Shapiro cases, they're all related and involve an estate

12    which is -- which was the primary initial transferee of the

13    BLMIS account that's operative in those complaints.  If Your

14    Honor recalls, the estate, at the time we served our

15    discovery, was without legal representation.  They are now

16    in the process of appointing new counsel.  We have been in

17    communication with them, they have been cooperative and

18    we've had fruitful discussions.

19              We have extended the return date on those

20    subpoenas until May 30th in the hopes that we can resolve

21    all of those outstanding issues.  And we would similarly

22    request that the Court adjourn the hearing with respect to

23    those subpoenas until June 15th.

24              THE COURT:  All right.

25              MR. JACOBS:  The last case out of the six is the
```

Page 17

1   Wilenitz matter.  Just by way of background, if the Court

2   recalls, the Court had some questions about the sufficiency

3   of the defendant's RFA responses and subsequently the

4   trustee's need for bank records in that case.  We had noted,

5   at the -- on the -- at the March 23rd conference that the

6   defendant -- the individual defendant, Ms. Wilenitz, had

7   submitted an affidavit in connection with her claim that was

8   filed in June 2009, in which she said that she had her bank

9   records, she had compared those to the customer statements

10   and that the BMLIS customer statements were correct.

11       So on that basis we suggested that instead of

12   pursuing the third party subpoena against the bank, that Ms.

13   Wilenitz produce those bank statements in her possession, in

14   the first instance, and the Court agreed and continued the

15   hearing on that basis.

16       Since that time we have been in touch with counsel

17   for the defendant, represented by Mr. Dexter here today.  We

18   were informed, yesterday, by Ms. Chaitman, his colleague,

19   that Ms. Wilenitz in fact does not have any bank records in

20   her possession.  She does have customer statements.  So to

21   us that begs the question, if Ms. Wilenitz had bank

22   statements in her possession in June 2009, what has happened

23   to those documents in the interim?

24       THE COURT:  Well has she conceded that the

25   transfers reflected in the trustee's schedule were made?

1      MR. JACOBS:  That's the nuance of the case that I

2  think of the RFA response that was concerning the Court, and

3  I can respond to that, Your Honor.

4      The RFA responses do concede that the customer

5  statements are correct with respect to the withdrawals and

6  the defendant does admit that the amount of the withdrawal

7  is correct.  However, if you -- upon a closer examination of

8  the RFA responses, later on that same defendant -- all of

9  the defendants deny that they actually received those

10  transfers.

11      THE COURT:  Let me see.

12      MR. JACOBS:  So there were two sets of RFA

13  responses submitted, one on behalf of Ms. Wilenitz,

14  individually, the rest on -- the others on behalf of the

15  remaining trustee defendants.  And each is substantially

16  similar --

17      THE COURT:  I'm looking at the trust defendant's

18  response; which paragraph are you referring to?

19      MR. JACOBS:  If you'll give me just one moment.

20      THE COURT:  Oh, I see here.

21      MR. JACOBS:  That's the -- that's Ms. Wilenitz.

22  One second.

23      THE COURT:  Oh, she denied that she received the

24  withdrawals.  I see.

25      MR. JACOBS:  Yes.  It's --

1           THE COURT:  It's number six.

2           MR. JACOBS:  Yes.  And number -- also request

3    number 11 is similar where the trust defendants also deny

4    that they received the $150,000 in excess of principal.

5           In addition to that issue, Your Honor, I also note

6    there are several other responses that were made in

7    discovery that are disturbing here.  In addition to

8    affirmative defenses that were raised about set off and

9    taxes paid, we also served interrogatory requests and the

10   defendants responded that they paid short term and long term

11   taxes on capital gains with respect to the fictitious

12   profits in every year that the account was maintained.  That

13   was supplied affirmatively in response to a request

14   concerning the basis of that affirmative defense.  So it's

15   not just the bank -- the bank records are not just relevant

16   to the receipt of the transfer issue, which is clearly

17   denied, they're also relevant to those affirmative defenses.

18          And also, we'd like to note for the record, that

19   the defendant served responses to our request for document

20   production where we requested bank records from the

21   defendant directly.  In those responses the defendant stated

22   that they had contacted their banks and the banks

23   represented that those records have not been maintained.

24   However, we subpoenaed Citibank, that's the subpoena that's

25   at issue today.  Citibank has a production ready to be

Page 20

1   produced pending this Court's ruling on that subpoena.  So

2   we have some -- I believe a possible issue of spoliation and

3   we also have some potential discovery disputes that we may

4   need to raise with the court, depending on hopefully what

5   happens after we get the production from Citibank.

6          So -- and with all of that said, Your Honor, we

7   request that the defendants withdraw their motions, if the

8   Court -- to remind the Court there's not just the motion to

9   quash the subpoena, there's also a pending motion to dismiss

10  the trustee's complaint, based on certain alleged discovery

11  --

12         THE COURT:  I thought I denied that the last time.

13         MR. JACOBS:  If that has been denied, then I stand

14  corrected.

15         THE COURT:  I thought I read it in -- a decision

16  into the record on that.

17         MR. JACOBS:  I had thought that motion had been

18  continued, together with the motion to quash, but if I'm

19  incorrect, I apologize.

20         THE COURT:  I denied all the motions to dismiss.

21         MR. JACOBS:  Okay.  Thank you, Your Honor.  Then

22  we request that the defendants withdraw their motion to

23  quash the subpoena.

24         MR. DEXTER:  Good morning, Your Honor.  Greg

25  Dexter, Chaitman, LLP.  We have no problem withdrawing our

Page 21

1    motion to quash the subpoena.  The Court's order is quite

2    clear that Wilenitz would produce whatever documents she had

3    in her possession.  She has no bank statements now in her

4    possession, therefore there's -- we have no choice but to

5    comply -- allow compliance with the subpoena.  There are no

6    documents she can produce.

7            With respect to allegations of spoliation, there's

8    really -- they're really unfounded because the SIPC claim

9    was made in 2009 at which point we did not represent the

10   defendant and no preservation letter was sent by the trustee

11   in 2011.  So presumably, between 2009 and 2011 she lost

12   track of the records, she's over 90 years old, we don't have

13   firsthand knowledge of that.  And if the records don't

14   exist, there's really nothing that we can do to produce

15   them.

16           THE COURT:  I got it.  All right.  Then I will

17   deny the motion to quash the subpoena with request to

18   Citibank.  That's the only bank at issue --

19           MR. JACOBS:  Yes, Your Honor.

20           THE COURT:  -- with Wilenitz?  All right.  You can

21   submit an order and we'll carry the Roth and Shapiro matters

22   over to June 15th.

23           MR. JACOBS:  Okay.  Thank you, Your Honor.

24           THE COURT:  Thank you.

25           MR. DEXTER:  Thank you, Your Honor.

1          THE COURT:  Thank you.

2          Next concerns the extension of the notice of

3     pendency.

4          MR. CAMPBELL:  Good morning, Your Honor.  My name

5     is Patrick Campbell and I represent the trustee in this

6     matter.

7          On April 6th the trustee filed a motion requesting

8     an extension of the notice of pendency that he caused to be

9     filed and recorded on Andrew Madoff's New York City real

10    property located at 433 East 74th Street, Apartment 5A.

11    After the parties agreed, and this Court ordered two six-

12    month extensions on the notice of pendency, that currently

13    expires on June 1st, 2016, we were not able to get the

14    defendants to agree to a further extension.  And I would

15    also note that they're -- they have not filed objections to

16    this motion either.

17         THE COURT:  Let me ask if there's anybody in court

18    today who wants to be heard in opposition to the motion.

19    The record should reflect there's no response.

20         The motion is granted.  You can submit an order.

21         MR. CAMPBELL:  Thank you, Your Honor.

22         THE COURT:  Final matter concerns the status of

23    discovery in the UBS matters.  Who would like to speak?

24         MS. JENSEN:  Good morning, Your Honor.

25         THE COURT:  Good morning.

1          MS. JENSEN:  Karin Jensen on behalf of the

2     trustee.  We're here today on a status conference in order

3     to move forward with discovery.  This case was filed --

4     these two cases, the first one I'll refer to as the Lux

5     action, that's 4285, and the other is 5311 that I'll refer

6     to as the LIF action.  These two cases were first filed

7     in -- five and a half years ago, they're both feeder fund

8     cases where the defendants are the funds themselves, in

9     addition to a number of service providers.  In the Luxalpha

10    action there are also director defendants so it's

11    structurally analogous to Kingate, which you're familiar

12    with.

13          We are -- the events at issue in the complaints

14    occurred more than 12 years ago, and I think given the

15    procedural posture of the case, we're looking at a full

16    decade after Madoff's arrest when we would be able to begin

17    discovery under the current state of affairs.

18          So we think that the first decision that's

19    relevant to these two actions is the extraterritoriality

20    decision, under that decision the feeder funds obviously, as

21    the initial transferees, will not be subject to dismissal

22    and so even if the remaining defendants who filed and

23    participated in the extraterritoriality proceedings, we will

24    still need discovery from those service provider defendants.

25    So that is the first order.

1          The second order would be a briefing on the motion

2     to amend, that pursuant to paragraph 15 of the

3     extraterritoriality order we would engage in briefing.  This

4     is one of those six or eight cases where we filed full

5     proffered amended complaints, these two cases.  So those are

6     attached to the extraterritoriality proceedings, the

7     briefing that we filed last June.  So then we would engage

8     on motion practice on whether those two complaints should go

9     forward.  And they contain new allegations, both on personal

10    jurisdiction, transfers and issues of good faith, both of

11    those complaints contain new allegations.  So we would

12    expect, you know, some robust briefing on that issue.

13          And then next we have an order in this case from

14    March 8th of 2012, where we agreed that the parties would

15    proceed on personal jurisdiction before other Rule 12

16    motions.  So the next round of briefing after the motion to

17    amend, and that order is granted, we would proceed to the

18    personal jurisdiction briefing.

19          THE COURT:  Is the motion to amend separate from

20    the allegations relating to the extraterritoriality?

21          MS. JENSEN:  The allegations relevant to the

22    decision on extraterritoriality are set forth in the

23    proffered amended complaint that's attached to the trustee's

24    submission in June.  But the complaint is not yet operative,

25    because it has not been -- we have not been granted leave to

1   amend.

2          So then after personal jurisdiction is decided, we

3   also have a forum non motions in both cases brought by the

4   funds, Luxalpha and LIF.

5          And then we would proceed to the other Rule 12

6   briefing, after the personal jurisdiction.

7          THE COURT:  It sounds like you're a long way from

8   the merits --

9          MS. JENSEN:  Exactly.

10         THE COURT:  -- if you ever get there.

11         MS. JENSEN:  Exactly.  And so at this point, given

12   that the events that occurred started 16 years ago in these

13   complaints, and we're looking at, you know, probably another

14   couple of years before we would get full decisions across

15   the board, a decade after Mr. Madoff's arrest, we are

16   interested in pursuing discovery now.  And we think that

17   even in the event that any of these motions are granted --

18   first of all, they're not dispositive of all claims, or all

19   defendants, we believe that we would still be engaging in

20   similar discovery, if not the exact same discovery after

21   these motions are granted, given that the service providers

22   have the documents and witnesses that relate to these two

23   funds.  And in addition, we have disallowance and equitable

24   subordination claims so the documents would be relevant to a

25   determination of those issues.

Page 26

```
 1            These are two -- Luxalpha and LIF are net losers

 2    and they have filed claims.  Both UBS SA filed claims on

 3    behalf of the funds, and they filed direct claims

 4    themselves.  And Luxalpha is in the order of 762 million and

 5    LIF is in the order of 23 million.

 6            THE COURT:  So what's the additional discovery,

 7    beyond the discovery you need for the claims resolution and

 8    the suit against the initial transferees, which presumably

 9    won't go away.

10            MS. JENSEN:  Right.  I don't see --

11            THE COURT:  Or some form of it won't go away.

12            MS. JENSEN:  We -- and we have talked amongst

13    ourselves, with the defendants as well, about how that

14    discovery might look different.  I cannot envision a subject

15    matter that would be carved off, even if the service

16    provider defendants are dismissed in any of these actions.

17            THE COURT:  Well the issue of the subsequent

18    transfers would be carved out, wouldn't know --

19            MS. JENSEN:  That would be carved off --

20            THE COURT:  -- what would be relevant --

21            MS. JENSEN:  -- but they have the documents that

22    supported the funds.  They served the funds, they did the

23    marketing, the funds themselves are, you know --

24            THE COURT:  You know, I've gotten draft case

25    management orders.
```

1          MS. JENSEN:  Um hmm.

2          THE COURT:  Has that been agreed to by the

3    parties?

4          MS. JENSEN:  It's -- the terms have been agreed

5    to, generally speaking.  I'll let the defendants speak for

6    themselves if they have any opposition to it.  But the fact

7    of whether we proceed is the open issue.

8          THE COURT:  Okay.  Thank you.

9          MR. KING:  Good morning, Your Honor.  Marshall

10   King from Gibson Dunn & Crutcher.  We represent the UBS

11   defendants.

12         Ms. Jensen recited the history fairly accurately,

13   but I think it's worth going through a little detail why

14   we're at the point where no discovery has taken place.  It's

15   not that nothing has happened in these cases.  We -- through

16   a series of events, both imposed by Courts and agreed by the

17   parties, we agreed to address a bunch of issues step by

18   step, these threshold issues.

19         We started with the issue of the trustee's

20   standing to pursue common law claims on behalf of customers;

21   those were briefed in the summer of 2011 and a decision was

22   rendered by the District Court in November 2011 that then

23   went up on appeal to the Second Circuit, where it was

24   affirmed and then cert was eventually denied.

25         At that same time, or following the District

1    Court's ruling, we did agree to address first, the question

2    of jurisdiction.  That was briefed in 2012.  Judge Lifland

3    held a -- we appeared for argument on the motions to

4    dismiss, excuse me, in December of 2012.  Judge Lifland

5    converted that to a status conference, asked us to try to

6    simply -- talk and try to simply the issues.  Talks ensued

7    thereafter, for a while.  Some of the issues were

8    simplified, and the trustee dismissed claims against a

9    number of the defendants, others, including one of my

10   clients, withdrew its jurisdiction motion, although others

11   remained pending.

12          We agreed that merits based 12(b)(6) motions would

13   await the outcome of the jurisdiction issue.  Somewhere

14   along the way there, of course, the extraterritoriality

15   proceedings intervened.  Most of the defendants in these two

16   cases joined those proceedings, and Your Honor knows that's

17   pending.

18          The logic of all of the -- and incidentally, all

19   along the way we have kicked off -- punted this initial

20   pretrial conference or status conference 19 times.  It's --

21   there's been a tacit agreement in the -- not a binding stay

22   of discovery, but a tacit agreement that it made sense to

23   resolve all those threshold issue before we got into

24   expensive and complicated discovery of mostly international

25   parties where issues -- international comity will become

1    quite relevant, present issues under the bank secrecy laws

2    of mostly Luxembourg and to some extent Switzerland and

3    perhaps some other places, I'm not sure where all the

4    defendants are.

5         But -- so the logic of not commencing this

6    expensive discovery is more relevant now than ever, applies

7    more now than ever.  When we think -- and I don't mean to

8    presume to know how Your Honor is going to decide the

9    extraterritoriality motion, but most of the defendants in

10   this case we think are going to be out of this case very

11   soon.

12        We do have other jurisdiction motions and 12(b)(6)

13   motions that we would make at the appropriate time.  And

14   I'll come back to whether we should just address that stuff

15   now.  I think if there's a desire to get this case moving,

16   so to speak, the way to get this case closer to resolution

17   is, okay, we'll brief all those other issues, tee them up

18   for Your Honor, in case the extraterritoriality ruling comes

19   down in favor of the trustee or in case -- well as will be

20   the case, some defendants will definitely be left after

21   extraterritoriality; I don't deny that.  But there are other

22   -- but my clients won't, number one.  And number two,

23   12(b)(6) motions, we think on issues of failure to plead

24   good faith -- failure to plead lack of good faith, excuse me

25   --

Page 30

```
 1          THE COURT:  From the perspective of the subsequent

 2    transferees?

 3          MR. KING:  And from the perspective of the initial

 4    transferees.  There's no doubt that these were transfers for

 5    value, this is just the return of the --

 6          THE COURT:  So the --

 7          MR. KING:  -- the parties' principal.

 8          THE COURT:  -- initial transferees are net losers

 9    in this one?

10          MR. KING:  The initial transferees are now losers.

11    So there would be issues of lack of good faith, and of

12    course the question of whether the trustee can go back six

13    years or two years will be relevant, also an important

14    issue, in terms of whose left in this case, how much are we

15    fighting over, et cetera.

16          THE COURT:  Yeah, I -- you know, I'll hear

17    everybody.  It just sounds like the way to deal with the

18    case most expeditiously is focus on the initial transfers.

19    Because if the initial transfers go away, everything else

20    goes away, right?

21          MR. KING:  Well that is certainly true,

22    although -- yeah, that is certainly true, I suppose Your

23    Honor.  We have, for obvious reasons I think, given who the

24    defendants are, the trustee has been quite focused on UBS as

25    a subsequent transferee.
```

1    THE COURT:  Who were the initial transferees?

2    MR. KING:  Two funds that are in liquidation in

3    Luxembourg -- or three funds, excuse me.  Two in liquidation

4    -- four?

5    MS. JENSEN:  Landmark and (Indiscernible).

6    MR. KING:  Four funds, I apologize, Your Honor.

7    THE COURT:  The Landmark Investment Funds --

8    MR. KING:  My client's involved with three.

9    THE COURT:  -- are the funds in 5311?

10    MS. JENSEN:  That's correct.  It's Landmark

11    Luxembourg Investment Funds in 5311 and in the Luxalpha

12    action it's Luxalpha and Groupement.

13    MR. KING:  Luxalpha --

14    THE COURT:  It's a big caption.

15    MR. KING:  It's gotten --

16    THE COURT:  I see, you put them on the end there.

17    MR. KING:  -- it's gotten smaller, Your Honor,

18    actually over the years.

19    THE COURT:  Maybe I shouldn't say anything.

20    MR. KING:  Yeah, the case keeps whittling away

21    without Your Honor needing to take action, although we'd

22    love to see --

23    THE COURT:  Certainly if the evidence goes away a

24    little also, right?

25    MR. KING:  Well look, if the trustee was really

Page 32

1    concerned about loss over evidence, the time to raise these

2    issues was probably five years ago, a long time ago.

3              THE COURT:  So he lost the right to raise the

4    concern?

5              MR. KING:  No.  Look, they don't -- they lose the

6    right to say, that's really the issue.  I think what's going

7    on here, Your Honor, is they realize a bunch of parties are

8    about to turn into nonparties and are trying to get

9    discovery in before Your Honor's dismissal ruling comes

10   down.

11             I recognize -- and I don't fault the trustee for

12   saying, look it's time to move this case along.  The way to

13   move this case along, if we -- if there's a desire by the

14   trustee or by the Court, is to brief those other Rule 12

15   motions.  I mean I guess I could assume we could address

16   them both to the existing operative complaints, although we

17   -- those seem to -- they seem to be abandoned in favor of

18   the proposed amended complaints that haven't yet been given

19   permission to file.  We could address it to either or both.

20             THE COURT:  Is there an objection for leave to re-

21   plead?

22             MR. KING:  We objected to leave to re-plead on the

23   ground that the pleadings on extraterritoriality were

24   futile, as that was -- that's the procedural posture that's

25   pending before Your Honor, I think.  And Your Honor's -- the

Page 33

 1    procedural order that's in place on the extraterritoriality

 2    says we're going to defer all that stuff to a later date,

 3    whether they get to amend, whether anybody objects to

 4    amendment and other proceedings, we're going to adjourn to a

 5    later date.

 6              The reason -- one reason why commencing discovery

 7    doesn't get us closer to resolution is the dates that are in

 8    the proposed case management plans.  And let me pause there

 9    a second, we did agree -- we -- the trustee made a proposal

10    on the case management plan.  We didn't think it was

11    appropriate to enter a discovery schedule, but we undertook

12    to resolve and address some issues that were in the

13    trustee's original proposal, and that's what's reflected

14    before Your Honor.

15              So in form, and in concept, we're fine with the

16    concepts embodied in that.  Whether that commences now or

17    awaits resolution of the Rule 12 motions,

18    extraterritoriality, jurisdiction, 12(b)(6), is very much in

19    dispute.

20              THE COURT:  Although, it doesn't --

21              MR. KING:  But --

22              THE COURT:  -- sound look they're years off when

23    you say resolution.

24              MR. KING:  Look, but we can brief the Rule 12

25    motions now, if that's what is desirable.  I think it has

1  always made sense, and agree that it was smart to brief

2  these issues step by step, resolve them, see if the -- see

3  what the case looked like after each step, whether -- who's

4  left, what issues are left, how much in transfers are left,

5  and then go forward.

6          But if we want to tee up those issues so that when

7  Your Honor decides extraterritoriality, that the red -- the

8  next issues are there before Your Honor, we can do that.

9          The other -- and I guess what I would say is, the

10  schedule that you'll see in the case management plans, the

11  deadlines run from decisions on those Rule 12 motions,

12  commencing discovery now doesn't get us closer to finishing

13  this case.

14          THE COURT:  Well what's the difference if you

15  don't -- if the deadlines don't run until the commence --

16  until the resolution or the disposition of the Rule 12

17  motions?

18          MR. KING:  Till the disposition of the last of the

19  Rule 12 motions.

20          THE COURT:  All right.  I've got --

21          MR. KING:  And --

22          THE COURT:  Go ahead.

23          MR. KING:  -- lastly, Your Honor, just one other

24  thing.  Because much of the discovery is overseas, we have

25  proposed, again, if there's a desire to move along, that the

Page 35

1    parties be permitted, the trustee really, be permitted, but

2    all parties be permitted, to issue letter -- have letters of

3    request issued through The Hague Convention.  As long as

4    we're waiting for Your Honor's decision on

5    extraterritoriality, yes, that letters of request process

6    will take time, but, you know, let's get it started and so

7    we don't have complaining about having wasted that time.

8            We very much think that Hague Convention discovery

9    is the right way to go, because of issues that I -- it's not

10   -- I don't think they're before Your Honor here today, but

11   there are bank secrecy and other privacy regulations in

12   Luxembourg where most of the documents are, Switzerland

13   where some of the documents are.  And proceeding by The

14   Hague Convention avoids putting parties in, you know, in a

15   Catch-22 situation where they run the risk of civil or

16   criminal sanctions by complying with discovery orders here.

17           Your Honor doesn't have to decide that that is the

18   method that will be applied here.  All I'm saying is, if we

19   want to move along, let's do that.  Let's get -- you know,

20   have those go off into the bureaucratic process and see what

21   comes back and see what happens, while we do all the other

22   things that we agreed to do all along, resolve

23   extraterritoriality, resolve jurisdiction and resolve

24   12(b)(6) motions.

25           THE COURT:  Thank you.

Page 36

```
1              MR. KING:  Thank you, Your Honor.

2              THE COURT:  Anybody else want to be heard?

3              MS. JENSEN:  Can I just respond on a few points,

4     please?

5              THE COURT:  Yeah.

6              MS. JENSEN:  Just two points briefly, Your Honor.

7     I think even if the initials were dismissed, we still have

8     the issue of their claims and resolving their claims.  And I

9     think discovery will be relevant to that point as well, and

10    again, I don't see a difference -- I can't conceptualize a

11    difference between the good faith discovery at issue in the

12    litigation, and the discovery that we would -- that the

13    trustee would require to adjudicate these claims.

14             And it's -- I'm sorry, 272,000 by LIF and I think

15    I misspoke before, I just want to correct myself, 260

16    million by LIF and 762 million, Luxalpha.

17             And the second point, we believe that we're

18    entitled to proceed under the federal rules, The Hague -- we

19    may get decisions on all these motions before we got

20    documents through The Hague.  Thank you.

21             THE COURT:  You know, the question I have here is

22    I haven't heard anything that really affects the initial

23    transfers or the claims resolution process and it strikes me

24    that most of this discovery, other than the amounts actually

25    paid to the subsequent transferees or the alleged subsequent
```

1   transferees.  It's going to be relevant, it isn't going to

2   go away.  So why not start the discovery now?

3          MR. KING:  Well the -- sure.

4          MR. MOORE:  Good morning, Your Honor.  Brett Moore

5   from Porzio, Bromberg & Newman on behalf of the liquidators

6   for the Luxalpha and Luxembourg Investment Fund.  And just

7   to be clear, Your Honor, we do have pending -- as alleged

8   initial transferees, we have pending, right now, motions to

9   dismiss based on personal jurisdiction as well as forum non

10  conveniens.  And we do intend to bring substantive 12(b)(6)

11  motions on what Mr. King's --

12         THE COURT:  You're an initial transferee that

13  invested in BLMIS, how are you going to get a dismissal on

14  those grounds?

15         MR. MOORE:  Well, Your Honor, it's -- the service

16  providers that were operating with these funds, we believe,

17  were the parties that were taking the steps and filed the

18  claims and dealt with Mr. Madoff and BLMIS.

19         THE COURT:  But weren't they acting as your agent?

20         MR. MOORE:  Yes, Your Honor.  And you get into the

21  question of whether they were acting within the scope of

22  their --

23         THE COURT:  But you were investing in BLMIS,

24  right?

25         MR. MOORE:  The funds invested -- the fund's

Page 38

1   proceeds were invested in BLMIS.

2            THE COURT:  Okay.  You represent the initial

3   transfer -- the invest -- the BLMIS customer and the initial

4   transferee then.

5            MR. MOORE:  Correct, Your Honor.

6            THE COURT:  So how can those claims be dismissed

7   on forum non conveniens grounds or personal jurisdiction

8   grounds?

9            MR. MOORE:  They may not be dismissed Your Honor,

10  but we have -- we believe the arguments are strong, forum

11  non conveniens.  There are pending cases in Luxembourg

12  involving a lot of these same parties right now.

13           THE COURT:  But these are SIPA claims of

14  fraudulent transfers.  Look, I haven't read any papers, I

15  just -- that sounds like a difficult argument to make.

16           MR. MOORE:  But --

17           THE COURT:  If you want to argue that the

18  complaint doesn't allege bad faith, maybe it's just a red

19  flag case, I don't know what it says, that's something else,

20  but --

21           MR. MOORE:  But exactly, Your Honor.

22           THE COURT:  But you still have your claims in here

23  as part of the claims resolution process, don't you?

24           MR. MOORE:  That's correct, Your Honor.  But with

25  respect to the safe harbor of 546, the good faith issues, we

1    believe that those things should be presented before the

2    Court and decided before we engage in discovery.

3            THE COURT:  Tell me why.  What's the difference

4    between the discovery relating to claims -- the claims and

5    discovery that might be relevant to whether or not you

6    received transfers?

7            MR. MOORE:  Well because if Your Honor -- if the

8    good faith under the fraudulent transfer action is going to

9    be duplicative of whether these claims should be equitably

10   subordinated.  So if the trustee has not proven that these

11   claims should be -- that he can proceed with a fraudulent

12   conveyance claim, I would submit then, therefore there is no

13   basis, at this point in time, to suggest that there should

14   be a substantive -- an equitable subordination either.

15           And I believe if we go back to Judge Rakoff's

16   ruling, he essentially had indicated that the two standards

17   would be the same in both of those instances.

18           THE COURT:  Which two standards?

19           MR. MOORE:  Under --

20           THE COURT:  Bad faith and equitable subordination?

21           MR. MOORE:  Correct, Your Honor.

22           THE COURT:  All right.

23           MR. KING:  Your Honor, I had one -- I'll -- one

24   question you asked was how is the discovery going to be

25   different.  From the perspective of every defendant here,

Page 40

1  who will be the focus of the trustee's discovery, the

2  discovery will be different, we'll be third parties.  In

3  that circumstance they will have to go through The Hague

4  Convention, for sure.  And we don't think they should get

5  discovery of us as a party simply because of the way this

6  has dragged.

7  THE COURT:  I grant you it's easier when you're a

8  party, but at the end of the day, and this sounds like a

9  document case at least from the subsequent transferee's

10  point of view, how is it going to be different?

11  MR. KING:  From a document point of view, the

12  scope will be somewhat similar.  But giving us the

13  protection of The Hague Convention is a huge --

14  THE COURT:  So -- well --

15  MR. KING:  -- difference.  It avoids putting us in

16  that -- between the rock and the hard place, and

17  accommodates international -- well, it accommodates

18  international comity, if Your Honor -- if we are parties.

19  If we aren't parties, having them go that route gives us the

20  protection we need to produce documents through that process

21  without fear of penalty in those foreign jurisdictions.  And

22  they -- so they can get the discovery they'll need.

23  THE COURT:  So you're suggesting that the document

24  discovery is all right, but they should do it through The

25  Hague Convention?

Page 41

1            MR. KING:  I'm -- look, I don't know that they

2    really need to kick this off, if the deadlines aren't for

3    210 days after the last of the Rule 12 motions is decided.

4    If the deadlines are that far out, we're not getting any

5    closer to resolution of this case by letting them commence

6    discovery now.  We're just giving them a whole lot longer

7    period to take that discovery.  So I don't think it's

8    necessary.  But if there's a desire to not sit around

9    waiting -- you know, to do something while we're sitting

10   around waiting, then that's one option.

11           THE COURT:  Yes, sir?

12           MR. PACCIONE:  Your Honor, Anthony Paccione,

13   Katten Muchin for the Access defendants and also one of the

14   initial transferees, Groupement Financier.

15           Groupement did not file a claim, so the rationale

16   on the arguments with respect to --

17           THE COURT:  Hold it down, please.  I'm sorry.  Go

18   ahead.

19           MR. PACCIONE:  Groupement did not file a claim and

20   so the issue of discovery with respect to it and its claim

21   and need to understand whether or not it should be

22   subordinated or not, I think is not relevant to Groupement

23   and that would narrow the focus of any discovery going

24   forward.  So for those reasons, Your Honor, I don't think

25   that the discovery -- and for the reasons that UBS fully

Page 42

1    articulated, I think it's premature to have discovery.  I

2    think a staggered approach, which we've adopted for the past

3    six, seven, eight years is still -- still makes sense.

4             THE COURT:  And tell me what the problem is with

5    getting documents through The Hague -- or going through The

6    Hague Convention, other than it's more cumbersome.

7             MR. ZEBALLOS:  Your Honor -- Your Honor, Gonzalo

8    Zeballos for the trustee.

9             The big difference is that the protections that

10   Mr. King was talking about are not -- he's saying they're

11   protections that would allow them to produce the documents,

12   but as you know, The Hague Conventions allows defenses under

13   local law that he would not get under the Federal Rules of

14   Civil Procedure.

15            So when he's saying they'd be allowed to produce

16   the documents, but they could turn around and say, no, you

17   get Luxembourg bank secrecy without the balancing test that

18   we would get here --

19            THE COURT:  But in the meantime, if they don't get

20   out of the case that may be their problem, not your problem,

21   if they don't produce the documents.

22            MR. ZEBALLOS:  If they don't get out of the case,

23   that's correct.

24            THE COURT:  All right.  But so -- all I'm

25   suggesting is these things can go along in parallel.

1          MR. ZEBALLOS:  That is right.

2          THE COURT:  All right.  Look, I'll permit the

3     discovery through The Hague Convention.  It sounds to me

4     like this -- the fastest way to streamline this case is to

5     determine whether or not the initial transfers are avoidable

6     or to the extent to which they may be avoidable.  We've had

7     a lot of motions to dismiss in this case on those issues,

8     while I'm not looking forward to another one, that seems to

9     -- the way to challenge it.

10          You know, motions to dismiss, based on personal

11     jurisdiction, that's going to probably require trial -- a

12     trial.  Forum non conveniens, it's -- it can certainly be

13     part of a motion to dismiss, but in the interim, the

14     extraterritoriality motion will move along, but it just

15     sounds like that's the fastest way or maybe the most

16     efficient way to deal with this case, to press the 12(b)(6)

17     motions directed at the initial transfers.

18          MR. KING:  I guess the only thing I would --

19          THE COURT:  I'm not ordering you to do it --

20          MR. KING:  Yeah.

21          THE COURT:  -- but that's -- it sounds like --

22          MR. KING:  The only thing I would say is just --

23          THE COURT:  -- it makes more sense than going

24     through seriatim briefings of forum non conveniens --

25          MR. KING:  Sure.

1        THE COURT:  -- personal jurisdiction, comity,

2    whatever else you have.

3        MR. KING:  I'm throwing this out there as opposed

4    to advocating it, but the good faith/bad faith of the

5    subsequent transferees is really the same issue as --

6        THE COURT:  Well no, because if the initial

7    transfers are not avoidable the whole case goes away.

8        MR. KING:  Yes.  But I guess I'm suggesting --

9        THE COURT:  Except for the claims resolution.

10       MR. KING:  -- that the -- one reason the initial

11   transfers aren't avoidable is because they haven't

12   adequately pled the lack of good faith of the initial

13   transferees.  And they're going to use the state of mind of

14   the service providers -- look, we can talk about it --

15       THE COURT:  All right.

16       MR. KING:  -- Your Honor and come up with a

17   proposal, but --

18       THE COURT:  It may be that your state of mind is

19   the state of mind of the initial transferees, because you

20   were the service providers.  I understand that.

21       MR. KING:  They're going to take that position.

22       THE COURT:  All right.  So, I don't have a problem

23   with that.

24       MR. KING:  Yeah.

25       THE COURT:  It just sounds like a way to deal with

Page 45

1   the case, rather than go through this waterfall of motions

2   to dismiss, that's all.  I'm not saying you won't have to do

3   that, but it sounds like it makes more sense to start at

4   that point.

5           MR. KING:  All right.

6           THE COURT:  So you can submit an order which

7   permits you to proceed with discovery under The Hague

8   Convention, I guess document discovery at this point.  And

9   as I've said, if it turns out they remain parties, and they

10  assert bank secrecy or something like that, which was

11  similar to what happened in the Appelbaum situation, that

12  may be their problem.

13          MR. KING:  Thank you, Your Honor.

14          MS. JENSEN:  Thank you, Your Honor.

15          THE COURT:  All right.  Thank you.  Thank you very

16  much.

17          (Whereupon these proceedings were concluded at

18  10:47 AM)

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3     I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6     Sonya
      Ledanski Hyde

      Digitally signed by Sonya Ledanski
      Hyde
      DN: cn=Sonya Ledanski Hyde, o, ou,
      email=digital1@veritext.com, c=US
      Date: 2016.04.28 16:55:02 -04'00'

7

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  April 28, 2016