KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Plaza
New York, New York 10020
(212) 940-8800

*Attorneys for RBC Investor Services S.A., RBC Investor Services Trust, and Banco Inversis, S.A.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                    Plaintiff,<br><br>          v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES, LLC,<br><br>                    Defendant. | **Adv. Pro. No. 08-01789 (CGM)**<br><br>**SIPA Liquidation**<br>**(Substantively Consolidated)** |
| In re:<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES, LLC,<br><br>                    Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff<br><br>                    Plaintiff,<br>          v.<br><br>BANQUE INTERNATIONALE À LUXEMBOURG S.A. (*f/k/a* Dexia Banque Internationale à Luxembourg S.A.); RBC INVESTOR SERVICES BANK S.A (*f/k/a* RBC Dexia Investor Services Bank S.A.); RBC INVESTOR SERVICES TRUST (*f/k/a* RBC Dexia Investor Services Trust); BANCO INVERSIS, S.A., as successor in interest to RBC Dexia Investor Services España S.A.; and BANQUE INTERNATIONALE À LUXEMBOURG (SUISSE) S.A. (*f/k/a* Dexia Private Bank (Switzerland) Ltd.),<br><br>                    Defendants. | **Adv. Pro. No. 12-01698 (CGM)**<br><br><br>**ANSWER WITH AFFIRMATIVE DEFENSES AND JURY DEMAND** |

Defendants RBC Investor Services Bank S.A. (*f/k/a* RBC-Dexia Investor Services Bank

S.A.) ("RBC-Dexia Bank"); RBC Investor Services Trust (*f/k/a* RBC-Dexia Investor Services

Trust) ("RBC-Dexia Trust"); Banco Inversis, S.A. ("Banco Inversis") (as successor in interest to

RBC-Dexia Investor Services España S.A. ("RBC-Dexia España")) (collectively the "RBC-Dexia

Defendants"), by their undersigned counsel, as and for its Answer to the Amended Complaint of

plaintiff Irving H. Picard (the "Trustee" or "Plaintiff"), Trustee for the liquidation of Bernard L.

Madoff Investment Securities LLC ("BLMIS") and the Chapter 7 Estate of Bernard L. Madoff,

respectfully avers as follows:

## I.    NATURE OF THE PROCEEDING[1]

1.      This adversary proceeding is part of the Trustee's continuing efforts to recover
BLMIS customer property, as defined by SIPA § 78*lll*(4), that was stolen by BLMIS as part of the
massive Ponzi scheme perpetrated by Madoff and others.

**Response**: The RBC-Dexia Defendants deny the allegations of Paragraph 1, except admit

upon information and belief that Madoff perpetrated a Ponzi scheme and admit that the Trustee

purports to bring this adversary proceeding as part of the Trustee's efforts to recover BLMIS

customer property within the meaning of 15 U.S.C. § 78lll(4).

2.      The Trustee seeks to recover at least $65,995,850 in subsequent transfers of BLMIS
customer property (the "Transfers") made to Defendants.  Defendants obtained the Transfers by
redeeming equity interests they held in the "BLMIS feeder funds" listed in the chart below.
BLMIS feeder funds were single-purpose entities that invested all or substantially all of their assets
with BLMIS's investment advisory business (the "IA Business"):

| Defendant | BLMIS feeder fund(s) | Transfers |
|-----------|----------------------|-----------|
|           |                      |           |

---

[1] The RBC-Dexia Defendants deem the section headings in the Amended Complaint not to
constitute allegations of the Amended Complaint. To the extent any section headings are
allegations, the RBC-Dexia Defendants admit or deny them consistent with their responses to the
allegations contained in the numbered paragraphs of the Amended Complaint.

| Dexia Banque | • Fairfield Sentry Limited ("Fairfield Sentry") | $52,331,690 |
| | • Fairfield Sigma Limited ("Fairfield Sigma") | $537,645 |
| Dexia Suisse | • Fairfield Sentry | $2,000,067 |
| | • Fairfield Sigma | $5,758 |
| RBC-Dexia Bank | • Fairfield Sentry | $5,146,594 |
| RBC-Dexia Trust | • Rye Select Broad Market Portfolio Limited (f/k/a American Masters Broad Market Fund II Limited, "Rye Portfolio Limited") | $2,433,046 |
| Banco Inversis as successor to RBC-Dexia España | • Fairfield Sentry | $2,037,173 |
| | • Fairfield Sigma | $1,503,877 |

**Response**:      The RBC-Dexia Defendants deny the allegations of Paragraph 2, including that the RBC-Dexia Defendants received subsequent transfers of customer property from BLMIS or any Madoff feeder fund, except the RBC-Dexia Defendants admit that the Trustee purports to allege claims to recover approximately $65,995,850 in alleged subsequent transfers to the Defendants in this action.

3.      BLMIS feeder funds Fairfield Sentry and Rye Portfolio Limited were investment vehicles that held direct BLMIS customer accounts; Fairfield Sigma (together with Fairfield Sentry, the "Fairfield Funds") invested in the IA Business by investing all of its assets with Fairfield Sentry.

**Response**:      On information and belief, the RBC-Dexia Defendants admit that Fairfield Sentry and Rye Portfolio Limited had direct customer accounts with BLMIS' investment advisory business, and Fairfield Sigma invested in Fairfield Sentry.

4.      Defendants consist of two closely-related, overlapping sets of highly sophisticated financial entities: (1) Dexia Banque and its 100%-owned subsidiary Dexia Suisse (together, the

"Dexia Defendants"), which entities were part of the worldwide financial enterprise headed by a non-party formerly known as Dexia S.A. (the enterprise collectively, "Dexia"); and (2) RBC-Dexia Bank, RBC-Dexia Trust, and RBC-Dexia España (collectively, the "RBC-Dexia Defendants"). The RBC-Dexia Defendants were subsidiaries of a joint venture (the "JV") between Defendant Dexia Banque and non-party Royal Bank of Canada.

**Response**:    The RBC-Dexia Defendants deny the allegations in the first sentence of Paragraph 4, except admit that the named Defendants in this case are the RBC-Dexia Defendants and two other entities. The RBC-Dexia Defendants admit upon present information and belief the allegations in the second sentence of Paragraph 4.

## II.    BACKGROUND, THE TRUSTEE, AND STANDING

5.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.   Contemporaneously, the Securities and Exchange Commission (the "SEC") commenced the District Court Proceeding.

**Response**:    The RBC-Dexia Defendants admit on information and belief that Madoff was arrested on or around the Filing Date as alleged in the first sentence of Paragraph 5. The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 5.

6.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6, and otherwise refer the Court to the application filed by SIPC alleged in Paragraph 6 for its complete and accurate contents.

7.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

    (a)    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3); and
    (b)    removed the case to this Court pursuant to SIPA § 78eee(b)(4).

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7, and otherwise refer the Court to the order issued by Judge Stanton alleged in Paragraph 7 for its complete and accurate contents.

8.        By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8, and otherwise refer the Court to the orders issued by the Court alleged in Paragraph 8 for their complete and accurate contents.

9.        On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to form a brief as to the truth of the allegations regarding the first clause of Paragraph 9, but admit the allegations in the second clause of Paragraph 9.

10.        At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10, and otherwise refer the Court to the transcript of the plea hearing alleged in Paragraph 10 for its complete and accurate contents.

11.        On July 16, 2009, this Court entered an order granting the Trustee's motion to retain Windels Marx Lane & Mittendorf, LLP as special counsel on behalf of the consolidated estate, nunc pro tunc as of June 9, 2009.

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11, and otherwise refer the Court to the order issued by the Court alleged in Paragraph 11 for its complete and accurate contents.

12.     At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

**Response**:     The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12, and otherwise refer the Court to the alleged indictment and transcript of the referenced plea hearing alleged in Paragraph 12 for their complete and accurate contents.

13.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

**Response**:     The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13, and otherwise refer the Court to the alleged information and transcript of the referenced plea hearing alleged in Paragraph 13 for their complete and accurate contents.

14.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

**Response**:     The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14.

15.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by BLMIS or Madoff to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 15, and state that the allegations concerning the Trustee's authority under SIPA and the Bankruptcy Code set forth legal conclusions to which no response is required. To the extent any further response is required, the RBC-Dexia Defendants deny such allegations.

16.        Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

**Response**:        The RBC-Dexia Defendants state that the allegations of Paragraph 16 set forth legal conclusions to which no response is required. To the extent a response is required, the RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16.

17.        The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

**Response**:        The RBC-Dexia Defendants state that the allegations of Paragraph 17 set forth legal conclusions to which no response is required. To the extent a response is required, the RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17.

## III.    **BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY**

### A.    **BLMIS**

18.        Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker-dealer with the SEC.  In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company.  At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

**Response**:       The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 18.

19.       In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status.  SIPC membership is contingent on registration of the broker-dealer with the SEC.

**Response**:       The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 19.

20.       For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker-dealer operation, and the IA Business.

**Response**:       The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 20.

21.       BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry.  BLMIS's website omitted the IA Business entirely.  BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

**Response**:       The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 21.

22.       For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

**Response**:       The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 22.

23.       In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total

assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 23.

### B.    The Ponzi Scheme

24.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 24.

25.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 25.

26.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

**Response**:    On information and belief, the RBC-Dexia Defendants deny knowledge or

information sufficient to form a belief as to the truth of the allegations in Paragraph 26.

27.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27, and otherwise refer the Court to the SEC Form X-17A-5 alleged in Paragraph 27 for its complete and accurate contents.

1.    Madoff's Investment Strategy

28.    In general, BLMIS purported to execute two primary investment strategies for BLMIS customers: the convertible arbitrage strategy and the split-strike conversion strategy (the "SSC Strategy").  For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28.

29.    All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank.  These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 29.

30.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time.  In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 30.

31.    From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 31.

32.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 32.

33.    By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations in Paragraph 33.

34.    The put options were to limit the downside risk of sizeable price changes in the basket.  The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option should have entailed a loss for BLMIS.

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 34.

35.    The sale of call options would partially offset the costs associated with acquiring puts, but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 35.

36.    The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protection while limiting the upside.

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 36, except admit that the term "collar"

is sometimes used to describe the simultaneous purchase of puts and sale of calls.

37.        If Madoff was putting on the same baskets of equities across all BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold, had to equal the market value of the equities in the basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 37.

38.        Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the SSC Strategy.

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 38.

39.        Madoff could not be using the SSC Strategy because his returns drastically outperformed the market.  BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly).  Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 39.

2.        BLMIS's Fee Structure

40.        BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits.  By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

**Response**:       The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 40.

      3.     <u>BLMIS's Market Timing</u>

41.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he succeeded at market timing by intermittently entering and exiting the market.  During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in U.S. Treasury securities ("Treasury Bills") or mutual funds invested in Treasury Bills.

**Response**:       The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 41.

42.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.  It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

**Response**:       The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 42.

43.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

**Response**:       The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 43.

      4.     <u>BLMIS Execution</u>

44.    BLMIS's execution showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

**Response**:       The RBC-Dexia Defendants deny the allegations of Paragraph 44.

5.    No Evidence of BLMIS Trading

45.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 45.

46.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 46.

6.    The Collapse of the Ponzi Scheme

47.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

**Response**:    The RBC-Dexia Defendants admit upon information and belief that Madoff's business continued until December 2008, but otherwise deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 47.

48.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

**Response**:    The RBC-Dexia Defendants refer the Court to the transcripts of the plea hearings alleged in Paragraph 48 for their complete and accurate contents, and otherwise deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 48.

49.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 49.

## IV.    DEFENDANTS

50.    The diagram immediately below illustrates the connections between Royal Bank of Canada, Dexia S.A. (the Dexia enterprise's parent entity), and Defendants (shaded in gray).

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 50.

51.    Defendant Dexia Banque is a *société anonyme* organized under the laws of Luxembourg and has its principal office at 69 Route d'Esch, L-2953 Luxembourg.  At the time of the Transfers, Dexia Banque was known as Dexia Banque Internationale à Luxembourg S.A. and was one of Dexia's three main operating entities.  According to Dexia Banque's website, in March 2012, Dexia S.A. sold its interests in Dexia Banque, and Dexia Banque's name was changed to Banque Internationale à Luxembourg S.A.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 51, and refer the Court to the alleged

Dexia Banque website for its complete and accurate contents.



52.    Defendant Dexia Suisse is a *société anonyme* organized under the laws of Switzerland and has its principal office at Beethovenstrasse 48, CH-8002 Zurich, Switzerland.  At the time of the Transfers, Dexia Suisse was known as Dexia Private Bank (Switzerland) Ltd. and was a wholly-owned subsidiary of Dexia Banque.  As set forth in financial websites and a U.S. Department of Justice press release, in 2012, when Dexia Banque changed its name to Banque

Internationale à Luxembourg S.A., Dexia Suisse's name was changed to Banque Internationale à Luxembourg (Suisse) S.A.

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 52, and refer to the contents of the referenced websites and press releases for their complete and accurate contents.

53.        At all times relevant to the applicable Transfers, the RBC-Dexia Defendants were wholly-owned subsidiaries of the JV, which was owned equally by non-party Royal Bank of Canada and Defendant Dexia Banque.  Royal Bank of Canada and Dexia Banque expressly entered into a joint venture, including sharing in its profits and losses.  In the words of Royal Bank of Canada's 2006 Annual Report, "[o]n January 2, 2006, we combined our Institutional & Investor Services business (IIS) . . . with the Dexia Funds Services business of [Dexia Banque] in return for a 50% joint venture interest in a newly formed company known as [the JV]."

**Response**:        The RBC-Dexia Defendants admit upon present information and belief the allegations of Paragraph 53, and refer to the contents of the referenced Annual Report for its complete and accurate contents.

54.        Defendant RBC-Dexia Bank is a *société anonyme* organized under the laws of Luxembourg and has its principal office at 14 Porte de France, L-4360 Esch-sur-Alzette, Luxembourg.  RBC-Dexia Bank was established prior to the formation of the JV under a different name and was a wholly-owned subsidiary of Dexia Banque.  In connection with the formation of the JV, RBC-Dexia Bank was renamed RBC-Dexia Investor Services Bank S.A. and became a subsidiary of the JV.  As set forth in the Stipulation and Order Regarding Changes to Defendants so-ordered by this Court on April 4, 2022 (ECF 128) (the "Stipulation"), in July 2012, Royal Bank of Canada acquired Dexia Banque's 50% interest in the JV, and RBC-Dexia Bank's name was changed to RBC Investor Services Bank S.A.

**Response**:        The RBC-Dexia Defendants admit upon present information and belief the allegations of Paragraph 54, and refer to the contents of the referenced stipulation for its complete and accurate contents.

55.        Defendant RBC-Dexia Trust is a trust company organized under the laws of Canada and has its principal office at 155 Wellington Street West, 10th floor, Toronto, Ontario M5V 3L3, Canada.  RBC-Dexia Trust was established in late 2005, prior to the formation of the JV, under a different name and was a wholly owned subsidiary of Royal Bank of Canada.  In connection with the formation of the JV, RBC-Dexia Trust was renamed RBC-Dexia Investor Services Trust, became a subsidiary of the JV, and took over certain operations of Royal Bank of Canada affiliates The Royal Trust Company and Royal Trust Corporation of Canada (together, "Royal Trust"),

including Royal Trust's investments in Rye Portfolio Limited. On January 1, 2006, Royal Trust assigned and transferred all the assets of its institutional investor services business to RBC-Dexia Trust, and RBC-Dexia Trust continued this business with essentially the same personnel and at the same locations. As set forth in the Stipulation, in July 2012, after Royal Bank of Canada acquired Dexia Banque's 50% interest in the JV, RBC-Dexia Trust's name was changed to RBC Investor Services Trust.

**Response**:        The RBC-Dexia Defendants admit upon present information and belief the

allegations of Paragraph 55, except deny that RBC-Dexia Trust "took over" any investments in

Rye Portfolio Limited, and refer to the contents of the referenced stipulation for its complete and

accurate contents.

56.        Defendant Banco Inversis, the successor in interest to RBC-Dexia España, is a *sociedad anónima* organized under the laws of Spain and has its principal office at Avenida de la Hispanidad, 6, 28042 Madrid, Spain. RBC-Dexia España was established prior to the formation of the JV under a different name and was a Dexia entity. In connection with the formation of the JV, RBC-Dexia España was renamed RBC-Dexia Investor Services España S.A. and became a subsidiary of the JV. According to Royal Bank of Canada press releases, in 2012, after Royal Bank of Canada acquired Dexia Banque's 50% interest in the JV, RBC-Dexia España's name was changed to RBC Investor Services España S.A. As set forth in the Stipulation, in October 2016 Banco Inversis acquired RBC-Dexia España, the entity was renamed Bancoval Securities Services, S.A., and in May 2017 the entity was merged into, and absorbed by, Banco Inversis.

**Response**:        The RBC-Dexia Defendants admit upon present information and belief the

allegations of Paragraph 56, and refer to the contents of the referenced stipulation and press

releases for their complete and accurate contents.

## V.        SUBJECT MATTER JURISDICTION AND VENUE

57.        This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities & Exchange Commission v. Bernard L. Madoff Investment Securities LLC*, *et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) and (e)(1), and SIPA §§ 78eee(b)(2)(A) and (b)(4).

**Response**:        The RBC-Dexia Defendants admit the allegations of the first sentence of

Paragraph 57. The RBC-Dexia Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of the second sentence of Paragraph 57. The RBC-Dexia

Defendants state that the third sentence of Paragraph 57 sets forth legal conclusions to which no response is required, but to the extent that a response is required, the RBC-Dexia Defendants deny that this Court has jurisdiction to enter a final order or judgment in this proceeding.

58.    This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (F), (H) and (O).  The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

**Response**:    The RBC-Dexia Defendants state that the allegations of Paragraph 58 set forth legal conclusions to which no response is required. To the extent a response is required, the RBC-Dexia Defendants deny the allegations in Paragraph 58. The RBC-Dexia Defendants do not consent to issuance or entry of final orders or judgments by the Bankruptcy Court.

59.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

**Response**:    The RBC-Dexia Defendants admit the allegations of Paragraph 59.

60.    This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

**Response**:    The RBC-Dexia Defendants state that the allegations of Paragraph 60 set forth legal conclusions to which no response is required. To the extent that a response is required, the RBC-Dexia Defendants deny the allegations of Paragraph 60.

## VI.    **PERSONAL JURISDICTION**

61.    Defendants are subject to the jurisdiction of this Court pursuant to Bankruptcy Rule 7004 and the United States Constitution, as well as section 302 of the New York Civil Practice Law and Rules, because Defendants purposely availed themselves of the laws and protections of the United States and the State of New York.

**Response**:    The RBC-Dexia Defendants state that the allegations of Paragraph 61 set forth legal conclusions to which no response is required. To the extent that a response is required, the RBC-Dexia Defendants deny the allegations of Paragraph 61.

62.    The Trustee's claims against Defendants arise from business they transacted within New York.  Defendants derived significant revenue from New York and maintained minimum

contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

**Response**:    The RBC-Dexia Defendants state that the allegations of Paragraph 62 set

forth legal conclusions to which no response is required. To the extent that a response is required,

the RBC-Dexia Defendants deny the allegations of Paragraph 62.

63.    In their Fairfield Sentry subscription agreements, Defendants Dexia Banque, Dexia Suisse, RBC-Dexia Bank, and RBC-Dexia España (collectively, the "Fairfield Transferee Defendants") submitted to New York jurisdiction, venue, service of process, and law. Specifically, as set forth in these agreements, the Fairfield Transferee Defendants (i) "agree[d] that any suit, action or proceeding . . . with respect to this Agreement and the Fund may be brought in New York," (ii) "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding," (iii) "consent[ed] to the service of process out of any New York court," and (iv) agreed that "[t]his Agreement shall be governed and enforced in accordance with the laws of New York . . . ."

**Response**:    The RBC-Dexia Defendants state that the allegations of Paragraph 63 set

forth legal conclusions to which no response is required. To the extent that a response is required,

the RBC-Dexia Defendants deny the allegations of Paragraph 63 as to RBC-Dexia Bank and RBC-

Dexia España, deny knowledge or information sufficient to form a belief as to the truth of the

allegations of Paragraph 63 as to Dexia Banque and Dexia Suisse, and refer the Court to the alleged

Fairfield Sentry subscription agreements for their complete and accurate contents.

64.    Moreover, Defendant Banco Inversis, a Spain-organized company, voluntarily subjected itself to this Court's jurisdiction by virtue of its predecessor RBC-Dexia España filing two customer claims with the Trustee (#007204 and #007224) in connection with the BLMIS SIPA liquidation proceeding.

**Response**:    The RBC-Dexia Defendants state that the allegations of Paragraph 64 set

forth legal conclusions to which no response is required. To the extent that a response is required,

the RBC-Dexia Defendants deny the allegations of Paragraph 64.

65.    On multiple occasions, beginning at least as early as 2005, Dexia Banque representatives met in New York with FGG and other BLMIS feeder fund executives—including FGG co-founder Jeffrey Tucker and Access International Advisors co-founder Thierry Magon de La Villehuchet—in connection with its BLMIS feeder fund investments. Dexia Banque also

engaged in numerous communications with FGG and other BLMIS feeder fund personnel in New York in connection with its investments, including FGG's Tucker and Lauren Ross.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 65.

66.    Each Defendant knowingly directed funds to be invested with, and then redeemed from, New York-based BLMIS via one or more of Fairfield Sentry, Fairfield Sigma, and Rye Portfolio Limited, each of which was managed and operated out of New York.

**Response**:    The RBC-Dexia Defendants deny the allegations of Paragraph 66.

67.    The Fairfield Funds were owned, managed, and operated by Fairfield Greenwich Group ("FGG"), a New York-based *de facto* partnership.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 67.

68.    The Fairfield Transferee Defendants signed subscription agreements each time they invested in the Fairfield Funds.  In these subscription agreements, the Fairfield Transferee Defendants affirmed that they received and read the respective fund's information memorandum or private placement memorandum ("PPM").

**Response**:    The RBC-Dexia Defendants deny the allegations of Paragraph 68 as to the

RBC-Dexia Defendants, deny knowledge or information sufficient to form a belief as to the truth

of the allegations of Paragraph 68 as to Dexia Banque and Dexia Suisse, and refer the Court to the

subscription agreements referenced in Paragraph 68 for their complete and accurate contents.

69.    Based on the subscription agreements, information memoranda, and PPMs, the Fairfield Transferee Defendants knew the following facts indicating that they were transacting business in New York in connection with their investments in the Fairfield Funds:

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS, and Fairfield Sigma invested 100% of its assets with Fairfield Sentry;

- BLMIS performed all investment management duties for these assets;

- BLMIS was registered with the SEC;

- BLMIS was the executing broker for the Fairfield Funds' investments, and purportedly operated and executed the SSC Strategy on the funds' behalf;

- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and Treasury Bills, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;

- Fairfield Sentry's investment documents provided that subscription payments be wired in U.S. dollars to New York;

- BLMIS was the custodian of the Fairfield Funds' investments with BLMIS; and

- BLMIS was "essential to the continued operation of" the Fairfield Funds.

**Response**:    The RBC-Dexia Defendants deny the allegations of Paragraph 69 as to the RBC-Dexia Defendants, deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 69 as to Dexia Banque and Dexia Suisse, and refer the Court to the subscription agreements, information memoranda, and PPMs referenced in Paragraph 69 for their complete and accurate contents.

70.    Rye Portfolio Limited, along with other "Rye Select" BLMIS feeder funds (together with Rye Portfolio Limited, the "Rye Select Funds"), was owned, managed, and operated by New York-based Tremont Group Holdings, Inc. (together with predecessors and affiliates, "Tremont").  The Rye Select Funds were at all relevant times managed and operated by Tremont's officers and employees in New York.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 70.

71.    Defendant RBC-Dexia Trust signed a subscription agreement each time it invested in Rye Portfolio Limited.  By signing the subscription agreements, RBC-Dexia Trust affirmed that it received and read Rye Portfolio Limited's prospectus.  The Rye Portfolio Limited prospectus provided essentially the same information as the Fairfield Funds' documents detailed above, including that Rye Portfolio Limited's assets would be invested with a manager using the SSC Strategy.

**Response**:    The RBC-Dexia Defendants deny the allegations of Paragraph 71, and refer to the subscription agreements referenced in Paragraph 71 for their complete and accurate contents.

72.    Rye Portfolio Limited's due diligence questionnaires ("DDQs") informed investors that the Rye Select Funds traded in the "U.S. equity market" and related equity index options, and that cash would be held in "U.S. short term treasury bills." The Rye Select Funds' PPMs and prospectuses confirmed that custody of the securities held on behalf of the Rye Select Funds would

be held in "a brokerage account with an NASD registered broker dealer" (i.e., BLMIS).  As a result of these representations, the Rye Select Funds' investors knew that a redemption from this account should have resulted in the investment manager liquidating U.S. securities.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations in the first and second sentence of Paragraph 72, and

deny the remaining allegations in Paragraph 72.

73.    The Transfers from Fairfield Sentry and Rye Portfolio Limited themselves also occurred in New York.  It was Defendants' practice to use New York bank accounts to receive redemptions (i.e., the Transfers) from these BLMIS feeder funds.  Based on the Trustee's information to date, each Defendant designated and used its relevant New York account(s) to receive numerous redemptions, totaling dozens of transfers and tens of millions of dollars in the aggregate.  Upon information and belief, Defendants used these accounts for all of their redemptions from Fairfield Sentry and Rye Portfolio Limited, based on the consistent use of them over time and because the Trustee has seen no evidence of any other accounts designated or used. The New York accounts specifically include:

- With respect to all but one of its redemptions from Fairfield Sentry, Defendant Dexia Banque designated and used an account in its own name or in the name of Defendant RBC-Dexia Bank at Citibank in New York.

- With respect to Defendant Dexia Banque's remaining redemption from Fairfield Sentry, Citco Global Custody NV, acting as Dexia Banque's agent, designated and used a New York correspondent bank account at HSBC Bank USA.

- Defendant Dexia Suisse designated and used an account in its own name at Citibank in New York.

- Defendant RBC-Dexia España designated and used an account in the name of Bancoval SA at Citibank in New York.

- Defendant RBC-Dexia Bank designated and used an account in its own name at JPMorgan Chase Bank in New York.

- Defendant RBC-Dexia Trust designated and used an account in the name of Royal Bank of Canada at Chase Manhattan Bank in New York.

**Response**:    The RBC-Dexia Defendants deny the allegations of Paragraph 73 as to the

RBC-Dexia Defendants, and deny knowledge or information sufficient to form a belief as to the

truth of the allegations of Paragraph 73 as to Dexia Banque and Dexia Suisse.

74.     In addition, each Defendant sent its Fairfield Sentry or, beginning in or around October 2006, its Rye Portfolio Limited subscription payments to a U.S. bank account (with respect to Rye Portfolio Limited) or U.S. correspondent account (with respect to Fairfield Sentry) of the feeder fund or its agent, from which the funds were ultimately deposited into BLMIS's account at JPMorgan Chase Bank in New York.

**Response**:     The RBC-Dexia Defendants admit that funds were sent from Fairfield

Sentry and Rye Portfolio Limited to accounts maintained by the RBC-Dexia Defendants, deny that

any of such funds constitute subsequent transfers of Customer Property or any other property

transferred from BLMIS to Fairfield Sentry and Rye Portfolio Limited, and deny any remaining

allegations of Paragraph 74 as to the RBC-Dexia Defendants, and deny knowledge or information

sufficient to form a belief as to the truth of the allegations of Paragraph 74 as to Dexia Banque and

Dexia Suisse.

75.     Each Defendant received its Transfers from these same BLMIS feeder fund U.S. accounts.

**Response**:     The RBC-Dexia Defendants deny the allegations in Paragraph 75.

## VII.    TREMONT KNEW THAT BLMIS'S IA BUSINESS WAS A FRAUD

76.     On December 7, 2010, the Trustee commenced an adversary proceeding against, among others, Tremont Group Holdings, Inc. and its predecessors ("Tremont Group"), Tremont Partners, and several Tremont funds invested wholly or in part with BLMIS (collectively, the "Tremont Feeder Funds"), seeking to avoid and recover $2.1 billion of initial transfers from BLMIS that constitute customer property under SIPA (the "Tremont Complaint").[2] The Trustee incorporates by reference the factual allegations in the Tremont Complaint, as supplemented below.

**Response**:     The RBC-Dexia Defendants (i) admit that the Trustee filed an action styled

as *Picard v. Tremont Group Holdings, Inc., et al. (In re Bernard L. Madoff Inv. Secs., LLC)*, Adv.

Pro. No. 10-05310, ECF No. 1 (Bankr. S.D.N.Y. Dec. 7, 2010) (the "Tremont Action"), (ii) deny

---

[2] *Picard v. Tremont Group Holdings, Inc., et al. (In re Bernard L. Madoff Inv. Secs., LLC)*, Adv. Pro. No. 10-05310, ECF No. 1 (Bankr. S.D.N.Y. Dec. 7, 2010). *See* the Tremont Complaint at ¶ 2 for the full names of the defendants.

knowledge or information sufficient to form a belief as to the truth of the allegation of the amounts

of the alleged transfers alleged in Paragraph 76; (iv) deny that the initial transfers of Customer

Property to Tremont the Trustee seeks to avoid and recover in the Tremont Action were avoided

or are avoidable, (v) to the extent necessary to support such denial, deny for lack of knowledge or

information sufficient to form a belief as to the truth of the allegations, each and every paragraph

of the complaint in the Tremont Action that supports the claim that any initial transfers of Customer

Property to Rye Portfolio Limited are or were avoided or avoidable, and (vi) objects to the

incorporation by reference of, and therefore does not answer, each and every other paragraph and

allegation in the complaint in the Tremont Action and to the inclusion in this adversary proceeding

of any issue implicated by the complaint in the Tremont Action other than the issue of the

avoidance or avoidability of the initial transfers of Customer Property, but reserves the right to

rely on and introduce any allegations in the referenced "Tremont Complaint" or its exhibits as

opposing party admissions admissible for the truth of their contents. To the extent any further

response is required, the RBC-Dexia Defendants lack knowledge sufficient to form a belief as to

the truth of the remaining allegations in Paragraph 76 and therefore deny such allegations.

77.     Tremont created, managed, and operated a number of feeder funds that invested
directly and indirectly with BLMIS.

**Response**:     The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 77.

78.     In a September 22, 2011 order, this Court approved a settlement between the
Trustee and more than a dozen of the Tremont Feeder Funds, Tremont and its affiliates, and a
former Tremont chief executive (collectively, the "Tremont Settling Defendants") that obligated
the Tremont Settling Defendants collectively to pay the Trustee $1.025 billion for the benefit of
the customer property estate (the "Tremont Settlement").  The Tremont Settlement also provides
that the transfers made to the Tremont Feeder Funds were "deemed avoided."

**Response**:    The RBC-Dexia Defendants admit upon information and belief that the Court approved a settlement on September 22, 2011, and refer to the referenced settlement agreement for its complete and accurate contents.

### A.    Tremont's Senior Executives Had a Close Relationship with Madoff

79.    Sandra Manzke founded Tremont in the mid-1980s and first met Madoff in or around 1991. Until her departure in 2004, Manzke served as Tremont's CEO and then co-CEO, helping to select money managers, including Madoff. Robert Schulman joined Tremont in 1994 and held various high-level positions, including President, co-CEO, and ultimately sole CEO.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 79.

80.    Manzke and Schulman met and had regular calls with both Madoff and his top lieutenant, Frank DiPascali. Schulman had a special relationship with Madoff, which Tremont described as its "competitive edge." In fact, Tremont touted Schulman's unusually close relationship with Madoff, stating that his "long-standing relationships with the principals of our existing managers [BLMIS listed first among them] is clearly an edge over any firm contemplating a similar business as our ability to negotiate preferential terms is related directly to the strength and longevity of the relationships." Emphasizing Schulman's special relationship with Madoff, in 2003, Tremont told its auditor, Ernst & Young ("E&Y") about Schulman's unique access to BLMIS, including that "Bob Schulman periodically visits [BLMIS's] facilities throughout the year. . . ." At least once, Madoff even sought Schulman's advice on hiring decisions at BLMIS. In June 2006, Tremont Vice President Chris Cichella explained to a potential investor that Schulman was "intimately familiar" with Madoff based on "a 10+ year relationship."

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 80.

81.    Investors took notice of the relationship between Schulman and Madoff. For example, a prospective investor had a call with Tremont in May 2007 where he referenced the "friendly relationship between Bob and Bernie." He also noted that, "[f]or Tremont, it goes back to the relationship . . . . Bob has been there many times and has worked w/ Bernie is [sic] business since the 1980s."

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 81.

**B.      Tremont Received Repeated, Direct Fraud Warnings About BLMIS's Investment Advisory Business**

82.     Tremont received warnings of BLMIS's fraudulent IA Business from clients as early as April 2001, when an investor in two of the Tremont Feeder Funds wrote to Schulman: "I know you are sick of answering this but man is it hot out there with the Bernie fraud rumors." The investor questioned why Madoff "need[ed] to go to cash at year-end every year" and used such a "small" firm as its auditor.

**Response**:      The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 82.

83.     Less than a month later, Tremont became aware of the *Barron's* and *MARHedge* articles questioning the legitimacy of BLMIS's IA Business and identifying Tremont as offering BLMIS feeder funds to its clients.  On May 7, 2001, Tremont Group's Chief Operating Officer (and later President) Barry Colvin emailed a number of Tremont employees alerting them to the articles and instructing them to direct third party questions to Tremont's management.

**Response**:      The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 83.

84.     On April 25, 2003, sales vice president Jim Mitchell relayed to Schulman a discussion Mitchell had with an investor about "associating Madoff with broker-dealer wrongdoing of late." The following month, Mitchell, Schulman, and the investor visited Madoff. The investor's meeting notes (which he shared with Tremont) characterized Madoff's operation as "controversial" and expressed numerous concerns that included: (i) Madoff's unwillingness to meet with investors; (ii) BLMIS's lack of management fees; (iii) Madoff's going to cash at every year end; (iv) the absence of a third party custodian; and (v) BLMIS's "exceptionally stable" returns "with only 7 negative months since 1990."

**Response**:      The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 84.

85.     Mitchell retained these notes and years later forwarded them to Tremont vice president and manager responsible for product line management and oversight, Darren Johnston, cautioning: "Don't attach this – but it's an interesting set of notes from a meeting years back . . . ."

**Response**:      The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 85.

86.     In March 2004, the investor who emailed Schulman in 2001 about the "Bernie fraud rumors" emailed him again, this time to redeem his Tremont Feeder Fund investments, explaining:

My motivation for doing this is not due to some new buzz out there for as you know that is a constant din but rather that I can no longer ignore my core instincts as an investor in which I have the [sic] battle the fact that I really don't know what is going on, what a [sic] do know is I am in an investment program that no one else in history has been able to make work, return series is flat out too good given how efficient the underlying securities are priced and he doesn't charge a fee all compounded by it seems every stone I turn over is another multi billion $ [M]adoff feeder. I . . . found that my inability to rationalize & be intellectually honest on why I was invested bothered me more than it has in the past . . . .

**Response**:     The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 86.

87.     When Madoff's scheme collapsed, that investor circulated an email among certain of his employees with the subject header "HOLY SH## !!!!!!!!!!!!!!!!!!!!! THE WORLD IS NOW RIGHT !!!" and wrote that "Bob Schulman & all the feeder groups could be going to jail over this . . . ." (Emphasis in original.)

**Response**:     The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 87.

88.     In May 2004, Cichella emailed Tremont senior vice president Rob Rosenbaum that investment advisory firm RogersCasey (where Tremont personnel, including Manzke, previously worked) was "concerned about Tremont's relationship with Madoff" and would thus recommend that its client not invest with Tremont. Cichella said RogersCasey would not reconsider its position because BLMIS "was prone to a blow-up that would destabilize Tremont . . . ." Analyzing Tremont for a prospective institutional investor in 2005, the investor's representative James Purnell raised concerns to Tremont's head of Product Management and Investment Advisory board member Stuart Pologe about what he dubbed "the Madoff black box" including, among other things, whether BLMIS's assets were segregated and being verified by a third party, how Madoff is paid, and whether any written Tremont materials exist mentioning Madoff (the response was that there were none and there never would be). After Madoff's arrest and the revelation of the fraud, a former coworker of Purnell emailed him and boasted that they were "finally vindicated on Madoff. If it looks too good to be true . . . ."

**Response**:     The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 88.

89.     In March 2007, representatives from Tremont's potential client, Agile Group ("Agile"), met with Johnston, product management senior vice president Patrick Kelly, and portfolio manager Brian Marsh as part of its due diligence. Agile's notes from the meeting (the

"Agile Notes") reflect that Agile peppered Tremont with numerous questions regarding operational and trading anomalies indicating fraud at BLMIS or its reporting fictional trades. This included queries about its auditors, the lack of information on options trading, identity of counterparties to the purported options transactions, BLMIS's AUM, BLMIS's inexplicable use of paper trade tickets and account statements, the inability to verify BLMIS's assets, and BLMIS's going in and out of the market in large transactions with no overall effect on the market for the securities it purportedly traded.

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 89.

90.    The Agile Notes reflect that Agile and Tremont discussed whether BLMIS's IA Business was a fraud and perhaps even a Ponzi scheme. Agile pointed out in the meeting how the fraud would be easy if BLMIS's auditor did "not work so hard" and if the "few key people" operating the IA Business were involved. During the discussion, it was deduced that, "[e]ither Madoff owns what he owns or they are fictitious. But if it is a Ponzi scheme, every dollar profit has been realized."

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 90.

91.    A month later, Agile employee Mariah Quish sent Tremont follow-up questions concerning BLMIS. Addressing Agile's request, Johnston instructed internally: "We should give answers by phone rather than email . . . ." After speaking with Johnston and Tremont's vice president of investor services Harry Hodges, Quish reported she found Tremont's "level of secrecy combined with a faith-based view on Madoff difficult to understand."

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 91.

92.    In May 2007, Cichella, who worked closely with Johnston and Hodges, forwarded to himself the May 2001 *Barron's* article.

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 92.

93.    Between 2005 and 2008, three major banks that provided leverage to the Tremont Feeder Funds each saw significant fraud risks associated with BLMIS, and each demanded and received from Tremont extraordinary contractual rights in an attempt to mitigate those risks, such as indemnification for fraud at BLMIS and special redemption rights if Madoff came under investigation for breach of securities laws. As communicated by one such provider, Citibank, to

Tremont, Madoff's lack of third party controls and how he executes on his volume of options were, in Johnston's words, "fundamental roadblocks" to Citibank's senior risk management people.

**Response**:         The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 93.

94.       Tremont continued to receive warnings that Madoff's trading was not real as late as October 2008, when Tremont sales representative Adrian Gordon reported to Johnston, Marsh, and Mitchell that a prospective institutional investor was "loathe to give his stamp of approval to [Madoff's] strategy when he has no idea what trades actually take place." A month later, Gordon emailed the Tremont global sales team that another potential investor was "very anti Madoff" and said Madoff was "probably a pyramid structure." That same month, Cichella once again pulled out the May 2001 *Barron's* article, this time forwarding it to Mitchell, stating, "Enjoy!"

**Response**:         The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 94.

### C.    Tremont's Own Reporting Showed That BLMIS's Purported Trades Were Impossible

95.       Despite exempting BLMIS from the due diligence, it conducted on other managers, Tremont regularly received from BLMIS customer statements, trade tickets, and other information containing an abundance of facts demonstrating that BLMIS reported fictitious trades and that the fraud warnings it received were well founded.  Tremont created reports and marketing materials of its own highlighting the impossible trading and performance.  For example, Tremont knew from the monthly analytic summaries its senior management prepared based on these BLMIS documents that the positions and prices BLMIS reported differed from prices Bloomberg reported. Tremont's auditor, KPMG, similarly found and reported to Tremont more than 20 such differences in 2006 alone.

**Response**:         The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 95.

96.       Tremont also estimated in its reports the amount BLMIS had in AUM and calculated whether or not there was sufficient volume in each instrument for Madoff to be able to execute such trades.  Given that Tremont knew BLMIS had "well in excess of $20 billion" in AUM by May 2003, and that according to Johnston it "monitored all trade activity," Tremont knew there was insufficient volume for dozens, if not hundreds of the trades Madoff purported to complete.

**Response**:         The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 96.

### D.    Tremont Exempted BLMIS from Its High Due Diligence Standards

97.    The majority of Tremont's business involved placing its clients' assets with third-party managers.  For managers other than Madoff, Tremont implemented due diligence procedures, investigated the quality of the management personnel, assessed key risk factors associated with the investment, and continuously monitored the investment and the managers.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 97.

98.    As a sophisticated manager with industry-leading due diligence standards, Tremont positioned itself at the forefront of initiatives to improve monitoring of investment managers in light of frauds that preceded Madoff.  Tremont claimed that its comprehensive operational risk evaluation served to mitigate any possibility of misrepresentation or fraudulent activity.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 98.

99.    Despite these claims and all of the fraud warnings, Tremont exempted BLMIS from its due diligence standards.  In fact, Tremont's executives deliberately prevented transparency into Madoff and BLMIS throughout the Tremont-BLMIS relationship.  To ensure that Tremont's employees did not conduct any meaningful due diligence on BLMIS and Madoff, Mitchell laid out in an email three of the most critical questions about Madoff's operations "ya don't ask" about: (1) BLMIS's AUM, (2) how Madoff generated his returns, and (3) Madoff's auditors.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 99.

100.    According to the SEC—which investigated Tremont after Madoff's arrest—Schulman personally conducted due diligence on Madoff, which was an "outlier" in Tremont's procedures as applied to other managers.  The SEC concluded that because "Schulman conducted the due diligence, he would be able to control what areas and information [were] reviewed or not reviewed."

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 100.

101.    Tremont also did not conduct due diligence on Friehling & Horowitz.  Rather, as the SEC found, Tremont's due diligence materials "did not reveal any evidence of conversations with Madoff's auditors." In 2007, Tremont even admitted to Agile that someone from Tremont "anonymously drop[ped] by" Friehling & Horowitz's strip-mall office, just "to make sure they exist."

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 101.

102.    In an unusually candid response to one strategic consulting firm, Pologe admitted that Tremont had "no manager due dili[gence] process for" its BLMIS investments and referred to Tremont's dealings with BLMIS as "a highly vulnerable, highly profitable business." Pologe noted: "We make a lot of money off this, though."

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 102.

### E.    BLMIS Failed Tremont's Requirements for Third-Party Oversight Yet Tremont Made an Exception for Madoff

103.    Tremont's due diligence standards considered independent oversight of its outside managers to be critical.   Tremont, however, knowingly made BLMIS an exception to its requirement of third-party oversight of its money managers.

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 103.

104.    For example, in June 2008, Tremont rejected a potential manager because, as stated in an internal memo, a "key part of any due diligence process is being able to verify the information provided by the Fund with independent parties, in this instance there aren't any independent parties to speak with to verify what the partners of [the fund] are doing."

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 104.

105.    The SEC also found Tremont had rejected another outside money manager because of a lack of operational infrastructure and the presence of only one person who was responsible for all operational duties.  Yet, the SEC noted, Tremont continued its investment with BLMIS, although "all operational guidelines with respect to trading and execution were controlled by one individual."

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 105.

106.    Tremont executives were unwilling to respond in writing to investors' questions about third-party asset verification.  This included at least one pointed question from an investor who asked Mitchell, because the BLMIS account statements were "generated by Madoff, how do I get comfort that the money is really there?" This investor also stated, "the accounting firm

[Friehling & Horowitz] doing the audit being a small firm made me a bit uneasy." Mitchell took the conversation off-line, replying, "What is your telephone number?"

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 106.

107.    Dealing with another investor question about asset verification, Johnston emailed Cichella that this would "lead closer to BLMIS which [Tremont] strictly wants to avoid." Cichella replied: "Keep in mind, they are looking for independent (of [Tremont] or Madoff) verification of the assets in a tangible form. . . . it would be great if you could convince them" that the assets existed.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 107.

108.    On or about October 1, 2008, Tremont personnel met with the managers of BLMIS feeder fund Fairfield Sentry concerning a possible investment with BLMIS through Fairfield Sentry, which Tremont understood operated in the same manner as its own BLMIS feeder funds. Tremont's notes acknowledged that Fairfield Sentry did not satisfy Tremont's due diligence requirements, including lack of independent oversight at BLMIS, no third-party prime broker, and Friehling & Horowitz's "material percentage of their annual revenue from Madoff." Evidencing that BLMIS feeder funds did not meet Tremont's usual due diligence standards and were fraught with red flags, the potential Fairfield Sentry investment was referred up the ladder for "an exception approval from the Investment Committee."

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 108.

### F.    Tremont Consistently Shielded Madoff from Third Party Due Diligence

109.    Tremont consistently shielded Madoff from questions by third parties conducting their own due diligence on BLMIS, calling it "Firm policy" not to provide access. On January 24, 2004, Mitchell asked Schulman whether a potential client could visit Madoff. Schulman responded: "They cannot and WILL NOT VISIT MADOFF please make it clear that this is OFF the table." (Emphasis in original.)

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 109.

110.    In 2005, when Purnell was questioning Pologe about Madoff, Pologe forwarded the questions to Tremont executive Suzanne Hammond, who at first responded "Do not go any further" and then sent a second response, copying Schulman, stating "I hope you have a confidentially [sp] agreement," before sending vague, one word answers to the questions.

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 110.

111.    On June 16, 2006, Mitchell, after being informed that an investor had been "relentless on meeting Bernie," emailed Tremont investment relationship assistant vice president Roy Soares, "[o]ur own analysts don't get to see Madoff – why should [investors]."

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 111.

112.    In swap agreements with three banks providing leverage, Tremont included the provision that if a bank contacted Madoff, Tremont had the right to cancel the swap without paying an early termination fee.

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 112.

113.    In 2008, Darren Johnston reported internally that he "made absolutely clear" to a major financial institution that it was not to contact Madoff's auditor and that "we do not offer up assistance to investors with Bernie, his staff or his auditor."

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 113.

114.    Later in 2008, Mitchell was especially careful about not letting a large new potential investor speak to Madoff, internally acknowledging that "I suspect they will want a meeting, being institutional.  We should discourage this . . . ." Another Tremont employee relayed this to the investor and assured others internally that "this would never happen and I told [the investor] that we have never had an on site meeting with a client and BM."

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 114.

115.    Tremont even restricted which of its employees could contact BLMIS.  In a September 2002 email, the message was relayed internally: "DON'T SEND ANY CORRESPONDENCE TO BERNARD MADOFF. ONLY [Tremont executives Soares, Schulman and Hammond] ARE ALLOWED TO SEND ANYTHING TO HIM!" (Emphasis in original.)

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 115.

116.    Tremont also refused to allow its administrator to receive the Tremont Feeder Fund customer statements and trade tickets directly from BLMIS, as Tremont arranged with its other managers.  Tremont also intervened to limit contact between Madoff and Tremont's auditor, E&Y. In May 2006, internal Tremont emails discussing E&Y's request for BLMIS's "internal control letter" and questioning whether an audit report was prepared for Madoff, revealed that Tremont acted as the go-between "[t]o keep the minimum amount of people contacting Madoff." In so doing, Tremont also misled E&Y, telling it that "Bob Schulman periodically visits [BLMIS's] facilities throughout the year and watches the company trade according to their highly secret strategy"—an obvious fiction given that BLMIS's IA Business never executed any trades.

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 116.

117.    This deliberate shielding of Madoff continued when Tremont replaced E&Y with KPMG and reported to potential clients that, other than minimal verification, "there is no contact" between KPMG and BLMIS.

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 117.

118.    Tremont also lied to investors when presented with concerns about BLMIS's auditors.  As set forth in a 2006 internal memo, Tremont's top investment managers knew that Friehling & Horowitz was a "small firm" that was "not specialized in investment firms [and] broker/dealers." Nevertheless, Johnston and others from Tremont told Agile that Friehling & Horowitz was "usually a name you hear [with] medium size broker dealers."

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 118.

### G.    Tremont Avoided Questions and Fabricated Answers About BLMIS's Purported Options Trading

119.    Tremont's senior management knew that the options trades were a central part of the SSC Strategy and were well aware of how the options trading for the strategy worked.  In fact, Schulman bragged internally that he taught Madoff how to trade options.  Nevertheless, in response to evidence on the face of BLMIS trade tickets that included suspect options trading, Tremont tried to explain away these issues by giving inconsistent and false explanations.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 119.

     1.   <u>Divergent Answers on Over-the-Counter/Listed Trading Questions</u>

   120.  As described in the Tremont Complaint, Tremont knew that Madoff could not be trading options over-the-counter ("OTC") as he represented, in light of (i) the CUSIP numbers on BLMIS's trade confirmations, which indicated the options were traded on an exchange, and (ii) the lack of counterparty information that should be on all OTC trade confirmations.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 120, and refer to the Tremont Complaint

for its compete and accurate contents.

   121.  Tremont also knew that Madoff had not entered into any ISDA agreements with any counterparties—a basic requirement for all OTC options trades.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 121.

   122.  Rather than openly acknowledge the options trading impossibilities—which were clear from the trade tickets that Tremont analyzed—Tremont would flip-flop on the question of whether BLMIS traded options OTC or traded them on the Chicago Board Options Exchange.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 122.

   123.  For example, a November 2006 DDQ for one of the Tremont Feeder Funds stated that "options [] are traded on a recognized exchange." In contrast, in November 2007, in response to a statement by HSBC Bank that it was under the impression that BLMIS traded options OTC, Johnston wrote, "our understanding is also that they are OTC." On yet another occasion, Rye Broad Market's July 2007 DDQ equivocated, stating options "may be either listed or OTC."

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 123.

   124.  As set forth in the Agile Notes, Tremont told Agile in 2007 that Madoff used both OTC and listed options for his strategy, and that Madoff has used OTC options since the beginning. Tremont even went so far as to make up a rationale for Madoff's use of one or the other, telling Agile that Madoff will go to listed options depending on price and that most of the time OTC options have a better price.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 124.

        2.     <u>Failure to Conduct Any Diligence on Purported Options Counterparties and
Covering up the Truth with Fabrications</u>

125.    Tremont failed to conduct any diligence on the lack of OTC counterparties on
BLMIS's trade confirmations, because it knew there was no legitimate explanation.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 125.

126.    Tremont senior management stated on certain occasions that Madoff purportedly
traded options with the counterparties as agent for the Tremont Feeder Funds.  This meant that the
Tremont Feeder Funds, not BLMIS, bore the risks involved with trading and settling with those
purported counterparties.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 126.

127.    Tremont senior management knew it had to conduct counterparty due diligence to
insulate against default risk.  A JPMorgan Chase ("JPM") representative even pointed out to
Johnston that the trading counterparties should all have been known to Tremont if Madoff
supposedly traded in the name of the account holder (i.e., Tremont's BLMIS Feeder Funds), and
not in BLMIS's name.  But Tremont never spoke with a single counterparty for Madoff's purported
options trading, because there were none.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 127.

128.    Tremont instead covered up for Madoff's fabrications with fabrications of its own,
which changed depending on who was asking.  In a March 24, 2006 email, Kelly told Schulman
that Citi, one of Tremont's leverage providers, had "asked around" and could not "find anyone
who admit[ted] to being [BLMIS's] counterparty." Schulman replied, "He [Madoff] has not
disclosed [any counterparty names] to us." Kelly nevertheless later told Agile that Schulman "has
seen the counterparty names – he just does not want to disclose it."

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 128.

129.    In October 2006, Soares emailed Fortis Bank, relaying information provided by Schulman that one of the Tremont Feeder Funds had 12 counterparties, "which Madoff must use in relation to his put options trades." Schulman, however, later admitted in sworn testimony that Tremont had never tried to identify any purported counterparties.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 129.

130.    In a June 2007 email, Kelly told JPM, which was considering a Tremont Feeder Fund investment, that "we do know the [counterparties'] general characteristics such as number and minimum credit rating." A month later, Mitchell told a different investor, "[o]ption counterparties are typical banks," and named JPM—who had just inquired on the identity of the counterparties—as one of them.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 130.

131.    In April 2008, Johnston told consultant Albourne Partners ("Albourne")—itself in the process of conducting diligence on Tremont Feeder Funds for its clients—that Tremont "has checked with counterparties to make sure they are trading with the Investment Advisor [BLMIS] in the relevant instruments."

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 131.

132.    In October 2008, Albourne emailed Johnston twice, asking about Tremont's counterparty exposure to "MS [Morgan Stanley] or GS [Goldman Sachs]." Johnston "confirm[ed] that Tremont had "[a]bsolutely no exposure" to those companies, which did not make any sense in light of prior statements unless Johnston knew Madoff was not trading options as he purported.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 132.

133.    The September 2008 collapse of Lehman Brothers Inc. and its affiliates and subsidiaries (collectively, "Lehman")—one of the largest OTC derivatives counterparties at the time—led to industry and investor panic. Many Tremont clients worried about their Lehman exposure, in light of BLMIS's purported billions of dollars in options holdings.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 133.

134.    By contrast, Tremont's senior management was seemingly unconcerned from the outset by these monumental events.  They knew that if BLMIS's OTC options positions were real, a crash of a major options counterparty would have catastrophic effects on the Tremont Feeder Funds.  For example, in 2007, Mitchell detailed to an investor how, if a counterparty to an options trade such as Bear Stearns defaulted, "then the option (otc) is gone."

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 134.

135.    Tremont worked to avoid discussions with investors regarding the Lehman collapse.  To one client trying to assess its Lehman exposure and exposure to other potentially precariously positioned counterparties, Johnston simply stated, "We are not responding to this."

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 135.

136.    Mitchell crafted an answer to investors asking whether the Tremont Feeder Funds had Lehman risk, stating internally that "the line we should follow is that . . . [w]e do not discuss our counterparty arrangements as we are contractually bound not to." In reply, Johnston went a step further, indicating his certainty that the "answer is 'no exposure'."

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 136.

137.    These statements were misleading by implying Tremont knew of actual counterparty arrangements and could assure the investors that Tremont's counterparties presented no risk.  If Tremont's senior management believed its BLMIS options were real, however, the Lehman collapse would have been more than a non-event.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 137.

### H.    Tremont's Executives Had a Powerful Motive to Hide What They Knew About BLMIS and Madoff

138.    Tremont's profitability and, as it turned out, its very existence, depended on BLMIS.  Tremont and the Tremont Feeder Funds benefitted from BLMIS's incredibly consistent, positive returns, which enhanced their investment track records and ability to attract business partners and clients.  This led to the Tremont Feeder Funds' AUM increasing rapidly.  For example, from its inception in January 1994 to November 2008, Rye Broad Market's AUM increased from $5.9 million to approximately $2.35 billion, a 400-fold increase.

**Response**:      The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 138.

139.    Tremont's revenues grew along with its AUM; during this period, Tremont
received at least $255 million in fees from its BLMIS-facing products.

**Response**:      The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 139.

140.    Chief Financial Officer Lynn Keeshan noted that Tremont was "highly dependent"
on Madoff, which accounted for "all of the profits of the firm." Cichella said Rye Prime Fund's
"only reason for being is as a $2b feeder into Madoff." Pologe said BLMIS was Tremont's "crack
addiction business."

**Response**:      The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 140.

141.    Tremont's parent company concluded that "the economics of Tremont's business
[was] Madoff." Tremont did nothing more to earn its fees through its Tremont Feeder Funds than
provide access to BLMIS. Pologe acknowledged Tremont "just sell[s] access [to BLMIS] for 2%
management fee . . . . We make a lot of money off this." As Schulman told Mitchell, for some
customers, on top of the management fee, Tremont levied "a 50 basis point surcharge for them to
access Madoff."

**Response**:      The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 141.

142.    Fees were a powerful reason for funds like Tremont to close their eyes and hide
what they knew about BLMIS's fraud.  As noted by Albourne in late 2008, "[w]e have been
advised by some of the [funds invested in BLMIS] that they are not interested in knowing more
about the product due to the fees they are earning on the product."

**Response**:      The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations of Paragraph 142.

**I.    Tremont Co-Managed Kingate Global**

143.    Tremont also had knowledge of Madoff's fraud based on its tight-knit relationship
with the Kingate-related feeder funds and management.[3]

---

[3] The factual allegations in the Trustee's Fourth Amended Complaint against Kingate Global Fund
Limited ("Kingate Global") and concerning the role of Kingate Management Limited are

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 143, and object to the incorporation by reference of, and therefore do not answer, each and every other paragraph and allegation in the complaint in the Kingate Global Action, but reserve the right to rely on and introduce any allegations in the referenced "Kingate Global Complaint" or its exhibits as opposing party admissions admissible for the truth of their contents.

144.    From the inception of their respective BLMIS investment accounts, Federico Ceretti and Carlo Grosso worked closely with Manzke to create Kingate Global and its manager, Kingate Management Limited (collectively, "Kingate").

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 144.

145.    Manzke introduced Ceretti and Grosso to Madoff in 1993 and worked with Ceretti and Grosso as a Kingate Global director and manager from 1995 until 2004.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 145.

146.    The Tremont-Kingate relationship continued through the revelation of Madoff's fraud. Kingate Global was co-managed by Kingate Management and Tremont affiliate Tremont (Bermuda) Ltd. ("Tremont Bermuda")—an entity described by Manzke as "a pass through," which delegated management responsibilities to Tremont in New York and shared officers and directors with Tremont Partners, including Schulman and Manzke. Specifically, in or around March 1995, Kingate Management and Tremont executed a co-manager agreement with Kingate Global. Pursuant to the agreement, Kingate Management and Tremont Bermuda were tasked with evaluating and monitoring BLMIS and providing necessary management services to Kingate Global. Manzke and Hammond were listed as "principal decision-makers" in May 2005.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 146.

---

incorporated by reference. *Picard v. Ceretti, et al. (In re Bernard L. Madoff Inv. Secs., LLC)*, Adv. Pro. No. 09-01161 (CGM) (Bankr. S.D.N.Y.) (ECF No. 100).

147.    As part of this deal, Kingate Management and Tremont Bermuda also split Kingate Global's management fees, which provided Tremont with significant revenue.  Between 1998 and 2008, Tremont received over $40 million in fees for funneling investor assets to Kingate Global.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 147.

148.    Tremont Bermuda and Kingate Management were co-agents to Kingate Global through their conduct and the operation of the various agreements entered into between the parties. As such, Kingate's knowledge that BLMIS's IA Business was a fraud may be imputed to Tremont. *See Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-1161 (CGM), 2015 WL 4734749, at *13 (Bankr. S.D.N.Y. Aug. 11, 2015).

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 148, and state that the allegations set forth legal conclusions to which no response is required.

## VIII.    RECOVERY OF SUBSEQUENT TRANSFERS TO DEFENDANTS

### A.    Fairfield Sentry

#### 1.    Initial Transfers from BLMIS to Fairfield Sentry

149.    The Trustee commenced a separate adversary proceeding against Fairfield Sentry and other defendants in this Court under the caption, *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (CGM), seeking to avoid and recover initial transfers of customer property from BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").

**Response**:    The RBC-Dexia Defendants admit that the Trustee filed an action styled as *Picard v. Fairfield Sentry, Ltd., et al.*, Adv. Pro No. 09-1239 (BRL) (the "Sentry Action"), deny that the purported initial transfers of Customer Property to Sentry the Trustee seeks to avoid and recover in the Sentry Action were avoided or are avoidable, and deny knowledge and information sufficient to form a belief as to the truth of the allegation of the amounts of the alleged transfers alleged in Paragraph 149.

150.    By orders dated June 7 and June 10, 2011, this Court approved a settlement among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a consent judgment in favor

of the Trustee and against Fairfield Sentry in the amount of $3,054,000,000 ("Judgment Amount") [ECF No. 109].

**Response**:        The RBC-Dexia Defendants admit upon information and belief that the

Court approved the settlement described in Paragraph 150 and entered a judgment as described in

Paragraph 150 on or about the dates alleged therein, and refer to the referenced settlement

agreement and the referenced judgment for their complete and accurate contents.

151.    The Fairfield Sentry Initial Transfers are set forth in the attached Exhibits A and B. The Fairfield Sentry Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegation of the timing and amounts of the alleged transfers

alleged in Exhibits A and B, and states that the remaining allegations in Paragraph 151 set forth

legal conclusions to which no response is required. To the extent a response is required, the RBC-

Dexia Defendants deny such allegations in Paragraph 151.

152.    On August 28, 2020, the Trustee filed a second amended complaint in the *Fairfield Sentry Ltd.* proceeding ("Second Amended Complaint") [ECF No. 286] seeking in part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

**Response**:        The RBC-Dexia Defendants admit that the Trustee filed the Second

Amended Complaint and deny knowledge and information sufficient to form a belief as to the truth

of the allegation of the amounts of the alleged transfers alleged in Paragraph 152.

153.    As set forth in the Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the BLMIS fraud.  The Trustee incorporates by reference the allegations contained in the Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, 315-16.

**Response**:        The RBC-Dexia Defendants object to the incorporation by reference of, and

therefore does not answer, each and every other paragraph and allegation in the Second Amended

Complaint and to the inclusion in this adversary proceeding of any issue implicated by the

complaint in the Second Amended Complaint other than the issue of the avoidance or avoidability

of the initial transfers of Customer Property, but reserve the right to rely on and introduce any

allegations in the referenced "Second Amended Complaint" or its exhibits as opposing party

admissions admissible for the truth of their contents. The RBC-Dexia Defendants state that the

allegations of Paragraph 153 set forth legal conclusions to which no response is required. To the

extent that a response is required, the RBC-Dexia Defendants deny the allegations of Paragraph

153.

154.    Of the Judgment Amount, $2,895,000,000 was transferred to Fairfield Sentry
during the six years preceding the Filing Date (the "Fairfield Sentry Six Year Transfers").  Each
of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code
and applicable provisions of the N.Y. Debt. & Cred. Law (the "NYDCL"), particularly §§ 273279,
and of SIPA, particularly § 78fff-2(c)(3).

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegation of the timing and amounts of the alleged transfers

alleged in Paragraph 154, and state that the remaining allegations set forth legal conclusions to

which no response is required. To the extent a response is required, the RBC-Dexia Defendants

deny such allegations in Paragraph 154.

155.    Of the Fairfield Sentry Six Year Transfers, $1,580,000,000 was transferred to
Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year
Transfers").  Each of the Fairfield Sentry Two Year Transfers is avoidable under section 548 of
the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegation of the timing and amounts of the alleged transfers

alleged in Paragraph 155, and state that the remaining allegations set forth legal conclusions to

which no response is required. To the extent a response is required, the RBC-Dexia Defendants

deny such allegations in Paragraph 155.

> 2.    Subsequent Transfers from Fairfield Sentry to the Fairfield Transferee
> Defendants

156.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to the Fairfield Transferee Defendants. Based on the Trustee's investigation to date, the subsequent transfers to the Fairfield Transferee Defendants total at least $61,515,524 (the "Fairfield Sentry Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry Subsequent Transfers is attached as Exhibit C.

**Response**:    The RBC-Dexia Defendants admit that funds were sent from Fairfield

Sentry to accounts maintained by the RBC-Dexia Defendants, deny that any of such funds

constitute subsequent transfers of Customer Property or any other property transferred from

BLMIS to Fairfield Sentry, deny any remaining allegations in Paragraph 156 as to the RBC-Dexia

Defendants, and deny knowledge or information sufficient to form a belief as to the truth of the

remaining allegations of Paragraph 156 as to Dexia Banque and Dexia Suisse.

157.    On June 6, 2012, the Trustee filed this action seeking recovery of the Fairfield Sentry Subsequent Transfers.

**Response**:    The RBC-Dexia Defendants admit the allegations in Paragraph 157.

158.    The Fairfield Sentry Subsequent Transfers are recoverable from Dexia Banque, RBC-Dexia Bank, Banco Inversis, and Dexia Suisse under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**Response**:    The RBC-Dexia Defendants state that the allegations in Paragraph 158 set

forth legal conclusions to which no response is required. To the extent a response is required, the

RBC-Dexia Defendants deny such allegations in Paragraph 158 as to RBC-Dexia Bank and Banco

Inversis, and deny knowledge or information sufficient to form a belief as to the truth of the

allegations of Paragraph 158 as to Dexia Banque and Dexia Suisse.

159.    The Fairfield Sentry Subsequent Transfers represent redemptions of equity interests by the Fairfield Transferee Defendants as shareholders in Fairfield Sentry. Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry

was insolvent when it made the Fairfield Sentry Subsequent Transfers to the Fairfield Transferee Defendants upon redemption of their interests.

**Response**:    The RBC-Dexia Defendants state that the allegations in Paragraph 159 set forth legal conclusions to which no response is required. To the extent a response is required, the RBC-Dexia Defendants deny such allegations in Paragraph 159.

> 3.    Subsequent Transfers from Fairfield Sentry to Fairfield Sigma and Subsequently to Dexia Banque, Dexia Suisse, and RBC-Dexia España

160.    Based on the Trustee's investigation to date, prior to the Filing Date, Fairfield Sentry subsequently transferred at least $772,690,257 of the Fairfield Sentry Initial Transfers directly to Fairfield Sigma. A chart setting forth the presently known such transfers is attached as Exhibit D.

**Response**:    The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 160.

161.    Thereafter, Fairfield Sigma transferred at least $2,047,280 to Dexia Banque, Dexia Suisse, and RBC-Dexia España (the "Fairfield Sigma Subsequent Transfers"). A chart setting forth the presently known Fairfield Sigma Subsequent Transfers is attached as Exhibit E.

**Response**:    The RBC-Dexia Defendants admit that funds were sent from Fairfield Sigma to accounts maintained by the RBC-Dexia España, deny that any of such funds constitute subsequent transfers of Customer Property or any other property transferred from BLMIS to Fairfield Sentry, deny knowledge or information sufficient to form a belief as to the truth of the allegation that funds were sent from Fairfield Sigma to accounts maintained by Dexia Banque and Dexia Suisse, and deny any remaining allegations of Paragraph 161.

162.    The Fairfield Sigma Subsequent Transfers are recoverable from Dexia Banque, Banco Inversis, and Dexia Suisse under section 550(a) of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**Response**:    The RBC-Dexia Defendants state that the allegations in Paragraph 162 set forth legal conclusions to which no response is required. To the extent a response is required, the RBC-Dexia Defendants deny such allegations in Paragraph 162 as to the RBC-Dexia Defendants,

and deny knowledge or information sufficient to form a belief as to the truth of the allegations of

Paragraph 162 as to Dexia Banque and Dexia Suisse.

163.    The Fairfield Sigma Subsequent Transfers in each case represent redemptions of equity interests by Dexia Banque, Dexia Suisse, and RBC-Dexia España as shareholders in Fairfield Sigma.  Because Fairfield Sigma invested all of its assets in Fairfield Sentry, and Fairfield Sentry, in turn, invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sigma was insolvent when it made the Fairfield Sigma Subsequent Transfers to Dexia Banque, Dexia Suisse, and RBC-Dexia España upon redemption of their interests.

**Response**:    The RBC-Dexia Defendants state that the allegations in Paragraph 163 set

forth legal conclusions to which no response is required. To the extent a response is required, the

RBC-Dexia Defendants deny such allegations in Paragraph 163 as to the RBC-Dexia Defendants,

and deny knowledge or information sufficient to form a belief as to the truth of the allegations of

Paragraph 163 as to Dexia Banque and Dexia Suisse.

### B.    Rye Portfolio Limited

#### 1.    <u>Initial Transfers from BLMIS to Rye Portfolio Limited</u>

164.    As discussed above, the Trustee commenced a separate adversary proceeding against Rye Portfolio Limited and other funds directly or indirectly invested with BLMIS that were managed by Tremont, seeking to avoid and recover initial transfers of customer property from BLMIS in the approximate amount of $2.1 billion.

**Response**:    The RBC-Dexia Defendants admit that the Trustee filed the Tremont

Action, deny that the initial transfers of Customer Property to Tremont the Trustee seeks to avoid

and recover in the Tremont Action were avoided or are avoidable, and deny knowledge and

information sufficient to form a belief as to the truth of the allegation of the amounts of the alleged

transfers alleged in Paragraph 164.

165.    Also as discussed above, by the Order dated September 22, 2011, this Court approved the Tremont Settlement under which the Trustee received a settlement payment of $1,025,000,000.  The Tremont Settlement specifically states that transfers to subsequent transfer defendants were not recovered with the partial payment by the Tremont Settling Defendants.

**Response**:       The RBC-Dexia Defendants admit upon information and belief that the

Court approved a settlement on September 22, 2011, and refer to the referenced settlement

agreement for its complete and accurate contents.

166.     From the inception of Rye Portfolio Limited's account with BLMIS to the Filing
Date, BLMIS made transfers to Rye Portfolio Limited of approximately $620,000,000 (the "Rye
Portfolio Limited Initial Transfers").   Each of the Rye Portfolio Limited Initial Transfers is
avoidable under section 544 of the Bankruptcy Code and applicable provisions of the NYDCL,
particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3), and N.Y. C.P.L.R. 203(g) and
213(8).

**Response**:       The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegation of the timing and amounts of the alleged transfers

alleged in Paragraph 166, and state that the remaining allegations set forth legal conclusions to

which no response is required. To the extent a response is required, the RBC-Dexia Defendants

deny such allegations in Paragraph 166.

167.     Of the Rye Portfolio Limited Initial Transfers, $609,000,000 was transferred to Rye
Portfolio Limited during the six years preceding the Filing Date (the "Rye Portfolio Limited Six
Year Transfers").  Each of the Rye Portfolio Limited Six Year Transfers is avoidable under section
544 of the Bankruptcy Code and applicable provisions of the NYDCL, particularly §§ 273-279,
and of SIPA, particularly § 78fff-2(c)(3).

**Response**:       The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegation of the timing and amounts of the alleged transfers

alleged in Paragraph 167, and state that the remaining allegations set forth legal conclusions to

which no response is required. To the extent a response is required, the RBC-Dexia Defendants

deny such allegations in Paragraph 167.

168.     Of the Rye Portfolio Limited Six Year Transfers, $350,000,000 was transferred to
Rye Portfolio Limited during the two years preceding the Filing Date (the "Rye Portfolio Limited
Two Year Transfers").  Each of the Rye Portfolio Limited Two Year Transfers is avoidable under
section 548 of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff-
2(c)(3).

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegation of the timing and amounts of the alleged transfers alleged in Paragraph 168, and state that the remaining allegations set forth legal conclusions to which no response is required. To the extent a response is required, the RBC-Dexia Defendants deny such allegations in Paragraph 168.

169.    As set forth above, Rye Portfolio Limited received each of the Rye Portfolio Limited Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Rye Portfolio Limited to inquire further into the BLMIS fraud.  *See also* Proffered Second Amended Complaint, *Picard v. HSBC Bank PLC, et al*, Adv. Pro. No. 09-1364 (CGM), ECF No. 399, ¶¶ 425–467 (Bankr. S.D.N.Y. June 26, 2015) (detailing Tremont's relationship with BLMIS).

**Response**:        The RBC-Dexia Defendants state that the allegations set forth in Paragraph 169 are legal conclusions to which no response is required. To the extent a response is required, the RBC-Dexia Defendants deny such allegations in Paragraph 169.

170.    Charts setting forth the Rye Portfolio Limited Initial Transfers are included as Exhibits F and G.  The Rye Portfolio Limited Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegation of the timing and amounts of the alleged transfers alleged in Exhibits F and G, and states that the remaining allegations in Paragraph 170 set forth legal conclusions to which no response is required. To the extent a response is required, the RBC-Dexia Defendants deny such allegations in Paragraph 170.

2.    Subsequent Transfers from Rye Portfolio Limited to RBC-Dexia Trust

171.    Prior to the Filing Date, Rye Portfolio Limited subsequently transferred a portion of the Rye Portfolio Limited Initial Transfers to RBC-Dexia Trust.  Based on the Trustee's investigation to date, the subsequent transfers to RBC-Dexia Trust total at least $2,433,046 (the "Rye Portfolio Limited Subsequent Transfers").  A chart setting forth the presently known Rye Portfolio Limited Subsequent Transfers is attached as Exhibit H.

**Response**:        The RBC-Dexia Defendants admit that funds were sent from Rye Portfolio

Limited to accounts maintained by the RBC-Dexia Trust, deny that any of such funds constitute

subsequent transfers of Customer Property or any other property transferred from BLMIS to

Tremont, and deny any remaining allegations in Paragraph 171.

172.    On June 6, 2012, the Trustee filed this action seeking recovery of the Rye Portfolio
Limited Subsequent Transfers.

**Response**:        The RBC-Dexia Defendants admit the allegations in Paragraph 172.

173.    The Rye Portfolio Limited Subsequent Transfers are recoverable from RBC-Dexia
Trust under section 550(a) of the Bankruptcy Code, and applicable provisions of SIPA, particularly
§ 78fff-2(c)(3).

**Response**:        The RBC-Dexia Defendants state that the allegations in Paragraph 173 set

forth legal conclusions to which no response is required. To the extent a response is required, the

RBC-Dexia Defendants deny such allegations in Paragraph 173.

174.    The Rye Portfolio Limited Subsequent Transfers in each case represent
redemptions of equity interests by RBC-Dexia Trust as a shareholder in Rye Portfolio Limited.
Because Rye Portfolio Limited invested all or substantially all of its assets into the BLMIS Ponzi
scheme, Rye Portfolio Limited was insolvent when it made the Rye Portfolio Limited Subsequent
Transfers to RBC-Dexia Trust upon redemption of its interests.

**Response**:        The RBC-Dexia Defendants deny the allegations in Paragraph 174.

175.    The Fairfield Sentry Subsequent Transfers, the Fairfield Sigma Subsequent
Transfers, and the Rye Portfolio Limited Subsequent Transfers together constitute the Transfers,
as defined above.

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations in Paragraph 175.

176.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the
right to: (i) supplement the information on the initial and subsequent transfers discussed above,
and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

**Response**:        The RBC-Dexia Defendants deny knowledge or information sufficient to

form a belief as to the truth of the allegations in Paragraph 176.

## COUNT ONE
## RECOVERY OF THE TRANSFERS
## 11 U.S.C. §§ 105(a) AND 550

177.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

**Response**:    The RBC-Dexia Defendants incorporate and reassert their responses to the allegations contained in each of the previous paragraphs of this Amended Complaint as though set forth fully herein.

178.    The Transfers are recoverable from Defendants under 11 U.S.C. § 550(a) and SIPA § 78fff-2(c)(3).

**Response**:    The RBC-Dexia Defendants state that the allegations in Paragraph 178 set forth legal conclusions to which no response is required. To the extent a response is required, the RBC-Dexia Defendants deny such allegations in Paragraph 178.

179.    Defendants are immediate or mediate transferees of the Transfers from Fairfield Sentry, Fairfield Sigma, and Rye Portfolio Limited.

**Response**:    The RBC-Dexia Defendants state that the allegations in Paragraph 179 set forth legal conclusions to which no response is required. To the extent a response is required, the RBC-Dexia Defendants deny such allegations in Paragraph 179.

180.    As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendants: (a) recovering the Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**Response**:    The RBC-Dexia Defendants state that the allegations in Paragraph 180 set forth legal conclusions to which no response is required. To the extent a response is required, the RBC-Dexia Defendants deny such allegations in Paragraph 180.

## RESPONSE TO PLAINTIFF'S REQUEST FOR RELIEF

The RBC-Dexia Defendants deny that the Trustee is entitled to his requested judgment in favor of the Trustee and against the RBC-Dexia Defendants or to any of the relief described herein.

## AFFIRMATIVE DEFENSES

181.    In the event that subsequent legal developments change the availability or nature of claims asserted by the Trustee, the RBC-Dexia Defendants hereby preserve each and every defense at law, in equity, or otherwise, available under federal and state law, including common law. Further, the RBC-Dexia Defendants reserve the right to amend this Answer to assert other and further defenses, cross-claims, and/or third party claims when and if, in the course of investigation, discovery, or preparation for trial, it becomes appropriate to do so.   In asserting the following defenses, the RBC-Dexia Defendants do not intend to suggest that matters designated herein as "defenses" are not elements of the Trustee's prima face case on the Trustee's purported claims or that they are not matters as to which the Trustee bears the burden of proof.   These defenses are set forth cumulatively and in the alternative.

## FIRST DEFENSE

### Bankruptcy Code Safe Harbor (11 U.S.C. § 546(e))

182.    The alleged subsequent transfers to the RBC-Dexia Defendants may not be recovered because the alleged initial transfers are subject to the safe harbor in Section 546(e) of the Bankruptcy Code, 11 U.S.C. § 546(e), in that the alleged initial transfers were (i) made by or to (or for the benefit of) a stockbroker (BLMIS), financial institution (Fairfield Sentry or Rye Portfolio Limited or the RBC-Dexia Defendants), financial participant (the RBC-Dexia Defendants), or other covered entity; (ii) settlement payments and/or transfers made in connection with a securities contract (between BLMIS and Fairfield Sentry, BLMIS and Rye Portfolio Limited, BLMIS and the RBC-Dexia Defendants, Fairfield Sentry and Fairfield Sigma, Fairfield Sigma and the RBC-Dexia Defendants, Fairfield Sentry and the RBC-Dexia Defendants, and/or Rye Portfolio Limited and the RBC-Dexia Defendants); and (iii) made more than two years before the petition date and are thus not recoverable under 11 U.S.C. § 548(a)(1)(A). Because the

Transfers are not avoidable, property received by the RBC-Dexia Defendants as part of the Transfers is not recoverable from the RBC-Dexia Defendants. In addition, at the time of the transfers to the RBC-Dexia Defendants, none of Fairfield Sentry, Fairfield Sigma, Rye Portfolio Limited or the RBC-Dexia Defendants had actual knowledge that Madoff or BLMIS were not trading securities or that they were perpetrating a Ponzi scheme.

## **SECOND DEFENSE**

### **No Customer Property (15 U.S.C. § 78fff-2(c)(3))**

183.    The property, if any, that the RBC-Dexia Defendants received from Fairfield Sentry, Fairfield Sigma, and/or Rye Portfolio Limited was not Customer Property, or proceeds of Customer Property, that BLMIS transferred to Fairfield Sentry, Fairfield Sigma, and/or Rye Portfolio Limited, and therefore the property is not recoverable by the Trustee from the RBC-Dexia Defendants.

## **THIRD DEFENSE**

### **For Value, in Good Faith, and Without Knowledge of the Voidability (11 U.S.C. § 550(b))**

184.    The RBC-Dexia Defendants took transfers from Fairfield Sentry, Fairfield Sigma, and Rye Portfolio Limited for value, in good faith, and without knowledge of the voidability of the transfers from BLMIS to Fairfield Sentry and from BLMIS to Tremont, and thus the transfers to the RBC-Dexia Defendants may not be recovered pursuant to 11 U.S.C. § 550(b).

The RBC-Dexia Defendants took for value because the transfers from Fairfield Sentry, Fairfield Sigma, and Rye Portfolio Limited were made in exchange for the RBC-Dexia Defendants' surrender of its shares in those funds.

The RBC-Dexia Defendants did not have actual knowledge of any fraudulent purpose behind the transfers it received. The RBC-Dexia Defendants did not know facts that would have

prompted a reasonable person in the RBC-Dexia Defendants' position to conduct further inquiry into whether there was any fraudulent purpose behind the transfers.

Even if the RBC-Dexia Defendants had been on inquiry notice of a possible fraudulent purpose behind the transfers it received, a diligent inquiry by the RBC-Dexia Defendants would not have discovered such a fraudulent purpose. Other entities, including the United States Securities and Exchange Commission, with greater investigatory tools and resources than the RBC-Dexia Defendants, and with more access to BLMIS personnel and documentation than the RBC-Dexia Defendants, repeatedly examined and investigated BLMIS but failed to uncover Madoff's fraud before December 2008. The RBC-Dexia Defendants did not have the ability to compel the production of information from third parties that would have been necessary to establish that BLMIS was committing fraud. Diligent inquiry by the RBC-Dexia Defendants would not have discovered the fraudulent purpose of the transfers.

The RBC-Dexia Defendants did not have knowledge of the voidability of the transfers from BLMIS to Fairfield Sentry, from BLMIS to Rye Portfolio Limited, and from BLMIS to Fairfield Sigma when it received the alleged subsequent transfers (if any).

## FOURTH DEFENSE

### Lack of Subject Matter Jurisdiction

### (U.S. Const. art. III; Fed. R. Civ. P. 12(b)(1); Fed. R. Bankr. P. 7012(b))

185.    This Court lacks jurisdiction under Article III of the U.S. Constitution to enter final orders or judgment in this proceeding.

## FIFTH DEFENSE

### Lack of Personal Jurisdiction

### (U.S. Const. Amend. V; Fed. R. Civ. P. 12(b)(2); Fed. R. Bankr. P. 7012(b))

186.    This Court lacks personal jurisdiction over the RBC-Dexia Defendants with respect to the claim herein.

## SIXTH DEFENSE

**Failure to State a Claim (Fed. R. Civ. P. 12(b)(6); Fed. R. Bankr. P. 7012(b))**

187.    The Amended Complaint fails to state a claim upon which relief can be granted, including for each of the reasons stated in the RBC-Dexia Defendants' Motion to Dismiss the Amended Complaint, filed on September 2, 2022 in this adversary proceeding, ECF 138, and proceedings thereon.

## SEVENTH DEFENSE

**Initial Transfer Not Avoided (11 U.S.C. § 550(a))**

188.    The Trustee may not recover the transfers from Fairfield Sentry, Fairfield Sigma, and Rye Portfolio Limited, to the RBC-Dexia Defendants, because he has not avoided the initial transfers from BLMIS to Fairfield Sentry and Rye Portfolio Limited.

## EIGHTH DEFENSE

**No Ponzi Scheme Presumption**

189.    The Trustee may not rely on a "Ponzi scheme presumption" to prove that the initial transfers from BLMIS to Fairfield Sentry and from BLMIS to Rye Portfolio Limited that he seeks to recover from the RBC-Dexia Defendants were made with actual intent to hinder, delay, or defraud any BLMIS creditor.

## NINTH DEFENSE

**RBC-Dexia Defendants as Initial Transferee – Mere Conduit Defense**

190.    In the alternative, Fairfield Sentry, Fairfield Sigma, and Rye Portfolio Limited were mere conduits, and consequently, the claimed transfers were initial transfers from BLMIS to the

RBC-Dexia Defendants. As the Trustee stated in *Picard v. Grosvenor Investment Management Ltd.*, No. 12-1021 (Bankr. S.D.N.Y. June 15, 2022), Fairfield Sentry's "sole purpose was to funnel money to BLMIS" and "no arm's length relationship exist[ed] between [Sentry] and BLMIS" (internal quotation marks and citation omitted). 12-1021 ECF 115, at 3, 6. The redemptions received by the RBC-Dexia Defendants were initial transfers from BLMIS to the RBC-Dexia Defendants that are subject to the safe harbor under 11 U.S.C. § 546(e); any Trustee proceeding to avoid the transfers is untimely; and the RBC-Dexia Defendants may retain the amount it received pursuant to 11 U.S.C. § 548(c) and 11 U.S.C. § 548(d)(2)(B) because it took the transfers for value and in good faith.

## **TENTH DEFENSE**

### **Fairfield Sentry as Initial Transferee – Mere Conduit Defense**

191.    In the alternative, the Trustee's claims are barred because the RBC-Dexia Defendants were not transferees of the subsequent transfers. To the extent that the RBC-Dexia Defendants received any subsequent transfer, the RBC-Dexia Defendants (a) received each subsequent transfer in good faith, in its capacity as custodian, and for the account and benefit of one or more of its customers, (b) did not have dominion or control or the right to assert dominion or control over subsequent transfers or the proceeds thereof or to use the subsequent transfers or the proceeds thereof for their own purposes; (c) rather, was a mere conduit for its customers; and (d) were obligated to credit the subsequent transfers to the account and for the benefit of one or more of its customers, who alone had the right to assert dominion and control over the subsequent transfers received by the RBC-Dexia Defendants for their benefit.

## **ELEVENTH DEFENSE**

### **New York Debtor and Creditor Law**

192.    The claims against the RBC-Dexia Defendants are barred, in whole or in part, because the Trustee failed to plead all of the elements of fraudulent transfer under section 544 of the Bankruptcy Code and sections 273, 274, 275, 276, 276-a, 278 and/or 279 of the New York Debtor and Creditor Law with sufficient particularity and factual support.

## TWELFTH DEFENSE

### Section 278(1) of New York Debtor and Creditor Law

193.    The Trustee's claims are barred, in whole or in part, because the Fairfield Sentry Initial Transfers and Rye Portfolio Limited Initial Transfers were taken for fair consideration and without knowledge of the fraud, as provided by section 278(1) of the New York Debtor and Creditor Law.

## THIRTEENTH DEFENSE

### Section 278(2) of New York Debtor and Creditor Law

194.    The Trustee's claims are barred, in whole or in part, because the Fairfield Sentry Initial Transfers and Rye Portfolio Limited Initial Transfers were taken without actual fraudulent intent and for fair consideration, as provided by section 278(2) of the New York Debtor and Creditor Law.

## FOURTEENTH DEFENSE

### Sufficient SIPC Funds

195.    The Trustee's claims should be dismissed if Plaintiff has recovered, or during the pendency of this action recovers, sufficient funds to reimburse SIPC for all payments that SIPC has made to satisfy allowed claims of BLMIS customers.

## FIFTEENTH DEFENSE

### Failure to Mitigate

196.    The Trustee's claims are barred, in whole or part, because the Trustee has failed to mitigate, minimize or avoid damages, if any.

### SIXTEENTH DEFENSE

### British Virgin Island Proceedings

197.    The Trustee's claims are barred, in whole or in part, based upon rulings, judgments, orders, or decisions entered in the liquidation proceedings of Fairfield Sentry before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands, including any related appellate rulings, judgments, orders, or decisions.

### SEVENTEENTH DEFENSE

### No Interest

198.    The Trustee is not entitled to an award of interest under 11 U.S.C. § 548.

### EIGHTEENTH DEFENSE

### Statute of Limitations

199.    The Trustee's claim is barred by the statute of limitations.

### NINETEENTH DEFENSE

### Estoppel

200.    The Trustee's claim is barred by estoppel.

### TWENTIETH DEFENSE

### Unreasonable Delay

201.    The Trustee's delay in bringing and prosecuting his claim, which was brought more than a decade ago and concerns transfers made more than 17 years ago, is unreasonable and unfairly prejudices the RBC-Dexia Defendants' ability to defend themselves.

## TWENTY-FIRST DEFENSE

### Extraterritoriality

202.    The Trustee's recovery of the transfers to the RBC-Dexia Defendants would constitute an impermissible extraterritorial application of U.S. law.

## TWENTY-SECOND DEFENSE

### Comity

203.    The Trustee's recovery of the transfers to the RBC-Dexia Defendants would violate principles of comity.

## TWENTY-THIRD DEFENSE

### Violation of Due Process (U.S. Const. amend. V)

204.    The use of the doctrine of law of the case to apply to the RBC-Dexia Defendants rulings made in other adversary proceedings to which it was not a party and in which it did not participate violates the RBC-Dexia Defendants' right to due process of law as guaranteed by the Fifth Amendment to the U.S. Constitution.

## TWENTY-FOURTH DEFENSE

### Single Satisfaction (11 U.S.C. § 550(d))

205.    Pursuant to 11 U.S.C. § 550(d), the Trustee may not recover any subsequent transfer from the RBC-Dexia Defendants to the extent he has recovered the amount of the initial transfers from Fairfield Sentry, Fairfield Sigma, Rye Portfolio Limited, or any other alleged immediate or mediate transferee the amount of the avoided initial transfers that included the customer property that the Trustee alleges the RBC-Dexia Defendants received.

## TWENTY-FIFTH DEFENSE

### Preservation of Rights (11 U.S.C. § 502(h))

206.    To the extent the Trustee recovers from the RBC-Dexia Defendants, the RBC-Dexia Defendants reserve their right to assert a claim arising from such recovery under 11 U.S.C. § 502(h).

## TWENTY-SIXTH DEFENSE

### Double Recovery

207.    The Trustee has entered into settlement agreements with Fairfield Sentry, Fairfield Sigma and Rye Portfolio Limited.   On May 9, 2011, a Settlement Agreement (the "Fairfield Settlement Agreement") with the Liquidators of Fairfield Sentry Limited and other Fairfield funds. This Court approved the Fairfield Settlement Agreement on June 7, 2011 and it was incorporated into the consent judgment entered against Fairfield Sentry on July 13, 2011 (the "Consent Judgment").   The Fairfield Settlement Agreement provides for the sharing of recoveries on the Trustee's and the Liquidators' claims for recovery of property that Fairfield Sentry and Fairfield Sigma transferred.   To the extent that the Liquidators recover from the RBC-Dexia Defendants in settlement or otherwise, the Trustee is barred from recovering on the ground that he is not entitled to double recovery, nor should the RBC-Dexia Defendants be subject to recovery of identical funds from two separate entities.

## JURY DEMAND

208.    The RBC-Dexia Defendants demand a trial by jury on all issues that may be tried by a jury.

## STATEMENT PURSUANT TO FED. R. BANKR. P. 7012(b)

209.    The RBC-Dexia Defendants do not consent to entry of final orders or judgment by the Bankruptcy Court.

## DEFENDANT'S REQUEST FOR RELIEF

WHEREFORE, The RBC-Dexia Defendants demand judgment dismissing the Amended Complaint with prejudice, together with an award of attorneys' fees, costs, disbursements, and such other relief as the Court deems just and appropriate.

Dated: May 15, 2023
        New York, New York

        **KATTEN MUCHIN ROSENMAN LLP**

        */s/ Anthony L. Paccione*
        Anthony L. Paccione
        Mark T. Ciani
        Zachary S. Beal
        50 Rockefeller Plaza
        New York, New York    10020
        Telephone:  (212) 940-8800
        anthony.paccione@katten.com
        mark.ciani@katten.com
        zachary.beal@katten.com

        *Attorneys for RBC Investor Services Bank S.A.,
        RBC Investor Services Trust, and Banco
        Inversis, S.A.*