**DAVIS+GILBERT LLP**                  **Hearing Date: October 18, 2023**
1675 Broadway                            **Objection Date: August 7, 2023**
New York, NY 10019                    **Reply Date: September 21, 2023**
T: (212) 468-4800

*Attorneys for Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | |
| v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | |
| Plaintiff, | Adv. Pro. No. 23-01017 (CGM) |
| v. | |
| NATIXIS FINANCIAL PRODUCTS LLC and BLOOM ASSET HOLDINGS FUND, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ...................................................................................................................... 3

    A.    Natixis FP and Bloom ................................................................................. 3

    B.    Groupement Financier Ltd. ......................................................................... 4

    C.    The Groupement Swap ............................................................................... 4

    D.    The Alpha Prime Settlement ...................................................................... 6

    E.    The Complaint ............................................................................................ 7

LEGAL STANDARD ............................................................................................................... 8

ARGUMENT ............................................................................................................................ 9

I.    THE TRUSTEE RELEASED NATIXIS FP AND BLOOM FROM ANY CLAIMS
    RELATED TO MADOFF AND BLMIS UNDER THE ALPHA PRIME SETTLEMENT
    AGREEMENT .............................................................................................................. 9

    A.    The Alpha Prime Settlement Agreement Requires Dismissal ................... 9

    B.    Additional Context Shows that Natixis FP and Bloom Were Intended Released
        Parties ......................................................................................................... 12

        i.    The Trustee Knew That Natixis FP and Bloom Were Direct or Indirect
            Shareholders of Alpha Prime and He Had a Pending Action Against Them
            .................................................................................................... 12

        ii.    The Release is Intentionally Broader Than Releases in Other Agreements
            .................................................................................................... 13

    C.    The Trustee is Estopped From Asserting that the Release Does Not Apply to
        Natixis FP and Bloom ............................................................................... 16

II.    THE TRUSTEE'S CLAIMS ARE BARRED BY THE SECTIONS 546(g) AND 546(e)
    SAFE HABORS ............................................................................................................ 16

    A.    The Section 546(g) Safe Harbor Bars the Trustee's Claims .................... 17

        i.    The Agreement at Issue is Undisputedly a Swap Agreement ................... 19

i

      ii.     The Initial Transfers Were "In Connection With Any Swap Agreement" 19

      iii.    Natixis FP and Bloom were "Financial Participants" .............................. 20

      iv.    The Initial Transfers Were For the Benefit of Financial Participants....... 21

  B.    The Section 546(e) Safe Harbor Bars the Trustee's Claims ................................ 22

      i.     The Initial Transfers Were Settlement Payments and Made In Connection With a Securities Contract ........................................................................ 22

      ii.    The Initial Transfers Were Made By or To (or For the Benefit of) a Covered Entity .......................................................................................... 23

      iii.    Section 546(e) Does Not Contain a "Knowledge" Exception .................. 24

  C.    The Section 548(a)(1)(A) Exception to the Safe Harbors Does Not Apply ......... 25

III.   LACHES BARS THE RECOVERY OF THE TERMINATION TRANSFER ............... 27

IV.   THE COURT LACKS PERSONAL JURISDICTION OVER BLOOM ........................ 30

  A.    Bloom is Not Subject to General Jurisdiction in this Court ................................. 30

  B.    Bloom is Not Subject to Specific Jurisdiction in this Court ................................ 31

V.    AVOIDABILITY OF THE INITIAL TRANSFERS IS INSUFFIENTLY PLED........... 33

VI.   THE COMPLAINT FAILS TO PLAUSIBLY ALLEGE THAT THE ALLEGED SUBSEQUENT TRANSFERS WERE COMPRISED OF BLMIS FUNDS ................... 34

  A.    The Trustee Fails to Tie the Initial Transfers to the Subsequent Transfers .......... 35

  B.    The Allegations Regarding the Termination Transfer are Devoid of Details....... 35

VII.  THE COMPLAINT ESTABLISHES THAT DEFENDANTS ARE ENTITLED TO THE GOOD FAITH DEFENSE............................................................................................. 36

  A.    The Alleged Subsequent Transfers Were Received For Value ............................ 36

  B.    Natixis FP and Bloom Received the Redemptions in Good Faith........................ 37

      i.     The facts alleged in the Complaint to be available to Natixis FP and Bloom were not sufficient to put them on inquiry notice ........................ 38

      ii.    The Trustee pled that Defendants conducted due diligence far exceeding a reasonably diligent inquiry .................................................................... 39

CONCLUSION.................................................................................................................... 40

## TABLE OF AUTHORITIES

**Cases**

*Ali v. City of N.Y.*,
    No. 20-30, 2021 U.S. Dist. LEXIS 255741
    (E.D.N.Y. Sep. 29, 2021) ........................................................................... 12

*Anwar v. Fairfield Greenwich Ltd.*,
    286 F.R.D. 258 (S.D.N.Y. 2012) ............................................................... 38

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)
    *cert. granted*, 132 S. Ct. 472 (2011) ........................................... 8, 31, 34

*Barshay v. Naithani*,
    No. 20-8579, 2023 U.S. Dist. LEXIS 26831
    (S.D.N.Y. Feb. 16, 2023) ................................................................ 10, 11, 12

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................... 8

*Blue Tree Hotels Inv. (Canada), Ltd.*
    *v. Starwood Hotels & Resorts Worldwide, Inc.*,
    369 F.3d 212 (2d Cir. 2004) ...................................................................... 9

*Browning v. City of N.Y.*,
    No. 16-7470, 2018 U.S. Dist. LEXIS 114653
    (S.D.N.Y. July 9, 2018) .............................................................................. 11

*Carbone v. Marone*,
    No. 04-2001, 2007 U.S. Dist. LEXIS 92350
    (S.D.N.Y. Dec. 14, 2007) ........................................................................... 11

*Chirag v. MT Marida Marguerite Schiffahrts*,
    604 F. App'x 16 (2d Cir. 2015) ................................................................ 30

*Cohen v. Bucci*,
    905 F.2d 1111 (7th Cir. 1990) ................................................................. 13

*Cox v. Spirit Airlines, Inc.*,
    No. 17-5172, 2023 U.S. Dist. LEXIS 24904
    (E.D.N.Y. Feb. 14, 2023) ........................................................................... 10

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014) .......................................................................................... 30

*DeLorenzo v. Viceroy Hotel Grp., LLC*,
    757 F. App'x 6 (2d Cir. 2018) ......................................................................... 31

*Erickson v. United States*,
    1 Cl. Ct. 163 (Ct. Cl. 1983) ............................................................................ 27

*ExpertConnect, LLC v. Fowler*,
    No. 18-4828, 2020 U.S. Dist. LEXIS 122494
    (S.D.N.Y. July 10, 2020) ................................................................................ 10

*Fagan v. Republic of Austria*,
    No. 08-6715, 2011 U.S. Dist. LEXIS 32058
    (S.D.N.Y. Mar. 25, 2011) ............................................................................... 32

*Fairfield Sentry Ltd. v. Migani*,
    [2014] UKPC 9 ................................................................................................ 37

*Finn v. Alliance Bank*,
    860 N.W.2d 638 (Minn. 2015) ................................................................. 26, 27

*Guenther v. Sedco, Inc.*, No. 93-4143,
    1998 U.S. Dist. LEXIS 19901
    (S.D.N.Y. Dec. 21, 1998) ................................................................................ 30

*H2O v. Town Bd. of the Town of E. Hampton*,
    No. 15-2349, 2015 U.S. Dist. LEXIS 160413
    (E.D.N.Y. Oct. 15, 2015) ................................................................................ 28

*Hau Yin To v. HSBC Hldgs. PLC*,
    No. 15-3590, 2017 U.S. Dist. LEXIS 28931
    (S.D.N.Y. Mar. 1, 2017) ................................................................................. 32

*In re Abernathy*,
    Nos. 17-55926, 17-5170, 2019 Bankr. LEXIS 1004
    (Bankr. N.D. Ga. Apr. 1, 2019) ...................................................................... 33

*In re Allou Distribs., Inc.*,
    379 B.R. 5 (Bankr. E.D.N.Y. 2007) ................................................................ 34

*In re B&M Linen Corp.*,
  Nos. 12-11560, 12-1885, 2013 Bankr. LEXIS 2832
  (Bankr. S.D.N.Y. July 12, 2013) ........................................................ 16

*In re Caremerica, Inc.*,
  409 B.R. 737 (Bankr. E.D.N.C. 2009) ................................................ 35

*In re CIL Ltd.*,
  582 B.R. 46 (Bankr. S.D.N.Y. 2018) ................................................... 33

*In re Decker*,
  No. 10-80029, 2011 Bankr. LEXIS 2143
  (Bankr. N.D.N.Y. June 1, 2011) .......................................................... 28

*In re Dini*,
  566 B.R. 220 (Bankr. N.D. Ill. Apr. 6, 2017) .................................... 29

*In re Dreier LLP*,
  453 B.R. 499 (Bankr. S.D.N.Y. 2011) ................................................ 38

*In re Enron Corp.*,
  367 B.R. 373 (Bankr. S.D.N.Y. 2007) ................................................ 16

*In re Forbes*,
  372 B.R. 321 (B.A.P. 6th Cir. 2007) .................................................. 34

*In re Generation Res. Holding Co.*,
  964 F.3d 958 (10th Cir. 2020) ............................................................ 34

*In re Lehman Bros. Hldgs. Inc.*,
  535 B.R. 608 (Bankr. S.D.N.Y. 2015) .................................................. 9

*In re Lehman Bros. Hldgs. Inc.*,
  617 B.R. 231 (Bankr. S.D.N.Y. 2020),
  *aff'd*, 2021 U.S. App. LEXIS 27241
  (2d Cir. Sept. 10, 2021) ...................................................................... 27

*In re Livent, Inc. Noteholders Sec. Litig.*,
  151 F. Supp. 2d 371 (S.D.N.Y. 2001) .................................................. 8

*In re Nw. Bay, Ltd.*,
  No. 19-10615, 2021 Bankr. LEXIS 1123
  (Bankr. N.D.N.Y. Apr. 27, 2021) .................................................. 27, 29

*In re Revlon Inc.*,
 Nos. 22-10760, 22-01167, 2023 Bankr. LEXIS 388
 (Bankr. S.D.N.Y. Feb. 14, 2023) ........................................................................ 9

*In re SSA Bonds Antitrust Litig.*,
 420 F. Supp. 3d 219 (S.D.N.Y. 2019) ............................................................... 32

*In re Trib. Co. Fraudulent Conv. Litig.*,
 10 F.4th 147 (2d Cir. 2021) ............................................................................... 24

*In re Unified Com. Cap., Inc.*,
 260 B.R. 343 (Bankr. W.D.N.Y. 2001) ............................................................. 26

*In re WorldCom, Inc.*,
 296 B.R. 115 (Bankr. S.D.N.Y. 2003) ............................................................... 11

*Innovation Ventures, Ltd. Liab. Co.*
 *v. Custom Nutrition Labs, Ltd. Liab. Co.*,
 912 F.3d 316 (6th Cir. 2018) ............................................................................. 28

*Intellivision v. Microsoft Corp.*,
 484 F. App'x 616 (2d Cir. 2012) ....................................................................... 16

*J. McIntyre Mach., Ltd. v. Nicastro*,
 564 U.S. 873 (2011) ........................................................................................... 33

*Jazini v. Nissan Motor Co.*,
 148 F.3d 181 (2d Cir. 1998) ............................................................................. 31

*Jeffries v. Chi. Transit Auth.*,
 770 F.2d 676 (7th Cir. 1985),
 *cert. denied* 475 U.S. 1050 (1986) .............................................................. 28, 29

*Law v. Siegel*,
 571 U.S. 415 (2014) ........................................................................................... 24

*Levy v. Young Adult Inst., Inc.*,
 No. 13-2861, 2016 U.S. Dist. LEXIS 143860
 (S.D.N.Y. Oct. 18, 2016) ................................................................................... 10

*Liman v. India Supply Mission*,
 381 F. Supp. 368 (S.D.N.Y. 1974) .................................................................... 29

*Loccenitt v. Pantea,*
No. 12-1356, 2014 U.S. Dist. LEXIS 179428
(S.D.N.Y. Dec. 29, 2014) ........................................................................ 10

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.,*
138 S. Ct. 883 (2018) ............................................................................... 24

*NCUA Bd. v. Morgan Stanley & Co.,*
No. 13-6705, 2014 U.S. Dist. LEXIS 58751
(S.D.N.Y. Apr. 28, 2014) ......................................................................... 33

*Negrete v. Citibank, N.A.,*
237 F. Supp. 3d 112 (S.D.N.Y. 2017) ....................................................... 3

*Nycomed US, Inc. v. Glenmark Generics, Ltd.,*
No. 08-5023, 2010 U.S. Dist. LEXIS 29267
(E.D.N.Y. Mar. 26, 2010) ........................................................................ 34

*Pani v. Empire Blue Cross Blue Shield,*
152 F.3d 67 (2d Cir. 1998) ........................................................................ 8

*Papasan v. Allain,*
478 U.S. 265 (1986) ................................................................................... 8

*Picard v. ABN Amro Bank (Ireland) LTD (In re Madoff),*
505 B.R. 135 (S.D.N.Y. 2013) ......................................................... *passim*

*Picard v. ABN Amro Bank (Ireland) Ltd. (In re Madoff),*
No. 10-05355, 2023 Bankr. LEXIS 768
(Bankr. S.D.N.Y. Mar. 28, 2023) ........................................................... 18

*Picard v. ABN Amro Bank N.A. (In re Madoff),*
No. 10-05354, 2020 Bankr. LEXIS 913
(Bankr. S.D.N.Y. Mar. 31, 2020) ........................................................... 37

*Picard v. ABN Amro Bank N.V. (In re Madoff),*
No. 10-05354, 2023 Bankr. LEXIS 554
(Bankr. S.D.N.Y. Mar. 3, 2023) ............................................................. 18

*Picard v. Banque SYZ & Co. (In re Madoff),*
No. 11-02149, 2022 Bankr. LEXIS 1678
(Bankr. S.D.N.Y. Jun. 14, 2022) ............................................................ 37

*Picard v. BNP Paribas S.A. (In re Madoff)*,
    594 B.R. 167 (Bankr. S.D.N.Y. 2018) .............................................................. 3, 39

*Picard v. Fairfield Inv. Fund Ltd. (In re Madoff)*,
    No. 09-01239, 2021 Bankr. LEXIS 2101
    (Bankr. S.D.N.Y. Aug. 6, 2021) .......................................................................... 36

*Picard v. Hebrew Univ. of Jerusalem (In re Madoff)*,
    No. 21-01190, 2023 Bankr. LEXIS 770
    (Bankr. S.D.N.Y. Mar. 28, 2023) ....................................................................... 33

*Picard v. Ida Fishman Revocable Trust (In re Madoff)*,
    773 F.3d 411 (2d Cir. 2014) .................................................................... 22, 23, 24

*Picard v. Multi-Strategy*,
    No. 22-06502, 2022 U.S. Dist. LEXIS 200858
    (S.D.N.Y. Nov. 3, 2022) .......................................................................... 23, 24, 25

*Picard v. Schneiderman (In re Madoff)*,
    491 B.R. 27 (S.D.N.Y. 2013) .............................................................................. 29

*Saltz v. First Frontier, LP*,
    782 F. Supp. 2d 61 (S.D.N.Y. 2010),
    *aff'd* 485 F. App'x 461(2d Cir. 2012) ................................................................. 39

*Sharp Int'l Corp. v. State St. Bank & Trust Co.*,
    403 F.3d 43 (2d Cir. 2005) ............................................................................ 25, 27

*SIPC v. BLMIS*,
    No. 12-115, 2013 U.S. Dist. LEXIS 56042
    (S.D.N.Y. 2013) ...................................................................... 17, 20, 23, 25

*Soot v. General Electric Co.*,
    681 F. Supp. 157 (S.D.N.Y. 1987) ..................................................................... 29

*SPV OSUS, Ltd. v. UBS AG*,
    882 F.3d 333 (2d Cir. 2018) ......................................................................... 30, 31

*Stoebner v. Opportunity Fin., LLC*,
    909 F.3d 219 (8th Cir. 2018) .............................................................................. 26

*Teamsters & Emplrs. Welfare Tr. v. Gorman Bros. Ready Mix*,
    283 F.3d 877 (7th Cir. 2002) .............................................................................. 28

*Watson v. Mayo*,
    2008 U.S. Dist. LEXIS 18444
    (S.D.N.Y. Feb. 26, 2008) .................................................................................. 28

*Wells v. Shearson Lehman/American Express, Inc.*,
    72 N.Y.2d 11 (1988) ........................................................................................ 11

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980) ........................................................................................ 33

*Zuckerman v. Metro. Museum of Art*,
    928 F.3d 186 (2d Cir. 2019) ............................................................................ 30

**Statutes**

11 U.S.C. § 101 ................................................................................... 19, 20, 24

11 U.S.C. § 546(e) ................................................................................... *passim*

11 U.S.C. § 546(g) ................................................................................... *passim*

11 U.S.C. § 550 ............................................................................................ 16

11 U.S.C. § 741 ............................................................................................ 23

**Rules**

Fed. R. Civ. P. 10 ........................................................................................ 33

Fed. R. Civ. P. 8 .......................................................................................... 33

Fed. R. Civ. P. 9(b) ................................................................................ 25, 27

**Treatises**

5B Charles Alan Wright & Arthur R. Miller,
    *Federal Practice and Procedure* § 1357 (3d ed. 2004) ......................................... 9

Defendants Natixis Financial Products LLC (as successor in interest to Natixis Financial Products Inc.) ("Natixis FP") and Bloom Asset Holdings Fund ("Bloom," together with Natixis FP, "Defendants"), by and through their undersigned counsel, submit this memorandum of law in support of their motion to dismiss the Complaint ("Complaint" or "Compl.," ECF No. 1,[1] attached hereto as Cioffi Ex. 1[2]) filed by Plaintiff Irving H. Picard ("Trustee"), trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the estate of Bernard L. Madoff, under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).

## PRELIMINARY STATEMENT

The Defendants are entities that were twice removed from Madoff's fraud. They never invested directly with Madoff and are net losers on a very grand scale, yet the Trustee is pursuing them as alleged "subsequent transferees" for hundreds of millions of dollars. As discussed below, Defendants' involvement with the Madoff-related fund at issue, Groupement Financier Ltd. ("Groupement"), was limited solely to the purchase of shares of Groupement in an effort to hedge against Natixis FP's obligations to its client under a swap transaction to pay a multiple of Groupement's performance. At best, Natixis FP could receive only fees in this transaction, but, if Groupement lost value, then it would bear the loss. Ultimately, Defendants (as well as Natixis S.A.[3]) lost hundreds of millions of dollars of their own money because of Madoff's unprecedented and decades-long Ponzi scheme.

The Complaint should be dismissed for several reasons:

---

[1] Unless otherwise noted, "ECF No. __" refers to documents filed in this adversary proceeding, Adv. Pro. No. 23-01017 (CGM) (Bankr. S.D.N.Y.).

[2] Unless otherwise noted, "Cioffi Ex. __" refers to exhibits annexed to the Declaration of Joseph Cioffi, dated May 22, 2023.

[3] Natixis S.A. is a defendant in *Picard v. Natixis. S.A., et al.*, Adv. Pro. No. 10-05353 (CGM) (Bankr. S.D.N.Y.) ("10-05353 Action"). On April 17, 2023, Natixis S.A. filed a motion to dismiss the amended complaint there, pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure.

*First*, as with the claims against Natixis S.A., the Trustee already expressly dismissed Defendants from the claims being asserted here. Specifically, in the Settlement Agreement with Alpha Prime Fund Limited ("Alpha Prime"), entered into less than a year ago, the Trustee released Alpha Prime's "current and former . . . direct or indirect shareholders" – which the Defendants are – from "**any and all past, present or future actions, causes of action, suits . . . known or unknown, arising out of or in any way related to Madoff or BLMIS**." *Infra* Sec. I.

*Second*, the Sections 546(g) and 546(e) safe harbors both bar the Trustee's claims. In particular, Section 546(g)'s safe harbor applies because, based on the Trustee's allegations, the subsequent transfers at issue were made for the benefit of financial participants (*i.e.*, Natixis FP and Bloom) in connection with swap agreements. *See Picard v. ABN Amro Bank (Ireland) LTD (In re Madoff)*, 505 B.R. 135, 141, 150 (S.D.N.Y. 2013) (Rakoff, J.) ("*ABN Amro*"). And, unlike the other defendants that recently sought to relitigate this decision by Judge Rakoff on their motions to dismiss, Defendants here are seeking to follow his ruling.

*Third*, the doctrine of laches squarely bars Court I, which seeks to recover a purported $153 million subsequent transfer ("Termination Transfer") that the Trustee has not mentioned in nearly 13 years of litigation against Defendants. Indeed, the Trustee has known the facts underlying this transfer since at least November 2010, when he commenced an action against the alleged initial transferee, Groupement. But the Trustee never sought to claw back funds from the first subsequent transferee that allegedly received them, and has never sought to claw back these funds as subsequent transfers from any party until he filed the operative pleading in March 2023.

*Fourth*, the Court lacks personal jurisdiction over Bloom. The remaining $80.9 million in alleged subsequent transfers that the Trustee seeks here all concern Bloom and took place

2

outside the United States, among non-U.S. entities (these "Bloom Redemptions" and the

Termination Transfer are referred to collectively as the "Alleged Subsequent Transfers").

*Fifth*, the Trustee fails to state that the initial transfers from BLMIS to Groupement have

been avoided – a key element of his Section 550(a) claim.  In violation of the Federal Rules of

Civil Procedure, the Trustee purports to incorporate by reference hundreds of paragraphs of

allegations from a complaint filed in a separate action – one that is ongoing and being vigorously

challenged.

*Sixth*, the Trustee does not adequately plead that the Alleged Subsequent Transfers from

Groupement to Defendants were comprised of BLMIS funds.  Among other things, the $153

million Termination Transfer is premised on Natixis FP being a mediate transferee, with the

funds allegedly flowing from (i) BLMIS, to (ii) Groupement, to (iii) a third-party called

Groupement Financier Levered Limited ("GFLL") via a redemption, and finally to (iv) Natixis

FP.  Yet, the Trustee does not allege, as he must, any specific facts regarding GFLL's purported

redemption from Groupement, including when it occurred or even how much GFLL redeemed.

*Last*, Defendants are entitled to the good faith defense under Section 550(b).

## BACKGROUND[4]

### A.  Natixis FP and Bloom

Natixis FP is a Delaware limited liability company and financial services company based

in New York.  *See* Compl. ¶ 10.  Bloom, an Irish umbrella trust affiliated with Natixis FP, made

investments in funds that did not permit direct investments by U.S. persons.  *See id.* ¶¶ 11-12.

---

[4] The facts set forth below are drawn from the allegations in the Initial Complaint (defined below), the Complaint, and the materials the Trustee referenced or relied on in framing those pleadings.  *See Negrete v. Citibank, N.A.*, 237 F. Supp. 3d 112, 129 (S.D.N.Y. 2017) ("A party [] cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version.") (citation omitted); *Picard v. BNP Paribas S.A. (In re Madoff)*, 594 B.R. 167, 195 (Bankr. S.D.N.Y. 2018) ("*BNP Paribas*") (noting that court may consider prior pleadings with statements "inconsistent with the latest version").  Defendants do not admit or concede the Trustee's allegations.

### B. Groupement Financier Ltd.

Groupement was a British Virgin Islands investment fund that invested 100% of its assets directly with BLMIS. *See id.* ¶¶ 2, 3, 15. On February 28, 2022, the Trustee filed a Second Amended Complaint against Groupement and other defendants ("Groupement Second Amended Complaint" or "Groupement SAC"), in *Picard v. UBS AG, et al.*, Adv. Pro. No. 10-04285 (CGM) (Bankr. S.D.N.Y.) ("*Groupement* Action"), seeking to avoid and recover approximately $352 million in alleged initial transfers of customer property from BLMIS to Groupement ("Initial Transfers"). *See* Compl. ¶¶ 3, 70, 74; Cioffi Ex. 2, Groupement SAC. In 2009, the Trustee obtained Rule 2004 discovery from the defendants in the *Groupement* Action, totaling over 4.5 million documents.[5]

GFLL is alleged to be an affiliate of Groupement. *See* Compl. ¶ 4. GFLL is not a defendant in the Trustee's action against Groupement. *See generally* Groupement SAC. In that action, the Trustee notes that GFLL did not have an account with BLMIS. *See id.* ¶ 72.

### C. The Groupement Swap

The Trustee alleges that between 2003 and 2008, Natixis FP and GFLL engaged in swap transactions for which Groupement was the reference asset ("Groupement Swap"). *See* Compl. ¶¶ 4, 64.[6] Pursuant to a November 5, 2003 Master Agreement, Natixis FP agreed to pay its swap

---

[5] *See* Cioffi Ex. 3, Access Defs.' and Groupement's Mot. to Dismiss the Groupement SAC at 30, *Groupement Action* (Apr. 22, 2022), ECF No. 292; Cioffi Ex. 4, Decl. of Patrick Littaye in Supp. of Mot. to Dismiss ¶¶ 59-62, *Groupement* Action (Apr. 22, 2022), ECF No. 291.

[6] As the Trustee explains in the Complaint: A swap is a financial transaction in which a party "swaps" the cash flows derived from an asset (the "reference asset") for another set of cash flows from its counterparty. *See* Compl. ¶ 61. Swaps can be used to reproduce the economics of a leveraged investment (*i.e.*, one made with borrowed money). *See id.* ¶ 62. Financial institutions provide this kind of simulated or "synthetic" leverage by paying to its counterparty cash flows equal to a multiple of the return on an amount notionally invested in a reference asset. *See id*. In exchange, the financial institution receives collateral and fees from the party seeking leverage. *See id*. The fees serve the function of interest payments on an "implied loan." *See id.* As a hedge to ensure its ability to pay the agreed returns on a notional investment asset, financial institutions typically acquire a corresponding position in the underlying reference asset for its own account. *See id.* ¶ 63.

counterparty, GFLL, returns based on the performance of a notional investment in Groupement. *See id.* ¶ 65. In exchange, GFLL provided Natixis FP with collateral of approximately half the amount to be notionally invested in Groupement. *See id.* The Groupement Swap thus allowed GFLL to receive returns equivalent to a two-times (2X) leveraged investment in Groupement. *See id.* ¶ 66. Natixis FP had to pay GFLL an amount equal to all upside in value of the swap, but GFLL had no obligation to compensate Natixis FP in the event there was a cumulative negative return on the Groupement shares. *See* Cioffi Ex. 5, Compl. ¶ 72, 10-05353 Action, ECF No. 1-1 ("Initial Complaint" or "Initial Compl."). That is, the most GFLL could lose if the reference fund shares decreased in value was its collateral.

In contrast, Natixis FP could not profit on the swap beyond interest at LIBOR plus a nominal margin on the "leverage" it provided. *See* Compl. ¶¶ 62, 65; Cioffi Ex. 5, Initial Compl. ¶ 85. Natixis FP hedged its obligation to pay out increases to GFLL by purchasing, with its own funds, shares in Groupement equal to the face value of the swap. *See* Compl. ¶ 67; Cioffi Ex. 5, Initial Compl. ¶ 73; Cioffi Ex. 6, Proposed Am. Compl. ¶ 74, 10-05353 Action (Dec. 28, 2018), ECF No. 170-1 ("Proposed Amended Complaint" or "PAC"). This hedge was discretionary on Natixis FP's part and nothing in the swap agreement required Natixis FP to hedge by investing its own money in Groupement. *See* Cioffi Ex. 5, Initial Compl. ¶¶ 73, 86. As a U.S. entity, Natixis FP could not itself invest in Groupement to hedge its liability, so Bloom acquired shares equal to GFLL's notional leveraged investment. *See* Compl. ¶ 67.

In October 2008, the Groupement Swap was terminated at GFLL's request. *See id.* ¶ 69. At termination, Bloom allegedly transferred the Groupement shares it had been holding (as a hedge for Natixis FP's obligations under the Groupement Swap) directly to GFLL. *See id.* Neither Bloom nor Natixis FP is alleged to have redeemed the shares or asked GFLL to do so,

and the Trustee includes no explanation of GFLL's reasons or strategy for requesting the termination of the Groupement Swap. The Trustee does allege that GFLL redeemed Groupement shares – notably failing to specify whether the shares redeemed were some, all, or any of those same shares transferred to GFLL by Bloom – and then purportedly used those proceeds to pay back Natixis FP the approximately $153 million "implied loan" GFLL had received pursuant to the Groupement Swap. *See id.* ¶¶ 69, 79, Ex. D. The Trustee does not set forth any specific facts regarding GFLL's purported redemption of Groupement shares, such as the date of the redemption or even the amount GFLL redeemed, let alone how this purported redemption traces to funds received by Natixis FP or Bloom.

### D. The Alpha Prime Settlement

On June 20, 2022, the Trustee and Alpha Prime entered into the Alpha Prime Settlement Agreement in *Picard v. HSBC Bank PLC*, Adv. Pro. No. 09-01364 (CGM) (Bankr. S.D.N.Y. June 23, 2022) ("*Alpha Prime* Action"), ECF No. 710-2. *See* Cioffi Ex. 7, Alpha Prime Settlement Agreement; Cioffi Ex. 8, Order approving settlement, *Alpha Prime* Action (July 20, 2022), ECF No. 715 ("Alpha Prime Rule 9019 Order"). As further discussed herein, the Alpha Prime Settlement Agreement releases all claims against Natixis FP and Bloom in this action. *See* Cioffi Ex. 7, Alpha Prime Settlement Agreement ¶ 7. Significantly, Alpha Prime agreed to share with the Trustee 50% of the proceeds from Alpha Prime's lawsuits against various HSBC entities in Bermuda and Luxembourg, providing considerable additional value to the BLMIS estate at the expense of Alpha Prime's shareholders. *See id.* ¶ 4.[7]

---

[7] To the extent that Alpha Prime makes payments to the Trustee in accordance with Paragraph 4 of the Alpha Prime Settlement Agreement, the amount of Alpha Prime's Section 502(h) claim increases, on a limited basis, as provided in the provision. *See* Cioffi Ex. 7, Alpha Prime Settlement Agreement.

### E.  The Complaint

The Trustee filed the Initial Complaint against Natixis FP and Bloom, as well as others

including Natixis S.A., over 12 years ago, on December 8, 2010, in the 10-05353 Action.  *See*

Cioffi Ex. 5, Initial Compl.  The Trustee filed the Proposed Amended Complaint in 2018, *see*

Cioffi Ex. 6, PAC, and then in 2021, the Trustee advised Defendants that he intended to amend

again.  Finally, on January 10, 2023, the Trustee voluntarily dismissed Natixis FP and Bloom

from that action without prejudice.  *See* Stipulation and Order, 10-05353 Action (Jan. 10, 2023),

ECF No. 192.  On March 1, 2023, the Trustee commenced the instant action in which he asserts

two claims, seeking to recover a total of $234 million allegedly transferred "to Defendants

pursuant to the Groupement Swap."  Compl. ¶ 77.

In Count I, the Trustee seeks to recover the $153 million Termination Transfer that GFLL

allegedly made to Natixis FP, on October 1, 2008, with funds purportedly received from

redeeming Groupement shares.  *See id.* ¶ 79, Ex. D.  Despite having filed multiple pleadings

against Defendants starting in 2010, the Trustee had never before sought to recover this transfer

from Defendants.  And, despite having filed multiple complaints against Groupement, the

Trustee has never named GFLL a defendant or sought to clawback GFLL's purported

Groupement redemptions that were allegedly used to fund the Termination Transfer.  *See*

Compl., *Groupement* Action (Nov. 23-24, 2010), ECF Nos. 1-2; Cioffi Ex. 2, Groupement SAC;

*see also* Am. Compl., *Groupement* Action (district court analogue), No. 11-04212 (S.D.N.Y.

Aug. 17, 2011), ECF No. 23.

In Count II, the Trustee seeks to recover the Bloom Redemptions – five transfers, totaling

$80.9 million, that Groupement allegedly made to Bloom within six years of the Madoff

bankruptcy filing.  *See Compl.* ¶ 78, Ex. C.  Three of the Bloom Redemptions, totaling $61

million, allegedly took place more than two years before Madoff's bankruptcy petition ("Six-

Year Bloom Redemptions"). *See id*. Ex. C. Two of the Bloom Redemptions, totaling $19.9

million, allegedly took place within two years of the bankruptcy ("Two-Year Bloom

Redemptions"). *See id.*

Importantly, the Complaint omits that Defendants had exposure to Groupement of

approximately $150 million, with their total exposure to BLMIS approaching $800 million or

more, including exposure of their affiliates. *Cf.* Cioffi Ex. 5, Initial Compl. ¶ 18.

## LEGAL STANDARD

The Court must dismiss a claim under Rule 12(b)(6) "when the allegations in a

complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 558 (2007). A claimant's allegations "must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v.

Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A plausible claim pleads

facts "that allow . . . the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Iqbal*, 556 U.S. at 678.

While the Court must accept well-pled factual allegations as true, it need not accept

assertions unsupported by factual allegations, *Iqbal*, 556 U.S. at 678-79, nor "legal conclusion

couched as a factual allegation[,]" *Papasan v. Allain*, 478 U.S. 265, 286 (1986), nor "conflicting

pleadings that make no sense, or that would render a claim incoherent, or that are contradicted

either by statements in the complaint itself or by documents upon which its pleadings rely." *In

re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001).

Defenses that appear on the face of the complaint are properly before the Court on a

motion to dismiss. *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998)

("An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6),

without resort to summary judgment procedure, if the defense appears on the face of the

complaint."); *see also* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 708-13 (3d ed. 2004) (explaining that complaint may be dismissed if plaintiff alleges facts that, taken as true, establish affirmative defense).

When deciding a motion to dismiss, in addition to the allegations in the relevant pleading, the Court "may also look to public records" including documents filed in other cases. *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004); *see In re Revlon Inc.*, Nos. 22-10760, 22-01167, 2023 Bankr. LEXIS 388, at *2 n.4 (Bankr. S.D.N.Y. Feb. 24, 2023) ("In the context of bankruptcy litigation . . . the court may take judicial notice [of] documents filed in a related bankruptcy proceeding, an adversary proceeding and the underlying bankruptcy case.") (quotation marks and citation omitted).

To survive a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction, "the plaintiff bears the burden to make a prima facie showing that jurisdiction exists." *In re Lehman Bros. Hldgs. Inc.*, 535 B.R. 608, 618 (Bankr. S.D.N.Y. 2015).

## ARGUMENT

I. **THE TRUSTEE RELEASED NATIXIS FP AND BLOOM FROM ANY CLAIMS RELATED TO MADOFF AND BLMIS UNDER THE ALPHA PRIME SETTLEMENT AGREEMENT**

### A. The Alpha Prime Settlement Agreement Requires Dismissal

The Alpha Prime Settlement Agreement provides, in relevant part:

> *[T]he Trustee*, on behalf of himself and BLMIS, and its consolidated estates, *hereby releases*, acquits and forever discharges Alpha Prime and Alpha Prime Asset Management LTD and its respective *current and former* directors . . . officers, employees, *direct or indirect shareholders*, limited partners, principals, members, successors, assigns, accountants, attorneys, *from any and all* past, present or future actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, damages, judgments, and *claims whatsoever, asserted or unasserted, known or unknown, arising out of or in any way related to Madoff or BLMIS*.  For the avoidance of doubt, Alpha Prime is not released from the Six-Year Transfer

Recovery Claim until either (i) Alpha Prime has paid to the Trustee the Six-Year Transfers or (ii) the Six-Year Transfers are deemed unrecoverable from Alpha Prime as set forth in paragraphs 5 above and 10 below.

Cioffi Ex. 7, Alpha Prime Settlement Agreement ¶ 7 ("Release") (emphases added).

The Trustee's claims against Defendants are indisputably "related to Madoff or BLMIS," and the Trustee has long known that Natixis FP and Bloom were direct or indirect shareholders of Alpha Prime. *See* Cioffi Ex. 5, Initial Compl. ¶¶ 79, 82, 111, 120; *see also* Cioffi Ex. 6, PAC ¶ 75 ("[Natixis FP] invested in . . . Alpha Prime Fund Ltd."). Thus, this Release releases the Trustee's claims here against Defendants, "as indicated by the language [it] employed."[8] *Loccenitt v. Pantea*, No. 12-1356, 2014 U.S. Dist. LEXIS 179428, at *5 (S.D.N.Y. Dec. 29, 2014) ("[W]here the language of the release is clear, effect must be given to the intent of the parties as indicated by the language employed.") (quotation marks and citation omitted); *Cox v. Spirit Airlines, Inc.*, No. 17-5172, 2023 U.S. Dist. LEXIS 24904, at *7 n.6 (E.D.N.Y. Feb. 14, 2023) ("A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent.") (quoting *Hotchkiss v. Nat'l City Bank of N.Y.*, 200 F. 287, 293 (S.D.N.Y. 1911) (Learned Hand, J). Indeed, "it is appropriate to grant a motion to dismiss on the basis of a binding release agreement where . . . the terms of the agreement are clear and unambiguous." *Barshay v. Naithani*, No. 20-8579, 2023 U.S. Dist. LEXIS 26831, at *24 (S.D.N.Y. Feb. 16, 2023) (citation omitted).

---

[8] It is clear that Defendants have standing to enforce the Alpha Prime Settlement Agreement as third-party beneficiaries. *See* Cioffi Ex. 7, Alpha Prime Settlement Agreement ¶¶ 7, 21; *Levy v. Young Adult Inst., Inc.*, No. 13-2861, 2016 U.S. Dist. LEXIS 143860, at *66 (S.D.N.Y. Oct. 18, 2016) ("To the extent that [defendant] is a 'Released Party,' he therefore has standing to enforce the contract in order to give effect to the release clause."); *ExpertConnect, LLC v. Fowler*, No. 18-4828, 2020 U.S. Dist. LEXIS 122494, at *16 (S.D.N.Y. July 10, 2020) (noting that, under New York law, "[a] third party may enforce a contract when . . . it is [] clear from the language of the contract that there was an intent to permit enforcement by the third party") (citation omitted).

As Natixis FP and Bloom both fall within categories of persons covered by the Release ("former . . . direct or indirect shareholders"), it is of no moment that the Release does not specifically identify them. *See, e.g.*, *Wells v. Shearson Lehman/American Express, Inc.*, 72 N.Y.2d 11, 22-23 (1988) (stating that plaintiff "had to have known, from the face of this release, that she was discharging first, the named defendants; second, an identified group of persons related to them" including "officers, directors, agents, attorneys, representatives, affiliates and general and limited partners"); *Carbone v. Marone*, No. 04-2001, 2007 U.S. Dist. LEXIS 92350, at *16-17 (S.D.N.Y. Dec. 14, 2007) (finding that express reference in release to certain descriptive categories of persons "entirely discharge[d]" liability of those persons "for any disputes within the scope of the release").

Moreover, the Release evidences the parties' intent to sweep in even uncontemplated claims, as it applies to "any and all past, present or future actions, causes of action, suits . . . *known or unknown*." Cioffi Ex. 7, Alpha Prime Settlement Agreement ¶ 7 (emphasis added); *see In re WorldCom, Inc.*, 296 B.R. 115, 123 (Bankr. S.D.N.Y. 2003) (holding that where release provision "specifically refers to 'all actions . . . whether known or unknown,' [it] reflect[s] the clear and unambiguous intent of the [parties] to bar all uncontemplated transactions."[9]

The unambiguous Release requires dismissal of this adversary proceeding against Defendants. *See Loccenitt*, 2014 U.S. Dist. LEXIS 179428, at *5 ("[A] release that is clear and

---

[9] That the Trustee incurred costs since the Release in continuing to litigate claims against Defendants is no reason to disregard the Release. *See Browning v. City of N.Y.*, No. 16-7470, 2018 U.S. Dist. LEXIS 114653, at *5 (S.D.N.Y. July 9, 2018) (rejecting plaintiff's equitable arguments against enforcing release based on incurring litigation costs over 18 months "while under the impression that he had not waived his right to assert his claims"). To do so would cut against federal courts' "strong policy in favor of enforcing settlement agreements and releases." *Barshay*, 2023 U.S. Dist. LEXIS 26831, at *24-25 (quotation marks and citation omitted). Notably, nothing Defendants or their affiliates have done in the past 18 months have led the Trustee to incur costs because the Trustee advised us in February 2022 that he would amend his complaint shortly and took more than a year before he did it.

unambiguous on its face and which is knowingly and voluntarily entered into will be enforced.")

(quoting *Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 463 (2d Cir. 1998)).

### B.    Additional Context Shows that Natixis FP and Bloom Were Intended Released Parties

Although the Court need look no further than the four corners of this Release to

understand its unambiguous meaning, additional context supports the conclusion that, at the time

the Release was executed, the Trustee knew that Natixis FP and Bloom had been direct or

indirect shareholders of Alpha Prime, and the scope of the Release intentionally included entities

like Defendants.

### i.    The Trustee Knew That Natixis FP and Bloom Were Direct or Indirect Shareholders of Alpha Prime and He Had a Pending Action Against Them

As the Trustee was aware of his claims against Natixis FP and Bloom when he agreed to

the Release, there is "no doubt that [this action] falls within [the Releases's] scope, ***even if [the***

***Trustee] were to subjectively believe that it does not***." *Barshay*, 2023 U.S. Dist. LEXIS 26831,

at *34 (emphasis added) (finding that where releasor was aware of claim at time he agreed to

release, any concern "that a given claim is not within the scope of a general release [ ] is not

implicated");[10] *see Ali v. City of N.Y.*, No. 20-30, 2021 U.S. Dist. LEXIS 255741, at *16-17, *19

(E.D.N.Y. Sep. 29, 2021) (finding that releasees do not carry burden of establishing they were

intended to be included in release and that "counsel's mistake and [signatory]'s unilateral failure

to appreciate the reach and effect of the release does not provide an adequate basis" to rescind it).

---

[10] Although *Barshay* noted that courts applying New York law have "more carefully scrutinized the context and language used in [general] releases to ascertain . . . a given release's scope," "[b]ased on a realistic recognition that [such] releases contain standardized, even ritualistic[ ] language," the carefully curated and extensively negotiated language in the Release here is anything but "standardized" or "ritualistic." 2023 U.S. Dist. LEXIS 26831, at *25-26, 27 (dismissing plaintiff's claim at pleading stage based on "plain, unambiguous language" of release).

The Trustee filed the Initial Complaint against Defendants over 12 years prior to the

execution of the Alpha Prime Settlement Agreement (in June 2022), and he filed the Proposed

Amended Complaint in late 2018.  His case against Defendants was still pending when the Alpha

Prime Settlement Agreement was executed and approved.  The same sophisticated counsel,

Baker & Hostetler LLP, represents the Trustee in both the proceedings against Alpha Prime and

Defendants.  *See* Cioffi Ex. 9, Trustee's motion for order approving Alpha Prime Settlement

Agreement at 11, *Alpha Prime* Action (June 23, 2022), ECF No. 710 ("Alpha Prime Rule 9019

Motion").  In addition, the actions against Alpha Prime and Defendants are part of the same

bankruptcy case.  *Cf. Cohen v. Bucci*, 905 F.2d 1111, 1112 (7th Cir. 1990) (explaining that

"[a]dversary proceedings in bankruptcy are not distinct pieces of litigation; they are components

of a single bankruptcy case" for purposes of law of the case).

### ii.  The Release is Intentionally Broader Than Releases in Other Agreements

The Release is significantly broader than release provisions the Trustee has agreed to in

multiple comparable settlements (all while being represented by the same attorneys).

The release in the Trustee's Partial Settlement Agreement with Alpha Prime, ECF No.

491-1 (Feb. 12, 2018) ("Alpha Prime Partial Settlement Agreement") – an earlier agreement

between the Trustee and Alpha Prime resolving different issues in the *Alpha Prime* Action – also

applies to "direct or indirect shareholders," but there, notably, the parties agreed that the release

"only concern[ed] direct or indirect ***transfers of money from Alpha Prime***."  Cioffi Ex. 10,

Alpha Prime Partial Settlement Agreement ¶ 2(a) (emphasis added).[11]  Conversely, in the

---

[11] Cioffi Ex. 10, Alpha Prime Partial Settlement Agreement ¶ 2(a) ("[U]pon Closing . . . the Trustee on behalf of himself, BLMIS, and its consolidated estates, shall provide a release discharging Alpha Prime's and APAM's current and former directors . . . officers, employees, ***direct or indirect shareholders***, limited partners, principals, members, successors, assigns, accountants, attorneys, agents, representatives, and vendors (the 'Additional Releasees'), ***only concerning direct or indirect transfers of money from Alpha Prime to the Additional Releasees but not for any claims that the Trustee may otherwise have***.") (emphases added).

Release, the parties in the *Alpha Prime* Action agreed that instead of releasing claims relating merely to certain transfers, the Trustee was now releasing "***any and all . . . claims whatsoever, asserted or unasserted, known or unknown, arising out of or in any way related to Madoff or BLMIS***." Cioffi Ex. 7, Alpha Prime Settlement Agreement ¶ 7 (emphasis added).[12]

The release in the Trustee's Agreement with Primeo Fund and Herald Fund SPC, each by their liquidators, ECF No. 338-2 (Nov. 17, 2014) ("Primeo Settlement Agreement"), which also pertains to the *Alpha Prime* Action, applies to shareholders, but – unlike in the Release – the parties specifically agreed not to release "claims . . . that are unrelated to the Funds' investments in or withdrawals from BLMIS." Cioffi Ex. 12, Primeo Settlement Agreement ¶ 4.[13] And, the release in the Trustee's Settlement Agreement with Herald (Lux) SICAV, by its liquidators, ECF No. 352-1 (Dec. 23, 2014) ("Herald (Lux) Settlement Agreement"), which also pertains to the same *Alpha Prime* Action, contained a release provision that did not release shareholders at all. *See* Cioffi Ex. 13, Herald (Lux) Settlement Agreement ¶ 5.[14]

---

[12] Prior to the filing of this motion, counsel for Natixis reached out to counsel for the Trustee to discuss the Alpha Prime Settlement Agreement and the effect of the Release. Counsel for the Trustee insisted that the Release was intended to "discharge[] certain entities from claims only concerning direct or indirect transfers from Alpha Prime and not for any claims that the Trustee otherwise has or may have," and that "the Trustee and Alpha Prime are prepared to modify the agreement to clarify the original meaning of their agreement." Cioffi Ex. 11, Trustee Email at 1 (Apr. 7, 2023). As discussed above, that may have been the intent of the release in the earlier Alpha Prime Partial Settlement Agreement, but that is *not* what the parties agreed to in the Release that is included in the final Alpha Prime Settlement Agreement. Thus, any future possible attempt by the Trustee to rewrite the Release and avoid the impact of its clear and unambiguous language must be rejected.

[13] Cioffi Ex. 12, Primeo Settlement Agreement ¶ 4 ("[T]he Trustee on behalf of himself, BLMIS, and its consolidated estates, shall release, acquit, and forever discharge the Funds and the Liquidators, including their successors and/or assigns, from any and all past, present, or future claims or causes of action . . . based on, arising out of, or in any way related to the Funds' respective direct or indirect relationship with BLMIS . . . . The release granted by the Trustee hereunder *shall extend to the Funds' shareholders* to the extent that any such shareholders received transfers of money from Herald and/or Primeo *but shall not include a release of claims that the Trustee may bring that are unrelated to the Funds' investments in or withdrawals from BLMIS*.") (emphases added).

[14] Cioffi Ex. 13, Herald (Lux) Settlement Agreement ¶ 5 ("[T]he Trustee, on behalf of himself, BLMIS, and its consolidated estate releases, acquits, and forever discharges the Liquidators and their professionals and agents, and Herald (Lux), from any past, present or future actions . . . asserted by the Trustee, based on, arising out of or in any way related to Madoff, BLMIS, or the Account, including, without limitation, any causes of action asserted in the Amended Complaint.").

Other release provisions in initial transfer settlements demonstrate that the Trustee and Alpha Prime could have bartered to limit the effect of the Release on shareholders here, but they struck a different deal, following "lengthy negotiations." Cioffi Ex. 14, Decl. of Irving H. Picard ¶ 7, *Alpha Prime* Action (June 23, 2022), ECF No. 710-4.[15] By way of example, the release in the Trustee's Agreement with Mount Capital Fund, Ltd. and Mount Capital Asset Subsidiary Limited, by their liquidators, Adv. Pro. No. 10-05123, ECF No. 14-2 (Aug. 31, 2011) ("Mount Capital Settlement Agreement") extended to "indirect or direct shareholders . . . of the Mount Capital Funds" and applied to "unknown" claims, but the parties also tailored this release to those claims that were "based on, arise out of, or are related to the Mount Capital Withdrawals and the Mount Capital Funds' Accounts."[16] Cioffi Ex. 17, Mount Capital Settlement Agreement ¶ 3.[17] In contrast, the Release here contains no such limitation.

---

[15] Other than the case here (and the case against Defendants' corporate parent Natixis S.A., in Adv. Pro. No. 10-05353), we are not aware of any other subsequent transferee cases in which the Trustee has pled that a defendant is a current or former direct or indirect shareholder of Alpha Prime.

[16] As another example, in his Settlement Agreement with Magnify, Inc. and certain other parties, the Trustee carved out from the release liability for transfers "received in connection with any account not specified herein . . . which constitute subsequent transfers of transfers made by BLMIS which are avoidable and recoverable under SIPA." Cioffi Ex. 15, Settlement Agreement ¶ 11(f), Adv. Pro. No. 10-05279, ECF No. 193-2 (Sept. 4, 2020). Similarly, in the Trustee's Settlement Agreement with Kingate Euro Fund, Ltd. and Kingate Global Fund, Ltd., by their liquidators, the release to shareholders expressly did "not include a release of claims that the Trustee may bring that are unrelated to the Kingate Funds' investments in or withdrawals from BLMIS." Cioffi Ex. 16, Settlement Agreement ¶ 13, Adv. Pro. No. 09-01161, ECF No. 413-2 (July 17, 2019).

[17] Cioffi Ex. 17, Mount Capital Settlement Agreement ¶ 3 ("[T]he Trustee, on behalf of himself, BLMIS and its consolidated estate shall release, acquit and forever discharge: . . . all past or present directors, officers, employees, ***indirect or direct shareholders***, limited partners, principals, successors, assigns, agents, representatives, accountants, administrators, and attorneys of the Mount Capital Funds . . . from all actions, causes of action . . . and claims whatsoever, asserted or unasserted, known or unknown, existing as of the date of the Closing that are, have been, could have been or might in the future be asserted by the Trustee ***and that are based on, arise out of, or are related to the Mount Capital Withdrawals and the Mount Capital Funds' Accounts***.") (emphases added).

### C. The Trustee is Estopped From Asserting that the Release Does Not Apply to Natixis FP and Bloom

In his motion seeking approval of the Alpha Prime Settlement Agreement, the Trustee argued that the Release is a "principal term[] and condition[]" of the settlement,[18] and he received a favorable Court ruling. *See* Cioffi Ex. 8, Alpha Prime Rule 9019 Order. Thus, the Trustee is judicially and contractually estopped from taking the "clearly inconsistent" position that Natixis is not absolutely discharged from any and all claims related to Madoff or BLMIS as an indirect shareholder. *Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 620 (2d Cir. 2012) (noting that doctrine of judicial estoppel "'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase'") (citation omitted); *In re B&M Linen Corp.*, Nos. 12-11560, 12-1885, 2013 Bankr. LEXIS 2832, at *24-26 (Bankr. S.D.N.Y. July 12, 2013) (finding debtor estopped from taking position contrary to court-approved settlement); *In re Enron Corp.*, 367 B.R. 373, 383 (Bankr. S.D.N.Y. 2007) (finding party contractually estopped from amending complaint to add allegations relating to agreement, where claims regarding that agreement had been released).

## II.    THE TRUSTEE'S CLAIMS ARE BARRED BY THE SECTIONS 546(g) AND 546(e) SAFE HABORS

The Trustee asserts claims under Section 550(a) of the Code, which provides that, to the extent a transfer is avoided, "the trustee may recover . . . the property transferred," or its value, from "the initial transferee" or any subsequent "transferee of such initial transferee." 11 U.S.C. § 550(a)(1)-(2). Here, both the Section 546(g) and the Section 546(e) safe harbors bar the

---

[18] *See* Cioffi Ex. 9, Alpha Prime Rule 9019 Motion at 6-7 (summarizing that "[t]he Trustee will release, acquit, and ***absolutely discharge*** Alpha Prime and Alpha Prime Asset Management LTD and its respective current and former . . . ***direct or indirect shareholders*** . . . from any and all past, present or future actions, causes of action, suits . . . and claims whatsoever, asserted or unasserted, known or unknown, arising out of or in any way related to Madoff or BLMIS") (emphases added).

Trustee from avoiding the Initial Transfers.  "[C]ourts will enforce the safe harbor provisions of

the Bankruptcy Code in appropriate cases by dismissing avoidance actions on the pleadings."

*ABN Amro*, 505 B.R. at 141 (citation omitted).  Defendants are entitled to raise Sections 546(g)

and 546(e) as alleged subsequent transferees.  *See id.*, 505 B.R. at 144; *SIPC v. BLMIS*, No. 12-

115, 2013 U.S. Dist. LEXIS 56042, at *40-41 (S.D.N.Y. 2013) (Rakoff, J.) ("*Cohmad*").

### A.   The Section 546(g) Safe Harbor Bars the Trustee's Claims

The Section 546(g) safe harbor provides that "[n]otwithstanding sections 544 . . .

548(a)(1)(B) and 548(b) of this title, the trustee may not avoid a transfer, made by or to (or for

the benefit of) a swap participant or financial participant, under or in connection with any swap

agreement and that is made before the commencement of the case, except under section

548(a)(1)(A) of this title."  11 U.S.C. § 546(g).  There is no exception to Section 546(g)'s

protection based on the knowledge of the initial transferee or the subsequent transferee.  *See ABN*

*Amro*, 505 B.R. at 142 n.6 ("Unlike section 546(e), the issue of knowledge is irrelevant to the

application of section 546(g) . . . .").

In *ABN Amro*, Judge Rakoff found that the Section 546(g) safe harbor protected

redemption payments – highly comparable to the Bloom Redemptions – from reference funds

that had invested in BLMIS to "defendants [in three actions that] had invested in [such funds] as

a hedge against their obligations under [] relevant swap agreements . . . ."  *ABN Amro*, 505 B.R.

at 146.  Judge Rakoff then dismissed the Trustee's claims to recover $30 million in alleged

subsequent transfers from Citigroup Global Markets Ltd. ("Citigroup").  *Id*. at 150.[19]  For the

---

[19] The only reason that Judge Rakoff did not also dismiss the Trustee's claims to recover the remaining $100 million from Citigroup, and the alleged redemption payments to various ABN Amro defendants, was because the claims related to those "transfers appear[ed] to have occurred within the [two year] reach-back period of section 548(a)(1)(A)."  *Id*. at 150-51.  Here, the Section 548(a)(1)(A) exception does not apply, and accordingly, the Termination Transfer and the Two-Year Bloom Redemptions are safe harbored.  *See infra* at 25-27.

same reasons Judge Rakoff relied on in *ABN Amro*, the elements of Section 546(g) are satisfied

here, and the Court should dismiss the Trustee's Complaint.[20]

Importantly, the subsequent transfer defendants that recently raised Section 546(g) in

their respective motions to dismiss before this Court were **the same parties** before Judge Rakoff

in *ABN Amro* and reargued **the same issues** that he decided there.  Namely, these defendants

again sought to apply Section 546(g)'s safe harbor to "collateral payments" that they received

from swap counterparties and to certain other redemptions that the District Court had determined

"appeared" to have occurred within Section 548(a)(1)(A)'s reach-back period.  *Picard v. ABN*

*Amro Bank N.V. (In re Madoff)*, No. 10-05354, 2023 Bankr. LEXIS 554, at *36-37 (Bankr.

S.D.N.Y. Mar. 3, 2023); *see also Picard v. ABN Amro Bank (Ireland) Ltd. (In re Madoff)*, No.

10-05355, 2023 Bankr. LEXIS 768, at *11 (Bankr. S.D.N.Y. Mar. 28, 2023) ("Defendants are

foreclosed from litigating [whether Section 546(g) bars the recovery of collateral payments]

again at this stage of the litigation.").  Here, in stark contrast, Defendants are seeking to receive

the benefit of Judge Rakoff's *ABN Amro* decision – not to change or relitigate it – given that (i)

the Trustee is not seeking to recover any "collateral payments" from Defendants, (ii) the Six-

Year Bloom Redemptions were indisputably made outside the Section 548(a)(1)(A) reach-back

period, and (iii) the Section 548(a)(1)(A) exception applies to neither the Termination Transfer

nor the Two-Year Bloom Redemptions, given the Trustee's improper reliance on the "ponzi-

scheme presumption," *see infra* at 25-27.

---

[20] *ABN Amro* is law of the case here.  That doctrine "posits that if a court decides a rule of law, that decision should continue to govern in subsequent stages of the same case."  *Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001) (quotation marks and citation omitted).  The doctrine "applies to different adversary proceedings filed within the same main bankruptcy case."  *Moise v. Ocwen Loan Sevicing LLC (In re Moise)*, 575 B.R. 191, 205 (Bankr. E.D.N.Y. 2017) (citation omitted).  Courts "are understandably reluctant to reopen a ruling once made, especially when one judge or court is asked to consider the ruling of a different judge or court."  *Romero v. Manhattan & Bronx Surface Transit Operating Auth.*, No. 21-4951, 2022 U.S. Dist. LEXIS 36892, at *46 (S.D.N.Y. Mar. 2, 2022) (citation and quotation marks omitted).

### i.    The Agreement at Issue is Undisputedly a Swap Agreement

"Swap agreement" is broadly defined as "any agreement . . . which is . . . a total return,

credit spread or credit swap, option, future, or forward agreement."  11 U.S.C. § 101(53B)(A)(i)

(VI).  Here, the Trustee does not dispute, just as in *ABN Amro*, that the agreement at issue here –

*i.e.*, the November 5, 2003 Master Agreement – constitutes a "swap agreement" for purposes of

Section 546(g).  *See* Compl. ¶ 64 ("Between 2003 and 2008, Natixis FP and GFLL engaged in

***swap transactions*** for which Groupement was the reference asset (the 'Groupement Swap')")

(emphasis added); *id.* ¶ 65 ("Pursuant to a November 5, 2003 Master Agreement governed by

New York law, the ***Groupement Swap*** provided for Natixis FP to pay returns to GFLL based on

the performance of a notional investment in Groupement.") (emphasis added); *see also id.* ¶¶ 3-

4, 13, 15, 64-69, 77-79.  Accordingly, this element is easily satisfied.

### ii.    The Initial Transfers Were "In Connection With Any Swap Agreement"

Section 546(g)'s requirement that a transfer be made "'in connection with any swap

agreement' simply means that the transfer must be ***related to*** such an agreement."  *ABN Amro*,

505 B.R. at 145 (collecting cases) (emphasis added).  It "is a relatively straightforward

proposition" that "initial transfers of [] redemption payments" of investments made in reference

funds as a hedge against obligations to swap counterparties are "related to, and therefore made in

connection with, the underlying swap agreements."  *Id*. at 146-47.

The same "relatively straightforward proposition" applies here, as the initial transfers of

redemptions allegedly related to the Alleged Subsequent Transfers "were related to, and

therefore made in connection with, an underlying swap agreement."  *Id*.  Specifically, the Trustee

alleges that "[o]ver the course of the Groupement Swap, Bloom received several redemptions

[*i.e.*, the Bloom Redemptions] from Groupement."  *See* Compl. ¶ 68.  In addition, he alleges that

the initial transfer related to the Termination Transfer directly related to the Groupement swap

agreement.  *See* Compl. ¶ 79 ("GFLL . . . transferred the amounts received from its redemption

of Groupement shares and thus indirectly from BLMIS [*i.e.*, an alleged Groupement Initial

Transfer] to Natixis FP **in settlement of the Groupement Swap**.") (emphasis added); *see also id.*

¶ 69 ("GFLL thereupon redeemed Groupement shares in order to pay back to Natixis FP the

'implied loan' that it had received **pursuant to the Groupement Swap** . . . .") (emphasis added)).

### iii.   Natixis FP and Bloom were "Financial Participants"

Defendants were each a "financial participant,"[21] *i.e.*, "an entity that, at the time it enters

into. . .  a swap agreement . . . or at the time of the date of the filing of the petition . . . has gross

mark-to-market positions of not less than $100,000,000 . . . in one or more such agreements or

transactions with the debtor or any other entity . . . at such time or on any day during the 15-

month period preceding the date of the filing of the petition."  11 U.S.C. § 101(22A)(A).

"[W]here the Trustee alleges that a defendant entered into a swap agreement with

collateral payments and reference amounts worth at least $100 million, the defendant may be

deemed to constitute a protected . . . 'financial participant' for the purposes of Section 546(e) on

the face of the complaint."  *Cohmad*, 2013 U.S. Dist. LEXIS 56042, at *44; *ABN Amro*, 505 B.R.

at 148 (finding each defendant met definition of financial participant based on pleadings,

including ABN Amro (Ireland) because the "Equity Notional Amount" of the swap was $706.5

million; ABN Amro (RBS) because two at-issue swaps involved $141 million and $87.5 million

in collateral; and Citigroup because complaint alleged that it held "$280 million of Sentry

shares" and accepted initial collateral payment of $140 million "[a]s part" of a swap).

---

[21] For claims against financial participants, rather than swap participants, it is irrelevant that the debtor was not a
party to the relevant swap transaction.  *See ABN Amro*, 505 B.R. at 148-49 (citing *In re Lancelot Investors Fund,
L.P.*, 467 B.R. 643, 656 (Bankr. N.D. Ill. 2012) ("Section 546(g) does not require that the transactions be structured
or tailored to include the debtor as a party.")).

Here, the Trustee's pleadings allege that both Natixis FP and Bloom more than meet the

$100 million threshold of positions in swap agreements or transactions at the time of the

Groupement Swap. *See* Compl. ¶¶ 67, 69 (alleging that GFLL received an "implied loan" from

Natixis FP pursuant to the Groupement Swap of "more than ***$153 million***," "Bloom, as an Irish

entity, acquired Groupement shares equal to GFLL's notional leveraged investment" and

"Natixis FP and Bloom entered into an agreement that required all positive returns on Bloom's

investment in Groupement to be transferred to Natixis FP, less applicable fees") (emphasis

added); *see also* Cioffi Ex. 5, Initial Compl. ¶¶ 102, 104 (alleging that GFLL paid initial

collateral of ***$111,497,551*** to Natixis FP and that "Natixis FP or BLOOM purchased hundreds of

millions of dollars of Groupement shares") (emphasis added).[22]

### iv. The Initial Transfers Were For the Benefit of Financial Participants

The Trustee himself alleges that the Initial Transfers related to the Bloom Redemptions

and Termination Transfer were "for the benefit of" Defendants (*i.e.*, financial participants).

11 U.S.C. § 546(g). He alleges that Groupement withdrew funds from their Madoff account to

make the Bloom Redemptions, which is sufficient under *ABN Amro*. *See* Compl. ¶ 78 ("[The

Bloom Redemptions] were subsequent transfers of BLMIS customer property."); *ABN Amro*,

505 B.R. at 149-50 ("Since the [reference] funds' withdrawals were directly caused by the

defendants' request for redemptions, these initial transfers were 'for the benefit' of defendants as

---

[22] Defendants also are "financial participants" based on the Initial Complaint's allegations that they invested hundreds of millions of dollars in various other Madoff-related reference funds in or around the same time as the Groupement Swap. *See, e.g.*, Cioffi Ex. 5, Initial Compl. ¶¶ 105-10 (alleging that in December 2005 Natixis FP and Bloom entered into $132 million total return swap related to Harley); *id.* ¶¶ 111-20 (alleging that in January 2006 Natixis FP and Bloom entered into $60 million total return swap related to Alpha Prime); *id.* ¶ 121 (alleging that in October 2006 Natixis FP entered $60 million total return swap related to FIFL); *id.* ¶ 122 (alleging that in November 2006 Natixis FP entered into $15 million swap related to FGF Luxembourg).

redeeming investors, who benefited by maintaining their perfect hedge on the swap

transactions.").

Likewise, the Complaint expressly states that BLMIS made the initial transfer related to

the Termination Transfer to Groupement for the benefit of Natixis FP.  *See* Compl. ¶ 69 ("GFLL

[] redeemed Groupement shares in order to pay back to Natixis FP the 'implied loan' that it had

received pursuant to the Groupement Swap with more than $153 million in funds ultimately

obtained from BLMIS."); *see also id.* ¶ 79 ("GFLL obtained these funds by redeeming the

Groupement shares that had been previously held by Bloom to hedge the Groupement Swap.

GFLL then transferred the amounts received from its redemption of Groupement shares and thus

indirectly from BLMIS to Natixis FP in settlement of the Groupement Swap. This transfer (the

'Natixis FP Subsequent Transfer') was a subsequent transfer of BLMIS customer property.").

### B.  The Section 546(e) Safe Harbor Bars the Trustee's Claims

Section 546(e) bars the Trustee from avoiding (other than under Section 548(a)(1)(A)

with a limited reach-back period of two years) a transfer, *inter alia*, (i) that was either a

settlement payment or a transfer in connection with a securities contract; and (ii) made by or to

(or for the benefit of) a covered entity such as a stockbroker, financial institution, or financial

participant.  *See* 11 U.S.C. § 546(e).

### i.  The Initial Transfers Were Settlement Payments and Made In Connection With a Securities Contract

The Second Circuit has already ruled that initial transfers from BLMIS to its customers

were settlement payments and were made in connection with a securities contract (*i.e.*, the

account agreements between BLMIS and its customers) for purposes of Section 546(e).  *See*

*Picard v. Ida Fishman Revocable Trust (In re Madoff)*, 773 F.3d 411, 418-23 (2d Cir. 2014).

Insofar as Groupement maintained "direct customer accounts with BLMIS," it held securities

contracts with BLMIS.  Cioffi Ex. 5, Initial Compl. ¶ 2 n.2.  Thus, the Initial Transfers easily

satisfy this "low bar."  *Ida Fishman*, 773 F.3d at 422.

Additionally, the Initial Transfers were made in connection with independent securities

contracts, including:  (i) the subscription agreement and associated redemption requests between

Groupement and Natixis FP and Bloom, *see* Cioffi Ex. 18, 10-05353 Action (June 27, 2015),

ECF Doc. No. 102 ("Proffer") ¶ 73, and (ii) the "November 5, 2003 Master Agreement," Compl.

¶ 65, which the Trustee alleges governed the Groupement Swap.  The definition of "securities

contract" includes "a contract for the purchase, sale, or loan of a security" or "any other

agreement or transaction that is similar" to such an agreement.  11 U.S.C. § 741(7)(A)(i)(vii);

*Cohmad*, 2013 U.S. Dist. LEXIS 56042, at *44-45 ("[T]he definition of a securities contract . . .

includes . . . investment fund subscription agreements and redemption requests . . . and total

return swaps coupled with a securities sale transaction."); *Picard v. Multi-Strategy*, No. 22-

06502, 2022 U.S. Dist. LEXIS 200858, at *24-28 (S.D.N.Y. Nov. 3, 2022) (Rakoff, J.)

(concluding subsequent transferees can invoke Section 546(e) by showing that initial transfers

were made in connection with securities contracts between themselves and reference fund).

### ii.  The Initial Transfers Were Made By or To (or For the Benefit of) a Covered Entity

Defendants meet the "covered entity" requirement under Section 546(e) in at least three

independent ways.  *First*, the Second Circuit already found that "[i]t is not disputed" that

BLMIS, which, of course, made the Initial Transfers, was a "stockbroker" for the purposes of

Section 546(e).  *Ida Fishman*, 773 F.3d at 417.  *Second*, as discussed, the Initial Transfers were

made for the benefit of Natixis FP and Bloom, both "financial participants."  *See supra* at 20-21.

*Third*, BLMIS made the Initial Transfers to a "financial institution" – namely,

Groupement – based on the Trustee's allegations.  A "financial institution" is not only "an entity

that is a commercial or savings bank," but also the customer of such a bank "when [the bank] is

acting as agent or custodian for a customer . . . in connection with a securities contract."

11 U.S.C. § 101(22)(A); *see In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 176 (2d Cir.

2021) (finding Computershare Trust Co., N.A. "was clearly acting on behalf of Tribune, which is

enough to satisfy § 546(e)."). The Trustee alleges that Groupement was a customer of certain

UBS entities (collectively, "UBS"), UBS is a commercial or savings bank,[23] and UBS acted as

Groupement's agent in connection with securities contracts with BLMIS.[24]

### iii.  Section 546(e) Does Not Contain a "Knowledge" Exception

Nothing in the language of Section 546(e) permits depriving an innocent subsequent

transferee who meets all of the requirements of the statute of its ability to invoke the safe

harbor.[25] Courts must adhere to "the plain meaning of the language" of the statute. *Merit Mgmt.*

*Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 897 (2018). The *only* exception to Section

546(e) is a claim under Section 548(a)(1)(A) which is inapplicable here. *See infra* at 25-27.

Where the Bankruptcy Code creates an exemption or safe harbor and specifies exceptions, a

court is not free to create additional exceptions, even when doing so is motivated by alleged

wrongdoing. *See Law v. Siegel*, 571 sU.S. 415, 424-25 (2014).

Even if the "securities contract" between BLMIS and Groupement was voidable because

of Groupement's purported knowledge about Madoff's fraud, that would not impact the separate

---

[23] *See* Cioffi Ex. 2, Groupement SAC ¶ 72 ("UBS SA served as Defendant Groupement Financier's prime bank"); *see also id.* ¶¶ 136, 168, 171.

[24] *See* Cioffi Ex. 2, Groupement SAC ¶ 323 (alleging "[t]he . . . UBS Defendants were . . . Groupement Financier's agents . . . ."); *id.* ¶ 136 (alleging that "UBSFSL served as Groupement Financier's . . . official administrator and was responsible for accounting functions, keeping register of shareholders, handling subscriptions and redemptions, communications with investors, and preparations of financial statements for the funds"); *see also id.* ¶¶ 135, 138.

[25] In *Ida Fishman*, the Second Circuit held that payments can qualify for safe harbor protection as having been made "in connection with" securities contracts notwithstanding that they were "'made in connection' with a Ponzi scheme." *Ida Fishman*, 773 F.3d at 422. Accordingly, the decision to the contrary in *Multi-Strategy* conflicts with applicable precedent. *See Multi-Strategy*, 2022 U.S. Dist. LEXIS 200858, at *19.

securities contracts between the Groupement and Defendants.[26]  As Judge Rakoff ruled in

*Cohmad*, even if the initial transferee knew BLMIS was a fraud and was not trading securities, if

the initial transferee withdrew funds from BLMIS to make a payment under a securities contract

between the initial transferee and the subsequent transferee, then the withdrawal from BLMIS

would be a transfer made in connection with the securities contract between the initial transferee

(Groupement) and the subsequent transferee (Defendants), and would not be avoidable.  *See*

*Cohmad*, 2013 U.S. Dist. LEXIS 56042, at *45; *see also Multi-Strategy*, 2022 U.S. Dist. LEXIS

200858, at *22 n.7 (finding initial transferee's alleged knowledge of Madoff fraud is irrelevant if

at-issue securities contract is between reference fund and subsequent transferee).

### C.  The Section 548(a)(1)(A) Exception to the Safe Harbors Does Not Apply

The safe harbors in Sections 546(g) and 546(e) do not apply to the Trustee's "actual

fraud" claims pursuant to Section 548(a)(1)(A), which allows the Trustee to avoid transfers made

"within 2 years before" the bankruptcy petition was filed if the debtor "made such transfer . . .

with actual intent to hinder, delay, or defraud . . . ."  11 U.S.C. § 548(a)(1)(A).  "'[A]ctual intent

to hinder, delay or defraud'. . . must be pled with specificity, as required by Fed. R. Civ. P. 9(b)."

*Sharp Int'l Corp. v. State St. Bank & Tr. Co.*, 403 F.3d 43, 56 (2d Cir. 2005) (citation omitted).

As an initial matter, the Section 548(a)(1)(A) exception cannot apply to the Six-Year

Bloom Redemptions, totaling $61 million, as these transfers are necessarily tied to *initial*

transfers that were made outside the two-year statutory period.  *See* Compl. Ex. C.  Accordingly,

because the elements of Sections 546(g) and 546(e) are satisfied, at a minimum the Court should

dismiss the Trustee's claim to recover the Six-Year Bloom Redemptions.

---

[26] Likewise, Groupement's purported knowledge about Madoff's fraud would not affect the securities contract between Natixis FP and GFLL, *i.e.*, the November 5, 2003 Master Agreement.

The Section 548(a)(1)(A) exception also does not apply to the Two-Year Bloom Redemptions and the Termination Transfer. Simply, the Complaint and the 97-page Groupement Second Amended Complaint are devoid of *any specific* allegation regarding BLMIS's actual intent to hinder, delay, or defraud. Instead, the Trustee appears to rely on the "Ponzi scheme presumption," a judicially-created shortcut that is not settled law and "presume[s] that transfers from a debtor in furtherance of a Ponzi scheme are made with fraudulent intent rather than to satisfy an antecedent debt." *Citibank*, 12 F.4th at 201 (Menashi J., concurring); *see In re Unified Com. Cap., Inc.*, 260 B.R. 343, 350 (Bankr. W.D.N.Y. 2001); *Finn v. Alliance Bank*, 860 N.W.2d 638, 647 (Minn. 2015). The Second Circuit has not definitively spoken on the presumption, applying it only where it is uncontested. *See e.g.*, *Citibank*, 12 F.4th at 181, n.7.

In *Citibank*, Judge Menashi explained that the "Ponzi scheme presumption" presents a "questionable" application of fraudulent transfer statutes for several reasons. *Id.* at 202. *First*, it "uses fraudulent transfer law rather than the law relating to preferences to promote an equal distribution among creditors." *Id.* at 202. Some courts have rejected the presumption on this basis. *Id.* at 201; *see also Unified*, 260 B.R. at 350. In the case of BLMIS, the presumption would essentially permit – subject to other defenses – the clawback of all property transferred from BLMIS within two years before the bankruptcy filing, effectively expanding the preference period by 21 months (*i.e.*, from 90 days to two years).

*Second*, Section 548(a)(1)(A) necessitates an "asset-by-asset and transfer-by-transfer" inquiry, which "requires a creditor to prove the elements of a fraudulent transfer with respect to each transfer, rather than relying on a presumption related to the form or structure of the entity making the transfer." *Finn*, 860 N.W.2d at 647; *see also Stoebner v. Opportunity Fin., LLC*, 909 F.3d 219, 226 (8th Cir. 2018). Thus, the Ponzi scheme presumption would permit the Trustee to

avoid entirely this "transfer-by-transfer" inquiry, which, given his failure to identify the relevant initial transfers, he clearly would not be able to satisfy.

*Last*, the Ponzi scheme presumption abrogates Rule 9(b)'s requirement that actual intent to hinder, delay, or defraud be pled "with particularity." Fed. R. Civ. P. 9(b); *see Sharp*, 403 F.3d at 56. A judicially created exception to the Federal Rules runs counter to Congress' intent. *Finn*, 860 N.W.2d at 647 (concluding "there is no statutory justification for relieving the Receiver of its burden of proving—or for preventing the transferee from attempting to disprove—fraudulent intent" under the "Ponzi-scheme presumption" and that a creditor must "prove the elements of a fraudulent transfer with respect to each transfer"); *see also Unified*, 260 B.R. at 350 (cited approvingly in *Citibank*, 12 F.4th at 202 (Menashi, J. concurring)).

## III.    LACHES BARS THE RECOVERY OF THE TERMINATION TRANSFER

"A complaint may be dismissed under Rule 12(b)(6) because it is barred . . . on the basis of laches." *In re Lehman Bros. Hldgs. Inc.*, 617 B.R. 231, 239 (Bankr. S.D.N.Y. 2020), *aff'd*, 2021 U.S. App. LEXIS 27241 (2d Cir. Sept. 10, 2021). A defendant asserting a laches defense must (i) show that "the plaintiff has inexcusably slept on its rights so as to make a decree against the defendant unfair," *id.* at 246 (citations and quotation marks omitted), and (ii) make "[s]ome showing of prejudice by the defendant," although "the longer the delay the less need there is to search for specific prejudice and the greater the shift to plaintiff of the task of demonstrating lack of prejudice." *Erickson v. United States*, 1 Cl. Ct. 163, 169 (Ct. Cl. 1983). These elements "are integrally related and must be weighed together." *In re Lehman Bros.*, 617 B.R. at 246; *see also In re Nw. Bay, Ltd.*, No. 19-10615, 2021 Bankr. LEXIS 1123, at *20 (Bankr. N.D.N.Y. Apr. 27, 2021) ("While a time delay alone will not determine if laches applies, the longer the duration between the ability to pursue an action and when that action is finally taken is a primary factor."). Importantly, laches may be raised even if the Trustee's claim was made within the

relevant statute of limitations.  *See, e.g.*, *Innovation Ventures, Ltd. Liab. Co. v. Custom Nutrition Labs, Ltd. Liab. Co.*, 912 F.3d 316, 343 (6th Cir. 2018) ("Defendants' laches defense is [] not necessarily barred merely because the case was brought within the statute of limitations.").[27]

*First*, the Trustee's over 12-year delay in bringing the Termination Transfer claim is "manifestly unreasonable."  *Jeffries v. Chi. Transit Auth.*, 770 F.2d 676, 680 (7th Cir. 1985), *cert. denied* 475 U.S. 1050 (1986).  The Trustee has had access to BLMIS's books and records for over 14 years, *see, e.g.*, Trustee's First Interim Report ¶¶ 107-09, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. July 9, 2009), ECF No. 314, and, for nearly that long, the Trustee has had access to over 4.5 million documents concerning Groupement and its related entities.  *See supra* at 4.  As such, the Trustee certainly "cannot claim surprise to excuse [his] lack of diligence." *H2O v. Town Bd. of the Town of E. Hampton*, No. 15-2349, 2015 U.S. Dist. LEXIS 160413, at *46 (E.D.N.Y. Oct. 15, 2015).

Yet, despite having filed multiple pleadings against Natixis FP since 2010 – including the Initial Complaint and the Proposed Amended Complaint – the Trustee has never even pled the occurrence of the Termination Transfer, let alone sought to recover it (nor did he ever mention it over the course of the last 18 months of meet-and-confers with Natixis FP preceding the filing of this motion).  Similarly, the Trustee has never named GFLL as a defendant in any action or sought to claw back (or even pled the existence of) the purported transfer GFLL received from Groupement that was allegedly used to fund the Termination Transfer – in other words, the

---

[27] *See also, e.g.*, *In re Decker*, No. 10-80029, 2011 Bankr. LEXIS 2143, at *5, *9, *18 (Bankr. N.D.N.Y. June 1, 2011) (barring trustee, based on laches, from pursuing February 2009 transfer as part of avoidance claim brought in June 2010, which was within two-year limitations period from transfer date); *Watson v. Mayo*, 2008 U.S. Dist. LEXIS 18444, at *22-23 (S.D.N.Y. Feb. 26, 2008) (ruling that laches barred 42 U.S.C.S. § 1983 claim for damages, even though claim was filed within limitations period, "since courts retain inherent authority to regulate their own docket"); *Teamsters & Emplrs. Welfare Tr. v. Gorman Bros. Ready Mix*, 283 F.3d 877, 881 (7th Cir. 2002) (Posner, J.) ("[J]ust as various tolling doctrines can be used to lengthen the period for suit specified in a statute of limitations, so laches can be used to contract it.").

Trustee is not pursuing (and has never pursued), from any defendant, the "first" subsequent transfer, which allegedly flowed from Groupement to GFLL, and which in turn allegedly funded the "second" subsequent transfer from GFLL to Natixis FP.  *See supra* at 7.  Failure to notify Defendants of a claim of this size (which is nearly twice the amount of all the other Groupement-related transfers combined that the Trustee seeks here), over the course of nearly 13 years of litigation, clearly constitutes unexcused delay.  As the Trustee "could have acted at any of a number of points in the history of these cases" to seek recovery of the Termination Transfer from Natixis FP or from GFLL, but chose not to, the Trustee "unreasonably and inexcusably slept on his rights."  *Picard v. Schneiderman (In re Madoff)*, 491 B.R. 27, 34-35 (S.D.N.Y. 2013).

*Second*, where, as here, "the delay is lengthy, prejudice is more likely to have occurred and less proof of prejudice is required."  *In re Dini*, 566 B.R. 220, 227 (Bankr. N.D. Ill. Apr. 6, 2017).[28]  Nevertheless, to the extent that any prejudice needs to be demonstrated, Defendants are materially prejudiced by, among other things, "expos[ure] to prolonged uncertainty about [their] legal rights and unlimited exposure to legal obligations."  *Id.* at 231; *accord In re Nw. Bay*, 2021 Bankr. LEXIS 1123, at *21.  After keeping Defendants in the dark for over 12 years, the Trustee surprised Defendants in the Complaint by seeking to recover a $153 million transfer from 2008 – comprising ***approximately two-thirds*** of the total amount of transfers now at issue.[29]  *Cf.*

---

[28] *See also, e.g.*, *Liman v. India Supply Mission*, 381 F. Supp. 368, 370-71 (S.D.N.Y. 1974) (finding "some prejudice [was] evident and [was], indeed, almost inevitable given the length of the delay" of nine years); *Soot v. General Electric Co.*, 681 F. Supp. 157, 163 (S.D.N.Y. 1987) ("[T]he longer the delay, the less need there is to show specific prejudice."); *Jeffries*, 770 F.2d at 680 ("The longer the delay, the less prejudice defendant must establish."); *Soot*, 681 F. Supp. at 163 (noting it is "well settled that a delay in bringing suit of six or more years creates a presumption both that the delay was unreasonable and that the defendant has suffered prejudice").

[29] In fact, even after this revelation, Defendants still have no certainty as to their legal exposure.  As in other adversary proceedings, the Trustee is seeking to recover prejudgment interest here; and, although Defendants dispute the availability of such relief (notably, the Trustee is silent as to the interest rate he would seek to apply), the possibility of Defendants also being liable for tens of millions of dollars of interest, based on this previously unaccounted for $153 million claim, is exactly the type of "unlimited exposure" and "uncertainty" against which the doctrine of laches seeks to protect.  *In re Dini*, 566 B.R. at 232; *In re Nw. Bay*, 2021 Bankr. LEXIS 1123, at *21.

*Guenther v. Sedco, Inc.*, No. 93-4143, 1998 U.S. Dist. LEXIS 19901, at *12 (S.D.N.Y. Dec. 21,

1998) (granting motion to dismiss based on laches as to claims for which "amount of money now

sought by plaintiffs . . . has increased significantly when compared to what might have been

recovered had plaintiffs brought this claim earlier").

Moreover, as the litigation develops, having to defend against a $153 million claim that

the Trustee never before mentioned will prejudice Defendants due to unavailable witnesses,

"'faded memories, . . . and hearsay testimony of questionable value.'"  *Zuckerman v. Metro.*

*Museum of Art*, 928 F.3d 186, 194 (2d Cir. 2019) (quotation marks and citation omitted); *see*

*also Liman*, 381 F. Supp. at 370-71 (justifying laches where "defendant[s] may be deprived of as

wide pre-trial discovery as might otherwise be available").  Separately, Defendants will suffer

prejudice from additional litigation costs based on the need to sift through and review documents

related to this late-added claim.  *See, e.g.*, *In re Lehman Bros.*, 617 B.R. at 248.

Accordingly, Count I of the Complaint, relating to the Termination Transfer, should be

dismissed on the basis of laches.

## IV.    THE COURT LACKS PERSONAL JURISDICTION OVER BLOOM

The Trustee "must make a prima facie showing that jurisdiction exists" over Bloom,

consistent with due process, *SPV OSUS, Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018),

which requires showing "non-conclusory fact-specific allegations or evidence showing that

activity that constitutes the basis of jurisdiction has taken place," *Chirag v. MT Marida*

*Marguerite Schiffahrts*, 604 F. App'x 16, 19 (2d Cir. 2015).

### A.  Bloom is Not Subject to General Jurisdiction in this Court

To establish general jurisdiction, the Trustee must show that Bloom is "at home" in the

forum state.  *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).  Generally, this requires that the

defendant be incorporated or have its principal place of business in the forum state.  *See id.*

Here, the Trustee does not allege any facts that would support exercising general jurisdiction over Bloom.  *See generally* Compl.

### B.  Bloom is Not Subject to Specific Jurisdiction in this Court

To establish specific jurisdiction, the Trustee must assert: (i) the claim against Bloom arises out of or relates to Bloom's "minimum contacts" with the forum and (ii) the "exercise of jurisdiction is reasonable in the circumstances." *SPV OSUS*, 882 F.3d at 343 (quotation marks and citation omitted).  Such contacts "must create a substantial connection with the forum State," and must also "arise out of contacts that the 'defendant *himself*' creates with the forum." *Walden v. Fiore*, 571 U.S. 277, 284 (2014).  "Non-fact specific" and conclusory allegations may "not establish a prima facie showing of jurisdiction" over Bloom.  *DeLorenzo v. Viceroy Hotel Grp., LLC*, 757 F. App'x 6, 8 (2d Cir. 2018).

The Trustee's half-hearted attempt to establish specific jurisdiction over Bloom fails on the pleadings.  *First*, the Trustee pleads several non-particularized, conclusory and boilerplate allegations that should be disregarded.  *See* Compl. ¶ 14 (alleging that Bloom "regularly conducted business in New York," "purposely availed itself" of New York's laws, "undert[ook] significant commercial activities" in New York, and "derived significant revenue" from New York); *id.* ¶ 16 (alleging that "Defendants maintained minimum contacts" with the forum); *Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."); *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998) ("[W]e are not bound to accept as true a legal conclusion couched as a factual allegation.") (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

*Second*, the Trustee must allege contacts between Bloom and the foreign state, but instead he improperly relies on the purported contacts of third parties.  *See Walden*, 571 U.S. at 284.  He alleges that Bloom "was operated and managed, in relevant part" by New York-based

employees of affiliates, that it "paid fees to New York-based Natixis Securities North America" in connection with its Groupement investments, and that the "purpose" of Bloom's investments in Groupement was to enable Natixis FP to transact business in New York. Compl. ¶ 15. The Trustee's claims to recover the specific Alleged Subsequent Transfers at issue do not arise from or relate to these allegations. *See SPV OSUS*, 882 F.3d at 344. Moreover, sending payments into New York does not "project" a foreign defendant into New York. *Hau Yin To v. HSBC Hldgs. PLC*, No. 15-3590, 2017 U.S. Dist. LEXIS 28931, at *14-15 (S.D.N.Y. Mar. 1, 2017). Finally, these allegations are also vague and lack specificity. *See Fagan v. Republic of Austria*, No. 08-6715, 2011 U.S. Dist. LEXIS 32058, at *46-47, *55 (S.D.N.Y. Mar. 25, 2011) (allegations that defendants had "offices and/or agents through which [they] advertise[d] and/or conduct[ed] business" and that they "market[ed] and promot[ed]" products and services in the forum did not support jurisdiction in absence of "factual proffers more specific than these").

*Third*, the Trustee's allegations that "[a]ny return" on Bloom's investments in BVI-based Groupement would ultimately be traced to BLMIS and that Defendants' contacts were "in connection with" transactions that were "ultimately predicated" on investments in an entity "***Defendants knew***" to be "based in New York" do not suffice. Compl. ¶¶ 15-16 (emphasis added). These allegations improperly rely on group pleading and also are not well-pled and thus should not be given any weight. *See In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 233 (S.D.N.Y. 2019) ("Allegations in the form of a group pleading are insufficient, even for affiliated corporate entities."). In fact, the Complaint lacks a single specific allegation – conclusory or otherwise – that *Bloom* knew or intended its investments would end up at BLMIS. In addition, these allegations conflate Groupement's actions with those of Bloom, *see Walden*, 571 U.S. at 284, and amount to no more than a variation of the "stream of commerce" theory of personal

32

jurisdiction that has been rejected by the Supreme Court. *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882 (2011) (plurality opinion) ("[I]t is not enough that [a] defendant might have predicted that its goods will reach the forum.").

*Last*, exercising jurisdiction over Bloom would not be consistent with due process. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Here, the Trustee has alleged only "attenuated and weak contacts" between the United States and Bloom that "would demand a strong showing of reasonableness." *Picard v. Hebrew Univ. of Jerusalem (In re Madoff)*, No. 21-01190, 2023 Bankr. LEXIS 770, at *28 (Bankr. S.D.N.Y. Mar. 28, 2023) (Morris, J.); *see In re CIL Ltd.*, 582 B.R. 46, 79 (Bankr. S.D.N.Y. 2018). Such a showing has not been made.

## V.   AVOIDABILITY OF THE INITIAL TRANSFERS IS INSUFFIENTLY PLED

To prevail under Section 550(a), the Trustee must show "that the transfer was avoided, and that the defendant is an initial or subsequent transferee." *Picard v. Citibank, N.A.*, 12 F.4th 171, 197 (2d Cir. 2021). Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although "[a] statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading," Fed. R. Civ. P. 10(c), the rules do not authorize the wholesale incorporation by reference of hundreds of allegations in a pleading. *See NCUA Bd. v. Morgan Stanley & Co.*, No. 13-6705, 2014 U.S. Dist. LEXIS 58751, at *28 (S.D.N.Y. Apr. 28, 2014).[30]

Here, rather than allege facts showing that the Initial Transfers were avoided, the Trustee conclusorily states that the initial transfers from BLMIS to Groupement are "avoidable," and that

---

[30] *See also In re Abernathy*, Nos. 17-55926, 17-5170, 2019 Bankr. LEXIS 1004, at *22 n.6 (Bankr. N.D. Ga. Apr. 1, 2019) (finding it improper to incorporate filings made in related adversary proceeding, in part, because "only pleadings *in the same action* can be adopted by reference") (emphasis added).

he commenced the *Groupement* Action seeking to avoid and recover initial transfers of BLMIS

customer property from Groupement and other defendants. *See* Compl. ¶¶ 3, 72-74, 76. The

Trustee then purports to adopt by reference hundreds of allegations in the complaint filed there.

*See id.* ¶ 75 ("The Trustee incorporates by reference the allegations contained in paragraphs 1-

17, 68-340 and 356-392 of the [*Groupement* Action] Complaint as if fully set forth herein.").

The Complaint thus makes only conclusory assertions that BLMIS made "avoidable" transfers to

Groupement. *See, e.g.*, Compl. ¶¶ 72-73. The Trustee's "[t]hreadbare recitals of the elements of

a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009). If Defendants were required to respond to these hundreds of

allegations, they would be left responding to allegations outside their knowledge and well

beyond the relevant period at issue in the Complaint. This is precisely "the kind of incorporation

that fails to give the requisite 'guidance to the responding party.'" *Nycomed US, Inc. v.*

*Glenmark Generics, Ltd.*, No. 08-5023, 2010 U.S. Dist. LEXIS 29267, at *13 (E.D.N.Y. Mar.

26, 2010) (citation omitted).

## VI.    THE COMPLAINT FAILS TO PLAUSIBLY ALLEGE THAT THE ALLEGED SUBSEQUENT TRANSFERS WERE COMPRISED OF BLMIS FUNDS

Under Section 550(a)(2), the Trustee may recover from a subsequent transferee only the

property or value of the property that was transferred in the initial transfer. *See In re Generation*

*Res. Holding Co.*, 964 F.3d 958, 966 (10th Cir. 2020). Thus, the Trustee "has the burden of

tracing funds he claims to be property of the estate." *In re Allou Distribs., Inc.*, 379 B.R. 5, 30

(Bankr. E.D.N.Y. 2007) (citation omitted); *see also In re Forbes*, 372 B.R. 321, 334 (B.A.P. 6th

Cir. 2007). The Trustee must also allege facts that support the inference that the funds at issue

originated with BLMIS, and contain the "necessary vital statistics" – the "who, when, and how

much" of the transfers – to establish that an entity was a subsequent transferee of the funds.

*Picard v. Shapiro (In re Madoff)*, 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015) (Bernstein, J.)

(dismissing claim because complaint did not "tie any initial transfer to any subsequent transfer or

[s]ubsequent [t]ransferee"); *In re Caremerica, Inc.*, 409 B.R. 737, 750-51 (Bankr. E.D.N.C.

2009) (dismissing preference claim because allegations failed to tie transfers into and out of

account to amounts received by supposed transferees).

### A.  The Trustee Fails to Tie the Initial Transfers to the Subsequent Transfers

Approximately 14 years ago, the Trustee obtained voluminous Rule 2004 discovery from

the defendants in the *Groupement* Action, totaling over 4.5 million documents, which should

have enabled him to adequately allege details of the subsequent transfers.  *See supra* at 4.

Although the Complaint attaches exhibits that list purported BLMIS-to-Groupement Initial

Transfers and Alleged Subsequent Transfers to Natixis FP and Bloom, it does not specify which,

if any, of the Initial Transfers included the BLMIS funds that the Trustee alleges Groupement

subsequently transferred to Defendants, let alone how those transfers are tied.  *See* Compl., Exs.

B-D.  The Complaint thus should be dismissed because it fails to make the connections required

to "tie any initial transfer to any subsequent transfer or [s]ubsequent [t]ransferee."  *Shapiro*, 542

B.R. at 119.

### B.  The Allegations Regarding the Termination Transfer are Devoid of Details

Count I seeks to recover the Termination Transfer from Natixis FP as a purported

mediate transferee.  Not only does the Trustee fail to identify the specific Initial Transfer from

BLMIS to Groupement related to the Termination Transfer, he fails to allege that Groupement

actually transferred BLMIS funds to GFLL.  The Trustee merely alleges that "GFLL . . .

redeemed Groupement shares in order to pay" Natixis FP such transfer.  Compl. ¶ 69; *see also id.*

¶ 79 (similar).  The Complaint mentions no factual details regarding this purported redemption,

such as the date the redemption occurred, or the specific amount redeemed.  Nor does the Trustee

refer to any transaction documents, such as a redemption request.  Because the Trustee fails to

adequately allege that GFLL received redemptions from Groupement – not to mention that those

purported redemptions were comprised of BLMIS funds – the Trustee fails to sufficiently allege

that the Termination Transfer to Natixis FP was comprised of BLMIS funds.

## VII.    THE COMPLAINT ESTABLISHES THAT DEFENDANTS ARE ENTITLED TO THE GOOD FAITH DEFENSE

A trustee may not recover from a subsequent transferee who took "for value, including

satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of

the voidability of the transfer avoided."  11 U.S.C. § 550(b).  The pleadings here demonstrate

that Natixis FP and Bloom took for value, in good faith, and without knowledge of the

voidability of the transfers.  In sum, there is no plausible reason for Defendants to invest in

Groupement over $150 million of their own money, if they had any reason to believe that

Groupement was investing in a Ponzi scheme.  In fact, Defendants, together with their affiliates,

had exposure to BLMIS approaching $800 million or more, *see* Cioffi Ex. 5, Initial Compl. ¶ 18,

and lost hundreds of millions across all of their Madoff-related investments.  Defendants are thus

entitled to the good faith defense with respect to all claims.

### A.  The Alleged Subsequent Transfers Were Received For Value

The value that a subsequent transferee must provide is merely consideration "sufficient to

support a simple contract, analogous to the 'value' required under state law to achieve the status

of a bona fide purchaser for value."  *Picard v. Fairfield Inv. Fund Ltd. (In re Madoff)*, No. 09-

01239, 2021 Bankr. LEXIS 2101, at *23 (Bankr. S.D.N.Y. Aug. 6, 2021) (Morris, J.) (quotation

marks and citation omitted).  Here, the Complaint clearly shows the Bloom Redemptions were in

exchange for "[s]urrendering equity interests" which "constitutes value for purposes of section

550(b)."  *Picard v. ABN Amro Bank N.A. (In re Madoff)*, No. 10-05354, 2020 Bankr. LEXIS

913, at *25 (Bankr. S.D.N.Y. Mar. 31, 2020) (Bernstein, J.); *see also Fairfield Sentry Ltd. (In Liquidation) v. Migani*, [2014] UKPC 9.  The Trustee also concedes that Natixis FP gave value for the Termination Transfer, which GFLL allegedly made "to pay back to Natixis FP the 'implied loan' that it had received pursuant to the Groupement Swap."  Compl. ¶ 69; *Fairfield Inv. Fund*, 2021 Bankr. LEXIS 2101, at *23.  Further, as explained below, the Trustee's allegations support the conclusion that, at the time of the alleged transfers, Defendants did not know "that the redemption prices were based on fictitious assets."  *See Picard v. Banque SYZ & Co. (In re Madoff)*, No. 11-02149, 2022 Bankr. LEXIS 1678, at * 28 (Bankr. S.D.N.Y. Jun. 14, 2022) (Morris, J.) (quotation marks and citation omitted).

### B.  Natixis FP and Bloom Received the Redemptions in Good Faith

"Good faith" in the context of fraudulent transfers under the Bankruptcy Code "embraces an inquiry notice standard."  *Citibank, N.A.*, 12 F.4th at 188.  Whether a defendant was on inquiry notice of fraud involves a three-step inquiry:  *First*, a court must examine what facts the defendant knew, a subjective inquiry.  *Second*, a court must determine whether these facts put the transferee on inquiry notice of the fraudulent purpose behind a transaction—that is, whether the facts the transferee knew would have led a reasonable person in the transferee's position to conduct further inquiry into a debtor-transferor's possible fraud.  *Third*, a court must ascertain whether diligent inquiry by the transferee would have discovered the fraudulent purpose of the transfer.  *Id.* at 191-92.  An objective "reasonable person" standard applies in the second and third steps.  *Id.* at 192.

### i. The facts alleged in the Complaint to be available to Natixis FP and Bloom were not sufficient to put them on inquiry notice

To support a claim that a defendant was on inquiry notice, the plaintiff must allege that the defendant at least had actual knowledge of "red flags" that it translated into a suspicion of fraud. *Anwar v. Fairfield Greenwich Ltd.*, 286 F.R.D. 258, 260 (S.D.N.Y. 2012).

Here, the Complaint does not make a single specific allegation about either Defendant's actual knowledge at the time of the alleged transfers. In fact, the Trustee's allegations are inconsistent with the notion that Defendants reasonably suspected that BLMIS was a Ponzi scheme. By entering into the Groupement Swap, Defendants set themselves up to *lose* money if the reference fund *rose* and to *make* money if the reference fund *fell*. *See supra* at 5. To hedge the risk that the reference fund would rise, Defendants purchased shares of Groupement. *Id.* If Defendants suspected BLMIS was a Ponzi scheme, the economically rational course of action would be not to purchase shares and simply collect the fees when the shares became worthless and the value of the Groupement reference fund fell. *In re Dreier LLP*, 453 B.R. 499 (Bankr. S.D.N.Y. 2011) is instructive on this point. Applying the inquiry notice standard, the Court held that it was facially implausible that the defendant bank would have knowingly chosen to facilitate the fraudulent scheme just to earn fees, and while it may not have accurately assessed Dreier as a credit risk, this did not amount to inquiry notice such that it could not satisfy the good faith test. *Id.* at 514. As in *Dreier*, it is facially implausible that Defendants suspected BLMIS was a Ponzi scheme, yet would *knowingly* choose to expose their own money to the scheme.

Although the Trustee describes several hindsight indicators suggesting that BLMIS was engaged in fraud, *see* Compl. ¶¶ 48-51, 53-57, the Trustee does not suggest that Defendants were aware of any of these facts or that they support an inference that Defendants were on inquiry notice of BLMIS's fraud. *See Anwar*, 286 F.R.D. at 260; *see also Citibank*, 12 F.4th at 191.

Even if the Trustee did argue that Defendants were aware of those red flags, this Court has

previously held that "red flag" allegations do not support an inference that defendants believed

BLMIS was not actually trading securities.  *See BNP Paribas*, 594 B.R. at 199; *Saltz v. First*

*Frontier, LP*, 782 F. Supp. 2d 61, 72 (S.D.N.Y. 2010), *aff'd*, 485 F. App'x 461 (2d Cir. 2012).

### ii.  The Trustee pled that Defendants conducted due diligence far exceeding a reasonably diligent inquiry

Even if Defendants were on notice that something was amiss at BLMIS (which they were

not), the Trustee will not be able to satisfy the third element – that "diligent inquiry" by

Defendants would have led them to "discover[] the fraudulent purpose of the transfer[s]" –

because here, as the Trustee himself has alleged, Defendants did conduct a diligent inquiry, and

they did not discover the fraud.  *Citibank*, 12 F.4th at 192 (quotation marks and citation omitted).

The Trustee represented repeatedly that Defendants conducted far beyond a "reasonably

diligent investigation," *id.*; *see, e.g.*, Cioffi Ex. 18, Proffer ¶ 72 ("Natixis FP conducted diligence

on Bloom's behalf in connection with the Groupement investment" and "prepared a

memorandum summarizing 'a due diligence meeting'" with another feeder fund); Trustee's

Supp. Opp. on Extraterritoriality at 14, 10-05353 Action (June 27, 2015), ECF No. 101 (referring

to due diligence "investigations" on BLMIS as "significant business"),[31] and yet the Trustee has

never alleged that Defendants uncovered the fraud.

While the Trustee should not be permitted to incorporate by reference the entire

Groupement Second Amended Complaint, *see supra* at Section V, his allegations there

underscore that any further inquiry would have been futile.  He alleges Madoff was highly

---

[31] *See also*, *e.g.*, *id.* ("Natixis FP conduct[ed] due diligence" on BLMIS and a feeder fund); *id.* at 5-6 (discussing Defendants and their affiliates' "due diligence efforts"); Cioffi Ex. 5, Initial Compl. ¶ 110 ("'due diligence' meeting" occurred "between [then-head of the Natixis Structured Fund Products Group in New York] and Madoff"); Cioffi Ex. 18, Proffer ¶ 85 (Natixis FP drafted "due diligence memoranda" regarding Alpha Prime); *id.* ¶¶ 74-75 (Natixis FP received BLMIS agreements and offering memoranda).

secretive and that "UBS [] complied with Madoff's demand for secrecy," that "the Access

Defendants shielded Madoff and BLMIS from scrutiny," and that "Littaye actively impeded any

inquiry into [] signs of fraud by quashing or deflecting questions and by purposely omitting the

names 'BLMIS' and 'Madoff' from prospectuses and regulatory filings." Cioffi Ex. 2,

Groupement SAC ¶¶ 9, 11, 280; *see id.* ¶¶ 227, 276-77.  He asserts that Groupement

intentionally violated the law and misled regulators by concealing the delegation of their duties

to BLMIS, that Access knowingly made misrepresentations about Groupement in violation of

applicable regulations, and that "Littaye suppressed Access's concerns regarding Madoff's

suspected market-timing edge." *Id.* ¶¶ 180-209, 210-14, 248.

The Complaint and Groupement Second Amended Complaint assert that BLMIS filed

fraudulent SEC financial reports, "omit[ing] . . . billions of dollars of customer funds BLMIS

managed through its IA Business." *Id.* ¶¶ 40-41; Compl. ¶¶ 33-34.  The Trustee also alleges that

Madoff "evade[d]" SEC reporting requirements.  Cioffi Ex. 2, Groupement SAC ¶ 307.  The

Second Circuit has recognized that the Madoff Ponzi scheme was "a fraud of 'unparalleled

magnitude.'" *Fairfield Greenwich Ltd.*, 2021 Bankr. LEXIS 2101, at *3 (citation omitted).  At

bottom, that Defendants could have discovered this highly secretive, longstanding Ponzi scheme

while thousands of other market participants and the SEC did not is simply implausible.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court dismiss the

Complaint with prejudice.

Dated:  May 22, 2023
     New York, New York         **DAVIS+GILBERT LLP**

By: */s/ Joseph Cioffi*
    Joseph Cioffi
    H. Seiji Newman
    Bruce M. Ginsberg
    Adam M. Levy
    Christine DeVito
    1675 Broadway
    New York, NY 10019
    T: (212) 468-4800
    jcioffi@dglaw.com
    bginsberg@dglaw.com
    hsnewman@dglaw.com
    alevy@dglaw.com
    cdevito@dglaw.com

*Attorneys for Defendants Natixis Financial Products
LLC (as successor in interest to Natixis Financial
Products Inc.) and Bloom Asset Holdings Fund*