# EXHIBIT 4

| | |
|---|---|
| KATTEN MUCHIN ROSENMAN LLP<br>50 Rockefeller Plaza<br>New York, New York 10020<br>(212) 940-8800<br><br>*Attorneys for Defendants*<br>*Access International Advisors LLC,*<br>*Access International Advisors Ltd.,*<br>*Access Management Luxembourg SA,*<br>*Access Partners SA, Patrick Littaye,*<br>*Claudine Magon de la Villehuchet, and*<br>*GroupementFinancier Ltd.* | **Hearing Date**: September 14, 2022 at 10:00 a.m. (ET)<br>**Opposition Date**: June 17, 2022<br>**Reply Date**: July 29, 2022 |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>    Plaintiff-Applicant,<br><br>    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>    Defendant. | **Adv. Pro. No. 08-01789 (CGM)**<br><br>**SIPA Liquidation**<br><br>**(Substantively Consolidated)** |
| In re:<br><br>BERNARD L. MADOFF,<br><br>    Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>UBS AG, UBS EUROPE SE (f/k/a UBS (LUXEMBOURG) SA), UBS FUND SERVICES (LUXEMBOURG) SA, UBS THIRD PARTY MANAGEMENT COMPANY SA, ACCESS INTERNATIONAL ADVISORS LLC, ACCESS INTERNATIONAL ADVISORS LTD., ACCESS MANAGEMENT LUXEMBOURG SA (f/k/a ACCESS INTERNATIONAL ADVISORS | **Adv. Pro. No. 10-04285 (CGM)** |

> (LUXEMBOURG) SA) as represented by its Liquidator MAÎTRE FERNAND ENTRINGER, ACCESS PARTNERS SA as represented by its Liquidator MAÎTRE FERNAND ENTRINGER, PATRICK LITTAYE, CLAUDINE MAGON DE LA VILLEHUCHET (a/k/a CLAUDINE DE LA VILLEHUCHET) in her capacity as Executrix under the Will of THIERRY MAGON DE LA VILLEHUCHET (a/k/a RENE THIERRY DE LA VILLEHUCHET), CLAUDINE MAGON DE LA VILLEHUCHET (a/k/a CLAUDINE DE LA VILLEHUCHET) individually as the sole beneficiary under the Will of THIERRY MAGON DE LA VILLEHUCHET (a/k/a RENE THIERRY DE LA VILLEHUCHET), PIERRE DELANDMETER, THEODORE DUMBAULD, LUXALPHA SICAV as represented by its Liquidators MAÎTRE ALAIN RUKAVINA and PAUL LAPLUME, MAÎTRE ALAIN RUKAVINA AND PAUL LAPLUME, in their capacities as liquidators and representatives of LUXALPHA, GROUPEMENT FINANCIER LTD.,
>
> Defendants.

## DECLARATION OF PATRICK LITTAYE

1. I am submitting this declaration pursuant to 28 U.S.C. § 1746 in support of the Motion of Access International Advisors Ltd. ("**Access Ltd.**"), Access Management Luxembourg SA ("**AML**") (f/k/a Access International Advisors (Luxembourg) S.A. ("**AIA (Lux)**")), Access Partners SA ("**AP (Lux)**"), Patrick Littaye (Littaye, together with Access Ltd., AML, and AP Lux are collectively known as the "**Foreign Access Defendants**"), Claudine Magon de la Villehuchet ("**CDLV**"), Groupement Financier Ltd. ("**Groupement**"), and Access International Advisors LLC ("**Access LLC**, together with CDLV, Groupement and the Foreign Access Defendants, collectively the "**Access Defendants**") to Dismiss the Second Amended Complaint (the "**SAC**") filed in the adversary proceeding by Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities, LLC (the "**Trustee**"). The facts and

matters to which I declare are based on my personal knowledge and are true to the best of my belief.

2. I have reviewed the Trustee's allegations made in the SAC, and while I believe that many of such allegations are erroneous, I am submitting this declaration to outline the organization and business structure of various of the Foreign Access Defendants and demonstrate their lack of contacts with the United States as well as my own.

3. While I will not specifically respond the other numerous erroneous statements made in the SAC, I need to address the Trustee's overarching claims that I conspired in the Madoff fraud, knew of it, or otherwise benefited from it. Nothing could be further from the truth. Not only did I not know if Madoff's fraud, I like so many others, am a victim of Madoff and his scheme. I was personally invested in BLMIS and lost millions of dollars of my own money (*i.e.*, a net loser). The same is true of Thierry Magon de la Villehuchet ("Villehuchet"), who also lost millions of dollars as well. It is beyond comprehension that we could have known of Madoff's fraud, but nonetheless put our life savings at risk. It makes no sense.

**My Contact with the United States**

4. At all times relevant to this proceeding, I was a resident of either France or Belgium, and always a citizen of France.

5. I understand that the Trustee has alleged that Villehuchet and I directed the activity of all of the Access[1] entities out of New York. This is false.

6. Access's roles and functions were segmented, and divided between the United States on the one hand, and Europe on the other. The work Access did in connection with the

---

[1] Throughout the SAC the Trustee uses the terms "Access," "Access Defendants" and "Access entities" to identify the different Access-related defendants (as well as various non-parties) without any degree of specificity. The use of this term in no way indicates that these entities are not separate from each other.

2

Madoff-related funds, including administration of Groupement and Luxalpha SICAV ("**Luxalpha**") (collectively, the "Funds"), as well as non-party Groupement Financier Levered Ltd. ("**Groupement Levered**") (which, as the Trustee concedes, did not have an account with BLMIS), was carried out in Europe and/or the Bahamas, where all the substantive decisions were made and important functions were performed.

7. By contrast, Access's U.S. based entities, including Access LLC and non-party Access International Advisors Inc. ("**AIA Inc.**"), which were run by Villehuchet, had virtually no role in regard to BLMIS or Madoff. Those entities administered and serviced the other ten to fifteen funds with which Access was involved that had nothing to do with BLMIS.

8. I worked almost exclusively in Europe (primarily in Paris, London and Luxembourg), not in the United States. Indeed, I only visited the United States three to four times a year to attend meetings of some of the Access entities. Those meetings did not focus on BLMIS or Madoff-related funds, and instead addressed the business of Access globally. While at these meetings, no contracts were signed, and no business decisions were made relating to BLMIS or Madoff-related funds, and in particular, we never addressed redemptions from those funds nor supposed payments of fees from those redemptions. No decisions were made regarding the Access entities based outside of the United States, including the Foreign Access Defendants.

9. Similarly, the Trustee's allegation that I "visited with Madoff and Madoff's New York office quarterly" is wrong. While I did visit with Mr. Madoff periodically (less than quarterly), I did so in my capacity as an officer and director of the Foreign Access Defendants. Importantly, our conversations never addressed and had nothing to do with the alleged subsequent transfers made by the Foreign Access Defendants to me that the Trustee is seeking to recover in this case. Indeed, those meetings did not even address redemptions and often

3

amounted to nothing more than conversations on the US economy and financial markets generally.

10. I understand that the Trustee also alleges that all of the Access entities (including the Foreign Access Defendants) were part of a "single business enterprise." That is wrong. Each of the Access entities, including the Foreign Access Defendants, were independent, having separate corporate personalities and distinct functions. Moreover, the New York office occupied by Access LLC and non-party AIA Inc. was not set up to, and indeed could not, control or bind the various Access entities (especially the Foreign Access Defendants) or make substantive decisions on their behalf.

**Groupement Financier**

11. Groupement is an investment fund organized under the laws of the British Virgin Islands ("BVI"). (Ex. 1.)

12. Groupement maintained its bank accounts in Luxembourg with UBS (Luxembourg) S.A. (Ex. 2.)

13. I further note that Groupement is a "BLMIS" net loser feeder fund, with an approximate $135,913,654 deficiency.

**Luxalpha**

14. Upon information and belief, Luxalpha is an investment fund organized under the laws of Luxembourg. (Ex. 3.)

15. Custodial bank accounts were maintained on behalf of Luxalpha in Luxembourg with UBS (Luxembourg) S.A.

16. I note that Luxalpha is a "BLMIS" net loser feeder fund, with an approximate $747,572,669 deficiency.

4

**AP (Lux)**

17.  AP (Lux) is a société anonyme incorporated and organized under the laws of Luxembourg, with a registered office within that jurisdiction. (Ex. 4.)

18.  AP (Lux) served as Luxalpha's investment advisor from February 13, 2007 through its liquidation. (Exs. 5, 6.) AP (Lux) was also designated Groupement's investment advisor. (Ex. 7.)

19.  AP (Lux)'s duties as investment advisor for Luxalpha and Groupement are set forth in the Investment Advisory Agreements, which describe AP (Lux)'s role as verifying that the investment policy was effectively implemented through review of the trade tickets, and making "recommendations," as necessary, to Luxalpha and Groupement's management companies, UBSTPM and Access Ltd., respectively. (Exs. 5, 6, 7.) It could not, and indeed did not, make decisions on behalf of either of the Funds. (*Id.*) As demonstrated in the agreements, AP (Lux) had no due diligence or risk management obligations with respect to Luxalpha or Groupement. (*Id.*) Further, AP (Lux) could not and did not direct any investments into BLMIS by Luxalpha or Groupement.

20.  AP (Lux) had its own office and its own lease in Luxembourg, had its own contracts with service providers, and bore its own share of the group insurance premiums. It paid these expenses with its own funds.

21.  AP (Lux) had its own, distinct ownership structure, the details of which are set forth in the chart annexed hereto as Exhibit 8, and supported by Ex. 4.

22.  AP (Lux) had its own regularly constituted board of directors, the details of which are set forth in the chart annexed hereto as Exhibit 8, and supported by Exhibits 4; 9 and 10. The board conducted its business exclusively in Luxembourg, predominantly through resolutions

5

drafted and executed in Luxembourg. The board acted independently and did not hold "combined" meetings with the boards of any other entities.

23. AP (Lux) had an independent management team, consisting of Patrick Ferrand and me. (Exs. 11; 12.)

24. AP (Lux) maintained a separate bank account in its own name in Luxembourg, and kept separate financial books and records.

25. AP (Lux) never operated or conducted business in the United States and had no contracts with United States brokers. It did not maintain an office, bank account or phone listing in the United States. Furthermore, to the best of my knowledge, AP (Lux) never sent any correspondence to BLMIS.

26. AP (Lux) never had a BLMIS account or otherwise invested money with Madoff.

27. AP (Lux) was not financially dependent on any of the Foreign Access Defendants, Access LLC, or AIA Inc., because it earned its own fee revenue. (*See, e.g.* Exs. 5; 6; 7.)

**AML/AIA (Lux)**

28. AML (previously known as AIA (Lux)) is a société anonyme incorporated and organized under the laws of Luxembourg, with a registered office therein. (Exs. 13; 14.)

29. AIA (Lux) served as Luxalpha's portfolio advisor beginning February 5, 2004. (Ex. 15.) It served as Groupement's Investment Advisor beginning June 23, 2003. (*See* Ex. 16.)

30. AIA (Lux)'s duties as Luxalpha and Groupement's portfolio and investment advisor are set forth in the Advisory Agreements, which describes AIA (Lux)'s role as verifying that the investment policy was effectively implemented through review of the trade tickets, and "advising" or making "recommendations," as necessary, to Luxalpha's management company.

6

(*See* Exs. 15; 16 at p. 3.) It could not, and indeed did not, make decisions on behalf of the Funds. (*Id*.) AIA (Lux) did not direct any investments into BLMIS by Luxalpha or Groupement.

31. Upon being renamed "AML," it was formally designated as Luxalpha's management company from November 17, 2008 through its liquidation, (*see* Ex. 17) but entered into an Investment Advisory Agreement with AP (Lux). (Ex. 18.)

32. I note, however, that AML's tenure as manager lasted for less than a month before Madoff's fraud was revealed, and thus it was portfolio manager in name only, never performing any of the associated duties.

33. Indeed, AML did not direct any investments into BLMIS by Luxalpha (or Groupement). Similarly, AML never performed services to distribute, market and promote the Funds, never performed any functions addressing subscription or redemption orders for the Funds, and never received or distributed funds from or on behalf of investors of the Funds.

34. Had it acted as Luxalpha's portfolio manager, AML's enumerated duties would have been those described in the Management Company Services Agreement, which tasks included managing Luxalpha's investments, but expressly excluded participating in the general administration of the fund. (Ex. 17 at p. 5.)

35. Contrary to the Trustee's allegations of AML being a "shell entity," it had its own office, its own employees, and its own lease in Luxembourg, had its own contracts with service providers, and bore its own share of the group insurance premiums. It paid these expenses with its own funds.

36. AML had its own, distinct ownership structure, the details of which are set forth in the chart annexed hereto as Exhibit 19 and supported by Exhibit 20. (*See also* Exs. 21; 22; 23.)

7

37. AML had its own regularly constituted board of directors, the details of which are set forth in the chart annexed hereto as Exhibit 19, and supported by Exhibits 24; 25; 26; 27; 28 and 29. The board conducted its business exclusively in Luxembourg, predominantly through resolutions drafted and executed in Luxembourg. The board acted independently and did not hold "combined" meetings with the boards of any other entities.

38. In order for AML/AIA (Lux) to perform its contractual duties, it entered into various contracts with Banque Degroof for Banque Degroof to provide human and technical resources. (*E.g.* Ex. 30.) It did not rely on AIA Inc., Access LLC, or their personnel.

39. AML also had an independent, three-person management team, consisting of Stephane Cremer, Alain Leonard, and myself. (Exs. 31; 32; 33.) Messrs. Cremer and Leonard were not employed by any other Access entity. This management team met exclusively in Luxembourg.

40. AML maintained a separate bank account in its own name in Luxembourg, and kept separate financial books and records.

41. AML never operated or conducted business in the United States and had no contracts with United States brokers. It did not maintain an office, bank account or phone listing in the United States. Furthermore, to the best of my knowledge, AML never sent any correspondence to BLMIS.

42. AML never had a BLMIS account or otherwise invested money with Madoff.

43. AML was not financially dependent on any of the Foreign Access Defendants, Access LLC, or AIA Inc., because it earned its own fee revenue. (*See, e.g.* Exs. 18; 34; 35.)

8

**Access Ltd.**

44.    Access Ltd. is a limited liability company incorporated in the Bahamas with its registered office located there. (Exs. 36; 37.)

45.    Access Ltd. served as Groupement's investment manager, as well as its operator, sponsor, and investment advisor. (*See* Ex. 38.)

46.    Access Ltd.'s duties as investment manager for Groupement are described in the Investment Management Agreement dated June 30, 2003, and included such tasks as making investment policy recommendations with respect to Groupement's funds, and monitoring the performance of the fund's trading. (*Id.*)

47.    Contrary to the Trustee's allegation that Access Ltd. was a "shell entity," in reality it had its own office and its own lease in the Bahamas through the end of 2008 (*See* Ex. 39), had its own contracts with service providers, and bore its own share of the group insurance premiums. It paid these expenses with its own funds.

48.    Access Ltd. had its own, distinct ownership structure, the details of which are set forth in the chart annexed hereto as Exhibit 40, and supported by Exhibit 41.

49.    Access Ltd. had its own regularly constituted board of directors, the details of which are set forth in the chart annexed hereto as Exhibit 40, and supported by Exhibit 42. Access Ltd.'s board never met in the United States to conduct the business of Access Ltd, and operated predominantly through resolutions drafted and executed outside of the United States. The board acted independently and did not hold "combined" meetings with the boards of any other entities.

50.    Access Ltd. maintained separate bank accounts in its own name, all of which were held outside of the United States.

9

51. Access Ltd. never operated or conducted business in the United States and had no contracts with United States brokers. It did not maintain an office, bank account or phone listing in the United States.

52. Access Ltd. never introduced clients directly to Bernard Madoff or anyone else at BLMIS. Instead, it introduced non-United States investors to a non-United States fund.

53. Access Ltd. never had a BLMIS account or otherwise invested money with Madoff.

54. Access Ltd. was not financially dependent on any of the Foreign Access Defendants, Access LLC, or AIA Inc., because it earned its own fee revenue for the services it rendered to Groupement. (*See, e.g.* Exs. 43, at 26; 38.)

**Alleged Subsequent Transfers**

55. I understand that the Trustee has alleged that the Access Defendants received, as subsequent transfers, fees and payments from funds that originated at BLMIS that were funneled through the Funds. That allegation is not only implausible, it is wrong.

56. Both Groupment and Luxalpha provided for "holdback" reserves maintained by UBSL that were funded from investor contributions *before* investments were made in the Funds. (*See* Exs. 44 at p. 20; 45 at p. 28.) These "holdback" reserves were specifically designated to pay the Funds' "running costs," including "administrative fees." (*Id.*)

57. It is my understanding and belief that any fees and payments made by the Funds to any of the Access Defendants came from these "holdback" reserves <u>that never went to BLMIS</u>, and, therefore, were not from redemptions made by BLMIS to any of the Funds.

58. Moreover, the Trustee's allegations of Transfers from BLMIS to the Funds demonstrates and supports that routine payments to the Access Defendants could not have been

10

funded from monies flowing out of the Funds. More specifically, the Trustee alleges that between March 2004 and August 2008 there were a total of only 8 withdrawals to Luxalpha. (*See* SAC at Ex. B.) Similarly, the Trustee alleges that between April 2003 and August 2008 there were a total of only 10 withdrawals to Groupement. (*See* SAC at Ex. C.) Such infrequent and irregular withdrawals could not have been the source of the alleged routine and regular payments made the Access Defendants.

**Discovery**

59.     The Access Defendants have already supplied substantial discovery to the Trustee.

60.     In early 2009, the Trustee issues several Subpoenas for Rule 2004 Examination subpoenas to Groupement and Access LLC in connection with the BLMIS bankruptcy requesting production of BLMIS related document (the "**Trustee Subpoenas**").

61.     Access LLC and AIA Inc. made productions to the Trustee in response to the Trustee Subpoenas under cover letters date April 1, 2009, April 27, 2009, June 2, 2009 and August 6, 2009.

62.     Those productions were significant. Access LLC and Access Inc. produced ***all*** electronic documents within their custody and control responsive to the Trustee Subpoenas. I understand that such productions totaled over 4.5 million documents. The Trustee has had these documents for well over a decade.

11

I declare, under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Paris, France on 22nd day of April, 2022

_____
Patrick Littaye

13