**Baker & Hostetler LLP**

45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for*
*the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Chapter 7 Estate of Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (CGM) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, <br><br> Plaintiff, <br><br> v. <br><br> BGL BNP PARIBAS S.A., BNP PARIBAS ARBITRAGE SNC, BNP PARIBAS BANK & TRUST CAYMAN LIMITED, BNP PARIBAS S.A., and BNP PARIBAS (SUISSE) S.A., <br><br> Defendants. | Adv. Pro. No. 12-01576 (CGM) <br><br> **SECOND AMENDED COMPLAINT** |

Irving H. Picard, as trustee (the "Trustee") for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act,

15 U.S.C. §§ 78aaa-*lll* ("SIPA"), substantively consolidated with the chapter 7 estate of Bernard

L. Madoff ("Madoff"), by and through his undersigned counsel, for his Second Amended

Complaint against defendants BGL BNP Paribas S.A., individually and as successor in interest to

BNP Paribas Luxembourg S.A. ("BGL BNP Paribas"), BNP Paribas Arbitrage SNC ("BNP

Paribas Arbitrage"), BNP Paribas Bank & Trust Cayman Limited ("BNP Paribas Cayman"), BNP

Paribas S.A., as successor in interest to BNP Paribas Securities Services S.C.A. ("BNP Paribas

Securities Services") and BNP Paribas Securities Services – Succursale de Luxembourg ("BNP

Paribas Securities Services Luxembourg"), and BNP Paribas (Suisse) S.A., individually and as

successor in interest to BNP Paribas Private Bank (Switzerland) S.A. and as successor in interest

to United European Bank ("BNP Paribas Suisse") (collectively, "Defendants"), states:

## I.  NATURE OF THE ACTION

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover

BLMIS customer property, as defined by SIPA § 78*lll*(4), that was stolen as part of the massive

Ponzi scheme perpetrated by Madoff and others.

2.    Defendants, led by their parent company BNP Paribas S.A. ("BNP Paribas," and

together with Defendants, the "BNP Paribas Enterprise"), comprise a global and sophisticated

financial enterprise with a longstanding relationship with Madoff, BLMIS, and "BLMIS Feeder

Funds"—funds that invested all or substantially all of their assets with BLMIS.

3.    The relationship between the BNP Paribas Enterprise and Madoff began in or

around November 1988, when BNP Paribas provided Madoff with a $15 million personal line of

credit, which increased to $30 million by May 1995, and to $75 million by October 1996.

Although in Madoff's personal name, BNP Paribas knew that the line of credit was received and repaid by BLMIS.

4.      From 2003 through 2008, BNP Paribas and Defendants worked together to grow BNP Paribas's Madoff-related businesses, and received hundreds of millions of dollars in customer property as a result.

5.      In all, BNP Paribas, Defendants, and their affiliates received approximately $1.4 billion in fraudulent transfers of BLMIS customer property from fourteen different BLMIS Feeder Funds.

6.      In this action, the Trustee seeks to recover more than $111 million in fraudulent transfers of BLMIS customer property that Defendants received from BLMIS Feeder Funds Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Fairfield Sigma," and together with Fairfield Sentry, the "Fairfield Funds"), Rye Select Broad Market XL Fund LP ("XL LP"), Rye Select Broad Market Portfolio Limited ("Portfolio Limited"), and Rye Select Broad Market XL Portfolio Ltd. ("XL Portfolio," and together with XL LP and Portfolio Limited, the "Tremont Funds").  These fraudulent transfers are recoverable from Defendants and should be returned to the Trustee for equitable distribution to BLMIS customers.  A chart setting forth all of the transfers Defendants received from these BLMIS Feeder Funds is attached as Exhibit A.

## II.  SUBJECT MATTER JURISDICTION AND VENUE

7.      This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC*, No. 08-CV-10791 (the "District Court Proceeding") and has been

referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

8.      This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

9.      Venue in this judicial district is proper under 28 U.S.C. § 1409.

10.     This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

### III. BACKGROUND, THE TRUSTEE, AND STANDING

11.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the U.S. Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

12.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

13.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

    a)      appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

    b)      appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

c)    removed the case to this Court pursuant to SIPA § 78eee(b)(4).

14.    By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

15.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

16.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

17.    At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

18.    At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

19.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

20.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtor to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

21.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

22.     The Trustee has standing to bring avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

## IV.  BLMIS, THE PONZI SCHEME, AND THE SSC STRATEGY

### A.    <u>BLMIS</u>

23.     Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker dealer with the SEC. In 2001, Madoff changed the corporate form of BLMIS from a sole

proprietorship to a New York limited liability company.  At all relevant times, Madoff controlled

BLMIS first as its sole member and thereafter as its chairman and chief executive.

24.     In compliance with 15 U.S.C. § 78*o*(b)(1) and SEC Rule 15b1-3, and regardless of

its business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public records

obtained from the Central Registration Depository of the Financial Industry Regulatory Authority

Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation.  At

all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management System

database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning

on January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC when SIPC was

created and continued its membership after 2001 without any change in status.  SIPC membership

is contingent on registration of the broker-dealer with the SEC.

25.     For most of its existence, BLMIS's principal place of business was 885 Third

Avenue in New York City, where Madoff operated three principal business units: a proprietary

trading desk, a broker dealer operation, and an investment advisory business (the "IA Business").

26.     BLMIS's website publicly boasted about the sophistication and success of its

proprietary trading desk and broker-dealer operations, which were well known in the financial

industry.  BLMIS's website omitted the IA Business entirely.  BLMIS did not register as an

investment adviser with the SEC until 2006, following an investigation by the SEC, which forced

Madoff to register.

27.     For more than 20 years preceding that registration, the financial reports BLMIS

filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds

BLMIS managed through its IA Business.

28.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment

Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total

assets under management ("AUM") of $11.7 billion.  BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion.  In reality, Madoff grossly understated these numbers.  In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM.  At all times, BLMIS's Form ADVs were publicly available.

**B.**     **The Ponzi Scheme**

29.     At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

30.     BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.  It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.  The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

31.     To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York.  Of the three employees at the firm, one

was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

32.     On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

### Madoff's Investment Strategy

33.     In general, BLMIS purported to execute two primary investment strategies for BLMIS customers:  the convertible arbitrage strategy and the split-strike conversion strategy (the "SSC Strategy").  At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

34.     All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank.  These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

35.     The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  By the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

36.     From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

37.     BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

38.     By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

39.     The put options were to limit the downside risk of sizeable price changes in the basket.  The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option should have entailed a loss for BLMIS.

40.     The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

41.     The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar."  The collar provides downside protection while limiting the upside.

42.     If Madoff was putting on the same baskets of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options, with a notional value (for each) of $11.7 billion.  There are

no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

43.     Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call or put option notional value to support the Madoff SSC Strategy.

44.     Madoff could not be using the SSC Strategy because his returns drastically outperformed the market.  BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly).  Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

BLMIS's Fee Structure

45.     BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

BLMIS's Market Timing

46.     Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he succeeded at market timing by intermittently entering and exiting the market.  During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

47.    As a registered broker-dealer, BLMIS was required, pursuant to 17 C.F.R. § 240.17a-5 to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS reportedly exited the market completely at every year end and every quarter end starting in 2003.  These quarterly and year-end exits were undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.

48.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

### BLMIS Execution

49.    BLMIS's execution showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

### No Evidence of BLMIS Trading

50.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

51.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

<u>The Collapse of the Ponzi Scheme</u>

52.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

53.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

54.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## V. RELEVANT BLMIS FEEDER FUNDS

**A.    <u>The Fairfield Funds</u>**

55.    Fairfield Sentry was the largest BLMIS Feeder Fund.  It had four customer accounts with BLMIS, and invested substantially all of its assets with BLMIS.

56.    Fairfield Sigma was a currency fund that accepted subscriptions in Euros, converted the money to U.S. Dollars, and then invested all of the money in Fairfield Sentry.

57.    All funds that Fairfield Sigma received from BLMIS were paid through Fairfield Sentry.

58.    Fairfield Sigma's Private Placement Memoranda ("PPMs") informed investors that its shares were offered "to subscribers who desire to invest in Fairfield Sentry" and disclosed to investors that Fairfield Sigma would use asset funds to purchase shares in Fairfield Sentry.

59.    The Fairfield Funds were created, operated, and controlled by the Fairfield Greenwich Group ("FGG"), a New York-based *de facto* partnership.

60.    FGG operated out of New York.  FGG had offices and employees in New York and substantially all of FGG's partners were based in the United States.

61.    Until 2003, FGG represented that the Fairfield Funds were managed from New York.  In 2003, FGG designated a Bermuda entity known as Fairfield Greenwich Bermuda Limited ("FG Bermuda") as manager.  However, despite this designation, key operations continued to be conducted from FGG's New York office.

62.    Subscriptions and capacity increases in the Fairfield Funds were approved or rejected by a New York-based FGG partner.  Except for administrative assistants, all FG Bermuda employees reported directly to FGG personnel in New York, and certain of FG Bermuda's officers and directors were physically located in New York.  FGG's Finance Group, which was responsible for processing subscriptions and redemptions from the Fairfield Funds, reviewing their performance, communicating with investors, and providing investor support, was also located in New York.

63.    By executing subscription agreements to invest in the Fairfield Funds, investors agreed to a New York choice of law provision: "This Agreement shall be governed and enforced in accordance with the laws of New York, without giving effect to its conflict of laws provisions."

64.    Similarly, investors in the Fairfield Funds agreed to the subscription agreement's New York venue, service of process, and forum selection clauses:

> Subscriber agrees that any suit, action or proceeding ("Proceeding") with respect to this Agreement and the Fund may be brought in New York.  Subscriber irrevocably submits to the jurisdiction of the New York courts with respect to any Proceeding and consents that service of process as provided by New York law may be made upon Subscriber in such Proceeding, and may not claim that a Proceeding has been brought in an inconvenient forum.

65.    The agreements instructed investors of the Fairfield Funds to send subscription payments to a bank account with HSBC Bank USA in New York (the "HSBC USA Account").

66.    The subscription agreements incorporated the Fairfield Funds' PPMs and by signing, investors warranted that they "received and read a copy of the [PPMs]."

13

67.    The PPMs explicitly disclosed BLMIS's multiple roles as the *de facto* investment manager, broker dealer, and custodian for the Fairfield Funds.  Regarding BLMIS's role as the funds' actual investment manager, the PPMs disclosed:

> The Manager has allocated the predominant portion of the Fund's assets to a managed account at Bernard L. Madoff Investment Securities. As a result, the Fund is subject to the judgment, decisions and trading opinions of Bernard L. Madoff Investment Securities and has no control over the decisions implemented by Bernard L. Madoff Investment Securities.

68.    The PPMs also disclosed how "[t]he services of BLM[IS] and its personnel are essential to the continued operation of [Fairfield Sentry], and its profitability, if any."

69.    Regarding BLMIS's roles as the Fairfield Funds' broker dealer and custodian, the PPMs disclosed:

> As a result of the Investment Manager's selection of Bernard L. Madoff Investment Securities, LLC ("BLM[IS]") as execution agent of the split strike conversion strategy, substantially all of the Fund's assets will be held in segregated accounts at BLM[IS], a U.S. registered broker-dealer and qualified custodian. Accordingly, BLM[IS] will be a sub-custodian of the Fund.

70.    Thus, the PPMs specifically informed investors that BLMIS—not the Fairfield Funds or their service providers—would have custody of Fairfield Sentry's assets in the United States and would execute the funds' purported investment strategy involving the purchase and sale of U.S. securities.

## B.    The Tremont Funds

71.    Portfolio Limited was a Tremont Fund organized offshore that invested all or substantially all of its funds directly in BLMIS.

72.    XL Portfolio was a Tremont Fund organized offshore that invested all or substantially all of its funds indirectly in BLMIS.

73.     XL LP was a Tremont Fund organized in Delaware that invested all or substantially all of its funds indirectly in BLMIS.

74.     The Tremont Funds were managed and operated by Tremont Group Holdings, Inc., a Delaware corporation ("TGH"), and its U.S. management arm, Tremont Partners, Inc., a Connecticut corporation ("Tremont Partners," and together with TGH, "Tremont").

75.     Tremont was founded by Sandra Manzke, a U.S. citizen and resident, in the mid-1980s.  Until her departure in 2004, Manzke served as Tremont's CEO and then co-CEO, helping to select money managers, including Madoff.  Robert Schulman, also a U.S. citizen and resident, joined Tremont in 1994 and held various high-level positions, including President, co-CEO, and ultimately sole CEO.

76.     Tremont's headquarters were located in Rye, New York.  The marketing and sale of shares in the Tremont Funds were performed by Tremont employees in New York.  Employees in Tremont's New York office communicated directly with investors and potential investors regarding the Tremont Funds.

77.     From 2006 forward, the published materials for the Tremont Funds, including prospectus statements and marketing materials, directed potential investors to contact Tremont's employees in New York.

78.     Investors' subscriptions and redemptions of shares in the Tremont Funds were approved by Tremont employees in New York.

79.     Tremont employees in New York also signed BLMIS Customer Agreements and other account opening documents on behalf of Portfolio Limited and XL Portfolio, and the Customer Agreements expressly stated that they were governed by New York law and that all disputes arising under the Customer Agreement would be resolved by arbitration under New York law.

80.    Bank of New York in New York served as the nominal custodial bank for each of the Tremont Funds.

81.    Tremont Partners or Bank of New York, each in New York, served as the purported administrator for the Tremont Funds.

82.    By subscribing in the Tremont Funds, investors agreed to deliver their subscription agreements to either Tremont Partners or a Bank of New York entity in New York.

83.    By subscribing in the Tremont Funds, investors agreed to wire funds in U.S. dollars to Bank of New York in New York, and to send redemption requests to Tremont Partners or Bank of New York in New York.

84.    Beginning in the fall of 2006, every redemption payment made by Tremont to a Tremont Fund investor was paid out in U.S. dollars from Tremont's New York-based bank account at Bank of New York.

## VI. DEFENDANTS

85.    BGL BNP Paribas is a *société anonyme* incorporated and organized under the laws of Luxembourg, and is located at 50 Avenue John F. Kennedy in Luxembourg, Luxembourg. As a result of a merger in 2010, Defendant BGL BNP Paribas is a successor in interest to BNP Paribas Luxembourg S.A.

86.    BNP Paribas Arbitrage is a general partnership incorporated and organized under the laws of France as a *société en nom collectif*. It is a wholly owned subsidiary of BNP Paribas and maintains offices at 16 Boulevard des Italiens in Paris, France and 787 Seventh Avenue in New York, New York. BNP Paribas is the Managing Director of BNP Paribas Arbitrage.

87.    BNP Paribas Cayman is incorporated and organized under the laws of the Cayman Islands. It is a wholly owned subsidiary of BNP Paribas and maintains an office at Royal Bank House, Shedden Road, in George Town, Grand Cayman, Cayman Islands.

88.    BNP Paribas Securities Services was incorporated and organized under the laws of France.  It was a wholly owned subsidiary of BNP Paribas and maintains offices at: 3 Rue d'Antin in Paris, France; 787 Seventh Avenue in New York, New York; and Royal Bank House, Shedden Road, in George Town, Grand Cayman, Cayman Islands.

89.    BNP Paribas Securities Services Luxembourg was incorporated and organized under the laws of France.  It was a wholly owned subsidiary of BNP Paribas and maintained offices at 33 rue de Gasperich in Hesperange, Luxembourg.

90.    BNP Paribas Suisse is a *société anonyme* incorporated and organized under the laws of Switzerland, and is located at Place de Hollande 2 in Geneva, Switzerland.  As a result of a merger in 2000, BNP Paribas Suisse is a successor in interest to BNP Paribas Private Bank (Switzerland) S.A. and to United European Bank.

## VII.  PERSONAL JURISDICTION

91.    Defendants are subject to personal jurisdiction in this judicial district under New York Civil Practice Law & Rules §§ 301 and/or 302 (McKinney 2001) and Federal Rule of Bankruptcy Procedure 7004.  Defendants knowingly accepted the rights, benefits, and privileges of conducting and profiting from business and/or transactions in the United States and New York and should reasonably expect to be subject to New York jurisdiction.

92.    Defendants purposely availed themselves of the laws and protections of the United States and New York State by, among other things, knowingly directing funds to be invested with New York-based BLMIS through the BLMIS Feeder Funds, including Ascot Partners, L.P. ("Ascot"), Equity Trading Portfolio Limited ("Equity Trading"), the two Fairfield Funds, Groupement Financier Ltd. ("Groupement"), Harley International (Cayman) Limited ("Harley"), Kingate Euro Fund Ltd. ("Kingate Euro"), Kingate Global Fund Ltd ("Kingate Global," and together with Kingate Euro, the "Kingate Funds"), and the three Tremont Funds.

A.    **BGL BNP Paribas**

93.    BGL BNP Paribas conducted business in New York during the relevant time period.

94.    BGL BNP Paribas invested in at least four BLMIS Feeder Funds, including the Kingate Funds and the Fairfield Funds.

95.    BGL BNP Paribas reviewed the Fairfield Funds' PPMs, executed their subscription agreements, and subscribed into and redeemed from the Fairfield Funds.

96.    In its Fairfield Sentry subscription agreement, BGL BNP Paribas specified that redemptions from Fairfield Sentry be received at a bank account at BNP Paribas New York ("BNP Paribas NY"), located at 919 Third Avenue, New York, New York.

B.    **BNP Paribas Arbitrage**

97.    BNP Paribas Arbitrage conducted business in New York during the relevant time period.

98.    BNP Paribas Arbitrage invested in at least seven BLMIS Feeder Funds, including Equity Trading, Fairfield Sentry, Groupement, Harley, the Kingate Funds, and XL Portfolio.

99.    BNP Paribas Arbitrage reviewed Fairfield Sentry's PPM, executed its subscription agreement, and subscribed into and redeemed from Fairfield Sentry.

100.    In its Fairfield Sentry subscription agreement, BNP Arbitrage specified that subscriptions would be paid from, and its redemption payments would be paid to, an account at BNP Paribas NY.

101.    BNP Paribas Arbitrage received and reviewed XL Portfolio's investment materials from Tremont, executed XL Portfolio Limited's subscription agreement, and subscribed into and redeemed from XL Portfolio.

102.    In its XL Portfolio subscription agreement, BNP Arbitrage specified that subscriptions would be paid from, and its redemption payments would be paid to, an account at BNP Paribas NY.

## C.    BNP Paribas Cayman

103.    BNP Paribas Cayman conducted business in New York during the relevant time period.

104.    BNP Paribas Cayman used BNP Paribas Securities Corp.'s New York address for correspondence related to Defendants' BLMIS-based business.

105.    BNP Paribas Cayman invested in at least five BLMIS Feeder Funds, including Fairfield Sentry, Kingate Global, and the three Tremont Funds.

106.    BNP Paribas Cayman reviewed Fairfield Sentry's PPM, executed its subscription agreements, and subscribed into and redeemed from Fairfield Sentry.

107.    BNP Paribas Securities Corp. employees located in New York acted as BNP Paribas Cayman's authorized agents with respect to its investments in Fairfield Sentry.

108.    These New York employees, on BNP Paribas Cayman's behalf, signed subscription agreements for BNP Paribas Cayman's investments in Fairfield Sentry and instructed that wires for BNP Paribas Cayman's subscription payments with Fairfield Sentry be made in U.S. dollars from an account at BNP Paribas NY.

109.    These same New York employees also made redemption requests to Fairfield Sentry on BNP Paribas Cayman's behalf, and instructed Fairfield Sentry to make redemption payments on BNP Paribas's behalf in U.S. dollars to an account at BNP Paribas NY.

110.    BNP Paribas Cayman received and reviewed the Tremont Funds' prospectus from Tremont, executed the Tremont Funds' subscription agreements, and subscribed into and redeemed from the Tremont Funds.

111.    BNP Paribas Securities Corp. employees located in New York acted as BNP Paribas Cayman's authorized agents with respect to its investments in the Tremont Funds.

112.    These New York employees, on BNP Paribas Cayman's behalf, received portfolio statements for BNP Paribas Cayman's investments in the Tremont Funds that were addressed to BNP Paribas's New York office, and corresponded with employees for Tremont and its administrator BNY Mellon, also located in New York, in connection with BNP Paribas Cayman's investments in the Tremont Funds.

113.    These New York employees, on BNP Paribas Cayman's behalf, also instructed in subscription agreements that wires for BNP Paribas Cayman's subscription and redemption payments with Portfolio Limited be made in U.S. dollars to and from an account at BNP Paribas NY.

114.    When these New York employees requested redemptions from XL LP and Portfolio Limited on BNP Paribas Cayman's behalf, they similarly instructed the funds to make payment in U.S. dollars to an account at BNP Paribas NY.

115.    BNP Paribas employees located in New York signed XL LP subscription documents on behalf of BNP Paribas Cayman and included New York contact information to be used to confirm receipt of funds and documents.

116.    Similarly, these New York employees signed subscription agreements with XL Portfolio on BNP Paribas Cayman's behalf and instructed correspondence to go to them in New York.

117.    Both Defendant BNP Paribas Securities Services and BNP Paribas Securities Corp. would communicate with BLMIS Feeder Funds, including the Fairfield and Tremont Funds, on behalf of BNP Paribas Cayman from their New York office.

D.    **BNP Paribas Securities Services**

118.    BNP Paribas Securities Services conducted business in New York during the relevant time period.

119.    BNP Paribas Securities Services invested in at least four BLMIS Feeder Funds, including the Fairfield Funds, Kingate Euro, and Portfolio Limited.

120.    BNP Paribas Securities Services had a New York office, which it used to, among other things, submit redemption requests to the BLMIS Feeder Funds, including the Fairfield Funds.

121.    BNP Paribas Securities Services reviewed the Fairfield Funds' PPMs, executed their subscription agreements, and subscribed into and redeemed from the Fairfield Funds.

122.    In the Fairfield Sentry subscription agreement, BNP Paribas Securities Services specified that subscriptions would be paid from, and its redemption payments would be paid to, an account at BNP Paribas NY.

123.    BNP Paribas Securities Services personnel corresponded by email and telephone with New York-based FGG regarding investments in the Fairfield Funds.

124.    BNP Paribas Securities Services received and reviewed the Portfolio Limited prospectus from Tremont, executed Portfolio Limited's subscription agreement, and subscribed into and redeemed from Portfolio Limited.

125.    BNP Paribas Securities Services personnel corresponded by email with New York-based Tremont personnel regarding investments in Portfolio Limited.

126.    In its Redemption Authorization Forms for Portfolio Limited, BNP Securities Services instructed that Portfolio Limited to deliver redemption payments to an account at BNP Paribas NY.

**E.**      **BNP Paribas Securities Services Luxembourg**

127.    BNP Paribas Securities Services Luxembourg conducted business in New York during the relevant time period.

128.    BNP Paribas Securities Services Luxembourg invested in at least three BLMIS Feeder Funds, the Fairfield Funds and Kingate Global.

129.    BNP Paribas Securities Services Luxembourg reviewed the Fairfield Funds' PPMs, executed their subscription agreements, and subscribed into and redeemed from the Fairfield Funds.

130.    In the Fairfield Sentry subscription agreement, BNP Paribas Securities Services Luxembourg specified that subscriptions would be paid from, and its redemption payments would be paid to, an account at BNP Paribas NY.

131.    In the Fairfield Sentry subscription agreement, BNP Paribas Securities Services Luxembourg also identified a New York-based affiliate, BNP Equity Derivatives, to receive all written communications from Fairfield Sentry related to BNP Paribas Securities Services Luxembourg's investment.

132.    BNP Paribas Securities Services Luxembourg personnel corresponded by email with New York-based FGG regarding investments in the Fairfield Funds.

**F.**      **BNP Paribas Suisse**

133.    BNP Paribas Suisse conducted business in New York during the relevant time period.

134.    BNP Paribas Suisse invested in at least two BLMIS Feeder Funds, including Fairfield Sentry and Kingate Global.

135.    BNP Paribas Suisse reviewed Fairfield Sentry's PPMs, executed its subscription agreements, and subscribed into and redeemed from Fairfield Sentry.

136.    Fairfield Sentry was directed to send payments to BNP Paribas Suisse to an account at BNP Paribas NY.

137.    BNP Paribas Suisse also marketed investment products that referenced BLMIS Feeder Funds, including the Kingate Funds and Fairfield Sentry.

## VIII.  THE FAIRFIELD FUNDS KNEW THAT BLMIS WAS A FRAUD

138.    The Fairfield Funds knew that BLMIS was a fraud, or, at the very least, were on inquiry notice of facts that would have led a reasonable person in their positions to conduct further inquiry into whether BLMIS was a possible fraud.

139.    The Trustee incorporates by reference the allegations contained in the second amended complaint filed in *Picard v. Fairfield Sentry Ltd*., Adv. Pro. No. 09-01239 (CGM) [ECF No. 286] (the "Fairfield Second Amended Complaint") as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, and 315-316.

## IX.  THE TREMONT FUNDS KNEW THAT BLMIS WAS A FRAUD

140.    The Tremont Funds knew that BLMIS was a fraud, or, at the very least, were on inquiry notice of facts that would have led a reasonable person in their positions to conduct further inquiry into whether BLMIS was a possible fraud.

141.    The Trustee incorporates by reference the allegations contained in the complaint filed in *Picard v. Tremont Group Holdings, Inc*., Adv. Pro. No. 10-05310 (CGM) [SCF No. 1] (the "Tremont Complaint") as if fully set forth herein.

### A.    Tremont's Senior Executives Had a Close Relationship with Madoff

142.    Manzke and Schulman shared a close relationship with Madoff, and had regular phone calls with him and his top lieutenant, Frank DiPascali.

143.    Tremont described its special relationship with Madoff as its "competitive edge." In fact, Tremont touted Schulman's unusually close relationship with Madoff, stating that his

"long-standing relationships with the principals of our existing managers [BLMIS listed first among them] is clearly an edge over any firm contemplating a similar business as our ability to negotiate preferential terms is related directly to the strength and longevity of the relationships." Emphasizing Schulman's special relationship with Madoff, in 2003, Tremont told its auditor, Ernst & Young ("E&Y") about Schulman's unique access to BLMIS, including that "Bob Schulman periodically visits [BLMIS's] facilities throughout the year . . . ."  At least once, Madoff even sought Schulman's advice on hiring decisions at BLMIS.  In June 2006, Tremont Vice President Chris Cichella explained to a potential investor that Schulman was "intimately familiar" with Madoff based on "a 10+ year relationship."

144.    Investors took notice of the relationship between Schulman and Madoff.  For example, a prospective investor had a call with Tremont in May 2007 where he referenced the "friendly relationship between Bob and Bernie."  He also noted that, "[f]or Tremont, it goes back to the relationship . . . Bob has been there many times and has worked w/ Bernie is [sic] business since the 1980s."

**B.    Tremont Received Repeated, Direct Fraud Warnings About BLMIS's Investment Advisory Business**

145.    Tremont received warnings of BLMIS's fraudulent IA Business from clients as early as April 2001, when an investor wrote to Schulman: "I know you are sick of answering this but man is it hot out there with the Bernie fraud rumors."  The investor questioned why Madoff "need[ed] to go to cash at year-end every year" and used such a "small" firm as its auditor.

146.    Less than a month later, Tremont became aware of the Barron's and Mar/Hedge articles questioning the legitimacy of BLMIS's IA Business and identifying Tremont as offering to its clients certain BLMIS Feeder Funds.  On May 7, 2001, Tremont Group's Chief Operating Officer (and later President) Barry Colvin emailed a number of Tremont employees alerting them to the articles and instructing them to direct third-party questions to Tremont's management.

147.    On April 25, 2003, sales vice president Jim Mitchell relayed to Schulman a discussion Mitchell had with an investor about "associating Madoff with broker-dealer wrongdoing of late." The following month, Mitchell, Schulman, and the investor visited Madoff. The investor's meeting notes (which he shared with Tremont) characterized Madoff's operation as "controversial" and expressed numerous concerns that included: (i) Madoff's unwillingness to meet with investors; (ii) BLMIS's lack of management fees; (iii) Madoff's going to cash at every year end; (iv) the absence of a third-party custodian; and (v) BLMIS's "exceptionally stable" returns "with only 7 negative months since 1990."

148.    Mitchell retained these notes and years later forwarded them to Tremont vice president and manager responsible for product line management and oversight, Darren Johnston, cautioning: "Don't attach this – but it's an interesting set of notes from a meeting years back . . . ."

149.    In March 2004, the investor who emailed Schulman in 2001 about the "Bernie fraud rumors" emailed him again, this time to redeem his Tremont Fund investments, explaining:

> My motivation for doing this is not due to some new buzz out there for as you know that is a constant din but rather that I can no longer ignore my core instincts as an investor in which I have the [sic] battle the fact that I really don't know what is going on, what a [sic] do know is I am in an investment program that no one else in history has been able to make work, return series is flat out too good given how efficient the underlying securities are priced and he doesn't charge a fee all compounded by it seems every stone I turn over is another multi billion $ [M]adoff feeder. I . . . found that my inability to rationalize & be intellectually honest on why I was invested bothered me more than it has in the past ….

150.    When Madoff's scheme collapsed, that investor circulated an email among certain of his employees with the subject header "HOLY SH## !!!!!!!!!!!!!!!!!!!! THE WORLD IS NOW RIGHT !!!" and wrote that "Bob Schulman & all the feeder groups could be going to jail over this…."

151.    In May 2004, Cichella emailed the senior vice president Rob Rosenbaum at that investment advisory firm, RogersCasey (where Tremont personnel, including Manzke, previously worked), was "concerned about Tremont's relationship with Madoff" and would thus recommend that its client not invest with Tremont.  Cichella said RogersCasey would not reconsider its position because BLMIS "was prone to a blow-up that would destabilize Tremont . . . ."  Analyzing Tremont for a prospective institutional investor in 2005, the investor's representative James Purnell raised concerns to Tremont's head of Product Management and Investment Advisory board member  Stuart Pologe about what he dubbed "the Madoff black box" including, among other things, whether BLMIS' assets were segregated and being verified by a third party, how Madoff is paid, and whether any written Tremont materials exist mentioning Madoff (the response was that there was not and there never would be).  After Madoff's arrest and the revelation of the fraud, a former coworker of Purnell emailed him and boasted that they were "finally vindicated on Madoff.  If it looks too good to be true…."

152.    In March 2007, representatives from Tremont's potential client, Agile Group ("Agile"), met with Johnston, product management senior vice president Patrick Kelly, and portfolio manager Brian Marsh as part of its due diligence.  Agile's notes from the meeting (the "Agile Notes") reflect that Agile peppered Tremont with numerous questions regarding operational and trading anomalies indicating fraud at BLMIS or its reporting fictional trades.  This included queries about its auditors, the lack of information on options trading, identity of counterparties to the purported options transactions, BLMIS's AUM, BLMIS's inexplicable use of paper trade tickets and account statements, the inability to verify BLMIS's assets, and BLMIS's going in and out of the market in large transactions with no overall effect on the market for the securities it purportedly traded.

153.    The Agile Notes reflect that Agile and Tremont discussed whether BLMIS's IA Business was a fraud and perhaps even a Ponzi scheme.  Agile pointed out in the meeting how the fraud would be easy if BLMIS's auditor did "not work so hard" and if the "few key people" operating the IA Business were involved.  During the discussion, it was deduced that, "[e]ither Madoff owns what he owns or they are fictitious.  But if it is a Ponzi scheme, every dollar profit has been realized."

154.    A month later, Agile employee Mariah Quish sent Tremont follow-up questions concerning BLMIS.  Addressing Agile's request, Johnston instructed internally: "We should give answers by phone rather than email . . . ."  After speaking with Johnston and Tremont's vice president of investor services Harry Hodges, Quish reported she found Tremont's "level of secrecy combined with a faith-based view on Madoff difficult to understand."

155.    In May 2007, Cichella, who worked closely with Johnston and Hodges, forwarded to himself the May 2001 Barron's article.

156.    Between 2005 and 2008, three major banks that provided leverage to the Tremont Feeder Funds each saw significant fraud risks associated with BLMIS, and each demanded and received from Tremont extraordinary contractual rights in an attempt to mitigate those risks, such as indemnification for fraud at BLMIS and special redemption rights if Madoff came under investigation for breach of securities laws.  As communicated by one such provider, Citibank, to Tremont, Madoff's lack of third-party controls and how he executes on his volume of options were, in Johnston's words, "fundamental roadblocks" to Citibank's senior risk management people.

157.    Tremont continued to receive warnings that Madoff's trading was not real as late as October 2008, when Tremont sales representative Adrian Gordon reported to Johnston, Marsh, and Mitchell that a prospective institutional investor was "loathe to give his stamp of approval to [Madoff's] strategy when he has no idea what trades actually take place."  A month later, Gordon

emailed the Tremont global sales team that another potential investor was "very anti Madoff" and said Madoff was "probably a pyramid structure." That same month, Cichella once again pulled out the May 2001 Barron's article, this time forwarding it to Mitchell, stating, "Enjoy!"

**C.**    **Tremont's Own Reporting Showed that BLMIS's Purported Trades Were Impossible**

158.    Despite exempting BLMIS from the due diligence it conducted on other managers, Tremont regularly received from BLMIS customer statements, trade tickets, and other information containing an abundance of facts demonstrating that BLMIS reported fictitious trades and that the fraud warnings it received were well founded. Tremont created reports and marketing materials of its own highlighting the impossible trading and performance. For example, Tremont knew from the monthly analytic summaries its senior management prepared based on these BLMIS documents that the positions and prices BLMIS reported differed from prices Bloomberg reported. Tremont's auditor, KPMG, similarly found and reported to Tremont more than 20 such differences in 2006 alone.

159.    Tremont also estimated in its reports the amount BLMIS had in AUM and calculated whether or not there was sufficient volume in each instrument for Madoff to be able to execute trades. Given that Tremont knew BLMIS had "well in excess of $200 billion" in AUM by May 2003, and that according to Johnston it "monitored all trade activity," Tremont knew there was insufficient volume for dozens, if not hundreds of the trades Madoff purported to complete.

**D.**    **Tremont Exempted BLMIS From Its High Due Diligence Standards**

160.    The majority of Tremont's business involved placing its clients' assets with third-party managers. For managers other than Madoff, Tremont implemented due diligence procedures, investigated the quality of the management personnel, assessed key risk factors associated with the investment, and continuously monitored the investment and the managers.

161.    As a sophisticated manager with industry-leading due diligence standards, Tremont positioned itself at the forefront of initiatives to improve monitoring of investment managers in light of frauds that preceded Madoff.  Tremont claimed that its comprehensive operational risk evaluation served to mitigate any possibility of misrepresentation or fraudulent activity.

162.    Despite these claims and all of the fraud warnings, Tremont exempted BLMIS from its due diligence standards.  In fact, Tremont's executives deliberately prevented transparency into Madoff and BLMIS throughout the Tremont-BLMIS relationship.  To ensure that Tremont's employees did not conduct any meaningful due diligence on BLMIS and Madoff, Mitchell laid out in an email three of the most critical questions about Madoff's operations "ya don't ask" about: (1) BLMIS's AUM, (2) how Madoff generated his returns, and (3) Madoff's auditors.

163.    According to the SEC—which investigated Tremont after Madoff's arrest—Schulman personally conducted due diligence on Madoff, which was an "outlier" in Tremont's procedures as applied to other managers.  The SEC concluded that because "Schulman conducted the due diligence, he would be able to control what areas and information [were] reviewed or not reviewed."

164.    Tremont did not conduct due diligence on Friehling & Horowitz.  Rather, as the SEC found, Tremont's due diligence materials "did not reveal any evidence of conversations with Madoff's auditors."  In 2007, Tremont even admitted to Agile that someone from Tremont "anonymously drop[ped] by" Friehling & Horowitz's strip-mall office, just "to make sure they exist."

165.    In an unusually candid response to one strategic consulting firm, Pologe admitted that Tremont had "no manager due dili[gence] process for" its BLMIS investments and referred to Tremont's dealings with BLMIS as "a highly vulnerable, highly profitable business."  Pologe noted: "We make a lot of money off this, though."

**E.**    **BLMIS Failed Tremont's Requirements for Third-Party Oversight Yet Tremont Made an Exception for Madoff**

166.    Tremont's due diligence standards considered independent oversight of its outside managers to be critical.    Tremont, however, knowingly made BLMIS an exception to its requirement of third-party oversight of its money managers.

167.    For example, in June 2008, Tremont rejected a potential manager because, as stated in an internal memo, a "key part of any due diligence process is being able to verify the information provided by the Fund with independent parties, in this instance there aren't any independent parties to speak with to verify what the partners of [the fund] are doing."

168.    The SEC also found Tremont had rejected another outside money manager because of a lack of operational infrastructure and the presence of only one person who was responsible for all operational duties.    Yet, the SEC noted, Tremont continued its investment with BLMIS, although "all operational guidelines with respect to trading and execution were controlled by one individual."

169.    Tremont executives were unwilling to respond in writing to investors' questions about third-party asset verification.    This included at least one pointed question from an investor who asked Mitchell, because the BLMIS account statements were "generated by Madoff, how do I get comfort that the money is really there?"    This investor also stated, "the accounting firm [Friehling & Horowitz] doing the audit being a small firm made me a bit uneasy."    Mitchell took the conversation off-line, replying, "What is your telephone number?"

170.    Dealing with another investor question about asset verification, Johnston emailed Cichella that this would "lead closer to BLMIS which [Tremont] strictly wants to avoid."    Cichella replied: "Keep in mind, they are looking for independent (of [Tremont] or Madoff) verification of the assets in a tangible form.  . . . it would be great if you could convince them" that the assets existed.

171.    On or about October 1, 2008, Tremont personnel met with FGG concerning a possible investment with BLMIS through Fairfield Sentry, which Tremont understood operated in the same manner as its own BLMIS Feeder Funds.  Tremont's notes acknowledged that Fairfield Sentry did not satisfy Tremont's due diligence requirements, including lack of independent oversight at BLMIS, no third-party prime broker, and Friehling & Horowitz's "material percentage of their annual revenue from Madoff."  Evidencing that BLMIS Feeder Funds did not meet Tremont's usual due diligence standards and were fraught with red flags, the potential Fairfield Sentry investment was referred up the ladder for "an exception approval from the Investment Committee."

## F.    **Tremont Consistently Shielded Madoff From Third-Party Due Diligence**

172.    Tremont consistently shielded Madoff from questions by third parties conducting their own due diligence on BLMIS, calling it "Firm policy" not to provide access.  On January 24, 2004, Mitchell asked Schulman whether a potential client could visit Madoff.  Schulman responded: "They cannot and WILL NOT VISIT MADOFF please make it clear that this is OFF the table."  (Emphasis in original.)

173.    In 2005, when Purnell was questioning Pologe about Madoff, Pologe forwarded the questions to Tremont executive Suzanne Hammond, who at first responded, "Do not go any further"  and then sent a second response, copying Schulman, stating, "I hope you have a confidentially [sic] agreement," before sending vague, one word answers to the questions.

174.    On June 16, 2006, Mitchell, after being informed that an investor had been "relentless on meeting Bernie," emailed Tremont investment relationship assistant vice president Roy Soares, "Our own analysts don't get to see Madoff – why should [investors]."

175.    In swap agreements with three banks providing leverage, Tremont included the provision that if a bank contacted Madoff, Tremont had the right to cancel the swap without paying an early termination fee.

176.    In 2008, Darren Johnston reported internally that he "made absolutely clear" to a major financial institution that it was not to contact Madoff's auditor and that "we do not offer up assistance to investors with Bernie, his staff or his auditor."

177.    Later in 2008, Mitchell was especially careful about not letting a large new potential investor speak to Madoff, internally acknowledging that "I suspect they will want a meeting, being institutional.  We should discourage this . . . ."  Another Tremont employee relayed this to the investor and assured others internally that "this would never happen and we told [the investor] that we have never had an on site meeting with a client and BM."

178.    Tremont even restricted which of its employees could contact BLMIS.  In a September 2002 email, the message was relayed internally: "DON'T SEND ANY CORRESPONDENCE TO BERNARD MADOFF.  ONLY [Tremont executives Soares, Schulman and Hammond] ARE ALLOWED TO SEND ANYTHING TO HIM!"  (Emphasis in original.)

179.    Tremont refused to allow its administrator to receive Tremont Fund customer statements and trade tickets directly from BLMIS, as Tremont arranged with its other managers.  Tremont also intervened to limit contact between Madoff and Tremont's auditor, E&Y.  In May 2006, internal Tremont emails discussing E&Y's request for BLMIS's "internal control letter" and questioning whether an audit report was prepared for Madoff, revealed that Tremont acted as the go-between "[t]o keep the minimum amount of people contacting Madoff."  In so doing, Tremont also misled E&Y, telling it that "Bob Schulman periodically visits [BLMIS's] facilities throughout

the year and watches the company trade according to their highly secret strategy"—an obvious fiction given that BLMIS's IA Business never executed any trades.

180.    This deliberate shielding of Madoff continued when Tremont replaced E&Y with KPMG and reported to potential clients that, other than minimal verification, "there is no contact" between KPMG and BLMIS.

181.    Tremont also lied to investors when presented with concerns about BLMIS's auditors.  As set forth in a 2006 internal memo, Tremont's top investment managers knew that Friehling & Horowitz was a "small firm" that was "not specialized in investment firms [and] broker/dealers."  Nevertheless, Johnston and others from Tremont told Agile that Friehling & Horowitz was "usually a name you hear [with] medium size broker dealers."

## G.    Tremont Avoided Questions and Fabricated Answers About BLMIS's Purported Options Trading

182.    Tremont's senior management knew that the options trades were a central part of the SSC Strategy and were well aware of how the options trading for the strategy worked.  In fact, Schulman bragged internally that he taught Madoff how to trade options.  Nevertheless, in response to evidence on the face of BLMIS trade tickets that included suspect options trading, Tremont tried to explain away these issues by giving inconsistent and false explanations.

### 1.    Divergent Answers on Over-the-Counter/Listed Trading Questions

183.    As described in the Tremont Complaint, Tremont knew that Madoff could not be trading options over-the-counter ("OTC") as he represented, in light of (i) the CUSIP numbers on BLMIS's trade confirmations, which indicated the options were traded on an exchange, and (ii) the lack of counterparty information that should be on all OTC trade confirmations.

184.    Tremont also knew that Madoff had not entered into any International Swaps and Derivatives Association (ISDA) agreements with any counterparties—a basic requirement for all OTC options trades.

185.    Rather than openly acknowledge the options trading impossibilities—which were clear from the trade tickets that Tremont analyzed—Tremont would flip-flop on the question of whether BLMIS traded options OTC or traded them on the Chicago Board Options Exchange.

186.    For example, a November 2006 Due Diligence Questionnaire ("DDQ") for one of the Tremont Funds stated that "options [] are traded on a recognized exchange."  In contrast, in November 2007, in response to a statement by HSBC Bank that it was under the impression that BLMIS traded options OTC, Johnston wrote, "our understanding is also that they are OTC."  On yet another occasion, Rye Broad Market's July 2007 DDQ equivocated, stating options "may be either listed or OTC."

187.    As set forth in the Agile Notes, Tremont told Agile in 2007 that Madoff used both OTC and listed options for his strategy, and that Madoff has used OTC options since the beginning. Tremont even went so far as to make up a rationale for Madoff's use of one or the other, telling Agile that Madoff will go to listed options depending on price and that most of the time OTC options have a better price.

## 2.    Failure to Conduct Any Diligence on Purported Options Counterparties and Covering up the Truth With Fabrications

188.    Tremont failed to conduct any diligence on the lack of OTC counterparties on BLMIS's trade confirmations, because it knew there was no legitimate explanation.

189.    Tremont senior management stated on certain occasions that Madoff purportedly traded options with the counterparties as agent for the Tremont Funds.  This meant that the Tremont Funds, not BLMIS, bore the risks involved with trading and settling with those purported counterparties.

190.    Tremont senior management knew it had to conduct counterparty due diligence to insulate against default risk.  A JPMorgan Chase ("JPM") representative even pointed out to Johnston that the trading counterparties should all have been known to Tremont if Madoff

supposedly traded in the name of the account holder (*i.e.*, the Tremont Funds'), and not in BLMIS's name. But Tremont never spoke with a single counterparty for Madoff's purported options trading, because there were none.

191.    Tremont instead covered up for Madoff's fabrications with fabrications of its own, which changed depending on who was asking. In a March 24, 2006 email, Kelly told Schulman that Citi, one of Tremont's leverage providers, had "asked around" and could not "find anyone who admit[ted] to being [BLMIS's] counterparty." Schulman replied, "He [Madoff] has not disclosed [any counterparty names] to us." Kelly nevertheless later told Agile that Schulman "has seen the counterparty names – he just does not want to disclose it."

192.    In October 2006, Soares emailed Fortis Bank, relaying information provided by Schulman that one of the Tremont Funds had 12 counterparties, "which Madoff must use in relation to his put options trades." Schulman, however, later admitted in sworn testimony that Tremont had never tried to identify any purported counterparties.

193.    In a June 2007 email, Kelly told JPM, which was considering a Tremont Fund investment, that "we do know the [counterparties'] general characteristics such as number and minimum credit rating." A month later, Mitchell told a different investor, "[o]ption counterparties are typical banks," and named JPM—who had just inquired on the identity of the counterparties—as one of them.

194.    In April 2008, Johnston told consultant Albourne Partners ("Albourne")—itself in the process of conducting diligence on Tremont Funds for its clients—that Tremont "has checked with counterparties to make sure they are trading with the Investment Advisor [BLMIS] in the relevant instruments."

195.    In October 2008, Albourne emailed Johnston twice, asking about Tremont's counterparty exposure to "MS [Morgan Stanley] or GS [Goldman Sachs]." Johnston "confirm[ed]

that Tremont had "[a]bsolutely no exposure" to those companies, which did not make any sense in light of prior statements unless Johnston knew Madoff was not trading options as he purported.

196.    The September 2008 collapse of Lehman Brothers Inc. and its affiliates and subsidiaries (collectively, "Lehman")—one of the largest OTC derivatives counterparties at the time—led to industry and investor panic.  Many Tremont clients worried about their Lehman exposure, in light of BLMIS's purported billions of dollars in options holdings.

197.    By contrast, Tremont's senior management was seemingly unconcerned from the outset by these monumental events.  They knew that if BLMIS's OTC options positions were real, a crash of a major options counterparty would have catastrophic effects on the Tremont Funds. For example, in 2007, Mitchell detailed to an investor how, if a counterparty to an options trade such as Bear Stearns defaulted, "then the option (otc) is gone."

198.    Tremont worked to avoid discussions with investors regarding the Lehman collapse.  To one client trying to assess its Lehman exposure and exposure to other potentially precariously positioned counterparties, Johnston simply stated, "We are not responding to this."

199.    Mitchell crafted an answer to investors asking whether the Tremont Funds had Lehman risk, stating internally that "the line we should follow is that … [w]e do not discuss our counterparty arrangements as we are contractually bound not to."  In reply, Johnston went a step further, indicating his certainty that the "answer is 'no exposure'."

200.    These statements were misleading by implying Tremont knew of actual counterparty arrangements and could assure the investors that Tremont's counterparties presented no risk.  If Tremont's senior management believed its BLMIS options were real, however, the Lehman collapse would have been more than a non-event.

H.    **Tremont's Executives Had a Powerful Motive to Hide What They Knew About BLMIS and Madoff**

201.    Tremont's profitability and, as it turned out, its very existence, depended on BLMIS.  Tremont and the Tremont Funds benefitted from BLMIS's incredibly consistent, positive returns, which enhanced their investment track records and ability to attract business partners and clients.  This led to the Tremont Funds' AUM increasing rapidly.  For example, from its inception in January 1994 to November 2008, Rye Broad Market's AUM increased from $5.9 million to approximately $2.35 billion, a 400-fold increase.

202.    Tremont's revenues grew along with its AUM; during this period, Tremont received at least $255 million in fees from its BLMIS-facing products.

203.    Chief Financial Officer Lynn Keeshan noted that Tremont was "highly dependent" on Madoff, which accounted for "all of the profits of the firm."  Cichella said Rye Prime Fund's "only reason for being is as a $2b feeder into Madoff."  Pologe said BLMIS was Tremont's "crack addiction business."

204.    Tremont's parent company concluded that "the economics of Tremont's business [was] Madoff."  Tremont did nothing more to earn its fees through its Tremont Funds than provide access to BLMIS.  Pologe acknowledged Tremont "just sell[s] access [to BLMIS] for 2% management fee . . . We make a lot of money off this."  As Schulman told Mitchell, for some customers, on top of the management fee, Tremont levied "a 50 basis point surcharge for them to access Madoff."

205.    Fees were a powerful reason for funds like Tremont to close their eyes and hide what they knew about BLMIS's fraud.  As noted by Albourne in late 2008, "We have been advised by some of the [funds invested in BLMIS] that they are not interested in knowing more about the product due to the fees they are earning on the product."

I.      **Tremont Co-Managed Kingate Global**

206.    Tremont also knew of Madoff's fraud based on its tight-knit relationship with the Kingate Funds and their management.[1]

207.    From the inception of their respective BLMIS investment accounts, Federico Ceretti and Carlo Grosso worked closely with Manzke to create Kingate Global and its manager, Kingate Management Limited ("Kingate Management," and collectively with the Kingate Funds, Ceretti, Grosso, and Manzke, "Kingate").

208.    Manzke introduced Ceretti and Grosso to Madoff in 1993 and worked with Ceretti and Grosso as a Kingate Global director and manager from 1995 until 2004.

209.    The Tremont-Kingate relationship continued through the revelation of Madoff's fraud. Kingate Global was co-managed by Kingate Management and Tremont affiliate Tremont (Bermuda) Ltd. ("Tremont Bermuda")—an entity described by—Manzke as "a pass through," which delegated management responsibilities to Tremont in New York and shared officers and directors with Tremont Partners, including Schulman and Manzke.

210.    In or around March 1995, Kingate Management and Tremont executed a co-manager agreement with Kingate Global. Pursuant to the agreement, Kingate Management and Tremont Bermuda were tasked with evaluating and monitoring BLMIS and providing necessary management services to Kingate Global. Manzke and Hammond were listed as "principal decision-makers" in May 2005.

211.    As part of this deal, Kingate Management and Tremont Bermuda also split Kingate Global's management fees, which provided Tremont with a significant revenue. Between 1998

---

[1] The factual allegations in the Trustee's Fourth Amended Complaint against Kingate Global and concerning the role of Kingate Management Limited are incorporated by reference. *Picard v. Ceretti*, Adv. Pro. No. 09-01161 (Bankr. S.D.N.Y. Mar. 17, 2014), ECF No. 100.

and 2008, Tremont received over $40 million in fees for funneling investor assets to Kingate Global.

212.    Tremont Bermuda and Kingate Management were co-agents to Kingate Global through their conduct and the operation of the various agreements entered into between the parties. As such, Kingate's knowledge that BLMIS's IA Business was a fraud may be imputed to Tremont.

## X.  TRANSFERS

### A.    The Fairfield Funds Transfers

#### 1.    Initial Transfers from BLMIS to Fairfield Sentry

213.    The Trustee commenced a separate adversary proceeding against the Fairfield Funds and other defendants in this Court under the caption *Picard v. Fairfield Sentry Ltd*., Adv. Pro. No. 09-01239 (CGM), seeking to avoid and recover initial transfers of customer property from BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").  A chart setting forth the Fairfield Sentry Initial Transfers is attached as Exhibit B.

214.    The Fairfield Sentry Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

215.    By orders dated June 7 and June 10, 2011, this Court approved a settlement among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a consent judgment in favor of the Trustee and against Fairfield Sentry in the amount of $3,054,000,000 ("Judgment Amount"). *Id*., ECF No. 109.

216.    On August 28, 2020, the Trustee filed the Fairfield Second Amended Complaint seeking in part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.  *Id*. (Bankr. S.D.N.Y. Aug. 28, 2020), ECF No. 286.

217.    As alleged in the Fairfield Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS.

218.    Of the Judgment Amount, $2,895,000,000 was transferred to Fairfield Sentry during the six years preceding the Filing Date (the "Fairfield Sentry Six Year Transfers").  Each of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code, applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

219.    Of the Fairfield Sentry Six Year Transfers, at least $1,580,000,000 was transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Transfers").  Each of the Fairfield Sentry Two Year Transfers is avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

## 2.    Subsequent Transfers from Fairfield Sentry to Defendant BGL BNP Paribas

220.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to BGL BNP Paribas.  Based on the Trustee's investigation to date, the subsequent transfers to BGL BNP Paribas total $428,837 (the "Fairfield Sentry-BGL BNP Paribas Subsequent Transfers").  A chart setting forth the Fairfield Sentry-BGL BNP Paribas Subsequent Transfers is attached as Exhibit C.

221.    The Fairfield Sentry-BGL BNP Paribas Subsequent Transfers are recoverable from BGL BNP Paribas under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

## 3.    Subsequent Transfers from Fairfield Sentry to Defendant BNP Paribas Arbitrage

222.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to BNP Paribas Arbitrage.  Based on the Trustee's investigation to date, the subsequent transfers to BNP Paribas Arbitrage total $20,187,336 (the "Fairfield Sentry-

BNP Paribas Arbitrage Subsequent Transfers"). A chart setting forth the Fairfield Sentry-BNP Paribas Arbitrage Subsequent Transfers is attached as Exhibit D.

223.    The Fairfield Sentry-BNP Paribas Arbitrage Subsequent Transfers are recoverable from BNP Paribas Arbitrage under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**4.    Subsequent Transfers from Fairfield Sentry to Defendant BNP Paribas Cayman**

224.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to BNP Paribas Cayman. Based on the Trustee's investigation to date, the subsequent transfers to BNP Paribas Cayman total $13,474,091 (the "Fairfield Sentry-BNP Paribas Cayman Subsequent Transfers"). A chart setting forth the Fairfield Sentry-BNP Paribas Cayman Subsequent Transfers is attached as Exhibit E.

225.    The Fairfield Sentry-BNP Paribas Cayman Subsequent Transfers are recoverable from BNP Paribas Cayman under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**5.    Subsequent Transfers from Fairfield Sentry to Defendant BNP Paribas Securities Services**

226.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to BNP Paribas Securities Services. Based on the Trustee's investigation to date, the subsequent transfers to BNP Paribas Securities Services total $29,999,237 (the "Fairfield Sentry-BNP Paribas Securities Services Subsequent Transfers"). A chart setting forth the Fairfield Sentry-BNP Paribas Securities Services Subsequent Transfers is attached as Exhibit F.

227.   The Fairfield Sentry-BNP Paribas Securities Services Subsequent Transfers are recoverable from BNP Paribas Securities Services under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

### 6.   Subsequent Transfers from Fairfield Sentry to Defendant BNP Paribas Securities Services Luxembourg

228.   Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to BNP Paribas Securities Services Luxembourg.  Based on the Trustee's investigation to date, the subsequent transfers to BNP Paribas Securities Services Luxembourg total $8,251,780 (the "Fairfield Sentry-BNP Paribas Securities Services Luxembourg Subsequent Transfers").  A chart setting forth the Fairfield Sentry-BNP Paribas Securities Services Luxembourg Subsequent Transfers is attached as Exhibit G.

229.   The Fairfield Sentry-BNP Paribas Securities Services Luxembourg Subsequent Transfers are recoverable from BNP Paribas Securities Services Luxembourg under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

### 7.   Subsequent Transfers from Fairfield Sentry to Defendant BNP Paribas Suisse

230.   Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to BNP Paribas Suisse.  Based on the Trustee's investigation to date, the subsequent transfers to BNP Paribas Suisse total $5,936,718 (the "Fairfield Sentry-BNP Paribas Suisse Subsequent Transfers").  A chart setting forth the Fairfield Sentry-BNP Paribas Suisse Subsequent Transfers is attached as Exhibit H.

231.   The Fairfield Sentry-BNP Paribas Suisse Subsequent Transfers are recoverable from BNP Paribas Suisse under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

### 8.    Subsequent Transfers from Fairfield Sentry to Fairfield Sigma

232.    Prior to the Filing Date, Fairfield Sentry subsequently transferred approximately $789,152,864 of the Fairfield Initial Transfers directly to Fairfield Sigma (the "Sigma Subsequent Transfers").  A chart setting forth the Sigma Subsequent Transfers is attached as Exhibit I.

### 9.    Subsequent Transfers from Fairfield Sigma to Defendant BGL BNP Paribas

233.    Fairfield Sigma transferred at least $1,270,141 of the Sigma Subsequent Transfers to BGL BNP Paribas (the "Fairfield Sigma-BGL BNP Paribas Subsequent Transfers"). A chart setting forth the Fairfield Sigma-BGL BNP Paribas Subsequent Transfers is attached as Exhibit J.

234.    The Fairfield Sigma-BGL BNP Paribas Subsequent Transfers are recoverable from BGL BNP Paribas under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

### 10.    Subsequent Transfers from Fairfield Sigma to Defendant BNP Paribas Securities Services

235.    Fairfield Sigma transferred at least $5,652,076 of the Sigma Subsequent Transfers to BNP Paribas Securities Services (the "Fairfield Sigma-BNP Paribas Securities Services Subsequent Transfers").  A chart setting forth the Fairfield Sigma-BNP Paribas Securities Services Subsequent Transfers is attached as Exhibit K.

236.    The Fairfield Sigma-BNP Paribas Securities Services Subsequent Transfers are recoverable from BNP Paribas Securities Services under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

### 11.    Subsequent Transfers from Fairfield Sigma to Defendant BNP Paribas Securities Services Luxembourg

237.    Fairfield Sigma transferred at least $1,677,928 of the Sigma Subsequent Transfers to BNP Paribas Securities Services Luxembourg (the "Fairfield Sigma-BNP Paribas Securities

Services Luxembourg Subsequent Transfers"). A chart setting forth the Fairfield Sigma-BNP Paribas Securities Services Luxembourg Subsequent Transfers is attached as Exhibit L.

238.    The Fairfield Sigma-BNP Paribas Securities Services Luxembourg Subsequent Transfers are recoverable from BNP Paribas Securities Services Luxembourg under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**12.    Subsequent Transfers from Fairfield Sigma to Defendant BNP Paribas Suisse**

239.    Fairfield Sigma transferred at least $1,231,839 of the Sigma Subsequent Transfers to BNP Paribas Suisse (the "Fairfield Sigma-BNP Paribas Suisse Subsequent Transfers"). A chart setting forth the Fairfield Sigma-BNP Paribas Suisse Subsequent Transfers is attached as Exhibit M.

240.    The Fairfield Sigma-BNP Paribas Suisse Subsequent Transfers are recoverable from BNP Paribas Suisse under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

241.    Each subsequent transfer to Defendants from the Fairfield Funds represents a redemption of an equity interest by Defendants as shareholders in the Fairfield Funds. Because the Fairfield Funds invested substantially all of their assets into the BLMIS Ponzi scheme, the Fairfield Funds were insolvent when they made each subsequent transfer to Defendants upon redemption of Defendants' interests.

242.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (a) supplement the information on the initial and subsequent transfers discussed above, and additional subsequent transfers from the Fairfield Funds; and (b) seek avoidance and recovery of such transfers.

B.    **The Tremont Funds Transfers**

1.    **The Tremont Avoidance Action**

243.    The Trustee commenced a separate adversary proceeding against the Tremont Funds and other funds directly or indirectly invested with BLMIS that were managed by Tremont, including Rye Select Broad Market Prime Fund L.P. ("Prime Fund") and Rye Select Broad Market Fund, L.P. ("Broad Market Fund"), in the Bankruptcy Court under the caption, *Picard v. Tremont Group Holdings, Inc.*, Adv. Pro. No. 10-05310 (CGM) (the "Tremont Avoidance Action"), seeking to avoid and recover initial transfers of customer property from BLMIS in the amount of $2,140,297,364 (the "Tremont Initial Transfers").    The Trustee incorporates by reference the allegations contained in the Tremont Avoidance Action Complaint as if fully set forth herein.    *Id.* (Bankr. S.D.N.Y. Dec. 7, 2010), ECF No. 1.

244.    By the Order dated September 22, 2011, this Court approved a settlement among the Trustee, the Tremont Funds, and other defendants in the Tremont Avoidance Action (the "Tremont Settlement"), and entered a consent judgment granting the Trustee a judgment in the amount of $1,025,000,000.

245.    The Tremont Settlement specifically provides that the transfers made to the various feeder fund defendants in the Tremont Complaint were "deemed avoided."

2.    **Initial Transfers from BLMIS to Prime Fund**

246.    Of the Tremont Initial Transfers, $945,000,000 was transferred to Prime Fund, Account Number 1C1260, in the six years preceding the Filing Date (the "Prime Fund Six Year Initial Transfers").    A chart setting forth the Prime Fund Six Year Initial Transfers is attached as Exhibit N.    The Prime Fund Six Year Initial Transfers are avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

247.    Of the Prime Fund Six Year Transfers, $495,000,000 was transferred to Prime Fund during the two years preceding the Filing Date (the "Prime Fund Two Year Initial Transfers"). The Prime Fund Two Year Initial Transfers are avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

248.    The Prime Fund Six Year Initial Transfers and the Prime Fund Two Year Initial Transfers are collectively defined as the "Prime Fund Initial Transfers."

249.    Prime Fund received the Prime Fund Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Prime Fund to inquire further into the BLMIS fraud.

250.    The Prime Fund Initial Transfers were and continue to be customer property within the meaning of 15 U.S.C. § 78*lll*(4).

### 3.    Initial Transfers from BLMIS to Broad Market Fund

251.    Of the Tremont Initial Transfers, $252,000,000 was transferred to Broad Market Fund, Account Number 1T0027, in the six years preceding the Filing Date (the "Broad Market Fund Six Year Initial Transfers").  A chart setting forth the Broad Market Fund Six Year Initial Transfers is included as Exhibit O.  The Broad Market Fund Six Year Initial Transfers are avoidable under section 544 of the Bankruptcy Code, applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

252.    Of the Broad Market Fund Six Year Transfers, $60,000,000 was transferred to Broad Market Fund during the two years preceding the Filing Date (the "Broad Market Fund Two Year Initial Transfers").  The Broad Market Fund Two Year Initial Transfers are avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

253.    The Broad Market Fund Six Year Initial Transfers, the Broad Market Fund Two Year Initial Transfers are collectively defined as the "Broad Market Fund Initial Transfers."

254.    Broad Market Fund received the Broad Market Fund Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Broad Market Fund to inquire further into the BLMIS fraud.

255.    The Broad Market Fund Initial Transfers were and continue to be customer property within the meaning of 15 U.S.C. § 78*lll*(4).

4.      **Subsequent Transfers to XL LP and Subsequently to Defendant BNP Paribas Cayman**

256.    Prior to the Filing Date, Broad Market Fund subsequently transferred at least $48,387,616 of the Broad Market Fund Initial Transfers directly to XL LP, and Prime Fund subsequently transferred at least $292,472,765 of the Prime Fund Initial Transfers directly to XL LP (the "XL-LP Transfers").  A chart setting forth the XL-LP Transfers is attached as Exhibit P.

257.    Thereafter, XL LP subsequently transferred at least $2,987,824 of the XL-LP Transfers to BNP Paribas Cayman (the "XL LP-BNP Paribas Cayman Subsequent Transfers").  A chart setting forth the XL LP-BNP Paribas Cayman Subsequent Transfers is attached as Exhibit Q.

258.    The XL LP-BNP Paribas Cayman Subsequent Transfers are recoverable from BNP Paribas Cayman under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

5.      **Initial Transfers from BLMIS to Portfolio Limited**

259.    Of the Tremont Initial Transfers, $609,000,000 was transferred to Portfolio Limited, Account Number 1FR080, in the six years preceding the Filing Date (the "Portfolio Limited Six Year Initial Transfers").  A chart setting forth the Portfolio Limited Six Year Initial Transfers is attached as Exhibit R.  The Portfolio Limited Six Year Initial Transfers are avoidable

under section 544 of the Bankruptcy Code, applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

260.    Of the Portfolio Limited Six Year Transfers, $350,000,000 was transferred to Portfolio Limited during the two years preceding the Filing Date (the "Portfolio Limited Two Year Initial Transfers"). The Portfolio Limited Two Year Initial Transfers are avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

261.    The Portfolio Limited Six Year Initial Transfers and the Portfolio Limited Two Year Initial Transfers are collectively defined as the "Portfolio Limited Initial Transfers."

262.    Portfolio Limited received the Portfolio Limited Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Portfolio Limited to inquire further into the BLMIS fraud.

263.    The Portfolio Limited Initial Transfers were and continue to be customer property within the meaning of 15 U.S.C. § 78*lll*(4).

**6.    Subsequent Transfers from Portfolio Limited to Defendant BNP Paribas Cayman**

264.    Prior to the Filing Date, Portfolio Limited transferred $8,370,304 of the Portfolio Limited Initial Transfers to BNP Paribas Cayman (the "Portfolio Limited-BNP Paribas Cayman Subsequent Transfers"). A chart setting forth the Portfolio Limited-BNP Paribas Cayman Subsequent Transfers is attached as Exhibit S.

265.    The Portfolio Limited-BNP Paribas Cayman Subsequent Transfers are recoverable from BNP Paribas Cayman under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

7.      **Subsequent Transfers from Portfolio Limited to Defendant BNP Paribas Securities Services**

266.    Prior to the Filing Date, Portfolio Limited transferred $3,097,994 of the Portfolio Limited Initial Transfers to BNP Paribas Securities Services (the "Portfolio Limited-BNP Paribas Securities Services Subsequent Transfers").   A chart setting forth the Portfolio Limited-BNP Paribas Securities Services Subsequent Transfer is attached as Exhibit T.

267.    The Portfolio Limited-BNP Paribas Securities Services Subsequent Transfers are recoverable from BNP Paribas Securities Services under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

8.      **Subsequent Transfers from Portfolio Limited to XL Portfolio**

268.    Prior to the Filing Date, Portfolio Limited subsequently transferred at least $74,298,573 of the Portfolio Limited Initial Transfers directly to XL Portfolio (the "XL Portfolio Transfers").  A chart setting forth the XL Portfolio Transfers is attached as Exhibit U.

9.      **Subsequent Transfers from XL Portfolio to Defendant BNP Paribas Arbitrage**

269.    XL Portfolio transferred at least $6,452,906 of the XL Portfolio Transfers to BNP Paribas Arbitrage (the "XL Portfolio-BNP Paribas Arbitrage Subsequent Transfers").   A chart setting forth the XL Portfolio-BNP Paribas Arbitrage Subsequent Transfers is attached as Exhibit V.

270.    The XL Portfolio-BNP Paribas Arbitrage Subsequent Transfers are recoverable from BNP Paribas Arbitrage under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

10.     **Subsequent Transfers from XL Portfolio to Defendant BNP Paribas Cayman**

271.    XL Portfolio transferred at least $2,500,000 to BNP Paribas Cayman (the "XL Portfolio-BNP Paribas Cayman Subsequent Transfers").  A chart setting forth the XL Portfolio-BNP Paribas Cayman Subsequent Transfers is attached as Exhibit W.

272.    The XL Portfolio-BNP Paribas Cayman Subsequent Transfers are recoverable from BNP Paribas Cayman under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

273.    Each subsequent transfer to Defendants from the Tremont Funds represents a redemption of an equity interest by Defendants as shareholders in the Tremont Funds.  Because the Tremont Funds invested all of their assets into the BLMIS Ponzi scheme, the Tremont Funds were insolvent when they made each subsequent transfer to Defendants upon redemption of Defendants' interests.

274.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (a) supplement the information on the initial and subsequent transfers discussed above, and additional subsequent transfers from the Tremont Funds; and (b) seek avoidance and recovery of such transfers.

## <u>COUNT ONE</u>

### RECOVERY OF SUBSEQUENT TRANSFERS
### FROM DEFENDANT BGL BNP PARIBAS
### UNDER 11 U.S.C. §§ 105(a) AND 550(a)

275.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

276.    The Fairfield Sentry-BGL BNP Paribas Subsequent Transfers and Fairfield Sigma-BGL BNP Paribas Subsequent Transfers (together, the "BGL BNP Paribas Subsequent Transfers") are recoverable from BGL BNP Paribas under section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

277.    BGL BNP Paribas is an immediate or mediate transferee of the BGL BNP Paribas Subsequent Transfers.

278.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against BGL BNP Paribas: (a) recovering the BGL BNP Paribas Subsequent Transfers, or the value thereof, from BGL BNP Paribas for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

## COUNT TWO

### RECOVERY OF SUBSEQUENT TRANSFERS
### FROM DEFENDANT BNP PARIBAS ARBITRAGE
### UNDER 11 U.S.C. §§ 105(a) AND 550(a)

279.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

280.    The Fairfield Sentry-BNP Paribas Arbitrage Subsequent Transfers and XL Portfolio-BNP Paribas Arbitrage Subsequent Transfers and (together, the "BNP Paribas Arbitrage Subsequent Transfers") are recoverable from BNP Paribas Arbitrage under section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

281.    BNP Paribas Arbitrage is an immediate or mediate transferee of the BNP Paribas Arbitrage Subsequent Transfers.

282.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against BNP Paribas Arbitrage: (a) recovering the BNP Paribas Arbitrage Subsequent Transfers, or the value thereof, from BNP Paribas Arbitrage for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

## COUNT THREE

### RECOVERY OF SUBSEQUENT TRANSFERS
### FROM DEFENDANT BNP PARIBAS CAYMAN
### UNDER 11 U.S.C. §§ 105(a) AND 550(a)

283.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

284.    The Fairfield Sentry-BNP Paribas Cayman Subsequent Transfers, XL LP-BNP Paribas Cayman Subsequent Transfers, Portfolio Limited-BNP Paribas Cayman Subsequent Transfers, and XL Portfolio-BNP Paribas Cayman Subsequent Transfers (collectively, the "BNP Paribas Cayman Subsequent Transfers") are recoverable from BNP Paribas Cayman under section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

285.    BNP Paribas Cayman is an immediate or mediate transferee of the BNP Paribas Cayman Subsequent Transfers.

286.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against BNP Paribas Cayman: (a) recovering the BNP Paribas Cayman Subsequent Transfers, or the value thereof, from BNP Paribas Cayman for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

## COUNT FOUR

### RECOVERY OF SUBSEQUENT TRANSFERS
### FROM DEFENDANT BNP PARIBAS SECURITIES SERVICES
### UNDER 11 U.S.C. §§ 105(a) AND 550(a)

287.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

288.    The Fairfield Sentry-BNP Paribas Securities Services Subsequent Transfers, Fairfield Sigma-BNP Paribas Securities Services Subsequent Transfers, and Portfolio Limited-BNP Paribas Securities Services Subsequent Transfers (collectively, the "BNP Paribas Securities Services Subsequent Transfers") are recoverable from BNP Paribas Securities Services under section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

289.   BNP Paribas Securities Services is an immediate or mediate transferee of the BNP Paribas Securities Services Subsequent Transfers.

290.   As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against BNP Paribas Securities Services: (a) recovering the BNP Paribas Securities Services Subsequent Transfers, or the value thereof, from BNP Paribas Securities Services for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

## COUNT FIVE

### RECOVERY OF SUBSEQUENT TRANSFERS
### FROM DEFENDANT BNP PARIBAS SECURITIES SERVICES LUXEMBOURG
### UNDER 11 U.S.C. §§ 105(a) AND 550(a)

291.   The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

292.   The Fairfield Sentry-BNP Paribas Securities Services Luxembourg Subsequent Transfers and Fairfield Sigma-BNP Paribas Securities Services Luxembourg Subsequent Transfers (collectively, the "BNP Paribas Securities Services Luxembourg Subsequent Transfers") are recoverable from BNP Paribas Securities Services Luxembourg under section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

293.   BNP Paribas Securities Services Luxembourg is an immediate or mediate transferee of the BNP Paribas Securities Services Luxembourg Subsequent Transfers.

294.   As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against BNP Paribas Securities Services Luxembourg: (a) recovering the BNP Paribas Securities Services Luxembourg Subsequent Transfers, or the value thereof, from BNP Paribas Securities Services

Luxembourg for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

## COUNT SIX

### RECOVERY OF SUBSEQUENT TRANSFERS FROM DEFENDANT BNP PARIBAS SUISSE UNDER 11 U.S.C. §§ 105(a) AND 550(a)

295.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

296.    The Fairfield Sentry-BNP Paribas Suisse Subsequent Transfers and Fairfield Sigma-BNP Paribas Suisse Subsequent Transfers (together, the "BNP Paribas Suisse Subsequent Transfers") are recoverable from BNP Paribas Suisse under section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

297.    BNP Paribas Suisse is an immediate or mediate transferee of the BNP Paribas Suisse Subsequent Transfers.

298.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against BNP Paribas Suisse: (a) recovering the BNP Paribas Suisse Subsequent Transfers, or the value thereof, from BNP Paribas Suisse for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Defendants as follows:

a.      On the First Claim for Relief, recovering the BGL BNP Paribas Subsequent Transfers, or the value thereof, from BGL BNP Paribas for the benefit of the estate;

b.        On the Second Claim for Relief, recovering the BNP Paribas Arbitrage Subsequent Transfers, or the value thereof, from BNP Paribas Arbitrage for the benefit of the estate;

c.        On the Third Claim for Relief, recovering the BNP Paribas Cayman Subsequent Transfers, or the value thereof, from BNP Paribas Cayman for the benefit of the estate;

d.        On the Fourth Claim for Relief, recovering the BNP Paribas Securities Services Subsequent Transfers, or the value thereof, from BNP Paribas Securities Services for the benefit of the estate;

e.        On the Fifth Claim for Relief, recovering the BNP Paribas Securities Services Luxembourg Subsequent Transfers, or the value thereof, from BNP Paribas Securities Services Luxembourg for the benefit of the estate;

e.        On the Sixth Claim for Relief, recovering the BNP Paribas Suisse Subsequent Transfers, or the value thereof, from BNP Paribas Suisse for the benefit of the estate;

f.        If any or all of the Defendants challenges the avoidability of the Tremont Initial Transfers and/or the Fairfield Sentry Initial Transfers, the Trustee seeks a judgement under Fed. R. Bank. P. 7001(1) and (9) declaring that such transfers are avoidable pursuant to 15 U.S.C. § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and §§ 273-279 of the N.Y. Debt. & Cred. Law, as applicable, and as necessary to recover the subsequent transfers sought herein pursuant to section 550 and 15 U.S.C. 78fff-2(c)(3);

g.        Awarding the Trustee prejudgment interest from the date on which the subsequent transfers sought herein were received by Defendants; and

h.    Awarding the Trustee fees and all applicable costs and disbursements, and

such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: May 26, 2023
New York, New York

/s/ David J. Sheehan
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201
David J. Sheehan
Email:  dsheehan@bakerlaw.com
Torello H. Calvani
Email:  tcalvani@bakerlaw.com
Joanna F. Wasick
Email:  jwasick@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Chapter 7 Estate of Bernard L. Madoff*