**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the
Substantively Consolidated SIPA Liquidation
of Bernard L. Madoff Investment Securities LLC
and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (CGM) <br><br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, <br><br> Plaintiff, <br> v. <br><br> BNP PARIBAS ARBITRAGE SNC, <br><br> Defendant. | Adv. Pro. No. 11-02796 (CGM) <br><br><br> **AMENDED COMPLAINT** |

Irving H. Picard, as trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa-*lll* ("SIPA"), substantively consolidated with the chapter 7 estate of Bernard L. Madoff, by and through his undersigned counsel, for his Amended Complaint against defendant BNP Paribas Arbitrage SNC ("BNP Paribas Arbitrage"), alleges the following:

## I.   NATURE OF THE ACTION

1. This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS customer property, as defined by SIPA § 78*lll*(4), that was stolen as part of the massive Ponzi scheme perpetrated by Madoff and others.

2. With this Amended Complaint, the Trustee seeks to recover $1,054,960.052 in subsequent transfers of BLMIS customer property received by BNP Paribas Arbitrage from Harley International (Cayman) Ltd. ("Harley"), a BLMIS "feeder fund" that invested all of its assets with BLMIS.

## II.   SUBJECT MATTER JURISDICTION AND VENUE

3. This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) and (e)(1) and 15 U.S.C. §§ 78eee(b)(2)(A) and (b)(4).

4. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (F), (H), and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that

consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

5. Venue in this judicial district is proper under 28 U.S.C. § 1409.

6. This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

### III. BACKGROUND, THE TRUSTEE, AND STANDING

7. On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

8. On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

9. Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

    (a) appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

    (b) appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

    (c) removed the case to this Court pursuant to SIPA § 78eee(b)(4).

10. By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

2

11. On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

12. At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

13. At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

14. At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

15. On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

16. As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

17. Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

18. The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

IV. **BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY**

    A. **BLMIS**

19. Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker-dealer with the SEC. In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company. At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

4

20. In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008. Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation. At all times, BLMIS was assigned CRD No. 2625. SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960. On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status. SIPC membership is contingent on registration of the broker-dealer with the SEC.

21. For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker-dealer operation, and an investment advisory business (the "IA Business").

22. BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

23. For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

24. In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total

5

assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

      B.      The Ponzi Scheme

25.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

26.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

27.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three

employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

28.     On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

Madoff's Investment Strategy

29.     In general, BLMIS purported to execute two primary investment strategies for BLMIS customers: the convertible arbitrage strategy and the split-strike conversion strategy (the "SSC Strategy"). At all relevant times, Madoff conducted no legitimate business operations using these strategies.

30.     All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

31.     The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets. By the early 1990s, the strategy was purportedly used in only a small percentage of BLMIS accounts.

32.     From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

7

33. BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

34. By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

35. The put options were to limit the downside risk of sizeable price changes in the basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option should have entailed a loss for BLMIS.

36. The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

37. The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protection while limiting the upside.

38. If Madoff was putting on the same baskets of equities across all BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket. For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the

8

purchase/sale of call and put options, with a notional value of $11.7 billion. There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

39. Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call or put option notional value to support the Madoff SSC Strategy.

40. Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

### BLMIS's Fee Structure

41. BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

### BLMIS's Market Timing

42. Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he succeeded at market timing by intermittently entering and exiting the market. During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury bills or mutual funds invested in Treasury bills.

9

43. As a registered broker-dealer, BLMIS was required, pursuant to 17 C.F.R. § 240.17a-5, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS reportedly exited the market completely at every year end and every quarter end starting in 2003. These quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

44. BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

BLMIS Execution

45. BLMIS's execution showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

No Evidence of BLMIS Trading

46. There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

47. All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing

10

Corporation ("OCC"). The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

### The Collapse Of The Ponzi Scheme

48. The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

49. At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS, through its IA Business, operated as a Ponzi scheme.

50. At all relevant times, BLMIS was insolvent because: (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## V.   THE DEFENDANT

51. Defendant BNP Paribas Arbitrage is a general partnership incorporated and organized under the laws of France as a *société en nom collectif*. It is a wholly owned subsidiary of BNP Paribas S.A. ("BNP Paribas").

52. BNP Paribas Arbitrage maintains offices at 16 Boulevard des Italiens in Paris, France and at 787 Seventh Avenue in New York, New York.

53. BNP Paribas Arbitrage invested in and/or received transfers of customer property from at least seven BLMIS feeder funds, including Equity Trading Portfolio Ltd., Fairfield Sentry Ltd., Groupement Financier Ltd., Kingate Euro Fund Ltd., Kingate Global Fund Ltd., Rye Select Broad Market XL Portfolio Ltd., and Harley.

## VI.  THE HARLEY FEEDER FUND

54. Harley was a Cayman Islands company that maintained a customer account at BLMIS. Harley invested all of its assets with BLMIS in New York.

55. In its Memorandum of Association, Harley represented that, under the Cayman Islands Companies Law: "The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands." As such, Harley was registered as an exempt company under Cayman Islands law and was not permitted to solicit investors in the Cayman Islands.

56. Harley had no employees or offices of its own. Harley acted through Fix Asset Management, Inc. ("FAM"), a fund-of-funds manager incorporated under New York law, with its principal place of business in New York, New York. FAM was owned and controlled by Charles Fix, a New York resident who owned and controlled all of the voting shares of Harley.

57. FAM in New York (i) received Harley's account statements from BLMIS; (ii) corresponded directly with BLMIS to request redemptions from Harley's BLMIS account; and (iii) marketed the sale of shares in Harley and Harley's levered sub-funds to investors.

58. In Harley's subscription agreements, investors affirmed having received and read the terms set forth in the Harley Confidential Explanatory Memorandum (the "Harley Memorandum").

59. As set forth in the Harley Memorandum, investors received copies of Harley's annual audited financial statements. The audited financial statements for years 2002 through 2007 disclosed that BLMIS in New York acted as Harley's custodian, holding virtually all of Harley's assets.

60. As set forth in the Harley Memorandum, investors agreed that their investments in Harley would be governed by the fund's articles of association (the "Harley Articles of Association"). The Harley Articles of Association, in turn, provided that all disputes among

Harley and its shareholders were subject to binding arbitration in New York pursuant to the rules established by the American Arbitration Association.

61. The Harley Memorandum disclosed that Euro-Dutch Trust Company (Bahamas) Limited acted as Harley's purported investment manager, and beginning in 2003, Euro-Dutch Management Limited in the Cayman Islands acted as Harley's purported investment manager. Neither entity played a meaningful role in managing Harley's investments with BLMIS. Instead, both entities delegated their investment management responsibilities to BLMIS in New York.

62. In its subscription agreements, Harley directed investors to wire U.S. dollars to an account at the Northern Trust Banking Corporation, located at 40 Broad Street in New York, New York. When Harley withdrew funds from its BLMIS account, BLMIS transferred the withdrawn funds to the same Northern Trust Banking Corporation account in New York.

## VII. THE FUND DERIVATIVES GROUP

63. The Fund Derivatives Group is a business group within the overarching BNP Paribas enterprise's Global Equity & Derivatives Division.

64. The Fund Derivatives Group is comprised of employees of BNP Paribas and certain of its branches and subsidiaries, including BNP Paribas Arbitrage and its affiliate, BNP Paribas Securities Corp., a U.S. registered broker-dealer based in New York.

65. During the relevant time period, the Fund Derivatives Group created, marketed, and serviced credit facilities and derivative financial instruments such as swaps, notes, and other structured products. These products generally offered BNP Paribas's customers leverage, and in return, BNP Paribas and its subsidiaries received tens of millions of dollars in fees and interest payments.

13

66. In 2003, BNP Paribas acquired the assets of Zurich Capital Markets, Inc. ("ZCM"). ZCM was the U.S. structured products business of Zurich Financial Services AG and was based in New York and incorporated in Delaware.

67. As part of the ZCM acquisition, approximately sixty former ZCM employees in New York became BNP Paribas employees.

68. The acquisition also included ZCM's investment portfolio, which included a multi-million-dollar credit facility with Santa Barbara Holdings Ltd. ("Santa Barbara"). Santa Barbara was a FAM fund that was invested entirely in Harley.

69. In February 2004, BNP Paribas, through its Fund Derivatives Group, executed a credit facility with Santa Barbara.

70. The credit facility agreement and related custody, control, and pledge agreements contained New York choice-of-law and venue provisions.

71. The credit facility agreement called for BNP Paribas to make senior secured loans to Santa Barbara for investments with Harley and explicitly referenced Harley's "Madoff Account" with BLMIS as collateral for the credit facility.

72. BNP Paribas Securities Corp. operated as calculation agent for the credit facility. In this role, BNP Paribas Securities Corp. calculated the facility's interest rates, fees, and loan-to-value ratio, and notified BNP Paribas and FAM of these calculations.

73. BNP Paribas Securities Corp. also operated as collateral agent, and provided operational support to BNP Paribas and BNP Paribas Arbitrage, including requesting redemptions and ensuring that loan valuations were communicated to FAM.

74. Between 2003 and 2008, BNP Paribas's and BNP Paribas Arbitrage's relationship with FAM, Santa Barbara, and Harley grew substantially. By the time of Madoff's arrest, BNP

14

Paribas Arbitrage had received transfers of approximately $1 billion in BLMIS customer property from Harley.

## VIII. PERSONAL JURISDICTION

77. BNP Paribas Arbitrage is subject to personal jurisdiction in this judicial district because it purposely availed itself of the laws and protections of the United States and New York State by, among other things, knowingly directing funds to be invested with New York-based BLMIS through Harley.

78. From its offices on Seventh Avenue in New York, and as part of the Fund Derivatives Group, BNP Paribas Arbitrage worked with employees of BNP Paribas and BNP Paribas Securities Corp. on transactions relating to investments with Harley and the transfers sought herein.

79. From these transactions, BNP Paribas Arbitrage knew:

    a. BLMIS in New York was the actual investment adviser for Harley;

    b. BLMIS in New York was the executing broker for Harley's investments and purportedly executed the SSC Strategy on behalf of Harley;

    c. Madoff's SSC Strategy purportedly involved the purchase and sale of U.S. equities, U.S. options, and Treasury bills, and the decisions regarding which securities to purchase were made by Madoff in New York;

    d. BLMIS in New York maintained custody of 99.99% of Harley's assets; and

    e. Harley's entire economic purpose was to deliver money to BLMIS in New York.

80. BNP Paribas Arbitrage received each of the transfers sought herein in a BNP Paribas bank account in New York, New York.

15

81. BNP Paribas Arbitrage thus maintained minimum contacts with the United States and New York in connection with the claims alleged herein. BNP Paribas Arbitrage should expect to be, and is, subject to the jurisdiction of the Bankruptcy Court under Bankruptcy Rule 7004, the New York Civil Practice Law and Rules, and the U.S. Constitution.

## IX.  RECOVERY OF SUBSEQUENT TRANSFERS TO BNP PARIBAS ARBITRAGE

82. The Trustee commenced a separate adversary proceeding against Harley in the Bankruptcy Court under the caption, *Picard v. Harley Int'l (Cayman) Ltd.,* Adv. Pro. No. 09-01187, to avoid and recover initial transfers of customer property from BLMIS to Harley in the amount of $1,072,800,000 (the "Initial Transfers"). The Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

83. On July 8, 2009, the Clerk of the Bankruptcy Court made an entry of default against Harley. On November 10, 2010, the Bankruptcy Court entered summary judgment against Harley in the amount of $1,066,800,000, and a default judgment against Harley in the amount of $6,020,000, for a total judgment against Harley in the amount of $1,072,820,000, from which no appeal was taken ("November 10, 2010 Judgment"). The Trustee has not yet recovered any monies as a result of the November 10, 2010 Judgment.

### A.  Initial Transfers From BLMIS To Harley

84. Of the Initial Transfers, BLMIS transferred $1,066,800,000 to Harley during the two years preceding the Filing Date (the "Two-Year Transfers"). Each of the Two-Year Transfers is avoidable under section 548 of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

85. The November 10, 2010 Judgment resulted in the avoidance of the Initial Transfers. The Trustee filed this action on October 6, 2011, thus timely filing this action within one year of the avoidance of the Initial Transfers.

16

86. Charts setting forth the Initial Transfers are attached as Exhibits A and B.

**B.    Subsequent Transfers from Harley to Defendant BNP Paribas Arbitrage**

87. Prior to the Filing Date, Harley transferred a portion of the Initial Transfers to BNP Paribas Arbitrage. Based on the Trustee's investigation to date, Harley transferred $1,054,960,052 in subsequent transfers of BLMIS customer property to BNP Paribas Arbitrage (the "Subsequent Transfers"). A chart setting forth the presently known Subsequent Transfers is attached as Exhibit C.

88. The Subsequent Transfers are recoverable from BNP Paribas Arbitrage under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

89. The Trustee's investigation is ongoing and the Trustee reserves the right to: (i) supplement the information on the Initial Transfers, Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

**COUNT ONE
RECOVERY OF SUBSEQUENT TRANSFERS –
11 U.S.C. § 550**

90. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

91. The Subsequent Transfers are recoverable from BNP Paribas Arbitrage under 11 U.S.C. § 550(a) and 15 U.S.C. § 78fff-2(c)(3).

92. BNP Paribas Arbitrage is an immediate or mediate transferee of the Subsequent Transfers.

93. As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and 15 U.S.C. §78fff-2(c)(3), the Trustee is entitled to a judgment against BNP Paribas Arbitrage: (a) recovering the Subsequent Transfers, or the value thereof, from BNP Paribas Arbitrage for

the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against BNP Paribas Arbitrage as follows:

a)  Recovering the Subsequent Transfers, or the value thereof, from BNP Paribas Arbitrage for the benefit of the estate;

b)  Awarding the Trustee prejudgment interest from the date on which the Subsequent Transfers were received by BNP Paribas Arbitrage; and

c)  Awarding the Trustee fees and all applicable costs and disbursements, and such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: May 26, 2023
New York, New York

*/s/ David J. Sheehan*
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Torello H. Calvani
Email: tcalvani@bakerlaw.com
Joanna F. Wasick
Email: jwasick@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Chapter 7 Estate of Bernard L. Madoff*

18