KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Plaza
New York, New York 10020
Tel: (212) 940-8800

*Attorneys for Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation (Substantively Consolidated) |
| v. | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant, | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 12-01699 (CGM) |
| Plaintiff, | **ANSWER WITH AFFIRMATIVE DEFENSES AND JURY DEMAND** |
| v. | |
| ROYAL BANK OF CANADA, individually and as successor in interest to Royal Bank of Canada (Asia) Limited; GUERNROY LIMITED; RBC TRUST COMPANY (JERSEY) LIMITED; BANQUE SYZ S.A., as successor in interest to Royal Bank of Canada (Suisse) S.A.; RBC DOMINION SECURITIES INC.; and RBC ALTERNATIVE ASSETS, L.P., | |
| Defendants. | |

156397914v3

Defendants Royal Bank of Canada, individually and as successor in interest to Royal Bank

of Canada (Asia) Limited, Guernroy Limited, RBC Trust Company (Jersey) Limited, Banque SYZ

S.A., as successor in interest to Royal Bank of Canada (Suisse) S.A., RBC Dominion Securities

Inc., and RBC Alternative Assets, L.P.'s (collectively, the "RBC Defendants") by their

undersigned counsel, as and for its Answer to the Amended Complaint of plaintiff Irving H. Picard

(the "Trustee" or "Plaintiff"), Trustee for the liquidation of Bernard L. Madoff Investment

Securities LLC ("BLMIS") and the Chapter 7 Estate of Bernard L. Madoff, respectfully aver as

follows:

## I.    **NATURE OF THE PROCEEDING**

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover
BLMIS customer property, as defined by SIPA § 78*lll*(4), that was stolen by BLMIS as part of the
massive Ponzi scheme perpetrated by Madoff and others.

**Response**:    The RBC Defendants deny the allegations of Paragraph 1, except admit

upon information and belief that Madoff perpetrated a Ponzi scheme and admit that the Trustee

purports to bring this adversary proceeding as part of the Trustee's efforts to recover BLMIS

customer property within the meaning of 15 U.S.C. § 78lll(4).

2.    The Trustee seeks to recover at least $77,217,644 in subsequent transfers of BLMIS
customer property (the "Transfers") made to Defendants. Defendants obtained the Transfers by
redeeming equity interests they held in the "BLMIS feeder funds" listed in the chart below.
BLMIS feeder funds were single-purpose entities that invested all or substantially all of their assets
with BLMIS's investment advisory business (the "IA Business"):

| Defendant | BLMIS feeder fund(s) | Transfers |
|---|---|---|
| Royal Bank of Canada, individually and as successor to RBC Asia | • Fairfield Sentry Limited ("Fairfield Sentry") | $19,130,650 |
| | • Rye Select Broad Market Prime Fund LP (*f/k/a* American Masters Broad Market Prime Fund, L.P., "Rye Prime Fund") | $938,000 |

| Guernroy | • Fairfield Sentry | $13,025,711 |
| | • Rye Select Broad Market Portfolio Limited (f/k/a American Masters Broad Market Fund II Limited, "Rye Portfolio Limited") | $4,836,009 |
| RBC Trust | • Fairfield Sentry | $178,459 |
| Banque SYZ as successor to RBC Suisse | • Fairfield Sentry | $3,726,744 |
| RBC Dominion | • Fairfield Sentry | $1,958,206 |
| RBC Alternative | • Rye Prime Fund | $15,346,605 |
| | • Rye Select Broad Market Fund LP (*f/k/a* American Masters Broad Market Fund, L.P., "Rye Broad Market" and together with Rye Prime Fund and Rye Portfolio Limited, the "Rye Select Funds") | $18,077,260 |

**Response**:    The RBC Defendants deny the allegations of Paragraph 2, including that the RBC Defendants received subsequent transfers of customer property from BLMIS or any Madoff feeder fund, except the RBC Defendants admit that the Trustee purports to allege claims to recover approximately $77,217,644 in alleged subsequent transfers to the RBC Defendants in this action.

3.    At all relevant times, each Defendant was part of the worldwide Royal Bank of Canada enterprise, a highly sophisticated financial organization consisting of Defendant Royal Bank of Canada and its subsidiaries, all of which operated under the master brand name "RBC" (the enterprise collectively, "RBC"). Defendant Royal Bank of Canada was the 100% indirect parent of each other Defendant.

**Response**:    The RBC Defendants deny the allegations of Paragraph 3, except admit that Defendant Royal Bank of Canada and certain of its subsidiaries, at times operated under a formulation of the name "RBC" and that Defendant Royal Bank of Canada was the 100% indirect parent of each other Defendant.

156397914v3

## II.    <u>BACKGROUND, THE TRUSTEE, AND STANDING</u>

4.      On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and Exchange Commission (the "SEC") commenced the District Court Proceeding.

**<u>Response</u>**:      The RBC Defendants admit on information and belief that Madoff was

arrested on or around the Filing Date as alleged in the first sentence of Paragraph 4. The RBC

Defendants deny knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 4.

5.      On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

**<u>Response</u>**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 5, and otherwise refer the Court to the

application filed by SIPC alleged in Paragraph 5 for its complete and accurate contents.

6.      Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

    (a)    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3); and
    (b)    removed the case to this Court pursuant to SIPA § 78eee(b)(4).

**<u>Response</u>**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 6, and otherwise refer the Court to the order

issued by Judge Stanton alleged in Paragraph 6 for its complete and accurate contents.

7.      By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person.  Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

156397914v3

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7, and otherwise refer the Court to the orders issued by the Court alleged in Paragraph 7 for their complete and accurate contents.

8.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a brief as to the truth of the allegations regarding the first clause of Paragraph 8, but admit the allegations in the second clause of Paragraph 8.

9.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9, and otherwise refer the Court to the transcript of the plea hearing alleged in Paragraph 9 for its complete and accurate contents.

10.    On July 16, 2009, this Court entered an order granting the Trustee's motion to retain Windels Marx Lane & Mittendorf, LLP as special counsel on behalf of the consolidated estate, nunc pro tunc as of June 9, 2009.

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10, and otherwise refer the Court to the order issued by the Court alleged in Paragraph 10 for its complete and accurate contents.

11.    At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

156397914v3

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 11, and otherwise refer the Court to the alleged

information and transcript of the referenced plea hearing alleged in Paragraph 11 for their complete

and accurate contents.

12.        At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 12, and otherwise refer the Court to the alleged

information and transcript of the referenced plea hearing alleged in Paragraph 12 for their complete

and accurate contents.

13.        On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 13.

14.        As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by BLMIS or Madoff to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 14, and state that the allegations concerning

the Trustee's authority under SIPA and the Bankruptcy Code set forth legal conclusions to which

6

156397914v3

no response is required. To the extent any further response is required, the RBC Defendants deny

such allegations.

15.     Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

**Response**:     The RBC Defendants state that the allegations of Paragraph 15 set forth

legal conclusions to which no response is required. To the extent a response is required, the RBC

Defendants deny knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 15.

16.     The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, SIPA §§ 78fff-1(a) and 78fff-2(c)(3), and N.Y. C.P.L.R. 203(g) and 213(8).

**Response**:     The RBC Defendants state that the allegations of Paragraph 16 set forth

legal conclusions to which no response is required. To the extent a response is required, the RBC

Defendants deny knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 16.

## III.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.    BLMIS

17.     Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker-dealer with the SEC. In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company. At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

**Response**:     The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 17.

18.     In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008. Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority

156397914v3

Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation. At all times, BLMIS was assigned CRD No. 2625. SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960. On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status. SIPC membership is contingent on registration of the broker-dealer with the SEC.

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 18.

19.    For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker-dealer operation, and the IA Business.

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 19.

20.    BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 20.

21.    For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 21.

22.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 22.

### B.        The Ponzi Scheme

23.        At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 23.

24.        BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.  It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.  The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 24.

25.        To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York.  Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

**Response**:        On information and belief, the RBC Defendants deny knowledge or

information sufficient to form a belief as to the truth of the allegations in Paragraph 25.

26.        On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 26, and otherwise refer the Court to the SEC

Form X-17A-5 alleged in Paragraph 26 for its complete and accurate contents.

1.    Madoff's Investment Strategy

27.    In general, BLMIS purported to execute two primary investment strategies for
BLMIS customers:  the convertible arbitrage strategy and the split-strike conversion strategy (the
"SSC Strategy").  For a limited group of BLMIS customers, primarily consisting of Madoff's close
friends and their families, Madoff also purportedly purchased securities that were held for a certain
time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no legitimate
business operations using any of these strategies.

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 27.

28.    All funds received from BLMIS customers were commingled in a single BLMIS
account maintained at JPMorgan Chase Bank.  These commingled funds were not used to trade
securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff
and his family personally, and to prop up Madoff's proprietary trading business.

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 28.

29.    The convertible arbitrage investment strategy was supposed to generate profits by
taking advantage of the pricing mismatches that can occur between the equity and bond/preferred
equity markets.  Investors were told they would gain profits from a change in the expectations for
the stock or convertible security over time.  In the 1970s this strategy represented a significant
portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in
only a small percentage of BLMIS accounts.

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 29.

30.    From the early 1990s forward, Madoff began telling BLMIS customers that he
employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any
securities for its BLMIS customers.

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 30.

31.     BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

**Response**:     The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 31.

32.     By 1992, the SSC Strategy purported to involve:  (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

**Response**:     The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 32.

33.     The put options were to limit the downside risk of sizeable price changes in the basket.  The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option should have entailed a loss for BLMIS.

**Response**:     The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 33.

34.     The sale of call options would partially offset the costs associated with acquiring puts, but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

**Response**:     The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 34.

35.     The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar."  The collar provides downside protection while limiting the upside.

**Response:**     The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 35, except admit that the term "collar" is

sometimes used to describe the simultaneous purchase of puts and sale of calls.

36.     If Madoff was putting on the same baskets of equities across all BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold, had to equal the market value of the equities in the basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 36.

37.     Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the SSC Strategy.

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 37.

38.     Madoff could not be using the SSC Strategy because his returns drastically outperformed the market.  BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly).  Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 38.

2.     BLMIS's Fee Structure

39.     BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits.  By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 39.

3.     BLMIS's Market Timing

40.     Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he succeeded at market timing by

12

intermittently entering and exiting the market.  During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in U.S. Treasury securities ("Treasury Bills") or mutual funds invested in Treasury Bills.

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 40.

41.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.  It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 41.

42.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 42.

4.    **BLMIS Execution**

43.    BLMIS's execution showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

**Response**:        The RBC Defendants deny the allegations of Paragraph 43.

5.    **No Evidence of BLMIS Trading**

44.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 44.

156397914v3

45.     All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

**Response**:     The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 45.

6.     <u>The Collapse of the Ponzi Scheme</u>

46.     The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

**Response**:     The RBC Defendants admit upon information and belief that Madoff's business continued until December 2008, but otherwise deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 46.

47.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

**Response**:     The RBC Defendants refer the Court to the transcripts of the plea hearings alleged in Paragraph 47 for their complete and accurate contents, and otherwise deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 47.

48.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

**Response**:     The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 48.

## IV.    **DEFENDANTS**

49.     Defendant Royal Bank of Canada is the 100% indirect parent of each other Defendant (or in the case of Banque SYZ, its predecessor RBC Suisse).

156397914v3

**Response**:        The RBC Defendants admit the allegations of Paragraph 49, except denies

that Royal Bank of Canada is the indirect parent of RBC Suisse.

50.        Defendant Royal Bank of Canada is a Schedule I bank under the Bank Act
(Canada), with its corporate headquarters located at Royal Bank Plaza, 200 Bay Street, Toronto,
Ontario M5J 2J5, Canada and its main U.S. branch at 3 World Financial Center, 200 Vesey Street,
New York, New York 10281. Defendant Royal Bank of Canada is a registered bank with the U.S.
Federal Reserve.

**Response**:        The RBC Defendants admit the allegations of Paragraph 50, except deny

the characterization of the address located at 3 World Financial Center, 200 Vesey Street, New

York, New York 10281 as Defendant Royal Bank of Canada's "main branch."

51.        Defendant Royal Bank of Canada is being sued in its individual capacity and as
successor in interest to RBC Asia, as set forth in the Stipulation and Order Regarding Changes to
Defendants so-ordered by this Court on December 22, 2021 (ECF 142) (the "Stipulation"). On
August 22, 2018, the United States Court of Appeals for the Second Circuit granted Royal Bank
of Canada's motion (made through its Singapore branch) to be substituted in place of RBC Asia
as a party in this action. *In re Picard*, No. 17-2992, ECF 1255 (2d Cir. Aug. 22, 2018). In its
motion, Royal Bank of Canada "agree[d] that it shall have and be bound by all liabilities of RBC
Asia in connection with the claims pending in this case or otherwise arising out of or relating to
any investments in or redemptions of shares of Fairfield Sentry Limited and Fairfield Sigma
Limited." *Id.*, ECF 1223 (2d Cir. July 11, 2018). RBC Asia was dissolved on October 30, 2020.

**Response**:        The RBC Defendants admit the allegations of Paragraph 51, and refer to the

contents of the referenced stipulation for its complete and accurate contents.

52.        Defendant Guernroy is a limited company incorporated in Guernsey, Channel
Islands, and has a registered office and place of business at PO Box 48, Canada Court, Upland
Road, St. Peter Port, Guernsey GY1 3BQ, Channel Islands.

**Response**:        The RBC Defendants admit the allegations of Paragraph 52, except deny

that Defendant Guernoy's registered office is PO Box 48, Canada Court, Upland Road, St. Peter

Port, Guernsey GY1 3BQ, Channel Islands.

53.        Defendant RBC Trust is a private limited company incorporated in Jersey, Channel
Islands, and has a registered office and place of business at Gaspé House, 66-72 Esplanade,
St Helier, Jersey JE2 3QT, Channel Islands. RBC Trust was named as "Royal Bank of Canada
Trust Company (Jersey) Limited" in the Trustee's original complaint in this action. As set forth

15

in the Stipulation, this Amended Complaint changes the name to "RBC Trust Company (Jersey) Limited" to conform with the Corporate Disclosure Statement filed by Defendants.

**Response**:        The RBC Defendants admit the allegations of Paragraph 53, and refer to the

contents of the referenced stipulation for its complete and accurate contents.

54.    Defendant Banque SYZ is being sued as the successor in interest to RBC Suisse, as set forth in the Stipulation.  Banque SYZ is a *société anonyme*, a type of joint stock corporation, organized under the laws of Switzerland with its offices located at Rue du Rhône 30, CH-1211 Geneva 11, Switzerland.  Banque SYZ acquired RBC Suisse on August 28, 2015, and on December 11, 2015, RBC Suisse was merged into Banque SYZ, as reflected in the Corporate Disclosure Statement filed in this action by Banque SYZ.  Banque SYZ thereby assumed all of the assets and liabilities of RBC Suisse, and RBC Suisse ceased to exist.  At the time of the merger, RBC Suisse was a *société anonyme* organized under the laws of Switzerland.  Banque SYZ is also subject to a separate adversary proceeding by the Trustee, *Picard v. Banque SYZ S.A.* (Adv. Pro. No. 11-02149), seeking recovery of other transfers.

**Response**:        The RBC Defendants admit the allegations of Paragraph 54, and refer to the

contents of the referenced corporate disclosure statement for its complete and accurate contents.

55.    Defendant RBC Dominion is a federal corporation organized under the laws of Canada with a registered office address of 200 Bay Street, Royal Bank Plaza, South Tower, 9th floor, Toronto, Ontario M5J 2J5, Canada.

**Response**:        The RBC Defendants admit the allegations of Paragraph 55.

56.    Defendant RBC Alternative is a limited partnership organized under the laws of Delaware, and has its principal office at 3 World Financial Center, 200 Vesey Street, New York, New York 10281.

**Response**:        The RBC Defendants admit the allegations of Paragraph 56.

## V.    **SUBJECT MATTER JURISDICTION AND VENUE**

57.    This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities & Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) and (e)(1), and SIPA §§ 78eee(b)(2)(A) and (b)(4).

**Response**:        The RBC Defendants admit the allegations of the first sentence of Paragraph

57. The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth

16

of the allegations of the second sentence of Paragraph 57. The RBC Defendants state that the third

sentence of Paragraph 57 sets forth legal conclusions to which no response is required, but to the

extent that a response is required, the RBC Defendants deny that this Court has jurisdiction to enter

a final order or judgment in this proceeding.

58.    This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (F), (H) and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

**Response**:    The RBC Defendants state that the allegations of Paragraph 58 set forth

legal conclusions to which no response is required. To the extent a response is required, the RBC

Defendants deny the allegations in Paragraph 58. The RBC Defendants do not consent to issuance

or entry of final orders or judgments by the Bankruptcy Court.

59.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

**Response**:    The RBC Defendants admit the allegations of Paragraph 59.

60.    This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

**Response**:    The RBC Defendants state that the allegations of Paragraph 60 set forth

legal conclusions to which no response is required. To the extent that a response is required, the

RBC Defendants deny the allegations of Paragraph 60.

## VI.    **PERSONAL JURISDICTION**

61.    Defendants are subject to the jurisdiction of this Court pursuant to Bankruptcy Rule 7004 and the United States Constitution, as well as section 302 of the New York Civil Practice Law and Rules, because Defendants purposely availed themselves of the laws and protections of the United States and the State of New York.

**Response**:    The RBC Defendants state that the allegations of Paragraph 61 set forth

legal conclusions to which no response is required. To the extent that a response is required, the

RBC Defendants deny the allegations of Paragraph 61.

156397914v3

62.    The Trustee's claims against Defendants arise from business they transacted within New York.  Defendants derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

**Response**:    The RBC Defendants state that the allegations of Paragraph 62 set forth legal conclusions to which no response is required. To the extent that a response is required, the RBC Defendants deny the allegations of Paragraph 62.

63.    Defendant RBC Alternative is a Delaware limited partnership with its principal place of business in New York.

**Response**:    The RBC Defendants admit the allegations of Paragraph 63.

64.    Defendant Banque SYZ, a Switzerland-organized company, has voluntarily subjected itself to this Court's jurisdiction by virtue of filing a customer claim with the Trustee (#004677) in connection with the BLMIS SIPA liquidation proceeding.

**Response**:    The RBC Defendants state that the allegations of Paragraph 64 set forth legal conclusions to which no response is required. To the extent that a response is required, the RBC Defendants deny the allegations of Paragraph 64.

65.    Defendant Guernroy, a Guernsey-organized company, has also voluntarily subjected itself to this Court's jurisdiction by virtue of filing two customer claims with the Trustee (#004415 and #004416).

**Response**:    The RBC Defendants state that the allegations of Paragraph 65 set forth legal conclusions to which no response is required. To the extent that a response is required, the RBC Defendants deny the allegations of Paragraph 65.

66.    In their Fairfield Sentry subscription agreements, Defendants Royal Bank of Canada, Guernroy, RBC Trust, RBC Asia, RBC Suisse, and RBC Dominion (collectively, the "Fairfield Sentry Transferee Defendants") submitted to New York jurisdiction, venue, service of process, and law.  Specifically, the Fairfield Sentry Transferee Defendants (i) "agree[d] that any suit, action or proceeding . . . with respect to this Agreement and the Fund may be brought in New York," (ii) "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding," (iii) "consent[ed] to the service of process out of any New York court," and (iv) agreed that "[t]his Agreement shall be governed and enforced in accordance with the laws of New York . . . ."

18

**<u>Response</u>**:    The RBC Defendants state that the allegations of Paragraph 66 set forth

legal conclusions to which no response is required. To the extent that a response is required, the

RBC Defendants deny the allegations of Paragraph 66 and refer the Court to the alleged Fairfield

Sentry subscription agreements for their complete and accurate contents.

67.    In their Rye Broad Market and Rye Prime Fund subscription agreements, Defendants Royal Bank of Canada and RBC Alternative also submitted to New York jurisdiction, venue, service of process, and law.  Specifically, these Defendants (i) "irrevocably agree[d] that any suit, action or proceeding with respect to this Agreement and any or all transactions relating hereto and thereto may be brought in U.S. Federal and state courts in the State of New York," (ii) "irrevocably submit[ted] to the jurisdiction of such courts with respect to any such suit, action or proceeding," (iii) "agree[d] and consent[ed] that service of process as provided by U.S. Federal and New York law may be made upon the Investor in any such suit, action or proceeding brought in any of said courts," and (iv) and agreed that "[t]his Agreement shall be governed and enforced in accordance with New York law."

**<u>Response</u>**:    The RBC Defendants state that the allegations of Paragraph 67 set forth

legal conclusions to which no response is required. To the extent that a response is required, the

RBC Defendants deny the allegations of Paragraph 67, and refer the Court to the alleged Rye

Broad Market and Rye Prime Fund subscription agreements for their complete and accurate

contents.

68.    Each Defendant knowingly directed funds to be invested with, and then redeemed from, New York-based BLMIS via one or more of Fairfield Sentry, Rye Broad Market, Rye Prime Fund, and Rye Portfolio Limited, each of which was managed and operated out of New York.

**<u>Response</u>**:    The RBC Defendants deny the allegations of Paragraph 68.

69.    Fairfield Sentry was owned, managed, and operated by Fairfield Greenwich Group ("FGG"), a New York-based *de facto* partnership.

**<u>Response</u>**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 69.

70.    The Rye Select Funds were owned, managed, and operated by New York-based Tremont Group Holdings, Inc. (together with predecessors and affiliates, "Tremont").  Rye Broad Market and Rye Prime Fund were U.S. entities, registered in Delaware and operating out of

Tremont's principal office in New York. Rye Portfolio Limited was at all relevant times managed and operated by Tremont's New York officers and employees out of that same New York office.

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 70.

71.    The Fairfield Sentry Transferee Defendants signed subscription agreements each time they invested in Fairfield Sentry. In these agreements, the Fairfield Sentry Transferee Defendants affirmed that they received and read Fairfield Sentry's information memorandum or private placement memorandum ("PPM"). Based on these documents, the Fairfield Sentry Transferee Defendants knew the following facts indicating that they were transacting business in New York in connection with their Fairfield Sentry investments:

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS;

- BLMIS performed all investment management duties for these assets;

- BLMIS was registered with the SEC;

- BLMIS was the executing broker for Fairfield Sentry's investments, and purportedly operated and executed the SSC Strategy on the fund's behalf;

- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and Treasury Bills, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;

- Fairfield Sentry's investment documents provided that subscription payments be wired in U.S. dollars to New York;

- BLMIS was the custodian of Fairfield Sentry's investments with BLMIS; and

- BLMIS was "essential to the continued operation of" Fairfield Sentry.

**Response**:    The RBC Defendants deny the allegations of Paragraph 71 and refer the

Court to the subscription agreements referenced in Paragraph 71 for their complete and accurate

contents.

72.    Similarly, Defendants Royal Bank of Canada, Guernroy, and RBC Alternative signed subscription agreements each time they invested in one or more Rye Select Funds. By signing the subscription agreements, Defendants affirmed having received and read each Rye Select Fund's PPM or prospectus. These PPMs and prospectuses provided essentially the same information as Fairfield Sentry's documents detailed above, including that each Rye Select Fund's

investments in U.S. securities would be custodied in New York by a New York investment adviser using the SSC Strategy.

**Response**:    The RBC Defendants deny the allegations of Paragraph 72 and refer the

Court to the subscription agreements, prospectuses, and PPMs referenced in Paragraph 72 for their

complete and accurate contents.

73.    The Rye Select Funds' due diligence questionnaires ("DDQs") informed investors that the Rye Select Funds traded in the "U.S. equity market" and related equity index options, and that cash would be held in "U.S. short term treasury bills."  The Rye Select Funds' PPMs and prospectuses confirmed that custody of the securities held on behalf of the Rye Select Funds would be held in "a brokerage account with an NASD registered broker dealer" (i.e., BLMIS).  As a result of these representations, the Rye Select Funds' investors knew that a redemption from this account should have resulted in the investment manager liquidating U.S. securities.

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in the first and second sentence of Paragraph 73, and deny

the remaining allegations in Paragraph 73.

74.    The RBC Capital Markets/Alternative Assets group (together with its predecessors, the "RBC Cap/Alt Group")—which was centered in New York, at Royal Bank of Canada's New York branch, and had a global presence—was responsible for due diligence and risk management for RBC's hedge fund and other alternative asset investments, including all Defendants' BLMIS feeder fund investments.  Among other things, RBC Cap/Alt Group personnel in New York: (i) met with Madoff in New York in the late 1990s and conducted due diligence on BLMIS in the late 1990s-early 2000s; (ii) regularly received and reviewed information from, and prepared internal reports and marketing materials on, the BLMIS feeder funds from the 1990s up through the revelation of the fraud; and (iii) repeatedly met and corresponded with BLMIS feeder fund managers regarding existing and additional investments during this same period of time, including meetings in New York with FGG executives and Tremont executives at least once a year from at least 2003 through 2007.

**Response**:    The RBC Defendants deny the allegations of Paragraph 74.

75.    In addition, RBC Cap/Alt Group personnel directly managed and controlled Defendants Royal Bank of Canada's and RBC Alternative's BLMIS feeder fund investments. These personnel, acting out of Royal Bank of Canada's New York branch, met, transacted, and corresponded with New York-based representatives of BLMIS feeder funds on behalf of Royal Bank of Canada and RBC Alternative, including requesting, receiving, and executing subscription and redemption documents and receiving customer statements.

**Response**:    The RBC Defendants deny the allegations of Paragraph 75.

156397914v3

76.     Defendant Royal Bank of Canada in many instances subscribed into, and received its Transfers from, BLMIS feeder funds as "NYROY," a name it used when operating through its New York branch.

**Response**:     The RBC Defendants, upon present information and belief, deny the allegations of Paragraph 76.

77.     Non-party RBC Capital Markets LLC—Defendant Royal Bank of Canada's New York-based, wholly owned U.S. subsidiary—often acted as designated agent for Royal Bank of Canada with respect to Royal Bank of Canada's BLMIS feeder fund business.

**Response**:     The RBC Defendants deny the allegations of Paragraph 77.

78.     The Transfers themselves also occurred in New York.  It was Defendants' practice to use New York bank accounts to send subscriptions into and receive redemptions (i.e., the Transfers) from the BLMIS feeder funds.  Based on the Trustee's information to date, each Defendant designated and used its relevant New York account(s) to send and receive numerous subscriptions and redemptions, totaling hundreds of transfers and tens of millions of dollars in the aggregate.  Upon information and belief, Defendants used these accounts for all of their subscriptions and redemptions, based on the consistent use of them over time and because the Trustee has seen no evidence of any other accounts designated or used.  The accounts are, specifically:

- Defendant Royal Bank of Canada, which received at least 19 redemptions from Fairfield Sentry and Rye Prime Fund and remitted at least 17 subscriptions, designated and used an account in its own name at JPMorgan Chase Bank in New York.

- Defendant RBC Alternative, which received at least 27 redemptions from Rye Broad Market and Rye Prime Fund and remitted at least 33 subscriptions, designated and used an account in the name of Defendant Royal Bank of Canada at JPMorgan Chase Bank in New York.

- Defendant Royal Bank of Canada's predecessor, RBC Asia, which received at least 11 redemptions from Fairfield Sentry and remitted at least 37 subscriptions, designated and used an account in the name of Defendant Royal Bank of Canada at JPMorgan Chase Bank in New York.

- Defendant Guernroy, which received at least 43 redemptions from Fairfield Sentry and Rye Portfolio Limited and remitted at least 85 subscriptions, designated and used an account in the name of its affiliate Royal Bank of Canada (Channel Islands) Limited at JPMorgan Chase Bank in New York to receive redemptions and designated and used an account in the name of Royal Bank of Canada (Channel Islands) Limited at Deustche Bank AG in New York to remit subscriptions.

- Defendant RBC Trust, which received at least two redemptions from Fairfield Sentry and remitted at least 64 subscriptions, designated and used accounts in the

22

name of its affiliate Royal Bank of Canada (Channel Islands) Limited at Deutsche
Bank and JPMorgan Chase Bank in New York.

- Defendant Banque SYZ's predecessor, RBC Suisse, which received at least
  17 redemptions from Fairfield Sentry and remitted at least 27 subscriptions,
  designated and used an account in its own name at Deutsche Bank Trust Company
  Americas in New York.

- Defendant RBC Dominion, which received at least 13 redemptions from Fairfield
  Sentry, designated and used an account in Defendant Royal Bank of Canada's name
  at JPMorgan Chase Bank in New York.

**Response**:    The RBC Defendants deny the allegations of Paragraph 78.

79.    In addition, each Defendant sent its BLMIS feeder fund subscription payments to a
U.S. bank account (with respect to each of Rye Broad Market and Rye Prime Fund) or U.S.
correspondent account (with respect to Fairfield Sentry) of the feeder fund or its agent, from which
the funds were ultimately deposited into BLMIS's account at JPMorgan Chase Bank in New York.
Each Defendant received its Transfers from these same BLMIS feeder fund U.S. accounts.
Beginning at least as early as the fall of 2006, Rye Portfolio Limited also used a New York bank
account to receive subscriptions and make redemption payments, including the majority of the
applicable Transfers, to Guernroy.  Prior to that time, upon information and belief, Rye Portfolio
Limited used a New York correspondent bank account to make redemption payments.

**Response**:    The RBC Defendants admit that funds were sent to and from Fairfield

Sentry and Rye Broad Market and Rye Prime Fund, deny that any of such funds constitute

subsequent transfers of customer property or any other property transferred from BLMIS to

Fairfield Sentry, Rye Portfolio Limited, Rye Broad Market and Rye Prime Fund, and deny any

remaining allegations of Paragraph 79.

## VII.    **TREMONT KNEW THAT BLMIS'S IA BUSINESS WAS A FRAUD**

80.    On December 7, 2010, the Trustee commenced an adversary proceeding against,
among others, Tremont Group Holdings, Inc. and its predecessors ("Tremont Group"), Tremont
Partners, and several Tremont funds invested wholly or in part with BLMIS (collectively, the
"Tremont Feeder Funds"), seeking to avoid and recover $2.1 billion of initial transfers from
BLMIS that constitute customer property under SIPA (the "Tremont Complaint"). The Trustee
incorporates by reference the factual allegations in the Tremont Complaint, as supplemented
below.

**Response**:    The RBC Defendants (i) admit that the Trustee filed an action styled as

*Picard v. Tremont Group Holdings, Inc., et al.* (*In re Bernard L. Madoff Inv. Secs., LLC*), Adv.

Pro. No. 10-05310, ECF No. 1 (Bankr. S.D.N.Y. Dec. 7, 2010) (the "Tremont Action"), (ii) deny

knowledge or information sufficient to form a belief as to the truth of the allegation of the amounts

of the alleged transfers alleged in Paragraph 80; (iv) deny that the initial transfers of customer

property to Tremont the Trustee seeks to avoid and recover in the Tremont Action were avoided

or are avoidable, (v) to the extent necessary to support such denial, deny for lack of knowledge or

information sufficient to form a belief as to the truth of the allegations, each and every paragraph

of the complaint in the Tremont Action that supports the claim that any initial transfers of customer

property to Fairfield Sentry, Rye Portfolio Limited, Rye Broad Market and Rye Prime Fund are or

were avoided or avoidable, and (vi) objects to the incorporation by reference of, and therefore does

not answer, each and every other paragraph and allegation in the complaint in the Tremont Action

and to the inclusion in this adversary proceeding of any issue implicated by the complaint in the

Tremont Action other than the issue of the avoidance or avoidability of the initial transfers of

customer property, but reserves the right to rely on and introduce any allegations in the referenced

"Tremont Complaint" or its exhibits as opposing party admissions admissible for the truth of their

contents. To the extent any further response is required, the RBC Defendants lack knowledge

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 80 and therefore

deny such allegations.

81.    Tremont created, managed, and operated a number of feeder funds that invested
directly and indirectly with BLMIS.

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 81.

82.    In a September 22, 2011 order, this Court approved a settlement between the
Trustee and more than a dozen of the Tremont Feeder Funds, Tremont and its affiliates, and a
former Tremont chief executive (collectively, the "Tremont Settling Defendants") that obligated
the Tremont Settling Defendants collectively to pay the Trustee $1.025 billion for the benefit of

the customer property estate (the "Tremont Settlement"). The Tremont Settlement also provides that the transfers made to the Tremont Feeder Funds were "deemed avoided."

**Response**:    The RBC Defendants admit upon information and belief that the Court

approved a settlement on September 22, 2011, and refer to the referenced settlement agreement

for its complete and accurate contents.

### A.    Tremont's Senior Executives Had a Close Relationship with Madoff

83.    Sandra Manzke founded Tremont in the mid-1980s and first met Madoff in or around 1991. Until her departure in 2004, Manzke served as Tremont's CEO and then co-CEO, helping to select money managers, including Madoff. Robert Schulman joined Tremont in 1994 and held various high-level positions, including President, co-CEO, and ultimately sole CEO.

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 83.

84.    Manzke and Schulman met and had regular calls with both Madoff and his top lieutenant, Frank DiPascali. Schulman had a special relationship with Madoff, which Tremont described as its "competitive edge." In fact, Tremont touted Schulman's unusually close relationship with Madoff, stating that his "long-standing relationships with the principals of our existing managers [BLMIS listed first among them] is clearly an edge over any firm contemplating a similar business as our ability to negotiate preferential terms is related directly to the strength and longevity of the relationships." Emphasizing Schulman's special relationship with Madoff, in 2003, Tremont told its auditor, Ernst & Young ("E&Y") about Schulman's unique access to BLMIS, including that "Bob Schulman periodically visits [BLMIS's] facilities throughout the year. . . ." At least once, Madoff even sought Schulman's advice on hiring decisions at BLMIS. In June 2006, Tremont Vice President Chris Cichella explained to a potential investor that Schulman was "intimately familiar" with Madoff based on "a 10+ year relationship."

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 84.

85.    Investors took notice of the relationship between Schulman and Madoff. For example, a prospective investor had a call with Tremont in May 2007 where he referenced the "friendly relationship between Bob and Bernie." He also noted that, "[f]or Tremont, it goes back to the relationship . . . . Bob has been there many times and has worked w/ Bernie is [sic] business since the 1980s."

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 85.

**B.**      **Tremont Received Repeated, Direct Fraud Warnings About BLMIS's Investment Advisory Business**

86.      Tremont received warnings of BLMIS's fraudulent IA Business from clients as early as April 2001, when an investor in two of the Tremont Feeder Funds wrote to Schulman: "I know you are sick of answering this but man is it hot out there with the Bernie fraud rumors." The investor questioned why Madoff "need[ed] to go to cash at year-end every year" and used such a "small" firm as its auditor.

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 86.

87.      Less than a month later, Tremont became aware of the *Barron's* and *MARHedge* articles questioning the legitimacy of BLMIS's IA Business and identifying Tremont as offering BLMIS feeder funds to its clients. On May 7, 2001, Tremont Group's Chief Operating Officer (and later President) Barry Colvin emailed a number of Tremont employees alerting them to the articles and instructing them to direct third party questions to Tremont's management.

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 87.

88.      On April 25, 2003, sales vice president Jim Mitchell relayed to Schulman a discussion Mitchell had with an investor about "associating Madoff with broker-dealer wrongdoing of late." The following month, Mitchell, Schulman, and the investor visited Madoff. The investor's meeting notes (which he shared with Tremont) characterized Madoff's operation as "controversial" and expressed numerous concerns that included: (i) Madoff's unwillingness to meet with investors; (ii) BLMIS's lack of management fees; (iii) Madoff's going to cash at every year end; (iv) the absence of a third party custodian; and (v) BLMIS's "exceptionally stable" returns "with only 7 negative months since 1990."

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 88.

89.      Mitchell retained these notes and years later forwarded them to Tremont vice president and manager responsible for product line management and oversight, Darren Johnston, cautioning: "Don't attach this – but it's an interesting set of notes from a meeting years back . . . ."

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 89.

90.      In March 2004, the investor who emailed Schulman in 2001 about the "Bernie fraud rumors" emailed him again, this time to redeem his Tremont Feeder Fund investments, explaining:

156397914v3

My motivation for doing this is not due to some new buzz out there for as you know that is a constant din but rather that I can no longer ignore my core instincts as an investor in which I have the [sic] battle the fact that I really don't know what is going on, what a [sic] do know is I am in an investment program that no one else in history has been able to make work, return series is flat out too good given how efficient the underlying securities are priced and he doesn't charge a fee all compounded by it seems every stone I turn over is another multi billion $ [M]adoff feeder. I . . . found that my inability to rationalize & be intellectually honest on why I was invested bothered me more than it has in the past . . . .

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 90.

91.    When Madoff's scheme collapsed, that investor circulated an email among certain of his employees with the subject header "HOLY SH## !!!!!!!!!!!!!!!!!!! THE WORLD IS NOW RIGHT !!!" and wrote that "Bob Schulman & all the feeder groups could be going to jail over this . . . ." (Emphasis in original.)

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 91.

92.    In May 2004, Cichella emailed Tremont senior vice president Rob Rosenbaum that investment advisory firm RogersCasey (where Tremont personnel, including Manzke, previously worked) was "concerned about Tremont's relationship with Madoff" and would thus recommend that its client not invest with Tremont. Cichella said RogersCasey would not reconsider its position because BLMIS "was prone to a blow-up that would destabilize Tremont . . . ." Analyzing Tremont for a prospective institutional investor in 2005, the investor's representative James Purnell raised concerns to Tremont's head of Product Management and Investment Advisory board member Stuart Pologe about what he dubbed "the Madoff black box" including, among other things, whether BLMIS's assets were segregated and being verified by a third party, how Madoff is paid, and whether any written Tremont materials exist mentioning Madoff (the response was that there were none and there never would be). After Madoff's arrest and the revelation of the fraud, a former coworker of Purnell emailed him and boasted that they were "finally vindicated on Madoff. If it looks too good to be true. . . ."

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 92.

93.    In March 2007, representatives from Tremont's potential client, Agile Group ("Agile"), met with Johnston, product management senior vice president Patrick Kelly, and portfolio manager Brian Marsh as part of its due diligence. Agile's notes from the meeting (the "Agile Notes") reflect that Agile peppered Tremont with numerous questions regarding

27

operational and trading anomalies indicating fraud at BLMIS or its reporting fictional trades. This included queries about its auditors, the lack of information on options trading, identity of counterparties to the purported options transactions, BLMIS's AUM, BLMIS's inexplicable use of paper trade tickets and account statements, the inability to verify BLMIS's assets, and BLMIS's going in and out of the market in large transactions with no overall effect on the market for the securities it purportedly traded.

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 93.

94.      The Agile Notes reflect that Agile and Tremont discussed whether BLMIS's IA Business was a fraud and perhaps even a Ponzi scheme. Agile pointed out in the meeting how the fraud would be easy if BLMIS's auditor did "not work so hard" and if the "few key people" operating the IA Business were involved. During the discussion, it was deduced that, "[e]ither Madoff owns what he owns or they are fictitious. But if it is a Ponzi scheme, every dollar profit has been realized."

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 94.

95.      A month later, Agile employee Mariah Quish sent Tremont follow-up questions concerning BLMIS. Addressing Agile's request, Johnston instructed internally: "We should give answers by phone rather than email . . . ." After speaking with Johnston and Tremont's vice president of investor services Harry Hodges, Quish reported she found Tremont's "level of secrecy combined with a faith-based view on Madoff difficult to understand."

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 95.

96.      In May 2007, Cichella, who worked closely with Johnston and Hodges, forwarded to himself the May 2001 *Barron's* article.

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 96.

97.      Between 2005 and 2008, three major banks that provided leverage to the Tremont Feeder Funds each saw significant fraud risks associated with BLMIS, and each demanded and received from Tremont extraordinary contractual rights in an attempt to mitigate those risks, such as indemnification for fraud at BLMIS and special redemption rights if Madoff came under investigation for breach of securities laws. As communicated by one such provider, Citibank, to Tremont, Madoff's lack of third party controls and how he executes on his volume of options were, in Johnston's words, "fundamental roadblocks" to Citibank's senior risk management people.

28

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 97.

98.    Tremont continued to receive warnings that Madoff's trading was not real as late
as October 2008, when Tremont sales representative Adrian Gordon reported to Johnston, Marsh,
and Mitchell that a prospective institutional investor was "loathe to give his stamp of approval to
[Madoff's] strategy when he has no idea what trades actually take place."  A month later, Gordon
emailed the Tremont global sales team that another potential investor was "very anti Madoff" and
said Madoff was "probably a pyramid structure."  That same month, Cichella once again pulled
out the May 2001 *Barron's* article, this time forwarding it to Mitchell, stating, "Enjoy!"

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 98.

### C.    Tremont's Own Reporting Showed That BLMIS's Purported Trades Were Impossible

99.    Despite exempting BLMIS from the due diligence it conducted on other managers,
Tremont regularly received from BLMIS customer statements, trade tickets, and other information
containing an abundance of facts demonstrating that BLMIS reported fictitious trades and that the
fraud warnings it received were well founded.  Tremont created reports and marketing materials
of its own highlighting the impossible trading and performance.  For example, Tremont knew from
the monthly analytic summaries its senior management prepared based on these BLMIS
documents that the positions and prices BLMIS reported differed from prices Bloomberg reported.
Tremont's auditor, KPMG, similarly found and reported to Tremont more than 20 such differences
in 2006 alone.

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 99.

100.    Tremont also estimated in its reports the amount BLMIS had in AUM and
calculated whether or not there was sufficient volume in each instrument for Madoff to be able to
execute such trades.  Given that Tremont knew BLMIS had "well in excess of $20 billion" in AUM
by May 2003, and that according to Johnston it "monitored all trade activity," Tremont knew there
was insufficient volume for dozens, if not hundreds of the trades Madoff purported to complete.

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 100.

### D.    Tremont Exempted BLMIS From Its High Due Diligence Standards

101.    The majority of Tremont's business involved placing its clients' assets with
third-party managers.  For managers other than Madoff, Tremont implemented due diligence

procedures, investigated the quality of the management personnel, assessed key risk factors associated with the investment, and continuously monitored the investment and the managers.

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 101.

102.    As a sophisticated manager with industry-leading due diligence standards, Tremont positioned itself at the forefront of initiatives to improve monitoring of investment managers in light of frauds that preceded Madoff.  Tremont claimed that its comprehensive operational risk evaluation served to mitigate any possibility of misrepresentation or fraudulent activity.

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 102.

103.    Despite these claims and all of the fraud warnings, Tremont exempted BLMIS from its due diligence standards.  In fact, Tremont's executives deliberately prevented transparency into Madoff and BLMIS throughout the Tremont-BLMIS relationship.  To ensure that Tremont's employees did not conduct any meaningful due diligence on BLMIS and Madoff, Mitchell laid out in an email three of the most critical questions about Madoff's operations "ya don't ask" about: (1) BLMIS's AUM, (2) how Madoff generated his returns, and (3) Madoff's auditors.

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 103.

104.    According to the SEC—which investigated Tremont after Madoff's arrest—Schulman personally conducted due diligence on Madoff, which was an "outlier" in Tremont's procedures as applied to other managers.  The SEC concluded that because "Schulman conducted the due diligence, he would be able to control what areas and information [were] reviewed or not reviewed."

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 104.

105.    Tremont also did not conduct due diligence on Friehling & Horowitz.  Rather, as the SEC found, Tremont's due diligence materials "did not reveal any evidence of conversations with Madoff's auditors."  In 2007, Tremont even admitted to Agile that someone from Tremont "anonymously drop[ped] by" Friehling & Horowitz's strip-mall office, just "to make sure they exist."

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 105.

156397914v3

106.    In an unusually candid response to one strategic consulting firm, Pologe admitted that Tremont had "no manager due dili[gence] process for" its BLMIS investments and referred to Tremont's dealings with BLMIS as "a highly vulnerable, highly profitable business." Pologe noted: "We make a lot of money off this, though."

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 106.

### E.    BLMIS Failed Tremont's Requirements for Third-Party Oversight Yet Tremont Made an Exception for Madoff

107.    Tremont's due diligence standards considered independent oversight of its outside managers to be critical. Tremont, however, knowingly made BLMIS an exception to its requirement of third-party oversight of its money managers.

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 107.

108.    For example, in June 2008, Tremont rejected a potential manager because, as stated in an internal memo, a "key part of any due diligence process is being able to verify the information provided by the Fund with independent parties, in this instance there aren't any independent parties to speak with to verify what the partners of [the fund] are doing."

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 108.

109.    The SEC also found Tremont had rejected another outside money manager because of a lack of operational infrastructure and the presence of only one person who was responsible for all operational duties. Yet, the SEC noted, Tremont continued its investment with BLMIS, although "all operational guidelines with respect to trading and execution were controlled by one individual."

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 109.

110.    Tremont executives were unwilling to respond in writing to investors' questions about third-party asset verification. This included at least one pointed question from an investor who asked Mitchell, because the BLMIS account statements were "generated by Madoff, how do I get comfort that the money is really there?" This investor also stated, "the accounting firm [Friehling & Horowitz] doing the audit being a small firm made me a bit uneasy." Mitchell took the conversation off-line, replying, "What is your telephone number?"

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 110.

111.    Dealing with another investor question about asset verification, Johnston emailed
Cichella that this would "lead closer to BLMIS which [Tremont] strictly wants to avoid." Cichella
replied:  "Keep in mind, they are looking for independent (of [Tremont] or Madoff) verification of
the assets in a tangible form. . . . it would be great if you could convince them" that the assets
existed.

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 111.

112.    On or about October 1, 2008, Tremont personnel met with the managers of BLMIS
feeder fund Fairfield Sentry concerning a possible investment with BLMIS through Fairfield
Sentry, which Tremont understood operated in the same manner as its own BLMIS feeder funds.
Tremont's notes acknowledged that Fairfield Sentry did not satisfy Tremont's due diligence
requirements, including lack of independent oversight at BLMIS, no third-party prime broker, and
Friehling & Horowitz's "material percentage of their annual revenue from Madoff."  Evidencing
that BLMIS feeder funds did not meet Tremont's usual due diligence standards and were fraught
with red flags, the potential Fairfield Sentry investment was referred up the ladder for "an
exception approval from the Investment Committee."

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 112.

**F.        Tremont Consistently Shielded Madoff From Third Party Due Diligence**

113.    Tremont consistently shielded Madoff from questions by third parties conducting
their own due diligence on BLMIS, calling it "Firm policy" not to provide access.  On January 24,
2004, Mitchell asked Schulman whether a potential client could visit Madoff.   Schulman
responded:  "They cannot and WILL NOT VISIT MADOFF please make it clear that this is OFF
the table."  (Emphasis in original.)

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 113.

114.    In 2005, when Purnell was questioning Pologe about Madoff, Pologe forwarded the
questions to Tremont executive Suzanne Hammond, who at first responded "Do not go any
further" and then sent a second response, copying Schulman, stating "I hope you have a
confidentially [sp] agreement," before sending vague, one word answers to the questions.

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 114.

115.    On June 16, 2006, Mitchell, after being informed that an investor had been
"relentless on meeting Bernie," emailed Tremont investment relationship assistant vice president
Roy Soares, "[o]ur own analysts don't get to see Madoff – why should [investors]."

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 115.

116.    In swap agreements with three banks providing leverage, Tremont included the
provision that if a bank contacted Madoff, Tremont had the right to cancel the swap without paying
an early termination fee.

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 116.

117.    In 2008, Darren Johnston reported internally that he "made absolutely clear" to a
major financial institution that it was not to contact Madoff's auditor and that "we do not offer up
assistance to investors with Bernie, his staff or his auditor."

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 117.

118.    Later in 2008, Mitchell was especially careful about not letting a large new potential
investor speak to Madoff, internally acknowledging that "I suspect they will want a meeting, being
institutional.  We should discourage this . . . ."  Another Tremont employee relayed this to the
investor and assured others internally that "this would never happen and we told [the investor] that
we have never had an on site meeting with a client and BM."

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 118.

119.    Tremont even restricted which of its employees could contact BLMIS.  In a
September 2002 email, the message was relayed internally:  "DON'T SEND ANY
CORRESPONDENCE TO BERNARD MADOFF.  ONLY [Tremont executives Soares,
Schulman and Hammond] ARE ALLOWED TO SEND ANYTHING TO HIM!" (Emphasis in
original.)

156397914v3

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 119.

120.    Tremont also refused to allow its administrator to receive the Tremont Feeder Fund customer statements and trade tickets directly from BLMIS, as Tremont arranged with its other managers. Tremont also intervened to limit contact between Madoff and Tremont's auditor, E&Y. In May 2006, internal Tremont emails discussing E&Y's request for BLMIS's "internal control letter" and questioning whether an audit report was prepared for Madoff, revealed that Tremont acted as the go-between "[t]o keep the minimum amount of people contacting Madoff." In so doing, Tremont also misled E&Y, telling it that "Bob Schulman periodically visits [BLMIS's] facilities throughout the year and watches the company trade according to their highly secret strategy"—an obvious fiction given that BLMIS's IA Business never executed any trades.

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 120.

121.    This deliberate shielding of Madoff continued when Tremont replaced E&Y with KPMG and reported to potential clients that, other than minimal verification, "there is no contact" between KPMG and BLMIS.

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 121.

122.    Tremont also lied to investors when presented with concerns about BLMIS's auditors. As set forth in a 2006 internal memo, Tremont's top investment managers knew that Friehling & Horowitz was a "small firm" that was "not specialized in investment firms [and] broker/dealers." Nevertheless, Johnston and others from Tremont told Agile that Friehling & Horowitz was "usually a name you hear [with] medium size broker dealers."

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 122.

### G.    Tremont Avoided Questions and Fabricated Answers About BLMIS's Purported Options Trading

123.    Tremont's senior management knew that the options trades were a central part of the SSC Strategy and were well aware of how the options trading for the strategy worked. In fact, Schulman bragged internally that he taught Madoff how to trade options. Nevertheless, in response to evidence on the face of BLMIS trade tickets that included suspect options trading, Tremont tried to explain away these issues by giving inconsistent and false explanations.

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 123.

        1.        <u>Divergent Answers on Over-the-Counter/Listed Trading Questions</u>

124.    As described in the Tremont Complaint, Tremont knew that Madoff could not be trading options over-the-counter ("OTC") as he represented, in light of (i) the CUSIP numbers on BLMIS's trade confirmations, which indicated the options were traded on an exchange, and (ii) the lack of counterparty information that should be on all OTC trade confirmations.

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 124, and refer to the Tremont Complaint for

its compete and accurate contents.

125.    Tremont also knew that Madoff had not entered into any ISDA agreements with any counterparties—a basic requirement for all OTC options trades.

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 125.

126.    Rather than openly acknowledge the options trading impossibilities—which were clear from the trade tickets that Tremont analyzed—Tremont would flip-flop on the question of whether BLMIS traded options OTC or traded them on the Chicago Board Options Exchange.

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 126.

127.    For example, a November 2006 DDQ for one of the Tremont Feeder Funds stated that "options [] are traded on a recognized exchange."  In contrast, in November 2007, in response to a statement by HSBC Bank that it was under the impression that BLMIS traded options OTC, Johnston wrote, "our understanding is also that they are OTC."  On yet another occasion, Rye Broad Market's July 2007 DDQ equivocated, stating options "may be either listed or OTC."

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 127.

128.    As set forth in the Agile Notes, Tremont told Agile in 2007 that Madoff used both OTC and listed options for his strategy, and that Madoff has used OTC options since the beginning. Tremont even went so far as to make up a rationale for Madoff's use of one or the other, telling Agile that Madoff will go to listed options depending on price and that most of the time OTC options have a better price.

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 128.

      2.    Failure to Conduct Any Diligence on Purported Options Counterparties and Covering up the Truth With Fabrications

129.    Tremont failed to conduct any diligence on the lack of OTC counterparties on BLMIS's trade confirmations, because it knew there was no legitimate explanation.

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 129.

130.    Tremont senior management stated on certain occasions that Madoff purportedly traded options with the counterparties as agent for the Tremont Feeder Funds.  This meant that the Tremont Feeder Funds, not BLMIS, bore the risks involved with trading and settling with those purported counterparties.

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 130.

131.    Tremont senior management knew it had to conduct counterparty due diligence to insulate against default risk.  A JPMorgan Chase ("JPM") representative even pointed out to Johnston that the trading counterparties should all have been known to Tremont if Madoff supposedly traded in the name of the account holder (i.e., Tremont's BLMIS Feeder Funds), and not in BLMIS's name.  But Tremont never spoke with a single counterparty for Madoff's purported options trading, because there were none.

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 131.

132.    Tremont instead covered up for Madoff's fabrications with fabrications of its own, which changed depending on who was asking.  In a March 24, 2006 email, Kelly told Schulman that Citi, one of Tremont's leverage providers, had "asked around" and could not "find anyone who admit[ted] to being [BLMIS's] counterparty."  Schulman replied, "He [Madoff] has not disclosed [any counterparty names] to us."  Kelly nevertheless later told Agile that Schulman "has seen the counterparty names – he just does not want to disclose it."

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 132.

156397914v3

133.    In October 2006, Soares emailed Fortis Bank, relaying information provided by Schulman that one of the Tremont Feeder Funds had 12 counterparties, "which Madoff must use in relation to his put options trades." Schulman, however, later admitted in sworn testimony that Tremont had never tried to identify any purported counterparties.

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 133.

134.    In a June 2007 email, Kelly told JPM, which was considering a Tremont Feeder Fund investment, that "we do know the [counterparties'] general characteristics such as number and minimum credit rating." A month later, Mitchell told a different investor, "[o]ption counterparties are typical banks," and named JPM—who had just inquired on the identity of the counterparties—as one of them.

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 134.

135.    In April 2008, Johnston told consultant Albourne Partners ("Albourne")—itself in the process of conducting diligence on Tremont Feeder Funds for its clients—that Tremont "has checked with counterparties to make sure they are trading with the Investment Advisor [BLMIS] in the relevant instruments."

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 135.

136.    In October 2008, Albourne emailed Johnston twice, asking about Tremont's counterparty exposure to "MS [Morgan Stanley] or GS [Goldman Sachs]." Johnston "confirm[ed] that Tremont had "[a]bsolutely no exposure" to those companies, which did not make any sense in light of prior statements unless Johnston knew Madoff was not trading options as he purported.

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 136.

137.    The September 2008 collapse of Lehman Brothers Inc. and its affiliates and subsidiaries (collectively, "Lehman")—one of the largest OTC derivatives counterparties at the time—led to industry and investor panic. Many Tremont clients worried about their Lehman exposure, in light of BLMIS's purported billions of dollars in options holdings.

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 137.

138.    By contrast, Tremont's senior management was seemingly unconcerned from the outset by these monumental events.  They knew that if BLMIS's OTC options positions were real, a crash of a major options counterparty would have catastrophic effects on the Tremont Feeder Funds.  For example, in 2007, Mitchell detailed to an investor how, if a counterparty to an options trade such as Bear Stearns defaulted, "then the option (otc) is gone."

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 138.

139.    Tremont worked to avoid discussions with investors regarding the Lehman collapse.  To one client trying to assess its Lehman exposure and exposure to other potentially precariously positioned counterparties, Johnston simply stated, "We are not responding to this."

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 139.

140.    Mitchell crafted an answer to investors asking whether the Tremont Feeder Funds had Lehman risk, stating internally that "the line we should follow is that . . . [w]e do not discuss our counterparty arrangements as we are contractually bound not to."  In reply, Johnston went a step further, indicating his certainty that the "answer is 'no exposure'."

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 140.

141.    These statements were misleading by implying Tremont knew of actual counterparty arrangements and could assure the investors that Tremont's counterparties presented no risk.  If Tremont's senior management believed its BLMIS options were real, however, the Lehman collapse would have been more than a non-event.

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 141.

### H.    Tremont's Executives Had a Powerful Motive to Hide What They Knew About BLMIS and Madoff

142.    Tremont's profitability and, as it turned out, its very existence, depended on BLMIS.  Tremont and the Tremont Feeder Funds benefitted from BLMIS's incredibly consistent, positive returns, which enhanced their investment track records and ability to attract business partners and clients.  This led to the Tremont Feeder Funds' AUM increasing rapidly.  For example, from its inception in January 1994 to November 2008, Rye Broad Market's AUM increased from $5.9 million to approximately $2.35 billion, a 400-fold increase.

156397914v3

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 142.

143.    Tremont's revenues grew along with its AUM; during this period, Tremont
received at least $255 million in fees from its BLMIS-facing products.

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 143.

144.    Chief Financial Officer Lynn Keeshan noted that Tremont was "highly dependent"
on Madoff, which accounted for "all of the profits of the firm."  Cichella said Rye Prime Fund's
"only reason for being is as a $2b feeder into Madoff."  Pologe said BLMIS was Tremont's "crack
addiction business."

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 144.

145.    Tremont's parent company concluded that "the economics of Tremont's business
[was] Madoff."  Tremont did nothing more to earn its fees through its Tremont Feeder Funds than
provide access to BLMIS.  Pologe acknowledged Tremont "just sell[s] access [to BLMIS] for 2%
management fee . . . . We make a lot of money off this."  As Schulman told Mitchell, for some
customers, on top of the management fee, Tremont levied "a 50 basis point surcharge for them to
access Madoff."

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 145.

146.    Fees were a powerful reason for funds like Tremont to close their eyes and hide
what they knew about BLMIS's fraud.  As noted by Albourne in late 2008, "[w]e have been
advised by some of the [funds invested in BLMIS] that they are not interested in knowing more
about the product due to the fees they are earning on the product."

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 146.

## I.      Tremont Co-Managed Kingate Global

147.    Tremont also had knowledge of Madoff's fraud based on its tight-knit relationship with the Kingate-related feeder funds and management.[1]

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 147, and object to the incorporation by

reference of, and therefore do not answer, each and every other paragraph and allegation in the

complaint in the Kingate Global Action, but reserve the right to rely on and introduce any

allegations in the referenced Fourth Amended Complaint against Kingate Global, or its exhibits,

as opposing party admissions admissible for the truth of their contents.

148.    From the inception of their respective BLMIS investment accounts, Federico Ceretti and Carlo Grosso worked closely with Manzke to create Kingate Global and its manager, Kingate Management Limited (collectively, "Kingate").

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 148.

149.    Manzke introduced Ceretti and Grosso to Madoff in 1993 and worked with Ceretti and Grosso as a Kingate Global director and manager from 1995 until 2004.

**Response**:      The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 149.

150.    The Tremont-Kingate relationship continued through the revelation of Madoff's fraud.  Kingate Global was co-managed by Kingate Management and Tremont affiliate Tremont (Bermuda) Ltd. ("Tremont Bermuda")—an entity described by Manzke as "a pass through," which delegated management responsibilities to Tremont in New York and shared officers and directors with Tremont Partners, including Schulman and Manzke.  Specifically, in or around March 1995, Kingate Management and Tremont executed a co-manager agreement with Kingate Global. Pursuant to the agreement, Kingate Management and Tremont Bermuda were tasked with evaluating and monitoring BLMIS and providing necessary management services to Kingate Global.  Manzke and Hammond were listed as "principal decision-makers" in May 2005.

---

[1] The factual allegations in the Trustee's Fourth Amended Complaint against Kingate Global Fund Limited ("Kingate Global") and concerning the role of Kingate Management Limited are incorporated by reference.  *Picard v. Ceretti, et al.* (*In re Bernard L. Madoff Inv. Secs., LLC)*, Adv. Pro. No. 09-01161 (CGM) (Bankr. S.D.N.Y.) (ECF No. 100).

156397914v3

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 150.

151.    As part of this deal, Kingate Management and Tremont Bermuda also split Kingate
Global's management fees, which provided Tremont with significant revenue.  Between 1998 and
2008, Tremont received over $40 million in fees for funneling investor assets to Kingate Global.

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 151.

152.    Tremont Bermuda and Kingate Management were co-agents to Kingate Global
through their conduct and the operation of the various agreements entered into between the parties.
As such, Kingate's knowledge that BLMIS's IA Business was a fraud may be imputed to Tremont.
*See Picard v. Ceretti* (*In re BLMIS*), Adv. Pro. No. 09-1161 (CGM), 2015 WL 4734749, at *13
(Bankr. S.D.N.Y. Aug. 11, 2015).

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 152, and state that the allegations set forth

legal conclusions to which no response is required.

## VIII.    RECOVERY OF SUBSEQUENT TRANSFERS TO DEFENDANTS

### A.    Fairfield Sentry

1.    Initial Transfers From BLMIS to Fairfield Sentry

153.    The Trustee commenced a separate adversary proceeding against Fairfield Sentry
and other defendants in this Court under the caption, *Picard v. Fairfield Sentry Ltd.*, et al., Adv.
Pro. No. 09-01239 (CGM), seeking to avoid and recover initial transfers of customer property from
BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry
Initial Transfers").

**Response**:        The RBC Defendants admit that the Trustee filed an action styled as *Picard*

*v. Fairfield Sentry, Ltd.,* et al., Adv. Pro No. 09-1239 (BRL) (the "Sentry Action"), deny that the

purported initial transfers of customer property to Sentry the Trustee seeks to avoid and recover in

the Sentry Action were avoided or are avoidable, and deny knowledge and information sufficient

to form a belief as to the truth of the allegation of the amounts of the alleged transfers alleged in

Paragraph 153.

156397914v3

154.    By orders dated June 7 and June 10, 2011, this Court approved a settlement among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a consent judgment in favor of the Trustee and against Fairfield Sentry in the amount of $3,054,000,000 ("Judgment Amount") [ECF No. 109].

**Response**:    The RBC Defendants admit upon information and belief that the Court approved the settlement described in Paragraph 154 and entered a judgment as described in Paragraph 154 on or about the dates alleged therein, and refer to the referenced settlement agreement and the referenced judgment for their complete and accurate contents.

155.    The Fairfield Sentry Initial Transfers are set forth in the attached Exhibits A and B. The Fairfield Sentry Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegation of the timing and amounts of the alleged transfers alleged in Exhibits A and B, and state that the remaining allegations in Paragraph 155 set forth legal conclusions to which no response is required. To the extent a response is required, the RBC Defendants deny such allegations in Paragraph 155.

156.    On August 28, 2020, the Trustee filed a second amended complaint in the *Fairfield Sentry Ltd.* proceeding ("Second Amended Complaint") [ECF No. 286] seeking in part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

**Response**:    The RBC Defendants admit that the Trustee filed the Second Amended Complaint and deny knowledge and information sufficient to form a belief as to the truth of the allegation of the amounts of the alleged transfers alleged in Paragraph 156.

157.    As set forth in the Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the BLMIS fraud.  The Trustee incorporates by reference the allegations contained in the Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, 315-16.

**Response**:       The RBC Defendants object to the incorporation by reference of, and therefore do not answer, each and every paragraph and allegation in the Second Amended Complaint and to the inclusion in this adversary proceeding of any issue implicated by the complaint in the Second Amended Complaint other than the issue of the avoidance or avoidability of the initial transfers of customer property, but reserve the right to rely on and introduce any allegations in the referenced "Second Amended Complaint" or its exhibits as opposing party admissions admissible for the truth of their contents. The RBC Defendants state that the allegations of Paragraph 157 set forth legal conclusions to which no response is required. To the extent that a response is required, the RBC Defendants deny the allegations of Paragraph 157.

158.    Of the Judgment Amount, $2,895,000,000 was transferred to Fairfield Sentry during the six years preceding the Filing Date (the "Fairfield Sentry Six Year Transfers"). Each of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law (the "NYDCL"), particularly §§ 273--279, and of SIPA, particularly § 78fff-2(c)(3).

**Response**:       The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegation of the timing and amounts of the alleged transfers alleged in Paragraph 158, and state that the remaining allegations set forth legal conclusions to which no response is required. To the extent a response is required, the RBC Defendants deny such allegations in Paragraph 158.

159.    Of the Fairfield Sentry Six Year Transfers, $1,580,000,000 was transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Transfers"). Each of the Fairfield Sentry Two Year Transfers is avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**Response**:       The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegation of the timing and amounts of the alleged transfers alleged in Paragraph 159, and state that the remaining allegations set forth legal conclusions to which no

156397914v3

response is required. To the extent a response is required, the RBC Defendants deny such allegations in Paragraph 159.

        2.    <u>Subsequent Transfers From Fairfield Sentry to the Fairfield Sentry Transferee Defendants</u>

160.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to the Fairfield Sentry Transferee Defendants. Based on the Trustee's investigation to date, the subsequent transfers to the Fairfield Sentry Transferee Defendants total at least $38,019,770 (the "Fairfield Sentry Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry Subsequent Transfers is attached as Exhibit C.

**<u>Response</u>**:    The RBC Defendants admit that funds were sent from Fairfield Sentry to accounts maintained by the RBC Defendants, deny that any of such funds constitute subsequent transfers of customer property or any other property transferred from BLMIS to Fairfield Sentry, and deny any remaining allegations in Paragraph 160.

161.    On June 6, 2012, the Trustee filed this action seeking recovery of subsequent transfers from Fairfield Sentry.

**<u>Response</u>**:    The RBC Defendants admit the allegations in Paragraph 161.

162.    The Fairfield Sentry Subsequent Transfers are recoverable from the Fairfield Sentry Transferee Defendants under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**<u>Response</u>**:    The RBC Defendants state that the allegations in Paragraph 162 set forth legal conclusions to which no response is required. To the extent a response is required, the RBC Defendants deny the allegations in Paragraph 162.

163.    The Fairfield Sentry Subsequent Transfers represent redemptions of equity interests by the Fairfield Sentry Transferee Defendants as shareholders in Fairfield Sentry. Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Fairfield Sentry Subsequent Transfers to the Fairfield Sentry Transferee Defendants upon redemption of their interests.

**<u>Response</u>**:    The RBC Defendants state that the allegations in Paragraph 163 set forth legal conclusions to which no response is required. To the extent a response is required, the RBC Defendants deny such allegations in Paragraph 163.

156397914v3

B.    **The Rye Select Funds**

1.    Initial Transfers From BLMIS to Rye Broad Market

164.    As discussed above, the Trustee commenced a separate adversary proceeding against the Rye Select Funds and other funds directly or indirectly invested with BLMIS that were managed by Tremont, seeking to avoid and recover initial transfers of customer property from BLMIS in the approximate amount of $2.1 billion.

**Response**:    The RBC Defendants admit that the Trustee filed the Tremont Action, deny

that the initial transfers of customer property to Tremont the Trustee seeks to avoid and recover in

the Tremont Action were avoided or are avoidable, and deny knowledge and information sufficient

to form a belief as to the truth of the allegations of the amounts of the alleged transfers alleged in

Paragraph 164.

165.    Also as discussed above, by the Order dated September 22, 2011, this Court approved the Tremont Settlement under which the Trustee received a settlement payment of $1,025,000,000.  The Tremont Settlement specifically states that transfers to subsequent transfer defendants were not recovered with the partial payment by the Tremont Settling Defendants.

**Response**:    The RBC Defendants admit upon information and belief that the Court

approved a settlement on September 22, 2011, and refer to the referenced settlement agreement

for its complete and accurate contents.

166.    From the inception of Rye Broad Market's account with BLMIS to the Filing Date, BLMIS made transfers to Rye Broad Market of approximately $380,000,000 (the "Rye Broad Market Initial Transfers").  Each of the Rye Broad Market Initial Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the NYDCL, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3), and N.Y. C.P.L.R. 203(g) and 213(8).

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of the timing and amounts of the alleged transfers alleged

in Paragraph 166, and state that the remaining allegations set forth legal conclusions to which no

response is required. To the extent a response is required, the RBC Defendants deny such

allegations in Paragraph 166.

156397914v3

167.    Of the Rye Broad Market Initial Transfers, $252,000,000 was transferred to Rye Broad Market during the six years preceding the Filing Date (the "Rye Broad Market Six Year Transfers"). Each of the Rye Broad Market Six Year Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the NYDCL, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegation of the timing and amounts of the alleged transfers alleged in Paragraph 167, and state that the remaining allegations set forth legal conclusions to which no response is required. To the extent a response is required, the RBC Defendants deny such allegations in Paragraph 167.

168.    Of the Rye Broad Market Six Year Transfers, $60,000,000 was transferred to Rye Broad Market during the two years preceding the Filing Date (the "Rye Broad Market Two Year Transfers"). Each of the Rye Broad Market Two Year Transfers is avoidable under section 548 of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegation of the timing and amounts of the alleged transfers alleged in Paragraph 168, and state that the remaining allegations set forth legal conclusions to which no response is required. To the extent a response is required, the RBC Defendants deny such allegations in Paragraph 168.

169.    As set forth above, Rye Broad Market received each of the Rye Broad Market Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Rye Broad Market to inquire further into the BLMIS fraud. See also Proffered Second Amended Complaint, *Picard v. HSBC Bank PLC, et al*, Adv. Pro. No. 09-1364 (CGM), ECF No. 399, ¶¶ 425–467 (Bankr. S.D.N.Y. June 26, 2015) (detailing Tremont's relationship with BLMIS) ("Tremont Proffer").

**Response**:    The RBC Defendants state that the allegations set forth in Paragraph 169 are legal conclusions to which no response is required. To the extent a response is required, the RBC Defendants deny such allegations in Paragraph 169.

170.    Charts setting forth the Rye Broad Market Initial Transfers are included as Exhibits D and E.  The Rye Broad Market Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of the timing and amounts of the alleged transfers alleged

in Exhibits D and E, and state that the remaining allegations in Paragraph 170 set forth legal

conclusions to which no response is required. To the extent a response is required, the RBC

Defendants deny such allegations in Paragraph 170.

2.        Subsequent Transfers From Rye Broad Market to RBC Alternative

171.    Prior to the Filing Date, Rye Broad Market subsequently transferred a portion of the Rye Broad Market Initial Transfers to RBC Alternative.  Based on the Trustee's investigation to date, the subsequent transfers to RBC Alternative total at least $18,077,260 (the "Rye Broad Market Subsequent Transfers").  A chart setting forth the presently known Rye Broad Market Subsequent Transfers is attached as Exhibit F.

**Response**:        The RBC Defendants admit that funds were sent from Rye Broad Market to

accounts maintained by RBC Alternative, deny that any of such funds constitute subsequent

transfers of customer property or any other property transferred from BLMIS to Tremont, and deny

any remaining allegations in Paragraph 171.

172.    On June 6, 2012, the Trustee filed this action seeking recovery of subsequent transfers from Rye Broad Market.

**Response**:        The RBC Defendants admit that the Trustee filed this action on June 6,

2012, seeking recovery of certain subsequent transfers from Rye Broad Market.

173.    The Rye Broad Market Subsequent Transfers are recoverable from RBC Alternative under section 550(a) of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**Response**:        The RBC Defendants state that the allegations in Paragraph 173 set forth

legal conclusions to which no response is required. To the extent a response is required, the RBC

Defendants deny such allegations in Paragraph 173.

47

174.   The Rye Broad Market Subsequent Transfers represent redemptions of equity interests by RBC Alternative as a limited partner in Rye Broad Market.  Because Rye Broad Market invested all or substantially all of its assets into the BLMIS Ponzi scheme, Rye Broad Market was insolvent when it made the Rye Broad Market Subsequent Transfers to RBC Alternative upon redemption of its interests.

**Response**:   The RBC Defendants deny the allegations in Paragraph 174.

3.   Initial Transfers From BLMIS to Rye Prime Fund

175.   From the inception of Rye Prime Fund's account with BLMIS to the Filing Date, BLMIS made transfers to Rye Prime Fund of approximately $1,000,000,000 (the "Rye Prime Fund Initial Transfers").  Each of the Rye Prime Fund Initial Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the NYDCL, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3), and N.Y. C.P.L.R. 203(g) and 213(8).

**Response**:   The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of the timing and amounts of the alleged transfers alleged in Paragraph 175, and state that the remaining allegations set forth legal conclusions to which no response is required. To the extent a response is required, the RBC Defendants deny such allegations in Paragraph 175.

176.   Of the Rye Prime Fund Initial Transfers, $945,000,000 was transferred to Rye Prime Fund during the six years preceding the Filing Date (the "Rye Prime Fund Six Year Transfers").  Each of the Rye Prime Fund Six Year Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the NYDCL, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

**Response**:   The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of the timing and amounts of the alleged transfers alleged in Paragraph 176, and state that the remaining allegations set forth legal conclusions to which no response is required. To the extent a response is required, the RBC Defendants deny such allegations in Paragraph 176.

177.   Of the Rye Prime Fund Six Year Transfers, $495,000,000 was transferred to Rye Prime Fund during the two years preceding the Filing Date (the "Rye Prime Fund Two Year Transfers").  Each of the Rye Prime Fund Two Year Transfers is avoidable under section 548 of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**Response**:       The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of the timing and amounts of the alleged transfers alleged in Paragraph 177, and state that the remaining allegations set forth legal conclusions to which no response is required. To the extent a response is required, the RBC Defendants deny such allegations in Paragraph 177.

178.    As set forth above, Rye Prime Fund received each of the Rye Prime Fund Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Rye Prime Fund to inquire further into the BLMIS fraud. *See also* Tremont Proffer.

**Response**:       The RBC Defendants state that the allegations set forth in Paragraph 178 are legal conclusions to which no response is required. To the extent a response is required, the RBC Defendants deny such allegations in Paragraph 178.

179.    Charts setting forth the Rye Prime Fund Initial Transfers are included as Exhibits G and H. The Rye Prime Fund Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

**Response**:       The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of the timing and amounts of the alleged transfers alleged in Exhibits G and H, and states that the remaining allegations in Paragraph 179 set forth legal conclusions to which no response is required. To the extent a response is required, the RBC Defendants deny such allegations in Paragraph 179.

4.    <u>Subsequent Transfers From Rye Prime Fund to Royal Bank of Canada and RBC Alternative</u>

180.    Prior to the Filing Date, Rye Prime Fund subsequently transferred a portion of the Rye Prime Fund Initial Transfers to Royal Bank of Canada and RBC Alternative. Based on the Trustee's investigation to date, the subsequent transfers to Royal Bank of Canada and RBC Alternative total at least $16,284,605 (the "Rye Prime Fund Subsequent Transfers"). A chart setting forth the presently known Rye Prime Fund Subsequent Transfers is attached as Exhibit I.

**Response**:       The RBC Defendants admit that funds were sent from Rye Prime Fund to accounts maintained by Royal Bank of Canada and RBC Alternative, deny that any of such funds

constitute subsequent transfers of customer property or any other property transferred from BLMIS

to Tremont, and deny any remaining allegations in Paragraph 180.

181.    On June 6, 2012, the Trustee filed this action seeking recovery of subsequent transfers from Rye Prime Fund.

**Response**:        The RBC Defendants admit that the Trustee filed this action on June 6,

2012, seeking recovery of certain subsequent transfers from Rye Prime Fund.

182.    The Rye Prime Fund Subsequent Transfers are recoverable from Royal Bank of Canada and RBC Alternative under section 550(a) of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**Response**:        The RBC Defendants state that the allegations in Paragraph 182 set forth

legal conclusions to which no response is required. To the extent a response is required, the RBC

Defendants deny such allegations in Paragraph 182.

183.    The Rye Prime Fund Subsequent Transfers in each case represent redemptions of equity interests by Royal Bank of Canada and RBC Alternative as limited partners in Rye Prime Fund. Because Rye Prime Fund invested all or substantially all of its assets into the BLMIS Ponzi scheme, Rye Prime Fund was insolvent when it made the Rye Prime Fund Subsequent Transfers to Royal Bank of Canada and RBC Alternative upon redemption of their interests.

**Response**:        The RBC Defendants deny the allegations in Paragraph 183.

5.        Initial Transfers From BLMIS to Rye Portfolio Limited

184.    From the inception of Rye Portfolio Limited's account with BLMIS to the Filing Date, BLMIS made transfers to Rye Portfolio Limited of approximately $620,000,000 (the "Rye Portfolio Limited Initial Transfers"). Each of the Rye Portfolio Limited Initial Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the NYDCL, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3), and N.Y. C.P.L.R. 203(g) and 213(8).

**Response**:        The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of the timing and amounts of the alleged transfers alleged

in Paragraph 184, and state that the remaining allegations set forth legal conclusions to which no

response is required. To the extent a response is required, the RBC Defendants deny such

allegations in Paragraph 184.

156397914v3

185.    Of the Rye Portfolio Limited Initial Transfers, $609,000,000 was transferred to Rye Portfolio Limited during the six years preceding the Filing Date (the "Rye Portfolio Limited Six Year Transfers"). Each of the Rye Portfolio Limited Six Year Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the NYDCL, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of the timing and amounts of the alleged transfers alleged in Paragraph 185, and state that the remaining allegations set forth legal conclusions to which no response is required. To the extent a response is required, the RBC Defendants deny such allegations in Paragraph 185.

186.    Of the Rye Portfolio Limited Six Year Transfers, $350,000,000 was transferred to Rye Portfolio Limited during the two years preceding the Filing Date (the "Rye Portfolio Limited Two Year Transfers"). Each of the Rye Portfolio Limited Two Year Transfers is avoidable under section 548 of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of the timing and amounts of the alleged transfers alleged in Paragraph 186, and state that the remaining allegations set forth legal conclusions to which no response is required. To the extent a response is required, the RBC Defendants deny such allegations in Paragraph 186.

187.    As set forth above, Rye Portfolio Limited received each of the Rye Portfolio Limited Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Rye Portfolio Limited to inquire further into the BLMIS fraud. *See also* Tremont Proffer.

**Response**:    The RBC Defendants state that the allegations set forth in Paragraph 187 are legal conclusions to which no response is required. To the extent a response is required, the RBC Defendants deny such allegations in Paragraph 187.

188.    Charts setting forth the Rye Portfolio Limited Initial Transfers are included as Exhibits J and K. The Rye Portfolio Limited Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

156397914v3

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations of the timing and amounts of the alleged transfers alleged

in Exhibits J and K, and state that the remaining allegations in Paragraph 188 set forth legal

conclusions to which no response is required. To the extent a response is required, the RBC

Defendants deny such allegations in Paragraph 188.

6.    Subsequent Transfers From Rye Portfolio Limited to Guernroy

189.    Prior to the Filing Date, Rye Portfolio Limited subsequently transferred a portion
of the Rye Portfolio Limited Initial Transfers to Guernroy.  Based on the Trustee's investigation
to date, the subsequent transfers to Guernroy total at least $4,836,009 (the "Rye Portfolio Limited
Subsequent Transfers").   A chart setting forth the presently known Rye Portfolio Limited
Subsequent Transfers is attached as Exhibit L.

**Response**:    The RBC Defendants admit that funds were sent from Rye Portfolio

Limited to accounts maintained by Guernroy, deny that any of such funds constitute subsequent

transfers of customer property or any other property transferred from BLMIS to Tremont, and deny

any remaining allegations in Paragraph 189.

190.    On June 6, 2012, the Trustee filed this action seeking recovery of subsequent
transfers from Rye Broad Market.

**Response**:    The RBC Defendants admit that the Trustee filed this action on June 6,

2012, seeking recovery of certain subsequent transfers from Rye Broad Market.

191.    The Rye Portfolio Limited Subsequent Transfers are recoverable from Guernroy
under section 550(a) of the Bankruptcy Code, and applicable provisions of SIPA, particularly
§ 78fff-2(c)(3).

**Response**:    The RBC Defendants state that the allegations in Paragraph 191 set forth

legal conclusions to which no response is required. To the extent a response is required, the RBC

Defendants deny such allegations in Paragraph 191.

192.    The Rye Portfolio Limited Subsequent Transfers in each case represent
redemptions of equity interests by Guernroy as a shareholder in Rye Portfolio Limited.  Because
Rye Portfolio Limited invested all or substantially all of its assets into the BLMIS Ponzi scheme,

52

Rye Portfolio Limited was insolvent when it made the Rye Portfolio Limited Subsequent Transfers to Guernroy upon redemption of its interests.

**Response**:    The RBC Defendants deny the allegations in Paragraph 192.

193.    The Fairfield Sentry Subsequent Transfers, the Rye Broad Market Subsequent Transfers, the Rye Prime Fund Subsequent Transfers, and the Rye Portfolio Limited Subsequent Transfers together constitute the Transfers, as defined above.

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 193.

194.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to:  (i) supplement the information on the initial and subsequent transfers discussed above, and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

**Response**:    The RBC Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 194.

## COUNT ONE
## RECOVERY OF THE TRANSFERS
## 11 U.S.C. §§ 105(a) AND 550

195.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

**Response**:    The RBC Defendants incorporate and reassert their responses to the

allegations contained in each of the previous paragraphs of this Amended Complaint as though set

forth fully herein.

196.    The Transfers are recoverable from Defendants under 11 U.S.C. § 550(a) and SIPA § 78fff-2(c)(3).

**Response**:    The RBC Defendants state that the allegations in Paragraph 196 set forth

legal conclusions to which no response is required. To the extent a response is required, the RBC

Defendants deny such allegations in Paragraph 196.

197.    Defendants are immediate or mediate transferees of the Transfers from Fairfield Sentry and the Rye Select Funds.

**Response**:        The RBC Defendants state that the allegations in Paragraph 197 set forth legal conclusions to which no response is required. To the extent a response is required, the RBC Defendants deny such allegations in Paragraph 197.

198.    As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendants:  (a) recovering the Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**Response**:        The RBC Defendants state that the allegations in Paragraph 198 set forth legal conclusions to which no response is required. To the extent a response is required, the RBC Defendants deny such allegations in Paragraph 198.

## RESPONSE TO PLAINTIFF'S REQUEST FOR RELIEF

The RBC Defendants deny that the Trustee is entitled to his requested judgment in favor of the Trustee and against the RBC Defendants or to any of the relief described herein.

## AFFIRMATIVE DEFENSES

199.    In the event that subsequent legal developments change the availability or nature of claims asserted by the Trustee, the RBC Defendants hereby preserve each and every defense at law, in equity, or otherwise, available under federal and state law, including common law. Further, the RBC Defendants reserve the right to amend this Answer to assert other and further defenses, cross-claims, and/or third party claims when and if, in the course of investigation, discovery, or preparation for trial, it becomes appropriate to do so.  In asserting the following defenses, the RBC Defendants do not intend to suggest that matters designated herein as "defenses" are not elements of the Trustee's prima face case on the Trustee's purported claims or that they are not matters as to which the Trustee bears the burden of proof.  These defenses are set forth cumulatively and in the alternative.

156397914v3

## FIRST DEFENSE

### Bankruptcy Code Safe Harbor (11 U.S.C. § 546(e))

200.    The alleged subsequent transfers to the RBC Defendants may not be recovered because the alleged initial transfers are subject to the safe harbor in Section 546(e) of the Bankruptcy Code, 11 U.S.C. § 546(e), in that the alleged initial transfers were (i) made by or to (or for the benefit of) a stockbroker (BLMIS), financial institution (Fairfield Sentry, Rye Prime Fund, Rye Broad Market, or Rye Portfolio Limited or the RBC Defendants), financial participant (the RBC Defendants), or other covered entity; (ii) settlement payments and/or transfers made in connection with a securities contract (between BLMIS and Fairfield Sentry; BLMIS and Rye Portfolio Limited, Rye Prime Fund, and/or Rye Broad Market; BLMIS and the RBC Defendants; Fairfield Sentry and the RBC Defendants; and/or Rye Portfolio Limited, Rye Prime Fund, and/or Rye Broad Market and the RBC Defendants); and (iii) made more than two years before the petition date and are thus not recoverable under 11 U.S.C. § 548(a)(1)(A). Because the Transfers are not avoidable, property received by the RBC Defendants as part of the Transfers is not recoverable from the RBC Defendants. In addition, at the time of the transfers to the RBC Defendants, none of Fairfield Sentry, Rye Portfolio Limited, Rye Broad Market, or Rye Prime Fund or the RBC Defendants had actual knowledge that Madoff or BLMIS were not trading securities or that they were perpetrating a Ponzi scheme.

## SECOND DEFENSE

### No Customer Property (15 U.S.C. § 78fff-2(c)(3))

201.    The property, if any, that the RBC Defendants received from Fairfield Sentry, Rye Broad Market, Rye Prime Fund, and/or Rye Portfolio Limited was not customer property, or proceeds of customer property, that BLMIS transferred to Fairfield Sentry, Rye Broad Market,

156397914v3

Rye Prime Fund, and/or Rye Portfolio Limited, and therefore the property is not recoverable by the Trustee from the RBC Defendants.

### THIRD DEFENSE

**For Value, in Good Faith, and Without Knowledge of the Voidability (11 U.S.C. § 550(b))**

202.    The RBC Defendants took transfers from Fairfield Sentry, Rye Broad Market, Rye Prime Fund, and Rye Portfolio Limited for value, in good faith, and without knowledge of the voidability of the transfers from BLMIS to Fairfield Sentry and from BLMIS to the Rye Select Funds, and thus the transfers to the RBC Defendants may not be recovered pursuant to 11 U.S.C. § 550(b).

The RBC Defendants took for value because the transfers from Fairfield Sentry, Rye Broad Market, Rye Prime Fund, and Rye Portfolio Limited were made in exchange for the RBC Defendants' surrender of its shares in those funds.

The RBC Defendants did not have actual knowledge of any fraudulent purpose behind the transfers it received. The RBC Defendants did not know facts that would have prompted a reasonable person in the RBC Defendants' position to conduct further inquiry into whether there was any fraudulent purpose behind the transfers.

Even if the RBC Defendants had been on inquiry notice of a possible fraudulent purpose behind the transfers it received, a diligent inquiry by the RBC Defendants would not have discovered such a fraudulent purpose. Other entities, including the United States Securities and Exchange Commission, with greater investigatory tools and resources than the RBC Defendants, and with more access to BLMIS personnel and documentation than the RBC Defendants, repeatedly examined and investigated BLMIS but failed to uncover Madoff's fraud before December 2008. The RBC Defendants did not have the ability to compel the production of

156397914v3

information from third parties that would have been necessary to establish that BLMIS was committing fraud. Diligent inquiry by the RBC Defendants would not have discovered the fraudulent purpose of the transfers.

The RBC Defendants did not have knowledge of the voidability of the transfers from BLMIS to Fairfield Sentry, and from BLMIS to Rye Broad Market, Rye Prime Fund, and/or Rye Portfolio Limited when it received the alleged subsequent transfers (if any).

## FOURTH DEFENSE

### Lack of Subject Matter Jurisdiction

### (U.S. Const. art. III; Fed. R. Civ. P. 12(b)(1); Fed. R. Bankr. P. 7012(b))

203.    This Court lacks jurisdiction under Article III of the U.S. Constitution to enter final orders or judgment in this proceeding.

## FIFTH DEFENSE

### Lack of Personal Jurisdiction

### (U.S. Const. Amend. V; Fed. R. Civ. P. 12(b)(2); Fed. R. Bankr. P. 7012(b))

204.    This Court lacks personal jurisdiction over the RBC Defendants with respect to the claim herein.

## SIXTH DEFENSE

### Failure to State a Claim (Fed. R. Civ. P. 12(b)(6); Fed. R. Bankr. P. 7012(b))

205.    The Amended Complaint fails to state a claim upon which relief can be granted, including for each of the reasons stated in the RBC Defendants' Motion to Dismiss the Amended Complaint, filed on July 8, 2022 in this adversary proceeding, ECF 155, and proceedings thereon.

## SEVENTH DEFENSE

### Initial Transfer Not Avoided (11 U.S.C. § 550(a))

206.    The Trustee may not recover the transfers from Fairfield Sentry, Rye Broad Market, Rye Prime Fund, and Rye Portfolio Limited, to the RBC Defendants, because he has not avoided the initial transfers from BLMIS to Fairfield Sentry, Rye Broad Market, Rye Prime Fund, and Rye Portfolio Limited.

## EIGHTH DEFENSE

### No Ponzi Scheme Presumption

207.    The Trustee may not rely on a "Ponzi scheme presumption" to prove that the initial transfers from BLMIS to Fairfield Sentry, Rye Broad Market, Rye Prime Fund, and Rye Portfolio Limited that he seeks to recover from the RBC Defendants were made with actual intent to hinder, delay, or defraud any BLMIS creditor.

## NINTH DEFENSE

### RBC Defendants as Initial Transferee – Mere Conduit Defense

208.    In the alternative, Fairfield Sentry, Rye Broad Market, Rye Prime Fund, and Rye Portfolio Limited were mere conduits, and consequently, the claimed transfers were initial transfers from BLMIS to the RBC Defendants. As the Trustee stated in *Picard v. Grosvenor Investment Management Ltd.*, No. 12-1021 (Bankr. S.D.N.Y. June 15, 2022), Fairfield Sentry's "sole purpose was to funnel money to BLMIS" and "no arm's length relationship exist[ed] between [Sentry] and BLMIS" (internal quotation marks and citation omitted). 12-1021 ECF 115, at 3, 6. The redemptions received by the RBC Defendants were initial transfers from BLMIS to the RBC Defendants that are subject to the safe harbor under 11 U.S.C. § 546(e); any Trustee proceeding to avoid the transfers is untimely; and the RBC Defendants may retain the amount it received pursuant to 11 U.S.C. § 548(c) and 11 U.S.C. § 548(d)(2)(B) because it took the transfers for value and in good faith.

## TENTH DEFENSE

### Fairfield Sentry, Rye Broad Market, Rye Prime Fund, and Rye Portfolio Limited as Initial Transferees – Mere Conduit Defense

209.    In the alternative, the Trustee's claims are barred because the RBC Defendants were not transferees of the subsequent transfers. To the extent that the RBC Defendants received any subsequent transfer, the RBC Defendants (a) received each subsequent transfer in good faith, in their capacity as custodians, and for the account and benefit of one or more of their customers, (b) did not have dominion or control or the right to assert dominion or control over subsequent transfers or the proceeds thereof or to use the subsequent transfers or the proceeds thereof for their own purposes; (c) rather, were mere conduits for their customers; and (d) were obligated to credit the subsequent transfers to the account and for the benefit of one or more of their customers, who alone had the right to assert dominion and control over the subsequent transfers received by the RBC Defendants for their benefit.

## ELEVENTH DEFENSE

### New York Debtor and Creditor Law

210.    The claims against the RBC Defendants are barred, in whole or in part, because the Trustee failed to plead all of the elements of fraudulent transfer under section 544 of the Bankruptcy Code and sections 273, 274, 275, 276, 276-a, 278 and/or 279 of the New York Debtor and Creditor Law with sufficient particularity and factual support.

## TWELFTH DEFENSE

### Section 278(1) of New York Debtor and Creditor Law

211.    The Trustee's claims are barred, in whole or in part, because the Fairfield Sentry Initial Transfers, Rye Broad Market Initial Transfers, Rye Prime Fund Initial Transfers, and Rye

156397914v3

Portfolio Limited Initial Transfers were taken for fair consideration and without knowledge of the fraud, as provided by section 278(1) of the New York Debtor and Creditor Law.

## THIRTEENTH DEFENSE

### Section 278(2) of New York Debtor and Creditor Law

212.    The Trustee's claims are barred, in whole or in part, because the Fairfield Sentry Initial Transfers, Rye Broad Market Initial Transfers, Rye Prime Fund Initial Transfers, and Rye Portfolio Limited Initial Transfers were taken without actual fraudulent intent and for fair consideration, as provided by section 278(2) of the New York Debtor and Creditor Law.

## FOURTEENTH DEFENSE

### Sufficient SIPC Funds

213.    The Trustee's claims should be dismissed if Plaintiff has recovered, or during the pendency of this action recovers, sufficient funds to reimburse SIPC for all payments that SIPC has made to satisfy allowed claims of BLMIS customers.

## FIFTEENTH DEFENSE

### Failure to Mitigate

214.    The Trustee's claims are barred, in whole or part, because the Trustee has failed to mitigate, minimize or avoid damages, if any.

## SIXTEENTH DEFENSE

### British Virgin Island Proceedings

215.    The Trustee's claims are barred, in whole or in part, based upon rulings, judgments, orders, or decisions entered in the liquidation proceedings of Fairfield Sentry before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands, including any related appellate rulings, judgments, orders, or decisions.

156397914v3

## SEVENTEENTH DEFENSE

### No Interest

216. The Trustee is not entitled to an award of interest under 11 U.S.C. § 548.

## EIGHTEENTH DEFENSE

### Statute of Limitations

217. The Trustee's claim is barred by the statute of limitations.

## NINETEENTH DEFENSE

### Estoppel

218. The Trustee's claim is barred by estoppel.

## TWENTIETH DEFENSE

### Unreasonable Delay

219. The Trustee's delay in bringing and prosecuting his claim, which was brought more than a decade ago and concerns transfers, in many cases, made more than 20 years ago (and in all cases, over 14 years ago), is unreasonable and unfairly prejudices the RBC Defendants' ability to defend themselves.

## TWENTY-FIRST DEFENSE

### Extraterritoriality

220. The Trustee's recovery of the transfers to the RBC Defendants would constitute an impermissible extraterritorial application of U.S. law.

## TWENTY-SECOND DEFENSE

### Comity

221. The Trustee's recovery of the transfers to the RBC Defendants would violate principles of comity.

156397914v3

## TWENTY-THIRD DEFENSE

### Violation of Due Process (U.S. Const. amend. V)

222.    The use of the doctrine of law of the case to apply to the RBC Defendants rulings

made in other adversary proceedings to which it was not a party and in which it did not participate

violates the RBC Defendants' right to due process of law as guaranteed by the Fifth Amendment

to the U.S. Constitution.

## TWENTY-FOURTH DEFENSE

### Single Satisfaction (11 U.S.C. § 550(d))

223.    Pursuant to 11 U.S.C. § 550(d), the Trustee may not recover any subsequent transfer

from the RBC Defendants to the extent he has recovered the amount of the initial transfers from

Fairfield Sentry, Rye Broad Market, Rye Prime Fund, and Rye Portfolio Limited, or any other

alleged immediate or mediate transferee the amount of the avoided initial transfers that included

the customer property that the Trustee alleges the RBC Defendants received.

## TWENTY-FIFTH DEFENSE

### Preservation of Rights (11 U.S.C. § 502(h))

224.    To the extent the Trustee recovers from the RBC Defendants, the RBC Defendants

reserve their right to assert a claim arising from such recovery under 11 U.S.C. § 502(h).

## TWENTY-SIXTH DEFENSE

### Double Recovery

225.    The Trustee has entered into settlement agreements with Fairfield Sentry.  On May

9, 2011, a Settlement Agreement (the "Fairfield Settlement Agreement") with the Liquidators of

Fairfield Sentry Limited and other Fairfield funds.  This Court approved the Fairfield Settlement

Agreement on June 7, 2011 and it was incorporated into the consent judgment entered against

Fairfield Sentry on July 13, 2011 (the "Consent Judgment").  The Fairfield Settlement Agreement provides for the sharing of recoveries on the Trustee's and the Liquidators' claims for recovery of property that Fairfield Sentry transferred.  To the extent that the Liquidators recover from the RBC Defendants in settlement or otherwise, the Trustee is barred from recovering on the ground that he is not entitled to double recovery, nor should the RBC Defendants be subject to recovery of identical funds from two separate entities.

## JURY DEMAND

226.    The RBC Defendants demand a trial by jury on all issues that may be tried by a jury.

## STATEMENT PURSUANT TO FED. R. BANKR. P. 7012(b)

227.    The RBC Defendants do not consent to entry of final orders or judgment by the Bankruptcy Court.

## DEFENDANT'S REQUEST FOR RELIEF

WHEREFORE, the RBC Defendants demand judgment dismissing the Amended Complaint with prejudice, together with an award of attorneys' fees, costs, disbursements, and such other relief as the Court deems just and appropriate.

Dated: June 2, 2023
      New York, New York

**KATTEN MUCHIN ROSENMAN LLP**

*/s/ Anthony L. Paccione*
Anthony L. Paccione
Mark T. Ciani
Zachary S. Beal
50 Rockefeller Plaza
New York, New York 10020
Telephone: (212) 940-8800
anthony.paccione@katten.com
mark.ciani@katten.com
zachary.beal@katten.com

*Attorneys for Defendants*

64