**CHAFFETZ LINDSEY LLP**
1700 Broadway, 33rd Floor
New York, New York 10019
Tel.: (212) 257-6960
Andreas.Frischknecht@chaffetzlindsey.com
Erin.Valentine@chaffettzlindsey.com

*Attorneys for SIX SIS AG*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 12-01195 (CGM) |
| Plaintiff, | |
| v. | **ANSWER TO SECOND AMENDED COMPLAINT AND JURY DEMAND** |
| SIX SIS AG, | |
| Defendant. | |

Defendant SIX SIS AG ("SIX SIS"), by and through its undersigned counsel, hereby

answers the Second Amended Complaint of Plaintiff Irving H. Picard (the "Trustee" or

"Plaintiff"), Trustee for the liquidation of Bernard L. Madoff Investment Securities LLC

("BLMIS") and the Chapter 7 Estate of Bernard L. Madoff, on current information and belief

as follows.  SIX SIS reserves the right to supplement and amend this Answer as may be

necessary.[1]

## RESPONSES TO SPECIFIC ALLEGATIONS

### I.    NATURE OF THE PROCEEDING

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover
BLMIS customer property, as defined by SIPA § 78*lll*(4), that was stolen by BLMIS
as part of the massive Ponzi scheme perpetrated by Madoff and others.

**ANSWER**:  The allegations of paragraph 1 constitute legal conclusions to which no

response is required.  To the extent a response is required, SIX SIS denies the allegations of

paragraph 1.

2.    With this Second Amended Complaint, the Trustee seeks to recover at least
$52,653,947 in subsequent transfers of BLMIS customer property made to SIX SIS
(the "Subsequent Transfers").  The Subsequent Transfers were obtained by SIX SIS
by redeeming shares it owned in BLMIS feeder funds Fairfield Sentry Limited
("Fairfield Sentry") and Fairfield Sigma Limited ("Sigma" and, together with
Fairfield Sentry, the "Fairfield Funds").  SIX SIS also invested in and received
subsequent transfers from Luxalpha SICAV and Groupement Financier Levered
Ltd. (together, the "Access Funds"), as well as from Kingate Global Fund, Ltd.
("Kingate Global") and Kingate Euro Fund, Ltd. (together, the "Kingate Funds"
and collectively with the Fairfield Funds and Access Funds, the "Feeder Funds").
Each of the Feeder Funds invested all or substantially all of its assets directly or
indirectly with BLMIS's investment advisory business (the "IA Business").

**ANSWER**:  SIX SIS denies the allegations set forth in the first three sentences of

paragraph 2.  SIX SIS states that its clients, all of which were regulated financial institutions,

---

[1] Capitalized terms not defined herein have the meaning set forth in the Second Amended
Complaint.

2

invested in one or more of the Fairfield Funds and one or more of the Kingate Funds on behalf

of their own clients.  At the instruction of its financial institution clients, SIX SIS executed

transactions on its clients' behalf.  SIX SIS otherwise lacks knowledge or information sufficient

to form a belief as to the truth of the remaining allegations of paragraph 2.

> 3.    The Fairfield Funds were the largest group of BLMIS feeder funds, and were
> created, operated, and controlled by Fairfield Greenwich Group ("FGG"), a New
> York-based *de facto* partnership. From November 1990 through December 2008,
> Fairfield Sentry maintained direct customer accounts with BLMIS; Sigma was a
> "currency fund," meaning it accepted subscriptions in euros, converted the money
> to U.S. dollars, and then invested 100% of its assets in Fairfield Sentry.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 3.

## II.    SUBJECT MATTER JURISDICTION AND VENUE

> 4.    This is an adversary proceeding commenced in this Court, in which the main
> underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA
> Proceeding"), is pending.  The SIPA Proceeding was originally brought in the
> United States District Court for the Southern District of New York as *Securities &
> Exchange Commission v. Bernard L. Madoff Investment Securities LLC, et al.*, No.
> 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.
> This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§
> 1334(b) and (e)(1), and SIPA §§ 78eee(b)(2)(A) and (b)(4).

**ANSWER**:  SIX SIS admits the allegations in the first and second sentences of paragraph

4.  The allegations in the third sentence of paragraph 4 constitute legal conclusions to which no

response is required.  To the extent a response is required, SIX SIS denies the allegations in the

third sentence of paragraph 4.

> 5.    This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (F), (H) and (O). The
> Trustee consents to the entry of final orders or judgment by this Court if it is
> determined that consent of the parties is required for this Court to enter final orders
> or judgment consistent with Article III of the U.S. Constitution.

**ANSWER**:  The allegations in the first sentence of paragraph 5 constitute legal conclusions

to which no response is required.  To the extent a response is required, SIX SIS denies the

allegations in the first sentence of paragraph 5.  SIX SIS acknowledges that the Trustee consents

to the entry of final orders or judgments by the Bankruptcy Court if it is determined that the consent

of the parties is required for this court to enter final orders or judgments consistent with Article III

of the U.S. Constitution.  SIX SIS does not consent to entry of final orders or judgments by the

Bankruptcy Court.

6.      Venue in this judicial district is proper under 28 U.S.C. § 1409.

**ANSWER**:  The allegations of paragraph 6 constitute legal conclusions to which no

response is required.  To the extent a response is required, SIX SIS denies the allegations of

paragraph 6.

7.      This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11
        U.S.C. §§ 105(a) and 550, and other applicable law.

**ANSWER**:  The allegations of paragraph 7 constitute legal conclusions to which no

response is required.  To the extent a response is required, SIX SIS admits that the Trustee has

purported to bring this proceeding under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a)

and 550, but denies that those provisions authorize the Trustee's claims or that the Trustee's claims

are brought under "other applicable law."

### III.    PERSONAL JURISDICTION

8.      SIX SIS is subject to the jurisdiction of the Bankruptcy Court pursuant to Federal
        Rule of Bankruptcy Procedure 7004 and the United States Constitution, as well as
        section 302 of the New York Civil Practice Law and Rules, because it purposely
        availed itself of the laws and protections of the United States and the State of New
        York.

**ANSWER**:  The allegations of paragraph 8 constitute legal conclusions to which no

response is required.  To the extent a response is required, SIX SIS denies the allegations of

paragraph 8.

9.      The Trustee's claims against SIX SIS arise from business it transacted within New

4

York. SIX SIS derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

**ANSWER**: SIX SIS denies the allegations of paragraph 9.

10.    SIX SIS invested in the Fairfield Funds for the purpose of profiting from BLMIS in New York, and relinquished control over investment decisions and their implementation to Madoff in New York.

**ANSWER**: SIX SIS denies the allegations of paragraph 10.

11.    SIX SIS knowingly directed funds to be invested in, and then redeemed from, New York-based BLMIS via the Fairfield Funds. By transacting with New York-based BLMIS and New York-based FGG, SIX SIS knowingly accepted the rights, benefits, privileges, and responsibilities of conducting business and transactions in the United States and New York.

**ANSWER**: SIX SIS denies the allegations of paragraph 11.

12.    SIX SIS voluntarily executed multiple subscription agreements in connection with its investments in Fairfield Sentry and Sigma. In these agreements, SIX SIS affirmed that it received and read the funds' private placement memoranda ("PPMs"). Based on the PPMs, SIX SIS knew the following facts indicating that it was transacting in New York:

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS, and Sigma invested substantially all of its assets in Fairfield Sentry;
- BLMIS performed all investment management duties for these assets;
- BLMIS was registered with the U.S. Securities and Exchange Commission (the "SEC");
- BLMIS was the executing broker for Fairfield Sentry's investments, and purportedly operated and executed the split-strike conversion strategy (the "SSC Strategy") on the fund's behalf;
- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities, U.S. options, and U.S. Treasury securities ("Treasury Bills"), and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;
- BLMIS was the custodian of Fairfield Sentry's investments with BLMIS; and
- BLMIS was "essential to the continued operation of" Fairfield Sentry.

**ANSWER**: SIX SIS denies the allegations of paragraph 12, except that SIX SIS admits

that it entered into a subscription agreement with Fairfield Sentry and refers the Court to that

document for its complete and accurate contents.

13.     The Fairfield Sentry subscription agreements provided that all money for the purchase of Fairfield Sentry shares be directed to a New York correspondent bank account for deposit into Fairfield Sentry's bank account. As set forth above, SIX SIS knew and intended that these funds would be then invested with BLMIS in New York. From Fairfield Sentry's bank account, the funds were deposited into BLMIS's account at JPMorgan Chase Bank in New York.

**ANSWER**: SIX SIS denies the allegations of paragraph 13. SIX SIS further refers the

Court to the Fairfield Sentry subscription agreements for their complete and accurate contents.

14.     SIX SIS directed subscription funds to these New York accounts on at least 35 occasions, if not more, over the course of its investments with Fairfield Sentry.

**ANSWER**: SIX SIS denies the allegations of paragraph 14.

15.     In addition, SIX SIS designated and used a bank account at Brown Brothers Harriman in New York in its own name (the "BBH Account") to receive redemption payments from, as well as remit subscription payments to, Fairfield Sentry. Over the course of its investments with Fairfield Sentry, SIX SIS used the BBH Account to receive at least 47 of the Subsequent Transfers from Fairfield Sentry sought herein (the "Sentry Subsequent Transfers"). SIX SIS likewise used the BBH Account to remit subscription payments on the at least 35 occasions discussed above. SIX SIS also used an HSBC Bank USA correspondent account in New York via Citco Global Custody NV, its agent for both subscriptions and redemptions, to receive additional Sentry Subsequent Transfers. The Sentry Subsequent Transfers thus occurred in New York.

**ANSWER**: SIX SIS admits that it had an account at Brown Brothers Harriman ("BBH")

in New York and that certain redemptions were made to that account. SIX SIS otherwise denies

the allegations of paragraph 14.

16.     In its Fairfield Sentry subscription agreements, SIX SIS submitted to New York jurisdiction, venue, service of process, and law. Specifically, SIX SIS (i) "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding," (ii) "agree[d] that any suit, action or proceeding . . . with respect to this Agreement and the Fund may be brought in New York," (iii) "consent[ed] to the service of process out of any New York court," and (iv) agreed that "[t]his Agreement shall be governed and enforced in accordance with the laws of New York. . . ."

**ANSWER**: SIX SIS denies the allegations of paragraph 16, except that SIX SIS admits

that it entered into a subscription agreement with Fairfield Sentry and refers the Court to that

document for its complete and accurate contents.

## IV.    **BACKGROUND, THE TRUSTEE AND STANDING**

17.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the SEC commenced the District Court Proceeding.

**ANSWER**:  SIX SIS admits on information and belief that Madoff was arrested on or

around the Filing Date and that the SEC filed a complaint against BLMIS.  SIX SIS otherwise

lacks knowledge or information sufficient to form a belief as to the truth of the allegations of

paragraph 17.

18.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC").  Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 18.

19.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:
   a)    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);
   b)    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and
   c)    removed the case to this Court pursuant to SIPA § 78eee(b)(4).

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 19.

20.    By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 20.

21.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 21.

22.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 22.

23.    At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 23.

24.    At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 24.

25.    On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George

Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 25.

26.    As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by BLMIS or Madoff to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 26.

27.    Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

**ANSWER**:  The allegations of paragraph 27 constitute legal conclusions to which no response is required.  To the extent a response is required, SIX SIS denies the allegations of paragraph 27.

28.    The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

**ANSWER**:  The allegations of paragraph 28 constitute legal conclusions to which no response is required.  To the extent a response is required, SIX SIS denies the allegations of paragraph 28.

## V.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.    BLMIS

29.    Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker dealer with the SEC. In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company. At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 29.

30.    In compliance with 15 U.S.C. § 78$o$(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008. Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation. At all times, BLMIS was assigned CRD No. 2625. SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status. SIPC membership is contingent on registration of the broker-dealer with the SEC.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 30.

31.    For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and the IA Business.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 31.

32.    BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 32.

33.    For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 33.

34.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 34.

### B.    The Ponzi Scheme

35.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 35.

36.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 36.

37.     To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 37.

38.     On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 38.

1.      Madoff's Investment Strategy

39.     In general, BLMIS purported to execute two primary investment strategies for BLMIS customers: the convertible arbitrage strategy and the SSC Strategy.  For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit. At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 39.

40.     All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 40.

41.     The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets. Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time. In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 41.

42.     From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 42.

43.     BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 43.

44.     By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 44.

45.     The put options were to limit the downside risk of sizeable price changes in the basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option should have entailed a loss for BLMIS.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 45.

46.    The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 46.

47.    The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protection while limiting the upside.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 47.

48.    If Madoff was putting on the same baskets of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket. For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 48.

49.    Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the SSC Strategy.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 49.

50.    Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 50.

### 2.    BLMIS's Fee Structure

51.    BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 51.

### 3.    BLMIS's Market Timing

52.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he succeeded at market timing by intermittently entering and exiting the market. During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 52.

53.    As a registered broker-dealer, BLMIS was required, pursuant to 17 C.F.R. § 240.17a-5, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 53.

54.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 54.

### 4.    BLMIS Execution

55.    BLMIS's execution showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 55.

### 5.    No Evidence Of BLMIS Trading

56.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 56.

57.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 57.

### 6.    The Collapse Of The Ponzi Scheme

58.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 58.

59.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

16

**ANSWER**: SIX SIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 59.

60. At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

**ANSWER**: The allegations of paragraph 60 constitute legal conclusions to which no response is required. To the extent a response is required, SIX SIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 60.

## VI.    THE DEFENDANT

61. SIX SIS is a corporation organized under the laws of Switzerland that maintains a place of business at Baslerstrasse 100, CH-4600 Olten, Switzerland and a place of business at Pfingstweidstrasse 110, 8005 Zürich, Switzerland.

**ANSWER**: SIX SIS admits the allegations of paragraph 61.

## VII.    RECOVERY OF SUBSEQUENT TRANSFERS TO SIX SIS

### A.    Initial Transfers From BLMIS To Fairfield Sentry

62. The Trustee commenced a separate adversary proceeding against Fairfield Sentry and other defendants in this Court under the caption, *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (CGM) (the "Fairfield Action"), seeking to avoid and recover initial transfers of customer property from BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").

**ANSWER**: The allegations of paragraph 62 refer to proceedings in another litigation to which SIX SIS is not a party. SIX SIS respectfully refers the Court to the docket and filings in that action for their contents. To the extent a further response is required, SIX SIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 62.

63. By orders dated June 7 and June 10, 2011, this Court approved a settlement among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a consent judgment in favor of the Trustee and against Fairfield Sentry in the amount of $3,054,000,000 ("Judgment Amount") [ECF No. 109].

17

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 63.

64.    The Fairfield Sentry Initial Transfers are set forth in the attached **Exhibits A** and **B**. The Fairfield Sentry Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

**ANSWER**:  SIX SIS denies the allegations of paragraph 64 and respectfully refers the Court to Exhibits A and B for their complete and accurate contents.

65.    On August 28, 2020, the Trustee filed a second amended complaint in the *Fairfield Sentry Ltd.* proceeding ("Fairfield Second Amended Complaint") [ECF No. 286] seeking in part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

**ANSWER**:  SIX SIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 65.

66.    As alleged in the Fairfield Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the BLMIS fraud. The Trustee incorporates by reference the allegations contained in the Fairfield Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, 315-16.

**ANSWER**:  SIX SIS objects to the purported incorporation by reference of a pleading from another litigation in which SIX SIS is not a party as a violation of Rule 8 of the Federal Rules of Civil Procedure as incorporated by Rule 7008 of the Federal Rules of Bankruptcy Procedure.  To the extent a further response is required, SIX SIS lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 66.

67.    Of the Judgment Amount, $2,895,000,000 was transferred to Fairfield Sentry during the six years preceding the Filing Date (the "Fairfield Sentry Six Year Transfers"). Each of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

**ANSWER**:  The allegations of paragraph 67 constitute legal conclusions to which no response is required.  To the extent a response is required, SIX SIS denies the allegations of paragraph 67.

68.     Of the Fairfield Sentry Six Year Transfers, $1,580,000,000 was transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Transfers"). Each of the Fairfield Sentry Two Year Transfers is avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER**:  The allegations of paragraph 68 constitute legal conclusions to which no response is required.  To the extent a response is required, SIX SIS denies the allegations of paragraph 68.

## B.     Subsequent Transfers From Fairfield Sentry To SIX SIS

69.     Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to SIX SIS. Based on the Trustee's investigation to date, the subsequent transfers to SIX SIS total $39,555,439 (as defined above, the "Sentry Subsequent Transfers"). A chart setting forth the presently known Sentry Subsequent Transfers is attached as **Exhibit C**.

**ANSWER**:  The allegations of paragraph 69 constitute legal conclusions to which no response is required.  To the extent a response is required, SIX SIS denies the allegations of paragraph 69 and respectfully refers the court to Exhibit C for its complete and accurate contents.

70.     On March 22, 2012, the Trustee filed this action seeking recovery of subsequent transfers from the Fairfield Funds.

**ANSWER**:  SIX SIS admits that the Trustee filed this action on March 22, 2012, but otherwise denies the allegations of paragraph 70.

71.     The Sentry Subsequent Transfers are recoverable from SIX SIS under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER**:  The allegations of paragraph 71 constitute legal conclusions to which no

response is required.  To the extent a response is required, SIX SIS denies the allegations of

paragraph 71.

72.     The Sentry Subsequent Transfers represent redemptions of equity interests by SIX SIS as a shareholder in Fairfield Sentry. Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Sentry Subsequent Transfers to SIX SIS upon redemptions of its interests.

**ANSWER**:  The allegations of paragraph 72 constitute legal conclusions to which no

response is required.  To the extent a response is required, SIX SIS denies the allegations of

paragraph 72.

C.    **Subsequent Transfers From Fairfield Sentry To Sigma And Subsequently To SIX SIS**

73.     Based on the Trustee's investigation to date, prior to the Filing Date, Fairfield Sentry subsequently transferred at least $789,152,864 of the Fairfield Sentry Initial Transfers directly to Sigma. A chart setting forth the presently known such transfers is attached as **Exhibit D**.

**ANSWER**:  SIX SIS denies the allegations of paragraph 73 and respectfully refers the

Court to Exhibit D for its complete and accurate contents.

74.     Thereafter, Sigma transferred at least $13,098,508 to SIX SIS (the "Sigma Subsequent Transfers"). A chart setting forth the presently known Sigma Subsequent Transfers is attached as **Exhibit E**.

**ANSWER**:  SIX SIS denies the allegations of paragraph 74 and respectfully refers the

Court to Exhibit E for its complete and accurate contents.

75.     The Sigma Subsequent Transfers are recoverable from SIX SIS under section 550(a) of the Bankruptcy Code, and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

**ANSWER**:  The allegations of paragraph 75 constitute legal conclusions to which no

response is required.  To the extent a response is required, SIX SIS denies the allegations of

paragraph 75.

76.    The Sigma Subsequent Transfers represent redemptions of equity interests by SIX SIS as a shareholder in Sigma.  Because Sigma invested all or substantially all of its assets into the BLMIS Ponzi scheme, Sigma was insolvent when it made the Sigma Subsequent Transfers to SIX SIS upon redemptions of its interests.

**ANSWER**:  The allegations of paragraph 76 constitute legal conclusions to which no response is required.  To the extent a response is required, SIX SIS denies the allegations of paragraph 76.

77.    As defined above, the Sentry Subsequent Transfers and the Sigma Subsequent Transfers are collectively referred to as the "Subsequent Transfers."

**ANSWER**:  SIX SIS admits that the Trustee refers to the Sentry Subsequent Transfers and the Sigma Subsequent Transfers collectively as the "Subsequent Transfers."

78.    The Trustee's discovery and investigation in this action and others, including the Fairfield Action, is ongoing. Recent discovery in the Fairfield Action revealed that SIX SIS received additional transfers, for which the Trustee is seeking recovery in this Second Amended Complaint.  Ongoing discovery in this action and others, including the Fairfield Action, may reveal additional subsequent transfers to SIX SIS. The Trustee reserves the right to: (i) supplement the information on the initial and Subsequent Transfers discussed above, and any additional subsequent transfers, based on continuing discovery in this action and others, including the Fairfield Action; and (ii) seek avoidance and recovery of such transfers.

**ANSWER**:  The allegations of paragraph 78 constitute legal conclusions to which no response is required.  To the extent a response is required, SIX SIS denies the allegations of paragraph 78.

## COUNT ONE
## RECOVERY OF THE SUBSEQUENT
## TRANSFERS11 U.S.C. §§ 105(a) AND 550

79.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

**ANSWER**:  SIX SIS incorporates and reasserts its responses to the allegations contained in the previous paragraphs of this Answer as though set forth fully herein.

80.    The Subsequent Transfers are recoverable from SIX SIS under 11 U.S.C. § 550(a)

and SIPA § 78fff-2(c)(3).

**ANSWER**:  The allegations of paragraph 80 constitute legal conclusions to which no response is required.  To the extent a response is required, SIX SIS denies the allegations of paragraph 80.

81.    SIX SIS is an immediate or mediate transferee of the Subsequent Transfers from the Fairfield Funds.

**ANSWER**:  The allegations of paragraph 81 constitute legal conclusions to which no response is required.  To the extent a response is required, SIX SIS denies the allegations of paragraph 81.

82.    As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against SIX SIS: (a) recovering the Subsequent Transfers, or the value thereof, from SIX SIS for the benefit of the estate of BLMIS;and (b) awarding any other relief as the Court deems appropriate.

**ANSWER**:  The allegations of paragraph 82 constitute legal conclusions to which no response is required.  To the extent a response is required, SIX SIS denies the allegations of paragraph 82.

## **AFFIRMATIVE DEFENSES**

SIX SIS asserts the following defenses without assuming the burden of proof or any other burden if such burdens would otherwise be on Plaintiff.  In the event that subsequent legal developments change the availability or nature of claims asserted by the Trustee, SIX SIS hereby preserves each and every defense at law, in equity, or otherwise, available under federal and state law, including common law.  Further, SIX SIS reserves the right to amend this Answer to assert other and further defenses, cross-claims, and/or third party claims when and if, in the course of investigation, discovery, or preparation for trial, it becomes appropriate to do so.  These defenses are set forth cumulatively and in the alternative.

### FIRST AFFIRMATIVE DEFENSE

**Failure to State a Claim (Fed. R. Civ. P. 12(b)(6); Fed. R. Bankr. P. 7012(b))**

The Second Amended Complaint fails to state a claim upon which relief can be granted against SIX SIS.

### SECOND AFFIRMATIVE DEFENSE

**Lack of Personal Jurisdiction**

The Second Amended Complaint must be dismissed because the Court lacks personal jurisdiction over SIX SIS.

### THIRD AFFIRMATIVE DEFENSE

**Lack of Dominion or Control (11 U.S.C. § 550(a)) and Mere Conduit**

The Trustee's claims are barred, in whole or part, because SIX SIS was not a transferee of the alleged "Fairfield Subsequent Transfers". To the extent SIX SIS received any transfers, it did so in its capacity as a custodian, for the account and benefit of one or more of its customers. SIX SIS did not have dominion or control, or the right to assert dominion or control, over the subsequent transfers or the proceeds thereof or to use the subsequent transfers or the proceeds thereof for its own purposes. SIX SIS was not a transferee for purposes of 11 U.S.C. § 550(a)(2). Rather, SIX SIS was a mere conduit for its customers, which alone had the right to assert dominion and control over the subsequent transfers that SIX SIS received for their benefit.

### FOURTH AFFIRMATIVE DEFENSE

**Good Faith (11 U.S.C. § 550(b))**

To the extent that SIX SIS received any so-called Fairfield Subsequent Transfers, the Trustee may not recover the transfers under 11 U.S.C. § 550(b) because SIX SIS took the transfers, if any, from Fairfield Sentry and Fairfield Sigma for value, in good faith, and without knowledge

of the voidability of the transfers from BLMIS to Fairfield Sentry.

*First*, SIX SIS gave value in the form of investment principal, in exchange for the redemption payments.

*Second*, SIX SIS did not have actual knowledge of any fraudulent purpose behind the transfers, if any, received. SIX SIS did not know facts that would have prompted a reasonable person in their position to conduct further inquiry into whether there was any fraudulent purpose behind the transfers.

Even if SIX SIS had been on inquiry notice of a possible fraudulent purpose behind the transfers, if any, received, a diligent inquiry by SIX SIS would not have discovered such a fraudulent purpose. Other entities, including the United States Securities and Exchange Commission, with greater investigatory tools and resources than SIX SIS, and with more access to BLMIS personnel and documentation than SIX SIS, repeatedly examined and investigated BLMIS but failed to uncover Madoff's fraud before December 2008. SIX SIS did not have the ability to compel the production of information from third parties that would have been necessary to establish that BLMIS was committing fraud. Diligent inquiry by SIX SIS would not have discovered the fraudulent purpose of the transfers.

*Finally*, SIX SIS did not have knowledge of the alleged voidability of the transfers from BLMIS to Fairfield Sentry.

### FIFTH AFFIRMATIVE DEFENSE

### Bankruptcy Code Safe Harbor (11 U.S.C. § 546(e))

The Trustee's claims are barred, in whole or in part, because the alleged subsequent transfers to SIX SIS, if any, may not be recovered because the alleged initial transfers, if any, are subject to the safe harbor in Section 546(e) of the Bankruptcy Code, 11 U.S.C. § 546(e).

## SIXTH AFFIRMATIVE DEFENSE

### No Customer Property (15 U.S.C. § 78fff-2(c)(3))

The Trustee's claims are barred, in whole or in part, because any property that SIX SIS received from the so-called Fairfield Subsequent Transfers was not BLMIS customer property, or proceeds of BLMIS customer property, that BLMIS transferred to Fairfield Sentry or Fairfield Sigma, and therefore any such property is not recoverable by the Trustee from SIX SIS.

## SEVENTH AFFIRMATIVE DEFENSE

### Statute of Limitations

The Trustee's claims are barred, in whole or in part, by the statute of limitations.

## EIGHTH AFFIRMATIVE DEFENSE

### Initial Transfers Not Avoided (11 U.S.C. § 550(a))

The Trustee's claims are barred, in whole or in part, because the Trustee may not recover the alleged Fairfield Subsequent Transfers because he has not avoided the alleged initial transfers from BLMIS to Fairfield Sigma or Fairfield Sentry. The Trustee has failed to plead all the elements of avoidable fraudulent transfer under Section 544 of the Bankruptcy Code and Sections 273, 273-a, 274, 275, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law with sufficient particularity and factual support. The Trustee may not rely on a "Ponzi scheme presumption" to prove that the alleged initial transfers from BLMIS to Fairfield Sigma or Fairfield Sentry were made with actual intent to hinder, delay, or defraud any BLMIS customer.

## NINTH AFFIRMATIVE DEFENSE

### Lack of Subject Matter Jurisdiction (U.S. Const. Art. III; Fed. R. Civ. P. 12(b)(1); Fed. R. Bankr. P. 7012(b))

This Court lacks jurisdiction under Article III of the U.S. Constitution to enter final orders or judgments in this proceeding.

## TENTH AFFIRMATIVE DEFENSE

### Extraterritoriality

The Trustee's recovery of any alleged transfers to SIX SIS would constitute an impermissible extraterritorial application of U.S. law.

## ELEVENTH AFFIRMATIVE DEFENSE

### Comity

The Trustee's claims to recover from SIX SIS subsequent transfers allegedly made to SIX SIS by Fairfield Sentry and Fairfield Sigma violate principles of international comity.

## TWELFTH AFFIRMATIVE DEFENSE

### Violation of Due Process (U.S. Const. Amend. V)

The use of the doctrine of law of the case to apply to SIX SIS rulings made in other adversary proceedings to which it was not a party and in which it did not participate violates SIX SIS's right to due process of law as guaranteed by the Fifth Amendment to the U.S. Constitution.

## THIRTEENTH AFFIRMATIVE DEFENSE

### Sufficient SIPC Funds

The Trustee's claims should be dismissed if there are recovered, now or during the pendency of this action, sufficient funds to reimburse SIPC for all payments that SIPC has made to satisfy allowed claims of BLMIS customers.

## FOURTEENTH AFFIRMATIVE DEFENSE

### No Double Recovery

The Trustee's claims are barred, in whole or in part, to the extent that any other entity, including but not limited to the Liquidators of Fairfield Sentry Ltd. and related funds, recovers any amounts based on the conduct alleged in the Second Amended Complaint, because the

Trustee is not entitled to double recovery, nor should SIX SIS be subject to recovery of identical funds from two separate entities.

On May 9, 2011, the Trustee entered into a Settlement Agreement (the "Fairfield Settlement Agreement") with the Liquidators of Fairfield Sentry Limited and related Fairfield funds. This Court approved the Fairfield Settlement Agreement on June 7, 2011 and it was incorporated into the consent judgment entered against Fairfield Sentry on July 13, 2011. The Fairfield Settlement Agreement provides for the sharing of recoveries on the Trustee's and the Fairfield Liquidators' claims for recovery of property that the Fairfield Funds transferred, but the Trustee and the Fairfield Liquidators cannot both recover the same funds.

## FIFTEENTH AFFIRMATIVE DEFENSE

### Laches

The Trustee's claims are barred by the doctrine of laches and similar doctrines. The Trustee's unreasonable delay in bringing and prosecuting his claim, which was brought more than a decade ago and concerns transfers made more than 15 years ago, has unreasonably and unfairly prejudiced SIX SIS's ability to defend itself.

## SIXTEENTH AFFIRMATIVE DEFENSE

### *In Pari Delicto*

The Trustee's claims against SIX SIS are barred by the doctrines of *in pari delicto* and unclean hands, because a trustee, standing in the shoes of the debtor, cannot recover for a wrong that the debtor itself took part in.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### No Interest

To the extent the Trustee recovers from SIX SIS, the Trustee is not entitled to an award

of interest under the facts and equities of this action.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 9015 of the Federal Rules of Bankruptcy Procedure, Defendant SIX SIS hereby demands a jury trial on all claims and issues that may be tried by a jury.

## STATEMENT PURSUANT TO FED. R. BANKR. P. 7012(b)

SIX SIS does not consent to entry of final orders or judgments by the Bankruptcy Court.

## PRAYER FOR RELIEF

WHEREFORE, Defendant SIX SIS requests that this Court dismiss the Second Amended Complaint with prejudice, award SIX SIS its costs incurred in connection with this action, and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
June 2, 2023

**CHAFFETZ LINDSEY LLP**

BY:      /s/ Andreas Frischknecht
Andreas A. Frischknecht
Erin E. Valentine

1700 Broadway, 33rd Floor
New York, New York 10019
Andreas.Frischknecht@chaffetzlindsey.com
Erin.Valentine@chaffettzlindsey.com

*Attorneys for SIX SIS AG*