**Young Conaway Stargatt & Taylor, LLP**
Rockefeller Center
1270 Avenue of the Americas
Suite 2210
New York, NY 10020
Telephone: (212) 332-8840
Facsimile: (212) 332-8855
Matthew B. Lunn
Michael S. Neiburg (admitted *pro hac vice*)
Justin P. Duda
Christopher M. Lambe (admitted *pro hac vice*)

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*
*and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 11-02758 (CGM) |
| Plaintiff, | |
| v. | **AMENDED COMPLAINT** |
| CACEIS BANK LUXEMBOURG and CACEIS BANK, | |
| Defendants. | |

Irving H. Picard, as trustee (the "Trustee") for the liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C.

§§ 78*aaa-lll*[1], substantively consolidated with the chapter 7 estate of Bernard L. Madoff

("Madoff"), by and through his undersigned counsel, for this amended Complaint (the

"Amended Complaint") against defendants CACEIS Bank Luxembourg, n/k/a CACEIS Bank

Luxembourg Branch ("CACEIS Bank Lux") and CACEIS Bank ("CACEIS Bank France" and

together with CACEIS Bank Lux for ease of reference only, the "CACEIS Defendants"), alleges

the following:

## I.    Nature of the Action

1.      This adversary proceeding is part of the Trustee's continuing efforts to recover

BLMIS customer property[2] that BLMIS stole as part of the massive Ponzi scheme perpetrated by

Madoff and others.

2.      The Trustee seeks to recover at least $77,633,803 of stolen BLMIS customer

property transferred to CACEIS Bank Lux and $33,213,014 of stolen BLMIS customer property

transferred to CACEIS Bank France (collectively, the "Subsequent Transfers") for a total of

$110,846,817, which Subsequent Transfers were transferred to the CACEIS Defendants between

2003 and 2008 (the "Transfer Period").  The Subsequent Transfers were derived from CACEIS

Bank France's and CACEIS Bank Lux's investments with BLMIS through the BLMIS feeder

funds Fairfield Sentry Limited ("Fairfield Sentry"), Fairfield Sigma Limited ("Fairfield Sigma"

and together with Fairfield Sentry, collectively, the "Fairfield Funds"), and Harley International

---

[1] For convenience, further references to SIPA will omit title 15 and be cited as SIPA § ____.

[2] SIPA § 78lll(4) defines customer property as cash and securities at any time received, acquired, or held by, or for the account of, a debtor from or for, the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.

(Cayman) Limited ("Harley" and together with the Fairfield Funds, collectively, the "BLMIS Feeder Funds").

3.      The following chart sets forth the currently known aggregate amounts of the Subsequent Transfers from the BLMIS Feeder Funds to the specific CACEIS Defendant:

|  | CACEIS Bank France | CACEIS Bank Lux |
|---|---|---|
| **Fairfield Sentry** | $33,213,014 | $35,759,150 |
| **Fairfield Sigma** | N/A | $35,824,693 |
| **Harley** | N/A | $6,049,960 |
| **Total** | **$33,213,014** | **$77,633,803** |

## II.      Subject Matter Jurisdiction and Venue

4.      This is an adversary proceeding commenced in this Court, in which the main underlying SIPA Liquidation proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Liquidation Proceeding"), is pending.  The SIPA Liquidation Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities & Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

5.      This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (F), (H) and (O).  The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

6.      Venue in this judicial district is proper under 28 U.S.C. § 1409.

7.       This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

### III.    Background, the Trustee, and Standing

8.       On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission (the "SEC") commenced the District Court Proceeding.

9.       On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

10.      Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

(a)      appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

(b)      appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

(c)      removed the case to this Court pursuant to SIPA § 78eee(b)(4).

11.      By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

12.      On April 13, 2009, certain creditors filed an involuntary bankruptcy petition against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Liquidation Proceeding.

13.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an eleven-count criminal information filed against him by the United States Attorney for the Southern District of New York.  At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

14.    At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme.  DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

15.    At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud.  Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

16.    On March 24, 2014, Daniel Bonventre, Annette Bongiorno, Jo Ann Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

17.    As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors.  The Trustee relies on SIPA and the Bankruptcy Code to avoid and recover payouts of

fictitious profits and/or other transfers made by the Debtors to customers and others to the

detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme.

Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described

in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

18.    Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy

trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant

to SIPA § 78fff(b).  Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy

Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

19.    The Trustee has standing to bring the avoidance and recovery claims under SIPA

§ 78fff-1(a) and applicable provisions of the Bankruptcy Code, including sections 323(b), 544,

and 704(a)(1) of the Bankruptcy Code, because the Trustee has the power and authority to avoid

and recover transfers under sections 544, 547, 548, 550(a), and 551 of the Bankruptcy Code, and

SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

**IV.    BLMIS, the Ponzi Scheme, and Madoff's Investment Strategy**

**A.    BLMIS**

20.    Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a

broker dealer with the SEC.  In 2001, Madoff changed the corporate form of BLMIS from a sole

proprietorship to a New York limited liability company.  At all relevant times, Madoff controlled

BLMIS first as its sole member, and thereafter as its chairman and chief executive.

21.    In compliance with SIPA § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its

business form, BLMIS operated as a broker-dealer from 1960 through 2008.  Public records

obtained from the Central Registration Depository of the Financial Industry Regulatory

Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its

operation.  At all times, BLMIS was assigned CRD No. 2625.  SIPC's Membership Management

System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960.  On December 30, 1970, BLMIS became a member of SIPC upon SIPA's creation and continued its membership after 2001 without any change in status. SIPC membership is contingent on registration of the broker-dealer with the SEC.

22.     For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and the investment advisory business ("IA Business").

23.     BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry.  BLMIS's website omitted the IA Business entirely.  BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

24.     For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

25.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion.  BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion.  In reality, Madoff grossly understated these numbers.  In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM.  At all times, BLMIS's Form ADVs were publicly available.

B.    **The Ponzi Scheme**

26.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

27.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.  It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.  The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

28.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York.  Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

29.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.  BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

8

C.    **Madoff's Investment Strategy**

30.    In general, BLMIS purported to execute two primary investment strategies for BLMIS customers:  the convertible arbitrage strategy and the split-strike conversion strategy (the "SSC Strategy").  For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit.  At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

31.    BLMIS commingled all funds received from its customers into a single BLMIS account maintained at JPMorgan Chase Bank.  BLMIS did not use these commingled funds to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

32.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets.  Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time.  In the 1970s, this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

33.    From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

34.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

35.     By 1992, the SSC Strategy purported to involve:  (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

36.     The put options were to limit the downside risk of sizeable price changes in the basket.  The exercise of put options could not turn losses into gains, but rather could only put a floor on losses.  By definition, the exercise of a put option should have entailed a loss for BLMIS.

37.     The sale of call options would partially offset the costs associated with acquiring puts, but would have the detrimental effect of putting a ceiling on gains.  The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

38.     The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar."  The collar provides downside protections while limiting the upside.

39.     If Madoff was putting on the same baskets of equities across all BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket.  For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion.  There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

40.    Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call or put option notional value to support the SSC Strategy.

41.    Madoff could not be using the SSC Strategy because his returns drastically outperformed the market.  BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period.  Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly).  Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

### 1.    BLMIS's Fee Structure

42.    BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits.  By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

### 2.    BLMIS's Market Timing

43.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he succeeded at market timing by intermittently entering and exiting the market.  During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in U.S. Treasury securities ("U.S. Treasury Bills") or mutual funds invested in U.S. Treasury Bills.

44.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets

and liabilities at the time of reporting.  BLMIS's reported quarterly and year-end exits were undertaken to avoid these SEC requirements.  But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.  It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.  Yet, this is precisely what BLMIS's customer statements reported.

45.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

### 3.    BLMIS Execution

46.    BLMIS's execution, as reported on its customer statements, showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

### 4.    No Evidence of BLMIS Trading

47.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities.  There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

48.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC").  The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

### 5.    The Collapse of the Ponzi Scheme

49.    The Ponzi scheme collapsed in December 2008, when BLMIS customers'

requests for redemptions overwhelmed the flow of new investments.

50.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased

none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS

through its IA Business operated as a Ponzi scheme.

51.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less

than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at

the time of the Subsequent Transfers, BLMIS was left with insufficient capital.

## V.    The Defendants, Their Predecessors, and Non-Parties

52.    Defendant CACEIS Bank France is a French *societe anonyme* maintaining a place

of business at 1-3, place Valhubert, 75206 Paris Cedex 13, France.  Defendant CACEIS Bank

France was formed in 2005 as a joint venture comprised of Credit Agricole Investor Services

Bank and IXIS Investor Services.

53.    Defendant CACEIS Bank Lux is a Luxembourg *societe anonyme* maintaining a

place of business at 5 allèe Schaffer, L-2520 Luxembourg.  During the Transfer Period, CACEIS

Bank Lux was a wholly owned subsidiary of CACEIS Bank France.

54.    At all relevant times, both CACEIS Bank France and CACEIS Bank Lux were

sophisticated global financial institutions with experience and expertise in providing professional

investment management and financial services to corporations, institutions, and high net worth

individuals.  In publicly available documents available at the time the Trustee filed the original

Complaint, the CACEIS Defendants held themselves out as custodian banks.  *See* **Exhibit A**.

That same document, however, also provided that CACEIS, through offices across Europe,

North America, and Asia, delivered a comprehensive set of high quality services covering

depository/trustee and custody, clearing, fund administration, transfer agency, and corporate trust.  *Id.*  CACEIS also provided (i) qualitative analysis for the growing information needs associated with the diversification of investment strategies and the increasing complexity of financial instruments, (ii) value-at-risk risk analysis, and (iii) performance attribute and measurement services.  *Id*.  A similar, current document states that CACEIS is engaged in providing (i) global and cross-asset market solutions, (ii) middle-office services, (iii) custody and cash services, (iv) asset administration and accounting services, and (v) reporting services.  *See* **Exhibit B**.

55.    The Fairfield Funds were single-purpose investment vehicles, created, operated, marketed, and controlled by Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York that solicited funds from third parties for investment with BLMIS.

56.    Non-party Fairfield Sentry, a BVI company, was an investment fund that had direct customer accounts with BLMIS's IA Business for the purpose of investing all or substantially all of its assets with BLMIS.  Fairfield Sentry maintained in excess of 95% of its assets in its BLMIS customer accounts.  Certain of the Subsequent Transfers from Fairfield Sentry came through non-party Fairfield Sigma, also a BVI company, which is a foreign currency fund that invested 100% of its assets in Fairfield Sentry.

57.    Non-party Harley, a Cayman Islands company, was a BLMIS feeder fund formed in the Cayman Islands.  Harley invested all or substantially all of its assets with BLMIS in New York.  In 2009, the Trustee filed an adversary proceeding against Harley in this Court, seeking to avoid and recover initial transfers of customer property from BLMIS to Harley.  On November 10, 2010, on a motion for summary default judgment, the Court entered a default judgment

against Harley avoiding the initial transfers.  The Trustee has not recovered any of the initial

transfers or their value avoided by the default judgment against Harley.

## VI.    Personal Jurisdiction

58.    Both CACEIS Bank Lux and CACEIS Bank France are subject to personal

jurisdiction in this judicial district because each purposely availed themselves of the laws and

protections of the United States and the State of New York by, among other things, knowingly

directing funds to be invested with New York-based BLMIS through the Fairfield Funds, which

were created, operated, and controlled by New York-based FGG.  CACEIS Bank Lux also

knowingly directed funds to be invested with New York-based BLMIS through New York-based

Harley.  By directing investments through the BLMIS Feeder Funds and relinquishing control

over investment decisions and their implementation to Madoff in New York, both CACEIS Bank

France and CACEIS Bank Lux knowingly accepted the rights, benefits, and privileges of

conducting business in New York.

59.    Upon information and belief, FGG maintained New York-based agents dedicated

to both CACEIS Bank France and CACEIS Bank Lux.

60.    CACEIS Bank France and, upon information and belief, CACEIS Bank Lux,

communicated directly with the above-referenced New York-based agents regarding their

respective investments, subscriptions, and redemptions from the Fairfield Funds.

61.    Both CACEIS Bank Lux and CACEIS Bank France voluntarily entered into at

least seven (7) subscription agreements with Fairfield Sentry between July 2004 and July 2007

under which they submitted to New York jurisdiction, sent copies of the subscription agreements

to FGG's New York City office, and wired funds to Fairfield Sentry through a designated bank

in New York.

62.     CACEIS Bank Lux also entered into at least four (4) subscription agreements with Fairfield Sigma between December 2006 and March 2008.  The Fairfield Sigma information memo or Private Placement Memoranda in place during these respective subscriptions (the "Fairfield Sigma PPM") provides, in relevant part, that "In order to subscribe for Shares, subscribers **must** complete and sign the Share Application Form included in the Subscription Documents which accompany this Memorandum . . . ."  The Subscription Agreement attached to the Fairfield Sigma PPM includes the same provisions as the Fairfield Sentry subscription agreements, requiring CACEIS Bank Lux to submit to New York jurisdiction, venue, and choice of law provisions.

63.     CACEIS Bank Lux and CACEIS Bank France representatives executed these subscription agreements, and as explained more fully below, identified New York bank accounts held in CACEIS Bank Lux's and CACEIS Bank France's own names to receive redemptions from the Fairfield Funds.

64.     The Private Placement Memoranda issued over time for Fairfield Sentry (each a "Fairfield Sentry PPM" and together with the Fairfield Sigma PPM, the "PPMs") contains the same information and representations as the Fairfield Sigma PPM.

65.     Each time CACEIS Bank Lux and CACEIS Bank France invested in Fairfield Sentry, and each time CACEIS Bank Lux invested in Fairfield Sigma, they were required to sign a subscription agreement through which they submitted to venue in New York, the jurisdiction of New York courts, the service of process out of New York courts, and the application of New York law.  Upon information and belief, CACEIS Bank Lux and CACEIS Bank France signed the required subscription agreements each time they invested with the Fairfield Funds.  Both CACEIS Bank France and CACEIS Bank Lux (i) "agree[d] that any suit, action or proceeding . .

16

. with respect to this Agreement and the Fund may be brought in New York," (ii) "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding," (iii) "consent[ed] to the service of process out of any New York court," and (iv) agreed that "[t]his Agreement shall be governed and enforced in accordance with the laws of New York . . . ."

66.     In the subscription agreements, CACEIS Bank France and CACEIS Bank Lux each affirmed that they received and read the relevant Fairfield Fund's PPM.  Based on the subscription agreements and PPMs, both CACEIS Bank France and CACEIS Bank Lux knew that BLMIS acted as the investment adviser, broker-dealer, and custodian for Fairfield Sentry. At least one PPM applicable to both CACEIS Bank France's and CACEIS Bank Lux's investments expressly stated that BLMIS would serve as sub-custodians for certain assets of Fairfield Sentry and that BLMIS held approximately 95% of the fund's assets.

67.     Based on the information and representations contained in the PPMs in effect at the time the CACEIS Defendants executed subscription agreements for the Fairfield Funds, CACEIS Bank Lux and CACEIS Bank France knew that BLMIS was the investment advisor and broker-dealer that executed the SSC Strategy for the Fairfield Funds.  The PPM explained that FGG "established a discretionary account for [Fairfield] Sentry at Bernard L. Madoff Investment Securities, Inc. ('BLM'), a registered broker-dealer in New York, New York, who utilizes a strategy described as 'split strike conversion,'" and that "BLM acts as a principal in connection with its sale of securities to the Company [Fairfield Sentry] and the purchase of securities from the Company."

68.     The PPMs further explained that FGG "delegated all investment management duties to Bernard L. Madoff Investment Securities.  As a result, the Company [Fairfield Sentry] is subject to the judgment, decisions and trading opinions of Bernard L. Madoff Investment

Securities and has no control over the decisions implemented by Bernard L. Madoff Investment
Securities."

69.    In addition, the PPM explained that "[a]ll investment decisions in the account at
BLM are effected by persons associated with BLM," and that "[t]he services of [Bernard L.
Madoff Investment Securities] and its personnel are essential to the continued operation of
[Fairfield Sentry], and its profitability, if any."

70.    At all relevant times, Fairfield Sentry operated from FGG's New York
headquarters.  FGG's New York personnel monitored Fairfield Sentry's investments; managed
Fairfield Sentry's relationship with BLMIS, Madoff, clients, and potential clients; created
marketing and performance materials for Fairfield Sentry; marketed Fairfield Sentry; performed
administrative functions required by Fairfield Sentry; negotiated confidentiality agreements and
other service provider contracts on behalf of Fairfield Sentry; directed investments into and out
of BLMIS; and conducted various other due diligence and risk management activities.  Until
Fairfield Sentry's liquidation, FGG maintained Fairfield Sentry's books and records in New
York.

71.    Based on the information contained in the PPM, CACEIS Bank Lux and CACEIS
Bank France each also knew the following facts indicating that they were transacting business in
New York:

- Fairfield Sentry invested at least 95% of its assets with New York-
  based BLMIS, and Fairfield Sigma invested 100% of its assets
  with Fairfield Sentry;

- BLMIS was the executing broker for Fairfield Sentry's
  investments, and purportedly operated and executed the SSC
  Strategy on Fairfield Sentry's behalf;

- BLMIS's SSC Strategy purportedly involved the purchase of U.S.
  equities, U.S. options, and U.S. Treasury Bills traded on U.S.

exchanges, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;

- BLMIS was registered with the SEC;

- BLMIS was the custodian of the Fairfield Funds' investments with BLMIS; and

- BLMIS was "essential to the continued operation of" Fairfield Sentry.

72.     New York was the specific situs repeatedly selected by both CACEIS Bank France and CACEIS Bank Lux to receive the Subsequent Transfers from the Fairfield Funds. Specifically, CACEIS Bank Lux used correspondent bank accounts at Calyon, New York and Citibank N.Y., which accounts were in CACEIS Bank Lux's own name and/or in the name of its affiliates, to receive redemption payments from Fairfield Sentry. CACEIS Bank France used correspondent bank accounts at Brown Brothers Harriman NY and Bankers Trust New York, which accounts were in CACEIS Bank France's own name, to receive redemption payments from Fairfield Sentry.

73.     CACEIS Bank France and CACEIS Bank Lux systematically and purposefully designated the use of these New York bank accounts in their Fairfield Sentry Subscription Agreements and certain redemption documents.

74.     The Fairfield Sentry subscription agreements that CACEIS Bank France and CACEIS Bank Lux executed required direct subscription payments to a HSBC Bank, New York correspondent bank account for ultimate deposit in Fairfield Sentry's bank account. From Fairfield Sentry's bank account, the funds were deposited in BLMIS's account at JPMorgan Chase Bank NA in New York.

75.     CACEIS Bank Lux and CACEIS Bank France also directed Fairfield Sentry to send transfers of BLMIS customer property through New York correspondent bank accounts.

76.     The Fairfield Sigma PPM states that Fairfield Sigma invested all of its assets in Fairfield Sentry and provides substantially similar information to that set forth in the Fairfield Sentry PPM.  Moreover, the Fairfield Sigma PPM described the significant role of BLMIS in New York-based Fairfield Sentry.  It also made substantially similar statements regarding Madoff's SSC Strategy, its use of U.S.-based investments, and BLMIS's role in those investments.  In fact, the October 2004 Fairfield Sigma PPM disclosed that because BLMIS was the custodian of Fairfield Sentry's assets, there was "always the risk" that BLMIS could misappropriate the assets or securities.

77.     Similar to the Fairfield Funds, investment in Harley required each investor to enter into a subscription agreement (a "Harley Subscription Agreement"), which agreement acknowledged that such investor received and read Harley's Confidential Explanatory Memorandum (the "Harley EM").

78.     Based upon the requirement that each investor execute a Harley Subscription Agreement prior to investment in Harley and upon information and belief, CACEIS Bank Lux entered into one or more Harley Subscription Agreements.

79.     In addition, each investor in Harley, including, upon information and belief, CACEIS Bank Lux, received copies of Harley's audited yearly financial statements, Memorandum of Association and Articles of Association.

80.     The Harley EM states that Harley "invests its assets with a single money manager [i.e., BLMIS].  The manager invests primarily in a basket of S&P 100 stocks.  The manager also

20

employs an index option overlay as a hedge against adverse market movements and to preserve

existing investor capital."

81.     The Harley EM also states that Harley "relies exclusively on the money manager

for the management of its investment portfolio.  There could be adverse consequences to

[Harley] in the event that the money manager ceases to be available to the Fund.  The success of

[Harley] is therefore expected to be significantly dependent upon the expertise and efforts of the

money manager."

82.     Each of Harley's audited financial statements for years 2003, 2004, 2005, 2006,

and 2007 disclosed that BLMIS acted as Harley's "Custodian."  Harley's audited financial

statements for year 2007 disclosed that BLMIS held 99.99% of Harley's assets.

83.     The Harley Subscription Agreements directed investors to wire their subscription

payments for shares in Harley to certain bank accounts in New York.  Prior to 2005, the Harley

Subscription Agreements required subscription payments to be wired to a JPMorgan Chase Bank

account in New York, held in the name of Fortis Bank (Cayman) Limited.

84.     After 2005, the Harley Subscription Agreements required investors to wire

subscriptions to a Northern Trust account in New York, held in the name of Fortis Prime Fund

Solutions (IOM).

85.     Upon information and belief, CACEIS Bank Lux directed one or more payments

for shares in Harley to one or both of these bank accounts in New York.

86.     Upon execution of the Harley Subscription Agreement and investment in Harley,

CACEIS Bank Lux was subject to Harley's Articles of Association, which establish that all

disputes among Harley and its shareholders were referred to binding arbitration in New York

pursuant to rules established by the American Arbitration Association.

87.     New York City, New York was the specific situs selected by CACEIS Bank Lux for receipt of at least one redemption payment from Harley.  Specifically, CACEIS Bank Lux used a correspondent bank account at JPMorgan Chase Bank in New York to receive such payment, which account was in CACEIS Bank Lux's own name.

88.     Upon information and belief, CACEIS Bank Lux designated this New York-based bank in its Harley Subscription Agreements and/or relevant redemption documents.  The receipt of transfers from Harley using JPMorgan Chase Bank in New York was purposeful on the part of CACEIS Bank Lux.

89.     CACEIS Bank France and CACEIS Bank Lux directed funds to the Fairfield Funds on at least twenty-seven (27) occasions over the course of at least five (5) years.

90.     Upon information and belief, CACEIS Bank Lux directed funds to Harley on at least one occasion over the course of at least five (5) years.

91.     As a result of their investments with the New York-based BLMIS Feeder Funds, both CACEIS Bank France and CACEIS Bank Lux derived significant benefits from New York and maintained minimum contacts and general business contacts with the United States and New York in connection with the claims alleged herein.

92.     Both CACEIS Bank Lux and CACEIS Bank France transacted business in New York, and the Trustee's claims alleged herein arose from those business activities.  CACEIS Bank Lux and CACEIS Bank France maintained minimum contacts and general business contacts with the United State and New York in connection with the Trustee's claims.

93.      Both CACEIS Bank Lux and CACEIS Bank France should reasonably expect to be subject to New York jurisdiction and are subject to personal jurisdiction pursuant to New York Civil Practice Law & Rules § 302 (McKinney 2001) and Bankruptcy Rule 7004.

## VII.    Recovery of Subsequent Transfers to the CACEIS Defendants

### A.    Initial Transfers from BLMIS to Fairfield Sentry

94.     The Trustee commenced a separate adversary proceeding against Fairfield Sentry

and other defendants, in the Bankruptcy Court, under the caption, *Picard v. Fairfield Investment

Fund, Ltd.*, Adv. Pro. No. 09-01239 (CGM) (the "Fairfield Avoidance Action"), seeking to avoid

and recover initial transfers of customer property from BLMIS to Fairfield Sentry in the

approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").

95.     By orders dated June 7 and June 10, 2011, this Court approved settlement among

the Trustee, Fairfield Sentry, and others (the "Fairfield Sentry Agreement"), and on July 13,

2011, entered a consent judgment in favor of the Trustee and against Fairfield Sentry in the

amount of $3,054,000,000 (the "Judgment Amount") [ECF No. 109].

96.     The Fairfield Sentry Initial Transfers are set forth in the attached **Exhibits C and

D**.  The Fairfield Sentry Initial Transfers were and continue to be customer property within the

meaning of SIPA § 78*lll*(4).

97.     On August 28, 2020, the Trustee filed a second amended complaint in the

*Fairfield Sentry Ltd.* proceeding (the "Second Amended Complaint") [ECF No. 286] seeking in

part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and

entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the

Judgment Amount are avoided.

98.     As alleged in the Second Amended Complaint, Fairfield Sentry received each of

the Fairfield Sentry Initial Transfers with actual knowledge of the fraud at BLMIS or, at a

minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further

into the BLMIS fraud.  The Trustee incorporates by reference the allegations contained in the

Second Amended Complaint as though fully set forth herein, including but not limited to paragraphs 1-10, 79-313, 315-16, and 320-329.

99.     Of the Fairfield Sentry Initial Transfers, BLMIS transferred $2,895,000,000 to Fairfield Sentry during the six years preceding the Filing Date (the "Fairfield Sentry Six Year Transfers").  Each of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

100.    Of the Fairfield Sentry Six Year Transfers, BLMIS transferred at least $1,580,000,000 to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Transfers").  Each of the Fairfield Sentry Two Year Transfers is avoidable under section 548 of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**B.      Subsequent Transfers from Fairfield Sentry to the CACEIS Defendants**

101.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to CACEIS Bank France and CACEIS Bank Lux.  Based on the Trustee's investigation to date, the subsequent transfers from Fairfield Sentry to CACEIS Bank France total $33,213,014 (the "Fairfield Sentry-CACEIS Bank France Subsequent Transfers"). A chart setting forth the presently known Fairfield Sentry-CACEIS Bank France Subsequent Transfers is attached as **Exhibit E**.  The subsequent transfers from Fairfield Sentry to CACEIS Bank Lux total $35,759,150 (the "Fairfield Sentry-CACEIS Bank Lux Subsequent Transfers" (and together with the Fairfield Sentry-CACEIS Bank France Subsequent Transfers, the "Fairfield Sentry Subsequent Transfers").  A chart setting forth the presently known Fairfield Sentry-CACEIS Bank Lux Subsequent Transfers is attached as **Exhibit F**.

102.     On October 6, 2011, the Trustee filed this action seeking recovery of the Fairfield Sentry Subsequent Transfers.

103.     The Fairfield Sentry Subsequent Transfers are recoverable from both CACEIS Bank France and CACEIS Bank Lux under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

104.     The Fairfield Sentry Subsequent Transfers represent a redemption of equity interest by both CACEIS Bank France and CACEIS Bank Lux as shareholders in Fairfield Sentry.  Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Subsequent Transfers to CACEIS Bank France and CACEIS Bank Lux upon redemption of their interests.

105.     The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to:  (i) supplement the information on the initial and Fairfield Sentry Subsequent Transfers discussed above, and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

**C.     Subsequent Transfers from Fairfield Sentry to Fairfield Sigma and Subsequently to CACEIS Bank Lux**

106.     Prior to the Filing Date, Fairfield Sentry subsequently transferred at least $789,152,864 directly to Fairfield Sigma (the "Fairfield Sigma Subsequent Transfers" and together with the Fairfield Sentry Subsequent Transfers, the "Fairfield Subsequent Transfers").  A chart setting forth the presently known Fairfield Sigma Subsequent Transfers by date and amount is attached here as **Exhibit G**.  Thereafter, Fairfield Sigma transferred at least $35,824,693 of the Fairfield Sigma Subsequent Transfers to CACEIS Bank Lux (the "Fairfield Sigma-CACEIS Bank Lux Subsequent Transfers").  A chart setting forth the Fairfield Sigma-CACEIS Bank Lux Subsequent Transfers is attached here as **Exhibit H**.

25

107.    On October 6, 2011, the Trustee filed this action seeking recovery of the Fairfield

Sigma Subsequent Transfers.

108.    The Fairfield Sigma Subsequent Transfers are recoverable from CACEIS Bank

Lux under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly

§ 78fff-2(c)(3).

109.    The Fairfield Sigma Subsequent Transfers represent a redemption of equity

interest by CACEIS Bank Lux as a shareholder in Fairfield Sigma.  Because Fairfield Sigma

invested 100% of its assets in Fairfield Sentry, and because Fairfield Sentry invested all or

substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sigma was insolvent when

it made the Subsequent Transfers to CACEIS Bank Lux upon redemption of its interests.

110.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the

right to:  (i) supplement the information on the initial and Fairfield Sigma Subsequent Transfers

discussed above, and any additional subsequent transfers; and (ii) seek avoidance and recovery

of such transfers.

**D.    Initial Transfers from BLMIS to Harley**

111.    The Trustee filed an adversary proceeding against Harley in the Bankruptcy Court

styled *Picard v. Harley Int'l (Cayman) Ltd.*, Adv. Pro. No. 09-01187 (BRL), in which, in part,

the Trustee sought to avoid and recover initial transfers of customer property from BLMIS to

Harley in the amount of approximately $1,074,592,422 (the "Harley Complaint").  The Trustee

incorporates by reference the allegations contained in the Harley Complaint as if fully set forth

herein.

112.    During the six years preceding the Filing Date, BLMIS made transfers to Harley

of $1,072,800,000 (the "Harley Six-Year Initial Transfers").  The Harley Six-Year Initial

Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4), and

are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

113.    The Harley Six-Year Initial Transfers include $1,066,800,000 that BLMIS transferred to Harley during the two years preceding the Filing Date (the "Harley Two-Year Initial Transfers").  The Harley Two-Year Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4), and are avoidable and recoverable under sections 544, 550, and 551 of the Bankruptcy Code, §§ 273-279 of the NYDCL, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3).

114.    The Harley Six-Year Initial Transfers and the Harley Two-Year Initial Transfers are collectively referred to as the "Harley Initial Transfers.  Charts setting forth these transfers are attached as **Exhibits I and J.**

115.    On November 10, 2010, the Bankruptcy Court entered default and summary judgment against Harley in the amount of $1,072,820,000, noting that the initial transfers from BLMIS to Harley were avoidable.  Of this amount, $1,066,800,000 was awarded in a default summary judgment against Harley.  The Trustee has not recovered any monies as result of this judgment.

**E.    Subsequent Transfers from Harley to CACEIS Bank Lux**

116.    Prior to the Filing Date, Harley subsequently transferred a portion of the Harley Initial Transfers to CACEIS Bank Lux.  Based on the Trustee's investigation to date, the subsequent transfers from Harley to CACEIS Bank Lux total $6,049,960 (the "Harley Subsequent Transfers").  A chart setting forth the presently known Harley Subsequent Transfers is attached as **Exhibit K**.

117.    On October 6, 2011, the Trustee filed this action seeking recovery of the Harley Subsequent Transfers.

27

118.     The Harley Subsequent Transfers are recoverable from CACEIS Bank Lux under

section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-

2(c)(3).

119.     The Harley Subsequent Transfers represent a redemption of equity interest by

CACEIS Bank Lux as a shareholder in Harley.  Because Harley invested all or substantially all

of its assets into the BLMIS Ponzi scheme, Harley was insolvent when it made the Harley

Subsequent Transfers to CACEIS Bank Lux upon redemption of their interests.

120.     The Trustee's investigation is on-going and the Trustee reserves the right to:

(i) supplement the information on the Harley Initial Transfers, Harley Subsequent Transfers, and

any additional transfers; and (ii) seek recovery of such additional transfers.

### COUNT ONE
### RECOVERY OF FAIRFIELD SENTRY SUBSEQUENT TRANSFERS –
### 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

121.     The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten here.

122.     The Fairfield Sentry Subsequent Transfers are recoverable from both CACEIS

Bank France and CACEIS Bank Lux (as applicable to each Defendant).

123.     Each of the Fairfield Sentry Subsequent Transfers was made directly or indirectly

to CACEIS BANK France or CACEIS Bank Lux.

124.     Both CACEIS Bank France and CACEIS Bank Lux are immediate or mediate

transferees of the Fairfield Sentry Subsequent Transfers.

125.     As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against

CACEIS Bank France and CACEIS Bank Lux:  (a) recovering the Fairfield Sentry Subsequent

Transfers, or the value thereof, from CACEIS Bank France and CACEIS Bank Lux for the

benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

### COUNT TWO
### RECOVERY OF FAIRFIELD SIGMA SUBSEQUENT TRANSFERS –
### 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

126.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten here.

127.    The Fairfield Sigma Subsequent Transfers are recoverable from CACEIS Bank

Lux.

128.    Each of the Fairfield Sigma Subsequent Transfers was made directly or indirectly

to CACEIS Bank Lux.

129.    CACEIS Bank Lux is an immediate or mediate transferee of the Fairfield Sigma

Subsequent Transfers from Fairfield Sigma.

130.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the

Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against

CACEIS Bank Lux:  (a) recovering the Fairfield Sigma Subsequent Transfers, or the value

thereof, from CACEIS Bank Lux for the benefit of the estate of BLMIS; and (b) awarding any

other relief as the Court deems appropriate.

### COUNT THREE
### RECOVERY OF HARLEY SUBSEQUENT TRANSFERS –
### 11 U.S.C. §§ 550 AND 551 AND NYDCL § 278

131.    The Trustee incorporates by reference the allegations contained in the previous

paragraphs of this Amended Complaint as if fully rewritten here.

132.    Each of the Harley Subsequent Transfers is recoverable from CACEIS Bank Lux

under section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

133.     Each of the Harley Subsequent Transfers was made directly or indirectly to CACEIS Bank Lux.

134.     CACEIS Bank Lux is an immediate or mediate transferee of the Harley Subsequent Transfers from Harley.

135.     As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against CACEIS Bank Lux:  (a) recovering the Harley Subsequent Transfers, or the value thereof, from CACEIS Bank Lux for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on Counts One, Two, and Three in favor of the Trustee and against CACEIS Bank France and CACEIS Bank Lux as follows:

a.       Recovering the Fairfield Sentry Subsequent Transfers or the value thereof, from CACEIS Bank France and CACEIS Bank Lux (as applicable from each Defendant) for the benefit of the estate;

b.       Recovering the Fairfield Sigma Subsequent Transfers or the value thereof, from CACEIS Bank Lux for the benefit of the estate;

c.       Recovering the Harley Subsequent Transfers, or the value thereof, from CACEIS Bank Lux for the benefit of the estate;

d.       If either of the CACEIS Defendants challenge the avoidability of the Fairfield Sentry Initial Transfers and/or the Harley Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such Transfers are avoidable pursuant to SIPA § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and §§

273-279 of the N.Y. Debt. & Cred. Law, as applicable, and as necessary to recover the Transfers

pursuant to section 550(a) and (b) and SIPA § 78fff-2(c)(3);

   e.  Awarding the Trustee prejudgment interest from December 11, 2008 through the

date of judgment; and

   f.  Awarding the Trustee fees and all applicable costs and disbursement, and such

other, further, and different relief as the Court deems just, proper, and equitable.


 Dated: June 30, 2023
     New York, New York

          YOUNG CONAWAY STARGATT & TAYLOR,
          LLP
          By: _/s/ *Matthew B. Lunn*_____
          Matthew B. Lunn
          Michael S. Neiburg (admitted *pro hac vice*)
          Justin P. Duda
          Christopher M. Lambe  (admitted *pro hac vice*)
          Rockefeller Center
          1270 Avenue of the Americas, Suite 2210
          New York, New York 10020
          Telephone:  (212) 332-8840
          Facsimile: (212) 332-8855
          Email:  mlunn@ycst.com
             mneiburg@ycst.com
             jduda@ycst.com
             clambe@ycst.com

          *Attorneys for Plaintiff Irving H. Picard, Trustee*
          *for the Liquidation of Bernard L. Madoff*
          *Investment Securities LLC*