**KOBRE & KIM LLP**
800 Third Avenue
New York, New York 10022
Telephone: (212) 488-1200
Zachary.Rosenbaum@kobrekim.com
Adam.Lavine@kobrekim.com
Donna.Xu@kobrekim.com

*Attorneys for Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 12-01690 (CGM) |
| Plaintiff, | |
| v. | **ANSWER TO AMENDED COMPLAINT WITH JURY DEMAND** |
| EFG BANK S.A., f/k/a EFG Private Bank S.A., EFG BANK (MONACO) S.A.M., f/k/a EFG Eurofinancière d'Investissements S.A.M., and EFG BANK & TRUST (BAHAMAS) LIMITED, as successor-in interest to Banco Atlántico (Bahamas) Bank & Trust Limited, | |
| Defendant. | |

EFG Bank S.A. (a/k/a EFG Bank AG) ("EFG Bank"), EFG Bank (Monaco) S.A.M. ("EFG

Monaco"), and EFG Bank & Trust (Bahamas) Limited ("EFG Bahamas," and collectively, the

"EFG Defendants"), by the undersigned, as and for their Answer to the Amended Complaint filed

by plaintiff Irving H. Picard (the "Trustee"), as trustee for the Liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS") (the "Complaint"), state as follows:[1]

## GENERAL DENIAL

Except as otherwise expressly admitted herein, the EFG Defendants deny each and every

allegation in the Complaint. The EFG Defendants state that the headings and sub-headings throughout

the Complaint do not constitute well-pleaded allegations of fact and therefore require no response. To

the extent a response is required, the allegations in the headings and subheadings in the Complaint are

denied. In answering the allegations in the Complaint, the EFG Defendants do not intend to waive, and

do not waive, any and all applicable objections to the relevance, admissibility, or prejudicial effect of

any of the allegations in the Complaint. The EFG Defendants expressly reserve the right to amend

and/or supplement this Answer.

## RESPONSES TO SPECIFIC ALLEGATIONS

### I.    NATURE OF THE ACTION

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover
BLMIS customer property, as defined by SIPA § 78*lll*(4), that was stolen as part of the massive
Ponzi scheme perpetrated by Madoff and others.

**ANSWER:**    The allegations in paragraph 1 contain legal conclusions to which no

response is required. To the extent a response is required, the EFG Defendants deny knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 1 of the

---

[1] Capitalized terms not defined herein have the meaning set forth in the Complaint.

Complaint, except admit that Plaintiff purports to bring this action as trustee for the liquidation of

BLMIS pursuant to the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq*.

2.      The Trustee seeks to recover approximately $298,443,562 in subsequent transfers of BLMIS customer property made to Defendants by Fairfield Sentry Limited ("Fairfield Sentry") directly, or through Fairfield Sigma Limited ("Fairfield Sigma") and Fairfield Lambda Limited ("Fairfield Lambda," and together with Fairfield Sentry and Fairfield Sigma, the "Fairfield Funds"). The Fairfield Funds are British Virgin Islands ("BVI") companies that are in liquidation in the BVI.

**ANSWER:**    The allegations in paragraph 2 contain legal conclusions to which no

response is required. To the extent a response is required, the EFG Defendants deny the allegations

in paragraph 2 of the Complaint, except admit that (i) the Trustee seeks to recover from the EFG

Defendants the amount of alleged subsequent transfers alleged in the Complaint, and (ii) on

information and belief, the Fairfield Funds are BVI companies that are in liquidation in the BVI.

3.      Fairfield Sentry had direct customer accounts with BLMIS's investment advisory business ("IA Business") for the purpose of investing assets with BLMIS. Fairfield Sentry maintained at least 95% of its assets in its BLMIS customer accounts. Some of the subsequent transfers from Fairfield Sentry came through Fairfield Sigma and Fairfield Lambda, which each invested 100% of their assets in Fairfield Sentry.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 3 of the Complaint and therefore deny each

and every such allegation.

## II.    SUBJECT MATTER JURISDICTION AND VENUE

4.      This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

**ANSWER:**    The EFG Defendants admit the allegations of the first sentence of paragraph

4 of the Complaint. The EFG Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations of the second sentence of paragraph 4. The EFG Defendants state

that the third sentence of paragraph 4 sets forth legal conclusions to which no response is required,

but to the extent that a response is required, the EFG Defendants deny that this Court has

jurisdiction to enter a final order or judgment in this proceeding.

5.      This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O). The
Trustee consents to the entry of final orders or judgment by this Court if it is determined that
consent of the parties is required for this Court to enter final orders or judgment consistent with
Article III of the U.S. Constitution.

**ANSWER:**    The allegations in paragraph 5 of the Complaint contain legal conclusions

to which no response is required. To the extent a response is required, the EFG Defendants deny

the allegations in paragraph 5 and object to the entry of final orders or judgments against the EFG

Defendants.

6.      Venue in this judicial district is proper under 28 U.S.C. § 1409.

**ANSWER:**    The allegations in paragraph 6 of the Complaint contain legal conclusions

to which no response is required. To the extent a response is required, the EFG Defendants deny

the allegations in paragraph 6 of the Complaint.

7.      This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11
U.S.C. §§ 105(a) and 550, and other applicable law.

**ANSWER:**    The allegations in paragraph 7 of the Complaint contain legal conclusions

and/or purported characterizations to which no response is required. To the extent a response is

required, the EFG Defendants admit solely that the Trustee purports to bring this adversary

proceeding under the statutory provisions cited in paragraph 7.

## III.    <u>BACKGROUND, THE TRUSTEE AND STANDING</u>

8.      On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents
for criminal violations of federal securities laws, including securities fraud, investment adviser
fraud, and mail and wire fraud. Contemporaneously, the U.S. Securities and Exchange
Commission (the "SEC") commenced the District Court Proceeding.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8 of the Complaint and therefore deny such allegations, except the EFG Defendants admit on information and belief that Madoff was arrested on December 11, 2008, and that the SEC filed a complaint against Madoff and BLMIS and respectfully refer the Court to that document for a complete and accurate statement of its contents.

9.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9 of the Complaint and therefore deny such allegations, and respectfully refer the Court to the application filed by SIPC referred to in paragraph 9 of the Complaint for a complete and accurate statement of its contents.

10.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

    a.    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

    b.    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

    c.    removed the case to this Court pursuant to § 78eee(b)(4) of SIPA.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10 of the Complaint and therefore deny such allegations, and respectfully refer the Court to the order issued by Judge Stanton referred to in paragraph 10 of the Complaint for a complete and accurate statement of its contents.

11.    By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

**ANSWER:** The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11 of the Complaint and therefore deny such allegations, and respectfully refer the Court to the Bankruptcy Court orders dated December 23, 2008, and February 4, 2009, referred to in paragraph 11 of the Complaint for a complete and accurate statement of their contents.

12.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

**ANSWER:** The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12 of the Complaint and therefore deny such allegations, and respectfully refer the Court to the bankruptcy petition filed on April 13, 2009, and the Bankruptcy Court order dated June 9, 2009, referred to in paragraph 12 of the Complaint for a complete and accurate statement of their contents.

13.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

**ANSWER:** The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 of the Complaint and therefore deny such allegations, except admit on information and belief that Bernard L. Madoff pled guilty at a plea hearing on March 12, 2009, and respectfully refer the Court to the transcript of that hearing for a complete and accurate statement of its contents.

14.    At a plea hearing on August 11, 2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a 10-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

**ANSWER:**     The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14 of the Complaint and therefore deny such allegations, and respectfully refer the Court to the transcript of the plea hearing of Frank DiPascali on August 11, 2009, for a complete and accurate statement of its contents.

15.     At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

**ANSWER:**     The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15 of the Complaint and therefore deny such allegations, and respectfully refer the Court to the docket and filings in Case No. 10-CR-228 (LTS) for a complete and accurate statement of their contents.

16.     On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

**ANSWER:**     The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16 of the Complaint and therefore deny such allegations.

17.     As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by BLMIS or Madoff to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

**ANSWER:**     The allegations in paragraph 17 of the Complaint contain legal conclusions and/or purported characterizations to which no response is required.  To the extent an answer is

required, the EFG Defendants deny knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 17 of the Complaint and therefore deny such allegations.

18.     Pursuant to § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff-1(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

**ANSWER:**    The allegations in paragraph 18 of the Complaint contain legal conclusions

to which no response is required.  To the extent a response is required, the EFG Defendants deny

the allegations in paragraph 18 of the Complaint.

19.     The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code §§ 544, 547, 548, 550(a), and 551 and SIPA §§ 78fff- 1(a) and 78fff-2(c)(3).

**ANSWER:**    The allegations in paragraph 19 of the Complaint contain legal conclusions

to which no response is required.  To the extent a response is required, the EFG Defendants deny

the allegations in paragraph 19 of the Complaint.

## IV.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A. BLMIS

20.     Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker-dealer with the SEC. In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company. At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 20 of the Complaint and therefore deny such

allegations.

21.     In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008. Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation. At all times, BLMIS was assigned CRD No. 2625. SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January

19, 1960. On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status. SIPC membership is contingent on registration of the broker-dealer with the SEC.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 21 of the Complaint and therefore deny such

allegations.

22.    For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker-dealer operation, and the IA Business.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 22 of the Complaint and therefore deny such

allegations.

23.    BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 23 of the Complaint and therefore deny such

allegations.

24.    For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 24 of the Complaint and therefore deny such

allegations.

25.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In December 2008, BLMIS had over

4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25 of the Complaint and therefore deny such allegations.

### B.  The Ponzi Scheme

26.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 26 of the Complaint and therefore deny such allegations.

27.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27 of the Complaint and therefore deny such allegations.

28.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28 of the Complaint and therefore deny such allegations.

29.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29 of the Complaint and therefore deny such allegations.

1.    Madoff's Investment Strategy

30.    In general, BLMIS purported to execute two primary investment strategies for BLMIS customers: the convertible arbitrage strategy and the split-strike conversion strategy (the "SSC Strategy"). For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit. At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30 of the Complaint and therefore deny such allegations.

31.    All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31 of the Complaint and therefore deny such allegations.

32.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets. Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time. In the 1970s this strategy represented a significant

portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 32 of the Complaint and therefore deny such

allegations.

33.    From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 33 of the Complaint and therefore deny such

allegations.

34.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 34 of the Complaint and therefore deny such

allegations. To the extent paragraph 34 purports to characterize the contents of documents, the

EFG Defendants respectfully refer the Court to those documents for a complete and accurate

statement of their contents.

35.    By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 35 of the Complaint and therefore deny such

allegations.

36.    The put options were to limit the downside risk of sizeable price changes in the basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option should have entailed a loss for BLMIS.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 36 of the Complaint and therefore deny such allegations.

37.    The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 37 of the Complaint and therefore deny such allegations.

38.    The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protection while limiting the upside.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 38 of the Complaint and therefore deny such allegations.

39.    If Madoff was putting on the same baskets of equities across all BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket. For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 39 of the Complaint and therefore deny such allegations.

40.    Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call or put option notional value to support the SSC Strategy.

12

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 40 of the Complaint and therefore deny such allegations.

41.    Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times, significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 41 of the Complaint and therefore deny such allegations.

2.    BLMIS's Fee Structure

42.    BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 42 of the Complaint and therefore deny such allegations.

3.    BLMIS's Market Timing

43.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he succeeded at market timing by intermittently entering and exiting the market. During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in U.S. Treasury securities ("Treasury Bills") or mutual funds invested in Treasury Bills. BLMIS's customer statements also showed, without fail, a total withdrawal from the market at every year end and at every quarter end starting in 2003.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 43 of the Complaint and therefore deny such

allegations. To the extent paragraph 43 purports to characterize the contents of documents, the

EFG Defendants respectfully refer the Court to those documents for a complete and accurate

statement of their contents.

44.     As a registered broker-dealer, BLMIS was required, pursuant to 17 C.F.R. § 240.17a-5, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS reportedly exited the market completely at every year end and every quarter end starting in 2003. These quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time. Yet, this is precisely what BLMIS's customer statements reported.

**ANSWER:**     The EFG Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 44 of the Complaint and therefore deny such

allegations.   The first sentence of paragraph 44 also contains legal conclusions to which no

response is required.   To the extent paragraph 44 purports to characterize the contents of

documents, the EFG Defendants respectfully refer the Court to those documents for a complete

and accurate statement of their contents.

45.     BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

**ANSWER:**     The EFG Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 45 of the Complaint and therefore deny such

allegations.

4.     BLMIS Execution

46.     BLMIS's execution, as reported on its BLMIS customer statements, showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

**ANSWER:**     The EFG Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 46 of the Complaint and therefore deny such

allegations.  To the extent paragraph 46 purports to characterize the contents of documents, the

EFG Defendants respectfully refer the Court to those documents for a complete and accurate

statement of their contents.

### 5.    No Evidence of BLMIS Trading

47.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 47 of the Complaint and therefore deny such

allegations.

48.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 48 of the Complaint and therefore deny such

allegations.

### 6.    The Collapse of the Ponzi Scheme

49.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in paragraph 49 of the Complaint and therefore deny such

allegations, except admit upon information and belief that Madoff was arrested on December 11,

2008, and that the SEC filed a complaint against Madoff and BLMIS on the same day.

50.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 50 of the Complaint and therefore deny such allegations, and respectfully refer the Court to the transcripts of the plea hearings of Bernard Madoff and Frank DiPascali for a complete and accurate statement of their contents.

51.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

**ANSWER:**    The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 51 of the Complaint and therefore deny such allegations.

## V.    THE DEFENDANTS

52.    When Defendants received subsequent transfers of BLMIS customer property, Defendants were part of a sophisticated financial entity that provided private banking services and products.

**ANSWER:**    The allegation that Defendants received BLMIS customer property is a legal conclusion to which no response is required. To the extent a response if required, the EFG Defendants deny the allegations in paragraph 52 of the Complaint, except each of the EFG Defendants admits that it has provided services to customers consistent with a private bank.

53.    Defendant EFG Bank, formerly known as EFG Private Bank S.A., is an *aktiengesellschaft* incorporated and organized under the laws of Switzerland and located at Bleicherweg 8, 8001 Zurich, Switzerland.

**ANSWER:**    The EFG Defendants admit that EFG Bank, formerly known as EFG Private Bank S.A., has a place of business at Bleicherweg 8, 8001 Zurich, Switzerland and that it is registered as an "*aktiengesellschaft*" under the laws of Switzerland. The EFG Defendants otherwise deny the allegations in paragraph 53 of the Complaint.

54.    Defendant EFG Monaco, formerly known as EFG Eurofinancière d'Investissements S.A.M., is a *société anonyme* incorporated and organized under the laws of Monaco and located at 15 Avenue d'Ostende, MC 98001, Monaco.

**ANSWER:**    The EFG Defendants admit that EFG Monaco, formerly known as EFG Eurofinancière d'Investissements S.A.M, has a place of business at 15 Avenue d'Ostende, MC 98001, Monaco and that it is registered as a "*società anonima*" under the laws of Monaco. The EFG Defendants otherwise deny the allegations in paragraph 54 of the Complaint.

55.    Defendant EFG Bahamas is a Bahamian company located at Goodman's Bay Corporate Centre, 3rd Floor, West Bay Street and Sea View Drive, P.O. Box CB-10956, Nassau, The Bahamas. In or about 2004, Banco Sabadell acquired EFG Bahamas' predecessor Banco Atlántico. Subsequently, in or about June 2005, Banco Sabadell entered into an agreement with EFG Bank to transfer its business in the Bahamas to EFG Bahamas. Upon information and belief, as part of this agreement, EFG Bahamas acquired the assets and liabilities of Banco Atlántico, including Banco Atlántico's bank accounts, and Banco Atlántico was thereafter dissolved. Upon information and belief, after this change in legal ownership and name, EFG Bahamas was the transferee of any subsequent transfers of BLMIS customer property received in the name of Banco Atlántico.

**ANSWER:** The EFG Defendants admit that EFG Bahamas has a place of business at Goodman's Bay Corporate Centre, 3rd Floor, West Bay Street and Sea View Drive, P.O. Box CB-10956, Nassau, The Bahamas. The EFG Defendants otherwise deny the allegations in paragraph 55 of the Complaint, and state, upon information and belief, that (i) on or about February 16, 2006, EFG Bahamas acquired the private banking business of Banco Atlántico through an asset sale, with limited acquisition of liabilities, (ii) EFG Bahamas was created to acquire the private banking business of Banco Atlántico through the asset sale, and (iii) the transfer of such business pursuant to the asset sale did not include liabilities associated with the claims brought in this proceeding.

56.    Non-party EFG International AG ("EFG International"), a global private banking group headquartered in Zurich, Switzerland, is the ultimate parent company of each of the Defendants.

**ANSWER:** The EFG Defendants admit that EFG International is the parent company of each of the EFG Defendants. The EFG Defendants otherwise deny the allegations in paragraph 56 of the Complaint.

57.    Non-party EFG Capital, an indirect subsidiary of EFG International, is incorporated in Delaware with a principal place of business at 701 Brickell Avenue, 9th Floor, Miami, Florida 33131.

**ANSWER:** The EFG Defendants admit that EFG International is the indirect parent of EFG Capital International Corp. ("EFG Capital"), that EFG Capital is incorporated in Delaware, and that EFG Capital has a place of business at 701 Brickell Avenue, 9th Floor, Miami, Florida 33131.

## VI.    <u>IMPUTATION</u>

58.    EFG Bank, EFG Monaco, EFG Capital, EFG International, and, after the June 2005 acquisition, EFG Bahamas, collectively functioned as one entity for the purposes alleged herein.

**ANSWER:** The allegations in paragraph 58 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, the EFG Defendants deny the allegations in paragraph 58 of the Complaint.

59.    EFG Capital advertised its ability to "access our organization's extensive global infrastructure, and bring together the best ideas for [each] portfolio." This global infrastructure included consolidating certain functions across Defendants related to hedge fund research, monitoring, diligence, and ongoing relationships with managers.

**ANSWER:** To the extent the first sentence in paragraph 59 purports to characterize the contents of documents, the EFG Defendants respectfully refer the Court to those documents for a complete and accurate statement of their contents. The EFG Defendants otherwise deny the allegations in paragraph 59 of the Complaint, including on the basis that the characterizations are inaccurate or incomplete.

60.    As a cooperative network, Defendants maintained significant and continuous operations through EFG Capital. On its website, EFG Capital explained that "EFG Capital . . . together with its affiliated investment advisers are the principal providers of wealth management services in the United States for EFG International."

**ANSWER:** To the extent the second sentence in paragraph 60 purports to characterize the contents of documents, the EFG Defendants respectfully refer the Court to those documents for a

complete and accurate statement of their contents. The EFG Defendants otherwise deny the

allegations in paragraph 60 of the Complaint.

61.    EFG Capital was responsible for providing U.S. coverage to the Defendants, which included managing the Defendants' relationships with Fairfield Greenwich Group ("FGG"), a *de facto* partnership that created, operated, and controlled the Fairfield Funds. Sixto Campano, EFG Capital's President, testified that "out of the different EFG offices, [EFG Capital] had the lead relationship with [FGG]."

**ANSWER:** To the extent the second sentence in paragraph 61 purports to characterize the

contents of documents or testimony, the EFG Defendants respectfully refer the Court to those

documents or testimony for a complete and accurate statement of their contents. The statement

that FGG was a "de facto partnership" states a legal conclusion to which no response is required.

To the extent a response to Paragraph 61 is required, the EFG Defendants otherwise deny the

allegations in paragraph 61 of the Complaint.

62.    EFG Capital communicated with BLMIS feeder funds, large investment funds created for the express purpose of funneling investors' funds into BLMIS, including the Fairfield Funds, and aggregated research materials, which EFG Capital then made available to Defendants. For example, in 2003, EFG Capital shared its concerns about BLMIS's unusual custody arrangement with EFG Bank.

**ANSWER:** The EFG Defendants admit that certain EFG Capital employees

communicated with certain FGG personnel about the Fairfield Funds.  To the extent the second

sentence in paragraph 62 purports to characterize the contents of documents, the EFG Defendants

respectfully refer the Court to those documents for a complete and accurate statement of their

contents. The EFG Defendants otherwise, at this time, lack knowledge or information sufficient to

form a belief as to the truth of the allegations in paragraph 62 of the Complaint and therefore deny

the allegations in paragraph 62 of the Complaint.

## VII.    <u>PERSONAL JURISDICTION</u>

63.    Defendants are subject to personal jurisdiction in this judicial district because they purposely availed themselves of the laws and protections of the United States and the state of New York.

**ANSWER:**    The allegations in paragraph 63 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, the EFG Defendants deny the allegations in paragraph 63 of the Complaint.

64.    Defendants knowingly directed funds to be invested with New York-based BLMIS through the Fairfield Funds and Kingate Global Fund Limited ("Kingate Global") (collectively, the "BLMIS Feeder Funds"). By directing Defendants' investments through Fairfield Sentry, and EFG Bank's and EFG Monaco's investments in Kingate Global, Defendants knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York.

**ANSWER:**    The EFG Defendants deny the allegations contained in the first sentence of paragraph 64 of the Complaint, except admit that certain customers of the EFG Defendants invested in one or more of the Fairfield Funds and/or Kingate Global Fund Limited. The allegations in the second sentence of paragraph 64 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, the EFG Defendants deny the allegations of the second sentence of paragraph 64 of the Complaint.

65.    Defendants were furnished with Fairfield Sentry's private placement memorandum. Based on the information contained therein, Defendants knew the following facts indicating that it was transacting business in New York by investing in Fairfield Sentry.

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS;

- BLMIS performed all investment management duties for these assets;

- BLMIS was registered with the SEC;

- BLMIS was the executing broker for Fairfield Sentry's investments, and purportedly operated and executed the SSC Strategy on the fund's behalf;

- BLMIS was the custodian of Fairfield Sentry's investments with BLMIS;

- BLMIS's SSC Strategy purportedly involved the purchase of U.S. equities,

- U.S. options, and U.S. Treasury Bills, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York; and

- BLMIS was "essential to the continued operation of" Fairfield Sentry.

**ANSWER:** The allegations in paragraph 65 purport to describe the contents of a Private

Placement Memorandum, which speaks for itself, and thus no response is required. To the extent

a response is required, at this time, the EFG Defendants deny knowledge or information sufficient

to form a belief as to the truth of the allegations in paragraph 65 of the Complaint and therefore

deny the allegations in paragraph 65 and refer the Court to any such Private Placement Memoranda

for a complete and accurate statement of their contents. In addition, the EFG Defendants deny that

the contents of the Private Placement Memoranda establish the EFG Defendants' knowledge of

facts allegedly set forth in such Private Placement Memoranda.

66.    Through meetings in New York with FGG and/or Madoff, EFG Bank and Banco
Atlántico were able to confirm that their investments in the BLMIS Feeder Funds were managed
in New York. EFG Capital also met with FGG in New York on behalf of Defendants.

**ANSWER:** The EFG Defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations in the first sentence of paragraph 66 of the Complaint as

they pertain to Banco Atlántico. The EFG Defendants otherwise deny the allegations contained in

paragraph 66 of the Complaint, except admit that certain EFG Bank and EFG Capital employees

communicated with certain FGG personnel concerning the Fairfield Funds and, upon information

and belief, met with FGG personnel in New York.

67.    In February 2003, after visiting the New York office of FGG, EFG Bank's Senior
Vice President, Mats Pehrsson, composed a memorandum and disseminated it to EFG Bank and
EFG Capital, identifying New York-based BLMIS as the "manager" of Defendants' investments
in Fairfield Sentry:
> F.S. [Fairfield Sentry] is managed by Bernard L. Madoff Securities LLC, New York
> (=MS). Established in 1960 by Bernard Madoff, MS is a US Broker Dealer and one of
> the largest market-makers in US equities. . . . It is located on Third Avenue, a few
> blocks away from FGG.

**ANSWER:** To the extent paragraph 67 purports to characterize the contents of

documents, the EFG Defendants respectfully refer the Court to those documents for a complete

and accurate statement of their contents. At this time, the EFG Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 67 of the Complaint and therefore deny the allegations in paragraph 67 of the Complaint.

68.     Armed with this knowledge, Defendants chose to execute subscription agreements with Fairfield Sentry, further memorializing the connections between Defendants and New York in several ways.

**ANSWER:** The EFG Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 68 of the Complaint and therefore deny the allegations contained in paragraph 68 of the Complaint, except the EFG Defendants admit that certain customers of the EFG Defendants invested in one or more of the Fairfield Funds.

69.     By executing subscription agreements with Fairfield Sentry, Defendants consented to jurisdiction in New York for claims with respect to the subscription agreements and Fairfield Sentry.

**ANSWER:**     The allegations in paragraph 69 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, the EFG Defendants deny the allegations in paragraph 69 of the Complaint.

70.     Defendants' subscription agreements with Fairfield Sentry also included a New York choice of law provision.

**ANSWER:** To the extent paragraph 70 purports to characterize the contents of documents, the EFG Defendants respectfully refer the Court to those documents for a complete and accurate statement of their contents. The EFG Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 70 of the Complaint and therefore deny the allegations in paragraph 70 of the Complaint.

71.     Fairfield Sentry's subscription agreement required Defendants to direct all of their subscription payments to either a Republic National Bank of New York or New York HSBC Bank USA correspondent bank account for ultimate deposit in Fairfield Sentry's bank account.

**ANSWER:** To the extent paragraph 71 purports to characterize the contents of documents, the EFG Defendants respectfully refer the Court to those documents for a complete and accurate statement of their contents. The EFG Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 71 of the Complaint and therefore deny the allegations in paragraph 71 of the Complaint.

72.    EFG Bank designated an "EFG Bank" account at UBS AG in Stamford, Connecticut to receive the proceeds of redemptions from Fairfield Sentry. EFG Bank then directed and received the proceeds of redemptions from Fairfield Sentry in that same U.S. bank account. At least 29 subsequent transfers from Fairfield Sentry, totaling approximately $18.4 million, were directed to and received in EFG Bank's account at UBS AG in Stamford, Connecticut.

**ANSWER:** At this time, the EFG Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 72 of the Complaint and therefore deny the allegations contained in paragraph 72 of the Complaint.

73.    Banco Atlántico selected and used its New York bank account at the Bank of New York to wire subscriptions to and receive redemption proceeds from Fairfield Sentry.

**ANSWER:** The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 73 of the Complaint and therefore deny the allegations contained in paragraph 73 of the Complaint.

74.    After acquiring Banco Atlántico, EFG Bahamas directed and received redemption proceeds from Fairfield Sentry to and in a New York bank account at the Bank of New York. Between 2003 and 2006, at least 20 subsequent transfers from Fairfield Sentry, totaling approximately $41.5 million, were directed to and received in Banco Atlántico's account at the Bank of New York.

**ANSWER:** At this time, the EFG Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 74 of the Complaint and therefore deny the allegations contained in paragraph 74 of the Complaint.

75.    To send subscription payments to Fairfield Sigma, EFG Bank utilized its own account at UBS AG in New York. EFG Bank directed FGG to remit the proceeds of its redemptions from Fairfield Sigma to an "EFG Bank NY" account at UBS AG in New York, New York.

**ANSWER:** At this time, the EFG Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 75 of the Complaint and therefore deny the allegations contained in paragraph 75 of the Complaint.

76.     In connection with their BLMIS Feeder Funds' investments, EFG Bank, EFG Capital, and Banco Atlántico visited and regularly communicated with the Fairfield Funds' New York-based representatives. For example:

- By 1998, Victor Echevarria (EFG Capital's Chairman) had met with FGG to discuss Fairfield Sentry and its returns.

- In February 2003, Mats Pehrsson (EFG Bank's Senior Vice President) met with FGG at FGG's offices in New York to discuss Fairfield Sentry and review information concerning Madoff, BLMIS, and the SSC Strategy.

- In November 2003, Sergio Miguez Martin (Banco Atlántico's Director General) and Miguel Coello (Banco Atlántico's General Manager) met with FGG at FGG's offices in New York to discuss Fairfield Sentry, Madoff, and BLMIS.

- In February 2004, Jerome Schonbachler (EFG Bank's Senior Vice President) and Romy Cabrera (EFG Capital's hedge fund specialist) met with FGG at FGG's offices in New York to review EFG Bank's existing investments in Fairfield Sentry.

- In February 2005, Mr. Schonbachler of EFG Bank met with FGG at FGG's offices in New York to discuss guaranteed capacity for EFG Bank in various FGG-managed funds, including Fairfield Sentry.

- In May 2006, Mr. Schonbachler of EFG Bank met with FGG's Amit Vijayvergiya at FGG's offices in New York to address questions EFG Bank had regarding Fairfield Sentry.

**ANSWER:** The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 76 of the Complaint as they pertain to Banco Atlántico, and therefore deny the allegations contained in paragraph 76 of the Complaint as they pertain to Banco Atlántico.  At this time, the EFG Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 76 of the Complaint and therefore deny the remaining allegations contained in paragraph 76 of the

Complaint, except admit that certain EFG Bank and EFG Capital employees communicated with certain FGG personnel concerning the Fairfield Funds and, upon information and belief, met with FGG personnel in New York.

77.     EFG Bank, EFG Capital, and Banco Atlántico each met with Madoff. For example:

- In 2005, Mr. Schonbachler of EFG Bank met with Madoff.

- In the late 1990s, Mr. Echevarria of EFG Capital visited BLMIS's office with FGG representatives. During this visit, Mr. Echevarria discussed the SSC Strategy.

- In November 2003, Sergio Miguez Martin and Miguel Coello of Banco Atlántico met with Madoff and FGG representatives at BLMIS's office in New York. This meeting included a discussion of Fairfield Sentry and the SSC Strategy.

**ANSWER:**     The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 77 of the Complaint as they pertain to Banco Atlántico, and therefore deny the allegations contained in paragraph 77 of the Complaint as they pertain to Banco Atlántico.   At this time, the EFG Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 77 of the Complaint, and therefore deny such allegations, except that they admit that Mr. Echevarria visited BLMIS's office and, upon information and belief, they deny that Mr. Schonbachler met with Madoff in 2005.

78.     Defendants are also subject to the jurisdiction of this Court because Defendants conducted business in New York through EFG Capital, a Delaware corporation that operated from offices in New York and Miami, Florida.

**ANSWER:** The EFG Defendants admit that EFG Capital is a Delaware corporation, which at certain times had offices in New York and Miami, Florida. The remaining allegations in paragraph 78 of the Complaint contain legal conclusions to which no response is required.  To the

extent a response is required, the EFG Defendants deny the remaining allegations in paragraph 78 of the Complaint.

79.    By at least 2003, Defendants' relationships with FGG were managed by EFG Capital in Miami. Campano, EFG Capital's President, also testified that the relationship between Defendants and Fairfield Sentry was "born in Miami" at EFG Capital.

**ANSWER:** To the extent the second sentence in paragraph 79 purports to characterize the contents of documents or testimony, the EFG Defendants respectfully refer the Court to those documents or testimony for a complete and accurate statement of their contents. The EFG Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 79 of the Complaint and therefore deny the allegations in paragraph 79 of the Complaint.

80.    Representatives from EFG Capital's Miami office coordinated Defendants' transfers to and from the Fairfield Funds by, among other things: (i) executing Fairfield Sentry subscription agreements as "attorneys-in-fact"; (ii) signing Fairfield Lambda redemption requests; (iii) transmitting Fairfield Sigma subscription agreements to FGG in New York; and (iv) corresponding with Defendants regarding FGG, the Fairfield Funds, and BLMIS. Further, EFG Bank directed duplicates of its Fairfield Sentry account confirmations to EFG Capital in Miami. And finally, on behalf of Defendants, EFG Capital made multiple visits to BLMIS's offices in New York.

**ANSWER:** To the extent the first and second sentences in paragraph 80 purport to characterize the contents of documents, the EFG Defendants respectfully refer the Court to those documents for a complete and accurate statement of their contents. The EFG Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 80 of the Complaint and therefore deny the allegations in paragraph 80 of the Complaint.

81.    In July 2003, EFG Bank negotiated and entered into a Letter of Understanding with New York-based Fairfield Greenwich Limited, a member of the FGG de facto partnership that managed the Fairfield Funds. The Letter of Understanding provided for a New York choice of law and directed Fairfield Greenwich Limited to pay retrocession fees—an investment incentive FGG provided to large subscribers—to EFG Bank's account at UBS AG Stamford, Connecticut Branch.

**ANSWER:** To the extent paragraph 81 purports to characterize the contents of documents, the EFG Defendants respectfully refer the Court to those documents for a complete and accurate statement of their contents. The EFG Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 81 of the Complaint and therefore deny the allegations in paragraph 81 of the Complaint.

82.    By at least 2003, EFG Bank, EFG Capital, and Banco Atlántico were reviewing BLMIS trade confirmations listing BLMIS as a member of SIPC regulated by the SEC. On behalf of Defendants, EFG Capital reviewed Fairfield Sentry's BLMIS account opening documents, which specified that the transactions with BLMIS would be subject to the provisions of the Securities Exchange Act and the Commodities Exchange Act, as well as the rules and regulations of the SEC, the Board of Governors of the Federal Reserve System, and the Commodities Futures Trading Commission.

**ANSWER:** To the extent paragraph 82 purports to characterize the contents of documents, the EFG Defendants respectfully refer the Court to those documents for a complete and accurate statement of their contents.  The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 82 of the Complaint as they pertain to Banco Atlántico, and therefore deny the allegations contained in paragraph 82 of the Complaint as they pertain to Banco Atlántico.  The EFG Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 82 of the Complaint and therefore deny the remaining allegations in paragraph 82 of the Complaint.

83.    Defendants derived significant revenue from New York, purposefully availed themselves of the benefits of the United States, and otherwise submitted themselves to this Court's jurisdiction for the purposes of this proceeding and in connection with the claims alleged herein.

**ANSWER:**    The allegations in paragraph 83 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, the EFG Defendants deny the allegations in paragraph 83 of the Complaint.

84.    Defendants should reasonably expect to be subject to New York jurisdiction and are subject to personal jurisdiction pursuant to New York Civil Practice Law & Rules §§ 301 and 302 (McKinney 2001) and Federal Rule of Bankruptcy Procedure 7004.

**ANSWER:**    The allegations in paragraph 84 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, the EFG Defendants deny the allegations in paragraph 84 of the Complaint.

## VIII.    <u>RECOVERY OF SUBSEQUENT TRANSFERS TO DEFENDANTS</u>

### A.  Initial Transfers from BLMIS to Fairfield Sentry

85.    The Trustee commenced a separate adversary proceeding against Fairfield Sentry and other defendants in the Bankruptcy Court, under the caption, *Picard v. Fairfield Investment Fund, Ltd*., Adv. Pro. No. 09-01239 (CGM), seeking to avoid and recover initial transfers of customer property from BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").

**ANSWER:**    The allegations in paragraph 85 contain legal conclusions to which no response is required. The allegations in paragraph 85 of the Complaint refer to proceedings in another litigation to which the EFG Defendants are not a party.  To the extent a response is required, the EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 85 of the Complaint and therefore deny such allegations, and respectfully refer the Court to the docket and filings in the action captioned *Picard v. Fairfield Sentry Ltd. Et al*., Adv. Pro. No. 09-01239 (CGM) for a complete and accurate statement of their contents.

86.    By orders dated June 7 and June 10, 2011, this Court approved a settlement among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a consent judgment in favor of the Trustee in the amount of $3,054,000,000 ("Judgment Amount") [ECF No. 109].

**ANSWER:**    The allegations in paragraph 86 of the Complaint refer to proceedings in another litigation to which the EFG Defendants are not a party.  The EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 86 of the Complaint and therefore deny such allegations, and respectfully refer the Court to the June 7, June 10, and July 13, 2011 orders or judgment referred to in paragraph 86 of the Complaint for a complete and accurate statement of their contents.

87.    The Fairfield Sentry Initial Transfers are set forth in the attached Exhibits A and B. The Fairfield Sentry Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

**ANSWER:**    The allegations in paragraph 87 contain legal conclusions to which no response is required. To the extent a response is required, the EFG Defendants deny that the Fairfield Sentry Initial Transfers were and continue to be customer property, and otherwise lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 87 of the Complaint and therefore deny such allegations.

88.    On August 28, 2020, the Trustee filed a second amended complaint in *Picard v. Fairfield Investment Fund, Ltd.*, Adv. Pro. No. 09-01239 (CGM) ("Second Amended Complaint") [ECF No. 286] seeking in part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

**ANSWER:**    The allegations in paragraph 88 contain legal conclusions to which no response is required. The allegations in paragraph 88 of the Complaint refer to proceedings in another litigation to which the EFG Defendants are not a party.  To the extent a response is required, the EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 88 of the Complaint and therefore deny such allegations, and respectfully refer the Court to the August 28, 2020 Second Amended Complaint referred to in paragraph 88 of the Complaint for a complete and accurate statement of its contents.

89.    As alleged in the Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the BLMIS fraud. The Trustee incorporates by reference the allegations contained in the Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, 315-16.

**ANSWER:**    The allegations in paragraph 89 of the Complaint contain legal conclusions to which no response is required. The allegations in paragraph 89 of the Complaint refer to proceedings in another litigation to which the EFG Defendants are not a party. The EFG

Defendants respectfully refer the Court to the docket and filings in the action referenced in paragraph 89 of the Complaint for a complete and accurate statement of their contents. To the extent a response is required, the EFG Defendants object to the purported wholesale incorporation by reference of a pleading from another litigation as a violation of Rule 8 of the Federal Rules of Civil Procedure as incorporated by Rule 7008 of the Federal Rules of Bankruptcy Procedure. To the extent a further response is required, the EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 89 of the Complaint and therefore deny such allegations, and respectfully refer the Court to the Second Amended Complaint for a complete and accurate statement of its contents.

90.    Of the Judgment Amount, $2,895,000,000 was transferred to Fairfield Sentry during the six years preceding the Filing Date (the "Fairfield Sentry Six Year Transfers"). Each of the Fairfield Sentry Six Year Transfers is avoidable under § 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

**ANSWER:**    The allegations in paragraph 90 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, the EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 90 of the Complaint and therefore deny such allegations.  To the extent a response is required, the EFG Defendants deny the allegations in the second sentence of paragraph 90 of the Complaint.

91.    Of the Fairfield Sentry Six Year Transfers, $1,580,000,000 was transferred to Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year Transfers"). Each of the Fairfield Sentry Two Year Transfers is avoidable under § 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER:**    The allegations in paragraph 91 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, the EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first

sentence of paragraph 91 of the Complaint and therefore deny such allegations.  To the extent a

response is required, the EFG Defendants deny the allegations in the second sentence of paragraph

91 of the Complaint.

### B.  Subsequent Transfers from Fairfield Sentry to EFG Bank

92.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the
Fairfield Sentry Initial Transfers to EFG Bank (the "Fairfield Sentry-EFG Bank Subsequent
Transfers"). Based on the Trustee's investigation to date, the Fairfield Sentry-EFG Bank
Subsequent Transfers total $187,418,854. A chart setting forth the presently known Fairfield
Sentry-EFG Bank Subsequent Transfers is attached as Exhibit C.

**ANSWER:**    The allegations in paragraph 92 of the Complaint contain legal conclusions

to which no response is required.  To the extent a response is required, the EFG Defendants deny

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph

92 of the Complaint and therefore deny such allegations, and respectfully refer the Court to

Exhibit C of the Complaint for its complete and accurate contents.

93.    On June 6, 2012, the Trustee filed this action seeking recovery of a majority of the
Fairfield Sentry-EFG Bank Subsequent Transfers sought in this Amended Complaint.

**ANSWER:**    The allegations in paragraph 93 contain legal conclusions to which no

response is required. To the extent a response is required, the EFG Defendants deny knowledge or

information sufficient to form a belief as to the truth of the allegations in paragraph 93 of the

Complaint and therefore deny such allegations, except that the EFG Defendants admit that the

Trustee filed this action on June 6, 2012, and that the Trustee purports to seek the recovery of the

Fairfield Sentry-EFG Bank Subsequent Transfers.

94.    The Fairfield Sentry-EFG Bank Subsequent Transfers are recoverable from EFG
Bank under § 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly §
78fff-2(c)(3).

**ANSWER:** The allegations in paragraph 94 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, the EFG Defendants deny the allegations in paragraph 94 of the Complaint.

95. The Fairfield Sentry-EFG Bank Subsequent Transfers represent a redemption of equity interests by EFG Bank as a shareholder in Fairfield Sentry. Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Fairfield Sentry-EFG Bank Subsequent Transfers to EFG Bank upon redemption of its interests.

**ANSWER:** To the extent the allegations in Paragraph 95 characterize the Fairfield Sentry-EFG Bank Subsequent Transfers and Fairfield Sentry's solvency status, the allegations state legal conclusions to which no response is required; to the extent a response is required, the EFG Defendants deny the allegations. At this time, the EFG Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 95 and therefore deny the remaining allegations in Paragraph 95.

**C. Subsequent Transfers from Fairfield Sentry to Fairfield Sigma and Subsequently to EFG Bank**

96. Prior to the Filing Date, Fairfield Sentry subsequently transferred at least $789,152,864 of the Fairfield Sentry Initial Transfers directly to Fairfield Sigma ("Sigma Subsequent Transfers"). A chart setting forth the presently known Fairfield Sigma Subsequent Transfers is attached as Exhibit D.

**ANSWER:** The allegations in paragraph 96 of the Complaint contain legal conclusions to which no response is required. To the extent a response is required, the EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 96 of the Complaint and therefore deny such allegations, and respectfully refer the Court to Exhibit D of the Complaint for its complete and accurate contents.

97. Thereafter, Fairfield Sigma transferred at least $7,367,027 to EFG Bank (the "Fairfield Sigma-EFG Bank Subsequent Transfers"). A chart setting forth the presently known Fairfield Sigma-EFG Bank Subsequent Transfers is attached as Exhibit E.

**ANSWER:**    The allegations in paragraph 97 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, the EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 97 of the Complaint and therefore deny such allegations, and respectfully refer the Court to Exhibit E of the Complaint for its complete and accurate contents.

98.    On June 6, 2012, the Trustee filed this action seeking recovery of a majority of the Fairfield Sigma-EFG Bank Subsequent Transfers.

**ANSWER:**    The allegations in paragraph 98 contain legal conclusions to which no response is required. To the extent a response is required, the EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 98 of the Complaint and therefore deny such allegations, except that the EFG Defendants admit that the Trustee filed this action on June 6, 2012, and that the Trustee purports to seek the recovery of the Fairfield Sigma-EFG Bank Subsequent Transfers.

99.    The Fairfield Sigma-EFG Bank Subsequent Transfers are recoverable from EFG Bank under § 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER:**    The allegations in paragraph 99 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, the EFG Defendants deny the allegations in paragraph 99 of the Complaint.

100.    The Fairfield Sigma-EFG Bank Subsequent Transfers represent a redemption of equity interests by EFG Bank as a shareholder in Fairfield Sigma. Because Fairfield Sigma invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sigma was insolvent when it made the Fairfield Sigma-EFG Bank Subsequent Transfers to EFG Bank upon redemption of its interests.

**ANSWER:**    To the extent the allegations in Paragraph 100 characterize the Fairfield Sigma-EFG Bank Subsequent Transfers and Fairfield Sigma's solvency status, the allegations state legal conclusions to which no response is required; to the extent a response is required, the EFG

Defendants deny the allegations. At this time, the EFG Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 100 and therefore deny the remaining allegations in Paragraph 100.

### D. Subsequent Transfers from Fairfield Sentry to Fairfield Lambda and Subsequently to EFG Bank

101.    Prior to the Filing Date, Fairfield Sentry subsequently transferred at least $55,256,883 of the Fairfield Sentry Initial Transfers directly to Fairfield Lambda ("Lambda Subsequent Transfers"). A chart setting forth the presently known Fairfield Lambda Subsequent Transfers is attached as Exhibit F.

**ANSWER:**    The allegations in paragraph 101 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, the EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 101 of the Complaint and therefore deny such allegations, and respectfully refer the Court to Exhibit F of the Complaint for its complete and accurate contents.

102.    Thereafter, Fairfield Lambda transferred at least $657,379 to EFG Bank (the "Fairfield Lambda-EFG Bank Subsequent Transfers"). A chart setting forth the presently known Fairfield Lambda-EFG Bank Subsequent Transfers is attached as Exhibit G.

**ANSWER:**    The allegations in paragraph 102 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, the EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 102 of the Complaint and therefore deny such allegations, and respectfully refer the Court to Exhibit G of the Complaint for its complete and accurate contents.

103.    On June 6, 2012, the Trustee filed this action seeking recovery of a majority of the Fairfield Lambda-EFG Bank Subsequent Transfers.

**ANSWER:**    The allegations in paragraph 103 contain legal conclusions to which no response is required. To the extent a response is required, the EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 103 of the

Complaint and therefore deny such allegations, except that the EFG Defendants admit that the

Trustee filed this action on June 6, 2012, and that the Trustee purports to seek the recovery of the

Fairfield Lambda-EFG Bank Subsequent Transfers.

104.    The Fairfield Lambda-EFG Bank Subsequent Transfers are recoverable from EFG
Bank under § 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly §
78fff-2(c)(3).

**ANSWER:**    The allegations in paragraph 104 of the Complaint contain legal conclusions

to which no response is required.  To the extent a response is required, the EFG Defendants deny

the allegations in paragraph 104 of the Complaint.

105.    The Fairfield Lambda-EFG Bank Subsequent Transfers represent a redemption of
equity interests by EFG Bank as a shareholder in Fairfield Lambda. Because Fairfield Lambda
invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Lambda was
insolvent when it made the Fairfield Lambda-EFG Bank Subsequent Transfers to EFG Bank upon
redemption of its interests.

**ANSWER:**    To the extent the allegations in Paragraph 105 characterize the Fairfield

Lambda-EFG Bank Subsequent Transfers and Fairfield Lambda's solvency status, the allegations

state legal conclusions to which no response is required; to the extent a response is required, the

EFG Defendants deny the allegations. At this time, the EFG Defendants lack knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 105

and therefore deny the remaining allegations in Paragraph 105.

### E.  Subsequent Transfers from Fairfield Sentry to EFG Monaco

106.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the
Fairfield Sentry Initial Transfers to EFG Monaco (the "Fairfield Sentry-EFG Monaco Subsequent
Transfers"). Based on the Trustee's investigation to date, the Fairfield Sentry-EFG Monaco
Subsequent Transfers total $5,045,022. A chart setting forth the presently known Fairfield Sentry-
EFG Monaco Subsequent Transfers is attached as Exhibit H.

**ANSWER:**    The allegations in paragraph 106 of the Complaint contain legal conclusions

to which no response is required.  To the extent a response is required, the EFG Defendants deny

knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph

106 of the Complaint and therefore deny such allegations, and respectfully refer the Court to Exhibit H of the Complaint for a complete and accurate statement of its contents.

107.    On June 6, 2012, the Trustee filed this action seeking recovery of the Fairfield Sentry-EFG Monaco Subsequent Transfers.

**ANSWER:**    The allegations in paragraph 107 contain legal conclusions to which no response is required. To the extent a response is required, the EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 107 of the Complaint and therefore deny such allegations, except that the EFG Defendants admit that the Trustee filed this action on June 6, 2012, and that the Trustee purports to seek the recovery of the Fairfield Sentry-EFG Monaco Subsequent Transfers.

108.    The Fairfield Sentry-EFG Monaco Subsequent Transfers are recoverable from EFG Monaco under § 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER:**    The allegations in paragraph 108 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, the EFG Defendants deny the allegations in paragraph 108 of the Complaint.

109.    The Fairfield Sentry-EFG Monaco Subsequent Transfers represent a redemption of equity interests by EFG Monaco as a shareholder in Fairfield Sentry. Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Fairfield Sentry-EFG Monaco Subsequent Transfers to EFG Monaco upon redemption of its interests.

**ANSWER:**    To the extent the allegations in Paragraph 109 characterize the Fairfield Sentry-EFG Monaco Subsequent Transfers and Fairfield Sentry's solvency status, the allegations state legal conclusions to which no response is required; to the extent a response is required, the EFG Defendants deny the allegations. At this time, the EFG Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 109 and therefore deny the remaining allegations in Paragraph 109.

### F.  Subsequent Transfers from Fairfield Sentry to EFG Bahamas

110.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the Fairfield Sentry Initial Transfers to EFG Bahamas (the "Fairfield Sentry-EFG Bahamas Subsequent Transfers"). Based on the Trustee's investigation to date, the Fairfield Sentry-EFG Bahamas Subsequent Transfers total $96,152,343. A chart setting forth the presently known Fairfield Sentry-EFG Bahamas Subsequent Transfers is attached as Exhibit I.

**ANSWER:**    The allegations in paragraph 110 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, the EFG Defendants deny that EFG Bahamas received any transfers or redemptions prior to its formation, which upon information and belief, occurred on or about December 19, 2005. The EFG Defendants otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 110 of the Complaint and therefore deny such allegations, and respectfully refer the Court to Exhibit I of the Complaint for a complete and accurate statement of its contents.

111.    On June 6, 2012, the Trustee filed this action seeking recovery of a majority of the Fairfield Sentry-EFG Bahamas Subsequent Transfers.

**ANSWER:**    The allegations in paragraph 111 contain legal conclusions to which no response is required. To the extent a response is required, the EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 111 of the Complaint and therefore deny such allegations, except that the EFG Defendants admit that the Trustee filed this action on June 6, 2012, and that the Trustee purports to seek the recovery of the Fairfield Sentry-EFG Bahamas Subsequent Transfers.

112.    The Fairfield Sentry-EFG Bahamas Subsequent Transfers are recoverable from EFG Bahamas under § 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER:**    The allegations in paragraph 112 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, the EFG Defendants deny the allegations in paragraph 112 of the Complaint.

113.    The Fairfield Sentry-EFG Bahamas Subsequent Transfers represent a redemption of equity interests by EFG Bahamas as a shareholder in Fairfield Sentry. Because Fairfield Sentry invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sentry was insolvent when it made the Fairfield Sentry-EFG Bahamas Subsequent Transfers to EFG Bahamas upon redemption of its interests.

**ANSWER:**    To the extent the allegations in Paragraph 113 characterize the Fairfield

Sentry-EFG Bahamas Subsequent Transfers and Fairfield Sentry's solvency status, the allegations

state legal conclusions to which no response is required; to the extent a response is required, the

EFG Defendants deny the allegations. Further, the EFG Defendants deny that EFG Bahamas

received any transfers or redemptions prior to its formation, which upon information and belief,

occurred on or about December 19, 2005.  At this time, the EFG Defendants lack knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 113

and therefore deny the remaining allegations in Paragraph 113.

### G. Subsequent Transfers from Fairfield Sentry to Fairfield Sigma and Subsequently to EFG Bahamas

114.    Prior to the Filing Date, Fairfield Sigma subsequently transferred a portion of the Fairfield Sigma Subsequent Transfers to EFG Bahamas ("Fairfield Sigma-EFG Bahamas Subsequent Transfers"). Based on the Trustee's investigation to date, the Fairfield Sigma-EFG Bahamas Subsequent Transfers total at least $1,802,938. A chart setting forth the presently known Fairfield Sigma-EFG Bahamas Subsequent Transfers is attached as Exhibit J.

**ANSWER:**    The allegations in paragraph 114 of the Complaint contain legal conclusions

to which no response is required.  To the extent a response is required, the EFG Defendants deny

that EFG Bahamas received any transfers or redemptions prior to its formation, which upon

information and belief, occurred on or about December 19, 2005. The EFG Defendants otherwise

deny knowledge or information sufficient to form a belief as to the truth of the allegations in

paragraph 114 of the Complaint and therefore deny such allegations, and respectfully refer the

Court to Exhibit J of the Complaint for a complete and accurate statement of its contents.

115.    The Fairfield Sigma-EFG Bahamas Subsequent Transfers are recoverable from EFG Bahamas under § 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**ANSWER:**    The allegations in paragraph 115 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, the EFG Defendants deny the allegations in paragraph 115 of the Complaint.

116.    The Fairfield Sigma-EFG Bahamas Subsequent Transfers represent a redemption of equity interests by EFG Bahamas as a shareholder in Fairfield Sigma. Because Fairfield Sigma invested all or substantially all of its assets into the BLMIS Ponzi scheme, Fairfield Sigma was insolvent when it made the Fairfield Sigma-EFG Bahamas Subsequent Transfers to EFG Bahamas upon redemption of its interests.

**ANSWER:**    To the extent the allegations in Paragraph 116 characterize the Fairfield Sigma-EFG Bahamas Subsequent Transfers and Fairfield Sigma's solvency status, the allegations state legal conclusions to which no response is required; to the extent a response is required, the EFG Defendants deny the allegations. Further, the EFG Defendants deny that EFG Bahamas received any transfers or redemptions prior to its formation, which upon information and belief, occurred on or about December 19, 2005.  At this time, the EFG Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 116 and therefore deny the remaining allegations in Paragraph 116 of the Complaint.

117.    The Fairfield Sentry-EFG Bank Subsequent Transfers, the Fairfield Sigma-EFG Bank Subsequent Transfers, the Fairfield Lambda-EFG Bank Subsequent Transfers, the Fairfield Sentry-EFG Bank Monaco Subsequent Transfers, the Fairfield Sentry-EFG Bahamas Subsequent Transfers, and the Fairfield Sigma-EFG Bahamas Subsequent Transfers are collectively defined as the "Subsequent Transfers."

**ANSWER:** The allegations in paragraph 117 of the Complaint do not assert any matter of fact and instead define a term for use, and therefore do not require a response.  To the extent any further response is required, the EFG Defendants deny the allegations in paragraph 117 of the Complaint.

118.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the initial and Subsequent Transfers discussed above, and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

**ANSWER:**    The allegations in paragraph 118 of the Complaint state legal conclusions to which no response is required. To the extent a response is required, the EFG Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 118 of the Complaint, and therefore deny such allegations.  To the extent any further response is required, the EFG Defendants object to any attempt by the Trustee to amend the Complaint to seek avoidance and recovery of any additional transfers that are not already alleged in the Complaint as a violation of, *inter alia*, Federal Rule of Civil Procedure 15, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7015.

## <u>COUNT ONE</u>

### <u>RECOVERY OF SUBSEQUENT TRANSFERS 11 U.S.C. §§ 105(a) AND 550(a)</u>

119.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

**ANSWER:**    The EFG Defendants incorporate by reference and reassert their responses to the allegations contained in each of the previous paragraphs of the Complaint as though set forth fully herein.

120.    The Subsequent Transfers are recoverable from Defendants under 11 U.S.C. § 550(a) and 15 U.S.C. § 78fff-2(c)(3).

**ANSWER:**    The allegations in paragraph 120 of the Complaint state legal conclusions to which no response is required. To the extent a response is required, the EFG Defendants deny the allegations in paragraph 120 of the Complaint.

121.    Defendants are immediate or mediate transferees of the Subsequent Transfers from Fairfield Sentry, Fairfield Sigma, and/or Fairfield Lambda.

**ANSWER:**    The allegations in paragraph 121 of the Complaint state legal conclusions to which no response is required. To the extent a response is required, the EFG Defendants deny the allegations in paragraph 121 of the Complaint.

122.    As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendants: (a) recovering the Subsequent Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**ANSWER:**    The allegations in paragraph 122 of the Complaint state legal conclusions to which no response is required. To the extent a response is required, the EFG Defendants deny the allegations in paragraph 122 of the Complaint.

## RESPONSE TO PLAINTIFF'S REQUEST FOR RELIEF

The EFG Defendants deny that the Trustee is entitled to his requested judgment in favor of the Trustee and against the EFG Defendants.

## AFFIRMATIVE DEFENSES

The EFG Defendants assert the following defenses without assuming the burden of proof or any other burden if such burdens would otherwise be on Plaintiff. By designating these matters "defenses," the EFG Defendants do not intend to suggest either that the Trustee does not bear the burden of proof as to such matters or that such matters are not elements of the Trustee's *prima facie* case against the EFG Defendants. The EFG Defendants reserve the right to assert any other defenses as discovery in this litigation proceeds or any counterclaims that they become aware of through discovery or other investigation as may be appropriate at a later time. Further, the EFG Defendants also reserve the right to amend this Answer to assert cross-claims and/or third-party claims when and if, in the course of investigation, discovery, or preparation for trial, it becomes appropriate to do so.

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

The allegations of actual fraudulent transfer as to the Fairfield Sentry Initial Transfers do not comply with Rule 9(b) and are not pled with sufficient particularity.

## THIRD AFFIRMATIVE DEFENSE

This Court lacks jurisdiction under Article III of the U.S. Constitution to enter final orders or judgments in this proceeding.

## FOURTH AFFIRMATIVE DEFENSE

The Complaint must be dismissed because the Court lacks personal jurisdiction over the EFG Defendants.

## FIFTH AFFIRMATIVE DEFENSE

The Fairfield Sentry Two Year Transfers are not avoidable under Section 548(a)(1)(A) of the Bankruptcy Code because such transfers were not made with actual intent to hinder, delay, or defraud creditors. The Trustee may not rely on a "Ponzi scheme presumption" to prove that the alleged initial transfers from BLMIS to Fairfield Sentry that he seeks to recover from the EFG Defendants were made with actual intent to hinder, delay, or defraud creditors, and the Trustee has not otherwise sufficiently pleaded the requisite level of intent. The Ponzi scheme presumption itself is extra-statutory and improper, but even if that were not the case, the presumption cannot apply to the alleged initial transfers from BLMIS to Fairfield Sentry to the extent the initial transfers were repayments of Fairfield Sentry's principal investments in BLMIS. The repayment of a customer's investment principal constitutes the repayment of a valid contractual antecedent debt, not a payment made in furtherance of the Ponzi scheme. To the extent, if any, that the EFG

Defendants received subsequent transfers arising from the unavoidable Fairfield Sentry Two Year Transfers, such subsequent transfers are not recoverable under Section 550(a) of the Bankruptcy Code or 15 U.S.C. § 78fff-2(c)(3).

## SIXTH AFFIRMATIVE DEFENSE

The Trustee's claims against the EFG Defendants are barred, in whole or in part, because the Trustee failed to plead all of the elements of an avoidable fraudulent transfer under Section 544 of the Bankruptcy Code and Sections 273, 273-a, 274, 275, 276, 276-a, 278 and/or 279 of the New York Debtor and Creditor Law[2] with sufficient particularity and factual support.

## SEVENTH AFFIRMATIVE DEFENSE

The Trustee's claims against the EFG Defendants are barred, in whole or in part, because the alleged Fairfield Sentry Six Year Transfers and the transfers from Fairfield Sentry to Fairfield Sigma (as alleged in paragraph 96 of the Complaint) and the transfers from Fairfield Sentry to Fairfield Lambda (as alleged in paragraph 101 of the Complaint) were taken, if at all, for fair consideration and without knowledge of the fraud, as provided by N.Y. Debt. & Cred. Law § 272-275, 278.

## EIGHTH AFFIRMATIVE DEFENSE

The Fairfield Sentry Six Year Transfers are subject to the safe harbor provision in Section 546(e) of the Bankruptcy Code because such alleged initial transfers were: (i) settlement payments and/or made in connection with securities contracts, such as Fairfield Sentry's account agreement with BLMIS and Fairfield Sentry's Articles of Association; and (ii) made by or to (or for the benefit of) an entity covered by Section 546(e) because: (a) "[i]t is not disputed [by the Trustee] that BLMIS was a 'stockbroker' for the purposes of § 546(e)," *Picard v. Ida Fishman Revocable Trust*

---

[2] References to the N.Y. Debt. & Cred. Law are to the prior version of the law that existed before passage of the Uniform Voidable Transactions Act, which became effective on April 4, 2020 but does not apply retroactively.

*In re Bernard L. Madoff Inv. Sec. LLC*), 773 F.3d 414, 417 (2d Cir. 2014), and/or (b) the Fairfield

Funds, the EFG Defendants are each financial institutions. *See Fairfield Sentry Ltd. v. Theodoor*

*GGC Amsterdam* (*In re Fairfield Sentry Ltd.*), No. 10-13164 (SMB), 2020 WL 7345988, at *6 &

n.11 (Bankr. S.D.N.Y. Dec. 14, 2020) (holding that the Fairfield Funds were "financial

institutions" because they were customers of Citco Bank Nederland N.V. Dublin Branch); Am.

Compl. ¶ 52 (conceding the EFG Defendants were "private banks"). The Fairfield Sentry Six Year

Transfers were not made with actual intent to defraud and, pursuant to Section 546(e) of the

Bankruptcy Code, they are not avoidable under Section 548(a)(1)(B) of the Bankruptcy Code or

section 544 of the Bankruptcy Code and certain provisions of the N.Y. Debt. & Cred. Law,

including §§ 273-279, or 15 U.S.C. § 78fff-2(c)(3).

## NINTH AFFIRMATIVE DEFENSE

To the extent, if any, that the EFG Defendants received Fairfield Sentry-EFG Bank

Subsequent Transfers, Fairfield Sentry-EFG Monaco Subsequent Transfers, or Fairfield Sentry-

EFG Bahamas Subsequent Transfers, such transfers are not recoverable because the EFG

Defendants took such transfers for value and in good faith, and therefore without knowledge of

the voidability of the transfer avoided within the meaning of 11 U.S.C. § 550(b).

The EFG Defendants took for value any transfers received from Fairfield Sentry, if any,

because any such transfers were made in exchange for the surrender of shares in Fairfield Sentry

by the EFG Defendants and of the rights attendant to those shares.

The EFG Defendants received Fairfield Sentry-EFG Bank Subsequent Transfers, Fairfield

Sentry-EFG Monaco Subsequent Transfers, and Fairfield Sentry-EFG Bahamas Subsequent

Transfers, if any, in good faith. The EFG Defendants had no knowledge that BLMIS was not

trading securities, and did not know facts that would have prompted a reasonable person in their

position to conduct further inquiry into BLMIS's possible fraud.  Indeed, a reasonable person with

the facts in the possession of the EFG Defendants at the time of the Transfers would not have been

on inquiry notice of the alleged fraudulent purpose behind the Fairfield Sentry Initial Transfers,

nor would those facts have led such a person to conduct further inquiry into whether BLMIS was

trading securities or was a fraud or a Ponzi scheme.

Even if the EFG Defendants had been on inquiry notice of the alleged fraudulent purpose

behind the Fairfield Sentry Initial Transfers or of facts that would have led a reasonable person to

conduct further inquiry into whether BLMIS was trading securities or was a fraud or a Ponzi

scheme, the EFG Defendants conducted a reasonably diligent investigation sufficient under the

circumstances and/or a diligent inquiry by the EFG Defendants would not have discovered the

alleged fraudulent purpose of the Fairfield Sentry Initial Transfers and would not have discovered

that BLMIS was allegedly not trading securities or was an alleged fraud or Ponzi scheme.  Indeed,

other entities with vastly greater investigatory tools and resources than the EFG Defendants, and

with more access to BLMIS personnel and documentation than the EFG Defendants, investigated

BLMIS before December 2008 but failed to uncover any fraud. This includes the SEC, which

began an investigation into BLMIS in 2006.  Unlike U.S. federal regulatory agencies, none of the

EFG Defendants had the ability to compel the production of information from third parties that

would have been necessary to establish that BLMIS was committing fraud.  None of the EFG

Defendants could have discovered the alleged fraudulent purpose of the Fairfield Sentry Initial

Transfers.

## TENTH AFFIRMATIVE DEFENSE

To the extent, if any, that the EFG Defendants received Fairfield Sigma-EFG Bank

Subsequent Transfers, Fairfield Lambda-EFG Bank Subsequent Transfers, or Fairfield Sigma-

EFG Bahamas Subsequent Transfers, such transfers are not recoverable because the EFG Defendants were alleged subsequent transferees of subsequent transferees that took such transfers in good faith within the meaning of 11 U.S.C. § 550(b)(2).

The EFG Defendants had no knowledge that BLMIS was not trading securities, and did not know facts that would have prompted a reasonable person in their position to conduct further inquiry into BLMIS's possible fraud. Indeed, a reasonable person with the facts in the possession of the EFG Defendants at the time of the Transfers would not have been on inquiry notice of the alleged fraudulent purpose behind the Fairfield Sentry Initial Transfers, nor would those facts have led such a person to conduct further inquiry into whether BLMIS was trading securities or was a fraud or a Ponzi scheme.

Even if the EFG Defendants had been on inquiry notice of the alleged fraudulent purpose behind the Fairfield Sentry Initial Transfers or of facts that would have led a reasonable person to conduct further inquiry into whether BLMIS was trading securities or was a fraud or a Ponzi scheme, the EFG Defendants conducted a reasonably diligent investigation sufficient under the circumstances and/or a diligent inquiry by the EFG Defendants would not have discovered the alleged fraudulent purpose of the Fairfield Sentry Initial Transfers and would not have discovered that BLMIS was allegedly not trading securities or was an alleged fraud or Ponzi scheme. Indeed, other entities with vastly greater investigatory tools and resources than the EFG Defendants, and with more access to BLMIS personnel and documentation than the EFG Defendants, investigated BLMIS before December 2008 but failed to uncover any fraud. This includes the SEC, which began an investigation into BLMIS in 2006. Unlike U.S. federal regulatory agencies, none of the EFG Defendants had the ability to compel the production of information from third parties that would have been necessary to establish that BLMIS was committing fraud. None of the EFG

Defendants could have discovered the alleged fraudulent purpose of the Fairfield Sentry Initial Transfers.

In addition, to the extent it is necessary under 11 U.S.C. § 550(b) for the EFG Defendants to establish that they received the Fairfield Sigma-EFG Bank Subsequent Transfers, Fairfield Lambda-EFG Bank Subsequent Transfers, and the Fairfield Sigma-EFG Bahamas Subsequent Transfers, without knowledge of the voidability of transfers avoided, the EFG Defendants assert that they had no such knowledge for the same reasons as set forth in the immediately proceeding paragraphs.

In addition, to the extent it is necessary under 11 U.S.C. § 550(b) for the EFG Defendants to establish that they received the Fairfield Sigma-EFG Bank Subsequent Transfers, Fairfield Lambda-EFG Bank Subsequent Transfers, and the Fairfield Sigma-EFG Bahamas Subsequent Transfers, for value, the EFG Defendants took any such transfers from Fairfield Sigma and Fairfield Lambda for value because any such transfers were made in exchange for the surrender of shares in Fairfield Sigma and Fairfield Lambda by the EFG Defendants.

In the alternative, if and to the extent necessary for the EFG Defendants to establish the defense under 11 U.S.C. §550(b)(2), the EFG Defendants assert that each subsequent transferee within the alleged chain of transfers ending with the EFG Defendants' alleged receipt of the Fairfield Sigma-EFG Bank Subsequent Transfers, Fairfield Lambda-EFG Bank Subsequent Transfers, and Fairfield Sigma-EFG Bahamas Subsequent Transfers received such transfers for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfers avoided.

## ELEVENTH AFFIRMATIVE DEFENSE

The Trustee's claims should be dismissed if Plaintiff has recovered, or during the pendency of this action recovers, sufficient funds to reimburse SIPC for all payments that SIPC has made to satisfy allowed claims of BLMIS customers.

## TWELFTH AFFIRMATIVE DEFENSE

The Trustee's claims are barred to the extent they have been or may in the future be dismissed by the Court or are based on allegations that have been or may in the future be dismissed by the Court or are based on theories or allegations that have been or may in the future be rejected by this Court or by another court on appeal from any orders of this Court.

## THIRTEENTH AFFIRMATIVE DEFENSE

On May 9, 2011, the Trustee entered into a Settlement Agreement (the "Fairfield Settlement Agreement") with the Liquidators of Fairfield Sentry Limited and other Fairfield funds (the "Liquidators"). This Court approved the Fairfield Settlement Agreement on June 7, 2011, *see* Bench Memorandum and Order, *Picard v. Fairfield Sentry Ltd.*, No. 09-1239 (Bankr. S.D.N.Y. June 7, 2011), Dkt. No. 92, and it was incorporated into the consent judgment entered against Fairfield Sentry on July 13, 2011, *see* Consent Judgment, *Picard v. Fairfield Sentry Ltd.*, No. 09-1239 (Bankr. S.D.N.Y. July 13, 2011), Dkt. No. 109. The Fairfield Settlement Agreement provides for the sharing of recoveries on the Trustee's and the Liquidators' claims for recovery of property that Fairfield Sentry transferred. To the extent that the Liquidators recover from the EFG Defendants in settlement or otherwise, the Trustee is barred from recovering on the ground that he is not entitled to double recovery, nor should the EFG Defendants be subject to recovery of identical funds from two separate entities.

## FOURTEENTH AFFIRMATIVE DEFENSE

To the extent that the alleged Transfers, or any portion thereof, alleged to have been received by the EFG Defendants were not customer property under 15 U.S.C. § 78fff-2(c)(3) or any other section of the U.S. Bankruptcy Code that BLMIS transferred to the Fairfield Funds, such Transfers (or portions thereof) are not recoverable by the Trustee from the EFG Defendants.

## FIFTEENTH AFFIRMATIVE DEFENSE

The Trustee's claims are barred because none of the EFG Defendants was a transferee of the Transfers. To the extent that a EFG Defendant received any subsequent transfer, that EFG Defendant (a) received each subsequent transfer in good faith, in its capacity as nominee or custodian, and for the account and benefit of one or more of its customers; (b) did not have dominion or control or the right to assert dominion or control over the subsequent transfers or the proceeds thereof or to use the subsequent transfers or the proceeds thereof for its own purposes; (c) was a mere conduit for its customers; and (d) was obligated to credit the subsequent transfers to the account and for the benefit of one or more of its customers, who alone had the right to assert dominion and control over the subsequent transfers received by the EFG Defendant for their benefit.

## SIXTEENTH AFFIRMATIVE DEFENSE

The Trustee's claims are barred, in whole or part, because the Trustee has failed to mitigate, minimize or avoid damages, if any.

## SEVENTEENTH AFFIRMATIVE DEFENSE

The Trustee's claims are barred, in whole or in part, based upon rulings, judgments, orders, or decisions entered in the liquidation proceedings of Fairfield Sentry before the Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands, including any

related appellate rulings, judgments, orders, or decisions, or based upon other rulings, judgments,

orders, or decisions entered in other proceedings in the British Virgin Islands or its appellate courts.

## EIGHTEENTH AFFIRMATIVE DEFENSE

The Trustee is not entitled to an award of interest.

## NINETEENTH AFFIRMATIVE DEFENSE

The Trustee's claims are barred by the applicable statute of limitations, including but not

limited to 11 U.S.C. §§ 546(a), 548(a), 550(f), or N.Y.C.P.L.R. §§ 203, 213.

## TWENTIETH AFFIRMATIVE DEFENSE

The Trustee's claims are barred by estoppel.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

Applying or using the against the EFG Defendants the doctrine of law of the case based on

rulings made in other adversary proceedings to which the EFG Defendants were not a party and in

which the EFG Defendants did not participate violates the EFG Defendants' rights to due process

of law as guaranteed by the Fifth Amendment to the U.S. Constitution.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

The Trustee's claims are barred by the doctrine of laches and similar doctrines. The

Trustee's unreasonable delay in bringing and prosecuting his claims, which was brought more than

a decade ago and concerns transfers made more than 15 years ago, has unreasonably and unfairly

prejudiced the EFG Defendants' ability to defend themselves.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

The Trustee's claims against the EFG Defendants are barred by the doctrines of *in pari*

*delicto* and unclean hands, because a trustee, standing in the shoes of the debtor, cannot recover

for a wrong that the debtor itself took part in.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

The Trustee may not recover the alleged Transfers, if any, because he has not avoided the alleged initial transfers from BLMIS to Fairfield Sentry.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

Pursuant to 11 U.S.C. § 550(d), the Trustee may not recover any subsequent transfer from the EFG Defendants to the extent he has recovered the amount of the initial transfers from Fairfield Sentry or any other immediate or mediate transferee the amount of the avoided initial transfers that included the customer property that the Trustee alleges the EFG Defendants received.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

To the extent the Trustee recovers from the EFG Defendants, the EFG Defendants reserve the right to assert a claim arising from such recovery under section 502(h) of the Bankruptcy Code.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

In the alternative, Fairfield Sentry, Fairfield Lambda, and Fairfield Sigma were mere conduits, and consequently, the Transfers were initial transfers from BLMIS to the EFG Defendants. As the Trustee stated in *Picard v. Grosvenor Investment Management Ltd.*, Case No. 12-1021 (Bankr. S.D.N.Y. June 15, 2022), Fairfield Sentry's "sole purpose was to funnel money to BLMIS" and "no arm's length relationship exist[ed] between [Sentry] and BLMIS" (internal quotation marks and citation omitted). Case No. 12-1021, ECF No. 115, at 3, 6. As a result, the redemptions received by the EFG Defendants were initial transfers from BLMIS that are subject to the safe harbor under 11 U.S.C. § 546(e); any Trustee proceeding to avoid the transfers is untimely; and the EFG Defendants may retain the amounts they received pursuant to 11 U.S.C. § 548(c) and 11 U.S.C. § 548(d)(2)(B) because they took the transfers for value and in good faith.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

The Trustee's claims to recover from the EFG Defendants subsequent transfers allegedly made to the EFG Defendants by Fairfield Sentry, Fairfield Lambda, and Fairfield Sigma constitute an impermissible extraterritorial application of 11 U.S.C. § 550(a) and N.Y. Debt. & Cred. Law § 273–279.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

The Trustee's claims to recover from the EFG Defendants subsequent transfers allegedly made to the EFG Defendants by Fairfield Sentry, Fairfield Lambda, and Fairfield Sigma violate principles of international comity.

## THIRTIETH AFFIRMATIVE DEFENSE

The Trustee may not recover from EFG Bahamas transfers received by Banco Atlántico, whether on a theory of successor-in interest, or otherwise. On or about February 16, 2006, EFG Bahamas acquired the private banking business of Banco Atlántico through an asset sale, with limited acquisition of liabilities, and the transfer of such business pursuant to the asset sale did not include liabilities associated with the claims brought in this adversary proceeding. Further, the Trustee may not recover from EFG Bahamas transfers alleged to have been received prior to EFG Bahamas' formation.

## JURY TRIAL DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rule 9015 of the Federal Rules of Bankruptcy Procedure, the EFG Defendants hereby demand a jury trial on all claims and issues that may be tried by a jury.

## STATEMENT PURSUANT TO FED. R. BANKR. P. 7012(b)

The EFG Defendants do not consent to entry of final orders or judgments by the Bankruptcy Court.

## THE EFG DEFENDANTS' PRAYER FOR RELIEF

WHEREFORE, the EFG Defendants request that this Court dismiss the Complaint with prejudice, award the EFG Defendants their costs incurred in connection with this action, and grant such other and further relief as the Court deems just and proper.

Dated: July 10, 2023
      New York, New York

                                   */s/ Adam M. Lavine*

                                  **KOBRE & KIM LLP**
                                  Zachary D. Rosenbaum
                                  Adam M. Lavine
                                  Donna (Dong Ni) Xu
                                  800 Third Avenue
                                  New York, New York 10022
                                  Telephone: (212) 488-1200
                                  Zachary.Rosenbaum@kobrekim.com
                                  Adam.Lavine@kobrekim.com
                                  Donna.Xu@kobrekim.com
                                  *Attorneys for Defendants*