**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | |
| v. | SIPA Liquidation (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Pro. No. 10-05311 (CGM) |
| Plaintiff, | **TRUSTEE'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT** |
| v. | |
| UBS EUROPE SE (f/k/a UBS (LUXEMBOURG) S.A.), UBS FUND SERVICES (LUXEMBOURG) S.A., UBS THIRD PARTY MANAGEMENT COMPANY S.A., M&B CAPITAL ADVISERS SOCIEDAD DE VALORES, S.A., RELIANCE INTERNATIONAL RESEARCH LLC, LUXEMBOURG INVESTMENT FUND AND LUXEMBOURG INVESTMENT FUND U.S. EQUITY PLUS, as represented by their Liquidators MAÎTRE ALAIN RUKAVINA and PAUL LAPLUME, MAÎTRE ALAIN; RUKAVINA and PAUL LAPLUME, in their capacities as liquidators and representatives of LUXEMBOURG INVESTMENT FUND AND LUXEMBOURG INVESTMENT FUND U.S. EQUITY PLUS, | |
| Defendants. | |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT AND BACKGROUND ............................................................. 1

ARGUMENT ......................................................................................................................... 7

I.     THE COURT HAS PERSONAL JURISDICTION OVER THE
DEFENDANTS ........................................................................................................ 7

       A.     THE TRUSTEE PLEADS SUFFICIENT MINIMUM
CONTACTS FOR THE PJ DEFENDANTS ............................................. 10

            1.     The Trustee Sufficiently Alleges that M&B Purposefully
Availed Itself of the Privilege of Doing Business in New
York .................................................................................... 10

                  a.     M&B Directed Investment Into BLMIS in New
York Through LIF-USEP and Other BLMIS Feeder
Funds ...................................................................... 13

                  b.     M&B Regularly Communicated With Madoff,
BLMIS and RIR Personnel in New York ........................... 19

                  c.     M&B Received Fees for Providing Services to LIF-
USEP ....................................................................... 21

                  d.     M&B Is Subject to This Court's Jurisdiction
Through the Actions of Its Agent, Manuel
Echeverría ......................................................................... 23

            2.     The Trustee Sufficiently Alleges That the UBS Defendants'
Operations and Roles as Service Providers to Multiple
BLMIS Feeder Funds, Including LIF-USEP, Establish
Minimum Contacts and Subject Them to this Court's
Jurisdiction ........................................................................... 26

                  a.     UBSFSL ....................................................................... 28

                  b.     UBSTPM ....................................................................... 31

       B.     HAVING SUFFICIENTLY ALLEGED CLAIMS AGAINST THE
PJ DEFENDANTS ARISING FROM THEIR CONTACTS WITH
NEW YORK, THE TRUSTEE DOES NOT NEED TO SHOW
PROXIMATE CAUSE TO SATISFY THE MINIMUM
CONTACTS PRONG ................................................................. 33

    1.    M&B ............................................................................35

    2.    UBSFSL & UBSTPM..............................................................36

C.    THE TRUSTEE'S ALLEGATIONS AGAINST THE PJ
      DEFENDANTS ARE NOT CONCLUSORY ..........................................37

    1.    M&B ............................................................................37

    2.    UBSFSL & UBSTPM..............................................................38

D.    THE EXERCISE OF PERSONAL JURISDICTION OVER THE
      PJ DEFENDANTS WOULD BE REASONABLE ...................................39

E.    AT A MINIMUM THE TRUSTEE IS ENTITLED TO
      JURISDICTIONAL DISCOVERY ..........................................................41

II.    THE TRUSTEE HAS STATED A SECTION 550 CLAIM AGAINST
       THE MOVING DEFENDANTS ..............................................................43

A.    LEGAL STANDARD.............................................................................43

B.    THE TRUSTEE HAS SUFFICIENTLY ALLEGED ACTUAL
      FRAUDULENT INTENT UNDER SECTION 548(a)(1)(A) ..................45

C.    SECTION 546(e) DOES NOT APPLY HERE ........................................50

D.    THE TRUSTEE HAS PLAUSIBLY ALLEGED THAT HE CAN
      RECOVER THE SUBSEQUENT TRANSFERS FROM THE
      DEFENDANTS ........................................................................................50

    1.    The SAC Pleads That the Defendants Received BLMIS
          Customer Property Under Section 550(a) of the Bankruptcy
          Code .............................................................................................51

    2.    The Defendants Misstate the Trustee's Pleading Burden ..............51

    3.    Further Details of the Subsequent Transfers Must Come
          From the Defendants' Books and Records ....................................54

    4.    The Trustee Need Not Tie Each Subsequent Transfer to an
          Initial Transfer at the Pleading Stage..............................................56

    5.    The Trustee Need Only Plead Some of the Transfers....................58

E.    THE SAC DOES NOT ESTABLISH THE DEFENDANTS'
      AFFIRMATIVE DEFENSES UNDER SECTION 550(b) ......................59

ii

1.    The SAC Does Not Establish Section 550(b)'s Value Requirement.....................................................................60

2.    The SAC Does Not Establish Section 550(b)'s Good Faith Requirement.....................................................................61

3.    The SAC Does Not Establish Section 550(b)'s Lack of Knowledge Requirement ..............................................................65

CONCLUSION...........................................................................................................66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 45 John Lofts, LLC,*
599 B.R. 730 (Bankr. S.D.N.Y. 2019) ..............................................................................51, 57

*Adler v. Berg Harmon Assocs.,*
816 F. Supp. 919 (S.D.N.Y. 1993) .................................................................................44

*Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.,*
98 F.3d 25 (2d Cir. 1996) ................................................................................................9

*Amsellem v. Host Marriot Corp.,*
280 A.D.2d 357 (N.Y. App. Div. 2001) ..........................................................................42

*Anderson News L.L.C. v. Am. Media Inc.,*
680 F.3d 162 (2d Cir. 2012) ............................................................................................44

*Armstrong v. Collins,*
No. 01 Civ. 2437(PAC), 2010 WL 1141158 (S.D.N.Y. Mar. 24, 2010) ........................46

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................................................................................44

*Ayyash v. Bank Al-Madina,*
No. 04 Civ. 9201 (GEL), 2006 WL 587342 (S.D.N.Y. Mar. 9, 2006) ..........................41

*In re Bayou Grp., LLC,*
439 B.R. 284 (S.D.N.Y. 2010) ........................................................................................46

*Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.),*
397 B.R. 1 (S.D.N.Y. 2007) ................................................................................46, 47, 48

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) .................................................................................................44, 50

*Burger King Corp. v. Rudzewicz,*
471 U.S. 462 (1985) .................................................................................9, 18, 33, 39

*Burlington Indus., Inc. v. Salem Int'l Co.,*
645 F. Supp. 872 (S.D.N.Y. 1986) .................................................................................19

*Cargo Partner AG v. Albatrans, Inc.,*
352 F.3d 41 (2d Cir. 2003) ..............................................................................................44

iv

*Chloé v. Queen Bee of Beverly Hills, LLC*,
    616 F.3d 158 (2d Cir. 2010)............................................................8, 39

*Cohen v. UBS Fin. Servs., Inc.*,
    No. 12-CV-02147, 2014 WL 240324 (S.D.N.Y. Jan. 22, 2014) ............................................47

*Cromer Fin. Ltd. v. Berger*,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001)....................................................8, 13, 28, 29

*CutCo Indus., Inc. v. Naughton*,
    806 F.2d 361 (2d Cir. 1986).............................................................23

*Dorchester Fin. Sec. Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d Cir. 2013)................................................................8

*Dorfman v. Marriott Int'l Hotels, Inc.*,
    No. 99 CIV 10496 (CSH), 2002 WL 14363 (S.D.N.Y. Jan. 3, 2002) .....................................31

*In re Dreier LLP*,
    452 B.R. 391 (Bankr. S.D.N.Y. 2011) ..............................................46, 48

*Drenis v. Haligiannis*,
    452 F. Supp. 2d 418 (S.D.N.Y. 2006)....................................................46

*In re Enron Corp.*,
    No. 01-16034 AJG, 2006 WL 2400369 (Bankr. S.D.N.Y. May 11, 2006) ............................51

*ESI, Inc. v. Coastal Corp.*,
    61 F. Supp. 2d 35 (S.D.N.Y. 1999) ....................................................9

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,
    397 F. Supp. 3d 323 (S.D.N.Y. 2019), *rev'd on other grounds*,
    40 F.4th 56 (2d Cir. 2022) ............................................................12

*Finn v. All. Bank*,
    860 N.W.2d 638 (Minn. 2015)...........................................................48

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
    141 S.Ct. 1017 (2021)....................................................................34

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
    No. 16 Civ. 5263 (AKH), 2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017).............................16

*GEM Advisors, Inc. v. Corporacion Sidenor*, *S.A.*,
    667 F. Supp. 2d 308 (S.D.N.Y. 2009)...................................................24

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011).....................................................................33

*Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*,
    Adv. Pro. No. 10-03493 (SMB), 2014 WL 47774
    (Bankr. S.D.N.Y. Jan. 3, 2014) ...................................................................................57

*Great Lakes Dredge & Dock Co. v. Tanker Robert Watt Miller*,
    957 F.2d 1575 (11th Cir. 1992) .................................................................................47

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*,
    310 B.R. 500 (Bankr. S.D.N.Y. 2002) .......................................................................46

*Hau Yin To v. HSBC Holdings PLC*,
    No. 15CV3590-LTS-SN, 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017), *aff'd*,
    700 F. App'x 66 (2d Cir. 2017) .................................................................................16

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945) ...............................................................................................9, 39

*In re J.P. Jeanneret Assocs., Inc.*,
    769 F. Supp. 2d 340 (S.D.N.Y. 2011) .......................................................................44

*Johnson v. Holder*,
    564 F.3d 95 (2d Cir. 2009) ........................................................................................47

*Kelley v. Westford Special Situations Master Fund, L.P.*,
    No. 19-cv-1073, 2020 WL 3077151 (D. Minn. June 10, 2020) ...............................58

*Kiobel v. Royal Dutch Petroleum Co.*,
    No. 02 Civ. 7618 (KMW) (HBP), 2009 WL 3817590
    (S.D.N.Y. Nov. 16, 2009) ..........................................................................................41

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) ......................................................................................16

*Lustig v. Weisz & Assocs., Inc. (In re Unified Com. Cap., Inc.)*,
    260 B.R. 343 (Bankr. W.D.N.Y. 2001) .....................................................................48

*Lynch v. City of New York*,
    952 F.3d 67 (2d Cir. 2020) ........................................................................................44

*McGee v. Int'l Life Ins. Co.*,
    335 U.S. 220 (1957) .....................................................................................................9

*Metro. Life. Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996) ..........................................................................................9

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. BP Amoco P.L.C.*,
    319 F. Supp. 2d 352 (S.D.N.Y. 2004) .......................................................................23

*Palmieri v. Estefan*,
  793 F. Supp. 1182 (S.D.N.Y. 1992)............................................................32

*Parke-Bernet Galleries, Inc. v. Franklyn*,
  26 N.Y.2d 13 (1970) ..............................................................................24

*Picard v. ABN AMRO Bank (Ireland), Ltd. (In re Madoff)*,
  650 B.R. 24 (Bankr. S.D.N.Y. 2023)..............................45, 46, 50, 59

*Picard v. Banque Internationale à Luxembourg S.A.*,
  Adv. Pro. No. 12-01698 (CGM), 2023 WL 2504787
  (Bankr. S.D.N.Y. Mar. 14, 2023).............................................................15

*Picard v. Banque Syz (In re BLMIS)*,
  Adv. Pro. No. 11-02149 (CGM), 2022 WL 2135019
  (Bank. S.D.N.Y. June 14, 2022) ............................................... *passim*

*Picard v. BNP Paribas S.A. (In re BLMIS)*,
  594 B.R. 167 (Bankr. S.D.N.Y. 2018).............................34, 35, 39, 60

*Picard v. Bureau of Labor Ins. (In re BLMIS)*,
  480 B.R. 501 (Bankr. S.D.N.Y. 2012)...............................8, 17, 23

*Picard v. Chais (In re BLMIS)*,
  440 B.R. 274 (Bankr. S.D.N.Y. 2010)...............................31, 34, 37

*Picard v. Charles Ellerin Rev. Tr. (In re BLMIS)*,
  No. 10-04398 (BRL), 2012 WL 892514 (Bankr. S.D.N.Y. Mar. 14, 2012)....................51, 57

*Picard v. Citibank (In re Bernard L. Madoff Inv. Secs. LLC)*,
  12 F.4th 171 (2d Cir. 2021) ...............................................47, 59, 61

*Picard v. Citibank, N.A., et al.*,
  Adv. Pro. No. 10-05345 (CGM), 2022 WL 4493234
  (Bankr. S.D.N.Y. Sept. 27, 2022) .......................................................47, 56

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
  418 B.R. 75 (Bankr. S.D.N.Y. 2009)...............................................34, 37

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
  454 B.R. 317 (Bankr. S.D.N.Y. 2011)...............................45, 51, 55

*Picard v. Estate of Seymour Epstein (In re BLMIS)*,
  No. 21-cv-02334-CM, 2022 WL 493734 (S.D.N.Y. Feb. 17, 2022) ....................................45

*Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*,
  627 B.R. 546 (Bankr. S.D.N.Y. 2021) .............................................8, 9, 34

*Picard v. Fairfield Pagma Assocs., LP*,
  Adv. Pro. No. 10-05169, 2022 WL 1110560 (Bankr. S.D.N.Y. Apr. 13, 2022),
  *vacated and remanded to* 2022 WL 16751911 (Bankr. S.D.N.Y. Nov. 7, 2022)...................45

*Picard v. Gerald & Barbara Keller Fam. Trust*,
  634 B.R. 39 (Bankr. S.D.N.Y. 2021)....................................................................................45

*Picard v. Gettinger et al.*,
  976 F.3d 184 (2d Cir. 2020), *cert. denied sub nom. Gettinger v. Picard*,
  141 S. Ct. 2603 (2021)...........................................................................................................46

*Picard v. JABA Assocs. LP*,
  528 F. Supp. 3d 219 (S.D.N.Y. 2021)..............................................................................45, 50

*Picard v. Ken-Wen Fam. Ltd. P'ship*,
  638 B.R. 41 (Bankr. S.D.N.Y. 2022) ....................................................................................45

*Picard v. Lisa Beth Nissenbaum Trust*,
  No. 20 cv. 3140, 2021 WL 1141638 (S.D.N.Y. Mar. 24, 2021) ......................................45, 50

*Picard v. Maxam Absolute Return Fund, L.P.*,
  460 B.R. 106 (Bankr. S.D.N.Y. 2011) .......................................................................... *passim*

*Picard v. Mayer, et al.*,
  No. 08-01789, 2021 WL 4994435 (Bankr. S.D.N.Y. Oct. 27, 2021) .........................54, 55, 56

*Picard v. Merkin*,
  515 B.R. 117 (Bankr. S.D.N.Y. 2014) ........................................................................... *passim*

*Picard v. Merkin (In re BLMIS)*,
  581 B.R. 370 (Bankr. S.D.N.Y. 2017) ..............................................................................57, 58

*Picard v. Merrill Lynch Int'l*,
  No. 08-01789 (CGM), 2023 WL 2544212 (Bankr. S.D.N.Y. Mar. 16, 2023) .......................56

*Picard v. Multi-Strategy Fund Ltd. (In re BLMIS)*,
  641 B.R.78 (Bankr. S.D.N.Y. 2022)............................................................................... *passim*

*Picard v. Nelson*,
  610 B.R. 197 (Bankr. S.D.N.Y. 2019)...............................................................................45, 50

*Picard v. Quilvest Finance Ltd.*,
  No. 08-01789 (CGM), 2022 WL 4493184 (Bankr. S.D.N.Y. Sept. 27, 2022).......................56

*Picard v. Sage Realty*,
  No. 20-CV-10109 (JFK), 2022 WL 1125643 (S.D.N.Y. Apr. 15, 2022) .........................45, 47

viii

*Picard v. Shapiro*,
    542 B.R. 100 (Bankr. S.D.N.Y. 2015) ...............................................................................53, 54

*Picard v. Six Sis AG*,
    Adv. Pro. No. 12-01195 (CGM), 2023 WL 2998470
    (Bankr. S.D.N.Y. Apr. 18, 2023) .........................................................................................15

*Picard v. UBS AG*,
    Adv. Pro. No. 10-04285 (CGM), 2022 WL 17968924
    (Bankr. S.D.N.Y. Dec. 27, 2022)................................................................................ *passim*

*Picard v. UBS AG, UBS (Luxembourg) SA*,
    647 B.R. 42 (Bankr. S.D.N.Y. 2022) ......................................................................... *passim*

*Picard v. UBS Europe SE*,
    650 B.R. 445 (Bankr. S.D.N.Y. 2023) .................................................................................15

*In re Picard*,
    917 F.3d 85 (2d Cir. 2019)....................................................................................................40

*Roper Starch Worldwide, Inc. v. Reymer & Associates, Inc.*,
    2 F. Supp. 2d 470 (S.D.N.Y. 1998) .....................................................................................16

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007)..................................................................................................44

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
    624 F.3d 123 (2d Cir. 2010)....................................................................................................8

*SAS Grp., Inc. v. Worldwide Inventions, Inc.*,
    245 F. Supp. 2d 543 (S.D.N.Y. 2003) .................................................................................19

*Scholastic, Inc. v. Stouffer*,
    No. 99 Civ. 11480 (AGS), 2000 WL 1154252 (S.D.N.Y. Aug. 14, 2000)............................24

*Schutte Bagclosures Inc. v. Kwik Lok Corp.*,
    48 F. Supp. 3d 675 (S.D.N.Y. 2014)....................................................................................23

*Sharp Int'l Corp. v. State Street Bank & Trust Co.*,
    403 F.3d 43 (2d Cir. 2005)....................................................................................................48

*Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*,
    379 B.R. 5 (Bankr. E.D.N.Y. 2007)...........................................................................51, 52, 57

*Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*,
    450 F.3d 100 (2d Cir. 2006)..................................................................................................33

*SPV Osus Ltd. v. UBS AG*,
  882 F.3d 333 (2d Cir. 2018) .................................................................................8

*Stadt v. Univ. of Rochester*,
  921 F. Supp. 1023 (W.D.N.Y. 1996) ...................................................................24

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*,
  916 F.3d 143 (2d Cir. 2019) ............................................................................9, 34

*United States v. Henshaw*,
  388 F.3d 738 (10th Cir. 2004) ............................................................................57

*United States v. Quintieri*,
  306 F.3d 1217 (2d Cir. 2002) ..............................................................................47

*Walden v. Fiore*,
  571 U.S. 277 (2014) ......................................................................................18, 19

*Waldman v. Palestine Liberation Org.*,
  835 F.3d 317 (2d Cir. 2016) ................................................................................39

*Winston & Strawn v. Dong Won Sec. Co.*,
  No. 02 Civ. 0193 (RWS), 2002 WL 31444625 (S.D.N.Y. Nov. 1, 2002) .............42

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980) ............................................................................................16

**Statutes**

11 U.S.C. § 546(e) .................................................................................................50

11 U.S.C. § 548(a)(1)(A) ...........................................................................45, 49, 50

11 U.S.C. § 550(a)(2) .............................................................................................50

11 U.S.C. § 550(b) .................................................................................................59

**Rules**

Fed. R. Bankr. P. 7004 ...........................................................................................37

Fed. R. Civ. P. 8(a) ................................................................................................51

Fed. R. Civ. P. 8(a)(2) ...........................................................................................44

Fed. R. Civ. P. 9(b) ..........................................................................................44, 45

Fed. R. Civ. P. 12(b)(6) .........................................................................................43

N.Y. C.P.L.R. § 301 ..................................................................................................................37

N.Y. C.P.L.R. § 302 ..................................................................................................................37

**Other Authorities**

U.S. Securities and Exchange Commission Office of Investigations, *Investigation
of Failure of the SEC To Uncover Bernard Madoff's Ponzi Scheme-Public
Version* (Aug. 31, 2009), https://www.sec.gov/files/oig-5090.pdf.........................................62

## TABLE OF ABBREVIATIONS

| Botín | **Francisco Javier Botín Sanz de Sautuola O'Shea**: principal of M&B |
|---|---|
| Echeverría | **Manuel Echeverría**: ran Optimal U.S. Equity Fund, a BLMIS feeder fund; assisted M&B found and operate LIF-USEP through his relationship with Madoff |
| LIF | **Luxembourg Investment Fund SICAV**: LIF-USEP's umbrella fund |
| LIF-USEP | **Luxembourg Investment Fund U.S. Equity Plus**: BLMIS feeder fund |
| Luxalpha | **Luxalpha SICAV**: a BLMIS feeder fund |
| M&B | **M&B Capital Advisers Sociedad de Valores, S.A.**: founder, operator, and exclusive distributor of LIF-USEP. The term "M&B" also includes M&B Capital Advisers Gestión SGIIC ("M&B SGIIC"), which was involved with M&B's BLMIS investments, merged into M&B in January 2010 |
| Morenes | **Guillermo Morenes Mariategui**: principal of M&B |
| Optimal | **Optimal**: Optimal Investment Services, S.A. and Optimal U.S. Equity Fund |
| PJ Defendants | **Personal Jurisdiction Defendants**: Defendants M&B, UBSFSL, and UBSTPM, which moved to dismiss the Trustee's claims for lack of personal jurisdiction |
| Reliance | **Reliance Group**: consisted of: (1) Reliance Management (Gibraltar) Limited, LIF-USEP's investment adviser; (2) Reliance Management (BVI); and (3) defendant RIR |
| RIR | **Reliance International Research LLC**: Member of the Reliance Group, which provided research for LIF-USEP and monitored the BLMIS investment |
| UBS | **UBS**: UBS AG, UBS SA, UBSFSL, and UBSTPM |
| UBS PJ Defendants | **UBS Personal Jurisdiction Defendants**: UBSFSL and UBSTPM, which moved to dismiss the Trustee's claims for lack of personal jurisdiction |
| UBS SA | **UBS Europe SE (f/k/a UBS (Luxembourg) S.A.**: Wholly owned subsidiary of UBS AG; LIF-USEP's custodian, main distributor and paying agent |
| UBSFSL | **UBS Fund Services (Luxembourg) S.A.**: Wholly owned subsidiary of UBS AG; LIF-USEP's administrator |
| UBSTPM | **UBS Third Party Management Company S.A.**: Wholly owned subsidiary of UBS AG; LIF-USEP's management company |

Plaintiff Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L.

Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15

U.S.C. §§ 78aaa–*lll* ("SIPA") and the substantively consolidated chapter 7 estate of Bernard L.

Madoff ("Madoff"), by and through his undersigned counsel, respectfully submits this

memorandum of law in opposition to the multiple motions to dismiss (the "Motions") the

Trustee's Second Amended Complaint ("SAC") made by Defendants UBS Europe SE (f/k/a

UBS (Luxembourg) S.A.) ("UBS SA"), UBS Fund Services (Luxembourg) S.A. ("UBSFSL"),

UBS Third Party Management Company S.A. ("UBSTPM," and together with UBS SA and

UBSFSL, the "UBS Defendants"); M&B Capital Advisers Sociedad de Valores, S.A. ("M&B");

and Reliance International Research LLC ("RIR," and together with the UBS Defendants and

M&B, the "Moving Defendants").

## PRELIMINARY STATEMENT AND BACKGROUND

For some of the Moving Defendants, the Motions are a second bite at the apple. Within

the last year, this Court in *Picard v. UBS AG*, Adv Pro. No. 10-4285 (CGM) ("*Luxalpha*"),

denied nearly identical motions to dismiss filed by a group of similarly situated service

providers—including the same UBS entities now here before the Court. *Picard v. UBS AG*, Adv.

Pro. No. 10-04285 (CGM), 2022 WL 17968924 (Bankr. S.D.N.Y. Dec. 27, 2022) ("*Luxalpha*

*UBS Decision*"); *Picard v. UBS AG, UBS (Luxembourg) SA*, 647 B.R. 42 (Bankr. S.D.N.Y.

2022) (Morris, J.) ("*Luxalpha Access Decision*"). LIF-USEP was the Luxalpha fund's sister

fund. (SAC ¶¶ 8, 130.) Its service providers played the same role Luxalpha's service providers

played. Each fund was set up in the same way—to obscure Madoff's control from Luxembourg

regulators—and for the same purpose—to direct money to and withdraw profit from BLMIS in

New York. (SAC ¶¶ 18, 74.) Perhaps even more importantly, each fund was set up despite its

founders' prior exposure to ample evidence of fraud indicating that BLMIS was not what it purported to be. (SAC ¶¶ 3, 6–7, 101, 116–29, 179, 181, 236, 267.) Why was this done? The answer is simple—the potential for profit was too good to pass up. As UBS Managing Director, and member of Luxalpha's and LIF-USEP's board, Berndt Stiehl said, after being presented with evidence raising the specter of fraud at BLMIS, "Business is business. We cannot permit ourselves to lose 300 million. Accept client." (SAC ¶ 122.) The Moving Defendants created LIF-USEP for one purpose only—to invest with BLMIS in New York and to profit from that endeavor. (SAC ¶¶ 1, 18, 74.) That was LIF-USEP's *raison d'être* just as it was Luxalpha's. (SAC ¶¶ 8, 65, 130.) The outcome of the Motions here should therefore be no different than the outcomes of the *Luxalpha* motions to dismiss. *See Luxalpha UBS Decision*, 2022 WL 17968924; *Luxalpha Access Decision*, 647 B.R. 42.

### *The Moving Defendants Established LIF-USEP*

The Moving Defendants were essential to LIF-USEP's formation, with each of them playing a part to create the impression that LIF-USEP was a well-regulated UCITS fund,[1] when in reality all substantive roles—except for attracting investors—were sub-delegated to BLMIS. M&B, which admits that LIF-USEP would not have existed without it, spurred the genesis of the fund, through its desire to get direct access to BLMIS. (SAC ¶¶ 86, 92.) Together with the other Defendants, they performed the day-to-day functions necessary to market the fund to European investors and direct the investors' moneys into and out of BLMIS—the sole destination of LIF-USEP's investment capital. (SAC ¶¶ 44, 65, 69–70, 86, 89, 169, 259.)

LIF-USEP's founders—the Moving Defendants—were well connected European investment professionals with prior experience investing with BLMIS. For more than a decade

---

[1] A fund compliant with the EU directive entitled, "Undertakings for Collective Investments in Transferable Securities," or "UCITS." A UCITS fund could be marketed to retail investors. (SAC ¶ 4.)

before the fund was established, Manuel Echeverría (one of LIF-USEP's principal architects) ran

Optimal, a $3.2 billion Banco Santander-owned BLMIS feeder fund. (SAC ¶ 2.) Madoff

regarded Echeverría as his top European envoy. (SAC ¶¶ 90–91.) Morenes and Botín, close

friends of Echeverría, were members of the Santander dynasty, and for many years, their

investment company, M&B, invested with BLMIS through Optimal. (SAC ¶¶ 88, 91.) But

Morenes and Botín were not content with indirect access to BLMIS and they lobbied Echeverría

to help them open a new BLMIS feeder fund that would give them direct access (and allow them

to collect fees, which investing through other funds deprived them of). (SAC ¶¶ 88–89.)

Echeverría agreed. (SAC ¶ 93.) He approached UBS, which he knew had recently set up

Luxalpha as a UCITS fund and asked UBS to structure LIF-USEP the same way. (SAC ¶¶ 94–

97.) UBS eagerly assisted. As with, Luxalpha, Defendants UBS SA, UBSFSL, and UBSTPM

were set up to serve as LIF-USEP's official custodian, administrator, and portfolio manager.

(SAC ¶¶ 77, 97, 117.) UBS also populated LIF-USEP's board with its own employees, many of

whom were also Luxalpha board members. (SAC ¶¶ 68, 98, 258, 260.) To round out the team,

Echeverría enlisted Reliance as LIF-USEP's nominal investment advisor. (SAC ¶ 259.) RIR was

part of Reliance, run by Echeverría's friend, Tim Brockmann, who, like M&B, had previously

invested with Madoff through other BLMIS feeder funds, and who, like M&B, was eager to

capitalize on this newfound direct access to BLMIS. (SAC ¶ 95.)

*The Moving Defendants Directed Their Activities to New York While Being Exposed to Evidence
of Madoff's Fraud*

Each of the Moving Defendants knew that: (1) Madoff ran BLMIS out of New York; (2)

all of the money received from clients to invest in LIF-USEP would be deposited with BLMIS in

New York; (3) BLMIS in New York would have custody over LIF-USEP investments rather

than a UBS entitiy; (4) LIF-USEP's investment strategy was simply to dump all of its investors'

3

funds into BLMIS in New York, where those funds would be managed by Madoff; (5) any and all profit made from investing with BLMIS would emanate from New York; and (6) warnings that Madoff could very well be a fraud, maybe even "the biggest Ponzi scheme in history" abounded in both the investment industry and internally, within each Moving Defendant. (SAC ¶¶ 1, 18, 74, 99, 109, 150.)

Through Optimal due diligence, Echeverría knew that BLMIS's options strategy was "an obvious impossibility" and that there was a chance that "the trade[s] actually d[id]n't take place." (SAC ¶¶ 108, 111.) Nonetheless, he helped M&B open LIF-USEP. And once LIF-USEP was up and running, Echeverría learned additional facts that further exposed the existence of fraud at BLMIS. (SAC ¶¶ 114, 174–77.) For its part, UBS knew as early as the 1990s that Madoff's performance was "impossible." (SAC ¶¶ 6, 124, 126.) One UBS AG employee remarked (noting the dangers of combining brokerage and custodian functions under the same roof): "We normally give 'NO' as the answer in cases like Madoff." (SAC ¶ 120.) Another UBS employee warned that no one at BLMIS could credibly explain Madoff's strategy or how it could generate the purported returns Madoff claimed and that Madoff should be avoided. (SAC ¶¶ 119–21, 126–29.) For years, including the period during which UBS helped create LIF-USEP, UBS's Private Wealth Management Group placed Madoff on its "non-approved" list for direct investment and derivative products. (SAC ¶¶ 6, 123.) And while UBS was unwilling to invest its Private Wealth clients with BLMIS, it happily generated fees for facilitating other people's investments. (SAC ¶¶ 6–7, 123.) UBS knew the risk of BLMIS investment should "not be underestimated," but recognized that such investment "would be advantageous on the income side." (SAC ¶ 121.) Likewise, when an RIR employee observed and reported instances of impossible trades and

multiple indicia of fraud at BLMIS, Reliance chose to ignore this information because BLMIS
was Reliance's "sacred cow." (SAC ¶¶ 11, 191.)

All of the Defendants in this action, including the Moving Defendants, deliberately and
improperly concealed BLMIS's role as LIF-USEP's de facto investment manager and custodian
from the Luxembourg financial regulator, the CSSF. (SAC ¶¶ 130–38.) Like Luxalpha, LIF-
USEP was a UCITS fund, subject to a strict regulatory framework to protect retail investors.
(SAC ¶ 131.) Luxembourg's UCITS regulations required LIF-USEP's custodian—which the
CSSF understood to be UBS SA—to safeguard the fund's assets. (SAC ¶ 136.) But unknown to
the CSSF, UBS SA had, in contravention of Luxembourg law, sub-delegated its custodial and
management duties to BLMIS and unlawfully hid that delegation from the CSSF and from the
retail investors that LIF-USEP targeted. (SAC ¶¶ 136–38.) At the same time, UBSFSL, LIF-
USEP's administrator, which was tasked with independently verifying BLMIS's reported
transactions, did nothing more than calculate the fund's purported NAV based on false data
provided by BLMIS, resulting in meaningless accounting records with no independent
verification. (SAC ¶¶ 155–56.) UBS knew, as did the remaining Defendants, that there was no
way to verify Madoff's trading activity. (SAC ¶ 174.) This structure allowed the Defendants to
earn fees for serving in illusory oversight and advisory roles that allowed Madoff to perpetuate
the Ponzi scheme.

### The Moving Defendants Repeat Already Failed Arguments

Last year, the Trustee filed his second amended complaint against Luxalpha and its
service providers, leading to motion practice that ultimately resulted in this Court's denial of all
the service providers' motions to dismiss in that action in late 2022. *See, e.g.*, *Luxalpha UBS
Decision*, 2022 WL 17968924; *Luxalpha Access Decision*, 647 B.R. 42. The Moving

5

Defendants' arguments here parrot those made by the *Luxalpha* defendants. As in *Luxalpha*, the

Court should reject the pending motions to dismiss here. The UBS Defendants' motion here, like

it was in *Luxalpha*, is based on (i) lack of personal jurisdiction, (ii) section 546(e) barring the

Trustee's claims; (iii) the SAC's purported deficiency in pleading BLMIS's actual intent to

defraud; (iv) the SAC's purported establishment of UBS's good faith; and (v) the Trustee's

purported failure to properly allege that UBS received customer property. As a threshold matter,

UBS's section 546(e) argument has no place here. The Trustee seeks to recover only two-year

transfers under section 548(a)(1)(A) to which section 546(e) does not apply. The remainder of

these arguments—made here by the same UBS entities acting in the same roles at the same times

for a virtually identical fund—were considered and rejected by this Court. *See Luxalpha UBS*

*Decision*, 2022 WL 17968924. The Court also found, as it has in more than *sixty* of the Trustee's

other actions, that (i) the Ponzi scheme presumption applies and that the Trustee has nevertheless

pleaded sufficient badges of fraud for purposes of Rule 9(b); (ii) all elements of the good faith

defense are a defendant's burden to plead and prove; and (iii) the Trustee need only show the

relevant "pathways" of funds transferred from BLMIS to a defendant, and need neither plead

every subsequent transfer with particularity nor trace every dollar to BLMIS at this stage. (*Id.*)

Like UBS, M&B also challenges personal jurisdiction. But in M&B's own words, there

would be no LIF-USEP but for M&B. (SAC ¶ 92.) LIF-USEP was created so that M&B could

get *direct access* to BLMIS in New York. (SAC ¶ 2.) M&B regularly communicated with

Madoff, BLMIS personnel and New York-based RIR employees in order to deepen its BLMIS

relationship and income base. (SAC ¶¶ 17, 172–73, 261–62.) And M&B received fees that were

derived from BLMIS's activities, which were exclusively undertaken in New York. (SAC ¶¶ 92,

6

171, 270, 272.) These were not random, fortuitous contacts. They are the definition of purposeful availment.

M&B's and RIR's argument concerning the Trustee's alleged failure to properly trace customer property should also fail. The Trustee alleges that M&B received at least $9,803,268 in subsequent transfers from LIF-USEP (SAC ¶ 272) and that RIR received at least $4,324,482 in subsequent transfers from LIF-USEP. (SAC ¶¶ 270, 273.) The Trustee further describes how the transfers flowed from LIF-USEP to these defendants and explains his basis for arriving at each figure by detailing the services M&B and RIR performed and the fees M&B and RIR received for those services. (SAC ¶¶ 171, 259, 270, 272–73.) Finally, the Trustee also demonstrates the "pathways" from BLMIS to each of the defendants. (SAC ¶ 276.) The Trustee has therefore met his burden at the pleading stage.

For these reasons, and as set forth below, the Trustee respectfully requests that the Motions be denied.

## ARGUMENT

## I.    THE COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANTS

This Court has personal jurisdiction over the Defendants moving to dismiss on personal jurisdiction grounds (the "PJ Defendants") because: (i) the PJ Defendants each had sufficient minimum contacts with the forum to have purposefully availed themselves of the benefits and privileges of investing in New York; and (ii) the exercise of jurisdiction over the each of the PJ Defendants would be reasonable.

"To survive a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, the Trustee must make a prima facie showing that jurisdiction exists." *See Picard v. Banque Syz (In re BLMIS)*, Adv. Pro. No. 11-02149 (CGM), 2022 WL 2135019, at *2 (Bankr. S.D.N.Y. June 14, 2022) (internal quotation marks

omitted) (quoting *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018)); *see also*

*Dorchester Fin. Sec. Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013). "At this

preliminary stage, 'the plaintiff's prima facie showing may be established solely by allegations.'"

*Banque Syz*, 2022 WL 2135019, at *2 (quoting *Dorchester Fin.*, 722 F.3d at 84–85). A plaintiff

also may establish a *prima facie* case for jurisdiction through affidavits and supporting materials

that contain averments of facts outside the pleadings. *See S. New England Tel. Co. v. Glob. NAPs

Inc.*, 624 F.3d 123, 138 (2d Cir. 2010). The pleadings and affidavits must be construed "in the

light most favorable to plaintiffs, resolving all doubts in their favor." *Chloé v. Queen Bee of

Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010).

"In order to be subjected to personal jurisdiction in the United States, due process

requires that a defendant have sufficient minimum contacts with the forum in which defendant is

sued such that the maintenance of the suit does not offend traditional notions of fair play and

substantial justice." *Picard v. Multi-Strategy Fund Ltd. (In re BLMIS)*, 641 B.R. 78, 85 (Bankr.

S.D.N.Y. 2022) (internal quotation marks omitted) (quoting *Picard v. Bureau of Labor Ins. (In re

BLMIS)*, 480 B.R. 501, 516 (Bankr. S.D.N.Y. 2012) ("*BLI*")). A court may exercise general or

specific personal jurisdiction based on the nature of the defendant's contacts with the forum. *See

Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 473 (S.D.N.Y. 2001). Specific jurisdiction

exists where the defendant purposely directs its activities into the forum "and the underlying

cause of action arises out of or relates to those activities." *Picard v. Fairfield Greenwich Grp. (In

re Fairfield Sentry Ltd.)*, 627 B.R. 546, 566 (Bankr. S.D.N.Y. 2021) (citing *Cromer*, 137 F.

Supp. 2d at 473).

The specific jurisdiction analysis is a two-step inquiry. First, the court assesses whether

the defendant established "minimum contacts" in the forum, such that the defendant purposely

availed itself of the privilege of conducting activities within the forum. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–76 (1985). Even a "single transaction" within the forum can constitute purposeful availment. *Picard v. Maxam Absolute Return Fund, L.P.*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011) (*citing McGee v. Int'l Life Ins. Co.*, 335 U.S. 220, 223 (1957)). Minimum contacts may be found when a "'defendant's allegedly culpable conduct involves at least in part financial transactions that touch the forum.'" *In re Fairfield Sentry Ltd.*, 627 B.R. at 566 (*quoting U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 151 (2d Cir. 2019)).

Second, the court determines whether the exercise of personal jurisdiction would be "reasonable," such that it will not offend the traditional notions of "fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 320. To determine whether its exercise of personal jurisdiction over a defendant would be reasonable, courts consider the following factors:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Metro. Life. Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) (citations omitted). Where the plaintiff has alleged purposeful availment, "the burden shifts to the defendant to present a 'compelling case' that jurisdiction would be unreasonable." *In re Fairfield Sentry Ltd.*, 627 B.R. at 567 (*citing Burger King*, 471 U.S. at 472–73).

In determining whether a defendant's contacts with the forum suffice to establish personal jurisdiction, the Court must look at the "totality of the circumstances," not at each contact in isolation. *See, e.g.*, *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996); *ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 59 (S.D.N.Y. 1999) ("[W]e

are directed by the Second Circuit to look at the 'totality of the circumstances'" in a personal

jurisdiction analysis) (internal citation omitted). In this case, the totality of the circumstances

demonstrates that the PJ Defendants each purposely availed themselves of the protections and

privileges of conducting business in New York and that the exercise of personal jurisdiction over

the PJ Defendants is reasonable. *Banque Syz*, 2022 WL 2135019, at *4 (holding that defendant's

contacts with New York were not "random, isolated, or fortuitous" where defendant intentionally

directed investment activity to BLMIS in New York and solicited clients to invest in BLMIS

feeder funds).

### A.    THE TRUSTEE PLEADS SUFFICIENT MINIMUM CONTACTS FOR THE PJ DEFENDANTS

#### 1.    The Trustee Sufficiently Alleges that M&B Purposefully Availed Itself of the Privilege of Doing Business in New York

"Without M&B [LIF-USEP] would not be possible." (SAC ¶ 92; Declaration of Geoffrey

A. North, dated July 14, 2023 ("North Decl."), Ex. 1, at UBSVAB0002166 ¶ 1; Ex. 2, at

UBSVAA003067 ¶ 1 (Consultancy and Exclusive Introducing Agreement whereby UBS SA

appointed M&B, the Principal Agent, "as consultant and exclusive introducing agent for" LIF-

USEP and M&B was to "provide information on potential investors ('Prospects') to [LIF-

USEP]; and to procure Prospects/Investors to" LIF-USEP).) M&B's director, Juan Carlos

Rodriguez Hergueta, wrote these words shortly after the fund had launched in an effort to justify

the fees M&B was to receive as a service provider. Hergueta was right. M&B was vital to

BLMIS feeder fund LIF-USEP's establishment and operations. (SAC ¶ 86; North Decl. Ex. 1, at

UBSVAB0002166 ¶ 1; *see also* Ex. 3, at 184:3–4 ("M&B is at the origin or the impetus for

creating the fund . . . .").) Through LIF-USEP and other BLMIS feeder funds, M&B directed

vast sums of money for investment into BLMIS and M&B profited handsomely from these

efforts. (SAC ¶¶ 12, 86, 92, 99, 272.) LIF-USEP's *raison d'être* was to direct funds to BLMIS in New York for investment and profit.

M&B's roots in the Madoff scheme ran deep. M&B had, for years, prior even to the creation of LIF-USEP, arranged for its clients' purchase of shares in BLMIS feeder funds Optimal Strategic U.S. Equity Limited and Plaza Investment International Ltd. (Declaration of Juan Carlos Rodriguez Hergueta, dated May 4, 2023 ("Hergueta Decl.") ¶ 24 (ECF No. 293).) But M&B's principals, Morenes and Botín wanted direct access to Madoff for their wealthy clientele. (SAC ¶ 2.) Through the creation of LIF-USEP, Echeverría provided M&B with that direct access.

Morenes and Botín, respectively the son-in-law and the son of Banco Santander's CEO, and both integral members of the bank's controlling family, befriended Echeverría when the three of them worked together at Banco Santander. (SAC ¶ 91.) They knew that Echeverría was Madoff's point of contact for a $3.2 billion BLMIS feeder fund, Optimal, and that Echeverría was one of Madoff's top envoys. (SAC ¶¶ 2, 91.) Although Morenes and Botín were familiar with Madoff through M&B's placement of clients with Optimal, M&B had remained a frustrating step removed from Madoff, forced to invest through other feeder funds. (SAC ¶ 88.) This limited M&B's ability to charge significant fees. (*Id.*)

Hungry for direct access to Madoff, M&B approached Echeverría in 2004 and urged him to set up LIF-USEP as a direct BLMIS investment vehicle for them. (SAC ¶ 92; North Decl. Ex. 3, at 166:15–167:25, 175:10–23.) M&B's business model vis-à-vis LIF-USEP was simple—direct money into BLMIS and charge significant fees for "investment services." LIF-USEP suited that strategy perfectly—LIF-USEP's <u>sole</u> purpose was to direct investment funds into BLMIS in New York, for which M&B would earn fees. (SAC ¶¶ 1, 171, 270, 272.) And once

LIF-USEP was up and running, M&B set its sights on further expanding direct access to Madoff, launching two additional BLMIS feeder funds—Landmark Investment Fund ("Landmark") and Defender Limited Fund ("Defender"). (SAC ¶¶ 179–80.) Like LIF-USEP, the sole purpose of these two funds was to feed and profit from BLMIS's New York-based investment activity. (*Id.*) These investments into BLMIS would not have been possible without M&B. There was nothing fortuitous or unintended about these endeavors—M&B was purposeful in its actions.

Nevertheless, M&B would like this Court to believe that its contacts with New York were random or attenuated. (M&B's Mem. of Law In Supp. of its Mot. to Dismiss the SAC, ECF No. 292 ("M&B Mot.") at 7.) They were anything but. M&B purposefully directed investments into BLMIS in New York. (SAC ¶¶ 1, 4, 18, 65, 89, 99, 169, 179–80.) M&B provided critical services to LIF-USEP and other BLMIS feeder funds in furtherance of knowingly directing its clients' investments into BLMIS. (SAC ¶¶ 4, 86, 92, 169, 179, 259.) Indeed, the flow of European investor funds M&B directed to LIF-USEP was essential for LIF-USEP's establishment as well as its growth and operations (just as it was essential for BLMIS to perpetuate its fraud). (SAC ¶¶ 86, 88, 169.) M&B regularly communicated with New York-based RIR employees, Madoff himself, and BLMIS personnel in furtherance of M&B's services. (SAC ¶¶ 17, 86, 170, 172–73, 261.) M&B received fees for the services it provided to LIF-USEP— crucially, these fees all derive from commercial activity purposefully undertaken in New York, activity that, again, would not have been possible without M&B. (SAC ¶¶ 92, 171, 270, 272.) Any of these contacts in isolation would be sufficient to subject M&B to jurisdiction; in their totality, they overwhelmingly establish that M&B purposefully directed its activities to New York. *See Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 397 F. Supp. 3d 323, 344 (S.D.N.Y. 2019), *rev'd on other grounds*, 40 F.4th 56 (2d Cir. 2022) ("[C]onsidered

together," defendant's contacts clearly demonstrate that it "purposely availed itself of the

forum.").

     As discussed below, the Trustee's allegations more than plausibly show that M&B's

contacts with New York are sufficient to establish minimum contacts for specific jurisdiction.

> ### a.    M&B Directed Investment Into BLMIS in New York Through LIF-USEP and Other BLMIS Feeder Funds

     Without the European investor funds that M&B directed to LIF-USEP for investment

with BLMIS in New York, LIF-USEP would not have existed. (SAC ¶ 92; *see also* North Decl.

Ex. 3, at 184:3–4; Ex. 1, at UBSVAB0002166 ¶ 1; Ex. 2, at UBSVAA003067 ¶ 1.) M&B created

and ran LIF-USEP, which invested $758 million with BLMIS, as its own BLMIS feeder fund.

(SAC ¶¶ 169, 259.) LIF-USEP was wholly invested with BLMIS—its *sole purpose* was to invest

with and profit from BLMIS's operations. (SAC ¶ 65.) As LIF-USEP's <u>exclusive</u> distributor,

M&B collected millions of dollars in fees as a direct result of LIF-USEP's operations. (SAC ¶¶

92, 171, 259, 272; North Decl. Ex. 2, at UBSVAA003067 ¶ 4 ; Ex. 4, at LIFVAA0000829;

Hergueta Decl. ¶ 12.) Because M&B provided essential services to LIF-USEP, inextricably tying

these two entities together, M&B is subject to this Court's jurisdiction. *Cromer*, 137 F. Supp. 2d

at 476–77 (finding that a foreign fund administrator was subject to jurisdiction given "the quality

and nature of [its] relationship with the United States, arising out of [its] work for the [f]und");

*Banque Syz*, 2022 WL 2135019, at *4 (finding sufficient minimum contacts based on investment

activity intentionally directed to New York).

13

M&B concedes in the Hergueta Declaration that it performed various services directed at New York for LIF-USEP. (Hergueta Decl. ¶¶ 12, 14, 19[2]; SAC ¶¶ 86, 92, 259.) For example, M&B distributed LIF-USEP's investments to clients and consulted with LIF-USEP and UBS on the types and liquidity of LIF-USEP's shares and on the amount and allocation among share classes of management fees. (Hergueta Decl. ¶¶ 12, 14.) M&B also edited the LIF-USEP Prospectus and Procedures regarding the fund's investment policy, fees, and other procedures, sending those edits to individuals in New York, including Justin Lowe of RIR. (*See generally* North Decl. Ex. 5.) M&B also received LIF-USEP's account statements and trade confirmations describing BLMIS's purported purchase and sale of securities, all of which took place in New York. (SAC ¶ 259.)

As noted above, M&B also used Landmark and Defender to capture foreign investment and direct it to BLMIS. (SAC ¶¶ 179–80.) To ensure a steady stream of fees, M&B installed itself as a service provider to these new feeder funds, and in doing so, performed duties directed at New York. (*Id.*) For example, M&B was behind Landmark's creation and advised on Landmark's structure. (Ruiz Decl. ¶ 16.) Hergueta executed Landmark's BLMIS account opening agreements, which were transmitted to BLMIS. (North Decl. Ex. 6.) Through these agreements, M&B delegated all management authority for Landmark to BLMIS. It also delegated custodial authority to BLMIS through a sub-custodian agreement. (North Decl. Ex. 7, at RIRSA10000153–54; Ex. 8, at AMF00078666.) M&B acted as "the principal of the [Landmark] account" in a Trading Authorization Directive signed by Madoff. (North Decl. Ex.

---

[2] M&B's declarations filed concurrently with its prior 2012 motion to dismiss and M&B's Motion are inconsistent. In 2012, Luis Antonio Garda-Izquierdo Ruiz stated that M&B acted as the exclusive distributor of LIF-USEP in Spain and Portugal since 2006 (Declaration of Mr. Luis Antonio García-Izquierdo Ruiz, dated March 28, 2012 ("Ruiz Decl.") ¶ 10 (ECF No. 104–1)), whereas in 2023, Hergueta stated M&B acted as the exclusive distributor of LIF-USEP from 2005 through 2008. (Hergueta Decl. ¶ 12.)

8, at AMF00078666–67; Ex. 9; Ex. 10 (listing M&B's address as Landmark's alternate address);

Ex. 11 (same).) M&B also requested Landmark's trade tickets describing BLMIS's purported

purchase and sale of securities, all of which took place in New York. (North Decl. Ex. 8, at

AMF00078667.)

　　　　M&B argues that this action is distinguishable from recent cases in which this Court

found personal jurisdiction over defendants because the Trustee did not specifically allege that

M&B "knowingly directed funds to be invested with and then redeemed from New York-based

BLMIS." (M&B Mot. at 10 (citing *Picard v. Six Sis AG*, Adv. Pro. No. 12-01195 (CGM), 2023

WL 2998470, at *2 (Bankr. S.D.N.Y. Apr. 18, 2023); *Picard v. UBS Europe SE*, 650 B.R. 445,

460 (Bankr. S.D.N.Y. 2023); *Picard v. Banque Internationale à Luxembourg S.A.*, Adv. Pro. No.

12-01698 (CGM), 2023 WL 2504787, at *3 (Bankr. S.D.N.Y. Mar. 14, 2023)).) But the Trustee

need not plead those exact words—the sum and substance of the Trustee's allegations is that

M&B knowingly directed funds to be invested with and then redeemed from LIF-USEP and

Landmark. (SAC ¶¶ 1, 4, 86, 92, 99, 270, 272.) And in the cases to which M&B points, the Court

based personal jurisdiction on the Trustee's allegations, not the recitation of a specific phrase. *Six

Sis AG*, 2023 WL 2998470, at *3–4 (Trustee also alleged, *inter alia*, that defendant used New

York bank accounts to receive redemptions and remit subscriptions); *UBS Europe SE*, 650 B.R.

at 460–61 (Trustee also alleged, *inter alia*, extensive communications between defendant and

New York FGG employees to discuss investments with Fairfield and the receipt of fees for

promoting Fairfield funds); *Banque Internationale à Luxembourg S.A.*, 2023 WL 2504787, at *4

(Trustee also alleged, *inter alia*, that "representatives of Dexia Banque engaged in 'numerous

communications' and even met with Fairfield Greenwich Group and other feeder fund executives

in New York regarding the Dexia Banque's investments."). The Trustee has made similar

allegations as to specific jurisdiction with respect to M&B. They are discussed *infra* at Sections
I.A.1.b & c.

M&B further argues that it did not seek the protections or benefits of New York law
because it never had any presence in the United States. (M&B Mot. at 9.) This argument is
disingenuous. M&B need not have set foot in the United States to be subject to personal
jurisdiction here. "[W]here . . . the conduct that forms the basis for the controversy occurs
entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore
in-forum effects harmful to the plaintiff . . . the exercise of personal jurisdiction may be
constitutionally permissible if the defendant expressly aimed its conduct at the forum."
*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 Civ. 5263 (AKH), 2017 WL
3600425, at *7 (S.D.N.Y. Aug. 18, 2017) (quoting *Licci ex rel. Licci v. Lebanese Canadian
Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013)). M&B's reliance on *World-Wide Volkswagen
Corp. v. Woodson* is misplaced. (M&B Mot. at 9 (citing *World-Wide Volkswagen Corp. v.
Woodson*, 444 U.S. 286, 295 (1980)).) In that case the defendant carried on "no activity
whatsoever" in the forum state and availed itself of no privileges or benefits under the laws of
the forum—entirely different circumstances from those present here.

M&B next asserts that its contacts with the forum were insufficient to "project" it into
New York. (M&B Mot. at 7–8.) But M&B relies on cases concerning services owed under
foreign contracts involving only incidental contacts with New York. (*See* M&B Mot. at 7–8
(*citing Hau Yin To v. HSBC Holdings PLC*, No. 15CV3590-LTS-SN, 2017 WL 816136, at *5–6
(S.D.N.Y. Mar. 1, 2017), *aff'd*, 700 F. App'x 66 (2d Cir. 2017) (finding "communications and
payments were incidental consequences of fulfilling a foreign contract and are insufficient to
'project' the Foreign Defendants into New York."); *Roper Starch Worldwide, Inc. v. Reymer &*

16

*Associates, Inc.*, 2 F. Supp. 2d 470, 473–74 (S.D.N.Y. 1998) (action for breach of contract and

unjust enrichment where defendant's actions did not show continuous contacts sufficient to

confer personal jurisdiction)).) This case, by contrast, is more like another of the Trustee's cases,

*BLI*, which, like the claims against M&B, arose out of a foreign contract that caused the party to

"project" itself into New York. In *BLI*, the relevant conduct was more than just fortuitous or

incidental to a foreign contract. 480 B.R. at 513–14. There, "'the ultimate objective' and the

'*raison d'etre*' of the Agreement between BLI and [the feeder fund]" was to move money to and

from BLMIS in the United States. *Id.* at 513; *see also Maxam*, 460 B.R. at 116–20 (finding

jurisdiction where defendant knew and intended that funds invested with BLMIS feeder fund

would be sent to New York for investment by BLMIS in New York).

There is nothing fortuitous or incidental about M&B's contacts with New York. LIF-

USEP's *raison d'être* was, as M&B intended it to be, to invest with BLMIS. (SAC ¶¶ 1, 65.) It

had no other function. M&B designed this structure to enable M&B to profit from BLMIS's

lucrative scheme. (SAC ¶¶ 65, 92, 272.) Through LIF-USEP and other BLMIS feeder funds,

M&B facilitated the investment of at least €150 million into BLMIS of its clients' private and

institutional capital. (SAC ¶ 169; North Decl. Ex. 12, at RIRSAG0000349–50.) By the time

Madoff was arrested in December 2008, LIF-USEP had deposited over $758 million with

BLMIS. (SAC ¶ 169.) M&B also made significant proprietary investments in LIF-USEP, and

received at least $3,779,187 from LIF-USEP in connection with its proprietary investments,

making it a net winner.[3] (SAC ¶ 272.) Thus, M&B knowingly directed funds to be invested with

New York-based BLMIS through LIF-USEP. *BLI*, 480 B.R. at 506 (finding that specific

---

[3] As discussed *infra* at Section I.A.1.c, because of the paucity of information available to the Trustee, there is a lack
of clarity about the amounts of M&B's proprietary investments. It is clear, however, that M&B invested and
redeemed significant amounts from LIF-USEP. The details of those transfers would, of course, be the subject to the
Trustee's discovery.

jurisdiction plainly extends to a subsequent transferee that directs "tens of millions of dollars in [Madoff feeder funds] with the specific goal of having funds invested in BLMIS in New York, with the intent to profit therefrom.").

M&B relies on *Walden v. Fiore*, 571 U.S. 277 (2014) arguing that "[m]ere knowledge that LIF-USEP would invest in New York [] does not support jurisdiction." (M&B Mot. at 10.) *Walden* has no application here. *Walden* was decided under the "effects test," used to assess personal jurisdiction in intentional tort cases, and that test focuses on injuries in a forum state based on tortious activity outside of that forum. In *Walden*, the court found that defendant's out-of-state "actions . . . did not create sufficient contacts with [the forum] simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections." *Walden*, 571 U.S. at 289. Although it was foreseeable that the unlawful seizure at issue in that case would harm plaintiffs in their home state of Nevada, the Court found that the defendant's conduct neither occurred in, nor was directed toward Nevada. *Id.* at 288–91. Rather, the harm occurred in Nevada solely because the plaintiffs chose to be in Nevada when they used the seized funds. *Id.* at 290. *Walden* simply reaffirms the well-established principle that personal jurisdiction cannot be premised solely on a plaintiff's unilateral contacts with the forum state. *See id.* at 284.

The Trustee's case is not like *Walden* because the Trustee does not allege personal jurisdiction based upon the foreseeable place of an injury. Rather, as in *BLI*, the Trustee alleges that M&B purposefully availed itself of the benefits and laws pertaining to investing in New York. M&B launched LIF-USEP to invest its assets with, and to profit from, BLMIS. (SAC ¶¶ 1, 4, 65, 92.) *See Burger King*, 471 U.S. at 471–74 (noting that due process allows for personal jurisdiction where an out-of-state defendant purposely directs his activities at residents of the

18

forum state and purposely benefits from those activities). Nothing in *Walden* precludes a finding

of jurisdiction over M&B, or has any bearing on *BLI*'s holding.

> **b.      M&B Regularly Communicated With Madoff, BLMIS and
> RIR Personnel in New York**

M&B asserts that "[e]xcept as stated in paragraph 19 [of its declaration], neither M&B

SA, nor M&B SGIIC, nor any of their employees, has ever communicated regularly with anyone

in the United States regarding BLMIS or LIF-USEP." (Hergueta Decl. ¶ 20.) Contrary to M&B's

assertion, the Trustee sufficiently alleges that M&B was in regular communication with Madoff,

BLMIS, and New York-based RIR with respect to the BLMIS feeder funds' activities, subjecting

it to this Court's jurisdiction.[4] (SAC ¶¶ 17, 86, 170, 172, 257); *SAS Grp., Inc. v. Worldwide

Inventions, Inc.*, 245 F. Supp. 2d 543, 549–50 (S.D.N.Y. 2003) (finding jurisdiction over

defendant who traveled to New York for meeting to develop business relationship); *see also

Burlington Indus., Inc. v. Salem Int'l Co.*, 645 F. Supp. 872, 874–75 (S.D.N.Y. 1986) (finding

jurisdiction over defendant based on two meetings in New York). In addition, as M&B's agent,

Echeverría regularly communicated and met with Madoff and New York-based RIR employees

to further expand BLMIS investment. *See infra* at I.A.1.d. And there was a steady flow of

information from Echeverría to M&B. After meetings with Madoff and RIR employees, he

reported to M&B.

M&B admits in its declaration that M&B met with Madoff and BLMIS personnel on

several occasions. (Hergueta Decl. ¶¶ 18–19; SAC ¶¶ 17, 170.) For example, Hergueta declares

that "[i]n M&B SA's capacity as investment adviser of the then newly created Landmark . . . ,

two representatives of M&B SA met with Frank Di Pascali of [BLMIS] . . . in November 2007

---

[4] The Trustee's insight into M&B's communications is limited because M&B never produced any documents in
Rule 2004 discovery. *See supra* at Section I.A.1.c.

relating to Landmark . . . ." (Hergueta Decl. ¶ 18.) During that meeting, Frank Di Pascali

discussed the implementation of the Landmark trading agreement and the BLMIS stock strategy.

(Hergueta Decl. ¶ 18.) Landmark had the same strategy as LIF-USEP—to invest exclusively

with BLMIS. Whenever M&B gained information in meetings about one fund, that information

immediately flowed to all other Madoff funds with which M&B was involved. (SAC ¶¶ 179–80.)

       With LIF-USEP in place, Morenes did everything he could to further his relationship

with Madoff. M&B acknowledges that Morenes visited New York and met with Madoff once in

2007 to "get to know Mr. Madoff . . . personally" and once in 2008 before Madoff's arrest.

(Hergueta Decl. ¶ 18.) M&B argues that, during these meetings, Morenes did not discuss any

BLMIS accounts. (Hergueta Decl. ¶ 18.) Given that M&B's sole purpose with respect to the

feeder funds was to invest into BLMIS, these meetings were undeniably in furtherance of the

BLMIS investment. (SAC ¶ 1.) The narrow, self-serving characterizations of the meetings it

proffers in its motion do not affect the jurisdictional analysis. These meetings and

communications with Madoff and BLMIS, relate directly to the Trustee's claims and are relevant

contacts for establishing the existence of specific jurisdiction. (SAC ¶¶ 86, 170.) As the Trustee's

investigation has uncovered, it was mutually beneficial for both M&B and Madoff for their

relationship to expand: for Madoff, it meant more capital and legitimacy from the family that

controlled Banco Santander to fuel the Ponzi scheme, and for M&B, it meant more investment

opportunities, and more fees and more profit. Without these meetings in New York, M&B could

not have maintained the close relationship with BLMIS that enabled it to service and market its

Madoff feeder funds. As Justin Lowe of RIR testified, Madoff "was very obsequious about how

he was so happy to have this relationship with [the Banco Santander] banking dynasty . . . ."

(North Decl. Ex. 3, at 184:7–16.)

M&B also communicated with individuals at New York-based RIR several times every month between 2005 and 2008 regarding LIF-USEP "for the purposes of carrying out M&B's obligations as the . . . distributor of LIF-USEP . . . including discussion of share classes, subscriptions, redemptions, volumes at each class, fund growth, and similar topics." (Hergueta Decl. ¶ 19; SAC ¶ 172.) M&B also received communications from New York-based RIR employees about wire transfers of subscriptions into LIF-USEP's BLMIS account. (SAC ¶ 172; North Decl. Ex. 13.) M&B frequently communicated with RIR about their investment in LIF-USEP, the changes made to LIF-USEP's Prospectus and Procedures, and their access to documents concerning other Madoff feeder funds. (SAC ¶ 179; North Decl. Ex. 5 (email from Lowe to Hergueta regarding the LIF-USEP Prospectus and Procedures); Ex. 14 (email from Lowe copying Hergueta, discussing "the Madoff situation as we understand it based on trade tickets"; Ex. 15, at RIRSAI0000006 (email from Lowe about speaking with Hergueta, regarding starting up Landmark); Ex. 16 (email from Hergueta to Lowe and Echeverría, regarding the Landmark prospectus); Ex. 17, at RIRSAI0000288–89 (email from Lowe to Echeverría copying Hergueta and Alberto Spagnolo, M&B's Managing Partner, regarding "money going out of LIF"); Ex. 18 (email chain between M&B, UBS SA, and RIR employees regarding LIF-USEP advisory fees for M&B); Ex. 19 (email from UBSFSL employee to M&B and RIR employees regarding LIF-USEP NAV); Ex. 20 (email from Hergueta to Lowe regarding LIF-USEP's redemptions).) Each of these communications evidences M&B's purposeful contact with New York.

### c.    M&B Received Fees for Providing Services to LIF-USEP

M&B received fees for acting as LIF-USEP's exclusive distributor. (SAC ¶¶ 171, 259, 270, 272.) Through contracts with LIF-USEP's official investment managers UBS SA and UBSTPM, M&B earned at least $6,024,082 in trailing and distribution fees that UBS SA and

UBSTPM paid out of management fees collected from LIF-USEP. (SAC ¶¶ 92, 272; North Decl. Ex. 2, at UBSVAA0003066 ¶ 4; Ex. 4, at LIFVAA0000829; Ex. 21, at RIRSAI0001341–42.) Between 2006 and 2007, LIF-USEP transferred at least $3,779,187 to M&B in connection with M&B's proprietary investments. (SAC ¶ 272.)

In its brief, M&B argues that the Trustee seeks to recover payments M&B received before the Initial Transfers. (M&B Mot. at 17.) It contends that the Trustee should have—but failed—to seek Bankruptcy Rule 2004 discovery to gather information about these transfers. (*Id.* at 18.) That is simply not true. The Trustee attempted to serve Rule 2004 subpoenas upon M&B. *See* Order Approving Requests for Judicial Assistance (Letter Rogatory) for M&B Capital Advisers, *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, Adv. Pro. No. 08-01789 (CGM) (Bankr. S.D.N.Y. June 15, 2010), ECF No. 2431. However, M&B shuttered the entities devoted to serving BLMIS feeder funds almost immediately after Madoff's arrest, rendering service impossible, and never responded to Rule 2004 discovery. (North Decl. Ex. 22.) The Defendants have engaged in seriatim dispositive motion practice since 2012, and, as a result, discovery has not yet opened. As such, the Trustee has never received any documents from M&B. The Trustee has thus relied on the limited documents he obtained from other parties, including the UBS Defendants and RIR, to support his allegations. Madoff's fraud may have been discovered fourteen years ago, but M&B's argument that the Trustee "has now had 14 years to gather information" with respect to M&B is a fallacy, as M&B and the other Defendants have attempted at every step to stymie the Trustee's investigation. Nor can M&B take issue with the Trustee's pleading regarding the timing of the transfers to M&B at this stage, in light of the constraints upon the availability of information to the Trustee. As discussed in

detail *infra* at Section I.D.3, the Trustee is a stranger to the details concerning the transactions

between LIF-USEP and M&B and is entitled to discovery on this issue.

In any event, the Trustee's allegations regarding M&B's direction of funds to LIF-USEP

and BLMIS, and the fees M&B received suffice to constitute a *prima facie* showing of

jurisdiction. Last year, in the Trustee's case against Luxalpha—the feeder fund from which LIF

was cloned—and Luxalpha's service providers, this Court found that the Trustee had sufficiently

alleged that a foreign entity "directed its activities to BLMIS in New York" where "its alleged

purpose was to collect fees generated by the Feeder Funds['] investments with BLMIS while

deflecting liability away from the 'real' actors." *Luxalpha Access Decision*, 647 B.R. at 57. That

same analysis applies here.

M&B directed its wrongful conduct into New York by creating LIF-USEP and other

BLMIS feeder funds and directing hundreds of millions of dollars into BLMIS to profit from this

scheme. In so doing, M&B "intentionally tossed a seed from abroad to take root and grow as a

new tree in the Madoff money orchard in the United States and reap the benefits therefrom." *BLI*,

480 B.R. at 506.

> ### d.    M&B Is Subject to This Court's Jurisdiction Through the Actions of Its Agent, Manuel Echeverría

M&B is subject to this Court's jurisdiction, in part, because of its contacts with New

York through Manuel Echeverría. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. BP Amoco

P.L.C.*, 319 F. Supp. 2d 352, 360 (S.D.N.Y. 2004). Echeverría was M&B's "main point of

contact" with Madoff and was M&B's agent in New York. (SAC ¶¶ 261–62; North Decl. Ex. 3,

at 174:5–175:18.) In determining agency for jurisdictional purposes, courts in this Circuit are

"focused on the realities of the relationship in question rather than the formalities of agency

law." *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986); *see also Schutte*

23

*Bagclosures Inc. v. Kwik Lok Corp.*, 48 F. Supp. 3d 675, 685 (S.D.N.Y. 2014) ("In order to make a prima facie showing of jurisdiction under an agency theory, the plaintiff does not need to establish a 'formal agency relationship.'"). The test is straightforward: "To establish an agency relationship for purposes of personal jurisdiction, a plaintiff must show that the alleged agent acts for the benefit of, and with the knowledge and consent of, the non-resident principal, and over which that principal exercises some control." *GEM Advisors, Inc. v. Corporacion Sidenor*, *S.A.*, 667 F. Supp. 2d 308, 318–19 (S.D.N.Y. 2009) (cleaned up); *see also Parke-Bernet Galleries, Inc. v. Franklyn*, 26 N.Y.2d 13, 19 (1970) ("The mere fact that the defendant was able to arrange to conduct his extensive and purposeful activity in New York without having to physically come here does not enable him to avoid the jurisdiction of our courts."). "The required control need not rise to the level of absolute control over the acts or decisions of the putative agent; rather, it may involve the ability of the principal to influence such acts or decisions by virtue of the parties' respective roles." *Scholastic, Inc. v. Stouffer*, No. 99 Civ. 11480 (AGS), 2000 WL 1154252, at *5 (S.D.N.Y. Aug. 14, 2000); *see also Stadt v. Univ. of Rochester*, 921 F. Supp. 1023, 1026 (W.D.N.Y. 1996) (finding defendant was subjected to the court's jurisdiction as defendant had sufficient control over agent who performed tortious acts forming the basis of the action at the direction of defendant).

Here, Echeverría acted for the benefit of, and with the knowledge and consent of, M&B in facilitating direct investment of millions of dollars into BLMIS in New York. Echeverría regularly communicated with Madoff, UBS, and RIR on behalf of M&B to further expand its BLMIS investments. (SAC ¶¶ 173, 261; North Decl. Ex. 3, at 174:5–175:23.) Despite M&B's contention that "[t]he [SAC] alleges merely an introduction and cooperation," the SAC actually alleges that Echeverría, acting at M&B's direction, was instrumental in assisting M&B to launch

LIF-USEP, as well as Landmark and Defender. (M&B Mot. at 12; SAC ¶¶ 1, 4, 87, 89, 92–93,

97; North Decl. Ex. 1, at UBSVAB0002166; Ex. 3, at 166:15–168:15; Ex. 8, at AMF00078667.)

Lowe of RIR testified that in creating LIF-USEP, "M&B sa[id] [to Echeverría], we need your

help to open an account with Madoff. Manuel [Echeverría]. . . went and helped them open an

account with Madoff." (North Decl. Ex. 3, at 166:25–167:4; SAC ¶ 1.) Echeverría was M&B's

mouthpiece at meetings with Madoff: in at least one instance, "M&B didn't come to the meeting,

because Manuel [Echeverría] was going for them. They only had one objective, which was to

open an account." (North Decl. Ex. 3, at 175:19–23.) Indeed, Echeverría arranged one of the

meetings with Madoff that facilitated the opening of LIF-USEP. (SAC ¶ 93.) When M&B

decided to create two other feeder funds, Echeverría again facilitated their opening and secured

the opening of BLMIS accounts. (North Decl. Ex. 3, at 167:22–168:15 ("[M&B] tasked Manuel

again to go in, see Madoff to open another account. And he again did it . . . ."); Ex. 8; Ex. 9; Ex.

23, at UBSVAF0010139; Ex. 24.) In August 2007, Hergueta wrote to secure Echeverría's help in

obtaining Madoff's approval for Landmark's BLMIS account. (North Decl. Ex. 16 (email from

Hergueta to Echeverría and Lowe, writing, "we also have to clear the account opening and

related documents with Madoff in advance (Manuel your help will be needed here)"); Ex. 25

(email from Lowe to other RIR employees regarding the establishment of Landmark, writing, "I

spoke to Juan Carlos [Hergueta of M&B] re the new LIF fund. They are still in holding pattern

as they need some assurance from Madoff as to # and names of options counterparties. Allegedly

Manuel [Echeverría] is working on that.").)

     After the formation of LIF-USEP, Echeverría continued to function as M&B's agent,

carrying out various behind-the-scenes roles critical to the fund's success. (SAC ¶ 100.)

Echeverría regularly communicated with Madoff about various investment-related issues by

visiting BLMIS's office in New York in person, by speaking with Madoff and other New York-based BLMIS personnel by phone, and by emailing and faxing Madoff and BLMIS personnel. (SAC ¶ 261; Hergueta Decl. ¶ 17 ("Echeverría transmitted communications for M&B SA from time to time with respect to matters related to LIF-USEP . . . ."); North Decl. Ex. 8, at AMF00078667 (Echeverría requested BLMIS send trade tickets to M&B); Ex. 26 (Echeverría emailed Hergueta that he had "just spoken to Bernard Madoff" regarding purported trades).) Echeverría also traveled with M&B to meet with UBS SA about LIF-USEP. (SAC ¶ 97; North Decl. Ex. 27, at UBSVAD0001095.) In December 2004, Echeverría secured UBS SA's agreement to sponsor LIF-USEP's formation. (SAC ¶ 97; North Decl. Ex. 28, at UBSVAD0001090.0002.) He regularly communicated with RIR about BLMIS, LIF-USEP, and Landmark on behalf of M&B. (North Decl. Ex. 14; Ex. 17, at RIRSAI0000287 (email from Echeverría to Lowe and Hergueta stating he "just spoke to Madoff" about LIF investments); Ex. 26; Ex. 29 (email from Echeverría to RIR employees confirming transfers with Madoff); Ex. 30, at RIRSAI0001963 (email from Echeverría to Hergueta and Lowe stating he "call[ed] B[ernie]M[adoff] now to tell him of our transfer.").) As M&B's agent, Echeverría's New York contacts should be imputed to M&B.

### 2. The Trustee Sufficiently Alleges That the UBS Defendants' Operations and Roles as Service Providers to Multiple BLMIS Feeder Funds, Including LIF-USEP, Establish Minimum Contacts and Subject Them to this Court's Jurisdiction

The UBS PJ Defendants, working together with M&B and Echeverría, played a critical role in conceiving and establishing LIF-USEP as a BLMIS feeder fund. (SAC ¶ 126.) And more than just facilitating its creation, the UBS PJ Defendants acted as LIF-USEP's agents. Each and every service the UBS PJ Defendants provided to LIF-USEP was undertaken for the express purpose of facilitating LIF-USEP's investment with BLMIS in New York. Because LIF-USEP's

only business was to invest with BLMIS, the acts that the UBS Defendants undertook in service of LIF-USEP could serve no other purpose. The UBS PJ Defendants, together with several other UBS entities, provided the framework upon which LIF-USEP structured its business, and without which, it could not have functioned. The UBS Defendants acted as: (1) custodian; (2) administrator; (3) sponsor; (4) distributor; (5) paying agent; (6) administrative agent; and (7) portfolio manager for LIF-USEP. (SAC ¶¶ 69, 70, 71, 77, 259.) Each of the UBS Defendants, on behalf of and in service to LIF-USEP, received the fund's BLMIS trade confirmations, which contained numerous indicia of fraud. (SAC ¶¶ 234–36.)

UBS SA does not dispute this Court's jurisdiction over it, nor can it. (Mem. of Law in Supp. of the UBS Defendants' Mot. to Dismiss the SAC, ECF No. 289 ("UBS Mot.") at 7.) UBS SA completed and executed all of LIF-USEP's account opening papers and agreements with BLMIS. (SAC ¶ 75.) It had a Consultancy and Exclusive Introducing Agreement with M&B for LIF-USEP, and was LIF-USEP's authorized custodian, a role that it (improperly) sub-delegated to BLMIS through a direct agreement. (SAC ¶¶ 92, 135–40; North Decl. Ex. 2.) UBS SA employees regularly corresponded with BLMIS to manage LIF-USEP's investments and redemptions. (SAC ¶ 75.) UBS SA stocked LIF-USEP's board of directors with five of its own employees. (SAC ¶ 260.) This same group of UBS SA employees also served as directors of Luxalpha, the fund that served as the model for LIF-USEP and a defendant in a parallel adversary proceeding pending before this Court. (SAC ¶¶ 76, 98, 203.)

UBS SA did not act alone. The UBS Defendants, together, functioned as a "coherent and effective whole" to provide essential services to LIF-USEP and facilitate its enterprise. (SAC ¶ 72.) Sharing a common purpose, the UBS Defendants worked together with M&B and Reliance to direct investments into BLMIS through LIF-USEP, facilitate subscriptions and redemptions to

27

and from LIF-USEP, and, most importantly, to profit from that joint endeavor. (SAC ¶ 74.) The

Trustee has plausibly alleged that the UBS PJ Defendants' contacts with New York are sufficient

to establish minimum contacts for specific jurisdiction, and neither UBSFSL nor UBSTPM have

any greater argument to escape jurisdiction than does UBS SA. *See Maxam*, 460 B.R. at 117

(finding jurisdiction as a result of defendants' "directing investments to the United States");

*Cromer*, 137 F. Supp. 2d at 477 (finding that a foreign fund administrator was subject to

jurisdiction given "the quality and nature of [its] relationship with the United States, arising out

of [its] work for the [f]und").

Most importantly, in *Luxalpha*, the Court found that the UBS PJ Defendants' contacts

with New York with respect to the Luxalpha fund—which were the same as their contacts with

respect to LIF-USEP—comprised sufficient minimum contacts for the exercise of specific

jurisdiction. *Luxalpha UBS Decision*, 2022 WL 17968924, at *5–10.

### a.    UBSFSL

UBSFSL is subject to personal jurisdiction because it "knew that any funds invested in

LIF-USEP were to be sent to New York for investment with BLMIS and that any returns or

redemptions related to investment emanated from New York." (SAC ¶ 70.) UBSFSL served as

LIF-USEP's administrator (*see* SAC ¶ 155) and played an essential role in the fund's operation,

management, and servicing. As administrator, "UBSFSL was responsible for calculating LIF-

USEP's NAV." (SAC ¶ 155.) To carry out this role, UBSFSL received the account statements

and trade confirmations from BLMIS in New York through UBS SA. (SAC ¶ 154.) UBSFSL

was aware that any revenues it received for its services for LIF-USEP were dependent on the

activity going into and coming out of BLMIS in New York. (SAC ¶ 70.)

Lacking offices of its own LIF-USEP (and LIF), shared the offices of UBSFSL,

UBSTPM and UBS SA, all of which had the same address. (SAC ¶¶ 64, 69–71.) In addition to

lending its address to LIF-USEP, UBSFSL acted as LIF-USEP's administrator, received the

fund's documents and correspondence, organized its annual general meeting, and filed

documents on LIF-USEP's behalf with the Luxembourg financial regulator. (SAC ¶¶ 154, 155;

North Decl. Ex. 21, at RIRSAI0001319, 1337, 1344–46, 1350.) These kinds of activities are

enough to subject a foreign fund administrator to jurisdiction. *Cromer*, 137 F. Supp. 2d at 476

(holding that because the administrator "received from the United States all of the information

from which it prepared the statements it disseminated as Fund administrators," it was subject to

jurisdiction).

UBSFSL also processed subscriptions and redemptions for LIF-USEP investors. (SAC ¶¶

70, 75.) It received LIF-USEP subscription requests from investors, and then coordinated with

UBS SA so that UBS SA could receive investor money and transfer it into BLMIS in New York.

(North Decl. Ex. 21, at RIRSAI0001330, 33, 34.) UBSFSL similarly handled redemption

requests for LIF-USEP. (*Id.* at RIRSAI0001332–34.) UBSFSL was also responsible for keeping

LIF's and LIF-USEP's books, which included preparing the annual accounts, reports, and

financial statements, and coordinating with the funds' auditor. (North Decl. Ex. 21, at

RIRSAI0001338; Ex. 31, at LIFVAA0000769–70; Ex. 32, at LIFVAA0000788–89.)

UBSFSL worked alongside the other UBS Defendants—UBS SA and UBSTPM—as well

as M&B and Reliance in the management, supervision, and administration of LIF-USEP. (SAC ¶

77.) UBSFSL, together with M&B and the other UBS Defendants, facilitated investment into

New York via BLMIS. (SAC ¶ 74.) As LIF-USEP's administrator and portfolio manager,

UBSFSL performed many of LIF-USEP's day-to-day tasks. Almost every one of these tasks

depended upon information received from New York. (SAC ¶ 70.) And while UBS attempts to

minimize its role in this case by arguing that the Trustee does not specify fund transfers or

meetings in the United States (UBS Mot. at 12), it is clear from the Trustee's allegations that UBSFSL directed activity at New York in its day-to-day actions servicing LIF-USEP. Moreover, BLMIS records demonstrate regular fax communications and telephone conversations between UBSFSL and BLMIS. (SAC ¶ 70; North Decl. Ex. 33.)

No less important is the fact that, while UBSFSL purported to independently verify BLMIS activity, this was merely for show. UBSFSL, in reality, verified nothing. And "[w]ithout independent verification, UBSFSL was creating meaningless accounting records that just repeated the trade confirmations and account statements that it received from BLMIS. UBSFSL thereby facilitated the concealment of BLMIS's true involvement and perpetuated the fraud." (SAC ¶ 156.)

> The net effect of the operating procedures put in place for LIF-USEP was to allow UBS SA and UBSFSL, two sophisticated financial institutions that appeared to the public to be directly involved in the operation of LIF-USEP, to earn fees for serving in oversight roles that actually provided no real oversight or protection for LIF-USEP's assets, and to allow BLMIS the freedom to manipulate reports as needed to perpetuate the Ponzi scheme.

(SAC ¶ 159.) UBSFSL served in these roles for several other BLMIS feeder funds, including Luxalpha, Groupement Financier, and Groupement Levered. (SAC ¶¶ 117–18.) *See Luxalpha UBS Decision*, 2022 WL 17968924, at *8–9 (finding that these allegations demonstrate UBSFSL's wrongful conduct directed at the forum).

The Trustee alleges that UBSFSL earned at least $747,560 in fees with respect to LIF-USEP from September 2005 to December 2008. (SAC ¶ 271(b); North Decl. Ex. 31, at LIFVAA0000783; Ex. 32, at LIFVAA0000796.) These fees, which the Trustee now seeks to recover, were based on LIF-USEP's assets under management with BLMIS and were paid to UBSFSL as a result of UBSFSL's facilitation of investment activity to New York.

The Court based its decision to exercise personal jurisdiction over UBSFSL in *Luxalpha* on substantially the same facts that are present here. *Luxalpha UBS Decision*, 2022 WL 17968924, at *8–9.

### b.    UBSTPM

UBSTPM is subject to jurisdiction because it "deliberately facilitated investment activity with BLMIS in New York and earned substantial fees in connection with those investments." (SAC ¶ 71); *see also Maxam*, 460 B.R. at 117–18; *Picard v. Chais* (*In re BLMIS*), 440 B.R. 274, 279 (Bankr. S.D.N.Y. 2010). UBSTPM served as LIF-USEP's management company from May 2006 to December 2008, taking over as portfolio manager from UBS SA. (SAC ¶¶ 160–61.) "After UBSTPM became LIF and LIF-USEP's management company, UBS continued to conceal the delegation of the fund's management to BLMIS." (SAC ¶ 161; *see* North Decl. Ex. 34.) As portfolio manager, UBSTPM made representations to the CSSF that it managed, administered, and monitored LIF's and LIF-USEP's investment policies and restrictions. (*Id.*) LIF-USEP's July 2006 prospectus listed USTPM as responsible for management, administration, and distribution of LIF-USEP's assets. (North Decl. Ex. 35, at LIFVAA0000464, 484, 485, 493.)

In its roles, UBSTPM "performed a host of fundamental tasks for LIF-USEP, and facilitated LIF-USEP's massive BLMIS investment." (SAC ¶ 68.) UBSTPM was responsible for managing and administering the fund, monitoring investment policies and restrictions, and (on paper) was officially responsible for LIF-USEP's investment management decisions. (SAC ¶ 71.) In reality, to keep the profits from BLMIS-related work flowing, UBSTPM simply adopted and did not disturb the decision to invest LIF-USEP entirely with BLMIS.

To the extent that UBS SA retained control over UBSTPM with respect to the management of LIF-USEP's portfolio after May 2006, UBS SA's numerous connections with New York should be imputed to UBSTPM for purposes of jurisdiction. *Dorfman v. Marriott Int'l*

*Hotels, Inc.*, No. 99 CIV 10496 (CSH), 2002 WL 14363, at *3, 6 (S.D.N.Y. Jan. 3, 2002) (finding jurisdiction of a foreign corporation based on agency where the corporation present in New York "does all the business which [the foreign corporation] could do were it here by its own officials"); *see also Palmieri v. Estefan*, 793 F. Supp. 1182, 1194 (S.D.N.Y. 1992).

As noted above, UBSTPM's role as LIF-USEP's manager was dictated by its Advisory Committee, which was formed by UBS SA and consisted entirely of UBS SA directors. (North Decl. Ex. 36, at LIFVAA0000820.) That committee's purpose was to advise UBSTPM with "recommendations . . . in relation to the management and investment policy and strategy of the Fund"—the very responsibilities that had supposedly been shifted from UBS SA to UBSTPM. (*Id.* at LIFVAA0000814.) The committee's "recommendations" were more than just advice. They were directives that UBSTPM was to "act upon and implement." (*Id.* at LIFVAA0000815.) UBSTPM and UBS SA also executed an "Agreement of Understanding and Indemnification," whereby UBS SA agreed to indemnify UBSTPM with respect to LIF, and UBSTPM agreed, upon request, to delegate its marketing functions to UBS SA. (North Decl. Ex. 37, at LIFVAA000363–64.) The Advisory Committee's work, on behalf of UBSTPM, constitutes additional contacts between UBSTPM and the forum, as alleged throughout the SAC. Pursuant to its contract with UBS SA, UBSTPM also agreed to delegate its administrative functions to UBSFSL. (*Id.*)

For all these reasons, it follows that the Trustee has properly alleged that the UBS PJ Defendants purposefully directed their wrongful acts at this forum. And as this Court already concluded in the *Luxalpha UBS Decision*, with respect to the same facts that are present here, "[t]hese allegations are legally sufficient to constitute a prima facie showing of jurisdiction." 2022 WL 17968924, at *9.

32

> UBS Defendants are alleged to have directed their wrongful conduct
> into New York by assisting the Feeder Funds, [other service
> providers] and BLMIS in continuing the fraud in order to profit from
> their participation in the scheme. The UBS Defendants
> "intentionally tossed a seed from abroad to take root and grow as a
> new tree in the Madoff money orchard in the United States and reap
> the benefits therefrom." *Picard v. Bureau of Labor Ins. (In re
> BLMIS)*, 480 B.R. 501, 506 (Bankr. S.D.N.Y. 2012). Defendants'
> alleged contacts with the United States and New York are not
> random, isolated, or fortuitous.

*Id.*

### B. HAVING SUFFICIENTLY ALLEGED CLAIMS AGAINST THE PJ DEFENDANTS ARISING FROM THEIR CONTACTS WITH NEW YORK, THE TRUSTEE DOES NOT NEED TO SHOW PROXIMATE CAUSE TO SATISFY THE MINIMUM CONTACTS PRONG

Specific jurisdiction exists over each of the PJ Defendants because the SAC seeks to

recover BLMIS funds subsequently transferred to the PJ Defendants as fees derived from the

activity they directed to New York. The basis for finding specific jurisdiction over the PJ

Defendants therefore "arises out of *or relates to*" the PJ Defendants' contacts with New York.

*See Luxalpha UBS Decision*, 2022 WL 17968924, at *9; *Burger King*, 471 U.S. at 472 (stating

that non-resident defendant is subject to jurisdiction "if the defendant has 'purposefully directed'

his activities at residents of the forum . . . and the litigation results from alleged injuries that

'arise out of or relate to' those activities") (internal citations omitted); *see also Sole Resort, S.A.

de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (requiring "some

articulable nexus between the business transacted and the cause of action sued upon" for

jurisdiction under CPLR § 302(a)(1)).

No more is needed. This Court has held that "'proof that a plaintiff's claim came about

because of the defendant's in-state conduct' is not required. Instead, the court need only find 'an

affiliation between the forum and the underlying controversy.'" *Luxalpha UBS Decision*, 2022

WL 17968924, at *9 (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915,

919 (2011)) (internal citations and quotations omitted); *see also Picard v. BNP Paribas S.A. (In re BLMIS)*, 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.") (internal quotations omitted).

The Trustee need not show that the PJ Defendants' contacts with the forum are the "but for" or proximate cause of the Trustee's claim. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S.Ct. 1017, 1026 (2021). A lawsuit can be properly issued against a defendant where the underlying claims "relate to" the defendant's contacts with the forum even if those contacts did not give rise to the claim. *Id.* The PJ Defendants' systematic and continued contacts with New York are such that proximate causation is not required.

"The 'arises out of or relates to those activities' prong may be satisfied when 'defendant's allegedly culpable conduct involves at least in part financial transactions that touch the forum.'" *In re Fairfield Sentry Ltd.*, 627 B.R. at 566 (quoting *U.S. Bank*, 916 F.3d at 151). The Trustee's allegations satisfy this prong. The Trustee has pleaded that the PJ Defendants received transfers of BLMIS money in the form of fees or profits through LIF-USEP. These transfers were received in connection with the services the PJ Defendants provided in directing investment activity to BLMIS in New York through LIF-USEP. *Chais*, 440 B.R. at 278 ("[F]oreign defendants who profited by their maintenance of BLMIS accounts and receipt of transfers subjected themselves to personal jurisdiction of this Court with regard to the Trustee's claims arising from such transfers.") (citing *Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 418 B.R. 75 (Bankr. S.D.N.Y. 2009) ("*Cohmad I*")).

34

The PJ Defendants knew that any funds invested into LIF-USEP were being directed to New York for investment with BLMIS. They were aware that any returns or redemptions related to those investments similarly emanated from New York. They received fees that were directly related to the economic activity being undertaken by BLMIS in New York, and received management and performance fees from LIF-USEP. (SAC ¶¶ 159, 171, 271–73.) The same is true of the other feeder funds the PJ Defendants serviced. (SAC ¶¶ 77, 117, 169, 170.)

### 1.    M&B

M&B argues that the Trustee's claims must fail because M&B "did not make any deposits and did not receive any withdrawals" from LIF-USEP's BLMIS account. (M&B Mot. at 11.) This self-serving statement contradicts the Trustee's allegations, which are that M&B created LIF-USEP and other BLMIS feeder funds for the sole purpose of furthering BLMIS investment in New York and profiting therefrom. (SAC ¶¶ 1–4, 18, 65, 86, 92, 99, 169, 179–80, 272.) M&B also invested its own funds into, and received transfers from LIF-USEP in connection with its proprietary investments. (SAC ¶ 272; North Decl. Ex. 38, at PUBLIC0018653.0012.) As the feeder fund's exclusive distributor, M&B received significant fees from LIF-USEP, which was 100% invested with BLMIS. (SAC ¶¶ 1, 4, 92, 99, 171, 259, 270, 272.)

Moreover, the jurisdictional analysis does not focus on the transfers themselves but rather "on [M&B's] U.S. contacts related to the receipt of the [] subsequent transfers at issue." *BNP Paribas*, 594 B.R. at 190 (finding the Trustee made a *prima facie* showing of personal jurisdiction with respect to the subsequent transfers at issue where "those subsequent transfers arose, for the most part, from the [BNP entities'] New York contacts"). Here, the Trustee has sufficiently pleaded that M&B received transfers of BLMIS money in the form of fees through LIF-USEP. (SAC ¶¶ 65, 92, 270, 272.) M&B received these fees in connection with the services

it provided to LIF-USEP by directing investment activity to BLMIS in New York through LIF-USEP. (*Id.*) M&B created LIF-USEP for the sole purpose of directing investor funds into BLMIS—it was wholly invested with BLMIS. (SAC ¶¶ 1, 4, 65, 88–89, 92, 99, 169.) As such, M&B knew that any funds invested in LIF-USEP were being directed to New York for investment with BLMIS. (SAC ¶¶ 18, 65.) M&B was also aware that any returns and any fees related to those investments similarly emanated from New York. (SAC ¶ 18.) M&B received fees that were directly related to the economic activity being undertaken by BLMIS in New York, and received trailing and distribution fees from LIF-USEP. (SAC ¶¶ 4, 92, 270, 272.)

### 2.    UBSFSL & UBSTPM

UBSTPM and UBSFSL similarly knew that any funds being invested into LIF-USEP were being directed to New York for investment with BLMIS. They were aware that any and all returns or redemptions related to those investments similarly emanated from New York. They received fees that were directly related to the economic activity being undertaken by BLMIS in New York, and received management and performance fees from LIF-USEP and LIF. (SAC ¶¶ 4, 7, 8, 70, 71, 153, 159, 171, 271.) The services that UBSTPM and UBSFSL provided to LIF-USEP were all in furtherance of BLMIS investment in New York. (SAC ¶¶ 68–77, 143, 153, 271.) UBSTPM, as the management company, managed and administered the fund, monitored investment policies and restrictions, and was responsible for LIF-USEP's investment management decisions—the handing over of investor funds to BLMIS in New York for investment. (SAC ¶ 71.) UBSFSL, as the administrative agent, performed day-to-day tasks that relied upon information received from New York and, in playing a critical role in operation, management, and servicing of LIF-USEP, was aware that all revenues were dependent on BLMIS's activity in New York. (SAC ¶ 70.) Additionally, the LIF-USEP board was stacked with employees of the UBS Defendants. (SAC ¶¶ 8, 68, 98.)

36

Thus, the Trustee's claims to recover these fees unquestionably "arise out of or relate to" the PJ Defendants' contacts with this forum. *See Luxalpha Access Decision*, 647 B.R. at 59 (finding the suit was affiliated with the alleged in-state conduct where "the Trustee is asserting subsequent transfer claims against [the] PJ Defendants for monies they received from the BLMIS Feeder Funds."); *Chais*, 440 B.R. at 278 ("[F]oreign defendants who profited by their maintenance of BLMIS accounts and receipt of transfers subjected themselves to personal jurisdiction of this Court with regard to the Trustee's claims arising from such transfers.") (citing *Cohmad I*, 418 B.R. 75.

### C.   THE TRUSTEE'S ALLEGATIONS AGAINST THE PJ DEFENDANTS ARE NOT CONCLUSORY

The allegations in the SAC are fact-specific jurisdictional allegations that satisfy the Trustee's *prima facie* burden to adequately plead jurisdiction over the PJ Defendants. The Trustee's allegations are neither formulaic nor inapplicable. (M&B Mot. at 3–4, 8; UBS Mot. at 5, 9, 11, 13.) And they must be taken as true—as they are—for purposes of a motion to dismiss.

#### 1.   M&B

M&B argues that that the Trustee has not pleaded personal jurisdiction over it because paragraphs 17 and 18 of the SAC lack sufficient specificity to identify M&B's jurisdictional conduct. This is incorrect. Paragraphs 17 and 18 set forth the legal bases—N.Y. C.P.L.R. 301 and 302 and Federal Rule of Bankruptcy Procedure 7004—of personal jurisdiction in this case and summarize the SAC's jurisdictional allegations in broad terms. M&B's argument insinuates that the detailed factual allegations throughout the rest of the SAC setting forth M&B's activities directed at investing with BLMIS in New York are nullified by the inclusion of summary language in paragraphs 17 and 18. This argument is nonsensical.

37

The SAC pleads in detail that: (i) M&B directed investment into BLMIS in New York through BLMIS feeder funds and profited from it; (ii) M&B attended meetings with Madoff in New York; (iii) M&B regularly communicated with Madoff, other BLMIS employees, and the New York employees of other LIF-USEP service providers, who worked in close coordination with M&B, about BLMIS feeder funds' investments; and (iv) Echeverría's contacts with New York should be imputed to M&B. (SAC ¶¶ 1, 3–4, 85–86, 88–89, 92–93, 99, 169–73, 179–80, 257–59, 261–62, 270, 272.) The Trustee has pleaded personal jurisdiction with the requisite specificity and M&B's argument to the contrary is disingenuous.

## 2.    UBSFSL & UBSTPM

Like M&B, UBS argues, citing only to paragraph 17 of the SAC, that the Trustee's allegations are conclusory. (UBS Mot. at 9.) The UBS PJ Defendants also ignore both (i) the fact-specific allegations contained throughout the SAC which set forth the UBS Defendants' activities directed at BLMIS investment in New York, and (ii) this Court's decision in *Luxalpha* that nearly identical allegations were sufficient to exercise personal jurisdiction over them.

The SAC details the activities that UBSFSL and UBSTPM engaged in to carry out their roles as administrator, portfolio manager, and management company of LIF-USEP and/or LIF. (SAC ¶¶ 70, 71, 74, 159.) All of those activities were carried out in furtherance of transferring vast sums of money to BLMIS in New York and in furtherance of the receipt of funds or redemptions from LIF-USEP that came directly from BLMIS in New York. (SAC ¶¶ 70, 71, 77, 242, 271.) The UBS Defendants also relied, with no effort to independently verify their contents, upon communications and information transmitted by BLMIS to carry out critical tasks, such as calculating the fund's NAV. (SAC ¶¶ 154–57.) The Trustee has pleaded personal jurisdiction over the UBS PJ Defendants with the specificity required.

D.    THE EXERCISE OF PERSONAL JURISDICTION OVER THE PJ
      DEFENDANTS WOULD BE REASONABLE

In addition to "minimum contacts," which the Trustee has sufficiently shown with respect

to the PJ Defendants, due process requires that the exercise of personal jurisdiction be

"reasonable." *Int'l Shoe*, 326 U.S. at 316–17; *see also Maxam*, 460 B.R. at 117. "The

reasonableness inquiry requires the court to determine whether the assertion of personal

jurisdiction . . . comports with 'traditional notions of fair play and substantial justice' under the

circumstances of the particular case." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331

(2d Cir. 2016) (citations omitted). The relevant facts for the Court to consider include "the

burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's

interest in obtaining convenient and effective relief, the interstate judicial system's interest in

obtaining the most efficient resolution of controversies, and the shared interest of the several

States in furthering fundamental substantive social policies." *Multi-Strategy Fund Ltd.*, 641 B.R.

at 88. Where a plaintiff has made a threshold showing of minimum contacts, a defendant must

present a "compelling case that the presence of some other considerations would render

jurisdiction unreasonable." *Chloé*, 616 F.3d at 165 (quoting *Burger King*, 471 U.S. at 477). This

Court has observed that "it would be a 'rare' case where the defendant's minimum contacts with

the forum support the exercise of personal jurisdiction but it is unreasonable to force the

defendant to defend the action in that forum." *BNP Paribas*, 594 B.R. at 188 (citations omitted).

This is not that "rare" case. The burden on the PJ Defendants is minimal. *See Maxam*,

460 B.R. at 119 (finding New York counsel and conveniences of modern communication and

transportation minimize any such burden). The PJ Defendants have also been litigating in this

Court for the past ten years. *See Luxalpha UBS Decision*, 2022 WL 17968924, at *10 ("[The

UBS Defendants] actively participated in this Court's litigation for over twelve years. They are

39

represented by U.S. Counsel and have continually associated with the New York based Access

Defendants and BLMIS."); *Multi-Strategy Fund Ltd.*, 641 B.R. at 88. The United States also has

a strong interest in applying U.S. law in this SIPA liquidation proceeding. *See id.*; *see also In re

Picard*, 917 F.3d 85, 103 (2d Cir. 2019) (noting a "compelling interest in allowing domestic

estates to recover fraudulently transferred property"). And the Trustee has a strong interest in

litigating in the United States. *See Luxalpha UBS Decision*, 2022 WL 17968924, at *10; *Maxam*,

460 B.R. at 119–20 (finding that the "the most efficient resolution of the controversy would be in

the United States, where the inextricably-related BLMIS litigation is ongoing. . . .").

M&B's claim that it would be burdened by being sued over 3,500 miles from home and

has no U.S. counsel other than the counsel retained to defend this action is specious. (M&B Mot.

at 13.) M&B's burden is minimal. *See Maxam*, 460 B.R. at 119 (finding New York counsel and

conveniences of modern communication and transportation minimize any such burden). M&B

has actively participated in litigation in this Court and in the United States District Court for the

Southern District of New York for over ten years.[5] *See Multi-Strategy Fund Ltd.*, 641 B.R. at 88;

*Luxalpha Access Decision*, 647 B.R. at 59. M&B need only be represented by one U.S. counsel,

as it is here.

The UBS Defendants' argument that they "were never themselves investors" (UBS Mot.

at 8) must fail because this Court already found jurisdiction to be reasonable, where these same

UBS entities "intentionally misled both U.S. and Luxembourg regulators concerning BLMIS's

---

[5] *See, e.g.,* ECF Nos. 84, 104, 141, 200, 223; *see also* The M&B Defs.' Mot. to Withdraw the Reference, *Picard v. UBS AG, et al.*, 12-cv-02483 (Bankr. S.D.N.Y. Apr. 2, 2012), ECF No. 1; Order at Ex. A No. 56, *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, No. 12-MC-0115 (JSR) (S.D.N.Y. May 16, 2012), ECF No. 119 (listing *Picard v. UBS AG, et al.* (M&B Capital Advisers Sociedad de Valores, S.A., M&B Capital Advisers Gestion SGIIC, S.A. – Moving Parties)); Ex. A to the Notice of Mot. to Dismiss at No. 15, *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, No. 12-MC-0115 (JSR) (S.D.N.Y. July 27, 2012), ECF No. 256-1 (M&B, listed among the defendants that moved to dismiss on Section 546(e) grounds).

roles, responsibilities, and options trading partners" and "worked together to extend Madoff's fraud to European investors, enriching themselves through the receipt of millions of dollars . . . ." *Luxalpha UBS Decision*, 2022 WL 17968924, at *21.

The Trustee has met his burden of alleging jurisdiction as to each subsequent transfer that originated with BLMIS by alleging that M&B intentionally targeted its activities at BLMIS. (SAC ¶¶ 1, 3–4, 17–18, 86, 88–89, 92–93, 99, 169–73, 179–80, 257–59, 261–62, 270, 272); *see also Luxalpha Access Decision*, 647 B.R. at 60. Where, as here, M&B "created BLMIS Feeder Funds and assisted Madoff in 'introducing Madoff to new sources of investment capital, which he needed to keep his Ponzi scheme alive[,]'" and where the UBS PJ Defendants' each and every action was to facilitate LIF-USEP's flow of capital to BLMIS, this Court's exercise of jurisdiction over the PJ Defendants is more than reasonable. *Luxalpha Access Decision*, 647 B.R. at 60.

## E.    AT A MINIMUM THE TRUSTEE IS ENTITLED TO JURISDICTIONAL DISCOVERY

If this Court finds that the Trustee has not made a *prima facie* showing of jurisdiction, the Trustee respectfully requests that he be granted jurisdictional discovery.

A party may be entitled to jurisdictional discovery when a "plaintiff has made a threshold showing that there is some basis for the assertion of jurisdiction." *Kiobel v. Royal Dutch Petroleum Co.*, No. 02 Civ. 7618 (KMW) (HBP), 2009 WL 3817590, at *4 (S.D.N.Y. Nov. 16, 2009) (internal citation marks and quotation omitted). The Trustee's factual allegations discussed *supra* at Sections I.B & I.C establish a "threshold showing" of jurisdiction sufficient for discovery. *Id.* at *6; *see also Ayyash v. Bank Al-Madina*, No. 04 Civ. 9201 (GEL), 2006 WL 587342, at *6 (S.D.N.Y. Mar. 9, 2006) (granting discovery because allegations of wire transfers through the United States made a "sufficient start" toward establishing jurisdiction).

Although the Trustee submits that he has made the required showing here, jurisdictional

discovery is appropriate where jurisidictional theories are fact-intensive. *See Winston & Strawn*

*v. Dong Won Sec. Co.*, No. 02 Civ. 0193 (RWS), 2002 WL 31444625, at *5 (S.D.N.Y. Nov. 1,

2002) (permitting discovery "where the facts necessary to establish personal jurisdiction . . . lie

exclusively within the defendant's knowledge.") (citations omitted); *see also Amsellem v. Host*

*Marriot Corp.*, 280 A.D.2d 357, 359 (N.Y. App. Div. 2001) (finding jurisdictional discovery

appropriate "especially since the corporate relationships are complex and the relevant facts are

exclusively within the control of the party seeking dismissal") (internal citations omitted).

Jurisdictional discovery would also be appropriate here, where M&B has resisted all

opportunities to provide the Trustee with meaningful information about its involvement with

BLMIS. *See supra* at Section I.A.1.c. The Trustee's allegations with respect to M&B are based

upon limited document production and Rule 2004 deposition testimony from other parties,

including UBS and RIR. Targeted jurisdictional discovery would elucidate the facts concerning

M&B's relationship with the feeder funds, Echeverría, UBS, and RIR. Jurisdictional discovery,

including narrowly focused document requests and interrogatories, would allow the Trustee to

confirm the extent of M&B's communications with Madoff and third-parties related to LIF-

USEP, and two other BLMIS feeder funds—Landmark and Defender—that M&B fueled with

investment. It would also confirm M&B's operations and its procedures in servicing LIF-USEP

and the other BLMIS feeder funds. Importantly, jurisdictional discovery would also enable the

Trustee to learn the details and timing of the transfers of BLMIS customer property that M&B

received from LIF-USEP (either directly or indirectly), out of which the Trustee's subsequent

transfer causes of action arise, and which form the basis for jurisdiction over M&B.

The Trustee acknowledges that he has received documents from UBS SA and non-defendant UBS AG through the Rule 2004 process. But the production from UBS is incomplete and the Trustee did not receive Rule 2004 discovery from either UBSFSL or UBSTPM. Additionally, the Trustee had sought third-party discovery in the form of letters of request from UBS SA, UBSFSL, and UBSTPM in 2018. *See* Order Issuing Letters of Request, *UBS, et al.*, Adv. Pro. 10-04285 (CGM) (Bankr. S.D.N.Y., June 17, 2022), ECF No. 242. The UBS Defendants, however, did not fully comply with those letters of request—producing mostly nonresponsive documents and throwing up roadblocks to compliance at every opportunity.[6]

The Trustee submits that he has made the required showing as to the UBS Defendants, but jurisdictional discovery, with a scope similar to that proposed for M&B, would allow the Trustee to confirm the extent of UBSFSL's and UBSTPM's communications with Madoff and third-parties related to LIF-USEP. It would also confirm UBSFSL's and UBSTPM's operations and its procedures in servicing LIF-USEP and the other BLMIS feeder funds. Jurisdictional discovery would also enable the Trustee to learn the details and timing of the transfers of BLMIS customer property that each UBS Defendant received from LIF-USEP (either directly or indirectly), out of which the Trustee's subsequent transfer causes of action arise, and which form the basis for jurisdiction.

## II.    THE TRUSTEE HAS STATED A SECTION 550 CLAIM AGAINST THE MOVING DEFENDANTS

### A.    LEGAL STANDARD

When considering motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), "the Court must liberally construe all claims, accept all factual allegations in the complaint as

---

[6] The Trustee recently withdrew those letters of request for the reasons separately articulated before this Court. Order Withdrawing Letters of Request, *Luxalpha*, Adv. Pro. 10-04285 (CGM) (Bankr. S.D.N.Y., June 1, 2023), ECF No. 301.

true, and draw all reasonable inferences" in the plaintiff's favor. *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 353 (S.D.N.Y. 2011) (citing *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 44 (2d Cir. 2003); *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007)). To survive a motion to dismiss, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). At the pleading stage, the allegations need only meet the "plausibility" standard, such that they "'nudge[] [the] claims' . . . 'across the line from conceivable to plausible.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). The court's task is "not to assess the weight of the evidence" or identify the most plausible inference. *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020); *Anderson News L.L.C. v. Am. Media Inc.*, 680 F.3d 162, 184–185 (2d Cir. 2012).

Rule 9(b), which governs claims to avoid intentional fraudulent transfers, requires a party's complaint to state "with particularity the circumstances constituting fraud" but permits "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally" and requires less particularity where the opposing parties are insiders or affiliates or otherwise control the relevant facts. Fed. R. Civ. P. 9(b); *Adler v. Berg Harmon Assocs.*, 816 F. Supp. 919, 928 (S.D.N.Y. 1993). "'Where the actual fraudulent transfer claim is asserted by a bankruptcy trustee, applicable Second Circuit precedent instructs courts to adopt a more liberal view since a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge.'" *Multi-Strategy Fund Ltd.*, 641 B.R. at 90–91. "[E]ven greater latitude should be afforded," when, in a case such as this one, "the Trustee's lack of personal knowledge is compounded with

complicated issues and transactions that extend over lengthy periods of time . . . ." *Id.* at 91

(citing *Picard v. Cohmad Sec. Corp., (In re BLMIS)*, 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011)

("*Cohmad II*")) (internal quotation marks omitted).

### B. THE TRUSTEE HAS SUFFICIENTLY ALLEGED ACTUAL FRAUDULENT INTENT UNDER SECTION 548(a)(1)(A)[7]

UBS argues that the Transfers are not avoidable or recoverable, because the Trustee has

failed to adequately allege BLMIS's "actual intent to hinder, delay or defraud" creditors under

section 548(a)(1)(A) of the Bankruptcy Code. UBS contends that the Trustee improperly relies

on the "Ponzi scheme presumption," and that the SAC otherwise lacks particularized allegations

of BLMIS's actual fraudulent intent, as required by Rule 9(b). (UBS Mot. at 24–27.) The Court

already rejected UBS's argument in the *Luxalpha UBS Decision*. 2022 WL 17968924, at *14–15.

This Court and the District Court have repeatedly held that the Trustee may rely on the

Ponzi scheme presumption to demonstrate BLMIS's actual intent to hinder, delay, or defraud

creditors.[8] *See*, *e.g.*, *Picard v. ABN AMRO Bank (Ireland), Ltd. (In re Madoff)*, 650 B.R. 24, 39

---

[7] RIR has adopted UBS's arguments concerning the Trustee's pleading of actual fraudulent intent under section 548(a)(1)(A). (Mem. of Law in Supp. of RIR's Mot. to Dismiss the SAC, ECF No. 296 ("RIR Mot.") at 4.) All of the Trustee's arguments in this section in response to UBS's brief equally apply to RIR.

[8] *See, e.g., Picard v. Sage Realty*, No. 20-CV-10109 (JFK), 2022 WL 1125643, at *27–28 (S.D.N.Y. Apr. 15, 2022) (concluding Trustee has established actual intent to defraud pursuant to Ponzi scheme presumption); *Picard v. Fairfield Pagma Assocs., LP*, Adv. Pro. No. 10-05169, 2022 WL 1110560, at *3 (Bankr. S.D.N.Y. Apr. 13, 2022), *vacated and remanded to* 2022 WL 16751911 (Bankr. S.D.N.Y. Nov. 7, 2022) (finding actual "[i]ntent to defraud is established as BLMIS operated a Ponzi scheme" at summary judgment stage); *Picard v. Estate of Seymour Epstein (In re BLMIS)*, No. 21-cv-02334-CM, 2022 WL 493734, at *17 (S.D.N.Y. Feb. 17, 2022) (holding that "the Trustee is entitled to the benefit of the Ponzi Scheme Presumption, and so can prove fraudulent intent as a matter of law."); *Picard v. Lisa Beth Nissenbaum Trust*, No. 20 cv. 3140 (JGK), 2021 WL 1141638, at *11 (S.D.N.Y. Mar. 24, 2021) ("There is no genuine dispute of material fact that BLMIS operated a Ponzi scheme. The breadth and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of the Ponzi scheme presumption to the facts of this case, particularly in light of Madoff's criminal admission.") (citations and quotation marks omitted); *Picard v. JABA Assocs. LP*, 528 F. Supp. 3d 219, 236–37 (S.D.N.Y. 2021) ("It is well established that the Trustee is entitled to rely on a presumption of fraudulent intent when the debtor operated a Ponzi scheme."); *Picard v. Ken-Wen Fam. Ltd. P'ship*, 638 B.R. 41, 49 (Bankr. S.D.N.Y. 2022) ("Intent to defraud is established as Madoff operated a Ponzi scheme."); *Picard v. Gerald & Barbara Keller Fam. Trust*, 634 B.R. 39, 47 (Bankr. S.D.N.Y. 2021) (same); *Picard v. Nelson*, 610 B.R. 197, 235 (Bankr. S.D.N.Y. 2019) ("[T]he Trustee has established that the Two-Year Transfers were made with actual intent to defraud under the Ponzi scheme presumption."); *see also Picard v. Gettinger et al.*,

(Bankr. S.D.N.Y. 2023) ("That BLMIS operated as a Ponzi scheme is well-established and the Court relies on earlier findings of same and holds that the Trustee has met its burden of pleading BLMIS' actual intent on this issue.") (citations omitted). These courts also have embraced the Ponzi scheme presumption outside of the Madoff context. *See, e.g.*, *In re Bayou Grp., LLC*, 439 B.R. 284, 307 (S.D.N.Y. 2010) (holding that the Ponzi scheme presumption was "fully applicable" to establish actual fraudulent intent); *Armstrong v. Collins*, No. 01 Civ. 2437(PAC), 2010 WL 1141158, at *20 (S.D.N.Y. Mar. 24, 2010) ("In considering claims of actual fraud, 'courts have widely found that Ponzi scheme operators necessarily act with actual intent to defraud creditors due to the very nature of their schemes.'") (citations omitted); *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 11 (S.D.N.Y. 2007) ("[T]he Ponzi scheme presumption remains the law of this Circuit[.]"); *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 429–30 (S.D.N.Y. 2006) (complaint adequately alleged actual intent under New York state law equivalent of section 548(a)(1)(A) where complaint alleged defendants perpetrated a Ponzi scheme); *In re Dreier LLP*, 452 B.R. 391, 425 (Bankr. S.D.N.Y. 2011) (noting that courts in this jurisdiction and elsewhere have "uniformly recognized" the Ponzi scheme presumption); *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 310 B.R. 500, 506–07 (Bankr. S.D.N.Y. 2002) (citing cases holding that debtor operating a Ponzi scheme is presumed to have made transfers with fraudulent intent). Because the SAC alleges that BLMIS operated a Ponzi scheme (SAC ¶¶ 24, 25, 38–63), "the Trustee's burden of pleading actual fraudulent intent is satisfied." *ABN AMRO*, 650 B.R. at 38.

---

976 F.3d 184, 188 (2d Cir. 2020), *cert. denied sub nom. Gettinger v. Picard*, 141 S. Ct. 2603 (2021) (in which the Second Circuit noted that the case "arises out of the infamous Ponzi scheme perpetrated by Bernard L. Madoff") (footnote omitted).

UBS concedes, as it must, that the Ponzi scheme presumption has been applied by this Court and by the District Court in the Trustee's actions and does not attempt to rebut that law of the case applies. (UBS Mot. at 25–26.) Nevertheless, UBS urges this Court to disregard this settled principle in light of *dicta* in a concurring opinion to the Second Circuit's *Citibank* decision, which questioned the Ponzi scheme presumption as applied to the facts in that case. (UBS Mot. at 25–26 (citing *Picard v. Citibank (In re Bernard L. Madoff Inv. Secs. LLC)*, 12 F.4th 171, 202 (2d Cir. 2021) (Menashi, J., concurring) ("*Citibank*")). However, the District Court recognized that, "[n]otwithstanding Judge Menashi's concerns, 'the Ponzi scheme presumption remains the law of this Circuit.'" *See Sage Realty*, 2022 WL 1125643, at *28 (citing *In re Manhattan Inv. Fund Ltd.*, 397 B.R. at 11). And this Court, even upon "re-read[ing] Judge Menashi's concurrence," found it "unpersuasive." *Picard v. Citibank, N.A., et al.*, Adv. Pro. No. 10-05345 (CGM), 2022 WL 4493234, at *4 (Bankr. S.D.N.Y. Sept. 27, 2022). *Dicta* in a concurring opinion has no precedential effect, and does not constitute an intervening change of controlling law or provide any other "cogent" or "compelling" reason to depart from the law. *See Johnson v. Holder*, 564 F.3d 95, 99–100 (2d Cir. 2009) ("We may depart from the law of the case for 'cogent' or 'compelling' reasons including an intervening change in law, availability of new evidence, or 'the need to correct a clear error or prevent manifest injustice.'") (citing *United States v. Quintieri*, 306 F.3d 1217, 1230 (2d Cir. 2002)); *Cohen v. UBS Fin. Servs., Inc.*, No. 12-CV-02147, 2014 WL 240324, at *4 (S.D.N.Y. Jan. 22, 2014) (preceding decision was not considered "intervening change in controlling law" when relevant finding was "mere dicta"); *Great Lakes Dredge & Dock Co. v. Tanker Robert Watt Miller,* 957 F.2d 1575, 1578 (11th Cir. 1992) (recognizing that dicta was "neither the law of the case nor binding precedent").

UBS attempts to cast doubt on the presumption's validity by citing a handful of inapplicable cases. *Finn v. All. Bank*, 860 N.W.2d 638, 646–47 (Minn. 2015) concludes that the presumption did not apply purely as a matter of Minnesota state law. *Lustig v. Weisz & Assocs., Inc. (In re Unified Com. Cap., Inc.)*, 260 B.R. 343, 350–54 (Bankr. W.D.N.Y. 2001) addresses avoidance of a fraudulent conveyance under a *constructive fraud* theory in connection with a Ponzi scheme, without even mentioning the presumption as it applies to an *actual fraud* theory. Neither case rejects the presumption as it applies to section 548(a)(1)(A). UBS also cites to *Sharp International Corp. v. State Street Bank & Trust Co.*, 403 F.3d 43 (2d Cir. 2005), but multiple courts have explained why *Sharp* does not do away with the Ponzi scheme presumption. *See, e.g.*, *In re Dreier*, 452 B.R. at 425 (rejecting argument that *Sharp* eliminated the Ponzi scheme presumption because "*Sharp* did not involve a Ponzi scheme and the Second Circuit did not discuss or refer to the Ponzi scheme presumption or Ponzi schemes in general"); *In re Manhattan Inv. Fund Ltd.*, 397 B.R. at 11 ("*Sharp* does not dispose of the Ponzi scheme presumption. At most, it simply means that courts must be sure that the transfers sought to be avoided are related to the scheme.").

Independent of the Ponzi scheme presumption, the SAC alleges myriad "badges of fraud" establishing BLMIS's fraudulent intent sufficient to satisfy Rule 9(b). *Luxalpha UBS Decision*, 2022 WL 17968924, at *15. First, and foremost, "the Court need not infer intent to defraud because Madoff has admitted that he had actual intent to defraud when he admitted under oath that he operated a Ponzi scheme." *Id.*; (*see* SAC ¶ 24.) Moreover, the Trustee alleges that: (i) "BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register" (SAC ¶ 35); (ii) "[f]or more than 20 years preceding that registration, the financial

48

reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of

customer funds BLMIS managed through its IA Business." (SAC ¶ 36); (iii) "Madoff was

assisted by several family members and a few employees, including Frank DiPascali, Irwin

Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others who pleaded to, or were

found guilty of, assisting Madoff in carrying out the fraud" (SAC ¶ 38); (iv) BLMIS used

customer funds to prop up its proprietary trading business (SAC ¶ 39); (v) BLMIS commingled

customer funds and used them to satisfy customer redemptions, rather than purchase securities

(SAC ¶¶ 43, 45); (vi) "BLMIS reported falsified trades using backdated trade data on monthly

account statements sent to BLMIS customers that typically reflected impossibly consistent gains

on the customers' principal investments" (SAC ¶ 46); (vii) "[t]here are no records to substantiate

Madoff's sale of call options or purchase of put options in any amount, much less in billions of

notional dollars." (SAC ¶ 51); (viii) "Madoff could not be using the SSC Strategy because his

returns drastically outperformed the market. BLMIS showed only 16 months of negative returns

over the course of its existence compared to 82 months of negative returns in the S&P 100 Index

over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly)

the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index

was down (at times significantly). Such results were impossible if BLMIS had actually been

implementing the SSC Strategy." (SAC ¶ 53); and (ix) "[t]here is no record of BLMIS clearing a

single purchase or sale of securities in connection with the SSC Strategy at the Depository Trust

& Clearing Corporation, the clearing house for such transactions, its predecessors, or any other

trading platform on which BLMIS could have traded securities." (SAC ¶ 59.)

  This Court has already found that, "[t]hough unnecessary," these allegations "sufficiently

plead[]the badges of fraud," for purposes of section 548(a)(1)(A). *Luxalpha UBS Decision*, 2022

WL 17968924, at *15; *see also ABN AMRO*, 650 B.R. at 39–40; *JABA Assocs. LP*, 528 F. Supp.

3d at 241 ("'[T]he existence of the badges of fraud supply a separate basis to conclude that the

Two-Year Transfers were made with the actual intent to defraud.'") (quoting *Nelson*, 610 B.R. at

235); *Lisa Beth Nissenbaum Trust*, 2021 WL 1141638, at *15  (same).

The Trustee has therefore adequately pleaded BLMIS's actual intent.

### C.   SECTION 546(e) DOES NOT APPLY HERE

Section 546(e) limits avoidance claims under certain sections of the Code—including

544, 547, and 548(a)(1)(B)—other than 548(a)(1)(A). The Trustee seeks only to avoid two-year

transfers under 548(a)(1)(A). (SAC ¶¶ 292–96.) UBS's and RIR's section 546(e) argument is

therefore moot.

As stated above, the Trustee has amply pleaded BLMIS's actual intent to defraud under

section 548(a)(1)(A).

### D.   THE TRUSTEE HAS PLAUSIBLY ALLEGED THAT HE CAN RECOVER THE SUBSEQUENT TRANSFERS FROM THE DEFENDANTS

The SAC states a claim for recovery under Section 550(a)(2) by plausibly alleging that

the Defendants received subsequent transfers of BLMIS stolen customer property. A complaint

must show that a claim is plausible, not that it is probable, and must show enough facts "to raise

a reasonable expectation that discovery will reveal evidence" of the claim. *Twombly*, 550 U.S. at

556. And "a well-pl[eaded] complaint may proceed even if it strikes a savvy judge that actual

proof of those facts is improbable, and that a recovery is very remote and unlikely." *Multi-

Strategy Fund Ltd.*, 641 B.R. at 89 (quoting *Twombly*, 550 U.S. at 556). The SAC far exceeds

thar bar.

1.    **The SAC Pleads That the Defendants Received BLMIS Customer Property Under Section 550(a) of the Bankruptcy Code**

To successfully plead a subsequent transfer claim, the Trustee must allege sufficient facts that support an inference "that the funds at issue originated with the debtor." *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 149–50 (Bankr. S.D.N.Y. 2014) ("*Merkin I*") (quoting *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*, 379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007). No tracing analysis is necessary—the pleading burden "'is not so onerous as to require 'dollar-for-dollar accounting' of 'the exact funds' at issue.'" *Id*. at 150 (quoting *Picard v. Charles Ellerin Rev. Tr. (In re BLMIS)*, No. 10-04398 (BRL), 2012 WL 892514, at *3 (Bankr. S.D.N.Y. Mar. 14, 2012)). Rather, "the Trustee need only allege sufficient facts to show the relevant pathways through which the funds were transferred from BLMIS to [the subsequent transferee] . . . ." *Charles Ellerin Rev. Tr.*, 2012 WL 892514, at *3; *see also In re 45 John Lofts, LLC*, 599 B.R. 730, 747 (Bankr. S.D.N.Y. 2019).

2.    **The Defendants Misstate the Trustee's Pleading Burden**

Rule 8(a) governs the Trustee's pleading burden, and thus a short and plain statement that the pleader is entitled to relief is all that is required. *See Multi-Strategy Fund Ltd.*, 641 B.R. at 90; *Merkin I*, 515 B.R. at 149; Fed. R. Civ. P. 8(a). This standard of pleading is meant to ensure that the defendant has proper notice of the claim, while recognizing the limitations a plaintiff may have in setting out each detail of the claim before discovery. *In re Enron Corp.*, No. 01-16034 AJG, 2006 WL 2400369, at *4 (Bankr. S.D.N.Y. May 11, 2006). In a subsequent transfer claim, this means only that a defendant must be adequately apprised of the subsequent transfers that the Trustee seeks to recover. *Cohmad II*, 454 B.R. at 340.

The SAC satisfies the Trustee's pleading burden. The allegations detail a common enterprise of entities and their agents participating in LIF-USEP's investment with BLMIS and

51

the subsequent transfer of customer property for their benefit. (SAC ¶¶ 74, 170, 257–59.) The

UBS Defendants, RIR, and M&B are service providers that received fees based on LIF-USEP's

assets under management. (SAC ¶¶ 171, 270.) Although UBS derides the allegations as "vague,"

"skimp[y]," and "generic" and M&B claims that the Trustee has failed to make the connections

between the funds it received and BLMIS customer property (UBS Mot. at 32; M&B Mot. at 17–

18), the allegations in the SAC describe the structure and relationships on which the subsequent

transfers are based, and provide additional detail on the subsequent transfers themselves,

including the identities of the transferors and transferees, and the date ranges and amounts of the

transfers, i.e., the transfers' "vital statistics." *Merkin I*, 515 B.R. at 150 (quoting *In re Allou

Distribs., Inc.*, 379 B.R. at 32).

The Trustee alleges that "LIF-USEP's service providers received millions of dollars in

fees for their work on behalf of the fund." (SAC ¶ 171.) The SAC also depicts the path of

customer property from BLMIS to each of the Defendants. (SAC ¶ 276.) Additionally, and as

UBS repeats in its Motion (UBS Mot. at 32), the Trustee alleges that UBS SA received at least

$5,453,579 million in subsequent transfers from LIF-USEP between September 2005 and

December 2008—the amounts, the identities of the transferor and transferee and the date ranges

of the transfers at issue. (SAC ¶ 271(a).) The Trustee alleges in the SAC that UBSTPM received

at least $10,590,437 million in subsequent transfers from LIF-USEP between May 2006 and

December 2008, and that UBSFSL received at least $747,560 in subsequent transfers from LIF-

USEP between September 2005 and December 2008. (SAC ¶¶ 271(b) & (c).) As this Court held

in the *Luxalpha UBS Decision*, where similar allegations were pleaded against UBS, "the Trustee

provides the UBS Defendants with the who, when, and how much of the purported transfers."

2022 WL 17968924, at *16 (citation omitted). With respect to M&B, the Trustee alleges that

M&B received at least $9,803,269 in subsequent transfers from LIF-USEP, and his allegations

detail the types of fees M&B received based on the type of service it provided to LIF-USEP.

(SAC ¶ 272.)

The Trustee does the same with respect to RIR, alleging that RIR received at least

$4,324,482 in subsequent transfers and describing how these monies flowed from LIF-USEP to

RIR. (SAC ¶¶ 270, 273.) RIR argues it was not an immediate or mediate transferee of any

transfer originating from LIF-USEP's account with BLMIS. (RIR Mot. at 5.) It claims that RIR

was not entitled to any compensation from LIF-USEP pursuant to any agreement and that RIR

did not receive compensation or payment from LIF-USEP. (*Id.*) But the Trustee alleges

otherwise in the SAC. Reliance Gibraltar was LIF-USEP's official investment advisor. (SAC ¶

95.) RIR, which was Reliance's "research entity," monitored the BLMIS investment along with

performing many other functions that Reliance was obligated to perform for LIF-USEP. (*Id.*)

UBS and Reliance were responsible for significant investment with LIF-USEP. (SAC ¶ 169.)

RIR received substantial fees for the services it provided LIF-USEP. (SAC ¶¶ 83, 171, 273.)

Reliance Gibraltar received fees through its August 18, 2005 Portfolio Advisory Agreement with

LIF-USEP and UBS SA and its May 2, 2006 Investment Advisory Agreement with UBSTPM.

(SAC ¶ 83.) Pursuant to the May 24, 2005 Research Services Agreement between Reliance

Gibraltar and RIR and the September 15, 2008 Research and Administrative Support Services

Agreement, Reliance Gibraltar subsequently paid to RIR a portion of the fees derived from LIF-

USEP, which the Trustee pleads was no less than $4,324,482. (SAC ¶¶ 83, 272.) The Trustee has

satisfied his pleading burden with respect to RIR.

The Defendants also erroneously seek to align the SAC with the complaint in *Picard v.*

*Shapiro*, 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015), where the subsequent transfer allegations

were deemed insufficient. (M&B Mot. at 17; UBS Mot. at 33–34.) In *Shapiro*, the Court found

that the Trustee's claims consisted of "barebones" allegations that "the Initial Transferee

Defendants subsequently transferred a portion of the $53,778,486 received from BLMIS" to

subsequent transferees, and did not satisfy the pleading burden. *Id*. The court in *Shapiro* found

that the allegations did not "plausibly imply that the initial transferees even made subsequent

transfers to the Subsequent Transferees as opposed to third parties, or that they made the

subsequent transfers rather than simply keep the initial transfers for themselves." *Id*.

The SAC is not the *Shapiro* complaint. In the SAC, the Trustee specifically outlines the

pathways through which customer property traveled, from BLMIS to LIF-USEP and then to the

Defendants. (SAC ¶ 276.) The Trustee also alleges the dates ranges, amounts, and bases for those

transfers. (SAC ¶¶ 271–73.) There can be no question that the allegations here apprise the

Defendants of the transfers that the Trustee seeks to recover. Nothing more is required at this

stage. *See, e.g.*, *Picard v. Mayer, et al.*, No. 08-01789, 2021 WL 4994435, at *5 (Bankr.

S.D.N.Y. Oct. 27, 2021) (rejecting argument that subsequent transfer claim was not pleaded

"with enough specificity as to how and what [defendant] received" and holding that the

complaint "contains sufficient information regarding which transfers the Trustee is seeking to

recover").

### 3.    Further Details of the Subsequent Transfers Must Come From the Defendants' Books and Records

The Defendants seek to diminish the Trustee's allegations by arguing that each and every

detail of the subsequent transfers has not been pleaded. This is neither required nor possible at

this stage of the proceeding. The Trustee is a stranger to the transactions between LIF-USEP and

the subsequent transferees and is entitled to discovery on this issue. "[I]n a case such as this one,

where 'the Trustee's lack of personal knowledge is compounded with complicated issues and

transactions [that] extend over lengthy periods of time, the Trustee's handicap increases,' and

'even greater latitude' should be afforded." *Cohmad II*, 454 B.R. at 329. In *Mayer*, this Court

recently recognized the Trustee's difficult position in similar circumstances:

> [T]he Trustee is an outsider to these transactions and will need
> discovery to identify the specific subsequent transfers by date,
> amount and the manner in which they were effected. The Moving
> Defendants are a group of interrelated individuals and entities . . . .
> Whether they additionally received Subsequent Transfers of BLMIS
> funds from one another is a question to which they, and they alone,
> have the requisite information to respond. *In re BLMIS, LLC*, 445
> B.R. 206, 236 (Bankr. S.D.N.Y. 2011). The Complaint contains
> sufficient information regarding which transfers the Trustee is
> seeking to recover . . . The allegations contain plausible grounds to
> infer that [the Defendant] received the Subsequent Transfers as part
> of a scheme and that discovery may reveal additional information
> on this scheme.

2021 WL 4994435, at *5.

The Court in *Merkin I* denied defendants' motion to dismiss for a similar reason, finding

"[t]he subsequent transfer claim must ultimately be proved through the books and records of the

defendants." 515 B.R. at 151. UBS claims that this case is unlike *Merkin I* because the "Trustee

purports to know the total amounts paid to UBS, the nature of the payments (*e.g.*, as custodian,

prime bank, administrator, or manager) and the broad time frames of such payments—yet he

failed (apparently deliberately) to allege specific dates or amounts for any Subsequent Transfer."

(UBS Mot. at 34.) This argument proves the Trustee's point. The Trustee has pleaded enough

details of the transfers to put the Defendants on notice. The Trustee should be entitled to move

beyond the pleading stage to obtain discovery and move forward with his claims.

As noted above, the Trustee did receive some documents pursuant to Rule 2004

subpoenas. (*See supra* Section I.E.) While it is true that the Trustee was able to formulate the

allegations concerning the subsequent transfers at issue in this case from these documents, those

productions were incomplete. They were too narrow in scope and timeframe, and did not supply

the granular detail of every transfer. M&B, of course, has not produced any documents at all.
The information necessary to determine the precise details of each subsequent transfer remains
within the exclusive possession, custody, and control of the Defendants.

> **4.    The Trustee Need Not Tie Each Subsequent Transfer to an Initial
> Transfer at the Pleading Stage**

The Defendants' arguments concerning the specifics of the subsequent transfers are fact-
based tracing arguments. They are not an appropriate basis for a motion to dismiss. Yet these
arguments reveal that the Defendants have, in fact, been sufficiently apprised of the transfers the
Trustee seeks to recover. (M&B Mot. 18–19; UBS Mot at 33–35.)

First, the Trustee's allegations that the Defendants received transfers originating from
BLMIS cannot be dismissed at the pleading stage simply based on the Defendants' conclusory
rejoinder that they did not originate from BLMIS. The Defendants attempt to distinguish this
case from prior decisions of this Court by raising issues of timing. (M&B Mot. at 17–18; UBS
Mot. at 34.) But the same issues have been raised by other subsequent transferees, and the
conclusion has been the same. *Picard v. Merrill Lynch Int'l*, No. 08-01789 (CGM), 2023 WL
2544212, at *12–13 (Bankr. S.D.N.Y. Mar. 16, 2023); *Picard v. Quilvest Finance Ltd.*, No. 08-
01789 (CGM), 2022 WL 4493184, at *7 (Bankr. S.D.N.Y. Sept. 27, 2022); *Citibank, N.A.*, 2022
WL 4493234, at *6–7. These are questions of fact. *See Mayer*, 2021 WL 4994435, at *4
(Whether the defendants "actually received the [Subsequent Transfers] is an issue to be
determined by this Court after discovery."); *Citibank, N.A.*, 2022 WL 4493234, at *7 ("The
Court will determine if this money came from BLMIS or from some other source at a later
date.")

The Defendants' tracing arguments are inappropriate on a motion to dismiss. The
appropriate approach to tracing at this stage is for the Court to allow the case to move forward so

that fact and expert discovery may be taken. *Banque Syz*, 2022 WL 2135019, at *12; *see also*

*Picard v. Merkin (In re BLMIS)*, 581 B.R. 370, 386 (Bankr. S.D.N.Y. 2017) ("*Merkin II*")

("Court's selection of an appropriate methodology is committed to the Court's discretion.")

(citation omitted); *Charles Ellerin Rev. Tr.*, 2012 WL 892514, at *3 n.7 ("Courts have broad

discretion to determine which monies of commingled funds derive from fraudulent sources.")

(citing *United States v. Henshaw*, 388 F.3d 738, 741 (10th Cir. 2004)). It would be "premature,"

as the *Merkin I* court found, "to cut off the Trustee's opportunity to satisfy his [tracing] burden

on a motion to dismiss" merely because the tracing may prove difficult. *See Merkin I*, 515 B.R.

at 152 (citing *Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*, Adv. Pro. No. 10-03493

(SMB), 2014 WL 47774, at *15 (Bankr. S.D.N.Y. Jan. 3, 2014) ("[T]he [subsequent transferees']

speculation that tracing is 'not likely' to reveal a subsequent transfer . . . hardly justifies granting

[their cross-motion for summary judgment]."))

> For now, the Trustee must allege that the subsequent transfers are customer property and
originate from the debtor, but he need not tie each subsequent transfer to a specific initial transfer
from BLMIS. In *Merkin I* the Court refused to dismiss subsequent transfer claims even though
the complaint did "not connect each of the subsequent transfers with an initial, voidable transfer
emanating from BLMIS . . . ." *Merkin I*, 515 B.R. at 150, *see also In re 45 John Lofts, LLC*, 599
B.R. at 747 (finding no requirement "to trace individual dollar amounts from the transferor to the
transferees to survive a motion to dismiss"). The Court also rejected the argument that the
Trustee must detail the portion of each subsequent transfer made up of customer property. *See*
*Merkin I*, 515 B.R. at 152–53 (refusing to dismiss complaint where "at least some of the
subsequent transfers . . . may be recoverable"); *see also In re Allou Distribs., Inc.*, 379 B.R. at 30
(finding that "if dollar-for-dollar accounting is not required at the proof stage, then surely it is

not required at the pleading stage either."). The Trustee has alleged that LIF-USEP's only business was investing with BLMIS, and that the fund received hundreds of millions of dollars in initial transfers of customer property from BLMIS. (SAC ¶¶ 2, 18, 266.) The Trustee also alleged that the Defendants "were together engaged for the sole purpose of directing investment into BLMIS and profiting from that endeavor" and received payment of fees from LIF-USEP. (SAC ¶¶ 74, 171.) Thus, the Trustee has plausibly alleged that the subsequent transfers originated with BLMIS. Nothing more is required at this stage. *See Luxalpha UBS Decision*, 2022 WL 17968924, at *16–17.

### 5.    The Trustee Need Only Plead Some of the Transfers

The Trustee is not required to plead <u>all</u> subsequent transfers. It is enough that some of them are sufficiently pleaded. *See Merkin I,* 515 B.R. at 151 ("The Court's conclusion that the TAC sufficiently pleads at least some subsequent transfers is also informed by the difficulties the Trustee faces in a case such as this."). The Defendants' arguments on timing of the subsequent transfers completely ignore that the date ranges of the alleged subsequent transfers, in most instances, span until December 2008. (SAC ¶¶ 271–73.) The Defendants do not deny that they received the payments, but rather focus on the accounting methods used. This analysis may be more appropriate for expert opinion which may be necessary to determine, for example, the portion of subsequent transfers that stemmed from the initial transfer or whether the subsequent transfers originated from a commingled account. *Merkin II*, 581 B.R. at 386; *see also Kelley v. Westford Special Situations Master Fund, L.P.*, No. 19-cv-1073, 2020 WL 3077151, at *1 (D. Minn. June 10, 2020) (denying summary judgment because trustee introduced expert report and associated documents from which a jury could infer that defendants received subsequent transfers of customer property).

### E.    THE SAC DOES NOT ESTABLISH THE DEFENDANTS' AFFIRMATIVE DEFENSES UNDER SECTION 550(b)

Defendants have the burden of proving their section 550(b) affirmative defense and must prove that defense with evidence. They cannot do so by simply referring to purported omissions in the SAC. *Banque Syz*, 2022 WL 2135019, at *10 (Defendants have the "burden to plead [the section 550 affirmative defense] in an answer and prove [it] with evidence; it cannot be established in a complaint"). UBS nonetheless ignores this rule and tries to convince the Court that the SAC establishes that UBS took its transfers for value, in good faith, and without knowledge of the voidability of the transfer. (UBS Br. at 27–31 (citing 11 U.S.C. § 550(b).) UBS fails to meet its burden of proof on this affirmative defense.

UBS's argument that the SAC establishes its good faith defense is untenable in light of the District Court's opinion in *ABN AMRO*, which flatly rejected a nearly identical argument that two ABN AMRO affiliates made in another case brought by the Trustee. *ABN AMRO*, 650 B.R. at 41. Following the Second Circuit's decision in *Citibank*, the District Court in *ABN AMRO* noted that good faith is an affirmative defense for which defendants bear the burden of proof. *Id*. But UBS does not just fail to meet its burden of proof on this issue. It ignores the Trustee's well-pleaded allegations that the UBS Defendants did not receive the transfers in good faith, but rather as part of a cynical and calculated scheme by which, *inter alia*, they intentionally misled regulators, lied to their own investors, created the illusion that they were performing services that they did not actually perform, and ignored substantial evidence of fraud. (SAC ¶¶ 130–63.) These hallmarks of bad faith that, viewed, as they must be, in the light most favorable to the Trustee, belie any notion that the SAC somehow pleads a good faith defense for the UBS Defendants.

### 1.    The SAC Does Not Establish Section 550(b)'s Value Requirement

The Trustee does not bear the burden of establishing that UBS did not provide value. Value is the transferee's burden to plead and prove. *BNP Paribas*, 594 B.R. at 196; *Banque Syz*, 2022 WL 2135019, at *11 ("Whether the Defendant gave value is a question of fact to be resolved either at the summary judgment stage or at trial.") (citation omitted). The question of whether UBS gave value is not appropriate for determination at this stage.

UBS nevertheless argues that because it is alleged to have provided services to LIF-USEP, and that because the Trustee purportedly does not allege that those services lacked value, any subsequent transfer the UBS Defendants received must have been in exchange for value. (UBS Mot. at 27–28.) But this Court has already ruled on this issue: with respect to Luxalpha, for which the same UBS entities performed the same services, the Court found that, "[t]he Complaint alleges that the opposite is true—the UBS Defendants received fees for pretending to provide services, which they knew to be done by BLMIS." *Luxalpha UBS Decision*, 2022 WL 17968924, at *17. Here, the SAC alleges that UBS misled regulators, delegated all vital management and custodial responsibilities to BLMIS, and that their supposed oversight role was nothing more than window-dressing. (*See, e.g.*, SAC ¶ 159 ("The net effect of the operating procedures put in place for LIF-USEP was to allow UBS SA and UBSFSL, two sophisticated financial institutions that appeared to the public to be directly involved in the operation of LIF-USEP, to earn fees for serving in oversight roles that actually provided no real oversight or protection for LIF-USEP's assets, and to allow BLMIS the freedom to manipulate reports as needed to perpetuate the Ponzi scheme."); ¶¶ 160–61 ("UBSTPM represented to the CSSF that it managed, administered, and monitored the fund's investment policies and restrictions . . . [and] continued to conceal the delegation of the fund's management to BLMIS."); ¶ 163 ("UBS SA complete[ly] abdicat[ed] its asset management responsibilities"); ¶ 135 ("UBS's role was to

60

create the appearance of UCITS compliance and to deflect regulatory scrutiny by interposing a

large, reputable, international bank between LIF-USEP and BLMIS.").)

### 2.   The SAC Does Not Establish Section 550(b)'s Good Faith Requirement

UBS acknowledges that, under *Citibank*, to determine good faith the Court must examine

(1) "what facts the defendant knew," (2) "whether these facts put the transferee on inquiry notice

of the fraudulent purpose behind a transaction—that is, whether the facts the transferee knew

would have led a reasonable person in the transferee's position to conduct further inquiry into a

debtor-transferor's possible fraud," and (3) "whether diligent inquiry by the transferee would

have discovered the fraudulent purpose of the transfer." (UBS Mot. at 28–29 (quoting *Citibank*,

12 F.4th at 191–92).) "The Second Circuit made clear in its decision in *Citibank* . . . that the

inquiry notice standard requires a 'fact-intensive inquiry to be determined on a case-by-case

basis, which naturally takes into account the disparate circumstances of differently situated

transferees.'" *Banque Syz*, 2022 WL 2135019, at *11 (citing *In re BLMIS, LLC*, Dec. & Order,

20-cv-02586 (CM) (May 2, 2022)) (internal quotation marks omitted). Because "'such a fact-

based determination can only be made based on the entirety of the factual record after

discovery,'" UBS cannot demonstrate that its good faith is evident on the face of the SAC. *Id.*

(citation omitted).

For its showing on the first two elements of the good faith requirement, UBS cherrypicks

a few allegations, (UBS Mot. at 29 (citing SAC ¶¶ 100–15, 127, 231)), and brushes them off as

"red flags" that "amount to, at most, a lack of transparency at BLMIS, potential self-dealing,

improper trading activities, and deviations from utilizing the SSC trading strategy." (UBS Mot.

at 29.) But UBS makes no effort to address the weight of the SAC, which over the course of

hundreds of paragraphs lays out the set of facts that demonstrate that all of the Defendants,

61

including the UBS Defendants, were aware of myriad indicia of fraud at BLMIS. (*E.g.*, SAC ¶¶

101, 180–81, 234–56, 267.) These allegations, taken together, would, at a minimum, have put

UBS on inquiry notice of Madoff's fraud, and nothing UBS argues changes that. Recognizing the

difficulty with their argument, the UBS Defendants posit that, even if the SAC alleges facts

sufficient to establish inquiry notice, it nevertheless confirms that a diligent inquiry could not

have led to the discovery of a fraudulent purpose of the transfers. To reach this conclusion, the

UBS Defendants point to the SEC investigation that failed to detect fraud at BLMIS—not only

an improper reliance on extrinsic facts, but a misapprehension of both the shortcomings of the

investigation, laid out in detail by the Office of the Inspector General's Report. U.S. Securities

and Exchange Commission Office of Investigations, *Investigation of Failure of the SEC To*

*Uncover Bernard Madoff's Ponzi Scheme–Public Version* (Aug. 31, 2009),

https://www.sec.gov/files/oig-5090.pdf. Finally, as an insider to the transactions with BLMIS,

UBS had *far more information* evidencing fraud at BLMIS than did the SEC. There is no reason

for the Court to engage in speculation about facts extrinsic to the SAC, however. The

shortcomings of the SEC's investigation do not excuse UBS's lack of good faith.

UBS's disingenuous reliance on the SEC's botched investigation of BLMIS to establish

"good faith" is all the more galling in light of the SAC's allegations concerning UBS's deliberate

efforts to thwart SEC oversight of BLMIS and impede the very investigation it now relies on for

exoneration. As alleged in the SAC, UBS's offices in the U.S. deliberately failed to cooperate

with the SEC's inquiries into BLMIS's purported options trading counterparties. (SAC ¶ 221.)

This, combined with intentionally misleading the CSSF to circumvent both U.S. and

Luxembourg efforts at fraud protection can never be viewed as consistent with acting in "good

faith." (SAC ¶¶ 130–63, 222.) Not surprisingly, UBS omits any discussion of these facts in connection with its good faith defense.

UBS contends that the SAC alleges that the Defendants "actually *did* conduct diligent inquiries" that failed to uncover the scheme. (UBS Mot. at 30–31). But UBS seems to refer only to the due diligence Optimal performed, and omits the fact that this very due diligence led Optimal to conclude that BLMIS could very well be a Ponzi scheme—evidence that UBS ignored in establishing LIF-USEP because it stood to profit from investment using other people's money. (SAC ¶¶ 109, 111, 114, 122.)

The only conclusions the SAC supports are either that UBS was aware of the fraud, or, at the very least, that a diligent inquiry would have enabled UBS to discover it. UBS's relationship with LIF-USEP and its service providers, followed the pay-to-play protocol it established with Luxalpha and its service providers: that is, for a fee, UBS would lend its reputation as a stable, highly capitalized bank to a BLMIS feeder fund to reassure regulators and potential investors. Just as it did with Luxalpha, UBS populated LIF-USEP's board with UBS employees, and UBS SA, UBSTPM, and UBSFSL, began to serve as LIF-USEP's nominal custodian, administrator, and portfolio manager. When UBS undertook this role for LIF-USEP in 2005, it was already aware that Madoff's performance was "impossible"(SAC ¶¶ 124–26) and that his returns could not be the product of the SSC strategy. (SAC ¶ 127.) UBS accepted the fact that BLMIS could be a fraud and became the face of LIF-USEP for the same reason as it did with other BLMIS feeder funds—it simply could not leave millions of dollars in fees on table. (SAC ¶ 122.) So UBS secured the proper indemnities and insurance to shield itself from potential liability and marched forward. (SAC ¶¶ 7, 129.) LIF-USEP, like Luxalpha, was a UCITS fund, meaning it was open to retail investors and therefore UBS was required to safeguard LIF-USEP's assets. But not only

did UBS delegate those duties to Madoff, in violation of applicable laws and regulations, it routinely lied to the CSSF, the Luxembourg regulator, and to investors about doing so. (SAC ¶¶ 140, 142, 145–46, 149–52.) UBS knew it had no way of verifying BLMIS's assets (SAC ¶¶ 147, 155) or whether BLMIS was making trades (SAC ¶¶ 147, 155–56), all the while UBS received BLMIS statements describing a strategy UBS knew to be impossible. (SAC ¶¶ 197, 205, 207–09.) These, certainly, are not allegations that demonstrate UBS's good faith.

RIR joins UBS's argument and further claims that "the SAC establishes RIR's good-faith defense because RIR performed services to a non-party, RMGL, and was paid for such services by RMGL[.]" (RIR Mot. at 4.) Contrary to RIR's assertion, however, the SAC sets forth facts demonstrating that RIR was on inquiry notice of BLMIS's fraudulent nature and a diligent inquiry would have revealed that BLMIS was a fraud.

RIR was, on multiple occasions, shown evidence of fraud at BLMIS. Jason Whitt, an RIR employee who was assigned as the senior research analyst in charge of monitoring BLMIS, communicated with industry professionals and had suspicions arising from the fact that Madoff's trading was entirely unaffected by events in 2008. (SAC ¶¶ 183–85.) He warned his superiors, Tim Brockmann and Justin Lowe, that he was unable to ascertain Madoff's counterparties and that he was aware of suspicious trading activity that was inconsistent with the unforeseen market conditions. (SAC ¶ 186.) Whitt specifically warned that there was "too much unknown fraud risk at Madoff." (SAC ¶ 187.) Questioning whether "the whole thing is a fraud," Whitt urged Lowe to have Reliance tap into Echeverría's insights about BLMIS's options counterparties because Echeverría had access to Madoff. (SAC ¶¶ 186–88.) RIR knew that Madoff's strategy "ma[de] no sense." (SAC ¶ 186.) Like UBS, Reliance omitted Madoff's name from its materials in violation of applicable law, rendering it complicit in hiding Madoff's role from third-parties.

(SAC ¶¶ 228–29.) Reliance knew that BLMIS was using a small, unknown auditing firm. One senior analyst from Reliance remarked that Friehling & Horowitz "looks so sketchy to me: why would they use an unheard of accountant in New City, New York . . . ?" (SAC ¶¶ 231–32.)

These warnings and conclusions went unheeded. The SAC therefore does not support a good faith defense for RIR. At a minimum, the SAC presents issues of fact that cannot be resolved on UBS's or RIR's motion to dismiss, and therefore, their motions must be denied.

### 3.    The SAC Does Not Establish Section 550(b)'s Lack of Knowledge Requirement

UBS's argument regarding the third requirement for its good faith defense, lack of knowledge of the voidability of the initial transfer, is conclusory. Despite acknowledging that the proper analysis would require a determination of UBS's subjective knowledge, UBS offers no explanation for how the SAC could establish or resolve such issues of fact, nor does it cite any paragraph or allegation that demonstrates UBS's supposed lack of knowledge.

UBS argues that the lack of knowledge requirement is coextensive with the good faith requirement. As a result, its argument fails for the same reasons detailed above. As this Court has repeatedly stated, "[h]aving determined that 'good faith' cannot be found on the face of a complaint, the Court must deny the Defendant's motion on th[e lack of knowledge] element." *Luxalpha UBS Decision*, 2022 WL 17968924, at *18; *see also Banque Syz*, 2022 WL 2135019, at *11 (same).

With respect to all three elements of the section 550(b) defense, "[i]t is not appropriate for the Court to resolve these factual issues at this stage of the litigation." *Luxalpha UBS Decision*, 2022 WL 17968924, at *18. UBS's and RIR's motion must therefore be denied on this basis as well.

## CONCLUSION

For all the foregoing reasons, the Court should deny the Moving Defendants' Motions.

Dated:     July 14, 2023              */s/ Oren J. Warshavsky*
           New York, New York         **BAKER & HOSTETLER LLP**
                                       45 Rockefeller Plaza
                                       New York, New York 10111
                                       Telephone: (212) 589-4200
                                       Facsimile: (212) 589-4200
                                       David J. Sheehan
                                       dsheehan@bakerlaw.com
                                       Oren J. Warshavsky
                                       owarshavsky@bakerlaw.com
                                       Gonzalo Zeballos
                                       gzeballos@bakerlaw.com
                                       Tatiana Markel
                                       tmarkel@bakerlaw.com

                                       *Attorneys for Irving H. Picard,*
                                       *Trustee for the Substantively Consolidated*
                                       *SIPA Liquidation of Bernard L. Madoff*
                                       *Investment Securities LLC and the Estate of*
                                       *Bernard L. Madoff*

**OF COUNSEL:**
**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4200
Benjamin Pergament
bpergament@bakerlaw.com
Robertson Beckerlegge
rbeckerlegge@bakerlaw.com
Geoffrey A. North
gnorth@bakerlaw.com
Michelle R. Usitalo
musitalo@bakerlaw.com