# EXHIBIT 3

1

1          C O N F I D E N T I A L

2          UNITED STATES BANKRUPTCY COURT
           SOUTHERN DISTRICT OF NEW YORK
3           ADV. PRO. NO. 08-01789 (BRL)

4

-------------------------------x
5    SECURITIES INVESTOR PROTECTION
     CORPORATION,                        Videotaped
6
              Plaintiff-Applicant,        Rule 2004
7         v.                            Examination of:

8    BERNARD L. MADOFF INVESTMENT         JUSTIN LOWE
     SECURITIES, LLC,
9             Defendant.
     -------------------------------x
10   In Re:

11   BERNARD L. MADOFF,

12            Debtor.
     -------------------------------x
13

14

15        TRANSCRIPT of testimony as taken by and before

16   NANCY C. BENDISH, Certified Court Reporter, RMR, CRR

17   and Notary Public of the States of New York and New

18   Jersey, at the offices of Baker & Hostetler, 45

19   Rockefeller Plaza, New York, New York on Wednesday,

20   June 9, 2010, commencing at 9:35 a.m.

21

22

23

                  BENDISH REPORTING, INC.
24                Litigation Support Services
                      877.404.2193
25                   www.bendish.com

2

```
 1    A P P E A R A N C E S:

 2

 3          BAKER & HOSTETLER, LLP
            Washington Square, Suite 1100
            1050 Connecticut Avenue, N.W.
 4          Washington, D.C. 20036-5304
            BY:  FREDERICK W. CHOCKLEY III, ESQ.
 5               KATHERINE L. McKNIGHT, ESQ.
            For Irving Picard, Trustee
 6
            BAKER & HOSTETLER, LLP
 7          45 Rockefeller Plaza
            New York, New York  10111
 8          BY:  JUDY A. SELBY, ESQ.
                 MIRIANNA SHELENKOVA, ESQ.
 9               MICHELLE YOUNG, ESQ.
            For Irving Picard, Trustee
10
            SEWARD & KISSEL LLP
11          One Battery Park Plaza
            New York, New York  10004
12          BY:  MARK J. HYLAND, ESQ.
            For the Witness, Justin Lowe
13

14    ALSO PRESENT:

15          DANIEL McCLUTCHY, Videographer

16

17

18

19

20

21

22

23

24

25
```

LOJCAA0000002

JUSTIN LOWE 6/9/10                CONFIDENTIAL                SIPC v. BLMIS

3

1                                I N D E X

2
     WITNESS                                              PAGE
3
4    JUSTIN LOWE

5      Examination by Mr. Chockley                          6

6      Examination by Ms. Selby                           211

7

8

9

10

11

12                            E X H I B I T S

13   IDENT.            DESCRIPTION                        PAGE

14
     Lowe-1    Reliance International Research LLC
15             Operating Agreement, RIR 05254-05264.     16

16   Lowe-2    Research Services Agreement, 2/25/02,
               RIR 05754-05757.
17                                                        40

     Lowe-3    Research Services Agreement, 5/24/05,
18             RIR 05749-05753.                           66

19   Lowe-4    Purchase and Sale Agreement, RIR
               05250-05253.
20                                                        89

     Lowe-5    Amendment to RIR Operating Agreement,
21             RIR 05249.                                 91

22   Lowe-6    Research and Administrative Support
               Services Agreement, RIR 05758-05764.       99
23
     Lowe-7    Response to Request No. 39,
24             RIR 7201-7202                              155

25

LOJCAA0000003

4

1                    E X H I B I T S (Cont'd)

2     IDENT.              DESCRIPTION                    PAGE

3

      Lowe-8     Reliance Management Note to File,
4                RIR 7015-7016.                          178

5     Lowe-9     Reliance Management Note to File,
                 RIR 7012-7014.                          195

6

      Lowe-10    Email 11/19/08 from Justin Lowe,
7                RIR 7320-7324.                          200

8     Lowe-11    Email 10/10/07 to Lowe from O'Hara,
                 RIR 7348.                                223

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LOJCAA0000004

5

1          THE VIDEOGRAPHER:  Good morning.  My

2     name is Daniel McClutchy of Bendish Reporting.  The

3     date today is June 9th, 2010 and the time is

4     approximately 9:35 a.m.  This deposition is being

5     held in the office of Baker Hostetler, located at 45

6     Rockefeller Plaza, New York, New York.  The caption

7     of this case is Securities Investor Protection

8     Corporation versus Bernard L. Madoff Investments

9     Securities, LLC in the US Bankruptcy Court, Southern

10    District of New York, case number 08-01789 (BRL).

11    The name of the witness is Justin Lowe.

12          At this time the attorneys will

13    identify themselves and the parties they represent,

14    after which our court reporter, Nancy Bendish, will

15    swear in the witness and we can proceed.

16          MR. CHOCKLEY:  Good morning.  My name

17    is Frederick Chockley.  I am counsel for the

18    Trustee.  I have some colleagues with me who are not

19    on the record at the moment, Kate McKnight, Judy

20    Selby.  Sorry, I'm blanking.

21          MS. SHELENKOVA:  Marianna Shelenkova.

22          MR. CHOCKLEY:  Michelle Young.  Thank

23    you.

24          MR. HYLAND:  Mark J. Hyland, Seward &

25    Kissel, One Battery Park Plaza, New York, New York,

LOJCAA0000005

6

1    for the witness.

2

3    J U S T I N   L O W E,

4         147 East 48th Street,

5         New York, New York, 10017, sworn.

6    EXAMINATION BY MR. CHOCKLEY:

7         Q.        This deposition is being taken

8    pursuant and governed by a Protective Order in the

9    case and both the witness and Mr. Hyland have signed

10   copies of undertakings indicating that they have

11   read the Protective Order and will abide by it.

12             I would ask Mr. Lowe, the witness, to

13   please affirm that he understands that that

14   undertaking binds him personally and not simply his

15   company, Reliance International Research LLC.

16        A.        Yes.

17             MR. CHOCKLEY:  And I would note that

18   we have copies of the Protective Order for the court

19   reporter and the videographer present.  I'd like to

20   give them each a copy of the Protective Order.  It's

21   not required that they execute the undertaking, but

22   I would like you to have copies of the Protective

23   Order, please.  And I'm going to read into the

24   record the provision concerning court reporters.

25             Paragraph 12:  "Any court reporter

LOJCAA0000006

163

1    people at Fidux Trust?

2         A.      Yes.

3         Q.      And does Reliance have an interest in

4    Fidux Trust?

5         A.      No.

6         Q.      Or does Mr. Brockmann have an

7    interest in Fidux Trust?

8         A.      No.

9         Q.      Are Mr. Hirschbaek and Gemma Cross

10   still employed there?

11        A.      Gemma -- Hirschbaek is -- the answer

12   is, I'm not quite sure.  Gemma doesn't work there

13   anymore, I believe, and I don't know the ownership

14   structure of Fidux.  I know Hirschbaek is involved,

15   but I don't know how the ownership structure is

16   created.

17              What I think -- I want to, if you

18   don't mind, clear up any kind of misunderstanding.

19   Sometimes, you know, sitting here, all this can seem

20   like kind of alphabet soup and a little cloak and

21   dagger.  It's not.

22              We believe, under RIR's side and Tim

23   believes under Reliance's side, that hedge funds,

24   any kind of funds, should have independent

25   directors.  We dislike, although we have recommended

LOJCAA0000163

08-01789-cgm   Doc 23397-3   Filed 07/14/23   Entered 07/14/23 20:37:22   Exhibit 3
Pg 9 of 30
JUSTIN LOWE 6/9/10                CONFIDENTIAL                SIPC v. BLMIS

164

1   investments in the past, we strongly dislike, I'm

2   sure Seward would agree, funds where the management

3   company guys are on the board of the fund, because

4   there's huge conflicts of interest.  You get

5   redemption, you gate the fund, because you want to

6   protect your fees.

7              It's very, very important to the

8   Reliance funds that the board be an external board

9   of directors.  You'll notice throughout every single

10  one of the funds it's Hirschbaek and Whitehead or

11  Fiman and Whitehead, specifically for that reason,

12  to make sure it's an independent board of directors

13  for the fund.  Defender, the same situation;

14  Reliance Multi-Advisor, same situation.

15             So, Fidux is completely separate from

16  any Reliance entity, has no involvement.  For better

17  or for worse, has a mind of its own.

18             Tim Brockmann has involvements in

19  different businesses and as an entrepreneur he has

20  involvement in the family asset management business,

21  was a client of many of the Reliance funds, and he's

22  got an interest in a brokerage company so he can

23  execute for his clients at relatively low cost.

24        Q.    What was Mr. Brockmann's father's

25  name?

LOJCAA0000164

JUSTIN LOWE 6/9/10                CONFIDENTIAL                    SIPC v. BLMIS

165

1        A.      Uwe, U-w-e.

2        Q.      You indicated that your father was a

3    Swiss citizen, right?

4        A.      Yes.  Is.

5        Q.      Is a Swiss citizen.

6        A.      Is.

7        Q.      Does your father hold citizenship in

8    any other country?

9        A.      No.

10       Q.      Is your mother an American citizen?

11       A.      Yes.

12       Q.      And were you born in the US?

13       A.      No.

14       Q.      Were you born in Switzerland?

15       A.      No.

16       Q.      Where were you born?

17       A.      In Japan.

18       Q.      Now, at some point you -- at some

19   point Reliance decided to start a new fund, the

20   Defender Fund?

21       A.      Yes.

22       Q.      Were you involved in that decision?

23       A.      No.  The decision was taken by Tim,

24   and I was asked to assist in the nuts and bolts

25   creation of the fund and doing the leg work which

LOJCAA0000165

JUSTIN LOWE 6/9/10                CONFIDENTIAL                SIPC v. BLMIS

166

1    was, to a large extent, our modus operandi.

2        Q.      And what was the purpose in setting

3    up the Defender Fund?

4        A.      The Defender Fund, there's a little

5    history to it.  As you know, in 2005, I might have

6    mentioned before, Reliance wanted to get access to

7    Madoff trade information, get more information, and

8    really see what was going on in terms of trading

9    activity.  And Tim had expressed that desire to

10   Manuel Echeverria, I really want to get some trade

11   information on your Optimal Fund.  Manuel said, yes,

12   we can provide some but we can't give you copies of

13   every single trade ticket as they come along, just

14   in time.

15           So, a few months later it turns out

16   Manuel mentioned to Tim that there was a group that

17   wanted to open an account with Madoff.  And the

18   group was M & B Capital.  M & B Capital -- I'm sure

19   I'm repeating things that you already know, but

20   Morenes & Botin Capital in Madrid are related

21   parties to the family that controls Banco Santander.

22   Banco Santander owns 100 percent of Optimal.

23           And so here you have the CEO of

24   Optimal, Manuel Echeverria, gets approached by

25   M & B.  M & B says, we need your help to open an

LOJCAA0000166

167

1    account with Madoff.  Manuel does what I guess one

2    does when the key shareholder in the bank, through a

3    related entity, asks him to do something, he went

4    and helped them open an account with Madoff.

5              The account was opened via UBS

6    Luxembourg, the fund I mentioned before called LIF

7    US Equity Plus.  And

8    M & B, due to their status in Spain -- M & B was

9    supposed to be the investment advisor to the fund.

10   And M & B said at the last minute, we can really

11   only be the distributor.  You need to find an

12   investment advisor.  And Manuel said, let me place

13   you in a marriage of convenience, let me put you

14   guys together because you, Botin, you, Javier Botin

15   and Guillermo Morenes and Tim Brockmann, because you

16   might be able to do some stuff together, and he did

17   some matchmaking, introduced them, and Tim decided

18   that it was important enough for him to get the

19   trade level information on Madoff that he was

20   willing to participate as an investment advisor in

21   the LIF US Equity Plus Fund.

22              Fast forward to December of '06,

23   M & B poured a lot of money into the LIF fund

24   through their clients and so on, and the fund grew

25   very quickly.  And UBS, the manager of the fund,

LOJCAA0000167

JUSTIN LOWE 6/9/10                CONFIDENTIAL                SIPC v. BLMIS

168

1     custodian, administrator and promoter, said, that's

2     growing a little too fast.  We're going to close the

3     fund for a little bit.  M & B said, we need to

4     allocate more capital, we've got a lot of demand,

5     and they tasked Manuel again to go in, see Madoff to

6     open another account.  And he again did it and again

7     Reliance thought that this new account would be a

8     very good way of getting more information on another

9     account, make sure they were pari passu and

10    everything, and would have the added advantage of

11    providing the firm with exposure to some of M & B's

12    institutional or institutional level clients that

13    could potentially become clients in the fund of

14    funds business.  And that's how the decision was

15    taken to create Defender.

16               Now, as we all know with the benefit

17    of hindsight, Defender is probably the last entrant,

18    or one of the last, well placed, I'm sure you know

19    that, but Defender is one of the last accounts that

20    was ever created.  The last guy on the boat.  But

21    obviously none of that was known at the time.

22               MR. CHOCKLEY:  Let's take a break

23    here .  The videographer needs to change the tape.

24               THE VIDEOGRAPHER:  Off the record,

25    the time is 3:25.  This ends tape number 4.

LOJCAA0000168

JUSTIN LOWE 6/9/10                  CONFIDENTIAL                    SIPC v. BLMIS

169

```
 1                   (Recess taken.)
 2                   THE VIDEOGRAPHER:  We're back on the
 3       record, the time is 3:47.  This is tape number 5.
 4       BY MR. CHOCKLEY:
 5            Q.      Mr. Lowe, I saw a document that had a
 6       reference to another RIR employee whose name did not
 7       come up earlier today.  That is Doug Scrivani.
 8            A.      Yes.
 9            Q.      Who is that?
10            A.      He was hired in November of 2008 --
11       October/November of 2008, and he was let go on -- he
12       was let go beginning of December of 2008.
13            Q.      What was his position?
14            A.      He was kind of an assistant to
15       Mr. O'Hara.  Or Mr. O'Hara was a controller and he
16       was just overwhelmed with the amount of stuff he had
17       to do, so he was acting as his assistant.  And he
18       was -- not only was he -- he was let go partially
19       due to the circumstances, but also because he wasn't
20       a particularly good employee.  So even if Madoff
21       hadn't happened, he probably would have been let go.
22       Ironically he ended up at the Federal Reserve.
23            Q.      So he's working for the Federal
24       Reserve in New York?
25            A.      Yes, I believe so.
```

BENDISH REPORTING, INC.
877.404.2193

JUSTIN LOWE 6/9/10                    CONFIDENTIAL                    SIPC v. BLMIS

170

1        Q.        Getting back to the process of

2    starting another fund, the Defender Fund, did

3    Reliance, as part of that process, undertake some

4    additional due diligence or review or monitoring of

5    Mr. Madoff?

6        A.        The answer is when the fund was

7    created, Reliance had already had trade level

8    information from the Luxembourg Investment Fund.

9    And so it had additional comfort compared to its

10   time when it was investing only in Kingate and in

11   Optimal.  So its involvement in Luxembourg

12   Investment Fund increased its understanding of the

13   strategy that was being applied, and also gave it

14   access to Madoff at a meeting that took place at the

15   beginning of February of 2007, the meeting I

16   referred to before, to which I was also invited.

17   And this happened prior to Defender.  The trades

18   were analyzed prior to Defender and Defender gave

19   even more information.

20                As I mentioned before, Reliance

21   Research was always talking to people who were

22   involved with Madoff and who had done business with

23   him and reading any articles that would have come

24   out in any kind of public search, reading the SEC

25   records, so there was always a process of being, in

LOJCAA0000170

171

1    an effort to do research about the person, about the

2    firm, and understand it.

3              But that said, Defender was created

4    for a particular client.  Interestingly enough,

5    there was a very interesting discussion with the

6    directors when the company was created where the

7    directors felt that it should not be called a fund.

8    And actually I think that was a great call because

9    it is not a fund in the sense of what I would call a

10   normal fund, where the principles of risk spreading

11   are applied.  It's a trading strategy.  So it's

12   similar to if you have a fund that's dedicated to

13   shorting, subprime or to betting on the euro raking

14   up, or on a particular discrete well-defined

15   strategy.  Those are trading vehicles.  I would call

16   them trading vehicles, I think is the best word.

17   For me, the Madoff funds, I said earlier this

18   morning, are not really feeder funds because they're

19   not designed to be diversified across a large number

20   of strategies and instruments.  They have a defined

21   purpose, which was to apply this particular

22   strategy.

23             So, in some way I think the, when

24   the, when Defender was created, yes, there was work

25   that was done over that whole period of time leading

JUSTIN LOWE 6/9/10                CONFIDENTIAL                SIPC v. BLMIS

172

1    up into it and then after to get to really know,

2    understand what is exactly going on at Madoff, and

3    the visit gave us a little bit more insight to the

4    person, the SEC, review of the SEC RAA registration

5    which Madoff had then, I believe in 2006, gave us a

6    little more insight, the NASD checks.

7              So, there's a significant amount of

8    work that was done prior to the creation, and it was

9    done while the fund was in existence.

10             But the most important part of that,

11   if I may add, the most important part of that is the

12   trade level verification, because that's the crux of

13   the matter.  We can talk about due diligence all we

14   want; the reality is that what you really want to

15   understand as an investor is exactly what's going on

16   from a trading perspective, what securities are in

17   and what can you get in terms of information, in

18   terms of the options, and make sure that prices are

19   traded -- securities are traded at the right prices.

20        Q.        You said you had access to the trade

21   level information from LIF, right?

22        A.        Yes.

23        Q.        How did you get that?

24        A.        Initially we got it from -- initially

25   UBS posted it on a website, on an internal kind of

LOJCAA0000172

173

1    private banking style website.  Because the fund was

2    created for M & B, the group that created it at UBS

3    was a private client group.  It's called Key Clients

4    Group for very, very wealthy families.  And so they

5    were essentially a part of private banking division.

6    They created the fund for a specific client.  And so

7    they use a private banking kind of website and they

8    reentered every single trade they received from

9    Madoff.  The problem is they reentered it with a lot

10   of mistakes.  And we kept discovering that small

11   little mistakes were made when they were entering

12   the trade tickets, which they then had to correct.

13   And it turns out that they were doing this process

14   some offshore location like India and it was full of

15   mistakes.

16              So basically we then, Reliance

17   asked -- we alerted Reliance, Reliance asked UBS if

18   they could send duplicate copies to Reliance

19   Research.  That took about six months to happen.  We

20   started getting them in January of 2007.  That's

21   most likely when we started appearing on the

22   so-called Madoff client list as a recipient of trade

23   tickets.

24        Q.        And just so I'm clear, you would

25   attribute then the access that you had to Madoff in

LOJCAA0000173

JUSTIN LOWE 6/9/10                CONFIDENTIAL                SIPC v. BLMIS

174

1    that meeting, sometime early 2007, to the Reliance

2    role as an investment advisor to LIF more than due

3    diligence in advance of beginning the Defender Fund?

4            A.       Absolutely.

5            Q.       So how was it that you were able to

6    get that access by virtue of serving as investment

7    advisor to LIF?

8            A.       Manuel Echeverria, who had brought

9    both M & B and Reliance together in the LIF product,

10   was the main point of contact for both groups into

11   Madoff.  And so he arranged a meeting and invited

12   Reliance and Tim invited me to come along to that

13   meeting.  Whether that meeting would have happened

14   if we were -- a meeting would have probably not

15   happened if we were investors only in Optimal.  The

16   fact that we were playing this role for M & B, M & B

17   was associated to essentially Manuel's boss, Manuel

18   had no choice but to invite everyone to the meeting.

19           Q.       I'm sorry, Manuel's boss was who?

20           A.       Manuel works for Optimal, runs

21   Optimal, or ran Optimal.  And Emilio Botin, Sr. was

22   chairman of the bank --

23           Q.       Santander?

24           A.       Of Santander.  His son runs M & B,

25   and his daughter works in the bank, is probably

LOJCAA0000174

JUSTIN LOWE 6/9/10                CONFIDENTIAL                SIPC v. BLMIS

175

1    going to take over the bank.  She's referred to in

2    one of those emails, I believe, or in one of the

3    memos we gave you.  She's called Ana Patricia.  Ana

4    Patricia's husband is Guillermo Morenes.  So

5    Morenes, the son-in-law of Emilio Botin, Sr., and

6    Emilio Botin, Sr.'s son Javier are in business

7    together.  They were the -- they're the ones that

8    wanted to get the LIF fund and they're the ones that

9    wanted to get the exposure by Defender.

10           Q.      And who was it who pushed for the

11   meeting with Madoff?

12           A.      I believe they asked Manuel to go --

13   they said, next time you see Madoff, see if you can

14   get an account for us.

15           Q.      So M & B wanted the meeting?

16           A.      Yes.

17           Q.      And you got to, essentially, tag

18   along?

19           A.      We got to tag along.  And M & B

20   didn't come to the meeting, because Manuel was going

21   for them.  They only had one objective, which was to

22   open an account.  And we were pretty curious to meet

23   this person who we had never had access to.

24           Q.      And you then -- and you've answered

25   the question I was about to ask you -- you had not

LOJCAA0000175

176

1    had access to him before?

2         A.      No, we'd never been able to have

3    access.  We had requested access, but access was not

4    given by Optimal to -- if Optimal started giving

5    access to one client, it would probably have to give

6    access to all clients.  They wouldn't want to treat

7    certain clients differently than other clients.

8              So some clients of these so-called

9    feeder funds over the years did meet Madoff, but I

10   think they were few and far between.

11        Q.      You had asked Optimal to get you

12   access to Madoff prior to February '07?

13        A.      Yes.  Not formally, but informally,

14   if there's a chance to meet him, we'd love to meet

15   him one day.

16        Q.      Had you ever asked Kingate or Carlo

17   Grosso to get you access?

18        A.      No, no.  The relationship was not as

19   close with Carlo Grosso.

20        Q.      Had you ever asked Madoff directly

21   for access?

22        A.      No.

23        Q.      And Mr. Brockmann?

24        A.      No.  He wouldn't have known us from

25   Adam because we were investors in the feeder fund,

JUSTIN LOWE 6/9/10                 CONFIDENTIAL                 SIPC v. BLMIS

177

1   someone else's feeder fund.  I don't think we would

2   have gotten past the reception.

3         Q.        And when you indicated to Optimal

4   that you wanted access if they were going to meet

5   them, meet Madoff, who did you ask, Mr. Echeverria?

6         A.        Yes.  I didn't ask him.  I think Tim

7   asked him, over the years, prior to 2007, that it

8   would be wonderful to meet him and I think he was

9   told, you know, the time will come when you can.

10   And then the time came at the beginning of February

11   2007.  But more than meeting the person, again, we

12   wanted the data.

13         Q.        But I take it you were getting the

14   data by that time via LIF?

15         A.        We started getting the data directly

16   from Madoff in the beginning of 2007.  Before we

17   were getting it via LIF, UBS, but the quality of it

18   was just not -- it wasn't adequate in terms of

19   quality to be able to run the kind of analytics that

20   we wanted to run via our systems.

21         Q.        So in February of '07 you got the

22   chance to meet with Madoff, right?

23         A.        Yes.

24              MR. CHOCKLEY:  Would you mark that as

25   Exhibit 8, please.

**BENDISH REPORTING, INC.**
**877.404.2193**

LOJCAA0000177

JUSTIN LOWE 6/9/10                CONFIDENTIAL                SIPC v. BLMIS

178

1                    (Exhibit Lowe-8 marked for

2       identification.)

3            Q.        Mr. Lowe, you've been handed now

4       what's marked as Exhibit 8, entitled "Reliance

5       Management Note to File Prepared by Justin Lowe for

6       RIR."

7            A.        Right.

8            Q.        It says, 2-1-07 visit with Bernard L.

9       Madoff, Madoff office, Lipstick Building, 8 a.m.,

10      present:  Manuel Echeverria (Optimal), Tim Brockmann

11      (RGML), Justin Lowe (RIR).  Right?

12           A.        Yes.

13           Q.        So is that right, that the three of

14      you met with him at 8 a.m.?

15           A.        Yes.

16           Q.        February 1st, 2007?

17           A.        Yes.

18           Q.        How much advance notice did you have

19      that you were going to have the meeting?

20           A.        I don't remember exactly, but it was

21      short.

22           Q.        I gather --

23           A.        Days, not months.

24           Q.        I gather you had prepared some

25      questions in advance of the meeting?

**BENDISH REPORTING, INC.**
**877.404.2193**

181

1    Q.      Did you meet the brother and the

2    sons?

3    A.      We shook hands with the brother and

4    the sons waved and walked into the trading room.  I

5    don't know which one was which.  They kind of look

6    the same.

7    Q.      Who did most of the talking?

8    A.      Manuel did 90 percent of the talking,

9    and Tim did 10 percent.

10   Q.      How about Madoff?

11   A.      Oh, including Madoff.

12   Q.      Was it 50/50 between Madoff --

13   A.      I would ballpark it at 50 Madoff, 40

14   Manuel and 10 Tim.

15   Q.      So you basically kept your mouth shut

16   and took notes?

17   A.      I took notes and, I could tell a long

18   story but a lot of the conversation was spent

19   talking about his friend who had just died.

20   Q.      Who was the friend who had just died?

21   A.      Some person that I never heard of who

22   was chairman of NASDAQ.  And he was going to go and

23   deliver the eulogy and he had to do it for the next

24   day.  And he went on about how wonderful this person

25   was, George Bush was going to be there and a number

LOJCAA0000181

JUSTIN LOWE 6/9/10                CONFIDENTIAL                SIPC v. BLMIS

182

1    of Washington types were going to be there and he

2    dropped a lot of names in a very short -- well, 30-

3    minute period talking about this, what the NASDAQ

4    meant and his involvement with Primex and that kind

5    of stuff.  He was talking about the past and none of

6    us in the room really had experienced that past.

7    Some of us weren't alive.

8          Q.      How old is Echeverria?

9          A.      I guess he's in his late 40's.

10          Q.      Had he met Madoff before?

11          A.      Yes.

12          Q.      How many times had he met with Madoff

13    before that occasion?

14          A.      I don't know, but my guess is that he

15    had met probably on an annual basis for many years.

16          Q.      Prior to the meeting, had you read

17    any of the articles about Madoff and the things you

18    described before, news articles, SEC type reports

19    and that sort of thing about Madoff?

20          A.      Yes.  Yes.

21          Q.      Had you studied up in preparation for

22    the meeting?

23          A.      Yes.

24          Q.      Did you have any concerns about the

25    Madoff investment strategy being a sham?

LOJCAA0000182

183

1      A.      No.

2      Q.      Did you pose any -- and by you, did

3   your team collectively pose any questions that did

4   not get answered?

5      A.      No.  There were questions that we

6   would have liked an answer that were not posed.  But

7   the answers that were posed were answered with what

8   we now know are falsehoods.  But the answers were at

9   times of a general nature.  They weren't

10  particularly specific, but they were not -- no

11  question was met with a "I can't comment on that" or

12  in any kind of a confrontational way.

13     Q.      Would you have a look at the fourth

14  bullet point where it talks about Echeverria, I

15  assume ME is Echeverria, right?

16     A.      Yes.

17     Q.      "Echeverria explained the

18  relationship between him, Reliance and the Botin

19  family and the JV on the new account."  By JV is

20  that a reference to a joint venture?

21     A.      Yes.

22     Q.      What is that?  That's LIF?

23     A.      That's LIF.

24     Q.      Was LIF a joint venture?

25     A.      No.  JV is a colloquial term, called

LOJCAA0000183

JUSTIN LOWE 6/9/10                    CONFIDENTIAL                    SIPC v. BLMIS

184

1    the arrangement.  It's a UBS product, a UBS fund.

2    Reliance is the investment advisor and M & B is the

3    distributor.  M & B is at the origin or the impetus

4    for creating the fund and Reliance was brought into

5    the picture, as mentioned earlier, to do some work

6    on the trades that were done, trade analytics.

7         Q.       What was your understanding of what

8    Madoff meant when he said how pleased he was with

9    his meetings with Botin and especially Ana Patricia?

10        A.       He had met them in Spain in some kind

11   of social context at a meeting that had taken place

12   a few months before.  And so he was very obsequious

13   about how he was so happy to have this relationship

14   with this banking dynasty, et cetera, et cetera, and

15   he felt that he was, you know, he was buttering them

16   up.

17        Q.       In the last bullet point on the first

18   page where you report on the discussion of a

19   strategy, did his answers appear to you to be

20   plausible?

21        A.       Yes.

22        Q.       That he was not using major

23   investment banks as counter-parties?

24        A.       Yes.

25        Q.       You note that he mentioned certain

LOJCAA0000184

JUSTIN LOWE 6/9/10                CONFIDENTIAL                SIPC v. BLMIS

185

1    names such as Capital on the mutual fund side.  What

2    Capital are you referring to there?

3           A.      I think it was referring to the Los

4    Angeles Capital group of companies.  The

5    participants in the -- first of all, was it

6    plausible?  Yes, because it was consistent with what

7    he had told other people over time.

8                  Two, it was known in the market

9    that -- everyone involved knew that he was active in

10   the -- that he was supposed to be active in the OTC

11   option market.  There is no volume in OTC options

12   available to check, so the question is are there

13   sellers of options.  Buyers of options, there are

14   always buyers of options.  But selling options is a

15   strategy where you can lose everything.  So the

16   question is who is selling the option to.  And in a

17   rising market, in a market where you have big

18   players with a lot of equity positions, selling one

19   month's put options to generate some yield in a low

20   yield kind of environment is very, very plausible.

21          Q.      There is a bullet point one, two,

22   three, four, five, about the auditors.  Did you know

23   who his auditors were at the time of the meeting?

24          A.      No, at the time of the meeting I

25   didn't know who they were.  I had been told by

LOJCAA0000185

186

 1    Optimal that it was a small firm.

 2         Q.        Had you done any check into them?

 3         A.        I had been told, I believe shortly

 4    before, so it was relatively new news that it was a

 5    small firm.  It's not something that Optimal

 6    disclosed to their investors, and we discussed it at

 7    this meeting.

 8         Q.        Did it give you any pause that he had

 9    small, unknown auditors?

10         A.        No.  And the answer -- a little

11    personal anecdote, which is that when I have to

12    explain what happened with Madoff to people who are

13    not in the business, my family or other people, they

14    often bring this up, it was a family business, it

15    was a small auditor.  The reality is that many of

16    these things that were viewed, that are now viewed

17    as negatives with the benefit of 20/20 hindsight,

18    were actually viewed as a positive.  So here's a guy

19    who tells you he's been using the same auditor from

20    the moment he started the business, that that

21    auditor has never had any issues with the SEC, that

22    he's been loyal to that person the whole time.  Many

23    of us in the industry thought, well, that's actually

24    a very honorable thing to do.

25                   Now, I was an investor in Enron, and

187

1  they had a big auditor, and you know what happened

2  there.  So I don't have more respect for big or for

3  small auditors.  In fact, I think that one can argue

4  that it's better sometimes to be with a small

5  auditor, they're more focused and more service

6  friendly.  So, it was not a negative.  It sounds

7  obvious now, but it was not at the time.

8          Q.      Did the funds managed by Reliance

9  have auditors?

10         A.      Yes.

11         Q.      And who did the audits for the

12 Reliance managed funds?

13         A.      It was Deloitte Gibraltar, so a four-

14 person operation.  Now, they may have a brand name,

15 but it's a four-person operation and you can tell

16 it's a four-person operation because Reliance at one

17 point represented probably half their revenues.

18         Q.      They did all the different funds?

19         A.      They did all of the fund of funds.

20 They did all the funds except for Defender, which

21 was done by PWC in Dublin, and Striker never got an

22 audit, but it was supposed to be PWC.  And LIF had

23 Ernst & Young in Luxembourg.  But apart from that,

24 those are specific situations, all the others were

25 done by Deloitte in Gibraltar.

LOJCAA0000187