Roger A. Cooper
Ari D. MacKinnon
Thomas S. Kessler
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Attorneys for BNP Paribas Arbitrage SNC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | Adv. Pro. No. 08-01789 (CGM) <br> SIPA Liquidation <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, <br><br> Plaintiff, <br><br> v. <br><br> BNP PARIBAS ARBITRAGE SNC, <br><br> Defendant. | Adv. Pro. No. 11-02796 (CGM) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**BNP PARIBAS ARBITRAGE SNC'S MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES.................................................................................... iii

PRELIMINARY STATEMENT.................................................................... 1

BACKGROUND ................................................................................. 2

LEGAL STANDARD ............................................................................ 4

ARGUMENT...................................................................................... 5

I.     THE COURT LACKS PERSONAL JURISDICTION OVER
BNPP ARBITRAGE ................................................................. 5

II.    THE TRUSTEE'S CLAIMS SHOULD BE DISMISSED FOR
FAILURE TO PLEAD THAT BNPP ARBITRAGE
RECEIVED BLMIS CUSTOMER PROPERTY ........................................... 9

III.    BNPP ARBITRAGE IS ENTITLED TO A "GOOD FAITH"
AND "FOR VALUE" DEFENSE................................................. 11

    A.    *BNPP Arbitrage Plainly Received the Alleged Transfers
"For Value"* ...................................................................... 11

    B.    *BNPP Arbitrage Acted in Good Faith and Without
Knowledge of Madoff's Fraud*............................................. 12

IV.    THE INITIAL TRANSFERS ARE NOT AVOIDABLE.............................. 13

    A.    *The Trustee Should Not Be Allowed to Rely on the
"Ponzi Scheme Presumption" to Avoid His Pleading
Burden Under Section 548(a)(1)(A)*................................... 14

    B.    *The Transfers Are Not Avoidable Under Section
548(a)(1)(B)* .................................................................... 16

V.    THE TRUSTEE'S CLAIMS ARE BARRED BY THE SAFE
HARBOR OF SECTION 546(E) .................................................. 17

    A.    *The Underlying Transaction Was Made in Connection
With a "Securities Contract"* ............................................. 18

    B.    *The Alleged Transfers Were "Settlement Payments"*........................ 19

    C.    *The Alleged Transfers Were Made by and to Covered
Entities Under Section 546(e)* ......................................... 19

**Page**

D.       *No Other Exception to the Safe Harbor Applies* ................................ 20

CONCLUSION ........................................................................................................... 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alki Partners, L.P. v. Vatas Holding GmbH*,
769 F. Supp. 2d 478 (S.D.N.Y. 2011), *aff'd sub nom.*
*Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7 (2d Cir. 2012) .......................... 5

*Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*,
480 U.S. 102 (1987) ........................................................................... 7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................... 4, 10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................... 4

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ........................................................................... 6

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) ........................................................................... 5

*Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.)*,
333 B.R. 205 (Bankr. S.D.N.Y. 2005) ................................................. 11

*Fairfield Sentry Ltd. v. Migani*
[2014] UKPC 915 ............................................................................... 9

*Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*,
No. 10-13164 (SMB), 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018).......... 8–9

*Finn v. All. Bank*,
860 N.W.2d 638 (Minn. 2015) ........................................................... 15

*Hau Yin To v. HSBC Holdings PLC*,
No. 15CV3590-LTS-SN, 2017 WL 816136 (S.D.N.Y. Mar. 1, 2017)................ 7

*Hertz Corp. v. Friend*,
559 U.S. 77 (2010) ............................................................................. 5

**Page(s)**

*Hill v. HSBC Bank PLC,*
207 F. Supp. 3d 333 (S.D.N.Y. 2016)................................................................ 7

*In re Bennett Funding Grp., Inc.,*
232 B.R. 565 (Bankr. N.D.N.Y. 1999) ............................................................ 16

*In re Dreier LLP,*
452 B.R. 391 (Bankr. S.D.N.Y. 2011) ............................................................ 17

*In re JVJ Pharmacy, Inc.,*
630 B.R. 388 (S.D.N.Y. 2021) ........................................................... 13–14

*In re Mexican Gov't Bonds Antitrust Litig.,*
No. 18-CV-2830, 2020 WL 7046837 (S.D.N.Y. Nov. 30, 2020) ......................... 7

*In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC,*
917 F.3d 85 (2d Cir. 2019)................................................................ 4

*In re Unified Com. Cap., Inc.,*
260 B.R. 343 (Bankr. W.D.N.Y. 2001)............................................................ 16

*Lavazza Premium Coffees Corp. v. Prime Line Distribs. Inc.,*
No. 20 Civ. 9993 (KPF), 2021 WL 5909976 (S.D.N.Y. Dec. 10, 2021) .............. 9

*Lehman Bros. Special Fin. Inc. v. Bank of Am. N.A.* (*In re Lehman Bros. Holdings Inc.*),
535 B.R. 608 (Bankr. S.D.N.Y. 2015)................................................................ 4–5

*Lustig v. Weisz & Assocs., Inc.* (*In re Unified Com. Cap., Inc.*),
260 B.R. 343, 350 (Bankr. W.D.N.Y. 2001)....................................................... 16

*Lyon v. Eiseman* (*In re Forbes*),
372 B.R. 321 (B.A.P. 6th Cir. 2007) ............................................................... 9

*Merrill v. Abbott* (*In re Indep. Clearing House Co.*),
77 B.R. 843 (D. Utah 1987)............................................................................ 15

*Papasan v. Allain,*
478 U.S. 265 (1986)......................................................................... 4, 10

*Picard v. ABN Amro Bank N.A.,*
Adv. Pro. No. 08-01789, 2020 WL 1584491
(Bankr. S.D.N.Y. Mar. 31, 2020) ................................................... 11, 12

**Page(s)**

*Picard v. BNP Paribas S.A.*,
    594 B.R. 167 (Bankr. S.D.N.Y. 2018) .............................................................. 13

*Picard v. Citibank, N.A.*,
    12 F.4th 171 (2d Cir. 2021).................................................................... *passim*

*Picard v. Citibank, N.A.*,
    608 B.R. 181 (Bankr. S.D.N.Y. 2019) .............................................................. 11

*Picard v. Fairfield Inv. Fund* (*In re BLMIS*)
    No. 08-01789, Adv. Pro. No. 09-01239, 2021 WL 3477479
    (Bankr. S.D.N.Y. Aug. 6, 2021)................................................................. 20-21

*Picard v. Ida Fishman Revocable Trust* (*In re BLMIS*),
    773 F.3d 411 (2d Cir. 2014).............................................................18, 19, 20

*Picard v. Legacy Cap. Ltd.* (*In re BLMIS*),
    603 B.R. 682 (Bankr. S.D.N.Y. 2019) .............................................................. 15

*Picard v. Multi-Strategy Fund Ltd.*,
    Adv. Pro. No. 12-01205 (CGM), 2022 WL 2137073
    (Bankr. S.D.N.Y. June 13, 2022)................................................................. 21

*Picard v. Multi-Strategy Fund Ltd.*,
    No. 22-cv-06502 (JSR), 2022 WL 16647767 (S.D.N.Y. Nov. 3, 2022)................ 21

*Picard v. Shapiro* (*In re BLMIS*),
    542 B.R. 100 (Bankr. S.D.N.Y. 2015)............................................................. 9-10

*Sharp Int'l Corp. v. State St. Bank & Trust Co.* (*In re Sharp Int'l Corp.*),
    403 F.3d 43 (2d Cir. 2005)...................................................................... 14, 16

*Silverman v. K.E.R.U. Realty Corp.* (*In re Allou Distribs., Inc.*),
    379 B.R. 5 (E.D.N.Y. 2007)......................................................................... 9

*SIPC v. BLMIS (In re BLMIS)*
    501 B.R. 26 (S.D.N.Y 2013)........................................................................ 14

*SIPC v. BLMIS*,
    641 B.R. 78 (Bankr. S.D.N.Y. 2022)............................................................... 21

*SIPC v. BLMIS*,
    531 B.R. 439 (Bankr. S.D.N.Y. 2015).............................................................. 9

**Page(s)**

*SIPC v. BLMIS*,
No. 08-01789 (SMB), 2016 WL 6900689 (Bankr. S.D.N.Y. Nov. 22, 2016)........    3

*SIPC v. BLMIS*,
No. 12 MC 115 JSR, 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013)....................    18, 20

*SIPC v. BLMIS*,
476 B.R. 715 (S.D.N.Y. 2012), *aff'd*, 773 F.3d 411 (2d Cir. 2014)....................    19

*SPV OSUS, Ltd. v. UBS AG*,
882 F.3d 333 (2d Cir. 2018)...............................................................    6

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*,
916 F.3d 143 (2d Cir. 2019)..............................................................    8

*Walden v. Fiore*,
571 U.S. 277 (2014)..........................................................................    6, 7

**Rules and Statutes**

Fed. R. Civ. P. 9(b)..............................................................................    16

Fed. R. Civ. P. 12(b)(6)........................................................................    4

11 U.S.C. § 101(22)(A).........................................................................    20

11 U.S.C. § 101(53A)(B)......................................................................    19

11 U.S.C. § 546(e)................................................................17, 18, 19, 20, 21, 22

11 U.S.C. § 548(a)(1)(A).....................................................................    14, 15, 16, 17

11 U.S.C. § 548(a)(1)(B).....................................................................    16

11 U.S.C § 550....................................................................................    4

11 U.S.C. § 550(a)(2)..........................................................................    9

11 U.S.C. § 550(b)...............................................................1, 11, 12, 13

11 U.S.C. § 741(7)(A)..........................................................................    18, 19

BNP Paribas Arbitrage SNC ("BNPP Arbitrage"), by and through its undersigned

counsel, submits this memorandum of law in support of its motion to dismiss the Amended

Complaint, ECF No. 100 (the "Amended Complaint") with prejudice filed by Irving H. Picard,

Trustee (the "Trustee") for the Liquidation of Bernard L. Madoff Investment Securities LLC

("BLMIS") pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(2).

## PRELIMINARY STATEMENT[1]

The Trustee's boilerplate Amended Complaint—over half of which is copied and

pasted from other actions—fails to plead sufficient facts to support a plausible claim for relief.

Therefore, for the following reasons, the Amended Complaint should be dismissed.

First, the Amended Complaint fails to establish that this Court has personal

jurisdiction over BNPP Arbitrage. The Trustee has failed to plead facts showing that BNPP

Arbitrage—a foreign entity—is "at home" in New York, or that BNPP established sufficient

"minimum contacts" in the United States in respect of the alleged transfers. On the contrary, the

relevant facts underlying the Amended Complaint are all foreign. The Trustee alleges BNPP

Arbitrage, a French financial institution, through a division of its French parent, allegedly

extended a credit facility to Santa Barbara, a BVI-based "fund that was invested entirely" in

Harley. Harley itself was a Cayman Island investment company, from which BNPP Arbitrage

allegedly received $1.054 billion in subsequent transfers that the Trustee claims now seeks to

claw back.

Second, the face of the Amended Complaint itself evinces that BNPP Arbitrage is

entitled to the protection of the "good faith" and "for value" defense available under section

550(b) of the Bankruptcy Code, 11 U.S.C. § 550(b). The Amended Complaint plainly

---

[1] Capitalized terms used in the Preliminary Statement have the meaning ascribed to them herein.

establishes that BNPP Arbitrage gave value for the alleged transfers, and is entirely devoid of

any allegation that BNPP Arbitrage was on inquiry notice of Madoff's fraud, or that a diligent

inquiry would have been sufficient to uncover it.

Third, the Amended Complaint does not demonstrate that the Subsequent

Transfers comprise customer property, which requires a sufficient link between the initial

transfers from BLMIS to Harley and the Subsequent Transfers he seeks to claw back.  Far from

satisfying that burden, the Amended Complaint presents unexplained and unconnected exhibits

that do not even try to establish that the Subsequent Transfers constitute customer property.

Fourth, the Trustee has failed to adequately pled that the Initial Transfers are

avoidable under section 548(a)(1).  Not only should the Trustee not be permitted to rely on the

flawed premise of the so-called "Ponzi scheme presumption" to avoid his burden of pleading

actual fraud (which the Amended Complaint otherwise does not even attempt to do), but his

failure to allege that BNPP Arbitrage received any fictitious profits also forecloses any claim that

the transfers were constructively fraudulent as well.

Finally, the safe harbor codified under section 546(e) shields all of the Subsequent

Transfers from the Trustee's clawback claims, because each was a settlement payment in

connection with a securities contract made by, to, or for the benefit of, a covered entity under the

statute.

For all of these reasons and as discussed more fully below, the Amended

Complaint fails as a matter of law, and should be dismissed with prejudice.

## **BACKGROUND**

Although the Amended Complaint is so barebones as to be essentially inscrutable,

the Trustee's complaint seems to stem from an alleged relationship between BNPP Arbitrage;

2

Santa Barbara Holdings Ltd. ("Santa Barbara"), a BVI-based fund; and Harley International

(Cayman) Ltd. ("Harley"), a Caymanian BLMIS "feeder" fund that is alleged to have invested in

BLMIS.  The complaint's factual allegations, threadbare and confusing as they are, appear to

loosely assert that this relationship involved (1) a 2004 credit facility and credit facility

agreement (the "Credit Facility" and the "Credit Agreement," respectively) between Santa

Barbara as borrower, non-party BNP Paribas S.A. as lender, and non-party BNP Paribas

Securities Corp. ("BNPP Sec. Corp.") as collateral agent, in connection with Santa Barbara's

investments with Harley; and/or (2) subscription agreements between Harley and unspecified

investors.

The Amended Complaint seeks to claw back approximately $1.05 billion in

alleged subsequent transfers (the "Subsequent Transfers") that Harley allegedly made to BNPP

Arbitrage between March 2008 and November 2008.  Am. Compl. Ex. C.  Confusingly, these

transfers are not alleged to have been made pursuant to either the Credit Facility or the

subscription agreements with unspecified investors.  The Trustee makes no effort to plead on

what basis BNPP Arbitrage allegedly received the transfers, relying solely on conclusory and

non-specific allusions to "investments."  Am. Compl. ¶ 78.

The Original Complaint (the "OC") in this case was filed on November 3, 2011,

and its claims contain a similar paucity of factual information.[2]  The claims undergirding the OC

were dismissed in November 2016.[3]  Following the Second Circuit's decision on

---

[2] Compl., *Picard v. BNP Paribas Arbitrage SNC*, Adv. Pro. No. 11-02796 (Bankr. S.D.N.Y. Nov. 3, 2011), ECF No. 1 (the "OC").

[3] *SIPC v. BLMIS*, No. 08-01789 (SMB), 2016 WL 6900689 (Bankr. S.D.N.Y. Nov. 22, 2016) (the "Extraterritoriality Decision").

extraterritoriality and comity issues in 2019,[4] and after a fallow period, the Trustee filed the

Amended Complaint, asserting a single cause of action under The Securities Investor Protection

Act ("SIPA") and section 550 against BNPP Arbitrage, 11 U.S.C § 550.  Although BNPP

Arbitrage recognizes that the Court is required to accept the well pled allegations in the

Amended Complaint as true for the limited purposes of evaluating arguments in a motion to

dismiss, BNPP Arbitrage vigorously contests all of the Trustee's vague and conclusory factual

assertions.[5]

## LEGAL STANDARD

The Court must dismiss a claim under Rule 12(b)(6) of the Federal Rules of Civil

Procedure (the "Federal Rules"), Fed. R. Civ. P. 12(b)(6), "when the allegations in a complaint,

however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 558 (2007).  A claimant's allegations "must contain sufficient factual matter, accepted

as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009).  A plausible claim for relief pleads facts "that allow . . . the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  Although the

Court must accept well-pleaded factual allegations as true, it need not accept assertions that are

unsupported by factual allegations, *Id.* at 678–79, nor a "legal conclusion couched as a factual

allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

To survive a motion to dismiss under Rule 12(b)(2), "the plaintiff bears the

burden to make a prima facie showing that jurisdiction exists." *Lehman Bros. Special Fin. Inc.*

---

[4] The Second Circuit reversed the Extraterritoriality Decision in 2019, reviving the Trustee's claims. *In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85 (2d Cir. 2019).

[5] *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

*v. Bank of Am. N.A.* (*In re Lehman Bros. Holdings Inc.*), 535 B.R. 608, 618 (Bankr. S.D.N.Y.

2015). "Conclusory allegations lacking factual specificity . . . do not satisfy plaintiff's burden"

of showing a prima facie case for exercising personal jurisdiction. *Alki Partners, L.P. v. Vatas*

*Holding GmbH*, 769 F. Supp. 2d 478, 487 (S.D.N.Y. 2011), *aff'd sub nom. Alki Partners, L.P. v.*

*Windhorst*, 472 F. App'x 7 (2d Cir. 2012).

## ARGUMENT

### I.    THE COURT LACKS PERSONAL JURISDICTION OVER BNPP ARBITRAGE

The Amended Complaint does not contain allegations sufficient to show that

BNPP Arbitrage is subject to the "general" personal jurisdiction of this Court. as it fails even to

try to demonstrate that BNPP Arbitrage is "at home" in New York (or any other State of the

United States). General jurisdiction exists only when the defendant is "at home" in the forum,

either because it is incorporated under the laws of the forum or has its principal place of business

there. *See Daimler AG v. Bauman*, 571 U.S. 117, 136–37 (2014). Here, BNPP Arbitrage is "a

general partnership incorporated and organized under the laws of France as a *société en nom*

*collectif*" (Am. Compl. ¶ 51), and is a wholly owned subsidiary of BNP Paribas, a French

financial institution. Numerous public filings confirm Paris as the site of BNPP Arbitrage's

principal place of business. The Trustee does not—because he cannot—credibly allege that BNP

Arbitrage is "at home" in New York. *See Hertz Corp. v. Friend*, 559 U.S. 77, 93, 96 (2010)

(holding that that the principal place of business is a "single place," and the place which is

typically held out to the public as "the corporation's main place of business" or where its "top

officers" who "direct [the company's] activities" are situated). Accordingly, the Trustee

apparently seeks to show that this Court possesses "specific" personal jurisdiction over BNPP

Arbitrage. That effort fails.

Specific jurisdiction requires an analysis of the connection between the defendant,

the forum, and the claim. *See SPV OSUS, Ltd. v. UBS AG*, 882 F.3d 333, 344 (2d Cir. 2018)

("The inquiry whether a forum State may assert specific jurisdiction over a nonresident

defendant focuses on the relationship among the defendant, the forum, and the litigation.")

(quoting *Walden v. Fiore*, 571 U.S. 277, 277, 283, 287, 291 (2014) (cleaned-up and internal

quotations omitted). Under this framework, the Trustee's attempts to shoehorn a finding of

personal jurisdiction into this entirely foreign fact pattern fall short: At its core, the Trustee's

allegations relate to wire transfers that occurred between a French bank and a Caymanian

investment fund in connection with a Credit Facility with a BVI-based borrower.

First, the "'minimum contacts' analysis looks to the defendant's contacts with the

forum State itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*,

571 U.S. 277, 285 (2014). Here, the Trustee's allegations impermissibly focus on Harley's

contacts with BLMIS in the forum, not BNPP Arbitrage's contacts, and therefore fail the test.

Where BNPP Arbitrage "never allegedly directed any activity toward the United States,"

personal jurisdiction cannot be found.

Second, the relevant contacts that purportedly support the exercise of personal

jurisdiction must be purposely directed towards the forum, as opposed to "fortuitous" or

"attenuated." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quoting *World-Wide

Volkswagen v. Woodson*, 444 U.S. 286, 297, 299 (1980)). The contacts must also relate to "the

wrong alleged" and be significant enough that a reasonable person would foresee that their

"conduct and connection with the forum State are such that he should reasonably anticipate being

haled into the court there." *Id.* Under this framework, the Trustee cannot claim that BNPP

Arbitrage has sufficient relevant contacts because it allegedly invested in Harley "knowing[]"

6

that Harley would in turn invest in BLMIS in New York, Am. Compl. ¶ 77, or because the

transfers were routed through New York-based correspondent bank accounts, *id*. ¶¶ 62, 80.

There is no "intent" or "knowledge" exception to the rule that specific personal

jurisdiction must be premised on <u>BNPP Arbitrage's</u> purposeful availment of the forum, rather

than on <u>Harley's</u> investment in BLMIS.  Such an exception would run squarely against *Walden*,

in which the Supreme Court held that allegations that the defendant police officer knew Plaintiff

"had a significant connection to [the forum state]," *Walden*, 571 U.S. at 282 n.3, were

insufficient to support the exercise of jurisdiction because such an approach would

"impermissibly allow a *plaintiff's* contacts with the defendant and forum to drive the

jurisdictional analysis." *Id.* at 289 (emphasis added). [6]

Nor is the use of New York-based correspondent bank accounts sufficient in this

case, because that alleged conduct is neither purposeful, nor proximate enough to establish

personal jurisdiction.  *See Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S.

102, 112 (1987) ("The substantial connection . . . between the defendant and the forum . . .

necessary for a finding of minimum contacts must come about by *an action of the defendant

purposefully directed toward the forum State*.") (quotation marks omitted) (emphasis in original);

*Hau Yin To v. HSBC Holdings PLC*, No. 15CV3590-LTS-SN, 2017 WL 816136, at *6 (S.D.N.Y.

Mar. 1, 2017); *Hill v. HSBC Bank PLC*, 207 F. Supp. 3d 333, 340 (S.D.N.Y. 2016) (transmission

of information and funds to and from BLMIS to be "incidental consequences of fulfilling a

foreign contract").  Furthermore, these alleged contacts do not relate to "the wrong alleged" in

the Amended Complaint, because the "wrong" in question is the fraudulent conduct perpetuated

---

[6] *See also, e.g.*, *In re Mexican Gov't Bonds Antitrust Litig.*, No. 18-CV-2830, 2020 WL 7046837, at *3–4 (S.D.N.Y.
Nov. 30, 2020) (holding that in the absence of defendant's contact with forum, neither attempt to profit from
conduct underlying the claim nor foreseeability of in-forum harm was sufficient to establish jurisdiction).

by BLMIS—conduct that BNPP Arbitrage played no role in, and to which it too fell victim. *See* Am. Compl. § IV (describing Madoff's fraud).

Third, the contacts must be sufficiently related to the claim at bar. *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (noting that to establish personal jurisdiction over a nonresident defendant, "the plaintiff's claims must arise out of or relate to the defendant's forum conduct"). The Trustee's allegations again fail under this prong: the Amended Complaint's laundry list of activities includes irrelevant purported contact with a number of funds that are <u>not</u> the subject of this action, such as the assertion that "BNP Paribas Arbitrage invested in and/or received transfers of customer property from at least seven BLMIS feeder funds," not at issue in this case. Am. Compl. ¶ 53. Under the "minimum contacts" test, this unrelated conduct cannot be the basis of an assertion of specific jurisdiction by the Trustee with respect to the claims included in the Amended Complaint. *See U.S. Bank Nat'l Ass'n*, 916 F.3d at 150.

Similarly, the alleged facts relating to the forum selection clauses in the credit facility agreements (*see, e.g.*, Am. Compl. ¶ 70) are also irrelevant to the claim in this action. To begin, the Trustee has not even alleged that BNPP Arbitrage is a party to these credit facility agreements—presumably because he is aware that the operative agreements confirm that it is not—and thus is not bound by any forum selection clause contained therein. Moreover, even if BNPP Arbitrage were a party to the credit facility agreements (it is not), this Court has already held in an analogous action involving the liquidators for the Fairfield Funds that the New York choice of forum provisions in the Fairfield Funds subscription agreement were irrelevant to disputes concerning redemptions made under a different contract (specifically, the Fairfield Funds' Articles of Association). *See Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re*

*Fairfield Sentry Ltd.*), No. 10-13164 (SMB), 2018 WL 3756343, at *11 (Bankr. S.D.N.Y.

Aug. 6, 2018) (adhering to the holding in *Fairfield Sentry Ltd. v. Migani* [2014] UKPC 915 that

the subscription agreement was irrelevant to actions to claw back the redemption payments); *see*

*also Lavazza Premium Coffees Corp. v. Prime Line Distribs. Inc.*, No. 20 Civ. 9993 (KPF), 2021

WL 5909976, at *7 (S.D.N.Y. Dec. 10, 2021) (rejecting enforcement of forum selection clause

for a non-party plaintiff bringing claims outside the clause's scope). The Trustee's claims are

likewise insufficiently linked to non-party BNPP S.A. and non-party BNPP Sec. Corp.'s credit

facility agreements with Santa Barbara, given that neither Harley, BNPP Arbitrage, nor BLMIS

is even a party to those agreements.

Because here, the Trustee's allegations fail to establish the requisite connection

between BNPP Arbitrage, the forum, and the claim, the Trustee's Amended Complaint should be

dismissed with respect to BNPP Arbitrage for lack of personal jurisdiction.

## II.    THE TRUSTEE'S CLAIMS SHOULD BE DISMISSED FOR FAILURE TO PLEAD THAT BNPP ARBITRAGE RECEIVED BLMIS CUSTOMER PROPERTY

Under section 550(a)(2), a trustee may only claw back from a subsequent

transferee the property (or value of the property) that was transferred in the initial transfer. *See*

*SIPC v. BLMIS*, 531 B.R. 439, 473 (Bankr. S.D.N.Y. 2015). In order to state a claim under

section 550(a), "the plaintiff has the burden of tracing funds it claims to be property of the

estate." *Silverman v. K.E.R.U. Realty Corp.* (*In re Allou Distribs., Inc.*), 379 B.R. 5, 30

(E.D.N.Y. 2007) (citing *IBT Int'l Inc. v. N.* (*In re Int'l Admin. Servs.*), 408 F.3d 689, 708 (11th

Cir. 2005)); *see also Lyon v. Eiseman* (*In re Forbes*), 372 B.R. 321, 334 (B.A.P. 6th Cir. 2007)

("[I]t is generally the [t]rustee's burden to trace the funds he claims are property of the estate.").

At a minimum, "[t]he Trustee must allege facts that support the inference that the funds at issue

originated with the BLMIS, and contain the 'necessary vital statistics'" that put BNPP Arbitrage

on some notice as to what funds are being referred to. *Picard v. Shapiro* (*In re BLMIS*), 542

B.R. 100, 119 (Bankr. S.D.N.Y. 2015).

      Here, the Trustee's allegations lack the necessary detail as to the "who, when, and

how much" of the transfers and, as such, are insufficient to support the applicable pleading

standard. The Trustee's conclusory allegations that the initial transfers from BLMIS to Harley

(as alleged in the Amended Complaint, the "Initial Transfers") "were and continue to be

customer property within the meaning of 15 U.S.C § 78*lll*(4)," Am. Compl. ¶ 82, and that "prior

to the filing date, Harley transferred a portion of the Initial Transfers to BNP Paribas Arbitrage,"

*id.* ¶ 87, are insufficient to meet *Twombly* and *Iqbal*'s pleading standards. *Iqbal*, 556 U.S. at

678. The Court need not accept a "legal conclusion couched as a factual allegation." *Papasan*,

478 U.S. at 286. Because the Amended Complaint fails to specify which, or what portion, of the

Initial Transfers were subsequently transferred by Harley to BNPP Arbitrage, it necessarily fails

to show that BNPP Arbitrage received customer property.

      The exhibits add nothing of substance to the threadbare allegations in the

Amended Complaint regarding the nature of the transfers. To the contrary, they contain <u>no</u>

information whatsoever that could rationally tie the Initial Transfers listed in Exhibit B—

spanning more than twenty pages of minute text—to the alleged list of Subsequent Transfers in

Exhibit C, which themselves contain only the dates and amounts of each transfer. In effect, the

Trustee relies on the Court to take his conclusory claims at face value and fill in the blanks on his

behalf. Not only does this approach contravene applicable law, the Trustee's own allegations

establish that such inferences are not warranted. Indeed, the Amended Complaint includes

several references to "investors" in Harley and Fix Asset Management, which provided

independent sources of funding, casting doubt on the Trustee's inference that every dollar that
flowed to BNPP Arbitrage constituted property of BLMIS, as opposed to property of Harley
customers other than BNPP Arbitrage.  Am. Compl. ¶ 60.

### III.    BNPP ARBITRAGE IS ENTITLED TO A "GOOD FAITH" AND "FOR VALUE" DEFENSE

The Trustee's Amended Complaint should also be dismissed because BNPP
Arbitrage received the subsequent transfers "for value," in good faith, and without knowledge of
the voidability of the transfers under section 550(b).  The Trustee's own pleadings conclusively
demonstrate that BNPP Arbitrage is entitled to this defense.

### A.    *BNPP Arbitrage Plainly Received the Alleged Transfers "For Value"*

To support a defense under section 550(b), a subsequent transferee need not give
reasonably equivalent value.  *See Enron Corp. v. Ave. Special Situations Fund II, LP (In re
Enron Corp.)*, 333 B.R. 205, 236 (Bankr. S.D.N.Y. 2005) ("There is no requirement that the
value given by the transferee be a reasonable or fair equivalent.").  The value provided need only
be enough consideration sufficient to support a contract.  *Picard v. ABN Amro Bank N.A.*, Adv.
Pro. No. 08-01789, 2020 WL 1584491, at *9 (Bankr. S.D.N.Y. Mar. 31, 2020).  Here, regardless
of how the Amended Complaint is read, it is facially evident that BNPP Arbitrage gave value to
Harley in exchange for the transfers.  If the Trustee intends to allege that the Subsequent
Transfers were received pursuant to the Credit Facility, then BNPP Arbitrage gave value because
loaning funds that are repaid by means of a subsequent transfer from a Feeder Fund has
previously been found to constitute sufficient value for purposes of section 550(a).  *See Picard v.
Citibank, N.A.*, 608 B.R. 181, 196 (Bankr. S.D.N.Y. 2019); *ABN Amro Bank N.A.*, 2020 WL
1584491, at *9.  If, alternatively, the Trustee intends to allege that the Subsequent Transfers were
received pursuant to unspecified subscriptions and redemptions, then this too would constitute

11

value, because executing subscriptions and surrendering shares in feeder funds for redemptions

has been previously found to be sufficient to establish that a defendant gave value. *ABN Amro

Bank N.A.*, 2020 WL 1584491, at *9. (collecting cases).

> **B.**    ***BNPP Arbitrage Acted in Good Faith and Without Knowledge of
> Madoff's Fraud***

The second component of the section 550(b) defense is met when the transferee

receives the funds in good faith and without knowledge of the voidability of the transfer.

11 U.S.C. § 550(b).  Under section 550(b), the Court must evaluate three factors when

determining whether a transferee received transfers in good faith.  *See Picard v. Citibank, N.A.*,

12 F.4th 171, 191–92 (2d Cir. 2021): (1) "[w]hat facts the defendant actually knew; this is a

subjective inquiry, not 'a theory of constructive notice;'" (2) "[w]hether these facts put the

transferee on inquiry notice of the fraudulent purpose behind a transaction—that is, whether the

facts the transferee knew would have led a reasonable person in the transferee's position to

conduct further inquiry into a debtor-transferor's possible fraud;" and (3) "[w]hether 'diligent

inquiry [by the transferee] would have discovered the fraudulent purpose' of the transfer."  *Id.*

The Amended Complaint fails to make any allegation that BNPP Arbitrage had

inquiry notice of Madoff's misconduct.  Instead, the Trustee dedicates over half of the Amended

Complaint to boilerplate language rehashing the history of Madoff's scheme.  He makes no

effort to connect these facts to any awareness or knowledge by BNPP Arbitrage, nor does he

attempt to allege that Harley had special knowledge of Madoff's fraud that was communicated to

BNPP Arbitrage.  To the contrary, the allegations in the Amended Complaint demonstrate that

Madoff scrupulously shielded his fraud from scrutiny by means of deceptive practices and

reporting which withstood examination from, among others, the U.S. Securities and Exchange

Commission.  *See, e.g.*, Am. Compl. ¶ 23–24.  Taking the Trustee's allegations at face value, the

only reasonable conclusion is that, in the face of such pervasive deception, BNPP Arbitrage could not have been on inquiry notice of the fraud (and the Trustee's essentially non-existent allegations with respect to BNPP Arbitrage's knowledge bear this out).

Moreover, even if the Trustee plausibly alleged that BNPP Arbitrage was on inquiry notice of Madoff's fraud, which he has not, BNPP Arbitrage would still have acted in good faith unless a "diligent inquiry" would have uncovered the fraud, which this Court has already effectively found not to be the case. In Judge Bernstein's 2018 decision with respect to Trustee's 2017 allegations against BNPP Arbitrage, he declined to find that BNPP Arbitrage and other BNPP entities were willfully blind to Madoff's fraud, despite the complaint's dozens of pages of allegations of so-called "red flags," finding that "[r]ather than turn a blind eye, the . . . allegations show that the Defendants engaged in ongoing due diligence and received repeated confirmations that the transactions were real." *Picard v. BNP Paribas S.A.*, 594 B.R. 167, 205 (Bankr. S.D.N.Y. 2018); *see* Am. Compl., *Picard v. BNP Paribas S.A.*, Adv. Pro. No. 12-01576 (Bankr. S.D.N.Y. Aug. 30, 2017), ECF No. 100, ¶¶ 75–83 (describing the extensive diligence efforts of the relevant BNPP defendants, including BNPP Arbitrage, with respect to Madoff investments).

Because the Trustee's own pleadings and this Court's prior decision demonstrate that BNPP Arbitrage received these transfers both for value and in good faith without knowledge of the fraud under section 550(b), the Amended Complaint should be dismissed.

## IV.    THE INITIAL TRANSFERS ARE NOT AVOIDABLE

In order for the Trustee to claw back under section 550(a), he must first establish that the transfers are avoidable and avoided. *Citibank*, 12 F.4th at 197. In *In re JVJ Pharmacy, Inc.*, the district court held that the relevant "[t]ransfers must be avoided under § 548(a)(1) before

13

the Trustee can invoke § 550 to seek recovery." 630 B.R. 388, 401 (S.D.N.Y. 2021). As a

subsequent transferee, BNPP Arbitrage is entitled to raise defenses to avoidance that are

available to the initial transferees. *SIPC v. BLMIS (In re BLMIS)*, 501 B.R. 26, 30 (S.D.N.Y

2013) ("Thus, if, as here, the initial transferee settled with the Trustee or failed to raise a given

defense, the subsequent-transferee defendant may assert any defenses to avoidance available to

the initial transferee, even if the initial transferee did not raise or resolve those defenses.").

Because the Trustee has not adequately pleaded the avoidability of the Initial Transfers, his

clawback claims for the alleged subsequent transfers fail.

A.    ***The Trustee Should Not Be Allowed to Rely on the "Ponzi Scheme
Presumption" to Avoid His Pleading Burden Under Section 548(a)(1)(A)***

Section 548(a)(1)(A) requires the Trustee to plead that BLMIS "made" each

"transfer" challenged under that provision "with actual intent to hinder, delay, or defraud any

entity to which the debtor was or became, on or after the date that such transfer was made."

Because "'actual intent to hinder, delay or defraud' constitutes fraud, it must be pled with

specificity, as required by Fed. R. Civ. P. 9(b)." *Sharp Int'l Corp. v. State St. Bank & Trust Co.*

(*In re Sharp Int'l Corp.*), 403 F.3d 43, 56 (2d Cir. 2005) (citation omitted); 11 U.S.C. §

548(a)(1)(A).

Rather than pleading facts establishing the fraudulent intent behind each transfer,

as required by section 548(a)(1)(A), the Trustee appears to rely upon the presumption "that

transfers from a debtor in furtherance of a Ponzi scheme are made with fraudulent intent rather

than to satisfy an antecedent debt." *Citibank*, 12 F.4th at 201 (Menashi, J., concurring). Without

the "Ponzi scheme presumption," the Amended Complaint alleges nothing whatsoever about

BLMIS's intent in making the specific transfers at issue here, and certainly not that they were

made with the requisite actual fraudulent intent.

14

Although this Court and the District Court have, at times, accepted the "Ponzi

scheme" presumption in actions commenced by the Trustee, Judge Menashi's concurring opinion

in *Citibank* made clear that its existence and application are not well-settled, and persuasively

explained why the "Ponzi scheme presumption" represents a "questionable" application of

fraudulent transfer statues. *Id.* at 202.

First, section 548(a)(1)(A) does not mention Ponzi schemes, nor does it authorize

courts to relax (or functionally eliminate) the Trustee's pleading burden in such cases, which

otherwise would require specific allegations regarding the intent requirements.

Second, fraudulent transfer cases require an "asset-by-asset and

transfer-by-transfer" inquiry—one that requires proof of "the elements of a fraudulent transfer

with respect to each transfer, rather than relying on a presumption related to the form or structure

of the entity making the transfer"—because the statutory focus is "on individual transfers, rather

than a pattern of transactions that are part of a greater 'scheme.'" *Finn v. All. Bank*, 860 N.W.2d

638, 647 (Minn. 2015) (construing Minnesota UFTA provision that is virtually identical to

section 548(a)(1)(A)); *see also Citibank*, 12 F.4th at 201 (Menashi, J., concurring).

Third, the Ponzi scheme presumption is based on the hypothesis that whenever a

Ponzi scheme operator "makes payments to present investors," it does so for the purpose of

"attract[ing] new investors." *Merrill v. Abbott* (*In re Indep. Clearing House Co.*), 77 B.R. 843,

860 (D. Utah 1987) (en banc). But that premise is unlikely to hold true in all cases or at all

times, especially in the later stages of a long-running scheme like Madoff's, which began

decades prior to its collapse. *See Picard v. Legacy Cap. Ltd.* (*In re BLMIS*), 603 B.R. 682, 691

(Bankr. S.D.N.Y. 2019).

15

Fourth, the Ponzi scheme presumption, as Judge Menashi explained, "improperly treats [preference claims under section 547] as fraudulent transfers," *Citibank*, 12 F.4th at 201, thereby "obscur[ing] the essential distinction between fraudulent transfers and preferences," and the presumption has accordingly been rejected by courts on these grounds. *Id.* at 202; *see also Lustig v. Weisz & Assocs., Inc.* (*In re Unified Com. Cap., Inc.)*, 260 B.R. 343, 350 (Bankr. W.D.N.Y. 2001).

Finally, the Ponzi scheme presumption conflicts with Rule 9(b), which requires particularity in pleading how each transfer was made with actual intent to defraud. *See, e.g.*, *Sharp*, 403 F.3d at 56. If such exceptions are to be created, Congress—not the courts—should create them. *See Unified*, 260 B.R. at 350 (cited approvingly in *Citibank*, 12 F.4th at 202 (Menashi, J., concurring)).

In the absence of this presumption, the Amended Complaint is devoid of any allegation that could establish BLMIS acted with the requisite intent to "hinder, delay or defraud" creditors. Accordingly, the Trustee has failed to meet his pleading burden that the transfers are avoidable under section 548(a)(1)(A) and the Amended Complaint should be dismissed.

B.    ***The Transfers Are Not Avoidable Under Section 548(a)(1)(B)***

Just as the Trustee has failed to plausibly allege the voidability of the transfers under section 548(a)(1)(A), he has likewise failed to meet the requirements of section 548(a)(1)(B), which permits the Trustee to claw back transfers made for less than reasonably equivalent value. 11 U.S.C. § 548(a)(1)(B). When seeking to avoid transfers under section 548(a)(1)(B), the Trustee bears the burden of showing that each element of the statute has been met. *In re Bennett Funding Grp., Inc.*, 232 B.R. 565, 570 (Bankr. N.D.N.Y. 1999).

The Amended Complaint includes no allegations that BNPP Arbitrage or Harley gave less than "reasonably equivalent value" to BLMIS in exchange for any of the alleged transfers. *See In re Dreier LLP*, 452 B.R. 391, 436 (Bankr. S.D.N.Y. 2011). It is axiomatic that a return of principal constitutes "reasonably equivalent value," and the Amended Complaint includes no allegations that the transfers to BNPP Arbitrage comprised "fictitious profits" received in excess of principal.[7] *See id.* at 401. As a result, none of the transfers alleged by the Trustee are avoidable, and his clawback claims should therefore be dismissed.

## V. THE TRUSTEE'S CLAIMS ARE BARRED BY THE SAFE HARBOR OF SECTION 546(E)

Section 546(e) provides that the Trustee may not avoid a transfer that qualifies as a settlement payment "made by or to (or for the benefit of) a . . . stockbroker, financial institution, [or] financial participant . . . in connection with a securities contract." The lone statutory exception concerns transfers avoided under section 548(a)(1)(A).[8] There is no question that the statutory requirements of the section 546(e) safe harbor provision are satisfied here: (1) the underlying agreement was a securities contract within the meaning of the statute; (2) the transfers under the agreement were "settlement payments"; and (3) the transfers were made by, to, and for the benefit of a covered entity under section 546(e). Because the transfers fall within the safe harbor, the Amended Complaint should be dismissed.

---

[7] Indeed, the Trustee's <u>own</u> complaint against Harley confirms that the fund received no fictitious profits. Compl., *Picard v. Harley International (Cayman) Limited*, Adv. Pro. No. 09-01187 (Bankr. S.D.N.Y. May 12, 2009), ECF No. 1 ¶ 34 (alleging that Harley invested "over two billion dollars with BLMIS" between 1996 and the filing of the SIPA liquidation); *id.* Ex. 1 (alleging approximately $1.1 billion in total transfers from BLMIS to Harley).

[8] BNPP Arbitrage recognizes that the Trustee's claims pertain entirely to two-year transfers sought under section 548(a)(1)(A), however, as explained above, the Trustee cannot rely on the so-called "Ponzi scheme presumption" to avoid his pleading burden under section 548(a)(1)(A) and thereby escape the application of the section 546(e) safe harbor. *See supra* § IV.

A.    ***The Underlying Transaction Was Made in Connection With a
"Securities Contract"***

The Amended Complaint is largely inscrutable, containing almost no facts tying

the alleged transfers to specific transactions.  Based on the barebones allegations, the only

plausible transactions through which the alleged transfers could have been made are either a

credit facility or a subscription and redemption of Harley shares—in both cases the transfers

were made in connection with "securities contracts" under section 741(7)(A) and therefore fall

under the section 546(e) safe harbor.  *See* Am. Compl. § VI.  If the Trustee is alleging the

underlying transaction involved a credit facility, that credit facility is a securities contract within

the meaning of the Bankruptcy Code, because it was a contract ultimately providing for the

purchase and redemptions of securities.  And if the Trustee is alleging the transfers were made as

a consequence of the redemption of Harley shares, then the transfers were made in connection

with subscription agreements and/or Harley's Articles of Association, and therefore also fit the

definition of a securities contract.  The definition of "securities contract" under section 741(7)(A)

covers "any contract for the purchase, sale, or loan of a security," "any extension of credit for the

clearance or settlement of securities transactions," and "any other agreement or transaction that is

similar to an agreement or transaction" referred to elsewhere in the definition of securities

contract.  11 U.S.C. § 741(7)(A).  This definition is intentionally broad.  *Picard v. Ida Fishman*

*Revocable Trust* (*In re BLMIS*), 773 F.3d 411, 419 (2d Cir. 2014) (noting that Congress intended

to "sweep broadly" and that "[f]ew words in the English language are as expansive as 'any' and

'similar'"); *SIPC v. BLMIS*, No. 12 MC 115 JSR, 2013 WL 1609154, at *8 (S.D.N.Y. Apr. 15,

2013) (definition of "securities contract" is broad and "includes, *inter alia*, investment fund

subscriptions and redemption requests").  In *Fishman*, the Second Circuit held that BLMIS's

18

account agreements with customers "satisfy the broad definition of 'securities contracts'" in

section 741(7)(A), which applies to section 546(e). *Fishman*, 773 F.3d at 418.

B.    ***The Alleged Transfers Were "Settlement Payments"***

The alleged transfers also meet the definition of "settlement payments" pursuant

to section 741(8).  The Second Circuit held in *Fishman* that "each transfer in respect of" a

customer's order or request to withdraw funds from BLMIS "constituted a settlement payment."

*Fishman*, 773 F.3d at 417, 422–23.  Though here, the Trustee's Amended Complaint is too vague

to clearly tie the transfers to any specific credit facility agreements or redemption requests, he

has seemingly alleged that Harley received approximately $1,066,800,000 in respect of such

withdrawal orders or requests.  Am. Compl. ¶ 84.  Precisely as in *Fishman*, it is indisputable that

these all fit within the definition of "settlement payments" for section 546(e) purposes.

C.    ***The Alleged Transfers Were Made by and to Covered Entities Under
        Section 546(e)***

The transfers at issue in the Amended Complaint were also made by, to, and for

the benefit of covered entities under section 546(e).  The Initial Transfers were made by an entity

covered by section 546(e), because they were made by a stockbroker (BLMIS).  The Bankruptcy

Code defines "stockbroker" to include entities "engaged in the business of effecting transactions

in securities."  11 U.S.C. § 101(53A)(B).  As Judge Rakoff concluded a decade ago, BLMIS

easily clears this bar.  *SIPC v. BLMIS*, 476 B.R. 715, 719 (S.D.N.Y. 2012), *aff'd*, 773 F.3d 411

(2d Cir. 2014) ("[E]ven assuming the truth of the allegation that Madoff Securities' investment

advisory division never traded securities on behalf of clients, Madoff Securities nonetheless

qualifies as a stockbroker by virtue of the trading conducted by its market making and

proprietary trading divisions.").  As the Second Circuit subsequently observed, "[i]t is not

disputed [by the Trustee] that BLMIS was a 'stockbroker' for the purposes of § 546(e)."

19

*Fishman*, 773 F.3d at 417. The fact that the Initial Transfers were made by a stockbroker independently satisfies the section 546(e) requirement.

The transfers were also made to, or "for the benefit of" BNPP Arbitrage, a financial institution. The Code defines "financial institution" to include not only "an entity that is a commercial or savings bank," or a "trust company," but also the customer of a bank "when [the bank] is acting as agent or custodian for a customer . . . in connection with a securities contract." 11 U.S.C. § 101(22)(A). *See In re Trib. Co. Fraudulent Conv. Litig.*, 946 F.3d 66, at 78–79 (2d Cir. 2019) (for purposes of section 101(22)(A), "customer" must be given its ordinary meaning, including "someone who buys goods or services" and "a person . . . for whom a bank has agreed to collect items") (citations omitted). Under this broad definition, BNPP Arbitrage— a subsidiary of BNPP that provides broad financial services, including investment management, issuance of shares, and the holding of assets—is considered a financial institution.[9] Therefore, insofar as the Amended Complaint alleges that Harley's transfers to BNPP Arbitrage were tied to payments of customer property transferred from BLMIS to BNPP Arbitrage, the alleged Initial Transfers were settlement payments for the benefit of a financial institution and are therefore subject to the section 546(e) safe harbor. *See SIPC v. BLMIS*, 2013 WL 1609154, at *9 (*Cohmad*).

D.   ***No Other Exception to the Safe Harbor Applies***

The limited, judicially created exception to section 546(e) for entities that had actual knowledge of the voidability of the transfers does not apply under these circumstances. In addition to the statutory requirements previously discussed, all of which are met here, the Court

---

[9] *See* Declaration of Thomas S. Kessler in Support of the Fairfield Defendants' Consolidated Motion to Dismiss, *Fairfield Sentry Limited (In Liquidation) v. Theodoor GGC Amsterdam, et al.*, Adv. Pro. No. 10-04098 (Bankr. S.D.N.Y. Mar. 23, 2020), ECF No. 55 (evidencing BNPP Arbitrage is a financial institution).

has recognized a limited, judicially imposed exception to section 546(e) where a transferee has

actual knowledge of the fraud. *Picard v. Fairfield Inv. Fund (In re BLMIS)*, No. 08-01789, Adv.

Pro. No. 09-01239, 2021 WL 3477479, at *4 (Bankr. S.D.N.Y. Aug. 6, 2021) (quoting *Cohmad*,

2013 WL 1609154, at *7).

   Here, the Trustee has declined to allege that Harley had knowledge of the fraud,

which renders wholly inapplicable any readings of this exception that purport to bar a subsequent

transferee from raising the section 546(e) defense under circumstances where the initial

transferee had actual knowledge of the voidability of the transfers. *See SIPC v. BLMIS*, 641 B.R.

78, 92 (Bankr. S.D.N.Y. 2022). As discussed above, the Trustee has made no such allegations of

actual knowledge with respect to BNPP Arbitrage, and the safe harbor therefore bars the

Trustee's claim. *See supra* § III. B. at 12.

   Additionally, in *Multi-Strategy Fund*, the District Court observed that section

546(e) may be applicable regardless of the feeder funds' alleged knowledge of the fraud by

virtue of the separate securities contract between the feeder funds and the subsequent transferee

(here BNPP Arbitrage). *Picard v. Multi-Strategy Fund Ltd.*, No. 22-cv-06502 (JSR), 2022 WL

16647767, at *8 (S.D.N.Y. Nov. 3, 2022). In other words, where the Initial Transfers between

BLMIS and the feeder funds "were made 'in connection with,' meaning they were clearly related

to, securities contracts between [the funds] and [their] financial institution or financial participant

clients," section 546(e) may also apply. *Multi-Strategy Fund Ltd.*, 2022 WL 2137073, at *9.

This is clearly the case for each of the Subsequent Transfers. As discussed above, the transfers

were made pursuant to "securities contracts" within the meaning of section 546(e), whether in

the form a credit facility, or redemption of Harley shares. *See supra* § V. A. at 17. As a result,

the Initial Transfers were made "in connection with" securities contracts between Harley and

BNPP Arbitrage, and, based on nothing more than his own allegations, section 546(e) operates to
bar the Trustee's claim.

## CONCLUSION

For all of the foregoing reasons, the Court should grant BNPP Arbitrage's motion
to dismiss the Amended Complaint with prejudice pursuant to Federal Rules of Civil Procedure
12(b)(6) and 12(b)(2).

Dated:    New York, New York
          July 24, 2023

Respectfully submitted,

*/s/ Thomas S. Kessler*
CLEARY GOTTLIEB STEEN & HAMILTON LLP

Roger A. Cooper
Ari D. MacKinnon
Thomas S. Kessler
One Liberty Plaza
New York, New York  10006
T: 212-225-2000
F: 212-225-3999
racooper@cgsh.com
amackinnon@cgsh.com
tkessler@cgsh.com

*Attorneys for BNP Paribas Arbitrage SNC*