**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | |
| v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 23-01017 (CGM) |
| NATIXIS FINANCIAL PRODUCTS LLC and BLOOM ASSET HOLDINGS FUND, | |
| Defendants. | |

**TRUSTEE'S MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ....................................................................................................4

I.      THE BLMIS PONZI SCHEME................................................................4

II.     DEFENDANTS AND THEIR INVESTMENTS IN GROUPEMENT.............................4

III.    PROCEDURAL HISTORY.......................................................................5

        A.      The Groupement Litigation..............................................................5

        B.      The Alpha Prime Litigation ............................................................6

        C.      The Natixis Parties Litigation .........................................................7

ARGUMENT ........................................................................................................8

I.      THE ALPHA PRIME SETTLEMENT DOES NOT RELEASE DEFENDANTS
        FROM CLAIMS FOR SUBSEQUENT TRANSFERS FROM GROUPEMENT .............8

        A.      The Alpha Prime Settlement Establishes That It Does Not Apply to the
                Groupement Claims ......................................................................9

                1.      The Alpha Prime Settlement Resolves Only the Controversy
                        Between the Trustee and Alpha Prime.........................................9

                2.      The Consideration Provided for the Alpha Prime Release Confirms
                        That the Alpha Prime Release Applies to Alpha Prime Transfers
                        Only.............................................................................11

        B.      Extrinsic Evidence Confirms That the Alpha Prime Release Does Not
                Apply to the Groupement Claims .....................................................12

                1.      The Trustee and Alpha Prime Agree on the Alpha Prime Release's
                        Narrow Scope................................................................12

                2.      The Narrow Scope of the Alpha Prime Release Is Consistent With
                        the Court's Approval of the Alpha Prime Settlement.................14

                3.      The Parties' Conduct Confirms the Narrow Scope of the Alpha
                        Prime Release.................................................................15

| | | | |
|---|---|---|---|
| | C. | Defendants Are Not Intended Third-Party Beneficiaries of the Alpha Prime Settlement With Respect to the Groupement Claims | 16 |
| | D. | The Trustee Is Not Estopped From Arguing That the Alpha Prime Release Does Not Apply to the Groupement Claims | 17 |
| | E. | If the Alpha Prime Settlement Is Ambiguous, It Should Be Reformed | 17 |
| II. | | SECTIONS 546(e) AND (g) DO NOT BAR THE TRUSTEE'S CLAIMS | 17 |
| | A. | Sections 546(e) and (g) Do Not Apply to Transfers Made Within Two Years of the Filing Date | 17 |
| | | 1. The Transfers Are Avoidable Under Section 548(a)(1)(A) | 18 |
| | | 2. The Ponzi Scheme Presumption Is the Law of this Circuit | 19 |
| | | 3. The Complaint Sufficiently Alleges That BLMIS Made the Initial Transfers with Fraudulent Intent | 19 |
| | B. | Section 546(e) Does Not Bar the Trustee's Claims | 20 |
| | | 1. Groupement Had Actual Knowledge of Madoff's Fraud | 21 |
| | | 2. Section 546(e) Does Not Apply Independently to Recovery Actions | 21 |
| | C. | Section 546(g) Does Not Bar Any of the Trustee's Claims Against Bloom | 22 |
| | | 1. As to Bloom, the Complaint Does Not Establish That the Initial Transfers Were for the Benefit of a Financial Participant | 22 |
| | | 2. The Complaint Does Not Establish That the Initial Transfers Were Made in Connection With a Swap Agreement | 24 |
| III. | | THE DOCTRINE OF LACHES DOES NOT BAR RECOVERY OF A SUBSEQUENT TRANSFER | 26 |
| IV. | | THE COURT HAS PERSONAL JURISDICTION OVER BLOOM | 29 |
| | A. | Bloom Waived the Defense of Personal Jurisdiction | 30 |
| | B. | Bloom Purposefully Availed Itself of the Laws and Privilege of Conducting Business in the Forum | 30 |
| | | 1. Bloom's Contacts With the Forum Support Personal Jurisdiction | 31 |
| | | 2. The Trustee Has Not Relied On "Group Pleading," a "Stream of Commerce" Theory, or the Contacts of Third Parties | 33 |

3.    The Trustee's Claims Relate to Bloom's Contacts With the Forum .........33

4.    Personal Jurisdiction Over Bloom Is Reasonable ......................................33

C.    In the Alternative, the Trustee Is Entitled to Jurisdictional Discovery .................34

V.    THE TRUSTEE SUFFICIENTLY ALLEGES THE AVOIDABILITY OF THE
INITIAL TRANSFERS TO GROUPEMENT ...................................................................34

VI.    THE TRUSTEE SUFFICIENTLY ALLEGES THAT DEFENDANTS
RECEIVED STOLEN BLMIS CUSTOMER PROPERTY ...............................................35

A.    The Trustee Plausibly Alleges That All of the Subsequent Transfers
Defendants Received Contained Stolen BLMIS Customer Property ...................36

B.    Defendants Misstate the Trustee's Pleading Burden ...........................................36

C.    Defendants' Remaining Tracing Arguments Fail ................................................37

VII.    A SECTION 550(b) GOOD FAITH AFFIRMATIVE DEFENSE IS
INAPPROPRIATE AT THE PLEADING STAGE ........................................................38

CONCLUSION ....................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Actrade Fin. Techs., Ltd.*,
 424 B.R. 59 (Bankr. S.D.N.Y. Dec. 31, 2009) ...................................................................10, 13

*ASI Sign Sys., Inc. v. Arch. Sys., Inc.*,
 No. 98 Civ. 4823, 1999 WL 553825 (S.D.N.Y. July 29, 1999) ............................................17

*Bakalar v. Vavra*,
 No. 05 Civ. 3037, 2006 WL 2311113 (S.D.N.Y. Aug. 10, 2006) ..........................................28

*Bankr. Est. of Norske Skogindustrier ASA v. Cyrus Cap. Partners, LP (In re
 Bankr. Est. of Norske Skogindustrier ASA)*,
 629 B.R. 717 (Bankr. S.D.N.Y. 2021) ..................................................................................22

*In re Beacon Assocs. Litig.*,
 745 F. Supp. 2d 386 (S.D.N.Y. 2010) ....................................................................................39

*In re BLMIS*,
 No. 20-cv-02586, 2022 WL 1304589 (S.D.N.Y. May 2, 2022) .............................................38

*Blockchain Mining Supply & Servs. Ltd. v. Super Crypto Mining, Inc.*,
 No. 18-cv-11099, 2020 WL 7128968 (S.D.N.Y. Dec. 4, 2020) .............................................34

*Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*,
 361 N.E.2d 999 (1977)...........................................................................................................10

*Burger King Corp. v. Rudzewicz*,
 471 U.S. 462 (1985)................................................................................................................31

*Cahill v. Regan*,
 157 N.E.2d 505 (N.Y. 1959).................................................................................................9, 11

*Chacko v. Costco Wholesale Corp.*,
 568 F. Supp. 3d 487 (S.D.N.Y. 2021)......................................................................................9

*Chloé v. Queen Bee of Beverly Hills, LLC*,
 616 F.3d 158 (2d Cir. 2010).......................................................................................31, 33, 34

*City of Almaty, Kazakhstan v. Sater*,
 No. 19-CV-2645, 2019 WL 6681560 (S.D.N.Y. Dec. 6, 2019) .............................................16

*City of N.Y. v. Mickalis Pawn Shop, LLC*,
 645 F.3d 114 (2d Cir. 2011)....................................................................................................30

*Collins v. Decker (In re Decker)*,
    Adv. Pro. No. 10-80029, 2011 WL 2174349 (Bankr. N.D.N.Y. June 1, 2011) ....................27

*Consol. Edison, Inc. v. Ne. Utils.*,
    332 F. Supp. 2d 639 (S.D.N.Y. 2004) ............................................................... *passim*

*In re Corp. Res. Servs., Inc.*,
    No. 15-1239, 2019 WL 5095709 (Bankr. S.D.N.Y. Oct. 10, 2019) ........................12

*Deere & Co. v. MTD Prods., Inc.*,
    No. 00-CIV-5936, 2001 WL 435613 (S.D.N.Y. Apr. 30, 2001) ...........................28

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d Cir. 2013) ...................................................................30

*In re Dynegy Inc.*,
    486 B.R. 585 (Bankr. S.D.N.Y. 2013) ...........................................................9

*Ferrari v. Cnty. of Suffolk*,
    790 F. Supp. 2d 34 (E.D.N.Y. 2011) ...........................................................35

*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*,
    130 F.3d 52 (2d Cir. 1997) ...................................................................23

*Fourth Toro Fam. Ltd. P'ship v. PV Bakery, Inc.*,
    88 F. Supp. 2d 188 (S.D.N.Y. 2000) ...........................................................28

*In re Gawker Media LLC*,
    588 B.R. 337 (Bankr. S.D.N.Y. 2018) ...........................................................10

*Gilmore v. Shearson/Am. Exp. Inc.*,
    811 F.2d 108 (2d Cir. 1987) ...................................................................30

*Golden Pac. Bancorp v. F.D.I.C.*,
    273 F.3d 509 (2d Cir. 2001) .................................................................9, 12

*Gowan v. Patriot Grp., LLC (In re Dreier LLP)*,
    452 B.R. 391 (Bankr. S.D.N.Y. 2011) ...........................................................39

*Herman v. Malamed*,
    487 N.Y.S.2d 791 (N.Y. App. Div. 1985) ...........................................................10

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945) ...........................................................................31

*In re Ionosphere Clubs, Inc.*,
    156 B.R. 414 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994) .........................15

*Ivani Contracting Corp. v. City of N.Y.*,
    103 F.3d 257 (2d Cir. 1997).....................................................................26

*J. McIntyre Mach., Ltd. v. Nicastro*,
    564 U.S. 873 (2011)...............................................................................33

*Kelly–Brown v. Winfrey*,
    717 F.3d 295 (2d Cir. 2013)....................................................................38

*Koch Indus., Inc. v. Picard (In re BLMIS)*,
    No. 23-CV-0294 (VEC), 2023 WL 3317926 (S.D.N.Y. May 9, 2023)............20, 22

*Lipsky v. Commw. United Corp.*,
    551 F.2d 887 (2d Cir. 1976)....................................................................17

*Merit Management Group, LP v. FTI Consulting, Inc.*,
    138 S. Ct. 883 (2018).......................................................................2, 24, 25

*Migliore v. Manzo*,
    813 N.Y.S.2d 762 (N.Y. App. Div. 2006) ...............................................17

*Neuman v. Harmon*,
    965 F. Supp. 503 (S.D.N.Y. 1997) ........................................................13

*Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*,
    549 B.R. 56 (S.D.N.Y. 2016)..................................................................33

*Peterson v. Regina*,
    935 F. Supp. 2d 628 (S.D.N.Y. 2013)..................................................9, 16

*Petracca v. Petracca*,
    756 N.Y.S.2d 587 (N.Y. App. Div. 2003) ................................................9

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
    572 U.S. 663 (2014)...........................................................................26, 27

*Picard v. ABN AMRO Bank (Ir.), Ltd. (In re Madoff)*,
    650 B.R. 24 (Bankr. S.D.N.Y. 2023) ............................................... *passim*

*Picard v. ABN AMRO Bank (Ir.) Ltd (In re Madoff Sec.)*,
    505 B.R. 135 (S.D.N.Y. 2013)...............................................18, 23, 24, 25

*Picard v. ABN AMRO Bank N.V. (In re Madoff)*,
    Adv. Pro. No. 10-05354 (CGM), 2023 WL 2358746 (Bankr. S.D.N.Y. Mar. 3,
    2023) ...............................................................................................18, 23

*Picard v. Avellino (In re BLMIS)*,
    557 B.R. 89 (Bankr. S.D.N.Y. 2016)......................................................39

*Picard v. Banca Carige S.p.A. (In re Madoff)*,
    Adv. Pro. No. 11-02570 (CGM), 2022 WL 2387522 (Bankr. S.D.N.Y. June
    30, 2022) ...................................................................................................................32, 35

*Picard v. Bank Julius Baer & Co. Ltd. (In re Madoff)*,
    Adv. Pro. No. 11-02922 (CGM), 2022 WL 17726520 (Bankr. S.D.N.Y. Dec.
    15, 2022) ...........................................................................................................................40

*Picard v. Banque Syz & Co., SA (In re Madoff)*,
    Adv. Pro. No. 11-02149 (CGM), 2022 WL 2135019 (Bankr. S.D.N.Y. June
    14, 2022) ...........................................................................................................................40

*Picard v. Barfield Nominees Ltd. (In re Madoff)*,
    Adv. Pro. No. 12-01669 (CGM), 2022 WL 4542915 (Bankr. S.D.N.Y. Sept.
    28, 2022) ...........................................................................................................................32

*Picard v. BNP Paribas S.A.*,
    594 B.R. 167 (Bankr. S.D.N.Y. 2018) .......................................................................31, 34

*Picard v. Cathay Life Ins. Co. Ltd. (In re Madoff)*,
    Adv. Pro. No. 11-02568 (CGM), 2022 WL 16626325 (Bankr. S.D.N.Y. Nov.
    1, 2022) .............................................................................................................................37

*Picard v. Charles Ellerin Revocable Tr. (In re BLMIS)*,
    Adv. Pro. Nos. 10-04398 (BRL), 10-05219 (BRL), 2012 WL 892514 (Bankr.
    S.D.N.Y. Mar. 14, 2012) ...................................................................................................36

*Picard v. Cohmad Sec. Corp. (In re BLMIS)*,
    454 B.R. 317 (Bankr. S.D.N.Y. 2011) .......................................................................19, 38

*Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*,
    627 B.R. 546 (Bankr. S.D.N.Y. 2021) ...............................................................................31

*Picard v. Fairfield Inv. Fund Ltd. (In re Madoff)*,
    Adv. Pro. No. 09-01239 (CGM), 2021 WL 3477479 (Bankr. S.D.N.Y. Aug. 6,
    2021) .............................................................................................................................39, 40

*Picard v. First Gulf Bank*,
    Adv. Pro. No. 11-02541 (CGM), 2022 WL 3354955 (Bankr. S.D.N.Y. July
    18, 2022) ...................................................................................................................19, 21, 38

*Picard v. Gettinger (In re BLMIS)*,
    976 F.3d 184 (2d Cir. 2020) ..............................................................................................19

*Picard v. Hebrew University of Jerusalem (In re Madoff)*,
    650 B.R. 5 (Bankr. S.D.N.Y. 2023) ...................................................................................34

*Picard v. JABA Assocs. LP (In re Madoff)*,
    528 F. Supp. 3d 219 (S.D.N.Y. 2021)....................................................................20

*Picard v. Katz*,
    466 B.R. 208 (S.D.N.Y. 2012)............................................................................18

*Picard v. Korea Exch. Bank (In re Madoff)*,
    Adv. Pro. No. 11-02572 (CGM), 2022 WL 4371908 (Bankr. S.D.N.Y. Sept.
    21, 2022) ........................................................................................................36, 37

*Picard v. Merkin (In re BLMIS)*,
    515 B.R. 117 (Bankr. S.D.N.Y. 2014)........................................................36, 37, 38

*Picard v. Merkin (In re Madoff)*,
    581 B.R. 370 (Bankr. S.D.N.Y. 2017)...................................................................38

*Picard v. Multi-Strategy Fund Ltd. (In re Madoff)*,
    641 B.R. 78 (Bankr. S.D.N.Y. 2022)............................................................. *passim*

*Picard v. Multi-Strategy Fund Ltd.*,
    Nos. 22-cv-06502, 22-cv-06512, 22-cv-07173, 22-cv-07189, 22-cv-07195, 22-
    cv-07372, 22-cv-07788 (JSR), 2022 WL 16647767 (S.D.N.Y. Nov. 3, 2022) .....21, 22, 23, 26

*Picard v. Nomura Int'l PLC (In re Madoff)*,
    Adv. Pro. No. 11-02759 (CGM), 2023 WL 3113188 (Bankr. S.D.N.Y. Apr.
    26, 2023) .......................................................................................................30

*Picard v. Shapiro (In re BLMIS)*,
    542 B.R. 100 (Bankr. S.D.N.Y. 2015)...................................................................36

*Picard v. SNS Bank N.V. (In re Madoff)*,
    Adv. Pro. No. 12-01046 (CGM), 2023 WL 2395734 (Bankr. S.D.N.Y. Mar. 7,
    2023) ........................................................................................................26, 35, 38

*Picard v. UBS AG (In re Madoff)*,
    Adv. Pro. No. 10-04285 (CGM), 2022 WL 17968924 (Bankr. S.D.N.Y. Dec.
    27, 2022) .......................................................................................................21

*Picard v. UBS AG (In re Madoff)*,
    647 B.R. 42 (Bankr. S.D.N.Y. 2022)................................................................21, 35

*In re Picard*,
    917 F.3d 85 (2d Cir. 2019)...................................................................................28

*In re Prudential Lines, Inc.*,
    170 B.R. 222 (S.D.N.Y. 1994).............................................................................15

*SCA Hygiene Prods. Aktiebloag v. First Quality Baby Prods., LLC*,
    580 U.S. 328 (2017) ................................................................................... 26, 27

*Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.)*,
    403 F.3d 43 (2d Cir. 2005) ................................................................................ 19

*SIPC v. BLMIS*,
    501 B.R. 26 (S.D.N.Y. 2013) ............................................................................. 27

*SIPC v. BLMIS (In re Madoff Sec.)*,
    No. 12 Misc. 115 (JSR), 2012 WL 13041475 (S.D.N.Y. May 15, 2012) ............. 22

*In re SSA Bonds Antitrust Litig.*,
    420 F. Supp. 3d 219 (S.D.N.Y. 2019) ............................................................... 33

*Strauss v. Belle Realty Co.*,
    469 N.Y.S.2d 948 (N.Y. App. Div. 1983) ............................................................ 8

*Toth v. N.Y.C. Dep't of Ed.*,
    No. 21-CV-4245, 2023 WL 121733 (E.D.N.Y. Jan. 5, 2023) .................... 10, 11, 12

*United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*,
    988 F. Supp. 367 (S.D.N.Y. 1997) .................................................................... 16

*United Teamster Fund v. MagnaCare Admin. Servs., LLC*,
    39 F. Supp. 3d 461 (S.D.N.Y. 2014) ................................................................. 38

*Veltri v. Bldg. Serv. 32B–J Pension Fund*,
    393 F.3d 318 (2d Cir. 2004) .............................................................................. 27

*Vines v. Gen. Outdoor Advert. Co.*,
    171 F.2d 487 (2d Cir. 1948) (Hand, J.) .............................................................. 10

*W. Alton Jones Found. v. Chevron U.S.A., Inc.*,
    97 F.3d 29 (2d Cir. 1996) ................................................................................. 15

*Walden v. Fiore*,
    571 U.S. 277 (2014) ......................................................................................... 33

*Watson v. Mayo*,
    No. 07 Civ. 54 (NRB), 2008 WL 538442 (S.D.N.Y. Feb. 26, 2008) ..................... 27

**Statutes**

11 U.S.C. § 101(22A) ............................................................................................ 22

11 U.S.C. § 101(53C) ............................................................................................ 22

11 U.S.C. § 502(h) ........................................................................................................................12

11 U.S.C. § 546 ......................................................................................................................17, 19

11 U.S.C. § 546(e) ................................................................................................................ *passim*

11 U.S.C. § 546(g) ................................................................................................................ *passim*

11 U.S.C. § 548(a)(1)(A) ..................................................................................................... *passim*

11 U.S.C. § 550 ...........................................................................................................................27

11 U.S.C. § 550(a) ......................................................................................................................26

11 U.S.C. § 550(a)(2) ............................................................................................................29, 35

11 U.S.C. § 550(f) ......................................................................................................................27

11 U.S.C. § 550(f)(1) .................................................................................................................27

15 U.S.C. § 78fff-1 .....................................................................................................................29

15 U.S.C. § 78fff-2 .....................................................................................................................29

**Rules**

Fed. R. Bankr. P. 9019(a) ...........................................................................................................15

Fed. R. Civ. P. 9(b) ..............................................................................................................19, 37

Fed. R. Civ. P. 10(c) ...................................................................................................................35

Irving H. Picard ("Trustee"), as trustee for the substantively consolidated liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"), and the chapter 7 estate of Bernard L. Madoff ("Madoff"), respectfully submits this memorandum of law in opposition to the motion ("Motion") brought by defendants Natixis Financial Products LLC (individually and together with its predecessors in interest Natixis Financial Products Inc. and CDC IXIS Financial Products, f/k/a IXIS Financial Products Inc., f/k/a CDC Financial Products Inc.) ("Natixis FP") and Bloom Asset Holdings Fund ("Bloom," and together with Natixis FP, "Defendants") to dismiss the Trustee's complaint ("Complaint") against Defendants seeking to recover subsequent transfers received from Groupement Financier Limited ("Groupement").

## PRELIMINARY STATEMENT

As part of the Trustee's continuing efforts to recover BLMIS customer property stolen in Madoff's Ponzi scheme, the Trustee's Complaint asserts claims to recover approximately $234 million of customer property transferred from Groupement to Defendants.

In their Motion, Defendants argue that: (1) a release ("Alpha Prime Release") in a 2022 court-approved settlement agreement ("Alpha Prime Settlement") in a case involving the transfer of customer property to Alpha Prime Fund Ltd. ("Alpha Prime") excuses Defendants from the Trustee's claims to recover subsequent transfers of customer property from Groupement; (2)  11 U.S.C. §§ 546(e) ("Section 546(e)") and 546(g) ("Section 546(g)") bar the Trustee's claims; (3) the doctrine of laches bars the Trustee's claim against Natixis FP; (4) the Court lacks personal jurisdiction over Bloom; (5) the Trustee insufficiently pleads the avoidability of the initial transfers of customer property to Groupement; (6) the Trustee insufficiently pleads that the

subsequent transfers contain BLMIS customer property; and (7) Defendants received the transfers in good faith. These arguments all fail.

*First*, the Alpha Prime Settlement has nothing to do with transfers of customer property from Groupement. The Alpha Prime Settlement resolved a separate case brought by the Trustee against a BLMIS feeder fund wholly unrelated to Groupement. The Alpha Prime Release can be interpreted to apply only to claims for transfers of stolen BLMIS customer property from Alpha Prime. Defendants' novel argument relies on selective quotations taken out of context. Under New York law, however, a contract containing a release must be read as a whole and to give effect to the intentions of the parties to that agreement. Here, the language of the Alpha Prime Settlement leaves no question that the Trustee and Alpha Prime intended to release claims for transfers of stolen BLMIS customer property from Alpha Prime only. This conclusion is confirmed by the nature of the consideration exchanged under the Alpha Prime Settlement, the subsequent conduct of the Trustee, Alpha Prime. and Defendants, Alpha Prime's own statements on the matter, and the Court's approval of the Alpha Prime Settlement as reasonable and in the best interests of the BLMIS customer property estate.

*Second*, Sections 546(e) and 546(g) do not bar the Trustee's claims to recover subsequent transfers from Defendants. By their plain language, neither provision applies to the Trustee's claims seeking two-year transfers. Separately, Section 546(e) does not apply to any of the transfers at issue because the Trustee has pleaded Groupement's actual knowledge of the BLMIS fraud in connection with the underlying initial transfers. And Section 546(g) does not apply to any of the transfers at issue here because the underlying initial transfers were not made "in connection with" a swap agreement as that language should be interpreted following the decision of the Supreme Court in *Merit Management Group, LP v. FTI Consulting, Inc.*, 138 S. Ct. 883

(2018), and because application of Section 546(g) would require fact-intensive determinations inappropriate at the motion to dismiss stage.

*Third*, Defendants' laches argument is specious. Laches is not an available defense to timely statutory claims. And, in any event, the Complaint here represents not a new case but a reframing—with Defendants' consent—of claims for recovery of Groupement subsequent transfers of stolen BLMIS customer property that the Trustee has continuously pursued since 2010. Defendants are not prejudiced by the Trustee's revising the details of his allegations about transactions which, pre-discovery, Defendants have far more information than the Trustee.

*Fourth*, the Court has personal jurisdiction over Bloom. Bloom has waived any defense to personal jurisdiction. In any event, as pleaded in the Complaint, Bloom purposefully and knowingly invested with BLMIS in New York through Groupement. This alone provides a basis for the Court's jurisdiction, but the Complaint alleges additional contacts between Bloom and the forum, including that New York-based Natixis FP and its New York affiliate operated Bloom as a vehicle to make indirect investments in BLMIS through feeder funds like Groupement. The Trustee's allegations overwhelmingly establish that personal jurisdiction over Bloom is proper.

*Fifth*, the Trustee sufficiently alleges that the initial transfers of BLMIS customer property to Groupement are avoidable. This Court has consistently held that the Trustee can plead the avoidability of initial transfers in a subsequent transfer action by reference to his complaint against the initial transferee.

*Sixth*, the Court has consistently rejected arguments that the Trustee has failed to sufficiently allege that the defendant's subsequent transfers contained stolen BLMIS customer property. The Complaint outlines the pathways through which stolen BLMIS customer property was transferred from BLMIS to Groupement and then to Defendants. No more is required.

*Seventh* and finally, the Court has consistently held that the affirmative defense of good faith requires fact-based determinations inappropriate at the pleading stage.

For all these reasons, Defendants' Motion should be denied.

## BACKGROUND

### I.    THE BLMIS PONZI SCHEME

Madoff operated BLMIS's investment advisory business as a Ponzi scheme until its collapse in 2008. Compl. ¶¶ 22–29, *Picard v. Natixis Fin. Prods. LLC*, Adv. Pro. No. 23-01017 (Bankr. S.D.N.Y. Mar. 1, 2023), ECF No. 1.[1] Madoff's fraud was fueled by numerous "feeder funds"—large investment funds that funneled investors' funds into BLMIS. *Id*. ¶ 2. Groupement, one such feeder fund, invested 100% of its assets directly with BLMIS and received approximately $352 million of customer property from BLMIS. *Id*. ¶ 3; Second Am. Compl. ¶¶ 104, 327, *Picard v. UBS AG*, Adv. Pro. No. 10-04285 (Bankr. S.D.N.Y. Feb. 28, 2022) ("*Luxalpha Action*"), ECF No. 274 ("Luxalpha SAC"). Alpha Prime and Fairfield Sentry Limited ("Sentry") were other, separate, BLMIS feeder funds. Compl. ¶ 211, *Picard v. Natixis S.A.*, Adv. Pro. No. 10-05353 (Bankr. S.D.N.Y. Dec. 8, 2010) ("*Natixis S.A. Action*"), ECF No. 1 ("2010 Complaint").

### II.    DEFENDANTS AND THEIR INVESTMENTS IN GROUPEMENT

Natixis FP is a Delaware corporation and financial services company with its principal place of business in New York, New York. Compl. ¶ 10. It is registered as a foreign LLC in New York and has an agent for service of process in New York. *Id*. ¶ 13.

Bloom is an Irish "umbrella trust" that was operated and controlled by its New York-based affiliates, Natixis FP and Natixis Securities North America Inc. (now Natixis North

---

[1] Unless otherwise indicated, all ECF references herein refer to the above-captioned case.

America LLC) ("Natixis Securities N.A."). *Id*. ¶ 11. At all relevant times, Bloom was wholly owned by affiliates of Natixis FP, had the same ultimate parent company as Natixis FP, and used Natixis Securities N.A. as its investment adviser. *Id*. ¶ 12.

Between 2003 and 2008, Defendants invested with BLMIS by participating in swap and related hedging transactions with Groupement affiliate Groupement Financier Levered Limited ("GFLL"), for which the underlying reference asset was Groupement. *Id*. ¶¶ 3–4, 64. Because Groupement was closed to U.S. investors, Bloom invested in Groupement on behalf of Natixis FP, hedging Natixis FP's exposure to Groupement and ensuring Natixis FP's ability to provide GFLL with the corresponding returns. *Id*. ¶¶ 4, 67. Bloom held these assets through a sub-fund called Blossom Asset Holdings Fund. *Id*. ¶ 12. Natixis FP and Natixis Securities N.A. directed Bloom's investments in and redemptions from Groupement and other feeder funds. *Id*. ¶ 15. In connection with its investments in Groupement, Bloom paid fees to New York-based Natixis Securities N.A. *Id*. The Groupement swap transactions between Natixis FP and GFFL were governed by New York law. *Id*. ¶ 13. Defendants knew when entering into the swap and related transactions that Groupement was a BLMIS feeder fund and that BLMIS was based—and purportedly engaged in securities transactions—in New York. *Id*. ¶ 68.

## III.    PROCEDURAL HISTORY

### A.    The Groupement Litigation

In November 2010, the Trustee filed an adversary proceeding against Groupement and others to avoid and recover approximately $1.1 billion in fraudulent transfers, including $352 million to Groupement. *See id*. ¶ 70; Luxalpha SAC ¶ 327. This Court denied Groupement's motion to dismiss the Luxalpha SAC on December 1, 2022. Order Denying the Access Defs.' Mot. to Dismiss the SAC, *Luxalpha Action*, ECF No. 337; *see also* Compl. ¶ 70.

5

**B.      The Alpha Prime Litigation**

In 2009, the Trustee filed an adversary proceeding against Alpha Prime and others seeking, *inter alia*, avoidance and recovery of $83,170,000 in initial transfers that Alpha Prime received from BLMIS.  Compl., *Picard v. HSBC Bank PLC*, Adv. Pro. No. 09-01364 (Bankr. S.D.N.Y. July 15, 2009) ("*Alpha Prime Action*"), ECF No. 1.  In 2018, Alpha Prime and the Trustee entered into a partial settlement agreement, pursuant to which Alpha Prime agreed to return $76,450,000 to the customer property estate and the Trustee agreed to dismiss his claims for two-year transfers to Alpha Prime and allow 95% of Alpha Prime's customer claim.  Mot. to Approve, *Alpha Prime Action*, ECF No. 491.

In 2022, Alpha Prime and the Trustee entered into the Alpha Prime Settlement to resolve remaining issues.  *See* Cioffi Decl., Ex. 7, ECF No. 19-7.  The Trustee and Alpha Prime agreed that: (1) transfers from BLMIS to Alpha Prime within six years of the filing date were avoidable in an amount to be determined following discovery and/or during binding mediation between the parties; (2) the Trustee would make a $54.6 million distribution towards Alpha Prime's customer claim; (3) Alpha Prime would continue cooperating with the Trustee's discovery efforts; and (4) Alpha Prime would share with the customer property estate recoveries from its claims against service providers involved in its relationship with BLMIS.  *See id.* ¶¶ 2, 4–6.

The Alpha Prime Settlement also contained the Alpha Prime Release, which in relevant part states that: "[i]n consideration for the terms herein," the Trustee releases "Alpha Prime and Alpha Prime Asset Management LTD and its . . . direct and indirect shareholders" from "all past, present or future actions . . . arising out of or in any way related to Madoff or BLMIS."  *Id.* ¶ 7.

In June 2022, the Trustee and Alpha Prime moved this Court to approve the Alpha Prime

Settlement, after providing notice to all parties, including Defendants.[2]  Mot. to Approve, *Alpha

Prime Action*, ECF No. 710.  The Court approved the Alpha Prime Settlement on July 20, 2022.

Order, *Alpha Prime Action*, ECF No. 715.

## C.    The Natixis Parties Litigation

In December 2010, the Trustee filed the 2010 Complaint against Defendants and related

entities, including Natixis S.A. and Tensyr Limited ("Tensyr," and together with Defendants and

Natixis S.A., "Natixis Parties") to recover subsequent transfers received from Groupement,

Alpha Prime, and Sentry.  *See generally* 2010 Compl.  In 2011, the Natixis Parties moved to

dismiss the Trustee's 2010 Complaint.  Mot. to Dismiss, *Natixis S.A. Action*, ECF Nos. 18–21.

The case was then stayed while issues pertinent to this case, including those related to

extraterritoriality, international comity, and good faith were heavily litigated.  *See* So Ordered

Stips., *Natixis S.A. Action*, ECF Nos. 181, 185.  Once resolved, the Trustee and the Natixis

Parties agreed, with the Court's approval, to reorganize the *Natixis S.A. Action* into two

proceedings: one in which the Trustee sought subsequent transfers from Sentry to Natixis S.A.

and Tensyr; and another against Defendants seeking subsequent transfers from Groupement.  *See*

Stip. & Order, *Natixis S.A. Action*, ECF No. 192.

On March 1, 2023, the Trustee commenced this action against Natixis FP and Bloom

seeking approximately $234 million in subsequent transfers Defendants received from

Groupement.

---

[2] Defendants do not dispute that, through their counsel, they received notices of all filings related to the Alpha Prime Settlement. Indeed, notice of the Alpha Prime Settlement motion papers was sent to seven different individuals at Davis & Gilbert LLP. *See, e.g.*, Mot. to Approve, *SIPC v. BLMIS*, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. June 23, 2022), ECF No. 21774 (listing jcioffi@dglaw.com, cdevito@dglaw.com, bginsberg@dglaw.com, jheatherton@dglaw.com, alevy@dglaw.com, hsnewman@dglaw.com, and nserratore@dglaw.com among email addresses to which "Notice [of the filing] will be electronically mailed"); Order Approving Settlement, *SIPC v. BLMIS*, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. July 20, 2022), ECF No. 21997 (same).

Prior to filing the Motion, Defendants informed the Trustee that they intended to argue that they had been released from the Trustee's Groupement subsequent transfer claims through the Alpha Prime Release. Mot. at 14 n.12. The Trustee responded, with Alpha Prime copied:

> [T]he Trustee and Alpha Prime agree that the [Alpha Prime Settlement] was <u>not</u> intended to and did <u>not</u> release existing defendants of anyone else from claims other than those concerning direct or indirect transfers of <u>money from Alpha Prime</u>. Put another way, the [Alpha Prime Settlement] discharged certain entities from claims only concerning direct or indirect transfers from Alpha Prime and not for any claims that the Trustee otherwise has or may have.

Cioffi Decl., Ex. 11, ECF No. 19-11; *see also* Decl. of Peter Fischer ¶¶ 5–10, *Natixis S.A. Action*, ECF No. 210 ("Fischer Decl.") (confirming that the Alpha Prime Settlement released only claims for Alpha Prime transfers and that other transfers were not addressed).

## **ARGUMENT**

### I.    THE ALPHA PRIME SETTLEMENT DOES NOT RELEASE DEFENDANTS FROM CLAIMS FOR SUBSEQUENT TRANSFERS FROM GROUPEMENT

Defendants' argument that the Alpha Prime Settlement releases them from claims to recover subsequent transfers from Groupement (the "Groupement Claims") fails. Defendants cannot meet their burden of showing that they were released from any claims for subsequent transfers other than those deriving from Alpha Prime. *See Strauss v. Belle Realty Co.*, 469 N.Y.S.2d 948, 950 (N.Y. App. Div. 1983) ("A party, claiming to be a third-party beneficiary, has the burden of demonstrating that he has an enforceable right."). The Alpha Prime Settlement neither releases Defendants from the Groupement Claims, nor impacts claims related to any other subsequent transfers from feeder funds other than Alpha Prime.

### A.    The Alpha Prime Settlement Establishes That It Does Not Apply to the Groupement Claims

In New York, "a release—like any contract—must be construed in accordance with the intent of the parties who executed it." *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 515 (2d Cir. 2001). A release should not be read to cover claims that the parties did not intend to waive. *Cahill v. Regan*, 157 N.E.2d 505, 509–10 (N.Y. 1959); *Peterson v. Regina*, 935 F. Supp. 2d 628, 636 (S.D.N.Y. 2013) ("Obviously, 'a release may not be read to cover matters which the parties did not desire or intend to dispose of.'" (citation omitted)). Here, the Alpha Prime Settlement unambiguously establishes that the Trustee and Alpha Prime intended that the Trustee release claims for transfers from Alpha Prime only.

### 1.    The Alpha Prime Settlement Resolves Only the Controversy Between the Trustee and Alpha Prime

To determine the scope of a release in a settlement agreement, a court first looks to the text of that agreement, which must be read "as a whole, and every part will be interpreted in reference to the whole." *See Consol. Edison, Inc. v. Ne. Utils.*, 332 F. Supp. 2d 639, 647 (S.D.N.Y. 2004) (citation omitted). "Single clauses cannot be construed by taking them out of their context and giving them an interpretation apart from the contract of which they are a part." *Chacko v. Costco Wholesale Corp.*, 568 F. Supp. 3d 487, 495–96 (S.D.N.Y. 2021). Instead, a release must be read in the context of the entire agreement in which it appears so as to "give fair meaning to all of the language employed by the parties to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized." *Petracca v. Petracca*, 756 N.Y.S.2d 587, 588 (N.Y. App. Div. 2003); *see also In re Dynegy Inc.*, 486 B.R. 585, 591–92 (Bankr. S.D.N.Y. 2013) (interpreting release in a confirmation order narrowly and explaining that interpretation of the release required reading the confirmation order "as a whole"

and "in context"); *In re Gawker Media LLC*, 588 B.R. 337, 345 (Bankr. S.D.N.Y. 2018)

(Bernstein, J.) (reading a third-party release restrictively while observing that in interpreting a

contract, "disproportionate emphasis is not to be put on any single act, phrase or other

expression, but, instead, on the totality of all of these, given the attendant circumstances, the

situation of the parties, and the objectives they were striving to attain" (quoting *Brown Bros.*

*Elec. Contractors, Inc. v. Beam Constr. Corp.*, 361 N.E.2d 999, 1001 (1977))).

Where a release arises in the context of a particular controversy, "the released claims are

interpreted in this light." *In re Actrade Fin. Techs., Ltd.*, 424 B.R. 59, 71 (Bankr. S.D.N.Y. Dec.

31, 2009). New York courts interpret releases with regard to the principle of *ejusdem generis*,

meaning that "in a release words of general import, followed or preceded by words relating to

specific claims, are, ceteris paribus, limited to the specific claims." *Vines v. Gen. Outdoor*

*Advert. Co.*, 171 F.2d 487, 492 (2d Cir. 1948) (Hand, J.); *see also Consol. Edison*, 332 F. Supp.

2d at 647–48 (explaining that "the general words of a release are limited by the recital of a

particular claim" and reading a release narrowly where the settlement agreement contained

references to a specific dispute (quoting *Herman v. Malamed*, 487 N.Y.S.2d 791, 793 (N.Y. App.

Div. 1985))); *Toth v. N.Y.C. Dep't of Ed.*, No. 21-CV-4245, 2023 WL 121733, at *6–7

(E.D.N.Y. Jan. 5, 2023) (limiting release to the recited claims). In other words, a release will be

interpreted as applicable to the claims that precede it.

These principles foreclose Defendants' argument. The Alpha Prime Settlement resolved

a controversy relating to Alpha Prime's receipt of stolen BLMIS customer property. It

references: Alpha Prime's BLMIS account; Alpha Prime's withdrawals from that account; Alpha

Prime's customer claim; the Trustee's subsequent transfer claims against Alpha Prime; a 2018

partial settlement between the Trustee and Alpha Prime; the Trustee's Second Amended

10

Complaint against Alpha Prime; and those of the Trustee's claims against Alpha Prime left unresolved by the 2018 partial settlement. Alpha Prime Settlement ¶¶ D–H, J, L. The Alpha Prime Settlement *never* mentions a dispute between the Trustee and Groupement, Defendants, or any feeder fund other than Alpha Prime.[3] That makes sense because the only dispute it resolved was the one between Alpha Prime and the Trustee regarding Alpha Prime transfers. *See generally* Fischer Decl. The appropriate interpretation of the Alpha Prime Release is therefore that it applies *only* to claims related to the recovery of transfers from Alpha Prime. *See Cahill*, 157 N.E.2d at 509–10; *Toth*, 2023 WL 121733, at *6–7.

### 2. The Consideration Provided for the Alpha Prime Release Confirms That the Alpha Prime Release Applies to Alpha Prime Transfers Only

The modest consideration exchanged for the Alpha Prime Release under the Alpha Prime Settlement further confirms that the Alpha Prime Release applies to claims for Alpha Prime transfers only. In *Consolidated Edison*, the court found that a release of "all claims that might have been or might be asserted that arise or potentially arise out of or relate in any way to the Merger Agreement" did *not* cover a $1.1 billion shareholder claim related to that merger's failure, where no monetary consideration had been paid and it was "inconceivable that sophisticated parties informed by counsel would bargain away such a claim without any monetary consideration." 332 F. Supp. 2d at 646–50.

Here, the Trustee's sole claim against Alpha Prime when entering into the Alpha Prime Settlement was for approximately $6.7 million in transfers of stolen BLMIS customer property made within six years of the Filing Date. Alpha Prime Settlement ¶ J. Yet Defendants argue that—for no upfront monetary payment from Alpha Prime or anyone else—the Trustee released

---

[3] The only other fund mentioned in the Alpha Prime Settlement is Primeo Fund (a co-defendant of Alpha Prime and alleged initial transferee and, later, subsequent transferee of Alpha Prime). *See generally* Am. Compl., *Alpha Prime Action*, ECF No. 170. The Trustee settled with Primeo Fund in 2014. Alpha Prime Settlement ¶ K.

not only that $6.7 million claim, but *every claim* for *any* transfer from *any* initial transferee to *any* subsequent transferee, provided that subsequent transferee had, directly or indirectly, invested in Alpha Prime. In other words, Defendants assert that the Trustee walked away from his claims for $234 million against Defendants, $179 million against Natixis S.A., and uncalculated claims for other non-Alpha Prime transfers to any other Alpha Prime investor. The Court should not acquiesce in such an implausible result: elephants do not hide in mouseholes.[4] *See In re Corp. Res. Servs., Inc.*, No. 15-1239, 2019 WL 5095709, at *8 (Bankr. S.D.N.Y. Oct. 10, 2019); *Toth*, 2023 WL 121733, at *6 (reading release narrowly where it was "difficult to believe that the plaintiff would bargain away" broader claims for such little consideration).

## B.    Extrinsic Evidence Confirms That the Alpha Prime Release Does Not Apply to the Groupement Claims

While extrinsic evidence is not required to evaluate an unambiguous agreement, the evidence now before the Court further confirms that the Alpha Prime Release was never intended to discharge Defendants from the Groupement Claims. *See Consol. Edison*, 332 F. Supp. 2d at 649 (holding that a contractual dispute may be resolved as a matter of law "if the extrinsic evidence is so one-sided that no reasonable factfinder could decide contrary to one party's interpretation"); *see also Golden Pac.*, 273 F.3d at 517.

### 1.    The Trustee and Alpha Prime Agree on the Alpha Prime Release's Narrow Scope

After Defendants advised the Trustee of their position that the Alpha Prime Release barred claims against them, the Trustee responded unequivocally, with Alpha Prime copied:

---

[4] Defendants suggest that Alpha Prime's agreement to share proceeds from Alpha Prime's lawsuits against various HSBC entities offers "considerable additional value to the BLMIS estate" (Mot. at 6) but provide no information on what that potential "value" may be. The Alpha Prime Settlement explicitly states that Alpha Prime would be entitled to an offsetting Section 502(h) claim for any recoveries from the HSBC entities. Alpha Prime Settlement ¶¶ 1–2(i). There is no guarantee that Alpha Prime recoveries from HSBC will add a penny to the BLMIS estate.

> [T]he Trustee and Alpha Prime agree that the [Alpha Prime
> Settlement] was <u>not</u> intended to and did <u>not</u> release existing
> defendants of anyone else from claims other than those concerning
> direct or indirect transfers of <u>money from Alpha Prime</u>.  Put
> another way, the [Alpha Prime Settlement] discharged certain
> entities from claims only concerning direct or indirect transfers
> from Alpha Prime and not for any claims that the Trustee
> otherwise has or may have.

Cioffi Decl., Ex. 11, ECF No. 19–11.  Alpha Prime has separately confirmed that the Alpha

Prime Release is limited to claims arising from Alpha Prime's own transfers, and that claims

involving transfers by other feeder funds were never part of, nor considered while negotiating,

the Alpha Prime Settlement.  Fischer Decl. ¶¶ 6–10.  Nor do Defendants suggest the slightest

reason *why* Alpha Prime would seek the release of claims completely unrelated to Alpha Prime

transfers.  *See Actrade*, 424 B.R. at 72–73 (finding that a release did not cover a dispute not

considered by the parties when negotiating their settlement).  Defendants point to differences in

the language of the Alpha Prime Release and those found in other settlements between the

Trustee and other defendants.  *See* Mot. at 13–15.  But these other settlements show only that in

settling an adversary proceeding the Trustee releases claims against unnamed parties only to the

extent of the transfers at issue in that adversary proceeding.  *See, e.g.*, Order Approving

Settlement, *Picard v. Ceretti*, Adv. Pro. No. 09-01161 (Bankr. S.D.N.Y. Aug. 6, 2019), ECF No.

417 (approving settlement with the Kingate funds that released only claims for subsequent

transfers from the Kingate funds).  Defendants do not—and cannot—explain why the Trustee

would do otherwise in his settlement with Alpha Prime.

Here, both contracting parties intended that the Alpha Prime Release would apply to

claims for Alpha Prime transfers only—not to unrelated claims for subsequent transfers from

Groupement.  *See Neuman v. Harmon*, 965 F. Supp. 503, 509 (S.D.N.Y. 1997) (finding that,

under New York law, the dispositive factor in determining the scope of a release is the parties'

intent).  Defendants cite no case in which both parties to a contract explicitly agreed on the scope

of its provisions, but a New York court accepted a third party's conflicting interpretation to

discharge claims against that third party.  Yet Defendants ask this Court to read the Alpha Prime

Settlement in just that unnatural way.  The Court should decline to do so.

> **2.**   **The Narrow Scope of the Alpha Prime Release Is Consistent With the Court's Approval of the Alpha Prime Settlement**

Interpreting the Alpha Prime Release as applicable solely to claims for Alpha Prime

transfers is also consistent with this Court's approval of the Alpha Prime Settlement.  *See*

*Consol. Edison*, 332 F. Supp. 2d at 651 (explaining that "if the release were as broad as Con Ed

now claims it is, the Settlement Agreement would not and could not have been approved as fair

and reasonable" by the prior court).  Notably, in his motion seeking the Court's approval of the

Alpha Prime Settlement, the Trustee set forth the scope of the issues being compromised, the

conditions agreed, and, crucially, an assessment of the proposed settlement's impact on the

BLMIS customer property estate and its creditors.  Mot. to Approve Settlement ¶¶ 14–15, 21,

*Alpha Prime Action*, ECF No. 710.  All parties to the overarching proceeding—including

Defendants here—had notice of the Trustee's motion to approve the Alpha Prime Settlement.

Mot. to Approve, *SIPC v. BLMIS*, Adv. Pro. No. 08-01789 (Bankr. S.D.N.Y. June 23, 2022),

ECF No. 21774.  Nowhere did the Trustee's motion refer to his claims against Defendants or to

recover transfers from feeder funds other than Alpha Prime.

If Defendants' interpretation of the Alpha Prime Release were correct, it would mean that

the Court approved a settlement that discharged all claims for any transfer of BLMIS customer

property to any Alpha Prime shareholders and their affiliates, without any payment to the

BLMIS customer property estate by those transferees or Alpha Prime—potentially depriving

customers of hundreds of millions of dollars in recovery.  That would be a deeply problematic

result, given that a bankruptcy court must approve only a compromise that is fair, equitable, reasonable, and in the best interests of a debtor's estate. *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994); *In re Prudential Lines, Inc.*, 170 B.R. 222, 246–47 (S.D.N.Y. 1994) (on a Rule 9019(a) motion a court must consider "the paramount interest" of creditors like customers here). That is, of course, what the Court did—because the Alpha Prime Release only applies to claims related to Alpha Prime transfers.

### 3. The Parties' Conduct Confirms the Narrow Scope of the Alpha Prime Release

The conduct of the Trustee and the Defendants following the Alpha Prime Settlement confirms that the Alpha Prime Settlement never released Defendants from the Groupement Claims. After the Alpha Prime Settlement was approved—by Order of this Court following notice to Defendants—the Trustee and Defendants negotiated a stipulation by which Defendants agreed to a schedule and to accept service of a new complaint, as well as to the filing of an amended complaint against Natixis S.A. and Tensyr (who have raised similar arguments about the Alpha Prime Settlement). Stip. & Order, *Natixis S.A. Action*, ECF No. 192; Mots. To Dismiss, *Natixis S.A. Action*, ECF Nos. 198–200 (Natixis S.A.), 203–06 (Tensyr). The Trustee then commenced this action by filing a complaint seeking Groupement subsequent transfers from Defendants and filed an amended complaint seeking Sentry subsequent transfers from Natixis S.A. and Tensyr. *See* Am. Compl., *Natixis S.A. Action*, ECF No. 193. Unlike the Trustee's 2010 Complaint, neither of these more recent complaints seeks Alpha Prime transfers.

Had the Trustee released all claims for subsequent transfers from any BLMIS feeder fund to any direct or indirect Alpha Prime shareholder, the Trustee would never have filed a new action against Defendants. Nor would the Natixis Parties plausibly have consented to his doing so if they had actually considered themselves released. *Cf. W. Alton Jones Found. v. Chevron*

*U.S.A., Inc.*, 97 F.3d 29, 33 (2d Cir. 1996) (a party's continuous pursuit of claims in one action showed that the party did not intend an earlier settlement agreement to release those claims, despite release's broad language); *Peterson*, 935 F. Supp. 2d at 641 (finding that continued litigation after settlement of another case meant that the release in that other case did not apply).

### C.    Defendants Are Not Intended Third-Party Beneficiaries of the Alpha Prime Settlement With Respect to the Groupement Claims

Defendants cannot show that they were intended third-party beneficiaries of the Alpha Prime Settlement as to the Groupement Claims.[5]  A non-party to a contract must establish that its recognition as a third-party beneficiary is "appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."  *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 988 F. Supp. 367, 371 (S.D.N.Y. 1997) (citing Restatement (Second) Contracts § 302 (1979)).  Defendants cannot show that the Trustee and Alpha Prime intended to benefit Defendants by releasing the Groupement Claims.  Indeed, Alpha Prime has confirmed that it *never* intended that those claims be released and never negotiated to that end.  *See* Fischer Decl. ¶¶ 5–10.  Rather, Alpha Prime intended the Alpha Prime Settlement "to release only claims related to transfers of BLMIS customer property to Alpha Prime."  *Id*. ¶ 8; *see also Consol. Edison*, 332 F. Supp. 2d at 650 (reading release narrowly where it was "clear that the lawyers for the parties in the [settled action] never discussed or even considered the effect of the release on the claims asserted").

---

[5] The Trustee is no longer pursuing claims against Defendants for Alpha Prime subsequent transfers.  But that does not mean that the Alpha Prime Settlement absolves them from liability for their receipt of stolen BLMIS customer property from a different initial transferee.  *See City of Almaty, Kazakhstan v. Sater*, No. 19-CV-2645, 2019 WL 6681560, at *11 (S.D.N.Y. Dec. 6, 2019) (explaining that contracting parties can intend a third party to benefit from some contractual provisions but not others).

D.     **The Trustee Is Not Estopped From Arguing That the Alpha Prime Release Does Not Apply to the Groupement Claims**

Defendants argue that the Trustee is "judicially and contractually estopped" from taking "the clearly inconsistent" position that the Alpha Prime Release does not cover the Groupement Claims. Mot. at 16. But the Trustee's position has been consistent: the Alpha Prime Release covers claims arising from Alpha Prime's transfers only. Estoppel is therefore a non-issue.

E.     **If the Alpha Prime Settlement Is Ambiguous, It Should Be Reformed**

Finally, if the Court determines there is any ambiguity as to the Alpha Prime Release's scope, the Court should deny the Motion so that discovery may be taken on the issue. *See Lipsky v. Commw. United Corp.*, 551 F.2d 887, 897 (2d Cir. 1976) (reversing grant of a motion to dismiss where contract term was ambiguous). Even if the Court were to decide that the Alpha Prime Release releases Defendants from the Groupement Claims, that would mean that the Alpha Prime Settlement failed to reflect the mutual intent of the Trustee and Alpha Prime such that the Court should allow reformation of the Alpha Prime Settlement on grounds of mutual mistake. *See ASI Sign Sys.*, *Inc. v. Arch. Sys., Inc.*, No. 98 Civ. 4823, 1999 WL 553825, at *6 (S.D.N.Y. July 29, 1999); *Migliore v. Manzo*, 813 N.Y.S.2d 762, 764 (N.Y. App. Div. 2006).

II.    **SECTIONS 546(e) AND (g) DO NOT BAR THE TRUSTEE'S CLAIMS**

None of the Trustee's claims against Defendants should be dismissed pursuant to 11 U.S.C. §§ 546(e) or (g).

A.     **Sections 546(e) and (g) Do Not Apply to Transfers Made Within Two Years of the Filing Date**

As an initial matter, the Trustee's entire claim against Natixis FP, and many of his claims against Bloom, cannot be barred by Section 546 because the subsequent transfers Defendants received were funded by initial transfers that are avoidable under Section 548(a)(1)(A).

17

### 1.    The Transfers Are Avoidable Under Section 548(a)(1)(A)

Fraudulent initial transfers made within two years of the filing date are avoidable despite

Sections 546(e) or (g).  *See* 11 U.S.C. § 546(e) (barring avoidance of initial transfers that meet

certain conditions, "except under section 548(a)(1)(A) of this title"); 11 U.S.C. § 546(g) (same);

*see also* 11 U.S.C. § 548(a)(1)(A) (permitting avoidance of transfers made with fraudulent intent

within two years of the filing date); *Picard v. ABN AMRO Bank (Ir.) Ltd (In re Madoff Sec.)*, 505

B.R. 135, 143 (S.D.N.Y. 2013) ("*546(g) Decision*") ("[T]o the extent section 546(g) applies . . .

the Trustee may recover a subsequent transfer . . . only insofar as the initial transfer is avoidable

under section 548(a)(1)(A)." (citing *Picard v. Katz*, 466 B.R. 208, 214 (S.D.N.Y. 2012))).

The Complaint alleges that BLMIS transferred over $275 million to Groupement in the

two years before the filing date.  Compl., Ex. B.  That amount exceeds the total subsequent

transfers received by Defendants.  *See id.*, Exs. C & D.  Because the Trustee has alleged the

avoidability of these initial transfers under Section 548(a)(1)(A), *see infra* Section VII, the

Trustee's claims for recovery of subsequent transfers funded by those two-year initial transfers

are also sufficiently pled.  *See, e.g.*, *Picard v. ABN AMRO Bank (Ir.), Ltd. (In re Madoff)*, 650

B.R. 24, 33 n.7 (Bankr. S.D.N.Y. 2023) ("*ABN Ireland*") (declining to dismiss redemption

"technically covered by § 546(g)" because it and preceding initial transfers "occurred within two

years of the SIPA filing date"); *Picard v. ABN AMRO Bank N.V. (In re Madoff)*, Adv. Pro. No.

10-05354 (CGM), 2023 WL 2358746, at *12 (Bankr. S.D.N.Y. Mar. 3, 2023) ("*NatWest*")

(rejecting application of Section 546(g) to initial transfers funding a redemption by subsequent

transferee because exhibits "show[ed] hundreds of millions of dollars of cash withdrawals from

BLMIS by [the initial transferee] within the two-year period," "[a]ny one" of which "could have

funded" the redemption).

### 2.    The Ponzi Scheme Presumption Is the Law of this Circuit

Defendants argue that the Trustee cannot rely on the Ponzi scheme presumption to plead BLMIS's fraudulent intent, and therefore the Section 548(a)(1)(A) exception to the Section 546 safe harbors does not apply.  Mot. at 25–27.  Defendants are again wrong.

"The Ponzi scheme presumption is the law of this Circuit and the Trustee is entitled to rely on it."  *Picard v. First Gulf Bank*, Adv. Pro. No. 11-02541 (CGM), 2022 WL 3354955, at *10 (Bankr. S.D.N.Y. July 18, 2022).  This Court and the District Court have repeatedly held that the Trustee may rely on the Ponzi scheme presumption to demonstrate BLMIS's actual intent to hinder, delay, or defraud creditors.  *See, e.g.*, *ABN Ireland*, 650 B.R. at 39 ("That BLMIS operated as a Ponzi scheme is well-established and the Court relies on earlier findings of same and holds that the Trustee has met its burden of pleading BLMIS' actual intent on this issue."); *Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011) ("As this Court has held on previous occasions, the breadth and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of the Ponzi scheme presumption to the facts of this case, particularly in light of Madoff's criminal admission.").  Here, as in other adversary proceedings in the BLMIS SIPA liquidation proceeding, the allegations in the Complaint regarding the BLMIS Ponzi scheme, Compl. ¶¶ 33–60, sufficiently plead the avoidability of the relevant transfers.

### 3.    The Complaint Sufficiently Alleges That BLMIS Made the Initial Transfers with Fraudulent Intent

Even without the Ponzi scheme presumption, the Complaint alleges BLMIS's fraudulent intent through multiple "badges of fraud" sufficient to satisfy Rule 9(b).[6]  *See, e.g.*,

---

[6] Defendants' citation to *Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43 (2d Cir. 2005), on this point is unavailing because, as the Second Circuit has ruled, that case involved a bankruptcy liquidation, not a SIPA liquidation.  *Picard v. Gettinger (In re BLMIS)*, 976 F.3d 184, 200–01 (2d Cir. 2020).

Compl. ¶¶ 33–60.    The Complaint alleges, among other things, that: BLMIS commingled customer funds and used them not to purchase securities, but to pay other customers, *id*. ¶¶ 39–40, 56; BLMIS filed false audit reports, *id*. ¶¶ 37–38; BLMIS filed false reports with the SEC, *id*. ¶¶ 33–34; BLMIS falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains, *id*. ¶ 43; BLMIS was insolvent at all relevant times, *id*. ¶ 60; and BLMIS had no legitimate business operations in its IA Business.  *Id*. ¶¶ 35–36, 42.  Indeed, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  *Id*. ¶ 22.  Several other BLMIS employees were convicted of fraud or other crimes for their participation in the Ponzi scheme.  *Id*. ¶¶ 23–25.

This Court and the District Court have found that such allegations sufficiently demonstrate BLMIS's fraudulent intent under Section 548(a)(1)(A).  *See ABN Ireland*, 650 B.R. at 39–40; *Picard v. JABA Assocs. LP (In re Madoff)*, 528 F. Supp. 3d 219, 236–38 (S.D.N.Y. 2021).

**B.    Section 546(e) Does Not Bar the Trustee's Claims**

Defendants argue that Section 546(e) bars the Trustee's claims to avoid or recover transfers made by BLMIS outside the two-year period.  Mot. at 16–17, 22–27.  But this Court has repeatedly rejected this argument on a motion to dismiss where the Trustee has pleaded the relevant initial transferor's actual knowledge of Madoff's fraud, *see, e.g.*, *Picard v. Multi-Strategy Fund Ltd. (In re Madoff)*, 641 B.R. 78, 92–95 (Bankr. S.D.N.Y. 2022) ("*Multi-Strategy I*"), as has the District Court.  *See Koch Indus., Inc. v. Picard (In re BLMIS)*, No. 23-CV-0294 (VEC), 2023 WL 3317926, at *4 (S.D.N.Y. May 9, 2023) (denying direct appeal and interlocutory appeal because, among other things, this Court's decisions on Section 546(e) are consistent with controlling law on the Section 546(e) issue).  These decisions control.

### 1.    Groupement Had Actual Knowledge of Madoff's Fraud

Defendants assert that the requirements of Section 546(e) are facially met in this case with respect to the initial transfers from BLMIS. Mot. at 22–24. This argument fails because the Trustee has sufficiently pleaded that Groupement had actual knowledge of Madoff's fraud.[7] Compl. ¶ 75. As such, Section 546(e) does not bar avoidance of initial transfers to Groupement, and those transfers may be recovered from Defendants regardless of whether Groupement or Defendants are financial institutions, their agreements are securities contracts, or their transfers are settlement payments.[8]  *See Picard v. UBS AG (In re Madoff)*, 647 B.R. 42, 64 (Bankr. S.D.N.Y. 2022) ("[T]he Trustee has sufficiently plead the Feeder Funds [Groupement and Luxalpha SICAV] had actual knowledge that BLMIS was not trading securities, which makes [Section 546(e)] inapplicable by its express terms."); *Picard v. UBS AG (In re Madoff)*, Adv. Pro. No. 10-04285 (CGM), 2022 WL 17968924, at *14 (Bankr. S.D.N.Y. Dec. 27, 2022) (same).

### 2.    Section 546(e) Does Not Apply Independently to Recovery Actions

Defendants also cannot independently claim protection under Section 546(e). Mot. at 24. This Court has explicitly held that Section 546(e) "is not applicable to subsequent transfers," and that subsequent transferees like Defendants may not invoke Section 546(e) on their own as subsequent transferees.  *See Multi-Strategy I*, 641 B.R. at 94–95; *First Gulf Bank*, 2022 WL

---

[7] The Trustee does not concede that any transfers between Defendants and Groupement implicate Section 546(e) or that any transferor or transferee is a "financial institution" or "financial participant" within the meaning of that section.  The Trustee also does not concede that the initial transfers were "in connection with" subscription agreements with Defendants or "for the benefit of" Defendants.

[8] Defendants also argue that Section 546(e) applies based on separate agreements between Defendants and Groupement. Mot. at 24–25.  The District Court has already addressed this hypothetical and confirmed that any application of Section 546(e) is "fact-intensive," not "answerable on the pleadings," and best addressed "with a full factual record before" the court.  *Picard v. Multi-Strategy Fund Ltd.*, Nos. 22-cv-06502, 22-cv-06512, 22-cv-07173, 22-cv-07189, 22-cv-07195, 22-cv-07372, 22-cv-07788 (JSR), 2022 WL 16647767, at *8–9 (S.D.N.Y. Nov. 3, 2022) ("*Multi-Strategy II*").

3354955, at *10; *see also Koch Indus.*, 2023 WL 3317926, at *4 (Section 546(e), "by its terms,

applies only to the 'initial transfer'" (quoting *Multi-Strategy II*, 2022 WL 16647767, at *5–7)).

### C.    Section 546(g) Does Not Bar Any of the Trustee's Claims Against Bloom

Section 546(g) bars the avoidance of an initial transfer made "for the benefit of" a

financial participant, "under or in connection with any swap agreement," except for initial

transfers avoidable under Section 548(a)(1)(A).  11 U.S.C. § 546(g).  It does not apply here.

### 1.    As to Bloom, the Complaint Does Not Establish That the Initial Transfers Were for the Benefit of a Financial Participant

In seeking to recover subsequent transfers from Bloom, the Trustee has not alleged that

the initial transfers from BLMIS were for the benefit of a "financial participant."

Preliminarily, determining whether Bloom is a financial participant[9] is a factual inquiry

inappropriate for a motion to dismiss.[10]  *See Bankr. Est. of Norske Skogindustrier ASA v. Cyrus*

*Cap. Partners, LP (In re Bankr. Est. of Norske Skogindustrier ASA)*, 629 B.R. 717, 759 (Bankr.

S.D.N.Y. 2021) (holding defendants failed to meet the "specific criteria" to be financial

participants on the pleadings); *SIPC v. BLMIS (In re Madoff Sec.)*, No. 12 Misc. 115 (JSR), 2012

WL 13041475, at *3 (S.D.N.Y. May 15, 2012) (withdrawing reference on the Section 546(g)

issue, noting the Court "may require further factual development in order to determine whether

defendants qualify as 'financial participant[s]'").

---

[9] A financial participant is defined as "an entity that, at the time it enters into a swap agreement, . . . has gross mark-to-market positions of not less than $100,000,000 . . . in one or more such agreements or transactions with the debtor or any other entity . . . at such time or on any day during the 15-month period preceding the date of the filing of the petition." 11 U.S.C. § 101(22A).  Defendants are not "swap participants" for purposes of Section 546(g) because the Bankruptcy Code defines "swap participant" to require "an outstanding swap agreement with the debtor," *i.e.*, with BLMIS.  *See* 11 U.S.C. § 101(53C); Mot. at 20 n.21.

[10] The Complaint itself does not establish that Bloom meets the definition of a financial participant.  Bloom is alleged to have received transfers worth only $80.9 million, with none received within 15 months of the filing date. *See* Compl., Ex. C.  And the Complaint does not allege that Bloom itself held $100 million worth of positions in the Groupement Swap, or in any other swap, within 15 months of the filing date.

Even if Bloom were a financial participant, whether initial transfers were made for its benefit—that is, whether the initial transferees' withdrawals from BLMIS "were directly caused by the defendants' request for redemptions"—is a factual question not answerable on the face of the pleadings.[11]  *See* Mot. at 21 (quoting *546(g) Decision*, 505 B.R. at 149–50); *NatWest*, 2023 WL 2358746, at *12 ("Discovery may show that the Rye Funds withdrew from BLMIS weeks or even months after a redemption request was made by a subsequent transferee like the Defendant. This fact-intensive accounting problem is an issue to be decided at a later stage of litigation."); *ABN Ireland*, 650 B.R. at 34 (denying motion to dismiss noting that defendants "may choose to assert the § 546(g) defense in their answer"); *see also Multi-Strategy II*, 2022 WL 16647767, at *8–9 (remanding for discovery into "fact-intensive" questions including whether initial transfers were "immediately precipitated by a specific withdrawal request made by a specific Fairfield client in connection with its securities agreement with Fairfield" for purposes of Section 546(e)).

Nor does the face of the Complaint plead "benefit," which requires "some intent-to-benefit on the part of either the initial transferee or the debtor," such that "either of the parties to the initial transfer must have contemplated that defendants would benefit from the transfer." *546(g) Decision*, 505 B.R. at 149.  No such intent appears on the face of the Complaint.  The one allegation that Defendants cite to support the idea that the initial transfers were made for Bloom's benefit is a statement that the transfers to Bloom "were subsequent transfers of BLMIS customer property." Mot. at 21 (citing Compl. ¶ 78).  But if that were enough to establish that the parties to the initial transfer intended to benefit a specific subsequent transferee, the District Court's detailed analysis of the relevant intent for each transaction in the *546(g) Decision* would

---

[11] The District Court in the *546(g) Decision* rejected the Trustee's arguments that the defendants there were definitionally "subsequent transferees" under the Bankruptcy Code rather than "entities for whose benefit the initial fraudulent transfers were made."  505 B.R. at 149 (citing *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 130 F.3d 52, 57 (2d Cir. 1997)).  The Trustee expressly preserves this argument for future appeal.

have been superfluous: *every* subsequent transfer to a party to a swap transaction would be funded by an initial transfer made for the subsequent transferee's benefit. *See 546(g) Decision*, 505 B.R. at 149–50. To the contrary, the District Court explicitly rejected an "expansive reading of 'for the benefit of'" that would "merely require[] that the initial transfer ultimately benefit a financial participant." *Id.* at 149. Moreover, while the *546(g) Decision* found that the redemption payments at issue were for the benefit of the defendants, the facts and context were different from those here. The complaints in those cases explicitly alleged that the initial transferees "withdrew funds from their [BLMIS] accounts at the behest of the defendants because the defendants requested redemptions of their shares in those funds." *Id.* (citing complaints). That is not the case here.[12] *Cf.* Mot. at 21 (citing no allegation that Groupement made a withdrawal from BLMIS because Defendants requested redemptions).

### 2.    The Complaint Does Not Establish That the Initial Transfers Were Made in Connection With a Swap Agreement

Because, based on the face of the Complaint, Bloom is neither a financial participant nor a swap participant nor an entity for whose benefit the initial transfer was made, the Court can end its analysis here and deny the Motion. Nevertheless, Defendants' assertion that it is "relatively straightforward" to connect Groupement's receipt of initial transfers to certain swap agreements with Bloom is also flawed. Mot. at 19 (citing *546(g) Decision*, 505 B.R. at 146–47).

As an initial matter, the District Court's analysis of "in connection with" cannot survive the Supreme Court's decision in *Merit Management*. 138 S. Ct. at 894. Contrary to the District Court's conflation of "in connection with" and "related to," *546(g) Decision*, 505 B.R. at 146,

---

[12] The same logic applies to the argument that the initial transfers were for Natixis FP's benefit. In addition, the Trustee does not concede that Natixis FP is a financial participant, but that issue need not be addressed because the initial transfers funding the sole subsequent transfer to Natixis FP plausibly occurred within the two-year period. *See supra* Section V.A.1.

Justice Sotomayor's opinion rejects the District Court's broad approach to interpreting the same phrase in the closely analogous context of Section 546(e), holding that "'a transfer that *is*' . . . 'in connection with'" is "[n]ot a transfer that involves. Not a transfer that comprises. But a transfer that is" covered by that section. *Merit Mgmt.*, 138 S. Ct. at 894. If, as the Supreme Court has held, "in connection with" does not mean "that involves," neither can it mean "related to." Put another way, if the initial transfer from BLMIS to Groupement was not ***itself*** made pursuant to a swap agreement, then, under *Merit Management*, Section 546(g) cannot apply.

In any event, regardless of the effect of *Merit Management*, the *546(g) Decision* is not determinative as to the facts at issue here. The Complaint does not link the initial transfers to Groupement to a swap transaction specifically involving Bloom. The lone allegation cited in the Motion purportedly establishing the connection between the initial transfers and a swap agreement involving Bloom is that over the course of the entire Groupement Swap, Bloom received redemptions from Groupement. *See* Mot. at 19 (quoting Compl. ¶ 68). The fact that Bloom received subsequent transfers does not link the initial transfer to a subsequent transferee's swap agreement. In contrast, a swap agreement before the District Court in the *546(g) Decision* "contemplated that the defendants would invest in the reference funds to perfectly hedge against their obligations under the swap agreements." 505 B.R. at 146–47. Also, while the District Court equated "'in connection with" with "related to," it found that threshold was met only because the initial transferees' withdrawals from BLMIS "were caused by the defendants' requests for redemptions," and because the defendants "requested redemptions only because the synthetic funds decided to reduce the amount of collateral at play in the swap transactions." *Id*. The Complaint does not make such allegations here.

Furthermore, as the District Court and this Court have held, whether a transfer was "in connection with" an agreement is a fact-intensive issue that often "do[es] not appear answerable on the pleadings." *See Multi-Strategy II*, 2022 WL 16647767, at *9 (remanding to this Court to decide if certain initial transfers were made "in connection with" a securities contract under Section 546(e) "with a full factual record"); *ABN Ireland*, 650 B.R. at 35 ("If such a fact-specific determination is needed, the Court will make it with the benefit of a 'full factual record.'" (citing *Multi-Strategy II*, 2022 WL 16647767, at *9)); *see also Picard v. SNS Bank N.V. (In re Madoff)*, Adv. Pro. No. 12-01046 (CGM), 2023 WL 2395734, at *10 (Bankr. S.D.N.Y. Mar. 7, 2023) (same).

The Court should therefore reject Defendants' arguments that Section 546(g) applies to any of the Trustee's claims here.

## III.   THE DOCTRINE OF LACHES DOES NOT BAR RECOVERY OF A SUBSEQUENT TRANSFER

Natixis FP argues that the Trustee's claim to recover approximately $154 million from a single subsequent transfer to it should be dismissed on the basis of laches. *See* Mot. at 27–30. This argument fails because laches cannot be invoked to bar relief where a statutory claim is made within time limits enacted by Congress, such as the Trustee's claim pursuant to 11 U.S.C. § 550(a). *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 679 (2014) ("[I]n face of a statute of limitations enacted by Congress, laches cannot be invoked to bar legal relief."); *SCA Hygiene Prods. Aktiebloag v. First Quality Baby Prods., LLC*, 580 U.S. 328, 336 (2017) (affirming *Petrella* and noting that "applying laches within a limitations period specified by Congress would give judges a 'legislation-overriding' role that is beyond the Judiciary's power"); *see also Ivani Contracting Corp. v. City of N.Y.*, 103 F.3d 257, 260 (2d Cir. 1997) ("[W]hen a plaintiff brings a federal statutory claim seeking legal relief, laches cannot bar that

26

claim, at least where the statute contains an express limitations period within which the action is timely."). This is because laches is an equitable defense applicable to claims for which the legislature has not provided a fixed time limit.[13]

Here, the Trustee's statutory subsequent transfer claims are timely. Pursuant to Section 550(f), subsequent transfer claims must be brought within one year after the avoidance of the initial transfer on the account for which recovery is sought. 11 U.S.C. § 550(f)(1). The Trustee is not required to avoid an initial transfer before asserting an action against subsequent transferees. *SIPC v. BLMIS*, 501 B.R. 26, 31–33 (S.D.N.Y. 2013). Rather, the Trustee must only allege that the initial transfer is avoidable. *Id*. The Trustee has done so here with regard to the initial transfers from BLMIS to Groupement (Compl. ¶¶ 3, 70, 72–74, 81), and all of his claims to recover subsequent transfers from Groupement to Defendants have been timely brought prior to the avoidance of any relevant transfer. *See* 11 U.S.C. § 550.

Yet even if laches were an available defense—and it is not—Natixis FP cannot show the delay and prejudice upon which such a defense would depend. *See SCA Hygiene Prods.*, 580 U.S. at 333 (explaining that a laches defense protects against "unreasonable, prejudicial delay in commencing suit"); *Veltri v. Bldg. Serv. 32B–J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004) ("A party asserting the equitable defense of laches must establish both plaintiff's unreasonable lack of diligence under the circumstances in initiating an action, as well as prejudice from such a delay."). "The mere lapse of time, without a showing of prejudice," is not basis for a laches

---

[13] Defendants cite *Collins v. Decker (In re Decker)*, Adv. Pro. No. 10-80029, 2011 WL 2174349 (Bankr. N.D.N.Y. June 1, 2011) and *Watson v. Mayo*, No. 07 Civ. 54 (NRB), 2008 WL 538442 (S.D.N.Y. Feb. 26, 2008) in support of their argument that laches can bar a statutory claim made within the statute of limitations. Mot. at 28 n.27. But these decisions predate and are inconsistent with *Petrella*. 572 U.S. at 679. Indeed, the *Watson* Court noted that it was departing from *Ivani Contracting*'s "prevailing rule . . . that when a plaintiff brings a federal statutory claim seeking legal relief, laches cannot bar that claim," because of "plaintiff's failure to join [defendant] in the earlier action, not plaintiff's delay in bringing the second suit . . . [which] do[es] not implicate the time within which a plaintiff must file suit, but his manner of doing so." 2008 WL 538442, at *4, *7.

defense. *Bakalar v. Vavra,* No. 05 Civ. 3037, 2006 WL 2311113, at *3 (S.D.N.Y. Aug. 10, 2006). Defendants cannot demonstrate either element.[14]

*First*, the Trustee has not, in fact, "slept on his rights," Mot. at 29, but has continuously pursued the Groupement Claims since filing the 2010 Complaint, which like the operative Complaint here, alleged Defendants' participation in the same Groupement-based swap transactions, and sought recovery of approximately $400 million in subsequent transfers received by Defendants from Groupement as a result. 2010 Compl. ¶¶ 2, 85, 211; Compl. ¶¶ 5, 69. Defendants' characterization of the Trustee's claims as delayed by 12 years falls flat because the gravamen of the Trustee's case has never changed.[15]

The duration of these proceedings—as Defendants know—results from numerous intervening appeals on matters of case-wide import, including extraterritoriality, international comity, and good faith. Natixis FP sought to stay briefing on the Trustee's pending motion for leave to amend in 2019 "to avoid piecemeal litigation and to facilitate an efficient resolution of the Trustee's claims" following the Second Circuit's decision on extraterritoriality reversing Judge Bernstein's 2016 decision dismissing Natixis S.A., Tensyr, and Bloom. *See So Ordered Stip.*, *Natixis S.A. Action*, ECF No. 181; *In re Picard*, 917 F.3d 85 (2d Cir. 2019). Similarly, in 2020, despite Natixis S.A., Tensyr, and Bloom returning as co-defendants, the Natixis Parties agreed to stay the action to "promote judicial economy," pending resolution of the "good faith"

---

[14] And in any event, a determination that a claim is barred by laches requires a factual inquiry into the reasons for plaintiff's purported delay and the extent and nature of the prejudice suffered by defendant as a result of that delay. *See Fourth Toro Fam. Ltd. P'ship v. PV Bakery, Inc.*, 88 F. Supp. 2d 188, 196 (S.D.N.Y. 2000). "[T]his inquiry is inappropriate on a motion to dismiss." *Deere & Co. v. MTD Prods., Inc.*, No. 00-CIV-5936, 2001 WL 435613, at *2 (S.D.N.Y. Apr. 30, 2001).

[15] Natixis FP's sticker shock is difficult to credit in light of the Trustee's prior pleadings: the Trustee's 2010 Complaint sought over $400 million in subsequent transfers, 2010 Compl. ¶ 2, and a 2019 proposed amended complaint sought to recover $148 million in subsequent transfers from Groupement to Natixis FP, specifically. Proposed Am. Compl. ¶¶ 1, 74, 257, *Natixis S.A. Action*, ECF No. 174-1 ("PAC"). Moreover, the Trustee has *always* sought to recover prejudgment interest on the Groupement subsequent transfers. *See* 2010 Compl. at 81 (Prayer for Relief ¶ h); PAC at 60 (Prayer for Relief ¶¶ c–d).

appeal.  So Ordered Stip., *Natixis S.A. Action*, ECF No. 185.  Defendants cannot claim delay where Defendants themselves previously (and reasonably) agreed to stay this action.

*Second*, to the extent that the Trustee has updated the details of his allegations regarding subsequent transfers from Groupement to Natixis FP since filing the 2010 Complaint, these updates reflect the Trustee's ongoing investigation into BLMIS and its feeder funds, including how customer property was transferred and subsequently transferred to Defendants.  *See* So Ordered Stip. Concerning Natixis's Mot. to Dismiss and the Trustee's Mot. for Leave to Replead, *Natixis S.A. Action*, ECF No. 165; PAC ¶ 1 n.1.  It is the Trustee's duty to do so.  *See generally* 15 U.S.C. §§ 78fff-1, 78fff-2.  But as the Trustee is a stranger to the relevant transactions, his allegations at the pleading stage necessarily depend on his ongoing investigation and the limited records available to him.  While Defendants may be displeased with the Trustee's allegations concerning what they style the "Termination Transfer," Defendants cannot claim prejudice where they have always had far better information and should have retained all records relating to the Groupement subsequent transfer(s) they received.[16]

For all these reasons, the Trustee's subsequent transfer claims are timely and the Court should reject Natixis FP's laches defense.

## IV.    THE COURT HAS PERSONAL JURISDICTION OVER BLOOM

The Court has personal jurisdiction over Bloom because Bloom waived any personal jurisdiction defense and because the Trustee's claims arise from Bloom's purposeful contacts with the jurisdiction.[17]

---

[16] Natixis FP's comment that "the Trustee has never named GFLL as a defendant in any action" is a non sequitur. Mot. at 28. The Trustee may recover subsequent transfers from "*any* immediate or mediate transferee" of an initial transferee.  *See* 11 U.S.C. § 550(a)(2) (emphasis added).  The Trustee has discretion over which transfers and transferees to pursue in the interests of the customer property estate.

[17] Personal jurisdiction over Natixis FP is undisputed.  Natixis FP did not raise the defense in its Motion.  And Natixis FP is "at home" in New York.  Compl. ¶ 13.

### A.    Bloom Waived the Defense of Personal Jurisdiction

Bloom waived any personal jurisdiction defense by failing to assert such a defense in its 2011 motion to dismiss the Trustee's 2010 Complaint that first asserted these claims against Defendants.  *See* Mot. to Dismiss, *Natixis S.A. Action*, ECF No. 21.  Although the Groupement Claims are now filed under a new adversary proceeding, they have been and are part of the same overall substantively consolidated case in which Bloom has consistently appeared.  Defendants and the Trustee stipulated to sever the Natixis-related actions—not to wipe the slate clean.  Bloom thus waived any lack of personal jurisdiction defense by failing to raise it previously and may not do so now.  *See City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 134 (2d Cir. 2011) ("It is well established that a party forfeits its defense of lack of personal jurisdiction by failing timely to raise the defense in its initial responsive pleading"); *cf. Gilmore v. Shearson/Am. Exp. Inc.*, 811 F.2d 108, 112 (2d Cir. 1987) (a lack of personal jurisdiction defense, "if waived by defendant's failure to raise [the] objection[] in response to the original complaint, may not be resurrected merely because a plaintiff has amended the complaint").

### B.    Bloom Purposefully Availed Itself of the Laws and Privilege of Conducting Business in the Forum

Bloom purposefully availed itself of the privilege of conducting business in the forum and of its laws.  Bloom had numerous purposeful contacts with New York, the Trustee's claims against Bloom arise from those contacts, and this Court's jurisdiction over Bloom is reasonable.  *See, e.g.*, *Picard v. Nomura Int'l PLC (In re Madoff)*, Adv. Pro. No. 11-02759 (CGM), 2023 WL 3113188, at *2–5 (Bankr. S.D.N.Y. Apr. 26, 2023).

To survive a motion to dismiss for lack of personal jurisdiction, the Trustee need only allege a prima facie case that personal jurisdiction exists.  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013).  Specific personal jurisdiction exists when (1) a

defendant purposefully directs its activities at the forum and (2) the underlying cause of action "arises out of or relates to those activities." *Picard v. Fairfield Greenwich Grp. (In re Fairfield Sentry Ltd.)*, 627 B.R. 546, 566 (Bankr. S.D.N.Y. 2021). As to the first prong, the court assesses whether the totality of the defendant's contacts with the forum show that the defendant purposefully availed itself of the privilege of conducting activities within the forum. *See Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010). As to the second prong, the court must find some "affiliation between the forum and the underlying controversy." *Multi-Strategy I*, 641 B.R. at 88. The court must also determine whether the exercise of personal jurisdiction is reasonable and will not offend the traditional notions of "fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945). Where a plaintiff alleges purposeful availment, the burden shifts to the defendant to present a "compelling case" that jurisdiction would be unreasonable. *In re Fairfield Sentry Ltd.*, 627 B.R. at 567 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985)).

### 1.    Bloom's Contacts With the Forum Support Personal Jurisdiction

Bloom's contacts with the forum support personal jurisdiction. In sum, New York-based individuals and entities operated Bloom to enable indirect investments with BLMIS in New York. Bloom's contacts with the forum accordingly subject it to this Court's personal jurisdiction. *See, e.g.*, *Picard v. BNP Paribas S.A.*, 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) (finding personal jurisdiction over foreign entities used by New York-based employees to facilitate BLMIS investments).

More specifically, the Trustee has alleged that: (i) Bloom was an Irish "umbrella trust" used to facilitate investments in Feeder funds that did not allow investments by U.S. persons, Compl. ¶ 11; (ii) at all relevant times, Natixis Securities N.A. in New York, and New York-

based employees of Natixis FP, operated and managed Bloom and directed Bloom's investments

in, and redemptions from, Groupement and other Feeder funds, *id*. ¶¶ 11, 15; (iii) Bloom was

wholly owned by affiliates of Natixis FP, had the same parent company as Natixis FP, and used

Natixis Securities N.A. as its investment adviser, *id*. ¶ 12; and that (iv) Natixis FP's managing

director served as Bloom's FINRA registered representative of record. *Id*. ¶ 11.

The Trustee has also alleged that Bloom had numerous contacts with the forum as part of

its Groupement investments. In particular, the Trustee has further alleged that (i) Bloom

purposefully invested in Groupement, knowing that the fund invested 100% of its assets in New

York-based BLMIS and generated returns based on BLMIS's purported purchase and sale of

securities in New York, *id*. ¶¶ 3, 15; (ii) Bloom made hedging investments in Groupement to

enable Natixis FP to enter into Groupement-based swap transactions, *id*. ¶ 15; (iii) those

transactions were governed by New York law, *id*.; (iv) Bloom paid fees to Natixis FP's parent

company, New York-based Natixis Securities N.A., in connection with Bloom's Groupement

investments, *id*.; and (v) Bloom also received redemptions from Groupement as a result of

transactions directed by Natixis employees in New York. *Id*. ¶ 67.

In short, the Complaint alleges that Bloom's role in the relevant transactions was to

enable investment with BLMIS in New York for its New York-based affiliates and operators. *Id*.

¶ 67. The Court therefore has personal jurisdiction over Bloom. *See, e.g.*, *Picard v. Banca

Carige S.p.A. (In re Madoff)*, Adv. Pro. No. 11-02570 (CGM), 2022 WL 2387522, at *2–5

(Bankr. S.D.N.Y. June 30, 2022) (finding jurisdiction over a subsequent transferee who

knowingly directed funds to be invested with New York-based BLMIS through a feeder fund in

order to profit from those investments); *Picard v. Barfield Nominees Ltd. (In re Madoff)*, Adv.

Pro. No. 12-01669 (CGM), 2022 WL 4542915, at *2–4 (Bankr. S.D.N.Y. Sept. 28, 2022) (same).

### 2.    The Trustee Has Not Relied On "Group Pleading," a "Stream of Commerce" Theory, or the Contacts of Third Parties

Defendants' arguments against jurisdiction fail.  *First*, contrary to Defendants' assertion, the Trustee's allegations do not rely on group pleading.  Mot. at 32.  Neither Defendant can escape this Court's jurisdiction merely because the Trustee alleged that "Defendants"—a defined term in the Complaint that includes Natixis FP and Bloom—engaged in purposeful contacts with the forum.  *See In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 232–33 (S.D.N.Y. 2019).  *Second*, Defendants' reliance on *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882 (2011), is unavailing because the Trustee does not assert this Court's jurisdiction over Bloom based on the "stream-of-commerce" theory that was rejected in *McIntyre*.  Mot. at 32–33.  *Third*, Defendants' argument that *Walden v. Fiore*, 571 U.S. 277 (2014), requires dismissal also fails.  *Walden* provides "no assistance" to defendants who invested in a feeder fund specifically to invest with BLMIS in New York.  *See Multi-Strategy I*, 641 B.R. at 87.

### 3.    The Trustee's Claims Relate to Bloom's Contacts With the Forum

The Trustee's claims against Bloom "arise out of or relate to" Bloom's contacts with New York and the United States.  The Court has repeatedly found the Trustee's recovery actions against subsequent transferees like Bloom to be related to the subsequent transferee's dealings with BLMIS and Feeder funds.  *See Multi-Strategy I*, 641 B.R. at 88; *see also Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56, 67–71 (S.D.N.Y. 2016) (requiring that the claim not be "completely unmoored" from the transaction).  The Trustee's claims here relate directly to Bloom's purposeful investment activities.

### 4.    Personal Jurisdiction Over Bloom Is Reasonable

Bloom fails to show why personal jurisdiction would be unreasonable.  *See Chloé*, 616 F.3d at 165 (finding "where a plaintiff has made a threshold showing of minimum contacts," the

defendant must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable"). Bloom is "not burdened by this litigation" as it has "actively participated in this Court's litigation for over ten years," is represented by U.S. counsel, and knowingly invested with New York-based BLMIS. *See Multi-Strategy I*, 641 B.R. at 88–89 (holding that the exercise of jurisdiction over subsequent transferee defendant is reasonable). Additionally, both the forum and the Trustee have a strong interest in litigating the BLMIS adversary proceedings in this Court. *Id*. Defendants' reference to *Picard v. Hebrew University of Jerusalem (In re Madoff)*, 650 B.R. 5, 14–21 (Bankr. S.D.N.Y. 2023), is misplaced. Mot. at 33. There, the Court found personal jurisdiction to be unreasonable where there was ongoing litigation between the Trustee and the defendants in Israel. *Hebrew Univ.*, 650 B.R. at 20. Here, there is no parallel foreign litigation involving the Trustee and Bloom.[18] In short, "it would be a 'rare' case where the defendant's minimum contacts with the forum support the exercise of personal jurisdiction, but it is unreasonable to force the defendant to defend the action in that forum." *BNP Paribas*, 594 B.R. at 188. This is not that "rare" case.

### C.     In the Alternative, the Trustee Is Entitled to Jurisdictional Discovery

If the Court were to find that the Trustee has not made a prima facie showing of jurisdiction over Bloom, it should grant jurisdictional discovery because the Trustee has pleaded facts that make at least a "threshold showing" of jurisdiction. *See Blockchain Mining Supply & Servs. Ltd. v. Super Crypto Mining, Inc.*, No. 18-cv-11099, 2020 WL 7128968, at *1 (S.D.N.Y. Dec. 4, 2020).

### V.     THE TRUSTEE SUFFICIENTLY ALLEGES THE AVOIDABILITY OF THE INITIAL TRANSFERS TO GROUPEMENT

The Complaint sufficiently pleads the avoidability of the initial transfers to Groupement.

---

[18] Further, the *Hebrew University* defendants were not feeder fund investors. 650 B.R. at 11.

Defendants object to the Trustee's addressing this point by, in part, incorporating by reference the Luxalpha SAC.

This Court has repeatedly held that the Trustee may incorporate pleadings within the same BLMIS liquidation proceeding to demonstrate the avoidability of initial transfers. In *Multi-Strategy I*, for example, the Court held that "pleadings filed in the 'same action' may be properly adopted by reference in other pleadings in that action" and "[t]he Fairfield Complaint was filed in the 'same action' as this adversary proceeding for purposes of Rule 10(c)." 641 B.R. at 91; *see also SNS Bank*, 2023 WL 2395734, at *7; *Banca Carige*, 2022 WL 2387522, at *6–7.

And, regardless of incorporation, "a court may take judicial notice of prior pleadings, orders, judgments, and other related documents that appear in the court records of prior litigation and that relate to the case *sub judice*." *Ferrari v. Cnty. of Suffolk*, 790 F. Supp. 2d 34, 38 n.4 (E.D.N.Y. 2011). The Court may therefore take judicial notice of the operative Luxalpha SAC and its prior decision that the complaint there sufficiently alleged the avoidability of the initial transfers from BLMIS to Groupement. *See UBS*, 647 B.R. at 66.

## VI.    THE TRUSTEE SUFFICIENTLY ALLEGES THAT DEFENDANTS RECEIVED STOLEN BLMIS CUSTOMER PROPERTY

The Complaint states claims for recovery under Section 550(a)(2) by plausibly alleging that Defendants received subsequent transfers of stolen BLMIS customer property from Groupement. Defendants argue that the Complaint falls short because it fails to tie the subsequent transfers to specific initial transfers and the allegations lack sufficient detail. Mot. at 34–36. As explained below, the Court has repeatedly rejected these arguments in similar cases.

A.      **The Trustee Plausibly Alleges That All of the Subsequent Transfers Defendants Received Contained Stolen BLMIS Customer Property**

To plead a claim to recover subsequent transfers, the Trustee must allege facts that support an inference "that the funds at issue originated with the debtor." *Picard v. Merkin (In re BLMIS)*, 515 B.R. 117, 149–50 (Bankr. S.D.N.Y. 2014) (citation omitted).  The Court has repeatedly rejected Defendants' argument, Mot. at 35, that the Trustee must also trace and tie each subsequent transfer Defendants received to a specific initial transfer from BLMIS to survive a motion to dismiss.  *See Multi-Strategy I*, 641 B.R. at 90.  Rather, "the Trustee need only allege facts sufficient to show the relevant pathways through which the funds were transferred from BLMIS to [the subsequent transferee]." *Picard v. Charles Ellerin Revocable Tr. (In re BLMIS)*, Adv. Pro. Nos. 10-04398 (BRL), 10-05219 (BRL), 2012 WL 892514, at *3 (Bankr. S.D.N.Y. Mar. 14, 2012); *see also Picard v. Korea Exch. Bank (In re Madoff)*, Adv. Pro. No. 11-02572 (CGM), 2022 WL 4371908, at *11 (Bankr. S.D.N.Y. Sept. 21, 2022).

That is what the Trustee has done here.  The Complaint alleges that Defendants received transfers of stolen BLMIS customer property, identified by date and amount from Groupement, and that Groupement invested all or substantially all of its funds with BLMIS.  Compl. ¶¶ 3–5, 15, 64–80.  No more is required.  *See, e.g.*, *Multi-Strategy I*, 641 B.R. at 95 (holding that the Trustee's exhibits provide defendants with the necessary "who, when, and how much").

B.      **Defendants Misstate the Trustee's Pleading Burden**

Defendants misstate the Trustee's pleading burden by suggesting that the Trustee must trace and tie each subsequent transfer Defendants received to a specific initial transfer from BLMIS in his Complaint.  Mot. at 34–36 (citing *Picard v. Shapiro (In re BLMIS)*, 542 B.R. 100, 119 (Bankr. S.D.N.Y. 2015)).  The Court has been clear that the Trustee "need not prove the path that each transfer took from BLMIS to Sentry and subsequently to each redeeming shareholder"

36

to survive a motion to dismiss. *Picard v. Cathay Life Ins. Co. Ltd. (In re Madoff)*, Adv. Pro. No.

11-02568 (CGM), 2022 WL 16626325, at *7 (Bankr. S.D.N.Y. Nov. 1, 2022); *Merkin*, 515 B.R.

at 149–50. The Court has likewise rejected the argument that the Trustee must detail the portion

of each subsequent transfer that comprises customer property. *See Korea Exch. Bank*, 2022 WL

4371908, at *11 (refusing to "hold a pre-discovery trial on all of the subsequent transfers actions

to determine which transfers were made from the $3 billion of BLMIS customer property and

which were not"); *Merkin*, 515 B.R. at 152–53 (refusing to dismiss complaint where "at least

some of the subsequent transfers . . . may be recoverable").[19]

## C.    Defendants' Remaining Tracing Arguments Fail

Defendants' argument that the Trustee "fails to allege that Groupement actually

transferred BLMIS funds to GFLL," Mot. at 35–36, also fails. The Trustee alleges that

Defendants and GFLL were involved in swap agreements in November 2007 and that

redemptions occurred to pay back an "'implied loan' that [GFLL] had received [from Natixis FP]

pursuant to the Groupement Swap with more than $153 million in funds ultimately obtained

from BLMIS." Compl. ¶ 69. And Defendants acknowledge that the Trustee "allege[d] that

'GFLL . . . redeemed Groupement shares in order to pay' Natixis FP such transfer." Mot. at 35.

As such, the Trustee "allege[d] the necessary vital statistics—the who, when, and how much—of

the purported transfers to establish an entity as a subsequent transferee of the funds," and that the

subsequent transfers from Groupement to Defendants comprise BLMIS customer property. *See*

*Multi-Strategy I*, 641 B.R. at 90.

---

[19] Defendants imply that the Trustee has a heightened pleading burden because of his purported access to "voluminous Rule 2004 discovery from the defendants in the *Groupement* Action." Mot. at 35. Defendants are wrong; the Trustee does not have all of Groupement's books and records and even if he did, there is no heightened pleading burden imposed here aside from Federal Rule of Civil Procedure 9(b). In any case, the Trustee has pleaded the relevant transactions in sufficient detail. *See Cathay Life*, 2022 WL 16626325, at *7; *Merkin*, 515 B.R. at 150.

Defendants' argument is also premature before discovery.   Until then, "where 'the [T]rustee's lack of personal knowledge is compounded with complicated issues and transactions [that] extend over lengthy periods of time, the [T]rustee's handicap increases,' and 'even greater latitude' should be afforded." *Cohmad*, 454 B.R. at 329; *see also Merkin*, 515 B.R. at 151 (denying motion to dismiss and noting that a "subsequent transfer claim must ultimately be proved through the books and records of the defendants").   Even after fact discovery, expert opinion is necessary to determine what portion of a subsequent transfer stemmed from the initial transfer where the subsequent transfers originated from commingled accounts.   *See Picard v. Merkin (In re Madoff)*, 581 B.R. 370, 386 (Bankr. S.D.N.Y. 2017); *SNS Bank*, 2023 WL 2395734, at *12 ("The calculation of Fairfield Sentry's customer property and what funds it used to make redemption payments are issues of fact better resolved at a later stage of litigation.").

## VII.   A SECTION 550(b) GOOD FAITH AFFIRMATIVE DEFENSE IS INAPPROPRIATE AT THE PLEADING STAGE

Although this Court has repeatedly rejected subsequent transferee defendants' "good faith" affirmative defenses at the pleading stage, Defendants attempt one again here, hoping that this time it will work.   It does not.

Affirmative defenses are fact-driven.   They "'often require[] consideration of facts outside of the complaint and thus [are] inappropriate to resolve on a motion to dismiss.'"   *United Teamster Fund v. MagnaCare Admin. Servs., LLC*, 39 F. Supp. 3d 461, 475 (S.D.N.Y. 2014) (quoting *Kelly–Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013)).   The District Court has held that a subsequent transferee defendant's good faith affirmative defense can only be determined post-discovery.   *See In re BLMIS*, No. 20-cv-02586, 2022 WL 1304589, at *3 (S.D.N.Y. May 2, 2022); *see also First Gulf Bank*, 2022 WL 3354955, at *10 ("This affirmative defense is

[Defendant's] burden to plead in an answer and prove with evidence; it cannot be established in a complaint.").

Defendants argue that their good faith defense may nevertheless be considered now because the Complaint itself supposedly pleads that Defendants were not on inquiry notice of Madoff's fraud, and that Defendants received Groupement redemptions for value.  Mot. at 36–39.  However, an affirmative defense can succeed at the pleading stage only where an "insuperable bar to securing relief" appears on the face of the complaint.  *Gowan v. Patriot Grp., LLC (In re Dreier LLP)*, 452 B.R. 391, 426 (Bankr. S.D.N.Y. 2011).  That is not the case here.

In particular, the SEC's failure to detect Madoff's fraud, Mot. at 40, does not prove any defendant's good faith.  *See Picard v. Avellino (In re BLMIS)*, 557 B.R. 89, 120 (Bankr. S.D.N.Y. 2016) (finding no inconsistency between the Trustee's allegations regarding defendants' knowledge of Madoff's fraud and failure by others—including the SEC—to detect the Ponzi scheme); *see also In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 402 (S.D.N.Y. 2010) (observing that in the context of investigating its own failure to detect Madoff's fraud, the SEC found "numerous private entities conducted basic due diligence of Madoff's operations and, without regulatory authority to compel information, came to the conclusion that an investment with Madoff was unwise").  Defendants are sophisticated entities—what they knew or ignored is a factual issue that will be investigated during discovery.

Value is also a fact-driven determination.  *See, e.g.*, *Picard v. Fairfield Inv. Fund Ltd. (In re Madoff)*, Adv. Pro. No. 09-01239 (CGM), 2021 WL 3477479, at *9 (Bankr. S.D.N.Y. Aug. 6, 2021) ("Whether the Defendants gave value is a question of fact to be resolved either at the summary judgment stage or at trial."); *see also id.* ("As to whether the Defendants 'gave value' in the form of surrendering shares in [a feeder fund], such a determination cannot be made as a

matter of law or fact at this stage."). To the extent Defendants argue that they gave value for their subsequent transfers because they were given in exchange for the redemption of shares in Groupement, the Court has already held that this cannot be decided at this stage. *See, e.g.*, *Picard v. Banque Syz & Co., SA (In re Madoff)*, Adv. Pro. No. 11-02149 (CGM), 2022 WL 2135019, at *11 (Bankr. S.D.N.Y. June 14, 2022); *Picard v. Bank Julius Baer & Co. Ltd. (In re Madoff)*, Adv. Pro. No. 11-02922 (CGM), 2022 WL 17726520, at *16–17 (Bankr. S.D.N.Y. Dec. 15, 2022); *Fairfield Inv. Fund*, 2021 WL 3477479, at *9.

## <u>CONCLUSION</u>

For all these reasons, Defendants' Motion should be denied.

Dated: August 7, 2023           Respectfully submitted,
New York, New York

BAKER & HOSTETLER LLP

By:    <u>/s/ Carlos Ramos-Mrosovsky</u>
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
dsheehan@bakerlaw.com
Carlos Ramos-Mrosovsky
cramosmrosovsky@bakerlaw.com
Joanna F. Wasick
jwasick@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff*