# EXHIBIT 1

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/15/22

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------- X
IRIVING H. PICARD,                      :
                                        :
        Plaintiff,         :
                                        :
  -against-                          :      No. 20 Civ. 10109 (JFK)
                                        :
SAGE REALTY, et al.,                    :      **FINDINGS OF FACT AND**
                                        :      **CONCLUSIONS OF LAW**
        Defendants.        :
                                        :
--------------------------------- X
IRVING H. PICARD,                       :
                                        :
        Plaintiff,         :
                                        :      No. 20 Civ. 10057 (JFK)
  -against-                          :
                                        :      **FINDINGS OF FACT AND**
SAGE ASSOCIATES, et al.,                :      **CONCLUSIONS OF LAW**
                                        :
        Defendants.        :
                                        :
--------------------------------- X

Appearances

FOR THE TRUSTEE, IRIVING H. PICARD
    David J. Sheehan, Nicolas J. Cremona, Stacey Ann Bell, Amy
    Elizabeth Vanderwal, James Hefferan Rollinson, Lan Hoang,
    Patrick Thomas Campbell, Seanna R. Brown, Stephanie Ann
    Ackerman, BAKER & HOSTETLER LLP

FOR THE DEFENDANTS
    Andrew Bennett Kratenstein, Carole Neville, Darren Todd
    Azman, Michael Robert Huttenlocher, McDERMOTT WILL & EMERY
    LLP

# **Table of Contents**

I.   Procedural Background ...................................... 4

II.  Findings of Fact .......................................... 7

  A.  Operation of BLMIS ...................................... 9

    1.  IA Business Computer Systems ......................... 10

    2.  Trading Strategies of the IA Business ................ 11

    3.  BLMIS's Change in Organization ....................... 19

  B.  The Sage Accounts ...................................... 20

    1.  Convertible Arbitrage Trading in the Sage Accounts ... 21

    2.  Portfolio Strategy in the Sage Accounts .............. 22

    3.  Split Strike Conversion Strategy in Sages Account .... 33

  C.  Evidence Related to Directed and Authorized Trading .... 34

    1.  Malcolm's Testimony .................................. 34

    2.  Madoff's Discretion Over Trading in the Sage Accounts . 39

    3.  Trustee's Evidence in Response to Sages' Directed Trading Claim .................................................... 41

    4.  Findings of Fact Regarding Directed and Authorized Trading ................................................... 43

  D.  The Sage Accounts on the Filing Date ................... 45

  E.  Evidence of Partnership Liability ...................... 46

III. Conclusions of Law ....................................... 48

  A.  Applicable Law ......................................... 50

    1.  The Securities Investor Protection Act ............... 50

    2.  The Second Circuit's Net Equity Decision ............. 53

  B.  Discussion ............................................. 56

    1.  The Use of the Net Investment Method is Sound as a Matter of Law ................................................... 56

    2.  The Trustee Properly Denied the Sages' Customer Claims 73

    3.  The Trustee Has Established a Prima Facie Case Under 11 U.S.C. § 548 .............................................. 75

    4.  The Sages are General Partners of Sages Associates and Sage Realty ............................................... 86

    5.  Prejudgment Interest Is Not Warranted ................ 91

IV.  Conclusion ............................................... 94

**JOHN F. KEENAN, United States District Judge:**

This litigation is the result of the theft of billions of dollars by Bernard L. Madoff ("Madoff") from customers of his investment firm, Bernard L. Madoff Investment Securities LLC ("BLMIS"), in the largest "Ponzi scheme" in American history. Four days after Madoff was arrested on December 11, 2008, BLMIS was placed into liquidation proceedings and a Trustee, Irving H. Picard, Esq. ("the Trustee"), was appointed under the Securities Investment Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa–78lll, for the purpose of recovering and distributing customer property that had been misappropriated by Madoff during the fraud. As a part of this effort, the Trustee initiated thousands of adversary proceedings to avoid and recover transfers made by Madoff to BLMIS customers who had withdrawn more money from their BLMIS account than they had deposited over the account's lifetime. The money recovered from these "net winners" is used by the Trustee to support a fund of "customer property" under SIPA. Pursuant to the statute, each BLMIS customer is entitled to a pro rata portion of the fund to the extent of their "net equity," as defined by 15 U.S.C. § 78lll(11). See 15 U.S.C. § 78fff-2(c)(1)(b). For purposes of this liquidation, the Trustee has limited net equity claims to BLMIS customers who have yet to recover their principal investment.

These consolidated cases involve two separate actions
arising from the Trustee's administration of the customer
property fund in this liquidation.  The first action consists of
two consolidated adversary proceedings filed by the Trustee in
the Bankruptcy Court to avoid and recover approximately
$16,880,000 that was transferred by BLMIS to the entity
defendants, Sage Associates and Sage Realty ("Sage Accounts"),
in the two years prior to BLMIS's filing for bankruptcy ("the
Filing Date"[1]).  (Factual Stipulation of the Parties
("Stipulation") ¶¶ 65–67, ECF No. 38-1.[2])  The Trustee seeks to
hold the individual defendants, Malcolm Sage, Martin Sage, and
Ann Sage Prasser ("the Sages") jointly and severally liable for
the transfers in their alleged capacities as general partners of
both entities.  The second action involves two customer claims
filed by the Sages against the BLMIS estate seeking a share in
the fund for customer property under SIPA.  The Trustee denied
the Sages customer claims and the Sages objected.

On December 1, 2020, the Sages filed a motion to withdraw
both proceedings from the bankruptcy court, arguing that the
legal and factual issues presented in these consolidated cases
turn on "substantial and material consideration" of SIPA.

---

[1] The Filing Date in this case is December 11, 2008, which is the date
the Securities and Exchange Commission filed suit against BLMIS and a
receiver was appointed for the entity.  See 15 U.S.C. § 78lll(7)(B).
[2] Unless otherwise noted, all docket citations are to the lead case, 20
Civ. 10057 (JFK).

<u>Picard v. Sage Realty</u>, No. 20 Civ. 10057 (AJN), 2021 WL 1987994,
at *2 (S.D.N.Y. May 18, 2021). Judge Alison Nathan, to whom
these cases were originally assigned, agreed with the Sages, and
removed the reference in a May 18, 2021, Opinion and Order. <u>See
id.</u> Following that Order, the parties consented to a bench
trial, which this Court held from January 9, 2022, to February
2, 2022.

Central to the resolution of both cases is the Sages'
objection to the Trustee's use of the "Net Investment Method" to
calculate the value of their BLMIS accounts on the Filing Date.
Under the Net Investment Method, the "net equity" of a given
BLMIS account is determined by calculating the total amount of
money that was invested in the account minus the total amount of
money that was withdrawn over the account's lifetime. Because
the Sages withdrew more from the Sage Associates and Sage Realty
accounts than they deposited, the Trustee determined that the
accounts had a negative net equity or zero balance. Based on
that determination, the Trustee denied the Sages' customer
claims and initiated the instant avoidance actions to recover
the fictitious profits that were transferred to the Sage
Accounts in the two years before the Filing Date.

The Sages contend that the Trustee's use of the Net
Investment Method was incorrect as a matter of law because they,
unlike all other claimants in this liquidation, directed or

3

authorized Madoff to purchase the securities reported on their
customer account statements. The Sages argue that because their
account statements "tracked the authorizations or directions
that Malcolm gave Madoff and mirrored how [the relevant]
securities performed in the market," the Trustee is required to
credit the securities reflected on the last customer account
statements when calculating their "net equity" under SIPA §
78lll(11). (Joint Pre-Trial Report at 10, ECF No. 38.)

This Opinion constitutes this Court's Findings of Fact and
Conclusions of Law in these consolidated cases pursuant to
Federal Rule of Civil Procedure 52(a)(1). For the reasons that
follow, the Court concludes that the Trustee appropriately used
the Net Investment Method to calculate the net equity of the
Sage Accounts and awards a final judgment in favor of the
Trustee and against the Defendants in the sum of $16,880,000.

## I. Procedural Background

On December 11, 2008, Madoff was arrested for securities
fraud. Later that day, the United States Securities and
Exchange Commission ("SEC") simultaneously commenced proceedings
against Madoff and BLMIS in the United States District Court for
the Southern District of New York. (Stipulation ¶ 1.) On
December 15, 2008, the Securities Investor Protection
Corporation ("SIPC") petitioned for a protective decree placing
BLMIS into liquidation in the Southern District and appointing

the Trustee.  (Id.)  That day, the District Court granted the
SIPC's application and entered an Order ("the Protective Order")
placing BLMIS's customers under the protection of SIPA.  (Id. ¶¶
2-4.)  The Protective Order further appointed Irving H. Picard
as trustee for the liquidation of BLMIS and removed the SIPA
liquidation to the bankruptcy court.  (Id.)

On December 23, 2008, the bankruptcy court entered a Claims
Procedure Order, which established the process for the filing,
determination, and adjudication of customer claims in the BLMIS
liquidation proceeding.  (Id. ¶ 27.)  Under the Order, all
customer claims must be submitted to the Trustee, who is
required to resolve each claim by way of a written
determination.  (Id.)  If a customer objects to the Trustee's
determination, they must file their objection with the
bankruptcy court.

On June 18, 2009, the Sages filed customer claims against
the BLMIS estate, seeking compensation for the securities listed
on the November 30, 2008, customer statements of the Sage
Associates Account (Account 1-S0547) and Sage Realty Account
(Account 1-S0316).  (Id. ¶¶ 27-29.)  As noted previously, the
Trustee applied the net investment method to determine the value
of the net equity in each account on the Filing Date.  (Id.)
Because the Sages had withdrawn more than they had deposited

5

into their accounts, the Trustee denied both customer claims.
(Id. ¶¶ 28, 29.)

On November 12, 2010, the Trustee initiated two adversary
proceedings against the Sages to avoid and recover transfers
made by BLMIS to the Sages through Sage Associates Account
1S0004, Sage Associates Account 1S0547, and Sage Realty Account
1S0316, totaling $16,880,000 within two years of the Filing
Date. (Id. ¶ 65.) The Sages answered the Trustee's Amended
Complaints and proceeded to discovery. As noted, after
discovery and mediation, the Sages moved to withdraw the
reference of the consolidated cases from the bankruptcy court
and Judge Nathan granted the Sages' motion in a May 18, 2021,
Opinion and Order. See Sage Realty, 2021 WL 1987994, at *3. On
November 2, 2021, the case was reassigned to this Court. (See
Notice of Case Reassigned, dated November 2, 2021.)

Following the resolution of three separate motions in
limine, this case proceeded to a bench trial before this Court.
Prior to trial, the parties submitted declarations of direct and
rebuttal testimony, as well as copies of anticipated exhibits
and deposition designations that they intended to use at trial.
The parties also submitted proposed findings of fact and
conclusions of law. The Court held a five-day bench trial that
ended on February 2, 2022. At trial, the parties only called
witnesses that they intended to cross-examine. In total, the

Court received testimony from eight witnesses, five of whom

provided live testimony, and admitted over 2,000 exhibits from

the parties.

## II. Findings of Fact

This section contains the Court's Findings of Fact in

accordance with Federal Rule of Civil Procedure 52(a)(1).[3]  Prior

to trial, the parties submitted a joint stipulation of fact as a

part of their Joint Pre-Trial Report.  The Court's factual

findings are drawn from that stipulation, witness testimony

submitted in the form of affidavits, witness testimony presented

at trial, and the parties' trial exhibits.  The Court finds the

Trustee's affidavits and testimony to be credible.  As the Court

explains in greater detail below, the Court credits the

testimony and reports of the Trustee's experts,[4] as well as the

---

[3] "To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa."  Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH, No. 14 Civ. 585 (AJN), 2018 WL 4253181, at *3 (S.D.N.Y. Sept. 5, 2018).

[4] The Trustee called three experts, Bruce Dubinsky, Lisa Collura, and Mathew Greenblatt, to establish his prima facie case and rebut the arguments advanced by the Sages.  Bruce Dubinsky is a forensic accountant with more than 35 years of experience in financial fraud investigations.  The Sages stipulated to his qualifications as an expert in the areas of forensic accounting, fraud examinations, computer forensics, solvency and business valuations, and investment theory and practices.  (Stipulation ¶ 69.)  Lisa Collura is also a forensic accountant with more than twenty years of experience in financial fraud investigations and cases.  The Sages stipulated to Collura's qualifications as an expert in the area of forensic accounting.  (Id. ¶ 68.)  Finally, Mathew Greenblatt is similarly a forensic accountant with more than twenty years of experience in financial fraud investigations and cases.  The Sages also stipulated

factual testimony of former BLMIS employees, such as Annette
Bongiorno.  As for the Sages' affidavits and testimony, the
Court finds both to be largely credible.  Where the testimony of
Malcolm Sage is contradicted by specific statements made by the
Trustee's experts, the Court credits the latter.  The Court did
not consider Malcolm Sage's charts and graphs, which were the
subject of a prior motion _in limine_, in arriving at the
following findings.  As the Court noted in its Opinion and Order
addressing the motion _in limine_, the analysis and conclusions
contained in the proffered exhibits constitute improper expert
testimony.  See Picard v. Sage Realty, No. 20 Civ. 10057 (JFK),
2021 WL 5926059, at *3 (S.D.N.Y. Dec. 15, 2021) (noting that the
"exhibits are based, in large part, on Malcolm's after-the-fact
research into historical securities pricing information and
various calculations that are arguably not the product of 'a
process of reasoning familiar in everyday life'" (citing United
States v. Cut, 720 F.3d 453, 457 (2d Cir. 2013))).  Furthermore,
Dubinsky's trial testimony established that many of the
calculations contained in Malcom's exhibits are incorrect.
Because the exhibits are unreliable and inadmissible as lay
testimony, the Court did not consider them.

---

to Greenblatt's qualifications as an expert in the area of forensic
accounting.  (Id. ¶ 70.)

The Court begins its Findings of Fact with an overview of
BLMIS and the mechanics of Madoff's Ponzi scheme.  Although
these facts are "well documented across many pages of Federal
Reporters," Picard v. Gettinger (In re BLMIS), 976 F.3d 184, 188
(2d Cir. 2020), the precise details of Madoff's fraud are
particularly relevant to the Sages' claim that they, unlike
every other BLIMS customer, are entitled to principal credit for
the securities listed on their final account statements.  After
summarizing the facts adduced at trial regarding the BLMIS Ponzi
scheme generally, the Court turns to its findings concerning the
Sages' various BLMIS accounts.  The Court then addresses the
evidence introduced at trial related to the Sages' claim that
Malcolm directed or authorized the trading in the Sage Accounts.
Finally, the Court addresses the Trustee's evidence that the
Sages are general partners of Sage Associates and Sage Realty.

**A. Operation of BLMIS**

In January 1960, Madoff founded BLMIS as a sole
proprietorship and registered as a broker-dealer with the SEC.
(Stipulation ¶ 10; Trustee Proposed Findings of Fact and
Conclusions of Law ¶ 271, ECF No. 53.)  By virtue of Madoff's
registration, BLMIS became a member of SIPC when SIPA was
enacted in 1970.  (Stipulation ¶ 10.)

BLMIS was comprised of three business units: (1) a
proprietary trading business, (2) a market-making business, and

(3) an investment advisory business ("IA Business"). (Id. ¶
12.)  The proprietary trading business traded for its own
account to make money for the broader broker-dealer business.
(Id. ¶ 13.)  The market making business bought and sold stocks
in large quantities in order to provide liquidity to various
institutional traders in the market.  (Dubinsky Decl. ¶ 36;
Stipulation ¶ 14.)  The IA Business ostensibly bought and sold
securities and options on behalf of its customer accounts.
(Stipulation ¶ 15.)  In the ten years before Madoff's arrest,
the IA Business used three bank accounts: a JPMorgan Chase Bank,
N.A. ("JPMorgan") account ending in 1703 (the "703 Account"); a
JPMorgan account ending in 1509 (the "509 Account"); and a
Bankers Trust account ending in 599 (the "BT Account").  (Id. ¶
16.)

The Trustee's expert, Bruce Dubinsky, determined through
his investigation of BLMIS that all of the reported trading
activity in the IA Business was fake, and no securities were
ever purchased on behalf of IA Business clients.  (Dubinsky
Decl. ¶ 23.)  Instead, the investments of new clients were used
to fulfill distribution requests made by existing clients.  It
was a classic Ponzi scheme on a never-before-seen scale.

### 1. IA Business Computer Systems

The IA Business existed entirely separate from the rest of
BLMIS.  Unlike the computer systems used by BLMIS's proprietary

trading business, the IA Business computers were incapable of executing trades. Dubinsky testified that the IA Business computers ran custom-built software that was designed to track information related to IA Business customer account statements, facilitate the manual entry of historical market data, and print fictitious customer statements. (Id. ¶ 75.) Dubinsky further found that the custom software included code that allowed trades reported on customer account statements to be fabricated after-the-fact using historical pricing information. (Id. ¶ 83.) Based on his analysis, Dubinsky concluded that the IA Business computer system was "akin to a giant automated typewriter used to facilitate the massive fraud through manual data manipulations." (Id. ¶ 82.)

### 2. Trading Strategies of the IA Business

Over the course of the fraud, BLMIS purported to employ three different investment strategies on behalf of IA Business customers: (1) a "convertible arbitrage" strategy; (2) a "split-strike conversion" strategy; and (3) a "buy-and-hold" or "portfolio" strategy. (Id. ¶¶ 104, 145, 175.) Dubinsky established that regardless of the trading strategy allegedly used, all of the trading activity in the IA Business accounts was fabricated by Madoff to achieve predetermined rates of return for each account. (Id. ¶¶ 269-73.)

11

### a) The Convertible Arbitrage Strategy

Starting in the early 1970s and continuing into the late 1990s, BLMIS represented to IA Business customers that it employed a "convertible arbitrage strategy." (Id. ¶ 104.) The trading strategy is commonly employed by hedge funds and involves the simultaneous purchase of a "convertible security"—i.e., a stock or bond that can be converted into common stock—and the short sale of the underlying common stock. (Id.) The convertible arbitrage transactions that were purportedly executed by the IA Business involved convertible bonds, warrants, and convertible preferred stock. (Id. ¶ 107.)

Based on his review of BLMIS's books and records, Dubinsky concluded that Madoff dictated the rate of return for each IA Business account purportedly invested in the convertible arbitrage strategy. (Id. ¶ 109; Declaration of Annette Bongiorno ("Bongiorno Decl.") ¶ 9, TX-001.) Dubinsky demonstrated that each convertible arbitrage deal was then "set up" or fabricated in a way to achieve the established rate of return for the particular account. (Id. ¶¶ 108-10.) The "set up" of each trade involved using historical pricing information to identify profitable arbitrage trades that could have been executed in the preceding weeks. (Id. ¶ 109.) IA Business personnel would then fabricate customer account statements to

make it appear as if the profitable trade had been executed in the given account. (Id. ¶¶ 110-27.)

Dubinsky's analysis was corroborated by the trial testimony submitted by Annette Bongiorno, a longtime BLMIS employee who played an integral role in operating the convertible arbitrage fraud. Bongiorno testified that all of the arbitrage trades reported in IA Business accounts were "as of" or "backdated" trades, meaning that the trades were reported as having occurred on an earlier date. (Bongiorno Decl. ¶ 11.) Bongiorno stated that the backdated convertible arbitrage trades were almost always fabricated "shortly before or after the end of the month in which they were reported." (Id. ¶ 26.)

Bongiorno further testified that David Kugel, a trader on the Market-Making and Property Trading desks at BLMIS, provided the IA Business with the historical price information that was used to manufacture the backdated convertible arbitrage trades. (Id. ¶¶ 11, 12.) Bongiorno stated that Kugel would provide IA Business personnel with the name, price, trade date, and settlement date for the convertible security, and the trade date and settlement date for the short sale of the underlying stock. (Id.) The trade dates for both the convertible security and the short sale of the underlying stock were always from earlier in the month. (Id.) Using this information, IA Business personnel would manually "set up" new arbitrage deals in IA Business

13

accounts based on (1) the amount of money purportedly available
in the account from previously fabricated arbitrage
transactions, and (2) the specific rate of return set by Madoff
for the given account. (Id.) At trial, the Trustee introduced
into evidence stenographic notebooks found in BLMIS's books and
records that were used by the IA Business to record the step-by-
step process for manufacturing the fake convertible arbitrage
trades. (TX-573; TX-574; TX-575.)

In the mid 1980s, the manual process for fabricating
convertible arbitrage transactions was automated through the use
of the IA Business's computer system. (Dubinsky Decl. ¶ 120.)
As noted previously, the computer system was only capable of
taking historical trading data and generating fake trade
confirmations and customer statements. (Id. ¶ 125.) The Sages
presented no expert testimony or evidence that suggested the
convertible arbitrage trading was real.

### b) The Portfolio Strategy

Starting in the early 1980s, BLMIS moved a number of its
long-time customers out of the convertible arbitrage strategy
and into the so-called "portfolio" or "buy-and-hold" strategy
("Portfolio Strategy"). Under the Portfolio Strategy, BLMIS
purportedly purchased individual securities and held those
securities in client accounts for an extended period of time.
(Id. ¶ 175.) Similar to the convertible arbitrage trades, all

14

of the trades reportedly made for IA Business accounts invested
in the Portfolio Strategy were backdated trades fabricated
after-the-fact using historical pricing information and the
benefit of hindsight.  (Id. ¶ 177.)

Bongiorno testified that the fake Portfolio Strategy trades
were nearly always entered into the BLMIS computer system at or
near the end of the month using pricing information from the
preceding weeks.  (Bongiorno Decl. ¶ 26.)  Bongiorno further
testified that she and Madoff typically relied on a report,
which was generated at the end of each month, that contained
historical pricing information for 250 single name securities.
(Id. ¶ 49; TX-465 ("Jodi Stocks — 6/30/06 16:29" Bloomberg
Pricing Report).)  From this report, Madoff would identify
securities that could be bought or sold "as of" earlier in the
month in order to bring a given account "back in line" with his
predetermined rate of return.  (Id. ¶ 37.)  When these backdated
trades were entered into the computer system by Bongiorno or
other IA Business employees, the system would assign consecutive
transaction numbers to the trades based on the order in which
they were entered.  (Id. ¶ 27; Dubinsky Decl. ¶ 193.)  As a
result, trades that reportedly occurred weeks or even months
apart were assigned consecutive transaction numbers.  (Dubinsky
Decl. ¶¶ 193, 210.)

15

To help ensure Portfolio Accounts remained "in line" with Madoff's desired rates of return, BLMIS generated monthly "Group Buying Power" reports, which listed the purported equity in each account and grouped the accounts based on ownership. (Bongiorno Decl. ¶ 46.) The grouping of associated accounts, such as Sage Associates and Sage Realty, allowed Madoff to track the overall rate of return for individual clients. (Id.) Two kinds of Group Buying Power Reports were produced for Madoff, a "preliminary" report, and a "final" report. (Id. ¶¶ 47, 53.) The "Preliminary" Group Buying Power reports ("Preliminary Report") were generated at the end of each month and provided information on the purported equity in the various Portfolio Accounts before any backdated trades had been fabricated. (Id. ¶ 47.) Each Preliminary Report contained an "OVER/UNDER" column, which reflected whether the reported equity for a group of associated accounts was over or under the benchmark set by Madoff. (Id.; TX-455.) Bongiorno testified that if a group of associated accounts was under or over Madoff's desired rate, he would direct Bongiorno to use backdated trades to bring the account "back in line." (Bongiorno Decl. ¶ 48.) Bongiorno further testified that Madoff used historical pricing information to identify securities that could be used in the backdated trades. (Id. ¶ 49.)

In the event the Group Buying Power report indicated that a group of Portfolio Accounts was over Madoff's benchmark, he would generally instruct Bongiorno to use backdated trades to create the appearance that the equity in the accounts had decreased over the prior month. (Id. ¶ 56.) These reductions were achieved in three different ways: (1) if the value of a stock purportedly held in an account increased during the month, BLMIS could report that the stock was sold "as of" a date prior to the increase in value; (2) if the value of a stock not purportedly held in the account decreased during the month, BLMIS could report a purchase of the stock earlier in the month or late in the prior month; and (3) if the value of a stock rose during the month, IA Business personnel could report that the stock was sold short as of a date early in the month or late in the preceding month. (Id. ¶ 59.)

Although the majority of backdated trades were fabricated at the end of each month, IA Business personnel frequently placed "as of" trades in prior months or prior years in order to bring accounts "back in line" with Madoff's desired rate of return. (Id. ¶ 69.) To do this, they used custom-coded software, known as "STMTPro," to alter pre-existing customer account statements. (Dubinsky Decl. ¶ 190.) When this system was used and replacement statements were created, Madoff

17

insisted that the original statement be sent back to BLMIS.
(Bongiorno Decl. ¶ 69.)

### c) The "Split-Strike Conversion" Strategy

The vast majority of IA Business accounts were purportedly
invested in the split-strike conversion strategy ("Split Strike
Strategy").  During his plea allocution, Madoff stated that his
purported use of the Split Strike Conversion Strategy began in
the "early 1990s."  (Madoff Plea Allocution at 7–8, TX-072;
Stipulation ¶ 21.)  The strategy allegedly involved
"opportunistically" buying and selling "basekt[s] of common
stocks within the Standard & Poor's 100 Index" and
"intermittently" moving client funds "out of the market" and
into "[U.S.] Government-issued securities such as [U.S.]
Treasury Bills."  (Id.)  Madoff also told customers that "as
part of the split strike conversion strategy, [he] would hedge
the investments [he] made in the basket of common stocks by
using client funds to buy and sell option contracts related to
those stocks, thereby limiting potential client losses caused by
unpredictable changes in stock prices."  (Id.)  Madoff admitted
during his plea allocution that he "never made those
investments."  (Id.)

Similar to the purported convertible arbitrage and
portfolio trades, all of the trades reportedly executed in
accordance with the Split Strike Conversion Strategy were

backdated trades manufactured using historical pricing
information.  During his investigation into BLMIS, Dubinsky
uncovered overwhelming evidence that the Split Strike trades
were fraudulent.  (Dubinsky Decl. ¶ 147.)  For example, Dubinsky
identified 912 instances where the stock transactions reported
in the Split Strike accounts exceeded the overall market volume
for the day.  (Id. ¶¶ 166-67.)

### 3. BLMIS's Change in Organization

When Madoff first registered as a broker-dealer with the
SEC in 1959, he was assigned Registrant Number 8-8132.
(Stipulation ¶ 9.)  Through that registration, Madoff's firm
became a member of the Securities Investor Protection
Corporation ("SIPC") when SIPA was enacted in 1970.  (Id. ¶ 10.)
Madoff's firm operated as a sole proprietorship for over forty
years before he converted it to a single member limited
liability company ("LLC") in 2001.  (Dubinsky Decl. ¶¶ 41-42.)
The sole proprietorship operated under the names "Bernard L.
Madoff" and "Bernard L. Madoff Investment Securities."  (Id. ¶
33.)  When Madoff converted the firm to an LLC, he filed an
Amended Form BD document with the SEC to reflect the change and
used the same SEC registrant number, 8-8132, that had been
associated with the sole proprietorship.  (Id. ¶ 49; TX-043.)
The Amended Form BD made clear that the reorganization was an

19

amendment to the existing registration, not an application for a separate broker-dealer.  (Dubinsky Decl. ¶ 49.)

On the Amended Form BD, Madoff attested that "[e]ffective January 1, 2001, predecessor will transfer to successor all of predecessor's assets and liabilities related to predecessor's business.  The transfer will not result in any change in ownership or control" and that no "accounts, funds, or securities of customers of the applicant are held or maintained by such other person, firm, or organization."  (Id. ¶ 50; TX-043.)  Madoff identified no assets or liabilities "not assumed by the successor."  (Dubinsky Decl. ¶ 50; TX-043.)  Where the Amended Form BD required the applicant to identify the types of businesses that the LLC would engage in, Madoff checked the boxes for BLMIS's market-making and propriety trading activities, however, he did not check the box next to "investment advisory services."  (Dubinsky Decl. ¶ 53; TX-043 at 7-8.)

### B. The Sage Accounts

The Sages maintained several IA Business accounts over the course of their 26-year relationship with BLMIS.  As relevant here, the Trustee seeks to avoid and recover transfers from three accounts: Sage Associates Account 1S0004, Sage Associates Account 1S0547, and Sage Realty Account 1S0316 ("Sage

Accounts").[5]  (Trustee Proposed Findings of Fact and Conclusions
of Law ¶ 323.)

Between the late 1970s and 2008, the various Sage Accounts
reportedly engaged in one or more of the IA Business' fake
investment strategies.  At trial, Dubinsky credibly testified
that based on his review of BLMIS's books and records, including
the customer account statements for the Sage Accounts, all of
the reported trading activity in the Sage Accounts was
fictitious and fabricated after-the-fact using historical
pricing information.  (Dubinsky Decl. ¶ 190.)

### 1. Convertible Arbitrage Trading in the Sage Accounts

From the late 1970s until 1997, several of the IA Business
accounts held by Sage Associates, Sage Realty, and members of
the Sage family, were reportedly engaged in the Convertible
Arbitrage Strategy.  (Bongiorno Decl. ¶¶ 13, 22.)  As was true
of every IA Business account invested in this strategy, the
purported convertible arbitrage trades in the Sage Accounts were
fabricated after-the-fact in order achieve a specific rate of
return.  (Dubinsky Decl. ¶ 109; Bongiorno Decl. ¶¶ 3, 26.)  At
trial, the Trustee demonstrated that the convertible arbitrage

---

[5] The Sage Associates Account was maintained under four separate
account numbers: 1-01902-1-3, 1-01902, 1-S0004, and 1-S0547.
(Stipulation ¶ 24-25.)  The Sage Associates II Account was maintained
under three separate account numbers: 1-01926, 1-S0005, and 1-S0548.
(Id.)  The Sage Realty Account was maintained under three separate
account numbers: 1-01993, 1-S0006, 1-S03156. (Id.)

transactions in the Sage Accounts were manufactured to
consistently generate returns of 2.5% or more. (Dubinsky Decl.
¶¶ 103-106.)

In 1997, Madoff transitioned all remaining convertible
arbitrage accounts, including the Sage Realty account, into the
supposed Split Strike Conversion strategy. (Dubinsky Decl. ¶
189.) On August 19, 1997, approximately $2.124 million in
purported convertible arbitrage proceeds were transferred from
Sage Realty account 1S0006 into Sage Realty account 1S0316.
(Greenblatt Decl. ¶ 119.)

### 2. Portfolio Strategy in the Sage Accounts

Between the early 1980s and November 2008, Madoff
purportedly employed a "buy and hold" strategy in several of the
Sage Accounts. (Dubinsky Decl. ¶ 188.) Under this strategy,
securities were reportedly purchased in the Sage Accounts, held
for a specific period of time, and then sold for a profit. (Id.
¶ 175.) Dubinsky testified that all of the portfolio trades
recorded in the Sages Accounts were backdated trades created at
the end of the month using already-published pricing
information. Corroborating Dubinsky's analysis, Bongiorno
testified as to her personal involvement in fabricating trades
in the Sages' Portfolio Strategy account ("Portfolio Accounts").

Bongiorno credibly testified that each of the trades
reported in the accounts were fabricated shortly before or after

22

the end of the month using historical pricing information.
(Bongiorno Decl. ¶ 26.) By way of example, Bongiorno explained
that the very first Portfolio Strategy trades reported in the
Sage Accounts were fabricated at month's end. (Id. ¶ 27.) The
customer account statement in question, the August 1982 customer
statement for Sage Associates Account 1-01902-1-3, reflects that
several single name securities were purchased in the account
during the month of August. (Id. ¶ 27.) The various
transactions, although purportedly executed days apart, are
assigned consecutive transactions numbers that do not align with
the reported timing of the trades. (Id.) For example, an
August 16 purchase of 2,000 shares of Oak Industries is assigned
transaction number "605," while an August 9 purchase of 2,000
shares of Apple Computer is assigned transaction number "606."
(Id.) Because the IA Business computers assigned transaction
numbers consecutively, the August 1982 ledger demonstrates that
the trades in question were entered one after the other at the
end of the month. (Id.)

The wholesale fabrication of trades allowed BLMIS to
"cancel" trades that had already been reported on customer
account statements. (Id. ¶¶ 29, 32, 75.) For example,
Bongiorno testified that in April 1984, BLMIS retroactively
canceled a large purchase of General Electric and American
Express shares that had been purportedly purchased on margin in

23

an account held by Sage Associates. (Id. ¶ 29.) The purpose of the cancelation was to facilitate a $143,188 cash withdrawal by the Sages. (Id. ¶ 26.) To cancel the transactions, Bongiorno altered the March 1984 customer ledger to show that the General Electric and American Express positions had been sold on March 12 and March 13 respectively. (Id. ¶ 29.) Bongiorno then backdated a new purchase of American Express stock for March 12. (Id.) The retroactive alteration of the original position reduced the purported margin debt in the account by almost $143,188.[6] (Id. ¶¶ 28, 29.)

Bongiorno further testified that when preparing month-end backdated trades, the IA Business frequently made the same backdated trade in several IA Business Portfolio accounts. (Id. ¶ 33.) For example, the May 1985 customer ledger for Sage Associates Account 101902-3-0 reflected a purchase of Disney stock on margin. (Id. ¶ 43; TX-222.) That month, BLMIS also

---

[6] As noted previously, when Madoff instructed IA Business personnel to backdate trades outside the current month, he required IA Business personnel to prepare a replacement customer statement and insisted that customers return the originally issued statement before the replacement was sent. (Bongiorno Decl. ¶ 30.) In the case of the statements issued for the Sage Associates account in March 1984 and April 1984, this process was not followed. As a result, the Sages produced to the Trustee in these proceedings the originally-issued statements. (Id. ¶ 30.) By contrast, when the IA Business canceled certain trades reported in the April, May, and June 1985 customer ledgers for a separate Sage Associates account, new replacement statements were prepared and sent to the Sages. (Id. ¶¶ 31-33, 35.) As a result, the majority of the account statements produced by the Sages do not reflect prior-month backdated trading activity. (Id.)

24

reported the purchase of blocks of Disney stock in six other IA Business accounts invested in the supposed Portfolio Strategy. (Bongiorno Decl. ¶ 34.)

As was the case in the Convertible Arbitrage Strategy, Madoff personally set benchmark rates of return for IA Business accounts purportedly invested in the Portfolio Strategy. (Id. ¶¶ 36-37.) If a Portfolio account or group of associated accounts fell short of Madoff's desired returns, Madoff would direct Bongiorno to use backdated trades to bring the account or accounts "back in line" with his benchmark.[7] (Id. ¶ 37.) Bongiorno credibly testified that this process was used in the Sage Associates account on several occasions. (Id. ¶ 38.) For example, the October 1985 account statement for Sage Associates Account 101902-4-0, which had a zero balance at the start of the month, reflects that S&P 100 index call options were purchased on October 8 and sold on October 21 for a profit of $51,324. (Id. ¶ 38; TX-228.) The two trades, although executed two weeks apart, have consecutive transaction numbers, demonstrating that the trades were entered into the IA Business computer system

---

[7] Corroborating Bongiorno's testimony and further supporting Dubinsky's conclusions, Frank DiPascali, a now-deceased former BLMIS employee, testified at the criminal trial of Daniel Bonaventure, another former BLMIS employee, that he provided Bongiorno with the historical pricing information that she used to fabricate backdated trades in the Portfolio Strategy accounts. (TX-073 at 47:16-22.) DiPascali also testified that BLMIS used the backdated trades to achieve predetermined rates of return set by Madoff. (Id.)

25

consecutively.  (TX-228.)  Similarly, in December 1987, Madoff
again backdated the purchase and sale of S&P index call options
in the Sage Associates account to generate a profit of $371,103.
(Bongiorno Decl. ¶ 39; TX-241.)  As was the case on the October
account statement, the transaction numbers of the December
trades are consecutive.  (TX-241.)  Bongiorno testified that
Madoff frequently employed this practice at or near the end of
the year.  (Bongiorno Decl. ¶ 43.)  For example, the Sage
Associates account statements from the final months of 1989,
1990, 1991, 1994, 1995, 1996, and 1997, all reflect the purchase
and sale of large blocks of common stocks weeks apart.  (Id. ¶¶
40-43.)

    As noted previously, because IA Business personnel entered
trades for Portfolio Strategy accounts shortly before or after
the end of a given month, the IA Business could report the
purchase of a security on one account statement and the sale of
the security on another.  (Id. ¶ 44.)  Bongiorno testified that
this was done in the Sage Accounts to increase the equity
available to the Sages.  (Id. ¶¶ 44, 45.)  For example, the
November 1998 Sage Associates account statement indicated that a
block of Yahoo was purchased for a total cost of $490,000.  (Id.
¶ 44.)  The December 1998 account statement shows that the same
block of Yahoo stock was sold for $840,000.  (Id.)  Although the
transactions were in different months, the transaction numbers

26

for the two trades are consecutive, demonstrating that the
backdated trades were entered into the BLMIS system at the same
time. (Id.) The fake transactions increased the reported
equity in the account by $350,000. (Id.)

Bongiorno also testified that in November 1999, IA Business
personnel fabricated a prior month trade in order to facilitate
a withdrawal that was requested by Malcolm Sage in a November
24, 1999, letter. (Id. ¶ 45; TX-173.) In the letter, Malcolm
states that he "would like to withdraw a sum of two hundred
thousand dollars from Sage Associates (account 1S000430) on or
about December 1, 1999." (TX-173.) Although the letter is
dated November 24, the November 30, 1999, account statement for
the relevant Sage Associates account reports that a block of
Compaq stock was purchased in October, with a reported
settlement date of November 2, and then sold on November 24 for
a profit of $200,812.50. (Bongiorno Decl. ¶ 45; TX-289.) No
other trades were reported on the statement. (TX-289.) On
December 1, 1999, BLMIS issued a $200,000 check to Sage
Associates. (Bongiorno Decl. ¶ 45.)

Bongiorno also credibly testified regarding Madoff's use of
the "Group Buying Power" reports to keep the various Sage
Accounts "in line" with his desired rate of return. (Id. ¶¶ 47–
51.) As noted previously, the "preliminary" Group Buying Power
reports listed the purported equity in the Portfolio Strategy

accounts before any backdated trades had been entered.  (Id.)

When the Group Buying Power reports indicated that the Sage

Accounts were out of line with Madoff's predetermined rate of

return, Madoff would direct Bongiorno to fabricate backdated

trades in the various accounts in order to increase or decrease

the Sages' overall equity.  (Id. ¶ 48.)

For example, Bongiorno testified that in June 2006, the

Preliminary Group Buying Power report indicated that the equity

across the Sage Accounts was $2.747 million under Madoff's

benchmark for the Sages.  (Id. ¶ 47; TX-455.)  To bring the

accounts back in line, Madoff directed Bongiorno to report the

following transactions in both Sage Associates Account 1-S0004-

3-0, and Sage Associates II Account 1-S0005-3-0: (1) a purchase

of a block of 90,000 shares of Amazon at $32.66 per share on

June 8 with a settlement date of June 13; (2) a purchase of a

separate block of 75,000 shares of Amazon at $32.70 per share,

also on June 8, with a settlement date of June 13; and (3) a

purchase of 50,000 shares of Carmax at $29.90 per share on June

12 with a settlement date of June 15.  (Bongiorno Decl. ¶ 51.)

The June 2006 account statements for the relevant accounts

reported that all six transactions were executed in both

accounts. (TX-384; TX-386.)  The transaction numbers for the

six trades are consecutive, indicating that the trades were

entered into the IA Business computer systems in the same order

they were listed in Madoff's instructions. (Bongiorno Decl. ¶ 52.) Taken together, the backdated trades in the two accounts increased the reported net equity of the Sage Accounts by approximately $2.6 million. (Bongiorno Decl. ¶¶ 51-53; TX-456.)

In the event the Group Buying Power report indicated that a group of associated accounts was over the benchmark rate of return, Madoff would instruct BLMIS personnel to reduce the value of the accounts. (Bongiorno Decl. ¶ 56.) Bongiorno testified that in April 2004, the Preliminary Group Buying Power report indicated that the Sage Accounts, taken together, were $5.027 million over Madoff's benchmark rate of return. (Id. ¶ 56.) According to Bongiorno's contemporaneous notes, Madoff viewed the accounts as being "way over," and directed her to fabricate transactions that would show a loss in the accounts by month's end. (Id. ¶ 57.) Bongiorno testified that, using historical pricing information, she identified two positions in the Sage Associates account that had appreciated significantly over the course of the month, eBay and Lilly Eli Co. ("Lilly Eli"), and two stocks not listed in the Sage Accounts that had depreciated significantly. (Id. ¶ 58.) Bongiorno then fabricated a series of trades to create the appearance of a considerable loss in the Sage Accounts. (Id.) First, Bongiorno backdated a sale of Lilly Eli at the beginning of the month, which reduced the value the account $587,000. (Id. ¶ 60; TX-

29

349.)  Second, Bongiorno backdated purchases of Palmone and U.S.
Steel stock, both of which had depreciated in value over the
course of the month, which further reduced the equity value of
the account by $385,000 and $272,250 respectively.  (Bongiorno
Decl. ¶ 60.)  Finally, Bongiorno fabricated a disastrous short
sale of eBay, which resulted in a $3.5 million loss on the
account statement.  (Id.)  As a result of these trades, the
reported equity in the Sage Accounts was only $243,000 over the
benchmark rate of return set by Madoff.  (Id. ¶ 61; TX-449.)
Bongiorno testified that she fabricated similar losses in the
Sage Accounts in both April 2003 and July 2006.  (Bongiorno
Decl. ¶¶ 62-68.)

As noted previously, the IA Business also resorted to
backdating trades in prior months or prior years in order to
bring Portfolio Strategy accounts back in line with Madoff's
desired benchmark.  (Id. ¶ 69.)  Both Dubinsky and Bongiorno
testified that this technique was used by Madoff in the Sages'
so-called "Naked Short Account."  (Id. ¶¶ 78-87; Dubinsky ¶
191.)  As Dubinsky explained during the trial, "naked shorts"
refers to the "selling of shares [of a security] that are not
currently owned."  (Dubinsky ¶ 192; Trial Tr. 352:7-9.)  In
September 2001, the IA Business created a naked short subaccount
for Sage Associates in order to fabricate four naked short
transactions to bring the Sage Accounts back in line with

30

Madoff's predetermined rate of return. (Bongiorno Decl. ¶¶ 78,
80.) The original September 2001 customer statements for the
naked short account reflects that IA Business personnel
fabricated naked short trades of KLA Tencor Corp., Peoplesoft
Inc., Applied Materials Inc., and Altera Corp. (Bongiorno Decl.
¶ 80; TX-308.) The transactions increased the equity in the
Sage Accounts by more than $3.5 million. (Bongiorno Decl. ¶
80.)

In an undated letter that was recovered from Bongiorno's
November 2001 "month-end folder," Malcolm Sage requested that
BLMIS "realize approximately $600,000 . . . of gain" in the
Sages' naked short account. (Id. ¶ 81; TX-461.) During his
deposition in this case, Malcolm testified that he was aware of
the positions in the naked short account at the time he wrote
the letter. (TX-093 (Nov. 15, 2017 Dep. of Defendant Malcolm
Sage) at 248:3-25.) Because the profits from the September 2001
sale exceeded Malcolm's requested $600,000, Madoff instructed
Bongiorno to retroactively modify the sale in order to generate
only the requested amount. (Bongiorno Decl. ¶ 84.) Based on
his review of BLMIS's books and records, Dubinsky concluded that
in November 2001, IA Business personnel used the IA Business's
custom software to reverse the purported September 2001 naked
short sale of Peoplesoft, Applied Materials, and Altera Corp.
(Dubinsky Decl. ¶¶ 213-14.) This left only one transaction on

31

the November 2001 customer statement for the Sages' naked short
account: the purported sale of the KLA Tenor short position for
exactly $600,000.  (Id. ¶ 214; Bongiorno Decl. ¶ 84; TX-318; DX-
EC.)

The evidence introduced at trial also established that
prior-month backdating was used to manipulate the January 2005
account statement for Sage Associates Account 1S0004-7-0.  The
original account statement reported four separate transactions
to purchase eBay stock on January 19, 2005.  (TX-357.)  In an
undated letter that was maintained in Bongiorno's "month-end"
folder for March 2005, Malcolm indicated to Madoff that he
"[r]ealize[s] that there will be a long-term loss of some amount
in eBay even if you are able to address the issues we
discussed."  (Bongiorno Decl. ¶ 72; TX-464.)  The letter then
states "[i]f it is not necessary to sell Pfizer in Sage
Associates or Amgen in Sage Associates II (because of the need
for buying power), it would be to our advantage because the
long-term gain realized by the sale of these positions would be
offset by the realized loss in eBay (which were sold short
against the box last year at 69)."  (TX-464.)

Bongiorno testified that in response to the letter, Madoff
directed her to cancel the purported January 2005 eBay
transactions and to "buy back" eBay stock at a lower price.
(Bongiorno Decl. ¶ 73.)  To effectuate Madoff's directions,

Bongiorno used Bloomberg pricing information to identify dates
in late January 2005 when eBay's stock traded below the January
19 price reported on the Sage Associates' original January 2005
account statement.  (Id.; TX-464; Dubinsky Decl. ¶¶ 196-97.)
Using this historical pricing information, Bongiorno revised the
January eBay trades so it appeared as if the reported purchases
were made later in the month when the stock was trading below
the January 19 price.  (Bongiorno Decl. ¶ 74-75; TX-464; TX-
365.)  IA Business personnel then fabricated a new January 2005
account statement, which recorded the March 2005 revisions as if
they had been executed in January.  (Bongiorno ¶¶ 75-76; TX-486;
TX-356; TX-358.)  As a result of these prior-month backdated
trades, the equity in the Sage Associates account increased
significantly.  (Bongiorno Decl. ¶¶ 73, 77.)

     In total, Dubinsky identified 38 instances of prior-month
backdated transactions in the Sage Accounts.  (Dubinsky Decl. ¶
191; TX-656.)

### 3. Split Strike Conversion Strategy in Sages Account

     In 1997, the Sage Realty account was purportedly
transitioned from the Convertible Arbitrage Strategy to the
Split Strike Strategy.  Four months before Madoff's arrest, the
Sage Associates account was placed in the Split Strike Strategy.
The Sages do not seek principal credit for the proceeds of the
split strike trading that was reported in either account.

## C. Evidence Related to Directed and Authorized Trading

At trial, the Sages presented testimonial and documentary evidence in support of their claim that Malcolm Sage "directed and authorized" the trading activity that was reported on customer account statements of the Sage Accounts. (Joint Pre-Trial Report at 10.) The Sages relied primarily on the testimony of Malcolm Sage, who testified concerning his relationship with Madoff and his experience "managing" the family's IA Business accounts. The Sages also introduced portions of Madoff's November 2017 deposition in this case, as well as several letters that Malcolm sent to Madoff and Annette Bongiorno.

### 1. Malcolm's Testimony[8]

At trial, Malcolm testified that his parents, Maurice and Lillian Sage, were among Madoff's earliest investors and first opened a brokerage account with BLMIS sometime in "the 1960s or early 1970s." (Declaration of Malcolm Sage ("Malcolm Decl.") ¶ 15.) After his father's sudden death in 1976, Malcolm and his two siblings became equal beneficiaries in a trust created under their father's will. (Id. ¶ 23.) The trust included a portfolio of stocks invested with a separate stockbroker. (Id.

---

[8] The Trustee called Malcolm as a direct witness in his case-in-chief. Malcolm was cross-examined by his attorney and the Trustee's counsel questioned Malcolm again on redirect examination. The Sages presented Malcolm's direct testimony in the form of an affidavit.

23.)  On the advice of that stockbroker, who was nearing retirement, the siblings invested the portfolio with Madoff. (Id. ¶ 24.)  At the time, Lillian Sage also maintained a small portfolio with Madoff.  (Id. ¶ 22.)

Malcolm testified that for approximately 30 years, he was responsible for managing his family's accounts with Madoff. (Id. ¶ 37.)  Malcolm explained that as the manager of the Sage Accounts, he met with Madoff in the BLMIS offices once or twice a year and spoke with Madoff frequently over the phone.  (Id. 40; Trial Tr. 194:10-12.)  He testified that during his conversations with Madoff, he "authorized or directed Madoff as to what specific stocks to buy, sell, and hold in specific accounts, and in what trading strategies to engage."  (Malcolm Decl. ¶ 40.)

For example, Malcolm testified that in 1982, he directed Madoff sell the arbitrage investments held in the Sage Associates account and transition the account to the portfolio or "buy and hold" Strategy.  (Id. ¶ 148.)  Malcolm testified that over the course of the 1980s, he directed Madoff to buy and sell various portfolios of single name securities in the Sage Associates Account.  (Id. ¶¶ 148-74.)  According to Malcolm's testimony, between August 1982 and January 1983, he directed Madoff to buy a portfolio of six "blue chip" stocks, including Apple, Jerrico, Transworld Corp., Tandem Computers, Flow General

Inc., and Oak Industries Inc. (<u>Id.</u> ¶¶ 158-59.) Malcolm further
testified that this portfolio was held in the Sage Associates
account until he directed Madoff to sell the majority of the
securities in the account in January 1984. (<u>Id.</u> ¶ 194.)
Malcolm also testified that in March 1984, he directed Madoff to
purchase a second portfolio of "blue chip stocks," consisting of
American Express, International Business Machines Corp., General
Electric, Schlumberger, AMR, and Digital Equipment. (<u>Id.</u> ¶¶
161, 163.) Malcolm testified that he directed Madoff to
purchase a third portfolio of stocks, comprised of positions in
Disney, Upjohn, Anheuser Busch, and Boise Cascade, in May 1985.
(<u>Id.</u> ¶ 166.)

In support of Malcolm's claims, the Sages offered several
letters sent by Malcolm to BLMIS ("Sage Letters"). The undated
letters were recovered from BLMIS's books and records during the
Trustee's investigation. (Dubinsky Decl. ¶ 220.) At trial, the
Trustee did not contest the authenticity of the letters and did
not challenge Malcolm's testimony concerning when the letters
were written.

The first Sage Letter, which was discovered in Bongiorno's
November 2001 "month-end folder," instructs Madoff to "realize
approximately $600,000 . . . of gain" in the Sages' naked short
account and requests that Madoff execute seven transactions
involving seven different single name securities held in the

36

Sages Associates Account and Sage Associates II Account. (Id.
¶¶ 177-187; DX-AE.) The second letter, written in December 2002
("December 2002 Letter"), is addressed to Bongiorno's attention
and requests that Madoff facilitate a $25,000 cash withdrawal
and close out various short positions. (Malcolm Decl. ¶¶ 194-
97; DX-AT.) The third letter, from January 2003, instructs
Madoff to purchase stock in two companies prior to January 30,
2003, in order to avoid tax liability related to previous
transactions reportedly executed in a Sage Associates account.
(Malcolm Decl. ¶ 214; DX-BA.) In a fourth letter, from December
2003, Malcolm requests that Madoff execute five different
transactions involving five different single name securities.
(DX-CC.) The letter also contains a request for a $16,000 cash
withdrawal. (Id.) At trial, Malcolm testified that the
requested transactions were intended to reduce the margin debt
in the relevant accounts. (Trial Tr. 259:23-260:7.)

In a fifth letter proffered by the Sages, purportedly from
November 2004, Malcolm expresses a desire to buy back into eBay
after selling eBay "short against the box" in April 2004. (DX-
CO.) At trial, Malcolm testified that Madoff called him after
receiving the letter and, during the phone call, he directed
Madoff to sell certain securities at the beginning of 2005 in
order to facilitate the purchase of eBay stock. (Trial Tr.
264:1-25; Malcolm Decl. ¶ 248.)

37

Malcolm testified that sometime in 2005, he and his
siblings discussed selling the security positions in the Sage
Associates account and transitioning the account into the Split
Strike Conversion Strategy. (Malcolm Decl. ¶¶ 253-55.)
According to Malcolm, he was growing increasingly concerned with
losses in the account and, after two decades of managing his
family's investments with BLMIS, he was nearing "the end . . .
of [his] rope."  (Id. ¶ 253; Trial Tr. 267:9-10.)  In a May 2006
letter to Madoff, Malcolm inquired if Madoff had "shorted [eBay]
against the box a while back" and stated, "if that was done, we
should start to begin the process of selling our holdings and
moving into [split strike] as we had discussed[.]"  (DX-CP.)
Within weeks of sending this letter, Malcolm sent a follow up
letter requesting that Madoff "not buy back into the eBay short
position."  (DX-CS.)  Malcolm testified that during the summer
of 2006, he decided against transitioning the Sage Accounts into
Split Strike and instead "continu[ed] to authorize and direct
trading in the accounts, as [he] had always done."  (Trial Tr.
276:17-19.)

According to Malcolm's testimony, he again considered
transitioning the Sage Accounts to Split Strike in December
2006.  (Malcolm Decl. ¶ 273.)  Malcolm testified that in order
to begin the transition, he directed Madoff to sell positions in
Abercrombie & Fitch, Apple, Disney, and eBay in December 2006

and January 2007.  (Id. ¶ 274.)  He testified that sometime in
January 2007, he again reversed his decision on the transition
and directed Madoff to purchase positions in Medco, Priceline,
and U.S. Treasuries.  (Id. ¶ 276.)

According to Malcolm's testimony, he directed and
authorized Madoff to purchase various single name securities in
the Sage Accounts over the course of 2007. (Id. ¶ 278.)  Malcolm
testified that in December 2007, he directed Madoff to sell all
of the security positions in the Sage Associates account, which
generated a reported profit of $23,534,857.25.  (Id. ¶¶ 281–83.)
According to Malcolm, he then directed Madoff to invest the
proceeds of the sale in a U.S. Treasury Bill and Treasury money
market fund.  (Trial Tr. 281:2–9.)  Malcolm testified that in
April 2008, he directed Madoff to sell the Treasury bill in
order to facilitate a $10 million cash withdrawal.  (Id. 283:1–
11.)  The withdrawal was used by Malcolm and his siblings to pay
local, state, and federal income taxes.  (Id. 283:6–11.)

Malcolm further testified that in August 2008, he directed
Madoff to transition the remaining equity purportedly held in
the Sage Accounts into the Split Strike Conversion Strategy.
(Malcolm Decl. ¶ 290.)

### 2. Madoff's Discretion Over Trading in the Sage Accounts

During his in-court testimony, Malcolm was questioned extensively about the discretion Madoff had over the trading activity in the Sage Accounts. Malcolm testified that although he "authorized or directed" the trading in the various accounts, Madoff had full discretion over the timing and price of trades. (Trial Tr. 213:1-3.) Malcolm further testified that he did not "direct" or approve of every trade that was reportedly executed in the Sage Accounts. (Id. 65:19, 70:3-71:6.) Instead, Malcolm stated that he authorized Madoff to operate "within certain guardrails," which "limited [Madoff's] discretion" to purchase and sell securities without prior approval. (Id. 57:7-9.) He testified that one such "guardrail" was that Madoff could not sell a position that the Sages had held for over a year without his approval. (Id. 219:23-220:4.)

In support of Malcolm's claims, the Sages proffered excerpts of Madoff's November 2017 deposition in this case. Specifically, the Sages noted that during the deposition, Madoff testified that the Sages "would give instructions to [him regarding] what they wanted to buy and . . . when they wanted to sell it and so on" and "directed [him] on . . . whether to buy or sell specific securities." (Madoff Nov. 8, 2017 Deposition 400:1-12.) Madoff further testified that this kind of relationship was "atypical" and "unusual" for IA Business customers. (Id.)

### 3. Trustee's Evidence in Response to Sages' Directed Trading Claim

In response to the Sages' evidence concerning Madoff's discretion, the Trustee proffered excerpts from Malcolm's 2017 deposition in this case, which was admitted into evidence without objection.  Reading from the transcript, counsel for the Trustee noted that Malcolm had responded "[n]o" when asked if "there was a limit to the amount of money [Madoff] could spend on a stock purchase without [his] approval."  (Malcolm Nov. 15, 2017 Deposition 302:11–14, TX-093.)  Counsel for the Trustee also noted that Malcolm, when describing Madoff's discretion, had testified that "[i]f Madoff saw market conditions . . . where he felt he needed to short the box, he had that discretion. . . . Madoff was a broker; he was close to the market.  As long as he followed our general strategy, he had this type of discretion to sell stocks or purchase stocks." (Id. 300:6–18.)

The Trustee also elicited testimony from Dubinsky in response to the Sages' claims of directed and authorized trading.  Dubinsky credibly testified that during his investigation of the Sage Accounts, he "did not find evidence to support" the conclusion that the trading strategies and transactions reported in the Sage Accounts were the result of Malcolm's directions or authorizations. (Dubinsky Decl. ¶ 187.)

Regarding the investment strategies used in the accounts,
Dubinsky testified that the changes in the strategies
purportedly used in the Sage Accounts largely mirrored the
changes BLMIS made generally to other IA Business accounts over
the course of the Ponzi Scheme.  (Id. ¶ 188.)  Dubinsky
testified that despite Malcolm's claim that the Sage Accounts
were taken out of the Convertible Arbitrage Strategy at his
direction, various Sage Accounts remained in convertible
arbitrage until the IA Business transitioned all convertible
arbitrage accounts to Split Strike in 1997.  (Id. ¶ 189;
Bongiorno Decl. ¶ 24.)

Similarly, Dubinsky testified that the BLMIS books and
records refute Malcolm's claim that the non-split strike trades
reported in the Sage Accounts were executed at his direction or
in accordance with his authorizations.  (Id. ¶ 226.)  For
example, Dubinsky testified that the securities identified in
the Sage letters and the securities purportedly purchased in the
1985 portfolio were also reportedly purchased in several other
IA Business accounts during the same period.  (Id.)  Dubinsky
found that between January 2000 and November 2008, the 23 unique
securities mentioned in the Sage Letters were reportedly traded
1,789,026 times across 6,278 individual IA Business accounts.
(Id. ¶ 227.)  Dubinsky also identified several instances where
20 of the 23 unique securities were purportedly traded in at

42

least 90 other IA Business accounts on the same day as the Sage
Accounts.  (Id. ¶ 228; TX-682.)  Finally, Dubinsky noted that
although specific security positions are referenced in the Sage
Letters, the letters do not contain specific instructions to
purchase stocks.  (Dubinsky Decl. ¶ 226.)  Instead, the letters
simply reflect requests to transfer existing stock or close out
existing positions.  (Id.)  Dubinsky testified that based on his
investigation, he did not believe that Malcolm Sage directed or
authorized the more than 5,200 transactions that were reportedly
executed in the Sage Accounts between 1984 and 2008.  (Id. ¶¶
220, 236.)

### 4. Findings of Fact Regarding Directed and Authorized Trading

In a bench trial, "[i]t is within the province of the
district court as the trier of fact to decide whose testimony
should be credited."  Krist v. Kolombos Rest. Inc., 688 F.3d 89,
95 (2d Cir. 2012).  "[A]s trier of fact, the judge is 'entitled,
just as a jury would be . . . to believe some parts and
disbelieve other parts of the testimony of any given witness.'"
Id. (quoting Diesel Props S.r.l. v. Greystone Business Credit II
LLC, 631 F.3d 42, 52 (2d Cir. 2011) (internal citations
omitted)).

In light of the Trustee's documentary evidence, Dubinsky's
testimony, and Malcolm's admission that Madoff had discretion

over the timing and price of trades in the Sage Accounts, the
Court finds that the transactions reflected on the Sages'
customer account statements were the product of Madoff's after-
the-fact fabrications, not the directions and authorizations of
Malcolm Sage.  In arriving at this conclusion, the Court does
not discredit the entirety of Malcolm's testimony.  In fact, the
Court credits Malcolm's testimony that he frequently discussed
trading and trading strategy with Madoff and occasionally
instructed Madoff to execute specific transactions, as evinced
by the instructions contained in the various Sage Letters.  The
Sages' evidence, however, falls well short of corroborating
Malcolm's claim that all of the transactions reported in the
Sage Accounts were the product of his directions or
authorizations.

        The weight of the evidence demonstrates that the over 5,200
transactions reported in the Sage Accounts were fabricated at or
near month's end using historical pricing information.  The
Court specifically credits Bongiorno's testimony that the
details of the fabricated transactions, such as the stock at
issue and the timing of the backdated trade, were manufactured
by Madoff and other IA Business personnel.  The Court also
credits Bongiorno's testimony that Madoff directed her to
manufacture losses in the Sage Accounts when the purported
equity in the accounts exceeded his benchmark rate of return.

Bongiorno's testimony is corroborated by documentary evidence
proffered by the Trustee and the expert testimony of Dubinsky,
which demonstrated that the transactions reported in the Sage
Accounts were not unique.

### D. The Sage Accounts on the Filing Date

On the Filing Date, the Sages had the following open
accounts at BLMIS: Sage Associates, Sage Realty, Maurice S. Sage
Foundation Inc. ("Sage Foundation"), and MMRN Associates
("MMRN"). (Stipulation ¶ 24.) Each account was maintained
under multiple BLMIS account numbers throughout the lifetime of
the account. (Id.) The final customer statements received by
the Sages for their various accounts, dated November 30, 2008
("Last Statements"), reflected the following balances in the
five accounts:

  (1) Sage Associates (1-S0547): $14,395,035.54

  (2) Sage Associates II (1-S0548): $1,096,061.40

  (3) Sage Realty (1-S0316): $3,530,385.49

  (4) Sage Foundation (1-S0549): $792,674.56

  (5) MMRN (1-M0124): $4,514,983.20.

(Id.) On June 18, 2009, the Sages filed customer claims in the
name of each account in the BLMIS SIPA proceeding seeking
compensation for the securities reflected on the Last Statements
of each account. (Id. ¶¶ 26-27.) With respect to the accounts
at issue in the instant adversary proceedings, the Sages'

45

customer claim for the Sage Associates Account (Account No. 1-
S0547) sought compensation for the securities reflected on the
Last Statement of the account in the amount of $14,395,035.54.
(Id. ¶ 28.)  For the Sage Realty Account (Account No. 1-S0316),
the Sages' sought to recover $3,530,384.79.  (Id. ¶ 29.)  The
Trustee, applying the Net Investment Method, denied both claims
on the grounds that the Sages' cash withdrawals exceeded their
cash deposits.  (Id. ¶¶ 28-32.)  Over the lifetime of the
accounts, the Sages deposited $1,005,549 in cash and principal
and withdrew a total of $28,811,737.  (Declaration of Matthew
Greenblatt ("Greenblatt Decl.") ¶ 42.)

### E. Evidence of Partnership Liability

Finally, the Court turns to the evidence proffered at trial
concerning the Trustee's claim that the entity defendants, Sage
Associates and Sage Realty, were partnerships and the individual
defendants, Malcolm Sage, Martin Sage, and Ann Sage Prasser,
were general partners of both entities at all relevant times.

The documentary and testimonial evidence established that
the Sages shared in the profits and losses of the entities based
on their ownership interests.  As for Sages Associates, each
Sage sibling maintained a one-third beneficial interest in the
entity.  (Trial Tr. 170:4-5.)  Each sibling also held an
interest in Sage Realty, however, the size of their respective
interests fluctuated over time.  (See, e.g., TX-739 (2006

46

Schedule K-1) at 15; TX-745 (2007 Schedule K-1) at 17; TX-751
(2008 Schedule K-1) at 18.)

Although the Sages did not enter into a partnership
agreement, they held themselves out as general partners of the
entity defendants to various third parties, including federal
and state tax authorities and the Bankruptcy Court.  For
example, both Sage Associates and Sage Realty filed federal,
state, and New York City partnership tax returns.  (See, e.g.,
TX-750; TX-751; TX-711; TX-714.)  On the Sage Associates'
federal returns, Malcolm identified himself as the entity's "Tax
Matter Partner."  (See, e.g., TX-750.)  The federal returns also
identified the Sages as owning a 50 percent or more interest in
the profit, loss, or capital of both Sage Associates and Sage
Realty.  (Id.)  The Schedule K-1 IRS forms issued by both
entities referred to each sibling as a "General Partner."  (Id.)
As for this litigation, Malcolm Sage signed the customer claims
for Sage Associates and Sage Realty as a "General Partner" of
both entities.  (TX-143.)  In their answer to the Trustee's
complaint, the Sages' represented that Sage Associates and Sage
Realty were New York partnerships and identified themselves as
"partners" of both entities.  (TX-148; TX-149.)

In response to the Trustee's evidence, the Sages argued
that they cannot be held jointly and severally liable as
"general partners" of the entity defendants because they never

47

intended to form a partnership and operated both Sage Associates
and Sage Realty as tenancies in common.  Specifically, Malcolm
claimed that he and his siblings only identified Sage Associates
and Sage Realty as partnerships for tax purposes.  (Trial Tr.
175:25–176:3.)  Malcolm also testified that the profits of both
entities were distributed based on the ownership interest of
each sibling.  The Sages conceded that they filed both federal
and state partnership tax returns.

## III. Conclusions of Law

In light of the foregoing findings of fact, the Court
reaches the following conclusions of law.  As noted previously,
the dispositive issue in these consolidated cases is whether the
Trustee can use the Net Investment Method to calculate the net
equity of the Sage Accounts.  The Sages argue that because
Malcolm purportedly directed and authorized the trading in their
accounts, the Trustee is required to employ the Last Statement
Method and credit the securities reported in their final account
statements when calculating net equity.  In support of this
argument, the Sages rely on the text of SIPA and various Second
Circuit decisions addressing the use of the Net Investment
Method in SIPA liquidations.  Under the Last Statement Method,
the Sages contend that they are entitled to net equity claims of
$13,887,147 for the Sage Associates account and $2,124,390 for
the Sage Realty account.

48

The Sages further argue that even if the Net Investment
Method is applied, they are entitled to "credits of principal"
for the proceeds of the non-split strike trades reported in the
Sage Accounts.  According to the Sages, because the trades were
"directed or authorized" by Malcolm, the Trustee is required to
treat them as "principal" when calculating "net equity" under
the Net Investment Method.  Under this theory, the Sages contend
that the Sages Associates and Sage Realty accounts have a net
equity balance of $1,253,016 and -$3,020,610 respectively.  As
for the Trustee's claim in the consolidated avoidance actions,
the Sages argue that regardless of the method used to calculate
the value of the Sage Accounts, the Trustee has failed to
establish that the transfers at issue can be avoided and
recovered under 11 U.S.C. § 548(a)(1)(A).

In response, the Trustee argues that the plain language of
SIPA, as well as the Second Circuit cases cited by the Sages,
support the use of the Net Investment Method to calculate the
net equity of the Sage Accounts, regardless of whether Malcolm
directed or authorized trading in the accounts.  The Trustee
also argues that Malcolm Sage, Martin Sage, and Ann Sage Passer,
are jointly and severally liable for any judgment entered
against Sage Associates and Sage Realty because the Sages are
general partners of both entities.  The Trustee seeks

prejudgment interest at a rate of four percent accruing from the commencement of the liquidation proceeding in 2008.

For the reasons set forth below, the Court concludes that the Trustee's use of the Net Investment Method to calculate net equity in this case is consistent with the text and purpose of SIPA and the Second Circuit's relevant decisions. The Court further concludes that the Trustee has established a prima facie case under 11 U.S.C. § 548(a)(1)(A) and can avoid and recover the "fraudulent transfers" received by the Sages in the two years leading up to the Filing Date. The Court also concludes that the Sages are jointly and severally liable for the judgment as general partners of Sage Associates and Sage Realty. The Court does not, however, conclude that prejudgment interest is appropriate in this case.

### A. Applicable Law

To fully understand the Sages' legal objections to the Trustee's use of the Net Investment Method, an overview of SIPA and the Second Circuit's decision in In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d 229, 233 (2d Cir. 2011) ("Net Equity Decision") is necessary.

### 1. The Securities Investor Protection Act

As discussed previously, "SIPA establishes procedures for liquidating failed broker-dealers and provides their customers with special protections. In a SIPA liquidation, a fund of

50

'customer property,' separate from the general estate of the failed broker-dealer, is established for priority distribution exclusively among customers.  The customer property fund consists of cash and securities received or held by the broker-dealer on behalf of customers, except securities registered in the name of individual customers.  15 U.S.C. § 78lll(4)."  Net Equity Decision, 654 F.3d at 233.

Under SIPA, customers of the failed broker-dealer are entitled to a pro rata share of that fund "to the extent of their respective net equities."  15 U.S.C. § 78fff-2(c)(1)(B).  "Net equity," in turn, is defined as: "the dollar amount of the accounts or accounts of a customer," which is determined by "calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date . . . all securities positions of such customer" minus "any indebtedness of such customer to the debtor."  15 U.S.C. § 78lll(11).  Particularly relevant in this liquidation, "SIPA provides that the Trustee should make payments to customers based on 'net equity' insofar as the amount owed to the customer is 'ascertainable from the books and records of the debtor or [is] otherwise established to the satisfaction of the trustee.'"  Id. at 237 (emphasis in original) (quoting § 78fff-2(b)).

In the event the fund of customer property is insufficient
to satisfy the "net equity" claims of each customer, the trustee
is authorized under SIPA and the Bankruptcy Code to pursue
recovery from customers who received fraudulent transfers of
customer property from the failed broker-dealer.  See In re
Bernard L. Madoff Inv. Sec. LLC, 424 B.R. 122, 136 (Bankr.
S.D.N.Y. 2010) ("Net Equity Bankruptcy Decision"), aff'd, 654
F.3d 229 (2d Cir. 2011) ("SIPA and the [Bankruptcy] Code
intersect to . . . grant a SIPA trustee the power to avoid
fraudulent transfers for the benefit of customers."); see also
15 U.S.C. § 78fff-1(a) ("A trustee shall be vested with the same
powers and title with respect to the debtor and the property of
the debtor, including the same rights to avoid preferences, as a
trustee in a case under Title 11.").  To avoid and recover such
property, the Trustee must establish three elements: (1) a
transfer of the interest of the debtor in property; (2) made
within two years of the bankruptcy; (3) with actual intent to
hinder, delay, or defraud a creditor.  11 U.S.C. § 548(a)(1)(A).

Pursuant to this statutory scheme, the Trustee in this SIPA
liquidation is charged with both recovering customer property—
i.e., the fictitious profits transferred from BLMIS to IA
Business customers—and distributing recovered customer property
to former BLMIS customers who have valid "net equity" claims.
See SIPC v. BLMIS (In re BLMIS), 499 B.R. 416, 420 (S.D.N.Y.

2013) ("Antecedent Debt Decision") (citing 15 U.S.C. §§ 78fff-
2(b)).  From the outset of this liquidation, "[t]he Trustee has
taken the position that . . . a customer's net equity and the
amounts sought in avoidance and recovery proceedings (assuming
the customer's good faith) are two sides of the same coin."  Id.
Applying the Net Investment Method, the Trustee has calculated
the net equity of former BLMIS accounts by "crediting the amount
of cash deposited by the customer into his or her BLMIS account,
less any amounts withdrawn from it."  Net Equity Decision, 654
F.3d at 233.  Accordingly, the Trustee has limited "the class of
customers who have allowable claims against the customer
property fund to those customers who deposited more cash into
their investment accounts than they withdrew, because only those
customers have positive 'net equity' under" the Net Investment
Method.  Id.  In the context of the avoidance proceedings, the
Trustee has "engaged in the same 'netting' process and has
brought avoidance actions for the amount in excess of their
deposits against those investors who withdrew more money from
their accounts than they deposited . . . ."  Antecedent Debt
Decision, 499 B.R. at 421.

### 2. The Second Circuit's Net Equity Decision

In 2011, the Second Circuit upheld the Trustee's use of the
Net Investment Method to calculate the net equity of BLMIS
customers who had invested exclusively in Madoff's fraudulent

53

Split Strike Conversion strategy ("Split Strike Claimants").
See Net Equity Decision, 654 F.3d at 239.  At the Second
Circuit, the Split Strike Claimants argued that the language of
SIPA obligated the Trustee to apply the Last Statement Method
and calculate their net equity based on the "the market value of
the securities reflected on their last BLMIS customer
statements."  Id. at 233.  Rejecting this argument, the Second
Circuit noted that the language of SIPA "does not prescribe a
single means of calculating 'net equity' that applies in the
myriad circumstances that may arise in a SIPA liquidation."  Id.
at 235.  The Second Circuit held, however, that given "the
extraordinary facts" of the Madoff Ponzi scheme, the use of the
Net Investment Method was "superior to the Last Statement Method
as a matter of law," id. at 238 n.7, because it was consistent
with the text of SIPA and the underlying purpose of the statute,
id. at 236–40.

Regarding the statute's text, the Second Circuit noted, "a
SIPA trustee's obligation to reimburse customers based on 'net
equity' must be considered together with SIPA's requirement that
the Trustee discharge 'obligations of the debtor to a customer
relating to, or net equity claims based upon . . . securities .
. . insofar as such obligations are ascertainable from the books
and records of the debtor or are otherwise established to the
satisfaction of the trustee.'"  Id. at 237 (citing 15 U.S.C. §

54

78fff-2(b)(2)).  In the case of BLMIS, the Second Circuit
observed that Madoff's books and records, including the customer
account statements of the Split Strike Claimants, were entirely
fraudulent and reflected fictitious trades that were constructed
"after-the-fact . . . to reflect a steady and upward trajectory
in good times and bad[] and were arbitrarily and unequally
distributed among customers."  Id. at 238.  In light of these
facts, the Second Circuit held that the Net Investment Method
and its exclusive reliance "on unmanipulated withdrawals and
deposits[,]" id., "was more consistent with the statutory
definition of 'net equity' than any other method advocated by
the parties or perceived by [the] Court[,]" id. at 235.

    As for the statute's purpose, the Second Circuit concluded
that the use of the Net Investment Method furthered SIPA's "dual
purpose: to protect investors, and to protect the securities
market as a whole."  Id. (citing Sec. Inv. Prot. Corp. v.
Barbour, 421 U.S. 412, 415 (1975)).  The Court reasoned that
applying the Last Statement Method to "net winner" claimants
would reduce the amount of customer property available to
claimants who had not yet recovered their principal investment.
Id.  Such a result, "would have the absurd effect of treating
fictitious and arbitrarily assigned paper profits as real and
would give legal effect to Madoff's machinations."  Id.

In dicta, the Second Circuit cautioned that although "the extraordinary facts of this case make the Net Investment Method appropriate," there are "many instances[ ] [where] it would not be." Id. at 238.  The Court noted that in "more conventional cases," a claimant's "last account statement will likely be the most appropriate means of calculating 'net equity' . . . ."  Id. Specifically, the Court noted that "[t]he Last Statement Method, for example, may be appropriate when securities were actually purchased by the debtor, but then converted by the debtor. Indeed, the Last Statement Method may be especially appropriate where—unlike with the BLMIS accounts at issue in this appeal—customers authorize or direct purchases of specific stocks." Id.

### B. Discussion

#### 1. The Use of the Net Investment Method is Sound as a Matter of Law

The Sages argue that the text of SIPA, the purpose of the statute, and the Second Circuit's Net Equity Decision support their position that the Trustee must credit the securities listed on their final account statements when calculating their net equity.  The Trustee disagrees, arguing that his decision to ignore the fictitious security positions and rely exclusively on cash deposits and withdrawals when calculating the net equity of the Sage Accounts is consistent with the Net Equity Decision and

other relevant Second Circuit precedent.  The Court agrees with
the Trustee.

### a) The Net Investment Method is Consistent with the Plain Language of SIPA

The Court "begins where all such inquires must . . . with
the language of the statute itself."  United States v. Ron Pair
Enters., Inc._, 489 U.S. 235, 241 (1989).  As noted previously,
SIPA requires the Trustee to "discharge Net Equity claims only
'insofar as such obligations are [1] ascertainable from the
books and records of the debtor or [2] are otherwise established
to the satisfaction of the trustee.'"  Net Equity Bankruptcy
Decision, 424 B.R. at 135.  The Sages submit that because
Malcolm purportedly "directed or authorized" the trading in the
Sage Accounts, the security positions reflected on their account
statements are "obligations" of BLMIS that are "ascertainable
from [BLMIS's] books and records."  Sage Proposed Findings of
Fact and Conclusions of Law ¶ 58 (citing 15 U.S.C. § 78fff-
2(b)).  The Sages contend that pursuant to § 78fff-2(b), the
Trustee is required to give principal credit for those
"obligations" when calculating the net equity in the Sage
Accounts.  The Court disagrees.

The Trustee properly concluded that the fictitious security
positions reported on the Sages' account statements are not
ascertainable "obligations" of BLMIS for purposes of 15 U.S.C. §

57

78fff-2(b). The Sages' account statements reflect fraudulent transactions that were fabricated by Madoff and other IA Business personnel at or near the end of each month using historical pricing information and the benefit of hindsight. As the bankruptcy court has previously noted, Madoff's "practice of backdating allowed [him] to engineer trades on the perfect dates at the best available prices to guarantee [his desired] results." Net Equity Bankruptcy Decision, 424 B.R. at 130. During the trial, Malcolm testified that Madoff had significant discretion over the trading in the Sage Accounts, including complete discretion over the price and timing of each trade. (See Trial Tr. 213:1-3.) Unbeknownst to Malcolm, Madoff used this discretion to fabricate backdated trades that were designed to keep the Sage Accounts "in line" with his predetermined rates of return. The reported transactions were fictitious not only because they did not occur, but because they could not have taken place. As the evidence adduced at trial established, the date, price, and size of each trade were fabricated weeks, sometimes months after the transaction was reportedly executed.

Accordingly, for the purpose of calculating net equity under SIPA, the Sages' customer account statements are no different from the customer account statements at issue in the Net Equity Decision. Here, as there, "the profits recorded over time on the customer statements were after-the-fact constructs

58

that were based on stock movements that had already taken place
. . . ." Net Equity Decision, 654 F.3d at 238. The details of
each transaction, including the price and timing of every trade,
were the product of Madoff's machinations, not the directions or
authorizations of Malcolm. The fictitious security positions in
the Sage Accounts, therefore, are "arbitrarily assigned paper
profits," id. at 236, "created by the perpetrator of the fraud,"
id. at 241. Consistent with the reasoning of the Net Equity
Decision, the Trustee declined to treat these security positions
as ascertainable "obligations" of BLMIS and instead relied
"'solely on unmanipulated withdrawals and deposits'" in the
accounts. Id. at 238 (quoting Net Equity Bankruptcy Decision,
424 B.R. at 140). The Court concludes that the Trustee's
decision comports with plain text of SIPA. See In re Bernard L.
Madoff Inv. Sec., LLC, No. 15 Civ. 1151 (PAE), 2016 WL 183492,
at *8 (S.D.N.Y. Jan. 14, 2016) ("Inter-Account Transfer
Decision") ("[T]he only entries in the 'books and records' that
have any anchor in reality are the transactions reflecting hard
cash entering and exiting the account."), aff'd sub nom. Matter
of Bernard L. Madoff Inv. Sec., LLC, 697 F. App'x 708 (2d Cir.
2017).

  **b) The Net Investment Method is Consistent with
      the Purpose of SIPA**

The Court also concludes that the use of the Net Investment Method in this case is consistent with the statute's "dual purpose: to protect investors, and to protect the securities market as a whole." Net Equity Decision, 654 F.3d at 235 (citing Sec. Inv. Prot. Corp. v. Barbour, 421 U.S. 412 (1975)). The Second Circuit has recognized that the "purpose of determining net equity under SIPA is to facilitate the proportional distribution of customer property actually held by the broker, not to restore to customers the value of the property that they originally invested." SIPC v. 2427 Parent Corp., 779 F.3d 74, 80 (2d Cir. 2015). This is because the goal of the Trustee's net equity calculation is to "achieve a fair allocation of the available resources among the customers." Net Equity Decision, 654 F.3d at 240.

In any Ponzi scheme, "permitting customers to retain [fraudulent] gains comes at the expense of the other customers." SEC v. Credit Bancorp, Ltd., No. 99 Civ. 11395 (RWS), 2000 WL 1752979, at *40 (S.D.N.Y. Nov. 29, 2000). In the Net Equity Decision, the Second Circuit recognized that calculating net equity "based on property that is a fiction . . . will necessarily diminish the amount of customer property available to . . . those who have not recouped even their initial investment[,]" and prevent the "fair allocation of the available

60

resources" to former BLMIS clients.  Net Equity Decision, 654
F.3d at 240.

As was true in the Net Equity Decision, crediting the
securities reported on the Sages' final customer account
statements "would have the absurd effect of treating fictitious
and arbitrarily assigned paper profits as real[,]" id. at 235,
and would diminish the amount of customer property available to
former BLMIS customers who have yet to recover their principal
investment.  Accordingly, because the security positions
reported on the Sages' final account statements are the product
of "impossible transactions," id. at 241–42, concocted using
historical pricing information, the Court concludes that the use
of the Net Investment Method is consistent with the purpose of
SIPA.  See Inter-Account Transfer Decision, 2016 WL 183492, at
*8 ("The core principle undergirding the Net Equity Decision is:
that the Trustee must calculate a customer account's net equity
in a manner that does not use the investment gains fabricated by
Madoff to augment a customer's investment principal.").

In arriving at this conclusion, the Court is mindful that
an unavoidable and unfortunate consequence of the Trustee's use
of the Net Investment Method is that the entirety of the Sages'
investment history will be wiped out.  There is no doubt that
the Sages profited tremendously from their IA Business accounts
over the course of their 26-year relationship with Madoff.  The

Sages, however, like so many other BLMIS customers, trusted
Madoff with their lifesavings.  At trial, Malcolm testified that
following his father's sudden death, he became responsible for
the financial wellbeing of his family, including his mother and
two siblings.  (Trial Tr. 206:15-20.)  Like his father before
him, Malcolm entrusted the family's finances to Madoff.  In one
of his letters to Madoff, Malcolm expressed his genuine
gratitude, writing:

> It has been my responsibility over the years to
> oversee the accounts on behalf of the family. I know
> that my mother, my brother, and my sister are deeply
> appreciative for what you have done for us in the 29
> years since my father died. Because I am more
> intimately involved, I am not only appreciative but
> amazed and dazzled. You have touched us, and our
> children, in a way that will affect future generations
> yet to come. For that I am humbled and grateful.

(TX-195.)  The adverse impacts of the Net Investment Method are
tragic for those who, like the Sages, relied on Madoff's
fraudulent representations and unwittingly received fraudulent
transfers of other customer's property.  As Judge Engelmayer
previously noted, "[i]n a real sense, any Madoff customer who
held a BLMIS account when Madoff's scheme came to light and was
unable to withdraw investment holdings on which he or she had
long relied was the victim of an epic unfairness."  See Inter-
Account Transfer Decision, 2016 WL 183492, at *16.

This unfairness, although disquieting for those who must
bear it, does not support deviating from the Net Investment

Method.  "'SIPA was not designed to provide full protection to
all victims of a brokerage collapse,' and 'arguments based
solely on the equities are not, standing alone, persuasive.'"
2427 Parent Corp, 779 F.3d at 81 (quoting SEC v. Packer, Wilbur
& Co., 498 F.2d 978, 983 (2d Cir. 1974)); see also Net Equity
Decision, 654 F.3d at 239 ("[I]t is clear that [SIPA] is not
designed to insure investors against all losses." (emphasis in
original) (citing Packer, Wilbur & Co., 498 F.2d at 983)).  In
the Net Equity Decision, the Second Circuit held that,
consistent with SIPA, the Net Investment Method prioritizes the
distribution of customer property to the "net loser" BLMIS
claimants.  Net Equity Decision, 654 F.3d at 240.  As the
bankruptcy court previously noted, "[e]quality is achieved in
this case by employing the Trustee's method, which looks solely
to deposits and withdrawals that in reality occurred.  To the
extent possible, principal will rightly be returned to Net
Losers rather than unjustly rewarded to Net Winners under the
guise of profits.  In this way, the Net Investment Method brings
the greatest number of investors closest to their positions
prior to Madoff's scheme in an effort to make them whole."  Net
Equity Bankruptcy Decision, 424 B.R. at 142; see also Net Equity
Decision, 654 F.3d at 238 ("The inequitable consequence of [the
Last Statement Method] would be that those who had already
withdrawn cash deriving from imaginary profits in excess of

63

their initial investment would derive additional benefit at the expense of those customers who had not withdrawn funds before the fraud was exposed."). Given the way Madoff fabricated the profit-generating transactions reported on the Sages' customer account statements, the Court concludes that the Trustee's use of the Net Investment Method comports with the purpose of SIPA as articulated by the Net Equity Decision.

### c) The Net Equity Decision Dicta Supports the Use of the Net Investment Method

In support of their position that the Last Statement Method should be used in this case, the Sages rely heavily on the Second Circuit's statement in dicta in the Net Equity Decision. As noted previously, the dicta in question reads as follows:

> In holding that it was proper for Mr. Picard to reject the Last Statement Method, we expressly do not hold that such a method of calculating "net equity" is inherently impermissible. To the contrary, a customer's last account statement will likely be the most appropriate means of calculating "net equity" in more conventional cases[] . . . because [the Net Investment Method] wipes out all events of a customer's investment history except for cash deposits and withdrawals. The extraordinary facts of this case make the Net Investment Method appropriate, whereas in many instances, it would not be. The Last Statement Method, for example, may be appropriate when securities were actually purchased by the debtor, but then converted by the debtor. Indeed, the Last Statement Method may be especially appropriate where—unlike with the BLMIS accounts at issue in this appeal—customers authorize or direct purchases of specific stocks.

Net Equity Decision, 654 F.3d at 238 (citations omitted). The
Sages contend that because Malcolm purportedly "authorized or
directed" the trading in their accounts, they are unlike the
Split Strike Claimants in the Net Equity Decision and the Last
Statement Method is the "most appropriate" method for
calculating the net equity of their accounts. Id.

As the Sages concede in their Proposed Findings of Fact and
Conclusions of Law, the Second Circuit's observation in dicta is
predicated on an assumption that customer account statements in
"more conventional cases" will reliably reflect security
positions that can be credited by a SIPA trustee when
calculating net equity. See Sage Proposed Findings of Fact and
Conclusions of Law ¶¶ 70-80. For example, in support of the
proposition that "the Last Statement Method may be especially
appropriate where . . . customers authorize or direct purchases
of specific stocks[,]" Net Equity Decision, 654 F.3d at 238, the
Second Circuit cited Miller v. DeQuine (In re Stratton Oakmont,
Inc.), No. 01 Civ. 2812 (RCC), 01 Civ. 2313 (RCC), 2003 WL
22698876 (S.D.N.Y. Nov. 14, 2003) ("Stratton Oakmont"). The
failed broker-dealer at issue in that case, the infamous
Stratton Oakmont, had purchased securities at the direction of
its clients and then sold those securities without their
client's authorization. See Stratton Oakmont, 2003 WL 22698876
at * 1. The customer account statements issued to Stratton

65

Oakmont customers, therefore, reflected real securities
transactions that had been executed in real-time and "exposed to
the uncertainties [and] fluctuations of the securities market."
Net Equity Decision, 654 F.3d at 232.

Conversely, the Sages' customer account statements "were
generated based on after-the-fact stock 'trades' using already-
published trading data to pick advantageous historical prices."
Id. As Judge Nathan noted in her opinion withdrawing the
reference in these consolidated cases, the Net Equity Decision
stands for the proposition that "if the customers' account
statements are based entirely on the fabrications of a
fraudulent debtor and . . . do not reflect any real securities
positions, then SIPA does not require the Trustee to rely on
those statements in determining amounts 'owed by the debtor' to
the customer for the purposes of net equity. . . . In such
cases, a method such as the Net Investment Method is more
appropriate." Sage Realty, 2021 WL 1987994, at *3 (internal
quotation marks and citations omitted). In the instant case,
the Sages' "account statements are entirely fictitious, do not
reflect actual securities positions that could be liquidated,
and therefore cannot be relied upon to determine Net Equity."
Net Equity Bankruptcy Decision, 424 B.R. at 135. Accordingly,
the Trustee properly declined to treat this as a "more
conventional case[]" where the Last Statement Method may be the

66

"most appropriate method for calculating 'net equity.'" Net
Equity Decision, 654 F.3d at 238.

### d) The Holding of New Times I Supports the Trustee's use of the Net Investment Method

Similar to the Split Strike Claimants before the Second
Circuit in the Net Equity Decision, the Sages also rely on a
pair of Second Circuit decisions, In re New Times Sec. Servs.,
Inc., 371 F.3d 68 (2d Cir. 2004) ("New Times I") and In re New
Times Sec. Services, Inc. (Stafford v. Giddens), 463 F.3d 125
(2d Cir. 2006) ("New Times II"), in support of their position
that the Last Statement Method is the most appropriate method
for calculating their net equity.

The New Times cases arose out of a Ponzi scheme in which
individuals were fraudulently induced into investing in either
"(i) one or more non-existent money market funds . . . [or] (ii)
shares of bona fide mutual funds (from, e.g., The Vanguard Group
and Putnam Investments), that were never, in fact, purchased . .
. ." New Times I, 371 F.3d at 71-72. Throughout the scheme,
the perpetrator issued fake monthly account statements that
reported fictitious profits and nonexistent security positions.
Id. at 71, 74. During the ensuing SIPA liquidation, the SIPA
trustee "divided the claimants into two groups." Net Equity
Decision, 654 F.3d at 240. The claimants who had been "misled
to believe that they were investing 'in mutual funds that in

67

reality existed'" ("the Real Securities Claimants") were treated
"as customers with claims for securities and [were] reimbursed .
. . based on their account statements." Net Equity Decision,
654 F.3d at 240. Conversely, the customers who were induced
into investing in bogus mutual funds that did not exist ("the
Fake Securities Claimants") were treated as customers with
claims for cash and their net equity was calculated using the
Net Investment Method. Id. The Fake Securities Claimants
objected, and the District Court sustained the objection,
"holding that they had claims for securities and that their net
equity should be determined by reference to their customer
statements." Id.

Reversing the District Court, the Second Circuit held that
the net equity of the Fake Securities Claimants "could not be
calculated by reference to the 'fictitious securities positions
reflected [on their] account statements.'" Id. (quoting New
Times I, 371 F.3d at 74). The Second Circuit concluded that the
Fake Security Claimants' net equity claims were "properly
calculated as the amount of money that the Claimants initially
placed with the Debtors to purchase the [fake mutual funds] and
does not include the artificial interest or dividend
reinvestments reflected in the fictitious account statements
that the Claimants received from the Debtors." New Times I, 371
F.3d at 88. Agreeing with a position espoused by the SEC in the

litigation, the Second Circuit noted that "basing customer
recoveries on fictitious amounts in the firm's books and records
would allow customers to recover arbitrary amounts that
necessarily have no relation to reality . . . [and] leaves the
SIPC fund unacceptably exposed."  Id. at 88 (internal quotation
marks and citation omitted).

In New Times II, a separate Second Circuit panel summarized
the reasoning behind the New Times I decision, noting that
"[t]he court declined to base the [Fake Securities Claimants']
recovery on the rosy account statements telling [them] how well
the imaginary securities were doing, because treating the
fictitious paper profits as within the ambit of the customers'
'legitimate expectations' would lead to the absurdity of 'duped'
investors reaping windfalls as a result of fraudulent promises
made on fake securities."  New Times II, 463 F.3d at 130
(quoting New Times I, 371 F.3d at 87–88).

The Sages argue that they are similarly situated to the
Real Securities Claimants in New Times I because the non-split
strike transactions reported in the Sage Accounts "mirrored what
would have happened had the given transactions[s] been
executed."  New Times I, 371 F.3d at 74.  Citing New Times II,
the Sages contend that the Second Circuit approved the use of
the Net Investment Method in the context of the Fake Security
Claimants because their reported security positions did not

69

exist in the market "and it was therefore impossible to
reimburse [the Fake Security Claimants] with actual securities
or their market value." New Times II, 463 F.3d at 129.  The
Sages submit that because their account statements reflect
transactions in real securities that were directed or authorized
by Malcolm, they are entitled to the value of the securities
listed on their final account.

The Sages' arguments are unavailing.  Similar to the Net
Equity Decision, the Second Circuit's decisions in New Times I
and New Times II "militate in favor" of using the Net Investment
Method is this case.  Net Equity Decision, 654 F.3d at 241.  The
Court recognizes that there are meaningful differences between
the Sages and the Fake Security Claimants in the New Times
liquidation.  As noted previously, Malcolm spoke to Madoff
personally about the trading activity in the Sage Accounts and,
according to Malcolm's testimony and undated letters,
occasionally instructed Madoff to execute specific transactions.
Nevertheless, despite these unique facts, the Sages remain
"similarly situated to the New Times [Fake Security Claimants]
in a crucial respect: assessing 'net equity' based on their
customer statements would require the Trustee to establish
[their] 'net equity' based on a fiction created by the
perpetrator of the fraud." Id.  The Sages' account statements
reflect backdated trades that were engineered to achieve rates

of return that were arbitrarily set by Madoff. "By backdating
trades to produce predetermined, favorable returns, Madoff, like
the fraudster in New Times, essentially pulled the fictitious
amounts from thin air." Net Equity Bankruptcy Decision, 424
B.R. at 139. Like the account statements of the Fake Securities
Claimants, the Sages' final account statements reflect security
positions that were "entirely divorced from the uncertainty and
risk of actual market trading," id., and, as a result, "have no
relation to reality," New Times I, 371 F.3d at 88.

The Sages are also easily distinguishable from the Real
Securities Claimants in the New Times cases. The initial
investment of each Real Securities Claimant was purportedly used
to purchase shares in a specific mutual fund. New Times I, 371
F.3d at 74. The customer account statements that the Real
Security Claimants received simply reflected the real-world
performance of the mutual fund that the customer believed they
were invested in. Id. As the bankruptcy court aptly noted,
"[t]he Real Securities Claimants' initial investments were
sufficient to acquire their securities positions, and the
corresponding paper earnings 'mirrored what would have happened'
had the fraudster purchased the securities as promised." Net
Equity Bankruptcy Decision, 424 B.R. at 140 (quoting New Times
I, 371 F.3d at 74). By contrast, the Sages' customer account
statements reflected thousands of backdated trades that were

71

engineered using already-published trading information.  The
fictitious profits generated by the backdated trades were used
by IA Business personnel, such as Annette Bongiorno, to
fabricate additional transactions and create new, fictitious
security positions in the Sage Accounts.  Unlike the Real
Security Claimants in the New Times liquidation, the Sages'
"initial investment[] [was] insufficient to acquire [the] . . .
securities positions" reflected on their final customer account
statements.  Id.  Accordingly, the Court rejects the Sages'
argument that their account statements are analogous to the
account statements received by the Real Securities Claimants in
the New Times cases.

Having considered the arguments of the parties and the
Second Circuit decisions cited by the Sages, the Court concludes
that the Trustee's use of the Net Investment Method is sound as
a matter of law.  Contrary to the Sages' assertions, New Times I
and the Net Equity Decision support the Trustee's decision to
rely "solely on unmanipulated withdrawals and deposits" when
calculating the "net equity" of the Sage Accounts.  Net Equity
Bankruptcy Decision, 424 B.R. at 140.  Like all account
statements at issue in this liquidation, the Sages' account
statements "reflect impossible transactions," Net Equity
Decision, 654 F.3d at 242, that were generated "after-the-fact .
. . based on stock movements that had already taken place[,]"

id. at 238. Accordingly, "assessing 'net equity' based on their customer statements would require the Trustee to establish [the Sages'] 'net equity' based on a fiction created by the perpetrator of the fraud." Id. at 241. The Court, therefore, concludes that the Net Investment Method "is superior to the Last Statement Method as a matter of law" for calculating the "net equity" of the Sage Accounts. Net Equity Decision, 654 F.3d at 241 ("It would . . . have been legal error for the Trustee to 'discharge claims upon the false premise that customers' securities positions are what the account statements purport them to be.'" (quoting Net Equity Bankruptcy Decision, 424 B.R. at 135)).

### 2. The Trustee Properly Denied the Sages' Customer Claims

The Court now turns to the Sages' objections to the Trustee's application of the Net Investment Method in the context of the Sage Associates and Sage Realty customer claims. As noted previously, shortly after this SIPA liquidation began, the Sages filed net equity claims on behalf of Sage Associates and Sage Realty. Applying the Net Investment Method, the Trustee denied both claims because the Sages had withdrawn more money from the accounts than they had deposited.[9] The Sages

---

[9] When calculating the net equity of the accounts, the Trustee credited the Sages' cash deposits and their deposit of certain real securities, which they had inherited from their father and delivered to Madoff

73

objected to the Trustee's determinations.  As relevant here,
only the Sage Associates objection remains pending.  (See Joint
Pre-Trial Report at 8.)  The Sages contend that under the Net
Investment Method, they are entitled to "net equity principal
credit" for the profits of their purported non-split strike
transactions because the transactions "mirrored reality and were
not a complete fiction invented by Madoff."  Sage Proposed
Findings of Fact and Conclusions of Law ¶ 133 (internal
quotation marks omitted).  This argument fails for two reasons.

First, as discussed at length above, the transactions
reported in the Sage Associates account were both fictitious and
invented by Madoff.  Although the fabricated transactions
involved real securities and historically accurate pricing
information, the trades were engineered retrospectively by
Madoff and other IA Business personnel.  The Trustee, therefore,
properly declined to treat the proceeds of the transactions as
"obligations of the debtor to a customer" for purposes of 15
U.S.C. § 78fff-2(b) and ignored the fake profits when
calculating the net equity of the Sage Accounts.

Second, under the Net Investment Method, net equity is
calculated by "crediting the amount of cash deposited by the

---

shortly after opening their IA business accounts.  (Stipulation ¶¶ 34-
48.)  The Trustee determined that over the life of the Sage Accounts,
the Sages deposited $1,005,549 in cash and principal. (Greenblatt
Decl. ¶ 41.)  The Sages withdrew or transferred a total of
$28,811,737.  Id.

customer into his or her BLMIS account, less any amounts withdrawn from it." Net Equity Decision, 654 F.3d at 233 (emphasis added). The method, accordingly, "limits the class of customers who have allowable claims against the customer property fund to those customers who deposited more cash into their investment accounts than they withdrew . . . ." Net Equity Decision, 654 F.3d at 233. Because the profits reported in the Sage Associates account were the product of fictious trading, rather than the investment of cash or principal, the Trustee properly determined that Sages Associates and Sage Realty have a negative net equity under the Net Investment Method. The Court, therefore, affirms the Trustee's denial of the Sage Associates customer claim and overrules the claims objection filed by Sage Associates.

### 3. The Trustee Has Established a Prima Facie Case Under 11 U.S.C. § 548

As noted previously, the Trustee seeks to avoid and recover $16,880,000 in transfers made by BLMIS to Sage Associates and Sage Realty pursuant to § 548(a)(1)(A) of the Bankruptcy Code. To avoid and recover transfers of fictitious profits under § 548(a)(1)(A), a trustee must establish three elements: (1) a transfer of the interest of the debtor in property; (2) made within two years of the bankruptcy; (3) with actual intent to hinder, delay, or defraud a creditor. 11 U.S.C. § 548(a)(1)(A).

75

If a trustee establishes a prima facie case, the transferee can retain the avoidable transfers only if they can show that the transfers were "take[n] for value . . . in good faith."  11 U.S.C. § 548(c); see also Picard v. Marshall (In re BLMIS), 740 F.3d 81, 90 n.11 (2d Cir. 2014) ("A recipient of a transfer is entitled to a 'good faith' defense upon a showing that it took the transfer 'for value' and 'in good faith.'" (quoting 11 U.S.C. § 548(c))).

The parties stipulate that the transfers in question were made within two years of the Filing Date.  (Joint Pre-Trial Report at 5.)  The Sages contend the Trustee has failed to establish that the transfers were "transfers of the interest of the debtor" for purposes of § 548(a)(1)(A) or that the transfers were made with the actual intent to defraud.  The Sages also claim that they are entitled to retain the disputed funds because they gave "value for [the] transfers . . . to the extent [the] transfers [were] comprised of principal."  Sage Proposed Findings of Fact and Conclusions of Law ¶ 154.  The Court address each of these arguments in turn.

### a) Transfer of an Interest of the Debtor in Property

According to the Sages, the Trustee is incapable of satisfying the first element as a matter of law because the bank accounts from which the transfers were made were owned by

Madoff's sole proprietorship, not BLMIS LLC.  The Trustee, in
response, argues that ownership of the relevant JPMorgan
Accounts was transferred from the sole proprietorship to the LLC
when the LLC was created in 2001.  The Court agrees with the
Trustee.

As an initial matter, the Court notes that every court to
address this issue has held that ownership of the JPMorgan
Accounts was transferred from Madoff's sole proprietorship to
the LLC in 2001.  See, e.g., Sec. Inv. Prot. Corp. v. Bernard L.
Madoff Inv. Sec. LLC ("Nissenbaum"), No. 20 Civ. 3140 (JGK),
2021 WL 1141638, at *10 (S.D.N.Y. Mar. 24, 2021), judgment
entered, No. 20 CV 3140 (JGK), 2021 WL 1167939 (S.D.N.Y. Mar.
25, 2021) ("There is no dispute of material fact that the IA
Business was part of the LLC, and as such, the Trustee has shown
that there was a transfer of an interest in the property of the
debtor."); Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec.
LLC (In re BLMIS), 624 B.R. 55, 61 (Bankr. S.D.N.Y. Dec. 11,
2020) ("BAM II") ("[T]his Court finds that all of the assets and
liabilities of the sole proprietorship, including the
[investment advisory] [b]usiness, were transferred to BLMIS
[LLC] via the 2001 SEC Amended Form BD.  As such, the
Defendants['] customer accounts and the Bank Accounts are
property of BLMIS [LLC] and the monies paid to Defendants from
those Bank Accounts must be turned over to the Trustee."

77

(footnote omitted)); <u>Picard v. Nelson</u>, 610 B.R. 197, 218 (Bankr.
S.D.N.Y. 2019) ("Madoff was not particularly attentive to the
names he used in operating his Ponzi scheme but his
representations made to the SEC confirm that Madoff Securities
ceased to operate on January 1, 2001.  At that moment, all of
its business and business property was transferred to BLMIS
[LLC].  No other person or entity retained any of that property
and the Chase Accounts were maintained by BLMIS [LLC] to hold
customer deposits . . . .").

Based on the evidence adduced at trial, the Court similarly
concludes that the Trustee has established that the transfers in
question were "transfers of an interest of the debtor in
property" for purposes of § 548(a)(1)(A).  As discussed above,
when Madoff converted his business from a sole proprietorship to
an LLC in 2001, he filed a Form BD document with the SEC.  (<u>See</u>
Dubinsky Decl. ¶ 49.)  Dubinsky testified that the Form BD
indicated that the assets of the sole proprietorship had been
transferred to the LLC, and that "none of the books, records,
funds, accounts, or securities of any customers were held by
another entity."  (<u>Id.</u> ¶ 51.)  The evidence establishes that by
the time the Form BD was filed, the JPMorgan Accounts were
controlled by BLMIS LLC.

The Sages did not present expert testimony in support of
their position that Madoff personally retained control over the

JPMorgan Accounts. Instead, they argue that the IA Business was never transferred to BLMIS, and was operated as an independent entity, because: (1) Madoff did not indicate on the Form BD that BLMIS was engaged in "investment advisory services," and (2) the account statements and checks received by the Sages bore the name "Bernard L. Madoff" or "Bernard L. Madoff Investment Securities," not BLMIS "LLC." (Stip. Of Facts. ¶¶ 16–19.) Neither of these arguments are persuasive. First, because the IA Business was not registered with the SEC until 2006, there was no need for Madoff to affirmatively indicate on the Form BD that the LLC was engaged in "investment advisory services" in 2001. (Dubinsky Decl. ¶ 64; TX-045.) Furthermore, when Madoff did register the IA Business, he registered it under BLMIS and used BLMIS's SEC registrant number. (TX-045.) Second, as Dubinsky credibly testified at trial, Madoff's representations on the Form BD clearly indicate that all assets of the sole proprietorship, including the JPMorgan Accounts and the "Bernard L. Madoff" and "Bernard L. Madoff Investment Securities" trade names, were transferred to BLMIS in January 2001. (Dubinsky Decl. ¶¶ 51–55.) The Court agrees with the bankruptcy court's observation that "forms filled out improperly [and] business names used interchangeably on bank accounts and checks . . . are the sleights of hand that one would expect to see when exhuming the remnants of a Ponzi scheme." BAM II, 624 B.R. at 60. The

Court, therefore, concludes that the transfers in question were
"transfer[s] of an interest in property of the debtor" as
contemplated by § 548(a)(1)(A).

### b) Intent to Defraud

The Court also concludes that the Trustee has established
that the transfers were made with the actual intent to hinder,
delay, or defraud some or all of BLMIS's creditors within the
meaning of § 548(a)(1)(A). It is well established in this
Circuit that "[t]he intent to hinder, delay or defraud creditors
is presumed if the Trustee can prove that (1) the transferor
operated a Ponzi scheme; and (2) the transfers made to the
transferee by the debtor were 'in furtherance' of the Ponzi
scheme." Nelson, 610 B.R. at 233; see also Picard v. JABA
Assoc. LP, 528 F. Supp. 3d 219, 236 (S.D.N.Y. 2021) ("It is well
established that the Trustee is entitled to rely on a
presumption of fraudulent intent when the debtor operated a
Ponzi scheme."). The Sages contend that the application of the
so-called "Ponzi scheme presumption" is inappropriate in this
case because "the parties are unrelated and operated at arm's
length, and [BLMIS] did not retain control of the transferred
property . . . ." Sage Proposed Findings of Fact and
Conclusions of Law ¶ 148. The Court disagrees.

In determining the applicability of the Ponzi scheme
presumption, courts consider "whether (1) deposits were made by

investors; (2) the debtor conducted little or no legitimate
business; (3) the debtor produced little or no profits or
earnings; and (4) the source of payments to investors was from
cash infused by new investors." See JABA, 528 F. Supp. 3d at
236 (citations omitted). "Because Ponzi schemes use investor
deposits rather than profits to pay returns, they are insolvent
and become more insolvent with each transaction." Nelson, 610
B.R. at 233 (citing Wiand v. Lee, 753 F.3d 1194, 1201 (11th Cir.
2014)). The presumption of actual intent in this context is
based on a recognition that the perpetrator of a Ponzi scheme
knows that the scheme will inevitably collapse when the pool of
investors runs dry, and the remaining investors will lose their
investments. See In re Bayou Grp., LLC, 439 B.R. 284, 306 n.19
(S.D.N.Y. 2010) ("Knowledge to a substantial certainty
constitutes intent in the eyes of the law, and awareness that
some investors will not be paid is sufficient to establish
actual intent to defraud." (internal quotation marks and
citation omitted)); see also Hayes v. Palm Seedlings Partners
(In re Agric. Rsch. & Tech. Grp.), 916 F.2d 528, 535 (9th Cir.
1990) ("[T]he debtor's actual intent to hinder, delay or defraud
its creditors may be inferred from the mere existence of a Ponzi
scheme.").

Here, Madoff admitted during his plea allocation that he
(1) ran a Ponzi scheme through the IA Business, (TX-07 at 23:15–

81

16); (2) did not execute trades on behalf of IA Business
customers, (id. at 24:9-17); and (3) paid redemption requests
with IA Business customer deposits, (id. at 23:18-22).  Madoff's
admissions are corroborated by the criminal plea allocutions of
former BLMIS employees, such as Frank DiPascali and David Kugel.
See TX-073 (DiPascali Plea Allocution) at 46:9-25 ("From at
least the early 1990s through December 2008 . . . [n]o purchases
or [sic] sales of securities were actually taking place in
[customers'] accounts."); TX-074 (Kugel Plea Allocution) at
32:1-19 ("I provided historical trade information to other BLMIS
employees, which was used to create false, profitable trades in
the Investment Advisory clients' accounts at BLMIS . . . [that]
gave the appearance of profitable trading when in fact no
trading had actually occurred.").  Additionally, Dubinsky's
expert report and trial testimony conclusively established that
the IA Business operated as a Ponzi scheme and no real
securities were purchased on behalf of IA Business customers.
Accordingly, the Court concludes that the Trustee is entitled to
the presumption that all transfers from BLMIS to the Sages in
the two years at issue were made with actual intent to defraud.
See In re Bernard L. Madoff Inv. Sec. LLC ("Chais"), 445 B.R.
206, 220 (Bankr. S.D.N.Y. 2011) ("The breadth and notoriety of
the Madoff Ponzi scheme leave no basis for disputing the
application of the Ponzi scheme presumption to the facts of this

case, particularly in light of Madoff's criminal admission.");
see also Picard v. RAR Entrepreneurial Fund, Ltd., No. 20 Civ.
1029 (JMF), 2021 WL 827195, at *4 (S.D.N.Y. Mar. 3, 2021)
("[T]here is ample admissible evidence to support a finding that
the transferor operated a Ponzi scheme and that the transfers
made . . . were in furtherance of that scheme—and no reasonable
factfinder could conclude otherwise.").

In support of the opposite conclusion, the Sages rely
heavily on Judge Steven Menashi's concurring opinion in Picard
v. Citibank, N.A. (In re BLMIS), 12 F.4th 171, 200 (2d Cir.
2021). As relevant here, Citibank involved two avoidance
actions brought by the Trustee to avoid and recover initial
transfers of BLMIS funds received by Legacy Capital Ltd. and
subsequent transfers of BLMIS funds received by Citibank N.A.,
Citicorp North America, Inc., and Khronos LLC. Id. at 178. In
his concurring opinion, Judge Menashi expressed concern that the
Ponzi scheme presumption improperly treats what would otherwise
be preferential transfers under 11 U.S.C. § 547 as fraudulent
transfers under 11 U.S.C. § 548. See id. at 201–202 ("By
treating preferential transfers to creditors as fraudulent
transfers in the context of a Ponzi scheme, the Ponzi scheme
presumption obscures the essential distinction between
fraudulent transfers and preferences" and improperly "uses
fraudulent transfer law rather than the law relating to

preferences to promote an equal distribution among creditors.")
Notwithstanding Judge Menashi's concerns, "the Ponzi scheme
presumption remains the law of this Circuit."[10] Bear Stearns
Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.), 397 B.R.
1, 11 (S.D.N.Y. 2007). Consequently, every court to opine on
the application of the presumption in the context of the BLMIS
Ponzi scheme has concluded that "the Trustee is entitled to the
benefit of the Ponzi Scheme Presumption, and so can prove
fraudulent intent as a matter of law." Picard v. Est. of
Seymour Epstein (In re BLMIS), No. 21 Civ. 02334 (CM), 2022 WL
493734, at *17 (S.D.N.Y. Feb. 17, 2022) ("Epstein") (collecting
cases). Consistent with those decisions and the Second
Circuit's prevailing precedent, this Court concludes that the
presumption applies in this case and the Trustee has satisfied
the fraudulent intent requirement of 11 U.S.C. § 548(a)(1)(A).

### c) The "For Value" Defense

The Sages argue that even if Trustee can establish a prima
facie case under § 548(a)(1)(A), they are entitled to retain the
transferred funds because they took the transfers "for value"

---

[10] The Court also notes that the Ponzi scheme presumption has been
adopted by federal courts of appeals throughout the country. See
Janvey v. Brown, 767 F.3d 430, 438-39 (5th Cir. 2014); Emerson v.
Maples (In re Mark Benskin & Co., Inc.), 59 F.3d 170 (6th Cir. 1995);
Scholes v. Lehmann, 56 F.3d 750, 757 (7th Cir. 1995); Donell v.
Kowell, 533 F.3d 762, 770 (9th Cir. 2008); Klein v. Cornelius, 786
F.3d 1310, 1320 (10th Cir. 2015); Perkins v. Haines, 661 F.3d 623, 626
(11th Cir. 2011).

within the meaning of § 548(c).  In an avoidance action such as

this one, "a transferee who takes for value and in good faith

may retain any interest transferred to the extent the transferee

gave value to the debtor in exchange for the transfer."  JABA,

528 F. Supp. 3d at 241 (citing 11 U.S.C. § 548(c)).  As the

parties note in their Joint Pre-Trial Report, "[u]nder

established law in this liquidation proceeding, see, e.g.,

Picard v. Gettinger, 976 F.3d 194 (2d Cir. 2020), [the Sages]

can show value for transfers in the two-year period to the

extent such transfers are comprised of principal."  (Joint Pre-

Trial Report at 6.)  The Sages argue that because they are

entitled to principal credit for the proceeds of their non-split

strike trading, the transfers of those proceeds were "for value"

within the meaning § 548(d)(2)(A).  In sum, the Sages contend

that they gave value in the form of Malcolm's purported

"directions" to Madoff.

This argument is unavailing.  As explained previously in

this opinion, the Sages are not entitled to "net equity

principal credit" for the proceeds of the fictitious

transactions reported in the Sage Accounts.  Moreover, in the

context of § 548(c), courts have repeatedly recognized that "a

transferee in a Ponzi scheme does not give value beyond his

deposit of principal."  Picard v. Legacy Capital Ltd., 603 B.R.

682, 699 (Bankr. S.D.N.Y. 2019) (collecting cases); see also

SIPC v. BLMIS (In re BLMIS), 596 B.R. 451, 463-65 (S.D.N.Y.
2019).  Because the Sages did not give "value" in exchange for
the fraudulent transfers, their affirmative defense fails.

### 4. The Sages are General Partners of Sages Associates and Sage Realty

The Court now turns to the Trustee's claim that the Sages
are general partners of Sage Associates and Sage Realty and are
jointly and severally liable for the $16,880,000 in fraudulent
transfers made to the entities in the two years before the
Filing Date.  Under New York law, a partnership is defined as
"an association of two or more persons to carry on, as co-
owners, a business for profit."  N.Y. P'ship Law § 10 (McKinney
2021).  Partners are jointly and severally liable for tort
claims against the partnership.  See Ryan v. Brophy, 755 F.
Supp. 595, 597 (S.D.N.Y. 1991).  In New York, fraudulent
transfer claims are considered tort claims.  See Cruden v. Bank
of N.Y., 957 F.2d 961, 974 (2d Cir. 1992).  Accordingly, courts
routinely hold general partners personally liable for avoidable
transfers made to a partnership.  See In re Bernard L. Madoff
Inv. Sec. LLC, 542 B.R. 100, 114 (Bankr. S.D.N.Y. 2015) (finding
individuals "liable as general partners of [the partnership] for
the fraudulent transfers that [the partnership] received").
"Under New York law, the party 'pleading the existence of a
partnership has the burden of proving its existence.'"  See

Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP, No. 03 Civ. 0613 (GBD), 2004 WL 112948, at *7 (S.D.N.Y. Jan. 22, 2004) (quoting Cent. Nat'l Bank, Canajoharie v. Purdy, 249 A.D.2d 825, 826 (3d Dep't 1998)).

As noted previously, the Sages did not enter into a partnership agreement. Accordingly, the Court must determine whether a de facto partnership existed based on "the conduct, intention, and relationship between the parties." Czernicki v. Lawniczak, 74 A.D.3d 1121, 1124 (2d Dep't 2010) ("When there is no written partnership agreement between the parties, the court must determine whether a partnership in fact existed . . . ."). In deciding whether a partnership exists under New York law, courts consider "a series of factors[,]" including: "(1) sharing of profits, (2) sharing of losses, (3) ownership of partnership assets, (4) joint management and control, (5) joint liability to creditors, (6) intention of the parties, (7) compensation, (8) contribution of capital, and (9) loans to the organization." Brodsky v. Stadlen, 138 A.D.2d 662, 663 (2d Dep't 1988); see also In re Fairfield Sentry Ltd., 627 B.R. 546, 563 (Bankr. S.D.N.Y. 2021) (same). While no one factor "is determinative . . . an agreement to share loses is 'indispens[a]ble' to partnership formation." Ardis Health, LLC v. Nankivell, No. 11 Civ. 5013 (NRB), 2012 WL 5290326, at *5 (S.D.N.Y. Oct. 23, 2012) (quoting Steinbeck v. Gerosa, 4 N.Y.2d 302, 315 (N.Y. 1958));

see also Chanler v. Roberts, 200 A.D.2d 489, 491 (1st Dep't
1994) ("It is axiomatic that the essential elements of a
partnership must include an agreement between the principals to
share losses as well as profits.").

Here, the Sages argue that the Trustee has failed to
establish that Sage Associates and Sage Realty were partnerships
in fact. The Sages maintain that they never intended to form a
partnership and that both entities operated as tenancies in
common. The Court disagrees and concludes that Malcolm Sage,
Martin Sage, and Ann Sage Prasser are jointly and severally
liable for any judgment entered against the entity defendants.

The evidence adduced at trial establishes that Sage
Associates and Sage Realty were de facto partnerships. Most
notably, the documentary and testimonial evidence demonstrates
that the Sages shared in the profits and losses of both
entities. The Schedule K-1 IRS forms issued by Sage Associates
and Sage Realty reflect that the Sages shared in the profits
according to their individual ownership percentages. The Sages
reported this income, as well as their shares of the entities'
losses, expenses, interest, and dividends on their individual
tax returns. (See, e.g., TX-743 (2005 Return for Ann Passer);
TX-729 (2005 Return for Malcolm Sage); TX-730 (2005 Return for
Martin Sage).) The Schedule K-1 forms also demonstrate that
each Sage sibling made financial contributions to the entities.

88

These facts strongly support the conclusion that both entities
were partnerships.  See Czernicki, 74 A.D.3d at 1125 (finding
partnership existed based on federal partnership tax returns
which demonstrated that each party owed 50% of the partnership's
capital and each shared 50% in its profits and losses).

As for their intent, the Sages' assertion that they did not
intend to form a partnership is belied by the record.  As an
initial matter, the sharing of profits and losses demonstrates
an intent to form a partnership.  See Growblox Scis., Inc. v.
GCM Admin. Servs., LLC, No. 14 CIV. 2280 (ER), 2016 WL 1275050,
at *9 (S.D.N.Y. Mar. 31, 2016) (finding intent to form a
partnership where "individuals agreed from the outset to each be
20% owners of the . . . Business and to share equally in its
profits").  Additionally, the Sages' intent is evinced by their
repeated identification of the entities as partnerships.  As
noted previously, the Sages filed federal, state, and local
partnership tax returns for Sage Associates and Sage Realty.
When opening bank accounts for the entities, the Sages
identified both Sage Associates and Sage Realty as "general
partnership[s]."  (TX-522; TX-523.)  Although "calling an
organization a partnership does not make it one," Kidz Cloz,
Inc. v. Officially for Kids, Inc., 320 F. Supp. 2d 164, 174
(S.D.N.Y. 2004) (citation omitted), the Sages also consistently
held themselves out personally as "general partners" of the

entity defendants. See Matlins v. Sargent, No. 86 Civ. 0370
(MJL), 1991 WL 79219, at *4 (S.D.N.Y. May 7, 1991) (finding
intent based on defendant's many references to the entity as a
partnership, execution of documents as a "general partner," and
representation of himself as a partner in legal documents,
including sworn testimony and affidavits).  Considering the
Sages' consistent representations and their sharing of profits
and losses, the Court concludes that the Sages manifested an
intent to form two partnerships.

Finally, the Court notes that Martin and Ann did
participate in the management and control of Sage Associates and
Sage Realty.  At trial, Malcolm testified that both Ann and
Martin attended meetings with Madoff to discuss the performance
of the entity defendants' investments.  Additionally, each of
the Sages had the authority to act on behalf of the entities and
each was a signatory to the entities' bank accounts.  See
Growblox Scis., Inc., 2015 WL 3504208, at *8 (noting that shared
access to the partnership's bank accounts and shared authority
to sign checks on the partnership's behalf are traditional
indicia of a partnership).  Furthermore, according to Malcolm's
testimony, the three siblings collectively made decisions
regarding the investment strategies purportedly employed in the
accounts.  (Trial Tr. 170:10-23.)  Considering the relationship
of the Sages as a whole, see Hammond v. Smith, 151 A.D.3d 1896,

1897 (4th Dep't 2017), the Court concludes that Sage Associates
and Sage Realty were partnerships and Malcom, Martin, and Ann
were general partners of both entities.

In reaching this conclusion, the Court rejects any argument
that it would be inequitable to impose joint and several
liability on the individual defendants for amounts they did not
personally receive.  It is well established that "each partner
concomitantly has an obligation to share or bear the losses of
the partnership through contribution and indemnification . . .
." Ederer v. Gursky, 9 N.Y.3d 514, 522 (N.Y. 2007).  Under New
York law, disputes over fairness and the equitable distribution
of costs between joint tortfeasors are addressed in subsequent
actions for contribution.  See In re Brooklyn Navy Yard Asbestos
Litig., 971 F.2d 831, 845 (2d Cir. 1992) ("The policy of
affording plaintiffs full compensation does not always mesh
neatly with the policy of protecting defendants from paying more
than their equitable share. . . . [However,] New York law . . .
does not provide any basis for deviating . . . from the
traditional rule of joint and several liability."); see also
Grimes v. CBS Corp., No. 17 Civ. 8361 (AJN), 2018 WL 3094919, at
*2 (S.D.N.Y. June 21, 2018) (same).

### 5. Prejudgment Interest Is Not Warranted

Finally, the Court turns to the Trustee's request for
prejudgment interest.  The Trustee seeks prejudgment interest

from the Filing Date through the date of the entry of judgment
at a rate of 4%.  The Sages oppose this request and argue that
prejudgment interest would be inequitable in this case.  The
Court agrees.

The Second Circuit has instructed that an award of
prejudgment interest "should be a function of (i) the need to
fully compensate the wronged party for actual damages suffered,
(ii) considerations of fairness and the relative equities of the
award, (iii) the remedial purpose of the statute involved,
and/or (iv) such other general principles as are deemed relevant
by the court."  Wickham Contracting Co., Inc. v. Local Union No.
3, Intern. Broth. of Elec. Workers, AFL-CIO, 955 F.2d 831, 833-
34 (2d Cir. 1992).  "In Wickham, the Second Circuit stated that
'the relative equities may make prejudgment interest
inappropriate' when (1) 'the defendant acted innocently and had
no reason to know of the wrongfulness of his actions,' (2)
'there is a good faith dispute between the parties as to the
existence of any liability,' or (3) 'the [litigant] is
responsible for the delay in recovery.'"  BAM II, 624 B.R. at 65
(quoting Wickman 955 F.2d at 834-35).

In this liquidation, prejudgment interest has been awarded
against defendants who have "insisted on relitigating issues
that have already been decided by the Court in this case . . .
[forcing] the Trustee to spen[d] time and energy having to

92

defend against legal arguments that have already been decided in these SIPA cases." Epstein, 2022 WL 493734, at *19 (internal quotation marks and citation omitted); see also BAM II, 624 B.R. at 64 ("Not only did the Defendants choose to go to trial on an issue that was resolved by the Court in Nelson almost a year earlier, . . . these Defendants took it further; they chose gamesmanship—going so far as to withdraw their customer claims in order to strip this Court of equitable jurisdiction over these avoidance actions and delay a prior scheduled trial." (citation omitted)); Picard v. The Gerald and Barbara Keller Family Trust (In re BLMIS), 634 B.R. 39, 52 (Bankr. S.D.N.Y. 2021) (noting "[t]his Court has considered this issue on multiple prior occasions").

Unlike the defendants against whom prejudgment interest has been awarded in this liquidation, the Sages asserted novel legal arguments based on the unique facts of their case. The Sages' arguments, although ultimately unsuccessful, were made in good faith and created a legitimate dispute over liability. As Judge Nathan noted in her opinion withdrawing the reference, "resolution of this proceeding involves much more than routine application of settled law. The proceeding raises the issues of whether the Net Investment Method is permissible if a customer has directed and authorized trades but those trades were not executed, and also whether the Trustee has the discretion to

93

choose between competing methods of calculating net equity

generally." Sage Realty, 2021 WL 1987994, at *6. Judge Nathan

further noted that "contrary to the Trustee's contention, it may

be the case that the most appropriate method for calculating the

Defendants' net equity under SIPA is the Last Statement Balance

method." Id. at *4. As Judge Nathan made clear, prior to the

instant trial, the ultimate outcome of this case was far from

certain.

Under these circumstances, the Court concludes that the

equities weigh against awarding prejudgment interest. In

arriving at this conclusion, the Court recognizes that a purpose

of prejudgment interest in this liquidation is to compensate the

Trustee for the "loss of the use of the Two-Year Transfers for

the years that [the] litigation has lasted . . . ." JABA, 528

F. Supp. 3d at 245–46. In this case, however, due to the

absence of controlling case law, the Sages have maintained a

"bona fide denial" of liability "sufficient to justify a

contest" throughout the course of this litigation. St. Louis &

O'Fallon Ry. Co. v. United States, 279 U.S. 461, 478 (1929).

Accordingly, the Court concludes that an award of prejudgment

interest would be inappropriate.

**IV. Conclusion**

For the foregoing reasons, the Court enters judgment in

favor of the Trustee as follows. The Trustee's denial of the

Sage Associates customer claim is AFFIRMED, and the related customer claims objection is OVERRULED.  As for the Trustee's avoidance actions, judgment is entered in favor of the Trustee and against the Defendants, Sage Associates, Sage Realty, Malcolm Sage, Martin Sage, and Ann Sage Prasser, jointly and severally, in the amount of $16,880,000.  The Court has reviewed the Sages' arguments and, to the extent not addressed herein, concludes that they are moot or lack merit.  The Clerk of the Court is respectfully directed to enter judgment in favor of the Trustee and close both cases.

**SO ORDERED.**

Dated:     New York, New York
           April 15, 2022

_John F. Keenan_
John F. Keenan
United States District Judge