# EXHIBIT 1

REICHMAN JORGENSEN
LEHMAN & FELDBERG LLP
*mfeldberg@reichmanjorgensen.com*
400 Madison Avenue, Suite 14D
New York, NY 10017
Tel.: (212) 381-4970

*Attorneys for Defendant NatWest Markets N.V.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| Plaintiff-Applicant, | Adv. Pro. No. 08-01789 (CGM) |
| v. | SIPA Liquidation |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 10-05354 (CGM)<br>Adv. Pro. No. 11-02760 (CGM) |
| v. | |
| ABN AMRO BANK N.V. (presently known as NATWEST MARKETS N.V.), | **JURY TRIAL DEMANDED** |
| Defendant. | |

**NATWEST MARKETS N.V.'S AMENDED ANSWER TO THE CONSOLIDATED**
**SECOND AMENDED COMPLAINT, AMENDED COUNTERCLAIMS,**
**AND JURY DEMAND**

Defendant NatWest Markets N.V. (formerly known as ABN AMRO Bank N.V.) ("NatWest")[1] respectfully submits this Amended Answer to the Consolidated Second Amended Complaint ("Complaint"), No. 10-05354, Dkt. 220, filed by plaintiff Irving H. Picard, Trustee ("Trustee") for the Liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the Estate of Bernard L. Madoff ("Madoff") and Amended Counterclaims against Counterclaim-Defendant Trustee as the representative of the bankruptcy estate of BLMIS and Madoff. In answering the allegations in the Complaint, NatWest does not intend to waive, and does not waive, any and all applicable objections to the relevance, admissibility, or prejudicial effect of any of the allegations in the Complaint. Except as otherwise expressly admitted below, NatWest denies all averments and each allegation in the Complaint, including, without limitation, the headings or subheadings throughout the Complaint. To the extent it is later determined that a response is required to any allegation NatWest avers has been mooted by a prior dismissal of the Trustee's claims, NatWest denies any such allegation. NatWest expressly reserves the right to amend and/or supplement the Answer and/or Counterclaims.

## I.      NATURE OF THE ACTION[2]

1.      NatWest states that the allegations in paragraph 1 set forth legal conclusions to which no response is required. To the extent a response is required NatWest denies the allegations in paragraph 1 except admits that Plaintiff purports to bring this action as trustee for the liquidation of BLMIS and the substantively consolidated estate of Bernard L. Madoff

---

[1]      After the events at issue in this litigation, ABN AMRO Bank N.V., a financial institution organized under laws of the Netherlands, was renamed The Royal Bank of Scotland N.V. and was later renamed again as NatWest Markets N.V. To avoid confusion with defendants in other Madoff adversary proceedings with similar names, "Defendant" or "NatWest" has been used throughout.

[2]      NatWest deems the section headings in the Complaint not to constitute allegations of the Complaint and therefore does not admit or deny any statements contained in any section heading. To the extent any section headings are allegations, NatWest admits or denies them consistent with its responses to the allegations contained in the numbered paragraphs of the Complaint.

("Madoff") pursuant to the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.* NatWest further states that it does not consent, and instead objects, to this Court's jurisdiction and/or to its authority to enter a final Order or Judgment against NatWest. In addition, NatWest demands, and does not waive its right to, a jury trial on all issues in this action so triable.

2.      NatWest states that the allegations of paragraph 2 set forth legal conclusions to which no response is required. To the extent a response is required NatWest denies the allegations in paragraph 2, specifically denying the allegation that the Trustee is entitled to any relief from NatWest, but admits that the Trustee seeks approximately $308,113,826 from NatWest based on the allegations in his Complaint and admits that the Trustee has consolidated the case involving the "Harley Transaction" that was previously alleged in *Picard v. ABN AMRO Bank N.V.*, No. 11-02760 (CGM), with this case, which makes allegations regarding the "Tremont Transactions," and denies knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph.

3.      NatWest admits that the Trustee seeks to recover approximately $286,313,906 based on the allegations in his Complaint, denies that the Trustee is entitled to any recovery or relief from NatWest, denies that NatWest received subsequent transfers of customer property from BLMIS, directly or indirectly, or from Tremont Group Holdings, Inc. (the "Tremont Group") and/or its management arm, Tremont Partners, Inc. ("Tremont Partners," and together with the Tremont Group, "Tremont"), directly or indirectly. NatWest denies knowledge or information sufficient to form a belief about the truth of the other allegations in this paragraph.

4.      NatWest denies knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph, including whether Rye Select Broad Market Portfolio

2

Limited ("Rye Portfolio Limited") and Rye Select Broad Market Fund L.P. ("Rye Broad

Market" and, collectively with Rye Portfolio Limited, the "Rye Funds") invested all or

substantially all of their assets with BLMIS's investment advisory business (the "IA Business")

and whether the Rye Funds were part of a group of funds known as BLMIS feeder funds, and,

therefore, denies these allegations.

5.      NatWest denies knowledge or information sufficient to form a belief about the

truth of the allegations in this paragraph, including whether Rye Select Broad Market XL

Portfolio, Ltd. ("XL Portfolio Limited"), and Rye Select Broad Market XL Fund L.P. ("XL

Broad Market," and collectively with XL Portfolio Limited, the "XL Funds") had direct BLMIS

accounts and whether they were established to provide investors with three-times levered returns

linked to the performance of BLMIS, and, therefore, denies these allegations.

6.      NatWest denies that the subsequent transfers from the Tremont Transactions

comprised payments that Defendant received from two separate leverage deals involving the XL

Funds and Rye Funds.  NatWest admits that each of the leverage deals followed the basic

structure of each XL Fund providing cash collateral to NatWest and in exchange NatWest agreed

to provide each XL Fund with returns generated by the Rye Funds, based on investments in the

Rye Funds equal to three times the amount of collateral the XL Funds provided to NatWest.

NatWest denies that for structuring these leverage deals, known as "total return swaps," the XL

Funds paid NatWest millions of dollars of fees.

7.      NatWest admits the allegations in paragraph 7.

8.      NatWest admits that in September 2006 it entered into a swap agreement with XL

Portfolio Limited (the "2006 Tremont Swap Agreement," and the underlying transaction, the

"2006 Tremont Transaction").  NatWest admits that in connection with the 2006 Tremont Swap

Agreement, by December 2008, it had received at least $217 million in collateral payments from XL Portfolio Limited.  NatWest denies knowledge or information sufficient to form a belief as to whether XL Portfolio Limited received $84,616,573 in BLMIS customer property from Rye Portfolio Limited and Rye Insurance LDC, as well as transfers from other Tremont-related entities, and, therefore, denies these allegations.  NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegation that Rye Insurance LDC is a Tremont BLMIS feeder fund and, therefore, denies this allegation.

9.      NatWest admits that it hedged its exposure by investing three times the collateral value it received from XL Portfolio Limited in Rye Portfolio Limited.  NatWest further admits that it redeemed at least $104,464,000 from Rye Portfolio Limited but denies knowledge or information sufficient to form a belief about whether any of this amount constitutes customer property and, therefore, denies the allegation that any of this amount constitutes customer property.  NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegation that Rye Portfolio Limited satisfied NatWest's redemption by withdrawing funds from its BLMIS customer account and, therefore, denies the allegation that Rye Portfolio Limited withdrew funds from its BLMIS customer account to satisfy NatWest's redemption.

10.      NatWest admits that in November 2007, it entered into a swap agreement with XL Broad Market (the "2007 Tremont Swap Agreement," and the underlying transaction, the "2007 Tremont Transaction").  NatWest admits that in connection with this swap agreement, NatWest received at least $95,833,333 in collateral payments from XL Broad Market but denies knowledge or information sufficient to form a belief as to the truth of the allegation that this amount constitutes customer property and, therefore, denies the allegation that any of this amount constitutes customer property.  NatWest further denies knowledge or information

4

sufficient to form a belief as to the truth of the allegation that this amount originated from fraudulent transfers BLMIS made to, among others, Rye Select Broad Market Prime Fund, L.P. ("Rye Prime Fund") or Rye Broad Market, and, therefore, denies the allegation that any of this amount originated from fraudulent transfers from BLMIS. NatWest further denies knowledge or information sufficient to form a belief as to the truth of the allegation that Rye Prime Fund is a Tremont BLMIS feeder fund and, therefore, denies this allegation.

11.     NatWest admits that it hedged its exposure by investing three times the collateral value it received from XL Broad Market in Rye Broad Market. NatWest admits that it redeemed at least $1.4 million from Rye Broad Market but denies knowledge or information sufficient to form a belief as to the truth of the allegation that this amount constitutes customer property and, therefore, denies the allegation that any of this amount constitutes customer property. NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegation that Rye Broad Market satisfied NatWest's redemption by withdrawing funds from its BLMIS customer account and, therefore, denies the allegation that Rye Broad Market withdrew funds from its BLMIS customer account to satisfy NatWest's redemption.

12.     NatWest admits that in 2008 it entered into a transaction to provide a leveraged return under a derivatives contract (the "Harley Derivatives Contract," and the underlying transaction, the "Harley Transaction") on investments in Harley International (Cayman) Ltd. ("Harley"). NatWest denies knowledge or information sufficient to form a belief about the truth of the allegations that Harley invested all of its assets with BLMIS or that Harley is a "BLMIS feeder fund" and, therefore, denies these allegations. NatWest denies that it made any sales of future performance of levered exposure to Harley in exchange for millions of dollars in interest and fees. NatWest admits that it sold to a counterparty the future performance over three years

of a 3.7 times levered exposure to Harley, less the costs of financing such an investment in

Harley and less a profit margin.  NatWest admits that in order to hedge its exposure it invested in

Harley and, in December 2008, redeemed $21,799,920 but denies knowledge or information

sufficient to form a belief as to the truth of the allegation that this amount constitutes customer

property and, therefore, denies the allegation that any of this amount constitutes customer

property.  NatWest denies knowledge or information sufficient to form a belief as to the truth of

the allegation that Harley satisfied NatWest's redemption by withdrawing funds from its BLMIS

customer account and, therefore, denies the allegation that Harley withdrew funds from its

BLMIS customer account to satisfy NatWest's redemption.

13.     NatWest denies that between at least 2006 and December 2008 it targeted BLMIS

feeder funds, denies that it sent its structuring brochure to (or otherwise contacted) at least a half

dozen BLMIS feeder fund managers pitching its structuring capabilities and appetite for "Madoff

risk."  NatWest denies knowledge or information sufficient to form a belief as to the truth of the

characterizations "sophisticated" and "industry leader," but admits that all relevant times it has

been a multinational bank performing derivative transactions.

14.     NatWest denies that BLMIS feeder funds obtained their funds from investors such

as NatWest and denies that it is liable for the return of BLMIS customer property it received.

NatWest denies knowledge or information sufficient to form a belief as to how Madoff sustained

his scheme and, therefore, denies the allegation that Madoff sustained his scheme with massive

capital infusions largely from BLMIS feeder funds.

## II.     SUBJECT MATTER JURISDICTION AND VENUE

15.     The allegations contained in paragraph 15 constitute legal conclusions, to which

no response is required.  To the extent a response is deemed necessary, NatWest denies the

allegations of paragraph 15, except to admit that (a) the Trustee has brought this adversary proceeding, and that (b) a substantively consolidated SIPA case (Case No. 08-01789 (CGM), the "SIPA Proceeding") is pending in this Court.

16.     The allegations contained in paragraph 16 constitute legal conclusions, to which no response is required.  To the extent a response is deemed necessary, NatWest denies the allegations of paragraph 16, and specifically denies that this proceeding constitutes a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (F), (H), and/or (O).  NatWest does not consent to entry of final orders or judgments by this Court.  NatWest demands trial by jury on all issues in this action so triable.

17.     Paragraph 17 constitutes a legal conclusion to which no response is required and, if a response is required, NatWest denies the allegations of paragraph 17.  NatWest contests personal and subject matter jurisdiction but does not contest venue in this District if jurisdiction is found and upheld.

18.     NatWest states that paragraph 18 constitutes a legal conclusion to which no response is required.  To the extent a response is deemed necessary, NatWest denies the allegations of paragraph 18, except to admit that the Trustee purports to bring this proceeding under the cited statutes.

### III.    BACKGROUND

19.     NatWest admits that the allegations in this paragraph present information that became available to NatWest and others through public sources after the events that the allegations concern occurred and otherwise denies knowledge or information sufficient to form a belief about their truth and therefore, denies the allegations of paragraph 19, except to admit on information and belief that Madoff was arrested on or around December 11, 2008 (the "Filing

Date") and that the SEC filed a complaint against BLMIS.  NatWest refers to the Amended

Complaint filed by the Securities and Exchange Commission ("SEC") for its complete and

accurate contents.

20.     NatWest admits that the allegations in this paragraph present information that

became available to NatWest and others through public sources after they occurred and

otherwise denies knowledge or information sufficient to form a belief about their truth and,

therefore, denies the allegations of paragraph 20.  NatWest refers to the Securities Investor

Protection Corporation ("SIPC") application referenced in paragraph 20 for a complete and

accurate statement of its contents.

21.     NatWest admits that the allegations in this paragraph present information that

became available to NatWest and others through public sources after they occurred and

otherwise denies knowledge or information sufficient to form a belief about their truth and,

therefore, denies the allegations of paragraph 21.  NatWest refers to the District Court's

December 15, 2008 Order for a complete and accurate statement of its contents.

22.     NatWest admits that the allegations in this paragraph present information that

became available to NatWest and others through public sources after they occurred and

otherwise denies knowledge or information sufficient to form a belief about their truth and,

therefore, denies the allegations of paragraph 22.  NatWest refers to the District Court's

December 23, 2008 and February 4, 2009 Orders for a complete and accurate statement of the

contents therein.

23.     NatWest admits that the allegations in this paragraph present information that

became available to NatWest and others through public sources after they occurred and

otherwise denies knowledge or information sufficient to form a belief about their truth and,

therefore, denies the allegations of paragraph 23.  NatWest refers the Court to the petition dated
April 13, 2009, and the order dated June 9, 2009, respectively, for a complete and accurate
statement of their contents.

24.    NatWest admits that the allegations in this paragraph present information that
became available to NatWest and others through public sources after they occurred and
otherwise denies knowledge or information sufficient to form a belief about their truth and,
therefore, denies the allegations of paragraph 24.  NatWest refers the Court to the transcript of
that plea hearing for a complete and accurate statement of its contents.

25.    NatWest admits that the allegations in this paragraph present information that
became available to NatWest and others through public sources after they occurred and
otherwise denies knowledge or information sufficient to form a belief about their truth and,
therefore, denies the allegations of paragraph 25.  NatWest refers the Court to the transcript of
that plea hearing for a complete and accurate statement of its contents.

26.    NatWest admits that the allegations in this paragraph present information that
became available to NatWest and others through public sources after they occurred and
otherwise denies knowledge or information sufficient to form a belief about their truth and,
therefore, denies the allegations of paragraph 26.  NatWest refers the Court to the transcript of
that plea hearing for a complete and accurate statement of its contents.

27.    NatWest admits that the allegations in this paragraph present information that
became available to NatWest and others through public sources after they occurred and
otherwise denies knowledge or information sufficient to form a belief about their truth and,
therefore, denies the allegations of paragraph 27.  NatWest refers the Court to the trial transcript
and judgment for a complete and accurate statement of their contents.

28.     NatWest denies knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 28, and further states that the allegations concerning the Trustee's authority constitute legal conclusions to which no response is required.  To the extent a response is required as to such allegations, NatWest denies such allegations.

29.     NatWest states that the allegations contained in paragraph 29 constitute legal conclusions, to which no response is required.  To the extent a response is determined to be required, NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 29 and, therefore, denies the allegations contained in paragraph 29.

30.     The allegations contained in paragraph 30 constitute legal conclusions, to which no response is required.  To the extent a response is determined to be required, NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 30 and, therefore, denies the allegations contained in paragraph 30.

### IV.     DEFENDANT AND NON-PARTIES

#### A.     Defendant ABN AMRO Bank N.V. (presently known as NatWest Markets N.V.) and Non-Parties ABN AMRO Incorporated and ABN AMRO Holding N.V.

31.     NatWest denies the allegations of paragraph 31, except admits that ABN AMRO Bank N.V. ("ABN AMRO") was a financial institution organized under the laws of the Netherlands that maintained, at all relevant times, a branch and representative office in New York, New York.  NatWest denies that it received each of the transfers at issue in this action. NatWest further denies that each of the transfers at issue constitute "subsequent transfers" within the meaning of 11 U.S.C. § 550 and related statutes.  NatWest admits that it was a party to each of the underlying agreements in the Tremont Transactions and the Harley Transaction.

32.     NatWest admits the allegations in paragraph 32.

33.     NatWest denies the allegations in paragraph 33.

34.     NatWest admits the allegations in paragraph 34.

35.     NatWest denies the allegations in paragraph 35, except to admit that following the purchase of ABN AMRO Holding, N.V. ("ABN Holding," the owner of ABN AMRO) by RFS Holdings B.V. (97.72% owned by The Royal Bank of Scotland Group plc, "RBS"), which purchase is herein referred to as the "Acquisition," David Schwartz, George Turner, and Stephan Kingham remained employed at the bank and that ABN Inc. continued its role as authorized agent of ABN AMRO.

36.     NatWest denies the allegations in paragraph 36, except denies knowledge or information sufficient to form a belief as to the truth of the allegation that it maintained any BLMIS feeder fund investments.

37.     NatWest denies the allegations in paragraph 37, except admits that it changed its name to NatWest Markets N.V. in April 2018.

**B.      Non-Party Tremont Funds**

38.     NatWest denies knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 38 and, therefore, denies the allegations.

39.     NatWest denies knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 39 and, therefore, denies the allegations.

40.     NatWest denies knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 40 and, therefore, denies the allegations.

41.     NatWest denies knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 41 and, therefore, denies the allegations.

11

42.     NatWest denies knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 42 and, therefore, denies the allegations.

### C.    Non-Party Harley

43.     NatWest denies knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 43 and, therefore, denies the allegations.

44.     NatWest denies knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 44 and, therefore, denies the allegations.

45.     NatWest denies knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 45 and, therefore, denies the allegations.

46.     NatWest denies knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 46 and, therefore, denies the allegations.

### V.    PERSONAL JURISDICTION

47.     NatWest states that the allegations in this paragraph are legal conclusions to which no response is required and that, if a response is required, it denies them.

48.     NatWest denies knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 48 and, therefore, denies the allegations.

49.     NatWest denies the allegations in paragraph 49, except to admit that it invested in the Rye Funds, but denies that it had any knowledge of whether the Rye Funds invested all or substantially all of their assets with BLMIS or that any returns would be earned by BLMIS.

50.     NatWest denies the allegations in paragraph 50.

51.     NatWest denies the allegations in paragraph 51.

52.    NatWest admits the allegations in paragraph 52, except denies knowledge or information sufficient to form a belief as to the truth of the information purportedly disclosed or the phrase "i.e., BLMIS" in the second bullet point.

53.    NatWest admits the allegations in paragraph 53.

54.    NatWest denies the allegations in paragraph 54.

55.    NatWest denies the allegations in paragraph 55, except admits that Tremont and Fairfield indicated to it the information alleged in paragraph 55.

56.    The first sentence of paragraph 56 is a legal conclusion to which no response is required.  To the extent a response is required, NatWest denies that documentation associated with the Tremont Transactions confirmed the central role of BLMIS and the transactions' connections to the United States and New York.  NatWest denies that it considered BLMIS in New York so central to its transactions with the Tremont funds that it negotiated provisions specifically conditioned upon BLMIS-related events.

57.    NatWest admits the allegations in paragraph 57.

58.    NatWest admits the allegations in paragraph 58.

59.    NatWest admits the allegations in paragraph 59.

60.    NatWest denies that it negotiated special rights that would be triggered if BLMIS were no longer the "Account Manager" or able to carry out the SSC Strategy but admits the remaining allegations in paragraph 60.

61.    NatWest admits that under the terms of the 2006 Tremont Swap Agreement if any of the events enumerated in paragraph 61 occurred it could terminate the swap agreement without penalty but denies the remaining allegations in paragraph 61.

62.     NatWest admits that it entered into an agreement with Tremont including the quoted language but denies that it and Tremont agreed that NatWest could exercise special redemption rights upon occurrence of the conditions quoted.

63.     NatWest admits that the 2007 Tremont Transaction operated substantially in the same manner as the 2006 Tremont Transaction but denies the remaining allegations in paragraph 63.

64.     NatWest admits that it invested in Harley with the purpose of having funds invested in BLMIS, but denies knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 64.

65.     NatWest admits the allegations of paragraph 65, except to deny that the Harley Derivatives Contract provided NatWest with any "special rights."

66.     NatWest admits the allegations in paragraph 66.

67.     NatWest denies that it understood that any returns on Harley investments were to be earned in New York by BLMIS engaging in the purchase and sale of U.S. Securities, options, and U.S. Treasuries.  NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegation that the 2007 Harley Audited Financial Statements disclosed that Harley's investments with BLMIS included U.S. Treasury Bills as well as U.S. traded equity securities or that the 2007 Harley Audited Financial Statements reflect that on December 31, 2007, all of Harley's over $3 billion of assets invested with BLMIS were purportedly invested in U.S. Treasury Bills and, therefore, denies these allegations.

68.     NatWest denies knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 68 and, therefore, denies the allegations.

69.    The first sentence of paragraph 69 constitutes a legal conclusion and therefore does not require a response.  To the extent a response is required, NatWest denies that additional elements of the Tremont and Harley Transactions demonstrated their connection to the United States or to New York.  NatWest admits that during the relevant time period it maintained a bank account ending in 1541 ("the 1541 Account") at ABN AMRO's New York, New York branch (the "1541 Account") and admits that it utilized this account to receive collateral and redemption payments from the XL Funds and Rye Funds, respectively, from Tremont bank accounts located in New York.

70.    NatWest admits the allegations in paragraph 70.

71.    NatWest admits the allegations in paragraph 71.

72.    NatWest admits that the Harley Derivatives Contract directed that Defendant would make any payments under the contract to the Northern Trust bank account in New York. NatWest denies knowledge or information sufficient to form a belief about the truth of the allegations that Harley instructed its shareholders to make subscription payments to a New York bank account at Northern Trust in the name of Fortis Prime Fund Solutions (IOM), the administrator, banker, and nominal custodian to Harley, and, therefore, denies these allegations. NatWest denies that as an investor in Harley it would have complied with these instructions.

73.    NatWest admits the allegations in paragraph 73.

74.    NatWest denies knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 74 and, therefore, denies the allegations.

75.    NatWest denies the allegations in paragraph 75.

76.    NatWest denies the allegations in paragraph 76.

**VI.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY**

15

### A.  BLMIS

77.    NatWest denies knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and, therefore, denies the allegations, except to admit that BLMIS was at one time registered with the United States Securities and Exchange Commission as a broker-dealer.

78.    NatWest denies knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and, therefore, denies the allegations, except to admit that BLMIS was at one time registered with the United States Securities and Exchange Commission as a broker-dealer.

79.    NatWest denies knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and, therefore, denies the allegations.

80.    NatWest denies knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and, therefore, denies the allegations.

81.    NatWest denies knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and, therefore, denies the allegations.

82.    NatWest denies knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and, therefore, denies the allegations.

### B.  The Ponzi Scheme

83.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 83, refers to paragraphs 24 through 27 above, and, therefore, denies the allegations, but admits upon information and belief that BLMIS claimed to invest money deposited by customers in securities.

16

84.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 84 and, therefore, denies the allegations.

85.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 85 and, therefore, denies the allegations.

86.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 86 and, therefore, denies the allegations, but does not contest that David Friehling pleaded guilty to criminal offenses on or about November 3, 2009 and refers the Court to the plea hearing transcript and BLMIS's SEC Form X-17A-5 for complete and accurate statements of their contents.

## 1. Madoff's Investment Strategy

87.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 87 and, therefore, denies the allegations.

88.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 88 and, therefore, denies the allegations.

89.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 89 and, therefore, denies the allegations.

90.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 90 and, therefore, denies the allegations.

91.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 91 and, therefore, denies the allegations.

92.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 92 and, therefore, denies the allegations.

93.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 93 and, therefore, denies the allegations.

94.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 94 and, therefore, denies the allegations.

95.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 95 and, therefore, denies the allegations.

96.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 96 and, therefore, denies the allegations.

97.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 97 and, therefore, denies the allegations.

98.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 98 and, therefore, denies the allegations.

### 2.    BLMIS's Fee Structure

99.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 99 and, therefore, denies the allegations.

### 3.    BLMIS's Market Timing

100.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 100 and, therefore, denies the allegations.

101.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 101 and, therefore, denies the allegations (and further, the first sentence states a legal conclusion to which no response is required).

102.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 102 and, therefore, denies the allegations.

### 4.    BLMIS Execution

103.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 103 and, therefore, denies the allegations.

### 5.    No Evidence of BLMIS Trading

104.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 104 and, therefore, denies the allegations.

105.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 105 and, therefore, denies the allegations.

### 6.    The Collapse of the Ponzi Scheme

106.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 106 and, therefore, denies the allegations, except to admit, upon information and belief, that BLMIS continued to operate until December 2008 and in and after December 2008, public sources disclosed that Madoff had admitted he had run his company as a Ponzi scheme.

107.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 107 and, therefore, denies the allegations and refers the Court to the transcripts of Madoff's and DiPascali's plea hearings for the complete and accurate contents and context of their statements.

108.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 108 and, therefore, denies the allegations.

## VII.    THE AVOIDANCE OF THE INITIAL TRANSFERS FROM BLMIS TO TREMONT

### A.    Tremont Knew That BLMIS's IA Business Was a Fraud

109.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 109 and, therefore, denies the allegations.  NatWest admits that the Trustee filed an adversary proceeding in this Court styled as *Picard v. Tremont Group Holdings, Inc., et al.*, No. 10-05310 (BRL) (the "Tremont Avoidance Action"), seeking to avoid and recover alleged initial transfers of customer property from BLMIS in the approximate amount of $2,140,297,364 (the "Tremont Initial Transfers"), but denies that the alleged initial transfers of customer property from BLMIS to the Rye Funds and the XL Funds were, or are, avoidable.  NatWest objects to the Trustee's purported incorporation by reference of all other paragraphs and allegations the complaint filed in the Tremont Avoidance Action, and because the purported incorporation by reference constitutes a legal conclusion, therefore, does not answer such allegations.  NatWest further objects to the inclusion in this adversary proceeding of any issue implicated by the incorporation of the Tremont Complaint.

The statements in paragraph 109 as to the nature of certain transfers, the characterization of certain funds as customer property, and transfers allegedly sought to be avoided and recovered constitute legal conclusions and thus no response is required.  To the extent a response is determined to be required, NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 109 and, therefore, denies the allegations contained in paragraph 109.  NatWest reserves the right to rely on and introduce any allegations in any of the Trustee's Tremont Complaint or in the exhibits thereto as party admissions.

110.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 110 and, therefore, denies the allegations.

111.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 111 and, therefore, denies the allegations, and refers the Court to the September 22, 2011 Order for a complete and accurate statement of its contents.

### 1.    Tremont's Senior Executives Had a Close Relationship with Madoff

112.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 112 and, therefore, denies the allegations.

113.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 113 and, therefore, denies the allegations.

114.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 114 and, therefore, denies the allegations.

### 2.    Tremont Received Repeated, Direct Fraud Warnings About BLMIS's IA Business

115.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 115 and, therefore, denies the allegations.

116.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 116 and, therefore, denies the allegations.

117.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 117 and, therefore, denies the allegations.

118.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 118 and, therefore, denies the allegations.

119.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 119 and, therefore, denies the allegations.

120.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 120 and, therefore, denies the allegations.

121.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 121 and, therefore, denies the allegations.

122.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 122 and, therefore, denies the allegations.

123.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 123 and, therefore, denies the allegations.

124.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 124 and, therefore, denies the allegations.

125.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 125 and, therefore, denies the allegations.

126.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 126 and, therefore, denies the allegations.

127.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 127 and, therefore, denies the allegations.

### 3.    Tremont's Own Reporting Showed That BLMIS's Purported Trades Were Impossible

128.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 128 and, therefore, denies the allegations.

129.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 129 and, therefore, denies the allegations.

### 4.    Tremont's Own Reporting Showed That BLMIS's Purported Trades Were Impossible

22

130.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 130 and, therefore, denies the allegations.

131.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 131 and, therefore, denies the allegations.

132.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 132 and, therefore, denies the allegations.

133.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 133 and, therefore, denies the allegations.

134.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 134 and, therefore, denies the allegations.

135.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 135 and, therefore, denies the allegations.

### 5.    BLMIS Failed Tremont's Requirements for Third-Party Oversight yet Tremont Made an Exception for Madoff

136.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 136 and, therefore, denies the allegations.

137.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 137 and, therefore, denies the allegations.

138.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 138 and, therefore, denies the allegations.

139.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 139 and, therefore, denies the allegations.

140.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 140 and, therefore, denies the allegations.

141.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 141 and, therefore, denies the allegations.

**6.    Tremont Consistently Shielded Madoff from
Third Party Due Diligence**

142.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 142 and, therefore, denies the allegations.

143.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 143 and, therefore, denies the allegations.

144.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 144 and, therefore, denies the allegations.

145.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 145 and, therefore, denies the allegations.

146.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 146 and, therefore, denies the allegations.

147.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 147 and, therefore, denies the allegations.

148.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 148 and, therefore, denies the allegations.

149.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 149 and, therefore, denies the allegations.

150.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 150 and, therefore, denies the allegations.

151.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 151 and, therefore, denies the allegations.

### 7.    Tremont Avoided Questions and Fabricated Answers About BLMIS's Purported Options Trading

152.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 152 and, therefore, denies the allegations.

### a)    Divergent Answers on Over-the-Counter/Listed Trading Questions

153.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 153 and, therefore, denies the allegations.

154.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 154 and, therefore, denies the allegations.

155.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 155 and, therefore, denies the allegations.

156.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 156 and, therefore, denies the allegations.

157.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 157 and, therefore, denies the allegations.

### b)    Failure to Conduct Any Diligence on Purported Options Counterparties and Covering up the Truth with Fabrications

158.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 158 and, therefore, denies the allegations.

159.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 159 and, therefore, denies the allegations.

160.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 160 and, therefore, denies the allegations.

161.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 161 and, therefore, denies the allegations.

162.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 162 and, therefore, denies the allegations.

163.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 163 and, therefore, denies the allegations.

164.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 164 and, therefore, denies the allegations.

165.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 165 and, therefore, denies the allegations.

166.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 166 and, therefore, denies the allegations.

167.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 167 and, therefore, denies the allegations.

168.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 168 and, therefore, denies the allegations.

169.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 169 and, therefore, denies the allegations.

170.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 170 and, therefore, denies the allegations.

**8.      Tremont's Executives Had a Powerful Motive to Hide What They Knew About BLMIS and Madoff**

171.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 171 and, therefore, denies the allegations.

172.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 172 and, therefore, denies the allegations.

173.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 173 and, therefore, denies the allegations.

174.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 174 and, therefore, denies the allegations.

175.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 175 and, therefore, denies the allegations.

### 9.    Tremont Co-Managed Kingate Global

176.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 176 and, therefore, denies the allegations.

177.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 177 and, therefore, denies the allegations.

178.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 178 and, therefore, denies the allegations.

179.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 179 and, therefore, denies the allegations.

180.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 180 and, therefore, denies the allegations.

181.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 181 and, therefore, denies the allegations.

## VIII.   RECOVERY OF THE TREMONT SUBSEQUENT TRANSFERS

### A.      The Initial Transfers to the Tremont Initial Transfer Funds

182.    NatWest denies knowledge or information sufficient to form a belief as to the

truth of the allegations in the first sentence of paragraph 182 and, therefore, denies the

allegations.  NatWest admits that the Trustee filed an adversary proceeding in this Court styled

as *Picard v. Tremont Group Holdings, Inc., et al.*, No. 10-05310 (BRL) (the "Tremont

Avoidance Action") but denies that the alleged initial transfers of customer property from

BLMIS to the Rye Funds and the XL Funds were, or are, avoidable.  The second sentence of

paragraph 182, the Trustee's purported attempt to incorporate by reference the Tremont

Complaint, constitutes a legal conclusion, to which no response is required.  NatWest further

objects to the inclusion in this adversary proceeding of any issue implicated by the incorporation

of the Tremont Complaint.

The statements in paragraph 182 as to the nature of certain transfers, the characterization

of certain funds as customer property, and transfers allegedly sought to be avoided and recovered

constitute legal conclusions and thus no response is required.  To the extent a response is

determined to be required, NatWest denies knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 182 and, therefore, denies the allegations

contained in paragraph 182.  NatWest reserves the right to rely on and introduce any allegations

in any of the Trustee's Tremont Complaint or in the exhibits thereto as party admissions.

183.    The allegations contained in the second sentence of paragraph 183 constitute legal

conclusions, to which no response is required.  To the extent a response is determined to be

required, NatWest denies knowledge or information sufficient to form a belief as to the truth of

the allegations contained in the second sentence of paragraph 183, and therefore denies those

allegations.  NatWest denies knowledge or information sufficient to form a belief as to the truth

of the remaining allegations contained in paragraph 183 or the basis or contents of Exhibits B, F,

I, and M, therefore, denies the remaining allegations contained in paragraph 183 and Exhibits B,

F, I, and M.

184.    NatWest denies knowledge or information sufficient to form a belief as to the

truth of the allegations contained in paragraph 184 and, therefore, denies the allegations in

paragraph 184.  NatWest refers the Court to the September 22, 2011 Order and the Consent

Judgment (ECF Nos. 17, 38) for a complete and accurate statement of the contents therein.

185.    NatWest denies knowledge or information sufficient to form a belief as to the

truth of the allegations contained in paragraph 185 and, therefore, denies the allegations in

paragraph 185.  NatWest refers the Court to the September 22, 2011 Order and the Consent

Judgment (ECF Nos. 17, 38) for a complete and accurate statement of the contents therein.

186.    NatWest denies knowledge or information sufficient to form a belief as to the

truth of the allegations of paragraph 186 and, therefore, denies the allegations, and refers the

Court to the Proffered Second Amended Complaint, *Picard v. HSBC Bank PLC, et al.*, Adv. Pro

No. 09-1364 (CGM), ECF No. 399 for a complete and accurate statements of the contents

therein.

## B.    Initial Transfers from BLMIS to Rye Broad Market

187.    NatWest denies knowledge or information sufficient to form a belief as to the

truth of the allegations contained in the first sentence of paragraph 187 or the basis or contents of

Exhibit B and, therefore, denies the allegations in the first sentence of paragraph 187 and Exhibit

B.  The final sentence of paragraph 187 constitutes a legal conclusion to which no response is

required, but to the extent a response is required, NatWest denies the allegations.

188.    NatWest denies knowledge or information sufficient to form a belief as to the
truth of the allegations contained in the first sentence of paragraph 188 or the basis or contents of
Exhibit B and, therefore, denies the allegations in the first sentence of paragraph 188 and Exhibit
B.  The final sentence of paragraph 188 constitutes a legal conclusion to which no response is
required, but to the extent a response is required, NatWest denies the allegations.

189.    NatWest states that paragraph 189 constitutes a legal conclusion to which no
response is required, but to the extent a response is required, NatWest denies the allegations.

### C.      Initial Transfers from BLMIS to Rye Prime Fund

190.    NatWest denies knowledge or information sufficient to form a belief as to the
truth of the allegations contained in the first sentence of paragraph 190 or the basis or contents of
Exhibit F and, therefore, denies the allegations in the first sentence of paragraph 190 and Exhibit
F.  The final sentence of paragraph 190 constitutes a legal conclusion to which no response is
required, but to the extent a response is required, NatWest denies the allegations.

191.    NatWest denies knowledge or information sufficient to form a belief as to the
truth of the allegations contained in the first sentence of paragraph 191 or the basis or contents of
Exhibit F and, therefore, denies the allegations in the first sentence of paragraph 191 and Exhibit
F.  The final sentence of paragraph 191 constitutes a legal conclusion to which no response is
required, but to the extent a response is required, NatWest denies the allegations.

192.    NatWest states that paragraph 192 constitutes a legal conclusion to which no
response is required, but to the extent a response is required, NatWest denies the allegations.

### D.      Initial Transfers from BLMIS to Rye Portfolio Limited

193.    NatWest denies knowledge or information sufficient to form a belief as to the
truth of the allegations contained in the first sentence of paragraph 193 or the basis or contents of

30

Exhibit I and, therefore, denies the allegations in the first sentence of paragraph 193 and Exhibit I. The final sentence of paragraph 193 constitutes a legal conclusion to which no response is required, but to the extent a response is required, NatWest denies the allegations.

194.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of paragraph 194 or the basis or contents of Exhibit I and, therefore, denies the allegations in the first sentence of paragraph 194. The final sentence of paragraph 194 constitutes a legal conclusion to which no response is required, but to the extent a response is required, NatWest denies the allegations.

195.    NatWest states that paragraph 195 constitutes a legal conclusion to which no response is required, but to the extent a response is required, NatWest denies the allegations.

**E.      Initial Transfers from BLMIS to Rye Insurance LDC**

196.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of paragraph 196 or the basis or contents of Exhibit M and, therefore, denies the allegations in the first sentence of paragraph 196 and Exhibit M. The final sentence of paragraph 196 constitutes a legal conclusion to which no response is required, but to the extent a response is required, NatWest denies the allegations.

197.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of paragraph 197 or the basis or contents of Exhibit M and, therefore, denies the allegations in the first sentence of paragraph 197. The final sentence of paragraph 197 constitutes a legal conclusion to which no response is required, but to the extent a response is required, NatWest denies the allegations.

198.    NatWest states that paragraph 198 constitutes a legal conclusion to which no response is required, but to the extent a response is required, NatWest denies the allegations.

31

**F.    The 2006 Tremont Transaction: Subsequent Transfers of
Collateral Payments and Redemption Payments**

199.    NatWest states that paragraph 199 constitutes a legal conclusion to which no
response is required, but to the extent a response is required, NatWest denies the allegations.

200.    NatWest denies knowledge or information sufficient to form a belief as to the
truth of the allegations contained in paragraph 200 or the basis or contents of Exhibit K and,
therefore, denies the allegations in paragraph 200 and Exhibit K.

201.    NatWest denies knowledge or information sufficient to form a belief as to the
truth of the allegations contained in paragraph 201 or the basis or contents of Exhibit N and,
therefore, denies the allegations in paragraph 201 and Exhibit N.

202.    NatWest admits the allegations in the first sentence of paragraph 202.  NatWest
denies knowledge or information sufficient to form a belief as to the truth of the allegations
contained in the second sentence of paragraph 202 and, therefore, denies the allegations in the
second sentence of paragraph 202 and refers to Exhibit P for a complete and accurate statement
of the contents therein.  To the extent the Trustee purports to reserve a right in footnote 1 to
paragraph 202, such reservation is a legal position to which no response is required.  Further,
NatWest objects to the Trustee's purported reservation of a right to add additional transfers and
states that such purported reservation is improper and violates procedural rules.  To the extent a
response is necessary, NatWest denies knowledge or information sufficient to form a belief as to
the truth of the allegations in footnote 1 to paragraph 202 and, therefore, denies the allegations in
footnote 1.

203.    NatWest denies the allegations in the final sentence of paragraph 203, including
the allegation that any portion of the monies it received from Rye Portfolio Limited constitute

customer property.  NatWest admits the remaining allegations in paragraph 203 and refers to

Exhibit J for a complete and accurate statement of the contents therein.

### G.    The 2007 Tremont Transaction: Subsequent Transfers of Collateral Payments and Redemption Payments

204.    NatWest states that paragraph 204 constitutes a legal conclusion to which no

response is required, but to the extent a response is required, NatWest denies the allegations.

205.    NatWest denies knowledge or information sufficient to form a belief as to the

truth of the allegations contained in paragraph 205 or the basis or contents of Exhibit D and,

therefore, denies the allegations in paragraph 205 and Exhibit D.

206.    NatWest denies knowledge or information sufficient to form a belief as to the

truth of the allegations contained in paragraph 206 or the basis or contents of Exhibit G and,

therefore, denies the allegations in paragraph 206 and Exhibit G.

207.    NatWest denies knowledge or information sufficient to form a belief as to the

truth of the allegations contained in paragraph 207 or the basis or contents of Exhibit O and,

therefore, denies the allegations in paragraph 207 and Exhibit O.

208.    NatWest denies that it received from Rye Broad Market a subsequent transfer of

customer property totaling at least $1,400,000 (the "Rye Broad Market Subsequent Transfers"),

including the allegation that any portion of the monies it received from Rye Broad Market

constitute customer property.  NatWest denies knowledge or information sufficient to form a

belief as to the truth of the basis or contents of Exhibit C and, therefore, denies the allegations

referring to Exhibit C and refers to Exhibit C for a complete and accurate statement of the

contents therein.  NatWest denies knowledge or information sufficient to form a belief as to the

truth of the allegations contained in the final sentence of paragraph 208 and, therefore, denies the

allegations in the final sentence of paragraph 208, including the allegation that any portion of the

monies it received from Rye Broad Market constitute customer property. NatWest admits the

remaining allegations in paragraph 208.

209.    NatWest denies knowledge or information sufficient to form a belief as to the

truth of the allegations contained in paragraph 209 and, therefore, denies the allegations in

paragraph 209.

210.    The allegations in paragraph 210 constitute a legal conclusion to which no

response is required, but to the extent a response is required, NatWest denies the allegations.

211.    To the extent the Trustee purports to reserve a right in paragraph 211, such

reservation is a legal position to which no response is required. Further, NatWest objects to the

Trustee's purported reservation of a right to add additional transfers and states that such

purported reservation is improper and violates procedural rules. To the extent a response is

necessary, NatWest denies knowledge or information sufficient to form a belief as to the truth of

the allegations in paragraph 211 and, therefore, denies the allegations in paragraph 211.

IX.    **RECOVERY OF THE HARLEY SUBSEQUENT TRANSFERS**

A.    **Initial Transfers from BLMIS to Harley**

212.    NatWest denies knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 212 and, therefore, denies the allegations. NatWest admits

that the Trustee filed an adversary proceeding in the Bankruptcy Court styled as *Picard v. Harley*

*Int'l (Cayman) Ltd.*, No. 09-01187 (BRL) (the "Harley Avoidance Action"), seeking to avoid

and recover alleged initial transfers of customer property from BLMIS to Harley in the amount

of approximately $1,072,800,000 (the "Harley Initial Transfers"), but denies that the alleged

initial transfers of customer property from BLMIS to Harley were, or are, avoidable. NatWest

objects to the Trustee's purported incorporation by reference of all other paragraphs and

allegations the complaint filed in the Harley Avoidance Action, and because the purported

incorporation by reference constitutes a legal conclusion, therefore, does not answer such

allegations.  NatWest further objects to the inclusion in this adversary proceeding of any issue

implicated by the incorporation of the Harley Complaint.

The statements in paragraph 212 as to the nature of certain transfers, the characterization

of certain funds as customer property, and transfers allegedly sought to be avoided and recovered

constitute legal conclusions and thus no response is required.  To the extent a response is

determined to be required, NatWest denies knowledge or information sufficient to form a belief

as to the truth of the allegations contained in paragraph 212 and, therefore, denies the allegations

contained in paragraph 212.  NatWest reserves the right to rely on and introduce any allegations

in any of the Trustee's Harley Complaint or in the exhibits thereto as party admissions.

213.    NatWest denies knowledge or information sufficient to form a belief as to the

truth of the allegations in paragraph 213 and, therefore, denies the allegations, and refers the

Court to the November 10, 2010 default judgment by the Bankruptcy Court (ECF No. 15) for a

complete and accurate statement of its contents.

214.    NatWest denies knowledge or information sufficient to form a belief as to the

truth of the allegations in the first sentence of paragraph 214 or the basis or contents of Exhibit R

and, therefore, denies the allegations in the first sentence of paragraph 214 and Exhibit R.  The

final sentence of paragraph 214 constitutes a legal conclusion to which no response is required,

but to the extent a response is required, NatWest denies the allegations.

215.    NatWest denies knowledge or information sufficient to form a belief as to the

truth of the allegations in the first sentence of paragraph 215 or the basis or contents of Exhibit R

and, therefore, denies the allegations in the first sentence of paragraph 215 and Exhibit R.  The

final sentence of paragraph 215 constitutes a legal conclusion to which no response is required, but to the extent a response is required, NatWest denies the allegations.

216.    NatWest states that paragraph 216 constitutes a legal conclusion to which no response is required, but to the extent a response is required, NatWest denies the allegations.

### B.    Subsequent Transfers from Harley to Defendant

217.    NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 217, including the prior status of the funds, or the basis or contents of Exhibit S and, therefore, denies the allegations in paragraph 217 and Exhibit S.

218.    The allegations in paragraph 218 constitute a legal conclusion to which no response is required, but to the extent a response is required, NatWest denies the allegations.

219.    To the extent the Trustee purports to reserve a right in paragraph 219, such reservation is a legal position to which no response is required.  Further, NatWest objects to the Trustee's purported reservation of a right to add additional transfers and states that such purported reservation is improper and violates procedural rules.  To the extent a response is necessary, NatWest denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 219 and, therefore, denies the allegations in paragraph 219.

### COUNT ONE

### RECOVERY OF RYE PORTFOLIO LIMITED SUBSEQUENT TRANSFERS

### 11 U.S.C. §§ 105(a) AND 550

220.    NatWest incorporates by reference its answers to the previous paragraphs of the Complaint as if fully rewritten herein.

221.    NatWest denies the allegations of paragraph 221, except it admits it received approximately $104,464,000 from Rye Portfolio Limited.

36

222.    NatWest denies the allegations of paragraph 222.

223.    NatWest denies the allegations of paragraph 223.

## COUNT TWO

### RECOVERY OF XL PORTFOLIO LIMITED SUBSEQUENT TRANSFERS

### 11 U.S.C. §§ 105(a) AND 550

224.    NatWest incorporates by reference its answers to the previous paragraphs of the Complaint as if fully rewritten herein.

225.    NatWest denies the allegations of paragraph 225, except it admits it received approximately $84,616,573 from XL Portfolio Limited.

226.    NatWest denies the allegations of paragraph 226.

227.    NatWest denies the allegations of paragraph 227.

## COUNT THREE

### RECOVERY OF RYE BROAD MARKET SUBSEQUENT TRANSFERS

### 11 U.S.C. §§ 105(a) AND 550

228.    NatWest incorporates by reference its answers to the previous paragraphs of the Complaint as if fully rewritten herein.

229.    NatWest denies the allegations of paragraph 229, except it admits it received approximately $1,400,000 from Rye Broad Market.

230.    NatWest denies the allegations of paragraph 230.

231.    NatWest denies the allegations of paragraph 231.

## COUNT FOUR

### RECOVERY OF XL BROAD MARKET SUBSEQUENT TRANSFERS

### 11 U.S.C. §§ 105(a) AND 550

232.    NatWest incorporates by reference its answers to the previous paragraphs of the Complaint as if fully rewritten herein.

233.    NatWest denies the allegations of paragraph 233, except it admits it received approximately $95,833,333 from XL Broad Market.

234.    NatWest denies the allegations of paragraph 234.

235.    NatWest denies the allegations of paragraph 235.

### COUNT FIVE

### RECOVERY OF HARLEY SUBSEQUENT TRANSFERS

### 11  U.S.C. §§ 105(a) AND 550

236.    NatWest incorporates by reference its answers to the previous paragraphs of the Complaint as if fully rewritten herein.

237.    NatWest denies the allegations of paragraph 237, except it admits it received approximately $21,799,920 from Harley.

238.    NatWest denies the allegations of paragraph 238.

239.    NatWest denies the allegations of paragraph 239.

### RESPONSE TO REQUEST FOR RELIEF

NatWest denies that the Trustee is entitled to judgment in his favor as against NatWest, in whole or in part, or any relief of any nature whatsoever.  NatWest further denies that this Court has jurisdiction to enter any such judgment or relief.  NatWest demands, and does not waive its right to, a jury trial on all issues in this action so triable.

### [PROPOSED] AMENDED AFFIRMATIVE DEFENSES

In the event that subsequent legal developments change the availability or nature of

claims asserted by Plaintiff, NatWest hereby preserves each and every defense at law, in equity, or otherwise, available under federal and state law, including common law.  Further, NatWest reserves the right to amend this Answer to assert other and further defenses, cross-claims, counterclaims, and/or third party claims when and if, in the course of investigation, discovery, or preparation for trial, or otherwise, it becomes appropriate to do so.  NatWest asserts the following defenses without assuming the burden of proof on any issue or element or any other burden if, as a matter of law, such burdens would otherwise be on the Trustee.  NatWest incorporates herein by reference the contents of its memorandum and reply memorandum in support of its motion to dismiss the Complaint as if fully rewritten herein.  NatWest reiterates that it does not consent, and instead objects, to this Court's jurisdiction and/or to its authority to enter a final Order or Judgment against NatWest.  In addition, NatWest demands, and does not waive its right to, a jury trial on all issues in this action so triable.  If the Court determines that any of these defenses should have been pled as counterclaims, they should be treated as counterclaims pursuant to Federal Rule of Civil Procedure 8(c)(2).  The following defenses are set forth cumulatively and in the alternative:

## FIRST AFFIRMATIVE DEFENSE

Under prior decisions applicable to this case, all of the claims alleged in the Complaint are barred but for those claims asserted under Section 548(a)(1)(A) and Section 550(a) of the Bankruptcy Code.

## SECOND AFFIRMATIVE DEFENSE

### (Failure to State a Claim for Relief)

The Complaint fails to state a claim upon which relief can be granted, including without limitation for the reasons stated in NatWest's Memorandum of Law in Support of its Motion to Dismiss the Complaint and Reply (Dkts. 224 and 230).

### THIRD AFFIRMATIVE DEFENSE

### (Dismissed Claims)

The Trustee's claims are barred to the extent they have been, or in the future may be, dismissed or released by the Trustee or the Court and/or are based on allegations that have been, or in the future may be, dismissed or released by the Trustee or the Court, or are based on theories or allegations that may in the future be rejected by this Court or by another court on appeal from any orders of this Court, including any claims released or dismissed in the Tremont Settlement Agreement.

### FOURTH AFFIRMATIVE DEFENSE

The Complaint fails to state a claim on which relief can be granted, and violates Fed. R. Civ. P. 10(c), because instead of properly pleading the elements required for the avoidance of the Tremont Initial Transfers ($2,140,297 allegedly transferred from BLMIS to the Rye Funds, Rye Insurance LDC, and Rye Prime Fund) or the Harley Initial Transfers ($1,072,800,000 allegedly transferred from BLMIS to Harley, Account Number 1FN094), the Complaint: (1) improperly incorporates by reference pleadings from another action; (2) improperly incorporates entire pleadings, not the statements in the pleadings, and; (3) improperly fails to specify the relevant allegations that are being incorporated.

### FIFTH AFFIRMATIVE DEFENSE

The Complaint fails to state a claim on which relief can be granted, and violates Fed. R.

of Civ. P. Rule 8(a)(2), and principles enumerated in the United States Supreme Court's

decisions in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) and *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544 (2007), because, given its improper incorporation by reference of an entire pleading,

and even if the incorporation by reference is found to be proper, it fails to identify the avoidable

Tremont Initial Transfers and Harley Initial Transfers that form the basis for the Trustee's claims

under 11 U.S.C. §§ 550 and 551, and/or fails to adequately allege the avoidability of such

transfers.

## SIXTH AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted, and violates Fed.

R. Civ. P. 9(b), because it fails to plead each element of fraudulent transfer under 11 U.S.C. §

548(a) with sufficient particularity, as Plaintiff has not identified the avoidable initial transfers,

or alleged facts sufficient to demonstrate that the Tremont Initial Transfers or Harley Initial

Transfers were made with actual intent to hinder, delay or defraud creditors or customers of

BLMIS. *See Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d

43, 56 (2d Cir. 2005) (Because "'actual intent to hinder, delay or defraud' constitutes fraud, it

must be pled with specificity, as required by Fed. R. Civ. P. 9(b)." (citation omitted)).

## SEVENTH AFFIRMATIVE DEFENSE

### (Predicate Initial Transfer Not Avoided: 11 U.S.C. § 550(a))

Plaintiff's claims based on alleged "subsequent transfers" are barred because Plaintiff has

not avoided, or adequately pled the avoidability of, any initial transfer within the meaning of 11

U.S.C. § 550(a). The Trustee may not recover transfers from NatWest until and unless transfers

between BLMIS and Tremont and between BLMIS and Harley have been avoided, which has

not occurred and may not occur.

## EIGHTH AFFIRMATIVE DEFENSE

Even if any of the Tremont Initial Transfers or Harley Initial Transfers are avoided, none

of the Tremont Initial Transfers or Harley Initial Transfers may be recovered from NatWest

under 11 U.S.C. 550(a), because NatWest is not (a) an initial transferee of the Tremont Initial

Transfers or Harley Initial Transfers, (b) an entity for whose benefit the Tremont Initial Transfers

or Harley Initial Transfers were made, or (c) a mediate or immediate transferee of the Tremont

Initial Transfers or Harley Initial Transfers.

## NINTH AFFIRMATIVE DEFENSE

### (No Customer Property: 15 U.S.C. § 78fff-2(c)(3))

The Complaint fails to state a claim for recovery under 15 U.S.C. § 78fff-2(c)(3) because

Plaintiff has not plausibly alleged that NatWest received transfers of BLMIS customer property.

Some or all of the transfers from the XL Funds to NatWest, upon information and belief, as set

forth in NatWest's Memorandum of Law in Support of its Motion to Dismiss the Complaint and

Reply (Dkts. 224 and 230) and other filings, are not traceable in whole or in part to the customer

property transferred from BLMIS to Tremont.  Many of the subsequent transfers by the XL

Funds could not have been sourced from BLMIS customer property because the allegedly

avoidable transfers from BLMIS to the Rye Feeder Funds (and thereby to XL Portfolio Limited

or XL Broad Market) were made after XL Portfolio Limited and XL Broad Market had

completed the alleged distributions to NatWest.  Many of the subsequent transfers by the XL

Funds could not have been sourced from BLMIS customer property because, as the Complaint

also alleges, that money was immediately returned to BLMIS and to its affiliates or other

institutions.  Therefore some or all of these XL Funds transfers to NatWest must have originated

from other sources including, upon information and belief, proceeds Tremont received from

selling shares to new investors that it used to make payments for redemptions of shares by

existing Tremont shareholders without ever remitting the new share proceeds to BLMIS.  Such

funds paid to redeeming Tremont shareholders are not BLMIS customer property.

### TENTH AFFIRMATIVE DEFENSE

The Trustee's claims are barred, in whole or in part, because none of the Tremont Initial

Transfers or Harley Initial Transfers may be avoided, or recovered from NatWest, under Sections

544, 548, and 550 of the Bankruptcy Code because Tremont, Harley, and NatWest all took the

alleged transfers for value and in good faith, as provided by 11 U.S.C. § 548(c).  NatWest did not

have knowledge that BLMIS was not trading securities but had only knowledge that was

available publicly, did not know facts that would have prompted a reasonable person in

NatWest's position to conduct further inquiry into BLMIS's possible fraud, and even if NatWest

had conducted a diligent inquiry, it would not have discovered the fraudulent purpose of the

Transfers.

NatWest took for value because the Transfers totaled less than the amount that NatWest

had invested with Tremont and Harley.

NatWest began investing in Tremont after David Schwartz, ABN Inc.'s Executive

Director, Fund Linked Derivatives of Structured Credit Products, met with Tremont in 2006.

NatWest began investing in Harley after meeting with Harley.  NatWest knew that Tremont and

Harley in turn invested in funds operated by Bernard L. Madoff, that Madoff was a well-

respected member of the investment community and one-time chair of NASDAQ, that BLMIS

was one of the largest market makers in NASDAQ stocks and reported delivering consistently

high returns on investment, and that BLMIS claimed to use a split strike conversion strategy to obtain these results, which NatWest did not know to be false before the Filing Date.

NatWest was not aware of information about BLMIS beyond what was publicly available. NatWest did not have access to non-public information regarding BLMIS, and handled its Tremont and Harley accounts on the basis of publicly known information about BLMIS. None of the communications NatWest had with Tremont or Harley employees revealed or suggested that BLMIS was not trading securities or was a fraud or a Ponzi scheme, and NatWest had no communications with Madoff or BLMIS employees.

The information regarding BLMIS's performance as compared to the S&P 500 during the Relevant Period did not reveal that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Analyzing funds' performance, like Tremont and Harley funds', against the S&P 500 was a common industry practice, and many funds had R-Squared coefficients similar to Tremont and Harley funds' performance, for example, when comparing their performance to the S&P 500 or other market indexes.

No one informed NatWest that BLMIS was not trading securities or was a fraud or a Ponzi scheme. David Schwartz, the aforementioned Executive Director, Fund Linked Derivatives of Structured Credit Products for ABN Inc. in the Trustee's Complaint, did not inform NatWest or other NatWest personnel that he believed BLMIS was not trading securities or was a fraud or a Ponzi scheme. Nor did Mr. Schwartz have such a belief.

A reasonable person with the facts in NatWest's possession at the time of the Transfers would not have been on inquiry notice of the fraudulent purpose behind the Transfers, nor would those facts have led such a person to conduct further inquiry into whether BLMIS was trading securities or was a fraud or a Ponzi scheme.

Even if NatWest had been on inquiry notice of the possible fraudulent purpose behind the Transfers or of facts that would have led a reasonable person to conduct further inquiry into whether BLMIS was trading securities or was a fraud or a Ponzi scheme, a diligent inquiry by NatWest would not have discovered that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Other entities with greater investigatory tools and resources than NatWest, and with more access to BLMIS personnel and documentation than NatWest, investigated BLMIS but failed to uncover that it was a Ponzi scheme before December 2008, including the United States Securities and Exchange Commission, which began an investigation into BLMIS in 2006 but could not determine BLMIS's fraudulent purpose. NatWest did not have the capability of discovering what federal regulators could not, and NatWest would not have discovered the fraudulent purpose of the Transfers.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Good Faith: 11 U.S.C. § 550(b))

Plaintiff's claims are barred in whole or in part by 11 U.S.C. § 550(b), because NatWest received the transfers from Tremont and Harley: for value, including but not limited to in exchange for NatWest's surrender of shares being redeemed; without knowledge of the alleged voidability of the Tremont Initial Transfers or Harley Initial Transfers within the meaning of 11 U.S.C. 550(b) and/or as a purchaser for fair consideration; and in good faith, with no knowledge of facts that would have put NatWest on inquiry notice of any fraudulent purpose behind the Tremont Initial Transfers or Harley Initial Transfers.

NatWest provided value in exchange for the transfers at issue. In exchange for the $104,464,000 redemption, NatWest surrendered an equivalent portion of its equity interest in Rye Portfolio Limited. In exchange for the $1,400,000 redemption, NatWest surrendered an

equivalent portion of its equity interest in Rye Broad Market.  In exchange for the $217 million

collateral transfer from Tremont, NatWest gave value by satisfying its contractual obligations to

provide leveraged returns in the 2006 Tremont Transaction. In exchange for the $95,833,333

collateral transfer from Tremont, NatWest gave value by satisfying its contractual obligations to

provide leveraged returns in the 2007 Tremont Transaction. In exchange for the $21,799,920

redemption from Harley, NatWest surrendered an equivalent portion of its equity interest in

Harley.

Moreover, in the event NatWest is found to have had inquiry notice, a diligent inquiry

would not have led NatWest to discover a fraudulent purpose behind the transfers.

To the extent that NatWest received any alleged Tremont Subsequent Transfers

($84,616,573 in alleged transfers from Rye Portfolio Limited and Rye Insurance LDC to XL

Portfolio Limited, the "XL Portfolio Limited Subsequent Transfers"; NatWest's alleged

redemption of $104,464,000 from Rye Portfolio Limited, the "Rye Portfolio Limited Subsequent

Transfers"; $95,833,333 XL Broad Market received from Rye Broad Market and Rye Prime

Fund and allegedly transferred to NatWest as collateral, the "XL Broad Market Subsequent

Transfers"; and Rye Broad Market Subsequent Transfers; collectively "Tremont Subsequent

Transfers") or any of $21,799,920 allegedly transferred by Harley to NatWest (the "Harley

Subsequent Transfers") or any proceeds thereof, it took in good faith because: (i) it lacked

knowledge or suspicion that Madoff, BLMIS, Tremont, Harley, or any of their respective

affiliates, officers, directors, employees, agents, or other personnel were not trading securities or

were conducting a fraud, or of any fraudulent purpose behind the alleged Tremont Subsequent

Transfers and Harley Subsequent Transfers; (ii) it lacked knowledge or suspicion of the

voidability of any alleged Tremont Initial Transfers or Harley Initial Transfers at the time that it

allegedly received any alleged Tremont Subsequent Transfers; and Harley Subsequent Transfers

(iii) it lacked actual fraudulent intent at the time it allegedly received any alleged Tremont

Subsequent Transfers or Harley Subsequent Transfers; (iv) it lacked knowledge or suspicion of

facts suggestive of any alleged fraud that would have caused a reasonable person in NatWest's

position to conduct further inquiry; and (v) even if NatWest had been on inquiry notice, a

diligent inquiry would not have discovered the allegedly fraudulent purpose of any transfers at

issue or that Madoff, BLMIS, Tremont, Harley, or any of their respective affiliates, officers,

directors, employees, agents, or other personnel were not trading securities or were conducting a

fraud.

 This is evidenced by the fact that, upon information and belief, many substantial

investors that provided funds for or in connection with purchases and holding of Tremont or

Harley shares, financial consultants, advisors, and other companies conducted diligent and

thorough investigations and did not obtain knowledge of the fraud.  Madoff and his fellow

conspirators actively concealed the existence of their fraud, including from customers and

government regulators, apparently for decades.

 Significant independent public auditing companies with substantial incentive to inquire

into the financial position of Tremont, Harley, and other so-called "Madoff feeder funds" did

not, upon information and belief, discover or obtain knowledge of fraud and certified Tremont's,

Harley's and other "feeder funds'" financial statements as fairly presenting their respective

financial positions.  In addition, upon information and belief, one or more government entities,

including the United States Securities and Exchange Commission, with greater investigatory

tools and resources than NatWest, and with more access to BLMIS personnel and documentation

than NatWest had, repeatedly examined and investigated BLMIS and Madoff based in part on

received detailed, factual third-party analyses of BLMIS's activities and yet did not discover or

obtain knowledge of their fraud before December 2008.  NatWest did not have the ability to

compel the production of information from third parties that would have been necessary to

establish that BLMIS was committing fraud.

At all relevant times, NatWest had access to, and was aware of, only publicly available

information about Tremont, Harley, and BLMIS, including the general information disseminated

by Tremont and Harley.  NatWest did not have personal access to Madoff or BLMIS, or ever

meet or communicate directly with either of them.

If, as the Trustee alleges, the Tremont Initial Transfers or Harley Initial Transfers are

avoidable, NatWest had no knowledge of such avoidability.

## TWELFTH AFFIRMATIVE DEFENSE

### (Safe Harbor: 11 U.S.C. § 546(e))

The Tremont Initial Transfers and Harley Initial Transfers may not be avoided, and the

Trustee may not pursue any recovery under 11 U.S.C. § 550(a) premised upon the alleged

avoidance or avoidability of any alleged Tremont Initial Transfers or Harley Initial Transfers, in

whole or in part, because they were transfers, or settlement payments made by or to, or for the

benefit of a stockbroker, financial institution, or financial participant, in connection with a

securities contract, before the commencement of the action, and were therefore not avoidable by

the Trustee by reason of 11 U.S.C. § 546(e), except to the extent that the Trustee can establish

such transfers were made with actual intent to defraud within two years before the Filing Date.

BLMIS, Tremont, Harley, and NatWest were at all relevant times covered entities under

that statute, being stockbrokers, financial institutions, financial participants, and/or otherwise

covered entities.

48

All alleged transfers received by NatWest were received in connection with or relation to a securities agreement between BLMIS and Tremont or Harley and/or between Tremont or Harley and NatWest.

None of the alleged transfers was made with intent to hinder, delay, or defraud BLMIS's, Tremont's, or Harley's creditors. The so-called "Ponzi scheme presumption" does not meet the "intent to hinder, delay or defraud" element because it is based on faulty legal and factual reasoning and has not been adopted by the Second Circuit Court of Appeals or the Supreme Court.

At the time of the alleged initial transfers, Tremont and Harley did not have actual knowledge that Madoff and/or BLMIS were not trading securities or that they were perpetuating a Ponzi scheme. The alleged initial transfers are also not avoidable under 11 U.S.C. §§ 544, 550, and 551, certain applicable provisions of the N.Y. Debt. & Cred. Law, including §§ 273-279, or 15 U.S.C. § 78fff-2(c)(3).

To the extent, if any, that NatWest received any subsequent transfers originating from the unavoidable alleged initial transfers, such subsequent transfers are not recoverable under 11 U.S.C. § 550(a) or 15 U.S.C. § 78fff-2(c)(3). At the times when NatWest received alleged transfers from Tremont or Harley, it had no knowledge of fraud committed by Madoff, BLMIS, Tremont, Harley, or any of their respective affiliates, officers, directors, employees, agents, or other personnel, and did not know or suspect that Madoff and BLMIS were not making securities trades or were engaged in a fraud.

### THIRTEENTH AFFIRMATIVE DEFENSE

**(Safe Harbor: 11 U.S.C. § 546(g))**

The Tremont Initial Transfers and Harley Initial Transfers may not be avoided, and the Trustee may not pursue any recovery under 11 U.S.C. § 550(a) premised upon the alleged avoidance or avoidability of any alleged Tremont Initial Transfers or Harley Initial Transfers, in whole or in part, because they were made by or to (or for the benefit of) a swap participant or financial participant and under or in connection with a swap agreement made before the commencement of the action and were therefore not avoidable by the Trustee by reason of 11 U.S.C. § 546(g), except to the extent that the Trustee can establish such transfers were made with actual intent to defraud within two years before the Filing Date.

BLMIS, Tremont, Harley, and NatWest were at all relevant times covered entities under that statute, being swap participants and/or financial participants.

All alleged transfers received by NatWest were received in connection with or relation to a swap agreement between BLMIS and Tremont or Harley and/or between Tremont or Harley and NatWest.

None of the alleged transfers was made with intent to hinder, delay, or defraud BLMIS's, Tremont's, or Harley's creditors. The so-called "Ponzi scheme presumption" does not meet the "intent to hinder, delay or defraud" element because it is based on faulty legal and factual reasoning and has not been adopted by the Second Circuit Court of Appeals or the Supreme Court.

At the time of the alleged initial transfers, Tremont and Harley did not have actual knowledge that Madoff and/or BLMIS were not trading securities or that they were perpetuating a Ponzi scheme. The alleged initial transfers are also not avoidable under 11 U.S.C. §§ 544, 550, and 551, certain applicable provisions of the N.Y. Debt. & Cred. Law, including §§ 273-279, or 15 U.S.C. § 78fff-2(c)(3).

To the extent, if any, that NatWest received any subsequent transfers originating from the unavoidable alleged initial transfers, such subsequent transfers are not recoverable under 11 U.S.C. § 550(a) or 15 U.S.C. § 78fff-2(c)(3). At the times when NatWest received alleged transfers from Tremont or Harley, it had no knowledge of fraud committed by Madoff, BLMIS, Tremont, Harley, or any of their respective affiliates, officers, directors, employees, agents, or other personnel, and did not know or suspect that Madoff and BLMIS were not making securities trades or were engaged in a fraud.

## FOURTEENTH AFFIRMATIVE DEFENSE

## (Good Faith: NYDCL § 278(2))

Plaintiff's claim under Bankruptcy Code § 544 that relies on the New York Debtor & Creditor Law is barred, in whole or in part, because the alleged transfers to NatWest were taken for fair consideration, without knowledge of the fraud, and without actual fraudulent intent, within the meaning of § 278(2).

The transfers were for fair consideration because NatWest provided value in exchange for the transfers at issue. In exchange for the $104,464,000 redemption, NatWest surrendered an equivalent portion of its equity interest in Rye Portfolio Limited. In exchange for the $1,400,000 redemption, NatWest surrendered an equivalent portion of its equity interest in Rye Broad Market. In exchange for the $217 million collateral transfer from Tremont, NatWest gave value by satisfying its contractual obligations to provide leveraged returns in the 2006 Tremont Transaction. In exchange for the $95,833,333 collateral transfer from Tremont, NatWest gave value by satisfying its contractual obligations to provide leveraged returns in the 2007 Tremont Transaction. In exchange for the $21,799,920 redemption from Harley, NatWest surrendered an equivalent portion of its equity interest in Harley.

51

To the extent that NatWest received any alleged Tremont Subsequent Transfers or Harley Subsequent Transfers or any proceeds thereof, it took in good faith because: it lacked actual fraudulent intent at the time it allegedly received any alleged Tremont Subsequent Transfers or Harley Subsequent Transfers.

If, as the Trustee alleges, the Tremont Initial Transfers or Harley Initial Transfers are avoidable, NatWest had no knowledge of such avoidability.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Good Faith: NYDCL § 278(1))

Plaintiff's claim under Bankruptcy Code § 544 that relies on the New York Debtor & Creditor Law is barred, in whole or in part, because the alleged transfers to NatWest were taken for fair consideration, without knowledge of the fraud, and without actual fraudulent intent, within the meaning of § 278(1).

The transfers were for fair consideration because NatWest provided value in exchange for the transfers at issue.  In exchange for the $104,464,000 redemption, NatWest surrendered an equivalent portion of its equity interest in Rye Portfolio Limited.  In exchange for the $1,400,000 redemption, NatWest surrendered an equivalent portion of its equity interest in Rye Broad Market.  In exchange for the $217 million collateral transfer from Tremont, NatWest gave value by satisfying its contractual obligations to provide leveraged returns in the 2006 Tremont Transaction.   In exchange for the $95,833,333 collateral transfer from Tremont, NatWest gave value by satisfying its contractual obligations to provide leveraged returns in the 2007 Tremont Transaction.  In exchange for the $21,799,920 redemption from Harley, NatWest surrendered an equivalent portion of its equity interest in Harley.

To the extent that NatWest received any alleged Tremont Subsequent Transfers or Harley Subsequent Transfers or any proceeds thereof, it took in good faith because: (i) it lacked knowledge that BLMIS was not trading securities or was conducting a fraud, or of any fraudulent purpose behind the alleged Tremont Subsequent Transfers or Harley Subsequent Transfers; (ii) it lacked knowledge of the voidability of any alleged Tremont Initial Transfers or Harley Initial Transfers at the time that it allegedly received any alleged Tremont Subsequent Transfers or Harley Subsequent Transfers; (iii) it lacked knowledge of facts suggestive of any alleged fraud that would have caused a reasonable person in NatWest's position to conduct further inquiry; and (iv) even if NatWest was on inquiry notice, a diligent inquiry would not have discovered the allegedly fraudulent purpose of any transfers at issue or that BLMIS was not trading securities or was conducting a fraud. At all relevant times, NatWest had access to, and was aware of, only publicly available information about Tremont, Harley, and BLMIS, including the general information disseminated by Tremont and Harley. NatWest did not have personal access to Madoff or BLMIS, or ever meet or communicate directly with either of them.

Madoff and his fellow conspirators actively concealed the existence of their fraud, including from customers and government regulators, apparently for decades. In addition, upon information and belief, one or more government entities, including the United States Securities and Exchange Commission, with greater investigatory tools and resources than NatWest, and with more access to BLMIS personnel and documentation than NatWest had, repeatedly examined and investigated BLMIS and Madoff based in part on received detailed, factual third-party analyses of BLMIS's activities and yet did not discover or obtain knowledge of their fraud before December 2008. NatWest did not have the ability to compel the production of

information from third parties that would have been necessary to establish that BLMIS was committing fraud.

If, as the Trustee alleges, the Tremont Initial Transfers or Harley Initial Transfers are avoidable, NatWest had no knowledge of such avoidability.

### SIXTEENTH AFFIRMATIVE DEFENSE

The claims against NatWest are barred, in whole or in part, because the Trustee failed to plead all of the elements of fraudulent transfer under section 544 of the Bankruptcy Code and sections 273, 274, 275, 276, 276-a, 278 and/or 279 of the New York Debtor and Creditor Law with sufficient particularity and factual support.

### SEVENTEENTH AFFIRMATIVE DEFENSE

### (Single Satisfaction: 11 U.S.C. § 550(d) and NYDCL § 278(1)(a))

The alleged transfers are not avoidable as against Tremont or Harley, or recoverable from NatWest, under the single satisfaction rule set forth in 11 U.S.C. § 550(d) (specifying the Trustee "is entitled to only a single satisfaction under" 11 U.S.C. § 550(a)).  Under NYDCL § 278(1)(a), the Trustee may only set aside a conveyance "to the extent necessary to satisfy his claim."

These statutes prevent the Trustee from recovering further because the Trustee has, on information and belief, recovered from other individuals and entities funds purportedly transferred by Tremont and Harley.  Accordingly, if and to the extent that the Trustee has recovered, or will recover, from Tremont or Harley or from any other immediate or mediate transferee the amount of any avoided initial transfer that includes customer property that the Trustee alleges was received by the NatWest, the Trustee is barred from recovering any such alleged transfer (or its proceeds) from NatWest by virtue of Bankruptcy Code § 550(d) and NYDCL § 278(1)(a).

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred to the extent Plaintiff lacks standing and/or capacity to assert claims against NatWest.

## NINETEETH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred to the extent that any damages allegedly suffered were caused by the intervening act(s) or omission(s) of persons or entities other than NatWest and said act(s) or omission(s) superseded any act or omission by NatWest for which it might be considered liable.

## TWENTIETH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because NatWest's alleged conduct was not the cause of Plaintiff's injuries.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### (Statute of Limitations)

Plaintiff's claims are barred, in whole or in part, by any applicable statutes of limitations.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

### (Unclean Hands and Other Equitable Doctrines)

Plaintiff's claims are barred, in whole or in part, by the equitable doctrines of waiver, equitable estoppel, *in pari delicto*, unclean hands, laches, and other equitable defenses that may appear upon further discovery and investigation.

The Trustee stands in the shoes of BLMIS and Madoff, who committed the alleged frauds that resulted in the alleged losses the Trustee seeks to recover from NatWest. The Trustee is

barred from recovering such losses from NatWest because BLMIS's and Madoff's acts and omissions are attributed to the Trustee by the doctrines of *in pari delicto* and unclean hands.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims should be dismissed if Plaintiff has recovered, or during the pendency of this action recovers, sufficient funds to reimburse SIPC for all payments that SIPC has made to satisfy allowed claims of BLMIS customers.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

Plaintiff failed to mitigate, minimize, or avoid damages, if any.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred on the grounds that NatWest reasonably and justifiably relied on the activities of industry groups, including SIPC, and governmental agencies and regulatory bodies, including the SEC and FINRA, to monitor and oversee the activities of BLMIS.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

The enforcement of relief against NatWest, a victim of Madoff's fraud, is unconscionable and a violation of public policy.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, based upon rulings, judgments, orders, or decisions entered in any liquidation proceedings of Tremont and any liquidation proceedings of Harley, including any related appellate rulings, judgments, orders, or decisions.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

### (Recovery from Liquidators)

If and to the extent the Trustee recovers from the Liquidators of Tremont or Harley all or any portion of the amount it seeks from NatWest pursuant to the sharing provisions of any

settlement agreement into which the Trustee and Liquidators entered and the Court approved, or

otherwise, the Trustee may not recover the same amount from NatWest because it would

constitute an impermissible double recovery for a single loss.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because they are preempted by the Securities Litigation

Uniform Standards Act, 15 U.S.C. § 78bb(f)(1).

## THIRTIETH AFFIRMATIVE DEFENSE

### (Preservation of Rights to Make Possible Claim: 11 U.S.C. § 502(h))

To the extent the Trustee recovers from NatWest, a victim of Madoff's fraud,

enforcement of relief against NatWest is subject to the right of setoff under Section 502(h) of the

Bankruptcy Code and NatWest reserves its rights of claim and recovery under that Section.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

### (NatWest Has Suffered as a BLMIS Victim as Its Own Investments Remain Unreturned)

NatWest made investments in Tremont and Harley in good faith as part of swap

transactions.  At the time of the collapse of BLMIS and its various feeder funds, many of these

investments, the "Unreturned Tremont Investments" and "Unreturned Harley Investments," each

arising out of the same contracts as the Trustee's claims in a single unified transaction, remained

unredeemed.  NatWest therefore is among the victims of Madoff's fraud, entitled to claims

pursuant to the common law doctrines of unjust enrichment and recoupment, pursuant to sections

502(h), 553, and any other applicable sections of the Bankruptcy Code, and pursuant to 15

U.S.C. § 78fff-2(b).  As a victim of the alleged fraud, NatWest cannot also be a perpetrator.

BLMIS and Madoff have been unjustly enriched at NatWest's expense.

The BLMIS estate was enriched by the money NatWest invested with BLMIS.  This enrichment was at NatWest's expense.  Permitting the BLMIS estate to recover money from NatWest when the estate is in possession of the much larger amount that NatWest invested with BLMIS cuts against equity and good conscience.

NatWest therefore does not owe BLMIS or Madoff anything; to the contrary, BLMIS and Madoff owe NatWest the return of NatWest's investments.  As a result, though NatWest seeks no affirmative recovery, despite its losses, should the Trustee's claims succeed, any recovery due the Trustee must be setoff or recouped by the much greater amounts due NatWest per the same contracts, netting the Trustee's claims to zero.

NatWest engaged in specific individual transactions with each of Tremont and Harley.  In these singular transactions, NatWest received money the Trustee alleges originated with BLMIS but then invested three times that amount back with BLMIS.

Two funds referred to herein as the XL Funds aimed to provide returns to their investors by investing fund assets in swap transactions with NatWest and other financial institution counterparties.  In each of two transactions, the XL Fund in question posted cash "collateral" with NatWest and, in exchange, NatWest agreed to provide three times the returns that would have been generated if that amount were invested in a specified "feeder fund" that invested with BLMIS.  Thus, from the perspective of the XL Funds, the swaps were essentially leveraged, synthetic investments in BLMIS.  NatWest in turn hedged its investment by investing in BLMIS, through the XL Funds, three times the collateral posted with NatWest, specifically $938,499,999. The money that was allegedly withdrawn from BLMIS was invested in BLMIS as part of the same overall transaction.

NatWest engaged in similar swap transactions with Harley. NatWest made these investments in Tremont and Harley in good faith as part of swap transactions. At the time of the collapse of BLMIS and its various feeder funds, many of these investments, the "Unreturned Tremont Investments" and "Unreturned Harley Investments," totaling at least $652,186,093, remained unredeemed. Again, the money that was allegedly withdrawn from BLMIS was invested in BLMIS as part of the same overall transaction.

NatWest provided valuable good faith investments to BLMIS, through its investments in the XL Funds and Harley; BLMIS, via the XL Funds and Harley, acknowledged, accepted, and benefitted from NatWest's investments; and it would be inequitable for BLMIS to enjoy the benefit NatWest provided without compensating NatWest. By NatWest's swap transactions, BLMIS, Madoff, Tremont, and Harley benefitted by providing returns to investors, enabling BLMIS, Madoff, the XL Funds, and Harley to solicit additional investors. As a good faith party to these swap transactions that made investments without knowledge of any wrongdoing or fraud, NatWest deserves to be compensated for BLMIS and Madoff's unjust enrichment.

NatWest incorporates by reference the allegations contained in the previous paragraphs of this Answer and Counterclaims as if fully rewritten herein. NatWest made investments in the Tremont funds, including as part of swap transactions, of over $900 million. Of that, over $600 million remains unreturned. NatWest also made millions of dollars of investments in the Harley funds, including as part of swap transactions. Of that, millions remain unreturned.

The Bankruptcy Code explicitly and implicitly preserves defendants' rights to setoff, recoupment, and claims that arise from the debtor estate's recovery in an adversary proceeding. The Unreturned Tremont Investments and Unreturned Harley Investments arise out of the same contracts as the Trustee's claims in single unified transactions and are recoverable pursuant to

the common law doctrines of unjust enrichment and recoupment, pursuant to sections 502(h), 553, and any other applicable sections of the Bankruptcy Code, and pursuant to 15 U.S.C. § 78fff-2(b).  As a result, the Trustee may not recover from NatWest when it is NatWest which is owed recovery under the same contracts by which the Trustee makes his claims.

Though NatWest seeks no recovery from the Madoff estate, should the Trustee's claims succeed in any respect, any recovery by the Trustee must be setoff or recouped by the recovery due NatWest, so that the Trustee, from NatWest, may recover nothing.  NatWest reserves any and all rights of recoupment.

### THIRTY-SECOND AFFIRMATIVE DEFENSE

NatWest's investments in Tremont and Harley outstripped what it received from Tremont and Harley, and any money NatWest received from Tremont and Harley, according to the Complaint, it immediately reinvested.  *See* Compl. ¶¶ 7, 39, 202, 207.  The Complaint thus fails as to the collateral payments because, assuming the allegations of the Complaint are true, NatWest immediately *returned* all of the collateral payments to BLMIS.

The Complaint fails to sufficiently allege that the XL Fund collateral payments were BLMIS customer property.  But even accepting the Trustee's speculation, the Complaint also alleges that this money was passed back to BLMIS, netting out the transfer.[3]

The Trustee seeks $84.6 million in XL Portfolio collateral payments and $95.8 million in XL Broad Market collateral payments.  *See* Compl. ¶¶ 202, 207.  But the Trustee also alleges that, in both swap transactions, NatWest proceeded to invest three times the amount of collateral it received from the XL Funds in Rye Feeder Funds, which in turn it invested in BLMIS.  *Id.* ¶¶

---

[3]      In fact, since NatWest is alleged in both instances to have invested three times the collateral in a so-called "feeder fund," NatWest's net transfer was to rather than from BLMIS.

7, 39.  That means that NatWest transferred back the money it supposedly received indirectly

from BLMIS—the collateral payments have already been "recovered" from NatWest.

Rather than recognizing this, the Trustee is attempting to double dip and "recover"

money from NatWest that it simultaneously alleges that NatWest already returned to BLMIS.

This is also in tension with the Trustee's own "Net Investment Method," which calculates a

customer's net equity by summing the amount of money deposited by a customer and subtracting

the amount withdrawn by the customer.  *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv.*

*Sec. LLC*, 654 F.3d 229, 233 (2d Cir. 2011).  Here the Trustee turns his approach on its head and

wants to look only at transfers allegedly from BLMIS and not consider whether the money was

then transferred back to BLMIS.  Common sense, equity, and the goals of SIPA dictate the

Trustee may not "double dip" to double recover monies NatWest already returned to Tremont

and Harley.

## THIRTY-THIRD AFFIRMATIVE DEFENSE

### (No Interest)

To the extent Plaintiff recovers from NatWest, Plaintiff is not entitled to an award of

interest, including prejudgment interest, under 11 U.S.C. § 548 or any other statute.

## THIRTY-FOURTH AFFIRMATIVE DEFENSE

NatWest adopts and incorporates by reference any and all other defenses asserted or to

be asserted by any other defendant or party-in-interest to the extent that NatWest may share in

such defenses.

## THIRTY-FIFTH AFFIRMATIVE DEFENSE

### (Extraterritoriality)

The Trustee's recovery of the transfer to NatWest would constitute an impermissible extraterritorial application of U.S. law.

## THIRTY-SIXTH AFFIRMATIVE DEFENSE

### (Comity)

The Trustee's recovery of the alleged transfers to NatWest would violate principles of comity.

## THIRTY-SEVENTH AFFIRMATIVE DEFENSE

### (Lack of Subject Matter Jurisdiction)

This Court lacks jurisdiction under Article III of the U.S. Constitution to enter final orders or judgment in this proceeding.

## THIRTY-EIGHTH AFFIRMATIVE DEFENSE

### (No Ponzi Scheme Presumption)

The Trustee may not rely on a "Ponzi scheme presumption" to prove that the alleged initial transfers from BLMIS to Tremont and/or Harley that he seeks to recover from NatWest were made with actual intent to hinder, delay, or defraud creditors, and the transfers were not made with actual intent to hinder, delay, or defraud creditors. The Ponzi scheme presumption is extra-statutory and improper, but even if that were not the case, the presumption cannot apply to the alleged initial transfers from BLMIS to Tremont or Harley to the extent the initial transfers were repayments of Tremont or Harley's principal investments. The repayment of a customer's investment principal constitutes the repayment of a valid contractual antecedent debt, not a payment made in furtherance of the Ponzi scheme. To the extent, if any, that NatWest received subsequent transfers arising from the unavoidable initial transfers to Tremont or Harley, such subsequent transfers are not recoverable under 11 U.S.C. § 550(a) or 15 U.S.C. § 78fff-2(c)(3).

## THIRTY-NINTH AFFIRMATIVE DEFENSE

### (Nonavoidability of Initial Transfers: Two-Year Lookback)

The Trustee's claims against NatWest are barred to the extent that they did not derive

from initial transfers within the two-year lookback period set forth in 11 U.S.C. § 548(a)(1)(A).

## FORTIETH AFFIRMATIVE DEFENSE

### (Res Judicata)

The Trustee's claims against NatWest are barred to the extent that they have been

previously adjudicated by orders from the District Court for the Southern District of New York

on appeals arising from this action, including from the order in *Sec. Inv. Prot. Corp. v. Bernard

L. Madoff Inv. Sec. LLC*, 505 B.R. 135, 150 (S.D.N.Y. 2013), or any other competent court.

## FORTY-FIRST AFFIRMATIVE DEFENSE

### (Violation of Due Process)

The use of the doctrine of law of the case to apply rulings made in other adversary

proceedings to NatWest, to the extent that NatWest was not a party to and did not participate in

those proceedings, violates NatWest's right to due process of law as guaranteed by the Fifth

Amendment to the U.S. Constitution.

## FORTY-SECOND AFFIRMATIVE DEFENSE

### (Recoupment)

NatWest made investments in Tremont and Harley in good faith as part of swap

transactions.  At the time of the collapse of BLMIS and its various feeder funds, many of these

investments, the "Unreturned Tremont Investments" and "Unreturned Harley Investments," each

arising out of the same contracts as the Trustee's claims in a single unified transaction, remained

unredeemed.  NatWest therefore is among the victims of Madoff's fraud, entitled to claims

pursuant to the common law doctrines of unjust enrichment and recoupment, pursuant to any applicable sections of the Bankruptcy Code, and pursuant to 15 U.S.C. § 78fff-2(b).  Because NatWest is owed recoupment out of the same transactions as the Trustee's claims, the amount of which far outstrips the Trustee's sought recovery, the Trustee may recover nothing from NatWest.

The BLMIS estate was enriched by the money NatWest invested with BLMIS.  This enrichment was at NatWest's expense.  Permitting the BLMIS estate to recover money from NatWest when the estate is in possession of the much larger amount that NatWest invested with BLMIS cuts against equity and good conscience.

NatWest therefore does not owe BLMIS or Madoff anything; to the contrary, BLMIS and Madoff owe NatWest the return of NatWest's investments.  As a result, though NatWest seeks no affirmative recovery, despite its losses, should the Trustee's claims succeed, any recovery due the Trustee must be recouped by the much greater amounts due NatWest per the same contracts, netting the Trustee's claims to zero.

NatWest engaged in specific transactions with each of Tremont and Harley.  In these singular transactions, NatWest received money the Trustee alleges originated with BLMIS but then invested three times that amount back with BLMIS.

Two funds referred to herein as the XL Funds aimed to provide returns to their investors by investing fund assets in swap transactions with NatWest and other financial institution counterparties.  In each of two transactions, the XL Fund in question posted cash "collateral" with NatWest and, in exchange, NatWest agreed to provide three times the returns that would have been generated if that amount were invested in a specified "feeder fund" that invested with BLMIS.  Thus, from the perspective of the XL Funds, the swaps were essentially leveraged,

64

synthetic investments in BLMIS.  NatWest in turn hedged its investment by investing in BLMIS, through the XL Funds, three times the collateral posted with NatWest, specifically $938,499,999. The money that was allegedly withdrawn from BLMIS was invested in BLMIS as part of the same overall transaction.

NatWest engaged in similar swap transactions with Harley.  NatWest made these investments in Tremont and Harley in good faith as part of swap transactions.  At the time of the collapse of BLMIS and its various feeder funds, many of these investments, the "Unreturned Tremont Investments" and "Unreturned Harley Investments," totaling at least $652,186,093, remained unredeemed.  Again, the money that was allegedly withdrawn from BLMIS was invested in BLMIS as part of the same overall transaction.

NatWest provided valuable good faith investments to BLMIS, through its investments in the XL Funds and Harley; BLMIS, via the XL Funds and Harley, acknowledged, accepted, and benefitted from NatWest's investments; and it would be inequitable for BLMIS to enjoy the benefit NatWest provided without compensating NatWest.  By NatWest's swap transactions, BLMIS, Madoff, Tremont, and Harley benefitted by providing returns to investors, enabling BLMIS, Madoff, the XL Funds, and Harley to solicit additional investors.  As a good faith party to these swap transactions that made investments without knowledge of any wrongdoing or fraud, NatWest deserves to be compensated, in the form of recoupment, for BLMIS and Madoff's unjust enrichment.

NatWest incorporates by reference the allegations contained in the previous paragraphs of this Answer and Counterclaims as if fully rewritten herein.  NatWest made investments in the Tremont funds, including as part of swap transactions, of over $900 million.  Of that, over $600

million remains unreturned. NatWest also made millions of dollars of investments in the Harley funds, including as part of swap transactions. Of that, millions remain unreturned.

The Bankruptcy Code explicitly and implicitly preserves defendants' rights to recoupment. The Unreturned Tremont Investments and Unreturned Harley Investments arise from the same contracts as the Trustee's claims in single unified transactions and are recoverable pursuant to the common law doctrines of unjust enrichment and recoupment, pursuant to any applicable sections of the Bankruptcy Code, and pursuant to 15 U.S.C. § 78fff-2(b). As a result, the Trustee may not recover from NatWest when it is NatWest who is owed recovery due to the same contracts by which the Trustee makes his claims.

Though NatWest seeks no recovery from the Madoff estate, should the Trustee's claims succeed in any respect, any recovery by the Trustee must be recouped by the recovery due NatWest, so that the Trustee, from NatWest, may recover nothing. NatWest reserves any and all rights of recoupment.

## COUNTERCLAIMS FOR UNJUST ENRICHMENT (FUNDS INVESTED BUT NOT RETURNED)

1.    By NatWest's swap transactions with Rye Select Broad Market XL Portfolio, Ltd. ("XL Portfolio Limited") and Rye Select Broad Market XL Fund L.P. ("XL Broad Market," and collectively with XL Portfolio Limited, the "XL Funds") and with Harley International (Cayman) Ltd. ("Harley"), Bernard L. Madoff Investment Securities LLC ("BLMIS"), Bernard L. Madoff ("Madoff"), Tremont Group Holdings, Inc. (the "Tremont Group") and/or its management arm, Tremont Partners, Inc. ("Tremont Partners," and together with the Tremont Group, "Tremont"), and Harley benefitted by providing returns to investors, enabling BLMIS,

Madoff, the XL Funds, and Harley to solicit additional investors.  As a good faith party to these swap transactions who made investments without knowledge of any wrongdoing or fraud, NatWest should be compensated for BLMIS and Madoff's unjust enrichment.

2.      The BLMIS estate was enriched by the money NatWest invested with BLMIS. This enrichment was at NatWest's expense.  Permitting the BLMIS estate to recover money from NatWest when the estate is in possession of the much larger amount that NatWest invested with BLMIS cuts against equity and good conscience.

3.      Despite its losses, NatWest seeks no affirmative recovery.  But due to NatWest's own losses under the same contracts by which the Trustee claims, which far outpace the Trustee's claims against NatWest, the Trustee's claims should be setoff or recouped against NatWest's counterclaims of unjust enrichment, netting the Trustee's claims to zero.

4.      Pursuant to Fed. R. Bankr. P. 7008, NatWest brings these counterclaims to the extent the Court decides it is proper to adjudicate the Trustee's claims, but states that it does not consent, and instead objects, to this Court's jurisdiction and/or to its authority to enter a final Order or Judgment against NatWest.  In addition, NatWest demands, and does not waive its right to, a jury trial on all issues in this action so triable.

<u>PARTIES</u>

5.      Defendant and Counterclaim-Plaintiff NatWest Markets N.V. ("NatWest") is a Netherlands corporation with its principal place of business in Amsterdam.  Plaintiff and Counterclaim-Defendant Irving H. Picard is trustee (the "Trustee") for the liquidation of BLMIS, and the substantively consolidated chapter 7 estate of Bernard L. Madoff, individually, under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*  On information and belief, BLMIS operated its principal place of business out of New York.

6.      Defendant and Counterclaim-Plaintiff brings these counterclaims against the Trustee as the representative of the bankruptcy estate of BLMIS and Madoff.

JURISDICTION AND VENUE

7.      NatWest contests jurisdiction in this Court, *see* ¶¶ 15-17, 47-76, *supra*, but to the extent this Court finds jurisdiction proper for the Trustee's claims, jurisdiction is proper for NatWest's counterclaims as related counterclaims pursuant to 28 U.S.C. §§ 1334(b), (e)(1), 1367; and 15 U.S.C. § 78eee(b)(2)(A), (4).  Because NatWest is a foreign corporation and the amount in controversy is greater than $75,000, diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), (c) is proper.

8.      NatWest's counterclaims are logically related to the Trustee's claims as both deal with investments NatWest made in Tremont and Harley and arise out of the same contracts.  For each swap agreement, NatWest's claims and the Trustee's claims are part of a single unified transaction.  Adjudicating the Trustee's claims, including adjudicating NatWest's defenses of setoff and recoupment, will involve determining the net amounts NatWest invested and did not receive back from Tremont and Harley, the matters at the center of NatWest's counterclaims.  Further, the remedy NatWest seeks is to setoff or recoup any affirmative recovery by the Trustee.

9.      This Court has personal jurisdiction over the Trustee as the representative of the bankruptcy estate of BLMIS and Madoff because the Trustee (as the representative of the bankruptcy estate of BLMIS and Madoff) has already submitted to the jurisdiction of this Court by initiating this action.  This Court has personal jurisdiction over the Trustee as the representative of the bankruptcy estate of BLMIS and Madoff because BLMIS and Madoff were based in and regularly conducted business in this district.

10.     The Trustee, acting on behalf of the bankruptcy estate of BLMIS and Madoff, resides in this district, the Trustee chose to bring this action in this forum, BLMIS and Madoff transacted business within this district, and the activities and interstate commerce of BLMIS and Madoff were carried out in substantial part in this district.

11.     NatWest further does not contest venue in this judicial district if jurisdiction is found and upheld.  Venue is proper for the counterclaims to the extent it is proper for the Trustee's claims pursuant to 28 U.S.C. § 1409(e).

12.     These claimss are brought pursuant to the common law doctrines of unjust enrichment and recoupment, pursuant to sections 502(h), 553, and any other applicable sections of the Bankruptcy Code, and pursuant to 15 U.S.C. §§ 78fff(b) and 78fff-2(b).

## BACKGROUND FACTS

13.     NatWest engaged in specific transactions with each of Tremont and Harley.  In these singular transactions, NatWest received money the Trustee alleges originated with BLMIS but then invested three times that amount back with BLMIS.

14.     Two funds referred to herein as the XL Funds aimed to provide returns to their investors by investing fund assets in swap transactions with NatWest and other financial institution counterparties.  In each of two transactions, the XL Fund in question posted cash "collateral" with NatWest and, in exchange, NatWest agreed to provide three times the returns that would have been generated if that amount were invested in a specified "feeder fund" that invested with BLMIS.  Thus, from the perspective of the XL Funds, the swaps were essentially leveraged, synthetic investments in BLMIS.  NatWest in turn hedged its investment by investing in BLMIS, through the XL Funds, three times the collateral posted with NatWest, specifically

$938,499,999. The money that was allegedly withdrawn from BLMIS was invested in BLMIS as part of the same overall transaction.

15.     NatWest engaged in similar swap transactions with Harley. NatWest made these investments in Tremont and Harley in good faith as part of swap transactions. At the time of the collapse of BLMIS and its various feeder funds, many of these investments, the "Unreturned Tremont Investments" and "Unreturned Harley Investments," totaling at least $652,186,093, remained unredeemed. Again, the money that was allegedly withdrawn from BLMIS was invested in BLMIS as part of the same overall transaction.

16.     NatWest therefore is among the victims of Madoff's fraud and BLMIS and Madoff, via Tremont and Harley, have been unjustly enriched at NatWest's expense. NatWest does not owe BLMIS or Madoff anything; to the contrary, BLMIS and Madoff owe NatWest the return of NatWest's investments.

17.     As a result, while NatWest chooses not to seek the affirmative recovery it is owed, should the Trustee succeed in his claims against NatWest, any recovery from NatWest must be setoff or recouped by the much greater amounts owed NatWest.

18.     NatWest provided valuable good faith investments to BLMIS and Madoff, through its investments in the XL Funds and Harley; BLMIS and Madoff, via the XL Funds and Harley, acknowledged, accepted, and benefitted from NatWest's investments; and it would be inequitable for BLMIS and Madoff to enjoy the benefit NatWest provided without compensating NatWest by netting out any affirmative recovery that might issue against NatWest.

19.     Once again, NatWest seeks no recovery from the Madoff estate. But due to NatWest's own losses under the same contracts by which the Trustee states claims, losses which far outpace the Trustee's claims against NatWest, the Trustee's claims should be setoff or

70

recouped against NatWest's counterclaims of unjust enrichment, netting the Trustee's claims to zero.

20.      The Bankruptcy Code explicitly and implicitly preserves defendants' rights to setoff, recoupment, and claims that arise from the debtor estate's recovery in an adversary proceeding.

21.      Pursuant to the common law doctrines of unjust enrichment and recoupment, pursuant to sections 502(h), 553, and any other applicable sections of the Bankruptcy Code, and pursuant to 15 U.S.C. § 78fff-2(b), NatWest hereby seeks to recover these amounts.

COUNTERCLAIM ONE

RECOVERY OF UNRETURNED TREMONT INVESTMENTS

22.      NatWest incorporates by reference the allegations contained in the previous paragraphs of this Answer and Counterclaims as if fully rewritten herein.

23.      NatWest made investments in the Tremont funds, including as part of swap transactions, totaling over $900 million.  Of that, more than $600 million remains unreturned.

24.      NatWest provided over $900 million of valuable good faith investments to BLMIS and Madoff, through its investments in the XL Funds; BLMIS and Madoff, via Tremont and the XL Funds, acknowledged, accepted, and benefitted from NatWest's investments; and it would be inequitable for BLMIS and Madoff to enjoy the benefit NatWest provided without compensating NatWest.

25.      The Unreturned Tremont Investments arise out of the same contracts as the Trustee's claims in single unified transactions and are recoverable pursuant to the common law doctrines of unjust enrichment and recoupment, pursuant to sections 502(h), 553, and any other applicable sections of the Bankruptcy Code, and pursuant to 15 U.S.C. § 78fff-2(b).

26.     As a result of the foregoing, pursuant to the common law doctrines of unjust enrichment and recoupment, pursuant to sections 502(h), 553, and any other applicable sections of the Bankruptcy Code, and pursuant to 15 U.S.C. § 78fff-2(b), NatWest is entitled to a judgment against Counterclaim-Defendant as the representative of the bankruptcy estate of BLMIS and Madoff: (a) setting off or recouping the Unreturned Tremont Investments, or the value thereof, for the benefit of NatWest, from any recovery that should issue to Counterclaim-Defendant against NatWest; and (b) awarding any other relief as the Court deems appropriate.

COUNTERCLAIM TWO

RECOVERY OF UNRETURNED HARLEY INVESTMENTS

27.     NatWest incorporates by reference the allegations contained in the previous paragraphs of this Answer and Counterclaims as if fully rewritten herein.

28.     NatWest made millions of dollars of investments in the Harley funds, including as part of swap transactions.  Of that millions remain unreturned.

29.     NatWest provided valuable good faith investments to BLMIS and Madoff, through its investments in Harley; BLMIS and Madoff, via Harley, acknowledged, accepted, and benefitted from NatWest's investments; and it would be inequitable for BLMIS and Madoff to enjoy the benefit NatWest provided without compensating NatWest.

30.     The Unreturned Harley Investments arise out of the same contracts as the Trustee's claims in a single unified transaction and are recoverable pursuant to the common law doctrines of unjust enrichment and recoupment, pursuant to sections 502(h), 553, and any other applicable sections of the Bankruptcy Code, and pursuant to 15 U.S.C. § 78fff-2(b).

31.     As a result of the foregoing, pursuant to the common law doctrines of unjust enrichment and recoupment, pursuant to sections 502(h), 553, and any other applicable sections

of the Bankruptcy Code, and pursuant to 15 U.S.C. § 78fff-2(b), NatWest is entitled to a judgment against Counterclaim-Defendant as the representative of the bankruptcy estate of BLMIS and Madoff: (a) setting off or recouping the Unreturned Harley Investments, or the value thereof, for the benefit of NatWest, from any recovery that should issue to Counterclaim-Defendant against NatWest; and (b) awarding any other relief as the Court deems appropriate.

**WHEREFORE**, NatWest respectfully requests that this Court enter judgment in favor of NatWest and against the Trustee, as the representative of the bankruptcy estate of BLMIS and Madoff, as follows:

On the First Counterclaim, setting off or recouping the Unreturned Tremont Investments, or the value thereof, for the benefit of NatWest, from any recovery that should issue to Counterclaim-Defendant against NatWest, including setting off or recouping any prejudgment interest;

On the Second Counterclaim, setting off or recouping the Unreturned Harley Investments, or the value thereof, for the benefit of NatWest, from any recovery that should issue to Counterclaim-Defendant against NatWest, including setting off or recouping any prejudgment interest;

On all counterclaims, awarding NatWest fees and all applicable costs and disbursements, and such other, further, and different relief as the Court deems just, proper, and equitable.

If the Court determines that any of these counterclaims should have been pled as affirmative defenses, they should be treated as affirmative defenses. pursuant to Federal Rule of Civil Procedure 8(c)(2).

## <u>JURY DEMAND</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, made applicable to this

adversary proceeding by Rule 9015 of the Federal Rules of Bankruptcy Procedure, Defendant

NatWest demands a trial by jury on all claims and issues that may be tried by a jury.

## STATEMENT PURSUANT TO FED. R. BANKR. P. 7012(b)

NatWest does not consent, but instead objects, to the entry of a final Order or Judgment

against it by the Bankruptcy Court.

WHEREFORE, NatWest demands judgment (a) dismissing the Complaint with

prejudice, together with costs, disbursements, attorneys' fees, expert fees, expenses, and court

costs; (b) granting NatWest judgment on its Counterclaims; and (c) granting NatWest such other

relief as the Court shall determine just and proper.

Dated: August 24, 2023                    Respectfully submitted,

                                          */s/ Michael S. Feldberg*

                                          Michael S. Feldberg
                                          REICHMAN JORGENSEN LEHMAN &
                                          FELDBERG LLP
                                          400 Madison Avenue, Suite 14D
                                          New York, New York 10017
                                          Tel: (212) 381-4970
                                          mfeldberg@reichmanjorgensen.com

                                          *Attorneys for Defendant NatWest Markets N.V.*