**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (BRL) |
| *Plaintiff-Applicant,* | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| *Defendant.* | |
| In re: | **JURY TRIAL DEMANDED** |
| BERNARD L. MADOFF, | |
| *Debtor.* | |
| IRVING H. PICARD, TRUSTEE FOR THE LIQUIDATION OF BERNARD L. MADOFF INVESTMENT SECURITIES LLC, AND BERNARD L. MADOFF, | Adv. Pro. No. 12-01697 (CGM) |
| *Plaintiff* | |
| v. | |
| ABN AMRO RETAINED NOMINEES (IOM) LIMITED, f/k/a ABN AMRO Fund Services (Isle of Man) Nominees, and f/k/a Fortis (Isle of Man) Nominees Limited, and PLATINUM ALL WEATHER FUND LIMITED, | |
| *Defendants.* | |

**PLATINUM ALL WEATHER FUND LIMITED'S**
**ANSWER TO AMENDED COMPLAINT AND JURY DEMAND**

Defendant Platinum All Weather Fund Limited ("PAWFL") hereby answers (this "Answer") the Amended Complaint of Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and the substantively consolidated estate of Bernard L. Madoff ("Plaintiff" or "Trustee"), as follows:

## GENERAL DENIAL

Except as otherwise expressly admitted herein, PAWFL denies each and every allegation in the Amended Complaint. PAWFL states that the headings and sub-headings throughout the Amended Complaint do not constitute well-pleaded allegations of fact and therefore require no response. To the extent a response is required, the allegations in the headings and subheadings in the Amended Complaint are denied. In answering the allegations in the Amended Complaint, PAWFL does not intend to waive, and does not waive, any and all applicable objections to the relevance, admissibility, or prejudicial effect of any of the allegations in the Amended Complaint. To the extent it is later determined that a response is required to any allegation PAWFL claims has been mooted by a prior dismissal of the Trustee's claims, PAWFL denies any such allegation. PAWFL expressly reserves the right to amend and/or supplement this Answer.

## RESPONSES TO SPECIFIC ALLEGATIONS

### I.    NATURE OF THE PROCEEDING

1.    This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS Customer Property, as defined by SIPA § 78*lll*(4), that was stolen by BLMIS as part of the massive Ponzi scheme perpetrated by Madoff and others.

**RESPONSE:** Paragraph 1 of the Amended Complaint sets forth legal conclusions to which no response is required. To the extent a response is required, PAWFL denies the allegations of paragraph 1 of the Amended Complaint, except PAWFL admits that the Trustee purports to bring this adversary proceeding as part of its continuing efforts to recover certain property.

2

2.     With this Amended Complaint, the Trustee seeks to recover at least $104,819,602 in subsequent transfers of BLMIS customer property made to Defendants (the "Subsequent Transfers"). The Subsequent Transfers were obtained by Defendants by redeeming shares owned in BLMIS feeder funds Fairfield Sentry Limited ("Fairfield Sentry") and Fairfield Sigma Limited ("Fairfield Sigma" and with Fairfield Sentry, the "Fairfield Funds"). From November 1990 through December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS; Fairfield Sigma was a "currency feeder," meaning it accepted subscriptions in euros, converted the money to U.S. dollars, and then invested 100% of these assets in Fairfield Sentry.

**RESPONSE:**  Paragraph 2 of the Amended Complaint sets forth legal conclusions to which no response is required.  To the extent a response is required, PAWFL denies the allegations of paragraph 2 of the Amended Complaint, except PAWFL admits that the Trustee purports to seek to recover certain transfers from Fairfield Sentry to Defendants.

3.     Defendants Platinum and/or Fortis IOM received at least $103,541,099 in subsequent transfers of BLMIS customer property from Fairfield Sentry. These equity interests in Fairfield Sentry were identified in the relevant subscription agreements and redemption requests as "Fortis (Isle of Man) Nominees Limited re Platinum."

**RESPONSE:**  The first sentence of paragraph 3 of the Amended Complaint sets forth legal conclusions to which no response is required.  To the extent a response is required, PAWFL denies the allegations of the first sentence of paragraph 3 of the Amended Complaint, except admits that PAWFL and/or Fortis IOM received $103,541,099 from Fairfield Sentry.  The second sentence of paragraph 3 of the Amended Complaint sets forth legal conclusions to which no response is required.  To the extent a response is required, PAWFL denies the allegations of the second sentence of paragraph 3 of the Amended Complaint, except PAWFL admits it received shares in Fairfield Sentry through subscription agreements, that it received certain funds from Fairfield Sentry via Fortis IOM through redemption requests, and that certain of those documents referred to "Fortis (Isle of Man) Nominees Limited re Platinum."  PAWFL refers to the referenced documents for the true and complete contents thereof.

4.     Additionally, Defendant Fortis IOM individually received at least $1,063,953 in subsequent transfers of BLMIS customer property from Fairfield Sentry and $214,549 in subsequent transfers of BLMIS customer property from Fairfield Sigma.

3

**RESPONSE:** Paragraph 4 of the Amended Complaint sets forth legal conclusions to which no response is required. To the extent a response is required, PAWFL denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 4 of the Amended Complaint.

5.      The Fairfield Funds were among the various investment vehicles that invested all or substantially all of their assets with BLMIS's investment advisory business ("BLMIS Feeder Funds"). In addition to the Fairfield Funds, Defendant Platinum also invested in other BLMIS Feeder Funds, including Kingate Global Fund Limited and Santa Clara II Fund Limited. Likewise, Defendant Fortis IOM served as administrator to Harley International (Cayman) Limited and assisted affiliates as they pursued investments with funds managed by Tremont Partners, Inc., both of which were other avenues to BLMIS.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 5 of the Amended Complaint and therefore denies such allegations, except PAWFL admits that it invested in the Fairfield Funds, Kingate Global Fund Limited, and Santa Clara II Fund Limited.

6.      The Trustee brings this proceeding to recover for the benefit of the estate the subsequent transfers of BLMIS customer property that Defendants received from the Fairfield Funds.

**RESPONSE:** Paragraph 6 of the Amended Complaint sets forth legal conclusions to which no response is required. To the extent a response is required, PAWFL denies the allegations of paragraph 6 of the Amended Complaint, except PAWFL admits that the Trustee purports to seek to recover certain transfers from Fairfield Sentry to Defendants.

## II.    SUBJECT MATTER JURISDICTION AND VENUE

7.      This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and SIPA § 78eee(b)(2)(A) and (b)(4).

**RESPONSE:** Paragraph 7 of the Amended Complaint states legal conclusions to which no response is required. To the extent a response is required, PAWFL admits that the first and second sentences of paragraph 7 accurately describe the titles and docket numbers of the proceeding and otherwise denies the allegations of paragraph 7 of the Amended Complaint.

8.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H), and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

**RESPONSE:** Paragraph 8 of the Amended Complaint states legal conclusions to which no response is required. To the extent a response is required, PAWFL denies the allegations of paragraph 8 of the Amended Complaint. PAWFL does not consent to the issuance of final orders or judgments by the Bankruptcy Court.

9.      Venue in this judicial district is proper under 28 U.S.C. § 1409.

**RESPONSE:** Paragraph 9 of the Amended Complaint states legal conclusions to which no response is required.

10.      This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

**RESPONSE:** Paragraph 10 of the Amended Complaint states legal conclusions to which no response is required.

### III.   BACKGROUND, THE TRUSTEE AND STANDING

11.      On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 11 of the Amended Complaint and therefore denies such allegations, except PAWFL admits, on information and belief, that Madoff was arrested on or

about December 11, 2008 and that the SEC filed a civil complaint against Madoff and BLMIS

on or about December 11, 2008.

12.    On December 15, 2008, under § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

**RESPONSE:**  PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 12 of the Amended Complaint, and refers to the referenced

application for the true and complete contents thereof.

13.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

   (a)    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

   (b)    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

   (c)    removed the case to this Court pursuant to SIPA § 78eee(b)(4).

**RESPONSE:**  PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 13 of the Amended Complaint, and refers to the

referenced order for the true and complete contents thereof.

14.    By orders dated December 23, 2008, and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

**RESPONSE:**  Paragraph 14 of the Amended Complaint states legal conclusions to which

no response is required.  To the extent a response is required, PAWFL denies knowledge or

information sufficient to form a belief as to the truth of the allegations of paragraph 14 of the

Amended Complaint, and refers to the referenced orders for the true and complete contents thereof.

15.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 15 of the Amended Complaint, and refers to the referenced

petition and order granting substantive consolidation for the true and complete contents thereof.

16.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*,
Case No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed
against him by the United States Attorney for the Southern District of New York. At the plea
hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of
[BLMIS]."

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 16 of the Amended Complaint, except PAWFL admits,

on information and belief, that Madoff pled guilty to crimes and was sentenced to prison.

PAWFL further refers to the referenced transcript for the true and complete contents thereof.

17.    At a plea hearing on August 11, 2009, in the case captioned *United States v.
DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded
guilty to a ten-count criminal information charging him with participating in and conspiring to
perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place
in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at
BLMIS since at least the 1980s.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 17 of the Amended Complaint and therefore denies such

allegations.

18.    At a plea hearing on November 21, 2011, in the case captioned *United States v.
Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded
guilty to a six-count criminal information charging him with securities fraud, falsifying the records
of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades
in BLMIS customer accounts beginning in the early 1970s.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 18 of the Amended Complaint and therefore denies such

allegations.

19.    On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

**RESPONSE:**  PAWFL denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 19 of the Amended Complaint and therefore denies such allegations.

20.    As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

**RESPONSE:**  PAWFL denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 20 of the Amended Complaint and states that the allegations concerning the Trustee's responsibilities and authority under SIPA and the Bankruptcy Code set forth legal conclusions to which no response is required.  To the extent a response is required, PAWFL denies such allegations.

21.    Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

**RESPONSE:**  Paragraph 21 of the Amended Complaint states legal conclusions to which no response is required.

22.    The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

**RESPONSE:**  Paragraph 22 of the Amended Complaint states legal conclusions to which no response is required.

## IV.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.    BLMIS

23.    Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker-dealer with the SEC. In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company. At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

**RESPONSE:**  PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 23 of the Amended Complaint and therefore denies such

allegations.

24.    In compliance with 15 U.S.C. § 78*o*(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008. Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority, Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation. At all times, BLMIS was assigned CRD No. 2625. SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960. On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status. SIPC membership is contingent on registration of the broker-dealer with the SEC.

**RESPONSE:**  PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 24 of the Amended Complaint and therefore denies such

allegations.

25.    For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker-dealer operation, and an investment advisory business (the "IA Business").

**RESPONSE:**  PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 25 of the Amended Complaint and therefore denies such

allegations.

26.    BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 26 of the Amended Complaint and therefore denies such

allegations.

27.    For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 27 of the Amended Complaint and therefore denies such

allegations.

28.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 28 of the Amended Complaint and therefore denies such

allegations.

## B.    The Ponzi Scheme

29.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 29 of the Amended Complaint and therefore denies such

allegations.

30.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the BLMIS customer deposits, but

fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 30 of the Amended Complaint and therefore denies such allegations.

31.     To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 31 of the Amended Complaint and therefore denies such allegations.

32.     On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 32 of the Amended Complaint and therefore denies such allegations.

1.     <u>Madoff's Investment Strategy</u>

33.     In general, BLMIS purported to execute two primary investment strategies for BLMIS customers: the convertible arbitrage strategy and the split-strike conversion strategy (the "SSC Strategy"). For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit. At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 33 of the Amended Complaint and therefore denies such

allegations.

34.    All funds received from BLMIS customers were commingled in a single BLMIS
account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade
securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff
and his family personally, and to prop up Madoff's proprietary trading business.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 34 of the Amended Complaint and therefore denies such

allegations.

35.    The convertible arbitrage investment strategy was supposed to generate profits by
taking advantage of the pricing mismatches that can occur between the equity and bond/preferred
equity markets. Investors were told they would gain profits from a change in the expectations for
the stock or convertible security over time. In the 1970s this strategy represented a significant
portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in
only a small percentage of BLMIS accounts.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 35 of the Amended Complaint and therefore denies such

allegations.

36.    From the early 1990s forward, Madoff began telling BLMIS customers that he
employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any
securities for its BLMIS customers.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 36 of the Amended Complaint and therefore denies such

allegations.

37.    BLMIS reported falsified trades using backdated trade data on monthly account
statements sent to BLMIS customers that typically reflected impossibly consistent gains on the
customers' principal investments.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 37 of the Amended Complaint and therefore denies such allegations.

38.     By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 38 of the Amended Complaint and therefore denies such allegations.

39.     The put options were to limit the downside risk of sizeable price changes in the basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option should have entailed a loss for BLMIS.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 39 of the Amended Complaint and therefore denies such allegations.

40.     The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 40 of the Amended Complaint and therefore denies such allegations.

41.     The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protection while limiting the upside.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 41 of the Amended Complaint and therefore denies such

allegations.

42.    If Madoff was putting on the same baskets of equities across *all* BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket. For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 42 of the Amended Complaint and therefore denies such

allegations.

43.    Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the Madoff SSC Strategy.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 43 of the Amended Complaint and therefore denies such

allegations.

44.    Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 44 of the Amended Complaint and therefore denies such

allegations.

2.    BLMIS's Fee Structure

45.    BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits.  By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 45 of the Amended Complaint and therefore denies such

allegations.

3.    BLMIS's Market Timing

46.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value.  Madoff explained that he succeeded at market timing by intermittently entering and exiting the market.  During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills.

**RESPONSE:**  PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 46 of the Amended Complaint and therefore denies such

allegations.

47.    As a registered broker-dealer, BLMIS was required, pursuant to  17 C.F.R.  § 240.17a-5, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting.  BLMIS reportedly exited the market completely at year end and every quarter ending in 2003.  These quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions.  It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 47 of the Amended Complaint and therefore denies such

allegations.

48.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 48 of the Amended Complaint and therefore denies such

allegations.

4.    BLMIS Execution

49.    BLMIS's execution showed a consistent ability to buy low and sell high, an ability
so uncanny that any sophisticated or professional investor would know it was statistically
impossible.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 49 of the Amended Complaint and therefore denies such

allegations.

5.    No Evidence of BLMIS Trading

50.    There is no record of BLMIS clearing a single purchase or sale of securities in
connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing
house for such transactions, its predecessors, or any other trading platform on which BLMIS could
have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded
securities using the SSC Strategy.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 50 of the Amended Complaint and therefore denies such

allegations.

51.    All exchange-listed options relating to the companies within the S&P 100 Index,
including options based upon the S&P 100 Index itself, clear through the Options Clearing
Corporation ("OCC"). The OCC has no records showing that BLMIS cleared any trades in any
exchange-listed options.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 51 of the Amended Complaint and therefore denies such

allegations.

6.    The Collapse of the Ponzi Scheme

52.    The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests
for redemptions overwhelmed the flow of new investments.

16

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 52 of the Amended Complaint and therefore denies such

allegations.

53.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none
of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through
its IA Business operated as a Ponzi scheme.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 53 of the Amended Complaint and therefore denies such

allegations.

54.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less
than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at
the time of the transfers alleged herein, BLMIS was left with insufficient capital.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 54 of the Amended Complaint and therefore denies such

allegations.

## V.     **DEFENDANTS AND RELEVANT NON-PARTIES**

### A.     **Defendant Platinum and Non-Party Platinum Management**

55.     Defendant Platinum was a single-strategy hedge fund that invested exclusively in
BLMIS Feeder Funds.

**RESPONSE:** PAWFL admits it invested in BLMIS Feeder Funds and otherwise denies

the allegations in paragraph 55 of the Amended Complaint.

56.     Platinum was organized under the laws of the Cayman Islands with a registered
address care of DMS Corporate Services, at DMS House, 20 Genesis Close, P.O. Box 31910,
Grand Cayman KY1-1208.

**RESPONSE:** PAWFL admits the allegations of paragraph 56 of the Amended Complaint.

57.     Platinum was managed by non-party Platinum Capital Management Ltd.
("Platinum Management"), a global investment firm that manages and distributes single-strategy
funds, funds of funds, and structured products. While headquartered in London, Platinum
Management had a global presence, with offices around the world and in America. Platinum

Management specifically used subsidiaries in New York and Stamford, Connecticut to manage its BLMIS Feeder Fund investments, including those made by Platinum.

**RESPONSE:** PAWFL admits its fund sponsor was Platinum Capital Management Ltd., which was headquartered in London, and otherwise denies the allegations of paragraph 57 of the Amended Complaint.

### B.     Defendant Fortis IOM and Non-Party Fortis

58.     Defendant Fortis IOM was a limited company incorporated and organized under the laws of the Isle of Man with a registered address at First Floor, Jubilee Building, Douglas, Isle of Man IM1 2SH.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 58 of the Amended Complaint and therefore denies such allegations.

59.     Throughout the relevant period, Fortis IOM served as administrator for Platinum's investments in the Fairfield Funds and, accordingly, acted as a Platinum's agent. Fortis IOM conducted due diligence, completed subscription agreements and made redemption requests all on Platinum's behalf.

**RESPONSE:** PAWFL admits the allegations in the first sentence of paragraph 59 of the Amended Complaint. PAWFL admits the allegations in the second sentence of paragraph 59, except denies knowledge or information sufficient to form a belief as to whether all of the referenced actions by Fortis IOM were done on Platinum's behalf.

60.     Fortis IOM was a wholly-owned subsidiary of Fortis Prime Fund Solutions (Isle of Man) Limited (formerly known as Fortis Fund Services (Isle of Man) Limited) ("FPFS IOM"). During the relevant period, Fortis IOM and FPFS IOM functioned as one entity, sharing the same address, offices, phone numbers, employees, and directors.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 60 of the Amended Complaint and therefore denies such allegations.

61.     Fortis IOM and FPFS IOM were part of a global network of financial organizations, collectively known as "Fortis," that provided banking, asset management, structured financing,

and administrative services. Fortis touted this network's unified approach, claiming in marketing materials and public filings that the constituent parts of the network "Act[ed] as One," and that the network communicated seamlessly.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 61 of the Amended Complaint, and refers to the referenced marketing materials and public filings for the true and complete contents thereof.

62.    Several entities, all part of the "Fortis" network, held roles with Platinum, sometimes concurrently. When Platinum launched in 2003, the marketing materials identified Fortis IOM as the fund's "Administrator, Custodian, and Transfer Agent." In the summary section of these marketing materials, FPFS IOM was also separately listed as the administrator. When negotiating the transactions with the Fairfield Funds in 2006, Platinum represented that "Fortis" was its administrator and would handle all subscription documents. In 2008 marketing materials, Platinum represented that, another entity, ABN Amro Custodial Services (Ireland) Ltd. (f/k/a/ Fortis Prime Fund Solutions Custodial Services (Ireland) Ltd.) was the fund's custodian.

**RESPONSE:** PAWFL admits that it launched it 2003 and that Fortis IOM served as its administrator, and otherwise refers the Court to the documents cited in paragraph 62 of the Amended Complaint, and denies any allegation inconsistent therewith.

### C.    Non-Party Fairfield Funds

63.    Non-party Fairfield Greenwich Group ("FGG"), a *de facto* partnership based in New York, operated and managed Fairfield Sentry and Fairfield Sigma.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 63 of the Amended Complaint and therefore denies such allegations.

64.    Non-party Fairfield Sentry was a hedge fund incorporated in the British Virgin Islands and had its headquarters and primary business operations in New York. From November 1990 until Madoff's arrest in December 2008, Fairfield Sentry maintained direct customer accounts with BLMIS in New York. Fairfield Sentry invested at least 95% of its assets with BLMIS.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 64 of the Amended Complaint and therefore denies such allegations.

19

65.    Non-party Fairfield Sigma, a Fairfield Sentry sister fund, was, as noted above, a "currency feeder" that accepted subscriptions in Euros, converted the money to U.S. Dollars, and then invested 100% of its assets by purchasing shares of Fairfield Sentry.

**RESPONSE:**  PAWFL denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 65 of the Amended Complaint and therefore denies such allegations.

### D.    Relevant BLMIS Feeder Funds

66.    This action seeks the recovery of subsequent transfers of BLMIS customer property Defendants received from the Fairfield Funds, but Defendants and their affiliates were experienced BLMIS investors, having gained knowledge of BLMIS through their investments in other BLMIS Feeder Funds.

**RESPONSE:**  Paragraph 66 of the Amended Complaint sets forth legal conclusions to which no response is required.  To the extent a response is required, PAWFL denies the allegations of paragraph 66 of the Amended Complaint, except PAWFL admits that the Trustee purports to seek recovery of transfers from the Fairfield Funds and that PAWFL and/or its affiliates invested in other funds that were invested in BLMIS.

67.    Defendants and their affiliates also invested in BLMIS Feeder Funds managed by Tremont Partners, Inc., Kingate Global Fund, Ltd., Harley International (Cayman) Limited, and Santa Clara II Fund Limited. Defendants understood that each of these BLMIS Feeder Funds were other access points to BLMIS, and through their investments, Defendants were exposed to clear indicia of BLMIS's fraud. Any information Defendants learned regarding Madoff, BLMIS, or the BLMIS Feeder Funds by virtue of these relationships and/or investments is relevant to the current action before this Court.

**RESPONSE:**  Paragraph 67 of the Amended Complaint sets forth legal conclusions to which no response is required.  To the extent a response is required, PAWFL admits that PAWFL invested in funds managed by Tremont Partners, Inc., Kingate Global Fund, Ltd., Harley International (Cayman) Limited, and Santa Clara II Fund Limited, and PAWFL otherwise denies the allegations of paragraph 67 of the Amended Complaint.

## VI.    **PERSONAL JURISDICTION**

68.    Defendants are subject to the jurisdiction of the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 7004 and the United States Constitution, as well as sections 301 and 302 of the New York Civil Practice Law and Rules, because they purposely availed themselves of the laws and protections of the United States and the State of New York. Defendants knowingly accepted the rights, benefits, and privileges of conducting business in the United States and the state of New York and should reasonably expect to be subject to New York jurisdiction.

**RESPONSE:**  Paragraph 68 of the Amended Complaint sets forth legal conclusions to which no response is required.  To the extent a response is required, PAWFL denies the allegations of paragraph 68 of the Amended Complaint.

69.    The Trustee's claims against Defendants arise from business they transacted within New York. Defendants derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

**RESPONSE:**  Paragraph 69 of the Amended Complaint sets forth legal conclusions to which no response is required.  To the extent a response is required, PAWFL denies the allegations of paragraph 69 of the Amended Complaint as to PAWFL and denies knowledge or information sufficient to form a belief as to the allegations regarding Defendants other than PAWFL.

### A.    **Defendants Purposefully Invested with Madoff in New York**

70.    Defendants invested in the Fairfield Funds with the specific purpose of investing with BLMIS in New York, and relinquished control over investment decisions and their implementation to Madoff in New York.

**RESPONSE:**  Paragraph 70 of the Amended Complaint sets forth legal conclusions to which no response is required.  To the extent a response is required, PAWFL denies the allegations of paragraph 70 of the Amended Complaint.

71.    In April 2003, Platinum Management launched Platinum as a single-manager fund directing 100% of its assets to BLMIS through investments in BLMIS Feeder Funds. Platinum Management hired U.S.-based Eric Munson to serve as the president of its New York subsidiary, and together Munson and Platinum Management's New York-based subsidiary launched and operated Platinum from New York.

21

**RESPONSE:** PAWFL admits that it launched in 2003 and that it invested in BLMIS

Feeder Funds via Fortis IOM. PAWFL otherwise denies the allegations in the first sentence of

paragraph 71 of the Amended Complaint. PAWFL denies the allegations of the second sentence

of paragraph 71 of the Amended Complaint, except PAWFL admits that Eric Munson was an

advisor to PAWFL.

72.    Platinum's business revolved around access to Madoff and the BLMIS Feeder
Funds. Platinum boasted in its marketing materials of its Madoff connection, describing itself as
"a feeder fund investing into Bernard Madoff's funds." And in discussions with potential clients,
such as on a June 2003 call with Ivy Asset Management, Platinum represented that it "is actually
a feeder fund into Madoff."

**RESPONSE:** PAWFL admits that its business involved investing in BLMIS Feeder Funds

and that its marketing materials referred to investing in Bernard Madoff's funds. PAWFL

otherwise denies knowledge or information sufficient to form a belief as to the truth of the

allegations of paragraph 72 of the Amended Complaint, refers to the referenced marketing

materials for the true and complete contents thereof, and otherwise denies the allegations in

paragraph 72 of the Amended Complaint.

73.    Platinum monitored the potential retrocession fees offered by different BLMIS
Feeder Funds. After investing with other BLMIS Feeder Funds, Platinum, via its agent Defendant
Fortis IOM, began investing in Fairfield Sentry in January 2007, receiving retrocession fees for
these investments.

**RESPONSE:** PAWFL admits the allegations of paragraph 73 of the Amended Complaint.

74.    Defendant Fortis IOM, individually and on behalf of Platinum, entered into a
subscription agreement with Fairfield Sentry (the "January 2007 Agreement"), by which both
Fortis IOM and Platinum affirmed having received and read Fairfield Sentry's private placement
memorandum ("PPM") and agreed to be bound by the terms set forth in the PPM.

**RESPONSE:** PAWFL admits Fortis IOM entered into the January 2007 Agreement and

refers to the referenced January 2007 Agreement for the true and complete contents thereof.

75.    In January 2008, Fortis IOM, individually and on behalf of Platinum, entered into
an additional subscription agreement with Fairfield Sentry (the "January 2008 Agreement"),

reaffirming the receipt of the PPM and the agreement to be bound by its terms. The January 2008 Agreement contained the same language as the January 2007 Agreement.

**RESPONSE:**  PAWFL admits, upon information and belief, that Fortis IOM entered into the January 2008 Agreement and refers to the referenced January 2008 Agreement for the true and complete contents thereof.

### B. Defendants Intended Their Fairfield Fund Investments to be Investments in U.S.-Based Securities

76.    By executing the Fairfield Sentry subscription agreements, Defendants submitted to New York jurisdiction, venue, service of process, and law. Specifically, Defendants (i) "irrevocably submit[ted] to the jurisdiction of the New York courts with respect to any [p]roceeding," (ii) "agree[d] that any suit, action or proceeding . . . with respect to this Agreement and the Fund may be brought in New York," (iii) "consent[ed] to the service of process out of any New York court," and (iv) agreed that "[t]his Agreement shall be governed and enforced in accordance with the laws of New York . . . ."

**RESPONSE:**  Paragraph 76 of the Amended Complaint sets forth legal conclusions to which no response is required.  To the extent a response is required, PAWFL denies the allegations of paragraph 76 of the Amended Complaint.

77.    Defendants intended that the monies they invested in the BLMIS Feeder Funds be used to purchase securities in the United States. By investing in this way, Defendants purposely undertook investment activities in New York.

**RESPONSE:**  Paragraph 77 of the Amended Complaint sets forth legal conclusions to which no response is required.  To the extent a response is required, PAWFL denies the allegations of paragraph 77 of the Amended Complaint.

78.    Defendants invested in Fairfield Sentry knowing that it was created, operated and controlled by New York-based FGG, with the specific purpose of having funds invested with BLMIS in New York and profiting therefrom.

**RESPONSE:**  Paragraph 78 of the Amended Complaint sets forth legal conclusions to which no response is required.  To the extent a response is required, PAWFL denies the allegations of paragraph 78 of the Amended Complaint.

79.    The Fairfield Sentry PPM explained that the SSC Strategy involved the purchase of a "basket" of U.S.-based equity securities consisting of approximately "35 to 50 stocks in the S&P 100 [Index]," as well as "the sale of out-of-the-money S&P 100 Index call options" and "the purchase of out-of-the-money S&P 100 Index put options."

**RESPONSE:**  PAWFL denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 79 of the Amended Complaint, and refers to the referenced Fairfield Sentry PPM for the true and complete contents thereof.

80.    Thus, Defendants knew that any purported return on investments in Fairfield Sentry would be earned in New York by BLMIS engaging in the purchase and sale of U.S. securities, options, and treasuries.

**RESPONSE:**  Paragraph 80 of the Amended Complaint sets forth legal conclusions to which no response is required.  To the extent a response is required, PAWFL denies the allegations of paragraph 80 of the Amended Complaint.

81.    Based on the Fairfield Sentry PPMs and other FGG materials, Defendants knew that:

(a)    Fairfield Sentry invested substantially all of its assets in accounts managed by New York-based BLMIS;

(b)    BLMIS was Fairfield Sentry's investment adviser;

(c)    BLMIS was the executing broker for Fairfield Sentry's investments and purportedly operated and executed the SSC Strategy on the fund's behalf;

(d)    The services of BLMIS and its personnel were essential to Fairfield Sentry;

(e)    BLMIS was the custodian of Fairfield Sentry's assets invested with BLMIS;

(f)    BLMIS was registered with the SEC;

(g)    Subscription payments were to be wired in US dollars to a New York bank account; and

(h)    BLMIS was "essential to the continued operation" of the Fairfield Funds.

**RESPONSE:**  PAWFL denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 81 of the Amended Complaint, and refers to the referenced Fairfield Sentry PPMs and other FGG materials for the true and complete contents thereof.

82.    Aware of these facts and risks, Defendants knowingly attempted to direct monies into the United States securities markets and undertook investment activities in the United States.

24

**RESPONSE:** Paragraph 82 of the Amended Complaint sets forth legal conclusions to which no response is required. To the extent a response is required, PAWFL denies the allegations of paragraph 82 of the Amended Complaint.

### C.    Defendants' Activities in Connection with Its BLMIS Feeder Fund Investments Were Directed to New York and the United States

83.    Defendants and their agents undertook purposeful acts aimed at New York and the United States as part of Defendants' Fairfield Funds' investments.

**RESPONSE:** Paragraph 83 of the Amended Complaint sets forth legal conclusions to which no response is required. To the extent a response is required, PAWFL denies the allegations of paragraph 83 of the Amended Complaint.

84.    The January 2007 Agreement listed Peter Sprecher, the U.S.-based founder of Platinum Management, as the "advisor with respect to this subscription." The January 2007 Agreement listed Scott Nevin, an FGG Managing Director based in New York, as the professional "with whom this subscription is associated."

**RESPONSE:** PAWFL admits that the January 2007 Agreement listed Peter Sprecher as the "advisor with respect to this subscription" and refers to the referenced 2007 Agreement for the true and complete contents thereof. PAWFL lacks knowledge or information sufficient to form a belief as to whether Scott Nevin was based in New York, and therefore denies the allegation. To the extent a response is otherwise required, PAWFL denies the allegations in paragraph 84 of the Amended Complaint and refers to the referenced 2007 Agreement for the true and complete contents thereof.

85.    Platinum representatives met with FGG representatives in New York to effectuate the transactions with the Fairfield Funds. In April 2007, Christopher Streit, Executive Director of Platinum Management, met with Scott Nevin of FGG in New York.

**RESPONSE:** PAWFL admits, upon information and belief, that in or around April 2007, Christopher Streit, Executive Director of Platinum Capital Management Limited, met with Scott

Nevin of FGG in New York regarding certain transactions with the Fairfield Funds. PAWFL

otherwise denies the allegations in Paragraph 85 of the Amended Complaint.

86.      On two separate occasions, in 2004 and 2006, Fortis conducted due diligence visits
with Madoff in New York. Fortis IOM and the Fortis network of entities used the findings of these
visits as support for approving transactions with BLMIS.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 86 of the Amended Complaint and therefore denies such

allegations, except PAWFL admits, upon information and belief, that Fortis conducted due

diligence visits with Madoff in New York.

87.      Fortis IOM maintained regular contact with New York entities and individuals
regarding BLMIS, including direct communications with BLMIS itself in New York. In addition,
Fortis IOM collaborated with its New York Fortis affiliate, Fortis Prime Fund Solutions (USA)
LLC, to review BLMIS trade confirmations and analyze BLMIS's purported trading. In 2006,
Fortis Prime Fund Solutions (USA) LLC sought approval for a credit facility with another BLMIS
Feeder Fund with Defendant Fortis IOM serving as administrator for this facility. From at least
November 2005 through December 2008, Fortis IOM and FPFS IOM acted as administrator for
BLMIS Feeder Fund Harley International (Cayman) Limited, which was managed and operated
out of New York.

**RESPONSE:** PAWFL denies knowledge or information sufficient to form a belief as to

the truth of the allegations of paragraph 87 of the Amended Complaint and therefore denies such

allegations, except admits, upon information and belief, that Fortis IOM maintained contact with

entities and individuals regarding BLMIS.

**D.      Defendants Used New York Bank Accounts for Its BLMIS Feeder Fund
Investments**

88.      The Fairfield Sentry subscription agreements provided that all money for the
purchase of Fairfield Sentry shares be directed to an HSBC bank account located in New York. As
set forth above, Defendants knew and intended that these funds would be then invested with
BLMIS in New York. From Fairfield Sentry's bank account, the funds were deposited into
BLMIS's account at JPMorgan Chase Bank in New York.

**RESPONSE:** PAWFL admits the first sentence of paragraph 88 of the Amended

Complaint, and refers to the referenced subscription agreements for the true and complete contents

thereof. The second sentence of paragraph 88 of the Amended Complaint sets forth legal

conclusions to which no response is required. To the extent a response is required, PAWFL denies

the allegations of the second sentence of paragraph 88 of the Amended Complaint. PAWFL denies

knowledge or information sufficient to form a belief as to the truth of the allegations of the third

sentence of paragraph 88 of the Amended Complaint and therefore denies such allegations.

89.    Defendants utilized a New York-based bank account at Northern Trust
International Banking Corporation (the "New York Account") to receive the redemption payments
from Fairfield Sentry, including the subsequent transfers of customer property the Trustee seeks
to recover in this action.

**RESPONSE:**  Paragraph 89 of the Amended Complaint sets forth legal conclusions to

which no response is required.  To the extent a response is required, PAWFL denies the allegations

of paragraph 89 of the Amended Complaint, except PAWFL admits that Defendants utilized a

bank account at Northern Trust International Banking Corporation.

90.    Defendants thus derived significant revenue from New York and maintained
minimum contacts and/or general business contacts with the United States and New York in
connection with the claims alleged herein.

**RESPONSE:**  Paragraph 90 of the Amended Complaint sets forth legal conclusions to

which no response is required.  To the extent a response is required, PAWFL denies the allegations

of paragraph 90 of the Amended Complaint.

91.    Defendants should therefore reasonably expect to be and are subject to personal
jurisdiction pursuant to the New York Civil Practice Law and Rules 301 and 302 (McKinney 2003)
and Rule 7004 of the Federal Rules of Bankruptcy Procedure.

**RESPONSE:**  Paragraph 91 of the Amended Complaint sets forth legal conclusions to

which no response is required.  To the extent a response is required, PAWFL denies the allegations

of paragraph 91 of the Amended Complaint.

## VII.    RECOVERY OF SUBSEQUENT TRANSFERS TO DEFENDANTS

### A.    Initial Transfers from BLMIS to Fairfield Sentry

92.    The Trustee commenced a separate adversary proceeding against Fairfield Sentry and other defendants in this Court under the caption, *Picard v. Fairfield Sentry Ltd., et al.*, Adv. Pro. No. 09-01239 (CGM), seeking to avoid and recover initial transfers of customer property from BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield Sentry Initial Transfers").

**RESPONSE:**  PAWFL (i) admits that the Trustee filed an action styled as *Picard* v. *Fairfield Sentry, Ltd., et al.*, Adv. Pro No. 09-01239 (CGM) (the "Sentry Action"), (ii) lacks knowledge and information sufficient to form a belief as to the truth of the allegation of the amounts of the alleged transfers alleged in paragraph 92 of the Amended Complaint and therefore denies such allegations, and (iii) denies that the initial transfers of Customer Property to Fairfield Sentry the Trustee seeks to avoid and recover in the Sentry Action were avoided or are avoidable. To the extent any further response is required, PAWFL lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 92 of the Amended Complaint and therefore denies such allegations.

93.    By orders dated June 7 and June 10, 2011, this Court approved a settlement among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a consent judgment in favor of the Trustee and against Fairfield Sentry in the amount of $3,054,000,000 ("Judgment Amount") [ECF No. 109].

**RESPONSE:**  PAWFL admits upon information and belief that the Court entered the orders and judgment as described in paragraph 93 of the Amended Complaint on or about the dates alleged therein, and respectfully refers the Court to the referenced orders and judgment for their complete and accurate contents.

94.    The Fairfield Sentry Initial Transfers are set forth in the attached Exhibits A and B. The Fairfield Sentry Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

**RESPONSE:**  Paragraph 94 of the Amended Complaint sets forth legal conclusions to which no response is required.  To the extent a response is required, PAWFL denies the allegations of paragraph 94 of the Amended Complaint, except PAWFL admits that Exhibits A and B are attached to the Amended Complaint.

95.    On August 28, 2020, the Trustee filed a second amended complaint in the *Fairfield Sentry Ltd.* proceeding ("Second Amended Complaint") [ECF No. 286] seeking in part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment Amount and entry of a declaratory judgment that the Fairfield Sentry Initial Transfers comprising the Judgment Amount are avoided.

**RESPONSE:**  PAWFL admits upon information and belief that the Trustee filed the Second Amended Complaint in the Sentry Action.  To the extent any further response is required, PAWFL lacks knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 95 of the Amended Complaint, and refers to the referenced Second Amended Complaint for the true and complete contents thereof.

96.    As alleged in the Second Amended Complaint, Fairfield Sentry received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to inquire further into the BLMIS fraud. The Trustee incorporates by reference the allegations contained in the Second Amended Complaint as if fully set forth herein, including but not limited to paragraphs 1-10, 79-313, 315-16.

**RESPONSE:**  PAWFL denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 96 of the Amended Complaint, and therefore denies such allegations.

97.    Of the Judgment Amount, $2,895,000,000 was transferred to Fairfield Sentry during the six years preceding the Filing Date (the "Fairfield Sentry Six Year Transfers"). Each of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy Code and applicable provisions of the N.Y. Debt. & Cred. Law, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

**RESPONSE**:  PAWFL denies knowledge or information sufficient to form a belief as to the existence, alleged timing and amounts of the transfers alleged in paragraph 97 of the Amended

Complaint and therefore denies such allegations. The remaining allegations in paragraph 97 of the

Amended Complaint set forth legal conclusions to which no response is required. To the extent a

response is required, PAWFL denies such allegations in paragraph 97 of the Amended Complaint.

98.    Of the Fairfield Sentry Six Year Transfers, $1,580,000,000 was transferred to
Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year
Transfers"). Each of the Fairfield Sentry Two Year Transfers is avoidable under section 548 of the
Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**RESPONSE**:  PAWFL denies knowledge or information sufficient to form a belief as to

the existence, alleged timing and amounts of the transfers alleged in paragraph 98 of the Amended

Complaint and therefore denies such allegations. The remaining allegations in paragraph 98 of the

Amended Complaint set forth legal conclusions to which no response is required. To the extent a

response is required, PAWFL denies such allegations in paragraph 98 of the Amended Complaint.

## B.    Subsequent Transfers from Fairfield Sentry to Defendants

99.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the
Fairfield Sentry Initial Transfers to Defendants. Based on the Trustee's investigation to date, the
subsequent transfers to Defendants total $104,605,052 ("Sentry Subsequent Transfers").
Specifically, (i) Defendants Platinum and/or Fortis IOM received $103,541,099 of subsequent
transfers of customer property; and (ii) Defendant Fortis IOM received $1,063,953 of subsequent
transfers of customer property. Charts setting forth the presently known Sentry Subsequent
Transfers are attached as Exhibits C and D, respectively.

**RESPONSE**:  The first sentence of paragraph 99 of the Amended Complaint sets forth

legal conclusions to which no response is required. To the extent a response is required, PAWFL

denies the allegations in the first sentence of paragraph 99 of the Amended Complaint, except

PAWFL admits that it received certain funds from Fairfield Sentry via Fortis IOM. The second

sentence of paragraph 99 of the Amended Complaint sets forth legal conclusions to which no

response is required. To the extent a response is required, PAWFL denies the allegations of the

second sentence of paragraph 99, except PAWFL admits that it and/or Fortis IOM received

$103,541,099.39 from Fairfield Sentry, and lacks knowledge or information sufficient to form a

belief as to the truth of the allegations regarding Fortis IOM's receipt of additional funds from Fairfield Sentry. The third sentence of paragraph 99 of the Amended Complaint sets forth legal conclusions to which no response is required. To the extent a response is required, PAWFL denies the allegations of the third sentence of paragraph 99, except PAWFL admits that Exhibits C and D are attached to the Amended Complaint and refers to those Exhibits for the true and complete contents thereof.

100.    On June 6, 2012, the Trustee filed this action seeking recovery of subsequent transfers from the Fairfield Funds.

**RESPONSE**: PAWFL denies the allegations in paragraph 100 of the Amended Complaint, except PAWFL admits that the Trustee filed suit against PAWFL on June 6, 2012.

101.    The Sentry Subsequent Transfers are recoverable from Defendants under § 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**RESPONSE**: Paragraph 101 of the Amended Complaint sets forth legal conclusions to which no response is required. To the extent a response is required, PAWFL denies the allegations of paragraph 101 of the Amended Complaint.

### C.    Subsequent Transfers From Fairfield Sentry To Fairfield Sigma And Subsequently To Defendant Fortis IOM

102.    Based on the Trustee's investigation to date, prior to the Filing Date, Fairfield Sentry subsequently transferred at least $789,152,864 of the Fairfield Sentry Initial Transfers directly to Fairfield Sigma ("Sigma Subsequent Transfers"). A chart setting forth the presently known Sigma Subsequent Transfers by date and amount is attached as Exhibit E.

**RESPONSE**: PAWFL denies knowledge or information sufficient to form a belief as to the existence, alleged timing and amounts of the transfers alleged in paragraph 102 of the Amended Complaint and therefore denies such allegations, except PAWFL admits that Exhibit E is attached to the Amended Complaint and refers to Exhibit E for the true and complete contents thereof.

103.    Thereafter, Fairfield Sigma transferred at least $214,549 to Defendant Fortis IOM (the "Sigma-IOM Subsequent Transfers"). A chart setting forth the presently known Sigma-IOM Subsequent Transfers by date and amount is attached as Exhibit F.

**RESPONSE**:  PAWFL denies knowledge or information sufficient to form a belief as to the existence, timing, and amounts of the transfers alleged in paragraph 103 of the Amended Complaint and therefore denies such allegations, except PAWFL admits that Exhibit F is attached to the Amended Complaint and refers to Exhibit F for the true and complete contents thereof.

104.     The Sigma-IOM Subsequent Transfers are recoverable from Defendant Fortis IOM under § 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

**RESPONSE**:  The allegations in paragraph 104 of the Amended Complaint set forth legal conclusions to which no response is required.  To the extent a response is required, PAWFL lacks knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 104 of the Amended Complaint, and therefore denies them.

105.     The Sentry Subsequent Transfers and Sigma-IOM Subsequent Transfers represent redemptions of equity interests by Defendants as shareholders in Fairfield Sentry and Fairfield Sigma. Because Fairfield Sentry and Fairfield Sigma invested all or substantially all of their assets into the BLMIS Ponzi scheme, each of Fairfield Sentry and Fairfield Sigma was insolvent when it made, respectively, the Sentry Subsequent Transfers and Sigma-IOM Subsequent Transfers to Defendants upon redemption of its interests.

**RESPONSE**:  The first sentence of paragraph 105 of the Amended Complaint sets forth legal conclusions to which no response is required.  To the extent a response is required, PAWFL denies the allegations in the first sentence of paragraph 105 of the Amended Complaint, except PAWFL admits that it held equity interests in Fairfield Sentry via Fortis IOM.  The second sentence of paragraph 105 of the Amended Complaint sets forth legal conclusions to which no response is required.  To the extent a response is required, PAWFL denies the allegations of the second sentence of paragraph 105, except PAWFL admits that it received certain funds from Fairfield Sentry via Fortis IOM.

106.     As defined above, the Sentry Subsequent Transfers and the Sigma-IOM Subsequent Transfers are collectively referred to as the "Subsequent Transfers."

**RESPONSE**:   The allegations in paragraph 106 set forth defined terms for purposes of the Amended Complaint to which no response is required.   To the extent a response is required, PAWFL admits that the Trustee has defined the Sentry Subsequent Transfers and the Sigma-IOM Subsequent Transfers collectively as the "Subsequent Transfers" in the Amended Complaint. PAWFL otherwise denies the allegations in paragraph 106 of the Amended Complaint.

107.    The Trustee's discovery and investigation is ongoing and the Trustee reserves the right to: (i) supplement the information on the initial and Subsequent Transfers discussed above, and any additional subsequent transfers; and (ii) seek avoidance and recovery of such transfers.

**RESPONSE**:   PAWFL denies knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 107 of the Amended Complaint and therefore denies such allegations.

<u>**COUNT ONE**</u>

**RECOVERY OF SUBSEQUENT TRANSFERS**
**11 U.S.C. §§ 105(a) AND 550**

108.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

**RESPONSE:**   PAWFL incorporates and reasserts its responses to the allegations contained in each of the previous paragraphs of this Amended Complaint as though set forth fully herein.

109.    The Subsequent Transfers are recoverable from Defendants under 11 U.S.C. § 550(a) and 15 U.S.C. § 78fff-2(c)(3).

**RESPONSE:**   The allegations of paragraph 109 of the Amended Complaint set forth legal conclusions to which no response is required.   To the extent a response is required, PAWFL denies the allegations of paragraph 109 of the Amended Complaint.

110.    Defendants are immediate or mediate transferees of the Subsequent Transfers from the Fairfield Funds.

**RESPONSE:** The allegations of paragraph 110 of the Amended Complaint set forth legal conclusions to which no response is required. To the extent a response is required, PAWFL denies the allegations of paragraph 110 of the Amended Complaint.

111. As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendants: (a) recovering the Subsequent Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**RESPONSE:** The allegations of paragraph 111 of the Amended Complaint set forth legal conclusions to which no response is required. To the extent a response is required, PAWFL denies the allegations of paragraph 111 of the Amended Complaint.

## <u>RESPONSE TO REQUEST FOR RELIEF</u>

The Request for Relief sets forth legal conclusions to which no response is required. To the extent a response is required, PAWFL denies that the Trustee is entitled to his requested relief or to any other relief from PAWFL.

## <u>AFFIRMATIVE DEFENSES</u>

PAWFL asserts the following defenses without assuming the burden of proof or any other burden if such burdens would otherwise be on Plaintiff. PAWFL reserves the right to amend this Answer to assert any additional defenses, as well as any counterclaims or claims against third parties based on discovery in this adversary proceeding or otherwise. These defenses are set forth cumulatively and in the alternative.

## <u>FIRST DEFENSE</u>

### **Bankruptcy Code Safe Harbor (11 U.S.C. § 546(e))**

The alleged subsequent transfers to PAWFL, if any, may not be recovered because the alleged initial transfers if any, are subject to the safe harbor in Section 546(e) of the Bankruptcy Code, 11 U.S.C. § 546(e). Any such alleged initial transfers were (i) made by or to (or for the

benefit of) a stockbroker, financial institution, financial participant, or other covered entity or entities and were (ii) settlement payments and/or transfers made in connection with a securities contract (including any between BLMIS and Fairfield Sentry, and/or between Fairfield Sentry, Fortis IOM and PAWFL).  In addition, at the time of the alleged transfers from Fairfield Sentry to Fortis IOM and/or PAWFL, PAWFL took any funds received for value and in good faith, and PAWFL had no actual knowledge that Madoff or BLMIS were not trading securities or that they were perpetrating a Ponzi scheme.  Upon information and belief, BLMIS, Fairfield Sentry, Fortis IOM and PAWFL were at all relevant times covered entities under the statute.

## SECOND DEFENSE

### No Customer Property (15 U.S.C. § 78fff-2(c)(3))

Some or all of any property that PAWFL received from Fairfield Sentry was not Customer Property, or proceeds of Customer Property, that BLMIS transferred to Fairfield Sentry, and therefore any such property is not recoverable by the Trustee from PAWFL.

## THIRD DEFENSE

### Proceeds Not Recoverable (11 U.S.C. § 550(a)(2))

In the alternative, to the extent that any property PAWFL received from Fairfield Sentry was proceeds of Customer Property that BLMIS transferred to Fairfield Sentry, it is not recoverable by the Trustee from PAWFL under section 550(a)(2) of the Bankruptcy Code.

## FOURTH DEFENSE

### For Value, in Good Faith, and Without Knowledge of Voidability
### (11 U.S.C. § 550(b))

PAWFL took any funds it received from Fairfield Sentry for value, in good faith, and without knowledge of the voidability of any alleged initial transfers from BLMIS to Fairfield

Sentry, and thus the alleged transfers to PAWFL, if any, may not be recovered pursuant to 11 U.S.C. § 550(b).

PAWFL took for value because the alleged transfers it received from Fairfield Sentry, if any, were made in exchange for PAWFL's surrender of its shares in Fairfield Sentry.

PAWFL did not have actual knowledge of any fraudulent purpose behind the alleged transfers it received, if any. PAWFL did not know facts that would have prompted a reasonable person in PAWFL's position to conduct further inquiry into whether there was any fraudulent purpose behind any alleged transfers. Further supporting PAWFL's good faith are the Trustee's own allegations that Fortis IOM, not PAWFL, conducted due diligence. Fortis IOM never put PAWFL on inquiry notice and never raised any concerns with PAWFL. Even if PAWFL had been on inquiry notice (which it was not) of a possible fraudulent purpose behind any alleged transfers it received, a diligent inquiry by PAWFL would not have discovered such a fraudulent purpose. Other entities, including the United States Securities and Exchange Commission, with greater investigatory tools and resources than PAWFL, and with more access to BLMIS personnel and documentation than PAWFL, repeatedly examined and investigated BLMIS but failed to uncover Madoff's fraud before December 2008. PAWFL did not have the ability to compel the production of information from third parties that would have been necessary to establish that BLMIS was committing fraud. Diligent inquiry by PAWFL would not have discovered the fraudulent purpose of any alleged transfers.

PAWFL did not have knowledge of the voidability of any alleged transfers from BLMIS to Fairfield Sentry when it received the alleged subsequent transfers, if any.

**FIFTH DEFENSE**

**Lack of Subject Matter Jurisdiction**
**(U.S. Const. art. III; Fed. R. Civ. P. 12(b)(1); Fed. R. Bankr. P. 7012(b))**

This Court lacks jurisdiction under Article III of the U.S. Constitution to enter final orders or judgment in this proceeding.

**SIXTH DEFENSE**

**Lack of Personal Jurisdiction**
**(Fed. R. Civ. P. 12(b)(2); Fed. R. Bankr. P. 7012(b))**

This Court lacks personal jurisdiction over PAWFL, including for each of the reasons stated in PAWFL's Memorandum of Law in Support of its Motion to Dismiss the Amended Complaint, filed on January 12, 2023 in this adversary proceeding, (ECF 150), and proceedings thereon, and PAWFL has **not** consented to a decision by this Court or this Court's authority to hear and determine the action.

**SEVENTH DEFENSE**

**Failure to State a Claim (Fed. R. Civ. P. 12(b)(6); Fed. R. Bankr. P. 7012(b))**

The Amended Complaint fails to state a claim upon which relief can be granted, including for each of the reasons stated in PAWFL's Memorandum of Law in Support of its Motion to Dismiss the Amended Complaint, filed on January 12, 2023 in this adversary proceeding, (ECF 150), and proceedings thereon.

**EIGHTH DEFENSE**

**Initial Transfer Not Avoided (11 U.S.C. § 550(a))**

The Trustee may not recover any alleged transfers from Fairfield Sentry to PAWFL, because he has not avoided the alleged initial transfers from BLMIS to Fairfield Sentry.

## NINTH DEFENSE

### No Ponzi Scheme Presumption

The Trustee may not rely on a "Ponzi scheme presumption" to prove that the alleged initial transfers from BLMIS to Fairfield Sentry that he seeks to recover from PAWFL were made with actual intent to hinder, delay, or defraud any BLMIS creditor.

## TENTH DEFENSE

### PAWFL as Initial Transferee—Mere Conduit Defense

Fairfield Sentry was a mere conduit, and consequently, any claimed transfers were initial transfers from BLMIS to PAWFL.  As the Trustee stated in *Picard v. Grosvenor Investment Management Ltd.*, No. 12-1021 (Bankr. S.D.N.Y. June 15, 2022), Fairfield Sentry's "sole purpose was to funnel money to BLMIS" and "no arm's length relationship exist[ed] between [Sentry] and BLMIS" (internal quotation marks and citation omitted). 12-1021 (ECF 115), at 3, 6. As a result, any redemptions received by PAWFL were initial transfers from BLMIS to PAWFL that are subject to the safe harbor under 11 U.S.C. § 546(e); any Trustee proceeding to avoid the alleged transfers is untimely; and PAWFL may retain the amount it received, if any, pursuant to 11 U.S.C. § 548(c) and 11 U.S.C. § 548(d)(2)(B) because it took any alleged transfers for value and in good faith.

## ELEVENTH DEFENSE

### New York Debtor and Creditor Law

The Trustee's claims are barred, in whole or in part, because the Trustee failed to plead all of the elements of fraudulent transfer under section 544 of the Bankruptcy Code and sections 273, 274, 275, 276, 276-a, 278 and/or 279 of the New York Debtor and Creditor Law with sufficient particularity and factual support.

### TWELFTH DEFENSE

#### Section 278(1) of New York Debtor and Creditor Law

The Trustee's claims are barred, in whole or in part, because the alleged Fairfield Sentry Initial Transfers were taken, if at all, for fair consideration and without knowledge of the fraud, as provided by section 278(1) of the New York Debtor and Creditor Law.

### THIRTEENTH DEFENSE

#### Section 278(2) of New York Debtor and Creditor Law

The Trustee's claims are barred, in whole or in part, because the alleged Fairfield Sentry Initial Transfers were taken, if at all, without actual fraudulent intent and for fair consideration, as provided by section 278(2) of the New York Debtor and Creditor Law.

### FOURTEENTH DEFENSE

#### Sufficient SIPC Funds

The Trustee's claims should be dismissed if Plaintiff has recovered, or during the pendency of this action recovers, sufficient funds to reimburse SIPC for all payments that SIPC has made to satisfy allowed claims of BLMIS customers.

### FIFTEENTH DEFENSE

#### Failure to Mitigate

The Trustee's claims are barred, in whole or part, because Plaintiff has failed to mitigate, minimize or avoid damages, if any.

### SIXTEENTH DEFENSE

#### British Virgin Island Proceedings

The Trustee's claims are barred, in whole or in part, based upon rulings, judgments, orders, or decisions entered in the liquidation proceedings of Fairfield Sentry before the

Commercial Division of the Eastern Caribbean High Court of Justice, British Virgin Islands, including any related appellate rulings, judgments, orders, or decisions.

## SEVENTEENTH DEFENSE

### Trustee Not Entitled to Interest

The Trustee is not entitled to an award of interest.

## EIGHTEENTH DEFENSE

### Statute of Limitations

The Trustee's claims are barred by the statute of limitations.

## NINETEENTH DEFENSE

### Estoppel

The Trustee's claims are barred by estoppel.

## TWENTIETH DEFENSE

### Unreasonable Delay/Laches

The Trustee's delay in bringing and prosecuting his claim, which was brought more than a decade ago, lay dormant for years and concerns alleged transfers made nearly 20 years ago, is unreasonable and unfairly prejudices PAWFL's ability to defend itself, including, without limit, with respect to any claim by the Trustee for interest accruing from and after the date of the filing of the Amended Complaint.

## TWENTY-FIRST DEFENSE

### Violation of Due Process (U.S. Const. Amend. V)

The use of the doctrine of law of the case to apply to PAWFL rulings made in other adversary proceedings to which it was not a party and in which it did not participate violates PAWFL's right to due process of law as guaranteed by the Fifth Amendment to the U.S. Constitution.

### TWENTY-SECOND DEFENSE

### Single Satisfaction (11 U.S.C. § 550(d))

Pursuant to 11 U.S.C. § 550(d), the Trustee may not recover any alleged subsequent transfers from PAWFL to the extent he has recovered the amount of the initial transfers from Fairfield Sentry or any other immediate or mediate transferee, and the amount of the avoided initial transfers is included in the alleged Customer Property that the Trustee alleges PAWFL received.

### TWENTY-THIRD DEFENSE

### Preservation of Rights (11 U.S.C. § 502(h))

To the extent the Trustee recovers from PAWFL, PAWFL reserves its right to assert a claim arising from such recovery under 11 U.S.C. § 502(h).

### TWENTY-FOURTH DEFENSE

### Double Recovery

On May 9, 2011, the Trustee entered into a Settlement Agreement (the "Fairfield Settlement Agreement") with the Liquidators of Fairfield Sentry Limited and other Fairfield funds.

This Court approved the Fairfield Settlement Agreement on June 7, 2011 and it was incorporated into the consent judgment entered against Fairfield Sentry on July 13, 2011 (the "Consent Judgment"). The Fairfield Settlement Agreement provides for the sharing of recoveries on the Trustee's and the Liquidators' claims for recovery of property that Fairfield Sentry transferred. To the extent that the Liquidators recover from PAWFL in settlement or otherwise, the Trustee is barred from recovering on the ground that he is not entitled to double recovery, nor should PAWFL be subject to recovery of identical funds from two separate entities.

## TWENTY-FIFTH DEFENSE

### Extraterritoriality

The Trustee's recovery from PAWFL of any transfer from Fairfield Sentry would constitute an impermissible extraterritorial application of U.S. law.

## TWENTY-SIXTH DEFENSE

### Comity

The Trustee's recovery from PAWFL of any transfer from Fairfield Sentry would violate principles of comity.

## TWENTY-SEVENTH DEFENSE

### Received Less Than Full Value

The Trustee's claims are barred, in whole or part, because PAWFL received less than the full value of its principal that was invested in BLMIS through BLMIS feeder funds, and it therefore would be inequitable and unjust for the Trustee to claw back funds from PAWFL.

## TWENTY-EIGHTH DEFENSE

### Equitable Setoff

Any enforcement of relief against PAWFL is subject to the right of equitable setoff.

## TWENTY-NINTH DEFENSE

### Dismissal

The Trustee's claims are barred to the extent it has been or may in the future be dismissed by the Court or is based on allegations that have been or may in the future be dismissed by the Court or is based on theories or allegations that have been or may in the future be rejected by this Court or by another court on appeal from any orders of this Court.

### THIRTIETH DEFENSE

#### Unclean Hands and Other Equitable Doctrines

The Trustee's claims are barred, in whole or in part, by the equitable doctrines of waiver, equitable estoppel, *in pari delicto*, unclean hands, laches, and other equitable defenses that may appear upon further discovery and investigation.

### THIRTY-FIRST DEFENSE

#### Nonavoidability of Initial Transfers

The Trustee's claims against PAWFL are barred to the extent that they do not derive from initial transfers within the two-year lookback period of 11 U.S.C. § 548(a)(1)(A).

### JURY DEMAND

PAWFL demands a trial by jury on all issues that may be tried by a jury.

### STATEMENT PURSUANT TO FED. R. BANKR. P. 7012(B)

PAWFL does not consent to entry of final orders or judgment by the Bankruptcy Court.

### DEFENDANT'S REQUEST FOR RELIEF

WHEREFORE, PAWFL requests judgment in its favor dismissing the Amended Complaint with prejudice, together with an award of attorneys' fees, costs, disbursements, and such other relief as the Court deems just and appropriate.

Dated: August 25, 2023
     New York, New York

*/s/ Scott B. Schreiber*
Scott B. Schreiber
Rosa J. Evergreen (admitted *pro hac vice*)
Daniel R. Bernstein
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, D.C. 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999

    -and-

Kent A. Yalowitz
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
Telephone: (212) 836-8000
Facsimile: (212) 836-8689

*Attorneys for Defendant Platinum All Weather
Fund Limited.*