**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-01789 (CGM)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff,<br><br>Plaintiff,<br>v.<br><br>RUSSELL OASIS,<br><br>Defendant. | Adv. Pro. No. 23-XXXXX (CGM) |

# COMPLAINT

Irving H. Picard, as trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"),[1] substantively consolidated with the chapter 7 estate of Bernard L. Madoff ("Madoff," and with BLMIS, "Debtors"), by and through his undersigned counsel, for his complaint (the "Complaint") against Russell Oasis, alleges the following:

## NATURE OF PROCEEDING

1. This adversary proceeding is part of the Trustee's continuing efforts to recover BLMIS "customer property," as defined by SIPA § 78*lll*(4), that was stolen by BLMIS as part of the massive Ponzi scheme perpetrated by Madoff and others.

2. Russell Oasis was a beneficiary of the Ponzi scheme. In the two-year period prior to BLMIS's collapse, Russell Oasis received $12,800,065 in subsequent transfers of fictitious profits from the Ponzi scheme through a BLMIS customer account held by RAR Entrepreneurial Fund, Ltd. ("RAR"). The initial transfers to RAR have been avoided by entry of judgment in favor of the Trustee. The Trustee seeks to recover these transfers of stolen customer property from Russell Oasis so that the property can be equitably distributed to whom it rightfully belongs—customers with allowed claims against BLMIS who have yet to be made whole.

3. This adversary proceeding is brought pursuant to SIPA §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3) and sections 105(a) and 550(a) of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code").

---

[1] For convenience, further references to SIPA will omit title 15 and be cited as SIPA §___.

2

## JURISDICTION AND VENUE

4. This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities & Exchange Commission v. Bernard L. Madoff Investment Securities LLC*, No. 08 CV 10791 (S.D.N.Y.) (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1) and SIPA § 78eee(b)(2)(A) and (b)(4).

5. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (H) and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

6. Venue in this judicial district is proper under 28 U.S.C. § 1409.

## DEFENDANT

7. Russell Oasis maintains his residence in Miami, Florida. He is a limited partner of RAR, and an owner of Tamiami Tower Corporation, the general partner of RAR.

8. RAR is a Florida Limited Partnership with its current principal place of business at 1172 S Dixie Highway #413, Coral Gables, FL 33146.

9. In April 1998, RAR opened BLMIS Customer Account No. 1R0172 in the name of RAR ENTREPRENEURIAL FUND. *See* Exhibit A.

10. Russell Oasis signed RAR's BLMIS account opening documents on behalf of RAR and listed RAR's address as 4840 SW 80 Street, Miami, FL—the same address as his personal residence. RAR used this address through at least 2008.

11. In April 1998, Russell Oasis informed BLMIS that "RAR Entrepreneurial Fund is a limited partnership, owned wholly by Russell Oasis (49.50%), Robert Potamkin, (24.75%), and Alan Potamkin (24.75%). The remaining 1% is owned by Tamiami Tower Corp., a Florida Corporation, which is owned by Russell Oasis (50%), Robert Potamkin (25%), and Alan Potamkin (25%). No other person or entity owns any share or interest in either Tamiami Tower Corp., or The RAR Entrepreneurial Fund."

12. Russell Oasis managed RAR's financial books and records and was the only person who authorized deposits into and withdrawals from BLMIS on behalf of RAR.

## BACKGROUND, THE TRUSTEE, AND STANDING

13. On December 11, 2008, Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

14. On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

15. Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

    (a)    appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

    (b)    appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

    (c)    removed the case to this Court pursuant to SIPA § 78eee(b)(4).

16. By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

17. On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

18. At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

19. At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

20. At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

21. On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their

5

participation in the Ponzi scheme as employees of BLMIS's investment advisory business ("IA Business").

22. As the Trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

23. Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

24. The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including Bankruptcy Code §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under the Bankruptcy Code §§ 544, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

I. **BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY**

    A. **BLMIS**

25. Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker dealer with the SEC under file number 8-8132. In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company. The BLMIS

6

file number 8-8132 remained the same. At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

26. In compliance with 15 U.S.C. § 78*o*(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008. Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration under SEC file number 8-8132 as a securities broker-dealer during its operation. At all times, BLMIS was assigned CRD No. 2625. SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960. On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status. SIPC membership is contingent on registration of the broker-dealer with the SEC.

27. For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and the IA Business.

28. BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

29. For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

7

30.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion.  BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion.  In reality, Madoff grossly understated these numbers.  In December 2008, BLMIS had over 4.900 active customer accounts with a purported value of approximately $68 billion in AUM.  At all times, BLMIS's Form ADVs were publicly available.

**B.     The Ponzi Scheme**

31.     At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities.  The IA Business had no legitimate business operations and produced no profits or earnings.  Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

32.     BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity.  It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS.  The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

33.     To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements and other regulatory reports that BLMIS filed.  Friehling & Horowitz was a three-person accounting firm

8

based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

34. On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

### 1. Madoff's Investment Strategy

35. In general, BLMIS purported to execute two primary investment strategies for BLMIS customers: the convertible arbitrage strategy and the split-strike conversion strategy (the "SSC Strategy"). For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit. At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

36. All funds received from IA Business customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

37. The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets. Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time. In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

38. BLMIS falsified the trades purportedly executed for the convertible arbitrage investment strategy, using backdated trade data to fabricate the trades reported on monthly account statements and trade confirmations sent to customers.

39. From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

40. BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

41. By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

42. The put options were to limit the downside risk of the sizeable price changes in the basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option should have entailed a loss for BLMIS.

43. The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

44. The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protection while limiting the upside.

45. If Madoff was putting on the same baskets of equities across all BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket. For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount much less in billions of notional dollars.

46. Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call or put option notional value to support the Madoff SSC Strategy.

47. Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times, significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

### 2. BLMIS's Fee Structure

48. BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

### 3. BLMIS's Market Timing

49. Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he succeeded at market timing by intermittently entering and exiting the market. During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in U.S. Treasury securities ("Treasury Bills") or mutual funds invested in Treasury Bills.

50. As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS reportedly exited the market completely at every year end and every quarter end starting in 2003. These quarterly and year-end exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would be impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time.

51. BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC Strategy, which does not depend on exiting the market in a particular month.

### 4. BLMIS Execution

52. BLMIS's execution showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

### 5. No Evidence of BLMIS Trading

53. There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing

house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC Strategy.

54. All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS cleared any trades in any exchange-listed options.

55. The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

56. At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS through its IA Business operated as a Ponzi scheme.

57. At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

## THE PRIOR AVOIDANCE ACTION

58. On November 30, 2010, the Trustee commenced a separate adversary proceeding in this Court against RAR, among others. *Picard v. RAR Entrepreneurial Fund, Ltd.*, Adv. Pro. No. 10-04352 (CGM) (Bankr. S.D.N.Y.) ("*RAR Entrepreneurial*"). The Trustee amended his complaint on December 14, 2011. *RAR Entrepreneurial*, ECF No. 26.

59. In *RAR Entrepreneurial*, the Trustee sought, among other relief, to avoid and recover, pursuant to Bankruptcy Code §§ 548(a)(1)(A) and 550(a), transfers of fictitious profits from the Ponzi scheme totaling $12,800,065 made by BLMIS to RAR in the two-year period prior to BLMIS's collapse—specifically two transfers sent to RAR on September 22, 2008 and October

13

6, 2008 (the "RAR Initial Transfers"). Amended Complaint, *RAR Entrepreneurial*, ECF No. 26. A chart setting forth the RAR Initial Transfers is attached as Exhibit B.

60. The Trustee also sought to recover, pursuant to Bankruptcy Code § 550(a), subsequent transfers of the RAR Initial Transfers from Russell Oasis, Alan Potamkin, and Robert Potamkin.

61. On April 11, 2013, Alan and Robert Potamkin were dismissed from the action without prejudice. Corrected So Ordered Stipulations, *RAR Entrepreneurial*, ECF Nos. 44 and 45.

62. On July 16, 2015, the Court dismissed the count seeking to recover subsequent transfers without prejudice to the Trustee's rights under Section 550(f) of the Bankruptcy Code. *RAR Entrepreneurial*, ECF No. 65.

63. On February 6, 2020, after the close of discovery, RAR moved to withdraw the reference of *RAR Entrepreneurial* to this Court. Mot. to Withdraw the Bankruptcy Reference, *Picard v. RAR Entrepreneurial Fund*, No. 20-cv-01029 (JMF) (S.D.N.Y. Feb. 6, 2020), ECF No. 1 ("*RAR District Action*"). The District Court granted the motion to withdraw on the consent of the Trustee, and the *RAR District Action* was scheduled for trial before a jury in the District Court. *RAR District Action*, ECF No. 6.

64. On April 1, 2020, the Trustee moved for summary judgment on Count Two of the Amended Complaint, seeking to avoid and recover fraudulent transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code. *RAR District Action*, ECF No. 11. RAR cross-moved for summary judgment on June 9, 2020. *RAR District Action*, ECF No. 29. On March 3, 2021, the District Court entered an Opinion and Order granting the Trustee's motion in part, with respect to two elements of his claim (that the transfers at issues were made within the two-year period and with actual intent to hinder, delay, or defraud), but denied with respect to the final element

(whether the transfer consisted of an interest of the debtor in property). *RAR District Action*, ECF No. 43. RAR's cross-motion was denied in full. *Id.*

65.  Over the course of three days in March 2022, the *RAR District Action* was tried before a jury in the District Court. On March 7, 2022, the jury issued a verdict in favor of the Trustee on the final element of his claim, thus establishing that the RAR Initial Transfers consisted of an interest of the debtor. *See* Order, Ex. 2 (Jury Verdict), *RAR District Action*, ECF No. 132. On September 23, 2022, following submission of additional briefing on prejudgment interest, the District Court entered final judgment against RAR in the total amount of the RAR Initial Transfers—$12,800,065—and awarded the Trustee prejudgment interest at a rate of 4 percent in the amount of $6,067,230.81. *See* Final Judgment, *RAR District Action*, ECF No. 151.[2]

### THE SUBSEQUENT TRANSFERS TO RUSSELL OASIS

66.  BLMIS transferred the RAR Initial Transfers to RAR's bank account number XXXXXX7952 held in its name at Northern Trust Bank of FL N.A (the "7952 Account").

67.  Russell Oasis controlled the 7952 Account on behalf of RAR.

68.  RAR did not produce any bank statements prior to 2010 related to the 7952 Account to the Trustee.

69.  In response to a Rule 2004 subpoena request seeking "any and all documents concerning any checking, savings or deposit account held by [Russell Oasis] at any financial institution or bank, domestic or foreign, that received monies in or transferred monies out to RAR and/or Tamiami, including but not limited to account statements, account opening documents, cancelled checks, wire transfer records, and documents reflecting deposits, withdrawals,

---

[2] RAR appealed the District Court's judgment to the United States Court of Appeals for the Second Circuit which, as of the date of this filing, remains pending. *Picard v. RAR Entrepreneurial Fund, Ltd.*, No. 22-3006 (2d Cir. Nov. 23, 2022).

15

Subsequent Transfers and cash activity," Russell Oasis stated that he "is not in possession, custody or control of any documents responsive to this request."

70. Upon information and belief, neither Russell Oasis nor RAR (acting through Russell Oasis) preserved RAR's copies of the relevant 7952 Account statements. Neither Russell Oasis nor RAR requested that Northern Trust preserve the 7952 Account statements in anticipation of litigation.

71. Following receipt of the RAR Initial Transfers, RAR transferred a portion of each of the RAR Initial Transfers to Russell Oasis (the "RAR Subsequent Transfers").

72. RAR maintained a document entitled "RAR Entrepreneurial Fund MADOFF ACCOUNT ACTIVITY" which purportedly showed each investor's percentage of ownership, beginning balance, deposits, withdrawals, and account value. At the beginning of September 2008, it showed a total beginning balance of $24,588,486 with $19,621,972 attributed to Russell Oasis.

RAR Entrepreneurial Fund
MADOFF ACCOUNT ACTIVITY

| INVESTORS | 7/31/08 | 8/31/08 | 9/30/08 | 10/31/08 | 11/30/08 |
|---|---|---|---|---|---|
| **RUSS OASIS** | | | | | |
| % of ownership | 75.378% | 79.801% | 60.740% | 35.530% | 35.530% |
| Beginning Balance | 15,131,374 | 15,144,987 | 19,621,972 | 7,766,620 | 2,778,781 |
| Deposits/Withdrawals | (11,744) | 4,400,000 | (12,000,000) | (5,000,000) | - |
| Change in market value | 25,357 | 76,986 | 144,648 | 12,161 | 55,369 |
| Account Value | 15,144,987 | 19,621,972 | 7,766,620 | 2,778,781 | 2,834,149 |
| Madoff Holdings: | | | | | |
| Equities | 15,144,987 | 19,547,278 | 7,766,620 | 2,778,781 | 2,875,464 |
| Options | - | 74,694 | - | - | (41,315) |
| Total | 15,144,987 | 19,621,972 | 7,766,620 | 2,778,781 | 2,834,149 |
| **GRAND TOTALS** | | | | | |
| % of ownership | 100.000% | 100.000% | 100.000% | 100.000% | 100.000% |
| Beginning Balance | 20,100,375 | 20,092,014 | 24,588,486 | 12,786,627 | 7,820,854 |
| Deposits/Withdrawals | (42,000) | 4,400,000 | (12,040,000) | (5,000,000) | - |
| Change in market value | 33,639 | 96,472 | 238,141 | 34,227 | 155,834 |
| Ending Balance | 20,092,014 | 24,588,486 | 12,786,627 | 7,820,854 | 7,976,688 |
| Madoff Holdings: | | | | | |
| Equities | 20,092,014 | 24,494,886 | 12,786,627 | 7,820,854 | 8,092,968 |
| Options | - | 93,600 | - | - | (116,280) |
| Total | 20,092,014 | 24,588,486 | 12,786,627 | 7,820,854 | 7,976,688 |

16

73. The document further shows that on or before September 30, 2008, RAR transferred $12 million to Russell Oasis.

74. The document further shows that on or before October 31, 2008, RAR transferred $5 million to Russell Oasis.

75. A chart setting forth the presently known RAR Subsequent Transfers is attached as Exhibit C.

76. The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement his allegations regarding the initial and subsequent transfers discussed above, and/or allege further transfers; and (ii) seek recovery of such transfers.

## COUNT ONE

### RECOVERY OF SUBSEQUENT TRANSFERS
### 11 U.S.C. §§ 105(a) AND 550(a)

77. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

78. The RAR Initial Transfers have been avoided by entry of judgment.

79. Each of the RAR Subsequent Transfers are recoverable from Russell Oasis under 11 U.S.C. § 550(a) and 15 U.S.C. § 78fff-2(c)(3) up to the amount of the avoided RAR Initial Transfers. Russell Oasis is an immediate or mediate transferee of each of the RAR Subsequent Transfers from RAR.

80. As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to judgment against Russell Oasis: (a) recovering the RAR Subsequent Transfers, or the value thereof, from Russell Oasis for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

_____

17

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on Count One in favor of the Trustee and against Russell Oasis as follows:

i.      Recovering the RAR Subsequent Transfers, or the value thereof, from Russell Oasis for the benefit of the estate;

ii.     Awarding the Trustee prejudgment interest from the date of the avoidance of the RAR Initial Transfers on September 23, 2022; and

iii.    Awarding the Trustee fees and all applicable costs and disbursements, and such other, further, and different relief as the Court deems just, proper and equitable incurred in this proceeding.

Date:  September 20, 2023
         New York, New York

By: */s/ Amy E. Vanderwal*

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Lan Hoang
Email: lhoang@bakerlaw.com
Brian W. Song
Email: bsong@bakerlaw.com
Amy E. Vanderwal
Email: avanderwal@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff*
*Investment Securities LLC and the*
*Chapter 7 Estate of Bernard L. Madoff*