# EXHIBIT A



Lindsay A. Bush
Binder & Schwartz LLP
675 Third Avenue, 26th Floor
New York, NY 10017

(T) 212.933.4557
(F) 212.510.7299
lbush@binderschwartz.com

September 29, 2023

By E-mail

Jason Oliver, Esq.
Baker Hostetler
45 Rockefeller Plaza
New York, New York 10111

      Re:     *Picard v. Legacy Capital Ltd.*, Adv. Pro. No. 10-05286 (CGM) (Bankr. S.D.N.Y.)

Dear Jason:

     We write in response to your August 17, 2023 letter regarding purported deficiencies with Legacy's document productions received by the Trustee to date.

     As an initial matter, and as we have explained to you on numerous occasions, Legacy's productions are being made on a rolling basis and we anticipate that document production will be completed by the end of November 2023 at the latest.  Accordingly, the "demands" throughout the Trustee's letter that Legacy "immediately" produce certain documents, or that Legacy confirm it is done with collection and production efforts, and/or seeking "confirmation" that no other documents are in Legacy's possession, custody, or control, are counterproductive and seek to manufacture disputes where none exist.  Legacy is continuing to review and produce documents responsive to the Trustee's requests in accordance with the agreed upon search parameters and will continue to do so as quickly as reasonably possible.  Demanding "immediate" production in the middle of a rolling production is disruptive to the process.  Similarly, until Legacy has reviewed all of its documents, it cannot "confirm" the existence—or not—of additional documents within any given category.  If, after Legacy completes its document production, the Trustee has questions about the completeness of the production, then he should raise such issues at that time.  In the meantime, we are doing our utmost to ensure a complete production of documents to the Trustee.

     We respond briefly below to the additional issues raised in your letter.

### I.    Legacy's Document Preservation and Collection Procedures

     With regard to Legacy's document preservation and collection, your letter misleadingly implies that Legacy failed to respond to the questions posed in the Trustee's March 14, 2023 letter because such responses were not "in writing."  We are not aware of any requirement that discovery meet and confer discussions take place in writing, but we welcome you to provide us with any authority that supports the Trustee's view.  In any event, the Trustee knows that such

issues were discussed initially during a telephonic meet and confer that took place on February 9, 2023, as summarized in the subsequent March 24, 2023 email to Trustee counsel that states:

> As we explained to you during our meet and confer, we have preserved millions of documents collected from multiple sources and have applied broad search terms, in order to cull down the millions of documents to the few hundred thousand documents most likely to relate to the Legacy BLMIS investment. We then provided you with the search terms we've applied to the collected data, along with a list of custodians, and invited you to comment on those terms promptly so that we could negotiate a reasonable universe of documents for review and start making productions.

The parties had an additional conversation about Legacy's document collection and preservation efforts during a meet and confer that took place on June 1, 2023. Thus, your suggestion that Legacy has failed to respond to the questions raised in your March 14, 2023 email is not accurate. If you have specific questions that you feel have not been addressed over the course of our prior discussions, then please let us know.

      Moreover, your supposed "heightened" concerns about Legacy's collection and preservation efforts are also baseless. Your statistics as to how many custodial files have been produced as part of rolling productions are, by definition, a moving target. To date, we have produced a total of 1,174 documents that are custodial to Rafael Mayer, David Mayer, and I. Jimmy Mayer, 956 of which are custodial to Rafael Mayer. This number will, of course, change as Legacy continues its document productions over the next few weeks. Further, it is not surprising or cause for concern that there are a few 2003 and 2004 emails that you received from Renaissance and that you have not received from Legacy. The Madoff fraud did not come to light until December 2008, and the first subpoena related in any way to Legacy was served on Rafael Mayer and David Mayer in July 2010. It is to be expected that over the period of many years, from when those Renaissance emails were sent in 2003 and 2004 to the date when a preservation obligation was triggered, some small number of emails may have been deleted. This is not a cause for concern, as businesses do not accumulate and store records indefinitely unless they have a legal requirement to do so.[1]

      Next, the Trustee lists certain "centralized email addresses" and questions why those addresses are not custodians. We are continuing to look into this issue, but it is our understanding that these are not centralized email addresses; rather, they are email distribution lists (commonly referred to as "listservs"), which allow users to create and maintain electronic mailing lists, facilitating group communication via email. Many of the recipients of the emails sent to the distribution lists include the custodians from whom we collected documents—and the metadata for the documents reflects the document

---

[1] We note that one of the documents produced by Renaissance, RE00008501, is an email from Rafael Mayer to Paul Broder, Nat Simons, and Mark Rhoades-Brown from Renaissance, dated December 2003, where he is sending 38MB of Madoff Statements, as well as other materials. This is in direct contradiction to the allegation in the Legacy Complaint (as well as numerous other filings and pleadings) that Rafael Mayer and David Mayer restricted access to such statements.

2

custodian.

## II. The Adam Albin Document Production

We can confirm that we searched for Adam Albin's name in the database and have produced all responsive documents. As we have mentioned to you during past meet and confer discussions, our understanding is that the only meeting that took place between Mr. Albin and our client was in March 2005, many years before the Madoff fraud was revealed and before any prospect of litigation involving our client surfaced. Thus, documents from 2005 may—or may not—have still existed at the time documents were collected on behalf of our client.[2] Moreover, as we also already represented to you during a past meet and confer discussion that included counsel for BNP, we have no reason to believe that Legacy's relationship with Mr. Albin was either longstanding or substantial.[3]

## III. Definition of "Accounts"

It is not clear what the Trustee contends is the dispute with respect to pre-Legacy BLMIS accounts. Legacy continues to disagree that the pre-Legacy BLMIS accounts have any relevance to the issue of Legacy's good faith at the time of the transfers that took place in 2007 and 2008. This is particularly true with respect to transfers between predecessor accounts that took place in 1998—a decade before the transfers at issue. Regardless, and as communicated to you in our June 22, 2023 letter, we are not withholding any documents within the agreed upon search parameters on the basis that they relate to predecessor accounts to the Legacy account. Documents in Legacy's possession that relate to the predecessor BLMIS accounts have been, and will continue to be, produced to the Trustee as part of rolling document productions. Further, the fact that Mr. Greenblatt included an analysis of the Olympus account as part of his expert report that was served on February 20, 2017, is irrelevant. Mr. Greenblatt's report was to support the "Principal Balance Calculation" of deposits and withdrawals from the Legacy and predecessor BLMIS accounts. These amounts—including amounts transferred from the predecessor accounts— are no longer in dispute, having been memorialized in a stipulation and order (ECF Doc. No. 155). Thus, we do not believe there is a dispute that requires further discussion—if the Trustee believes otherwise, please let us know.

## IV. Time Period for Production

By letter dated July 17, 2023, Legacy agreed to undertake to review and produce documents dated between January 1, 2009, and December 31, 2009, that contained the following terms: Bernard w/3 "Madoff Investment Securities LLC"; Bernie*; BLMIS*; BMIS*; BMLIS*;

---

[2] Your note that LC000000002 was produced from Piero DiCapua as a custodian, but not from Rafael Mayer's files is misguided, as you can tell from the face of the email that Rafael Mayer was copied on the email.

[3] The Trustee contends that Legacy must have additional documents relating to Mr. Albin because ten of the documents Legacy produced were Mr. Albin's Outlook contact information. Notably, however, and as should have been apparent from the metadata produced to the Trustee alongside the production, four of those records belong to the same custodian, Don Mather, and two of them belong to "IBM BladeCenter KRHNYMX2," which is not an individual but instead references a physical server from which documents were collected. In actuality, at the time of preservation, only five individuals had Mr. Albin's Outlook contact information saved.

3

BMLS\*; Maddof\*; Mado\*; Madoff\*; and Ponzi.  It is therefore mystifying that the Trustee asserts in his letter that "[t]he Trustee disputes Legacy's continued efforts to limit the relevant time period for document production and demands that all relevant and responsive documents after December 11, 2008 be produced."  Contrary to the Trustee's suggestion, Legacy has not "withheld production of documents within this timeframe"; rather, Legacy's productions are being made on a *rolling basis* and documents within this 2009 timeframe to the Trustee have already been produced.  *See, e.g.*, LC000070495-96 (produced email dated March 24, 2009); LC000058404-05 (produced email dated September 8, 2009); LC000056171-73 (produced email dated November 11, 2009).

Moreover, Legacy is not "withholding" documents from after December 31, 2009.  Rather it is Legacy's position that any such documents are not relevant.  This is a disagreement as to a relevant time frame for review, which has been clearly and consistently communicated to the Trustee.  We note that the Trustee's document requests fail to include any time frame at all for this or any other request.

### V.    Legacy's Third-Party Service Providers / "Virtual Back Office System"

The Trustee's asserts, without any support, that Legacy had an obligation to collect and produce "all communications, agreements, work product, and any other document, electronic or otherwise, concerning the defendants" from every one of its third-party service providers.  However, absent a contractual provision that establishes control over the information, Legacy has no such obligation.  *See, e.g.*, *Suriel v. Port Authority of New York and New Jersey*, 2023 WL 2727522, at \*5-6 (E.D.N.Y. Mar. 31, 2023).

As you concede in your letter, Legacy has already produced (and will continue to produce) all responsive documents and communications in its possession with Spectrum and its other third-party service providers.  Legacy also has voluntarily collected hard-copy files from Omnium Bermuda, Ltd. (f/k/a Citadel Solutions Bermuda Ltd.),  and responsive documents from these hard-copy files will be produced or made available for inspection as part of Legacy's rolling production of documents.  We disagree with your unsupported assertion that Spectrum was acting as Legacy's "agent."  Spectrum, which at the time was an independent and privately owned fund administrator with hundreds of fund clients, was a hired fund administrator that provided a technology platform and standard accounting, administration, and related middle-office services to Legacy.  In terms of "Virtual Back Office," screenshots of which have been produced (LC000000924-926), this was the platform used by Spectrum.  At the time of its use, Legacy had access to the system through a VPN connection.  The Virtual Back Office was not stored or maintained by Legacy.  Legacy will produce documents in its possession, custody or control that reference or relate to the Virtual Back Office.

### VI.    Legacy's June 22, 2023 Letter

As an initial matter, the Trustee misconstrues the chart that Legacy provided in its June 22, 2023 letter, which was an effort to illustrate what responsive documents have already been produced to the Trustee.  Legacy specifically indicated at the end of the chart that "[a]s Legacy continues to review and produce documents within the agreed upon search parameters, additional

4

responsive, non-privileged documents that are located will be produced on a rolling basis." And, in fact, this is exactly what Legacy has done, and continues to do. Therefore, the Trustee's repeated reference in Section VII of the August 17, 2023 letter to documents that were identified in the chart, immediately followed by requests to confirm that all such documents have been produced and/or that there are no additional documents in Legacy's possession, custody, or control, completely ignores the purpose of the chart and Legacy's statement that it is continuing to search for and produce additional documents.

Legacy also confirms that, with the exception of the payment of legal fees (Trustee Request No. 65), Legacy is not withholding from production any documents within the agreed upon search parameters that are responsive to the documents you describe in your letter as relating to Legacy's "financial picture." This is precisely what was communicated to you in pages 3-4 of our June 22, 2023 letter – it is unclear why these same requests are the subject of yet another discovery letter from you requiring us to reconfirm what we previously confirmed to you. Legacy's position with regard to Trustee's Request No. 65 remains unchanged from what was communicated in our June 22, 2023 letter.

### VII. Legacy Capital Banking/Financial Information

As the Trustee concedes, Legacy has produced account statements for Account No. xxxxx4472 (the "Santander Bank Account") from the time the account was opened in early 2004, through November 2008. The statement from the month of April 2005 was inadvertently omitted but has since been produced. *See* LC000083051. Legacy did not require a separate deposit account before it entered into the credit agreement with BNP Paribas - Dublin Branch, as lender in mid-2004. As the statement from November 2008 illustrates, the balance in the account at that time was approximately $73,000. Immediately thereafter, in December 2008, BNP Paribas took control over the Santander Bank Account pursuant to the Deposit Account Control Agreement, dated July 26, 2004. To the extent there are additional, non-privileged documents within the agreed upon search parameters that relate to the Santander Bank Account, they will be produced as part of Legacy's rolling document productions.

In your letter, the Trustee further requests all documents concerning Legacy's cash activity "by way of ledgers, QuickBooks, or any other internal accounting method and reports that were used to track Legacy's monies, accounts, and expenses." Similar to what we explained to you in our November 2, 2020 letter regarding the financial records for Montpellier International Ltd., Khronos used Excel spreadsheets to track Legacy's expenses and engaged administrator firms to run the books and provide other accounting services. There are no QuickBooks files or similar electronic accounting files maintained by Khronos on behalf of Legacy. Non-privileged documents within the agreed upon search parameters that relate to Legacy's cash activity have been, and will continue to be, produced as part of Legacy's rolling document productions. Please note that notwithstanding Legacy's agreement to produce such documents, it continues to be Legacy's position that these documents are not relevant to Legacy's good faith defense.

### VIII. Redacted Document(s)

The portions of certain documents that you cite in your letter have been redacted on the basis of privilege. Legacy anticipates providing a privilege log by the end of November, upon completion of its document productions to the Trustee.

There are additional documents that have been redacted to exclude information that is prohibited from disclosure under foreign law. As the Trustee is aware, Montpellier International Ltd. and Khronos Group Ltd. (f/k/a Montpellier Resources Ltd.) were organized under the laws of Bermuda. Section 68 of the Bermuda Investment Funds Act 2006 (the "IFA"), which governs the registration and authorization of investment funds, prohibits the disclosure of information relating to the business or other affairs of any person absent consent of the person to whom the information relates. The IFA permits only the production of a summary or collection of information that would not allow information relating to any individual person to be ascertained. Accordingly, Legacy has redacted (and will continue to redact in subsequent productions) information that Khronos, as the investment advisor to Legacy, Montpellier International Ltd. and Khronos Group Ltd. (f/k/a Montpellier Resources Ltd.), is not permitted to disclose and that would breach the mandatory provisions of the IFA.[4]

### IX. Time to Complete Production

Legacy maintains its position that a lengthy extension of discovery is not necessary in this case. Legacy has repeatedly stated that it anticipates that document production on all issues of good faith—from all defendants in both actions with custody and control over relevant documents—will be completed by the end of November. Legacy has already produced 34,512 documents to the Trustee, consisting of 124,989 pages.

Very truly yours,

/s/ Lindsay A. Bush

Lindsay A. Bush

---

[4] *Société Nationale Industrielle Aerospatiale v. U.S. District Court for the Southern District of Iowa*, 482 U.S. 522, 544 n. 29 (1987), is inapposite and does not compel a different result. *Société Nationale* involved France's "blocking statute," which prohibits parties from seeking or disclosing discovery in connection with *any* foreign proceeding. Thus, the court in *Societe Nationale* held that "[b]locking statutes that frustrate [discovery] goal[s] need not be given the same deference by courts of the United States as *substantive rules of law at variance with the law of the United States*." (quoting Restatement, § 437, Rep's Note 5, pp. 41, 42) (internal quotation marks and alterations omitted) (emphasis added). Here, the Bermuda statute at issue is not a blocking statute that prevents any discovery relating to a Bermuda fund. Instead, it is a *substantive* law of Bermuda that protects investor names from disclosure without frustrating any other element of discovery in connection with the funds.

6