JENNER & BLOCK LLP
Richard Levin
Carl Wedoff
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600

Vincent E. Lazar
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350

*Counsel for Defendant M&B Capital
Advisers Sociedad De Valores, S.A.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | |
| *Plaintiff-Applicant,* | Adv. Proc. No. 08-01789 (CGM) |
| v. | SIPA LIQUIDATION |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | (Substantively Consolidated) |
| *Defendant.* | |
| In re | |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| *Debtor.* | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | Adv. Proc. No. 10-5311 (CGM) |
| *Plaintiff,* | **M&B CAPITAL ADVISERS SOCIEDAD DE VALORES S.A.'S ANSWER TO THE SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | |
| UBS EUROPE SE (f/k/a UBS (LUXEMBOURG) S.A.), UBS FUND SERVICES (LUXEMBOURG) S.A., UBS THIRD PARTY MANAGEMENT COMPANY S.A., M&B CAPITAL ADVISERS SOCIEDAD DE VALORES, S.A., RELIANCE INTERNATIONAL RESEARCH LLC, | |

1

LUXEMBOURG INVESTMENT FUND AND
LUXEMBOURG INVESTMENT FUND U.S.
EQUITY PLUS, as represented by their Liquidators
MAÎTRE ALAIN RUKAVINA and PAUL
LAPLUME, MAÎTRE ALAIN RUKAVINA and
PAUL LAPLUME, in their capacities as liquidators
and representatives of LUXEMBOURG
INVESTMENT FUND AND LUXEMBOURG
INVESTMENT FUND U.S. EQUITY PLUS,

*Defendants.*

## ANSWER

Defendant M&B Capital Advisers Sociedad De Valores, S.A. answers the claims of

Plaintiff Irving H. Picard (the "**Trustee**") in the Trustee's Second Amended Complaint

("**Complaint**") [Adv. Dkt. 284].

## I.    NATURE OF THE PROCEEDING[1]

1.      "Suppose this [is] the largest Ponzi scheme in history." These were the words
a high-ranking Optimal Investment Services, S.A. ("Optimal") executive wrote to his
colleague Manuel Echeverría in June 2004, reflecting upon a quantitative analyst's
mathematical proof that Bernie Madoff's purported strategy was impossible. Yet within six
months, Echeverría had facilitated the opening of defendant Luxembourg Investment Fund
U.S. Equity Plus ("LIF-USEP"), a new BLMIS feeder fund, for his long-time colleagues
Guillermo Morenes Mariategui ("Morenes") and Francisco Javier Botín Sanz de Sautuola
O'Shea ("Botín"). LIF-USEP's sole purpose was to direct investor funds into BLMIS in New
York and to profit therefrom.

**ANSWER:**  Defendant **admits** that Manuel Echeverría ("**Echeverría**") facilitated

the opening of the LIF-USEP account at BLMIS to deposit investments, as an accommodation

and not under any contract or legal obligation to or as agent of M&B or LIF-USEP or any

other person, and did not receive any direct or indirect compensation for facilitating the

opening of the account, and admits that LIF-USEP was formed to open an account at BLMIS

---

[1] Defendant deem the section headings in the Complaint not to constitute allegations of the Complaint.
To the extent any section headings are allegations, Defendant admit or deny them consistent with
their responses to the allegations contained in the numbered paragraphs of the Complaint.

in New York and to deposit funds in that account. Defendant **lacks knowledge** sufficient to

form a belief as to the truth of the remaining allegations in Paragraph 1 and therefore **denies**

the remaining allegations in Paragraph 1.

2.     Morenes and Botín, as the principals of defendant M&B Capital Advisers
Sociedad de Valores S.A. ("M&B"), had been seeking direct access to Madoff for their wealthy
clientele. They knew that Echeverría had for years been in charge of the Madoff relationship
for Optimal U.S. Equity Fund ("Optimal SUS"), a $3.2 billion BLMIS feeder fund, and that
Echeverría had cultivated a relationship with Madoff and a network of Madoff-approved
investment professionals.

**ANSWER:**    Defendant **admits** that M&B Capital Advisers Sociedad de Valores S.A.

("**M&B**") had wealthy clientele and that Morenes and Botín knew that Echeverría was

formerly the Chief Executive Officer of Optimal SUS. M&B **lacks knowledge** sufficient to

form a belief as to the truth of the remaining allegations in Paragraph 2 and therefore **denies**

the remaining allegations in Paragraph 2.

3.     That network included the defendants in this action. The members of this
network—LIF-USEP, its service providers, and their principals—were, from LIF-USEP's
inception, on notice of BLMIS's fraud and were nevertheless eager to further their
participation in BLMIS's fraudulent enterprise. Through channels like Echeverría, Optimal,
UBS (including the UBS Defendants, as defined herein), and BLMIS, the members of the
network received evidence of BLMIS's fraud and shared that information among themselves.
They thus willingly participated in Madoff's fraud throughout LIF-USEP's existence. And
they profited from the fraud, receiving fraudulent transfers of customer property that the
Trustee now seeks to recover through this action.

**ANSWER:**    Defendant **denies** the allegations in Paragraph 3.

4.     Once Echeverría had secured a BLMIS account for LIF-USEP, he facilitated
the establishment of the fund as compliant with the EU directive entitled, "Undertakings for
Collective Investments in Transferable Securities," or "UCITS." As a UCITS fund, LIF-USEP
could be marketed to retail investors, thereby ensuring that its service providers could receive
substantial fees. M&B enshrined itself as LIF-USEP's distributor and began to recruit
investment capital.

**ANSWER:**    Defendant **admits** that LIF-USEP was a UCITS fund, that it could be

marketed to retail investors, and that M&B became a LIF-USEP distributor for Spain and

Portugal and **denies** the remaining allegations in Paragraph 4.

3

5.    Echeverría knew that UBS had experience as a service provider to UCITS-qualified BLMIS feeder funds and recommended to Morenes and Botín that UBS be engaged as a service provider for LIF-USEP. This would provide the new fund with UBS's imprimatur, and, in turn, attract investors.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 5 and therefore **denies** the remaining allegations in Paragraph 5.

6.    By the time of LIF-USEP's formation, UBS had a long history with Madoff. In the 1990s, UBS analysts reviewing Madoff's returns had concluded that BLMIS's performance was "IMPOSSIBLE" in light of the strategy BLMIS claimed to employ. This was more than just a vague uncertainty about Madoff. UBS's research yielded glaring signs of fraud: inability to identify trading counterparties, improper concentration of administrative and custodial functions in a single entity (BLMIS), and the very real possibility that BLMIS's returns were the result not of the Split-Strike Conversion strategy Madoff BLMIS claimed to employ, but some other source UBS could not discern. BLMIS therefore landed on UBS Private Wealth Management Group's "non-approved" list, where it remained through the opening of LIF-USEP.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 6 and therefore **denies** the allegations in Paragraph 6.

7.    But for UBS, "business [was] business": UBS did not allow the possibility of fraud at BLMIS to get in the way of profiting from BLMIS investment in other ways. While setting up Luxalpha SICAV ("Luxalpha"), another UBS-branded fund that fed hundreds of millions of dollars into BLMIS, approximately nine months earlier, a senior executive at defendant UBS SA (as defined herein) bluntly directed his colleague to "[a]ccept client [because] we cannot permit ourselves to lose $300 million." In other words, UBS would ignore concerns about BLMIS, sign on as Luxalpha's service provider, receive fees, and cash in on the fraud. Because Madoff demanded it, UBS then delegated its service provider roles to BLMIS while insulating itself against BLMIS-related liability with indemnity agreements and insurance policies.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 7 and therefore **denies** the allegations in Paragraph 7.

8.    LIF-USEP was designed to be a Luxalpha clone and followed Luxalpha's example by appointing defendants UBS SA, UBS Third Party Management Company S.A. ("UBSTPM"), and UBS Fund Services (Luxembourg) S.A. ("UBSFSL"), to serve as LIF-USEP's custodian, administrator, and portfolio manager. LIF-USEP's board was populated with UBS employees, many of whom were also Luxalpha board members.

**ANSWER:**   Defendant **admits** that UBS employees served on LIF-USEP's board.

Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 8 and therefore **denies** the remaining allegations in Paragraph 8.

9.    After LIF-USEP was up and running, its service providers and agents continued to receive information demonstrating BLMIS's fraud. Optimal, a constant source of such information for LIF-USEP, admitted in 2006 that it was "aware" that Madoff might be "a ticking time bomb." A high-ranking Optimal executive conceded that he "constantly worrie[d] over Madoff and could not completely dismiss the possibility that it might be a Ponzi scheme with all the trades fabrications."

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 9 and therefore **denies** the allegations in Paragraph 9.

10.    Defendant Reliance International Research LLC ("RIR"), which provided LIF-USEP with research and, together with M&B, managed the fund, likewise admitted that "the whole thing" could be "a fraud." The Reliance Group, which included RIR and at least two other Reliance entities headed by Echeverría's cohort Tim Brockmann, regularly compared notes on Madoff with its industry contacts, receiving information about BLMIS from not only Echeverría and Optimal, but also other BLMIS feeder funds like Fairfield Sentry, Kingate, and Thema International.

**ANSWER:**   Defendant **denies** that M&B managed LIF-USEP. Defendant **lacks**

**knowledge** sufficient to form a belief as to the truth of the remaining allegations in

Paragraph 10 and therefore **denies** the remaining allegations in Paragraph 10.

11.    One Reliance analyst repeatedly attempted to raise concerns about BLMIS with Brockmann and Justin Lowe, the head of RIR. He commented to Lowe, "I am not trying to give you a heart attack . . . but my honest opinion is that [BLMIS] is extremely worrisome." The analyst recognized that "all the [BLMIS] account holders (ourselves included) are so hooked on the low vol[atility] returns that we are not really thinking objectively: it makes no sense." But because Reliance viewed Madoff as its "sacred cow," the analyst was told to yield.

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 11 and therefore **denies** the allegations in Paragraph 11.

12.    Despite being repeatedly presented with evidence of fraud, LIF-USEP invested hundreds of millions of dollars with BLMIS. By the time Madoff's scheme unraveled, LIF-USEP had received approximately $498,300,000 in avoidable transfers from BLMIS.

**ANSWER:**  Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 12 and therefore **denies** the allegations in Paragraph 12.

## II.    SUBJECT MATTER JURISDICTION AND VENUE

13.    This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as Securities and Exchange Commission v. Bernard L. Madoff Investment Securities LLC, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) and (e)(1), and 15 U.S.C. §§ 78eee(b)(2)(A) and (b)(4).

**ANSWER:**  Defendant **denies** that this Court has jurisdiction over this adversary

proceeding under 28 U.S.C. §§ 1334(b) and (e)(1) and 15 U.S.C. §§ 78eee(b)(2)(A) and (b)(4).

Defendant **states** that the United States District Court for the Southern District of New York

has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and SIPA

§ 78eee(b)(2)(A)(iii) and (b)(4) and this Court has jurisdiction over this adversary proceeding

to the extent provided in SIPA § 78eee(b)(4). Defendant **admits** the remaining allegations in

Paragraph 13.

14.    This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (F), (H), and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

**ANSWER:**  Defendant **admits** this adversary proceeding is of a kind specified as a

core proceeding in 28 U.S.C. §§ 157(b)(2)(H) and **denies** the remaining allegations in

Paragraph 14. Defendant **does not consent** to issuance or entry of final orders or judgments

by the Bankruptcy Court and **demands trial by jury** of all issues that may be tried by a

jury.

15.    Venue in this judicial district is proper under 28 U.S.C. § 1409.

**ANSWER:**  Defendant **admits** the allegations in Paragraph 15.

16.    This adversary proceeding is brought under 15 U.S.C. §§ 78fff(b) and 78fff-2(c)(3), and 11 U.S.C. §§ 105(a), 502(a), (b) and (d), 510(c), 544(b), 548(a), 550(a), and 551, and other applicable law.[2]

**ANSWER:**  Defendant **avers** that the allegations in Paragraph 16 state legal conclusions to which no response is required. To the extent any further response is required, Defendant **admits** that the Trustee has brought this adversary proceeding but **denies** the remaining allegations in Paragraph 16.

### III.    PERSONAL JURISDICTION

17.    This Court has personal jurisdiction over each of the Defendants under N.Y. C.P.L.R. 301 and 302, and Bankruptcy Rule 7004. Each Defendant has maintained minimum contacts with New York in connection with the claims in this adversary proceeding. As further alleged herein, the Defendants have or had offices in New York, are doing or did business in New York, and/or transact or transacted business in New York during the time periods addressed herein. For some, New York is or was their principal place of business. LIF-USEP had an account with BLMIS in New York. The UBS Defendants, RIR, LIF-USEP, and LIF-USEP's umbrella fund, Luxembourg Investment Fund SICAV ("LIF"), delivered agreements or caused agreements to be delivered in New York, relating to BLMIS. In addition, certain of the UBS Defendants, RIR, and M&B communicated regularly with persons in New York regarding LIF-USEP and/or BLMIS, met (directly or through their agents) with BLMIS in New York, and sent and/or received funds to and/or from BLMIS in New York, utilizing New York banks. In addition, Customer Claims were filed in the SIPA Proceeding, purportedly on behalf of LIF and/or LIF-USEP.

**ANSWER:**  Defendant **avers** that to the extent the allegations in Paragraph 17 state legal conclusions, no response is required. To the extent any further response is required, Defendant **lacks knowledge** sufficient to form a belief as to the truth of whether the UBS Defendants, RIR, LIF-USEP, and LIF-USEP's umbrella fund, Luxembourg Investment Fund SICAV ("LIF"), delivered agreements or caused agreements to be delivered in New York, relating to BLMIS, and therefore **denies** these allegations. Defendant **denies** the remaining allegations in Paragraph 17.

---

[2] To preserve all claims until a final determination on appeal, the Trustee asserts avoidance claims arising under sections 548(a)(1)(B) and 544(b)(1) of the Bankruptcy Code in this proceeding and objections to claims under sections 502(a) and (b)(1) and on equitable grounds.

18.    Finally, it is beyond dispute that LIF-USEP's sole purpose was to direct investments into BLMIS in New York. Thus, the ultimate source of profit and/or revenue, for all of the Defendants in this action, was business activity expected to be undertaken exclusively in New York—and this was known to each and every Defendant to this proceeding. All of the Defendants together engaged in an effort to direct investor funds into New York via BLMIS and to profit therefrom.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations that LIF-USEP's sole purpose was to direct investments into BLMIS in New York, and therefore **denies** this allegation. Defendant **denies** the remaining allegations in Paragraph 18.

## IV.    BACKGROUND, THE TRUSTEE, AND STANDING

19.    On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

**ANSWER:**    Defendant **admits** on information and belief the allegations in Paragraph 19.

20.    On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(4)(A)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

**ANSWER:**    Defendant **admits** on information and belief the allegations in Paragraph 20.

21.    Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

a. appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

b. appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

c. removed the case to this Court pursuant to SIPA § 78eee(b)(4).

**ANSWER:** Defendant **admits** on information and belief the allegations in Paragraph 21.

22.    By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

**ANSWER:** Defendant **admits** on information and belief the allegations in Paragraph 22.

23.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated Madoff's chapter 7 estate into the SIPA Proceeding.

**ANSWER:** Defendant **admits** the allegations in Paragraph 23.

24.    At a plea hearing on March 12, 2009, in the case captioned United States v. Madoff, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

**ANSWER:** Defendant **admits** on information and belief the allegations in Paragraph 24.

25.    At a plea hearing on August 11, 2009, in the case captioned United States v. DiPascali, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

**ANSWER:** Defendant **admits** on information and belief the allegations in Paragraph 25.

26.    At a plea hearing on November 21, 2011, in the case captioned United States v. Kugel, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false, backdated trades in BLMIS customer accounts beginning in the early 1970s.

**ANSWER:** Defendant **admits** on information and belief the allegations in Paragraph 26.

27.    On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their participation in the Ponzi scheme as employees of BLMIS.

**ANSWER:** Defendant **admits** on information and belief the allegations in Paragraph 27.

28.    As the trustee appointed under SIPA, the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers and others to the detriment of defrauded, innocent customers whose money was consumed by the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

**ANSWER:** Defendant **avers** that the allegations in Paragraph 28 state legal conclusions to which no response is required. To the extent any further response is required, Defendant admits that the Trustee is charged with assessing claims, recovering and distributing customer property to BLMIS's customers holding allowed customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and its creditors. The Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 28 and therefore **denies** the allegations in Paragraph 28.

29.    Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

**ANSWER:** Defendant **avers** that the allegations in Paragraph 29 state legal conclusions to which no response is required. To the extent any further response is required, Defendant admits the allegations in Paragraph 29.

30.    The Trustee has standing to bring the avoidance and recovery claims under SIPA § 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b), 544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-1(a) and 78fff-2(c)(3).

**ANSWER:** Defendant **avers** that the allegations in Paragraph 30 state legal conclusions to which no response is required. To the extent any further response is required, Defendant admits the allegations in Paragraph 30.

31.    The Trustee has standing to object to customer and creditor claims under SIPA §§ 78fff-1(a) and 78fff(b), and 11 U.S.C. § 502(a), because the Trustee has the power and authority to discharge obligations to a customer to the extent they are established to the satisfaction of the Trustee under SIPA §§ 78lll(2) and 78fff-2(b). By his objection, the Trustee seeks disallowance of any customer and general creditor claims that are unenforceable against the Debtors or their property under (i) SIPA § 78fff-2(b), because such claims have not been established to his satisfaction; (ii) SIPA § 78lll(2), because such claims are not entitled to a distribution pari passu with other customers; and (iii) 11 U.S.C. § 502(b)(1), because such claims are otherwise unenforceable under applicable law.

**ANSWER:** Defendant **avers** that the allegations in Paragraph 31 state legal conclusions to which no response is required. To the extent any further response is required, Defendant admits the allegations in Paragraph 31.

## V.    BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY

### A.    BLMIS

32.    Madoff founded BLMIS in or about 1960 as a sole proprietorship and registered it as a broker-dealer with the SEC. In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company. At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 32 and therefore **denies** the allegations in Paragraph 32.

33.    In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008. Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation. At all times, BLMIS was assigned CRD No. 2625. SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning in January 19, 1960. On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status. SIPC membership is contingent on registration of the broker-dealer with the SEC.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 33 and therefore **denies** the allegations in Paragraph 33.

34.    For most of its existence, BLMIS's principal place of business was 885 Third Avenue, New York, New York, where Madoff operated three principal business units: a proprietary trading desk, a broker-dealer operation, and an investment advisory business (the "IA Business").

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 34 and therefore **denies** the allegations in Paragraph 34.

35.    BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 35 and therefore **denies** the allegations in Paragraph 35.

36.    For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 36 and therefore **denies** the allegations in Paragraph 36.

37.    In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 37 and therefore **denies** the allegations in Paragraph 37.

B.    **The Ponzi Scheme**

38.    At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin

Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others who pleaded guilty to, or were found guilty of, assisting Madoff in carrying out the fraud.

**ANSWER:** Defendant **admits** upon information and belief that BLMIS claimed to invest money deposited by customers in securities, that Madoff admitted that he operated BLMIS as a Ponzi scheme, and that Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others pleaded guilty to, or were found guilty of, various crimes that assisted Madoff in carrying out the fraud. Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 38 and therefore **denies** the remaining allegations in Paragraph 38.

39.    BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. This was funded, in part, by money taken from BLMIS customer deposits, but BLMIS fraudulently reported that funding as coming from trading revenues and/or commissions in BLMIS's financial statements and other regulatory reports it filed. BLMIS's proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 39 and therefore **denies** the allegations in Paragraph 39.

40.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor. Friehling & Horowitz was a three-person accounting firm based out of a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida. Friehling & Horowitz accepted the fraudulently reported trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports that BLMIS filed.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 40 and therefore **denies** the allegations in Paragraph 40.

41.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of these fictitious annual audited financial statements prepared by Friehling & Horowitz.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 41 and therefore **denies** the allegations in Paragraph 41.

Madoff's Investment Strategy

42.    In general, BLMIS purported to execute two primary investment strategies for BLMIS customers: the convertible arbitrage strategy and the Split Strike Conversion ("SSC") strategy. For a limited group of BLMIS customers, primarily consisting of Madoff's close friends and their families, Madoff also purportedly purchased securities that were held for a certain time and then purportedly sold for a profit. At all relevant times, Madoff conducted no legitimate business operations using any of these strategies.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 42 and therefore **denies** the allegations in Paragraph 42.

43.    All funds received from BLMIS customers were commingled in a single BLMIS account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade securities, but rather to make distributions to, or payments for, other customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary trading business.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 43 and therefore **denies** the allegations in Paragraph 43.

44.    The convertible arbitrage investment strategy was supposed to generate profits by taking advantage of the pricing mismatches that can occur between the equity and bond/preferred equity markets. Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time. In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 44 and therefore **denies** the allegations in Paragraph 44.

45.    From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 45 and therefore **denies** the allegations in Paragraph 45.

46.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 46 and therefore **denies** the allegations in Paragraph 46.

14

47.    By 1992, the SSC strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 47 and therefore **denies** the allegations in Paragraph 47.

48.    The put options were to limit the downside risk of sizeable price changes in the basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option should have entailed a loss for BLMIS.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 48 and therefore **denies** the allegations in Paragraph 48.

49.    The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 49 and therefore **denies** the allegations in Paragraph 49.

50.    The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protection while limiting the upside.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 50 and therefore **denies** the allegations in Paragraph 50.

51.    If Madoff was putting on the same baskets of equities across all BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold had to equal the market value of the equities in the basket. For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 51 and therefore **denies** the allegations in Paragraph 51.

52.    Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call option notional value to support the Madoff SSC strategy.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 52 and therefore **denies** the allegations in Paragraph 52.

53.    Madoff could not be using the SSC strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC strategy.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 53 and therefore **denies** the allegations in Paragraph 53.

BLMIS's Fee Structure

54.    BLMIS charged commissions on purportedly executed trades rather than industry-standard management and performance fees based on AUM or profits. By using a commission-based structure instead, Madoff inexplicably walked away from hundreds of millions of dollars in fees.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 54 and therefore **denies** the allegations in Paragraph 54.

BLMIS's Market Timing

55.    Madoff also lied to customers when he told them that he carefully timed securities purchases and sales to maximize value. Madoff explained that he succeeded at market timing by intermittently entering and exiting the market. During the times when Madoff purported to be out of the market, he purported to invest BLMIS customer funds in Treasury Bills or mutual funds invested in Treasury Bills. BLMIS's customer statements also showed, without fail, a total withdrawal from the market at every year-end and quarter-end starting in 2003.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 55 and therefore **denies** the allegations in Paragraph 55.

56.    As a registered broker-dealer, BLMIS was required, pursuant to section 240.17a-5 of the Securities Exchange Act of 1934, to file quarterly and annual reports with the SEC that showed, among other things, financial information on customer activity, cash on hand, and assets and liabilities at the time of reporting. BLMIS's reported quarterly and

year-end market exits were undertaken to avoid these SEC requirements. But these exits also meant that BLMIS was stuck with the then-prevailing market conditions. It would have been impossible to automatically sell all positions at fixed times, independent of market conditions, and win almost every time. Yet this is precisely what BLMIS's customer statements reported.

**ANSWER:** Defendant **avers** that the allegations in Paragraph 56 state legal conclusions to which no response is required. To the extent any further response is required, Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 56 and therefore **denies** the allegations in Paragraph 56.

57.    BLMIS's practice of exiting the market at fixed times, regardless of market conditions, was completely at odds with the opportunistic nature of the SSC strategy, which does not depend on exiting the market in a particular month.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 57 and therefore **denies** the allegations in Paragraph 57.

BLMIS Execution

58.    BLMIS's execution, as reported on its BLMIS customer statements, showed a consistent ability to buy low and sell high, an ability so uncanny that any sophisticated or professional investor would know it was statistically impossible.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 58 and therefore **denies** the allegations in Paragraph 58.

No Evidence of BLMIS Trading

59.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC strategy at the Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities. There are no other BLMIS records that demonstrate that BLMIS traded securities using the SSC strategy.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 59 and therefore **denies** the allegations in Paragraph 59.

60.    All exchange-listed options relating to the companies within the S&P 100 Index, including options based upon the S&P 100 Index itself, clear through the Options Clearing Corporation ("OCC"). The OCC has no records showing that BLMIS's IA Business cleared trades in any exchange-listed options.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 60 and therefore **denies** the allegations in Paragraph 60.

<u>The Collapse of The Ponzi Scheme</u>

61.     The Ponzi scheme collapsed in December 2008, when BLMIS customers' requests for redemptions overwhelmed the flow of new investments.

**ANSWER:** Defendant **admits** that BLMIS's business continued until December 2008. Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 61 and therefore **denies** the remaining allegations in Paragraph 61.

62.     At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS, through the IA Business, operated as a Ponzi scheme.

**ANSWER:** Defendant **admits** upon information and belief that Madoff and DiPascali admitted that BLMIS, through the IA Business, operated as a Ponzi scheme. Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 62 and therefore **denies** the allegations in Paragraph 62.

63.     At all relevant times, BLMIS was insolvent because (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers alleged herein, BLMIS was left with insufficient capital.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 63 and therefore **denies** the allegations in Paragraph 63.

VI.     **THE DEFENDANTS AND THEIR AGENTS**

A.     **LIF and LIF-USEP**

64.     Defendant Luxembourg Investment Fund SICAV ("LIF") was founded in 2002 under Luxembourg law. It was organized pursuant to the EU UCITS directive, under which open-ended investment schemes were regulated. Luxembourg, like other EU member states, enacted legislation implementing various EU UCITS directives. LIF was subject to the regulatory authority of Luxembourg's Commission de Surveillance du Secteur Financier ("CSSF"). LIF's registered office was 33a, Avenue John F. Kennedy, L-1855, the same address used by all three UBS Defendants.

18

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 64 and therefore **denies** the allegations in Paragraph 64.

65.    Defendant LIF-USEP was established as a sub-fund of LIF's part II umbrella structure. LIF-USEP was wholly invested with BLMIS—its raison d'être was to invest with and profit from BLMIS's operations, which LIF-USEP and its agents knew took place in New York.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 65 and therefore **denies** the allegations in Paragraph 65.

66.    LIF was placed in liquidation by the District Court of Luxembourg on April 30, 2009. At the time LIF was placed into liquidation, LIF-USEP was the only LIF sub-fund still open. LIF and LIF-USEP are represented by court-appointed liquidators, Maître Alain Rukavina, barrister (avocat à la Cour) and Paul Laplume, company auditor.

**ANSWER:**    Defendant **admits** that LIF and LIF-USEP are represented by Maître Alain Rukavina ("Rukavina") and Paul Laplume ("Laplume"). Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 66 and therefore **denies** the remaining allegations in Paragraph 66.

67.    Me. Rukavina and Mr. Laplume are defendants solely in their capacity as the court-appointed liquidators and representatives of LIF and LIF-USEP, and as representatives of their investors and creditors, according to the provisions of the District Court of Luxembourg judgment dated April 30, 2009. References to Defendants LIF and LIF-USEP herein include Me. Rukavina and Mr. Laplume.

**ANSWER:**    Defendant **admits** that Rukavina and Laplume are defendants solely in their capacity as liquidators of LIF and LIF-USEP. Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 67 and therefore **denies** the remaining allegations in Paragraph 67.

B.    **The UBS Defendants**

68.    The "UBS Defendants" (i.e., collectively, UBS SA, UBSFSL, and UBSTPM, as those terms are defined herein) were integral to LIF-USEP's operations, performed a host of fundamental tasks for LIF-USEP, and facilitated LIF-USEP's massive BLMIS investment. LIF-USEP had no offices of its own, but used the same address as UBSFSL, UBSTM, and UBS S.A. LIF-USEP had no employees of its own, but its board was populated by UBS employees.

19

**ANSWER:** Defendant **admits** that LIF-USEP had no offices or employees of its own and that UBS employees were on its board. Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 68 and therefore **denies** the remaining allegations in Paragraph 68.

69.    Defendant UBS Europe SE (f/k/a UBS (Luxembourg) SA) ("UBS SA")) is a Societas Europaea incorporated in Germany and registered with the Register of Commerce of Frankfurt (HRB 107046). It has a registered office at Bockenheimer Landstrasse 2–4, 60306 Frankfurt am Main. On or about December 1, 2016, UBS S.A. merged with and was absorbed into UBS Europe SE. UBS S.A.'s business operations continue to be carried out by UBS Europe SE, Luxembourg Branch, with a place of business at 33a, Avenue John F. Kennedy, L-1855 Luxembourg, and an R.C.S. Luxembourg number of B209123. UBS SA was listed as LIF-USEP's custodian, main distributor, and main paying agent in the fund's prospectus.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 69 and therefore **denies** the allegations in Paragraph 69.

70.    Defendant UBS Fund Services (Luxembourg) S.A. ("UBSFSL") is a Luxembourg limited liability company incorporated as a société anonyme. Its registered office is at 33a, Avenue John F. Kennedy, L-1855 Luxembourg. UBSFSL acted as LIF-USEP's administrative agent. It played a critical role in LIF-USEP's operation, management, and servicing. As a result, UBSFSL knew that any funds invested in LIF-USEP were to be sent to New York for investment with BLMIS and that any returns or redemptions related to investment emanated from New York. Moreover, UBSFSL knew that its revenues were dependent on economic activity undertaken by BLMIS. UBSFSL performed LIF-USEP's day-to-day tasks, almost all of which relied upon information received from New York. Three UBSFSL employees were the "day-to-day managers" of LIF-USEP's management company, UBS Third Party Management Company S.A. Not only did UBSFSL facilitate investment into New York via BLMIS, BLMIS records demonstrate fax communications and telephone conversations between UBSFSL and BLMIS.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 70 and therefore **denies** the allegations in Paragraph 70.

71.    Defendant UBS Third Party Management Company S.A. ("UBSTPM") is a Luxembourg limited liability company incorporated as a société anonyme. Its registered office is at 33a, Avenue John F. Kennedy, L-1855 Luxembourg. UBSTPM was LIF-USEP's management company. Like its affiliated UBS Defendants, UBSTPM deliberately facilitated investment activity with BLMIS in New York and earned substantial fees in connection with those investments. UBSTPM was responsible for managing and administering the fund, as well as monitoring investment policies and restrictions, and was officially responsible for

LIF-USEP's investment management decisions, which, again, involved the handing over of investor funds to BLMIS for investment activity undertaken in this jurisdiction.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 71 and therefore **denies** the allegations in Paragraph 71.

72.    The UBS Defendants presented themselves to the public as part of a unified global entity operating as a "coherent and effective whole." UBS shared—and continues to share—a centralized structure for core enterprise functions such as finance, risk, legal, and compliance, and shared services such as human resources, information technology, communications, branding, and corporate development.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 72 and therefore **denies** the allegations in Paragraph 72.

73.    Each UBS Defendant was a wholly owned subsidiary of UBS AG. Upon information and belief, UBS's organizational structure is designed to ensure UBS AG's centralized control of global business strategy and reporting obligations for UBS group companies. UBS AG subsidiaries market themselves as part of a "worldwide financial network," providing "an international network of experts" that "can propose truly global investment solutions" based on "the experience, know-how, and substantial resources provided by the UBS Group as a whole."

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 73 and therefore **denies** the allegations in Paragraph 73.

74.    UBS SA, UBSFSL, and UBSTPM worked closely with M&B and Reliance in the management, supervision, and administration of LIF-USEP, and were together engaged for the sole purpose of directing investment into BLMIS in New York and profiting from that endeavor.

**ANSWER:** Defendant **admits** that UBS SA, UBSFSL, UBSTPM, M&B, and Reliance were involved with LIF-USEP. Defendant **denies** the remaining allegations in Paragraph 74.

75.    All LIF-USEP account opening papers and agreements were completed and executed by UBS SA employees, including Managing Director Viviane DeAngelis and Director Serge Karp. UBS SA employees regularly corresponded with Frank DiPascali of BLMIS in order to manage LIF-USEP's investments and redemptions. All LIF-USEP subscription and redemption requests processed by the UBS Defendants involved the transfer of funds into and/or out of BLMIS in New York.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 75 and therefore **denies** the allegations in Paragraph 75.

76.    LIF-USEP Directors Roger Hartmann, Ralf Schroeter, René Egger, Alain Hondequin, and Bernd Stiehl were all UBS SA employees. Messrs. Hartmann, Schroeter, Egger, Hondequin, and Stiehl also acted as Luxalpha directors.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 76 and therefore **denies** the allegations in Paragraph 76.

77.    The UBS Defendants' deep involvement with Madoff and the BLMIS feeder funds was far-reaching, extended well beyond LIF-USEP, and involved billions of dollars being funneled into BLMIS. UBS entities also sponsored, managed, administered, or served as custodian for several other BLMIS feeder funds that the Trustee is pursuing or has pursued through separate actions. For example, UBS SA served as Luxalpha's custodian, main paying agent and, for a time, portfolio manager. UBS SA was Groupement Financier's prime bank and UBSFSL was its administrator. UBS SA also acted as Groupement Financier Levered's custody bank, and as the custodian for Plaza Investments International Limited. And at various times, UBS SA served as portfolio manager for Thybo Asset Management Limited, Thybo Global Fund Limited, Thybo Return Fund Limited, and Thybo Stable Fund Limited, which collectively directed investments of over $200 million into BLMIS. These BLMIS feeder funds, together with LIF-USEP, directed billions of dollars of investments into BLMIS.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 77 and therefore **denies** the allegations in Paragraph 77.

**C.    RIR, Reliance Gibraltar, and the Reliance Group**

78.    Tim Brockmann created and operated the Reliance Group, which consisted of at least three entities: (1) Reliance Management (Gibraltar) Limited ("Reliance Gibraltar"); (2) Reliance Management (BVI); and (3) RIR (Reliance Gibraltar, Reliance BVI, and RIR together, are "Reliance"). Reliance Gibraltar and Reliance BVI, which are not parties to this action, were, respectively, LIF-USEP's investment advisor and Reliance Gibraltar's parent company. RIR, to which Reliance referred as its "research entity," was based in New York. One of RIR's primary responsibilities for LIF-USEP was to monitor its BLMIS investment, but it also performed many other functions that Reliance was obligated to perform for LIF-USEP.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 78 and therefore **denies** the allegations in Paragraph 78.

79.    Reliance often held itself out as a single business enterprise whose New York operations were essential to Reliance's ability to market and perform services for its clients.

RIR's New York office housed the majority of Reliance's employees. Of the eight members of Reliance's "Investment Team," six were RIR employees working from the New York office.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 79 and therefore **denies** the allegations in Paragraph 79.

80.    The Reliance entities used personnel interchangeably and often disregarded corporate formalities. For example, Brockmann was in the RIR office in New York at least quarterly between 2000 and 2008, even though he maintained Swiss citizenship. At least one of Brockmann's stints in New York lasted several months. During that stay, Brockmann took up residence in an apartment in Manhattan, and he moved his family from Europe to New York. But even when Brockmann and other Reliance personnel were not in New York, they were in near-constant communication with the RIR employees in New York.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 80 and therefore **denies** the allegations in Paragraph 80.

81.    Justin Lowe and Trevor Uhl were partial owners of RIR and worked from the New York office, but were sometimes listed as associated with Reliance Gibraltar.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 81 and therefore **denies** the allegations in Paragraph 81.

82.    All of the Reliance entities used a single RIR-designed and -maintained website, www.reliance-funds.com, one of the means through which Reliance held itself out as a single, undifferentiated whole.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 82 and therefore **denies** the allegations in Paragraph 82.

83.    Reliance Gibraltar and RIR received substantial fees for the services they provided LIF-USEP. Reliance Gibraltar received fees through its August 18, 2005 Portfolio Advisory Agreement with LIF-USEP and UBS SA and its May 2, 2006 Investment Advisory Agreement with UBSTPM. Pursuant to the May 24, 2005 Research Services Agreement between Reliance Gibraltar and RIR and the September 15, 2008 Research and Administrative Support Services Agreement, Reliance Gibraltar subsequently paid to RIR a portion of the fees derived from LIF-USEP. These fees were transferred to RIR's bank account in New York.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 83 and therefore **denies** the allegations in Paragraph 83.

### D.    M&B Capital Advisers Sociedad de Valores

84.    M&B Capital Advisers Sociedad de Valores, S.A. ("M&B") is a securities broker-dealer organized under Spanish law. M&B has an office at Plaza Manuel Gomez Moreno, No. 2 Edificio Alfredo Mahou, 28020 Madrid, Spain.

**ANSWER:**    Defendant **admits that** M&B Capital Advisers Sociedad de Valores, S.A. ("M&B") was a securities broker-dealer organized under Spanish law and had an office until 2012 at Plaza Manuel Gomez Moreno, No. 2 Edificio Alfredo Mahou, 28020 Madrid, Spain. M&B **denies** the remaining the allegations in Paragraph 84.

85.    M&B SV was one of several entities formed by Morenes and Botín. Another entity, M&B Capital Advisers Gestión SGIIC ("M&B SGIIC"), which was involved with M&B's BLMIS investments, merged into M&B in January 2010, and received transfers of customer property. The defined term "M&B" includes M&B SGIIC.

**ANSWER:**    Defendant **admits** that the Amended Complaint uses the defined term "M&B" to include M&B SGIIC, solely for the purposes of this Answer, except as otherwise stated in this Answer, Defendant **denies** that M&B SV or M&B SGIIC received transfers of customer property, and **admits** the remaining allegations in Paragraph 85.

86.    The M&B entities collectively functioned as a family office for wealthy European investors, providing a variety of investment advisory and related services. As alleged herein, M&B (including through its agents' acts) was crucial to LIF-USEP's establishment and operations and the growth of its BLMIS investments. M&B and its agents were in regular communication with respect to investment subscriptions and redemptions and BLMIS's activities.

**ANSWER:**    Defendant **admits** that M&B entities provided clients investment advisory and related services and that M&B was involved with LIF-USEP, and **denies** the remaining allegations in Paragraph 86.

### VII.    THE CREATION OF LIF-USEP

### A.    LIF-USEP Originated with Madoff-Savvy Investment Professionals

87.    LIF-USEP was established in 2005 as a BLMIS feeder fund by a group of well-connected investment professionals that Echeverría brought together around Morenes and Botín.

**ANSWER:** Defendant **admits** that LIF-USEP was established in 2005. Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 87 and therefore **denies** the remaining allegations in Paragraph 87.

88.    M&B operated as a broker under the supervision of the Spanish market regulator La Comision Nacional del Mercado de Valores until it transformed into a broker-dealer and incorporated as a member of the Madrid Stock Exchange in 2004. M&B offered its clients investment opportunities in various investment vehicles under the umbrella of LIF. While M&B was familiar with Madoff, having placed clients with Optimal SUS for several years, it had remained a step removed from Madoff. Investing through other feeder funds, however, limited both M&B's access to BLMIS and its ability to charge fees related to such investments.

**ANSWER:** Defendant **admits** that M&B operated as a broker under the supervision of the Spanish market regulator until it transformed into a broker-dealer and incorporated as a member of the Madrid Stock Exchange in 2004, **alleges** that M&B was a diversified investment company and **admits** that M&B offered its clients investment opportunities in various investment vehicles, including, under the umbrella of LIF, investments in LIF-USEP, and that M&B previously placed clients with Optimal SUS. Defendant **denies** the remaining allegations in Paragraph 88.

89.    In Echeverría, who had been overseeing the day-to-day activities of M&B's Optimal investment, M&B found a way to unlock an opportunity for direct BLMIS investment.

**ANSWER:** Defendant **denies** the allegations in Paragraph 89.

90.    Since 1996, Echeverría had been helping to expand Optimal into a multi-billion-dollar BLMIS feeder. In 1996, the Optimal Arbitrage Limited fund opened a BLMIS account and in 1997, the Optimal SUS fund opened a BLMIS account. Optimal Arbitrage and Optimal SUS, both of which were ultimately owned by Banco Santander and managed by Echeverría, together directed more than $2 billion into BLMIS.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 90 and therefore **denies** the allegations in Paragraph 90.

91.    Commanding such significant investment capital gave Echeverría privileged access both to Madoff and to Santander's upper ranks. Madoff viewed Echeverría as one of his top European envoys and a source of new investment capital. And at Santander,

Echeverría had befriended Morenes and Botín, both of whom were part of the bank's controlling family. Botín is then-Santander CEO Emilio Botín's son and current Santander CEO Ana Patricia Botín's brother. Morenes is Ana Patricia Botín's husband.

**ANSWER:** Defendant **admits** that Botín is then-Santander CEO Emilio Botín's son and current Santander CEO Ana Patricia Botín's brother, that Morenes is Ana Patricia Botín's husband, and that Botín and Morenes were familiar with Echeverría. Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 91 and therefore **denies** the remaining allegations in Paragraph 91.

92.    M&B was essential to the formation of LIF-USEP as a BLMIS feeder fund. As M&B director Juan Carlos Hergueta later wrote, "[w]ithout M&B, [LIF-USEP] would not be possible." In 2004, M&B approached Echeverría with the idea of setting up LIF-USEP as a UCITS-compliant BLMIS feeder fund, and Echeverría began to develop the architecture for the new fund. M&B would serve as the fund's distributor, signing a Consultancy and Exclusive Introducing Agreement with UBS SA. Under the agreement, M&B was entitled to receive from UBS a trailing fee, which was part of the portfolio manager's fee, "with respect to the net assets held by shareholders procured to [LIF-USEP]."

**ANSWER:** Defendant **admits** that Juan Carlos Hergueta ("Hergueta") wrote, "[w]ithout M&B, [LIF-USEP] would not be possible" and that M&B signed a Consultancy and Exclusive Introducing Agreement with UBS SA that entitled it to fees "with respect to the net assets held by shareholders procedure to [LIF-USEP]." Defendant **denies** the remaining allegations in Paragraph 92.

93.    Echeverría arranged for a meeting with Madoff and facilitated the opening of a BLMIS account for LIF-USEP.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 93 and therefore **denies** the allegations in Paragraph 93.

94.    Echeverría also drew upon his experience with BLMIS feeder funds to assemble a slate of service providers that would be acceptable to both investment industry regulators, who would grant the fund UCITS status, and Madoff.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 94 and therefore **denies** the allegations in Paragraph 94.

95.    Echeverría knew that, as a Luxembourg-based UCITS fund, LIF-USEP would need an EU-based investment advisor. He knew that Reliance, the firm headed by his friend and colleague Tim Brockmann, was seeking access to a BLMIS feeder fund. Reliance had for years invested with BLMIS through Optimal and Kingate, but like M&B, Reliance wanted the opportunity to capitalize on direct BLMIS investment. When Echeverría approached Brockmann about LIF-USEP, Brockmann committed Reliance Gibraltar to serve as LIF-USEP's official investment advisor.

**ANSWER:**    Defendant **denies** that "[M&B] wanted the opportunity to capitalize on direct BLMIS investment." Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 95 and therefore **denies** the remaining allegations in Paragraph 95.

96.    Echeverría also knew that UBS had acted as a service provider for, and thereby endorsed, other BLMIS feeder funds, like Plaza Investments International Limited, Thybo Asset Management Limited, Thybo Global Fund Limited, Thybo Return Fund Limited and Thybo Stable Fund Limited, and more recently, Luxalpha, another Luxembourg UCITS fund.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 96 and therefore **denies** the allegations in Paragraph 96.

97.    In December 2004, Echeverría and M&B director Juan-Carlos Hergueta traveled to Luxembourg to meet with UBS SA about LIF-USEP. As it had with Luxalpha, UBS signed on to serve as LIF's official sponsor, administrator, and custodian.

**ANSWER:**    Defendant **admits** that Hergueta and Echeverría traveled to Luxembourg to meet with UBS SA about LIF-USEP and **denies** the remaining allegations in Paragraph 97.

98.    UBS also agreed to stock LIF-USEP's board of directors with UBS employees. All five of LIF-USEP's directors were employees of UBS SA, LIF-USEP's custodian. All of the directors also served on Luxalpha SICAV's board. The following chart sets forth LIF-USEP's organizational structure:



**ANSWER:**  Defendant **admits** that UBS employees served on LIF-USEP's board and that M&B acted with respect to LIF solely as LIF-USEP's distributor for Spain and Portugal. Defendant **lacks knowledge** sufficient to form a belief as to the truth of remaining allegations in Paragraph 98 and therefore **denies** these allegations.

99.    With this architecture in place, LIF-USEP was officially formed on August 18, 2005, as a sub-fund of LIF. As of 2007, LIF and LIF-USEP had a registered office at 33A Avenue John F. Kennedy, L-2010 Luxembourg. LIF-USEP maintained account number 1FR123 with BLMIS and began investing directly with BLMIS in September 2005. LIF and LIF-USEP did not have any employees or independent office space, as UBS, M&B, and Reliance operated the fund. Throughout its life, LIF-USEP was wholly invested with BLMIS in New York.

**ANSWER:**  Defendant **admits** that LIF-USEP was formed on August 18, 2005, as a sub-fund of LIF; that LIF and LIF-USEP had a registered office at 33A Avenue John F.

Kennedy, L-2010 Luxembourg; that LIF-USEP maintained account number 1FR123 with

BLMIS; that LIF-USEP began investing with BLMIS in September 2005; that LIF and LIF-

USEP did not have any employees or independent office space, that LIF-USEP's service

providers (which did not include M&B) operated LIF-USEP. Defendant **lacks knowledge**

sufficient to form a belief as to the truth of whether "LIF-USEP was wholly invested with

BLMIS in New York" and therefore **denies** this allegation. Defendant **denies** the remaining

allegations in Paragraph 99.

### VIII.    LIF-USEP'S FOUNDERS, SERVICE PROVIDERS, AND AGENTS POSSESSED KNOWLEDGE OF BLMIS'S FRAUD

### A.    Optimal and Santander

100.    After the formation of LIF-USEP, Echeverría continued to function as M&B's and LIF-USEP's agent, carrying out a number of behind-the-scenes roles critical to the fund's success. Echeverría acted as a conduit for communications between LIF-USEP, its clients, and BLMIS. He helped to manage the flow of subscription and redemption requests so as to head off Madoff's irritation—well-known to insiders like Echeverría—with inopportune redemption requests. He shared information about BLMIS with LIF-USEP's service providers, much of which indicated that BLMIS was engaged in fraud. Echeverría's efforts ensured that Madoff and LIF-USEP investors were pacified, and that LIF-USEP's service providers could continue to benefit from the fraud.

**ANSWER:** Defendant **denies** that Echeverría functioned as M&B's agent.

Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 100 and therefore **denies** the allegations in Paragraph 100.

101.    Echeverría had a history with Madoff even before he worked to establish LIF-USEP. Under his management, Optimal had performed "intensive and thorough due diligence" on its investment targets and BLMIS was no exception. Although these efforts took many forms, Optimal's due diligence consistently turned up indicia of BLMIS's fraud.

**ANSWER:** Defendant **admits** that Echeverría was formerly the Chief Executive

Officer of Optimal SUS. Defendant **lacks knowledge** sufficient to form a belief as to the

truth of the remaining allegations in Paragraph 101 and therefore **denies** the remaining

allegations in Paragraph 101.

102.    On July 8, 1999, for example, Echeverría and other Santander personnel conducted a conference call with Arthur Andersen, the auditor for Optimal's predecessor fund. They discussed the "mounting concerns about [BLMIS's] investment strategy and the risks associated with investing with a broker/dealer who is not a registered investment adviser." Santander could not understand how "such a simple strategy" could produce such "extremely high and extremely consistent" returns. They also noted that "investors ha[d] raised suspicions regarding the strategy and the manager."

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 102 and therefore **denies** the allegations in Paragraph 102.

103.    One Arthur Anderson employee on the call pointed to Madoff's good reputation in the industry but offered no concrete assurances about how Madoff was generating his returns. The Santander personnel left the call unclear how the purportedly "simple strategy" could generate the returns Madoff claimed. They noted that Santander still needed "to strengthen [its] confidence in [its BLMIS] investment," recognizing Santander's "fiduciary duty to assure [investors] that we have done everything in our power regarding the due diligence process."

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 103 and therefore **denies** the allegations in Paragraph 103.

104.    In September 2002, Optimal sent an investigative team to New York to meet with Madoff and attorneys from several New York law firms. The investigation resulted in two memoranda to Echeverría by Optimal in-house counsel, one setting forth Optimal's concerns going into the meeting and the second addressing concerns that the meeting had failed to dispel.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 104 and therefore **denies** the allegations in Paragraph 104.

105.    The first memorandum stated, "Madoff is very secretive and has a policy requiring its clients of not disclosing [BLMIS's] name in any documents such as Prospectus, audited financial statements, marketing reports . . . ." The memorandum further noted that BLMIS held Optimal Arbitrage Limited's and Optimal SUS's assets and refused to allow the assets to be custodied elsewhere. The second memorandum stated that "[Optimal's] primary main concern was that Madoff did not permit any customer, including us, to disclose his/[BLMIS's] name in the Prospectus, financial statements, both as broker-dealer and as custodian of the assets." It also addressed Madoff's insistence on self-custody.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 105 and therefore **denies** the allegations in Paragraph 105.

106.    Optimal employees regularly met with BLMIS employees and usually came away with more questions than answers. For example, Jonathan Clark spoke with Frank

DiPascali regarding BLMIS's strategy and came away with lingering questions about BLMIS's trading strategy noting that "[DiPascali's] explanation about backtesting the stock basket seems like a distraction on his part—making it sound more sophisticated than it is."

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 106 and therefore **denies** the allegations in Paragraph 106.

107.    Optimal employees also regularly consulted with other analysts in the investment industry. At one such meeting, on June 15, 2004, Optimal met with Telluride Asset Management, who walked the Optimal representatives through a mathematical analysis of Madoff's purported options trading, based on BLMIS statements.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 107 and therefore **denies** the allegations in Paragraph 107.

108.    Telluride's analysis demonstrated that to carry out the split-strike conversion strategy for the $12 billion BLMIS reportedly then had under management, BLMIS would have had to trade more than the entire volume of the Chicago Board Options Exchange ("CBOE") each time it carried out its options strategy—an obvious impossibility. In addition to the clear logistical impossibility that premise presented, Telluride noted that trading in such large volumes would have affected market volatility and pricing in ways that were simply never present when Madoff claimed to be trading. Telluride presented Optimal with undeniable proof that Madoff's claims about options trading were impossible and had to be false.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 108 and therefore **denies** the allegations in Paragraph 108.

109.    Telluride's presentation resonated with Optimal. The day after the Telluride meeting, June 16, 2004, senior Optimal due diligence employee Hugh Burnaby-Atkins asked Echeverría and other Optimal personnel to consider the possibility that BLMIS was a Ponzi scheme:

QUESTIONS: Why are there no former Madoff employees out in the market place? Does he really pay them so well that they never leave? These people ought to be able to command unholy prices if they were to go to, say, Millennium, DE Shaw or Rennaissance [sic] taking his "secret" with them . . . Why are tickets not time stamped? What are the commissions on winning/losing trades? How can he move $20bn of equities in/our [sic] of the market without affecting prices? Has anyone spoken to any of his counterparties (either on the equity or the option trades) to confirm fills?

**SUPPOSE this was the largest Ponzi scheme in history** – unpalatable but we are not the first to suggest it – he would need (1) to ensure that no-one saw how the signal was generated (2) ensure that no one knew which trades were split-strike and which were regular customer orders – **this could be achieved if there were**

**really no trades! And no traders to take the secret to competitors. But for
this he would need a constant inflow of funds to support the pyramid –
which appears to be the case** . . . No doubt many of these questions have been
asked already but given his size and significance to our business we feel we should
be asking them again. (emphasis added).

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 109 and therefore **denies** the allegations in Paragraph 109.

110.    During the summer of 2005, Optimal tasked an analyst with conducting an in-
depth examination of BLMIS. Optimal gave the analyst broad latitude to examine BLMIS
from multiple perspectives. Throughout the summer of 2005, the analyst spoke with a range
of BLMIS personnel, members of the investment industry, and academics.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 110 and therefore **denies** the allegations in Paragraph 110.

111.    In one such conversation, the analyst, accompanied by Jonathan Clark, spoke
with BLMIS's Frank DiPascali. The conversation left Clark grappling with "2 potential
frauds": (1) that the "avg. price given on trade ticket is wrong or 'inflated'" and (2) that "the
trade actually doesn't take place."

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 111 and therefore **denies** the allegations in Paragraph 111.

112.    The Optimal examination was revealing. For example, one of the experts the
analyst consulted challenged the idea that Madoff could be achieving his returns with market
timing. Madoff simply did not have the "highly quantitative background" that most successful
market timers had. Moreover, though she tried, the analyst could not determine who at
BLMIS was responsible for building and maintaining the trading "model."

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 112 and therefore **denies** the allegations in Paragraph 112.

113.    Near the end of the summer, while preparing a memorandum on the
examination, the analyst solicited input from senior members of the Optimal team, who
recommended revisions to neutralize the analysis of some of the problem areas with BLMIS.
Even with those revisions, the resulting memorandum identified a number of red flags. For
example, the analyst was unable to "independently verify the existence of Optimal's
brokerage account at Madoff, and the net asset value it contains." She was unable to identify
any of Madoff's counterparties even though he claimed to execute at least "5% of US daily
equity flows." She found DiPascali's responses to questions about the trading model to be
"elusive, circular, and nonsensical." She noted that BLMIS's auditor, Friehling & Horowitz,
was unqualified (and recognized that Fairfield Sentry, whose personnel she had consulted on

this question, had misrepresented Friehling & Horowitz's qualifications). And she found that there was no correlation between BLMIS's returns and market trends, and questioned how BLMIS's returns could be "so consistent," noting "surpris[e] that Madoff has not produced more negative months."

> **ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 113 and therefore **denies** the allegations in Paragraph 113.

114.    On June 29, 2006, Hugh Burnaby-Atkins spoke with Albourne Partners analyst Hitoshi Nagata about Madoff. Burnaby-Atkins acknowledged that Madoff could be a "ticking time bomb," that "he constantly worrie[d] over Madoff," and that he "could not completely dismiss the possibility that it might be a Ponzi scheme with all the trades fabrications." Burnaby-Atkins told Nagata that Optimal received trade tickets, but could not identify any counterparties. He also noted that Optimal had never seen any Madoff financials.

> **ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 114 and therefore **denies** the allegations in Paragraph 114.

115.    By November 2008, Echeverría and some members of his team had left Optimal, leaving the massive BLMIS investment to be monitored by another team. Jeff Collard, a new analyst assigned to the Optimal funds, began to take a fresh look at BLMIS and quickly realized that there were numerous, unanswered questions concerning Madoff's trading strategy and profitability. Collard commented to his team that he had "just looked at older memos on Madoff, and the theory that most of the performance comes from [Madoff's] position as an OTC market maker d[id]n't look right." The older memos Collard referred to were those that Echeverría and his team had deliberately disregarded in order to preserve their lucrative relationship with BLMIS.

> **ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 115 and therefore **denies** the allegations in Paragraph 115.

**B.    UBS**

116.    UBS had its own pre-LIF-USEP history with Madoff and recognized the clear signs of BLMIS's fraud.

> **ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 116 and therefore **denies** the allegations in Paragraph 116.

117.    Since March 2004, when UBS SA opened a BLMIS account in the name "UBS (Luxembourg) S.A. for the benefit of Luxalpha," UBS entities had acted as Luxalpha's administrator (UBSFSL), investment manager (UBSTPM), and portfolio manager (UBS SA). Ultimately, Luxalpha directed more than $1.5 billion into BLMIS.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 117 and therefore **denies** the allegations in Paragraph 117.

118.    In 2005, UBS began to service Groupement Financier and Groupement Levered. UBS SA was Groupement Financier's official prime bank and Groupement Levered's official custodian, although UBS SA did not exercise any actual custodial authority over the money invested with Groupement Financier, having contractually delegated this responsibility to BLMIS. From February 2005, UBSFSL served as Groupement Financier's and Groupement Levered's official administrator responsible for accounting functions, keeping the register of shareholders, handling subscriptions and redemptions, communications with investors, and preparations of financial statements for the funds. It also calculated the funds' respective NAVs.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 118 and therefore **denies** the allegations in Paragraph 118.

119.    In connection with the services they provided to Groupement Financier, UBSFL and UBS SA deliberately avoided any direct legal or contractual links to BLMIS or Madoff. A combined Groupement Financier and Groupement Levered Operating Memorandum dated July 12, 2005, § 3.5, entitled "Not to do," read in extra-large, bold font: **"Neither [UBS SA] nor UBSFSL should ever enter into a direct contract with Bernard Madoff!!!"**

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 119 and therefore **denies** the allegations in Paragraph 119.

120.    Despite amassing its own evidence of fraud at BLMIS, UBS SA also helped to create Luxalpha while disregarding these persistent warnings of fraud at BLMIS. For example, a UBS AG (Zurich) employee expressed deep reservations about Madoff's role as Luxalpha's broker and custodian, which, standing alone, were sufficient reason to decline investments with BLMIS:

> We normally have to give "NO" as the answer in cases like Madoff. In doing so, we make reference to the following principles: no broker as depository, and the broker may under no circumstances also be a depository at the same time! Such a NO is easy to comprehend for both business policy reasons and risk reasons.

This did not even appear to take into account that Madoff held yet a third role—investment adviser—which further heightened the risk of fraud.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 120 and therefore **denies** the allegations in Paragraph 120.

121.    But UBS SA disregarded these and other concerns, concluding that even though "[t]he risk [of investing with BLMIS] should not be underestimated . . . [investing with BLMIS] would be advantageous on the income side."

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 121 and therefore **denies** the allegations in Paragraph 121.

122.    The internal message imparted by high-level UBS employees was clear: potential fraud at BLMIS should not stand in the way of UBS profits. Bernd Stiehl, a UBS SA managing director, a Luxalpha director, and later, a LIF director, put it in a message to a doubting colleague: "Business is business. We cannot permit ourselves to lose 300 million. Accept client."

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 122 and therefore **denies** the allegations in Paragraph 122.

123.    UBS Wealth Management, a UBS AG business division, had previously considered and rejected BLMIS as a vehicle for direct investment and derivative financial products.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 123 and therefore **denies** the allegations in Paragraph 123.

124.    Several other UBS entities also analyzed BLMIS and as early as 2002 at least one UBS affiliate noted that "[t]he fund seems to do very well, but there are voices in the industry warning because generating such consistent returns with such a strategy is more or less impossible." The UBS analysts assessing the strategy stated "[w]e consider ourselves pretty smart, and no one [at BLMIS] has properly explained their strategy to match the return profile to us, so we avoid stuff like that."

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 124 and therefore **denies** the allegations in Paragraph 124.

125.    Notwithstanding that several UBS entities rejected BLMIS as an unsuitable investment for UBS clients, UBS recognized the opportunity for it to make money from Madoff investments by non-UBS clients.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 125 and therefore **denies** the allegations in Paragraph 125.

126.    Assessing BLMIS again in 2004—the same year that M&B, Echeverría, and UBS conceived LIF-USEP as a BLMIS feeder fund—one UBS subsidiary reiterated its prior conclusion that "it would be IMPOSSIBLE to generate the returns that [Madoff] has produced since 1990." UBS's prior analysis had also flagged lack of transparency and

impossibly stable returns as reasons for concern, highlighting that since 1990 there had only been a handful of negative months, and that BLMIS's strategy generated incredibly consistent returns each year.

**ANSWER:** Defendant **denies** that M&B conceived LIF-USEP as a BLMIS feeder fund. Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 126 and therefore **denies** the remaining allegations in Paragraph 126.

127.    In addition to concluding that BLMIS's returns were impossible under the SSC strategy, Madoff's practice of not charging fees and choosing to receive revenue only from commissions was identified as a red flag under the portion of the analysis entitled "Thoughts and Rationale for NOT Investing": "The simple fact that an investor has to start considering how the fund and the [broker/dealer] benefit one another is a non-starter."

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 127 and therefore **denies** the allegations in Paragraph 127.

128.    In a separate email, dated March 5, 2004, a UBS AG employee echoed the aforementioned concerns about the UBS Defendants doing business with BLMIS, stating:

> [w]e should have a proper UBS view on what we think of all this rather than a purely personal view on my part, but I think you will find that the general UBS view would steer on the negative side given the great need for transparency . . . . My natural leaning would be negative as well, not because of anything against the strategy or Madoff himself, but because of the size, the lack of transparency, [and] the lack of cap[a]city . . . .

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 128 and therefore **denies** the allegations in Paragraph 128.

129.    Upon reading the above email, UBS Managing Director Viviane DeAngelis responded: "[t]hanks, does not contribute to me having a better feeling. I have inquired about additional insurance."

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 129 and therefore **denies** the allegations in Paragraph 129.

**C.** **In Coordination with UBS and M&B, LIF-USEP Intentionally Violated the Law and Misled Regulators by Concealing the Delegation of Their Duties to BLMIS**

130.    LIF-USEP was modeled after Luxalpha, another UBS-backed UCITS fund previously formed under Luxembourg law.

**ANSWER:**   Defendant **admits** the allegations in Paragraph 130.

131.    UCITS funds are subject to a strict regulatory framework to protect retail investors, to whom such funds are directed.

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 131 and therefore **denies** the allegations in Paragraph 131.

132.    Under applicable Luxembourg law, LIF-USEP, as a UCITS fund, had to have a sponsor, or promoter, responsible for creating the fund. The promoter would be liable to third parties for damages in the event the fund was mismanaged.

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 132 and therefore **denies** the allegations in Paragraph 132.

133.    A UCITS fund promoter must be a regulated entity with sufficient financial resources. For Luxembourg's national regulator, the CSSF, to authorize a UCITS fund in Luxembourg, the fund's promoter must meet certain requirements concerning experience and financial soundness, determined in part by the adequacy of its capital base.

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 133 and therefore **denies** the allegations in Paragraph 133.

134.    UBS AG served as LIF-USEP's sponsor and promoter. As such, UBS AG created the appearance, both with the CSSF and with potential investors, that the fund was backed by a highly capitalized, stable bank.

**ANSWER:**   Defendant **admits** that UBS AG was involved in LIF-USEP. Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 134 and therefore **denies** the remaining allegations in Paragraph 134.

135.    UBS's role was to create the appearance of UCITS compliance and to deflect regulatory scrutiny by interposing a large, reputable, international bank between LIF-USEP and BLMIS.

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 135 and therefore **denies** the allegations in Paragraph 135.

136.    As the authorized custodian for a UCITS fund, UBS SA was, by law, responsible for both the safekeeping and the supervision of the fund's assets. UBS SA delegated its core custodial functions to BLMIS. It did so knowing that BLMIS was also LIF-USEP's investment manager, and knowing that this structure violated applicable laws and regulations.

**ANSWER:**   Defendant **avers** that the allegations in Paragraph 136 state legal conclusions to which no response is required. To the extent any further response is required, Defendant **admits** that UBS SA was involved in LIF-USEP, and Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 136 and therefore **denies** the allegations in Paragraph 136.

137.    Under Luxembourg law, the sub-delegation by UBS of custodial authority to BLMIS was illegal. BLMIS was not an accredited custodian and could never have met Luxembourg's strict requirements for either custodians or investment managers.

**ANSWER:**   Defendant **avers** that the allegations in Paragraph 137 state legal conclusions to which no response is required. To the extent any further response is required, Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 137 and therefore **denies** the allegations in Paragraph 137.

138.    The appointment of BLMIS as both custodian and investment manager was not in compliance with the regulations governing UCITS funds either at the time LIF-USEP was created or, throughout the entire period of its operations.

**ANSWER:**   Defendant **avers** that the allegations in Paragraph 138 state legal conclusions to which no response is required. To the extent any further response is required, Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 138 and therefore **denies** the allegations in Paragraph 138.

139.    The sub-delegation of custodial authority to BLMIS also violated UBS's internal policies.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 139 and therefore **denies** the allegations in Paragraph 139.

140.    The delegation of these functions was not disclosed either to the CSSF or in LIF-USEP's sales prospectus, in violation of Luxembourg law.

**ANSWER:** Defendant **avers** that the allegations in Paragraph 140 state legal conclusions to which no response is required. To the extent any further response is required, Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 140 and therefore **denies** the allegations in Paragraph 140.

141.    UBS AG made an exception to its prohibition on the delegation of custodial and management authority to a single entity after UBS SA persuaded it to do so.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 141 and therefore **denies** the allegations in Paragraph 141.

142.    The purpose of the UCITS regulations was to protect against fraud. Yet UBS, together with M&B, built a structure designed to circumvent those UCITS regulations.

**ANSWER:** Defendant **denies** that M&B "built a structure designed to circumvent those UCITS regulations." Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 142 and therefore **denies** the remaining allegations in Paragraph 142.

143.    UBS SA was LIF-USEP's nominal portfolio manager from the fund's inception, even though throughout this time the management of the fund's assets was delegated to BLMIS.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 143 and therefore **denies** the allegations in Paragraph 143.

144.    As LIF-USEP's manager, UBS SA executed an agreement with BLMIS entitled "Trading Authorization Limited to Purchases and Sales of Securities and Options." Under the agreement's terms, UBS and LIF-USEP delegated management of the fund's assets to BLMIS, designating BLMIS as their "agent and attorney in fact to buy, sell and trade in stocks, bonds, options and any other securities."

39

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 144 and therefore **denies** the allegations in Paragraph 144.

145. UBS SA entered into a Sub-Custodian Agreement with BLMIS, which delegated UBS SA's custodial duties to BLMIS "with the function of safekeeping holder and settlement and corporate agent of United States securities, cash, derivatives instruments and other assets" and noted that the "US assets of the Fund" would be invested with BLMIS. The Sub-Custodian Agreement was not disclosed to the CSSF or in any LIF or LIF-USEP prospectus.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 145 and therefore **denies** the allegations in Paragraph 145.

146. The Sub-Custodian Agreement put in place could not have met the approval of the CSSF because BLMIS did not meet the regulatory criteria to perform the duties of a custodian of a Luxembourg UCITS fund.

**ANSWER:** Defendant **avers** that the allegations in Paragraph 146 state legal conclusions to which no response is required. To the extent any further response is required, Defendant **lacks knowledge** sufficient to form a belief as the truth of the allegations in Paragraph 146 and therefore **denies** the remaining allegations in Paragraph 146.

147. The lack of an independent custodian at BLMIS made it impossible to independently verify the existence of assets at BLMIS.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 147 and therefore **denies** the allegations in Paragraph 147.

148. LIF-USEP's prospectuses dated August 2005, July 2006, December 2006, October 2007, and September 2008 each misleadingly states that UBS SA had assumed LIF-USEP's custodial rights and duties and conceals the delegation of custodial responsibilities to BLMIS. Each of those prospectuses touted UBS SA's banking experience.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 148 and therefore **denies** the allegations in Paragraph 148.

149. Even after the undisclosed delegation of myriad functions to BLMIS, UBS SA represented to the CSSF and potential investors that it actively managed LIF-USEP's assets and monitored and adjusted the fund's investments "under the supervision and responsibility of the fund's Board of Directors."

**ANSWER:**  Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 149 and therefore **denies** the allegations in Paragraph 149.

150.    Documents submitted to the CSSF on UBS SA's behalf also misrepresented UBS SA's custodial function. In a report dated January 15, 2008, entitled "Controls' Report of the Independent Auditor on the Custodian Bank Function in the Context of the CSSF Circular 02/81," UBS SA purported to set forth complete lists of the funds for which it served as custodian and the sub-custodians that UBS SA used worldwide. Although LIF-USEP was included in the list of funds in the report, neither Madoff nor BLMIS was identified as a sub-custodian and neither is mentioned in the report. The report falsely lists Brown Brothers Harriman as the only sub-custodian that UBS SA used in the United States. Sub-custody of assets in a UCITS fund is information that is required to be mentioned in sales prospectuses submitted to the CSSF.

**ANSWER:**  Defendant **avers** that the allegations in Paragraph 150 state legal conclusions to which no response is required. To the extent any further response is required, Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 150 and therefore **denies** the allegations in Paragraph 150.

151.    If the Sub-Custodian Agreement had been disclosed to the CSSF, it would not have been approved because neither Madoff nor BLMIS complied with Luxembourg law governing fund custodians. BLMIS received no compensation for serving as de facto manager and sub-custodian.

**ANSWER:**  Defendant **avers** that the allegations in Paragraph 151 state legal conclusions to which no response is required. To the extent any further response is required, Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 151 and therefore **denies** the allegations in Paragraph 151.

152.    The 2009 Annual Report of the CSSF further confirms that the documents submitted to it on behalf of LIF-USEP, upon which the CSSF based its decision to approve LIF-USEP as a UCITS fund:

> did not contain any reference either to the identity of B[L]MIS or to the multiple responsibilities carried on de facto by one entity. Between the launch of [LIF-USEP] and the breakout of the Madoff affair in December 2008, the CSSF was never informed in a transparent manner, by the professionals involved, of the structure actually set in place nor of the role played in practice by B[L]MIS at different levels of this structure.

41

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 152 and therefore **denies** the allegations in Paragraph 152.

153.    Following the delegation of custodial and management functions to BLMIS, UBS SA remained in regular contact with BLMIS. In addition to receiving account statements and trade confirmations from BLMIS, UBS SA communicated regularly with BLMIS via mail, fax, and telephone to request withdrawals from LIF-USEP's account and to address a variety of issues, including erroneous trade tickets, tax issues, and missing account statements.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 153 and therefore **denies** the allegations in Paragraph 153.

154.    LIF-USEP's account statements and trade confirmations were sent from BLMIS to UBS SA, which then shared the contents of those documents with UBSFSL.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 154 and therefore **denies** the allegations in Paragraph 154.

155.    UBSFSL was LIF-USEP's administrator. In this role, UBSFSL was responsible for calculating LIF-USEP's NAV, which is the total market value of each share of the fund, by independently verifying the execution of trades and the prices at which those trades took place. In reality, UBSFL calculated NAV based solely on data provided by BLMIS, with no independent verification.

**ANSWER:** Defendant **admits** that UBSFSL was involved in LIF-USEP.

Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 155 and therefore **denies** the remaining allegations in Paragraph

155.

156.    Without independent verification, UBSFSL was creating meaningless accounting records that just repeated the trade confirmations and account statements that it received from BLMIS. UBSFSL thereby facilitated the concealment of BLMIS's true involvement and perpetuated the fraud.

**ANSWER:** Defendant **avers** that the allegations in Paragraph 151 state legal

conclusions to which no response is required. To the extent any further response is required,

Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in

Paragraph 156 and therefore **denies** the allegations in Paragraph 156.

157.    With regard to the calculation of LIF-USEP's NAV, the Operating Memorandum specifically noted that: "[d]ue to the considerable delay in the dispatching of the trade confirmations and Broker statements from B. Madoff, the client has accepted that UBSFSL issues the NAV with a delay of up to 10 business days."

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 157 and therefore **denies** the allegations in Paragraph 157.

158.    The Operating Memorandum also provided that BLMIS, as sub-custodian, would "promptly report by fax as of each trade date the transactions entered into the Account." These daily faxes were supposed to be sent to UBS SA. Upon information and belief, this procedure was not followed. Instead, BLMIS reported trades in a delayed, hard copy-only manner.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 158 and therefore **denies** the allegations in Paragraph 158.

159.    The net effect of the operating procedures put in place for LIF-USEP was to allow UBS SA and UBSFSL, two sophisticated financial institutions that appeared to the public to be directly involved in the operation of LIF-USEP, to earn fees for serving in oversight roles that actually provided no real oversight or protection for LIF-USEP's assets, and to allow BLMIS the freedom to manipulate reports as needed to perpetuate the Ponzi scheme.

**ANSWER:**    Defendant **avers** that the allegations in Paragraph 159 state legal conclusions to which no response is required. To the extent any further response is required, Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 159 and therefore **denies** the allegations in Paragraph 159.

160.    UBSTPM replaced UBS SA as LIF and LIF-USEP's nominal portfolio manager from May 2006 to December 2008. UBSTPM represented to the CSSF that it managed, administered, and monitored the fund's investment policies and restrictions.

**ANSWER:**    Defendant **admits** that UBSTPM was involved in LIF-USEP. Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 160 and therefore **denies** the remaining allegations in Paragraph 160.

161.    After UBSTPM became LIF and LIF-USEP's management company, UBS continued to conceal the delegation of the fund's management to BLMIS. LIF-USEP's July 2006 prospectus states that UBSTPM:

[i]s responsible for the management, the administration and the distribution of the Fund's assets but is allowed to delegate, under its supervision and control, all or part of these duties to third parties. In case of changes or appointment of additional third parties, the prospectus will be updated accordingly.

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 161 and therefore **denies** the allegations in Paragraph 161.

162.   No such "updated" prospectus disclosing LIF-USEP's delegation of management to BLMIS was ever provided. Nor did UBSTPM ever attempt to exercise any "supervision" or "control" over BLMIS.

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 162 and therefore **denies** the allegations in Paragraph 162.

163.   UBS SA's complete abdication of its asset management responsibilities came as a surprise to the then-Head of Portfolio Management at UBS SA, Christian Schoen. In a March 22, 2004 email discussing Luxalpha, which like LIF-USEP had delegated its management to BLMIS, Schoen raised his concerns to another UBS SA employee:

> I am wondering how this is supposed to work and how one can argue that we are officially the portfolio manager but do not have a cent posted on our books. To date I had assumed that Madoff certainly makes the trades and executes them, but that the assets lie with us and that in the end we settle the trades with Madoff. This way I would have been in a position to exercise a certain oversight function.

**ANSWER:**   Defendant **avers** that the allegations in Paragraph 163 state legal conclusions to which no response is required. To the extent any further response is required, Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 163 and therefore **denies** the allegations in Paragraph 163.

### D.   UBS Ignored Its Own Due Diligence Requirements In Order to Remain a BLMIS Feeder Fund Service Provider

164.   To approve investments, UBS AG required its analysts to obtain certain information about the underlying fund manager. This requirement applied to BLMIS-related products. One due diligence requirement was a "face to face meeting with the manager and a site visit to the HQ of the firm where money is managed." For BLMIS, this task was assigned to a UBS AG analyst in London, Mary Kleckner. In preparation, Kleckner asked her team for a list of specific questions or topics that they would like answered. The team responded with concerns about the total volume of assets BLMIS was managing and whether there was a point at which these assets would be voluminous enough to deteriorate the strategy's performance. Additionally, Kleckner's team raised questions about the potential misuse of information between BLMIS's marketing and investment advisory arms.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 164 and therefore **denies** the allegations in Paragraph 164.

165.    These questions were never answered.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 165 and therefore **denies** the allegations in Paragraph 165.

166.    In conducting due diligence on another BLMIS-related investment, Madoff refused to meet with Kleckner. In a September 17, 2008 email, Kleckner was informed:

> Madoff has turned down our request for a meeting. His simple explanation was that if he meets with one client he would be obligated, perhaps even from a regulatory standpoint now that he is an RIA, to meet with all of them, and he would literally be forced to build an infrastructure to support meetings and devote a huge amount of time to it.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 166 and therefore **denies** the allegations in Paragraph 166.

167.    Kleckner also reached out to others for their opinions on Madoff. On October 31, 2007, in response to her question, "What are your feelings on Madoff," Kleckner received the following response:

> I think [M]adoff is one of the most controversial funds out there. The historic returns and low vol[atility] make the [M]adoff feeders look very attractive for leveraged structured products and FAs love it. In addition, [M]adoff is very involved with the [NASD] and on a number of committees there. We get asked about s[tructured] p[roduct]s on these feeders all the time, but there are a lot of folks who are concerned about the fund. Everything is probably fine, but there are a number of things that are odd or different than the norm. Like no prime broker, all trades done through [M]adoff securities through an ordinary brokerage account. It's also unclear which dealers are executing the [OTC] collars for him? They are pretty big, but no one seems to know who is trading them.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 167 and therefore **denies** the allegations in Paragraph 167.

## IX.    EVIDENCE OF BLMIS'S FRAUD CONTINUED TO MOUNT AFTER THE ESTABLISHMENT OF LIF-USEP

168.    LIF-USEP was founded even though its directors, service providers, and agents were aware of BLMIS's fraud. And throughout the fund's life as a BLMIS feeder fund, from 2005 to December 2008, the flow of information demonstrating this fraud continued.

**ANSWER:**  Defendant **denies** that M&B was aware of BLMIS's fraud. Defendant

**lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in

Paragraph 168 and therefore **denies** the remaining allegations in Paragraph 168.

169.    Even in the face of this information demonstrating fraud, M&B did not stop
marketing LIF-USEP. Instead, M&B placed more than €150 million of its clients' private and
institutional capital with BLMIS, through LIF-USEP and other BLMIS feeder funds. UBS
and Reliance were also responsible for significant investment with LIF-USEP. There were
nearly monthly infusions of new investment capital throughout LIF-USEP's life. By the time
Madoff was arrested in December 2008, the fund had deposited over $758 million with
BLMIS.

**ANSWER:**  Defendant **admits** that M&B marketed LIF-USEP and that it placed

clients' capital with LIF-USEP. Defendant **denies** M&B did so "in the face of [] information

demonstrating fraud." Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the remaining allegations in Paragraph 169 and therefore **denies** the remaining

allegations in Paragraph 169.

170.    LIF-USEP's service providers monitored the activity reported in LIF-USEP's
BLMIS account statements, received information about other BLMIS feeder funds,
periodically met with BLMIS personnel and Madoff, spoke with industry sources, and shared
findings and suppositions about BLMIS and Madoff.

**ANSWER:**  Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 170 and therefore **denies** the allegations in Paragraph 170.

171.    LIF-USEP's service providers received millions of dollars in fees for their work
on behalf of the fund.

**ANSWER:**  Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 171 and therefore **denies** the allegations in Paragraph 171.

172.    Information concerning BLMIS's fraud continued to be disseminated
throughout the same well-connected network that had founded LIF-USEP. For example, RIR
communicated with both UBS and M&B personnel by email at least several times every
month between 2005 and 2008, discussing LIF-USEP's account activity, Madoff's purported
trades and the process of obtaining trade-level information, and subscriptions and
redemptions from LIF-USEP's account. RIR received all trade confirmations for LIF-USEP's
account directly from BLMIS.

**ANSWER:**  Defendant **admits** that M&B communicated with RIR regarding LIF-USEP. Defendant **denies** that information concerning BLMIS's fraud was disseminated to M&B. Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 172 and therefore **denies** the remaining allegations in Paragraph 172.

173.    M&B and Reliance also regularly communicated with Echeverría and Optimal personnel throughout LIF-USEP's existence.

**ANSWER:**  Defendant **admits** that M&B communicated with Echeverría regarding LIF-USEP. Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 173 and therefore **denies** the remaining allegations in Paragraph 173.

174.    In 2006, Optimal's chief risk officer Rajiv Jaitly was overseeing an ongoing operational due diligence probe into BLMIS. A memorandum reporting interim results, including the Optimal due diligence team's takeaways from their February 1, 2006 visit with Madoff highlighted several fraud risks. Jaitly observed that there was no evidence that BLMIS had established segregated client accounts, which left BLMIS investors dangerously exposed in the event of BLMIS's or a purported trading counterparty's failure. Even more troubling was the fact that there was no way "to verify actual trading activity in the market" with counterparties or others. This forced Optimal and its investors into the precarious position of trusting only in BLMIS's uncorroborated statements in the face of fraud risk. Optimal shared this memorandum with Reliance.

**ANSWER:**  Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 174 and therefore **denies** the allegations in Paragraph 174.

175.    Rather than act on Jaitly's advice, Optimal disregarded and suppressed it. And, in the face of Jaitly's increasingly agitated efforts to convince his superiors that they needed to implement measures to reduce the risk that BLMIS presented, Optimal fired him.

**ANSWER:**  Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 175 and therefore **denies** the allegations in Paragraph 175.

176.    In July 2006, Jonathan Clark (the Optimal employee who had in 2005 noted that trading may not "actually take place" at BLMIS), summarized certain areas of risk related to the company's BLMIS investments. Clark identified seven risk areas:

47

Privately owned family business shrouded in secrecy; Counterparty risk in the options trading; No independent custody of client assets (Madoff is the custodian); Lack of transparency into client accounts, through either clearing or banking accounts (although this is standard brokerage firm procedure); No independent verification of trading activity (unlike a standard hedge fund that has a prime broker); Lack of realistically independent auditor—Friehling & Horowitz is a very small firm with Madoff as its only major client.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 176 and therefore **denies** the allegations in Paragraph 176.

177. In a draft outline of the risk issues, Hugh Burnaby-Atkins added that "the lack of independence of the auditors" gives [Madoff] effective control of his auditor."

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 177 and therefore **denies** the allegations in Paragraph 177.

178. Despite their mounting concerns about BLMIS, LIF-USEP's agents and service providers helped to rapidly grow LIF-USEP. But, by March 2007, UBS sensed that its BLMIS exposure through LIF-USEP was too large and closed the fund to new subscriptions.

**ANSWER:** Defendant **admits** that the LIF-USEP fund was closed to new subscriptions, except to the extent the subscription was matched to a redemption. Defendant **lacks knowledge** sufficient to form a belief as to the truth of whether "UBS sensed that its BLMIS exposure through LIF-USEP was too large" and therefore **denies** this allegation. Defendant **denies** the remaining allegations in Paragraph 178.

179. Around the same time, M&B and Reliance leveraged the knowledge they obtained in creating LIF-USEP to launch two new BLMIS feeder funds—Landmark Investment Fund and Defender Limited Fund—to capture investment capital that would have been invested in LIF-USEP. Both M&B and Reliance became service providers to Landmark and Defender.

**ANSWER:** Defendant **admits** that M&B participated in opening Landmark Investment Fund ("**Landmark**"). Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 179 and therefore **denies** the remaining allegations in Paragraph 179.

180. Landmark and Defender, like LIF-USEP, funneled additional investment into BLMIS, deepening BLMIS's insolvency, and like LIF-USEP, created a false appearance of

48

regulatory compliance. The new funds gave M&B and Reliance more BLMIS data and exposed them to more indicia of BLMIS's fraud.

**ANSWER:** Defendant **avers** that to the extent the allegations in Paragraph 180 state legal conclusions, no response is required. Defendant **admits** that Landmark invested in BLMIS. Defendant **denies** that it was exposed to indicia of BLMIS's fraud. Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 180 and therefore **denies** the remaining allegations in Paragraph 180.

181.    It was Reliance's practice to assign a single analyst to monitor all of its BLMIS exposure. By the time Defender opened, Reliance had assigned Jason Whitt to be the senior research analyst in charge of monitoring BLMIS. Whitt saw the purported trading data from the full array of Reliance holdings in BLMIS feeder funds and observed startling indicia of BLMIS's fraud, which he repeatedly brought to Brockmann's and Lowe's attention. But Brockmann and Lowe made clear to Whitt that Madoff was essential to Reliance's existence.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 181 and therefore **denies** the allegations in Paragraph 181.

182.    Reliance received BLMIS trade confirmations in connection with its roles with LIF and Defender, and Whitt was charged with analyzing BLMIS trading data to compare LIF's and Defender's performance, given that they were purported to be "identical in strategy."

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 182 and therefore **denies** the allegations in Paragraph 182.

183.    In November 2007, Whitt and Lowe learned from Optimal that Optimal had received "erroneous trade tickets" from BLMIS. Reliance admitted that it too had received erroneous trade tickets.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 183 and therefore **denies** the allegations in Paragraph 183.

184.    The economic meltdown of 2007 and 2008 increased Reliance's suspicions about Madoff's trading, which appeared to be entirely unaffected by these unpredictable events.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 184 and therefore **denies** the allegations in Paragraph 184.

185.    Whitt had been communicating with other industry colleagues, who, despite less exposure than BLMIS in the options market, saw their ability to find options trading counterparties dramatically affected by those events. Whitt had recently learned from an industry contact that Deutsche Bank refused to trade with BLMIS. He also recognized that it was nearly impossible that Bear Stearns' March 2008 and Lehman Brothers' September 2008 collapses could have had no discernible effect on Madoff's trading.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 185 and therefore **denies** the allegations in Paragraph 185.

186.    Whitt warned his superiors Brockmann and Lowe that he was unable to ascertain who Madoff's counterparties were, understand how Madoff could be impervious to the unforeseen market conditions, or how Madoff could be trading in the volumes he claimed if he was not trading with major players in the options market like Deutsche Bank, Bear Stearns, or Lehman Brothers.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 186 and therefore **denies** the allegations in Paragraph 186.

187.    In an August 2008 email to Reliance principal Trevor Uhl, Whitt repeated his concern that there was "too much unknown fraud risk at Madoff."

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 187 and therefore **denies** the allegations in Paragraph 187.

188.    Around the same time, Whitt urged Lowe to have Reliance get in touch with Echeverría, whom Whitt believed could provide some insight about BLMIS's options counterparties, given Echeverría's privileged access to Madoff:

It makes absolutely zero sense that [L]ehman was not one [of the BLMIS counterparties] given their prominence in the otc equity derivatives market (and neither is [D]eutsche as we recently heard, also a large player). I don't even want to send this by email, but my actual opinion is that *IF the whole thing is a fraud, in this environment it could/will be exposed*. I am not trying to give you a heart attack . . . but my honest opinion is that it is extremely worrisome. (emphasis added)

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 188 and therefore **denies** the allegations in Paragraph 188.

189.    Lowe agreed that they could try to meet with Echeverría the next time he was planning to be in New York, in October 2008, but that in the meantime, Whitt should try to speak with "competitor" funds. Whitt responded that he had already done so, and that the exercise had been fruitless.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 189 and therefore **denies** the allegations in Paragraph 189.

190.    Whitt recommended that Reliance redeem from BLMIS. He told Lowe of his fear that "all the account holders (ourselves included) are so hooked on the low vol[atility] returns that we are not really thinking objectively: it makes no sense."

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 190 and therefore **denies** the allegations in Paragraph 190.

191.    But Brockmann and Lowe disregarded Whitt's concern: Madoff was Reliance's "sacred cow" and Reliance could not do without him.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 191 and therefore **denies** the allegations in Paragraph 191.

192.    The alarm over Madoff's counterparties escalated with additional concerns brought to Echeverría and Reliance. And it continued to be disregarded.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 192 and therefore **denies** the allegations in Paragraph 192.

193.    Reliance learned in November 2008 that the head of Santander risk management would be meeting with Madoff on Thanksgiving and had offered to raise concerns with Madoff on their behalf. As a starting point, Lowe forwarded to the Reliance team the set of questions they had drafted for a meeting with BLMIS almost two years before, in February 2007, but that still remained unanswered. Whitt proposed several questions, which struck at the core of the question of whether BLMIS was engaged in fraud: who were BLMIS's options counterparties? Did Madoff segregate client assets? To what use could Madoff put client assets?

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 193 and therefore **denies** the allegations in Paragraph 193.

194.    Lowe reviewed the new questions and added them to the "Unanswered Questions on BLMIS" subfolder on Reliance's system.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 194 and therefore **denies** the allegations in Paragraph 194.

195.    At the meeting, Madoff refused to identify any counterparties, claiming he had to prevent his customers from dealing directly with counterparties, and that he had to protect the names as "proprietary." Reliance never reviewed any form of draft or final counterparty

agreement or OTC transaction confirmation. Of course, Reliance could not have done so even if it had insisted because no such agreements or counterparties existed.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 195 and therefore **denies** the allegations in Paragraph 195.

### X.    THE DEFENDANTS WERE AWARE OF OBJECTIVE MARKET IMPOSSIBILITIES FOR WHICH THERE WAS NO PLAUSIBLE EXPLANATION OTHER THAN FRAUD

196.    Once LIF-USEP was operational, the Defendants quickly became aware of numerous trading impossibilities. These were objective impossibilities—quantitative evidence that LIF-USEP's customer statements and trade confirmations reported non-existent securities transactions.

**ANSWER:** Defendant **denies** the allegations in Paragraph 196 with respect to M&B. Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 196 and therefore **denies** the remaining allegations in Paragraph 196.

### A.    LIF-USEP's Account Statements Reported Impossible Volumes of Options Trades

197.    Madoff's SSC strategy required the purchase and sale of vast numbers of S&P 100 Index options—volumes so large that they were impossible.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 197 and therefore **denies** the allegations in Paragraph 197.

198.    BLMIS claimed that the options trades were being traded on the market: BLMIS trade confirmations contained the unique ticker symbols and CUSIP numbers (i.e., "Committee on Uniform Securities Identification Procedures" number) associated solely with exchange-traded options.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 198 and therefore **denies** the allegations in Paragraph 198.

199.    More often than not, BLMIS's reported options trades exceeded the volume of such options trades on the CBOE. This occurred more than 100 times.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 199 and therefore **denies** the allegations in Paragraph 199.

200.    The options discrepancy was stark. As shown below in Chart 1, the volume of S&P 100 put options BLMIS purported to trade on behalf of LIF-USEP (red bars) dwarfs the total volume of the respective S&P 100 put options traded on the CBOE (black bars).

**Chart 1**



LIF-USEP, 1FR123 – HISTORIC OPTION ACTIVITY COMPARED TO CBOE 2007-2008 (PUTS ONLY)

Red bars indicate BLMIS Volume
Black bars indicate CBOE Volume

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 200 and therefore **denies** the allegations in Paragraph 200.

201.    Chart 2 below depicts the volume of S&P 100 call options BLMIS purportedly traded on behalf of LIF-USEP (blue bars) as compared to the entire CBOE exchange volume (black bars) for the respective options contracts.

**Chart 2**

**LIF-USEP, 1FR123 – Historic Option Activity compared to CBOE 2007-2008 (Calls Only)**



Blue bars indicate BLMIS Volume
Black bars indicate CBOE Volume

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 201 and therefore **denies** the allegations in Paragraph 201.

201.    There were at least 169 instances over LIF-USEP's lifetime in which BLMIS's
purported trading for LIF-USEP exceeded the total CBOE volume. In at least 127 of these
instances, the volume traded was at least twice the CBOE; in at least 51 instances, the
volume traded was at least ten times the volume traded on the CBOE.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 202 and therefore **denies** the allegations in Paragraph 202.

203.    The Defendants knew that BLMIS was purportedly trading the same options
for hundreds of other accounts, underscoring the implausibility of Madoff's claims about
options trading.

**ANSWER:**    Defendant **denies** the allegations in Paragraph 203 with respect to

M&B. Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 203 and therefore **denies** the remaining allegations in Paragraph 203.

204.    The statements and trade confirmations revealed that in 61% of the instances when Madoff purported to trade options for LIF-USEP, he purported to trade more than 100% of such options that were traded on the entire CBOE on that day. This is, of course, impossible. Even one instance of trading more than the entire CBOE volume should have been a major red flag. But there was not one instance, there were many—hundreds of events where BLMIS's purported purchases or sales of options with the same strike price and expiration date for LIF-USEP exceeded the entire volume of such options traded on the CBOE.

ANSWER:    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 204 and therefore **denies** the allegations in Paragraph 204.

**B.    BLMIS's SSC Strategy Could Not Yield the Results Reported on the BLMIS Account Statements**

205.    The SSC strategy purported to be a "collared" investment strategy that was supposed to track the S&P 100 while also tempering returns in volatile markets. But the virtual elimination of volatility would have been impossible under the SSC strategy. Properly implemented, the SSC strategy should have yielded results for LIF-USEP that were closely correlated to the S&P 100, but with less dramatic downswings and upswings.

ANSWER:    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 205 and therefore **denies** the allegations in Paragraph 205.

206.    The S&P 100 Index options ("OEX Options") collars attached to BLMIS's stock purchases should, in theory, have ensured that when the S&P 100 dropped, it would not drop as much for BLMIS investors. Collapses in stock price would be hedged by put contracts funded by the sale of call options. The effect of that strategy, however, would also limit gains when the S&P 100 went up.

ANSWER:    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 206 and therefore **denies** the allegations in Paragraph 206.

207.    Had BLMIS been deploying the SSC strategy, it would have been impossible for LIF-USEP to post gains on its BLMIS investments when the S&P 100 was significantly down. This is because downswings were only hedged by put options. Exercising those options would not have turned losses into gains, it would simply have put a floor on losses.

ANSWER:    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 207 and therefore **denies** the allegations in Paragraph 207.

208.    Similarly, outperforming the S&P 100 during a major upswing should also have been impossible, as call options sold by BLMIS would have been exercised during a significant market upswing, putting a ceiling on gains.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 208 and therefore **denies** the allegations in Paragraph 208.

209.    LIF-USEP's account statements consistently showed gains when the market was down. When the market was up, LIF-USEP appeared to outperform the market. This is objectively impossible under the SSC strategy and reflects the same "IMPOSSIBLE" returns UBS previously identified.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 209 and therefore **denies** the allegations in Paragraph 209.

210.    The following chart, which reflects the performance of a theoretical $100 investment, shows the complete and impossible lack of correlation between BLMIS and the S&P 100 index:



**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 210 and therefore **denies** the allegations in Paragraph 210.

211.    BLMIS's returns purported to be immune to any market instability, enjoying consistently positive rates of return at all times, even during catastrophic market downturns such as the "dot com" bubble bursting of 2000, the 2000–2002 bear market, and the disastrous

and unforeseeable market impact of September 11, 2001. The following table demonstrates the consistency of the LIF-USEP's returns and their lack of correlation to the S&P 100:

| Year | LIF-USEP's Rate of Return | S&P 100 Rate of Return |
|---|---|---|
| 2005 (from Sept) | 4.3% | 1.0% |
| 2006 | 12.3% | 15.9% |
| 2007 | 11.2% | 3.8% |
| 2008 (through Nov) | 9.3% | (36.9%) |

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 211 and therefore **denies** the allegations in Paragraph 211.

212.    During its 39-month operational life, LIF-USEP's BLMIS account had a negative rate of return in only one month. In the same period, the S&P 100 had a negative rate of return in 16 months.

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 212 and therefore **denies** the allegations in Paragraph 212.

213.    Over the lifetime of LIF-USEP's account, BLMIS account statements and trade confirmations show that almost always, the trades beat the market—another impossibility. Approximately 80% of (reported) stock purchases occurred below the volume-weighted average price. Approximately 70% of (reported) stock sales occurred above the volume-weighted average price. Reliance and UBS possessed clear evidence that the frequency with which BLMIS purported to trade at the optimal price point was statistically impossible.

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 213 and therefore **denies** the allegations in Paragraph 213.

## C.    BLMIS's Volume of Assets Under Management Was Too Large to Properly Implement the SSC Strategy

214.    In connection with financial markets, "scalability" refers to an investment strategy's ability to handle higher trading volumes or growing assets under management. As assets under management increase, it becomes more difficult for a manager to find opportunities of a scale proportional to a fund's growing size.

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 214 and therefore **denies** the allegations in Paragraph 214.

215.    The SSC strategy, which purported to capitalize on market inefficiencies, was limited because S&P 100 Index companies are efficiently traded. The purported strategy was still further restricted by the limited volumes of stock in S&P 100 Index companies and in the S&P 100 Index options relative to BLMIS's purported assets under management.

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 215 and therefore **denies** the allegations in Paragraph 215.

216.    The SSC strategy was not scalable for the amount of BLMIS's purported assets under management. For example, to execute the SSC strategy with at least $10 billion of assets under management, BLMIS would have needed $10 billion of notional value in call options.

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 216 and therefore **denies** the allegations in Paragraph 216.

217.    In 2006, BLMIS began publicly disclosing its assets under management in Form ADVs filed with the SEC, reporting that it had approximately $11.7 billion as of July 2006, $13.2 billion as of December 2006, and $17.1 billion as of December 2007. Reliance and UBS SA reviewed BLMIS's filings.

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 217 and therefore **denies** the allegations in Paragraph 217.

218.    Between 2000 and 2008, there was no time when there were enough options on the listed market to implement Madoff's purported SSC strategy.

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 218 and therefore **denies** the allegations in Paragraph 218.

### D.    The Defendants Could Not Identify Any of Madoff's Counterparties, Marking a Significant Risk to LIF-USEP

219.    Madoff initially purported to trade options contracts on the CBOE. But when customers questioned whether there was adequate volume on the CBOE, Madoff changed his story and claimed to be trading options contracts over-the-counter. This created a new problem for Madoff, as options trades executed via the CBOE are guaranteed by that exchange. Over-the-counter trades, however, require willing counterparties whose performance is not guaranteed.

**ANSWER:**  Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 219 and therefore **denies** the allegations in Paragraph 219.

220.    The inability to identify counterparties created a major risk for LIF-USEP. BLMIS purported to enter into vast numbers of private options contracts as LIF-USEP's agent. Had the counterparties to those contracts defaulted or otherwise failed to perform, LIF-USEP would have been exposed to substantial losses.

**ANSWER:**  Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 220 and therefore **denies** the allegations in Paragraph 220.

221.    U.S. regulators were also eager to identify Madoff's counterparties. On June 16, 2006, the SEC's Enforcement Staff sent a draft document request to UBS's offices in the U.S. in an attempt to verify whether any of UBS's European affiliates had served as one of Madoff's purported OTC option counterparties. Instead of providing the SEC with a direct answer, UBS's U.S. offices claimed to be unable to access the relevant data from Europe and informed the SEC's Enforcement Staff that it would have to seek the relevant information directly from Europe. However, UBS knew in 2006 that no UBS entity had ever acted as a counterparty to an options trade with BLMIS's IA business.

**ANSWER:**  Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 221 and therefore **denies** the allegations in Paragraph 221.

222.    In 2006, LIF-USEP also falsely reported in its Long Form Report on the Activity of the Fund to the CSSF that BLMIS's options counterparties were approved by UBS AG as LIF-USEP's promoter. No such counterparties were ever identified to, or approved by, UBS AG. Of course, no such counterparties ever existed.

**ANSWER:**  Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 222 and therefore **denies** the allegations in Paragraph 222.

XI.    **BLMIS'S STRUCTURE AND OPERATIONS PROVIDED AMPLE EVIDENCE OF FRAUD**

A.    **Madoff's Unusual Fee Structure**

223.    The customary investment advisory fee charged by a hedge fund manager ranges from 1% to 2% of assets under management plus a performance fee of 10% to 20% of profits earned by the investment. Fees normally run higher for investment advisers with a history of success. BLMIS did not charge investors any traditional management or performance fees. Madoff was purportedly satisfied with simply charging BLMIS's IA Business customers $1 per option contract and $0.04 per equity share traded. Compared with industry practice, this fee structure had Madoff leaving hundreds of millions, if not billions, of dollars on the table. As one UBS affiliate noted, the "simple fact that an investor has to

start considering how the fund and the [broker/dealer] benefit one another is a non-starter," and was reason enough to stay away from BLMIS investment.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 223 and therefore **denies** the allegations in Paragraph 223.

224.    Other industry professionals also realized that BLMIS's highly unusual fee structure was a serious warning sign.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 224 and therefore **denies** the allegations in Paragraph 224.

**B.    Madoff's Insistence on Secrecy**

225.    Madoff insisted that his name not appear in any official offering document relating to LIF-USEP. The Defendants acquiesced to that request even though the absence of Madoff's name from such documents violated applicable laws.

**ANSWER:** Defendant **avers** that the allegations in Paragraph 225 state legal conclusions to which no response is required. To the extent any further response is required, Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 225 and therefore **denies** the allegations in Paragraph 225.

226.    Madoff's name was not allowed to appear as the custodian, primary broker, or manager for any fund.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 226 and therefore **denies** the allegations in Paragraph 226.

227.    UBS complied with Madoff's demand for secrecy. In addition to omitting Madoff's name from LIF-USEP's offering documents and the Control Report on custodian bank functions submitted to the CSSF, UBS SA also took steps to remove all references to Madoff from UBS audit reports prepared by Ernst & Young. UBS SA requested Ernst & Young remove Madoff's name from the March 2006 long form report for LIF-USEP, something it had already agreed to for the equivalent report for the Luxalpha fund after "very long discussions on the subject" with a UBS SA executive. That same executive later cautioned another UBS SA executive that "[o]ne has to be careful about everything" when it comes to ensuring Madoff's name remains undisclosed. UBS SA chose to risk regulatory and legal sanctions rather than jeopardize its lucrative relationship with BLMIS.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 227 and therefore **denies** the allegations in Paragraph 227.

228.   Reliance similarly omitted Madoff from its marketing materials to existing and potential clients in violation of applicable law. For example, a January 2008 draft version of Reliance's Due Diligence Questionnaire for LIF-USEP did not even mention that the sub-fund's assets had been entrusted to a sub-custodian—BLMIS. Rather, the document misleadingly stated that UBS SA was LIF-USEP's prime broker and custodian of its assets. Justin Lowe also discussed Madoff's "sensitivity" in an email regarding the drafting of Defender's offering memorandum, explaining that Madoff would not review the offering memorandum and that Madoff "d[id] not care as long as his name does not appear."

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 228 and therefore **denies** the allegations in Paragraph 228.

229.   Reliance again evinced its willingness to take steps to maintain Madoff's secrecy when, in an email discussing Reliance's relationship with a third-party distributor, Lowe wrote that he did not "want these guys mentioning the word Madoff . . . If they do that and I get hold of them then I want to be able to terminate immediately."

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 229 and therefore **denies** the allegations in Paragraph 229.

### C.   Madoff's Auditor Was Neither Qualified Nor Capable of Auditing a Global Investment Management Company with Billions of Dollars Under Management

230.   BLMIS's auditor was Friehling & Horowitz, a three-person accounting firm based in a strip mall in Rockland County, New York. Of the three employees at the firm, one was a licensed CPA, one was an administrative assistant, and one was a semi-retired accountant living in Florida.

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 230 and therefore **denies** the allegations in Paragraph 230.

231.   Reliance knew that BLMIS was using a small, unknown auditing firm for the reports it filed with the SEC and provided to investors. One senior Reliance analyst warned his superiors that Friehling & Horowitz "looks so sketchy to me: why would they use an unheard of accountant in New City, New York . . . ?" Nevertheless, the Defendants failed to perform any independent, meaningful, or reasonable investigation of Friehling & Horowitz.

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 231 and therefore **denies** the allegations in Paragraph 231.

232.   The Defendants were aware that Friehling & Horowitz was incapable of providing auditing services to a global investment adviser of BLMIS's purported size, with billions of dollars under management.

**ANSWER:**  Defendant **denies** the allegations of Paragraph 232 with respect to M&B. Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 232 and therefore **denies** the remaining allegations in Paragraph 232.

233.    As sophisticated market participants, M&B, Reliance, and UBS also had to know that all accounting firms that perform audit work must enroll in the American Institute of Certified Public Accountants' ("AICPA") peer review program. This program requires audit firms to submit to periodic peer review by experienced auditors. The results of these peer reviews are on public file with the AICPA. Friehling & Horowitz never appeared on the public peer review list because Friehling and Horowitz had notified the AICPA that it did not perform audits.

**ANSWER:**  Defendant **denies** that M&B was aware that accounting firms that perform audit work must enroll in the AICPA peer review program. Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 233 and therefore **denies** the remaining allegations in Paragraph 233.

### XII.    LIF-USEP'S TRADE STATEMENTS CONTAINED FURTHER INDICIA OF FRAUD

### A.    BLMIS Purported to Trade Equities Outside the Daily Reported Price Range

234.    BLMIS trade confirmations showed the prices for every purported purchase and sale of stocks and options. The LIF-USEP BLMIS trade confirmations showed trades executed outside the daily price range.

**ANSWER:**  Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 234 and therefore **denies** the allegations in Paragraph 234.

235.    On at least four occasions, BLMIS sent trade confirmations for LIF-USEP's account showing stock trades that could not have occurred because they took place outside of the range of stock prices on the day of the purported trades. These impossibly priced transactions represented more than 117,000 shares of stock. For example, BLMIS's records for LIF-USEP's account reflect that 46,659 shares of Merck (MRK) were sold for $44.61 with a trade date of December 22, 2006 and settlement date of December 28, 2006. This was impossible given that the actual price range for Merck on December 22, 2006 ranged from $42.78 to $43.42.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 235 and therefore **denies** the allegations in Paragraph 235.

236.    Reliance and the UBS Defendants, all of which received and reviewed copies of BLMIS's trade confirmations for LIF-USEP, were aware of these impossibilities.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 236 and therefore **denies** the allegations in Paragraph 236.

### B.    LIF-USEP Regularly Had Negative Cash Balances with BLMIS

237.    On at least 15 occasions, for a total of 40 days, LIF-USEP's cash balance with BLMIS had a negative value. When LIF-USEP's cash balance was negative, its average value was negative $4,727,578.99.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 237 and therefore **denies** the allegations in Paragraph 237.

238.    Three such instances occurred in LIF-USEP's account in December 2007 alone.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 238 and therefore **denies** the allegations in Paragraph 238.

239.    On December 3, 2007, UBS SA requested a $16,000,000 withdrawal from the account. At the time of the request, the account's cash balance was $0.75. On December 4, 2007, BLMIS issued a $16,000,000 wire, resulting in an account balance of negative $15,940,292.47. Only on December 5, when Treasury Bills were purportedly sold did the account regain a positive balance.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 239 and therefore **denies** the allegations in Paragraph 239.

240.    On December 17, 2007, UBS SA requested a $3,000,000 withdrawal from the account. BLMIS issued a $3,000,000 wire on December 18, 2007, resulting in an account balance of negative $2,789,862.80. Only on December 20, 2007, when equities and put options were purportedly sold, did the account regain a positive balance.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 240 and therefore **denies** the allegations in Paragraph 240.

241.    On December 21, 2007, UBS SA requested a $15,000,000 withdrawal from the account. BLMIS issued a $15,000,000 wire on December 24, 2007, resulting in an account

balance of negative $14,789,862.49. Only on December 31, 2007, when Treasury Bills were purportedly sold, did the account regain a positive balance.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 241 and therefore **denies** the allegations in Paragraph 241.

242.    UBSFSL, as LIF-USEP's administrator, tracked the fund's cash balance, and noted that, from time to time, the funds had a negative cash balance. For example, in July 2006, UBSFSL recognized that LIF-USEP had been in an "overdraft position" for several weeks and attempted to obtain an explanation for that "leverage situation."

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 242 and therefore **denies** the allegations in Paragraph 242.

243.    LIF-USEP did not have margin accounts with BLMIS and BLMIS never charged LIF-USEP any interest for its margin trades, effectively providing millions of dollars of interest-free loans. No legitimate institution would have advanced LIF-USEP millions of dollars at zero percent interest.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 243 and therefore **denies** the allegations in Paragraph 243.

### C.    LIF-USEP's Statements Show Impossible Dividend Activity

244.    At various times when not in the market, BLMIS customer funds were purportedly invested in a money market fund that also paid dividends. Typically, money market funds declare dividends daily and pay them monthly. If an entity transacts in a money market fund multiple times in one month, that activity is tracked, the proper dividend is accrued for the days invested, and the dividend is paid once per month.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 244 and therefore **denies** the allegations in Paragraph 244.

245.    LIF-USEP's customer statements and trade confirmations reflected numerous anomalies relating to dividends. Eighty percent of the money market dividends purportedly received were noted as being received on dates different than the disclosed dividend payment dates. In addition, in all of the 33 months in which money market dividends were paid, the statements noted multiple payments in the same month—even though the money market funds at issue paid dividends only once a month.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 245 and therefore **denies** the allegations in Paragraph 245.

### D.    BLMIS Reported Trades for LIF-USEP that Were Inconsistent with the SSC Strategy

246.    Madoff's options trades on behalf of LIF-USEP often showed significant gains from speculative options trades that were inconsistent with the SSC strategy. Some of these reported transactions involved short-term options trading that resulted in substantial gains for LIF-USEP. For example, in 2008, LIF-USEP participated in two such trades, which generated gains of approximately $5.9 million. These gains were purportedly achieved through speculation in the options market, which is inconsistent with the SSC strategy.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 246 and therefore **denies** the allegations in Paragraph 246.

247.    Also inconsistent with the SSC strategy were multiple instances in which Madoff purported to sell a specific stock or stocks from a basket before the rest of the basket was liquidated. Not only was the premature sale of stock inconsistent with the SSC strategy, but the liquidation of these positions should have caused Madoff to adjust the options collar for the basket, which he almost always failed to do. When purported hedges were not adjusted based on changes in the value of the equity position, the BLMIS position would, if real, have been left exposed to market risk, and this additional risk was not an element of the SSC strategy. For example, LIF-USEP's account statements indicate that in April 2007, BLMIS purported to purchase a basket of S&P 100 Index stocks that included shares of 3M Company and CVS Caremark Corp. The shares of 3M Company and CVS Caremark were sold in May 2007 whereas the other equities contained in the basket were not sold until June 2007. In light of the early sale of the 3M and CVS Caremark shares, the corresponding options collar should have been rebalanced to protect against exposure to market risk. No such adjustment was reflected in the customer statements or trade confirmations.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 247 and therefore **denies** the allegations in Paragraph 247.

248.    Both of these trading activities contradicted the SSC strategy and were known to Reliance and UBS, which regularly reviewed Madoff's account statements and trade confirmations.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 248 and therefore **denies** the allegations in Paragraph 248.

### E.    Madoff' Practice of Providing Only Hard Copy Trade Confirmation Defied Industry Practice and Facilitated Fraud

249.    Reliance knew that it received trade confirmations from BLMIS only in a hard copy, paper format and that these were delayed because they were sent via regular mail, sometimes several days after the purported trade.

**ANSWER:**  Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 249 and therefore **denies** the allegations in Paragraph 249.

250.    Reliance also repeatedly recognized that receipt of paper-only trade confirmations impeded its ability to monitor BLMIS's purported trading activity. For instance, Lowe called BLMIS in September 2007 to ask why Reliance had not yet received trade confirmations. Lowe reported that BLMIS personnel informed him that "it happens sometimes that tickets are late . . . and we should give it more time." In July 2008, Trevor Uhl of RIR noted in an email to Emilio Botín O'Shea (Javier Botín's brother and the head of SwissRisk, a major Defender Fund investor), that the receipt of paper trade confirmations was "one of our key challenges in monitoring the Madoff accounts." Uhl explained that Reliance could not guarantee a timetable for the delivery of the funds' portfolio because "[t]rade tickets are shipped to our office via post without advance notice."

**ANSWER:**  Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 250 and therefore **denies** the allegations in Paragraph 250.

251.    UBS also repeatedly asked Madoff for electronic trade and transfer information, but was rebuffed each time. In a January 13, 2006 email, a UBS SA managing director stated: "Unfortunately although we submitted this request [for electronic data] several times the answer remains still no."

**ANSWER:**  Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 251 and therefore **denies** the allegations in Paragraph 251.

252.    As a result of BLMIS's delays in providing trade information, Reliance Gibraltar provided UBS SA with backdated monthly investment recommendations for LIF-USEP.

**ANSWER:**  Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 252 and therefore **denies** the allegations in Paragraph 252.

**F.    BLMIS's Trade Confirmations Frequently Contained Settlement Anomalies in Purported Options Transactions**

253.    According to industry standards, the settlement date for exchange-listed options is the business day following the trade date, referred to as "T+1." Indeed, all of the options trade confirmations provided by BLMIS showed CBOE-traded OEX options, which would have been subject to the T+1 settlement date. Yet 80% of trade confirmations produced by BLMIS for LIF-USEP's purported options transactions settled at least three business days after execution and were thus out of compliance with standard market practice.

**ANSWER:**  Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 253 and therefore **denies** the allegations in Paragraph 253.

G.    **BLMIS Avoided Reporting Requirements by Consistently Claiming to Be Out of the Market at Quarter-End and Year-End Even Though Such Behavior Was Inconsistent with the SSC Strategy**

254.    Various SEC reporting requirements are triggered when securities are invested in the market at either the end of the quarter or the end of the year. To evade these reporting requirements, Madoff purported to liquidate all investments at those times, and to invest the proceeds in Treasury Bills.

**ANSWER:** Defendant **avers** that the allegations in Paragraph 254 state legal conclusions to which no response is required. To the extent any further response is required, Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 254 and therefore **denies** the allegations in Paragraph 254.

255.    LIF-USEP's account statements showed no equity positions at quarter- and year-end.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 255 and therefore **denies** the allegations in Paragraph 255.

256.    Madoff's practice of exiting the market according to the calendar, rather than market or economic indicators, was a badge of fraud. Defendants knew that Madoff touted "market timing" as a cornerstone of the SSC strategy and that Madoff's practice of liquidating all stocks and options at quarter- and year-end contravened that strategy because it meant that Madoff was locked into whatever market conditions existed at those times, regardless of whether they were favorable. Such trading was inconsistent with the SSC strategy.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 256 and therefore **denies** the allegations in Paragraph 256.

XIII.   **IMPUTATION OF KNOWLEDGE FROM UBS, RELIANCE, M&B, AND ECHEVERRÍA TO LIF AND LIF-USEP**

257.    M&B, Reliance, and UBS were intertwined with respect to LIF and LIF-USEP, working closely together in creating and servicing LIF-USEP and expanding its BLMIS investment.

**ANSWER:** Defendant **admits** that M&B, Reliance, and UBS were each involved in LIF-USEP. Defendant **denies** the remaining allegations in Paragraph 257.

258.    At all times, M&B, Reliance, and UBS dominated and controlled LIF-USEP. LIF-USEP never had any employees or office space, but rather listed a UBS address as its

own and stocked its board with UBS employees. M&B, Reliance, and UBS operated the fund as a common enterprise, of which they were the constituent parts.

**ANSWER:** Defendant **admits** that LIF-USEP never had any employees or office space, that it listed a UBS address as its own, and that UBS employees served on LIF-USEP's board.. Defendant **denies** the remaining allegations in Paragraph 258.

259.    M&B, Reliance, and UBS created and ran LIF-USEP. UBS entities served as LIF-USEP's official sponsor, custodian, administrator, and manager. M&B and Reliance served as the fund's distributor and advisor. The UBS Defendants and Reliance received LIF-USEP's BLMIS account statements and trade confirmations. Upon information and belief, M&B also received LIF-USEP's BLMIS account statements and trade confirmations.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth of whether UBS and Reliance received such statements and confirmations and therefore **denies** these allegations. Defendant **denies** the remaining allegations in Paragraph 259.

260.    LIF-USEP's board of directors was at all times composed of UBS SA personnel. As LIF-USEP directors, the UBS SA personnel's conduct and/or direct knowledge of fraud at BLMIS is imputed to the fund.

**ANSWER:** Defendant **avers** that the allegations in Paragraph 260 state legal conclusions to which no response is required. To the extent any further response is required, Defendant **admits** that UBS SA employees served on LIF-USEP's board. Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 260 and therefore **denies** the allegations in Paragraph 260.

261.    Echeverría regularly communicated with Madoff in person, by telephone, and by fax regarding LIF-USEP's establishment and operations. He also regularly communicated with Reliance about BLMIS and LIF-USEP. At least fifty times during LIF-USEP's existence, Echeverría communicated with Madoff, Reliance, or UBS on LIF-USEP's and M&B's behalf, in furtherance of the effort to expand BLMIS investment.

**ANSWER:** Defendant **denies** that Echeverria communicated with Madoff on M&B's behalf. Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 261 and therefore **denies** the allegations in Paragraph 261.

262.    At all relevant times, Echeverría was LIF-USEP's and M&B's agent with respect to LIF-USEP and its investments with BLMIS, such that Echeverría's knowledge of fraud at BLMIS is imputed to LIF, LIF-USEP, and M&B.

**ANSWER:**  Defendant **avers** that the allegations in Paragraph 163 state legal conclusions to which no response is required. To the extent any further response is required, Defendant **denies** that "Echeverría was … M&B's agent … such that Echeverría's knowledge of fraud at BLMIS is imputed to … M&B." Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 262 and therefore **denies** the remaining allegations in Paragraph 262.

263.    M&B, Reliance, and UBS were LIF-USEP's agents, and their conduct and willful blindness to BLMIS's fraud is imputed to LIF-USEP.

**ANSWER:**  Defendant **avers** that the allegations in Paragraph 263 state legal conclusions to which no response is required. To the extent any further response is required, Defendant **denies** that "M&B . . . [was] LIF-USEP's agent" and that "[its alleged] conduct and willful blindness to BLMIS's fraud is imputed to LIF-USEP." Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 263 and therefore **denies** the remaining allegations in Paragraph 263.

## XIV.    THE TRANSFERS

### A.    The Initial Transfers

264.    Before the Filing Date, LIF-USEP maintained BLMIS account no. 1FR123 (the "Account"), as set forth on Exhibit A. LIF-USEP executed, or caused to be executed, BLMIS Account Opening Agreements (as defined herein) for its account, and delivered, or caused those documents to be delivered to BLMIS at BLMIS's headquarters at 885 Third Avenue, New York, New York.

**ANSWER:**  Defendant **admits** that LIF-USEP maintained BLMIS account No. 1FR123. Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 264 and therefore **denies** the remaining allegations in Paragraph 264.

265.    The BLMIS Account Opening Agreements were to be performed in New York through securities trading activities that would take place there. The Account were held in New York and LIF-USEP sent funds to BLMIS and/or to BLMIS's account at JPMorgan Chase in New York, Account No. xxxxxxxxxx1703 (the "703 Account"), for application to the Account and the purported conducting of trading activities.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 265 and therefore **denies** the allegations in Paragraph 265.

266.    During the two years preceding the Filing Date, BLMIS made transfers to or for the benefit of LIF-USEP in the amount of at least $498,300,000 (the "Initial Transfers"). The Initial Transfers are avoidable under section 548 of the Bankruptcy Code, and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3). The Initial Transfers are recoverable under section 550(a)(1) of the Bankruptcy Code, and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

**ANSWER:** Defendant **avers** that the allegations in Paragraph 266 state legal

conclusions to which no response is required. To the extent any further response is required,

Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in

Paragraph 266 and therefore **denies** the allegations in Paragraph 266.

267.    The numerous indicia of BLMIS's fraud, and LIF-USEP's continued BLMIS investment despite those indicia of fraud, demonstrates a motive and opportunity to commit fraud, and/or conscious misbehavior or recklessness amounting to fraudulent intent. LIF-USEP was neither innocent nor a good faith investor.

**ANSWER:** Defendant **avers** that the allegations in Paragraph 267 state legal

conclusions to which no response is required. To the extent any further response is required,

Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in

Paragraph 267 and therefore **denies** the allegations in Paragraph 267.

268.    LIF-USEP had information that put it on actual notice of fraud at BLMIS, that BLMIS was insolvent, and/or that the transfers might have been made with a fraudulent purpose, and strategically chose to ignore that information in order to continue to enrich itself through its relationship with Madoff and BLMIS.

**ANSWER:** Defendant **avers** that the allegations in Paragraph 268 state legal

conclusions to which no response is required. To the extent any further response is required,

Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 268 and therefore **denies** the allegations in Paragraph 268.

269.    Charts setting forth the Initial Transfers are included as Exhibit B. The Initial Transfers were and continue to be customer property within the meaning of 15 U.S.C. § 78lll(4).

**ANSWER:**    Defendant **avers** that the allegations in Paragraph 269 state legal conclusions to which no response is required. To the extent any further response is required, Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 269 and therefore **denies** the allegations in Paragraph 269.

### B.    The Subsequent Transfers

270.    Based on the Trustee's investigation to date, LIF-USEP subsequently transferred some of the Initial Transfers to the UBS Defendants, M&B, and RIR (the "Subsequent Transferee Defendants") as payment for their alleged service of LIF-USEP. All of these payments constitute subsequent transfers of Initial Transfers. All avoidable transfers from BLMIS to LIF-USEP, which it subsequently transferred, either directly or indirectly, to the Subsequent Transferee Defendants (the "Subsequent Transfers"), are recoverable from the Subsequent Transferee Defendants under § 550(a) of the Bankruptcy Code and applicable provisions of SIPA.

**ANSWER:**    Defendant **avers** that the allegations in Paragraph 270 state legal conclusions to which no response is required. To the extent any further response is required, Defendant **admits** that it received transfers from LIF-USEP. Defendant **lacks knowledge** sufficient to form a belief as to truth of whether UBS and RIR received such transfers, and therefore **denies** these allegations. Defendant **denies** the remaining allegations in Paragraph 270.

271.    Based on the Trustee's investigation to date, the UBS Defendants received at least $18,537,826 million in subsequent transfers from LIF-USEP:

a. UBS SA received at least $5,162,211 in fees from LIF-USEP for serving as LIF-USEP's official custodian from September 2005 to December 2008, and received another $291,368 in fees for serving as LIF-USEP's official manager from September 2005 through at least April 2006. 10-05311-cgm Doc 284 Filed 02/24/23 Entered 02/24/23 15:14:34 Main Document Pg 63 of 74 64

b. UBSFSL received at least $747,560 in fees from LIF-USEP for serving as LIF-USEP's official administrator from September 2005 to December 2008.

c. UBSTPM received at least $10,590,437 in fees from LIF-USEP for serving as LIF-USEP's official manager from May 2006 to December 2008.

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 271 and therefore **denies** the allegations in Paragraph 271.

272.    Based on the Trustee's investigation to date, M&B (including M&B SGIIC, which merged into M&B) received at least $9,803,268 in subsequent transfers from LIF-USEP:

a. M&B received at least $6,024,082 in trailing and distribution fees from UBS SA and UBSTPM, consisting of management fees UBS SA and UBSTPM received from LIF-USEP in connection with M&B's role as LIF-USEP's distributor from September 2005 to December 2008.

b. Between 2006 and 2007, LIF-USEP transferred at least $2,878,597 to M&B in connection with M&B's proprietary investments.

c. Between 2006 and 2007, LIF-USEP transferred at least $900,590 to M&B SGIIC in connection with M&B SGIIC's proprietary investments.

**ANSWER:**   Defendant **admits** that

a. M&B SV (not including M&B SCIIC) received $5,953,981.03 in distribution fees from UBS SA from April 2006 to October 2008.

b. Between 2006 and 2007, LIF-USEP transferred at least $2,878,597 to M&B SV (not including M&B SGIIC) in connection with M&B's (not including M&B SGIIC's) proprietary investments.

c. Between 2006 and 2007, LIF-USEP transferred at least $900,590 to M&B SGIIC in connection with M&B SGIIC's proprietary investments.

Defendant **denies** the remaining allegations in Paragraph 272.

273.    Based on the Trustee's investigation to date, RIR received at least $4,324,482 in subsequent transfers from LIF-USEP:

a. Reliance Gibraltar received at least $2,358,709 in advisory fees from UBS SA and UBSTPM, consisting of management fees UBS SA and UBSTPM received from LIF-USEP in connection with Reliance Gibraltar's role as LIF-USEP's investment advisor from September 2005 to December 2008.

b. Upon information and belief, Reliance Gibraltar received additional fees from UBS SA and UBSTPM based upon amounts collected from LIF-USEP.

c. Reliance Gibraltar shared a portion of these fees with RIR. From January 2006 through December 2008, Reliance Gibraltar transferred at least $4,324,482 to RIR's New York bank account in connection with the provision of services to all investment funds.

**ANSWER:** Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 273 and therefore **denies** the allegations in Paragraph 273.

274.    To the extent that any of the avoidance and recovery counts may be inconsistent with each other, they are to be treated as being pleaded in the alternative.

**ANSWER:** Defendant **avers** that the allegations in Paragraph 274 state legal

conclusions to which no response is required. To the extent any further response is required,

Defendant **admits** that the Trustee seeks such treatment of its pleadings and **denies** the

remaining allegations in Paragraph 274.

275.    The Trustee's discovery and investigation is ongoing, and the Trustee reserves the right to: (i) supplement the information on the Initial Transfers, the Subsequent Transfers, and any additional transfers; and (ii) seek avoidance and recovery of such transfers.

**ANSWER:** Defendant **admits** that the Trustee's discovery and investigation is

ongoing and that the Trustee seeks to reserve such rights, and **denies** the remaining

allegations in Paragraph 275.

276.    The following chart summarizes the Initial Transfers and the Subsequent Transfers:



**ANSWER:**  Defendant **admits** that M&B received transfers from UBS entities and

LIF-USEP, **lacks knowledge** sufficient to form a belief as to truth of whether UBS entities,

Reliance, and RIR received such transfers, and therefore **denies** these allegations, and

**denies** the remaining allegations in Paragraph 276.

## XV.    CUSTOMER CLAIMS

277.    On or about March 2, 2009, a customer claim was filed with the Trustee and
designated as Claim No. 004417. On March 3, 2009, a customer claim was filed with the
Trustee and designated as Claim No. 006182. Claim Nos. 004417 and 006182 were signed by
Ralf Schroeter and Alan Hondequin and each claim was in the amount of $492,145,401.25.
Messrs. Schroeter and Hondequin were UBS employees as well as LIF-USEP directors. In
addition, on or about March 2, 2009, UBS SA filed with the Trustee an additional claim on
behalf of LIF-USEP, designated as Claim No. 004536, also in the amount of $492,145,401.25.
These customer claims are collectively referred to herein as the "Customer Claims." The
Trustee objected to the Customer Claims.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 277 and therefore **denies** the allegations in Paragraph 277.

278.    LIF-USEP has taken the position that a factual dispute exists with regard to whether LIF-USEP itself maintained an account at BLMIS or filed the Customer Claims.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 278 and therefore **denies** the allegations in Paragraph 278.

279.    Specifically, LIF-USEP has asserted that UBS SA maintained and legally owned Account 1FR123.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 279 and therefore **denies** the allegations in Paragraph 279.

280.    LIF-USEP has also disavowed the Customer Claims by asserting that UBS SA, and not LIF-USEP, filed the Customer Claims and that UBS SA did so only for purposes of protecting its own interests—not in LIF-USEP's interest—and limiting UBS's potential liability to LIF-USEP in Luxembourg.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 280 and therefore **denies** the allegations in Paragraph 280.

281.    There continues to be an ongoing litigation between LIF-USEP and UBS in Luxembourg.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 281 and therefore **denies** the allegations in Paragraph 281.

282.    LIF-USEP has further asserted that neither its BLMIS account nor the Customer Claims can be attributed to LIF-USEP for purposes of determining whether LIF-USEP had contact with or otherwise availed itself of the privileges of conducting activities within this jurisdiction.

**ANSWER:**    Defendant **lacks knowledge** sufficient to form a belief as to the truth

of the allegations in Paragraph 282 and therefore **denies** the allegations in Paragraph 282.

283.    Although LIF-USEP has acknowledged that UBS SA was an agent of LIF-USEP, it has asserted that there is a question as to whether UBS SA, as such agent, was acting within the scope of its authority when it filed the Customer Claims.

**ANSWER:**   Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 283 and therefore **denies** the allegations in Paragraph 283.

<u>**COUNT ONE**</u>
<u>**EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS**</u>

*Against LIF and LIF-USEP*

284.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this complaint as if fully rewritten herein.

**ANSWER:**   Count One of the Complaint is not directed at Defendant, and therefore no response is required. To the extent any response is required, Defendant **incorporates by reference** its responses to the allegations contained in each of the previous paragraphs of this Answer as if fully rewritten in this paragraph.

285.    LIF and LIF-USEP engaged in inequitable conduct, including the conduct described in this complaint.

**ANSWER:**   Count One of the Complaint is not directed at Defendant, and therefore no response is required. To the extent any response is required, Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 285 and therefore **denies** the allegations in Paragraph 285.

286.    Based on LIF's and LIF-USEP's inequitable conduct, BLMIS's customers were misled as to BLMIS's true financial condition, and were induced to invest without knowledge of the actual facts regarding BLMIS's financial condition, and/or customers and creditors are less likely to recover the full amounts due to them.

**ANSWER:**   Count One of the Complaint is not directed at Defendant, and therefore no response is required. To the extent any response is required, Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 286 and therefore **denies** the allegations in Paragraph 286.

287.    LIF's and LIF-USEP's conduct enabled Madoff to prolong the Ponzi scheme that resulted in injury to all customers and creditors of the BLMIS estate and conferred an unfair advantage on LIF and LIF-USEP.

**ANSWER:**   Count One of the Complaint is not directed at Defendant, and therefore no response is required. To the extent any response is required, Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 287 and therefore **denies** the allegations in Paragraph 287.

288.   LIF and LIF-USEP inflicted harm to the estate far in excess of the fraudulent transfers it received. LIF and LIF-USEP harmed the estate by directing more than $750 million into the Ponzi scheme during a time in which it was willfully blind to the fraud at BLMIS, which significantly contributed to the Ponzi scheme's expansion.

**ANSWER:**   Count One of the Complaint is not directed at Defendant, and therefore no response is required. To the extent any response is required, Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 288 and therefore **denies** the allegations in Paragraph 288.

289.   The Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by LIF and LIF-USEP, directly or indirectly against the estate—and only to the extent such claims are allowed—are subordinated for distribution purposes pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code to the allowed claims of all other customers and creditors of BLMIS.

**ANSWER:**   Count One of the Complaint is not directed at Defendant, and therefore no response is required. To the extent any response is required, Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 289 and therefore **denies** the allegations in Paragraph 289.

290.   Equitable subordination, as requested herein, is consistent with the provisions and purposes of the Bankruptcy Code.

**ANSWER:**   Count One of the Complaint is not directed at Defendant, and therefore no response is required. To the extent any response is required, Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 290 and therefore **denies** the allegations in Paragraph 290.

**COUNT TWO**
**FRAUDULENT TRANSFERS**
**11 U.S.C. §§ 105(a), 502(d), 548(a)(1)(A), 550(a), AND 551**

***Against LIF-USEP***

291.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this complaint as if fully rewritten herein.

**ANSWER:**    Count Two of the Complaint is not directed at Defendant, and therefore no response is required. To the extent any response is required, Defendant **incorporates by reference** its responses to the allegations contained in each of the previous paragraphs of this Answer as if fully rewritten in this paragraph.

292.    Each of the Initial Transfers was made on or within two years before the Filing Date.

**ANSWER:**    Count Two of the Complaint is not directed at Defendant, and therefore no response is required. To the extent any response is required, Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 292 and therefore **denies** the allegations in Paragraph 292.

293.    Each of the Initial Transfers constituted a transfer of an interest of BLMIS in property within the meaning of 11 U.S.C. §§ 101(54) and 548(a), and pursuant to 15 U.S.C. § 78fff-2(c)(3).

**ANSWER:**    Count Two of the Complaint is not directed at Defendant, and therefore no response is required. To the extent any response is required, Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 293 and therefore **denies** the allegations in Paragraph 293.

294.    Each of the Initial Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors. BLMIS made the Initial Transfers to or for the benefit of LIF-USEP in furtherance of a fraudulent investment scheme.

**ANSWER:**    Count Two of the Complaint is not directed at Defendant, and therefore no response is required. To the extent any response is required, Defendant **lacks knowledge**

sufficient to form a belief as to the truth of the allegations in Paragraph 294 and therefore

**denies** the allegations in Paragraph 294.

295.    Each of the Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from LIF-USEP pursuant to section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-(2)(c)(3).

**ANSWER:**    Count Two of the Complaint is not directed at Defendant, and therefore

no response is required. To the extent any response is required, Defendant **lacks knowledge**

sufficient to form a belief as to the truth of the allegations in Paragraph 295 and therefore

**denies** the allegations in Paragraph 295.

296.    As a result of the foregoing, pursuant to sections 105(a), 502(d), 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against LIF-USEP: (a) avoiding and preserving the Initial Transfers; (b) directing that the Initial Transfers be set aside; (c) recovering the Initial Transfers, or the value thereof, for the benefit of the estate of BLMIS; (d) disallowing any claim that LIF-USEP may have against the Debtors until such time as the Initial Transfers are repaid to the Trustee; (e) awarding attorneys' fees and costs from LIF-USEP; and (f) awarding any other relief the Court deems just and appropriate.

**ANSWER:**    Count Two of the Complaint is not directed at Defendant, and therefore

no response is required. To the extent any response is required, Defendant **lacks knowledge**

sufficient to form a belief as to the truth of the allegations in Paragraph 296 and therefore

**denies** the allegations in Paragraph 296.

## <u>COUNT THREE</u>
## <u>RECOVERY OF SUBSEQUENT TRANSFERS: 11 U.S.C. §§ 105(a) and 550(a)</u>

### *Against the Subsequent Transferee Defendants*

297.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully realleged herein.

**ANSWER:**    Defendant **incorporates by reference** its responses to the allegations

contained in each of the previous paragraphs of this Answer as if fully rewritten in this

paragraph.

298.    Each of the Initial Transfers is avoidable under sections 544, 548, and/or 550 of the Bankruptcy Code.

**ANSWER:**    Defendant **avers** that the allegations in Paragraph 298 state legal conclusions to which no response is required. To the extent any further response is required, Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 298 and therefore **denies** the allegations in Paragraph 298.

299.    Each of the Subsequent Transfers is recoverable from the Subsequent Transferee Defendants under section 550(a) of the Bankruptcy Code.

**ANSWER:**    Defendant **avers** that the allegations in Paragraph 299 state legal conclusions to which no response is required. To the extent any further response is required, Defendant **denies** that alleged "Subsequent Transfers" to M&B are recoverable. Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 299 and therefore **denies** the remaining allegations in Paragraph 299.

300.    Each of the Subsequent Transfers was made directly or indirectly to the Subsequent Transferee Defendants.

**ANSWER:**    Defendant **avers** that the allegations in Paragraph 300 state legal conclusions to which no response is required. To the extent any further response is required, Defendant **admits** that M&B received transfers from UBS entities and LIF-USEP and **denies** the remaining allegations in Paragraph 300.

301.    As a result of the foregoing, pursuant to sections 105(a) and 550(a) of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Subsequent Transferee Defendants: (a) recovering the Subsequent Transfers, or the value thereof, from the Subsequent Transferee Defendants for the benefit of the estate of BLMIS; (b) directing the Subsequent Transferee Defendants to the extent allowable by law, to disgorge to the Trustee all profits, including any and all management fees, incentive fees or other compensation and/or remuneration received by the Subsequent Transferee Defendants related to or arising from, or concerning the Subsequent Transfers from BLMIS to the Subsequent Transferee Defendants; (c) disallowing any claim that the Subsequent Transferee Defendants may have against the Debtors until such time as the Subsequent Transfers are repaid to the Trustee; (d) recovering attorneys' fees and costs from the Subsequent Transferee Defendants; and (e) awarding any other relief the Court deems just and appropriate.

80

**ANSWER:** Defendant **avers** that the allegations in Paragraph 301 state legal conclusions to which no response is required. To the extent any further response is required, Defendant **denies** that the Trustee is entitled to any judgment against M&B. Defendant **lacks knowledge** sufficient to form a belief as to the truth of the remaining allegations in Paragraph 301 and therefore **denies** the remaining allegations in Paragraph 301.

**COUNT FOUR**
**OBJECTION TO AND DISALLOWANCE OF CLAIMS**

*Against LIF and LIF-USEP*

302.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this complaint as if fully rewritten herein.

**ANSWER:** Count Four of the Complaint is not directed at Defendant, and therefore no response is required. To the extent any response is required, Defendant **incorporates by reference** its responses to the allegations contained in each of the previous paragraphs of this Answer as if fully rewritten in this paragraph.

303.    LIF and LIF-USEP are the recipients of Transfers of BLMIS's property that are avoidable and recoverable under SIPA section 78fff-2(c)(3), sections 544(b), 547, 548(a) and 550(a) of the Bankruptcy Code, and they have not returned the Transfers to the Trustee. As a result, pursuant to section 502(d) of the Bankruptcy Code, the Customer Claim must be disallowed unless and until LIF and LIF-USEP return the Transfers to the Trustee.

**ANSWER:** Count Four of the Complaint is not directed at Defendant, and therefore no response is required. To the extent any response is required, Defendant **lacks knowledge** sufficient to form a belief as to the truth of the allegations in Paragraph 303 and therefore **denies** the allegations in Paragraph 303.

304.    LIF and LIF-USEP were not innocent investors at the time they invested with BLMIS and provided no consideration to the estate.

**ANSWER:** Count Four of the Complaint is not directed at Defendant, and therefore no response is required. To the extent any response is required, Defendant **lacks knowledge**

sufficient to form a belief as to the truth of the allegations in Paragraph 304 and therefore

**denies** the allegations in Paragraph 304.

305.    LIF and LIF-USEP acted with actual knowledge of fraudulent activity at BLMIS at the time they invested with BLMIS. By their conduct, at the time they invested with BLMIS, they enabled Madoff to perpetuate the fraud at BLMIS.

**ANSWER:**    Count Four of the Complaint is not directed at Defendant, and therefore

no response is required. To the extent any response is required, Defendant **lacks knowledge**

sufficient to form a belief as to the truth of the allegations in Paragraph 305 and therefore

**denies** the allegations in Paragraph 305.

306.    Alternatively, LIF and LIF-USEP were willfully blind to numerous and serious indications of fraudulent activity at BLMIS, as described in this complaint.

**ANSWER:**    Count Four of the Complaint is not directed at Defendant, and therefore

no response is required. To the extent any response is required, Defendant **lacks knowledge**

sufficient to form a belief as to the truth of the allegations in Paragraph 306 and therefore

**denies** the allegations in Paragraph 306.

307.    As a result of their conduct, LIF and LIF-USEP are not entitled to the protections afforded by SIPA. Thus, LIF and LIF-USEP do not have a claim enforceable against the BLMIS estate under SIPA or other applicable law.

**ANSWER:**    Count Four of the Complaint is not directed at Defendant, and therefore

no response is required. To the extent any response is required, Defendant **lacks knowledge**

sufficient to form a belief as to the truth of the allegations in Paragraph 307 and therefore

**denies** the allegations in Paragraph 307.

308.    As a result of the conduct of LIF and LIF-USEP, as described above, pursuant to section 502(a) of the Bankruptcy Code, the Trustee's objections to LIF's and LIF-USEP's Customer Claims should be sustained and the claims be disallowed pursuant to section 502(b)(1) of the Bankruptcy Code.

**ANSWER:**    Count Four of the Complaint is not directed at Defendant, and therefore

no response is required. To the extent any response is required, Defendant **lacks knowledge**

sufficient to form a belief as to the truth of the allegations in Paragraph 308 and therefore **denies** the allegations in Paragraph 308.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense
(Personal Jurisdiction)

1.    This Court lacks personal jurisdiction over Defendant with respect to the claims asserted in the Complaint. Defendant does **not** consent to a decision by this Court or to this Court's authority to hear and determine this action.

### Second Affirmative Defense
(Failure to State a Claim for Relief)

2.    The Complaint fails to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable under Rule 7012(b) of the Federal Rules of Bankruptcy Procedure.

### Third Affirmative Defense
(Section 550(b)—Value, Good Faith, Without Knowledge of Voidability: LIF-USEP Subsequent Transfers)

3.    To the extent, if any, that Defendant received any LIF-USEP Subsequent Transfers, such LIF-USEP Subsequent Transfers may not be recovered because Defendant took such LIF-USEP Subsequent Transfers for value and in good faith and without knowledge of the voidability of the LIF-USEP Initial Transfers within the meaning of 11 U.S.C. § 550(b).

4.    **Value.** To the extent, if any, that Defendant received any LIF-USEP Subsequent Transfers, Defendant took the LIF-USEP Subsequent Transfers in exchange for LIF-USEP's redemption from Defendant of LIF-USEP's own shares or for services rendered to LIF-USEP, or both, and therefore took, if any, for value.

5.    **Good Faith.** Defendant began procuring investments in LIF-USEP in 2005 and investing in LIF-USEP in 2006. At the time each of the LIF-USEP Subsequent Transfers,

if any, was made, Defendant understood that LIF-USEP invested in U.S. securities primarily

through an account that LIF-USEP held at BLMIS, that BLMIS was founded and operated

by Bernard L. Madoff, that Madoff was a well-respected member of the investment

community and former chair of NASDAQ, that BLMIS was one of the largest market makers

in NASDAQ stocks and reported delivering consistent returns on investments, and that

BLMIS claimed to use a split strike conversion strategy to obtain these results, which

Defendant did not then know to be false.

6.      Defendant did not have any knowledge or awareness of concerns that some

investment professionals had raised about BLMIS. On and prior to the Filing Date,

Defendant did not have access to non-public information regarding BLMIS. Defendant

handled its procurement of investments in LIF-USEP and LIF-USEP account consistent with

other industry professionals based on publicly known information about LIF-USEP and

about BLMIS. None of the communications Defendant had with LIF-USEP or its directors,

officers, or employees or with BLMIS or any of its officers or employees, or with any other

party on or prior to the Filing Date revealed or suggested that BLMIS was not trading

securities or was a fraud or a Ponzi scheme or that LIF-USEP or its directors, officers, or

employees suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

To the extent, if any, that Defendant received any LIF-USEP Subsequent Transfers, at the

time each LIF-USEP Subsequent Transfer was made, Defendant did not have any knowledge

or awareness of concerns that some investment professionals had raised about BLMIS.

7.      At no time on or prior to the Filing Date was any director, officer, employee,

agent, or consultant of Defendant aware that BLMIS was not trading securities or was a

fraud or a Ponzi scheme or that LIF-USEP or its directors, officers, employees, agents, or

consultants knew or suspected that BLMIS was not trading securities or was a fraud or a Ponzi scheme.

8.      The LIF-USEP Subsequent Transfers (if any) did not have a fraudulent purpose but were routine investment placement fees and transfers in exchange for redemption of shares in LIF-USEP. A reasonable person with the facts in Defendant's possession at the time of each of the LIF-USEP Subsequent Transfers (if any) would not have been on inquiry notice of any fraudulent purpose behind such LIF-USEP Subsequent Transfers nor would those facts have led such a person to conduct further inquiry into whether there was a fraudulent purpose to such LIF-USEP Subsequent Transfers or the LIF-USEP Initial Transfers or whether BLMIS was trading securities or was a fraud or a Ponzi scheme. In fact, the SEC and FINRA had investigated and/or examined Madoff or BLMIS or both, or entities that did business with Madoff or BLMIS or both, and found no evidence of fraud at BLMIS, and Madoff proactively informed potential investors that the SEC had examined his operations to establish credibility and allay suspicions or investor doubts that may have arisen.

9.      A diligent inquiry by Defendant would not have discovered that BLMIS was not trading securities or was a fraud or a Ponzi scheme. Other entities with greater investigatory tools and resources than Defendant, and with more access to BLMIS personnel and documentation than Defendant, investigated BLMIS but failed to uncover that it was a Ponzi scheme before December 2008, including the SEC, which began an investigation into BLMIS in 2006 but could not determine BLMIS's fraudulent purpose. As alleged in paragraph 43 of the Amended Complaint, all funds that BLMIS received from its customers were commingled in a single account maintained at JPMorgan Chase Bank, were not used to trade securities, but rather were used to make distributions to, or payments for, other

customers, to benefit Madoff and his family personally, and to prop up Madoff's proprietary

trading business. Defendant did not have the capability nor the obligation of discovering what

United States SEC and FINRA inspectors could not have discovered and did not discover and

what JPMorgan Chase Bank did not discover as the fraudulent purpose of the LIF-USEP

Initial Transfers or, if there were any fraudulent purpose of the LIF-USEP Subsequent

Transfer (if any), of such fraudulent purpose, and as an entity without privity with BLMIS

or Madoff, did not have any reasonable ability to conduct a diligent investigation into BLMIS,

including into its IA business, that could have led to a discovery of the fraudulent purpose of

the LIF-USEP Initial Transfers.

10.    **Without Knowledge of the Voidability of the LIF-USEP Initial
Transfers.** Defendant did not have knowledge of the voidability of the LIF-USEP Initial

Transfers when they received each of the LIF-USEP Subsequent Transfers (if any).

**Fourth Affirmative Defense**
(Non-Avoidability of Initial Transfers Under Section 546(e)—Settlement Payment)

11.    Under section 546(e) of the Bankruptcy Code, the Initial Transfers are not

avoidable because they were settlement payments, as defined in section 101 or 741 of the

Bankruptcy Code, made before the commencement of the case by or to (or for the benefit of)

BLMIS, which was then a stockbroker, or LIF-USEP, which, on information and belief, was

then a financial institution or financial participant and, on information and belief, did not

have actual knowledge that BLMIS was not trading securities or was a fraud or a Ponzi

scheme. Because the Initial Transfers are not avoidable, property received by Defendant as

Subsequent Transfers (if any) is not recoverable from Defendant. In addition, at the times of

any Subsequent Transfers (if any) from LIF-USEP to Defendant, Defendant had no actual

knowledge that BLMIS was not trading securities or that it was a fraud or a Ponzi scheme.

### Fifth Affirmative Defense
(Non-Avoidability of Initial Transfers Under Section 546(e)—Securities Contract)

12.     Under section 546(e) of the Bankruptcy Code, the Initial Transfers were not avoided and are not avoidable because they were transfers made before the commencement of the case by or to (or for the benefit of) BLMIS, which was then a stockbroker, or LIF-USEP, which, on information and belief, was then a financial institution or financial participant, and, on information and belief, did not have actual knowledge that BLMIS was not trading securities or was a fraud or a Ponzi scheme, in connection with a securities contract, as defined in section 741(7) of the Bankruptcy Code, between BLMIS and LIF-USEP or between LIF-USEP and Defendant or both. Because the Initial Transfers are not avoidable, property received by Defendant as Subsequent Transfers (if any) is not recoverable from Defendant. In addition, at the time of each Subsequent Transfer (if any) from LIF-USEP to Defendant, Defendant had no actual knowledge that BLMIS was not trading securities or that it was a fraud or a Ponzi scheme.

### Eighth Affirmative Defense
(Not Customer Property—LIF-USEP Initial Transfers)

13.     The property, if any, that Defendant received from LIF-USEP was not Customer Property, or proceeds of Customer Property, that BLMIS transferred to LIF-USEP, and therefore the property is not recoverable by the Trustee from Defendant.

### Ninth Affirmative Defense
(Proceeds Not Recoverable—LIF-USEP Initial Transfers)

14.     In the alternative, to the extent that the property, if any, that Defendant received from LIF-USEP was proceeds of Customer Property or other property that BLMIS transferred to LIF-USEP, it is not recoverable by the Trustee from Defendant under section 550(a)(2) of the Bankruptcy Code.

### Tenth Affirmative Defense
### (Section 550(d)—Single Satisfaction—LIF-USEP Transfers)

15.     Under section 550(d) of the Bankruptcy Code, the Trustee may not recover from Defendant any subsequent transfer to the extent the Trustee has recovered from LIF-USEP or any other immediate or mediate transferee the amount of the avoided initial transfer that included the customer property that the Trustee alleges Defendant received.

### Eleventh Affirmative Defense
### (Section 550—Recovery/Single Satisfaction—Repayment or Restoration)

16.     To the extent, if any, that Defendant received Subsequent Transfers from LIF-USEP, after Defendant received the LIF-USEP Subsequent Transfers, Defendant transferred to LIF-USEP, for investment in LIF-USEP's account at the Debtor, approximately €400,000. Under section 550 of the Bankruptcy Code, the Trustee may not recover from Defendant any subsequent transfer to the extent that Defendant restored the subsequently transferred property to the Debtor.

### Twelfth Affirmative Defense
### (Extraterritoriality)

17.     The Trustee's recovery from Defendant of any transfer from LIF-USEP would constitute an impermissible extraterritorial application of U.S. law.

### Thirteenth Affirmative Defense
### (Comity)

18.     The Trustee's recovery from Defendant of any transfer from LIF-USEP would violate principles of comity.

### DEMAND FOR JURY TRIAL

Defendant **does not consent** to issuance or entry of final orders or judgments by the Bankruptcy Court and **demands trial by jury** before the District Court of all issues that may be tried by a jury.

**WHEREFORE** Defendant prays that Plaintiff Trustee take nothing by his complaint and that the Court grant Defendant such other relief, including an award of attorneys' fees, costs, and disbursements, as may be just.

Dated: December 22, 2023

Respectfully submitted,

By: */s/ Richard Levin*

JENNER & BLOCK LLP
Richard Levin
Carl Wedoff
1155 Avenue of the Americas
New York, NY 10036
(212) 891-1600

Vincent E. Lazar
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350

*Counsel for Defendant M&B Capital
Advisers Sociedad De Valores, S.A.*