**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | Adv. Pro. No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA Liquidation |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

In re:

BERNARD L. MADOFF,

      Debtor.

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 09-01364 (CGM) |
| Plaintiff, | **SECOND AMENDED COMPLAINT** |
| v. | |
| HSBC BANK PLC, HSBC BANK USA, N.A., HSBC USA, INC., and HSBC PRIVATE BANK (SUISSE) S.A., | |
| Defendants. | |

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff, | Adv. Pro. No. 12-01005 (CGM) |
| Plaintiff, | |
| v. | |

SICO LIMITED,

Defendant.

**GLOSSARY OF TERMS**

| TERM | DEFINITION |
|---|---|
| AFS | Alternative Fund Services |
| Alpha Prime | Alpha Prime Fund |
| Bank of Bermuda | Bank of Bermuda Limited |
| Defender | Defender Limited |
| Fairfield Sentry | Fairfield Sentry Limited |
| FGG | Fairfield Greenwich Group |
| GFS | Global Fund Services |
| Greenwich Sentry | Greenwich Sentry L.P. |
| GSFP | HSBC Global Structured Fund Products |
| Harley | Harley International (Cayman) Ltd. |
| Herald | Herald Fund SPC |
| Hermes | Hermes International Fund |
| HITSB | HSBC Institutional Trust Services (Bermuda) Limited |
| HITSI | HSBC Institutional Trust Services (Ireland) Limited |
| HSBC Administrators | HSSB, HSBC Bank Bermuda, HSSL, HSSI, and HSBC Fund Services |
| HSBC Bank Bermuda | HSBC Bank Bermuda Limited |
| HSBC Bank USA | HSBC Bank USA, N.A. |
| HSBC Cayman | HSBC Bank (Cayman) Limited |
| HSBC Fund Services | HSBC Fund Services (Luxembourg) S.A. |
| HSBC Guyerzeller | HSBC Guyerzeller Bank AG |

| | |
|---|---|
| HSBC Private Bank (Suisse) | HSBC Private Bank (Suisse) S.A. |
| HSBC USA | HSBC USA Inc. |
| HSS | HSBC Securities Services |
| HSSB | HSBC Securities Services (Bermuda) Limited |
| HSSI | HSBC Securities Services (Ireland) Limited |
| HSSL | HSBC Securities Services Luxembourg S.A. |
| Kingate Euro | Kingate Euro Fund Limited |
| Kingate Global | Kingate Global Fund Limited |
| Lagoon | Lagoon Investment Fund Limited |
| Landmark | Alternative Advantage Fund (a/k/a Landmark Investment Fund Ireland) |
| Primeo | Primeo Fund |
| Rye Broad Market | Rye Select Broad Market Fund L.P. |
| Rye Insurance | Rye Select Broad Market Insurance Portfolio LDC |
| Rye Portfolio | Rye Select Broad Market Portfolio Limited |
| Rye XL Portfolio | Rye Select Broad Market XL Portfolio Limited |
| Senator | Senator Fund SPC |
| SICO | SICO Limited |
| Thema International | Thema International plc |
| Thema Wise | Thema Fund Limited, and Thema Wise Investments Limited |
| Tremont Group | Tremont Group Holdings, Inc. |
| Tremont Partners | Tremont Partners, Inc. |

Plaintiff Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of

Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor

Protection Act, 15 U.S.C. §§ 78aaa–*lll* ("SIPA"),[1] substantively consolidated with the chapter 7

estate of Bernard L. Madoff ("Madoff," and with BLMIS, "Debtors"), by the Trustee's

undersigned counsel, for his Second Amended Complaint against HSBC Bank plc, HSBC Bank

USA, N.A., HSBC USA Inc., HSBC Private Bank (Suisse) S.A., and SICO Limited,

(collectively, "Defendants") states:

## I.    NATURE OF THE PROCEEDING

1.    In this proceeding, the Trustee seeks to recover at least $501,668,969 in

subsequent transfers of BLMIS customer property made to Defendants, as well as any other

relief the Court deems just, proper, and equitable.

2.    HSBC, at one time, was the self-professed "World's Local Bank." The

Defendants in this action worked as a singular whole through which information flowed. These

Defendants are all part of the HSBC group of companies, touting that group as "one of the

world's largest banking and financial services organizations [with a] global business [that]

serves around 39 million customers worldwide though a network that covers 62 countries and

territories." This group of companies (collectively referred to herein as "HSBC") had myriad

connections to BLMIS and Madoff, through investment with BLMIS feeder funds and

administrative, custodial, advisory, and many other related services they provided to various

funds that invested all or substantially all of their holdings with BLMIS.

---

[1] Hereinafter, applicable sections of SIPA shall be cited as SIPA § ____ and omit reference to title 15, United States Code.

3.      HSBC had a widespread presence in Madoff's business activities, with
connections in various forms to more than one-third of the assets purportedly under BLMIS's
management.

4.      Through these connections to BLMIS, HSBC derived substantial profits. HSBC
also gained extensive knowledge of BLMIS's operations, providing the Defendants with glaring
warnings that BLMIS was not what it purported to be.

5.      The sentiment that BLMIS was a "perfect structure for fraud" pervaded HSBC.
HSBC employees recognized that Madoff's end-to-end control of assets was irregular,
inconsistent with industry standards, and gave BLMIS the opportunity to commit fraud. HSBC
employees repeatedly raised concerns that Madoff was operating a Ponzi scheme.

6.      But despite uncovering increasing evidence of fraud and the red flags raised by
HSBC's employees and consultants, HSBC never took its inquiry to its logical conclusion: it
never sought proof of actual trade execution or the existence of purported assets under
management. Moreover, rather than retreat from its relationship with BLMIS, as many of its
officers recommended, HSBC *expanded* its relationship with BLMIS. HSBC also offered
leveraged investment products to third parties, effectively allowing investors to increase their
exposure to Madoff's scheme.

7.      HSBC's redemptions through various BLMIS feeder funds as a result of their
extensive involvement with BLMIS, are customer property as defined by SIPA section 78*lll*(4),
and must be returned to the Trustee for equitable distribution to BLMIS customers with
allowable claims.

## II.    SUBJECT MATTER JURISDICTION AND VENUE

8.      This is an adversary proceeding commenced in this Court, in which the main
underlying SIPA proceeding, No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending. The

2

SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

9.      This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O). The Trustee consents to the entry of final orders or judgment by this Court if it is determined that consent of the parties is required for this Court to enter final orders or judgment consistent with Article III of the U.S. Constitution.

10.     Venue in this judicial district is proper under 28 U.S.C. § 1409.

11.     This adversary proceeding is brought under SIPA §§ 78fff(b) and 78fff-2(c)(3), 11 U.S.C. §§ 105(a) and 550, and other applicable law.

## III.    BACKGROUND, THE TRUSTEE AND STANDING

12.     On December 11, 2008 (the "Filing Date"), Madoff was arrested by federal agents for criminal violations of federal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud. Contemporaneously, the Securities and Exchange Commission ("SEC") commenced the District Court Proceeding.

13.     On December 15, 2008, under SIPA § 78eee(a)(4)(A), the SEC consented to combining its action with an application by the Securities Investor Protection Corporation ("SIPC"). Thereafter, under SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, among other things, that BLMIS could not meet its obligations to securities customers as they came due and its customers needed the protections afforded by SIPA.

14.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA, which, in pertinent part:

(a)  appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

(b)  appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3); and

(c)  removed the case to this Court pursuant to SIPA § 78eee(b)(4).

15.    By orders dated December 23, 2008 and February 4, 2009, respectively, this Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate.

16.    On April 13, 2009, an involuntary bankruptcy petition was filed against Madoff, and on June 9, 2009, this Court substantively consolidated the chapter 7 estate of Madoff into the SIPA Proceeding.

17.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York. At the plea hearing, Madoff admitted he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."

18.    At a plea hearing on August 11, 2009, in the case captioned *United States v. DiPascali*, Case No. 09-CR-764 (RJS), Frank DiPascali, a former BLMIS employee, pleaded guilty to a ten-count criminal information charging him with participating in and conspiring to perpetuate the Ponzi scheme. DiPascali admitted that no purchases or sales of securities took place in connection with BLMIS customer accounts and that the Ponzi scheme had been ongoing at BLMIS since at least the 1980s.

19.    At a plea hearing on November 21, 2011, in the case captioned *United States v. Kugel*, Case No. 10-CR-228 (LTS), David Kugel, a former BLMIS trader and manager, pleaded guilty to a six-count criminal information charging him with securities fraud, falsifying the

records of BLMIS, conspiracy, and bank fraud. Kugel admitted to helping create false,

backdated trades in BLMIS customer accounts beginning in the early 1970s.

20.    On March 24, 2014, Daniel Bonventre, Annette Bongiorno, JoAnn Crupi, George

Perez, and Jerome O'Hara were convicted of fraud and other crimes in connection with their

participation in the Ponzi scheme as employees of BLMIS.

21.    As the Trustee appointed under SIPA, the Trustee is charged with assessing

claims, recovering and distributing customer property to BLMIS's customers holding allowed

customer claims, and liquidating any remaining BLMIS assets for the benefit of the estate and

its creditors. The Trustee is using his authority under SIPA and the Bankruptcy Code to avoid

and recover payouts of fictitious profits and/or other transfers made by the Debtors to customers

and others to the detriment of defrauded, innocent customers whose money was consumed by

the Ponzi scheme. Absent this and other recovery actions, the Trustee will be unable to satisfy

the claims described in subparagraphs (A) through (D) of SIPA § 78fff-2(c)(1).

22.    Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy

trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant

to SIPA § 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy

Code apply to this proceeding to the extent consistent with SIPA pursuant to SIPA § 78fff(b).

23.    The Trustee has standing to bring the avoidance and recovery claims under SIPA

§ 78fff-1(a) and applicable provisions of the Bankruptcy Code, including 11 U.S.C. §§ 323(b),

544, and 704(a)(1), because the Trustee has the power and authority to avoid and recover

transfers under Bankruptcy Code sections 544, 547, 548, 550(a), and 551, and SIPA §§ 78fff-

1(a) and 78fff-2(c)(3).

IV.    **BLMIS, THE PONZI SCHEME, AND MADOFF'S INVESTMENT STRATEGY**

A. **BLMIS**

24.    Madoff founded BLMIS in 1960 as a sole proprietorship and registered it as a broker dealer with the SEC. In 2001, Madoff changed the corporate form of BLMIS from a sole proprietorship to a New York limited liability company. At all relevant times, Madoff controlled BLMIS first as its sole member and thereafter as its chairman and chief executive.

25.    In compliance with 15 U.S.C. § 78o(b)(1) and SEC Rule 15b1-3, and regardless of its business form, BLMIS operated as a broker-dealer from 1960 through 2008. Public records obtained from the Central Registration Depository of the Financial Industry Regulatory Authority Inc. reflect BLMIS's continuous registration as a securities broker-dealer during its operation. At all times, BLMIS was assigned CRD No. 2625. SIPC's Membership Management System database also reflects BLMIS's registration with the SEC as a securities broker-dealer beginning on January 19, 1960. On December 30, 1970, BLMIS became a member of SIPC when SIPC was created and continued its membership after 2001 without any change in status. SIPC membership is contingent on registration of the broker-dealer with the SEC.

26.    For most of its existence, BLMIS's principal place of business was 885 Third Avenue in New York City, where Madoff operated three principal business units: a proprietary trading desk, a broker dealer operation, and an investment advisory business (the "IA Business").

27.    BLMIS's website publicly boasted about the sophistication and success of its proprietary trading desk and broker-dealer operations, which were well known in the financial industry. BLMIS's website omitted the IA Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register.

28.     For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its IA Business.

29.     In 2006, BLMIS filed its first Form ADV (Uniform Application for Investment Adviser Registration) with the SEC, reporting that BLMIS had 23 customer accounts with total assets under management ("AUM") of $11.7 billion. BLMIS filed its last Form ADV in January 2008, reporting that its IA Business still had only 23 customer accounts with total AUM of $17.1 billion. In reality, Madoff grossly understated these numbers. In December 2008, BLMIS had over 4,900 active customer accounts with a purported value of approximately $68 billion in AUM. At all times, BLMIS's Form ADVs were publicly available.

### B.  The Ponzi Scheme

30.     At all relevant times, Madoff operated the IA Business as a Ponzi scheme using money deposited by customers that BLMIS claimed to invest in securities. The IA Business had no legitimate business operations and produced no profits or earnings. Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud.

31.     BLMIS's proprietary trading desk was also engaged in pervasive fraudulent activity. It was funded, in part, by money taken from the BLMIS customer deposits, but fraudulently reported that funding as trading revenues and/or commissions on BLMIS's financial statements and other regulatory reports filed by BLMIS. The proprietary trading business was incurring significant net losses beginning in at least mid-2002 and thereafter, and thus required fraudulent infusions of cash from the IA Business to continue operating.

32.    To provide cover for BLMIS's fraudulent IA Business, BLMIS employed

Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz") as its auditor, which accepted

BLMIS's fraudulently reported trading revenues and/or commissions on its financial statements

and other regulatory reports that BLMIS filed. Friehling & Horowitz was a three-person

accounting firm based out of a strip mall in Rockland County, New York. Of the three

employees at the firm, one was a licensed CPA, one was an administrative assistant, and one

was a semi-retired accountant living in Florida.

33.    On or about November 3, 2009, David Friehling, the sole proprietor of Friehling

& Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns

for Madoff and others. BLMIS's publicly available SEC Form X-17A-5 included copies of

these fictitious annual audited financial statements prepared by Friehling & Horowitz.

<u>Madoff's Investment Strategy</u>

34.    In general, BLMIS purported to execute two primary investment strategies for

BLMIS customers: the convertible arbitrage strategy and the split-strike conversion strategy

(the "SSC Strategy"). For a limited group of BLMIS customers, primarily consisting of

Madoff's close friends and their families, Madoff also purportedly purchased securities that

were held for a certain time and then purportedly sold for a profit. At all relevant times, Madoff

conducted no legitimate business operations using any of these strategies.

35.    All funds received from BLMIS customers were commingled in a single BLMIS

account maintained at JPMorgan Chase Bank. These commingled funds were not used to trade

securities, but rather to make distributions to, or payments for, other customers, to benefit

Madoff and his family personally, and to prop up Madoff's proprietary trading business.

36.    The convertible arbitrage investment strategy was supposed to generate profits by

taking advantage of the pricing mismatches that can occur between the equity and

bond/preferred equity markets. Investors were told they would gain profits from a change in the expectations for the stock or convertible security over time. In the 1970s this strategy represented a significant portion of the total BLMIS accounts, but by the early 1990s the strategy was purportedly used in only a small percentage of BLMIS accounts.

37.    From the early 1990s forward, Madoff began telling BLMIS customers that he employed the SSC Strategy for their accounts, even though in reality BLMIS never traded any securities for its BLMIS customers.

38.    BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments.

39.    By 1992, the SSC Strategy purported to involve: (i) the purchase of a group or basket of equities intended to highly correlate to the S&P 100 Index; (ii) the purchase of out-of-the-money S&P 100 Index put options; and (iii) the sale of out-of-the-money S&P 100 Index call options.

40.    The put options were to limit the downside risk of sizeable price changes in the basket. The exercise of put options could not turn losses into gains, but rather could only put a floor on losses. By definition, the exercise of a put option should have entailed a loss for BLMIS.

41.    The sale of call options would partially offset the costs associated with acquiring puts but would have the detrimental effect of putting a ceiling on gains. The call options would make it difficult, if not impossible, for BLMIS to perform as well as the market, let alone outperform the market, because in a rising market, calls would have been expected to be exercised by the counterparty.

42.    The simultaneous purchase of puts and sale of calls to hedge a securities position is commonly referred to as a "collar." The collar provides downside protection while limiting the upside.

43.    If Madoff was putting on the same baskets of equities across all BLMIS accounts, as he claimed, the total notional value of the puts purchased and of the calls sold would have had to equal the market value of the equities in the basket. For example, to properly implement a collar to hedge the $11.7 billion of AUM that Madoff publicly reported in 2006 would have required the purchase/sale of call and put options with a notional value (for each) of $11.7 billion. There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars.

44.    Moreover, at all times that BLMIS reported its total AUM, publicly available information about the volume of exchange-traded options showed that there was simply not enough call or put option notional value to support the Madoff SSC Strategy.

45.    Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, but BLMIS also regularly showed gains when the S&P 100 Index was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy.

<u>No Evidence of BLMIS Trading</u>

46.    There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS

could have traded securities. There are no other BLMIS records that demonstrate that BLMIS

traded securities using the SSC Strategy.

47.    All exchange-listed options relating to the companies within the S&P 100 Index,

including options based upon the S&P 100 Index itself, clear through the Options Clearing

Corporation ("OCC"). The OCC has no records showing that BLMIS cleared any trades in any

exchange-listed options.

The Collapse Of The Ponzi Scheme

48.    The Ponzi scheme collapsed in December 2008, when BLMIS customers'

requests for redemptions overwhelmed the flow of new investments.

49.    At their plea hearings, Madoff and DiPascali admitted that BLMIS purchased

none of the securities listed on the BLMIS customers' fraudulent statements, and that BLMIS

through its IA Business operated as a Ponzi scheme.

50.    At all relevant times, BLMIS was insolvent because (i) its assets were worth less

than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at

the time of the transfers alleged herein, BLMIS was left with insufficient capital.

**V.    DEFENDANTS AND THEIR RESPECTIVE POSITIONS WITHIN HSBC'S
GLOBAL ORGANIZATION AND BUSINESS DIVISIONS**

51.    HSBC holds itself out as a unified financial institution that provides a

comprehensive range of financial services through a global network linked by advanced

technology.

52.    Defendants are part of HSBC's global organization.

53.    At all relevant times, HSBC operated three global business divisions that

transacted or invested with the network of international investment funds that invested all or

substantially all of their assets with BLMIS (the "BLMIS Feeder Funds"): HSBC Securities

Services ("HSS"), HSBC Private Bank, and HSBC Global Structured Fund Products ("GSFP").

54.    Each Defendant operated within one or more of those global business divisions

rather than as separate entities. Each of these business divisions operated across HSBC entities

as a single corporate unit.

55.    The global business divisions were comprised of employees from various HSBC

entities, including employees of Defendants. As a result, certain employees held titles within a

particular HSBC entity and also would hold titles specifically for HSS, HSBC Private Bank, or

GSFP.

56.    Information was shared and communicated throughout HSBC and accross

business divisions. Such sharing took place through meetings, conference calls, and access to

materials through shared databases and presentations.

57.    HSBC's website and many of its marketing materials do not distinguish between

its constituent companies, but instead tout HSBC's interconnected global reach.

58.    In 2006, HSBC's international network comprised around 9,500 offices in 76

countries and territories.

59.    Defendant HSBC Bank plc was at the center of HSBC's connections with BLMIS

and Madoff.

60.    HSBC Bank plc is a British public limited company with its principal place of

business at 8 Canada Square, London E14 5HQ, United Kingdom. It serves as the main hub and

coordinates directions, information, communications, and resources to HSBC's various entities

around the world.

61.    HSBC's directives, policies, and procedures were determined on a global business division level and passed on to the HSBC entites.

62.    At all relevant times, HSBC used a centralized and structured risk management monitoring and reporting framework that required close coordination and cooperation among the HSBC entities. It has publicly described this framework, referring to the HSBC entities collectively as the "HSBC Group":

- "Centralised functional control is exercised over all computer systems developments and operations … Credit and market risks are measured and reported on in the bank and major subsidiaries and aggregated for review of risk concentrations on an HSBC Group-wide basis." (HSBC Bank's 2007 Annual Report and Accounts; HSBC Holdings plc's 2004 Annual Report and Accounts).

- "[C]ooperation between head office departments and businesses is required to ensure a strong adherence to the group's risk management system and its corporate social responsibility practices." (HSBC Bank's 2007 Annual Report and Accounts; HSBC Holdings plc's 2004 Annual Report and Accounts).

- "Chief Risk Officers in each major operating subsidiary typically report directly to their local Chief Executive Officer or country manager but also have a reporting line to the Group Chief Risk Officer. . . . Group Risk works closely with its functional colleagues across the group. . . . Risk measurement, monitoring and reporting structures are mirrored in Group subsidiaries and global businesses." (HSBC Holdings plc's June 2008 Risk Disclosure).

- "Within the Group Risk function, HSBC has constructed a centralised database covering substantially all of the Group's direct lending exposures to support regulatory reporting and deliver comprehensive management information at an increasingly granular level." (HSBC Holdings plc's June 2008 Risk Disclosure).

- "The measurement and monitoring of the major risks encountered by the Group, including credit, market and operational risks, are increasingly delivered by central systems . . . ." (HSBC Holdings plc's June 2009 Risk Disclosure).

- "Global risk . . . establishes Group policy, exercises Group-wide oversight and provides reporting and analysis of portfolio composition and trends on a global and regional basis to senior management." (HSBC Holdings plc's 2009 Risk Disclosure).

### HSBC Private Bank

63.    HSBC Private Bank is the HSBC global business division that invests in hedge

funds. Defendants HSBC Bank USA, HSBC Private Bank (Suisse) S.A, and SICO Limited all

function within the HSBC Private Bank division ("HSBC Private Bank").

64.    Defendant HSBC Bank USA, N.A. ("HSBC Bank USA") is a national bank

chartered by the Office of the Comptroller of the Currency with its principal executive office at

452 Fifth Avenue, New York, New York 10018 and its corporate headquarters at 1800 Tysons

Boulevard, Suite 50, McLean, Virginia 22102.

65.    Defendant HSBC Private Bank (Suisse) S.A. ("HSBC Private Bank (Suisse)") is

formerly known as HSBC Republic Bank (Suisse) S.A. HSBC Private Bank (Suisse) wholly

owned HSBC Guyerzeller Bank AG ("HSBC Guyerzeller") until 2008, when it merged HSBC

Guyerzeller into HSBC Private Bank (Suisse). HSBC Private Bank (Suisse) is a Swiss *société*

*anonyme* with a principal office at 9-17 Quai des Bergues, 1201 Geneva, Switzerland.

66.    Defendant SICO Limited ("SICO") is a business incorporated and existing under

the laws of the British Virgin Islands ("BVI") that maintains a mailing address at P.O. Box 3162,

Woodbourne Hall, Road Town, Tortola VG1110, BVI. At the time of its creation, SICO was a

wholly owned subsidiary of non-defendant HSBC Guyerzeller, but later was wholly owned by

HSBC Private Bank (Suisse).

67.    SICO had no employees, physical address, or operations of its own. SICO's

letterhead noted it was "fully owned by HSBC Guyerzeller Bank AG" and listed its address as

"SICO Limited c/o HSBC Guyerzeller Bank AG" at HSBC Guyerzeller's Switzerland address,

telephone, and fax number. The email address used to direct information to SICO was

PBCH.FUNDS@HSBC.GUYERZELLER.COM.

68.     SICO's only purpose was to act on behalf of HSBC Guyerzeller and HSBC Private Bank (Suisse) and their clients. All of SICO's directors, officers, and authorized signatories were HSBC Guyerzeller employees who executed subscription agreements on behalf of SICO and directed SICO's subscriptions in and redemptions from various BLMIS Feeder Funds. HSBC Private Bank's relationship with Madoff dates to the late 1990s, when it began soliciting clients to invest in various BLMIS Feeder Funds.

69.     HSBC Private Bank marketed, recommended, and invested in the BLMIS Feeder Funds, even though funds like Fairfield Sentry Limited ("Fairfield Sentry") were not on HSBC's list of approved funds for investment. It was not on that list because HSBC had identified numerous factors indicating fraud, including its too-good-to-be-true track record, Madoff's failure to charge investment management or performance fees, the lack of an independent custodian, BLMIS's lack of transparency, and the unacceptable counterparty risk, among other indicia of fraud.

70.     In 2008, Peter Rigg, an HSBC executive noted "We review this fund [Fairfield Sentry] every year in NY and always give it a 2/5—a low rating as it is a complete black box or to be more precise is not a strategy we can fully understand and do not have any access to the portfolio manager Madoff Securities…it is not a fund that we recommend to clients…."

71.     HSBC Private Bank made written and oral representations that it performed reviews of the funds it recommended.

72.     In the early 2000s, HSBC Private Bank formed a research committee, which included employees of Defendant HSBC Bank USA, that performed multiple due diligence reviews on Fairfield Sentry.

73.    Acting within HSBC Private Bank, HSBC Bank USA invested with Fairfield Sentry, HSBC Private Bank (Suisse) invested with Fairfield Sentry and Fairfield Sigma, and SICO invested with Farifield Sentry.

***Global Structured Fund Products***

74.    GSFP was an HSBC division managed from New York. GSFP provided structured financing and leveraged investment products to clients. Defendants HSBC Bank USA, HSBC Bank plc, and HSBC USA Inc. ("HSBC USA") operated within the GSFP division.

75.    HSBC USA is a Maryland corporation registered to do business in New York, with a principal executive office at 452 Fifth Avenue, Tower 7, New York, New York 10018. HSBC USA is a holding company. HSBC Bank USA is its subsidiary. HSBC USA and HSBC Bank USA have the same principal executive offices, chief executive officer and president (since 2000), and share multiple directors (since 2006).

76.    In or around 2006, GSFP began investing in BLMIS Feeder Funds in connection with certain of its derivative financial products (the "GSFP Structured Products").

77.    Each GSFP Structured Product offered a return pegged to a specific BLMIS Feeder Fund (the "Reference Fund"). GSFP's Structured Products also allowed investors to receive varying degrees of leveraged return on notional investments in BLMIS Feeder Funds.

78.    GSFP hedged its customers' investments in its structured product offerings by investing the equivalent value in the relevant Reference Fund (the "Hedge Transactions"). In this way GSFP was structured to not lose money should the Reference Fund significantly outperform the market, as the returns from the Hedge Transactions could be used to pay the

returns due to the investor. The underlying fees and interest tied to the GSFP Structured Product ensured GSFP's profit margin in this scenario.

79.     The Hedge Transactions were direct investments by HSBC Bank plc, HSBC Bank USA and/or HSBC USA in the Reference Funds, and the redemptions from those investments, constitute some of the subsequent transfers sought to be recovered in this action from those Defendants.

80.     Specifically, in connection with the Hedge Transactions, HSBC Bank plc invested in and redeemed from the following Reference Funds: (i) Harley International (Cayman) Ltd. ("Harley"), beginning in June 2007; (ii) Thema International plc ("Thema International"), beginning in August 2007; (iii) Rye Select Broad Market Portfolio Limited ("Rye Portfolio"), beginning in August 2007; and (iv) Senator Fund SPC, beginning in September 2007.

81.     Also in connection with the Hedge Transactions, HSBC Bank USA and/or HSBC USA invested in and redeemed from the following Reference Funds: (i) Rye Select Broad Market Fund L.P. ("Rye Broad Market"), beginning in September 2006; and (ii) Greenwich Sentry L.P. ("Greenwich Sentry"), beginning in March 2007.

82.     GSFP had no obligation to hedge its Structured Products by investing in the underlying Reference Fund. For an underperforming Reference Fund, GSFP could instead "short" the Reference Fund by making an alternate investment, betting that the alternate investment would outperform the Reference Fund's return.

83.     As set forth in greater detail below, Defendants did ultimately identify sufficient risk of fraud at BLMIS, such that GSFP began redeeming the Hedge Transactions and shorting certain Reference Funds.

*HSS*

84.    HSBC touts HSS as a global network of securities services that provides fund

administration and global and direct custody.

85.    HSS's origins date back to HSBC's acquisition of Bank of Bermuda, and its

related entities ("Bank of Bermuda") in 2004 and Bank of Bermuda's provision of

administrative and custodial services. Thus, HSS has been involved with BLMIS since 1992

when it was appointed as the custodian and administrator for BLMIS Feeder Fund, Hermes

International Fund Limited.

86.    Alternative Fund Services ("AFS") is the hedge fund administration division of

HSS. Prior to HSBC's acquisition of Bank of Bermuda, this division was known as Global Fund

Services ("GFS").

87.    HSS provided services for the following BLMIS Feeder Funds: Alpha Prime

Fund ("Alpha Prime"), Alternative Advantage Fund (a/k/a Landmark Investment Fund Ireland)

("Landmark"), Defender Limited ("Defender"), Herald Fund SPC ("Herald"), Hermes

International Fund ("Hermes"), Kingate Global Fund Limited ("Kingate Global"), Kingate Euro

Fund Limited ("Kingate Euro") (Kingate Euro and Kingate Global, collectively, the "Kingate

Funds"), Lagoon Investment Fund Limited ("Lagoon"), Optimal Arbitrage Limited, Optimal

Strategic US Equity Limited, Primeo Fund ("Primeo"), Senator Fund SPC ("Senator"), Square

One Limited, Thema International, Thema Fund Limited, and Thema Wise Investments Limited

("Thema Wise" and collectively, the "HSBC-Serviced Feeder Funds").

88.    In providing services to the HSBC-Serviced Feeder Funds and other clients, HSS

acted through the following HSBC entities: HSBC Bank Bermuda Limited ("HSBC Bank

Bermuda"), HSBC Securities Services (Bermuda) Limited ("HSSB"), HSBC Securities

Services Luxembourg S.A. ("HSSL"), HSBC Institutional Trust Services (Bermuda) Limited

("HITSB"), HSBC Fund Services (Luxembourg) S.A., which was later absorbed by HSBC

Securities Services (Luxembourg) ("HSBC Fund Services"), HSBC Bank (Cayman) Limited

("HSBC Cayman"), HSBC Institutional Trust Services (Ireland) Limited ("HITSI"), and HSBC

Securities Services (Ireland) Limited ("HSSI" and collectively, the "HSBC Service Providers").

89.    HITSB, HSBC Bank Bermuda, HSSL, and HITSI (collectively, the "HSBC

Custodians") acted as custodians to the HSBC-Serviced Feeder Funds.

90.    The HSBC Custodians were contractually obligated under their respective

custodian agreements to ensure proper custody of the assets of HSBC-Serviced Feeder Funds.

91.    HSSB, HSBC Bank Bermuda, HSSL, HSSI, and HSBC Fund Services

(collectively, the "HSBC Administrators") acted as administrators to the HSBC-Serviced

Feeder Funds, with the exception of Kingate Global and Kingate Euro, and were responsible

for, *inter alia*, calculating the net asset value ("NAV") of the funds they serviced.

92.    HSBC Bank plc also entered into overdraft, foreign exchange, and credit facility

agreements with many of the HSBC-Serviced Feeder Funds. In doing so, HSBC extended credit

to the HSBC-Serviced Feeder Funds, allowing it to continue the flow of investment with

BLMIS.

## VI.    **PERSONAL JURISDICTION**

93.    This Court has personal jurisdiction over Defendants because they purposefully

availed themselves of the laws and protections of the United States and state of New York by

undertaking significant commercial activity in New York, including, among other things,

knowingly directing investments to New York-based BLMIS via various BLMIS Feeder Funds.

By directing investments through the BLMIS Feeder Funds, Defendants knowingly accepted the

rights, benefits, and privileges of conducting business and/or transactions in the United States

and New York.

94.    Defendants derived significant revenue from New York and maintained minimum contacts and/or general business contacts with the United States and New York in connection with the claims alleged herein.

### HSBC Private Bank (Suisse)and SICO

95.    HSBC Private Bank (Suisse) and SICO knew that the Fairfield Funds into which they invested were owned, managed, and operated by Fairfield Greenwich Group ("FGG"), a New York-based *de facto* partnership.

96.    To invest in the Fairfield Funds, HSBC Private Bank (Suisse) and SICO entered into subscription agreements that were governed by New York law and included agreements to submit to venue in New York and the jurisdiction of the New York courts.

97.    In executing subscription agreements upon investing with Fairfield Sentry, HSBC Private Bank (Suisse) and SICO also agreed that all subscription payments to Fairfield Sentry were required to be made in U.S. dollars and sent to Fairfield Sentry's HSBC bank account located in New York. HSBC Private Bank (Suisse) and SICO directed funds to this New York-based HSBC bank account in connection with their investments in Fairfield Sentry.

98.    HSBC Private Bank (Suisse) and SICO redeemed monies from Fairfield Sentry and requested that redemptions be sent in U.S. dollars to HSBC Private Bank (Suisse)'s account at HSBC Bank USA in New York.

99.    When executing the Fairfield Sentry subscription agreements, HSBC Private Bank (Suisse) and SICO agreed that they had read and reviewed a copy of Fairfield Sentry's Private Placement Memorandum ("PPM"), which explained that FGG maintained accounts at BLMIS, a U.S. registered broker-dealer that utilized a strategy described as "split strike conversion" ("the SSC Strategy"), which involved the purchase of U.S. securities.

20

100.   The Fairfield Sentry PPM, which HSBC Private Bank (Suisse) and SICO both received and affirmed that they had received and read, explained that the SSC Strategy involved the purchase of a "basket" of U.S.- based equity securities consisting of "approximately 35-50 stocks in the S&P 100 Index," as well as "the sale of out-of-the-money S&P 100 Index call options" and the purchase of an equivalent number of "out-of-the-money S&P 100 Index put options."

101.   HSBC Private Bank (Suisse) and SICO also knew from the documents they received from FGG and reviewed that BLMIS purported to maintain custody of its investments—including its investments on behalf of Fairfield Sentry—in New York.

102.   The Fairfield Sigma PPM contained similar representations regarding the SSC Strategy and described BLMIS's role as investment advisor, executing broker, and custodian.

103.   Based on the subscription agreements, information memoranda, and PPMs, HSBC Private Bank (Suisse) and SICO knew the following facts indicating that they were transacting business in New York in connection with their investments in the Fairfield Funds:

- Fairfield Sentry invested at least 95% of its assets with New York-based BLMIS, and Fairfield Sigma invested 100% of its assets with Fairfield Sentry;

- BLMIS performed all investment management duties for these assets;

- BLMIS was registered with the SEC;

- BLMIS was the executing broker for the Fairfield Funds' investments, and purportedly operated and executed the SSC strategy on the funds' behalf;

- BLMIS's SSC strategy purportedly involved the purchase of U.S. equities, U.S. options, and Treasury Bills, and the decisions regarding which U.S. securities to purportedly purchase, and when to make such purchases, were made by BLMIS in New York;

- Fairfield Sentry's investment documents provided that subscription payments be wired in U.S. dollars to New York;

- BLMIS was the custodian of the Fairfield Funds' investments with BLMIS; and

- BLMIS was "essential to the continued operation of" the Fairfield Funds.

104.    HSBC Private Bank (Suisse) and SICO knew and intended that FGG would invest their money with BLMIS in New York and undertook purposeful acts aimed at New York as a part of their BLMIS Fairfield Fund investments.

105.    On behalf of HSBC Private Bank, HSBC Bank USA employees also regularly communicated with FGG concerning, among other things, the identity of the counterparties to Madoff's purported options trades, Fairfield Sentry's risk reporting, BLMIS's correlation with the S&P 100, and BLMIS acting as custodian to the funds.

106.    HSBC Private Bank regularly sent HSBC Bank USA employees to assess both BLMIS and certain BLMIS Feeder Funds New York offices.  For example, HSBC questioned FGG and sought to understand BLMIS by "see[ing] the desks where the SSC strategy is executed" and "meet[ing] with a [sic] operations person at BLM[IS] to understand how the custody of assets takes place."

107.    HSBC Private Bank (Suisse) and SICO knowingly received subsequent transfers from BLMIS in the form of withdrawals, rebates, and fees from the Fairfield Funds.

108.    HSBC Private Bank (Suisse) and SICO knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York.

109.    This Court has personal jurisdiction over HSBC Private Bank (Suisse) and SICO pursuant to N.Y. CPLR 301 and 302 and Bankruptcy Rule 7004. HSBC Private Bank (Suisse) and SICO derived significant revenue from New York and maintained minimum contacts with New York and the United States in connection with the claims alleged herein. Thus, this Court

has personal jurisdiction over HSBC Private Bank (Suisse) and SICO based on their contacts

with the United States and New York.

### GSFP

110.    The HSBC Defendants operating within GSFP are subject to personal jurisdiction

in this judicial district because they purposely availed themselves of the laws and protections of

the United States and New York by, among other things, knowingly directing investments into

BLMIS via various BLMIS Feeder Funds.

111.    GSFP knew that the Tremont funds into which it invested were owned, managed,

and operated by New York-based Tremont Group Holdings, Inc. (together with predecessors

and affiliates, "Tremont Group"). The Rye Select Funds were at all relevant times managed and

operated by Tremont's officers and employees in New York.

112.    GSFP knew that Greenwich Sentry, into which it invested, was a Delaware

limited partnership that used the same split strike conversion strategy as Fairfield Sentry.

113.    HSBC Bank plc agreed to send U.S. dollars to an account for Rye Portfolio at the

Bank of New York in New York. GSFP, and its New York employees, requested that

redemptions be sent in U.S. dollars to the HSBC Bank plc account at HSBC Bank USA in New

York.

114.    GSFP, through New York-based employees at HSBC Bank USA, signed a

subscription agreement on behalf of HSBC Bank plc each time it invested in Rye Portfolio. By

signing the subscription agreements, GSFP affirmed that it had received and read Rye

Portfolio's prospectus. The Rye Portfolio prospectus provided essentially the same information

as the Fairfield Funds' documents detailed above, including that Rye Portfolio's assets would be

invested with a manager using the SSC strategy.

115.    HSBC Bank plc invested directly in Harley by executing subscription agreements, which were regularly signed by New York-based HSBC Bank USA employees on behalf of HSBC Bank plc. Pursuant to these subscription agreements, HSBC Bank plc agreed to send subscriptions to Fortis's bank account at The Northern Trust Banking Corporation in New York.

116.    HSBC Bank USA employees requested that redemptions from Harley be sent in U.S. dollars to the HSBC Bank plc account at HSBC Bank USA in New York.

117.    As part of GSFP, HSBC Bank USA in New York was involved in setting up the transactions underlying the structured product relating to GSFP's investment in Thema International Fund. These transactions were routed through HSBC Bank plc but "ring fenced" by New York-based HSBC accounts.

118.    GSFP knew and intended that the BLMIS Feeder Funds would invest their money with BLMIS in New York and undertook purposeful acts aimed at New York as a part of their BLMIS Feeder Fund investments.

119.    GSFP sent HSBC Bank USA employees to assess both BLMIS and the New York offices related to certain BLMIS Feeder Funds.

120.    On behalf of GSFP, HSBC Bank USA employees also regularly communicated with FGG and Tremont concerning, among other things, the identity of the counterparties to Madoff's purported options trades, risk reporting, BLMIS's correlation with the S&P 100, and BLMIS acting as custodian to the funds.

121.    GSFP knowingly received subsequent transfers from BLMIS in the form of withdrawals and fees from the BLMIS Feeder Funds.

122.    GSFP knowingly accepted the rights, benefits, and privileges of conducting business and/or transactions in the United States and New York.

123.    This Court has personal jurisdiction over the HSBC Defendants operating within

GSFP pursuant to N.Y. CPLR 301 and 302 and Bankruptcy Rule 7004 because they derived

significant revenue from New York and have maintained minimum contacts with New York

and the United States in connection with the claims alleged herein.

124.    Additionally, the HSS entities regularly analyzed BLMIS, including multiple

visits to BLMIS's New York office and regular communications with BLMIS. As discussed

more fully below, HSBC Bank plc orchestrated multiple visits to BLMIS's New York office on

behalf of its three business divisions, and sent employees from several HSBC entities, including

HSSL, HSBC Bank plc, and HSBC Bank Bermuda to New York.

## VII.    HSBC WAS ON INQUIRY NOTICE OF FRAUD AT BLMIS

125.    In 2008, Christine Coe, the Head of Global Risk for HSS and an employee of

HSBC Bank plc, declared BLMIS to be "the perfect structure for fraud." Her conclusion was

not novel—it was a natural conclusion reflecting years of deep-seated concern across HSBC.

BLMIS's business practices had raised myriad red flags and spawned multiple inquiries

regarding Madoff's operations. Thus, in declaring BLMIS to be the perfect structure for fraud,

Coe articulated a belief that many at HSBC had held for years—that Madoff was a scam.

### A.    HSBC Had Multiple Avenues of Insight into BLMIS Operations

126.    HSBC was uniquely positioned to identify fraud at BLMIS. By the time of

BLMIS's collapse, HSBC's clients' investments represented approximately 33% of BLMIS's

purported assets under management—a fact known to Defendants.

127.    In addition, HSBC also provided extensive services to many BLMIS Feeder

Funds, including providing custodial and/or administrative services to no fewer than 18 BLMIS

Feeder Funds and sub-funds. In this role, HSBC gained knowledge of, among other things,

Madoff's purported trading practices and his purported assets under management.

25

128.    HSBC Private Bank was also an investor in several BLMIS Feeder Funds and examined those funds, including Fairfield Sentry, Fairfield Sigma, Kingate Global, and Ascot Fund.

129.    When acting as custodian to the HSBC-Serviced Feeder Funds, the HSBC Custodians' primary legal and/or contractual obligation was to verify the existence of the assets under management and to safeguard those assets.

130.    HSBC Bank Bermuda, HSSL, and HITSI each entered into sub-custody agreements with BLMIS on behalf of the HSBC-Serviced Feeder Funds delegating to BLMIS their primary custodial duty of holding and safeguarding assets. They remained obligated, however, to supervise and monitor BLMIS as subcustodian, which exposed them to considerable evidence of fraud at BLMIS.

131.    By delegating their custodial obligations to BLMIS, the HSBC Custodians knew they were concentrating the functions of fund adviser, custodian, and broker-dealer responsible for initiating and executing securities trades in BLMIS.

132.    In addition to their contractual obligations, the HSBC Custodians were obligated to follow their respective jurisdictions' statutes and regulations governing to whom they could subdelegate duties.

133.    In each of the jurisdictions relevant to the HSBC Custodians and HSBC Administrators, local law requires an independent custodian to hold and properly segregate customer assets, to verify the existence and value of the assets, and to verify any transactions involving those assets. The failure to have an independent custodian also violated industry best practices.

134.    Through its multiple roles as investor, service provider, and custodian, HSBC was able to see the results of BLMIS's operations from multiple points of view. And for many at HSBC, it was clear that those results did not add up, sometimes because they were indicative of fraud, but sometimes because they were simply impossible.

135.    When Christine Coe identified BLMIS as "a perfect structure for fraud," she was focusing on the delegation of multiple key functions—investment adviser, custodian, and broker dealer—to BLMIS, which BLMIS performed for free and which prevented any system of checks and balances—an obvious, unequivocal hallmark of fraud.

136.    The Defendants knew that BLMIS's assumption of all major oversight roles eliminated transprancy and that it was a significant fraud risk. In 2005, HSBC Private Bank's research committee determined that "our concerns regarding the strategy remain significant . . . Madoff Investment Securities may utilize fund holdings for brokerage inventory, Madoff is custodian, no independent broker . . . ."

137.    Nevertheless, Defendants sought to maintain the status quo. With respect to at least two structured products tied to funds managed by Tremont Group Holdings, Inc. ("Tremont Group"), and Tremont Partners, Inc. ("Tremont Partners," and with Tremont Group, "Tremont"), HSBC Bank USA and HSBC Bank plc each agreed to refer to Madoff only as the "Account Manager" and not by name. Tremont understood that HSBC had assented to the unacceptable "reality that the custody of the assets is with Madoff (the[y] seem to have experience with this already)."

138.    HSBC Bank plc was aware that HSBC had neither "full control of assets" nor "realtime site [sic] of transaction flows," and noted that "there [was] no proof of best execution…or even actual execution."

27

139.    HSBC also knew that they were not the only ones in the industry with these

concerns. In an email among HSSL employees and executives, Fund Administration Manager

Saverio Fiorino identified the "rumours" surrounding Madoff, including "what is [Madoff's]

real strategy, how on earth can he always produce 12%pa (2) where are the assets and are there

really assets or is it all fictitious."

### B. HSBC Commissioned a Third-Party Review That Unequivocally Identified a Serious Risk of Fraud.

140.    In September 2005, just before the first of the GSFP Structured Products was

issued and at the same time HSBC Bank plc was providing custodial and administrative services

to the HSBC-Serviced Feeder Funds and following on the many concerns that had been raised

internally at HSBC, HSBC Bank plc engaged KPMG to review BLMIS for fraud and related

operational risk (the "2005 KPMG Review"). Both this review, and later reviews by KPMG

relied upon information available to HSBC across the broad spectrum of its BLMIS-related

activities and involved consulting with employees across HSBC entities, including members of

HSBC Bank plc, HSBC Bank Bermuda, HSSL, and HITSI.

141.    The 2005 KPMG Review was a source of tension at HSBC. While there was

genuine concern that BLMIS was engaged in fraud, HSBC did not want to cut off access to

BLMIS Feeder Funds by offending Madoff. In addition, HSBC wanted Madoff to "pass" the

review, and in this regard Christine Coe and others (including KPMG) coordinated with Madoff

to help him prepare, including providing him with an outline of questions and responses in

advance.

142.    The 2005 KPMG Review went forward, focusing on the risk associated with

Madoff's control of all key aspects of the HSBC-Serviced Feeder Funds' investment activity.

According to the ultimate report, the review was intended to "make sure that the trades were

28

real and that the money that the investors were placing into Madoff Securities was being used to

make investments." In the end, the review did not resolve either of these concerns. HSBC's

positions with BLMIS remained unchanged and HSBC never confirmed that Madoff's

purported trades were real.

143.   KPMG's findings from the 2005 KPMG Review were set forth in a February 16,

2006 report to HSBC, entitled "Review of fraud risk and related operational risks at Bernard L.

Madoff Investment Securities LLC" (the "2006 KPMG Report"). It identified, among other

things, risks of:

(a)     falsification of client mandates;

(b)     embezzlement of client funds;

(c)     use of fabricated client instructions to disguise poor proprietary positions;

(d)     diversion of client funds for Madoff's personal gain;

(e)     inaccurate allocation of reinvested funds;

(f)     diversion of cash resulting from the sale of equities and Treasury Bills;

(g)     trades executed by unauthorized BLMIS staff members;

(h)     sham trading to divert client cash;

(i)     false reporting of trades without execution to collect commissions; and

(j)     falsification of trade confirmations.

144.   The 2006 KPMG Report recommended that HSBC Bank plc independently

confirm BLMIS's purported trading activities because the materials KPMG relied on for the

review were provided by BLMIS and thus could have been "easily replicated or falsified in

order to commit fraud." Despite multiple warnings, HSBC Bank plc, never independently

confirmed BLMIS's purported trading activities—if it had, even once, it would have discovered

the fraud.

### C. HSBC Recognized BLMIS's Lack of Account Segregation as a Serious Fraud Risk

145.   HSBC had concerns not only about the risk that there were no assets or trades, but also that client accounts were not segregated at BLMIS or at the Depository Trust and Clearing Corporation ("DTC"), where BLMIS purportedly held accounts for its customers.

146.   BLMIS's Frank DiPascali informed KPMG that BLMIS deposited all client assets into a single Fidelity money-market account in BLMIS's name. This was identified as a red flag by an HSBC employee who noted that this was similar to the practices revealed in the "Refco" fraud, a fraud revealed in early 2008. The HSBC employee further noted that: "[I]n Refco's case, they were able to essentially use client money as a way of funding themselves . . . ."

147.   The 2006 KPMG Report identified the "failure to hold stocks in client names" as a fraud risk. The report specifically identified DTC's segregation of client assets as a control against this and other fraud risks.

148.   HSBC Bank plc acknowledged that under HSBC Bank Bermuda's 1996 sub-custodian agreement with BLMIS, BLMIS was required to act as a fiduciary and segregate the custodied assets from the assets of other BLMIS customers. HSBC Bank plc stated that "this should be confirmed annually." Such confirmation could not be achieved.

149.   In fact, GSFP reached the opposite conclusion—that the funds' assets were not segregated. By the end of July 2008, a GSFP report compared the BLMIS Feeder Funds in which it invested and confirmed a KPMG finding that all of the Reference Funds were feeding into a single managed account at BLMIS. The report concluded that there was "no segregation of fund positions."

**D. Over the Course of More Than a Decade, HSBC Was Never Able to Independently Confirm the Existence of its Clients' Assets at BLMIS Despite Contractual, Statutory, and Fiduciary Duties to Do So**

150.    The principal responsibility of a custodian is to safeguard its client's assets—a duty that HSBC never carried out for its clients invested with BLMIS.

151.    As early as 1996, HSBC affiliate HITSI, Thema International's custodian, was aware that it could not independently confirm the existence of Thema International's assets. HITSI admitted that its knowledge of how Thema International's assets were being handled at BLMIS was "dependent on the flow of information from Madoff."

152.    Thema International was an Irish investment fund established pursuant to the Undertakings for the Collective Investment in Transferable Securities ("UCITS") as implemented in Ireland. UCITS provided statutory safeguards requiring UCITS funds to have separate, independent entities perform the roles of custodian and "investment manager" as a check on the verification of assets. The UCITS directives also require UCITS funds to publicly disclose their investment adviser and custodian.

153.    The UCITS directives define "investment manager" as the person or entity that manages the assets of the fund and sets the investment strategy. BLMIS, which was also Thema International's investment adviser and custodian, performed those functions.

154.    Before delegating custodian and advisory responsibilities to BLMIS, the Thema International directors filed a submission with the Central Bank of Ireland, the relevant regulatory authority, proposing that the Central Bank agree that Thema International not be required to identify sub-advisors. Upon information and belief, that submission was filed to avoid disclosing the fact that BLMIS improperly held multiple roles for Thema International. The Central Bank rejected the submission.

31

155.    After the Central Bank rejected the Thema International submission, BLMIS's

multiple roles were never disclosed. Instead, Thema International identified HITSI as custodian.

HITSI appointed HSBC Bank Bermuda sub-custodian of Thema International, and HSBC Bank

Bermuda subsequently entered into an agreement with BLMIS designating BLMIS as sub-

custodian. A June 19, 1996 email from a Bank of Bermuda entity to BLMIS explains that the

sub-custody arrangement was "required to avoid the disclosure [of Madoff's role as custodian]

to the [Irish] Central Bank."

156.    In 1997, an employee at HSS warned that Thema International used an

"unauthorized custodian . . . not subject to any form of vetting and performance monitoring by

the bank's network managers." That unauthorized custodian was BLMIS.

157.    Three years later, in or around 2000, another HSS employee requested

"[i]ndependent confirmation that the assets of Thema [International] exist and are registered in

the name of Thema [International]." No such independent confirmation was ever received.

158.    In late 2001, HSSI managing director Brian Wilkinson expressed additional

concerns to HSBC employee and Thema International director, Gerald Brady, about Thema

International's custody arrangement, noting that HSSI could not independently verify that

Madoff was trading: "[T]here are no 'Chinese' walls between asset management and

clearing/custody [at BLMIS]. We are receiving trade details from Madoff the sub-custodian

with no confirmation from Madoff the investment advisor, consequently, we are posting

trades…with no confirmation…[that] these are valid trades." Brady responded, "What we did a

few years ago is not acceptable today." Nevertheless, no independent verification of trades was

pursued or received.

159.    By 2002, Wilkinson and Paul Smith, Chairman of HSS, worried about the risks

inherent in BLMIS acting as "both the investment manager to the fund and the sub-custodian"

without being "subject to the normal due diligence and monitoring procedures that all other

[HSBC] sub-custodians are subject to."

160.    Paul Smith later wrote to HSSL executive Nigel Fielding stating, "[w]e have a

problem with [Madoff]. He is the manager, broker, and custodian to his accounts. In today's

world, this is a red flag."

161.    By May 2005, John Gubert, head of HSS at that time, was prepared—almost a

decade after HSS first noted its inability to independently verify the existence of its clients'

assets at BLMIS—to terminate HSBC's custodial and administrative relationships with the

BLMIS Feeder Funds, declaring the information BLMIS provided "unacceptable." It was then

that Gubert noted that HSBC had neither "full control of assets" nor "realtime site [sic] of

transaction flows," and noted that "there [was] no proof of best execution . . . *or even actual

execution*." (emphasis added). No proof of actual execution of trades was ever received by

HSBC.

162.    With respect to Fairfield Sentry, HSBC Private Bank repeatedly raised concerns

between 2001 and 2008 as to the lack of an independent custodian and the inability to verify

Fairfield Sentry's trading activity. Yet each time HSBC failed to take steps to verify the

existence of the assets purportedly held by BLMIS or to verify the trades reported on the

BLMIS customer statements.

### E.    HSBC Knew the SSC Strategy Simply Could Not Produce BLMIS's Purported Returns

163.    Beginning in the 1990s, Madoff ascribed the consistent investment success of

BLMIS's IA Business to his SSC Strategy. Madoff claimed this strategy would produce steady

returns without the volatility inherent in the stock market or other high return investment strategies.

164.   The SSC strategy, had it actually been implemented, would have smoothed out the peaks and valleys in the returns the basket of S&P 100 stocks generated. But the strategy would not, and could not, have eliminated market volatility, which was precisely what Madoff's supposed returns appeared to consistently do. Had the SSC Strategy actually been implemented, it would have generated returns that correlated with the S&P 100's performance when BLMIS was in the market.

165.   GSFP personnel acknowledged that the SSC Strategy was expected "to replicate the performance of the S&P100." GSFP claimed to monitor certain trades to ensure that the equity basket had an equities correlation of at least 90% with the S&P 100. A basket comprising stocks at least 90% correlated to the S&P 100 would necessarily have generated returns that were similarly highly correlated to the underlying index. But the opposite was true: BLMIS's returns were—throughout its existence—almost completely uncorrelated to returns of the S&P 100.

166.   The lack of correlation between BLMIS and the S&P 100 Index's returns was obvious and highly problematic. It should have been impossible for BLMIS investors to obtain gains on their investment when the S&P 100 was significantly down. The put options provided only a hedge on losses; exercising those options would not have turned losses into gains but rather only created a floor for losses. HSBC Private Bank noted: "[because] the [SSC] strategy loses money in down markets we believe that [it] is unlikely that [BLMIS's] returns can be attributed solely to this strategy."

167.    Similarly, the SSC Strategy could not have outperformed the S&P 100 during a major upswing, as each Reference Fund's and all of the BLMIS Feeder Funds' returns purported to do. This is because a significant market upswing would have resulted in counterparties exercising their call options. HSBC knew that call options would have put a ceiling on gains.

168.    "I would not invest in this fund [Fairfield Sentry], nor would I want investors to invest." So concluded David Mullane, a member of HSBC Private Bank, who reported that, in addition to other concerns, "investors (and the media) have questioned" whether Madoff's investment strategy could yield BLMIS's returns.

169.    During the last 14 months of its existence, the IA Business generated positive returns while the S&P 100 fell by nearly 40%—an impossibility under the SSC Strategy.

170.    A 2001 diligence report by HSBC Private Bank states:

> Bernie Madoff's <u>12 year track record</u> trading a <u>split strike conversion strategy</u> on the <u>S&P 100</u>, is quite simply <u>astounding</u>. His <u>annualized return</u> of 15%, (net of a 20% performance fee) at a <u>risk</u> of 3%, yields a <u>sharpe ratio</u> of 3.3. Over this period the fund has endured only <u>4 down months</u> (the maximum of which was down 0.5%), and has now gone almost 6 years without a <u>drawdown</u>. With this track record, seemingly derived from such a <u>simple investment strategy</u>, certain members of the investment community are <u>baffled</u>, as to how such a return stream has been earned [(emphasis in original)].

171.    In January 2003, HSBC Private Bank found it "unclear how [Madoff's] strategy has generated a track record with almost no down months."

172.    In 2004, HSBC Private Bank issued another report warning that Madoff had a "'too good to be true' track record," and concluded that Fairfield Sentry is "a fund we are not completely comfortable with" and "not a fund that we recommend."

173.    HSBC Private Bank's research committee's May 2007 meeting minutes noted that Fairfield Sentry did not "really know how [BLMIS's trading] model work[ed]."

174.    David Smith, a member of HSBC's global senior management team, knew that sophisticated investors attempted to apply the SSC Strategy over significant periods of time but were unable to replicate BLMIS's returns. In relaying this information to HSBC's Paul Smith (who in turn forwarded the information to HSBC's Nigel Fielding and Christine Coe), David Smith offered no explanation other than that Madoff had a "magic formula."

175.    As early as 2001, HSBC Private Bank suspected that Madoff was using returns from the market making business to subsidize the IA Business. It also suggested that Madoff was making "trades outside the stated universe," and worried that "[a] potentially greater risk could be that BLM[IS] [was] seek[ing] another means of generating returns," echoing Christine Coe's concern that "[Madoff] m[ight] be tempted to use [invested] money to do other things…."

176.    In the 2006 KPMG Report, KPMG informed HSBC that there were risks that BLMIS could be (i) using client funds to make opportunistic trades that deviated from the SSC Strategy; (ii) systematically over-valuing positions and failing to report positions to HSBC to manipulate control relationships; and (iii) front running order flow in the market making business.

177.    BLMIS account statements received by HSBC indeed showed full investment in Treasury Bills at quarter-end and year-end, a clear violation of the SSC Strategy and a practice over which HSBC Private Bank expressed concern as early as 2001. Madoff attributed these transactions to his need to avoid certain SEC reporting requirements that could expose confidential information about his investment strategy. But Madoff's purported practice of

exiting the market according to the calendar, rather than market or economic indicators, was wholly inconsistent with the SSC Strategy, which relied on careful market timing.

178.   HSBC knew that Madoff touted "market-timing" as a cornerstone of the SSC Strategy, but it also knew that exiting the market at quarter-end and year-end locked Madoff into prevailing market conditions, regardless of whether they were favorable. This is inconsistent with the SSC Strategy, based on long positions hedged by options contracts.

179.   In 2007, the Structured Trade Annual Review ("STAR") review observed that HSBC was relying on Madoff, rather than its own internal diligence or use of an external source, to monitor compliance with investment guidelines—a departure from normal procedure. GSFP admitted that it could not confirm BLMIS's trade data with independent data and in fact never undertook such an independent confirmation.

180.   That same year, Tremont banned GSFP from contacting BLMIS, around the same time that GSFP sought internal approval for a swap transaction involving Rye Select Broad Market XL Portfolio Limited ("Rye XL Portfolio") and HSBC Bank USA and admonished a GSFP employee for calling Madoff to ask about the number of people BLMIS employed.

### F.   With Concerns Still Unaddressed and Fraud Risks Still Present, HSBC Directs KPMG to Conduct a Second Review

181.   In 2007, HSBC asked KPMG to conduct a second review of BLMIS. As with the first review, HSBC failed to investigate the indicators of fraud presented by KPMG.

182.   The second KPMG review came about primarily as a result of the concern that "[Madoff] m[ight] be tempted to use [invested] money to do other things in the event that many of the funds asked for their money back."

183.   The second KPMG review was expanded to assess the risk presented by BLMIS's custody of the HSBC-Serviced Feeder Funds' and the Reference Funds' assets, and by HSBC having its own direct BLMIS investments through GSFP and HSBC Private Bank.

184.   In late June 2008, Coe wrote to KPMG requesting an urgent meeting among KPMG and HSBC personnel, including GSFP.

185.   On a July 17, 2008 conference call (the "Conference Call"), which involved HSBC personnel from around the world (including HSBC Bank plc, and, upon information and belief, HSSL, HSBC USA and HSBC Bank USA, *see supra* paragraph 56), several employees voiced concerns that BLMIS was running either a Ponzi scheme or a fraudulent front running operation, or was employing other practices that opened HSBC to fraud risk.

186.   It was during the Conference Call that Coe identified BLMIS as "a perfect structure for fraud." Coe also (correctly) identified the "biggest risk" at BLMIS to be that Madoff was simply "taking the money." Another HSBC employee stated: "we're concerned [about] the fact that [BLMIS] could be a fraud and . . . [that] there is no real trading . . . and it's just a Ponzi scheme."

187.   KPMG warned the Conference Call participants that: "[t]he key thing is you need to test the existence of the actual trade. It's the only way you're going to be able to verify that this is not just an elaborate fraud." Despite the fact that this very same warning had been issued by KPMG as the result of its 2005 review and raised as a red flag by HSBC employees as early as 2001, no such test was ever undertaken.

188.   The results of KPMG's 2008 review were published in a September 8, 2008 report entitled "Review of fraud risk and related operational risks at Bernard L. Madoff Investment Securities LLC" (the "2008 KPMG Report").

189.    The 2008 KPMG Report reiterated the largely ignored fraud concerns that the 2006 KPMG Report identified, including: (i) the "failure to hold stocks in client names"; (ii) the use of client funds to make opportunistic trades that deviated from the SSC Strategy; (iii) systematically over-valuing positions and failing to report positions to HSBC to manipulate control relationships; and (iv) front running order flow in BLMIS's market making business.

190.    The 2008 KPMG Report also flagged additional indicia of fraud including that:

(a)      "Client cash is diverted—signatures falsified on client instruction in an attempt to legitimize an unauthorized transaction (i.e., redemption)."

(b)      "Stocks are intentionally not allocated a fair price from the bulk trade."

191.    Following the issuance of the 2008 KPMG Report, HSBC Bank plc's Head of Network Management expressed "nervousness in HSBC about the model *i.e.* broking, asset [management] and custody all under one roof, particularly in view of the Sentinel fraud, which had a similar structure." As with the first review, however, HSBC failed to follow up on these clear indicators of fraud.

192.    In October 2008, GSFP, unwilling any longer to ignore the risk of fraud at BLMIS, redeemed $65 million—the majority of its hedge on swap transactions with Wailea Advisors LP's funds—from Senator. Wailea's principal remarked that HSBC indicated it was "shorting" Madoff, and betting on Senator losing money.

193.    GSFP's decision to redeem came as a surprise to Wailea and Senator. Wailea stated that "there [had] never been a situation where the bank chose to not own the underlying [reference] fund (at least in the case of Madoff investments) . . . until now."

194.    HSBC's access to data from its investments in the BLMIS Feeder Funds, combined with the KPMG and other diligence reviews, revealed numerous trading impossibilities, including the fact that Madoff was lying about his investment strategy.

195.   It was not just GSFP that identified the risk of fraud at BLMIS. The evidence of fraud at BLMIS, in the eyes of HSBC Private Bank, disqualified Madoff as a recommended investment for HSBC clients. Indeed, in the aftermath of the revelation of fraud at BLMIS, HSBC Private Bank informed its customers that it had "consistently not approved the Madoff strategy for investments. All hedge funds that we recommend are followed by our analysts in terms of due diligence, including meeting physically the managers, which was not possible with Madoff's hedge funds."

### G.   The Trade Tickets and Customer Statements Reviewed by HSBC Revealed Trade Impossibilities and Practices Inconsistent with the SSC Strategy

196.   In 2008, Stephan Phan, Global Head of GSFP, noted concerns about the trading activity that had been plaguing HSBC, asking Christine Coe: "[h]ave you been able to verify… that the month end positions calculated by going through the intramonth deal tickets, add up to the statements we received from Madoff for month end holdings? This would finally and fully clear out concerns over [BLMIS's] ability to generate returns, i.e., [that BLMIS is] not a Ponz[i] scheme." In its many roles, HSBC received and reviewed the BLMIS trade tickets and customer statements that reflected impossible trades and inconsistencies with the SSC Strategy.

### i.   HSBC Identified Speculative Options Trades That Were Inconsistent with the SSC Strategy

197.   The 2006 KPMG Report alerted Defendants to risks of fraud involving Madoff's purported options trades. The report identified the risks that Madoff was: (i) manipulating option prices to maximize commissions; (ii) exercising options while instead informing the client that option was left to expire; and (iii) inflating call values to disguise misappropriation or poor positions. All of these were known risks that demanded further inquiry.

198.    GSFP monitored the monthly trade activity and underlying portfolios for the Reference Funds and the HSBC Administrators and Custodians received and reviewed the monthly trading activity for the HSBC-Serviced BLMIS Feeder Funds.

199.    After implementing enhanced reporting standards in 2007, GSFP received position reports, transaction reports, risk reports, and/or trade confirmations BLMIS sent for Greenwich Sentry, Harley, Rye Broad Market, Rye Portfolio, Thema International, and Senator.

200.    The trade data HSBC received showed that Madoff purported to engage in short term, speculative options trading that resulted in substantial gains for BLMIS customers. This was a deviation from the SSC Strategy.

201.    Under the SSC Strategy, options trades were intended to hedge the underlying equities, not to independently generate profit.

202.    But on many occasions, BLMIS purported to buy back its call positions, only to rewrite them the following business day, almost invariably at a significant profit. For example, on August 5, 2008, on behalf of Rye Broad Market, Madoff purported to buy 15,685 August 585 call options, which he then purported to sell the following day, for a net gain of $10,948,130. As was clear from the trading information HSBC received from Rye Broad Market, this options transaction was not executed for the purpose of hedging an equity position, but rather to generate short-term profit—a high-risk transaction completely at odds with the SSC Strategy.

203.    GSFP received a net gain from speculative options trades of $58,133,383 based on twelve such trades. The HSBC-Serviced Feeder Funds received a net gain of $363,488,314 from 476 such trades.

204.    This massive high-risk deviation from the SSC Strategy, known to HSBC, put

HSBC on notice of suspicious facts and demanded further inquiry.

### ii.    The Trade Tickets Reviewed by HSSL and GSFP Reflected Out-of-Sequence Options Trades

205.    GSFP received copies of BLMIS trade tickets from Harley, Rye Broad Market,

and Rye Portfolio.

206.    The HSBC Administrators, including HSSL, received "copies of all trade tickets

[directly] from Madoff and replicate[d] the trades on their system rather than simply receiving

the month-end statements."

207.    Under the SSC Strategy, the sale of call options purported to fund the purchase of

put options. Accordingly, had the SSC Strategy actually been implemented, the sales of call

options would have had to precede the purchases of put options. However, there were numerous

instances in which the sequence of the transaction as reported on the trade confirmations and

customer statement is backwards—the purchase precedes the sale.

208.    For example, trade confirmations and customer statements for Alpha Prime's

account, which were received by HSSL, indicate the purported purchase of an "October 515"

put settling on October 9, 2003 and the purported sale of an "October 525" call settling on

October 10, 2003.

209.    Because BLMIS did not allow trading on margin in the BLMIS Feeder Fund

accounts, any given customer would have had to first sell the call to have the cash needed to

purchase the put options. Accordingly, BLMIS would have to have been undertaking

unauthorized margin transactions—however at no point did HSBC inquire into preceisly how

BLMIS could have purchased put options without first selling call options.

210. In addition, the BLMIS trade confirmations were backwards. When BLMIS purportedly bought a security, as indicated on the customer statement, the trade confirmation would show a "sale" of the security.

### iii. The Customer Statements and Trade Tickets Reviewed by HSBC Reflected Unbalanced Options Hedges

211. An unbalanced hedge occurs where, for example, certain equities in a basket are sold, but there is no corresponding adjustment to the relevant options positions, creating potentially significant exposure to losses because the value of the basket and the corresponding options positions no longer match.

212. BLMIS customer statements regularly reflected "unbalanced hedges," in which the options hedge did not correspond to the basket of equities purportedly purchased for customers.

213. A balanced hedge was critical to the execution of the SSC Strategy because it was intended to provide a low-risk investment scenario. An unbalanced hedge creates significant downside exposure. This was a known risk, specifically examined by GSFP as part of its due diligence procedures.

214. GSFP reviewed and monitored "actual portfolios to ensure that the put options executed provide[d] the expected downside protection" and was therefore aware of the existence of several unhedged equity positions.

215. For example, in April 2007, Madoff purported to purchase on behalf of Rye Broad Market a basket of S&P 100 stocks, which included shares of 3M Company and CVS Caremark Corp. According to the account statements, the shares of 3M Company and CVS Caremark Corp. were sold in May 2007 whereas the other equities contained in the baskets were not sold until mid-June 2007. In light of this supposed early sale of the 3M amd CVS Caremark

shares, the corresponding options collar should have been rebalanced to protect against exposure to market risk. No such adjustment was reflected in the customer statements or trade confirmations.

216.    The HSBC-Serviced Feeder Funds customer statements also show unbalanced hedges. For example, between January 5 and 12, 2004, on behalf of Lagoon, Alpha Prime, Thema International, and Thema Wise, Madoff purported to purchase a basket of S&P 100 stocks, which included Texas Instruments Inc. shares. According to the account statements, the Texas Instruments shares were sold on January 16, 2004 whereas the other equities contained in the baskets were not sold until February 2007. In light of this early sale of the Texas Instruments shares, the corresponding options collar should have been rebalanced to protect against exposure to market risk. No such adjustment was reflected in the customer statements or trade confirmations.

217.    As set forth in the following table, the HSBC-Serviced Feeder Funds' and Reference Funds' BLMIS account statements demonstrate that Madoff regularly did not make changes to the corresponding hedges when he purportedly sold one or more equities before the rest of the basket:

|  | Early Sells Without Hedge Adjustment |
|---|---|
| GSFP | 15 |
| HSBC-Serviced Feeder Funds | 266 |

#### iv.   The BLMIS Account Statements Reflected Impossible Options Trading Volumes

218.    BLMIS account statements frequently showed OEX call and put option contracts being traded at volumes that exceeded the total market volume of calls and puts with the same strike price and expiration date being traded on the Chicago Board Options Exchange ("CBOE").

219.   The HSBC Custodians held themselves out as "receiv[ing] and retain[ing] confirmations or other documents evidencing the purchase or writing of an option . . . in accordance with a notice or other communication evidencing the expiration, termination, or exercise of any such option furnished by the securities or options exchange on which such option is traded."

220.   When verifying BLMIS's purported trading activity, no one could have believed that it was possible to trade above the market volume for any security—even once.

221.   The BLMIS Feeder Funds' account statements and trade confirmations reported the strike price (the price at which an option may be exercised) and expiration date (the last date at which the holder of the option may exercise it) of options purportedly traded in their respective BLMIS accounts.

222.   As described in the following graphs, from 2001 to 2008, BLMIS purported to trade—on behalf of accounts serviced by the HSBC Administrators—volumes that regularly were many hundreds of times greater than the total number of put and call options executed on the CBOE with the same trade date, strike price, and expiration date:





223.    Similarly, as described in the following graphs, from 2001 to 2008, BLMIS

purported to trade—on behalf of accounts serviced by the HSBC Custodians—volumes that

regularly were many thousands of times greater than the total number of put and call options

executed on the CBOE with the same trade date, strike price, and expiration date:





224.    In or around 2005, Capital Bank, an Austrian investment bank, met with HSSL in connection with a potential investment in a BLMIS-related structured product based on the returns of Herald Fund.

225.    Capital Bank's diligence team met with HSSL in Luxembourg where they expressed concerns about trade volumes, and specifically asked how BLMIS could trade in seemingly impossible volumes. HSSL's administrative team explained the procedure for calculating Herald's NAV and confirmed to Capital Bank that it verified all options trading in Herald's account. HSSL's administrative team also proffered the explanation that Madoff operated an options exchange over which he traded the options for his IA accounts. If HSSL's explanation had been true, Madoff's options exchange would have been larger than the CBOE.

49

226.    For example, on October 18, 2001, Thema International's and Lagoon's BLMIS account statements reflected a purchase of 3,674 OEX call option contracts (with an October 20, 2001 expiration date and a strike price of 505). CBOE market data shows that there was not a single option contract with the same expiration date and strike price traded that day. In ten instances in which BLMIS purported to execute options trades for both Thema International and Lagoon, no matching options contracts were traded that day.

227.    The BLMIS account records of Thema International, Lagoon, Thema Wise, and Alpha Prime reflect the sale of thousands of OEX put option contracts (with a November 22, 2008 expiration date and a strike price of 475) on November 14, 2008. Public records show only *three* such contracts actually traded on the CBOE on that date.

228.    As set forth in the following table, the Reference Funds' and the HSBC-Serviced Feeder Funds' customer statements regularly reported options trades that exceeded the total volume for options with the same trade date, strike price, and expiration date as traded over the CBOE:

|  | Total Transactions Over Volume | Total Transactions | Percentage of Transactions Over Volume |
|---|---|---|---|
| GSFP | 349 | 381 | 91.6% |
| HSBC-Serviced Feeder Funds | 801 | 877 | 91.3% |

### v.  The Volume of Assets Under Management Was Too Large to Execute the SSC Strategy

229.    In the 2006 KPMG Report, KPMG stated that of the $16 billion under management with BLMIS, $2 billion was being managed on behalf of HSBC's clients. KPMG estimated that between approximately five and eight percent of all of BLMIS's trade executions related to HSBC clients.

230.    In August 2006, BLMIS filed a Form ADV with the SEC stating that, as of the end of July 2006, BLMIS had approximately $11.7 billion of assets under management. To execute the SSC strategy with at least $11.7 billion under management, BLMIS would have needed at least $11.7 billion of notional value in call options.

231.    In or around September 2007, GSFP estimated that BLMIS's assets under management were $20 billion.

232.    On the 2008 HSBC Conference Call, HSBC estimated that BLMIS had between $22 billion and $24 billion in assets under management.

233.    The 2008 KPMG Report stated that HSBC client investments had increased since the 2006 KPMG report and now represented 33% of the assets under management with BLMIS.

234.    To execute the SSC Strategy with between $11.7 billion and $24 billion in assets under management, BLMIS would have needed at least between $11.7 billion and $24 billion of notional value in call options.

235.    Between 2001 and 2008, there were never enough options on the entire listed market to implement the SSC Strategy.

236.    Therefore, HSBC knew that it was impossible to execute the SSC Strategy at the volume of assets under management purportedly held by BLMIS.

237.    GSFP's STAR Review "raised concerns about the strategy of the underlying Madoff [Reference F]unds, noting possible liquidity issues as [the] strategy grows."

238.    The SSC Strategy's lack of scalability was evident even to potential HSBC-Serviced Feeder Fund investors. One such investor, analyzing only one account statement for Thema International recognized that there were not enough available options for BLMIS to execute the SSC Strategy:

> If you look at entire open interest of August OEX calls there is
> [sic] only 22,248 contracts outstanding. Assuming Madoff was the
> entire open interest for the upcoming month at an average strike of
> 700, he could only hedge $1.5B of stock. Given the fact he is
> running $5 to $20B depending on who you talk to, then this would
> be impossible."

HSBC received and reviewed hundreds of HSBC-Serviced Feeder Fund account statements.

### vi.    The Timing of BLMIS's Purported Securities Transactions Was Impossible

239.    Upon information and belief, Madoff also represented to Defendants that he was time-slicing (i.e., entering the market for a particular stock at different times throughout a trading day) and that the prices reported on the account statements reflected the average price over the course of the day. The consistently favorable execution BLMIS claimed to achieve—in which it purported nearly always to trade at an optimal price point—was statistically impossible. If BLMIS had been purchasing or selling stocks multiple times throughout a trading day, BLMIS's reported prices would have necessarily gravitated toward the daily midpoint.

240.    The average price at which a given security is traded throughout a trading day can be measured by a metric called volume weighted average price, or "VWAP." Consistently buying below the VWAP and selling above the VWAP year after year is statistically impossible. But BLMIS's customer statements showed that it did just that.

241.    These statistical impossibilities were apparent to the BLMIS Feeder Funds and their service providers.

242.    During the time that HSBC Private Bank invested in Harley, Harley's trade tickets show that BLMIS reported 850 purchases of equities, 651 (or 76.59%) of which were below the VWAP and 801 equity sales, 539 (or 66.79%) of which were above the VWAP.

243.    As illustrated in the table below, BLMIS reported to the Reference Funds and the

HSBC-Serviced Feeder Funds that it was purchasing equities below the VWAP and selling

equities above the VWAP at statistically impossible rates:

|  | Total Below VWAP | Total Buys | Percentage Below VWAP | Total Above VWAP | Total Sells | Percentage Above VWAP |
|---|---|---|---|---|---|---|
| GSFP | 2,337 | 2,650 | 88.2% | 1,621 | 2,476 | 65.5% |
| HSBC-Serviced Feeder Funds | 54,022 | 66,425 | 81.3% | 44,686 | 59,259 | 75.4% |

244.    Achieving these statistics while trading even a single equity is impossible, but

Madoff claimed to trade in baskets containing between 35 and 40 equities. To achieve the

results reported on the BLMIS Feeder Fund account statements, Madoff would have had to

enter and exit the market at the optimal time of the day, not just for one equity, but for 35 to 40

equities simultaneously.

### vii.    BLMIS Purported to Sell Equities Outside the Daily Reported Price Ranges

245.    BLMIS regularly purported to execute equities transactions for the BLMIS Feeder

Funds' accounts that were outside the security's daily price range.

246.    Each HSBC Administrator's primary responsibility was to calculate the NAV of

the fund for which it was administrator. According to Alpha Prime's offering memorandum, for

example, securities held for the fund were to be valued pursuant to International Financial

Reporting Standards.

247.    HSSL regularly reviewed the trade confirmations for the HSBC-Serviced Feeder

Funds as part of its duties as service provider. Thus, HSSL knew that on many occasions

Madoff purported to buy or sell shares outside the range of daily prices.

248.    For example, as Herald's administrator, HSSL "provide[d] share issue,

redemption, transfer, accounting and valuation services . . . . These valuations [were] based on

trade tickets Madoff sen[t] to HSBC." HSSL entered trades and independently verified the trade details on Reuters, and calculated Herald's NAV.

249.    HSSL executive Nigel Fielding, who also held the title of Deputy Head of Global Client Services for Bank of Bermuda's Global Fund Services Group, and later became Chief Administration Officer of AFS, and then Chief Executive Officer of HSSL, explained that HSSL "provide[d] a fund accounting and investment valuation service. As part of this service we validate the price of all investments to market data sources, this includes all investments held by BLMIS."

250.    The HSBC Administrators priced "investment fund assets independently of the Fund Manager . . . using a number of market sources . . . ." Upon information and belief, HSSL was aware of differences between actual market values reported in the financial press and the trades reported on the customer statements of the HSBC-Serviced Feeder Funds it served.

251.    For example, the December 2006 account statements of Alpha Prime, Lagoon, Thema International, and Thema Wise reported the sale of thousands of shares of Merck & Co. with a settlement date of December 28, 2006 at a price of $44.61. BLMIS's records indicate that these shares were purchased on December 22, 2006 at a price of $44.61. On December 22, 2006, however, Merck & Co. stock traded between $42.78 and $43.42.

252.    There were 1,461 total equities transactions outside of the daily price range over the life of the HSBC-Serviced Feeder Funds' accounts.

### viii.    The Dividend Activity Shown on Customer Statements Was Impossible

253.    During the periods that BLMIS's IA Business was purportedly out of the market, BLMIS claimed to invest in the Fidelity Spartan U.S. Treasury Money Market Fund (the "Fidelity Spartan Fund"). BLMIS purported to do so notwithstanding the fact that the Fidelity

Spartan Fund changed its name in August 2005. Nevertheless, from the end of 2005 until

Madoff's arrest in 2008, the HSBC-Serviced Feeder Funds' account statements continued to

show transactions with a fund that no longer existed under the name reported on customer

statements.

254.   The Fidelity Spartan Fund issued dividend payments only once a month, either at

month's beginning or end. But the HSBC-Serviced Feeder Funds' account statements often

reported multiple dividend payments by Fidelity Spartan Fund in a calendar month, on dates

that did not correspond with published dividend payments. In February 2007, for example,

Thema International's BLMIS account statement reported eight dividend payments purportedly

made by the Fidelity Spartan Fund (which by then no longer existed). During the same month,

Alpha Prime's BLMIS account statement reported seven Fidelity Spartan Fund dividends.

255.   The number of improper dividend payments credited to the Reference Funds' and

the HSBC-Serviced Feeder Funds' accounts are set forth in the following table:

| | Improper Dividend Payments | Total Dividend Payments | Percentage of Improper Dividend Payments |
|---|---|---|---|
| GSFP | 144 | 147 | 98.0% |
| HSBC-Serviced Feeder Funds | 2,281 | 2,342 | 97.4% |

### H.  Other Indicia of Fraud

#### i.  Unusual Fee Structure

256.   BLMIS purported to perform three basic services for its feeder funds: (i)

investment management; (ii) custody of assets; and (iii) securities trading. It is a standard

practice in the investment industry to charge for these services.

257.   An investment fund's performance depends in large part on the skill and active

decision-making of its investment managers, who typically charge two types of fees: (i)

management fees, usually based on a fixed percentage of the AUM; and (ii) performance fees, usually based on profits.

258.    BLMIS did not charge the IA Business customers any management or performance fees. Instead, BLMIS purported to accept only commissions for purportedly executing trades, as reflected in the fraudulent customer statements it prepared. Others that solicited investors for BLMIS, or, directly or indirectly, funded customer accounts, charged hundreds of millions of dollars for investment advisory services that consisted of nothing more than directing money into BLMIS.

259.    BLMIS Feeder Funds turned over all investment advisory duties to Madoff at BLMIS, who performed those services for free, inexplicably walking away from hundreds of millions of dollars in management and performance fees.

260.    As early as 2001, in a report on Fairfield Sentry, HSBC Private Bank recognized that Madoff's forfeiture of the typical management and performance fees was a concern.

261.    In a 2007 report on Fairfield Sentry, HSBC Private Bank noted Madoff's failure to charge management and performance fees and found that "[t]he lack of transparency involving fees paid to Madoff was disturbing." The report also noted that the only fees that BLMIS was supposed to charge—brokerage fees—were "not disclosed anywhere, not even [in] the audited financial statements."

262.    Thema director David Smith in 2005 wrote to HSBC's Paul Smith about BLMIS's fee structure, stating, "Madoff does not receive a management fee" and further observing that BLMIS's brokerage fees were "extremely cheap . . . and below market price."

### ii.  BLMIS, Known as an Innovator in Electronic Trading, Provided Only Delayed Paper Statements

263.    By June 2000, the practice of granting clients electronic access to their accounts was industry custom, particularly as a result of the Electronic Signatures in Global and National Commerce Act, 15 U.S.C. § 7001, which permits using electronic records to comply with federal law.

264.    Throughout the 2000s, ordinary consumers were also conducting transactions and accessing their checking, savings, and investment accounts online.

265.    Although Madoff held himself out as a pioneer of electronic trading technology, he did not provide his customers with electronic access to their accounts and refused to put information about customers' account holdings online. BLMIS instead used outmoded technology and provided only paper account statements and paper confirmations, sent by U.S. mail or fax three to four days after the trades supposedly occurred.

266.    The lack of real-time access to account data or electronic statements facilitated the manufacture of fictitious trades and manipulation of reported prices on BLMIS customer statements.

267.    BLMIS customer statements were delivered by U.S. mail or fax. Aside from faxes, Madoff allowed no form of electronic communication regarding trade confirmations.

268.    HSBC's sub-custodian agreements with BLMIS required information to be timely delivered. In 2005, HSBC Bank plc noted that the typical one-week delay in delivering trade information did not comply with BLMIS's sub-custodian agreement.

### iii.   Madoff's "Strip Mall" Auditor Was Neither Qualified for, Nor Capable of, an Audit of a Global Investment Management Company with Billions of Dollars Under Management

269.   BLMIS had tens of billions of dollars under management, but was audited by Friehling & Horowitz, CPA, P.C. ("Friehling & Horowitz"), an accounting firm with only two accountants, one of whom was semi-retired and living in Florida. The firm's offices were located in a strip mall in suburban Rockland County, New York.

270.   On or about November 3, 2009, David Friehling, the sole proprietor of Friehling & Horowitz, pleaded guilty to filing false audit reports for BLMIS and filing false tax returns for Madoff and others.

271.   All accounting firms that perform audit work must enroll in the American Institute of Certified Public Accountants' ("AICPA") peer review program, and those that do are listed on the public area of the AICPA website. Despite holding itself out as an AICPA member, Friehling & Horowitz avoided peer review after 1993 by representing that it did no audit work and, therefore, was not listed on the AICPA website.

272.   Friehling & Horowitz was not on HSBC's list of recognized auditors. Their shortcomings were known to HSBC, who questioned whether it could rely on statements produced by Friehling & Horowitz. In the 2008 Conference Call, Christine Coe expressed her concern asking whether BLMIS's auditor was qualified "to make sure [Madoff was] not fabricating" his returns. Acknowledging Coe's concern about whether BLMIS's auditor provided a sufficient safeguard, KPMG responded, "Exactly. And the answer is no."

273.   HSBC Private Bank did not believe that Friehling & Horowitz was capable of auditing BLMIS and acknowledged in its research committee report that Friehling & Horowitz was not a "realistically independent auditor," and that its only major client was BLMIS.

#### iv. Purported Options Contracts Entered into by BLMIS on Behalf of Customers Did Not Identify Counterparties

274. Options trades undertaken in the OTC market are entered into pursuant to private contracts between a party and a counterparty. Madoff claimed to be trading options in the OTC market, which would have required BLMIS to enter into private, individually negotiated, arm's-length contracts with willing counterparties. BLMIS customers bore the risk if the counterparty failed to perform. Madoff claimed that counterparties entered into agreements identical to those executed by BLMIS's investors, and that counterparties were obligated to deposit Treasury Bills as collateral for performance. But no such agreements were ever produced to BLMIS customers, nor did Madoff ever provide any confirmation of where and how those Treasury Bills were posted.

275. Because BLMIS allegedly traded options in large blocks and then divided the contracts proportionally among its investors, a party (such as a BLMIS investor or its service provider) could not assess the credit risk of the counterparty upon which it was relying for performance. Furthermore, there were only a few possible counterparties capable of supplying the necessary options liquidity at the volume BLMIS was trading. One such counterparty would have been HSBC, but HSBC knew that it was not engaged in options trading with BLMIS.

276. On the 2008 Conference Call, HSBC discussed the options counterparties, noting, "the only thing you actually can see is the option on [Madoff's] blotter. And you can't actually see the name of the account or party . . . ."

277. By October 2008, Coe was told that "there is little transparency around this . . . [t]he real risk here is the Put on [sic] Call Options on the S&P 100. Who is the counterparty?"

VIII.   **THE INITIAL TRANSFEREE OF CERTAIN SUBSEQUENT TRANSFERS, TREMONT, KNEW THAT BLMIS'S IA BUSINESS WAS A FRAUD**

278.   On December 7, 2010, the Trustee commenced an adversary proceeding by filing a complaint (the "Tremont Complaint") against, among others, Tremont and several Tremont funds invested wholly or in part with BLMIS (collectively, the "Tremont Feeder Funds"), seeking to avoid and recover $2.1 billion of initial transfers from BLMIS that constitute customer property under SIPA. The Trustee incorporates by reference the factual allegations in the Tremont Complaint, as supplemented below.

279.   Tremont created, managed, and operated a number of feeder funds that invested directly and indirectly with BLMIS.

280.   In a September 22, 2011 order, this Court approved a settlement between the Trustee and more than a dozen of the Tremont Feeder Funds, Tremont and its affiliates, and a former Tremont chief executive (collectively, the "Tremont Settling Defendants") that obligated the Tremont Settling Defendants collectively to pay the Trustee $1.025 billion for the benefit of the customer property estate (the "Tremont Settlement"). The Tremont Settlement also provides that the transfers made to the Tremont Feeder Funds were "deemed avoided."

**A. Tremont's Senior Executives Had a Close Relationship with Madoff**

281.   Sandra Manzke founded Tremont in the mid-1980s and first met Madoff in or around 1991. Until her departure in 2004, Manzke served as Tremont's CEO and then co-CEO, helping to select money managers, including Madoff. Robert Schulman joined Tremont in 1994 and held various high-level positions, including President, co-CEO, and ultimately sole CEO.

282.   Manzke and Schulman met and had regular calls with both Madoff and his top lieutenant, Frank DiPascali. Schulman had a special relationship with Madoff, which Tremont described as its "competitive edge." In fact, Tremont touted Schulman's unusually close

relationship with Madoff, stating that his "long-standing relationships with the principals of our existing managers [BLMIS listed first among them] is clearly an edge over any firm contemplating a similar business as our ability to negotiate preferential terms is related directly to the strength and longevity of the relationships." Emphasizing Schulman's special relationship with Madoff, in 2003, Tremont told its auditor, Ernst & Young ("E&Y") about Schulman's unique access to BLMIS, including that "Bob Schulman periodically visits [BLMIS's] facilities throughout the year. . . ." At least once, Madoff even sought Schulman's advice on hiring decisions at BLMIS. In June 2006, Tremont Vice President Chris Cichella explained to a potential investor that Schulman was "intimately familiar" with Madoff based on "a 10+ year relationship."

283.    Investors took notice of the relationship between Schulman and Madoff. For example, a prospective investor had a call with Tremont in May 2007 where he referenced the "friendly relationship between Bob and Bernie." He also noted that, "[f]or Tremont, it goes back to the relationship . . . . Bob has been there many times and has worked w/ Bernie is [sic] business since the 1980s."

**B.  Tremont Received Repeated, Direct Fraud Warnings About BLMIS's Investment Advisory Business**

284.    Tremont received warnings of BLMIS's fraudulent IA Business from clients as early as April 2001, when an investor in two of the Tremont Feeder Funds wrote to Schulman: "I know you are sick of answering this but man is it hot out there with the Bernie fraud rumors." The investor questioned why Madoff "need[ed] to go to cash at year-end every year" and used such a "small" firm as its auditor.

285.    Less than a month later, Tremont became aware of the *Barron's* and *MARHedge* articles questioning the legitimacy of BLMIS's IA Business and identifying Tremont as offering

BLMIS Feeder Funds to its clients. On May 7, 2001, Tremont Group's Chief Operating Officer

(and later President) Barry Colvin emailed a number of Tremont employees alerting them to the

articles and instructing them to direct third party questions to Tremont's management.

286.    On April 25, 2003, sales vice president Jim Mitchell relayed to Schulman a

discussion Mitchell had with an investor about "associating Madoff with broker-dealer

wrongdoing of late." The following month, Mitchell, Schulman, and the investor visited

Madoff. The investor's meeting notes (which he shared with Tremont) characterized Madoff's

operation as "controversial" and expressed numerous concerns that included: (i) Madoff's

unwillingness to meet with investors; (ii) BLMIS's lack of management fees; (iii) Madoff's

going to cash at every year end; (iv) the absence of a third party custodian; and (v) BLMIS's

"exceptionally stable" returns "with only 7 negative months since 1990."

287.    Mitchell retained these notes and years later forwarded them to Tremont vice

president and manager responsible for product line management and oversight, Darren

Johnston, cautioning: "Don't attach this – but it's an interesting set of notes from a meeting

years back . . . ."

288.    In March 2004, the investor who emailed Schulman in 2001 about the "Bernie

fraud rumors" emailed him again, this time to redeem his Tremont Feeder Fund investments,

explaining:

> My motivation for doing this is not due to some new buzz out there for as you
> know that is a constant din but rather that I can no longer ignore my core instincts
> as an investor in which I have the [sic] battle the fact that I really don't know
> what is going on, what a [sic] do know is I am in an investment program that no
> one else in history has been able to make work, return series is flat out too good
> given how efficient the underlying securities are priced and he doesn't charge a
> fee all compounded by it seems every stone I turn over is another multibillion $
> [M]adoff feeder. I . . . found that my inability to rationalize & be intellectually
> honest on why I was invested bothered me more than it has in the past . . . .

289.   When Madoff's scheme collapsed, that investor circulated an email among certain of his employees with the subject header "HOLY SH## !!!!!!!!!!!!!!!!!!! THE WORLD IS NOW RIGHT !!!" and wrote that "Bob Schulman & all the feeder groups could be going to jail over this . . . ." (Emphasis in original.)

290.   In May 2004, Cichella emailed Tremont senior vice president Rob Rosenbaum that investment advisory firm RogersCasey (where Tremont personnel, including Manzke, previously worked) was "concerned about Tremont's relationship with Madoff" and would thus recommend that its client not invest with Tremont. Cichella said RogersCasey would not reconsider its position because BLMIS "was prone to a blow-up that would destabilize Tremont . . . ." Analyzing Tremont for a prospective institutional investor in 2005, the investor's representative James Purnell raised concerns to Tremont's head of Product Management and Investment Advisory board member Stuart Pologe about what he dubbed "the Madoff black box" including, among other things, whether BLMIS's assets were segregated and being verified by a third party, how Madoff is paid, and whether any written Tremont materials exist mentioning Madoff (the response was that there were none and there never would be). After Madoff's arrest and the revelation of the fraud, a former coworker of Purnell emailed him and boasted that they were "finally vindicated on Madoff. If it looks too good to be true . . . ."

291.   In March 2007, representatives from Tremont's potential client, Agile Group ("Agile"), met with Johnston, product management senior vice president Patrick Kelly, and portfolio manager Brian Marsh as part of its due diligence. Agile's notes from the meeting (the "Agile Notes") reflect that Agile peppered Tremont with numerous questions regarding operational and trading anomalies indicating fraud at BLMIS or its reporting fictional trades. This included queries about its auditors, the lack of information on options trading, identity of

counterparties to the purported options transactions, BLMIS's AUM, BLMIS's inexplicable use of paper trade tickets and account statements, the inability to verify BLMIS's assets, and BLMIS's going in and out of the market in large transactions with no overall effect on the market for the securities it purportedly traded.

292.    The Agile Notes reflect that Agile and Tremont discussed whether BLMIS's IA Business was a fraud and perhaps even a Ponzi scheme. Agile pointed out in the meeting how the fraud would be easy if BLMIS's auditor did "not work so hard" and if the "few key people" operating the IA Business were involved. During the discussion, it was deduced that, "[e]ither Madoff owns what he owns or they are fictitious. But if it is a Ponzi scheme, every dollar profit has been realized."

293.    A month later, Agile employee Mariah Quish sent Tremont follow-up questions concerning BLMIS. Addressing Agile's request, Johnston instructed internally: "We should give answers by phone rather than email . . . ." After speaking with Johnston and Tremont's vice president of investor services Harry Hodges, Quish reported she found Tremont's "level of secrecy combined with a faith-based view on Madoff difficult to understand."

294.    In May 2007, Cichella, who worked closely with Johnston and Hodges, forwarded to himself the May 2001 *Barron's* article.

295.    Between 2005 and 2008, three major banks that provided leverage to the Tremont Feeder Funds each saw significant fraud risks associated with BLMIS, and each demanded and received from Tremont extraordinary contractual rights in an attempt to mitigate those risks, such as indemnification for fraud at BLMIS and special redemption rights if Madoff came under investigation for breach of securities laws. As communicated by one such provider, Citibank, to Tremont, Madoff's lack of third party controls and how he executes on his volume of options

were, in Johnston's words, "fundamental roadblocks" to Citibank's senior risk management people.

296.    Tremont continued to receive warnings that Madoff's trading was not real as late as October 2008, when Tremont sales representative Adrian Gordon reported to Johnston, Marsh, and Mitchell that a prospective institutional investor was "loathe to give his stamp of approval to [Madoff's] strategy when he has no idea what trades actually take place." A month later, Gordon emailed the Tremont global sales team that another potential investor was "very anti Madoff" and said Madoff was "probably a pyramid structure." That same month, Cichella once again pulled out the May 2001 *Barron's* article, this time forwarding it to Mitchell, stating, "Enjoy!"

## C.  Tremont's Own Reporting Showed That BLMIS's Purported Trades Were Impossible

297.    Despite exempting BLMIS from the due diligence it conducted on other managers, Tremont regularly received from BLMIS customer statements, trade tickets, and other information containing an abundance of facts demonstrating that BLMIS reported fictitious trades and that the fraud warnings it received were well founded. Tremont created reports and marketing materials of its own highlighting the impossible trading and performance. For example, Tremont knew from the monthly analytic summaries its senior management prepared based on these BLMIS documents that the positions and prices BLMIS reported differed from prices Bloomberg reported. Tremont's auditor, KPMG, similarly found and reported to Tremont more than 20 such differences in 2006 alone.

298.    Tremont also estimated in its reports the amount BLMIS had in AUM and calculated whether or not there was sufficient volume in each instrument for Madoff to be able to execute such trades. Given that Tremont knew BLMIS had "well in excess of $20 billion" in

AUM by May 2003, and that according to Johnston it "monitored all trade activity," Tremont
knew there was insufficient volume for dozens, if not hundreds of the trades Madoff purported
to complete.

### D.  Tremont Exempted BLMIS from Its High Due Diligence Standards

299.   The majority of Tremont's business involved placing its clients' assets with third-
party managers. For managers other than Madoff, Tremont implemented due diligence
procedures, investigated the quality of the management personnel, assessed key risk factors
associated with the investment, and continuously monitored the investment and the managers.

300.   As a sophisticated manager with industry-leading due diligence standards,
Tremont positioned itself at the forefront of initiatives to improve monitoring of investment
managers in light of frauds that preceded Madoff. Tremont claimed that its comprehensive
operational risk evaluation served to mitigate any possibility of misrepresentation or fraudulent
activity.

301.   Despite these claims and all of the fraud warnings, Tremont exempted BLMIS
from its due diligence standards. In fact, Tremont's executives deliberately prevented
transparency into Madoff and BLMIS throughout the Tremont-BLMIS relationship. To ensure
that Tremont's employees did not conduct any meaningful due diligence on BLMIS and
Madoff, Mitchell laid out in an email three of the most critical questions about Madoff's
operations "ya don't ask" about: (1) BLMIS's AUM, (2) how Madoff generated his returns, and
(3) Madoff's auditors.

302.   According to the SEC—which investigated Tremont after Madoff's arrest—
Schulman personally conducted due diligence on Madoff, which was an "outlier" in Tremont's
procedures as applied to other managers. The SEC concluded that because "Schulman

conducted the due diligence, he would be able to control what areas and information [were] reviewed or not reviewed."

303.   Tremont also did not conduct due diligence on Friehling & Horowitz. Rather, as the SEC found, Tremont's due diligence materials "did not reveal any evidence of conversations with Madoff's auditors." In 2007, Tremont even admitted to Agile that someone from Tremont "anonymously drop[ped] by" Friehling & Horowitz's strip-mall office, just "to make sure they exist."

304.   In an unusually candid response to one strategic consulting firm, Pologe admitted that Tremont had "no manager due dili[gence] process for" its BLMIS investments and referred to Tremont's dealings with BLMIS as "a highly vulnerable, highly profitable business." Pologe noted: "We make a lot of money off this, though."

### E.   BLMIS Failed Tremont's Requirements for Third-Party Oversight Yet Tremont Made an Exception for Madoff

305.   Tremont's due diligence standards considered independent oversight of its outside managers to be critical. Tremont, however, knowingly made BLMIS an exception to its requirement of third-party oversight of its money managers.

306.   For example, in June 2008, Tremont rejected a potential manager because, as stated in an internal memo, a "key part of any due diligence process is being able to verify the information provided by the Fund with independent parties, in this instance there aren't any independent parties to speak with to verify what the partners of [the fund] are doing."

307.   The SEC also found Tremont had rejected another outside money manager because of a lack of operational infrastructure and the presence of only one person who was responsible for all operational duties. Yet, the SEC noted, Tremont continued its investment

with BLMIS, although "all operational guidelines with respect to trading and execution were controlled by one individual."

308.    Tremont executives were unwilling to respond in writing to investors' questions about third-party asset verification. This included at least one pointed question from an investor who asked Mitchell, because the BLMIS account statements were "generated by Madoff, how do I get comfort that the money is really there?" This investor also stated, "the accounting firm [Friehling & Horowitz] doing the audit being a small firm made me a bit uneasy." Mitchell took the conversation off-line, replying, "What is your telephone number?"

309.    Dealing with another investor question about asset verification, Johnston emailed Cichella that this would "lead closer to BLMIS which [Tremont] strictly wants to avoid." Cichella replied: "Keep in mind, they are looking for independent (of [Tremont] or Madoff) verification of the assets in a tangible form. . . . it would be great if you could convince them" that the assets existed.

310.    On or about October 1, 2008, Tremont personnel met with the managers of BLMIS Feeder Fund Fairfield Sentry concerning a possible investment with BLMIS through Fairfield Sentry, which Tremont understood operated in the same manner as its own BLMIS Feeder Funds. Tremont's notes acknowledged that Fairfield Sentry did not satisfy Tremont's due diligence requirements, including lack of independent oversight at BLMIS, no third-party prime broker, and Friehling & Horowitz's "material percentage of their annual revenue from Madoff." Evidencing that BLMIS Feeder Funds did not meet Tremont's usual due diligence standards and were fraught with red flags, the potential Fairfield Sentry investment was referred up the ladder for "an exception approval from the Investment Committee."

**F. Tremont Consistently Shielded Madoff from Third Party Due Diligence**

311.    Tremont consistently shielded Madoff from questions by third parties conducting their own due diligence on BLMIS, calling it "Firm policy" not to provide access. On January 24, 2004, Mitchell asked Schulman whether a potential client could visit Madoff. Schulman responded: "They cannot and WILL NOT VISIT MADOFF please make it clear that this is OFF the table." (Emphasis in original.)

312.    In 2005, when Purnell was questioning Pologe about Madoff, Pologe forwarded the questions to Tremont executive Suzanne Hammond, who at first responded "Do not go any further" and then sent a second response, copying Schulman, stating "I hope you have a confidentially [sp] agreement," before sending vague, one word answers to the questions.

313.    On June 16, 2006, Mitchell, after being informed that an investor had been "relentless on meeting Bernie," emailed Tremont investment relationship assistant vice president Roy Soares, "[o]ur own analysts don't get to see Madoff – why should [investors]."

314.    In swap agreements with three banks providing leverage, Tremont included the provision that if a bank contacted Madoff, Tremont had the right to cancel the swap without paying an early termination fee.

315.    In 2008, Darren Johnston reported internally that he "made absolutely clear" to a major financial institution that it was not to contact Madoff's auditor and that "we do not offer up assistance to investors with Bernie, his staff or his auditor."

316.    Later in 2008, Mitchell was especially careful about not letting a large new potential investor speak to Madoff, internally acknowledging that "I suspect they will want a meeting, being institutional. We should discourage this . . . ." Another Tremont employee relayed this to the investor and assured others internally that "this would never happen and we told [the investor] that we have never had an onsite meeting with a client and BM."

69

317.    Tremont even restricted which of its employees could contact BLMIS. In a September 2002 email, the message was relayed internally: "DON'T SEND ANY CORRESPONDENCE TO BERNARD MADOFF. ONLY [Tremont executives Soares, Schulman and Hammond] ARE ALLOWED TO SEND ANYTHING TO HIM!" (Emphasis in original.)

318.    Tremont also refused to allow its administrator to receive the Tremont Feeder Fund customer statements and trade tickets directly from BLMIS, as Tremont arranged with its other managers. Tremont also intervened to limit contact between Madoff and Tremont's auditor, E&Y. In May 2006, internal Tremont emails discussing E&Y's request for BLMIS's "internal control letter" and questioning whether an audit report was prepared for Madoff, revealed that Tremont acted as the go-between "[t]o keep the minimum amount of people contacting Madoff." In so doing, Tremont also misled E&Y, telling it that "Bob Schulman periodically visits [BLMIS's] facilities throughout the year and watches the company trade according to their highly secret strategy"—an obvious fiction given that BLMIS's IA Business never executed any trades.

319.    This deliberate shielding of Madoff continued when Tremont replaced E&Y with KPMG and reported to potential clients that, other than minimal verification, "there is no contact" between KPMG and BLMIS.

320.    Tremont also lied to investors when presented with concerns about BLMIS's auditors. As set forth in a 2006 internal memo, Tremont's top investment managers knew that Friehling & Horowitz was a "small firm" that was "not specialized in investment firms [and] broker/dealers." Nevertheless, Johnston and others from Tremont told Agile that Friehling & Horowitz was "usually a name you hear [with] medium size broker dealers."

### G. Tremont Avoided Questions and Fabricated Answers About BLMIS's Purported Options Trading

321.    Tremont's senior management knew that the options trades were a central part of the SSC Strategy and were well aware of how the options trading for the strategy worked. In fact, Schulman bragged internally that he taught Madoff how to trade options. Nevertheless, in response to evidence on the face of BLMIS trade tickets that included suspect options trading, Tremont tried to explain away these issues by giving inconsistent and false explanations.

### H. Divergent Answers on Over-the-Counter/Listed Trading Questions

322.    As described in the Tremont Complaint, Tremont knew that Madoff could not be trading options over-the-counter ("OTC") as he represented, in light of (i) the CUSIP numbers on BLMIS's trade confirmations, which indicated the options were traded on an exchange, and (ii) the lack of counterparty information that should be on all OTC trade confirmations.

323.    Tremont also knew that Madoff had not entered into any ISDA agreements with any counterparties—a basic requirement for all OTC options trades.

324.    Rather than openly acknowledge the options trading impossibilities—which were clear from the trade tickets that Tremont analyzed—Tremont would flip-flop on the question of whether BLMIS traded options OTC or traded them on the Chicago Board Options Exchange.

325.    For example, a November 2006 Due Diligence Questionaire ("DDQ") for one of the Tremont Feeder Funds stated that "options [] are traded on a recognized exchange." In contrast, in November 2007, in response to a statement by HSBC Bank plc that it was under the impression that BLMIS traded options OTC, Johnston wrote, "our understanding is also that they are OTC." On yet another occasion, Rye Broad Market's July 2007 DDQ equivocated, stating options "may be either listed or OTC."

326.   As set forth in the Agile Notes, Tremont told Agile in 2007 that Madoff used both OTC and listed options for his strategy, and that Madoff has used OTC options since the beginning. Tremont even went so far as to make up a rationale for Madoff's use of one or the other, telling Agile that Madoff will go to listed options depending on price and that most of the time OTC options have a better price.

### i. Failure to Conduct Any Diligence on Purported Options Counterparties and Covering up the Truth with Fabrications

327.   Tremont failed to conduct any diligence on the lack of OTC counterparties on BLMIS's trade confirmations, because it knew there was no legitimate explanation.

328.   Tremont senior management stated on certain occasions that Madoff purportedly traded options with the counterparties as agent for the Tremont Feeder Funds. This meant that the Tremont Feeder Funds, not BLMIS, bore the risks involved with trading and settling with those purported counterparties.

329.   Tremont senior management knew it had to conduct counterparty due diligence to insulate against default risk. A JPMorgan Chase ("JPM") representative even pointed out to Johnston that the trading counterparties should all have been known to Tremont if Madoff supposedly traded in the name of the account holder (i.e., Tremont's BLMIS Feeder Funds), and not in BLMIS's name. But Tremont never spoke with a single counterparty for Madoff's purported options trading, because there were none.

330.   Tremont instead covered up for Madoff's fabrications with fabrications of its own, which changed depending on who was asking. In a March 24, 2006 email, Kelly told Schulman that Citi, one of Tremont's leverage providers, had "asked around" and could not "find anyone who admit[ted] to being [BLMIS's] counterparty." Schulman replied, "He

72

[Madoff] has not disclosed [any counterparty names] to us." Kelly nevertheless later told Agile

that Schulman "has seen the counterparty names – he just does not want to disclose it."

331.    In October 2006, Soares emailed Fortis Bank, relaying information provided by

Schulman that one of the Tremont Feeder Funds had 12 counterparties, "which Madoff must

use in relation to his put options trades." Schulman, however, later admitted in sworn testimony

that Tremont had never tried to identify any purported counterparties.

332.    In a June 2007 email, Kelly told JPM, which was considering a Tremont Feeder

Fund investment, that "we do know the [counterparties'] general characteristics such as number

and minimum credit rating." A month later, Mitchell told a different investor, "[o]ption

counterparties are typical banks," and named JPM—who had just inquired on the identity of the

counterparties—as one of them.

333.    In April 2008, Johnston told consultant Albourne Partners ("Albourne")—itself in

the process of conducting diligence on Tremont Feeder Funds for its clients—that Tremont "has

checked with counterparties to make sure they are trading with the Investment Advisor

[BLMIS] in the relevant instruments."

334.    In October 2008, Albourne emailed Johnston twice, asking about Tremont's

counterparty exposure to "MS [Morgan Stanley] or GS [Goldman Sachs]." Johnston

"confirm[ed] that Tremont had "[a]bsolutely no exposure" to those companies, which did not

make any sense in light of prior statements unless Johnston knew Madoff was not trading

options as he purported.

335.    The September 2008 collapse of Lehman Brothers Inc. and its affiliates and

subsidiaries (collectively, "Lehman")—one of the largest OTC derivatives counterparties at the

time—led to industry and investor panic. Many Tremont clients worried about their Lehman exposure, in light of BLMIS's purported billions of dollars in options holdings.

336.    By contrast, Tremont's senior management was seemingly unconcerned from the outset by these monumental events. They knew that if BLMIS's OTC options positions were real, a crash of a major options counterparty would have catastrophic effects on the Tremont Feeder Funds. For example, in 2007, Mitchell detailed to an investor how, if a counterparty to an options trade such as Bear Stearns defaulted, "then the option (otc) is gone."

337.    Tremont worked to avoid discussions with investors regarding the Lehman collapse. To one client trying to assess its Lehman exposure and exposure to other potentially precariously positioned counterparties, Johnston simply stated, "We are not responding to this."

338.    Mitchell crafted an answer to investors asking whether the Tremont Feeder Funds had Lehman risk, stating internally that "the line we should follow is that . . . [w]e do not discuss our counterparty arrangements as we are contractually bound not to." In reply, Johnston went a step further, indicating his certainty that the "answer is 'no exposure'."

339.    These statements were misleading by implying Tremont knew of actual counterparty arrangements and could assure the investors that Tremont's counterparties presented no risk. If Tremont's senior management believed its BLMIS options were real, however, the Lehman collapse would have been more than a non-event.

## I.    Tremont's Executives Had a Powerful Motive to Hide What They Knew About BLMIS and Madoff

340.    Tremont's profitability and, as it turned out, its very existence, depended on BLMIS. Tremont and the Tremont Feeder Funds benefitted from BLMIS's incredibly consistent, positive returns, which enhanced their investment track records and ability to attract business partners and clients. This led to the Tremont Feeder Funds' AUM increasing rapidly.

74

For example, from its inception in January 1994 to November 2008, Rye Broad Market's AUM increased from $5.9 million to approximately $2.35 billion, a 400-fold increase.

341.    Tremont's revenues grew along with its AUM; during this period, Tremont received at least $255 million in fees from its BLMIS-facing products.

342.    Chief Financial Officer Lynn Keeshan noted that Tremont was "highly dependent" on Madoff, which accounted for "all of the profits of the firm." Cichella said Rye Select Broad Market Prime Fund L.P.'s "only reason for being is as a $2b feeder into Madoff." Pologe said BLMIS was Tremont's "crack addiction business."

343.    Tremont's parent company concluded that "the economics of Tremont's business [was] Madoff." Tremont did nothing more to earn its fees through its Tremont Feeder Funds than provide access to BLMIS. Pologe acknowledged Tremont "just sell[s] access [to BLMIS] for 2% management fee . . . . We make a lot of money off this." As Schulman told Mitchell, for some customers, on top of the management fee, Tremont levied "a 50 basis point surcharge for them to access Madoff."

344.    Fees were a powerful reason for funds like Tremont to close their eyes and hide what they knew about BLMIS's fraud. As noted by Albourne in late 2008, "[w]e have been advised by some of the [funds invested in BLMIS] that they are not interested in knowing more about the product due to the fees they are earning on the product."

### J.    Tremont Co-Managed Kingate Global

345.    Tremont also had knowledge of Madoff's fraud based on its tight-knit relationship with the Kingate-related feeder funds and management.[2]

---

[2] The factual allegations in the Trustee's Fourth Amended Complaint against Kingate Global Fund Limited ("Kingate Global") and concerning the role of Kingate Management Limited are incorporated by reference. *Picard v. Ceretti, et al. (In re Bernard L. Madoff Inv. Secs., LLC)*, Adv. Pro. No. 09-01161 (CGM) (Bankr. S.D.N.Y.) (ECF No. 100).

346.    From the inception of their respective BLMIS investment accounts, Federico

Ceretti and Carlo Grosso worked closely with Manzke to create Kingate Global and its

manager, Kingate Management Limited (collectively, "Kingate").

347.    Manzke introduced Ceretti and Grosso to Madoff in 1993 and worked with Ceretti

and Grosso as a Kingate Global director and manager from 1995 until 2004.

348.    The Tremont-Kingate relationship continued through the revelation of Madoff's

fraud. Kingate Global was co-managed by Kingate Management and Tremont affiliate Tremont

(Bermuda) Ltd. ("Tremont Bermuda")—an entity described by Manzke as "a pass through,"

which delegated management responsibilities to Tremont in New York and shared officers and

directors with Tremont Partners, including Schulman and Manzke. Specifically, in or around

March 1995, Kingate Management and Tremont executed a co-manager agreement with

Kingate Global. Pursuant to the agreement, Kingate Management and Tremont Bermuda were

tasked with evaluating and monitoring BLMIS and providing necessary management services to

Kingate Global. Manzke and Hammond were listed as "principal decision-makers" in May

2005.

349.    As part of this deal, Kingate Management and Tremont Bermuda also split

Kingate Global's management fees, which provided Tremont with significant revenue. Between

1998 and 2008, Tremont received over $40 million in fees for funneling investor assets to

Kingate Global.

350.    Tremont Bermuda and Kingate Management were co-agents to Kingate Global

through their conduct and the operation of the various agreements entered into between the

parties. As such, Kingate's knowledge that BLMIS's IA Business was a fraud may be imputed

to Tremont. *See Picard v. Ceretti (In re BLMIS)*, Adv. Pro. No. 09-1161 (CGM), 2015 WL

4734749, at *13 (Bankr. S.D.N.Y. Aug. 11, 2015).

## IX.    THE SUBSEQUENT TRANSFERS TO THE DEFENDANTS ARE RECOVERABLE BY THE TRUSTEE

351.    Rye Broad Market, Rye Portfolio, Rye Select Broad Market Insurance Portfolio

LDC ("Rye Insurance"), Greenwich Sentry, Harley, and Fairfield Sentry (collectively, the

"Initial Transferees"), received transfers directly from BLMIS. Those transfers were then

subsequently transferred either directly or indirectly to HSBC Bank plc, HSBC Bank USA,

HSBC USA, HSBC Private Bank (Suisse), and SICO. Based on the Trustee's investigation to

date, Defendants received approximately $501,668,969 in the aggregate before the Filing Date.

### A.    Initial Transfers from BLMIS to Fairfield Sentry

352.    The Trustee commenced a separate adversary proceeding against Fairfield Sentry

and other defendants in this Court under the caption, *Picard v. Fairfield Sentry Ltd., et al.*, Adv.

Pro. No. 09-01239 (CGM), seeking to avoid and recover initial transfers of customer property

from BLMIS to Fairfield Sentry in the approximate amount of $3,000,000,000 (the "Fairfield

Sentry Initial Transfers").

353.    By orders dated June 7 and June 10, 2011, this Court approved a settlement

among the Trustee, Fairfield Sentry, and others, and on July 13, 2011, entered a consent

judgment in favor of the Trustee and against Fairfield Sentry in the amount of $3,054,000,000

("Judgment Amount") [ECF No. 109].

354.    The Fairfield Sentry Initial Transfers were and continue to be customer property

within the meaning of SIPA § 78*lll*(4).

355.    On August 28, 2020, the Trustee filed a second amended complaint in the

Fairfield Sentry Ltd. proceeding ("Fairfield Second Amended Complaint") [ECF No. 286]

seeking in part recovery of the Fairfield Sentry Initial Transfers in satisfaction of the Judgment

Amount and entry of a declaratory judgment that the Fairfield Sentry Initial Transfers

comprising the Judgment Amount are avoided.

356.    As set forth in the Fairfield Second Amended Complaint, Fairfield Sentry

received each of the Fairfield Sentry Initial Transfers with actual knowledge of fraud at BLMIS,

or, at a minimum, while aware of suspicious facts that would have led Fairfield Sentry to

inquire further into the BLMIS fraud. The Trustee incorporates by reference the allegations

contained in the Fairfield Second Amended Complaint as if fully set forth herein, including but

not limited to paragraphs 1-10, 79-313, 315-16.

357.    Of the Judgment Amount, $2,895,000,000 was transferred to Fairfield Sentry

during the six years preceding the Filing Date (the "Fairfield Sentry Six Year Transfers"). Each

of the Fairfield Sentry Six Year Transfers is avoidable under section 544 of the Bankruptcy

Code and applicable provisions of the N.Y. Debt. & Cred. Law (the "NYDCL"), particularly §§

273-279, and of SIPA, particularly § 78fff-2(c)(3).

358.    Of the Fairfield Sentry Six Year Transfers, $1,580,000,000 was transferred to

Fairfield Sentry during the two years preceding the Filing Date (the "Fairfield Sentry Two Year

Transfers"). Each of the Fairfield Sentry Two Year Transfers is avoidable under section 548 of

the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

359.    A chart setting forth the presently known Fairfield Sentry Initial Transfers is

attached as Exhibits A and B.

### i.    Subsequent Transfers from Fairfield Sentry to HSBC Private Bank (Suisse), HSBC Bank USA, and SICO

360.    Prior to the Filing Date, Fairfield Sentry subsequently transferred a portion of the

Fairfield Sentry Initial Transfers to HSBC Private Bank (Suisse), HSBC Bank USA, and SICO.

361.    Based on the Trustee's investigation to date, the subsequent transfers to HSBC

Private Bank (Suisse) total at least $283,291,567, the subsequent transfers to HSBC Bank USA

total at least $31,775,129, and the subsequent transfers to SICO total at least $16,017,911

(together the "Fairfield Sentry Subsequent Transfers"). A chart setting forth the presently

known Fairfield Sentry Subsequent Transfers is attached as Exhibit C.

362.    On December 5, 2010, the Trustee filed this action seeking recovery of the

Fairfield Sentry Subsequent Transfers to HSBC Bank USA and HSBC Private Bank (Suisse),

and on October 27, 2011, the Trustee filed a separate action seeking the Fairfield Sentry

Subsequent Transfers to SICO.

363.    The Fairfield Sentry Subsequent Transfers are recoverable from HSBC Private

Bank (Suisse), HSBC Bank USA, and SICO under section 550(a) of the Bankruptcy Code and

applicable provisions of SIPA, particularly § 78fff-2(c)(3).

###### ii.    Subsequent Transfers from Fairfield Sentry to Fairfield Sigma and Subsequently to HSBC Private Bank (Suisse)

364.    Based on the Trustee's investigation to date, prior to the Filing Date, Fairfield

Sentry subsequently transferred at least $789,152,864 of the Fairfield Sentry Initial Transfers

directly to Fairfield Sigma. A chart setting forth the presently known such transfers is attached

as Exhibit D.

365.    Thereafter, Fairfield Sigma transferred at least $9,182,501 to HSBC Private Bank

(Suisse) (the "Fairfield Sigma Subsequent Transfers"). A chart setting forth the presently known

Fairfield Sigma Subsequent Transfers is attached as Exhibit E.

366.    The Fairfield Sigma Subsequent Transfers are recoverable from HSBC Private

Bank (Suisse), under section 550(a) of the Bankruptcy Code, and applicable provisions of SIPA,

particularly § 78fff-2(c)(3).

## B. Initial Transfers to Greenwich Sentry and Subsequently to HSBC USA

367.    By order dated July 7, 2011, this Court approved a settlement among the Trustee,

Greenwich Sentry, and others, and on April 17, 2012, entered a consent judgment in favor of the

Trustee and against Greenwich Sentry in the amount of $206,038,654 ("Judgment Amount")

(Adv. Pro. No. 09-01239, ECF No. 125).

368.    As set forth in the Fairfield Second Amended Complaint, Greenwich Sentry

received each of the initial transfers with actual knowledge of fraud at BLMIS, or, at a

minimum, while aware of suspicious facts that would have led Greenwich Sentry to inquire

further into the BLMIS fraud.[3]

369.    A chart setting forth the presently known Greenwich Sentry Initial Transfers is

attached as Exhibits F and G.

370.    Based on the Trustee's investigation to date, Greenwich Sentry transferred at least

$13,000,000 to HSBC USA (the "Greenwich Sentry Subsequent Transfers"). A chart setting

forth the presently known Greenwich Sentry Subsequent Transfers is attached as Exhibit H.

371.    The Greenwich Sentry Subsequent Transfers are recoverable from HSBC USA,

under section 550(a) of the Bankruptcy Code, and applicable provisions of SIPA, particularly §

78fff-2(c)(3).

## C. Initial Transfers from BLMIS to the Tremont Funds

372.    As discussed above, the Trustee filed the Tremont Complaint, seeking to avoid

and recover initial transfers of customer property from BLMIS in the amount of

$2,140,297,364.  The Trustee incorporates by reference the allegations contained in the

---

[3] *See Fairfield Complaint*, ¶¶ 11-20, 79-132, 134, 136, 138, 140, 141, 147-49, 151, 153-55, 165,
170, 173, 176, 181-82, 184, 188-212, 233-62 283-88, 292-97, 395-402.

complaint filed with the Bankruptcy Court under the caption *Picard v. Tremont Group Holdings, Inc. et al*, Adv. Pro. No. 10-05310 (CGM) as if fully set forth herein.

373.    The Tremont Initial Transfers are set forth in the attached Exhibit J (reflecting Tremont Initial Transfers to Rye Broad Market, "Rye Broad Market Initial Transfers"), Exhibit K (reflecting Tremont Initial Transfers to Rye Portfolio, "Rye Portfolio Initial Transfers"), and Exhibit L (reflecting Tremont Initial Transfers to Rye Insurance, "Rye Insurance Limited Initial Transfers"). The Rye Broad Market Fund Initial Transfers, the Rye Insurance Limited Initial Transfers, and the Rye Portfolio Initial Transfers are collectively as the "Tremont Initial Transfers." The Tremont Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

374.    Also as discussed above, under the Tremont Settlement, the Trustee received a settlement payment of $1,025,000,000.

375.    The Tremont Settlement specifically provides that the transfers made to the various feeder fund defendants in the Tremont Complaint, including the Tremont Initial Transfers, were "deemed avoided" and that transfers to subsequent transfer defendants were not recovered with the partial payment by the Tremont Settling Defendants.

376.    As alleged above in Section VII and in the Tremont Complaint, Tremont received each of the Tremont Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Tremont to inquire further into the BLMIS fraud.

### i.   Initial Transfers from BLMIS to Rye Broad Market

377.    Of the Tremont Initial Transfers, $252,000,000 was transferred from BLMIS to Rye Broad Market, Account Number 1T0027, in the six years preceding the Filing Date (the "Rye Broad Market Six Year Transfers"). The Rye Broad Market Six Year Transfers are

avoidable under section 544 of the Bankruptcy Code, applicable provisions of the NYDCL, particularly §§ 273-279, and of SIPA, particularly § 78fff-2(c)(3).

378.    Of the Rye Broad Market Six Year Transfers, $60,000,000 was transferred from BLMIS to Rye Broad Market during the two years preceding the Filing Date (the "Rye Broad Market Two Year Transfers"). The Rye Broad Market Two Year Transfers are avoidable under section 548 of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

379.    The Rye Broad Market Six Year Transfers and the Rye Broad Market Two Year Transfers are collectively defined as the "Rye Broad Market Initial Transfers."  A chart setting forth the presently known Rye Broad Market Initial Transfers is attached as Exhibit J.

380.    As alleged above in Section VII and in the Tremont Complaint, Rye Broad Market received each of the Rye Broad Market Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Tremont to inquire further into the BLMIS fraud.

### ii.    Subsequent Transfers from Rye Broad Market to HSBC Bank USA and HSBC USA

381.    Prior to the Filing Date, of the Rye Broad Market Initial Transfers, Rye Broad Market subsequently transferred at least $50,000,000 to HSBC Bank USA and at least $13,500,000 to HSBC USA ("Rye Broad Market-HSBC Subsequent Transfers").  A chart setting forth the presently known Rye Broad Market-HSBC Subsequent Transfers is attached as Exhibit M.

382.    The Rye Broad Market-HSBC Subsequent Transfers are recoverable from HSBC Bank USA and HSBC USA. under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

### iii.    Initial Transfers from BLMIS to Rye Portfolio

383.    Of the Tremont Initial Transfers, $609,000,000 was transferred BLMIS to Rye

Portfolio, Account Number 1FR080, in the six years preceding the Filing Date (the "Rye

Portfolio Six Year Transfers"). The Rye Portfolio Six Year Transfers are avoidable under

section 544 of the Bankruptcy Code, applicable provisions of the NYDCL, particularly §§ 273-

279, and of SIPA, particularly § 78fff-2(c)(3).

384.    Of the Rye Portfolio Six Year Transfers, $350,000,000 was transferred from

BLMIS to Rye Portfolio during the two years preceding the Filing Date (the "Rye Portfolio

Two Year Transfers"). The Rye Portfolio Two Year Transfers are avoidable under section 548

of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

385.    The Rye Portfolio Six Year Transfers and the Rye Portfolio Two Year Transfers

are collectively defined as the "Portfolio Limited Initial Transfers."  A chart setting forth the

presently known Portfolio Limited Initial Transfers is attached as Exhibit K.

386.    As alleged above in Section VII and in the Tremont Complaint, Rye Portfolio

received each of the Portfolio Limited Initial Transfers with actual knowledge of fraud at

BLMIS, or, at a minimum, while aware of suspicious facts that would have led Tremont to

inquire further into the BLMIS fraud.

### iv.    Subsequent Transfers from Rye Portfolio to HSBC Bank PLC

387.    Prior to the Filing Date, Portfolio Limited subsequently transferred at least

$16,301,901 of the Portfolio Limited Initial Transfers to HSBC Bank plc (Rye Portfolio-HSBC

Subsequent Transfers"). A chart setting forth the presently known Rye Portfolio-HSBC

Subsequent Transfers is attached as Exhibit N.

388.    The Rye Portfolio-HSBC Subsequent Transfers are recoverable from HSBC Bank

plc under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly

§ 78fff-2(c)(3).

### v.    Initial Transfers from BLMIS to Rye Insurance

389.    Of the Tremont Initial Transfers, $90,650,000 was transferred to Rye Insurance,

Account Number 1FR010, in the six years preceding the Filing Date (the "Rye Insurance Six

Year Transfers"). The Rye Insurance Six Year Transfers are avoidable under section 544 of the

Bankruptcy Code, applicable provisions of the NYDCL, particularly §§ 273-279, and of SIPA,

particularly § 78fff-2(c)(3).

390.    Of the Rye Insurance Six Year Transfers, $48,750,000 was transferred to Rye

Insurance during the two years preceding the Filing Date (the "Rye Insurance Two Year

Transfers"). The Rye Insurance Two Year Transfers are avoidable under section 548 of the

Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

391.    The Rye Insurance Six Year Transfers and the Rye Insurance Two Year Transfers

are collectively defined as the "Rye Insurance Initial Transfers." A chart setting forth the

presently known Rye Insurance Initial Transfers is attached as Exhibit L.

392.    As alleged above in Section VII and in the Tremont Complaint, Rye Insurance

received each of the Rye Insurance Initial Transfers with actual knowledge of fraud at BLMIS,

or, at a minimum, while aware of suspicious facts that would have led Tremont to inquire

further into the BLMIS fraud.

### vi.    Subsequent Transfers to Rye XL Portfolio and Subsequently to HSBC Bank PLC

393.    Prior to the Filing Date, Portfolio Limited subsequently transferred $74,298,573

of the Portfolio Limited Initial Transfers directly to Rye Select Broad Market XL Portfolio

Limited ("Rye XL Portfolio"), and Rye Insurance subsequently transferred $10,318,000 of the

Rye Insurance Initial Transfers directly to Rye XL Portfolio (together, the "XL Portfolio

Subsequent Transfers"). A chart setting forth the presently known Rye XL Portfolio Subsequent

Transfers by date and amount is attached as Exhibit O.

394.    Thereafter, Rye XL Portfolio subsequently transferred at least $53,000,000 of the

XL Portfolio Subsequent Transfers to HSBC Bank plc's account at HSBC Bank USA (the "Rye

XL Portfolio-HSBC Subsequent Transfers"). A chart setting forth the presently known Rye XL

Portfolio-HSBC Subsequent Transfers is attached as Exhibit P.

395.    The Rye XL Portfolio-HSBC Subsequent Transfers are recoverable from HSBC

Bank plc under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA,

particularly § 78fff-2(c)(3).

### D.  Initial Transfers from BLMIS to Harley

396.    The Trustee commenced a separate adversary proceeding against Harley in this

Court under the caption, *Picard v. Harley International (Cayman) Limited*, Adv. Pro. No. 09-

01187, seeking to avoid and recover initial transfers of customer property from BLMIS to

Harley in the approximate amount of $1,072,800,000 (the "Harley Initial Transfers").

397.    On July 8, 2009, the Clerk of the Bankruptcy Court made an entry of default

against Harley. On November 10, 2010, the Bankruptcy Court entered summary judgment

against Harley in the amount of $1,066,800,000, and a default judgment against Harley in the

amount of $6,020,000, for a total judgment against Harley in the amount of $1,072,820,000,

from which no appeal was taken ("November 10, 2010 Judgment"), ECF No. 15.  The Trustee

has not yet recovered any monies as a result of the November 10, 2010 Judgment.

398.    Of the Harley Initial Transfers, $1,066,800,000 was transferred to Harley during

the two years preceding the Filing Date (the "Harley Two Year Transfers"). Each of the Harley

Two Year Transfers is avoidable under section 548 of the Bankruptcy Code, and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

399.   Charts setting forth the presently known Harley Initial Transfers by date and amount are attached as Exhibits Q and R. The Harley Initial Transfers were and continue to be customer property within the meaning of SIPA § 78*lll*(4).

400.   In the November 10, 2010 Judgment, the Bankruptcy Court held that hundreds of millions of dollars' worth of transfers to Harley were "avoidable fraudulent transfers" under the Bankruptcy Code and entered summary judgment against Harley, avoiding the Harley Two Year Transfers in the amount of $1,066,800. November 10, 2010 Judgment, Conclusions of Law ¶ 6, pp. 10-11. The Trustee filed this action on December 5, 2010, thus timely filing this action within one year of the avoidance of the Harley Initial Transfers.

401.   Harley received the Harley Initial Transfers with actual knowledge of fraud at BLMIS, or, at a minimum, while aware of suspicious facts that would have led Harley to inquire further into the BLMIS fraud.

### i.   Subsequent Transfers from Harley to HSBC Bank plc

402.   Prior to the Filing Date, Harley subsequently transferred a portion of the Harley Initial Transfers to HSBC Bank plc's account at HSBC Bank USA. Based on the Trustee's investigation to date, the subsequent transfers to HSBC Bank plc total at least $15,599,960 ("Harley Subsequent Transfers"). A chart setting forth the presently known Harley Subsequent Transfers is attached as Exhibit S.

403.   The Harley Subsequent Transfers are recoverable from HSBC Bank plc under section 550(a) of the Bankruptcy Code and applicable provisions of SIPA, particularly § 78fff-2(c)(3).

## COUNT ONE

### RECOVERY OF SUBSEQUENT TRANSFERS

### 11 U.S.C. §§ 105(a) and 550(a)

404.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Second Amended Complaint as if fully rewritten herein.

405.    The Subsequent Transfers are recoverable from Defendants under 11 U.S.C. § 550(a) and SIPA § 78fff-2(c)(3).

406.    Defendants are immediate or mediate transferees of the Subsequent Transfers from the Initial Transferees.

407.    As a result of the foregoing, pursuant to 11 U.S.C. §§ 105(a) and 550(a), and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against Defendants: (a) recovering the Transfers, or the value thereof, from Defendants for the benefit of the estate of BLMIS; and (b) awarding any other relief as the Court deems appropriate.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment on Count One in favor of the Trustee and against Defendants as follows:

A.    Recovering the Subsequent Transfers, or the value thereof, from Defendants for the benefit of the estate;

B.    If Defendants challenge the avoidability of the Initial Transfers, the Trustee seeks a judgment under Fed. R. Bankr. P. 7001(1) and (9) declaring that such transfers are avoidable pursuant to SIPA § 78fff-2(c)(3), sections 105(a), 544(b), 547(b), 548(a), and 551 of the Bankruptcy Code, and §§ 273-279 of the NYDCL, as applicable, and as necessary to recover the Subsequent Transfers pursuant to section 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3);

C.    Awarding the Trustee prejudgment interest from the date on which the

Subsequent Transfers were received by Defendants; and

D.    Awarding the Trustee fees and all applicable costs and disbursements, and such

other, further, and different relief as the Court deems just, proper, and equitable.

Date: December 27, 2023                    **BAKER & HOSTETLER LLP**
        New York, New York


By: _/s/ Oren J. Warshavsky_____
    45 Rockefeller Plaza
    New York, New York 10111
    Telephone: (212) 589-4200
    Facsimile: (212) 589-4201
    David J. Sheehan
    Email: dsheehan@bakerlaw.com
    Oren J. Warshavsky
    Email: owarshavsky@bakerlaw.com

    *Attorneys for Irving H. Picard, Trustee for the*
    *Substantively Consolidated SIPA Liquidation*
    *of Bernard L. Madoff Investment Securities*
    *LLC and the Chapter 7 Estate of Bernard L.*
    *Madoff*