**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION | Adv. Pro. No. 08-01789 (LGB) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | Adv. Pro. No. 09-01364 (LGB) |
| Plaintiff, | |
| v. | |
| HSBC BANK PLC, HSBC BANK USA, N.A., HSBC USA, INC., and HSBC PRIVATE BANK (SUISSE) S.A., | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

*A P P E A R A N C E S:*

*Attorneys for the Private Bank Defendants*
CLEARY GOTTLIEB STEEN & HAMILTON LLP

One Liberty Plaza
New York, New York 10006
By:    Nowell D. Bamberger
       Jeffrey A. Rosenthal

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of Bernard L. Madoff*
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
By:    Oren J. Warshavsky
       Michelle R. Usitalo

**LISA G. BECKERMAN**
**UNITED STATES BANKRUPTCY JUDGE**

Irving Picard, the trustee ("Trustee") for the liquidation of Bernard L. Madoff Investment

Securities LLC ("BLMIS") filed his Second Amended Complaint (the "SAC," ECF No. 745) on

December 27, 2023 seeking to recover avoidable transfers totaling approximately $502 million

from subsequent transferees HSBC Bank plc ("HSBC Bank"), SICO Limited, HSBC USA Inc.,

HSBC USA, N.A. ("HBUS"), and HSBC Private Bank (Suisse) S.A. ("PBRS," together with

HBUS, the "Private Bank Defendants").

Before the Court is the motion (the "Motion," ECF No.767) of the Private Bank

Defendants seeking judgment on the pleadings to dismiss certain subsequent transfer claims

totaling approximately $324 million that are alleged in the SAC.  The Private Bank Defendants

argue that the claims are time-barred by § 550(f) of the Bankruptcy Code and fail to relate back

under Federal Rule of Civil Procedure 15 ("Rule 15").  For the reasons outlined below, the

Motion is granted.

## BACKGROUND

The Trustee commenced this Adversary Proceeding by filing the First Amended

Complaint (the "FAC," ECF No. 170) on December 5, 2010.  The FAC alleged twenty-four

causes of action against HSBC Holdings plc, HSBC Bank plc, and their affiliates (collectively,

2

the "Original HSBC Defendants" or "HSBC Holdings").  The Private Bank Defendants were

named as defendants in twelve counts contained in the FAC.  On December 27, 2023, the Trustee

filed the SAC.  Of relevance for the Motion, the SAC alleges that the Private Bank Defendants

received subsequent transfers totaling:

- $283,291,567 allegedly received by PBRS from Fairfield Sentry Ltd. ("Fairfield

  Sentry");

- $9,182,501 allegedly received by PBRS from Fairfield Sigma Ltd. ("Fairfield Sigma"

  and, together with Fairfield Sentry, the "Fairfield Funds"); and

- $31,775,129 allegedly received by HBUS from Fairfield Sentry (collectively, the

  "Newly Alleged Transfers").

On March 11, 2025, the Private Bank Defendants filed the Motion and an accompanying

Memorandum of Law (the "Memorandum," ECF No. 768) seeking to dismiss claims for the

Newly Alleged Transfers pursuant to Federal Rule of Civil Procedure 12(c) ("Rule 12(c)").  The

Trustee filed the Opposition to Defendants' Motion for Judgment on the Pleadings (the

"Opposition," ECF No. 770) on April 25, 2025.  The Private Bank Defendants filed the Reply

Memorandum of Law (the "Reply," ECF No. 774) on May 20, 2025.

The Court held a hearing on the Motion on May 29, 2025.  (ECF No. 775.)  The Court

heard arguments from both counsel for the Private Bank Defendants and the Trustee.  (*Id.*)

## 1. <u>The First Amended Complaint[1]</u>

The FAC sought to recover against HSBC Holdings for their role in aiding the

development and perpetuation of the Madoff Ponzi scheme[2].  (FAC ¶ 1.)  HSBC Holdings

---

[1] For purposes of the Motion, all the allegations in the FAC and SAC are presumed to be true.
[2] The Court presumes familiarity with the background of the BLMIS Ponzi scheme and its SIPA proceeding.  *Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Secs. LLC)*, 12 F.4th 171, 178-83 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard*, 142 S. Ct. 1209, 212 L. Ed. 2d 217 (2022).

purportedly acted as a "marketer, custodian, and administrator" of various BLMIS feeder funds. (*Id.* ¶ 8.)  In exchange for driving new investors into the BLMIS Investment Advisory ("IA") Business, HSBC Holdings received various "fees" composed of customer property that the Trustee sought to recover.  (*Id.* ¶ 16.)

      Of relevance for the Motion, the FAC alleged that HSBC Bank was the "payee bank for all of the Feeder Fund Defendants" and "all moneys which were withdrawn from BLMIS by the Madoff Feeder Fund Defendants went through HSBC Bank." (*Id.* ¶ 96.)  The "Feeder Fund Defendants" are defined as "Primeo, Herald, Herald (Lux), Alpha Prime, Senator, Hermes, Lagoon, Thema Fund, Thema Wise, Thema International, Geo Currencies, and Lagoon Trust"— Fairfield Sentry and Fairfield Sigma were not defendants to the FAC.  (*Id.* ¶ 69.)  "Madoff Feeder Fund Defendants" is not defined in the FAC, but the Court presumes that the term refers to the same entities as the "Feeder Fund Defendants."  The FAC alleged that HBUS "created structured financial products and entered into transactions involving those structured products, which ultimately served to increase the amount of money invested with BLMIS's IA Business," (*Id.* ¶ 97), and PBRS "marketed Madoff Feeder Funds, including the Feeder Fund Defendants to investors."[3]  (*Id.* ¶ 104.)  The actions of HSBC Bank and HBUS "increased the flow of funds into Madoff's Ponzi scheme by creating and marketing structured financial products."  (*Id.* ¶ 141.)

      Paragraphs 292 through 304 of the FAC are entitled "HSBC Marketed Madoff to its Private Banking Clients" and describe the actions of HSBC Private Banking Holdings (Suisse) S.A., PBRS, HBUS and related affiliates (collectively, "HSBC Private Bank") in marketing the "Feeder Fund Defendants" to clients despite HSBC Holdings issuing negative due diligence

---

[3] "Madoff Feeder Funds" is defined as "[i]nvestment funds with the principal or primary purpose of investing funds with BLMIS's IA Business."  (*Id.* at 5.)

4

reports.  This section contains most of the particularized descriptions of the Private Bank

Defendants' conduct.  It includes the following relevant allegations:

- HSBC Private Bank began marketing "Sentry" to clients as early as 1999 even though "Sentry" was not a part of the HSBC Private Bank platform.  (*Id.* ¶ 294.)  "Sentry" is defined as "Greenwich Sentry, L.P." [4]  (FAC at 7.)

- "On at least nine separate occasions between 2001 and 2009, [HBUS] conducted due diligence on Sentry for the purpose of including the fund on its official platform." (*Id.* ¶ 294.)

- "In July 2001, the HSBC Private Bank due diligence team met with Fairfield Greenwich ('Fairfield') officers."  (*Id.* ¶ 295.)  At this meeting, a high-ranking member of HBUS's due diligence team inquired about red flags associated with BLMIS that Fairfield Greenwich's officers did not provide adequate responses to. (*Id.*)

- On August 7, 2001, HBUS issued a due diligence report on "Sentry" that noted multiple red flags associated with BLMIS.  (*Id.* ¶ 296.)

- In January 2003, HBUS issued another due diligence report on "Sentry" that noted similar concerns as the 2001 report.  (*Id.* ¶ 297.)

- In 2004, HBUS issued another report on "Sentry" that noted similar concerns as prior reports.  (*Id.* ¶ 299.)

---

[4] Greenwich Sentry, L.P. ("Greenwich Sentry") was a different Madoff feeder fund that was created and controlled by the Fairfield Greenwich Group (FAC at 7.)

- "[HBUS's] comprehensive knowledge of these many red flags did not prevent HSBC Private Bank from simultaneously encouraging high-net worth investors to invest in Madoff Feeder Funds, including the Feeder Fund Defendants." (*Id.* ¶ 300.)

- In 2004, an HSBC Private Bank advisor communicated to a client that Kingate Global was "part of HSBC's diversified funds and that HSBC was, itself, invested in Kingate Global." (*Id.* ¶ 300.) In 2008, HSBC Private Bank told an investor that HSBC Holdings "completely divested from Kingate due to 'problems' with the fund." (*Id.*)

- HSBC Private Bank informed an investor in 2004 that HSBC Private Bank only sold funds that passed the company's due diligence requirements, leading investors to invest in "Sentry." (*Id.* ¶ 302.)

- "In early 2005, based on the recommendations of an HSBC Private Bank adviser in Zurich, one investor placed $300,000 in Sentry." (*Id.* ¶ 303.) HSBC Private Bank did not inform the investor of its concerns regarding "Sentry, any other Madoff Feeder Funds, or BLMIS's IA Business." (*Id.*) In 2007, an advisor recommended the investor to "get out" because HSBC Holdings did not understand the investment strategy. (*Id.*)

- In 2005, HSBC Private Bank recommended "Sentry" to another investor, and advised the investor that HSBC Holdings was "in contact with the fund, was confident in the fund, and was performing due diligence." (*Id.* ¶ 304.) "In September 2005, [HSBC Holdings] provided an 'Investment View and Proposal' listing Sentry as one the proposed funds." (*Id.*) HSBC Private Bank never warned the investor about its concerns, and after Madoff's arrest, the same HSBC Private Bank adviser "stated that he, in fact, disliked Sentry." (*Id.*)

The FAC stated that "[a] sizeable portion of the Non-Party Initial Transfers was subsequently transferred by the Non-Party Funds to [HSBC Holdings]." (*Id.* ¶ 376.)  Non-Party Initial Transfers are defined as the "Sentry Initial Transfers, the Broad Market Initial Transfers, the Broad Market Portfolio Initial Transfers, the Harley Initial Transfers, the Kingate Global Initial Transfers, the Kingate Euro Initial Transfers, the Landmark Initial Transfers, the Defender Initial Transfers, and the Square One Initial Transfers." (*Id.* ¶ 375.)  The "Sentry Six Year Initial Transfers," in turn, are defined as the $206 million of transfers from BLMIS to "Sentry (account number 1G0092)." (*Id.* ¶ 359.)  With respect to the Private Bank Defendants, the FAC alleged that HSBC Bank, HBUS, and PBRS each "received fees and/or distributions to which it is not entitled and/or which are composed, in part, of [c]ustomer [p]roperty." (*Id.* ¶¶ 96, 97, 103.)

In addition, the FAC contained a few more general allegations related to the purpose of the FAC and the Trustee's ongoing investigation.  The FAC stated that "[t]hrough this complaint, the Trustee seeks the return of [c]ustomer [p]roperty belonging to the BLMIS estate, including redemptions, fees, compensation, and assets, as well as compensatory and punitive damages caused by the Defendants' misconduct, and the disgorgement of all amounts by which the Defendants were unjustly enriched at the expense of BLMIS's customers." (*Id.* ¶ 23.)  The FAC also provided a paragraph stating that "[t]he Trustee's investigation is on-going and the Trustee reserves the right to (i) supplement the information regarding the Transfers and any additional transfers, and (ii) seek recovery of such additional transfers." (*Id.* ¶ 356.)

## 2. **The Second Amended Complaint**

The SAC seeks to recover at least $501 million in subsequent transfers made to HSBC Bank, SICO Limited, HSBC USA Inc., and the Private Bank Defendants.  (SAC ¶ 1.)  The

Trustee alleges that these subsequent transfers were the result of "redemptions" made by HSBC Holdings.  (*Id.* ¶ 7.)

The SAC contains a number of new allegations pertaining to the Private Bank Defendants' investment and redemption activities with respect to BLMIS feeder funds.  (*e.g. id.* ¶¶ 53, 63, 69.)  Specifically, the SAC alleges that HBUS invested with Fairfield Sentry and PBRS invested with Fairfield Sentry and Fairfield Sigma.  (*e.g. id.* ¶¶ 73, 128.)  These investments presumably were the basis for the redemptions comprising the Newly Alleged Transfers.  As discussed *infra*, the Newly Alleged Transfers include the following:

- PBRS received at least $283 million of subsequent transfers from Fairfield Sentry (*Id.* ¶ 361) and at least $9 million from Fairfield Sigma (*Id.* ¶ 365.)

- HBUS received at least $31 million in subsequent transfers from Fairfield Sentry (*Id.* ¶ 361.)

The dates and amounts of the Newly Alleged Transfers are shown in Exhibits C and E to the SAC.

### 3.  **The Motion for Judgment on the Pleadings**

The Motion seeks to dismiss the claims for the Newly Alleged Transfers alleged under Count 1 of the SAC pursuant to Rule 12(c).  It argues that claims for the Newly Alleged Transfers fall outside the statute of limitations period provided by 11 U.S.C. § 550(f). (Memorandum at 1.)  Further, the Newly Alleged Transfers do not relate back to the FAC under Rule 15.  (*Id.* at 3.)  As a result, the claims should be dismissed.  The Trustee seems to concede, and the Court agrees, that the Newly Alleged Transfers are barred by the one-year statute of limitations period proscribed by § 550(f).  (*See* Opposition at 1.)  At issue is whether the Newly Alleged Transfers relate back to the FAC pursuant to Rule 15.

8

The Memorandum makes two primary arguments. First, the Memorandum argues that the FAC did not allege the existence of any transfers from the Fairfield Funds to PBRS or HBUS. (Memorandum at 19-20.) Under this Court's prior decisions from this Case, the Memorandum argues that the Newly Alleged Transfers do not relate back as a matter of law. (*Id.* at 16.) Second, and in the alternative, the Memorandum argues that the Newly Alleged Transfers arise out of different "conduct, transaction[s], or occurrence[s]" from the facts pled in the FAC. (*Id.* at 19.) (quoting *Picard v. BNP Paribas S.A. et al.*, 594 B.R. 167, 210–211 (Bankr. S.D.N.Y. Oct. 3, 2018)). As a result, the Newly Alleged Transfers alleged under Count 1 of the SAC do not relate back to the FAC and should be dismissed.

The Memorandum notes that the first time the Trustee indicated that he might bring claims for the Newly Alleged Transfers was in 2015. (*Id.* at 2-3.) At that time, the Trustee proffered an amended complaint (the "2015 Proffered Amended Complaint"). (*Id.* at 9.) The 2015 Proffered Amended Complaint included allegations of subsequent transfers from Fairfield Sentry and Fairfield Sigma to PBRS and HBUS. (*Id.*) However, the 2015 Proffered Amended Complaint never became operative.[5] (*Id.* at 10.) Further, the 2015 Proffered Amended Complaint was proffered more than three years after the statute of limitations period expired. (*Id.*) As a result, the 2015 Proffered Amended Complaint does not alter the Court's analysis. (*Id.*)

### 4. **The Opposition**

---

[5] On August 28, 2014, the Trustee filed a motion seeking leave to file an amended complaint. (ECF No. 314.) The Trustee docketed the 2015 Proffered Amended Complaint in connection with that motion. (*See* ECF No. 399.) However, the 2015 Proffered Amended Complaint never operative because, on November 22, 2016, the Court dismissed, and denied leave to amend, subsequent transfer claims in this Proceeding that arose from the avoidance of initial transfers to the Fairfield Funds. (*See* Memorandum Decision Regarding Claims to Recover Foreign Subsequent Transfers, Case No. 08-01789, ECF No. 14495 at 36-37.)

The Opposition argues that the Newly Alleged Transfers are not untimely since they relate back to the filing of the FAC pursuant to Rule 15(c)(1)(B). (Opposition at 1.) Under Rule 15(c)(1)(B), new claims relate back to the date of an earlier filing if the new claims "arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." (Opposition at 1) (quoting Fed. R. Civ. P. 15(c)(1)(B).)

The Opposition first states that the FAC described a relationship between HSBC Holdings and the Fairfield Funds.[6] It claims that this relationship was described in a dedicated section of the FAC that contained particularized allegations of the Private Bank Defendants' conduct with respect to Fairfield Sentry. (*Id.* at 2) (citing FAC ¶¶ 292-304.) That conduct included descriptions of the Private Bank Defendants' investments with Fairfield Sentry, due diligence, communications with clients, and internal discussions. (*Id.*) The Opposition concedes however, that paragraphs 292-304 of the FAC contained a mistake—paragraphs 292-304 of the FAC only describe the Private Bank Defendants' activities with respect to "Sentry." (*Id.*) Since the FAC defines "Sentry" as "Greenwich Sentry," a literal interpretation of the FAC is that paragraphs 292-304 only described a relationship between Greenwich Sentry, not Fairfield Sentry, and the Private Bank Defendants. (*See id.*) However, the Opposition argues that the use of the word "Sentry" instead of "Fairfield Sentry" was a simple mistake in pleading, and HSBC Holdings understood that paragraphs 292-304 described a relationship between the Private Bank Defendants and Fairfield Sentry. (*Id.*)

Next, the Opposition asserts that the Newly Alleged Transfers arose out of the relationship between HSBC Private Bank and Fairfield Sentry that the FAC described. (*Id.*) As stated above, the FAC included allegations describing the relationship between Fairfield Sentry

---

[6] The Memorandum does not allege or admit that the FAC did not describe "a relationship" at all between the Private Bank Defendants and the Fairfield Funds.

and the Private Bank Defendants—including descriptions of HSBC Private Bank's due diligence, communications with clients, and internal discussions regarding Fairfield Sentry.  (*Id.*)  The Newly Alleged Transfers are the natural offshoot of this conduct and therefore relate back.  (*Id.*)

In addition, the Opposition notes that the FAC contained other allegations that put the Defendants on notice of the Newly Alleged Transfers.  Paragraphs 97 and 104 of the FAC indicated that the Private Bank Defendants received distributions which are customer property. (*Id.* at 28.)  The FAC also incorporated the complaint (the "Fairfield Amended Complaint") filed in *Picard v. Fairfield Sentry Ltd., et al. (In re Bernard L. Madoff Inv. Sec. LLC),* No. 09-1239 (Bankr. S.D.N.Y. filed May 18, 2009), as amended on July 20, 2010.  (FAC ¶ 358.)  The Fairfield Amended Complaint was the Trustee's proceeding that sought to avoid and recover the initial transfers from BLMIS to the Fairfield Funds.  (Opposition at 17.)  The Opposition argues that this reference put the Private Bank Defendants on notice that the Trustee could pursue claims in this proceeding for the Newly Alleged Transfers.  (*Id.*)

Lastly, the Opposition argues that the Defendants have already demonstrated that they were on notice through statements they made regarding the 2015 Proffered Amended Complaint. (*Id.* at 17-18.)  After the Trustee proffered the 2015 Proffered Amended Complaint, HSBC Holdings included the following statement in a brief,

> The [FAC] makes clear that foreign transferee [PBRS] received the payments at issue from foreign transferors Fairfield Sentry and Fairfield Sigma on account of the investments [PBRS] made in those foreign funds at the direction of its clients.

(*Id.* at 3) (quoting The HSBC Defs.' Separate Mem. of Law Addressing the Claims in the Kingate, Omnibus, Somers, and SICO Actions and in Further Supp. of Transferee Defs.' Mot. to Dismiss Based on Extraterritoriality, (Sept. 30, 2015), ECF No. 413 (the "ET Brief"), at 14–15.)

In the ET Brief, HSBC Holdings cited paragraph 293 of the FAC[7] and paragraph 129 of the 2015 Proffered Amended Complaint[8] to support this statement. (*Id.* at 18.) The statements made in the ET Brief therefore qualify as a judicial admission that the Private Bank Defendants understood paragraph 293 of the FAC as meaning that PBRS placed investments abroad in the Fairfield Funds. (*Id.* at 19.) This admission shows that the Private Bank Defendants were on notice of the Newly Alleged Transfers. (*Id.*)

## 5. **The Reply**

The Reply first disputes that the FAC alleged a relationship at all between the Fairfield Funds and the Private Bank Defendants. (*See* Reply at 1.) "Sentry" was defined throughout the FAC as Greenwich Sentry. (*Id.*) The Trustee did pursue, and is currently pursuing, a claim against HBUS related to Greenwich Sentry. (*Id.*) However, even if the "Sentry" referenced in paragraphs 292-304 referred to Fairfield Sentry, the FAC still did not describe conduct, transaction, or occurrences related to the Newly Alleged Transfers. (*Id.*) The FAC only described the how the Private Bank Defendants solicited "other people's investments *into* BLMIS" whereas the Newly Alleged Transfers are "predicated upon [the Private Bank Defendant's] alleged receipt of BLMIS customer property *from* the Fairfield Funds." (*Id.*) Fundamentally, this constitutes different conduct or transactions. (*Id.*)

---

[7] Paragraph 293 states, "[u]pon information and belief, HSBC Private Bank's high net-worth clients had relationships of trust and confidence with HSBC Private Bank. These clients trusted HSBC Private Bank and relied on HSBC's reputation when deciding among investment strategies. Upon information and belief, but for the recommendations of HSBC Private Bank, these individuals would not have invested with BLMIS through the Feeder Fund Defendants." (FAC ¶ 293.)

[8] Paragraph 129 states, "[b]eginning in the late 1990s, HSBC Private Bank solicited its clients to invest in BLMIS feeder funds, including, but not limited to, Fairfield Sentry, Fairfield Sigma, Kingate Global, Kingate Euro, Primeo, Thema International, and Ascot Fund, Ltd. (collectively, the 'Madoff Private Bank Feeder Funds')." ([Proffered] Second Amended Complaint (June 26, 2015), *Picard v. HSBC Bank plc et al.*, Adv. Pro. No. 09-01364, at ¶ 129, ECF No. 399.) (Bamberger Decl., Ex. J., at ¶ 129, ECF No. 769.)

The Reply also refutes two arguments made in the Opposition.  First, it argues that

paragraphs 97 and 104 of the FAC are insufficient to have put the Private Bank Defendants on

notice of the Newly Alleged Transfers.  (*Id.* at 2.)  Second, it notes that the statements made by

HSBC Holdings in relation to the 2015 Proffered Amended Complaint are not a judicial

admission and are incorrectly interpreted by the Opposition.  (*Id.* at 15.)  The 2015 Proffered

Amended Complaint was filed years after the statute of limitations period expired, and the

statements made by HSBC Holdings in 2015 do not indicate that the Private Bank Defendants

were on notice of the Newly Alleged Transfers *at the time the FAC was filed or within the statute

of limitations period*.  (*Id.* at 14.)

The Reply argues that the Trustee's assertions regarding the 2015 Proffered Amended

Complaint are irrelevant since the proper consideration is whether the Private Bank Defendants

were on notice within the statue of limitations period—the Trustee's arguments regarding the

2015 Proffered Amended Complaint only address the Private Bank Defendants' understanding of

the FAC at the time the 2015 Proffered Amended Complaint was shared, which was after the

statute of limitations period expired.  (*See id.*)

Further, the Reply argues that the Trustee misreads the excerpt from the ET Brief.  (*Id.* at

14-15.)  HSBC Holdings referenced the FAC in support of their argument that the alleged

redemptions discussed in the 2015 Proffered Amended Complaint were foreign transfers on

behalf of HSBC Holdings' foreign clients.  (*Id.* at 15.)  This was a statement made in support of a

separate issue—it only discussed an interpretation of the FAC in light of the transactions alleged

in the 2015 Proffered Amended Complaint.  (*Id.*)  As part of the same briefing cycle, a brief was

filed, on behalf of HSBC Holdings, that listed all the funds the FAC alleged had made transfers

to HSBC Holdings' entities and none of those funds were Fairfield Sentry or Fairfield Sigma.

13

(*Id.*)  Regardless, the excerpt does not qualify as a judicial admission since it is not intentional, clear, and unambiguous.  (*See id.*)  At most, the excerpt suggests that HSBC Holdings understood the FAC as alleging that PBRS made investments in the Fairfield Funds at the direction of their clients—not redemptions of customer property from BLMIS.  (*See id.*)

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(c)

Rule 12(c) provides that, "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  Rule 12(c) is made applicable to this Adversary Proceeding through Federal Rule of Bankruptcy Procedure 7012(b).  Fed R. Bankr. P. 7012(b).

Federal Rule of Civil Procedure 15(c)

Rule 15(c) provides,

> (1) *When an Amendment Relates Back.* An amendment to a pleading relates back to the date of the original pleading when:
> (A) the law that provides the applicable statute of limitations allows relation back;
> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>> (i)  received such notice of the action that it will not be prejudiced in defending on the merits; and
>> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c).  Rule 15 is made applicable to this Adversary Proceeding through Federal Rule of Bankruptcy Procedure 7015.  Fed R. Bankr. P. 7015.

Here, the SAC does not seek to change the party or naming of the party against whom a claim is asserted. Instead, the SAC seeks to add claims against the Private Bank Defendants—parties that were named in the FAC. Therefore, the relevant inquiry is whether the SAC "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading" under Rule 15(c)(1)(B).

"To relate back, the new claim must arise out of 'a common "core of operative facts" uniting the original and newly asserted claims.'" *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff)*, 594 B.R. 167, 210 (Bankr. S.D.N.Y. 2018) ("*BNP I*") (quoting *Mayle v. Felix*, 545 U.S. 644, 659 (2005)). The "central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." *Id.* (quoting *Slayton v. Am. Express Co.*, 460 F.3d 215, 228 (2d Cir. 2006)). Rule 15 "does not set a high bar for relation back, so long as the claims attempted to be asserted in the new complaint share a reasonable measure of common ground with the allegations in the original pleading." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, Nos. 08-01789 (CGM), 12-01576 (CGM), 2024 Bankr. LEXIS 1299, at *49 (Bankr. S.D.N.Y. June 4, 2024) ("*BNP II*") (quoting *Picard v. Peter Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, 468 B.R. 620, 633 (Bankr. S.D.N.Y. 2012) ("*Peter Madoff*")). "Rule 15(c) should be 'liberally construed.'" *BNP II*, 2024 Bankr. LEXIS 1299, at *49-50 (quoting *Siegel v. Converters Transp., Inc.*, 714 F.2d 213, 215 (2d Cir. 1983)). "[T]he purpose of Rule 15 is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities." *Id.* at *50 (quoting *Picard v. Fairfield Inv. Fund (In re BLMIS)*, No. 08-01789 (CGM), Adv. Pro. No. 09-01239, 2021 Bankr. LEXIS 2101, at *12 (Bankr. S.D.N.Y. Aug. 6, 2021)).

15

While the original pleading does not need to inform the defendants of new legal theories, it must "inform the defendants of the facts that support those new claims." *BNP I*, 594 B.R. at 210 (quoting *Official Comm. of Unsecured Creditors of 360networks (USA), Inc. v. Pirelli Commun. Cables & Sys. USA LLC (In re 360networks Inc.)*, 367 B.R. 428, 434 (Bankr. S.D.N.Y. 2007)).  Relation back is appropriate when a new claim is "based on the same facts as the original pleading and only changes the legal theory." 3 MOORE'S FEDERAL PRACTICE — CIVIL § 15.19 (3d ed. 2025).  "[A]llegations pronouncing new claims in an amended pleading will not relate back when based upon new facts and different transactions." *In re Chaus Sec. Litig.*, 801 F. Supp. 1257, 1264 (S.D.N.Y. 1992).  However, allegations that "simply 'amplify the facts alleged in the original pleading or set forth those facts with greater specificity' will relate back." *Id.* (quoting *Oliner v. McBride's Indus., Inc.,* 106 F.R.D. 9, 12 (S.D.N.Y. 1985)).  In the context of avoidance actions, "[n]ew fraudulent transfer claims relate back to the original pleading where the newly alleged transfers occurred as part of the 'same "course of conduct"' as the originally alleged transfers." *BNP II*, 2024 Bankr. LEXIS 1299 at *49 (quoting *Peter Madoff*, 468 B.R. at 633).

## DISCUSSION

### Overview of *BNP I* and *BNP II*

The Memorandum's first argument is that the Trustee did not allege a transfer between the Fairfield Funds and the Private Bank Defendants in the FAC, so claims for the Newly Alleged Transfers do not relate back under *BNP I* and *BNP II*.  (*See, e.g.,* Memorandum at 3.) The Memorandum argues that *BNP I* and *BNP II* stand for the proposition that where the Trustee has not previously alleged a transfer between a transferee and the relevant fund, subsequent

16

transfer claims to recover such transfers do not relate back and are time barred if they were not filed within the statute of limitations period proscribed by § 550(f).  (*Id.* at 16.)

It is true that the FAC does not allege the existence of a transfer from Fairfield Sentry or Fairfield Sigma to HBUS or PBRS.  As stated *infra*, the FAC alleged that "[a] sizeable portion of the Non-Party Initial Transfers was subsequently transferred by the Non-Party Funds to [HSBC Holdings]."  (FAC ¶ 376.)  The Non-Party Initial Transfers are defined as the "Sentry Initial Transfers, the Broad Market Initial Transfers, the Broad Market Portfolio Initial Transfers, the Harley Initial Transfers, the Kingate Global Initial Transfers, the Kingate Euro Initial Transfers, the Landmark Initial Transfers, the Defender Initial Transfers, and the Square One Initial Transfers."  (FAC ¶ 375.)  None of these initial transfers describe transfers to Fairfield Sentry or Fairfield Sigma.  While "Non-Party Initial Transfers" is defined to include "[t]he Sentry Initial Transfers," the "Sentry Initial Transfers" are defined as $206 million of transfers from BLMIS to "Sentry (account number 1G0092)."  (FAC ¶ 359.)  "Sentry," in turn, is defined as "Greenwich Sentry, L.P."  (FAC at 7.)  Furthermore, in describing the Sentry Initial Transfers, the Trustee incorporated the Fairfield Amended Complaint.  (FAC ¶ 358.)  A review of the Fairfield Amended Complaint shows that the "Sentry Initial Transfers" referred to an account held by Greenwich Sentry.  (*Compare* FAC ¶ 359 ("account number 1G0092") *with* Fairfield Amended Complaint, Case No. 09-01239, at ¶ 40, ECF No. 23 ("[Greenwich Sentry] opened its account at BLMIS in November 1992 (Account No. 1G0092)".)  Therefore, it is clear that the FAC did not identify any transfers from BLMIS to Fairfield Sentry.  Nor did it allege specific transfers from Fairfield Sentry to HBUS or PBRS.  Fairfield Sigma, for its part, is not mentioned at all in the FAC.  Therefore, the FAC does not allege any particularized transfers from the Fairfield Funds to the Private Bank Defendants.

The problem with the Private Bank Defendants' argument, however, is that *BNP I* and *BNP II* do not necessarily stand for the proposition that new subsequent transfer claims will not relate back where the Trustee has not previously alleged a transfer between a transferee and the relevant fund. In *BNP II*, the Trustee sought to amend a complaint to add new subsequent transfer claims where the original complaint failed to allege any transfer between the initial transferee and alleged subsequent transferee. There, the Trustee argued that the new transfers arose from the same conduct alleged in the original complaint—the conduct being their investment into BLMIS through feeder funds and their receipt of customer property through the same feeder funds. *BNP II*, 2024 Bankr. LEXIS 1299, at *55. The Court found that this framing of the defendants' conduct was too broad to allow relation back—the proposed framing would have effectively allowed the Trustee to amend pleadings for any transfers connected with the BLMIS Ponzi Scheme pursuant to Rule 15. In elaborating, the Court stated, "[t]he Court has already found in this case that new transfers alleged in subsequent amended complaints do not relate back where they are alleged to relate to previously unnamed initial transferees and where they arose out of different loans, facilities, or transactions." *Id.* This finding, while persuasive, should not be construed as a *per se* rule as it was given in the context of that specific proceeding whereas Rule 15 requires an analysis of the specific facts in the action before the Court. *See, e.g., Warren v. Garvin*, 219 F.3d 111, 114 (2d Cir. 2000). Regardless, the statement in *BNP II* is seemingly based in part on *BNP I*—a decision that thoroughly investigates the case law surrounding the relation back of avoidance actions under Rule 15. In *BNP I*, the Trustee sought to amend a complaint to add new subsequent transfer claims where the original complaint alleged transfers of a different type from the newly added claims. The Court dismissed the newly alleged claims, finding that they "ar[ose] from different facts and circumstances and

depend on different proof" than the transfers alleged in the original complaint. *BNP I*, 594 B.R. at 210. In its opinion, the Court discussed the decisions rendered in *Fabrikant II*, *Metzeler*, and *360networks*. *Id.* These cases show that, in the context of avoidance actions, "each preferential and fraudulent transaction is treated separately and distinctly." *Id.* (quoting *Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 480 B.R. 480, 492 (S.D.N.Y. 2012) ("*Fabrikant II*"). "[P]roof offered for one transaction does not govern as to another and, as such, relation back cannot be ordered between different transactions merely for being similar or arising from the same conduct." *Id.* (quoting *Fabrikant II*, 480 B.R. at 492). In *BNP I*, the Court also discussed two cases—*Adelphia* and *Peter Madoff*—that seemingly contradict this finding.

In *Adelphia* and *Peter Madoff*, the courts found that newly alleged transfers related back to the original complaints because they arose out of similar conduct or occurrences. In *Adelphia*, the court found that newly alleged fraudulent transfers related back to an original pleading. *Adelphia Recovery Tr. v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 333-34 (S.D.N.Y. 2009) ("*Adelphia*"). The Court did not treat each transfer separately for purposes of relation back since the newly alleged transfers arose out of the same conduct, at the same time, and involved the same facilities as those alleged in the original complaint. Furthermore, the original complaint noted that the plaintiff sought to recover all "monies related to the margin loans broadly." *BNP I*, 594 B.R. at 211 (quoting *Adelphia*, 624 F. Supp. 2d at 333-34). In *Peter Madoff*, the Trustee sought leave to amend a complaint to bring new initial fraudulent transfer claims against Peter Madoff and Bernard Madoff's sons or their estates. *BNP I*, 594 B.R. at 211. There, the court found that new transfers related back since they arose from allegations in the original complaint that the defendants used BLMIS as a "piggy bank," and claims for the new transfers "relied on

the same legal theories as the initial complaint." *Id.* Furthermore, the original complaint "gave reasonable notice that the Trustee was still uncovering additional transfers." *Id*. These cases do not contradict the court's statement in *BNP II* that "new transfers alleged in subsequent amended complaints do not relate back where they are alleged to relate to previously unnamed initial transferees and where they arose out of different loans, facilities, or transactions." *BNP II*, 2024 Bankr. LEXIS 1299, at *55. This is because the *Peter Madoff* decision provided leave to add new initial fraudulent transfers—not new subsequent transfers—and the *Adelphia* court found that newly alleged subsequent transfer claims arose from the same facilities as those at issue in the original complaint. However, the *BNP II* dicta should not be construed as a broader rule for this Case since the determination of whether allegations relate back depends on the facts of the specific action before the Court. As a result, the Court will conduct an ordinary Rule 15 analysis to determine whether the Newly Alleged Transfers relate back to the FAC.

**Whether the FAC describes a relationship with Fairfield Sentry**

As a primary matter, it is arguable whether the FAC alleges a relationship between the Fairfield Funds and the Private Bank Defendants at all. As previously discussed, the FAC does not identify the existence of transfers from the Fairfield Funds to the Private Bank Defendants. Further, the FAC only alleges a relationship between the Private Bank Defendants and "Sentry," which is defined as "Greenwich Sentry, L.P." (FAC at 7.) Therefore, a literal interpretation of the FAC is it does not allege any relationship at all between the Private Bank Defendants and the Fairfield Funds. However, Rule 15 is meant to be construed liberally, and the Court will not prejudice a plaintiff for a mere mistake in pleading. *See, e.g., BNP II*, 2024 Bankr. LEXIS 1299, at *49-50. A review of the FAC shows that the Trustee attempted to describe the relationship of the Private Bank Defendants and Fairfield Sentry in some instances, but the FAC does not

attempt to allege any relationship between the Private Bank Defendants and Fairfield Sigma at all.

In most of the FAC, the Trustee seems to reference "Greenwich Sentry" when using the term, "Sentry." The words, "Fairfield Sentry," appear only twice in the FAC. First, "Fairfield Sentry" is included in the caption of the complaint that the FAC incorporated by reference. Second, "Fairfield Sentry" is mentioned in a quote that the Trustee included under general allegations of the Madoff enterprise. (FAC ¶ 214.) That quote states,

> The Feeder Fund Defendants were happy to accept Madoff's minimal commission policy, because the fees went directly into the pockets of those funds' managers and service providers. As HSBC Private Bank noted, '[t]he 20% performance fee goes to *Fairfield Sentry*.' The more money the Feeder Fund Defendants were making, the more money the HSBC Administrator Defendants, the HSBC Custodian Defendants, and the Management Defendants— and, ultimately, the Beneficial Owners—were taking in fees. These Defendants continued to procure billions of dollars to fuel the Madoff Ponzi scheme so that they could continue to reap their enormous fees.

(*Id.* ¶ 214) (emphasis added).

However, the particularized allegations of the Private Bank Defendants' conduct with respect to "Sentry" refer to those entities' interactions with Fairfield Sentry—not Greenwich Sentry. Allegations pertaining to HBUS and PBRS's conduct with respect to "Sentry" include the following:

- "HSBC Private Bank began marketing Sentry to its high net-worth clients as early as 1999." (FAC ¶ 294.)

- "On August 7, 2001, HSBC Bank USA issued a due diligence report on Sentry . . . ." (*Id.* ¶ 296.)

- "In January of 2003, HSBC Bank USA issued another due diligence report on Sentry . . . ." (*Id.* ¶ 297.)

21

- "In 2004, HSBC Bank USA issued yet another report regarding Sentry." (*Id.* ¶ 299.)

- "HSBC Private Bank forwarded marketing materials to the same investor recommending Kingate Global and Sentry for investment." (*Id.* ¶ 300.)

- "[T]hese recommendations led these investors to invest in Kingate Global and Sentry." (*Id.* ¶ 302.)

- "In early 2005, based on the recommendations of an HSBC Private Bank adviser in Zurich, one investor placed $300,000 in Sentry." (*Id.* ¶ 303.)

- "HSBC Private Bank in New York recommended Sentry to another investor in 2005, assuring him that [HSBC Holdings] was in contact with the fund, was confident in the fund, and was performing due diligence." (*Id.* ¶ 304.)

- "In September 2005, [HSBC Holdings] provided an 'Investment View and Proposal' listing Sentry as one of the proposed funds." (*Id.* ¶ 304.)

The reports about "Sentry" mentioned in paragraphs 296, 297, 298, and 299 all rely on reports related to Fairfield Sentry. (*See* Usitalo Decl., Exs. 5-7, ECF No. 771.) The Memorandum does not dispute that these reports refer to Fairfield Sentry, and the Court may consider documents that were integral to the pleading—including those that the Trustee relied upon. *See Carrico v. Duo Wen, Inc.*, No. 23-cv-00927, 2024 U.S. Dist. LEXIS 153945, at *6-7 (S.D.N.Y. Aug. 27, 2024). The Trustee makes additional arguments showing that the "Sentry" referred to in the above allegations referred to Fairfield Sentry. For example, PBRS did not invest any funds with Greenwich Sentry and HBUS did not create structured products with Greenwich Sentry until 2007. *Compare* Opposition at 15 ("HBUS did not create any structured products with Greenwich Sentry until September 2007"), *with* FAC ¶ 294 ("[Greenwich Sentry] was not a part

22

of the [PBRS] platform".) Therefore, the Original HSBC Defendants likely knew that the above-mentioned allegations described Fairfield Sentry and not Greenwich Sentry.

**Whether the Newly Alleged Transfers arise out of the conduct or occurrences in the FAC**

Although the FAC outlines a relationship between Fairfield Sentry and the Private Bank Defendants, Rule 15 still requires that the Newly Alleged Transfers arise out of the conduct, transaction, or occurrences set out in the FAC.  The Opposition concedes, and the Court agrees, that the subsequent transfers do not arise out of the transactions alleged in the FAC.  (*See* Opposition at 29.)  Rather, the Opposition argues that the subsequent transfers arise out of the conduct and occurrences alleged in the FAC.  (Opposition at 29.)  The Court finds this argument to be unpersuasive.

The Supreme Court has found that, "relation back depends on the existence of a common 'core of operative facts' uniting the original and newly asserted claims."  *Mayle v. Felix*, 545 U.S. 644, 659 (2005) (quoting *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1259 n.29 (C.A.9 1982)).  Operative facts, in turn, are the factual allegations "which give rise to a right enforceable in the courts."  *Original Ballet Russe v. Ballet Theatre*, 133 F.2d 187, 189 (2d Cir. 1943).  To plead a subsequent transfer claim, the complaint must allege the operative facts that "the *initial* transfer is avoidable, and the defendant is a subsequent transferee of that initial transferee, that is, 'that the funds at issue originated with the debtor.'" *See BNP I*, 594 B.R. at 195 (quoting *Picard v. Legacy Capital Ltd. (In re Bernard L. Madoff Inv. Sec. LLC)*, 548 B.R. 13, 36 (Bankr. S.D.N.Y. 2016)).  Further, the "plaintiff must allege the 'necessary vital statistics — the who, when, and how much — ' of the purported transfers to establish an entity as a subsequent transferee of the funds."  *Id.* (quoting *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.*), 379 B.R. 5, 32 (Bankr. E.D.N.Y. 2007)).  "The

23

'principal inquiry'" for Rule 15(c)(1)(B) "is whether 'the general fact situation alleged in the original pleading' provides 'adequate notice' to the opposing party 'of the matters raised in the amended pleading.'"  *Peter Madoff*, 468 B.R. at 633 (quoting *Buchwald Capital Advisors LLC v. J.P. Morgan Chase Bank, N.A. (In re Fabrikant & Sons, Inc.)*, 447 B.R. 170, 181 (Bankr. S.D.N.Y. 2011) ("*Fabrikant I")*).  Here, the Private Bank Defendants did not receive notice since the operative facts for the Newly Alleged Transfers are fundamentally different from those alleged in the FAC.

First, the FAC does not provide the operative fact that the initial transfers to the Fairfield Funds were voidable.  As discussed *infra*, the FAC did not describe the initially avoided transfers to Fairfield Sentry with any particularity.  While the FAC incorporated the Fairfield Amended Complaint, the Fairfield Amended Complaint provided the operative fact that there was an initial avoidance action against Greenwich Sentry.  The fact that the Trustee was also pursuing an initial avoidance action against Fairfield Sentry through the Fairfield Amended Complaint was not relevant to the FAC's counts.  The context of the FAC illustrates this.  The Fairfield Amended Complaint is incorporated by paragraph 358 of the FAC.  It states, "[t]he Trustee has filed an action against Sentry to avoid and recover the initial transfers of [c]ustomer [p]roperty.  *See Picard v. Fairfield Sentry Ltd., et al.* (*In re Bernard L. Madoff Inv. Sec. LLC*), No. 09-1239 (Bankr. S.D.N.Y filed May 18, 2009), as amended on July 20, 2010.  (*See* FAC ¶ 358.)  The following paragraph then identifies the transfers to "Sentry" that form the basis for the FAC's subsequent transfer counts that were plead against HSBC Holdings.  (*See* FAC ¶ 359.)  As previously discussed, these transfers only describe transfers to Greenwich Sentry and not Fairfield Sentry.  Further, the existence of an initial fraudulent transfer action against Fairfield Sentry was not a necessary predicate for any of the FAC's other counts.  Accordingly, the

avoidance action against Fairfield Sentry contained in the Fairfield Amended Complaint did not provide an operative fact for any of the FAC's claims.

Second, even if the initial avoidance action was an operative fact for claims in the FAC, the FAC still did not allege the existence of any transfers from the Fairfield Funds to the Private Bank Defendants. This represents an omission of a second operative fact for a subsequent transfer claim. While the FAC states that "[a] sizeable portion of the Non-Party Initial Transfers was subsequently transferred by the Non-Party Funds to the HSBC Defendants," the Non-Party Initial Transfers are not defined as including transfers to Fairfield Sentry or Fairfield Sigma. (FAC ¶ 376.) Therefore, the FAC does not allege with any particularity that the Private Bank Defendants received transfers from the Fairfield Funds.

The Newly Alleged Transfers are also not the "natural offshoot" of the activities described in the FAC since the Newly Alleged Transfers are unrelated to the particularized conduct alleged against the Private Bank Defendants. The allegations pertaining to the Private Bank Defendants activities are largely confined to the section, "HSBC Marketed Madoff to its Private Banking Clients." (FAC ¶¶ 294-302.) The allegations in that section center on how HBUS and PBRS marketed, performed due diligence, and communicated with clients about Fairfield Sentry[9] despite HSBC Private Bank's understanding of the BLMIS fraud. The FAC alleges that the Private Bank Defendants "marketed" Fairfield Sentry. (FAC ¶ 294.) It states that HBUS "conducted due diligence" on at least nine separate occasions. (*Id.* ¶ 294.) It alleges that HSBC Private Bank "encourage[ed]" investment into Madoff feeder funds. (*Id.* ¶ 300.) HBUS purportedly "informed" an investor that Fairfield Sentry passed due diligence requirements. (*Id.* ¶ 303.) HSBC Holdings "advised" an investor to "get out" of Fairfield Sentry. (*Id.* ¶ 303.)

---

[9] The FAC did not describe any relationship at all between Fairfield Sigma and the Private Bank Defendants.

HSBC Private Bank "recommended" Fairfield Sentry.  (*Id.* ¶ 304.)  And HSBC Private Bank "never warned" an investor about concerns.  (*Id.*)

These actions did not involve HBUS or PBRS redeeming money, or receiving any transfer, from the Fairfield Sentry.  Nor does the FAC mention that HBUS or PBRS invested into the Fairfield Funds themselves.  The FAC's allegations are focused on actions that occurred *before* any money was invested into the Fairfield Funds.  Further, the paragraph noting the adviser's recommendation to "get out" of Fairfield Sentry is used to support the allegation that HSBC Holdings did not "understand the investment strategy."  (*Id.* ¶ 303.)  A review of the Fairfield Amended Complaint shows that it also did not identify the Newly Alleged Transfers either.  Therefore, the FAC did not allege or infer the existence of the Newly Alleged Transfers.

Instead, the allegations against the Private Bank Defendants provided operative facts for the previously dismissed common law claims against the Private Bank Defendants, and any customer property at issue largely revolved around the "fees" that the Private Bank Defendants generated as a result of their marketing activities.  (*See, e.g., id.* ¶¶ 214, 540.)  In contrast, the subsequent transfer claims arose during a different time period.  They concern the actions that the Private Bank Defendants took *after* funds were funneled into the feeder funds.  *See Mayle*, 545 U.S. at 645 ("An amended habeas petition does not relate back (and thereby avoid AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both *time and type* from those set forth in the original pleading.") (emphasis added).  Furthermore, the type of conduct at issue is different.  The receipt of redemptions for their own investments is fundamentally different from soliciting investments from clients.  The SAC's claims against the Private Bank Defendants focus on the harm suffered by the customers of HSBC Holdings whereas the FAC primarily sought to recover against the Private Bank Defendants for "allegedly

violat[ing] a duty to Madoff Securities' customers by failing to detect Madoff's fraud." *Picard v. HSBC Bank PLC*, 454 B.R. 25, 28 (S.D.N.Y. 2011), *aff'd sub nom.*, *Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54, 63 (2d Cir. 2013).

While the FAC alleges nefarious conduct on the part of HBUS and PBRS, that conduct must still be related to the Newly Alleged Transfers. *Hill v. Oria (In re Juliet Homes, LP)*, No. 07-36424, 09-03429, 2011 Bankr. LEXIS 5116, at *21 (Bankr. S.D. Tex. Dec. 28, 2011) ("The Court must consider two questions: (1) Does the Second Amended Complaint allege that *the new transfers occurred as part of the same course of conduct as the transfers alleged in the original complaint*? (2) Did the original complaint give sufficient notice to the defendants that the Trustees may sue for additional transfers that were part of the same course of conduct?") (emphasis added). This is not a situation where the Private Bank Defendants were ". . .at the center of a common scheme to strip assets from BLMIS." *BNP II*, 2024 Bankr. LEXIS 1299, at *53 (quoting *BNP I*, 594 B.R. at 211-212). Since the Newly Alleged Transfers rely on entirely distinct facts than those alleged in the FAC, they are also not the "offshoot" of the conduct pled in the FAC. *See Slayton*, 460 F.3d at 228 ("[E]ven where an amended complaint tracks the legal theory of the first complaint, claims that are based on an 'entirely distinct set' of factual allegations will not relate back.") (quoting *Nettis v. Levitt*, 241 F.3d 186, 193 (2d Cir. 2001)).

The Newly Alleged Transfers resulted from the Private Bank Defendants redeeming their own money in the Feeder Funds—not the marketing of BLMIS to HBUS and PBRS clients. "If the facts in the original pleading do not provide defendant with notice of facts out of which the time-barred claim arises then relation back is inappropriate." *360networks*, 367 B.R. at 433-34 (quoting *106 Mile Transp. Associates v. Koch,* 656 F. Supp. 1474, 1487 (S.D.N.Y. 1987)). Here,

allegations against the Private Bank Defendants are insufficient to have put them on notice, and the generalized allegations contained in the FAC do not cure this deficiency.

The Opposition argues that PBRS and HBUS were on notice of the Trustee's intent to pursue the claims for the Newly Alleged Transfers due to the inclusion of certain carve-outs in the FAC.  (*See, e.g.,* Opposition at 30-31, 33-34.) (citing FAC ¶¶ 97, 104, 356-358.) Specifically, the Opposition argues that the Private Bank Defendants were on notice since the FAC alleged that the "Trustee's investigation is on-going and the Trustee reserves the right to (i) supplement the information regarding the Transfers and any additional transfers, and (ii) seek recovery of such additional transfers."  (FAC ¶ 356.)  However, the Court has previously rejected attempts to amend pleadings for additional subsequent transfers based on similar language.  *See BNP II*, 2024 Bankr. LEXIS 1299, at *55.  Generalized assertions of the plaintiff's intent to pursue subsequent transfer claims are not sufficient to have put defendants on notice.  *Fabrikant II*, 480 B.R. at 492.  "Overly general original pleadings do not provide defendants with adequate notice as to what facts they are to defend against, and, therefore, such general allegations cannot be hooks on which to hang later amended pleadings."  *Id.* at 493.

The Opposition also cites to paragraph 357 of the FAC as providing notice that the Trustee intended to pursue claims related to the Fairfield Sentry avoidance action.  (*See, e.g.,* Opposition at 34.)  That paragraph states, "[HSBC Holdings] received subsequent transfers from Madoff Feeder Funds that are not named as defendants herein, including Sentry, Broad Market, Broad Market Portfolio, Harley, Kingate Global, Kingate Euro, Landmark, Defender, and Square One (collectively, the "Non-Party Funds")—each of which maintained one or more accounts with BLMIS."  (FAC ¶ 357.)  The Trustee argues that the word, "including," provided notice that the Newly Alleged Transfers could be pursued.  However, this paragraph is far too general to provide

notice to the Original HSBC Defendants that the Trustee, in this specific action, could pursue

claims for subsequent transfers related to the Fairfield Funds.  Holding otherwise would

"effectively allow any transfers connected to the BLMIS Ponzi Scheme to be amended to the

[c]omplaint."  *See BNP II*, 2024 Bankr. LEXIS 1299, at *55.

The Opposition cites one other allegation that purportedly put the Defendants on notice

of the Newly Alleged Transfers: "Upon information and belief, [PBRS and HBUS] received fees

and/or distributions to which [they were] not entitled and/or which are composed, in part, of

[c]ustomer [p]roperty."  (FAC ¶¶ 97, 104.)  This statement, however, is also insufficient to have

put the Private Bank Defendants on notice of the Newly Alleged Transfers.  It is too generalized

and does not identify the specific type of transfers that occurred (*i.e.* redemptions), the specific

initial transfer at issue, or the timing of any subsequent transfer to HBUS or PBRS.   A "passing

reference" to the "receipt of 'proceeds'" is insufficient to place defendants on notice of the

plaintiff's intention to recover for later amended subsequent transfers.  *Fabrikant I*, 447 B.R. at

182; *see also Fabrikant II*, 480 B.R. at 493 (finding that newly alleged avoidance claims do not

relate back because "[t]he general allegation that transfers from October 2004 until Appellees

sold their claims were fraudulent fails to identify any particular objectionable transactions.").

The Opposition's other arguments that HSBC Holdings was on notice are also unavailing.

The Opposition claims that HBUS and PBRS were on notice of the Newly Alleged Transfers

since the FAC incorporated the Fairfield Amended Complaint.  Since HSBC Holdings was on

notice of the initially voided transfers and the Private Bank Defendants were aware of their own

conduct, the Private Bank Defendants were purportedly on notice of the Trustee's intent to

recover claims that derived from the initial avoidance action.  (Opposition at 34.)  However, as

discussed above, the Fairfield Amended Complaint did not put the Private Bank Defendants on

notice of the Newly Alleged Transfers.  Further, this argument also fails since the subjective state

of mind of the defendants is irrelevant for a court conducting a Rule 15(c) analysis.  *See*

*360networks*, 367 B.R. at 433.

For similar reasons, the ET Brief does not show that the Private Bank Defendants were

on notice of the Newly Alleged Transfers.[10]  Notice is not dependent on the subjective state of

mind of the Defendants.  "Courts will not consider the subjective state of mind of what one party

was thinking when it filed its original complaint, but will instead objectively consider whether

the original complaint put the other party on notice as to the cause of action being asserted

against it."  *360networks*, 367 B.R. at 433.  "[M]atters outside of the Complaint are irrelevant for

purposes of a Rule 15(c)(2) analysis."  *Id.* at 434.  Whether or not the defendants had notice

outside of the original pleadings of the intent for the plaintiff to bring subsequent transfer claims

at a later date is not relevant for purposes of relation back.  *See BNP I*, 594 B.R. at 210.  The

original pleading, here, is the FAC.  Therefore, the ET Brief is not relevant to the Court's

analysis as it constitutes a matter outside of the *original* pleadings.

However, to the extent the ET Brief is relevant, it does not show that the Private Bank

Defendants were on notice of the Newly Alleged Transfers within the statute of limitations

period.  *Slayton*, 460 F.3d at 228 ("Under Rule 15, the 'central inquiry is whether adequate notice

of the matters raised in the amended pleading has been given to the opposing party *within the*

*statute of limitations* by the general fact situation alleged in the original pleading.'") (emphasis

added) (quoting *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86 (2d Cir. 1999)).  The ET Brief

was filed after the statute of limitations period for the Newly Alleged Transfers expired and

---

[10] As discussed under Part 1, the Opposition points to the following quote from the ET Brief: "The operative
complaint makes clear that foreign transferee HSBC Suisse received the payments at issue from foreign transferors
Fairfield Sentry and Fairfield Sigma on account of the investments HSBC Suisse made in those foreign funds at the
direction of its clients."  (ET Brief at 14-15.)

responded to the 2015 Proffered Amended Complaint which was itself filed after the statute of limitations period expired.  The ET Brief therefore only reflects an interpretation of the FAC as of the date that the ET Brief was filed.

Further, it is arguable whether the ET Brief concedes that the FAC described transfers from the Fairfield Funds to the Private Bank Defendants.  First, the ET Brief construed the FAC in the context of the 2015 Proffered Amended Complaint which alleged the existence of certain transfers.  (*See* ET Brief at 14) ("The operative complaint makes clear that foreign transferee HSBC Suisse received *the payments at issue* ….") (emphasis added).  It does not argue that the FAC, standing alone, described those payments.  The excerpted portion of the ET Brief cites paragraph 293 of the FAC which states, "HSBC Private Bank's high net-worth clients had relationships of trust and confidence with HSBC Private Bank. These clients trusted HSBC Private Bank and relied on HSBC's reputation when deciding among investment strategies. Upon information and belief, but for the recommendations of HSBC Private Bank, these individuals would not have invested with BLMIS through the Feeder Fund Defendants." (FAC ¶ 293.)  This quote supports the FAC's claim that the Private Bank Defendants' clients would not have invested into BLMIS through the Feeder Fund Defendants but for the recommendations of the Private Bank Defendants.  It is unclear how this paragraph could have put the Private Bank Defendants on notice of the redemptions from the Fairfield Funds.  Second, related briefing from this Proceeding also supports a finding that the ET Brief did not concede that the FAC provided notice of the Newly Alleged Transfers.  As part of the same briefing cycle that the ET Brief was filed in, the consolidated defendants filed a different brief that portrayed HSBC Holdings' understanding of all the funds that the FAC alleged had made transfers to HSBC Holdings.  *See* Consolidated Suppl. Mem. of Law in Supp. of the Transferee Defs.' Mot. to Dismiss Based on

31

Extraterritoriality, (Jan. 2, 2015), ECF No. 355, at 19-20.  Transfers from the Fairfield Funds to

the Private Bank Defendants were not listed.  (*See id.*)  This omission supports the view that the

excerpt from the ET Brief should not be interpreted as conceding notice.

The excerpt also does not qualify as a judicial admission since it is a legal conclusion and

ambiguous.  "A judicial admission is a statement made by a party or its counsel which has the

effect of withdrawing a fact from contention and which binds the party making it throughout the

course of the proceeding."  *Pillars v. GM LLC (In re Motors Liquidation Co.)*, 957 F.3d 357, 360

(2d Cir. 2020).  "To constitute a judicial admission, the statement must be one of fact—a legal

conclusion does not suffice."  *Id.*  A judicial admission must also be "intentional, clear, and

unambiguous."  *Id.* at 361.  Here, the excerpt from the ET Brief does not appear to meet this

standard.  The excerpt from the ET Brief is a legal conclusion and not a statement of fact.  The

ET Briefing centered around an extraterritoriality dispute.  (*See* ET Brief at 2) ("The Trustee's

claims against the HSBC Defendants as subsequent transferees under § 550(a) of the Bankruptcy

Code fall into two categories . . . . In both cases, because both the transferor and transferee for

each transfer are foreign entities, 'there is no plausible inference that the transfer occurred

domestically.'").  The excerpt interprets the FAC and 2015 Proffered Amended Complaint for the

legal conclusion that certain transfers identified in the 2015 Proffered Amended Complaint were

transfers from foreign transferors to foreign transferees.  The ET Brief does not say that the FAC

described transfers from the Fairfield Funds—those transfers were described in the 2015

Proffered Amended Complaint.  For this reason, the excerpt from the ET Brief is also not clear

and unambiguous.  Additionally, there is an inconsistency between such a finding and briefing

from a similar time period, as discussed above.  *See In re Motors Liquidation Co.*, 957 F.3d at

361 ("[O]ur conclusion is informed by the fact that these filings—both done on the same day—

contain inherent inconsistencies between the cited language and the actual operative agreement appended to the notice of removal.").  As a result, the ET Brief does not contain a judicial admission that the Private Bank Defendants were on notice of the Newly Alleged Transfers.

This Court's holding comports with case law discussing the relation back of subsequent transfers.

> In the context of avoidance actions, "each preferential and fraudulent transaction is treated separately and distinctly," because the "[p]roof offered for one transaction does not govern as to another and, as such, relation back cannot be ordered between different transactions merely for being similar or arising from the same conduct."

*BNP I*, 594 B.R. at 210 (quoting *Fabrikant II*, 480 B.R. at 492; *accord 360networks*, 367 B.R. at 434; *In re Metzeler*, 66 B.R. 977, 983 (Bankr. S.D.N.Y. 1986)).

"Furthermore, the 'mere allegation' that the previously identified transfers and the newly added transfers are 'all . . . fraudulent transfers does not make them part of the same conduct.'" *Id*. (quoting *In re Metzeler*, 66 B.R. at 983).  Here, the FAC failed to identify any specific transfers to the Defendants and the SAC fails to show how the Newly Alleged Transfers arose out of the same conduct alleged in the FAC.

## CONCLUSION

For the reasons described herein, the Motion is granted and the claims relating to the Newly Alleged Transfers are dismissed.

Dated: September 29, 2025
      New York, New York

                        */s/ Lisa G. Beckerman*
                        THE HONORABLE LISA G. BECKERMAN
                        UNITED STATES BANKRUPTCY JUDGE